| | | | |
|---|---|---|---|
| 16179267 | 75.23999786 | No MI | 2.65 |
| 16179259 | 53.88999939 | No MI | 3.15 |
| 16179287 | 74.93000031 | No MI | 3.525 |
| 16179130 | 80 | No MI | 3.525 |
| 16179956 | 80 | No MI | 3.45 |
| 16180011 | 80 | No MI | 3.45 |
| 16178840 | 80 | No MI | 2.25 |
| 16178817 | 80 | No MI | 2.25 |
| 16179890 | 80 | No MI | 3.45 |
| 16180524 | 80 | No MI | 2.25 |
| 16179642 | 74.69000244 | No MI | 4.5 |
| 16179446 | 44.41999817 | No MI | 3.325 |
| 16179012 | 79.72000122 | No MI | 3.5 |
| 16180249 | 47.52999878 | No MI | 2.25 |
| 16179040 | 74.22000122 | No MI | 3.55 |
| 16178950 | 80 | No MI | 4.375 |
| 16179504 | 45.45000076 | No MI | 3.325 |
| 16179288 | 68.68000031 | No MI | 3.4 |
| 16179911 | 76.68000031 | No MI | 3.45 |
| 16179957 | 80 | No MI | 3.45 |
| 16180012 | 80 | No MI | 3.45 |
| 16180069 | 76.69999695 | No MI | 3.275 |
| 16180060 | 73.68000031 | No MI | 3.825 |
| 16180525 | 69.65000153 | No MI | 2.25 |
| 16179447 | 80 | No MI | 3.45 |
| 16179973 | 94.93000031 | Mortgage Guaranty In | 3.45 |
| 16180134 | 75 | No MI | 3.7 |
| 16178908 | 80 | No MI | 3.3 |
| 16179657 | 80 | No MI | 3.075 |
| 16179788 | 80 | No MI | 3.5 |
| 16180032 | 80 | No MI | 2.95 |
| 16179110 | 90 | Mortgage Guaranty In | 3.7 |
| 16178674 | 80 | No MI | 2.25 |
| 16179901 | 80 | No MI | 3.45 |
| 16180608 | 80 | No MI | 2.25 |
| 16179457 | 80 | No MI | 3.45 |
| 16179997 | 80 | No MI | 3.45 |
| 16180049 | 67.63999939 | No MI | 3.15 |
| 16179104 | 79.84999847 | No MI | 3.275 |
| 16180508 | 79.98999786 | No MI | 2.25 |
| 16179174 | 74.55000305 | No MI | 3.95 |
| 16179435 | 80 | No MI | 3.2 |
| 16178782 | 80 | No MI | 2.25 |
| 16180046 | 59.65999985 | No MI | 3.95 |
| 16179030 | 80 | No MI | 3.5 |
| 16179020 | 80 | No MI | 4.4 |
| 16178585 | 70.47000122 | No MI | 2.25 |
| 16180098 | 79.94000244 | No MI | 2.25 |
| 16178574 | 80 | No MI | 2.25 |
| 16178289 | 55.56000137 | No MI | 3.5 |
| 16178254 | 72 | No MI | 2.25 |
| 16179853 | 79.98999786 | No MI | 3.45 |
| 16179902 | 80 | No MI | 3.325 |
| 16180609 | 80 | No MI | 2.25 |
| 16179458 | 80 | No MI | 2.95 |
| 16179998 | 80 | No MI | 3.325 |
| 16179005 | 80 | No MI | 4.375 |
| 16179400 | 80 | No MI | 3.45 |
| 16178932 | 80 | No MI | 4 |
| 16180081 | 80 | No MI | 3.575 |
| 16178582 | 89.98999786 | Mortgage Guaranty In | 2.25 |
| 16179257 | 75 | No MI | 3.4 |
| 16178615 | 62.61000061 | No MI | 2.25 |
| 16179126 | 75 | No MI | 3.7 |
| 16179903 | 80 | No MI | 3.45 |
| 16180610 | 80 | No MI | 2.25 |
| 16180160 | 20.62000084 | No MI | 3.325 |
| 16179459 | 79.98999786 | No MI | 3.325 |
| 16179626 | 60 | No MI | 3.45 |
| 16178443 | 80 | No MI | 2.25 |
| 16179357 | 76.59999847 | No MI | 3.45 |
| 16179401 | 80 | No MI | 3.325 |
| 16179021 | 75 | No MI | 3.88 |
| 16178331 | 79.80999756 | No MI | 2.25 |
| 16179658 | 79.98999786 | No MI | 3.45 |
| 16180041 | 57.56000137 | No MI | 3.9 |
| 16179218 | 80 | No MI | 3.15 |
| 16178465 | 79.98000336 | No MI | 2.25 |
| 16178665 | 80 | No MI | 3.5 |
| 16178255 | 80 | No MI | 2.25 |
| 16179854 | 79.98999786 | No MI | 3.45 |
| 16179904 | 80 | No MI | 3.45 |
| 16179945 | 80 | No MI | 3.45 |
| 16180611 | 80 | No MI | 2.25 |
| 16179402 | 80 | No MI | 3.45 |
| 16179974 | 79.98000336 | No MI | 3.45 |
| 16178957 | 80 | No MI | 3.3 |
| 16178480 | 80 | No MI | 2.25 |
| 16178677 | 80 | No MI | 3.45 |
| 16180093 | 70.15000153 | No MI | 2.8 |
| 16178285 | 80 | No MI | 2.25 |
| 16178346 | 80 | No MI | 2.25 |
| 16179111 | 80 | No MI | 3.525 |
| 16179855 | 80 | No MI | 3.45 |
| 16179905 | 76.91999817 | No MI | 3.45 |

| | | | |
|---|---|---|---|
| 16180168 | 75 | No MI | 3.225 |
| 16178703 | 69.83000183 | No MI | 2.25 |
| 16178695 | 80 | No MI | 2.25 |
| 16178777 | 80 | No MI | 2.25 |
| 16178235 | 80 | No MI | 2.25 |
| 16179994 | 80 | No MI | 3.45 |
| 16179876 | 80 | No MI | 3.45 |
| 16180501 | 80 | No MI | 2.25 |
| 16180571 | 80 | No MI | 2.25 |
| 16179094 | 80 | No MI | 4.44 |
| 16178356 | 75 | No MI | 2.25 |
| 16180339 | 89.98999786 | Republic MIC | 2.25 |
| 16180403 | 80 | No MI | 2.25 |
| 16179730 | 80 | No MI | 3.45 |
| 16179343 | 80 | No MI | 3.75 |
| 16180086 | 79.73000336 | No MI | 3.075 |
| 16178673 | 80 | No MI | 2.25 |
| 16178185 | 80 | No MI | 2.75 |
| 16179995 | 80 | No MI | 3.45 |
| 16180502 | 79.98999786 | No MI | 2.25 |
| 16180572 | 80 | No MI | 2.25 |
| 16180187 | 80 | No MI | 3.575 |
| 16179430 | 80 | No MI | 3.45 |
| 16180340 | 90 | United Guaranty | 2.25 |
| 16180404 | 70 | No MI | 2.25 |
| 16178810 | 80 | No MI | 2.25 |
| 16178973 | 80 | No MI | 4.375 |
| 16179050 | 61.86000061 | No MI | 4.1 |
| 16178433 | 80 | No MI | 2.25 |
| 16178329 | 47.49000168 | No MI | 2.25 |
| 16178308 | 90 | Mortgage Guaranty In | 2.25 |
| 16178236 | 80 | No MI | 2.25 |
| 16180503 | 80 | No MI | 2.25 |
| 16179877 | 80 | No MI | 3.45 |
| 16180573 | 80 | No MI | 2.25 |
| 16179078 | 75 | No MI | 3.25 |
| 16179095 | 80 | No MI | 3.75 |
| 16179431 | 80 | No MI | 3.45 |
| 16180341 | 80 | No MI | 2.25 |
| 16180405 | 41.70000076 | No MI | 2.25 |
| 16179832 | 54.36000061 | No MI | 3.02 |
| 16180113 | 68.97000122 | No MI | 2.925 |
| 16179971 | 80 | No MI | 3.45 |
| 16178903 | 80 | No MI | 3.7 |
| 16179768 | 80 | No MI | 3.75 |
| 16178788 | 80 | No MI | 2.25 |
| 16178902 | 75 | No MI | 3.7 |
| 16179237 | 75 | No MI | 3.7 |
| 16180604 | 73.55999756 | No MI | 2.25 |
| 16179547 | 80 | No MI | 3.325 |
| 16179103 | 70 | No MI | 3.7 |
| 16180504 | 80 | No MI | 2.25 |
| 16180574 | 58.81999969 | No MI | 2.25 |
| 16179432 | 80 | No MI | 3.45 |
| 16180342 | 79.98999786 | No MI | 2.25 |
| 16179833 | 80 | No MI | 3.45 |
| 16178800 | 80 | No MI | 2.25 |
| 16179541 | 90 | GE Capital MI | 3.45 |
| 16178288 | 68.83999634 | No MI | 3.5 |
| 16178464 | 80 | No MI | 2.25 |
| 16178252 | 16.04000092 | No MI | 2.25 |
| 16178343 | 80 | No MI | 2.25 |
| 16178554 | 80 | No MI | 2.25 |
| 16180605 | 38.45999908 | No MI | 2.25 |
| 16179944 | 80 | No MI | 3.45 |
| 16178526 | 79.33000183 | No MI | 3.25 |
| 16178237 | 80 | No MI | 2.25 |
| 16180505 | 77.36000061 | No MI | 2.25 |
| 16179878 | 79.58999634 | No MI | 3.45 |
| 16180575 | 74.98000336 | No MI | 2.25 |
| 16178474 | 80 | No MI | 2.25 |
| 16179433 | 80 | No MI | 3.45 |
| 16179780 | 79.68000031 | No MI | 3.25 |
| 16180343 | 80 | No MI | 2.25 |
| 16179834 | 59.5 | Republic MIC | 3.075 |
| 16178412 | 80 | No MI | 2.25 |
| 16178698 | 80 | No MI | 2.25 |
| 16178905 | 80 | No MI | 3.7 |
| 16180131 | 80 | No MI | 3.45 |
| 16180104 | 75 | No MI | 3.95 |
| 16180031 | 80 | No MI | 3.2 |
| 16178751 | 77.44999695 | No MI | 2.25 |
| 16179256 | 75 | No MI | 3.55 |
| 16178467 | 71.73999786 | No MI | 2.25 |
| 16179222 | 70 | No MI | 2.8 |
| 16179900 | 80 | No MI | 3.45 |
| 16178749 | 79.98999786 | No MI | 2.25 |
| 16180606 | 80 | No MI | 2.25 |
| 16178559 | 80 | No MI | 2.25 |
| 16178553 | 94.98000336 | PMI | 2.25 |
| 16179199 | 80 | No MI | 2.25 |
| 16180506 | 80 | No MI | 2.25 |
| 16179767 | 80 | No MI | 3.5 |
| 16180344 | 80 | No MI | 2.25 |
| 16178442 | 79.43000031 | No MI | 2.25 |

| | | | |
|---|---|---|---|
| 16179972 | 80 | No MI | 3.325 |
| 16179169 | 80 | No MI | 3.5 |
| 16178253 | 74.91000366 | No MI | 2.25 |
| 16179210 | 80 | No MI | 3.525 |
| 16180607 | 80 | No MI | 2.25 |
| 16179996 | 72.30999756 | No MI | 3.45 |
| 16178492 | 80 | No MI | 2.25 |
| 16180507 | 80 | No MI | 2.25 |
| 16179879 | 80 | No MI | 3.45 |
| 16179079 | 79.69999695 | No MI | 4.1 |
| 16179434 | 80 | No MI | 3.45 |
| 16178720 | 80 | No MI | 2.25 |
| 16180043 | 80 | No MI | 3.275 |
| 16178871 | 80 | No MI | 2.25 |
| 16179281 | 80 | No MI | 3.525 |
| 16178233 | 79.97000122 | No MI | 2.25 |
| 16180567 | 80 | No MI | 2.25 |
| 16180335 | 61.54000092 | No MI | 2.25 |
| 16180399 | 80 | No MI | 2.25 |
| 16180068 | 75 | No MI | 4.15 |
| 16180467 | 80 | No MI | 2.25 |
| 16179086 | 80 | No MI | 3.3 |
| 16180305 | 80 | No MI | 2.25 |
| 16178411 | 69.94000244 | No MI | 2.25 |
| 16178400 | 90 | PMI | 3.5 |
| 16178452 | 80 | No MI | 2.25 |
| 16179615 | 80 | No MI | 4 |
| 16178500 | 51.18999863 | No MI | 2.75 |
| 16179873 | 79.98999786 | No MI | 3.45 |
| 16180568 | 95 | Republic MIC | 2.25 |
| 16180336 | 80 | No MI | 2.25 |
| 16180400 | 80 | No MI | 2.25 |
| 16180306 | 80 | No MI | 2.25 |
| 16179645 | 80 | No MI | 2.75 |
| 16180154 | 56.93999863 | No MI | 3.7 |
| 16179728 | 80 | No MI | 3.45 |
| 16180021 | 75 | No MI | 3.2 |
| 16179616 | 80 | No MI | 3.5 |
| 16178234 | 77.48000336 | No MI | 2.25 |
| 16180499 | 80 | No MI | 2.25 |
| 16179874 | 80 | No MI | 3.45 |
| 16180569 | 79.18000031 | No MI | 2.25 |
| 16180337 | 80 | No MI | 2.25 |
| 16180175 | 79.98999786 | No MI | 2.9 |
| 16179479 | 80 | No MI | 3.075 |
| 16180401 | 78.63999939 | No MI | 2.25 |
| 16178994 | 80 | No MI | 4.4 |
| 16180468 | 80 | No MI | 2.25 |
| 16179729 | 80 | No MI | 3.45 |
| 16178453 | 80 | No MI | 2.25 |
| 16180096 | 75 | No MI | 3.35 |
| 16178677 | 80 | No MI | 2.25 |
| 16178461 | 80 | No MI | 2.25 |
| 16178182 | 75 | No MI | 3.325 |
| 16180078 | 80 | No MI | 3.325 |
| 16180500 | 70 | No MI | 2.25 |
| 16179875 | 80 | No MI | 3.325 |
| 16180570 | 80 | No MI | 2.25 |
| 16180338 | 80 | No MI | 2.25 |
| 16180402 | 80 | No MI | 2.25 |
| 16180469 | 84.41999817 | Mortgage Guaranty In | 2.25 |
| 16178653 | 69.51999664 | No MI | 2.25 |
| 16179075 | 80 | No MI | 3.5 |
| 16179049 | 67.69000244 | No MI | 3.5 |
| 16180118 | 80 | No MI | 2.925 |
| 16179501 | 80 | No MI | 3.5 |
| 16180229 | 79.62000275 | No MI | 2.25 |
| 16178362 | 69.98999786 | No MI | 2.25 |
| 16178744 | 80 | No MI | 2.25 |
| 16179376 | 80 | No MI | 3.075 |
| 16179546 | 80 | No MI | 3.45 |
| 16180529 | 69.09999847 | No MI | 2.25 |
| 16180298 | 80 | No MI | 2.25 |
| 16180366 | 79.72000122 | No MI | 2.25 |
| 16178421 | 80 | No MI | 2.25 |
| 16179693 | 80 | No MI | 3.45 |
| 16180123 | 80 | No MI | 3.65 |
| 16180035 | 80 | No MI | 3.15 |
| 16179776 | 80 | No MI | 3 |
| 16180230 | 80 | No MI | 2.25 |
| 16179502 | 80 | No MI | 3.5 |
| 16180063 | 79.22000122 | No MI | 3.075 |
| 16180180 | 78.97000122 | No MI | 3.7 |
| 16179189 | 80 | No MI | 3.525 |
| 16180461 | 80 | No MI | 2.25 |
| 16180530 | 80 | No MI | 2.25 |
| 16180299 | 80 | No MI | 2.25 |
| 16180367 | 80 | No MI | 2.25 |
| 16178491 | 80 | No MI | 2.25 |
| 16178450 | 80 | No MI | 2.25 |
| 16178946 | 80 | No MI | 3.75 |
| 16178968 | 49.36000061 | No MI | 3.375 |
| 16179046 | 80 | No MI | 4.2 |
| 16178709 | 74.68000031 | No MI | 2.25 |
| 16180112 | 62.5 | No MI | 3.45 |

| | | | |
|---|---|---|---|
| 16179053 | 80 | No MI | 4.4 |
| 16179705 | 80 | No MI | 3.975 |
| 16178624 | 80 | No MI | 2.25 |
| 16180103 | 80 | No MI | 3.95 |
| 16180231 | 80 | No MI | 2.25 |
| 16179119 | 80 | No MI | 2.65 |
| 16180462 | 80 | No MI | 2.25 |
| 16180531 | 80 | No MI | 2.25 |
| 16180300 | 80 | No MI | 2.25 |
| 16180368 | 70 | No MI | 2.25 |
| 16179722 | 80 | No MI | 3.45 |
| 16178694 | 53.09000015 | No MI | 2.25 |
| 16180050 | 65 | No MI | 3.45 |
| 16180149 | 78.26999664 | No MI | 3.375 |
| 16179279 | 80 | No MI | 3.525 |
| 16179296 | 79.30999756 | No MI | 3.025 |
| 16180072 | 72 | No MI | 3.95 |
| 16180232 | 80 | No MI | 2.25 |
| 16178886 | 80 | No MI | 3.25 |
| 16179308 | 59.70000076 | No MI | 3.975 |
| 16179377 | 78.88999939 | No MI | 3.45 |
| 16180463 | 80 | No MI | 2.25 |
| 16180532 | 80 | No MI | 2.25 |
| 16179147 | 95 | United Guaranty | 3.525 |
| 16179084 | 80 | No MI | 4.375 |
| 16180301 | 85 | United Guaranty | 2.25 |
| 16180369 | 60.18999863 | No MI | 2.25 |
| 16179723 | 80 | No MI | 3.45 |
| 16178451 | 80 | No MI | 2.25 |
| 16179813 | 80 | No MI | 3.2 |
| 16179027 | 80 | No MI | 2.9 |
| 16179706 | 80 | No MI | 2.95 |
| 16178326 | 25.55999947 | No MI | 2.25 |
| 16180089 | 77.62999725 | No MI | 3.075 |
| 16178388 | 47.65000153 | No MI | 2.25 |
| 16178670 | 80 | No MI | 2.25 |
| 16179378 | 80 | No MI | 3.975 |
| 16180464 | 80 | No MI | 2.25 |
| 16180533 | 80 | No MI | 2.25 |
| 16180302 | 80 | No MI | 2.25 |
| 16180370 | 54.04999924 | No MI | 2.25 |
| 16179724 | 80 | No MI | 3.45 |
| 16179766 | 80 | No MI | 3.45 |
| 16178702 | 80 | No MI | 2.25 |
| 16178947 | 80 | No MI | 3.625 |
| 16179814 | 65 | No MI | 2.8 |
| 16178422 | 80 | No MI | 2.25 |
| 16180094 | 80 | No MI | 3.9 |
| 16180150 | 80 | No MI | 3.2 |
| 16179515 | 80 | No MI | 3.5 |
| 16178740 | 80 | No MI | 2.25 |
| 16180398 | 80 | No MI | 2.25 |
| 16180465 | 75 | No MI | 2.25 |
| 16180534 | 80 | No MI | 2.25 |
| 16179085 | 71.76999664 | No MI | 4.25 |
| 16178972 | 80 | No MI | 3.9 |
| 16180303 | 45 | No MI | 2.25 |
| 16180158 | 80 | No MI | 3.75 |
| 16179159 | 89.80000305 | PMI | 3.525 |
| 16180371 | 57.13999939 | No MI | 2.25 |
| 16179063 | 79.88999939 | No MI | 4.4 |
| 16178987 | 80 | No MI | 3.4 |
| 16179725 | 90 | Mortgage Guaranty In | 3.45 |
| 16179595 | 90 | Mortgage Guaranty In | 2.284 |
| 16178797 | 59.38000107 | No MI | 2.25 |
| 16180135 | 75.19000244 | No MI | 3.525 |
| 16178606 | 70.59999847 | No MI | 2.25 |
| 16179342 | 80 | No MI | 3.45 |
| 16178899 | 72.12000275 | No MI | 3.525 |
| 16180566 | 63.95000076 | No MI | 2.25 |
| 16180466 | 80 | No MI | 2.25 |
| 16178965 | 64.51999664 | No MI | 4.375 |
| 16180535 | 80 | No MI | 2.25 |
| 16180304 | 79.83999634 | No MI | 2.25 |
| 16178432 | 80 | No MI | 2.25 |
| 16178988 | 80 | No MI | 3.5 |
| 16179726 | 73.44999695 | No MI | 3.45 |
| 16178881 | 86.69999695 | Radian Guaranty | 2.25 |
| 16180055 | 80 | No MI | 4.65 |
| 16179962 | 80 | No MI | 3.45 |
| 16178910 | 80 | No MI | 4.4 |
| 16178573 | 80 | No MI | 2.25 |
| 16179239 | 66.66999817 | No MI | 3.95 |
| 16179305 | 76.81999969 | No MI | 2.8 |
| 16178244 | 72.11000061 | No MI | 2.25 |
| 16178664 | 80 | No MI | 3.5 |
| 16178513 | 80 | No MI | 2.25 |
| 16179841 | 79.98999786 | No MI | 3.075 |
| 16179887 | 80 | No MI | 3.45 |
| 16180520 | 80 | No MI | 2.25 |
| 16180589 | 80 | No MI | 2.25 |
| 16179988 | 80 | No MI | 3.45 |
| 16180422 | 77.65000153 | No MI | 2.25 |
| 16180182 | 76.18000031 | No MI | 3.4 |
| 16179171 | 80 | No MI | 3.7 |

| | | | |
|---|---|---|---|
| 16178417 | 79.98999786 | No MI | 2.25 |
| 16178275 | 80 | No MI | 3.25 |
| 16178478 | 80 | No MI | 2.25 |
| 16178190 | 79.98999786 | No MI | 3.25 |
| 16180120 | 79.30999756 | No MI | 3.35 |
| 16180009 | 90 | No MI | 3.2 |
| 16179842 | | Mortgage Guaranty In | 3.45 |
| 16179633 | 80 | No MI | 3.2 |
| 16180521 | 74.51999664 | No MI | 2.25 |
| 16180590 | 80 | No MI | 2.25 |
| 16179936 | 80 | No MI | 3.45 |
| 16179444 | 80 | No MI | 3.45 |
| 16180059 | 61.54000092 | No MI | 3.775 |
| 16180423 | 61.22000122 | No MI | 2.25 |
| 16179963 | 80 | No MI | 3.45 |
| 16179770 | 80 | No MI | 5.25 |
| 16179954 | 80 | No MI | 3.45 |
| 16178245 | 65.66999817 | No MI | 2.25 |
| 16180522 | 80 | No MI | 2.25 |
| 16179634 | 80 | No MI | 3.075 |
| 16179122 | 63.11000061 | No MI | 3.7 |
| 16180591 | 80 | No MI | 2.25 |
| 16179782 | 80 | No MI | 3.5 |
| 16180424 | 79.98999786 | No MI | 2.25 |
| 16178418 | 80 | No MI | 2.25 |
| 16179964 | 80 | No MI | 3.45 |
| 16178911 | 80 | No MI | 3.6 |
| 16179667 | 80 | No MI | 3.325 |
| 16179240 | 90 | PMI | 3.525 |
| 16179955 | 80 | No MI | 3.45 |
| 16179844 | 80 | No MI | 3.45 |
| 16179635 | 90 | Mortgage Guaranty In | 3.2 |
| 16179889 | 80 | No MI | 3.45 |
| 16180523 | 74.13999939 | No MI | 2.25 |
| 16179197 | 69.94999695 | No MI | 3.4 |
| 16180592 | 80 | No MI | 2.25 |
| 16179937 | 79.98999786 | No MI | 3.45 |
| 16178457 | 80 | No MI | 2.75 |
| 16179445 | 69.51999664 | No MI | 3.325 |
| 16178725 | 80 | No MI | 2.25 |
| 16179069 | 80 | No MI | 4 |
| 16178543 | 80 | No MI | 2.25 |
| 16179668 | 80 | No MI | 3.45 |
| 16180085 | 80 | No MI | 3.325 |
| 16179311 | 80 | No MI | 3.325 |
| 16178680 | 76.91999817 | No MI | 2.25 |
| 16179286 | 75 | No MI | 2.9 |
| 16180010 | 90 | Mortgage Guaranty In | 3.45 |
| 16178246 | 77.87000275 | No MI | 2.25 |
| 16178844 | 80 | No MI | 2.25 |
| 16179793 | 80 | No MI | 3.75 |
| 16179636 | 56.95999908 | No MI | 3.075 |
| 16180593 | 80 | No MI | 2.25 |
| 16178419 | 80 | No MI | 2.25 |
| 16179789 | 80 | No MI | 3.5 |
| 16180136 | 70 | No MI | 3.775 |
| 16178333 | 69.76999664 | No MI | 2.25 |
| 16178176 | 80 | No MI | 2.25 |
| 16179375 | 80 | No MI | 3.45 |
| 16179550 | 80 | No MI | 3.5 |
| 16180528 | 80 | No MI | 2.25 |
| 16180297 | 78.68000031 | No MI | 2.25 |
| 16179158 | 80 | No MI | 3.525 |
| 16180365 | 80 | No MI | 2.25 |
| 16179038 | 80 | No MI | 3.7 |
| 16180267 | 80 | No MI | 2.25 |
| 16179591 | 74.02999878 | No MI | 3.325 |
| 16179026 | 75 | No MI | 4.375 |
| 16178312 | 75 | No MI | 2.25 |
| 16179568 | 80 | No MI | 3.45 |
| 16178324 | 64.86000061 | No MI | 2.25 |
| 16178711 | 80 | No MI | 2.25 |
| 16178630 | 80 | No MI | 2.25 |
| 16179522 | 80 | No MI | 3.5 |
| 16178631 | 70 | No MI | 2.25 |
| 16179523 | 74.80000305 | No MI | 3.5 |
| 16178470 | 80 | No MI | 2.25 |
| 16180095 | 80 | No MI | 3.15 |
| 16179961 | 90 | Mortgage Guaranty In | 3.45 |
| 16179532 | 20.39999962 | No MI | 3.45 |
| 16178393 | 79.81999969 | No MI | 2.25 |
| 16180101 | 80 | No MI | 3.2 |
| 16180087 | 75 | No MI | 3.775 |
| 16180100 | 65 | No MI | 4.075 |
| 16178737 | 75 | No MI | 2.25 |
| 16178614 | 64.70999908 | No MI | 2.25 |
| 16180519 | 72.22000122 | No MI | 2.25 |
| 16179886 | 80 | No MI | 3.45 |
| 16180588 | 80 | No MI | 2.25 |
| 16179934 | 80 | No MI | 3.45 |
| 16179987 | 79.98999786 | No MI | 3.45 |
| 16180421 | 78.86000061 | No MI | 2.25 |
| 16178986 | 80 | No MI | 4.4 |
| 16180488 | 80 | No MI | 2.25 |
| 16178995 | 80 | No MI | 3.5 |

| | | | |
|---|---|---|---|
| 16179420 | 79.97000122 | No MI | 2.95 |
| 16178287 | 68.18000031 | No MI | 3.5 |
| 16178438 | 50 | No MI | 2.25 |
| 16178752 | 80 | No MI | 2.25 |
| 16178229 | 80 | No MI | 2.25 |
| 16180489 | 80 | No MI | 2.25 |
| 16179865 | 80 | No MI | 3.45 |
| 16180559 | 80 | No MI | 2.25 |
| 16180394 | 80 | No MI | 2.25 |
| 16180459 | 80 | No MI | 2.25 |
| 16178408 | 80 | No MI | 2.25 |
| 16179606 | 80 | No MI | 3.5 |
| 16179625 | 80 | No MI | 3.5 |
| 16178982 | 80 | No MI | 3.6 |
| 16179720 | 80 | No MI | 3.975 |
| 16180038 | 79.98000336 | No MI | 3.575 |
| 16180082 | 80 | No MI | 2.95 |
| 16178867 | 80 | No MI | 2.25 |
| 16179989 | 80 | No MI | 3.975 |
| 16179866 | 80 | No MI | 3.45 |
| 16180490 | 79.19000244 | No MI | 2.25 |
| 16180560 | 80 | No MI | 2.25 |
| 16179421 | 80 | No MI | 3.45 |
| 16180329 | 80 | No MI | 2.25 |
| 16180395 | 80 | No MI | 2.25 |
| 16180460 | 80 | No MI | 2.25 |
| 16178807 | 80 | No MI | 2.25 |
| 16179167 | 80 | No MI | 3.7 |
| 16180164 | 80 | No MI | 3.75 |
| 16180056 | 79.98999786 | No MI | 3.275 |
| 16179827 | 54.74000168 | No MI | 2.875 |
| 16178430 | 80 | No MI | 2.25 |
| 16178530 | 80 | No MI | 2.25 |
| 16178776 | 80 | No MI | 2.25 |
| 16179534 | 79.98999786 | No MI | 3.45 |
| 16179517 | 80 | No MI | 3.5 |
| 16178230 | 65 | No MI | 2.25 |
| 16179990 | 87.04000092 | Mortgage Guaranty In | 3.2 |
| 16179867 | 44.34999847 | No MI | 3.45 |
| 16180491 | 80 | No MI | 2.25 |
| 16180561 | 69.04000092 | No MI | 2.25 |
| 16178977 | 80 | No MI | 3.8 |
| 16180330 | 80 | No MI | 2.25 |
| 16180396 | 79.98999786 | No MI | 2.25 |
| 16178409 | 80 | No MI | 2.25 |
| 16179721 | 80 | No MI | 3.45 |
| 16179312 | 30.48999977 | No MI | 3.125 |
| 16179535 | 79.98999786 | No MI | 3.45 |
| 16179304 | 58.09999847 | No MI | 3.4 |
| 16178577 | 80 | No MI | 2.25 |
| 16178671 | 80 | No MI | 2.25 |
| 16178746 | 65 | No MI | 2.25 |
| 16178507 | 80 | No MI | 2.25 |
| 16178558 | 80 | No MI | 2.25 |
| 16180425 | 80 | No MI | 2.25 |
| 16180492 | 80 | No MI | 2.25 |
| 16180562 | 80 | No MI | 2.25 |
| 16179002 | 80 | No MI | 4 |
| 16180331 | 80 | No MI | 2.25 |
| 16178439 | 80 | No MI | 2.25 |
| 16179058 | 76.95999908 | No MI | 4.4 |
| 16178431 | 80 | No MI | 2.25 |
| 16180167 | 80 | No MI | 3.575 |
| 16179536 | 80 | No MI | 3.45 |
| 16179332 | 80 | No MI | 3.25 |
| 16180071 | 60 | No MI | 3.325 |
| 16179938 | 80 | No MI | 3.45 |
| 16178231 | 72.62000275 | No MI | 2.25 |
| 16180426 | 80 | No MI | 2.25 |
| 16179868 | 80 | No MI | 3.45 |
| 16180493 | 80 | No MI | 2.25 |
| 16180563 | 80 | No MI | 2.25 |
| 16178978 | 80 | No MI | 4.4 |
| 16179647 | 80 | No MI | 3.5 |
| 16180332 | 80 | No MI | 2.25 |
| 16180397 | 80 | No MI | 2.25 |
| 16179743 | 80 | No MI | 3.45 |
| 16180142 | 70 | No MI | 3.775 |
| 16179965 | 80 | No MI | 3.45 |
| 16179537 | 75 | No MI | 3.45 |
| 16178672 | 79.98999786 | No MI | 2.25 |
| 16180189 | 79.98000336 | No MI | 3.7 |
| 16179939 | 80 | No MI | 3.45 |
| 16180594 | 80 | No MI | 2.25 |
| 16179991 | 79.98999786 | No MI | 3.45 |
| 16180427 | 80 | No MI | 2.25 |
| 16179869 | 80 | No MI | 3.45 |
| 16180494 | 75 | No MI | 2.25 |
| 16180564 | 80 | No MI | 2.25 |
| 16179003 | 80 | No MI | 2.95 |
| 16179093 | 80 | No MI | 3.5 |
| 16180333 | 80 | No MI | 2.25 |
| 16178993 | 80 | No MI | 3.5 |
| 16179798 | 70.83999634 | No MI | 1 |
| 16179538 | 79.98999786 | No MI | 3.45 |

| | | | |
|---|---|---|---|
| 16179338 | 80 | No MI | 3.5 |
| 16178276 | 80 | No MI | 2.25 |
| 16178542 | 87.09999847 | GE Capital MI | 2.25 |
| 16178247 | 80 | No MI | 2.25 |
| 16180595 | 80 | No MI | 2.25 |
| 16178232 | 79.08999634 | No MI | 2.25 |
| 16180428 | 80 | No MI | 2.25 |
| 16179870 | 80 | No MI | 3.45 |
| 16180495 | 80 | No MI | 2.25 |
| 16180565 | 80 | No MI | 2.25 |
| 16179172 | 75 | No MI | 3.525 |
| 16179425 | 79.94999695 | No MI | 2.95 |
| 16178410 | 80 | No MI | 2.25 |
| 16178929 | 67.5 | No MI | 3.2 |
| 16178747 | 80 | No MI | 2.25 |
| 16179940 | 75 | No MI | 3.45 |
| 16180596 | 80 | No MI | 2.25 |
| 16179992 | 80 | No MI | 3.45 |
| 16180429 | 80 | No MI | 2.25 |
| 16179871 | 80 | No MI | 3.45 |
| 16180496 | 80 | No MI | 2.25 |
| 16180173 | 80 | No MI | 2.5 |
| 16179426 | 80 | No MI | 3.45 |
| 16180334 | 80 | No MI | 2.25 |
| 16178440 | 80 | No MI | 2.25 |
| 16179745 | 80 | No MI | 3.45 |
| 16178808 | 80 | No MI | 2.25 |
| 16179966 | 69.18000031 | No MI | 2.95 |
| 16179028 | 75 | No MI | 3.9 |
| 16178930 | 80 | No MI | 3.15 |
| 16178344 | 59.34999847 | No MI | 2.25 |
| 16178248 | 69 | No MI | 2.25 |
| 16179893 | 80 | No MI | 3.45 |
| 16179941 | 90 | PMI | 3.45 |
| 16180597 | 60.54999924 | No MI | 2.25 |
| 16179181 | 80 | No MI | 3.7 |
| 16180430 | 80 | No MI | 2.25 |
| 16179186 | 80 | No MI | 3.45 |
| 16179872 | 80 | No MI | 3.45 |
| 16180497 | 80 | No MI | 2.25 |
| 16178861 | 90 | GE Capital MI | 2.25 |
| 16179004 | 80 | No MI | 4.4 |
| 16179427 | 80 | No MI | 3.45 |
| 16178731 | 80 | No MI | 2.25 |
| 16180145 | 76.47000122 | No MI | 3.95 |
| 16179967 | 80 | No MI | 3.45 |
| 16179539 | 80 | No MI | 3.45 |
| 16178539 | 73.75 | No MI | 2.25 |
| 16180121 | 80 | No MI | 3.325 |
| 16178345 | 80 | No MI | 2.25 |
| 16178217 | 65.55000305 | No MI | 2.25 |
| 16178738 | 75 | No MI | 2.25 |
| 16178498 | 80 | No MI | 2.25 |
| 16180015 | 80 | No MI | 3.45 |
| 16178609 | 80 | No MI | 2.25 |
| 16179894 | 79.98999786 | No MI | 3.45 |
| 16180002 | 80 | No MI | 3.45 |
| 16179187 | 80 | No MI | 3.525 |
| 16178501 | 80 | No MI | 2.25 |
| 16180513 | 80 | No MI | 2.25 |
| 16179882 | 80 | No MI | 3.325 |
| 16179440 | 80 | No MI | 3.85 |
| 16178445 | 65 | No MI | 2.25 |
| 16178316 | 80 | No MI | 2.25 |
| 16180064 | 79.48999786 | No MI | 3.275 |
| 16179543 | 80 | No MI | 3.45 |
| 16178907 | 80 | No MI | 3.4 |
| 16178347 | 79.98999786 | No MI | 2.25 |
| 16179649 | 61.24000168 | No MI | 3.375 |
| 16178257 | 65 | No MI | 2.25 |
| 16179200 | 80 | No MI | 3.525 |
| 16180615 | 80 | No MI | 2.25 |
| 16180003 | 80 | No MI | 3.45 |
| 16178242 | 80 | No MI | 2.25 |
| 16178321 | 78.05000305 | No MI | 2.25 |
| 16178998 | 80 | No MI | 3.6 |
| 16180514 | 80 | No MI | 2.25 |
| 16179629 | 70 | No MI | 3.45 |
| 16180583 | 80 | No MI | 2.25 |
| 16179441 | 80 | No MI | 3.45 |
| 16179340 | 80 | No MI | 3.5 |
| 16178274 | 70.94999695 | No MI | 3.25 |
| 16178538 | 80 | No MI | 2.25 |
| 16179612 | 77.04000092 | No MI | 3.375 |
| 16179651 | 72.09999847 | No MI | 3.5 |
| 16178904 | 80 | No MI | 3.7 |
| 16178579 | 80 | No MI | 2.25 |
| 16180090 | 70 | No MI | 4.15 |
| 16178616 | 80 | No MI | 2.25 |
| 16179907 | 80 | No MI | 3.45 |
| 16180616 | 80 | No MI | 2.25 |
| 16179949 | 80 | No MI | 3.45 |
| 16179188 | 80 | No MI | 3.95 |
| 16180515 | 80 | No MI | 2.25 |
| 16179080 | 80 | No MI | 4 |

Unassociated Document                                         Page 286 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 8 of 279

| | | | |
|---|---|---|---|
| 16178446 | 80 | No MI | 2.25 |
| 16179800 | 80 | No MI | 3.5 |
| 16178839 | 80 | No MI | 2.25 |
| 16179661 | 76.62000275 | No MI | 3.325 |
| 16178348 | 79.95999908 | No MI | 2.25 |
| 16178330 | 69.15000153 | No MI | 2.25 |
| 16178258 | 75 | No MI | 2.25 |
| 16180097 | 80 | No MI | 3.2 |
| 16179908 | 80 | No MI | 3.45 |
| 16179238 | 69.37000275 | No MI | 3.15 |
| 16180617 | 80 | No MI | 2.25 |
| 16179192 | 80 | No MI | 3.55 |
| 16180516 | 65 | No MI | 2.25 |
| 16180148 | 80 | No MI | 2.775 |
| 16178732 | 80 | No MI | 2.25 |
| 16179662 | 80 | No MI | 3.975 |
| 16178187 | 80 | No MI | 3.25 |
| 16178268 | 64.98999786 | No MI | 2.25 |
| 16178188 | 80 | No MI | 3.25 |
| 16179791 | 80 | No MI | 3.5 |
| 16179795 | 80 | No MI | 3.5 |
| 16179797 | 80 | No MI | 3.5 |
| 16179959 | 80 | No MI | 3.5 |
| 16179799 | 80 | No MI | 3.75 |
| 16178350 | 80 | No MI | 2.25 |
| 16178351 | 64.94000244 | No MI | 2.25 |
| 16178270 | 80 | No MI | 2.25 |
| 16178514 | 80 | No MI | 2.25 |
| 16178352 | 80 | No MI | 3.25 |
| 16178271 | 80 | No MI | 2.25 |
| 16178272 | 80 | No MI | 2.25 |
| 16179325 | 80 | No MI | 4.75 |
| 16179406 | 80 | No MI | 3.5 |
| 16178515 | 80 | No MI | 2.25 |
| 16179326 | 80 | No MI | 5.125 |
| 16178516 | 80 | No MI | 2.25 |
| 16178273 | 80 | No MI | 2.25 |
| 16178193 | 80 | No MI | 3.25 |
| 16179409 | 80 | No MI | 3.5 |
| 16178194 | 80 | No MI | 3.25 |
| 16178195 | 90 | Mortgage Guaranty In | 2.25 |
| 16178196 | 80 | No MI | 2.25 |
| 16178277 | 64.91999817 | No MI | 2.25 |
| 16178358 | 80 | No MI | 2.25 |
| 16178197 | 78.66000366 | No MI | 3.25 |
| 16178278 | 66.94999695 | No MI | 3.5 |
| 16178198 | 80 | No MI | 3.5 |
| 16178279 | 80 | No MI | 2.25 |
| 16178199 | 80 | No MI | 3.25 |
| 16180004 | 83.76000214 | Mortgage Guaranty In | 3.2 |
| 16178520 | 80 | No MI | 2.25 |
| 16178603 | 80 | No MI | 2.25 |
| 16178360 | 80 | No MI | 2.25 |
| 16178604 | 89.98999786 | Mortgage Guaranty In | 2.25 |
| 16178607 | 60 | No MI | 2.25 |
| 16179336 | 80 | No MI | 4 |
| 16178283 | 80 | No MI | 2.25 |
| 16178284 | 46.50999832 | No MI | 2.25 |
| 16179337 | 80 | No MI | 4 |
| 16178527 | 80 | No MI | 2.25 |
| 16178529 | 54.16999817 | No MI | 2.25 |
| 16179892 | 79.98999786 | No MI | 3.075 |
| 16180019 | 80 | No MI | 3.5 |
| 16178612 | 80 | No MI | 2.25 |
| 16178370 | 69.44999695 | No MI | 2.25 |
| 16178533 | 70 | No MI | 2.25 |
| 16178534 | 78.56999969 | No MI | 2.25 |
| 16178535 | 80 | No MI | 2.25 |
| 16178536 | 80 | No MI | 2.25 |
| 16178537 | 80 | No MI | 2.25 |
| 16178456 | 80 | No MI | 3.25 |
| 16178294 | 93 | GE Capital MI | 2.25 |
| 16178618 | 70 | No MI | 2.25 |
| 16178296 | 62.61999893 | No MI | 2.25 |
| 16178459 | 80 | No MI | 2.25 |
| 16178298 | 90 | Radian Guaranty | 2.25 |
| 16178379 | 80 | No MI | 2.25 |
| 16180020 | 80 | No MI | 3.5 |
| 16178701 | 80 | No MI | 2.25 |
| 16178540 | 80 | No MI | 2.25 |
| 16179350 | 80 | No MI | 3.5 |
| 16178460 | 80 | No MI | 2.25 |
| 16178623 | 90 | Mortgage Guaranty In | 2.25 |
| 16178705 | 80 | No MI | 2.25 |
| 16178463 | 79.98000336 | No MI | 2.25 |
| 16178382 | 79.98999786 | No MI | 2.25 |
| 16178544 | 79.98999786 | No MI | 2.25 |
| 16178707 | 54.65000153 | No MI | 2.25 |
| 16179518 | 90 | Radian Guaranty | 3.5 |
| 16178627 | 80 | No MI | 2.25 |
| 16178385 | 80 | No MI | 2.25 |
| 16178628 | 80 | No MI | 2.25 |
| 16178466 | 80 | No MI | 2.25 |
| 16178469 | 82.97000122 | GE Capital MI | 2.25 |
| 16178389 | 80 | No MI | 2.25 |

Unassociated Document             Page 287 of 835
12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 9 of 279

| | | | |
|---|---|---|---|
| 16178710 | 94.27999878 | GE Capital MI | 3.25 |
| 16180393 | 45.70999908 | No MI | 2.25 |
| 16178964 | 80 | No MI | 3.5 |
| 16179000 | 80 | No MI | 4.4 |
| 16179083 | 80 | No MI | 3.74 |
| 16180296 | 75 | No MI | 2.25 |
| 16179605 | 74.88999939 | No MI | 3.375 |
| 16179157 | 90 | PMI | 3.7 |
| 16179719 | 79.98999786 | No MI | 3.45 |
| 16180042 | 80 | No MI | 3.825 |
| 16178532 | 80 | No MI | 2.25 |
| 16178521 | 80 | No MI | 2.75 |
| 16179486 | 90 | Triad Guaranty | 2.65 |
| 16178896 | 80 | No MI | 3.525 |
| 99999001 | 80 | No MI | 2.25 |
| 99999004 | 80 | No MI | 2.25 |
| 99999005 | 80 | GE Capital MI | 2.25 |
| 99999007 | 79.5 | No MI | 2.25 |
| 99999010 | 80 | No MI | 3.1 |
| 15980136 | 59.11999893 | No MI | 3.075 |
| 99999200 | 80 | No MI | 2.25 |
| 99999201 | 76.48000336 | No MI | 2.25 |
| 99999202 | 80 | No MI | 2.25 |

| LOAN_SEQ | NEXT_RATE_ ADJ_DATE1 | MAX_RATE | MIN_RATE | PER_RATE _CAP |
|---|---|---|---|---|
| 16180262 | 20110201 | 12.25 | 2.25 | 2 |
| 122405144 | 20060501 | 9.999 | 2.9 | 0 |
| 16178479 | 20110201 | 11.125 | 2.25 | 2 |
| 16179674 | 20060501 | 9.95 | 3.075 | 0 |
| 16180224 | 20110201 | 12.5 | 2.25 | 2 |
| 16179289 | 20060501 | 9.95 | 3.525 | 0 |
| 16179228 | 20060501 | 9.95 | 2.9 | 0 |
| 16178371 | 20110201 | 11.5 | 2.25 | 2 |
| 16179245 | 20060501 | 9.95 | 3.4 | 0 |
| 16179852 | 20060501 | 9.95 | 3.45 | 0 |
| 16180263 | 20110201 | 12.75 | 2.25 | 2 |
| 16179810 | 20060501 | 9.95 | 3.075 | 0 |
| 16178940 | 20060501 | 9.999 | 3.8 | 0 |
| 16180106 | 20060501 | 12.5 | 3.525 | 0 |
| 16180161 | 20060501 | 12.5 | 4.15 | 0 |
| 16180225 | 20110201 | 12.875 | 2.25 | 2 |
| 16179773 | 20060501 | 9.95 | 3.5 | 0 |
| 16178566 | 20110201 | 11.25 | 2.25 | 2 |
| 16179511 | 20060501 | 10.45 | 3.325 | 0 |
| 16179290 | 20060501 | 9.95 | 2.9 | 0 |
| 16179920 | 20060501 | 9.95 | 3.45 | 0 |
| 16179019 | 20060501 | 9.999 | 3.875 | 0 |
| 16180362 | 20110201 | 13.5 | 2.25 | 2 |
| 16180264 | 20110201 | 12.125 | 2.25 | 2 |
| 16179811 | 20060501 | 9.95 | 3.075 | 0 |
| 16178420 | 20110101 | 11.875 | 2.25 | 2 |
| 16179566 | 20060501 | 9.95 | 3.45 | 0 |
| 16179675 | 20060501 | 9.95 | 3.45 | 0 |
| 16180122 | 20060501 | 12.5 | 3.65 | 0 |
| 16178735 | 20110201 | 12.125 | 2.25 | 2 |
| 16180226 | 20110201 | 12.25 | 2.25 | 2 |
| 16179512 | 20060501 | 9.95 | 3.325 | 0 |
| 16179214 | 20060501 | 9.95 | 3.7 | 0 |
| 16179133 | 20060501 | 9.95 | 2.9 | 0 |
| 16179373 | 20060501 | 9.95 | 3.45 | 0 |
| 16180363 | 20110201 | 12.75 | 2.25 | 2 |
| 16180265 | 20110201 | 13.5 | 2.25 | 2 |
| 16179703 | 20060501 | 9.95 | 3.45 | 0 |
| 16179567 | 20060501 | 9.95 | 3.45 | 0 |
| 16178332 | 20110101 | 12.875 | 2.25 | 2 |
| 16178522 | 20110201 | 11.625 | 2.25 | 2 |
| 16179482 | 20060501 | 9.95 | 3.125 | 0 |
| 16179118 | 20060501 | 9.95 | 3.525 | 0 |
| 16179134 | 20060501 | 9.95 | 3.15 | 0 |
| 16179772 | 20060501 | 9.95 | 4 | 0 |
| 16179374 | 20060501 | 9.95 | 3.45 | 0 |
| 16180364 | 20110201 | 13.75 | 2.25 | 2 |
| 16178546 | 20110201 | 10.875 | 2.25 | 2 |
| 16178967 | 20060501 | 9.999 | 3.05 | 0 |
| 16180266 | 20110201 | 13 | 2.25 | 2 |
| 16179812 | 20060501 | 9.95 | 2.725 | 0 |
| 16179704 | 20060501 | 9.95 | 3.45 | 0 |
| 16179034 | 20060501 | 9.999 | 3.7 | 0 |
| 16179692 | 20060501 | 9.95 | 3.45 | 0 |
| 16180137 | 20060501 | 12.5 | 2.85 | 0 |
| 16178328 | 20110101 | 12.875 | 2.25 | 2 |
| 16179278 | 20060501 | 9.95 | 3.275 | 0 |
| 16180228 | 20110201 | 12.25 | 2.25 | 2 |
| 16178855 | 20110301 | 11.875 | 2.25 | 2 |
| 16180185 | 20060501 | 12.5 | 2.725 | 0 |
| 16179922 | 20060501 | 9.95 | 3.2 | 0 |
| 16179942 | 20060501 | 9.95 | 3.45 | 0 |
| 16180598 | 20110201 | 12.625 | 2.25 | 2 |
| 16179008 | 20060501 | 9.999 | 3.7 | 0 |
| 16179013 | 20060501 | 9.999 | 3.5 | 0 |
| 16179203 | 20060501 | 9.95 | 3.925 | 0 |

| | | | | |
|---|---|---|---|---|
| 16179449 | 20060501 | 9.95 | 3.45 | 0 |
| 16180431 | 20110201 | 12.875 | 2.25 | 2 |
| 16178813 | 20110301 | 12.125 | 2.25 | 2 |
| 16179102 | 20060501 | 9.95 | 3.525 | 0 |
| 16179328 | 20060501 | 10.45 | 3.325 | 0 |
| 16178996 | 20060501 | 9.999 | 4.4 | 0 |
| 16179428 | 20060501 | 9.95 | 2.95 | 0 |
| 16178441 | 20110101 | 11.25 | 2.25 | 2 |
| 16179747 | 20060501 | 9.95 | 3.45 | 0 |
| 16178706 | 20110301 | 11.125 | 2.25 | 2 |
| 16179393 | 20060501 | 9.95 | 3.45 | 0 |
| 16178681 | 20110301 | 11.875 | 2.25 | 2 |
| 16178669 | 20110201 | 11.75 | 2.25 | 2 |
| 16178528 | 20110201 | 11.875 | 3.25 | 1 |
| 16179255 | 20060501 | 9.95 | 3.4 | 0 |
| 16178249 | 20101001 | 11.375 | 2.25 | 2 |
| 16180076 | 20060501 | 12.5 | 3.525 | 0 |
| 16178600 | 20110201 | 11.125 | 2.25 | 2 |
| 16179895 | 20060501 | 9.95 | 3.45 | 0 |
| 16180599 | 20110201 | 13.125 | 2.25 | 2 |
| 16179993 | 20060501 | 9.95 | 3.45 | 0 |
| 16180432 | 20110201 | 12.25 | 2.25 | 2 |
| 16179173 | 20060501 | 9.95 | 3.925 | 0 |
| 16179429 | 20060501 | 9.95 | 3.45 | 0 |
| 16180129 | 20060501 | 12.5 | 2.875 | 0 |
| 16179748 | 20060501 | 9.95 | 3.325 | 0 |
| 16179968 | 20060501 | 9.95 | 3.45 | 0 |
| 16179029 | 20060501 | 9.999 | 4.35 | 0 |
| 16178912 | 20060501 | 9.999 | 4 | 0 |
| 16178931 | 20060501 | 9.999 | 4.4 | 0 |
| 16178335 | 20110101 | 11.75 | 2.25 | 2 |
| 16179650 | 20060501 | 9.95 | 3.5 | 0 |
| 16178310 | 20110201 | 11.625 | 2.25 | 2 |
| 16178218 | 20110101 | 11.875 | 2.25 | 2 |
| 16179205 | 20060501 | 9.95 | 3.525 | 0 |
| 16178739 | 20110301 | 10.875 | 2.25 | 2 |
| 16180016 | 20060501 | 9.95 | 3.45 | 0 |
| 16178266 | 20110101 | 11.75 | 2.25 | 2 |
| 16179847 | 20060501 | 9.95 | 3.45 | 0 |
| 16179896 | 20060501 | 9.95 | 3.4 | 0 |
| 16179123 | 20060501 | 9.95 | 3.525 | 0 |
| 16180600 | 20110201 | 12.75 | 2.25 | 2 |
| 16179204 | 20060501 | 11.7 | 3.925 | 0 |
| 16179450 | 20060501 | 9.95 | 3.325 | 0 |
| 16178997 | 20060501 | 9.999 | 4 | 0 |
| 16178781 | 20110301 | 12.125 | 2.25 | 2 |
| 16179969 | 20060501 | 9.95 | 3.45 | 0 |
| 16178953 | 20060501 | 9.999 | 4 | 0 |
| 16178309 | 20110201 | 11.75 | 2.25 | 2 |
| 16179242 | 20060501 | 9.95 | 3.7 | 0 |
| 16178250 | 20101001 | 11.375 | 2.25 | 2 |
| 16180017 | 20060501 | 9.95 | 3.45 | 0 |
| 16180601 | 20110201 | 12 | 2.25 | 2 |
| 16179014 | 20060501 | 9.999 | 3 | 0 |
| 16180433 | 20110201 | 12 | 2.25 | 2 |
| 16178805 | 20110101 | 11.25 | 2.25 | 2 |
| 16179355 | 20060501 | 9.95 | 3.45 | 0 |
| 16179042 | 20060501 | 9.999 | 3.25 | 0 |
| 16180091 | 20060501 | 12.5 | 3.95 | 0 |
| 16178590 | 20110201 | 11 | 2.25 | 2 |
| 16178219 | 20101201 | 11.375 | 2.25 | 2 |
| 16178264 | 20110101 | 12.125 | 2.25 | 2 |
| 16179897 | 20060501 | 9.95 | 3.325 | 0 |
| 16179125 | 20060501 | 9.95 | 3.15 | 0 |
| 16179193 | 20060501 | 10.95 | 3.15 | 0 |
| 16180602 | 20110201 | 12.875 | 2.25 | 2 |
| 16179198 | 20060501 | 9.95 | 3.525 | 0 |
| 16179451 | 20060501 | 9.95 | 3.45 | 0 |
| 16178726 | 20110301 | 11.625 | 2.25 | 2 |
| 16180048 | 20060501 | 12.5 | 3.15 | 0 |
| 16180170 | 20060501 | 12.5 | 2.725 | 0 |
| 16179970 | 20060501 | 9.95 | 3.2 | 0 |
| 16179022 | 20060501 | 9.999 | 3.5 | 0 |
| 16178295 | 20110201 | 11 | 2.25 | 1 |
| 16178575 | 20110201 | 11.625 | 2.25 | 2 |
| 16178666 | 20101201 | 12.75 | 3.5 | 2 |
| 16180116 | 20060501 | 12.5 | 3.4 | 0 |
| 16178601 | 20110201 | 11.875 | 2.25 | 2 |
| 16178251 | 20101101 | 11.5 | 2.25 | 2 |
| 16179783 | 20060501 | 9.95 | 3.5 | 0 |
| 16179849 | 20060501 | 9.95 | 3.2 | 0 |
| 16179898 | 20060501 | 9.95 | 3.075 | 0 |
| 16179194 | 20060501 | 9.95 | 3.525 | 0 |
| 16180603 | 20110201 | 12.875 | 2.25 | 2 |
| 16179452 | 20060501 | 9.95 | 3.525 | 0 |
| 16180627 | 20100401 | 11.75 | 2.25 | 2 |
| 16179396 | 20060501 | 9.95 | 3.2 | 0 |
| 16178936 | 20060501 | 9.999 | 3.1 | 0 |
| 16178954 | 20060501 | 9.999 | 4 | 0 |
| 16178913 | 20060501 | 9.999 | 3.1 | 0 |
| 16179672 | 20060501 | 9.95 | 3.45 | 0 |
| 16180110 | 20060501 | 12.5 | 3.325 | 0 |
| 16178291 | 20110101 | 12.75 | 3.5 | 2 |
| 16179264 | 20060501 | 9.95 | 3.025 | 0 |
| 16178220 | 20110201 | 11.375 | 2.25 | 2 |

| | | | | |
|---|---|---|---|---|
| 16180018 | 20060501 | 9.95 | 3.45 | 0 |
| 16179784 | 20060501 | 9.95 | 3.5 | 0 |
| 16179108 | 20060501 | 9.95 | 3.4 | 0 |
| 16179453 | 20060501 | 9.95 | 3.45 | 0 |
| 16180259 | 20110201 | 12 | 2.25 | 2 |
| 16179673 | 20060501 | 9.95 | 3.45 | 0 |
| 16178689 | 20110301 | 11.625 | 2.25 | 2 |
| 16178822 | 20110101 | 12.25 | 2.25 | 2 |
| 16179265 | 20060501 | 9.95 | 3.525 | 0 |
| 16179217 | 20060501 | 9.95 | 3.025 | 0 |
| 16179243 | 20060501 | 9.95 | 3.7 | 0 |
| 16179201 | 20060501 | 9.95 | 3.4 | 0 |
| 16179850 | 20060501 | 9.95 | 3.45 | 0 |
| 16179899 | 20060501 | 9.95 | 3.45 | 0 |
| 16179454 | 20060501 | 9.95 | 2.575 | 0 |
| 16180260 | 20110201 | 12.125 | 2.25 | 2 |
| 16179149 | 20060501 | 9.95 | 3.525 | 0 |
| 16179033 | 20060501 | 9.999 | 3.1 | 0 |
| 16179564 | 20060501 | 9.95 | 3.2 | 0 |
| 16178550 | 20110201 | 11.375 | 2.75 | 2 |
| 16178937 | 20060501 | 9.999 | 3.1 | 0 |
| 16179790 | 20060501 | 9.95 | 3.5 | 0 |
| 16180190 | 20060501 | 12.5 | 3.15 | 0 |
| 16178581 | 20110201 | 11.25 | 2.25 | 2 |
| 16178568 | 20110201 | 12 | 2.25 | 2 |
| 16179132 | 20060501 | 9.95 | 3.15 | 0 |
| 16179918 | 20060501 | 9.95 | 3.45 | 0 |
| 16178221 | 20100901 | 10.625 | 2.25 | 2 |
| 16179244 | 20060501 | 9.95 | 3.4 | 0 |
| 16179017 | 20060501 | 9.999 | 4 | 0 |
| 16179109 | 20060501 | 9.95 | 3.525 | 0 |
| 16178364 | 20101101 | 11.5 | 2.25 | 2 |
| 16179351 | 20060501 | 9.95 | 3.5 | 0 |
| 16179398 | 20060501 | 9.95 | 3.45 | 0 |
| 16180261 | 20110201 | 13.375 | 2.25 | 2 |
| 16179052 | 20060501 | 9.999 | 4.2 | 0 |
| 16179565 | 20060501 | 9.95 | 3.325 | 0 |
| 16178938 | 20060501 | 9.999 | 3.5 | 0 |
| 16178339 | 20110101 | 12.875 | 2.25 | 2 |
| 16180105 | 20060501 | 12.5 | 3.275 | 0 |
| 16180088 | 20060501 | 12.5 | 3.2 | 0 |
| 16178281 | 20110101 | 10.875 | 2.25 | 2 |
| 16179919 | 20060501 | 9.95 | 3.45 | 0 |
| 16178192 | 20110101 | 11.625 | 3.25 | 1 |
| 16179018 | 20060501 | 9.999 | 4.2 | 0 |
| 16179851 | 20060501 | 9.95 | 3.45 | 0 |
| 16179456 | 20060501 | 9.95 | 3.45 | 0 |
| 16178773 | 20110301 | 11.5 | 2.25 | 2 |
| 16178640 | 20110201 | 11.75 | 2.25 | 2 |
| 16178688 | 20110301 | 11.375 | 2.25 | 2 |
| 16179294 | 20060501 | 9.95 | 3.525 | 0 |
| 16179235 | 20060501 | 10.95 | 3.7 | 0 |
| 16180220 | 20110201 | 12.75 | 2.25 | 2 |
| 16179250 | 20060501 | 9.95 | 3.15 | 0 |
| 16179207 | 20060501 | 9.95 | 3.525 | 0 |
| 16180070 | 20060501 | 12.5 | 3.575 | 0 |
| 16179478 | 20060501 | 9.95 | 3.325 | 0 |
| 16179370 | 20060501 | 9.95 | 3.45 | 0 |
| 16179526 | 20060501 | 9.95 | 3.25 | 0 |
| 16180452 | 20110201 | 12.875 | 2.25 | 2 |
| 16180289 | 20110201 | 13.25 | 2.25 | 2 |
| 16180358 | 20110101 | 12.875 | 2.25 | 2 |
| 16179163 | 20060501 | 9.95 | 3.525 | 0 |
| 16179036 | 20060501 | 9.999 | 4.4 | 0 |
| 16179586 | 20060501 | 9.95 | 3.45 | 0 |
| 16178784 | 20110101 | 12.125 | 2.25 | 2 |
| 16178485 | 20110201 | 11.75 | 2.25 | 2 |
| 16179654 | 20060501 | 9.95 | 3.45 | 0 |
| 16180036 | 20060501 | 12.5 | 3.575 | 0 |
| 16180163 | 20060501 | 12.5 | 3.825 | 0 |
| 16179273 | 20060501 | 9.95 | 2.65 | 0 |
| 16180221 | 20110201 | 12.75 | 2.25 | 2 |
| 16178387 | 20110101 | 11.875 | 2.25 | 2 |
| 16178359 | 20110201 | 10.875 | 2.25 | 2 |
| 16178897 | 20060501 | 9.95 | 3.7 | 0 |
| 16180077 | 20060501 | 12.5 | 3.525 | 0 |
| 16179371 | 20060501 | 9.95 | 3.45 | 0 |
| 16180453 | 20110201 | 12.5 | 2.25 | 2 |
| 16180290 | 20110201 | 13 | 2.25 | 2 |
| 16179716 | 20060501 | 9.95 | 3.45 | 0 |
| 16179061 | 20060501 | 9.999 | 4.2 | 0 |
| 16179764 | 20060501 | 9.95 | 3.45 | 0 |
| 16179143 | 20060501 | 9.95 | 2.65 | 0 |
| 16179807 | 20060501 | 9.95 | 2.725 | 0 |
| 16178809 | 20090301 | 12.5 | 3.25 | 2 |
| 16179024 | 20060501 | 9.999 | 4.2 | 0 |
| 16178793 | 20110301 | 11.875 | 2.25 | 2 |
| 16180139 | 20060501 | 12.5 | 4.025 | 0 |
| 16179274 | 20060501 | 9.95 | 3.525 | 0 |
| 16179295 | 20060501 | 9.95 | 3.525 | 0 |
| 16180222 | 20110201 | 12 | 2.25 | 2 |
| 16178842 | 20110301 | 11.625 | 2.25 | 2 |
| 16178510 | 20110201 | 11.125 | 2.25 | 2 |
| 16180622 | 20110201 | 13.875 | 2.25 | 2 |
| 16180454 | 20110201 | 12.25 | 2.25 | 2 |

| | | | | |
|---|---|---|---|---|
| 16179166 | 20060501 | 9.95 | 3.325 | 0 |
| 16179073 | 20060501 | 9.999 | 4 | 0 |
| 16180291 | 20110201 | 13.5 | 2.25 | 2 |
| 16180359 | 20110201 | 12.875 | 2.25 | 2 |
| 16178448 | 20110101 | 11.75 | 2.25 | 2 |
| 16180065 | 20060501 | 12.5 | 4.45 | 0 |
| 16179808 | 20060501 | 9.95 | 3.2 | 0 |
| 16179587 | 20060501 | 9.95 | 3.45 | 0 |
| 16178638 | 20110201 | 11.25 | 2.25 | 2 |
| 16179702 | 20060501 | 9.95 | 2.425 | 0 |
| 16179655 | 20060501 | 9.95 | 3.325 | 0 |
| 16179025 | 20060501 | 9.99 | 3.6 | 0 |
| 16179691 | 20060501 | 9.95 | 3.45 | 0 |
| 16178587 | 20110201 | 11.375 | 2.25 | 2 |
| 16178523 | 20110201 | 11.875 | 2.75 | 2 |
| 16180223 | 20110201 | 12.5 | 2.25 | 2 |
| 16179372 | 20060501 | 9.95 | 3.25 | 0 |
| 16180623 | 20110201 | 13 | 2.25 | 2 |
| 16180389 | 20110201 | 12.25 | 2.25 | 2 |
| 16180455 | 20110201 | 12.375 | 2.25 | 2 |
| 16179074 | 20060501 | 9.999 | 3.8 | 0 |
| 16180292 | 20110201 | 12.5 | 2.25 | 2 |
| 16180360 | 20110201 | 12 | 2.25 | 2 |
| 16179809 | 20060501 | 9.95 | 2.725 | 0 |
| 16180141 | 20060501 | 12.5 | 3.075 | 0 |
| 16178620 | 20110201 | 11.875 | 2.25 | 2 |
| 16178699 | 20110301 | 12 | 2.25 | 2 |
| 16178629 | 20110201 | 10.75 | 2.25 | 2 |
| 16180084 | 20060501 | 12.5 | 3.2 | 0 |
| 16178825 | 20110301 | 11.25 | 2.25 | 2 |
| 16179275 | 20060501 | 9.95 | 3.7 | 0 |
| 16180181 | 20060501 | 12.5 | 3.275 | 0 |
| 16178378 | 20110101 | 12.125 | 2.25 | 2 |
| 16180624 | 20110201 | 12.5 | 2.25 | 2 |
| 16180390 | 20110201 | 12.625 | 2.25 | 2 |
| 16179184 | 20060501 | 10.45 | 3.7 | 0 |
| 16180456 | 20110201 | 12.75 | 2.25 | 2 |
| 16180293 | 20110201 | 12.875 | 2.25 | 2 |
| 16179825 | 20060501 | 9.95 | 2.95 | 0 |
| 16180361 | 20110201 | 12.625 | 2.25 | 2 |
| 16178449 | 20110201 | 11.875 | 2.25 | 2 |
| 16179717 | 20060501 | 9.95 | 3.45 | 0 |
| 16180192 | 20060501 | 12.5 | 3.525 | 0 |
| 16178652 | 20110101 | 11.75 | 3.25 | 1 |
| 16180156 | 20060501 | 12.5 | 3.75 | 0 |
| 16178945 | 20060501 | 9.999 | 3.5 | 0 |
| 16178639 | 20110201 | 12.125 | 2.25 | 2 |
| 16178778 | 20110301 | 11.75 | 2.25 | 2 |
| 16178304 | 20110101 | 12 | 2.25 | 2 |
| 16178325 | 20110101 | 11.875 | 2.75 | 2 |
| 16179775 | 20060501 | 9.95 | 3.5 | 0 |
| 16179236 | 20060501 | 9.95 | 3.525 | 0 |
| 16178551 | 20101201 | 11.75 | 2.25 | 2 |
| 16180556 | 20110201 | 12.5 | 2.25 | 2 |
| 16180625 | 20110201 | 12.75 | 2.25 | 2 |
| 16180391 | 20110201 | 13.5 | 2.25 | 2 |
| 16179185 | 20060501 | 9.95 | 3.7 | 0 |
| 16180457 | 20110201 | 13.375 | 2.25 | 2 |
| 16179082 | 20060501 | 9.999 | 3.875 | 0 |
| 16180294 | 20110201 | 12.375 | 2.25 | 2 |
| 16179826 | 20060501 | 9.95 | 2.95 | 0 |
| 16179718 | 20060501 | 9.95 | 3.45 | 0 |
| 16179037 | 20060501 | 9.999 | 4.4 | 0 |
| 16180151 | 20060501 | 12.5 | 3.4 | 0 |
| 16178693 | 20110301 | 12 | 2.25 | 2 |
| 16178865 | 20110301 | 11.875 | 2.25 | 2 |
| 16179276 | 20060501 | 9.95 | 3.525 | 0 |
| 16179499 | 20060501 | 9.95 | 3.5 | 0 |
| 16178512 | 20110201 | 11 | 2.25 | 2 |
| 16178228 | 20110101 | 11.75 | 2.25 | 2 |
| 16180557 | 20110201 | 12.25 | 2.25 | 2 |
| 16180392 | 20110201 | 12.25 | 2.25 | 2 |
| 16180458 | 20110201 | 11.875 | 2.25 | 2 |
| 16180172 | 20060501 | 12.5 | 3.95 | 0 |
| 16180295 | 20110201 | 12.5 | 2.25 | 2 |
| 16178407 | 20110101 | 11.625 | 2.25 | 2 |
| 16180157 | 20060501 | 12.5 | 3.075 | 0 |
| 16179062 | 20060501 | 9.999 | 4.4 | 0 |
| 16178708 | 20110301 | 11.375 | 2.25 | 2 |
| 16178338 | 20110101 | 12.5 | 2.25 | 2 |
| 16178525 | 20110201 | 11.375 | 3.25 | 1 |
| 16178181 | 20101101 | 12.875 | 2.75 | 1 |
| 16179303 | 20060501 | 9.95 | 3.525 | 0 |
| 16178391 | 20110101 | 11.625 | 2.25 | 2 |
| 16179277 | 20060501 | 9.95 | 3.525 | 0 |
| 16179500 | 20060501 | 9.95 | 3.5 | 0 |
| 16179648 | 20060501 | 9.95 | 3.5 | 0 |
| 16180074 | 20060501 | 12.5 | 3.15 | 0 |
| 16180558 | 20110201 | 12.625 | 2.25 | 2 |
| 16180327 | 20110201 | 13 | 2.25 | 2 |
| 16180586 | 20110201 | 12 | 2.25 | 2 |
| 16179932 | 20060501 | 9.95 | 3.45 | 0 |
| 16179985 | 20060501 | 9.95 | 3.45 | 0 |
| 16178959 | 20060501 | 9.999 | 4.4 | 0 |
| 16180326 | 20110201 | 12.625 | 2.25 | 2 |

Unassociated Document                                    Page 291 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 13 of 279

| | | | | |
|---|---|---|---|---|
| 16179646 | 20060501 | 9.95 | 3.5 | 0 |
| 16179148 | 20060501 | 9.95 | 3.025 | 0 |
| 16179162 | 20060501 | 9.95 | 3.7 | 0 |
| 16179740 | 20060501 | 9.95 | 3.45 | 0 |
| 16178713 | 20110201 | 11.375 | 2.25 | 2 |
| 16178645 | 20110201 | 12 | 2.25 | 2 |
| 16178548 | 20110201 | 11.5 | 3.25 | 1 |
| 16178243 | 20110201 | 10.75 | 2.25 | 2 |
| 16180518 | 20110201 | 12.875 | 2.25 | 2 |
| 16179121 | 20060501 | 9.95 | 3.525 | 0 |
| 16180587 | 20110201 | 12 | 2.25 | 2 |
| 16179933 | 20060501 | 9.95 | 3.325 | 0 |
| 16180186 | 20060501 | 12.5 | 2.875 | 0 |
| 16179986 | 20060501 | 9.95 | 3.45 | 0 |
| 16180420 | 20110201 | 12.875 | 2.25 | 2 |
| 16178733 | 20110301 | 11.375 | 2.25 | 2 |
| 16180487 | 20110201 | 12.375 | 2.25 | 2 |
| 16179067 | 20060501 | 9.999 | 3.75 | 0 |
| 16179170 | 20060501 | 9.95 | 3.775 | 0 |
| 16178416 | 20110201 | 11 | 2.25 | 2 |
| 16180067 | 20060501 | 12.5 | 3.825 | 0 |
| 16179057 | 20060501 | 9.999 | 4.2 | 0 |
| 16178200 | 20090201 | 11.75 | 2.25 | 2 |
| 16178201 | 20090201 | 12.5 | 2.25 | 2 |
| 16178202 | 20090101 | 11.75 | 2.25 | 2 |
| 16178203 | 20090201 | 12.375 | 2.25 | 2 |
| 16178204 | 20090201 | 12.625 | 2.25 | 2 |
| 16178205 | 20090201 | 11.875 | 2.25 | 2 |
| 16178206 | 20090101 | 12.625 | 2.25 | 2 |
| 16178207 | 20090101 | 12.25 | 2.25 | 2 |
| 16178208 | 20090201 | 11.75 | 2.25 | 2 |
| 16178209 | 20090101 | 12.25 | 2.25 | 2 |
| 16178841 | 20110301 | 12.375 | 2.25 | 2 |
| 16178762 | 20110301 | 12.5 | 2.25 | 2 |
| 16178843 | 20090301 | 13.25 | 2.25 | 2 |
| 16178763 | 20110301 | 12.5 | 2.25 | 2 |
| 16178845 | 20110301 | 12.5 | 2.25 | 2 |
| 16178846 | 20090301 | 13.375 | 2.25 | 2 |
| 16178684 | 20090301 | 13.375 | 2.25 | 2 |
| 16178847 | 20090301 | 12.125 | 2.25 | 2 |
| 16178685 | 20090201 | 12.5 | 2.25 | 2 |
| 16178686 | 20090301 | 13 | 2.25 | 2 |
| 16178848 | 20110301 | 12.5 | 2.25 | 2 |
| 16178849 | 20090301 | 12.375 | 2.25 | 2 |
| 16178687 | 20110301 | 12.375 | 2.25 | 2 |
| 16178210 | 20090201 | 12.875 | 2.25 | 2 |
| 16178211 | 20090201 | 12.375 | 2.25 | 2 |
| 16178212 | 20090201 | 12.375 | 2.25 | 2 |
| 16178213 | 20090201 | 12.75 | 2.25 | 2 |
| 16178214 | 20090201 | 12.5 | 2.25 | 2 |
| 16178215 | 20090201 | 11.5 | 2.25 | 2 |
| 16178850 | 20090301 | 12.75 | 2.25 | 2 |
| 16178852 | 20090301 | 12.25 | 2.25 | 2 |
| 16178853 | 20110301 | 12.5 | 2.25 | 2 |
| 16178772 | 20110301 | 12.5 | 2.25 | 2 |
| 16178854 | 20090301 | 12.625 | 2.25 | 2 |
| 16178692 | 20110301 | 12.5 | 2.25 | 2 |
| 16178774 | 20090301 | 13.375 | 2.25 | 2 |
| 16178857 | 20090301 | 13.375 | 2.25 | 2 |
| 16178858 | 20090301 | 12 | 2.25 | 2 |
| 16178859 | 20090301 | 12.625 | 2.25 | 2 |
| 16178697 | 20090301 | 13.375 | 2.25 | 2 |
| 16178779 | 20090301 | 12 | 2.25 | 2 |
| 16178301 | 20090201 | 13.375 | 2.25 | 2 |
| 16178303 | 20110101 | 12.5 | 2.25 | 2 |
| 16178305 | 20090101 | 12.375 | 2.75 | 2 |
| 16178307 | 20090201 | 13 | 2.25 | 2 |
| 16179831 | 20060501 | 9.95 | 3.5 | 0 |
| 16178860 | 20090301 | 11.75 | 2.25 | 2 |
| 16178863 | 20110301 | 12.5 | 2.25 | 2 |
| 16178866 | 20110301 | 12.5 | 2.25 | 2 |
| 16178786 | 20090301 | 12.5 | 2.25 | 2 |
| 16178868 | 20090301 | 12.875 | 2.25 | 2 |
| 16178787 | 20090301 | 13.375 | 2.25 | 2 |
| 16178869 | 20090301 | 13.375 | 2.25 | 2 |
| 16178311 | 20090101 | 12.25 | 2.25 | 2 |
| 16180194 | 20090101 | 12.875 | 2.25 | 2 |
| 16180195 | 20090201 | 13.075 | 2.25 | 2 |
| 16180196 | 20090201 | 13.5 | 2.25 | 2 |
| 16180197 | 20090201 | 12.375 | 2.25 | 2 |
| 16178317 | 20090101 | 12.625 | 3.375 | 1 |
| 16180198 | 20090201 | 12.75 | 2.25 | 2 |
| 16180199 | 20090201 | 13.5 | 2.25 | 2 |
| 16179921 | 20060501 | 9.95 | 3.45 | 0 |
| 16178319 | 20101201 | 12.875 | 3.5 | 1 |
| 16178870 | 20090301 | 13.375 | 2.25 | 2 |
| 16178790 | 20090301 | 12.25 | 2.25 | 2 |
| 16178872 | 20090301 | 12.5 | 2.25 | 2 |
| 16178873 | 20090301 | 12.125 | 2.25 | 2 |
| 16178792 | 20110301 | 12.5 | 2.25 | 2 |
| 16178874 | 20090301 | 13.125 | 2.25 | 2 |
| 16178794 | 20110301 | 12.5 | 2.25 | 2 |
| 16178875 | 20090301 | 12.625 | 2.25 | 2 |
| 16178876 | 20090301 | 12.875 | 2.25 | 2 |
| 16178795 | 20090301 | 13 | 2.25 | 2 |

Unassociated Document                                           Page 292 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 14 of 279

| | | | | |
|---|---|---|---|---|
| 16178877 | 20110301 | 12.5 | 2.25 | 2 |
| 16178322 | 20090201 | 12.875 | 2.25 | 2 |
| 16178880 | 20110301 | 12.375 | 2.25 | 2 |
| 16179771 | 20060501 | 9.95 | 3.5 | 0 |
| 16178882 | 20090301 | 13.375 | 2.25 | 2 |
| 16178883 | 20110301 | 12.5 | 2.25 | 2 |
| 16179778 | 20060501 | 9.95 | 2.875 | 0 |
| 16178170 | 20081201 | 12.625 | 3.25 | 1 |
| 16178173 | 20080901 | 13.125 | 3.25 | 2 |
| 16178336 | 20081201 | 11.75 | 2.25 | 2 |
| 16178174 | 20081201 | 13.25 | 2.25 | 2 |
| 16178177 | 20081201 | 12.5 | 3.25 | 2 |
| 16178259 | 20090101 | 13 | 3.25 | 2 |
| 16178178 | 20081101 | 13.25 | 3.25 | 2 |
| 16178179 | 20090101 | 12.625 | 2.25 | 2 |
| 16179785 | 20060501 | 9.95 | 3.5 | 0 |
| 16179787 | 20060501 | 9.95 | 2.875 | 0 |
| 16178502 | 20090201 | 11.875 | 2.25 | 2 |
| 16180626 | 20071201 | 11.875 | 2.25 | 2 |
| 16178503 | 20110201 | 12.5 | 2.25 | 2 |
| 16178180 | 20081201 | 11.875 | 3.25 | 2 |
| 16178504 | 20090201 | 13.125 | 2.25 | 2 |
| 16178263 | 20081201 | 11.875 | 2.25 | 2 |
| 16178506 | 20090201 | 12.875 | 2.25 | 2 |
| 16178184 | 20101201 | 12.5 | 2.25 | 2 |
| 16178508 | 20090201 | 12.5 | 2.25 | 2 |
| 16178186 | 20081201 | 13.375 | 3.25 | 2 |
| 16178267 | 20081201 | 11.875 | 2.25 | 2 |
| 16180385 | 20110201 | 13.25 | 2.25 | 2 |
| 16180449 | 20110201 | 12.875 | 2.25 | 2 |
| 16179601 | 20060501 | 9.95 | 3.45 | 0 |
| 16180286 | 20110201 | 12.375 | 2.25 | 2 |
| 16178355 | 20110101 | 11.875 | 2.75 | 2 |
| 16179713 | 20060501 | 9.95 | 3.45 | 0 |
| 16180054 | 20060501 | 12.5 | 3.2 | 0 |
| 16179761 | 20060501 | 9.95 | 3.45 | 0 |
| 16178775 | 20110301 | 11.875 | 2.25 | 2 |
| 16178286 | 20110201 | 11.625 | 3.25 | 1 |
| 16179516 | 20060501 | 9.95 | 3.5 | 0 |
| 16179407 | 20060501 | 9.95 | 3.5 | 0 |
| 16180246 | 20110201 | 12.875 | 2.25 | 2 |
| 16178481 | 20110201 | 12 | 2.25 | 2 |
| 16178519 | 20110201 | 11.625 | 2.25 | 2 |
| 16180479 | 20110201 | 12.625 | 2.25 | 2 |
| 16178890 | 20060501 | 9.95 | 3.9 | 0 |
| 16180549 | 20110201 | 12.375 | 2.25 | 2 |
| 16180319 | 20110201 | 12.5 | 2.25 | 2 |
| 16179089 | 20060501 | 9.999 | 3.8 | 0 |
| 16180450 | 20110201 | 12.85 | 2.25 | 2 |
| 16179165 | 20060501 | 9.95 | 4.05 | 0 |
| 16180058 | 20060501 | 12.5 | 3.7 | 0 |
| 16178405 | 20110201 | 11.5 | 2.25 | 2 |
| 16178314 | 20110201 | 11.875 | 2.25 | 2 |
| 16179714 | 20060501 | 9.95 | 3.2 | 0 |
| 16178783 | 20110301 | 11.375 | 2.25 | 2 |
| 16178524 | 20110201 | 11.25 | 2.25 | 2 |
| 16180247 | 20110201 | 13 | 2.25 | 2 |
| 16179390 | 20060501 | 9.95 | 3.45 | 0 |
| 16179982 | 20060501 | 9.95 | 3.45 | 0 |
| 16180480 | 20110201 | 12.25 | 2.25 | 2 |
| 16180550 | 20110201 | 12.375 | 2.25 | 2 |
| 16180320 | 20110201 | 13 | 2.25 | 2 |
| 16179415 | 20060501 | 9.95 | 3.45 | 0 |
| 16179738 | 20060501 | 9.95 | 2.95 | 0 |
| 16180451 | 20110201 | 12.875 | 2.25 | 2 |
| 16180144 | 20060501 | 12.5 | 3.15 | 0 |
| 16179602 | 20060501 | 9.95 | 3.45 | 0 |
| 16179146 | 20060501 | 9.95 | 3.7 | 0 |
| 16178428 | 20110201 | 11.25 | 2.25 | 2 |
| 16178644 | 20110201 | 11 | 2.25 | 2 |
| 16178401 | 20110101 | 11.875 | 3.5 | 2 |
| 16178691 | 20110301 | 11.625 | 2.25 | 2 |
| 16179301 | 20060501 | 9.95 | 3.525 | 0 |
| 16180248 | 20110201 | 12.75 | 2.25 | 2 |
| 16179254 | 20060501 | 9.95 | 3.525 | 0 |
| 16179391 | 20060501 | 9.95 | 3.45 | 0 |
| 16179983 | 20060501 | 9.95 | 3.45 | 0 |
| 16178225 | 20110201 | 11.875 | 2.25 | 2 |
| 16178562 | 20110201 | 11.375 | 2.25 | 2 |
| 16180481 | 20110201 | 12.125 | 2.25 | 2 |
| 16178489 | 20110201 | 11.25 | 2.25 | 2 |
| 16180551 | 20110201 | 12.25 | 2.25 | 2 |
| 16180321 | 20110201 | 13.5 | 2.25 | 2 |
| 16179779 | 20060501 | 9.95 | 3.5 | 0 |
| 16179009 | 20060501 | 9.999 | 2.875 | 0 |
| 16180386 | 20110101 | 12.875 | 2.25 | 2 |
| 16178785 | 20110301 | 11.5 | 2.25 | 2 |
| 16179048 | 20060501 | 9.999 | 4.4 | 0 |
| 16179715 | 20060501 | 9.95 | 3.45 | 0 |
| 16180138 | 20060501 | 12.5 | 3.575 | 0 |
| 16178390 | 20110101 | 11.875 | 2.25 | 2 |
| 16179984 | 20060501 | 9.95 | 3.45 | 0 |
| 16180416 | 20110201 | 13 | 2.25 | 2 |
| 16180482 | 20110201 | 12.125 | 2.25 | 2 |
| 16180552 | 20110201 | 12 | 2.25 | 2 |

| | | | |
|---|---|---|---|
| 16180322 | 20110201 | 13.5 | 2.25 | 2 |
| 16179416 | 20060501 | 9.95 | 3.45 | 0 |
| 16179090 | 20060501 | 9.999 | 4.4 | 0 |
| 16178976 | 20060501 | 9.999 | 4.4 | 0 |
| 16180387 | 20110201 | 12.125 | 2.25 | 2 |
| 16179183 | 20060501 | 9.95 | 2.65 | 0 |
| 16180052 | 20060501 | 12.5 | 2.925 | 0 |
| 16180178 | 20060501 | 12.5 | 4.575 | 0 |
| 16179739 | 20060501 | 9.95 | 3.45 | 0 |
| 16178992 | 20060501 | 9.999 | 3.6 | 0 |
| 16179072 | 20060501 | 9.999 | 4.125 | 0 |
| 16178429 | 20110201 | 11.5 | 2.25 | 2 |
| 16178226 | 20101101 | 11.5 | 2.25 | 2 |
| 16179202 | 20060501 | 9.95 | 3.25 | 0 |
| 16180417 | 20110201 | 12 | 2.25 | 2 |
| 16180483 | 20110201 | 13.25 | 2.25 | 2 |
| 16178473 | 20110201 | 11.375 | 2.25 | 2 |
| 16180553 | 20110201 | 12.125 | 2.25 | 2 |
| 16180323 | 20110201 | 13.5 | 2.25 | 2 |
| 16180388 | 20110201 | 12.875 | 2.25 | 2 |
| 16179830 | 20060501 | 9.95 | 3.5 | 0 |
| 16178297 | 20110201 | 11.625 | 3.25 | 1 |
| 16178505 | 20110201 | 12 | 2.25 | 2 |
| 16178483 | 20110201 | 11.625 | 2.25 | 2 |
| 16179306 | 20060501 | 9.95 | 3.45 | 0 |
| 16180079 | 20060501 | 12.5 | 3.45 | 0 |
| 16180584 | 20110201 | 12.125 | 2.25 | 2 |
| 16180418 | 20110201 | 12.5 | 2.25 | 2 |
| 16180484 | 20110201 | 12.25 | 2.25 | 2 |
| 16180554 | 20110201 | 12.375 | 2.25 | 2 |
| 16180324 | 20110201 | 13.5 | 2.25 | 2 |
| 16179417 | 20060501 | 9.95 | 3.45 | 0 |
| 16179091 | 20060501 | 9.999 | 3.75 | 0 |
| 16178437 | 20110201 | 11.75 | 2.25 | 2 |
| 16180169 | 20060501 | 12.5 | 3.15 | 0 |
| 16179619 | 20060501 | 9.95 | 3.5 | 0 |
| 16179960 | 20060501 | 9.95 | 2.875 | 0 |
| 16178541 | 20110201 | 10.875 | 2.25 | 2 |
| 16178265 | 20110101 | 11.75 | 2.25 | 2 |
| 16178462 | 20110201 | 11.875 | 2.25 | 2 |
| 16179196 | 20060501 | 9.95 | 3.7 | 0 |
| 16180585 | 20110201 | 12 | 2.25 | 2 |
| 16179931 | 20060501 | 9.95 | 3.45 | 0 |
| 16178227 | 20101101 | 11.25 | 2.25 | 2 |
| 16178511 | 20110201 | 11.5 | 2.25 | 2 |
| 16180419 | 20110201 | 12.125 | 2.25 | 2 |
| 16180485 | 20110201 | 12.25 | 2.25 | 2 |
| 16180555 | 20110201 | 12.375 | 2.25 | 2 |
| 16180325 | 20110201 | 12.75 | 2.25 | 2 |
| 16179418 | 20060501 | 9.95 | 3.45 | 0 |
| 16178717 | 20110301 | 11.625 | 2.25 | 2 |
| 16179177 | 20060501 | 9.95 | 3.7 | 0 |
| 16179092 | 20060501 | 9.999 | 3.75 | 0 |
| 16179161 | 20060501 | 9.95 | 3.525 | 0 |
| 16178729 | 20110301 | 11.375 | 2.25 | 2 |
| 16178406 | 20110101 | 11.25 | 2.25 | 2 |
| 16178716 | 20110301 | 12 | 2.25 | 2 |
| 16180047 | 20060501 | 12.5 | 3.15 | 0 |
| 16179348 | 20060501 | 9.95 | 2.95 | 0 |
| 16179531 | 20060501 | 9.95 | 3.45 | 0 |
| 16178189 | 20110201 | 11.125 | 2.25 | 1 |
| 16180099 | 20060501 | 12.5 | 3.225 | 0 |
| 16179884 | 20060501 | 9.95 | 3.45 | 0 |
| 16179684 | 20060501 | 9.95 | 3.45 | 0 |
| 16180152 | 20060501 | 12.5 | 3.45 | 0 |
| 16180092 | 20060501 | 12.5 | 3.2 | 0 |
| 16178829 | 20110301 | 12 | 2.25 | 2 |
| 16178761 | 20110301 | 11.375 | 2.25 | 2 |
| 16179774 | 20060501 | 9.95 | 2.625 | 0 |
| 16178961 | 20060501 | 9.999 | 4.43 | 0 |
| 16179206 | 20060501 | 9.95 | 3.525 | 0 |
| 16180443 | 20110201 | 12.75 | 2.25 | 2 |
| 16178280 | 20110101 | 11.125 | 2.25 | 2 |
| 16180281 | 20110201 | 12 | 2.25 | 2 |
| 16180350 | 20110201 | 12.5 | 2.25 | 2 |
| 16179757 | 20060501 | 9.95 | 3.45 | 0 |
| 16180241 | 20110201 | 12.625 | 2.25 | 2 |
| 16179293 | 20060501 | 9.95 | 3.4 | 0 |
| 16178468 | 20110201 | 11.5 | 2.25 | 2 |
| 16179232 | 20060501 | 9.95 | 3.025 | 0 |
| 16180053 | 20060501 | 12.5 | 3.7 | 0 |
| 16180061 | 20060501 | 12.5 | 3.45 | 0 |
| 16179386 | 20060501 | 9.95 | 3.45 | 0 |
| 16179367 | 20060501 | 9.95 | 3.45 | 0 |
| 16178610 | 20110201 | 12.25 | 2.25 | 2 |
| 16180444 | 20110201 | 12.5 | 2.25 | 2 |
| 16179070 | 20060501 | 9.999 | 3.75 | 0 |
| 16180282 | 20110201 | 12.5 | 2.25 | 2 |
| 16180351 | 20101201 | 11.875 | 2.25 | 2 |
| 16179710 | 20060501 | 9.95 | 3.45 | 0 |
| 16179758 | 20060501 | 9.95 | 3.45 | 0 |
| 16179579 | 20060501 | 9.95 | 3.325 | 0 |
| 16178944 | 20060501 | 9.999 | 2.8 | 0 |
| 16179142 | 20060501 | 9.95 | 3.525 | 0 |
| 16180193 | 20060501 | 12.5 | 3.375 | 0 |

| | | | | |
|---|---|---|---|---|
| 16178696 | 20110301 | 12 | 2.25 | 2 |
| 16178712 | 20110101 | 11.125 | 2.25 | 2 |
| 16178269 | 20101201 | 12.375 | 2.25 | 2 |
| 16180242 | 20110201 | 12 | 2.25 | 2 |
| 16179491 | 20060501 | 9.95 | 3.5 | 0 |
| 16180381 | 20110201 | 12.625 | 2.25 | 2 |
| 16180445 | 20110201 | 12.125 | 2.25 | 2 |
| 16179164 | 20060501 | 9.95 | 3.7 | 0 |
| 16180283 | 20110201 | 12.75 | 2.25 | 2 |
| 16178427 | 20110201 | 11.625 | 2.25 | 2 |
| 16180352 | 20101201 | 12.375 | 2.25 | 2 |
| 16179759 | 20060501 | 9.95 | 3.45 | 0 |
| 16179580 | 20060501 | 9.95 | 3.45 | 0 |
| 16178789 | 20110301 | 11.875 | 2.25 | 2 |
| 16180039 | 20060501 | 12.5 | 3.025 | 0 |
| 16179298 | 20060501 | 9.95 | 3.525 | 0 |
| 16180243 | 20110201 | 13.5 | 2.25 | 2 |
| 16179253 | 20060501 | 9.95 | 2.4 | 0 |
| 16179492 | 20060501 | 9.95 | 3.5 | 0 |
| 16180382 | 20110201 | 12.25 | 2.25 | 2 |
| 16180446 | 20110201 | 12.75 | 2.25 | 2 |
| 16179071 | 20060501 | 9.999 | 4.4 | 0 |
| 16180284 | 20110201 | 12.75 | 2.25 | 2 |
| 16180353 | 20110201 | 12.375 | 2.25 | 2 |
| 16180166 | 20060501 | 12.5 | 3.325 | 0 |
| 16178803 | 20110301 | 10.75 | 2.25 | 2 |
| 16179711 | 20060501 | 9.95 | 3.85 | 0 |
| 16179777 | 20060501 | 9.95 | 4.75 | 0 |
| 16179828 | 20060501 | 9.95 | 3.5 | 0 |
| 16180155 | 20060501 | 12.5 | 3.825 | 0 |
| 16180127 | 20060501 | 12.5 | 3.275 | 0 |
| 16179581 | 20060501 | 9.95 | 3.45 | 0 |
| 16180165 | 20060501 | 12.5 | 3.375 | 0 |
| 16180037 | 20060501 | 12.5 | 4.65 | 0 |
| 16180130 | 20060501 | 12.5 | 3.95 | 0 |
| 16179493 | 20060501 | 9.95 | 3.5 | 0 |
| 16179388 | 20060501 | 9.95 | 3.45 | 0 |
| 16178660 | 20110301 | 11.75 | 2.25 | 2 |
| 16180383 | 20110101 | 13.5 | 2.25 | 2 |
| 16180447 | 20110201 | 12.625 | 2.25 | 2 |
| 16178991 | 20060501 | 9.999 | 3.75 | 0 |
| 16178963 | 20060501 | 9.999 | 3.75 | 0 |
| 16179600 | 20060501 | 9.95 | 3.45 | 0 |
| 16180285 | 20110201 | 12.375 | 2.25 | 2 |
| 16179035 | 20060501 | 9.999 | 4 | 0 |
| 16179582 | 20060501 | 9.95 | 3.45 | 0 |
| 16178597 | 20110201 | 11.375 | 2.25 | 2 |
| 16180045 | 20060501 | 12.5 | 3.225 | 0 |
| 16180244 | 20110201 | 12.625 | 2.25 | 2 |
| 16178320 | 20090101 | 12.375 | 3.375 | 1 |
| 16179139 | 20060501 | 9.95 | 3.275 | 0 |
| 16178377 | 20101101 | 11.25 | 2.25 | 2 |
| 16180547 | 20110201 | 12.875 | 2.25 | 2 |
| 16180317 | 20110201 | 13 | 2.25 | 2 |
| 16178171 | 20100901 | 12 | 3.25 | 2 |
| 16180384 | 20110201 | 12.875 | 2.25 | 2 |
| 16180448 | 20110201 | 12.25 | 2.25 | 2 |
| 16178404 | 20110101 | 11.5 | 2.25 | 2 |
| 16179155 | 20060501 | 9.95 | 3.525 | 0 |
| 16179712 | 20060501 | 9.95 | 3.45 | 0 |
| 16180191 | 20060501 | 12.5 | 3.15 | 0 |
| 16178928 | 20060501 | 9.999 | 3.6 | 0 |
| 16179760 | 20060501 | 9.95 | 3.45 | 0 |
| 16178833 | 20110301 | 12 | 2.25 | 2 |
| 16179583 | 20060501 | 9.95 | 3.45 | 0 |
| 16178625 | 20110201 | 11.375 | 2.25 | 1 |
| 16178622 | 20110201 | 11.375 | 2.25 | 2 |
| 16179299 | 20060501 | 9.95 | 3.525 | 0 |
| 16180245 | 20110201 | 12.25 | 2.25 | 2 |
| 16179484 | 20060501 | 9.95 | 3.5 | 0 |
| 16179272 | 20060501 | 9.95 | 3.55 | 0 |
| 16179495 | 20060501 | 9.95 | 3.5 | 0 |
| 16178608 | 20110301 | 11 | 2.25 | 2 |
| 16180548 | 20110201 | 12 | 2.25 | 2 |
| 16180318 | 20110201 | 12.5 | 2.25 | 2 |
| 16179260 | 20060501 | 9.95 | 3.15 | 0 |
| 16179863 | 20060501 | 9.95 | 3.45 | 0 |
| 16179195 | 20060501 | 9.95 | 3.525 | 0 |
| 16180621 | 20110201 | 12.625 | 2.25 | 2 |
| 16178884 | 20060501 | 9.95 | 3.7 | 0 |
| 16179405 | 20060501 | 9.95 | 3.45 | 0 |
| 16180347 | 20110201 | 12.5 | 2.25 | 2 |
| 16179575 | 20060501 | 9.95 | 3.45 | 0 |
| 16178892 | 20060501 | 9.95 | 3.275 | 0 |
| 16178851 | 20110201 | 11.375 | 2.25 | 2 |
| 16179792 | 20060501 | 9.95 | 3.5 | 0 |
| 16178736 | 20110201 | 11.75 | 2.75 | 2 |
| 16178767 | 20110201 | 10.875 | 2.25 | 2 |
| 16179230 | 20060501 | 9.95 | 3.95 | 0 |
| 16179113 | 20060501 | 9.95 | 3.4 | 0 |
| 16179864 | 20060501 | 9.95 | 3.45 | 0 |
| 16178369 | 20101101 | 11.125 | 2.25 | 2 |
| 16179365 | 20060501 | 9.95 | 3.45 | 0 |
| 16180278 | 20110201 | 12.875 | 2.25 | 2 |
| 16180348 | 20110201 | 13.625 | 2.25 | 2 |

| | | | | |
|---|---|---|---|---|
| 16179802 | 20060501 | 9.95 | 2.725 | 0 |
| 16178626 | 20110201 | 11.875 | 2.25 | 2 |
| 16179137 | 20060501 | 9.95 | 2.9 | 0 |
| 16179248 | 20060501 | 9.95 | 3.95 | 0 |
| 16178386 | 20110101 | 10.5 | 2.25 | 2 |
| 16179261 | 20060501 | 9.95 | 3.525 | 0 |
| 16179910 | 20060501 | 9.95 | 3.45 | 0 |
| 16179487 | 20060501 | 9.95 | 2.875 | 0 |
| 16180279 | 20110201 | 12.25 | 2.25 | 2 |
| 16179060 | 20060501 | 9.999 | 4.4 | 0 |
| 16179577 | 20060501 | 9.95 | 3.45 | 0 |
| 16179803 | 20060501 | 9.95 | 2.725 | 0 |
| 16179618 | 20060501 | 9.95 | 3.5 | 0 |
| 16178764 | 20110301 | 11.875 | 2.25 | 2 |
| 16178282 | 20110101 | 11.75 | 2.25 | 2 |
| 16179292 | 20060501 | 9.95 | 3.525 | 0 |
| 16179231 | 20060501 | 9.95 | 3.275 | 0 |
| 16179138 | 20060501 | 9.95 | 2.9 | 0 |
| 16178376 | 20101101 | 11.375 | 2.25 | 2 |
| 16179100 | 20060501 | 9.95 | 3.525 | 0 |
| 16180184 | 20060501 | 12.5 | 3.7 | 0 |
| 16180442 | 20110201 | 12.75 | 2.25 | 2 |
| 16180349 | 20101201 | 11.875 | 2.25 | 2 |
| 16179578 | 20060501 | 9.95 | 3.45 | 0 |
| 16179804 | 20060501 | 9.95 | 2.725 | 0 |
| 16179045 | 20060501 | 9.999 | 4.125 | 0 |
| 16180051 | 20060501 | 12.5 | 4.45 | 0 |
| 16178893 | 20060501 | 9.95 | 3.45 | 0 |
| 16179806 | 20060501 | 9.95 | 3.075 | 0 |
| 16180257 | 20110201 | 12.75 | 2.25 | 2 |
| 16179700 | 20060501 | 9.95 | 3.45 | 0 |
| 16178828 | 20110301 | 12.5 | 2.25 | 2 |
| 16178748 | 20110301 | 12.375 | 2.25 | 2 |
| 16178668 | 20110201 | 12.375 | 2.25 | 2 |
| 16178589 | 20090201 | 12.5 | 2.25 | 2 |
| 16180075 | 20060501 | 12.5 | 3.45 | 0 |
| 16180159 | 20060501 | 12.5 | 3.2 | 0 |
| 16179801 | 20060501 | 9.95 | 3.5 | 0 |
| 16178830 | 20090301 | 13 | 2.25 | 2 |
| 16178831 | 20110301 | 12.5 | 2.25 | 2 |
| 16179628 | 20060501 | 9.95 | 3.45 | 0 |
| 16180582 | 20110201 | 12.625 | 2.25 | 2 |
| 16179439 | 20060501 | 9.95 | 3.45 | 0 |
| 16180415 | 20110201 | 12.25 | 2.25 | 2 |
| 16180146 | 20060501 | 12.5 | 3.3 | 0 |
| 16180115 | 20060501 | 12.5 | 4.075 | 0 |
| 16178415 | 20110201 | 11.5 | 2.25 | 2 |
| 16179665 | 20060501 | 9.95 | 3.45 | 0 |
| 16180119 | 20060501 | 12.5 | 3.375 | 0 |
| 16178588 | 20110201 | 11.375 | 2.25 | 2 |
| 16179520 | 20060501 | 9.95 | 3.5 | 0 |
| 16178368 | 20101201 | 11.625 | 2.25 | 2 |
| 16180620 | 20110201 | 12.875 | 2.25 | 2 |
| 16179953 | 20060501 | 9.95 | 3.45 | 0 |
| 16180109 | 20060501 | 12.5 | 3.175 | 0 |
| 16179563 | 20060501 | 9.95 | 3.45 | 0 |
| 16178832 | 20110301 | 12.5 | 2.25 | 2 |
| 16179480 | 20060501 | 9.95 | 4.875 | 0 |
| 16179481 | 20060501 | 9.95 | 3.5 | 0 |
| 16178834 | 20090301 | 13.375 | 2.25 | 2 |
| 16178591 | 20090201 | 12.5 | 2.25 | 2 |
| 16179644 | 20060501 | 9.95 | 3.5 | 0 |
| 16178754 | 20090301 | 13.125 | 2.25 | 2 |
| 16179483 | 20060501 | 9.95 | 3.5 | 0 |
| 16178835 | 20090301 | 12.25 | 2.25 | 2 |
| 16178836 | 20110301 | 12.375 | 2.25 | 2 |
| 16178755 | 20090301 | 12.875 | 2.25 | 2 |
| 16178593 | 20090201 | 12.625 | 2.25 | 2 |
| 16178756 | 20090301 | 13 | 2.25 | 2 |
| 16180183 | 20060501 | 12.5 | 3.4 | 0 |
| 16180174 | 20060501 | 12.5 | 3.2 | 0 |
| 16180044 | 20060501 | 12.5 | 3.275 | 0 |
| 16179545 | 20060501 | 9.95 | 3.45 | 0 |
| 16180346 | 20101101 | 12.25 | 2.25 | 2 |
| 16178323 | 20110101 | 11.875 | 2.25 | 2 |
| 16178586 | 20110201 | 12 | 2.25 | 2 |
| 16180219 | 20110201 | 12 | 2.25 | 2 |
| 16180188 | 20060501 | 12.5 | 3.7 | 0 |
| 16179916 | 20060501 | 9.95 | 3.45 | 0 |
| 16178455 | 20110101 | 11.125 | 3.25 | 1 |
| 16179621 | 20060501 | 9.95 | 3.5 | 0 |
| 16180288 | 20110201 | 12.625 | 2.25 | 2 |
| 16178594 | 20090201 | 11.875 | 2.25 | 2 |
| 16178676 | 20090201 | 12.625 | 2.25 | 2 |
| 16178757 | 20110301 | 12.5 | 2.25 | 2 |
| 16178838 | 20110301 | 12.5 | 2.25 | 2 |
| 16178758 | 20110301 | 12.5 | 2.25 | 2 |
| 16178596 | 20090201 | 12.5 | 2.25 | 2 |
| 16178759 | 20110301 | 12.5 | 2.25 | 2 |
| 16179569 | 20060501 | 9.95 | 3.45 | 0 |
| 16178678 | 20110301 | 12.5 | 2.25 | 2 |
| 16178679 | 20090301 | 12 | 2.25 | 2 |
| 16179327 | 20060501 | 9.95 | 3.5 | 0 |
| 16178780 | 20110301 | 11.5 | 2.25 | 2 |
| 16179347 | 20060501 | 9.95 | 3.075 | 0 |

| | | | | |
|---|---|---|---|---|
| 16180614 | 20110201 | 12.75 | 2.25 | 2 |
| 16179948 | 20060501 | 9.95 | 3.45 | 0 |
| 16178656 | 20110201 | 10.875 | 2.25 | 2 |
| 16179044 | 20060501 | 9.95 | 3.1 | 0 |
| 16179620 | 20060501 | 9.95 | 4 | 0 |
| 16180132 | 20060501 | 12.5 | 4.2 | 0 |
| 16178771 | 20110201 | 10.75 | 2.75 | 2 |
| 16178682 | 20110101 | 11.5 | 2.25 | 2 |
| 16179136 | 20060501 | 9.95 | 2.9 | 0 |
| 16179175 | 20060501 | 9.95 | 3.95 | 0 |
| 16180357 | 20110201 | 12.875 | 2.25 | 2 |
| 16179763 | 20060501 | 9.95 | 3.45 | 0 |
| 16179585 | 20060501 | 9.95 | 3.45 | 0 |
| 16180258 | 20110201 | 12 | 2.25 | 2 |
| 16179701 | 20060501 | 9.95 | 2.95 | 0 |
| 16179653 | 20060501 | 9.95 | 3.45 | 0 |
| 16178922 | 20060501 | 9.99 | 2.95 | 0 |
| 16178598 | 20090201 | 11.75 | 2.25 | 2 |
| 16178599 | 20110201 | 12.375 | 2.25 | 2 |
| 16180512 | 20110201 | 12.375 | 2.25 | 2 |
| 16179247 | 20060501 | 9.95 | 2.9 | 0 |
| 16179099 | 20060501 | 9.95 | 3.7 | 0 |
| 16179952 | 20060501 | 9.95 | 3.45 | 0 |
| 16179466 | 20060501 | 9.95 | 3.45 | 0 |
| 16179364 | 20060501 | 9.95 | 3.45 | 0 |
| 16178659 | 20110201 | 12.375 | 2.25 | 2 |
| 16178820 | 20090301 | 13.375 | 2.25 | 2 |
| 16178741 | 20090301 | 12.75 | 2.25 | 2 |
| 16179552 | 20060501 | 9.95 | 3.5 | 0 |
| 16178742 | 20110301 | 12.5 | 2.25 | 2 |
| 16178580 | 20090201 | 12.5 | 2.25 | 2 |
| 16178661 | 20090301 | 12.125 | 2.25 | 2 |
| 16178823 | 20110301 | 12.5 | 2.25 | 2 |
| 16178743 | 20090301 | 12.5 | 2.25 | 2 |
| 16179553 | 20060501 | 9.95 | 3.5 | 0 |
| 16178824 | 20090301 | 12 | 2.25 | 2 |
| 16179554 | 20060501 | 9.95 | 3.5 | 0 |
| 16178663 | 20110301 | 12.5 | 2.25 | 2 |
| 16178826 | 20090301 | 12.5 | 2.25 | 2 |
| 16178745 | 20110301 | 12.375 | 2.25 | 2 |
| 16178583 | 20090201 | 13.125 | 2.25 | 2 |
| 16179404 | 20060501 | 9.95 | 3.45 | 0 |
| 16180345 | 20101201 | 12.125 | 2.25 | 2 |
| 16179683 | 20060501 | 9.95 | 3.45 | 0 |
| 16179829 | 20060501 | 9.95 | 4 | 0 |
| 16179762 | 20060501 | 9.95 | 3.325 | 0 |
| 16180126 | 20060501 | 12.5 | 3.15 | 0 |
| 16180033 | 20060501 | 12.5 | 3.95 | 0 |
| 16179555 | 20060501 | 9.95 | 3.75 | 0 |
| 16178827 | 20090301 | 12 | 2.25 | 2 |
| 16179670 | 20060501 | 9.95 | 3.45 | 0 |
| 16179861 | 20060501 | 9.95 | 3.45 | 0 |
| 16178675 | 20110301 | 11.5 | 2.25 | 2 |
| 16179249 | 20060501 | 9.95 | 2.95 | 0 |
| 16179115 | 20060501 | 9.95 | 3.7 | 0 |
| 16178398 | 20081001 | 12.375 | 3.5 | 2 |
| 16180200 | 20090201 | 12.5 | 2.25 | 2 |
| 16180201 | 20090201 | 12.25 | 2.25 | 2 |
| 16179216 | 20060501 | 9.95 | 3.15 | 0 |
| 16179315 | 20060501 | 9.95 | 2.95 | 0 |
| 16180202 | 20090201 | 12.625 | 2.25 | 2 |
| 16180204 | 20090101 | 13.175 | 2.25 | 2 |
| 16180205 | 20090101 | 12.5 | 2.25 | 2 |
| 16180206 | 20090201 | 12.875 | 2.25 | 2 |
| 16180207 | 20090201 | 13 | 2.25 | 2 |
| 16180208 | 20090201 | 13.5 | 2.25 | 2 |
| 16180209 | 20090201 | 13.175 | 2.25 | 2 |
| 16179476 | 20060501 | 9.95 | 2.95 | 0 |
| 16180179 | 20060501 | 12.5 | 4.075 | 0 |
| 16179530 | 20060501 | 9.95 | 3.5 | 0 |
| 16179611 | 20060501 | 9.95 | 3.875 | 0 |
| 16180255 | 20110201 | 12.25 | 2.25 | 2 |
| 16178920 | 20060501 | 9.99 | 3.5 | 0 |
| 16178801 | 20090301 | 12.375 | 2.25 | 2 |
| 16179613 | 20060501 | 9.95 | 4 | 0 |
| 16178641 | 20090301 | 12.625 | 2.25 | 2 |
| 16178722 | 20110301 | 12.5 | 2.25 | 2 |
| 16178444 | 20110201 | 11.375 | 2.25 | 2 |
| 16179561 | 20060501 | 9.95 | 3.2 | 0 |
| 16178804 | 20090301 | 12.375 | 2.25 | 2 |
| 16178561 | 20090201 | 12 | 2.25 | 2 |
| 16180414 | 20110201 | 12.875 | 2.25 | 2 |
| 16178436 | 20110201 | 11.5 | 2.25 | 2 |
| 16179226 | 20060501 | 9.95 | 3.525 | 0 |
| 16180619 | 20110201 | 12 | 2.25 | 2 |
| 16178290 | 20110101 | 12.625 | 3.5 | 2 |
| 16178293 | 20110101 | 12 | 3.25 | 2 |
| 16178770 | 20110201 | 11.125 | 2.25 | 2 |
| 16179233 | 20060501 | 9.95 | 3.45 | 0 |
| 16178642 | 20110201 | 12.375 | 2.25 | 2 |
| 16178724 | 20090201 | 12.875 | 2.25 | 2 |
| 16179346 | 20060501 | 9.95 | 3.075 | 0 |
| 16179840 | 20060501 | 9.95 | 3.45 | 0 |
| 16180217 | 20110201 | 12.125 | 2.25 | 2 |
| 16178643 | 20090201 | 12.5 | 2.25 | 2 |

| | | | | |
|---|---|---|---|---|
| 16178806 | 20090301 | 11.75 | 2.25 | 2 |
| 16178484 | 20090201 | 13 | 2.25 | 2 |
| 16178565 | 20090201 | 13.25 | 2.25 | 2 |
| 16178889 | 20060501 | 9.95 | 3.7 | 0 |
| 16179632 | 20060501 | 9.95 | 3.325 | 0 |
| 16178646 | 20090201 | 12.25 | 2.25 | 2 |
| 16178727 | 20110301 | 12.5 | 2.25 | 2 |
| 16178647 | 20110301 | 12.5 | 2.25 | 2 |
| 16178567 | 20090201 | 12.5 | 2.25 | 2 |
| 16179947 | 20060501 | 9.95 | 3.45 | 0 |
| 16179488 | 20060501 | 9.95 | 2.875 | 0 |
| 16179914 | 20060501 | 9.95 | 3.45 | 0 |
| 16178486 | 20090201 | 12.5 | 2.25 | 2 |
| 16178649 | 20090201 | 12.75 | 2.25 | 2 |
| 16178488 | 20090201 | 13.5 | 2.25 | 2 |
| 16180210 | 20090201 | 12.875 | 2.25 | 2 |
| 16180211 | 20090201 | 12.875 | 2.25 | 2 |
| 16180212 | 20090201 | 12.5 | 2.25 | 2 |
| 16180147 | 20060501 | 12.5 | 3 | 0 |
| 16180213 | 20090101 | 12.625 | 2.25 | 2 |
| 16180214 | 20090201 | 12.5 | 2.25 | 2 |
| 16180215 | 20090201 | 12.75 | 2.25 | 2 |
| 16180216 | 20090101 | 12 | 2.25 | 2 |
| 16178172 | 20101201 | 11.125 | 2.25 | 1 |
| 16178493 | 20110201 | 11.375 | 2.25 | 2 |
| 16180355 | 20110201 | 12.875 | 2.25 | 2 |
| 16178730 | 20090301 | 13.375 | 2.25 | 2 |
| 16178811 | 20090301 | 13.375 | 2.25 | 2 |
| 16178812 | 20090301 | 13.375 | 2.25 | 2 |
| 16178650 | 20090201 | 13.25 | 2.25 | 2 |
| 16179622 | 20060501 | 9.95 | 4 | 0 |
| 16178570 | 20090201 | 12.875 | 2.25 | 2 |
| 16180256 | 20110201 | 12.75 | 2.25 | 2 |
| 16179032 | 20060501 | 9.999 | 3.6 | 0 |
| 16178921 | 20060501 | 9.999 | 3.5 | 0 |
| 16179081 | 20060501 | 9.999 | 4.375 | 0 |
| 16178447 | 20110201 | 11.75 | 2.25 | 2 |
| 16178571 | 20090201 | 13.125 | 2.25 | 2 |
| 16178814 | 20090301 | 13.5 | 2.25 | 2 |
| 16179562 | 20060501 | 9.95 | 3.45 | 0 |
| 16178799 | 20110301 | 11.5 | 2.25 | 2 |
| 16178490 | 20110201 | 12.5 | 2.25 | 2 |
| 16179624 | 20060501 | 9.95 | 3.5 | 0 |
| 16179363 | 20060501 | 9.95 | 3.45 | 0 |
| 16179051 | 20060501 | 9.999 | 4.375 | 0 |
| 16178549 | 20110201 | 11.75 | 3.25 | 1 |
| 16178605 | 20110201 | 11.375 | 2.25 | 2 |
| 16179234 | 20060501 | 9.95 | 3.525 | 0 |
| 16178815 | 20090301 | 13.375 | 2.25 | 2 |
| 16178734 | 20090301 | 12.5 | 3.25 | 2 |
| 16178241 | 20101201 | 11.25 | 2.25 | 2 |
| 16179105 | 20060501 | 9.95 | 3.525 | 0 |
| 16180218 | 20110201 | 12.875 | 2.25 | 2 |
| 16178318 | 20090101 | 11.999 | 3.375 | 1 |
| 16178654 | 20090301 | 12.375 | 2.25 | 2 |
| 16178655 | 20090301 | 12.875 | 2.25 | 2 |
| 16179915 | 20060501 | 9.95 | 3.45 | 0 |
| 16178818 | 20110301 | 12.5 | 2.25 | 2 |
| 16178819 | 20090301 | 12.125 | 2.25 | 2 |
| 16179221 | 20060501 | 9.95 | 3.15 | 2 |
| 16178495 | 20090201 | 13.375 | 2.25 | 2 |
| 16178576 | 20090201 | 12.875 | 2.25 | 2 |
| 16178496 | 20110201 | 12.5 | 2.25 | 2 |
| 16179549 | 20060501 | 9.95 | 3.5 | 0 |
| 16178578 | 20090201 | 12.625 | 2.25 | 2 |
| 16178497 | 20110201 | 12.5 | 2.25 | 2 |
| 16179477 | 20060501 | 9.95 | 3.45 | 0 |
| 16179369 | 20060501 | 9.95 | 3.45 | 0 |
| 16180287 | 20110201 | 12 | 2.25 | 2 |
| 16180356 | 20110101 | 13.125 | 2.25 | 2 |
| 16178632 | 20090201 | 12.375 | 2.25 | 2 |
| 16179524 | 20060501 | 9.95 | 3.5 | 0 |
| 16178471 | 20090201 | 12.375 | 2.25 | 2 |
| 16178552 | 20090101 | 12.125 | 2.25 | 2 |
| 16178633 | 20110201 | 12.5 | 2.25 | 2 |
| 16178634 | 20110101 | 12.5 | 2.25 | 2 |
| 16179525 | 20060501 | 9.95 | 4 | 0 |
| 16180254 | 20110201 | 12.25 | 2.25 | 2 |
| 16178919 | 20060501 | 9.999 | 3.4 | 0 |
| 16178472 | 20090201 | 12.375 | 2.25 | 2 |
| 16178392 | 20090101 | 11.875 | 2.25 | 2 |
| 16179608 | 20060501 | 9.95 | 3.5 | 0 |
| 16178555 | 20110201 | 12.375 | 2.25 | 2 |
| 16179527 | 20060501 | 9.95 | 3.75 | 0 |
| 16179609 | 20060501 | 9.95 | 3.5 | 0 |
| 16178556 | 20090201 | 13.375 | 2.25 | 2 |
| 16178475 | 20090201 | 12.625 | 2.25 | 2 |
| 16178394 | 20110201 | 12.375 | 2.25 | 2 |
| 16179366 | 20060501 | 9.95 | 2.95 | 0 |
| 16178637 | 20110201 | 12.5 | 2.25 | 2 |
| 16178718 | 20090301 | 12.25 | 2.25 | 2 |
| 16178476 | 20110201 | 12.5 | 2.25 | 2 |
| 16178719 | 20090301 | 12.25 | 2.25 | 2 |
| 16180581 | 20110201 | 12 | 2.25 | 2 |
| 16179438 | 20060501 | 9.95 | 3.45 | 0 |

| | | | | |
|---|---|---|---|---|
| 16179529 | 20060501 | 9.95 | 3.5 | 0 |
| 16178395 | 20110201 | 12.5 | 2.25 | 2 |
| 16178396 | 20110201 | 12.5 | 2.25 | 2 |
| 16178798 | 20110301 | 11.375 | 2.25 | 2 |
| 16178952 | 20060501 | 9.999 | 3.65 | 0 |
| 16178958 | 20060501 | 9.999 | 3.4 | 0 |
| 16179011 | 20060501 | 9.999 | 4.375 | 0 |
| 16179368 | 20060501 | 9.95 | 2.95 | 0 |
| 16178397 | 20081101 | 12 | 2.75 | 2 |
| 16178238 | 20101201 | 12.125 | 2.25 | 2 |
| 16180577 | 20110201 | 12.375 | 2.25 | 2 |
| 16179980 | 20060501 | 9.95 | 3.45 | 0 |
| 16178224 | 20101101 | 10.875 | 2.25 | 2 |
| 16179179 | 20060501 | 9.95 | 3.15 | 0 |
| 16180409 | 20110201 | 12.875 | 2.25 | 2 |
| 16179786 | 20060501 | 9.95 | 3.5 | 0 |
| 16179066 | 20060501 | 9.999 | 3.5 | 0 |
| 16180545 | 20110201 | 13.5 | 2.25 | 2 |
| 16180315 | 20110201 | 12.875 | 2.25 | 2 |
| 16178413 | 20110101 | 11.5 | 2.25 | 2 |
| 16178985 | 20060501 | 9.999 | 3.2 | 0 |
| 16179313 | 20060501 | 11.95 | 3.5 | 0 |
| 16178403 | 20110101 | 11.5 | 2.25 | 2 |
| 16180125 | 20060501 | 12.5 | 2.925 | 0 |
| 16178891 | 20060501 | 9.95 | 3.925 | 0 |
| 16178750 | 20110301 | 11.625 | 2.25 | 2 |
| 16178299 | 20110101 | 11.625 | 2.25 | 2 |
| 16178560 | 20110201 | 11.625 | 2.25 | 2 |
| 16179208 | 20060501 | 9.95 | 3.525 | 0 |
| 16179880 | 20060501 | 9.95 | 3.325 | 0 |
| 16179307 | 20060501 | 9.95 | 3.5 | 0 |
| 16179180 | 20060501 | 9.95 | 3.45 | 0 |
| 16180410 | 20110201 | 12.375 | 2.25 | 2 |
| 16180476 | 20110201 | 12.875 | 2.25 | 2 |
| 16179836 | 20060501 | 9.95 | 3.075 | 0 |
| 16180066 | 20060501 | 12.5 | 3.45 | 0 |
| 16180316 | 20110201 | 12.5 | 2.25 | 2 |
| 16178974 | 20060501 | 9.999 | 4.2 | 0 |
| 16178435 | 20110201 | 11.5 | 2.25 | 2 |
| 16178723 | 20110301 | 11.5 | 2.25 | 2 |
| 16178183 | 20110201 | 11.625 | 2.25 | 2 |
| 16179344 | 20060501 | 9.95 | 3.075 | 0 |
| 16179309 | 20060501 | 9.95 | 3.45 | 0 |
| 16179341 | 20060501 | 9.95 | 3.45 | 0 |
| 16178302 | 20110201 | 11.625 | 2.25 | 2 |
| 16178239 | 20110201 | 11.875 | 2.25 | 2 |
| 16179209 | 20060501 | 9.95 | 3.525 | 0 |
| 16180509 | 20110201 | 13 | 2.25 | 2 |
| 16179010 | 20060501 | 9.999 | 4.375 | 0 |
| 16180411 | 20110201 | 12 | 2.25 | 2 |
| 16180477 | 20110201 | 12.125 | 2.25 | 2 |
| 16179837 | 20060501 | 9.95 | 3.325 | 0 |
| 16179413 | 20060501 | 9.95 | 3.45 | 0 |
| 16178414 | 20110201 | 11.5 | 2.25 | 2 |
| 16178975 | 20060501 | 9.999 | 4.375 | 0 |
| 16180040 | 20060501 | 12.5 | 3.275 | 0 |
| 16178509 | 20110201 | 10.875 | 2.25 | 2 |
| 16180510 | 20110201 | 12.375 | 2.25 | 2 |
| 16178494 | 20110201 | 11.25 | 2.25 | 2 |
| 16180579 | 20110201 | 13.375 | 2.25 | 2 |
| 16179781 | 20060501 | 9.95 | 4.75 | 0 |
| 16179436 | 20060501 | 9.95 | 3.2 | 0 |
| 16180412 | 20110201 | 12.375 | 2.25 | 2 |
| 16180478 | 20110201 | 12.375 | 2.25 | 2 |
| 16179001 | 20060501 | 9.999 | 3.8 | 0 |
| 16179736 | 20060501 | 9.95 | 3.45 | 0 |
| 16178621 | 20110301 | 11.375 | 2.25 | 2 |
| 16179503 | 20060501 | 9.95 | 3.325 | 0 |
| 16178617 | 20110301 | 12.5 | 3.25 | 2 |
| 16178572 | 20110201 | 11.75 | 2.25 | 2 |
| 16178753 | 20110101 | 12 | 2.25 | 2 |
| 16179623 | 20060501 | 9.95 | 3.5 | 0 |
| 16178240 | 20110201 | 11.625 | 2.25 | 2 |
| 16180580 | 20110201 | 12.625 | 2.25 | 2 |
| 16179981 | 20060501 | 9.95 | 3.45 | 0 |
| 16179437 | 20060501 | 9.95 | 3.325 | 0 |
| 16180413 | 20110201 | 12.75 | 2.25 | 2 |
| 16179076 | 20060501 | 9.999 | 4.449 | 0 |
| 16179737 | 20060501 | 9.95 | 3.45 | 0 |
| 16178340 | 20110101 | 12.875 | 2.25 | 2 |
| 16178816 | 20110301 | 11.875 | 2.25 | 2 |
| 16179627 | 20060501 | 9.95 | 3.45 | 0 |
| 16179006 | 20060501 | 9.999 | 4 | 0 |
| 16178518 | 20110201 | 11.375 | 2.25 | 2 |
| 16179977 | 20060501 | 9.95 | 3.45 | 0 |
| 16179190 | 20060501 | 9.89 | 3.525 | 0 |
| 16180472 | 20110201 | 13 | 2.25 | 2 |
| 16180541 | 20110201 | 12.625 | 2.25 | 2 |
| 16180311 | 20110201 | 12.75 | 2.25 | 2 |
| 16179410 | 20060501 | 9.95 | 3.45 | 0 |
| 16178658 | 20110301 | 11.875 | 2.25 | 2 |
| 16179176 | 20060501 | 9.95 | 3.7 | 0 |
| 16180378 | 20110201 | 12.875 | 2.25 | 2 |
| 16178989 | 20060501 | 9.999 | 4.4 | 0 |
| 16179732 | 20060501 | 9.95 | 3.45 | 0 |

| | | | | |
|---|---|---|---|---|
| 16178728 | 20110301 | 11.625 | 2.25 | 2 |
| 16178454 | 20110201 | 11.875 | 2.25 | 2 |
| 16178402 | 20110101 | 11.375 | 2.25 | 2 |
| 16179697 | 20060501 | 9.95 | 3.45 | 0 |
| 16178595 | 20110201 | 11.375 | 2.25 | 2 |
| 16180107 | 20060501 | 12.5 | 4.075 | 0 |
| 16180240 | 20110201 | 12.375 | 2.25 | 2 |
| 16178363 | 20110101 | 11 | 2.25 | 2 |
| 16178602 | 20110201 | 11.75 | 2.25 | 2 |
| 16179978 | 20060501 | 9.95 | 3.45 | 0 |
| 16180406 | 20110201 | 12.125 | 2.25 | 2 |
| 16180473 | 20110201 | 12.25 | 2.25 | 2 |
| 16180542 | 20110201 | 12.75 | 2.25 | 2 |
| 16180312 | 20110201 | 13 | 2.25 | 2 |
| 16179411 | 20060501 | 9.95 | 3.45 | 0 |
| 16179056 | 20060501 | 9.999 | 4.4 | 0 |
| 16180379 | 20110201 | 12.625 | 2.25 | 2 |
| 16178434 | 20110201 | 11.5 | 2.25 | 2 |
| 16179733 | 20060501 | 9.95 | 3.45 | 0 |
| 16178704 | 20110201 | 11.5 | 2.25 | 2 |
| 16179820 | 20060501 | 9.95 | 2.725 | 0 |
| 16180128 | 20060501 | 12.5 | 3.15 | 0 |
| 16180153 | 20060501 | 12.5 | 2.925 | 0 |
| 16178426 | 20110101 | 11.25 | 2.25 | 2 |
| 16179698 | 20060501 | 9.95 | 3.45 | 0 |
| 16180114 | 20060501 | 12.5 | 4.075 | 0 |
| 16179283 | 20060501 | 9.95 | 3.525 | 0 |
| 16178381 | 20110101 | 11.875 | 2.25 | 2 |
| 16178900 | 20060501 | 9.95 | 3.525 | 0 |
| 16178342 | 20101201 | 12.875 | 2.25 | 2 |
| 16178223 | 20101101 | 11.625 | 2.25 | 2 |
| 16180407 | 20110201 | 12.25 | 2.25 | 2 |
| 16180474 | 20110201 | 13.375 | 2.25 | 2 |
| 16179168 | 20060501 | 9.95 | 2.725 | 0 |
| 16180543 | 20110201 | 13.375 | 2.25 | 2 |
| 16180313 | 20110201 | 13.5 | 2.25 | 2 |
| 16179087 | 20060501 | 9.999 | 4.375 | 0 |
| 16180380 | 20110201 | 12.5 | 2.25 | 2 |
| 16179734 | 20060501 | 9.95 | 3.45 | 0 |
| 16178715 | 20110301 | 11 | 2.25 | 2 |
| 16179521 | 20060501 | 9.95 | 3.875 | 0 |
| 16178327 | 20110101 | 12.125 | 2.375 | 2 |
| 16179284 | 20060501 | 9.95 | 3.525 | 0 |
| 16178613 | 20110301 | 11.625 | 2.25 | 2 |
| 16180576 | 20110201 | 13.125 | 2.25 | 2 |
| 16178557 | 20110201 | 11.5 | 2.25 | 2 |
| 16179979 | 20060501 | 9.95 | 3.45 | 0 |
| 16180408 | 20110201 | 12.75 | 2.25 | 2 |
| 16179835 | 20060501 | 9.95 | 3.2 | 0 |
| 16180475 | 20110201 | 12.5 | 2.25 | 2 |
| 16179169 | 20060501 | 9.95 | 3.45 | 0 |
| 16180544 | 20110201 | 12.25 | 2.25 | 2 |
| 16180314 | 20110201 | 12.125 | 2.25 | 2 |
| 16179088 | 20060501 | 9.999 | 4.4 | 0 |
| 16179160 | 20060501 | 9.95 | 3.275 | 0 |
| 16178990 | 20060501 | 9.999 | 4.375 | 0 |
| 16179735 | 20060501 | 9.95 | 3.45 | 0 |
| 16178306 | 20110201 | 11.375 | 2.25 | 2 |
| 16179039 | 20060501 | 9.999 | 3.5 | 0 |
| 16178949 | 20060501 | 9.999 | 3.25 | 0 |
| 16179334 | 20060501 | 10.95 | 3.25 | 0 |
| 16179135 | 20060501 | 9.95 | 3.7 | 0 |
| 16179489 | 20060501 | 9.95 | 2.875 | 0 |
| 16178894 | 20060501 | 9.95 | 3.15 | 0 |
| 16179381 | 20060501 | 9.95 | 3.075 | 0 |
| 16180536 | 20110201 | 12.375 | 2.25 | 2 |
| 16179598 | 20060501 | 9.95 | 3.45 | 0 |
| 16179816 | 20060501 | 9.95 | 3.075 | 0 |
| 16180276 | 20110201 | 12.5 | 2.25 | 2 |
| 16179144 | 20060501 | 9.95 | 3.525 | 0 |
| 16178700 | 20110201 | 11.75 | 2.25 | 2 |
| 16179573 | 20060501 | 9.95 | 3.45 | 0 |
| 16180124 | 20060501 | 12.5 | 3.225 | 0 |
| 16178619 | 20110201 | 11.25 | 2.25 | 2 |
| 16179282 | 20060501 | 9.95 | 3.025 | 0 |
| 16178374 | 20101101 | 11.625 | 2.25 | 2 |
| 16179928 | 20060501 | 9.95 | 3.45 | 0 |
| 16179382 | 20060501 | 9.95 | 2.95 | 0 |
| 16180537 | 20110201 | 12.625 | 2.25 | 2 |
| 16180307 | 20110201 | 13 | 2.25 | 2 |
| 16180374 | 20110201 | 12.125 | 2.25 | 2 |
| 16179064 | 20060501 | 9.999 | 4.2 | 0 |
| 16180439 | 20110201 | 12.5 | 2.25 | 2 |
| 16178714 | 20110201 | 11.875 | 2.25 | 2 |
| 16179599 | 20060501 | 9.95 | 3.45 | 0 |
| 16179817 | 20060501 | 9.95 | 2.95 | 0 |
| 16178927 | 20060501 | 9.999 | 3.6 | 0 |
| 16179755 | 20060501 | 9.95 | 3.45 | 0 |
| 16178878 | 20110301 | 12.125 | 2.25 | 2 |
| 16178349 | 20110101 | 11.375 | 2.25 | 2 |
| 16180022 | 20060501 | 9.95 | 3.45 | 0 |
| 16180236 | 20110201 | 12 | 2.25 | 2 |
| 16179929 | 20060501 | 9.95 | 3.45 | 0 |
| 16178895 | 20060501 | 9.95 | 3.275 | 0 |
| 16180538 | 20110201 | 12.125 | 2.25 | 2 |

| | | | | |
|---|---|---|---|---|
| 16180308 | 20110201 | 12.375 | 2.25 | 2 |
| 16180375 | 20110201 | 12.125 | 2.25 | 2 |
| 16180440 | 20110201 | 12.5 | 2.25 | 2 |
| 16178547 | 20110201 | 11.25 | 2.25 | 2 |
| 16179818 | 20060501 | 9.95 | 3.075 | 0 |
| 16180277 | 20110201 | 12.875 | 2.25 | 2 |
| 16179153 | 20060501 | 9.95 | 3.525 | 0 |
| 16178980 | 20060501 | 9.999 | 3.94 | 0 |
| 16179054 | 20060501 | 9.999 | 4.375 | 0 |
| 16178424 | 20110101 | 11 | 2.25 | 2 |
| 16179708 | 20060501 | 9.95 | 3.45 | 0 |
| 16180140 | 20060501 | 12.5 | 3.9 | 0 |
| 16180023 | 20060501 | 9.95 | 3.45 | 0 |
| 16178768 | 20110201 | 12 | 2.25 | 2 |
| 16178260 | 20110301 | 11.875 | 2.25 | 2 |
| 16180237 | 20110201 | 12.25 | 2.25 | 2 |
| 16178375 | 20101101 | 12.25 | 2.25 | 2 |
| 16178864 | 20110101 | 11.875 | 2.25 | 2 |
| 16178341 | 20110101 | 11.375 | 2.25 | 2 |
| 16178611 | 20110201 | 11.75 | 2.25 | 2 |
| 16179383 | 20060501 | 9.95 | 3.45 | 0 |
| 16178222 | 20110201 | 11.5 | 2.25 | 2 |
| 16180539 | 20110201 | 12.625 | 2.25 | 2 |
| 16180309 | 20110201 | 12 | 2.25 | 2 |
| 16180376 | 20110201 | 12 | 2.25 | 2 |
| 16178948 | 20060501 | 9.999 | 3.5 | 0 |
| 16178970 | 20060501 | 9.999 | 4.3 | 0 |
| 16180171 | 20060501 | 12.5 | 3.4 | 0 |
| 16178879 | 20110301 | 11.875 | 2.25 | 2 |
| 16180133 | 20060501 | 12.5 | 3.2 | 0 |
| 16178651 | 20110201 | 11.5 | 2.25 | 2 |
| 16180024 | 20060501 | 9.95 | 3.45 | 0 |
| 16180238 | 20110201 | 12.375 | 2.25 | 2 |
| 16179352 | 20060501 | 9.95 | 3.5 | 0 |
| 16179384 | 20060501 | 9.95 | 3.45 | 0 |
| 16179976 | 20060501 | 9.95 | 3.45 | 0 |
| 16180471 | 20110201 | 12.625 | 2.25 | 2 |
| 16180540 | 20110201 | 12 | 2.25 | 2 |
| 16178983 | 20060501 | 9.999 | 4.4 | 0 |
| 16180377 | 20110201 | 13.25 | 2.25 | 2 |
| 16180441 | 20110201 | 12.5 | 2.25 | 2 |
| 16179731 | 20060501 | 9.95 | 3.45 | 0 |
| 16179819 | 20060501 | 9.95 | 3.075 | 0 |
| 16178971 | 20060501 | 9.999 | 3.5 | 0 |
| 16178425 | 20110201 | 11.625 | 2.25 | 2 |
| 16180162 | 20060501 | 12.5 | 4.45 | 0 |
| 16180143 | 20060501 | 12.5 | 3.825 | 0 |
| 16179709 | 20060501 | 9.95 | 3.975 | 0 |
| 16179696 | 20060501 | 9.95 | 3.45 | 0 |
| 16178313 | 20110101 | 11.875 | 2.25 | 2 |
| 16180025 | 20060501 | 9.95 | 3.45 | 0 |
| 16178592 | 20110201 | 12.25 | 2.25 | 2 |
| 16179310 | 20060501 | 9.95 | 3.2 | 0 |
| 16180239 | 20110201 | 12.5 | 2.25 | 2 |
| 16178380 | 20110101 | 12 | 2.25 | 2 |
| 16179252 | 20060501 | 9.95 | 3.7 | 0 |
| 16178856 | 20110301 | 12.25 | 2.25 | 2 |
| 16180436 | 20110201 | 12.5 | 2.25 | 2 |
| 16180273 | 20110201 | 12.75 | 2.25 | 2 |
| 16178175 | 20101001 | 11.375 | 2.75 | 1 |
| 16179707 | 20060501 | 9.95 | 3.45 | 0 |
| 16178925 | 20060501 | 9.99 | 3.9 | 0 |
| 16179695 | 20060501 | 9.95 | 3.2 | 0 |
| 16178796 | 20110301 | 10.875 | 2.25 | 2 |
| 16180177 | 20060501 | 12.5 | 3.525 | 0 |
| 16178635 | 20110201 | 11 | 2.25 | 2 |
| 16178531 | 20110201 | 11.375 | 2.25 | 2 |
| 16179682 | 20060501 | 9.95 | 3.45 | 0 |
| 16180108 | 20060501 | 12.5 | 4.075 | 0 |
| 16178337 | 20110101 | 11.125 | 2.25 | 2 |
| 16179297 | 20060501 | 9.95 | 3.525 | 0 |
| 16180234 | 20110201 | 12 | 2.25 | 2 |
| 16179925 | 20060501 | 9.95 | 3.45 | 0 |
| 16179641 | 20060501 | 9.95 | 3.5 | 0 |
| 16179379 | 20060501 | 9.95 | 3.45 | 0 |
| 16179362 | 20060501 | 9.95 | 3.45 | 0 |
| 16179182 | 20060501 | 9.95 | 3.525 | 0 |
| 16180372 | 20110201 | 12.125 | 2.25 | 2 |
| 16180437 | 20110201 | 12.875 | 2.25 | 2 |
| 16178969 | 20060501 | 9.999 | 3.4 | 0 |
| 16179047 | 20060501 | 9.999 | 4.375 | 0 |
| 16180274 | 20110201 | 12.375 | 2.25 | 2 |
| 16179815 | 20060501 | 9.95 | 3.2 | 0 |
| 16178423 | 20110101 | 11.5 | 2.25 | 2 |
| 16178315 | 20110201 | 11.75 | 2.25 | 2 |
| 16179753 | 20060501 | 9.95 | 3.45 | 0 |
| 16178821 | 20110301 | 11.625 | 2.25 | 2 |
| 16179270 | 20060501 | 9.95 | 3.525 | 0 |
| 16179120 | 20060501 | 9.95 | 3.4 | 0 |
| 16180062 | 20060501 | 12.5 | 3.2 | 0 |
| 16179926 | 20060501 | 9.95 | 3.45 | 0 |
| 16179098 | 20060501 | 9.95 | 3.7 | 0 |
| 16179380 | 20060501 | 9.95 | 3.325 | 0 |
| 16180373 | 20110201 | 12.625 | 2.25 | 2 |
| 16178662 | 20110201 | 11.5 | 2.25 | 2 |

| | | | | |
|---|---|---|---|---|
| 16180438 | 20110201 | 12 | 2.25 | 2 |
| 16180275 | 20110201 | 12.375 | 2.25 | 2 |
| 16178802 | 20110301 | 11.5 | 2.25 | 2 |
| 16178926 | 20060501 | 9.999 | 3.7 | 0 |
| 16179572 | 20060501 | 9.95 | 3.45 | 0 |
| 16178760 | 20110301 | 12.25 | 2.25 | 2 |
| 16180235 | 20110201 | 12.625 | 2.25 | 2 |
| 16179271 | 20060501 | 9.95 | 3.275 | 0 |
| 16179640 | 20060501 | 9.95 | 3.075 | 0 |
| 16178887 | 20060501 | 9.95 | 3.7 | 0 |
| 16179354 | 20060501 | 9.95 | 3.45 | 0 |
| 16180354 | 20110201 | 12.5 | 2.25 | 2 |
| 16179805 | 20060501 | 9.95 | 2.95 | 0 |
| 16179128 | 20060501 | 9.95 | 3.275 | 0 |
| 16180618 | 20110201 | 12.25 | 2.25 | 2 |
| 16180006 | 20060501 | 9.95 | 3.075 | 0 |
| 16178960 | 20060501 | 9.999 | 3.625 | 0 |
| 16180517 | 20110201 | 12 | 2.25 | 2 |
| 16179630 | 20060501 | 9.95 | 3.2 | 0 |
| 16179442 | 20060501 | 9.95 | 2.95 | 0 |
| 16178934 | 20060501 | 9.999 | 3.75 | 0 |
| 16178262 | 20110201 | 11.25 | 3.25 | 1 |
| 16178837 | 20110301 | 12 | 2.25 | 2 |
| 16180117 | 20060501 | 12.5 | 2.9 | 0 |
| 16178563 | 20110201 | 11.375 | 2.25 | 2 |
| 16179212 | 20060501 | 9.95 | 3.7 | 0 |
| 16179860 | 20060501 | 9.95 | 3.45 | 0 |
| 16179129 | 20060501 | 9.95 | 3.525 | 0 |
| 16179909 | 20060501 | 9.95 | 3.975 | 0 |
| 16179016 | 20060501 | 9.999 | 4.25 | 0 |
| 16178999 | 20060501 | 9.999 | 2.6 | 0 |
| 16179631 | 20060501 | 9.95 | 3.075 | 0 |
| 16179443 | 20060501 | 9.95 | 3.45 | 0 |
| 16178909 | 20060501 | 9.999 | 3.5 | 0 |
| 16179664 | 20060501 | 9.95 | 3.45 | 0 |
| 16180027 | 20060501 | 12.5 | 2.775 | 0 |
| 16178499 | 20110201 | 11.75 | 2.25 | 2 |
| 16179858 | 20060501 | 9.95 | 3.325 | 0 |
| 16179551 | 20060501 | 9.95 | 3.5 | 0 |
| 16180270 | 20110201 | 12.25 | 2.25 | 2 |
| 16179151 | 20060501 | 9.95 | 3.15 | 0 |
| 16179750 | 20060501 | 9.95 | 3.45 | 0 |
| 16178942 | 20060501 | 9.999 | 4.4 | 0 |
| 16179141 | 20060501 | 9.95 | 3.15 | 0 |
| 16178354 | 20110201 | 12.125 | 2.25 | 2 |
| 16179680 | 20060501 | 9.95 | 3.45 | 0 |
| 16178690 | 20110201 | 11.375 | 2.25 | 2 |
| 16180034 | 20060501 | 12.5 | 3.15 | 0 |
| 16179268 | 20060501 | 9.95 | 3.7 | 0 |
| 16179514 | 20060501 | 10.45 | 3.325 | 0 |
| 16178372 | 20101201 | 12.25 | 2.25 | 2 |
| 16179097 | 20060501 | 9.95 | 2.65 | 0 |
| 16179859 | 20060501 | 9.95 | 3.45 | 0 |
| 16178367 | 20101101 | 11.125 | 2.25 | 2 |
| 16179464 | 20060501 | 9.95 | 3.45 | 0 |
| 16180434 | 20110201 | 12.25 | 2.25 | 2 |
| 16178487 | 20110201 | 11.875 | 2.25 | 2 |
| 16180271 | 20110201 | 12.375 | 2.25 | 2 |
| 16178191 | 20110101 | 11.5 | 3.25 | 1 |
| 16179152 | 20060501 | 9.95 | 3.525 | 0 |
| 16178979 | 20060501 | 9.999 | 4.4 | 0 |
| 16178924 | 20060501 | 9.99 | 3 | 0 |
| 16178943 | 20060501 | 9.999 | 3.9 | 0 |
| 16179610 | 20060501 | 9.95 | 3.5 | 0 |
| 16179269 | 20060501 | 9.95 | 2.525 | 0 |
| 16179519 | 20060501 | 9.95 | 3.5 | 0 |
| 16179923 | 20060501 | 9.95 | 3.2 | 0 |
| 16179360 | 20060501 | 9.95 | 2.8 | 0 |
| 16180073 | 20060501 | 12.5 | 4.325 | 0 |
| 16180435 | 20110201 | 13.375 | 2.25 | 2 |
| 16180272 | 20110201 | 12.375 | 2.25 | 2 |
| 16179752 | 20060501 | 9.95 | 3.45 | 0 |
| 16178545 | 20110201 | 11.375 | 2.25 | 2 |
| 16178648 | 20110201 | 12 | 2.25 | 2 |
| 16178915 | 20060501 | 9.999 | 3.1 | 0 |
| 16179681 | 20060501 | 9.95 | 3.45 | 0 |
| 16178584 | 20110201 | 11.25 | 2.25 | 2 |
| 16180233 | 20110201 | 13 | 2.25 | 2 |
| 16179291 | 20060501 | 9.95 | 3.525 | 0 |
| 16178373 | 20101101 | 12.375 | 2.25 | 2 |
| 16179361 | 20060501 | 9.95 | 3.2 | 0 |
| 16180250 | 20110201 | 12 | 2.25 | 2 |
| 16178935 | 20060501 | 9.999 | 3.6 | 0 |
| 16179556 | 20060501 | 9.95 | 3.45 | 0 |
| 16178962 | 20060501 | 9.999 | 4.375 | 0 |
| 16178791 | 20110301 | 12.25 | 2.25 | 2 |
| 16178292 | 20110101 | 12.5 | 3.5 | 2 |
| 16180083 | 20060501 | 12.5 | 2.95 | 0 |
| 16178334 | 20101101 | 10.875 | 2.75 | 2 |
| 16179262 | 20060501 | 9.95 | 3.7 | 0 |
| 16178667 | 20101201 | 12.75 | 3.5 | 2 |
| 16179241 | 20060501 | 9.95 | 3.15 | 0 |
| 16179958 | 20060501 | 9.95 | 3.45 | 0 |
| 16178357 | 20110201 | 11.875 | 2.25 | 2 |
| 16178216 | 20101201 | 11.5 | 2.25 | 2 |

| | | | | |
|---|---|---|---|---|
| 16180013 | 20060501 | 9.95 | 2.875 | 0 |
| 16179846 | 20060501 | 9.95 | 3.45 | 0 |
| 16179637 | 20060501 | 9.95 | 3.075 | 0 |
| 16180251 | 20110201 | 12.25 | 2.25 | 2 |
| 16180102 | 20060501 | 12.5 | 4.45 | 0 |
| 16178683 | 20110301 | 11.875 | 2.25 | 2 |
| 16178300 | 20112201 | 12 | 2.25 | 2 |
| 16178765 | 20110301 | 11.375 | 2.75 | 2 |
| 16179796 | 20060501 | 9.95 | 3.875 | 0 |
| 16178564 | 20110201 | 11.75 | 2.25 | 2 |
| 16179114 | 20060501 | 9.95 | 3.55 | 0 |
| 16178383 | 20110101 | 12.5 | 2.25 | 2 |
| 16180014 | 20060501 | 9.95 | 3.45 | 0 |
| 16179473 | 20060501 | 9.95 | 2.5 | 0 |
| 16179794 | 20060501 | 9.95 | 3.375 | 0 |
| 16180176 | 20060501 | 12.5 | 4.15 | 0 |
| 16179007 | 20060501 | 9.999 | 4.05 | 0 |
| 16180252 | 20110201 | 12.5 | 2.25 | 2 |
| 16179699 | 20060501 | 9.95 | 3.45 | 0 |
| 16179041 | 20060501 | 9.999 | 4.4 | 0 |
| 16180111 | 20060501 | 12.5 | 2.925 | 0 |
| 16179614 | 20060501 | 9.95 | 3.5 | 0 |
| 16178517 | 20110201 | 11.5 | 2.25 | 2 |
| 16179213 | 20060501 | 9.95 | 3.525 | 0 |
| 16179215 | 20060501 | 9.95 | 3.025 | 0 |
| 16179639 | 20060501 | 9.95 | 3.45 | 0 |
| 16179353 | 20060501 | 9.95 | 3.45 | 0 |
| 16180253 | 20110201 | 12.625 | 2.25 | 2 |
| 16178951 | 20060501 | 9.999 | 3.4 | 0 |
| 16179669 | 20060501 | 9.95 | 3.45 | 0 |
| 16180030 | 20060501 | 12.5 | 3.325 | 0 |
| 16179263 | 20060501 | 9.95 | 3.525 | 0 |
| 16179506 | 20060501 | 10.45 | 3.325 | 0 |
| 16179131 | 20060501 | 9.95 | 3.7 | 0 |
| 16179227 | 20060501 | 10.95 | 3.525 | 0 |
| 16179913 | 20060501 | 9.95 | 3.45 | 0 |
| 16178365 | 20101101 | 11.5 | 2.25 | 2 |
| 16178862 | 20110301 | 12 | 2.25 | 2 |
| 16179946 | 20060501 | 9.95 | 3.075 | 0 |
| 16180612 | 20110201 | 12.5 | 2.25 | 2 |
| 16179461 | 20060501 | 9.95 | 3.45 | 0 |
| 16180057 | 20060501 | 12.5 | 3.275 | 0 |
| 16179339 | 20060501 | 9.95 | 3.125 | 0 |
| 16179617 | 20060501 | 9.95 | 3.5 | 0 |
| 16179023 | 20060501 | 9.999 | 3.6 | 0 |
| 16178482 | 20110201 | 11.5 | 2.25 | 2 |
| 16178906 | 20060501 | 9.95 | 3.95 | 0 |
| 16178769 | 20110301 | 11.625 | 2.75 | 2 |
| 16179219 | 20060501 | 9.95 | 2.9 | 0 |
| 16178384 | 20110101 | 11.75 | 2.25 | 2 |
| 16179096 | 20060501 | 9.95 | 3.7 | 0 |
| 16178256 | 20110201 | 11.5 | 2.25 | 2 |
| 16179112 | 20060501 | 9.95 | 2.65 | 0 |
| 16179856 | 20060501 | 9.95 | 3.45 | 0 |
| 16179224 | 20060501 | 9.95 | 2.775 | 0 |
| 16180613 | 20110201 | 12.375 | 2.25 | 2 |
| 16179462 | 20060501 | 9.95 | 3.2 | 0 |
| 16178721 | 20110301 | 11.125 | 2.25 | 2 |
| 16179358 | 20060501 | 9.95 | 3.45 | 0 |
| 16179408 | 20060501 | 9.95 | 3.5 | 0 |
| 16178941 | 20060501 | 9.999 | 3.95 | 0 |
| 16179043 | 20060501 | 9.999 | 4.1 | 0 |
| 16178914 | 20060501 | 9.999 | 3.2 | 0 |
| 16179678 | 20060501 | 9.95 | 3.45 | 0 |
| 16178933 | 20060501 | 9.999 | 4.4 | 0 |
| 16178766 | 20110201 | 10.875 | 2.75 | 2 |
| 16178569 | 20110201 | 11.25 | 2.25 | 2 |
| 16179220 | 20060501 | 9.95 | 3.15 | 0 |
| 16179211 | 20060501 | 9.95 | 3.525 | 0 |
| 16179857 | 20060501 | 9.95 | 3.45 | 0 |
| 16178361 | 20110201 | 12 | 2.25 | 2 |
| 16179127 | 20060501 | 9.95 | 3.15 | 0 |
| 16179906 | 20060501 | 9.95 | 3.45 | 0 |
| 16178366 | 20101101 | 11.5 | 2.25 | 2 |
| 16179463 | 20060501 | 9.95 | 3.45 | 0 |
| 16179403 | 20060501 | 9.95 | 3.45 | 0 |
| 16178657 | 20110301 | 11.5 | 2.25 | 2 |
| 16179749 | 20060501 | 9.95 | 3.45 | 0 |
| 16179570 | 20060501 | 9.95 | 3.45 | 0 |
| 16179140 | 20060501 | 9.95 | 3.525 | 0 |
| 16179031 | 20060501 | 9.999 | 4.4 | 0 |
| 16179679 | 20060501 | 9.95 | 3.45 | 0 |
| 16178261 | 20110101 | 11.625 | 2.25 | 2 |
| 16180080 | 20060501 | 12.5 | 3.825 | 0 |
| 16179267 | 20060501 | 9.95 | 2.65 | 0 |
| 16179259 | 20060501 | 9.95 | 3.15 | 0 |
| 16179287 | 20060501 | 9.95 | 3.525 | 0 |
| 16179130 | 20060501 | 9.95 | 3.525 | 0 |
| 16179956 | 20060501 | 9.95 | 3.45 | 0 |
| 16180011 | 20060501 | 9.95 | 3.45 | 0 |
| 16178840 | 20110301 | 12.125 | 2.25 | 2 |
| 16178817 | 20110301 | 11.625 | 2.25 | 1 |
| 16179890 | 20060501 | 9.95 | 3.45 | 0 |
| 16180524 | 20110201 | 13 | 2.25 | 2 |
| 16179642 | 20060501 | 9.95 | 4.5 | 0 |

| | | | | |
|---|---|---|---|---|
| 16179446 | 20060501 | 9.95 | 3.325 | 0 |
| 16179012 | 20060501 | 9.999 | 3.5 | 0 |
| 16180249 | 20110201 | 12.625 | 2.25 | 2 |
| 16179040 | 20060501 | 9.99 | 3.55 | 0 |
| 16178950 | 20060501 | 9.999 | 4.375 | 0 |
| 16179504 | 20060501 | 9.95 | 3.325 | 0 |
| 16179288 | 20060501 | 9.95 | 3.4 | 0 |
| 16179911 | 20060501 | 9.95 | 3.45 | 0 |
| 16179957 | 20060501 | 9.95 | 3.45 | 0 |
| 16180012 | 20060501 | 9.95 | 3.45 | 0 |
| 16180069 | 20060501 | 12.5 | 3.275 | 0 |
| 16180060 | 20060501 | 12.5 | 3.825 | 0 |
| 16180525 | 20110201 | 12.375 | 2.25 | 2 |
| 16179447 | 20060501 | 9.95 | 3.45 | 0 |
| 16179973 | 20060501 | 9.95 | 3.45 | 0 |
| 16180134 | 20060501 | 12.5 | 3.7 | 0 |
| 16178908 | 20060501 | 9.999 | 3.3 | 0 |
| 16179657 | 20060501 | 9.95 | 3.075 | 0 |
| 16179788 | 20060501 | 9.95 | 3.5 | 0 |
| 16180032 | 20060501 | 12.5 | 2.95 | 0 |
| 16179110 | 20060501 | 9.95 | 3.7 | 0 |
| 16178674 | 20110301 | 11.625 | 2.25 | 2 |
| 16179901 | 20060501 | 9.95 | 3.45 | 0 |
| 16180608 | 20110201 | 12.25 | 2.25 | 2 |
| 16179457 | 20060501 | 9.95 | 3.45 | 0 |
| 16179997 | 20060501 | 9.95 | 3.45 | 0 |
| 16180049 | 20060501 | 12.5 | 3.15 | 0 |
| 16179104 | 20060501 | 9.95 | 3.275 | 0 |
| 16180508 | 20110201 | 12.75 | 2.25 | 2 |
| 16179174 | 20060501 | 9.95 | 3.95 | 0 |
| 16179435 | 20060501 | 9.95 | 3.2 | 0 |
| 16178782 | 20110301 | 11.75 | 2.25 | 2 |
| 16180046 | 20060501 | 12.5 | 3.95 | 0 |
| 16179030 | 20060501 | 9.999 | 3.5 | 0 |
| 16179020 | 20060501 | 9.999 | 4.4 | 0 |
| 16178585 | 20110201 | 11.75 | 2.25 | 2 |
| 16180098 | 20060501 | 12.5 | 2.25 | 0 |
| 16178574 | 20110201 | 11.5 | 2.25 | 2 |
| 16178289 | 20110101 | 12.625 | 3.5 | 1 |
| 16178254 | 20110101 | 12.25 | 2.25 | 2 |
| 16179853 | 20060501 | 9.95 | 3.45 | 0 |
| 16179902 | 20060501 | 9.95 | 3.325 | 0 |
| 16180609 | 20110201 | 12.125 | 2.25 | 2 |
| 16179458 | 20060501 | 9.95 | 2.95 | 0 |
| 16179998 | 20060501 | 9.95 | 3.325 | 0 |
| 16179005 | 20060501 | 9.999 | 4.375 | 0 |
| 16179400 | 20060501 | 9.95 | 3.45 | 0 |
| 16178932 | 20060501 | 9.999 | 4 | 0 |
| 16180081 | 20060501 | 12.5 | 3.575 | 0 |
| 16178582 | 20110201 | 12.125 | 2.25 | 2 |
| 16179257 | 20060501 | 9.95 | 3.4 | 0 |
| 16178615 | 20110201 | 11.25 | 2.25 | 2 |
| 16179126 | 20060501 | 9.95 | 3.7 | 0 |
| 16179903 | 20060501 | 9.95 | 3.45 | 0 |
| 16180610 | 20110201 | 13.125 | 2.25 | 2 |
| 16180160 | 20060501 | 12.5 | 3.325 | 0 |
| 16179459 | 20060501 | 9.95 | 3.325 | 0 |
| 16179626 | 20060501 | 9.95 | 3.45 | 0 |
| 16178443 | 20110201 | 11.25 | 2.25 | 2 |
| 16179357 | 20060501 | 9.95 | 3.45 | 0 |
| 16179401 | 20060501 | 9.95 | 3.325 | 0 |
| 16179021 | 20060501 | 9.99 | 3.88 | 0 |
| 16178331 | 20110101 | 12.75 | 2.25 | 2 |
| 16179658 | 20060501 | 9.95 | 3.45 | 0 |
| 16180041 | 20060501 | 12.5 | 3.9 | 0 |
| 16179218 | 20060501 | 9.95 | 3.15 | 0 |
| 16178465 | 20110201 | 12 | 2.25 | 2 |
| 16178665 | 20110101 | 12.625 | 3.5 | 2 |
| 16178255 | 20110101 | 11.75 | 2.25 | 2 |
| 16179854 | 20060501 | 9.95 | 3.45 | 0 |
| 16179904 | 20060501 | 9.95 | 3.45 | 0 |
| 16179945 | 20060501 | 9.95 | 3.45 | 0 |
| 16180611 | 20110201 | 13 | 2.25 | 2 |
| 16179402 | 20060501 | 9.95 | 3.45 | 0 |
| 16179974 | 20060501 | 9.95 | 3.45 | 0 |
| 16178957 | 20060501 | 9.999 | 3.3 | 0 |
| 16178480 | 20110201 | 11.5 | 2.25 | 2 |
| 16179677 | 20060501 | 9.95 | 3.45 | 0 |
| 16180093 | 20060501 | 12.5 | 2.8 | 0 |
| 16178285 | 20110101 | 11.25 | 2.25 | 2 |
| 16178346 | 20101201 | 12.5 | 2.25 | 2 |
| 16179111 | 20060501 | 9.95 | 3.525 | 0 |
| 16179855 | 20060501 | 9.95 | 3.45 | 0 |
| 16179905 | 20060501 | 9.95 | 3.45 | 0 |
| 16180168 | 20060501 | 12.5 | 3.225 | 0 |
| 16178703 | 20110301 | 11.5 | 2.25 | 2 |
| 16178695 | 20110201 | 11.25 | 2.25 | 2 |
| 16178777 | 20110301 | 11.375 | 2.25 | 2 |
| 16182235 | 20101201 | 10.75 | 2.25 | 2 |
| 16179994 | 20060501 | 9.95 | 3.45 | 0 |
| 16179876 | 20060501 | 9.95 | 3.45 | 0 |
| 16180501 | 20110201 | 12.75 | 2.25 | 2 |
| 16180571 | 20110201 | 12.25 | 2.25 | 2 |
| 16179094 | 20060501 | 9.999 | 4.44 | 0 |
| 16178356 | 20101201 | 11.45 | 2.25 | 1 |

| | | | | |
|---|---|---|---|---|
| 16180339 | 20110201 | 12.875 | 2.25 | 2 |
| 16180403 | 20110201 | 13.4 | 2.25 | 2 |
| 16179730 | 20060501 | 9.95 | 3.45 | 0 |
| 16179343 | 20060501 | 9.95 | 3.75 | 0 |
| 16180086 | 20060501 | 12.5 | 3.075 | 0 |
| 16178673 | 20110301 | 11.75 | 2.25 | 2 |
| 16178185 | 20101201 | 11.5 | 2.75 | 2 |
| 16179995 | 20060501 | 9.95 | 3.45 | 0 |
| 16180502 | 20110201 | 11.875 | 2.25 | 2 |
| 16180572 | 20110201 | 12.75 | 2.25 | 2 |
| 16180187 | 20060501 | 12.5 | 3.575 | 0 |
| 16179430 | 20060501 | 9.95 | 3.45 | 0 |
| 16180340 | 20110201 | 13.25 | 2.25 | 2 |
| 16180404 | 20110201 | 13.75 | 2.25 | 2 |
| 16178810 | 20110301 | 11.875 | 2.25 | 2 |
| 16178973 | 20060501 | 9.999 | 4.375 | 0 |
| 16179050 | 20060501 | 9.999 | 4.1 | 0 |
| 16178433 | 20110201 | 11.5 | 2.25 | 2 |
| 16178329 | 20110101 | 12.375 | 2.25 | 2 |
| 16178308 | 20110201 | 11.25 | 2.25 | 2 |
| 16178236 | 20100101 | 11.5 | 2.25 | 2 |
| 16180503 | 20110201 | 12.25 | 2.25 | 2 |
| 16179877 | 20060501 | 9.95 | 3.45 | 0 |
| 16180573 | 20110201 | 12.5 | 2.25 | 2 |
| 16179078 | 20060501 | 9.999 | 3.25 | 0 |
| 16179095 | 20060501 | 9.999 | 3.75 | 0 |
| 16179431 | 20060501 | 9.95 | 3.45 | 0 |
| 16180341 | 20110201 | 12.5 | 2.25 | 2 |
| 16180405 | 20110201 | 12.625 | 2.25 | 2 |
| 16179832 | 20060501 | 9.95 | 3.02 | 0 |
| 16180113 | 20060501 | 12.5 | 2.925 | 0 |
| 16179971 | 20060501 | 9.95 | 3.45 | 0 |
| 16178903 | 20060501 | 9.95 | 3.7 | 0 |
| 16179768 | 20060501 | 9.95 | 3.75 | 0 |
| 16178788 | 20110301 | 10.875 | 2.25 | 2 |
| 16178902 | 20060501 | 9.95 | 3.7 | 0 |
| 16179237 | 20060501 | 9.95 | 3.7 | 0 |
| 16180604 | 20110201 | 12.5 | 2.25 | 2 |
| 16179547 | 20060501 | 9.95 | 3.325 | 0 |
| 16179103 | 20060501 | 9.95 | 3.7 | 0 |
| 16180504 | 20110201 | 13 | 2.25 | 2 |
| 16180574 | 20110201 | 12.5 | 2.25 | 2 |
| 16179432 | 20060501 | 9.95 | 3.45 | 0 |
| 16180342 | 20110201 | 12.75 | 2.25 | 2 |
| 16179833 | 20060501 | 9.95 | 3.45 | 0 |
| 16178800 | 20110301 | 11.125 | 2.25 | 2 |
| 16179541 | 20060501 | 9.95 | 3.45 | 0 |
| 16178288 | 20110101 | 12.75 | 3.5 | 2 |
| 16178464 | 20110201 | 11.625 | 2.25 | 2 |
| 16178252 | 20110101 | 11.375 | 2.25 | 2 |
| 16178343 | 20101201 | 11.875 | 2.25 | 2 |
| 16178554 | 20110201 | 11.375 | 2.25 | 2 |
| 16180605 | 20110201 | 12.75 | 2.25 | 2 |
| 16179944 | 20060501 | 9.95 | 3.45 | 0 |
| 16178526 | 20110201 | 11.625 | 3.25 | 1 |
| 16178237 | 20110201 | 10.75 | 2.25 | 2 |
| 16180505 | 20110201 | 12.875 | 2.25 | 2 |
| 16179878 | 20060501 | 9.95 | 3.45 | 0 |
| 16180575 | 20110201 | 12.625 | 2.25 | 2 |
| 16178474 | 20110201 | 11.75 | 2.25 | 2 |
| 16179433 | 20060501 | 9.95 | 3.45 | 0 |
| 16179780 | 20060501 | 9.95 | 3.25 | 0 |
| 16180343 | 20110201 | 12.5 | 2.25 | 2 |
| 16179834 | 20060501 | 9.95 | 3.075 | 0 |
| 16178412 | 20110201 | 11.625 | 2.25 | 2 |
| 16178698 | 20110101 | 11.875 | 2.25 | 2 |
| 16178905 | 20060501 | 9.95 | 3.7 | 0 |
| 16180131 | 20060501 | 12.5 | 3.45 | 0 |
| 16180104 | 20060501 | 12.5 | 3.95 | 0 |
| 16180031 | 20060501 | 12.5 | 3.2 | 0 |
| 16178751 | 20110201 | 11.5 | 2.25 | 2 |
| 16179256 | 20060501 | 9.95 | 3.55 | 0 |
| 16178467 | 20110201 | 11.75 | 2.25 | 2 |
| 16179222 | 20060501 | 9.95 | 2.8 | 0 |
| 16179900 | 20060501 | 9.95 | 3.45 | 0 |
| 16178749 | 20110301 | 11.625 | 2.25 | 2 |
| 16180606 | 20110201 | 12.125 | 2.25 | 2 |
| 16178559 | 20110201 | 12.125 | 2.25 | 2 |
| 16178553 | 20100801 | 10.625 | 2.25 | 2 |
| 16179199 | 20060501 | 9.95 | 2.25 | 0 |
| 16180506 | 20110201 | 12.5 | 2.25 | 2 |
| 16179767 | 20060501 | 9.95 | 3.5 | 0 |
| 16180344 | 20110201 | 13.125 | 2.25 | 2 |
| 16178442 | 20110201 | 11.5 | 2.25 | 2 |
| 16179972 | 20060501 | 9.95 | 3.325 | 0 |
| 16179769 | 20060501 | 9.95 | 3.5 | 0 |
| 16178253 | 20110101 | 10.75 | 2.25 | 2 |
| 16179210 | 20060501 | 9.95 | 3.525 | 0 |
| 16180607 | 20110201 | 12.375 | 2.25 | 2 |
| 16179996 | 20060501 | 9.95 | 3.45 | 0 |
| 16178492 | 20110201 | 12.25 | 2.25 | 2 |
| 16180507 | 20110201 | 12.625 | 2.25 | 2 |
| 16179879 | 20060501 | 9.95 | 3.45 | 0 |
| 16179079 | 20060501 | 9.999 | 4.1 | 0 |
| 16179434 | 20060501 | 9.95 | 3.45 | 0 |

Unassociated Document

Page 305 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 27 of 279

| | | | | |
|---|---|---|---|---|
| 16178720 | 20110301 | 11.5 | 2.25 | 2 |
| 16180043 | 20060501 | 12.5 | 3.275 | 0 |
| 16178871 | 20110301 | 11.75 | 2.25 | 2 |
| 16179281 | 20060501 | 9.95 | 3.525 | 0 |
| 16178233 | 20110201 | 11.25 | 2.25 | 2 |
| 16180567 | 20110201 | 12.375 | 2.25 | 2 |
| 16180335 | 20110201 | 12.75 | 2.25 | 2 |
| 16180399 | 20110201 | 12.625 | 2.25 | 2 |
| 16180068 | 20060501 | 12.5 | 4.15 | 0 |
| 16180467 | 20110201 | 12.5 | 2.25 | 2 |
| 16179086 | 20060501 | 9.999 | 3.3 | 0 |
| 16180305 | 20110201 | 13 | 2.25 | 2 |
| 16178411 | 20110101 | 11.75 | 2.25 | 2 |
| 16178400 | 20110101 | 12.375 | 3.5 | 2 |
| 16178452 | 20110201 | 11.375 | 2.25 | 2 |
| 16179615 | 20060501 | 9.95 | 4 | 0 |
| 16178500 | 20110201 | 11.5 | 2.75 | 2 |
| 16179873 | 20060501 | 9.95 | 3.45 | 0 |
| 16180568 | 20110201 | 12.625 | 2.25 | 2 |
| 16180336 | 20110201 | 12 | 2.25 | 2 |
| 16180400 | 20110201 | 11.75 | 2.25 | 2 |
| 16180306 | 20110201 | 12.25 | 2.25 | 2 |
| 16179645 | 20060501 | 9.95 | 2.75 | 0 |
| 16180154 | 20060501 | 12.5 | 3.7 | 0 |
| 16179728 | 20060501 | 9.95 | 3.45 | 0 |
| 16180021 | 20060501 | 9.95 | 3.2 | 0 |
| 16179616 | 20060501 | 9.95 | 3.5 | 0 |
| 16178234 | 20101001 | 10.75 | 2.25 | 2 |
| 16180499 | 20110201 | 12.375 | 2.25 | 2 |
| 16179874 | 20060501 | 9.95 | 3.45 | 0 |
| 16180569 | 20110201 | 12.625 | 2.25 | 2 |
| 16180337 | 20110201 | 13.25 | 2.25 | 2 |
| 16180175 | 20060501 | 12.5 | 2.9 | 0 |
| 16179479 | 20060501 | 9.95 | 3.075 | 0 |
| 16180401 | 20110201 | 12.875 | 2.25 | 2 |
| 16178994 | 20060501 | 9.999 | 4.4 | 0 |
| 16180468 | 20110201 | 12.875 | 2.25 | 2 |
| 16179729 | 20060501 | 9.95 | 3.45 | 0 |
| 16178453 | 20110201 | 11.625 | 2.25 | 2 |
| 16180096 | 20060501 | 12.5 | 3.35 | 0 |
| 16178677 | 20110201 | 11.875 | 2.25 | 2 |
| 16178461 | 20110201 | 11.25 | 2.25 | 2 |
| 16178182 | 20110101 | 11.375 | 3.25 | 1 |
| 16180078 | 20060501 | 12.5 | 3.325 | 0 |
| 16180500 | 20110201 | 12.875 | 2.25 | 2 |
| 16179875 | 20060501 | 9.95 | 3.325 | 0 |
| 16180570 | 20110201 | 12.375 | 2.25 | 2 |
| 16180338 | 20110201 | 12.875 | 2.25 | 2 |
| 16180402 | 20110201 | 12.75 | 2.25 | 2 |
| 16180469 | 20110201 | 13.375 | 2.25 | 2 |
| 16178653 | 20110301 | 11 | 2.25 | 2 |
| 16179075 | 20060501 | 9.999 | 3.5 | 0 |
| 16179049 | 20060501 | 9.999 | 3.5 | 0 |
| 16180118 | 20060501 | 12.5 | 2.925 | 0 |
| 16179501 | 20060501 | 9.95 | 3.5 | 0 |
| 16180229 | 20110201 | 12.75 | 2.25 | 2 |
| 16178362 | 20101101 | 11.5 | 2.25 | 2 |
| 16178744 | 20110301 | 11.75 | 2.25 | 2 |
| 16179376 | 20060501 | 9.95 | 3.075 | 0 |
| 16179546 | 20060501 | 9.95 | 3.45 | 0 |
| 16180529 | 20110201 | 12 | 2.25 | 2 |
| 16180298 | 20110201 | 12 | 2.25 | 2 |
| 16180366 | 20110201 | 13.25 | 2.25 | 2 |
| 16178421 | 20110101 | 11.625 | 2.25 | 2 |
| 16179693 | 20060501 | 9.95 | 3.45 | 0 |
| 16180123 | 20060501 | 12.5 | 3.65 | 0 |
| 16180035 | 20060501 | 12.5 | 3.15 | 0 |
| 16179776 | 20060501 | 9.95 | 3 | 0 |
| 16180230 | 20110201 | 12 | 2.25 | 2 |
| 16179502 | 20060501 | 9.95 | 3.5 | 0 |
| 16180063 | 20060501 | 12.5 | 3.075 | 0 |
| 16180180 | 20060501 | 12.5 | 3.7 | 0 |
| 16179189 | 20060501 | 12.45 | 3.525 | 0 |
| 16180461 | 20110201 | 13.25 | 2.25 | 2 |
| 16180530 | 20110201 | 12.75 | 2.25 | 2 |
| 16180299 | 20110201 | 13.125 | 2.25 | 2 |
| 16180367 | 20110201 | 11.875 | 2.25 | 2 |
| 16178491 | 20110201 | 10.875 | 2.25 | 2 |
| 16178450 | 20110201 | 11.25 | 2.25 | 2 |
| 16178946 | 20060501 | 9.999 | 3.75 | 0 |
| 16178968 | 20060501 | 9.999 | 3.375 | 0 |
| 16179046 | 20060501 | 9.999 | 4.2 | 0 |
| 16178709 | 20110301 | 11.875 | 2.25 | 2 |
| 16180112 | 20060501 | 12.5 | 3.45 | 0 |
| 16179053 | 20060501 | 9.999 | 4.4 | 0 |
| 16179705 | 20060501 | 9.95 | 3.975 | 0 |
| 16178624 | 20110201 | 12.25 | 2.25 | 2 |
| 16180103 | 20060501 | 12.5 | 3.95 | 0 |
| 16180231 | 20110201 | 12.25 | 2.25 | 2 |
| 16179119 | 20060501 | 9.95 | 2.65 | 0 |
| 16180462 | 20110201 | 13 | 2.25 | 2 |
| 16180531 | 20110201 | 12.5 | 2.25 | 2 |
| 16180300 | 20110201 | 12.5 | 2.25 | 2 |
| 16180368 | 20110201 | 12.375 | 2.25 | 2 |
| 16179722 | 20060501 | 9.95 | 3.45 | 0 |

| | | | | |
|---|---|---|---|---|
| 16178694 | 20110301 | 11.875 | 2.25 | 2 |
| 16180050 | 20060501 | 12.5 | 3.45 | 0 |
| 16180149 | 20060501 | 12.5 | 3.375 | 0 |
| 16179279 | 20060501 | 9.95 | 3.525 | 0 |
| 16179296 | 20060501 | 9.95 | 3.025 | 0 |
| 16180072 | 20060501 | 12.5 | 3.95 | 0 |
| 16180232 | 20110201 | 12.5 | 2.25 | 2 |
| 16178886 | 20060501 | 9.95 | 3.25 | 0 |
| 16179308 | 20060501 | 9.95 | 3.975 | 0 |
| 16179377 | 20060501 | 9.95 | 3.45 | 0 |
| 16180463 | 20110201 | 12.375 | 2.25 | 2 |
| 16180532 | 20110201 | 12 | 2.25 | 2 |
| 16179147 | 20060501 | 9.95 | 3.525 | 0 |
| 16179084 | 20060501 | 9.999 | 4.375 | 0 |
| 16180301 | 20110201 | 12.75 | 2.25 | 2 |
| 16180369 | 20110201 | 12 | 2.25 | 2 |
| 16179723 | 20060501 | 9.95 | 3.45 | 0 |
| 16178451 | 20110201 | 11.5 | 2.25 | 2 |
| 16179813 | 20060501 | 9.95 | 3.2 | 0 |
| 16179027 | 20060501 | 9.999 | 2.9 | 0 |
| 16179706 | 20060501 | 9.95 | 2.95 | 0 |
| 16178326 | 20110101 | 11.75 | 2.25 | 2 |
| 16180089 | 20060501 | 12.5 | 3.075 | 0 |
| 16178388 | 20110101 | 11.875 | 2.25 | 2 |
| 16178670 | 20110301 | 11.75 | 2.25 | 2 |
| 16179378 | 20060501 | 9.95 | 3.975 | 0 |
| 16180464 | 20110201 | 12.5 | 2.25 | 2 |
| 16180533 | 20110201 | 13 | 2.25 | 2 |
| 16180302 | 20110201 | 12.5 | 2.25 | 2 |
| 16180370 | 20110201 | 12.125 | 2.25 | 2 |
| 16179724 | 20060501 | 9.95 | 3.45 | 0 |
| 16179766 | 20060501 | 9.95 | 3.45 | 0 |
| 16178702 | 20110301 | 11.5 | 2.25 | 2 |
| 16178947 | 20060501 | 9.999 | 3.625 | 0 |
| 16179814 | 20060501 | 9.95 | 2.8 | 0 |
| 16178422 | 20110101 | 11.875 | 2.25 | 2 |
| 16180094 | 20060501 | 12.5 | 3.9 | 0 |
| 16180150 | 20060501 | 12.5 | 3.2 | 0 |
| 16179515 | 20060501 | 9.95 | 3.5 | 0 |
| 16178740 | 20110301 | 10.625 | 2.25 | 2 |
| 16180398 | 20110201 | 13.25 | 2.25 | 2 |
| 16180465 | 20110201 | 13.125 | 2.25 | 2 |
| 16180534 | 20110201 | 13.5 | 2.25 | 2 |
| 16179085 | 20060501 | 9.999 | 4.25 | 0 |
| 16178972 | 20060501 | 9.999 | 3.9 | 0 |
| 16180303 | 20110201 | 11.875 | 2.25 | 2 |
| 16180158 | 20060501 | 12.5 | 3.75 | 0 |
| 16179159 | 20060501 | 9.95 | 3.525 | 0 |
| 16180371 | 20110201 | 12.125 | 2.25 | 2 |
| 16179063 | 20060501 | 9.999 | 4.4 | 0 |
| 16178987 | 20060501 | 9.999 | 3.4 | 0 |
| 16179725 | 20060501 | 9.95 | 3.45 | 0 |
| 16179595 | 20060501 | 9.95 | 2.284 | 0 |
| 16178797 | 20110301 | 11.75 | 2.25 | 2 |
| 16180135 | 20060501 | 12.5 | 3.525 | 0 |
| 16178606 | 20110201 | 11.875 | 2.25 | 2 |
| 16179342 | 20060501 | 9.95 | 3.45 | 0 |
| 16178899 | 20060501 | 9.95 | 3.525 | 0 |
| 16180566 | 20110201 | 12.25 | 2.25 | 2 |
| 16180466 | 20110201 | 12.25 | 2.25 | 2 |
| 16178965 | 20060501 | 9.999 | 4.375 | 0 |
| 16180535 | 20110201 | 12.5 | 2.25 | 2 |
| 16180304 | 20110201 | 12.25 | 2.25 | 2 |
| 16178432 | 20110101 | 11.75 | 2.25 | 2 |
| 16178988 | 20060501 | 9.999 | 3.5 | 0 |
| 16179726 | 20060501 | 9.95 | 3.45 | 0 |
| 16178881 | 20110301 | 11 | 2.25 | 2 |
| 16180055 | 20060501 | 12.5 | 4.65 | 0 |
| 16179962 | 20060501 | 9.95 | 3.45 | 0 |
| 16178910 | 20060501 | 9.999 | 4.4 | 0 |
| 16178573 | 20110201 | 11.375 | 2.25 | 2 |
| 16179239 | 20060501 | 9.95 | 3.95 | 0 |
| 16179305 | 20060501 | 9.95 | 2.8 | 0 |
| 16178244 | 20101201 | 10.875 | 2.25 | 2 |
| 16178664 | 20101201 | 12.625 | 3.5 | 2 |
| 16178513 | 20110201 | 11.5 | 2.25 | 2 |
| 16179841 | 20060501 | 9.95 | 3.075 | 0 |
| 16179887 | 20060501 | 9.95 | 3.45 | 0 |
| 16180520 | 20110201 | 12.75 | 2.25 | 2 |
| 16180589 | 20110201 | 13.5 | 2.25 | 2 |
| 16179988 | 20060501 | 9.95 | 3.45 | 0 |
| 16180422 | 20110201 | 13 | 2.25 | 2 |
| 16180182 | 20060501 | 12.5 | 3.4 | 0 |
| 16179171 | 20060501 | 8.95 | 3.7 | 0 |
| 16178417 | 20110101 | 11.5 | 2.25 | 2 |
| 16178275 | 20110201 | 11.375 | 3.25 | 1 |
| 16178478 | 20110201 | 11.375 | 2.25 | 2 |
| 16178190 | 20110101 | 11.125 | 3.25 | 1 |
| 16180120 | 20060501 | 12.5 | 3.35 | 0 |
| 16180009 | 20060501 | 9.95 | 3.2 | 0 |
| 16179842 | 20060501 | 9.95 | 3.45 | 0 |
| 16179633 | 20060501 | 9.95 | 3.2 | 0 |
| 16180521 | 20110201 | 12.5 | 2.25 | 2 |
| 16180590 | 20110201 | 12.375 | 2.25 | 2 |
| 16179936 | 20060501 | 9.95 | 3.45 | 0 |

Unassociated Document                                        Page 307 of 835
12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 29 of 279

| | | | | |
|---|---|---|---|---|
| 16179444 | 20060501 | 9.95 | 3.45 | 0 |
| 16180059 | 20060501 | 12.5 | 3.775 | 0 |
| 16180423 | 20110201 | 12.625 | 2.25 | 2 |
| 16179963 | 20060501 | 9.95 | 3.45 | 0 |
| 16179770 | 20060501 | 9.95 | 5.25 | 0 |
| 16179954 | 20060501 | 9.95 | 3.45 | 0 |
| 16178245 | 20110201 | 11.125 | 2.25 | 2 |
| 16180522 | 20110201 | 12.875 | 2.25 | 2 |
| 16179634 | 20060501 | 9.95 | 3.075 | 0 |
| 16179122 | 20060501 | 9.95 | 3.7 | 0 |
| 16180591 | 20110201 | 12.375 | 2.25 | 2 |
| 16179782 | 20060501 | 9.95 | 3.5 | 0 |
| 16180424 | 20110201 | 12.5 | 2.25 | 2 |
| 16178418 | 20110201 | 11.75 | 2.25 | 2 |
| 16179964 | 20060501 | 9.95 | 3.45 | 0 |
| 16178911 | 20060501 | 9.999 | 3.6 | 0 |
| 16179667 | 20060501 | 9.95 | 3.325 | 0 |
| 16179240 | 20060501 | 9.95 | 3.525 | 0 |
| 16179955 | 20060501 | 9.95 | 3.45 | 0 |
| 16179844 | 20060501 | 9.95 | 3.45 | 0 |
| 16179635 | 20060501 | 9.95 | 3.2 | 0 |
| 16179889 | 20060501 | 9.95 | 3.45 | 0 |
| 16180523 | 20110201 | 12.25 | 2.25 | 2 |
| 16179197 | 20060501 | 9.95 | 3.4 | 0 |
| 16180592 | 20110201 | 12.5 | 2.25 | 2 |
| 16179937 | 20060501 | 9.95 | 3.45 | 0 |
| 16178457 | 20110201 | 11.375 | 2.75 | 2 |
| 16179445 | 20060501 | 9.95 | 3.325 | 0 |
| 16178725 | 20110301 | 11.375 | 2.25 | 2 |
| 16179069 | 20060501 | 9.999 | 4 | 0 |
| 16178543 | 20110201 | 11.625 | 2.25 | 2 |
| 16179668 | 20060501 | 9.95 | 3.45 | 0 |
| 16180085 | 20060501 | 12.5 | 3.325 | 0 |
| 16179311 | 20060501 | 9.95 | 3.325 | 0 |
| 16178680 | 20110201 | 11.75 | 2.25 | 2 |
| 16179286 | 20060501 | 9.95 | 2.9 | 0 |
| 16180010 | 20060501 | 9.95 | 3.45 | 0 |
| 16178246 | 20110201 | 11.875 | 2.25 | 2 |
| 16178844 | 20110301 | 11.625 | 2.25 | 2 |
| 16179793 | 20060501 | 9.95 | 3.75 | 0 |
| 16179636 | 20060501 | 9.95 | 3.075 | 0 |
| 16180593 | 20110201 | 12.5 | 2.25 | 2 |
| 16178419 | 20110101 | 11.5 | 2.25 | 2 |
| 16179789 | 20060501 | 9.95 | 3.5 | 0 |
| 16180136 | 20060501 | 12.5 | 3.775 | 0 |
| 16178333 | 20110101 | 11.25 | 2.25 | 2 |
| 16178176 | 20101201 | 10.75 | 2.25 | 1 |
| 16179375 | 20060501 | 9.95 | 3.45 | 0 |
| 16179550 | 20060501 | 9.95 | 3.5 | 0 |
| 16180528 | 20110201 | 12.5 | 2.25 | 2 |
| 16180297 | 20110201 | 13.5 | 2.25 | 2 |
| 16179158 | 20060501 | 9.95 | 3.525 | 0 |
| 16180365 | 20110201 | 13.75 | 2.25 | 2 |
| 16179038 | 20060501 | 9.99 | 3.7 | 0 |
| 16180267 | 20110201 | 12.75 | 2.25 | 2 |
| 16179591 | 20060501 | 9.95 | 3.325 | 0 |
| 16179026 | 20060501 | 9.999 | 4.375 | 0 |
| 16178312 | 20110201 | 11.125 | 2.25 | 2 |
| 16179568 | 20060501 | 9.95 | 3.45 | 0 |
| 16178324 | 20110101 | 12 | 2.25 | 2 |
| 16178711 | 20090201 | 12.5 | 2.25 | 2 |
| 16178630 | 20110301 | 12.5 | 2.25 | 2 |
| 16179522 | 20060501 | 9.95 | 3.5 | 0 |
| 16178631 | 20090201 | 12.5 | 2.25 | 2 |
| 16179523 | 20060501 | 9.95 | 3.5 | 0 |
| 16178470 | 20090201 | 12.5 | 2.25 | 2 |
| 16180095 | 20060501 | 12.5 | 3.15 | 0 |
| 16179961 | 20060501 | 9.95 | 3.45 | 0 |
| 16179532 | 20060501 | 9.95 | 3.45 | 0 |
| 16178393 | 20110201 | 11.25 | 2.25 | 2 |
| 16180101 | 20060501 | 12.5 | 3.2 | 0 |
| 16180087 | 20060501 | 12.5 | 3.775 | 0 |
| 16180100 | 20060501 | 12.5 | 4.075 | 0 |
| 16178737 | 20110301 | 12.125 | 2.25 | 2 |
| 16178614 | 20110201 | 11.625 | 2.25 | 2 |
| 16180519 | 20110201 | 12.625 | 2.25 | 2 |
| 16179886 | 20060501 | 9.95 | 3.45 | 0 |
| 16180588 | 20110201 | 12.5 | 2.25 | 2 |
| 16179934 | 20060501 | 9.95 | 3.45 | 0 |
| 16179987 | 20060501 | 9.95 | 3.45 | 0 |
| 16180421 | 20110201 | 12.375 | 2.25 | 2 |
| 16178986 | 20060501 | 9.999 | 4.4 | 0 |
| 16180488 | 20110201 | 13 | 2.25 | 2 |
| 16178995 | 20060501 | 9.999 | 3.5 | 0 |
| 16179420 | 20060501 | 9.95 | 2.95 | 0 |
| 16178287 | 20110101 | 12.25 | 3.5 | 2 |
| 16178438 | 20110201 | 11.5 | 2.25 | 2 |
| 16178752 | 20110301 | 11.25 | 2.25 | 2 |
| 16178229 | 20110201 | 11.75 | 2.25 | 2 |
| 16180489 | 20110201 | 12 | 2.25 | 2 |
| 16179865 | 20060501 | 9.95 | 3.45 | 0 |
| 16180559 | 20110201 | 12.75 | 2.25 | 2 |
| 16180394 | 20110201 | 12.75 | 2.25 | 2 |
| 16180459 | 20110201 | 12.75 | 2.25 | 2 |
| 16178408 | 20110101 | 11.25 | 2.25 | 2 |

| | | | | |
|---|---|---|---|---|
| 16179606 | 20060501 | 9.95 | 3.5 | 0 |
| 16179625 | 20060501 | 9.95 | 3.5 | 0 |
| 16178982 | 20060501 | 9.999 | 3.6 | 0 |
| 16179720 | 20060501 | 9.95 | 3.975 | 0 |
| 16180038 | 20060501 | 12.5 | 3.575 | 0 |
| 16180082 | 20060501 | 12.5 | 2.95 | 0 |
| 16178867 | 20110301 | 11.625 | 2.25 | 2 |
| 16179989 | 20060501 | 9.95 | 3.975 | 0 |
| 16179866 | 20060501 | 9.95 | 3.45 | 0 |
| 16180490 | 20110201 | 13.5 | 2.25 | 2 |
| 16180560 | 20110201 | 12.25 | 2.25 | 2 |
| 16179421 | 20060501 | 9.95 | 3.45 | 0 |
| 16180329 | 20110201 | 12.75 | 2.25 | 2 |
| 16180395 | 20110201 | 12.375 | 2.25 | 2 |
| 16180460 | 20110201 | 13.125 | 2.25 | 2 |
| 16178807 | 20110301 | 11.5 | 2.25 | 2 |
| 16179167 | 20060501 | 9.95 | 3.7 | 0 |
| 16180164 | 20060501 | 12.5 | 3.75 | 0 |
| 16180056 | 20060501 | 12.5 | 3.275 | 0 |
| 16179827 | 20060501 | 9.95 | 2.875 | 0 |
| 16178430 | 20110201 | 11.75 | 2.25 | 2 |
| 16178530 | 20110201 | 11.375 | 2.25 | 2 |
| 16178776 | 20110301 | 11.375 | 2.25 | 2 |
| 16179534 | 20060501 | 9.95 | 3.45 | 0 |
| 16179517 | 20060501 | 9.95 | 3.5 | 0 |
| 16178230 | 20110201 | 11.625 | 2.25 | 2 |
| 16179990 | 20060501 | 9.95 | 3.2 | 0 |
| 16179867 | 20060501 | 9.95 | 3.45 | 0 |
| 16180491 | 20110201 | 12.75 | 2.25 | 2 |
| 16180561 | 20110201 | 11.875 | 2.25 | 2 |
| 16178977 | 20060501 | 9.999 | 3.8 | 0 |
| 16180330 | 20110201 | 12 | 2.25 | 2 |
| 16180396 | 20110201 | 12.25 | 2.25 | 2 |
| 16178409 | 20110201 | 11.875 | 2.25 | 2 |
| 16179721 | 20060501 | 9.95 | 3.45 | 0 |
| 16179312 | 20060501 | 9.95 | 3.125 | 0 |
| 16179535 | 20060501 | 9.95 | 3.45 | 0 |
| 16179304 | 20060501 | 9.95 | 3.4 | 0 |
| 16178577 | 20110201 | 11.625 | 2.25 | 2 |
| 16178671 | 20110301 | 11.5 | 2.25 | 2 |
| 16178746 | 20110301 | 11.5 | 2.25 | 2 |
| 16178507 | 20110201 | 11.75 | 2.25 | 2 |
| 16178558 | 20110201 | 12.25 | 2.25 | 2 |
| 16180425 | 20110201 | 12.375 | 2.25 | 2 |
| 16180492 | 20110201 | 11.875 | 2.25 | 2 |
| 16180562 | 20110201 | 13.25 | 2.25 | 2 |
| 16179002 | 20060501 | 9.999 | 4 | 0 |
| 16180331 | 20110201 | 13.25 | 2.25 | 2 |
| 16178439 | 20110201 | 11.875 | 2.25 | 2 |
| 16179058 | 20060501 | 9.99 | 4.4 | 0 |
| 16178431 | 20110201 | 11.375 | 2.25 | 2 |
| 16180167 | 20060501 | 12.5 | 3.575 | 0 |
| 16179536 | 20060501 | 9.95 | 3.45 | 0 |
| 16179332 | 20060501 | 9.95 | 3.25 | 0 |
| 16180071 | 20060501 | 12.5 | 3.325 | 0 |
| 16179938 | 20060501 | 9.95 | 3.45 | 0 |
| 16178231 | 20110201 | 11.625 | 2.25 | 2 |
| 16180426 | 20110201 | 12.25 | 2.25 | 2 |
| 16179868 | 20060501 | 9.95 | 3.45 | 0 |
| 16180493 | 20110201 | 12.875 | 2.25 | 2 |
| 16180563 | 20110201 | 12.5 | 2.25 | 2 |
| 16178978 | 20060501 | 9.999 | 4.4 | 0 |
| 16179647 | 20060501 | 9.95 | 3.5 | 0 |
| 16180332 | 20110201 | 13.75 | 2.25 | 2 |
| 16180397 | 20110201 | 12 | 2.25 | 2 |
| 16179743 | 20060501 | 9.95 | 3.45 | 0 |
| 16180142 | 20060501 | 12.5 | 3.775 | 0 |
| 16179965 | 20060501 | 9.95 | 3.45 | 0 |
| 16179537 | 20060501 | 9.95 | 3.45 | 0 |
| 16178672 | 20110301 | 11.75 | 2.25 | 2 |
| 16180189 | 20060501 | 12.5 | 3.7 | 0 |
| 16179939 | 20060501 | 9.95 | 3.45 | 0 |
| 16180594 | 20110201 | 12.25 | 2.25 | 2 |
| 16179991 | 20060501 | 9.95 | 3.45 | 0 |
| 16180427 | 20110201 | 12.75 | 2.25 | 2 |
| 16179869 | 20060501 | 9.95 | 3.45 | 0 |
| 16180494 | 20110201 | 13.375 | 2.25 | 2 |
| 16180564 | 20110201 | 13.5 | 2.25 | 2 |
| 16179003 | 20060501 | 9.999 | 2.95 | 0 |
| 16179093 | 20060501 | 9.999 | 3.5 | 0 |
| 16180333 | 20110201 | 12.125 | 2.25 | 2 |
| 16178993 | 20060501 | 9.999 | 3.5 | 0 |
| 16179798 | 20060501 | 9.95 | 1 | 0 |
| 16179538 | 20060501 | 9.95 | 3.45 | 0 |
| 16179338 | 20060501 | 9.95 | 3.5 | 0 |
| 16178276 | 20090101 | 12.625 | 2.25 | 2.25 |
| 16178542 | 20110201 | 11.25 | 2.25 | 2 |
| 16178247 | 20110101 | 11.5 | 2.25 | 2 |
| 16180595 | 20110201 | 12.375 | 2.25 | 2 |
| 16178232 | 20101101 | 11.5 | 2.25 | 2 |
| 16180428 | 20110201 | 13.375 | 2.25 | 2 |
| 16179870 | 20060501 | 9.95 | 3.45 | 0 |
| 16180495 | 20110201 | 12.625 | 2.25 | 2 |
| 16180565 | 20110201 | 12.5 | 2.25 | 2 |
| 16179172 | 20060501 | 9.95 | 3.525 | 0 |

| | | | | |
|---|---|---|---|---|
| 16179425 | 20060501 | 9.95 | 2.95 | 0 |
| 16178410 | 20110201 | 11.5 | 2.25 | 2 |
| 16178929 | 20060501 | 9.999 | 3.2 | 0 |
| 16178747 | 20110301 | 11.5 | 2.25 | 2 |
| 16179940 | 20060501 | 9.95 | 3.45 | 0 |
| 16180596 | 20110201 | 12.375 | 2.25 | 2 |
| 16179992 | 20060501 | 9.95 | 3.45 | 0 |
| 16180429 | 20110201 | 11.875 | 2.25 | 2 |
| 16179871 | 20060501 | 9.95 | 3.45 | 0 |
| 16180496 | 20110201 | 12.5 | 2.25 | 2 |
| 16180173 | 20060501 | 12.5 | 2.5 | 0 |
| 16179426 | 20060501 | 9.95 | 3.45 | 0 |
| 16180334 | 20110201 | 12.125 | 2.25 | 2 |
| 16178440 | 20110201 | 11.375 | 2.25 | 2 |
| 16179745 | 20060501 | 9.95 | 3.45 | 0 |
| 16178808 | 20110301 | 12.125 | 2.25 | 2 |
| 16179966 | 20060501 | 9.95 | 2.95 | 0 |
| 16179028 | 20060501 | 9.999 | 3.9 | 0 |
| 16178930 | 20060501 | 9.999 | 3.15 | 0 |
| 16178344 | 20110101 | 12.375 | 2.25 | 2 |
| 16178248 | 20101001 | 10.875 | 2.25 | 2 |
| 16179893 | 20060501 | 9.95 | 3.45 | 0 |
| 16179941 | 20060501 | 9.95 | 3.45 | 0 |
| 16180597 | 20110201 | 11.875 | 2.25 | 2 |
| 16179181 | 20060501 | 9.95 | 3.7 | 0 |
| 16180430 | 20110201 | 13.5 | 2.25 | 2 |
| 16179186 | 20060501 | 9.95 | 3.45 | 0 |
| 16179872 | 20060501 | 9.95 | 3.45 | 0 |
| 16180497 | 20110201 | 12.375 | 2.25 | 2 |
| 16178861 | 20110301 | 11.625 | 2.25 | 2 |
| 16179004 | 20060501 | 9.999 | 4.4 | 0 |
| 16179427 | 20060501 | 9.95 | 3.45 | 0 |
| 16178731 | 20110301 | 11.375 | 2.25 | 2 |
| 16180145 | 20060501 | 12.5 | 3.95 | 0 |
| 16179967 | 20060501 | 9.95 | 3.45 | 0 |
| 16179539 | 20060501 | 9.95 | 3.45 | 0 |
| 16178539 | 20110201 | 11.375 | 2.25 | 2 |
| 16180121 | 20060501 | 12.5 | 3.325 | 0 |
| 16178345 | 20101201 | 12.5 | 2.25 | 2 |
| 16178217 | 20110101 | 11.75 | 2.25 | 2 |
| 16178738 | 20110301 | 10.875 | 2.25 | 2 |
| 16178498 | 20110201 | 11.25 | 2.25 | 2 |
| 16180015 | 20060501 | 9.95 | 3.45 | 0 |
| 16178609 | 20110201 | 11.375 | 2.25 | 2 |
| 16179894 | 20060501 | 9.95 | 3.45 | 0 |
| 16180002 | 20060501 | 9.95 | 3.45 | 0 |
| 16179187 | 20060501 | 9.95 | 3.525 | 0 |
| 16178501 | 20110201 | 11.75 | 2.25 | 2 |
| 16180513 | 20110201 | 12.5 | 2.25 | 2 |
| 16179882 | 20060501 | 9.95 | 3.325 | 0 |
| 16179440 | 20060501 | 9.95 | 3.85 | 0 |
| 16178445 | 20110101 | 11.75 | 2.25 | 2 |
| 16178316 | 20101201 | 12.875 | 2.25 | 2 |
| 16180064 | 20060501 | 12.5 | 3.275 | 0 |
| 16179543 | 20060501 | 9.95 | 3.45 | 0 |
| 16178907 | 20060501 | 9.95 | 3.4 | 0 |
| 16178347 | 20110101 | 11.875 | 2.25 | 2 |
| 16179649 | 20060501 | 9.95 | 3.375 | 0 |
| 16178257 | 20110201 | 11.25 | 2.25 | 2 |
| 16179200 | 20060501 | 12.45 | 3.525 | 0 |
| 16180615 | 20110201 | 12.25 | 2.25 | 2 |
| 16180003 | 20060501 | 9.95 | 3.45 | 0 |
| 16178242 | 20110201 | 11.5 | 2.25 | 2 |
| 16178321 | 20110201 | 10.625 | 2.25 | 2 |
| 16178998 | 20060501 | 9.999 | 3.6 | 0 |
| 16180514 | 20110201 | 12.125 | 2.25 | 2 |
| 16179629 | 20060501 | 9.95 | 3.45 | 0 |
| 16180583 | 20110201 | 12.75 | 2.25 | 2 |
| 16179441 | 20060501 | 9.95 | 3.45 | 0 |
| 16179340 | 20060501 | 9.95 | 3.5 | 0 |
| 16178274 | 20110201 | 11.625 | 3.25 | 1 |
| 16178538 | 20110201 | 11.5 | 2.25 | 2 |
| 16179612 | 20060501 | 9.95 | 3.375 | 0 |
| 16179651 | 20060501 | 9.95 | 3.5 | 0 |
| 16178904 | 20060501 | 9.95 | 3.7 | 0 |
| 16178579 | 20110201 | 12.25 | 2.25 | 2 |
| 16180090 | 20060501 | 12.5 | 4.15 | 0 |
| 16178616 | 20110201 | 11.875 | 2.25 | 2 |
| 16179907 | 20060501 | 9.95 | 3.45 | 0 |
| 16180616 | 20110201 | 12.25 | 2.25 | 2 |
| 16179949 | 20060501 | 9.95 | 3.45 | 0 |
| 16179188 | 20060501 | 9.95 | 3.95 | 0 |
| 16180515 | 20110201 | 12.375 | 2.25 | 2 |
| 16179080 | 20060501 | 9.999 | 4 | 0 |
| 16178446 | 20110101 | 11.5 | 2.25 | 2 |
| 16179800 | 20060501 | 9.95 | 3.5 | 0 |
| 16178839 | 20110301 | 12 | 2.25 | 2 |
| 16179661 | 20060501 | 9.95 | 3.325 | 0 |
| 16178348 | 20110101 | 11.75 | 2.25 | 2 |
| 16178330 | 20110101 | 12.875 | 2.25 | 2 |
| 16178258 | 20110201 | 11.875 | 2.25 | 2 |
| 16180097 | 20060501 | 12.5 | 3.2 | 0 |
| 16179908 | 20060501 | 9.95 | 3.45 | 0 |
| 16179238 | 20060501 | 9.95 | 3.15 | 0 |
| 16180617 | 20110201 | 13.5 | 2.25 | 2 |

Unassociated Document                                                    Page 310 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 32 of 279

| | | | | |
|---|---|---|---|---|
| 16179192 | 20060501 | 9.95 | 3.55 | 0 |
| 16180516 | 20110201 | 11.875 | 2.25 | 2 |
| 16180148 | 20060501 | 12.5 | 2.775 | 2 |
| 16178732 | 20110301 | 11.375 | 2.25 | 2 |
| 16179662 | 20060501 | 9.95 | 3.975 | 0 |
| 16178187 | 20090101 | 13.375 | 3.25 | 2 |
| 16178268 | 20081201 | 12 | 2.25 | 2 |
| 16178188 | 20081201 | 13.25 | 3.25 | 2 |
| 16179791 | 20060501 | 9.95 | 3.5 | 0 |
| 16179795 | 20060501 | 9.95 | 3.5 | 0 |
| 16179797 | 20060501 | 9.95 | 3.5 | 0 |
| 16179959 | 20060501 | 9.95 | 3.5 | 0 |
| 16179799 | 20060501 | 9.95 | 3.75 | 0 |
| 16178350 | 20110201 | 12.5 | 2.25 | 2 |
| 16178351 | 20110101 | 12.5 | 2.25 | 1 |
| 16178270 | 20090101 | 11.875 | 2.25 | 2 |
| 16178514 | 20090201 | 12.75 | 2.25 | 2 |
| 16178352 | 20110101 | 11.75 | 3.25 | 2 |
| 16178271 | 20081201 | 12.125 | 2.25 | 2 |
| 16178272 | 20081201 | 12.125 | 2.25 | 2 |
| 16179325 | 20060501 | 9.95 | 4.75 | 0 |
| 16179406 | 20060501 | 9.95 | 3.5 | 0 |
| 16178515 | 20090201 | 13.25 | 2.25 | 2 |
| 16179326 | 20060501 | 9.95 | 5.125 | 0 |
| 16178516 | 20090201 | 12.5 | 2.25 | 2 |
| 16178273 | 20110101 | 12.5 | 2.25 | 2 |
| 16178193 | 20081201 | 13 | 3.25 | 2 |
| 16179409 | 20060501 | 9.95 | 3.5 | 0 |
| 16178194 | 20090101 | 13 | 3.25 | 2 |
| 16178195 | 20101201 | 12.5 | 2.25 | 1 |
| 16178196 | 20090101 | 13.375 | 2.25 | 2 |
| 16178277 | 20090201 | 11.125 | 2.25 | 1 |
| 16178358 | 20090201 | 12.875 | 2.25 | 2 |
| 16178197 | 20090101 | 13 | 3.25 | 2 |
| 16178278 | 20090101 | 12.625 | 3.5 | 2 |
| 16178198 | 20081201 | 12 | 3.5 | 2 |
| 16178279 | 20090101 | 13.375 | 2.25 | 2 |
| 16178199 | 20090101 | 12.125 | 3.25 | 2 |
| 16180004 | 20060501 | 9.95 | 3.2 | 0 |
| 16178520 | 20090201 | 12.5 | 2.25 | 2 |
| 16178603 | 20110201 | 12.375 | 2.25 | 2 |
| 16178360 | 20090201 | 12.25 | 2.25 | 2 |
| 16178604 | 20110201 | 12.5 | 2.25 | 1 |
| 16178607 | 20090201 | 12.375 | 2.25 | 2 |
| 16179336 | 20060501 | 9.95 | 4 | 0 |
| 16178283 | 20090101 | 12.125 | 2.25 | 2 |
| 16178284 | 20090101 | 13 | 2.25 | 2 |
| 16179337 | 20060501 | 9.95 | 4 | 0 |
| 16178527 | 20110201 | 12.5 | 2.25 | 2 |
| 16178529 | 20090201 | 12.5 | 2.25 | 2 |
| 16179892 | 20060501 | 9.95 | 3.075 | 0 |
| 16180019 | 20060501 | 9.95 | 3.5 | 0 |
| 16178612 | 20110301 | 12.5 | 2.25 | 2 |
| 16178370 | 20081101 | 11.625 | 2.25 | 2 |
| 16178533 | 20090201 | 12.875 | 2.25 | 2 |
| 16178534 | 20090201 | 12.125 | 2.25 | 2 |
| 16178535 | 20110201 | 12.375 | 2.25 | 2 |
| 16178536 | 20090201 | 12.5 | 2.25 | 2 |
| 16178537 | 20090201 | 12.5 | 2.25 | 2 |
| 16178456 | 20090201 | 13.25 | 3.25 | 2 |
| 16178294 | 20090101 | 13.375 | 2.25 | 2 |
| 16178618 | 20110201 | 12.625 | 2.25 | 2 |
| 16178296 | 20090201 | 12.25 | 2.25 | 2 |
| 16178459 | 20090201 | 13.375 | 2.25 | 2 |
| 16178298 | 20090101 | 13.375 | 2.25 | 2 |
| 16178379 | 20090101 | 11.875 | 2.25 | 2 |
| 16180020 | 20060501 | 9.95 | 3.5 | 0 |
| 16178701 | 20090301 | 13.375 | 2.25 | 2 |
| 16178540 | 20090201 | 13 | 2.25 | 2 |
| 16179350 | 20060501 | 9.95 | 3.5 | 0 |
| 16178460 | 20090201 | 13.375 | 2.25 | 2 |
| 16178623 | 20090201 | 12.5 | 2.25 | 2 |
| 16178705 | 20090301 | 12.125 | 2.25 | 2 |
| 16178463 | 20090201 | 12.25 | 2.25 | 2 |
| 16178382 | 20090101 | 11.875 | 2.25 | 2 |
| 16178544 | 20090201 | 13.375 | 2.25 | 2 |
| 16178707 | 20090301 | 12.75 | 2.25 | 2 |
| 16179518 | 20060501 | 9.95 | 3.5 | 0 |
| 16178627 | 20110201 | 12.375 | 2.25 | 2 |
| 16178385 | 20090101 | 11.875 | 2.25 | 2 |
| 16178628 | 20110301 | 12.375 | 2.25 | 2 |
| 16178466 | 20110201 | 12.375 | 2.25 | 2 |
| 16178469 | 20110201 | 12.5 | 2.25 | 2 |
| 16178389 | 20090101 | 11.25 | 2.25 | 2 |
| 16178710 | 20090301 | 13.25 | 3.25 | 1 |
| 16180393 | 20110201 | 12.625 | 2.25 | 2 |
| 16179964 | 20060501 | 9.999 | 3.5 | 0 |
| 16179000 | 20060501 | 9.999 | 4.4 | 0 |
| 16179083 | 20060501 | 9.999 | 3.74 | 0 |
| 16180296 | 20110201 | 13.25 | 2.25 | 0 |
| 16179605 | 20060501 | 9.95 | 3.375 | 0 |
| 16179157 | 20060501 | 9.95 | 3.7 | 0 |
| 16179719 | 20060501 | 9.95 | 3.45 | 0 |
| 16180042 | 20060501 | 12.5 | 3.825 | 0 |
| 16178532 | 20110201 | 11.25 | 2.25 | 2 |

| 16178521 | 20110101 | 10.75 | 2.75 | 2 |
| 16179486 | 20060501 | 9.95 | 2.65 | 0 |
| 16178896 | 20060501 | 9.95 | 3.525 | 0 |
| 99999001 | 20110201 | 12.875 | 2.25 | 2 |
| 99999004 | 20110201 | 13.225 | 2.25 | 2 |
| 99999005 | 20110201 | 12.875 | 2.25 | 2 |
| 99999007 | 20110201 | 12.875 | 2.25 | 2 |
| 99999010 | 20060501 | 9.999 | 3.1 | 0 |
| 15980136 | 20060501 | 9.95 | 3.075 | 0 |
| 99999200 | 20110201 | 13.75 | 2.25 | 2 |
| 99999201 | 20110101 | 12.625 | 2.25 | 2 |
| 99999202 | 20110201 | 13.25 | 2.25 | 2 |

| LOAN_SEQ | LIEN | BALLOON | IO_FLAG | IO_PERIOD | PREPAY |
|---|---|---|---|---|---|
| 16180262 | First Lien | No | YES | 10YRIO | No |
| 122405144 | First Lien | No | NO | NONIO | Yes |
| 16178479 | First Lien | No | YES | 10YRIO | No |
| 16179674 | First Lien | No | NO | NONIO | Yes |
| 16180224 | First Lien | No | NO | NONIO | No |
| 16179289 | First Lien | No | NO | NONIO | Yes |
| 16179228 | First Lien | No | NO | NONIO | Yes |
| 16178371 | First Lien | No | YES | 10YRIO | Yes |
| 16179245 | First Lien | No | NO | NONIO | Yes |
| 16179852 | First Lien | No | NO | NONIO | Yes |
| 16180263 | First Lien | No | NO | NONIO | No |
| 16179810 | First Lien | No | NO | NONIO | Yes |
| 16178940 | First Lien | No | NO | NONIO | No |
| 16180106 | First Lien | No | NO | NONIO | Yes |
| 16180161 | First Lien | No | NO | NONIO | Yes |
| 16180225 | First Lien | No | YES | 10YRIO | No |
| 16179773 | First Lien | No | NO | NONIO | Yes |
| 16178566 | First Lien | No | YES | 10YRIO | No |
| 16179511 | First Lien | No | NO | NONIO | Yes |
| 16179290 | First Lien | No | NO | NONIO | Yes |
| 16179920 | First Lien | No | NO | NONIO | Yes |
| 16179019 | First Lien | No | NO | NONIO | Yes |
| 16180362 | First Lien | No | YES | 10YRIO | No |
| 16180264 | First Lien | No | YES | 10YRIO | No |
| 16179811 | First Lien | No | NO | NONIO | Yes |
| 16178420 | First Lien | No | YES | 10YRIO | No |
| 16179566 | First Lien | No | NO | NONIO | Yes |
| 16179675 | First Lien | No | NO | NONIO | Yes |
| 16180122 | First Lien | No | NO | NONIO | Yes |
| 16178735 | First Lien | No | YES | 5YRIO | No |
| 16180226 | First Lien | No | YES | 10YRIO | No |
| 16179512 | First Lien | No | NO | NONIO | Yes |
| 16179214 | First Lien | No | NO | NONIO | No |
| 16179133 | First Lien | No | NO | NONIO | Yes |
| 16179373 | First Lien | No | NO | NONIO | Yes |
| 16180363 | First Lien | No | YES | 10YRIO | Yes |
| 16180265 | First Lien | No | YES | 10YRIO | No |
| 16179703 | First Lien | No | NO | NONIO | Yes |
| 16179567 | First Lien | No | NO | NONIO | Yes |
| 16178332 | First Lien | No | YES | 10YRIO | No |
| 16178522 | First Lien | No | YES | 5YRIO | No |
| 16179482 | First Lien | No | NO | NONIO | Yes |
| 16179118 | First Lien | No | NO | NONIO | Yes |
| 16179134 | First Lien | No | NO | NONIO | Yes |
| 16179772 | First Lien | No | NO | NONIO | Yes |
| 16179374 | First Lien | No | NO | NONIO | Yes |
| 16180364 | First Lien | No | YES | 10YRIO | No |
| 16178546 | First Lien | No | YES | 10YRIO | No |
| 16178967 | First Lien | No | NO | NONIO | Yes |
| 16180266 | First Lien | No | YES | 10YRIO | No |
| 16179812 | First Lien | No | NO | NONIO | Yes |
| 16179704 | First Lien | No | NO | NONIO | Yes |
| 16179034 | First Lien | No | NO | NONIO | Yes |
| 16179692 | First Lien | No | NO | NONIO | Yes |
| 16180137 | First Lien | No | NO | NONIO | Yes |
| 16178328 | First Lien | No | YES | 10YRIO | No |
| 16179278 | First Lien | No | NO | NONIO | Yes |
| 16180228 | First Lien | No | YES | 10YRIO | No |
| 16178855 | First Lien | No | NO | NONIO | No |
| 16180185 | First Lien | No | NO | NONIO | Yes |
| 16179922 | First Lien | No | NO | NONIO | Yes |
| 16179942 | First Lien | No | NO | NONIO | Yes |
| 16180598 | First Lien | No | YES | 10YRIO | No |
| 16179008 | First Lien | No | NO | NONIO | Yes |
| 16179013 | First Lien | No | NO | NONIO | Yes |
| 16179203 | First Lien | No | NO | NONIO | Yes |
| 16179449 | First Lien | No | NO | NONIO | Yes |
| 16180431 | First Lien | No | YES | 10YRIO | Yes |
| 16178813 | First Lien | No | YES | 10YRIO | No |
| 16179102 | First Lien | No | NO | NONIO | Yes |
| 16179328 | First Lien | No | NO | NONIO | Yes |
| 16178996 | First Lien | No | NO | NONIO | Yes |
| 16179428 | First Lien | No | NO | NONIO | Yes |
| 16178441 | First Lien | No | YES | 10YRIO | No |
| 16179747 | First Lien | No | NO | NONIO | Yes |
| 16178706 | First Lien | No | YES | 10YRIO | No |
| 16179393 | First Lien | No | NO | NONIO | Yes |
| 16178681 | First Lien | No | YES | 10YRIO | No |

| | | | | | |
|---|---|---|---|---|---|
| 16178669 | First Lien | No | YES | 5YRIO | No |
| 16178528 | First Lien | No | YES | 10YRIO | Yes |
| 16179255 | First Lien | No | NO | NONIO | No |
| 16178249 | First Lien | No | YES | 5YRIO | No |
| 16180076 | First Lien | No | NO | NONIO | Yes |
| 16178600 | First Lien | No | YES | 10YRIO | No |
| 16179895 | First Lien | No | NO | NONIO | Yes |
| 16180599 | First Lien | No | YES | 10YRIO | No |
| 16179993 | First Lien | No | NO | NONIO | Yes |
| 16180432 | First Lien | No | YES | 10YRIO | No |
| 16179173 | First Lien | No | NO | NONIO | No |
| 16179429 | First Lien | No | NO | NONIO | Yes |
| 16180129 | First Lien | No | NO | NONIO | No |
| 16179748 | First Lien | No | NO | NONIO | Yes |
| 16179968 | First Lien | No | NO | NONIO | Yes |
| 16179029 | First Lien | No | NO | NONIO | No |
| 16178912 | First Lien | No | NO | NONIO | Yes |
| 16178931 | First Lien | No | NO | NONIO | Yes |
| 16178335 | First Lien | No | YES | 10YRIO | No |
| 16179650 | First Lien | No | NO | NONIO | Yes |
| 16178310 | First Lien | No | YES | 10YRIO | No |
| 16178218 | First Lien | No | YES | 5YRIO | No |
| 16179205 | First Lien | No | NO | NONIO | Yes |
| 16178739 | First Lien | No | YES | 10YRIO | Yes |
| 16180016 | First Lien | No | NO | NONIO | Yes |
| 16178266 | First Lien | No | YES | 10YRIO | No |
| 16179847 | First Lien | No | NO | NONIO | Yes |
| 16179896 | First Lien | No | NO | NONIO | No |
| 16179123 | First Lien | No | NO | NONIO | Yes |
| 16180600 | First Lien | No | NO | NONIO | No |
| 16179204 | First Lien | No | NO | NONIO | Yes |
| 16179450 | First Lien | No | NO | NONIO | Yes |
| 16178997 | First Lien | No | NO | NONIO | No |
| 16178781 | First Lien | No | YES | 10YRIO | Yes |
| 16179969 | First Lien | No | NO | NONIO | Yes |
| 16178953 | First Lien | No | NO | NONIO | No |
| 16178309 | First Lien | No | NO | NONIO | No |
| 16179242 | First Lien | No | NO | NONIO | Yes |
| 16178250 | First Lien | No | YES | 5YRIO | No |
| 16180017 | First Lien | No | NO | NONIO | Yes |
| 16180601 | First Lien | No | YES | 10YRIO | No |
| 16179014 | First Lien | No | NO | NONIO | No |
| 16180433 | First Lien | No | YES | 10YRIO | No |
| 16178805 | First Lien | No | YES | 10YRIO | No |
| 16179355 | First Lien | No | NO | NONIO | Yes |
| 16179042 | First Lien | No | NO | NONIO | No |
| 16180091 | First Lien | No | NO | NONIO | Yes |
| 16178590 | First Lien | No | YES | 10YRIO | No |
| 16178219 | First Lien | No | YES | 5YRIO | No |
| 16178264 | First Lien | No | YES | 10YRIO | No |
| 16178897 | First Lien | No | NO | NONIO | No |
| 16179125 | First Lien | No | NO | NONIO | Yes |
| 16179193 | First Lien | No | NO | NONIO | No |
| 16180602 | First Lien | No | YES | 10YRIO | No |
| 16179198 | First Lien | No | NO | NONIO | Yes |
| 16179451 | First Lien | No | NO | NONIO | Yes |
| 16178726 | First Lien | No | YES | 10YRIO | No |
| 16180048 | First Lien | No | NO | NONIO | Yes |
| 16180170 | First Lien | No | NO | NONIO | No |
| 16179970 | First Lien | No | NO | NONIO | Yes |
| 16179022 | First Lien | No | NO | NONIO | Yes |
| 16178295 | First Lien | No | YES | 10YRIO | No |
| 16178575 | First Lien | No | YES | 10YRIO | No |
| 16178666 | First Lien | No | YES | 10YRIO | Yes |
| 16180116 | First Lien | No | NO | NONIO | No |
| 16178601 | First Lien | No | YES | 10YRIO | No |
| 16178251 | First Lien | No | YES | 5YRIO | No |
| 16179783 | First Lien | No | NO | NONIO | Yes |
| 16179849 | First Lien | No | NO | NONIO | Yes |
| 16179898 | First Lien | No | NO | NONIO | Yes |
| 16179194 | First Lien | No | NO | NONIO | Yes |
| 16180603 | First Lien | No | YES | 10YRIO | No |
| 16179452 | First Lien | No | NO | NONIO | Yes |
| 16180627 | First Lien | No | YES | 10YRIO | No |
| 16179396 | First Lien | No | NO | NONIO | Yes |
| 16178936 | First Lien | No | NO | NONIO | No |
| 16178954 | First Lien | No | NO | NONIO | No |
| 16178913 | First Lien | No | NO | NONIO | Yes |
| 16179672 | First Lien | No | NO | NONIO | Yes |
| 16180110 | First Lien | No | NO | NONIO | Yes |
| 16178291 | First Lien | No | YES | 10YRIO | Yes |
| 16179264 | First Lien | No | NO | NONIO | Yes |
| 16178220 | First Lien | No | YES | 5YRIO | No |
| 16180018 | First Lien | No | NO | NONIO | No |
| 16179784 | First Lien | No | NO | NONIO | Yes |
| 16179108 | First Lien | No | NO | NONIO | No |
| 16179453 | First Lien | No | NO | NONIO | Yes |
| 16180259 | First Lien | No | YES | 10YRIO | No |
| 16179673 | First Lien | No | NO | NONIO | Yes |
| 16178689 | First Lien | No | YES | 10YRIO | Yes |
| 16178822 | First Lien | No | YES | 10YRIO | No |
| 16179265 | First Lien | No | NO | NONIO | Yes |
| 16179217 | First Lien | No | NO | NONIO | Yes |
| 16179243 | First Lien | No | NO | NONIO | No |
| 16179201 | First Lien | No | NO | NONIO | Yes |

Unassociated Document

Page 313 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 35 of 279

| | | | | | |
|---|---|---|---|---|---|
| 16179850 | First Lien | No | NO | NONIO | Yes |
| 16179899 | First Lien | No | NO | NONIO | Yes |
| 16179454 | First Lien | No | NO | NONIO | Yes |
| 16180260 | First Lien | No | YES | 10YRIO | No |
| 16179149 | First Lien | No | NO | NONIO | Yes |
| 16179033 | First Lien | No | NO | NONIO | Yes |
| 16179564 | First Lien | No | NO | NONIO | Yes |
| 16178550 | First Lien | No | YES | 5YRIO | No |
| 16178937 | First Lien | No | NO | NONIO | Yes |
| 16179790 | First Lien | No | NO | NONIO | Yes |
| 16180190 | First Lien | No | NO | NONIO | Yes |
| 16178581 | First Lien | No | YES | 10YRIO | No |
| 16178568 | First Lien | No | YES | 10YRIO | Yes |
| 16179132 | First Lien | No | NO | NONIO | Yes |
| 16179918 | First Lien | No | NO | NONIO | Yes |
| 16178221 | First Lien | No | NO | NONIO | No |
| 16179244 | First Lien | No | NO | NONIO | Yes |
| 16179017 | First Lien | No | NO | NONIO | No |
| 16179109 | First Lien | No | NO | NONIO | Yes |
| 16178364 | First Lien | No | YES | 10YRIO | No |
| 16179351 | First Lien | No | NO | NONIO | Yes |
| 16179398 | First Lien | No | NO | NONIO | Yes |
| 16180261 | First Lien | No | YES | 10YRIO | No |
| 16179052 | First Lien | No | NO | NONIO | No |
| 16179565 | First Lien | No | NO | NONIO | Yes |
| 16178938 | First Lien | No | NO | NONIO | No |
| 16178339 | First Lien | No | NO | NONIO | No |
| 16180105 | First Lien | No | NO | NONIO | Yes |
| 16180088 | First Lien | No | NO | NONIO | Yes |
| 16178281 | First Lien | No | YES | 10YRIO | No |
| 16179919 | First Lien | No | NO | NONIO | Yes |
| 16178192 | First Lien | No | YES | 10YRIO | No |
| 16179018 | First Lien | No | NO | NONIO | Yes |
| 16179851 | First Lien | No | NO | NONIO | Yes |
| 16179456 | First Lien | No | NO | NONIO | Yes |
| 16178773 | First Lien | No | NO | NONIO | No |
| 16178640 | First Lien | No | YES | 10YRIO | No |
| 16178688 | First Lien | No | YES | 10YRIO | No |
| 16179294 | First Lien | No | NO | NONIO | Yes |
| 16179235 | First Lien | No | NO | NONIO | No |
| 16180220 | First Lien | No | YES | 10YRIO | Yes |
| 16179250 | First Lien | No | NO | NONIO | Yes |
| 16179207 | First Lien | No | NO | NONIO | Yes |
| 16180070 | First Lien | No | NO | NONIO | Yes |
| 16179478 | First Lien | No | NO | NONIO | Yes |
| 16179370 | First Lien | No | NO | NONIO | Yes |
| 16179526 | First Lien | No | NO | NONIO | Yes |
| 16180452 | First Lien | No | YES | 10YRIO | Yes |
| 16180289 | First Lien | No | YES | 10YRIO | No |
| 16180358 | First Lien | No | YES | 10YRIO | No |
| 16179163 | First Lien | No | NO | NONIO | Yes |
| 16179036 | First Lien | No | NO | NONIO | Yes |
| 16179586 | First Lien | No | NO | NONIO | Yes |
| 16178784 | First Lien | No | YES | 10YRIO | No |
| 16178485 | First Lien | No | YES | 10YRIO | No |
| 16179654 | First Lien | No | NO | NONIO | Yes |
| 16180036 | First Lien | No | NO | NONIO | Yes |
| 16180163 | First Lien | No | NO | NONIO | Yes |
| 16179273 | First Lien | No | NO | NONIO | Yes |
| 16180221 | First Lien | No | YES | 10YRIO | No |
| 16178387 | First Lien | No | YES | 10YRIO | No |
| 16178359 | First Lien | No | NO | NONIO | No |
| 16178897 | First Lien | No | NO | NONIO | No |
| 16180077 | First Lien | No | NO | NONIO | Yes |
| 16179371 | First Lien | No | NO | NONIO | Yes |
| 16180453 | First Lien | No | NO | NONIO | No |
| 16180290 | First Lien | No | YES | 10YRIO | No |
| 16179716 | First Lien | No | NO | NONIO | Yes |
| 16179061 | First Lien | No | NO | NONIO | Yes |
| 16179764 | First Lien | No | NO | NONIO | Yes |
| 16179143 | First Lien | No | NO | NONIO | Yes |
| 16179807 | First Lien | No | NO | NONIO | Yes |
| 16178809 | First Lien | No | YES | 10YRIO | Yes |
| 16179024 | First Lien | No | NO | NONIO | Yes |
| 16178793 | First Lien | No | YES | 10YRIO | Yes |
| 16180139 | First Lien | No | NO | NONIO | No |
| 16179274 | First Lien | No | NO | NONIO | Yes |
| 16179295 | First Lien | No | NO | NONIO | Yes |
| 16180222 | First Lien | No | YES | 10YRIO | No |
| 16178842 | First Lien | No | YES | 10YRIO | Yes |
| 16178510 | First Lien | No | YES | 10YRIO | No |
| 16180622 | First Lien | No | YES | 10YRIO | No |
| 16180454 | First Lien | No | YES | 10YRIO | No |
| 16179166 | First Lien | No | NO | NONIO | Yes |
| 16179073 | First Lien | No | NO | NONIO | Yes |
| 16180291 | First Lien | No | YES | 10YRIO | No |
| 16180359 | First Lien | No | YES | 10YRIO | No |
| 16178448 | First Lien | No | YES | 10YRIO | No |
| 16180065 | First Lien | No | NO | NONIO | Yes |
| 16179808 | First Lien | No | NO | NONIO | Yes |
| 16179587 | First Lien | No | NO | NONIO | Yes |
| 16178638 | First Lien | No | NO | NONIO | No |
| 16179702 | First Lien | No | NO | NONIO | Yes |
| 16179655 | First Lien | No | NO | NONIO | Yes |
| 16179025 | First Lien | No | NO | NONIO | Yes |

Unassociated Document

Page 314 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 36 of 279

| | | | | | |
|---|---|---|---|---|---|
| 16179691 | First Lien | No | NO | NONIO | Yes |
| 16178587 | First Lien | No | YES | 10YRIO | No |
| 16178523 | First Lien | No | YES | 5YRIO | No |
| 16180223 | First Lien | No | YES | 10YRIO | No |
| 16179372 | First Lien | No | NO | NONIO | Yes |
| 16180623 | First Lien | No | YES | 10YRIO | No |
| 16180389 | First Lien | No | NO | NONIO | No |
| 16180455 | First Lien | No | YES | 10YRIO | No |
| 16179074 | First Lien | No | NO | NONIO | Yes |
| 16180292 | First Lien | No | YES | 10YRIO | No |
| 16180360 | First Lien | No | YES | 10YRIO | No |
| 16179809 | First Lien | No | NO | NONIO | Yes |
| 16180141 | First Lien | No | NO | NONIO | No |
| 16178620 | First Lien | No | YES | 10YRIO | No |
| 16178699 | First Lien | No | YES | 10YRIO | Yes |
| 16178629 | First Lien | No | NO | NONIO | No |
| 16180084 | First Lien | No | NO | NONIO | Yes |
| 16178825 | First Lien | No | YES | 10YRIO | No |
| 16179275 | First Lien | No | NO | NONIO | No |
| 16180181 | First Lien | No | NO | NONIO | Yes |
| 16178378 | First Lien | No | YES | 10YRIO | No |
| 16180624 | First Lien | No | NO | NONIO | No |
| 16180390 | First Lien | No | YES | 10YRIO | No |
| 16179184 | First Lien | No | NO | NONIO | No |
| 16180456 | First Lien | No | YES | 10YRIO | No |
| 16180293 | First Lien | No | YES | 10YRIO | No |
| 16179825 | First Lien | No | NO | NONIO | Yes |
| 16180361 | First Lien | No | NO | NONIO | No |
| 16178449 | First Lien | No | YES | 10YRIO | No |
| 16179717 | First Lien | No | NO | NONIO | Yes |
| 16180192 | First Lien | No | NO | NONIO | No |
| 16178652 | First Lien | No | YES | 10YRIO | Yes |
| 16180156 | First Lien | No | NO | NONIO | No |
| 16178945 | First Lien | No | NO | NONIO | Yes |
| 16178639 | First Lien | No | YES | 5YRIO | No |
| 16178778 | First Lien | No | YES | 5YRIO | No |
| 16178304 | First Lien | No | YES | 10YRIO | No |
| 16178325 | First Lien | No | YES | 10YRIO | Yes |
| 16179775 | First Lien | No | NO | NONIO | Yes |
| 16179236 | First Lien | No | NO | NONIO | Yes |
| 16178551 | First Lien | No | YES | 10YRIO | No |
| 16180556 | First Lien | No | NO | NONIO | No |
| 16180625 | First Lien | No | YES | 10YRIO | No |
| 16180391 | First Lien | No | YES | 10YRIO | No |
| 16179185 | First Lien | No | NO | NONIO | No |
| 16180457 | First Lien | No | YES | 10YRIO | Yes |
| 16179082 | First Lien | No | NO | NONIO | Yes |
| 16180294 | First Lien | No | YES | 10YRIO | No |
| 16179826 | First Lien | No | NO | NONIO | Yes |
| 16179718 | First Lien | No | NO | NONIO | Yes |
| 16179037 | First Lien | No | NO | NONIO | Yes |
| 16180151 | First Lien | No | NO | NONIO | Yes |
| 16178693 | First Lien | No | YES | 10YRIO | No |
| 16178865 | First Lien | No | YES | 10YRIO | No |
| 16179276 | First Lien | No | NO | NONIO | No |
| 16179499 | First Lien | No | NO | NONIO | Yes |
| 16178512 | First Lien | No | YES | 10YRIO | No |
| 16178228 | First Lien | No | YES | 5YRIO | No |
| 16180557 | First Lien | No | YES | 10YRIO | No |
| 16180392 | First Lien | No | YES | 10YRIO | No |
| 16180458 | First Lien | No | YES | 10YRIO | No |
| 16180172 | First Lien | No | NO | NONIO | Yes |
| 16180295 | First Lien | No | NO | NONIO | No |
| 16178407 | First Lien | No | YES | 10YRIO | No |
| 16180157 | First Lien | No | NO | NONIO | No |
| 16179062 | First Lien | No | NO | NONIO | No |
| 16178708 | First Lien | No | YES | 10YRIO | No |
| 16178338 | First Lien | No | YES | 10YRIO | Yes |
| 16178525 | First Lien | No | NO | NONIO | Yes |
| 16178181 | First Lien | No | YES | 10YRIO | Yes |
| 16179303 | First Lien | No | NO | NONIO | Yes |
| 16178391 | First Lien | No | YES | 10YRIO | Yes |
| 16179277 | First Lien | No | NO | NONIO | Yes |
| 16179500 | First Lien | No | NO | NONIO | Yes |
| 16179648 | First Lien | No | NO | NONIO | Yes |
| 16180074 | First Lien | No | NO | NONIO | Yes |
| 16180558 | First Lien | No | YES | 10YRIO | No |
| 16180327 | First Lien | No | YES | 10YRIO | No |
| 16180586 | First Lien | No | NO | NONIO | No |
| 16179932 | First Lien | No | NO | NONIO | Yes |
| 16179985 | First Lien | No | NO | NONIO | No |
| 16178959 | First Lien | No | NO | NONIO | Yes |
| 16180326 | First Lien | No | YES | 10YRIO | No |
| 16179646 | First Lien | No | NO | NONIO | No |
| 16179148 | First Lien | No | NO | NONIO | Yes |
| 16179162 | First Lien | No | NO | NONIO | No |
| 16179740 | First Lien | No | NO | NONIO | Yes |
| 16178713 | First Lien | No | YES | 10YRIO | Yes |
| 16178645 | First Lien | No | YES | 10YRIO | Yes |
| 16178548 | First Lien | No | NO | NONIO | Yes |
| 16178243 | First Lien | No | YES | 5YRIO | No |
| 16180518 | First Lien | No | YES | 10YRIO | No |
| 16179121 | First Lien | No | NO | NONIO | Yes |
| 16180587 | First Lien | No | NO | NONIO | No |
| 16179933 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16180186 | First Lien | No | NO | NONIO | Yes |
| 16179986 | First Lien | No | NO | NONIO | Yes |
| 16180420 | First Lien | No | NO | NONIO | No |
| 16178733 | First Lien | No | NO | NONIO | No |
| 16180487 | First Lien | No | YES | 10YRIO | No |
| 16179067 | First Lien | No | NO | NONIO | No |
| 16179170 | First Lien | No | NO | NONIO | Yes |
| 16178416 | First Lien | No | YES | 10YRIO | No |
| 16180067 | First Lien | No | NO | NONIO | Yes |
| 16179057 | First Lien | No | NO | NONIO | Yes |
| 16178200 | First Lien | No | YES | 3YRIO | No |
| 16178201 | First Lien | No | YES | 3YRIO | No |
| 16178202 | First Lien | No | YES | 3YRIO | No |
| 16178203 | First Lien | No | YES | 3YRIO | No |
| 16178204 | First Lien | No | YES | 3YRIO | No |
| 16178205 | First Lien | No | YES | 3YRIO | No |
| 16178206 | First Lien | No | YES | 3YRIO | No |
| 16178207 | First Lien | No | YES | 3YRIO | No |
| 16178208 | First Lien | No | YES | 3YRIO | No |
| 16178209 | First Lien | No | YES | 3YRIO | No |
| 16178841 | First Lien | No | YES | 10YRIO | No |
| 16178762 | First Lien | No | NO | NONIO | No |
| 16178843 | First Lien | No | YES | 10YRIO | No |
| 16178763 | First Lien | No | YES | 10YRIO | No |
| 16178845 | First Lien | No | YES | 10YRIO | No |
| 16178846 | First Lien | No | YES | 10YRIO | No |
| 16178684 | First Lien | No | YES | 10YRIO | No |
| 16178847 | First Lien | No | YES | 10YRIO | No |
| 16178685 | First Lien | No | YES | 3YRIO | No |
| 16178686 | First Lien | No | NO | NONIO | No |
| 16178848 | First Lien | No | NO | NONIO | No |
| 16178849 | First Lien | No | YES | 10YRIO | No |
| 16178687 | First Lien | No | YES | 10YRIO | Yes |
| 16178210 | First Lien | No | YES | 3YRIO | No |
| 16178211 | First Lien | No | YES | 3YRIO | No |
| 16178212 | First Lien | No | YES | 3YRIO | No |
| 16178213 | First Lien | No | YES | 3YRIO | No |
| 16178214 | First Lien | No | YES | 3YRIO | No |
| 16178215 | First Lien | No | YES | 3YRIO | No |
| 16178850 | First Lien | No | YES | 10YRIO | No |
| 16178852 | First Lien | No | YES | 10YRIO | No |
| 16178853 | First Lien | No | YES | 10YRIO | No |
| 16178772 | First Lien | No | NO | NONIO | No |
| 16178854 | First Lien | No | NO | NONIO | No |
| 16178692 | First Lien | No | NO | NONIO | No |
| 16178774 | First Lien | No | YES | 10YRIO | No |
| 16178857 | First Lien | No | NO | NONIO | No |
| 16178858 | First Lien | No | YES | 10YRIO | No |
| 16178859 | First Lien | No | YES | 10YRIO | Yes |
| 16178697 | First Lien | No | YES | 10YRIO | No |
| 16178779 | First Lien | No | NO | NONIO | No |
| 16178301 | First Lien | No | YES | 10YRIO | No |
| 16178303 | First Lien | No | NO | NONIO | No |
| 16178305 | First Lien | No | YES | 3YRIO | No |
| 16178307 | First Lien | No | YES | 10YRIO | No |
| 16179831 | First Lien | No | NO | NONIO | Yes |
| 16178860 | First Lien | No | YES | 10YRIO | No |
| 16178863 | First Lien | No | YES | 10YRIO | No |
| 16178866 | First Lien | No | YES | 10YRIO | No |
| 16178786 | First Lien | No | YES | 10YRIO | No |
| 16178868 | First Lien | No | YES | 10YRIO | No |
| 16178787 | First Lien | No | YES | 10YRIO | Yes |
| 16178869 | First Lien | No | NO | NONIO | No |
| 16178311 | First Lien | No | YES | 10YRIO | No |
| 16180194 | First Lien | No | YES | 10YRIO | No |
| 16180195 | First Lien | No | NO | NONIO | No |
| 16180196 | First Lien | No | NO | NONIO | No |
| 16180197 | First Lien | No | YES | 10YRIO | No |
| 16178317 | First Lien | No | YES | 10YRIO | Yes |
| 16180198 | First Lien | No | YES | 10YRIO | No |
| 16180199 | First Lien | No | YES | 10YRIO | No |
| 16179921 | First Lien | No | NO | NONIO | Yes |
| 16178319 | First Lien | No | YES | 10YRIO | Yes |
| 16178870 | First Lien | No | YES | 10YRIO | No |
| 16178790 | First Lien | No | YES | 10YRIO | No |
| 16178872 | First Lien | No | YES | 10YRIO | Yes |
| 16178873 | First Lien | No | YES | 10YRIO | No |
| 16178792 | First Lien | No | YES | 10YRIO | No |
| 16178874 | First Lien | No | YES | 10YRIO | No |
| 16178794 | First Lien | No | YES | 10YRIO | No |
| 16178875 | First Lien | No | YES | 10YRIO | No |
| 16178876 | First Lien | No | NO | NONIO | No |
| 16178795 | First Lien | No | YES | 10YRIO | No |
| 16178877 | First Lien | No | YES | 10YRIO | No |
| 16178322 | First Lien | No | NO | NONIO | No |
| 16178880 | First Lien | No | NO | NONIO | Yes |
| 16179771 | First Lien | No | NO | NONIO | Yes |
| 16178882 | First Lien | No | YES | 10YRIO | No |
| 16178883 | First Lien | No | YES | 10YRIO | No |
| 16179778 | First Lien | No | NO | NONIO | Yes |
| 16178170 | First Lien | No | YES | 10YRIO | No |
| 16178173 | First Lien | No | YES | 10YRIO | No |
| 16178336 | First Lien | No | YES | 10YRIO | No |
| 16178174 | First Lien | No | YES | 3YRIO | No |
| 16178177 | First Lien | No | YES | 10YRIO | No |

| | | | | | |
|---|---|---|---|---|---|
| 16178259 | First Lien | No | YES | 10YRIO | No |
| 16178178 | First Lien | No | YES | 10YRIO | Yes |
| 16178179 | First Lien | No | YES | 10YRIO | No |
| 16179785 | First Lien | No | NO | NONIO | Yes |
| 16179787 | First Lien | No | NO | NONIO | Yes |
| 16178502 | First Lien | No | YES | 10YRIO | No |
| 16180626 | First Lien | No | YES | 3YRIO | No |
| 16178503 | First Lien | No | YES | 10YRIO | No |
| 16178180 | First Lien | No | YES | 10YRIO | No |
| 16178504 | First Lien | No | YES | 10YRIO | No |
| 16178263 | First Lien | No | YES | 3YRIO | No |
| 16178506 | First Lien | No | YES | 10YRIO | No |
| 16178184 | First Lien | No | YES | 5YRIO | No |
| 16178508 | First Lien | No | YES | 5YRIO | No |
| 16178186 | First Lien | No | YES | 10YRIO | No |
| 16178267 | First Lien | No | NO | NONIO | Yes |
| 16180385 | First Lien | No | YES | 10YRIO | No |
| 16180449 | First Lien | No | YES | 10YRIO | No |
| 16179601 | First Lien | No | NO | NONIO | Yes |
| 16180286 | First Lien | No | NO | NONIO | No |
| 16178355 | First Lien | No | NO | NONIO | No |
| 16179713 | First Lien | No | NO | NONIO | Yes |
| 16180054 | First Lien | No | NO | NONIO | Yes |
| 16179761 | First Lien | No | NO | NONIO | Yes |
| 16178775 | First Lien | No | YES | 10YRIO | No |
| 16178286 | First Lien | No | YES | 10YRIO | No |
| 16179516 | First Lien | No | NO | NONIO | Yes |
| 16179407 | First Lien | No | NO | NONIO | Yes |
| 16180246 | First Lien | No | YES | 10YRIO | Yes |
| 16178481 | First Lien | No | YES | 10YRIO | No |
| 16178519 | First Lien | No | YES | 5YRIO | No |
| 16180479 | First Lien | No | YES | 10YRIO | No |
| 16178890 | First Lien | No | NO | NONIO | No |
| 16180549 | First Lien | No | YES | 10YRIO | No |
| 16180319 | First Lien | No | YES | 10YRIO | No |
| 16179089 | First Lien | No | NO | NONIO | Yes |
| 16180450 | First Lien | No | YES | 10YRIO | Yes |
| 16179165 | First Lien | No | NO | NONIO | No |
| 16180058 | First Lien | No | NO | NONIO | Yes |
| 16178405 | First Lien | No | NO | NONIO | No |
| 16178314 | First Lien | No | NO | NONIO | No |
| 16179714 | First Lien | No | NO | NONIO | Yes |
| 16178783 | First Lien | No | YES | 10YRIO | No |
| 16178524 | First Lien | No | YES | 5YRIO | Yes |
| 16180247 | First Lien | No | YES | 10YRIO | No |
| 16179390 | First Lien | No | NO | NONIO | No |
| 16179982 | First Lien | No | NO | NONIO | Yes |
| 16180480 | First Lien | No | YES | 10YRIO | No |
| 16180550 | First Lien | No | YES | 10YRIO | No |
| 16180320 | First Lien | No | YES | 10YRIO | No |
| 16179415 | First Lien | No | NO | NONIO | Yes |
| 16179738 | First Lien | No | NO | NONIO | Yes |
| 16180451 | First Lien | No | YES | 10YRIO | No |
| 16180144 | First Lien | No | NO | NONIO | Yes |
| 16179602 | First Lien | No | NO | NONIO | Yes |
| 16179146 | First Lien | No | NO | NONIO | No |
| 16178428 | First Lien | No | YES | 10YRIO | No |
| 16178644 | First Lien | No | YES | 10YRIO | No |
| 16178401 | First Lien | No | YES | 10YRIO | Yes |
| 16178691 | First Lien | No | YES | 10YRIO | No |
| 16179301 | First Lien | No | NO | NONIO | Yes |
| 16180248 | First Lien | No | YES | 10YRIO | No |
| 16179254 | First Lien | No | NO | NONIO | Yes |
| 16179391 | First Lien | No | NO | NONIO | Yes |
| 16179983 | First Lien | No | NO | NONIO | Yes |
| 16178225 | First Lien | No | NO | NONIO | No |
| 16178562 | First Lien | No | YES | 10YRIO | No |
| 16180481 | First Lien | No | YES | 10YRIO | No |
| 16178489 | First Lien | No | YES | 10YRIO | No |
| 16180551 | First Lien | No | YES | 10YRIO | No |
| 16180321 | First Lien | No | YES | 10YRIO | No |
| 16179779 | First Lien | No | NO | NONIO | Yes |
| 16179009 | First Lien | No | NO | NONIO | Yes |
| 16180386 | First Lien | No | NO | NONIO | No |
| 16178785 | First Lien | No | YES | 10YRIO | No |
| 16179048 | First Lien | No | NO | NONIO | Yes |
| 16179715 | First Lien | No | NO | NONIO | Yes |
| 16180138 | First Lien | No | NO | NONIO | Yes |
| 16178390 | First Lien | No | YES | 10YRIO | Yes |
| 16179984 | First Lien | No | NO | NONIO | No |
| 16180416 | First Lien | No | YES | 10YRIO | No |
| 16180482 | First Lien | No | YES | 10YRIO | No |
| 16180552 | First Lien | No | YES | 10YRIO | No |
| 16180322 | First Lien | No | YES | 10YRIO | No |
| 16179416 | First Lien | No | NO | NONIO | Yes |
| 16179090 | First Lien | No | NO | NONIO | Yes |
| 16178976 | First Lien | No | NO | NONIO | No |
| 16180387 | First Lien | No | YES | 10YRIO | Yes |
| 16179183 | First Lien | No | NO | NONIO | Yes |
| 16180052 | First Lien | No | NO | NONIO | Yes |
| 16180178 | First Lien | No | NO | NONIO | Yes |
| 16179739 | First Lien | No | NO | NONIO | Yes |
| 16178992 | First Lien | No | NO | NONIO | Yes |
| 16179072 | First Lien | No | NO | NONIO | Yes |
| 16178429 | First Lien | No | YES | 10YRIO | No |

| | | | | | |
|---|---|---|---|---|---|
| 16178226 | First Lien | No | YES | 5YRIO | No |
| 16179202 | First Lien | No | NO | NONIO | No |
| 16180417 | First Lien | No | YES | 10YRIO | Yes |
| 16180483 | First Lien | No | YES | 10YRIO | No |
| 16178473 | First Lien | No | YES | 10YRIO | No |
| 16180553 | First Lien | No | YES | 10YRIO | No |
| 16180323 | First Lien | No | YES | 10YRIO | No |
| 16180388 | First Lien | No | YES | 10YRIO | No |
| 16179830 | First Lien | No | NO | NONIO | Yes |
| 16178297 | First Lien | No | NO | NONIO | No |
| 16178505 | First Lien | No | YES | 10YRIO | No |
| 16178483 | First Lien | No | YES | 10YRIO | No |
| 16179306 | First Lien | No | NO | NONIO | Yes |
| 16180079 | First Lien | No | NO | NONIO | Yes |
| 16180584 | First Lien | No | YES | 10YRIO | No |
| 16180418 | First Lien | No | YES | 10YRIO | No |
| 16180484 | First Lien | No | NO | NONIO | No |
| 16180554 | First Lien | No | YES | 10YRIO | No |
| 16180324 | First Lien | No | YES | 10YRIO | No |
| 16179417 | First Lien | No | NO | NONIO | Yes |
| 16179091 | First Lien | No | NO | NONIO | Yes |
| 16178437 | First Lien | No | YES | 10YRIO | No |
| 16180169 | First Lien | No | NO | NONIO | No |
| 16179619 | First Lien | No | NO | NONIO | Yes |
| 16179960 | First Lien | No | NO | NONIO | Yes |
| 16178541 | First Lien | No | YES | 5YRIO | No |
| 16178265 | First Lien | No | YES | 10YRIO | No |
| 16178462 | First Lien | No | YES | 10YRIO | No |
| 16179196 | First Lien | No | NO | NONIO | No |
| 16180585 | First Lien | No | YES | 10YRIO | No |
| 16179931 | First Lien | No | NO | NONIO | Yes |
| 16178227 | First Lien | No | YES | 5YRIO | No |
| 16178511 | First Lien | No | NO | NONIO | No |
| 16180419 | First Lien | No | YES | 10YRIO | No |
| 16180485 | First Lien | No | NO | NONIO | No |
| 16180555 | First Lien | No | YES | 10YRIO | No |
| 16180325 | First Lien | No | YES | 10YRIO | No |
| 16179418 | First Lien | No | NO | NONIO | Yes |
| 16178717 | First Lien | No | NO | NONIO | Yes |
| 16179177 | First Lien | No | NO | NONIO | No |
| 16179092 | First Lien | No | NO | NONIO | Yes |
| 16179161 | First Lien | No | NO | NONIO | Yes |
| 16178729 | First Lien | No | NO | NONIO | No |
| 16178406 | First Lien | No | NO | NONIO | Yes |
| 16178716 | First Lien | No | YES | 10YRIO | No |
| 16180047 | First Lien | No | NO | NONIO | Yes |
| 16179348 | First Lien | No | NO | NONIO | Yes |
| 16179531 | First Lien | No | NO | NONIO | Yes |
| 16178189 | First Lien | No | YES | 10YRIO | No |
| 16180099 | First Lien | No | NO | NONIO | Yes |
| 16179984 | First Lien | No | NO | NONIO | Yes |
| 16179684 | First Lien | No | NO | NONIO | Yes |
| 16180152 | First Lien | No | NO | NONIO | Yes |
| 16180092 | First Lien | No | NO | NONIO | Yes |
| 16178829 | First Lien | No | YES | 10YRIO | No |
| 16178761 | First Lien | No | YES | 10YRIO | No |
| 16179774 | First Lien | No | NO | NONIO | No |
| 16178961 | First Lien | No | NO | NONIO | Yes |
| 16179206 | First Lien | No | NO | NONIO | Yes |
| 16180443 | First Lien | No | YES | 10YRIO | No |
| 16178280 | First Lien | No | YES | 10YRIO | No |
| 16180281 | First Lien | No | YES | 10YRIO | No |
| 16180350 | First Lien | No | YES | 10YRIO | No |
| 16179757 | First Lien | No | NO | NONIO | Yes |
| 16180241 | First Lien | No | YES | 10YRIO | No |
| 16179293 | First Lien | No | NO | NONIO | Yes |
| 16178468 | First Lien | No | YES | 10YRIO | No |
| 16179232 | First Lien | No | NO | NONIO | Yes |
| 16180053 | First Lien | No | NO | NONIO | Yes |
| 16180061 | First Lien | No | NO | NONIO | Yes |
| 16179386 | First Lien | No | NO | NONIO | Yes |
| 16179367 | First Lien | No | NO | NONIO | Yes |
| 16178610 | First Lien | No | YES | 10YRIO | No |
| 16180444 | First Lien | No | NO | NONIO | No |
| 16179070 | First Lien | No | NO | NONIO | No |
| 16180282 | First Lien | No | YES | 10YRIO | No |
| 16180351 | First Lien | No | YES | 10YRIO | Yes |
| 16179710 | First Lien | No | NO | NONIO | Yes |
| 16179758 | First Lien | No | NO | NONIO | Yes |
| 16179579 | First Lien | No | NO | NONIO | Yes |
| 16178944 | First Lien | No | NO | NONIO | Yes |
| 16179142 | First Lien | No | NO | NONIO | Yes |
| 16180193 | First Lien | No | NO | NONIO | Yes |
| 16178696 | First Lien | No | YES | 10YRIO | Yes |
| 16178712 | First Lien | No | YES | 10YRIO | No |
| 16178269 | First Lien | No | YES | 10YRIO | No |
| 16180242 | First Lien | No | YES | 10YRIO | Yes |
| 16179491 | First Lien | No | NO | NONIO | Yes |
| 16180381 | First Lien | No | NO | NONIO | No |
| 16180445 | First Lien | No | YES | 10YRIO | Yes |
| 16179164 | First Lien | No | NO | NONIO | No |
| 16180283 | First Lien | No | YES | 10YRIO | No |
| 16178427 | First Lien | No | YES | 10YRIO | No |
| 16180352 | First Lien | No | NO | NONIO | No |
| 16179759 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16179580 | First Lien | No | NO | NONIO | Yes |
| 16178789 | First Lien | No | YES | 5YRIO | No |
| 16180039 | First Lien | No | NO | NONIO | No |
| 16179298 | First Lien | No | NO | NONIO | Yes |
| 16180243 | First Lien | No | YES | 10YRIO | No |
| 16179253 | First Lien | No | NO | NONIO | Yes |
| 16179492 | First Lien | No | NO | NONIO | Yes |
| 16180382 | First Lien | No | YES | 10YRIO | No |
| 16180446 | First Lien | No | YES | 10YRIO | No |
| 16179071 | First Lien | No | NO | NONIO | No |
| 16180284 | First Lien | No | NO | NONIO | No |
| 16180353 | First Lien | No | YES | 10YRIO | No |
| 16180166 | First Lien | No | NO | NONIO | Yes |
| 16178803 | First Lien | No | YES | 10YRIO | No |
| 16179711 | First Lien | No | NO | NONIO | Yes |
| 16179777 | First Lien | No | NO | NONIO | Yes |
| 16179828 | First Lien | No | NO | NONIO | Yes |
| 16180155 | First Lien | No | NO | NONIO | Yes |
| 16180127 | First Lien | No | NO | NONIO | Yes |
| 16179581 | First Lien | No | NO | NONIO | Yes |
| 16180165 | First Lien | No | NO | NONIO | Yes |
| 16180037 | First Lien | No | NO | NONIO | No |
| 16180130 | First Lien | No | NO | NONIO | Yes |
| 16179493 | First Lien | No | NO | NONIO | Yes |
| 16179388 | First Lien | No | NO | NONIO | Yes |
| 16178660 | First Lien | No | YES | 10YRIO | No |
| 16180383 | First Lien | No | YES | 10YRIO | No |
| 16180447 | First Lien | No | YES | 10YRIO | No |
| 16178991 | First Lien | No | NO | NONIO | Yes |
| 16178963 | First Lien | No | NO | NONIO | Yes |
| 16179600 | First Lien | No | NO | NONIO | Yes |
| 16180285 | First Lien | No | YES | 10YRIO | No |
| 16179035 | First Lien | No | NO | NONIO | Yes |
| 16179582 | First Lien | No | NO | NONIO | Yes |
| 16178597 | First Lien | No | YES | 10YRIO | No |
| 16180045 | First Lien | No | NO | NONIO | Yes |
| 16180244 | First Lien | No | YES | 10YRIO | No |
| 16178320 | First Lien | No | YES | 10YRIO | No |
| 16179139 | First Lien | No | NO | NONIO | Yes |
| 16178377 | First Lien | No | YES | 10YRIO | No |
| 16180547 | First Lien | No | YES | 10YRIO | No |
| 16180317 | First Lien | No | YES | 10YRIO | No |
| 16178171 | First Lien | No | YES | 10YRIO | No |
| 16180384 | First Lien | No | YES | 10YRIO | No |
| 16180448 | First Lien | No | YES | 10YRIO | No |
| 16178404 | First Lien | No | YES | 10YRIO | No |
| 16179155 | First Lien | No | NO | NONIO | Yes |
| 16179712 | First Lien | No | NO | NONIO | Yes |
| 16180191 | First Lien | No | NO | NONIO | Yes |
| 16178928 | First Lien | No | NO | NONIO | No |
| 16179760 | First Lien | No | NO | NONIO | Yes |
| 16178833 | First Lien | No | YES | 10YRIO | No |
| 16179583 | First Lien | No | NO | NONIO | Yes |
| 16178625 | First Lien | No | YES | 11YRIO | Yes |
| 16178622 | First Lien | No | YES | 10YRIO | No |
| 16179299 | First Lien | No | NO | NONIO | Yes |
| 16180245 | First Lien | No | YES | 10YRIO | No |
| 16179484 | First Lien | No | NO | NONIO | Yes |
| 16179272 | First Lien | No | NO | NONIO | No |
| 16179495 | First Lien | No | NO | NONIO | Yes |
| 16178608 | First Lien | No | YES | 10YRIO | Yes |
| 16180548 | First Lien | No | YES | 10YRIO | No |
| 16180318 | First Lien | No | YES | 10YRIO | No |
| 16179260 | First Lien | No | NO | NONIO | Yes |
| 16179863 | First Lien | No | NO | NONIO | Yes |
| 16179195 | First Lien | No | NO | NONIO | Yes |
| 16180621 | First Lien | No | YES | 10YRIO | Yes |
| 16178884 | First Lien | No | NO | NONIO | No |
| 16179405 | First Lien | No | NO | NONIO | Yes |
| 16180347 | First Lien | No | YES | 10YRIO | No |
| 16179575 | First Lien | No | NO | NONIO | Yes |
| 16178892 | First Lien | No | NO | NONIO | Yes |
| 16178851 | First Lien | No | NO | NONIO | No |
| 16179792 | First Lien | No | NO | NONIO | Yes |
| 16178736 | First Lien | No | YES | 5YRIO | No |
| 16178767 | First Lien | No | YES | 5YRIO | No |
| 16179230 | First Lien | No | NO | NONIO | No |
| 16179113 | First Lien | No | NO | NONIO | Yes |
| 16179864 | First Lien | No | NO | NONIO | Yes |
| 16178369 | First Lien | No | YES | 10YRIO | Yes |
| 16179365 | First Lien | No | NO | NONIO | Yes |
| 16180278 | First Lien | No | YES | 10YRIO | Yes |
| 16180348 | First Lien | No | YES | 10YRIO | No |
| 16179802 | First Lien | No | NO | NONIO | Yes |
| 16178626 | First Lien | No | YES | 10YRIO | No |
| 16179137 | First Lien | No | NO | NONIO | Yes |
| 16179248 | First Lien | No | NO | NONIO | No |
| 16178386 | First Lien | No | YES | 5YRIO | No |
| 16179261 | First Lien | No | NO | NONIO | Yes |
| 16179910 | First Lien | No | NO | NONIO | Yes |
| 16179487 | First Lien | No | NO | NONIO | Yes |
| 16180279 | First Lien | No | YES | 10YRIO | No |
| 16179060 | First Lien | No | NO | NONIO | No |
| 16179577 | First Lien | No | NO | NONIO | Yes |
| 16179803 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16179618 | First Lien | No | NO | NONIO | Yes |
| 16178764 | First Lien | No | NO | NONIO | No |
| 16178282 | First Lien | No | YES | 10YRIO | No |
| 16179292 | First Lien | No | NO | NONIO | Yes |
| 16179231 | First Lien | No | NO | NONIO | Yes |
| 16179138 | First Lien | No | NO | NONIO | Yes |
| 16178376 | First Lien | No | YES | 10YRIO | No |
| 16179100 | First Lien | No | NO | NONIO | Yes |
| 16180184 | First Lien | No | NO | NONIO | Yes |
| 16180442 | First Lien | No | YES | 10YRIO | No |
| 16180349 | First Lien | No | NO | NONIO | No |
| 16179578 | First Lien | No | NO | NONIO | Yes |
| 16179804 | First Lien | No | NO | NONIO | No |
| 16179045 | First Lien | No | NO | NONIO | Yes |
| 16180051 | First Lien | No | NO | NONIO | Yes |
| 16178893 | First Lien | No | NO | NONIO | No |
| 16179806 | First Lien | No | NO | NONIO | Yes |
| 16180257 | First Lien | No | YES | 10YRIO | No |
| 16179700 | First Lien | No | NO | NONIO | Yes |
| 16178828 | First Lien | No | NO | NONIO | No |
| 16178748 | First Lien | No | YES | 10YRIO | No |
| 16178668 | First Lien | No | YES | 5YRIO | No |
| 16178589 | First Lien | No | NO | NONIO | No |
| 16180075 | First Lien | No | NO | NONIO | Yes |
| 16180159 | First Lien | No | NO | NONIO | Yes |
| 16179801 | First Lien | No | NO | NONIO | Yes |
| 16178830 | First Lien | No | YES | 10YRIO | No |
| 16178831 | First Lien | No | NO | NONIO | No |
| 16179628 | First Lien | No | NO | NONIO | Yes |
| 16180582 | First Lien | No | YES | 10YRIO | No |
| 16179439 | First Lien | No | NO | NONIO | Yes |
| 16180415 | First Lien | No | YES | 10YRIO | No |
| 16180146 | First Lien | No | NO | NONIO | No |
| 16180115 | First Lien | No | NO | NONIO | Yes |
| 16178415 | First Lien | No | YES | 10YRIO | No |
| 16179665 | First Lien | No | NO | NONIO | Yes |
| 16180119 | First Lien | No | NO | NONIO | Yes |
| 16178588 | First Lien | No | YES | 10YRIO | No |
| 16179520 | First Lien | No | NO | NONIO | Yes |
| 16178368 | First Lien | No | YES | 10YRIO | No |
| 16180620 | First Lien | No | YES | 10YRIO | No |
| 16179953 | First Lien | No | NO | NONIO | Yes |
| 16180109 | First Lien | No | NO | NONIO | No |
| 16179563 | First Lien | No | NO | NONIO | Yes |
| 16178832 | First Lien | No | NO | NONIO | No |
| 16179480 | First Lien | No | NO | NONIO | Yes |
| 16179481 | First Lien | No | NO | NONIO | Yes |
| 16178834 | First Lien | No | YES | 10YRIO | No |
| 16178591 | First Lien | No | NO | NONIO | No |
| 16179644 | First Lien | No | NO | NONIO | Yes |
| 16178754 | First Lien | No | YES | 10YRIO | No |
| 16179483 | First Lien | No | NO | NONIO | Yes |
| 16178835 | First Lien | No | YES | 10YRIO | No |
| 16178836 | First Lien | No | YES | 10YRIO | No |
| 16178755 | First Lien | No | YES | 10YRIO | No |
| 16178593 | First Lien | No | NO | NONIO | No |
| 16178756 | First Lien | No | YES | 10YRIO | No |
| 16180183 | First Lien | No | NO | NONIO | Yes |
| 16180174 | First Lien | No | NO | NONIO | Yes |
| 16180044 | First Lien | No | NO | NONIO | Yes |
| 16179545 | First Lien | No | NO | NONIO | Yes |
| 16180346 | First Lien | No | NO | NONIO | Yes |
| 16178323 | First Lien | No | YES | 10YRIO | Yes |
| 16178586 | First Lien | No | YES | 10YRIO | No |
| 16180219 | First Lien | No | YES | 10YRIO | Yes |
| 16180188 | First Lien | No | NO | NONIO | Yes |
| 16179916 | First Lien | No | NO | NONIO | Yes |
| 16178455 | First Lien | No | YES | 10YRIO | No |
| 16179621 | First Lien | No | NO | NONIO | Yes |
| 16180288 | First Lien | No | YES | 10YRIO | No |
| 16178594 | First Lien | No | YES | 10YRIO | No |
| 16178676 | First Lien | No | NO | NONIO | No |
| 16178757 | First Lien | No | YES | 10YRIO | No |
| 16178838 | First Lien | No | YES | 10YRIO | No |
| 16178758 | First Lien | No | NO | NONIO | No |
| 16178596 | First Lien | No | YES | 10YRIO | No |
| 16178759 | First Lien | No | YES | 10YRIO | No |
| 16179569 | First Lien | No | NO | NONIO | Yes |
| 16178678 | First Lien | No | YES | 10YRIO | No |
| 16178679 | First Lien | No | YES | 3YRIO | No |
| 16179327 | First Lien | No | NO | NONIO | Yes |
| 16178780 | First Lien | No | YES | 10YRIO | No |
| 16179347 | First Lien | No | NO | NONIO | Yes |
| 16180614 | First Lien | No | YES | 10YRIO | No |
| 16179948 | First Lien | No | NO | NONIO | Yes |
| 16178656 | First Lien | No | YES | 10YRIO | No |
| 16179044 | First Lien | No | NO | NONIO | Yes |
| 16179620 | First Lien | No | NO | NONIO | Yes |
| 16180132 | First Lien | No | NO | NONIO | Yes |
| 16178771 | First Lien | No | YES | 5YRIO | No |
| 16178682 | First Lien | No | YES | 10YRIO | No |
| 16179136 | First Lien | No | NO | NONIO | Yes |
| 16179175 | First Lien | No | NO | NONIO | No |
| 16180357 | First Lien | No | YES | 10YRIO | No |
| 16179763 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16179585 | First Lien | No | NO | NONIO | Yes |
| 16180258 | First Lien | No | YES | 10YRIO | Yes |
| 16179701 | First Lien | No | NO | NONIO | No |
| 16179653 | First Lien | No | NO | NONIO | Yes |
| 16178922 | First Lien | No | NO | NONIO | Yes |
| 16178598 | First Lien | No | YES | 10YRIO | No |
| 16178599 | First Lien | No | YES | 10YRIO | No |
| 16180512 | First Lien | No | NO | NONIO | No |
| 16179247 | First Lien | No | NO | NONIO | Yes |
| 16179099 | First Lien | No | NO | NONIO | No |
| 16179952 | First Lien | No | NO | NONIO | Yes |
| 16179466 | First Lien | No | NO | NONIO | Yes |
| 16179364 | First Lien | No | NO | NONIO | Yes |
| 16178659 | First Lien | No | YES | 10YRIO | Yes |
| 16178820 | First Lien | No | YES | 10YRIO | Yes |
| 16178741 | First Lien | No | YES | 10YRIO | No |
| 16179552 | First Lien | No | NO | NONIO | Yes |
| 16178742 | First Lien | No | YES | 10YRIO | No |
| 16178580 | First Lien | No | YES | 10YRIO | No |
| 16178661 | First Lien | No | YES | 10YRIO | No |
| 16178823 | First Lien | No | NO | NONIO | No |
| 16178743 | First Lien | No | YES | 10YRIO | No |
| 16179553 | First Lien | No | NO | NONIO | Yes |
| 16178824 | First Lien | No | YES | 10YRIO | No |
| 16179554 | First Lien | No | NO | NONIO | Yes |
| 16178663 | First Lien | No | YES | 5YRIO | No |
| 16178826 | First Lien | No | NO | NONIO | No |
| 16178745 | First Lien | No | NO | NONIO | No |
| 16178583 | First Lien | No | YES | 10YRIO | No |
| 16179404 | First Lien | No | NO | NONIO | Yes |
| 16180345 | First Lien | No | YES | 10YRIO | No |
| 16179683 | First Lien | No | NO | NONIO | Yes |
| 16179829 | First Lien | No | NO | NONIO | No |
| 16179762 | First Lien | No | NO | NONIO | Yes |
| 16180126 | First Lien | No | NO | NONIO | Yes |
| 16180033 | First Lien | No | NO | NONIO | No |
| 16179555 | First Lien | No | NO | NONIO | Yes |
| 16178827 | First Lien | No | YES | 10YRIO | No |
| 16179670 | First Lien | No | NO | NONIO | Yes |
| 16179861 | First Lien | No | NO | NONIO | Yes |
| 16178675 | First Lien | No | YES | 10YRIO | No |
| 16179249 | First Lien | No | NO | NONIO | No |
| 16179115 | First Lien | No | NO | NONIO | No |
| 16178398 | First Lien | No | YES | 10YRIO | Yes |
| 16180200 | First Lien | No | YES | 10YRIO | No |
| 16180201 | First Lien | No | YES | 10YRIO | No |
| 16179216 | First Lien | No | NO | NONIO | No |
| 16179315 | First Lien | No | NO | NONIO | Yes |
| 16180202 | First Lien | No | YES | 10YRIO | No |
| 16180204 | First Lien | No | NO | NONIO | No |
| 16180205 | First Lien | No | YES | 10YRIO | No |
| 16180206 | First Lien | No | YES | 10YRIO | No |
| 16180207 | First Lien | No | YES | 10YRIO | No |
| 16180208 | First Lien | No | YES | 10YRIO | No |
| 16180209 | First Lien | No | YES | 10YRIO | Yes |
| 16179476 | First Lien | No | NO | NONIO | Yes |
| 16180179 | First Lien | No | NO | NONIO | No |
| 16179530 | First Lien | No | NO | NONIO | Yes |
| 16179611 | First Lien | No | NO | NONIO | Yes |
| 16180255 | First Lien | No | NO | NONIO | No |
| 16178920 | First Lien | No | NO | NONIO | No |
| 16178801 | First Lien | No | YES | 10YRIO | No |
| 16179613 | First Lien | No | NO | NONIO | Yes |
| 16178641 | First Lien | No | YES | 10YRIO | No |
| 16178722 | First Lien | No | YES | 10YRIO | No |
| 16178444 | First Lien | No | YES | 10YRIO | No |
| 16179561 | First Lien | No | NO | NONIO | Yes |
| 16178804 | First Lien | No | NO | NONIO | No |
| 16178561 | First Lien | No | YES | 10YRIO | No |
| 16180414 | First Lien | No | YES | 10YRIO | No |
| 16178436 | First Lien | No | YES | 10YRIO | No |
| 16179226 | First Lien | No | NO | NONIO | Yes |
| 16180619 | First Lien | No | YES | 10YRIO | No |
| 16178290 | First Lien | No | YES | 10YRIO | Yes |
| 16178293 | First Lien | No | YES | 5YRIO | No |
| 16178770 | First Lien | No | NO | NONIO | No |
| 16179233 | First Lien | No | NO | NONIO | No |
| 16178642 | First Lien | No | YES | 10YRIO | No |
| 16178724 | First Lien | No | YES | 10YRIO | No |
| 16179346 | First Lien | No | NO | NONIO | Yes |
| 16179840 | First Lien | No | NO | NONIO | Yes |
| 16180217 | First Lien | No | YES | 10YRIO | Yes |
| 16178643 | First Lien | No | YES | 10YRIO | Yes |
| 16178806 | First Lien | No | YES | 10YRIO | No |
| 16178484 | First Lien | No | YES | 10YRIO | Yes |
| 16178565 | First Lien | No | YES | 10YRIO | No |
| 16178889 | First Lien | No | NO | NONIO | No |
| 16179632 | First Lien | No | NO | NONIO | Yes |
| 16178646 | First Lien | No | NO | NONIO | No |
| 16178727 | First Lien | No | YES | 10YRIO | No |
| 16178647 | First Lien | No | YES | 10YRIO | No |
| 16178567 | First Lien | No | YES | 10YRIO | No |
| 16179947 | First Lien | No | NO | NONIO | Yes |
| 16179488 | First Lien | No | NO | NONIO | Yes |
| 16179914 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16178486 | First Lien | No | YES | 10YRIO | No |
| 16178649 | First Lien | No | YES | 10YRIO | No |
| 16178488 | First Lien | No | YES | 10YRIO | No |
| 16180210 | First Lien | No | YES | 10YRIO | Yes |
| 16180211 | First Lien | No | YES | 10YRIO | No |
| 16180212 | First Lien | No | YES | 10YRIO | No |
| 16180147 | First Lien | No | NO | NONIO | Yes |
| 16180213 | First Lien | No | NO | NONIO | No |
| 16180214 | First Lien | No | YES | 10YRIO | No |
| 16180215 | First Lien | No | YES | 10YRIO | No |
| 16180216 | First Lien | No | YES | 10YRIO | No |
| 16178172 | First Lien | No | YES | 10YRIO | No |
| 16178493 | First Lien | No | YES | 10YRIO | No |
| 16180355 | First Lien | No | YES | 10YRIO | No |
| 16178730 | First Lien | No | YES | 10YRIO | No |
| 16178811 | First Lien | No | NO | NONIO | No |
| 16178812 | First Lien | No | YES | 10YRIO | No |
| 16178650 | First Lien | No | YES | 3YRIO | No |
| 16179622 | First Lien | No | NO | NONIO | Yes |
| 16178570 | First Lien | No | NO | NONIO | No |
| 16180256 | First Lien | No | YES | 10YRIO | No |
| 16179032 | First Lien | No | NO | NONIO | Yes |
| 16178921 | First Lien | No | NO | NONIO | No |
| 16179081 | First Lien | No | NO | NONIO | Yes |
| 16178447 | First Lien | No | YES | 10YRIO | Yes |
| 16178571 | First Lien | No | YES | 10YRIO | No |
| 16178814 | First Lien | No | YES | 10YRIO | No |
| 16179562 | First Lien | No | NO | NONIO | Yes |
| 16178799 | First Lien | No | YES | 10YRIO | No |
| 16178490 | First Lien | No | YES | 10YRIO | No |
| 16179624 | First Lien | No | NO | NONIO | Yes |
| 16179363 | First Lien | No | NO | NONIO | No |
| 16179051 | First Lien | No | NO | NONIO | Yes |
| 16178549 | First Lien | No | YES | 10YRIO | Yes |
| 16178605 | First Lien | No | YES | 5YRIO | No |
| 16179234 | First Lien | No | NO | NONIO | Yes |
| 16178815 | First Lien | No | YES | 10YRIO | No |
| 16178734 | First Lien | No | NO | NONIO | No |
| 16178241 | First Lien | No | NO | NONIO | No |
| 16179105 | First Lien | No | NO | NONIO | Yes |
| 16180218 | First Lien | No | YES | 10YRIO | Yes |
| 16178318 | First Lien | No | YES | 10YRIO | Yes |
| 16178654 | First Lien | No | YES | 10YRIO | No |
| 16178655 | First Lien | No | YES | 10YRIO | No |
| 16179915 | First Lien | No | NO | NONIO | Yes |
| 16178818 | First Lien | No | YES | 10YRIO | No |
| 16178819 | First Lien | No | YES | 10YRIO | Yes |
| 16179221 | First Lien | No | NO | NONIO | Yes |
| 16178495 | First Lien | No | YES | 10YRIO | No |
| 16178576 | First Lien | No | NO | NONIO | No |
| 16178496 | First Lien | No | YES | 10YRIO | No |
| 16179549 | First Lien | No | NO | NONIO | Yes |
| 16178578 | First Lien | No | YES | 10YRIO | Yes |
| 16178497 | First Lien | No | YES | 10YRIO | No |
| 16179477 | First Lien | No | NO | NONIO | Yes |
| 16179369 | First Lien | No | NO | NONIO | Yes |
| 16180287 | First Lien | No | YES | 10YRIO | No |
| 16180356 | First Lien | No | YES | 10YRIO | No |
| 16178632 | First Lien | No | YES | 10YRIO | No |
| 16179524 | First Lien | No | NO | NONIO | Yes |
| 16178471 | First Lien | No | YES | 10YRIO | No |
| 16178552 | First Lien | No | YES | 10YRIO | No |
| 16178633 | First Lien | No | NO | NONIO | No |
| 16178634 | First Lien | No | YES | 10YRIO | No |
| 16179525 | First Lien | No | NO | NONIO | Yes |
| 16180254 | First Lien | No | YES | 10YRIO | No |
| 16178919 | First Lien | No | NO | NONIO | No |
| 16178472 | First Lien | No | YES | 10YRIO | No |
| 16178392 | First Lien | No | YES | 10YRIO | Yes |
| 16179608 | First Lien | No | NO | NONIO | No |
| 16178555 | First Lien | No | NO | NONIO | No |
| 16179527 | First Lien | No | NO | NONIO | Yes |
| 16179609 | First Lien | No | NO | NONIO | Yes |
| 16178556 | First Lien | No | YES | 10YRIO | No |
| 16178475 | First Lien | No | NO | NONIO | No |
| 16178394 | First Lien | No | YES | 10YRIO | No |
| 16179366 | First Lien | No | NO | NONIO | Yes |
| 16178637 | First Lien | No | YES | 10YRIO | No |
| 16178718 | First Lien | No | YES | 10YRIO | No |
| 16178476 | First Lien | No | YES | 10YRIO | No |
| 16178719 | First Lien | No | NO | NONIO | No |
| 16180581 | First Lien | No | NO | NONIO | No |
| 16179438 | First Lien | No | NO | NONIO | Yes |
| 16179529 | First Lien | No | NO | NONIO | Yes |
| 16178395 | First Lien | No | YES | 10YRIO | No |
| 16178396 | First Lien | No | YES | 5YRIO | No |
| 16178798 | First Lien | No | YES | 10YRIO | No |
| 16178952 | First Lien | No | NO | NONIO | No |
| 16178958 | First Lien | No | NO | NONIO | No |
| 16179011 | First Lien | No | NO | NONIO | No |
| 16179368 | First Lien | No | NO | NONIO | Yes |
| 16178397 | First Lien | No | NO | NONIO | Yes |
| 16178238 | First Lien | No | NO | NONIO | No |
| 16180577 | First Lien | No | YES | 10YRIO | No |
| 16179980 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16178224 | First Lien | No | YES | 5YRIO | No |
| 16179179 | First Lien | No | NO | NONIO | Yes |
| 16180409 | First Lien | No | YES | 10YRIO | No |
| 16179786 | First Lien | No | NO | NONIO | Yes |
| 16179066 | First Lien | No | NO | NONIO | No |
| 16180545 | First Lien | No | YES | 10YRIO | Yes |
| 16180315 | First Lien | No | YES | 10YRIO | No |
| 16178413 | First Lien | No | YES | 10YRIO | No |
| 16178985 | First Lien | No | NO | NONIO | Yes |
| 16179313 | First Lien | No | NO | NONIO | Yes |
| 16178403 | First Lien | No | YES | 10YRIO | No |
| 16180125 | First Lien | No | NO | NONIO | Yes |
| 16178891 | First Lien | No | NO | NONIO | No |
| 16178750 | First Lien | No | YES | 10YRIO | No |
| 16178299 | First Lien | No | YES | 10YRIO | No |
| 16178560 | First Lien | No | YES | 10YRIO | No |
| 16179208 | First Lien | No | NO | NONIO | Yes |
| 16179880 | First Lien | No | NO | NONIO | No |
| 16179307 | First Lien | No | NO | NONIO | Yes |
| 16179180 | First Lien | No | NO | NONIO | No |
| 16180410 | First Lien | No | YES | 10YRIO | No |
| 16180476 | First Lien | No | NO | NONIO | Yes |
| 16179836 | First Lien | No | NO | NONIO | No |
| 16180066 | First Lien | No | NO | NONIO | Yes |
| 16180316 | First Lien | No | YES | 10YRIO | No |
| 16178974 | First Lien | No | NO | NONIO | Yes |
| 16178435 | First Lien | No | YES | 10YRIO | No |
| 16178723 | First Lien | No | YES | 10YRIO | No |
| 16178183 | First Lien | No | YES | 10YRIO | No |
| 16179344 | First Lien | No | NO | NONIO | Yes |
| 16179309 | First Lien | No | NO | NONIO | Yes |
| 16179341 | First Lien | No | NO | NONIO | Yes |
| 16178302 | First Lien | No | YES | 10YRIO | No |
| 16178239 | First Lien | No | YES | 5YRIO | No |
| 16179209 | First Lien | No | NO | NONIO | Yes |
| 16180509 | First Lien | No | YES | 10YRIO | No |
| 16179010 | First Lien | No | NO | NONIO | Yes |
| 16180411 | First Lien | No | YES | 10YRIO | No |
| 16180477 | First Lien | No | NO | NONIO | No |
| 16179837 | First Lien | No | NO | NONIO | Yes |
| 16179413 | First Lien | No | NO | NONIO | Yes |
| 16178414 | First Lien | No | YES | 10YRIO | No |
| 16178975 | First Lien | No | NO | NONIO | No |
| 16180040 | First Lien | No | NO | NONIO | Yes |
| 16178509 | First Lien | No | NO | NONIO | No |
| 16180510 | First Lien | No | YES | 10YRIO | No |
| 16178494 | First Lien | No | YES | 10YRIO | No |
| 16180579 | First Lien | No | YES | 10YRIO | No |
| 16179781 | First Lien | No | NO | NONIO | Yes |
| 16179436 | First Lien | No | NO | NONIO | Yes |
| 16180412 | First Lien | No | YES | 10YRIO | No |
| 16180478 | First Lien | No | YES | 10YRIO | No |
| 16179001 | First Lien | No | NO | NONIO | Yes |
| 16179736 | First Lien | No | NO | NONIO | Yes |
| 16178621 | First Lien | No | YES | 10YRIO | Yes |
| 16179503 | First Lien | No | NO | NONIO | Yes |
| 16178617 | First Lien | No | YES | 5YRIO | No |
| 16178572 | First Lien | No | YES | 10YRIO | No |
| 16178753 | First Lien | No | YES | 10YRIO | No |
| 16179623 | First Lien | No | NO | NONIO | Yes |
| 16178240 | First Lien | No | YES | 5YRIO | No |
| 16180580 | First Lien | No | YES | 10YRIO | No |
| 16179981 | First Lien | No | NO | NONIO | Yes |
| 16179437 | First Lien | No | NO | NONIO | Yes |
| 16180413 | First Lien | No | YES | 10YRIO | No |
| 16179076 | First Lien | No | NO | NONIO | Yes |
| 16179737 | First Lien | No | NO | NONIO | Yes |
| 16178340 | First Lien | No | YES | 10YRIO | No |
| 16178816 | First Lien | No | YES | 5YRIO | No |
| 16179627 | First Lien | No | NO | NONIO | Yes |
| 16179006 | First Lien | No | NO | NONIO | Yes |
| 16178518 | First Lien | No | YES | 10YRIO | No |
| 16179977 | First Lien | No | NO | NONIO | Yes |
| 16179190 | First Lien | No | NO | NONIO | Yes |
| 16180472 | First Lien | No | YES | 10YRIO | No |
| 16180541 | First Lien | No | YES | 10YRIO | No |
| 16180311 | First Lien | No | YES | 10YRIO | No |
| 16179410 | First Lien | No | NO | NONIO | Yes |
| 16178658 | First Lien | No | YES | 10YRIO | No |
| 16179176 | First Lien | No | NO | NONIO | No |
| 16180378 | First Lien | No | YES | 10YRIO | No |
| 16178989 | First Lien | No | NO | NONIO | Yes |
| 16179732 | First Lien | No | NO | NONIO | Yes |
| 16178728 | First Lien | No | YES | 10YRIO | Yes |
| 16178454 | First Lien | No | YES | 10YRIO | No |
| 16178402 | First Lien | No | YES | 10YRIO | No |
| 16179697 | First Lien | No | NO | NONIO | Yes |
| 16178595 | First Lien | No | YES | 10YRIO | No |
| 16180107 | First Lien | No | NO | NONIO | Yes |
| 16180240 | First Lien | No | YES | 10YRIO | No |
| 16178363 | First Lien | No | YES | 5YRIO | No |
| 16178602 | First Lien | No | YES | 10YRIO | No |
| 16179978 | First Lien | No | NO | NONIO | Yes |
| 16180406 | First Lien | No | YES | 10YRIO | No |
| 16180473 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16180542 | First Lien | No | YES | 10YRIO | Yes |
| 16180312 | First Lien | No | YES | 10YRIO | Yes |
| 16179411 | First Lien | No | NO | NONIO | Yes |
| 16179056 | First Lien | No | NO | NONIO | No |
| 16180379 | First Lien | No | YES | 10YRIO | No |
| 16178434 | First Lien | No | YES | 10YRIO | No |
| 16179733 | First Lien | No | NO | NONIO | Yes |
| 16178704 | First Lien | No | YES | 10YRIO | No |
| 16179820 | First Lien | No | NO | NONIO | Yes |
| 16180128 | First Lien | No | NO | NONIO | Yes |
| 16180153 | First Lien | No | NO | NONIO | Yes |
| 16178426 | First Lien | No | NO | NONIO | No |
| 16179698 | First Lien | No | NO | NONIO | Yes |
| 16180114 | First Lien | No | NO | NONIO | Yes |
| 16179283 | First Lien | No | NO | NONIO | Yes |
| 16178381 | First Lien | No | YES | 10YRIO | No |
| 16178900 | First Lien | No | NO | NONIO | Yes |
| 16178342 | First Lien | No | NO | NONIO | Yes |
| 16178223 | First Lien | No | NO | NONIO | No |
| 16180407 | First Lien | No | YES | 10YRIO | Yes |
| 16180474 | First Lien | No | YES | 10YRIO | No |
| 16179168 | First Lien | No | NO | NONIO | No |
| 16180543 | First Lien | No | YES | 10YRIO | No |
| 16180313 | First Lien | No | YES | 10YRIO | No |
| 16179087 | First Lien | No | NO | NONIO | Yes |
| 16180380 | First Lien | No | YES | 10YRIO | No |
| 16179734 | First Lien | No | NO | NONIO | Yes |
| 16178715 | First Lien | No | NO | NONIO | No |
| 16179521 | First Lien | No | NO | NONIO | Yes |
| 16178327 | First Lien | No | YES | 10YRIO | No |
| 16179284 | First Lien | No | NO | NONIO | Yes |
| 16178613 | First Lien | No | YES | 10YRIO | No |
| 16180576 | First Lien | No | YES | 10YRIO | No |
| 16178557 | First Lien | No | YES | 10YRIO | No |
| 16179979 | First Lien | No | NO | NONIO | Yes |
| 16180408 | First Lien | No | YES | 10YRIO | No |
| 16179835 | First Lien | No | NO | NONIO | Yes |
| 16180475 | First Lien | No | YES | 10YRIO | No |
| 16179169 | First Lien | No | NO | NONIO | No |
| 16180544 | First Lien | No | YES | 10YRIO | Yes |
| 16180314 | First Lien | No | YES | 10YRIO | No |
| 16179088 | First Lien | No | NO | NONIO | No |
| 16179160 | First Lien | No | NO | NONIO | Yes |
| 16178990 | First Lien | No | NO | NONIO | Yes |
| 16179735 | First Lien | No | NO | NONIO | Yes |
| 16178306 | First Lien | No | YES | 10YRIO | No |
| 16179039 | First Lien | No | NO | NONIO | No |
| 16178949 | First Lien | No | NO | NONIO | Yes |
| 16179334 | First Lien | No | NO | NONIO | Yes |
| 16179135 | First Lien | No | NO | NONIO | No |
| 16179489 | First Lien | No | NO | NONIO | Yes |
| 16178894 | First Lien | No | NO | NONIO | Yes |
| 16179381 | First Lien | No | NO | NONIO | Yes |
| 16180536 | First Lien | No | NO | NONIO | No |
| 16179598 | First Lien | No | NO | NONIO | Yes |
| 16179816 | First Lien | No | NO | NONIO | Yes |
| 16180276 | First Lien | No | YES | 10YRIO | No |
| 16179144 | First Lien | No | NO | NONIO | Yes |
| 16178700 | First Lien | No | YES | 10YRIO | No |
| 16179573 | First Lien | No | NO | NONIO | Yes |
| 16180124 | First Lien | No | NO | NONIO | Yes |
| 16178619 | First Lien | No | YES | 5YRIO | No |
| 16179282 | First Lien | No | NO | NONIO | Yes |
| 16178374 | First Lien | No | YES | 10YRIO | No |
| 16179928 | First Lien | No | NO | NONIO | Yes |
| 16179382 | First Lien | No | NO | NONIO | Yes |
| 16180537 | First Lien | No | YES | 10YRIO | No |
| 16180307 | First Lien | No | YES | 10YRIO | No |
| 16180374 | First Lien | No | YES | 10YRIO | Yes |
| 16179064 | First Lien | No | NO | NONIO | Yes |
| 16180439 | First Lien | No | NO | NONIO | No |
| 16178714 | First Lien | No | YES | 10YRIO | No |
| 16179599 | First Lien | No | NO | NONIO | Yes |
| 16179817 | First Lien | No | NO | NONIO | Yes |
| 16178927 | First Lien | No | NO | NONIO | Yes |
| 16179755 | First Lien | No | NO | NONIO | Yes |
| 16178878 | First Lien | No | NO | NONIO | No |
| 16178349 | First Lien | No | YES | 5YRIO | No |
| 16180022 | First Lien | No | NO | NONIO | Yes |
| 16180236 | First Lien | No | YES | 10YRIO | Yes |
| 16179929 | First Lien | No | NO | NONIO | Yes |
| 16178895 | First Lien | No | NO | NONIO | Yes |
| 16180538 | First Lien | No | NO | NONIO | Yes |
| 16180308 | First Lien | No | YES | 10YRIO | No |
| 16180375 | First Lien | No | YES | 10YRIO | No |
| 16180440 | First Lien | No | YES | 10YRIO | Yes |
| 16178547 | First Lien | No | YES | 10YRIO | No |
| 16179818 | First Lien | No | NO | NONIO | Yes |
| 16180277 | First Lien | No | YES | 10YRIO | No |
| 16179153 | First Lien | No | NO | NONIO | Yes |
| 16178980 | First Lien | No | NO | NONIO | Yes |
| 16179054 | First Lien | No | NO | NONIO | No |
| 16178424 | First Lien | No | YES | 10YRIO | Yes |
| 16179708 | First Lien | No | NO | NONIO | Yes |
| 16180140 | First Lien | No | NO | NONIO | No |

| | | | | | |
|---|---|---|---|---|---|
| 16180023 | First Lien | No | NO | NONIO | Yes |
| 16178768 | First Lien | No | NO | NONIO | No |
| 16178260 | First Lien | No | YES | 5YRIO | No |
| 16180237 | First Lien | No | YES | 10YRIO | No |
| 16178375 | First Lien | No | YES | 10YRIO | No |
| 16178864 | First Lien | No | YES | 10YRIO | No |
| 16178341 | First Lien | No | YES | 5YRIO | No |
| 16178611 | First Lien | No | YES | 10YRIO | No |
| 16179383 | First Lien | No | NO | NONIO | Yes |
| 16178222 | First Lien | No | YES | 5YRIO | No |
| 16180539 | First Lien | No | YES | 10YRIO | No |
| 16180309 | First Lien | No | NO | NONIO | No |
| 16180376 | First Lien | No | YES | 10YRIO | No |
| 16178948 | First Lien | No | NO | NONIO | No |
| 16178970 | First Lien | No | NO | NONIO | Yes |
| 16180171 | First Lien | No | NO | NONIO | Yes |
| 16178879 | First Lien | No | YES | 10YRIO | No |
| 16180133 | First Lien | No | NO | NONIO | Yes |
| 16178651 | First Lien | No | NO | NONIO | No |
| 16180024 | First Lien | No | NO | NONIO | Yes |
| 16180238 | First Lien | No | YES | 10YRIO | No |
| 16179352 | First Lien | No | NO | NONIO | Yes |
| 16179384 | First Lien | No | NO | NONIO | Yes |
| 16179976 | First Lien | No | NO | NONIO | Yes |
| 16180471 | First Lien | No | YES | 10YRIO | No |
| 16180540 | First Lien | No | YES | 10YRIO | No |
| 16178983 | First Lien | No | NO | NONIO | Yes |
| 16180377 | First Lien | No | YES | 10YRIO | No |
| 16180441 | First Lien | No | YES | 10YRIO | No |
| 16179731 | First Lien | No | NO | NONIO | Yes |
| 16179819 | First Lien | No | NO | NONIO | Yes |
| 16178971 | First Lien | No | NO | NONIO | No |
| 16178425 | First Lien | No | YES | 10YRIO | No |
| 16180162 | First Lien | No | NO | NONIO | Yes |
| 16180143 | First Lien | No | NO | NONIO | Yes |
| 16179709 | First Lien | No | NO | NONIO | No |
| 16179696 | First Lien | No | NO | NONIO | Yes |
| 16178313 | First Lien | No | YES | 10YRIO | No |
| 16180025 | First Lien | No | NO | NONIO | Yes |
| 16178592 | First Lien | No | YES | 10YRIO | No |
| 16179310 | First Lien | No | NO | NONIO | No |
| 16180239 | First Lien | No | YES | 10YRIO | No |
| 16178380 | First Lien | No | YES | 5YRIO | No |
| 16179252 | First Lien | No | NO | NONIO | No |
| 16178856 | First Lien | No | YES | 10YRIO | No |
| 16180436 | First Lien | No | YES | 10YRIO | No |
| 16180273 | First Lien | No | YES | 10YRIO | No |
| 16178175 | First Lien | No | YES | 10YRIO | Yes |
| 16179707 | First Lien | No | NO | NONIO | Yes |
| 16178925 | First Lien | No | NO | NONIO | No |
| 16179695 | First Lien | No | NO | NONIO | Yes |
| 16178796 | First Lien | No | YES | 10YRIO | Yes |
| 16180177 | First Lien | No | NO | NONIO | No |
| 16178635 | First Lien | No | YES | 10YRIO | No |
| 16178531 | First Lien | No | NO | NONIO | No |
| 16179682 | First Lien | No | NO | NONIO | Yes |
| 16180108 | First Lien | No | NO | NONIO | Yes |
| 16178337 | First Lien | No | YES | 5YRIO | No |
| 16179297 | First Lien | No | NO | NONIO | Yes |
| 16180234 | First Lien | No | YES | 10YRIO | No |
| 16179925 | First Lien | No | NO | NONIO | Yes |
| 16179641 | First Lien | No | NO | NONIO | Yes |
| 16179379 | First Lien | No | NO | NONIO | Yes |
| 16179362 | First Lien | No | NO | NONIO | Yes |
| 16179182 | First Lien | No | NO | NONIO | No |
| 16180372 | First Lien | No | YES | 10YRIO | No |
| 16180437 | First Lien | No | YES | 10YRIO | No |
| 16178969 | First Lien | No | NO | NONIO | Yes |
| 16179047 | First Lien | No | NO | NONIO | No |
| 16180274 | First Lien | No | YES | 10YRIO | No |
| 16179815 | First Lien | No | NO | NONIO | Yes |
| 16178423 | First Lien | No | YES | 10YRIO | No |
| 16178315 | First Lien | No | YES | 5YRIO | No |
| 16179753 | First Lien | No | NO | NONIO | Yes |
| 16178821 | First Lien | No | NO | NONIO | No |
| 16179270 | First Lien | No | NO | NONIO | Yes |
| 16179120 | First Lien | No | NO | NONIO | No |
| 16180062 | First Lien | No | NO | NONIO | Yes |
| 16179926 | First Lien | No | NO | NONIO | Yes |
| 16179098 | First Lien | No | NO | NONIO | No |
| 16179380 | First Lien | No | NO | NONIO | Yes |
| 16180373 | First Lien | No | YES | 10YRIO | No |
| 16178662 | First Lien | No | YES | 10YRIO | No |
| 16180438 | First Lien | No | YES | 10YRIO | No |
| 16180275 | First Lien | No | YES | 10YRIO | No |
| 16178802 | First Lien | No | YES | 10YRIO | No |
| 16178926 | First Lien | No | NO | NONIO | Yes |
| 16179572 | First Lien | No | NO | NONIO | Yes |
| 16178760 | First Lien | No | YES | 10YRIO | No |
| 16180235 | First Lien | No | YES | 10YRIO | No |
| 16179271 | First Lien | No | NO | NONIO | Yes |
| 16179640 | First Lien | No | NO | NONIO | Yes |
| 16178887 | First Lien | No | NO | NONIO | No |
| 16179354 | First Lien | No | NO | NONIO | Yes |
| 16180354 | First Lien | No | YES | 10YRIO | No |

| | | | | | |
|---|---|---|---|---|---|
| 16179805 | First Lien | No | NO | NONIO | Yes |
| 16179128 | First Lien | No | NO | NONIO | Yes |
| 16180618 | First Lien | No | YES | 10YRIO | No |
| 16180006 | First Lien | No | NO | NONIO | Yes |
| 16178960 | First Lien | No | NO | NONIO | Yes |
| 16180517 | First Lien | No | NO | NONIO | Yes |
| 16179630 | First Lien | No | NO | NONIO | Yes |
| 16179442 | First Lien | No | NO | NONIO | Yes |
| 16178934 | First Lien | No | NO | NONIO | Yes |
| 16178262 | First Lien | No | YES | 10YRIO | No |
| 16178837 | First Lien | No | YES | 10YRIO | No |
| 16180117 | First Lien | No | NO | NONIO | Yes |
| 16178563 | First Lien | No | NO | NONIO | No |
| 16179212 | First Lien | No | NO | NONIO | No |
| 16179860 | First Lien | No | NO | NONIO | Yes |
| 16179129 | First Lien | No | NO | NONIO | Yes |
| 16179909 | First Lien | No | NO | NONIO | Yes |
| 16179016 | First Lien | No | NO | NONIO | Yes |
| 16178999 | First Lien | No | NO | NONIO | Yes |
| 16179631 | First Lien | No | NO | NONIO | Yes |
| 16179443 | First Lien | No | NO | NONIO | Yes |
| 16178909 | First Lien | No | NO | NONIO | Yes |
| 16179664 | First Lien | No | NO | NONIO | Yes |
| 16180027 | First Lien | No | NO | NONIO | Yes |
| 16178499 | First Lien | No | YES | 10YRIO | No |
| 16179858 | First Lien | No | NO | NONIO | Yes |
| 16179551 | First Lien | No | NO | NONIO | Yes |
| 16180270 | First Lien | No | YES | 10YRIO | No |
| 16179151 | First Lien | No | NO | NONIO | Yes |
| 16179750 | First Lien | No | NO | NONIO | Yes |
| 16178942 | First Lien | No | NO | NONIO | Yes |
| 16179141 | First Lien | No | NO | NONIO | Yes |
| 16178354 | First Lien | No | YES | 10YRIO | No |
| 16179680 | First Lien | No | NO | NONIO | Yes |
| 16178690 | First Lien | No | YES | 10YRIO | Yes |
| 16180034 | First Lien | No | NO | NONIO | No |
| 16179268 | First Lien | No | NO | NONIO | No |
| 16179514 | First Lien | No | NO | NONIO | Yes |
| 16178372 | First Lien | No | YES | 10YRIO | No |
| 16179097 | First Lien | No | NO | NONIO | Yes |
| 16179859 | First Lien | No | NO | NONIO | Yes |
| 16178367 | First Lien | No | YES | 10YRIO | Yes |
| 16179464 | First Lien | No | NO | NONIO | Yes |
| 16180434 | First Lien | No | YES | 10YRIO | No |
| 16178487 | First Lien | No | YES | 10YRIO | No |
| 16180271 | First Lien | No | NO | NONIO | Yes |
| 16178191 | First Lien | No | YES | 10YRIO | No |
| 16179152 | First Lien | No | NO | NONIO | Yes |
| 16178979 | First Lien | No | NO | NONIO | Yes |
| 16178924 | First Lien | No | NO | NONIO | No |
| 16178943 | First Lien | No | NO | NONIO | No |
| 16179610 | First Lien | No | NO | NONIO | Yes |
| 16179269 | First Lien | No | NO | NONIO | Yes |
| 16179519 | First Lien | No | NO | NONIO | Yes |
| 16179923 | First Lien | No | NO | NONIO | Yes |
| 16179360 | First Lien | No | NO | NONIO | Yes |
| 16180073 | First Lien | No | NO | NONIO | Yes |
| 16180435 | First Lien | No | YES | 10YRIO | Yes |
| 16180272 | First Lien | No | YES | 10YRIO | No |
| 16179752 | First Lien | No | NO | NONIO | Yes |
| 16178545 | First Lien | No | YES | 10YRIO | No |
| 16178648 | First Lien | No | YES | 10YRIO | Yes |
| 16178915 | First Lien | No | NO | NONIO | No |
| 16179681 | First Lien | No | NO | NONIO | Yes |
| 16178584 | First Lien | No | YES | 5YRIO | No |
| 16180233 | First Lien | No | YES | 10YRIO | No |
| 16179291 | First Lien | No | NO | NONIO | Yes |
| 16178373 | First Lien | No | YES | 10YRIO | No |
| 16179361 | First Lien | No | NO | NONIO | Yes |
| 16180250 | First Lien | No | YES | 10YRIO | No |
| 16178935 | First Lien | No | NO | NONIO | Yes |
| 16179556 | First Lien | No | NO | NONIO | Yes |
| 16178962 | First Lien | No | NO | NONIO | No |
| 16178791 | First Lien | No | YES | 10YRIO | Yes |
| 16178292 | First Lien | No | YES | 10YRIO | Yes |
| 16180083 | First Lien | No | NO | NONIO | Yes |
| 16178334 | First Lien | No | YES | 10YRIO | No |
| 16179262 | First Lien | No | NO | NONIO | No |
| 16178667 | First Lien | No | YES | 10YRIO | Yes |
| 16179241 | First Lien | No | NO | NONIO | Yes |
| 16179958 | First Lien | No | NO | NONIO | Yes |
| 16178357 | First Lien | No | YES | 10YRIO | No |
| 16178216 | First Lien | No | YES | 5YRIO | No |
| 16180013 | First Lien | No | NO | NONIO | Yes |
| 16179846 | First Lien | No | NO | NONIO | Yes |
| 16179637 | First Lien | No | NO | NONIO | Yes |
| 16180251 | First Lien | No | YES | 10YRIO | Yes |
| 16180102 | First Lien | No | NO | NONIO | Yes |
| 16178683 | First Lien | No | YES | 10YRIO | No |
| 16178300 | First Lien | No | YES | 10YRIO | No |
| 16178765 | First Lien | No | YES | 5YRIO | No |
| 16179796 | First Lien | No | NO | NONIO | Yes |
| 16178564 | First Lien | No | YES | 10YRIO | No |
| 16179114 | First Lien | No | NO | NONIO | No |
| 16178383 | First Lien | No | YES | 10YRIO | No |

| | | | | | |
|---|---|---|---|---|---|
| 16180014 | First Lien | No | NO | NONIO | Yes |
| 16179473 | First Lien | No | NO | NONIO | Yes |
| 16179794 | First Lien | No | NO | NONIO | Yes |
| 16180176 | First Lien | No | NO | NONIO | Yes |
| 16179007 | First Lien | No | NO | NONIO | Yes |
| 16180252 | First Lien | No | NO | NONIO | No |
| 16179699 | First Lien | No | NO | NONIO | Yes |
| 16179041 | First Lien | No | NO | NONIO | No |
| 16180111 | First Lien | No | NO | NONIO | Yes |
| 16179614 | First Lien | No | NO | NONIO | Yes |
| 16178517 | First Lien | No | YES | 10YRIO | No |
| 16179213 | First Lien | No | NO | NONIO | No |
| 16179215 | First Lien | No | NO | NONIO | No |
| 16179639 | First Lien | No | NO | NONIO | Yes |
| 16179353 | First Lien | No | NO | NONIO | Yes |
| 16180253 | First Lien | No | YES | 10YRIO | No |
| 16178951 | First Lien | No | NO | NONIO | No |
| 16179669 | First Lien | No | NO | NONIO | Yes |
| 16180030 | First Lien | No | NO | NONIO | Yes |
| 16179263 | First Lien | No | NO | NONIO | Yes |
| 16179506 | First Lien | No | NO | NONIO | Yes |
| 16179131 | First Lien | No | NO | NONIO | No |
| 16179227 | First Lien | No | NO | NONIO | Yes |
| 16179913 | First Lien | No | NO | NONIO | Yes |
| 16178365 | First Lien | No | YES | 10YRIO | Yes |
| 16178862 | First Lien | No | YES | 10YRIO | No |
| 16179946 | First Lien | No | NO | NONIO | Yes |
| 16180612 | First Lien | No | NO | NONIO | No |
| 16179461 | First Lien | No | NO | NONIO | Yes |
| 16180057 | First Lien | No | NO | NONIO | Yes |
| 16179339 | First Lien | No | NO | NONIO | Yes |
| 16179617 | First Lien | No | NO | NONIO | Yes |
| 16179023 | First Lien | No | NO | NONIO | Yes |
| 16178482 | First Lien | No | YES | 10YRIO | No |
| 16178906 | First Lien | No | NO | NONIO | No |
| 16178769 | First Lien | No | YES | 5YRIO | No |
| 16179219 | First Lien | No | NO | NONIO | Yes |
| 16178384 | First Lien | No | YES | 10YRIO | No |
| 16179096 | First Lien | No | NO | NONIO | No |
| 16178256 | First Lien | No | YES | 5YRIO | No |
| 16179112 | First Lien | No | NO | NONIO | No |
| 16179856 | First Lien | No | NO | NONIO | Yes |
| 16179224 | First Lien | No | NO | NONIO | Yes |
| 16180613 | First Lien | No | YES | 10YRIO | Yes |
| 16179462 | First Lien | No | NO | NONIO | Yes |
| 16178721 | First Lien | No | YES | 10YRIO | No |
| 16179358 | First Lien | No | NO | NONIO | Yes |
| 16179408 | First Lien | No | NO | NONIO | Yes |
| 16178941 | First Lien | No | NO | NONIO | Yes |
| 16179043 | First Lien | No | NO | NONIO | No |
| 16178914 | First Lien | No | NO | NONIO | No |
| 16179678 | First Lien | No | NO | NONIO | Yes |
| 16178933 | First Lien | No | NO | NONIO | Yes |
| 16178766 | First Lien | No | YES | 5YRIO | No |
| 16178569 | First Lien | No | YES | 10YRIO | No |
| 16179220 | First Lien | No | NO | NONIO | Yes |
| 16179211 | First Lien | No | NO | NONIO | Yes |
| 16179857 | First Lien | No | NO | NONIO | Yes |
| 16178361 | First Lien | No | YES | 10YRIO | No |
| 16179127 | First Lien | No | NO | NONIO | Yes |
| 16179906 | First Lien | No | NO | NONIO | Yes |
| 16178366 | First Lien | No | YES | 10YRIO | No |
| 16179463 | First Lien | No | NO | NONIO | Yes |
| 16179403 | First Lien | No | NO | NONIO | Yes |
| 16178657 | First Lien | No | YES | 10YRIO | No |
| 16179749 | First Lien | No | NO | NONIO | Yes |
| 16179570 | First Lien | No | NO | NONIO | Yes |
| 16179140 | First Lien | No | NO | NONIO | Yes |
| 16179031 | First Lien | No | NO | NONIO | Yes |
| 16179679 | First Lien | No | NO | NONIO | Yes |
| 16178261 | First Lien | No | YES | 10YRIO | No |
| 16180080 | First Lien | No | NO | NONIO | Yes |
| 16179267 | First Lien | No | NO | NONIO | Yes |
| 16179259 | First Lien | No | NO | NONIO | Yes |
| 16179287 | First Lien | No | NO | NONIO | Yes |
| 16179130 | First Lien | No | NO | NONIO | Yes |
| 16179956 | First Lien | No | NO | NONIO | Yes |
| 16180011 | First Lien | No | NO | NONIO | Yes |
| 16178840 | First Lien | No | YES | 10YRIO | No |
| 16178817 | First Lien | No | YES | 11YRIO | No |
| 16179890 | First Lien | No | NO | NONIO | Yes |
| 16180524 | First Lien | No | YES | 10YRIO | No |
| 16179642 | First Lien | No | NO | NONIO | Yes |
| 16179446 | First Lien | No | NO | NONIO | Yes |
| 16179012 | First Lien | No | NO | NONIO | Yes |
| 16180249 | First Lien | No | YES | 10YRIO | No |
| 16179040 | First Lien | No | NO | NONIO | Yes |
| 16178950 | First Lien | No | NO | NONIO | Yes |
| 16179504 | First Lien | No | NO | NONIO | Yes |
| 16179288 | First Lien | No | NO | NONIO | Yes |
| 16179911 | First Lien | No | NO | NONIO | Yes |
| 16179957 | First Lien | No | NO | NONIO | Yes |
| 16180012 | First Lien | No | NO | NONIO | Yes |
| 16180069 | First Lien | No | NO | NONIO | Yes |
| 16180060 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16180525 | First Lien | No | YES | 10YRIO | Yes |
| 16179447 | First Lien | No | NO | NONIO | Yes |
| 16179973 | First Lien | No | NO | NONIO | Yes |
| 16180134 | First Lien | No | NO | NONIO | Yes |
| 16178908 | First Lien | No | NO | NONIO | Yes |
| 16179657 | First Lien | No | NO | NONIO | Yes |
| 16179788 | First Lien | No | NO | NONIO | Yes |
| 16180032 | First Lien | No | NO | NONIO | Yes |
| 16179110 | First Lien | No | NO | NONIO | No |
| 16178674 | First Lien | No | YES | 10YRIO | No |
| 16179901 | First Lien | No | NO | NONIO | Yes |
| 16180608 | First Lien | No | YES | 10YRIO | No |
| 16179457 | First Lien | No | NO | NONIO | Yes |
| 16179997 | First Lien | No | NO | NONIO | Yes |
| 16180049 | First Lien | No | NO | NONIO | Yes |
| 16179104 | First Lien | No | NO | NONIO | Yes |
| 16180508 | First Lien | No | YES | 10YRIO | No |
| 16179174 | First Lien | No | NO | NONIO | No |
| 16179435 | First Lien | No | NO | NONIO | Yes |
| 16178782 | First Lien | No | YES | 10YRIO | Yes |
| 16180046 | First Lien | No | NO | NONIO | Yes |
| 16179030 | First Lien | No | NO | NONIO | No |
| 16179020 | First Lien | No | NO | NONIO | Yes |
| 16178585 | First Lien | No | YES | 10YRIO | No |
| 16180098 | First Lien | No | NO | NONIO | No |
| 16178574 | First Lien | No | YES | 10YRIO | No |
| 16178289 | First Lien | No | YES | 10YRIO | Yes |
| 16178254 | First Lien | No | NO | NONIO | No |
| 16179853 | First Lien | No | NO | NONIO | Yes |
| 16179902 | First Lien | No | NO | NONIO | Yes |
| 16180609 | First Lien | No | YES | 10YRIO | No |
| 16179458 | First Lien | No | NO | NONIO | Yes |
| 16179998 | First Lien | No | NO | NONIO | Yes |
| 16179005 | First Lien | No | NO | NONIO | Yes |
| 16179400 | First Lien | No | NO | NONIO | Yes |
| 16178932 | First Lien | No | NO | NONIO | Yes |
| 16180081 | First Lien | No | NO | NONIO | Yes |
| 16178582 | First Lien | No | YES | 10YRIO | No |
| 16179257 | First Lien | No | NO | NONIO | Yes |
| 16178615 | First Lien | No | YES | 10YRIO | No |
| 16179126 | First Lien | No | NO | NONIO | No |
| 16179903 | First Lien | No | NO | NONIO | Yes |
| 16180610 | First Lien | No | YES | 10YRIO | No |
| 16180160 | First Lien | No | NO | NONIO | Yes |
| 16179459 | First Lien | No | NO | NONIO | Yes |
| 16179626 | First Lien | No | NO | NONIO | Yes |
| 16178443 | First Lien | No | YES | 10YRIO | No |
| 16179357 | First Lien | No | NO | NONIO | Yes |
| 16179401 | First Lien | No | NO | NONIO | Yes |
| 16179021 | First Lien | No | NO | NONIO | No |
| 16178331 | First Lien | No | NO | NONIO | No |
| 16179658 | First Lien | No | NO | NONIO | Yes |
| 16180041 | First Lien | No | NO | NONIO | No |
| 16179218 | First Lien | No | NO | NONIO | Yes |
| 16178465 | First Lien | No | YES | 10YRIO | No |
| 16178665 | First Lien | No | NO | NONIO | Yes |
| 16178255 | First Lien | No | NO | NONIO | No |
| 16179854 | First Lien | No | NO | NONIO | Yes |
| 16179904 | First Lien | No | NO | NONIO | Yes |
| 16179945 | First Lien | No | NO | NONIO | Yes |
| 16180611 | First Lien | No | YES | 10YRIO | No |
| 16179402 | First Lien | No | NO | NONIO | Yes |
| 16179974 | First Lien | No | NO | NONIO | Yes |
| 16178957 | First Lien | No | NO | NONIO | Yes |
| 16178480 | First Lien | No | YES | 10YRIO | No |
| 16179677 | First Lien | No | NO | NONIO | Yes |
| 16180093 | First Lien | No | NO | NONIO | Yes |
| 16178285 | First Lien | No | YES | 10YRIO | No |
| 16178346 | First Lien | No | YES | 10YRIO | Yes |
| 16179111 | First Lien | No | NO | NONIO | Yes |
| 16179855 | First Lien | No | NO | NONIO | Yes |
| 16179905 | First Lien | No | NO | NONIO | Yes |
| 16180168 | First Lien | No | NO | NONIO | Yes |
| 16178703 | First Lien | No | YES | 10YRIO | No |
| 16178695 | First Lien | No | YES | 10YRIO | No |
| 16178777 | First Lien | No | YES | 10YRIO | No |
| 16178235 | First Lien | No | YES | 5YRIO | No |
| 16179994 | First Lien | No | NO | NONIO | Yes |
| 16179876 | First Lien | No | NO | NONIO | Yes |
| 16180501 | First Lien | No | YES | 10YRIO | Yes |
| 16180571 | First Lien | No | NO | NONIO | No |
| 16179094 | First Lien | No | NO | NONIO | Yes |
| 16178356 | First Lien | No | YES | 10YRIO | No |
| 16180339 | First Lien | No | YES | 10YRIO | No |
| 16180403 | First Lien | No | NO | NONIO | No |
| 16179730 | First Lien | No | NO | NONIO | Yes |
| 16179343 | First Lien | No | NO | NONIO | Yes |
| 16180086 | First Lien | No | NO | NONIO | Yes |
| 16178673 | First Lien | No | YES | 10YRIO | No |
| 16178185 | First Lien | No | YES | 5YRIO | No |
| 16179995 | First Lien | No | NO | NONIO | Yes |
| 16180502 | First Lien | No | YES | 10YRIO | No |
| 16180572 | First Lien | No | NO | NONIO | No |
| 16180187 | First Lien | No | NO | NONIO | Yes |
| 16179430 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16180340 | First Lien | No | NO | NONIO | Yes |
| 16180404 | First Lien | No | YES | 10YRIO | No |
| 16178810 | First Lien | No | YES | 10YRIO | No |
| 16178973 | First Lien | No | NO | NONIO | Yes |
| 16179050 | First Lien | No | NO | NONIO | Yes |
| 16178433 | First Lien | No | YES | 10YRIO | No |
| 16178329 | First Lien | No | YES | 10YRIO | Yes |
| 16178308 | First Lien | No | YES | 5YRIO | No |
| 16178236 | First Lien | No | YES | 5YRIO | No |
| 16180503 | First Lien | No | YES | 10YRIO | No |
| 16179877 | First Lien | No | NO | NONIO | Yes |
| 16180573 | First Lien | No | NO | NONIO | Yes |
| 16179078 | First Lien | No | NO | NONIO | No |
| 16179095 | First Lien | No | NO | NONIO | Yes |
| 16179431 | First Lien | No | NO | NONIO | Yes |
| 16180341 | First Lien | No | YES | 10YRIO | No |
| 16180405 | First Lien | No | YES | 10YRIO | No |
| 16179832 | First Lien | No | NO | NONIO | Yes |
| 16180113 | First Lien | No | NO | NONIO | Yes |
| 16179971 | First Lien | No | NO | NONIO | Yes |
| 16178903 | First Lien | No | NO | NONIO | Yes |
| 16179768 | First Lien | No | NO | NONIO | Yes |
| 16178788 | First Lien | No | YES | 10YRIO | Yes |
| 16178902 | First Lien | No | NO | NONIO | No |
| 16179237 | First Lien | No | NO | NONIO | No |
| 16180604 | First Lien | No | YES | 10YRIO | No |
| 16179547 | First Lien | No | NO | NONIO | Yes |
| 16179103 | First Lien | No | NO | NONIO | No |
| 16180504 | First Lien | No | YES | 10YRIO | No |
| 16180574 | First Lien | No | YES | 10YRIO | No |
| 16179432 | First Lien | No | NO | NONIO | Yes |
| 16180342 | First Lien | No | YES | 10YRIO | No |
| 16179833 | First Lien | No | NO | NONIO | No |
| 16178800 | First Lien | No | YES | 5YRIO | Yes |
| 16179541 | First Lien | No | NO | NONIO | Yes |
| 16178288 | First Lien | No | YES | 10YRIO | No |
| 16178464 | First Lien | No | YES | 5YRIO | No |
| 16178252 | First Lien | No | YES | 5YRIO | No |
| 16178343 | First Lien | No | YES | 5YRIO | No |
| 16178554 | First Lien | No | YES | 10YRIO | No |
| 16180605 | First Lien | No | YES | 10YRIO | No |
| 16179944 | First Lien | No | NO | NONIO | Yes |
| 16178526 | First Lien | No | YES | 10YRIO | No |
| 16178237 | First Lien | No | YES | 5YRIO | No |
| 16180505 | First Lien | No | YES | 10YRIO | No |
| 16179878 | First Lien | No | NO | NONIO | Yes |
| 16180575 | First Lien | No | YES | 10YRIO | No |
| 16178474 | First Lien | No | YES | 10YRIO | No |
| 16179433 | First Lien | No | NO | NONIO | Yes |
| 16179780 | First Lien | No | NO | NONIO | Yes |
| 16180343 | First Lien | No | YES | 10YRIO | No |
| 16179834 | First Lien | No | NO | NONIO | Yes |
| 16178412 | First Lien | No | YES | 10YRIO | Yes |
| 16178698 | First Lien | No | YES | 10YRIO | No |
| 16178905 | First Lien | No | NO | NONIO | No |
| 16180131 | First Lien | No | NO | NONIO | Yes |
| 16180104 | First Lien | No | NO | NONIO | Yes |
| 16180031 | First Lien | No | NO | NONIO | Yes |
| 16178751 | First Lien | No | YES | 10YRIO | No |
| 16179256 | First Lien | No | NO | NONIO | No |
| 16178467 | First Lien | No | YES | 10YRIO | No |
| 16179222 | First Lien | No | NO | NONIO | No |
| 16179900 | First Lien | No | NO | NONIO | Yes |
| 16178749 | First Lien | No | YES | 10YRIO | No |
| 16180606 | First Lien | No | YES | 10YRIO | No |
| 16178559 | First Lien | No | YES | 10YRIO | No |
| 16178553 | First Lien | No | NO | NONIO | No |
| 16179199 | First Lien | No | NO | NONIO | Yes |
| 16180506 | First Lien | No | YES | 10YRIO | Yes |
| 16179767 | First Lien | No | NO | NONIO | Yes |
| 16180344 | First Lien | No | NO | NONIO | No |
| 16178442 | First Lien | No | YES | 10YRIO | No |
| 16179972 | First Lien | No | NO | NONIO | Yes |
| 16179769 | First Lien | No | NO | NONIO | Yes |
| 16178253 | First Lien | No | YES | 5YRIO | No |
| 16179210 | First Lien | No | NO | NONIO | Yes |
| 16180607 | First Lien | No | NO | NONIO | No |
| 16179996 | First Lien | No | NO | NONIO | Yes |
| 16178492 | First Lien | No | YES | 10YRIO | No |
| 16180507 | First Lien | No | NO | NONIO | Yes |
| 16179879 | First Lien | No | NO | NONIO | Yes |
| 16179079 | First Lien | No | NO | NONIO | Yes |
| 16179434 | First Lien | No | NO | NONIO | Yes |
| 16178720 | First Lien | No | YES | 10YRIO | Yes |
| 16180043 | First Lien | No | NO | NONIO | Yes |
| 16178871 | First Lien | No | YES | 10YRIO | No |
| 16179281 | First Lien | No | NO | NONIO | Yes |
| 16178233 | First Lien | No | NO | NONIO | No |
| 16180567 | First Lien | No | YES | 10YRIO | No |
| 16180335 | First Lien | No | YES | 10YRIO | No |
| 16180399 | First Lien | No | NO | NONIO | No |
| 16180068 | First Lien | No | NO | NONIO | Yes |
| 16180467 | First Lien | No | YES | 10YRIO | No |
| 16179086 | First Lien | No | NO | NONIO | Yes |
| 16180305 | First Lien | No | YES | 10YRIO | No |

| | | | | | |
|---|---|---|---|---|---|
| 16178411 | First Lien | No | YES | 10YRIO | No |
| 16178400 | First Lien | No | NO | NONIO | Yes |
| 16178452 | First Lien | No | YES | 10YRIO | No |
| 16179615 | First Lien | No | NO | NONIO | Yes |
| 16178500 | First Lien | No | YES | 5YRIO | No |
| 16179873 | First Lien | No | NO | NONIO | Yes |
| 16180568 | First Lien | No | YES | 10YRIO | No |
| 16180336 | First Lien | No | YES | 10YRIO | No |
| 16180400 | First Lien | No | YES | 10YRIO | No |
| 16180306 | First Lien | No | YES | 10YRIO | No |
| 16179645 | First Lien | No | NO | NONIO | Yes |
| 16180154 | First Lien | No | NO | NONIO | Yes |
| 16179728 | First Lien | No | NO | NONIO | Yes |
| 16180021 | First Lien | No | NO | NONIO | Yes |
| 16179616 | First Lien | No | NO | NONIO | Yes |
| 16178234 | First Lien | No | YES | 5YRIO | No |
| 16180499 | First Lien | No | YES | 10YRIO | No |
| 16179874 | First Lien | No | NO | NONIO | Yes |
| 16180569 | First Lien | No | YES | 10YRIO | No |
| 16180337 | First Lien | No | YES | 10YRIO | No |
| 16180175 | First Lien | No | NO | NONIO | Yes |
| 16179479 | First Lien | No | NO | NONIO | Yes |
| 16180401 | First Lien | No | YES | 10YRIO | No |
| 16178994 | First Lien | No | NO | NONIO | No |
| 16180468 | First Lien | No | YES | 10YRIO | No |
| 16179729 | First Lien | No | NO | NONIO | Yes |
| 16178453 | First Lien | No | YES | 10YRIO | No |
| 16180096 | First Lien | No | NO | NONIO | Yes |
| 16178677 | First Lien | No | YES | 10YRIO | No |
| 16178461 | First Lien | No | YES | 10YRIO | No |
| 16178182 | First Lien | No | YES | 10YRIO | No |
| 16180078 | First Lien | No | NO | NONIO | Yes |
| 16180500 | First Lien | No | YES | 10YRIO | No |
| 16179875 | First Lien | No | NO | NONIO | Yes |
| 16180570 | First Lien | No | YES | 10YRIO | No |
| 16180338 | First Lien | No | NO | NONIO | No |
| 16180402 | First Lien | No | YES | 10YRIO | No |
| 16180469 | First Lien | No | YES | 10YRIO | Yes |
| 16178653 | First Lien | No | YES | 10YRIO | No |
| 16179075 | First Lien | No | NO | NONIO | No |
| 16179049 | First Lien | No | NO | NONIO | Yes |
| 16180118 | First Lien | No | NO | NONIO | No |
| 16179501 | First Lien | No | NO | NONIO | Yes |
| 16180229 | First Lien | No | YES | 10YRIO | No |
| 16178362 | First Lien | No | YES | 10YRIO | Yes |
| 16178744 | First Lien | No | YES | 10YRIO | No |
| 16179376 | First Lien | No | NO | NONIO | Yes |
| 16179546 | First Lien | No | NO | NONIO | Yes |
| 16180529 | First Lien | No | YES | 10YRIO | No |
| 16180298 | First Lien | No | YES | 10YRIO | No |
| 16180366 | First Lien | No | YES | 10YRIO | No |
| 16178421 | First Lien | No | YES | 10YRIO | No |
| 16179693 | First Lien | No | NO | NONIO | Yes |
| 16180123 | First Lien | No | NO | NONIO | Yes |
| 16180035 | First Lien | No | NO | NONIO | Yes |
| 16179776 | First Lien | No | NO | NONIO | Yes |
| 16180230 | First Lien | No | YES | 10YRIO | No |
| 16179502 | First Lien | No | NO | NONIO | Yes |
| 16180063 | First Lien | No | NO | NONIO | Yes |
| 16180180 | First Lien | No | NO | NONIO | Yes |
| 16179189 | First Lien | No | NO | NONIO | Yes |
| 16180461 | First Lien | No | YES | 10YRIO | Yes |
| 16180530 | First Lien | No | YES | 10YRIO | No |
| 16180299 | First Lien | No | YES | 10YRIO | Yes |
| 16180367 | First Lien | No | YES | 10YRIO | No |
| 16178491 | First Lien | No | YES | 10YRIO | No |
| 16178450 | First Lien | No | YES | 10YRIO | No |
| 16178946 | First Lien | No | NO | NONIO | Yes |
| 16178968 | First Lien | No | NO | NONIO | Yes |
| 16179046 | First Lien | No | NO | NONIO | Yes |
| 16178709 | First Lien | No | YES | 10YRIO | No |
| 16180112 | First Lien | No | NO | NONIO | Yes |
| 16179053 | First Lien | No | NO | NONIO | Yes |
| 16179705 | First Lien | No | NO | NONIO | Yes |
| 16178624 | First Lien | No | YES | 10YRIO | No |
| 16180103 | First Lien | No | NO | NONIO | Yes |
| 16180231 | First Lien | No | YES | 10YRIO | No |
| 16179119 | First Lien | No | NO | NONIO | Yes |
| 16180462 | First Lien | No | YES | 10YRIO | Yes |
| 16180531 | First Lien | No | YES | 10YRIO | No |
| 16180300 | First Lien | No | NO | NONIO | No |
| 16180368 | First Lien | No | NO | NONIO | No |
| 16179722 | First Lien | No | NO | NONIO | Yes |
| 16178694 | First Lien | No | YES | 10YRIO | No |
| 16180050 | First Lien | No | NO | NONIO | Yes |
| 16180149 | First Lien | No | NO | NONIO | No |
| 16179279 | First Lien | No | NO | NONIO | Yes |
| 16179296 | First Lien | No | NO | NONIO | Yes |
| 16180072 | First Lien | No | NO | NONIO | Yes |
| 16180232 | First Lien | No | YES | 10YRIO | Yes |
| 16178886 | First Lien | No | NO | NONIO | No |
| 16179308 | First Lien | No | NO | NONIO | Yes |
| 16179377 | First Lien | No | NO | NONIO | Yes |
| 16180463 | First Lien | No | YES | 10YRIO | No |
| 16180532 | First Lien | No | YES | 10YRIO | No |

| | | | | | |
|---|---|---|---|---|---|
| 16179147 | First Lien | No | NO | NONIO | Yes |
| 16179084 | First Lien | No | NO | NONIO | Yes |
| 16180301 | First Lien | No | YES | 10YRIO | No |
| 16180369 | First Lien | No | NO | NONIO | No |
| 16179723 | First Lien | No | NO | NONIO | Yes |
| 16178451 | First Lien | No | YES | 10YRIO | No |
| 16179813 | First Lien | No | NO | NONIO | Yes |
| 16179027 | First Lien | No | NO | NONIO | No |
| 16179706 | First Lien | No | NO | NONIO | Yes |
| 16178326 | First Lien | No | YES | 10YRIO | No |
| 16180089 | First Lien | No | NO | NONIO | Yes |
| 16178388 | First Lien | No | YES | 10YRIO | No |
| 16178670 | First Lien | No | YES | 10YRIO | Yes |
| 16179378 | First Lien | No | NO | NONIO | Yes |
| 16180464 | First Lien | No | YES | 10YRIO | No |
| 16180533 | First Lien | No | YES | 10YRIO | No |
| 16180302 | First Lien | No | YES | 10YRIO | No |
| 16180370 | First Lien | No | YES | 10YRIO | No |
| 16179724 | First Lien | No | NO | NONIO | Yes |
| 16179766 | First Lien | No | NO | NONIO | Yes |
| 16178702 | First Lien | No | YES | 10YRIO | Yes |
| 16178947 | First Lien | No | NO | NONIO | No |
| 16179814 | First Lien | No | NO | NONIO | Yes |
| 16178422 | First Lien | No | YES | 10YRIO | No |
| 16180094 | First Lien | No | NO | NONIO | No |
| 16180150 | First Lien | No | NO | NONIO | Yes |
| 16179515 | First Lien | No | NO | NONIO | Yes |
| 16178740 | First Lien | No | YES | 10YRIO | Yes |
| 16180398 | First Lien | No | YES | 10YRIO | No |
| 16180465 | First Lien | No | YES | 10YRIO | No |
| 16180534 | First Lien | No | YES | 10YRIO | No |
| 16179085 | First Lien | No | NO | NONIO | No |
| 16178972 | First Lien | No | NO | NONIO | No |
| 16180303 | First Lien | No | YES | 10YRIO | Yes |
| 16180158 | First Lien | No | NO | NONIO | No |
| 16179159 | First Lien | No | NO | NONIO | Yes |
| 16180371 | First Lien | No | YES | 10YRIO | Yes |
| 16179063 | First Lien | No | NO | NONIO | No |
| 16178987 | First Lien | No | NO | NONIO | Yes |
| 16179725 | First Lien | No | NO | NONIO | Yes |
| 16179595 | First Lien | No | NO | NONIO | Yes |
| 16178797 | First Lien | No | YES | 10YRIO | No |
| 16180135 | First Lien | No | NO | NONIO | Yes |
| 16178606 | First Lien | No | YES | 10YRIO | No |
| 16179342 | First Lien | No | NO | NONIO | Yes |
| 16178899 | First Lien | No | NO | NONIO | Yes |
| 16180566 | First Lien | No | YES | 10YRIO | Yes |
| 16180466 | First Lien | No | YES | 10YRIO | No |
| 16178965 | First Lien | No | NO | NONIO | Yes |
| 16180535 | First Lien | No | YES | 10YRIO | No |
| 16180304 | First Lien | No | YES | 10YRIO | Yes |
| 16178432 | First Lien | No | YES | 10YRIO | No |
| 16178988 | First Lien | No | NO | NONIO | No |
| 16179726 | First Lien | No | NO | NONIO | Yes |
| 16178881 | First Lien | No | YES | 10YRIO | No |
| 16180055 | First Lien | No | NO | NONIO | No |
| 16179962 | First Lien | No | NO | NONIO | No |
| 16178910 | First Lien | No | NO | NONIO | No |
| 16178573 | First Lien | No | YES | 10YRIO | No |
| 16179239 | First Lien | No | NO | NONIO | No |
| 16179305 | First Lien | No | NO | NONIO | Yes |
| 16178244 | First Lien | No | YES | 5YRIO | No |
| 16178664 | First Lien | No | YES | 10YRIO | No |
| 16178513 | First Lien | No | YES | 10YRIO | No |
| 16179841 | First Lien | No | NO | NONIO | Yes |
| 16179887 | First Lien | No | NO | NONIO | Yes |
| 16180520 | First Lien | No | YES | 10YRIO | No |
| 16180589 | First Lien | No | YES | 10YRIO | No |
| 16179988 | First Lien | No | NO | NONIO | Yes |
| 16180422 | First Lien | No | YES | 10YRIO | No |
| 16180182 | First Lien | No | NO | NONIO | No |
| 16179171 | First Lien | No | NO | NONIO | No |
| 16178417 | First Lien | No | YES | 10YRIO | No |
| 16178275 | First Lien | No | YES | 10YRIO | No |
| 16178478 | First Lien | No | YES | 10YRIO | Yes |
| 16178190 | First Lien | No | YES | 10YRIO | No |
| 16180120 | First Lien | No | NO | NONIO | Yes |
| 16180009 | First Lien | No | NO | NONIO | Yes |
| 16179842 | First Lien | No | NO | NONIO | Yes |
| 16179633 | First Lien | No | NO | NONIO | Yes |
| 16180521 | First Lien | No | YES | 10YRIO | No |
| 16180590 | First Lien | No | YES | 10YRIO | No |
| 16179936 | First Lien | No | NO | NONIO | Yes |
| 16179444 | First Lien | No | NO | NONIO | Yes |
| 16180059 | First Lien | No | NO | NONIO | Yes |
| 16180423 | First Lien | No | YES | 10YRIO | Yes |
| 16179963 | First Lien | No | NO | NONIO | Yes |
| 16179770 | First Lien | No | NO | NONIO | Yes |
| 16179954 | First Lien | No | NO | NONIO | No |
| 16178245 | First Lien | No | YES | 5YRIO | No |
| 16180522 | First Lien | No | YES | 10YRIO | Yes |
| 16179634 | First Lien | No | NO | NONIO | Yes |
| 16179122 | First Lien | No | NO | NONIO | No |
| 16180591 | First Lien | No | YES | 10YRIO | No |
| 16179782 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16180424 | First Lien | No | YES | 10YRIO | No |
| 16178418 | First Lien | No | YES | 10YRIO | No |
| 16179964 | First Lien | No | NO | NONIO | Yes |
| 16178911 | First Lien | No | NO | NONIO | No |
| 16179667 | First Lien | No | NO | NONIO | Yes |
| 16179240 | First Lien | No | NO | NONIO | Yes |
| 16179955 | First Lien | No | NO | NONIO | Yes |
| 16179844 | First Lien | No | NO | NONIO | Yes |
| 16179635 | First Lien | No | NO | NONIO | Yes |
| 16179889 | First Lien | No | NO | NONIO | Yes |
| 16180523 | First Lien | No | NO | NONIO | No |
| 16179197 | First Lien | No | NO | NONIO | Yes |
| 16180592 | First Lien | No | YES | 10YRIO | No |
| 16179937 | First Lien | No | NO | NONIO | Yes |
| 16178457 | First Lien | No | YES | 5YRIO | No |
| 16179445 | First Lien | No | NO | NONIO | Yes |
| 16178725 | First Lien | No | NO | NONIO | No |
| 16179069 | First Lien | No | NO | NONIO | No |
| 16178543 | First Lien | No | YES | 10YRIO | No |
| 16179668 | First Lien | No | NO | NONIO | Yes |
| 16180085 | First Lien | No | NO | NONIO | No |
| 16179311 | First Lien | No | NO | NONIO | Yes |
| 16178680 | First Lien | No | YES | 10YRIO | No |
| 16179286 | First Lien | No | NO | NONIO | Yes |
| 16180010 | First Lien | No | NO | NONIO | Yes |
| 16182246 | First Lien | No | NO | NONIO | No |
| 16178844 | First Lien | No | YES | 10YRIO | No |
| 16179793 | First Lien | No | NO | NONIO | Yes |
| 16179636 | First Lien | No | NO | NONIO | Yes |
| 16180593 | First Lien | No | NO | NONIO | Yes |
| 16178419 | First Lien | No | YES | 10YRIO | No |
| 16179789 | First Lien | No | NO | NONIO | Yes |
| 16180136 | First Lien | No | NO | NONIO | Yes |
| 16178333 | First Lien | No | YES | 10YRIO | No |
| 16178176 | First Lien | No | YES | 10YRIO | No |
| 16179375 | First Lien | No | NO | NONIO | Yes |
| 16179550 | First Lien | No | NO | NONIO | Yes |
| 16180528 | First Lien | No | YES | 10YRIO | No |
| 16180297 | First Lien | No | YES | 10YRIO | No |
| 16179158 | First Lien | No | NO | NONIO | Yes |
| 16180365 | First Lien | No | YES | 10YRIO | No |
| 16179038 | First Lien | No | NO | NONIO | No |
| 16180267 | First Lien | No | YES | 10YRIO | No |
| 16179591 | First Lien | No | NO | NONIO | Yes |
| 16179026 | First Lien | No | NO | NONIO | Yes |
| 16178312 | First Lien | No | YES | 10YRIO | No |
| 16179568 | First Lien | No | NO | NONIO | Yes |
| 16178324 | First Lien | No | YES | 10YRIO | Yes |
| 16178711 | First Lien | No | YES | 10YRIO | No |
| 16178630 | First Lien | No | YES | 10YRIO | No |
| 16179522 | First Lien | No | NO | NONIO | Yes |
| 16178631 | First Lien | No | YES | 10YRIO | No |
| 16179523 | First Lien | No | NO | NONIO | Yes |
| 16178470 | First Lien | No | YES | 10YRIO | No |
| 16180095 | First Lien | No | NO | NONIO | Yes |
| 16179961 | First Lien | No | NO | NONIO | Yes |
| 16179532 | First Lien | No | NO | NONIO | Yes |
| 16178393 | First Lien | No | YES | 5YRIO | No |
| 16180101 | First Lien | No | NO | NONIO | Yes |
| 16180087 | First Lien | No | NO | NONIO | Yes |
| 16180100 | First Lien | No | NO | NONIO | Yes |
| 16178737 | First Lien | No | YES | 10YRIO | No |
| 16178614 | First Lien | No | YES | 10YRIO | No |
| 16180519 | First Lien | No | YES | 10YRIO | No |
| 16179886 | First Lien | No | NO | NONIO | Yes |
| 16180588 | First Lien | No | YES | 10YRIO | No |
| 16179934 | First Lien | No | NO | NONIO | Yes |
| 16179987 | First Lien | No | NO | NONIO | Yes |
| 16180421 | First Lien | No | YES | 10YRIO | No |
| 16178986 | First Lien | No | NO | NONIO | Yes |
| 16180488 | First Lien | No | NO | NONIO | No |
| 16179895 | First Lien | No | NO | NONIO | Yes |
| 16179420 | First Lien | No | NO | NONIO | Yes |
| 16178287 | First Lien | No | YES | 10YRIO | Yes |
| 16178438 | First Lien | No | YES | 10YRIO | No |
| 16178752 | First Lien | No | YES | 10YRIO | No |
| 16178229 | First Lien | No | YES | 5YRIO | No |
| 16180489 | First Lien | No | YES | 10YRIO | No |
| 16179865 | First Lien | No | NO | NONIO | Yes |
| 16180559 | First Lien | No | YES | 10YRIO | No |
| 16180394 | First Lien | No | YES | 10YRIO | No |
| 16180459 | First Lien | No | YES | 10YRIO | No |
| 16178408 | First Lien | No | YES | 10YRIO | No |
| 16179606 | First Lien | No | NO | NONIO | Yes |
| 16179625 | First Lien | No | NO | NONIO | Yes |
| 16178982 | First Lien | No | NO | NONIO | No |
| 16179720 | First Lien | No | NO | NONIO | Yes |
| 16180038 | First Lien | No | NO | NONIO | Yes |
| 16180082 | First Lien | No | NO | NONIO | No |
| 16178867 | First Lien | No | YES | 10YRIO | No |
| 16179989 | First Lien | No | NO | NONIO | Yes |
| 16179866 | First Lien | No | NO | NONIO | Yes |
| 16180490 | First Lien | No | YES | 10YRIO | Yes |
| 16180560 | First Lien | No | YES | 10YRIO | No |
| 16179421 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16180329 | First Lien | No | YES | 10YRIO | No |
| 16180395 | First Lien | No | YES | 10YRIO | No |
| 16180460 | First Lien | No | YES | 10YRIO | No |
| 16178807 | First Lien | No | YES | 10YRIO | No |
| 16179167 | First Lien | No | NO | NONIO | No |
| 16180164 | First Lien | No | NO | NONIO | Yes |
| 16180056 | First Lien | No | NO | NONIO | Yes |
| 16179827 | First Lien | No | NO | NONIO | Yes |
| 16178430 | First Lien | No | YES | 10YRIO | No |
| 16178530 | First Lien | No | YES | 10YRIO | No |
| 16178776 | First Lien | No | NO | NONIO | No |
| 16179534 | First Lien | No | NO | NONIO | Yes |
| 16179517 | First Lien | No | NO | NONIO | Yes |
| 16178230 | First Lien | No | YES | 5YRIO | No |
| 16179990 | First Lien | No | NO | NONIO | Yes |
| 16179867 | First Lien | No | NO | NONIO | Yes |
| 16180491 | First Lien | No | YES | 10YRIO | No |
| 16180561 | First Lien | No | YES | 10YRIO | No |
| 16178977 | First Lien | No | NO | NONIO | No |
| 16180330 | First Lien | No | YES | 10YRIO | No |
| 16180396 | First Lien | No | YES | 10YRIO | No |
| 16178409 | First Lien | No | YES | 10YRIO | No |
| 16179721 | First Lien | No | NO | NONIO | No |
| 16179312 | First Lien | No | NO | NONIO | Yes |
| 16179535 | First Lien | No | NO | NONIO | Yes |
| 16179304 | First Lien | No | NO | NONIO | Yes |
| 16178577 | First Lien | No | YES | 10YRIO | No |
| 16178671 | First Lien | No | YES | 10YRIO | No |
| 16178746 | First Lien | No | YES | 10YRIO | No |
| 16178507 | First Lien | No | YES | 10YRIO | No |
| 16178558 | First Lien | No | YES | 10YRIO | No |
| 16180425 | First Lien | No | YES | 10YRIO | Yes |
| 16180492 | First Lien | No | YES | 10YRIO | No |
| 16180562 | First Lien | No | YES | 10YRIO | No |
| 16179002 | First Lien | No | NO | NONIO | Yes |
| 16180331 | First Lien | No | YES | 10YRIO | No |
| 16178439 | First Lien | No | YES | 10YRIO | No |
| 16179058 | First Lien | No | NO | NONIO | No |
| 16178431 | First Lien | No | YES | 10YRIO | Yes |
| 16180167 | First Lien | No | NO | NONIO | Yes |
| 16179536 | First Lien | No | NO | NONIO | Yes |
| 16179332 | First Lien | No | NO | NONIO | Yes |
| 16180071 | First Lien | No | NO | NONIO | Yes |
| 16179938 | First Lien | No | NO | NONIO | Yes |
| 16178231 | First Lien | No | NO | NONIO | No |
| 16180426 | First Lien | No | YES | 10YRIO | No |
| 16179868 | First Lien | No | NO | NONIO | Yes |
| 16180493 | First Lien | No | YES | 10YRIO | No |
| 16180563 | First Lien | No | NO | NONIO | No |
| 16178978 | First Lien | No | NO | NONIO | Yes |
| 16179647 | First Lien | No | NO | NONIO | Yes |
| 16180332 | First Lien | No | YES | 10YRIO | No |
| 16180397 | First Lien | No | NO | NONIO | No |
| 16179743 | First Lien | No | NO | NONIO | Yes |
| 16180142 | First Lien | No | NO | NONIO | Yes |
| 16179965 | First Lien | No | NO | NONIO | Yes |
| 16179537 | First Lien | No | NO | NONIO | Yes |
| 16178672 | First Lien | No | YES | 10YRIO | No |
| 16180189 | First Lien | No | NO | NONIO | Yes |
| 16179939 | First Lien | No | NO | NONIO | Yes |
| 16180594 | First Lien | No | YES | 10YRIO | No |
| 16179991 | First Lien | No | NO | NONIO | Yes |
| 16180427 | First Lien | No | YES | 10YRIO | No |
| 16179869 | First Lien | No | NO | NONIO | Yes |
| 16180494 | First Lien | No | YES | 10YRIO | No |
| 16180564 | First Lien | No | YES | 10YRIO | No |
| 16179003 | First Lien | No | NO | NONIO | Yes |
| 16179093 | First Lien | No | NO | NONIO | Yes |
| 16180333 | First Lien | No | YES | 10YRIO | No |
| 16178993 | First Lien | No | NO | NONIO | No |
| 16179798 | First Lien | No | NO | NONIO | Yes |
| 16179538 | First Lien | No | NO | NONIO | Yes |
| 16179338 | First Lien | No | NO | NONIO | Yes |
| 16178276 | First Lien | No | YES | 3YRIO | No |
| 16178542 | First Lien | No | YES | 10YRIO | No |
| 16178247 | First Lien | No | NO | NONIO | No |
| 16180595 | First Lien | No | YES | 10YRIO | Yes |
| 16178232 | First Lien | No | YES | 5YRIO | No |
| 16180428 | First Lien | No | YES | 10YRIO | No |
| 16179870 | First Lien | No | NO | NONIO | Yes |
| 16180495 | First Lien | No | YES | 10YRIO | No |
| 16180565 | First Lien | No | YES | 10YRIO | No |
| 16179172 | First Lien | No | NO | NONIO | Yes |
| 16179425 | First Lien | No | NO | NONIO | Yes |
| 16178410 | First Lien | No | YES | 10YRIO | No |
| 16178929 | First Lien | No | NO | NONIO | No |
| 16178747 | First Lien | No | YES | 10YRIO | No |
| 16179940 | First Lien | No | NO | NONIO | Yes |
| 16180596 | First Lien | No | YES | 10YRIO | No |
| 16179992 | First Lien | No | NO | NONIO | Yes |
| 16180429 | First Lien | No | NO | NONIO | No |
| 16179871 | First Lien | No | NO | NONIO | Yes |
| 16180496 | First Lien | No | YES | 10YRIO | No |
| 16180173 | First Lien | No | NO | NONIO | No |
| 16179426 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16180334 | First Lien | No | YES | 10YRIO | No |
| 16178440 | First Lien | No | YES | 10YRIO | No |
| 16179745 | First Lien | No | NO | NONIO | Yes |
| 16178808 | First Lien | No | YES | 10YRIO | No |
| 16179966 | First Lien | No | NO | NONIO | Yes |
| 16179028 | First Lien | No | NO | NONIO | No |
| 16178930 | First Lien | No | NO | NONIO | No |
| 16178344 | First Lien | No | YES | 10YRIO | No |
| 16178248 | First Lien | No | YES | 5YRIO | No |
| 16179893 | First Lien | No | NO | NONIO | Yes |
| 16179941 | First Lien | No | NO | NONIO | Yes |
| 16180597 | First Lien | No | YES | 10YRIO | No |
| 16179181 | First Lien | No | NO | NONIO | No |
| 16180430 | First Lien | No | YES | 10YRIO | No |
| 16179186 | First Lien | No | NO | NONIO | No |
| 16179872 | First Lien | No | NO | NONIO | Yes |
| 16180497 | First Lien | No | YES | 10YRIO | No |
| 16178861 | First Lien | No | YES | 10YRIO | No |
| 16179004 | First Lien | No | NO | NONIO | No |
| 16179427 | First Lien | No | NO | NONIO | Yes |
| 16178731 | First Lien | No | NO | NONIO | No |
| 16180145 | First Lien | No | NO | NONIO | Yes |
| 16179967 | First Lien | No | NO | NONIO | No |
| 16179539 | First Lien | No | NO | NONIO | Yes |
| 16178539 | First Lien | No | NO | NONIO | Yes |
| 16180121 | First Lien | No | NO | NONIO | Yes |
| 16178345 | First Lien | No | YES | 10YRIO | No |
| 16178217 | First Lien | No | YES | 5YRIO | No |
| 16178738 | First Lien | No | YES | 10YRIO | Yes |
| 16178498 | First Lien | No | YES | 10YRIO | No |
| 16180015 | First Lien | No | NO | NONIO | Yes |
| 16178609 | First Lien | No | YES | 10YRIO | No |
| 16179894 | First Lien | No | NO | NONIO | Yes |
| 16180002 | First Lien | No | NO | NONIO | Yes |
| 16179187 | First Lien | No | NO | NONIO | Yes |
| 16178501 | First Lien | No | YES | 5YRIO | No |
| 16180513 | First Lien | No | YES | 10YRIO | No |
| 16179882 | First Lien | No | NO | NONIO | No |
| 16179440 | First Lien | No | NO | NONIO | Yes |
| 16178445 | First Lien | No | NO | NONIO | No |
| 16178316 | First Lien | No | YES | 5YRIO | No |
| 16180064 | First Lien | No | NO | NONIO | Yes |
| 16179543 | First Lien | No | NO | NONIO | Yes |
| 16178907 | First Lien | No | NO | NONIO | Yes |
| 16178347 | First Lien | No | YES | 5YRIO | No |
| 16179649 | First Lien | No | NO | NONIO | Yes |
| 16178257 | First Lien | No | YES | 5YRIO | No |
| 16179200 | First Lien | No | NO | NONIO | Yes |
| 16180615 | First Lien | No | YES | 10YRIO | No |
| 16180003 | First Lien | No | NO | NONIO | Yes |
| 16178242 | First Lien | No | YES | 5YRIO | No |
| 16178321 | First Lien | No | YES | 10YRIO | No |
| 16178998 | First Lien | No | NO | NONIO | Yes |
| 16180514 | First Lien | No | YES | 10YRIO | No |
| 16179629 | First Lien | No | NO | NONIO | Yes |
| 16180583 | First Lien | No | YES | 10YRIO | No |
| 16179441 | First Lien | No | NO | NONIO | Yes |
| 16179340 | First Lien | No | NO | NONIO | Yes |
| 16178274 | First Lien | No | YES | 10YRIO | No |
| 16178538 | First Lien | No | YES | 10YRIO | No |
| 16179612 | First Lien | No | NO | NONIO | Yes |
| 16179651 | First Lien | No | NO | NONIO | Yes |
| 16178904 | First Lien | No | NO | NONIO | No |
| 16178579 | First Lien | No | YES | 10YRIO | No |
| 16180090 | First Lien | No | NO | NONIO | Yes |
| 16178616 | First Lien | No | YES | 10YRIO | No |
| 16179907 | First Lien | No | NO | NONIO | Yes |
| 16180616 | First Lien | No | YES | 10YRIO | No |
| 16179949 | First Lien | No | NO | NONIO | Yes |
| 16179188 | First Lien | No | NO | NONIO | No |
| 16180515 | First Lien | No | YES | 10YRIO | Yes |
| 16179080 | First Lien | No | NO | NONIO | Yes |
| 16178446 | First Lien | No | YES | 10YRIO | No |
| 16179800 | First Lien | No | NO | NONIO | Yes |
| 16178839 | First Lien | No | YES | 10YRIO | No |
| 16179661 | First Lien | No | NO | NONIO | Yes |
| 16178348 | First Lien | No | YES | 10YRIO | No |
| 16178330 | First Lien | No | YES | 10YRIO | No |
| 16178258 | First Lien | No | NO | NONIO | No |
| 16180097 | First Lien | No | NO | NONIO | Yes |
| 16179908 | First Lien | No | NO | NONIO | Yes |
| 16179238 | First Lien | No | NO | NONIO | Yes |
| 16180617 | First Lien | No | YES | 10YRIO | No |
| 16179192 | First Lien | No | NO | NONIO | Yes |
| 16180516 | First Lien | No | YES | 10YRIO | No |
| 16180148 | First Lien | No | NO | NONIO | Yes |
| 16178732 | First Lien | No | NO | NONIO | No |
| 16179662 | First Lien | No | NO | NONIO | Yes |
| 16178187 | First Lien | No | YES | 10YRIO | No |
| 16178268 | First Lien | No | YES | 10YRIO | Yes |
| 16178188 | First Lien | No | YES | 10YRIO | No |
| 16179791 | First Lien | No | NO | NONIO | Yes |
| 16179795 | First Lien | No | NO | NONIO | Yes |
| 16179797 | First Lien | No | NO | NONIO | Yes |
| 16179959 | First Lien | No | NO | NONIO | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 16179799 | First Lien | No | NO | NONIO | Yes |
| 16178350 | First Lien | No | YES | 10YRIO | No |
| 16178351 | First Lien | No | YES | 11YRIO | No |
| 16178270 | First Lien | No | YES | 10YRIO | No |
| 16178514 | First Lien | No | YES | 10YRIO | No |
| 16178352 | First Lien | No | YES | 5YRIO | No |
| 16178271 | First Lien | No | YES | 10YRIO | Yes |
| 16178272 | First Lien | No | YES | 10YRIO | No |
| 16179325 | First Lien | No | NO | NONIO | Yes |
| 16179406 | First Lien | No | NO | NONIO | Yes |
| 16178515 | First Lien | No | YES | 10YRIO | No |
| 16179326 | First Lien | No | NO | NONIO | Yes |
| 16178516 | First Lien | No | YES | 10YRIO | Yes |
| 16178273 | First Lien | No | YES | 10YRIO | No |
| 16178193 | First Lien | No | YES | 10YRIO | No |
| 16179409 | First Lien | No | NO | NONIO | Yes |
| 16178194 | First Lien | No | YES | 10YRIO | No |
| 16178195 | First Lien | No | YES | 5YRIO | No |
| 16178196 | First Lien | No | YES | 10YRIO | No |
| 16178277 | First Lien | No | YES | 10YRIO | No |
| 16178358 | First Lien | No | YES | 10YRIO | No |
| 16178197 | First Lien | No | YES | 10YRIO | No |
| 16178278 | First Lien | No | YES | 10YRIO | Yes |
| 16178198 | First Lien | No | YES | 10YRIO | Yes |
| 16178279 | First Lien | No | YES | 3YRIO | No |
| 16178199 | First Lien | No | YES | 10YRIO | No |
| 16180004 | First Lien | No | NO | NONIO | Yes |
| 16178520 | First Lien | No | YES | 10YRIO | No |
| 16178603 | First Lien | No | YES | 10YRIO | No |
| 16178360 | First Lien | No | YES | 10YRIO | No |
| 16178604 | First Lien | No | YES | 5YRIO | No |
| 16178607 | First Lien | No | YES | 10YRIO | No |
| 16179336 | First Lien | No | NO | NONIO | Yes |
| 16178283 | First Lien | No | NO | NONIO | No |
| 16178284 | First Lien | No | YES | 10YRIO | No |
| 16179337 | First Lien | No | NO | NONIO | Yes |
| 16178527 | First Lien | No | YES | 5YRIO | No |
| 16178529 | First Lien | No | YES | 10YRIO | No |
| 16179892 | First Lien | No | NO | NONIO | Yes |
| 16180019 | First Lien | No | NO | NONIO | Yes |
| 16178612 | First Lien | No | YES | 10YRIO | No |
| 16178370 | First Lien | No | YES | 10YRIO | No |
| 16178533 | First Lien | No | NO | NONIO | No |
| 16178534 | First Lien | No | YES | 10YRIO | No |
| 16178535 | First Lien | No | YES | 10YRIO | No |
| 16178536 | First Lien | No | NO | NONIO | No |
| 16178537 | First Lien | No | YES | 10YRIO | No |
| 16178456 | First Lien | No | YES | 3YRIO | No |
| 16178294 | First Lien | No | YES | 10YRIO | No |
| 16178618 | First Lien | No | YES | 5YRIO | No |
| 16178296 | First Lien | No | YES | 10YRIO | No |
| 16178459 | First Lien | No | YES | 10YRIO | No |
| 16178298 | First Lien | No | YES | 10YRIO | No |
| 16178379 | First Lien | No | YES | 10YRIO | No |
| 16180020 | First Lien | No | NO | NONIO | Yes |
| 16178701 | First Lien | No | YES | 10YRIO | No |
| 16178540 | First Lien | No | YES | 10YRIO | No |
| 16179350 | First Lien | No | NO | NONIO | Yes |
| 16178460 | First Lien | No | YES | 10YRIO | No |
| 16178623 | First Lien | No | NO | NONIO | No |
| 16178705 | First Lien | No | YES | 10YRIO | Yes |
| 16178463 | First Lien | No | YES | 10YRIO | No |
| 16178382 | First Lien | No | YES | 10YRIO | Yes |
| 16178544 | First Lien | No | YES | 10YRIO | No |
| 16178707 | First Lien | No | YES | 10YRIO | No |
| 16179518 | First Lien | No | NO | NONIO | Yes |
| 16178627 | First Lien | No | YES | 10YRIO | No |
| 16178385 | First Lien | No | YES | 10YRIO | No |
| 16178628 | First Lien | No | YES | 10YRIO | No |
| 16178466 | First Lien | No | YES | 10YRIO | No |
| 16178469 | First Lien | No | YES | 10YRIO | No |
| 16178389 | First Lien | No | YES | 10YRIO | Yes |
| 16178710 | First Lien | No | NO | NONIO | No |
| 16180393 | First Lien | No | NO | NONIO | No |
| 16178964 | First Lien | No | NO | NONIO | No |
| 16179000 | First Lien | No | NO | NONIO | No |
| 16179083 | First Lien | No | NO | NONIO | Yes |
| 16180296 | First Lien | No | YES | 10YRIO | Yes |
| 16179605 | First Lien | No | NO | NONIO | No |
| 16179157 | First Lien | No | NO | NONIO | No |
| 16179719 | First Lien | No | NO | NONIO | Yes |
| 16180042 | First Lien | No | NO | NONIO | Yes |
| 16178532 | First Lien | No | YES | 10YRIO | No |
| 16178521 | First Lien | No | YES | 10YRIO | No |
| 16179486 | First Lien | No | NO | NONIO | Yes |
| 16178896 | First Lien | No | NO | NONIO | Yes |
| 99999001 | First Lien | No | NO | NONIO | No |
| 99999004 | First Lien | No | YES | 10YRIO | No |
| 99999005 | First Lien | No | YES | 10YRIO | No |
| 99999007 | First Lien | No | YES | 10YRIO | No |
| 99999010 | First Lien | No | NO | NONIO | No |
| 15980136 | First Lien | No | NO | NONIO | Yes |
| 99999200 | First Lien | No | NO | NONIO | No |
| 99999201 | First Lien | No | YES | 10YRIO | No |
| 99999202 | First Lien | No | YES | 10YRIO | No |

| LOAN_SEQ | HYBRID_PERIOD | AMORT_TERM1 | PORTFOLIO |
|----------|---------------|-------------|-----------|
| 16180262 | 60 | 360 | |
| 122405144 | 1 | 360 | |
| 16178479 | 60 | 360 | |
| 16179674 | 1 | 360 | |
| 16180224 | 60 | 360 | |
| 16179289 | 1 | 360 | |
| 16179228 | 1 | 360 | |
| 16178371 | 60 | 360 | |
| 16179245 | 1 | 360 | |
| 16179852 | 1 | 360 | |
| 16180263 | 60 | 360 | |
| 16179810 | 1 | 360 | |
| 16178940 | 1 | 360 | |
| 16180106 | 1 | 480 | |
| 16180161 | 1 | 360 | |
| 16180225 | 60 | 360 | |
| 16179773 | 1 | 360 | |
| 16178566 | 60 | 360 | |
| 16179511 | 1 | 360 | |
| 16192290 | 1 | 360 | |
| 16179920 | 1 | 360 | |
| 16179019 | 1 | 360 | |
| 16180362 | 60 | 360 | |
| 16180264 | 60 | 360 | |
| 16179811 | 1 | 360 | |
| 16178420 | 60 | 360 | |
| 16179566 | 1 | 360 | |
| 16179675 | 1 | 360 | |
| 16180122 | 1 | 360 | |
| 16178735 | 60 | 360 | |
| 16180226 | 60 | 360 | |
| 16179512 | 1 | 360 | |
| 16179214 | 1 | 360 | |
| 16179133 | 1 | 360 | |
| 16179373 | 1 | 360 | |
| 16180363 | 60 | 360 | |
| 16180265 | 60 | 360 | |
| 16179703 | 1 | 360 | |
| 16179567 | 1 | 360 | |
| 16178332 | 60 | 360 | |
| 16178522 | 60 | 360 | |
| 16179482 | 1 | 360 | |
| 16179118 | 1 | 360 | |
| 16179134 | 1 | 360 | |
| 16179772 | 1 | 480 | |
| 16179374 | 1 | 360 | |
| 16180364 | 60 | 360 | |
| 16178546 | 60 | 360 | |
| 16178967 | 1 | 360 | |
| 16180266 | 60 | 360 | |
| 16179812 | 1 | 360 | |
| 16179704 | 1 | 360 | |
| 16179034 | 1 | 360 | |
| 16179692 | 1 | 360 | |
| 16180137 | 1 | 360 | |
| 16178328 | 60 | 360 | |
| 16179278 | 1 | 360 | |
| 16180228 | 60 | 360 | |
| 16178855 | 60 | 360 | |
| 16180185 | 1 | 360 | |
| 16179922 | 1 | 480 | |
| 16179942 | 1 | 360 | |
| 16180598 | 60 | 360 | |
| 16179008 | 1 | 360 | |
| 16179013 | 1 | 360 | |
| 16179203 | 1 | 360 | |
| 16179449 | 1 | 360 | |
| 16180431 | 60 | 360 | |
| 16178813 | 60 | 360 | |
| 16179102 | 1 | 360 | |
| 16179328 | 1 | 360 | |
| 16178996 | 1 | 360 | |
| 16179428 | 1 | 360 | |
| 16178441 | 60 | 360 | |
| 16179747 | 1 | 360 | |
| 16178706 | 60 | 360 | |
| 16179393 | 1 | 360 | |
| 16178681 | 60 | 360 | |
| 16178669 | 60 | 360 | |
| 16178528 | 60 | 360 | |
| 16179255 | 1 | 360 | |
| 16178249 | 60 | 360 | |
| 16180076 | 1 | 360 | |
| 16178600 | 60 | 360 | |
| 16179895 | 1 | 360 | |
| 16180599 | 60 | 360 | |
| 16179993 | 1 | 360 | |
| 16180432 | 60 | 360 | |
| 16179173 | 1 | 360 | |

| | | |
|---|---|---|
| 16179429 | 1 | 360 |
| 16180129 | 1 | 360 |
| 16179748 | 1 | 360 |
| 16179968 | 1 | 360 |
| 16179029 | 1 | 360 |
| 16178912 | 1 | 360 |
| 16178931 | 1 | 360 |
| 16178335 | 60 | 360 |
| 16179650 | 1 | 360 |
| 16178310 | 60 | 360 |
| 16178218 | 60 | 360 |
| 16179205 | 1 | 360 |
| 16178739 | 60 | 360 |
| 16180016 | 1 | 360 |
| 16178266 | 60 | 360 |
| 16179847 | 1 | 360 |
| 16179896 | 1 | 480 |
| 16179123 | 1 | 360 |
| 16180600 | 60 | 360 |
| 16179204 | 1 | 360 |
| 16179450 | 1 | 360 |
| 16178997 | 1 | 360 |
| 16178781 | 60 | 360 |
| 16179969 | 1 | 360 |
| 16178953 | 1 | 360 |
| 16178309 | 60 | 360 |
| 16179242 | 1 | 360 |
| 16178250 | 60 | 360 |
| 16180017 | 1 | 480 |
| 16180601 | 60 | 360 |
| 16179014 | 1 | 360 |
| 16180433 | 60 | 360 |
| 16178805 | 60 | 360 |
| 16179355 | 1 | 360 |
| 16179042 | 1 | 360 |
| 16180091 | 1 | 360 |
| 16178590 | 60 | 360 |
| 16178219 | 60 | 360 |
| 16178264 | 60 | 360 |
| 16179897 | 1 | 360 |
| 16179125 | 1 | 360 |
| 16179193 | 1 | 360 |
| 16180602 | 60 | 360 |
| 16179198 | 1 | 360 |
| 16179451 | 1 | 360 |
| 16178726 | 60 | 360 |
| 16180048 | 1 | 360 |
| 16180170 | 1 | 360 |
| 16179970 | 1 | 480 |
| 16179022 | 1 | 360 |
| 16178295 | 60 | 360 |
| 16178575 | 60 | 360 |
| 16178666 | 60 | 360 |
| 16180116 | 1 | 480 |
| 16178601 | 60 | 360 |
| 16178251 | 60 | 360 |
| 16179783 | 1 | 360 |
| 16179849 | 1 | 360 |
| 16179898 | 1 | 360 |
| 16179194 | 1 | 360 |
| 16180603 | 60 | 360 |
| 16179452 | 1 | 360 |
| 16180627 | 60 | 360 |
| 16179396 | 1 | 480 |
| 16178936 | 1 | 360 |
| 16178954 | 1 | 360 |
| 16178913 | 1 | 360 |
| 16179672 | 1 | 360 |
| 16180110 | 1 | 360 |
| 16178291 | 60 | 360 |
| 16179264 | 1 | 360 |
| 16178220 | 60 | 360 |
| 16180018 | 1 | 480 |
| 16179784 | 1 | 480 |
| 16179108 | 1 | 360 |
| 16179453 | 1 | 360 |
| 16180259 | 60 | 360 |
| 16179673 | 1 | 360 |
| 16178689 | 60 | 360 |
| 16178822 | 60 | 360 |
| 16179265 | 1 | 360 |
| 16179217 | 1 | 360 |
| 16179243 | 1 | 360 |
| 16179201 | 1 | 360 |
| 16179850 | 1 | 480 |
| 16179899 | 1 | 360 |
| 16179454 | 1 | 360 |
| 16180260 | 60 | 360 |
| 16179149 | 1 | 360 |
| 16179033 | 1 | 360 |
| 16179564 | 1 | 480 |
| 16178550 | 60 | 360 |
| 16178937 | 1 | 360 |
| 16179790 | 1 | 480 |
| 16180190 | 1 | 360 |

| | | |
|---|---|---|
| 16178581 | 60 | 360 |
| 16178568 | 60 | 360 |
| 16179132 | 1 | 360 |
| 16179918 | 1 | 360 |
| 16178221 | 60 | 360 |
| 16179244 | 1 | 360 |
| 16179017 | 1 | 360 |
| 16179109 | 1 | 360 |
| 16178364 | 60 | 360 |
| 16179351 | 1 | 360 |
| 16179398 | 1 | 360 |
| 16180261 | 60 | 360 |
| 16179052 | 1 | 360 |
| 16179565 | 1 | 360 |
| 16178938 | 1 | 360 |
| 16178339 | 60 | 360 |
| 16180105 | 1 | 480 |
| 16180088 | 1 | 360 |
| 16178281 | 60 | 360 |
| 16179919 | 1 | 360 |
| 16178192 | 60 | 360 |
| 16179018 | 1 | 360 |
| 16179851 | 1 | 480 |
| 16179456 | 1 | 360 |
| 16178773 | 60 | 360 |
| 16178640 | 60 | 360 |
| 16178688 | 60 | 360 |
| 16179294 | 1 | 360 |
| 16179235 | 1 | 360 |
| 16180220 | 60 | 360 |
| 16179250 | 1 | 360 |
| 16179207 | 1 | 360 |
| 16180070 | 1 | 480 |
| 16179478 | 1 | 360 |
| 16179370 | 1 | 360 |
| 16179526 | 1 | 360 |
| 16180452 | 60 | 360 |
| 16180289 | 60 | 360 |
| 16180358 | 60 | 360 |
| 16179163 | 1 | 360 |
| 16179036 | 1 | 360 |
| 16179586 | 1 | 360 |
| 16178784 | 60 | 360 |
| 16178485 | 60 | 360 |
| 16179654 | 1 | 480 |
| 16180036 | 1 | 360 |
| 16180163 | 1 | 480 |
| 16179273 | 1 | 360 |
| 16180221 | 60 | 360 |
| 16178387 | 60 | 360 |
| 16178359 | 60 | 360 |
| 16178897 | 1 | 360 |
| 16180077 | 1 | 360 |
| 16179371 | 1 | 360 |
| 16180453 | 60 | 360 |
| 16180290 | 60 | 360 |
| 16179716 | 1 | 360 |
| 16179061 | 1 | 360 |
| 16179764 | 1 | 480 |
| 16179143 | 1 | 360 |
| 16179807 | 1 | 360 |
| 16178809 | 36 | 360 |
| 16179024 | 1 | 360 |
| 16178793 | 60 | 360 |
| 16180139 | 1 | 360 |
| 16179274 | 1 | 360 |
| 16179295 | 1 | 360 |
| 16180222 | 60 | 360 |
| 16178842 | 60 | 360 |
| 16178510 | 60 | 360 |
| 16180622 | 60 | 360 |
| 16180454 | 60 | 360 |
| 16179166 | 1 | 360 |
| 16179073 | 1 | 360 |
| 16180291 | 60 | 360 |
| 16180359 | 60 | 360 |
| 16178448 | 60 | 360 |
| 16180065 | 1 | 360 |
| 16179808 | 1 | 360 |
| 16179587 | 1 | 360 |
| 16178638 | 60 | 360 |
| 16179702 | 1 | 360 |
| 16179655 | 1 | 360 |
| 16179025 | 1 | 360 |
| 16179691 | 1 | 360 |
| 16178587 | 60 | 360 |
| 16178523 | 60 | 360 |
| 16180223 | 60 | 360 |
| 16179372 | 1 | 360 |
| 16180623 | 60 | 360 |
| 16180389 | 60 | 360 |
| 16180455 | 60 | 360 |
| 16179074 | 1 | 360 |
| 16180292 | 60 | 360 |
| 16180360 | 60 | 360 |

| | | |
|---|---|---|
| 16179809 | 1 | 360 |
| 16180141 | 1 | 360 |
| 16178620 | 60 | 360 |
| 16178699 | 60 | 360 |
| 16178629 | 60 | 360 |
| 16180084 | 1 | 360 |
| 16178825 | 60 | 360 |
| 16179275 | 1 | 360 |
| 16180181 | 1 | 360 |
| 16178378 | 60 | 360 |
| 16180624 | 60 | 360 |
| 16180390 | 60 | 360 |
| 16179184 | 1 | 360 |
| 16180456 | 60 | 360 |
| 16180293 | 60 | 360 |
| 16179825 | 1 | 360 |
| 16180361 | 60 | 360 |
| 16178449 | 60 | 360 |
| 16179717 | 1 | 360 |
| 16180192 | 1 | 360 |
| 16178652 | 60 | 360 |
| 16180156 | 1 | 360 |
| 16178945 | 1 | 360 |
| 16178639 | 60 | 360 |
| 16178778 | 60 | 360 |
| 16178304 | 60 | 360 |
| 16178325 | 60 | 360 |
| 16179775 | 1 | 480 |
| 16179236 | 1 | 360 |
| 16178551 | 60 | 360 |
| 16180556 | 60 | 360 |
| 16180625 | 60 | 360 |
| 16180391 | 60 | 360 |
| 16179185 | 1 | 360 |
| 16180457 | 60 | 360 |
| 16179082 | 1 | 360 |
| 16180294 | 60 | 360 |
| 16179826 | 1 | 360 |
| 16179718 | 1 | 360 |
| 16179037 | 1 | 360 |
| 16180151 | 1 | 360 |
| 16178693 | 60 | 360 |
| 16178865 | 60 | 360 |
| 16179276 | 1 | 360 |
| 16179499 | 1 | 360 |
| 16178512 | 60 | 360 |
| 16178228 | 60 | 360 |
| 16180557 | 60 | 360 |
| 16180392 | 60 | 360 |
| 16180458 | 60 | 360 |
| 16180172 | 1 | 360 |
| 16180295 | 60 | 360 |
| 16178407 | 60 | 360 |
| 16180157 | 1 | 360 |
| 16179062 | 1 | 360 |
| 16178708 | 60 | 360 |
| 16178338 | 60 | 360 |
| 16178525 | 60 | 360 |
| 16178181 | 60 | 360 |
| 16179303 | 1 | 360 |
| 16178391 | 60 | 360 |
| 16179277 | 1 | 360 |
| 16179500 | 1 | 360 |
| 16179648 | 1 | 360 |
| 16180074 | 1 | 360 |
| 16180558 | 60 | 360 |
| 16180327 | 60 | 360 |
| 16180586 | 60 | 360 |
| 16179932 | 1 | 360 |
| 16179985 | 1 | 360 |
| 16178959 | 1 | 360 |
| 16180326 | 60 | 360 |
| 16179646 | 1 | 480 |
| 16179148 | 1 | 360 |
| 16179162 | 1 | 360 |
| 16179740 | 1 | 360 |
| 16178713 | 60 | 360 |
| 16178645 | 60 | 360 |
| 16178548 | 60 | 360 |
| 16178243 | 60 | 360 |
| 16180518 | 60 | 360 |
| 16179121 | 1 | 360 |
| 16180587 | 60 | 360 |
| 16179933 | 1 | 480 |
| 16180186 | 1 | 360 |
| 16179986 | 1 | 360 |
| 16180420 | 60 | 360 |
| 16178733 | 60 | 360 |
| 16180487 | 60 | 360 |
| 16179067 | 1 | 360 |
| 16179170 | 1 | 360 |
| 16178416 | 60 | 360 |
| 16180067 | 1 | 360 |
| 16179057 | 1 | 360 |
| 16178200 | 36 | 360 |

| | | |
|---|---|---|
| 16178201 | 36 | 360 |
| 16178202 | 36 | 360 |
| 16178203 | 36 | 360 |
| 16178204 | 36 | 360 |
| 16178205 | 36 | 360 |
| 16178206 | 36 | 360 |
| 16178207 | 36 | 360 |
| 16178208 | 36 | 360 |
| 16178209 | 36 | 360 |
| 16178841 | 60 | 360 |
| 16178762 | 60 | 360 |
| 16178843 | 36 | 360 |
| 16178763 | 60 | 360 |
| 16178845 | 60 | 360 |
| 16178846 | 36 | 360 |
| 16178684 | 36 | 360 |
| 16178847 | 36 | 360 |
| 16178685 | 36 | 360 |
| 16178686 | 36 | 360 |
| 16178848 | 60 | 360 |
| 16178849 | 36 | 360 |
| 16178687 | 60 | 360 |
| 16178210 | 36 | 360 |
| 16178211 | 36 | 360 |
| 16178212 | 36 | 360 |
| 16178213 | 36 | 360 |
| 16178214 | 36 | 360 |
| 16178215 | 36 | 360 |
| 16178850 | 36 | 360 |
| 16178852 | 36 | 360 |
| 16178853 | 60 | 360 |
| 16178772 | 60 | 360 |
| 16178854 | 36 | 360 |
| 16178692 | 60 | 360 |
| 16178774 | 36 | 360 |
| 16178857 | 36 | 360 |
| 16178858 | 36 | 360 |
| 16178859 | 36 | 360 |
| 16178697 | 36 | 360 |
| 16178779 | 36 | 360 |
| 16178301 | 36 | 360 |
| 16178303 | 60 | 360 |
| 16178305 | 36 | 360 |
| 16178307 | 36 | 360 |
| 16179831 | 1 | 480 |
| 16178860 | 36 | 360 |
| 16178863 | 60 | 360 |
| 16178866 | 60 | 360 |
| 16178786 | 36 | 360 |
| 16178868 | 36 | 360 |
| 16178787 | 36 | 360 |
| 16178869 | 36 | 360 |
| 16178311 | 36 | 360 |
| 16180194 | 36 | 360 |
| 16180195 | 36 | 360 |
| 16180196 | 36 | 360 |
| 16180197 | 36 | 360 |
| 16178317 | 36 | 360 |
| 16180198 | 36 | 360 |
| 16180199 | 36 | 360 |
| 16179921 | 1 | 360 |
| 16178319 | 60 | 360 |
| 16178870 | 36 | 360 |
| 16178790 | 36 | 360 |
| 16178872 | 36 | 360 |
| 16178873 | 36 | 360 |
| 16178792 | 60 | 360 |
| 16178874 | 36 | 360 |
| 16178794 | 60 | 360 |
| 16178875 | 36 | 360 |
| 16178876 | 36 | 360 |
| 16178795 | 36 | 360 |
| 16178877 | 60 | 360 |
| 16178322 | 36 | 360 |
| 16178880 | 60 | 360 |
| 16179771 | 1 | 360 |
| 16178882 | 36 | 360 |
| 16178883 | 60 | 360 |
| 16179778 | 1 | 360 |
| 16178170 | 36 | 360 |
| 16178173 | 36 | 360 |
| 16178336 | 36 | 360 |
| 16178174 | 36 | 360 |
| 16178177 | 36 | 360 |
| 16178259 | 36 | 360 |
| 16178178 | 36 | 360 |
| 16178179 | 36 | 360 |
| 16179785 | 1 | 360 |
| 16179787 | 1 | 360 |
| 16178502 | 36 | 360 |
| 16180626 | 36 | 360 |
| 16178503 | 60 | 360 |
| 16178180 | 36 | 360 |
| 16178504 | 36 | 360 |
| 16178263 | 36 | 360 |

| | | |
|---|---|---|
| 16178506 | 36 | 360 |
| 16178184 | 60 | 360 |
| 16178508 | 36 | 360 |
| 16178186 | 36 | 360 |
| 16178267 | 36 | 360 |
| 16180385 | 60 | 360 |
| 16180449 | 60 | 360 |
| 16179601 | 1 | 480 |
| 16180286 | 60 | 360 |
| 16178355 | 60 | 360 |
| 16179713 | 1 | 360 |
| 16180054 | 1 | 360 |
| 16179761 | 1 | 480 |
| 16178775 | 60 | 360 |
| 16178286 | 60 | 360 |
| 16179516 | 1 | 360 |
| 16179407 | 1 | 360 |
| 16180246 | 60 | 360 |
| 16178481 | 60 | 360 |
| 16178519 | 60 | 360 |
| 16180479 | 60 | 360 |
| 16178890 | 1 | 360 |
| 16180549 | 60 | 360 |
| 16180319 | 60 | 360 |
| 16179089 | 1 | 360 |
| 16180450 | 60 | 360 |
| 16179165 | 1 | 360 |
| 16180058 | 1 | 480 |
| 16178405 | 60 | 360 |
| 16178314 | 60 | 360 |
| 16179714 | 1 | 360 |
| 16178783 | 60 | 360 |
| 16178524 | 60 | 360 |
| 16180247 | 60 | 360 |
| 16179390 | 1 | 360 |
| 16179982 | 1 | 360 |
| 16180480 | 60 | 360 |
| 16180550 | 60 | 360 |
| 16180320 | 60 | 360 |
| 16179415 | 1 | 360 |
| 16179738 | 1 | 360 |
| 16180451 | 60 | 360 |
| 16180144 | 1 | 360 |
| 16179602 | 1 | 480 |
| 16179146 | 1 | 360 |
| 16178428 | 60 | 360 |
| 16178644 | 60 | 360 |
| 16178401 | 60 | 360 |
| 16178691 | 60 | 360 |
| 16179301 | 1 | 360 |
| 16180248 | 60 | 360 |
| 16179254 | 1 | 360 |
| 16179391 | 1 | 360 |
| 16179983 | 1 | 360 |
| 16178225 | 60 | 360 |
| 16178562 | 60 | 360 |
| 16180481 | 60 | 360 |
| 16178489 | 60 | 360 |
| 16180551 | 60 | 360 |
| 16180321 | 60 | 360 |
| 16179779 | 1 | 360 |
| 16179009 | 1 | 360 |
| 16180386 | 60 | 360 |
| 16178785 | 60 | 360 |
| 16179048 | 1 | 360 |
| 16179715 | 1 | 360 |
| 16180138 | 1 | 360 |
| 16178390 | 60 | 360 |
| 16179984 | 1 | 360 |
| 16180416 | 60 | 360 |
| 16180482 | 60 | 360 |
| 16180552 | 60 | 360 |
| 16180322 | 60 | 360 |
| 16179416 | 1 | 480 |
| 16179090 | 1 | 360 |
| 16178976 | 1 | 360 |
| 16180387 | 60 | 360 |
| 16179183 | 1 | 360 |
| 16180052 | 1 | 360 |
| 16180178 | 1 | 360 |
| 16179739 | 1 | 360 |
| 16178992 | 1 | 360 |
| 16179072 | 1 | 360 |
| 16178429 | 60 | 360 |
| 16178226 | 60 | 360 |
| 16179202 | 1 | 360 |
| 16180417 | 60 | 360 |
| 16180483 | 60 | 360 |
| 16178473 | 60 | 360 |
| 16180553 | 60 | 360 |
| 16180323 | 60 | 360 |
| 16180388 | 60 | 360 |
| 16179830 | 1 | 360 |
| 16178297 | 60 | 360 |
| 16178505 | 60 | 360 |

Unassociated Document          Page 341 of 835
12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 63 of 279

| | | |
|---|---|---|
| 16178483 | 60 | 360 |
| 16179306 | 1 | 360 |
| 16180079 | 1 | 360 |
| 16180584 | 60 | 360 |
| 16180418 | 60 | 360 |
| 16180484 | 60 | 360 |
| 16180554 | 60 | 360 |
| 16180324 | 60 | 360 |
| 16179417 | 1 | 480 |
| 16179091 | 1 | 360 |
| 16178437 | 60 | 360 |
| 16180169 | 1 | 360 |
| 16179619 | 1 | 360 |
| 16179960 | 1 | 480 |
| 16178541 | 60 | 360 |
| 16178265 | 60 | 360 |
| 16178462 | 60 | 360 |
| 16179196 | 1 | 360 |
| 16180585 | 60 | 360 |
| 16179931 | 1 | 360 |
| 16178227 | 60 | 360 |
| 16178511 | 60 | 360 |
| 16180419 | 60 | 360 |
| 16180485 | 60 | 360 |
| 16180555 | 60 | 360 |
| 16180325 | 60 | 360 |
| 16179418 | 1 | 480 |
| 16178717 | 60 | 360 |
| 16179177 | 1 | 360 |
| 16179092 | 1 | 360 |
| 16179161 | 1 | 360 |
| 16178729 | 60 | 360 |
| 16178406 | 60 | 360 |
| 16178716 | 60 | 360 |
| 16180047 | 1 | 360 |
| 16179348 | 1 | 360 |
| 16179531 | 1 | 360 |
| 16178189 | 60 | 360 |
| 16180099 | 1 | 360 |
| 16179884 | 1 | 360 |
| 16179684 | 1 | 360 |
| 16180152 | 1 | 360 |
| 16180092 | 1 | 360 |
| 16178829 | 60 | 360 |
| 16178761 | 60 | 360 |
| 16179774 | 1 | 360 |
| 16178961 | 1 | 360 |
| 16179206 | 1 | 360 |
| 16180443 | 60 | 360 |
| 16178280 | 60 | 360 |
| 16180281 | 60 | 360 |
| 16180350 | 60 | 360 |
| 16179757 | 1 | 480 |
| 16180241 | 60 | 360 |
| 16179293 | 1 | 360 |
| 16178468 | 60 | 360 |
| 16179232 | 1 | 360 |
| 16180053 | 1 | 360 |
| 16180061 | 1 | 360 |
| 16179386 | 1 | 360 |
| 16179367 | 1 | 360 |
| 16178610 | 60 | 360 |
| 16180444 | 60 | 360 |
| 16179070 | 1 | 360 |
| 16180282 | 60 | 360 |
| 16180351 | 60 | 360 |
| 16179710 | 1 | 360 |
| 16179758 | 1 | 360 |
| 16179579 | 1 | 360 |
| 16178944 | 1 | 360 |
| 16179142 | 1 | 360 |
| 16180193 | 1 | 360 |
| 16178696 | 60 | 360 |
| 16178712 | 60 | 360 |
| 16178269 | 60 | 360 |
| 16180242 | 60 | 360 |
| 16179491 | 1 | 360 |
| 16180381 | 60 | 360 |
| 16180445 | 60 | 360 |
| 16179164 | 1 | 360 |
| 16180283 | 60 | 360 |
| 16178427 | 60 | 360 |
| 16180352 | 60 | 360 |
| 16179759 | 1 | 360 |
| 16179580 | 1 | 360 |
| 16178789 | 60 | 360 |
| 16180039 | 1 | 360 |
| 16179298 | 1 | 360 |
| 16180243 | 60 | 360 |
| 16179253 | 1 | 360 |
| 16179492 | 1 | 360 |
| 16180382 | 60 | 360 |
| 16180446 | 60 | 360 |
| 16179071 | 1 | 360 |
| 16180284 | 60 | 360 |

| | | |
|---|---|---|
| 16180353 | 60 | 360 |
| 16180166 | 1 | 480 |
| 16178803 | 60 | 360 |
| 16179711 | 3 | 360 |
| 16179777 | 1 | 360 |
| 16179828 | 1 | 360 |
| 16180155 | 1 | 480 |
| 16180127 | 1 | 360 |
| 16179581 | 1 | 360 |
| 16180165 | 1 | 360 |
| 16180037 | 1 | 360 |
| 16180130 | 1 | 360 |
| 16179493 | 1 | 360 |
| 16179388 | 1 | 360 |
| 16178660 | 60 | 360 |
| 16180383 | 60 | 360 |
| 16180447 | 60 | 360 |
| 16178991 | 1 | 360 |
| 16178963 | 1 | 360 |
| 16179600 | 1 | 360 |
| 16180285 | 60 | 360 |
| 16179035 | 1 | 360 |
| 16179582 | 1 | 360 |
| 16178597 | 60 | 360 |
| 16180045 | 1 | 480 |
| 16180244 | 60 | 360 |
| 16178320 | 36 | 360 |
| 16179139 | 1 | 360 |
| 16178377 | 60 | 360 |
| 16180547 | 60 | 360 |
| 16180317 | 60 | 360 |
| 16178171 | 60 | 360 |
| 16180384 | 60 | 360 |
| 16180448 | 60 | 360 |
| 16178404 | 60 | 360 |
| 16179155 | 1 | 360 |
| 16179712 | 1 | 360 |
| 16180191 | 1 | 360 |
| 16178928 | 1 | 360 |
| 16179760 | 1 | 480 |
| 16178833 | 60 | 360 |
| 16179583 | 1 | 360 |
| 16178625 | 60 | 360 |
| 16178622 | 60 | 360 |
| 16179299 | 1 | 360 |
| 16180245 | 60 | 360 |
| 16179484 | 1 | 360 |
| 16179272 | 1 | 360 |
| 16179495 | 1 | 360 |
| 16178608 | 60 | 360 |
| 16180548 | 60 | 360 |
| 16180318 | 60 | 360 |
| 16179260 | 1 | 360 |
| 16179863 | 1 | 360 |
| 16179195 | 1 | 360 |
| 16180621 | 60 | 360 |
| 16178884 | 1 | 360 |
| 16179405 | 1 | 480 |
| 16180347 | 60 | 360 |
| 16179575 | 1 | 360 |
| 16178892 | 1 | 360 |
| 16178851 | 60 | 360 |
| 16179792 | 1 | 360 |
| 16178736 | 60 | 360 |
| 16178767 | 60 | 360 |
| 16179230 | 1 | 360 |
| 16179113 | 1 | 360 |
| 16179864 | 1 | 360 |
| 16178369 | 60 | 360 |
| 16179365 | 1 | 360 |
| 16180278 | 60 | 360 |
| 16180348 | 60 | 360 |
| 16179802 | 1 | 360 |
| 16178626 | 60 | 360 |
| 16179137 | 1 | 360 |
| 16179248 | 1 | 360 |
| 16178386 | 60 | 360 |
| 16179261 | 1 | 360 |
| 16179910 | 1 | 360 |
| 16179487 | 1 | 360 |
| 16180279 | 60 | 360 |
| 16179060 | 1 | 360 |
| 16179577 | 1 | 360 |
| 16179803 | 1 | 360 |
| 16179618 | 1 | 480 |
| 16178764 | 60 | 360 |
| 16178282 | 60 | 360 |
| 16179292 | 1 | 360 |
| 16179231 | 1 | 360 |
| 16179138 | 1 | 360 |
| 16178376 | 60 | 360 |
| 16179100 | 1 | 360 |
| 16180184 | 1 | 360 |
| 16180442 | 60 | 360 |
| 16180349 | 60 | 360 |

| | | |
|---|---|---|
| 16179578 | 1 | 360 |
| 16179804 | 1 | 360 |
| 16179045 | 1 | 360 |
| 16180051 | 1 | 480 |
| 16178893 | 1 | 360 |
| 16179806 | 1 | 360 |
| 16180257 | 60 | 360 |
| 16179700 | 1 | 360 |
| 16178828 | 60 | 360 |
| 16178748 | 60 | 360 |
| 16178668 | 60 | 360 |
| 16178589 | 36 | 360 |
| 16180075 | 1 | 360 |
| 16180159 | 1 | 360 |
| 16179801 | 1 | 360 |
| 16178830 | 36 | 360 |
| 16178831 | 60 | 360 |
| 16179628 | 1 | 360 |
| 16180582 | 60 | 360 |
| 16179439 | 1 | 360 |
| 16180415 | 60 | 360 |
| 16180146 | 1 | 360 |
| 16180115 | 1 | 360 |
| 16178415 | 60 | 360 |
| 16179665 | 1 | 360 |
| 16180119 | 1 | 360 |
| 16178588 | 60 | 360 |
| 16179520 | 1 | 360 |
| 16178368 | 60 | 360 |
| 16180620 | 60 | 360 |
| 16179953 | 1 | 360 |
| 16180109 | 1 | 480 |
| 16179563 | 1 | 480 |
| 16178832 | 60 | 360 |
| 16179480 | 1 | 360 |
| 16179481 | 1 | 480 |
| 16178834 | 36 | 360 |
| 16178591 | 36 | 360 |
| 16179644 | 1 | 360 |
| 16178754 | 36 | 360 |
| 16179483 | 1 | 480 |
| 16178835 | 36 | 360 |
| 16178836 | 60 | 360 |
| 16178755 | 36 | 360 |
| 16178593 | 36 | 360 |
| 16178756 | 36 | 360 |
| 16180183 | 1 | 480 |
| 16180174 | 1 | 360 |
| 16180044 | 1 | 360 |
| 16179545 | 1 | 360 |
| 16180346 | 60 | 360 |
| 16178323 | 60 | 360 |
| 16178586 | 60 | 360 |
| 16180219 | 60 | 360 |
| 16180188 | 1 | 480 |
| 16179916 | 1 | 360 |
| 16178455 | 60 | 360 |
| 16179621 | 1 | 360 |
| 16180288 | 60 | 360 |
| 16178594 | 36 | 360 |
| 16178676 | 36 | 360 |
| 16178757 | 60 | 360 |
| 16178838 | 60 | 360 |
| 16178758 | 60 | 360 |
| 16178596 | 36 | 360 |
| 16178759 | 60 | 360 |
| 16179569 | 1 | 360 |
| 16178678 | 60 | 360 |
| 16178679 | 36 | 360 |
| 16179327 | 1 | 360 |
| 16178780 | 60 | 360 |
| 16179347 | 1 | 360 |
| 16180614 | 60 | 360 |
| 16179948 | 1 | 360 |
| 16178656 | 60 | 360 |
| 16179044 | 1 | 360 |
| 16179620 | 1 | 480 |
| 16180132 | 1 | 480 |
| 16178771 | 60 | 360 |
| 16178682 | 60 | 360 |
| 16179136 | 1 | 360 |
| 16179175 | 1 | 360 |
| 16180357 | 60 | 360 |
| 16179763 | 1 | 480 |
| 16179585 | 3 | 360 |
| 16180258 | 60 | 360 |
| 16179701 | 1 | 360 |
| 16179653 | 1 | 360 |
| 16178922 | 1 | 360 |
| 16178598 | 36 | 360 |
| 16178599 | 60 | 360 |
| 16180512 | 60 | 360 |
| 16179247 | 1 | 360 |
| 16179099 | 1 | 360 |
| 16179952 | 1 | 360 |

| | | |
|---|---|---|
| 16179466 | 1 | 360 |
| 16179364 | 1 | 360 |
| 16178659 | 60 | 360 |
| 16178820 | 36 | 360 |
| 16178741 | 36 | 360 |
| 16179552 | 1 | 480 |
| 16178742 | 60 | 360 |
| 16178580 | 36 | 360 |
| 16178661 | 36 | 360 |
| 16178823 | 60 | 360 |
| 16178743 | 36 | 360 |
| 16179553 | 1 | 480 |
| 16178824 | 36 | 360 |
| 16179554 | 1 | 360 |
| 16178663 | 60 | 360 |
| 16178826 | 36 | 360 |
| 16178745 | 60 | 360 |
| 16178583 | 36 | 360 |
| 16179404 | 1 | 360 |
| 16180345 | 60 | 360 |
| 16179683 | 1 | 360 |
| 16179829 | 1 | 480 |
| 16179762 | 1 | 360 |
| 16180126 | 1 | 360 |
| 16180033 | 1 | 360 |
| 16179555 | 1 | 360 |
| 16178827 | 36 | 360 |
| 16179670 | 1 | 360 |
| 16179861 | 1 | 360 |
| 16178675 | 60 | 360 |
| 16179249 | 1 | 360 |
| 16179115 | 1 | 360 |
| 16178398 | 36 | 360 |
| 16180200 | 36 | 360 |
| 16180201 | 36 | 360 |
| 16179216 | 1 | 360 |
| 16179315 | 1 | 360 |
| 16180202 | 36 | 360 |
| 16180204 | 36 | 360 |
| 16180205 | 36 | 360 |
| 16180206 | 36 | 360 |
| 16180207 | 36 | 360 |
| 16180208 | 36 | 360 |
| 16180209 | 36 | 360 |
| 16179476 | 1 | 360 |
| 16180179 | 1 | 360 |
| 16179530 | 1 | 360 |
| 16179611 | 1 | 360 |
| 16180255 | 60 | 360 |
| 16178920 | 1 | 360 |
| 16178801 | 36 | 360 |
| 16179613 | 1 | 360 |
| 16178641 | 36 | 360 |
| 16178722 | 60 | 360 |
| 16178444 | 60 | 360 |
| 16179561 | 1 | 360 |
| 16178804 | 36 | 360 |
| 16178561 | 36 | 360 |
| 16180414 | 60 | 360 |
| 16178436 | 60 | 360 |
| 16179226 | 1 | 360 |
| 16180619 | 60 | 360 |
| 16178290 | 60 | 360 |
| 16178293 | 60 | 360 |
| 16178770 | 60 | 360 |
| 16179233 | 1 | 360 |
| 16178642 | 60 | 360 |
| 16178724 | 36 | 360 |
| 16179346 | 1 | 360 |
| 16179840 | 1 | 360 |
| 16180217 | 60 | 360 |
| 16178643 | 36 | 360 |
| 16178806 | 36 | 360 |
| 16178484 | 36 | 360 |
| 16178565 | 36 | 360 |
| 16178889 | 1 | 360 |
| 16179632 | 1 | 360 |
| 16178646 | 36 | 360 |
| 16178727 | 60 | 360 |
| 16178647 | 60 | 360 |
| 16178567 | 36 | 360 |
| 16179947 | 1 | 360 |
| 16179488 | 1 | 360 |
| 16179914 | 1 | 360 |
| 16178486 | 36 | 360 |
| 16178649 | 36 | 360 |
| 16178488 | 36 | 360 |
| 16180210 | 36 | 360 |
| 16180211 | 36 | 360 |
| 16180212 | 36 | 360 |
| 16180147 | 1 | 360 |
| 16180213 | 36 | 360 |
| 16180214 | 36 | 360 |
| 16180215 | 36 | 360 |
| 16180216 | 36 | 360 |

| | | |
|---|---|---|
| 16178172 | 60 | 360 |
| 16178493 | 60 | 360 |
| 16180355 | 60 | 360 |
| 16178730 | 36 | 360 |
| 16178811 | 36 | 360 |
| 16178812 | 36 | 360 |
| 16178650 | 36 | 360 |
| 16179622 | 1 | 360 |
| 16178570 | 36 | 360 |
| 16180256 | 60 | 360 |
| 16179032 | 1 | 360 |
| 16178921 | 1 | 360 |
| 16179081 | 1 | 360 |
| 16178447 | 60 | 360 |
| 16178571 | 36 | 360 |
| 16178814 | 36 | 360 |
| 16179562 | 1 | 360 |
| 16178799 | 60 | 360 |
| 16178490 | 60 | 360 |
| 16179624 | 1 | 360 |
| 16179363 | 1 | 360 |
| 16179051 | 1 | 360 |
| 16178549 | 60 | 360 |
| 16178605 | 60 | 360 |
| 16179234 | 1 | 360 |
| 16178815 | 36 | 360 |
| 16178734 | 36 | 360 |
| 16178241 | 60 | 360 |
| 16179105 | 1 | 360 |
| 16180218 | 60 | 360 |
| 16178318 | 36 | 360 |
| 16178654 | 36 | 360 |
| 16178655 | 36 | 360 |
| 16179915 | 1 | 360 |
| 16178818 | 60 | 360 |
| 16178819 | 36 | 360 |
| 16179221 | 1 | 360 |
| 16178495 | 36 | 360 |
| 16178576 | 36 | 360 |
| 16178496 | 60 | 360 |
| 16179549 | 1 | 480 |
| 16178578 | 36 | 360 |
| 16178497 | 60 | 360 |
| 16179477 | 1 | 360 |
| 16179369 | 1 | 360 |
| 16180287 | 60 | 360 |
| 16180356 | 60 | 360 |
| 16178632 | 36 | 360 |
| 16179524 | 1 | 360 |
| 16178471 | 36 | 360 |
| 16178552 | 36 | 360 |
| 16178633 | 60 | 360 |
| 16178634 | 60 | 360 |
| 16179525 | 1 | 480 |
| 16180254 | 60 | 360 |
| 16178919 | 1 | 360 |
| 16178472 | 36 | 360 |
| 16178392 | 36 | 360 |
| 16179608 | 1 | 360 |
| 16178555 | 60 | 360 |
| 16179527 | 1 | 360 |
| 16179609 | 1 | 360 |
| 16178556 | 36 | 360 |
| 16178475 | 36 | 360 |
| 16178394 | 60 | 360 |
| 16179366 | 1 | 360 |
| 16178637 | 60 | 360 |
| 16178718 | 36 | 360 |
| 16178476 | 60 | 360 |
| 16178719 | 36 | 360 |
| 16180581 | 60 | 360 |
| 16179438 | 1 | 360 |
| 16179529 | 1 | 360 |
| 16178395 | 60 | 360 |
| 16178396 | 60 | 360 |
| 16178798 | 60 | 360 |
| 16178952 | 1 | 360 |
| 16178958 | 1 | 360 |
| 16179011 | 1 | 360 |
| 16179368 | 1 | 360 |
| 16178397 | 36 | 360 |
| 16178238 | 60 | 360 |
| 16180577 | 60 | 360 |
| 16179980 | 1 | 360 |
| 16178224 | 60 | 360 |
| 16179179 | 1 | 360 |
| 16180409 | 60 | 360 |
| 16179786 | 1 | 360 |
| 16179666 | 1 | 360 |
| 16180545 | 60 | 360 |
| 16180315 | 60 | 360 |
| 16178413 | 60 | 360 |
| 16178985 | 1 | 360 |
| 16179313 | 1 | 360 |
| 16178403 | 60 | 360 |

| | | |
|---|---|---|
| 16180125 | 1 | 360 |
| 16178891 | 1 | 360 |
| 16178750 | 60 | 360 |
| 16178299 | 60 | 360 |
| 16178560 | 60 | 360 |
| 16179208 | 1 | 360 |
| 16179880 | 1 | 480 |
| 16179307 | 1 | 360 |
| 16179180 | 1 | 360 |
| 16180410 | 60 | 360 |
| 16180476 | 60 | 360 |
| 16179836 | 1 | 360 |
| 16180066 | 1 | 360 |
| 16180316 | 60 | 360 |
| 16178974 | 1 | 360 |
| 16178435 | 60 | 360 |
| 16178723 | 60 | 360 |
| 16178183 | 60 | 360 |
| 16179344 | 1 | 360 |
| 16179309 | 1 | 480 |
| 16179341 | 3 | 360 |
| 16178302 | 60 | 360 |
| 16178239 | 60 | 360 |
| 16179209 | 1 | 360 |
| 16180509 | 60 | 360 |
| 16179010 | 1 | 360 |
| 16180411 | 60 | 360 |
| 16180477 | 60 | 360 |
| 16179837 | 1 | 360 |
| 16179413 | 1 | 360 |
| 16178414 | 60 | 360 |
| 16178975 | 1 | 360 |
| 16180040 | 1 | 360 |
| 16178509 | 60 | 360 |
| 16180510 | 60 | 360 |
| 16178494 | 60 | 360 |
| 16180579 | 60 | 360 |
| 16179781 | 1 | 360 |
| 16179436 | 1 | 360 |
| 16180412 | 60 | 360 |
| 16180478 | 60 | 360 |
| 16179001 | 1 | 360 |
| 16179736 | 1 | 360 |
| 16178621 | 60 | 360 |
| 16179503 | 1 | 360 |
| 16178617 | 60 | 360 |
| 16178572 | 60 | 360 |
| 16178753 | 60 | 360 |
| 16179623 | 1 | 360 |
| 16178240 | 60 | 360 |
| 16180580 | 60 | 360 |
| 16179981 | 1 | 360 |
| 16179437 | 1 | 360 |
| 16180413 | 60 | 360 |
| 16179076 | 1 | 360 |
| 16179737 | 1 | 360 |
| 16178340 | 60 | 360 |
| 16178816 | 60 | 360 |
| 16179627 | 1 | 360 |
| 16179006 | 1 | 360 |
| 16178518 | 60 | 360 |
| 16179977 | 1 | 360 |
| 16179190 | 1 | 360 |
| 16180472 | 60 | 360 |
| 16180541 | 60 | 360 |
| 16180311 | 60 | 360 |
| 16179410 | 1 | 360 |
| 16178658 | 60 | 360 |
| 16179176 | 1 | 360 |
| 16180378 | 60 | 360 |
| 16178989 | 1 | 360 |
| 16179732 | 1 | 360 |
| 16178728 | 60 | 360 |
| 16178454 | 60 | 360 |
| 16178402 | 60 | 360 |
| 16179697 | 1 | 360 |
| 16178595 | 60 | 360 |
| 16180107 | 1 | 360 |
| 16180240 | 60 | 360 |
| 16178363 | 60 | 360 |
| 16178602 | 60 | 360 |
| 16179978 | 1 | 360 |
| 16180406 | 60 | 360 |
| 16180473 | 60 | 360 |
| 16180542 | 60 | 360 |
| 16180312 | 60 | 360 |
| 16179411 | 1 | 360 |
| 16179056 | 1 | 360 |
| 16180379 | 60 | 360 |
| 16178434 | 60 | 360 |
| 16179733 | 1 | 360 |
| 16178704 | 60 | 360 |
| 16179820 | 1 | 360 |
| 16180128 | 1 | 360 |
| 16180153 | 1 | 360 |

| | | |
|---|---|---|
| 16178426 | 60 | 360 |
| 16179698 | 1 | 360 |
| 16180114 | 1 | 360 |
| 16179283 | 1 | 360 |
| 16178381 | 60 | 360 |
| 16178900 | 1 | 360 |
| 16178342 | 60 | 360 |
| 16178223 | 60 | 360 |
| 16180407 | 60 | 360 |
| 16180474 | 60 | 360 |
| 16179168 | 1 | 360 |
| 16180543 | 60 | 360 |
| 16180313 | 60 | 360 |
| 16179087 | 1 | 360 |
| 16180380 | 60 | 360 |
| 16179734 | 1 | 360 |
| 16178715 | 60 | 360 |
| 16179521 | 1 | 360 |
| 16178327 | 60 | 360 |
| 16179284 | 1 | 360 |
| 16178613 | 60 | 360 |
| 16180576 | 60 | 360 |
| 16178557 | 60 | 360 |
| 16179979 | 1 | 480 |
| 16180408 | 60 | 360 |
| 16179835 | 1 | 360 |
| 16180475 | 60 | 360 |
| 16179169 | 1 | 360 |
| 16180544 | 60 | 360 |
| 16180314 | 60 | 360 |
| 16179088 | 1 | 360 |
| 16179160 | 1 | 360 |
| 16178990 | 1 | 360 |
| 16179735 | 1 | 360 |
| 16178306 | 60 | 360 |
| 16179039 | 1 | 360 |
| 16178949 | 1 | 360 |
| 16179334 | 1 | 360 |
| 16179135 | 1 | 360 |
| 16179489 | 1 | 360 |
| 16178894 | 1 | 360 |
| 16179381 | 1 | 360 |
| 16180536 | 60 | 360 |
| 16179598 | 1 | 360 |
| 16179816 | 1 | 360 |
| 16180276 | 60 | 360 |
| 16179144 | 1 | 360 |
| 16178700 | 60 | 360 |
| 16179573 | 1 | 360 |
| 16180124 | 1 | 360 |
| 16178619 | 60 | 360 |
| 16179282 | 1 | 360 |
| 16178374 | 60 | 360 |
| 16179928 | 1 | 360 |
| 16179382 | 1 | 360 |
| 16180537 | 60 | 360 |
| 16180307 | 60 | 360 |
| 16180374 | 60 | 360 |
| 16179064 | 1 | 360 |
| 16180439 | 60 | 360 |
| 16178714 | 60 | 360 |
| 16179599 | 1 | 360 |
| 16179817 | 1 | 360 |
| 16178927 | 1 | 360 |
| 16179755 | 1 | 360 |
| 16178878 | 60 | 360 |
| 16178349 | 60 | 360 |
| 16180022 | 1 | 360 |
| 16180236 | 60 | 360 |
| 16179929 | 1 | 360 |
| 16178895 | 1 | 360 |
| 16180538 | 60 | 360 |
| 16180308 | 60 | 360 |
| 16180375 | 60 | 360 |
| 16180440 | 60 | 360 |
| 16178547 | 60 | 360 |
| 16179818 | 1 | 360 |
| 16180277 | 60 | 360 |
| 16179153 | 1 | 360 |
| 16178980 | 1 | 360 |
| 16179054 | 1 | 360 |
| 16178424 | 60 | 360 |
| 16179708 | 1 | 360 |
| 16180140 | 1 | 360 |
| 16180023 | 1 | 360 |
| 16178768 | 60 | 360 |
| 16178260 | 60 | 360 |
| 16180237 | 60 | 360 |
| 16178375 | 60 | 360 |
| 16178864 | 60 | 360 |
| 16178341 | 60 | 360 |
| 16178611 | 60 | 360 |
| 16179383 | 1 | 360 |
| 16178222 | 60 | 360 |
| 16180539 | 60 | 360 |

| | | |
|---|---|---|
| 16180309 | 60 | 360 |
| 16180376 | 60 | 360 |
| 16178948 | 1 | 360 |
| 16178970 | 1 | 360 |
| 16180171 | 1 | 360 |
| 16178879 | 60 | 360 |
| 16180133 | 1 | 360 |
| 16178651 | 60 | 360 |
| 16180024 | 1 | 360 |
| 16180238 | 60 | 360 |
| 16179352 | 1 | 360 |
| 16179384 | 1 | 360 |
| 16179976 | 1 | 360 |
| 16180471 | 60 | 360 |
| 16180540 | 60 | 360 |
| 16178983 | 1 | 360 |
| 16180377 | 60 | 360 |
| 16180441 | 60 | 360 |
| 16179731 | 1 | 360 |
| 16179819 | 1 | 360 |
| 16178971 | 1 | 360 |
| 16178425 | 60 | 360 |
| 16180162 | 1 | 360 |
| 16180143 | 1 | 360 |
| 16179709 | 3 | 360 |
| 16179696 | 1 | 360 |
| 16178313 | 60 | 360 |
| 16180025 | 1 | 360 |
| 16178592 | 60 | 360 |
| 16179310 | 1 | 360 |
| 16180239 | 60 | 360 |
| 16178380 | 60 | 360 |
| 16179252 | 1 | 360 |
| 16178856 | 60 | 360 |
| 16180436 | 60 | 360 |
| 16180273 | 60 | 360 |
| 16178175 | 60 | 360 |
| 16179707 | 1 | 480 |
| 16178925 | 1 | 360 |
| 16179695 | 1 | 360 |
| 16178796 | 60 | 360 |
| 16180177 | 1 | 360 |
| 16178635 | 60 | 360 |
| 16178531 | 60 | 360 |
| 16179682 | 1 | 360 |
| 16180108 | 1 | 360 |
| 16178337 | 60 | 360 |
| 16179297 | 1 | 360 |
| 16180234 | 60 | 360 |
| 16179925 | 1 | 360 |
| 16179641 | 1 | 480 |
| 16179379 | 1 | 480 |
| 16179362 | 1 | 360 |
| 16179182 | 1 | 360 |
| 16180372 | 60 | 360 |
| 16180437 | 60 | 360 |
| 16178969 | 1 | 360 |
| 16179047 | 1 | 360 |
| 16180274 | 60 | 360 |
| 16179815 | 1 | 360 |
| 16178423 | 60 | 360 |
| 16178315 | 60 | 360 |
| 16179753 | 1 | 360 |
| 16178821 | 60 | 360 |
| 16179270 | 1 | 360 |
| 16179120 | 1 | 360 |
| 16180062 | 1 | 360 |
| 16179926 | 1 | 360 |
| 16179098 | 1 | 360 |
| 16179380 | 1 | 360 |
| 16180373 | 60 | 360 |
| 16178662 | 60 | 360 |
| 16180438 | 60 | 360 |
| 16180275 | 60 | 360 |
| 16178802 | 60 | 360 |
| 16178926 | 1 | 360 |
| 16179572 | 1 | 360 |
| 16178760 | 60 | 360 |
| 16180235 | 60 | 360 |
| 16179271 | 1 | 360 |
| 16179640 | 1 | 360 |
| 16178887 | 1 | 360 |
| 16179354 | 1 | 360 |
| 16180354 | 60 | 360 |
| 16179805 | 1 | 360 |
| 16179128 | 1 | 360 |
| 16180618 | 60 | 360 |
| 16180006 | 1 | 360 |
| 16178960 | 1 | 360 |
| 16180517 | 60 | 360 |
| 16179630 | 1 | 360 |
| 16179442 | 1 | 360 |
| 16178934 | 1 | 360 |
| 16178262 | 60 | 360 |
| 16178837 | 60 | 360 |

| | | |
|---|---|---|
| 16180117 | 1 | 360 |
| 16178563 | 60 | 360 |
| 16179212 | 1 | 360 |
| 16179860 | 1 | 360 |
| 16179129 | 1 | 360 |
| 16179909 | 3 | 360 |
| 16179016 | 1 | 360 |
| 16178999 | 1 | 360 |
| 16179631 | 1 | 360 |
| 16179443 | 1 | 480 |
| 16178909 | 1 | 360 |
| 16179664 | 1 | 360 |
| 16180027 | 1 | 360 |
| 16178499 | 60 | 360 |
| 16179858 | 1 | 360 |
| 16179551 | 1 | 360 |
| 16180270 | 60 | 360 |
| 16179151 | 1 | 360 |
| 16179750 | 1 | 360 |
| 16178942 | 1 | 360 |
| 16179141 | 1 | 360 |
| 16178354 | 60 | 360 |
| 16179680 | 1 | 360 |
| 16178690 | 60 | 360 |
| 16180034 | 1 | 360 |
| 16179268 | 1 | 360 |
| 16179514 | 1 | 360 |
| 16178372 | 60 | 360 |
| 16179097 | 1 | 360 |
| 16179859 | 1 | 360 |
| 16178367 | 60 | 360 |
| 16179464 | 1 | 360 |
| 16180434 | 60 | 360 |
| 16178487 | 60 | 360 |
| 16180271 | 60 | 360 |
| 16178191 | 60 | 360 |
| 16179152 | 1 | 360 |
| 16178979 | 1 | 360 |
| 16178924 | 1 | 360 |
| 16178943 | 1 | 360 |
| 16179610 | 1 | 360 |
| 16179269 | 1 | 360 |
| 16179519 | 1 | 360 |
| 16179923 | 1 | 360 |
| 16179360 | 1 | 360 |
| 16180073 | 1 | 480 |
| 16180435 | 60 | 360 |
| 16180272 | 60 | 360 |
| 16179752 | 1 | 360 |
| 16178545 | 60 | 360 |
| 16178648 | 60 | 360 |
| 16178915 | 1 | 360 |
| 16179681 | 1 | 480 |
| 16178584 | 60 | 360 |
| 16180233 | 60 | 360 |
| 16179291 | 1 | 360 |
| 16178373 | 60 | 360 |
| 16179361 | 1 | 360 |
| 16180250 | 60 | 360 |
| 16178935 | 1 | 360 |
| 16179556 | 1 | 480 |
| 16178962 | 1 | 360 |
| 16178791 | 60 | 360 |
| 16178292 | 60 | 360 |
| 16180083 | 1 | 360 |
| 16178334 | 60 | 360 |
| 16179262 | 1 | 360 |
| 16178667 | 60 | 360 |
| 16179241 | 1 | 360 |
| 16179958 | 1 | 360 |
| 16178357 | 60 | 360 |
| 16178216 | 60 | 360 |
| 16180013 | 1 | 360 |
| 16179846 | 1 | 360 |
| 16179637 | 1 | 360 |
| 16180251 | 60 | 360 |
| 16180102 | 1 | 360 |
| 16178683 | 60 | 360 |
| 16178300 | 60 | 360 |
| 16178765 | 60 | 360 |
| 16179796 | 1 | 360 |
| 16178564 | 60 | 360 |
| 16179114 | 1 | 360 |
| 16178383 | 60 | 360 |
| 16180014 | 1 | 360 |
| 16179473 | 1 | 480 |
| 16179794 | 1 | 360 |
| 16180176 | 1 | 360 |
| 16179007 | 1 | 360 |
| 16180252 | 60 | 360 |
| 16179699 | 1 | 360 |
| 16179041 | 1 | 360 |
| 16180111 | 1 | 360 |
| 16179614 | 1 | 360 |
| 16178517 | 60 | 360 |

| | | |
|---|---|---|
| 16179213 | 1 | 360 |
| 16179215 | 1 | 360 |
| 16179639 | 1 | 360 |
| 16179353 | 1 | 360 |
| 16180253 | 60 | 360 |
| 16178951 | 1 | 360 |
| 16179669 | 1 | 360 |
| 16180030 | 1 | 360 |
| 16179263 | 1 | 360 |
| 16179506 | 1 | 360 |
| 16179131 | 1 | 360 |
| 16179227 | 1 | 360 |
| 16179913 | 1 | 360 |
| 16178365 | 60 | 360 |
| 16178862 | 60 | 360 |
| 16179946 | 1 | 480 |
| 16180612 | 60 | 360 |
| 16179461 | 1 | 360 |
| 16180057 | 1 | 360 |
| 16179339 | 1 | 480 |
| 16179617 | 1 | 360 |
| 16179023 | 1 | 360 |
| 16178482 | 60 | 360 |
| 16178906 | 1 | 360 |
| 16178769 | 60 | 360 |
| 16179219 | 1 | 360 |
| 16178384 | 60 | 360 |
| 16179096 | 1 | 360 |
| 16178256 | 60 | 360 |
| 16179112 | 1 | 360 |
| 16179856 | 1 | 360 |
| 16179224 | 1 | 360 |
| 16180613 | 60 | 360 |
| 16179462 | 1 | 360 |
| 16178721 | 60 | 360 |
| 16179358 | 1 | 360 |
| 16179408 | 1 | 360 |
| 16178941 | 1 | 360 |
| 16179043 | 1 | 360 |
| 16178914 | 1 | 360 |
| 16179678 | 1 | 360 |
| 16178933 | 1 | 360 |
| 16178766 | 60 | 360 |
| 16178569 | 60 | 360 |
| 16179220 | 1 | 360 |
| 16179211 | 1 | 360 |
| 16179857 | 1 | 480 |
| 16178361 | 60 | 360 |
| 16179127 | 1 | 360 |
| 16179906 | 1 | 480 |
| 16178366 | 60 | 360 |
| 16179463 | 1 | 480 |
| 16179403 | 1 | 480 |
| 16178657 | 60 | 360 |
| 16179749 | 1 | 480 |
| 16179570 | 1 | 360 |
| 16179140 | 1 | 360 |
| 16179031 | 1 | 360 |
| 16179679 | 1 | 360 |
| 16178261 | 60 | 360 |
| 16180080 | 1 | 360 |
| 16179267 | 1 | 360 |
| 16179259 | 1 | 360 |
| 16179287 | 1 | 360 |
| 16179130 | 1 | 360 |
| 16179956 | 1 | 360 |
| 16180011 | 1 | 360 |
| 16178840 | 60 | 360 |
| 16178817 | 60 | 360 |
| 16179890 | 1 | 360 |
| 16180524 | 60 | 360 |
| 16179642 | 1 | 360 |
| 16179446 | 1 | 360 |
| 16179012 | 1 | 360 |
| 16180249 | 60 | 360 |
| 16179040 | 1 | 360 |
| 16178950 | 1 | 360 |
| 16179504 | 1 | 360 |
| 16179288 | 1 | 360 |
| 16179911 | 1 | 360 |
| 16179957 | 1 | 360 |
| 16180012 | 1 | 480 |
| 16180069 | 1 | 360 |
| 16180060 | 1 | 360 |
| 16180525 | 60 | 360 |
| 16179447 | 1 | 360 |
| 16179973 | 1 | 480 |
| 16180134 | 1 | 480 |
| 16178908 | 1 | 360 |
| 16179657 | 1 | 360 |
| 16179788 | 1 | 360 |
| 16180032 | 1 | 360 |
| 16179110 | 1 | 360 |
| 16178674 | 60 | 360 |
| 16179901 | 1 | 480 |

| | | |
|---|---|---|
| 16180608 | 60 | 360 |
| 16179457 | 1 | 360 |
| 16179997 | 1 | 360 |
| 16180049 | 1 | 360 |
| 16179104 | 1 | 360 |
| 16180508 | 60 | 360 |
| 16179174 | 1 | 360 |
| 16179435 | 1 | 360 |
| 16178782 | 60 | 360 |
| 16180046 | 1 | 360 |
| 16179030 | 1 | 360 |
| 16179020 | 1 | 360 |
| 16178585 | 60 | 360 |
| 16180098 | 1 | 360 |
| 16178574 | 60 | 360 |
| 16178289 | 60 | 360 |
| 16178254 | 60 | 360 |
| 16179853 | 1 | 360 |
| 16179902 | 1 | 360 |
| 16180609 | 60 | 360 |
| 16179458 | 1 | 480 |
| 16179998 | 1 | 360 |
| 16179005 | 1 | 360 |
| 16179400 | 1 | 360 |
| 16178932 | 1 | 360 |
| 16180081 | 1 | 360 |
| 16178582 | 60 | 360 |
| 16179257 | 1 | 360 |
| 16178615 | 60 | 360 |
| 16179126 | 1 | 360 |
| 16179903 | 1 | 360 |
| 16180610 | 60 | 360 |
| 16180160 | 1 | 360 |
| 16179459 | 1 | 360 |
| 16179626 | 1 | 360 |
| 16178443 | 60 | 360 |
| 16179357 | 1 | 360 |
| 16179401 | 1 | 360 |
| 16179021 | 1 | 360 |
| 16178331 | 60 | 360 |
| 16179658 | 1 | 360 |
| 16180041 | 1 | 360 |
| 16179218 | 1 | 360 |
| 16178465 | 60 | 360 |
| 16178665 | 60 | 360 |
| 16178255 | 60 | 360 |
| 16179854 | 1 | 360 |
| 16179904 | 1 | 480 |
| 16179945 | 1 | 360 |
| 16180611 | 60 | 360 |
| 16179402 | 1 | 360 |
| 16179974 | 1 | 360 |
| 16178957 | 1 | 360 |
| 16178480 | 60 | 360 |
| 16179677 | 1 | 480 |
| 16180093 | 1 | 360 |
| 16178285 | 60 | 360 |
| 16178346 | 60 | 360 |
| 16179111 | 1 | 360 |
| 16179855 | 1 | 360 |
| 16179905 | 1 | 360 |
| 16180168 | 1 | 360 |
| 16178703 | 60 | 360 |
| 16178695 | 60 | 360 |
| 16178777 | 60 | 360 |
| 16178235 | 60 | 360 |
| 16179994 | 1 | 360 |
| 16179876 | 1 | 480 |
| 16180501 | 60 | 360 |
| 16180571 | 60 | 360 |
| 16179094 | 1 | 360 |
| 16178356 | 60 | 360 |
| 16180339 | 60 | 360 |
| 16180403 | 60 | 360 |
| 16179730 | 1 | 360 |
| 16179343 | 1 | 360 |
| 16180086 | 1 | 360 |
| 16178673 | 60 | 360 |
| 16178185 | 60 | 360 |
| 16179995 | 1 | 360 |
| 16180502 | 60 | 360 |
| 16180572 | 60 | 360 |
| 16180187 | 1 | 360 |
| 16179430 | 1 | 360 |
| 16180340 | 60 | 360 |
| 16180404 | 60 | 360 |
| 16178810 | 60 | 360 |
| 16178973 | 1 | 360 |
| 16179050 | 1 | 360 |
| 16178433 | 60 | 360 |
| 16178329 | 60 | 360 |
| 16178308 | 60 | 360 |
| 16178236 | 60 | 360 |
| 16180503 | 60 | 360 |
| 16179877 | 1 | 480 |

| | | |
|---|---|---|
| 16180573 | 60 | 360 |
| 16179078 | 1 | 360 |
| 16179095 | 1 | 360 |
| 16179431 | 1 | 360 |
| 16180341 | 60 | 360 |
| 16180405 | 60 | 360 |
| 16179832 | 1 | 360 |
| 16180113 | 1 | 360 |
| 16179971 | 1 | 480 |
| 16178903 | 1 | 360 |
| 16179768 | 1 | 360 |
| 16178788 | 60 | 360 |
| 16178902 | 1 | 360 |
| 16179237 | 1 | 360 |
| 16180604 | 60 | 360 |
| 16179547 | 1 | 360 |
| 16179103 | 1 | 360 |
| 16180504 | 60 | 360 |
| 16180574 | 60 | 360 |
| 16179432 | 1 | 360 |
| 16180342 | 60 | 360 |
| 16179833 | 1 | 360 |
| 16178800 | 60 | 360 |
| 16179541 | 1 | 360 |
| 16178288 | 60 | 360 |
| 16178464 | 60 | 360 |
| 16178252 | 60 | 360 |
| 16178343 | 60 | 360 |
| 16178554 | 60 | 360 |
| 16180605 | 60 | 360 |
| 16179944 | 1 | 360 |
| 16178526 | 60 | 360 |
| 16178237 | 60 | 360 |
| 16180505 | 60 | 360 |
| 16179878 | 1 | 360 |
| 16180575 | 60 | 360 |
| 16178474 | 60 | 360 |
| 16179433 | 1 | 480 |
| 16179780 | 1 | 480 |
| 16180343 | 60 | 360 |
| 16179834 | 1 | 360 |
| 16178412 | 60 | 360 |
| 16178698 | 60 | 360 |
| 16178905 | 1 | 360 |
| 16180131 | 1 | 480 |
| 16180104 | 1 | 360 |
| 16180031 | 1 | 360 |
| 16178751 | 60 | 360 |
| 16179256 | 1 | 360 |
| 16178467 | 60 | 360 |
| 16179222 | 1 | 360 |
| 16179900 | 1 | 360 |
| 16178749 | 60 | 360 |
| 16180606 | 60 | 360 |
| 16178559 | 60 | 360 |
| 16178553 | 60 | 360 |
| 16179199 | 1 | 360 |
| 16180506 | 60 | 360 |
| 16179767 | 1 | 360 |
| 16180344 | 60 | 360 |
| 16178442 | 60 | 360 |
| 16179972 | 1 | 480 |
| 16179769 | 1 | 480 |
| 16178253 | 60 | 360 |
| 16179210 | 1 | 360 |
| 16180607 | 60 | 360 |
| 16179996 | 1 | 360 |
| 16178492 | 60 | 360 |
| 16180507 | 60 | 360 |
| 16179879 | 1 | 360 |
| 16179079 | 1 | 360 |
| 16179434 | 1 | 360 |
| 16178720 | 60 | 360 |
| 16180043 | 1 | 480 |
| 16178871 | 60 | 360 |
| 16179281 | 1 | 360 |
| 16178233 | 60 | 360 |
| 16180567 | 60 | 360 |
| 16180335 | 60 | 360 |
| 16180399 | 60 | 360 |
| 16180068 | 1 | 360 |
| 16180467 | 60 | 360 |
| 16179086 | 1 | 360 |
| 16180305 | 60 | 360 |
| 16178411 | 60 | 360 |
| 16178400 | 60 | 360 |
| 16178452 | 60 | 360 |
| 16179615 | 1 | 480 |
| 16178500 | 60 | 360 |
| 16179873 | 1 | 360 |
| 16180568 | 60 | 360 |
| 16180336 | 60 | 360 |
| 16180400 | 60 | 360 |
| 16180306 | 60 | 360 |
| 16179645 | 1 | 480 |

| | | |
|---|---|---|
| 16180154 | 1 | 480 |
| 16179728 | 1 | 360 |
| 16180021 | 1 | 360 |
| 16179616 | 1 | 360 |
| 16178234 | 60 | 360 |
| 16180499 | 60 | 360 |
| 16179874 | 1 | 360 |
| 16180569 | 60 | 360 |
| 16180337 | 60 | 360 |
| 16180175 | 1 | 360 |
| 16179479 | 1 | 360 |
| 16180401 | 60 | 360 |
| 16178994 | 1 | 360 |
| 16180468 | 60 | 360 |
| 16179729 | 1 | 360 |
| 16178453 | 60 | 360 |
| 16180096 | 1 | 360 |
| 16178677 | 60 | 360 |
| 16178461 | 60 | 360 |
| 16178182 | 60 | 360 |
| 16180078 | 1 | 360 |
| 16180500 | 60 | 360 |
| 16179875 | 1 | 360 |
| 16180570 | 60 | 360 |
| 16180338 | 60 | 360 |
| 16180402 | 60 | 360 |
| 16180469 | 60 | 360 |
| 16178653 | 60 | 360 |
| 16179075 | 1 | 360 |
| 16179049 | 1 | 360 |
| 16180118 | 1 | 360 |
| 16179501 | 1 | 360 |
| 16180229 | 60 | 360 |
| 16178362 | 60 | 360 |
| 16178744 | 60 | 360 |
| 16179376 | 1 | 360 |
| 16179546 | 1 | 360 |
| 16180529 | 60 | 360 |
| 16180298 | 60 | 360 |
| 16180366 | 60 | 360 |
| 16178421 | 60 | 360 |
| 16179693 | 1 | 360 |
| 16180123 | 1 | 360 |
| 16180035 | 1 | 360 |
| 16179776 | 1 | 360 |
| 16180230 | 60 | 360 |
| 16179502 | 1 | 360 |
| 16180063 | 1 | 360 |
| 16180180 | 1 | 480 |
| 16179189 | 1 | 360 |
| 16180461 | 60 | 360 |
| 16180530 | 60 | 360 |
| 16180299 | 60 | 360 |
| 16180367 | 60 | 360 |
| 16178491 | 60 | 360 |
| 16178450 | 60 | 360 |
| 16178946 | 1 | 360 |
| 16178968 | 1 | 360 |
| 16179046 | 1 | 360 |
| 16178709 | 60 | 360 |
| 16180112 | 1 | 360 |
| 16179053 | 1 | 360 |
| 16179705 | 3 | 360 |
| 16178624 | 60 | 360 |
| 16180103 | 1 | 360 |
| 16180231 | 60 | 360 |
| 16179119 | 1 | 360 |
| 16180462 | 60 | 360 |
| 16180531 | 60 | 360 |
| 16180300 | 60 | 360 |
| 16180368 | 60 | 360 |
| 16179722 | 1 | 360 |
| 16178694 | 60 | 360 |
| 16180050 | 1 | 480 |
| 16180149 | 1 | 360 |
| 16179279 | 1 | 360 |
| 16179296 | 1 | 360 |
| 16180072 | 1 | 360 |
| 16180232 | 60 | 360 |
| 16178886 | 1 | 360 |
| 16179308 | 3 | 360 |
| 16179377 | 1 | 360 |
| 16180463 | 60 | 360 |
| 16180532 | 60 | 360 |
| 16179147 | 1 | 360 |
| 16179084 | 1 | 360 |
| 16180301 | 60 | 360 |
| 16180369 | 60 | 360 |
| 16179723 | 1 | 360 |
| 16178451 | 60 | 360 |
| 16179813 | 1 | 360 |
| 16179027 | 1 | 360 |
| 16179706 | 1 | 360 |
| 16178326 | 60 | 360 |
| 16180089 | 1 | 360 |

| | | |
|---|---|---|
| 16178388 | 60 | 360 |
| 16178670 | 60 | 360 |
| 16179378 | 3 | 360 |
| 16180464 | 60 | 360 |
| 16180533 | 60 | 360 |
| 16180302 | 60 | 360 |
| 16180370 | 60 | 360 |
| 16179724 | 1 | 360 |
| 16179766 | 1 | 360 |
| 16178702 | 60 | 360 |
| 16178947 | 1 | 360 |
| 16179814 | 1 | 360 |
| 16178422 | 60 | 360 |
| 16180094 | 1 | 360 |
| 16180150 | 1 | 360 |
| 16179515 | 1 | 360 |
| 16178740 | 60 | 360 |
| 16180398 | 60 | 360 |
| 16180465 | 60 | 360 |
| 16180534 | 60 | 360 |
| 16179085 | 1 | 360 |
| 16178972 | 1 | 360 |
| 16180303 | 60 | 360 |
| 16180158 | 1 | 360 |
| 16179159 | 1 | 360 |
| 16180371 | 60 | 360 |
| 16179063 | 1 | 360 |
| 16178987 | 1 | 360 |
| 16179725 | 1 | 480 |
| 16179595 | 1 | 480 |
| 16178797 | 60 | 360 |
| 16180135 | 1 | 480 |
| 16178606 | 60 | 360 |
| 16179342 | 1 | 360 |
| 16178899 | 1 | 360 |
| 16180566 | 60 | 360 |
| 16180466 | 60 | 360 |
| 16178965 | 1 | 360 |
| 16180535 | 60 | 360 |
| 16180304 | 60 | 360 |
| 16178432 | 60 | 360 |
| 16178988 | 1 | 360 |
| 16179726 | 1 | 480 |
| 16178881 | 60 | 360 |
| 16180055 | 1 | 360 |
| 16179962 | 1 | 360 |
| 16178910 | 1 | 360 |
| 16178573 | 60 | 360 |
| 16179239 | 1 | 360 |
| 16179305 | 1 | 360 |
| 16178244 | 60 | 360 |
| 16178664 | 60 | 360 |
| 16178513 | 60 | 360 |
| 16179841 | 1 | 480 |
| 16179887 | 1 | 480 |
| 16180520 | 60 | 360 |
| 16180589 | 60 | 360 |
| 16179988 | 1 | 360 |
| 16180422 | 60 | 360 |
| 16180182 | 1 | 360 |
| 16179171 | 1 | 360 |
| 16178417 | 60 | 360 |
| 16178275 | 60 | 360 |
| 16178478 | 60 | 360 |
| 16178190 | 60 | 360 |
| 16180120 | 1 | 360 |
| 16180009 | 1 | 480 |
| 16179842 | 1 | 360 |
| 16179633 | 1 | 360 |
| 16180521 | 60 | 360 |
| 16180590 | 60 | 360 |
| 16179936 | 1 | 360 |
| 16179444 | 1 | 360 |
| 16180059 | 1 | 360 |
| 16180423 | 60 | 360 |
| 16179963 | 1 | 360 |
| 16179770 | 1 | 360 |
| 16179954 | 1 | 480 |
| 16178245 | 60 | 360 |
| 16180522 | 60 | 360 |
| 16179634 | 1 | 360 |
| 16179122 | 1 | 360 |
| 16180591 | 60 | 360 |
| 16179782 | 1 | 360 |
| 16180424 | 60 | 360 |
| 16178418 | 60 | 360 |
| 16179964 | 1 | 360 |
| 16178911 | 1 | 360 |
| 16179667 | 1 | 360 |
| 16179240 | 1 | 360 |
| 16179955 | 1 | 480 |
| 16179844 | 1 | 360 |
| 16179635 | 1 | 360 |
| 16179889 | 1 | 360 |
| 16180523 | 60 | 360 |

| | | |
|---|---|---|
| 16179197 | 1 | 360 |
| 16180592 | 60 | 360 |
| 16179937 | 1 | 360 |
| 16178457 | 60 | 360 |
| 16179445 | 1 | 360 |
| 16178725 | 60 | 360 |
| 16179069 | 1 | 360 |
| 16178543 | 60 | 360 |
| 16179668 | 1 | 360 |
| 16180085 | 1 | 360 |
| 16179311 | 1 | 360 |
| 16178680 | 60 | 360 |
| 16179286 | 1 | 360 |
| 16180010 | 1 | 480 |
| 16178246 | 60 | 360 |
| 16178844 | 60 | 360 |
| 16179793 | 1 | 360 |
| 16179636 | 1 | 360 |
| 16180593 | 60 | 360 |
| 16178419 | 60 | 360 |
| 16179789 | 1 | 360 |
| 16180136 | 1 | 360 |
| 16178333 | 60 | 360 |
| 16178176 | 60 | 360 |
| 16179375 | 1 | 360 |
| 16179550 | 1 | 360 |
| 16180528 | 60 | 360 |
| 16180297 | 60 | 360 |
| 16179158 | 1 | 360 |
| 16180365 | 60 | 360 |
| 16179038 | 1 | 360 |
| 16180267 | 60 | 360 |
| 16179591 | 1 | 360 |
| 16179026 | 1 | 360 |
| 16178312 | 60 | 360 |
| 16179568 | 1 | 360 |
| 16178324 | 60 | 360 |
| 16178711 | 36 | 360 |
| 16178630 | 60 | 360 |
| 16179522 | 1 | 360 |
| 16178631 | 36 | 360 |
| 16179523 | 1 | 360 |
| 16178470 | 36 | 360 |
| 16180095 | 1 | 360 |
| 16179961 | 1 | 360 |
| 16179532 | 1 | 360 |
| 16178393 | 60 | 360 |
| 16180101 | 1 | 360 |
| 16180087 | 1 | 360 |
| 16180100 | 1 | 360 |
| 16178737 | 60 | 360 |
| 16178614 | 60 | 360 |
| 16180519 | 60 | 360 |
| 16179886 | 1 | 360 |
| 16180588 | 60 | 360 |
| 16179934 | 1 | 360 |
| 16179987 | 1 | 360 |
| 16180421 | 60 | 360 |
| 16178986 | 1 | 360 |
| 16180488 | 60 | 360 |
| 16178995 | 1 | 360 |
| 16179420 | 1 | 480 |
| 16178287 | 60 | 360 |
| 16178438 | 60 | 360 |
| 16178752 | 60 | 360 |
| 16178229 | 60 | 360 |
| 16180489 | 60 | 360 |
| 16179865 | 1 | 360 |
| 16180559 | 60 | 360 |
| 16180394 | 60 | 360 |
| 16180459 | 60 | 360 |
| 16178408 | 60 | 360 |
| 16179606 | 1 | 480 |
| 16179625 | 1 | 360 |
| 16178982 | 1 | 360 |
| 16179720 | 3 | 360 |
| 16180038 | 1 | 360 |
| 16180082 | 1 | 360 |
| 16178867 | 60 | 360 |
| 16179989 | 3 | 360 |
| 16179866 | 1 | 480 |
| 16180490 | 60 | 360 |
| 16180560 | 60 | 360 |
| 16179421 | 1 | 480 |
| 16180329 | 60 | 360 |
| 16180395 | 60 | 360 |
| 16180460 | 60 | 360 |
| 16178807 | 60 | 360 |
| 16179167 | 1 | 360 |
| 16180164 | 1 | 480 |
| 16180056 | 1 | 360 |
| 16179827 | 1 | 360 |
| 16178430 | 60 | 360 |
| 16178530 | 60 | 360 |
| 16178776 | 60 | 360 |

| | | |
|---|---|---|
| 16179534 | 1 | 360 |
| 16179517 | 1 | 360 |
| 16178230 | 60 | 360 |
| 16179990 | 1 | 360 |
| 16179867 | 1 | 480 |
| 16180491 | 60 | 360 |
| 16180561 | 60 | 360 |
| 16178977 | 1 | 360 |
| 16180330 | 60 | 360 |
| 16180396 | 60 | 360 |
| 16178409 | 60 | 360 |
| 16179721 | 1 | 360 |
| 16179312 | 1 | 480 |
| 16179535 | 1 | 360 |
| 16179304 | 1 | 360 |
| 16178577 | 60 | 360 |
| 16178671 | 60 | 360 |
| 16178746 | 60 | 360 |
| 16178507 | 60 | 360 |
| 16178558 | 60 | 360 |
| 16180425 | 60 | 360 |
| 16180492 | 60 | 360 |
| 16180562 | 60 | 360 |
| 16179002 | 1 | 360 |
| 16180331 | 60 | 360 |
| 16178439 | 60 | 360 |
| 16179058 | 1 | 360 |
| 16178431 | 60 | 360 |
| 16180167 | 1 | 360 |
| 16179536 | 1 | 360 |
| 16179332 | 1 | 480 |
| 16180071 | 1 | 360 |
| 16179938 | 1 | 360 |
| 16178231 | 60 | 360 |
| 16180426 | 60 | 360 |
| 16179868 | 1 | 360 |
| 16180493 | 60 | 360 |
| 16180563 | 60 | 360 |
| 16178978 | 1 | 360 |
| 16179647 | 1 | 360 |
| 16180332 | 60 | 360 |
| 16180397 | 60 | 360 |
| 16179743 | 1 | 360 |
| 16180142 | 1 | 360 |
| 16179965 | 1 | 360 |
| 16179537 | 1 | 360 |
| 16178672 | 60 | 360 |
| 16180189 | 1 | 360 |
| 16179939 | 1 | 360 |
| 16180594 | 60 | 360 |
| 16179991 | 1 | 360 |
| 16180427 | 60 | 360 |
| 16179869 | 1 | 360 |
| 16180494 | 60 | 360 |
| 16180564 | 60 | 360 |
| 16179003 | 1 | 360 |
| 16179093 | 1 | 360 |
| 16180333 | 60 | 360 |
| 16178993 | 1 | 360 |
| 16179798 | 1 | 360 |
| 16179538 | 1 | 360 |
| 16179338 | 1 | 360 |
| 16178276 | 36 | 360 |
| 16178542 | 60 | 360 |
| 16178247 | 60 | 360 |
| 16180595 | 60 | 360 |
| 16178232 | 60 | 360 |
| 16180428 | 60 | 360 |
| 16179870 | 1 | 360 |
| 16180495 | 60 | 360 |
| 16180565 | 60 | 360 |
| 16179172 | 1 | 360 |
| 16179425 | 1 | 360 |
| 16178410 | 60 | 360 |
| 16178929 | 1 | 360 |
| 16178747 | 60 | 360 |
| 16179940 | 1 | 360 |
| 16180596 | 60 | 360 |
| 16179992 | 1 | 360 |
| 16180429 | 60 | 360 |
| 16179871 | 1 | 360 |
| 16180496 | 60 | 360 |
| 16180173 | 1 | 360 |
| 16179426 | 1 | 360 |
| 16180334 | 60 | 360 |
| 16178440 | 60 | 360 |
| 16179745 | 1 | 360 |
| 16178808 | 60 | 360 |
| 16179966 | 1 | 360 |
| 16179028 | 1 | 360 |
| 16178930 | 1 | 360 |
| 16178344 | 60 | 360 |
| 16178248 | 60 | 360 |
| 16179893 | 1 | 360 |
| 16179941 | 1 | 360 |

| | | |
|---|---|---|
| 16180597 | 60 | 360 |
| 16179181 | 1 | 360 |
| 16180430 | 60 | 360 |
| 16179186 | 1 | 360 |
| 16179872 | 1 | 360 |
| 16180497 | 60 | 360 |
| 16178861 | 60 | 360 |
| 16179004 | 1 | 360 |
| 16179427 | 1 | 360 |
| 16178731 | 60 | 360 |
| 16180145 | 1 | 480 |
| 16179967 | 1 | 360 |
| 16179539 | 1 | 360 |
| 16178539 | 60 | 360 |
| 16180121 | 1 | 360 |
| 16178345 | 60 | 360 |
| 16178217 | 60 | 360 |
| 16178738 | 60 | 360 |
| 16178498 | 60 | 360 |
| 16180015 | 1 | 360 |
| 16178609 | 60 | 360 |
| 16179894 | 1 | 360 |
| 16180002 | 1 | 360 |
| 16179187 | 1 | 360 |
| 16178501 | 60 | 360 |
| 16180513 | 60 | 360 |
| 16179882 | 1 | 480 |
| 16179440 | 3 | 360 |
| 16178445 | 60 | 360 |
| 16178316 | 60 | 360 |
| 16180064 | 1 | 360 |
| 16179543 | 1 | 360 |
| 16178907 | 1 | 360 |
| 16178347 | 60 | 360 |
| 16179649 | 1 | 360 |
| 16178257 | 60 | 360 |
| 16179200 | 1 | 360 |
| 16180615 | 60 | 360 |
| 16180003 | 1 | 480 |
| 16178242 | 60 | 360 |
| 16178321 | 60 | 360 |
| 16178998 | 1 | 360 |
| 16180514 | 60 | 360 |
| 16179629 | 1 | 360 |
| 16180583 | 60 | 360 |
| 16179441 | 1 | 360 |
| 16179340 | 1 | 360 |
| 16178274 | 60 | 360 |
| 16178538 | 60 | 360 |
| 16179612 | 1 | 360 |
| 16179651 | 1 | 480 |
| 16178904 | 1 | 360 |
| 16178579 | 60 | 360 |
| 16180090 | 1 | 360 |
| 16178616 | 60 | 360 |
| 16179907 | 1 | 360 |
| 16180616 | 60 | 360 |
| 16179949 | 1 | 360 |
| 16179188 | 1 | 360 |
| 16180515 | 60 | 360 |
| 16179080 | 1 | 360 |
| 16178446 | 60 | 360 |
| 16179800 | 1 | 360 |
| 16178839 | 60 | 360 |
| 16179661 | 1 | 360 |
| 16178348 | 60 | 360 |
| 16178330 | 60 | 360 |
| 16178258 | 60 | 360 |
| 16180097 | 1 | 360 |
| 16179908 | 1 | 360 |
| 16179238 | 1 | 360 |
| 16180617 | 60 | 360 |
| 16179192 | 1 | 360 |
| 16180516 | 60 | 360 |
| 16180148 | 1 | 360 |
| 16178732 | 60 | 360 |
| 16179662 | 3 | 360 |
| 16178187 | 36 | 360 |
| 16178268 | 36 | 360 |
| 16178188 | 36 | 360 |
| 16179791 | 1 | 360 |
| 16179795 | 1 | 480 |
| 16179797 | 1 | 360 |
| 16179959 | 1 | 480 |
| 16179799 | 1 | 360 |
| 16178350 | 60 | 360 |
| 16178351 | 60 | 360 |
| 16178270 | 36 | 360 |
| 16178514 | 36 | 360 |
| 16178352 | 60 | 360 |
| 16178271 | 36 | 360 |
| 16178272 | 36 | 360 |
| 16179325 | 1 | 360 |
| 16179406 | 1 | 480 |
| 16178515 | 36 | 360 |

Unassociated Document                                          Page 358 of 835
12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 80 of 279

| | | |
|---|---|---|
| 16179326 | 1 | 360 |
| 16178516 | 36 | 360 |
| 16178273 | 60 | 360 |
| 16178193 | 36 | 360 |
| 16179409 | 1 | 360 |
| 16178194 | 36 | 360 |
| 16178195 | 60 | 360 |
| 16178196 | 36 | 360 |
| 16178277 | 36 | 360 |
| 16178358 | 36 | 360 |
| 16178197 | 36 | 360 |
| 16178278 | 36 | 360 |
| 16178198 | 36 | 360 |
| 16178279 | 36 | 360 |
| 16178199 | 36 | 360 |
| 16180004 | 1 | 360 |
| 16178520 | 36 | 360 |
| 16178603 | 60 | 360 |
| 16178360 | 36 | 360 |
| 16178604 | 60 | 360 |
| 16178607 | 36 | 360 |
| 16179336 | 1 | 480 |
| 16178283 | 36 | 360 |
| 16178284 | 36 | 360 |
| 16179337 | 1 | 480 |
| 16178527 | 60 | 360 |
| 16178529 | 36 | 360 |
| 16179892 | 1 | 480 |
| 16180019 | 1 | 480 |
| 16178612 | 60 | 360 |
| 16178370 | 36 | 360 |
| 16178533 | 36 | 360 |
| 16178534 | 36 | 360 |
| 16178535 | 60 | 360 |
| 16178536 | 36 | 360 |
| 16178537 | 36 | 360 |
| 16178456 | 36 | 360 |
| 16178294 | 36 | 360 |
| 16178618 | 60 | 360 |
| 16178296 | 36 | 360 |
| 16178459 | 36 | 360 |
| 16178298 | 36 | 360 |
| 16178379 | 36 | 360 |
| 16180020 | 1 | 360 |
| 16178701 | 36 | 360 |
| 16178540 | 36 | 360 |
| 16179350 | 1 | 480 |
| 16178460 | 36 | 360 |
| 16178623 | 36 | 360 |
| 16178705 | 36 | 360 |
| 16178463 | 36 | 360 |
| 16178382 | 36 | 360 |
| 16178544 | 36 | 360 |
| 16178707 | 36 | 360 |
| 16179518 | 1 | 480 |
| 16178627 | 60 | 360 |
| 16178385 | 36 | 360 |
| 16178628 | 60 | 360 |
| 16178466 | 60 | 360 |
| 16178469 | 60 | 360 |
| 16178389 | 36 | 360 |
| 16178710 | 36 | 360 |
| 16180393 | 60 | 360 |
| 16178964 | 1 | 360 |
| 16179000 | 1 | 360 |
| 16179083 | 1 | 360 |
| 16180296 | 60 | 360 |
| 16179605 | 1 | 360 |
| 16179157 | 1 | 360 |
| 16179719 | 1 | 360 |
| 16180042 | 1 | 480 |
| 16178532 | 60 | 360 |
| 16178521 | 60 | 360 |
| 16179486 | 1 | 360 |
| 16178896 | 1 | 360 |
| 99999001 | 60 | 360 |
| 99999004 | 60 | 360 |
| 99999005 | 60 | 360 |
| 99999007 | 60 | 360 |
| 99999010 | 1 | 360 |
| 15980136 | 1 | 360 |
| 99999200 | 60 | 360 |
| 99999201 | 60 | 360 |
| 99999202 | 60 | 360 |

Unassociated Document                                    Page 359 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 81 of 279

EXHIBIT C

FORM OF TRANSFER AFFIDAVIT

Affidavit pursuant to Section 860E(e)(4) of the Internal Revenue Code of 1986, as amended, and for other purposes

STATE OF_____                )
                                     )       ss.:
COUNTY OF_____                 )

[NAME OF OFFICER], being first duly sworn, deposes and says:

1. That he/she is [Title of Officer] of [Name of Investor] (the "Investor"), a [savings institution] [corporation] duly organized and existing under the laws of [the State of _____] [the United States], on behalf of which he makes this affidavit.

2. That (i) the Investor is not a "disqualified organization" as defined in Section 860E(e)(5) of the Internal Revenue Code of 1986, as amended (the "Code"), and will not be a disqualified organization as of [Closing Date] [date of purchase]; (ii) it is not acquiring the Structured Asset Mortgage Investments II Inc. Mortgage Pass-Through Certificates, Series 2006-3, Class R-__ Certificates (the "Residual Certificates") for the account of a disqualified organization; (iii) it consents to any amendment of the Pooling and Servicing Agreement that shall be deemed necessary by Structured Asset Mortgage Investments II Inc. (upon advice of counsel) to constitute a reasonable arrangement to ensure that the Residual Certificates will not be owned directly or indirectly by a disqualified organization; and (iv) it will not transfer such Residual Certificates unless (a) it has received from the transferee an affidavit in substantially the same form as this affidavit containing these same four representations and (b) as of the time of the transfer, it does not have actual knowledge that such affidavit is false.

3. That the Investor is one of the following: (i) a citizen or resident of the United States, (ii) a corporation or partnership (including an entity treated as a corporation or partnership for federal income tax purposes) created or organized in, or under the laws of, the United States or any state thereof or the District of Columbia (except, in the case of a partnership, to the extent provided in regulations), provided that no partnership or other entity treated as a partnership for United States federal income tax purposes shall be treated as a United States Person unless all persons that own an interest in such partnership either directly or through any entity that is not a corporation for United States federal income tax purposes are United States Persons, (iii) an estate whose income is subject to United States federal income tax regardless of its source, or (iv) a trust other than a Aforeign trust,@ as defined in Section 7701 (a)(31) of the Code.

4. That the Investor=s taxpayer identification number is _____.

5. That no purpose of the acquisition of the Residual Certificates is to avoid or impede the assessment or collection of tax.

6. That the Investor understands that, as the holder of the Residual Certificates, the Investor may incur tax liabilities in excess of any cash flows generated by such Residual Certificates.

7. That the Investor intends to pay taxes associated with holding the Residual Certificates as they become due.

IN WITNESS WHEREOF, the Investor has caused this instrument to be executed on its behalf, pursuant to authority of its Board of Directors, by its [Title of Officer] this _____ day of _____, 20__.

[NAME OF INVESTOR]

By:
_____
[Name of Officer]
[Title of Officer]
[Address of Investor for receipt of distributions]

Address of Investor for receipt of tax information:

Unassociated Document                                                                                  Page 360 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 82 of 279

Personally appeared before me the above-named [Name of Officer], known or proved to me to be the same person who executed the foregoing instrument and to be the [Title of Officer] of the Investor, and acknowledged to me that he/she executed the same as his/her free act and deed and the free act and deed of the Investor.

Subscribed and sworn before me this ___ day of _____, 20___.

NOTARY PUBLIC

COUNTY OF

STATE OF

My commission expires the ___ day of _____, 20___.

Unassociated Document                                    Page 361 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 83 of 279

EXHIBIT D

FORM OF TRANSFEROR CERTIFICATE

_____,200___

Structured Asset Mortgage Investments II Inc.
383 Madison Avenue
New York, New York 10179

Wells Fargo Bank, N.A.
Sixth Street and Marquette Avenue
Minneapolis, Minnesota 55479

Attention: Luminent Mortgage Trust 2006-3

      Re:    Luminent Mortgage Trust 2006-3
          Mortgage Pass-Through Certificates, Series 2006-3, Class __

Ladies and Gentlemen:

In connection with the sale by _____ (the "Seller") to _____ (the "Purchaser") of $_____ Initial Certificate Principal Balance of Mortgage Pass-Through Certificates, Series 2006-3, Class _____ (the "Certificates"), issued pursuant to the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of April 1, 2006, among Structured Asset Mortgage Investments II Inc., as depositor (the "Depositor"), Luminent Mortgage Capital, Inc., as sponsor, Wells Fargo Bank, National Association, as master servicer and securities administrator and HSBC Bank USA, National Association, as trustee (the "Trustee"). The Seller hereby certifies, represents and warrants to, a covenants with, the Depositor, the Certificate Registrar and the Trustee that:

Neither the Seller nor anyone acting on its behalf has (a) offered, pledged, sold, disposed of or otherwise transferred any Certificate, any interest in any Certificate or any other similar security to any person in any manner, (b) has solicited any offer to buy or to accept a pledge, disposition or other transfer of any Certificate, any interest in any Certificate or any other similar security from any person in any manner, (c) has otherwise approached or negotiated with respect to any Certificate, any interest in any Certificate or any other similar security with any person in any manner, (d) has made any general solicitation by means of general advertising or in any other manner, or (e) has taken any other action, that (as to any of (a) through (e) above) would constitute a distribution of the Certificates under the Securities Act of 1933 (the "Act"), that would render the disposition of any Certificate a violation of Section 5 of the Act or any state securities law, or that would require registration or qualification pursuant thereto. The Seller will not act in any manner set forth in the foregoing sentence with respect to any Certificate. The Seller has not and will not sell or otherwise transfer any of the Certificates, except in compliance with the provisions of the Pooling and Servicing Agreement.

Very truly yours,

(Seller)

By: _____
Name: _____
Title: _____

EXHIBIT E

FORM OF INVESTMENT LETTER

[Date]

[SELLER]

Structured Asset Mortgage Investments II Inc.
383 Madison Avenue
New York, New York 10179

Wells Fargo Bank, N.A
Sixth Street and Marquette Avenue
Minneapolis, Minnesota 55479

Re:     Lumient Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3 (the "Certificates"), including the Class R, Class P, Class I-B-IO, Class II-B-4, Class
        II-B-5 and Class II-B-6 Certificates (the "Privately Offered Certificates")

Dear Ladies and Gentlemen:

In connection with our purchase of Privately Offered Certificates, we confirm that:

(i)     we understand that the Privately Offered Certificates are not being registered under the Securities Act of 1933, as amended (the "Act") or any applicable state securities or
        "Blue Sky" laws, and are being sold to us in a transaction that is exempt from the registration requirements of such laws;

(ii)    any information we desired concerning the Certificates, including the Privately Offered Certificates, the trust in which the Certificates represent the entire beneficial
        ownership interest (the "Trust") or any other matter we deemed relevant to our decision to purchase Privately Offered Certificates has been made available to us;

(iii)   we are able to bear the economic risk of investment in Privately Offered Certificates; we are an institutional "accredited investor" as defined in Section 501(a) of Regulation
        D promulgated under the Act and a sophisticated institutional investor;

(iv)    we are acquiring Privately Offered Certificates for our own account, not as nominee for any other person, and not with a present view to any distribution or other disposition
        of the Privately Offered Certificates;

(v)     we agree the Privately Offered Certificates must be held indefinitely by us (and may not be sold, pledged, hypothecated or in any way disposed of) unless subsequently
        registered under the Act and any applicable state securities or "Blue Sky" laws or an exemption from the registration requirements of the Act and any applicable state
        securities or "Blue Sky" laws is available;

(vi)    we agree that in the event that at some future time we wish to dispose of or exchange any of the Privately Offered Certificates (such disposition or exchange not being
        currently foreseen or contemplated), we will not transfer or exchange any of the Privately Offered Certificates unless:

        (A) (1) the sale is to an Eligible Purchaser (as defined below), (2) if required by the Pooling and Servicing Agreement (as defined below) a letter to substantially
        the same effect as either this letter or, if the Eligible Purchaser is a Qualified Institutional Buyer as defined under Rule 144A of the Act, the Rule 144A and Related Matters
        Certificate in the form attached to the Pooling and Servicing Agreement (as defined below) (or such other documentation as may be acceptable to the Securities
        Administrator) is executed promptly by the purchaser and delivered to the addresses hereof and (3) all offers or solicitations in connection with the sale, whether directly or
        through any agent acting on our behalf, are limited only to Eligible Purchasers and are not made by means of any form of general solicitation or general advertising
        whatsoever; and

        (B) if the Privately Offered Certificate is not registered under the Act (as to which we acknowledge you have no obligation), the Privately Offered Certificate is
        sold in a transaction that does not require registration under the Act and any applicable state securities or "blue sky" laws and, if HSBC Bank USA, National Association
        (the "Trustee") or Wells Fargo Bank, N.A. (the "Securities Administrator") so requests, a satisfactory Opinion of Counsel is furnished to such effect, which Opinion of
        Counsel shall be an expense of the transferor or the transferee;

(vii)   we agree to be bound by all of the terms (including those relating to restrictions on transfer) of the Pooling and Servicing, pursuant to which the Trust was formed; we have
        reviewed carefully and understand the terms of the Pooling and Servicing Agreement;

(viii)  we either: (i) are not acquiring the Privately Offered Certificate directly or indirectly by, or on behalf of, an employee benefit plan or other retirement arrangement which is
        subject to Title I of the Employee Retirement Income Security Act of 1974, as amended, or section 4975 of the Internal Revenue Code of 1986, as amended, or (ii) in the
        case of the Class I-B-IO, Class II-B-4, Class II-B-5 and Class II-B-6 Certificates, are providing a representation to the effect that the proposed transfer and holding of a
        Privately Offered Certificate and the servicing, management and operation of the Trust and its assets: (I) will not result in any prohibited transaction which is not covered
        under an individual or class prohibited transaction exemption, including, but not limited to, Prohibited Transaction Exemption ("PTE") 84-14, PTE 91-38, PTE 90-1, PTE
        95-60, or PTE 96-23 and (II) will not give rise to any additional obligations on the part of the Depositor, the Master Servicer, the Securities Administrator or the Trustee or
        (iii) in the case of the Privately Offered Securities have attached hereto the Opinion of Counsel specified in Section 6.02 of the Agreement.

(ix)    We understand that each of the Privately Offered Certificates bears, and will continue to bear, a legend to substantiate the following effect: ATHIS CERTIFICATE HAS
        NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE
        SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS CERTIFICATE, AGREES THAT THIS CERTIFICATE MAY BE REOFFERED, RESOLD,
        PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (1)
        PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A") TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED
        INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A (A "QIB"), PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE
        ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING
        MADE IN RELIANCE ON RULE 144A, (2) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT
        (IF AVAILABLE) OR (3) IN CERTIFICATED FORM TO AN "INSTITUTIONAL ACCREDITED INVESTOR" WITHIN THE MEANING THEREOF IN RULE 501(a)
        (1), (2), (3) or (7) OF REGULATION D UNDER THE ACT OR ANY ENTITY IN WHICH ALL OF THE EQUITY OWNERS COME WITHIN SUCH PARAGRAPHS
        PURCHASING NOT FOR DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, SUBJECT TO (A) THE RECEIPT BY THE CERTIFICATE REGISTRAR
        OF A LETTER SUBSTANTIALLY IN THE FORM PROVIDED IN THE AGREEMENT AND (B) THE RECEIPT BY THE CERTIFICATE REGISTRAR OF SUCH
        OTHER EVIDENCE ACCEPTABLE TO THE SECURITIES ADMINISTRATOR THAT SUCH REOFFER, RESALE, PLEDGE OR TRANSFER IS IN COMPLIANCE
        WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS OR IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF

Unassociated Document

Page 363 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 85 of 279

THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION. [In the case of the Class II-B-4, Class II-B-5 and Class II-B-6 Certificates: THIS CERTIFICATE MAY NOT BE ACQUIRED DIRECTLY OR INDIRECTLY BY, OR ON BEHALF OF, AN EMPLOYEE BENEFIT PLAN OR OTHER RETIREMENT ARRANGEMENT WHICH IS SUBJECT TO TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, UNLESS THE TRANSFEREE CERTIFIES OR REPRESENTS THAT THE PROPOSED TRANSFER AND HOLDING OF A CERTIFICATE AND THE SERVICING, MANAGEMENT AND OPERATION OF THE TRUST AND ITS ASSETS: (1) WILL NOT RESULT IN ANY PROHIBITED TRANSACTION WHICH IS NOT COVERED UNDER AN INDIVIDUAL OR CLASS PROHIBITED TRANSACTION EXEMPTION, INCLUDING, BUT NOT LIMITED TO, PROHIBITED TRANSACTION EXEMPTION (APTE@) 84-14, PTE 91-38, PTE 90-1, PTE 95-60 OR PTE 96-23 AND (II) WILL NOT GIVE RISE TO ANY ADDITIONAL OBLIGATIONS ON THE PART OF THE DEPOSITOR, THE MASTER SERVICER, THE SECURITIES ADMINISTRATOR OR THE TRUSTEE, WHICH WILL BE DEEMED REPRESENTED BY AN OWNER OF A BOOK-ENTRY CERTIFICATE OR A GLOBAL CERTIFICATE OR UNLESS THE OPINION PROVIDED IN SECTION 6.02 OF THE AGREEMENT IS PROVIDED.@] [In the case of the Class P Certificates: THIS CERTIFICATE MAY NOT BE ACQUIRED DIRECTLY OR INDIRECTLY BY, OR ON BEHALF OF, AN EMPLOYEE BENEFIT PLAN OR OTHER RETIREMENT ARRANGEMENT WHICH IS SUBJECT TO TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, UNLESS THE PROPOSED TRANSFEREE PROVIDES THE SECURITIES ADMINISTRATOR WITH AN OPINION OF COUNSEL ADDRESSED TO THE TRUSTEE, DEPOSITOR, MASTER SERVICER AND SECURITIES ADMINISTRATOR AND ON WHICH THEY MAY RELY THAT IS SATISFACTORY TO THE SECURITIES ADMINISTRATOR THAT THE PURCHASE OF CERTIFICATES ON BEHALF OF SUCH PERSON WILL NOT RESULT IN OR CONSTITUTE A NONEXEMPT PROHIBITED TRANSACTION, IS PERMISSIBLE UNDER APPLICABLE LAW AND WILL NOT GIVE RISE TO ANY ADDITIONAL OBLIGATIONS ON THE PART OF THE DEPOSITOR, THE MASTER SERVICER, THE SECURITIES ADMINISTRATOR OR THE TRUSTEE.]

"Eligible Purchaser" means a corporation, partnership or other entity which we have reasonable grounds to believe and do believe (i) can make representations with respect to itself to substantially the same effect as the representations set forth herein, and (ii) is either a Qualified Institutional Buyer as defined under Rule 144A of the Act or an institutional AAccredited Investor@ as defined under Rule 501 of the Act.

Terms not otherwise defined herein shall have the meanings assigned to them in the Pooling and Servicing Agreement, dated as of April 1, 2006, among Structured Asset Mortgage Investments II Inc., as depositor, Luminent Mortgage Capital, Inc., as sponsor, Wells Fargo Bank, National Association, as master servicer and securities administrator and HSBC Bank USA, National Association, as Trustee (the "Pooling and Servicing Agreement").

If the Purchaser proposes that its Certificates be registered in the name of a nominee on its behalf, the Purchaser has identified such nominee below, and has caused such nominee to complete the Nominee Acknowledgment at the end of this letter.

Name of Nominee (if any): _____

      IN WITNESS WHEREOF, this document has been executed by the undersigned who is duly authorized to do so on behalf of the undersigned Eligible Purchaser on the ___ day of _____, 20___.

Very truly yours,

[PURCHASER]

By: _____
(Authorized Officer)

[By: _____
Attorney-in-fact]

Unassociated Document                                    Page 365 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 87 of 279

Nominee Acknowledgment

The undersigned hereby acknowledges and agrees that as to the Certificates being registered in its name, the sole beneficial owner thereof is and shall be the Purchaser identified above, for whom the undersigned is acting as nominee.

[NAME OF NOMINEE]

By: _____
                                    (Authorized Officer)

[By: _____
                                    Attorney-in-fact]

EXHIBIT F

FORM OF RULE 144A AND RELATED MATTERS CERTIFICATE

[SELLER]

Structured Asset Mortgage Investments II Inc.
383 Madison Avenue
New York, New York 10179

Wells Fargo Bank, N.A.
Sixth Street and Marquette Avenue
Minneapolis, Minnesota 55479

Re:    Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3 (the "Certificates"), including the Class R, Class P, Class I-B-IO, Class I-B-4, Class II-B-4, Class II-B-5 and Class II-B-6 Certificates (the "Privately Offered Certificates")

Dear Ladies and Gentlemen:

In connection with our purchase of Privately Offered Certificates, the undersigned certifies to each of the parties to whom this letter is addressed that it is a qualified institutional buyer (as defined in Rule 144A under the Securities Act of 1933, as amended (the "Act")) as follows:

1.    It owned and/or invested on a discretionary basis eligible securities (excluding affiliate=s securities, bank deposit notes and CD=s, loan participations, repurchase agreements, securities owned but subject to a repurchase agreement and swaps), as described below:

Date: _____, 20__ (must be on or after the close of its most recent fiscal year)

Amount: $ _____; and

2.    The dollar amount set forth above is:

a.    greater than $100 million and the undersigned is one of the following entities:

(x)    [_]    an insurance company as defined in Section 2(13) of the Act[1] ; or

(y)    [_]    an investment company registered under the Investment Company Act or any business development company as defined in Section 2(a)(48) of the Investment Company Act of 1940; or

(z)    [_]    a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; or

(aa)    [_]    a plan (i) established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, the laws of which permit the purchase of securities of this type, for the benefit of its employees and (ii) the governing investment guidelines of which permit the purchase of securities of this type; or

(bb)    [_]    a business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940; or

(cc)    [_]    a corporation (other than a U.S. bank, savings and loan association or equivalent foreign institution), partnership, Massachusetts or similar business trust, or an organization described in Section 501(c)(3) of the Internal Revenue Code; or

(dd)    [_]    a U.S. bank, savings and loan association or equivalent foreign institution, which has an audited net worth of at least $25 million as demonstrated in its latest annual financial statements; or

(ee)    [_]    an investment adviser registered under the Investment Advisers Act; or

b.    [_]    greater than $10 million, and the undersigned is a broker-dealer registered with the SEC; or

c.    [_]    less than $ 10 million, and the undersigned is a broker-dealer registered with the SEC and will only purchase Rule 144A securities in transactions in which it acts as a riskless principal (as defined in Rule 144A); or

d.    [_]    less than $100 million, and the undersigned is an investment company registered under the Investment Company Act of 1940, which, together with one or more registered investment companies having the same or an affiliated investment adviser, owns at least $100 million of eligible securities; or

e.    [_]    less than $100 million, and the undersigned is an entity, all the equity owners of which are qualified institutional buyers.

---

[1]    A purchase by an insurance company for one or more of its separate accounts, as defined by Section 2(a)(37) of the Investment Company Act of 1940, which are neither registered nor required to be registered thereunder, shall be deemed to be a purchase for the account of such insurance company.

The undersigned further certifies that it is purchasing a Privately Offered Certificate for its own account or for the account of others that independently qualify as "Qualified Institutional Buyers" as defined in Rule 144A. It is aware that the sale of the Privately Offered Certificates is being made in reliance on its continued compliance with Rule 144A. It is aware that the transferor may rely on the exemption from the provisions of Section 5 of the Act provided by Rule 144A. The undersigned understands that the Privately Offered Certificates may be resold, pledged or transferred only to (i) a person reasonably believed to be a Qualified Institutional Buyer that purchases for its own account or for the account of a Qualified Institutional Buyer to whom notice is given that the resale, pledge or transfer is being made in reliance in Rule 144A, or (ii) an institutional "accredited investor," as such term is defined under Rule 501 of the Act in a transaction that otherwise does not constitute a public offering.

Unassociated Document                                                                                     Page 367 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 89 of 279

The undersigned agrees that if at some future time it wishes to dispose of or exchange any of the Privately Offered Certificates, it will not transfer or exchange any of the Privately Offered Certificates to a Qualified Institutional Buyer without first obtaining a Rule 144A and Related Matters Certificate in the form hereof from the transferee and delivering such certificate to the addressees hereof. Prior to making any transfer of Privately Offered Certificates, if the proposed Transferee is an institutional "accredited investor," the transferor shall obtain from the transferee and deliver to the addressees hereof an Investment Letter in the form attached to the Pooling and Servicing Agreement, dated as of April 1, 2006, among Structured Asset Mortgage Investments II Inc., Wells Fargo Bank, National Association, Luminent Mortgage Capital, Inc. and HSBC Bank USA, National Association, as Trustee, pursuant to which the Certificates were issued.

The undersigned certifies that it either: (i) is not acquiring the Privately Offered Certificate directly or indirectly by, or on behalf of, an employee benefit plan or other retirement arrangement which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended, or section 4975 of the Internal Revenue Code of 1986, as amended, or (ii) in the case of the Class I-B-IO, Class II-B-4, Class II-B-5 and Class II-B-6 Certificates, is providing a representation to the effect that the proposed transfer and holding of a Privately Offered Certificate and the servicing, management and operation of the Trust and its assets: (I) will not result in any prohibited transaction which is not covered under a prohibited transaction exemption, including, but not limited to, Prohibited Transaction Exemption (APTE@) 84-14, PTE 91-38, PTE 90-1, PTE 95-60, PTE 96-23 and (II) will not give rise to any additional obligations on the part of the Depositor, the Master Servicer, the Securities Administrator or the Trustee or (iii) in the case of the Privately Offered Certificates, has attached hereto the Opinion of Counsel specified in Section 6.02 of the Agreement.

If the Purchaser proposes that its Certificates be registered in the name of a nominee on its behalf, the Purchaser has identified such nominee below, and has caused such nominee to complete the Nominee Acknowledgment at the end of this letter.

Name of Nominee (if any):

IN WITNESS WHEREOF, this document has been executed by the undersigned who is duly authorized to do so on behalf of the undersigned Eligible Purchaser on the ____ day of _____, 20___.

                                        Very truly yours,

                                        [PURCHASER]


                        By:    _____
                                                        (Authorized Officer)


                        [By:   _____
                                                        Attorney-in-fact]

Unassociated Document                                                    Page 369 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 91 of 279

Nominee Acknowledgment

The undersigned hereby acknowledges and agrees that as to the Certificates being registered in its name, the sole beneficial owner thereof is and shall be the Purchaser identified above, for whom the undersigned is acting as nominee.

[NAME OF NOMINEE]

By:  _____
                                    (Authorized Officer)


[By:  _____
                                    Attorney-in-fact]

EXHIBIT G

FORM OF REQUEST FOR RELEASE

To:   HSBC Bank USA, National Association
      10 E. 40th Street, 14th Floor
      Corporate Trust & Loan Agency
      New York, New York 10016

          Re:     Pooling and Servicing Agreement, dated as of April 1, 2006, among Structured Asset Mortgage Investments II Inc., as Depositor, Luminent Mortgage
                  Capital, Inc., as sponsor, Wells Fargo Bank, National Association, as master servicer and securities administrator and HSBC Bank USA, National
                  Association, as Trustee

          In connection with the administration of the Mortgage Loans held by you pursuant to the above-captioned Pooling and Servicing Agreement, we request the release, and hereby acknowledge receipt, of the Mortgage File for the Mortgage Loan described below, for the reason indicated.

Mortgage Loan Number:

Mortgagor Name, Address & Zip Code:

Reason for Requesting Documents (check one):

      _____        1.    Mortgage Paid in Full and proceeds have been deposited into the Custodial Account

      _____        2.    Foreclosure

      _____        3.    Substitution

      _____        4.    Other Liquidation

      _____        5.    Nonliquidation                              Reason:_____

      _____        6.    California Mortgage Loan paid in full

                  By:    _____
                                              (authorized signer)

                  Issuer:    _____
                  Address:   _____
                  Date:      _____

EXHIBIT H

DTC Letter of Representations
[provided upon request]

EXHIBIT I

Schedule of Mortgage Loans with Lost Notes
[provided upon request]

---

Unassociated Document                                                                        Page 373 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 95 of 279

EXHIBIT J

**CUSTODIAL AGREEMENT**

THIS CUSTODIAL AGREEMENT (as amended and supplemented from time to time, the "Agreement"), dated as of April 28, 2006, by and among HSBC BANK USA, NATIONAL ASSOCIATION, as trustee under the Pooling and Servicing Agreement defined below (including its successors under the Pooling and Servicing Agreement defined below, the "Trustee"), STRUCTURED ASSET MORTGAGE INVESTMENTS II INC., as depositor (together with any successor in interest, the "Depositor"), MAIA MORTGAGE FINANCE STATUTORY TRUST as seller (the "Seller") and WELLS FARGO BANK, NATIONAL ASSOCIATION, as master servicer (together with any successor in interest or successor under the Pooling and Servicing Agreement referred to below, the "Master Servicer"), securities administrator and custodian (together with any successor in interest or any successor appointed hereunder, the "Custodian").

**WITNESSETH THAT:**

WHEREAS, the Depositor, the Master Servicer, Trustee and Luminent Mortgage Capital, Inc., as sponsor (the "Sponsor") have entered into a Pooling and Servicing Agreement, dated as of April 1, 2006, relating to the issuance of Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3 (as in effect on the date of this Agreement, the "Original Pooling and Servicing Agreement," and as amended and supplemented from time to time, the "Pooling and Servicing Agreement"); and

WHEREAS, the Custodian has agreed to act as agent for the Trustee for the purposes of receiving and holding certain documents and other instruments delivered by the Depositor, the Seller or the Master Servicer under the Pooling and Servicing Agreement and the Servicers under their respective Servicing Agreements, all upon the terms and conditions and subject to the limitations hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the Trustee, the Depositor, the Seller, the Master Servicer and the Custodian hereby agree as follows:

SECTION 1.
DEFINITIONS

Capitalized terms used in this Agreement and not defined herein shall have the meanings assigned in the Original Pooling and Servicing Agreement, unless otherwise required by the context herein.

SECTION 2.
CUSTODY OF MORTGAGE DOCUMENTS

(a) Custodian to Act as Agent: Acceptance of Mortgage Files. The Custodian, as the duly appointed custodial agent of the Trustee for these purposes, acknowledges (subject to any exceptions noted in the Initial Certification referred to in Section 2.3(a)) receipt of the Mortgage Files relating to the Mortgage Loans identified on the schedule attached hereto (the "Mortgage Files") and declares that it holds and will hold such Mortgage Files as agent for the Trustee, in trust, for the use and benefit of all present and future Certificateholders.

(b) Recordation of Assignments. If any Mortgage File includes one or more assignments of Mortgage that have not been recorded pursuant to the provisions of Section 2.01 of the Pooling and Servicing Agreement and the related Mortgage Loan is not a MOM Loan or the related Mortgaged Properties are located in jurisdictions specifically excluded by the Opinion of Counsel delivered to the Trustee pursuant to Section 2.01 of the Pooling and Servicing Agreement, each such assignment shall be delivered by the Custodian to the Depositor for the purpose of recording it in the appropriate public office for real property records, and the Depositor, at no expense to the Custodian, shall promptly cause to be recorded in the appropriate public office for real property records each such assignment of Mortgage and, upon receipt thereof from such public office, shall return each such assignment of Mortgage to the Custodian.

(c) Review of Mortgage Files.

(i) On or prior to the Closing Date, in accordance with Section 2.02 of the Pooling and Servicing Agreement, the Custodian shall deliver to the Seller, the Trustee and the Servicers an Initial Certification in the form annexed hereto as Exhibit One evidencing receipt (subject to any exceptions noted therein) of a Mortgage File for each of the Mortgage Loans listed on the Schedule attached hereto (the "Mortgage Loan Schedule").

(ii) Within 90 days of the Closing Date, the Custodian agrees, for the benefit of Certificateholders, to review, in accordance with the provisions of Section 2.02 of the Pooling and Servicing Agreement, each such document, and shall deliver to the Seller, the Trustee and the Servicers an Interim Certification in the form annexed hereto as Exhibit Two to the effect that all such documents have been executed and received and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule, except for any exceptions listed on Schedule A attached to such Interim Certification. The Custodian shall be under no duty or obligation to inspect, review or examine said documents, instruments, certificates or other papers to determine that the same are genuine, enforceable, or appropriate for the represented purpose or that they have actually been recorded or that they are other than what they purport to be on their face.

(iii) Not later than 180 days after the Closing Date, the Custodian shall review the Mortgage Files as provided in Section 2.02 of the Pooling and Servicing Agreement and deliver to the Seller, the Trustee and the Servicers a Final Certification in the form annexed hereto as Exhibit Three evidencing the completeness of the Mortgage Files.

(iv) In reviewing the Mortgage Files as provided herein and in the Pooling and Servicing Agreement, the Custodian shall make no representation as to and shall not be responsible to verify (i) the validity, legality, enforceability, due authorization, recordability, sufficiency or genuineness of any of the documents included in any Mortgage File or (ii) the collectability, insurability, effectiveness or suitability of any of the documents in any Mortgage File.

Upon receipt of written request from the Trustee, the Custodian shall as soon as practicable supply the Trustee with a list of all of the documents relating to the Mortgage Loans missing from the Mortgage Files.

(d) Notification of Breaches of Representations and Warranties. Upon discovery by the Custodian of a breach of any representation or warranty made by the Depositor as set forth in the Pooling and Servicing Agreement with respect to a Mortgage Loan relating to a Mortgage File, the Custodian shall give prompt written notice to the Depositor, the Seller, the related Servicer and the Trustee.

(e) Custodian to Cooperate: Release of Mortgage Files. Upon receipt of written notice from the Trustee that the Seller or Underlying Seller, as applicable, has repurchased a Mortgage Loan pursuant to the Mortgage Loan Purchase Agreement, and a request for release (a "Request for Release") confirming that the purchase price therefore has been deposited in the Master Servicer Collection Account or the Distribution Account, then the Custodian agrees to promptly release to the Seller or Underlying Seller, as applicable, the related Mortgage File.

Upon the Custodian's receipt of a Request for Release substantially in the form of Exhibit G to the Pooling and Servicing Agreement signed by a Servicing Officer of a Servicer, stating that it has received payment in full of a Mortgage Loan or that payment in full will be escrowed in a manner customary for such purposes, the Custodian agrees to release to the Servicer within five Business Days, the related Mortgage File. The Depositor shall deliver to the Custodian and the Custodian agrees to review in accordance with the provisions of their Agreement the Mortgage Note and other documents constituting the Mortgage File with respect to any Replacement Mortgage Loan.

From time to time as is appropriate for the servicing or foreclosure of any Mortgage Loan, including, for this purpose, collection under any Primary Insurance Policy or PMI Policy, the Seller or the related Servicer, as applicable, shall deliver to the Custodian a Request for Release signed by a Servicing Officer requesting that possession of all of the Mortgage File be released to the Seller or the related Servicer, as applicable, and certifying as to the reason for such release and that such release will not invalidate any insurance coverage provided in respect of the Mortgage Loan under any of the Insurance Policies. Upon receipt of the foregoing, the Custodian shall deliver within five Business Days the Mortgage File to the Seller or the related Servicer, as applicable. The Seller or the related Servicer, as applicable, shall cause such Mortgage File or any document therein so released to be returned to the Custodian when the need therefor by the Seller or the related Servicer, as applicable, no longer exists, unless (i) the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Master Servicer Collection Account or the Distribution Account or (ii) the Mortgage File or such document has been delivered to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Seller or the related Servicer, as applicable, has delivered to the Custodian a certificate of a Servicing Officer certifying as to the name and address of the Person to which such Mortgage File or such document was delivered and the purpose or purposes of such delivery.

At any time that the Seller or the related Servicer is required to deliver to the Custodian a Request for Release, the Seller or the related Servicer, as applicable, shall deliver two copies of the Request for Release if delivered in hard copy or the Seller or the related Servicer, as applicable, may furnish such Request for Release electronically to the Custodian, in which event the Servicing Officer transmitting the same shall be deemed to have signed the Request for Release. In connection with any Request for Release of a Mortgage File because of a repurchase of a Mortgage Loan, such Request for Release shall be accompanied by an assignment of mortgage, without recourse, representation or warranty from the Trustee to the Seller or Underlying Seller, as applicable, (unless such Mortgage Loan is a MOM Loan) and the related Mortgage Note shall be endorsed without recourse, representation or warranty by the Trustee (unless such Mortgage Loan is registered on the MERS System) and be returned to the Seller. In connection with any Request for Release of a Mortgage File because of the payment in full of a Mortgage Loan, such Request for Release shall be accompanied by a certificate of satisfaction or other similar instrument to be executed by or on behalf of the Trustee and returned to the Seller or the related Servicer, as applicable.

(f) <u>Assumption Agreements</u>. In the event that any assumption agreement, substitution of liability agreement or sale of servicing agreement is entered into with respect to any Mortgage Loan subject to this Agreement in accordance with the terms and provisions of the Pooling and Servicing Agreement, the Master Servicer, to the extent provided in the Pooling and Servicing Agreement or the related Servicing Agreement, shall cause the Seller or the related Servicer, as applicable, to notify the Custodian that such assumption or substitution agreement has been completed by forwarding to the Custodian the original of such assumption or substitution agreement, which shall be added to the related Mortgage File and, for all purposes, shall be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting parts thereof.

SECTION 3.
CONCERNING THE CUSTODIAN

(a) <u>Custodian a Bailee and Agent of the Trustee</u>. With respect to each Mortgage Note, Mortgage and other documents constituting each Mortgage File which are delivered to the Custodian, the Custodian is exclusively the bailee and custodal agent of the Trustee and has no instructions to hold any Mortgage Note or Mortgage for the benefit of any person other than the Trustee and the Certificateholders and undertakes to perform such duties and only such duties as are specifically set forth in this Agreement and in the Pooling and Servicing Agreement. Except upon compliance with the provisions of Section 2.5 of this Agreement, no Mortgage Note, Mortgage or Mortgage File shall be delivered by the Custodian to the Seller, the Depositor, any Servicer or the Master Servicer or otherwise released from the possession of the Custodian.

(b) <u>Custodian May Own Certificates</u>. The Custodian in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights it would have if it were not Custodian.

(c) <u>Master Servicer to Pay Custodian's Fees and Expenses</u>. The Master Servicer covenants and agrees to pay to the Custodian, and the Custodian shall be entitled to, reasonable compensation for all services rendered by it in the exercise and performance of any of the powers and duties hereunder of the Custodian, and the Master Servicer will pay or reimburse the Custodian upon its request for all reasonable expenses, disbursements and advances incurred or made by the Custodian in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all persons not regularly in its employ), except any such expense, disbursement or advance as may arise from its negligence or bad faith or to the extent that such cost or expense is indemnified by the Depositor pursuant to the Pooling and Servicing Agreement. The obligations of the Master Servicer to pay Custodial for such fees and expenses in connection with services provided by Custodian hereunder shall survive the termination of this agreement, or the resignation or removal of the Custodian.

(d) <u>Custodian May Resign; Trustee May Remove Custodian</u>. The Custodian may resign upon at least 60 days' prior notice from the obligations and duties hereby imposed upon it as such obligations and duties relate to its acting as Custodian of the Mortgage Loans. Upon receiving such written notice of resignation, the Trustee shall either take custody of the Mortgage Files itself and give prompt written notice thereof to the Seller, the Depositor, the Master Servicer and the Custodian, or promptly appoint a successor Custodian by written instrument, in duplicate, one copy of which instrument shall be delivered to the resigning Custodian and one copy to the successor Custodian. If the Trustee shall not have taken custody of the Mortgage Files and no successor Custodian shall have been so appointed and have accepted appointment within 30 days after the giving of such written notice of resignation, the resigning Custodian may petition any court of competent jurisdiction for the appointment of a successor Custodian.

The Trustee may remove the Custodian at any time upon 60 days prior written notice to Custodian. In such event, the Trustee shall appoint, or petition a court of competent jurisdiction to appoint, a successor Custodian hereunder. Any successor Custodian shall be a depository institution subject to supervision or examination by federal or state authority shall be able to satisfy the other requirements contained in Section 3.6 and shall be unaffiliated with the Servicers, the Seller and the Depositor.

Any resignation or removal of the Custodian and appointment of a successor Custodian pursuant to any of the provisions of this Section 3.4 shall become effective upon acceptance of appointment by the successor Custodian. The Trustee shall give prompt notice to the Depositor and the Master Servicer of the appointment of any successor Custodian. No successor Custodian shall be appointed by the Trustee without the prior approval of the Depositor and the Master Servicer.

(e) <u>Merger or Consolidation of Custodian</u>. Any Person into which the Custodian may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Custodian shall be a party, or any Person succeeding to the business of the Custodian, shall be the successor of the Custodian hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

(f) <u>Representations of the Custodian</u>. The Custodian hereby represents that it is a depository institution subject to supervision or examination by a federal or state authority, has a combined capital and surplus of at least $15,000,000 and is qualified to do business in the jurisdictions in which it will hold any Mortgage File.

SECTION 4.
COMPLIANCE WITH REGULATION AB

(a) <u>Intent of the Parties; Reasonableness</u>. The parties hereto acknowledge and agree that the purpose of this Article IV is to facilitate compliance by the Depositor with the provisions of Regulation AB and related rules and regulations of the Commission. The Depositor shall not exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission under the Securities Act and the Exchange Act. Each of the parties hereto acknowledges that interpretations of the requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, consensus among participants in the mortgage-backed securities markets, advice of counsel, or otherwise, and agrees to comply with requests made by the Depositor in good faith for delivery of information under these provisions on the basis of evolving interpretations of Regulation AB to the extent reasonably practicable. The Custodian shall cooperate reasonably with the Depositor to deliver to the Depositor (including any of its assignees or designees), any and all disclosure, statements, reports, certifications, records and any other information necessary in the reasonable, good faith determination of the Depositor to permit the Depositor to comply with the provisions of Regulation AB.

(b) <u>Additional Representations and Warranties of the Custodian</u>.

(i) The Custodian hereby represents and warrants that the information set forth in the Prospectus Supplement under the caption "Description of the Certificates - The Custodian" (the

"Custodian Disclosure") does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(ii) The Custodian shall be deemed to represent to the Depositor as of the date hereof and on each date on which information is provided to the Depositor under Section 4.3 that, except as disclosed in writing to the Depositor prior to such date: (i) there are no aspects of its financial condition that could have a material adverse effect on the performance by it of its Custodian obligations under this Agreement or any other Securitization Transaction as to which it is the custodian; (ii) there are no material legal or governmental proceedings pending (or known to be contemplated) against it; and (iii) there are no affiliations, relationships or transactions relating to the Custodian with respect to the Depositor or any sponsor, issuing entity, servicer, trustee, originator, significant obligor, enhancement or support provider or other material transaction party (as such terms are used in Regulation AB) relating to the Securitization Transaction contemplated by the Agreement, as identified by the Depositor to the Custodian in writing as of the Closing Date (each, a "Transaction Party").

(iii) If so requested by the Depositor on any date following the Closing Date, the Custodian shall, within five Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (a) of this Section or, if any such representation and warranty is not accurate as of the date of such confirmation, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party. Any such request from the Depositor shall not be given more than once each calendar quarter, unless the Depositor shall have a reasonable basis for a determination that any of the representations and warranties may not be accurate.

(c) <u>Additional Information to Be Provided by the Custodian</u>. For so long as the Certificates are outstanding, for the purpose of satisfying the Depositor 's reporting obligation under the Exchange Act with respect to any class of Certificates, the Custodian shall (a) notify the Depositor in writing of any material litigation or governmental proceedings pending against the Custodian that would be material to Certificateholders, and (b) provide to the Depositor a written description of such proceedings. Any notices and descriptions required under this Section 4.3 shall be given no later than five Business Days prior to the Determination Date following the month in which the Custodian has knowledge of the occurrence of the relevant event. As of the date the Depositor or Master Servicer files each Report on Form 10-D or Form 10-K with respect to the Certificates, the Custodian will be deemed to represent that any information previously provided under this Section 4.3, if any, is materially correct and does not have any material omissions unless the Custodian has provided an update to such information.

(d) <u>Report on Assessment of Compliance and Attestation</u>. On or before March 15 of each calendar year, the Custodian shall:

(i) deliver to the Depositor a report (in form and substance reasonably satisfactory to the Depositor) regarding the Custodian's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB. Such report shall be addressed to the Depositor and signed by an authorized officer of the Custodian, and shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit Five hereto; and

(ii) deliver to the Depositor a report of a registered public accounting firm reasonably acceptable to the Depositor that attests to, and reports on, the assessment of compliance made by the Custodian and delivered pursuant to the preceding paragraph. Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act.

(e) <u>Indemnification; Remedies</u>.

(i) The Custodian shall indemnify the Depositor, each affiliate of the Depositor and each broker dealer acting as underwriter, placement agent or initial purchaser of the Certificates or each Person who controls any of such parties (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees and agents of each of the foregoing, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(i) (A) any untrue statement of a material fact contained or alleged to be contained in the Custodian Disclosure and any information, report, certification, accountants' attestation or other material provided under this Article IV by or on behalf of the Custodian (collectively, the "Custodian Information"), or (B) the omission or alleged omission to state in the Custodian Information a material fact required to be stated in the Custodian Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; or

(ii) any failure by the Custodian to deliver any information, report, certification, accountants' attestation or other material when and as required under this Article IV.

(iii) the negligence, bad faith or willful misconduct of the Custodian in the performance of its obligations under this Article IV.

(ii) In the case of any failure of performance described in clause (ii) of Section 4.5(a), the Custodian shall promptly reimburse the Depositor for all costs reasonably incurred by the Depositor in order to obtain the information, report, certification, accountants' letter or other material not delivered as required by the Custodian.

(iii) In no event shall the Custodian or its directors, officers, and employees be liable for any special, indirect or consequential damages from any action taken or omitted to be taken by it or them hereunder or in connection herewith even if advised of the possibility of such damages.

This indemnification shall survive the termination of this Agreement or the termination of the Custodian.

SECTION 5.
MISCELLANEOUS PROVISIONS

(a) <u>Notices</u>. All notices, requests, consents and demands and other communications required under this Agreement or pursuant to any other instrument or document delivered hereunder shall be in writing and, unless otherwise specifically provided, may be delivered personally, by telegram or telex or by registered or certified mail, postage prepaid, return receipt requested, at the addresses specified on the signature page hereof (unless changed by the particular party whose address is stated herein by similar notice in writing), in which case the notice will be deemed delivered when received.

(b) [Reserved].

(c) <u>Amendments</u>. No modification or amendment of or supplement to this Agreement shall be valid or effective unless the same is in writing and signed by all parties hereto. The Trustee shall give prompt notice to the Custodian of any amendment or supplement to the Pooling and Servicing Agreement and furnish the Custodian with written copies thereof.

(d) <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(e) <u>Recordation of Agreement</u>. To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Depositor and at the Trust's expense, but only upon direction accompanied by an Opinion of Counsel reasonably satisfactory to the Depositor to the effect that the failure to effect such recordation is likely to materially and adversely affect the interests of the Certificateholders.

For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of

Unassociated Document                                                                    Page 376 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 98 of 279

counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

(f) <u>Severability of Provisions</u>. If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the holders thereof.

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

| | |
|---|---|
| Address: | HSBC BANK USA, NATIONAL ASSOCIATION, not individually but solely as Trustee |
| 452 Fifth Avenue | |
| New York, New York 10018 | By: _____ |
| | Name: |
| | Title: |
| Address: | STRUCTURED ASSET MORTGAGE INVESTMENTS II INC. |
| 383 Madison Avenue | |
| New York, New York 10179 | By: _____ |
| | Name:    Baron Silverstein |
| | Title:    Vice President |
| Address: | MAIA MORTGAGE FINANCE STATUTORY TRUST |
| One Market Street | |
| Spear Tower, 30th Floor | By: _____ |
| San Francisco, California 94105 | Name: |
| | Title: |
| Address: | WELLS FARGO BANK, NATIONAL ASSOCIATION, as Master Servicer |
| 9062 Old Annapolis Road | |
| Columbia, Maryland 21045 | By: _____ |
| | Name: |
| | Title: |
| Address: | WELLS FARGO BANK, NATIONAL ASSOCIATION, as Custodian |
| 24 Executive Park, Suite 100 | |
| Irvine, California 92614 | By: _____ |
| | Name: |
| | Title: |

STATE OF_____                    )
                                         )        ss.:
COUNTY OF_____                     )


On the 28th day of April 2006 before me, a notary public in and for said State, personally appeared _____, known to me to be a(n) _____ of HSBC Bank USA, National Association, a national banking association, one of the parties that executed the within agreement, and also known to me to be the person who executed the within agreement on behalf of said party and acknowledged to me that such party executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public


[SEAL]

STATE OF NEW YORK                              )
                                               )        ss.:
COUNTY OF NEW YORK                             )

On the 28th day of April 2006 before me, a notary public in and for said State, personally appeared Baron Silverstein, known to me to be a(n) Vice President of Structured Asset Mortgage Investments II Inc., and also known to me to be the person who executed the within instrument on behalf of said party, and acknowledged to me that such party executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

[SEAL]

STATE OF_____                          )
                                               )        ss.:
COUNTY OF_____                           )


On the 28th day of April 2006 before me, a notary public in and for said State, personally appeared _____, known to me to be an authorized representative of Maia Mortgage Finance Statutory Trust, one of the parties that executed the within instrument, and also known to me to be the person who executed the within instrument on behalf of said party, and acknowledged to me that such party executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.


_____
Notary Public


[Notarial Seal]

STATE OF MARYLAND                              )
                                              )    ss.:
COUNTY OF HOWARD                              )


On the 28th day of April 2006 before me, a notary public in and for said State, personally appeared _____, known to me to be a(n) _____ of Wells Fargo Bank, National Association, a national banking association, one of the parties that executed the within instrument, and also known to me to be the person who executed it on behalf of said party, and acknowledged to me that such party executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.


_____
Notary Public


[Notarial Seal]

STATE OF MINNESOTA                                    )
                                                     )          ss.:
COUNTY OF _____                                  )


        On the 28th day of April 2006 before me, a notary public in and for said State, personally appeared _____, known to me to be a(n) _____of Wells Fargo Bank, National Association, a national banking association, one of the parties that executed the within instrument, and also known to me to be the person who executed it on behalf of said party, and acknowledged to me that such party executed the within instrument.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.


                                                     _____
                                                     Notary Public


[Notarial Seal]

Unassociated Document

Page 383 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 105 of 279

EXHIBIT ONE

FORM OF CUSTODIAN INITIAL CERTIFICATION

April 28, 2006

HSBC Bank USA, National Association
10 E. 40th Street, 14th Floor
Corporate Trust & Loan Agency
New York, NY 10016

Maia Mortgage Finance Statutory Trust
One Market Street
Spear Tower, 30th Floor
San Francisco, CA 94105

Attention: Luminent Mortgage Trust 2006-3, Series 2006-3

Re:    Custodial Agreement, dated as of April 28, 2006, by and
among HSBC Bank USA, National Association, Wells
Fargo Bank, National Association, Structured Asset
Mortgage Investments II Inc. and Maia Mortgage Finance
Statutory Trust relating to Luminent Mortgage Trust 2006-
3, Mortgage Pass-Through Certificates, Series 2006-3

Ladies and Gentlemen:

In accordance with Section 2.3(a) of the above-captioned Custodial Agreement, and subject to Section 2.02(a) of the Pooling and Servicing Agreement, the undersigned, as Custodian, hereby certifies that it has received a Mortgage File (which contains an original Mortgage Note or lost note affidavit) to the extent required in Section 2.01 of the Pooling and Servicing Agreement with respect to each Mortgage Loan listed in the Mortgage Loan Schedule, with any exceptions listed on Schedule A attached hereto.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-captioned Custodial Agreement.

WELLS FARGO BANK, NATIONAL ASSOCIATION

By:
Name:
Title:

EXHIBIT TWO

FORM OF CUSTODIAN INTERIM CERTIFICATION

[DATE]

HSBC Bank USA, National Association
10 E. 40th Street, 14th Floor
Corporate Trust & Loan Agency
New York, NY 10016

Maia Mortgage Finance Statutory Trust
One Market Street
Spear Tower, 30th Floor
San Francisco, CA 94105

Attention: Luminent Mortgage Trust 2006-3, Series 2006-3

Re:    Custodial Agreement, dated as of April 28, 2006, by and
among HSBC Bank USA, National Association, Wells
Fargo Bank, National Association, Structured Asset
Mortgage Investments II Inc. and Maia Mortgage Finance
Statutory Trust relating to Luminent Mortgage Trust 2006-
3, Mortgage Pass-Through Certificates, Series 2006-3

Ladies and Gentlemen:

In accordance with Section 2.3(b) of the above-captioned Custodial Agreement and subject to Section 2.02(a) of the Pooling and Servicing Agreement, the undersigned, as Custodian, hereby certifies that it has received a Mortgage File to the extent required pursuant to Section 2.01 of the Pooling and Servicing Agreement with respect to each Mortgage Loan listed in the Mortgage Loan Schedule, and it has reviewed the Mortgage File and the Mortgage Loan Schedule and has determined that: all required documents have been executed and received and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule, with any exceptions listed on Schedule A attached hereto.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-captioned Custodial Agreement.

WELLS FARGO BANK, NATIONAL ASSOCIATION

By:    _____
Name:  _____
Title: _____

EXHIBIT THREE

FORM OF CUSTODIAN FINAL CERTIFICATION

[DATE]

HSBC Bank USA, National Association
10 E. 40th Street, 14th Floor
Corporate Trust & Loan Agency
New York, NY 10016

Maia Mortgage Finance Statutory Trust
One Market Street
Spear Tower, 30th Floor
San Francisco, CA 94105

Attention: Luminent Mortgage Trust 2006-3, Series 2006-3

Re:    Custodial Agreement, dated as of April 28, 2006, by and
among HSBC Bank USA, National Association, Wells
Fargo Bank, National Association, Structured Asset
Mortgage Investments II Inc. and Maia Mortgage Finance
Statutory Trust relating to Luminent Mortgage Trust 2006-
3, Mortgage Pass-Through Certificates, Series 2006-3

In accordance with Section 2.3(c) of the above-captioned Custodial Agreement and, subject to Section 2.02(b) of the Pooling and Servicing Agreement, the undersigned, as Custodian, hereby certifies that it has received a Mortgage File to the extent required pursuant to Section 2.01 of the Pooling and Servicing Agreement with respect to each Mortgage Loan listed in the Mortgage Loan Schedule, and it has reviewed the Mortgage File and the Mortgage Loan Schedule and has determined that: all required documents have been executed and received and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule, with any exceptions listed on Schedule A attached hereto.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-captioned Custodial Agreement or in the Pooling and Servicing Agreement, as applicable.

WELLS FARGO BANK, NATIONAL ASSOCIATION

By:    _____
Name:    _____
Title:    _____

Unassociated Document                                                                 Page 386 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 108 of 279

SCHEDULE A

(PROVIDED UPON REQUEST)

Unassociated Document                                                                 Page 387 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 109 of 279

EXHIBIT K

MORTGAGE LOAN PURCHASE AGREEMENT

among

MAIA MORTGAGE FINANCE STATUTORY TRUST

as Mortgage Loan Seller

LUMINENT MORTGAGE CAPITAL, INC.

as Sponsor

and

STRUCTURED ASSET MORTGAGE INVESTMENTS II INC.

as Purchaser

Dated as of

April 28, 2006

**TABLE OF CONTENTS**

SECTION 1. Definitions

SECTION 2. Purchase and Sale of the Mortgage Loans and Related Rights.

SECTION 3. Mortgage Loan Schedules

SECTION 4. Mortgage Loan Transfer.

SECTION 5. Examination of Mortgage Files.

SECTION 6. Recordation of Assignments of Mortgage.

SECTION 7. Representations and Warranties of Mortgage Loan Seller Concerning the Mortgage Loans

SECTION 8. Representations and Warranties Concerning the Mortgage Loan Seller

SECTION 9. Representations and Warranties Concerning the Purchaser

SECTION 10. Conditions to Closing.

SECTION 11. Fees and Expenses

SECTION 12. Accountants' Letters.

SECTION 13. Indemnification.

SECTION 14. Notices

SECTION 15. Transfer of Mortgage Loans

SECTION 16. Termination

SECTION 17. Representations, Warranties and Agreements to Survive Delivery

SECTION 18. Severability

SECTION 19. Counterparts

SECTION 20. Amendment

SECTION 22. Further Assurances

SECTION 23. Successors and Assigns.

SECTION 24. The Mortgage Loan Seller and the Purchaser

SECTION 25. Entire Agreement

SECTION 26. No Partnership

SECTION 27. Fiduciary Duty

**EXHIBITS AND SCHEDULE TO**
**MORTGAGE LOAN PURCHASE AGREEMENT**

| | |
|---|---|
| Exhibit 1 | Contents of Mortgage File |
| Exhibit 2 | Mortgage Loan Schedule Information |
| Exhibit 3 | Sponsor's Information |
| Exhibit 4 | Purchaser's Information |
| Exhibit 5 | Schedule of Lost Certificates |
| Exhibit 6 | Standard & Poor's Levels Glossary, Version 5.6(c) Revised, Appendix E |
| Schedule A | Required Ratings for Each Class of Certificates |
| Schedule B | Mortgage Loan Schedule |

Unassociated Document                                                                Page 389 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 111 of 279

MORTGAGE LOAN PURCHASE AGREEMENT

MORTGAGE LOAN PURCHASE AGREEMENT, dated as of April 28, 2006, as amended and supplemented by any and all amendments hereto (collectively, the "Agreement"), by and among MAIA MORTGAGE FINANCE STATUTORY TRUST, a Maryland Business Trust (the "Mortgage Loan Seller"), LUMINENT MORTGAGE CAPITAL, INC. (the "Sponsor") and STRUCTURED ASSET MORTGAGE INVESTMENTS II INC., a Delaware corporation (the "Purchaser").

Upon the terms and subject to the conditions of this Agreement, the Mortgage Loan Seller agrees to sell, and the Purchaser agrees to purchase, certain conventional, first lien mortgage loans secured primarily by one- to four-family residential properties and individual condominium units (collectively, the "Mortgage Loans") as described herein. The Purchaser intends to deposit the Mortgage Loans into a trust fund (the "Trust Fund") and create Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3 (the "Certificates"), under a pooling and servicing agreement, to be dated as of April 1, 2006 (the "Pooling and Servicing Agreement"), among the Purchaser, as purchaser, the Sponsor, as sponsor, Wells Fargo Bank, National Association, as master servicer (the "Master Servicer") and as securities administrator and HSBC Bank USA, National Association, as trustee (the "Trustee").

The Purchaser has filed with the Securities and Exchange Commission (the "Commission") a registration statement on Form S-3 (Number 333-132232) relating to its Mortgage Pass-Through Certificates and the offering of certain series thereof (including certain classes of the Certificates) from time to time in accordance with Rule 415 under the Securities Act of 1933, as amended, and the rules and regulations of the Commission promulgated thereunder (the "Securities Act"). Such registration statement, when it became effective under the Securities Act, and the prospectus relating to the public offering of certain classes of the Certificates by the Purchaser (the "Public Offering"), as each may be amended or supplemented from time to time pursuant to the Securities Act or otherwise, are referred to herein as the "Registration Statement" and the "Prospectus," respectively. The "Prospectus Supplement" shall mean that supplement, dated April 27, 2006, to the Prospectus, dated March 28, 2006, relating to certain classes of the Certificates. With respect to the Public Offering of certain classes of the Certificates, the Purchaser, Bear, Stearns & Co. Inc. ("Bear Stearns") and Wachovia Capital Markets, LLC ("Wachovia") have entered into a terms agreement dated as of April [__], 2006 to an underwriting agreement dated March 22, 2006, among the Purchaser, Bear Stearns and Wachovia (together, the "Underwriting Agreement").

Now, therefore, in consideration of the premises and the mutual agreements set forth herein, the parties hereto agree as follows:

SECTION 6. Definitions. Certain terms are defined herein. Capitalized terms used herein but not defined herein shall have the meanings specified in the Pooling and Servicing Agreement. The following other terms are defined as follows:

Acquisition Price: Cash in an amount equal to $[____*____,__] (plus $[____*____,__] in accrued interest) and the Certificates issued pursuant to the Trust Agreement.

AmNet: American Mortgage Network, Inc.

AmNet Sale Agreement : Mortgage Loan Sale Agreement, dated as of April 25, 2006, among AmNet as seller, Luminent Capital Markets, Inc. as purchaser, Mercury Mortgage Finance Statutory Trust as purchaser and Maia Mortgage Finance Statutory Trust as purchaser.

Bear Stearns: Bear, Stearns & Co. Inc.

Closing Date: April 28, 2006.

Co-op Lease: With respect to a Co-op Loan, the lease with respect to a dwelling unit occupied by the Mortgagor and relating to the stock allocated to the related dwelling unit.

Co-op Loan: A Mortgage Loan secured by the pledge of stock allocated to a dwelling unit in a residential cooperative housing corporation and a collateral assignment of the related Co-op Lease.

Co-op Stock: With respect to a Co-op Loan, the single outstanding class of stock, partnership interest or other ownership instrument in the related residential cooperative housing corporation.

Cut-off Date: April 1, 2006.

Cut-off Date Balance: $673,771,000.

Deleted Mortgage Loan: A Mortgage Loan replaced or to be replaced by a Substitute Mortgage Loan.

Due Date: With respect to each Mortgage Loan, the date in each month on which its scheduled payment is due if such due date is the first day of a month and otherwise is deemed to be the first day of the following month or such other date specified in the Wells Fargo Servicing Agreement.

EMC: EMC Mortgage Corporation.

EMC Servicing Agreement: That certain Amended and Restated Purchase, Warranties and Servicing Agreement, dated as of April 24, 2006, among the EMC Mortgage Corporation, Maia Mortgage Finance Statutory Trust, Luminent Mortgage Capital, Inc. and Mercury Mortgage Finance Statutory Trust, as amended by the Assignment, Assumption and Recognition Agreement, dated as of April 28, 2006.

IndyMac: IndyMac Bank, F.S.B.

IndyMac Servicing Agreement: That certain Flow Sale and Servicing Agreement, dated as of April 21, 2006, among Maia Mortgage Finance Statutory Trust, Luminent Mortgage Capital, Inc., Mercury Mortgage Finance Statutory Trust and the IndyMac Bank, F.S.B as amended by the Assignment, Assumption and Recognition Agreement, dated as of April 28, 2006.

Master Servicer: Wells Fargo Bank, N.A.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS® System: The system of recording transfers of Mortgages electronically maintained by MERS.

Moody's: Moody's Investors Service, Inc., or its successors in interest.

Mortgage: The mortgage or deed of trust creating a first lien on an interest in real property securing a Mortgage Note.

Mortgage File: The items referred to in Exhibit 1 pertaining to a particular Mortgage Loan and any additional documents required to be added to such documents pursuant to this Agreement.

Mortgage Interest Rate: The annual rate of interest borne by a Mortgage Note as stated therein.

Mortgagor: The obligor(s) on a Mortgage Note.

Net Rate: For each Mortgage Loan, the Mortgage Interest Rate for such Mortgage Loan less the Servicing Fee Rate and the Lender-Paid PMI Rate (if applicable) expressed as a per annum rate.

Opinion of Counsel: A written opinion of counsel, who may be counsel for the Mortgage Loan Seller or the Purchaser, reasonably acceptable to the Trustee.

Paul Financial: Paul Financial, LLC.

Paul Financial Servicing Agreement: That certain Flow Sale and Servicing Agreement, dated as of January 24, 2006, among the Maia Mortgage Finance Statutory Trust, Luminent Mortgage Capital, Inc., Mercury Mortgage Finance Statutory Trust and Paul Financial as amended by the Assignment, Assumption and Recognition Agreement, dated as of April 28, 2006.

Person: Any legal person, including any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Purchase Price: With respect to any Mortgage Loan (or any property acquired with respect thereto) required to be repurchased by the Mortgage Loan Seller or Underlying Seller, as applicable, pursuant to this Agreement, an amount equal to the sum of (i) 100% of the principal remaining unpaid on such Mortgage Loan as of the date of purchase (including if a foreclosure has already occurred, the principal balance of the related Mortgage Loan at the time the Mortgaged Property was acquired), (ii) accrued and unpaid interest thereon at the Mortgage Rate through and including the last day of the month of purchase and (iii) any costs and damages (if any) incurred by the Trust in connection with any violation of such Mortgage Loan of any anti-predatory lending laws.

Rating Agencies: Standard & Poor's, Moody's and Fitch, each a "Rating Agency."

RFC: Residential Funding Corporation.

RFC Servicing Agreement: Standard Terms and Provisions of Sale and Servicing Agreement, dated as of March 30, 2006 (the "Sale and Servicing Agreement"), among the Assignor, Luminent, Mercury and RFC, together with that certain Reference Agreement, dated as of March 30, 2006 as amended by the Assignment, Assumption and Recognition Agreement, dated as of April 28, 2006.

Securities Act: The Securities Act of 1933, as amended.

Security Instrument: A written instrument creating a valid first lien on a Mortgaged Property securing a Mortgage Note, which may be any applicable form of mortgage, deed of trust, deed to secure debt or security deed, including any riders or addenda thereto.

Standard & Poor's: Standard & Poor's, a division of The McGraw-Hill Companies, Inc. or its successors in interest.

Substitute Mortgage Loan: A mortgage loan substituted for a Deleted Mortgage Loan which must meet, on the date of such substitution, the requirements stated herein and in the Sale and Servicing Agreement with respect to such substitution; upon such substitution, such mortgage loan shall be a "Mortgage Loan" hereunder.

Underlying Sale Agreement: The EMC Servicing Agreement, IndyMac Servicing Agreement, Paul Financial Servicing Agreement, RFC Servicing Agreement or AmNet Sale Agreement, as applicable.

Underlying Seller: EMC, RFC, Paul Financial, IndyMac or AmNet, as applicable.

Value: The value of the Mortgaged Property at the time of origination of the related Mortgage Loan, such value being the lesser of (i) the value of such property set forth in an appraisal accepted by the applicable originator of the Mortgage Loan or (ii) the sales price of such property at the time of origination.

---

* Please contact Bear Stearns for pricing information.

SECTION 7. Purchase and Sale of the Mortgage Loans and Related Rights.

(a) Upon satisfaction of the conditions set forth in Section 10 hereof, the Mortgage Loan Seller agrees to sell, and the Purchaser agrees to purchase Mortgage Loans having an aggregate outstanding principal balance as of the Cut-off Date equal to the Cut-off Date Balance.

(b) The closing for the purchase and sale of the Mortgage Loans and the closing for the issuance of the Certificates will take place on the Closing Date at the office of the Purchaser's counsel in New York, New York or such other place as the parties shall agree.

(c) Upon the satisfaction of the conditions set forth in Section 10 hereof, on the Closing Date, the Purchaser shall pay to the Mortgage Loan Seller the cash portion of the Acquisition Price for the Mortgage Loans in immediately available funds by wire transfer to such account or accounts as shall be designated by the Mortgage Loan Seller and shall deliver the Certificates to the Mortgage Loan Seller or its designee.

(d) In addition to the foregoing, on the Closing Date the Mortgage Loan Seller assigns to the Purchaser all of its right, title and interest in the Underlying Sale Agreements to the extent relating to the Mortgage Loans.

SECTION 8. Mortgage Loan Schedules. The Mortgage Loan Seller agrees to deliver or cause to be delivered to the Purchaser as of the date hereof a preliminary listing of the Mortgage Loans (the "Preliminary Mortgage Loan Schedule") setting forth the information listed on Exhibit 2 to this Agreement with respect to each of the Mortgage Loans being sold by the Mortgage Loan Seller. If there are changes to the Preliminary Mortgage Loan Schedule, the Mortgage Loan Seller shall provide to the Purchaser as of the Closing Date a final schedule (the "Final Mortgage Loan Schedule") setting forth the information listed on Exhibit 2 to this Agreement with respect to each of the Mortgage Loans being sold by the Mortgage Loan Seller to the Purchaser. The Final Mortgage Loan Schedule shall be delivered to the Purchaser on the Closing Date, shall be attached to an amendment to this Agreement to be executed on the Closing Date by the parties hereto and shall be in form and substance mutually agreed to by the Mortgage Loan Seller and the Purchaser (the "Amendment"). If there are no changes to the Preliminary Mortgage Loan Schedule, the Preliminary Mortgage Loan Schedule shall be the Final Mortgage Loan Schedule for all purposes hereof.

SECTION 9. Mortgage Loan Transfer.

(a) The Purchaser will be entitled to all scheduled payments of principal and interest on the Mortgage Loans due after the Cut-off Date (regardless of when actually collected) and all payments thereon, other than scheduled principal and interest due on or before the Cut-off Date but received after the Cut-off Date. The Mortgage Loan Seller will be entitled to all scheduled payments of principal and interest on the Mortgage Loans due on or before the Cut-off Date (including payments collected after the Cut-off Date) and all payments thereon, other than scheduled

Unassociated Document                                                                 Page 391 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 113 of 279

principal and interest due after the Cut-off Date but received on or before the Cut-off Date. Such principal amounts and any interest thereon belonging to the Mortgage Loan Seller as described above will not be included in the aggregate outstanding principal balance of the Mortgage Loans as of the Cut-off Date as set forth on the Final Mortgage Loan Schedule.

(b) Pursuant to various conveyancing documents to be executed on the Closing Date and pursuant to the Pooling and Servicing Agreement, the Purchaser will assign on the Closing Date all of its right, title and interest in and to the Mortgage Loans to the Trustee for the benefit of the Certificateholders. In connection with the transfer and assignment of the Mortgage Loans, the Mortgage Loan Seller has delivered or will deliver or cause to be delivered to the Trustee or the Custodian on behalf of the Trustee by the Closing Date or such later date as is agreed to by the Purchaser and the Mortgage Loan Seller (each of the Closing Date and such later date is referred to as a "Mortgage File Delivery Date"), the items of each Mortgage File, provided, however, that in lieu of the foregoing, the Mortgage Loan Seller may deliver the following documents, under the circumstances set forth below: (x) in lieu of the original Mortgage, assignments to the Trustee or intervening assignments thereof which have been delivered, are being delivered or will upon receipt of recording information relating to the Mortgage required to be included thereon, be delivered to recording offices for recording and have not been returned in time to permit their delivery as specified above, the Mortgage Loan Seller may deliver a true copy thereof with a certification by the Mortgage Loan Seller or the Master Servicer, on the face of such copy, substantially as follows: "Certified to be a true and correct copy of the original, which has been transmitted for recording;" (y) in lieu of the Mortgage, assignments to the Trustee or intervening assignments thereof, if the applicable jurisdiction retains the originals of such documents or if the originals are lost (in each case, as evidenced by a certification from the Mortgage Loan Seller or the Master Servicer to such effect), the Mortgage Loan Seller may deliver photocopies of such documents containing an original certification by the judicial or other governmental authority of the jurisdiction where such documents were recorded; and (z) in lieu of the Mortgage Notes relating to the Mortgage Loans, each identified in the list delivered by the Purchaser to the Trustee on the Closing Date and attached hereto as Exhibit 5 the Mortgage Loan Seller may deliver lost note affidavits and indemnities of the Mortgage Loan Seller; and provided further, however, that in the case of Mortgage Loans which have been prepaid in full after the Cut-off Date and prior to the Closing Date, the Mortgage Loan Seller, in lieu of delivering the above documents, may deliver or cause to be delivered to the Trustee a certification by the Master Servicer to such effect. The Mortgage Loan Seller shall deliver or cause to be delivered such original documents (including any original documents as to which certified copies had previously been delivered) or such certified copies to the Trustee, or the Custodian on behalf of the Trustee, promptly after they are received. The Trustee shall cause the Mortgage and intervening assignments, if any, and the assignment of the Mortgage to be recorded not later than 180 days after the Closing Date unless such assignment is not required to be recorded under the terms set forth in Section 6(a) hereof.

(c) In connection with the assignment of any Mortgage Loan registered on the MERS® System, the Trustee further agrees that it will cause, at the Sponsor's own expense, and with the cooperation of the Depositor and the Master Servicer within 30 days after the Closing Date, the MERS® System to indicate that such Mortgage Loans have been assigned by the Mortgage Loan Seller to the Purchaser, by the Purchaser to the Issuer and by the Issuer to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field "Pool Field" which identifies the series of the Certificates issued in connection with such Mortgage Loans. The Trustee further agrees that it will not, and will not permit any Servicer or the Master Servicer to alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of the Pooling and Servicing Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of the Pooling and Servicing Agreement.

(d) The Mortgage Loan Seller and the Purchaser acknowledge hereunder that all of the Mortgage Loans and the related servicing will ultimately be assigned to HSBC Bank USA, National Association, as Trustee on behalf of the Certificateholders, on the date hereof.

SECTION 10. Examination of Mortgage Files.

(a) On or before the Mortgage File Delivery Date, the Mortgage Loan Seller will have made the Mortgage Files available to the Purchaser or its agent for examination which may be at the offices of the Trustee or the Mortgage Loan Seller's custodian. The fact that the Purchaser or its agent has conducted or has failed to conduct any partial or complete examination of the Mortgage Files shall not affect the Purchaser's rights to demand cure, repurchase, or substitution for as provided in this Agreement. In furtherance of the foregoing, the Mortgage Loan Seller, upon reasonable request, shall make the Mortgage Files available through the Custodian thereof to the Purchaser or its agent from time to time so as to permit the Purchaser to confirm the Mortgage Loan Seller's compliance with the delivery and recordation requirements of this Agreement and the Pooling and Servicing Agreement. In addition, upon request of the Purchaser, the Mortgage Loan Seller agrees to provide to the Purchaser, Bear Stearns and to any investors or prospective investors in the Certificates information regarding the Mortgage Loans and their servicing, to make the Mortgage Files available to the Purchaser, Bear Stearns and to such investors or prospective investors (which may be at the offices of the Mortgage Loan Seller and/or the Mortgage Loan Seller's custodian) and to make available personnel knowledgeable about the Mortgage Loans for discussions with the Purchaser, Bear Stearns and such investors or prospective investors, upon reasonable request during regular business hours, sufficient to permit the Purchaser, Bear Stearns and such investors or potential investors to conduct such due diligence as any such party reasonably believes is appropriate.

(b) Pursuant to the Custodial Agreement, on the Closing Date the Custodian, on behalf of the Trustee, for the benefit of the Certificateholders, will acknowledge receipt of each Mortgage Loan, by delivery to the Mortgage Loan Seller, the Purchaser and the Issuer of an initial certification in the form attached as Exhibit One to the Custodial Agreement.

(c) Pursuant to the Custodial Agreement, within 90 days of the Closing Date, the Trustee will review or shall cause the Custodian to review items of the Mortgage Files as set forth on Exhibit 1 and will deliver to the Mortgage Loan Seller, the Purchaser and the Trustee an interim certification substantially in the form of Exhibit Two to the Custodial Agreement. If the Trustee or Custodian, as its agent, finds any document listed on Exhibit 1 not to have been executed or received, or to be unrelated, determined on the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans identified in the Final Mortgage Loan Schedule or to appear defective on its face to review criteria specified in Section 2.01 of the Pooling and Servicing Agreement (a "Material Defect"), the Trustee in accordance with the Pooling and Servicing Agreement or the Custodian, as its agent, shall promptly notify the Mortgage Loan Seller of such Material Defect. The Mortgage Loan Seller shall correct or cure any such Material Defect within 90 days from the date of notice from the Trustee or the Custodian, as its agent, of the Material Defect and if the Mortgage Loan Seller or Underlying Seller, as applicable, fails to correct or cure such Material Defect within such period and such defect materially and adversely affects the interests of the Certificateholders in the related Mortgage Loan, the Mortgage Loan Seller or Underlying Seller, as applicable, will, in accordance with the terms of the Pooling and Servicing Agreement, within 90 days of the date of notice, provide the Trustee with a Substitute Mortgage Loan (if within two years of the Closing Date) or purchase the related Mortgage Loan at the applicable Purchase Price; provided that, if such defect would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such cure, repurchase or substitution must occur within 90 days from the date such breach was discovered; provided, however, that if such defect relates solely to the inability of the Mortgage Loan Seller or Underlying Seller, as applicable, to deliver the original Security Instrument or intervening assignments thereof, or a certified copy because the originals of such documents, or a certified copy, have not been returned by the applicable jurisdiction, the Mortgage Loan Seller or Underlying Seller, as applicable, shall not be required to purchase such Mortgage Loan if the Mortgage Loan Seller or Underlying Seller, as applicable, delivers such original documents or certified copy promptly upon receipt, but in no event later than 360 days after the Closing Date. The foregoing repurchase obligation shall not apply in the event that the Mortgage Loan Seller or Underlying Seller, as applicable, cannot deliver such original or copy of any document submitted for recording to the appropriate recording office in the applicable jurisdiction because such document has not been returned by such office; provided that the Mortgage Loan Seller or Underlying Seller, as applicable, shall instead deliver a recording receipt of such recording office or, if such receipt is not available, a certificate confirming that such documents have been accepted for recording, and delivery to the Trustee or the Custodian, as its agent, shall be effected by the Mortgage Loan Seller or Underlying Seller, as applicable, within thirty days of its receipt of the original recorded document.

(d) Pursuant to the Custodial Agreement, within 180 days of the Closing Date (or, with respect to any Substitute Mortgage Loan, within five Business Days after the receipt by the Indenture Trustee or Custodian thereof) the Trustee will review or cause the Custodian to review items of the Mortgage Files as set forth on Exhibit 1 and will deliver to the Mortgage Loan Seller, the Purchaser and the Trustee a final certification substantially in the form of Exhibit Three to the Custodial Agreement. If the Trustee or the Custodian, as its agent, finds a Material Defect, the Trustee or the Custodian, as its agent, shall promptly notify the Mortgage Loan Seller of such Material Defect. The Mortgage Loan Seller or Underlying Seller, as applicable, shall correct or cure any such Material Defect within 90 days from the date of notice from the Trustee or the Custodian, as its agent, of the Material Defect and if the Mortgage Loan Seller fails to correct or cure such Material Defect within such period and such defect materially and adversely affects the interests of the Certificateholders in the related Mortgage Loan, the Mortgage Loan Seller or Underlying Seller, as applicable, will, in accordance with the terms of the Pooling and Servicing Agreement, within 90 days of the date of notice, provide the Trustee with a Substitute Mortgage Loan (if within two years of the Closing Date) or purchase the related Mortgage Loan at the applicable Purchase Price; provided, however, that if such defect relates solely to the inability of the Mortgage Loan Seller or Underlying Seller, as applicable, to deliver the original Security Instrument or intervening assignments thereof, or a certified copy because the originals of such documents, or a certified copy, have not been returned by the applicable jurisdiction, the Mortgage Loan Seller or Underlying Seller, as applicable, shall not be required to purchase such Mortgage Loan if the Mortgage Loan Seller or Underlying Seller, as applicable, delivers such original documents or certified copy promptly upon receipt, but in no event later than 360 days after the Closing Date. The foregoing repurchase obligation shall not apply in the event that the Mortgage Loan Seller or Underlying Seller, as applicable, cannot deliver such original or copy of any document submitted for recording to the appropriate recording office in the applicable jurisdiction because such document has not been returned by such office; provided that the Mortgage Loan Seller or Underlying Seller, as applicable, shall instead deliver a recording receipt of such recording office or, if such receipt is not available, a certificate confirming that such documents have been accepted for recording, and delivery to the Trustee or the Custodian, as its agent, shall be effected by the Mortgage Loan Seller or Underlying Seller within thirty days of its receipt of the original recorded document.

(e) At the time of any substitution, the Mortgage Loan Seller or Underlying Seller, as applicable, shall deliver or cause to be delivered the Substitute Mortgage Loan, the related

Mortgage File and any other documents and payments required to be delivered in connection with a substitution pursuant to the Pooling and Servicing Agreement. At the time of any purchase or substitution, the Trustee in accordance with the terms of the Pooling and Servicing Agreement shall (i) assign to the Mortgage Loan Seller and cause the Custodian to release the documents (including, but not limited to, the Mortgage, Mortgage Note and other contents of the Mortgage File) in the possession of the Custodian relating to the Deleted Mortgage Loan and (ii) execute and deliver such instruments of transfer or assignment, in each case without recourse, as shall be necessary to vest in the Mortgage Loan Seller or Underlying Seller, as applicable, title to such Deleted Mortgage Loan.

SECTION 11. Recordation of Assignments of Mortgage.

(a) The Purchaser shall cause each assignment of the Security Instrument from the Mortgage Loan Seller to the Trustee to be recorded not later than 180 days after the Closing Date, unless (a) such recordation is not required by the Rating Agencies or an Opinion of Counsel have been provided to the Trustee (with a copy to the Custodian) which states that the recordation of such assignments is not necessary to protect the interests of the Certificateholders in the related Mortgage Loans or (b) MERS is identified on the Mortgage or on a properly recorded assignment of the Mortgage, as the Mortgagee of record solely as nominee for the Mortgage Loan Seller and its successors and assigns; provided, however, notwithstanding the delivery of any such Opinion of Counsel, each assignment of Mortgage shall be submitted for recording by the Purchaser in the manner described above, at no expense to the Sponsor or the Trustee, upon the earliest to occur of (i) reasonable direction by the Holders of Certificates aggregating at least 25% of the Certificate Principal Balance of the Certificates, (ii) the occurrence of a Master Servicer Event of Default or an Event of Default, (iii) the occurrence of a bankruptcy, insolvency or foreclosure relating to the Mortgage Loan Seller and, (iv) the occurrence of a servicing transfer as described in Section 9.05 of the Pooling and Servicing Agreement or an assignment of the servicing as described in Section 8.05(b) of the Pooling and Servicing Agreement or (iv) with respect to any one assignment of Mortgage, the occurrence of a bankruptcy, insolvency or foreclosure relating to the Mortgagor under the related Mortgage.

While each such Mortgage or assignment is being recorded, if necessary, the Mortgage Loan Seller shall leave or cause to be left with the Trustee a certified copy of such Mortgage or assignment. All customary recording fees and reasonable expenses relating to the recordation of the assignments of mortgage to the Trustee or the Opinion of Counsel, as the case may be, shall be borne by the Sponsor as set forth in Section 11.

(b) It is the express intent of the parties hereto that the conveyance of the Mortgage Loans by the Mortgage Loan Seller to the Purchaser, as contemplated by this Agreement be, and be treated as, a sale, except under United States generally accepted accounting principles. It is, further, not the intention of the parties that such conveyance be deemed a pledge of the Mortgage Loans by the Mortgage Loan Seller to the Purchaser to secure a debt or other obligation of the Mortgage Loan Seller. However, in the event that, notwithstanding the intent of the parties, the Mortgage Loans are held by a court to continue to be property of the Mortgage Loan Seller, then (i) this Agreement shall also be deemed to be a security agreement within the meaning of Articles 8 and 9 of the applicable Uniform Commercial Code; (ii) the transfer of the Mortgage Loans provided for herein shall be deemed to be a grant by the Mortgage Loan Seller to the Purchaser of a security interest in all of the Mortgage Loan Seller's right, title and interest in and to the Mortgage Loans and all amounts payable to the holders of the Mortgage Loans in accordance with the terms thereof and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, to the extent the Purchaser would otherwise be entitled to own such Mortgage Loans and proceeds pursuant to Section 4 hereof, including all amounts, other than investment earnings, from time to time held or invested in any accounts created pursuant to the Pooling and Servicing Agreement, whether in the form of cash, instruments, securities or other property; (iii) the possession by the Purchaser, the Issuer or the Trustee of Mortgage Certificates and such other items of property as constitute instruments, money, negotiable documents or chattel paper shall be deemed to be "possession by the secured party" for purposes of perfecting the security interest pursuant to Section 9-313 (or comparable provision) of the applicable Uniform Commercial Code; and (iv) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of the Purchaser for the purpose of perfecting such security interest under applicable law. Any assignment of the interest of the Purchaser pursuant to any provision hereof or pursuant to the Pooling and Servicing Agreement shall also be deemed to be an assignment of any security interest created hereby. The Mortgage Loan Seller hereby authorizes the Purchaser, to the extent consistent with this Agreement, to take such actions as may be reasonably necessary to ensure that, if this Agreement were deemed to create a security interest in the Mortgage Loans, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of the Pooling and Servicing Agreement.

SECTION 12. Representations and Warranties of Mortgage Loan Seller Concerning the Mortgage Loans.

(a) The Mortgage Loan Seller hereby represents and warrants to the Purchaser as of the Closing Date, or such other date as may be specified below with respect to each Mortgage Loan being sold by it, that:

(i) Each mortgage loan at the time it was made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, all applicable predatory and abusive lending laws;

(ii) No mortgage loan is a "High Cost Loan" or "Covered Loan," as applicable, (as such terms are defined in the then current Standard & Poor's LEVELS® Glossary, Appendix E, in effect as of the Closing Date) and no mortgage loan originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act; and; and

(iii) With respect to each representation and warranty with respect to any mortgage loan made by the servicers in the Underlying Sale Agreements that is made as of the related Closing Date (as defined in the applicable Underlying Sale Agreement), no event has occurred since the related Closing Date (as defined in the applicable Underlying Sale Agreement) that would render such representations and warranties to be untrue in any material respect as of the Closing Date.

(b) It is understood and agreed that the representations and warranties set forth in this Section 7 will inure to the benefit of the Purchaser, its successors and assigns, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or assignment of Mortgage or the examination of any Mortgage File. Upon any substitution for a Mortgage Loan, the representations and warranties set forth above shall be deemed to be made by the Mortgage Loan Seller as to any Substitute Mortgage Loan as of the date of substitution.

(c) Upon discovery by any of the parties hereto of a breach of a representation or warranty set forth in Section 7 of the Mortgage Loan Purchase Agreement or in any Underlying Sale Agreement that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt written notice thereof to the other parties. The Mortgage Loan Seller hereby covenants with respect to the representations and warranties set forth in Section 7 of the Mortgage Loan Purchase Agreement and each Underlying Seller hereby covenants with respect to the representations and warranties set forth in the related Underlying Sale Agreement, that within 90 days of the discovery of a breach of any representation or warranty set forth therein that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, it shall cure such breach in all material respects and, if such breach is not so cured, (i) if such 90-day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan from the Trust Fund and substitute in its place a Replacement Mortgage Loan, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trust Fund at the Purchase Price; provided that, any such substitution pursuant to (i) above or repurchase pursuant to (ii) above shall not be effected prior to the delivery to the Trustee, the Securities Administrator of an Opinion of Counsel if required by Section 2.05 of the Pooling and Servicing Agreement and any such substitution pursuant to (i) above shall not be effected prior to the additional delivery to the Securities Administrator and the Trustee of a Request for Release. With respect to the representations and warranties in Section 7 of the Mortgage Loan Purchase Agreement or the representations and warranties contained in each Underlying Sale Agreement that are made to the best of the Mortgage Loan Seller's or Underlying Seller's knowledge, as applicable, if it is discovered by any of the Depositor, the Master Servicer, the Sponsor, the Securities Administrator, the Trustee that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan, notwithstanding the Mortgage Loan Seller's or Underlying Seller's knowledge, as applicable, lack of knowledge with respect to the substance of such representation or warranty, the Mortgage Loan Seller or Underlying Seller, as applicable, shall nevertheless be required to cure, substitute for or repurchase the affected Mortgage Loan in accordance with the foregoing. Notwithstanding the foregoing, to the extent that any fact, condition or event with respect to a Mortgage Loan constitutes a breach of a representation or warranty of Paul Financial under the related Underlying Sale Agreement which materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall request that Paul Financial cure such breach or repurchase such Mortgage Loan and if Paul Financial fails to cure such breach or repurchase such Mortgage Loan within 60 days of such request from the Trustee, the Trustee shall then request that the Mortgage Loan Seller cure such breach or repurchase such Mortgage Loan, and if the Mortgage Loan Seller fails to cure such breach or repurchase such Mortgage Loan within 60 days of receipt of such request from the Trustee, the Trustee shall then request that the Sponsor cure such breach or repurchase such Mortgage Loan.

SECTION 13. Representations and Warranties Concerning the Mortgage Loan Seller. As of the date hereof and as of the Closing Date, the Mortgage Loan Seller represents and warrants to the Purchaser as to itself in the capacity indicated as follows:

Unassociated Document                                                                    Page 393 of 835

12-12020-mg     Doc 5106-9     Filed 09/18/13     Entered 09/18/13 18:18:12     Exhibit 7
Part 3     FST-CV-09-5011591     Doc 163     Exhibit D     Part 2 of 3     Pg 115 of 279

(a) the Mortgage Loan Seller (i) is a business trust duly organized, validly existing and in good standing under the laws of the State of Maryland and (ii) is qualified in and good standing to do business in each jurisdiction where such qualification is necessary, except where the failure so to qualify would not reasonably be expected to have a material adverse effect on the Mortgage Loan Seller's business as presently conducted or on the Mortgage Loan Seller's ability to enter into this Agreement and to consummate the transactions contemplated hereby;

(b) the Mortgage Loan Seller has full requisite power to own its property, to carry on its business as presently conducted and to enter into and perform its obligations under this Agreement;

(c) the execution and delivery by the Mortgage Loan Seller of this Agreement have been duly authorized by all necessary action on the part of the Mortgage Loan Seller; and neither the execution and delivery of this Agreement, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof, will conflict with or result in a breach of, or constitute a default under, any of the provisions of any law, governmental rule, regulation, judgment, decree or order binding on the Mortgage Loan Seller or its properties or the articles of formation or trust agreement of the Mortgage Loan Seller, except those conflicts, breaches or defaults which would not reasonably be expected to have a material adverse effect on the Mortgage Loan Seller's ability to enter into this Agreement and to consummate the transactions contemplated hereby;

(d) the execution, delivery and performance by the Mortgage Loan Seller of this Agreement and the consummation of the transactions contemplated hereby do not require the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any state, federal or other governmental authority or agency, except those consents, approvals, notices, registrations or other actions as have already been obtained, given or made and, in connection with the recordation of the Mortgages, powers of attorney or assignments of Mortgages not yet completed;

(e) this Agreement has been duly executed and delivered by the Mortgage Loan Seller and, assuming due authorization, execution and delivery by the Purchaser, constitutes a valid and binding obligation of the Mortgage Loan Seller enforceable against it in accordance with its terms (subject to applicable bankruptcy and insolvency laws and other similar laws affecting the enforcement of the rights of creditors generally);

(f) there are no actions, suits or proceedings pending or, to the knowledge of the Mortgage Loan Seller, threatened against the Mortgage Loan Seller, before or by any court, administrative agency, arbitrator or governmental body (i) with respect to any of the transactions contemplated by this Agreement or (ii) with respect to any other matter which in the judgment of the Mortgage Loan Seller will be determined adversely to the Mortgage Loan Seller and will if determined adversely to the Mortgage Loan Seller materially and adversely affect the Mortgage Loan Seller's ability to perform its obligations under this Agreement; and the Mortgage Loan Seller is not in default with respect to any order of any court, administrative agency, arbitrator or governmental body so as to materially and adversely affect the transactions contemplated by this Agreement; and

(g) the Mortgage Loan Seller's Information (as defined in Section 13(a) hereof) does not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

SECTION 14. Representations and Warranties Concerning the Purchaser. As of the date hereof and as of the Closing Date, the Purchaser represents and warrants to the Mortgage Loan Seller as follows:

(a) the Purchaser (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and (ii) is qualified in and good standing as a foreign corporation to do business in each jurisdiction where such qualification is necessary, except where the failure so to qualify would not reasonably be expected to have a material adverse effect on the Purchaser's business as presently conducted or on the Purchaser's ability to enter into this Agreement and to consummate the transactions contemplated hereby;

(b) the Purchaser has full corporate power to own its property, to carry on its business as presently conducted and to enter into and perform its obligations under this Agreement;

(c) the execution and delivery by the Purchaser of this Agreement have been duly authorized by all necessary corporate action on the part of the Purchaser; and neither the execution and delivery of this Agreement, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof, will conflict with or result in a breach of, or constitute a default under, any of the provisions of any law, governmental rule, regulation, judgment, decree or order binding on the Purchaser or its properties or the articles of incorporation or by-laws of the Purchaser, except those conflicts, breaches or defaults which would not reasonably be expected to have a material adverse effect on the Purchaser's ability to enter into this Agreement and to consummate the transactions contemplated hereby;

(d) the execution, delivery and performance by the Purchaser of this Agreement and the consummation of the transactions contemplated hereby do not require the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any state, federal or other governmental authority or agency, except those consents, approvals, notices, registrations or other actions as have already been obtained, given or made;

(e) this Agreement has been duly executed and delivered by the Purchaser and, assuming due authorization, execution and delivery by the Mortgage Loan Seller, constitutes a valid and binding obligation of the Purchaser enforceable against it in accordance with its terms (subject to applicable bankruptcy and insolvency laws and other similar laws affecting the enforcement of the rights of creditors generally);

(f) there are no actions, suits or proceedings pending or, to the knowledge of the Purchaser, threatened against the Purchaser, before or by any court, administrative agency, arbitrator or governmental body (i) with respect to any of the transactions contemplated by this Agreement or (ii) with respect to any other matter which in the judgment of the Purchaser will be determined adversely to the Purchaser and will if determined adversely to the Purchaser materially and adversely affect the Purchaser's ability to perform its obligations under this Agreement; and the Purchaser is not in default with respect to any order of any court, administrative agency, arbitrator or governmental body so as to materially and adversely affect the transactions contemplated by this Agreement; and

(g) the Purchaser's Information (as defined in Section 13(b) hereof) does not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

SECTION 15. Conditions to Closing.

(a) The obligations of the Purchaser under this Agreement will be subject to the satisfaction, on or prior to the Closing Date, of the following conditions:

(i) Each of the obligations of the Mortgage Loan Seller required to be performed at or prior to the Closing Date pursuant to the terms of this Agreement shall have been duly performed and complied with in all material respects; all of the representations and warranties of the Mortgage Loan Seller under this Agreement shall be true and correct as of the Closing Date specified in all material respects.

(ii) The Purchaser shall have received all of the following closing documents, in such forms as are agreed upon and reasonably acceptable to the Purchaser, duly executed by all signatories other than the Purchaser as required pursuant to the respective terms thereof:

(a) If required pursuant to Section 3 hereof, the Amendment dated as of the Closing Date and any documents referred to therein;

(b) If required pursuant to Section 3 hereof, the Final Mortgage Loan Schedule containing the information set forth on Exhibit 2 hereto, one copy to be attached to each counterpart of the Amendment;

Unassociated Document                                                                                    Page 394 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 116 of 279

(c) The Pooling and Servicing Agreement, in form and substance reasonably satisfactory to the Trustee and the Purchaser, and all documents required thereby duly executed by all signatories;

(d) A certificate of an officer of the Mortgage Loan Seller dated as of the Closing Date, in a form reasonably acceptable to the Purchaser, and attached thereto the resolutions of the Mortgage Loan Seller authorizing the transactions contemplated by this Agreement and the other Transaction Documents to which it is a party, together with copies of the articles of formation or trust agreement and certificate of good standing of the Mortgage Loan Seller;

(e) One or more opinions of counsel from the Mortgage Loan Seller's counsel otherwise in form and substance reasonably satisfactory to the Purchaser, the Trustee and each Rating Agency;

(f) A letter from each of the Rating Agencies giving each Class of Certificates set forth on Schedule A hereto the rating set forth therein; and

(g) Such other documents, certificates (including additional representations and warranties) and opinions as may be reasonably necessary to secure the intended ratings from each Rating Agency for the Certificates.

(iii) The Certificates to be sold to Bear Stearns and Wachovia pursuant to the Underwriting Agreement and the Purchase Agreement shall have been issued and sold to Bear Stearns and Wachovia.

(iv) The Mortgage Loan Seller shall have furnished to the Purchaser such other certificates of its officers or others and such other documents and opinions of counsel to evidence fulfillment of the conditions set forth in this Agreement and the transactions contemplated hereby as the Purchaser and its counsel may reasonably request.

(b) The obligations of the Mortgage Loan Seller under this Agreement shall be subject to the satisfaction, on or prior to the Closing Date, of the following conditions:

(i) The obligations of the Purchaser required to be performed by it on or prior to the Closing Date pursuant to the terms of this Agreement shall have been duly performed and complied with in all material respects, and all of the representations and warranties of the Purchaser under this Agreement shall be true and correct in all material respects as of the date hereof and as of the Closing Date, and no event shall have occurred which would constitute a breach by it of the terms of this Agreement, and the Mortgage Loan Seller shall have received a certificate to that effect signed by an authorized officer of the Purchaser.

(ii) The Mortgage Loan Seller shall have received copies of all of the following closing documents, in such forms as are agreed upon and reasonably acceptable to the Mortgage Loan Seller, duly executed by all signatories other than the Mortgage Loan Seller as required pursuant to the respective terms thereof:

(a) If required pursuant to Section 3 hereof, the Amendment dated as of the Closing Date and any documents referred to therein;

(b) The Pooling and Servicing Agreement, in form and substance reasonably satisfactory to the Sponsor, and all documents required thereby duly executed by all signatories;

(c) A certificate of an officer of the Purchaser dated as of the Closing Date, in a form reasonably acceptable to the Mortgage Loan Seller, and attached thereto the written consent of the member of the Purchaser authorizing the transactions contemplated by this Agreement and the other Transaction Documents to which it is a party, together with copies of the Purchaser's certificate of formation, limited liability company agreement, and evidence as to the good standing of the Purchaser dated as of a recent date;

(d) One or more opinions of counsel from the Purchaser's counsel in form and substance reasonably satisfactory to the Mortgage Loan Seller and the Rating Agencies; and

(e) Such other documents, certificates (including additional representations and warranties) and opinions as may be reasonably necessary to secure the intended rating from each Rating Agency for the Certificates.

SECTION 16. Fees and Expenses. Subject to Section 16 hereof, the Mortgage Loan Seller shall pay on the Closing Date or such later date as may be agreed to by the Purchaser (i) the fees and expenses of the Mortgage Loan Seller's attorneys and the fees and expenses of the Purchaser's attorneys (subject to the limitation on fees mutually agreed upon by such Purchaser's attorneys and the Mortgage Loan Seller), (ii) the fees and expenses of Deloitte & Touche LLP, (iii) the fee for the use of Purchaser's Registration Statement based on the aggregate original principal amount of the Certificates and the filing fee of the Commission as in effect on the date on which the Registration Statement was declared effective, (iv) the fees and expenses including counsel's fees and expenses in connection with any "blue sky" and legal investment matters, (v) the fees and expenses of each Rating Agency (both initial and ongoing) and (vi) the fees and expenses relating to the preparation and recordation of mortgage assignments (including intervening assignments, if any and if available, to evidence a complete chain of title from the originator to the Trustee) from the Mortgage Loan Seller to the Trustee or the expenses relating to the Opinion of Counsel (which shall be included in fees payable to the Purchaser's attorneys) referred to in Section 6(a) hereof, as the case may be.

SECTION 17. Accountants' Letters.

(a) Deloitte & Touche LLP will review the characteristics of a sample of the Mortgage Loans described in the Final Mortgage Loan Schedule will compare those characteristics to the description of the Mortgage Loans contained in the Prospectus Supplement under the captions "Summary of Prospectus Supplement—The Mortgage Loans" and "The Mortgage Pool" and in Schedule A thereto. The Mortgage Loan Seller will cooperate with the Purchaser in making available all information and taking all steps reasonably necessary to permit such accountants to complete the review and to deliver the letters required of them under the Underwriting Agreement. Deloitte & Touche LLP will also confirm certain calculations as set forth under the caption "Yield On The Certificates" in the Prospectus Supplement.

(b) To the extent statistical information with respect to the Master Servicer's or a Servicer's servicing portfolio is included in the Prospectus Supplement under the caption "[The Master Servicer and the Servicers,]" a letter from the certified public accountant for the Master Servicer and such Servicer or Servicer s will be delivered to the Purchaser dated the date of the Prospectus Supplement, in the form previously agreed to by the Mortgage Loan Seller and the Purchaser, with respect to such statistical information.

SECTION 18. Indemnification.

(a) The Sponsor shall indemnify and hold harmless the Purchaser and its directors, officers and controlling persons (as defined in Section 15 of the Securities Act) from and against any loss, claim, damage or liability or action in respect thereof, to which they or any of them may become subject, under the Securities Act or otherwise, insofar as such loss, claim, damage, liability or action arises out of, or is based upon (i) any untrue statement of a material fact contained in the Sponsor's Information as identified in Exhibit 3, the omission to state in the Sponsor's information a material fact about the Mortgage Loans required to be stated therein or necessary to make the statements therein in light of the circumstances in which they were made, not misleading, (ii) any representation or warranty made by the Sponsor in Section 9 hereof being, or alleged to be, untrue or incorrect, or (iii) any failure by the Sponsor to perform its obligations under this Agreement; and the Sponsor shall reimburse the Purchaser, and each other indemnified party for any legal and other expenses reasonably incurred by them in connection with investigating or defending or preparing to defend any such loss, claim, damage, liability or action. The foregoing indemnity agreement is in addition to any liability which the Sponsor otherwise may have to the Purchaser, or any other such indemnified party,

Unassociated Document                                      Page 395 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 117 of 279

The foregoing indemnity agreement is in addition to any liability which the Sponsor otherwise may have to the Purchaser or any other such indemnified party.

(b) The Purchaser shall indemnify and hold harmless the Sponsor and its respective directors, officers and controlling persons (as defined in Section 15 of the Securities Act) from and against any loss, claim, damage or liability or action in respect thereof, to which they or any of them may become subject, under the Securities Act or otherwise, insofar as such loss, claim, damage, liability or action arises out of, or is based upon (i) any untrue statement of a material fact contained in the <u>Purchaser's Information</u> as identified in <u>Exhibit 4</u>, the omission to state in the Prospectus Supplement or Prospectus (or any amendment thereof or supplement thereto approved by the Purchaser and in which additional Purchaser's Information is identified), in reliance upon and in conformity with the Purchaser's Information, a material fact required to be stated therein or necessary to make the statements therein in light of the circumstances in which they were made, not misleading, (ii) any representation or warranty made by the Purchaser in Section 9 hereof being, or alleged to be, untrue or incorrect, or (iii) any failure by the Purchaser to perform its obligations under this Agreement; and the Purchaser shall reimburse the Sponsor, and each other indemnified party for any legal and other expenses reasonably incurred by them in connection with investigating or defending or preparing to defend any such loss, claim, damage, liability or action. The foregoing indemnity agreement is in addition to any liability which the Purchaser otherwise may have to the Sponsor, or any other such indemnified party,

(c) Promptly after receipt by an indemnified party under subsection (a) or (b) above of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under such subsection, notify each party against whom indemnification is to be sought in writing of the commencement thereof (but the failure so to notify an indemnifying party shall not relieve it from any liability which it may have under this Section 13 except to the extent that it has been prejudiced in any material respect by such failure or from any liability which it may have otherwise). In case any such action is brought against any indemnified party, and it notifies an indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein and, to the extent it may elect by written notice delivered to the indemnified party promptly (but, in any event, within 30 days) after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel reasonably satisfactory to such indemnified party. Notwithstanding the foregoing, the indemnified party or parties shall have the right to employ its or their own counsel in any such case, but the fees and expenses of such counsel shall be at the expense of such indemnified party or parties unless (i) the employment of such counsel shall have been authorized in writing by one of the indemnifying parties in connection with the defense of such action, (ii) the indemnifying parties shall not have employed counsel to have charge of the defense of such action within a reasonable time after notice of commencement of the action, or (iii) such indemnified party or parties shall have reasonably concluded that there is a conflict of interest between itself or themselves and the indemnifying party in the conduct of the defense of any claim or that the interests of the indemnified party or parties are not substantially co-extensive with those of the indemnifying party (in which case the indemnifying parties shall not have the right to direct the defense of such action on behalf of the indemnified party or parties), in any of which events such fees and expenses shall be borne by the indemnifying parties (<u>provided</u>, <u>however</u>, that the indemnifying party shall be liable only for the fees and expenses of one counsel in addition to one local counsel in the jurisdiction involved. Anything in this subsection to the contrary notwithstanding, an indemnifying party shall not be liable for any settlement of any claim or action effected without its written consent; <u>provided</u>, <u>however</u>, that such consent was not unreasonably withheld.

(d) If the indemnification provided for in paragraphs (a) and (b) of this Section 13 shall for any reason be unavailable to an indemnified party in respect of any loss, claim, damage or liability, or any action in respect thereof, referred to in Section 13, then the indemnifying party shall in lieu of indemnifying the indemnified party contribute to the amount paid or payable by such indemnified party as a result of such loss, claim, damage or liability, or action in respect thereof, in such proportion as shall be appropriate to reflect the relative benefits received by the Sponsor on the one hand and the Purchaser on the other from the purchase and sale of the Mortgage Loans, the offering of the Certificates and the other transactions contemplated hereunder. No person found liable for a fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation.

(e) The parties hereto agree that reliance by an indemnified party on any publicly available information or any information or directions furnished by an indemnifying party shall not constitute negligence, bad faith or willful misconduct by such indemnified party.

SECTION 19. <u>Notices</u>. All demands, notices and communications hereunder shall be in writing but may be delivered by facsimile transmission subsequently confirmed in writing. Notices to the Mortgage Loan Seller shall be directed to Maia Mortgage Finance Statutory Trust, One Market Street, Spear Tower, 30th Floor, San Francisco, CA 94105, and notices to the Purchaser shall be directed to Structured Asset Mortgage Investments II Inc., 383 Madison Avenue, New York, New York 10179 (Telecopy: (212-272-7206)), Attention: Baron Silverstein; or to any other address as may hereafter be furnished by one party to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt) provided that it is received on a business day during normal business hours and, if received after normal business hours, then it shall be deemed to be received on the next business day.

SECTION 20. <u>Transfer of Mortgage Loans</u>. The Purchaser retains the right to assign the Mortgage Loans and any or all of its interest under this Agreement to the Issuer, with the understanding that the Issuer will then assign such rights to the Trustee pursuant to the Pooling and Servicing Agreement, without the consent of the Mortgage Loan Seller, and, upon such assignment, the Trustee, as the ultimate assignee, shall succeed to the applicable rights and obligations of the Purchaser hereunder; <u>provided</u>, <u>however</u>, the Purchaser shall remain entitled to the benefits set forth in Sections 11, 13 and 17 hereto and as provided in Section 2(a). Notwithstanding the foregoing, the sole and exclusive right and remedy of the Issuer or the Trustee with respect to a breach of representation or warranty of the Mortgage Loan Seller shall be the cure, purchase or substitution obligations of the Mortgage Loan Seller contained in Sections 5 and 7 hereof.

SECTION 21. <u>Termination</u>. This Agreement may be terminated (a) by the mutual consent of the parties hereto prior to the Closing Date, (b) by the Purchaser, if the conditions to the Purchaser's obligation to close set forth under Section 10(a) hereof are not fulfilled as and when required to be fulfilled or (c) by the Mortgage Loan Seller, if the conditions to the Mortgage Loan Seller's obligation to close set forth under Section 10(b) hereof are not fulfilled as and when required to be fulfilled. In the event of termination pursuant to clause (b), the Mortgage Loan Seller shall pay, and in the event of termination pursuant to clause (c), the Purchaser shall pay, all reasonable out-of-pocket expenses incurred by the other in connection with the transactions contemplated by this Agreement. In the event of a termination pursuant to clause (a), each party shall be responsible for its own expenses.

SECTION 22. <u>Representations, Warranties and Agreements to Survive Delivery</u>. All representations, warranties and agreements contained in this Agreement, or contained in certificates of officers of the Mortgage Loan Seller submitted pursuant hereto, shall remain operative and in full force and effect and shall survive delivery of the Mortgage Loans to the Purchaser (and by the Purchaser to the Trustee). Subsequent to the delivery of the Mortgage Loans to the Purchaser, the Mortgage Loan Seller's representations and warranties contained herein with respect to the Mortgage Loans shall be deemed to relate to the Mortgage Loans actually delivered to the Purchaser and included in the Final Mortgage Loan Schedule and any Replacement Mortgage Loan and not to those Mortgage Loans deleted from the Preliminary Mortgage Loan Schedule pursuant to Section 3 hereof prior to the Closing.

SECTION 23. <u>Severability</u>. If any provision of this Agreement shall be prohibited or invalid under applicable law, the Agreement shall be ineffective only to such extent, without invalidating the remainder of this Agreement.

SECTION 24. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be an original, but which together shall constitute one and the same agreement.

SECTION 25. <u>Amendment</u>. This Agreement cannot be amended or modified in any manner without the prior written consent of each party.

**SECTION 21. GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

<u>Further Assurances</u>. Each of the parties agrees to execute and deliver such instruments and take such actions as another party may, from time to time, reasonably request in order to effectuate the purpose and to carry out the terms of this Agreement including any amendments hereto which may be required by either Rating Agency.

SECTION 26. <u>Successors and Assigns</u>.

This Agreement shall bind and inure to the benefit of and be enforceable by the Mortgage Loan Seller, the Sponsor and the Purchaser and their permitted successors and assigns and, to the extent specified in Section 13 hereof, Bear Stearns, and their directors, officers and controlling persons (within the meaning of federal securities laws). The Mortgage Loan Seller and the Sponsor acknowledges and agrees that the Purchaser may assign its rights under this Agreement (including, without limitation, with respect to the Mortgage Loan Seller's representations and warranties

Unassociated Document                                                           Page 396 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 118 of 279

respecting the Mortgage Loans) to the Issuer and that the Issuer may further assign such rights to the Trustee. Any person into which the Mortgage Loan Seller or the Sponsor may be merged or consolidated (or any person resulting from any merger or consolidation involving the Mortgage Loan Seller), any person resulting from a change in form of the Mortgage Loan Seller or the Sponsor or any person succeeding to the business of the Mortgage Loan Seller or the Sponsor, shall be considered the "successor" of the Mortgage Loan Seller or the Sponsor, as applicable, hereunder and shall be considered a party hereto without the execution or filing of any paper or any further act or consent on the part of any party hereto. Except as provided in the two preceding sentences and in Section 15 hereto, this Agreement cannot be assigned, pledged or hypothecated by either party hereto without the written consent of the other parties to this Agreement and any such assignment or purported assignment shall be deemed null and void.

SECTION 27. The Mortgage Loan Seller and the Purchaser. The Mortgage Loan Seller, the Sponsor and the Purchaser will keep in full effect all rights as are necessary to perform their respective obligations under this Agreement.

SECTION 28. Entire Agreement. This Agreement contains the entire agreement and understanding between the parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.

SECTION 29. No Partnership. Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties hereto.

SECTION 30. Fiduciary Duty. Each party to this Agreement acknowledges that (A) the terms of this Agreement were negotiated at arms length between sophisticated parties represented by counsel, (B) no fiduciary, advisory or agency relationship between the Depositor and the Mortgage Loan Seller has been created as a result of any of the transactions contemplated by this Agreement, irrespective of whether the Mortgage Loan Seller has advised or is advising the Depositor on other matters; (C) the Mortgage Loan Seller's obligations to the Depositor are set forth in this Agreement in their entirety; and (D) it has obtained such legal, tax, accounting and other advice as it deems appropriate with respect to this Agreement and the transactions contemplated hereby and any other activities undertaken in connection therewith, and it is not relying on the Depositor with respect to any such matters.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused their names to be signed hereto by their respective duly authorized officers as of the date first above written.

MAIA MORTGAGE FINANCE STATUTORY TRUST

By: _____

Name:

Title:

LUMINENT MORTGAGE CAPITAL, INC.

By: _____

Name:

Title:

STRUCTURED ASSET MORTGAGE INVESTMENTS II INC.

By: _____

Name: Baron Silverstein

Title:   Vice President

**EXHIBIT 1**

**CONTENTS OF MORTGAGE FILE**

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items, which shall be available for inspection by the Purchaser or its designee, and which shall be delivered to the Purchaser or its designee pursuant to the terms of the Agreement.

(a) with respect to each Mortgage Loan:

(i) The original Mortgage Note, endorsed without recourse to the order of the Indenture Trustee and showing an unbroken chain of endorsements from the originator thereof to the Person endorsing it to the Indenture Trustee, or a lost note affidavit together with a copy of the related Mortgage Note;

(ii) The original Mortgage and, if the related Mortgage Loan is a MOM Loan, noting the presence of the MIN and language indicating that such Mortgage Loan is a MOM Loan, which shall have been recorded (or if the original is not available, a copy), with evidence of such recording indicated thereon (or if the original is not available, a copy), with evidence of such recording indicated thereon (or if the original Security Instrument, assignments to the Indenture Trustee or intervening assignments thereof which have been delivered, are being delivered or will, upon receipt of recording information relating to the Security Instrument required to be included thereon, be delivered to recording offices for recording and have not been returned to the Mortgage Loan Seller in time to permit their recording as specified in Section 2.01(a) of the Pooling and Servicing Agreement, shall be in recordable form);

(iii) unless the Mortgage Loan is a MOM Loan, a certified copy of the assignment (which may be in the form of a blanket assignment if permitted in the jurisdiction in which the Mortgaged Property is located) in blank or to "LaSalle Bank National Association, as Indenture Trustee", with evidence of recording with respect to each Mortgage Loan in the name of the Indenture Trustee thereon (or if (A) the original Security Instrument, assignments to the Indenture Trustee or intervening assignments thereof which have been delivered, are being delivered or will, upon receipt of recording information relating to the Security Instrument required to be included thereon, be delivered to recording offices for recording and have not been returned to the Mortgage Loan Seller in time to permit their delivery as specified in Section 2.01(a) of the Pooling and Servicing Agreement, the Mortgage Loan Seller may deliver a true copy thereof with a certification by the Mortgage Loan Seller, on the face of such copy, substantially as follows: "Certified to be a true and correct copy of the original, which has been transmitted for recording" or (B) the related Mortgaged Property is located in a state other than Maryland and an Opinion of Counsel has been provided as set forth in Section 2.01(a) of the Pooling and Servicing Agreement, shall be in recordable form);

(iv) all intervening assignments of the Security Instrument, if applicable and only to the extent available to the Mortgage Loan Seller with evidence of recording thereon;

(v) the original or a copy of the policy or certificate of primary mortgage guaranty insurance, to the extent available, if any;

(vi) the original or copy of the policy of title insurance or mortgagee's certificate of title insurance or commitment or binder for title insurance; and

(vii) originals of all modification agreements, if applicable and available.

Unassociated Document                                    Page 399 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 121 of 279

**EXHIBIT 2**

**MORTGAGE LOAN SCHEDULE INFORMATION**

The Preliminary and Final Mortgage Loan Schedules shall set forth the following information with respect to each Mortgage Loan:

(a)     the loan number;
(b)     [Reserved];
(c)     the city, state and zip code of the Mortgaged Property;
(d)     the property type;
(e)     the Mortgage Interest Rate;
(f)     the Servicing Fee Rate;
(g)     the Net Rate;
(h)     the original term to maturity;
(i)     the maturity date;
(j)     the stated remaining term to maturity;
(k)     the original principal balance;
(l)     the first Payment Date;
(m)     the principal and interest payment in effect as of the Cut-off Date;
(n)     the unpaid principal balance as of the Cut-off Date;
(o)     the Loan-to-Value Ratio at origination;
(p)     paid-through date;
(q)     the insurer of any Primary Mortgage Insurance Policy;
(r)     the Gross Margin, if applicable;
(s)     the Maximum Lifetime Mortgage Rate, if applicable;
(t)     the Minimum Lifetime Mortgage Rate, if applicable;
(u)     the Periodic Rate Cap, if applicable;
(v)     the number of days delinquent, if any;
(w)     which Mortgage Loans adjust after an initial fixed-rate period of five or seven years;
(x)     the Prepayment Charge Loans; and
(y)     the Servicer.

Such schedule also shall set forth for all of the Mortgage Loans, the total number of Mortgage Loans, the total of each of the amounts described under (k) and (n) above, the weighted average by principal balance as of the Cut-off Date of each of the rates described under (e), (f) and (g) above, and the weighted average remaining term to maturity by unpaid principal balance as of the Cut-off Date.

Unassociated Document                                                    Page 400 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 122 of 279

EXHIBIT 3

**SPONSOR'S INFORMATION**

    All information in the Prospectus Supplement described under the following captions: (1) "THE MORTGAGE POOL" and "SCHEDULE A—CERTAIN CHARACTERISTICS OF THE MORTGAGE LOANS," excluding any tabular information in the section "THE MORTGAGE POOL—INDICES OF THE MORTGAGE LOANS" (2) "THE SPONSOR A ND THE SELLER" and "STATIC POOL INFORMATION", but only to the extent set forth in the link entitled "Luminent Capital" on the website http://www.bearstearns.com/transactions/sami_ii/luminent 2006-3.

**EXHIBIT 4**

**PURCHASER'S INFORMATION**

All information in the Prospectus Supplement and the Prospectus, except the Mortgage Loan Seller's Information.

**EXHIBIT 5**

**<u>SCHEDULE OF LOST NOTES</u>**

Available Upon Request

---

EXHIBIT 6

<span style="color:blue">REVISED August 1, 2005</span>

APPENDIX E - STANDARD & POOR'S PREDATORY LENDING CATEGORIES

Standard & Poor's has categorized loans governed by anti-predatory lending laws in the Jurisdictions listed below into three categories based upon a combination of factors that include (a) the risk exposure associated with the assignee liability and (b) the tests and thresholds set forth in those laws. Note that certain loans classified by the relevant statute as Covered are included in Standard & Poor's High Cost Loan Category because they included thresholds and tests that are typical of what is generally considered High Cost by the industry.

## STANDARD & POOR'S HIGH COST LOAN CATEGORIZATION

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| Arkansas | Arkansas Home Loan Protection Act, Ark. Code Ann. §§ 23-53-101 et seq. <br><br> Effective July 16, 2003 | High Cost Home Loan |
| Cleveland Heights, OH | Ordinance No. 72-2003 (PSH), Mun. Code § 757.01 et seq. <br><br> Effective June 2, 2003 | Covered Loan |
| Colorado | Consumer Equity Protection, Colo. Stat. Ann. §§ 5-3.5-101 et seq. <br><br> Effective for covered loans offered or entered into on or after January 1, 2003. Other provisions of the Act took effect on June 7, 2002 | Covered Loan |
| Connecticut | Connecticut Abusive Home Loan Lending Practices Act, Conn. Gen. Stat. §§ 36a-746 et seq. <br><br> Effective October 1, 2001 | High Cost Home Loan |
| District of Columbia | Home Loan Protection Act, D.C. Code §§ 26-1151.01 et seq. <br><br> Effective for loans closed on or after January 28, 2003 | Covered Loan |
| Florida | Fair Lending Act, Fla. Stat. Ann. §§ 494.0078 et seq. <br><br> Effective October 2, 2002 | High Cost Home Loan |
| Georgia (Oct. 1, 2002 - Mar. 6, 2003) | Georgia Fair Lending Act, Ga. Code Ann. §§ 7-6A-1 et seq. | High Cost Home Loan |

## STANDARD & POOR'S HIGH COST LOAN CATEGORIZATION

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
|  | Effective October 1, 2002 - March 6, 2003 |  |
| Georgia as amended (Mar. 7, 2003 - current) | Georgia Fair Lending Act, Ga. Code Ann. §§ 7-6A-1 et seq. <br> Effective for loans closed on or after March 7, 2003 | High Cost Home Loan |
| HOEPA Section 32 | Home Ownership and Equity Protection Act of 1994, 15 U.S.C. § 1639, 12 C.F.R. §§ 226.32 and 226.34 <br> Effective October 1, 1995, amendments October 1, 2002 | High Cost Loan |
| Illinois | High Risk Home Loan Act, Ill. Comp. Stat. tit. 815, §§ 137/5 et seq. <br><br> Effective January 1, 2004 (prior to this date, regulations under Residential Mortgage License Act effective from May 14, 2001) | High Risk Home Loan |
| Kansas | Consumer Credit Code, Kan. Stat. Ann. §§ 16a-1-101 et seq. <br><br> Sections 16a-1-301 and 16a-3-207 became effective April 14, 1999; Section 16a-3-308a became effective July 1, 1999 | High Loan to Value Consumer Loan (id. § 16a-3-207) and; <br><br> High APR Consumer Loan (id. § 16a-3-308a) |
| Kentucky | 2003 KY H.B. 287 - High Cost Home Loan Act, Ky. Rev. Stat. §§ 360.100 et seq. <br><br> Effective June 24, 2003 | High Cost Home Loan |
| Maine | Truth in Lending, Me. Rev. Stat. tit. 9-A, §§ 8-101 et seq. <br><br> Effective September 29, 1995 and as amended from time to time | High Rate High Fee Mortgage |
| Massachusetts | Part 40 and Part 32, 209 C.M.R. §§ 32.00 et seq. and 209 C.M.R. §§ 40.01 et seq. | High Cost Home Loan |

**STANDARD & POOR'S HIGH COST LOAN CATEGORIZATION**

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| | Effective March 22, 2001 and amended from time to time | |
| Nevada | Assembly Bill No. 284, Nev. Rev. Stat. §§ 598D.010 et seq. <br><br> Effective October 1, 2003 | Home Loan |
| New Jersey | New Jersey Home Ownership Security Act of 2002, N.J. Rev. Stat. §§ 46:10B-22 et seq. <br><br> Effective for loans closed on or after November 27, 2003 | High Cost Home Loan |
| New Mexico | Home Loan Protection Act, N.M. Rev. Stat. §§ 58-21A-1 et seq. <br><br> Effective as of January 1, 2004; Revised as of February 26, 2004 | High Cost Home Loan |
| New York | N.Y. Banking Law Article 6-1 <br><br> Effective for applications made on or after April 1, 2003 | High Cost Home Loan |
| North Carolina | Restrictions and Limitations on High Cost Home Loans, N.C. Gen. Stat. §§ 24-1.1E et seq. <br><br> Effective July 1, 2000; amended October 1, 2003 (adding open-end lines of credit) | High Cost Home Loan |
| Ohio | H.B. 386 (codified in various sections of the Ohio Code), Ohio Rev. Code Ann. §§ 1349.25 et seq. <br><br> Effective May 24, 2002 | Covered Loan |
| Oklahoma | Consumer Credit Code (codified in various sections of Title 14A) <br><br> Effective July 1, 2000; amended effective January 1, 2004 | Subsection 10 Mortgage |
| South Carolina | South Carolina High Cost and Consumer Home Loans Act, S.C. Code | High Cost Home Loan |

Unassociated Document                                    Page 405 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 127 of 279

**STANDARD & POOR'S HIGH COST LOAN CATEGORIZATION**

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| | Ann. §§ 37-23-10 et seq. Effective for loans taken on or after January 1, 2004 | |
| West Virginia | West Virginia Residential Mortgage Lender, Broker and Servicer Act, W. Va. Code Ann. §§ 31-17-1 et seq. Effective June 5, 2002 | West Virginia Mortgage Loan Act Loan |

**STANDARD & POOR'S COVERED LOAN CATEGORIZATION**

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| Georgia (Oct. 1, 2002 - Mar. 6, 2003) | Georgia Fair Lending Act, Ga. Code Ann. §§ 7-6A-1 et seq. Effective October 1, 2002 - March 6, 2003 | Covered Loan |
| New Jersey | New Jersey Home Ownership Security Act of 2002, N.J. Rev. Stat. §§ 46:10B-22 et seq. Effective November 27, 2003 - July 5, 2004 | Covered Home Loan |

**STANDARD & POOR'S HOME LOAN CATEGORIZATION**

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| Georgia (Oct. 1, 2002 - Mar. 6, 2003) | Georgia Fair Lending Act, Ga. Code Ann. §§ 7-6A-1 et seq. Effective October 1, 2002 - March 6, 2003 | Home Loan |
| New Jersey | New Jersey Home Ownership Security | Home Loan |

**STANDARD & POOR'S HOME LOAN CATEGORIZATION**

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| | Act of 2002, N.J. Rev. Stat. §§ 46:10B-22 et seq. Effective for loans closed on or after November 27, 2003 | |
| New Mexico | Home Loan Protection Act, N.M. Rev. Stat. §§ 58-21A-1 et seq. Effective as of January 1, 2004; Revised as of February 26, 2004 | Home Loan |
| North Carolina | Restrictions and Limitations on High Cost Home Loans, N.C. Gen. Stat. §§ 24-1.1E et seq. Effective July 1, 2000; amended October 1, 2003 (adding open-end lines of credit) | Consumer Home Loan |
| South Carolina | South Carolina High Cost and Consumer Home Loans Act, S.C. Code Ann. §§ 37-23-10 et seq. Effective for loans taken on or after January 1, 2004 | Consumer Home Loan |

**SCHEDULE A**

**REQUIRED RATINGS FOR EACH CLASS OF NOTES**

Public Notes

| Class | S&P | Fitch | Moody's |
|---|---|---|---|
| Class I-1A-1 | AAA | NR | Aaa |
| Class I-1A-2 | AAA | NR | Aaa |
| Class I-1A-3 | AAA | NR | Aaa |
| Class I-2A-1 | AAA | NR | Aaa |
| Class I-2A-2 | AAA | NR | Aaa |
| Class I-2A-3 | AAA | NR | Aaa |
| Class I-2X | AAA | NR | Aaa |
| Class I-M-1 | AA+ | NR | Aa1 |
| Class I-M-2 | AA | NR | Aa2 |
| Class I-M-3 | AA- | NR | Aa3 |
| Class I-B-1 | A+ | NR | A2 |
| Class I-B-2 | A | NR | Baa1 |
| Class I-B-3 | BBB | NR | Baa2 |
| Class I-B-4 | BBB- | NR | Baa3 |
| Class II-1A-1 | NR | AAA | Aaa |
| Class II-1A-2 | NR | AAA | Aaa |
| Class II-1X-1 | NR | AAA | Aaa |
| Class II-2A-1 | NR | AAA | Aaa |
| Class II-2A-2 | NR | AAA | Aaa |
| Class II-2X-1 | NR | AAA | Aaa |
| Class II-3A-1 | NR | AAA | Aaa |
| Class II-3A-2 | NR | AAA | Aaa |
| Class II-3X-1 | NR | AAA | Aaa |
| Class II-B-1 | NR | AA | NR |
| Class II-B-2 | NR | A | NR |
| Class II-B-3 | NR | BBB | NR |

None of the above ratings has been lowered since the respective dates of such letters.

Private Notes

| Class | S&P | Fitch | Moody's |
|---|---|---|---|
| Class R | AAA | AAA | Aaa |
| Class I-B-IO | -- | -- | -- |
| Class II-B-4 | -- | BB | -- |
| Class II-B-5 | -- | B | -- |
| Class II-B-6 | -- | -- | -- |
| Class P | -- | -- | -- |

None of the above ratings has been lowered since the respective dates of such letters.

Unassociated Document                                                                 Page 409 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 131 of 279

**SCHEDULE B**

**MORTGAGE LOAN SCHEDULE**

[Provided upon request]

---

EXHIBIT L

FORM OF BACK-UP CERTIFICATION TO FORM 10-K CERTIFICATE

**I.** The [ ] agreement dated as of [ ↓ 200[ ] (the "Agreement"), among [IDENTIFY PARTIES]
I, _____, the _____ of [NAME OF COMPANY], certify to [the Depositor] and the [Master Servicer] [Securities Administrator] [Trustee], and their officers, with the knowledge and intent that they will rely upon this certification, that:

(1) I have reviewed the servicer compliance statement of the Company provided in accordance with Item 1123 of Regulation AB (the "Compliance Statement"), the report on assessment of the Company's compliance with the servicing criteria set forth in Item 1122(d) of Regulation AB (the "Servicing Criteria", provided in accordance with Rules 13a-18 and 15d-18 under Securities Exchange Act of 1934, as amended (the "Exchange Act") and Item 1122 of Regulation AB (the "Servicing Assessment"), the registered public accounting firm's attestation report provided in accordance with Rules 13a-18 and 15d-18 under the Exchange Act and Section 1122(b) of Regulation AB (the "Attestation Report"), and all servicing reports, officer's certificates and other information relating to the servicing of the Mortgage Loans by the Company during 200[ ] that were delivered by the Company to the Depositor and the Securities Administrator pursuant to the Agreement (collectively, the "Company Servicing Information");

(2) Based on my knowledge, the Company Servicing Information, taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period of time covered by the Company Servicing Information;

(3) Based on my knowledge, all of the Company Servicing Information required to be provided by the Company under the Agreement has been provided to the Depositor and the Securities Administrator;

(4) I am responsible for reviewing the activities performed by the Company as servicer under the Agreement, and based on my knowledge and the compliance review conducted in preparing the Compliance Statement and except as disclosed in the Compliance Statement, the Servicing Assessment or the Attestation Report, the Company has fulfilled its obligations under the Agreement in all material respects; and

(5) The Compliance Statement required to be delivered by the Company pursuant to the Agreement, and the Servicing Assessment and Attestation Report required to be provided by the Company and by any subservicer or subcontractor pursuant to the Agreement, have been provided to the the Depositor and the Securities Administrator. Any material instances of noncompliance described in such reports have been disclosed to the the Depositor and the Securities Administrator. Any material instance of noncompliance with the Servicing Criteria has been disclosed in such reports.

Date: _____

By: _____
Name: _____
Title: _____

EXHIBIT M

**(Multicurrency-Cross Border)**

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of April 28, 2006

**WACHOVIA BANK, N.A.**                    and          HSBC BANK USA, NATIONAL ASSOCIATION, not in its individual capacity but solely
as Trustee for Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates,
Series 2006-3

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1. **Interpretation**

(a) *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b) *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c) *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2. **Obligations**

(a) *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

|                                      | HSBC BANK USA, NATIONAL ASSOCIATION, not in its individual capacity but solely as Trustee for Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3 |
| WACHOVIA BANK, N.A. | |
| *(Name of Party)* | *(Name of Party)* |
| By:_____ | By:_____ |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

(Multicurrency - Cross Border)

# ISDA®

International Swaps and Derivatives Association, Inc.

**SCHEDULE**
**to the**
**Master Agreement**

dated as of April 28, 2006

between

|  |  |  |
|---|---|---|
| **WACHOVIA BANK, N.A.** | and | **HSBC BANK USA, NATIONAL ASSOCIATION,** **not in its individual capacity but solely as Trustee** **for Luminent Mortgage Trust 2006-3, Mortgage** **Pass-Through Certificates, Series 2006-3** |
| ("Party A") |  | ("Party B") |

Part 1. **Termination Provisions.**

(a) The parties agree that subparagraph (ii) of Section 2(c) of the ISDA Form Master Agreement will apply to any Transaction.

(b) *Termination Provisions.* For purposes of the ISDA Form Master Agreement:

(i) "Specified Entity" is not applicable to Party A or Party B for any purpose.

(ii) "Specified Transaction" is not applicable to Party A or Party B for any purpose, and accordingly, Section 5(a)(v) shall not apply to Party A or Party B.

(iii) The "Cross Default" provisions of Section 5(a)(vi) shall not apply to Party A or Party B.

(iv) The "Bankruptcy" provisions of Section 5(a)(vii)(2) shall not apply to Party B.

(v) The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will not apply to Party A or Party B.

(vi) The "Automatic Early Termination" provisions of Section 6(a) will not apply to Party A or Party B.

(vii) Payments on Early Termination. For the purposes of Section 6(e) of this ISDA Form Master Agreement:
(1) Market Quotation will apply.
(2) Second Method will apply.

(viii) "Termination Currency" means United States Dollars.

Part 2. **Tax Representations.**

(a) **Payer Representations.** For the purpose of Section 3(e) of this Agreement, Party A will make the following representation and Party B will make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b) **Payee Representations.** For the purpose of Section 3(f) of this Agreement, Party A and Party B make the representations specified below, if any:

(i) Party A represents that it is a national banking association organized or formed under the laws of the United States and is a United States resident for United States federal income tax purposes.

(ii) Party B represents that it is the Trustee for the Trust created pursuant to the Pooling and Servicing Agreement

Part 3. **Documents to be Delivered.**

For the purposes of Section 4(a):

(a) Tax forms to be delivered. Each party agrees to complete, execute and deliver to the other party a correct, complete and duly executed U.S. Internal Revenue Service Form W-9 (or successor

Unassociated Document                                    Page 413 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 135 of 279

thereto) (A) before the first Payment Date with respect to this Confirmation, (B) promptly upon reasonable demand by the other party and (C) promptly upon learning that any such form previously provided by the party has become obsolete or incorrect.

(b) Other documents to be delivered are:

| Party required to Deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Any documents required by the receiving party to evidence the authority of the delivering party or its Credit Support Provider, if any, for it to execute and deliver this Agreement, any Confirmation, and any Credit Support Documents to which it is a party, and to evidence the authority of the delivering party or its Credit Support Provider to perform its obligations under this Agreement, such Confirmation and/or Credit Support Document, as the case may be | Upon the execution and delivery of this Agreement and such Confirmation | Yes |
| Party A and Party B | A certificate of an authorized officer of the party, as to the incumbency and authority of the respective officers of the party signing this Agreement, any relevant Credit Support Document, or any Confirmation, as the case may be | Upon the execution and delivery of this Agreement and such Confirmation | Yes |
| Party A | An opinion of counsel | Concurrent with the execution of this Agreement | Yes |
| Party A | Annual Report of Wachovia Corporation containing financial statements certified by independent certified public accountants and prepared in accordance with generally accepted accounting principles in the country in which such party is organized | To be made available on http://wachovia.com/inside/page/0,,133_202_270,00.html as soon as available and in any event within 90 days after the end of each fiscal year of Party A | Yes |
| Party A | Quarterly Financial Statements of Wachovia Corporation containing unaudited, consolidated financial statements of such party's fiscal quarter prepared in accordance with generally accepted accounting principles in the country in which such party is organized | To be made available on http://wachovia.com/inside/page/0,,133_202_270,00.html as soon as available and in any event within 30 days after the end of each fiscal quarter of Party A | Yes |

Part 4. **Miscellaneous.**

(a) Address for Notices. For the purposes of Section 12(a) of this ISDA Form Master Agreement:

Address for notices or communication to Party A:

Address:        301 South College Street
                Charlotte, NC 28288

                Wachovia Contacts
                Settlement and/or Rate Resets:
                Tel: (800) 249-3865
                Fax: (704) 383-8429

                Documentation:
                Tel: (704) 383-4599

Fax: (704) 383-9139

Collateral:

Tel: (704) 383-9529

Address for notices or communication to Party B:

| | |
|---|---|
| Address: | 452 Fifth Avenue, 14th Floor |
| | New York, NY 10018 |
| Attention: | Luminent Mortgage Trust 2006-3 |

with a copy to the Securities Administrator:

| | |
|---|---|
| Address: | P. O. Box 98, |
| | Columbia, Maryland 21046 |
| | (or, for overnight deliveries, |
| | 9062 Old Annapolis Road, |
| | Columbia, Maryland 21045) |
| Attention: | BSABS I 2006-3 |

(b)   Process Agent. For the purposes of Section 13(c) of the ISDA Form Master Agreement:

Party A appoints as its Process Agent:  Not Applicable.

Party B appoints as its Process Agent:  Not Applicable.

(c)   Offices. The provisions of Section 10(a) will not apply to this Agreement.

(d)   Multibranch Party. For purposes of Section 10(c) of the ISDA Form Master Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)   Calculation Agent. The Calculation Agent is Party A.

(f)   Credit Support Document.

Party A: None or, in that event that Party A posts collateral under a Credit Support Annex pursuant to Part 4(o) below, such Credit Support Annex
Party B: Not applicable.

(g)   Credit Support Provider.

Party A: Not applicable, unless Party A provides a guarantee or other contingent agreement pursuant to Part 4(o) below

Party B: Not Applicable.

(h)   Governing Law. The parties to this Agreement hereby agree that the law of the State of New York, without reference to or giving effect to its rules and principles governing conflicts of laws other than New York General Obligations Law Section 5-1401 and 5-1402, shall govern their rights and duties in whole.

(i)   Severability. If any term, provision, covenant or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants, and conditions hereof shall continue in full force and effect as if this Agreement has been executed with the invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties. The parties shall endeavor to engage in good faith negotiations to replace any invalid or unenforceable term, provision, covenant or condition with a valid or enforceable term, provision, covenant or condition, the economic effect of which comes as close as possible to that of the invalid or unenforceable term, provision, covenant or condition.

(j)   Consent to Recording. Each party hereto consents to the monitoring or recording, at anytime and from time to time, by the other party of any and all communications between officers or employees of the parties, waives any further notice of such monitoring or recording, and agrees to notify its officers and employees of such monitoring or recording.

(k)   Waiver of Jury Trial. Each party waives any right it may have to a trial by jury in respect of any Proceedings relating to this Agreement or any Credit Support Document.

(l)   Non-Petition. Party A hereby irrevocably and unconditionally agrees that it will not institute against, or join any other person in instituting against, Party B, any bankruptcy, reorganization, arrangement, insolvency, or similar proceeding under the laws of the United States, the Cayman Islands or any other jurisdiction for the non-payment of any amount due hereunder or any other reason until the payment of the Certificates (as defined in the Pooling and Servicing Agreement) and the expiration of a period of one year plus ten days (or if longer, the applicable preference period) following such payment.

(m)   Additional Provisions. Notwithstanding the terms of Section 5 and 6 of the ISDA Form Master Agreement, the provisions of Sections 5(a)(ii), 5(a)(iii) (except as provided in the following sentence), 5(a)(iv) and 5(a)(v) shall not apply to Party A or Party B. Section 5(a)(iii)(1) will apply to Party A in the event that Party A posts collateral or provides a guarantee or other contingent agreement pursuant to Part 4(o) below.

(n)   No Set-off. Notwithstanding any provision of this Agreement or any other existing or future agreement, each party irrevocably waives any and all rights it may have to set off, net, recoup or otherwise withhold or suspend or condition payment or performance of any obligation between it and the other party hereunder against any obligation between it and the other party under any other agreements. The provisions for Set-off set forth in Section 6(e) of the Agreement shall not apply for purposes of this Transaction.

(o) Rating Agency Downgrade. In the event that (i) Party A's short-term debt rating is withdrawn or reduced below "A- 1" by S&P or, if Party A does not have a short-term debt rating by S&P, Party A's issuer or long-term senior unsecured debt rating is withdrawn or reduced below "A+" by S&P, or (ii) Party A's long-term unsecured and unsubordinated debt rating is withdrawn or reduced below "A1" and not on "Watch For Downgrade" (and the short-term unsecured and unsubordinated debt of Party A is rated "P-1" and not on "Watch For Downgrade") or "Aa3" and not on "Watch For Downgrade", (if only the long-term debt obligations are rated) by Moody's or (iii) Party A's long-term unsecured and unsubordinated debt rating is withdrawn or reduced below "A" by Fitch or Party A's short-term unsecured and unsubordinated debt rating is withdrawn or reduced below "F1" by Fitch (and together with S&P and Moody's, the "Swap Rating Agencies", and such rating " thresholds, "Approved Rating Thresholds"), then within 30 days after such rating withdrawal or downgrade (a "Collateral Event") (unless, within 30 days after such withdrawal or downgrade, each such Swap Rating Agency has reconfirmed the rating of the relevant Certificates, which was in effect immediately prior to such withdrawal or downgrade), Party A shall, at its own expense, either (i) cause another entity to replace Party A as party to this Agreement that meets or exceeds the Approved Rating Thresholds on terms substantially similar to this Agreement, (ii) obtain a guaranty of, or a contingent agreement of another person with the Approved Rating Thresholds, to honor Party A's obligations under this Agreement, (iii) post collateral under a Credit Support Annex or (iv) establish any other arrangement satisfactory to the applicable Swap Rating Agency. In the event that Party A's long-term debt rating is withdrawn or reduced below "BBB-" by S&P, then within 10 business days after such rating withdrawal or downgrade Party A shall, at its own expense either (i) cause another entity to replace Party A as party to this Agreement that meets or exceeds the Approved Rating Thresholds on terms substantially similar to this Agreement or(ii) obtain a guaranty of, or a contingent agreement of another person with the Approved Rating Thresholds, to honor Party A's obligations under this Agreement.

(p) "Affiliate" will have the meaning specified in Section 14 of the ISDA Form Master Agreement, provided that Party A and Party B shall be deemed not to have any Affiliates for purposes of this Agreement, including for purposes of Section 6(b)(ii).

(q) Section 3 of the ISDA Form Master Agreement is hereby amended by adding at the end thereof the following subsection (g):

"(g) Relationship Between Parties.

Each party represents to the other party on each date when it enters into a Transaction that:-

(1) Nonreliance. It is not relying on any statement or representation of the other party regarding the Transaction (whether written or oral), other than the representations expressly made in this Agreement or the Confirmation in respect of that Transaction.

(2)    Evaluation and Understanding.

(i)    It has the capacity to evaluate (internally or through independent professional advice) the Transaction and has made its own decision to enter into the Transaction; and

(ii)    It understands the terms, conditions and risks of the Transaction and is willing and able to accept those terms and condition and to assume those risks, financial and otherwise.

(3) Purpose. It is engaging into the Transaction for the purposes of managing its borrowings or investments, hedging its underlying assets or liabilities or in connection with a line of business.

(4) Eligible Contract Participant. Each party constitutes an "eligible contract participant" as such term is defined in Section 1(a)12 of the Commodity Exchange Act, as amended.

(5)    Principal. In the case of Party A, it is entering into the Transaction as principal, and not as agent or in any other capacity, fiduciary or otherwise.

(6)    The material terms of each Transaction are subject to individual negotiation."

(r) Regulation AB Provisions.

(i) Party A represents and acknowledges that Structured Asset Mortgage Investments II Inc. (the "Depositor") may be required under Regulation AB, as defined in the Pooling and Servicing Agreement, to disclose certain financial information regarding Party A or its group of affiliated entities, if applicable, depending on the aggregate "significance percentage" of the Cap Contracts (as defined in the Pooling and Servicing Agreement), as calculated from time to time in accordance with Item 1115 of Regulation AB.

(ii) It shall be a swap disclosure event ("Swap Disclosure Event") if, on any Business Day after the date hereof for so long as the Issuing Entity is required to file periodic reports under the Exchange Act with respect to the Certificates, Party B or the Depositor requests from Party A the applicable financial information described in Item 1115(b) of Regulation AB (such request to be based on a reasonable determination by the Depositor, based on "significance estimates" made in substantially the same manner as that used in the Sponsor's internal risk management process in respect of similar instruments and furnished by the Sponsor to the Depositor, or if the Sponsor does not furnish such significance estimates to the Depositor, based on a determination of such significance estimates by the Depositor in a manner that it deems reasonable) (the "Swap Financial Disclosure").

(iii) Upon the occurrence of a Swap Disclosure Event, Party A, at its own expense, shall either (1)(a) either (i) provide to the Depositor the current Swap Financial Disclosure in an EDGAR-compatible format (for example, such information may be provided in Microsoft Word® or Microsoft Excel® format but not in .pdf format) or (ii) provide written consent to the Depositor to incorporation by reference of such current Swap Financial Disclosure that are filed with the Securities and Exchange Commission in the Exchange Act Reports of the Depositor, (b) if applicable, cause its outside accounting firm to provide its consent to filing or incorporation by reference in the Exchange Act Reports of the Depositor of such accounting firm's report relating to their audits of such current Swap Financial Disclosure, and (c) provide to the Depositor any updated Swap Financial Disclosure with respect to Party A or any entity that consolidates Party A within five days of the release of any such updated Swap Financial Disclosure; (2) secure another entity to replace Party A as party to this Agreement on terms substantially similar to this Agreement, which entity (or a guarantor therefor) meets or exceeds the Approved Rating Thresholds and which entity complies with the requirements of Item 1115 of Regulation AB and clause (1) above, (3) obtain a guaranty of Party A's obligations under this Agreement from an affiliate of Party A that complies with the financial information disclosure requirements of Item 1115 of Regulation AB, and cause such affiliate to provide Swap Financial Disclosure and any future Swap Financial Disclosure and other information pursuant to clause (1), such that disclosure provided in respect of such affiliate will satisfy any disclosure requirements applicable to the Swap Provider, or (4) transfer Eligible Collateral to Party B's Custodian in an amount (taking into account any amount posted pursuant to paragraph (o) of this Agreement, if any) which is sufficient, as reasonably determined in good faith by the Depositor, to reduce the aggregate significance percentage below 10% (or, so long as Party A is able to provide the Swap Financial Disclosure required pursuant to Item 1115(b)(1) of Regulation AB, below 20%, in the event Party A is requested to provide the Swap Financial Disclosure required pursuant to Item 1115(b)(2) of Regulation AB).

(iv) Third Party Beneficiary. Depositor shall be an express third party beneficiary of this Agreement as if a party hereto to the extent of Depositor's rights explicitly specified herein.

(s) Fully-Paid Transactions. Notwithstanding the terms of Sections 5 and 6 of the ISDA Form Master Agreement, if Party B has satisfied its payment obligations under Section 2(a)(i) of the ISDA Form Master Agreement, then unless Party A is required pursuant to appropriate proceedings to return to Party B or otherwise returns to Party B upon demand of Party B any portion of such payment, (a) the occurrence of an event described in Section 5(a) of the ISDA Form Master Agreement with respect to Party B shall not constitute an Event of Default or Potential Event of Default with respect to Party B as the Defaulting Party and (b) Party A shall be entitled to designate an Early Termination Date pursuant to Section 6 of the ISDA Form Master Agreement only as a result of a Termination Event set forth in either Section 5(b)(i) or Section 5(b)(ii) of the ISDA Form Master Agreement with respect to Party A as the Affected Party or Section 5(b)(iii) of the ISDA Form Master Agreement with respect to Party A as the Burdened Party. For purposes of the Transaction to which this Agreement relates, Party B's only obligation under Section 2(a)(i) of the ISDA Form Master Agreement is to pay the Fixed Amount on the Fixed Rate Payer Payment Date.

(t)    Additional Termination Events will apply.

(i) It shall be an Additional Termination Event with Party A as the sole Affected Party if, upon the occurrence of a Swap Disclosure Event, Party A has not, within ten (10) days after such Swap Disclosure Event complied with any of the provisions set forth in Paragraph 12(iii) above.

(ii) It shall be an Additional Termination Event with Party A as the sole Affected Party if a Rating Agency Downgrade has occurred and Party A has not complied with Part 8(q) above within the time period specified therein.

(u)  Limitation of Liability. It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by HSBC Bank USA, National Association ("HSBC"), not individually or personally but solely as Trustee of the trust created pursuant to the Pooling and Servicing Agreement (the "Trust"), in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of Party B is made and intended not as personal representations, undertakings and agreements by HSBC but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on HSBC, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto, and (d) under no circumstances shall HSBC be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other related documents.

(v)  Failure to Pay or Deliver. The word "third" shall be replaced by the word "first" in the third line of Section 5(a)(i).

(w)  Section 7 of the Master Agreement is hereby amended by adding the words the "Depositor and the Sponsor" after the words "prior written consent of the other party", and Section 9(b) of the Master Agreement is hereby amended by adding at the end of such Section the words ", and unless the Depositor and the Sponsor consents".

Unassociated Document                                    Page 417 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 139 of 279

We are very pleased to have executed this Transaction with you and we look forward to completing other transactions with you in the near future.

Very truly yours,

**WACHOVIA BANK, N.A.**

By:_____
Name:
Its:

SP:____

Party B, acting through its duly authorized signatory, hereby agrees to, accepts and confirms the terms of the foregoing as of the Trade Date.

**HSBC BANK USA, NATIONAL ASSOCIATION, not in its individual capacity but solely as Trustee for Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3**

By: _____
Name:
Its:

EXHIBIT N

SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

Definitions
Primary Servicer - transaction party having borrower contact
Master Servicer - aggregator of pool assets
Securities Administrator - waterfall calculator
Back-up Servicer - named in the transaction (in the event a Back up Servicer becomes the Primary Servicer, follow Primary Servicer obligations)
Custodian - safe keeper of pool assets
Trustee - fiduciary of the transaction

Note: The definitions above describe the essential function that the party performs, rather than the party's title. So, for example, in a particular transaction, the trustee may perform the "paying agent" and "securities administrator" functions, while in another transaction, the securities administrator may perform these functions.

Where there are multiple checks for criteria the attesting party will identify in their management assertion that they are attesting only to the portion of the distribution chain they are responsible for in the related transaction agreements.

Key: X - obligation
    [X] - under consideration for obligation

| Reg AB Reference | Servicing Criteria | Primary Servicer | Master Servicer | Securities Admin | Custodian | Trustee (nominal) |
|---|---|---|---|---|---|---|
| | **General Servicing Considerations** | | | | | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | X̲ | X̲ | X̲ | | |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | X̲ | X̲ | | | |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the Pool Assets are maintained. | | | | | |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | X̲ | X̲ | | | |
| | **Cash Collection and Administration** | | | | | |
| 1122(d)(2)(i) | Payments on pool assets are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | X̲ | X̲ | X̲ | | |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | X̲ | X̲ | X̲ | | |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | X̲ | X̲ | X̲ | | |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of over collateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | X̲ | X̲ | X̲ | | |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. | X̲ | X̲ | X̲ | | |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | X̲ | | X̲ | | |
| | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved | X̲ | X̲ | X̲ | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1122(d)(2)(vii) | by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | | | | | |
| **Investor Remittances and Reporting** | | | | | | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of Pool Assets serviced by the Servicer. | X | X | X | | |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | X | X | X | | |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the Servicer's investor records, or such other number of days specified in the transaction agreements. | X | X | X | | |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | X | X | X | | |
| **Pool Asset Administration** | | | | | | |
| 1122(d)(4)(i) | Collateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents. | X | | | X | |
| 1122(d)(4)(ii) | Pool assets and related documents are safeguarded as required by the transaction agreements | X | | | X | |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | X | | | | |
| 1122(d)(4)(iv) | Payments on pool assets, including any payoffs, made in accordance with the related pool asset documents are posted to the Servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related pool asset documents. | X | | | | |
| 1122(d)(4)(v) | The Servicer's records regarding the pool assets agree with the Servicer's records with respect to an obligor's unpaid principal balance. | X | | | | |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's pool assets (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. | X | | | | |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | X | | | | |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a pool asset is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent pool assets including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | X | | | | |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for pool assets with variable rates are computed based on the related pool asset documents. | X | | | | |
| | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's pool asset documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors | X | | | | |

Unassociated Document          Page 420 of 835
12-12020-mg    Doc 5106-9     Filed 09/18/13     Entered 09/18/13 18:18:12     Exhibit 7
Part 3     FST-CV-09-5011591     Doc 163     Exhibit D     Part 2 of 3     Pg 142 of 279

| | | | | | | |
|---|---|---|---|---|---|---|
| 1122(d)(4)(x) | in accordance with applicable pool asset documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related pool assets, or such other number of days specified in the transaction agreements. | | | | | |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | __X__ | | | | |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the Servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | __X__ | | | | |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. | __X__ | | | | |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | __X__ | __X__ | | | |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. [In this transaction there is no external enhancement or other support.] | __X__ | | __X__ | | |

EXHIBIT O

FORM 10-D, FORM 8-K AND FORM 10-K
REPORTING RESPONSIBILITY

As to each item described below, the entity indicated as the Responsible Party shall be primarily responsible for reporting the information to the party identified as responsible for preparing the Securities Act Reports pursuant to Section 4.18 of the Pooling and Servicing Agreement.

Under Item 1 of Form 10-D: a) items marked "Monthly Statement to Certificateholders" are required to be included in the periodic Distribution Date statement under Section 6.06, provided by the Securities Administrator based on information received from the party providing such information; and b) items marked "Form 10-D report" are required to be in the Form 10-D report but not the Monthly Statements to Certificateholders, provided by the party indicated. Information under all other Items of Form 10-D is to be included in the Form 10-D report. All such information and any other Items on Form 8-K and Form 10-D set forth in this Exhibit shall be sent to the Securities Administrator and the Depositor.

| Form | Item | Description | Servicers | Master Servicer | Securities Administrator | Custodian | Trustee | Depositor | Sponsor |
|------|------|-------------|-----------|-----------------|--------------------------|-----------|---------|-----------|---------|
| 10-D | | Must be filed within 15 days of the distribution date for the asset-backed securities. | | | | | (nominal) | | |
| | 1 | **Distribution and Pool Performance Information** | | | | | | | |
| | | *Item 1121(a) - Distribution and Pool Performance Information* | | | | | | | |
| | | (1) Any applicable record dates, accrual dates, determination dates for calculating distributions and actual distribution dates for the distribution period. | | | X<br><br>**(Monthly Statements to Certificateholders)** | | | | |
| | | (2) Cash flows received and the sources thereof for distributions, fees and expenses. | | | X<br><br>**(Monthly Statements to Certificateholders)** | | | | |
| | | (3) Calculated amounts and distribution of the flow of funds for the period itemized by type and priority of payment, including: | | | X<br><br>**(Monthly Statements to Certificateholders)** | | | | |
| | | (i) Fees or expenses accrued and paid, with an identification of the general purpose of such fees and the party receiving such fees or expenses. | | | X<br><br>**(Monthly Statements to Certificateholders)** | | | | |
| | | (ii) Payments accrued or paid with respect to enhancement or other support identified in Item 1114 of Regulation AB (such as insurance premiums or other enhancement maintenance fees), with an identification of the general purpose of such payments and the party receiving such payments. | | | X<br><br>**(Monthly Statements to Certificateholders)** | | | | |
| | | (iii) Principal, interest and other distributions accrued and paid on the asset-backed securities by type and by class or series and any principal or interest shortfalls or carryovers. | | | X<br><br>**(Monthly Statements to Certificateholders)** | | | | |
| | | (iv) The amount of excess cash flow or excess spread and the disposition of excess cash flow. | | | X<br><br>**(Monthly Statements to Certificateholders)** | | | | |
| | | (4) Beginning and ending principal balances of the asset-backed securities. | | | X<br><br>**(Monthly Statements to Certificateholders)** | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| (5) Interest rates applicable to the pool assets and the asset-backed securities, as applicable. Consider providing interest rate information for pool assets in appropriate distributional groups or incremental ranges. | | | X<br><br>(Monthly Statements to Certificateholders) | | | |
| (6) Beginning and ending balances of transaction accounts, such as reserve accounts, and material account activity during the period. | | | X<br><br>(Monthly Statements to Certificateholders) | | | |
| (7) Any amounts drawn on any credit enhancement or other support identified in Item 1114 of Regulation AB, as applicable, and the amount of coverage remaining under any such enhancement, if known and applicable. | | | X<br><br>(Monthly Statements to Certificateholders) | | | |
| (8) Number and amount of pool assets at the beginning and ending of each period, and updated pool composition information, such as weighted average coupon, weighted average remaining term, pool factors and prepayment amounts. | | | X<br><br>(Monthly Statements to Certificateholders) | | | Updated pool composition information fields to be as specified by Depositor from time to time |
| (9) Delinquency and loss information for the period. | X | X | X<br><br>(Monthly Statements to Certificateholders) | | | |
| In addition, describe any material changes to the information specified in Item 1100(b)(5) of Regulation AB regarding the pool assets. (methodology) | X | | | | | |
| (10) Information on the amount, terms and general purpose of any advances made or reimbursed during the period, including the general use of funds advanced and the general source of funds for reimbursements. | X | X | X<br><br>(Monthly Statements to Certificateholders) | | | |
| (11) Any material modifications, extensions or waivers to pool asset terms, fees, penalties or payments during the distribution period or that have cumulatively become material over time. | X | X | X<br><br>(Monthly Statements to Certificateholders) | | | |
| (12) Material breaches of pool asset representations or warranties or transaction covenants. | X | X | X<br><br>(if agreed upon by the parties) | | | X |
| (13) Information on ratio, coverage or other tests used for determining any early amortization, liquidation or other performance trigger and whether the trigger was met. | | | X<br><br>(Monthly Statements to Certificateholders) | | | |
| (14) Information regarding any new issuance of asset-backed securities backed by the same asset pool, | | | | | | X |
| information regarding any pool | X | X | X | | | X |

Unassociated Document        Page 423 of 835
12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 145 of 279

| # | Description | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | asset changes (other than in connection with a pool asset converting into cash in accordance with its terms), such as additions or removals in connection with a prefunding or revolving period and pool asset substitutions and repurchases (and purchase rates, if applicable), and cash flows available for future purchases, such as the balances of any prefunding or revolving accounts, if applicable. | | | | | | | |
| | Disclose any material changes in the solicitation, credit-granting, underwriting, origination, acquisition or pool selection criteria or procedures, as applicable, used to originate, acquire or select the new pool assets. | | | | | | X | X |
| | *Item 1121(b) - Pre-Funding or Revolving Period Information* <br><br> Updated pool information as required under Item 1121(b). | | | | | | X | |
| 2 | **Legal Proceedings** | | | | | | | |
| | Item 1117 - Legal proceedings pending against the following entities, or their respective property, that is material to Certificateholders, including proceedings known to be contemplated by governmental authorities: | | | | | | | |
| | Sponsor (Seller) | | | | | | | X |
| | Depositor | | | | | | X | |
| | Trustee | | | | | | | |
| | Issuing entity | | | | | | X | |
| | Master Servicer, affiliated Servicer, other Servicer servicing 20% or more of pool assets at time of report, other material servicers | X | X | | | | | |
| | Securities Administrator | | | X | | | | |
| | Originator of 20% or more of pool assets as of the Cut-off Date | | | | | | X | |
| | Custodian | | | X | | | | |
| 3 | **Sales of Securities and Use of Proceeds** | | | | | | | |
| | *Information from Item 2(a) of Part II of Form 10-Q:* <br><br> With respect to any sale of securities by the sponsor, depositor or issuing entity, that are backed by the same asset pool or are otherwise issued by the issuing entity, whether or not registered, provide the sales and use of | | | | | | X | |

| | | | | X | | | | X | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | proceeds information in Item 701 of Regulation S-K. Pricing information can be omitted if securities were not registered. | | | | | | | | | | |
| 4 | **Defaults Upon Senior Securities** | | | | | | | | | | |
| | *Information from Item 3 of Part II of Form 10-Q:* | | | X | | | | | | |
| | Report the occurrence of any Event of Default (after expiration of any grace period and provision of any required notice) | | | | | | | | | | |
| 5 | **Submission of Matters to a Vote of Security Holders** | | | | | | | | | | |
| | *Information from Item 4 of Part II of Form 10-Q* | | | X | | | | | | |
| 6 | **Significant Obligors of Pool Assets** | | | | | | | | | | |
| | *Item 1112(b) - Significant Obligor Financial Information\** | | | | | | | X | | |
| | *This information need only be reported on the Form 10-D for the distribution period in which updated information is required pursuant to the Item. | | | | | | | | | | |
| 7 | **Significant Enhancement Provider Information** | | | | | | | | | | |
| | *Item 1114(b)(2) - Credit Enhancement Provider Financial Information\** | | | | | | | | | | |
| | Determining applicable disclosure threshold | | | X | | | | | | |
| | Requesting required financial information or effecting incorporation by reference | | | X | | | | | | |
| | *Item 1115(b) - Derivative Counterparty Financial Information\** | | | | | | | | | | |
| | Determining current maximum probable exposure | | | | | | | X | | |
| | Determining current significance percentage | | | X | | | | | | |
| | Requesting required financial information or effecting incorporation by reference | | | X | | | | | | |
| | *This information need only be reported on the Form 10-D for the distribution period in which updated information is required pursuant to the Items. | | | | | | | | | | |
| 8 | **Other Information** | | | | | | | | | | |
| | *Disclose any information required to be reported on Form 8-K during the period covered by the Form 10-D but not reported* | The Responsible Party for the applicable Form 8-K item as indicated below. | | | | | | | | |
| 9 | **Exhibits** | | | | | | | | | | |
| | Distribution report | | | X | | | | | | |
| | *Exhibits required by Item* | | | | | | | X | | |

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
|  | *601 of Regulation S-K, such as material agreements* |  |  |  |  |  |  |  |
| **8-K** | Must be filed within four business days of an event reportable on Form 8-K. |  |  |  |  |  |  |  |
| 1.01 | **Entry into a Material Definitive Agreement** |  |  |  |  |  |  |  |
|  | Disclosure is required regarding entry into or amendment of any definitive agreement that is material to the securitization, even if depositor is not a party.<br><br>Examples: servicing agreement, custodial agreement.<br><br>Note: disclosure not required as to definitive agreements that are fully disclosed in the prospectus | X | X | X |  |  | X | X |
| 1.02 | **Termination of a Material Definitive Agreement** | X | X | X |  |  | X | X |
|  | Disclosure is required regarding termination of any definitive agreement that is material to the securitization (other than expiration in accordance with its terms), even if depositor is not a party.<br><br>Examples: servicing agreement, custodial agreement. |  |  |  |  |  |  |  |
| 1.03 | **Bankruptcy or Receivership** |  |  |  |  |  |  |  |
|  | Disclosure is required regarding the bankruptcy or receivership, if known to the Master Servicer, with respect to any of the following:<br><br>Sponsor (Seller), Depositor, Master Servicer, affiliated Servicer, other Servicer servicing 20% or more of pool assets at time of report, other material servicers, Certificate Administrator, Trustee, significant obligor, credit enhancer (10% or more), derivatives counterparty, Custodian | X | X | X | X |  | X | X |
| 2.04 | **Triggering Events that Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement** |  |  |  |  |  |  |  |
|  | Includes an early amortization, performance trigger or other event, including event of default, that would materially alter the payment priority/distribution of cash flows/amortization schedule.<br><br>Disclosure will be made of events other than waterfall triggers which are disclosed in the Monthly Statement to |  | X | X |  |  |  |  |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Certificateholders | | | | | | |
| 3.03 | **Material Modification to Rights of Security Holders** | | | | | | |
| | Disclosure is required of any material modification to documents defining the rights of Certificateholders, including the Pooling and Servicing Agreement | | | X | | | X | |
| 5.03 | **Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year** | | | | | | |
| | Disclosure is required of any amendment "to the governing documents of the issuing entity" | | | | | X | |
| 5.06 | **Change in Shell Company Status** | | | | | | |
| | [Not applicable to ABS issuers] | | | | | X | |
| 6.01 | **ABS Informational and Computational Material** | | | | | | |
| | [Not included in reports to be filed under Section 3.18] | | | | | X | |
| 6.02 | **Change of Servicer or Trustee** | | | | | | |
| | Requires disclosure of any removal, replacement, substitution or addition of any master servicer, affiliated servicer, other servicer servicing 10% or more of pool assets at time of report, other material servicers, certificate administrator or trustee. | X | X | X | | | X | |
| | Reg AB disclosure about any new servicer is also required. | X | | | | | |
| | Reg AB disclosure about any new trustee is also required. | | | X(to the extent of a new trustee) | | | |
| | Reg AB disclosure about any new securities administrator is also required. | | | X | | | |
| 6.03 | **Change in Credit Enhancement or Other External Support [In this transaction there is no external enhancement or other support.]** | | | | | | |
| | Covers termination of any enhancement in manner other than by its terms, the addition of an enhancement, or a material change in the enhancement provided. Applies to external credit enhancements as well as derivatives. | | | X | | | X | |
| | Reg AB disclosure about any new enhancement provider is also required. | | | X | | | X | |
| 6.04 | **Failure to Make a Required Distribution** | | | X | | | |
| 6.05 | **Securities Act Updating Disclosure** | | | | | | |
| | If any material pool characteristic differs by 5% or more at the time of issuance of the securities from the description in the final prospectus, provide updated Reg AB disclosure | | | | | X | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | about the actual asset pool. | | | | | | | |
| | | If there are any new servicers or originators required to be disclosed under Regulation AB as a result of the foregoing, provide the information called for in Items 1108 and 1110 respectively. | | | | | | X | |
| | 7.01 | **Regulation FD Disclosure** | X | X | X | X | | X | |
| | 8.01 | **Other Events** | | | | | | | |
| | | Any event, with respect to which information is not otherwise called for in Form 8-K, that the registrant deems of importance to security holders. | | | | | | X | |
| | 9.01 | **Financial Statements and Exhibits** | The Responsible Party applicable to reportable event. | | | | | | |
| **10-K** | | Must be filed within 90 days of the fiscal year end for the registrant. | | | | | | | |
| | 9B | **Other Information** | | | | | | | |
| | | Disclose any information required to be reported on Form 8-K during the fourth quarter covered by the Form 10-K but not reported | The Responsible Party for the applicable Form 8-K item as indicated above. | | | | | | |
| | 15 | **Exhibits and Financial Statement Schedules** | | | | | | | |
| | | *Item 1112(b) - Significant Obligor Financial Information* | | | | | | X | |
| | | *Item 1114(b)(2) - Credit Enhancement Provider Financial Information* | | | | | | | |
| | | Determining applicable disclosure threshold | | | X | | | | |
| | | Requesting required financial information or effecting incorporation by reference | | | X | | | | |
| | | *Item 1115(b) - Derivative Counterparty Financial Information* | | | | | | | |
| | | Determining current maximum probable exposure | | | | | | X | |
| | | Determining current significance percentage | | | X | | | | |
| | | Requesting required financial information or effecting incorporation by reference | | | X | | | | |
| | | Item 1117 - Legal proceedings pending against the following entities, or their respective property, that is material to Certificateholders, including proceedings known to be contemplated by governmental authorities: | | | | | | | |
| | | Sponsor (Seller) | | | | | | | X |
| | | Depositor | | | | | | X | |
| | | Trustee | | | | X | | | |
| | | Issuing entity | | | | | | X | |
| | | Master Servicer, affiliated Servicer, other Servicer servicing 20% or more of pool assets at time of | X | X | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| report, other material servicers | | | | | | | |
| Securities Administrator | | | X | | | | |
| Originator of 20% or more of pool assets as of the Cut-off Date | | | | | | X | |
| Custodian | | | | X | | | |
| Item 1119 - Affiliations and relationships between the following entities, or their respective affiliates, that are material to Certificateholders: | | | | | | | |
| Sponsor (Seller) | | | | | | | X |
| Depositor | | | | | | X | |
| Trustee | | | | | X (with respect to 1119 (a) affiliations only) | | |
| Master Servicer, affiliated Servicer, other Servicer servicing 20% or more of pool assets at time of report, other material servicers | X | X | | | | | |
| Securities Administrator | | | X | | | | |
| Originator | | | | | | X | |
| Custodian | | | | X | | | |
| Credit Enhancer/Support Provider | | | | | | X | |
| Significant Obligor | | | | | | X | |
| Item 1122 - Assessment of Compliance with Servicing Criteria | X | X | X | X | | | |
| Item 1123 - Servicer Compliance Statement | X | X | | | | | |

EXHIBIT P

Additional Disclosure Notification

Wells Fargo Bank, N.A. as [Securities Administrator]
9062 Old Annapolis Road
Columbia, Maryland 21045
Fax: (410) 715-2380
E-mail: cts.sec.notifications@wellsfargo.com

Structured Asset Mortgage Investments II Inc.
383 Madison Avenue
New York, New York 10179

Attn: Corporate Trust Services - LUMINENT MORTGAGE TRUST 2006-3-SEC REPORT PROCESSING

RE: **Additional Form [ ] Disclosure**Required

Ladies and Gentlemen:

        In accordance with Section 4.18 of the Pooling and Servicing Agreement, dated as of April 1, 2006, among Luminent Mortgage Capital, Inc., as Sponsor, Wells Fargo Bank, National Association, as Master Servicer and Securities Administrator and HSBC Bank USA, National Association as Trustee. The undersigned hereby notifies you that certain events have come to our attention that [will][may] need to be disclosed on Form [ ].

Description of Additional Form [ ] Disclosure:


List of Any Attachments hereto to be included in the Additional Form [ ] Disclosure:

        Any inquiries related to this notification should be directed to [ ], phone number: [ ]; email address: [ ].

                                                                    [NAME OF PARTY]
                                                                    as [role]

                                                          By: _____
                                                                    Name:
                                                                    Title:

EXHIBIT Q-1

AMENDED AND RESTATED
PURCHASE, WARRANTIES AND SERVICING AGREEMENT

---

RESIDENTIAL FUNDING CORPORATION,
the Company,


and


LUMINENT MORTGAGE CAPITAL, INC.,
MERCURY MORTGAGE FINANCE STATUTORY TRUST AND
MAJA MORTGAGE FINANCE STATUTORY TRUST
the Initial Owners

STANDARD TERMS AND PROVISIONS OF
SALE AND SERVICING AGREEMENT


Dated as of March 30, 2006


Adjustable Rate Mortgage Loans

---



---

**TABLE OF CONTENTS**

ARTICLE I
DEFINITIONS

Section 1.01    Definitions

ARTICLE II
CONVEYANCE 0F MORTGAGE LOANS

Section 2.01    Conveyance of Mortgage Loans; Possession of Mortgage Files.
Section 2.02    Acceptance by the Initial Owners
Section 2.03    Assignment of Mortgage Loans
Section 2.04    Representations and Warranties of the Company.
Section 2.05    Representations
Section 2.06    Protection of Confidential Information and Consumer Information.
Section 2.07    Early Payment Default
Section 2.08    Prepayment Protection
Section 2.09    Delivery of Collateral Documents

ARTICLE III
ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

Section 3.01    Company to Act as Servicer
Section 3.02    Agreements Between Company and Subservice
Section 3.03    Collection of Certain Mortgage Loan Payments and Liquidation of Mortgage Loans
Section 3.04    Principal and Interest Accounts
Section 3.05    Escrow Accounts
Section 3.06    Custodial Account
Section 3.07    Permitted Withdrawals From the Custodial Account
Section 3.08    Permitted Instruments
Section 3.09    Primary Insurance Policies
Section 3.10    Maintenance of Hazard Insurance and Errors and Omissions and Fidelity Coverage.
Section 3.11    Enforcement of Due-On-Sale Clauses.
Section 3.12    Realization Upon Defaulted Mortgage Loans.
Section 3.13    Owner to Cooperate: Release of Mortgage Files.
Section 3.14    Reports to the Owners.
Section 3.15    REO Property
Section 3.16    Compensating Interest
Section 3.17    Filing Requirements
Section 3.18    Reconstitution.
Section 3.19    Reserved.
Section 3.20    Compliance with Regulation AR

ARTICLE IV
PAYMENTS TO THE OWNERS

Section 4.01    Distributions
Section 4.02    Statements to the Owners
Section 4.03    Distribution Reports; Monthly Advances by the Company
Section 4.04    Reports and Returns to be Filed by the Company
Section 4.05    Format of Reports and Statements
Section 4.06    Records; Audit

ARTICLE V
THE COMPANY

Section 5.01    Indemnification.
Section 5.02    Liability of the Company and Others.
Section 5.03    Merger or Consolidation of the Company
Section 5.04    Limitation on Resignation and Assignment by Company
Section 5.05    Right to Examine Company Records

ARTICLE VI
DEFAULT

Section 6.01    Events of Default of the Company
Section 6.02    Waiver of Defaults

ARTICLE VII
TERMINATION

Section 7.01        Termination

ARTICLE VIII
MISCELLANEOUS PROVISIONS

Section 8.01        Successor to the Company
Section 8.02        Entire Agreement: Amendment
Section 8.03        Governing Law
Section 8.04        Notices
Section 8.05        Severability of Provisions
Section 8.06        No Partnership
Section 8.07        Exhibits
Section 8.08        Counterparts; Successors and Assigns


EXHIBIT A - FORM OF REFERENCE AGREEMENTA-1

EXHIBIT B - FORM OF CUSTODIAL AGREEMENTB-1

EXHIBIT C - FORM OF SUBSERVICING AGREEMENTC-1

EXHIBIT D - FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENTD-1

EXHIBIT E -FORM OF CERTIFICATIONE-1

EXHIBIT F - FORM OF REQUEST FOR RELEASEF-1

EXHIBIT G- FORMAT FOR REPORTS AND STATEMENTSG-1

EXHIBIT H - REGULATION AD COMPLIANCE ADDENDUMH-1

EXHIBIT I - FORM OF SPECIAL FORECLOSURE RIGHTS SECTIONI-1

Unassociated Document                                                                          Page 433 of 835

12-12020-mg     Doc 5106-9     Filed 09/18/13     Entered 09/18/13 18:18:12     Exhibit 7
Part 3     FST-CV-09-5011591     Doc 163     Exhibit D     Part 2 of 3     Pg 155 of 279

### STANDARD TERMS AND PROVISIONS OF SALE AND SERVICING AGREEMENT

This is a STANDARD TERMS AND PROVISIONS OF SALE AND SERVICING AGREEMENT for adjustable rate mortgage loans, dated and effective as of March 30, 2006, by and between RESIDENTIAL FUNDING CORPORATION, as seller and master servicer (the "Company") and Luminent Mortgage Capital, Inc., Mercury Mortgage Finance Statutory Trust and Maia Mortgage Finance Statutory Trust, as the initial owner (the "Initial Owners"), together with all amendments hereof and supplements hereto (as it pertains to the Mortgage Pool and as incorporated by reference in and made a part of a Reference Agreement (as defined below), this "Agreement").

### PRELIMINARY STATEMENT

The Initial Owners have agreed to purchase from time to time from the Company and the Company has agreed to sell to the Initial Owners, on a servicing retained basis and without recourse, pools of adjustable rate Mortgage Loans. Each pool of Mortgage Loans will have the characteristics set forth herein and in a reference agreement, which shall be in the form attached hereto as Exhibit A (each, a "Reference Agreement"). The sale of the Mortgage Loans in each Mortgage Pool will be governed by the applicable Reference Agreement together with this Agreement, which will be incorporated by reference into and made a part of such Reference Agreement.

In consideration of the premises and the mutual agreements hereinafter set forth, and intending to be legally bound, each Initial Owner and the Company agree hereby as follows:

### ARTICLE I

### DEFINITIONS

**Section 1.01     Definitions.** Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article.

Accrued Interest: With respect to each Remittance Date, one month's interest accrued at the then applicable Pass-Through Rate on the aggregate Principal Balance of the Mortgage Loans in the Mortgage Pool as of the close of business on the immediately preceding Remittance Date (or in the case of the first Remittance Date, the applicable Cut-off Date). Accrued Interest will be calculated on the basis of a 360-day year consisting of twelve 30-day months. In each case Accrued Interest will be adjusted in accordance with Section 1.02.

Acquisition Date: As defined in Section 3.15.

Adjustment Date: As to each Mortgage Loan, each date set forth in the related Mortgage Note on which an adjustment to the interest rate on such Mortgage Loan becomes effective.

Agency: Fannie Mae and/or Freddie Mac.

Appraised Value: With respect to any Mortgaged Property, generally, the lesser of (a) the appraised value of such Mortgaged Property based on an appraisal made at the time of the origination or modification of the related Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac and (b) the sales price of the Mortgaged Property at such time of origination; except in the case of a Mortgaged Property securing a refinanced or modified Mortgage Loan as to which it is either the appraised value determined above or the appraised value determined in an appraisal at the time of refinancing or modification, as the case may be by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac.

Assignment: An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect of record the sale of the Mortgage.

Bankruptcy Code: The Bankruptcy Code of 1978, as amended.

Business Day: Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the State of Minnesota, the State of California or the State of Illinois (or such other state or states in which the Custodial Account is at the time located) are required or authorized by law or executive order to be closed.

Cash Receipts: As defined in Section 3.15.

Closing Date: With respect to each Mortgage Pool, as defined in the Reference Agreement for such Mortgage Pool.

Code: The internal Revenue Code of 1986, as amended.

Commission: The United States Securities and Exchange Commission.

Company: Residential Funding Corporation, a Delaware corporation, or its successor in interest, or any successor as herein provided.

Compensating Interest: With respect to any Remittance Date, an amount equal to Prepayment Interest Shortfalls resulting from Full Prepayments during the related Prepayment Period and Partial Prepayments during the prior calendar month, but, except as otherwise agreed by the Company and the relevant Initial Owner in the commitment letter with respect to any Mortgage Loan, not more than the sum of the Servicing Fee and all income and gain on amounts held in the Custodial Account with respect to the Mortgage Loans and such Remittance Date.

Confidential Information: As defined in Section 2.06.

Consumer Information: Information, including, but not limited to, all personal information about the Mortgagors that is supplied to any Initial Owner by or on behalf of the Company.

Converted Mortgage Loan: Any Convertible Mortgage Loan with respect to which the interest rate borne by such Mortgage Loan has been converted from an adjustable interest rate to a fixed interest rate.

Convertible Mortgage Loan: Any Mortgage Loan which by its terms grants to the related Mortgagor the option to convert the interest rate borne by such Mortgage Loan from an adjustable interest rate to a fixed interest rate.

Converting Mortgage Loan: Any Convertible Mortgage Loan with respect to which the related Mortgagor has given notice of his intent to convert from an adjustable interest rate to a fixed interest rate and prior to the conversion of such Mortgage Loan.

Custodial Account: The custodial account created and maintained pursuant to Section 3.06.

Custodial Agreement: A Custodial Agreement among the Initial Owners and the Custodian.

Custodian: A custodian, which shall not be an Owner, appointed by the Owner pursuant to a Custodial Agreement.

Cut-off Date: With respect to each Mortgage Pool, as defined in the Reference Agreement for such Mortgage Pool.

Debt Service Reduction: With respect to any Mortgage Loan, a reduction in the scheduled Monthly Payment for such Mortgage Loan by a court of competent jurisdiction in a proceeding under the Bankruptcy Code, except such a reduction constituting a Deficient Valuation or any reduction that results in a permanent forgiveness of principal.

Deficient Valuation: With respect to any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under the Mortgage Loan, or any reduction in the amount of principal to be paid in connection with any scheduled Monthly Payment that constitutes a permanent forgiveness of principal, which valuation or reduction results from a proceeding under the Bankruptcy Code.

Determination Date: With respect to any Remittance Date, the 16th day (or if such 16th day is not a Business Day, the Business Day immediately succeeding such 16th day) of the month in which such Remittance Date occurs.

Due Date: With respect to any Remittance Date, the first day of the month in which such Remittance Date occurs.

Due Period: With respect to any Remittance Date, the period commencing on the second day of the month preceding the month of such Remittance Date and ending on the related Due Date.

ERISA: The Employee Retirement Income Security Act of 1974, as amended.

Event of Default: As defined in Section 6.01.

Fannie Mae: Federal National Mortgage Association, a federally chartered and privately owned corporation organized and existing under the Federal National Mortgage Association Charter Act, or any successor thereto.

Fitch: Fitch, Inc. or its successor in interest.

Freddie Mac: Federal Home Loan Mortgage Corporation, a corporate instrumentality of the United States created and existing under Title III of the Emergency Home Finance Act of 1970, as amended, or any successor thereto.

Full Prepayment: Any payment of the entire principal balance of a Mortgage Loan which is received in advance of its scheduled Due Date and is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Gross Margin: As to each Mortgage Loan, the fixed percentage set forth in the related Mortgage Note and indicated on the Mortgage Loan Schedule as the "NOTE MARGIN", which percentage is added to the Index on each Adjustment Date to determine (subject to rounding in accordance with the related Mortgage Note, the applicable Periodic Cap, Maximum Interest Rate and Minimum Interest Rate) the interest rate to be borne by such Mortgage Loan until the next Adjustment Date thereof.

Index: With respect to each Mortgage Pool, as defined in the Reference Agreement for such Mortgage Pool.

Insurance Proceeds: Proceeds paid in respect of any Mortgage Loan pursuant to any insurance policy covering such Mortgage Loan to the extent such proceeds are payable to the mortgagee under the Mortgage, any Subservicer or the Company and are not applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures set forth in the Program Guide.

Insured Expenses: Expenses that are covered or will be paid by any mortgage insurance policy, any replacement insurance policy or policies or any other insurance policy.

Interim Certification: As defined in Section 2.02.

Lender-Paid Mortgage Insurance Policy: A policy of primary mortgage guaranty insurance pursuant to which the related premium is to be paid by the servicer of the related Mortgage Loan from payments of interest made by the Mortgagor in an amount as is set forth in the related Mortgage Loan Schedule.

Liquidated Mortgage Loan: A Mortgage Loan as to which payment has been made to the Company of all Liquidation Proceeds and other payments or recoveries which the Company deems to be finally recoverable.

Liquidation Expenses: Expenses which are incurred by the Company in connection with the liquidation of any defaulted Mortgage Loan (to the extent such amount is reimbursable under the terms of this Agreement or the Program Guide) and not recovered by the Company under any insurance policy for reasons other than the Company's failure to comply with Section 3.09 or 3.10.

Liquidation Proceeds: Cash (including Insurance Proceeds and condemnation proceeds) received in connection with the liquidation of defaulted Mortgage Loans, whether through trustee's sale, condemnation, foreclosure sale or otherwise, net of Liquidation Expenses and Insured Expenses.

Loan-to-Value Ratio: As of any date, the fraction, expressed as a percentage, the numerator of which is the principal balance of the related Mortgage Loan at the date of determination and the denominator of which is the Appraised Value of the related Mortgaged Property.

Maximum Interest Rate: As to any Mortgage Loan, the maximum interest rate that may be borne by such Mortgage Loan as set forth in the related Mortgage Note and indicated in the related Mortgage Loan Schedule as the "NOTE CEILING," which rate may be applicable to such Mortgage Loan at any time during the life of such Mortgage Loan.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS® System: The system of recording transfers of Mortgages electronically maintained by MERS.

MIN: The Mortgage Identification Number of Mortgage Loans registered with MERS on the MERS® System.

Minimum Interest Rate: As to any Mortgage Loan, the greater of (i) the Gross Margin and (ii) the rate indicated in the related Mortgage Loan Schedule as the "NOTE FLOOR," which rate may be applicable to such Mortgage Loan at any time during the life of such Mortgage Loan.

Minimum Monthly Payment: With respect to a Pay Option ARM Mortgage Loan, the minimum Monthly Payment calculated in accordance with the terms of the related Mortgage Note.

MOM Loan: Any Mortgage Loan where MERS acts as the mortgagee of record of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

Monthly Advance: The aggregate of the advances made by the Company with respect to any Remittance Date pursuant to Section 4.03, the amount of any such Monthly Advance being equal to the aggregate of the principal portion of such Monthly Payments on the Mortgage Loans which were due on the related Due Date but extended pursuant to Section 3.03 or delinquent (in whole or in part) as of the close of business on the Business Day next preceding the related Remittance Date, plus the interest portion of such Monthly Payments adjusted to the related Mortgage Loan Remittance Rates, and less the amount of any advances which the Company has determined would constitute Nonrecoverable Monthly Advances, if made.

Monthly Payment: With respect to any Mortgage Loan and any month, the scheduled monthly payment of principal and interest on such Mortgage Loan which is payable by a Mortgagor in such month under the related Mortgage Note.

Moody's: Moody's Investors Service, Inc. or its successor in interest.

Mortgage: The mortgage, deed of trust or other instrument creating a first lien on a fee simple interest or leasehold interest in real property securing a Mortgage Note.

Mortgage File: The mortgage documents listed in Section 2.01 pertaining to a particular Mortgage Loan which shall be delivered to the Custodian, as the duly appointed agent of the Owners, or as otherwise agreed by the parties to this Agreement and the Custodian, if any, in writing and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Interest Rate: The annual rate at which interest accrues on any Mortgage Loan. The Mortgage Interest Rate for each Mortgage Loan as of the applicable Cutoff Date will be the rate indicated as the "C1.TRR RATE" on the Mortgage Loan Schedule and, with respect to any adjustable rate Mortgage Loan, will be adjusted on each Adjustment Date to a rate equal to the sum of the Index applicable to such Adjustment Date and the Gross Margin, rounded to the nearest multiple of 0.125%, subject to the application of the applicable Periodic Cap, Maximum Interest Rate and Minimum Interest Rate.

Mortgage Loan: An individual mortgage loan which is the subject of this Agreement and identified on the Mortgage Loan Schedule including, without limitation, each related Mortgage Note, Mortgage and Mortgage File and all rights appertaining hereto, but excluding the servicing rights with respect thereto as provided herein.

Mortgage Loan Remittance Rate: With respect to each Mortgage Loan and Due Date occurring prior to the first Adjustment Date for such Mortgage Loan occurring after the applicable Cut-off Date, the rate designated as the "NET MTG RT" for such Mortgage Loan on the related Mortgage Loan Schedule. With respect to each Mortgage Loan and each Due Date occurring on or after each Adjustment Date, a rate equal to the then-applicable Mortgage Interest Rate minus the sum of the then-applicable Servicing Fee Rate and Subservicing Fee Rate.

Mortgage Loan Schedule: Each schedule of Mortgage Loans attached to a Reference Agreement.

Mortgage Note: The originally executed note evidencing the indebtedness of a Mortgagor under a Mortgage Loan and any modification thereto.

Mortgage Pool: Each pool of Mortgage Loans conveyed by the Company to the an Initial Owner from time to time pursuant to a Reference Agreement referencing this Agreement.

Mortgaged Property: The underlying property securing a Mortgage Loan.

Mortgagor: The obligor on a Mortgage Note.

Nonrecoverable Monthly Advance: Any Monthly Advance previously made or proposed to be made by the Company which, in the judgment of the Company, is not or, in the case of a proposed Monthly Advance, would not be ultimately recoverable by the Company from Liquidation Proceeds or otherwise.

Negative Amortization: With respect to a Pay Option ARM Mortgage Loan, any portion of interest accrued at the Mortgage Interest Rate in any month which exceeds the Monthly Payment on the related Mortgage Loan for such month and which, pursuant to the terms of the Mortgage Note, is added to the principal balance of the Mortgage Loan.

Opinion of Counsel: A written opinion of counsel, who may, unless otherwise provided herein, be counsel for the Company.

Outside Conversion Date: The latest date on which a Mortgagor may elect, in accordance with the terms of the related Mortgage Note, to convert the interest rate borne by the related Convertible Mortgage Loan from an adjustable interest rate to a fixed interest rate.

Owner: Any Person from time to Lime having an Ownership Interest in the Mortgage Loans.

Ownership Interest: The undivided ownership interest in the Mortgage Pool.

Partial Prepayment: Any payment of principal on a Mortgage Loan, other than a Full Prepayment, which is received in advance of its scheduled Due Date and is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Pass-Through Rate: As to any Remittance Date, a rate equal to the weighted average, expressed as a percentage, of the Mortgage Loan Remittance Rates of all Mortgage Loans in the Mortgage Pool as of the close of business on the Due Date in the month preceding the month in which such Remittance Date occurs, weighted on the basis of the respective Principal Balances of such Mortgage Loans, which Principal Balances shall be the Principal Balances of such Mortgage Loans immediately prior to such Remittance Date.

Pay Option ARM Mortgage Loan: Any Mortgage Loan that lets Mortgagors choose one of various different payments each month which may include, but not be limited to, a Minimum Monthly Payment, an interest-only payment, full principal and interest amortized over thirty (30) years, or full principal and interest amortized over fifteen (15) years.

Periodic Cap: With respect to each Mortgage Loan, the maximum increase or decrease in the Mortgage Interest Rate on any Adjustment Date, which shall be an increase or decrease of not more than 2.00% per annum.

Permitted Instrument: As defined in Section 3.08.

Person: Any individual, corporation, partnership, joint venture, limited liability company, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Plan: As defined in Section 2.03.

Prepayment Interest Shortfall: As to any Remittance Date and any Mortgage Loan (other than a Mortgage Loan relating to an REQ Property) that was the subject of (a) a Full Prepayment during the portion of the related Prepayment Period that falls during the prior calendar month, an amount equal to the excess of one month's interest at the Mortgage Loan Remittance Rate on the Principal Balance of such Mortgage Loan over the amount of interest (adjusted to the Mortgage Loan Remittance Rate) paid by the Mortgagor for such month to the date of such Full Prepayment or (b) a Partial Prepayment during the prior calendar month, an amount equal to one month's interest at the Mortgage Loan Remittance Rate on the amount of such Partial Prepayment.

Unassociated Document                                                                 Page 436 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 158 of 279

Prepayment Penalty: Any prepayment charge or penalty interest required to be paid by a Mortgagor in connection with a prepayment of the related Mortgage Loan, as provided in the related Mortgage Note or Mortgage, to which the Company is entitled and which is sold by the Company hereunder, and as specified on the related Mortgage Loan Schedule.

Prepayment Period: As to any Remittance Date and a Full Prepayment, the prior calendar month.

Primary Insurance Policy: Each primary policy of mortgage guaranty insurance or any replacement policy thereof.

Principal Balance: As to each Mortgage Loan, as of the time of any determination, (i) the principal balance remaining to be paid by the Mortgagor at the close of business on the applicable Cut-off Date, after deduction of all payments due on or before the applicable Cut-off Date whether or not paid, minus (ii) all amounts distributed to the Owner with respect to such Mortgage Loan and reported to the Owner as allocable to principal, including the principal component of any Monthly Advances and any losses incurred with respect to such Mortgage Loan, plus (iii) without duplication of amounts described in clause (i) above, the cumulative amount of any Negative Amortization.

Principal Remittance Amount: With respect to any Remittance Date, the sum of (a) the principal component of any Monthly Advance for such Remittance Date; (b) any amount required to be deposited in the Custodial Account pursuant to Section 3.10(a); and (c) the amount on deposit in the Custodial Account as of the close of business on the Determination Date immediately preceding such Remittance Date which is allocable to payments on account of principal of the Mortgage Loans, which amount shall not include (i) Full Prepayments and Partial Prepayments and the principal portion of any Liquidation Proceeds, Insurance Proceeds or proceeds of the purchase of any Mortgage Loan pursuant to Sections 2.02 and 2.04 received in the month in which such Remittance Date occurs (other than such Liquidation Proceeds, Insurance Proceeds or proceeds of the purchase of any Mortgage Loan pursuant to Sections 2.02 and 2.04 that the Company has deemed to have been received in the preceding month), (ii) payments which represent receipt of scheduled payments of principal due on a date or dates subsequent to the related Due Date and (iii) late payments of principal which have been the subject of a previous Monthly Advance and which are eligible for withdrawal pursuant to clauses (ii) or (vii) of Section 3.07.

Program Guide: Collectively, the Client Guide and the Servicer Guide for Residential Funding Corporation's mortgage loan purchase and conduit servicing program and all supplements and amendments thereto published by Residential Funding Corporation from time to time..

Rating Agencies: Fitch, Moody's and S&P.

Reconstitution: As defined in Exhibit H.

Record Date: With respect to each Remittance Date, the close of business on the last Business Day of the month next preceding the month in which the related Remittance Date occurs.

Reference Agreement: As defined in the preliminary statement hereto.

Regulation AB: Subpart 229.1100 — Asset Backed Securities (Regulation AB), 17 C.F.R. §229.1 100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

REMIC: A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

REMIC Provisions: Provisions of the federal income tax law relating to a REMIC, which appear at Section 860A through 860G of Subchapter M of Chapter 1, Subtitle A of the Code, and related provisions, and regulations, rulings or pronouncements promulgated thereunder, as the foregoing may be in effect from time to time.

Remittance Amount: With respect to any Remittance Date, an amount equal to, subject to Section 1.02, (i) the Principal Remittance Amount (if any) for such Remittance Date, plus (ii) the Accrued Interest for such Remittance Date, minus (iii) any amounts payable to the Company pursuant to Section 3.07 that are not taken into account in the adjustment of Accrued Interest pursuant to Section 1.02, plus (iv) the amount of any Compensating Interest with respect to that Remittance Date, plus (v) any Prepayment Penalties collected during the related Prepayment Period.

Remittance Date: The 18th day of any month, beginning in the month following the month in which the applicable Cut-off Date occurs, or if such 18th day is not a Business Day, the first Business Day immediately following.

REO Acquisition: The acquisition by the Company on behalf of an Initial Owner of any REO Property pursuant to Section 3.12.

REO Property: A Mortgaged Property acquired by an Owner or the Company on behalf of an Owner through foreclosure or deed in lieu of foreclosure..

Repurchase Price: With respect to any Mortgage Loan, a price equal to (i) the principal balance of the Mortgage Loan (including any Negative Amortization), plus (ii) interest on such principal balance at the Mortgage Interest Rate from the date on which interest has last been paid and distributed to the relevant Initial Owner to the date of repurchase, less amounts received, if any, plus amounts advanced, if any, by any servicer, in respect of such repurchased Mortgage Loan, plus (iii) any costs and damages incurred with respect to the Mortgage Loan in connection with any violation by such Mortgage Loan of any predatory or abusive-lending law and plus (iv) if the repurchase occurs within 12 months of the Closing Date, any premium paid by the relevant Initial Owner for the Mortgage Loan or minus any discount paid by the relevant Initial Owner for the Mortgage Loan as set forth in the related Mortgage Loan Schedule or commitment letter; provided, that, if, on the date of repurchase, the Principal Balance of the relevant Mortgage Loan is greater than the Principal Balance of such Mortgage Loan on the applicable Closing Date, then the premium shall be calculated on the Principal Balance of such Mortgage Loan as of such Closing T)ate.

Request for Release: A request for release, the form of which is attached as Exhibit F hereto, or an electronic request in a form acceptable to the Custodian.

Retention Period: As defined in Section 4.05.

Securities Act: The Securities Act of 1933, as amended.

Securitization Transaction: As defined in Exhibit H.

Seller: As to any Mortgage Loan, a Person that executed a Seller's Agreement applicable to such Mortgage Loan.

Seller's Agreement: An agreement for the origination and sale of Mortgage Loans in the form referred to in the Program Guide.

Servicing : As to each Mortgage Loan, the annual fee, payable monthly to the Company out of the interest portion of the Monthly Payment received on each Mortgage Loan.

Servicing Fee Rate: With respect to each Mortgage Loan, as defined in the Reference Agreement for such Mortgage Loan and the related Mortgage Loan Schedule.

Standard & Poor's: Standard & Poor's, a division of the McGraw-Hill Companies, Inc., or its successor in interest.

Subservicer: Any Person, including any successor, with whom the Company has entered into a Subservicing Agreement pursuant to the Program Guide.

Subsicing Agreement: The written contract between the Company and a Subservicer as may be amended from time to time, a representative form of which is attached hereto as Exhibit C.

Subservicing Fee: The annual fee, payable monthly to the Subservicer out of the interest portion of the Monthly Payment received on each Mortgage Loan.

Subservicing Fee Rate: As to each Mortgage Loan, the rate per annum set forth in the Mortgage Loan Schedule as the "SUBSERV FEE."

Successor Servicer: My successor servicer appointed pursuant to Section 8.01.

Whole Loan Transfer: As defined in Exhibit H.

Section 1.02. Calculations Respecting Accrued Interest.

(a)    The Accrued Interest on any Remittance Date shall be reduced by the amount of any Prepayment Interest Shortfalls with respect to that Remittance Date (to the extent not offset by the Company with a payment of Compensating Interest).

(b)    In the event that the Liquidation Proceeds with respect to any Mortgage Loan (net of amounts payable or reimbursable therefrom pursuant to Sections 3 .07(iii) and 3.07(iv)) are less than the Principal Balance of such Mortgage Loan, together with one month's interest thereon at the applicable Mortgage Loan Remittance Rate, the Accrued Interest on the Remittance Date in the next succeeding month shall be reduced by the amount of such insufficiency. In the event that such Liquidation Proceeds exceed the sum of the Principal Balance of such Mortgage Loan plus one month's interest thereon at the applicable Mortgage Interest Rate, such excess shall be payable to the relevant Owner.

(c)    In the event that any amount or amounts shall be withdrawn from amounts attributable to the Mortgage Loans on deposit in the Custodial Account pursuant to clauses (ii), (iii) (other than for servicing compensation), (iv), (v), (vi), (vii), (viii) or (ix) of Section 3.07 and the related withdrawal or withdrawals shall not be reflected in any adjustment required pursuant to subsections (a) and (b) above, the Accrued Interest on the immediately succeeding Remittance Date shall be reduced by the total of such amounts so withdrawn to the extent such amounts would result in a shortfall of Accrued Interest.

(d)    In the event that as of the end of any Due Period, for any reason (including, without limitation, acquisition of title to the underlying Mortgaged Property through foreclosure or acceptance of a deed in lieu of foreclosure, application of the Servicemembers' Civil Relief Act or similar legislation or regulations as in effect from time to time, or a Debt Service Reduction or a Deficient Valuation), less than the full amount of the interest portion of the Monthly Payment at the Mortgage Loan Remittance Rate due on the Due Date in such Due Period on any Mortgage Loan is deposited in the Custodial Account and no Monthly Advance is made or required to be made in respect thereof, the Accrued Interest on the immediately succeeding Remittance Date shall be reduced by the amount of such insufficiency.

(e)    In the event that on or in the month of any Due Date (after adjustment for the Subservicing Fee and the Servicing Fee) more than one month's interest at the applicable Mortgage Loan Remittance Rate on the Principal Balance of any Mortgage Loan is deposited in the Custodial Account as a result of late recoveries of interest in respect of which no Monthly Advance was made in respect of such amount, the Accrued Interest on the immediately succeeding Remittance Date shall be increased by the amount of such excess.

(f)    All references to the Principal Balance of any Mortgage Loan in this Section 102 are to the Principal Balance of such Mortgage Loan as of the close of business on the Remittance Date immediately preceding the Remittance Date in respect of which the Accrued Interest thereon is being adjusted pursuant to the applicable subsection of this Section 1.02 or, in the case of the first Remittance Date, as of the applicable Cut-off Date.


# ARTICLE II

## CONVEYANCE 0F MORTGAGE LOANS

Section 2.01    **Conveyance of Mortgage Loans; Possession of Mortgage Files.**

(a)    The Company, simultaneously with the execution and delivery of a Reference Agreement, shall sell, transfer and assign, without recourse, to the relevant Initial Owner, the Ownership Interest comprising all right, title and interest of the Company in and to the Mortgage Loans, including all interest at the applicable Mortgage Loan Remittance Rate and principal received on or with respect to the Mortgage Loans after the applicable Cut-off Date set forth in the applicable Reference Agreement (other than payments of principal and interest due on the Mortgage Loans on or before the applicable Cut-off Date) on a servicing retained basis.

(b)    In connection with the Company's sale of the Mortgage Loans to the relevant Initial Owner pursuant to a Reference Agreement, the Company shall deliver to, and deposit with, the Custodian, as the duly appointed agent of the Owners for such purpose, the following original documents or instruments (or copies thereof as permitted by this Section) with respect to each Mortgage Loan so assigned:

(i)    The original Mortgage Note, endorsed in blank by the Company without recourse, and showing an unbroken chain of endorsements from the originator thereof to the Company or, for no more than 1.0% of the related Mortgage Pool (measured by the Cut-Off Date Principal Balance), an original lost note affidavit from the related Seller or the Company stating that the original Mortgage Note was lost, misplaced or destroyed, together with a copy of the related Mortgage Note;

(ii)    Unless the Mortgage Loan is registered on the MERS® System, an unrecorded original Assignment of the Mortgage from the Company in blank;

(iii)    The original Mortgage, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording indicated thereon or a copy of the Mortgage with evidence of recording indicated thereon;

(iv)    The original recorded assignment or assignments of the Mortgage showing an unbroken chain of title from the originator thereof to the Company (or to MERS, if the Mortgage Loan is registered on the MERS® System and noting the presence of a MN) with evidence of recordation noted thereon or attached thereto, or a copy of such assignment or assignments of the Mortgage with evidence of recording indicated thereon;

(v)    The original of each modification, assumption agreement or preferred loan agreement, if any, relating to such Mortgage Loan with evidence of recording thereon or a certified copy of each modification, assumption agreement or preferred loan agreement;

(vi)    The original of any guarantee executed in connection with such Mortgage Loan, if any;

(vii)    Relating to a Mortgage Note or Mortgage that is executed by an attorney-in-fact, an original or certified copy of the fully executed power of attorney; and

(viii)    The original policy of title insurance, including riders and endorsements thereto, or if the policy has not yet been issued, a written commitment or interim

Unassociated Document

Page 438 of 835

12-12020-mg   Doc 5106-9   Filed 09/18/13   Entered 09/18/13 18:18:12   Exhibit 7
Part 3   FST-CV-09-5011591   Doc 163   Exhibit D   Part 2 of 3   Pg 160 of 279

binder or preliminary report of title issued by the title insurance or escrow company.

The Company may, in lieu of delivery of the original of the documents set forth in Section 2.0l(b)(iii) through (viii) (or copies thereof as permitted by Section 2.01(b)) to the Custodian, retain such documents and hold such documents in trust for the use and benefit of all present and future Owners until 10 Business Days following the receipt of the original of all of the documents or instruments set forth in Section 2.01 (b)(iii) through (viii) (or copies thereof as permitted by such Section) for any Mortgage Loan. At such time, the Company shall deliver a complete set of such documents to the Custodian as the duly appointed agent of the Owners.

In the event that the Company has been notified by the Custodian that it has determined to the Custodian any Mortgage Note endorsed in blank or Assignment of Mortgage in blank by a party other than the Company, the Company shall complete the endorsement of the Mortgage Note and Assignment of Mortgage into the name of the Company and deliver an endorsement in blank by the Company and an Assignment of the Mortgage from the Company in blank in conjunction with the Interim Certification issued by the Custodian as contemplated by Section 2.02.

(c)      Notwithstanding the provisions of Section 2.01(b), in the event that in connection with any Mortgage Loan the Company cannot deliver the original of the Mortgage, any assignment, modification, assumption agreement or preferred loan agreement (or a copy thereof as permitted by Section 2.01(b)) with evidence of recording thereon concurrently with the execution and delivery of this Agreement because of a delay caused by a public recording office where such Mortgage, assignment, modification, assumption agreement or preferred loan agreement as the Case may be, has been delivered for recordation, the Company shall deliver to the Custodian a copy of such Mortgage, assignment, modification, assumption agreement or preferred loan agreement The Company shall promptly deliver to the Custodian such Mortgage, assignment, modification, assumption agreement or preferred loan agreement with evidence of recording indicated thereon in accordance with Section 2.01(b).

In connection with the assignment of any Mortgage Loan registered on the MERS® System, the Company further agrees that it will, at the relevant Initial Owners' request, cause the MERS® System to indicate that such Mortgage Loans have been assigned by the Company to such Initial Owner by including (or, if applicable, deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files the code in the field "Pool Field" which identifies the series in which such loans were sold. The Company further agrees that it will not alter the code referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

(d)      Any documents required to be delivered to the Custodian by the Company pursuant to this Section 2.01 which are in the possession or control of the Company or a Subservicer and which are not delivered to the Custodian or are requested from the Custodian in connection with the servicing of the Mortgage Loans are and shall be held by the Company, either directly or through the related Subservicer, in trust for the benefit of the Owners.

The sale of each Mortgage Loan shall be reflected on the Company's balance sheet and other financial statements as a sale of assets by the Company. The Company shall be responsible for maintaining, and shall maintain records for each Mortgage Loan which shall be clearly marked to reflect the ownership of each Mortgage Loan by the Owners.

**Section 2.02   Acceptance by the Initial Owners.** The relevant Initial Owner, upon its receipt of the Initial Certification (as found on Exhibit One of the applicable Custodial Agreement) from the Custodian, shall acknowledge receipt by the Custodian as the duly appointed agent of the Owners of the documents referred to in Section 2.01 above and declares that the Custodian as its agent, holds and will hold such documents and the other documents constituting a part of the Mortgage Files delivered to the Custodian as its agent, in trust for the use and benefit of such Initial Owner and any other future Owner. The Custodian, being so obligated under the applicable Custodial Agreement, shall, for the benefit of the Owners, review each Mortgage File delivered to it within 45 days after the applicable Closing Date to ascertain that all required documents have been executed and received, and that such documents relate to the Mortgage Loans identified on an exhibit to the applicable Reference Agreement, and deliver to the Owners a certificate (the "Interim Certification") to the effect that all documents required to be delivered pursuant to Section 2.01(b) have been executed and received and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule, except for any exceptions listed on Schedule A attached to such Interim Certification. Pursuant to the applicable Custodial Agreement, the Custodian shall notify the relevant Initial Owner and the Company if any document or documents constituting a part of the Mortgage File are missing or defective in respect of the items reviewed by it pursuant to the applicable Custodial Agreement. The relevant Initial Owner shall notify the Company and the Custodian of any such omission or defect which it finds in respect of any Mortgage Loan. If such omission or defect materially and adversely affects the interests of an Owner, the Company shall promptly notify the related Subservicer or Seller of such omission or defect and shall request that such Subservicer or Seller correct or cure such omission or defect within 60 days from the date the Company was notified of such omission or defect. if such Subservicer or Seller does not correct or cure such omission or defect within such period, the Company shall use reasonable efforts to cause such Subservicer or Seller to purchase such Mortgage Loan from the Owners within 75 days from the date the Company was notified of such omission or defect by depositing in the Custodial Account or otherwise delivering the Repurchase Price for such Mortgage Loan to the Company; provided, however, if such Subservicer or Seller fails to purchase such Mortgage Loan from the Owners within such 75 day period, the Company shall purchase, from its own funds, such Mortgage Loan at the Repurchase Price within 15 Business Days of the expiration of such 75 day period. The Company shall exercise reasonable efforts to enforce the related Subservicer's or Seller's obligation to purchase such Mortgage Loan from the Owners. The Repurchase Price for such Mortgage Loan shall be deposited by the Company in the Custodial Account. Upon receipt by the relevant Initial Owner of written notification of such deposit signed by an officer of the Company, the Custodian shall release to the Company the related Mortgage File and the Owners shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as shall be necessary to vest in the Company, Seller or its designee or the Subservicer or its designee, as the case may be, any Mortgage Loan released pursuant hereto. In furtherance of the foregoing, if the Subservicer or the Seller that is obligated to purchase a Mortgage Loan under this Section 2.02 is not a member of MERS, and the Mortgage is registered on the MERS® System, the Company shall cause MERS to execute and deliver an Assignment in recordable form to transfer the Mortgage from MERS to such Subservicer or Seller and shall cause such Mortgage to be removed from registration on the MERS® System in accordance with MERS' rules and regulations. The obligation of the Seller, the Subservicer or the Company, as the case may be, under this Section 2.02 to cure any material and adverse omissions or defects with respect to any Mortgage Loan or to purchase any Mortgage Loan as to which a material and adverse defect in or omission of a constituent document exists shall constitute the sole remedy respecting such defect or omission available to the Owners.

**Section 2.03   Assignment of Mortgage Loans.** The Initial Owners shall have the right to assign its interest under this Agreement with respect to a Mortgage Pool in whole or in part and designate any person to exercise any rights of an Owner hereunder with respect to such Mortgage Pool, and the assignee or designee shall accede to the rights and obligations hereunder of an Owner with respect to such Mortgage Pool; provided, however, that (i) such Mortgage Pool shall at all times be subject to the terms of this Agreement; and (ii) with respect to any Mortgage Pool, there will be no more than three Owners at one time, and provided further that the Company shall be given 20 days' prior written notice before any such assignment shall be effective. Prior to assigning its interests under this Agreement, the relevant Initial Owner shall deliver a copy of this Agreement to such assignee or designee. Each assignee or designee may assign its interest in a Mortgage Pool owned by it in whole or in part to no more than three Persons; provided, however, that at no time will there be more than three Owners with respect to any Mortgage Pool,. No sale or transfer of a Mortgage Loan or assignment of this Agreement shall be binding upon the Company for any purpose under this Agreement unless the Owner proposing to make such sale, transfer or assignment and its prospective assignee have executed and delivered to the Company (with a copy to the Custodian) an assignment and assumption agreement substantially in the form of Exhibit D annexed hereto and the Company has acknowledged such agreement. No sale of the Mortgage Loans shall be made to any employee benefit plan or other plan that is subject to ERISA or Section 4975 of the Code (each, a "Plan") or to any person or entity that is investing on behalf of or with "plan assets" of any Plan or to any insurance company, other than an insurance company investing with funds held in its general account (if such funds do not include "plan assets" of any Plan), unless an Owner's prospective assignee provides the Company with a certification or Opinion of Counsel or both, which establishes to the Company's satisfaction that such disposition will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA and Section 4975 of the Code. The Company shall not be required to pay any costs or expenses incurred in connection with obtaining such Opinion of Counsel. The Company may require that such prospective assignee certify to the Company in writing the facts establishing that such disposition will not violate the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code.

The sale of the Mortgage Loans has not been registered or qualified under the Securities Act or any state securities law. No sale, transfer, pledge or other disposition of the Mortgage Loans or any interest therein shall be made unless such disposition is made pursuant to an effective registration statement under the Securities Act and effective registration or qualification under applicable state securities laws, or is made in a transaction which does not require such registration or qualification. If an Owner proposes to make a disposition (by sale, hypothecation, pledge or otherwise) without registration or qualification, the Company shall require, in order to assure compliance with such laws, that the Owner desiring to effect the disposition, and an Owner's prospective transferee, certify to the Company in writing the facts surrounding the disposition. Unless the Company requests otherwise, such certification of facts shall he in the form of an assignment and assumption agreement annexed hereto as Exhibit I). In the event that such certification of facts does not on its face establish that registration or qualification is not required, the Company may require an Opinion of Counsel satisfactory to it that the transfer may be made without such registration or qualification. Any such Opinion of Counsel shall not be an expense of the Company. The Company is not obligated to register or qualify the Mortgage Loans under the Securities Act or any other securities law or to take any action not otherwise required under this Agreement to permit the transfer of the Mortgage Loans without registration or qualification.

Upon compliance with the foregoing conditions and receipt of an assignment and assumption agreement executed by an Owner and its prospective assignee and acknowledged by the Company, the Company shall make the appropriate notations in its books to reflect the sale of the affected Mortgage Loans to such assignee, such assignee shall accede to the rights and the obligations of such Owner hereunder with respect to such Mortgage Loans, and such Owner shall be released from its obligations hereunder with respect to such Mortgage Loans that have been sold

in accordance with this Agreement. For the purposes of this Agreement, the Company shall be under no obligation to deal with any Person with respect to this Agreement or the Mortgage Loans unless the books and records of the Company show such Person as an Owner of such Mortgage Loans,. The Company shall not be responsible for expenses incurred by an Owner or any transferee in connection with any sale or transfer pursuant to this Section 2.03.

**Section 2.04**     **Representations and Warranties of the Company.**

(a)    With respect to each Mortgage Loan, Company hereby represents and warrants to the relevant Initial Owner that as of each Closing Date or such other date specifically provided for herein, unless otherwise specified in a Reference Agreement:

(i)    Each Primary Insurance Policy insures the named insured and its successors and assigns, and the issuer of the Primary Insurance Policy is an insurance company whose claims-paying ability is currently acceptable to any nationally recognized rating agency;

(ii)    There is no default, breach, violation or event of acceleration existing under any Mortgage Note or Mortgage and no event which, with notice and expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by any Seller or Subservicer or by any other entity involved in originating or servicing a Mortgage Loan.,

(iii)    No Mortgagor has any right of offset, defense or counterclaim as to the related Mortgage Note or Mortgage except as may be provided under the Servicemembers Civil Relief Act;

(iv)    The improvements upon the Mortgaged Properties are insured against loss by fire and other hazards as required by the Program Guide including flood insurance if required under the National Flood Insurance Act of 1968, as amended. The Mortgage requires the Mortgagor to maintain such casualty insurance at the Mortgagor's expense, and on the Mortgagor's failure to do so, authorize the holder of the Mortgage to obtain and maintain such insurance at the Mortgagor's expense and to seek reimbursement therefore from the Mortgagor;

(v)    No Mortgage Loan is secured by a leasehold estate;

(vi)    The Mortgage Loans are secured by one- to four-family dwelling units. No Mortgage Loan is secured by a mobile or manufactured home. No portion of the Mortgaged Property has been used for commercial or mixed-use purposes;

(vii)    All parties to the Mortgage Note and the Mortgage had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage, and the Mortgage Note and the Mortgage have been duly and properly executed by such parties. The Mortgagor is a natural person, the identity of such natural person was hilly verified by the originator and such Mortgagor is not in violation of any laws regarding identity theft;

(viii)    (A) The terms of the Mortgage and the Mortgage Note have not been impaired, waived, altered or modified and (B) no instrument of release or waiver has been executed in connection with the Mortgage Loans, and no Mortgagor has been released, in whole or in part from its obligations in connection with a Mortgage Loan, except in either case of (A) or (B) above by a written instrument which has been recorded, if necessary, to protect the interest of the Owners and which has been delivered in accordance with this Agreement., The substance of any such alteration or modification is reflected on the Mortgage Loan Schedule and, to the extent necessary, has been approved by the primary mortgage insurer, if any, and the insurer under the applicable mortgage title insurance policy;

(ix)    With respect to each Mortgage Loan, either (i) the Mortgage Loan is assumable pursuant to the terms of the Mortgage Note, or (ii) the Mortgage Loan contains a customary provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event the related Mortgaged Property is sold without the prior consent of the mortgagee thereunder;

(x)    Any escrow arrangements established with respect to any Mortgage Loan are in compliance with all applicable local, state and federal laws and are in compliance with the terms of the related Mortgage Note;

(xi)    Each Mortgage Loan constitutes a qualified mortgage under Section 860G(a)(3)(A) of the Code and Treasury Regulations Section 1 .860G-2(a)( 1);

(xii)    There are no toxic materials or other environmental hazards on, in or that could affect any Mortgaged Property in any material respect;

(xiii)    No Mortgage Loan secured by a property located in the State of Georgia was originated on or after October 1, 2002 and before March 7, 2003;

(xiv)    None of the Mortgage Loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost," "covered," "high risk home," or "predatory" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees;

(xv)    No Mortgage Loan originated on or after October 1, 2002 provides for the payment of a Prepayment Premium beyond the three year term following the origination of the Mortgage Loan. No Mortgage Loan originated prior to such date provides for the payment of a Prepayment Premium beyond the five-year term following the origination of the Mortgage Loan;

(xvi)    The Company has fully furnished, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis;

(xvii)    Article XVI, Section 50(a)(6) of the Texas Constitution is not applicable to the Mortgage Loan or the origination thereof. If the Mortgage Loan was originated in Texas, it is not a cash-out refinancing;

(xviii)    The Debt-to-Income Ratio of the Mortgage Loan is accurately reflected in the Mortgage Loan Schedule;

(xix)    With respect to any Mortgage Loan originated on or after August 1, 2004, neither the related Mortgage nor the related Mortgage Note requires the Mortgagor to submit to arbitration to resolve any dispute arising thereunder or in connection with the origination of such Mortgage Loan;

(xx)    The Loan-to-Value Ratio of the Mortgage Loan is accurately reflected in the Mortgage Loan Schedule;

(xxi)    No Mortgage Loan is a High Cost Loan or Covered Loan, as applicable (as such terms are defined in S&P's current edition of its LEVELS Glossary, Appendix E);

(xxii)    All fees and charges (including finance charges) and whether or not financed, assessed, collected or to be collected with the origination and servicing of each Mortgage Loan has been disclosed in writing to the Mortgagor in accordance with applicable state and federal law and regulation;

(xxiii)    No Mortgage Loans have been prepaid in full prior to the related Closing Date;

(xxiv)    Neither the origination of the Mortgage Loan nor the purchase thereof by the Initial Owner will cause the Mortgage Loan or the Initial Owner to fail to comply with the 0CC Guidelines Establishing Standards for Residential Mortgage Lending Practices;

(xxv)    The credit score of such Mortgage Loan is accurately reflected in the Mortgage Loan Schedule and each credit score was obtained from Experian, Transunion or Credit Repository;

(xxvi)    None of the Mortgage Loans are buy-down loans, graduated payment loans or have a shared appreciation or other contingent interest feature;

(xxvii)    Reserved;

(xxviii)    The interest only period with respect to any Interest Only Mortgage Loan shall be for a fixed period not to exceed ten years; and

(xxix)    Interest on each Mortgage Loan is calculated on the basis of a 360-day year consisting of twelve 30-day months, with Monthly Payments due on the first of the month and interest payable in arrears;

(xxx)    No Mortgage Loan is one month or more delinquent in payment of principal and interest and, unless otherwise agreed by the Company and the relevant Initial Owner in the commitment letter with respect to such Mortgage Loan, has not been so delinquent more than once in the 12-month period immediately prior to the applicable Closing Date;

(xxxi)    There is no delinquent tax or assessment lien against any Mortgaged Property;

(xxxii)    There are no delinquent insurance premiums affecting any Mortgaged Property;

(xxxiii)    The information set forth in the Mortgage Loan Schedule (including, without limitation, any information with respect to any Lender-Paid Mortgage Insurance Policy) with respect to each Mortgage Loan or the Mortgage Loans, as the case may be, is true and correct in all material respects at the date or dates respecting which such information is furnished;

(xxxiv)    As of the applicable Closing Date, the Mortgage Loans were originated and have been serviced in all material respects in accordance with the Program Guide;

(xxxv)    Each Mortgage Loan has been closed and fully disbursed, and immediately prior to the sale of the Mortgage Loans to such Initial Owner, the Company had good title to, and was the sole owner of, each Mortgage Loan and the sale of each Mortgage Loan by the Company validly transfers such Mortgage Loan to such Initial Owner free and clear of any pledge, lien, encumbrance or security interest (other than rights to servicing and related compensation) and no action has been taken or failed to be taken by the Company that would materially adversely affect the enforceability of any Mortgage Loan or the interests therein of such Initial Owner;

(xxxvi)    No misrepresentation, fraud or similar occurrence in respect of a Mortgage Loan has taken place on the part of any person, including without limitation, the Mortgagor, any appraiser or any party involved in the origination of the Mortgage Loan or in the application for any insurance in relation to such Mortgage Loan that might result in a denial, contesting, failure or impairment of full and timely coverage under any insurance policies required to be obtained with respect to the Mortgage Loans;

(xxxvii)    Each Mortgage constitutes a valid first lien on the related Mortgaged Property subject only to (1) the lien of current real property taxes and assessments, (2) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of the Mortgage, and such other permissible title exceptions as are listed in the Program Guide, and (3) other matters to which like properties are commonly subject which do not materially adversely affect the value, use, enjoyment and marketability of the Mortgaged Property;

(xxxviii)    The Mortgaged Property is free of damage and is in good repair, and no notice of condemnation has been given with respect thereto and the Company knows of nothing involving any Mortgaged Property that could reasonably be expected to adversely affect the value or marketability of any Mortgaged Property;

(xxxix)    There are no mechanics' liens or claims for work, labor or material affecting any Mortgaged Property which are or may be a lien prior to, or equal with, the lien of the related Mortgage, except such liens that are insured or indemnified against by a title insurance policy described under clause (xlviii) below;

(xl)    Each Mortgage Loan was originated by the Company in accordance with the Program Guide except for such variances as were justified by compensating factors identified in writing at the time of origination of such Mortgage Loan;

(xli)    Each Mortgage Loan as of the time of its origination complied with all applicable local, state and federal laws, including, but not limited to, all applicable predatory lending laws;

(xlii)    None of the Mortgage Loans are "high cost loans", subject to the Home Ownership and Equity Protection Act of 1994, as amended or "high cost", covered or predatory loans under other applicable state federal or local law;

(xliii)    Each Mortgage Loan was originated (1) by a savings and loan association, savings bank, commercial bank, credit union, insurance company or similar institution that is supervised and examined by a federal or state authority, (2) by a mortgagee approved by the Secretary of HUD pursuant to Sections 203 and 211 of the National Housing Act, as amended, or (3) by a mortgage broker in a manner such that any mortgage backed securities representing interests in the Mortgage Loans would not fail to qualify as "mortgage related securities" within the meaning of Section 3(a)(41) of the Securities Exchange Act of 1934, as amended;

(xliv)    Each Mortgage contains customary and enforceable provisions which render the rights and remedies of the holder adequate to realize the benefits of the security against the Mortgaged Property, including (1) in the case of a Mortgage that is a deed of trust, by trustee's sale, (2) by summary foreclosure, if available under applicable law, and (3) otherwise by foreclosure, and there is no homestead or other exemption or dower, courtesy or other rights or interests available to the Mortgagor or the Mortgagor's spouse that would interfere with such right to sell at a trustee's sale or right to foreclosure, subject in each case to applicable federal and state laws and judicial precedents with respect to bankruptcy and rights of redemption;

(xlv)    No Mortgage Loan was made in connection with (I) the construction or rehabilitation of a Mortgaged Property or (2) facilitating the trade-in or exchange of a Mortgaged Property or an REO Property;

(xlvi)    With respect to each Mortgage that is a deed of trust, a trustee duly qualified under applicable law to serve as such is properly named, designated and serving;

(xlvii)    Except in connection with a trustee's sale after default by a Mortgagor, no fees or expenses are payable by the Company or the Subservicer to the trustee under any Mortgage that is a deed of trust;

(xlviii)    A policy of title insurance in the form and amount required by the Program Guide was effective as of the closing of each Mortgage Loan, is valid and binding and remains

in full force and effect, unless the Mortgaged Property is located in the State of Iowa and an attorney's certificate has been provided as described in the Program Guide; with respect to any Pay Option ARM Mortgage Loan, such policy of title insurance includes a negative amortization endorsement and insures the Company against any loss by reason of the invalidity or the unenforceability of the lien resulting from the provisions of the Mortgage providing for the adjustment of the mortgage interest rate and/or the monthly payment including any Negative Amortization thereunder;

(xlix)    There is no requirement for future advances under the Mortgage Loan and any and all requirements as to completion of any on-site or off site improvements and as to disbursements of any escrow funds therefor (including any escrow funds held to make Monthly Payments pending completion of such improvements) have been complied with. MI costs, fees and expenses incurred in making, closing or recording the Mortgage Loans were paid.

(l)    Each Mortgage Note constitutes a legal, valid and binding obligation of the Mortgagor enforceable in accordance with its terms except as limited by bankruptcy, insolvency or other similar laws affecting generally the enforcement of creditors' rights;

(li)    The Mortgage Note is not and has not been secured by any collateral, pledged account, or other security except the lien of the Mortgage;

(lii)    The Mortgagor has not notified the Company or a Subservicer, and no relief has been requested or allowed to the Mortgagor, under the Servicemembers' Civil Relief Act.

(liii)    No Mortgagor is the subject to any pending bankruptcy, insolvency, reorganization or moratorium proceeding;

(liv)    All improvements which were considered in determining the Appraised Value of the Mortgaged Property lie wholly within the boundaries and the building restriction lines of the Mortgaged Property, or the policy of title insurance affirmatively insures against loss or damage by reason of any violation, variation, encroachment or adverse circumstance that either is disclosed or would have been disclosed by an accurate survey;

(lv)    The Company is a member of MERS, in good standing, and current in payment of all fees and assessments imposed by MERS, and has complied with all rules and procedures of MERS in connection with its assignment on the MERS® System to such Initial Owner;

(lvi)    To the extent an appraisal of the Mortgaged Property was made, the appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in the Program Guide;

(lvii)    Each Mortgage Loan was underwritten and approved in accordance with the Company's general procedures and standards in all material respects;

(lviii)    The servicing of each Mortgage Loan has been legal, proper, prudent and customary and in accordance with the Program Guide;

(lix)    The Mortgaged Property is in material compliance with all applicable environmental laws pertaining to environmental hazards (including without limitation, asbestos) and neither the Company, nor to the Company's knowledge, the related Mortgagor, has received any notice of any violation or potential violation of such environmental laws;

(lx)    No misrepresentation or fraud in respect of such Mortgage Loan has taken place on the part of any Person in connection with the origination and servicing of such Mortgage Loan;

(lxi)    There is no mortgage loan in the trust that was originated on or after March 7, 2003, which is a "high cost home loan" as defined under the Georgia Fair Lending Act;

(lxii)    No mortgage loan in the trust is a "high cost home," "covered"1 (excluding home loans defined as "covered home loans" in the New Jersey Home Ownership Security Act of 2002 that were originated between November 26, 2003 and July 7, 2004), "high risk home" or "predatory" loan under any applicable state, federal or local law (or a similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees);

(lxiii)    With respect to each mortgage loan underlying the Security, no borrower obtained a prepaid single-premium credit-life, credit disability, credit unemployment or credit property insurance policy In connection with the origination of the mortgage loan;

(lxiv)    No subprime mortgage loan originated on or after October 1, 2002 underlying the Security will impose a prepayment premium for a term in excess of three years. Any loans originated prior to such date, and any non-subprime loans, will not impose prepayment penalties in excess of five years;

(lxv)    The servicer for each mortgage loan underlying the Security will fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (it., favorable and unfavorable) on its borrower credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis;

(lxvi)    With respect to Pay Option ARM Mortgage Loans, the related Mortgage Note requires a Monthly Payment which is a Minimum Monthly Payment, an interest-only payment, full principal and interest amortized over thirty (30) years, or full principal and interest amortized over fifteen (15) years, and in each case, such Monthly Payment is in accordance with the related Mortgage Note;

(lxvii)    With respect to any Pay Option ARM Mortgage Loan, as of any Adjustment Date, the Mortgagor is and was provided with any and all disclosures and amortization schedules required by applicable law; and

(lxviii)    No Pay Option ARM Mortgage Loan has a Loan-to-Value Ratio as of the Closing Date equal to or greater than 115%, and no Mortgage Loan or Mortgage Note allows for a Loan-to-Value Ratio equal to or greater than 115%.

(b)    It is understood and agreed that the representations and warranties set forth in Section 2.04(a) herein and any additional representations and warranties set forth in a Reference Agreement shall survive the sale of the Mortgage Loans and shall inure to the benefit of any Owners, notwithstanding any restrictive or qualified endorsement or assignment. Upon discovery by either the Company or an Owner of a breach of any of the representations and warranties in Section 2.04(a) or any additional representations and warranties set forth in a Reference Agreement, which materially and adversely affects the interest of the Owners, including, but not limited to, value and enforceability, in the related Mortgage Loan, the party discovering such breach shall give prompt written notice to the other. Within 90 days of its discovery or its receipt of notice of any such breach, the Company shall (i) cure such breach in all material respects or (ii) repurchase such Mortgage Loan at the Repurchase Price provided that if the breach would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such cure or repurchase must occur within 90 days from the date such breach was discovered. The Repurchase Price for the repurchased Mortgage Loan shall be deposited by the Company in the Custodial Account and, upon receipt by the Owners of such Repurchase Price, the Owners shall cause the Custodian to promptly deliver the related Mortgage File to the Company. If any breach of representation or warranty set forth in clauses (xxi), (xli) and (xlii) of Section 2.04(a) gives rise to an obligation to repurchase a Mortgage Loan pursuant to this Section 2.04(b), then the Company shall pay to the Owner an amount equal to any liability, penalty or expense that is actually incurred and paid by the Owner and that directly resulted from such breach. The Company shall prepare the Assignment of the related Mortgage for execution by or at the direction of the Owners, as applicable, and shall pay all costs and expenses reasonably incurred by the Owners in effecting the reconveyance of a repurchased Mortgage Loan including, without limitation, the cost of recording the Assignment of the related Mortgage for any Mortgage Loan that is not registered with MERS. Notwithstanding the foregoing, the Company shall indemnify the Owner for any reasonable expense, cost, loss or liability (including but not limited to reasonable attorney's fees) incurred by the Owner arising from any breach of warranty or representation or covenant of the Company made herein that materially and adversely affects the interests of the Owner in such Mortgage Loan. It is

understood and agreed that the.. obligation of the Company to cure such breach or to so purchase such Mortgage Loan as to which such a breach has occurred and is continuing and the obligation of the Company to indemnify the Owner pursuant to the preceding sentence shall constitute the sole remedy respecting such breach available to the Owners.

(c)    The Company hereby represents and warrants to each Initial Owner that as of each Closing Date:

(i)    The Company is a corporation duly organized, validly existing and in good standing under the laws governing its creation and existence and is or will be in compliance with the laws of each state in which any Mortgaged Property is located to the extent necessary to ensure the enforceability of each Mortgage Loan in accordance with the terms of this Agreement;

(ii)    The execution, delivery and performance of this Agreement by the Company have been duly authorized and its execution, delivery, performance and compliance with the terms of this Agreement will not violate the Company's Certificate of Incorporation or Bylaws or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the material breach of, any material contract, agreement or other instrument to which the Company is a party or which may be applicable to the Company or any of its assets;

(iii)    This Agreement, assuming due authorization, execution and delivery by each Initial Owner, constitutes a valid, legal and binding obligation of the Company enforceable against it in accordance with the terms hereof subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law;

(iv)    The Company is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of the Company or its properties or might have consequences that would materially adversely affect its performance hereunder;

(v)    The Company believes that it can perform the covenants contained in this Agreement in all material respects. The Company is solvent and will not be rendered insolvent by the consummation of the transactions contemplated by this Agreement;

(vi)    The performance of the Company's obligations under this Agreement and the consummation of the transactions contemplated hereby do not require any consent, approval, authorization or order of, filing with or notice to any State of Minnesota agency or other governmental body in any other applicable jurisdiction, except such as have been obtained, effected or given;

(vii)    No litigation is pending or, to the best of the Company's knowledge, threatened against the Company which would prohibit the Company from entering into this Agreement or which would have a material adverse effect on the Company's ability to perform its obligations under this Agreement;

(viii)    The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Company, and the transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Company pursuant to this Agreement are not subject Lo the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction;

(ix)    The Company has not dealt with any broker, investment banker, agent or other person that may be entitled to any commission or compensation in connection with the sale of the Mortgage Loans that will be borne by the relevant Initial Owner;

(x)    Except as previously disclosed to the Initial Owners in writing (a) the financial statements of the Company delivered to the Initial Owners for the fiscal year ended December 31, 2004 fairly present the results of operations and changes in financial position of the Company for such period and the financial position of the Company as of the end of such period, and (b) such financial statements are true, correct and complete as of their respective dates and have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved, except as set forth in the notes to such financial statements.

(xi)    No information, certificate of an officer, statement furnished in writing or report delivered by the Company to the Initial Owners will contain any untrue statement of a material fact;

(xii)    Each Mortgage Loan was originated by a Seller that was in good standing with the Company as a seller under the Program Guide at the time of purchase of the Mortgage Loan by the Company;

(xiii)    The electronic data file listing the Mortgage Loans and characteristics thereof provided to the relevant Initial Owner by the Company prior to the Closing Date is true and correct in all material respects; and

(xiv)    The Company has complied with all anti-money laundering laws and regulations currently in effect and applicable to it,.

**Section 2.05    Representations, Warranties and Covenants of the Initial Owners.** Each Initial Owner hereby represents and warrants to and covenants with, the Company that as of the applicable Closing Date:

(i)    Such Initial Owner understands that the Mortgage Loans have not been registered under the Securities Act or the securities laws of any state. Such Initial Owner is acquiring the Mortgage Loans for investment for its own account only and not with a view to or for sale or other transfer in connection with any distribution of the Mortgage Loans in any manner that would violate the Securities Act or any applicable state securities law. Such Initial Owner considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Mortgage Loans. Such Initial Owner has been furnished with all information regarding the Mortgage Loans that it has requested from the Company. Neither such Initial Owner nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Mortgage Loans or any interest in the Mortgage Loans to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Mortgage Loans or any interest in the Mortgage Loans from, or otherwise approached or negotiated with respect to the Mortgage Loans, any interest in the Mortgage Loans with, any Person in any manner, or made any general solicitation by means of general advertising or in any other manner or taken any other action, which would constitute a distribution of the Mortgage Loans under the Securities Act or which would render the disposition of the Mortgage Loans a violation of Section 5 of the Securities Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Mortgage Loans;

(ii)    Such Initial Owner is either (a) not a Plan that is subject to ERISA or Section 4975 of the Code and not a Person acting, directly or indirectly, on behalf of or investing with "plan assets" of any such Plan or (b) an employee benefit plan that is subject to ERISA or Section 4975 of the Code and the transaction contemplated herein does not constitute and will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code;

(iii)    Such Initial Owner has executed this Agreement, the applicable Reference Agreement and the applicable Custodial Agreement contemporaneously with the sale of the Mortgage Loans by the Company to such Initial Owner and the transfer of the purchase price by such Initial Owner to the Company. The appropriate credit and investment committees of such Initial Owner has approved this Agreement, such Reference Agreement and such Custodial Agreement and such committees have the corporate authority to approve this Agreement, such Reference Agreement and such Custodial Agreement;

(iv)    Such Initial Owner shall maintain this Agreement, each Reference Agreement and each Custodial Agreement continuously, from the time of their execution, as an official record of such Initial Owner; and

(v)    Such Initial Owner has the full corporate power and authority to purchase the Mortgage Loans and to execute, deliver and perform and to enter into and consummate all transactions contemplated by this Agreement, the applicable Reference Agreement and applicable Custodial Agreement, has duly authorized the execution and delivery of this Agreement, such Reference Agreement and such Custodial Agreement, and this Agreement, such Reference Agreement and such Custodial Agreement each constitute the legal, valid and binding obligation of such Initial Owner, enforceable against it in accordance with their respective terms, except as limited by bankruptcy, insolvency or other similar laws affecting generally the enforcement of creditors' rights and by general principles of equity regardless of whether such enforcement is considered in a proceeding in equity or at law.

The relevant Initial Owner shall indemnify the Company and hold it harmless against any loss, liability or expense incurred in connection with any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of such Initial Owner's representations, warranties and covenants contained in this Section 2.05.

**Section 2.06**    **Protection of Confidential Information and Consumer Information.**

(a)    Each Owner agrees that the Sellers are customers of the Company and that the relationships between the Company and such Sellers are confidential (the "Confidential Information"). Each Owner agrees that it shall not directly solicit the Sellers of Mortgage Loans for the purpose of purchasing loans similar to the Mortgage Loans from any such Seller unless (I) such a relationship already exists between such Owner or its affiliates and such Seller, (ii) such a purchase of a mortgage loan is established by a broker or agent of such Owner, which agent or broker is acting independently, and neither such Owner nor its affiliates have provided such broker or agent with any Confidential Information, or (iii) such a purchase of a mortgage loan is in such Owner's ordinary course of business and is not based on the use of Confidential Information. Each Owner shall keep confidential and shall not, without the Company's prior written consent, divulge to any party the price paid by such Owner for the Mortgage Loans, except to the extent that it is appropriate for such Owner to do so in working with legal counsel, auditors, examiners, taxing authorities or other governmental or regulatory agencies.

(b)    Each Owner agrees that it (i) shall comply with any applicable laws and regulations regarding the privacy and security of Consumer Information, (ii) shall not use Consumer Information in any manner inconsistent with any applicable laws and regulations regarding the privacy and security of Consumer Information, (iii) shall not disclose Consumer Information to third parties except as permitted or required by applicable law and regulations or at the specific written direction of the Company, (iv) shall maintain adequate physical, technical and administrative safeguards to protect Consumer Information from unauthorized access, and (v) shall immediately notify the Company of any actual or suspected breach of the confidentiality of Consumer Information.

Each Owner agrees that it shall indemnify, defend and hold the Company harmless from and against any loss, claim or liability the Company may suffer by reason of such Owner's failure to perform the obligations set forth in this Section 2.06(b).

(c)    The Company agrees that (i) it shall not solicit any Mortgagors (in writing or otherwise) to refinance any of the Mortgage Loans; provided that mass advertising or mailings (such as placing advertisements on television, on radio, in magazines or in newspapers or including messages in billing statements) that are not exclusively directed towards the Mortgagors shall not constitute solicitation and shall not violate this covenant and (ii) it shall comply with any applicable laws and regulations regarding the privacy and security of Consumer Information, it shall not use Consumer Information in any manner inconsistent with any applicable laws and regulations regarding the privacy and security of Consumer Information, it shall not disclose Consumer Information to third parties except as permitted or required by applicable law and regulations, it shall maintain adequate physical, technical and administrative safeguards to protect Consumer Information from unauthorized access and it shall immediately notify the Owner of any actual or suspected breach of the confidentiality of Consumer Information.

The Company shall indemnify, defend and hold the Owner harmless from and against any loss, claim or liability the Owner may suffer by reason of the Company's failure to perform the obligations set forth in this Section 2.06(c).

(d)    The Company agrees and acknowledges that as to all nonpublic personal information received or obtained by it with respect to any Mortgagor: (a) such information is and shall be held by the Company in accordance with all applicable law, including but not limited to the privacy provisions of the Gramm-Leach Bliley Act; (b) such information is in connection with a proposed or actual secondary market sale related to a transaction of the Mortgagor for purposes of 16 C.F.R.312. 14(a)(3); and (c) Company is hereby prohibited from disclosing or using any such information other than to carry out the express provisions of this Agreement, or as otherwise permitted by applicable law.

(e)    The agreements under this Section 2.06 shall survive any termination of this Agreement.

**Section 2.07**    **Early Payment Default.** If the related Mortgagor is thirty (30) days or more delinquent with respect to the first Monthly Payment (or, if the Company and the relevant Initial Owner expressly agree in any commitment letter with respect to any Mortgage Loan, the second Monthly Payment) under a Mortgage Loan due following the related Closing Date, the Company shall, at the Initial Owner's option, repurchase such Mortgage Loan from the Initial Owner at the Repurchase Price within forty-five (45) days of the Due Date relating to such Monthly Payment; provided that the Company shall not be required to repurchase such Mortgage Loan if it can demonstrate to the Initial Owner's reasonable satisfaction within thirty (30) days of such reported delinquency that the related Mortgagor timely made all payments required of the Mortgagor but such payment was otherwise misapplied.

**Section 2.08**    **Prepayment Protection.** If any Mortgage Loan prepays in full within the first two (2) months following the related Closing Date, then the Company will pay to the Initial Owner an amount equal to the greater of (without duplication of any prepayment penalty fees otherwise paid with respect to such Mortgage Loan hereunder) (y) (1) the excess of the "purchase price percentage" paid by the Initial Owner to the Company for such Mortgage Loan over 100% as set forth in the related Mortgage Loan Schedule and/or commitment letter, times (2) the outstanding principal balance of the Mortgage Loan as of the date of such prepayment in full and (z) the amount of any prepayment penalty fees paid with respect to such Mortgage Loan. Such amount shall be deposited in the Custodial Account maintained by the Company In the event any Mortgage Loan is paid in full after the related Cut-off Date and on or prior to the related Closing Date, the Company shall also pay, in addition to the premium, the accrued interest paid by the Initial Owner for such Mortgage Loan. Nothing contained in this Section 2.08 shall in any way limit the rights of the Initial Owner to all collections and recoveries of principal and interest received or applied to any Mortgagor's account and the Company's obligation to remit such recoveries of principal and interest to the Initial Owner.

**Section 2.09**    **Delivery of Collateral Documents.** Upon request from the Owner, the Company shall deliver no later than fifteen (15) days after such request copies of any documents related to a Mortgage Loan that required to be delivered pursuant to Section 2.01(b) that are held by the Company, to the Owner at the direction of the Owner. If the Company fails to furnish copies within the time period specified in this Section after the Owner has requested such copies, the Company shall repurchase such Mortgage Loan from the Owner in accordance with Section 2.04 hereof.

In connection with any Mortgage Loan that is a "Streamline Refi" Mortgage Loan, upon request from the Owner, the Company shall deliver, no later than fifteen (15) days after such request, copies of any documents related to the original mortgage loan that was the subject of the refinancing; provided, however, that any such document was required to be included in the related mortgage loan file pursuant to the related underwriting guidelines which have been provided to the Owner. If the Company fails to furnish such copies within the time period specified in this Section after the Owner has requested such copies, the Company shall repurchase such Mortgage Loan from the Owner in accordance with Section 2.04 hereof.

**ARTICLE III**

**ADMINISTRATION AND SERVICING OF MORTGAGE LOANS**

**Section 3.01**    **Company to Act as Servicer.** The Company shall act as master servicer, and in such capacity shall service and administer the Mortgage Loans in accordance with

this Agreement and the Program Guide, and in connection therewith shall follow such procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities for mortgage loans similar to the Mortgage Loans, and as if the Mortgage Loans were owned by the Company and that are in accordance with accepted mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as the Mortgage Loans. The Company shall have full power and authority to the extent provided herein, acting alone and/or through the Subservicer as provided in Section 3.02, to do or cause to be done any and all things which it may deem necessary or prudent in connection with such servicing and administration. The Company will perform its duties and obligations as master servicer hereunder in accordance with all applicable laws in all material respects. The Owner shall furnish the Company and any Subservicer with any powers of attorney and other documents necessary or appropriate to enable the Company to service and administer the Mortgage Loans.

Section 3.02    **Agreements Between Company and Subservicer.** The Company may enter into one or more Subservicing Agreements with one or more Subservicers for the servicing and administration of the Mortgage Loans. Each Subservicer shall be approved by the Company as a servicer in accordance with the terms and conditions of the Program Guide and shall be entitled to receive and retain the Subservicing Fee in respect of the related Mortgage Loans. References in this Agreement to actions taken or to be taken by the Company in servicing the Mortgage Loans include actions taken or to be taken by a Subservicer on behalf of the Company. Each Subservicing Agreement will be upon such terms and conditions as are required or permitted by the Program Guide and are not inconsistent with this Agreement. Any Subservicing Agreement shall be deemed to be between the Subservicer and the Company alone and the Owners shall not be deemed a party thereto and shall have no claims, rights, obligations, duties or liabilities with respect to the Subservicer in its capacity as such except as hereinafter set forth in this Section 3.02.

The Company further is authorized and empowered by the Owners, with the Owners' knowledge and consent, in its own name or in the name of the Subservicer, when the Company believes it appropriate in its best judgment to register any Mortgage Loan on the MERS® System, or cause the removal from the registration of any Mortgage Loan on the MERS® System, to execute and deliver, on behalf of the Owners any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Owners and its successors and assigns. The cost of any such registration, removal, assignment or re-recording shall be paid by the Owners.

The Company shall be entitled to terminate any Subservicing Agreement that may exist and the rights and obligations of any Subservicer pursuant to any Subservicing Agreement in accordance with the terms and conditions of such Subservicing Agreement and without any limitation by virtue of this Agreement; provided, however, that in the event of termination of any Subservicing Agreement by the Company or the Subservicer, all servicing obligations of such Subservicer shall be assumed simultaneously by the Company, and the Company shall either act as servicer of the related Mortgage Loan or enter into a Subservicing Agreement with a successor Subservicer which will be bound by the terms of the related Subservicing Agreement.

The Company shall remain obligated and primarily liable to the Owners for the servicing and administering of the Mortgage Loans in accordance with the provisions of Section 3.01 without diminution of such obligation or liability by virtue of such Subservicing Agreements or arrangements or by virtue of indemnification from the Subservicer and to the same extent and under the same terms and conditions as if the Company alone were servicing and administering the Mortgage Loans.

In the event the Company shall for any reason no longer be the master servicer of the Mortgage Loans hereunder, the Successor Servicer appointed pursuant to Section 8.01, if any, or the Owners, as the case may be, shall thereupon assume all of the rights and obligations of the Company under each Subservicing Agreement that may have been entered into, unless the Subservicer or Owner is then permitted and elects to terminate any Subservicing Agreement in accordance with its terms.

Section 3.03    **Collection of Certain Mortgage Loan Payments and Liquidation of Mortgage Loans.** The Company shall cause all payments called for under the terms and provisions of the Mortgage Loans to be collected. Consistent with the foregoing, the Company may in its discretion (i) waive any late payment charge or penalty interest in connection with the prepayment of a Mortgage Loan and (ii) only upon determining that the coverage of such Mortgage Loan by the related mortgage insurance policy if any, will not be affected, extend the Due Dates for the Monthly Payments due on a Mortgage Note in accordance with the Program Guide. The Company may (or shall, in the case of clauses (ii) or (iii) below) waive (or permit a Subservicer to waive) a Prepayment Penalty only under the following circumstances: (i) such waiver relates to a default or a reasonably foreseeable default and would, in the reasonable judgment of the Company, maximize recovery of total proceeds taking into account the value of such Prepayment Penalty and the related Mortgage Loan, (ii) such waiver is required under state or federal law or (iii) the mortgage debt has been accelerated as a result of the Mortgagor's default in making its Monthly Payments. The Company shall not waive (and shall not permit any Subservicer to waive) any Prepayment Penalty unless it is waived in accordance with the immediately preceding sentence.

Section 3.04    **Principal and Interest Accounts.** In those cases where a Subservicer is servicing a Mortgage Loan pursuant to a Subservicing Agreement, the Subservicer will be required to establish and maintain one or more principal and interest accounts in accordance with the Program Guide. The Subservicer will generally be required to deposit into such accounts all proceeds of Mortgage Loans received by the Subservicer, less its servicing compensation, and remit such amounts to the Company as described in the Subservicing Agreement.

Section 3.05    **Escrow Accounts.** In addition to the principal and interest account described in Section 3.04, the Company shall cause each Subservicer pursuant to the related Subservicing Agreement to establish and maintain one or more escrow accounts for the benefit of the Company and deposit and retain therein all collections from the Mortgagors for the payment of taxes, assessments, hazard insurance premiums, mortgage insurance policy premiums, if applicable, and comparable items for the account of the Mortgagors.

Section 3.06    **Custodial Account.** The Company shall establish and maintain one or more Custodial Accounts, which may be interest bearing accounts. A Custodial Account may contain funds which do not belong to the Owners. Except as otherwise set forth below, the following payments and collections shall be deposited therein (other than in respect of principal and interest on the Mortgage Loans due on or before the applicable Cut-off Date): (i) all payments on account of principal on the Mortgage Loans; (ii) all payments on account of interest on the Mortgage Loans, net of the Subservicing Fee or any portion of the Servicing Fee payable to the Subservicer, including Compensating Interest; (iii) all Insurance Proceeds and Liquidation Proceeds; (iv) any Monthly Advances; (v) all proceeds of any Mortgage Loan repurchased pursuant to Sections 2.02 and 2.04 and clause (iii) of Section 7.01, (vi) any amounts required to be deposited pursuant to Section 2.07, 2.08, the first paragraph of Section 3.08 and Section 3.19 and (vii) any Prepayment Penalties.

With respect to Liquidation Proceeds, Insurance Proceeds and the proceeds of the purchase of any Mortgage Loan pursuant to Sections 2.02 and 2.04 received in any calendar month, the Company may elect to treat such amounts as included in the Principal Remittance Amount for the Remittance Date in the month of receipt, but is not obligated to do so. If the Company so elects, such amounts will be deemed to have been received on the last day of the month prior to the receipt thereof.

Section 3.07    **Permitted Withdrawals From the Custodial Account.** The Company may, from time to time as provided herein, make withdrawals from the Custodial Account for the following purposes:

(i)    to make payments to the Owners in the amounts and in the manner provided for in Section 4.01;

(ii)    to reimburse itself for Monthly Advances, the Company's right to reimburse itself pursuant to this subclause (ii) being limited to amounts received on the related Mortgage Loan which represent late payments of principal and/or interest respecting which any such advance was made;

(iii)    to reimburse itself as to any Liquidated Mortgage Loan from related Liquidation Proceeds for related Monthly Advances, Insured Expenses and Liquidation Expenses, and to reimburse itself for any unpaid servicing compensation on such Liquidated Mortgage Loan;

(iv)    to reimburse itself as to any Mortgage Loan which became an REO Property, from related Liquidation Proceeds for related Insured Expenses and Liquidation Expenses;

(v)    (a) to pay to itself as servicing compensation any interest earned on or investment income with respect to funds in the Custodial Account to the extent interest earnings are in excess of the amount of Compensating Interest owed and (b) to pay to itself as to each Mortgage Loan the Servicing Fee, and to the related Subservicer the Subservicing Fee;

(vi)    to pay to itself with respect to each Mortgage Loan that has been repurchased pursuant to Sections 2.02, 2.04 and 3.19 all amounts received thereon and not required to be distributed to the Owners;

Unassociated Document                                                                    Page 445 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 167 of 279

(vii)    to reimburse itself for any Nonrecoverable Monthly Advance or to reimburse itself for any Liquidation Expenses not previously recovered pursuant to subclauses (iii) and (iv) above;

(viii)    to reimburse itself for expenses incurred by and reimbursable to it pursuant to Section 5.01;

(ix)    to reimburse itself for any other expenses incurred and reimbursable to it pursuant to Section 3.12 or otherwise; and

(x)    to clear the Custodial Account of all amounts on deposit therein attributable to the Mortgage Loans upon the termination of this Agreement.

**Section 3.08    Permitted Instruments.** The depository institution at which the Custodial Account has been established may at the direction of the Company, invest the funds in the Custodial Account in Permitted Instruments, which shall mature not later than the Remittance Date next following the date of such investment. All income and gain realized from any such investment shall be for the benefit of the Company and shall be subject to its withdrawal or order from time to time. The amount of any losses incurred in respect of any such investments shall be deposited in the Custodial Account by the Company out of its own funds immediately as such losses are realized. As used herein, Permitted Instruments shall include the following:

(i)    obligations of, or obligations fully guaranteed as to principal and interest, by the United States or any agency or instrumentality thereof, provided such obligations are backed by the frill faith and credit of the United States;

(ii)    repurchase obligations with respect to any security described in clause (i) above maturing not more than one month from the date of acquisition thereof provided that the unsecured obligations of the party agreeing to repurchase such obligations are at the tune rated by any nationally recognized rating agency as investment grade;

(iii)    federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S.. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company incorporated under the laws of the United States or any state, provided that the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a depository institution holding company system, debt obligations of the depository institution holding company) at the date of acquisition thereof have been rated by any nationally recognized rating agency as investment grade; and provided further that, if the depository or trust company is a principal subsidiary of a depository institution holding company and the debt obligations of such subsidiary are not separately rated, the applicable rating shall be that of the depository institution holding company; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall be rated by any nationally recognized rating agency as investment grade;

(iv)    commercial paper and demand notes (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition has a remaining maturity of not more than 30 days and has been rated by any nationally recognized rating agency as investment grade;

(v)    a money market fund or a qualified investment fund rated by any nationally recognized rating agency as investment grade; and

(vi)    other obligations or securities that are acceptable to any nationally recognized rating agency as a Permitted Instrument for a security rated as investment grade

**Section 3.09    Primary Insurance Policies.** The Company shall not take any action which would result in non-coverage under any applicable mortgage insurance policy or any loss which, but for the actions of the Company, would have been covered thereunder. To the extent coverage is in full force and effect on the Mortgage Loans as of the Cut-off Date, the Company shall use reasonable efforts to keep or cause to be kept in full force and effect each such mortgage insurance policy until the principal balance of the related Mortgage Loan is reduced to 80% or less of the Appraised Value in the case of such a Mortgage Loan having a Loan-to-Value Ratio at origination in excess of 80%. The Company shall pay or use reasonable efforts to cause the premium for each mortgage insurance policy to be paid on a timely basis.

**Section 3.10    Maintenance of Hazard Insurance and Errors and Omissions and Fidelity Coverage.**

(a)    The Company shall use reasonable efforts to cause to be maintained for each Mortgage Loan and on property acquired upon foreclosure, or deed in lieu of foreclosure, of any Mortgage Loan, fire insurance with extended coverage and flood insurance in accordance with the Program Guide. Any amounts applied to the Company under any such policies (other than amounts applied to the restoration or repair of the related Mortgaged Property or property thus acquired or amounts released to the Mortgagor in accordance with the Company's normal servicing procedures) shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 3.07. In the event that the Company shall obtain and maintain a blanket policy insuring against hazard losses on all of the Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first sentence of this Section 3.10(a), it being understood and agreed that such policy may contain a deductible clause, in which case the Company shall, in the event that there shall not have been maintained on the related Mortgaged Property a policy complying with the first sentence of this Section 3.10(a) and there shall have been a loss which would have been covered by such policy, deposit in the Custodial Account the amount not otherwise payable under the blanket policy because of such deductible clause. In connection with its activities as administrator and servicer of the Mortgage Loans, the Company agrees to present, on behalf of itself and the Owners, claims under any such blanket policy in a timely fashion in accordance with the terms of such policy.

(b)    The Company shall obtain and maintain at its own expense and keep in full force and effect throughout the term of this Agreement a blanket fidelity bond and an errors and omissions insurance policy covering the Company's officers and employees and other persons acting on behalf of the Company in connection with its activities under this Agreement. The amount of coverage shall be at least equal to the coverage that would be required by Fannie Mae or Freddie Mac with respect to the Company if the Company were servicing and administrating the Mortgage Loans for Fannie Mae or Freddie Mac in addition to other mortgage loans being serviced and administered by the Company.

**Section 3.11    Enforcement of Due-On-Sale Clauses.**

(a)    When any Mortgaged Property is conveyed, the Company shall declare such Mortgage Loan due and payable and shall enforce any due-on-sale clause contained in any Mortgage Note or Mortgage in accordance with the Program Guide, to the extent permitted under applicable law and governmental regulations, but only to the extent that such enforcement will not adversely affect or jeopardize coverage under any insurance policy. Notwithstanding the foregoing:

(i)    the Company shall not be deemed to be in default under this Section 3.11(a) by reason of any transfer or assumption which the Company is restricted by law from preventing; and

(ii)    if the Company determines that it is reasonably likely that any Mortgagor will bring, or if any Mortgagor does bring, legal action to declare invalid or otherwise avoid enforcement of a due-on-sale clause contained in any Mortgage Note or Mortgage, the Company shall not be required to enforce the due-on-sale clause or to contest such action.

(b)    Subject to the Company's duty to enforce any due-on-sale clause to the extent set forth in Section 3.11(a), in any case in which a Mortgaged Property is to be conveyed to a Person by a Mortgagor, and such Person is to enter into an assumption or modification agreement or supplement to the Mortgage Note or Mortgage which requires the signature of the Owners, or if an

Unassociated Document                                                    Page 446 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 168 of 279

instrument of release signed by the Owners is required releasing the Mortgagor from liability on the Mortgage Loan, the Company is authorized, subject to the requirements of the sentence next following, to execute and deliver, on behalf of the Owners, the assumption agreement with the Person to whom the Mortgaged Property is to be conveyed and such modification agreement or supplement to the Mortgage Note or Mortgage or other instruments as are reasonable or necessary to carry out the terms of the Mortgage Note or Mortgage or otherwise to comply with any applicable laws regarding assumptions or the transfer of the Mortgaged Property to such Person. The Company shall execute and deliver such documents only if it reasonably determines that (i) its execution and delivery thereof will not conflict with or violate any terms of this Agreement or cause the unpaid balance and interest on the Mortgage Loan to be uncollectible in whole or in part, (ii) any required consents of insurers under any related insurance policies have been obtained and (iii) subsequent to the closing of the transaction involving the assumption or transfer (A) the Mortgage Loan will continue to be secured by a first mortgage lien pursuant to the terms of the Mortgage, (B) such transaction will not adversely affect the coverage under any related Insurance Policies, (C) the Mortgage Loan will fully amortize over the remaining term thereof, (D) no material term of the Mortgage Loan (including the interest rate on the Mortgage Loan) will be altered nor will the term of the Mortgage Loan be changed and (B) if the seller/transferor of the Mortgaged Property is to be released from liability on the Mortgage Loan, such release will not (based on the Company's or the Subservicer's good faith determination) adversely affect the collectability of the Mortgage Loan,. Upon receipt of appropriate instructions from the Company in accordance with the foregoing, the Custodian shall execute any necessary instruments for such assumption or substitution of liability as directed by the Company. Upon the closing of the transactions contemplated by such documents, the Company shall cause the originals or true and correct copies of the assumption agreement, the release (if any), or the modification or supplement to the Mortgage Note or Mortgage to be delivered to the Custodian and deposited with the Mortgage File for such Mortgage Loan. Any fees collected by the Company or the related Subservicer for entering into an assumption or substitution of liability agreement will be retained by the Company or such Subservicer as additional servicing compensation. The Company shall notify the Owner, in writing, of any such assumption, modification, supplement or substitution of liability with respect to any Mortgage Loan and the date thereof.

(c)    The Company or the related Subservicer, as the case may be, shall be entitled to approve a request from a Mortgagor for a partial release of the related Mortgaged Property, the granting of an easement thereon in favor of another Person, any alteration or demolition of the related Mortgaged Property or other similar matters if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related Mortgage Loan, that the security for, and the timely and full collectability of, such Mortgage Loan would not be adversely affected thereby Any fee collected by the Company or the related Subservicer for processing such a request will be retained by the Company or such Subservicer as additional servicing compensation.

(d)    Subject to any other applicable terms and conditions of this Agreement, the Custodian and Company shall be entitled to approve an assignment in lieu of satisfaction with respect to any Mortgage Loan, provided the obligee with respect to such Mortgage Loan following such proposed assignment provides the Custodian and Company with a "Certification" in the form attached hereto as Exhibit F, in form and substance satisfactory to the Custodian and Company, providing the following: (i) that the Mortgage Loan is secured by Mortgaged Property located in a jurisdiction in which an assignment in lieu of satisfaction is required to preserve lien priority, minimize or avoid mortgage recording taxes or otherwise comply with, or facilitate a refinancing under, the laws of such jurisdiction; (ii) that the substance of the assignment is, and is intended to be, a refinancing of such Mortgage Loan and that the form of the transaction is solely to comply with, or facilitate the transaction under, such local laws; (iii) that the Mortgage Loan following the proposed assignment will have a rate of interest at least 0.25 percent below or above the rate of interest on such Mortgage Loan prior to such proposed assignment and (iv) that such assignment is at the request of the borrower under the related Mortgage Loan, upon approval of such assignment in lieu of satisfaction with respect to any Mortgage Loan, the Company shall receive cash in an amount equal to the unpaid principal balance of and accrued interest on such Mortgage Loan and the Company shall treat such amount as a Full Prepayment with respect to such Mortgage Loan for all purposes hereof.

Section 3.12    Realization Upon Defaulted Mortgage Loans.

(a)    Subject to Section 3.18(f), the Company shall foreclose upon or otherwise comparably convert the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.03; provided, however, that the Company shall notify the Owners of the Company's intent to foreclose on any such properties at least 5 Business Days prior to the commencement of foreclosure on such properties. In connection with such foreclosure or other conversion, the Company shall, consistent with this Agreement, follow such practices and procedures as it shall deem necessary or advisable and as shall be normal and usual in its general mortgage servicing activities; provided that the Company shall not be liable in any respect hereunder if the Company is acting in a manner that is consistent with the provisions of this Agreement and the applicable Custodial Agreement. The foregoing is subject to the proviso that the Company shall not be required to expend its own funds in connection with any foreclosure or towards the restoration of any property unless it shall determine (i) that such restoration and/or foreclosure will increase the proceeds of liquidation of the Mortgage Loan to the Owners after reimbursement to itself for such expenses and (ii) that such expenses will be recoverable to it through Liquidation Proceeds from the related Mortgaged Property, as contemplated in Section 3.07. In the event of a determination by the Company pursuant to this Section 3.12(a), the Company shall be entitled to reimbursement of its hinds so expended pursuant to Section 3.07. The Company shall be responsible for all other costs and expenses incurred by it in any such proceeding; provided, however, that it shall be entitled to reimbursement thereof from the related Mortgaged Property, as contemplated in Section 3.07.

(b)    Any proceeds collected by the Subservicer and received by the Company with respect to any Mortgage Loan, including without limitation, Insurance Proceeds, Liquidation Proceeds or any other proceeds realized with respect to the sale of the Mortgage Loan (other than any such amounts relating to PRO Property) shall be applied as follows: first, to reimburse the Subservicer and the Company for all unreimbursed Monthly Advances with respect to such Mortgage Loan and servicing advances and expenses incurred by the Subservicer and the Company with respect to such Mortgage Loan in accordance with the Program Guide and this Agreement, including without limitation, taxes, assessments and hazard insurance premiums; second, to pay to the Company any unpaid Servicing Fees and Subservicing Fees owed with respect to the related Mortgage Loan; third, to pay to the Owners an amount equal to accrued and unpaid interest on the Principal Balance of such Mortgage Loan at the Subservicing Loan Remittance Rate to the Due Date prior to the Remittance Date on which such amounts are to be distributed; fourth, to pay to the Owners an amount equal to the Principal Balance of such Mortgage Loan; and fifth, to pay to the Owners any amounts remaining.

Section 3.13    Owner to Cooperate: Release of Mortgage Files.

(a)    Upon becoming aware of the payment in full of any Mortgage Loan or upon the receipt by the Company of a notification that payment in fill will be escrowed in a manner customary for such purposes, the Company will immediately notify the relevant Initial Owner and the Custodian by delivering to such Initial Owner and the Custodian a Request for Release. Upon receipt of such Request for Release, such Initial Owner shall, within five Business Days, release or cause the Custodian to release the related Mortgage File to the Company. No expenses incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to finds attributable to the Mortgage Loans on deposit in the Custodial Account.

(b)    From time to time as is appropriate for the servicing or foreclosure of any Mortgage Loan, the Company will deliver to the Owners and the Custodian a Request for Release. Upon receipt of such Request for Release, the Owners shall promptly cause the Custodian to deliver the related Mortgage File, as requested, to the Company. The Company shall cause each Mortgage File so released to be returned to the Custodian when the need therefor by the Company no longer exists, unless (i) the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Custodial Account or (ii) the Mortgage File or such document has been delivered directly or through a Subservicer to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially.

Section 3.14    Reports to the Owners.

(a)    The Company will deliver to the Owners on or before March 15 of each year, beginning with the first March 15 that occurs at least three (3) months after the initial Cutoff Date, a certificate of an officer of the Company stating, as to each signer thereof, that (i) a review of the activities of the Company during the preceding calendar year and of performance under agreements similar to this Agreement has been made under such officer's supervision, (ii) to the best of such officer's knowledge, based on such review, the Company has fulfilled its obligations in all material respects throughout such year, or, if there has been a default in the fulfillment in all material respects of any such obligation relating to this Agreement, specifying each such default known to such officer and the nature and status thereof and (iii) to the best of such officer's knowledge, each Subservicer has fulfilled its material obligations under its Subservicing Agreement in all material respects, or if there has been a material default in the fulfillment of such obligations as it relates to the Mortgage Loans, specifying such default known to such officer and the nature and status thereof.

(b)    On or before March 15 of each year, beginning with the first March 15 that occurs at least three (3) months after the initial Cut-off Date, the Company shall cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Owners to the effect that such firm has examined certain documents and records relating to the servicing of the mortgage loans under various agreements (including this Agreement) similar one to another and that, on the basis of such examination conducted substantially in compliance with the Uniform Single Audit Program for Mortgage Bankers or the Audit Program for Mortgages serviced for Freddie Mac, such servicing has been conducted in compliance with such agreements except for such significant exceptions or errors in records that, in the opinion of such firm, the Uniform Single Audit Program for Mortgage Bankers or the Audit Program for Mortgages serviced for Freddie Mac requires it to report. The Company shall use its best efforts to eliminate any such reported exceptions or errors as promptly as practicable.

Unassociated Document                                                                          Page 447 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 169 of 279

**Section 3.15    REO Property.** In the event that title to a Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale to the REO Property shall be taken in the name of the related Owner of the related Mortgage Loan on which such Mortgaged Property becomes an REO Property, or in the name of such other Person or Persons as requested by the Owners, provided, however, that title to the REO Property shall not be taken in the name of the Company unless the Company has obtained an Opinion of Counsel satisfactory to it from an attorney duly licensed to practice law in the State where the REO Property is located to the effect that the Company will not suffer any adverse tax, financial, regulatory or licensing consequences as a result of obtaining record title to the REO property. The Person or Persons other than the Owners holding record title to an REO Property shall acknowledge in writing that such title is being held as nominee for such Owners.

The Company by itself or through an affiliate shall manage or cause the Subservicer to manage the REO Property in accordance with the terms and provisions of the Program Guide and in a manner that is consistent with the manner in which it would manage its own property, and in a manner that is in the best interests of the Owners. Any proceeds collected by the Subservicer after the Acquisition Date with respect to the REO Property, including without limitation, insurance, liquidation or any proceeds realized with respect to the sale or rental of the REO Property (collectively, the "Cash Receipts") shall be promptly applied as follows: First, to pay the commission of the broker, if any, who introduced the purchaser of the REO Property to the Subservicer; and Second, to reimburse the Subservicer and the Company for all unreimbused Monthly Advances and pre and post Acquisition Date cash outlays made by the Subservicer and the Company (or such affiliate) with respect to such P.130 Property in accordance with the Program Guide, including without limitation, taxes, assessments and hazard insurance premiums. All Cash Receipts remaining thereafter shall be distributed to the Owners on the first Remittance Date which occurs one calendar month after the sale of the REO Property.

The Company and the Owners hereby agree that the Subservicer shall be relieved of its obligation, as set forth in the Program Guide, to advance to the Company on the 18th day of the month following the Acquisition Date uncollected principal and net interest with respect to the Mortgage Loan relating to the PLO Property.

**Section 3.16    Compensating Interest.** Notwithstanding any other provisions contained herein, the amount of servicing compensation that the Company shall be entitled to receive for its activities hereunder for the period ending on each Remittance Date shall be reduced (but not below zero) by an amount equal to Compensating Interest (if any) for such Remittance Date. Such reduction shall be applied during such period as follows: first, to any Servicing Fee or Subservicing Fee to which the Company is entitled pursuant to Section 3.07, and second, to any income or gain realized from any investment of funds held in the Custodial Account to which the Company is entitled pursuant to Section 3.08. In making such reduction, the Company (i) will not withdraw from the Custodial Account any such amount representing all or a portion of the Servicing Fee to which it is entitled pursuant to Section 3.07, and (ii) will not withdraw from the Custodial Account any such amount to which it is entitled pursuant to Section 3.08.

**Section 3.17    Filing Requirements.** In the event that the Mortgage Loans in a Mortgage Pool are transferred by the Owner directly or indirectly to a securitization trust (a "Securitization Trust"), other than pursuant to Section 3.18(a), then, upon request of the Owner or any other person as specified in the related pooling and servicing agreement or similar agreement (and except as otherwise specified therein), the Company shall cause the servicing officer in charge of servicing of the Company to execute and deliver a certification (the "Backup Certification") in the form set forth as Exhibit A to the Regulation AB Compliance Addendum attached hereto as Exhibit H in connection with such Securitization Trust, not later than March 15 of each calendar year following the first fiscal year of the Securitization Trust; provided that such Backup Certification shall no longer be required if periodic reports under the Securities Exchange Act of 1934 are no longer required with respect to the Securitization Trust.,

**Section 3.18    Reconstitution.**

(a)    Upon 20 days' prior written notice of intent to the Company, the Owner and the Company agree that the Owner may consummate a Whole-Loan Transfer or Securitization Transaction and assign its rights under this Agreement with respect to the Mortgage Loans subject to such Whole-Loan Transfer or Securitization Transaction subject to the terms of this Agreement; provided, however, that the transferee will not be deemed to be the Owner hereunder unless such transferee shall agree in writing to be bound by the terms of this Agreement and an original counterpart of the document evidencing such agreement shall have been executed by the Owner and the transferee and delivered to the Company. Notwithstanding the foregoing, no transfer shall be effective if such transfer would result in there being more than three (3) transferees outstanding hereunder with respect to any Mortgage Loan Package.

(b)    The Owner and the Company agree that in connection with the completion of a Securitization Transaction, the Company shall:

(i)    provide the Owner with an Officer's Certificate on behalf of the Company that restates as of the date of the Reconstitution all representations and warranties made by the Company pursuant to Section 2.04(c) of this Agreement and to restate the representations and warranties made by the Company in Section 2.04(a) as of the Closing Date on which such Mortgage Loans were purchased by the Initial Owner pursuant to this Agreement, together with any additional reasonable representations and warranties which may be required by the rating agencies in connection with the Securitization Transaction, which shall be mutually agreed upon by the Company and the Owner and shall be standard representations and warranties for Securitization Transactions involving mortgage loans similar to the Mortgage Loans and shall not impose any additional material obligations or liabilities on the Company than are set forth in this Agreement;

(ii)    cooperate with the Owner with respect to reasonable requests which have been made by the Owner by prior notice and if the Company is required to be a party to any of the Reconstitution Agreements, execute any Reconstitution Agreement, subject to the provisions of this Section 3.1 8, and subject to the mutual agreement between the Owner and the Company as to the terms thereof within a reasonable period of time, but in no event shall any prior notice and request to execute a Reconstitution Agreement be made to the Company less than ten (10) days prior to the date such Reconstitution Agreement is to be executed;

(iii)    provide to any master servicer or trustee, as applicable, and/or the Owner, as of a recent date prior to the Securitization Transaction, any and all publicly available information and appropriate verification of information which may be reasonably available to the Company, whether through letters of its auditors and counsel or otherwise, as the Owner. trustee or a master servicer shall reasonably request as to the related Mortgage Loans and that is customary information for a Securitization Transaction;

(iv)    agree to service the Mortgage Loans in accordance with the requirements of the Securitization Transaction, including, without limitation, servicing the Mortgage Loans in accordance with the requirements of the applicable Agency if the Securitization Transaction is an Agency securitization, or servicing the Mortgage Loans in accordance with the requirements of the private label securitization if the Securitization Transaction is a private label securitization; provided that no such servicing requirements shall impose any additional obligations or liabilities on the Company than are set forth in this Agreement unless mutually agreed upon by the Company and the Owner;

(v)    deliver to the Owner an Opinion of Counsel with respect to the enforceability of the Reconstitution Agreement against the Company, it being understood that the cost of any Opinion of Counsel from outside counsel shall be the responsibility of the Owner, subject to Section 3.18(b): and

(vi)    provide all other assistance reasonably requested by the Owner in connection with effectuation and completion of the Securitization Transaction.

With respect to any Securitization Transaction, the Owner shall be entitled to include in any disclosure document information provided by the Company as required by the rating agencies (the "Company Information"), and the Company acknowledges and agrees that the related investors will be permitted to rely on such information. The Company shall indemnify the Owner for any untrue statement or alleged untrue statement of any material fact contained in such Company Information, or the omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading. In addition, the Owner shall indemnify the Company and its affiliates for any untrue statement of any material fact contained in information other than the Company Information contained in any disclosure document, or the omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading.

(c)    The Owner shall reimburse the Company for all reasonable out-of-pocket costs and expenses (including auditor and legal fees) incurred in connection with any Securitization Transaction; provided, however, that all amounts required to be paid by the Owner pursuant to this clause (c) shall be subject to the prior notice and approval of the Owner, such approval not to be unreasonably withheld; and provided, further, that, unless otherwise agreed by the Owner and the Company in a term sheet related to a Securitization Transaction, such legal fees for the first such Securitization Transaction shall not exceed $20,000 and shall not exceed $10,000 for any additional Securitization Transaction.

(d)     All Mortgage Loans not sold or transferred pursuant to Section 2.03 or a Securitization Transaction shall be subject to this Agreement and shall continue to be serviced in accordance with the terms of this Agreement and with respect thereto this Agreement shall remain in full force and effect.

(e)     If a REMIC election has been made with respect to the arrangement under which the Mortgage Loans and REO Property are held, the Company shall not take any action, cause the REMIC to take any action or fail to take (or fail to cause to be taken) any action that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of the REMIC as a REMIC or (ii) result in the imposition of a tax upon the REMIC (including but not limited to the tax on "prohibited transactions" as defined Section 860(a)(2) of the Code and the tax on "contributions" to a REMIC set forth in Section 860(d) of the Code) unless the Company has received an Opinion of Counsel (at the expense of the party seeking to take such an action) to the effect that the contemplated action will not endanger such REMIC status or result in the imposition of any such tax.

(f)     (i) The Company hereby agrees to the inclusion in any Reconstitution Agreement, where applicable, a section relating to special foreclosure rights in the form of Exhibit I attached hereto which provisions shall be applicable to the Company or any Subservicer with respect to the applicable Mortgage Loans. Notwithstanding the foregoing, prior to any Reconstitution in respect of any Mortgage Loan, the provisions of Exhibit I attached hereto shall be applicable to the Company, any Subservicer, Luminent Mortgage Capital, Inc. ("Luminent"), the Initial Owners and the Owners; provided that, for purposes of each Exhibit I, during any such pre-Reconstitution period in respect of a Mortgage Loan, any reference in Exhibit I to (A) "Master Servicer" (other than in clause (c) thereof) shall be deemed to be a reference to the relevant Initial Owner in respect of such Mortgage Loan, (B) "Master Servicer" in clause (c) thereof shall be deemed to be a reference to the Company, (C) to the "holder of the most junior of the Subordinate Certificates" shall be deemed to be a reference to the relevant Owner in respect of such Mortgage Loan, and (D) to the "Servicer" shall be deemed a reference to the Company or any Subservicer, as applicable.

(i)

(ii)     In connection with any notice required to be delivered pursuant to clause (a) of Exhibit I (whether prior to or after a Reconstitution with respect to a Mortgage Loan), so long as Luminent or an affiliate thereof is the Owner of such Mortgage Loan or the holder of the most junior of the Subordinate Certificates in respect of a Securitization Transaction in respect of such Mortgage Loan, as applicable, Luminent shall provide evidence to the Company as to the Person that is the 100% holder of the most junior of the Subordinate Certificates (as defined in the relevant Reconstitution Agreement) or the Owner of the Mortgage Loan, as applicable, in the form of an officer's certificate of Luminent setting forth the 100% holder of the most junior of the Subordinate Certificates or Owner of the Mortgage Loan, as applicable, together with (A) if the Subordinate Certificate is registered in the name of the Depository Trust Company, an account statement through the applicable broker-dealer or such other evidence as the Company shall reasonably request or (B) if the Subordinate Certificate is held in physical form, the trade confirmation with respect to such Subordinate Certificate or such other evidence as the Company shall reasonably request.

(iii)     In the event that the provisions of Exhibit I are no longer applicable to the servicer with respect to any Mortgage Loan pursuant to the terms of the first paragraph of Exhibit I, then, if the Company is the servicer with respect to such Mortgage Loan, the Company shall be entitled to elect to whether to continue the applicability of this Section 3.18(f) with respect to such Mortgage Loan in its sole discretion.

(iv)     So long as Luminent or any affiliate thereof is the holder of the most junior of the Subordinate Certificates (under, and as defined in the relevant Reconstitution Agreement) or the Owner of a Mortgage Loan, as applicable, Luminent shall deliver to the Company written notice of any transfer of such Subordinate Certificate or Mortgage Loan, as applicable, promptly upon any transfer thereof, which notice shall set forth the name and address of the transferee and the date upon which such transfer was effected.

(v)     It is expressly understood and agreed by the parties hereto that the servicing procedures set forth in this Section 3.18 and Exhibit I hereto differ from the standard servicing practices of the Company and that the Company's compliance with such procedures may (i) increase the time to resolution of any foreclosure or in respect of any REO Property, and the Company shall not be responsible for any losses resulting from such delays and (ii) result in additional expenses that will be borne by the Owner or holder of the most junior of the Subordinate Certificates, as applicable.

(g)     With respect to any Securitization Transaction, at the option of the Company, in the event that any payment due under any Mortgage Loan and not postponed is not paid when the same becomes due and payable, or in the event the related Mortgagor fails to perform any other covenant or obligation under such Mortgage Loan and such failure continues beyond any applicable grace period, the Company shall take such action, which action (notwithstanding anything contained herein or incorporated by reference to the contrary) may include but is not limited to effecting the sale of such Mortgage Loan on an as-is basis, as (1) the Company would undertake under similar circumstances with respect to a similar mortgage loan held for its own account for investment, (2) shall be consistent with accepted servicing practices, and (3) the Company shall determine prudently to be in the best interest of the Company. The Company, on behalf of the Owner, may also, in its sole and exclusive discretion, as an alternative to foreclosure, sell defaulted Mortgage Loans at fair market value to third-parties, if the Company believes, in its sole and exclusive discretion, that such sale would maximize proceeds to the Owner (on a present value basis) with respect to each such Mortgage Loan. Notwithstanding any other provision in this Agreement or otherwise, the Company shall have no liability to the Owner or any other party for the Company's determination hereunder.

**Section 3.19     Reserved.**

**Section 3.20     Compliance with Regulation AB.** In order to facilitate compliance with Regulation AB, the Company and each Owner agree to comply with the provisions of the Regulation AB Compliance Addendum attached hereto as Exhibit H.

ARTICLE IV

PAYMENTS TO THE OWNERS

**Section 4.01     Distributions.** On each Remittance Date the Company shall distribute to the Owners of record on the next preceding Record Date in immediately available funds (by wire transfer or otherwise) to the account of such Owner in accordance with the wire instructions set forth in, or provided to the Company in accordance with, Section 8.04 the Remittance Amount payable to such Owner.

**Section 4.02     Statements to the Owners.** Concurrently with each distribution charged to the Custodial Account, the Company shall furnish to the Owners in an electronic format agreed upon by the Company and the Owners a statement setting forth certain information in respect of the Mortgage Loans including:

(i)     the amount, if any, of such distribution allocable to principal and/or interest;

(ii)     the amount of related servicing compensation received by the Company and the Subservicer and such other customary information as the Company deems necessary or desirable to enable each Owner to prepare its tax returns;

(iii)     the number and aggregate Principal Balance of the Mortgage Loans at the close of business on such Remittance Date after giving effect to all distributions allocable to principal made on such Remittance Date, including, for this purpose, the Principal Balances of all Mortgage Loans purchased pursuant to Section 2.02 or 2.04 the proceeds of which are being distributed on such Remittance Date;

(iv)     on the basis of the most recent reports furnished to it by the Subservicer, the number and aggregate principal balances of Mortgage Loans in each Mortgage Pool delinquent (a) one month, (b) two or more months, and (c) the number and aggregate balance of Mortgage Loans that are in foreclosure;

Unassociated Document                                                                                    Page 449 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 171 of 279

(v)    the number and aggregate balance of REO Properties;

(vi)    the Pass-Through Rate for such Remittance Date;

(vii)    loan-level data, including but not limited to "paid to date" information, Partial Prepayments and Mortgage Interest Rate Adjustments; and

(viii)    such other information as shall be reasonably requested by the Owner.

Within a reasonable period of time after the end of each calendar year, the Company shall furnish to the Owners a statement containing the information set forth in clauses (i) and (iii) above aggregated for such calendar year. Such obligation of the Company shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Company pursuant to any requirements of the Code as from time to time in force.

Section 4.03    **Distribution Reports; Monthly Advances by the Company.** Prior to the close of business on the Business Day next succeeding each Determination Date, the Company shall furnish a statement to the Owners setting forth the amount to be distributed on the next succeeding Remittance Date on account of principal of and interest on the Mortgage Loans. Prior to such time as title to a Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, on or before each Remittance Date, the Company shall either (i) deposit in the Custodial Account an amount equal to the Monthly Advance, if any, or (ii) cause to be made an appropriate entry in the records of the Custodial Account that funds in such account that are being held for future distribution or withdrawal or which do not belong to the Owners have been used by the Company in discharge of any such Monthly Advance or (iii) make advances in the form of any combination of (i) and (ii) aggregating the amount of such Monthly Advance. Any funds being held for future distribution to the Owners and so used shall be replaced by the Company by deposit in the Custodial Account on any future Remittance Date to the extent that funds in the Custodial Account relating to the Mortgage Loans on such Remittance Date shall be less than payments to the Owners required to be made on such date.

Section 4.04    **Reports and Returns to be Filed by the Company.** The Company shall file information reports with respect to the receipt of mortgage interest received in a trade or business, reports of foreclosures and abandonments of any Mortgaged Property and information returns relating to cancellation of indebtedness income with respect to any Mortgaged Property as required by Sections 6050H, 60503 and 6050P of the Code. Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by such Sections 605011, 60503 and 6050P of the Code.

Section 4.05    **Format of Reports and Statements.** The reports and statements delivered by the Company to the Owners pursuant to this Article IV shall be substantially in the form attached hereto as Exhibit G.

Section 4.06    **Records; Audit.** The Company shall maintain complete and accurate records in accordance with standard accounting practices during the term of this Agreement and for a period of at least six (6) years following the termination of this Agreement (the "Retention Period"); provided, however, that in the event of any dispute arising under or with respect to this Agreement, the Retention Period shall last until the resolution of such dispute becomes final and non-appealable and all obligations of the parties hereto have been satisfied in full. The Company shall as and when so requested by any Initial Owner or by a regulatory authority acting pursuant to law at all reasonable times and from time to time during the Retention Period (i) make such records available for inspection by such person or persons as such Initial Owner designates as its authorized representatives or such regulatory authority, who shall have the right to take copies of or extracts from any records kept pursuant to this Agreement, (ii) permit such initial Owner's authorized representatives or such regulatory authority to examine and make copies of that portion of any of the Company's external audit opinions (including, but not limited to, the external auditor's management letter and reports prepared in accordance with Statement of Auditing Standards No. 70 Type II or other reports) which relates to the Company provision of services under this Agreement, (iii) give such Initial Owner's authorized representatives or such regulatory authority complete access, during regular business hours to the Company's officers, employees and other representatives, including attorneys, accountants and others, in connection with such audit, and (iv) provide such computer access, office space and furniture and telephone, photocopying and electric service as may be necessary or advisable for such Initial Owner's authorized representatives or such regulatory authority to conduct such audit.

ARTICLE V

THE COMPANY

Section 5.01    **Indemnification.**

(a)    The Company shall indemnify and hold harmless the Owner and any director, officer, employee or agent of the Owner against any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that the Owner may sustain arising out of, resulting from, or caused by (i) any material breach of any of Company's representations, warranties or covenants set forth in this Agreement; provided, however, that if the Company breaches a representation or warranty set forth in clauses (xxi), (xli) or (xlii) of Section 2.04(a), then the Company shall pay to the relevant Owner, concurrently with and in addition to the repurchase or substitution obligations set forth in Section 2.04 an amount equal to any liability, penalty or expense that was actually incurred and paid out of or on behalf of such Owner (including any reasonable attorney's fees), and that directly resulted from such breach, or if incurred and paid by an Owner thereafter, concurrently with such payment, or (ii) the failure by the Company to perform its duties hereunder. The Owner shall notify the Company promptly if a claim is made by a third party with respect to this Agreement or the Mortgage Loans, and the Company may assume the defense of any such claim and pay all expenses in connection therewith, including counsel fees, and promptly pay, discharge and satisfy any judgment or decree that may be entered against it or the Owner in respect of such claim. The Owner promptly shall reimburse the Company for all amounts advanced by it pursuant to the preceding sentence unless the Company's indemnification obligation described in this paragraph is applicable.

(b)    The Owner shall indemnify and hold harmless the Company and any director, officer, employee or agent of the Company against any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses incurred in connection with any audit, controversy or judicial proceeding relating to a governmental taxing authority or legal action relating to this Agreement, other than any such amounts incurred by reason of a material breach by the Company of any representation or warranty made by it herein or the failure by the Company to perform its duties hereunder.

(c)    The Company shall not be under any obligation to appear in, prosecute or defend any legal action that is not incidental to its duties under this Agreement and which in its opinion may involve it in any expense or liability; provided, however, that the Company may in its discretion undertake any such legal action relating to the servicing of the Mortgage Loans under this Agreement that it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto. in such event, the legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities payable or reimbursable out of the Custodial Account as provided by Section 3.07 unless the Company's indemnification obligation described in Section 5.01(a) above is applicable and, notwithstanding any other provision hereof, distributions pursuant to Section 4.01 shall be reduced accordingly.

(d)    For purposes of this Section 5.01, "Owner" shall mean the Person then acting as the Owner under this Agreement and any and all Persons who previously were "Owners" under this Agreement.

Section 5.02    **Liability of the Company and Others.**

(a)    The Company shall be liable in accordance herewith only to the extent of the obligations specifically imposed upon and undertaken by the Company herein.

(b)    Neither the Company, nor any of the directors, officers, employees or agents of the Company shall be under any liability to any Owner for any action taken or for refraining

from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Company or any such person against any breach of warranties or representations made herein, failure to perform its duties hereunder or any liability that would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder.. The Company and any director, officer, employee or agent of the Company may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.

Section 5.03    Merger or Consolidation of the Company. The Company will keep in full effect its existence, rights and franchises as a corporation under the laws of the State of Delaware, and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement or any of the Mortgage Loans and to perform its duties under this Agreement.

Any Person into which the Company may be merged or consolidated, or any corporation resulting from any merger or consolidation to which the Company shall be a party, or any Person succeeding to the business of the Company, shall be the successor of the Company hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, such successor shall be a Fannie Mae and Freddie Mac approved seller/servicer.

Section 5.04    Limitation on Resignation and Assignment by Company. The Company shall not assign this Agreement or the servicing hereunder or delegate its rights or duties hereunder or any portion hereof without the prior written consent of the Owner; provided, however, that no such prior written consent shall be required if such assignee is a Fannie Mae and Freddie Mac approved Seller/Servicer with a net worth of at least $25 million.

The Company shall not resign from the obligations and duties hereby imposed on it except by mutual consent of the Company and the Owner or upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Company. Any such determination permitting the resignation of the Company shall be evidenced by an Opinion of Counsel to such effect delivered to the Owner which Opinion of Counsel shall be in form and substance acceptable to the Owner. No such resignation shall become effective until a successor acceptable to the Owner shall have assumed the Company's responsibilities and obligations hereunder.

Section 5.05    Right to Examine Company Records. The Owner, or its designee, shall have the right to examine and audit any of the related books, records or other information of the Company, whether held by the Company or by another on its behalf, with respect to or concerning this Agreement or the Mortgage Loans, during business hours or at such other times as may be reasonable under applicable circumstances, upon reasonable advance notice. The Owner shall pay its own travel expenses and any other costs and expenses incurred by the Owner and the Company associated with such examination.

The Company shall provide to the Owner and any supervisory agents or examiners which may relate to the Owner access to any documentation regarding the Mortgage Loans which may be required by any applicable regulations, including but not limited to any disaster recovery/business continuity plan and/or any measures taken by the Company to protect Consumer Information, provided, however, that the Company shall only be obligated to provide such documentation to the extent such documentation is maintained by the Company in the ordinary course of business. Such access shall be afforded without charge, upon reasonable request, upon ten Business Days prior written notice, during normal business hours and at the offices of the Company, all in accordance with applicable federal government regulations.

ARTICLE VI

DEFAULT

Section 6.01    Events of Default of the Company. Event of Default, wherever used herein, means any one of the following events:

(i)    the Company shall fail to remit to any Owner any payment required to be made under the terms of this Agreement and such failure shall continue unremedied for a period of 2 Business Days after the date upon which written notice or oral notice (promptly confirmed in writing) of such failure, requiring such failure to be remedied, shall have been given to the Company by such Owner; or

(ii)    the Company shall fail to observe or perform in any material respect any other of the covenants or agreements on the part of the Company contained in this Agreement and such failure shall continue unremedied for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Company by an Owner; or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or appointing a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Company and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days; or

(iv)    the Company shall consent to the appointment of a conservator or receiver or Liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of, or relating to, the Company or of, or relating to, all or substantially all of the property of the Company; or

(v)    the Company shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of, or commence a voluntary case under, any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vi)    any failure of the Company to be in compliance with applicable qualification or licensing laws of any jurisdiction where Mortgaged Property is located, provided that such failure has a material adverse effect on the ability of the Company to perform its obligations under this Agreement; or

(vii)    any representation or warranty made by the Company hereunder (other than the representations and warranties set forth in Section 2.04(a)) shall prove to be untrue or incomplete in any material respect and continues unremedied for a period of thirty (30) days after the discovery of same; or

(viii)    the Company ceases to meet the qualifications of either FNMA or FHLMC; or

(ix)    the Company's servicer rating (if any) by any rating agency for a classification of loans sold under this Agreement falls below an "average" rating at any time after the effectiveness of this Agreement.

If an Event of Default described in this Section shall occur, then, and in each and every such case, so long as such Event of Default shall not have been remedied, the Owners by notice in writing to the Company, may terminate all of the rights and obligations of the Company under this Agreement other than its right to receive servicing compensation for servicing the Mortgage Loans hereunder during any period prior to the date of such termination and may exercise any and all other remedies available at law or equity; provided, however, that any liability of the Company under this Agreement arising prior to such termination shall survive. On or after the receipt by the Company of such written notice, all authority and power of the Company under this Agreement shall, in accordance with Section 8.01, pass to and be vested in the Owners or the Successor Servicer appointed pursuant to Section 8.01. Upon written request from the Owner, the Company shall prepare, execute and deliver to a successor any and all documents and other instruments, place in such successor's possession all Mortgage Files and do or cause to be done all other acts or things necessary or appropriate to effect the purposes of such notice of termination, including, but not limited to, the transfer and endorsement or assignment of the Mortgage Loans and related documents to the successor at the Company's sole expense. The Company agrees to cooperate with the Owner and such successor in effecting the termination of the Company's responsibilities and rights hereunder, including, without limitation, the transfer to such successor for administration by it of all amounts which shall at the time be credited by the Company to the Custodial Account or

Escrow Account or thereafter received with respect to the Mortgage Loans. If the Company obtains knowledge of an Event of Default, the Company shall promptly notify the Owner thereof.

**Section 6.02    Waiver of Defaults.** The Owner may waive such default by the Company in the performance of its obligations hereunder and its consequences. Upon any such waiver of a past default, such default shall cease to exist, and any Event of Default, as defined in Section 6.01, arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

## ARTICLE VII

### TERMINATION

**Section 7.01    Termination.** The obligations and responsibilities of the Company hereunder shall terminate upon the earlier of: (i) the later of the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan in the Mortgage Pool and the remittance of all funds due hereunder, or (ii) by mutual consent of the Company and each Initial Owner in writing, or (iii) the purchase by the Company of all Mortgage Loans in the Mortgage Pool and all property acquired in respect of any such Mortgage Loan remaining subject to this Agreement at a price equal to the aggregate Principal Balance of such Mortgage Loans (including, with respect to any such Mortgage Loan as to which title to the underlying Mortgaged Property has been acquired, the Principal Balance thereof as of the date of such acquisition), together with interest on such aggregate Principal Balance at the then applicable Pass-Through Rate to the first day of the month in which such repurchase price is distributed to the Owners.

## ARTICLE VIII

### MISCELLANEOUS PROVISIONS

**Section 8.01    Successor to the Company.** Any successor servicer appointed as provided herein (the "Successor Servicer") shall have a net worth of not less than $25,000,000 and shall execute, acknowledge and deliver to the Company and the Owners an instrument accepting such appointment, whereupon such Successor Servicer shall succeed to the rights and obligations of the Company under the Subservicing Agreements and shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Company with like effect as if originally named as a party to this Agreement. The Successor Servicer shall promptly deliver a copy of any such instrument to the Custodian. The resignation or removal of the Servicer hereunder shall not become effective until a successor shall be appointed pursuant to this Section 8.01- In connection with the termination or resignation of the Company as servicer hereunder, either (i) the Successor Servicer shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, or (ii) the Company shall cooperate with the Successor Servicer in causing MERS to execute and deliver an Assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Owners and to execute and deliver such other notices, documents and other instruments us may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS® System to the Successor Servicer. The Company shall file or cause to be filed any such assignment in the appropriate recording office. The Successor Servicer shall cause such assignment to be delivered to the Custodian promptly upon receipt of the original with evidence of recording thereon or a copy certified by the public recording office in which such assignment was recorded.

**Section 8.02    Entire Agreement; Amendment.** This Agreement may be amended from time to time by the Company and each Initial Owner by written agreement signed by the Company and each Initial Owner. This Agreement together with each Reference Agreement shall constitute the entire agreement between the parties.

**Section 8.03    GOVERNING LAW.** THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED N ACCORDANCE WITH SUCH LAWS.

EACH OF THE COMPANY AND THE OWNER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AN ALL RIGHTS FI' MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY OTHER DOCUMENTS AND INSTRUMENTS EXECUTED IN CONNECTION HERE WITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF THE COMPANY OR THE OWNER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE OWNER TO ENTER INTO THIS AGREEMENT.

**Section 8.04    Notices.** All demands and notices hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, postage prepaid, or sent by overnight courier to (a) in the case of the Company: (i) in the case of any notice delivered pursuant to Exhibit I, Residential Funding Corporation, 2255 N. Ontario Street, Suite 400, Burbank, California 91504, Attention: Servicing Manager and/or such other address as may hereafter be furnished to the Initial Owner in writing by the Company and (ii) in the case of any other notice, Residential Funding Corporation, 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention: Office of the President, and Residential Funding Corporation, 2255 N. Ontario Street, Suite 400, Burbank, California 91504, Attention: Servicing Manager and/or such other address as may hereafter be furnished to the Initial Owner in writing by the Company; (b) in the case of the Initial Owners: Luminent Mortgage Capital, Inc., One Commerce Square, 2005 Market Street, Suite 2100, Philadelphia, Pennsylvania 19103, Attention: Trez Moore, COO, Telephone: (215) 564-5900, Fax: (215) 564- 5990, with a copy to Luminent Mortgage Capital, Inc., One Market Street, Spear Tower, 30th Floor, San Francisco, California 94105, Attention: Christopher Zyda, CFO, Telephone: (415) 978-3000, Fax: (415) 978-3014, or such other address or addresses as may hereafter be furnished to the Company in writing by an Initial Owner; (c) in the case of any Owner other than the Initial Owner, to such address as may be furnished to the Company in writing by such Owner; and (d) in the case of the Custodian, Wells Fargo Bank, N.A., 1015 Tenth Avenue Southeast, Minneapolis, Minnesota 55414, Attention: Mortgage Document Custody, or such other address or addresses as may hereafter be furnished to the Company in writing by the Custodian.

Distributions that may be made by wire transfer pursuant to Section 4.01 shall be made in accordance with wire instructions provided in the applicable Reference Agreement or in accordance with such other instructions as may hereafter be furnished to the Company in writing by an Owner, provided that such instructions have been received by the Company prior to the Record Date.

**Section 8.05    Severability of Provisions.** If any provision of this Agreement or a Reference Agreement shall be for any reason whatsoever held invalid, then such provision shall be deemed severable from the remaining provisions of this Agreement and such Reference Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or such Reference Agreements.

**Section 8.06    No Partnership.** Nothing herein contained shall be deemed or construed to create a co-partnership or joint venture between the parties hereto and the services of the Company shall be rendered as an independent contractor and not as agent for the Owners.

**Section 8.07    Exhibits.** The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

**Section 8.08    Counterparts; Successors and Assigns.** This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same instrument. Subject to Section 5.04, this Agreement shall inure to the benefit of and be binding upon the Company and the Owners and their respective successors and assigns.

[Signature Page Follows]

Unassociated Document                                                    Page 453 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 175 of 279

IN WITNESS WHEREOF, the Company and each Initial Owner have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

RESIDENTIAL FUNDING CORPORATION

By: _____
Name:
Title:

LUMINENT MORTGAGE CAPITAL, INC.,

By: _____
Name:
Title:

MERCURY MORTGAGE FINANCE
STATUTORY TRUST

By: _____
Name:
Title:

MAIA MORTGAGE FINANCE STATUTORY
TRUST

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Company and each Initial Owner have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

RESIDENTIAL FUNDING CORPORATION

By: _____
Name:
Title:


LUMINENT MORTGAGE CAPITAL, INC.,

By: _____
Name:
Title:


MERCURY MORTGAGE FINANCE
STATUTORY TRUST

By: _____
Name:
Title:


MAIA MORTGAGE FINANCE STATUTORY
TRUST

By: _____
Name:
Title:

Unassociated Document                                        Page 455 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 177 of 279

EXHIBIT A


FORM OF REFERENCE AGREEMENT

---

RESIDENTIAL FUNDING CORPORATION,
the Company,


and


_____
the Initial Owner


REFERENCE AGREEMENT


Dated as of [_____ —, 20J


Adjustable Rate Mortgage Loans


Series 20 -WH

---

Unassociated Document                                                    Page 456 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 178 of 279

## REFERENCE AGREEMENT

THIS REFERENCE AGREEMENT, dated as of [_____ ____ 20___] (this "Reference Agreement"), is hereby executed by and between RESIDENTIAL FUNDING CORPORATION, as seller and master servicer (the "Company") and _____, as initial owner (the "Initial Owner") under this Reference Agreement and the Standard Terms and Provisions of Sale and Servicing Agreement, dated as of—, 2QJ (as further amended or restated from time to time, the "Standard Terms"), all the provisions of which are incorporated herein and shall be a part of this Reference Agreement as if set forth herein in full (this Reference Agreement together with the Standard Terms so incorporated, the "Agreement").

## PRELIMINARY STATEMENT

The Initial Owner has agreed to purchase from the Company and the Company has agreed to sell to the Initial Owner, on a servicing retained basis and without recourse, a 100% undivided Ownership Interest in the Mortgage Loans, which an aggregate outstanding principal balance as of the Cut-off Date of $[_____] as described in the Mortgage Loan Schedule attached hereto as Exhibit A.

The Mortgage Loans are adjustable rate, [fully-amortizing] mortgage loans with terms to maturity from the date of origination or modification of not more than [15] [30] [40] years.. The interest rate on each Mortgage Loan will adjust annually to equal the sum of (i) the Index plus (ii) the Gross Margin for such Mortgage Loan, rounded to the nearest multiple of 0.125%, subject to the Periodic Cap, Minimum Mortgage Rate and Maximum Mortgage Rate applicable to such Mortgage Loan. [With respect to [____]% of the Mortgage Loans, the related Mortgage Files and Mortgage Notes require that interest only be paid for not more than ten years.] [The interest rate on each Mortgage Loan will adjust annually after a fixed initial period of [_____] years, to equal the sum of (i) the Index, as most recently available as of the applicable Adjustment Date specified in the related Mortgage Note, plus (ii) the Gross Margin for such Mortgage Loan, rounded to the nearest multiple of 0.125%, subject to the Periodic Cap, Minimum Mortgage Rate and Maximum Mortgage Rate applicable to such Mortgage Loan.]

In consideration of the premises and the mutual agreements hereinafter set forth, and intending to be legally bound, the Initial Owner and the Company agree hereby as follows:

Standard Terms; Designation.

The Company and the Initial Owner acknowledge that the Standard Terms prescribe certain obligations of the Company and the Initial Owner with respect to the Mortgage Loans. The Company and the Initial Owner each agree to observe and perform such prescribed duties, responsibilities and obligations, and acknowledge that the Standard Terms are shall be a part of this Agreement to the same extent as if set forth herein in full.

The Mortgage Loans are designated generally as the Adjustable Rate Mortgage Loans, Series [20____-WH____].

Defined Terms.

In addition to the definitions set forth in Section 1.01 of the Standard Terms, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article.

Closing Date: [_____ ____, 20___].

Cut-off Date: [_____ ____, 20___].

First Remittance Date: [_____ ____, 20___].

Index: With respect to any Mortgage Loan and as to any Adjustment Date therefor, a rate per annum equal to either (a) the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market based on quotations of major banks as published in The Wall Street Journal, (b) the average of interbank offered rates for six-month U. S. dollar-denominated deposits in the London market based on quotations of major banks as published in The Wall Street Journal, (c) the weekly average yield on U.S. Treasury securities adjusted to a constant maturity of one year, as reported by the Federal Reserve Board in Statistical Release No. H. 15(519), as most recently available as of the applicable Adjustment Date specified in the related Mortgage Note, or (d) in the event that the related index is no longer available, an index selected by the Company that is based on comparable information.

Servicing Fee Rate: As to each Mortgage Loan, an amount equal to 0.05% per annum plus, if such Mortgage Loan is not serviced by a Subservicer at the time of determination, an amount equal to the Subservicing Fee Rate for such Mortgage Loan.

Subservicing Fee Rate: As to each Mortgage Loan, the rate per annum set forth in the Mortgage Loan Schedule as the "SUBSERV FEE." The weighted average subservice fee is [____].

Conveyance of Mortgage Loans; Possession of Mortgage Files.

The Company, simultaneously with the execution and delivery of this Reference Agreement, does hereby sell, transfer and assign, without recourse, to the Initial Owner the Ownership Interest comprising all of the right, title and interest of the Company in and to the Mortgage Loans, including all documents maintained as part of the related Mortgage Files all Mortgaged Properties which secure an Mortgage Loan but are acquired by foreclosure, deed in lieu of foreclosure after the Cut-Off Date or otherwise, all interest at the applicable Mortgage Loan Remittance Rate and principal received on or with respect to the Mortgage Loans after the Cut-off Date (other than payments of principal and interest due on the Mortgage Loans on or before the Cut-off Date) on a servicing retained basis, all other unscheduled collections collected in respect of the Mortgage Loans after the Cut-off Date, and all proceeds of the foregoing (other than the servicing tights with respect thereto, and any late fees in respect thereof). Additionally, in connection with the Company's assignment to the Initial Owner, and subject to Section 2.01 of the Standard Terms, the Company has delivered to, and deposited with, the Custodian, as the duly appointed agent of the Owners for such purpose, the documents or instruments or copies thereof set forth in Section 2.01(b) of the Standard Terms.

Additional Representations and Warranties of the Company.

The Company hereby restates each of the representations and warranties in the standard terms as of the date hereof and further represents and warrants to the Initial Owner that as of the Closing Date or such other date specifically provided for herein:

(i)     [With respect to the Mortgage Loans described in the Mortgage Loan Schedule attached hereto as Exhibit A, the Company has complied with its obligations under Section 2.01 of the Standard Terms;]

(ii)     The Mortgage Loans are adjustable rate, [filly-amortizing] mortgage loans having terms to maturity of not more than [15] [30] [40] years from the date of origination or modification with monthly payments due on the first day of each month, with interest payable in arrears;

(iii)     [Each Mortgage Loan with a Loan-to-Value Ratio at origination in excess of 80% is the subject of a primary insurance policy that insures at least 30% of the principal balance of the Mortgage Loan at origination if the Loan-to-Value Ratio is between 95.00% and 90.01%, at least 25% of the principal balance of the Mortgage Loan at origination if the Loan-to-Value Ratio is between 90.00% and 85.01%, and at least 12% of the principal balance of the Mortgage Loan at origination if the Loan-to-Value Ratio is between 85.00% and 80.01%;]

(iv)    [None of the Mortgage Loans are buydown mortgage loans;]

(v)    [None of the Mortgage Loans are balloon mortgage loans;]

(vi)    [All condominiums or units in a planned unit development (other than a de minimis planned unit development) on any Mortgaged Property meet the eligibility requirements set forth in the Program Guide;)

(vii)    [The Mortgage Loan is not a graduated payment loan nor does it have a shared appreciation feature, or other contingent interest feature];

(viii)    [The Mortgage Loans are secured by one- to four family dwelling units;]

(ix)    [None of the Mortgage Loans are secured by a leasehold estate or is a cooperative loan] and

(x)    [INSERT OTHER APPLICABLE REPRESENTATIONS AND WARRANTIES TO COVER THE MORTGAGE LOANS PURCHASED WITH THE REFERENCE AGREEMENT].

Wire Instructions.

Distributions that may be made by wire transfer pursuant to Section 4.01 of the Standard Terms shall be made in accordance with the following wire instructions:

Bank: [_____]
ABA Number: [_____]
Account Name: [_____]
Account Number: [_____]
Reference: PORT [_____]

or in accordance with such other instructions as may hereafter be furnished to the Company in writing by an Owner, provided that such instructions have been received by the Company prior to the Record Date.

Counterparts.

This Reference Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Governing Law.

This Reference Agreement shall be governed by and construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Amendment.

This Reference Agreement may be amended from time to time by the Company and the Initial Owner by written agreement signed by the Company and the Initial Owner.

[Signature Page Follows]

Unassociated Document                                    Page 458 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 180 of 279

IN WITNESS WHEREOF, the Company and the Initial Owner have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

RESIDENTIAL FUNDING CORPORATION

By: _____
Name:
Title:

_____

By: _____
Name:
Title:

Unassociated Document                                                                 Page 459 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 181 of 279

EXHIBIT [A] [A-1] [A-2]

TO THE REFERENCE AGREEMENT

MORTGAGE LOAN SCHEDULE

EXHIBIT B

<u>RESERVED</u>

---

EXHBIT C

FORM OF SUBSERVICING AGREEMENT

<u>SUBSERVICING AGREEMENT</u>

This Seller/Servicer Contract (as may be amended, supplemented or otherwise modified from time to time, this "Contract") is made this ____ day of_____ , 20_, by and between Residential Funding Corporation, its successors and assigns ("Residential Funding") and _____ (the "Seller/Servicer," and, together with Residential Funding, the "parties" and each, individually, a "party").

WHEREAS, the Seller/Servicer desires to sell Loans to, and/or service Loans foi; Residential Funding, and Residential Funding desires to purchase Loans from the Seller/Servicer and/or have the Seller/Servicer service various of its Loans, pursuant to the terms of this Contract and the Residential Funding Seller and Servicer Guides incorporated herein by reference, as amended, supplemented or otherwise modified, from time to time (together, the "Guides");

NOW, THEREFORE, in consideration of the premises, and the terms, conditions and agreements set forth below, the parties agree as follows:

ARTICLE I

<u>Incorporation of Guides b Reference.</u>

The Seller/Servicer acknowledges that it has received and read the Guides. All provisions of the Guides are incorporated by reference into and made a part of this Contract, and shall be binding upon the parties; provided, however, that the Seller/Servicer shall be entitled to sell Loans to and/or service Loans for Residential Funding only if and for so Long as it shall have been authorized to do so by Residential Funding in writing. Specific reference in this Contract to particular provisions of the Guides and not to other provisions does not mean that those provisions of the Guides not specifically cited in this Contract are not applicable. All terms used herein shall have the same meanings as such terms have in the Guides, unless the context clearly requires otherwise.

ARTICLE II

<u>Amendments.</u>

This Contract may not be amended or modified orally, and no provision of this Contract may be waived or amended except in writing signed by the party against whom enforcement is sought. Such a written waiver or amendment must expressly reference this Contract.. However, by their terms, the Guides may be amended or supplemented by Residential Funding from time to time. Any such amendment(s) to the Guides shall be binding upon the parties hereto.

ARTICLE III

<u>Representations and Warranties.</u>

A.    *Reciprocal Representations and Warranties.*

The Seller/Servicer and Residential Funding each represents and warrants to the other that as of the date of this Contract:

Each party is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, is qualified, if necessary, to do business and in good standing in each jurisdiction in which it is required to be so qualified, and has the requisite power and authority to enter into this Contract and all other agreements which are contemplated by this Contract and to carry out its obligations hereunder and under the Guides and under such other agreements.

This Contract has been duly authorized, executed and delivered by each party and constitutes a valid and legally binding agreement of each party enforceable in accordance with its terms.

There is no action, proceeding or investigation pending or threatened, and no basis therefor is known to either party, that could affect the validity or prospective validity of this Contract.

Insofar as its capacity to carry out any obligation under this Contract is concerned, neither party is in violation of any charter, articles of incorporation, bylaws, mortgage, indenture, indebtedness, agreement, instrument, judgment, decree, order, statute, rule or regulation and none of the foregoing adversely affects its capacity to fulfill any of its obligations under this Contract. Its execution of, and performance pursuant to, this Contract will not result in a violation of any of the foregoing.

B.    *Seller/Servicer's Representations, Warranties and Covenants.*

In addition to the representations, warranties and covenants made by the Seller/Servicer pursuant to subparagraph (a) of this paragraph 3, the Seller/Servicer makes the representations, warranties and covenants set forth in the Guides and, upon request, agrees to deliver to Residential Funding the certified Resolution of Board of Directors which authorizes the execution and delivery of this Contract.

ARTICLE IV

<u>Remedies of Residential Funding.</u>

If an Event of Seller Default or an Event of Servicer Default shall occur, Residential Funding may, at its option, exercise one or more of those remedies set forth in the Guides.

ARTICLE V

<u>Seller/Servicer's Status as Independent Contractor.</u>

At no time shall the Seller/Servicer represent that it is acting as an agent of Residential Funding. The Seller/Servicer shall, at all times, act as an independent contractor.

ARTICLE VI

<u>Prior Agreements Superseded.</u>

Unassociated Document                                                          Page 462 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 184 of 279

This Contract restates, amends and supersedes any and all prior Seller Contracts or Servicer Contracts between the parties except that any subservicing agreement executed by the Seller/Servicer in connection with any loan-security exchange transaction shall not be affected.

ARTICLE VII

Assignment.

This Contract may not be assigned or transferred, in whole or in part, by the Seller/Servicer without the prior written consent of Residential Funding. Residential Funding may sell, assign, convey, hypothecate, pledge or in any other way transfer, in whole or in part, without restriction, its rights under this Contract and the Guides with respect to any Commitment or Loan.

Article VIII

Notices.

All notices, requests, demands or other communications that are to be given under this Contract shall be in writing, addressed to the appropriate parties and sent by facsimile or by overnight courier or by United States mail, postage prepaid, to the addresses and facsimile numbers specified below. However, another name, address and/or facsimile number may be substituted by the Seller/Servicer pursuant to the requirements of this paragraph 8, or Residential Funding pursuant to an amendment to the Guides.

If to Residential Funding, notices must be sent to the appropriate address or facsimile number specified in the Guides.

If to the Seller/Servicer, notice must be sent to:

Attention:

Facsimile Number: (_____) _____-_____

ARTICLE IX

Jurisdiction and Venue.

Each of the pasties irrevocably submits to the jurisdiction of any state or federal court located in Hennepin County, Minnesota, over any action, suit or proceeding to enforce or defend any right under this Contract or otherwise arising from any loan sale or servicing relationship existing in connection with this Contract, and each of the parties irrevocably agrees that all claims in respect of any such action or proceeding may be heard or determined in such state or federal court. Each of the parties irrevocably waives the defense of an inconvenient forum to the maintenance of any such action or proceeding and any other substantive or procedural rights or remedies it may have with respect to the maintenance of any such action or proceeding in any such forum. Each of the parties agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law. Each of the parties further agrees not to institute any legal actions or proceedings against the other party or any director, officer, employee, attorney, agent or property of the other party, arising out of or relating to this Contract in any court other than as hereinabove specified in this paragraph 9.

ARTICLE X

Miscellaneous.

This Contract, including all documents incorporated by reference herein, constitutes the entire understanding between the parties hereto and supersedes all other agreements, covenants, representations, warranties, understandings and communications between the parties, whether written or oral, with respect to the transactions contemplated by this Contract. All paragraph headings contained herein are for convenience only and shall not be construed as part of this Contract. Any provision of this Contract that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction, and, to this end, the provisions hereof are severable. This Contract shall be governed by, and construed and enforced in accordance with, applicable federal laws and the laws of the State of Minnesota.

[Signature Page Follows]

IN WITNESS WHEREOF, the duly authorized officers of the Seller/Servicer and Residential Funding have executed this Seller/Servicer Contract as of the date first above written.

ATTEST:                                              SELLER/SERVICER
[Corporate Seal]
(If none, so state.)

_____
                                                    *(Name of Seller/Servicer)*

                                                    By: _____
                                                                                    (Signature)

_____             By: _____
            *(Typed Name)*                                                       (Typed Name)

Title:                                              Title:

ATTEST:                                             RESIDENTIAL FUNDING CORPORATION

                                                    By: _____
                                                                                    (Signature)

_____             By: _____
            *(Typed Name)*                                                       (Typed Name)

Title: _____              Title: _____

EXHIBIT D

FORM OF ASSIGNMENT AN]) ASSUMPTION AGREEMENT

<u>ASSIGNMENT AND ASSUMPTION AGREEMENT</u>

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT is dated [_____ __, 20__], between _____ ("Assignor"), and _____ ("Assignee").

For and in consideration of the sum of TEN DOLLARS ($10.00) and other valuable consideration the receipt and sufficiency of which hereby are acknowledged, and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

The Assignor hereby grants, transfers and assigns to Assignee all of the right, title and interest of the Assignor, as Owner in, to and under that certain Reference Agreement, Adjustable Rate Mortgage Loans, Series 20__-WH__ (the "Servicing Agreement"), dated as of [_____ __, 20__], by and between Residential Funding Corporation (the "Company") and _____ the Mortgage Loans delivered thereunder by the Company to the Assignor; **[and that certain Custodial Agreement, Series 20,_-WJ1_ (the "Custodial Agreement"), dated [_____ __, 20__], by and among _____ and Wells Fargo Bank ,N.A., as custodian].**

The Assignor warrants and represents to, and covenants with, the Assignee that:

(a) The Assignor is the lawful owner of the Mortgage Loans with the full right to transfer such Mortgage Loans, which transfer is made subject to the terms and provisions of the Servicing Agreement but free from any other claims and encumbrances;

(b) The Assignor has not received notice of, and has no knowledge of, any offsets, counterclaims or other defenses available to the Company with respect to the Servicing Agreement or the Mortgage Loans;

(c) Unless noted below, the Assignor has not waived or agreed to any waiver under, or agreed to any amendment or other modification of, the Servicing Agreement, the Custodial Agreement or the Mortgage Loans, including without limitation the transfer of the servicing obligations under the Servicing Agreement. The Assignor has no knowledge of, and has not received notice of, any waivers under or amendments or other modifications of, or assignments of rights or obligations under, the Servicing Agreement, the Custodial Agreement or the Mortgage Loans; and

(d) Neither the Assignor nor anyone acting on its behalf has offered, transferred, pledged sold or otherwise disposed of the Mortgage Loans or any interest in the Mortgage Loans to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Mortgage Loans or any interest in the Mortgage Loans from, or otherwise approached or negotiated with respect to the Mortgage Loans, any interest in the Mortgage Loans with, any Person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action which would constitute a distribution of the Mortgage Loans under the Securities Act of 1933 (the "Securities Act") or which would render the disposition of the Mortgage Loans a violation of Section 5 of the Securities Act or require registration pursuant thereto.

The Assignee represents and warrants to, and covenants with, the Assignor and the Company pursuant to Section 2.03 of the Servicing Agreement that:

(a) The Assignee agrees to be bound, as Owner by all of the terms, covenants and conditions of the Servicing Agreement, the Mortgage Loans and the Custodial Agreement and from and after the date hereof, the Assignee assumes for the benefit of each of the Company and the Assignor all of the Assignor's obligations as Owner thereunder;

(b) Assignee understands that the Mortgage Loans have not been registered under the Securities Act or the securities laws of any state. Assignee is acquiring the Mortgage Loans for investment for its own account only and not with a view to or for sale or other transfer in connection with any distribution of the Mortgage Loans in any manner that would violate the Securities Act or any applicable state securities law. Assignee considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Mortgage Loans. Assignee has been furnished with all information regarding the Mortgage Loans that it has requested from Assignor or the Company. Neither the Assignee nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Mortgage Loans, any interest in the Mortgage Loans to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Mortgage Loans, any interest in the Mortgage Loans from, or otherwise approached or negotiated with respect to the Mortgage Loans, any interest in the Mortgage Loans with, any Person in any manner, or made any general solicitation by means of general advertising or in any other manner or taken any other action, which would constitute a distribution of the Mortgage Loans under the Securities Act or which would render the disposition of Mortgage Loans a violation of Section 5 of the Securities Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Mortgage Loans;

(c) The Assignee is either (i) not an employee benefit plan that is subject to the Employee Retirement Income Security Act of 1974, as amended ("ER1SA") or Section 4975 of the Internal Revenue Code of 1986 (the "Code")(a "Plan") and not a Person acting, directly or indirectly, on behalf of or investing with "plan assets" of any such Plan or (ii) an employee benefit plan that is subject to ERISA and the assignment contemplated herein does not constitute and will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code; and

(d) The Assignee shall indemnify the Company and hold it harmless against any loss, liability or expense incurred in connection with any claim, demand, defense or assertion based on or grounded upon or resulting from, a breach of the Assignee's representations, warranties and covenants set forth in this Assignment and Assumption Agreement.

(h) The Assignee's address for purposes of all notices and correspondence related to the Mortgage Loans and the Servicing Agreement is:

[Assignee's address]
Attention:
Telephone:
Fax:
Email:

The Assignee's wire transfer instructions for purposes of all remittances and payments related to the Mortgage Loans and the Servicing Agreement is:

For the account of

ABA#:
AJC#:
A/C Name:
Taxpayer ID#:

From and after the date hereof, the Company shall note the transfer of the Mortgage Loans to the Assignee in its books and records and the Company shall recognize the Assignee as the owner of the Mortgage Loans. The Company hereby agrees that it shall continue to provide information pursuant to Section 4.02(vii) of the Standard Terms (as defined in the Servicing Agreement) to the Assignor following the date hereof. The Company acknowledges that the Mortgage Loans may become part of a REMIC and the Company shall service the Mortgage Loans in

accordance with the Servicing Agreement, the terms of which are incorporated herein by reference, but in no event in a manner that would (i) cause any REMIC to fail to qualify as a REMIC or (ii) result in the imposition of a tax upon any REMIC (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMJC set forth in Section 860G(d) of the Code). It is the intention of the Assignor, the Company and the Assignee that the Servicing Agreement shall be binding upon and inure to the benefit of the Company and the Assignee and their respective successors and assigns.

[Signature Page Follows]

Capitalized words and phrases used but not otherwise defined in this Assignment and Assumption Agreement shall have the respective meanings assigned to them in the Servicing Agreement.

IN WITNESS WHEREOF, the parties have caused this Assignment and Assumption Agreement to be executed by their duly authorized officers as of the date first above written.

_____
Assignor

By: _____
Name: _____
Title: _____

_____
Assignee

By: _____
Name: _____
Title: _____

Taxpayer
Identification No. _____

EXHIBIT E

FORM OF CERTIFICATION

_____ ___,_____

Residential Funding Corporation
8400 Normandale Lake Drive, Suite 600
Minneapolis, Minnesota 55437

Re:     Adjustable Rate Mortgage Loans,
        Series [20____-WH____] - Assignment of Mortgage Loan

Ladies and Gentlemen:

        This letter is delivered to you in connection with the assignment by (the "Owner") to _____ (the "Lender") of _____ (the "Mortgage Loan") pursuant to Section 3.11(d) of the Sale and Servicing Agreement (the "Sale and Servicing Agreement"), dated as of [_____, 20__], among Residential Funding Corporation, as company (the "Company") and _____, as Initial Owner. All terms used herein and not otherwise defined shall have the meanings set forth in the Sale and Servicing Agreement. The Lender hereby certifies, represents and warrants to, and covenants with, the Company and the Custodian that:

        (i) the Mortgage Loan is secured by Mortgaged Property located in a jurisdiction in which an assignment in lieu of satisfaction is required to preserve lien priority, minimize or avoid mortgage recording taxes or otherwise comply with, or facilitate a refinancing under, the laws of such jurisdiction;

        (ii) the substance of the assignment is, and is intended to be, a refinancing of such Mortgage Loan and the form of the transaction is solely to comply with, or facilitate the transaction under, such local laws;

        (iii) the Mortgage Loan following the proposed assignment will be modified to have a rate of interest at least 0.25 percent below or above the rate of interest on such Mortgage Loan prior to such proposed assignment; and

        (iv) such assignment is at the request of the borrower under the related Mortgage Loan.

        Very truly yours,

        LENDER

        By: _____
        Name: _____
        Title: _____

EXHIBIT F

FORM OF REQUEST FOR RELEASE

DATE:

TO:

RE:      REQUEST FOR RELEASE OF DOCUMENTS

In connection with the administration of the pool of Mortgage Loans held by you for the referenced pool, we request the release of the Mortgage File described below.

Sale and Servicing Agreement Dated:
Series#:
Account#:
Pool#:
Loan#:
Min#:
Borrower Name(s):

Reason for Document Request: (circle one)          Mortgage Loan Prepaid in Full
                                                   Mortgage Loan Repurchased
                                                   Mortgage Loan in Foreclosure

"We hereby certify that all amounts received or to be received in connection with such payments which are required to be deposited have been or will be so deposited as provided in the Sale and Servicing Agreement."

_____
Residential Funding Corporation
Authorized Signature

TO CUSTODIAN: Please acknowledge this request, and check off documents being enclosed with a copy of this form. You should retain this form for your files in accordance with the terms of the Sale and Servicing Agreement,

Enclosed Documents:                    [   ]  Promissory Note
                                       [   ]  Primary Insurance Policy
                                       [   ]  Mortgage or Deed of Trust
                                       [   ]  Assignment(s) of Mortgage or Deed of Trust
                                       [   ]  Title Insurance Policy
                                       [   ]  Other: _____

By: _____
Name: _____
Title: _____
Date: _____

Unassociated Document                                                    Page 469 of 835

12-12020-mg     Doc 5106-9     Filed 09/18/13     Entered 09/18/13 18:18:12     Exhibit 7
Part 3     FST-CV-09-5011591     Doc 163     Exhibit D     Part 2 of 3     Pg 191 of 279

EXHIBIT G

FORMAT FOR REPORTS AND STATEMENTS

[See Attachment]

---

EXHIBIT H

REGULATION AB COMPLIANCE ADDENDUM

See Attached

Unassociated Document                                                                 Page 471 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 193 of 279

ARTICLE I

DEFINED TERMS

Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Agreement. The following terms shall have the meanings set forth below, unless the context clearly indicates otherwise:

Commission: The United States Securities and Exchange Commission.

Company Information: As defined in Section 2.07(a).

Depositor: The depositor, as such term is defined in Regulation AB, with respect to any

Securitization Transaction.

Exchange Act: The Securities Exchange Act of 1934, as amended.

Master Servicer: With respect to any Securitization Transaction, the "master servicer," if any, identified in the related transaction documents.

Qualified Correspondent: Any Person from which the Company purchased Mortgage Loans, provided that the following conditions are satisfied: (i) such Mortgage Loans were originated pursuant to an agreement between the Company and such Person that contemplated that such Person would underwrite mortgage loans from time to time, for sale to the Company, in accordance with underwriting guidelines designated by the Company ("Designated Guidelines") or guidelines that do not vary materially from such Designated Guidelines; (ii) such Mortgage Loans were in fact underwritten as described in clause (1) above and were acquired by the Company within 180 days after origination; (iii) either (x) the Designated Guidelines were, at the time such Mortgage Loans were originated, used by the Company in origination of mortgage loans of the same typo as the Mortgage Loans for the Company's own account or (y) the Designated Guidelines were, at the time such Mortgage Loans were underwritten, designated by the Company on a consistent basis for use by lenders in originating mortgage loans to be purchased by the Company; and (iv) the Company employed, at the time such Mortgage Loans were acquired by the Company, pre-purchase or post-purchase quality assurance procedures (which may involve, among other things, review of a sample of mortgage loans purchased during a particular time period or through particular channels) designed to ensure that Persons from which it purchased mortgage loans properly applied the underwriting criteria designated by the Company.

Reconstitution: Any Securitization Transaction or Whole Loan Transfer.

Reconstitution Agreement: An agreement entered into by the Company and the Purchaser and/or certain third parties in connection with a Reconstitution with respect to any or all of the Mortgage Loans serviced under this Agreement.

Regulation AB: Subpart 229.1100—Asset Backed Securities (Regulation AB), 17 C.F.R. §229.1 100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-85 18, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

Securities Act: The Securities Act of 1933, as amended.

Securitization Transaction: Any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

Servicer: As defined in Section 2.03(c).

Servicing Criteria: The "servicing criteria" set forth in item 1122(d) of Regulation AS, as such may be amended from time to time.

Static Pool Information: Static pool information as described in Item 1 105(a)(l)-(3) and 1105(c) of Regulation AB.

Subcontractor: Any vendor, subcontractor or other Person that is not responsible for the overall servicing (as "servicing" is commonly understood by participants in the mortgage-backed securities market) of Mortgage Loans but performs one or more discrete functions identified in Item 1122( d) of Regulation AB with respect to Mortgage Loans under the direction or authority of the Company or a Subservicer.

Subservicer: Any Person that services Mortgage Loans on behalf of the Company or any Subservicer and is responsible for the performance (whether directly or through Subservicers or Subcontractors) of a substantial portion of the material servicing functions required to be performed by the Company under this Agreement or any Reconstitution Agreement that are identified in Item 1122(d) of Regulation AD.

Whole Loan Transfer: Any sale or transfer of some or all of the Mortgage Loans, other than a Securitization Transaction.

ARTICLE II

COMPLIANCE WITH REGULATION AB

Section 2.01. Intent of the Parties; Reasonableness.

The Purchaser and the Company acknowledge and agree that the purpose of Article II of this Reg AB Addendum is to facilitate compliance by the Purchaser and any Depositor with the provisions of Regulation AB and related rules and regulations of the Commission and that the provisions of this Reg AD Addendum shall be applicable to all Mortgage Loans included in a Securitization Transaction closing on or after January 1, 2006, regardless whether the Mortgage Loans were purchased by the Purchaser from the Company prior to the date hereof. Although Regulation AB is applicable by its terms only to offerings of asset-backed securities that are registered under the Securities Act, the Company acknowledges that investors in privately offered securities may require that the Purchaser or any Depositor provide comparable disclosure in unregistered offerings. References in this Agreement to compliance with Regulation AB include provision of comparable disclosure in private offerings.

Neither the Purchaser nor any Depositor shall exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission thereunder (or the provision in a private offering of disclosure comparable to that required under the Securities Act). The Company acknowledges that interpretations of the requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff; consensus among participants in the asset-backed securities markets, advice of counsel, or otherwise, and agrees to comply with requests made by the Purchaser, any Master Servicer or any Depositor in good faith for delivery of information under these provisions on the basis of evolving interpretations of Regulation AB. In connection with any Securitization Transaction,

the Company shall cooperate fully with the Purchaser and any Master Servicer to deliver to the Purchaser (including any of its assignees or designees), any Master Servicer and any Depositor, any and all statements, reports, certifications, records and any other information necessary in the good faith determination of the Purchaser, the Master Servicer or any Depositor to permit the Purchaser, such Master Servicer or such Depositor to comply with the provisions of Regulation AB, together with such disclosures relating to the Company, any Subservicer and the Mortgage Loans, or the servicing of the Mortgage Loans, reasonably believed by the Purchaser or any Depositor to be necessary in order to effect such compliance.

The Purchaser (including any of its assignees or designees) shall cooperate with the Company by providing timely notice of requests for information under these provisions and by reasonably limiting such requests to information required to comply with Regulation AB.

Section 2.02. Additional Representations and Warranties of the Company.

(a) The Company hereby represents to the Purchaser, to any Master Servicer and to any Depositor, as of the date on which information is first provided to the Purchaser or any Depositor under Section 2.03 that, except as disclosed in writing to the Purchaser or such Depositor prior to such date: (i) the Company is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other Securitization Transaction due to any default by the Company as a Servicer; (ii) the Company has not been terminated as servicer in a residential mortgage loan securitization due to a servicing default; (iii) no material noncompliance with the applicable Servicing Criteria with respect to other securitizations of residential mortgage loans involving the Company as servicer has been disclosed or reported by the Company; (iv) no material changes to the Company's policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreement for mortgage loans of a type similar to the Mortgage Loans have occurred during the three-year period immediately preceding the related Securitization Transaction; (v) there are no changes to the Company's financial condition that could have a material adverse effect on the performance by the Company of its servicing obligations under this Agreement; (vi) there are no legal or governmental proceedings pending (or governmental proceedings known to be contemplated) against the Company or any Subservicer that are material to investors in the related Securitization Transaction; (vii) there are no affiliations, relationships or transactions relating to the Company or any Sub servicer with respect to any Securitization Transaction and ally party thereto identified by the related Depositor of a type described in Item 1119 of Regulation AS; and (viii) each Mortgage Loan was originated by a Qualified Correspondent.

(b) If so requested by the Purchaser, any Master Servicer or any Depositor on any date following the date on which information is first provided to the Purchaser, any Master Servicer or any Depositor under Section 203, the Company shall, within five Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (a) of this Section or, if any such representation and warranty is not accurate as of the date of such request, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party.

Section 2.03. Information to Be Provided by the Company.

In connection with any Securitization Transaction, the Company shall (i) within five Business Days following a request by the Purchaser or any Depositor, provide to the Purchaser and such Depositor (or, as applicable, cause each Subservicer to provide), in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, the information and materials specified in paragraphs (a), (b), (c), (l) and (g) of this Section, provided, that the Company shall not be required to provide such information and materials with respect to a Subservicer if Regulation AB does not require disclosure of such information and materials and (ii) as promptly as practicable following notice to or discovery by the Company, provide to the Purchaser and any Depositor (in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor) the information specified in paragraph (d) of this Section.

(a) If so requested by the Purchaser or any Depositor, the Company shall provide such information regarding (i) the Company, as originator of the Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent) and (ii) as applicable, each Subservicer, as is requested for the purpose of compliance with Items I 103(a)(1), 1105, 1110, 1117 and 1119 of Regulation ALL Such information shall include, at a minimum:

(A) the originator's form of organization;

(B) a description of the originator's origination program and how long the originator has been engaged in originating residential mortgage loans, which description shall include a discussion of the originator's experience in originating mortgage loans of a similar type as the Mortgage Loans; information regarding the size and composition of the originator's origination portfolio; and information that may be material to an analysis of the performance of the Mortgage Loans, including the originators' credit-granting or underwriting criteria for mortgage loans of similar type(s) as the Mortgage Loans and such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 11 10(b)(2) of Regulation AR;

(C) a description of any legal or governmental proceedings pending (or governmental proceedings known to be contemplated) against the Company and each Subservicer that would be material to investors in the related Securitization Transaction; and

(D) a description of any affiliation or relationship, as described in Item 1119 of Regulation AB, between the Company, each Subservicer and any of the following parties to a Securitization Transaction, as such parties axe identified to the Company by the Purchaser or any Depositor in writing in advance of such Securitization Transaction:

(1) the sponsor;
(2) the depositor;
(3) the issuing entity;
(4) any servicer;
(5) any trustee;
(6) any originator;
(7) any significant obligor;
(8) any enhancement or support provider; and
(9) any other material transaction party.

(b) If so requested by the Purchaser or any Depositor, the Company shall provide Static Pool Information with respect to the mortgage loans (of a similar type as the Mortgage Loans) originated by the Company, if the Company is an originator of Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent). Such Static Pool Information shall be prepared by the Company on the basis of its reasonable, good faith interpretation of the requirements of Item 11 05(a)( 1)-(3) of Regulation AB. The content of such Static Pool Information may be in the form customarily provided by the Company, and need not be customized for the Purchaser or any Depositor. Such Static Pool Information for each vintage origination year or prior securitized pool, as applicable, shall be presented in increments no less frequently than quarterly over the life of the mortgage loans included in the vintage origination year or prior securitized pool. The most recent periodic increment must be as of a date no later than 135 days prior to the date of the prospectus or other offering document in which the Static Pool information is to be included or incorporated by reference. The Static Pool Information shall be provided in an electronic format that provides a permanent record of the information provided, such as a portable document format (pdf) file, or other such electronic format reasonably required by the Purchaser or the Depositor, as applicable.

Promptly following notice or discovery of a material error in Static Pool Information provided pursuant to the immediately preceding paragraph (including an omission to include therein information required to be provided pursuant to such paragraph), the Company shall provide corrected Static Pool Information to the Purchaser or any Depositor, as applicable, in the same format in which Static Pool Information was previously provided to such party by the Company.

If so requested by the Purchaser or any Depositor, the Company shall provide at the expense of the requesting party (to the extent of any additional incremental expense associated with delivery pursuant to this Agreement), such statements and agreed-upon procedures letters of certified public accountants reasonably acceptable to the Purchaser or Depositor, as applicable, pertaining to Static Pool Information relating to prior securitized pools for securitizations closed on or after January 1, 2006 or, in the case of Static Pool Information with respect to the Company's originations or purchases, to calendar months commencing January 1, 2006, as the Purchaser or such Depositor shall reasonably request. Such statements and letters shall be addressed to and be for the benefit of such parties as the Purchaser or such Depositor shall designate, which may include, by way of example, any Sponsor, any Depositor and any broker dealer acting as underwriter, placement agent or initial purchaser with respect to a Securitization Transaction. My such statement or letter may take the form of a standard, generally applicable document accompanied by a reliance letter authorizing reliance by the addressees designated by the Purchaser or such Depositor.

Unassociated Document                                                                                                    Page 473 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 195 of 279

(c) If so requested by the Purchaser or any Depositor, the Company shall provide such information regarding the Company, as servicer of the Mortgage Loans, and each Subservicer (each of the Company and each Subservicer, for purposes of this paragraph, a "Servicer"), as is requested for the purpose of compliance with Items 1108, 1117 and 1119 of Regulation AB. Such information shall include, at a minimum:

(A) the Servicer's form of organization;

(B) a description of how long the Servicer has been servicing residential mortgage loans; a general discussion of the Servicer's experience in servicing assets of any type as well as a more detailed discussion of the Servicer's experience in, and procedures for, the servicing function it will perform under the Agreement and any Reconstitution Agreements; information regarding the size, composition and growth of the Servicer's portfolio of residential mortgage loans of a type similar to the Mortgage Loans and information on factors related to the Servicer that may be material to any analysis of the servicing of the Mortgage Loans or the related asset-backed securities, as applicable, including, without limitation:

(1) whether any prior securitizations of mortgage loans of a type similar to the Mortgage Loans involving the Servicer have defaulted because of servicing during the three-year period immediately preceding the related Securitization Transaction;

(2) the extent of outsourcing the Servicer utilizes;

(3) whether there has been previous disclosure of material noncompliance with the applicable servicing criteria with respect to other securitizations of residential mortgage loans involving the Servicer as a servicer during the three-year period immediately preceding the related Securitization Transaction;

(4) whether the Servicer has been terminated as servicer in a residential mortgage loan securitizatiort due to a servicing default; and

(5) such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1 108(b)(2) of Regulation AB;

(C) a description of any material changes during the three-year period immediately preceding the related Securitization Transaction to the Servicer's policies or procedures with respect to the servicing function it will perform under the Agreement and any Reconstitution Agreements for mortgage loans of a type similar to the Mortgage Loans;

(D) information regarding the Servicer's financial condition, to the extent that there is a material risk that an adverse financial event or circumstance involving the Servicer could have a material adverse effect on the performance by the Company of its servicing obligations under the Agreement or any Reconstitution Agreement;

(E) a statement by an authorized officer of the Servicer to the effect that the Servicer has made all advances required to be made on residential mortgage loans serviced by it during the three-year period immediately preceding the related Securitization Transaction, or, if such statement would not be accurate, information regarding the percentage arid type of advances not made as required, and the reasons for such failure to advance;

(F) a description of the Servicer's processes and procedures designed to address any special or unique factors involved in servicing loans of a similar type as the Mortgage Loans;

(G) a description of the Servicer's processes for handling delinquencies, losses, bankruptcies and recoveries, such as through liquidation of mortgaged properties, sale of defaulted mortgage loans or workouts; and

(H) information as to how the Servicer defines or determines delinquencies and charge-offs, including the effect of any grace period, re-aging, restructuring, partial payments considered current or other practices with respect to delinquency and loss experience.

(d) For the purpose of satisfying the reporting obligation under the Exchange Act with respect to any class of asset-backed securities, for so long as the Depositor is required to file reports under the Exchange Act with respect to a Securitization Transaction, the Company shall (or shall cause each Subservicer to) (i) provide prompt notice to the Purchaser, any Master Servicer and any Depositor in writing of (A) any litigation or governmental proceedings involving the Company or any Subservicer that would be material to investors in the related Securitization Transaction, (B) any affiliations or relationships of the type described in Item 1119 of Regulation AB that develop following the closing date of a Securitization Transaction between the Company or any Subservicer and any of the parties specified in clause (D) of paragraph (a) of this Section (and any other parties identified in writing by the requesting party) with respect to such Securitization Transaction, (C) any Event of Default under the terms of this Agreement or any Reconstitution Agreement, (D) any merger, consolidation or sale of substantially all of the assets of the Company, and (B) the Company's entry into a material agreement after the applicable closing date with a Subservicer to perform or assist in the performance of any of the Company's obligations under this Agreement or any Reconstitution Agreement and (ii) provide to the Purchaser and any Depositor a description of such proceedings, affiliations or relationships.

(e) As a condition to the succession to the Company or any Subservicer as a servicer or subservicer of at least 10% of the pool assets in a Securitization Transaction or sub-pool thereof under the Agreement or any Reconstitution Agreement by any Person (i) into which the Company or such Subservicer may be merged or consolidated, or (ii) which may be appointed as a successor to the Company or any Subservicer, the Company shall provide to the Purchaser, any Master Servicer, and any Depositor, at least 15 calendar days prior to the effective date of such succession or appointment, (x) written notice to the Purchaser and any Depositor of such' succession or appointment and (y) in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, all information reasonably requested by the Purchaser or any Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K with respect to any class of asset-backed securities.

(f) In addition to such information as the Company, as servicer, is obligated to provide pursuant to other provisions of the Agreement, not later than ten days prior to the deadline for the filing of any distribution report on Form 10-fl in respect of any Securitization Transaction that includes any of the Mortgage Loans serviced by the Company or any Subservicer, the Company or such Subservicer, as applicable, shall, to the extent the Company or such Subservicer has knowledge, provide to the party responsible for filing such report (including, if applicable, the Master Servicer) notice of the occurrence of any of the following events along with all information, data, and materials related thereto as may be required to be included in the related distribution report on Form 1 0-fl (as specified in the provisions of Regulation AB referenced below):

(i) any material modifications, extensions or waivers of pool asset terms, fees, penalties or payments during the distribution period or that have cumulatively become material over time (Item 1121 (a)(1 ) of Regulation AB);

(ii) material breaches of pool asset representations or warranties or transaction covenants (Item 1 I21(a(l2) of Regulation AB); and

(iii) information regarding any material pool asset changes (such as additions, substitutions or repurchases) (Item 112 l(a)( 14) of Regulation AB).

(g) The Company shall provide to the Purchaser, any Master Servicer and any Depositor, upon request evidence of the authorization of the person signing any certification or statement, copies or other evidence of Fidelity Bond Insurance and Errors and Omissions Insurance policy, publicly available financial information and reports, and such other information reasonably related to the Company's or such Subservicer's performance hereunder.

(h) In the event that (i) the Company does not reasonably believe that certain information requested under Section 2.03 is required to be disclosed pursuant to Regulation AB and (ii) the Company has not provided such information for any of its own securitizations, the Purchaser shall pay all reasonable documented costs incurred by the Company in connection with the preparation and delivery of such information, and the Company shall promptly deliver such infonnation after expiration of a reasonable period of time for establishing the necessary systems and procedures to

produce such information. Further, notwithstanding anything to the contrary herein, when determining if information is required under Regulation AB, all threshold arid other requirements shall be determined solely by looking at the Company's mortgage loans and those of its third-party originators. The Company shall have no obligation with respect to disclosure or reporting under Regulation AU in the event that the aggregation of its third-party originated Mortgage Loans with those of the Purchaser's other sellers require additional disclosure; provided, however, the Company shall otherwise cooperate with the Purchaser to provide disclosure or reporting under Regulation AB in the event that such disclosure or reporting is required under Regulation AB and not otherwise available to the Purchaser.

Section 2.04. Servicer Compliance Statement.

On or before March 15 of each calendar year, commencing in 2007, the Company shall deliver to the Purchaser, any Master Servicer and any Depositor a statement of compliance addressed to the Purchaser, such Master Servicer and such Depositor and signed by an authorized officer of the Company, to the effect that (1) a review of the Company's activities during the immediately preceding calendar year (or applicable portion thereof) and of its performance under the Agreement and any applicable Reconstitution Agreement during such period has been made under such officer's supervision, and (ii) to the best of such officers' knowledge, based on such review, the Company has fulfilled all of its obligations under the Agreement and any applicable Reconstitution Agreement in all material respects throughout such calendar year (or applicable portion thereof) or, if there has been a failure to fulfill any such obligation in any material respect, specifically identifying each such failure known to such officer and the nature and the status thereof.

Section 2.05. Report on Assessment of Compliance and Attestation.

(a) On or before March 15 of each calendar year when the Depositor is required to file reports under the Exchange Act with respect to the related Securitization Transaction commencing in 2007, the Company shall:

(i) deliver to the Purchaser, any Master Servicer and any Depositor a report (in form and substance reasonably satisfactory to the Purchaser, such Master Servicer and such Depositor) regarding the Company's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules l3a-lS and lsd-l8 of the Exchange Act and Item 1122 of Regulation AB. Such report shall be signed by an authorized officer of the Company, and shall address each of the "Applicable Servicing Criteria" specified on Exhibit B hereto;

(ii) deliver to the Purchaser, any Master Servicer and any Depositor a report of a registered public accounting firm reasonably acceptable to the Purchaser, such Master Servicer and such Depositor that attests to, and reports on, the assessment of compliance made by the Company and delivered pursuant to the preceding paragraph. Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act;

(iii) cause each Subservicer and each Subcontractor determined by the Company pursuant to Section 2.06(b) to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB to deliver to the Purchaser, any Master Servicer and any Depositor an assessment of compliance and accountants' attestation as and when provided in paragraphs (a) and (b) of this Section; and

(iv) deliver, and cause each Subservicer and Subcontractor described in clause (iii) to provide, to the Purchaser, any Depositor, any Master Servicer and any other Person that will be responsible for signing the certification (a "Sarbanes Certification") required by Rules 13a-14(d) and lSd-14(d) under the Exchange Act (pursuant to Section 302 of the Sarbanes-Oxley Act of 2002) on behalf of an asset-backed issuer with respect to a Securitization Transaction a certification, signed by the appropriate officer of the Company, in the form attached hereto as Exhibit A.

The Company acknowledges that the parties identified in clause (a)(iv) above may rely on the certification provided by the Company pursuant to such clause in signing a Sarbanes Certification and filing such with the Commission. Neither the Purchaser nor any Depositor will request delivery of a certification under clause (a)(iv) above unless a Depositor is required under the Exchange Act to file an annual report on Form 10-K with respect to an issuing entity whose asset pool includes Mortgage Loans.

(b) Each assessment of compliance provided by a Subservicer pursuant to Section 2.05(a)(iii) shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit B hereto delivered to the Purchaser concurrently with the execution of this Reg AB Addendum or, in the case of a Subservicer subsequently appointed as such, on or prior to the date of such appointment. An assessment of compliance provided by a Subcontractor pursuant to Section 2.05(a)(iii) need not address any elements of the Servicing Criteria other than those specified by the Company pursuant to Section 2.06.

Section 2.06. Use of Subservicers and Subcontractors.

The Company shall not hire or otherwise utilize the services of any Subservicer "participating in the Servicing function" within the meaning of Item 1122 of Regulation AB, to fulfill any of the obligations of the Company as servicer under the Agreement or any Reconstitution Agreement unless the Company complies with the provisions of paragraph (a) of this Section. The Company shall not hire or otherwise utilize the services of any Subcontractor "participating in the Servicing function" within the meaning of Item 1122 of Regulation AB, and shall not permit any Subservicer to hire or otherwise utilize the services of any such Subcontractor to fulfill any of the obligations of the Company as servicer under the Agreement or any Reconstitution Agreement unless the Company complies with the provisions of paragraph (b)of this Section.

(a) It shall not be necessary for the Company to seek the consent of the Purchaser, any Master Servicer or any Depositor to the utilization of any Subservicer. The Company shall cause any Subservicer used by the Company (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of this Section and with Sections 2.02, 2.03, c), (e), (I) and (g), 2.04, 2.05 and 2.07 of this Reg AB Addendum to the same extent as if such Subservicer were the Company, to the extent required under Regulation AB, and to provide the information required with respect to such Subservicer under Section 2.03(d) of this Reg AB Addendum. The Company shall be responsible for obtaining from each Subservicer and delivering to the Purchaser and any Depositor any servicer compliance statement required to be delivered by such Subservicer under Section 2.04 and Regulation AB, any assessment of compliance and attestation required to be delivered by such Subservicer under Section 2.05 and Regulation AB and any certification required to be delivered to the Person that will be responsible for signing the Sarbanes Certification under Section 2.05 as and when required to be delivered under Regulation AB.

(b) It shall not be necessary for the Company to seek the consent of the Purchaser, any Master Servicer or any Depositor to the utilization of any Subcontractor. If required under Regulation AB, the Company shall promptly upon request provide to the Purchaser, any Master Servicer and any Depositor (or any designee of the Depositor, such as an administrator) a written description (in form and substance reasonably satisfactory to the Purchaser, such Depositor and such Master Servicer) of the role and function of each Subcontractor utilized by the Company or any Subservicer, specifying (i) the identity of each such Subcontractor, (ii) which (if any) of such Subcontractors are "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, and (iii) which elements of the Servicing Criteria will be addressed in assessments of compliance provided by each Subcontractor identified pursuant to clause (ii) of this paragraph.

As a condition to the utilization of any Subcontractor determined to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, the Company shall cause any such Subcontractor used by the Company (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the applicable provisions of Sections 2.05 and 2.07 of this Reg AB Addendum. The Company shall be responsible for obtaining from each Subcontractor and delivering to the Purchaser and any Depositor any assessment of compliance and attestation and the other certifications required to be delivered by such Subservicer and such Subcontractor under Section 2.05, in each case as and when required to be delivered under Regulation AB.

Section 2.07. Indemnification; Remedies.

(a) The Company shall indemnify the Purchaser, each affiliate of the Purchaser, and each of the following parties participating in a Securitization Transaction: each sponsor and issuing entity; each Person (including, but not limited to, any Master Servicer if applicable) responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction; each broker dealer acting as underwriter, placement agent or initial purchaser, each Person who controls any of such parties or the Depositor (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees, agents and affiliates of each of the foregoing and of the Depositor (each, a "Purchaser

Indemnified Party"), and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, reasonable legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(i) (A) any untrue statement of a material fact contained or alleged to be contained in any information, report, certification, data or other material provided under this Article II by or on behalf of the Company, or provided under this Article II by or on behalf of any Subservicer or Subcontractor (collectively, the "Company Information"), or (B) the omission or alleged omission to state in the Company Information a material fact required to be stated therein, in the light of the circumstances under which they were made, not misleading; *provided, by way of clarification*, that clause (B) of this paragraph shall be construed solely by reference to the Company Information and not to any other information communicated in connection with a sale or purchase of securities, without regard to whether the Company Information or any portion thereof is presented together with or separately from such other information;

(ii) any breach by the Company of its obligations under this Article II, including particularly any failure by the Company, any Subservicer or any Subcontractor to deliver any information, report, certification, accountants' letter or other material when and as required under this Article II, including any failure by the Company to identify pursuant to Section 2.06(b) any Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB;

(iii) any breach by the Company of a representation or warranty set forth in Section 2.02(a) or in a writing furnished pursuant to Section 2.02(b) and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Company of a representation or warranty in a writing furnished pursuant to Section 2.02(b) to the extent made as of a date subsequent to such closing date; or

(iv) the gross negligence, bad faith or willful misfeasance in the performance of the Company's duties, or by reason of reckless disregard of obligations and duties, under this Article ii;

*provided, however*, that in no event, other than with respect to any indemnification obligations of the Company relating to any Company Information provided by the Company for inclusion in the any prospectus, prospectus supplement, or any private placement memorandum, or in any amendment or supplement thereto, in a Securitization Transaction, will the Company be liable for any consequential or punitive damages pursuant to this Section 2.07, even if advised of the possibility of such damages.

The Purchaser shall indemnify the Company, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the respective present and former directors, officers, employees, agents and affiliates of each of the foregoing (each, a "Company Indemnified Party;" together with the Purchaser Indemnified Parties, the "Indemnified Parties"), and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, reasonable legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon any untrue statement contained or alleged to be contained in any filing with the Commission or the omission or alleged omission to state in any filing with the Commission a material fact required to be stated or necessary to be stated in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in each case to the extent, but only to the extent, that such untrue statement, alleged untrue statement, omission, or alleged omission arose out of or was based upon any information or statement, other than the Company Information, in a filing with the Commission.

If the indemnification provided for herein is unavailable or insufficient to hold harmless an Indemnified Party, then the Company agrees that it shall contribute to the amount paid or payable by such Indemnified Party as a result of any claims, losses, damages or liabilities incurred by such Indemnified Party in such proportion as is appropriate to reflect the relative fault of such Indemnified Party on the one hand and the Company on the other..

In the case of any failure of performance described in clause (a)(ii) of this Section, the Company shall promptly reimburse the Purchaser, any Depositor, as applicable, and each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction, for all costs reasonably incurred by each such party in order to obtain the information, report, certification, accountants' letter or other material not delivered as required under Regulation AB by the Company, any Subservicer or any Subcontractor.

This indemnification shall survive the termination of this Agreement or the termination of any party to this Agreement.

(b) (i) Any failure by the Company, any Subservicer or any Subcontractor to deliver any information, report, certification, accountants' letter or other material when and as required under this Article II, or any breach by the Company of a representation or warranty set forth in Section 2.02(a) or in a writing furnished pursuant to Section 2.02(b) and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Company of a representation or warranty in a writing furnished pursuant to Section 2.02(b) to the extent made as of a date subsequent to such closing date, shall immediately and automatically, without notice or grace period, constitute an Event of Default with respect to the Company under the Agreement and any applicable Reconstitution Agreement, and shall entitle the Purchaser or any Depositor, as applicable, in its sole discretion to terminate the rights and obligations of the Company as servicer under the Agreement and/or any applicable Reconstitution Agreement without payment (notwithstanding anything in this Agreement or any applicable Reconstitution Agreement to the contrary) of any compensation to the Company (and if the Company is servicing any of the Mortgage Loans in a Securitization Transaction, appoint a successor servicer reasonably acceptable to any Master Servicer for such Securitization Transaction); provided that to the extent that any provision of the Agreement and/or any applicable Reconstitution Agreement expressly provides for the survival of certain rights or obligations following termination of the Company as servicer, such provision shall be given effect. Neither the Purchaser, any Master Servicer nor any Depositor shall be entitled to terminate the rights and obligations of the Company pursuant to this subparagraph (b)(i) if a failure of the Company to identify a Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB was attributable solely to the role or functions of such Subcontractor with respect to mortgage loans other than the Mortgage Loans.

(ii) The Company shall promptly reimburse the Purchaser (or any designee of the Purchaser, such as a master servicer) and any Depositor, as applicable, for all reasonable expenses incurred by the Purchaser (or such designee) or such Depositor, as such are incurred, in connection with the termination of the Company as servicer and the transfer of servicing of the Mortgage Loans to a successor servicer. The provisions of this paragraph shall not limit whatever rights the Purchaser or any Depositor may have under other provisions of the Agreement and/or any applicable Reconstitution Agreement or otherwise, whether in equity or at law, such as an action for damages, specific performance or injunctive relief.

Section 2.08. <u>Third-Party Beneficiary</u>.

For purposes of this Article II and any related provisions thereto, each Master Servicer shall be considered a third-party beneficiary of this Reg AB Addendum, entitled to all the rights and benefits hereof as if it were a direct party to Article II of this Agreement.

EXHIBIT A

FORM OF ANNUAL CERTIFICATION

Re: The [  ] agreement dated as of [      1, 200[  ]  (the "Agreement"), among [IDENTIFY PARTIES]

I, _____-_____ —, the _____ of [NAME OF COMPANY] (the "Company"), certify to [the Purchaser], [the Depositor], and the [Master Servicer] [Securities Administrator] [Trustee], and their officers, with the knowledge and intent that they will rely upon this certification, that:

(1) I have reviewed the servicer compliance statement of the Company provided in accordance with Item 1123 of Regulation AB (the "Compliance Statement"), the report on assessment of the Company's compliance with the servicing criteria set forth in Item 1122(d) of Regulation AB and identified as the responsibility of the Company on Exhibit B to the Regulation AB Compliance Addendum to the Agreement (the "Servicing Criteria"), provided in accordance with Rules 13a-18 and 15d-18 under Securities Exchange Act of 1934, as amended (the "Exchange Act") and Item 1122 of Regulation AB (the "Servicing Assessment"), the registered public accounting firm's attestation report provided in accordance with Rules 1 3a-18 and I5d-18 under the Exchange Act and Section 1122(b) of Regulation AB (the "Attestation Report"), and all servicing reports, officer's certificates and other information relating to the servicing of the Mortgage Loans by the Company during 200[  ] that were delivered by the Company to the [Depositor] [Master Servicer] [Securities Administrator] [Trustee] pursuant to the Agreement (collectively, the "Company Servicing Information");

(2) Based on my knowledge, the Company Servicing Information, taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which such statements were made, not misleading with respect to the period of time covered by the Company Servicing Information;

(3) Based on my knowledge, all of the Company Servicing Information required to be provided by the Company under the Agreement has been provided to the [Depositor] [Master Servicer] [Securities Administrator] [Trustee];

(4) I am responsible for reviewing the activities performed by the Company as servicer under the Agreement, and based on my knowledge and the compliance review conducted in preparing the Compliance Statement and except as disclosed in the Compliance Statement, the Servicing Assessment or the Attestation Report, the Company has fulfilled its obligations under the Agreement in all material respects; and

(5) The Compliance Statement required to be delivered by the Company pursuant to this Agreement, and the Servicing Assessment and Attestation Report required to be provided by the Company and by any Subservicer and Subcontractor pursuant to the Agreement, have been provided to the [Depositor] [Master Servicer].

Any material instances of noncompliance described in such reports have been disclosed to the [Depositor] [Master Servicer]. Any material instance of noncompliance with the Servicing Criteria has been disclosed in such reports.

Date: _____

By: _____
        Name:
        Title:

By: _____
        Name:
        Title:

EXHIBIT B

SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

The assessment of compliance to be delivered by the Servicer shall address, at a minimum, the criteria identified as below as "Applicable Servicing Criteria":

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| **General Servicing Considerations** | | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | ✓ |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | ✓ |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the pool assets are maintained. | ✓ |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | ✓ |
| **Cash Collection and Administration** | | |
| 1122(d)(2)(i) | Payments on pool assets are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified In the transaction agreements. | ✓ |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | ✓ |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | ✓ |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of overcollateralization. are separately maintained (e .g., with respect to commingling of cash) as set forth In the transaction agreements. | ✓ |
| 1122(d)(2)(v) | Each custodial account Is maintained at a federally insured depository institution as set forth In the transaction agreements. For purposes of this criterion. "federally Insured depository institution" with respect to a foreign financial Institution means a foreign financial institution that meets the | ✓ |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | ✓ |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements: C) reviewed and approved by someone other than the person who prepared the reconciliation: and (D) contain explanations for reconciling items. These reconciling Items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | ✓ |
| **Investor Remittances and Reporting** | | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained In accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth In the transaction agreements; (B) provide Information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by Its rules and regulations; and (D) agree with Investors' or the trustee's records as to the total unpaid principal balance and number of pool assets serviced by the servicer. | ✓ |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | ✓ |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the servicer's investor records, or such other number of days specified in the transaction agreements. | ✓ |
| 1122(d)(3)(iv) | Amounts remitted to Investors per the investor reports agree with cancelled 22(d)(3)(iv) checks, or other form of payment, or custodial bank statements. | ✓ |
| **Pool Asset Administration** | | |
| 1122(d)(4)(i) | Collateral or security on pool assets is maintained as required by the transaction agreements or related asset pool documents. | ✓ |
| 1122(d)(4)(ii) | Pool assets and related documents are safeguarded as required by the 22(d)(4)(it) transaction agreements | ✓ |
| 1122(d)(2)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved In accordance with any conditions or requirements in the transaction agreements. | ✓ |
| 1122(d)(4)(iv) | Payments on pod assets, including any payoffs, made In accordance with the related pool asset documents are posted to the servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related pool asset documents. | ✓ |
| 1122(d)(4)(v) | The servicer's records regarding the pool assets agree with the servicer's records with respect to an obligor's unpaid principal balance. | ✓ |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's pool asset (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel In accordance with the transaction agreements and related pod asset documents. | ✓ |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds In Lieu of foreclosure, foreclosures and repossessions, as applicable) are Initiated, conducted and concluded In accordance with the timeframes or other requirements established by the transaction agreements. | ✓ |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a pool asset is delinquent In accordance with the transaction agreements.. Such records are maintained on at least a monthly basis, or such other period specified In the transaction agreements, and describe the entity's activities in monitoring delinquent pool assets Including, for example, phone calls, letters and payment rescheduling plans In cases where delinquency Is deemed temporary (e.g., Illness or unemployment). | ✓ |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for pool assets with variable rates are computed based on the related pool asset documents. | ✓ |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, In accordance | |

Unassociated Document                                                    Page 478 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 200 of 279

|  |  |  |
|---|---|---|
|  | with the obligor's pool asset documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable pool asset documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related pool asset, or such other number of days specified in me transaction agreements. | ✓ |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as Indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | ✓ |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the unless tile late payment was due to the obligor's error or omission. | ✓ |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligors records maintained by the servicer, or such other number of days specified in the transaction agreements. |  |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | ✓ |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in item 11 14(a)(1) through (3) or Item 1115 of Regulation AB, Is maintained as set forth In the transaction agreements. | ✓ |

EXHIBIT I

FORM OF SPECIAL FORECLOSURE RIGHTS SECTION

Notwithstanding anything in this Agreement to the contrary, for so long as the Master Servicer has not notified the Servicer that a real estate investment trust or one of its subsidiaries and is no longer the holder of the entire interest in the most junior of the Subordinate Certificates is no longer entitled to the rights described in this Section U:

(a) The Servicer shall not commence foreclosure proceedings with respect to a Mortgage Loan unless (i) no later than five Business Days prior to its commencement of such foreclosure proceedings, it notifies the Master Servicer of its intention to do so, and (ii) the holder of the entire interest in the most junior of the Subordinate Certificates, either directly or through the Master Servicer, does not, within five-Business-Day period, affirmatively object to such action.

(b) In the event that the Servicer determines not to proceed with foreclosure proceedings with respect to a Mortgage Loan that becomes 60 days' or more delinquent and the Servicer has determined that it is unable to collect payments due under such Mortgage Loan in accordance with Accepted Servicing Practices, the Servicer shall, prior to taking any action with respect to such Mortgage Loan, promptly provide the Master Servicer with notice of such determination and a description of such other action as it intends to take with respect to such Mortgage Loan; provided, that the Servicer shall not be permitted to proceed with any such action unless the holder of the entire interest in the most junior of the Subordinate Certificates, either directly or through the Master Servicer, does not, within five Business Days following such notice, affirmatively object to the Servicer taking such action.

(c) If the holder of the entire interest in the most junior of the Subordinate Certificates timely and affirmatively objects to an action or contemplated action of the Servicer pursuant to either (a) or (b) above, then such holder shall instruct the Master Servicer to hire, at such holder's sole cost and expense, three appraisal firms, selected by the Master Servicer in its reasonable discretion, to compute the fair value of the Mortgaged Property relating to the related Mortgage Loan utilizing the Fannie Mae Form 2055 Exterior-Only Inspection Residential Appraisal Report (each such appraisal-firm computation, a "Fair Value Price"), in each case (other than as set forth in (d) below) no later than 30 days from the date of such holder's objection. If the Master Servicer shall have received three Fair Value Prices by the end of such 30-day period, then the holder of the entire interest in the most junior of the Subordinate Certificates shall, no later than 5 days after the expiration of such 30-day period, purchase such Mortgage Loan and the related Mortgaged Property at an amount equal to the sum of(i) accrued and unpaid interest on such Mortgage Loan as of such purchase date ("Accrued Interest") and (ii) the highest of such three Fair Value Prices respectively determined by such appraisal firms, and shall promptly delivery such amount to the Servicer for deposit into the Custodial Account. All costs relating to the computation of the related Fair Value Prices shall be (x) set forth in an invoice delivered by the Master Servicer, (y) for the account of the holder of the entire interest in the most junior of the Subordinate Certificates and (z) paid to the Master Servicer in immediately available funds by the holder of the entire interest in the most junior of the Subordinate Certificates at the time of such Mortgage Loan and the related Mortgaged Property are purchased by such holder..

(d) If the Master Servicer shall not have received three Fair Value Prices at the end of the 30-day period set forth in (c) above, then:

(i) The Master Servicer shall obtain such three Fair Value Prices no later than 15 days after the end of such 30-day period.

(ii) If the Master Servicer shall have only received two Fair Value Prices at the end of such 15-day extension period, then the Master Servicer will determine, in its sole and absolute discretion, the fair value of the Mortgaged Property relating to such Mortgage Loan, related Insurance Proceeds and the current delinquency status of such Mortgage Loan (such fair value, the "Master Servicer Fair Value Price"), and the holder of the entire interest in the most junior of the Subordinate Certificates shall, no later than 5 days after the expiration of such 15-day extension period, purchase (and deliver to the Servicer the purchase price for) such Mortgage Loan and the related Mortgaged Property at an amount equal to the sum of (A) Accrued Interest thereon and (B) the higher of (1) the highest of such two Fair Value Prices determined by such appraisal firms and (2) the Master Servicer Fair Value Price.

(iii) If the Master Servicer shall have received only one Fair Value Price at the end of such 15-day extension period, then the Master Servicer will determine, in its sole and absolute discretion, the Master Servicer Fair Value Price of the Mortgaged Property related to such Mortgage Loan, and:

(A) if such Master Servicer Fair Value Price is equal to or greater than the unpaid principal balance of the related Mortgage Loan as of such date (the "Unpaid Principal Balance"), then the holder of the entire interest in the most junior of the Subordinate Certificates shall, no later than 5 days after the expiration of such 15- day extension period, purchase (and deliver to the Servicer the purchase price for) such Mortgage Loan and the related Mortgaged Property at an amount equal to the sum of (1) Accrued Interest thereon and (2) such Master Servicer Fair Value Price; and

(B) if such Master Servicer Fair Value Price is less than the related Unpaid Principal Balance, then the holder of the entire interest in the most junior of the Subordinate Certificates shall, no later than 5 days after the expiration of such 15-day extension period, purchase (and deliver to the Servicer the purchase price for) such Mortgage Loan and the related Mortgaged Property at an amount equal to the sum of (1) Accrued Interest thereon and (2) the related Unpaid Principal Balance (such sum, the "Preliminary Purchase Price"); provided, that the provisions of clause (d)(iv) shall thereafter apply.

(iv) Following the payment by the holder of the entire interest in the most junior of the Subordinate Certificates of the Preliminary Purchase Price, the Master Servicer shall continue to hire appraisal firms at the holder of the entire interest in the most junior of the Subordinate Certificates' sole cost and expense (which shall be payable by the holder of the entire interest in the most junior of the Subordinate Certificates to the Master Servicer in immediately available funds promptly upon the delivery to it by the Master Servicer of an invoice with respect thereto) to compute the Fair Value Price of the Mortgaged Property related to such Mortgage Loan, and at such time as two such Fair Value Prices shall have been obtained:

(A) if such Master Servicer Fair Value Price is equal to or greater than the unpaid principal balance of the related Mortgage Loan as of such date (the "Unpaid Principal Balance"), then the holder of the entire interest in the most junior of the Subordinate Certificates shall, no later than 5 days after the expiration of such 15- day extension period, purchase (and deliver to the Servicer the purchase price for) such Mortgage Loan and the related Mortgaged Property at an amount equal to the sum of(l) Accrued interest thereon and (2) such Master Servicer Fair Value Price; and

(B) if the sum of(l) Accrued Interest on the related Mortgage Loan and (2) the higher of (x) the highest of such two Fair Value Prices determined by such appraisal firms and (y) the Master Servicer's Fair Value Price of the Mortgaged Property related to such Mortgage Loan (such sum, the "Revised Fair Value Price") is greater than such Preliminary Purchase Price, then the Master Servicer shall promptly notify the holder of the entire interest in the most junior of the Subordinate Certificates and the Servicer of such calculation, and such holder shall, no later than 5 days after such notice, remit to the Servicer, for deposit into the Custodial Account, the difference between such Revised Fair Value Price and such Preliminary Purchase Price; and

(C) if such Preliminary Purchase Price is greater than such Revised Fair Value Price, then the Master Servicer shall promptly notify the holder of the entire interest in the most junior of the Subordinate Certificates and the Servicer of such calculation, and the Servicer shall, no later than 5 days after such notice, remit to such holder, from funds then on deposit in the Custodial Account, the difference between such Preliminary Purchase Price and such Revised Fair Value Price.

(e) Notwithstanding anything herein to the contrary, the holder of the entire interest in the most junior of the Subordinate Certificates shall not be entitled to any of its rights set forth herein with respect to a Mortgage Loan following its failure to purchase such Mortgage Loan and the related Mortgaged Property, at the related purchase price set forth in this Section [J within the timeframe set forth in this Section [J following such holder's objection to an action of the Servicer, and the Servicer shall provide the Master Servicer written notice of such failure. Moreover, the holder of the entire interest in the most junior of the Subordinate Certificates shall not be entitled to the foregoing rights if any of the Subordinate Certificates are held by entities that are unaffiliated with such holder.

(f) Any notice, confirmation, instruction or objection pursuant to paragraphs (a), (b), (c) and (d) above may be delivered via facsimile or other written or electronic communication as the parties hereto and the holder of the entire interest in the most junior of the Subordinate Certificates may agree to from time to time.

(g) For the avoidance of doubt, the holder of the entire interest in the most junior of the Subordinate Certificates' rights set forth in this Section U are intended to provide such holder, for so long as it has not forfeited its right under this Section U as set forth in clause (e) above, with the unilateral right to control foreclosure decisions in respect of delinquent arid defaulted Mortgage Loans, and certain exclusive purchase rights so as to maximize the recovery value on delinquent and defaulted Mortgage Loans.

(h) The holder of the entire interest in the most junior of the Subordinate Certificates as of the Closing Date is [_____]. Any notice delivered by such holder (or any other holder of the entire interest in the most junior of the Subordinate Certificates), either directly or through the Master Servicer, shall be accompanied by an officer's certificate of such holder certifying to the Servicer that it is the holder of the entire interest in the most junior of the Subordinate Certificates and shall attach thereto (A) if the Subordinate Certificate is registered in the name of a nominee of the Depository Trust Company, an account statement through the applicable broker-dealer or such other evidence as the Servicer shall reasonably request or (B) if the Subordinate Certificate is held in physical form, the trade confirmation with respect to such Subordinate Certificate or such other evidence as the Servicer shall reasonably request. For purposes of this Section [___], the Servicer shall be entitled to rely on any notice delivered by [_____] until a notice (together with an officer's certificate and the supporting evidence of ownership set forth in the immediately preceding sentence) is delivered to the Servicer by any subsequent holder of the entire interest in the most junior of the Subordinate Certificates.

(i) To the extent that the holder of the entire interest in the most junior of the Subordinate Certificates purchases any Mortgage Loan pursuant to this Section L] the Servicer will continue to service such Mortgage Loan in accordance with this Agreement.. The parties acknowledge that, in such event, the Master Servicer will have no duty or responsibility to master service any such Mortgage Loan.

Unassociated Document                                      Page 481 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 203 of 279

EXHIBIT Q-2

PURCHASE, WARRANTIES AND SERVICING AGREEMENT

**FLOW SALE AND SERVICING AGREEMENT**
(Residential Mortgage Loans)

Dated as of January 24, 2006

by and between

**LUMINENT MORTGAGE CAPITAL, INC.,**

**MERCURY MORTGAGE FINANCE STATUTORY TRUST**

and

**MAIA MORTGAGE FINANCE STATUTORY TRUST**,
as Purchasers

and

**PAUL FINANCIAL, LLC**,
as Company

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS

ARTICLE II AGREEMENT TO PURCHASE; PURCHASE PRICE; POSSESSION OF MORTGAGE FILES; MAINTENANCE OF SERVICING FILES; BOOKS AND RECORDS;
        CUSTODIAL AGREEMENT; DELIVERY OF DOCUMENTS; CLOSING CONDITIONS

        Section 2.01    Agreement to Purchase; Purchase Price; Mortgage and Servicing Files.
        Section 2.02    Books and Records; Transfers of Mortgage Loans.
        Section 2.03    Custodial Agreement; Delivery of Documents.
        Section 2.04    Quality Control Procedures.
        Section 2.05    Closing Conditions.

ARTICLE III REPRESENTATIONS AND WARRANTIES REMEDIES AND BREACH

        Section 3.01    Company Representations and Warranties.
        Section 3.02    Representations and Warranties Regarding Individual Mortgage Loans.
        Section 3.03    Repurchase.
        Section 3.04    Repurchase of Mortgage Loans With First Payment Defaults.
        Section 3.05    Purchase Price Protection.
        Section 3.06    Review of Mortgage Loans.

ARTICLE IV ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

        Section 4.01    Company to Act as Servicer.
        Section 4.02    Liquidation of Mortgage Loans.
        Section 4.03    Collection of Mortgage Loan Payments.
        Section 4.04    Establishment of and Deposits to Custodial Account.
        Section 4.05    Permitted Withdrawals From Custodial Account.
        Section 4.06    Establishment of and Deposits to Escrow Account.
        Section 4.07    Permitted Withdrawals From Escrow Account.
        Section 4.08    Payment of Taxes, Insurance and Other Charges.
        Section 4.09    Transfer of Accounts.
        Section 4.10    Maintenance of Hazard Insurance.
        Section 4.11    Maintenance of Mortgage Impairment Insurance.
        Section 4.12    Maintenance of Fidelity Bond and Errors and Omissions Insurance.
        Section 4.13    Inspections.
        Section 4.14    Restoration of Mortgaged Property.
        Section 4.15    Maintenance of PMI Policy; Claims.
        Section 4.16    Title, Management and Disposition of REO Property.
        Section 4.17    Real Estate Owned Reports.
        Section 4.18    Liquidation Reports.
        Section 4.19    Reports of Foreclosures and Abandonments of Mortgaged Property.
        Section 4.20    Application of Buydown Funds.
        Section 4.21    Notification of Adjustments.
        Section 4.22    Modifications, Waivers, Amendments and Consents.
        Section 4.23    Specially Serviced Mortgage Loans.
        Section 4.24    Disaster Recovery/Business Continuity Plan.
        Section 4.25    Fair Credit Reporting Act.

ARTICLE V PAYMENTS TO PURCHASER

        Section 5.01    Remittances.
        Section 5.02    Automated Servicing Systems and Statements to Purchaser.
        Section 5.03    Monthly Advances by Company.

ARTICLE VI GENERAL SERVICING PROCEDURES

        Section 6.01    Due-on-Sale Provision and Assumptions.
        Section 6.02    Satisfaction of Mortgages and Release of Mortgage Files.
        Section 6.03    Servicing Compensation.
        Section 6.04    [Reserved]
        Section 6.05    [Reserved]
        Section 6.06    Right to Examine Company Records.
        Section 6.07    Compliance with REMIC Provisions.

ARTICLE VII COMPANY TO COOPERATE

Unassociated Document       Page 483 of 835
12-12020-mg Doc 5106-9 Filed 09/18/13 Entered 09/18/13 18:18:12 Exhibit 7
Part 3 FST-CV-09-5011591 Doc 163 Exhibit D Part 2 of 3 Pg 205 of 279

Section 7.01  Provision of Information.
Section 7.02  Financial Statements; Servicing Facility.
Section 7.03  Cooperation with Third-party Service Providers.

ARTICLE VIII THE COMPANY

Section 8.01  Indemnification; Third Party Claims.
Section 8.02  Merger or Consolidation of the Company.
Section 8.03  Limitation on Liability of Company and Others.
Section 8.04  Limitation on Resignation and Assignment by Company.

ARTICLE IX WHOLE LOAN TRANSFERS AND Securitization Transactions

Section 9.01  Removal of Mortgage Loans from Inclusion Under this Agreement.

ARTICLE X DEFAULT

Section 10.01  Events of Default.
Section 10.02  Waiver of Defaults.

ARTICLE XI TERMINATION

Section 11.01  Termination.
Section 11.02  Termination Without Cause.

ARTICLE XII MISCELLANEOUS PROVISIONS

Section 12.01  Successor to Company.
Section 12.02  Amendment.
Section 12.03  Governing Law.
Section 12.04  Arbitration.
Section 12.05  Duration of Agreement.
Section 12.06  Notices.
Section 12.07  Severability of Provisions.
Section 12.08  Relationship of Parties.
Section 12.09  Execution; Successors and Assigns.
Section 12.10  Recordation of Assignments of Mortgage.
Section 12.11  Assignment by Purchaser.
Section 12.12  Solicitation of Mortgagor.
Section 12.13  Further Agreements.
Section 12.14  Confidential Information.
Section 12.15  Equal Opportunity.
Section 12.16  Counterparts.
Section 12.17  Exhibits.
Section 12.18  General Interpretive Principles.
Section 12.19  Reproduction of Documents.
Section 12.20  Purchase Price and Terms Letter.

EXHIBITS

Exhibit A  Form of Mortgage Loan Schedule
Exhibit B  Contents of Each Mortgage File
Exhibit C  Form of Custodial Agreement
Exhibit D  Form of Assignment, Assumption and Recognition Agreement
Exhibit E  Underwriting Guidelines
Exhibit F  Representations and Warranties Regarding Individual Mortgage Loans
Exhibit G  Form of Opinion of Counsel
Exhibit H  Form of SEC Certification
Exhibit I  Form of Memorandum of Sale
Exhibit J  Servicer Requirements
Exhibit K  Regulation AB Compliance Addendum
Exhibit L  Form of Special Foreclosure Rights Section

FLOW SALE AND SERVICING AGREEMENT, dated as of January 24, 2006 (as amended, restated, supplemented or otherwise modified and in effect from time to time, this "Agreement"), is made by and between LUMINENT MORTGAGE CAPITAL, INC., MERCURY MORTGAGE FINANCE STATUTORY TRUST, MAIA MORTGAGE FINANCE STATUTORY TRUST, as purchasers (collectively, the "Purchasers", and individually, as the purchaser of any Mortgage Loan (defined below) hereunder, the "Purchaser"), and PAUL FINANCIAL, LLC, as seller and servicer (the "Company").

## WITNESSETH

WHEREAS, each Purchaser has agreed to purchase from time to time from the Company and the Company has agreed to sell from time to time to any Purchaser first lien jumbo, alternate 'A' and conforming fixed and adjustable rate mortgage loans; and

WHEREAS, the Mortgage Loans will be sold by the Company and purchased by the Purchaser as pools or groups of whole loans, servicing retained (each, a "Mortgage Loan Package") on the various Closing Dates as provided herein; and

WHEREAS, each of the Mortgage Loans will be secured by a mortgage, deed of trust or other security instrument creating a first lien on a residential dwelling located in the jurisdiction indicated on the related Mortgage Loan Schedule for the related Mortgage Loan Package, which will be annexed to a Memorandum of Sale (as defined herein) on the related Closing Date; and

WHEREAS, each of the Purchasers and the Company wish to prescribe the manner of purchase of the Mortgage Loans and the conveyance, servicing and control of the Mortgage Loans; and

WHEREAS, following any purchase of the Mortgage Loans from the Company, the Purchaser may desire to sell some or all of the Mortgage Loans to one or more purchasers as a whole loan transfer, agency transfer or a public or private, rated or unrated mortgage securitization transaction.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, each of the Purchasers and the Company agree as follows:

## ARTICLE I

### DEFINITIONS

Whenever used herein, the following words and phrases, unless the content otherwise requires, shall have the following meanings:

Accepted Servicing Practices: With respect to any Mortgage Loan, procedures (including collection procedures) that comply with applicable federal, state and local law and that the Company customarily employs and exercises in servicing and administering mortgage loans for its own account and that are in accordance with the Fannie Mae Single Family Servicing Guide and the accepted mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as the Mortgage Loans in the jurisdiction where the related Mortgaged Property is located.

Adjustable Rate Mortgage Loan: A Mortgage Loan that contains a provision pursuant to which the Mortgage Interest Rate is adjusted periodically.

Adjustment Date: As to each Adjustable Rate Mortgage Loan, the date on which the Mortgage Interest Rate is adjusted in accordance with the terms of the related Mortgage Note and Mortgage.

Agreement: As defined in the introductory paragraph hereof.

ALTA: The American Land Title Association or any successor thereto.

Anti-Money Laundering Laws: As defined in Section 3.01(n).

Appraisal: A written appraisal of a Mortgaged Property made by a Qualified Appraiser, which appraisal must be written, in form and substance, to Fannie Mae and Freddie Mac standards, and satisfy the requirements of Title XI of the Financial Institution, Reform, Recovery and Enforcement Act of 1989 and the regulations promulgated thereunder, in effect as of the date of the appraisal.

Appraised Value: With respect to any Mortgage Loan, the lesser of (i) the value set forth on the Appraisal made in connection with the origination of the related Mortgage Loan as the value of the related Mortgaged Property, or (ii) the purchase price paid for the Mortgaged Property, *provided, however*, that in the case of a refinanced Mortgage Loan, such value shall be based solely on the Appraisal made in connection with the origination of such Mortgage Loan.

Approved Flood Policy Insurer: An insurer that meets the guidelines of the Federal Insurance Administration.

Assignment, Assumption and Recognition Agreement: The agreement substantially in the form of Exhibit D attached hereto.

Assignment of Mortgage: An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the sale of the Mortgage to the Purchaser.

BIF: The Bank Insurance Fund, or any successor thereto.

BPO: A broker's price opinion with respect to a Mortgaged Property.

Business Day: Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in the State of New York or the state in which the Company's servicing operations are located are authorized or obligated by law or executive order to be closed.

Buydown Agreement: An agreement between the Company and a Mortgagor, or an agreement among the Company, a Mortgagor and a seller of a Mortgaged Property or a third party with respect to a Mortgage Loan which provides for the application of Buydown Funds.

Buydown Funds: In respect of any Buydown Mortgage Loan, any amount contributed by the seller of a Mortgaged Property subject to a Buydown Mortgage Loan, the buyer of such property, the Company or any other source, plus interest earned thereon, in order to enable the Mortgagor to reduce the payments required to be made from the Mortgagor's funds in the early years of a Mortgage Loan.

Buydown Mortgage Loan: Any Mortgage Loan in respect of which, pursuant to a Buydown Agreement, (i) the Mortgagor pays less than the full monthly payments specified in the Mortgage

Note for a specified period, and (ii) the difference between the payments required under such Buydown Agreement and the Mortgage Note is provided from Buydown Funds.

Buydown Period: The period of time when a Buydown Agreement is in effect with respect to a related Buydown Mortgage Loan.

Closing Date: With respect to a Mortgage Loan Package, the date or dates, set forth in the related Memorandum of Sale, on which the Purchaser will purchase and the Company will sell the Mortgage Loans identified therein.

Code: The Internal Revenue Code of 1986, as it may be amended from time to time or any successor statute thereto, and applicable U.S. Department of the Treasury regulations issued pursuant thereto.

Company: As defined in the introductory paragraph hereof.

Company Employees: As defined in Section 4.12.

Condemnation Proceeds: All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan Documents.

Consumer Information: Any personally identifiable information in any form (written electronic or otherwise) relating to a Mortgagor, including, but not limited to: a Mortgagor's name, address, telephone number, Mortgage Loan number, Mortgage Loan payment history, delinquency status, insurance carrier or payment information, tax amount or payment information; the fact that the Mortgagor has a relationship with the Company or the originator of the related Mortgage Loan; and any other non-public personally identifiable information.

Co-op Shares: Shares issued by private non-profit housing corporations.

Custodial Account: The separate account or accounts created and maintained pursuant to Section 4.04.

Custodial Agreement: The agreement governing the retention of the originals of each Mortgage Note, Mortgage, Assignment of Mortgage and other Mortgage Loan Documents, a form of which is annexed hereto as Exhibit C.

Custodian: The custodian under the Custodial Agreement, or its successor in interest or assigns, or any successor to the Custodian under the Custodial Agreement as provided therein.

Cut-off Date: With respect to each Mortgage Loan, the first day of the month of the related Closing Date as set forth in the related Purchase Price and Terms Letter.

Defective Document: As defined in Section 3.03.

Deleted Mortgage Loan: A Mortgage Loan which is repurchased by the Company in accordance with the terms of this Agreement and which is, in the case of a substitution pursuant to Section 3.03, replaced or to be replaced with a Qualified Substitute Mortgage Loan.

Determination Date: The fifteenth calendar day of each month (or if such fifteenth day is not a Business Day, the next immediately preceding Business Day).

Due Date: The first day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Due Period: With respect to each Remittance Date, the period commencing on the second day of the month preceding the month of the Remittance Date and ending on the first day of the month of the Remittance Date.

Errors and Omissions Insurance Policy: An errors and omissions insurance policy to be maintained by the Company pursuant to Section 4.12.

Escrow Account: The separate account or accounts created and maintained pursuant to Section 4.06.

Escrow Payments: With respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the Mortgage or any other related document.

Event of Default: Any one of the conditions or circumstances enumerated in Section 10.01.

FACT Act: As defined in Section 3.01.

Fannie Mae: The entity formerly known as Federal National Mortgage Association (FNMA), or any successor thereto.

FDIC: The Federal Deposit Insurance Corporation, or any successor thereto.

Fidelity Bond: A fidelity bond to be maintained by the Company pursuant to Section 4.12.

First Remittance Date: February 18, 2006.

Freddie Mac: The entity formerly known as Federal Home Loan Mortgage Corporation (FHLMC), or any successor thereto.

GAAP: Generally accepted accounting procedures, consistently applied.

Gross Margin: With respect to each Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note which is added to the Index in order to determine the related Mortgage Interest Rate, as set forth in the Mortgage Loan Schedule.

Holding Period: As to each Mortgage Loan, the period beginning on the Closing Date and ending on the last day of the second calendar month thereafter.

Index: With respect to any Adjustable Rate Mortgage Loan, the index identified on the Mortgage Loan Schedule and set forth in the related Mortgage Note for the purpose of calculating interest therein.

Insurance Proceeds: With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

Interim Funder: With respect to each MERS Designated Mortgage Loan, the Person named on the MERS System as the interim funder pursuant to the MERS Procedures Manual.

<u>Investor</u>: With respect to each MERS Designated Mortgage Loan, the Person named on the MERS System as the investor pursuant to the MERS Procedures Manual.

<u>Liquidation Proceeds</u>: Cash received in connection with the liquidation of a defaulted Mortgage Loan, whether through the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise, or the sale of the related Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage Loan.

<u>Loan-to-Value Ratio or LTV</u>: With respect to any Mortgage Loan, the ratio of the original loan amount of the Mortgage Loan at its origination (unless otherwise indicated) to the Appraised Value of the Mortgaged Property.

<u>Manufactured Home</u>: A single family residential unit that is constructed in a factory in sections in accordance with the Federal Manufactured Home Construction and Safety Standards adopted on July 15, 1976, by the Department of Housing and Urban Development ("<u>HUD Code</u>"), as amended in 2000, which preempts state and local building codes. Each unit is identified by the presence of a HUD Plate/Compliance Certificate label. The sections are then transported to the site and joined together and affixed to a pre-built permanent foundation (which satisfies the manufacturer's requirements and all state, county, and local building codes and regulations). The manufactured home is built on a non-removable, permanent frame chassis that supports the complete unit of walls, floors, and roof. The underneath part of the home may have running gear (wheels, axles, and brakes) that enable it to be transported to the permanent site. The wheels and hitch are removed prior to anchoring the unit to the permanent foundation. The manufactured home must be classified as real estate and taxed accordingly. The permanent foundation may be on land owned by the mortgagor or may be on leased land.

<u>Market Change Event</u>: (a) a suspension or material limitation in trading in securities generally on the New York Stock Exchange or on NASDAQ; (b) a general moratorium on commercial banking activities declared by either Federal or New York State authorities or a material disruption in commercial banking or securities settlement or clearance services in the United States; or (c) the outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war, if the effect of any such event specified in clause (c) in the judgment of any Purchaser makes it impracticable or inadvisable to proceed with the transactions as contemplated in this Agreement on the terms and in the manner contemplated in this Agreement.

<u>Material Adverse Change</u>: (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, condition (financial or otherwise) or prospects of the Company; (b) a material impairment of the ability of the Company to perform under this Agreement or any related agreements; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability of this Agreement against the Company (unless such material adverse effect is directly caused by an action of any Purchaser which can be remedied by such Purchaser).

<u>Memorandum of Sale</u>: With respect to each Mortgage Loan and the Mortgage Loan Package, the memorandum of sale, substantially in the form of <u>Exhibit I</u> attached hereto, confirming the sale by Company and the purchase by Purchaser of the Mortgage Loan Package on the related Closing Date.

<u>MERS</u>: MERSCORP, Inc., its successors and assigns.

<u>MERS Designated Mortgage Loan</u>: A Mortgage Loan for which (a) the Company has designated or will designate MERS as, and, has taken or will take such action as is necessary to cause MERS to be, the mortgagee of record, as nominee for the Company, in accordance with MERS Procedures Manual and (b) the Company has designated or will designate the Custodian as the Investor on the MERS System.

<u>MERS Procedures Manual</u>: The MERS Procedures Manual, as it may be amended, supplemented or otherwise modified from time to time.

<u>MERS Report</u>: The report from the MERS System listing MERS Designated Mortgage Loans and other information.

<u>MERS System</u>: MERS mortgage electronic registry system, as more particularly described in the MERS Procedures Manual.

<u>Monthly Advance</u>: The portion of each Monthly Payment that is delinquent with respect to each Mortgage Loan at the close of business on the Determination Date required to be advanced by the Company pursuant to Section 5.03 on the Business Day immediately preceding the Remittance Date of the related month.

<u>Monthly Payment</u>: With respect to any Mortgage Loan (other than an Option ARM Mortgage Loan), the scheduled payment of principal and interest payable by a Mortgagor under the related Mortgage Note on each Due Date, which payment may change on any Adjustment Date as provided in the related Mortgage Note and Mortgage for any Adjustable Rate Mortgage Loan. With respect to any Option ARM Mortgage Loan, the payment of interest and/or principal elected to be paid by a Mortgagor pursuant to the payment options under the related Mortgage Note on each Due Date, which payment may change on any Due Date as provided in the related Mortgage Note.

<u>Moody's</u>: Moody's Investors Service, Inc.

<u>Mortgage</u>: The mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first lien on an unsubordinated estate in fee simple or leasehold estate in real property securing the Mortgage Note.

<u>Mortgage File</u>: The items pertaining to a particular Mortgage Loan referred to in <u>Exhibit B</u> annexed hereto, and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

<u>Mortgage Impairment Insurance Policy</u>: A mortgage impairment or blanket hazard insurance policy as described in Section 4.11.

<u>Mortgage Interest Rate</u>: The annual rate of interest borne on a Mortgage Note in accordance with the provisions of the Mortgage Note.

<u>Mortgage Loan</u>: An individual Mortgage Loan which is the subject of this Agreement, each Mortgage Loan originally sold and subject to this Agreement being identified on the Mortgage Loan Schedule annexed to the related Memorandum of Sale, which Mortgage Loan includes without limitation the Mortgage File, the Monthly Payments, Principal Prepayments, Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, REO Disposition Proceeds and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

<u>Mortgage Loan Documents</u>: The documents referred to in <u>Exhibit B</u> as items 1 through  11.

<u>Mortgage Loan Package</u>: The pool or group of whole loans purchased on a Closing Date, as described in the Mortgage Loan Schedule annexed to the related Memorandum of Sale.

<u>Mortgage Loan Remittance Rate</u>: With respect to each Mortgage Loan, the annual rate of interest remitted to the Purchaser, which shall be equal to the related Mortgage Interest Rate minus the Servicing Fee Rate.

<u>Mortgage Loan Schedule</u>: With respect to each Mortgage Loan Package, the schedule of Mortgage Loans substantially in the form attached as <u>Exhibit A</u> hereto and annexed to the related Memorandum of Sale (and delivered in electronic format to the Purchaser), such schedule setting forth the following information with respect to each Mortgage Loan in the related Mortgage Loan Package:

      (1)  the Company's Mortgage Loan number;

      (2)  Mortgagor's name (including any co-mortgagors);

      (3)  the full street address, city, state and zip code of the Mortgaged Property;

Unassociated Document                                      Page 487 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 209 of 279

(4)  the Mortgagor's and co-mortgagor's FICO score;

(5)  a code indicating whether the loan was originated through a correspondent, retail, or wholesale channel;

(6)  the number of units for all Mortgaged Properties;

(7)  the number of bedrooms and eligible rents;

(8)  a code indicating whether the Mortgaged Property is a single family residence, two-family residence, three-family residence, four-family residence, PUD, townhouse or condominium or secured by Co-op Shares;

(9)  the Mortgage Interest Rate as of the Cut-off Date;

(10)  the Mortgage Interest Rate as of the date of origination;

(11)  the current Mortgage Loan Remittance Rate;

(12)  the Monthly Payment as of the date of origination;

(13)  the Monthly Payment as of the Cut-off Date;

(14)  the date of the Mortgage Note;

(15)  the principal balance of the Mortgage Loan as of the Cut-off Date after deduction of payments of principal due on or before the Cut-off Date whether or not collected;

(16)  the date on which the first Monthly Payment was due;

(17)  the last payment date on which a payment was applied;

(18)  the original term to maturity or the remaining months to maturity from the related Cut-off Date, in any case based on the original amortization schedule, and if different, the maturity expressed in the same manner but based on the actual amortization schedule;

(19)  the scheduled maturity date;

(20)  the Loan-to-Value Ratio;

(21)  a code indicating the type of Adjustable Rate Mortgage Loan (i.e. 3/1, 5/1, 7/1, etc.);

(22)  the Gross Margin;

(23)  the Index;

(24)  Adjustment Dates and the next Adjustment Date;

(25)  the lifetime Mortgage Interest Rate cap and Periodic Caps;

(26)  a code indicating whether the Mortgage Loan is convertible or not;

(27)  a code indicating the name of the issuer of the PMI Policy, if any;

(28)  a code indicating the lien status of the Mortgage Loan;

(29)  a code indicating whether the Mortgage Loan is a Buydown Mortgage Loan;

(30)  a code indicating whether such Mortgage Loan provides for a Prepayment Penalty and, if applicable, the Prepayment Penalty period for such loan;

(31)  a code indicating whether the Mortgaged Property is owner-occupied or investor property;

(32)  the documentation level (full, alternative, limited);

(33)  loan purpose;

(34)  the Appraised Value;

(35)  the applicable Servicing Fee Rate;

(36)  a code indicating whether the Mortgage Loan is a "high cost" (or similarly classified) loan under applicable federal, state and local laws; and

(37)  a code indicating whether the Mortgage Loan is an Option ARM Mortgage Loan.

With respect to the Mortgage Loans in the aggregate in the related Mortgage Loan Package, the respective Mortgage Loan Schedule shall set forth the following information, as of the Cut-Off Date:

(i)  the number of Mortgage Loans;

(ii)  the current aggregate outstanding principal balance of the Mortgage Loans;

(iii)  the weighted average Mortgage Interest Rate of the Mortgage Loans;

(iv)  the weighted average months to maturity of the Mortgage Loans.

Mortgage Note: The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgaged Property: The real property, including any improvements, securing repayment of the debt evidenced by a Mortgage Note.

Mortgagor: The obligor on a Mortgage Note.

Negative Amortization: An increase in the mortgage debt that occurs when the Monthly Payment is not sufficient for full application to both principal and interest. The interest shortage is added to the unpaid principal balance to create "negative" amortization.

OCC: The Office of the Comptroller of the Currency.

Officer's Certificate: A certificate signed by the Chairman of the Board or the Vice Chairman of the Board or the President, a Senior Vice President, a First Vice President, a Vice President or an Assistant Vice President and by the Treasurer or the Secretary or one of the Assistant Treasurers or Assistant Secretaries of the Company, and delivered to the Purchaser as required by this Agreement.

Opinion of Counsel: A written opinion of counsel, who may be an employee of the Company, reasonably acceptable to the Purchaser.

Option ARM Mortgage Loan: An Adjustable Rate Mortgage Loan with an original term to maturity of not more than forty (40) years and with respect to which the related borrower may choose a flexible payment option each month pursuant to the terms of the related Mortgage Note.

Periodic Interest Rate Cap: As to each Adjustable Rate Mortgage Loan, the maximum increase or decrease in the Mortgage Interest Rate on any Adjustment Date pursuant to the terms of the Mortgage Note.

Person: Any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

PMI Policy: A policy of primary mortgage guaranty insurance issued by a Qualified Insurer, as required by this Agreement with respect to certain Mortgage Loans.

Prepayment Interest Shortfall: As to any Remittance Date and each Mortgage Loan subject to a Principal Prepayment received during the calendar month preceding such Remittance Date, the amount, if any, by which one month's interest at the related Mortgage Loan Remittance Rate on such Principal Prepayment exceeds the amount of interest paid in connection with such Principal Prepayment.

Prepayment Premium: Payments received on a Mortgage Loan as a result of a Principal Prepayment hereon, not otherwise due thereon in respect of principal or interest, which are intended to be a disincentive to prepayment.

Prepayment Premium Loan: A Mortgage Loan with respect to which the Mortgagor must pay a Prepayment Premium in connection with a Principal Prepayment.

Prime Rate: The prime rate announced to be in effect from time to time, as published as the average rate in The Wall Street Journal.

Principal Prepayment: Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any Prepayment Premium thereon and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Principal Prepayment Period: The month preceding the month in which the related Remittance Date occurs.

Purchase Price: The price paid on the Closing Date by the Purchaser to the Company for the Mortgage Loans, as calculated as set forth in the related Purchase Price and Terms Letter.

Purchase Price and Terms Letter: The letter agreement between the Company and the Purchaser entered into prior to the related Closing Date relating to the sale of one or more Mortgage Loan Packages.

Purchaser(s): As defined in the introductory paragraph hereof.

Qualified Appraiser: An appraiser, duly appointed by the Company, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, and whose compensation was not affected by the approval or disapproval of the Mortgage Loan, and such appraiser and the appraisal made by such appraiser both satisfied the requirements of Title XI of the Financial Institution Reform, Recovery, and Enforcement Act and the regulations promulgated thereunder, all as in effect on the date the Mortgage Loan was originated.

Qualified Depository: Either (i) an account or accounts maintained with a federal or state chartered depository institution or trust company the short-term unsecured debt obligations of which (or, in the case of a depository institution or trust company that is the principal subsidiary of a holding company, the debt obligations of such holding company) have the highest short-term ratings of each Rating Agency at the time any amounts are held on deposit therein, or (ii) a trust account or accounts maintained with the trust department of a federal or state chartered depository institution or trust company, acting in its fiduciary capacity.

Qualified Insurer: A mortgage guaranty insurance company duly authorized and licensed where required by law to transact mortgage guaranty insurance business and approved as an insurer by Fannie Mae or Freddie Mac.

Qualified Substitute Mortgage Loan: A mortgage loan eligible to be substituted by the Company for a Deleted Mortgage Loan which must, on the date of such substitution be approved by the Purchaser and (i) have an outstanding principal balance, after deduction of all scheduled payments due in the month of substitution (or in the case of a substitution of more than one mortgage loan for a Deleted Mortgage Loan, an aggregate principal balance), not in excess of the Stated Principal Balance of the Deleted Mortgage Loan; (ii) have a Mortgage Loan Remittance Rate not less than, and not more than 2% greater than, the Mortgage Loan Remittance Rate of the Deleted Mortgage Loan; (iii) have a remaining term to maturity not greater than and not more than one year less than that of the Deleted Mortgage Loan; (iv) comply with each representation and warranty set forth in Sections 3.01 and 3.02; (v) be of the same type as the Deleted Mortgage Loan; (vi) have a Gross Margin not less than that of the Deleted Mortgage Loan; (vii) have the same Index as the Deleted Mortgage Loan; (viii) will have a FICO score not less than that of the Deleted Mortgage Loan; (ix) have an LTV not greater than that of the Deleted Mortgage Loan; (x) have a Prepayment Premium with a term and an amount at least equal to the Prepayment Premium of the Deleted Mortgage Loan; and (xi) have a Company credit grade not lower in quality than that of the Deleted Mortgage Loan.

Rating Agency: Each of Fitch, Inc., Moody's and S&P, or any successor thereto.

Reconstitution Agreement: As defined in Section 9.01.

Reconstitution Date: The date on which any or all of the Mortgage Loans serviced under this Agreement shall be removed from this Agreement and reconstituted as part of a Securitization Transaction or Whole Loan Transfer pursuant to Section 9.01 hereof. The Reconstitution Date shall be such date which the Purchaser and the subsequent purchaser or transferee of the related Mortgage Loans shall designate. On such date, except as provided in this Agreement, the Mortgage Loans transferred shall cease to be covered by this Agreement and the Company's servicing

Unassociated Document                                                    Page 489 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 211 of 279

responsibilities shall cease under this Agreement with respect to the related transferred Mortgage Loans.

Record Date: The close of business of the last Business Day of the month preceding the month of the related Remittance Date.

REMIC: A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

REMIC Provisions: Provisions of the federal income tax law relating to a REMIC, which appear at Section 860A through 860G of Subchapter M of Chapter 1, Subtitle A of the Code, and related provisions, and regulations, rulings or pronouncements promulgated thereunder, as the foregoing may be in effect from time to time.

Remittance Date: The 18th day (or if such 18th day is not a Business Day, the first Business Day immediately preceding such 18th day) of any month, beginning with the First Remittance Date.

REO Disposition: The final sale by the Company of any REO Property.

REO Disposition Proceeds: All amounts received with respect to an REO Disposition pursuant to Section 4.16.

REO Property: A Mortgaged Property acquired by the Company on behalf of the Purchaser through foreclosure or by deed in lieu of foreclosure, as described in Section 4.16.

Repurchase Price: With respect to any Mortgage Loan, a price equal to (i) (A) prior to the date which is twelve (12) months following the Closing Date, the product of the Stated Principal Balance of such Mortgage Loan times the greater of (x) the Purchase Price Percentage, or (y) 100%, and (B) thereafter, the Stated Principal Balance of the Mortgage Loan plus (ii) interest on such Stated Principal Balance at the Mortgage Loan Interest Rate from the date on which interest has been paid and distributed to the Purchaser to the last day of the month in which such repurchase occurs, less amounts received or advanced in respect of such repurchased Mortgage Loan which are being held in the Custodial Account for distribution in the month of repurchase plus the amount of any advances owed to any servicer, plus all costs and expenses incurred by the Purchaser or any servicer arising out of or based upon such breach, including without limitation, costs and expenses incurred in the enforcement of the Company's repurchase obligation hereunder plus (iii) with respect to any Mortgage Loan subject to a Securitization Transaction, any costs and damages incurred by the related trust in connection with any violation by such Mortgage Loan of any predatory or abusive lending law.

RESPA: The Real Estate Settlement Procedures Act, as amended.

SAIF: The Savings Association Insurance Fund, or any successor thereto.

S&P: Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies., Inc.

SEC: As defined in Section 9.01(f).

SEC Certification: As defined in Section 9.01(f).

Securities Act of 1933 or the 1933 Act: The Securities Act of 1933, as amended.

Securitization Transaction: Any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

Servicer Requirements: As defined in Section 5.02.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) other than Monthly Advances incurred in the performance by the Company of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or judicial proceedings, including foreclosures, (c) the management and liquidation of any REO Property and (d) compliance with the obligations under Section 4.08.

Servicing Fee: With respect to each Mortgage Loan, the amount of the annual fee the Purchaser shall pay to the Company, which shall, for a period of one full month, be equal to one-twelfth of the product of (a) the applicable Servicing Fee Rate and (b) the outstanding principal balance of such Mortgage Loan. Such fee shall be payable monthly, computed on the basis of the same principal amount and period respecting which any related interest payment on a Mortgage Loan is computed. The obligation of the Purchaser to pay the Servicing Fee is limited to, and the Servicing Fee is payable solely from, the interest portion (including recoveries with respect to interest from Liquidation Proceeds, Condemnation Proceeds and Insurance Proceeds to the extent permitted by Section 4.05) of such Monthly Payment collected by the Company, or as otherwise provided under Section 4.05.

Servicing Fee Rate: With respect to each Mortgage Loan, the per annum rate specified for such Mortgage Loan set forth on the Mortgage Loan Schedule or if not specified thereon, in the Purchase Price and Terms Letter.

Servicing File: With respect to each Mortgage Loan, the file retained by the Company consisting of originals or copies, which may be imaged copies, of all documents in the Mortgage File which are not delivered to the Custodian and copies of the Mortgage Loan Documents listed in the Custodial Agreement the originals of which are delivered to the Custodian pursuant to Section 2.03.

Servicing Officer: Any officer of the Company involved in or responsible for the administration and servicing of the Mortgage Loans whose name appears on a list of servicing officers furnished by the Company to the Purchaser upon request, as such list may from time to time be amended.

Servicing Systems: As defined in Section 5.02.

Servicing Transfer Event: With respect to any Mortgage Loan, the occurrence of any of the following events:

(i) a payment default shall have occurred on such Mortgage Loan at its original maturity date, or if the original maturity date of such Mortgage Loan has been extended, a payment default occurs on such Mortgage Loan at its extended maturity date; or

(ii) any Monthly Payment is 90 days or more delinquent; or

(iii) the date upon which the Company determines that a payment default is imminent and is not likely to be cured by the related Mortgagor within 90 days; or

(iv) the date upon which a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law, or the appointment of a conservator, receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, and being entered against the related Mortgagor; and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days; or

(v) the related Mortgagor shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities

or similar proceedings of or relating to such Mortgagor or of or relating to all or substantially all of its property; or

(vi)  the related Mortgagor shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vii)  a default of which the Company has notice (other than a failure by such Mortgagor to pay principal or interest) and which in the opinion of the Company materially and adversely affects the interests of the Purchaser has occurred and remained unremedied for the applicable grace period specified in such Mortgage Loan (or if no grace period is specified for those defaults which are capable of cure, 30 days); or

(viii)  the Company has received notice of the foreclosure or proposed foreclosure of any lien on the related Mortgaged Property.

<u>Special Servicer</u>: A special servicer appointed by the Purchaser to service Mortgage Loans after the occurrence of a Servicing Transfer Event.

<u>Stated Principal Balance</u>: As to each Mortgage Loan as to any date of determination, (i) the principal balance of the Mortgage Loan at the related Cut-off Date after giving effect to the principal portion of any Monthly Payments due on or before such date, whether or not received (except with respect to Option ARM Mortgage Loans, in which case, to the extent received), as well as any Principal Prepayments received before such date, minus (ii) all amounts previously distributed to the Purchaser with respect to the Mortgage Loan representing payments or recoveries of principal, or advances in lieu thereof.

<u>Subservicer</u>: Any Person with which the Company has entered into a Subservicing Agreement, provided that such Person is a Fannie Mae or Freddie Mac approved seller/servicer in good standing and no event has occurred, including but not limited to a change in insurance coverage, that would make it unable to comply with the eligibility for seller/servicers imposed by Fannie Mae or Freddie Mac.

<u>Subservicing Agreement</u>: Any subservicing agreement (which, in the event the Subservicer is an affiliate of the Company, need not be in writing) between the Company and any Subservicer relating to servicing and/or administration of certain Mortgage Loans as provided in Section 3.01(b).

<u>Substitution Adjustment Amount</u>: As defined in Section 3.03.

<u>Underwriting Guidelines</u>: The underwriting guidelines of the Company with respect to jumbo and alternate 'A' Mortgage Loans, attached as <u>Exhibit E</u> hereto, as the same shall be updated from time to time; <u>provided</u>, that no updated underwriting guidelines of the Company shall constitute "Underwriting Guidelines" hereunder until such updates have been received by the Purchasers. The exception policies of the Company shall be incorporated into and considered a part of the Underwriting Guidelines.

<u>Whole Loan Transfer</u>: Any sale or transfer of some or all of the Mortgage Loans, other than a Securitization Transaction.

ARTICLE II

AGREEMENT TO PURCHASE; PURCHASE PRICE; POSSESSION OF MORTGAGE FILES; MAINTENANCE OF SERVICING FILES; BOOKS AND RECORDS; CUSTODIAL AGREEMENT; DELIVERY OF DOCUMENTS; CLOSING CONDITIONS

Section 2.01    <u>Agreement to Purchase; Purchase Price; Mortgage and Servicing Files</u>.

(a)  <u>Agreement to Purchase</u>.

In exchange for the payment of the Purchase Price to the Company on the related Closing Date, the Company agrees to sell and the Purchaser agrees to purchase, without recourse but subject to the terms of this Agreement, on a servicing retained basis, all the right, title and interest of the Company in and to the Mortgage Loans included in a Mortgage Loan Package, which have an aggregate Stated Principal Balance on the related Cut-off Date in an amount as set forth in the related Purchase Price and Terms Letter, or in such other amount as agreed by the Purchaser and the Company as evidenced by the aggregate Stated Principal Balance of the Mortgage Loan Package accepted by the Purchaser on the related Closing Date. The Company shall deliver the Mortgage Loan Schedule for the Mortgage Loan Package to be purchased on the related Closing Date to the Purchaser at least five (5) Business Days prior to such Closing Date.

(b)  <u>Purchase Price</u>.

The Purchase Price for each Mortgage Loan Package shall be the percentage of par as stated in or as otherwise calculated pursuant to the related Purchase Price and Terms Letter (subject to adjustment as provided therein), plus accrued interest on the aggregate Stated Principal Balance of the Mortgage Loan Package at the weighted average Mortgage Loan Remittance Rate from the related Cut-off Date through the day prior to the related Closing Date, inclusive. The initial principal amount of the Mortgage Loans shall be the aggregate Stated Principal Balance of the Mortgage Loans, so computed as of the related Cut-off Date, after application of scheduled payments of principal due on or before the related Cut-off Date, whether or not collected (except with respect to Option ARM Mortgage Loans, in which case, to the extent received). Such payments shall be made to the account designated by the Company by wire transfer to immediately available funds by 3:00 p.m., Charlotte, North Carolina time, on the related Closing Date.

The Purchaser shall be entitled to (1) all scheduled principal due (except with respect to Option ARM Mortgage Loans, in which case, to the extent received) after the related Cut-off Date, (2) all other recoveries of principal collected on or after the related Cut-off Date (provided, however, that, except with respect to Option ARM Mortgage Loans, all scheduled payments of principal due on or before the related Cut-off Date and collected by the Company or any successor servicer after the related Cut-off Date shall belong to the Company) and (3) all payments of interest on the Mortgage Loans at the Mortgage Loan Remittance Rate (minus that portion of any such payment that is allocable to the period prior to the related Cut-off Date). The Stated Principal Balance of each Mortgage Loan as of the related Cut-off Date is determined after application of payments of principal due on or before the related Cut-off Date whether or not collected together with any unscheduled principal prepayments collected prior to the related Cut-off Date, provided, however, that payments of scheduled principal and interest prepaid for a Due Date beyond the Cut-off Date shall not be applied to the principal balance as of the Cut-off Date. Such prepaid amounts (minus interest at the Servicing Fee Rate) shall be the property of the Purchaser. The Company shall deposit any such prepaid amounts into the Custodial Account for the benefit of the Purchaser.

(c)  <u>Possession of Mortgage Files; Maintenance of Servicing Files</u>.

The contents of each Servicing File are and shall be held in trust by the Company for the benefit of the Purchaser as the owner thereof. Possession of each Servicing File by the Company is at the will of the Purchaser for the sole purpose of servicing the related Mortgage Loan, and such retention and possession by the Company is in a custodial capacity only. Upon the sale of the Mortgage Loans the ownership of each Mortgage Note, the related Mortgage and the related Mortgage File and Servicing File shall vest immediately in the Purchaser, and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of the Company shall vest immediately in the Purchaser and shall be retained and maintained by the Company, in trust, at the will of the Purchaser and only in such custodial capacity. The Company shall release its custody of the contents of any Servicing File only in accordance with written instructions from the Purchaser, unless such release is required as incidental to the Company's servicing of the Mortgage Loans or is in connection with a repurchase of any Mortgage Loan pursuant to Section 3.03 or 6.02.

Section 2.02    <u>Books and Records; Transfers of Mortgage Loans</u>.

From and after the sale of the Mortgage Loans to the Purchaser all rights arising out of the Mortgage Loans, including, but not limited to, all funds received on or in connection with the Mortgage Loans, except Prepayment Premiums, shall be received and held by the Company in trust for the benefit of the Purchaser as owner of the Mortgage Loans, and the Company, if applicable,

shall retain record title to the related Mortgages for the sole purpose of facilitating the servicing and the supervision of the servicing of the Mortgage Loans.

The sale of each Mortgage Loan shall be reflected on the Company's balance sheet and other financial statements, tax returns and business records as a sale of assets by the Company. The Company shall be responsible for maintaining, and shall maintain, a complete set of books and records for each Mortgage Loan, which shall be marked clearly to reflect the ownership of each Mortgage Loan by the Purchaser. In particular, the Company shall maintain in its possession, available for inspection by the Purchaser, or its designee, and shall deliver to the Purchaser upon demand, evidence of compliance with all federal, state and local laws, rules and regulations, and requirements of Fannie Mae or Freddie Mac, including but not limited to documentation as to the method used in determining the applicability of the provisions of the Flood Disaster Protection Act of 1973, as amended, to the Mortgaged Property, documentation evidencing insurance coverage and eligibility of any condominium project for approval by Fannie Mae or Freddie Mac and periodic inspection reports as required by Section 4.13. To the extent that original documents are not required for purposes of realization of Liquidation Proceeds or Insurance Proceeds, documents maintained by the Company may be in the form of microfilm or microfiche or such other reliable means of recreating original documents, including but not limited to, optical imagery techniques so long as the Company complies with the requirements of Fannie Mae or Freddie Mac.

The Company shall maintain with respect to each Mortgage Loan and shall make available for inspection by the Purchaser or its designee the related Servicing File during the time the Purchaser retains ownership of a Mortgage Loan and thereafter in accordance with applicable laws and regulations.

The Company shall keep at its servicing office books and records in which, subject to such reasonable regulations as it may prescribe, the Company shall note transfers of Mortgage Loans. No transfer of a Mortgage Loan may be made unless such transfer is in compliance with the terms hereof. For the purposes of this Agreement, the Company shall be under no obligation to deal with any person with respect to this Agreement or the Mortgage Loans unless the books and records show such person as the owner of the Mortgage Loan. The Purchaser may, subject to the terms of this Agreement, sell and transfer one or more of the Mortgage Loans. The Purchaser shall advise the Company of any such transfer. Upon receipt of notice of the transfer, the Company shall mark its books and records to reflect the ownership of the Mortgage Loans of such assignee, and shall release the previous Purchaser from its obligations hereunder with respect to the Mortgage Loans sold or transferred. If the Company receives notification of a transfer less than five (5) Business Days before the last calendar day of the month, the Company's duties to remit and report as required by Article V shall begin with the next Due Period.

Section Custodial Agreement; Delivery of Documents.
2.03

Pursuant to the related Custodial Agreement, the Company will, with respect to each Mortgage Loan, deliver and release the Mortgage Loan Documents to the Custodian at least five (5) Business Days prior to the related Closing Date. In addition, in connection with the assignment of any MERS Designated Mortgage Loan, the Company agrees that on or prior to each Closing Date it will cause, at its own expense, the MERS System to indicate that the related Mortgage Loans have been assigned by the Company to the Purchaser in accordance with this Agreement by entering in the MERS System the information required by the MERS System to identify the Purchaser as owner of such Mortgage Loans. The Company further agrees that it will not alter the information referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

The Custodian shall be required to certify its receipt of the Mortgage Loan Documents required to be delivered pursuant to the Custodial Agreement prior to the related Closing Date, as evidenced by the initial certification of the Custodian in the form annexed to the Custodial Agreement. The Company shall be responsible for recording the Assignments of Mortgage, if necessary, in accordance with Accepted Servicing Practices and this Agreement. The Purchaser shall be responsible for the initial and on-going fees and expenses of the Custodian.

All recording fees and other costs associated with the recording of Assignments of Mortgage and other relevant documents to the Purchaser or its designee will be borne by the Company. For Mortgage Loans not registered under the MERS System, if the Purchaser requests that the related Assignments of Mortgage be recorded, the Company shall cause such Assignments of Mortgage which were delivered in blank to be completed and to be recorded. The Company shall be required to deliver such Assignments of Mortgage for recording within thirty (30) days after the date on which the Company is notified that recording will be required pursuant to this Section 2.03. The Company shall furnish the Custodian with a copy of each Assignment of Mortgage submitted for recording. In the event that any such Assignment is lost or returned unrecorded because of a defect therein, the Company shall promptly have a substitute Assignment of Mortgage prepared or have such defect cured, as the case may be, and thereafter cause such Assignment of Mortgage to be duly recorded.

Except as otherwise provided in this Section 2.03, upon discovery or receipt of notice of any materially defective Mortgage Loan Document, or that a Mortgage Loan Document is missing, the Company shall have ninety (90) days to cure such defect or deliver such missing document to the Custodian. Any Mortgage that is not executed as required or does not strictly comply with all legal requirements shall be deemed to be materially defective. If the Company does not cure such defect or deliver such missing document within such time period, the Company shall either repurchase or substitute for such Mortgage Loan in accordance with Section 3.03.

The Company shall forward to the Custodian original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan entered into in accordance with Section 4.01 or 6.01 within one week of their execution, provided, however, that the Company shall provide the Custodian with a certified true copy of any such document submitted for recordation within ten (10) days after its execution, and shall provide the original of any document submitted for recordation or a copy of such document certified by the appropriate public recording office to be a true and complete copy of the original within sixty (60) days after its submission for recordation.

If the original or a copy certified by the appropriate recording office of any document submitted for recordation to the appropriate public recording office is not so delivered to the Custodian within 180 days following the related Closing Date, and if the Company does not cure such failure within thirty (30) days after receipt of written notification of such failure from the Purchaser, the related Mortgage Loan shall, upon the request of the Purchaser, be repurchased by the Company at a price and in the manner specified in Section 3.03.

In the event the public recording office is delayed in returning any original document, the Company shall deliver to the Custodian within 180 days after its submission for recordation, a copy of such document and an Officer's Certificate, which shall (i) identify the recorded document, (ii) state that the recorded document has not been delivered to the Custodian due solely to a delay by the public recording office, (iii) state the amount of time generally required by the applicable recording office to record and return a document submitted for recordation and (iv) specify the date the applicable recorded document will be delivered to the Custodian. The Company shall not impair or diminish the rights of the Purchaser to the document specified in (iv) above. An extension of the date specified in (iv) above may be requested from the Purchaser, which consent shall not be unreasonably withheld. However, if the Company cannot deliver such original or clerk-certified copy of any document submitted for recordation to the appropriate public recording office within the specified time for any reason, within thirty (30) days after receipt of written notification of such failure from the Purchaser, the Company shall repurchase the related Mortgage Loan at the price and in the manner specified in Section 3.03.

In addition to any rights granted to the Purchaser hereunder to underwrite the Mortgage Loan Documents prior to the Closing Date, the Purchaser shall be entitled to conduct a due diligence review of the Mortgage Files in accordance with the timetable and any additional terms and conditions set forth in the Purchase Price and Terms Letter. Such underwriting by the Purchaser or its designee shall not impair or diminish the rights of the Purchaser or any of its successors under this Agreement with respect to a breach of the representations and warranties contained in this Agreement. The fact that the Purchaser or its designee has conducted a due diligence review or has failed to conduct any partial or complete examination of the Mortgage Files shall not affect the Purchaser's or any of its successors' rights to demand repurchase or other relief or remedy provided for in this Agreement.

Section Quality Control Procedures.
2.04

The Company shall have an internal quality control program that verifies, on a regular basis, the existence and accuracy of the legal documents, credit documents, property appraisals, and underwriting decisions. The program shall include evaluating and monitoring the overall quality of the Company's loan production and the servicing activities of the Company in accordance with industry standards. The Company shall make available upon request of any Purchaser information regarding its quality control program.

Section Closing Conditions.
2.05

The closing for the purchase and sale of each Mortgage Loan Package shall take place on the respective Closing Date. The closing shall be either by telephone, confirmed by letter or wire as the parties shall agree, or conducted in person, at such place as the parties may agree.

The closing for each Mortgage Loan Package shall be subject to the satisfaction of each of the following conditions precedent:

(a)  with respect to the Purchaser's obligations to close:

(i)  the Company shall have delivered to the Purchaser and the Custodian the related Mortgage Loan Schedule and an electronic data file containing information on a loan-level basis;

(ii)  all of the representations and warranties of the Company under this Agreement shall be true and correct as of the related Closing Date (or, with respect to Section 3.02, such other date specified therein) in all material respects and no default shall have occurred hereunder which, with notice or the passage of time or both, would constitute an Event of Default hereunder;

(iii)  the Purchaser and its counsel shall have received an opinion from the Company's counsel, substantially in the form of Exhibit G attached hereto (with respect to the initial closing only);

(iv)  the Purchaser shall have received from the Custodian an initial certification with respect to its receipt of the Mortgage Loan Documents for the related Mortgage Loans;

(v)  the Purchaser shall have received originals of the related Memorandum of Sale, the related Purchase Price and Terms Letter and a funding memorandum setting forth the Purchase Price(s), and the accrued interest thereon, for the Mortgage Loan Package, in each case executed on behalf of the Company;

(vi)  no Material Adverse Change or Market Change Event shall have occurred since the date of the Purchase Price and Terms Letter;

(vii)  all other terms and conditions of this Agreement, the related Memorandum of Sale and the related Purchase Price and Terms Letter to be satisfied by the Company shall have been complied with in all material respects; and

(b)  with respect to the Company's obligations to close:

(i)  the Company shall have received a copy of the initial certification of the Custodian with respect to its receipt of the Mortgage Loan Documents for the related Mortgage Loans;

(ii)  the Company has received originals of the related Memorandum of Sale, the related Purchase Price and Terms Letter and a funding memorandum setting forth the Purchase Price(s), and accrued interest thereon, for the Mortgage Loan Package, in each case executed on behalf of the Purchaser; and

(iii)  all terms and conditions of this Agreement, the related Memorandum of Sale and the related Purchase Price and Terms Letter to be satisfied by the Purchaser shall have been materially complied with.

Upon satisfaction of the foregoing conditions, the Purchaser shall pay to the Company on such Closing Date the Purchase Price for the related Mortgage Loan Package, including accrued interest pursuant to Section 2.01 of this Agreement.

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES REMEDIES AND BREACH**

Section 3.01    Company Representations and Warranties.

The Company hereby represents and warrants to the Purchaser that, as of the related Closing Date:

(a)  Due Organization and Authority.

The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all licenses necessary to carry on its business as now being conducted and is licensed, qualified and in good standing in each state where a Mortgaged Property is located if the laws of such state require licensing or qualification in order to conduct business of the type conducted by the Company, and in any event the Company is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of the related Mortgage Loan and the servicing of such Mortgage Loan in accordance with the terms of this Agreement; the Company has the full corporate power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement (including all instruments of transfer to be delivered pursuant to this Agreement) by the Company and the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of the Company; and all requisite corporate action has been taken by the Company to make this Agreement valid and binding upon the Company in accordance with its terms.

(b)  Ordinary Course of Business.

The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Company, who is in the business of selling and servicing loans, and the transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Company pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction.

(c)  No Conflicts.

Neither the execution and delivery of this Agreement, the acquisition of the Mortgage Loans by the Company, the sale of the Mortgage Loans to the Purchaser or the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with or result in a breach of any of the terms, articles of incorporation or by-laws or any legal restriction or any agreement or instrument to which the Company is now a party or by which it is bound, or constitute a default or result in the violation of any law, rule, regulation, order, judgment or decree to which the Company or its property is subject, or impair the ability of the Purchaser to realize on the Mortgage Loans, or impair the value of the Mortgage Loans.

(d)  Ability to Service.

The Company is an approved seller/servicer of conventional residential mortgage loans for Fannie Mae or Freddie Mac, with the facilities, procedures, and experienced personnel necessary for the sound servicing of mortgage loans of the same type as the Mortgage Loans. The Company is a HUD approved mortgagee pursuant to Section 203 of the National Housing Act and is in good standing to sell mortgage loans to and service mortgage loans for Fannie Mae or Freddie Mac, and no event has occurred, including but not limited to a change in insurance coverage, which would make the Company unable to comply with Fannie Mae or Freddie Mac eligibility requirements or which would require notification to either Fannie Mae or Freddie Mac.

(e)  Reasonable Servicing Fee; Fair Consideration.

The Company acknowledges and agrees that the Servicing Fee represents reasonable compensation for performing such services and that the entire Servicing Fee shall be treated by the Company, for accounting and tax purposes, as compensation for the servicing and administration of the Mortgage Loans pursuant to this Agreement. The consideration received by the Company upon the sale of the Mortgage Loans under this Agreement shall constitute fair consideration and reasonably equivalent value for the Mortgage Loans.

(f)   Ability to Perform; Solvency.

The Company does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement. The Company is solvent and the sale of the Mortgage Loans will not cause the Company to become insolvent. The sale of the Mortgage Loans is not undertaken to hinder, delay or defraud any of the Company's creditors.

(g)   No Litigation Pending.

There is no action, suit, proceeding or investigation pending or to its knowledge threatened against the Company which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Company, or in any material impairment of the right or ability of the Company to carry on its business substantially as now conducted, or in any material liability on the part of the Company, or which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be contemplated herein, or which may be likely to impair materially the ability of the Company to perform under the terms of this Agreement.

(h)   No Consent Required.

No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Company of or compliance by the Company with this Agreement or the sale of the Mortgage Loans as evidenced by the consummation of the transactions contemplated by this Agreement, or if required, such consent, approval, authorization or order has been obtained prior to the related Closing Date.

(i)   Selection Process.

The Mortgage Loans will be selected on such Closing Date from among the outstanding fixed and adjustable rate one- to four-family mortgage loans in the Company's portfolio at such Closing Date as to which the representations and warranties set forth in Section 3.02 could be made and such selection will not be made in a manner so as to affect adversely the interests of the Purchaser.

(j)   No Untrue Information.

Neither this Agreement nor any statement, report or other document furnished by or on behalf of the Company or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained therein not misleading.

(k)   Sale Treatment.

The Company has determined that the disposition of the Mortgage Loans pursuant to this Agreement will be afforded sale treatment for accounting and tax purposes.

(l)   No Material Change.

There has been no material adverse change in the business, operations, financial condition or assets of the Company since the date of the Company's most recent financial statements.

(m)   No Brokers' Fees.

The Company has not dealt with any broker, investment banker, agent or other Person that may be entitled to any commission or compensation in the connection with the sale of the Mortgage Loans.

(n)   Anti-Money Laundering Law Compliance.

The Company has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); the Company has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws.

(o)   Securities Law Compliance.

Neither the Company nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of any Mortgage Loans, any interest in any Mortgage Loans or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of any Mortgage Loans, any interest in any Mortgage Loans or any other similar security from, or otherwise approached or negotiated with respect to any Mortgage Loans, any interest in any Mortgage Loans or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action which would constitute a distribution of the Mortgage Loans under the Securities Act of 1933 or which would render the disposition of any Mortgage Loans a violation of Section 5 of the 1933 Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Mortgage Loans.

(p)   MERS.

The Company is in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the MERS Designated Mortgage Loans. On or within two (2) Business Days following the related Closing Date, the Company shall provide the Custodian and the Purchaser with a MERS Report reflecting the Purchaser as the Investor on the MERS System with respect to each MERS Designated Mortgage Loan and no Person as Interim Funder for each MERS Designated Mortgage Loan.

(q)   Financial Statements.

The Company has delivered to the Purchaser financial statements as requested by the Purchaser. All such financial statements fairly present the pertinent results of operations and changes in financial position for each of such periods and the financial position at the end of each such period of the Company and its subsidiaries and have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved. There has been no change in the business, operations, financial condition, properties or assets of the Company since the date of the Company's financial statements that would have a material adverse effect on its ability to perform its obligations

under this Agreement.

(r)    Compliance with the FACT Act.

As of the Closing Date, the sale or transfer of each Mortgage Loan by the Company complies with all applicable federal, state and local laws, rules and regulations governing such sale or transfer, including without limitation, the Fair and Accurate Transactions Act (the "FACT Act") and the Fair Credit Reporting Act, each as may be amended from time to time, and the Company has not received any actual or constructive notice of any identity theft, fraud, or other misrepresentation in connection with such Mortgage Loan or any party thereto.

Section Representations and Warranties Regarding Individual Mortgage Loans.
3.02

As to each Mortgage Loan, the Company hereby represents and warrants to the Purchaser that as of the related Closing Date all of the representations and warranties set forth on Exhibit F are true, complete and correct.

Section Repurchase.
3.03

It is understood and agreed that the representations and warranties set forth in Sections 3.01 and 3.02 shall survive the sale of the Mortgage Loans to the Purchaser and the delivery of the Mortgage Loan Documents to the Custodian and shall inure to the benefit of the Purchaser, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination or failure to examine any Mortgage File. Upon discovery by either the Company or the Purchaser of any materially defective or missing Mortgage Loan Document ("Defective Document") or a breach of any of the foregoing representations and warranties that materially and adversely affects the value of a Mortgage Loan or the interest of the Purchaser (or that materially and adversely affects the interests of the Purchaser in the related Mortgage Loan in the case of a representation and warranty relating to a particular Mortgage Loan), the party discovering such Defective Document or a breach shall give prompt written notice to the other. Any such breach or Defective Document that causes a Mortgage Loan not to be a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code shall be deemed to materially and adversely affect the interests of the Purchaser.

Within sixty (60) days after the earlier of either discovery or by notice to the Company of any Defective Document or a breach of a representation or warranty which materially and adversely affects the value of a Mortgage Loan or the interest of the Purchaser therein, the Company shall use its best efforts promptly to cure such breach in all material respects, and, if such Defective Document or breach cannot be cured, the Company shall, at the Purchaser's option, repurchase such Mortgage Loan at the Repurchase Price. In the event that a breach shall involve any representation or warranty set forth in Section 3.01, and such breach cannot be cured within sixty (60) days of the earlier of either discovery or by notice to the Company of such breach, all of the Mortgage Loans shall, at the Purchaser's option, be repurchased by the Company at the Repurchase Price. However, if the breach or Defective Document shall involve a representation or warranty set forth in Section 3.02 and the Company discovers or receives notice of any such breach within ninety (90) days of the related Closing Date, the Company shall, if the breach or Defective Document cannot be cured, at the Purchaser's option and provided that the Company has a Qualified Substitute Mortgage Loan, rather than repurchase the Mortgage Loan as provided above, remove such Mortgage Loan (a "Deleted Mortgage Loan") and substitute in its place a Qualified Substitute Mortgage Loan, provided that any such substitution shall be effected not later than one hundred twenty (120) days after the related Closing Date. Notwithstanding any of the foregoing, if a breach or Defective Document would cause the Mortgage Loan to be other than a "qualified mortgage," as defined in Section 860G(a)(3) of the Code, any such repurchase or substitution must occur within forty-five (45) days from the date the breach or Defective Document was discovered unless such breach is cured during such period.

If the Company has no Qualified Substitute Mortgage Loan, it shall repurchase the deficient Mortgage Loan within sixty (60) days after the written notice of the breach or Defective Document. Notwithstanding the above sentence, within sixty (60) days after the earlier of discovery by, or notice to, the Company of any breach of the representations or warranties set forth in Section 3.02 relating to a predatory or abusive lending law, the Company shall repurchase such Mortgage Loan at the Repurchase Price. Any repurchase of a Mortgage Loan or Loans pursuant to the foregoing provisions of this Section 3.03 shall occur on a date designated by the Purchaser and shall be accomplished by deposit in the Custodial Account of the amount of the Repurchase Price for distribution to the Purchaser on the next scheduled Remittance Date, after deducting therefrom any amount received in respect of such repurchased Mortgage Loan or Loans and being held in the Custodial Account for future distribution.

At the time of repurchase or substitution, the Purchaser and the Company shall arrange for the reassignment of the Deleted Mortgage Loan to the Company and the delivery to the Company of any documents held by the Custodian relating to the Deleted Mortgage Loan. In the event of a repurchase or substitution, the Company shall, simultaneously with such reassignment, give written notice to the Purchaser that such repurchase or substitution has taken place, amend the related Mortgage Loan Schedule to reflect the withdrawal of the Deleted Mortgage Loan from this Agreement, and, in the case of substitution, identify a Qualified Substitute Mortgage Loan and amend the related Mortgage Loan Schedule to reflect the addition of such Qualified Substitute Mortgage Loan to this Agreement. In connection with any such substitution, the Company shall be deemed to have made as to such Qualified Substitute Mortgage Loan the representations and warranties set forth in Sections 3.01 and 3.02 except that all such representations and warranties set forth in this Agreement shall be deemed made as of the date of such substitution. The Company shall effect such substitution by delivering to the Custodian for such Qualified Substitute Mortgage Loan the documents required by Section 2.03, with the Mortgage Note endorsed as required by Section 2.03. No substitution will be made in any calendar month after the Determination Date for such month. The Company shall deposit in the Custodial Account the Monthly Payment less the Servicing Fee due on such Qualified Substitute Mortgage Loan or Loans in the month following the date of such substitution. Monthly Payments due with respect to Qualified Substitute Mortgage Loans in the month of substitution shall be retained by the Company. With respect to any Deleted Mortgage Loan, distributions to the Purchaser shall include the Monthly Payment due on any Deleted Mortgage Loan in the month of substitution, and the Company shall thereafter be entitled to retain all amounts subsequently received by the Company in respect of such Deleted Mortgage Loan.

For any month in which the Company substitutes one or more Qualified Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the amount (if any) by which the aggregate principal balance of all such Qualified Substitute Mortgage Loans as of the date of substitution is less than the aggregate Stated Principal Balance of all such Deleted Mortgage Loans (after application of the principal portion of the Monthly Payments due in the month of substitution) (the "Substitution Adjustment Amount") shall be deposited in the Custodial Account by the Company on or before the Remittance Date in the month succeeding the calendar month during which the related Mortgage Loan is required to be purchased or replaced hereunder.

In addition to such repurchase or substitution obligation, the Company shall indemnify the Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a material breach of the representations and warranties of the Company contained in this Agreement; provided, however, that such indemnification shall not include punitive, consequential, exemplary or special damages (other than punitive, consequential, exemplary and special damages required to be paid by the indemnified party under this Agreement to any Person (other than a party to this Agreement or any of its affiliates) arising out of an action or proceeding by such Person, which damages shall be deemed to be direct damages to the party required to pay such punitive, consequential, exemplary or incidental damages). It is understood and agreed that the obligations of the Company set forth in this Section 3.03 to cure, substitute for or repurchase a defective Mortgage Loan and to indemnify the Purchaser as provided in this Section 3.03 constitute the sole remedies of the Purchaser respecting a breach of the foregoing representations and warranties.

Any cause of action against the Company relating to or arising out of the breach of any representations and warranties made in Sections 3.01 and 3.02 shall accrue as to any Mortgage Loan upon (i) discovery of such breach by the Purchaser or notice thereof by the Company to the Purchaser, (ii) failure by the Company to cure such breach or repurchase such Mortgage Loan as specified above, and (iii) demand upon the Company by the Purchaser for compliance with this Agreement.

In the event that any Mortgage Loan is held by a REMIC, notwithstanding any contrary provision of this Agreement, with respect to any Mortgage Loan that is not in default or as to which no default is imminent, the Purchaser may, in connection with any repurchase or substitution of a Mortgage Loan pursuant to this Section 3.03, require that the Company deliver, at the Company's expense, an Opinion of Counsel to the effect that such repurchase or substitution will not (i) result in the imposition of taxes on "prohibited transactions" of such REMIC (as defined in Section 860F of the Code) or otherwise subject the REMIC to tax, or (ii) cause the REMIC to fail to qualify as a REMIC at any time.

Section Repurchase of Mortgage Loans With First Payment Defaults.
3.04

If the related Mortgagor is thirty (30) days or more delinquent with respect to a Monthly Payment under a Mortgage Loan at any time prior to the expiration of the Holding Period for such

Mortgage Loan, the Company shall, at the Purchaser's option, repurchase such Mortgage Loan from the Purchaser in accordance with Section 3.03 hereof; *provided*, that the Company shall not be required to repurchase such Mortgage Loan if it can demonstrate to the Purchaser's reasonable satisfaction within thirty (30) days of such reported delinquency that the related Mortgagor timely made all payments required of the Mortgagor but such payment was otherwise misapplied. In the event a Mortgagor exercises any right of recession it may have with respect to the related Mortgage Loan that arises as a result of an act or omission prior to the related Closing Date, the Company shall repurchase such Mortgage Loan at the related Repurchase Price within thirty (30) days of receiving notice of such Mortgagor's intention to rescind the Mortgage Loan.

Section 3.05 Purchase Price Protection.

With respect to any Mortgage Loan that prepays in full at any time prior to the date that is sixty (60 days after the Closing Date for such Mortgage Loan, the Company shall reimburse the Purchaser, within 30 days following the prepayment in full of such Mortgage Loan, the amount (if any) by which the portion of the Purchase Price paid by the Purchaser to the Company for such Mortgage Loan exceeded 100% of the outstanding scheduled principal balance of the Mortgage Loan as of the related Cut-off Date.

Section 3.06 Review of Mortgage Loans.

From the related Closing Date until the date thirty (30) days after the related Closing Date, the Purchaser shall have the right to review the Mortgage Files and obtain BPOs on the Mortgaged Properties relating to the Mortgage Loans purchased on the related Closing Date, with the results of such BPO reviews to be communicated to the Company for a period up to thirty (30) days after the related Closing Date. In addition, the Purchaser shall have the right to reject any Mortgage Loan which in the Purchaser's sole determination (i) fails to conform to the Underwriting Guidelines, (ii) is underwritten without verification of the Mortgagor's assets and there is no credit report or FICO Score, (iii) is not an acceptable credit risk, or (iv) the value of the Mortgaged Property pursuant to any BPO varies by more than plus or minus 15% from the lesser of (A) the original appraised value of the Mortgaged Property or (B) the purchase price of the Mortgaged Property as of the date of origination of the related Mortgage Loan. In the event that the Purchaser so rejects any Mortgage Loan, the Company shall repurchase the rejected Mortgage Loan at the Repurchase Price in the manner prescribed in Section 3.03 upon receipt of notice from the Purchaser of the rejection of such Mortgage Loan. Any rejected Mortgage Loan shall be removed from the terms of this Agreement. The Company shall make available all files required by the Purchaser in order to complete its review, including all CRA/HMDA required data fields. To the extent that during the course of the Purchaser's initial review, the Purchaser discovers that the Mortgage Loans do not otherwise meet the Company's Underwriting Guidelines or the terms of this Agreement, the Purchaser shall have the right to carry out additional due diligence reviews, which additional due diligence shall be at the expense of the Purchaser. The Purchaser's decision to increase its due diligence review or obtain additional BPO's or other property evaluations is at its sole discretion. The additional review may be for any reason including but not limited to credit quality, property valuations, and data integrity. Any review performed by the Purchaser prior to the related Closing Date shall not limit the Purchaser's rights or Company's obligations under this section.

### ARTICLE IV

### ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

Section 4.01 Company to Act as Servicer.

(a) The Company, as an independent contractor, shall service and administer the Mortgage Loans, all in accordance with the terms of this Agreement (including, without limitation, the provisions set forth in the Regulation AB Compliance Addendum attached as Exhibit K hereto), Accepted Servicing Practices, applicable law and the terms of the Mortgage Notes and Mortgages. In connection with such servicing and administration, the Company shall have full power and authority, acting alone or through Subservicers, to do or cause to be done any and all things in connection with such servicing and administration which the Company may deem necessary or desirable, including, without limitation, the power and authority (1) to execute and deliver, on behalf of the Purchaser, customary consents or waivers and other instruments and documents, (2) to consent, with respect to the Mortgage Loans it services, to transfers of any Mortgaged Property and assumptions of the Mortgage Notes and related Mortgages (but only in the manner provided in this Agreement), (3) to collect any Insurance Proceeds and other Liquidation Proceeds relating to the Mortgage Loans it services, and (4) to effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing any Mortgage Loan it services. The Servicer shall represent and protect the interests of the Purchaser in the same manner as it protects its own interests in mortgage loans in its own portfolio in any claim, proceeding or litigation regarding a Mortgage Loan and shall not make or permit any modification, waiver or amendment of any term of any Mortgage Loan, except as provided pursuant to Section 4.22. Without limiting the generality of the foregoing, the Company shall continue, and is hereby authorized and empowered, to execute and deliver on behalf of itself and the Purchaser, all instruments of satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties. If reasonably required by the Company, the Purchaser shall furnish the Company with any powers of attorney and other documents necessary or appropriate to enable the Company to carry out its servicing and administrative duties under this Agreement.

(b) The Company may arrange for the subservicing of any Mortgage Loan it services by a Subservicer pursuant to a Subservicing Agreement; *provided, however*, that such subservicing arrangement and the terms of the related Subservicing Agreement must provide for the servicing of such Mortgage Loan in a manner consistent with the servicing arrangements contemplated hereunder. The Company shall be solely liable for all fees owed to the Subservicer under the Subservicing Agreement, regardless whether the Company's compensation hereunder is adequate to pay such fees. Notwithstanding the provisions of any Subservicing Agreement, any of the provisions of this Agreement relating to agreements or arrangements between the Company and a Subservicer or reference to actions taken through a Subservicer or otherwise, the Company shall remain obligated and liable to the Purchaser for the servicing and administration of the Mortgage Loans it services in accordance with the provisions of this Agreement without diminution of such obligation or liability by virtue of such Subservicing Agreements or arrangements or by virtue of indemnification from the Subservicer and to the same extent and under the same terms and conditions as if the Company alone were servicing and administering those Mortgage Loans. All actions of each Subservicer performed pursuant to the related Subservicing Agreement shall be performed as agent of the Company with the same force and effect as if performed directly by the Company. For purposes of this Agreement, the Company shall be deemed to have received any collections, recoveries or payments with respect to the Mortgage Loans it services that are received by a Subservicer regardless of whether such payments are remitted by the Subservicer to the Company. Any Subservicing Agreement entered into by the Company shall provide that it may be assumed or terminated by the Purchaser at any time, if the Purchaser has assumed the duties of the Company, or by any successor servicer, at the Purchaser's or successor servicer's option, as applicable, without cost or obligation to the assuming or terminating party or its assigns. Any Subservicing Agreement, and any other transactions or services relating to the Mortgage Loans involving a Subservicer, shall be deemed to be between the Company and such Subservicer alone, and the Purchaser shall not be deemed parties thereto and shall have no claims or rights of action against, rights, obligations, duties or liabilities to or with respect to the Subservicer or its officers, directors or employees, except as set forth in Section 4.01(a).

Section 4.02 Liquidation of Mortgage Loans.

In the event that any payment due under any Mortgage Loan and not postponed pursuant to Section 4.01 is not paid when the same becomes due and payable, or in the event the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the Company shall take such action as (1) the Company would take under similar circumstances with respect to a similar mortgage loan held for its own account for investment, (2) shall be consistent with Accepted Servicing Practices, (3) the Company shall determine prudently to be in the best interest of the Purchaser, and (4) is consistent with PMI Policy. The Company, on behalf of the Purchaser, may also, in its sole and exclusive discretion, as an alternative to foreclosure, sell defaulted Mortgage Loans at fair market value to third-parties, if the Company believes, in its sole and exclusive discretion, that such sale would maximize proceeds to the Purchaser (on a present value basis) with respect to each such Mortgage Loan. Notwithstanding any other provision in this Agreement or otherwise, the Company shall have no liability to the Purchaser or any other party for the Company's determination hereunder. Foreclosure or comparable proceedings shall be initiated within one hundred twenty (120) days after default with respect to Mortgaged Properties for which no satisfactory arrangements can be made for collection of delinquent payments unless prevented by statutory limitations or states whose bankruptcy laws prohibit such actions within such timeframe. The Company shall use its best efforts to realize upon defaulted Mortgage Loans in such manner as will maximize the receipt of principal and interest by the Purchaser, taking into account, among other things, the timing of foreclosure proceedings. In such connection, the Company shall from its own funds make all necessary and proper Servicing Advances, provided, however, that the Company shall not be required to expend its own funds in connection with any foreclosure or towards the restoration or preservation of any Mortgaged Property, unless it shall determine (a) that such preservation, restoration and/or foreclosure will increase the proceeds of liquidation of the Mortgage Loan to Purchaser after reimbursement to itself for such expenses and (b) that such expenses will be recoverable by it either through Liquidation Proceeds (respecting which it shall have priority for purposes of withdrawals from the Custodial Account pursuant to Section 4.05) or through Insurance Proceeds (respecting which it shall have similar priority).

Notwithstanding anything to the contrary contained herein, in connection with a foreclosure or acceptance of a deed in lieu of foreclosure, in the event the Company has reasonable cause to believe that a Mortgaged Property is contaminated by hazardous or toxic substances or wastes, or if the Purchaser otherwise requests an environmental inspection or review of such Mortgaged

Property, such an inspection or review is to be conducted by a qualified inspector. The cost for such inspection or review shall be borne by the Purchaser. Upon completion of the inspection or review, the Company shall promptly provide the Purchaser with a written report of the environmental inspection.

After reviewing the environmental inspection report, the Purchaser shall determine how the Company shall proceed with respect to the Mortgaged Property. In the event (a) the environmental inspection report indicates that the Mortgaged Property is contaminated by hazardous or toxic substances or wastes and (b) the Purchaser directs the Company to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, the Company shall be reimbursed for all reasonable costs associated with such foreclosure or acceptance of a deed in lieu of foreclosure and any related environmental clean up costs, as applicable, from the related Liquidation Proceeds, and/or Insurance Proceeds, or if the Liquidation Proceeds and/or Insurance Proceeds are insufficient to fully reimburse the Company, the Company shall be entitled to be reimbursed from amounts in the Custodial Account pursuant to Section 4.05 hereof. In the event the Purchaser directs the Company not to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, the Company shall be reimbursed for all Servicing Advances made with respect to the related Mortgaged Property from the Custodial Account pursuant to Section 4.05 hereof.

Section    Collection of Mortgage Loan Payments.
4.03

Continuously from the date hereof until the principal and interest on all Mortgage Loans are paid in full, in accordance with this Agreement and Accepted Servicing Standards, the Company shall proceed diligently to collect all payments due under each of the Mortgage Loans when the same shall become due and payable and shall take special care in ascertaining and estimating Escrow Payments and all other charges that will become due and payable with respect to the Mortgage Loan and the Mortgaged Property, to the end that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.

Consistent with the foregoing, the Company may in its discretion (i) waive any late payment charge with respect to a Mortgage Loan it services and (ii) extend the due dates for payments due on a Mortgage Note for a period not greater than 120 days; *provided, however*, that the Company cannot extend the maturity of any such Mortgage Loan past the date on which the final payment is due on the latest maturing Mortgage Loan as of the related Cut-off Date. In the event of any such arrangement, the Company shall make Monthly Advances on the related Mortgage Loan in accordance with the provisions of Section 5.03 during the scheduled period in accordance with the amortization schedule of such Mortgage Loan without modification thereof by reason of such arrangements. The Company shall not be required to institute or join in litigation with respect to collection of any payment (whether under a Mortgage, Mortgage Note or otherwise or against any public or governmental authority with respect to a taking or condemnation) if it reasonably believes that enforcing the provision of the Mortgage or other instrument pursuant to which such payment is required is prohibited by applicable law.

Section    Establishment of and Deposits to Custodial Account.
4.04

The Company shall segregate and hold all funds collected and received pursuant to a Mortgage Loan separate and apart from any of its own funds and general assets and shall establish and maintain one or more Custodial Accounts, in the form of time deposit or demand accounts, titled "Paul Financial, LLC, in trust for [Name of the Purchaser] and/or subsequent purchasers of Mortgage Loans, and various Mortgagors - P&I." The Custodial Account shall be established with a Qualified Depository. Upon request of the Purchaser and within ten (10) days thereof, the Company shall provide the Purchaser with written confirmation of the existence of such Custodial Account. Any funds deposited in the Custodial Account shall at all times be insured to the fullest extent allowed by applicable law. Funds deposited in the Custodial Account may be drawn on by the Company in accordance with Section 4.05.

The Company shall deposit in the Custodial Account within one Business Day of Company's receipt, and retain therein, the following collections received by the Company and payments made by the Company after the related Cut-off Date, other than payments of principal and interest due on or before the related Cut-off Date, or received by the Company prior to the related Cut-off Date but allocable to a period subsequent thereto:

(i)    all payments on account of principal on the Mortgage Loans, including all Principal Prepayments (including Prepayment Premiums paid by the Mortgagor or by the Company pursuant to Section 4.22 of this Agreement);

(ii)    all payments on account of interest on the Mortgage Loans adjusted to the Mortgage Loan Remittance Rate;

(iii)    all Liquidation Proceeds;

(iv)    all Insurance Proceeds, including amounts required to be deposited pursuant to Section 4.10 (other than proceeds to be held in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with Section 4.14), Section 4.11 and Section 4.15;

(v)    all Condemnation Proceeds which are not applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with Section 4.14;

(vi)    any amounts required to be deposited in the Custodial Account pursuant to Section 4.01, 5.01, 5.03, 6.01 or 6.02;

(vii)    any amounts payable in connection with the repurchase of or substitution for any Mortgage Loan pursuant to Section 3.03;

(viii)    with respect to each Principal Prepayment an amount (to be paid by the Company out of its funds) which, when added to all amounts allocable to interest received in connection with the Principal Prepayment, equals one month's interest on the amount of principal so prepaid at the Mortgage Loan Remittance Rate;

(ix)    any amounts required to be deposited by the Company pursuant to Section 4.10 in connection with the deductible clause in any blanket hazard insurance policy; and

(x)    any amounts received with respect to or related to any REO Property and all REO Disposition Proceeds pursuant to Section 4.16.

The foregoing requirements for deposit into the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of late payment charges, assumption fees and other ancillary income (other than Prepayment Premiums), to the extent permitted by Section 6.01, need not be deposited by the Company into the Custodial Account. Any interest paid on funds deposited in the Custodial Account by the depository institution shall accrue to the benefit of the Company and the Company shall be entitled to retain and withdraw such interest from the Custodial Account pursuant to Section 4.05. The Company shall maintain adequate records with respect to all deposits and withdrawals made pursuant to this Section 4.04 and Section 4.05. All funds required to be deposited in the Custodial Account shall be held in trust for the Purchaser until withdrawn in accordance with Section 4.05.

Section    Permitted Withdrawals From Custodial Account.
4.05

The Company shall, from time to time, withdraw funds from the Custodial Account for the following purposes:

(i)    to make payments to the Purchaser in the amounts and in the manner provided for in Section 5.01;

(ii)    to reimburse itself for Monthly Advances of the Company pursuant to Section 5.03, the Company's right to reimburse itself pursuant to this subclause (ii) being limited to amounts received on the related Mortgage Loan which represent late payments of principal and/or interest respecting which any such advance was made, it being understood that, in the case of any such reimbursement, the Company's right thereto shall be prior to the rights of the Purchaser, except that, where the Company is required to repurchase a Mortgage Loan pursuant to Section 3.03 or 6.02, the Company's right to such reimbursement shall be subsequent to the payment to the Purchaser of the Repurchase Price pursuant to such sections and all other amounts required to be paid to the Purchaser with respect to such Mortgage Loan;

(iii) to reimburse itself for unreimbursed Servicing Advances, and for any unpaid Servicing Fees, the Company's right to reimburse itself pursuant to this subclause (iii) with respect to any Mortgage Loan being limited to related Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds and such other amounts as may be collected by the Company from the Mortgagor or otherwise relating to the Mortgage Loan, it being understood that, in the case of any such reimbursement, the Company's right thereto shall be prior to the rights of the Purchaser, except that where the Company is required to repurchase a Mortgage Loan pursuant to Section 3.03, 3.04 or 6.02, in which case the Company's right to such reimbursement shall be subsequent to the payment to the Purchaser of the Repurchase Price pursuant to such sections and all other amounts required to be paid to the Purchaser with respect to such Mortgage Loan;

(iv) to pay itself as part of its servicing compensation interest on funds deposited in the Custodial Account;

(v) to reimburse itself for expenses incurred and reimbursable to it pursuant to Section 8.01;

(vi) to pay any amount required to be paid pursuant to Section 4.16 related to any REO Property, it being understood that, in the case of any such expenditure or withdrawal related to a particular REO Property, the amount of such expenditure or withdrawal from the Custodial Account shall be limited to amounts on deposit in the Custodial Account with respect to the related REO Property;

(vii) to remove funds inadvertently placed in the Custodial Account by the Company;

(viii) to transfer funds to another Qualified Depository; and

(ix) to clear and terminate the Custodial Account upon the termination of this Agreement.

In the event that the Custodial Account is interest bearing, on each Remittance Date, the Company shall withdraw all funds from the Custodial Account except for those amounts which, pursuant to Section 5.01, the Company is not obligated to remit on such Remittance Date. The Company may use such withdrawn funds only for the purposes described in this Section 4.05.

The Company shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the Custodial Account.

Section Establishment of and Deposits to Escrow Account.
4.06

The Company shall segregate and hold all funds collected and received pursuant to a Mortgage Loan constituting Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Accounts, in the form of time deposit or demand accounts, titled, "Paul Financial, LLC, in trust for [Name of the Purchaser] and/or subsequent purchasers of Residential Mortgage Loans, and various Mortgagors - T & I." The Escrow Accounts shall be established with a Qualified Depository, in a manner which shall provide maximum available insurance thereunder. Upon request of the Purchaser and within ten (10) days thereof, the Company shall provide the Purchaser with written confirmation of the existence of such Escrow Account. Funds deposited in the Escrow Account may be drawn on by the Company in accordance with Section 4.07.

The Company shall deposit in the Escrow Account or Accounts, within two (2) Business Days after the Company's receipt, and retain therein:

(i) all Escrow Payments collected on account of the Mortgage Loans, for the purpose of effecting timely payment of any such items as required under the terms of this Agreement;

(ii) all amounts representing Insurance Proceeds or Condemnation Proceeds which are to be applied to the restoration or repair of any Mortgaged Property; and

(iii) all payments on account of Buydown Funds.

The Company shall make withdrawals from the Escrow Account only to effect such payments as are required under this Agreement, as set forth in Section 4.07. The Company shall be entitled to retain any interest paid on funds deposited in the Escrow Account by the depository institution, other than interest on escrowed funds required by law to be paid to the Mortgagor. To the extent required by law, the Company shall pay interest on escrowed funds to the Mortgagor notwithstanding that the Escrow Account may be non-interest bearing or that interest paid thereon is insufficient for such purposes.

Section Permitted Withdrawals From Escrow Account.
4.07

Withdrawals from the Escrow Account or Accounts may be made by the Company only:

(i) to effect timely payments of ground rents, taxes, assessments, water rates, mortgage insurance premiums, condominium charges, fire and hazard insurance premiums or other items constituting Escrow Payments for the related Mortgage;

(ii) to reimburse the Company for any Servicing Advances made by the Company pursuant to Section 4.08 with respect to a related Mortgage Loan, but only from amounts received on the related Mortgage Loan which represent late collections of Escrow Payments thereunder;

(iii) to refund to any Mortgagor any funds found to be in excess of the amounts required under the terms of the related Mortgage Loan;

(iv) for transfer to the Custodial Account for application to reduce the principal balance of the Mortgage Loan in accordance with the terms of the related Mortgage and Mortgage Note;

(v) for application to the restoration or repair of the Mortgaged Property in accordance with the procedures outlined in Section 4.14;

(vi) to pay to the Company, or any Mortgagor to the extent required by law, any interest paid on the funds deposited in the Escrow Account;

(vii) to remove funds inadvertently placed in the Escrow Account by the Company;

(viii) to remit to the Purchaser payments on account of Buydown Funds as applicable; and

(ix) to clear and terminate the Escrow Account on the termination of this Agreement.

Section Payment of Taxes, Insurance and Other Charges.
4.08

With respect to each Mortgage Loan, the Company shall maintain accurate records reflecting the status of ground rents, taxes, assessments, water rates, sewer rents, and other charges which are or may become a lien upon the Mortgaged Property and the status of PMI Policy premiums and fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges (including renewal premiums) and shall effect payment thereof prior to the applicable penalty or termination date, employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Company in amounts sufficient for such purposes, as allowed under the terms of the Mortgage. The Company assumes full responsibility for the timely payment of all such bills and shall effect timely payment of all such charges irrespective of each Mortgagor's faithful performance in the payment of same of the making

Unassociated Document                                                                    Page 498 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 220 of 279

of the Escrow Payments, and the Company shall make advances from its own funds to effect such payments, which advances shall constitute Servicing Advances hereunder; provided that the Company shall be required to so advance only to the extent that the Company, in its good faith judgment, believes the Servicing Advance to be recoverable from Insurance Proceeds or Liquidation Proceeds or otherwise. The costs incurred by the Company, if any, in effecting the timely payments of taxes and assessments on the Mortgaged Properties and related insurance premiums shall not be added to the Stated Principal Balances of the related Mortgage Loans, notwithstanding that the terms of such Mortgage Loans so permit.

Section Transfer of Accounts.
4.09

The Company may transfer the Custodial Account or the Escrow Account to a different Qualified Depository from time to time; provided that the Company shall give written notice to the Purchaser of any proposed change of the location of either Account not later than ten (10) Business Days prior to any change thereof.

Section Maintenance of Hazard Insurance.
4.10

The Company shall cause to be maintained for each Mortgage Loan hazard insurance such that all buildings upon the Mortgaged Property are insured by an insurer acceptable to Fannie Mae or Freddie Mac against loss by fire, hazards of extended coverage and such other hazards as are customary or required by law in the area where the Mortgaged Property is located, in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such Mortgage Loan and (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan and (b) an amount such that the proceeds thereof shall be sufficient to prevent the Mortgagor or the loss payee from becoming a co-insurer. In the event a hazard insurance policy shall be in danger of being terminated, or in the event the insurer shall cease to be acceptable to Fannie Mae or Freddie Mac, the Company shall notify the Purchaser and the related Mortgagor, and shall use its best efforts, as permitted by applicable law, to obtain from another qualified insurer a replacement hazard insurance policy substantially and materially similar in all respects to the original policy. In no event, however, shall a Mortgage Loan be without a hazard insurance policy at any time, subject only to Section 4.11 hereof.

If the related Mortgaged Property is located in an area identified by the Flood Emergency Management Agency as having special flood hazards (and such flood insurance has been made available), the Company will cause to be maintained a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect with a generally acceptable insurance carrier acceptable to Fannie Mae or Freddie Mac in an amount representing coverage equal to the lesser of (i) the minimum amount required, under the terms of coverage, to compensate for any damage or loss on a replacement cost basis (or the unpaid balance of the mortgage if replacement cost coverage is not available for the type of building insured) and (ii) the maximum amount of insurance which is available under the Flood Disaster Protection Act of 1973, as amended. If at any time during the term of the Mortgage Loan, the Company determines in accordance with applicable law and pursuant to the FEMA Guides that a Mortgaged Property is located in a special flood hazard area and is not covered by flood insurance or is covered in an amount less than the amount required by the Flood Disaster Protection Act of 1973, as amended, the Company shall notify the related Mortgagor to obtain such flood insurance coverage, and if said Mortgagor fails to obtain the required flood insurance coverage within forty-five (45) days after such notification, the Company shall immediately force place the required flood insurance on the Mortgagor's behalf. Any out-of-pocket expenses or advance made by the Company on such force placed flood insurance coverage shall be deemed a Servicing Advance.

If a Mortgage is secured by a unit in a condominium project, the Company shall verify that the coverage required of the owner's association, including hazard, flood, liability, and fidelity coverage, is being maintained in accordance with then current Fannie Mae or Freddie Mac requirements, and secure from the owner's association its agreement to notify the Company promptly of any change in the insurance coverage or of any condemnation or casualty loss that may have a material effect on the value of the Mortgaged Property as security.

In the event that the Purchaser or the Company shall determine that the Mortgaged Property should be insured against loss or damage by hazards and risks not covered by the insurance required to be maintained by the Mortgagor pursuant to the terms of the Mortgage, the Company shall communicate and consult with the Mortgagor with respect to the need for such insurance and bring to the Mortgagor's attention the desirability of protection of the Mortgaged Property.

All policies required hereunder shall name the Company as loss payee and shall be endorsed with standard mortgagee clauses, without contribution, which shall provide for at least thirty (30) days prior written notice of any cancellation, reduction in amount or material change in coverage.

The Company shall not interfere with the Mortgagor's freedom of choice in selecting either an insurance carrier or agent, provided, however, that the Company shall not accept any such insurance policies from insurance companies unless such companies are acceptable to Fannie Mae or Freddie Mac and are licensed to do business in the jurisdiction in which the Mortgaged Property is located. The Company shall determine that such policies provide sufficient risk coverage and amounts, that they insure the property owner, and that they properly describe the property address. The Company shall furnish to the Mortgagor a formal notice of expiration of any such insurance in sufficient time for the Mortgagor to arrange for renewal coverage by the expiration date.

Pursuant to Section 4.04, any amounts collected by the Company under any such policies (other than amounts to be deposited in the Escrow Account and applied to the restoration or repair of the related Mortgaged Property, or property acquired in liquidation of the Mortgage Loan, or to be released to the Mortgagor, in accordance with the Company's normal servicing procedures as specified in Section 4.14) shall be deposited in the Custodial Account subject to withdrawal pursuant to Section 4.05.

Section Maintenance of Mortgage Impairment Insurance.
4.11

In the event that the Company shall obtain and maintain a blanket policy insuring against losses arising from fire and hazards covered under extended coverage on all of the Mortgage Loans, then, to the extent such policy (1) names the Company as loss payee, (2) provides coverage in an amount equal to the amount required pursuant to Section 4.10 without coinsurance, and (3) otherwise complies with Accepted Servicing Practices and all other requirements of Section 4.10, it shall conclusively be deemed to have satisfied its obligations as set forth in Section 4.10. The Company shall prepare and make any claims on the blanket policy as deemed necessary by the Company in accordance with prudent servicing practices. Any amounts collected by the Company under any such policy relating to a Mortgage Loan shall be deposited in the Custodial Account subject to withdrawal pursuant to Section 4.05. Such policy may contain a deductible clause, in which case, in the event that there shall not have been maintained on the related Mortgaged Property a policy complying with Section 4.10, and there shall have been a loss which would have been covered by such policy, the Company shall deposit in the Custodial Account at the time of such loss the amount not otherwise payable under the blanket policy because of such deductible clause, such amount to be deposited from the Company's funds, without reimbursement therefor. Upon request of the Purchaser, the Company shall cause to be delivered to the Purchaser a certified true copy of such policy and a statement from the insurer thereunder that such policy shall in no event be terminated or materially modified without thirty (30) days' prior written notice to the Purchaser.

Section Maintenance of Fidelity Bond and Errors and Omissions Insurance.
4.12

The Company shall maintain with responsible companies, at its own expense, a blanket Fidelity Bond and an Errors and Omissions Insurance Policy, with broad coverage on all officers, employees or other persons acting in any capacity requiring such persons to handle funds, money, documents or papers relating to the Mortgage Loans ("Company Employees"). Any such Fidelity Bond and Errors and Omissions Insurance Policy shall be in the form of the Mortgage Banker's Blanket Bond and shall protect and insure the Company against losses, including forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such Company Employees. Such Fidelity Bond and Errors and Omissions Insurance Policy also shall protect and insure the Company against losses in connection with the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby. No provision of this Section 4.12 requiring such Fidelity Bond and Errors and Omissions Insurance Policy shall diminish or relieve the Company from its duties and obligations as set forth in this Agreement. The minimum coverage under any such Fidelity Bond and Errors and Omissions Insurance Policy shall be at least equal to the amounts acceptable to Fannie Mae or Freddie Mac. Upon the request of the Purchaser, the Company shall cause to be delivered to the Purchaser a certificate of insurance for such Fidelity Bond and Errors and Omissions Insurance Policy and a statement from the surety and the insurer that such Fidelity Bond and Errors and Omissions Insurance Policy shall in no event be terminated or materially modified without 30 days' prior written notice to the Purchaser.

Section Inspections.
4.13

If any Mortgage Loan is more than sixty (60) days delinquent, the Company immediately shall inspect the Mortgaged Property and shall conduct subsequent inspections in accordance with Accepted Servicing Practices or as may be required by the primary mortgage guaranty insurer. The Company shall keep a written report of each such inspection.

Unassociated Document                                                                 Page 499 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 221 of 279

Section Restoration of Mortgaged Property.
4.14

The Company need not obtain the approval of the Purchaser prior to releasing any Insurance Proceeds or Condemnation Proceeds to the Mortgagor to be applied to the restoration or repair of the Mortgaged Property if such release is in accordance with Accepted Servicing Practices. For claims greater than $15,000, at a minimum the Company shall comply with the following conditions in connection with any such release of Insurance Proceeds or Condemnation Proceeds:

    (i) the Company shall receive satisfactory independent verification of completion of repairs and issuance of any required approvals with respect thereto;

    (ii) the Company shall take all steps necessary to preserve the priority of the lien of the Mortgage, including, but not limited to requiring waivers with respect to mechanics' and materialmen's liens;

    (iii) the Company shall verify that the Mortgage Loan is not in default; and

    (iv) pending repairs or restoration, the Company shall place the Insurance Proceeds or Condemnation Proceeds in the Escrow Account.

If the Purchaser is named as an additional loss payee, the Company is hereby empowered to endorse any loss draft issued in respect of such a claim in the name of the Purchaser.

Section Maintenance of PMI Policy; Claims.
4.15

If a Mortgage Loan has original LTV of 80% or greater, the Company shall, without any cost to the Purchaser maintain or cause the Mortgagor to maintain in full force and effect a PMI Policy insuring the portion over 75% until terminated pursuant to the Homeowners Protection Act of 1998, 12 UCS §4901, et seq. In the event that such PMI Policy shall be terminated other than as required by law, the Company shall obtain from another Qualified Insurer a comparable replacement policy, with a total coverage equal to the remaining coverage of such terminated PMI Policy. If the insurer shall cease to be a Qualified Insurer, the Company shall determine whether recoveries under the PMI Policy are jeopardized for reasons related to the financial condition of such insurer, it being understood that the Company shall in no event have any responsibility or liability for any failure to recover under the PMI Policy for such reason. If the Company determines that recoveries are so jeopardized, it shall notify the Purchaser and the Mortgagor, if required, and obtain from another Qualified Insurer a replacement insurance policy. The Company shall not take any action which would result in noncoverage under any applicable PMI Policy of any loss which, but for the actions of the Company would have been covered thereunder. In connection with any assumption or substitution agreement entered into or to be entered into pursuant to Section 6.01, the Company shall promptly notify the insurer under the related PMI Policy, if any, of such assumption or substitution of liability in accordance with the terms of such PMI Policy and shall take all actions which may be required by such insurer as a condition to the continuation of coverage under such PMI Policy. If such PMI Policy is terminated as a result of such assumption or substitution of liability, the Company shall obtain a replacement PMI Policy as provided above.

In connection with its activities as servicer, the Company agrees to prepare and present, on behalf of itself and the Purchaser, claims to the insurer under any PMI Policy in a timely fashion in accordance with the terms of such PMI Policy and, in this regard, to take such action as shall be necessary to permit recovery under any PMI Policy respecting a defaulted Mortgage Loan. Pursuant to Section 4.04, any amounts collected by the Company under any PMI Policy shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 4.05.

Section Title, Management and Disposition of REO Property.
4.16

In the event that title to any Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be taken in the name of the Purchaser, or in the event the Purchaser is not authorized or permitted to hold title to real property in the state where the REO Property is located, or would be adversely affected under the "doing business" or tax laws of such state by so holding title, the deed or certificate of sale shall be taken in the name of such Person or Persons as shall be consistent with an Opinion of Counsel obtained by the Company from any attorney duly licensed to practice law in the state where the REO Property is located. The Person or Persons holding such title other than the Purchaser shall acknowledge in writing that such title is being held as nominee for the Purchaser.

The Company shall manage, conserve, protect and operate each REO Property for the Purchaser solely for the purpose of its prompt disposition and sale. However, the Purchaser shall have the option to manage and operate the REO Property provided the Purchaser gives written notice of its intention to do so within sixty (60) days after such REO Property is acquired in foreclosure or by deed in lieu of foreclosure. The election by the Purchaser to manage the REO Property shall not constitute a termination of any rights of the Company pursuant to Section 11.02.

If the Purchaser does not elect to manage and operate the REO Property, the Company shall manage, conserve, protect and operate each REO Property for the Purchaser solely for the purpose of its prompt disposition and sale. The Company, either itself or through an agent selected by the Company, shall manage, conserve, protect and operate the REO Property in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the REO Property is managed. The Company shall attempt to sell the same (and may temporarily rent the same for a period not greater than one year, except as otherwise provided below) on such terms and conditions as the Company deems to be in the best interest of the Purchaser.

The Company shall use its best efforts to dispose of the REO Property as soon as possible and shall sell such REO Property in any event within one year after title has been taken to such REO Property, unless (i) a REMIC election has not been made with respect to the arrangement under which the Mortgage Loans and the REO Property are held, and (ii) the Company determines, and gives an appropriate notice to the Purchaser to such effect, that a longer period is necessary for the orderly liquidation of such REO Property. If a period longer than one year is permitted under the foregoing sentence and is necessary to sell any REO Property, (i) the Company shall report monthly to the Purchaser as to the progress being made in selling such REO Property and (ii) if, with the written consent of the Purchaser, a purchase money mortgage is taken in connection with such sale, such purchase money mortgage shall name the Company as mortgagee, and such purchase money mortgage shall not be held pursuant to this Agreement, but instead a separate participation agreement among the Company and the Purchaser shall be entered into with respect to such purchase money mortgage.

The Company shall also maintain on each REO Property fire and hazard insurance with extended coverage in amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, liability insurance and, to the extent required and available under the Flood Disaster Protection Act of 1973, as amended, flood insurance in the amount required above.

The disposition of REO Property shall be carried out by the Company at such price, and upon such terms and conditions, as the Company deems to be in the best interests of the Purchaser. Notwithstanding any other provision in this Section, no REO Property shall be marketed for less than the Appraised Value without the prior consent of the Purchaser, and no REO Property shall be sold for less than ninety percent (90%) of its Appraised Value without the prior consent of the Purchaser. The proceeds of sale of the REO Property shall be promptly deposited in the Custodial Account. As soon as practical thereafter the expenses of such sale shall be paid and the Company shall reimburse itself for any related unreimbursed Servicing Advances, unpaid Servicing Fees and unreimbursed advances made pursuant to Section 5.03. On the Remittance Date immediately following the Principal Prepayment Period in which such sale proceeds are received the net cash proceeds of such sale remaining in the Custodial Account shall be distributed to the Purchaser.

The Company shall withdraw from the Custodial Account funds necessary for the proper operation management and maintenance of the REO Property, including the cost of maintaining any hazard insurance pursuant to Section 4.11. The Company shall make monthly distributions on each Remittance Date to the Purchaser of the net cash flow from the REO Property (which shall equal the revenues from such REO Property net of the expenses described in this Section 4.16 and of any reserves reasonably required from time to time to be maintained to satisfy anticipated liabilities for such expenses).

Section Real Estate Owned Reports.
4.17

Together with the statement furnished pursuant to Section 5.02, the Company shall furnish to the Purchaser on or before the Remittance Date each month a statement with respect to any REO Property covering the operation of such REO Property for the previous month and the Company's efforts in connection with the sale of such REO Property and any rental of such REO Property incidental to the sale thereof for the previous month. That statement shall be accompanied by such other information as the Purchaser shall reasonably request.

Section Liquidation Reports.
4.18

Upon the foreclosure sale of any Mortgaged Property or the acquisition thereof by the Company pursuant to a deed in lieu of foreclosure, the Company shall submit to the Purchaser a liquidation report with respect to such Mortgaged Property.

Section Reports of Foreclosures and Abandonments of Mortgaged Property.
4.19

Following the foreclosure sale or abandonment of any Mortgaged Property, the Company shall report such foreclosure or abandonment as required pursuant to Section 6050J of the Code. The Company shall file information returns with respect to the receipt of mortgage interest received in a trade or business, reports of foreclosures and abandonments of any Mortgaged Property and information returns relating to cancellation of indebtedness income with respect to any Mortgaged Property as required by the Code. Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by the Code.

Section Application of Buydown Funds.
4.20

With respect to each Buydown Mortgage Loan, the Company shall have deposited into the Escrow Account, no later than the last day of the month, Buydown Funds in an amount equal to the aggregate undiscounted amount of payments that, when added to the amount the Mortgagor on such Mortgage Loan is obligated to pay on all Due Dates in accordance with the terms of the Buydown Agreement, is equal to the full scheduled Monthly Payments which are required to be paid by the Mortgagor under the terms of the related Mortgage Note (without regard to the related Buydown Agreement as if the Mortgage Loan were not subject to the terms of the Buydown Agreement). With respect to each Buydown Mortgage Loan, the Company will distribute to the Purchaser on each Remittance Date an amount of Buydown Funds equal to the amount that, when added to the amount required to be paid on such date by the related Mortgagor, pursuant to and in accordance with the related Buydown Agreement, equals the full Monthly Payment that would otherwise be required to be paid on such Mortgage Loan by the related Mortgagor under the terms of the related Mortgage Note (as if the Mortgage Loan were not a Buydown Mortgage Loan and without regard to the related Buydown Agreement).

If the Mortgagor on a Buydown Mortgage Loan defaults on such Mortgage Loan during the Buydown Period and the Mortgaged Property securing such Buydown Mortgage Loan is sold in the liquidation thereof (either by the Company or the insurer under any related Primary Insurance Policy) the Company shall, on the Remittance Date following the date upon which Liquidation Proceeds or REO Disposition proceeds are received with respect to any such Buydown Mortgage Loan, distribute to the Purchaser all remaining Buydown Funds for such Mortgage Loan then remaining in the Escrow Account. Pursuant to the terms of each Buydown Agreement, any amounts distributed to the Purchaser in accordance with the preceding sentence will be applied to reduce the outstanding principal balance of the related Buydown Mortgage Loan. If a Mortgagor on a Buydown Mortgage Loan prepays such Mortgage Loan in it entirety during the related Buydown Period, the Company shall be required to withdraw from the Escrow Account any Buydown Funds remaining in the Escrow Account with respect to such Buydown Mortgage Loan in accordance with the related Buydown Agreement. If a principal prepayment by a Mortgagor on a Buydown Mortgage Loan during the related Buydown Period, together with any Buydown Funds then remaining in the Escrow Account related to such Buydown Mortgage Loan, would result in a principal prepayment of the entire unpaid principal balance of the Buydown Mortgage Loan, the Company shall distribute to the Purchaser on the Remittance Date occurring in the month immediately succeeding the month in which such Principal Prepayment is received, all Buydown Funds related to such Mortgage Loan so remaining in the Escrow Account, together with any amounts required to be deposited into the Custodial Account.

Section Notification of Adjustments.
4.21

With respect to each Mortgage Loan, the Company shall adjust the Mortgage Interest Rate on the related Adjustment Date in compliance with the requirements of applicable law and the related Mortgage and Mortgage Note. The Company shall execute and deliver any and all necessary notices required under applicable law and the terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate adjustments. The Company shall promptly, upon written request, deliver to the Purchaser such notifications along with information regarding the applicable date of such adjustments and the methods used to calculate and implement such adjustments. Upon the discovery by the Company or the receipt of notice from the Purchaser that the Company has failed to adjust a Mortgage Interest Rate in accordance with the terms of the related Mortgage Note, the Company shall immediately deposit in the Custodial Account from its own funds the amount of any interest loss or deferral caused the Purchaser thereby.

Section Modifications, Waivers, Amendments and Consents.
4.22

(a) Subject to this Section 4.22, the Company may agree to any modification, waiver, forbearance, or amendment of any term of any Mortgage Loan without the consent of the Purchaser. All modifications, waivers, forbearances or amendments of any Mortgage Loan shall be in writing and shall be consistent with Accepted Servicing Practices.

(b) The Company shall not agree to enter into, and shall not enter into, any modification, waiver, forbearance or amendment of any term of any Mortgage Loan if such modification, waiver, forbearance, or amendment would:

(i) affect the amount or timing of any related payment of principal, interest or other amount payable thereunder;

(ii) in the Company's judgment, materially impair the security for such Mortgage Loan or reduce the likelihood of timely payment of amounts due thereon; or

(iii) otherwise constitutes a "significant modification" within the meaning of Treasury Regulations Section 1.860G-2(b);

unless, in each case, (A) such Mortgage Loan is 90 days or more past due or (B) the Company delivers to the Purchaser an Opinion of Counsel to the effect that such modification, waiver, forbearance or amendment would not affect the REMIC status of the Trust Estate and, in either case, such modification, waiver, forbearance or amendment is reasonably likely to produce a greater recovery with respect to such Mortgage Loan than would liquidation. Subject to Accepted Servicing Practices, the Company may permit a forbearance for a Mortgage Loan which, in the Company's judgment, is subject to imminent default.

(c) Any payment of interest, which is deferred pursuant to any modification, waiver, forbearance or amendment permitted hereunder, shall not, for purposes hereof, be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan or such modification, waiver or amendment so permit.

(d) The Company may, as a condition to granting any request by a Mortgagor for consent, modification, waiver, forbearance or amendment, the granting of which is within the Company's discretion pursuant to the Mortgage Loan and is permitted by the terms of this Agreement, require that such Mortgagor pay to the Company, as additional servicing compensation, a reasonable or customary fee for the additional services performed in connection with such request, together with any related costs and expenses incurred by the Company, which amount shall be retained by the Company as additional servicing compensation.

(e) The Company shall notify the Purchaser, in writing, of any modification, waiver, forbearance or amendment of any term of any Mortgage Loan and the date thereof, and shall deliver to the Purchaser (or, at the direction of the Purchaser, the Custodian) for deposit in the related Mortgage File, an original counterpart of the agreement relating to such modification, waiver, forbearance

or amendment, promptly (and in any event within ten Business Days) following the execution thereof; *provided, however,* that if any modification, waiver, forbearance or amendment is required by applicable law to be recorded, the Company (i) shall deliver to the Purchaser a copy thereof and (ii) shall deliver to the Purchaser such document, with evidence of notification upon receipt thereof from the public recording office.

(f) To the extent consistent with the terms of this Agreement, the Company may waive (or permit a Subservicer to waive) a Prepayment Premium only under the following circumstances: (i) such waiver relates to a default or a reasonably foreseeable default and would, in the reasonable judgment of the Company, maximize recovery of total proceeds taking into account the value of such Prepayment Premium and the related Mortgage Loan, (ii) such waiver is required under state or federal law or (iii) the mortgage debt has been accelerated as a result of the Mortgagor's default in making its Monthly Payments. The Company shall not waive any Prepayment Premium unless it is waived in accordance with this Section 4.22(f). The Company shall pay the amount of any Prepayment Premium (to the extent not collected and remitted to the Purchaser) to the Purchaser or its assignees if (1) the representation in Section 3.02(ggg) is breached and such breach materially and adversely affects the interests of the Purchaser or its assigns or (2) the Company waives any Prepayment Premium other than as permitted under this Section 4.22(f). The Company shall pay the amount of such Prepayment Premium, for the benefit of the Purchaser or any assignee of the Purchaser, by depositing such amount into the Custodial Account at the time that the amount prepaid on the related Mortgage Loan is required to be deposited into the Custodial Account.

Section Specially Serviced Mortgage Loans.
4.23

(a)    Upon determining that a Servicing Transfer Event has occurred with respect to any Mortgage Loan, the Company shall promptly give notice thereof to the Purchaser and the Special Servicer, and, unless otherwise directed in writing by the Purchaser, shall deliver a copy of the related Servicing File to the Special Servicer and shall use its reasonable efforts to provide the Special Servicer with all information, documents and records (including records stored electronically on computer tapes, magnetic discs and the like) relating to the Mortgage Loan either in the Company's possession or otherwise available to the Company without undue burden or expense, and reasonably requested by the Special Servicer to enable it to assume its functions hereunder with respect thereto. The Company shall use its reasonable efforts to comply with the preceding sentence within five Business Days of the occurrence of each related Servicing Transfer Event and in any event shall continue to service and administrator of such Mortgage Loan until the Special Servicer has commenced the servicing of such Mortgage Loan, which will commence upon receipt by the Special Servicer of the Servicing File. The Company shall deliver to the Custodian a copy of the notice of such Servicing Transfer Event provided by the Company to the Purchaser and Special Servicer pursuant to this Section.

(b)    Upon determining that a Specially Serviced Mortgage Loan (other than an REO Loan) has become current and has remained current for three consecutive Monthly Payments (*provided* that (i) no additional Servicing Transfer Event is foreseeable in the reasonable judgment of the Special Servicer, and (ii) for such purposes taking into account any modification or amendment of such Mortgage Loan), and that no other Servicing Transfer Event is continuing with respect thereto, the Special Servicer shall immediately give notice thereof to the Company and the Purchaser, and shall return the related Servicing File to the Company (or copies thereof if copies were delivered to the Special Servicer) and upon giving such notice, and returning such Servicing File to the Company, the Special Servicer's obligation to service such Mortgage Loan shall terminate and the obligations of the Company to service and administer such Mortgage Loan shall re-commence.

(c)    Notwithstanding the transfer of a Specially Serviced Mortgage Loan to the Special Servicer, the Company shall maintain ongoing payment records with respect to each of the Specially Serviced Mortgage Loans and REO Properties and shall provide the Special Servicer with any information in its possession required by the Special Servicer to perform its duties under this Agreement *provided* that the Company shall only be required to maintain in such records to the extent the Special Servicer has provided such information to the Company.

Section Disaster Recovery/Business Continuity Plan.
4.24

The Company shall establish contingency plans, recovery plans and proper risk controls to ensure Company's continued performance under this Agreement. The plans must be in place within thirty (30) calendar days after the date of this Agreement and shall include, but not be limited to, testing, control functions, accountability and corrective actions to be immediately implemented, if necessary. The Company agrees to make copies or summaries of the plans available to the Purchaser or its regulators upon request.

Section Fair Credit Reporting Act.
4.25

(a) The Company shall furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on each Mortgagor's credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis.

(b) The Company agrees to transmit full-file credit reporting data for each Mortgage Loan pursuant to Fannie Mae Guide Announcement 95-19 and for each Mortgage Loan, the Company shall report one of the following statuses each month: new origination, current, delinquent (30-, 60-, 90-days, etc.), foreclosed or charged-off.

(c) The Company shall comply with Title V of the Gramm-Leach-Bliley Act of 1999 and all applicable regulations promulgated thereunder, relating to the Mortgage Loans and the related Mortgagors and shall provide all required notices thereunder.

## ARTICLE V

## PAYMENTS TO PURCHASER

Section Remittances.
5.01

On each Remittance Date the Company shall remit by wire transfer of immediately available funds to the Purchaser (a) all amounts deposited in the Custodial Account as of the close of business on the Determination Date (net of charges against or withdrawals from the Custodial Account pursuant to Section 4.05), plus (b) all amounts, if any, which the Company is obligated to distribute pursuant to Section 5.03, minus (c) any amounts attributable to Principal Prepayments received after the applicable Principal Prepayment Period which amounts shall be remitted on the following Remittance Date, together with any additional interest required to be deposited in the Custodial Account in connection with such Principal Prepayment in accordance with Section 4.04(viii); minus (d) any amounts attributable to Monthly Payments collected but due on a Due Date or Dates subsequent to the first day of the month of the Remittance Date, and minus (e) any amounts attributable to Buydown Funds being held in the Custodial Account, which amounts shall be remitted on the following Remittance Date on which amounts shall be remitted on the Due Period for such amounts.

With respect to any remittance received by the Purchaser after the Remittance Date on which such payment was due, the Company shall pay to the Purchaser interest on any such late payment at an annual rate equal to the Prime Rate, adjusted as of the date of each change, plus three percentage points, but in no event greater than the maximum amount permitted by applicable law. Such interest shall be deposited in the Custodial Account by the Company on the date such late payment is made and shall cover the period commencing with the day following the Business Day on which such payment was due and ending with the Business Day on which such payment is made, both inclusive. Such interest shall be remitted along with the distribution payable on the next succeeding Remittance Date. The payment by the Company of any such interest shall not be deemed an extension of time for payment or a waiver of any Event of Default by the Company.

Section Automated Servicing Systems and Statements to Purchaser.
5.02

The Company shall setup, format, maintain and transmit to the Purchaser the Company's servicing date and other electronic data storage and transmission systems related to the Mortgage Loans (collectively, the "Servicing Systems") in accordance with the guidelines and requirements set forth in Exhibit J attached hereto (the "Servicer Requirements"), and the Company shall cooperate with the Purchaser to receive data fields from the Purchaser that are to be incorporated in the Servicing Systems in accordance with the Servicer Requirements.

Not later than the first (1st) Business Day of each month, the Company shall furnish to the Purchaser, with respect to the preceding month, a monthly collection report, a monthly paid in full report that summarizes Mortgage Loans paid in full during the Due Period and a monthly trial balance report that provides a trial balance as of the last day of the month preceding such Remittance Date in electronic format agreed upon by the Company and the Purchaser.

Not later than the fifth (5th) Business Day of each month, the Company shall furnish to the Purchaser a delinquency report and a monthly remittance advice, including the information set forth in Exhibit J, in both a physical form and a mutually agreeable electronic format as to the remittance on such Remittance Date and as to the period ending on the last day of the month preceding such Remittance Date.

Section 5.03 Monthly Advances by Company.

No later than the close of business on the Business Day preceding each Remittance Date, the Company shall deposit in the Custodial Account from its own funds or from amounts held for future distribution an amount equal to (i) except in the case of Option Arm Mortgage Loans, all Monthly Payments (with interest adjusted to the Mortgage Loan Remittance Rate) which were due on the Mortgage Loans during the applicable Due Period and which were delinquent at the close of business on the related Determination Date or which were deferred pursuant to Section 4.01 and (ii) in the case of each Option Arm Mortgage Loan, an amount equal to the greater of (A) the Monthly Payment received from the slated Mortgagor and (B) the minimum Monthly Payment required with respect to the related Due Date pursuant to the terms of the related Mortgage Note. Any amounts held for future distribution and so used shall be replaced by the Company by deposit in the Custodial Account on or before any future Remittance Date if funds in the Custodial Account on such Remittance Date shall be less than payments to the Purchaser required to be made on such Remittance Date. The Company's obligation to make such Monthly Advances as to any Mortgage Loan will continue through the last Monthly Payment due prior to the payment in full of the Mortgage Loan, or through the earlier of: (i) the last Remittance Date prior to the Remittance Date for the distribution of all Liquidation Proceeds and other payments or recoveries (including Insurance Proceeds and Condemnation Proceeds) with respect to the Mortgage Loan; and (ii) the Remittance Date prior to the date the Mortgage Loan is converted to REO Property, provided however, that if requested by a Rating Agency in connection with a securitization, the Company shall be obligated to make such advances through the Remittance Date prior to the date on which cash is received in connection with the liquidation of REO Property; provided, however, that any such obligation under this Section 5.03 shall cease if the Company determines, in its sole reasonable opinion, that advances with respect to such Mortgage Loan are non-recoverable by the Company from Liquidation Proceeds, Insurance Proceeds, Condemnation Proceeds, or otherwise with respect to a particular Mortgage Loan. In the event that the Company determines that any such advances are non-recoverable, the Company shall provide the Purchaser with a certificate signed by two officers of the Company evidencing such determination.

### ARTICLE VI

### GENERAL SERVICING PROCEDURES

Section 6.01 Due-on-Sale Provision and Assumptions.

The Company shall use its best efforts to enforce any "due-on-sale" provision contained in any Mortgage or Mortgage Note and to deny assumption by the person to whom the Mortgaged Property has been or is about to be sold whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains liable on the Mortgage and the Mortgage Note. When the Mortgaged Property has been conveyed by the Mortgagor, the Company shall, to the extent it has knowledge of such conveyance, exercise its rights to accelerate the maturity of such Mortgage Loan under the "due-on-sale" clause applicable thereto, provided, however, that the Company shall not exercise such rights if prohibited by law from doing so or if the exercise of such rights would impair or threaten to impair any recovery under the related PMI Policy, if any.

If the Company reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause or that either a decision not to exercise the "due-on-sale" provision or a decision to permit an assumption of the Mortgage Loan is in the best interest of the Purchaser, the Company shall enter into (i) an assumption and modification agreement with the person to whom such property has been conveyed, pursuant to which such person becomes liable under the Mortgage Note and the original Mortgagor remains liable thereon or (ii) in the event the Company is unable under applicable law to require that the original Mortgagor remain liable under the Mortgage Note and the Company has the prior consent of the primary mortgage guaranty insurer, a substitution of liability agreement with the purchaser of the Mortgaged Property pursuant to which the original Mortgagor is released from liability and the purchaser of the Mortgaged Property is substituted as Mortgagor and becomes liable under the Mortgage Note. The Company shall notify the Purchaser that any such substitution of liability or assumption agreement has been completed by forwarding to the Purchaser the original of any such substitution of liability or assumption agreement, which document shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof. If an assumption fee is collected by the Company for entering into an assumption agreement such fee will be retained by the Company as additional servicing compensation. In connection with any such assumption, neither the Mortgage Interest Rate borne by the related Mortgage Note, the term of the Mortgage Loan, the outstanding principal amount of the Mortgage Loan nor any other material terms shall be changed without the Purchaser's consent.

To the extent that any Mortgage Loan is assumable, the Company shall inquire diligently into the credit-worthiness of the proposed transferee, and shall use the underwriting criteria for approving the credit of the proposed transferee which are used by Fannie Mae with respect to underwriting mortgage loans of the same type as the Mortgage Loans. If the credit-worthiness of the proposed transferee does not meet such underwriting criteria, the Company diligently shall, to the extent permitted by the Mortgage or the Mortgage Note and by applicable law, accelerate the maturity of the Mortgage Loan.

Section 6.02 Satisfaction of Mortgages and Release of Mortgage Files.

Upon the payment in full of any Mortgage Loan, or the receipt by the Company of a notification that payment in full will be escrowed in a manner customary for such purposes, the Company immediately shall notify the Purchaser and shall request the release of any Mortgage Loan Documents.

If the Company satisfies or releases a Mortgage without first having obtained payment in full of the indebtedness secured by the Mortgage or should the Company otherwise prejudice any rights the Purchaser may have under the mortgage instruments, upon written demand of the Purchaser, the Company shall repurchase the related Mortgage Loan at the Repurchase Price, plus any prepayment penalty or premium provided for in the terms of the Mortgage Note, if applicable, by deposit thereof in the Custodial Account within one Business Day of receipt of such demand by the Purchaser. The Company shall maintain the Fidelity Bond and Errors and Omissions Insurance Policy as provided for in Section 4.12 insuring the Company against any loss it may sustain with respect to any Mortgage Loan not satisfied in accordance with the procedures set forth herein.

Section 6.03 Servicing Compensation.

As compensation for its services hereunder, the Company shall be entitled to withdraw from the Custodial Account the amount of its Servicing Fee. The Servicing Fee shall be payable monthly and shall be computed on the basis of the same unpaid principal balance and for the period respecting which any related interest payment on a Mortgage Loan is computed. The obligation of the Purchaser to pay the Servicing Fee is limited to, and payable solely from, the interest portion of such Monthly Payments. Notwithstanding the foregoing, with respect to the payment of the Servicing Fee for any month, the aggregate Servicing Fee shall be reduced (but not below zero) by an amount equal to the Prepayment Interest Shortfall for the related Principal Prepayment Period.

Additional servicing compensation in the form of assumption fees, to the extent provided in Section 6.01, late payment charges and other ancillary income (including Prepayment Premiums) shall be retained by the Company to the extent not required to be deposited in the Custodial Account. The Company shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement thereof except as specifically provided for herein.

Section 6.04 [Reserved]

Section[Reserved]
6.05

Section<u>Right to Examine Company Records</u>.
6.06

The Purchaser, or its designee, shall have the right to examine and audit any and all of the related books, records, or other information of the Company, whether held by the Company or by another on its behalf, with respect to or concerning this Agreement or the Mortgage Loans, during business hours or at such other times as may be reasonable under applicable circumstances, upon reasonable advance notice. The Purchaser shall pay its own travel expenses associated with such examination.

Section<u>Compliance with REMIC Provisions</u>.
6.07

If a REMIC election has been made with respect to the arrangement under which the Mortgage Loans and REO Property are held, the Company shall not take any action, cause the REMIC to take any action or fail to take (or fail to cause to be taken) any action that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of the REMIC as a REMIC or (ii) result in the imposition of a tax upon the REMIC (including but not limited to the tax on "prohibited transactions" as defined in Section 860 (a) (2) of the Code and the tax on "contributions" to a REMIC set forth in Section 860(d) of the Code) unless the Company has received an Opinion of Counsel (at the expense of the party seeking to take such action) to the effect that the contemplated action will not endanger such REMIC status or result in the imposition of any such tax.

### ARTICLE VII

### COMPANY TO COOPERATE

Section<u>Provision of Information</u>.
7.01

During the term of this Agreement, the Company shall furnish to the Purchaser such periodic, special, or other reports or information, and copies or originals of any documents contained in the Servicing File for each Mortgage Loan provided for herein. All other special reports or information not provided for herein as shall be necessary, reasonable, or appropriate with respect to the Purchaser or any regulatory agency will be provided at the Purchaser's expense. All such reports, documents or information shall be provided by and in accordance with all reasonable instructions and directions which the Purchaser may give. Upon request from the Purchaser, the Company shall deliver no later than sixty (60) days after such request any Servicing File or document therein, or copies thereof, to the Purchaser at the direction of the Purchaser. The Purchaser shall return any original Servicing File or document therein delivered pursuant to this Section no later than forty-five (45) days after receipt thereof. In the event that the Company fails to make delivery of the requested Servicing File or document therein, or copies thereof, as required under this Section, the Company shall repurchase the related Mortgage Loan in accordance with this Agreement within thirty (30) days of a request to do so by the Purchaser.

In addition, during the term of this Agreement, the Company shall provide to the OCC and to comparable regulatory authorities supervising the Purchaser or any of the Purchaser's assigns (including beneficial owners of securities issued in Securitization Transactions backed by the Mortgage Loans) and the examiners and supervisory agents of the OCC and such other authorities, access to the documentation required by applicable regulations of the OCC and other authorities supervising the Purchaser or any of its assigns with respect to the Mortgage Loans. Such access shall be afforded without charge, but only upon reasonable and prior written request and during normal business hours at the offices designated by the Company.

The Company shall execute and deliver all such instruments and take all such action as any Purchaser may reasonably request from time to time, in order to effectuate the purposes and to carry out the terms of this Agreement.

Section<u>Financial Statements; Servicing Facility</u>.
7.02

In connection with marketing the Mortgage Loans, a Purchaser may make available to a prospective purchaser the audited financial statements of the Company, which shall include information relating to the Company, for the most recently completed two fiscal years for which such financial statements are available, as well as a Consolidated Statement of Condition at the end of the last two fiscal years covered by such Consolidated Statement of Operations. The Company also shall make available any comparable interim statements to the extent any such statements have been prepared by or on behalf of the Company (and are available upon request to members or stockholders of the Company or to the public at large).

The Company also shall make available to a Purchaser or prospective purchaser a knowledgeable financial or accounting officer for the purpose of answering questions respecting recent developments affecting the Company or the financial statements of the Company, and to permit any prospective purchaser to inspect the Company's servicing facilities for the purpose of satisfying such prospective purchaser that the Company has the ability to service the Mortgage Loans as provided in this Agreement.

Section<u>Cooperation with Third-party Service Providers</u>.
7.03

The Company shall cooperate with the Purchaser in servicing the Mortgage Loans in accordance with the usual and customary requirements of any credit enhancement, risk management and other service providers and shall otherwise cooperate with the Purchaser in connection with such third-party service providers and the provision of third-party services; *provided, however,* that such requirements are reasonably acceptable to the Company and pose no greater risk, obligation or expense to the Company than otherwise set forth in this Agreement. Any additional costs and/or expenses will be paid by the requesting party.

### ARTICLE VIII

### THE COMPANY

Section<u>Indemnification; Third Party Claims</u>.
8.01

The Company shall indemnify each Purchaser and hold it harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that any Purchaser may sustain in any way related to the failure of the Company to perform its duties and service the Mortgage Loans in strict compliance with the terms of this Agreement; provided, however, that such indemnification shall not include punitive, consequential, exemplary or special damages (other than punitive, consequential, exemplary and special damages required to be paid by the indemnified party under this Agreement to any Person (other than a party to this Agreement or any of its affiliates) arising out of an action or proceeding by such Person, which damages shall be deemed to be direct damages to the party required to pay such punitive, consequential, exemplary or incidental damages). The Company immediately shall notify the Purchasers if a claim is made by a third party with respect to this Agreement or the Mortgage Loans, assume (with the prior written consent of the Purchaser) the defense of any such claim and pay all expenses in connection therewith, including counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it or any Purchaser in respect of such claim. The Company shall follow any written instructions received from the Purchaser in connection with such claim. The Purchasers promptly shall reimburse the Company for all amounts advanced by it pursuant to the preceding sentence except when the claim is in any way related to the Company's indemnification pursuant to Section 3.03, or the failure of the Company to service and administer the Mortgage Loans in strict compliance with the terms of this Agreement. The provisions of this Section 8.01(a) shall survive termination of this Agreement.

Section<u>Merger or Consolidation of the Company</u>.
8.02

Unassociated Document                                                                                                    Page 504 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 226 of 279

The Company shall keep in full effect its existence, rights and franchises as a corporation, and shall obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement or any of the Mortgage Loans and to perform its duties under this Agreement.

Any person into which the Company may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Company shall be a party, or any Person succeeding to the business of the Company, shall be the successor of the Company hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding, *provided*, *however*, that the successor or surviving Person shall be an institution (i) having a GAAP net worth of not less than $25,000,000, (ii) the deposits of which are insured by the FDIC, SAIF and/or BIF, (iii) who  is a Fannie Mae/Freddie Mac-approved company in good standing. Furthermore, in the event the Company transfers or otherwise disposes of all or substantially all of its assets to an affiliate of the Company, such affiliate shall satisfy the condition above, and shall also be fully liable to the Purchasers for all of the Company's obligations and liabilities hereunder.

Section 8.03 Limitation on Liability of Company and Others.

Neither the Company nor any of the directors, officers, employees or agents of the Company shall be under any liability to any Purchaser for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment, provided, however, that this provision shall not protect the Company or any such person against any breach of warranties or representations made herein, or failure to perform its obligations in strict compliance with any standard of care set forth in this Agreement or any other liability which would otherwise be imposed under this Agreement. The Company and any director, officer, employee or agent of the Company may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder. The Company shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Mortgage Loans in accordance with this Agreement and which in its opinion may involve it in any expense or liability, provided, however, that the Company may, with the consent of the Purchasers, undertake any such action which it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto. In such event, the Company shall be entitled to reimbursement from the Purchasers of the reasonable legal expenses and costs of such action, unless any such costs result from a breach of the Company's representations and warranties made herein or its failure to perform its obligations in compliance with this Agreement.

Section 8.04 Limitation on Resignation and Assignment by Company.

Each Purchaser has entered into this Agreement with the Company and subsequent purchasers will purchase the Mortgage Loans in reliance upon the independent status of the Company, and the representations as to the adequacy of its servicing facilities, personnel, records and procedures, its integrity, reputation and financial standing, and the continuance thereof. Therefore, the Company shall neither assign this Agreement or the servicing hereunder or delegate its rights or duties hereunder or any portion hereof or sell or otherwise dispose of all of its property or assets without the prior written consent of each Purchaser, which consent shall not be unreasonably withheld.

Except to the extent provided in Sections 4.01 and 8.02, the Company shall not resign from the obligations and duties hereby imposed on it except by mutual consent of the Company and each Purchaser or upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Company. Any such determination permitting the resignation of the Company shall be evidenced by an Opinion of Counsel to such effect delivered to the Purchasers, which Opinion of Counsel shall be in form and substance acceptable to each Purchaser. No such resignation shall become effective until a successor shall have assumed the Company's responsibilities and obligations hereunder in the manner provided in Section 12.01.

Without in any way limiting the generality of this Section 8.04, in the event that the Company either shall assign this Agreement or the servicing responsibilities hereunder or delegate its duties hereunder or any portion thereof or sell or otherwise dispose of all or substantially all of its property or assets, without the prior written consent of each Purchaser, then any Purchaser shall have the right to terminate this Agreement upon notice given as set forth in Section 10.01, without any payment of any penalty or damages and without any liability whatsoever to the Company or any third party.

### ARTICLE IX

### WHOLE LOAN TRANSFERS AND SECURITIZATION TRANSACTIONS

Section 9.01 Removal of Mortgage Loans from Inclusion Under this Agreement.

The Purchasers and the Company agree that with respect to some or all of the Mortgage Loans, the Purchaser, at its sole option, may effect one or more Whole Loan Transfers or Securitization Transactions, retaining the Company as the servicer thereof or subservicer if a master servicer is employed, or as applicable the "seller/servicer." On the Reconstitution Date, the Mortgage Loans transferred shall cease to be serviced by the Company pursuant to this Agreement; *provided*, *however*, that, in the event that any Mortgage Loan transferred pursuant to this Section 9.01 is rejected by the transferee, the Company shall continue to service such rejected Mortgage Loan on behalf of the Purchaser in accordance with the terms and provisions of this Agreement.

The Company shall cooperate with the Purchaser in connection with each Whole Loan Transfer or Securitization Transaction in accordance with this Section 9.01. In connection therewith the Company shall:

    (a) make all representations and warranties made herein with respect to the Mortgage Loans as of the related Closing Date and with respect to the Company itself as of the closing date of each Whole Loan Transfer or Securitization Transaction and, in the event of a Whole Loan Transfer or Securitization Transaction occurring within twelve (12) months of the related Closing Date or such later period as specified in the related Purchase Price and Terms Letter, the representations and warranties set forth in Section 3.02 of this Agreement with respect to the Mortgage Loans subject to such Whole Loan Transfer or Securitization Transaction as of the date of such Whole Loan Transfer or Securitization Transaction, modified to the extent necessary to accurately reflect the pool statistics of the Mortgage Loans as of the date of such Whole Loan Transfer or Securitization Transaction and any events or circumstances existing subsequent to the related Closing Date(s);

    (b) execute an Assignment, Assumption and Recognition Agreement or at the option of the Purchaser, negotiate in good faith and execute any pooling and servicing agreement or similar agreements (a "Reconstitution Agreement") necessary to effectuate the foregoing provided such agreements create no greater obligation or cost on the part of the Company than otherwise set forth in this Agreement or do not materially and adversely alter the Company's rights hereunder;

    (c) make representations and warranties (1) that the Company has serviced the Mortgage Loans in accordance with the terms of this Agreement, provided accurate statements to the Purchaser pursuant to Section 5.02 of this Agreement, and otherwise complied with all covenants and obligations hereunder and (2) that the Company has taken no action or omitted to take any required action the omission of which would have the effect of impairing any mortgage insurance or guarantee on the Mortgage Loans, and (3) regarding the accuracy of the information provided to the Purchaser by the Company on or before the closing date of the applicable Whole Loan Transfer or Securitization Transaction;

    (d) provide as applicable:

        (i) any and all information and appropriate verification of information which may be reasonably available to the Company, including information regarding the Company's foreclosure, delinquency and loss experience and the Company's underwriting standards, whether through letters of its auditors and counsel or otherwise, as the Purchaser shall request; and

        (ii) such additional opinions of counsel, letters from auditors, and certificates of public officials or officers of the Company as are reasonably believed necessary by the trustee, any rating agency or any credit enhancement provider, as the case may be, in connection with Whole-Loan Transfers or Securitization Transactions; provided, however, that the Purchaser shall pay the reasonable third-party costs associated with the preparation of the foregoing information;

(e) indemnify each Purchaser, each Affiliate designated by any Purchaser, each Person who controls any Purchaser or such Affiliate and the Successor Servicer and hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that each of them may sustain in any way related to any information provided by or on behalf of the Company regarding the Company, the Mortgage Loans or the Underwriting Guidelines which is set forth in any offering document prepared in connection with any Securitization Transaction. For purposes of the previous sentence, "Purchaser" shall mean the Person then acting as the Purchaser under this Agreement and any and all Persons who previously were "Purchasers" under this Agreement and "Successor Servicer" shall mean the Person then acting as a Successor Servicer under this Agreement and any and all Persons who previously were "Successor Servicers" under this Agreement; and

(f) with respect to any Mortgage Loans that are subject to a Securitization Transaction, unless otherwise provided in the related pooling and servicing agreement or similar agreement, the Company shall (i) cause the servicing officer in charge of servicing for the Company to execute and deliver a certification (the "SEC Certification") in the format attached hereto as Exhibit H (or in such other form as may be required by the SEC), which at Purchaser's option shall be (A) attached to any Form 10-K's filed with the Securities and Exchange Commission ("SEC") in connection with the related securitization trust (or similar transaction) or (B) provided to the Purchaser and such other Persons as are specified in the pooling and servicing agreement or similar agreement, and (ii) indemnify the Purchaser and such other Persons as are specified in the pooling and servicing agreement or similar agreement for losses in connection with or relating to the inaccuracy of the SEC Certification provided by the Company.

The Company hereby agrees to the inclusion in any Reconstitution Agreement, where applicable, a section relating to special foreclosure rights in the form of Exhibit L attached hereto which provisions shall be applicable to the Company or any subservicer with respect to the applicable Mortgage Loans.

In the event the Purchaser has elected to have the Company hold record title to the Mortgages, prior to the Reconstitution Date the Company shall prepare an Assignment of Mortgage in blank or to the trustee from the Company acceptable to the Purchaser or the trustee for each Mortgage Loan that is part of the Whole Loan Transfers or Securitization Transactions. The Company shall pay all preparation and recording costs associated therewith if the Assignments of Mortgage have not been previously prepared and recorded in Purchaser's name. The Company shall execute each Assignment of Mortgage, track such Assignments of Mortgage to ensure they have been recorded and deliver them as required by the Purchaser or the trustee upon the Company's receipt thereof. Additionally, the Company shall prepare and execute, at the direction of the Purchaser, any note endorsements in connection with any pooling and servicing agreements.

All Mortgage Loans not sold or transferred pursuant to Whole Loan Transfers or Securitization Transactions shall remain subject to this Agreement and shall continue to be serviced in accordance with the terms of this Agreement and with respect thereto this Agreement shall remain in full force and effect.

**ARTICLE X**

**DEFAULT**

Section 10.01  Events of Default.

Each of the following shall constitute an Event of Default on the part of the Company:

(i) any failure by the Company to remit to the Purchaser any payment required to be made under the terms of this Agreement which continues unremedied for a period of one (1) Business Day after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the Company by the Purchaser or, the Company first becomes aware of such failure; or

(ii) failure by the Company duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Company set forth in this Agreement, including but not limited to breach by the Company of any one or more of the representations, warranties and covenants of the Company as set forth in Section 3.01 of this Agreement which continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Company by the Purchaser or by the Custodian; or

(iii) failure by the Company to maintain its license to do business in any jurisdiction where the Mortgaged Property is located if such license is required; or

(iv) a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, including bankruptcy, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Company and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days; or

(v) the Company shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Company or of or relating to all or substantially all of its assets; or

(vi) the Company shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency, bankruptcy or reorganization statute, make an assignment for the benefit of its creditors, voluntarily suspend payment of its obligations or cease its normal business operations for three Business Days; or

(vii) the Company ceases to meet the servicer eligibility qualifications of Fannie Mae or Freddie Mac; or

(viii) the Company attempts to assign its right to servicing compensation hereunder or to assign this Agreement or the servicing responsibilities hereunder or to delegate its duties hereunder or any portion thereof in violation of Section 8.04.

If the Company obtains knowledge of an Event of Default, the Company shall promptly notify the Purchasers. In each and every such case, so long as an Event of Default shall not have been remedied, in addition to whatever rights any Purchaser may have at law or equity to damages, including injunctive relief and specific performance, any Purchaser, by notice in writing to the Company, may terminate all the rights and obligations of the Company under this Agreement and in and to the Mortgage Loans and the proceeds thereof.

Upon receipt by the Company of such written notice, all authority and power of the Company under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the successor appointed pursuant to Section 12.01. Upon written request from the Purchaser, the Company shall, at its expense, prepare, execute and deliver to the successor entity designated by the Purchaser any and all documents and other instruments, place in such successor's possession all Mortgage Files, and do or cause to be done all other acts or things necessary or appropriate to effect the purposes of such notice of termination, including but not limited to the transfer and endorsement or assignment of the Mortgage Loans and related documents, at the Company's sole expense. The Company shall cooperate with the Purchaser and such successor in effecting the termination of the Company's responsibilities and rights hereunder, including without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by the Company to the Custodial Account or Escrow Account or thereafter received with respect to the Mortgage Loans.

Section 10.02  Waiver of Defaults.

By a written notice, the Purchasers may waive any default by the Company in the performance of its obligations hereunder and its consequences. Upon any waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

**ARTICLE XI**

**TERMINATION**

Section 11.01  Termination.

This Agreement shall terminate upon either: (i) the later of the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan or the disposition of any REO Property with respect to the last Mortgage Loan and the remittance of all funds due hereunder; or (ii) mutual consent of the Company and the Purchaser in writing. The representations and warranties and indemnification provisions contained herein shall survive the termination of this Agreement.

Upon written request from the Purchasers in connection with any such termination, the Company shall prepare, execute and deliver, any and all documents and other instruments, place in the Purchaser's possession all Mortgage Files, and do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise, at the Company's sole expense. The Company agrees to cooperate with the Purchasers and such successor in effecting the termination of the Company's responsibilities and rights hereunder as servicer, including, without limitation, the transfer to such successor for administration by it of all cash then received with respect to the Mortgage Loans.

Section 11.02  Termination Without Cause.

The Purchaser may terminate, at its sole option, any rights the Company may have hereunder with respect to any Mortgage Loan Package, without cause as provided in this Section 11.02. Any such notice of termination shall be in writing and delivered to the Company by registered mail as provided in Section 12.05.

In the event the servicing rights with respect to a Mortgage Loan Package are terminated pursuant to this Section 11.02, the Company shall be entitled to receive, as liquidated damages, upon the transfer of the servicing rights, an amount equal to the fair market value of such servicing rights based on the aggregate outstanding principal amount of the Mortgage Loans as of the termination date, plus all reasonable costs and expenses incurred by the Company in managing the transfer of the servicing. The fair market value of the servicing rights shall be determined based on the average of three bids made by experienced evaluators unaffiliated to the Purchaser and the Company and chosen as follows: one by the Purchaser, one by the Company and one by mutual agreement.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

Section 12.01  Successor to Company.

Prior to termination of the Company's responsibilities and duties under this Agreement pursuant to Sections 8.04, 10.01, 11.01(ii) or pursuant to Section 11.02, the Purchaser shall, (i) succeed to and assume all of the Company's responsibilities, rights, duties and obligations under this Agreement, or (ii) appoint a successor having the characteristics set forth in Section 8.02 and which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of the Company under this Agreement prior to the termination of Company's responsibilities, duties and liabilities under this Agreement. In connection with such appointment and assumption, the Purchaser may make such arrangements for the compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree. In the event that the Company's duties, responsibilities and liabilities under this Agreement should be terminated pursuant to the aforementioned sections, the Company shall discharge such duties and responsibilities during the period from the date it acquires knowledge of such termination until the effective date thereof with the same degree of diligence and prudence which it is obligated to exercise under this Agreement, and shall take no action whatsoever that might impair or prejudice the rights or financial condition of its successor. The resignation or removal of the Company pursuant to the aforementioned sections shall not become effective until a successor shall be appointed pursuant to this Section 12.01 and shall in no event relieve the Company of the representations and warranties made pursuant to Sections 3.01 and 3.02 and the remedies available to the Purchaser under Section 3.03, it being understood and agreed that the provisions of such Sections 3.01, 3.02, and 3.03 shall be applicable to the Company notwithstanding any such sale, assignment, resignation or termination of the Company, or the termination of this Agreement.

Any successor appointed as provided herein shall execute, acknowledge and deliver to the Company and to the Purchaser an instrument accepting such appointment, wherein the successor shall make the representations and warranties set forth in Section 3.01, except for subsections (h), (i) and (k) thereof, whereupon such successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Company, with like effect as if originally named as a party to this Agreement. Any termination or resignation of the Company or termination of this Agreement pursuant to Section 8.04, 10.01, 11.01 or 11.02 shall not affect any claims that any Purchaser may have against the Company arising out of the Company's actions or failure to act prior to any such termination or resignation.

The Company shall deliver promptly to the successor servicer the funds in the Custodial Account and Escrow Account and all Mortgage Files and related documents and statements held by it hereunder and the Company shall account for all funds and shall execute and deliver such instruments and do such other things as may reasonably be required to more fully and definitively vest in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Company.

Unless the Company is terminated pursuant to Section 11.02, the Purchaser shall be entitled to be reimbursed from the Company for all costs associated with the transfer of servicing, including, without limitation, any costs or expenses associated with the complete transfer of all servicing data and the completion, correction or manipulation of such servicing data as may be required by the Purchaser to correct any errors or insufficiencies in the servicing data or otherwise to enable the Purchaser to service the Mortgage Loans properly and effectively.

Upon a successor's acceptance of appointment as such, the Company shall notify by mail the Purchaser of such appointment in accordance with the procedures set forth in Section 12.05.

Section 12.02  Amendment.

This Agreement may be amended from time to time by the Company and by written agreement signed by the Company and the Purchaser.

Section 12.03  Governing Law.

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

EACH OF THE COMPANY AND THE PURCHASERS HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OR ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY OTHER DOCUMENTS AND INSTRUMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF THE COMPANY OR THE PURCHASER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PURCHASER TO ENTER INTO THIS AGREEMENT.

Section 12.04  Arbitration.

In the event a claim or controversy arises concerning the interpretation or enforcement of the terms of this Agreement, the parties hereto agree that such claim or controversy may be settled by final, binding arbitration if the parties hereto, as applicable, consent to such arbitration at the time such claim or controversy arises which consent may be withheld by any party hereto in its sole discretion.

Section 12.05  Duration of Agreement.

This Agreement shall continue in existence and effect until terminated as herein provided. This Agreement shall continue notwithstanding transfers of the Mortgage Loans by the Purchaser.

Section 12.06  Notices.

Unassociated Document                                                                                    Page 507 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 229 of 279

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, postage prepaid, addressed as follows:

    (i) if to the Company:

        Paul Financial, LLC
        1401 Los Gamos Dr
        San Rafael, CA 94903
        Attention: Manager, Secondary Marketing
        Telephone: 415-479-9700
        Fax:
        or such other address as may hereafter be furnished to the Purchasers in writing by the Company;

    (ii) if to any Purchaser:

        Luminent Mortgage Capital, Inc.
        One Commerce Square,
        2005 Market Street, Suite 2100
        Philadelphia, PA 19103
        Attention: Trez Moore
        Telephone: (215) 564-5900
        Fax: (215) 564-5990

        with a copy to:
        Luminent Mortgage Capital Inc.
        One Market Street, Spear Tower, 30th floor
        San Francisco, CA 94105
        Attention: Christopher Zyda
        Telephone: 415-978-3000
        Fax: 415-978-3014

    or such other address as may hereafter be furnished to the Company in writing by any Purchaser.

## Section 12.07 Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

## Section 12.08 Relationship of Parties.

Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties hereto and the services of the Company shall be rendered as an independent contractor and not as agent for any Purchaser.

## Section 12.09 Execution; Successors and Assigns.

This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement. Subject to Sections 8.02 and 8.04, this Agreement shall inure to the benefit of and be binding upon the Company and each Purchaser and their respective successors and assigns.

## Section 12.10 Recordation of Assignments of Mortgage.

To the extent permitted by applicable law, each of the Assignments of Mortgage is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected at the Company's expense, in the event recordation is either necessary or advisable in accordance with Acceptable Servicing Practices or under applicable law or is requested by the Purchaser at its sole option in the case of Mortgage Loans that are not registered on MERS.

## Section 12.11 Assignment by Purchaser.

The Purchaser shall have the right, without the consent of the Company but subject to the limits set forth in Section 2.02 and Section 9.01 hereof, to assign, in whole or in part, its interest under this Agreement with respect to some or all of the Mortgage Loans, and designate any person to exercise any rights of the Purchaser hereunder, by executing an Assignment, Assumption and Recognition Agreement and the assignee or designee shall accede to the rights and obligations hereunder of the Purchaser with respect to such Mortgage Loans. All references to the Purchaser in this Agreement shall be deemed to include its assignee or designee. In the event the Purchaser assigns this Agreement, and the assignee assumes any of the Purchaser's obligations hereunder, the Company acknowledges and agrees to look solely to such assignee, and not the Purchaser, for performance of the obligations so assumed and the Purchaser shall be relieved from any liability to the Company with respect thereto.

## Section 12.12 Solicitation of Mortgagor.

From and after the Closing Date, the Company agrees that it will not take any action or permit or cause any action to be taken by any of its agents or affiliates, or by any independent contractors or independent mortgage brokerage companies on the Company's behalf, to personally, by telephone, mail or electronic mail, solicit the Mortgagor under any Mortgage Loan for the purpose of refinancing such Mortgage Loan. It is understood and agreed that (i) promotions undertaken by the Company or any of its affiliates which are directed to the general public at large, including, without limitation, mass mailings based on commercially acquired mailing lists, newspaper, radio or television advertisements shall not constitute solicitation under this Section, nor is the Company prohibited from responding to unsolicited requests or inquiries made by a Mortgagor or an agent of a Mortgagor and (ii) all rights and benefits relating to the solicitation of any Mortgagors to refinance any Mortgage Loans and the attendant rights, title and interest in and to the list of such Mortgagors and data relating to their mortgages (including insurance renewal dates) shall be transferred to the Purchaser on the Closing Date and the Company shall take no action to undermine these rights and benefits.

## Section 12.13 Further Agreements.

Each of the Purchasers and the Company agrees to execute and deliver to the other such additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 12.14  Confidential Information.

    The Company shall keep confidential and shall not divulge to any party, without the Purchaser's prior written consent, the price paid by the Purchaser for the Mortgage Loans, except to the extent that it is reasonable and necessary for the Company to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies.

    Each of the Purchasers and the Company agrees that it (i) shall comply with all applicable laws and regulations regarding the privacy or security of Consumer Information, (ii) shall not collect, create, use, store, access, disclose or otherwise handle Consumer Information in any manner inconsistent with any applicable laws or regulations regarding the privacy or security of Consumer Information, (iii) shall not disclose Consumer Information to any affiliated or non-affiliated third party except to enforce or preserve its rights, as otherwise permitted or required by applicable law (or by regulatory authorities having jurisdiction in the premises) or, in the case of the Company, at the specific written direction of any Purchaser, (iv) shall maintain appropriate administrative, technical and physical safeguards to protect the security, confidentiality and integrity of Consumer Information, including maintaining security measures designed to meet the Interagency Guidelines Establishing Standards for Safeguarding Consumer Information published in final form on February 1, 2001, 66 Fed. Reg. 8616, and the rules promulgated thereunder and (v) shall promptly notify the other party in writing upon becoming aware of any actual breach and of any suspected breach of this section. The Company shall promptly provide any Purchaser's regulators information regarding such security measures upon the reasonable request of such Purchaser, which information shall include, but not be limited to, any SAS 70 or similar independent audit reports, summaries of test results or equivalent measures taken by the Company with respect to its security measures, as agreed upon by the parties. Each party shall indemnify and defend the other party against, and shall hold the other party harmless from, any cost, expense, loss, claim or other liability that such other party may suffer as a result of or in connection with its failure to comply with or perform the obligations set forth in this section. The restrictions set forth herein shall survive the termination of this Agreement.

Section 12.15  Equal Opportunity.

    Each of the Purchasers and the Company represents that it is an equal opportunity employer and that it does not discriminate in employment of persons or awarding of subcontracts because of a person's race, sex, age, religion, national origin, veteran or handicap status. The Company is aware of and fully informed of each Purchaser's responsibilities and agrees to the provisions under the following: (a) Executive Order 11246, as amended or superseded in whole or in part, and as contained in Section 202 of said Executive Order as found at 41 C.F.R. § 60-1.4(a)(1-7); (b) Section 503 of the Rehabilitation Act of 1973 as contained in 41 C.F.R. § 60-741.4; and (c) The Vietnam Era Veterans' Readjustment Assistance Act of 1974 as contained in 41 C.F.R. § 60-250.4.

Section 12.16  Counterparts.

    This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 12.17  Exhibits.

    The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 12.18  General Interpretive Principles.

    For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

        (a)  the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

        (b)  accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

        (c)  references herein to "Articles", "Sections", "Subsections", "Paragraphs", and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

        (d)  a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

        (e)  the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

        (f)  the term "include" or "including" shall mean without limitation by reason of enumeration.

Section 12.19  Reproduction of Documents.

    This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 12.20  Purchase Price and Terms Letter.

    The terms and conditions set forth in the Purchase Price and Terms Letter among the Purchasers and the Company with respect to each Closing Date shall be incorporated herein. In the event of any conflict between the terms of this Agreement and the related Purchase Price and Terms Letter, the Purchase Price and Terms Letter shall control.

[SIGNATURES FOLLOW]

Unassociated Document         Page 509 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 231 of 279

IN WITNESS WHEREOF, the Company and the Purchasers have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

COMPANY

**PAUL FINANCIAL, LLC**

By: _____
       Name:
       Title:

PURCHASERS

**LUMINENT MORTGAGE CAPITAL, INC.**

By: _____
       Name:
       Title:

**MERCURY MORTGAGE FINANCE STATUTORY TRUST**

By: _____
       Name:
       Title:

**MAIA MORTGAGE FINANCE STATUTORY TRUST**

By: _____
       Name:
       Title:

Unassociated Document                                           Page 510 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 232 of 279

EXHIBIT A

FORM OF MORTGAGE LOAN SCHEDULE

[On file with Purchaser]

EXHIBIT B

CONTENTS OF EACH MORTGAGE FILE

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items, which shall be available for inspection by the Purchaser and any prospective Purchaser, and which shall be retained by the Company in the Servicing File or delivered to the Custodian pursuant to Sections 2.01, 2.02 and 2.03 of the Flow Sale and Servicing Agreement to which this Exhibit is attached (the "Agreement"):

1.  The original Mortgage Note endorsed "Pay to the order of _____, without recourse" and signed in the name of the Company by an authorized officer (provided that, in the event the Mortgage Loan was acquired by the Company in a merger, the signature must be in the following form: "[Company], successor by merger to [name of predecessor]"; and in the event that the Mortgage Loan was acquired or originated by the Company while doing business under another name, the signature must be in the following form: "[Company], formerly known as [previous name]"). The Mortgage Note must contain all necessary intervening endorsements showing a complete chain of endorsement from the originator (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note);

2.  The original of any guarantee executed in connection with the Mortgage Note (if any).

3.  The original Mortgage, with evidence of recording thereon, except as follows. If in connection with any Mortgage Loan, the Company cannot deliver or cause to be delivered the original Mortgage with evidence of recording thereon on or prior to the Closing Date because of a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage has been lost or because such public recording office retains the original recorded Mortgage, the Company shall deliver or cause to be delivered to the Custodian, a photocopy of such Mortgage, together with (i) in the case of a delay caused by the public recording office, an Officer's Certificate of the Company stating that such Mortgage has been dispatched to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Custodian upon receipt thereof by the Company; or (ii) in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office or by the title insurance company that issued the title policy to be a true and complete copy of the original recorded Mortgage.

4.  The originals or certified true copies of any document sent for recordation of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon, or, if the original of any such agreement with evidence of recording thereon has not been returned by the public recording office where such agreement has been delivered for recordation or such agreement has been lost or such public recording office retains the original recorded agreement, a photocopy of such agreement, certified by the Company or its agent to be a true and correct copy of the agreement delivered to the appropriate public recording office for recordation. The original recorded agreement, or, in the case of a agreement where a public recording office retains the original recorded agreement or in the case where an agreement is lost after recordation in a public recording office, a copy of such agreement certified by such public recording office to be a true and complete copy of the original recorded agreement, will be promptly delivered to the Custodian upon receipt thereof by the Company.

5.  The original Assignment of Mortgage, in blank, for each Mortgage Loan, in form and substance acceptable for recording (except for the insertion of the name of the assignee and recording information). If the Mortgage Loan was acquired by the Company in a merger, the Assignment of Mortgage must be made by "[Company], successor by merger to [name of predecessor]." If the Mortgage Loan was acquired or originated by the Company while doing business under another name, the Assignment of Mortgage must be made by "[Company], formerly known as [previous name]." Subject to the foregoing and where permitted under the applicable laws of the jurisdiction wherein the Mortgaged property is located, such Assignments of Mortgage may be made by blanket assignments for Mortgage Loans secured by the Mortgaged Properties located in the same county. If the related Mortgage has been recorded in the name of Mortgage Electronic Registration Systems, Inc. ("MERS") or its designee, no Assignment of Mortgage will be required to be prepared or delivered and instead, the Company shall take all actions as are necessary to cause the Purchaser to be shown as the owner of the related Mortgage Loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

6.  For any Mortgage Loan not recorded in the name of MERS, originals or certified true copies of documents sent for recordation of all intervening assignments of the Mortgage with evidence of recording thereon, or if any such intervening assignment has not been returned from the applicable recording office or has been lost or if such public recording office retains the original recorded assignments of mortgage, the Company shall deliver or cause to be delivered to the Custodian, a photocopy of such intervening assignment, together with (i) in the case of a delay caused by the public recording office, an Officer's Certificate of the Company stating that such intervening Assignment of Mortgage has been dispatched to the appropriate public recording office for recordation and that such original recorded intervening Assignment of Mortgage or a copy of such intervening Assignment of Mortgage certified by the appropriate public recording office or by the title insurance company that issued the title policy to be a true and complete copy of the original recorded intervening Assignment of Mortgage will be promptly delivered to the Custodian upon receipt thereof by the Company; or (ii) in the case of an intervening assignment where a public recording office retains the original recorded intervening Assignment of Mortgage or in the case where an intervening Assignment of Mortgage is lost after recordation in a public recording office, a copy of such intervening Assignment of Mortgage certified by such public recording office to be a true and complete copy of the original recorded intervening Assignment of Mortgage.

7.  The original PMI Policy or certificate of insurance, where required pursuant to the Agreement.

8.  The original mortgagee policy of title insurance or evidence of title.

9.  Any security agreement, chattel mortgage or equivalent executed in connection with the Mortgage.

10. For each Mortgage Loan which is secured by a residential long-term lease, if any, a copy of the lease with evidence of recording indicated thereon, or, if the lease is in the process of being recorded, a photocopy of the lease, certified by an officer of the respective prior owner of such Mortgage Loan or by the applicable title insurance company, closing/settlement/escrow agent or company or closing attorney to be a true and correct copy of the lease transmitted for recordation.

11. For each Mortgage Loan secured by Co-op Shares, the originals of the following documents or instruments:

      (A) the stock certificate;

      (B) the stock power executed in blank;

      (C) the executed proprietary lease;

      (D) the executed recognition agreement;

      (E) the executed assignment of recognition agreement;

Unassociated Document                                                        Page 512 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 234 of 279

(F) the executed UCC-1 financing statement with evidence of recording thereon; and

(G) executed UCC-3 financing statements or other appropriate UCC financing statements required by state law, evidencing a complete and unbroken line from the mortgagee to the Trustee with evidence of recording thereon (or in a form suitable for recordation).

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items to the extent in the possession of the Company or in the possession of the Company's agent(s):

12.     The original hazard insurance policy and, if required by law, flood insurance policy, in accordance with Section 4.10 of the Agreement.

13.     Residential loan application.

14.     Mortgage Loan closing statement.

15.     Verification of employment and income.

16.     Verification of acceptable evidence of source and amount of down payment.

17.     Credit report on the Mortgagor.

18.     Residential appraisal report.

19.     Photograph of the Mortgaged Property.

20.     Survey of the Mortgaged Property, if required by the title company or applicable law.

21.     Copy of each instrument necessary to complete identification of any exception set forth in the exception schedule in the title policy, i.e. map or plat, restrictions, easements, sewer agreements, home association declarations, etc.

22.     All required disclosure statements.

23.     If available, termite report, structural engineer's report, water potability and septic certification.

24.     Sales contract, if applicable.

25.     Evidence of payment of taxes and insurance premiums, insurance claim files, correspondence, current and historical computerized data files, and all other processing, underwriting and closing papers and records which are customarily contained in a mortgage file and which are required to document the Mortgage Loan or to service the Mortgage Loan.

26.     Amortization schedule, if available.

27.     Original power of attorney, if applicable.

In the event of a delay by the public recording office in returning any recorded document, the Company shall deliver to the Custodian, within 180 days of the Closing Date, an Officer's Certificate which shall (i) identify the recorded document, (ii) state that the recorded document has not been delivered to the Custodian due solely to a delay caused by the public recording office, (iii) state the amount of time generally required by the applicable recording office to record and return a document submitted for recordation, and (iv) specify the date the applicable recorded document will be delivered to the Custodian. The Company shall be required to deliver to the Custodian the applicable recorded document by the date specified in (iv) above. An extension of the date specified in (iv) above may be requested form the Purchaser, which consent shall not be unreasonably withheld.

Unassociated Document                                      Page 513 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 235 of 279

EXHIBIT C

FORM OF CUSTODIAL AGREEMENT

EXHIBIT D

FORM OF ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT

[DATE OF ASSIGNMENT]

ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT dated _____, among _____, a _____ corporation having an office at _____ ("Assignor"), _____, having an office at _____ ("Assignee") and [NAME OF COMPANY] (the "Company"), having an office at [INSERT COMPANY ADDRESS]:

For and in consideration of the sum of one dollar ($1.00) and other valuable consideration the receipt and sufficiency of which are hereby acknowledged, and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1. With respect to the Mortgage Loans listed on Exhibit A hereto, the Assignor hereby grants, transfers and assigns to Assignee all of the right, title and interest of Assignor, as Purchaser, in, to and under that certain Flow Sale and Servicing Agreement, (the "Flow Sale and Servicing Agreement"), dated as of [INSERT DATE OF AGREEMENT], and the Memorandum of Sale dated [INSERT DATE] (together with the Flow Sale and Servicing Agreement, the "Flow Sale Agreement"), each by and among Luminent Mortgage Capital, Inc., Mercury Mortgage Finance Statutory Trust, Maia Mortgage Finance Statutory Trust, as purchasers (collectively, the "Purchasers", and individually, as the purchaser of any Mortgage Loan under the Flow Sale Agreement, the "Purchaser"), and the Company, and the Mortgage Loans delivered thereunder by the Company to the Assignor, and that certain Custodial Agreement, (the "Custodial Agreement"), dated as of [INSERT DATE OF AGREEMENT], by and among the Company, the Purchasers and _____ (the "Custodian").

2. The Assignor warrants and represents to, and covenants with, the Assignee that:

a. The Assignor is the lawful owner of the Mortgage Loans with the full right to transfer the Mortgage Loans free from any and all claims and encumbrances whatsoever;

b. The Assignor has not received notice of, and has no knowledge of, any offsets, counterclaims or other defenses available to the Company with respect to the Flow Sale Agreement or the Mortgage Loans;

c. The Assignor has not waived or agreed to any waiver under, or agreed to any amendment or other modification, of the Flow Sale Agreement, the Custodial Agreement or the Mortgage Loans, including without limitation the transfer of the servicing obligations under the Flow Sale Agreement. The Assignor has no knowledge of, and has not received notice of, any waivers under or amendments or other modifications of, or assignments of rights or obligations under, the Flow Sale Agreement or the Mortgage Loans; and

d. Neither the Assignor nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Mortgage Loans, any interest in the Mortgage Loans or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Mortgage Loans, any interest in the Mortgage Loans or any other similar security from, or otherwise approached or negotiated with respect to the Mortgage Loans, any interest in the Mortgage Loans or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action which would constitute a distribution of the Mortgage Loans under the Securities Act of 1933 (the "Securities Act") or which would render the disposition of the Mortgage Loans a violation of Section 5 of the Securities Act or require registration pursuant thereto.

3. That Assignee warrants and represent to, and covenants with, the Assignor and the Company pursuant to Section 12.10 of the Flow Sale Agreement that:

a. The Assignee agrees to be bound, as Purchaser, by all of the terms, covenants and conditions of the Flow Sale Agreement, the Mortgage Loans and the Custodial Agreement, and from and after the date hereof, the Assignee assumes for the benefit of each of the Company and the Assignor all of the Assignor's obligations as purchaser thereunder;

b. The Assignee understands that the Mortgage Loans have not been registered under the Securities Act or the securities laws of any state;

c. The purchase price being paid by the Assignee for the Mortgage Loans is in excess of $250,000.00 and will be paid by cash remittance of the full purchase price within 60 days of the sale;

d. The Assignee is acquiring the Mortgage Loans for investment for its own account only and not for any other person. In this connection, neither the Assignee nor any person authorized to act therefor has offered to sell the Mortgage Loans by means of any general advertising or general solicitation within the meaning of Rule 502(c) Regulation D, promulgated under the Securities Act;

e. The Assignee considers itself a substantial sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Mortgage Loans;

f. The Assignee has been furnished with all information regarding the Mortgage Loans that it has requested from the Assignor or the Company;

g. Neither the Assignee nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Mortgage Loans, any interest in the Mortgage Loans or any other similar security to, or solicited any offer to buy or accepted a transfer, pledge or other disposition of the Mortgage Loans, any interest in the Mortgage Loans or any other similar security from, or otherwise approached or negotiated with respect to the Mortgage Loans, any interest in the Mortgage Loans or any other similar security with, any person in any manner which would constitute a distribution of the Mortgage Loans under the Securities Act or which would render the disposition of the Mortgage Loans a violation of Section 5 of the Securities Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Mortgage Loans; and

h. Either (1) the Assignee is not an employee benefit plan ("Plan") within the meaning of section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or a plan ("Plan") within the meaning of section 4975(e)(1) of the Internal Revenue Code of 1986 ("Code"), and the Assignee is not directly or indirectly purchasing the Mortgage Loans on behalf of, investment manager of, as named fiduciary of, as trustee of, or with assets of, a Plan; or (2) the Assignee's purchase of the Mortgage Loans will not result in a prohibited transaction under section 406 of ERISA or section 4975 of the Code.

i. The Assignee's address for purposes of all notices and correspondence related to the Mortgage Loans and the Flow Sale Agreement is:

[NAME AND ADDRESS OF ASSIGNEE]
Attention: _____
Telephone: _____
Fax: _____

The Assignee's wire transfer instructions for purposes of all remittances and payments related to the Mortgage Loans and the Flow Sale Agreement is:

> For the account of [NAME OF ASSIGNEE]
> A/C#: _____
> ABA#: _____
> Attention: _____
> Taxpayer ID#: _____

4. Accuracy of the Servicing Agreement.

The Company and the Assignor represent and warrant to the Assignee that (i) attached hereto as <u>Exhibit B</u> are true, accurate and complete copies of the Flow Sale Agreement, the Custodial Agreement and all amendments and modifications, if any, thereto, (ii) neither the Flow Sale Agreement nor the Custodial Agreement has been amended or modified in any respect, except as set forth in this Agreement, and (iii) no notice of termination has been given to the Company under the Flow Sale Agreement. The Company represents and warrants that through the date hereof the Company has serviced the Mortgage Loans in accordance with the terms of the Flow Sale Agreement.

5. Recognition of Assignee.

From and after the date hereof, the Company shall note the transfer of the Mortgage Loans to the Assignee in its books and records, the Company shall recognize the Assignee as the owner of the Mortgage Loans and the Company shall service the Mortgage Loans for the benefit of the Assignee pursuant to the Flow Sale Agreement, the terms of which are incorporated herein by reference. It is the intention of the Assignor, the Company and the Assignee that the Flow Sale Agreement and the Custodial Agreement shall be binding upon and inure to the benefit of the Company and the Assignee and their respective successors and assigns.

[Signatures Follow]

IN WITNESS WHEREOF, the parties have caused this Assignment, Assumption and Recognition Agreement be executed by their duly authorized officers as of the date first above written.

[NAME OF ASSIGNOR]                                    [NAME OF ASSIGNEE]

By:                                                    By:
Name: _____                          Name: _____

Its: _____                           Its: _____


[NAME OF COMPANY]
Company

By:
Name: _____

Its: _____

Unassociated Document                                                                 Page 517 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 239 of 279

EXHIBIT A

to the Assignment, Assumption and Recognition Agreement

MORTGAGE LOAN SCHEDULE

Unassociated Document                                                Page 518 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 240 of 279

EXHIBIT B

to the Assignment, Assumption and Recognition Agreement

EXECUTION COPIES OF FLOW SALE AND SERVICING AGREEMENT
AND MEMORANDUM OF SALE

EXHIBIT E

<u>UNDERWRITING GUIDELINES</u>

[On file with Purchaser]

Unassociated Document                                                                 Page 520 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 242 of 279

EXHIBIT F

REPRESENTATIONS AND WARRANTIES
REGARDING INDIVIDUAL MORTGAGE LOANS

(a) Mortgage Loans as Described.

The information set forth in the Mortgage Loan Schedule annexed to the related Memorandum of Sale and the information contained on the related electronic data file delivered to the Purchaser is complete, true and correct;

(b) Payments Current.

All payments required to be made prior to the related Cut-off Date for the Mortgage Loan under the terms of the Mortgage Note have been made and credited. No payment under any Mortgage Loan has ever been 30 days or more delinquent. The first two (2) Monthly Payments after the related Cut-off Date shall be made with respect to the Mortgage Loan within the respective month in which it is due, all in accordance with the terms of the Mortgage Note;

(c) [Reserved].

(d) No Outstanding Charges.

There are no defaults in complying with the terms of the Mortgages, and there are no delinquent taxes, governmental assessments, insurance premiums, leasehold payments, ground rents, water, sewer and municipal charges, including assessments payable in future installments or any other charge affecting the lien priority of the related Mortgaged Property. The Company has not advanced funds, or induced, or solicited directly or indirectly, the payment of any amount required under the Mortgage Loan, except for interest accruing from the date of the Mortgage Note or date of disbursement of the Mortgage Loan proceeds, whichever is later, to the day which precedes by one month the Due Date of the first installment of principal and interest;

(e) Original Terms Unmodified.

The terms of the Mortgage Note and Mortgage have not been impaired, waived, altered or modified in any respect, except by a written instrument which has been recorded, if necessary, to protect the interests of the Purchaser and maintain the lien priority of the Mortgage and which has been delivered to the Custodian. The substance of any such waiver, alteration or modification has been approved by the issuer of any related PMI Policy and the title insurer, to the extent required by the policy, and its terms are reflected on the Mortgage Loan Schedule. No instrument of waiver, alteration or modification has been executed, and no Mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the issuer of any related PMI Policy and the title insurer, to the extent required by the policy, and which assumption agreement is part of the Mortgage File delivered to the Custodian and the terms of which are reflected on the related Mortgage Loan Schedule;

(f) No Defenses.

The Mortgage Note and the Mortgage are not subject to any right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury, nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render either the Mortgage Note or the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto, and no Mortgagor was a debtor in any state or federal bankruptcy or insolvency proceeding at the time the Mortgage Loan was originated;

(g) No Satisfaction of Mortgage.

The Mortgage has not been satisfied, canceled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such satisfaction, release, cancellation, subordination or rescission;

(h) Validity of Mortgage Documents.

The Mortgage Note and the Mortgage and related documents are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms. All parties to the Mortgage Note and the Mortgage had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage, and the Mortgage Note and the Mortgage have been duly and properly executed by such parties;

(i) No Fraud.

No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Company, or to the best of the Company's knowledge after reasonable inquiry, the Mortgagor, the appraiser, any builder, or any developer, or any other party involved in the solicitation or origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan or in connection with the sale of such Mortgage Loan to the Purchaser, and there are no circumstances existing with respect to the Mortgage Loan which would permit the primary mortgage guaranty insurer to deny coverage under any insurance policy;

(j) Compliance with Applicable Laws.

All requirements of federal, state and local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, predatory and abusive lending, equal credit opportunity or disclosure laws applicable to the solicitation, origination and servicing of the Mortgage Loan have been complied with, the Mortgagor received all disclosure materials required by applicable law with respect to the making of mortgage loans of the same type as the Mortgage Loan and, if the Mortgage Loan is a refinanced Mortgage Loan, rescission materials required by applicable laws, and the Company shall maintain in its possession, available for the Purchaser's inspection, and shall deliver to the Purchaser upon demand, evidence of compliance with all such requirements. All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including, but not limited to, certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities;

(k) Fair Credit Reporting Act.

The Company has fully furnished, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on the related Mortgagor's credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis.

(l) Location and Type of Mortgaged Property.

The Mortgaged Property is located in the state identified in the Mortgage Loan Schedule and consists of a contiguous parcel of real property with a detached single family residence erected thereon, or a two- to four-family dwelling, or an individual condominium unit in a condominium project, or an individual unit in a planned unit development, or, in the case of a Mortgage Loan secured by a Co-op Share, leases or occupancy agreements. None of the Mortgaged Properties are Manufactured Homes, log homes, mobile homes, geodesic domes or other unique property types. As of the respective appraisal date for each Mortgaged Property, no portion of the Mortgaged Property was being used for commercial or mixed-use purposes and, to the Company's knowledge, since the date of such Appraisal, no portion of the Mortgaged Property has been used for commercial purposes. No Mortgage Loan finances builder inventory. If the Mortgaged Property is next to another Mortgaged Property, such "row houses" do not, in the aggregate for all the Mortgage Loans in the Mortgage Loan Package, represent more than 1.0% of the aggregate principal balance of such Mortgage Loans;

(m)  Valid First Lien.

The Mortgage is a valid, subsisting and enforceable first lien on the Mortgaged Property, including all buildings on the Mortgaged Property and all installations and mechanical, electrical, plumbing, heating and air conditioning systems located in or annexed to such buildings, and all additions, alterations and replacements made at any time with respect to the foregoing. The lien of the Mortgage is subject only to:

(1)  the lien of current real property taxes and assessments not yet due and payable;

(2)  covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Mortgage Loan and (i) referred to or otherwise considered in the Appraisal made for the originator of the Mortgage Loan and (ii) which do not adversely affect the Appraised Value of the Mortgaged Property set forth in such Appraisal;

(3)  if the Mortgaged Property consists of Co-op Shares, any lien for amounts due to the cooperative housing corporation for unpaid assessments or charges or any lien of any assignment of rents or maintenance expenses secured by the real property owned by the cooperative housing corporation; and

(4)  other matters to which like properties are commonly subject which do not individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property.

Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, subsisting and enforceable first lien and first priority security interest on the property described therein and the Company has full right to sell and assign the same to the Purchaser;

(n)  Full Disbursement of Proceeds.

The proceeds of the Mortgage Loan have been fully disbursed to or for the account of the Mortgagor, and there is no requirement for future advances thereunder. Any and all requirements as to completion of any on-site or off-site improvements and any and all requirements as to disbursements of escrow funds for such improvements have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage were paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(o)  Consolidation of Future Advances.

Any future advances made prior to the related Cut-off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term reflected on the Mortgage Loan Schedule. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first lien priority by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to Fannie Mae or Freddie Mac; the consolidated principal amount does not exceed the original principal amount of the Mortgage Loan; the Company shall not make future advances after the related Cut-off Date;

(p)  Ownership.

The Company is the sole owner of record and holder of the Mortgage Loan, and the related Mortgage Note and the Mortgage are not assigned or pledged, and the Company has good and marketable title thereto and has full right and authority to transfer and sell the Mortgage Loan to the Purchaser. The Company is transferring the Mortgage Loan free and clear of any and all encumbrances, liens, pledges, equities, participation interests, claims, agreements with other parties to sell or otherwise transfer the Mortgage Loan, charges or security interests of any nature encumbering such Mortgage Loan;

(q)  Origination/Doing Business.

The Mortgage Loan was originated by a savings and loan association, a savings bank, a commercial bank, a credit union, an insurance company, or similar institution that is supervised and examined by a federal or state authority or by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act. All parties which had any interest in the Mortgage Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (1) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (2) either (A) organized under the laws of such state, (B) qualified to do business in such state, (C) federal savings and loan associations or national banks having principal offices in such state, or (D) not doing business in such state;

(r)  LTV, PMI Policy.

No Mortgage Loan has a LTV greater than 95%. If a Mortgage Loan had an original LTV of 80% or greater, the excess over 75% is and will be insured as to payment defaults by a PMI Policy until terminated pursuant to the Homeowners Protection Act of 1998, 12 USC §4901, et seq. All provisions of such PMI Policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid. The insurer under such PMI Policy is a Qualified Insurer that has a claims paying ability acceptable to Fannie Mae or Freddie Mac. Any Mortgage Loan subject to a PMI Policy obligates the Mortgagor thereunder to maintain the PMI Policy and to pay all premiums and charges in connection therewith. The Mortgage Interest Rate for the Mortgage Loan as set forth on the Mortgage Loan Schedule is net of any such insurance premium;

(s)  Title Insurance.

The Mortgage Loan is covered by an ALTA lender's title insurance policy, acceptable to Fannie Mae or Freddie Mac, or other generally acceptable form of policy of insurance acceptable to Fannie Mae or Freddie Mac, issued by a title insurer acceptable to Fannie Mae or Freddie Mac and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring the Company, its successors and assigns, as to the first priority lien of the Mortgage in the original principal amount of the Mortgage Loan, subject only to the exceptions contained in clauses (1), (2), (3) and (4) of Paragraph (m) of this Section 3.02. For an Adjustable Rate Mortgage Loan, such policy shall include an adjustable rate mortgage endorsement and shall insure the Company, its successors and assigns, against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment to the Mortgage Interest Rate or Monthly Payment. Additionally, such lender's title insurance policy affirmatively insures ingress and egress, and against encroachments by or upon the Mortgaged Property or any interest therein. Where required by state law or regulation, the Mortgagor has been given the opportunity to choose the carrier of such lender's title insurance policy. The Company, its successors and assigns, are the sole insureds of such lender's title insurance policy for each Mortgage Loan, and such lender's title insurance policy is valid and remains in full force and effect and will be in full force and effect upon the sale of the Mortgage Loan to the Purchaser. No claims have been made under such lender's title insurance policy, and no prior holder of the Mortgage, including the Company, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy. In connection with the issuance of such lender's title insurance policy, no unlawful fee, commission,

kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other person or entity, and no such unlawful items have been received, retained or realized by the Company;

(t)  <u>No Defaults</u>.

There is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and neither the Company nor its predecessors have waived any default, breach, violation or event of acceleration;

(u)  <u>No Mechanics' Liens</u>.

There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under the law could give rise to such liens) affecting the related Mortgaged Property which are or may be liens prior to, or equal to coordinate with, the lien of the related Mortgage;

(v)  <u>Location of Improvements; No Encroachments</u>.

All improvements which were considered in determining the Appraised Value of the Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property and no improvements on adjoining properties encroach upon the Mortgaged Property. No improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning law or regulation;

(w)  <u>Payment Terms</u>.

Payments on the Mortgage Loan commenced no more than 60 days after the proceeds of such Mortgage Loan were disbursed to the related Mortgagor. The Mortgage Loans have an original term to maturity of not more than 40 years, with interest payable, to the extent required, in arrears on the Due Date set forth on the related Mortgage Loan Schedule. As to each Adjustable Rate Mortgage Loan on each applicable Adjustment Date, the Mortgage Interest Rate has been or will be adjusted to equal the sum of the Index plus the applicable Gross Margin, rounded up or down to the nearest multiple of 0.125% indicated by the Mortgage Note; *provided* that the Mortgage Interest Rate has not increased or decreased and will not increase or decrease by more than the Periodic Interest Rate Cap on any Adjustment Date, and has not, nor will it in any event, exceed the maximum Mortgage Interest Rate or be lower than the minimum Mortgage Interest Rate listed on the Mortgage Loan Schedule for such Mortgage Loan. The related Mortgage Note requires a monthly payment which is sufficient, during the period prior to the first adjustment to the Mortgage Interest Rate, to fully amortize the outstanding principal balance as of the first day of such period over the then remaining term of such Mortgage Note and to pay interest at the related Mortgage Interest Rate. Except with respect to Option ARM Mortgage Loans, no Mortgage Loan contains terms or provisions which would result in Negative Amortization;

(x)  <u>Customary Provisions</u>.

The Mortgage and related Mortgage Note contain customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure. There is no homestead or other exemption available to a Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage;

(y)  <u>Occupancy of the Mortgaged Property</u>.

As of the date of origination, the Mortgaged Property was lawfully occupied under applicable law and to the best of the Company's knowledge, the Mortgaged Property is lawfully occupied as of the Closing Date;

(z)  <u>No Additional Collateral</u>.

The Mortgage Note is not and has not been secured by any collateral, pledged account or other security except the lien of the corresponding Mortgage and the security interest of any applicable security agreement or chattel mortgage referred to in Paragraph (m) above;

(aa)  <u>Deeds of Trust</u>.

In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Mortgagee to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(bb)  <u>Acceptable Investment</u>.

The Company has no knowledge of any circumstances or conditions with respect to the Mortgage Loan, the Mortgaged Property, the Mortgagor or the Mortgagor's credit standing that can reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value or marketability of the Mortgage Loan;

(cc)  <u>Transfer of Mortgage Loans</u>.

With respect to each Mortgage that is not recorded in the name of MERS or its designee, the Assignment of Mortgage, upon the insertion of the name of the assignee and recording information, is in recordable form (other than the name of the assignee if in blank) and is acceptable for recording under the laws of the jurisdiction in which the related Mortgaged Property is located;

(dd)  <u>Mortgaged Property Undamaged</u>.

The Mortgaged Property is in good repair and undamaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado or other casualty so as to affect adversely the value of the Mortgaged Property as security for the Mortgage Loan or the use for which the premises were intended;

(ee)  <u>Servicing and Collection Practices; Escrow Deposits</u>.

The origination, servicing and collection practices used with respect to the Mortgage Loan have been in accordance with Accepted Servicing Practices and the terms of the Mortgage Note and have been in all material respects legal and proper. All escrow deposits and Escrow Payments, if any, are in the possession of, or under the control of, Seller and have been collected and handled in full compliance with the Real Estate Settlement Procedures Act ("<u>RESPA</u>") and other state and federal laws. No escrow deposits or Escrow Payments or other charges or payments due the Company have been capitalized under the Mortgage Note;

(ff)  <u>No Condemnation</u>.

There is no proceeding pending or to the best of the Company's knowledge threatened for the total or partial condemnation of the related Mortgaged Property;

(gg)  The Appraisal.

The Mortgage File contains an Appraisal of the related Mortgaged Property in a form acceptable to Fannie Mae or Freddie Mac. The appraisal was made and signed, prior to the approval of the Mortgage Loan application, by a Qualified Appraiser (1) who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, (2) whose compensation is not affected by the approval or disapproval of the Mortgage Loan, and (3) who met the minimum qualifications of Fannie Mae or Freddie Mac and Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 and the regulations promulgated thereunder, all as in effect on the date the Mortgage Loan was originated;

(hh)  Insurance.

All buildings on the Mortgaged Property are insured by an insurer generally acceptable to prudent mortgage lending institutions (and to Fannie Mae or Freddie Mac) against loss by fire and such hazards as are covered under a standard extended coverage endorsement and such other hazards as are customary in the area where the Mortgaged Property is located pursuant to insurance policies conforming to Accepted Servicing Practices and the requirements of Section 4.10, in an amount which is not less than the lesser of 100% of the insurable value of the Mortgaged Property and, subject to insurability, the outstanding principal balance of the Mortgage Loan, but in no event less than the minimum amount necessary to fully compensate for any damage or loss on a replacement cost basis. If the Mortgaged Property is a condominium unit, it is included under the coverage afforded by a blanket policy for the project. If the improvements on the Mortgaged Property are in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, then a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect with a generally acceptable insurance carrier and such policy conforms to the requirements of Fannie Mae or Freddie Mac. Such flood insurance policy is in an amount representing coverage not less than the least of (A) the outstanding principal balance of the Mortgage Loan, (B) the full insurable value and (C) the maximum amount of insurance which was available under the Flood Disaster Protection Act of 1973, as amended. All individual insurance policies contain a standard mortgagee clause naming the Company and its successors and assigns as mortgagee, and all premiums thereon have been paid. The Mortgage obligates the Mortgagor thereunder to maintain a hazard insurance policy at the Mortgagor's cost and expense, and on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at such Mortgagor's cost and expense, and to seek reimbursement therefor from the Mortgagor. Each such insurance policy is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect and inure to the benefit of the Purchaser upon the consummation of the transactions contemplated by this Agreement. The Company has not acted or failed to act so as to impair the coverage of any such insurance policy or the validity, binding effect and enforceability thereof;

(ii)  No Impairment of Insurance Coverage.

No action, inaction, or event has occurred and no state of facts exists or has existed that has resulted or will result in the exclusion from, denial of, or defense to coverage under any applicable hazard insurance policy, PMI Policy or bankruptcy bond, irrespective of the cause of such failure of coverage. In connection with the placement of any such insurance, no commission, fee, or other compensation has been or will be received by the Company or any designee of the Company or any corporation which the Company or any officer, director, or employee had a financial interest at the time of placement of such insurance.

(jj)  Servicemembers Civil Relief Act.

The Mortgagor has not notified the Company, and the Company has no knowledge of any relief requested by or provided to the Mortgagor under the Servicemembers Civil Relief Act, as amended, or any similar state law;

(kk)  Balloon Payments, Graduated Payments or Contingent Interests.

With respect to any Mortgage Loan which is identified on the Mortgage Loan Schedule as a balloon mortgage loan (each, a "Balloon Mortgage Loan"), the Mortgage Note is payable in Monthly Payments based on a thirty (30) or forty (40) year amortization schedule with a final Monthly Payment substantially greater than the preceding Monthly Payment which is sufficient to amortize the remaining principal balance of the Balloon Mortgage Loan and such final Monthly Payment shall not be due prior to 180 months following the origination of the Balloon Mortgage Loan. The Mortgage Loan is not a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature;

(ll)  No Construction Loans.

No Mortgage Loan was made in connection with (i) the construction or rehabilitation of a Mortgaged Property or (ii) facilitating the trade-in or exchange of a Mortgaged Property other than a construction-to-permanent loan which has converted to a permanent Mortgage Loan;

(mm)  Underwriting.

Each Mortgage Loan was underwritten in accordance with the Underwriting Guidelines; and the Mortgage Note, the Mortgage and all other documents contained in the Mortgage Files are on Fannie Mae or Freddie Mac uniform instruments or are on forms acceptable to Fannie Mae or Freddie Mac;

(nn)  Buydown Mortgage Loans.

With respect to each Mortgage Loan that is a Buydown Mortgage Loan:

(i)  On or before the date of origination of such Mortgage Loan, the Company and the Mortgagor, or the Company, the Mortgagor and the seller of the Mortgaged Property or a third party entered into a Buydown Agreement. The Buydown Agreement provides that the seller of the Mortgaged Property (or third party) shall deliver to the Company temporary Buydown Funds in an amount equal to the aggregate undiscounted amount of payments that, when added to the amount the Mortgagor on such Mortgage Loan is obligated to pay on each Due Date in accordance with the terms of the Buydown Agreement, is equal to the full scheduled Monthly Payment due on such Mortgage Loan. The temporary Buydown Funds enable the Mortgagor to qualify for the Buydown Mortgage Loan. The effective interest rate of a Buydown Mortgage Loan if less than the interest rate set forth in the related Mortgage Note will increase within the Buydown Period as provided in the related Buydown Agreement so that the effective interest rate will be equal to the interest rate as set forth in the related Mortgage Note. The Buydown Mortgage Loan satisfies the requirements of Fannie Mae or Freddie Mac guidelines;

(ii)  The Mortgage and Mortgage Note reflect the permanent payment terms rather than the payment terms of the Buydown Agreement. The Buydown Agreement provides for the payment by the Mortgagor of the full amount of the Monthly Payment on any Due Date that the Buydown Funds are available. The Buydown Funds were not used to reduce the original principal balance of the Mortgage Loan or to increase the Appraised Value of the Mortgage Property when calculating the Loan-to-Value Ratios for purposes of the Agreement and, if the Buydown Funds were provided by the Company and if required under Fannie Mae or Freddie Mac guidelines, the terms of the Buydown Agreement were disclosed to the Qualified Appraiser of the Mortgaged Property;

(iii)  The Buydown Funds may not be refunded to the Mortgagor unless the Mortgagor makes a principal payment for the outstanding balance of the Mortgage Loan; and

(iv)  As of the date of origination of the Mortgage Loan, the provisions of the related Buydown Agreement complied with the requirements of Fannie Mae or Freddie Mac regarding buydown agreements;

(oo)  Delivery of Mortgage Files.

The Mortgage Loan Documents for the related Mortgage Loans have been delivered to the Custodian in accordance with the Custodial Agreement. The Company is in possession of a complete Mortgage File for each Mortgage Loan in compliance with Exhibit B, except for such documents the originals of which have been delivered to the Custodian. All documents required to be included in the Mortgage File shall be complete, executed as required and in compliance with applicable law. With respect to each Mortgage Loan for which a lost note affidavit has been delivered to the Custodian in place of the original Mortgage Note, the related Mortgage Note is no longer in existence, and, if such Mortgage Loan is subsequently in default, the enforcement of such Mortgage Loan or of the related Mortgage by or on behalf of the Purchaser will not be affected by the absence of the original Mortgage Note.

(pp)  No Bankruptcy.

No Mortgagor was a debtor in any state or federal bankruptcy or insolvency proceeding at the time the Mortgage Loan was originated and, to the best of the Company's knowledge, following the date of origination of the Mortgage Loan, the Mortgagor with respect to the Mortgage Loan was not a debtor in any state or federal bankruptcy or insolvency proceeding, and the Mortgaged Property has not been subject to any bankruptcy or foreclosure proceedings;

(qq)  No Violation of Environmental Laws.

The Mortgaged Property is free from any and all toxic or hazardous substances and there exists no violation of any local, state or federal environmental law, rule or regulation. There is no pending action or proceeding directly involving any Mortgaged Property of which the Company is aware in which compliance with any environmental law, rule or regulation is an issue; and to the best of the Company's knowledge, nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation constituting a prerequisite to use and enjoyment of said property;

(rr)  Texas Refinance Mortgage Loans.

Each Mortgage Loan originated in the state of Texas pursuant to Article XVI, Section 50(a)(6) of the Texas Constitution has been originated in compliance with the provisions of Article XVI, Section 50(a)(6) of the Texas Constitution, Texas Civil Statutes and the Texas Finance Code. If the Mortgage Loan was originated in Texas, it is not a cash-out refinancing;

(ss)  Conversion to Fixed Interest Rate.

No Adjustable Rate Mortgage Loan contains a provision permitting or requiring conversion to a fixed interest rate Mortgage Loan;

(tt)  The Mortgagor.

The Mortgagor is one or more natural persons and/or an Illinois land trust or a "living trust" and such "living trust" is in compliance with Fannie Mae or Freddie Mac guidelines. In the event the Mortgagor is a trust, the trustee of such trust is a natural person and is an obligor under the Mortgage Note in his or her individual capacity;

(uu)  Homeownership and Equity Protection Act; No High Cost Loans.

No Mortgage Loan is (a) a "high cost" loan under the Home Ownership and Equity Protection Act of 1994 as amended, or (b) a "high cost," "threshold," "covered," "predatory," "abusive," or similarly defined loan, including refinance loans, under any other applicable state, federal or local law (or a similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees), provided that any Mortgage Loan secured by a Mortgaged Property in Illinois characterized as a "threshold" loan shall not be a "high cost" loan unless it is characterized as "predatory" under applicable local law or (c) a "High Cost Loan" or "Covered Loan" as defined in the S&P LEVELS Glossary; the Company has implemented and conducted compliance procedures to determine if each Mortgage Loan is "high-cost" home loan under the applicable laws and performed a review of the disclosure provided to the related Mortgagor in accordance with such laws and the related Mortgage Note in order to determine that such Mortgage Loan, if subject to any such law, does not violate any such law;

(vv)  Georgia Mortgage Loans.

No Mortgage Loan secured by property located in Georgia and originated on or after October 1, 2002 and prior to March 7, 2003 meets the definition of a "home loan" under the Georgia Fair Lending Act;

(ww)  Kentucky Mortgage Loans.

No Mortgage Loan secured by property located in the Commonwealth of Kentucky and originated on or after June 24, 2003 had an original principal amount of $200,000 or less;

(xx)  [Reserved]

(yy)  New Jersey Mortgage Loans.

Each Mortgage Loan secured by property located within the State of New Jersey and subject to the provisions of the New Jersey Home Ownership Security Act of 2002 (the "NJ Act") (i) is either a purchase money mortgage loan or a rate-term refinancing and (ii) does not meet definition of a (A) "Covered Home Loan," except for a Mortgage Loan that is (x) a purchase money mortgage loan and (y) neither a "High-Cost Home Loan" nor a "Manufactured Home Loan" under the NJ Act, (B) "High-Cost Home Loan," (C) "Home Improvement Loan" or (D) "Manufactured Housing Loan" under the NJ Act;

(zz)  New York Loans.

No Mortgage Loan is secured by property located in the State of New York, had an original principal balance of $300,000 or less, and has a mortgage application date on or after April 1, 2003, the terms of which loan equal or exceed either the annual percentage rate or the points and fees threshold for "high-cost home loans," as defined in Section 6-L of the New York State Banking Law;

(aaa)  New Mexico Loans.

No Mortgage Loan secured by property located in the State of New Mexico and originated on or after January 1, 2004 meets the definition of a "home loan" under The Home Loan Protection Act;

(bbb)  Qualified Mortgages.

Each Mortgage Loan is a "qualified mortgage" within Section 860G(a)(3) of the Code;

(ccc)  Pledged Asset Loans.

The Mortgage Loan is not a "pledged asset" mortgage loan;

(ddd)   Leaseholds.

If the Mortgage Loan is secured by a long-term residential lease, (i) the lessor under the lease holds a fee simple interest in the land; (ii) the terms of such lease expressly permit the mortgaging of the leasehold estate, the assignment of the lease without the lessor's consent and the acquisition by the holder of the Mortgage of the rights of the lessee upon foreclosure or assignment in lieu of foreclosure or provide the holder of the Mortgage with substantially similar protections; (iii) the terms of such lease do not (A) allow the termination thereof upon the lessee's default without the holder of the Mortgage being entitled to receive written notice of, and opportunity to cure, such default, (B) allow the termination of the lease in the event of damage or destruction as long as the Mortgage is in existence, (C) prohibit the holder of the Mortgage from being insured (or receiving proceeds of insurance) under the hazard insurance policy or policies relating to the Mortgaged Property (D) permit any increase in the rent other than pre-established increases set forth in the lease, (E) the original term of such lease is not less than the term of the related Mortgage; (F) the term of such lease does not terminate earlier than five years after the maturity date of the Mortgage Note, and (G) the Mortgaged Property is located in a jurisdiction in which the use of leasehold estates in transferring ownership in residential properties is a widely accepted practice;

(eee)   Adjustments.

All of the terms of the related Mortgage Note pertaining to interest adjustments, payment adjustments and adjustments of the outstanding principal balance, if any, are enforceable and such adjustments on such Mortgage Loan have been made properly and in accordance with the provisions of such Mortgage Loan, including any required notices, and such adjustments do not and will not affect the priority of the Mortgage lien;

(fff)   FICO Scores.

Each Mortgage Loan has a non-zero FICO score and a minimum FICO score of 620;

(ggg)   Prepayment Penalties.

All information on the Mortgage Loan Schedule and electronic data file delivered to the Purchaser regarding the Prepayment Premium is complete and accurate in all material respects and each Prepayment Premium is permissible and enforceable in accordance with its terms under applicable law. Prepayment Premiums on the Mortgage Loans are applicable to prepayments resulting from both refinancings and sales of the related Mortgaged Properties, as disclosed in the related Mortgage Loan Schedule, and the terms of such Prepayment Premiums do not provide for a waiver or release (i.e., "holidays") during the term of the Prepayment Premium. No Mortgage Loan originated on or after October 1, 2002 provides for the payment of a Prepayment Premium beyond the three year term following the origination of the Mortgage Loan. No Mortgage Loan originated prior to such date provides for the payment of a Prepayment Premium beyond the five-year term following the origination of the Mortgage Loan. With respect to any Mortgage Loan that contains a provision permitting imposition of a Prepayment Premium: (i) prior to the Mortgage Loan's origination, the Mortgagor agreed to such Prepayment Premium in exchange for a monetary benefit, including, but not limited to, a rate or fee reduction, (ii) prior to the Mortgage Loan's origination, the Mortgagor was offered the choice of another mortgage product that did not require payment of such a premium, (iii) the Prepayment Premium is disclosed to the Mortgagor in the loan documents pursuant to applicable state and federal law, and (iv) notwithstanding any state or federal law to the contrary, the Company shall not impose such Prepayment Premium in any instance when the mortgage debt is accelerated as the result of the Mortgagor's default in making the Monthly Payments;

(hhh)   Interest Calculation.

Interest on each Mortgage Loan is calculated on the basis of a 360-day year consisting of twelve 30-day months;

(iii)   Due on Sale.

The Mortgage contains an enforceable provision, to the extent not prohibited by federal law as of the date of such Mortgage, for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the mortgagee thereunder;

(jjj)   Flood Certification Contract.

The Company has obtained a life of loan, transferable flood certification contract with an Approved Flood Policy Insurer acceptable to Purchaser in its sole discretion for each Mortgage Loan and such contract is assignable without penalty, premium or cost to the Purchaser;

(kkk)   Single Premium Credit Life Insurance.

None of the proceeds of the Mortgage Loan were used to finance single premium credit life insurance policies;

(lll)   Tax Service Contracts.

The Company has obtained a life of loan, transferable real estate Tax Service Contract on each Mortgage Loan with an Approved Tax Servicer Contract Provider and such contract is assignable without penalty, premium or cost to the Purchaser;

(mmm)   Debt to Income Ratio.

Each Mortgage Loan has a debt to income ratio of 60% or less. Each Mortgage Loan with an original principal balance of $1 million or more has a debt to income ratio of 50% or less;

(nnn)   No Arbitration Provisions.

With respect to any Mortgage Loan originated on or after August 1, 2004, neither the related Mortgage nor Mortgage Note requires the Mortgagor to submit to arbitration to resolve any dispute arising thereunder or in connection with the origination of such Mortgage Loan; and

(ooo)   OCC Guidelines.

Neither the origination of the Mortgage Loan nor the purchase thereof by the Purchaser will cause the Mortgage Loan or the Purchaser to fail to comply with the OCC Guidelines Establishing Standards for Residential Mortgage Lending Practices.

Unassociated Document               Page 526 of 835
12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 248 of 279

EXHIBIT G

FORM OF OPINION OF COUNSEL

Luminent Mortgage Capital, Inc.
[___]

Re: [NAME OF COMPANY]

Dear Sir/Madam:

I am [general counsel] of [NAME OF COMPANY] (the "Company"), with respect to certain matters in connection with the sale by the Company of certain mortgage loans (the "Mortgage Loans") pursuant to that certain Flow Sale and Servicing Agreement, dated as of [___] (the "Agreement"), by and among the Company and by and among Luminent Mortgage Capital, Inc., Mercury Mortgage Finance Statutory Trust, Maia Mortgage Finance Statutory Trust, as purchasers (collectively, the "Purchasers", and individually, as the purchaser of any Mortgage Loan under the Agreement, the "Purchaser"), which sale is in the form of whole Mortgage Loans. Capitalized terms not otherwise defined herein have the meanings set forth in the Agreement.

I have examined the following documents:

1.       the Agreement;

2.       the Custodial Agreement;

3.       the form of endorsement of the Mortgage Notes; and

4.       such other documents, records and papers as I have deemed necessary and relevant as a basis for this opinion.

To the extent I have deemed necessary and proper, I have relied upon the representations and warranties of the Company contained in the Agreement. I have assumed the authenticity of all documents submitted to me as originals, the genuineness of all signatures, the legal capacity of natural persons and the conformity to the originals of all documents.

Based upon the foregoing, it is my opinion that:

1.       The Company is a [___] duly organized, validly existing and in good standing under the laws of the state of [___].

2.       The Company has the power to engage in the transactions contemplated by the Agreements, the Custodial Agreement and all requisite power, authority and legal right to execute and deliver the Agreement, the Custodial Agreement and the Mortgage Loans, and to perform and observe the terms and conditions of such instruments.

3.       Each person who, as an officer or attorney-in-fact of the Company, signed (a) the Agreement and the Custodial Agreement, and (b) any other document delivered prior hereto or on the date hereof in connection with the sale and servicing of the Mortgage Loans in accordance with the Agreement and the person was, at the respective times of such signing and delivery, and is, as of the date hereof, duly elected or appointed, qualified and acting and as such officer or attorney-in-fact, and the signatures of such persons appearing on such documents are their genuine signatures.

4.       Each of the Agreement, the Custodial Agreement, and the Mortgage Loans, has been duly authorized, executed and delivered by the Company and is a legal, valid and binding agreement enforceable in accordance with its terms, subject to bankruptcy laws and other similar laws of general application affecting rights of creditors and subject to the application of the rules of equity, including those respecting the availability of specific performance, none of which will materially interfere with the realization of the benefits provided thereunder or with the Purchaser's ownership of the Mortgage Loans.

5.       The Company has been duly authorized to allow any of its officers to execute any and all documents by original signature in order to complete the transactions contemplated by the Agreement and the Custodial Agreement, and by original or facsimile signature in order to execute the endorsements to the Mortgage Notes and the assignments of the Mortgages, and the original or facsimile signature of the officer at the Company executing the endorsements to the Mortgage Notes and the assignments of the Mortgages represents the legal and valid signature of said officer of the Company.

6.       Either (i) no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Company of or compliance by the Company with the Agreement, the Custodial Agreement or the sale and delivery of the Mortgage Loans or the consummation of the transactions contemplated by the Agreement, and the Custodial Agreement; or (ii) any required consent, approval, authorization or order has been obtained by the Company.

7.       Neither the consummation of the transactions contemplated by, nor the fulfillment of the terms of the Agreement and the Custodial Agreement, will conflict with or results in or will result in a breach of or constitutes or will constitute a default under the charter or by-laws of the Company, the terms of any indenture or other agreement or instrument to which the Company is a party or by which it is bound or to which it is subject, or violates any statute or order, rule, regulations, writ, injunction or decree of any court, governmental authority or regulatory body to which the Company is subject or by which it is bound.

8.       There is no action, suit, proceeding or investigation pending or, to the best of my knowledge, threatened against the Company which, in my opinion, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Company or in any material impairment of the right or ability of the Company to carry on its business substantially as now conducted or in any material liability on the part of the Company or which would draw into question the validity of the Agreement or the Custodial Agreement, or of any action taken or to be taken in connection with the transactions contemplated thereby, or which would be likely to impair materially the ability of the Company to perform under the terms of the Agreement and the Custodial Agreement.

9.       The sale of each Mortgage Note and Mortgage as and in the manner contemplated by the Agreement is sufficient fully to transfer all right, title and interest of the Company thereto as noteholder and mortgagee, apart from the rights to service the Mortgage Loans pursuant to the Agreement.

10.      The form of endorsement that is to be used with respect to the Mortgage Loans is legally valid and sufficient to duly endorse the Mortgage Notes to the Purchaser. Upon the completion of the endorsement of the Mortgage Notes and the completion of the assignments of the Mortgages, and the recording thereof, the endorsement of the Mortgage Notes, the delivery to the Custodian of the completed assignments of the Mortgages, and the delivery of the original endorsed Mortgage Notes to the Custodian would be sufficient to permit the entity to which such Mortgage Note is initially endorsed at the Purchaser's direction, and to whom such assignment of Mortgages is initially assigned at the Purchaser's direction, to avail itself of all protection available

under applicable law against the claims of any present or future creditors of the Company, and would be sufficient to prevent any other sale, transfer, assignment, pledge or hypothecation of the Mortgages and the Mortgage Notes by the Company from being enforceable.

This opinion is given to you for your sole benefit, and no other person or entity is entitled to rely hereon except that the purchaser or purchasers to which you initially and directly resell the Mortgage Loans may rely on this opinion as if it were addressed to them as of its date.

Sincerely,

Unassociated Document

Page 528 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 250 of 279

EXHIBIT H

<u>SEC CERTIFICATION</u>

I, _____, certify to _____ (the "Depositor"), and its officers, directors and affiliates, and with the knowledge and intent that they will rely upon this certification, that:

(a)  I have reviewed the information required to be delivered to the trustee by the servicer pursuant to the pooling and servicing agreement (the "Servicing Information");

(b)  Based on my knowledge, the Servicing Information, taken as a whole, does not contain erroneous or incomplete information required to be provided to the trustee by the servicer under the pooling and servicing agreement;

(c)  Based on my knowledge, the Servicing Information required to be provided to the trustee by the servicer under the pooling and servicing agreement has been provided to the trustee;

(d)  I am responsible for reviewing the activities performed by the servicer under the pooling and servicing agreement and based upon the review required under the pooling and servicing agreement, and except as disclosed in the report, the servicer has fulfilled its obligations under the pooling and servicing agreement; and

(e)  I have disclosed to _____ all significant deficiencies relating to the servicer's compliance with the minimum servicing standards in accordance with a review conducted in compliance with the Uniform Single Attestation Program for Mortgage Bankers or similar standard as set forth in the pooling and servicing agreement.

Date: _____

_____
[Signature]

_____
[Title]

EXHIBIT I

FORM OF MEMORANDUM OF SALE

CLOSING DATE:

This Memorandum of Sale (this "Memorandum"), dated as of _____ (the "Closing Date"), confirms the sale by PAUL FINANCIAL, LLC (the "Company"), to [LUMINENT MORTGAGE CAPITAL, INC. / MERCURY MORTGAGE FINANCE STATUTORY TRUST / MAIA MORTGAGE FINANCE STATUTORY TRUST] (the "Purchaser"), and the purchase by the Purchaser from the Company, of the first lien [fixed rate] [adjustable rate] residential mortgage loans on a servicing retained basis described on the Mortgage Loan Schedule attached hereto as Schedule I (the "Mortgage Loans"), pursuant to the terms of the Flow Sale and Servicing Agreement (the "Flow Sale and Servicing Agreement"), dated as of _____ , and is by and between the Purchaser and the Company.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company does hereby bargain, sell, convey, assign and transfer to Purchaser without recourse, except as provided in the Flow Sale and Servicing Agreement, and on a servicing retained basis, all right, title and interest of the Company in and to each of the Mortgage Loans, together with all documents maintained as part of the related Mortgage Files, all Mortgaged Properties which secure any Mortgage Loan but are acquired by foreclosure, deed in lieu of foreclosure after the Cut-off Date or otherwise, all payments of principal and interest received on the Mortgage Loans after the Cut-off Date, all other unscheduled collections collected in respect of the Mortgage Loans after the Cut-off Date, and all proceeds of the foregoing, subject, however, to the rights of the Company under the Flow Sale and Servicing Agreement.

The Company has delivered to the Custodian prior to the date hereof the documents with respect to each Mortgage Loan required to be delivered under the Flow Sale and Servicing Agreement.

Capitalized terms that are used herein but are not defined herein shall have the respective meanings set forth in the Flow Sale and Servicing Agreement.

IN WITNESS WHEREOF, the parties hereto, by the hands of their duly authorized officers, execute this Memorandum as of the Closing Date referred to above.

[LUMINENT MORTGAGE CAPITAL, INC.
MERCURY MORTGAGE FINANCE STATUTORY TRUST
MAIA MORTGAGE FINANCE STATUTORY TRUST],
as Purchaser


By:
Name: _____

Its:   _____



PAUL FINANCIAL, LLC,
as Company


By:
Name: _____

Its:   _____

Unassociated Document                                                                 Page 531 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 253 of 279

SCHEDULE I

MORTGAGE LOAN SCHEDULE

Unassociated Document                                                    Page 532 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 254 of 279

EXHIBIT J

SERVICER REQUIREMENTS

[On file with Purchaser]

EXHIBIT K

REGULATION AB COMPLIANCE ADDENDUM

ARTICLE I
DEFINED TERMS

Capitalized terms used but not defined in this Regulation AB Compliance Addendum (this "Reg AB Addendum") shall have the meanings assigned to such terms in the Agreement to which this Reg AB Addendum is attached and of which it forms a part. As used in this Reg AB Addendum, the following terms shall have the meanings set forth below, unless the context clearly indicates otherwise:

Commission: The United States Securities and Exchange Commission.

Company Information: As defined in Section 2.07(a) of this Reg AB Addendum.

Depositor: The depositor, as such term is defined in Regulation AB, with respect to any Securitization Transaction.

Exchange Act: The Securities Exchange Act of 1934, as amended.

Master Servicer: With respect to a Securitization Transaction, the "master servicer," if any, identified by the Purchaser and identified in related transaction documents.

Qualified Correspondent: Any Person from which the Company purchased Mortgage Loans, provided that the following conditions are satisfied: (i) such Mortgage Loans were originated pursuant to an agreement between the Company and such Person that contemplated that such Person would underwrite mortgage loans from time to time, for sale to the Company, in accordance with underwriting guidelines designated by the Company ("Designated Guidelines") or guidelines that do not vary materially from such Designated Guidelines; (ii) such Mortgage Loans were in fact underwritten as described in clause (i) above and were acquired by the Company within 180 days after origination; (iii) either (x) the Designated Guidelines were, at the time such Mortgage Loans were originated, used by the Company in origination of mortgage loans of the same type as the Mortgage Loans for the Company's own account or (y) the Designated Guidelines were, at the time such Mortgage Loans were underwritten, designated by the Company on a consistent basis for use by lenders in originating mortgage loans to be purchased by the Company; and (iv) the Company employed, at the time such Mortgage Loans were acquired by the Company, pre-purchase or post-purchase quality assurance procedures (which may involve, among other things, review of a sample of mortgage loans purchased during a particular time period or through particular channels) designed to ensure that Persons from which it purchased mortgage loans properly applied the underwriting criteria designated by the Company.

Reconstitution: Any Securitization Transaction or Whole Loan Transfer.

Regulation AB: Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

Securities Act: The Securities Act of 1933, as amended.

Securitization Transaction: Any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

Servicer: As defined in Section 2.03(c) of this Reg AB Addendum.

Servicing Criteria: The "servicing criteria" set forth in Item 1122(d) of Regulation AB, as such may be amended from time to time.

Static Pool Information: Static pool information as described in Item 1105(a)(1)-(3) and 1105(c) of Regulation AB.

Subcontractor: Any vendor, subcontractor or other Person that is not responsible for the overall servicing (as "servicing" is commonly understood by participants in the mortgage-backed securities market) of Mortgage Loans but performs one or more discrete functions identified in Item 1122( d) of Regulation AB with respect to Mortgage Loans under the direction or authority of the Company or a Subservicer.

Subservicer: Any Person that services Mortgage Loans on behalf of the Company or any Subservicer and is responsible for the performance (whether directly or through Subservicers or Subcontractors) of a substantial portion of the material servicing functions required to be performed by the Company under this Agreement or any Reconstitution Agreement that are identified in Item 1122(d) of Regulation AB.

Third-Party Originator: Each Person, other than a Qualified Correspondent, that originated Mortgage Loans acquired by the Company.

Whole Loan Transfer: Any sale or transfer of some or all of the Mortgage Loans, other than a Securitization Transaction.

ARTICLE II
COMPLIANCE WITH REGULATION AB

Section 2.01.    Intent of the Parties; Reasonableness.

The Purchaser and the Company acknowledge and agree that the purpose of this Reg AB Addendum is to facilitate compliance by the Purchaser and any Depositor with the provisions of Regulation AB and related rules and regulations of the Commission and that the provisions of this Reg AB Addendum shall be applicable to all Mortgage Loans included in a Securitization Transaction closing on or after January 1, 2006, regardless whether the Mortgage Loans were purchased by the Purchaser from the Company prior to the date hereof. Although Regulation AB is applicable by its terms only to offerings of asset-backed securities that are registered under the Securities Act, the Company acknowledges that investors in privately offered securities may require that the Purchaser or any Depositor provide comparable disclosure in unregistered offerings. References in this Agreement to compliance with Regulation AB include provision of comparable disclosure in private offerings.

Neither the Purchaser nor any Depositor shall exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes other

than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission thereunder (or the provision in a private offering of disclosure comparable to that required under the Securities Act). The Company acknowledges that interpretations of the requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, consensus among participants in the asset-backed securities markets, advice of counsel, or otherwise, and agrees to comply with requests made by the Purchaser or any Depositor in good faith for delivery of information under these provisions on the basis of evolving interpretations of Regulation AB. In connection with any Securitization Transaction, the Company shall cooperate fully with the Purchaser to deliver to the Purchaser (including any of its assignees or designees) and any Depositor, any and all statements, reports, certifications, records and any other information necessary in the good faith determination of the Purchaser or any Depositor to comply with the provisions of Regulation AB, together with such disclosures relating to the Company, any Subservicer, any Third-Party Originator and the Mortgage Loans, or the servicing of the Mortgage Loans, reasonably believed by the Purchaser or any Depositor to be necessary in order to effect such compliance.

The Purchaser (including any of its assignees or designees) shall cooperate with the Company by providing timely notice of requests for information under these provisions and by reasonably limiting such requests to information required, in the Purchaser's reasonable judgment, to comply with Regulation AB.

Section 2.02.    Additional Representations and Warranties of the Company.

(a)    The Company shall be deemed to represent to the Purchaser and to any Depositor, as of the date on which information is first provided to the Purchaser or any Depositor under Section 2.03 of this Reg AB Addendum that, except as disclosed in writing to the Purchaser or such Depositor prior to such date: (i) the Company is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other securitization due to any act or failure to act of the Company; (ii) the Company has not been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; (iii) no material noncompliance with the applicable Servicing Criteria with respect to other securitizations of residential mortgage loans involving the Company as servicer has been disclosed or reported by the Company; (iv) no material changes to the Company's policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreement for mortgage loans of a type similar to the Mortgage Loans have occurred during the three-year period immediately preceding the related Securitization Transaction; (v) there are no aspects of the Company's financial condition that could have a material adverse effect on the performance by the Company of its servicing obligations under this Agreement or any Reconstitution Agreement; (vi) there are no material legal or governmental proceedings pending (or known to be contemplated) against the Company, any Subservicer or any Third-Party Originator; and (vii) there are no affiliations, relationships or transactions relating to the Company, any Subservicer or any Third-Party Originator with respect to any Securitization Transaction and any party thereto identified by the related Depositor of a type described in Item 1119 of Regulation AB.

(b)    If so requested by the Purchaser or any Depositor on any date following the date on which information is first provided to the Purchaser or any Depositor under Section 2.03 of this Reg AB Addendum, the Company shall, within five (5) Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (a) of this Section or, if any such representation and warranty is not accurate as of the date of such request, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party.

Section 2.03.    Information to Be Provided by the Company.

In connection with any Securitization Transaction, the Company shall (i) within five (5) Business Days following request by the Purchaser or any Depositor, provide to the Purchaser and such Depositor (or, as applicable, cause each Third-Party Originator and each Subservicer to provide), in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, the information and materials specified in paragraphs (a), (b), (c) and (f) of this Section, and (ii) as promptly as practicable following notice to or discovery by the Company, provide to the Purchaser and any Depositor (in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor) the information specified in paragraph (d) of this Section.

(a)    If so requested by the Purchaser or any Depositor, the Company shall provide such information regarding (i) the Company, as originator of the Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent), or (ii) each Third-Party Originator, and (iii) as applicable, each Subservicer, as is requested for the purpose of compliance with Items 1103(a)(1), 1105, 1110, 1117 and 1119 of Regulation AB. Such information shall include, at a minimum:

(A)    the originator's form of organization;

(B)    a description of the originator's origination program and how long the originator has been engaged in originating residential mortgage loans, which description shall include a discussion of the originator's experience in originating mortgage loans of a similar type as the Mortgage Loans; information regarding the size and composition of the originator's origination portfolio; and information that may be material, in the good faith judgment of the Purchaser or any Depositor, to an analysis of the performance of the Mortgage Loans, including the originators' credit-granting or underwriting criteria for mortgage loans of similar type(s) as the Mortgage Loans and such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1110(b)(2) of Regulation AB;

(C)    a description of any material legal or governmental proceedings pending (or known to be contemplated) against the Company, each Third-Party Originator and each Subservicer; and

(D)    a description of any affiliation or relationship between the Company, each Third-Party Originator, each Subservicer and any of the following parties to a Securitization Transaction, as such parties are identified to the Company by the Purchaser or any Depositor in writing in advance of such Securitization Transaction:

(1)    the sponsor;

(2)    the depositor;

(3)    the issuing entity;

(4)    any servicer;

(5)    any trustee;

(6)    any originator;

(7)    any significant obligor;

(8)    any enhancement or support provider; and

(9)    any other material transaction party.

(b)    If so requested by the Purchaser or any Depositor, the Company shall provide (or, as applicable, cause each Third-Party Originator to provide) Static Pool Information with respect to the mortgage loans (of a similar type as the Mortgage Loans, as reasonably identified by the Purchaser as provided below) originated by (i) the Company, if the Company is an originator of Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent), and/or (ii) each Third-Party Originator. Such Static Pool Information shall be prepared by the Company (or Third-Party Originator) on the basis of its reasonable, good faith interpretation of the requirements of Item 1105(a)(1)-(3) of Regulation AB. To the extent that there is reasonably available to the Company (or Third-Party Originator) Static Pool Information with respect to more than one mortgage loan type, the Purchaser or any Depositor shall be entitled to specify whether some or all of such information shall be provided pursuant to this paragraph. The content of such Static Pool Information may be in the form customarily provided by the Company, and need not be customized for the Purchaser or any Depositor. Such Static Pool Information for each vintage origination year or prior securitized pool, as applicable, shall be presented in increments no less frequently than quarterly over the life of the mortgage loans included in the vintage origination year or prior securitized pool. The most recent periodic increment must be as of a date no later than 135 days prior to the date of the prospectus or other offering document in which the Static Pool Information is to be included or incorporated by reference. The Static Pool Information shall be provided in an electronic format that provides a permanent record of the information provided, such as a portable document format (pdf) file, or other such electronic format reasonably required by the Purchaser or the Depositor, as applicable.

Promptly following notice or discovery of a material error in Static Pool Information provided pursuant to the immediately preceding paragraph (including an omission to include therein information required to be provided pursuant to such paragraph), the Company shall provide corrected Static Pool Information to the Purchaser or any Depositor, as applicable, in the same format in which Static Pool Information was previously provided to such party by the Company.

If so requested by the Purchaser or any Depositor, the Company shall provide (or, as applicable, cause each Third-Party Originator to provide), at the expense of the requesting party (to the extent of any additional incremental expense associated with delivery pursuant to this Agreement), such agreed-upon procedures letters of certified public accountants reasonably acceptable to the Purchaser or Depositor, as applicable, pertaining to Static Pool Information relating to prior securitized pools for securitizations closed on or after January 1, 2006 or, in the case of Static Pool Information with respect to the Company's or Third-Party Originator's originations or purchases, to calendar months commencing January 1, 2006, as the Purchaser or such Depositor shall reasonably request. Such letters shall be addressed to and be for the benefit of such parties as the Purchaser or such Depositor shall designate, which may include, by way of example, any Sponsor, any Depositor and any broker dealer acting as underwriter, placement agent or initial purchaser with respect to a Securitization Transaction. Any such letter may take the form of a standard, generally applicable document accompanied by a reliance letter authorizing reliance by the addressees designated by the Purchaser or such Depositor.

(c)    If so requested by the Purchaser or any Depositor, the Company shall provide such information regarding the Company, as servicer of the Mortgage Loans, and each Subservicer (each of the Company and each Subservicer, for purposes of this Section 2.03(c), a "Servicer"), as is requested for the purpose of compliance with Item 1108, 1117 and 1119 of Regulation AB. Such information shall include, at a minimum:

(A)    the Servicer's form of organization;

(B)    a description of how long the Servicer has been servicing residential mortgage loans; a general discussion of the Servicer's experience in servicing assets of any type as well as a more detailed discussion of the Servicer's experience in, and procedures for, the servicing function it will perform under the Agreement and any Reconstitution Agreements; information regarding the size, composition and growth of the Servicer's portfolio of residential mortgage loans of a type similar to the Mortgage Loans and information on factors related to the Servicer that may be material, in the good faith judgment of the Purchaser or any Depositor, to any analysis of the servicing of the Mortgage Loans or the related asset-backed securities, as applicable, including, without limitation:

(1)    whether any prior securitizations of mortgage loans of a type similar to the Mortgage Loans involving the Servicer have defaulted or experienced an early amortization or other performance triggering event because of servicing during the three-year period immediately preceding the related Securitization Transaction;

(2)    the extent of outsourcing the Servicer utilizes;

(3)    whether there has been previous disclosure of material noncompliance with the applicable servicing criteria with respect to other securitizations of residential mortgage loans involving the Servicer as a servicer during the three-year period immediately preceding the related Securitization Transaction;

(4)    whether the Servicer has been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; and

(5)    such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1108(b)(2) of Regulation AB;

(C)    a description of any material changes during the three-year period immediately preceding the related Securitization Transaction to the Servicer's policies or procedures with respect to the servicing function it will perform under the Agreement and any Reconstitution Agreements for mortgage loans of a type similar to the Mortgage Loans;

(D)    information regarding the Servicer's financial condition, to the extent that there is a material risk that an adverse financial event or circumstance involving the Servicer could have a material adverse effect on the performance by the Company of its servicing obligations under the Agreement or any Reconstitution Agreement;

(E)    information regarding advances made by the Servicer on the Mortgage Loans and the Servicer's overall servicing portfolio of residential mortgage loans for the three-year period immediately preceding the related Securitization Transaction, which may be limited to a statement by an authorized officer of the Servicer to the effect that the Servicer has made all advances required to be made on residential mortgage loans serviced by it during such period, or, if such statement would not be accurate, information regarding the percentage and type of advances not made as required, and the reasons for such failure to advance;

(F)    a description of the Servicer's processes and procedures designed to address any special or unique factors involved in servicing loans of a similar type as the Mortgage Loans;

(G)    a description of the Servicer's processes for handling delinquencies, losses, bankruptcies and recoveries, such as through liquidation of mortgaged properties, sale of defaulted mortgage loans or workouts;

(H)    information as to how the Servicer defines or determines delinquencies and charge-offs, including the effect of any grace period, re-aging, restructuring, partial payments considered current or other practices with respect to delinquency and loss experience;

(I)    a description of any material legal or governmental procedures pending (or known to be contemplated against the Company; and

(J)    a description of any affiliation or relationship between the Company and any of the following parties to a Securitization Transaction, as such parties are identified to the Company by the Purchaser or any Depositor in writing in advance of such Securitization Transaction: (1) the sponsor, (2) the depositor, (3) the issuing entity, (4) any servicer, (5) any trustee, (6) any originator, (7) any significant obligor, (8) any enhancement or support provider and (9) any other material transaction party.

(d)    If so requested by the Purchaser or any Depositor for the purpose of satisfying its reporting obligation under the Exchange Act with respect to any class of asset-backed securities, the Company shall (or shall cause each Subservicer and Third-Party Originator to) (i) notify the Purchaser, any Depositor, and any Master Servicer in writing of (A) any material litigation or governmental proceedings pending against the Company, any Subservicer or any Third-Party Originator and (B) any affiliations or relationships that develop following the closing date of a Securitization Transaction between the Company, any Subservicer or any Third-Party Originator and any of the parties specified in clause (D) of paragraph (a) of this Section (and any other parties identified in writing by the requesting party) with respect to such Securitization Transaction, and (ii) provide to the Purchaser, any Depositor, and any Master Servicer a description of such proceedings, affiliations or relationships.

(e)    As a condition to the succession to the Company or any Subservicer as servicer or subservicer under the Agreement or any Reconstitution Agreement by any Person (i) into which the Company or such Subservicer may be merged or consolidated, or (ii) which may be appointed as a successor to the Company or any Subservicer, the Company shall provide to the Purchaser and any Depositor, at least 15 calendar days prior to the effective date of such succession or appointment, (x) written notice to the Purchaser and any Depositor of such succession or appointment and (y) in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, all information reasonably requested by the Purchaser or any Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K with respect to any class of asset-backed securities.

(f)    In addition to such information as the Company, as servicer, is obligated to provide pursuant to other provisions of the Agreement, if so requested by the Purchaser, any Depositor or any Master Servicer, the Company shall provide such information regarding the performance or servicing of the Mortgage Loans as is reasonably required to facilitate preparation of distribution reports in accordance with Item 1121 of Regulation AB. Additionally, the Company shall provide to the Purchaser or its designee any loan-level or pool information necessary to comply with respect to the Mortgage Loans necessary to confirm loss, prepayment and delinquency information required in connection with the provision of Static Pool Information pursuant to Item 1105 of Regulation AB. Such information shall be provided concurrently with the monthly reports otherwise required to be delivered by the servicer under this Agreement, commencing with the first such report due not less than ten (10) Business Days following such request. Such information will include, but not be limited to: (i) any material modifications, extensions or waivers of pool asset terms, fees, penalties or payments during the distribution period or that have cumulatively become material over time; (ii) material breaches of pool asset representations or warranties or transaction covenants; and (iii)

Unassociated Document                          Page 536 of 835
12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 258 of 279

information regarding new asset-backed securities issuances backed by the same pool assets, any pool asset changes (such as additions, substitutions or repurchases), and any material changes in origination, underwriting or other criteria for acquisition or selection of pool assets.

(g)     The Company shall provide to the Purchaser, any Depositor and any Master Servicer such additional information as they may reasonably request, including evidence of the authorization of the person signing any certification or statement, financial information and reports, and such other information related to the Company or its performance hereunder.

Section 2.04.     Servicer Compliance Statement.

On or before March 1 of each calendar year, commencing in 2007, the Company shall deliver to the Purchaser, any Depositor, and any Master Servicer a statement of compliance addressed to the Purchaser, such Depositor, and such Master Servicer and signed by an authorized officer of the Company, to the effect that (i) a review of the Company's activities during the immediately preceding calendar year (or applicable portion thereof) and of its performance under the Agreement and any applicable Reconstitution Agreement during such period has been made under such officer's supervision, and (ii) to the best of such officers' knowledge, based on such review, the Company has fulfilled all of its obligations under the Agreement and any applicable Reconstitution Agreement in all material respects throughout such calendar year (or applicable portion thereof) or, if there has been a failure to fulfill any such obligation in any material respect, specifically identifying each such failure known to such officer and the nature and the status thereof.

Section 2.05.     Report on Assessment of Compliance and Attestation.

(a)     On or before March 1 of each calendar year, commencing in 2007, the Company shall:

(i)     deliver to the Purchaser, any Depositor, and any Master Servicer a report (in form and substance reasonably satisfactory to the Purchaser and such Depositor) regarding the Company's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB. Such report shall be addressed to the Purchaser and such Depositor and signed by an authorized officer of the Company, and shall address each of the applicable Servicing Criteria as specified on the form of certification attached as Annex II hereto;

(ii)     deliver to the Purchaser, any Depositor, and any Master Servicer a report of a registered public accounting firm reasonably acceptable to the Purchaser and such Depositor that attests to, and reports on, the assessment of compliance made by the Company and delivered pursuant to the preceding paragraph. Such attestation shall be in accordance with Rules 1-02(a) (3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act;

(iii)     cause each Subservicer, and each Subcontractor determined by the Company pursuant to Section 2.06(b) of this Reg AB Addendum to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, to deliver to the Purchaser, any Depositor, and any Master Servicer an assessment of compliance and accountants' attestation as and when provided in paragraphs (a) and (b) of this Section; and

(iv)     deliver to the Purchaser, any Depositor, any Master Servicer and any other Person that will be responsible for signing the certification (a "Sarbanes Certification") required by Rules 13a-14(d) and 15d-14(d) under the Exchange Act (pursuant to Section 302 of the Sarbanes-Oxley Act of 2002) on behalf of an asset-backed issuer with respect to a Securitization Transaction a certification in the form attached hereto as Annex I.

The Company acknowledges that the parties identified in clause (a)(iv) above may rely on the certification provided by the Company pursuant to such clause in signing a Sarbanes Certification and filing such with the Commission. Neither the Purchaser nor any Depositor will request delivery of a certification under clause (a)(iv) above unless a Depositor is required under the Exchange Act to file an annual report on Form 10-K with respect to an issuing entity whose asset pool includes Mortgage Loans.

(b)     Each assessment of compliance provided by a Subservicer pursuant to Section 2.05(a)(iii) of this Reg AB Addendum shall address each of the Servicing Criteria specified on a certification substantially in the form of Annex II hereto delivered to the Purchaser concurrently with the execution of this Reg AB Addendum or, in the case of a Subservicer subsequently appointed as such, on or prior to the date of such appointment. An assessment of compliance provided by a Subcontractor pursuant to Section 2.05(a)(iii) of this Reg AB Addendum need not address any elements of the Servicing Criteria other than those specified by the Company pursuant to Section 2.06 of this Reg AB Addendum.

Section 2.06.     Use of Subservicers and Subcontractors.

The Company shall not hire or otherwise utilize the services of any Subservicer to fulfill any of the obligations of the Company as servicer under the Agreement or any Reconstitution Agreement unless the Company complies with the provisions of paragraph (a) of this Section. The Company shall not hire or otherwise utilize the services of any Subcontractor, and shall not permit any Subservicer to hire or otherwise utilize the services of any Subcontractor, to fulfill any of the obligations of the Company as servicer under the Agreement or any Reconstitution Agreement unless the Company complies with the provisions of paragraph (b) of this Section.

(a)     It shall not be necessary for the Company to seek the consent of the Purchaser or any Depositor to the utilization of any Subservicer. The Company shall cause any Subservicer used by the Company (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of this Section and with Sections 2.02, 2.03( c) and (e), 2.04, 2.05 and 2.07 of this Reg AB Addendum to the same extent as if such Subservicer were the Company. The Company shall be responsible for obtaining from each Subservicer and delivering to the Purchaser and any Depositor any servicer compliance statement required to be delivered by such Subservicer under Section 2.04 of this Reg AB Addendum, any assessment of compliance and attestation required to be delivered by such Subservicer under Section 2.05 of this Reg AB Addendum and any certification required to be delivered to the Person that will be responsible for signing the Sarbanes Certification under Section 2.05 of this Reg AB Addendum as and when required to be delivered.

(b)     It shall not be necessary for the Company to seek the consent of the Purchaser or any Depositor to the utilization of any Subcontractor. The Company shall promptly upon request provide to the Purchaser and any Depositor (or any designee of the Depositor, such as a master servicer or administrator) a written description (in form and substance satisfactory to the Purchaser and such Depositor) of the role and function of each Subcontractor utilized by the Company or any Subservicer, specifying (i) the identity of each such Subcontractor, (ii) which (if any) of such Subcontractors are "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, and (iii) which elements of the Servicing Criteria will be addressed in assessments of compliance provided by each Subcontractor identified pursuant to clause (ii) of this paragraph.

As a condition to the utilization of any Subcontractor determined to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, the Company shall cause any such Subcontractor used by the Company (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of Sections 2.05 and 2.07 of this Reg AB Addendum to the same extent as if such Subcontractor were the Company. The Company shall be responsible for obtaining from each Subcontractor and delivering to the Purchaser and any Depositor any assessment of compliance and attestation required to be delivered by such Subcontractor under Section 2.05 of this Reg AB Addendum, in each case as and when required to be delivered.

Section 2.07.     Indemnification; Remedies.

(a)     The Company shall indemnify the Purchaser, each affiliate of the Purchaser, and each of the following parties participating in a Securitization Transaction: each sponsor and issuing entity; each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction; each broker dealer acting as underwriter, placement agent or initial purchaser, each Person who controls any of such parties or the Depositor (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees and agents of each of the foregoing and of the Depositor, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(i)     (A) any untrue statement of a material fact contained or alleged to be contained in any information, report, certification, accountants' letter or other material in written or electronic form provided under this Article II by or on behalf of the Company, or provided under this Article II by or on behalf of any Subservicer, Subcontractor or Third-Party Originator (collectively, the "Company Information"), or (B) the omission or alleged omission to state in the Company Information a material fact required to be stated in the Company Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, by way of clarification,* that clause (B) of this paragraph shall be construed solely by reference to the Company Information and not to any other information communicated in connection with a sale or purchase of securities, without regard to whether the Company Information or any portion thereof is presented together with or separately from such other information;

(ii)     any failure by the Company, any Subservicer, any Subcontractor or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under this Article II, including any failure by the Company to identify pursuant to Section 2.06(b) of this Reg AB Addendum any Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB;

(iii)     any breach by the Company of a representation or warranty set forth in Section 2.02(a) of this Reg AB Addendum or in a writing furnished pursuant to Section 2.02(b) of this Reg AB Addendum and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Company of a representation or warranty in a writing furnished pursuant to Section 2.02(b) of this Reg AB Addendum to the extent made as of a date subsequent to such closing date; or

(iv)     the negligence, bad faith or willful misconduct of the Company in connection with its performance hereunder.

This indemnification shall survive the termination of this Reg AB Addendum, or any party to this Reg AB Addendum.

In the case of any failure of performance described in clause (a)(ii) of this Section, the Company shall promptly reimburse the Purchaser, any Depositor, as applicable, and each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction, for all costs reasonably incurred by each such party in order to obtain the information, report, certification, accountants' letter or other material not delivered as required by the Company, any Subservicer, any Subcontractor or any Third-Party Originator.

(b)     (i) Any failure by the Company, any Subservicer, any Subcontractor or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under this Article II, or any breach by the Company of a representation or warranty set forth in Section 2.02(a) of this Reg AB Addendum or in a writing furnished pursuant to Section 2.02(b) of this Reg AB Addendum and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Company of a representation or warranty in a writing furnished pursuant to Section 2.02(b) of this Reg AB Addendum to the extent made as of a date subsequent to such closing date, shall, except as provided in clause (ii) of this paragraph, immediately and automatically, without notice or grace period, constitute an Event of Default with respect to the Company under the Agreement and any applicable Reconstitution Agreement, and shall entitle the Purchaser or Depositor, as applicable, in its sole discretion to terminate the rights and obligations of the Company as servicer under the Agreement and any applicable Reconstitution Agreement without payment (notwithstanding anything in this Agreement or any applicable Reconstitution Agreement to the contrary) of any compensation to the Company; *provided* that to the extent that any provision of the Agreement and/or any applicable Reconstitution Agreement expressly provides for the survival of certain rights or obligations following termination of the Company as servicer, such provision shall be given effect.

(ii)     Any failure by the Company, any Subservicer or any Subcontractor to deliver any information, report, certification or accountants' letter when and as required under Section 2.04 or 2.05 of this Reg AB Addendum, including (except as provided below) any failure by the Company to identify pursuant to Section 2.06(b) of this Reg AB Addendum any Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, which continues unremedied for ten (10) calendar days after the date on which such information, report, certification or accountants' letter was required to be delivered shall constitute an Event of Default with respect to the Company under the Agreement and any applicable Reconstitution Agreement, and shall entitle the Purchaser or Depositor, as applicable, in its sole discretion to terminate the rights and obligations of the Company as servicer under the Agreement and/or any applicable Reconstitution Agreement without payment (notwithstanding anything in this Agreement to the contrary) of any compensation to the Company; *provided* that to the extent that any provision of the Agreement and/or any applicable Reconstitution Agreement expressly provides for the survival of certain rights or obligations following termination of the Company as servicer, such provision shall be given effect.

Neither the Purchaser nor any Depositor shall be entitled to terminate the rights and obligations of the Company pursuant to this subparagraph (b)(ii) if a failure of the Company to identify a Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB was attributable solely to the role or functions of such Subcontractor with respect to mortgage loans other than the Mortgage Loans

(iii)     The Company shall promptly reimburse the Purchaser (or any designee of the Purchaser, such as a master servicer) and any Depositor, as applicable, for all reasonable expenses incurred by the Purchaser (or such designee) or such Depositor, as such are incurred, in connection with the termination of the Company as servicer and the transfer of servicing of the Mortgage Loans to a successor servicer. The provisions of this paragraph shall not limit whatever rights the Purchaser or any Depositor may have under other provisions of the Agreement and/or any applicable Reconstitution Agreement or otherwise, whether in equity or at law, such as an action for damages, specific performance or injunctive relief.

Section 2.08.    <u>Third Party Beneficiary</u>.

For purposes of Sections 2.03, 2.04, and 2.05 related to the requirements of delivery of Reports on Assessment of Compliance, attestation reports, statements of compliance, Sarbanes Certifications and additional monthly reporting requirements, the Master Servicer shall be considered a third-party beneficiary of this Reg AB Addendum, entitled to all the rights and benefits hereof as if it were a direct party to this Reg AB Addendum.

ANNEX I

FORM OF ANNUAL CERTIFICATION

Re:     The [  ] agreement dated as of [  **],** 200[ ] (the "Agreement"), among
[IDENTIFY PARTIES]

I, _____, the _____ of [NAME OF COMPANY], certify to [the Purchaser], [the Depositor], and the [Master Servicer] [Securities Administrator] [Trustee], and their officers, with the knowledge and intent that they will rely upon this certification, that:

(1)  I have reviewed the servicer compliance statement of the Company provided in accordance with Item 1123 of Regulation AB (the "Compliance Statement"), the report on assessment of the Company's compliance with the servicing criteria set forth in Item 1122(d) of Regulation AB and identified as the responsibility of the Company on Annex II to the Regulation AB Compliance Addendum to the Agreement (the "Servicing Criteria"), provided in accordance with Rules 13a-18 and 15d-18 under Securities Exchange Act of 1934, as amended (the "Exchange Act") and Item 1122 of Regulation AB (the "Servicing Assessment"), the registered public accounting firm's attestation report provided in accordance with Rules 13a-18 and 15d-18 under the Exchange Act and Section 1122(b) of Regulation AB (the "Attestation Report"), and all servicing reports, officer's certificates and other information relating to the performance of the Company under the terms of the Agreement and the servicing of the Mortgage Loans by the Company during 200[ ] that were delivered by the Company to the [Depositor] [Master Servicer] [Securities Administrator] [Trustee] pursuant to the Agreement (collectively, the "Company Servicing Information");

(2)  Based on my knowledge, the Company Servicing Information, taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which such statements were made, not misleading with respect to the period of time covered by the Company Servicing Information;

(3)  Based on my knowledge, all of the Company Servicing Information required to be provided by the Company under the Agreement has been provided to the [Depositor] [Master Servicer] [Securities Administrator] [Trustee];

(4)  I am responsible for reviewing the activities performed by the Company as servicer under the Agreement, and based on my knowledge and the compliance review conducted in preparing the Compliance Statement and except as disclosed in the Compliance Statement, the Servicing Assessment or the Attestation Report, the Company has fulfilled its obligations under the Agreement in all material respects; and

(5)  The Compliance Statement required to be delivered by the Company pursuant to this Agreement, and the Servicing Assessment and Attestation Report required to be provided by the Company and by any Subservicer or Subcontractor pursuant to the Agreement, have been provided to the [Depositor] [Master Servicer]. Any material instances of noncompliance described in such reports have been disclosed to the [Depositor] [Master Servicer]. Any material instance of noncompliance with the Servicing Criteria has been disclosed in such reports.

Date:  _____

By:  _____

Name:
Title:

ANNEX II

SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

The assessment of compliance to be delivered by [the Company] [Name of Subservicer] shall address, at a minimum, the criteria identified as below as "Applicable Servicing Criteria";

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| **General Servicing Considerations** | | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | X |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | X |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the mortgage loans are maintained. | X |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | X |
| **Cash Collection and Administration** | | |
| 1122(d)(2)(i) | Payments on mortgage loans are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two (2) business days following receipt, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | X |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | X |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of overcollateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | X |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1 (b)(1) of the Securities Exchange Act. | X |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | X |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | X |
| **Investor Remittances and Reporting** | | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of mortgage loans serviced by the Servicer. | X |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | X |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two (2) business days to the Servicer's investor records, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | X |
| **Pool Asset Administration** | | |
| 1122(d)(4)(i) | Collateral or security on mortgage loans is maintained as required by the transaction agreements or related mortgage loan documents. | X |
| 1122(d)(4)(ii) | Mortgage loan and related documents are safeguarded as required by the transaction agreements | X |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | X |
| 1122(d)(4)(iv) | Payments on mortgage loans, including any payoffs, made in accordance with the related mortgage loan documents are posted to the Servicer's obligor records maintained no more than two (2) business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other fees (e.g., escrow) in accordance with the related mortgage loan documents. | X |
| 1122(d)(4)(v) | The Servicer's records regarding the mortgage loans agree with the Servicer's records with respect to an obligor's unpaid principal balance. | X |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's mortgage loans (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. | X |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and | |

| | | |
|---|---|---|
| | repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | X |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a mortgage loan is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent mortgage loans including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | X |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for mortgage loans with variable rates are computed based on the related mortgage loan documents. | X |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's mortgage loan documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable mortgage loan documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related mortgage loans, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | X |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two (2) business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | X |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | X |

[NAME OF COMPANY / SUBSERVICER]

By: _____

       Name:

       Title:

       Date:

EXHIBIT L

FORM OF SPECIAL FORECLOSURE RIGHTS SECTION

Notwithstanding anything in this Agreement to the contrary, for so long as the Master Servicer has not notified the Servicer that the majority holder of the most junior of the Subordinate Certificates is no longer entitled to the rights described in this Section [__]:

(a) The Servicer shall not commence foreclosure proceedings with respect to a Mortgage Loan unless (i) no later than five (5) Business Days prior to its commencement of such foreclosure proceedings, it notifies the Master Servicer of its intention to do so, and (ii) the majority holder of the most junior of the Subordinate Certificates, either directly or through the Master Servicer, does not, within such five-Business-Day period, affirmatively object to such action.

(b) In the event that the Servicer determines not to proceed with foreclosure proceedings with respect to a Mortgage Loan that becomes 60 days' or more delinquent and the Servicer has determined that it is unable to collect payments due under such Mortgage Loan in accordance with Accepted Servicing Practices, the Servicer shall, prior to taking any action with respect to such Mortgage Loan, promptly provide the Master Servicer with notice of such determination and a description of such other action as it intends to take with respect to such Mortgage Loan; provided, that the Servicer shall not be permitted to proceed with any such action unless the majority holder of the most junior of the Subordinate Certificates, either directly or through the Master Servicer, does not, within five (5) Business Days following such notice, affirmatively object to the Servicer taking such action.

(c) If the majority holder of the most junior of the Subordinate Certificates timely and affirmatively objects to an action or contemplated action of the Servicer pursuant to either (a) or (b) above, then the majority holder of the most junior of the Subordinate Certificates shall instruct the Master Servicer to hire, at the majority holder of the most junior of the Subordinate Certificates' sole cost and expense, three appraisal firms, selected by the Master Servicer in its sole and absolute discretion from the list of appraisal firms attached as Exhibit [__], to compute the fair value of the Mortgaged Property relating to the related Mortgage Loan utilizing the Fannie Mae Form 2055 Exterior-Only Inspection Residential Appraisal Report (each such appraisal-firm computation, a "Fair Value Price"), in each case (other than as set forth in (d) below) no later than 30 days from the date of such majority holder of the most junior of the Subordinate Certificates objection. If the Master Servicer shall have received three Fair Value Prices by the end of such 30-day period, then the majority holder of the most junior of the Subordinate Certificates shall, no later than 5 days after the expiration of such 30-day period, purchase such Mortgage Loan and the related Mortgaged Property at an amount equal to the sum of (i) accrued and unpaid interest on such Mortgage Loan as of such purchase date ("Accrued Interest") and (ii) the highest of such three Fair Value Prices respectively determined by such appraisal firms, and shall promptly delivery such amount to the Servicer for deposit into the Custodial Account. All costs relating to the computation of the related Fair Value Prices shall be for the account of the majority holder of the most junior of the Subordinate Certificates and shall be paid by the majority holder of the most junior of the Subordinate Certificates at the time of such Mortgage Loan and the related Mortgaged Property are purchased by the majority holder of the most junior of the Subordinate Certificates.

(d) If the Master Servicer shall not have received three Fair Value Prices at the end of the 30-day period set forth in (c) above, then:

(i) The Master Servicer shall obtain such three Fair Value Prices no later than 15 days after the end of such 30-day period.

(ii) If the Master Servicer shall have only received two Fair Value Prices at the end of such 15-day extension period, then the Master Servicer will determine, in its sole and absolute discretion, the fair value of the Mortgaged Property relating to such Mortgage Loan, related Insurance Proceeds and the current delinquency status of such Mortgage Loan (such fair value, the "Master Servicer Fair Value Price"), and the majority holder of the most junior of the Subordinate Certificates shall, no later than 5 days after the expiration of such 15-day extension period, purchase (and deliver to the Servicer the purchase price for) such Mortgage Loan and the related Mortgaged Property at an amount equal to the sum of (A) Accrued Interest thereon and (B) the higher of (1) the highest of such two Fair Value Prices determined by such appraisal firms and (2) the Master Servicer Fair Value Price.

(iii) If the Master Servicer shall have received only one Fair Value Price at the end of such 15-day extension period, then the Master Servicer will determine, in its sole and absolute discretion, the Master Servicer Fair Value Price of the Mortgaged Property related to such Mortgage Loan, and:

(A)     if such Master Servicer Fair Value Price is equal to or greater than the unpaid principal balance of the related Mortgage Loan as of such date (the "Unpaid Principal Balance"), then the majority holder of the most junior of the Subordinate Certificates shall, no later than 5 days after the expiration of such 15-day extension period, purchase (and deliver to the Servicer the purchase price for) such Mortgage Loan and the related Mortgaged Property at an amount equal to the sum of (1) Accrued Interest thereon and (2) such Master Servicer Fair Value Price; and

(B)     if such Master Servicer Fair Value Price is less than the related Unpaid Principal Balance, then the majority holder of the most junior of the Subordinate Certificates shall, no later than 5 days after the expiration of such 15-day extension period, purchase (and deliver to the Servicer the purchase price for) such Mortgage Loan and the related Mortgaged Property at an amount equal to the sum of (1) Accrued Interest thereon and (2) the related Unpaid Principal Balance (such sum, the "Preliminary Purchase Price"); provided, that the provisions of clause (d)(iv) shall thereafter apply.

(iv) Following the payment by the majority holder of the most junior of the Subordinate Certificates of the Preliminary Purchase Price, the Master Servicer shall continue to hire appraisal firms at the majority holder of the most junior of the Subordinate Certificates' sole cost and expense to compute the Fair Value Price of the Mortgaged Property related to such Mortgage Loan, and at such time as two such Fair Value Prices shall have been obtained:

(A)     if such Master Servicer Fair Value Price is equal to or greater than the unpaid principal balance of the related Mortgage Loan as of such date (the "Unpaid Principal Balance"), then the majority holder of the most junior of the Subordinate Certificates shall, no later than 5 days after the expiration of such 15-day extension period, purchase (and deliver to the Servicer the purchase price for) such Mortgage Loan and the related Mortgaged Property at an amount equal to the sum of (1) Accrued Interest thereon and (2) such Master Servicer Fair Value Price; and

(B)     if the sum of (1) Accrued Interest on the related Mortgage Loan and (2) the higher of (x) the highest of such two Fair Value Prices determined by such appraisal firms and (y) the Master Servicer's Fair Value Price of the Mortgaged Property related to such Mortgage Loan (such sum, the "Revised Fair Value Price") is greater than such Preliminary Purchase Price, then the Master Servicer shall promptly notify the majority holder of the most junior of the Subordinate Certificates and the Servicer of such calculation, and the majority holder of the most junior of the Subordinate Certificates shall, no later than 5 days after such notice, remit to the Servicer, for deposit into the Custodial Account, the difference between such Revised Fair Value Price and such Preliminary Purchase Price; and

(C)     if such Preliminary Purchase Price is greater than such Revised Fair Value Price, then the Master Servicer shall promptly notify the majority holder of the most junior of the Subordinate Certificates and the Servicer of such calculation, and the Servicer shall, no later than 5 days after such notice, remit to the majority holder of the most junior of the Subordinate Certificates, from funds then on deposit in the Custodial Account, the difference between such Preliminary Purchase Price and such Revised Fair Value Price.

(e) Notwithstanding anything herein to the contrary, the majority holder of the most junior of the Subordinate Certificates shall not be entitled to any of its rights set forth herein with respect to a Mortgage Loan following its failure to purchase such Mortgage Loan and the related Mortgaged Property, at the related purchase price set forth in this Section [__] within the timeframe set forth in this Section [__] following the majority holder of the most junior of the Subordinate Certificates' objection to an action of the Servicer, and the Servicer shall provide the Master Servicer

Unassociated Document                                                                                    Page 542 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 264 of 279

written notice of such failure. [Moreover, the majority holder of the most junior of the Subordinate Certificates shall not be entitled to the foregoing rights if any of the [Subordinate Certificates] are held by entities that are unaffiliated with such majority holder of the most junior of the Subordinate Certificates.]

(f) Any notice, confirmation, instruction or objection pursuant to paragraphs (a), (b), (c) and (d) above may be delivered via facsimile or other written or electronic communication as the parties hereto and the majority holder of the most junior of the Subordinate Certificates may agree to from time to time.

(g) For the avoidance of doubt, the majority holder of the most junior of the Subordinate Certificates' rights set forth in this Section [__] are intended to provide the majority holder of the most junior of the Subordinate Certificates, for so long as it has not forfeited its right under this Section [__] as set forth in clause (e) above, with the unilateral right to control foreclosure decisions in respect of delinquent and defaulted Mortgage Loans, and certain exclusive purchase rights so as to maximize the recovery value on delinquent and defaulted Mortgage Loans.

(h) To the extent that the majority holder of the most junior of the Subordinate Certificates purchases any Mortgage Loan pursuant to this Section [__], the Servicer will continue to service such Mortgage Loan in accordance with this Agreement. The parties acknowledge that, in such event, the Master Servicer will have no duty or responsibility to master service any such Mortgage Loan.

EXHIBIT Q-3


AMENDMENT NUMBER ONE
to the
PURCHASE, WARRANTIES AND SERVICING AGREEMENT


**FLOW SALE AND SERVICING AGREEMENT**
(Residential Mortgage Loans)


Dated as of April 21, 2006


by and between


**LUMINENT MORTGAGE CAPITAL, INC.,**


**MERCURY MORTGAGE FINANCE STATUTORY TRUST**


and


**MAIA MORTGAGE FINANCE STATUTORY TRUST**,
as Purchasers


and


**INDMAC BANK, F.S.B.,**
as Company

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS

ARTICLE II AGREEMENT TO PURCHASE; PURCHASE PRICE; POSSESSION OF MORTGAGE FILES; MAINTENANCE OF SERVICING FILES; BOOKS AND RECORDS; CUSTODIAL AGREEMENT; DELIVERY OF DOCUMENTS; CLOSING CONDITIONS

    Section 2.01    Agreement to Purchase; Purchase Price; Mortgage and Servicing Files.
    Section 2.02    Books and Records; Transfers of Mortgage Loans.
    Section 2.03    Custodial Agreement; Delivery of Documents.
    Section 2.04    Quality Control Procedures.
    Section 2.05    Closing Conditions.

ARTICLE III REPRESENTATIONS AND WARRANTIES REMEDIES AND BREACH

    Section 3.01    Company Representations and Warranties.
    Section 3.02    Representations and Warranties Regarding Individual Mortgage Loans.
    Section 3.03    Repurchase.
    Section 3.04    Repurchase of Mortgage Loans With First Payment Defaults.
    Section 3.05    Purchase Price Protection.
    Section 3.06    Review of Mortgage Loans.

ARTICLE IV ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

    Section 4.01    Company to Act as Servicer.
    Section 4.02    Liquidation of Mortgage Loans.
    Section 4.03    Collection of Mortgage Loan Payments.
    Section 4.04    Establishment of and Deposits to Custodial Account.
    Section 4.05    Permitted Withdrawals From Custodial Account.
    Section 4.06    Establishment of and Deposits to Escrow Account.
    Section 4.07    Permitted Withdrawals From Escrow Account.
    Section 4.08    Payment of Taxes, Insurance and Other Charges.
    Section 4.09    Transfer of Accounts.
    Section 4.10    Maintenance of Hazard Insurance.
    Section 4.11    Maintenance of Mortgage Impairment Insurance.
    Section 4.12    Maintenance of Fidelity Bond and Errors and Omissions Insurance.
    Section 4.13    Inspections.
    Section 4.14    Restoration of Mortgaged Property.
    Section 4.15    Maintenance of PMI Policy; Claims.
    Section 4.16    Title, Management and Disposition of REO Property.
    Section 4.17    Real Estate Owned Reports.
    Section 4.18    Liquidation Reports.
    Section 4.19    Reports of Foreclosures and Abandonments of Mortgaged Property.
    Section 4.20    Application of Buydown Funds.
    Section 4.21    Notification of Adjustments.
    Section 4.22    Modifications, Waivers, Amendments and Consents.
    Section 4.23    Specially Serviced Mortgage Loans.
    Section 4.24    Disaster Recovery/Business Continuity Plan.
    Section 4.25    Fair Credit Reporting Act.

ARTICLE V PAYMENTS TO PURCHASER

    Section 5.01    Remittances.
    Section 5.02    Automated Servicing Systems and Statements to Purchaser.
    Section 5.03    Monthly Advances by Company.

ARTICLE VI GENERAL SERVICING PROCEDURES

    Section 6.01    Due-on-Sale Provision and Assumptions.
    Section 6.02    Satisfaction of Mortgages and Release of Mortgage Files.
    Section 6.03    Servicing Compensation.
    Section 6.04    [Reserved]
    Section 6.05    [Reserved]
    Section 6.06    Right to Examine Company Records.
    Section 6.07    Compliance with REMIC Provisions.

ARTICLE VII COMPANY TO COOPERATE

Section 7.01    Monthly Servicing Calls; Provision of Information.
Section 7.02    Financial Statements; Servicing Facility.
Section 7.03    Cooperation with Third-party Service Providers.

ARTICLE VIII THE COMPANY
Section 8.01
Section 8.02    Merger or Consolidation of the Company.
Section 8.03    Limitation on Liability of Company and Others.
Section 8.04    Limitation on Resignation and Assignment by Company.

ARTICLE IX WHOLE LOAN TRANSFERS AND Securitization Transactions

Section 9.01    Removal of Mortgage Loans from Inclusion Under this Agreement.

ARTICLE X DEFAULT

Section 10.01    Events of Default.
Section 10.02    Waiver of Defaults.

ARTICLE XI TERMINATION

Section 11.01    Termination.

ARTICLE XII MISCELLANEOUS PROVISIONS

Section 12.01    Successor to Company.
Section 12.02    Amendment.
Section 12.03    Governing Law.
Section 12.04    Arbitration.
Section 12.05    Duration of Agreement.
Section 12.06    Notices.
Section 12.07    Severability of Provisions.
Section 12.08    Relationship of Parties.
Section 12.09    Execution; Successors and Assigns; Counterparts
Section 12.10    Recordation of Assignments of Mortgage.
Section 12.11    Assignment by Purchaser.
Section 12.12    Solicitation of Mortgagor.
Section 12.13    Further Agreements.
Section 12.14    Confidential Information.
Section 12.15    Equal Opportunity.
Section 12.16    Exhibits.
Section 12.17    General Interpretive Principles.
Section 12.18    Reproduction of Documents.
Section 12.19    Purchase Price and Terms Letter.
Section 12.20    Clean-up Call

                                    EXHIBITS

Exhibit A    Form of Mortgage Loan Schedule
Exhibit B    Contents of Each Mortgage File
Exhibit C    Form of Custodial Agreement
Exhibit D    Form of Assignment, Assumption and Recognition Agreement
Exhibit E    Underwriting Guidelines
Exhibit F    Representations and Warranties Regarding Individual Mortgage Loans
Exhibit G    Form of Opinion of Counsel
Exhibit H    Form of SEC Certification
Exhibit I    Form of Memorandum of Sale
Exhibit J    Servicer Requirements
Exhibit K    Regulation AB Compliance Addendum
Exhibit L    Form of Special Foreclosure Rights Section

FLOW SALE AND SERVICING AGREEMENT, dated as of April 21, 2006 (as amended, restated, supplemented or otherwise modified and in effect from time to time, this "Agreement"), is made by and between LUMINENT MORTGAGE CAPITAL, INC., MERCURY MORTGAGE FINANCE STATUTORY TRUST, MAIA MORTGAGE FINANCE STATUTORY TRUST, as purchasers (collectively, the "Purchasers", and individually, as the purchaser of any Mortgage Loan (defined below) hereunder, the "Purchaser"), and INDYMAC BANK, F.S.B., as seller and servicer (the "Company").

W I T N E S S E T H

WHEREAS, each Purchaser has agreed to purchase from time to time from the Company and the Company has agreed to sell from time to time to any Purchaser first lien jumbo, alternate 'A' and conforming fixed and adjustable rate mortgage loans; and

WHEREAS, the Mortgage Loans will be sold by the Company and purchased by the Purchaser as pools or groups of whole loans, servicing retained (each, a "Mortgage Loan Package") on the various Closing Dates as provided herein; and

WHEREAS, each of the Mortgage Loans will be secured by a mortgage, deed of trust or other security instrument creating a first lien on a residential dwelling located in the jurisdiction indicated on the related Mortgage Loan Schedule for the related Mortgage Loan Package, which will be annexed to a Memorandum of Sale (as defined herein) on the related Closing Date; and

WHEREAS, each of the Purchasers and the Company wish to prescribe the manner of purchase of the Mortgage Loans and the conveyance, servicing and control of the Mortgage Loans; and

WHEREAS, following any purchase of the Mortgage Loans from the Company, the Purchaser may desire to sell some or all of the Mortgage Loans to one or more purchasers as a whole loan transfer, agency transfer or a public or private, rated or unrated mortgage securitization transaction.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, each of the Purchasers and the Company agree as follows:

ARTICLE I

DEFINITIONS

Whenever used herein, the following words and phrases, unless the content otherwise requires, shall have the following meanings:

Accepted Servicing Practices: With respect to any Mortgage Loan, procedures (including collection procedures) that comply with applicable federal, state and local law and that the Company customarily employs and exercises in servicing and administering mortgage loans for its own account and that are in accordance with the Fannie Mae Single Family Servicing Guide in all material respects and the accepted mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as the Mortgage Loans in the jurisdiction where the related Mortgaged Property is located.

Adjustable Rate Mortgage Loan: A Mortgage Loan that contains a provision pursuant to which the Mortgage Interest Rate is adjusted periodically.

Adjustment Date: As to each Adjustable Rate Mortgage Loan, the date on which the Mortgage Interest Rate is adjusted in accordance with the terms of the related Mortgage Note and Mortgage.

Agreement: As defined in the introductory paragraph hereof.

ALTA: The American Land Title Association or any successor thereto.

Anti-Money Laundering Laws: As defined in Section 3.01(n).

Appraisal: A written appraisal of a Mortgaged Property made by a Qualified Appraiser, which appraisal must be written, in form and substance, to Fannie Mae and Freddie Mac standards, and satisfy the requirements of Title XI of the Financial Institution, Reform, Recovery and Enforcement Act of 1989 and the regulations promulgated thereunder, in effect as of the date of the appraisal.

Appraised Value: With respect to any Mortgage Loan, the lesser of (i) the value set forth on the Appraisal made in connection with the origination of the related Mortgage Loan as the value of the related Mortgaged Property, or (ii) the purchase price paid for the Mortgaged Property, provided, however, that in the case of a refinanced Mortgage Loan, such value shall be based solely on the Appraisal made in connection with the origination of such Mortgage Loan.

Approved Flood Policy Insurer: An insurer that meets the guidelines of the Federal Insurance Administration.

Assignment, Assumption and Recognition Agreement: The agreement substantially in the form of Exhibit D attached hereto.

Assignment of Mortgage: An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the sale of the Mortgage to the Purchaser.

BIF: The Bank Insurance Fund, or any successor thereto.

BPO: A broker's price opinion with respect to a Mortgaged Property.

Business Day: Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in the State of New York or the state in which the Company's servicing operations are located are authorized or obligated by law or executive order to be closed.

Buydown Agreement: An agreement between the Company and a Mortgagor, or an agreement among the Company, a Mortgagor and a seller of a Mortgaged Property or a third party with respect to a Mortgage Loan which provides for the application of Buydown Funds.

Buydown Funds: In respect of any Buydown Mortgage Loan, any amount contributed by the seller of a Mortgaged Property subject to a Buydown Mortgage Loan, the buyer of such property, the Company or any other source, plus interest earned thereon, in order to enable the Mortgagor to reduce the payments required to be made from the Mortgagor's funds in the early years of a Mortgage Loan.

Buydown Mortgage Loan: Any Mortgage Loan in respect of which, pursuant to a Buydown Agreement, (i) the Mortgagor pays less than the full monthly payments specified in the Mortgage

Note for a specified period, and (ii) the difference between the payments required under such Buydown Agreement and the Mortgage Note is provided from Buydown Funds.

Buydown Period: The period of time when a Buydown Agreement is in effect with respect to a related Buydown Mortgage Loan.

Closing Date: With respect to a Mortgage Loan Package, the date or dates, set forth in the related Memorandum of Sale, on which the Purchaser will purchase and the Company will sell the Mortgage Loans identified therein.

Code: The Internal Revenue Code of 1986, as it may be amended from time to time or any successor statute thereto, and applicable U.S. Department of the Treasury regulations issued pursuant thereto.

Company: As defined in the introductory paragraph hereof.

Company Employees: As defined in Section 4.12.

Condemnation Proceeds: All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan Documents.

Consumer Information: Any personally identifiable information in any form (written electronic or otherwise) relating to a Mortgagor, including, but not limited to: a Mortgagor's name, address, telephone number, Mortgage Loan number, Mortgage Loan payment history, delinquency status, insurance carrier or payment information, tax amount or payment information; the fact that the Mortgagor has a relationship with the Company or the originator of the related Mortgage Loan; and any other non-public personally identifiable information.

Co-op Shares: Shares issued by private non-profit housing corporations.

Custodial Account: The separate account or accounts created and maintained pursuant to Section 4.04.

Custodial Agreement: The agreement governing the retention of the originals of each Mortgage Note, Mortgage, Assignment of Mortgage and other Mortgage Loan Documents, a form of which is annexed hereto as Exhibit C.

Custodian: The custodian under the Custodial Agreement, or its successor in interest or assigns, or any successor to the Custodian under the Custodial Agreement as provided therein.

Cut-off Date: With respect to each Mortgage Loan, the first day of the month of the related Closing Date as set forth in the related Purchase Price and Terms Letter.

Defective Document: As defined in Section 3.03.

Deleted Mortgage Loan: A Mortgage Loan which is repurchased by the Company in accordance with the terms of this Agreement and which is, in the case of a substitution pursuant to Section 3.03, replaced or to be replaced with a Qualified Substitute Mortgage Loan.

Determination Date: The fifteenth calendar day of each month (or if such fifteenth day is not a Business Day, the next immediately preceding Business Day).

Due Date: The first day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Due Period: With respect to each Remittance Date, the period commencing on the second day of the month preceding the month of the Remittance Date and ending on the first day of the month of the Remittance Date.

Errors and Omissions Insurance Policy: An errors and omissions insurance policy to be maintained by the Company pursuant to Section 4.12.

Escrow Account: The separate account or accounts created and maintained pursuant to Section 4.06.

Escrow Payments: With respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the Mortgage or any other related document.

Event of Default: Any one of the conditions or circumstances enumerated in Section 10.01.

FACT Act: As defined in Section 3.01.

Fannie Mae: The entity formerly known as Federal National Mortgage Association (FNMA), or any successor thereto.

FDIC: The Federal Deposit Insurance Corporation, or any successor thereto.

Fidelity Bond: A fidelity bond to be maintained by the Company pursuant to Section 4.12.

First Remittance Date: May 18, 2006.

Freddie Mac: The entity formerly known as the Federal Home Loan Mortgage Corporation (FHLMC), or any successor thereto.

GAAP: Generally accepted accounting procedures, consistently applied.

Gross Margin: With respect to each Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note which is added to the Index in order to determine the related Mortgage Interest Rate.

Holding Period: As to each Mortgage Loan, the period beginning on the Closing Date and ending on the last day of the second full calendar month thereafter.

Index: With respect to any Adjustable Rate Mortgage Loan, the index set forth in the related Mortgage Note for the purpose of calculating interest therein.

Insurance Proceeds: With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

Interim Funder: With respect to each MERS Designated Mortgage Loan, the Person named on the MERS System as the interim funder pursuant to the MERS Procedures Manual.

Investor: With respect to each MERS Designated Mortgage Loan, the Person named on the MERS System as the investor pursuant to the MERS Procedures Manual.

Unassociated Document                                                                    Page 548 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 270 of 279

Liquidation Proceeds: Cash received in connection with the liquidation of a defaulted Mortgage Loan, whether through the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise, or the sale of the related Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage Loan.

Loan-to-Value Ratio or LTV: With respect to any Mortgage Loan, the ratio of the original loan amount of the Mortgage Loan at its origination (unless otherwise indicated) to the Appraised Value of the Mortgaged Property.

Manufactured Home: A single family residential unit that is constructed in a factory in sections in accordance with the Federal Manufactured Home Construction and Safety Standards adopted on July 15, 1976, by the Department of Housing and Urban Development ("HUD Code"), as amended in 2000, which preempts state and local building codes. Each unit is identified by the presence of a HUD Plate/Compliance Certificate label. The sections are then transported to the site and joined together and affixed to a pre-built permanent foundation (which satisfies the manufacturer's requirements and all state, county, and local building codes and regulations). The manufactured home is built on a non-removable, permanent frame chassis that supports the complete unit of walls, floors, and roof. The underneath part of the home may have running gear (wheels, axles, and brakes) that enable it to be transported to the permanent site. The wheels and hitch are removed prior to anchoring the unit to the permanent foundation. The manufactured home must be classified as real estate and taxed accordingly. The permanent foundation may be on land owned by the mortgagor or may be on leased land.

Market Change Event: (a) a suspension or material limitation in trading in securities generally on the New York Stock Exchange or on NASDAQ; (b) a general moratorium on commercial banking activities declared by either Federal or New York State authorities or a material disruption in commercial banking or securities settlement or clearance services in the United States; or (c) the outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war, if the effect of any such event specified in clause (c) in the judgment of any Purchaser makes it impracticable or inadvisable to proceed with the transactions as contemplated in this Agreement on the terms and in the manner contemplated in this Agreement.

Material Adverse Change: (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, condition (financial or otherwise) or prospects of the Company; (b) a material impairment of the ability of the Company to perform under this Agreement or any related agreements; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability of this Agreement against the Company (unless such material adverse effect is directly caused by an action of any Purchaser which can be remedied by such Purchaser).

Memorandum of Sale: With respect to each Mortgage Loan and the Mortgage Loan Package, the memorandum of sale, substantially in the form of Exhibit I attached hereto, confirming the sale by Company and the purchase by Purchaser of the Mortgage Loan Package on the related Closing Date.

MERS: MERSCORP, Inc., its successors and assigns.

MERS Designated Mortgage Loan: A Mortgage Loan for which (a) the Company has designated or will designate MERS as, and has taken or will take such action as is necessary to cause MERS to be, the mortgagee of record, as nominee for the Company, in accordance with MERS Procedures Manual and (b) the Company has designated or will designate the Custodian as the Investor on the MERS System.

MERS Procedures Manual: The MERS Procedures Manual, as it may be amended, supplemented or otherwise modified from time to time.

MERS Report: The report from the MERS System listing MERS Designated Mortgage Loans and other information.

MERS System: MERS mortgage electronic registry system, as more particularly described in the MERS Procedures Manual.

Monthly Advance: The portion of each Monthly Payment that is delinquent with respect to each Mortgage Loan at the close of business on the Determination Date required to be advanced by the Company pursuant to Section 5.03 on the Business Day immediately preceding the Remittance Date of the related month.

Monthly Payment: With respect to any Mortgage Loan (other than an Option ARM Mortgage Loan), the scheduled payment of principal and interest payable by a Mortgagor under the related Mortgage Note on each Due Date, which payment may change on any Adjustment Date as provided in the related Mortgage Note and Mortgage for any Adjustable Rate Mortgage Loan. With respect to any Option ARM Mortgage Loan, the payment of interest and/or principal elected to be paid by a Mortgagor pursuant to the payment options under the related Mortgage Note on each Due Date, which payment may change on any Due Date as provided in the related Mortgage Note.

Moody's: Moody's Investors Service, Inc.

Mortgage: The mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first lien on an unsubordinated estate in fee simple or leasehold estate in real property securing the Mortgage Note.

Mortgage File: The items pertaining to a particular Mortgage Loan referred to in Exhibit B annexed hereto, and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Impairment Insurance Policy: A mortgage impairment or blanket hazard insurance policy as described in Section 4.11.

Mortgage Interest Rate: The annual rate of interest borne on a Mortgage Note in accordance with the provisions of the Mortgage Note net of any Relief Act Reduction.

Mortgage Loan: An individual Mortgage Loan which is the subject of this Agreement, each Mortgage Loan originally sold and subject to this Agreement being identified on the Mortgage Loan Schedule annexed to the related Memorandum of Sale, which Mortgage Loan includes without limitation the Mortgage File, the Monthly Payments, Principal Prepayments, Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, REO Disposition Proceeds and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

Mortgage Loan Documents: The documents referred to in Exhibit B as items 1 through 9.

Mortgage Loan Package: The pool or group of whole loans purchased on a Closing Date, as described in the Mortgage Loan Schedule annexed to the related Memorandum of Sale.

Mortgage Loan Remittance Rate: With respect to each Mortgage Loan, the annual rate of interest remitted to the Purchaser, which shall be equal to the related Mortgage Interest Rate minus the Servicing Fee Rate.

Mortgage Loan Schedule: With respect to each Mortgage Loan Package, the schedule of Mortgage Loans substantially in the form attached as Exhibit A hereto and annexed to the related Memorandum of Sale (and delivered in electronic format to the Purchaser), such schedule setting forth the following information with respect to each Mortgage Loan in the related Mortgage Loan Package:

(1) the Company's Mortgage Loan number;

(2) Mortgagor's name (including any co-mortgagors);

(3) the full street address, city, state and zip code of the Mortgaged Property;

(4) the Mortgagor's and co-mortgagor's FICO score;

(5)  a code indicating whether the loan was originated through a correspondent, retail, or wholesale channel;

(6)  the number of units for all Mortgaged Properties;

(7)  the number of bedrooms and eligible rents;

(8)  a code indicating whether the Mortgaged Property is a single family residence, two-family residence, three-family residence, four-family residence, PUD, townhouse or condominium or secured by Co-op Shares;

(9)  the Mortgage Interest Rate as of the Cut-off Date;

(10)  the Mortgage Interest Rate as of the date of origination;

(11)  the current Mortgage Loan Remittance Rate;

(12)  the Monthly Payment as of the date of origination;

(13)  the Monthly Payment as of the Cut-off Date;

(14)  the date of the Mortgage Note;

(15)  the principal balance of the Mortgage Loan as of the Cut-off Date after deduction of payments of principal due on or before the Cut-off Date whether or not collected;

(16)  the date on which the first Monthly Payment was due;

(17)  the last payment date on which a payment was applied;

(18)  the original term to maturity or the remaining months to maturity from the related Cut-off Date, in any case based on the original amortization schedule, and if different, the maturity expressed in the same manner but based on the actual amortization schedule;

(19)  the scheduled maturity date;

(20)  the Loan-to-Value Ratio;

(21)  a code indicating the type of Adjustable Rate Mortgage Loan (i.e. 3/1, 5/1, 7/1, etc.);

(22)  the Gross Margin;

(23)  the Index;

(24)  Adjustment Dates and the next Adjustment Date;

(25)  the lifetime Mortgage Interest Rate cap and Periodic Caps;

(26)  a code indicating whether the Mortgage Loan is convertible or not;

(27)  a code indicating the name of the issuer of the PMI Policy, if any;

(28)  a code indicating the lien status of the Mortgage Loan;

(29)  a code indicating whether the Mortgage Loan is a Buydown Mortgage Loan;

(30)  a code indicating whether such Mortgage Loan provides for a Prepayment Penalty and, if applicable, the Prepayment Penalty period for such loan;

(31)  a code indicating whether the Mortgaged Property is owner-occupied or investor property;

(32)  the documentation level (full, alternative, limited);

(33)  loan purpose;

(34)  the Appraised Value;

(35)  the applicable Servicing Fee Rate;

(36)  a code indicating whether the Mortgage Loan is a "high cost" (or similarly classified) loan under applicable federal, state and local laws; and

(37)  a code indicating whether the Mortgage Loan is an Option ARM Mortgage Loan.

With respect to the Mortgage Loans in the aggregate in the related Mortgage Loan Package, the respective Mortgage Loan Schedule shall set forth the following information, as of the Cut-Off Date:

(i)  the number of Mortgage Loans;

(ii)  the current aggregate outstanding principal balance of the Mortgage Loans;

(iii)  the weighted average Mortgage Interest Rate of the Mortgage Loans;

(iv)  the weighted average months to maturity of the Mortgage Loans.

Mortgage Note: The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgaged Property: The real property, including any improvements, securing repayment of the debt evidenced by a Mortgage Note.

Mortgagor: The obligor on a Mortgage Note.

Negative Amortization: An increase in the mortgage debt that occurs when the Monthly Payment is not sufficient for full application to both principal and interest. The interest shortage is added to the unpaid principal balance to create "negative" amortization.

Nonrecoverable Advance: Any Monthly Advance or Servicing Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Property that, in the good faith business judgment of the Company, will not or, in the case of a proposed Monthly Advance or Servicing Advance, would not ultimately be recoverable from collections on such Mortgage Loan, Monthly Payments, Insurance Proceeds, Condemnation Proceeds or Liquidation Proceeds or other amounts received with respect to such Mortgage Loan or REO Property as provided herein; *provided, however*, to the extent that the Company determines that any such amount is not recoverable from collections or other recoveries in respect of such Mortgage Loan, such determination shall be evidenced by an Officer's Certificate setting forth such determination and the procedures and considerations of the Company forming the basis of such determination.

OCC: The Office of the Comptroller of the Currency.

Officer's Certificate: A certificate signed by the Chairman of the Board or the Vice Chairman of the Board or the President, a Senior Vice President, a First Vice President, a Vice President or an Assistant Vice President and by the Treasurer or the Secretary or one of the Assistant Treasurers or Assistant Secretaries of the Company, and delivered to the Purchaser as required by this Agreement.

Opinion of Counsel: A written opinion of counsel, who may be an employee of the Company, reasonably acceptable to the Purchaser.

Option ARM Mortgage Loan: An Adjustable Rate Mortgage Loan with an original term to maturity of not more than forty (40) years and with respect to which the related borrower may choose a flexible payment option each month pursuant to the terms of the related Mortgage Note.

Payment Adjustment Date: With respect to each Adjustable Rate Mortgage Loan or interest-only Mortgage Loan, the date on which Monthly Payments shall be adjusted. With respect to each Adjustable Rate Mortgage Loan, the Payment Adjustment Date shall occur on the date which is eleven months from the first payment date for the Mortgage Loan, unless otherwise specified in the Mortgage Note, and on each anniversary of such first Payment Adjustment Date.

Periodic Interest Rate Cap: As to each Adjustable Rate Mortgage Loan, the maximum increase or decrease in the Mortgage Interest Rate on any Adjustment Date pursuant to the terms of the Mortgage Note.

Permitted Investments: Any one or more of the following obligations or securities acquired at a purchase price of not greater than par, regardless of whether issued or managed by the Company or any of its affiliates or for which an affiliate of the Company serves as an advisor:

(i) direct obligations of, or obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States;

(ii) (A) demand and time deposits in, certificates of deposit of, bankers' acceptances issued by or federal funds sold by any depository institution or trust company incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state authorities, so long as, at the time of such investment or contractual commitment providing for such investment, such depository institution or trust company or its ultimate parent has a short-term uninsured debt rating in the highest available rating category of each Rating Agency and provided that each such investment has an original maturity of no more than 365 days; and provided further that, if the only Rating Agency is S&P and if the depository or trust company is a principal subsidiary of a bank holding company and the debt obligations of such subsidiary are not separately rated, the applicable rating shall be that of the bank holding company; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall be A-1+ in the case of S&P if S&P is the Rating Agency; and (B) any other demand and time deposit or deposit which is fully insured by the FDIC;

(iii) repurchase obligations with a term not to exceed 30 days with respect to any security described in clause (i) above and entered into with a depository institution or trust company (acting as principal) rated F-1+ or higher by Fitch, rated A-1+ by S&P and rated A2 or higher by Moody's;

(iv) securities bearing interest or sold at a discount that are issued by any corporation incorporated under the laws of the United States of America or any State thereof and that are rated by each Rating Agency in its highest long-term unsecured rating category at the time of such investment or contractual commitment providing for such investment;

(v) commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than 30 days after the date of acquisition thereof) that is rated by each Rating Agency in its highest short-term unsecured debt rating available at the time of such investment; and

(vi) units of taxable money market funds (which may be 12b-1 funds, as contemplated under the rules promulgated by the Securities and Exchange Commission under the Investment Company Act of 1940), which funds have the highest rating available for such securities from the Rating Agencies or which have been designated in writing by the Rating Agencies as Permitted Investments;

provided, that no instrument described hereunder shall evidence either the right to receive (a) only interest with respect to the obligations underlying such instrument or (b) both principal and interest payments derived from obligations underlying such instrument and the interest and principal payments with respect to such instrument provide a yield to maturity at par greater than 120% of the yield to maturity at par of the underlying obligations.

Person: Any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

PMI Policy: A policy of primary mortgage guaranty insurance issued by a Qualified Insurer at levels and in amounts which are in accordance with the requirements of Fannie Mae, as required by this Agreement with respect to certain Mortgage Loans.

Prepayment Interest Shortfall: As to any Remittance Date and each Mortgage Loan subject to a Principal Prepayment received during the calendar month preceding such Remittance Date, the amount, if any, by which one month's interest at the related Mortgage Loan Remittance Rate on such Principal Prepayment exceeds the amount of interest paid in connection with such Principal Prepayment.

Prepayment Premium: Payments received on a Mortgage Loan as a result of a Principal Prepayment hereon, not otherwise due thereon in respect of principal or interest, which are intended to be a disincentive to prepayment.

Prepayment Premium Loan: A Mortgage Loan with respect to which the Mortgagor must pay a Prepayment Premium in connection with a Principal Prepayment.

Prime Rate: The prime rate announced to be in effect from time to time, as published as the average rate in The Wall Street Journal.

Principal Prepayment: Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any Prepayment Premium thereon and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Purchase Price: The price paid on the Closing Date by the Purchaser to the Company for the Mortgage Loans, as calculated as set forth in the related Purchase Price and Terms Letter.

Purchase Price and Terms Letter: The letter agreement between the Company and the Purchaser entered into prior to the related Closing Date relating to the sale of one or more Mortgage Loan Packages.

Purchaser(s): As defined in the introductory paragraph hereof.

Qualified Appraiser: An appraiser, duly appointed by the Company, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, and whose compensation was not affected by the approval or disapproval of the Mortgage Loan, and such appraiser and the appraisal made by such appraiser both satisfied the requirements of Title XI of the Financial Institution Reform, Recovery, and Enforcement Act and the regulations promulgated thereunder, all as in effect on the date the Mortgage Loan was originated.

Qualified Depository: Either (i) an account or accounts maintained with a federal or state chartered depository institution or trust company the short-term unsecured debt obligations of which (or, in the case of a depository institution or trust company that is the principal subsidiary of a holding company, the debt obligations of such holding company) have the highest short-term ratings of each Rating Agency at the time any amounts are held on deposit therein, or (ii) a trust account or accounts maintained with the trust department of a federal or state chartered depository institution or trust company, acting in its fiduciary capacity.

Qualified Insurer: A mortgage guaranty insurance company duly authorized and licensed where required by law to transact mortgage guaranty insurance business and approved as an insurer by Fannie Mae or Freddie Mac.

Qualified Substitute Mortgage Loan: A mortgage loan eligible to be substituted by the Company for a Deleted Mortgage Loan which must, on the date of such substitution be approved by the Purchaser and (i) have an outstanding principal balance, after deduction of all scheduled payments due in the month of substitution (or in the case of a substitution of more than one mortgage loan for a Deleted Mortgage Loan, an aggregate principal balance), not in excess of the Stated Principal Balance of the Deleted Mortgage Loan; (ii) have a Mortgage Loan Remittance Rate not less than, and not more than 2% greater than, the Mortgage Loan Remittance Rate of the Deleted Mortgage Loan; (iii) have a remaining term to maturity not greater than and not more than one year less than that of the Deleted Mortgage Loan; (iv) comply with each representation and warranty set forth in Sections 3.01 and 3.02; (v) be of the same type as the Deleted Mortgage Loan; (vi) have a Gross Margin not less than that of the Deleted Mortgage Loan; (vii) have the same Index as the Deleted Mortgage Loan; (viii) will have a FICO score not less than that of the Deleted Mortgage Loan; (ix) have an LTV not greater than that of the Deleted Mortgage Loan; (x) have a Prepayment Premium with a term and an amount at least equal to the Prepayment Premium of the Deleted Mortgage Loan; and (xi) have a Company credit grade not lower in quality than that of the Deleted Mortgage Loan.

Rating Agency: Each of Fitch, Inc., Moody's and S&P, or any successor thereto.

Reconstitution Agreement: As defined in Section 9.01.

Reconstitution Date: The date on which any or all of the Mortgage Loans serviced under this Agreement shall be removed from this Agreement and reconstituted as part of a Securitization Transaction or Whole Loan Transfer pursuant to Section 9.01 hereof. The Reconstitution Date shall be such date which the Purchaser and the subsequent purchaser or transferee of the related Mortgage Loans shall designate. On such date, except as provided in this Agreement, the Mortgage Loans transferred shall cease to be covered by this Agreement and the Company's servicing responsibilities shall cease under this Agreement with respect to the related transferred Mortgage Loans.

Record Date: The close of business of the last Business Day of the month preceding the month of the related Remittance Date.

Relief Act Reduction: With respect to any Mortgage Loan as to which there has been a reduction in the amount of interest collectible thereon as a result of the application of the Servicemembers Civil Relief Act, as amended, or any similar state law, any amount by which interest collectible on such Mortgage Loan for the Due Date in the related Due Period is less than the interest accrued thereon for the applicable one-month period at the Mortgage Interest Rate without giving effect to such reduction.

REMIC: A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

REMIC Provisions: Provisions of the federal income tax law relating to a REMIC, which appear at Section 860A through 860G of Subchapter M of Chapter 1, Subtitle A of the Code, and related provisions, and regulations, rulings or pronouncements promulgated thereunder, as the foregoing may be in effect from time to time.

Remittance Date: The 18th day (or if such 18th day is not a Business Day, the first Business Day immediately preceding such 18th day) of any month, beginning with the First Remittance Date.

REO Disposition: The final sale by the Company of any REO Property.

REO Disposition Proceeds: All amounts received with respect to an REO Disposition pursuant to Section 4.16.

REO Property: A Mortgaged Property acquired by the Company on behalf of the Purchaser through foreclosure or by deed in lieu of foreclosure, as described in Section 4.16.

Repurchase Price: With respect to any Mortgage Loan, a price equal to (i) (A) prior to the date which is twelve (12) months following the Closing Date, the product of the Stated Principal Balance of such Mortgage Loan times the greater of (x) the Purchase Price Percentage, or (y) 100%, and (B) thereafter, the Stated Principal Balance of the Mortgage Loan plus (ii) interest on such Stated Principal Balance at the Mortgage Loan Interest Rate from the date on which interest has last been paid and distributed to the Purchaser to the last day of the month in which such repurchase occurs, less amounts received or advanced in respect of such repurchased Mortgage Loan which are being held in the Custodial Account for distribution in the month of repurchase plus the amount of any advances owed to any servicer, plus all costs and expenses incurred by the Purchaser or any servicer arising out of or based upon such breach, including without limitation, costs and expenses incurred in the enforcement of the Company's repurchase obligation hereunder plus (iii) with respect to any Mortgage Loan subject to a Securitization Transaction, any costs and damages incurred by the related trust in connection with any violation by such Mortgage Loan of any predatory or abusive lending law.

RESPA: The Real Estate Settlement Procedures Act, as amended.

SAIF: The Savings Association Insurance Fund, or any successor thereto.

S&P: Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies., Inc.

SEC: As defined in Section 9.01(f).

SEC Certification: As defined in Section 9.01(f).

Securities Act of 1933 or the 1933 Act: The Securities Act of 1933, as amended.

Securitization Transaction: Any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

Servicer Requirements: As defined in Section 5.02.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) other than Monthly Advances incurred in the performance by the Company of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or judicial proceedings, including foreclosures, (c) the management and liquidation of any REO Property and (d) compliance with the obligations under Section 4.08.

Servicing Fee: With respect to each Mortgage Loan, the amount of the annual fee the Purchaser shall pay to the Company, which shall, for a period of one full month, be equal to one-twelfth of the product of (a) the applicable Servicing Fee Rate and (b) the outstanding principal balance of such Mortgage Loan. Such fee shall be payable monthly, computed on the basis of the same principal amount and period respecting which any related interest payment on a Mortgage Loan is computed. The obligation of the Purchaser to pay the Servicing Fee is limited to, and the Servicing Fee is payable solely from, the interest portion (including recoveries with respect to interest from Liquidation Proceeds, Condemnation Proceeds and Insurance Proceeds to the extent permitted by Section 4.05) of such Monthly Payment collected by the Company, or as otherwise provided under Section 4.05.

Servicing Fee Rate: With respect to each Mortgage Loan, the per annum rate specified for such Mortgage Loan set forth on the Mortgage Loan Schedule or if not specified thereon, in the Purchase Price and Terms Letter.

Servicing File: With respect to each Mortgage Loan, the file retained by the Company consisting of originals or copies, which may be imaged copies, of all documents in the Mortgage File which are not delivered to the Custodian and copies of the Mortgage Loan Documents listed in the Custodial Agreement the originals of which are delivered to the Custodian pursuant to Section 2.03.

Servicing Officer: Any officer of the Company involved in or responsible for the administration and servicing of the Mortgage Loans whose name appears on a list of servicing officers furnished by the Company to the Purchaser upon request, as such list may from time to time be amended.

Servicing Systems: As defined in Section 5.02.

Servicing Transfer Event: With respect to any Mortgage Loan, the occurrence of any of the following events:

(i)    a payment default shall have occurred on such Mortgage Loan at its original maturity date, or if the original maturity date of such Mortgage Loan has been extended, a payment default occurs on such Mortgage Loan at its extended maturity date; or

(ii)   any Monthly Payment is 90 days or more delinquent; or

(iii)  the date upon which the Company determines that a payment default is imminent and is not likely to be cured by the related Mortgagor within 90 days; or

(iv)   the date upon which a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law, or the appointment of a conservator, receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, and being entered against the related Mortgagor; and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days; or

(v)    the related Mortgagor shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to such Mortgagor or of or relating to all or substantially all of its property; or

(vi)   the related Mortgagor shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vii)  a default of which the Company has notice (other than a failure by such Mortgagor to pay principal or interest) and which in the opinion of the Company materially and adversely affects the interests of the Purchaser has occurred and remained unremedied for the applicable grace period specified in such Mortgage Loan (or if no grace period is specified for those defaults which are capable of cure, 30 days); or

(viii) the Company has received notice of the foreclosure or proposed foreclosure of any lien on the related Mortgaged Property.

Special Servicer: A special servicer appointed by the Purchaser to service Mortgage Loans after the occurrence of a Servicing Transfer Event.

Stated Principal Balance: As to each Mortgage Loan as to any date of determination, (i) the principal balance of the Mortgage Loan at the related Cut-off Date after giving effect to the principal portion of any Monthly Payments due on or before such date, whether or not received (except with respect to Option ARM Mortgage Loans, in which case, to the extent received), as well as any Principal Prepayments received before such date, minus (ii) all amounts previously distributed to the Purchaser with respect to the Mortgage Loan representing payments or recoveries of principal, or advances in lieu thereof.

Subservicer: Any Person with which the Company has entered into a Subservicing Agreement, provided that such Person is a Fannie Mae or Freddie Mac approved seller/servicer in good standing and no event has occurred, including but not limited to a change in insurance coverage, that would make it unable to comply with the eligibility for seller/servicers imposed by Fannie Mae or Freddie Mac.

Subservicing Agreement: Any subservicing agreement (which, in the event the Subservicer is an affiliate of the Company, need not be in writing) between the Company and any Subservicer relating to servicing and/or administration of certain Mortgage Loans as provided in Section 3.01(b).

Substitution Adjustment Amount: As defined in Section 3.03.

Underwriting Guidelines: The underwriting guidelines of the Company with respect to jumbo and alternate 'A' Mortgage Loans, attached as Exhibit E hereto, as the same shall be updated from time to time; provided, that no updated underwriting guidelines of the Company shall constitute "Underwriting Guidelines" hereunder until such updates have been received by the Purchasers. The exception policies of the Company shall be incorporated into and considered a part of the Underwriting Guidelines.

Whole Loan Transfer: Any sale or transfer of some or all of the Mortgage Loans, other than a Securitization Transaction.

**ARTICLE II**

**AGREEMENT TO PURCHASE; PURCHASE PRICE; POSSESSION OF MORTGAGE FILES; MAINTENANCE OF SERVICING FILES; BOOKS AND RECORDS; CUSTODIAL**

**AGREEMENT; DELIVERY OF DOCUMENTS; CLOSING CONDITIONS**

Section 2.01    Agreement to Purchase; Purchase Price; Mortgage and Servicing Files.

(a)    Agreement to Purchase.

In exchange for the payment of the Purchase Price to the Company on the related Closing Date, the Company agrees to sell and the Purchaser agrees to purchase, without recourse but subject to the terms of this Agreement, on a servicing retained basis, all the right, title and interest of the Company in and to the Mortgage Loans included in a Mortgage Loan Package, which have an aggregate Stated Principal Balance on the related Cut-off Date in an amount as set forth in the related Purchase Price and Terms Letter, or in such other amount as agreed by the Purchaser and the Company as evidenced by the aggregate Stated Principal Balance of the Mortgage Loan Package accepted by the Purchaser on the related Closing Date. The Company shall deliver the Mortgage Loan Schedule for the Mortgage Loan Package to be purchased on the related Closing Date to the Purchaser at least two (2) Business Days prior to such Closing Date.

(b)    Purchase Price.

The Purchase Price for each Mortgage Loan Package shall be the percentage of par as stated in or as otherwise calculated pursuant to the related Purchase Price and Terms Letter (subject to adjustment as provided therein), plus accrued interest on the aggregate Stated Principal Balance of the Mortgage Loan Package at the weighted average Mortgage Loan Remittance Rate from the related Cut-off Date through the day prior to the related Closing Date, inclusive. The initial principal amount of the Mortgage Loans shall be the aggregate Stated Principal Balance of the Mortgage Loans, so computed as of the related Cut-off Date, after application of scheduled payments of principal due on or before the related Cut-off Date, whether or not collected (except with respect to Option ARM Mortgage Loans, in which case, to the extent received). Such payments shall be made to the account designated by the Company by wire transfer to immediately available funds by 3:00 p.m., Charlotte, North Carolina time, on the related Closing Date.

The Purchaser shall be entitled to (1) all scheduled principal due (except with respect to Option ARM Mortgage Loans, in which case, to the extent received) after the related Cut-off Date, (2) all other recoveries of principal collected on or after the related Cut-off Date (provided, however, that, except with respect to Option ARM Mortgage Loans, all scheduled payments of principal due on or before the related Cut-off Date and collected by the Company or any successor servicer after the related Cut-off Date shall belong to the Company) and (3) all payments of interest on the Mortgage Loans at the Mortgage Loan Remittance Rate (minus that portion of any such payment that is allocable to the period prior to the related Cut-off Date). The Stated Principal Balance of each Mortgage Loan as of the related Cut-off Date is determined after application of payments of principal due on or before the related Cut-off Date whether or not collected together with any unscheduled principal prepayments collected prior to the related Cut-off Date, provided, however, that payments of scheduled principal and interest prepaid for a Due Date beyond the Cut-off Date shall not be applied to the principal balance as of the Cut-off Date. Such prepaid amounts (minus interest at the Servicing Fee Rate) shall be the property of the Purchaser. The Company shall deposit any such prepaid amounts into the Custodial Account for the benefit of the Purchaser.

(c)    Possession of Mortgage Files; Maintenance of Servicing Files.

The contents of each Servicing File are and shall be held in trust by the Company for the benefit of the Purchaser as the owner thereof. Possession of each Servicing File by the Company is at the will of the Purchaser for the sole purpose of servicing the related Mortgage Loan, and such retention and possession by the Company is in a custodial capacity only. Upon the sale of the Mortgage Loans the ownership of each Mortgage Note, the related Mortgage and the related Mortgage File and Servicing File shall vest immediately in the Purchaser, and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of the Company shall vest immediately in the Purchaser and shall be retained and maintained by the Company, in trust, at the will of the Purchaser and only in such custodial capacity. The Company shall release its custody of the contents of any Servicing File only in accordance with written instructions from the Purchaser, unless such release is required as incidental to the Company's servicing of the Mortgage Loans or is in connection with a repurchase of any Mortgage Loan pursuant to Section 3.03 or 6.02.

Section 2.02    Books and Records; Transfers of Mortgage Loans.

From and after the sale of the Mortgage Loans to the Purchaser all rights arising out of the Mortgage Loans, including, but not limited to, all funds received on or in connection with the Mortgage Loans, except Prepayment Premiums, shall be received and held by the Company in trust for the benefit of the Purchaser as owner of the Mortgage Loans, and the Company, if applicable, shall retain record title to the related Mortgages for the sole purpose of facilitating the servicing and the supervision of the servicing of the Mortgage Loans.

The sale of each Mortgage Loan shall be reflected on the Company's balance sheet and other financial statements, tax returns and business records as a sale of assets by the Company. The Company shall be responsible for maintaining, and shall maintain, a complete set of books and records for each Mortgage Loan, which shall be marked clearly to reflect the ownership of each Mortgage Loan by the Purchaser. In particular, the Company shall maintain in its possession, available for inspection by the Purchaser, or its designee, and shall deliver to the Purchaser upon demand, evidence of compliance with all federal, state and local laws, rules and regulations, and requirements of Fannie Mae or Freddie Mac, including but not limited to documentation as to the method used in determining the applicability of the provisions of the Flood Disaster Protection Act of 1973, as amended, to the Mortgaged Property, documentation evidencing insurance coverage and eligibility of any condominium project for approval by Fannie Mae or Freddie Mac and periodic inspection reports as required by Section 4.13. To the extent that original documents are not required for purposes of realization of Liquidation Proceeds or Insurance Proceeds, documents maintained by the Company may be in the form of microfilm or microfiche or such other reliable means of recreating original documents, including but not limited to, optical imagery techniques so long as the Company complies with the requirements of Fannie Mae or Freddie Mac.

The Company shall maintain with respect to each Mortgage Loan and shall make available for inspection by the Purchaser or its designee the related Servicing File during the time the Purchaser retains ownership of a Mortgage Loan and thereafter in accordance with applicable laws and regulations.

The Company shall keep at its servicing office books and records in which, subject to such reasonable regulations as it may prescribe, the Company shall note transfers of Mortgage Loans. No transfer of a Mortgage Loan may be made unless such transfer is in compliance with the terms hereof. For the purposes of this Agreement, the Company shall be under no obligation to deal with any person with respect to this Agreement or the Mortgage Loans unless the books and records show such person as the owner of the Mortgage Loan. The Purchaser may, subject to the terms of this Agreement, sell and transfer one or more of the Mortgage Loans. The Purchaser shall advise the Company of any such transfer. Upon receipt of notice of the transfer, the Company shall mark its books and records to reflect the ownership of the Mortgage Loans of such assignee, and shall release the previous Purchaser from its obligations hereunder with respect to the Mortgage Loans sold or transferred. If the Company receives notification of a transfer less than five (5) Business Days before the last calendar day of the month, the Company's duties to remit and report as required by Article V shall begin with the next Due Period.

Section 2.03    Custodial Agreement; Delivery of Documents.

Pursuant to the related Custodial Agreement, the Company will, with respect to each Mortgage Loan, deliver and release the Mortgage Loan Documents to the Custodian at least five (5) Business Days prior to the related Closing Date. In addition, in connection with the assignment of any MERS Designated Mortgage Loan, the Company agrees that on or prior to each Closing Date it will cause, at its own expense, the MERS System to indicate that the related Mortgage Loans have been assigned by the Company to the Purchaser in accordance with this Agreement by entering in the MERS System the information required by the MERS System to identify the Purchaser as owner of the Mortgage Loans. The Company further agrees that it will not alter the information referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

If pursuant to the foregoing provisions the Company repurchases a Mortgage Loan that is a MERS Designated Mortgage Loan, the Company shall either (i) cause MERS to execute and deliver an Assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Company and shall cause such Mortgage to be removed from registration on the MERS system in accordance with MERS' rules and regulations or (ii) cause MERS to designate on the MERS System the Company or its designee as the beneficial holder of such Mortgage Loan.

The Custodian shall be required to certify its receipt of the Mortgage Loan Documents required to be delivered pursuant to the Custodial Agreement prior to the related Closing Date, as evidenced by the initial certification of the Custodian in the form annexed to the Custodial Agreement. The Company shall be responsible for recording the Assignments of Mortgage, if necessary, in

Unassociated Document                                                                 Page 554 of 835

12-12020-mg     Doc 5106-9     Filed 09/18/13     Entered 09/18/13 18:18:12     Exhibit 7
Part 3     FST-CV-09-5011591     Doc 163     Exhibit D     Part 2 of 3     Pg 276 of 279

accordance with Accepted Servicing Practices and this Agreement. The Purchaser shall be responsible for the initial and on-going fees and expenses of the Custodian.

All recording fees and other costs associated with the recording of Assignments of Mortgage and other relevant documents to the Purchaser or its designee will be borne by the Company. For Mortgage Loans not registered under the MERS System, if the Purchaser requests that the related Assignments of Mortgage be recorded, the Company shall cause such Assignments of Mortgage which were delivered in blank to be completed and to be recorded. The Company shall be required to deliver such Assignments of Mortgage for recording within thirty (30) days after the date on which the Company is notified that recording will be required pursuant to this Section 2.03. The Company shall furnish the Custodian with a copy of each Assignment of Mortgage submitted for recording. In the event that any such Assignment is lost or returned unrecorded because of a defect therein, the Company shall promptly have a substitute Assignment of Mortgage prepared or have such defect cured, as the case may be, and thereafter cause such Assignment of Mortgage to be duly recorded.

Except as otherwise provided in this Section 2.03, upon discovery or receipt of notice of any materially defective Mortgage Loan Document, or that a Mortgage Loan Document is missing, the Company shall have ninety (90) days to cure such defect or deliver such missing document to the Custodian. Any Mortgage that is not executed as required or does not strictly comply with all legal requirements shall be deemed to be materially defective. If the Company does not cure such defect or deliver such missing document within such time period, the Company shall either repurchase or substitute for such Mortgage Loan in accordance with Section 3.03.

The Company shall forward to the Custodian original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan entered into in accordance with Section 4.01 or 6.01 within one week of their execution, provided, however, that the Company shall provide the Custodian with a certified true copy of any such document submitted for recordation within ten (10) days after its execution, and shall provide the original of any document submitted for recordation or a copy of such document certified by the appropriate public recording office to be a true and complete copy of the original within sixty (60) days after its submission for recordation.

If the original or a copy certified by the appropriate recording office of any document submitted for recordation to the appropriate public recording office is not so delivered to the Custodian within 180 days following the related Closing Date, and if the Company does not cure such failure within thirty (30) days after receipt of written notification of such failure from the Purchaser, the related Mortgage Loan shall, upon the request of the Purchaser, be repurchased by the Company at a price and in the manner specified in Section 3.03.

In the event the public recording office is delayed in returning any original document, the Company shall deliver to the Custodian within 180 days after its submission for recordation, a copy of such document and an Officer's Certificate, which shall (i) identify the recorded document, (ii) state that the recorded document has not been delivered to the Custodian due solely to a delay by the public recording office, (iii) state the amount of time generally required by the applicable recording office to record and return a document submitted for recordation and (iv) specify the date the applicable recorded document will be delivered to the Custodian. The Company shall be required to deliver the document to the Custodian by the date specified in (iv) above. An extension of the date specified in (iv) above may be requested from the Purchaser, which consent shall not be unreasonably withheld. However, if the Company cannot deliver such original or clerk-certified copy of any document submitted for recordation to the appropriate public recording office within the specified time for any reason, within thirty (30) days after receipt of written notification of such failure from the Purchaser, the Company shall repurchase the related Mortgage Loan at the price and in the manner specified in Section 3.03.

In addition to any rights granted to the Purchaser hereunder to underwrite the Mortgage Loans and review the Mortgage Loan Documents prior to the Closing Date, the Purchaser shall be entitled to conduct a due diligence review of the Mortgage Files in accordance with the timetable and any additional terms and conditions set forth in the Purchase Price and Terms Letter. Such underwriting by the Purchaser or its designee shall not impair or diminish the rights of the Purchaser or any of its successors under this Agreement with respect to a breach of the representations and warranties contained in this Agreement. The fact that the Purchaser or its designee has conducted or has failed to conduct any partial or complete examination of the Mortgage Files shall not affect the Purchaser's or any of its successors' rights to demand repurchase or other relief or remedy provided for in this Agreement.

Section 2.04     Quality Control Procedures.

The Company shall have an internal quality control program that verifies, on a regular basis, the existence and accuracy of the legal documents, credit documents, property appraisals, and underwriting decisions. The program shall include evaluating and monitoring the overall quality of the Company's loan production and the servicing activities of the Company in accordance with industry standards. The Company shall make available upon request of any Purchaser information regarding its quality control program.

Section 2.05     Closing Conditions.

The closing for the purchase and sale of each Mortgage Loan Package shall take place on the respective Closing Date. The closing shall be either by telephone, confirmed by letter or wire as the parties shall agree, or conducted in person, at such place as the parties may agree.

The closing for each Mortgage Loan Package shall be subject to the satisfaction of each of the following conditions precedent:

(a) with respect to the Purchaser's obligations to close:

(i) the Company shall have delivered to the Purchaser and the Custodian the related Mortgage Loan Schedule and an electronic data file containing information on a loan-level basis;

(ii) all of the representations and warranties of the Company under this Agreement shall be true and correct as of the related Closing Date (or, with respect to Section 3.02, such other date specified therein) in all material respects and no default shall have occurred hereunder which, with notice or the passage of time or both, would constitute an Event of Default hereunder;

(iii) the Purchaser and its counsel shall have received an opinion from the Company's counsel, substantially in the form of Exhibit G attached hereto (with respect to the initial closing only);

(iv) the Purchaser shall have received from the Custodian an initial certification with respect to its receipt of the Mortgage Loan Documents for the related Mortgage Loans;

(v) the Purchaser shall have received originals of the related Memorandum of Sale, the related Purchase Price and Terms Letter and a funding memorandum setting forth the Purchase Price(s), and the accrued interest thereon, for the Mortgage Loan Package, in each case executed on behalf of the Company;

(vi) no Material Adverse Change or Market Change Event shall have occurred since the date of the Purchase Price and Terms Letter;

(vii) all other terms and conditions of this Agreement, the related Memorandum of Sale and the related Purchase Price and Terms Letter to be satisfied by the Company shall have been complied with in all material respects; and

(b) with respect to the Company's obligations to close:

(i) the Company shall have received a copy of the initial certification of the Custodian with respect to its receipt of the Mortgage Loan Documents for the related Mortgage Loans;

(ii) the Company has received originals of the related Memorandum of Sale, the related Purchase Price and Terms Letter and a funding memorandum setting forth the Purchase Price(s), and accrued interest thereon, for the Mortgage Loan Package, in each case executed on behalf of the Purchaser; and

Unassociated Document                                                                                                                            Page 555 of 835

12-12020-mg    Doc 5106-9    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 7
Part 3    FST-CV-09-5011591    Doc 163    Exhibit D    Part 2 of 3    Pg 277 of 279

(iii) all terms and conditions of this Agreement, the related Memorandum of Sale and the related Purchase Price and Terms Letter to be satisfied by the Purchaser shall have been materially complied with.

Upon satisfaction of the foregoing conditions, the Purchaser shall pay to the Company on such Closing Date the Purchase Price for the related Mortgage Loan Package, including accrued interest pursuant to Section 2.01 of this Agreement.

ARTICLE III

REPRESENTATIONS AND WARRANTIES REMEDIES AND BREACH

Section 3.01 <u>Company Representations and Warranties</u>.

The Company hereby represents and warrants to the Purchaser that, as of the related Closing Date:

(a) <u>Due Organization and Authority</u>.

The Company is a federally chartered savings bank company duly organized, validly existing and in good standing under the laws of the United States and has all licenses necessary to carry on its business as now being conducted and is licensed, qualified and in good standing in each state where a Mortgaged Property is located if the laws of such state require licensing or qualification in order to conduct business of the type conducted by the Company, and in any event the Company is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of the related Mortgage Loan and the servicing of such Mortgage Loan in accordance with the terms of this Agreement; the Company has the full corporate power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement (including all instruments of transfer to be delivered pursuant to this Agreement) by the Company and the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of the Company; and all requisite corporate action has been taken by the Company to make this Agreement valid and binding upon the Company in accordance with its terms.

(b) <u>Ordinary Course of Business</u>.

The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Company, who is in the business of selling and servicing loans, and the transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Company pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction.

(c) <u>No Conflicts</u>.

Neither the execution and delivery of this Agreement, the acquisition of the Mortgage Loans by the Company, the sale of the Mortgage Loans to the Purchaser or the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with or result in a breach of any of the terms, articles of incorporation or by-laws or any legal restriction or any agreement or instrument to which the Company is now a party or by which it is bound, or constitute a default or result in the violation of any law, rule, regulation, order, judgment or decree to which the Company or its property is subject, or impair the ability of the Purchaser to realize on the Mortgage Loans, or impair the value of the Mortgage Loans.

(d) <u>Ability to Service</u>.

The Company is an approved seller/servicer of conventional residential mortgage loans for Fannie Mae or Freddie Mac, with the facilities, procedures, and experienced personnel necessary for the sound servicing of mortgage loans of the same type as the Mortgage Loans. The Company is a HUD approved mortgagee pursuant to Section 203 of the National Housing Act and is in good standing to sell mortgage loans to and service mortgage loans for Fannie Mae or Freddie Mac, and no event has occurred, including but not limited to a change in insurance coverage, which would make the Company unable to comply with Fannie Mae or Freddie Mac eligibility requirements or which would require notification to either Fannie Mae or Freddie Mac.

(e) <u>Reasonable Servicing Fee; Fair Consideration</u>.

The Company acknowledges and agrees that the Servicing Fee represents reasonable compensation for performing such services and that the entire Servicing Fee shall be treated by the Company, for accounting and tax purposes, as compensation for the servicing and administration of the Mortgage Loans pursuant to this Agreement. The consideration received by the Company upon the sale of the Mortgage Loans under this Agreement shall constitute fair consideration and reasonably equivalent value for the Mortgage Loans.

(f) <u>Ability to Perform; Solvency</u>.

The Company does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement. The Company is solvent and the sale of the Mortgage Loans will not cause the Company to become insolvent. The sale of the Mortgage Loans is not undertaken to hinder, delay or defraud any of the Company's creditors.

(g) <u>No Litigation Pending</u>.

There is no action, suit, proceeding or investigation pending or to its knowledge threatened against the Company which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Company, or in any material impairment of the right or ability of the Company to carry on its business substantially as now conducted, or in any material liability on the part of the Company, or which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be contemplated herein, or which would be likely to impair materially the ability of the Company to perform under the terms of this Agreement.

(h) <u>No Consent Required</u>.

No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Company of or compliance by the Company with this Agreement or the sale of the Mortgage Loans as evidenced by the consummation of the transactions contemplated by this Agreement, or if required, such consent, approval, authorization or order has been obtained prior to the related Closing Date.

(i) <u>Selection Process</u>.

The Mortgage Loans will be selected on such Closing Date from among the outstanding fixed and adjustable rate one- to four-family mortgage loans in the Company's portfolio at such Closing Date as to which the representations and warranties set forth in Section 3.02 could be made and such selection will not be made in a manner so as to affect adversely the interests of the Purchaser.

(j) <u>No Untrue Information</u>.

Neither this Agreement nor any statement, report or other document furnished by or on behalf of the Company or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained therein not misleading.

(k)  Sale Treatment.

The Company has determined that the disposition of the Mortgage Loans pursuant to this Agreement will be afforded sale treatment for accounting and tax purposes.

(l)  No Material Change.

There has been no material adverse change in the business, operations, financial condition or assets of the Company since the date of the Company's most recent financial statements.

(m)  No Brokers' Fees.

The Company has not dealt with any broker, investment banker, agent or other Person that may be entitled to any commission or compensation in the connection with the sale of the Mortgage Loans.

(n)  Anti-Money Laundering Law Compliance.

The Company has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); the Company has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws.

(o)  MERS.

The Company is in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the MERS Designated Mortgage Loans. On or within two (2) Business Days following the related Closing Date, the Company shall provide the Custodian and the Purchaser with a MERS Report reflecting the Purchaser as the Investor on the MERS System with respect to each MERS Designated Mortgage Loan and no Person as Interim Funder for each MERS Designated Mortgage Loan.

(p)  Financial Statements.

The Company has delivered to the Purchaser financial statements as requested by the Purchaser. All such financial statements fairly present the pertinent results of operations and changes in financial position for each of such periods and the financial position at the end of each such period of the Company and its subsidiaries and have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved. There has been no change in the business, operations, financial condition, properties or assets of the Company since the date of the Company's financial statements that would have a material adverse effect on its ability to perform its obligations under this Agreement.

(q)  Compliance with the FACT Act.

As of the Closing Date, the sale or transfer of each Mortgage Loan by the Company complies with all applicable federal, state and local laws, rules and regulations governing such sale or transfer, including without limitation, the Fair and Accurate Transactions Act (the "FACT Act") and the Fair Credit Reporting Act, each as may be amended from time to time, and the Company has not received any actual or constructive notice of any identity theft, fraud, or other misrepresentation in connection with such Mortgage Loan or any party thereto.

Section 3.02    Representations and Warranties Regarding Individual Mortgage Loans.

As to each Mortgage Loan, the Company hereby represents and warrants to the Purchaser that as of the related Closing Date all of the representations and warranties set forth on Exhibit F are true, complete and correct.

Section 3.03    Repurchase.

It is understood and agreed that the representations and warranties set forth or referred to in Sections 3.01 and 3.02 shall survive the sale of the Mortgage Loans to the Purchaser and the delivery of the Mortgage Loan Documents to the Custodian and shall inure to the benefit of the Purchaser, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination or failure to examine any Mortgage File. Upon discovery by either the Company or the Purchaser of any materially defective or missing Mortgage Loan Document ("Defective Document") or a breach of any of the foregoing representations and warranties that materially and adversely affects the value of a Mortgage Loan or the interest of the Purchaser (or that materially and adversely affects the interests of the Purchaser in the related Mortgage Loan in the case of a representation and warranty relating to a particular Mortgage Loan), the party discovering such Defective Document or a breach shall give prompt written notice to the other. Any such breach or Defective Document that causes a Mortgage Loan not to be a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code shall be deemed to materially and adversely affect the interests of the Purchaser.

Within sixty (60) days after the earlier of either discovery by or notice to the Company of a breach of a representation or warranty which materially and adversely affects the value of a Mortgage Loan or the interest of the Purchaser therein, the Company shall use its best efforts promptly to cure such breach in all material respects and, if such Defective Document or breach cannot be cured, the Company shall, at the Purchaser's option, repurchase such Mortgage Loan at the Repurchase Price. In the event that a breach shall involve any representation or warranty set forth in Section 3.01, and such breach cannot be cured within sixty (60) days of the earlier of either discovery by or notice to the Company of such breach, such of the Mortgage Loans as shall be necessary to cure such breach shall, at the Purchaser's option, be repurchased by the Company at the Repurchase Price. However, if the breach or Defective Document shall involve a representation or warranty set forth or referred to in Section 3.02 and the Company discovers or receives notice of any such breach within ninety (90) days of the related Closing Date, the Company may, if the breach or Defective Document cannot be cured, with the Purchaser's consent and provided that the Company has a Qualified Substitute Mortgage Loan, rather than repurchase the Mortgage Loan as provided above, remove such Mortgage Loan (a "Deleted Mortgage Loan") and substitute in its place a Qualified Substitute Mortgage Loan or Loans, provided that any such substitution shall be effected not later than one hundred twenty (120) days after the related Closing Date. Notwithstanding any of the foregoing, if a breach or Defective Document would cause the Mortgage Loan to be other than a "qualified mortgage," as defined in Section 860G(a)(3) of the Code, any such repurchase or substitution must occur within forty-five (45) days from the date the breach or Defective Document was discovered unless such breach is cured during such period.

If the Company has no Qualified Substitute Mortgage Loan, it shall repurchase the deficient Mortgage Loan within sixty (60) days after the written notice of the breach or Defective Document. Notwithstanding the above sentence, within sixty (60) days after the earlier of discovery by, or notice to the Company of any breach of the representations or warranties set forth or referred to in Section 3.02 related to a predatory or abusive lending law, the Company shall repurchase such Mortgage Loan at the Repurchase Price. Any repurchase of a Mortgage Loan or Loans pursuant to the foregoing provisions of this Section 3.03 shall occur on a date mutually acceptable to the Purchaser and the Company and within the timeframes set forth in this Agreement and shall be accomplished by deposit in the Custodial Account of the amount of the Repurchase Price for distribution to the Purchaser on the next scheduled Remittance Date, after deducting therefrom any

amount received in respect of such repurchased Mortgage Loan or Loans and being held in the Custodial Account for future distribution.

At the time of repurchase or substitution, the Purchaser and the Company shall arrange for the reassignment of the Deleted Mortgage Loan to the Company and the delivery to the Company of any documents held by the Custodian relating to the Deleted Mortgage Loan. In the event of a repurchase or substitution, the Company shall, simultaneously with such reassignment, give written notice to the Purchaser that such repurchase or substitution has taken place, amend the related Mortgage Loan Schedule to reflect the withdrawal of the Deleted Mortgage Loan from this Agreement, and, in the case of substitution, identify a Qualified Substitute Mortgage Loan and amend the related Mortgage Loan Schedule to reflect the addition of such Qualified Substitute Mortgage Loan to this Agreement. In connection with any such substitution, the Company shall be deemed to have made as to such Qualified Substitute Mortgage Loan the representations and warranties set forth or referred to in Sections 3.01 and 3.02 except that all such representations and warranties set forth in this Agreement shall be deemed made as of the date of such substitution. The Company shall effect such substitution by delivering to the Custodian for such Qualified Substitute Mortgage Loan the documents required by Section 2.03, with the Mortgage Note endorsed as required by Section 2.03. No substitution will be made in any calendar month after the Determination Date for such month. The Company shall deposit in the Custodial Account the Monthly Payment less the Servicing Fee due on such Qualified Substitute Mortgage Loan or Loans in the month following the date of such substitution. Monthly Payments due with respect to Qualified Substitute Mortgage Loans in the month of substitution shall be retained by the Company. With respect to any Deleted Mortgage Loan, distributions to the Purchaser shall include the Monthly Payment due on any Deleted Mortgage Loan in the month of substitution, and the Company shall thereafter be entitled to retain all amounts subsequently received by the Company in respect of such Deleted Mortgage Loan.

For any month in which the Company substitutes one or more Qualified Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the amount (if any) by which the aggregate principal balance of all such Qualified Substitute Mortgage Loans as of the date of substitution is less than the aggregate Stated Principal Balance of all such Deleted Mortgage Loans (after application of the principal portion of the Monthly Payments due in the month of substitution) (the "Substitution Adjustment Amount") shall be deposited into the Custodial Account by the Company on or before the Remittance Date in the month succeeding the calendar month during which the related Mortgage Loan is required to be purchased or replaced hereunder.

In addition to such repurchase or substitution obligation, the Company shall indemnify (from its own funds and not from the Custodial Account or Escrow Account) the Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a material breach of the representations and warranties of the Company contained in this Agreement; provided, however, that such indemnification shall not include punitive, consequential, exemplary or special damages (other than punitive, consequential, exemplary and special damages required to be paid by the indemnified party under this Agreement to any Person (other than a party to this Agreement or any of its affiliates) arising out of an action or proceeding by such Person, which damages shall be deemed to be direct damages to the party required to pay such punitive, consequential, exemplary or incidental damages). It is understood and agreed that the obligations of the Company set forth in this Section 3.03 to cure, substitute for or repurchase a defective Mortgage Loan and to indemnify the Purchaser as provided in this Section 3.03 constitute the sole remedies of the Purchaser respecting a breach of the foregoing representations and warranties.

Any cause of action against the Company relating to or arising out of the breach of any representations and warranties made in Sections 3.01 and 3.02 shall accrue as to any Mortgage Loan upon (i) discovery of such breach by the Purchaser or notice thereof by the Company to the Purchaser, (ii) failure by the Company to cure such breach or repurchase such Mortgage Loan as specified above, and (iii) demand upon the Company by the Purchaser for compliance with this Agreement.

Section    Repurchase of Mortgage Loans With First Payment Defaults.
3.04

If the related Mortgagor is thirty (30) days or more delinquent with respect to a Monthly Payment under a Mortgage Loan at any time prior to the expiration of the Holding Period for such Mortgage Loan, the Company shall, at the Purchaser's option exercised no later then ninety (90) days after the end of the related Holding Period, repurchase such Loan from the Purchaser in accordance with Section 3.03 hereof; provided, that the Company shall not be required to repurchase such Mortgage Loan if it can demonstrate to the Purchaser's reasonable satisfaction within thirty (30) days of such reported delinquency that the related Mortgagor timely made all payments required of the Mortgagor but such payment was otherwise misapplied. In the event a Mortgagor exercises any right of rescission it may have with respect to the related Mortgage Loan that arises as a result of an act or omission prior to the related Closing Date, the Company shall repurchase such Mortgage Loan at the related Repurchase Price within thirty (30) days of receiving notice of such Mortgagor's intention to rescind the Mortgage Loan.

Section    Purchase Price Protection.
3.05

With respect to any Mortgage Loan that prepays in full at any time prior to the date that is sixty (60) days after the Closing Date for such Mortgage Loan, the Company shall reimburse the Purchaser, within 30 days following the prepayment in full of such Mortgage Loan, the amount (if any) by which the portion of the Purchase Price paid by the Purchaser to the Company for such Mortgage Loan exceeded 100% of the outstanding scheduled principal balance of the Mortgage Loan as of the related Cut-off Date.

Section    Review of Mortgage Loans.
3.06

(a)    Prior to the related Closing Date, the Purchaser shall have the right at its own expense to review the Mortgage Files and obtain BPOs on the Mortgaged Properties relating to the Mortgage Loans purchased on the related Closing Date, with the results of such BPO reviews to be communicated to the Company for a period up to two (2) Business Days prior to the related Closing Date. In addition, the Purchaser shall have the right to reject any Mortgage Loan which in the Purchaser's sole determination (i) fails to conform to the Underwriting Guidelines, (ii) is underwritten without verification of the Mortgagor's assets and there is no credit report or FICO Score, (iii) is not an acceptable credit risk, or (iv) the value of the Mortgaged Property pursuant to any BPO varies by more than plus or minus 15% from the lesser of (A) the original appraised value of the Mortgaged Property or (B) the purchase price of the Mortgaged Property as of the date of origination of the related Mortgage Loan. The Company shall make available all files required by the Purchaser in order to complete its review, including all CRA/HMDA required data fields. To the extent that during the course of the Purchaser's initial review, the Purchaser discovers that the Mortgage Loans do not otherwise meet the Company's Underwriting Guidelines or the terms of this Agreement, the Purchaser shall have the right to carry out additional due diligence reviews, which additional due diligence shall be at the expense of the Purchaser. The Purchaser's decision to increase its due diligence review or obtain additional BPO's or other property evaluations is at its sole discretion. The additional review may be for any reason including but not limited to credit quality, property valuations, and data integrity. Any review performed by the Purchaser prior to the related Closing Date shall not limit the Purchaser's rights or the Company's obligations under this section.

(b)    If post-closing due diligence review is permitted under the related Purchase Price and terms Letter, from the related Closing Date until the date thirty (30) days after the related Closing Date, the Purchaser shall have the right to review the Mortgage Files and obtain BPOs on the Mortgaged Properties relating to the Mortgage Loans purchased on the related Closing Date, with the results of such BPO reviews to be communicated to the Company for a period up to thirty (30) days after the related Closing Date. In addition, the Purchaser shall have the right to reject any Mortgage Loan which in the Purchaser's sole determination (i) fails to conform to the Underwriting Guidelines, (ii) is underwritten without verification of the Mortgagor's assets and there is no credit report or FICO Score, (iii) is not an acceptable credit risk, or (iv) the value of the Mortgaged Property pursuant to any BPO varies by more than plus or minus 15% from the lesser of (A) the original appraised value of the Mortgaged Property or (B) the purchase price of the Mortgaged Property as of the date of origination of the related Mortgage Loan. In the event that the Purchaser so rejects any Mortgage Loan, the Company shall repurchase the rejected Mortgage Loan at the Repurchase Price in the manner prescribed in Section 3.03 upon receipt of notice from the Purchaser of the rejection of such Mortgage Loan. Any rejected Mortgage Loan shall be removed from the terms of this Agreement. The Company shall make available all files required by the Purchaser in order to complete its review, including all CRA/HMDA required data fields. To the extent that during the course of the Purchaser's initial review, the Purchaser discovers that the Mortgage Loans do not otherwise meet the Company's Underwriting Guidelines or the terms of this Agreement, the Purchaser shall have the right to carry out additional due diligence reviews, which additional due diligence shall be at the expense of the Purchaser. The Purchaser's decision to increase its due diligence review or obtain additional BPO's or other property evaluations is at its sole discretion. The additional review may be for any reason including but not limited to credit quality, property valuations, and data integrity. Any review performed by the Purchaser prior to the related Closing Date shall not limit the Purchaser's rights or the Company's obligations under this section.

## ARTICLE IV

### ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

Section    Company to Act as Servicer.
4.01