Exhibit 3

B 10 (Official Form 10) (04/10)

| **UNITED STATES BANKRUPTCY COURT**    Southern District of New York | **PROOF OF CLAIM** |
|---|---|

| Name of Debtor: <br> GMAC Mortgage, LLC; Residential Funding Company, LLC; Residential Accredit Loans, Inc. | Case Number: <br> 12-12032; 12-12019; 12-12052 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property): <br> Syncora Guarantee Inc., formerly known as XL Capital Assurance | ☑ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent: <br> Syncora Guarantee Inc. <br> 135 W. 50th Street, 20th Floor, New York, New York 10020 <br> Attn: R. Sharon Smith, Esq. <br><br> Telephone number: <br> (212) 478-3673 | Court Claim Number: __2781__ <br> *(If known)* <br><br> Filed on: ___11/07/2012___ |
| Name and address where payment should be sent (if different from above): <br><br><br><br> Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. <br><br> ☐ Check this box if you are the debtor or trustee in this case. |

| 1. Amount of Claim as of Date Case Filed:    $ __UNLIQUIDATED__ <br><br> If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. <br><br> If all or part of your claim is entitled to priority, complete item 5. <br><br> ☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | 5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount. <br><br> Specify the priority of the claim. |
|---|---|

| 2. **Basis for Claim:** __See attached__ <br> (See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
|---|---|
| 3. **Last four digits of any number by which creditor identifies debtor:** _____ <br><br>   3a. Debtor may have scheduled account as: _____ <br>   (See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| 4. **Secured Claim (See instruction #4 on reverse side.)** <br> Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information. <br><br> Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other <br> Describe: <br><br> Value of Property:$_____ Annual Interest Rate_____% <br><br> Amount of arrearage and other charges as of time case filed included in secured claim, <br> if any: $_____  Basis for perfection: _____ <br><br> Amount of Secured Claim: $_____  Amount Unsecured: $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5). <br><br> ☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7). <br><br> ☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| 6. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__). |
| 7. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)* <br><br> DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING. <br><br> If the documents are not available, please explain: | Amount entitled to priority: <br><br> $_____ <br><br> *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| Date: 9/2/13 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. <br><br> R. Sharon Smith, Esq., Associate General Counsel, Syncora Guarantee Inc. | FOR COURT USE ONLY <br><br> **RECEIVED** <br><br> SEP 0 5 2013 <br><br> KURTZMAN CARSON CONSULTANTS |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§



WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
Paul R. DeFilippo
Randall R. Rainer

*Attorneys for Syncora Guarantee Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                           :

| | |
|---|---|
| In re: | Chapter 11 |
| Residential Capital, LLC, *et al.* | Case No. 12-12020 (MG) |
| Debtors. | (Jointly Administered) |

-----------------------------------------------------------------x

## ADDENDUM TO SYNCORA GUARANTEE INC.'S AMENDED PROOF OF CLAIM

       1.      On May 14, 2012 (the "*Commencement Date*"), GMAC Mortgage, LLC,

formerly known as GMAC Mortgage Corporation, ("*GMAC*"), Residential Funding Company,

LLC, formerly known as Residential Funding Corp., ("*RFC*"), and certain affiliated entities

(collectively, the "*Debtors*") sought relief under chapter 11 of title 11 of the United States Code

(the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of New

York (the "*Bankruptcy Court*").

       2.      Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc.,

("*Syncora*") insured payment of principal and interest for the benefit of the holders of certain

securities issued by certain trusts that own loans serviced by GMAC[1] and one trust that owns

---

[1] The GMAC-serviced trusts include (i) Bear Stearns Second Lien Trust 2007-SV1 ("BSSLT 2007-SV1") and (ii) SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1 ("STACS 2007-1"). Syncora is not asserting a claim against any Debtors with respect to GreenPoint Mortgage Funding Trust 2006-HE1 at this time.

loans serviced by RFC.[2]  These trusts are referred to herein collectively as the "*Syncora-Related Trusts*." Syncora is a party to, is a third-party beneficiary of, or has rights arising under or related to, the agreements and documents associated with each such trust (collectively, including all other offering documents, agreements, documents, amendments, exhibits and appendices related to the Syncora-Related Trusts, the "*Trust Documents*"), including, without limitation, the Trust Documents listed on Exhibit A attached hereto.

3.     The basis for Syncora's claim is Syncora's rights arising out of, arising under, related to, or associated with the Syncora-Related Trusts, including, without limitation, all rights arising out of or related to the Trust Documents, which includes, without limitation, rights of indemnification, reimbursement and subrogation and all other rights (including those arising out of common law) that Syncora has as a result of a breach of or in connection with any provision in the Trust Documents for which Syncora is a beneficiary, whether through the explicit terms of such provision, through Syncora's third-party beneficiary or subrogation rights or otherwise.  For the avoidance of doubt, Syncora asserts a claim based on all of its rights associated with the Syncora-Related Trusts and the Trust Documents, regardless of whether any such right arises from a Trust Document, including, without limitation, any and all rights of setoff or counterclaim, and any and all rights against GMAC for liabilities incurred in connection with the origination, sale, or transfer of the loans ultimately sold or transferred into the Syncora-Related Trusts (including any repurchase obligations incurred in connection with such origination, sale or transfer) or in connection with the creation of the Syncora-Related Trusts and the issuance of the securities backed by such loans.

---

[2] The RFC-serviced trust is Residential Accredit Loans, Inc., Series 2006-QO4 ("RALI 2006-QO4").

