Exhibit 7

# WOLLMUTH MAHER & DEUTSCH LLP

500 FIFTH AVENUE

NEW YORK, NEW YORK 10110

TELEPHONE (212) 382-3300
FACSIMILE (212) 382-0050

July 3, 2013

*WITHOUT PREJUDICE AND*
*SUBJECT TO FRE 408*

BY E-MAIL AND
FIRST CLASS MAIL

J. Alexander Lawrence, Esq.
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104

Re:  In re Residential Capital, LLC, *et al.*, Chapter 11 Case No. 12-12020 (MG)

Dear Mr. Lawrence:

    I write on behalf of our client, Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc. ("Syncora"), in response to your June 26, 2013 letter regarding Syncora's claims in the above-referenced case. Setting aside for the moment your characterization of the nature and substance of prior discussions between the Debtors and Syncora, with which we disagree, Syncora responds to your questions as follows.

    Without waiver of the claims described in Syncora's proof of claim number 2781 and further to Syncora's express reservation of rights therein, including Syncora's reservation of the right to amend, modify and supplement its proof of claim to reflect additional claims Syncora may have against any Debtor, Syncora's claims against the Debtors include its claims against Residential Funding Corporation, now known as Residential Funding Company, LLC ("RFC"), based upon RFC's negligence and breach of its duties and obligations as Master Servicer and Sponsor in connection with the securitization known as Residential Accredit Loans, Inc., Series

J. Alexander Lawrence, Esq.                     2                              July 3, 2013

2006-Q04 ("RALI 2006-Q04").[1] In addition, Syncora rightfully expected the Trustee for RALI 2006-Q04 to file a proof of claim against RFC, as it did, and to pursue that claim. To the extent the forthcoming proposed Plan of Reorganization proposes to reallocate such claim to Syncora and the Debtors argue that Syncora cannot pursue that claim, the Plan does not work.

In the RALI 2006-Q04 transaction, RFC is the Sponsor and seller of the underlying mortgage loans and initially made the representations and warranties concerning the quality of the mortgage loans and the loan underwriting. RFC also served as the Master Servicer for such loans. Under the Standard Terms of Pooling and Servicing Agreement dated as of March 1, 2006 (the "PSA"), upon discovering a material breach of any representation and warranty for a loan, RFC, as Master Servicer, is required to give prompt written notice of such breach to the RALI 2006-Q04 Trustee and other parties. PSA § 2.04. Such written notice also triggers the Master Servicer's obligation to request that the Sponsor (*i.e.*, RFC itself) repurchase the defective loan or substitute a conforming loan. *Id.* Moreover, as part of its servicing duties "for the benefit of the . . . Certificateholders," the PSA states that the Master Servicer "shall use its best reasonable efforts to enforce of the obligations of . . . each Seller [*i.e.*, RFC] to purchase a Mortgage Loan on account of defective documentation . . . or on account of a breach of a representation and warranty." § 3.02(b). The PSA further states that such enforcement by the Master Servicer "shall be in such form and carried out to such an extent and at such time as the Master Servicer would employ in its good faith judgment and which are normal and usual in its general servicing activities." *Id.* By the same token, RFC has an on-going obligation as Sponsor/seller to cure, repurchase or substitute mortgage loans in the pool that materially breach the Sponsor's representations and warranties concerning the quality of the mortgage loans and the loan underwriting. PSA § 2.04.

First, we understand that RFC failed as Sponsor to repurchase loans that it knew were defective and materially breached representations and warranties, amply demonstrating RFC's negligence (or gross negligence or willful misconduct) that would eviscerate RFC's contractual exculpation for any liability for what occurred. PSA § 6.03. Moreover, RFC was negligent (and, we believe, even grossly negligent) in failing to fulfill the foregoing servicing duties and obligations. While *more than half* of the loans in the RALI 2006-Q04 pool have defaulted thus

---

[1] Due to an internal error, Syncora did not include a reference to RALI 2006-Q04 in its initial proof of claim, an error that only recently came to the attention of Syncora and its counsel. Nevertheless, the claims described herein related to RALI 2006-Q04 are of the same nature described in the proof of claim for the three referenced securitizations.

J. Alexander Lawrence, Esq.					3					July 3, 2013

far,[2] we further understand that RFC, as Master Servicer, has not sought to have the Sponsor buy back or substitute a *single* loan. As we believe discovery will show, in the ordinary course of RFC's performance as Master Servicer, RFC would have encountered loan files for at least several hundred borrowers whose loans were not originated in conformity with prudent loan underwriting practices. As such, we fully expect that it will be proven that RFC became aware of pervasive, material breaches of representations and warranties. Although RFC was required, as Master Servicer, to exercise its "good faith best judgment" in making a "best reasonable effort" to cause such defective loans to be repurchased or replaced, we understand it did nothing.

