Exhibit 9

# WOLLMUTH MAHER & DEUTSCH LLP

500 FIFTH AVENUE

NEW YORK, NEW YORK 10110

TELEPHONE (212) 382-3300
FACSIMILE (212) 382-0050

July 15, 2013

*WITHOUT PREJUDICE AND*
*SUBJECT TO FRE 408*

BY E-MAIL AND
FIRST CLASS MAIL

J. Alexander Lawrence, Esq.
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104

Re: In re Residential Capital, LLC, *et al.*, Chapter 11 Case No. 12-12020 (MG)

Dear Mr. Lawrence:

    I write on behalf of our client, Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc. ("Syncora"), in response to your July 10, 2013 letter regarding Syncora's claims in the above-referenced case. This letter is without waiver of the claims described in Syncora's proof of claim number 2781, the claims described in the proof of claim filed by Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas bearing claim number 6706 (the "DB Claim"), and further to Syncora's express reservation of rights in its proof of claim, including Syncora's reservation of the right to amend, modify and supplement the proof of claim or the DB Claim to reflect additional claims Syncora may have against any Debtor.

A.    Claims against Debtor GMAC Mortgage LLC ("GMACM") as Servicer in connection with the securitization known as Bear Stearns Second Lien Trust 2007-SV1 ("BSSLT 2007-SV1").

    In connection with the BSSLT 2007-SV1 transaction, GMACM is the Servicer pursuant to the Servicing Agreement, dated as of May 1, 2011, by and between EMC Mortgage

J. Alexander Lawrence, Esq.                    2                         July 15, 2013

Corporation ("EMC") and GMACM, as amended by Amendment No. 1 to the Servicing Agreement, dated as of October 1, 2001, as further amended by Amendment No. 2 to the Servicing Agreement, dated as of July 31, 2002, and as further amended by Amendment No. 3 to the Servicing Agreement, dated as of December 20, 2005 (collectively, the "Servicing Agreement").[1] Under the Servicing Agreement, in servicing the BSSLT 2007-SV1 mortgage loans, GMACM was required to "exercise the same care that it customarily employs for its own account." Servicing Agreement § 4.01. GMACM also was required to service and administer the mortgage loans "in accordance with all applicable requirements of [Item 1122(d) of Regulation AB]." *Id.* § 6.09. GMACM was further required to employ quality control procedures "to ensure that the Mortgage Loans are serviced in accordance with prudent mortgage banking practices." *Id.* § 2.06. In addition, in seeking to realize upon defaulted mortgage loans, GMACM was obligated to do so "in such manner as will maximize the receipt of principal and interest by [EMC], taking into account, among other things, the timing of foreclosure proceedings." *Id.* § 4.03.

Nearly 25% of the loans in the BSSLT 2007-SV1 transaction (8,821 of 37,535) defaulted, far in excess of what normally would be expected. As we believe discovery will show, in the ordinary course of GMACM's performance as Servicer, GMACM was aware of such high rate of defaults (its monthly reporting obligations under Section 5.02 of the Servicing Agreement required it to itemize such defaults) and would have encountered loan files for thousands of borrowers whose loans were not originated in conformity with prudent loan underwriting practices and lacked required material mortgage documentation. As such, we fully expect that it will be proven that GMACM became aware of pervasive, material breaches of representations and warranties. As a prudent servicer under a duty to service the loans as if they were its own and to maximize the receipt of principal and interest for certificateholders, including those insured by Syncora, GMACM's single best available method for maximizing loan receipts was to notify its Master Servicer, Wells Fargo Bank, National Association ("Master Servicer"), of such breached representations and warranties. Pursuant to the Pooling and Servicing Agreement, dated as of March 1, 2007, between and among SACO I Inc. as Depositor, EMC as Seller, the Master Servicer and Citibank, N.A. as Trustee (the "PSA"), upon learning of such breaches from GMACM, the Master Servicer would have been required to formally and promptly notify the Trustee, who in turn would have been required to "put back" each defective loan for repurchase or substitution. *See* PSA § 2.02(d). As we believe discovery will further show, the Servicer failed to exercise such care or prudence without good faith.

---

[1] GMACM services 79.89% of the BSSLT 2007-SV1 mortgage loans.

J. Alexander Lawrence, Esq.                3                              July 15, 2013

      Had GMACM fulfilled its duties in good faith, more than $181 million in principal and interest losses in the BSSLT 2007-SV1 transaction could have been avoided. *See* Exhibit A hereto. Instead, the transaction experienced substantial principal and interest shortfalls in the mortgage loan pool, which in turn have caused principal write-downs and shortfalls in interest payments in respect of "first-loss position" junior notes. Such losses have spread up the waterfall priority toward the more senior notes insured by Syncora, although Syncora has not yet paid claims. Given such distress in the transaction, Syncora has expended $15,682,080 in remediation expenses. Had GMACM acted and the $181 million in principal and interest losses been avoided as shown on Exhibit A, the BSSLT 2007-SV1 transaction would not have experienced nearly the same distress that it has, and Syncora would not have incurred such remediation expense. In addition, Syncora still forecasts future claims payments of $1,737,173.

