Exhibit 11

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| SUNTRUST ACQUISITION CLOSED-END SECONDS TRUST, SERIES 2007-1, by HSBC BANK USA, NATIONAL ASSOCIATION, in its capacity as Trustee pursuant to a Pooling and Servicing Agreement, dated as of April 1, 2007,<br><br>Plaintiff,<br><br>v.<br><br>SUNTRUST ROBINSON HUMPHREY FUNDING, LLC (f/k/a SUNTRUST ASSET FUNDING, LLC) and SUNTRUST BANKS, INC.,<br><br>Defendant | Civ. Action No.:<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

NOW COMES Plaintiff, SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1 (the "Trust" or "STACS 2007-1"), acting by and through HSBC Bank USA, National Association, not individually but solely in its capacity as Trustee of the Trust (the "Trustee"), and acting by and through its attorneys McKool Smith P.C. and at the direction of certain holders of residential mortgage-

backed securities issued by the Trust, hereby brings this complaint against
SunTrust Robinson Humphrey Funding, LLC (f/k/a SunTrust Asset Funding LLC)
and SunTrust Banks, Inc.. (SunTrust Asset Funding, LLC is referred to herein as
"STAF" or the "Sponsor," and SunTrust Banks, Inc. is referred to herein as
"SunTrust" or "Guarantor").  Except as otherwise indicated as to its own actions
and conduct, the Trustee alleges upon information and belief as follows:

## <u>NATURE OF ACTION</u>

1.     This action arises out of STAF's breaches of contract relating to a
securitized pool of 5,767 mortgage loans (the "Mortgage Loans" or "Loans")
selected and sold by STAF and held by the Trust for the benefit of the holders of
Certificates issued by the Trust (the "Certificateholders").  The Mortgage Loans
were (and remain) the primary source of income from which the Trust makes
payments to Certificateholders.  STAF made extensive contractual representations
and warranties regarding the characteristics of these Mortgage Loans, including
their credit quality and their compliance with applicable laws.  Potential investors
in the Certificates relied upon those representations and warranties and did not
have access to the information necessary to verify whether the Mortgage Loans
were accurately described by STAF in compliance with them.  Thus, STAF's

representations and warranties were essential to the securitization of the Mortgage Loans and investors' decision to invest in the Certificates issued by the Trust.

2.    Highlighting the critical importance of these representations and warranties, STAF further promised to cure any breach of the representations and warranties that materially and adversely affected the value of any Mortgage Loan or the interest of Certificateholders in the Loans or, if it failed to cure within ninety days, to repurchase the Loan.  This obligation to cure or repurchase was not contingent on any action by any other party; STAF had an independent obligation both (i) to notify the Trustee when it discovered a breach on its own, and (ii) to cure or repurchase the affected Loan within ninety days of becoming aware of a breach of a representation and warranty through either its own discovery or notice from any other transaction party.[1]    In essence, the parties agreed that Certificateholders would assume the risk that there might be defaults on Mortgage Loans which conformed to STAF's representations and warranties but that STAF would assume the risk that Loans failed to meet those representations and warranties in the first instance.  Moreover, SunTrust, as Guarantor, agreed that should STAF fail to meet its obligations, SunTrust would make right what STAF made wrong.

---

[1] If the breach was discovered within the first two years after the Trust was created, STAF could also replace the defective loan with one that complied with the representations and warranties.

-3-

Case 1:13-cv-01853-TWT    Document 1    Filed 09/14/13    Page 4 of 41

3.     Despite clear evidence of numerous breaches of representations and warranties with respect to the Mortgage Loans in the Trust, STAF has failed, and continues to fail, to fulfill its promise to cure the breaches or repurchase those Loans.  Analysis of available information regarding the Mortgage Loans revealed that more than 1,000 Mortgage Loans breached one or more of STAF's representations and warranties in a manner that materially and adversely affected the value of those Loans and the interests of Certificateholders in them.  STAF was properly notified of these breaches, including a detailed description of the basis for each breach.  The Trustee demanded that STAF cure the breaches or repurchase the defective Mortgage Loans as it had promised.   But STAF has failed and continues to fail to cure or repurchase the identified Mortgage Loans.  Moreover, SunTrust has failed and refused to honor its obligations as Guarantor under the Trust agreements.

4.     These reviews indicate a pervasive problem within the Trust, and STAF knew or should have known about additional breaches and notified the Trustee of same, which STAF did not do.  The Trustee therefore anticipates it will discover additional breaches during discovery.

5.      Because the very essence of the parties' bargain has been irrevocably altered by STAF's pervasive breaches and its subsequent failure to cure or repurchase, the Trust is entitled to rescissory damages.

6.      In the alternative, STAF's failure to provide notice of breaches it previously discovered, and its refusal to cure or repurchase the identified Mortgage Loans (identified either through notice from the Trustee or STAF's own knowledge), entitle the Trust to compensatory damages and/or specific performance to compel STAF to repurchase the Mortgage Loans for which it has been given notice, as well as for any other Mortgage Loans that STAF knows or has reason to know contain similar breaches.

7.      The Trust is further entitled to rescissory damages or, in the alternative, compensatory damages from SunTrust for its failure to honor its guaranty, and/or specific performance to compel SunTrust to honor its guaranty.

