Exhibit 12

FILED: NEW YORK COUNTY CLERK 02/16/2011

INDEX NO. 650398/2011

NYSCEF DOC. NO. 2

12-12020-mg   Doc 5115-12   Filed 09/19/13   Entered 09/19/13 15:39:29   Exhibit 12

RECEIVED NYSCEF: 02/15/2011

Pg 2 of 167

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

ALLSTATE BANK, ALLSTATE
INSURANCE COMPANY, ALLSTATE
LIFE INSURANCE COMPANY,
ALLSTATE NEW JERSEY INSURANCE
COMPANY, ALLSTATE LIFE
INSURANCE COMPANY OF NEW YORK,
AGENTS PENSION PLAN, and ALLSTATE
RETIREMENT PLAN,

            Plaintiffs,

      -against-

JPMORGAN CHASE BANK, N.A.; J.P.
MORGAN ACQUISITION CORPORATION;
J.P. MORGAN SECURITIES INC.; J.P.
MORGAN ACCEPTANCE CORPORATION
I; WM ASSET HOLDINGS
CORPORATION; WAMU ASSET
ACCEPTANCE CORPORATION; WAMU
CAPITAL CORPORATION;
WASHINGTON MUTUAL MORTGAGE
SECURITIES CORPORATION; LONG
BEACH SECURITIES CORPORATION;
DAVID BECK; DIANE NOVAK; THOMAS
LEHMANN; EMC MORTGAGE
CORPORATION; STRUCTURED ASSET
MORTGAGE INVESTMENTS II INC.;
BEAR STEARNS ASSET BACKED
SECURITIES I LLC; and SACO I INC.

            Defendants.

Index No.

**COMPLAINT**

NATURE OF ACTION ....................................................................................1

PARTIES .......................................................................................................7

JURISDICTION AND VENUE ....................................................................16

BACKGROUND ..........................................................................................17

A.   THE MECHANICS OF MORTGAGE SECURITIZATION ...........................17

B.   SECURITIZATION OF MORTGAGE LOANS:  THE TRADITIONAL MODEL ........19

C.   THE SYSTEMIC VIOLATION OF UNDERWRITING AND APPRAISAL
     STANDARDS IN THE MORTGAGE SECURITIZATION INDUSTRY.....................21

D.   DEFENDANTS WERE AN INTEGRATED VERTICAL OPERATION
     CONTROLLING EVERY ASPECT OF THE SECURITIZATION PROCESS.............24

     (1)   JPMorgan Defendants.............................................................24

     (2)   WaMu Defendants ..................................................................26

     (3)   Bear Stearns Defendants ........................................................27

E.   DEFENDANTS' OFFERING MATERIALS...................................................29

     (1)   The JPMorgan Offerings.........................................................29

     (2)   The WaMu Offerings ..............................................................30

     (3)   The Long-Beach Offering.......................................................32

     (4)   The Bear Stearns Offerings.....................................................32

SUBSTANTIVE ALLEGATIONS ..............................................................34

I.   THE OFFERING MATERIALS CONTAINED UNTRUE STATEMENTS OF
     MATERIAL FACT AND OMISSIONS ABOUT THE MORTGAGE
     ORIGINATORS' UNDERWRITING STANDARDS AND PRACTICES, AND
     MATERIAL CHARACTERISTICS OF THE MORTGAGE LOAN POOLS................34

     A.   Defendants' Misrepresentations Regarding  Underwriting Standards And
          Practices .......................................................................................34

          (1)   JPMorgan Defendants' Misrepresentations Regarding
                Underwriting Standards And Practices.......................................35

|     | (2) | WaMu Defendants' Misrepresentations Regarding Underwriting Standards and Practices | 35 |

|     | (3) | Long Beach Defendants' Misrepresentations Regarding Underwriting Standards and Practices | 36 |

|     | (4) | Bear Stearns Defendants' Misrepresentations Regarding Underwriting Standards and Practices | 39 |

B. Defendants' Misrepresentations Regarding Owner-Occupancy Statistics ...........40

(1) JPMorgan Defendants' Misrepresentations Regarding Owner-Occupancy Statistics ................................................................40

(2) WaMu Defendants' Misrepresentations Regarding Owner Occupancy Statistics ................................................................41

(3) Bear Stearns Defendants' Misrepresentations Regarding Owner Occupancy Statistics ................................................................41

C. Defendants' Misrepresentations Regarding Loan-to-Value and Combined Loan-to-Value Ratios ............................................................42

(1) JPMorgan Defendants' Misrepresentations Regarding LTV and CLTV Ratios ................................................................42

(2) WaMu Defendants' Misrepresentations Regarding LTV and CLTV Ratios ................................................................42

(3) Bear Stearns Defendants' Misrepresentations Regarding LTV and CLTV Ratios ................................................................43

D. Defendants' Misrepresentations Regarding Debt-to-Income Ratios ....................44

(1) JPMorgan Defendants' Misrepresentations Regarding Debt-to-Income Ratios ................................................................44

(2) WaMu Defendants' Misrepresentations Regarding Debt-to-Income Ratios ................................................................44

(3) Bear Stearns Defendants' Misrepresentations Regarding Debt-to-Income Ratios ................................................................45

E. Defendants' Misrepresentations Regarding Credit Ratings.................................46

(1) JPMorgan Defendants' Misrepresentations Regarding Credit Ratings ................................................................46

(2) WaMu Defendants' Misrepresentations Regarding Credit Ratings...........47

(3)     Long Beach Defendants' Misrepresentations Regarding Credit Ratings ...............................................................................48

(4)     Bear Stearns Defendants' Misrepresentations Regarding Credit Ratings ...............................................................................48

F.     Defendants' Misrepresentations Regarding Credit Enhancements.......................49

(1)     JPMorgan Defendants' Misrepresentations Regarding Credit Enhancements ...........................................................................49

(2)     WaMu Defendants' Misrepresentations Regarding Credit Enhancements ...........................................................................50

(3)     Long Beach Defendants' Misrepresentations Regarding Credit Enhancements ...........................................................................50

(4)     Bear Stearns Defendants' Misrepresentations Regarding Credit Enhancements ...........................................................................51

G.     Defendants' Misrepresentations Regarding Underwriting Exceptions.................51

(1)     JPMorgan Defendants' Misrepresentations Regarding Underwriting Exceptions .........................................................51

(2)     WaMu Defendants' Misrepresentations Regarding Underwriting Exceptions.........................................................................52

(3)     Long  Beach Defendants' Misrepresentations Regarding Underwriting Exceptions .........................................................53

(4)     Bear Stearns Defendants' Misrepresentations Regarding Underwriting Exceptions .........................................................53

H.     Defendants' Misrepresentations Regarding  Alternative Documentation Loans.....................................................................................53

(1)     JPMorgan Defendants' Misrepresentations Regarding Alternative Documentation Loans ...................................................54

(2)     WaMu Defendants' Misrepresentations Regarding Alternative Documentation Loans ...................................................54

(3)     Bear Stearns Defendants' Misrepresentations Regarding Alternative Documentation Loans ...........................................55

I.     Defendants' Misrepresentations Regarding Full-Documentation Loans...............55

J.      Defendants' Misrepresentations Regarding Adverse Selection of Mortgage
        Loans ...................................................................................................56

K.      Defendants' Failure to Disclose the Negative Results of Due Diligence ..............57

II.     ALL OF DEFENDANTS' REPRESENTATIONS WERE UNTRUE AND
        MISLEADING BECAUSE DEFENDANTS SYSTEMATICALLY IGNORED
        THEIR OWN UNDERWRITING GUIDELINES ...........................................58

A.      Evidence Demonstrates Defendants' Underwriting Abandonment:  High
        Default Rates And Plummeting Credit Ratings ...................................59

B.      Statistical Evidence of Faulty Underwriting:  Borrowers Did Not Actually
        Occupy The Mortgaged Properties As Represented ...........................62

        (1)     The JPMorgan Offerings ..................................................64

        (2)     The WaMu Offerings ......................................................64

        (3)     The Bear Stearns Offerings ............................................65

C.      Statistical Evidence of Faulty Underwriting:  The Loan-to-Value Ratios In
        The Offering Materials Were Inaccurate ...........................................65

        (1)     The JPMorgan Offerings ..................................................66

        (2)     The WaMu Offerings ......................................................68

        (3)     The Bear Stearns Offerings ............................................71

D.      Other Statistical Evidence Demonstrates That The Problems In
        Defendants' Loans Were Tied To Underwriting Guideline Abandonment ..........72

E.      Evidence Demonstrates That Credit Ratings Were A Garbage-In,
        Garbage-Out Process ......................................................................75

F.      Evidence From Defendants' Own Documents And Former Employees
        Demonstrates That The Representations In Defendants' Offering Materials
        Were False ...................................................................................76

        (1)     The JPMorgan Offerings ..................................................76

        (2)     The WaMu Offerings ......................................................80

        (3)     The Long Beach Offerings ..............................................87

        (4)     The Bear Stearns Offerings ............................................92

G.     Evidence From Defendants' Third-Party Due Diligence Firm
Demonstrates That Defendants Were Originating Defective Loans.....................94

H.     Evidence Of Other Investigations Demonstrates The Falsity Of
Defendants' Representations .................................................................97

    (1)    The WaMu and Long Beach Offerings.......................................97

    (2)    The Bear Stearns Offerings.......................................................99

III.   DEFENDANTS' REPRESENTATIONS CONCERNING UNAFFILIATED
ORIGINATORS' UNDERWRITING GUIDELINES WERE ALSO FALSE ..............102

A.    Countrywide....................................................................................104

    (1)    Defendants' Misrepresentations Concerning Countrywide's
Underwriting Practices.............................................................104

    (2)    These Representations Were Untrue And Misleading..............105

B.    GreenPoint .....................................................................................109

    (1)    Defendants' Misrepresentations Concerning GreenPoint's
Underwriting Practices.............................................................109

    (2)    These Representations Were Untrue And Misleading..............111

C.    PHH...............................................................................................115

    (1)    Defendants' Misrepresentations Concerning PHH's Underwriting
Practices ..................................................................................115

    (2)    These Representations Were Untrue And Misleading..............116

D.    Option One.....................................................................................118

    (1)    Defendants' Misrepresentations Concerning Option One's
Underwriting Practices.............................................................118

    (2)    These Representations Were Untrue and Misleading:..............120

E.    Fremont .........................................................................................122

    (1)    Defendants' Misrepresentations Concerning Fremont's
Underwriting Practices.............................................................122

    (2)    These Representations Were Untrue and Misleading..............124

IV.   THE DEFENDANTS KNEW THEIR REPRESENTATIONS WERE FALSE ............126

A.    The Statistical Evidence Is Itself Persuasive Evidence Defendants Knew Or Recklessly Disregarded The Falsity Of Their Representations .....................126

B.    Evidence From Third Party Due Diligence Firms Demonstrates That Defendants Knew Defective Loans Were Being Securitized .............................127

C.    Evidence Of Defendants' Influence Over The Appraisal Process Demonstrates That Defendants Knew The Appraisals Were Falsely Inflated ..........................................................................................................130

D.    Evidence Of Internal Documents And Former Employee Testimony Demonstrates That Defendants Knew Their Representations Were False .........131

(1)    JPMorgan Defendants Knew Their Representations Were False ...........131

(2)    WaMu Defendants Knew Their Representations Were False ................133

(3)    Long Beach Defendants Knew Their Representations Were False ........138

(4)    Bear Stearns Defendants Knew Their Representations Were False ........140

V.    ALLSTATE'S DETRIMENTAL RELIANCE AND DAMAGES ...............................144

VI.    TOLLING OF THE SECURITIES ACT OF 1933 CLAIMS .........................146

FIRST CAUSE OF ACTION ..................................................................149

SECOND CAUSE OF ACTION ...............................................................150

THIRD CAUSE OF ACTION ..................................................................152

FOURTH CAUSE OF ACTION ...............................................................155

FIFTH CAUSE OF ACTION ..................................................................157

PRAYER FOR RELIEF ......................................................................157

JURY TRIAL DEMANDED...................................................................158

Plaintiffs Allstate Bank (f.k.a. Allstate Federal Savings Bank), Allstate Insurance Company, Allstate Life Insurance Company, Allstate New Jersey Insurance Company, Allstate Life Insurance Company of New York, Agents Pension Plan, and Allstate Retirement Plan (collectively, "Allstate"), by and through their attorneys, bring this action against JPMorgan Chase Bank, N.A.; J.P. Morgan Acquisition Corporation; J.P. Morgan Securities Inc.; J.P. Morgan Acceptance Corporation I; WM Asset Holdings Corporation; WaMu Asset Acceptance Corporation; WaMu Capital Corporation; Washington Mutual Mortgage Securities Corporation; Long Beach Securities Corporation; David Beck; Diane Novak; Thomas Green; EMC Mortgage Corporation; Bear, Stearns & Co. Inc.; Structured Asset Mortgage Investments II Inc.; Bear Stearns Asset Backed Securities I LLC; and SACO I Inc. (collectively, the "Defendants"); and allege as follows:

## NATURE OF ACTION

1.     This action arises out of Defendants' fraudulent sale of residential mortgage-backed securities in the form of pass-through certificates (the "Certificates") to Allstate. Whereas Allstate was made to believe it was buying highly-rated, safe securities backed by pools of loans with specifically-represented risk profiles, in fact, Defendants knew the pool was a toxic mix of loans given to borrowers that could not afford the properties, and thus were highly likely to default.

2.     Defendants made numerous material misrepresentations and omissions regarding the riskiness and credit quality of the Certificates in registration statements, prospectuses, prospectus supplements, and other written materials (the "Offering Materials").  For example:

(i)     ***Underwriting Guidelines.***  The Offering Materials represented that a particular, reasonable underwriting process was followed to ensure that only loans that the borrower could repay would be included in the pools underlying the Certificates (the "Mortgage

1

Loans"). In fact, the disclosed underwriting standards were systematically ignored in originating

or otherwise acquiring non-compliant loans. For instance, recent reviews of the loan files

underlying some of Allstate's Certificates reveal a pervasive lack of proper documentation,

facially absurd (yet unchecked) claims about the borrower's purported income, and the routine

disregard of purported underwriting guidelines. Based on data compiled from third-party due

diligence firms, the federal Financial Crisis Inquiry Commission ("FCIC") noted in its January

2011 report:

> The Commission concludes that firms securitizing mortgages
> failed to perform adequate due diligence on the mortgages they
> purchased and at times knowingly waived compliance with
> underwriting standards. **Potential investors were not fully
> informed or were misled** about the poor quality of the mortgages
> contained in some mortgage-related securities. **These problems
> appear to be significant.**

 (FCIC Report at 187 (emphasis added).)

      (ii)      ***Percentage of Known Non-Conforming Loans.***  Defendants fraudulently

omitted the fact that both the underwriters' internal due diligence, as well as third-party due

diligence firms, had identified numerous loans that did not conform to the stated underwriting

guidelines. Nor did Defendants disclose that many of those very same non-conforming loans

had been "waived" into the collateral pools underlying the Certificates anyway. That high

numbers of rejected loans were knowingly being included in the underlying mortgage pools is

not only a fraudulent omission in its own right, but makes even more misleading Defendants'

disclosures about their underwriting process. Defendants intended for Allstate to understand that

their underwriting and due diligence procedures were being used to keep problem loans *out* – not

just to go through the motions of appearing to search for such loans only to have them routinely

approved for inclusion anyway.

(iii)    ***Owner Occupancy Statistics.***   The Offering Materials made specific representations regarding the percentage of borrowers who would be occupying the property being mortgaged – a key risk metric given that borrowers are less likely to "walk away" from properties they live in, as compared to properties being used as vacation homes or investments. Analytical tools recently made available to investors confirm that, in truth, a far greater percentage of the loans underlying Allstate's Certificates than represented were given to borrowers who lived elsewhere.

(iv)    ***Loan-to-Value Ratios.***   The Offering Materials represented that the underlying loans had specific loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios.  These are additional key risk metrics, because they represent the equity "cushion" that borrowers have, and the likelihood of repayment to lenders upon foreclosure.  Analytical tools recently made available to investors confirm that the Offering Materials vastly overstated the value of the collateral being included in the loan pools, and hid additional liens that had been placed on the properties.  This falsely reduced the loans' LTV and CLTV ratios.

(v)    ***Purpose And Use Of Exceptions.***   The Offering Materials represented that loans which did not meet certain criteria were approved as "exceptions" only on the basis of countervailing features of the borrowers' risk profiles that 'made up' for negative aspects of the risk profile.  In truth, however, "exceptions" were used as a way to increase loan volume by circumventing the applicable underwriting guidelines.  For instance, recent reviews of the loan files underlying some of Allstate's Certificates reveal that non-compliant mortgage loans did not have any identified countervailing features, and that various undisclosed procedures were employed to create loan pools outside of the disclosed underwriting guidelines.

(vi)    ***Credit Ratings.***  The Offering Materials represented that the Certificates had specific investment grade credit ratings.  Defendants fed the same misrepresentations found in the Offering Materials to the ratings agencies in an attempt to manufacture predetermined ratings.  The rating agencies relied on this inaccurate loan information when rating the Certificates, and employed outdated assumptions and relaxed ratings criteria.  This not only rendered false Defendants' representations about how the ratings process really functioned, but also assured that the ratings themselves in no way reflected the actual risk underlying the Certificates.

(vii)    ***Credit Enhancement Features.***  The Offering Materials represented that the Certificates had certain "credit enhancements" used to improve the likelihood that holders of such certificates would receive regular principal and interest payments thereon.  "Credit enhancements" are features designed to reduce the risk of loss to investors in the senior tranches of certificates.  These features can include overcollateralization (*i.e.*, the value of the collateral underlying the certificates is greater than the principal balance of the certificates), the subordination in right of payment of junior certificates to senior certificates, the establishment of reserve accounts, a mortgage pool insurance policy, an interest rate swap agreement, or a combination of such features.

The level of credit enhancement utilized for each Offering was to be correlated to the risk associated with the underlying loan pool.  However, due to the pervasive underwriting deficiencies that rendered the Mortgage Loans far riskier and less valuable than disclosed, the credit enhancements described in the Offering Materials were never adequate to protect certificateholders from loss.  As a result, the purported "credit enhancements" were really no protection at all.

4

3.      In reliance on these and the other misrepresentations and omissions, Allstate

purchased over $700 million of Defendants' mortgage-backed securities, as follows:

| Asset | Purchase Price |
|---|---|
| JPMMT 2004-S1, 1A7 | $1,882,541.68 |
| JPMAC 2005-OPT2, M1 | $4,000,000.00 |
| JPMAC 2005-OPT2, M2 | $10,499,630.40 |
| JPALT 2006-A2, 2A1 | $12,250,000.00 |
| JPMAC 2006-CH2, AF6 | $1,609,954.44 |
| JPMAC 2006-CH2, MF1 | $2,069,942.36 |
| JPMAC 2006-CH2, MF2 | $6,299,847.81 |
| JPMAC 2006-CH2, MF3 | $4,906,527.47 |
| JPMAC 2006-CW2, AF6 | $59,780,514.68 |
| JPMAC 2006-FRE2, A3 | $20,000,000.00 |
| JPMAC 2007-CH1, MF1 | $28,860,355.53 |
| JPMAC 2007-CH1, MF2 | $15,117,635.57 |
| JPMAC 2007-CH1, MF3 | $5,134,204.59 |
| JPMAC 2007-CH1, MF4 | $6,349,473.50 |
| JPMAC 2007-CH1, MF5 | $19,352,044.81 |
| JPMAC 2007-CH2, AF6 | $24,349,559.17 |
| JPMAC 2007-CH2, MF1 | $14,260,028.06 |
| JPMAC 2007-CH2, MF2 | $19,621,394.99 |
| JPMAC 2007-CH2, MF3 | $28,617,484.45 |
| JPMAC 2007-CH2, MF4 | $9,106,844.62 |
| JPMAC 2007-CH2, MF5 | $5,300,777.93 |
| WMALT 2005-4, CB11 | $7,726,845.31 |
| WaMu 2005-AR2, 2A-1B | $50,000,000.00 |
| WaMu 2006-AR1, 2A-1A | $22,709,125.17 |
| WaMu 2006-AR5, A1-B2 | $13,006,094.40 |
| WaMu 2006-AR9, A1-B2 | $8,000,000.00 |
| WaMu 2006-AR11, CA-1B2 | $17,050,719.58 |
| WaMu 2007-OA1, A-1B | $25,185,695.78 |
| WaMu 2007-OA3, 2A | $18,355,168.40 |
| WaMu 2007-HY7, 1-A1 | $20,637,626.29 |
| WMHEN 2007-WM1, N1 | $6,346,688.52 |
| LBMLT 2006-6, 2A2 | $20,000,000.00 |
| BALTA 2005-4 1A2 | $19,141,911.07 |
| BALTA 2006-5 11A2 | $10,000,000.00 |
| BSABS 2006-HE4, IA2 | $20,000,000.00 |
| BSMF 2006-SL1, A | $50,000,000.00 |
| BSSLT 2007-SV1A, A1 | $25,000,000.00 |
| BSSLT 2007-SV1A, A3 | $25,000,000.00 |

| Asset | Purchase Price |
|---|---|
| SACO 2006-3, A1 | $40,000,000.00 |
| SACO 2006-6, A | $60,000,000.00 |
| **Total** | **$757,528,636.58** |

Exhibits A and B provide further detail on the Certificates.  All of the exhibits attached to this Complaint are incorporated as if set forth fully herein.

4.      Allstate invested in the Certificates as part of a broader plan to invest in a diverse array of mortgage-backed securities.  Allstate typically purchased senior classes of mortgage-backed securities (*i.e.*, those rated AAA/Aaa or AA/Aa by the rating agencies Standard & Poor's and Moody's Investors Service).  Allstate purchased the Certificates to generate income and total return through safe investments.  But Allstate also purchased the securities with the expectation that the investments could be – and indeed some would be – sold on the secondary market.

5.      The systemic (but hidden) abandonment of the disclosed underwriting guidelines has predictably led to soaring default rates in the mortgage loans underlying the Certificates.  For instance, despite the fact that most of the of the Certificates started out with AAA ratings – the same rating given to treasury bills backed by the full faith and credit of the United States government – 97% are now not even considered to be investment grade.  These problems are so drastic and their onset was so rapid (in comparison to the long-term security of the investments Allstate thought it was purchasing) that the Certificates' poor performance to date is itself powerful evidence that the Mortgage Loans were not underwritten according to the procedures represented to Allstate.  With the underlying loans performing so poorly, the market value of Allstate's Certificates has plummeted, causing Allstate to incur significant losses.

## PARTIES

### *The Plaintiffs*

6.    Plaintiff Allstate Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Illinois, with its principal place of business in Northbrook, Illinois.  It sells property and casualty insurance.  Allstate Insurance Company is licensed to do business in New York and writes insurance policies to New York residents.  Allstate Insurance Company is a wholly-owned subsidiary of Allstate Insurance Holdings, LLC, which is a Delaware limited liability company.  Allstate Insurance Holdings, LLC is a wholly-owned subsidiary of The Allstate Corporation, which is a Delaware corporation.

7.    Plaintiff Allstate Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Illinois, with its principal place of business in Northbrook, Illinois.  It sells life insurance and annuity products.  Allstate Life Insurance Company is a wholly-owned subsidiary of Allstate Insurance Company.

8.    Plaintiff Allstate Bank (formerly known as Allstate Federal Savings Bank) is a federally-chartered thrift institution that provides retail bank products and services.  Its registered office is in Northbrook, Illinois.  It is wholly owned by The Allstate Corporation.

9.    Plaintiff Allstate New Jersey Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Illinois, with its statutory office in Northbrook, Illinois.  It is licensed in the States of Illinois and New Jersey, writing property and casualty insurance products in New Jersey.

10.    Plaintiff Allstate Life Insurance Company of New York is an insurance company formed under the laws of, and domiciled in, the State of New York, with its principal place of business in Hauppauge, New York.  Allstate Life Insurance Company of New York is licensed to do business in New York and writes insurance policies to New York residents.  It sells life,

7

accident and health insurance and annuity products.  Allstate Life Insurance Company of New York is a wholly-owned subsidiary of Allstate Life Insurance Company.

11.     Plaintiff Agents Pension Plan is an ERISA plan sponsored by Allstate Insurance Company.

12.     Plaintiff Allstate Retirement Plan is an ERISA plan sponsored by Allstate Insurance Company.

### ***The JPMorgan Defendants***

13.     *The JPMorgan Seller/Sponsor Defendant.*  Defendant J.P. Morgan Acquisition Corp. ("JPM Acquisition") is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017.  JPM Acquisition is a direct, wholly-owned subsidiary of JPMorgan Chase Bank, N.A.  JPM Acquisition served as the sponsor and seller with regard to each of the JPMorgan Trusts (defined below) and securitization of the underlying mortgage loans.

14.     *The JPMorgan Underwriter Defendant.*  Defendant J.P. Morgan Securities Inc. ("J.P. Morgan Securities") is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017.  J.P. Morgan Securities engages in investment banking activities in the United States and is the primary nonbank subsidiary of JPMorgan Chase & Co.  J.P. Morgan Securities acted as the underwriter of the JPMorgan Certificates (defined below) within the meaning of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(11).  As the sole underwriter, J.P. Morgan Securities participated in the drafting and dissemination of the prospectus supplements pursuant to which all of the JPMorgan Certificates were sold to Allstate.

15.     *The JPMorgan Depositor Defendant.*  Defendant J.P. Morgan Acceptance Corporation I ("JPMAC") is a Delaware corporation with its principal executive offices at 270 Park Avenue, New York, New York 10017.  JPMAC is a direct, wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC.  JPMAC served in the role of depositor in the securitization of the JPMorgan Trusts.  As depositor, JPMAC was the issuer of all the JPMorgan Certificates within the meaning of Section 2(a)(4) of the Securities Act, and in accordance with Section 11(a) of the Securities Act, and filed the relevant registration statements with the Securities and Exchange Commission ("SEC").

16.     *The JPMorgan Successor Defendant.*  Defendant JPMorgan Chase Bank, N.A. ("JPMC Bank") is a defendant in this action solely as the successor in interest to Washington Mutual Bank, and no claims are brought against JPMC Bank in its own right.  JPMC Bank is a national banking association, a wholly-owned bank subsidiary of JPMorgan Chase & Co., and a Delaware corporation.  Its main office is located in Columbus, Ohio.  JPMC Bank is a commercial bank that is chartered, and its business is subject to examination and regulation by the Officer of the Comptroller of Currency ("OCC").  It is a member of the Federal Reserve System and its deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").

17.     *The Relevant JPMorgan Non-Parties.*  Each certificate acquired by Allstate from a JPMorgan-affiliated entity relevant to this action was issued by a trust.  Each issuing trust (collectively, the "JPMorgan Trusts") is identified in Exhibit A along with other details regarding Allstate's purchases.  The JPMorgan Trusts are managed by trustees.  The trustees for the offerings at issue here were U.S. Bank, N.A., Wachovia Bank, N.A., and Deutsche Bank National Trust Company.

18.     JPMorgan Chase & Co. ("JPMorgan Chase") is a Delaware corporation whose principal office is located in New York, New York.  It is chartered and its business is subject to examination and regulation by the OCC.  It is the direct or indirect parent of all the JPMorgan corporate defendants in this action.

19.     Chase Home Finance, LLC ("CHF"), a Delaware limited liability company, is wholly-owned by and an indirect subsidiary of JPMC Bank.  CHF originated certain JPMC Bank mortgage loans and subsequently provided these loans to JPM Acquisition, on behalf of JPMC Bank, for the following JPMorgan Trusts:  JPMAC 2006-CH2, JPMAC 2007-CH1, and JPMAC 2007-CH2.

20.     JPM Acquisition, J.P. Morgan Securities, and JPMAC are collectively referred to herein as the "JPMorgan Defendants."

21.     At all relevant times, JPMorgan Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in Sections I-IV of this Complaint.  Any allegations about acts of the corporate defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

### *The WaMu Defendants*

22.     *The WaMu Sponsor Defendant.*  At all relevant times, Washington Mutual Bank ("WMB") was a federal savings association that provided financial services to consumer and commercial clients.  WMB served as the servicer with respect to WMALT 2005-4, WaMu 2006-AR1, WaMu 2006-AR5, WaMu 2006-AR9, WaMu 2006-AR11, WaMu 2007-OA1, WaMu 2007-OA3, WaMu 2007-HY7, and WMHEN 2007-WM1 (collectively with WaMu 2005-AR2, the "WaMu Offerings"), and the sponsor with respect to each WaMu Offering other than

WMALT 2005-4 and WMHEN 2007-WM1.  It also served as sponsor and servicer with respect to LBMLT 2006-6.

23.    On September 25, 2008, JPMC Bank entered into a Purchase and Assumption Agreement dated as of the same day (the "PAA") with the FDIC, under which JPMC Bank agreed to assume substantially all of WMB's liabilities and purchase substantially all of WMB's assets, including WaMu Capital Corporation, WM Asset Holdings Corporation, WaMu Asset Acceptance Corporation, Washington Mutual Mortgage Securities Corporation, and Long Beach Securities Corporation.  Therefore, this action is brought against JPMC Bank as the successor to WMB.  WMB is not a defendant to this action.

24.    Defendant WM Asset Holdings Corporation ("WMAHC") is a Delaware corporation that was, at all relevant times, a wholly-owned, special-purpose subsidiary of WMB. WMAHC was the sponsor of the offering known as WMHEN 2007-WM1.  WMAHC was organized for the purpose of acquiring, holding and securitizing mortgage loans.

25.    _The WaMu Underwriter Defendant._  Defendant WaMu Capital Corporation ("WCC") was, at all relevant times, an SEC-registered broker-dealer principally located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.  WCC was a wholly-owned subsidiary of WMB, and served as either the sole or co-underwriter for all the WaMu Offerings. In this capacity, WCC was intimately involved in structuring, pricing and selling, and drafting the prospectus supplements for all the WaMu Offerings.  WCC is not currently affiliated with WMB and is now a subsidiary of JPMC Bank, successor-in-interest to WMB.

26.    _The WaMu Depositor Defendants._  Defendant WaMu Asset Acceptance Corporation ("WMAAC") was, at all relevant times, a wholly-owned subsidiary of WMB and was principally located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.

WMAAC served as depositor and filed registration statements and accompanying prospectuses with respect to each of the WaMu Offerings other than WaMu 2005-AR2, WMALT 2005-4, and WMHEN 2007-WM1.  WMAAC is not currently affiliated with WMB and is now a subsidiary of JPMC Bank, successor-in-interest to WMB.

27.     Defendant Washington Mutual Mortgage Securities Corporation ("WMMSC") is a Delaware corporation and was, at all relevant times, a wholly-owned, special-purpose subsidiary of WMB with its principal offices located in Vernon Hills, Illinois.  WMMSC filed the registration statement and prospectus supplement with the SEC, and served as the depositor, with respect to WaMu 2005-AR2 and WMALT 2005-4.  WMMSC is not currently affiliated with WMB and is now a subsidiary of JPMC Bank, successor-in-interest to WMB.

28.     Defendant Long Beach Securities Corporation is a Delaware corporation and was, at all relevant times, a wholly-owned subsidiary of WMB with a principal place of business at 1100 Town & Country Road, Orange, California 92868.  Long Beach Securities filed the registration statement and prospectus supplement with the SEC, and served as the depositor, with respect to Long Beach Mortgage Loan Trust 2006-6.  On information and belief, Long Beach Securities is not currently affiliated with WMB and is now a subsidiary of JPMC Bank, successor-in-interest to WMB.

29.     *The Individual WaMu Defendants.*  Defendant David Beck ("Beck") was, at all relevant times, the president, principal executive officer and a director of WMAAC.  Beck signed WMAAC's February 28, 2005 and March 13, 2007 Registration Statements and the January 3, 2006 and April 9, 2007 Registration Statement Amendments.

30.     Defendant Diane Novak ("Novak") was, at all relevant times, a director of WMAAC.  Novak signed WMAAC's February 28, 2005, December 30, 2005,  and March 13,

2007 Registration Statements and the June 13, 2005, January 3, 2006, and April 9, 2007

Registration Statement Amendments.

31.    Defendant Thomas Lehmann ("Lehmann") was, at all relevant times, a director of

WMAAC and the first vice president and a director of WMMSC.  Lehmann signed WMAAC's

February 20, 2003 and March 13, 2007 Registration Statements and the March 7, 2003 and April

9, 2007 Registration Statement Amendments.

