Exhibit 16

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
SYNCORA GUARANTEE INC.,

              Plaintiff,

        -against-

COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE SECURITIES CORP., and
COUNTRYWIDE FINANCIAL CORP.,

              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. _____ /__

SUMMONS

Date Index No. Purchased:

To the above named Defendants,

    You are hereby summoned to answer the complaint in this action and to serve a copy of

your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiff's attorney within 20 days after the serviced of this summons,

exclusive of the day of service (or with 30 days after the service is complete if this summons is

not personally delivered to you within the State of New York); and in case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

complaint.

    The basis of the venue is Plaintiff's residence, CPLR §§ 503(a), (c), and a contractual

provision, CPLR § 501.

Dated:    New York, New York
        January 28, 2009

                        DEBEVOISE & PLIMPTON LLP

                    By: _____
                        Mark P. Goodman
                        Donald W. Hawthorne
                        John S. Craig

Felix J. Gilman
919 Third Avenue
New York, New York  10022
(212) 909-6000

*Attorneys for Plaintiff.*

*Defendants' Addresses:*

To:     Countrywide Financial Corporation and Countrywide Securities Corporation
c/o The Prentice Hall Corporation System
2711 Centerville Road, Suite 400
Wilmington, DE 19808


To:     Countrywide Home Loans, Inc.
c/o C T Corporation System
111 Eighth Avenue
New York, NY 10011

2

SUPREME COURT OF THE STATE OF NEW YORK,
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SYNCORA GUARANTEE INC.,                                    :

                                    Plaintiff,        :        Index No. _____

    - against -

                                            :

COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE SECURITIES CORP. and                           :        COMPLAINT
COUNTRYWIDE FINANCIAL CORP.,

                                     :

                          Defendants.

                                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Plaintiff Syncora Guarantee Inc. ("Syncora"), by and through its undersigned

attorneys, for its complaint against Countrywide Home Loans, Inc. ("Countrywide Home

Loans"), Countrywide Securities Corporation ("Countrywide Securities") and

Countrywide Financial Corporation ("Countrywide Financial") (collectively,

"Countrywide"), alleges as follows:

**Overview of Claims**

        1.     This is an action for fraud and breach of contract arising out of

misrepresentations made by Countrywide in connection with two securitizations of home

equity mortgage loans ("HELOCs") originated by Countrywide and insured by Syncora.

To obtain Syncora's agreement to insure these securities against default, and thus

enhance their marketability, Countrywide represented to Syncora that Countrywide had

acted prudently and responsibly in underwriting the loans: among other things,

Countrywide represented to Syncora that the loans in the portfolios conformed with its

underwriting guidelines and that it knew nothing about the loans that would cause a

reasonable underwriter to conclude they would default.  These representations were false.

It has become clear that, in originating the loans in these portfolios, Countrywide, consistent with its business practices at the time, systematically ignored its own underwriting guidelines and made imprudent loans that no reasonable underwriter would have made in a single-minded pursuit of generating ever-greater volumes of new loans. As a result, thousands of non-performing loans in the securitized portfolios violated Countrywide's own guidelines and should never have been made, and Syncora has already been required to pay over $120 million in claims on the policies. Countrywide's fraudulent inducement of Syncora's agreement to insure the securitizations and Countrywide's breach of its fundamental contractual obligations to Syncora entitle Syncora to compensation for all damages it has suffered as a result of its agreement to insure the securities, including the over one hundred million dollars it has paid and will pay in claims. Alternatively, Countrywide is liable for the tens of millions of dollars of non-performing loans that it included in the securitizations in breach of its express contractual representations and warranties.

2.    Countrywide created the securitizations by aggregating thousands of HELOCs that it and its subsidiaries originated and selling them to two trusts. The trusts issued notes backed by the HELOCs. Payments to the noteholders of interest and principal on the notes depend on the continuing stream of interest and principal payments on the HELOCs held by the trusts. When HELOC borrowers default, the trusts have less money available to pay the noteholders. If too many HELOC borrowers default, the trusts cannot make payments on the notes.

2

3.      To make the notes more attractive to investors, Countrywide contracted

with Syncora to act as an insurer, or "credit enhancer," of the notes issued in these

securitizations. Syncora improved the credit rating of the notes by guaranteeing to the

noteholders that they would receive timely payments of interest and principal, and that

Syncora would make up any shortfall between the principal balance of the insured notes

and the principal balance of the mortgage loans that collateralized the notes on each

distribution date. The risk that Syncora would have to pay claims was directly tied to the

soundness of the underlying loans in the portfolio.

4.      To induce Syncora to agree to insure the securitizations, Countrywide

made extensive representations about the credit-worthiness of the securitized loans in

prospectuses, loan tapes, and other documents provided to Syncora. Countrywide also

represented in these documents and the contracts that it would follow its own guidelines

in originating loans, that it qualified borrowers based on income, that the borrowers'

properties (which served as collateral for the loans) had been appraised independently

and fairly, that it appropriately verified borrower income, and that its originating

activities complied with applicable law.

5.      Countrywide knew that these representations were false, since they were

inconsistent with Countrywide's current underwriting practices. As disclosures by

former Countrywide employees, suits by numerous attorneys general and other public

authorities, and Syncora's own investigation of Countrywide's loan files have revealed,

Countrywide systematically ignored its lending guidelines in order to focus on increasing

the volume of loan originations, and its own fees, at the expense of any regard for the

quality of the loans, the credit-worthiness of borrowers, or the potential impact of its conduct on Syncora or the noteholders.

6.      Countrywide regularly ignored its own guidelines when they were too stringent to permit a loan, employed inflated home appraisals, and accepted obviously exorbitant, unconfirmed self-reported statements of income in order to justify making loans that should never have been made.  Rather than rejecting loans that failed to meet its underwriting guidelines, Countrywide referred them to more senior underwriters, who almost invariably approved them, based on bogus "compensating factors."  As a former senior Countrywide officer put it, "the fiduciary responsibility of making sure whether the loan should truly be done was not as important as getting the deal done."

7.      Attorneys general in states across the nation have brought suit against Countrywide for these underwriting practices.  Their claims describe in detail how Countrywide sacrificed underwriting standards in order to increase loan volume at the expense of borrowers, the securitized mortgage markets, and insurers like Syncora.  For example, the California Attorney General has alleged that Countrywide Financial and Home Loans "set out to double Countrywide's share of the national mortgage market . . . through a deceptive scheme to mass produce loans for the secondary market . . . with little or no regard to borrowers' long-term ability to afford" the loans Countrywide made.

8.      As the attorney generals' suits and Countrywide's recent $8.6 billion settlement with eleven states make clear, Countrywide's breaches of its guidelines reflect a company-wide rejection of responsible underwriting practices in pursuit of greater loan volume, regardless of risk.  In 2004, Angelo Mozilo, Countrywide's former chairman and

4

CEO, publicly announced that Countrywide would double its market share of loan originations within four years. Mozilo claimed that this expansion would lead to "no compromise" in Countrywide's underwriting standards – a claim that has proved to be spectacularly inaccurate. To meet this goal, Countrywide's management pressured its underwriters to ignore underwriting guidelines and generate an enormous volume of loans to be securitized and sold on the secondary market. High-risk borrowers, rather than being a source of concern, became a source of additional fees and points. Countrywide developed an automated "exception processing system" designed, as internal Countrywide documents reveal, to "[a]pprove virtually every borrower and loan profile, with pricing add on where necessary." Countrywide intended that the resulting loans would be sold and securitized, and that Countrywide would retain only a limited residual interest in the securitized loans. The downside risk and cost of default would be borne by the noteholders who purchased the securities and the companies like Syncora that insured them.

9.      The loans in the Countrywide portfolios insured by Syncora reflect the abandonment of sound underwriting practices described by the attorneys general. Syncora has reviewed all loans in the two Countrywide securitizations with balances of over $25,000 that were non-performing as of February 2008, the most recent date for which Countrywide has provided Syncora the loan data to which it is contractually entitled. Of these, Syncora has already identified at least two thousand loans – *75% of the loans reviewed, with an aggregate principal balance in excess of $187 million* – that were underwritten in violation of Countrywide's own lending guidelines, lack any

5

compensating factors that could justify their increased risk, and should never have been made. When Countrywide provides the missing data, Syncora will be able to extend its review to loans that became or will become non-performing after February 2008; Syncora expects to find that a similar proportion of any further non-performing loans are in breach of Countrywide's contractual commitments.

10.    The harm to Syncora from Countrywide's misrepresentations, omissions, and breaches of its representations and warranties is ongoing. As of early January, 2009, Syncora had already paid $120 million in claims to noteholders of these securitizations, and these payments will continue, and may grow, as defaults continue.

11.    Because Countrywide fraudulently induced Syncora to enter the contracts of insurance based on representations concerning the quality of its loans and its underwriting practices that Countrywide knew to be false, and because Countrywide's intentional, wholesale disregard of its own basic underwriting standards deprived Syncora of the basis of its bargain, Syncora is entitled to recover all losses suffered as a result of entering into the contracts of insurance. In the alternative, Countrywide must compensate Syncora for the thousands of securitized loans that were originated in violation of Countrywide's own guidelines or otherwise materially breached Countrywide's representations and warranties.

**The Parties**

12.    Syncora is a monoline insurance corporation headquartered in New York. It is a wholly-owned subsidiary of Syncora Holdings Ltd., a financial services holding company domiciled in Bermuda. At the time the securitizations at issue here were entered into, Syncora was known by its former name, XL Capital Assurance Inc.

6

13.    Monoline insurers such as Syncora often are engaged to enhance the credit-worthiness of securitizations such as those at issue here by writing "credit enhancement" insurance policies guaranteeing the timely payment to the noteholders of the scheduled amounts of principal and interest due on the notes, and any payments necessary to maintain parity between the balance of the notes and the collateral.

14.    Defendant Countrywide Financial Corporation is, on information and belief, a Delaware corporation, with its headquarters in California. It is the successor to a company of the same name, which was merged into Red Oak Merger Corporation on July 1, 2008, and which was subsequently renamed Countrywide Financial Corporation. It is a diversified financial services holding company and, as of July 1, 2008, a wholly owned subsidiary of Bank of America Corporation.

15.    Defendant Countrywide Home Loans, Inc. is, on information and belief, a wholly-owned subsidiary of Countrywide Financial Corporation. Countrywide Home Loans is a New York corporation with its principal executive offices in California. Countrywide Home Loans describes itself as "the nation's leading independent home loan lender."