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
Paul R. DeFilippo
Randall R. Rainer

*Attorneys for Syncora Guarantee Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                        :
In re:                                  :    Chapter 11
                                        :
Residential Capital, LLC, et al.        :    Case No. 12-12020 (MG)
                                        :
                    Debtors.            :    (Jointly Administered)
                                        :
------------------------------------------------------------x
```

## ADDENDUM TO SYNCORA GUARANTEE INC.'S AMENDED PROOF OF CLAIM

      1.      On May 14, 2012 (the "***Commencement Date***"), GMAC Mortgage, LLC,

formerly known as GMAC Mortgage Corporation, ("***GMAC***"), Residential Funding Company,

LLC, formerly known as Residential Funding Corp., ("***RFC***"), and certain affiliated entities

(collectively, the "***Debtors***") sought relief under chapter 11 of title 11 of the United States Code

(the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New

York (the "***Bankruptcy Court***").

      2.      Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc.,

("***Syncora***") insured payment of principal and interest for the benefit of the holders of certain

securities issued by certain trusts that own loans serviced by GMAC[1] and one trust that owns

---

[1] The GMAC-serviced trusts include (i) Bear Stearns Second Lien Trust 2007-SV1 ("BSSLT 2007-SV1") and (ii) SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1 ("STACS 2007-1"). Syncora is not asserting a claim against any Debtors with respect to GreenPoint Mortgage Funding Trust 2006-HE1 at this time.

loans serviced by RFC.[2]   These trusts are referred to herein collectively as the "***Syncora-Related Trusts***." Syncora is a party to, is a third-party beneficiary of, or has rights arising under or related to, the agreements and documents associated with each such trust (collectively, including all other offering documents, agreements, documents, amendments, exhibits and appendices related to the Syncora-Related Trusts, the "***Trust Documents***"), including, without limitation, the Trust Documents listed on Exhibit A attached hereto.

       3.       The basis for Syncora's claim is Syncora's rights arising out of, arising under, related to, or associated with the Syncora-Related Trusts, including, without limitation, all rights arising out of or related to the Trust Documents, which includes, without limitation, rights of indemnification, reimbursement and subrogation and all other rights (including those arising out of common law) that Syncora has as a result of a breach of or in connection with any provision in the Trust Documents for which Syncora is a beneficiary, whether through the explicit terms of such provision, through Syncora's third-party beneficiary or subrogation rights or otherwise.  For the avoidance of doubt, Syncora asserts a claim based on all of its rights associated with the Syncora-Related Trusts and the Trust Documents, regardless of whether any such right arises from a Trust Document, including, without limitation, any and all rights of setoff or counterclaim, and any and all rights against GMAC for liabilities incurred in connection with the origination, sale, or transfer of the loans ultimately sold or transferred into the Syncora-Related Trusts (including any repurchase obligations incurred in connection with such origination, sale or transfer) or in connection with the creation of the Syncora-Related Trusts and the issuance of the securities backed by such loans.

---

[2] The RFC-serviced trust is Residential Accredit Loans, Inc., Series 2006-QO4 ("RALI 2006-QO4").

4.     More specifically, with respect to each of the Syncora-Related Trusts, Syncora's claims arise from GMACM's and RFC's respective contractual obligations and duties as Servicers as follows:

**BSSLT 2007-SV1**

5.     In connection with the BSSLT 2007-SV1 transaction, GMACM is the Servicer pursuant to the Servicing Agreement, dated as of May 1, 2011, by and between EMC Mortgage Corporation ("*EMC*") and GMACM, as amended by Amendment No. 1 to the Servicing Agreement, dated as of October 1, 2001, as further amended by Amendment No. 2 to the Servicing Agreement, dated as of July 31, 2002, and as further amended by Amendment No. 3 to the Servicing Agreement, dated as of December 20, 2005 (collectively, the "*Bear Stearns Servicing Agreement*"). GMACM services 79.89% of the BSSLT 2007-SV1 mortgage loans. (PHH Mortgage Corporation ("*PHH*") services the remaining 20.11%.)

6.     Under the Bear Stearns Servicing Agreement, in servicing the BSSLT 2007-SV1 mortgage loans, GMACM was required to "exercise the same care that it customarily employs for its own account." Bear Stearns Servicing Agreement § 4.01. GMACM also was required to service and administer the mortgage loans "in accordance with all applicable requirements of [Item 1122(d) of SEC Regulation AB, 17 C.F.R. 229.1122]." *Id.* § 6.09. GMACM was further required to employ quality control procedures "to ensure that the Mortgage Loans are serviced in accordance with prudent mortgage banking practices." *Id.* § 2.06. In addition, in seeking to realize upon defaulted mortgage loans, GMACM was obligated to do so "in such manner as will maximize the receipt of principal and interest by [EMC], taking into account, among other things, the timing of foreclosure proceedings." *Id.* § 4.03.

7.    Pursuant to the Insurance and Indemnity Agreement, dated as of March 30, 2007, between and among Syncora, EMC, SACO I, GMACM and the Trustee, GMACM represented, warranted and covenanted to Syncora that it would service the BSSLT 2007-SV1 mortgage loans in compliance with the criteria set forth in the Servicing Agreement. I&I § 2.04(f). GMACM further agreed to indemnify Syncora for any and all losses arising out of or relating to the breaches of such representation and warranty, or arising from GMACM's negligence or misfeasance in connection with servicing. *Id.* § 3.04(b) & (b)(i).