The PSA and the PSA Series Supplement dated as of April 1, 2006 ("PSA Supp") state throughout that the Master Servicer is to perform its servicing duties and obligations "for the benefit of the Certificateholders" (*e.g.*, § 2.04), and the PSA and PSA Supp state the same with respect to the Sponsor's repurchase obligations (*id.*). The PSA Supp further provides that Syncora is fully subrogated to the rights of Insured Certificateholders to the extent Syncora pays claims under its Policy for their benefit. PSA Supp § 13.03; *see also* Syncora Financial Guaranty Insurance Policy in respect of certain RALI 2006-Q04 certificates, Payment Notice at ¶ 7 (same). In addition to its subrogation rights, Syncora is itself a third party beneficiary of the Master Servicer's obligations under the PSA and PSA Supp. PSA Supp § 13.09. Accordingly, Syncora may assert its claim against RFC for losses that RFC caused, as both Master Servicer and Sponsor.

We have determined that the damage Syncora suffered as the result of RFC's negligence and breaches of contract is at least equal to the full $74,816,151 in insurance claims that Syncora has paid on RALI 2006-Q04 to date, plus interest of $5,308,164 through the Petition Date (PSA Supp. §§ 1.01 (definition of Cumulative Insurance Payment); 4.02(d)(iii)). RFC's failure to take steps to cause defective loans to be replaced with cash or performing loans created cash shortfalls in the loan pools which in turn caused shortfalls in interest payments to the "first-loss position" junior notes, which eventually spread up the waterfall priority to the more senior Class I-A-2 and Class II-A-3 certificates that Syncora insured. As a result, Syncora paid $74,816,151 in claims to cover such additional shortfalls. This conclusion is buttressed by calculating the amount of principal losses in the RALI 2006-Q04 loan pool that would have been avoided had defective loans promptly been put back and repurchased or substituted by RFC. As set forth in the calculations in Exhibit A hereto, the losses to the transaction that would have been avoided

---

[2] The May 28, 2013 Trustee report for RALI 2006-Q04 reported that, of the original pool of 2,470 loans, 1,291 loans (or 52.2%) have defaulted.

J. Alexander Lawrence, Esq.                  4                      July 3, 2013

were approximately $130 million, a figure that would have more than compensated for the losses experienced by the certificates for which Syncora paid claims.[3]

In response to your last question, Syncora has not asserted a claim against any other party in connection with the RALI 2006-Q04 transaction.

We would like to speak with you about reaching agreement on a discovery schedule on the above claims. We will reach out to you. In the meantime, Syncora reserves any and all rights and remedies in respect of the foregoing and any other claims against the Debtors.

Very truly yours,

Randall R. Rainer

Attachment

cc:    Paul R. DeFilippo, Esq.

---

[3] As you know, Syncora has been denied access to the analysis and quantification of repurchase and servicing claims which Duff & Phelps recently completed for the Trustees and which calculates a damage number with respect to similar breaches of duty. Although we cannot state whether we would adopt any or all of Duff & Phelps' methodology since we have yet to see it, the Duff & Phelps analysis may be a useful reference point in considering the value of Syncora's claims described herein.

## EXHIBIT A

<u>Summary of calculation below:</u> Of the 1,291 RALI 2006-Q04 loans that have defaulted, one can very conservatively and safely assume for the present exercise (prior to expert testimony) that (a) at least 75% of the defaulted loans were defective (*i.e.*, were made to borrowers whose loan applications would have been rejected had prudent underwriting standards been applied), breached mortgage loan representations and warranties, and should have been substituted, and (b) the remaining 25% of such loans were prudently underwritten but nevertheless experienced defaults due to legitimate changes in the borrower's financial circumstance in the current economy. (We believe the percentage of defectively underwritten loans is actually much higher than 75%.) For the substituted loans that should have been sourced from the same largely defective pool and loan originators, the same 75%-25% split is assumed. As a result, one can determine the number of defective loans that the master servicer would have caused to be put back and removed from the pool, and then using the average loan size, determine the amount of principal losses in the transaction that would have been avoided had the master servicer fulfilled its duties.

| | |
|---|---:|
| Original number of loans: | 2,470 |
| Total principal face amount: | $850,027,283 |
| Average loan size: | $344,141 |
| # of defaulted loans | 1,291 |
| # of defaulted loans that were defective and master servicer should have put back (75% of 1,291): | 968 |
| # of defaulted loans that were not defective but would have defaulted irrespective of servicing (25% of 1,291): | 323 |
| # of loan substitutions that should have occurred: | 968 |
| # of substituted loans that were not defective but would have defaulted irrespective of servicing (25% of 968): | 242 |
| # of loan defaults that could have been avoided had the pool been serviced properly (1,291 - [323 + 242]): | 726 |
| Total amount of loans for which default could have been avoided (726 x $344,141): | $249,846,075 |
| Total losses on loans for which default could have been avoided ($249,846,075 x 52% average loss severity per loan to date): | **$129,919,959** |