      Pursuant to the Insurance and Indemnity Agreement, dated as of March 30, 2007, between and among Syncora, EMC, SACO I, GMACM and the Trustee (the "I&I"), GMACM represented and warranted to Syncora that it would service the mortgage loans in compliance with the criteria in the Servicing Agreement. I&I § 2.04(f). GMACM further agreed to indemnify Syncora for any and all losses arising out of or relating to the breaches of such representation and warranty resulting from GMACM's misfeasance or negligence. *Id.* § 3.04(b)(i). For the reasons described above, GMACM breached its obligations under the Servicing Agreement and therefore is required to indemnify Syncora for its $15,682,080 in remediation expenses, as well as for its future claims payments that currently are forecasted to total $1,737,173.

B.      Potential Claims against Debtor GMAC Mortgage LLC ("GMACM") as Servicer in connection with the securitizations known as (i) Greenpoint Mortgage Funding Trust 2006-HE1 ("GP 2006-HE1") and (ii) SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1 ("STACS 2007-1").

      Syncora is still determining whether to assert additional claims against Debtor GMACM in respect of GP 2006-HE1 and STACS 2007-1. With respect to each transaction, the provisions of the governing documents are essentially the same as the provisions of the BSSLT 2007-SV1 agreements described above,[2] and the mortgage loan default rates in the transactions are even more egregious.

---

[2] *See, e.g.,* Objection of Syncora Guarantee Inc. to Debtors' Motion for an Order Under Bankruptcy Code Sections 105(A) and 363(B) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., The Creditors' Committee and Certain Consenting Claimants [Docket No. 4028] at 2-4.

J. Alexander Lawrence, Esq.              4              July 15, 2013

       For the GP 2006-HE1 transaction, Syncora has paid a total of $524,798,528 in insurance claims, forecasts paying future claims totaling $62,971,254, and has incurred substantial related expenses.

       For the STACS 2007-1 transaction, Syncora has paid a total of $165,399,376 in insurance claims, forecasts paying future claims totaling $30,356,200, and has incurred substantial related expenses.

       Finally, with respect to the final question in your letter, whether Syncora has asserted a claim in respect of any of the above-referenced transactions is not legally relevant to Syncora's claims against Debtor GMACM for GMACM's own wrongful conduct.

       Syncora reserves any and all rights and remedies in respect of the foregoing and any other claims against the Debtors.

                                                   Very truly yours,

                                                   Randall R. Rainer

Attachment

cc:     Paul R. DeFilippo, Esq.

## **EXHIBIT A**

Summary of calculation below: Of the 8,821 loans in BSSLT 2007-SV1 that have defaulted, all of which were serviced by GMACM, one can very conservatively and safely assume for the present exercise (prior to expert testimony) that (a) at least 75% of the defaulted loans were defective (*i.e.*, were made to borrowers whose loan applications would have been rejected had prudent underwriting standards been applied), breached mortgage loan representations and warranties, and should have been substituted, and (b) the remaining 25% of such loans were prudently underwritten but nevertheless experienced defaults due to legitimate changes in the borrower's financial circumstance in the current economy. (We believe the percentage of defectively underwritten loans is actually much higher than 75%.) For the substituted loans that should have been sourced from the same largely defective pool and loan originators, the same 75%-25% split is assumed. As a result, one can determine the number of defective loans that the servicer should have caused to be put back and removed from the pool, and then using the average loan size, determine the amount of principal losses in the transaction that would have been avoided had the servicer fulfilled its duties.

| | |
|---|---:|
| Original number of loans: | 37,535 |
| Total principal face amount: | $1,415,853,132 |
| Average loan size: | $37,721 |
| # of defaulted loans | 8,821 |
| # of defaulted loans that were defective and GMACM should have notified the Trustee to put back (75% of 8,821): | 6,616 |
| # of defaulted loans that were not defective but would have defaulted irrespective of servicing (25% of 8,821): | 2,205 |
| # of loan substitutions that should have occurred: | 6,616 |
| # of substituted loans that were not defective but would have defaulted irrespective of servicing (25% of 6,616): | 1,654 |
| # of loan defaults that could have been avoided had the pool been serviced properly (8,821 - [2,205 + 1,654]): | 4,962 |
| Total amount of loans for which default could have been avoided (4,962 x $37,721): | $187,171,602 |
| Total losses on loans for which default could have been avoided ($187,171,602 x 97% average loss severity per loan to date): | **$181,556,453** |