## **PARTIES**

8.      The Trust is a New York common law trust established pursuant to a Pooling and Servicing Agreement dated April 1, 2007, with a Closing Date of May 15, 2007, among STAF, GMAC Mortgage LLC ("GMAC"), as Servicer, Wells Fargo Bank, National Association ("Wells Fargo"), as Master Servicer and

Case 1:13-cv-01633-TWT   Document 1   Filed 09/14/13   Page 9 of 41

Securities Administrator, and HSBC, as Trustee (the "PSA"). [2]  The Trust itself is
not a juridical entity.  HSBC is a national banking association organized and
existing under the laws of the United States with its registered main office in
McLean, Virginia, and serves as Trustee of the Trust under the terms of the PSA.
HSBC, acting solely in its capacity as Trustee and on behalf of the Trust, has
undertaken the conduct of this litigation pursuant to the direction of certain
Certificateholders of the Trust.

9.     STAF (n/k/a SunTrust Robinson Humphrey Funding, LLC) is a
Delaware limited liability company with a principal place of business in Atlanta,
Georgia.  STAF is the Sponsor pursuant to the PSA and the Mortgage Loan
Purchase Agreement. [3]

10.     SunTrust Bank is a Georgia banking corporation, with a principal
place of business in Atlanta, Georgia.  SunTrust is the Guarantor under the PSA.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction and venue over this proceeding pursuant to
28 U.S.C. § 1332 because there is complete diversity of citizenship between the
parties and the amount in controversy, exclusive of costs, exceeds $75,000.  For

---

[2] A true and correct copy of the PSA is attached hereto as Exhibit 1.

[3] A true and correct copy of the MLPA is attached hereto as Exhibit 2.

diversity purposes, a national banking association's citizenship is determined solely by the location of its main office.

12.    Venue is proper in this district pursuant to 28 U.S.C. §1391(1) because STAF is a foreign corporation authorized to transact business within this judicial district.  Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(2) because a substantial part of the events and omissions that give rise to the claims herein occurred in Georgia   In addition, STAF made the relevant representations and warranties and undertook the relevant obligations in Georgia.

## FACTUAL BACKGROUND

## I.    THE STACS 2007-1 SECURITIZATION.

13.    This case concerns mortgage-backed pass-through certificates, more commonly known as residential mortgage-backed securities.   Asset-backed securitizations distribute risk by pooling cash-producing assets, such as mortgage loans, and issuing securities backed by that pool of assets.  The most common form of securitization of mortgage loans involves the creation of a trust to which a sponsor entity sells a portfolio of mortgage loans.  The transfer of assets to a trust is typically a two-step process:  "the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the depositor will transfer the assets

to the [trust] for the particular asset-backed transaction."  Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

14.    After receiving a pool of mortgage loans, the trust issues securities, known as certificates, using the pool of loans as collateral.  Investors in the certificates acquire rights to the income flowing from the mortgages (borrowers' payments of principal and interest on their mortgages).

15.    In or about 2007, STAF purchased and securitized approximately 5,767 residential mortgage loans (the "Mortgage Loans") with the intent and understanding that such loans would serve as the basis for payment on securities sold to investors. STAF accomplished this securitization in part by selling the Mortgage Loans pursuant to the MLPA to GMAC Mortgage, LLC ("GMAC"), which, pursuant to an Assignment, Assumption and Recognition Agreement, dated May 15, 2007 ("AARA") [4],  sold the loans and transferred all of its rights under the MLPA to ACE Securities Corp. ("ACE").  Pursuant to the PSA, ACE, in turn, sold and deposited the loans into the Trust and transferred its rights under the MLPA and AARA to the Trustee. The Trust then issued securities backed by the Mortgage

---

[4] A true and correct copy of the AARA is attached hereto as Exhibit 3.

Case 1:13-cv-01633-TWT   Document 1   Filed 09/14/13   Page 39 of 41

Loans. These securities, also known as "Certificates," were issued on May 15, 2007 and sold to investors (the "Certificateholders").

16.    Concurrently with its transfer of the Mortgage Loans, the Depositor also transferred, assigned, set over and otherwise conveyed to the Trustee "all of the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans identified in the Mortgage Loan Schedule, the rights of the Depositor under the Mortgage Loan Purchase Agreement and Assignment Agreement (including, but not limited to, the right to enforce the obligations of the other parties thereto (including the Guarantor) thereunder) . . . ."  PSA § 2.01.  The Trustee was thus entitled to exercise all rights of the Depositor under the Mortgage Loan Purchase Agreement and Assignment Agreement as if, for such purpose, it was the Depositor.

17.    The Trust is administered by Wells Fargo, which is the Master Servicer and Securities Administrator.  The Master Servicer and Securities Administrator is responsible for aggregating monthly reports and remittances from the Servicers and for generally overseeing the performance of the Servicers under the governing agreements.  The Master Servicer acts independently of the Trustee pursuant to the terms of the PSA.  GMAC is the designated Servicer of the Trust, and is, among other things, responsible for collecting monthly mortgage payments

from borrowers and seeking to recover from borrowers who default on their Mortgage Loans, consistent with the PSA and generally accepted servicing standards.

18.     The Trust therefore holds the Mortgage Loans for the benefit of the Certificateholders.  The Trustee, as assignee of the Depositor, has the right to enforce STAF's representations and warranties under the MLPA and its obligation to cure or repurchase Mortgage Loans that fail to comply with such representations and warranties in a manner that materially adversely affects the value of the Mortgage Loans or the interests of Certificateholders therein.

## II.     <u>STAF'S REPRESENTATIONS AND WARRANTIES.</u>

19.     As with all mortgage loan securitizations, the marketability, value, credit ratings and credit quality of the Certificates were (and are) dependent in significant part upon the credit quality of the Mortgage Loans in the Trust, the underwriting of those loans, the quality of the information provided with respect thereto, and the accuracy of the representations and warranties that were made with respect to the Mortgage Loans.