32.    Beck, Novak, and Lehmann are collectively referred to herein as the "Individual

WaMu Defendants."

33.    _Relevant Non-Parties._  The securities sponsored by WMB that were acquired by

Allstate were issued by trusts.  The issuing trusts (collectively, the "WaMu Trusts") are

identified in Exhibit A, along with other details regarding Allstate's purchases.

34.    Washington Mutual acquired subprime originator Long Beach Mortgage

Company ("Long Beach") in 1999.  From December 2000 to March 2006, Long Beach was a

subsidiary of Washington Mutual, Inc.  From March 2006 until July 2006, Long Beach was a

subsidiary of WMB.  In July 2006, Long Beach became a division of WMB.  WMB shut down

Long Beach in 2007.

35.     WCC, WMAAC, WMMSC, JPMC Bank as successor to WMB, and Individual

WaMu Defendants are collectively referred to herein as the "WaMu Defendants."  The term

"WaMu" refers to the Washington Mutual group of companies before September 25, 2008,

including the WaMu Defendants.

36.    Long Beach Securities and JPMC Bank as successor to WMB are collectively

referred to herein as the "Long Beach Defendants."

37.    At all relevant times, the WaMu Defendants and the Long Beach Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in Sections I-IV of this Complaint.  Any allegations about acts of the corporate defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

### **_The Bear Stearns Defendants_**

38.    *The Bear Stearns Sponsor Defendant.*  Defendant EMC Mortgage Corporation ("EMC") is incorporated in the State of Delaware and was, at all relevant times, a wholly-owned subsidiary of The Bear Stearns Companies Inc. ("BSI").  EMC was organized for the purpose of acquiring, holding, servicing, and securitizing mortgage loans and mortgage securities.  These activities were directed by Bear, Stearns & Co. Inc., which had its principal place of business in New York.  EMC was the sponsor of offerings: BALTA 2005-4, BALTA 2006-5, BSABS 2006-HE4, BSMF 2006-SL1, BSSLT 2007-SV1, SACO 2006-3, and SACO 2006-6 (collectively, the "Bear Stearns Offerings").  Pursuant to a Merger Agreement (the "Merger") effective May 30, 2008, BSI merged with Bear Stearns Merger Corporation, a wholly-owned subsidiary of JPMorgan Chase, making EMC a wholly-owned indirect subsidiary of JPMorgan Chase.

39.    *The Bear Stearns Underwriter Defendant.*  Bear, Stearns & Co. Inc. ("BSC" and, together with EMC, "Bear Stearns") was, at all relevant times, an SEC-registered broker-dealer with its principal place of business at 383 Madison Avenue, New York, New York 10179.  BSC was a wholly-owned subsidiary of BSI, and served as the underwriter for each of the Bear Stearns Offerings, and was intimately involved in structuring, pricing and selling the Offerings. It also assisted in drafting and disseminating the prospectus supplements for the Offerings and

was a co-underwriter for WaMu 2005-AR2.  Following the Merger, on or about October 1, 2008,

BSC merged with a subsidiary of JPMorgan Chase, Defendant J.P. Morgan Securities, and is

now doing business as J.P. Morgan Securities.  All allegations against BSC are thus made against

its successor-in-interest, J.P. Morgan Securities.

40.    *The Bear Stearns Depositor Defendants.*  Defendant Structured Asset Mortgage

Investments II Inc. ("SAMI") was, at all relevant times, a Delaware corporation with its principal

place of business at 383 Madison Avenue, New York, New York 10179.  SAMI was a wholly-

owned subsidiary of BSI.  SAMI filed the registration statements and prospectus supplements

with the SEC, and served as depositor, in connection with the BALTA 2005-4 and BALTA

2006-5 Offerings.  On information and belief, SAMI is now a subsidiary of JPMorgan Chase.

41.    Defendant Bear Stearns Asset Backed Securities I LLC ("BSABS") was, at all

relevant times, a Delaware limited liability company with its principal place of business at 383

Madison Avenue, New York, New York 10179.  BSABS was a wholly-owned subsidiary of BSI.

BSABS filed the registration statements and prospectus supplements with the SEC, and served as

depositor for the BSABS 2006-HE4, BSMF 2006-SL1, SACO 2006-3, and SACO 2006-6

Offerings.  On information and belief, BSABS is now a subsidiary of JPMorgan Chase.

42.    Defendant SACO I Inc. ("SACO") was, at all relevant times, a Delaware

corporation with its principal place of business at 383 Madison Avenue, New York, New York

10179.  SACO served as depositor in connection with the BSSLT 2007-SV1 Offering.  On

information and belief, SACO is now a subsidiary of JPMorgan Chase.

43.    *Relevant Non-Parties.*  Each security acquired by Allstate from a Bear Stearns-

affiliated entity was issued by a trust.  The issuing trusts (collectively, the "Bear Stearns Trusts")

are identified in Exhibit A, along with other details regarding Allstate's purchases.  The Bear

Stearns Trusts are managed by trustees.  The trustees for the Bearn Stearns Trusts were JPMC

Bank, Citibank N.A., LaSalle Bank N.A., and U.S. Bank N.A.

44.     EMC, SAMI, BSABS, and J.P. Morgan Securities as successor in interest to BSC,

are collectively referred to herein as the "Bear Stearns Defendants."

45.     At all relevant times, the Bear Stearns Defendants committed the acts, caused or

directed others to commit the acts, or permitted others to commit the acts alleged in Section I-IV

of this Complaint.  Any allegations about acts of the corporate defendants means that those acts

were committed through their officers, directors, employees, agents, and/or representatives while

those individuals were acting within the actual or implied scope of their authority.

46.     No recovery is sought in this action against any bankrupt entity.

## JURISDICTION AND VENUE

47.     The jurisdiction of this Court is founded upon C.P.L.R. §§ 301 and 302.

48.     All of Defendants do business in or derive substantial revenue from activities

carried out in New York.

49.     JPMorgan Defendants are licensed to do business in New York and have

maintained principal offices in New York during the relevant time period.  With regard to

JPMorgan Defendants, almost all activity pertaining to the securitization of the mortgage loans at

issue occurred in New York, including the underwriting, negotiating, drafting and signing of the

operative agreements, the formation of the trusts, the compilation of offering materials, and the

marketing of the JP Morgan Offerings (defined below).

50.     On information and belief, WaMu Defendants engaged in significant business

activity in the State of New York as it pertains to the securitization of the mortgage loans at

issue, including negotiating and marketing the WaMu Offerings, and selling the WaMu

Certificates to New York residents.  Defendants WCC and WMMSC are, and at all relevant

times have been, licensed to do business in New York.  WMB, at all relevant times, operated over 100 retail banking institutions in New York.

51.     Bear Stearns Defendants conducted almost all activity pertaining to the securitization of the mortgage loans in New York, including, on information and belief, the underwriting, negotiating, drafting and signing of the operative agreements, the formation of the trusts, the compilation of offering materials, and the marketing of the Bear Stearns Offerings.  At all relevant times, BSC, SAMI, BSABS, and SACO maintained principal offices in New York, and BSC directed EMC's conduct with respect to the mortgage loans.

52.     Venue is proper in this County pursuant to C.P.L.R. § 503(a).

## BACKGROUND

### A.     The Mechanics of Mortgage Securitization

53.     Mortgage pass-through securities or certificates represent interests in a pool of mortgage loans; the securities are "shares" in the pool that are sold to investors.  The pass-through securities entitle the holder to payments from the pool of mortgages.  Although the structure and underlying collateral may vary by offering, the basic principle of pass-through securities remains the same:  the cash flow from the pool of mortgages is "passed through" to the securities holders when payments are made by the underlying mortgage borrowers.

54.     The initial step in creating a mortgage pass-through security is the acquisition by a "depositor" of an inventory of loans from a "sponsor" or "seller," which either originates the loans or acquires the loans from other mortgage originators.  The types of loans in the inventory may vary, including conventional, fixed-rate or adjustable-rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity.  Upon acquisition, the depositor transfers, or deposits, the acquired pool of loans to an "issuing trust."

55.     The depositor then securitizes the pool of loans in the issuing trust so that the

rights to the cash flows from the pool can be sold to investors.  The securitization transactions

are structured such that the risk of loss is divided among different levels of investment, or

"tranches."  Tranches consist of multiple series of related securities offered as part of the same

offering, each with a different level of risk and reward.  Any losses on the underlying loans -

whether due to default, delinquency, or otherwise - are generally applied in reverse order of

seniority.  As such, the most senior tranches of pass-through securities receive the highest credit

ratings.  Junior tranches, being less insulated from risk, typically obtain lower credit ratings, but

offer greater potential returns.

56.     Once the tranches are established, the issuing trust passes the securities or

certificates back to the depositor, who becomes the issuer of the securities.  The depositor then

passes the securities to one or more underwriters, who offer and sell the securities to investors in

exchange for cash that is passed back to the depositor, minus any fees owed to the underwriters.

57.     The underwriters, often Wall Street banks, play a critical role in the securitization

process by purchasing the securities from the issuing trust through a depositor and then selling

them to investors.  Significantly, the underwriters provide the information that potential investors

like Allstate use to decide whether to purchase the securities.

58.     Because the cash flow from the loans in the collateral pool of a securitization is

the source of payments to holders of the securities issued by the trust, the credit quality of the

securities depends upon the credit quality of the loans in the collateral pool.  The most important

information about the credit quality of the loans is contained in the "loan files" that the mortgage

originator develops while making the loans.  For residential mortgage loans, each loan file

normally contains documents including the borrower's application for the loan; verification of

the borrower's income, assets, and employment; references; credit reports on the borrower; an appraisal of the property that will secure the loan and provide the basis for measures of credit quality, such as loan-to-value ratios; and a statement of the occupancy status of the property.

59.     The collateral pool for each securitization usually includes thousands of loans. Instead of having each potential investor reviewing all of these loan files, the underwriters are generally responsible for gathering, verifying, and presenting to potential investors accurate and complete information about the credit quality and characteristics of the loans that are deposited into the issuing trust.

60.     The *Wall Street Journal* has summarized the securitization process as follows:



## B.     Securitization of Mortgage Loans:  The Traditional Model

61.     Traditionally, mortgage originators financed their mortgage business through customer deposits, retained ownership of the loans they originated, and directly received the mortgage payment streams.  When an originator held a mortgage through the term of the loan, the originator also bore the risk of loss if the borrower defaulted and the value of the collateral was insufficient to repay the loan.  As a result, the originator had a strong economic incentive to

verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate

appraisal of the value of the underlying property before making the mortgage loan.

62.     Mortgage loan securitization, however, shifted the traditional "originate to hold"

model to an "originate to distribute" model, in which originators sell the mortgages and transfer

credit risk to investors through the issuance and sale of residential mortgage backed securities

("RMBS").  Under the new model, originators no longer hold the mortgage loans to maturity.

Instead, by selling the mortgages to investors, the originators obtain the funds to make more

loans.  Securitization also enables originators to earn most of their income from transaction and

loan-servicing fees, rather than from the spread between interest rates paid on deposits and

interest rates received on mortgage loans, as in the traditional model.  Thus, securitization gives

originators an incentive to increase the number of mortgages they issue and reduces their

incentive to ensure the mortgages' credit quality.  Contractual terms and good business practices

nevertheless obligate originators to underwrite loans in accordance with their stated policies and

to obtain accurate appraisals of the mortgaged properties.

63.     During the 1980s and 1990s, the mortgage securitization business grew rapidly,

making it possible for mortgage originators to make more loans than would have been possible

using only the traditional primary source of funds from deposits.  Originators during that period

generally made loans in accordance with their stated underwriting and appraisal standards and

provided accurate information about the loans, borrowers, and mortgaged properties to the Wall

Street banks that securitized the loans.  In turn, the Wall Street banks provided accurate

information about the loans, borrowers, and properties to RMBS investors.

64.     At the time, most mortgage securitizations were conducted through the major

Government Sponsored Enterprises (the "Agencies"), *i.e.*, the Federal National Mortgage

Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"),

and the Government National Mortgage Association ("Ginnie Mae").  The Agencies purchased

loans from originators and securitized the loans.  These Agency securitizations  had high credit

quality because the Agencies required the underlying loans to be originated in accordance with

strict underwriting guidelines.  Most non-Agency mortgage securitizations during this period

also had relatively high credit quality because they typically complied with the Agencies'

underwriting standards.

## C.    The Systemic Violation Of Underwriting And Appraisal Standards In The Mortgage Securitization Industry

65.    Unbeknown to investors, the game fundamentally changed in the early 2000s,

leading to a collapse of the entire market by late 2008.  While both originators and Wall Street

banks, through the 1990s, played by the rules and complied with their obligations to underwrite

loans responsibly and provide accurate information to RMBS investors, this ceased to be the case

in the following decade.  The history of this market collapse was investigated by the FCIC,

which "reviewed millions of pages of documents, interviewed more than 700 witnesses, and held

19 days of public hearings in New York, Washington, D.C., and communities across the

country."  The FCIC issued a report in January 2011 which described the crisis:

> [I]t was the collapse of the housing bubble –fueled by low interest
> rates, easy and available credit, scant regulation, and toxic
> mortgages – that was the spark that ignited a string of events,
> which led to a full-blown crises in the fall of 2008.  Trillions of
> dollars in risky mortgages had become embedded throughout the
> financial system, as mortgage-related securities were packaged,
> repackaged, and sold to investors around the world.

(FCIC Report at xvi.)

66.    With interest rates at historic lows and pushing down the profits of traditional

lending and even securitization through Fannie Mae or Freddie Mac, Wall Street banks looked

for new ways to increase fees.  Banks began to focus on creating products outside the traditional

lending guidelines and expanding the number of borrowers who could purportedly qualify for

loans, while also charging those borrowers much higher fees than they would have paid on

conforming loan terms.  As a result, the number of loans that were riskier than those that could

be securitized through Fannie Mae or Freddie Mac skyrocketed.  For instance, according to an

April 7, 2010 report by the FCIC, non-conforming loans grew from around $670 billion in 2004

to over $2 trillion in 2006.

67.     Such an enormous rise in mortgage volume over a short period of time created

problems with loan funding capital and risk allocation.  As the FCIC put it:  "[U]nder the radar,

the lending and financial services industry had mutated."  (FCIC Report at 7.)  It found that

"[s]ecuritization and subprime origination grew hand in hand," as "[t]he nonprime mortgage

securitization process created a pipeline through which risky mortgages were conveyed and sold

throughout the financial system.  The pipeline was essential to the origination of the burgeoning

numbers of high-risk mortgages."  (FCIC Report at 70, 125.)

68.     In other words, the shift away from non-traditional loans sparked a growing focus

on the "originate and distribute" model.  What has now become clear is that the risk of non-

payment was transferred to investors, and the only remaining incentive for originators,

underwriters, and others in the securitization chain was to pump out as many loans as possible,

the more exotic (and thus the more lucrative), the better – as long as they could be sold.

Originators were willing to abandon sound underwriting practices because they routinely

offloaded the risk onto investors like Allstate by misrepresenting the resulting loans to ensure

their marketability.  As the FCIC concluded:  "The originate-to-distribute model undermined

responsibility and accountability for the long-term viability of the mortgages and mortgage-related securities and contributed to the poor quality of mortgage loans."  (FCIC Report at 125.)

69.     Because the underlying loans were on non-traditional terms, banks could offer investors higher rates of return on the securitized pools, even as the deal's structure (such as, for instance, including "extra" mortgage loans in the collateral pool) purportedly made the investments safe.  Unknown to investors like Allstate, however, the securities were much riskier than disclosed because Defendants misrepresented many aspects of the mortgage loans.  For instance, Defendants overstated how many loans were owner-occupied (owner-occupied properties have lower risks), understated the loan pools' average loan-to-value ratios (suggesting the borrowers had more of an equity "cushion" than they did), misrepresented their abandonment of standard underwriting practices, misrepresented the amount of verification of the borrower's assets and income that had been done (understating the risk that the borrower could not actually afford the monthly payments), failed to disclose that they were pushing exotic loans on borrowers who did not understand or need them, and omitted to inform investors such as Allstate that high numbers of defective loans were "waived" into the mortgage pools by the underwriters (making representations regarding the quality of the underwriting process even more misleading).

70.     Each misrepresentation and omission created an additional, hidden layer of risk well beyond that known to be associated with an "adjustable rate mortgage" or a "home equity loan" in the abstract.  Since the payment streams from borrowers ultimately fund payments to investors, if enough loans in the pool default, investors will not be paid the interest returns promised and may even lose their principal.  The market value of the certificates also decreases as the perceived risk of the underlying mortgage pool increases.  As such, any representation

bearing on the riskiness of the underlying mortgage loans was material to investors, including

Allstate.  In short, by misrepresenting the true risk profile of the underlying loan pools,

Defendants defrauded investors like Allstate into accepting the risks created by their shoddy

lending and underwriting practices.

### D. Defendants Were An Integrated Vertical Operation Controlling Every Aspect Of The Securitization Process

71.     Because the Wall Street banks, such as JPMorgan and Bear Stearns, wanted to

ensure a steady supply of mortgage loans to securitize, they often acquired their own loan

originators.  Conversely, loan originators, such as WMB, often formed their own underwriters so

they could securitize their loans without paying fees to the Wall Street banks. In this way,

Defendants became integrated vertical operations controlling every aspect of the securitization

process, giving them actual knowledge about every aspect of the securitization process, from

loan origination through sale to Allstate.

### (1)    JPMorgan Defendants

72.     Out of the eight JPMorgan Trusts from which Allstate purchased certificates,

JPMC Bank was the originator and servicer for three of them, and was a co-underwriter and co-

servicer for two more.  As such, JPMC Bank originated and/or serviced the underlying mortgage

loans for 17 out of the 21 tranches of JPMorgan Certificates that Allstate purchased.  The

percentage of loans in each JPMorgan Trust originated by JPMC Bank or its affiliate CHF or

unaffiliated originators is as follows:

| JPMorgan Trust | Originator(s) | % of Origination |
|---|---|---|
| JPMMT 2004-S1 | Chase Manhattan Mortgage Corporation (now Chase Home Finance LLC ) | 98.00% |
|  | Harris Trust and Savings Bank | 2.00% |
| JPALT 2006-A2 | Countrywide Home Loans, Inc. | 20.94% |
|  | Chase Home Finance LLC or JPMorgan Chase Bank, N.A. | 19.38% |

24

| JPMorgan Trust | Originator(s) | % of Origination |
|---|---|---|
| | PHH Mortgage Corporation | 17.38% |
| | M&T Mortgage Corporation | 15.44% |
| | GreenPoint Mortgage Funding, Inc. | 13.30% |
| | Unspecified | 13.56% |
| JPMAC 2005-OPT2 | Option One Mortgage Corporation | 100% |
| JPMAC 2006-CH2 | Chase Home Finance LLC or JPMorgan Chase Bank, N.A. | 100% |
| JPMAC 2006-CW2 | Countrywide Home Loans, Inc. | 100% |
| JPMAC 2006-FRE2 | Freemont Investment and Loan | 100% |
| JPMAC 2007-CH1 | Chase Home Finance LLC or JPMorgan Chase Bank, N.A. | 100% |
| JPMAC 2007-CH2 | Chase Home Finance LLC or JPMorgan Chase Bank, N.A. | 100% |

73.     As originator, JPMC Bank, together with CHF, provided mortgage loans to borrowers purportedly according to underwriting guidelines described in the Offering Materials. Of the JPMorgan Trusts that Allstate invested in, 61% of the loans overall were originated by JPMC Bank or CHF.  As servicer, JPMC Bank was primarily responsible for debt collection, mitigation, high risk property management, bankruptcy, foreclosure and real estate owned for the underlying mortgage loans on behalf of the JPMorgan Trusts.

74.     For each JPMorgan Offering (defined below), JPM Acquisition acted as the sponsor and seller.  JPM Acquisition obtained the mortgage loans from JPMC Bank or other brokers, and then sold, transferred, or otherwise conveyed title to those loans to the depositor pursuant to Assignment and Assumption Agreements, which are governed by New York law.

75.     JPMAC was the depositor for the offerings.  JPMAC sold, transferred, or otherwise conveyed the mortgage loans obtained from JPM Acquisition to the trustees of the JPMorgan Trusts, which held the mortgage loans pursuant to Pooling and Servicing Agreements, which are governed by New York law.  JPMAC then securitized the pool of loans and issued the Certificates.

76.     J.P. Morgan Securities was the underwriter for all of the JPMorgan Offerings at issue.  In that role, it was responsible for underwriting and managing the sale of the JPMorgan Certificates to Allstate and other investors, including screening the mortgage loans for compliance with stated underwriting guidelines.

### (2)    WaMu Defendants

77.     WMB acted as sponsor and servicer on seven of the 10 WaMu Offerings. WMAHC acted as sponsor for one and WMMSC acted as servicer for another.  For nine of the 10 Offerings, WMB originated the loans itself or acquired them from approved mortgage loan correspondent lenders.  In each instance, WMB would either underwrite the loan itself or the correspondent lender would represent to WMB that the loan had been underwritten in accordance with WMB's underwriting guidelines.  WMB – or WMAHC in the case of one Offering – transferred the mortgage loans to the depositor.  WMB was also involved in structuring the majority of the WaMu Offerings.

78.     Of the 10 WaMu Offerings at issue, WMAAC acted as depositor on seven of them, and WMMSC and WMAHC separately acted as depositors for the remaining two.  WMB has engaged in securitizations of first lien single-family residential mortgage loans through WMAAC, as depositor, since 2005, and through WMMSC, as depositor, since 2001.  The depositors sold, transferred, or otherwise conveyed the mortgage loans obtained from WMB or WMAHC to the trustees of the WaMu Trusts.

79.     WCC was the sole underwriter on nine of the ten WaMu Offerings, and the co-underwriter on the remaining one.  RBS Securities Inc. ("RBSSI") and Bear, Stearns & Co. Inc. acted as co-underwriters for WaMu 2005-AR2.  RBSSI is not a party to this action.  WCC was responsible for underwriting and managing the sale of the WaMu Certificates to Allstate and

other investors, including screening the mortgage loans for compliance with stated underwriting guidelines.

### (3)    Bear Stearns Defendants

80.    According to the FCIC, Bear Stearns "pioneered" the "'vertical integration' mortgage model" so that it could have "a stake in every step of the mortgage business—originating mortgages, bundling these loans into securities, bundling these securities into other securities, and selling all of them on Wall Street." (FCIC Report at 204.)  The Bear Stearns Offerings were no different, involving affiliated Bear Stearns originators, sellers, sponsors, servicers, underwriters, and depositors.  All of the Bear Stearns Defendants were related directly or indirectly through BSI and are now owned by BSI's successor-in-interest, JPMorgan Chase.

81.    EMC generated the flow of loans into the securitization pipeline from which the mortgage-backed securities issued.  EMC guided the flow of loans through the pipeline by (i) acquiring and aggregating the mortgage loans to be securitized, (ii) sponsoring the securitizations by selling loan pools to the trusts that issued the securities, and (iii) acting as servicer for many of the securitized loans.  EMC originated some of the loans, but others were purchased from third party originators.

82.    The percentage of loans in each Bear Stearns Trust originated by EMC and unaffiliated originators is as follows:

| Bear Stearns Trust | Originator(s) | % of Origination |
|---|---|---|
| BALTA 2005-4 | EMC Mortgage Corporation | 32.88% |
| | SunTrust Mortgage, Inc. | 20.95% |
| | GreenPoint Mortgage Funding | 17.11% |
| | Various unspecified | 29.06% |
| BALTA 2006-5 | EMC Mortgage Corporation | 63.37% |
| | Countrywide Home Loans, Inc. | 17.10% |
| | Various unspecified | 19.53% |
| BSABS 2006-HE4 | ResMAE Mortgage Corporation | 45.63% |
| | Aames Capital Corporation | 15.00% |

| Bear Stearns Trust | Originator(s) | % of Origination |
|---|---|---|
| | Various unspecified | 39.37% |
| BSMF 2006-SL1 | EMC Mortgage Corporation | 86.70% |
| | Bear Stearns Residential Mortgage Corp | 13.30% |
| BSSLT 2007-SV1 | PHH Mortgage Corporation | 20.11% |
| | Decision One Mortgage Company | 17.75% |
| | Wilmington Finance | 12.00% |
| | Various unspecified | 50.14% |
| SACO 2006-3 | American Home Mortgage Investment | 10.12% |
| | Various unspecified | 89.88% |
| SACO 2006-6 | EMC purchased loans from various unspecified | 56.09% |
| | Various unspecified | 43.91% |

83.    BSC acted as lead underwriter and designated its employees as the deal managers to broker the Bear Stearns Offerings.  It solicited the rating agencies to rate, financial guarantors such as Ambac to insure, and investors such as Allstate to purchase the certificates.  Thus, BSC (i) worked with EMC to structure the transactions, (ii) took the lead in coordinating the flow of documents and information among the rating agencies and parties to the transactions, (iii) purchased the mortgage-backed securities issued in the transactions on a firm commitment basis pursuant to written agreements with the depositor, and (iv) offered and sold certificates to investors, such as Allstate.  BSC also made decisions on the volume of securitizations to effectuate, and BSC executives made decisions regarding the due diligence, quality control, and repurchase protocols to be followed by EMC in relation to the securitized loans.

84.    Through BSC and EMC, BSI recorded gains and earned fees at every step in the chain:  (i) loan-origination fees, (ii) gains on sale of the mortgages to the securitization trusts, (iii) fees from underwriting mortgage-backed securities, (iv) fees from servicing the securitized loans, and (v) management fees and carried interests from hedge funds and other investment vehicles that invested in these financial products.

E.    **Defendants' Offering Materials**

(1)    **The JPMorgan Offerings**

85.    Allstate acquired the following tranches of certificates in the following offerings

issued by JPMorgan:

| Asset | Purchase Price |
|-------|---------------|
| JPMMT 2004-S1, 1A7 | $1,882,541.68 |
| JPMAC 2005-OPT2, M1 | $4,000,000.00 |
| JPMAC 2005-OPT2, M2 | $10,499,630.40 |
| JPALT 2006-A2, 2A1 | $12,250,000.00 |
| JPMAC 2006-CH2, AF6 | $1,609,954.44 |
| JPMAC 2006-CH2, MF1 | $2,069,942.36 |
| JPMAC 2006-CH2, MF2 | $6,299,847.81 |
| JPMAC 2006-CH2, MF3 | $4,906,527.47 |
| JPMAC 2006-CW2, AF6 | $59,780,514.68 |
| JPMAC 2006-FRE2, A3 | $20,000,000.00 |
| JPMAC 2007-CH1, MF1 | $28,860,355.53 |
| JPMAC 2007-CH1, MF2 | $15,117,635.57 |
| JPMAC 2007-CH1, MF3 | $5,134,204.59 |
| JPMAC 2007-CH1, MF4 | $6,349,473.50 |
| JPMAC 2007-CH1, MF5 | $19,352,044.81 |
| JPMAC 2007-CH2, AF6 | $24,349,559.17 |
| JPMAC 2007-CH2, MF1 | $14,260,028.06 |
| JPMAC 2007-CH2, MF2 | $19,621,394.99 |
| JPMAC 2007-CH2, MF3 | $28,617,484.45 |
| JPMAC 2007-CH2, MF4 | $9,106,844.62 |
| JPMAC 2007-CH2, MF5 | $5,300,777.93 |
| **Total** | **$299,368,762.06** |

These offerings are collectively referred to herein as the "JPMorgan Offerings," and the

certificates are collectively referred to as the "JPMorgan Certificates."

86.    JPMAC, as depositor, filed Form S-3 Registration Statements with the SEC

indicating its intention to sell mortgage-backed securities.  The relevant registration statements

covering the JPMorgan Certificates at issue here were filed on November 6, 2003, July 29, 2005

or February 8, 2006.  The registration statements were prepared by J.P. Morgan Securities.

87.    The certificates for all the JPMorgan Offerings were issued pursuant to a prospectus.  The relevant prospectuses, filed on August 24, 2004, August, 25, 2005, April 24, 2006, September 21, 2006, and February 26, 2007, provided that the JPMorgan Trusts would offer a series of certificates representing beneficial ownership interests in the related trust, and that the assets of each trust would generally consist of a pool or pools of fixed or adjustable interest rate mortgage loans secured by a lien on a one- to four-family residential property.

88.    The respective prospectus supplements provided the specific terms of a particular certificate series offering.  The prospectus supplements, also filed with the SEC, contained a more detailed description of the mortgage pools underlying the certificates, including (but not limited to) the type of loans, the number of loans, the mortgage rates and net mortgage rates, the aggregate scheduled principal balance of the loans, the purported original weighted-average combined loan-to-value ratio, the borrowers' debt-to-income ratios, the property type, the owner-occupancy data, and the geographic concentration of the mortgaged properties.

89.    The Offering Materials for each of the JPMorgan Offerings at issue here had similar representations to those highlighted below.  A larger sample of the representations on which Allstate relied is found in Exhibits D-K.

### (2)    The WaMu Offerings

90.    Allstate acquired the following certificates in the following offerings issued by WMAAC, underwritten and sold by WCC, and sponsored and originated by WMB:

| Asset | Purchase Price |
|---|---|
| WaMu 2006-AR1, 2A-1A | $45,418,250.34 |
| WaMu  2006-AR5, A1-B2 | $13,006,094.40 |
| WaMu  2006-AR9, A1-B2 | $8,000,000.00 |
| WaMu  2006-AR11, CA-1B2 | $17,050,719.58 |
| WaMu 2007-OA1, A-1B | $25,185,695.78 |
| WaMu 2007-OA3, 2A | $18,355,168.40 |
| WaMu 2007-HY7, 1-A1 | $20,637,626.29 |

91.    Allstate also acquired certificates in:  (a) WMALT 2005-4, which were issued by WMMSC, and underwritten and sold by WCC; (b) WaMu 2005-AR2, which were issued by WMMSC, underwritten and sold by WCC, RBS Securities Inc., and BSC, and originated by WMB; and (c) WMHEN 2007-WM1, which were issued by WM Asset Holding Corp. CI 2007-WM1 and WM Asset Holding Corp. CI 2007-WMI LLC, underwritten and sold by WCC, sponsored by WMAHC, and originated or acquired in the secondary market by WMB.  The total purchase price paid by Allstate for all of the above WaMu Offerings was approximately $211,727,088.62.

92.    WMAAC and WMMSC, as depositors, filed Form S-3 Registration Statements with the SEC indicating their intention to sell mortgage-backed securities.  WMAAC filed registration statements and amendments covering the WaMu Certificates for which it acted as depositor on February 28, 2005, June 13, 2005, December 30, 2005, January 3, 2006, March 13, 2007, and April 09, 2007.  WMMSC filed registration statements and amendments covering the WaMu Certificates for which it acted as depositor on February 20, 2003 and March 7, 2003.

93.    The certificates for all the WaMu Offerings were issued pursuant to prospectuses. The relevant prospectuses, filed on February 10, 2004, APRIL 20, 2005, January 6, 2006, January 11, 2007, March 22, 2007, and April 17, 2007, provided that the WaMu Trusts would offer a series of certificates representing beneficial ownership interests in the related trust, and that the assets of each trust would generally consist of a pool or pools of fixed or adjustable interest rate mortgage loans secured by a lien on a one- to four-family residential property.

94.    The respective prospectus supplements provided the specific terms of a particular certificate series offering.  The prospectus supplements, also filed with the SEC, contained a

more detailed description of the mortgage pools underlying the certificates, including (but not limited to) the type of loans, the number of loans, the mortgage rates and net mortgage rates, the aggregate scheduled principal balance of the loans, the purported original weighted-average combined loan-to-value ratio, the borrowers' debt-to-income ratios, the property type, the owner-occupancy data, and the geographic concentration of the mortgaged properties.

95.     The Offering Materials for each of the WaMu Offerings at issue here had similar representations to those highlighted below.  A larger sample of the representations on which Allstate relied is found in the Exhibits L-U to this Complaint.

### (3)     The Long-Beach Offering

96.     Allstate acquired certificates in Long Beach Mortgage Loan Trust 2006-6 ("LBMLT 2006-6") for $20,000,000 (the "Long Beach Certificates").  WMB acted as sponsor and servicer of the offering and Long Beach Securities, its wholly-owned subsidiary, acted as depositor.  The offering was underwritten and sold by WCC, Banc of America Securities LLC, and Credit Suisse Securities (USA) LLC.