16.    Defendant Countrywide Securities Corporation is, on information and belief, a wholly-owned subsidiary of Countrywide Financial. Countrywide Securities is a Delaware corporation with executive offices in California and New York. Countrywide Securities is a registered broker-dealer and underwrites offerings of mortgage-backed securities.

7

17.    Countrywide or its affiliates originated, selected, sold and serviced all of the loans at issue here, and marketed the securitizations backed by those loans, including making all related SEC filings.

## Jurisdiction And Venue

18.    The Court has jurisdiction, and venue is proper, because Countrywide Home Loans has consented to the jurisdiction of the courts of New York State for any claim arising out of the contracts and transactions at issue and has waived any objections to venue.

19.    In addition, Countrywide Home Loans and Countrywide Securities are registered or licensed to do business in New York, have appointed an agent for service of process in New York, and have agreed to the jurisdiction of New York courts over matters arising out of activities in the State.  All defendants do business in or derive substantial revenue from New York State.  All defendants made representations and participated in negotiations and other activities within New York that led to the transactions at issue, the transactions themselves occurred within New York, and Syncora was injured in New York.

## Factual Allegations

### The Securitizations And Syncora's Role As Credit Enhancer

20.    Two securitizations of mortgage loans are principally at issue in this case: Revolving Home Equity Loan Asset Backed Notes, Series 2005-K ("the 2005-K Series") and Revolving Home Equity Loan Asset Backed Notes, Series 2006-D ("the 2006-D Series") (together with the 2005-Series, the "Securitizations").

8

21.     The mortgage loans included in the Securitizations are HELOCs. A HELOC is a revolving loan secured by a lien against real property, providing the borrower a line of credit that can be drawn up to a specified maximum amount. The HELOCs at issue here are second liens, junior in priority to first liens on the properties. If the property securing one of these HELOCs is foreclosed upon, the first lien holder must be fully paid before there is any recovery for the HELOC.

22.     As represented by Countrywide, all of the mortgage loans in the Securitizations were underwritten by Countrywide or by its affiliates. Countrywide then selected and pooled the mortgage loans into securitizations.

23.     Effective December 29, 2005, Countrywide Home Loans and Park Monaco, Inc. ("Park Monaco"), a special purpose vehicle created and controlled by Countrywide, entered into a Purchase Agreement ("the 2005-K Purchase Agreement") with CWHEQ, Inc., also a Countrywide subsidiary. Pursuant to this Purchase Agreement, Countrywide Home Loans and Park Monaco sold more than 10,000 mortgage loans to CWHEQ, Inc.

24.     Effective December 29, 2005, CWHEQ, Inc., Countrywide Home Loans, J.P. Morgan Chase Bank, N.A. ("J.P. Morgan," acting as Indenture Trustee), and the CWHEQ Revolving Home Equity Loan Trust, Series 2005-K ("the 2005-K Trust"), entered into a Sale and Servicing Agreement ("the 2005-K Sale and Servicing Agreement"). Pursuant to this Sale and Servicing Agreement, CWHEQ, Inc., acting as Depositor, deposited the mortgage loans into the 2005-K Trust. The Sale and Servicing

9

Agreement also provided that Countrywide Home Loans would act as Sponsor and Master Servicer for the Trust.

25.     Effective March 30, 2006, Countrywide Home Loans and Park Monaco entered into a second and similar Purchase Agreement ("the 2006-D Purchase Agreement") with CWHEQ, Inc., pursuant to which Countrywide Home Loans and Park Monaco sold more than 30,000 mortgage loans to CWHEQ, Inc.

26.     Effective March 30, 2006, CWHEQ, Inc., Countrywide Home Loans, J.P. Morgan acting as Indenture Trustee, and the CWHEQ Revolving Home Equity Loan Trust, Series 2006-D ("the 2006-D Trust") (together with the 2005-K Trust, "the Trusts"), entered into a Sale and Servicing Agreement ("the 2006-D Sale and Servicing Agreement"), pursuant to which CWHEQ, Inc. deposited the additional mortgage loans sold to it into the 2006-D Trust. Again, the 2006-D Sale and Servicing Agreement provided that Countrywide Home Loans would act as Sponsor and Master Servicer for the 2006-D Trust.

27.     Backed by the deposited loans, the two Trusts issued different classes and series of notes and other securities. Countrywide Home Loans, acting as the Master Servicer for both securitizations, collected payments of interest and principal from the borrowers on the mortgage loans. Countrywide Home Loans deposited those funds, at regular contractually-specified intervals, into accounts maintained on behalf of the Trusts. Using those funds, the indenture trustee for each Trust made scheduled payments to the respective noteholders, at regular monthly intervals as set forth in the contracts.

28.     The Securitizations were intended to become over-collateralized.  The
Prospectuses for the Securitizations state that "[t]he mortgage loans are expected to
generate more interest than is needed to pay monthly interest on the . . . notes."  The
additional interest expected to be generated by the mortgage loans was to be used to pay
down the aggregate balance of the notes below the aggregate balance of the mortgage
loans, thereby increasing the protection for the noteholders and Syncora from potential
defaults.

29.     Syncora was engaged as the credit enhancer for the securitizations.  As
credit enhancer, Syncora wrote insurance policies guaranteeing the sufficiency of the
collateral held by the securitizations and the payment of the amounts due on the bulk of
the notes, as follows:

    a.     Effective December 29, 2005, Syncora (under its former name of
XL Capital Assurance Inc.), Countrywide Home Loans, CWHEQ, Inc., the 2005-
K Trust, and J.P. Morgan acting as Indenture Trustee, entered into an Insurance
and Indemnity Agreement (the "2005-K Insurance Agreement").  Pursuant to this
Agreement, Syncora issued a Financial Guaranty Insurance Policy, dated
December 29, 2005 (the "2005-K Policy"), guaranteeing to the Indenture Trustee
for the benefit of the noteholders the full and complete payment of the scheduled
amounts due on six classes of the notes: the Class 1-A, 2-A-1, 2-A-2A, 2-A-2B,
2-A-3 and 2-A-4 Notes.  The insured notes, totaling more than $1 billion, were
the bulk of the notes issued by the 2005-K Series.

11

b.    Effective March 30, 2006, Syncora (under its former name of XL Capital Assurance Inc.), Countrywide Home Loans, CWHEQ, Inc., the 2006-D Trust, and J.P. Morgan acting as Indenture Trustee, entered into a second and similar Insurance and Indemnity Agreement ("the 2006-D Insurance Agreement" and together with the 2005-K Insurance Agreement, collectively the "Insurance Agreements"). Pursuant to this Agreement, Syncora issued a Financial Guaranty Insurance Policy, dated March 30, 2006 (the "2006-D Policy" and together with the 2005-K Policy, collectively the "Policies"), guaranteeing to the Indenture Trustee for the benefit of the noteholders the full and complete payment of the scheduled amounts due on two classes of the notes, the Class 1-A Notes and the Class 2-A Notes. The insured notes, totaling nearly $2 billion, were the bulk of the notes issued by the 2006-D Series.

30.    As credit enhancer and insurer of the notes, Syncora was ultimately liable for scheduled payments on the notes in accordance with these insurance policies. If the borrowers on the underlying mortgage loans began to default on their obligations in sufficient numbers that the Trusts could no longer make scheduled payments on the notes, Syncora was contractually obligated to make up for the shortfall.

31.    Syncora was also liable for payments to maintain parity between the outstanding principal balance of the underlying mortgages, the collateral for the notes, and the principal balance of the notes in the event that defaults and write-offs of loans caused the loan balance to decline below the note balance. To date, Syncora has paid over a hundred million dollars of claims to maintain parity in both securitizations.

22823437v42

**Countrywide's Representations in SEC Filings and
Other Materials Provided to Syncora Regarding the Securitized Loans**

32.     Countrywide provided to Syncora and caused to be filed with the SEC a

Prospectus and Supplemental Prospectus in connection with each of the Securitizations,

dated respectively August 4, and December 27, 2005 for the 2005-K series and February

7, and March 29, 2006 for the 2006-D series (collectively, the "Prospectuses").

33.     Countrywide represented and warranted in the Insurance Agreements that

all material information furnished to Syncora by Countrywide, including in the

descriptions contained in the Prospectuses of Countrywide's operations and the loans

held by the Securitizations, was accurate and contained no statement of a material fact

which was untrue or misleading in any material respect when made.  Syncora was

entitled to, and did, rely on Countrywide's representations in the Prospectuses and other

SEC filings in agreeing to enter into the contracts to insure the Securitizations.

34.     The Prospectuses contain detailed descriptions of a diligent, thorough

mortgage origination process that Countrywide had purportedly employed to assess

borrowers' credit-worthiness and ensure the quality of the loans in the Securitizations. In

each of the Prospectuses, Countrywide made the following statements and

representations:

      a.     That Countrywide was "an institution experienced in originating

and servicing loans" and that it "maintain[s] satisfactory facilities to originate . . .

those loans," and that, in respect of the 2005-K Securitization, that Countrywide

was experienced at originating loans "in accordance with accepted practices and

prudent guidelines."

13

b.     That the securitized loans were "underwritten in accordance with standards consistent with those utilized by mortgage lenders generally during the period of origination for similar types of loans."

c.     That Countrywide's underwriting procedures as applied to the mortgage loans in the securitized portfolios were "intended to assess the applicant's credit standing and repayment ability, and the value and adequacy of the real property security as collateral for the proposed loan."

d.     That each applicant for a mortgage loan was required to submit an application to Countrywide "that lists the applicant's assets, liabilities, income, employment history, and other demographic and personal information," and that, if this information "demonstrates that the applicant has sufficient income and there is sufficient equity in the real property to justify making a home equity loan," Countrywide would then "conduct a further credit investigation of the applicant . . . to evaluate the applicant's ability and willingness to repay."

e.     That Countrywide determined based on information in the loan application and credit reports whether an applicant qualified for loans under the various documentation programs offered by Countrywide. The Prospectuses state that borrowers under the full documentation program would be required to document their employment, income and assets, including by providing verifications of employment, one month's paystubs and W-2s from the most recent two years (or, alternatively, no verification of employment, but two years' paystubs and W-2s).