8.    Separate from its contractual obligations under the Bear Stearns Servicing Agreement, GMACM owed Syncora a duty of care, but acted negligently toward Syncora (and its insured certificateholders). GMACM was fully aware that Syncora had issued an insurance policy guaranteeing the payment of principal and interest in respect of certain tranches of certificates issued by the BSSLT 2007-SV1 trust. GMACM also was fully aware that Syncora's risk of paying claims under its Policy would increase if cash flows from the underlying mortgage loans being serviced by GMACM substantially decreased. Furthermore, GMACM was aware that Syncora would not have issued the Policy without GMACM's representation and promise that it would perform its servicing obligations, which would reduce the risk of Syncora paying claims. Accordingly, it was entirely foreseeable to GMACM that its failure to exercise due care with respect to servicing the BSSLT 2007-SV1 mortgage loans would cause Syncora to pay claims, and/or to face a greatly enhanced risk of paying claims, under the Policy.

9.    As it turned out, nearly 25% of the loans in the BSSLT 2007-SV1 transaction (8,821 of 37,535) defaulted – far in excess of what normally would be expected. Moreover, *all* of the 8,821 loans that defaulted were loans being serviced by GMACM (*i.e.*, none were serviced by PHH). As Syncora believes discovery will show, in the ordinary course of

4

GMACM's performance as Servicer, GMACM was well aware of such high rate of defaults among the BSSLT 2007-SV1 loans it was servicing (GMACM's monthly reporting obligations under Section 5.02 of the Bear Stearns Servicing Agreement required it to itemize such defaults), and while GMACM was aware that such an inordinately high number of borrowers were defaulting, GMACM also would have encountered loan files for thousands of delinquent or defaulting borrowers whose loans indicated they had not been originated in conformity with prudent loan underwriting practices and/or lacked required material mortgage documentation in the file.  In both instances, the mortgage loans would have breached origination-related representations and warranties, of which GMACMM would or should have been aware of on a pervasive basis.

        10.    As a prudent servicer under a duty to service the loans as if they were its own and to maximize the receipt of principal and interest for certificateholders, including those insured by Syncora, GMACM's single best available method for minimizing the number of defaulting loans and maximizing loan receipts was to notify its Master Servicer, Wells Fargo Bank, National Association, of such breached representations and warranties.  Pursuant to the Pooling and Servicing Agreement, dated as of March 1, 2007, between and among SACO I Inc. as Depositor, EMC as Seller, the Master Servicer and Citibank, N.A. as Trustee (the "*Bear Stearns PSA*"), upon learning of such breaches from GMACM, the Master Servicer would have been required to promptly give formal notice to Trustee of such fact, who in turn would have been required to "put back" each defective loan for repurchase or substitution.  *See* Bear Stearns PSA § 2.02(d) (imposing such notice obligation upon each of "the parties hereto" upon its discovery of the breach).  As Syncora believes discovery will further show, the Servicer failed to exercise such care or prudence, without good faith.

11.     Had GMACM fulfilled its duties in good faith, more than $181 million in principal and interest losses in the BSSLT 2007-SV1 transaction could have been avoided. *See* Exhibit B hereto. Instead, the transaction experienced substantial principal and interest shortfalls in the mortgage loan pool, which in turn have caused principal write-downs and shortfalls in interest payments in respect of "first-loss position" junior notes. Such losses have spread up the waterfall priority toward the more senior notes insured by Syncora, although Syncora has not yet paid claims.

12.     Given such distress in the transaction, Syncora's financial advisors projected principal losses on the two tranches of BSSLT 2007-SV1 certificates insured by Syncora to total up to approximately $232 million. Therefore, as a consequence of such risk of loss, Syncora sought to hedge against exposure by investing in a tender offer for such certificates, paying consent fees totaling $15,682,080 to consummate the remediation.

13.     Had GMACM acted as it should have as Servicer and had the $181 million in principal and interest losses been avoided as shown on Exhibit B, the BSSLT 2007-SV1 transaction would not have experienced nearly the same distress that it has, and Syncora would not have incurred such remediation expense. In addition, Syncora still forecasts future claims payments to certificateholders of $1,737,173.

14.     For the reasons described above, GMACM breached its covenant to fully perform its obligations as Servicer under the Bear Stearns Servicing Agreement, and thus GMACM is liable to Syncora for damages totaling at least $17,419,253, plus interest. In addition, GMACM is required to indemnify Syncora for the same amount of losses under § 3.04(b)(i) of the Bear Stearns I&I. GMACM is independently liable to Syncora for its

negligence and owes Syncora damages in at least the same amount, as well as indemnity for

negligence under the I&I.

**STACS 2007-1**

15.    In connection with the STACS 2007-1 transaction, GMACM is the

Servicer pursuant to the Pooling and Servicing Agreement, dated as of April 1, 2007, among

ACE Securities Corp., as depositor, GMAC Mortgage, LLC, as servicer, Wells Fargo Bank,

National Association, as master servicer and securities administrator and HSBC Bank USA,

National Association, as trustee ("***SunTrust Servicing Agreement***").

16.    Under the SunTrust Servicing Agreement, GMACM is required to service

the underlying mortgage loans prudently, as if the loans were its own and in a manner that

maximizes a timely and complete recovery.  Section 3.01 of the SunTrust Servicing Agreement

states:

> From and after the Closing Date, the Servicer [GMACM] . . . shall service and
> administer the Mortgage Loans on behalf of the Trust Fund and in the best
> interests of and for the benefit of the Certificateholders (as determined by the
> Servicer in its reasonable judgment) in accordance with the terms of this
> Agreement and the Mortgage Loans and all applicable law and regulations and, to
> the extent consistent with such terms, in the same manner in which it services and
> administers similar mortgage loans for its own portfolio, giving due consideration
> to customary and usual standards of practice of prudent mortgage lenders and loan
> servicers administering similar mortgage loans but without regard to [conflicting
> interests of the Servicer's affiliates].  To the extent consistent with the foregoing,