20.     STAF's representations and warranties regarding the Mortgage Loans are specified, in Section 3.02 and Exhibit G of the MLPA (the "Mortgage Loan Representations"), and include, without limitation, the following:

- "No fraud, error, omission, misrepresentation, negligence, or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Company or the Mortgagor, any appraiser, any builder or any developer or any other party involved in the solicitation or origination of the Mortgage Loan or in the application for any insurance in relation to such Mortgage Loan or in connection with the sale of such Mortgage Loan to the Purchaser…;" MLPA Exhibit G(i).

- "All requirements of any applicable federal, state or local law including, without limitation, all applicable predatory and abusive lending, usury, truth-in-lending, real estate settlement procedures, consumer credit protection (including Uniform Consumer Credit Code laws), fair credit reporting, unfair collection practices, equal credit opportunity or fair housing and disclosure laws applicable to the solicitation, origination, servicing and collection of the Mortgage Loan have been complied with in all material respects, the Mortgagor received all disclosure materials required by applicable law with respect to the making of mortgage loans of the same type as the Mortgage Loan and, if the Mortgage Loan is a refinanced Mortgage Loan, rescission materials required by applicable laws, and the Company shall maintain in its possession, available for the Purchaser's inspection, and shall deliver to the Purchaser upon demand, evidence of compliance with all such requirements;" MLPA Exhibit G(j).

- "Other than payments due but not yet thirty (30) days or more delinquent, there is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and neither the Company nor its predecessors have waived any default, breach, violation or event of acceleration;" MLPA Exhibit G(s).

- "Each Mortgage Loan was underwritten in accordance with the applicable Underwriting Guidelines or if eligible for sale to Fannie Mae or Freddie Mac, through the DU, which Underwriting Guidelines satisfy the standards of prudent mortgage lenders of the same type of

-11-

mortgage loans as the Mortgage Loans in the secondary market;" MLPA Exhibit G(kk).

21.     STAF also made representations and warranties regarding itself and its own conduct with respect to the transaction (the "Company-Specific Representations"), including that "[n]o statement, report or other document furnished or to be furnished by or on behalf of the Company pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they were made, not misleading."  MLPA § 3.01 & Ex. F §(h) thereof.

22.     STAF's representations and warranties were, and remain, material to the Trust and the Certificateholders.  Indeed, Section 2.04 of the MLPA expressly makes the accuracy of STAF's representations and warranties a condition to the closing of the transaction: "[t]he closing for the purchase and sale of the Mortgage Loan Package shall be subject to the satisfaction of each of the following conditions:  (ii) [a]ll of the representations and warranties of [STAF] under this Agreement shall be true and correct as of the Closing Date (or, with respect to the Mortgage Loan Representations, such other date specified therein) in all material respects."

23.     Through the representations and warranties, STAF promised that, as of the Closing Date, the Mortgage Loans met certain credit quality thresholds regarding the borrowers' ability to repay their loans on time and in full, that the Mortgage Loans were originated in compliance with legal requirements, and that the documentation required to issue (and enforce) the Mortgage Loans was complete.  Without these assurances, the Certificates would not have been purchased by investors, or at the very least, would not have been purchased on the same economic terms.

24.     The MLPA provides that: "Within ninety (90) days of the earlier of either discovery by, or notice to, [STAF] of any Defective Document or a breach of a representation or warranty which materially and adversely affects the value of a Mortgage Loan or the interest of the Purchaser therein, [STAF] shall use reasonable efforts promptly to cure such breach in all material respects and, if such Defective Document or breach cannot be cured, [STAF] shall repurchase such Mortgage Loan at the Repurchase Price."  MLPA § 3.03.

25.     Pursuant to Section 2.03 of the PSA, substitution of a breaching Mortgage Loan may only occur within two years of the Closing Date.  This option is thus no longer available to the Trust, as the Closing Date was in 2007.

26.     The PSA provides that upon any party's discovery of a breach, that party must notify the other parties.  The Trustee is one of the parties then charged with requesting that STAF, as Sponsor, cure the breaches or repurchase the Mortgage Loans.  PSA § 2.03(a).  If STAF cannot cure the breach it must repurchase the affected Mortgage Loan or Mortgage Loans at the contractually defined Repurchase Price.

27.     The MLPA defines Repurchase Price as:

> With respect to any Mortgage Loan, (i) the unpaid principal balance of the Mortgage Loan as of the date of repurchase, plus (ii) interest on such unpaid principal balance at the Mortgage Loan Interest Rate from the date on which interest has last been paid and distributed to the Purchaser to the last day of the month in which such repurchase occurs, less amounts received or advanced in respect of such repurchased Mortgage Loan, plus (iii) the amount of any unreimbursed Servicing Advances, plus (iv) actual and out-of-pocket costs and expenses incurred in the enforcement of the Company's repurchase obligation hereunder plus, (v) with respect to any Mortgage Loan subject to a Securitization, any costs and damages incurred by the related trust in connection with any violation by such Mortgage Loan of any predatory or abusive lending law.

MLPA art. I.

28.     STAF's cure or repurchase obligation was central to the securitization of the Mortgage Loans because it (1) incentivized STAF to ensure that the

-14-

Mortgage Loans were issued using prudent lending practices and (2) allocated the risk of poor lending practices to the party best able to detect and prevent them— STAF.  Traditionally, loan originators financed their mortgage business through customer deposits, retained ownership of the loans they originated, and directly received mortgage payments from borrowers.  They earned a profit based on the spread between the interest they received on the loans and the interest they paid on the depository accounts.  When an originator held a mortgage through the term of the loan, it alone bore the risk of loss if the borrower defaulted and the value of the collateral was insufficient to repay the loan.  As a result, originators had a strong economic incentive to apply prudent underwriting standards to verify the borrower's creditworthiness.