97.     Long Beach Securities filed a Form S-3 Registration Statement and Form S-3/A Amendments with the SEC on January 24, 2006, March 21, 2006, and March 31, 2006, and the prospectus and prospectus supplement on July 21, 2006.

### (4)     The Bear Stearns Offerings

98.     Allstate acquired the following certificates in the following offerings underwritten and sold by BSC, and sponsored by EMC:

| Asset | Purchase Price |
|---|---|
| BALTA 2005-4, 1A2 | $19,141,911.07 |
| BALTA 2006-5, 11A2 | $10,000,000.00 |
| BSABS 2006-HE4, IA2 | $20,000,000.00 |
| BSMF 2006-SL1, A | $50,000,000.00 |
| BSSLT 2007-SV1A, A1 | $25,000,000.00 |

| Asset | Purchase Price |
|---|---|
| BSSLT 2007-SV1A, A3 | $25,000,000.00 |
| SACO 2006-3, A1 | $40,000,000.00 |
| SACO 2006-6, A | $60,000,000.00 |
| **Total** | **$249,141,911.07** |

99.     EMC was also an originator for the mortgage loans in BALTA 2005-4, BALTA 2006-5, and BSMF 2006-SL1.  The Certificates in the chart above will be collectively referred to as the "Bear Stearns Certificates."

100.    SAMI, as depositor, filed Form S-3 Registration Statements with the SEC indicating its intention to sell mortgage-backed securities with respect to BALTA 2005-4 and BALTA 2006-5.  The relevant registration statements were filed on December 1, 2004 and March 6, 2006.

101.    BSABS, as depositor, filed Form S-3 Registration Statements with the SEC indicating its intention to sell mortgage-backed securities with respect to BSABS 2006-HE4, BSMF 2006-SL1, SACO 2006-3, and SACO 2006-6.  The relevant registration statements were filed on June 1, 2005 and January 30, 2006.

102.    With the exception of BSSLT 2007-SV1, the certificates for each of the Bear Stearns Offerings were issued pursuant to a written prospectus.  The relevant prospectuses, filed on December 20, 2004, June 24, 2005, March 28, 2006, April 5, 2006, April 5, 2006, and June 7, 2006, provide that these offerings would offer a series of certificates representing beneficial ownership interests in the related trust, and that the assets of each trust would generally consist of a pool or pools of fixed or adjustable interest rate mortgage loans secured by a lien on a one- to four-family residential property.  A prospectus supplement accompanied each prospectus and provided the specific terms of a particular offering.  BSSLT 2007-SV1 was issued by SACO pursuant to a private placement memorandum filed on March 30, 2007.

103.    The Offering Materials for each of the Bear Stearns Offerings had similar representations to those highlighted below.  A larger sample of the representations on which Allstate relied is found in Exhibits W-CC.

## SUBSTANTIVE ALLEGATIONS

**I.    THE OFFERING MATERIALS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT AND OMISSIONS ABOUT THE MORTGAGE ORIGINATORS' UNDERWRITING STANDARDS AND PRACTICES, AND MATERIAL CHARACTERISTICS OF THE MORTGAGE LOAN POOLS**

**A.    Defendants' Misrepresentations Regarding  Underwriting Standards And Practices**

104.    The Offering Materials associated with each of Allstate's Certificates describe underwriting guidelines purportedly employed by the lenders or underwriters to evaluate the loans.  The purported goal of the guidelines was "to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property, home improvements or manufactured home, as applicable, as collateral."  (JPMAC Prospectus dated April 24, 2006, at 18.)

105.    The underwriting process used to originate the pools of mortgage loans underlying Allstate's Certificates was material to Allstate because, as discussed above, the quality of loans in the pool determines the risk of the certificates backed by those loans.  If a reasonable underwriting process was not actually followed, the chances that the loans had riskier features than Defendants claimed (whether due to error, borrower misrepresentation, or otherwise) greatly increases, making the entire loan pool much riskier.  A systemic underwriting failure decreases the reliability of *all* the information investors have about the loans, and thus greatly increases their perceived and actual risk, and greatly decreases their market value.

### (1)    JPMorgan Defendants' Misrepresentations Regarding Underwriting Standards And Practices

106.    The JPMorgan Offering Materials represent that the underlying mortgage loans had been vetted to ensure that they had been originated according to a reasonable, consistent underwriting program.  For example, the Offering Materials for JPMAC 2007-CH2 represent that "[a]ll of the Mortgage Loans were underwritten by the Originator substantially in accordance with the related underwriting criteria specified herein" (JPMAC 2005-OPT2 Prospectus Supplement dated December 15, 2005, at S-23), and that the originator's "Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and require [the originator's] underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal, supports the loan balance."  (*Id.* at S-56.)

107.    The Offering Materials for each JPMorgan Offering contain substantially similar, if not identical, statements of material fact concerning the JPMorgan Defendants' underwriting standards and practices.  These statements are excerpted in Exhibits D-K.

### (2)    WaMu Defendants' Misrepresentations Regarding Underwriting Standards and Practices

108.    Like the JPMorgan Offerings, the WaMu Offering Materials represent that the mortgage loans had been vetted to ensure that they had been originated according to a reasonable, consistent underwriting program.  For example, the Offering Materials for WaMu 2006-AR5 represent:

> All of the mortgage loans owned by the Trust have been originated in accordance with the underwriting guidelines of the sponsor [WMB] as described in this section. . .  The sponsor's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral . . . Prospective borrowers are required to complete a standard loan application in

> which they provide financial information regarding such factors as
> their assets, liabilities and related monthly payments, income,
> employment history and credit history.
>
> . . .
>
> Each mortgage loan has been underwritten under one of three
> documentation guidelines for verification of the borrower's stated
> income and assets.  Under the sponsor's full/alternative
> documentation program, the prospective borrower's stated income
> is verified through receipt of the borrower's most recent pay stub
> and most recent W-2 form or, in the case of self-employed
> borrowers or borrowers with more than 25% of their income from
> commissions, two years of personal (and, if applicable, business)
> tax returns. . . .Under the full/alternative documentation program,
> the borrower's stated assets are verified through receipt of the
> borrower's two most recent bank or brokerage statements.
>
> . . .
>
> Under WaMu's "low documentation" program, "[t]he borrower's
> stated income must be reasonable for the borrower's occupation
> and assets. . .

(WaMu 2006-AR5 Prospectus Supplement dated May 23, 2006, at S-31-33.)

109.    The Offering Materials for each WaMu Offering contain substantially similar, if
not identical, statements of material fact concerning WMB's underwriting standards and
practices.  These statements are excerpted in Exhibits L-U.

### (3)    Long Beach Defendants' Misrepresentations Regarding Underwriting Standards and Practices

110.    The Offering Materials for LBMLT 2006-6 also represent that the mortgage loans
had been vetted to ensure that they had been originated according to a reasonable, consistent
underwriting program.  These representations include the following:

> All of the mortgage loans owned by the trust have been, or will be,
> originated by the sponsor [WMB] through wholesale brokers or re-
> underwritten upon acquisition from correspondents by the sponsor
> generally in accordance with the Long Beach underwriting
> guidelines described in this section.  The Long Beach underwriting
> guidelines are primarily intended to evaluate the prospective

borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral.

. . .

The Long Beach underwriting guidelines include a set of specific criteria pursuant to which the underwriting evaluation is made.

. . .

Prospective borrowers are required to complete a standard loan application in which they provide financial information regarding the amount of income and related sources, liabilities and related monthly payments, credit history and employment history, as well as certain other personal information.  During the underwriting or re-underwriting process, the sponsor reviews and verifies the prospective borrower's sources of income (only under the full documentation residential loan program), calculates the amount of income from all such sources indicated on the loan application, reviews the credit history and credit score(s) of the prospective borrower and calculates the debt-to-income ratio to determine the prospective borrower's ability to repay the loan, and determines whether the mortgaged property complies with the Long Beach underwriting guidelines.

. . .

Under Long Beach's limited and stated income documentation residential loan programs, "[t]he prospective borrower's income as stated must be reasonable for the related occupation . . . Verification of employment is required for salaried prospective borrowers.

(LBMLT 2006-6 Prospectus Supplement dated July 21, 2006, at S-35, S-39 & S-37.)

111.    Moreover, the Offering Materials represent that WMB used several tools to underwrite or re-underwrite loans.  First, WMB "uses a credit scoring methodology as part of its underwriting and re-underwriting process.  The credit scoring methodology assesses a prospective borrower's ability to repay a mortgage loan based upon predetermined mortgage loan characteristics and credit risk factors."  (*Id.* at S-36.)  Second, "risk categories are used to grade the likelihood that the prospective borrower will satisfy the repayment conditions of the

37

mortgage loan.  These risk categories establish the maximum permitted loan-to-value ratio and

loan amount, given the occupancy status of the mortgaged property and the prospective

borrower's credit history and debt ratio."  (*Id.* at S-37.)

112.    For example, under the "Premium A" risk category:

> [T]he prospective borrower must have a credit report reflecting a
> one year credit history and a prior mortgage or rental history
> evidencing no 30-day late payments during the last 12 months.  No
> notice of default filings or foreclosures may have occurred during
> the preceding 36 months.  No open lawsuits are permitted;
> however, the prospective borrower may be a plaintiff in a lawsuit if
> a reasonable explanation is provided. Maximum qualifying debt
> service-to income ratio is 55.  A maximum loan-to-value ratio of
> 100% is permitted for owner occupied single-family, two-unit and
> condominium properties, a maximum loan-to-value ratio of 95% is
> permitted for second homes, and a maximum loan-to-value ratio of
> 85% is permitted for owner occupied mortgage properties
> consisting of three-to-four units.  A maximum loan-to-value ratio
> of 90% is permitted for non-owner occupied single family, two-
> unit and condominium properties, and a maximum loan-to-value
> ratio of 80% is permitted for non-owner occupied properties
> consisting of three-to-four units.  In addition, the prospective
> borrower must have a credit score of 600 or higher for mortgage
> loans secured by non-owner occupied mortgaged properties
> consisting of one-to-two units and 640 or higher for mortgage
> loans secured by non-owner occupied mortgaged properties
> consisting of three-to-four units.

(*Id.* at S-37-38.)  The description of each risk category can be found in the Prospectus

Supplement at pages S-37 to S-40.

113.    Finally, the Offering Materials represent that WMB undertakes pre-funding and

post-funding due diligence on the loans:

> As part of its quality control system, the sponsor [WMB] re-
> verifies information that has been provided by the mortgage
> brokerage company prior to funding a loan and the sponsor
> conducts a post-funding audit of every origination file.  In addition,
> Washington Mutual Bank periodically audits files based on a
> statistical sample of closed loans.  In the course of its pre-funding
> review, the sponsor re-verifies the income of each prospective
> borrower or, for a self-employed prospective borrower, reviews the

income documentation obtained under the full documentation and
limited documentation residential loan programs. The sponsor
generally requires evidence of funds to close on the mortgage loan.

(*Id.* at S-37.)

### (4)    Bear Stearns Defendants' Misrepresentations Regarding Underwriting Standards and Practices

114.    Similarly, the Offering Materials for each of the Bear Stearns Offerings represent

that the mortgage loans had been originated according to a reasonable, consistent underwriting

program.  For example, the Offering Materials for BALTA 2005-4 represent:  "The EMC

mortgage loans were originated or purchased by EMC and were generally underwritten in

accordance with the standards described herein.  Such underwriting standards are applied to

evaluate the prospective borrower's credit standing and repayment ability and the value and

adequacy of the mortgaged property as collateral. These standards are applied in accordance with

the applicable federal and state laws and regulations."  (BALTA 2005-4 Prospectus Supplement

dated April 28, 2005, at S-38.)

115.    Likewise, the Offering Materials for BSMF 2006-SL1 represent that "[t]he

underwriting guidelines are primarily intended to assess the borrower's ability to repay the

mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the

mortgaged property as collateral for the mortgage loan.  While the originator's primary

consideration in underwriting a mortgage loan is the value of the mortgaged property, the

originator also considers, among other things, a mortgagor's credit history, repayment ability and

debt service to income ratio as well as the type and use of the mortgaged property."  (BSMF

2006-SL1 Prospectus Supplement dated July 31, 2006, at S-29-30.)

116.    The Offering Materials for each Bear Stearns Offering contain substantially similar, if not identical, statements of material fact concerning Bear Stearns' underwriting standards and practices.  These statements are excerpted in Exhibits W-CC.

### B.    Defendants' Misrepresentations Regarding Owner-Occupancy Statistics

117.    Owner-occupancy statistics were material to Allstate because high owner-occupancy rates should have made the certificates safer investments than certificates backed by second homes or investment properties.  Homeowners who reside in mortgaged properties are less likely to default than owners who purchase homes as investments or vacation homes.

### (1)    JPMorgan Defendants' Misrepresentations Regarding Owner-Occupancy Statistics

118.    The Offering Materials for each JPMorgan Offering contain detailed statistics regarding the mortgage loans in the collateral pools, including their reported owner-occupancy characteristics.  For example, in the Offering Materials for JPMAC 2006-CW2, it was claimed that of the 6,057 mortgage loans in the aggregate pool backing Allstate's certificates, 5,860, or 96.91% by principal balance at origination, were purportedly secured by owner-occupied properties.  (JPMAC 2006-CW2 Prospectus Supplement dated August 3, 2006, at S-36.)  Likewise, the Offering Materials for JPMAC 2006-CH2 represent that 9,769 out of the 10,334 loans in the relevant sub-pool backing Allstate's certificates, or 96.35% by principal balance at origination, were secured by the borrower's primary residence.  (JPMAC 2006-CH2 Prospectus Supplement dated November 21, 2006, at S-35.)

119.    The Offering Materials for each JPMorgan Offering contain the same type of statistics concerning the proportion of loans secured by owner-occupied properties underlying each mortgage pool.  These statistics are excerpted in Exhibits D-K.

### (2)    WaMu Defendants' Misrepresentations Regarding Owner Occupancy Statistics

120.    Like the JPMorgan Offerings, the WaMu Offering Materials contain detailed statistics regarding owner-occupancy characteristics.  For example, the Offering Materials for WaMu 2007-OA1 represent that, of the 1,909 loans in the aggregate loan pool, 81.81% were secured by owner-occupied properties.  (Prospectus Supplement dated January 23, 2007, at S-100.)  Similarly, the Offering Materials for WaMu 2006-AR11 represent that 86.6% of the properties in the aggregate loan pool were owner occupied.

121.    The Offering Materials for each WaMu Offering contain the same type of statistics concerning the proportion of loans secured by owner-occupied properties underlying each mortgage pool.  These statistics are excerpted in Exhibits L-U.

### (3)    Bear Stearns Defendants' Misrepresentations Regarding Owner Occupancy Statistics

122.    The Bear Stearns Offering Materials also contain detailed owner-occupancy statistics.  For example, the Offering Materials for BSSLT 2007-SV1 represent that, of 37,535 loans in the aggregate pool, 99.82% were secured by owner-occupied properties.  Similarly, the Offering Materials for BSABS 2006-HE4 represent that, of 4,326 loans in the aggregate pool, 92.53% were purportedly secured by owner-occupied properties.  (BSSLT 2007-SV1 Private Placement Memorandum dated March 30, 2007, at AX-6.)

123.    The Offering Materials for each Bear Stearns Offering contain the same type of statistics concerning the proportion of loans secured by owner-occupied properties underlying each mortgage pool.  These statistics are excerpted in Exhibits W-CC.

C.    **Defendants' Misrepresentations Regarding Loan-to-Value and Combined Loan-to-Value Ratios**

124.    The loan-to-value ("LTV") ratio is the ratio of a mortgage loan's original principal balance to the appraised value of the mortgaged property.  The related Combined LTV ("CLTV") takes into account other liens on the property.  These ratios were material to Allstate and other investors because higher ratios are correlated with a higher risk of default.  A borrower with a small equity position in a property has less to lose if he or she defaults on the loan.  There is also a greater likelihood that a foreclosure will result in a loss for the lender if the borrower fully leveraged the property.  These are common metrics for analysts and investors to evaluate the price and risk of mortgage-backed securities.

(1)    **JPMorgan Defendants' Misrepresentations Regarding LTV and CLTV Ratios**

125.    The Offering Materials for each JPMorgan Offering contain detailed statistics regarding these ratios for the mortgage loans in the relevant collateral pools.  For example, the Offering Materials for JPMAC 2006-CW2 represent that the weighted-average LTV ratio at origination of the aggregate loan pool backing Allstate's Certificates was 79.66%, and the CLTV ratio was 99.46% by principal balance at origination.  (JPMAC 2006-CW2 Prospectus Supplement dated August 3, 2006, at S-21.)

126.    The Offering Materials for each JPMorgan Offering contain the same type of factual representations concerning the LTV and CLTV ratios of the underlying mortgage pools. These representations are excerpted in Exhibits D-K.

(2)    **WaMu Defendants' Misrepresentations Regarding LTV and CLTV Ratios**

127.    Like the JPMorgan Offerings, the WaMu Offering Materials contain detailed statistics regarding the LTV and CLTV ratios for the mortgage loans in each collateral pool.  For

example, the Offering Materials for WMHEN 2007-WM1 represent that "the weighted average loan-to-value ratio of the mortgage loans at origination was approximately 81.38%."  (Private Placement Memorandum dated January 30, 2007, Ex. 2 at S-51.)  Similarly, the Offering Materials for WaMu 2007-OA1 represent that only 1.97% of the loans by aggregate principal balance at the cut-off date had an LTV ratio over 80%.  (WaMu 2007-OA1 Prospectus Supplement dated January 11, 2007, at S-100.)

128.    The Offering Materials for each WaMu Offering contain the same type of factual representations concerning the LTV and CLTV ratios of the underlying mortgage pools.  These representations are excerpted in Exhibits L-U.

### (3)    Bear Stearns Defendants' Misrepresentations Regarding LTV and CLTV Ratios

129.    The Bear Stearns Offering Materials also contain detailed statistics regarding LTV and CLTV ratios for the mortgage loans in each collateral pool.  For example, the Offering Materials for BALTA 2005-4 represent that the weighted-average LTV ratio at origination was 77.06% for the loans in Group I and 76.57% for the loans in Group II.  (BALTA 2005-4 Prospectus Supplement dated April 28, 2005, at A-3, A-53.)  Likewise, the Offering Materials for BSABS 2006-HE4 represent that the weighted-average CLTV ratio was 86.81%.  (BSABS 2006-HE4 Prospectus Supplement dated April 25, 2006, at A-9.)

130.    The Offering Materials for each Bear Stearns Offering contain the same type of factual representations concerning the LTV and CLTV ratios of the underlying mortgage pools.  These representations are excerpted in Exhibits W-CC.

D. **Defendants' Misrepresentations Regarding Debt-to-Income Ratios**

131. The ratio of a borrower's debt to his or her income was material to Allstate because it represents a borrower's ability to afford the mortgage payments at issue, and thus implicates the likelihood of default.

(1) **JPMorgan Defendants' Misrepresentations Regarding Debt-to-Income Ratios**

132. The Offering Documents for JPMAC 2006-CW2 represent that: (a) mortgagors were generally required to furnish information regarding "assets, liabilities, income and employment history" (JPMAC 2006-CW2 Prospectus Supplement dated August 3, 2006, at S-68); (b) based on all of this data, the originator purportedly used a "debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations" (*Id.*); and (c) "the non-zero weighted average Debt Ratio" for the aggregate pool backing Allstate's Certificates was "expected to be approximately 40.37%." (*Id.* at S-34.)

133. The Offering Materials for each JPMorgan Offering contain the same type of factual representations concerning the underwriter's evaluation of the prospective borrower's ability to repay a mortgage loan, and debt-to-income ratios in the underlying loan pool. These representations are excerpted in Exhibits D-K.

(2) **WaMu Defendants' Misrepresentations Regarding Debt-to-Income Ratios**

134. Similarly, each of the WaMu Offerings made specific factual representations concerning the underwriter's evaluation of the borrower's debt-to-income ratio. For example, the Offering Documents for WaMu 2007-AO3 represent that:

> In evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing

> expenses to the borrower's gross income (referred to as the
> "housing-to-income ratio" or "front end ratio"), and the ratio of the
> borrower's total monthly debt (including non-housing expenses) to
> the borrower's gross income (referred to as the "debt-to-income
> ratio" or "back end ratio").

(WaMu 2007-AO3 Prospectus Supplement dated March 23, 2007, at S-38.)

135.    Specifically with respect to Option ARM loans, the same Offering Materials

represented that "the borrower's monthly mortgage debt is determined based on the fully indexed

rate and a predetermined factor as set by the sponsor's credit department from time to time

(which rate may be greater than the rate in effect for the mortgage loan during the initial fixed-

rate period)." (*Id.*)

136.    The Offering Materials for each WaMu Offering contain the same type of factual

representations concerning the underwriter's evaluation of the prospective borrower's ability to

repay a mortgage loan, and debt-to-income ratios in the underlying loan pool.  These

representations are excerpted in Exhibits L-U.

### (3)    Bear Stearns Defendants' Misrepresentations Regarding Debt-to-Income Ratios

137.    The Offering Documents for BALTA 2006-5 represent that a mortgagor was

generally (subject to limited exceptions) required to furnish "information with respect to its

assets, liabilities, income . . . credit history, employment history and personal information. . . ."

(BALTA 2006-5 Prospectus Supplement dated July 28, 2006, at S-47.)  Based on all of this data,

a mortgagor had to demonstrate that his or her "monthly gross income" was sufficient to meet

"monthly housing expenses (including principal and interest on the proposed mortgage loan and,

as applicable, the related monthly portion of property taxes, hazard insurance and mortgage

insurance)." (*Id*. at S-46.)

138.    The Offering Materials for each Bear Stearns Offering contain the same type of factual representations concerning the underwriter's evaluation of the prospective borrower's ability to repay a mortgage loan, and debt-to-income ratios in the underlying loan pool.  These representations are excerpted in Exhibits W-CC.

### E.    Defendants' Misrepresentations Regarding Credit Ratings

139.    Each tranche of the Allstate Certificates received a credit rating indicating the rating agencies' view of its risk profile.  The initial and current ratings given to the Certificates are contained in Exhibit C.  The ratings were material to reasonable investors, including Allstate, because the ratings provided additional assurances that investors would receive the expected interest and principal payments.  The Certificates would have been unmarketable and would not have been issued but for the provision of these ratings, as almost every prospectus stated that it was "a condition to the issuance of the Offered Certificates" that they receive certain, specified ratings from the rating agencies.  (*See, e.g.,* JPMAC Prospectus dated August 25, 2005, at 140.)

### (1)    JPMorgan Defendants' Misrepresentations Regarding Credit Ratings

140.    The JPMorgan Offering Materials represent that the rating agencies conducted an analysis designed to assess the likelihood of delinquencies and defaults in the underlying mortgage pools and issued ratings accordingly.  For example, the Offering Materials for JPMAC 2006-FRE2 represent:

> The certificates offered by this prospectus supplement will initially have ratings at least as high as the ratings specified in the table. . . The ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued.  Such ratings take into consideration the credit quality of the related mortgage group, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the

> payment stream on the mortgage group is adequate to make the
> payments required by such certificates.

(JPMAC 2006-FRE2 Prospectus Supplement dated March 9, 2006)

141.    Each prospectus supplement also provides the ratings for each class of certificate

issued, based on ratings analyses done by two or three ratings agencies.

142.    The Offering Materials for each JPMorgan Offering contain the same type of

factual representations concerning the rating agencies' evaluation of the JPMorgan Certificates

and the significance of the ratings assigned by them.  These representations are excerpted in

Exhibits D-K.

### (2)    WaMu Defendants' Misrepresentations Regarding Credit Ratings

143.    Each tranche of the WaMu Certificates also received a rating indicating the rating

agencies' view of its risk profile.  As with the JPMorgan Offerings, the WaMu Offering

Materials represent that the rating agencies conducted an independent analysis designed to assess

the likelihood of delinquencies and defaults in the underlying mortgage pools.  For example, the

Offering Materials for WaMu 2006-AR11 represent:  "It is a condition to the issuance of the

offered certificates that they receive the ratings from S&P and Moody's indicated:  . . . The

rating assigned to each class of offered certificates by each rating agency is based on that rating

agency's independent evaluation of that class of certificates…"  (WaMu 2006-AR11 Prospectus

Supplement dated August 22, 2006, at S-145-46 (emphasis added).)

144.    The Offering Materials for each WaMu Offering contain the same type of factual

representations concerning the rating agencies' evaluation of the WaMu Certificates and the

significance of the ratings assigned by them.  These representations are excerpted in Exhibits L-

U.

(3)   **Long Beach Defendants' Misrepresentations Regarding Credit Ratings**

145.    Similarly, the LBMLT 2006-6 Offering Materials represent that "[i]t is a condition to the issuance of the offered certificates that they receive the ratings indicated from Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P"), Moody's Investors Service, Inc. ("Moody's") and Fitch, Inc. ("Fitch") . . . The rating takes into consideration the characteristics of the mortgage loans and the structural, legal and tax aspects associated with the certificates . . . The rating assigned to each class of  offered certificates by each rating agency is based on that rating agency's **independent evaluation** of that class of certificates."  (Prospectus Supplement dated July 21, 2006, at S-136 (emphasis added).)

(4)   **Bear Stearns Defendants' Misrepresentations Regarding Credit Ratings**

146.    Each tranche of the Bear Stearns Certificates also received a rating indicating the rating agencies' view of its risk profile.  The Bear Stearns Offering Materials represent that the rating agencies conducted an analysis designed to assess the likelihood of delinquencies and defaults in the underlying mortgage pools.  For example, the Offering Materials for BALTA 2005-4 represented:  "It is a condition to the issuance of each class of Offered Certificates that it receives at least the ratings set forth below from S&P and Moody's . . . The ratings assigned by S&P and Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates were issued."  (BALTA 2005-4 Prospectus dated April 28, 2005, at S-98-99.)

147.    The Offering Materials for each Bear Stearns Offering contain the same type of factual representations concerning the rating agencies' evaluation of the Bear Stearns Certificates

48

and the significance of the ratings assigned by them.  These representations are excerpted in

Exhibits W-CC.

### F.    Defendants' Misrepresentations Regarding Credit Enhancements

148.    Credit enhancement represents the amount of "cushion" or protection from loss

exhibited by a given security.  This cushion is intended to improve the likelihood that holders of

highly-rated certificates receive the interest and principal to which they are entitled.  The level of

credit enhancement offered is based on the make-up of the loans in the underlying collateral

pool.  Riskier pools necessarily need higher levels of credit enhancement to ensure payment to

senior certificateholders.  Credit enhancements for a given trust also impact the overall credit

rating a given tranche of certificates receives.  The level of credit enhancement for the

Certificates was material to Allstate because it represented the protection purportedly afforded

from loss.

### (1)    JPMorgan Defendants' Misrepresentations Regarding Credit Enhancements

149.    The Offering Materials for each of the JPMorgan Offerings describe the credit

enhancements applicable to the certificates.  For example, the prospectus supplement for JPMAC

2006-CW2 lists the specific credit enhancements for the "benefit of the holders of the Offered

Certificates" as "subordination, overcollateralization, excess interest, [and] the Interest Rate

Swap Agreement."  (JPMAC 2006-CW2 Prospectus Supplement dated August 3, 2006, at S-97.)

These credit enhancements were "to enhance the likelihood of timely receipt by the holders of

the Senior Certificates of the full amount of their scheduled monthly payments of interest and

principal, as applicable, and to afford such holders protection against Realized Losses."  (*Id.*)

150.    The Offering Materials for each JPMorgan Offering contain substantially similar, if not identical, statements of material fact concerning the protection afforded by credit enhancements.  These statements are excerpted in Exhibits D-K.

### (2)    WaMu Defendants' Misrepresentations Regarding Credit Enhancements

151.    The Offering Materials for each of the WaMu Offerings make similar representations that credit enhancements would "increase[] the likelihood that holders of these senior certificates will be paid the full amount of principal to which they are entitled."  (WaMu 2006-AR9 Prospectus Supplement dated January 6, 2006, at S-17.)  These credit enhancements include subordination, overcollateralization, and excess interest.  *Id*.

152.    The Offering Materials for each WaMu Offering contain substantially similar, if not identical, statements of material fact concerning the protection afforded by credit enhancements.  These statements are excerpted in Exhibits L-U.

### (3)    Long Beach Defendants' Misrepresentations Regarding Credit Enhancements

153.    The Offering Materials for the Long Beach Offering likewise represent that "[s]ubordination is intended to enhance the likelihood of regular distributions on the more senior classes of certificates in respect of interest and principal and to afford such certificates protection against realized losses on the mortgage loans."  (LBMLT 2006-6 Prospectus Supplement dated July 21, 2006, at S-6.)  The LBMLT 2006-6 Offering Materials further state that "the excess interest from the mortgage loans each month will be available to absorb realized losses on the mortgage loans and to maintain overcollateralization at required levels as described in the pooling agreement."  (*Id*. at 7.)  The LBMLT 2006-6 Offering Materials contain other similar statements of material fact concerning the protection afforded by credit enhancements, which are excerpted in Exhibit V to this Complaint.

**(4)    Bear Stearns Defendants' Misrepresentations Regarding Credit Enhancements**

154.    The Offering Materials for each Bear Stearns Offering also describe the credit enhancements applicable to the Bear Stearns Certificates.  For example, the prospectus supplement for BALTA 2005-4 represents that "loss protection is accomplished by allocating any realized losses" from senior to subordinate classes of certificates.  (BALTA 2005-4 Prospectus Supplement dated April 28, 2005, at S-14.)  The BALTA 2005-4 prospectus supplement further states that "[i]nterest payments received in respect of the mortgage loans in excess of the amount that is needed to pay interest on the group I offered certificates and the Class I-B-3 Certificates and related trust expenses will be used to reduce the total principal balance of the group I certificates and the Class I-B-3 Certificates until a required level of overcollateralization has been achieved."  (*Id.*)

155.    The Offering Materials for each Bear Stearns Offering contain substantially similar, if not identical, statements of material fact concerning the protection afforded by credit enhancements.  These statements are excerpted in Exhibits W-CC.

### G.    Defendants' Misrepresentations Regarding Underwriting Exceptions

156.    Whether Defendants were making case-by-case (rather than bulk) exceptions to the otherwise-applicable underwriting guidelines was material to Allstate.  A disclosed guideline is irrelevant – and indeed misleading – from a risk-analysis perspective if large numbers of loans were peremptorily excused from those guidelines.

**(1)    JPMorgan Defendants' Misrepresentations Regarding Underwriting Exceptions**

157.    JPMorgan Defendants represented that they made case-by-case exceptions to the disclosed underwriting standards based on compensating factors that increased the quality of the loan application.  For example, the Offering Materials for JPMAC 2005-OPT2 represent:

> [O]n a case-by-case basis, it may be determined that an applicant
> warrants a debt-to-income ratio exception, a pricing exception, a
> loan-to-value exception, a credit score exception or an exception
> from certain requirements of a particular risk category.  An
> upgrade will be granted if the application reflects certain
> compensating factors, among others: a relatively lower LTV; a
> maximum of one 30-day late payment on all mortgage loans during
> the last 12 months; stable employment; greater than 50% fixed
> source of income; ownership of current residence of four or more
> years; or cash reserves equal to or in excess of three monthly
> payments of principal, interest, taxes and insurance.

(JPMAC 2005-OPT2 Prospectus Supplement dated December 15, 2005, at S-58.)

158.   The Offering Materials for each JPMorgan Offering contain the same type of

factual representations concerning the use of underwriting exceptions to originate the underlying

loans in the mortgage pools.  These representations are excerpted in Exhibits D-K.

### (2)   WaMu Defendants' Misrepresentations Regarding Underwriting Exceptions

159.   Similarly, WaMu Defendants represented that they made only case-by-case

exceptions to the disclosed underwriting standards based on "compensating factors."  For

example, the Offering Materials for WaMu 2007-HY7 represent that "exceptions to the

sponsor's loan program parameters may be made on a case-by-case basis if compensating factors

are present.  In those cases, the basis for the exception is documented, and in some cases the

approval of a senior underwriter is required."  (Prospectus Supplement dated June 21, 2007, at S-

27.)  Similarly, the Offering Materials state that "[e]xceptions to the [debt-to-income] ratio

guidelines may be made when compensating factors are present."  (*Id*. at S-26.)