14

f.    That only applicants whose "credit histories . . . demonstrate an established ability to repay indebtedness in a timely fashion" would be eligible to use Countrywide's "Reduced Documentation Program," which "waived . . . certain credit underwriting documentation concerning income and employment verification."

g.    That "independent third-party . . . [f]ull appraisals are generally performed on all home equity loans."

h.    That, after "obtaining all applicable income, liability, asset, employment, credit and property information," Countrywide would determine if the applicant met the loan program guidelines, and whether "the prospective borrower has sufficient monthly income available to support the payments on the home equity loan in addition to any senior mortgage loan payments."

i.    That only where the applicant met the guidelines – or where compensating factors such as "employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan" were present – would Countrywide make the loan.

35.    When Countrywide made these representations in the Prospectuses it knew that it was misrepresenting its underwriting process and failing to disclose its routine, material deviations from sound underwriting practices.

36.    Countrywide also falsely represented in its annual reports and other public filings that its underwriting process was "sound" and "designed to produce high quality loans." The 2004 Countrywide annual report stated that:

15

> Our Credit Policy establishes standards for the
> determination of acceptable credit risks. Those standards
> encompass borrower and collateral quality, underwriting
> guidelines and loan origination standards and procedures.
> Borrower quality includes consideration of the borrower's
> credit and capacity to pay. We assess credit and capacity to
> pay through the use of credit scores, application of a
> mortgage scorecard, and manual or automated underwriting
> of additional credit characteristics. Collateral quality
> includes consideration of property value, condition and
> marketability and is determined through physical
> inspections and the use of manual and automated valuation
> models. . . . In addition, we employ proprietary
> underwriting systems in our loan origination process that
> improve the consistency of underwriting standards, assess
> collateral adequacy and help to prevent fraud, while at the
> same time increasing productivity.

In addition to this purportedly rigorous underwriting process, Countrywide claimed to

employ "an extensive post-funding quality control process:"

> Our Quality Control Department, under the direction of the
> Chief Credit Officer, is responsible for completing
> comprehensive loan audits that consist of a reverification of
> loan documentation, an in-depth underwriting and appraisal
> review, and if necessary, a fraud investigation. We also
> employ a pre- and post-funding proprietary loan
> performance evaluation system. This system identifies
> fraud and poor performance of individuals and business
> entities associated with the origination of our loans. The
> combination of this system and our audit results allows us
> to evaluate and measure adherence to prescribed
> underwriting guidelines and compliance with laws and
> regulations.

37.    In addition to such representations regarding its underwriting practices,

Countrywide provided Syncora with information regarding the loans included in the

Securitizations to induce Syncora to insure them. For example, Countrywide provided

Syncora with data concerning each securitized loan, in what is commonly known as a

"loan tape." The tape made representations about the characteristics of each loan,

16

including debt-to-income ratios and combined loan to value ratios ("CLTVs"). (A CLTV is the ratio of the combined value of the loans on a mortgaged property, including first and second mortgages, to the value of the property.) Countrywide represented that the information contained in these tapes was accurate. These representations have proved to be false and misleading.

38.    Countrywide also provided Syncora with aggregated information about the securitized loans in annexes to the Prospectuses. The annexes included statistical information based on the outstanding balances as of the statistical calculation date of a significant portion of the loans to be transferred to the Trusts. This statistical information was updated as of the cut-off date in a similar filing with the SEC. The annexes contain detailed information about such statistics as CLTV ratios, credit scores, and property ownership characteristics, for stratified segments of each group of loans. Syncora relied on the accuracy of this information in agreeing to insure the securitizations. Syncora's ongoing analysis of non-performing loans has already demonstrated that these statistics were erroneous, and significantly understated the credit risk of the securitized loans.

39.    Countrywide also provided information to the ratings agencies so that they could issue shadow ratings on the pools of mortgage loans to Syncora. Shadow ratings are evaluations of the risk of a proposed securitization issued by third-party rating agencies, based on expected default rates and losses of the underlying loans (without regard to the insurance policy provided by Syncora). Syncora's agreement to insure the securitizations was expressly contingent on certain minimum credit ratings being issued by Standard and Poor's and Moody's. Countrywide solicited these shadow credit ratings

17

from the credit rating agencies through misrepresentations to the agencies concerning the credit-worthiness of the loans and omissions of critical facts about Countrywide's underwriting process, including by providing loan tapes to the ratings agencies containing misrepresentations concerning the characteristics of the securitized loans.

40.    Countrywide also provided Syncora with copies of Countrywide's own due diligence on the loans in the portfolios.  For example, on March 29, 2006, prior to execution of Syncora's agreement to insure the 2006-D Securitization, Tonya LyBrand of Countrywide provided Linda Kobrin of Syncora with a copy of the Executive Summary of Countrywide's due diligence on the transaction.  The Countrywide document described a due diligence review undertaken by Watterson Prime.  According to the Executive Summary "the purpose of the audit review was to ascertain that the loans in this security conform to [Countrywide's] credit guidelines and that prudent and reasonable underwriting decisions were made if loans were approved as exceptions to those guidelines."  The Review concluded that "the overall qualify of the loan portfolio sample reviewed was found to be acceptable . . . .  There was no discernable pattern across all categories that would deem [sic] to increase both the credit and compliance samples."  As Countrywide well knew, Syncora relied on these representations regarding Countrywide's underwriting processes and the characteristics of the securitized loans.

41.    The 2005-K and 2006-D Securitizations involved tens of thousands of individual loans.  As Syncora and Countrywide both recognized, the period of a few weeks between Countrywide's solicitation of bids and its selection of a credit enhancer did not provide Syncora sufficient opportunity to evaluate independently more than a tiny

22823437v42

fraction of the loans in the portfolios. Many of the loans at issue were not even added to the Securitizations until after closing. The few loans that Syncora was able to review in this brief period did not reveal Countrywide's pervasive failure to adhere to underwriting standards, or put Syncora on notice that further review was necessary. Accordingly, both Syncora and Countrywide understood that Syncora was required to rely on the accuracy of Countrywide's representations in agreeing to insure the Securitizations.

**Countrywide's Contractual Representations
and Warranties Regarding the Securitized Loans**

42.     The Purchase Agreements for both Securitizations contain more than sixty representations and warranties by Countrywide concerning the quality of the loans in the portfolio and Countrywide's underwriting practices, and covering such topics as the loans' compliance with Countrywide's underwriting guidelines, applicable law, and Fannie Mae and Freddie Mac standards, the nature of the mortgaged property, and the credit-worthiness of the loan.

43.     Among other things, Countrywide represented and warranted that:

- "[E]ach Mortgage Loan was originated in accordance with [Countrywide's] underwriting guidelines and [Countrywide] had no knowledge of any fact that would have caused a reasonable originator of mortgage loans to conclude on the date of origination of each Mortgage Loan that each such Mortgage Loan would not be paid in full when due."

- The CLTV of each loan at the time of origination was not in excess of 100%.

- "Before approval of the Mortgage Loan application, an appraisal of the related Mortgaged Property was obtained from a qualified appraiser, duly appointed by the Sponsor, who had no interest, direct or indirect, in the Mortgaged Property or in any loan secured by the Mortgaged Property, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan."

19

- "The Initial Mortgage Loans, individually and in the aggregate, conform in all material respects to their descriptions in the Prospectus Supplement," and that the Initial Mortgage Loans had the aggregate and average characteristics set out in the adoption annexes to the Purchase Agreements. The Prospectus supplements and adoption annexes included representations concerning weighted average and aggregate CLTVs and credit scores. The Prospectus supplements also described Countrywide's origination practices, including the circumstances under which stated income loans would be made available to borrowers.

- "As of the Closing Date [or Subsequent Closing Date for subsequently added loans] the information in the Mortgage Loan Schedule for the [] Mortgage Loans is correct in all material respects." The Mortgage Loan Schedule contains individual information on each loan, including CLTV and documentation type.

- "At origination, each Mortgage Loan and the related Mortgage Note complied in all material respects with applicable local, state, and federal laws, including all applicable predatory and abusive lending laws, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, or disclosure laws applicable to the Mortgage Loan, and the servicing practices used by [Countrywide] have been consistent with the practices and degree of skill and care [Countrywide] exercises in servicing for itself loans that it owns that are comparable to the Mortgage Loans."

- "As of the Closing Date [or Subsequent Closing Date for subsequently added loans] no default exists under any applicable Mortgage Note or applicable Mortgage Loan." In fact, many loans show evidence of borrower fraud, in particular with respect to stated incomes. This constitutes a default under the terms of the loan agreements, as of the time of their origination, and prior to the Closing Date of the securitizations.

- "No Mortgage Loan is classified as (1) a 'high cost' loan under the Home Ownership and Equity Protection Act of 1994 or (2) a 'high cost,' 'threshold,' 'covered,' 'predatory,' or similar loan under any other applicable state, federal or local law."

44.     Countrywide is strictly liable for the accuracy of these representations and warranties. As the Sale and Servicing Agreements provide, Countrywide must pay for

20

these breaches even if Countrywide "did not know the substance of the representation

and warranty was inaccurate at the time the representation or warranty was made."

45.    The Insurance Agreements contained further material representations and

warranties relating to the quality of individual mortgage loans in the portfolios,

Countrywide's origination practices, and the securitizations, including that:

- "[N]one of the Mortgage Loans designated in the Mortgage Loan Schedule as being covered by the Loan Insurance Policy [a third-party insurance policy covering certain loans in the 2006-D Securitization] has any characteristics that would result in its being excluded for coverage under the Loan Insurance Policy."

- "Neither the [contractual documents] nor other material information relating to the Mortgage Loans [or] the operations of Countrywide . . . furnished to the Insurer contains any statement of a material fact which was untrue or misleading in any material adverse respect when made."

- "No practice, procedure or policy employed by any of Countrywide, the Depositor or the Issuer in the conduct of its business violates any law, regulation, judgment, agreement, order or decree applicable to it which, if enforced, could reasonably be expected to result in a Material Adverse Change with respect to it or have a material adverse effect on the Transaction."

- The offering of the notes backed by the Securitizations complied "in all material respects with all requirements of law, including all registration and reporting requirements of applicable securities laws."

46.    Countrywide repeatedly and routinely breached these and other

contractual representations and warranties, materially and adversely affecting Syncora's

interests in the related loans.