> the Servicer shall also seek to maximize the timely and complete recovery of
> principal and interest on the related Mortgage Notes . . . .

SunTrust Servicing Agreement § 3.01 (emphasis added).  The Agreement further requires that

GMACM "service and administer the related Mortgage Loans in accordance with applicable

state and federal law."  *Id.*  In that vein, GMACM also is required to certify annually its

compliance with the servicing criteria required by Item 1122 of SEC Regulation AB, 17 C.F.R.

229.1122, which includes certifying that the mortgage loans in the collateral pool and the

requisite loan documentation have been "safeguarded" by GMACM. *Id.* § 3.18(a) & Exhibit E

thereto (listing such Relevant Servicing Criteria).

   17.  Pursuant to the Insurance and Indemnity Agreement, dated as of May 15,

2007, among XL Capital Assurance Inc., SunTrust Asset Funding, LLC, SunTrust Bank, ACE

Securities Corp., GMAC Mortgage, LLC and Wells Fargo Bank, National Association

("***SunTrust I&I***"), GMACM represented, warranted and covenanted to Syncora that it would

service the STACS 2007-1 mortgage loans in compliance with the criteria in the Servicing

Agreement. SunTrust I&I § 2.02(a) & (m). GMACM further agreed to indemnify Syncora for

any and all losses arising out of or relating to the breaches of such representation and warranty,

or arising from GMACM's negligence or misfeasance in connection with servicing. *Id.* § 3.04(a)

& (a)(ii), unless GMACM acted or refrained from acting "in good faith" or acted or refrained

from acting due to an "error in judgment," SunTrust Servicing Agreement § 7.03.

   18.  Separate from its contractual obligations under the SunTrust Servicing

Agreement, GMACM owed Syncora a duty of care, but acted negligently toward Syncora (and

its insured certificateholders). GMACM was fully aware that Syncora had issued an insurance

policy guaranteeing the payment of principal and interest in respect of a certain class of

certificates issued by the STACS 2007-1 trust. GMACM also was fully aware that Syncora's

risk of paying claims under its Policy would increase if cash flows from the underlying mortgage

loans being serviced by GMACM substantially decreased. Furthermore, GMACM was aware

that Syncora would not have issued the Policy without GMACM's representation and promise

that it would perform its servicing obligations, which would reduce the risk of Syncora paying

claims. Accordingly, it was entirely foreseeable to GMACM that its failure to exercise due care

8

with respect to servicing the STACS 2007-1 mortgage loans would cause Syncora to pay claims, and/or to face a greatly enhanced risk of paying claims, under the Policy.

19.     Approximately 63% of the loans in the STACS 2007-1 transaction (3,617 of 5,767) defaulted – far in excess of what normally would be expected.  As Syncora believes discovery will show, in the ordinary course of GMACM's performance as Servicer, GMACM was well aware of such high rate of defaults among the STACS 2007-1 loans it was servicing (GMACM's monthly reporting obligations under Sections 5.02 and 5.03 of the SunTrust Servicing Agreement required it to itemize such defaults), and while GMACM was aware that such an inordinately high number of borrowers were defaulting, GMACM also would have encountered loan files for thousands of delinquent or defaulting borrowers whose loans indicated they had not been originated in conformity with prudent loan underwriting practices and/or lacked required material mortgage documentation in the file.  In both instances, the mortgage loans would have breached origination-related representations and warranties, of which GMACMM would or should have been aware of on a pervasive basis.

20.     As a prudent Servicer under a duty to service the loans as if they were its own and to maximize the receipt of principal and interest for certificateholders, including those insured by Syncora, GMACM's single best available method for minimizing the number of defaulting loans and maximizing loan receipts was to notify the Trustee, HSBC Bank, of such breached representations and warranties so that, pursuant to its obligation in Section 2.03(a) of the SunTrust Servicing Agreement, the Trustee would have been obligated to enforce the Sponsor's "put back" obligation.  As a result, the defective loan in the mortgage pool would have been replaced with a new, performing mortgage loan or cash.  GMACM failed to do so, however, and the loans have since defaulted and have been liquidated and/or charged off and

removed from the transaction. As Syncora believes discovery will further show, the Servicer failed to exercise such care or prudence, without good faith.

21.    Had GMACM fulfilled its duties in good faith, more than $221 million in principal and interest losses in the STACS 2007-1 transaction could have been avoided, but the opportunity has long since been lost. *See* Exhibit C hereto. Instead, the transaction experienced substantial principal and interest shortfalls in the mortgage loan pool, which in turn have caused principal write-downs and shortfalls in interest payments in respect of "first-loss position" junior notes. Such losses have spread up the waterfall priority to the more senior notes insured by Syncora, and as a result, Syncora has paid $148,914,678 in insurance claims.

22.    Given such distress in the transaction and Syncora's losses, and as a consequence of the harm inflicted by GMACM's faulty servicing, Syncora sought to hedge against exposure by investing in a tender offer for such certificates, paying consent fees totaling $19,962,638 to consummate the remediation.

23.    Had GMACM acted as it should have as Servicer and had the $221 million in principal and interest losses been avoided as shown on Exhibit C, the STACS 2007-1 transaction would not have experienced nearly the same distress that it has, and Syncora would not have incurred such claims payments and remediation expense. In addition, Syncora still forecasts future claims payments to certificateholders of $30,356,200.

24.    For the reasons described above, GMACM breached its covenant to fully perform its obligations as Servicer under the SunTrust Servicing Agreement, and thus GMACM is liable to Syncora for damages totaling at least $199,233,516, plus interest. In addition, GMACM is required to indemnify Syncora for the same amount of losses under § 3.04(a) & (a)(ii) of the STACS I&I. GMACM is independently liable to Syncora for its negligence and