29.     Mortgage securitization can remove these incentives toward prudent lending.  In the securitization context, originators earn a profit from the sale of the loan rather than the interest spread.  Once the loans are sold, the credit risk on those loans shifts to investors.  Thus, the more loans an originator issues, the more product it has available for sale and the more profit it can generate.  Rather than being a key component of profitability, underwriting guidelines and other credit criteria act as a constraint on profitability, because they restrict a lender from issuing more loans to less creditworthy borrowers.  By undercutting or ignoring

those credit criteria, the lender can issue more loans. As long as the lender sells

the loan, it does not take on additional risk by issuing riskier loans—it just makes

more money.

30.    Likewise, if a sponsor originates or purchases loans to hold on its

books as investments, the risk of default will loom large in its decision to issue or

purchase the loans. But because securitization sponsors intend to sell and

securitize most of the loans, their primary focus may become increasing volume,

even at the expense of credit quality. If they are allowed to escape their obligation

to cure or repurchase defective loans, they could pass the increased and

undisclosed risk of default onto investors, and thereby will have little incentive to

carefully scrutinize the loans they acquire.

31.    The cure/repurchase mechanism provides an essential deterrent to

such misconduct. If a sponsor is faced with the risk that it will be forced to

repurchase a materially deficient loan, the sponsor will have the necessary

incentive to ensure that its representations and warranties are accurate. And

because the sponsor is in the best position to verify the quality of the loans it

intends to securitize, allocating the risk of deficiencies in the loans to the sponsor is

appropriate and reasonable.

32.     However, the cure/repurchase mechanism was not a cure-all by which investors or trusts accepted the possibility of pervasive breaches—breaches that would leave the trust and investors with either a significantly riskier pool of assets that were far less likely to perform or a far smaller pool of assets (with more limited cash flows) from which to pay investors after the sponsor repurchased the defective loans.   Indeed, a sponsor that intended in good faith to abide by its repurchase obligation would never securitize—and would take steps to insure it did not securitize—a pool of mortgage loans rife with violations of representations and warranties.

## III.    STAF'S BREACHES OF ITS MORTGAGE LOAN REPRESENTATIONS AND ITS FAILURE TO CURE OR REPURCHASE.

33.     At three different points in time after the Closing Date, Syncora Guaranty, Inc. (f/k/a XL Capital Assurance Inc.) [5]  and certain Certificateholders separately informed the Trustee of breaches of representations and warranties that materially and adversely affected the value of the Mortgage Loans or the interests of Syncora or the Certificateholders therein.   In each case, the Trustee provided prompt notice to STAF of the breaches and requested that STAF cure the breaches or repurchase the affected Mortgage Loans.   In total, the Trustee has notified STAF

---

[5] Syncora provided a financial guaranty insurance policy to the Trust, which insured payments to some, but not all, of the Certificates.

(and SunTrust) of well over 1,000 Mortgage Loans that breach one or more Mortgage Loan Representations.

34.     Given the number, extent, and nature of the breaches uncovered, it is not commercially plausible that STAF's own due diligence, conducted, on information and belief, before it even made the representations and warranties, did not reveal the same problems with the Mortgage Loans.  Here, where at least 1,000 of the Mortgage Loans in the pool were riddled with material breaches, due diligence on even a small sample would have alerted STAF to fundamental problems with the pool.  Accordingly, STAF delivered to the Trust substantial numbers of Mortgage Loans that failed to conform to the representations and warranties STAF made to the Trust regarding those loans.  STAF's failure to notify the Trustee of the breaches it had discovered and its failure to cure or repurchase the affected Mortgage Loans, constitute separate and independent breaches of multiple provisions of the MLPA.

**A.     The Trustee's 2008 Breach Notice.**

35.     In a letter dated February 26, 2008, the Trustee notified STAF (and SunTrust) of breaches of representations and warranties with respect to 131 Mortgage Loans (the "2008 Notice").  Each Mortgage Loan identified in the 2008 Notice was thirty or more days delinquent as of the Closing Date, in breach of

MLPA § 3.02 and Exhibit G §(b) thereof. The 2008 Notice identified the affected Mortgage Loans and included supporting detail from the Credit Risk Manager's report of Mortgage Loans with early payment defaults ("EPDs"). [6]

36.     The MLPA required STAF to cure the breaches, substitute non-breaching loans for the defective loans or repurchase the defective loans. It also required STAF to take commercially reasonable efforts to require the originators of the identified Mortgage Loans (the "Underlying Sellers") to repurchase those loans.     See MLPA § 3.04.     STAF did not comply with its cure/substitute/repurchase obligation, or its obligation to enforce the obligations of the Underlying Sellers.  Indeed, although STAF may have substituted some of the 131 identified Mortgage Loans, many of the substitute Mortgage Loans also contained breaches of its representations and warranties.

### B.     The Trustee's 2011 Breach Notice.

37.     Syncora also obtained the Loan Files for certain of the Mortgage Loans and conducted a review if STAF's compliance with its representations.  A review of the Loan Files includes analyzing the credit, collateral and compliance components of Mortgage Loans and comparing the underwriting parameters and

---

[6] The Credit Risk Manager, Clayton Fixed Income Servicers, Inc., is charged with, among other things, providing reports to the Depositor and Sponsor concerning "certain delinquent and defaulted Mortgage Loans" pursuant to separate agreements.  PSA § 7.08.  The reports are based on information from the Master Servicer and are not provided to the Trustee in the ordinary course.

standards in place at the time of origination against the representations and warranties contained in the MLPA.  This type of review is also known as a "re-underwriting" because it repeats the loan underwriting exercise the loan originator was supposed to conduct prior to issuing the loan.