160.   The Offering Materials for each WaMu Offering contain the same type of factual

representations concerning the use of underwriting exceptions to originate the underlying loans

in the mortgage pools.  These representations are excerpted in Exhibits L-U.

### (3) Long Beach Defendants' Misrepresentations Regarding Underwriting Exceptions

161.    Long Beach Defendants also represented that "[o]n a case-by-case basis and only with the approval of an employee with appropriate risk level authority, the sponsor may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the Long Beach underwriting risk category guidelines warrants an underwriting exception." (Prospectus Supplement dated July 21, 2006, at S-36.)

### (4) Bear Stearns Defendants' Misrepresentations Regarding Underwriting Exceptions

162.    Likewise, Bear Stearns Defendants represented that they made only case-by-case exceptions to the disclosed underwriting standards based on compensating factors. For example, the Offering Materials for BALTA 2005-4 represent that "[e]xceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process." (BALTA 2005-4 Prospectus Supplement dated April 28, 2005, at S-42.)

163.    The Offering Materials for each Bear Stearns Offering contain the same type of factual representations concerning the use of underwriting exceptions to originate the underlying loans in the mortgage pools. These representations are excerpted in Exhibits W-CC.

### H.    Defendants' Misrepresentations Regarding Alternative Documentation Loans

164.    Defendants also misrepresented the manner in which alternative documentation loan programs were utilized. Reduced or alternative documentation programs were typically intended only as a convenience for safe borrowers – for example those making a significant down-payment in cash or with strong credit histories – not as a *de facto* exception to standard underwriting procedures for patently unqualified borrowers. The representation that alternative

or reduced documentation programs for underwriting loans were used only where compensating factors reduced the risk associated with such programs was material to Allstate.

### (1)    JPMorgan Defendants' Misrepresentations Regarding Alternative Documentation Loans

165.    JPMorgan Defendants represented that alternative documentation programs – such as limited or no document loans – were used on a limited basis.  For example, the February 2007 Prospectus represents that "[l]oans underwritten under these [alternative] programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion.  Permitted maximum loan-to-value ratios under these programs are generally more restrictive than those under the lender's standard underwriting criteria."  (JPMAC Prospectus dated February 26, 2007, at 23.)

166.    The Offering Materials for each JPMorgan Offering contain substantially similar, if not identical, statements of material fact regarding the use of alternative documentation programs.  These representations are excerpted in Exhibits D-K to this Complaint.

### (2)    WaMu Defendants' Misrepresentations Regarding Alternative Documentation Loans

167.    WaMu Defendants similarly represented that alternative documentation loans were only granted on a limited basis.  For example, the Offering Materials for WaMu 2006-AR5 represent that the "low documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets."  (WaMu 2006-AR5 Prospectus Supplement dated May 23, 2006, at S-33.)  The Offering Materials further represent that these alternative documentation programs are only "available to borrowers with certain loan-to-value ratios, loan amounts and credit scores."

168.    The Offering Materials for each WaMu Offering contain substantially similar, if not identical, statements of material fact regarding the use of alternative documentation programs.  These representations are excerpted in Exhibits L-U to this Complaint.

### (3)    Bear Stearns Defendants' Misrepresentations Regarding Alternative Documentation Loans

169.    Bear Stearns Defendants also represented that alternative documentation programs were only used on a limited basis.  For instance, the Offering Materials for BALTA 2005-4 represent that "limited documentation programs . . . are generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion, and certain credit underwriting documentation concerning income or income verification and/or employment verification is waived."  (BALTA 2005-4 Prospectus Supplement dated April 28, 2005, at S-40.)

170.    The Offering Materials for each Bear Stearns Offering contain substantially similar, if not identical, statements of material fact regarding the use of alternative documentation programs.  These representations are excerpted in Exhibits W-CC to this Complaint.

### I.    Defendants' Misrepresentations Regarding Full-Documentation Loans

171.    Whether the information in a loan file was fully documented, or whether it was instead approved pursuant to a reduced or no-documentation procedure, was material to Allstate. Reduced-documentation or stated-income loans are riskier because the borrower provides less – and in some cases, no – substantiating information for items such as his or her income and assets. With less confirmation, it is more likely that there are errors or misrepresentations in the loan file, such that a borrower is taking on more debt than he or she can actually afford.

55

172.    The Offering Materials for each of the JPMorgan Offerings contain detailed

statistics regarding the documentation procedures purportedly used to originate the mortgage

loans.  For example, the Offering Materials for JPMAC 2007-CH1 represent that 8,231 out of

12,304 loans in the aggregate pool backing Allstate's Certificates, or 59.18% by principal

balance at origination, were full documentation loans, whereas only 3,375 out of 12,304 loans, or

33.11% by principal balance at origination, were stated income loans.  (JPMAC 2007-CH1

Prospectus Supplement dated March 7, 2007, at S-39.)

173.    The Offering Materials for each JPMorgan Offering contain substantially similar,

if not identical, statements of material fact concerning the documentation procedures used to

originate the loans underlying the mortgage pools.  These statements are excerpted in Exhibits

D-K to this Complaint.

**J.    Defendants' Misrepresentations Regarding Adverse Selection of Mortgage
        Loans**

174.    It is important for any investor in a structured-finance product, such as mortgage-

backed securities, to know whether the underlying assets have been adversely selected to shift

the risk associated with underperforming assets from the seller to the investor.  The WaMu and

Long Beach Defendants consistently represented that the mortgage loans underlying their

offerings were not adversely selected.

175.    For example, in WaMu 2006-AR1, the Offering Materials represent that the

"sponsor used no adverse selection procedures in selecting the mortgage loans from among the

outstanding adjustable rate conventional mortgage loans owned by it which were available for

sale and as to which the representations and warranties in the mortgage loan sale agreement

could be made."  (WaMu 2006-AR1 Prospectus Supplement dated January 24, 2006, at S-50.)

Likewise, the Offering Materials for WaMu 2007-OA3 represent that the "sponsor selected the

mortgage loans from among its portfolio of mortgage loans held for sale based on a variety of

considerations . . . **and taking into account investor preferences** and the depositor's objective

of obtaining the most favorable combination of ratings on the certificates." (WaMu 2007-OA3

Prospectus Supplement dated March 23, 2007, at S-59 (emphasis added).)

176.    The Offering Materials for each WaMu Offering contain substantially similar, if

not identical, statements of material fact concerning the selection of the mortgage loans for

inclusion in the Offering.  These statements are excerpted in Exhibits L-U to this Complaint.

177.    The Offering Materials for LBMLT 2006-6 similarly represent that the "sponsor

selected the mortgage loans from among its portfolio of mortgage loans held for sale based on a

variety of considerations . . . and taking into account **investor preferences** and the depositor's

objective of obtaining the most favorable combination of ratings on the certificates." (Prospectus

Supplement dated July 21, 2006, at S-67-68 (emphasis added).)

### K.    **Defendants' Failure to Disclose the Negative Results of Due Diligence**

178.    Defendants' representations regarding the underwriting process would be

understood by any reasonable investor, including Allstate, to mean that non-compliant loans

would not be included in the mortgage pools.  Indeed, Defendants underwriting disclosures

would be pointless if read to mean only that the defendants would apply certain disclosed

standards to underwrite loans, but securitize them anyway even if they failed those standards.

179.    Defendants' failure to disclose that high numbers of loans had been rejected by

the due diligence process, yet "waived" into the collateral pools anyway, was a fraudulent

omission, and rendered the disclosures regarding Defendants' underwriting, sampling, and due

diligence processes even more misleading.  Had Defendants disclosed such practices earlier,

Allstate would not have continued to invest in securities collateralizing loans that Defendants

knew were defective.

57

## II.    ALL OF DEFENDANTS' REPRESENTATIONS WERE UNTRUE AND MISLEADING BECAUSE DEFENDANTS SYSTEMATICALLY IGNORED THEIR OWN UNDERWRITING GUIDELINES

180.    Defendants' representations regarding the underwriting processes, underwriting quality, loan selection, credit enhancements, use of exceptions and alternative documentation programs, and due diligence results were all untrue.  The mortgage loans underlying Allstate's Certificates did not comply with the underwriting standards the Offering Materials described because those standards were systemically ignored.  In originating or acquiring the loans, the originators – including JPMC Bank, WMB and EMC – ignored borrowers' actual repayment ability and the value and adequacy of mortgaged property used as collateral.  Systematic, bulk exceptions to underwriting standards were granted without consideration of any compensating factors.  Defendants also misleadingly omitted that they were systematically abusing "exceptions" and alternative documentation programs in order to further circumvent their purported underwriting standards.

181.    Defendants' representations regarding the underwriting and due diligence processes were made even more misleading by their fraudulent omission of information regarding the number of rejected loans identified, and the high number of such loans that were "waived" into the collateral pools anyway.

182.    Defendants' representations regarding owner-occupancy and debt-to-income ratios were also untrue.  The abandonment of sound underwriting practices facilitated the widespread falsification of these statistics within the Offering Documents.  In reality, a far greater percentage of properties were *not* owner-occupied, and borrowers' claimed income was regularly inflated.  LTV and CLTV ratios were equally baseless.  Defendants did not genuinely believe the appraisal values used in these statistics because they knew that the property values were being artificially inflated in order to increase the amount of money that could be given to a

borrower.  The CLTV ratios also omitted the effect of additional liens on the underlying

properties, rendering them even further from the truth.  Defendants also misleadingly omitted

that the disclosed statistics were baseless and that the appraisers were systematically pressured to

inflate their appraisals.

183.    Defendants fed these fake loan statistics to the rating agencies, essentially pre-

determining the ratings that would be given.  The use of baseless statistics also rendered false

Defendants' representations about the ratings process being designed to assess credit risk

because the entire ratings process was rigged from the start through the use of incorrect data.

Defendants thus did not genuinely believe that the Certificates' ratings reflected their actual risk,

and they failed to disclose that the ratings were baseless.

> **A.    Evidence Demonstrates Defendants' Underwriting Abandonment:  High Default Rates And Plummeting Credit Ratings**

184.    The drastic rise in default rates on the mortgage loans underlying Allstate's

Certificates is cogent evidence of faulty underwriting.  The Certificates were supposed to be

long-term, stable investments, yet they have already experienced payment problems significantly

beyond what was expected for loan pools that were properly underwritten and which contained

loans that actually had the characteristics Defendants' Offering Materials claim.  The following

table shows the stunning percentages of the underlying mortgage loans presently delinquent or in

default:

| Offering | Current Number of Loans in Pool | Current Number of Delinquent Loans | Delinquent Loans as a Percentage of Current Loans |
|---|---|---|---|
| JPMAC 2005-OPT2 | 1,445 | 567 | 39.24% |
| JPALT 2006-A2 | 1,620 | 674 | 41.60% |
| JPMAC 2006-CH2 | 5,952 | 2,720 | 45.70% |
| JPMAC 2006-CW2 | 2,655 | 1,744 | 65.70% |
| JPMAC 2006-FRE2 | 1,216 | 767 | 63.08% |
| JPMAC 2007-CH1 | 7,239 | 1,461 | 20.18% |

| Offering | Current Number of Loans in Pool | Current Number of Delinquent Loans | Delinquent Loans as a Percentage of Current Loans |
|---|---|---|---|
| JPMAC 2007-CH2 | 2,724 | 942 | 34.58% |
| JPMMT 2004-S1 | 913 | 55 | 6.02% |
| WMALT 2005-4 | 3,171 | 419 | 13.21% |
| WaMu 2005-AR2 | 1,448 | 562 | 38.81% |
| WaMu 2006-AR1 | 1,028 | 425 | 41.34% |
| WaMu 2006-AR5 | 646 | 275 | 42.60% |
| WaMu 2006-AR9 | 1,060 | 373 | 35.20% |
| WaMu 2006-AR11 | 2,071 | 670 | 32.40% |
| WaMu 2007-OA1 | 1,132 | 414 | 36.60% |
| WaMu 2007-OA3 | 1,177 | 472 | 40.10% |
| WaMu 2007-HY7 | 2,615 | 841 | 32.20% |
| LBMLT 2006-6 | 2,932 | 1,756 | 59.89% |
| BALTA 2005-4 | 2,767 | 646 | 23.30% |
| BALTA 2006-5 | 1,500 | 817 | 54.47% |
| BSABS 2006-HE4 | 1,292 | 698 | 54.02% |
| BSMF 2006-SL1 | 1,794 | 574 | 32.00% |
| SACO 2006-3 | 2,915 | 786 | 26.96% |
| SACO 2006-6 | 2,400 | 445 | 18.54% |

185.    Defaults are usually caused by a large and unexpected disruption to a borrower's income.  In a properly underwritten pool of loans, one would thus not expect to see a large spike of defaults occurring shortly after origination, because it is unlikely that many borrowers would all incur a sudden and unexpected change to their payment ability so soon after purchasing a home.  Indeed, as discussed further below, economic studies have confirmed that high default rates early in a loan's life are highly correlated with misrepresentations in the loan files.  This makes sense – when borrowers are put in loan products they cannot actually afford, they quickly and predictably fall behind on their payments.

186.    Not only have Allstate's Certificates experienced extraordinary rates of delinquency, their ratings have significantly deteriorated.  Most of Allstate's Certificates initially received the highest possible ratings – S&P's AAA rating or its equivalent from the other rating agencies.  According to S&P's website:  "An obligation rated 'AAA' has the highest rating

assigned by Standard & Poor's.  The obligor's capacity to meet its financial commitment on the

obligation is extremely strong."  Moody's similarly describes its highest rating, Aaa, as meaning

that the investment is "judged to be of the highest quality, with minimal credit risk."  This is the

same rating typically given to bonds backed by the full faith and credit of the U.S. government,

such as treasury bills.  Historically, an AAA-rated security had an expected loss rate of less than

0.05%.

     187.    Because of the high delinquency and default rates, and deficient credit

enhancement efforts, the majority of Allstate's Certificates have been downgraded from the

highest possible ratings to "junk-bond" ratings.  Any instrument rated lower than BBB (or Baa

for ratings provided by Moody's) is considered below investment-grade or a junk bond.

According to S&P's website, far from having the "extremely strong capacity" to meet

commitments that AAA ratings do, these junk-bond ratings now indicate that Allstate's

Certificates are "currently vulnerable and dependent on favorable business, financial and

economic conditions to meet financial commitments."

     188.    Currently, **all but one** of the JPMorgan Certificates are rated as non-investment

grade by at least two of the three ratings agencies which originally provided their ratings.  The

ratings given to the WaMu Certificates have also significantly deteriorated.  Despite all of the

Allstate's WaMu Certificates being originally rated AAA or equivalent, currently more than

**80%** of the Certificates have fallen to "junk-bond" status.  Likewise, more than **94%** of the Bear

Stearns Certificates have fallen to "junk-bond" status.  The ratings history for all of the

Certificates is set forth in Exhibit C.

     189.    The dismal performance of the mortgage loans underlying Allstate's Certificates

is itself strong evidence that they were improperly underwritten, and that they did not have the

credit risk characteristics Defendants' Offering Materials claim.  The defaults and related drop in market value thus are due to Defendants' wrongdoing, and not because of the general change in economic conditions.

190.    Indeed, the allegations of fraud that have surrounded Defendants' conduct at issue here have gotten the attention of the government.  According to a May 13, 2010 *Reuters* news article, the SEC and "U.S. prosecutors are conducting a broad criminal investigation of six major Wall Street Banks, including J.P. Morgan" about whether they misled investors about mortgage securities deals.

191.    Significant downgrades on these Certificates did not take place until mid-2008 or later.

B.    **Statistical Evidence of Faulty Underwriting:  Borrowers Did Not Actually Occupy The Mortgaged Properties As Represented**

192.    As discussed above, Defendants repeatedly represented that the loan pools underlying Allstate's Certificates had high percentages of loans issued to borrowers that were living in the mortgaged properties.  Because borrowers are less likely to "walk away" from properties they live in, as compared to properties being used as a vacation home or investment, such certificates appear less risky than certificates backed by loan pools where borrowers are not in fact living in the mortgaged properties.

193.    Allstate selected a random sample of loans from each offering in which it invested to test Defendants' representations on a loan-level basis.  Using techniques and methodologies that only recently became available, Allstate conducted loan-level analyses on nearly 26,809 mortgage loans underlying its Certificates, across 17 of the offerings at issue here.

194.    For each offering, Allstate attempted to analyze 800 defaulted loans and 800 randomly-sampled loans from within the collateral pool.  These sample sizes are more than

sufficient to provide statistically-significant data to demonstrate the degree of misrepresentation of the Mortgage Loans' characteristics.  Analyzing data for each Mortgage Loan in each Offering would have been cost-prohibitive and unnecessary.  Statistical sampling is an accepted method of establishing reliable conclusions about broader data sets, and is routinely used by courts, government agencies, and private businesses.  As the size of a sample increases, the reliability of its estimations of the total population's characteristics increase as well.  Experts in RMBS cases have found that a sample size of just 400 loans can provide statistically significant data, regardless of the size of the actual loan pool, because it is unlikely that such a sample would yield results markedly different from results for the entire population.

195.    To determine whether a given borrower actually occupied the property as claimed, Allstate investigated tax information for the sampled loans.  One would expect that a borrower residing at a property would have his or her tax bills sent to that address, and would take all applicable tax exemptions available to residents of that property.  If a borrower had his or her tax records sent to another address, that is good evidence that he or she was not actually residing at the mortgaged property.  If a borrower declined to make certain tax exemption elections that depend on the borrower living at the property, that also is strong evidence the borrower was living elsewhere.

196.    A review of credit records was also conducted.  One would expect that people have bills sent to their primary address.  If a borrower was telling creditors to send bills to another address, even six months after buying the property, it is good evidence he or she was living elsewhere.

197.    A review of property records was also conducted.  It is less likely that a borrower lives in any one property if in fact that borrower owns multiple properties.  It is even less likely

the borrower resides at the mortgaged property if a concurrently-owned separate property did not have its own tax bills sent to the property included in the mortgage pool.

198.    A review of other lien records was also conducted.  If the property was subject to additional liens but those materials were sent elsewhere, that is good evidence the borrower was not living at the mortgaged property.  If the other lien involved a conflicting declaration of residency, that too would be good evidence that the borrower did not live in the subject property.

(1)    **The JPMorgan Offerings**

199.    The results of Allstate's loan-level analysis of true owner-occupancy rates on the mortgage loans underlying the JPMorgan Offerings are set forth below and are further detailed in Exhibits D-K.  These statistics show that a much higher percentage of borrowers did not occupy the mortgaged properties than represented:

| Asset | Percentage of Owner-Occupied Properties in Prospectus | Actual Percentage of Owner-Occupied Properties | Prospectus Overstatement |
|-------|-------------------------------------------------------|------------------------------------------------|--------------------------|
| JPMAC 2005-OPT2 | 93.7% | 85.0% | 8.7% |
| JPALT 2006-2A | 78.3% | 64.8% | 13.5% |
| JPMAC 2006-CH2 | 94.5% | 80.7% | 13.8% |
| JPMAC 2006-CW2 | 96.7% | 83.6% | 13.2% |
| JPMAC 2007-CH1 | 92.1% | 80.5% | 11.7% |
| JPMAC 2007-CH2 | 94.5% | 81.3% | 13.2% |

(2)    **The WaMu Offerings**

200.    Similarly, loan-level analysis of true owner-occupancy rates on the mortgage loans underlying the WaMu Offerings shows that a much higher percentage of borrowers did not occupy the mortgaged properties than represented:

| Asset | Percentage of Owner-Occupied Properties in Prospectus | Actual Percentage of Owner-Occupied Properties | Prospectus Overstatement |
|---|---|---|---|
| WaMu 2006-AR5 | 78.9% | 64.9% | 14% |
| WaMu 2006-AR9 | 92.5% | 77.9% | 14.6% |
| WaMu 2006-AR11 | 86.6% | 70.3% | 16.3% |
| WaMu 2007-OA1 | 83.5% | 69.1% | 14.4% |
| WaMu 2007-HY7 | 96% | 79.2% | 16.8% |

### (3)    The Bear Stearns Offerings

201.    The results of Allstate's loan-level analysis of true owner-occupancy rates on the mortgage loans underlying the Bear Stearns Offerings shows that the Bear Stearns Defendants also misrepresented the percentages of owner occupied properties:

| Asset | Percentage of Owner-Occupied Properties in Prospectus | Actual Percentage of Owner-Occupied Properties | Prospectus Overstatement |
|---|---|---|---|
| BALTA 2005-04 | 69.7% | 58.6% | 11.11% |
| BALTA 2006-05 | 52.6% | 42.6% | 9.94% |
| BSABS 2006-HE4 | 92.5% | 80.6% | 11.96% |
| BSMF 2006-SL1 | 55.2% | 47.7% | 7.44% |
| SACO 2006-03 | 59.9% | 51.0% | 8.97% |
| SACO 2006-06 | 60.6% | 51.7% | 8.95% |

### C.    Statistical Evidence of Faulty Underwriting:  The Loan-to-Value Ratios In The Offering Materials Were Inaccurate

202.    As discussed above, all of the Offering Materials contain material representations about the Mortgage Loans' LTV and CLTV ratios.  These ratios compare the amount of the loan to the value of the mortgaged property, theoretically calculated using an appraisal process.  An erroneous appraisal would thus directly result in erroneous LTV and CLTV ratios.

203.    Using techniques and methodologies that only recently became available, Allstate had each underlying property valued by an industry-standard automated valuation model ("AVM").  AVMs are routinely used in the industry as a way of valuing properties during

65

prequalification, origination, portfolio review, and servicing.  AVMs have become so ubiquitous that their testing and use is specifically outlined in regulatory guidance, and is discussed in the Dodd-Frank Act.  AVMs rely upon similar data as appraisers – primarily, county assessor records, tax rolls, and data on comparable properties.  AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.  The AVM that Allstate used incorporates a database of 500 million mortgage transactions covering zip codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States.  Independent testing services have determined that this AVM is the most accurate of all such models.

204.    Applying the AVM to the available data for the loans underlying the Certificates shows that the property values used by Defendants to calculate the represented LTV ratios were materially and consistently inflated.  This caused the disclosed LTV and CLTV ratios to be lower than they really were, *i.e.*, the owners were represented to have more of an equity "cushion" than they really did.

### (1)    The JPMorgan Offerings

205.    The JPMorgan Offerings had recalculated LTV ratios that were at least 10%-60% higher than represented in the Offering Materials.  This overvaluation affected numerous statistics in the Offering Materials.  For instance, the JPMorgan Offering Materials made representations about the percentage of loans that had LTV ratios higher than 80%.  LTV ratios in excess of 80% provide the lender little value cushion to protect against borrower default and loss upon foreclosure.  However, the AVM indicates that a much higher percentage of the loans than represented had LTV ratios higher than 80%, as shown in the chart below:

| Asset | Percentage of Loans Represented to Have LTVs Greater than 80% | Actual Percentage of Loans With LTVs Greater than 80% | Prospectus Understatement of Percent of Loans With High LTVs |
|---|---|---|---|
| JPMAC 2005-OPT2 | 42.95% | 53.15% | 10.20% |
| JPALT 2006-2A | 6.42% | 66.69% | 60.28% |
| JPMAC 2006-CH2 | 31.95% | 70.61% | 38.66% |
| JPMAC 2006-CW2 | 38.81% | 57.35% | 18.54% |
| JPMAC 2007-CH1 | 37.45% | 51.24% | 13.79% |
| JPMAC 2007-CH2 | 41.63% | 66.19% | 24.56% |

206.    The JPMorgan Offering Materials also represent that none of the mortgage loans in the subject loan pools had LTV ratios greater than 100 percent, meaning the size of the loan is greater than the value of the property.  (This is known as being "underwater," where a borrower owes more on the property than it is worth.)  Loans with an LTV ratio over 100%  afford the lender no equity cushion and leave the lender with inadequate collateral from the outset of the loan.  Allstate's analysis found that, despite JPMorgan Defendants' representations, a substantial number of the mortgage loans had LTV ratios greater than 100%, as follows:

| Asset | Percentage of Loans Represented to Have LTVs Greater than 100% | Actual Percentage of Loans With LTVs Greater than 100% | Prospectus Understatement of Percent of Loans Already Underwater |
|---|---|---|---|
| JPMAC 2005-OPT2 | 0.00% | 17.13% | 17.13% |
| JPALT 2006-2A | 0.00% | 11.38% | 11.38% |
| JPMAC 2006-CH2 | 0.00% | 20.02% | 20.02% |
| JPMAC 2006-CW2 | 0.00% | 16.88% | 16.88% |
| JPMAC 2007-CH1 | 0.00% | 15.89% | 15.89% |
| JPMAC 2007-CH2 | 0.00% | 22.86% | 22.86% |

207.    Allstate also analyzed the weighted average LTV ratio of the mortgage loans in each pool and found that these too were overstated, as follows:

| Asset | Represented Weighted Average LTV | Actual Weighted Average LTV | Prospectus Understatement |
|---|---|---|---|
| JPMAC 2005-OPT2 | 79.00% | 84.86% | 5.86% |
| JPALT 2006-2A | 75.67% | 85.65% | 9.98% |
| JPMAC 2006-CH2 | 77.51% | 88.72% | 11.21% |

| Asset | Represented Weighted Average LTV | Actual Weighted Average LTV | Prospectus Understatement |
|---|---|---|---|
| JPMAC 2006-CW2 | 79.31% | 83.73% | 4.42% |
| JPMAC 2007-CH1 | 75.40% | 83.58% | 8.18% |
| JPMAC 2007-CH2 | 77.49% | 88.71% | 11.22% |

208.    Other JPMorgan Offering Materials, particularly for those deals with a large

number of second-lien loans, focus more on the CLTV statistics of the underlying loans.  This is

because those statistics should take into account the total value of the liens on the property.

Again, like with the LTV statistics, the JPMorgan Offering Materials grossly misrepresent the

number of loans that had CLTV ratios higher than 100%:

| Asset | Percentage of Loans Represented to Have CLTVs Greater than 100% | Actual Percentage of Loans With CLTVs Greater than 100% | Prospectus Understatement of Percent of Loans Already Underwater |
|---|---|---|---|
| JPMAC 2006-CH2 | 0.00% | 44.04% | 44.04% |
| JPMAC 2006-CW2 | 0.00% | 37.81% | 37.81% |
| JPMAC 2007-CH1 | 0.00% | 41.01% | 41.01% |
| JPMAC 2007-CH2 | 0.00% | 39.52% | 39.52% |

209.    Even when the JPMorgan Offering Materials disclosed that the mortgage loans

had high CLTV ratios, they significantly understated how high.  For example, the weighted

average CLTV ratio for JPMAC 2007-CH1 was understated by 18.61%.

210.    JPMorgan Defendants did not genuinely believe the appraised values were

reasonable estimations of the properties' values at the time they were given.  JPMorgan

Defendants knew that the appraisals were being inflated to allow borrowers to be approved for

loans that they could not afford.  As such, they knew the LTV and CLTV statistics were baseless.

### (2)    The WaMu Offerings

211.    Applying the AVM to the available data for the loans underlying the WaMu

Certificates produced the same results.  The AVM indicates that the percentage of loans with

LTV ratios greater than 80% was much higher than represented in the WaMu Offering Materials,

as shown in the chart below:

| Asset | Percentage of Loans Represented to Have LTVs Greater than 80% | Actual Percentage of Loans With LTVs Greater than 80% | Prospectus Understatement of Percent of Loans With High LTVs |
|---|---|---|---|
| WaMu 2006-AR5 | 5.02% | 51.31% | 46.28% |
| WaMu 2006-AR9 | 1.07% | 52.08% | 51.01% |
| WaMu 2006-AR11 | 4.66% | 61.19% | 56.53% |
| WaMu 2007-OA1 | 4.35% | 59.11% | 54.76% |
| WaMu 2007-HY7 | 2.16% | 68.91% | 66.75% |

212.    Allstate's loan-level analysis also found that, despite WaMu Defendants'

representations, a substantial number of the Mortgage Loans had LTV ratios greater than 100%:

| Asset | Percentage of Loans Represented to Have LTVs Greater than 100% | Actual Percentage of Loans With LTVs Greater than 100% | Prospectus Understatement of Percent of Loans Already Underwater |
|---|---|---|---|
| WaMu 2006-AR5 | 0% | 10.44% | 10.44% |
| WaMu 2006-AR9 | 0% | 10.01% | 10.01% |
| WaMu 2006-AR11 | 0% | 19.54% | 19.54% |
| WaMu 2007-OA1 | 0% | 13.69% | 13.69% |
| WaMu 2007-HY7 | 0% | 24.56% | 24.56% |

213.    Allstate also found that WaMu Defendants misrepresented the weighted average

LTV ratios, as follows:

| Asset | Represented Weighted Average LTV | Actual Weighted Average LTV | Prospectus Understatement |
|---|---|---|---|
| WaMu 2006-AR5 | 70.90% | 84.94% | 14.04% |
| WaMu 2006-AR9 | 69.85% | 83.34% | 13.49% |
| WaMu 2006-AR11 | 69.91% | 82.93% | 13.02% |
| WaMu 2007-OA1 | 70.50% | 89.64% | 19.14% |
| WaMu 2007-HY7 | 68.33% | 92.87% | 24.54% |

214.    The WaMu Offering Materials likewise misrepresented the number of loans that

had CLTV ratios higher than 80% and 100%.  The AVM indicates that the percentage of loans

with CLTV ratios greater than 80% was much higher than represented in the WaMu Offering

Materials, as shown in the chart below:

| Asset | Percentage of Loans Represented to Have CLTVs Greater than 80% | Actual Percentage of Loans With CLTVs Greater than 80% | Prospectus Understatement of Percent of Loans With High CLTVs |
|---|---|---|---|
| WaMu  2006-AR5 | 21.54% | 62.32% | 40.78% |
| WaMu  2006-AR9 | 23.23% | 66.25% | 43.03% |
| WaMu  2006-AR11 | 17.69% | 61.19% | 43.50% |
| WaMu  2007-OA1 | 26.31% | 67.54% | 41.24% |
| WaMu 2007-HY7 | 25.02% | 78.01% | 52.99% |

215.    Allstate's loan-level analysis also found that, despite WaMu Defendants'

representations, a substantial number of the Mortgage Loans had CLTV ratios greater than

100%:

| Asset | Percentage of Loans Represented to Have CLTVs Greater than 100% | Actual Percentage of Loans With CLTVs Greater than 100% | Prospectus Understatement of Percent of Loans Already Underwater |
|---|---|---|---|
| WaMu  2006-AR5 | 0% | 19.07% | 19.07% |
| WaMu  2006-AR9 | 0% | 19.93% | 19.93% |
| WaMu  2006-AR11 | 0% | 19.54% | 19.54% |
| WaMu  2007-OA1 | 0% | 25.57% | 25.57% |
| WaMu 2007-HY7 | 0% | 37.81% | 37.81% |

216.    Much like the JPMorgan Offering Materials, even when the WaMu Offering

Materials disclosed that the mortgage loans had high CLTV ratios, they significantly understated

how high.  The weighted average CLTV ratio for WaMu 2007-OA1 was understated by 23.21%,

and the understatement for WaMu 2007-HY7 was 19.04%.

217.    Like the JPMorgan Defendants, WaMu Defendants did not genuinely believe the

appraised values were reasonable estimations of the properties' values at the time they were

given.  Indeed, an internal WaMu document published during the Senate's recent hearings on the

financial crisis notes that the Office of Thrift Supervision ("OTS") formally criticized the

Company because "WaMu (non appraisal) employees were able to inappropriately influence

values of appraisals."