**Syncora's Contractual Remedies for Countrywide's**
**Breach of its Representations and Warranties Regarding the Securitized Loans**

47.      Syncora has the right under the operative documents to the benefit of
Countrywide's representations and warranties in the Purchase Agreements and to obtain a
remedy for their breach.  Pursuant to the Insurance Agreements, each of the
representations and warranties contained in the Purchase Agreements is made "to, and for
the benefit of, . . . [Syncora] as if the same were set forth in full herein."  Additionally,
Syncora is a contractually-defined third party beneficiary to the Sale and Servicing
Agreements, which provide remedies for Countrywide's breach of its representations and
warranties under the Purchase Agreements.  As credit enhancer and insurer of the notes,
and pursuant to the Insurance Agreements, Syncora is also subrogated to the rights of the
noteholders to the extent that it has paid claims under the policies.  Syncora is thus
additionally entitled to assert the noteholders' claims to damages resulting from
Countrywide's breaches of the representations and warranties which, pursuant to the
Sales and Service Agreement, were made for the benefit of the noteholders as well.

48.      The Sale and Servicing Agreements provide that once Countrywide has
been given notice of a material breach of the representations and warranties, it has 90
days in which to cure the breach.  Syncora, as the credit enhancer, is one of the parties
authorized to give Countrywide notice of breach, triggering Countrywide's obligation to
cure.

49.      If Countrywide fails to cure a material breach with respect to any loan
"within 90 days of becoming aware of it," Countrywide is obligated to repurchase the
loan.  This repurchase remedy is commonly described as a "put-back" remedy.

22

50.     This put-back mechanism was not intended by the parties to excuse Countrywide from its obligations to act in good faith, to originate loans pursuant to its own underwriting guidelines, and to observe reasonable and prudent procedures to ensure loan quality and borrowers' credit-worthiness, as Countrywide represented when it induced Syncora to enter the insurance contracts.  While the put-back remedy is appropriate for individual breaches of the representations and warranties, Countrywide's systematic and pervasive disregard for underwriting standards goes to the basis of Syncora's bargain, and represents fraudulent inducement or a material breach of contract, entitling Syncora to all damages it has incurred as a result of entering into the contracts of insurance.

**Loan Defaults In the Securitizations Escalate And
Syncora Begins Making Payments On The Policies**

51.     In the fall of 2007, defaults began to escalate among the securitized loans. By November 2008, more than 12 % of the loans in Series 2005-K and 2006-D were more than 60 days delinquent, and 3 % of the loans in each securitization were more than 180 days delinquent.

52.     As a result of defaults and write-offs among the securitized loans, the outstanding principal balance of the loans in each securitization no longer exceeds the balance of the related insured notes.  To restore the Securitizations to parity, Syncora has been required to make payments equivalent to the resulting shortfall.

**Countrywide's Pervasive Underwriting
Abuses and Failure to Exercise Underwriting Control Come to Light**

53.     **Countrywide's Abandonment of Underwriting Standards**.  In recent months, the extent of Countrywide's misrepresentations and omissions to Syncora

23

concerning Countrywide's underwriting practices has come to light as a result of

government investigations and public and private litigation. As revealed in suits filed by

state attorneys general and municipalities, borrowers, and Countrywide's own

shareholders and employees, far from maintaining any reasonable underwriting

discipline, Countrywide adopted a corporate policy of systematically ignoring its own

underwriting guidelines and appraisal requirements in an effort to write as many

HELOCs as possible without regard for borrowers' ability to repay.

54.     As these suits have shown, Countrywide developed a computer program to

route loans that did not meet its guidelines to senior underwriters, providing them the

opportunity to override Countrywide's underwriting standards and ensure that no loan

went unwritten. Countrywide's proprietary computer software, the "Exception

Processing System" ("EPS"), directed loans rejected by the first-line loan officers and by

Countrywide's automated underwriting criteria to central underwriting offices called

"Structured Loan Desks" ("SLD") for senior underwriting approval. The loans in the

Securitizations appear to have been processed through this same system. Most of the

currently non-performing loans in the Securitizations appear to have been referred by

EPS to senior underwriters for special approval.

55.     Once loans arrived at the SLD, senior underwriters found a way to write

these loans, regardless of the risk. A Countrywide document, filed as an exhibit in a

criminal case against a former Countrywide loan officer, describes the objective of EPS

and the SLDs as to "[a]pprove virtually every borrower and loan profile with pricing add

on when necessary."

56.     This same sentiment is echoed by a former senior level vice president at Countrywide, who has said, according to a securities class action complaint filed against Countrywide, that "'so long as we could sell it, we'd do it,' . . . every loan 'has a price.'" A former senior regional vice president, Brian Koss, told Business Week that Countrywide: "approached making loans like making widgets, focusing on cost to produce and not risk or compliance.  Programs like 'Fast and Easy' where the income and assets were stated, not verified, were open to abuse and misuse.  The fiduciary responsibility of making sure whether the loan should truly be done was not as important as getting the deal done."

57.     As government regulators have alleged, rather than establishing controls to prevent making bad loans, Countrywide implemented "safeguards" to ensure that loans were not rejected, requiring two signatures before its employees could deny a loan application.  Like Countrywide itself, its employees were also rewarded for their ability to generate high volume and high fees rather than their ability to gauge applicants' creditworthiness.  As alleged in a securities complaint, a substantial portion of Countrywide's underwriters' compensation was based on the volume of loans they originated.  Underwriters' bonuses were based on a point system.  Each underwriter would get a number of points for every loan underwritten; however, more points were awarded to underwriters approving loans than to those who denied them.  As one former Countrywide employee put it, he could "count on one finger" the number of loans he had rejected.

25

58.    Volume became so important to Countrywide that, as the *Wall Street Journal* reported, in one Countrywide office giant novelty bonus checks hung over employees' desks, letting each employee know how much money their co-workers made by writing loans.

59.    Countrywide knew that it could not package and sell a securitization if it told counterparties – such as Syncora – the truth about its underwriting and appraisal standards.  Instead Countrywide continued to claim that it was adhering to prudent underwriting standards while, in practice, it ignored them.

60.    **Countrywide's $8.6 Billion Predatory Lending Settlement.** By entering into the largest predatory lending settlement in history, Countrywide has now demonstrated that, in addition to misrepresenting its underwriting practices to Syncora, it breached its representation to comply with applicable law.  On October 6, 2008, Countrywide entered into a settlement with eleven state attorney generals, resolving allegations of fraud, deceit and illegal predatory lending in connection with Countrywide's underwriting practices.  As part of this settlement, Countrywide agreed to provide $8.6 *billion* in home loan and foreclosure relief to borrowers who were unlawfully deceived into taking on loans that they could not afford.  Despite the magnitude of this settlement, Countrywide's origination practices continue to be the object of suits by many attorneys general and other public authorities.

61.    The predatory and abusive lending practices alleged by the attorneys general who settled with Countrywide support both that Countrywide misrepresented its origination practices to Syncora and that it violated its representations and warranties that

the loans in the Securitizations were in compliance with all applicable state, local and federal laws, including predatory and abusive lending laws.

62.    **Countrywide's Abuse of Stated Income Loans**.  Countrywide made widely available to borrowers "reduced documentation", or "stated income" loans, which did not require verification of a borrower's claimed income, but qualified borrowers based on income information supplied by the borrowers themselves.  As has now become apparent, Countrywide exercised no control over this loan program, accepting borrower statements of income even where the claims of reported income were highly implausible and could easily have been confirmed or disproved.

63.    Despite its representations in the Prospectus supplements that it would only make stated income loans available to borrowers with "a credit history that demonstrates an established ability to repay indebtedness in a timely fashion," it is now clear that Countrywide routinely made stated income loans available to borrowers with below-average credit.  Among the non-performing loans that Syncora has reviewed, 90% were stated income loans.  Nearly 30% had FICO scores that were "fair" or "poor," based on the standards of Fair Isaac & Company, the originator of the "FICO" score.  Stated income loans were even made available to borrowers with recent bankruptcies.

64.    Moreover, as Syncora has now discovered, substantial numbers of the non-performing loans in the Securitizations rely on stated incomes that are facially unreasonable for the types of jobs the borrowers claim to hold.  For example, one HELOC borrower in the 2006-D securitization claimed to earn $600,000 a year as a loan officer.  Given the implausibility of this self-reported income, a prudent lender should

27

have converted the loan to a full document loan and required the borrower to substantiate

the claimed income with a W-2 or pay stub; Countrywide did not do so. Instead,

Countrywide bent its rules even further and loaned this borrower more than double the

$200,000 HELOC for which he was eligible based on his *stated* income. No salary.com

report was included in this borrower's loan file; and, although Countrywide had the

borrower's authorization, no income tax reports were collected. This loan is now over

360 days delinquent.

65.    According to one attorney general's investigation, Countrywide at one

point required its employees to compare borrower's stated incomes to the results of

salary.com, a website that provides salary ranges based on job title and location.

According to the attorney general, Countrywide did not use these reports as a check or

safeguard against unreasonable stated incomes. Instead, Countrywide's employees used

the reports to coach borrowers to inflate their reported income to help qualify for loans.

If the salary.com report suggested that the applicant's stated income was unreasonable,

the Countrywide underwriter would discard the report. While salary.com reports appear

in some of the loan files in the Securitizations, they are generally absent from files of

non-performing loans with unreasonably excessive stated incomes.

66.    **Countrywide's Use of Inflated Appraisals**. As has now come to light,

Countrywide consistently urged appraisers to inflate the values of properties securing

mortgages originated by Countrywide. For example, one former Regional Vice President

of a Countrywide joint venture has alleged that Countrywide routinely encouraged its

affiliated appraisers to inflate property values. Similarly, a group of independent

28

appraisers has stated in a recently-filed class action that Countrywide pressured them to provide inflated appraisals and use improper appraisal techniques. Independent appraisers who refused to comply would be placed on Countrywide's "Field Review List," a list of firms from which Countrywide would not accept appraisals.

67.    By inflating appraisal values Countrywide could falsely suggest that loans that should never have been made complied with its guidelines. For example, the calculation of a CLTV (combined loan-to-value ratio) depends on appraised value. The higher the appraised value, the lower the CLTV. By inflating appraised values, Countrywide could increase the amount lent to a borrower and justify the loan by reference to a CLTV that appeared to be below 100% or other relevant benchmarks in Countrywide's guidelines, while in reality, based on realistic appraised values, the loan clearly would have exceeded those guidelines and should not have been made.

68.    Syncora has found that Countrywide's appraisals of properties secured by non-performing loans show a clear pattern of inflation compared to sales prices achieved for comparable properties in the locale at the time of Countrywide obtained its appraisals. Moreover, despite Countrywide's promise in the contractual documents and the Prospectuses to obtain "independent third party" appraisals, the properties underlying the vast majority of the loans in the Securitizations were appraised by Countrywide's own affiliated appraisal company, Landsafe, Inc. ("Landsafe"). Landsafe, like Countrywide Home Loans, is a subsidiary of Countrywide Financial.