owes Syncora damages in at least the same amount, as well as indemnity for negligence under the I&I.

### RALI 2006-QO4

25.    In connection with RALI 2006-QO4, RFC is the (a) Sponsor and seller of the underlying mortgage loans and initially made the representations and warranties concerning the quality of the mortgage loans and the loan underwriting, and (b) the Master Servicer pursuant to the (i) Standard Terms of Pooling and Servicing Agreement, dated as of March 1, 2006, for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates and (ii) Series Supplement, dated as of April 1, 2006, to Standard Terms of Pooling and Servicing Agreement, dated as of March 1, 2006, between Residential Accredit Loans, Inc., Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee (together, the "*RALI Servicing Agreement*").

26.    Under the RALI Servicing Agreement, upon discovering a material breach of any representation and warranty for a loan, RFC, as Master Servicer, is required to give prompt written notice of such breach to the RALI 2006-QO4 Trustee and other parties. RALI Servicing Agreement § 2.04. Such written notice also triggers the Master Servicer's (or Trustee's) obligation to request that the Sponsor (*i.e.*, RFC itself) repurchase the defective loan or substitute a conforming loan. *Id*. Moreover, as part of its servicing duties "for the benefit of the . . . Certificateholders," the Servicing Agreement states that the Master Servicer "shall use its best reasonable efforts to enforce of the obligations of . . . each Seller [*i.e.*, RFC] to purchase a Mortgage Loan on account of defective documentation . . . or on account of a breach of a representation and warranty." *Id*. § 3.02(b).

27.     The RALI Servicing Agreement further states that such enforcement by the Master Servicer "shall be in such form and carried out to such an extent and at such time as the Master Servicer would employ in its good faith judgment and which are normal and usual in its general servicing activities." *Id.* By the same token, RFC has an on-going obligation as Sponsor/seller to cure, repurchase or substitute mortgage loans in the pool that materially breach the Sponsor's representations and warranties concerning the quality of the mortgage loans and the loan underwriting. *Id.* § 2.04.

28.     Separate from its contractual obligations under the RALI Servicing Agreement, RFC owed Syncora a duty of care, but acted negligently toward Syncora (and its insured certificateholders). RFC was fully aware that Syncora had issued an insurance policy guaranteeing the payment of principal and interest in respect of certain tranches of certificates issued by the RALI 2006-QO4 trust. RFC also was fully aware that Syncora's risk of paying claims under its Policy would increase if cash flows from the underlying mortgage loans being serviced by RFC substantially decreased. Furthermore, RFC was aware that Syncora would not have issued the Policy without the reasonable expectation that RFC would perform its servicing obligations, which would reduce the risk of Syncora paying claims. Accordingly, it was entirely foreseeable to RFC that its failure to exercise due care with respect to servicing the RALI 2006-QO4 mortgage loans would cause Syncora to pay claims, and/or to face a greatly enhanced risk of paying claims, under the Policy.

29.     More than nearly 52% of the loans in the RALI 2006-QO4 transaction (1,291 of 2,470) defaulted – far in excess of what normally would be expected. As Syncora believes discovery will show, in the ordinary course of RFC's performance as Servicer, RFC was well aware of such high rate of defaults among the RALI 2006-QO4 loans it was servicing, and

while RFC was aware that such an inordinately high number of borrowers were defaulting, RFC

also would have been encountering loan files for hundreds of delinquent or defaulting borrowers

whose loans indicated they had not been originated in conformity with prudent loan underwriting

practices and/or lacked required material mortgage documentation in the file. In both instances,

the mortgage loans would have breached origination-related representations and warranties, of

which RFC would or should have been aware of on a pervasive basis.

        30.     As a prudent servicer under a duty to service the loans as if they were its

own and to maximize the receipt of principal and interest for certificateholders, including those

insured by Syncora, RFC's single best available method for minimizing the number of defaulting

loans and maximizing loan receipts was to notify the Sponsor (also RFC) of such breached

representations and warranties. Pursuant to the RALI Servicing Agreement, upon learning of

such breaches, RFC as the Master Servicer would have been required to promptly (within 90

days) "put back" each defective loan to the Sponsor (also RFC) for repurchase or substitution.

*See* RALI Servicing Agreement § 2.03(a) (imposing such notice and enforcement obligations

upon the Master Servicer, and others, upon the discovery of the breach). As Syncora believes

discovery will further show, RFC as the Servicer failed to exercise such care or prudence,

without good faith.

        31.     RFC was negligent (and, we believe, even grossly negligent) in failing to

fulfill the foregoing servicing duties and obligations. While *more than half* of the loans in the

RALI 2006-Q04 pool have defaulted thus far, we further understand that RFC, as Master

Servicer, has not sought to have the Sponsor buy back or substitute a *single* loan. As we believe

discovery will show, in the ordinary course of RFC's performance as Master Servicer, RFC

would have encountered loan files for at least several hundred borrowers whose loans were not

originated in conformity with prudent loan underwriting practices. As such, we fully expect that it will be proven that RFC became aware of pervasive, material breaches of representations and warranties. Although RFC was required, as Master Servicer, to exercise its "good faith best judgment" in making a "best reasonable effort" to cause such defective loans to be repurchased or replaced, we understand it did nothing.