38.     On January 19, 2011, HSBC provided a second notice of breaches of representations and warranties to STAF and SunTrust (the "2011 Notice").  The 2011 Notice identified 455 Mortgage Loans that breached at least one, and often multiple, Mortgage Loan Representations.  HSBC's notice was accompanied by a more than 550 page report detailing, on a loan-by-loan basis, the specific Mortgage Loan Representations breached and a narrative description of each breach.  The 2011 Notice detailed breaches including, without limitation, misrepresentations of the borrower's income, outstanding debt, assets and employment; violations of the originator's underwriting guidelines; and the failure to obtain documents essential to the issuance of the loan.

39.     STAF responded to the 2011 Notice but failed to cure each of the breaches or repurchase the identified Mortgage Loans.

### C.     The Trustee's 2013 Breach Notice.

40.     In a May 14, 2013 letter to STAF and SunTrust, the Trustee provided a third notice to breaches of Mortgage Loan Representations (the "2013 Notice"),

based on an analysis conducted by certain Certificateholders based on the limited publicly available data about the Mortgage Loans. The 2013 Notice identified breaches of Mortgage Loan Representations with respect to 859 Mortgage Loans, including substituted Mortgage Loans that were presumably added to the Trust to resolve breaches with respect to other Mortgage Loans. Among other problems, these Mortgage Loans failed to comply with Mortgage Loan Representations regarding the payment status of the Loans when they were included in the Trust and the accuracy of information concerning the Loans included in the Mortgage Loan Schedule. The 2013 Notice detailed each identified breach with respect to each of the 859 Mortgage Loans.

41. STAF was in breach of its obligation to cure such breaches, substitute conforming loans, or repurchase breaching Mortgage Loans within the contractually specified time periods long before it received notice from the Trustee. Notwithstanding that breach, the contractually specified cure or repurchase period pursuant to the 2013 Notice will expire on August 13, 2013. The Trustee reasonably anticipates, based upon STAF's past actions, that it will not cure such breaches or repurchase such Mortgage Loans.

### D.   STAF's Breaches Materially and Adversely Affected the Value of the Mortgage Loans and the Interests of Certificateholders.

42.   The breaches of Mortgage Loan Representations identified in the Breach Notices substantially undermine the value of these Mortgage Loans and the interests of Certificateholders by, among other things, concealing the heightened risks inherent in the loans.   For example, a borrower's income and other debt obligations are primary factors used to assess whether the borrower is able to repay a loan.   Indeed, the ratio of monthly debt payments to monthly income (also known as the debt-to-income or "DTI" ratio) is a primary criterion in the underwriting process.   Mortgage loans with missing documentation or that fail to comply with applicable law can, among other things, be more difficult to enforce against the borrower or subject property, may increase the difficulty and expense of servicing the loans, or make it virtually impossible to fully and completely verify that the Mortgage Loan was as represented.   Fundamentally, such mortgage loans should never have been issued.   Further, borrowers that have failed to make timely payments are more likely to ignore their payment obligations in the future.   The defective Mortgage Loans at issue here often contain breaches of more than one representation and warranty, further increasing the risk to Certificateholders and decreasing the value of the Loans.

## IV.    STAF'S BREACH OF ITS COMPANY-SPECIFIC REPRESENTATIONS.

43.    The 2013 Notice further identified material breaches of STAF's Company-Specific Representation that it had made no untrue statement of material fact.   STAF represented and warranted that "[n]o statement, report or other document furnished or to be furnished by or on behalf of the Company pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they were made, not misleading."   MLPA § 3.01 and Ex. F §(h) (the "No Untrue Information Representation").   On information and belief, STAF provided statements, reports or other documents that included key information regarding the Mortgage Loans for inclusion in the Mortgage Loan Schedule and the prospectus supplement used to market the Certificates to investors.   Both the Mortgage Loan Schedule and the prospectus supplement stated, based on information furnished by STAF, that no Mortgage Loan was delinquent for more than thirty days as of the Closing Date.   The prospectus supplement stated that only a single Mortgage Loan had even been delinquent for more than thirty days.

44.    In fact, no fewer than 120 Mortgage Loans (including or in addition to the Loans identified in the 2008 Notice)—or at last 2.2% of the Mortgage Loans in

the Trust—were more than thirty days delinquent as of the Closing Date.  This
substantial deviation from the disclosed incidents of defaults (one loan according
to the prospectus supplement; none according to the Mortgage Loan Schedule) in
the Trust was unquestionably material.  Accurate information regarding the
presence and extent of current and historical delinquencies is necessary for
Certificateholders to assess the likelihood that borrowers will be able to repay their
loans and, as a result, whether the Trust will suffer losses on, or will recover and
profit from, the investment in the Mortgage Loans.  Accordingly, STAF's
misrepresentations regarding the number of delinquent Mortgage Loans violated
the No Untrue Information Representation.