### (3)     The Bear Stearns Offerings

218.     Applying the AVM to the available data for the loans underlying the Bear Stearns

Offerings also shows that a much higher percentage of loans than represented in the Bear Stearns

Offering Materials had LTV ratios higher than 80%:

| Asset | Percentage of Loans Represented to Have LTVs Greater than 80% | Actual Percentage of Loans With LTVs Greater than 80% | Prospectus Understatement of Percent of Loans With High LTVs |
|---|---|---|---|
| BALTA 2005-04 | 11.00% | 64.66% | 53.66% |
| BALTA 2006-05 | 1.73% | 66.44% | 64.70% |
| BSABS 2006-HE4 | 44.06% | 77.60% | 33.54% |

219.     Allstate's analysis also found that, despite Bear Stearns Defendants'

representations, a substantial number of the mortgage loans had LTV ratios greater than 100%:

| Asset | Percentage of Loans Represented to Have LTVs Greater than 100% | Actual Percentage of Loans With LTVs Greater than 100% | Prospectus Understatement of Percent of Loans Already Underwater |
|---|---|---|---|
| BALTA 2005-04 | 0.00% | 7.13% | 7.13% |
| BALTA 2006-05 | 0.00% | 6.94% | 6.94% |
| BSABS 2006-HE4 | 0.00% | 10.63% | 10.63% |

220.     Allstate also analyzed the weighted average LTV ratio of the mortgage loans in

each pool and found that this too was overstated:

| Asset | Represented Weighted Average LTV | Actual Weighted Average LTV | Prospectus Understatement |
|---|---|---|---|
| BALTA 2005-04 | 76.66% | 84.34% | 7.68% |
| BALTA 2006-05 | 76.09% | 86.92% | 10.83% |
| BSABS 2006-HE4 | 80.54% | 85.15% | 4.61% |

221.    The Bear Stearns Offering Materials likewise misrepresented the number of loans

that had CLTV ratios higher than 100%.  The AVM indicates that the percentage of loans with

CLTV ratios greater than 100% was much higher than represented in the Bear Stearns Offering

Materials, as shown in the chart below:

| Asset | Percentage of Loans Represented to Have CLTVs Greater than 100% | Actual Percentage of Loans With CLTVs Greater than 100% | Prospectus Understatement of Percent of Loans Already Underwater |
|---|---|---|---|
| BSABS 2006-HE4 | 0.00% | 44.60% | 44.60% |
| BSMF 2006-SL1 | 0.00% | 63.85% | 63.85% |
| SACO 2006-3 | 0.00% | 65.82% | 65.82% |
| SACO 2006-6 | 0.00% | 62.64% | 62.64% |

222.    Allstate's loan-level analysis also found that the weighted average CLTV was

significantly understated:

| Asset | Represented Weighted Average CLTV | Actual Weighted Average CLTV | Prospectus Understatement |
|---|---|---|---|
| BSABS 2006-HE4 | 86.81% | 96.03% | 9.22% |
| BSMF 2006-SL1 | 97.13% | 106.65% | 9.52% |
| SACO 2006-3 | 97.61% | 107.43% | 9.82% |
| SACO 2006-6 | 97.13% | 104.73% | 7.60% |

223.    Like the other Defendants, Bear Stearns Defendants did not genuinely believe the

appraised values were reasonable estimations of the properties' values at the time they were

given.  Bear Stearns Defendants knew that the appraisals were being inflated to allow borrowers

to be approved for loans that they could not afford.  As such, they knew the LTV and CLTV

statistics were baseless.

**D.    Other Statistical Evidence Demonstrates That The Problems In Defendants'
      Loans Were Tied To Underwriting Guideline Abandonment**

224.    As depicted by the data above and in the accompanying charts, the mortgage

loans underlying Allstate's Certificates have experienced unprecedented rates of delinquencies,

foreclosures, real estate owned after the servicer foreclosed on the property underlying the

mortgage loans ("REOs"), and bankruptcies.  Other studies have corroborated this result.  For

example, the rates of 60-day or greater delinquencies, foreclosures, REOs and bankruptcies on

the mortgage loans underlying JPMAC 2006-CH2 have skyrocketed in recent years, whereas the

loans underlying JPMMT 2003-A2—largely originated only three years earlier—have

experienced much lower rates of delinquencies, foreclosures, REOs and bankruptcies.  Allstate

purchased approximately $15 million worth of certificates in the JPMAC 2006-CH2 Offering.



Source:  Bloomberg.

225.    The JPMAC 2006-CH2 Prospectus Supplement specifically highlighted that, at

issuance, only 1.3% of the loans (representing 1.4% of the scheduled principal balance) were

between 30-60 days delinquent, and there were no later delinquencies, foreclosures, REOs or

bankruptcies.  Currently, however, approximately 9.07% are 30 days delinquent, 18.89% are in foreclosure, and 10.56% are REOs.

226.    Based on extensive empirical studies of mortgage loans made and sold into securitizations during this period, economists at the University of Michigan and elsewhere found that the high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

227.    These studies have found that the number of loans relating to Bear Stearns or its affiliates that suffered from a particular performance problem – 60 or more days delinquent as of six months after origination – skyrocketed beginning in mid-2006, *i.e.*, around the time many of the mortgage loans at issue here were being originated and securitized.  This drastic change did not occur because of a change in the claimed FICO or LTV scores:



228.    A study conducted by the F.B.I. has also linked the rate of delinquencies to widespread misrepresentations in the underwriting of loans.  The F.B.I. investigated three million residential mortgages, and found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  Loans containing egregious misrepresentations were **five times** more likely to default in the first six months than loans that did not.

229.    These additional studies confirm the results of Allstate's own loan-by-loan statistical analysis – Defendants were systematically abandoning their underwriting standards in creating and characterizing the Mortgage Loans.

E.    **Evidence Demonstrates That Credit Ratings Were A Garbage-In, Garbage-Out Process**

230.    The supposedly-independent ratings given to the Certificates by the major credit rating agencies were based on the loan profiles fed to the agencies by Defendants.  As previously

explained, key components of that data were false.  As such, Defendants essentially pre-determined the ratings by feeding garbage into the ratings system.  This rendered misleading Defendants' representations concerning the significance of the Certificates' credit ratings because Defendants failed to disclose that the ratings would be based entirely on information provided by Defendants themselves, and therefore would not reflect the true credit risk associated with the Certificates.

231.    As previously noted, the credit ratings of the Offerings at issue have plummeted as the true quality of the collateral pools and the true nature of Defendants' misconduct have been revealed, and as the ratings agencies have obtained more accurate information regarding the Offerings at issue.  The ratings history for all of Allstate's Certificates is set forth in Exhibit C.

**F.    Evidence From Defendants' Own Documents And Former Employees Demonstrates That The Representations In Defendants' Offering Materials Were False**

**(1)    The JPMorgan Offerings**

232.    Many of the mortgage loans backing the JPMorgan Certificates that Allstate purchased were originated by CHF, the home mortgage division of Defendant JPMC Bank.  Overall, 61.48% of all the mortgage loans underlying the JPMorgan Offerings were originated by CHF, far more than any other originator.  For three JPMorgan Trusts, CHF was responsible for as many as 100% of the underlying mortgage loans.  Specifically, JPMC Bank, through CHF, originated all the loans in the following offerings:  JPMAC 2006-CH2, JPMAC 2007-CH1 and JPMAC 2007-CH2.  All of Allstate's Certificates from these offerings are currently rated as non-investment grade.

233.    The JPMorgan Offering Documents contain material misstatements and omissions related to CHF's underwriting standards because CHF:  (1) systematically disregarded and regularly made exceptions to its underwriting guidelines in the absence of compensating factors;

and (2) largely disregarded appraisal standards and did not prepare appraisals in conformity with Fannie Mae or Freddie Mac appraisal standards.

234.    CHF's departure from underwriting standards was confirmed by James Dimon, CEO of JPMorgan Chase.  Mr. Dimon testified under oath to the FCIC on January 13, 2010 that "the underwriting standards of our mortgage business should have been higher.  We have substantially enhanced our mortgage underwriting standards, essentially returning to traditional 80 percent loan to value ratios and requiring borrowers to document their income."  Mr. Dimon also testified that the increase in Alt-A and subprime loan products allowed loans to be underwritten even if they were based on speculative or falsified data and produced in a sales-driven culture:

> I think it's also true there were some bad products and some bad actors and excess speculation.  Well, I think as it turned out, you know, option ARMs were not a great product.  I think certain subprime, Alt-A products weren't great products.  I think there were some—there were some unscrupulous mortgage salesmen and mortgage brokers.  And, you know, some people missold. And there was a lot of speculation, far too many people buying second and third homes using these things, as opposed to the place you're going to live.

235.    When asked whether JPMorgan conducted stress tests in order to prevent its exposure to these systemic risks and what risk management procedures were in place, Mr. Dimon replied:  "[i]n mortgage underwriting, somehow we just missed, you know, that home prices don't go up forever and that it's not sufficient to have stated income in home [loans]." Mr. Dimon has also been quoted as saying,"[t]here was a large failure of common sense" because "[v]ery complex securities shouldn't have been rated as if they were easy-to-value bonds."

236.    CHF also relied heavily on third parties to originate loans.  For example, approximately 24% of CHF loans which made up the JPMAC 2006-CH2 Trust came through its call center, while the remainder of the loans came from its wholesale, correspondence, and retail operations from third-party mortgage brokers.  Mr. Dimon testified that these broker-loans performed markedly worse:  "We've also closed down most—almost all of the business originated by mortgage brokers where credit losses have generally been over two times worse than the business we originate ourselves," and admitted that "there were some unscrupulous mortgage salesmen and mortgage brokers."

237.    The problems admitted to by Mr. Dimon have been corroborated and expanded upon in many different investigations of JPMorgan entities and numerous legal actions that have been brought against them as a result.  On information and belief, witnesses will testify in this action that during the relevant period:

- CHF underwriters faced intense pressure to close loans at any cost, due in large part to the fact that their salaries were dependent upon the quantity of loans they originated.  This pressure for volume resulted in underwriting errors.

- CHF management would often override the decisions of underwriters to reject a loan.  In 2006, approximately 20% to 30% of the loans approved by CHF were based on management overriding underwriters' initial rejection of the loans.

- CHF underwriters would use lax income verification techniques, were discouraged from verifying income information, and were encouraged to

make exceptions for the "reasonableness" of the stated income amounts on applications.

- CHF underwriters were often not provided with all of the relevant borrower information, and certain data, such as credit scores and income, were susceptible to manipulation, especially with low documentation loans.

238. The JPMorgan Offering Materials also contain untrue statements and omissions regarding the appraisals for the collateral underlying the Offerings because the JP Morgan Defendants' appraisers and originators systematically failed to follow accepted appraisal guidelines, resulting in pervasive appraisal inflation. On information and belief, witnesses will testify in this action that during the relevant period:

- CHF underwriters were in control of the appraisal process, because they were on a commission-only pay structure and were motivated to close as many loans as possible, regardless of quality.

- CHF underwriters would pressure appraisers to appraise properties at artificially high levels or threaten not to hire the appraiser again. In some instances, CHF underwriters would state on the appraisal request the target price in order for the mortgage to be approved.

- CHF appraisals were often done on a "drive-by" basis, and in some instances, the underlying properties were not inspected at all; property value was determined by merely checking comparables in the area online.

- The process used by CHF during this period did not conform to USPAP appraisal guidelines. CHF's management department pushed appraisers to complete the appraisals without the reports required by law.

239.    Alan Hummel, Chair of the Appraisal Institute, in his testimony before the Senate Committee on Banking noted that the dynamic of financial dependence between appraisers and underwriters created a "terrible conflict of interest," where appraisers "experience systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists."

240.    Appraisals of the properties underlying the mortgage loans supporting the JP Morgan Certificates were inaccurate and inflated, and not performed in accordance with professional appraisal practices. As a result of the inflated appraisals, the LTV ratios contained in the JPMorgan Offering Materials materially overstated borrowers' equity in their homes and failed to disclose that the mortgaged properties would be inadequate to cover the full loan balance in the event of foreclosure.

### (2)    The WaMu Offerings

241.    With the market for conventional, fixed-rate loans drying up, in 2005, WaMu formalized a strategy to move away from low risk to high risk home loans. As James G. Vanasek, WMB's former Chief Credit Officer/Chief Risk Officer, testified to the PSI, by mid-2005, WMB's focus had shifted "to becoming more of a higher risk, sub-prime lender . . . This effort was characterized by statements advocating that the company become either via acquisition or internal growth a dominant sub-prime lender." According to documents recently released by the PSI, in April 2006, the President of WaMu's Home Loans Division gave a presentation to the WaMu Board of Directors entitled "Shift to Higher Margin Products." The presentation showed that the least profitable loans were government-backed and fixed loans; the

most profitable were Option ARM, Home Equity, and Subprime Loans.  Subprime, at 150 basis

points, was eight times more profitable than a fixed loan at 19 basis points.

242.    In its push to generate more risky loan products, WMB pressed its sales agents to

pump out loans while disregarding underwriting guidelines.  WMB gave mortgage brokers

handsome commissions for selling the riskiest loans, which carried higher fees, bolstering profits

and ultimately the compensation of the bank's executives.  "It was the Wild West," said Steven

M. Knobel, founder of an appraisal company, Mitchell, Maxwell & Jackson, that did business

with WaMu until 2007.  "If you were alive, they would give you a loan.  Actually, I think if you

were dead, they would still give you a loan."  Indeed, Mr. Vanasek testified that "[b]ecause of

the compensation systems rewarding volume vs. quality and the independent structure of the loan

originators, I am confident that at times borrowers were coached to fill out applications with

overstated incomes or net worth adjusted to meet the minimum underwriting policy

requirements."

243.    WaMu's own internal documents confirm these accounts.  An internal WaMu

presentation shows that WaMu targeted unsophisticated borrowers for its high-risk Option ARM

loans.  The presentation states that appropriate "Option ARM Candidates" are:

- Savvy Investors

- **First Time Home Buyers**

- High Income Earners

- Self Employed Borrowers

- **Retired Borrowers**

- Real Estate Agents

(Emphasis added.)  The next page of the same presentation further explains that WaMu's target borrowers were of:

- All Ages

- Any Social Status

- All Economic Levels

244.    In other words, WaMu pushed its Option ARM loans on borrowers regardless of their sophistication, income level, or financial stability.  Fay Chapman, WaMu's former Chief Legal Officer, candidly admitted to the *Seattle Times*, that "[m]ortgage brokers put people into the product who shouldn't have been."  Another former WaMu employee, Renee Larsen, related that borrowers did not know they were getting cheated because the loan was so difficult to understand.  Yet, sales of these high-risk loans soared.  In 2003, WaMu originated $32.3 billion of Option ARM loans.  By 2005, that number had doubled to $64.1 billion.

245.    One reason WaMu could increase its volume of high-risk home loans so rapidly was its employee compensation structure.  In a document entitled "2007 Product Strategy," WaMu noted that it must "maintain a compensation structure that supports the high margin product strategy."  A compensation grid from 2007 shows the company paid the highest commissions on Option ARMs, subprime loans and home-equity loans:  A $300,000 Option ARM, for example, would earn a $1,200 commission, versus $960 for a fixed-rate loan of the same amount.  The rates increased as a consultant made more loans; some regularly pulled down six-figure incomes.  Likewise, a WaMu "Retail Loan Consultant 2007 Incentive Plan" explained that "[i]ncentive tiers reward high margin products . . . such as the Options ARM, Non-prime referrals and Home Equity Loans . . . WaMu also provides a 15 bps 'kicker' for selling 3 year prepayment penalties."

246.    Another reason WaMu could originate so many high–risk loans is because its underwriting guidelines became so loose as to render them effectively meaningless. Notwithstanding that, according to regulatory agencies including the FDIC and the OTS, "prime" loans should have been available only to borrowers with FICO scores of 660 or above, WaMu regularly made loans to borrowers with FICO scores well below this standard.  A recently published WaMu training document for subprime loan production employees, entitled "Specialty Lending UW [Underwriter] HLCA [Home Loans Credit Authority] Training," revised September 26, 2007, makes clear that, regardless of a borrowers' credit history or actual potential to repay a loan, if the borrower had a FICO score over 619, he or she was considered a "prime" borrower.

247.    In another stunning example, WaMu instructed its underwriters that if a borrower applied for a "5/1 Amortizing ARM" and had a bankruptcy "less than 4 years ago," but a FICO score of 621, that borrower should still be considered "prime."  In fact, on information and belief, borrowers with credit scores as low as 540 (well below any accepted prime threshold) were approved for "prime" loans during the relevant period.

248.    However, even these already-loose standards were systematically abandoned in the pursuit of volume and profits.  In a recently-surfaced internal newsletter dated October 31, 2005, risk managers were told they needed to "shift (their) ways of thinking" away from acting as a "regulatory burden" on the company's lending operations and toward being a "customer service" that supported WaMu's five-year growth plan.  Melissa Martinez, WaMu's Chief Compliance and Risk Oversight Officer, told risk managers that they were to rely less on examining borrowers' documentation individually and more on automated processes.

249.    It was recently revealed that, on September 28, 2007, WaMu's Corporate Credit Review ("CCR") Team circulated an internal report on first payment defaults in Wholesale Specialty Lending.  The report determined that "[c]redit weakness and underwriting deficiencies is a repeat finding with CCR.  It was also identified as a repeat finding and Criticism in the OTS Asset Quality memo 3 issued May 17, 2007."  It additionally concluded that fraud detection tools "are not being utilized effectively by the Underwriters and Loan Coordinator," and "the credit infrastructure is not adhering to the established process and controls."

250.    In a November 2, 2008 *New York Times* article entitled "Was There a Loan It Didn't Like?," former WaMu Senior Mortgage Underwriter Keysha Cooper, who started at WaMu in 2003 and left in 2007, explained that "[a]t WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify.  Instead, it was how many loans did you guys close and fund?"  According to the article, "[i]n February 2007, . . . the pressure became intense.  WaMu executives told employees they were not making enough loans and had to get their numbers up . . . ."  Ms. Cooper concluded, "I swear 60 percent of the loans I approved I was made to. . . . If I could get everyone's name, I would write them apology letters."

251.    Nancy Erken, a former WaMu loan consultant in Seattle, told the *Seattle Times* in December 2009, that "[t]he big saying was 'A skinny file is a good file."  She would "take the files over to the processing center in Bellevue and they'd tell me 'Nancy, why do you have all this stuff in here?  We're just going to take this stuff and throw it out," she said.  Fay Chapman, WaMu's Chief Legal Officer from 1997 to 2007, relayed that, on one occasion, "[s]omeone in Florida made a second-mortgage loan to O.J. Simpson, and I just about blew my top, because there was this huge judgment against him from his wife's parents."  When she asked how they

could possibly foreclose it, "they said there was a letter in the file from O.J. Simpson saying 'the judgment is no good, because I didn't do it.'"

252.    According to Tom Golon, a former senior home loan consultant for WaMu in Seattle, Countrywide "was held up as the competitor, because they would do anything – low-doc, no-doc, subprime, no money down." The WaMu staff was subjected to "total blanketing – e-mails, memos, meetings set up so people understood that this was what the company wanted them to do."

253.    Various witnesses with direct experience in WaMu's underwriting operations will also testify that, during the relevant period, exceptions to WaMu's already loose underwriting guidelines were the rule. For example, in testimony before the PSI, Mr. Vanasek admitted that adherence to policy "was a continual problem at Washington Mutual where line managers particularly in the mortgage area not only authorized but encouraged policy exceptions."

254.    Moreover, contrary to WaMu Defendants' misrepresentations, WaMu did **not** underwrite its Option ARM loans to the fully-indexed rate. Throughout the relevant period until late 2007, WaMu had underwritten its Option ARM loans to ensure only that the borrower could make monthly payments at the lower "teaser" rate. A WaMu document entitled "Mortgage Securities Corp. Seller Guide Update – Announcement Concerning Qualifying Rate and Qualifying Payment for Hybrid ARM, IO, and Option ARM Products" indicates that only on August 1, 2007 did WaMu Option ARM loan underwriting change to require qualification for such loans at the fully-indexed rate. Importantly, a majority of the WaMu Offerings at issue in this case securitized Option ARM loans originated in 2005 through 2007.

255.    WaMu's internal documents (only recently made available) also show that, toward the end of 2006 and the beginning of 2007, WMB started to see rising delinquency and

default rates in its mortgage loans, particularly among Option ARM loans.  WaMu thus made a

deliberate decision at the highest levels to "off-load" these loans through securitization and sale

to investors.  In a recently published October 17, 2006 presentation to WMB's Board of

Directors, David Schneider, the former President of WaMu Home Loans, described one of

WMB's "Mitigating Procedures" as "[p]eriodic non performing asset sales to manage credit

risk."  It has also been freshly discovered that, on February 14, 2007, David Beck, at the time an

Executive Vice President at WCC, sent an e-mail to Mr. Schneider and Cheryl Feltgen, Chief

Credit Officer for Home Loans, observing that "[t]he performance of newly minted option arm

loans is causing us problems . . . We should address selling 1Q as soon as we can before we

loose [sic] the oppty."  Ms. Feltgen responded that:

> California, Option ARMs, large loan size ($1 to $2.5 million) have
> been the fastest increasing delinquency rates in the SFR [Single
> Family Residential] portfolio. . . . Our California concentration is
> getting close to 50% and many submarkets within California
> actually have declining house prices according to the most recent
> OFHEO data from third quarter of 2006.  There is a meltdown in
> the subprime market which is creating a "flight to quality." . . .
> There is still strong interest around the world in US residential
> mortgages.  Gain on sale margins for Option ARMs are attractive.
> **This seems to me to be a great time to sell as many Option
> ARMs as we possibly can.**  [CEO] Kerry Killinger was certainly
> encouraging us to think seriously about it at the MBR last week.

(Emphasis added.)

256.    Ms. Feltgen then forwarded these e-mails to additional WaMu executives, noting:

"We are contemplating selling a larger portion of our Option ARMs than we have in the recent

past.  Gain on sale is attractive and this could be a way to address California concentration,

**rising delinquencies**, falling house prices in California with a favorable arbitrage given that the

market seems not yet to be discounting a lot for those factors."  (Emphasis added.)  As noted

above, the majority of the WaMu Offerings that are the subject of this action securitized the very

types of loans that Ms Feltgen and other senior WaMu executives identified – Option ARM

loans originated from 2005 through 2007 with high concentrations in California.

257.    In response to Ms. Feltgen's e-mail, on February 20, 2007, Robert Shaw, Senior

Credit Officer at WaMu, sent an analysis of the delinquency rates in WaMu's investment

portfolio.  Mr. Shaw explained that the results "show that seven combined factors contain $8.3

billion HFI [Hold for Investment] Option ARM balances which experienced above-average

increases in the 60+ delinquency rate during the last 12 months (a 821% increase, or 10 times

faster than the average increase of 70%)."  Accordingly, Mr. Shaw "recommend[ed] that we

select loans with some or all of these characteristics to develop a HFS [Hold for Sale] pool."

258.    Needless to say, none of these documents were disclosed to investors, such as

Allstate, but were only recently revealed by the PSI.  WaMu Defendants did not disclose that

WMB was pushing high risk loans on borrowers who could not afford them.  Nor did they

disclose that WMB had effectively lowered its underwriting standards to such an extent as to

render them meaningless, or that they were granting exceptions without regard to loan quality.

Likewise, WaMu Defendants did not disclose that they were selling assets that they knew would

underperform in order to shift "credit risk" off their books.  It goes without saying that had

Allstate known these facts, it never would have acquired the WaMu Certificates.

### (3)    The Long Beach Offerings

259.    Long Beach was acquired by WaMu in 1999.  Long Beach served as WMB's

subprime loan origination division until January 1, 2006, and was thereafter known as WMB's

"specialty mortgage lending" channel.  Some of the programs at Long Beach included stated

income loans for W-2 wage earners, a program that started in 2005.  Stated-income programs, to

the extent that lenders accepted them, were traditionally reserved for self-employed borrowers

with significant assets.  At Long Beach, however, these "liar's loans" were common, even for

those borrowers who were not self-employed.  Long Beach would also approve 100% financing

for stated-income borrowers with FICO scores as low as 500.

260.    There was also a "three letters of reference" program for self-employed

borrowers, where a borrower only had to submit three letters of reference from anyone for whom

they supposedly worked.  No attempt was made to verify the information in the letters.  Some of

the accepted letters included statements such as:  "So-and-so cuts my lawn and does a good job."

At Long Beach, FICO scores ranged from 500-620, but Long Beach salespeople considered a

borrower with a 620 FICO score to have good credit.

261.    Borrowers could get a loan with no established FICO score merely by providing

"three alternative trade lines."  An "alternative trade line" was anything that did not appear on

the borrower's credit report, including documentation of car insurance payments, verification of

rent payment, or a note from a person claiming the borrower had repaid a personal debt.  Long

Beach originated a significant amount of these types of problematic loans.  These loans made up

the majority of first payment defaults – *i.e.*, loans on which the borrower failed to make even the

first payment – during the end of 2006.

262.    As a result of these and other practices, in January 2004, the FDIC and the State

of Washington sent a report to WaMu's Board concerning, *inter alia*, "unsatisfactory

underwriting practices at affiliate Long Beach Mortgage Company."  The recently released

report noted an internal report dated July 31, 2003, which found that "40% (109 of 271) of loans

reviewed were considered unacceptable due to one or more critical errors.  This raised concerns

over LBMC's ability to meet the representations and warranty's [sic] made to facilitate sales of

loan securitizations."  It further noted that a second report in August 2003 had "reached similar

conclusions and disclosed that LBMC's credit management and portfolio oversight practices

were unsatisfactory."  The FDIC-Washington examiners themselves found that, out of 4,000

loans reviewed, "approximately, 950 were deemed saleable, 800 were deemed unsalable, and the

remainder contained deficiencies requiring remediation prior to sale."  The examiners concluded

that "[t]he culture, practices, and systems at Long Beach Mortgage Company are inconsistent

with the lending activity of the bank."

263.    In a recently discovered internal November 2005 report entitled "LBMC Post

Mortem," the authors concluded that Long Beach's "[u]nderwriting guidelines are not

consistently followed and conditions are not consistently or effectively met."  What is more,

"[u]nderwriters are not consistently recognizing non-arm's length transactions and/or

underwriting associated risk effectively."

264.    Another recently surfaced April 17, 2006 report from WaMu's General Auditor,

Randy Melby, to the Audit Committee of WaMu's Board of Directors, discussed Long Beach's

"relaxed credit guidelines, breakdowns in manual underwriting processes, and inexperienced

subprime personnel."  Mr. Melby concluded that "[t]hese factors, coupled with a push to increase

loan volume and the lack of an automated fraud monitoring tool, exacerbated the deterioration in

loan quality."

265.    Ten days later, on April 27, 2006, Steve Rotella, WaMu's COO informed

WaMu's Chairman and CEO, Kerry Killinger, that Long Beach "delinquencies are up 140% and

foreclosures close to 70% . . . First payment defaults are way up and the 2005 vintage is way up

relative to previous years.  It is ugly."  In another recently uncovered e-mail, Mr. Rotella

commented two weeks later that "LBMC is terrible" due, among other things to, "repurchases,

EPDs, manual underwriting, very weak servicing/collections practices and a weak staff."

266.    In a freshly disclosed December 11, 2006 e-mail from Cynthia Abercrombie,

Senior Vice President/Senior Risk Officer to Ron Cathcart, WaMu's Chief Enterprise Risk

Officer, Ms. Abercrombie noted that post-funding reviews of Long Beach loans identified the

following issues:

- Appraisal deficiencies that could impact value and were not addressed
- Material misrepresentations relating to credit evaluation were confirmed
- Legal documents were missing or contained errors or discrepancies
- Credit evaluation or loan decision errors
- Required credit documentation was insufficient or missing from the file.

The conclusion of the reviews was "a lack of proper execution of the credit guidelines" and

"weakness in controls around clearing conditions."  In response, Mr. Cathcart admitted that

"Long Beach represents a real problem for WaMu."

267.    On August 20, 2007, WaMu Audit Services issued a report (recently made public)

entitled "Long Beach Mortgage Loan Origination & Underwriting."  The report was sent to

WaMu's most senior executives, including Mr. Killinger, Mr. Rotella, Mr. Melby, Mr. Schneider

and Mr. Cathcart.  Among its conclusions were:

- Underwriting guidelines established to mitigate the risk of unsound underwriting are not always followed and decision-making methodology is not always fully documented.

- [F]ocused areas of improvement for LMB are appraisal deficiencies, credit evaluation or loan decision errors, unaddressed fraud alerts, missing legal documents, material misrepresentations relating to credit evaluations, debt capacity or debt ratio error, missing title report, insufficient credit documentation, invalid or insufficient signing authority, misrepresentation in appraisal information, missing Final HUD 1 statements that when obtained had unaddressed issues.

90

- Policies and procedures defined [sic] to allow and monitor reasonable and appropriate exceptions to underwriting guidelines are not consistently followed.

268.    On information and belief, testimony by former Long Beach and WMB employees will tell the same story.  In a 2009 interview with the *Huffington Post Investigative Fund*, Diane Kosch, a former member of Long Beach's quality control team, stated that "[m]ost of the time everything that we wanted to stop the loan for went above our heads to upper management."  Quality team members became so suspicious, she said, that they started making copies of problem files to protect themselves.  Karen Weaver, a former underwriter in Long Beach's Atlanta office, attested that a lot of brokers "were making up pay stubs and presenting that."  A former Long Beach account executive for Colorado sales, Pam Tellinger, admitted she "knew brokers who were doing fraudulent documents all day long."  Antoinette Hendryx, a former underwriter and team manager at Long Beach in California, described how account executives would "offer kickbacks of money" to underwriters to get questionable loans approved.

269.    On information and belief, various witnesses with direct experience in Long Beach's underwriting operations will also testify that, during the relevant period, exceptions to Long Beach's already loose underwriting guidelines were ubiquitous.  If Long Beach's competitors could not approve a loan, it was known to send the loan to Long Beach who would make an exception to get the loan through.  If an underwriter at Long Beach refused to force a file through, they would be written up; not because they made a bad decision but because the sales team did not like their decision.

270.    Not wanting to be stuck with thousands of loans originated pursuant to fundamentally defective underwriting practices, WaMu deliberately selected the worst performing Long Beach loans to securitize and sell to investors.  At the conclusion of his e-mail

describing Long Beach's performance as "ugly," discussed above, Mr. Rotella informed Mr.

Killinger that he has "asked the guys to work with Beck's group to see if we could package and

sell any of the bad portfolio product flat."  In response, Mr. Killinger suggested that "[w]e may

want to continue to sell most of the Long Beach originations until everyone gets comfortable

with credit."

271.    Although adverse selection of the underlying loans would obviously have been a

material fact to Allstate, this was never disclosed.  Instead, Long Beach Defendants were happy

to offload mortgages they knew had been improperly underwritten to unsuspecting investors,

such as Allstate, and let them assume risk until WaMu got "comfortable with credit.".

### (4)    The Bear Stearns Offerings

272.    Bear Stearns Defendants' own conduct unambiguously shows that they

themselves believed their underwriting practices were defective.  At the height of the mortgage-

backed securities boom, even as they were securitizing loans at a record pace, Bear Stearns

Defendants were secretly submitting billions of dollars of repurchase claims to loan originators

for defective loans.  By 2006, the accrued number of non-compliant loans purchased by EMC

was so high that its quality control and claims departments were overwhelmed by the sheer

volume of repurchase claims that needed to be processed.  A recently discovered February 28,

2006 internal audit report identified "a significant backlog for collecting from and submitting"

9,000 outstanding repurchase claims to sellers, worth over $720 million.  The report went on to

conclude that the procedures in place were insufficient to process, collect, resolve, and monitor

so many claims.

273.    Over time, the number of repurchase claims made by EMC to sellers of defective

mortgage loans continued to rise.  Through October 31, 2005, EMC had resolved a total of $1.7

billion in claims.  But in 2006 alone, EMC filed $2.5 billion in claims, an increase of 78% from

the prior year, and resolved $1.7 billion of claims, an increase of over 227% from the previous

year.  EMC's internal reports show that it submitted repurchase claims against originators on the

grounds that (a) borrowers failed to disclose existing liabilities at the time of origination; and (b)

the loans violated underwriting guidelines and were originated through fraud, error, negligence,

misrepresentation or material omission.  On information and belief, at least some of EMC's

repurchase claims involved loans in the mortgage pools underlying the Bear Stearns Certificates

purchased by Allstate.  As such, the Bear Stearns Offering Materials materially understated the

number of loans that were not compliant with the represented underwriting guidelines.

274.     Moreover, recently disclosed documents reveal that a quality control sampling

review commissioned by EMC concluded that a substantial percentage of the loans it securitized

were defective.  EMC hired a third party firm, Adfitech, Inc. ("Adfitech"), to "review loans to

evaluate if they meet investor quality guidelines, if sound underwriting judgment was used, and

if the loan is devoid of all misrepresentation or fraud characteristics."  Based on its analysis of a

sample of EMC's loans, Adfitech discovered that **38.8%** of the loans were defective under

EMC's quality control guidelines.  On information and belief, some of these defective loans

tested by Adfitech were included in the Bear Stearns Offerings.  The results of Adfitech's loan

analysis further highlight the material misrepresentations regarding loan quality and underwriting

guidelines that pervaded the Bear Stearns Offering Materials.