22823437v42

69.     Because the mortgage loans held by the Securitizations were secured by second liens subordinated to the primary mortgage on the property, the full impact of inflated appraisals was felt by the Trusts, and hence by Syncora..

**Countrywide's Pervasive Breaches of its Representations
and Warranties Regarding the Securitized Loans Are Uncovered by Syncora**

70.     As the securitized loans began defaulting in large numbers, Syncora commenced a review of non-performing loans in order to determine whether the loans had been originated in compliance with Countrywide's representations and warranties.

71.     As part of this review, Syncora requested information from Countrywide to which Syncora was contractually entitled concerning the origination and servicing of the loans, including copies of the relevant Countrywide underwriting guidelines and complete loan files, copies of which had been supplied to Syncora were often incomplete or missing key documents.  Countrywide has stonewalled, providing this information only grudgingly and after long delays, and often refusing to provide information to Syncora in breach of express contractual obligations.

72.     Nonetheless, based on the limited information available to it, Syncora has already identified an extraordinarily high level of loans that breached Countrywide's representations and warranties.  75% of the loans reviewed have been found to be materially in breach of Countrywide's representations and warranties, representing over $187 million in defective loans.  The 90-day cure period on many of these loans has already lapsed without Countrywide repurchasing a single defective loan.

73.     The defective loans breach Countrywide's contractual obligations in many respects, including Countrywide's representation and warranty that each loan was

30

originated in accordance with Countrywide's underwriting guidelines, and that

Countrywide had no knowledge of any fact that would have caused a reasonable

originator of mortgage loans to conclude that a mortgage loan would not be paid in full.

The majority of the non-performing loans in the Securitizations exceed or ignore one or

more of the following Countrywide underwriting guidelines:

a.    **Excessive DTI**.  The guidelines specify the maximum debt-to

income ratio ("DTI") that any borrower may have.  DTI is the ratio of the

borrower's costs to service outstanding debt obligations, including payments on

the borrower's first lien and HELOC, divided by the borrower's gross income.

Countrywide's guidelines allowed for DTIs as high in some cases as 55%, yet

numerous loans in the pools have DTIs significantly in excess of even that

generous limit, without adequate factors to compensate for the substantial

increase in default risk.

b.    **Excessive CLTV**.  The guidelines set out maximum CLTVs, or

combined-loan-to-value ratios, for different types of loans, depending on factors

including the property type, the borrower's credit rating, and the level of

documentation of the loan.  In addition, Countrywide represented and warranted

that no loan in the Securitizations had a CLTV higher than 100%.  Both the

guidelines-imposed CLTV limits and the 100% ceiling were regularly violated by

Countrywide's underwriters, without the presence of factors that could

compensate for the substantial increase in exposure from lending beyond the

value of the borrower's collateral, and numerous currently non-performing loans

31

in the Securitizations were originated with CLTVs which, when properly calculated, exceeded the applicable guidelines and 100% ceiling.

    c.    **Excessive Loan Amounts**. Countrywide's guidelines impose limits on the maximum amount a borrower may draw from a HELOC depending on the borrower's credit, the type of documentation provided by the borrower, and the CLTV of the loan. Loan amount maximums limit the potential risk and cost of default, yet Countrywide routinely ignored its own limits, offering borrowers HELOCs two, three or more times larger than their credit scores, documentation and property values dictated, geometrically increasing Syncora's risk and exposure.

    d.    **Improper Calculation Of First-Lien Debt**. Countrywide routinely calculated borrowers' DTI without taking into account the real burden of their first liens. The guidelines require that where a borrower's first lien is negatively amortizing, or there are fewer than 36 months until the first lien amortizes, the borrower's first-lien debt should be calculated on a fully amortized basis. This means that, for first mortgages with reduced interest, interest only, or partial interest payments for the first three years or less, Countrywide was required to calculate the debt associated with the mortgage taking into consideration the full extent of principal and interest payments that would come due thereafter. Any other approach would understate the real debt burden on the borrower. However, in violation of its own guidelines, Countrywide routinely calculated such borrowers' first-lien debt solely on the basis of their interest

32

payments. This practice allowed Countrywide to originate loans that would, if based on a proper calculation of borrower debt, have significantly exceeded Countrywide's own limits on DTI, CLTV and other guidelines parameters

      e.      **Improper Calculation of Property Values**. Under Countrywide's guidelines, and consistent with industry practice, the value of a mortgaged property purchased within twelve months of the origination of the mortgage is – for purposes of calculating CLTV – the *lower* of the sale price or the appraised value. By ignoring this rule, and basing CLTV's on appraisals in excess of recent sales prices, thereby imputing sky-rocketing appreciation to properties purchased less than 12 months earlier, Countrywide's underwriters were able to approve loans that would, if the property value had been properly calculated, have had a CLTV well in excess of the applicable guidelines limits.

      f.      **Patently Unreasonable Stated Incomes**. Countrywide's representations that loans had been originated in accordance with its guidelines, such as maximum debt-to-income ratios, would be meaningless if Countrywide did not follow procedures to ensure that stated income loans were reasonable given the borrower's profession and location. Countrywide representatives told Syncora executives, including Linda Kobrin, in a meeting on October 18, 2005 at Countrywide's offices in Calabasas, California, that stated incomes were reviewed by Countrywide underwriters for reasonableness, as part of Countrywide's procedures. Countrywide's own due diligence review on the 2006-D securitization, which Countrywide provided to Syncora and which

33

Countrywide stated was undertaken on the same basis as "that used by [Countrywide] to initially qualify the borrowers," accepted stated borrower incomes "*except as they appeared unreasonable or internally contradictory to [Countrywide's] . . . guidelines.*" In fact, as Syncora has now learned, Countrywide routinely made loans to borrowers on the basis of obviously unreasonable statements of income without making any effort to verify the borrower's claims, or following any review process to identify unreasonable stated incomes. Salary.com reports, which would have demonstrated the unreasonableness of these stated incomes (and which, according to some complaints, Countrywide underwriters routinely ran), are present in some loan files reviewed by Syncora, but are consistently absent from files of applicants with unreasonably high stated incomes. By ignoring or encouraging inflated statements of income, Countrywide breached its own underwriting guidelines and created loans with unacceptably high credit risks.

g.     **Borrower Fraud**. In addition, where borrowers fraudulently overstated their incomes (or made other material misrepresentations) in connection with their loan applications, the affected loans were in default under the terms of the loan agreements as of their origination. Countrywide, through its representation and warranty in the Purchase Agreements that no loan would be in default as of the Closing Date (or subsequent date on which the loan was added to the securitizations) also represented and warranted that no loan would be the product of borrower fraud. Yet Syncora has found numerous loans which appear

to be the product of fraud on the part of borrowers concerning material issues including stated incomes, employment and occupancy status.

h.    **Indiscriminate Availability of Stated Income Loans**. Country-wide claimed in the Prospectus supplements that it made stated income loans available to borrowers with "an established ability to repay indebtedness in a timely fashion." Instead, Syncora has learned that Countrywide made reduced documentation loans available indiscriminately to borrowers in general, including applicants with fair or poor FICO scores.

i.    **Inflated Appraisals**. In the Prospectus, and in the Purchase Agreements, Countrywide represented and warranted that all loans would be appraised by an "independent third-party" appraiser, with no direct or indirect interest in the loan, and whose compensation was not affected by the approval or disapproval of the loan. In fact, appraisals for the vast majority of the loans were performed by a Countrywide affiliate, Landsafe. Syncora's review of non-performing loans has revealed that appraisals provided by Countrywide's affiliated appraiser consistently and significantly exceeded contemporaneous sale prices for comparable properties in the same location. Use by Countrywide of such inflated appraisals artificially reduced CLTVs. Substituting non-inflated appraisals would have resulted in many cases in CLTVs well in excess of the maximum ratios permitted under Countrywide's guidelines.

j.    **Insufficient Borrower Credit**. Countrywide's guidelines set a number of parameters for acceptable credit history, which vary depending on the

35

size and nature of the mortgage loan at issue, including minimum FICO scores,

restrictions on the maximum number of late mortgage payments by the borrower

in the preceding year, and minimum credit depth and credit history requirements.

Countrywide routinely violated these restrictions in the absence of factors

compensating for the increased risk of default, resulting in the origination of loans

with credit risk significantly in excess of Countrywide's own guidelines.

k.    **Insufficient Cash Reserves**.  The guidelines require

Countrywide's underwriters to verify that borrowers have a minimum level of

cash on hand to meet their monthly payments.  In fact, Countrywide regularly

violated that requirement, qualifying borrowers with as little as a month or two of

reserves or lacking documented reserves of any kind.

l.    **Missing Documentation**.  Although specific document

requirements varied depending on the documentation program for which a

borrower qualified, the guidelines require documentation of borrowers' income,

assets, credit, employment, and cash reserves, and the value of the property

securing the lien.  The documents required by the documentation program

applicable to borrowers are regularly missing from Countrywide's loan files.  The

failure to require documents confirming critical aspects of the loans' credit-

worthiness increased the risk of the affected loans.