32.    The Series Supplement dated as of April 1, 2006 ("*PSA Supp*") that comprises part of the RALI Servicing Agreement states throughout that the Master Servicer is to perform its servicing duties and obligations "for the benefit of the Certificateholders" (*e.g.*, § 2.04), and the Standard Terms and PSA Supp state the same with respect to the Sponsor's repurchase obligations (*id.*). The PSA Supp further provides that Syncora is fully subrogated to the rights of Insured Certificateholders to the extent Syncora pays claims under its Policy for their benefit. PSA Supp § 13.03; *see also* Syncora Financial Guaranty Insurance Policy in respect of certain RALI 2006-Q04 certificates, Payment Notice at ¶ 7 (same). In addition to its subrogation rights, Syncora is itself a third party beneficiary of the Master Servicer's obligations under the PSA Supp. PSA Supp § 13.09. Accordingly, Syncora may assert its claim against RFC for losses that RFC caused, as both Master Servicer and Sponsor.

33.    With respect to its role as Sponsor, RFC is obligated to repurchase or substitute mortgage loans in the RALI 2006-QO4 mortgage pool for which there is a breach of an origination-related representation and warranty that materially adversely affects the value of the loan and/or for which material loan documentation is missing from the loan file. *See* RALI Servicing Agreement §§ 2.02, 2.04. The Trustee is permitted to bring claims against RFC to enforce RFC's repurchase obligations. *Id.* § 2.04.

34.     Syncora understands that RFC failed as Sponsor to repurchase loans that it knew were defective and materially breached representations and warranties, amply demonstrating RFC's negligence (or gross negligence or willful misconduct) that would eviscerate RFC's contractual exculpation for any liability for what occurred. *Id.* § 6.03. In its Proof of Claim filed in this case on February 28, 2013, Trustee Deutsche Bank Trust Company Americas asserted such claims of Syncora (as well as the same servicing claims described herein) against RFC. *See* Proof of Claim No. 6706.

35.     However, for RMBS Trusts with respect to which a monoline insurance policy has been issued (**"*Insured Trusts*"**), the Trustees and Debtors recently announced with the filing of their Plan Support Agreement that the Trustees were abandoning their repurchase and servicing claims. Further, the Insured Trusts are not participating in the RMBS Trust Settlement wherein repurchase claims are being allowed claims in the Plan. Instead, the repurchase claim is being given instead to the relevant monoline insurer as an allowed claim under the Plan.

36.     RALI 2006-QO4 is an "Insured Trust" under the Plan Support Agreement and proposed Plan of Reorganization, and as such the Trustee's repurchase claim against RFC is being given to Syncora as monoline insurer under the proposed Plan. Therefore, Syncora asserts such repurchase claims against RFC as part of this amendment for purposes of obtaining an allowed claim under the Plan.

37.     Had RFC fulfilled its duties in good faith, approximately $230 million in principal and interest losses in the RALI 2006-QO4 transaction could have been avoided. *See* Exhibit D hereto. Instead, the transaction experienced substantial principal and interest shortfalls in the mortgage loan pool, which in turn have caused principal write-downs and shortfalls in interest payments in respect of "first-loss position" junior notes. Such losses have spread up the

waterfall priority to the more senior notes insured by Syncora, and as a result, Syncora has paid $74,816,151 in insurance claims.

38.     Given such distress in the transaction and Syncora's losses, and as a consequence of the harm inflicted by RFC's faulty servicing, Syncora sought to hedge against exposure by investing in a tender offer for such certificates, paying consent fees totaling $8,623,129 to consummate the remediation.

39.     Had RFC acted as it should have as Servicer and had the $130 million in principal and interest losses been avoided as shown on Exhibit D, the RALI 2006-QO4 transaction would not have experienced nearly the same distress that it has, and Syncora would not have incurred such remediation expense.

40.     For the reasons described above, RFC breached its obligations as Servicer under the RALI Servicing Agreement, and thus RFC is liable to Syncora for damages totaling at least $83,439,280, plus interest.  Separately, RFC is liable to Syncora for its negligence and owes Syncora damages in at least the same amount.

41.     In the event that any of the Trust Documents are rejected by GMAC or RFC, this proof of claim is also a proof of claim for the claims under any Trust Document or portion of a Trust Document that is rejected pursuant to section 365 of the Bankruptcy Code; *provided, however,* that Syncora reserves the right to file additional proofs of claim asserting additional rejection damages claims following any such rejection.

42.     Syncora does not waive its rights to any claims or other rights by referencing or not referencing any such claim or right, or by not stating a specific figure therefor at this time.

16

43. Upon information and belief, the Debtors have copies of all of the documents and writings upon which this claim is founded, and those writings are voluminous. Copies of relevant supporting documents, subject to any confidentiality and privilege restrictions, will be made available to the Debtors upon request.

44. No judgment has been rendered on this claim.

45. This claim is not subject to any right of setoff or counterclaim held by GMAC or RFC.

46. The execution and filing of this proof of claim is not: (i) a waiver or release of the rights of Syncora against any entity or person, including, without limitation, entities or persons that may be liable for all or any part of the claims claimed herein; (ii) a waiver or release of any obligation owed to Syncora or any right to any security that may be determined to be held by a third party for the benefit of Syncora; (iii) a waiver of any past, present, or future defaults (or events of default) by GMAC, RFC or others in connection with the Trust Documents; (iv) a consent by Syncora to the jurisdiction of the Bankruptcy Court, or the authority of the Bankruptcy Court to enter a final order, with respect to any proceeding which has been or may be commenced in these cases against or otherwise involving Syncora; (v) a waiver of the right to move for the withdrawal of reference with respect to the subject matter of this claim, any objection or other proceedings commenced with respect thereto, or any other proceeding which has been or may be commenced in these cases against or otherwise involving Syncora; or (vi) an election of remedies or a waiver or limitation of any procedural or substantive rights or any procedural or substantive defenses to any claim that may be asserted by or against Syncora.