## V.   SUNTRUST'S BREACH OF ITS GUARANTY.

45.    SunTrust promised in Article V of the MLPA, "for the sole and
exclusive benefit of Purchaser and its assignees" (including the Trustee) to
"absolutely, unconditionally and irrevocably guarantee to the Purchaser, the full
and prompt performance by [STAF] of any and all obligations of [STAF] under
Section 3.03 of [the MLPA]."  SunTrust Bank further agreed that its obligations
under this guaranty "shall be a continuing, absolute and unconditional guarantee of
the full and punctual performance" of STAF and that it "shall not be necessary for
such claimant to first pursue any remedy from or exhaust any proceedings against"

STAF, provided that the Trustee demand payment from STAF and STAF fails to make such payment for a period of thirty days.  MLPA art. V.

46.    These obligations were incorporated into and made a material term of the PSA.  Specifically, Section 2.03 of the PSA provides that, "Pursuant to the terms of the Mortgage Loan Purchase Agreement, if the Sponsor fails to perform its repurchase obligations thereunder, the Guarantor shall repurchase such Mortgage Loan at the Purchase Price."

47.    SunTrust has breached its continuing obligations under its guaranty.  STAF has received notices of breaches of representations and warranties and has failed to comply with its obligations under Section 3.03 of the MLPA, including by failing to make the required payments within thirty days.  Despite these failures, SunTrust has not complied with its obligations under its guaranty by repurchasing the affected Mortgage Loans or otherwise making payments to the Trust.

## FIRST CAUSE OF ACTION (AGAINST STAF)

### Fundamental Breach and Anticipatory Breach/Rescissory Damages

48.     Plaintiff incorporates by reference the allegations in the preceding paragraphs 1-47 as if they were set forth fully herein.

49.     The MLPA is a valid, enforceable agreement to which STAF is a party.    The PSA and Assignment Agreement are a valid and enforceable agreements related to, and executed contemporaneously with, the MLPA.

50.     Under the terms of the PSA, the Trustee is given the right to enforce the obligations of STAF to the Trust and Certificateholders.

51.     The Trustee has performed all of its obligations and prerequisites with regard to and in advance of filing this action described herein.  In particular, the Trustee delivered the Breach Notices to STAF on February 26, 2008, January 19, 2011, and May 14, 2013.  More than ninety days have passed since the Trust notified STAF of its breaches of representations and warranties.

52.     As explained above, Certificateholders are given relatively little information regarding the underlying mortgage loans in an MBS securitization. Certificateholders thus must rely upon the information provided by the Sponsor, and the Sponsor's representations and warranties regarding the loans, in order

confirm that the Mortgage Loans in the Trust have the represented risk characteristics.

53.     STAF's representations and warranties further serve to assure potential investors that all of the Mortgage Loans were "covered" by STAF; in other words, that the loans were what STAF represented them to be, that they possessed the risk characteristics that it represented them to have, that any exceptions would be few and would be dealt with promptly by STAF, that indeed so few loans would be defective that STAF itself would bring them to light if it "discovered" them, and that STAF, not the Trust (and not investors), would bear the risks associated with breaching loans.

54.     In fact, the MLPA provides that STAF must *itself* notify the Trustee and the Servicer of the existence of a breach. This obligation shows that it was the intent of the parties that STAF assume all of the risk related to the characteristics of the Mortgage Loans set forth it its representations and warranties. It further shows that the parties—including STAF—intended that STAF would stand behind its representations and warranties, even if doing so exposed STAF to liability.

55.     STAF's actions in response to the Breach Notice, however, show that the deal the Trust (and the Certificateholders) thought they were making is not the one they actually made. The PSA and MLPA state that STAF would convey to the

Trust approximately 5,767 Mortgage Loans that met the characteristics guaranteed by the representations and warranties.  In reality, however, STAF transferred a massive number of Mortgage Loans to the Trust which, from day one, failed to have their promised characteristics.

56.     When confronted with the sheer volume of its breaches, STAF did not repurchase the Mortgage Loans at issue.  Instead, STAF stalled, refusing to honor its obligations under the PSA until the Trust fulfilled certain extra-contractual, unilaterally-imposed conditions to STAF's satisfaction.  To date, STAF has never acknowledged that a single Mortgage Loan is in breach, and STAF has never cured in full or repurchased a single Mortgage Loan.

57.     The parties' agreements do not contemplate the Sponsor transferring such a massive number of defective Mortgage Loans to the Trust.  Instead, the agreements contemplated that there would be very few, if any, loans with representation and warranty breaches; and if breaches did exist, the breaches would be cured or the loans at issue would be repurchased promptly.

58.     STAF's actions have rendered the bargain that the Trust and investors made unrecognizable. STAF has fundamentally defeated and frustrated the parties' agreements and repudiated its contractual obligations, shifting onto other parties a

contractual burden it promised to undertake.  STAF's actions thus constitute a fundamental breach that defeats the purpose of the parties' agreements.

59.    STAF's breaches of the MLPA were willful.  On information and belief, STAF intentionally or with reckless disregard made a series of representations and warranties that have been proven to be untrue in more than 1,000 instances.  STAF had access to—and, on information and belief, performed a detailed review of — the Mortgage Loans' Loan Files.  It is thus impossible for STAF to have conveyed the Mortgage Loans to the Trust without contemporaneous knowledge of the existence of many, if not all, of such a massive and pervasive number of breaches.

60.    STAF has also willfully failed to fulfill its obligations to cure in full, substitute, or repurchase loans after being provided the Breach Notice.

61.    STAF also anticipatorily will fail to fulfill its obligations to cure in full or repurchase loans identified in the 2013 Notice, as well as in any future breach notices.