275.     In a May 2010 article, *The Atlantic* interviewed a former EMC mortgage analyst,

Matt Van Leeuwen, who was with the company between 2004 and 2006.  Among other things,

Mr. Leeuwen revealed that:  (a) Bear Stearns pushed EMC analysts to perform their loan

analyses of the underlying mortgages in only one to three days so that Bear Stearns would not

have to hold the loans on its books; (b) EMC analysts were encouraged to falsify loan data (such

93

as FICO scores) if that information was missing from the loan file and the mortgage originators

did not respond to requests for information; (c) the documentation level (*i.e.*, no documentation,

partial documentation) of the loans was often incorrectly identified; and (d) rather than going

back to the mortgage originator for clarification, such as verification of income, Bear Stearns

would avoid investigating and make the loan "fit."

### G.    Evidence From Defendants' Third-Party Due Diligence Firm Demonstrates That Defendants Were Originating Defective Loans

276.    To fuel their mortgage securitization machines, Defendants both originated loans

through affiliated entities and purchased loans in bulk from unaffiliated originators.  Before

making bulk loan purchases, Defendants hired third-party due diligence firms to conduct a

compliance review of the proposed loan pool.  As described by the FCIC's January 2011 report,

this review covered three areas – "credit, compliance, and valuation" – which included

answering such questions as whether the "loans meet the underwriting guidelines," "comply with

federal and state laws, notably predatory-lending laws and truth-in-lending requirements," and

"were the reported property values accurate."  (FCIC Report at 166.)  It also "critically" analyzed

whether, to the extent a loan was deficient, there were any "compensating factors."  (*Id.*)

277.    Defendants used these third party due diligence firms in order to create the

appearance that an independent audit had vouched for Defendants' adherence to stated

underwriting guidelines.  This façade of credibility, in turn, induced investors like Allstate to

purchase Defendants' certificates.  Clayton Holdings, Inc. ("Clayton") was one such third party

due diligence firm hired by Defendants on a routine basis.  Recently released internal Clayton

documents show that, contrary to Defendants' representations, a startling number of loans

reviewed by Clayton were defective.

278.    Each day, Clayton generated reports for Defendants and the loan seller that summarized Clayton's review findings, including summaries of the loan files that suffered from exceptions to the relevant underwriting standards.  Some exceptions were benign, such as a credit score that was slightly below the acceptable range (*i.e.*, 680 score required, 670 actual).  Others, such as lack of an appraisal, stated income not being reasonable for the job stated, or missing critical documents in a HUD-1 form, were more severe.  Once Clayton identified exceptions, the seller had the option to attempt to cure them by providing missing documentation or otherwise explaining to Clayton why a loan complied with the underwriting standards.  If additional information was provided, Clayton re-graded the loan.  Once this process was complete, Clayton provided the underwriters with final reports.

279.    As the FCIC put it:  "[b]ecause of the volume of loans examined by Clayton during the housing boom, the firm had a unique inside view of the underwriting standards that originators were actually applying – and that securitizers were willing to accept."  (FCIC Report at 166.)  This included giving loans three grades – Grade 3 loans "failed to meet guidelines and were not approved," while a Grade 1 loan "met guidelines."  Tellingly, only 54% of the nearly one-million loans reviewed by Clayton Holdings "met guidelines," a number that its former president admitted indicated "there [was] a quality control issue in the factory" for mortgage-backed securities.

280.    Clayton's records of its work on J.P. Morgan Securities, WCC, and EMC transactions demonstrate that Defendants consistently purchased enormous quantities of defective loans to include in securitizations.  According to an internal Clayton "Trending Report" made public in September 2010, each of these Defendant underwriters was informed of a high number of defective loans in the potential mortgage pools underlying the offerings at issue in this

case, but nonetheless decided to waive large proportions of those loans into the securitizations

anyway.

281.     For instance, J.P. Morgan Securities was informed that 27% of all of its loans

reviewed by Clayton had been rejected.  Nevertheless, J.P. Morgan "waived" **51%** of those

rejected loans into securitizations.  Similarly, Clayton rejected 27% of WCC's loans, but WCC

"waived" in **29%** of the defective loans.  Clayton also rejected 16% of EMC loans, but EMC

"waived" in **42%**.  These numbers show that Defendants regularly securitized large numbers of

defective loans, including in all of Defendants' Offerings at issue here, contrary to Defendants'

representations to investors like Allstate.

282.     The hidden "waiver" of rejected loans that were not subject to any compensating

factors was a fraudulent omission and rendered Defendants' disclosures regarding their

underwriting and due diligence processes even more misleading.  As the FCIC report concluded:

> [M]any prospectuses indicated that the loans in the pool either met
> guidelines outright or had compensating factors, even though
> Clayton's records show that only a portion of the loans were
> sampled, and that of those that were sampled, a substantial
> percentage of Grade 3 loans were waived in.
>
> . . . .
>
> [O]ne could reasonably expect [the untested loans] to have many
> of the same deficiencies, at the same rate, as the sampled loans.
> **Prospectuses for the ultimate investors in the mortgage-backed
> securities did not contain this information, or information on
> how few of the loans were reviewed, raising the question of
> whether the disclosures were materially misleading, in
> violation of the securities laws.**

(FCIC Report at 167, 170 (emphasis added).)

**H.    Evidence Of Other Investigations Demonstrates The Falsity Of Defendants' Representations**

   **(1)    The WaMu and Long Beach Offerings**

283.    In April 2010, the PSI held a series of hearings "to examine some of the causes and consequences of the [financial] crisis." The hearings were based on an in-depth bipartisan investigation that began in November 2008. The PSI conducted over 100 detailed interviews and depositions, consulted with dozens of experts, and collected and reviewed millions of pages of documents.

284.    On April 13, 2010, the PSI held a hearing that focused on the role high risk loans played in the financial crisis, using WaMu as a case history. It showed how WaMu originated and sold hundreds of billions of dollars in high risk loans to Wall Street banks in return for big fees, polluting the financial system with toxic mortgages. Importantly, the PSI made the following findings of fact:

(1) **High Risk Lending Strategy.** Washington Mutual ("WaMu") executives embarked upon a high risk lending strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

(2) **Shoddy Lending Practices.** WaMu and its affiliate, Long Beach Mortgage Company ("Long Beach"), used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

(3) **Steering Borrowers to High Risk Loans.** WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

(4) **Polluting the Financial System.**  WaMu and Long Beach
securitized over $77 billion in subprime home loans and
billions more in other high risk home loans, used Wall Street
firms to sell the securities to investors worldwide, and polluted
the financial system with mortgage backed securities which
later incurred high rates of delinquency and loss.

(5) **Securitizing Delinquency-Prone and Fraudulent Loans.**  At
times, WaMu selected and securitized loans that it had
identified as likely to go delinquent, without disclosing its
analysis to investors who bought the securities, and also
securitized loans tainted by fraudulent information, without
notifying purchasers of the fraud that was discovered.

(6) **Destructive Compensation.**  WaMu's compensation system
rewarded loan officers and loan processors for originating large
volumes of high risk loans, paid extra to loan officers who
overcharged borrowers or added stiff prepayment penalties,
and gave executives millions of dollars even when its high risk
lending strategy placed the bank in financial jeopardy.

285.    In his remarks, Chairman Levin noted that "WaMu loan officers routinely made

very risky loans to people with below average credit scores" and that "volume was king."  He

concluded that:

> To keep the conveyor belt running and feed the securitization
> machine on Wall Street, Washington Mutual engaged in lending
> practices that created a mortgage time bomb.  This chart, Exhibit
> 1(b), summarizes the lending practices that produced high risk
> mortgages and junk securities: targeting high risk borrowers;
> steering borrowers to higher risk loans; increasing sales of high
> risk loans to Wall Street; not verifying income and using stated
> income or "liar" loans, accepting inadequate documentation loans;
> promoting teaser rates, interest only and pick a payment loans
> which were often negatively amortizing; ignoring signs of
> fraudulent borrower information, and more.

286.    Specifically with respect to Long Beach, Chairman Levin observed that

"[s]ubprime lending can be a responsible business.  Most subprime borrowers pay their loans on

time and in full.  **Long Beach, however, was not a responsible lender.**  Its loans and mortgage

backed securities were among the worst performing in the subprime industry."  (Emphasis

added.)  Chairman Levin and Senator Coburn also noted that "[o]ver the years, both Long Beach

and Washington Mutual were the subject of repeated criticisms by the bank's internal auditors

and reviewers, as well as its regulators, OTS and the FDIC, for deficient lending and

securitization practices.  Long Beach loans repeatedly suffered from early payment defaults, poor

underwriting, fraud, and high delinquency rates."

### (2)    The Bear Stearns Offerings

287.    Unlike Allstate, Ambac Assurance Corporation ("Ambac") had access to some of

the complete loan files for certain Bear Stearns securitizations that are part of the same sequence

of offerings as some of the Bear Stearns Certificates at issue here.  Ambac's analyses – made

public only in November 2008 and further expanded in January 2011 – provide additional strong

evidence that essential characteristics of the mortgage loans underlying the Bear Stearns

Offerings were misrepresented, and that the problems in Bear Stearns Defendants' underwriting

practices were systemic.

288.    Ambac is a New York-based insurer that wrote insurance for certain Bear Stearns

mortgage-backed securities offerings.  Ambac conducted an investigation into the loan files for

these offerings after it was asked to make payments on the insurance policies.  Ambac's analysis

involved four offerings that were part of the same series of offerings in which Allstate invested:

SACO 2005-10, SACO 2006-2, SACO 2006-8, and BSSLT 2007-1.  These offerings involved

the same types of collateral originated at roughly the same time and by the same entities that

originated the mortgage loans underlying Allstate's Bear Stearns Certificates.

289.    In its review of 1,486 loans from these offerings, Ambac discovered that **89%**

gave rise to breaches of representations and warranties made by EMC in the insurance contracts.

Ambac also found that "[t]he most prevalent and troubling of the breaches … involve (1)

rampant misrepresentation about borrower income, employment, assets, and intentions to occupy

the purchased properties, and (2) the loan originators' abject failures to adhere to proper and prudent mortgage-lending practices, including their own underwriting guidelines."

290.    Based on its investigation, Ambac concluded that "the entire pool of loans that EMC securitized in each Transaction is plagued by rampant fraud and an abdication of sound mortgage-origination and underwriting practice." As such, these fraudulent practices implicated not only EMC, but the entire "Bear Stearns securitization machine," which Ambac described as "a house of cards, supported not by real value and sound practices but by Bear Stearns's appetite for loans and disregard as to the risks those loans presented."

291.    Ambac's random sampling of loans – which included loans from the same series and time period as offerings in which Allstate invested – produced the following results:

- Of the sample of 372 randomly selected loans in the SACO 2005-10 Transaction, Ambac identified breaches of representations and warranties in 336 loans, or 90%;

- Of the sample of 369 randomly selected loans in the SACO 2006-2 Transaction, Ambac identified breaches of representations and warranties in 337 loans, or 91%;

- Of the sample of 379 randomly selected loans in the SACO 2006-8 Transaction, Ambac identified breaches of representations and warranties in 334 loans, or 88%;

- Of the sample of 366 randomly selected loans in the BSSLT Transaction, Ambac identified breaches of representations and warranties in 325 loans, or 88%; and

- The analysis described above demonstrates with a high degree of certainty that breaches of representations and warranties exist in a comparable percentage of loans in the **total loan pool** in each Transaction.

(Emphasis added.)

292.    Ambac's investigation also uncovered e-mails in which the Bear Stearns Vice President who acted as the deal manager for the SACO 2006-8 offering – which was part of the same sequence of offerings as Allstate's SACO 2006-3 and SACO 2006-6 investments at issue here – referred to the deal as a "shit breather" and a "SACK OF SHIT."  As noted above, Ambac's later analysis of SACO 2006-8 loans revealed breaches of representations and warranties in 88% of the loans sampled.

293.    Similarly, a Bear Stearns analyst working on the BSSLT 2007-1 offering – which was part of the same sequence of offerings as Allstate's BSSLT 2007-SV1 investment at issue here – described the deal in internal correspondence as a "going out of business sale," while his colleague called it a "DOG."  As noted above, Ambac's later analysis of BSSLT 2007-1 loans revealed breaches of representations and warranties in 88% of the loans sampled.

294.    Assured Guaranty Corp. ("Assured"), a New York-based monoline insurer, made similar discoveries about the fraudulent practices of Bear Stearns Defendants through its analysis of loan files associated with EMC's SACO 2005-GP1 offering.  Assured wrote insurance for the offering and had access to some of the complete files for loans that were included in the trust pool.

295.    Assured conducted two separate analyses of samples of defaulted loans from the offering, which were made public in July 2010.  Assured's first review of a sample of 430 defaulted loans revealed "widespread breaches of EMC's representations and warranties in over

88% of the loans examined." Assured's second review of an additional sample of 476 defaulted loans uncovered "widespread breaches of EMC's representations and warranties in over 92% of the loans examined." These widespread defaults involved the same types of loans during the same time period as those underlying Allstate's Bear Stearns Certificates.

296.    Assured found that EMC's breaches of representations and warranties stemmed from:

- [R]ampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property.

- [F]ailure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property.

- [I]nflated and fraudulent appraisals.

- [P]ervasive violations of [the originator's] own underwriting guidelines and prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social security numbers, (iii) with credit scores below the minimum, (iv) with DTI and/or CLTV ratios above the allowed maximum, or (v) with relationships to [the originator] or other non-arm's length relationships.

297.    On information and belief, all of these findings apply to all of the Bear Stearns Offerings at issue here. Ambac's and Assured's findings are consistent with, and confirmed by, Allstate's loan-level statistical analyses discussed above, and involve the same types of collateral originated during the same time period by the same originators.

## III.    DEFENDANTS' REPRESENTATIONS CONCERNING UNAFFILIATED ORIGINATORS' UNDERWRITING GUIDELINES WERE ALSO FALSE

298.    The vast majority of the mortgage loans underlying Defendants' Offerings at issue here were originated by Defendants' affiliates. However, a relatively small proportion

were originated by unaffiliated third-party lenders.  Of these, the majority were originated by

Countrywide Home Loans, Inc. ("Countrywide"), GreenPoint Mortgage Funding, Inc.

("GreenPoint"), PHH Mortgage Corporation ("PHH"), Option One Mortgage Corporation

("Option One"), and Fremont Investment & Loan ("Fremont").  With respect to each of these

third-party originators, Defendants' Offering Materials made certain representations about the

underwriting standards and practices used to originate the underlying loans.  These

representations were made to give comfort to investors, such as Allstate, that the third-party

loans included in the securitized mortgage pools were properly originated and not defective in

some manner.

299.    However, as discussed above, the results of Allstate's loan-level analysis shows

significant deviations in important loan characteristics, such as owner-occupancy rates and LTV

ratios, from the representations in the Offering Materials for each of Defendants' Offerings.  For

each Offering, including each Offering that contained loans originated by third-party originators,

Defendants greatly overstated the percentage of underlying loans that were secured by owner-

occupied properties and vastly understated that LTV ratios of the loans in the mortgage pools.

This uniform statistical deviation is, by itself, powerful evidence that the third-party originators

of loans in Defendants' Offerings failed to adhere to their stated underwriting guidelines.

300.    Moreover, as noted above, the startling levels of loan defaults and delinquencies

across all of Defendants' Offerings provides further compelling evidence these third-party

originators systemically deviated from their underwriting guidelines.  Recently uncovered

documents, testimony, and analyses confirm that representations made about the third-party

originators' adherence to underwriting standards were false, and that the third-party originators

were infected by the same underwriting problems as Defendants' affiliated originators.

A.    **Countrywide**

(1)    **Defendants' Misrepresentations Concerning Countrywide's Underwriting Practices**

301.    Countrywide originated approximately 17.1% of the 4,439 mortgage loans in the

BALTA 2006-5 Offering, 20.94% of the 3,458 mortgage loans in the JPALT 2006-A2 Offering,

and 100% of the 6,057 mortgage loans in JPMAC 2006-CW2 Offering.  The Prospectus

Supplement for each of these Offerings makes substantially similar representations that

Countrywide employed a particular, reasonable underwriting process to originate its loans.  For

example, the Prospectus Supplements for BALTA 2006-5 and JPALT 2006-A2 state:

> Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations. As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. . . . Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years . . .
>
> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. . . . In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

(BALTA 2006-5 Prospectus Supplement dated July 28, 2006, at S-46; JPALT 2006-A2

Prospectus Supplement dated April 27, 2006, at S-41-42; JPMAC 2006-CW2 Prospectus

Supplement dated August 3, 2006, at S-68-69.)

302.    The Offering Materials for these Offerings also represent that Countrywide

required and relied upon independent, industry-standard appraisals to determine the adequacy of

the underlying collateral:

> Except with respect to the mortgage loans originated pursuant to its
> Streamlined Documentation Program, whose values were
> confirmed with a Fannie Mae proprietary automated valuation
> model, Countrywide Home Loans obtains appraisals from
> **independent** appraisers or appraisal services for properties that are
> to secure mortgage loans.  The appraisers inspect and appraise the
> proposed mortgaged property and verify that the property is in
> acceptable condition.  Following each appraisal, the appraiser
> prepares a report which includes a market data analysis based on
> recent sales of comparable homes in the area and, when deemed
> appropriate, a replacement cost analysis based on the current cost
> of constructing a similar home.  All appraisals are required to
> conform to Fannie Mae or Freddie Mac appraisal standards then in
> effect.

(BALTA 2006-5 Prospectus Supplement dated July 28, 2006, at S-48; JPALT 2006-A2

Prospectus Supplement dated April 27, 2006 at S-43; JPMAC 2006-CW2 Prospectus

Supplement dated August 3, 2006, at S-68-69.)

**(2)        These Representations Were Untrue And Misleading**

303.    The Offering Documents contain material misstatements and omissions related to

Countrywide's underwriting standards because, as described herein: (1) Countrywide

systematically disregarded its underwriting standards and granted exceptions in the absence of

compensating factors; and (2) appraisals on properties originated by Countrywide were routinely

inflated because appraisers knew that if they appraised under certain levels they would not be

105

hired again.  Thus, the appraisals were inherently unreliable and there was little to support the value and adequacy of the mortgaged property.

304.    During the relevant period, Countrywide was the single largest U.S. mortgage lender and one of the largest subprime lenders.  Recent government investigations and their accompanying public release of internal documents have revealed Countrywide's widespread departure from its stated loan origination underwriting guidelines throughout the relevant period.  On information and belief, Countrywide's systemic underwriting failures involved the same exact type of loans, products, and processes underlying Allstate's BALTA 2006-5, JPALT 2006-A2, and JPMAC 2006-CW2 Certificates.

305.    Countrywide's remarkable growth from 2003 to 2007 was fueled by its unbridled pursuit of increasing mortgage loan origination volume, regardless of borrowers' qualifications or ability to repay.  During a conference call with analysts in 2003, co-founder Angelo Mozilo stated that his goal for Countrywide was to "dominate" the mortgage market and "to get our market share to the ultimate 30% by 2006, 2007."  Accomplishing Mozilo's goal of a 30% market share required Countrywide to systematically depart from its credit risk and underwriting standards.

306.    In order to meet its volume and market share goals, Countrywide employed a policy of matching any product that a competitor was willing to offer.  A former finance executive at Countrywide explained that:  "To the extent more than 5 percent of the [mortgage] market was originating a particular product, any new alternative mortgage product, then Countrywide would originate it . . . .  [I]t's the proverbial race to the bottom."

307.    Countrywide's internal documents and communications, recently made public by the SEC, show that this "matching" strategy led to systemic underwriting failures that implicated

all of the loans originated by Countrywide during the relevant period including, on information

and belief, the loans underlying Allstate's Certificates.  A recently-disclosed June 2005

document shows that John McMurray, Countrywide's Chief Risk Officer, warned that, "as a

consequence of [Countrywide's] strategy to have the widest product line in the industry, we are

clearly out on the 'frontier' in many areas," adding that the "frontier" had "high expected default

rates and losses."  He further warned that because of the "matching" strategy, Countrywide's

underwriting guidelines "will be a composite of the outer boundaries across multiple lenders,"

and that the resulting "composite guides [sic] are likely among the most aggressive in the

industry."

309.    The recently-released results of a 2006 internal Countrywide audit corroborate

Mr. McMurray's concerns.  Among the findings were that "approximately 40% of the Bank's

reduced documentation loans . . . could potentially have income overstated by more than 10%

and a significant percent of those loans would have income overstated by 50% or more."  Mr.

McMurray asserted that it is "obviously the case" that "perhaps many" of these overstatements

were the result of misrepresentations.

309.    Around the same time, according to the SEC, Countrywide made internal

disclosures at a credit meeting that one-third of the loans referred out of Countrywide's

automated underwriting system violated "major" underwriting guidelines, 23% of the subprime

first-lien loans were generated as "exceptions," and that "exception" loans were performing 2.8

times worse than loans written within guidelines.  That the loans approved by exceptions were

performing so much worse than other similar loans is itself strong evidence that the "exceptions"

were not being granted based on any purported countervailing circumstances in the borrowers'

credit profile.

310.    Another recently-disclosed internal Countrywide review showed that 23% of the subprime loans originated by Countrywide in 2006 were generated as exceptions, even taking into account "all guidelines, published and not published, approved and not yet approved."  This study occurred during the same period in which loans were being generated and included in Allstate's Certificates.  As a result of the study, Countrywide Managing Director of Risk Management concluded that "[t]he results speak towards our inability to adequately impose and monitor controls on production operations."

311.    In a recently-uncovered May 7, 2007 letter to the OTS, Countrywide candidly admitted:  "Specifically looking at originations in the fourth quarter of 2006, we know that almost 60% of the borrowers who obtained subprime hybrid ARMs [from Countrywide] would not have qualified at the fully indexed rate."  Countrywide also admitted that "almost 25% of the borrowers would not have qualified for any other [Countrywide] product."  In other words, Countrywide was shuffling borrowers to exotic products because the borrowers could not afford anything else, making those loans all the riskier.  Moreover, when a borrower did not qualify for a conventional loan, Countrywide's loan officers would often steer the borrower into riskier loans that did not require documentation, so-called "liar loans."

312.    In addition, Countrywide regularly engaged appraisers that were affiliated with Countrywide, including appraisal businesses that were owned or controlled by Countrywide, rather than the purported independent appraisals that it represented were used.  This created a conflict of interest.  As originator and securitizer of the loans, Countrywide had an incentive to inflate the value of properties because doing so would result in lower LTV ratios.  A lower LTV ratio would allow a loan to be approved when it otherwise would not be, and would appear less risky to Allstate and other investors.  In practice, Countrywide's appraisals were not intended to

determine the adequacy of the collateral in the event of a default, but rather to ensure that a large volume of mortgages were rapidly originated, underwritten and securitized, with no regard to the value of the collateral.

313.    According to Capitol West Appraisals, LLC, a company that has provided real estate appraisals to mortgage brokers and lenders since 2005, Countrywide engaged in a pattern and practice of pressuring even non-affiliated real estate appraisers to artificially increase appraised values for properties underlying mortgages Countrywide originated. Capitol West stated that Countrywide officers sought to pressure it to increase appraised values for three separate loan transactions. When Capitol West refused to vary the appraised values from what it independently determined was appropriate, Countrywide retaliated by blacklisting it.

314.    Because Countrywide was one of the nation's largest mortgage lenders, a substantial portion of any mortgage broker's loans was submitted to Countrywide. Because a broker could not rule out that Countrywide would be the ultimate lender, and because mortgage brokers knew from the blacklist that a field review would be required if a blacklisted appraiser were chosen, with the likely result that a mortgage would not be issued with that appraisal, and that its mortgage applicant would have to incur the cost of retaining another appraiser, such a broker had a strong incentive to refrain from using a blacklisted appraiser. By these means, Countrywide systematically and deliberately enlisted appraisers in its scheme to inflate appraisals and issue low-quality, extremely risky loans.

**B.    GreenPoint**

    **(1)    Defendants' Misrepresentations Concerning GreenPoint's
    Underwriting Practices**

315.    GreenPoint originated approximately 13.3% of the 3,458 mortgage loans in the JPALT 2006-A2 Offering and 17.11% of the loans in the BALTA 2005-4 Offering. The

Offering Materials for both of these Offerings represent that GreenPoint employed a particular,

reasonable underwriting process to originate its loans.  For example, the JPALT 2006-A2

Prospectus Supplement states:

> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Exceptions to the guidelines are permitted where compensating factors are present. . . . In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers the ratio of those amounts to the proposed borrower's monthly gross income. . . . The ratios generally are limited to 40% but may be extended to 50% with adequate compensating factors, such as disposable income, reserves, higher FICO credit score, or lower LTV's. . . . As part of its evaluation of potential borrowers, GreenPoint generally requires a description of the borrower's income. . . . Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

(JPALT 2006-A2 Prospectus Supplement dated April 27, 2007, at S-39-40;  *see also* BALTA

2005-4 Prospectus Supplement dated April 28, 2005, at S-40.)

     316.    In originating the JPALT 2006-A2 loans, GreenPoint also purported to require

and rely upon independent, industry-standard appraisals, as follows:

> In determining the adequacy of the property as collateral, an **independent** appraisal is generally made of each property considered for financing.  All appraisals are required to conform [to] the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation.  Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in a good condition and verify that construction, if new, has been substantially completed. . . . GreenPoint's Underwriting Guidelines require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding

> loan balance, and provides sufficient value to mitigate the effects
> of adverse shifts in real estate values.

(JPALT 2006-A2 Prospectus Supplement dated April 27, 2007, at S-40-41 (emphasis added).)

317.    Finally, the Prospectus Supplements represented that GreenPoint would only

utilize "limited documentation" or "no documentation" programs where the borrower had a

favorable credit history, and imposed stricter loan-to-value parameters:

> GreenPoint acquires or originates many mortgage loans under
> "limited documentation" or "no documentation" programs.  Under
> limited documentation programs, more emphasis is placed on the
> value and adequacy of the mortgaged property as collateral, credit
> history and other assets of the borrower, than on verified income of
> the borrower.  Mortgage loans underwritten under this type of
> program are generally limited to borrowers with credit histories
> that demonstrate an established ability to repay indebtedness in a
> timely fashion,  . . . Permitted maximum loan-to-value ratios
> (including secondary financing) under limited documentation
> programs are generally more restrictive than mortgage loans
> originated with full documentation requirements. . . .  Mortgage
> loans underwritten under no documentation programs are generally
> limited to borrowers with favorable credit histories and who satisfy
> other standards for limited documentation programs.

(JPALT 2006-A2 Prospectus Supplement dated April 27, 2007, at S-40; BALTA 2005-4

Prospectus Supplement dated April 28, 2005, at S-40.)

### (2)    These Representations Were Untrue And Misleading

318.    The Offering Documents contain material misstatements and omissions related to

GreenPoint's underwriting standards because, as described herein:  (1) GreenPoint

systematically disregarded its underwriting standards, granted exceptions in the absence of

compensating factors, required less documentation, and granted no- or limited documentation

loans to individuals without good credit histories; and (2) appraisals on properties originated by

GreenPoint were consistently inflated as appraisers knew if they appraised under certain levels

they would not be hired again.  Thus, the appraisals were inherently unreliable and there was little to support the value and adequacy of the mortgaged property.

319.    According to the *Washington Business Journal*, as of August 2007, GreenPoint specialized in non-conforming and Alt-A mortgages, which generated higher origination fees than standard loans.  As reported in *Business Week Magazine* in November 2008, during this period, GreenPoint's employees and independent mortgage brokers also targeted more and more borrowers who were unable to afford these loans, and who had no realistic ability to repay them. GreenPoint's employees used this system to increase their own commissions at the expense of fidelity to the underwriting guidelines.

320.    GreenPoint did not verify the income of borrowers as represented.  Indeed, many of GreenPoint's Alt-A loans were actually subprime loans.  What is more, GreenPoint routinely extended "stated income" or "no doc" loans to borrowers with weak credit, even though it knew that these loans were highly likely to contain misinformation from the borrower, particularly when coupled with nontraditional products, such as ARMs.

321.    GreenPoint also routinely granted "exceptions" to its underwriting guidelines where no compensating factors existed, merely so the borrower could qualify.  Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any degree of realistic control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved.

322.    On information and belief, GreenPoint's wholesale abandonment of underwriting guidelines will be confirmed by its former employees.  These employees will testify that:

- Around 2005, GreenPoint relaxed its underwriting standards, especially towards higher risk borrowers, so that it could remain competitive in the lending market;

- GreenPoint employees faced intense pressure to close loans at any cost, due in large part to the fact that their bonuses depended on the number of loans originated;

- GreenPoint managers overrode employees' decisions to reject loans, and approved loans based upon inflated incomes; and

- GreenPoint often relied upon "stated income" loans so that managers could approve loans based upon falsely inflated incomes.

323.    A study by U.S. Bank further confirms GreenPoint's abandonment of underwriting guidelines. U.S. Bank conducted a random sampling of 1,030 GreenPoint loans during the same period as those at issue in this case. It found that **93%** of those loans were made in violation of GreenPoint's underwriting guidelines and suffered from serious defects, including:

- pervasive misrepresentations and/or negligence with respect to the claimed income, assets or employment of the borrower;

- misrepresentations of the borrower's intent to occupy the property as the borrower's residence and subsequent failure to so occupy the property;

- inflated appraisal values; and

- other underwriting violations, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social security numbers, (iii) with credit scores below the required minimum,

(iv) with debt-to-income and/or loan-to-value ratios above the allowed

maximum or (v) with relationships to GreenPoint or other non-arm's-length

relationships.

324.    Similarly, numerous borrowers and former GreenPoint employees have recently

sued the  company for fraud and other pervasive failures in its origination and underwriting

practices.  Such actions include a "whistleblower" action filed in June 2008 by a former senior

underwriter.  The underwriter alleges that GreenPoint forced him to approve loan applications

containing fraudulent information after he had either denied such applications or made approval

contingent upon obtaining additional borrower documentation.  *See Steinmetz v. GreenPoint*

*Mortgage Funding, Inc.*, Case No. 08-civ-5367 (S.D.N.Y. June 12, 2008).

325.    Additionally, multiple individual borrowers and a class of borrowers have sued

GreenPoint, alleging, among other things, fraudulent loan-origination practices based on

misstated or overstated income and/or employment status.  *See Ferguson v. GreenPoint*

*Mortgage Funding, Inc., et al.*, Case No. 0:08-CV-60854-WPD (S.D. Fla. June 5, 2008); *Lewis*

*v. GreenPoint Mortgage Funding, Inc., et al.*, Case No. 1:08-cv-00567-TSE-TCB (E.D. Va. June

3, 2008); *Perez v. GreenPoint Mortgage Funding, Inc., et al.*, Case No. 5:08-cv-01972-JW (N.D.

Cal. Apr. 15, 2008).

326.    In a 2010 study, GreenPoint was identified by the OCC as the fourteenth worst

subprime lender in the country based on the delinquency rates of the mortgages it originated in

the 10 metropolitan areas with the highest rates of delinquency.

C.    **PHH**

(1)    **Defendants' Misrepresentations Concerning PHH's Underwriting Practices**

327.    PHH originated approximately 17.38% of the 3,458 mortgage loans in the JPALT

2006-A2 Offering and 20.11% of the loans in the BSSLT 2007-SV1 Offering.  The Offering

Materials for JPALT 2006-A2 represent that GreenPoint employed a particular, reasonable

underwriting process to originate its loans.  For example, the Prospectus Supplement states:

> The following describes the general underwriting procedures used
> for mortgage loans originated or purchased, and underwritten by
> PHH Mortgage.  From time to time, exceptions to PHH
> Mortgage's underwriting policies may be made.  Such exceptions
> are made on a loan-by-loan basis only at the discretion of PHH
> Mortgage's underwriters and may be made only after careful
> consideration of certain compensating factors such as borrower
> capacity, liquidity, equity, employment and residential stability.
> PHH Mortgage's underwriting guidelines are applied to evaluate
> an applicant's credit standing, financial condition, and repayment
> ability, as well as the value and adequacy of the mortgaged
> property as collateral for any loan made.  As part of the loan
> application process, the applicant is required to provide
> information concerning his or her assets, liabilities, income and
> expenses (except as described below), . . . . Except as described
> below, PHH Mortgage verifies the applicant's liquid assets to
> ensure that the client has adequate liquid assets to apply toward
> any required down payment, closing costs, prepaid interest, and a
> specified amount of cash reserves after the closing of the related
> mortgage.  Additional liquid assets may not be verified. Except as
> described below, PHH Mortgage also evaluates the applicant's
> income to determine its stability, probability of continuation, and
> adequacy to service the proposed PHH Mortgage debt payment.