74.    Countrywide's breaches of its guidelines, and of industry standards, are

not close calls.  Loan after loan reflects Countrywide's systematic disregard of its

warranties and guidelines, and of its responsibilities as an underwriter.  A few examples

36

follow. As these examples will illustrate, Countrywide's breaches of its guidelines frequently occur in combination, resulting in loans that violate Countrywide's guidelines and responsible underwriting practices in several different respects. This creates "layered risk," which greatly increases the likelihood of default.

      a.      Loan # 121540538, a representative non-performing loan in the 2006-D Securitization, has a CLTV (when properly calculated, using the lower of the purchase price or appraised value) of 112%; the applicable guidelines maximum is 80%. The borrower claimed to make $13,500 a month as a realtor in Temecula, California. According to salary.com, this is more than *three times* the income earned by the 90th percentile of highest-earning realtors in the borrower's area – in other words, if the borrower's stated income were divided by three, he would still make more than 90% of comparable realtors. This salary is also incompatible with other evidence in the loan file. The loan was made with a very high DTI – 48.30%, near the guidelines maximum of 50%. Use of a more realistic income would result in a DTI grossly in excess of the guidelines, and over 100%. The borrower had less than half the minimum reserves amount required by the guidelines. Finally, important and guidelines-mandated documentation is missing from the loan file, including the terms of the borrower's first lien and documentation required to support the claimed property value.

      b.      Loan # 127368380, in the 2006-D portfolio, has a CLTV of 111%, when the CLTV is properly calculated; the guidelines maximum was 100%. The borrower claimed a monthly income of $13,333 as an engineer; this stated income

is roughly twice the 90th percentile according to salary.com, and is incompatible

with the evidence of the borrower's assets in the file.  Again, this loan was made

with a very high DTI – 49.10% – and the use of a more realistic income would

result in a DTI grossly in excess of the guidelines.  The borrower also fell short of

the guidelines-mandated reserves amount.

   c. Loan # 123499779, in the 2005-K portfolio, was made to a

borrower who claimed to make $13,520 monthly as a room service attendant in

Atlantic City.  This is nearly *five times* higher than the 90th percentile for that

occupation and location according to salary.com.  Using a more realistic income

results in a DTI well over 300%.  Even if the borrower's highly improbable

statement of income could be taken at face value, the loan would still have a DTI

of 67.68%, well in excess of the guidelines maximum of 50%, once the negative

rents on the borrower's rental property are properly calculated.

   d. Loan # 81754508, in the 2006-D portfolio, has a CLTV of 89.20%;

the applicable guidelines maximum is 80%.  The borrower claimed to make

$17,250 monthly as an academic director of a charter school.  This income is well

over twice the 90th percentile for that position according to salary.com, and

inconsistent with evidence of the borrower's assets in the file. Use of a more

plausible income results in a DTI of 90% – and, again, even if the borrower's

implausible statement of income could be taken at face value, the loan would *still*

have a DTI in excess of the guidelines.  The borrower's credit score is 649, 11

points lower than the applicable guidelines minimum of 660. The borrower had reserves of only 2.9 months, less than half the applicable guidelines minimum.

e.      Loan # 125471962, in the 2006-D portfolio, has a CLTV (properly calculated) of 114.05%; the applicable guidelines maximum is 90%. The borrower claimed to make $32,000 monthly as a realtor in Gilbert, Arizona – more than *five times* his realistic income according to indeed.com. Using a more realistic income results in a DTI over 200%. Additionally, the borrower had only 0.10 months' reserves, well under the 3 months' reserves required by the guidelines. Yet, despite these glaring defects, Countrywide loaned this borrower $193,571, well over the applicable maximum loan amount of $150,000.

f.      Loan # 9844523 was made to a borrower who claimed to make $16,754 monthly as a stylist. This is *more than five times* the 90th percentile in incomes for this profession in the borrower's location according to salary.com, and is also inconsistent with other evidence in the loan file. Use of a more realistic income results in a DTI of more than 210%. Additionally, the file does not contain any verification of minimum assets, the guidelines-mandated employment verification, or the required residence history.

g.      Loan # 127524136, in the 2006-D portfolio, has a CLTV of 100%, in excess of the applicable guidelines maximum of 95%, and a credit score of 668, well under the guidelines minimum of 700. The borrower claimed to make $10,416 a month as a public school teacher in New York – far in excess of the 90th percentile for this profession according to salary.com. Using a more realistic

39

income results in a DTI of 80%. There are internal inconsistencies in the
borrower's file that should have triggered further investigation, but Countrywide
ignored them. Countrywide cited as compensating factors the borrower's assets
and employment history – and yet, in violation of the guidelines, the file contains
no verification of assets or of employment.

h.    Loan # 125888186, in the 2006-D portfolio, has a CLTV of 99.9%
and a credit score of 656, where the guidelines require a maximum CLTV of 95%
and a minimum credit score of 680. According to the loan file, Countrywide
approved this loan despite these flaws because the borrower had strong reserves –
when in fact the borrower had *less* than the guidelines minimum of 3 months.

i.    Loan # 105642182, in the 2005-K portfolio, was made to a
borrower who claimed to make $12,500 monthly as an airline technician – more
than twice the 90th percentile for this profession according to salary.com. Using a
more realistic income results in a DTI of nearly 100%. The loan was originally
approved as a fully documented loan, but the originator subsequently reduced and
approved the loan as a stated income loan, without explanation – suggesting that
Countrywide knew that the borrower could not qualify for the loan if he were
required to provide his true income.

j.    Loan # 121518097, in the 2005-K portfolio, has a CLTV of 100%
and a credit score of 622; the guidelines require a maximum CLTV of 80% and a
minimum credit score of 660. The borrower claimed to make $12,500 a month as
an antique restorer – well over twice the 90th percentile of incomes for this

40

profession according to salary.com. Using a more realistic income results in a DTI of nearly 100%. Even if one could take the borrower's highly improbable statement of income at face value, the loan would still have a DTI over the guidelines maximum.

75.     Syncora has reviewed all loans with balances of over $25,000 in the 2005-K and 2006-D Securitizations that were non-performing as of February 2008, the most recent date for which Countrywide has provided Syncora the loan data to which it is contractually entitled. When Countrywide provides the missing data, Syncora will be able to extend its review to loans that became or will become non-performing after February 2008; Syncora expects to find that a similar proportion of any further non-performing loans are in breach of Countrywide's contractual commitments, and that Countrywide's liability for put-back loans will greatly exceed the $187 million in defective loans identified to date.

76.     In addition to these breaches of its representations and warranties, Countrywide has breached its obligations under the Insurance Agreements, including by:

- Including among the loans designated in the Mortgage Loan Schedule for the 2006-D Securitations loans with characteristics that would result in their being excluded for coverage under the third-party Loan Insurance Policy.

- Furnishing Syncora with documents containing numerous untrue and misleading statements of material facts.

- Carrying out practices and policies in the conduct of its business which were in violation of law, which, if enforced, could reasonably be expected to result in a material adverse change to Countrywide or a material adverse effect on the Securitizations.

- Making material misstatements in the offering materials for the Securitizations, in violation of law.

41

•   Ignoring Syncora's requests for contractually-required information.

77.   The impact of Countrywide's pervasive breaches of its representations and warranties goes beyond any harm that the "put back" remedy was intended to, or could, remedy. Syncora has already identified put-back claims amounting to many times the aggregate profits that Syncora projected from insuring the portfolios – indeed, many times the premiums on the policies for the entire deal. Countrywide's underwriting conduct fundamentally altered the risk profile of the Securitizations, increasing Syncora's exposure far beyond anything it could have anticipated based on Countrywide's pre-contractual representations and the representations and warranties in the contracts. Had Syncora known the criteria that Countrywide was actually applying in approving loans, the inaccuracy of the descriptions of the loans provided by Countrywide, and the lack of control Countrywide was exercising over its underwriting process, Syncora would never have insured the securitizations, regardless of the availability of a put-back remedy. Countrywide's representations about its underwriting and the characteristics of the securitized loans (as stated, *e.g.*, in the annexes to the Supplemental Prospectuses), which induced  Syncora to insure the securitizations, were fraudulent, and Syncora is therefore entitled to all appropriate remedies, including damages representing all claims paid on the Policies. In the alternative, Countrywide's actions constitute a breach going to the basis of the bargain between the parties that cannot be adequately remedied through the put-back mechanism, and which also entitles Syncora to all damages resulting from agreeing to insure the Policies, including all claims paid under the Policies.

42

**Countrywide's Refusal To Repurchase The Defective Loans**

78.    By letters dated May 22, 2008 ("the May 22 Letters"), Syncora gave

Countrywide notice of defective loans in the 2005-K Series and the 2006-D Series.  The

May 22 Letters informed Countrywide that it was required either to cure those breaches

within 90 days or to repurchase the affected loans by the contractually-determined date of

September 12, 2008.

79.    Although the cure period and repurchase date have expired, Countrywide

has failed to cure or repurchase a single loan.

80.    Syncora has now given Countrywide notice of further defective loans in

the 2005-K and 2006-D Series, by letters dated December 17, 2008.  Syncora has yet to

receive a response.

**Countrywide's Refusal to Provide Syncora With Contractually-Required
Information**

81.    Countrywide is required under each of the Securitizations to provide

Syncora with basic information concerning the loans in the portfolios, including

origination and servicing files.

82.    Countrywide has similar obligations to Syncora under the terms of other

Securitizations, including the CWABS Revolving Home Equity Loan Trust Series 2004-

Q, the CWABS Revolving Home Equity Loan Trust Series 2004-R, and the CWHEQ

Home Equity Loan Trust, Series 2006-S7 (the "Other Securitizations").

83.    Countrywide has consistently failed to provide Syncora with the

information to which it is contractually entitled.  Syncora's frequent requests, by

telephone, email and letter, have been met with stonewalling, foot-dragging, and

43

unfulfilled promises. Notably, by email dated August 13, 2008, Syncora requested

servicing files for the 2005-K, 2006-D and 2006-S7 Securitizations. In the same email

Syncora requested the origination files for the 2006-S7 transaction, and information

regarding claims under the third-party loan insurance policy that covers certain loans in

the 2006-D Securitization. Five months later, Countrywide is still dragging its feet over

these requests.

84.    By two letters dated October 10, 2008, following a series of telephone

calls, Syncora requested current information sufficient to identify which loans in the

2005-K and 2006-D Securitizations are non-performing, or have been paid off, charged

off, or liquidated. This request, too, has gone unanswered. At present, Syncora's most

recent information on the performance of the loans comes from February 2008 – nearly a

year out of date. Inevitably, this has hampered Syncora's investigation.

85.    Syncora has repeatedly requested complete copies of the guidelines relied

on by Countrywide in the underwriting of the loans in the Securitizations, most recently

by letters dated October 10, 2008. So far, Countrywide has provided only a fraction of

the relevant guidelines.

86.    Syncora requested the origination files for the 2004-Q and 2004-R

Securitizations *more than a year ago*, on November 28, 2007; Countrywide has still not

provided those files.

87.    It is obvious why Countrywide has stonewalled Syncora's requests. When

Countrywide provides this contractually-required information, Syncora expects it will

discover evidence of further fraudulent conduct and contractual breaches with respect to both the Securitizations and the Other Securitizations.

## FIRST CAUSE OF ACTION

### (Fraudulent Inducement - Against All Defendants)

88.    Syncora incorporates by reference all of the foregoing allegations as fully set forth herein.

89.    As set forth above, Countrywide made materially false statements and omitted material facts with the intent to defraud Syncora at precontractual meetings between Syncora and Countrywide officers, and in the Prospectuses, presentations of statistical information concerning the securitized loans, contract drafts, loan tapes, and other documents and information provided to Syncora in order to induce it to enter into the contracts of insurance, which statements and omissions Syncora reasonably relied upon when it entered into the Insurance Agreements and issued the Policies.