17

47.    Syncora reserves the right to (i) amend, modify, supplement, or otherwise revise this proof of claim to reflect any additional claims of whatever kind or nature that Syncora has or may have against GMAC, RFC or any other Debtor, and (ii) file proofs of claim for additional claims, whether arising from or relating to any of the Trust Documents, or with respect to any other liability or indebtedness of GMAC of RFC.  Although, at this time, Syncora is unaware of claims against the Debtors in these cases other than GMAC and RFC, Syncora reserves the right to file claims against Debtors other than GMAC if additional claims are discovered.  In addition, Syncora reserves the right to withdraw this proof of claim, or any portion hereof, for any reason whatsoever.

48.    This proof of claim does not encompass claims that Syncora has or may have that are entitled to administrative priority, and Syncora expressly reserves its rights to file such claims or any similar claims at the appropriate time.

49.    Syncora reserves the right to attach or bring forth additional documents supporting this proof of claim and additional documents that may become available after further investigation and discovery.

50.    To the extent that Syncora has or may have a right to subrogation under 11 U.S.C. § 509 or any other equitable claim under common law against GMAC or RFC, Syncora expressly preserves such rights.

51.    All notices concerning and payments in connection with this proof of claim should be sent to:

Syncora Guarantee Inc.
135 West 50th Street 20th Floor
New York, New York  10020
Attention:    R. Sharon Smith, Esq. (rsharon.smith@scafg.com)
Telephone:    212-478-3673

18

A copy of all notices concerning this proof of claim should also be sent to:

Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, New York 10110
Attention: Paul R. DeFilippo (pdefilippo@wmd-law.com)

Dated: September 3, 2013

SYNCORA GUARANTEE INC.

By:
Name: R. Sharon Smith, Esq.
Title:   Managing Director and Associate General Counsel

# EXHIBIT A

## Syncora-Related Servicing Agreements

### BSSLT 2007-SV1

- Servicing Agreement, dated as of May 1, 2001, as amended by Amendment No. 1, dated as of October 1, 2001, Amendment No. 2, dated as of July 31, 2002 and Amendment No. 3, dated as of December 20, 2005, between EMC Mortgage Corporation and GMAC Mortgage, LLC

- Insurance and Indemnity Agreement, dated as of March 30, 2007, among XL Capital Assurance Inc., EMC Mortgage Corporation, SACO I Inc., GMAC Mortgage, LLC and Citibank, N.A.

- Side Letter Agreement, dated as of March 30, 2007, between GMAC Mortgage, LLC and XL Capital Assurance Inc.

- Assignment, Assumption and Recognition Agreement, dated as of March 30, 2007, among EMC Mortgage Corporation, Citibank, N.A. and GMAC Mortgage, LLC

- Pooling and Servicing Agreement, dated as of March 1, 2007, among SACO I Inc., EMC Mortgage Corporation, Wells Fargo Bank, National Association and Citibank, N.A.

- Financial Guaranty Insurance Policy No. CA03636A, effective as of March 30, 2007, executed by XL Capital Assurance Inc. in relation to Bear Stearns Second Lien Trust 2007-SV1 Class A-2 and A-3 Certificates

- All other documents (including offering documents) related to the Bear Stearns Transaction

### STACS 2007-1

- Pooling and Servicing Agreement, dated as of April 1, 2007, among ACE Securities Corp., as depositor, GMAC Mortgage, LLC, as servicer, Wells Fargo Bank, National Association, as master servicer and securities administrator and HSBC Bank USA, National Association, as trustee

- Insurance and Indemnity Agreement, dated as of May 15, 2007, among XL Capital Assurance Inc., SunTrust Asset Funding, LLC, SunTrust Bank, ACE Securities Corp., GMAC Mortgage, LLC and Wells Fargo Bank, National Association

- GMACM Side Letter Agreement, dated as of May 15, 2007, between GMAC Mortgage, LLC and XL Capital Assurance Inc.

- Credit Risk Management Agreement, dated as of May 14, 2007, between GMAC Mortgage, LLC and Clayton Fixed Income Services Inc.

- Premium Letter, dated as of May 15, 2007, among XL Capital Assurance Inc., HSBC Bank USA, National Association, Wells Fargo Bank, National Association, SunTrust Asset Funding, LLC, GMAC Mortgage, LLC and ACE Securities Corp.

- Custodial Agreement, dated as of April 1, 2007, among HSBC Bank USA, National Association, as trustee, GMAC Mortgage, LLC, as servicer and Deutsche Bank National Trust Company, as custodian

- Financial Guaranty Insurance Policy No. CA03757A, effective as of May 15, 2007, executed by XL Capital Assurance Inc. in relation to SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1 Class A Certificates

- Mortgage Loan Purchase and Sale Agreement, dated as of May 15, 2007, between GMAC Mortgage, LLC as purchaser and SunTrust Asset Funding, LLC

- Assignment, Assumption and Recognition Agreement, dated May 15, 2007 among GMAC Mortgage, LLC, ACE Securities Corp., SunTrust Asset Funding, LLC, and Wells Fargo Bank, N.A.

- All other documents (including offering documents) related to the SunTrust Transaction

## RALI 2006-QO4

- Standard Terms of Pooling and Servicing Agreement, dated as of March 1, 2006, for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates

- Series Supplement, dated as of April 1, 2006, to Standard Terms of Pooling and Servicing Agreement, dated as of March 1, 2006, between Residential Accredit Loans, Inc., Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee.

- Custodial Agreement, dated as of April 1, 2006, between Deutsche Bank Trust Company Americas as Trustee, Residential Accredit Loans, Inc., Residential Funding Corporation as master servicer, and Wells Fargo Bank, National Association as Custodian.

- Financial Guaranty Insurance Policy No. CA02956A, effective as of April 27, 2006, executed by XL Capital Assurance Inc. in relation to RALI Series 2006-QO4 Class I-A-2 and Class 11-A-3 notes.

- Indemnification Agreement, dated April 26, 2006, between Residential Accredit Loans, Inc., Residential Funding Corporation and XL Capital Assurance Inc.

- All other documents (including offering documents) related to the RALI 2006-QO4 transaction.