62.    STAF's breaches are so fundamental that they give rise to a right to rescissory damages. However, rescission of the agreements is impractical, if not impossible.  The Certificates issued to the Depositor in exchange for the Mortgage Loans have been sold to Certificateholders, and in many cases sold again.  It is not

possible for the Trustee to tender those Certificates the Trustee does not seek actual rescission on behalf of the Trust. Instead, the Trust is entitled to, and thus the Trustee seeks an award of, rescissory damages in an amount to be determined at trial.

63.    The rescissory damages sought by the Trust include all damages arising from the breaches of contract alleged herein.

## <u>SECOND CAUSE OF ACTION (AGAINST STAF)</u>

### Breach and Anticipatory Breach of Representation & Warranty: Specific Performance

64.    Plaintiff incorporates by reference the allegations in the preceding paragraphs 1-63 as if they were set forth fully herein.

65.    The MLPA is a valid, enforceable agreement to which STAF is a party. The PSA and Assignment Agreement are valid and enforceable agreements related to, and executed contemporaneously with, the MLPA.

66.    Under the terms of the MLPA, and through the assignment in the Assignment Agreement and the PSA of the Depositor's rights under the MLPA, the Trustee is given the right to enforce the obligations of STAF to the Trust and Certificateholders.

67.    The Trustee has performed all of its obligations and prerequisites with regard to and in advance of filing this action described herein. In particular, the

Trustee delivered the Breach Notices to STAF on February 26, 2008, January 19, 2011, and May 14, 2013, identifying 131, 455 and 859 Mortgage Loans, respectively, in breach of one or more representations and warranties that materially and adversely affect the value of the Loans and the interests of Certificateholders therein.  More than ninety days have passed since the Trust first notified STAF of its breaches of representations and warranties in each of the Breach Notices.

68.     Section 3.03 of the MLPA require STAF to repurchase any Mortgage Loan within 90 days of discovery or notice of a breach of its representations and warranties if that breach has not been cured by STAF and materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders.

69.     STAF breached its obligations under the MLPA by not curing the breaches of representations and warranties with respect to the Mortgage Loans identified in the Breach Notices or repurchasing the identified Mortgage Loans.

70.     STAF also anticipatorily will fail to fulfill its obligations to cure in full or repurchase loans from the 2013 Notice, as well as in any future breach notices.

71.     The Trust has been irreparably damaged by STAF's breaches. STAF's breaches materially and adversely affect the value of the identified Mortgage Loans and the interests of the Certificateholders.

72.     In the alternative to rescissory and compensatory damages, the Trustee pleads that damages are not a sufficient remedy at law.  The Trust is therefore entitled to an order that STAF must specifically perform its obligations under the MLPA—specifically, that it must repurchase all Mortgage Loans breaching STAF's representation and warranties, both those listed in the Breach Notices and those identified in the future.

## **THIRD CAUSE OF ACTION (AGAINST STAF)**

### **Breach and Anticipatory Breach of Contract: Damages for Failure to Cure/Repurchase**

73.     Plaintiff incorporates by reference the allegations in the preceding paragraphs 1-72 as if they were set forth fully herein.

74.     The MLPA is a valid, enforceable agreement to which STAF is a party.  The Assignment Agreement and PSA are valid and enforceable agreements related to, and executed contemporaneously with, the MLPA.

75.     Under the terms of the MLPA and PSA, the Trustee is given the right and duty to enforce the obligations of STAF to the Trust and Certificateholders.

76.     The Trustee has performed all of its obligations and prerequisites with regard to and in advance of filing this action described herein.  In particular, the Trustee delivered the Breach Notices to STAF on February 26, 2008, January 19, 2011, and May 14, 2013, identifying 131, 455 and 859 Mortgage Loans, respectively, in breach of one or more representations and warranties.  More than ninety days have passed since the Trust notified STAF of its breaches of representations and warranties.

77.     STAF has failed to cure or repurchase any Mortgage Loans identified in the Breach Notices in violation of Section 2.03(c) of the PSA and Section 3.03 of the MLPA.

78.     STAF also anticipatorily will fail to fulfill its obligations to cure in full or repurchase loans identified in the 2013 Notice, as well as in any future breach notices.

79.     STAF should be required to pay damages for the losses caused to the Trust by STAF's breaches of its contractual duties.  As STAF has refused to comply with its repurchase obligations, the Trust is not limited to its contractual repurchase remedy.

80.     The Trust is therefore entitled to damages, in an amount to be determined at trial, for STAF's breaches of contract.

## FOURTH CAUSE OF ACTION (AGAINST STAF)

### Breach of Contract: Failure to Notify and Cure or Repurchase

81.     Plaintiff incorporates by reference the allegations in the preceding paragraphs 1-80 as if they were set forth fully herein.

82.     The MLPA is a valid, enforceable agreement to which STAF is a party.  The PSA and Assignment Agreement are valid and enforceable agreements related to, and executed contemporaneously with, the MLPA.

83.     Under the terms of the MLPA, and through the assignment in the PSA of the Depositor's rights under the MLPA, the Trustee is given the right to enforce the obligations of STAF to the Trust and Certificateholders.

84.     The Trustee has performed all of its obligations and prerequisites with regard to and in advance of filing this action described herein.

85.     Section 3.03 of the MLPA and Section 2.03 of the PSA require STAF to notify the Trustee of a breach of any of its representations and warranties in Exhibit F and Exhibit G of the MLPA that materially and adversely affects the value of the Mortgage Loan or the interests of Certificateholders therein promptly upon its discover of such breach.

86.     Section 3.03 further requires STAF to repurchase any Mortgage Loan within 90 days of its discovery of such a breach if that breach has not been cured by STAF.