(JPALT 2006-A2 Prospectus Supplement dated April 27, 2006, at S-32-33.)

328.    The Offering Materials also represent that PHH requires and relies upon

independent, industry-standard appraisals, as set forth in the Prospectus Supplement for JPALT

2006-A2 as follows:

> In determining the adequacy of the property as collateral for a first
> lien mortgage loan, **a Fannie Mae/Freddie Mac conforming**

> **appraisal of the property is performed by an independent
> appraiser selected by PHH Mortgage**, except as noted in this
> prospectus supplement.  The appraiser is required to inspect the
> property and verify that it is in good condition and that
> construction or renovation, if new, has been completed.  The
> appraisal report indicates a value for the property and provides
> information concerning marketability, the neighborhood, the
> property site, interior and exterior improvements, and the condition
> of the property.  In lieu of an appraisal, alternative collateral
> assessment products which comply with Fannie Mae/Freddie Mac
> criteria may be used.

(JPALT 2006-A2 Prospectus Supplement dated April 27, 2006, at p. S-33 (emphasis added).)

329.    Finally, the JPALT 2006-A2 Prospectus Supplement represents that PHH only

utilized "limited documentation" or "no documentation" programs where the borrower had a

favorable credit history, and imposed stricter loan-to-value parameters:

> Under the Streamlined Documentation Program, which is generally
> available only to the loans in PHH Mortgage's portfolio having no
> mortgage delinquencies in the past 12 months, rate and term
> refinance loans are underwritten based solely on the original
> appraisal and limited credit verification, if any. . . . Another
> program (the "Liquidity Program") provides for expedited
> processing on certain loans based on the risk profile of the loan.
> During the origination process, PHH Mortgage conducts an
> assessment of the risk profile of the prospective borrower and
> subject property to determine the level of income verification
> required to process the loan.

(JPALT 2006-A2 Prospectus Supplement dated April 27, 2006, at S-35.)

### (2)    These Representations Were Untrue And Misleading

330.    The statements in the Offering Materials concerning PHH's underwriting

practices were false and misleading because, as described herein:  (1) PHH systematically

disregarded its underwriting standards, granted exceptions in the absence of compensating

factors, required less documentation, and granted no- or limited documentation loans to

individuals without good credit histories; and (2) appraisals on properties originated by PHH

were consistently inflated because appraisers knew that if they appraised under certain levels

they would not be hired again.  In fact, in its Form 10-Q filed August 8, 2008, PHH admitted to

"loans with origination flaws" and that the demand for its mortgages in the secondary market had

therefore declined.

331.    On information and belief, former PHH employees will confirm the breakdown of

PHH's underwriting process.  For example, they will testify that:

- PHH employees faced intense pressure to close loans at any cost, primarily because their commissions were based on the number of loans they closed;

- PHH employees manipulated data in order to close loans, and knowingly included false information and inflated values in loan applications;

- PHH had a policy that prohibited underwriters from investigating the veracity of the income stated on loan applications; and

- PHH increasingly approved risky, low- or no-documentation loans without adequate review.

332.    PHH's defective underwriting practices have been confirmed by extensive

empirical studies of mortgage loans made and sold into securitizations during this period.  For

example, economists at the University of Michigan and elsewhere have found that the number of

loans relating to PHH or its affiliates that suffered from a particular performance problem – 60 or

more days delinquent as of six months after origination – skyrocketed beginning in mid-2006,

*i.e.*, around the exact time many of the mortgage loans at issue here were being originated and

securitized.



Figure 2: Percent of Loans Originated by PHH Mortgage Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

333.    The above table – which encompasses the period at issue in this case – demonstrates that the drastic change in PHH-originated loan performance did not occur because of a change in claimed FICO or LTV scores.  Rather, it resulted from PHH's abandonment of sound underwriting practices.

**D.    Option One**

    **(1)    Defendants' Misrepresentations Concerning Option One's Underwriting Practices.**

334.    Option One originated 100% of the 5,066 mortgage loans underlying the JPMAC 2005-OPT2 Offering.  The Offering Materials for JPMAC 2005-OPT2 represent that Option One employed a particular, reasonable underwriting process to originate its loans.  For example, the Prospectus Supplement states:

> The Mortgage Loans will have been originated generally in accordance with Option One's Guidelines (the "Option One Underwriting Guidelines").  The Option One Underwriting Guidelines are primarily intended to assess the value of the

mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan. . . . On a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made where compensating factors exist.  Except as specifically stated herein, the Option One Underwriting Guidelines are the same for first lien mortgage loans and second lien mortgage loans.  Each mortgage loan applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.

. . .

 The Option One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and require Option One's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal supports the loan balance.

. . .

Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan. Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed.

. . .

 Except with respect to the No Documentation program that is described below, the Option One Underwriting Guidelines require verification or evaluation of the income of each applicant and, for purchase transactions, verification of the seasoning or source of funds (in excess of $2,500) required to be deposited by the applicant into escrow.

. . .

For wage earning borrowers, all documentation types require a verbal verification of employment to be conducted within 48 hours prior to funding.

(JPMAC 2005-OPT2 Prospectus Supplement dated December 15, 2005, at S-56-57.)

119

335.    According to the Prospectus Supplement, Option One also purported to require

and rely upon appraisals prepared "by qualified independent appraisers" and which "conform to

the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards

Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and

Freddie Mac."  (JPMAC 2005-OPT2 Prospectus Supplement dated December 15, 2005, at S-56.)

### (2)    These Representations Were Untrue and Misleading:

336.    The statements in the Offering Materials related to Option One's underwriting

standards were false and misleading because Option One: (1) systematically failed to follow its

stated underwriting standards; (2) allowed pervasive exceptions to its stated underwriting

standards in the absence of compensating factors; (3) disregarded credit quality in favor of

generating increased loan volume; and (4) violated its stated appraisal standards and in many

instances materially inflated the values of the underlying mortgage properties in the loan

origination and underwriting process.

337.    Option One was a national mortgage lender formerly owned by H&R Block, Inc.,

until its assets were sold to American Home Mortgage Servicing, Inc. in April 2008.  Option One

was the sixth worst mortgage originator, by number of foreclosures as of March 22, 2010,

according to the OCC's "Ten Worst in the Ten Worst" list.  On information and belief, former

employees of Option One will testify that the company routinely violated its stated standards for

underwriting and appraisals.

338.    For example, they will testify that:

- It was Option One's practice that if an underwriter denied a loan and an
  account executive complained, the loan was escalated to the branch manager
  and the loan would be pushed through;

- Option One knowingly approved stated income loans that contained falsified income information, and the majority of stated income loans contained falsified income information;

- Option One's main driver was income, not accuracy in the underwriting process;

- Option One account executives and managers did not seek to reduce risk because Option One shifted the mortgages to investors; and

- Option One was motivated to violate its underwriting and appraisal standards in order to increase the volume of loans it could sell to Wall Street banks to be securitized.

339.    On information and belief, former employees will also testify that it was Option One's practice that if an underwriter questioned the appraised value, the account executive and branch manager would override the underwriter's objection.  In addition, when underwriters objected to loans because of flawed appraisals, the loan officer would complain to the branch manager, who would complain to the Appraisals Department at headquarters in Irvine, California, and on up the chain until the loan was given the green light.

340.    The Attorney General for the Commonwealth of Massachusetts has investigated Option One, and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans.  She determined that Option One increasingly disregarded underwriting standards, created incentives for loan officers and brokers to disregard the interests of the borrowers and steer them into high-cost loans, and originated thousands of loans that Option One knew or should have known the borrowers would be unable to pay.  This was all in an effort to increase loan origination volume, so as to profit from the practice of packaging and

selling the vast majority of Option One's residential subprime loans to the secondary market.

She has also determined that Option One's agents and brokers frequently overstated an

applicant's income and/or ability to pay, and inflated the appraised value of the applicant's

home, and that Option One avoided implementing reasonable measures that would have

prevented or limited these fraudulent practices.

### E.    Fremont

#### (1)    Defendants' Misrepresentations Concerning Fremont's Underwriting Practices

341.    Fremont originated all of the 4,569 mortgage loans in the JPMAC 2006-FRE2

Offering.  The JPMAC 2006-FRE2 Offering Materials represent that Fremont employed a

particular, reasonable underwriting process to originate its loans.  For example, the Prospectus

Supplement states:

> Mortgage loans are underwritten in accordance with Fremont's
> current underwriting programs, referred to as the Scored Programs
> ("Scored Programs"), subject to various exceptions as described in
> this section.  Fremont's underwriting standards are primarily
> intended to assess the ability and willingness of the borrower to
> repay the debt and to evaluate the adequacy of the mortgaged
> property as collateral for the mortgage loan.  The Scored Programs
> assess the risk of default by using Credit Scores as described below
> along with, but not limited to, past mortgage payment history,
> seasoning on bankruptcy and/or foreclosure and loan-to-value ratio
> as an aid to, not a substitute for, the underwriter's judgment. . . .
>
> All of the mortgage loans were underwritten by Fremont's
> underwriters having the appropriate approval authority.  Each
> underwriter is granted a level of authority commensurate with their
> proven judgment, experience and credit skills. **On a case by case
> basis,** Fremont may determine that, **based upon compensating
> factors**, a prospective mortgagor not strictly qualifying under the
> underwriting risk category guidelines described below is
> nonetheless qualified to receive a loan, i.e., an underwriting
> exception.  Compensating factors may include, but are not limited
> to, low loan-to-value ratio, low debt to income ratio, substantial
> liquid assets, good credit history, stable employment and time in
> residence at the applicant's current address.

(JPMAC 2006-FRE2 Prospectus Supplement dated March 9, 2006 (emphasis added).)

342.    The Prospectus Supplement also represents that Freemont required and relied upon independent, industry-standard appraisals:

> Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal.  Generally, initial appraisals are provided by qualified **independent** appraisers licensed in their respective states. . . . Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont.  Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.

(JPMAC 2006-FRE2 Prospectus Supplement dated March 9, 2006 (emphasis added).)

343.    Finally, the Prospectus Supplement represents that prudent underwriting was undertaken even for mortgages where less borrower documentation was required:

> There are three documentation types, Full Documentation ("Full Documentation"), Easy Documentation ("Easy Documentation") and Stated Income ("Stated Income").  Fremont's underwriters verify the income of each applicant under various documentation types as follows: under Full Documentation, applicants are generally required to submit verification of stable income for the periods of one to two years preceding the application dependent on credit profile; under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements; under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application.  The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work.

(JPMAC 2006-FRE2 Prospectus Supplement dated March 9, 2006.)

(2)    **These Representations Were Untrue and Misleading**

344.    The JPMAC 2006-FRE2 Offering Materials contain material misstatements and omissions related to Fremont's underwriting standards because it was not disclosed that Fremont: (1) systematically failed to follow its stated underwriting standards; (2) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (3) disregarded credit quality in favor of generating increased loan volume; and (4) violated its stated appraisal standards and, in many instances, materially inflated the values of the underlying mortgage properties.

345.    Fremont was one of the country's largest subprime lenders and originated subprime residential real estate loans nationwide on a wholesale basis through independent loan brokers in nearly all 50 states.  On information and belief, former Fremont employees will testify that:

- Fremont's Regulatory Risk Management group submitted numerous, repeated adverse written findings to senior Fremont executives in 2005 and 2006, which highlighted, among other things, unfair and deceptive acts, poor underwriting, and problematic incentive compensation;

- Fremont filed repeated Suspicious Activity Reports ("SARs") regarding broker fraud as to certain brokers, but Fremont executives would not end its relationships with the identified brokers;

- Fremont underwriters were instructed that Fremont's underwriting policies were merely a "guide," and broad use of exceptions to Fremont's underwriting standards was promoted in order to drive loan quantity.  Indeed, between 2005 and 2007, an estimated 30% of Fremont's loans had some sort of exception,

partly because anyone from an assistant manager on up had the authority to approve exceptions;

- Fremont would convert borrowers who were rejected under full documentation loan applications to "stated income" loans – with a higher reported income than previously documented –  so that the loans were ultimately approved;

- Fremont underwriters would ignore obviously fraudulent documents when approving loans, and when information could not be falsified – such as pay stubs – Fremont underwriters would simply remove it from the application files;

- Fremont underwriters would call appraisers and directly request that they inflate their appraisal values in order to close a deal;

- Fremont experienced rampant fraud with regard to appraisals, such as appraisals that were incomplete, did not match the address of the property, or described the home as owner-occupied, when it was rented; and

- Fremont loosened its debt-to-income-ratio requirements.  Before 2004, Fremont generally did not approve loans with more than a 50% debt-to-income ratio.  Thereafter, Fremont approved loans with a 55% debt-to-income ratio, and in many instances, the debt-to-income ratios were actually between 65% or 70%, or even up to 90%.

346.   On June 18, 2008, Fremont filed for bankruptcy.

IV.     **THE DEFENDANTS KNEW THEIR REPRESENTATIONS WERE FALSE**

   A.     **The Statistical Evidence Is Itself Persuasive Evidence Defendants Knew Or
          Recklessly Disregarded The Falsity Of Their Representations**

347.     As discussed above, all of Allstate's Certificates have significantly

underperformed, and an analysis of the underlying loans shows seriously misrepresented owner-

occupancy, LTV, and CLTV statistics.  For instance, Allstate's loan-level analysis shows that

Defendants frequently overstated the percentage of loans secured by owner-occupied properties

in a given mortgage pool by more than 10%.  Because borrowers are less likely to "walk away"

from properties they live in,  Defendants' repeated overstatements concerning owner occupancy

materially misrepresented the risk profiles of each of the Offerings at issue here.

348.     Allstate's loan-level analysis also revealed that Defendants consistently

understated the percentage of loans underlying the mortgage pools with high LTV ratios,

sometimes by **more than 46%**.  Even more strikingly, Defendants uniformly represented that

none of the loans have LTV ratios greater than 100%, yet Allstate's analysis revealed that a

substantial percentage of loans – up to **16.69%** – in each of Defendants' Offerings were already

"underwater,"  This meant that many of the borrowers had no equity cushion to protect against

borrower default, and in fact guaranteed a loss upon foreclosure.

349.     In addition, the testimony of current and former employees attests to pervasive

and systemic problems in the underwriting of the loans that secured each offering.  The breadth

and depth of the problems are not just evidence that the Offering Materials were false and

misleading.  They are persuasive evidence that Defendants knew or should have known that the

mortgage loans did not comply with the disclosed underwriting guidelines.

350.     The significance of Defendants' systemic underwriting problems is magnified

when one considers the size of Defendants' operations.  It is inconceivable that problems on the

scale at issue here could be anything but the result of knowing or reckless conduct with regard to the true risk profiles of the mortgage loans underlying Defendants' securitizations.  As noted above, Defendants controlled the entire origination to securitization process, from borrower to Allstate, making it implausible that the mortgage loans could have made it to the market without Defendants' knowledge of their problems.

351.    This vertical integration between originators and issuers heightened the already-perverse incentives created by the move to the "originate and distribute" business model.  The originator, secure with a pipeline to the market, would have even more incentive to loosen its guidelines.  Those responsible for the securitization, focused on volume, would push them to do so even more.  And once the loans were issued, they would have significant incentives to ignore problem loans because rejecting a loan would saddle an affiliated company – often run out of the very same corporate headquarters – with a toxic loan.

352.    This process gave Defendants yet another source of actual knowledge of the falsity of the representations they made to Allstate.  As it was often affiliated entities that generated the loans in the first place, Defendants had a direct window into the lax practices that led to the creation of the toxic pools of loans to begin with.

**B.    Evidence From Third Party Due Diligence Firms Demonstrates That Defendants Knew Defective Loans Were Being Securitized**

353.    As discussed above, the strikingly high number of Defendants' loans that were rejected by third party due diligence firms, yet subsequently "waived" into securitizations by Defendants, demonstrates Defendants' knowledge that defective loans were being included in their offerings.  On information and belief, these defective loans were included in each of Defendants' Offerings at issue here despite their rejection by due diligence firms.  Defendants

failed to make any disclosure to investors regarding the number of loans waived in over

objection, or that such action was even taking place.

354.    As described above, J.P. Morgan Securities was informed that 27% of all loans

reviewed by Clayton had been rejected, but it nonetheless waived 51% of those rejected loans

into securitizations.  WCC was also informed that 27% of all the loans reviewed by Clayton had

been rejected, but nonetheless waived 29% of those rejected loans into securitizations.  Likewise,

Bear Stearns was informed that 16% of the loans it asked Clayton Holdings to review had been

rejected, but it nonetheless waived in 42% of those loans.

355.    Such actions not only show that the mortgage loans were defective, but also

demonstrate Defendants' *scienter*.  According to the September 2010 testimony of Clayton's

Vice President Vicky Beal, the third-party due diligence firms' "exception reports" were

provided not just to the underwriters, but also to the sellers, making Defendants aware of the

defective loans in multiple stages in the securitization process.

356.    Internal BSC communications discovered by Ambac demonstrate that BSC's top

officers recognized that the excessively high number of exception waivers rendered the third

party due diligence a sham.  Jeffrey Verschleiser, a Senior Managing Director at BSC, in e-mails

to another Senior Managing Director, stated that "[w]e are wasting too much money on Bad Due

Diligence" and that "[w]e are just burning money hiring them."

357.    In response to the mounting numbers of waived exceptions, BSC adopted an

internal policy of deleting communications with its third-party due diligence firms leading to its

final loan purchase decisions.  BSC tried to hide the fact that it consistently overrode loan

rejections by destroying the audit trail.  On information and belief, JPMorgan Defendants,

WaMu Defendants and Long Beach Defendants employed similar policies to waive in defective loans.

358.    Not only were Defendants aware of Clayton's reports and their disregard of them, Defendants actually leveraged this information to their benefit.  Defendants were also incentivized to allow the rejected mortgages to remain in the securitizations because (1) mortgage originators would not invite a bank that consistently kicked out large numbers of loans to future auctions; and (2) the securitization became smaller as loans were kicked out, thus decreasing the underwriting fee.  According to September 2010 testimony before the FCIC by Clayton's former president, D. Keith Johnson, in many instances, instead of kicking loans with underwriting exceptions out of the pools, investment banks simply included the loans and used the reports which Clayton and other due diligence firms generated to negotiate a lower purchase price for the loan pools they were attempting to acquire.

359.    Moreover, Defendants' internal due diligence corroborated this systemic deviation from underwriting guidelines.  For example, the Long Beach Offering Materials confirm that "the sponsor verifies information that has been provided by the mortgage brokerage company prior to funding a loan and the sponsor conducts a post-funding audit of every origination file."  (LBMLT 2006-6 Prospectus Supplement dated July 21, 2006, at S-37.)  On information and belief, these kinds of internal audits revealed to Defendants that a high percentage of loans did not conform to the represented underwriting guidelines.  But despite Defendants' knowledge of large numbers of defective loans – stemming from both internal and third party due diligence reports – Defendants nonetheless securitized these loans to shift the inevitable losses to investors like Allstate.

**C.**    **Evidence Of Defendants' Influence Over The Appraisal Process
Demonstrates That Defendants Knew The Appraisals Were Falsely Inflated**

360.    On information and belief, Defendants used their economic leverage over both in-house and third-party appraisers to make the appraised values fit the loan they wanted to approve, rather than to fit the true value of the property.  This further establishes that they knew the LTV and CLTV statistics were false.

361.    That all the misstatements go heavily in one direction – seriously inflated property values leading to materially understated LTV and CLTV statistics – is itself persuasive evidence that the inaccuracies revealed by Allstate's recent analysis were not mere errors or differences of opinion, but conscious misrepresentations.  For instance, as discussed above, Defendants severely understated the percentage of loans in the mortgage pools that had high LTV ratios.  In BALTA 2006-5, the Offering Materials represented that only 1.73% of the loans had an LTV ratio greater than 80%.  In fact, however, **48.38%** of the loans had an LTV ratio greater than 80% – an understatement of **46.64%**.  Similarly, the WaMu 2007-HY7 Offering Materials represented that 2.16% of the underlying loans had an LTV ratio greater than 80%, whereas **47.50%** did – an overstatement of **45.34%**.  Similar material misrepresentations are made throughout Defendant's Offering Materials.

362.    Similar to Defendants' control over the credit ratings process, so too did Defendants leverage their economic control to secure the highest appraisals possible. Congressional testimony and other statements made by those in the industry confirm the widespread corruption in the appraisal processes during the period relevant to this Complaint. Richard Bitner, a former executive of a subprime lender for fifteen years, testified in April 2010 that "the appraisal process [was] highly susceptible to manipulation," and that the rise in property values was in part due to "the subprime industry's acceptance of overvalued

130

appraisals."  Similarly, Patricia Lindsay, a former wholesale lender, testified that in her

experience appraisers were "often times pressured into coming in 'at value," *i.e.*, at least the

amount needed for the loan to be approved.  "Fearing" for their "future business and their

livelihoods," the appraisers would choose properties "that would help support the needed value

rather than finding the best comparables to come up with the most accurate value."

363.    Jim Amorin, President of the Appraisal Institute, testified in April 2009 that "in

many cases, appraisers are ordered or severely pressured to doctor their reports to convey a

particular, higher value for a property, or else never see work from those parties again . . . [T]oo

often state licensed and certified appraisers are forced into making a "Hobson's Choice."'"

### D.    Evidence Of Internal Documents And Former Employee Testimony Demonstrates That Defendants Knew Their Representations Were False

#### (1)    JPMorgan Defendants Knew Their Representations Were False

364.    Management level employees at JPMC Bank and CHF had knowledge of, and

indeed encouraged, the mortgage origination fraud that was occurring in their organizations.

Specifically, senior management would often override an underwriter's rejection of a loan

application by falsifying income information, removing harmful background documentation, and

seeking altered appraisal values, in order to push the application through.  In other instances,

senior management would work with underwriters, instructing them on how to find a way to

successfully close a loan, such as calculating an LTV ratio or an income level that was needed

for a particular loan to close.

365.    An internal CHF memorandum outlining "cheats and tricks" to gain approval for

risky mortgage loans from the "Zippy" system – a CHF automated loan underwriting system –

demonstrates that abandonment of CHF underwriting guidelines was in fact internal policy.  This

memo advised CHF personnel to inflate the borrowers' income or otherwise falsify loan

applications.  The memo exhorted brokers to "Never Fear!!" if Zippy rejects a "stated

income/stated asset" loan application, "Zippy can be adjusted (just ever so slightly)."  The memo

encouraged brokers to game the Zippy system because "[i]t's super easy!  Give it a try!"

Brokers were instructed not to break down income by base, overtime, commissions, or bonuses,

but to lump it all into base income.  The memo recommended that "[i]f your borrower is getting

a gift, add it to the bank account along with the rest of the assets.  Be sure to remove any mention

of gift funds[.]"  As additional measure to attain approval for these risky loans, the author

counseled "resubmitting with slightly higher income.  Inch it up $500 to see if you can get the

findings you want.  Do the same for assets."

366.    JPMorgan Defendants also understood the risk of their subprime lending as it

related to securitized investments.  According to an article in *Bloomberg* on February 17, 2010,

JPMorgan's CEO was fully aware that its mortgage backed securities were garbage, and

attempted to free JPMorgan from such risk.  The article noted that "[i]n October 2006, Mr.

Dimon, JPMorgan's CEO, told William King, then its head of securitized products, that

[JPMorgan] needed to start selling its subprime-mortgage positions. . . By late 2006, JPMorgan

had offloaded $12 billion in such mortgages that it had originated and was advising clients to

follow suit."  This was exactly the time period in which Allstate acquired most of its JPMorgan

Certificates.

367.    In late 2008, Fortune Magazine also quoted Mr. Dimon instructing his

subordinates to offload the companies' subprime securities, when he noted that "this stuff could

go up in smoke" and to "watch out for subprime."  *Fortune Magazine*, September 2, 2008,

"Jamie Dimon's Swat Team."

### (2)  WaMu Defendants Knew Their Representations Were False

368.    As discussed above, the WaMu Certificates have significantly underperformed.

Allstate's statistical analysis of the underlying loans shows grossly misrepresented owner-

occupancy, LTV, and CLTV statistics, and WaMu's own employees, executives and internal

documents all highlight persistent and systemic underwriting problems.  The breadth and depth

of these problems is not just evidence that the Offering Materials were false and misleading.

Rather, it is persuasive evidence the WaMu Defendants knew or should have known that the

representations in the Offering Materials were false.  This is confirmed by numerous WaMu's

documents from the relevant period that have surfaced only recently.

369.    Recently-available documents show that, in August of 2007, more than a year

before WaMu's collapse, WaMu's President, Steve Rotella, emailed CEO Kerry Killinger saying

that, aside from Long Beach, WaMu's prime business "was the worst managed business I had

seen in my career."  In fact, WaMu personnel regularly identified enormous problems with

mortgage loans, but the problems received little attention from management.

370.    Perhaps the most compelling evidence involves two top loan producers at two

different WaMu offices, called Montebello and Downey, in Southern California.  Each of those

loan officers made hundreds of millions of dollars in home loans each year and consistently won

recognition for their efforts.  In 2005, an internal WaMu review found that loans from those two

offices had "an extremely high incidence of confirmed fraud (58% for [Downey], 83% for

[Montebello])."  The review found that "an extensive level of loan fraud exists in the Emerging

Markets CFCs, virtually all of it stemming from employees in these areas circumventing bank

policy surrounding loan verification and review."  The review went on:  "Based on the consistent

and pervasive pattern of activity among these employees, we are recommending firm action be

taken to address these particular willful behaviors on the part of the employees named."

371.    This review had taken over a year to complete and was discussed with senior management at WMB, including WaMu Home Loans President David Schneider.  But virtually none of the proposed recommendations were implemented.  The fraud problem was left to fester until two years later, when in June 2007, one of the Bank's mortgage insurance companies refused to insure any more loans issued by the loan producer from the Montebello office, and complained to WaMu's state and federal regulators about fraudulent borrower information.

372.    WaMu then conducted another internal investigation, this one lasting ten months. In April 2008, a WaMu audit and legal team produced an internal memorandum which, at first, WaMu tried to keep from its regulator, the OTS.  But the OTS Examiner In Charge demanded to see the memorandum, and it was eventually turned over.  Once he read it, he considered it the "last straw" that changed his view of how the Bank dealt with fraud.

373.    The April 2008 memorandum stated that employees at the Montebello loan center "consistently described an environment where production volume rather than quality and corporate stewardship were the incented focus."  At this loan center, **62%** of the sampled loans from two months in 2007 contained misrepresentations and suspected loan fraud.  The memorandum noted that similar levels of fraud had been uncovered at the same loan center in 2005, and that no action had been taken in response.  The memorandum raised the question of whether the **billions of dollars** in loans from that center should be reviewed, given the longstanding fraud problem and the fact that the loans may have been sold to investors. Importantly, a true proportion of the loans supporting the WaMu Offerings at issue in this case were originated in California.

374.    These fraudulent loans, shocking in themselves, were symptomatic of a larger problem.  Report after report to the highest levels of WaMu's management indicated that WaMu

loan personnel often ignored the Bank's credit standards, and yet nothing was done about it.

December 2006 minutes from a WaMu Market Risk Committee meeting stated, for example:

"[D]elinquency behavior was flagged in October [2006] for further review and analysis . . . . The

primary factors contributing to increased delinquency appear to be caused by process issues

including the sale and securitization of delinquent loans, loans not underwritten to standards,

lower credit quality loans and seller servicers reporting false delinquent payment status."

375.    Likewise, in a February 20, 2008 e-mail to Mr. Rotella and Mr. Killinger,

WaMu's Chief Enterprise Risk Officer admitted to "poor underwriting which in some cases

causes our origination data to be suspect particularly with respect to DTI [Debt To Income]."

376.    In early 2008, Radian Guaranty Inc., one of WMB's loan insurers, issued a report

to WMB with the results of a review conducted from August 13, 2007 to September 28, 2007.

The objective of the review was, *inter alia,* to determine WMB's "compliance with Radian's

underwriting guidelines and eligible loan criteria," and "to assess the quality of the lender's

underwriting decisions."  Radian gave WMB an overall rating of "Unacceptable."  Of 133 loans

reviewed, it found 11 or 8% had "insufficient documents to support the income used to qualify

the borrower and exceptions to approved guidelines."  Of the 10 delinquent loans it reviewed, it

found that half had "questionable property values, occupancy and possible strawbuyers [sic]."

377.    An internal September 2008 review found that controls intended to prevent the

sale of fraudulent loans to investors were "not currently effective" and there was no "systematic

process to prevent a loan . . . confirmed to contain suspicious activity from being sold to an

investor."  In other words, even where a loan was marked with a red flag indicating fraud, that

did not stop the loan from being sold to investors.  The 2008 review found that of 25 loans

tested, "11 reflected a sale date after the completion of the investigation which confirmed fraud.

There is evidence that this control weakness has existed for some time." This review was sent to WaMu's new CEO, Alan Fishman, as well as its President, Chief Financial Officer, Chief Enterprise Risk Officer, and General Auditor.

378.    Thus, WaMu's own executives and internal documents clearly show that it was aware of the rampant fraud and abandonment of underwriting practices but simply chose to turn a blind eye.  In a highly revealing exchange during the PSI's hearings, David Beck, the WCC executive in charge of securitizations, admitted that he knew the securitizations were tainted by fraud and underwriting deficiencies.

> Senator Levin:  Purchasers of these securities were relying on you to provide truthful information.  You knew about it.  (Referring to fraudulent loans in securities).  Wasn't that your job?
>
> David Beck:  **I understood there was fraud.**
>
> . . .
>
> Senator Coburn:  Were you aware ever that the loans underlying the securities were having problems?
>
> Mr. Beck:  **I knew we had underwriting problems.**

379.    Not only were WaMu Defendants aware of rampant fraud and underwriting violations at WMB, they also knew that many borrowers simply did not understand the loans pushed onto them.  In 2003, WaMu held focus groups with borrowers, loan officers, and mortgage brokers to determine how to sell its Option ARM product.  A 2003 report summarizing the focus group research stated:  "Few participants fully understood the Option ARM. . . . Participants generally chose an Option ARM because it was recommended to them by their Loan Consultant. . . . Only a couple of people had any idea how the interest rate on their loan was determined."  It said that while borrowers "generally thought that negative amortization was a moderately or very bad concept," that perception could be turned around by mentioning "that

price appreciation would likely overcome any negative amortization." The report concluded: "[T]he best selling point for the Option ARM loan was [borrowers] being shown how much lower their monthly payment would be . . . versus a fixed-rate loan." Significantly, the majority of the WaMu Offerings at issue here securitize Option ARM loans.

380.    Indeed, in July 2007, the federal financial regulatory agencies issued a Statement on Subprime Mortgage Lending, which addressed issues relating to ARM products that can cause payment shock. The Statement established prudent safety and soundness and consumer protection standards that should be followed to ensure that consumers, especially subprime borrowers, obtain loans they can afford to repay and receive information that adequately describes product features. However, when WaMu ran the numbers, according to an internal e-mail, it found it would lose 33 percent of its business if it went along with the regulators' guidance. It thus decided to "hold[] off on implementation until required to act for public relations (CFC announces unexpectedly) or regulatory reasons."

381.    Perhaps most egregiously, WaMu was pushing these high-risk loans and selling them to unsuspecting investors like Allstate when it believed that these loans would tank.

382.    In testimony before the PSI, Mr. Rotella admitted that as "the U.S. housing market continued to deteriorate and its impact began to spread to the overall economy, we continued to shift focus toward reducing WaMu's credit exposure." To do this, "the bank sold nearly all 2004 and 2005 subprime residuals and began to sell the majority of Option ARM loans that it originated." In other words, being in a first-hand position to see what was happening to the housing market, WaMu decided to off-load its high-risk loans to unsuspecting investors. And, WaMu could do this because it knew that the consequences would only materialize several years down the road. A January 2005 presentation to the WaMu Board of Directors entitled

"Higher Risk Lending Strategy," noted that "credit-related losses from newly originated HRL

[High Risk Loan] portfolio . . . will occur several years after origination." Thus, WaMu simply

unloaded its high-risk portfolio onto investors who would only feel the consequences several

years down the track.