90.    As a result of Countrywide's misrepresentations, Syncora insured two pools of loans which -- due to Countrywide's systematic and knowing abandonment of its own underwriting Guidelines -- had an overall risk profile far greater than Syncora was led by Countrywide's representations and omissions to expect. The level of defaults on these loans has now caused Syncora to pay over one hundred million dollars of claims to the noteholders of both Securitizations. Syncora has thus been damaged by Countrywide's fraud, since Syncora would not have been obliged to make these payments had it not been fraudulently induced by Countrywide to insure the Securitizations.

45

91.    Among other things, Countrywide made the following misrepresentations:

a.    **Statistical Information About the Loans**.  Countrywide provided, in the Prospectuses, loan tapes and other documents, detailed statistical information about the securitized loans, including such parameters as CLTV and DTI.  These statistics have proved to be false.  Among other things, Countrywide relied on inflated appraisals, miscalculated home values and debt obligations, and inflated reported incomes, resulting in statistics that drastically under-estimated the credit risk of the securitized loans.  While Syncora's review of non-performing loans is ongoing, it is already apparent, from the defective loans identified in the notices provided by Syncora to Countrywide, that the statistics included in the Prospectus annexes and loan tapes were materially false and misleading.  As Countrywide knew, these misrepresentations were crucial to inducing Syncora to insure the securitizations.

b.    **Underwriting Standards**.  Countrywide represented in drafts and final contractual documents and Prospectuses that it provided to Syncora that each mortgage loan held by the Securitizations had been underwritten in accordance with its guidelines.  In the draft and final Purchase Agreements, Countrywide represented that "each Mortgage Loan was originated in accordance with [Countrywide's] underwriting guidelines."  The Prospectuses claimed that Countrywide followed an "underwriting process . . . intended to assess the applicant's credit standing and repayment ability."  In reality, Countrywide routinely ignored its underwriting guidelines.

46

c.    **Borrower Income**.  Countrywide represented that it would qualify

borrowers based on their income.  For example, Countrywide stated in the

Prospectuses that it would only accept loans if "the prospective borrower has

sufficient monthly income to support the payments on the home equity loan."  In

fact, Countrywide routinely accepted clearly excessive stated incomes without

question.  Countrywide based its underwriting decisions on these excessive stated

incomes, and provided them (or numbers derived from them) to Syncora.

d.    **Appraisal Standards**.  Countrywide represented that it would

have the properties appraised independently and fairly.  In the Prospectuses,

Countrywide represented that all properties would generally be appraised by an

"independent third-party."  Instead Countrywide directed almost every loan to an

affiliated appraiser from which it obtained appraisals that were frequently

significantly higher than contemporaneous evidence of comparable home sale

prices.  Countrywide based its underwriting decisions on these inflated appraisals

and provided them (or numbers derived from them) to Syncora.

e.    **Income Verification**.  Countrywide represented in the

Prospectuses that it would require appropriate income verification from all

borrowers and that it would make its "reduced documentation program," available

only to applicants whose "credit histories . . . demonstrate an established ability to

repay indebtedness in a timely fashion."  Even for such applicants, Countrywide

represented that it would only "waive[] . . . certain credit underwriting

documentation concerning income and employment verification."  Countrywide

47

reiterated this critical representation on other occasions. At a meeting on October 18, 2005 at Countrywide's offices in Calabasas, California, Countrywide representatives assured Syncora that Countrywide underwriters performed a reasonableness review of stated incomes as part of Countrywide's procedures. Countrywide's own due diligence review of the 2006-D securitization, which Countrywide provided to Syncora, indicated that borrower statements of income were reviewed for reasonableness and rejected if *"they appeared unreasonable or internally contradictory to [Countrywide's] . . . guidelines."* In fact, Countrywide ignored its own criteria for the level of income verification required, made its reduced documentation program available indiscriminately to loan applicants, and, rather than waiving only "certain credit underwriting documentation," required no more of most of these applicants than self-reported statements of income.

        f.      **Reasonable Originator**. Countrywide represented in the draft and final Purchase Agreements that it "had no knowledge of any facts that would have caused a reasonable originator of mortgage loans to conclude on the date of origination of each Mortgage Loan that each such Mortgage Loan would not be paid in full when due." In fact, Countrywide was in possession of facts concerning most currently non-performing loans that would have caused a reasonable underwriter not to make the loan, including facts concerning the unreasonableness of stated incomes, the absence of factors compensating for one or more violations of its underwriting guidelines, the unreasonableness of the

48

inflated appraisals provided by Countrywide's affiliated appraiser, and the layered

risk created by the presence of two or more deficiencies in the same loan

application.

     g.    **Compliance with Law**.  Countrywide represented in the draft and

final Purchase Agreements that "each Mortgage Loan . . . complied in all material

respects with applicable local, state and federal laws, including all applicable

predatory and abusive lending laws."  As reflected in the pleadings filed in the

multitude of suits and actions brought by attorneys general and other public

authorities across the country, this representation was false.  Countrywide's

willingness to settle claims of several attorneys general that Countrywide had

engaged in illegal predatory lending for the unprecedented sum of $8.6 billion

supports that Countrywide routinely engaged in illegal conduct in its mortgage

origination activities.

    92.    Countrywide omitted material facts necessary to make its other statements

in is draft and final contractual documents and Prospectuses not misleading.  As

described above, Countrywide stated that it would underwrite the mortgage loans held by

the Securitizations using borrowers' incomes and property appraisals, but Countrywide

did not disclose that it knowingly or recklessly would accept inflated incomes and

appraisals and ignore its own underwriting guidelines.

    93.    Countrywide provided false and misleading draft and final contractual

documents to Syncora on multiple occasions, including the following:

a.     On December 15, 2005 and December 29, 2005, Countrywide (including Countrywide Home Loans and Countrywide Securities) caused its attorneys to transmit the drafts of the contractual documents for 2005-K to Syncora.

b.     On March 27, 2006 and March 30, 3006, Countrywide (including Countrywide Home Loans and Countrywide Securities) caused its attorneys to transmit the drafts of the contractual documents for 2006-D to Syncora.

94.     Countrywide provided false and misleading Prospectuses and draft Prospectuses, including annexes with statistical information concerning the loan pools, to Syncora on multiple occasions, including the following:

a.     On December 15, 2005, Countrywide Home Loans and Countrywide Securities caused Countrywide Home Loans' attorneys to transmit the first draft of the Prospectus supplement for Series 2005-K to Syncora.

b.     On December 28, 2005, Countrywide Home Loans and Countrywide Securities caused Countrywide Home Loans' attorneys to transmit the final Prospectus supplement for Series 2005-K to Syncora.

c.     On March 24, 2006, Countrywide Home Loans and Countrywide Securities caused Countrywide Home Loans' attorneys to transmit the first draft of the Prospectus supplement for Series 2006-D to Syncora.

d.     On March 30, 2006, Countrywide Home Loans and Countrywide Securities caused Countrywide Home Loans' attorneys to transmit the final Prospectus supplement for Series 2006-D to Syncora.

95.    Countrywide also provided false and misleading information to Syncora regarding the securitized loans in the loan tapes, containing information concerning each mortgage loan to be included in the Securitizations that Countrywide provided with its bid materials.  Among other misrepresentations and misleading statements, the loan tapes contained CLTVs calculated with inflated appraisals, debt-to-income calculations based on inflated incomes, and improperly calculated property values.

96.    Countrywide provided false and misleading loan tapes to Syncora on multiple occasions, including the following:

   a.    On November 29, 2005, Garrett Galati of Countrywide Home Loans provided a loan tape for 2005-K to Syncora by electronic mail containing these misrepresentations and requesting a bid from Syncora for the note insurance policy on 2005-K.

   b.    On December 6, 2005, Tonya LyBrand of Countrywide Securities provided a loan tape for 2005-K to Syncora by electronic mail containing these misrepresentations, as part of Countrywide's efforts to induce Syncora to bid on providing note insurance for 2005-K.

   c.    On March 15, 2006, Garrett Galati of Countrywide Home Loans provided a loan tape for 2006-D to Syncora by electronic mail containing these misrepresentations and requesting a bid from Syncora for the note insurance policy on 2006-D.

97.    Countrywide also submitted loan tapes and statistical information about the loan pools containing these misrepresentations to rating agencies, in order to procure

22823437v42

the favorable shadow ratings on which Syncora's consent to insure the Securitizations was expressly conditioned.

98.      At a meeting on October 18, 2005, at Countrywide's offices in Calabasas, California between representatives of Countrywide and Syncora, Countrywide's representatives discussed their underwriting procedures, in order to reassure Syncora as to the soundness of their procedures.  In particular, Countrywide officers represented that its underwriters reviewed stated incomes for reasonableness as part of Countrywide's underwriting procedures.  Countrywide omitted material facts necessary to make these representations not misleading, failing to disclose that it knowingly or recklessly would accept inflated incomes and appraisals and ignore its own underwriting guidelines.

99.      On March 29, 2006, Tonya LyBrand of Countrywide Securities provided Syncora with the Executive Summary of Countrywide's due diligence on the 2006-D transaction.  This document stated that the due diligence was conducted on the same basis as "that used by [Countrywide] to initially qualify the borrowers," and that stated borrower incomes were reviewed for reasonableness and rejected if "*they appeared unreasonable or internally contradictory to [Countrywide's] . . . guidelines.*"

100.      Countrywide knew at the time it made these representations to Syncora and provided Syncora with these materials that the above statements were false or, at the very least, made recklessly, without any belief in the truth of the statements, because these representations were inconsistent with Countrywide's current underwriting practices.

52

101.    As Countrywide knew, the brief period between solicitation of bids and Countrywide's selection of a credit enhancer for the 2005-K and 2006-D Securitizations did not allow sufficient opportunity for Syncora independently to evaluate the vast majority of loans in the Securitizations.  Accordingly, both Syncora and Countrywide understood that Syncora had to, and did, rely upon the accuracy of Countrywide's representations.