# EXHIBIT B

<u>Summary of calculation below</u>:  Of the 8,821 loans in BSSLT 2007-SV1 that have defaulted, all of which were serviced by GMACM, one can very conservatively and safely assume for the present exercise (prior to expert testimony) that (a) at least 75% of the defaulted loans were defective (*i.e.*, were made to borrowers whose loan applications would have been rejected had prudent underwriting standards been applied), breached mortgage loan representations and warranties, and should have been substituted, and (b) the remaining 25% of such loans were prudently underwritten but nevertheless experienced defaults due to legitimate changes in the borrower's financial circumstance in the current economy.  (Syncora believes the percentage of defectively underwritten loans is actually much higher than 75%.)  For the substituted loans that should have been sourced from the same largely defective pool and loan originators, the same 75%-25% split is assumed.  As a result, one can determine the number of defective loans that the servicer should have caused to be put back and removed from the pool, and then using the average loan size, determine the amount of principal losses in the transaction that would have been avoided had the servicer fulfilled its duties.

| | |
|---|---:|
| Original number of loans: | 37,535 |
| Total principal face amount: | $1,415,853,132 |
| Average loan size: | $37,721 |
| | |
| # of defaulted loans | 8,821 |
| | |
| # of defaulted loans that were defective and GMACM should have notified the Trustee to put back (75% of 8,821): | 6,616 |
| | |
| # of defaulted loans that were not defective but would have defaulted irrespective of servicing (25% of 8,821): | 2,205 |
| | |
| # of loan substitutions that should have occurred: | 6,616 |
| | |
| # of substituted loans that were not defective but would have defaulted irrespective of servicing (25% of 6,616): | 1,654 |
| | |
| # of loan defaults that could have been avoided had the pool been serviced properly (8,821 - [2,205 + 1,654]): | 4,962 |
| | |
| Total amount of loans for which default could have been avoided (4,962 x $37,721): | $187,171,602 |
| | |
| Total losses on loans for which default could have been avoided ($187,171,602 x 97% average loss severity per loan to date): | **$181,556,453** |

## **EXHIBIT C**

<u>Summary of calculation below</u>:  Of the 3,617 loans in STACS 2007-1 that have defaulted, all of which were serviced by GMACM, one can very conservatively and safely assume for the present exercise (prior to expert testimony) that (a) at least 75% of the defaulted loans were defective (*i.e.*, were made to borrowers whose loan applications would have been rejected had prudent underwriting standards been applied), breached mortgage loan representations and warranties, and should have been substituted, and (b) the remaining 25% of such loans were prudently underwritten but nevertheless experienced defaults due to legitimate changes in the borrower's financial circumstance in the current economy.  (Syncora believes the percentage of defectively underwritten loans is actually much higher than 75%.)  For the substituted loans that should have been sourced from the same largely defective pool and loan originators, the same 75%-25% split is assumed.  As a result, one can determine the number of defective loans that the servicer should have caused to be put back and removed from the pool, and then using the average loan size, determine the amount of principal losses in the transaction that would have been avoided had the servicer fulfilled its duties.

| | |
|---|---:|
| Original number of loans: | 5,767 |
| Total principal face amount: | $370,848,626 |
| Average loan size: | $64,305 |

*Based upon Defaulted Loans*

| | |
|---|---:|
| Defaulted loans | 3,617 |
| # of defaulted loans that were defective and servicer should have put back (98% of 3,617): | 3,545 |
| # of defaulted loans that were not defective but would have defaulted irrespective of servicing (2% of 3,617): | 72 |
| # of loan substitutions that should have occurred: | 3,545 |
| # of substituted loans that were not defective but would have defaulted irrespective of servicing (2% of 3,545): | 71 |
| # of loan defaults that could have been avoided had the pool been serviced properly (3,617 - [72 + 71]): | 3,474 |
| Total amount of loans for which default could have been avoided (3,474 x $64,305): | $223,395,570 |
| Total losses on loans for which default could have been avoided ($223,395,570 x 99% severity): | $221,161,614 |

## EXHIBIT D

<u>Summary of calculation below</u>:  Of the 1,291 RALI 2006-Q04 loans that have defaulted, one can very conservatively and safely assume for the present exercise (prior to expert testimony) that (a) at least 75% of the defaulted loans were defective (*i.e.*, were made to borrowers whose loan applications would have been rejected had prudent underwriting standards been applied), breached mortgage loan representations and warranties, and should have been substituted, and (b) the remaining 25% of such loans were prudently underwritten but nevertheless experienced defaults due to legitimate changes in the borrower's financial circumstance in the current economy.  (Syncora believes the percentage of defectively underwritten loans is actually much higher than 75%.)  For the substituted loans that should have been sourced from the same largely defective pool and loan originators, the same 75%-25% split is assumed.  As a result, one can determine the number of defective loans that the master servicer would have caused to be put back and removed from the pool, and then using the average loan size, determine the amount of principal losses in the transaction that would have been avoided had the master servicer fulfilled its duties.

| | |
|---|---:|
| Original number of loans: | 2,470 |
| Total principal face amount: | $850,027,283 |
| Average loan size: | $344,141 |
| # of defaulted loans | 1,291 |
| # of defaulted loans that were defective and master servicer should have put back (75% of 1,291): | 968 |
| # of defaulted loans that were not defective but would have defaulted irrespective of servicing (25% of 1,291): | 323 |
| # of loan substitutions that should have occurred: | 968 |
| # of substituted loans that were not defective but would have defaulted irrespective of servicing (25% of 968): | 242 |
| # of loan defaults that could have been avoided had the pool been serviced properly (1,291 - [323 + 242]): | 726 |
| Total amount of loans for which default could have been avoided (726 x $344,141): | $249,846,075 |
| Total losses on loans for which default could have been avoided ($249,846,075 x 52% average loss severity per loan to date): | **$129,919,959** |