87.     STAF conducted due diligence before it made the representations and warranties contained in the MLPA and exhibits thereto, and incorporated into its repurchase obligations in the MLPA.  Based upon that due diligence, STAF discovered that many of the Mortgage Loans breached its representations and warranties, including Mortgage Loans identified in the Breach Notices, and that these breaches materially and adversely affect the value of the Loan and the interests of Certificateholders therein.

88.     STAF breached its obligations under the MLPA by (a) failing to provide notice to the Trustee of breaches identified during its due diligence and otherwise with respect to Mortgage Loans; (b) failing to cure the discovered breaches or repurchase the defective Mortgage Loans.

89.     STAF's breaches of the MLPA have fundamentally defeated the protection the cure/repurchase mechanism was intended to provide.

90.     The Trust is entitled to an order that STAF must specifically perform its obligation to repurchase Mortgage Loans with respect to which STAF discovered breaches of representations and warranties, which materially and

adversely affect the value of the Loans and/or the interests of the Trust and Certificateholders therein.

91.     The Trust is further entitled to an award of damages for STAF's failure to notify the Trustee of breaches of representations and warranties that STAF discovered and its subsequent failure to cure such breaches or repurchase such Mortgage Loans, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION (AGAINST SUNTRUST)

### Breach of Contract: Breach of Guaranty

92.     92.     Plaintiff incorporates by reference the allegations in the preceding paragraphs 1-91 as if they were set forth fully herein.

93.     The MLPA is a valid, enforceable agreement to which SunTrust is a party.  The PSA and Assignment Agreement are valid and enforceable agreements related to, and executed contemporaneously with, the MLPA.

94.     Under the terms of the MLPA, and through the assignment in the PSA of the Depositor's rights under the MLPA, the Trustee is given the right to enforce the obligations of SunTrust to the Trust and Certificateholders.

95.     The Trustee has performed all of its obligations and prerequisites with regard to and in advance of filing this action described herein.

Case 1:13-cv-01635-TWT   Document 1   Filed 05/14/13   Page 37 of 41

96.     SunTrust promised in Article V of the MLPA, "for the sole and exclusive benefit of Purchaser and its assignees" (including the Trustee) to "absolutely, unconditionally and irrevocably guarantee to the Purchaser, the full and prompt performance by [STAF] of any and all obligations of [STAF] under Section 3.03 of [the MLPA]."  SunTrust Bank further agreed that its obligations under this guaranty "shall be a continuing, absolute and unconditional guarantee of the full and punctual performance" of STAF and that it "shall not be necessary for such claimant to first pursue any remedy from or exhaust any proceedings against" STAF, provided that the Trustee demand payment from STAF and STAF fails to make such payment for a period of thirty days.  MLPA art. V.

97.     SunTrust has breached its continuing obligations under its guaranty. STAF has received notices of breaches of representations and warranties and has failed to comply with its obligations under Section 3.03 of the MLPA, including by failing to make the required payments within thirty days.  Despite these failures, SunTrust has not complied with its obligations under its guaranty by repurchasing the affected Mortgage Loans or otherwise making payments to the Trust.

98.     The Trust is entitled to an order that SunTrust must specifically perform its obligation to repurchase Mortgage Loans at the Repurchase Price.

99.    The Trust is further entitled to an award of damages for SunTrust's
failure to repurchase Mortgage Loans at the Repurchase Price within thirty days of
STAF's failure to cure such breaches or repurchase such Mortgage Loans, in an
amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

(a)    On the first cause of action, for an award of rescissory damages
against STAF in an amount to be proven at trial;

(b)    On the second cause of action, for an order of specific performance
that STAF be required to repurchase all Mortgage Loans identified in the Breach
Notices and those identified in the future;

(c)    On the third cause of action, for an award of damages against STAF
compensating the Trust for STAF's breaches of the MLPA relating to the
Mortgage Loans identified in the Breach Notices and those identified in the future,
in an amount to be proven at trial;

(d)    On the fourth cause of action, for an order of specific performance
that STAF be required to repurchase all Mortgage Loans with respect to which
STAF discovered breaches of representations and warranties, and an award of
damages for STAF's failure to comply with its obligation to notify the Trustee of

such breaches, and its subsequent failure to either cure such breaches or repurchase the affected Mortgage Loans.

(e)     On the fifth cause of action, for an order of specific performance that SunTrust be required to repurchase all Mortgage Loans that are not compliant with STAF's representations and warranties and for which STAF did not cure or repurchase, and an award of damages in the amount of the Repurchase Price for all such affected Mortgage Loans.

(e)     All costs of the Trust associated with this action (including the Trustee's attorneys' fees), in an amount to be proven at trial;

(e)     Prejudgment interest as approved by the Court; and

(f)     For all such other relief to which the Plaintiff is entitled under law or in equity.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable as a matter of right.

This 14th day of May, 2013.

Respectfully submitted,

McKOOL SMITH, P.C.


s/ Jill Wassserman
Jill Wasserman
  (Ga. Bar No. 739662)
One Atlantic Center
1201 W. Peachtree Street NW
Suite 3210
Atlanta, GA 30309
(404) 920-1852

Gayle R. Klein (Pro Hac Vice to be filed)
Robert W. Scheef (Pro Hac Vice to be filed)
Courtney Statfeld (Pro Hac Vice to be filed)
One Bryant Park, 47th Floor
New York, NY 10036
(212) 402-9400

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE WITH LR 5.1(C)

This is to certify that the foregoing document was prepared using Times New Roman 14 point font in accordance with LR 5.1(C).

DATED:  May 14, 2013

/s/ Jill Wasserman
Jill Wasserman