383.    Institutional knowledge that its high-risk loans would deteriorate, large numbers

of loans that did not meet credit standards, offices issuing loans in which 58, 62, or 83% contain

evidence of fraudulent borrower information, loans marked as containing fraud but then sold to

investors anyway; these are massive, deep seated problems.  And they are problems that were

communicated to the WaMu Defendants' senior management who were content to keep making

money from originating and securitizing "toxic" loans and let investors such as Allstate suffer

the consequences.

(3)    <strong>Long Beach Defendants Knew Their Representations Were False</strong>

384.    Similarly, recently-published documents reveal that Long Beach Defendants were

aware of the falsity of the representations in the LBMLT 2006-6 Offering.  In 2003, things got so

bad at Long Beach that WaMu's legal department put a stop to all Long Beach securitizations

until the company cleaned up its act.  It sent in a legal team for three months to address problems

and ensure its securitizations and whole loan sales were meeting the representations and

warranties in Long Beach's sale agreements.  An FDIC report noted at the time that of 4,000

Long Beach loans reviewed, less than one quarter, about 950, could be sold to investors, another

800 were unsalable, and the rest – over half of the loans – had deficiencies that had to be fixed

before a sale could take place.  Several months later, WaMu allowed Long Beach to start

securitizing its loans again as well as selling them in bulk.

385.    However, in 2005, trouble erupted again.  A freshly-published internal WaMu

audit of Long Beach found that, "relaxed credit guidelines, breakdowns in manual underwriting

processes, and inexperienced subprime personnel. . . . coupled with a push to increase loan

volume and the lack of an automated fraud monitoring tool" led to deteriorating loans.  In

response, WaMu fired Long Beach's senior management and moved the company under the

direct supervision of the President of its Home Loans Division, David Schneider.  WaMu

promised its regulator that Long Beach would improve.  But it did not.

386.    In April 2006, WaMu's President, Steve Rotella, sent a recently-disclosed email

to CEO Kerry Killinger, noting that Long Beach "delinquencies are up 140% and foreclosures

close to 70%. . . . It is ugly."  Five months later, in September, he emailed that Long Beach is

"terrible . . . Repurchases, [early payment defaults], manual underwriting, very weak

servicing/collections practices and a weak staff."  Two months after that, in November 2006, the

head of WCC in New York, David Beck, wrote to Mr. Schneider that, "LBMC [Long Beach]

paper is among the worst performing in the [market]."

387.    At the end of 2006, Long Beach saw another surge in early payment defaults.  Mr.

Schneider sent a recently-surfaced email to his subordinates that, "[w]e are all rapidly losing

credibility as a management team."  2007 was no better.  Audit after audit detailed problems.

WaMu's Chief Risk Officer, Ron Cathcart, forwarded an email from a colleague about Long

Beach noting:  "Appraisal deficiencies . . . . Material misrepresentations . . . Legal documents

were missing or contained errors or discrepancies . . . loan decision errors . . . . [D]eterioration

was accelerating in recent vintages with each vintage since 2002 having performed worse than

the prior vintage."  In testimony before the PSI, Mr. Cathcart similarly noted that (a) Long

Beach's "quality of underwriting was below standard," (b) the "credit performance of Long-

Beach-originated loans did not meet acceptable risk standards," and (c) "the deficiencies at Long

Beach were a focus of concern for the regulators, who during each annual review, formally requested that the Board take action to address them."

388.    Having failed to clean up Long Beach over a six-year period, in June 2007, WaMu shut down Long Beach as a separate entity, and took over its subprime lending operations.  In these circumstances, there can be no doubt that the Long Beach Defendants were aware of the falsity of their representations concerning adherence to underwriting standards and characteristics of the underlying mortgage loans.

       (4)      **Bear Stearns Defendants Knew Their Representations Were False**

           (a)      **Bear Stearns' Shifting Internal Policy Towards The "Early Payment Default" Period Demonstrates Its Awareness Of Defective Loans**

389.    In 2005, BSC quietly changed its internal protocols to allow EMC to securitize loans before the expiration of the 30 to 90-day "early payment default" ("EPD") period following the acquisition of a loan by EMC.  This change enabled EMC to offload defective loans onto investors like Allstate, while enhancing earnings by increasing the volume of its securitizations.

390.    BSC's prior policy had been to keep loans in inventory until the EPD period was over.  Seasoning loans during the EPD period prevented EMC from securitizing loans that, according to its internal guidelines, were likely to "contain some form of misrepresentations and should not have been made."  As increasing numbers of loans purchased by EMC began to default, however, BSC devised its new policy to securitize the loans as quickly as possible – before a default or delinquency would render them unsecuritizable.

391.    This approach produced an additional benefit:  extra profit on the defaulted loans.  As the defective loans securitized by EMC began to default en masse, EMC turned around and issued repurchase claims against the loan originators.  But remarkably EMC did not notify the

purchasers of the securities, such as Allstate.  Instead of requiring the originators to repurchase

the loans, which would have forced EMC to repurchase the loans from the investors, EMC

sought cash settlements for a fraction of the repurchase price.  This arrangement helped EMC

maintain its relationship with the originators, who continued to feed the Bear Stearns mortgage

securitization pipeline, and also allowed EMC to covertly pocket additional profits at the expense

of securities purchasers.  As a BSC Managing Director explained in an email recently discovered

by Ambac:  "It is very important to try to down bid items rather than have [the originator] buy

them back.  That is how we pay for the lights. . ."

392.    The Bear Stearns Defendants thus not only knew that large numbers of defective

loans were being included in securities sold to investors like Allstate, but had a strong economic

incentive to continue this practice.  For this reason, BSC executives, such as Mr. Verschleiser,

forcefully advocated packaging loans purchased by EMC into securities as quickly as possible.

In a recently-published June 13, 2006 email, Mr. Verschleiser asserted that his office needed "to

be certain we can securitize the loans with 1 month epd before the epd period expires."

Similarly, fresh documents show that, on or about December 2005, Mr. Verschleiser ordered

Bear Stearns' deal managers and traders to start securitizing all "the subprime loans closed in

December for the conduit" by January.

393.    BSC's  internal policy shift to securitize loans during the EPD period was a

conscious decision – taken during the precise period at issue here – to pool loans that BSC knew

violated its stated underwriting guidelines.  As such, this practice shows that Bear Stearns

Defendants knew of the false representations in the Bear Stearns Offering Materials.

**(b)** **Bear Stearns Ignored Warnings From Its External Auditor
And Internal Counsel**

394.    Bear Stearns received warnings from its external auditor and internal counsel

during the relevant period that it was breaching representations and warranties made in

connection with its mortgage-backed securities offerings.  In an August 31, 2006 report, the audit

firm PricewaterhouseCoopers ("PwC") advised Bear Stearns that its failure to promptly review

loans identified as defaulting or defective was a breach of its obligations to the securitizations.

PwC further advised Bear Stearns to begin the "[i]mmediate processing of the buy-out [of

defective loans] if there is a clear breach in the PSA agreement to match common industry

practices, the expectation of investors and to comply with the provisions in the PSA agreement."

395.    At or around the same time, Bear Stearns' legal counsel advised that Bear Stearns

could no longer pocket repurchase claim recoveries, and that it was required to review the loans

for which it obtained recoveries to assess whether the loans breached representations and

warranties in the securitizations.

396.    Bear Stearns ignored these warnings, however, and failed to implement a policy

to promptly review the defective or defaulted loans for breaches.  Instead, Bear Stearns

continued to sell securitized mortgage pools that it knew contained large numbers of defective

loans, including, on information and belief, those underlying some of the Bear Stearns

Certificates at issue here.  To induce investors like Allstate to invest in these securities, the Bear

Stearns Defendants represented in the Offering Materials that the underlying loans conformed to

the stated underwriting standards.  But warnings by PwC and legal counsel demonstrate that the

Bear Stearns Defendants knew these representations were false.

### (c)    Bear Stearns Ignored Repeated Warnings From Its Head Of Due Diligence

397.    Recently released documents prove that Bear Stearns also ignored numerous warnings during the relevant period from the head of its due diligence department, John Mongelluzzo.  Starting in April 2005, Mr. Mongelluzzo repeatedly implored the co-heads of the mortgage finance department, Mary Haggerty and Baron Silverstein, to revise EMC's due diligence protocols.  Recognizing that the existing protocols allowed for the purchase and securitization of defective loans, Mr. Mongelluzzo proposed to rank loans slotted for due diligence by risk criteria and apply incremental resources to the review of each successive gradation of loan.  But Ms. Haggerty and Mr. Silverstein rejected this proposal.  In March 2007, Mr. Mongelluzzo re-submitted the same proposal to Ms. Haggerty and Mr. Silverstein, asserting that "I think we need to completely revamp how we do due diligence."  Once again, however, the proposal was rejected.

398.    Around May 2005 – before the issuance of most of the Bear Stearns Certificates at issue here – Ms. Haggerty and Mr. Silverstein had also rejected Mr. Mongelluzzo's proposal to "track loans that are overridden by our due diligence managers and track the performance of those loans."  This protocol would have allowed Bear Stearns to compare the performance of "exception" loans to those that passed due diligence inspection.  Such a policy, however, would have impaired Bear Stearns' ability to accomplish its goal of securitizing as many loans are possible.

399.    For this reason, Bear Stearns implemented the exact opposite policy, which directed its underwriting managers communicating with third-party due diligence firms to "purg[e] all of the older reports on the trade leaving only the final reports."  Under this policy, Bear Stearns' due diligence managers were required to destroy the "daily reports" submitted by

the third-party due diligence firms.  This allowed Bear Stearns to conceal the high incidence of

overrides and waivers leading up to its final purchase decisions.  However, records from one of

the due diligence firms, described below, show that Bear Stearns waived defective loans into

securitizations up to 56% of the time in the third quarter of 2006, when Allstate purchased

BALTA 2005-4, BALTA 2006-5, BSABS 2006-HE4, BSMF 2006-SL1, BSSLT 2007-SV1,

SACO 2006-3, and SACO 2006-6.

400.    Mr. Mongelluzzo brought this high incidence of overrides to the attention of Ms.

Haggerty and Mr. Silverstein, and proposed bringing due diligence in-house to more effectively

screen out defective loans.  This proposal, like the others, was rejected.  Instead, Bear Stearns

steadily reduced its due diligence standards.  According to a former EMC mortgage analyst, Bear

Stearns a) pushed EMC analysts to perform their due diligence of the underlying mortgages in

unreasonably short time frames, b) encouraged analysts "to just make up data like FICO scores"

and other critical mortgage metrics if that information was missing and the mortgage originators

did not respond to information requests, and c) "instead of spending time to go back to the lender

and demand clarification, like if verification of income actually backed these loans, the

executives at Bear would just make the loan type fit."

401.    Mr. Mongelluzzo's repeated warnings during the period at issue about the due

diligence failures in Bear Stearns' securitization process, combined with the explicit rejection of

his proposals to fix these problems, show that the Bear Stearns Defendants knew that

representations about the underlying loans in the Offering Materials were false.

## V.    ALLSTATE'S DETRIMENTAL RELIANCE AND DAMAGES

402.    In making the investments, Allstate relied upon Defendants' representations and

assurances regarding the quality of the mortgage collateral underlying the Certificates, including

the quality of their underwriting processes whereby they generated or acquired the underlying

mortgage loans. Allstate received, reviewed, and relied upon the Offering Materials, which described in detail the mortgage loans underlying each offering.

403.     In purchasing the Certificates, Allstate justifiably relied on Defendants' false representations and omissions of material fact detailed above, including the misstatements and omissions in the Offering Materials.

404.     But for the misrepresentations and omissions in the Offering Materials, Allstate would not have purchased or acquired the Certificates, because those representations and omissions were material to its decision to acquire the Certificates, as described above.

405.     The false and misleading statements of material facts and omissions of material facts in the Offering Materials directly caused Allstate damage, because the Certificates were in fact far riskier than Defendants had described them to be. The loans underlying the Certificates experienced default and delinquency at very high rates due to Defendants' abandonment of the disclosed underwriting guidelines.

406.     Allstate has incurred substantial losses in market value and lost principal and interest payments, due to the poor quality of the collateral underlying the Certificates. The income and principal payments Allstate received has been lower than Allstate expected and lower than the payments to which Allstate is entitled under the "waterfall" provisions of the securitizations.

407.     The disclosure of fundamental irregularities in Defendants' underwriting practices and increased risk regarding future cash flow has also led to a substantial decline in market value of the Certificates. Allstate purchased the Certificates not only for their income stream, but also with an expectation of potential resale on the secondary market. Allstate thus viewed market value as a critical aspect of the Certificates it purchased. Allstate incurred substantial losses on

the Certificates due to a drastic decline in market value attributable to the misrepresentations which, when disclosed, revealed that the mortgage loans likely had a substantially higher risk profile than investors (including Allstate) were led to believe.

408.    Allstate's losses on the Certificates have been much greater than they would have been if the loans were as Defendants described them to be.  For example, the fact that the loans were not secured by owner-occupied properties at their claimed rate made them more prone to default.  Owners who do not occupy their properties are more likely to default on their loans, which made the Certificates poorer investments, accelerated the Certificates decline in value, and greatly worsened Allstate's losses.

409.    The drastic and rapid loss in value of Allstate's Certificates was primarily and proximately caused by the issuance of loans to borrowers who could not afford them, in contravention of the prudent underwriting guidelines described in the Offering Materials.  These rates of delinquency and default were much higher than expected for securitizations supported by collateral fitting Defendants' representations, and much higher than they would have been if the mortgage loans had been properly underwritten.  The drastic increases in delinquency and default on the mortgage loans were not attributable to the recent decline in the U.S. housing market, but rather due to Defendants' wrongdoing.

## VI.    TOLLING OF THE SECURITIES ACT OF 1933 CLAIMS

410.    The statutory claims raised by Allstate herein are currently the subject of class action lawsuits.  Allstate is a putative class member of three class action lawsuits for its purchases of certificates from the following trusts:

JPALT 2006-A2; JPMAC 2006-CH2; JPMAC 2007-CH1; JPMAC 2007-CH2;

BALTA 2006-5; WaMu 2006-AR5; WaMu 2006-AR9; WaMu 2006-AR11; and

WaMu 2007-HY7

411.    **The JPMorgan Class Action.**  On March 26, 2008, a class action was filed

against various JPMorgan entities, former officers, and ratings agencies on behalf of all investors

who purchased or otherwise acquired certain mortgage-backed securities that were issued,

underwritten or sold by these entities.  *See Plumbers' & Pipefitters' Local #562 Supplemental*

*Plan and Trust, et al. v. J.P. Morgan Acceptance Corporation 1, et al.*, Case No. 5675/08 (N.Y.

Supr. Ct. 2008) (the "JP Morgan Class Action").  This action was later consolidated and

transferred to the United States District Court for the Eastern District of New York, Case No.

2:08-cv-01713-ERK-WDW.  The JPMorgan Class Action complaint alleges claims under

Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

412.    Allstate was included in the defined class in the JPMorgan Class Action

complaint with respect to its investments in:  JPALT 2006-A2, JPMAC 2006-CH2, JPMAC

2007-CH1, JPMAC 2007-CH2.

413.    Defendants J.P. Morgan Securities and JPMAC in this Complaint are also

defendants in the JPMorgan Class Action, for the same statutory causes of action asserted herein.

414.    **The Bear Class Action.**  On July 9, 2009, a class action was filed against various

Bear Stearns entities, former officers, and ratings agencies on behalf of all investors who

purchased or otherwise acquired certain mortgage-backed securities that were issued,

underwritten or sold by these entities.  *See Pension Trust Fund Operating Engineers v.*

*Structured Asset Mortgage Investment et al.*, S.D.N.Y. Case No. 09 Civ. 6172  (the "Bear

Stearns Class Action").  This action was later consolidated into *In re Bear Stearns Mortgage*

*Pass-Through Certificates Litigation*, S.D.N.Y. Master File No. 08 Civ. 8093 (LTS)(KNF).

415.    The Bear Stearns Class Action complaint alleges claims under Sections 11,

12(a)(2), and 15 of the Securities Act of 1933.

416.    Allstate was included in the defined class in the Bear Stearns Class Action complaint with respect to its investment in BALTA 2006-5.

417.    Defendant SAMI and BSC  (whose successor J.P. Morgan Securities is sued herein) are defendants in the Bear Stearns Class Action, for the same statutory causes of action asserted herein.

418.    **The WaMu Class Action.**  On January 12, 2009, a class action was filed against various Washington Mutual entities, former officers, and ratings agencies on behalf of all investors who purchased or otherwise acquired certain mortgage-backed securities that were issued, underwritten or sold by these entities.  *See Boilermakers National Annuity Trust Fund v. WaMu Mortgage Pass-Through Certificates, Series AR1,* W.D.Wa. Case No. C09-0037 (MJP) (the "WaMu Class Action," and together with the JPMorgan Class Action and the Bear Stearns Class Action, the "Class Actions").  On March 24, 2010, this action was consolidated as Case No. C09-0037MJP.  The WaMu Class Action complaint alleged claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

419.    Allstate was originally included in the defined class in the WaMu Class Action complaint with respect to its investment in WaMu 2006-AR5; WaMu 2006-AR9; WaMu 2006-AR11; and WaMu 2007-HY7.  The district court's September 2010 ruling, however, dismissed all but one of these offerings from the action, prompting Allstate to bring this separate suit.

420.    Defendants WCC and WMAAC in this Complaint are also Defendants in the WaMu Class Action, for the same statutory causes of action asserted herein.

421.    Allstate thus reasonably and justifiably relied on the named plaintiffs in the Class Actions to protect its rights and it reasonably and justifiably relied on the class action tolling doctrines of *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and *In re*

*WorldCom Securities Litigation*, 496 F.3d 245, 256 (2d Cir. 2007) to toll the statute of limitations on its 1933 Act claims.

422.    Under *American Pipe*, all putative class members are treated as if they filed their own individual actions until they either opt out or until a certification decision excludes them. *American Pipe*, 414 U.S. at 255.  As the Second Circuit stated in *WorldCom* "because Appellants were members of a class asserted in a class action complaint, their limitations period was tolled under the doctrine of *American Pipe* until such time as they ceased to be members of the asserted class, notwithstanding that they also filed individual actions prior to the class certification decision."  *WorldCom*, 496 F.3d at 256.

423.    Although the classes in the Class Actions have not been certified yet and Allstate's claims related to these trusts may be covered in the Class Actions, Allstate has chosen to file this separate action and to assert its 1933 Act claims, which have been tolled by the pendency of the Class Actions, in order to preserve its rights thereto.

## FIRST CAUSE OF ACTION
### (Common-law Fraud)

424.    Allstate realleges each allegation above as if fully set forth herein.

425.    This count is against all Defendants, including JPMC Bank in its capacity as successor in interest to WMB, and J.P. Morgan Securities in its capacity as successor in interest to BSC.

426.    The material representations set forth above were fraudulent, and Defendants' representations fraudulently omitted material statements of fact.  The representations at issue are identified and summarized in Section I above and further identified in Exhibits D-CC.

427.   Each of Defendants knew their representations and omissions were false and/or misleading at the time they were made.  Each made the misleading statements with an intent to defraud Allstate.

428.   Allstate justifiably relied on Defendants' false representations and misleading omissions.

429.   Had Allstate known the true facts regarding Defendants' underwriting practices and quality of the loans making up the securitizations, it would not have purchased the Certificates.

430.   As a result of the foregoing, Allstate has suffered damages according to proof.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation)

431.   Allstate realleges each allegation above as if fully set forth herein.

432.   This count is against Defendants.

433.   Including not only the Certificates at issue here but others not part of this action, Allstate made approximately 45 purchases in offerings of mortgage-backed securities that Defendants securitized and sold.

434.   Because Defendants arranged the securitizations, and originated or acquired, underwrote, and serviced most of the underlying mortgage loans, they had unique and special knowledge about the loans in the Offerings.  In particular, they had unique and special knowledge and expertise regarding the quality of the underwriting of those loans, as well as the servicing practices employed as to such loans.

435.   Because Allstate could not evaluate the loan files for the mortgage loans underlying its Certificates, and because Allstate could not examine the underwriting quality or servicing practices for the mortgage loans in the Offerings on a loan-by-loan basis, it was heavily

reliant on Defendants' unique, special and superior knowledge regarding the mortgage loans

when determining whether to make each investment in the Certificates.  Allstate was entirely

reliant on Defendants to provide accurate information regarding the loans in engaging in that

analysis.  Accordingly, Defendants were uniquely situated to evaluate the economics of each

Offering.

436.    Allstate relied on Defendants' unique, special and superior knowledge regarding

the quality of the underlying mortgage loans and their underwriting when determining whether to

invest in the Certificates at issue in this action.  Allstate's longstanding relationship with

Defendants, coupled with Defendants' unique and special knowledge about the underlying loans,

created a special relationship of trust, confidence, and dependence between Defendants and

Allstate.

437.    Defendants were aware that Allstate relied on their unique, special and superior

knowledge, expertise and experience and depended upon them for accurate and truthful

information.  They also knew that the facts regarding their compliance with their underwriting

standards were exclusively within their knowledge.

438.    Based on their expertise, superior knowledge, and relationship with Allstate,

Defendants owed a duty to Allstate to provide complete, accurate, and timely information

regarding the mortgage loans and the Offerings.  Defendants breached their duty to provide such

information to Allstate.

439.    Defendants likewise made misrepresentations in order to induce Allstate's

investment in the Offerings.  These misrepresentations are set forth above and in Exhibits D-CC.

At the time they made these misrepresentations, Defendants knew, or at a minimum were

negligent in not knowing, that these statements were false, misleading, and incorrect.  Such

information was known to Defendants but not known or readily known to Allstate, and

Defendants knew that Allstate was acting in reliance on mistaken information.

440.     Allstate reasonably relied on the information Defendants did provide and was

damaged as a result of these misrepresentations.  Had Allstate known the true facts regarding

Defendants' underwriting practices and the quality of the loans making up the Offerings, it

would not have purchased the Certificates.

441.     Defendants were in the business of providing information for use by others,

including Allstate.  Specifically, but without limitation, they were in the business of providing

information by way of the Offering Materials so that investors could rely on them in deciding

whether to invest in the securities being offered.  This information was for the use of a small

class of large, institutional investors.

442.     Defendants' material misrepresentations and omissions set forth above were made

without any reasonable ground for believing that the representations were true.

443.     As a result of the foregoing, Allstate has suffered damages according to proof.

### THIRD CAUSE OF ACTION
**(Violation of Section 11 of the 1933 Act) )**

444.     Allstate realleges each allegation above as if fully set forth herein, except to the

extent that Allstate expressly excludes from this cause of action any allegation that could be

construed as alleging fraud or intentional or reckless conduct.

445.     This claim is brought under Section 11 of the Securities Act of  1933 (the "1933

Act"), 15 U.S.C. §77k ("Section 11"), against J.P. Morgan Securities (both in its own capacity

and as successor to BSC) and WCC as underwriters, JPMAC, WMAAC, WMMSC, Long Beach

Securities, SAMI, and BSABS as depositors, and Individual WaMu Defendants (collectively, the

"Section 11 Defendants"), arising from Allstate's purchases of the Certificates.

446.    This cause of action is based solely on claims of strict liability or negligence

under the 1933 Act.  This count is predicated upon the Section 11 Defendants' strict liability for

making untrue and materially misleading statements in the Offering Materials for the following

Offerings that Allstate invested in (identified by the name of the Offering):

> JPALT 2006-A2; JPMAC 2006-CH2; JPMAC 2007-CH1; JPMAC 2007-CH2;
>
> BALTA 2006-5; WaMu 2006-AR5; WaMu 2006-AR9; WaMu 2006-AR11; and
>
> WaMu 2007-HY7.

447.    Each of Allstate's purchases of the Certificates was made pursuant to the false

and misleading Offering Materials, including the registration statements.

448.    The Offering Materials for the Offerings were materially untrue, misleading,

contained untrue statements of material facts, and omitted to state material facts required to be

stated therein or necessary to make the statements therein not misleading.  At the time it obtained

the Certificates, Allstate did not know of the facts concerning the untrue and misleading

statements and omissions alleged herein.

449.    The materially untrue statements and omissions of material fact in the Offering

Materials are set forth in Sections I and II above, and in Exhibits D-CC.

450.    The Section 11 Defendants caused to be issued and disseminated, directed other

parties to disseminate at the time of the filing of the Offering Materials, and/or participated in the

issuance and dissemination to Allstate of materially untrue statements of facts and omissions of

material facts, which were contained in the Offering Materials.

451.    The Section 11 Defendants are strictly liable to Allstate for the materially untrue

statements and omissions in the Offering Materials under Section 11.  Defendants JPMAC,

WMAAC, WMMSC, Long Beach Securities, SAMI, and BSABS, as depositors, are liable for

issuing the Certificates, in particular, within the meaning of Section 2(a)(4) of the 1933 Act, 15

U.S.C. §77b(a)(4), and in accordance with Section 11(a) of the 1933 Act, 15 U.S.C. §77k(a).

452.    Defendants J.P. Morgan Securities and WCC are liable for their roles as

underwriters of the Offerings, in accordance with Section 11(a)(5) of the 1933 Act, 15 U.S.C.

§77k(a)(5).

453.    Individual WaMu Defendants are liable for signing the registration statements, in

accordance with Section 11(a)(1) of the 1933 Act, 15 U.S.C. §77k(a)(1).

454.    The Section 11 Defendants owed Allstate a duty to make a reasonable and

diligent investigation of the statements contained in the Offering Materials at the time they

became effective to ensure that such statements were true and correct and that there was no

omission of material facts required to be stated in order to make the statements contained therein

not misleading.  The Section 11 Defendants failed to exercise such due diligence by failing to

conduct a reasonable investigation.

455.    This action is brought within one year of the discovery of the materially untrue

statements and omissions in the Offering Materials, and brought within three years of the

effective date of the Offering Materials, by virtue of the timely filing of the Class Actions and by

the tolling of Allstate's claims afforded by such filings.

456.    Allstate has sustained damages measured by the difference between the price

Allstate paid for the Certificates and (1) the value of the Certificates at the time this suit is

brought, or (2) the price at which Allstate sold the Certificates in the market prior to the time suit

is brought.  Allstate's Certificates lost substantial market value subsequent to and due to the

materially untrue statements of facts and omissions of material facts in the Offering Materials

alleged herein.

457.    By reason of the conduct herein alleged, the Section 11 Defendants violated Section 11 of the 1933 Act and are jointly and severally liable for their wrongdoing.  By virtue of the foregoing, Allstate is entitled to damages from each of the Section 11 Defendants.

## FOURTH CAUSE OF ACTION
### (Violation of Section 12(a)(2) of the 1933 Act)

458.    Allstate realleges each allegation above as if fully set forth herein, except to the extent that Allstate expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct.

459.    This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.

460.    This count is predicated upon Defendants' negligence for making untrue and materially misleading statements in the Offering Materials for the following Offerings that Allstate invested in (identified by the name of the Offering):

JPALT 2006-A2; JPMAC 2006-CH2; JPMAC 2007-CH1; JPMAC 2007-CH2;

BALTA 2006-5; WaMu 2006-AR5; WaMu 2006-AR9; WaMu 2006-AR11; and

WaMu 2007-HY7.

461.    This is a claim brought under Section 12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2) ("Section 12(a)(2)"), against J.P. Morgan Securities (both in its own capacity and as successor in interest to BSC) and WCC, as underwriters, and JPMAC, WMAAC, WMMSC, Long Beach Securities, SAMI, and BSABS as depositors (collectively the "Section 12(a)(2) Defendants"), arising from Allstate's purchases of the Certificates.

462.    The Section 12(a)(2) Defendants offered and sold the Certificates to Allstate by means of the defective Offering Materials, including the Prospectuses and Prospectus Supplements, which contain materially untrue statements of facts and omit to state material facts

necessary to make the statements, in light of the circumstances under which they were made, not

misleading.  Allstate purchased the Certificates directly from the Section 12(a)(2) Defendants,

who both transferred title to Allstate and who solicited Allstate for financial gain.

463.    The materially untrue statements of facts and omissions of material fact in the

Offering Materials are set forth in Sections I above and in Exhibits D-CC.

464.    The Section 12(a)(2) Defendants offered the Certificates for sale, sold them, and

distributed them by the use of means or instruments of transportation and communication in

interstate commerce.

465.    The Section 12(a)(2) Defendants owed to Allstate the duty to make a reasonable

and diligent investigation of the statements contained in the Offering Materials, to ensure that

such statements were true, and to ensure that there was no omission to state a material fact

required to be stated in order to make the statements contained therein not misleading.  The

Section 12(a)(2) Defendants failed to exercise such reasonable care.

466.    The Section 12(a)(2) Defendants knew, or in the exercise of reasonable care

should have known, that the Offering Materials contained materially untrue statements of facts

and omissions of material facts, as set forth above, at the time of the Offerings.  Conversely,

Allstate did not know, nor in the exercise of reasonable diligence could it have known, of the

untruths and omissions contained in the Offering Materials at the time it purchased the

Certificates.

467.    This action is brought within one year of the time when Allstate discovered or

reasonably could have discovered the facts upon which this action is based, and within three

years of the time that the Certificates upon which this cause of action is brought were sold to the

public, by virtue of the timely filing of the Class Actions and by the tolling of Allstate's claims

afforded by such filings.

468.    Allstate sustained material damages in connection with its investments in the

Offerings and accordingly has the right to rescind and recover the consideration paid for the

Certificates, with interest thereon, in exchange for tendering the Certificates.  Allstate hereby

tenders its Certificates and demands rescission.

### FIFTH CAUSE OF ACTION
**(Successor and Vicarious Liability)**

469.    Allstate realleges each allegation above as if fully set forth herein.

470.    Defendant J. P. Morgan Securities is the successor to BSC, pursuant to a merger

agreement.  J.P. Morgan Securities is liable for BSC's wrongdoing, in its entirety, under

common law, because BSC merged and consolidated with J. P. Morgan Securities, because J. P.

Morgan Securities has expressly or impliedly assumed BSC's tort liabilities, and because J. P.

Morgan Securities is a mere continuation of BSC.

471.    Defendant JPMC Bank succeeded to WMB's liabilities pursuant to the PAA.

JPMC  Bank is liable for WMB's wrongdoing, in its entirety, under common law, because WMB

merged and consolidated with JPMC Bank, because JPMC Bank has expressly or impliedly

assumed WMB's tort liabilities, and because JPMC Bank is a mere continuation of WMB.  This

action is thus brought against JPMC Bank both in its own capacity and as successor to WMB.

### PRAYER FOR RELIEF

WHEREFORE Allstate prays for relief as follows:

An award of damages in favor of Allstate against all Defendants, jointly and severally,

for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at

trial, but including at a minimum:

a.      Allstate's monetary losses, including loss of the Certificates' market value and

loss of principal and interest payments;

b.      Attorneys' fees and costs;

c.      Prejudgment interest at the maximum legal rate; and

d.      Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Allstate hereby demands a trial by jury on all issues triable by jury.

DATED:    New York, New York
          February 15, 2011

                              Respectfully submitted,

                              QUINN EMANUEL URQUHART &
                              SULLIVAN, LLP

                              By: _____

                              Daniel L. Brockett
                              David D. Burnett
                              51 Madison Avenue, 22nd Floor
                              New York, New York  10010-1601
                              Telephone:  (212) 849-7000
                              Fax:  (212) 849-7100
                              danbrockett@quinnemanuel.com
                              daveburnett@quinnemanuel.com


                              *Of Counsel: (pro hac vice* applications
                                           forthcoming)

                              Anthony P. Alden
                              Jeanine M. Zalduendo
                              John S. Lee
                              865 South Figueroa Street, 10th Floor
                              Los Angeles, California, 90017
                              Telephone:  (213) 443-3000
                              Fax:  (213) 443-3100
                              anthonyalden@quinnemanuel.com
                              jeaninezalduendo@quinnemanuel.com
                              johnlee@quinnemanuel.com

                              *Attorneys for Plaintiffs Allstate Bank,
                              Allstate Insurance Company, Allstate Life
                              Insurance Company, Allstate New Jersey
                              Insurance Company, Allstate Life
                              Insurance Company of New York, Agents
                              Pension Plan, and Allstate Retirement Plan*