102.    Countrywide knew that Syncora would rely on Countrywide's representations at the October 18, 2005 meeting between Syncora and Countrywide officers, and in the contractual documents, loan tapes, due diligence, other bid materials and Prospectuses.  Countrywide also knew that Syncora was relying on Countrywide's expertise, knowledge of its own underwriting process and knowledge of the mortgage loans held by the Securitizations, and Countrywide encouraged this reliance. Countrywide knew that  Syncora entered into the Insurance Agreements in reliance on its belief that Countrywide's underwriting process was sound and in accordance with Countrywide's representations, and the mortgage loans were as represented.

103.    As a result of Countrywide's false and misleading statements and omissions, Syncora has suffered, and will continue to suffer, damages, including paying out claims under the Policies.

104.    Because Countrywide committed these acts and omissions maliciously, wantonly and oppressively, and because the consequences of Countrywide's acts knowingly affected the general public, Syncora is entitled to recover punitive damages.

53

## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation - Against All Defendants)

105.    Syncora incorporates by reference all of the foregoing allegations as fully set forth herein.

106.    As the originator of the loans, and the sponsor, depositor and master servicer for the Securitizations, the facts regarding Countrywide's compliance with its underwriting guidelines and with its representations regarding the quality of the loans were exclusively within Countrywide's knowledge.

107.    Countrywide was aware that Syncora relied on Countrywide's expertise and experience in originating, underwriting, selecting and servicing the loans, and that Syncora depended on Countrywide for accurate and truthful information.

108.    Countrywide breached its duty to provide Syncora with accurate information regarding the loans, the Securitizations, and Countrywide's underwriting practices.

109.    Syncora reasonably relied on the truth of Countrywide's representations and statements and was injured as a result of their falsity.

## THIRD CAUSE OF ACTION:

### (Breach Of Contract - Against Countrywide Home Loan)

110.    Syncora incorporates by reference all of the foregoing allegations as fully set forth herein.

111.    Countrywide has committed multiple material breaches of the Indemnity and Insurance Agreement, Sales and Servicing Agreements, and the Purchase

22823437v42

Agreements, entitling Syncora to damages for all loss it has suffered as a result of entering into the contracts of insurance.

112.    Countrywide represented in the Insurance Agreements that "[n]either the contractual documents nor other material information relating to the Mortgage Loans [or] the operations of Countrywide . . . furnished to the Insurer contains any statement of a material fact which was untrue or misleading in any material adverse respect when made." In fact, as set out above, the Prospectuses, the loan tapes, and the contractual documents for the Securitizations contained statements regarding the origination of the mortgage loans and Countrywide's underwriting practices that were untrue and misleading in material adverse respects.

113.    Syncora was a beneficiary of Countrywide's representations and warranties concerning its underwriting practices and the quality of the securitized HELOCs in the Purchase Agreements and, as provided in the Insurance Agreements and the Sales and Servicing Agreements. Countrywide's breaches of those representations and warranties were widespread and systematic; Countrywide did not simply fail to live up to its underwriting standards in a few instances, but abandoned them wholesale. The repurchase remedy provided by the contracts was intended to address the possibility that the securitizations would contain a small number of defective loans. It was never intended to be an adequate remedy for the situation in which Countrywide breached its own guidelines so severely and so consistently that thousands of loans would be defective, and where the risk profile of the entire portfolio would thereby significantly deteriorate. Countrywide's comprehensive pattern and practice of rejecting its own

underwriting procedures and underwriting discipline, and the resulting increase in credit

risk and defaults in the loan portfolios, goes to the essence of the Insurance Agreements,

and represents a material breach of those contracts, entitling Syncora to damages

compensating it for all injury resulting from entering into the contracts of insurance,

including all claims paid on the Policies.

114.    Countrywide represented in the Insurance Agreements that:

> No practice, procedure or policy employed by any of
> Countrywide, the Depositor or the Issuer in the conduct of
> its business violates any law, regulation, judgment,
> agreement, order or decree applicable to it which, if
> enforced, could reasonably be expected to result in a
> Material Adverse Change with respect to it or have a
> material adverse effect on the Transaction.

However, as demonstrated by the actions filed by numerous attorneys general and other

public officials across the country, and Countrywide's $8.6 billion settlement of a portion

of these claims, this representation was not true. Countrywide's practices violated state

consumer protection laws, including those that prohibit unfair or deceptive business

practices, and state lending laws. These violations of law could reasonably be expected

to have a material adverse effect on Countrywide, its operations and the transactions.

115.    Countrywide represented in the Insurance Agreements that the offering of

the notes backed by the Securitizations complied "in all material respects with all

requirements of law, including all registration and reporting requirements of applicable

securities laws." However, this was not true. Countrywide made numerous

misrepresentations and omissions in the offering materials, as detailed above.

116.    By virtue of Countrywide's foregoing material breaches, Syncora has been

injured, and is entitled to damages in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION:

### (Breach Of Contract - Against Countrywide Home Loan)

117.    Syncora incorporates by reference all of the foregoing allegations as fully set forth herein.

118.    The Purchase Agreements, Sale and Servicing Agreements and Insurance Agreements are valid and enforceable contracts that give rise to obligations on the part of Countrywide with respect to the mortgage loans.

119.    Syncora has performed all conditions, covenants and promises required on its part to be performed in accordance with the terms and conditions of the subject contracts.

120.    As set out above, Countrywide made extensive representations and warranties in the Purchase Agreements regarding the underwriting and credit-worthiness of the mortgage loans.  Under the Sales and Servicing Agreements, Syncora is a third-party beneficiary of both Purchase Agreements, and the representations and warranties are incorporated for Syncora's benefit in the Insurance Agreements.  Syncora is also entitled, under the Insurance Agreements and otherwise, to be subrogated to the noteholders' claims against Countrywide for breach of these representations and warranties.

121.    Countrywide's breaches of its representations and warranties in the Purchase Agreements regarding its underwriting practices and the creditworthiness of the mortgage loans in the Securitizations materially and adversely affect Syncora's interests.

122.    The Sale and Servicing Agreements provide that once Countrywide becomes aware of a material breach of the representations and warranties regarding the

57

mortgage loans, Countrywide must either cure the breach within 90 days or repurchase the affected loans in the month following the expiry of the 90-day cure period. Under the terms of the Sale and Servicing Agreement, Syncora, as the credit enhancer for the securitizations, is authorized to give Countrywide notice of a breach, triggering Countrywide's obligation to cure or repurchase.

123.    Syncora has notified Countrywide of numerous material breaches of the representations and warranties. The contractual period in which to cure or repurchase the defective loans has now expired, and Countrywide has taken no action to cure or repurchase any defective loan.

124.    Syncora is therefore entitled to damages representing not less than the original principal value, additional net draws, and accumulated interest on all mortgage loans in the Securitizations that are inconsistent with and in breach of Countrywide's representations and warranties concerning the loans and Countrywide's origination practices; costs and expenses incurred as a result of Countrywide's breach of its representations, warranties and contractual obligations, including its failure to timely provide Syncora with contractually-required information concerning the Securitizations and Other Securitizations; and interest thereon.

125.    In the alternative, Syncora is entitled to a declaratory judgment that Countrywide has breached its obligations to repurchase the defective loans identified by Syncora, and is required to repurchase such defective loans and to pay consideration not less than the original principal value, additional net draws, and accumulated interest on all mortgage loans in the Securitizations that are inconsistent with and in breach of

Countrywide's representations and warranties concerning the loans and Countrywide's origination practices; costs and expenses incurred as a result of Countrywide's breach of its representations, warranties and contractual obligations; and interest thereon.

## FIFTH CAUSE OF ACTION

### (Breach of Implied Duty of Good Faith And Fair Dealing – Against Countrywide Home Loan)

126.    Syncora incorporates by reference all of the foregoing allegations as fully set forth herein.

127.    Countrywide owed Syncora an implied duty of good faith and fair dealing with respect to matters arising out of the Insurance Agreements and the contractual documents incorporated therein. This implied duty required Countrywide to apply underwriting standards consistent with its representations, with Syncora's reasonable understanding, and with responsible industry practice.

128.    The quality and credit-worthiness of the loans in the Securitizations were fundamental to Syncora's agreement to insure them. In the contracts and the Prospectuses for the Securitizations, Countrywide held itself out as an experienced and expert underwriter and originator of mortgage loans. Syncora entered into the Insurance Agreements in reliance on Countrywide's representations.

129.    As a result of Countrywide's breach of its implied duty of good faith and fair dealing, Syncora has suffered, and is likely to continue suffering, damages in an amount to be proved at trial, including damages representing Syncora's payments on the Policies.

22823437v42

## SIXTH CAUSE OF ACTION

### (Indemnification - Against Countrywide Home Loan)

130.    Syncora incorporates by reference all of the foregoing allegations as fully set forth herein.

131.    Countrywide is required under the Insurance Agreements to indemnify Syncora for losses, costs and expenses (including attorneys' fees and costs and costs of investigations) arising out of or relating to Countrywide's breach of representations and warranties, to the extent set out in Insurance and Indemnity Agreement § 3.04(a)(iv), or arising out of or relating to untrue statements of material fact in the offering documents or registration statements for the Securitizations. This includes, among other things, an obligation to indemnify Syncora for its attorneys' fees and costs incurred in connection with the present litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.    An award of damages, in an amount to be proven at trial, including at a minimum damages representing:

a.    Syncora's obligations to pay claims on the Policies;

b.    The repurchase payments due under the Insurance Agreements in respect of each defective mortgage loan;

c.    Indemnification for Syncora's damages, losses, costs and expenses, including its accountants' and attorneys' fees and costs incurred herein;

d.    Syncora's other economic and consequential damages, including lost profits;

60

    e.          Punitive damages;

    f.          Prejudgment interest at the maximum legal rate; and

    g.          Syncora's costs of suit;

2.      A judgment declaring that Countrywide has breached its obligations to repurchase the defective loans identified by Syncora, and is required to repurchase such defective loans, in accordance with the Sale and Servicing Agreements, and that Countrywide is required to indemnify Syncora for its losses, costs and expenses, including accountants' and attorneys' fees and interest incurred as a result of Countrywide's breach of its representations, warranties and contractual obligations; and

3.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for all issues so triable as a matter of right.

Dated: New York, New York
      January 28, 2009

                        Respectfully submitted,

                        DEBEVOISE & PLIMPTON, LLP

                        By:

                        Mark P. Goodman
                        Donald W. Hawthorne
                        John S. Craig
                        Felix J. Gilman

                        919 Third Avenue
                        New York, New York  10022
                        (212) 909-6000

                        Attorneys for Plaintiff

22823437v42