Exhibit 17

Philip R. Forlenza
David W. Dykhouse
Erik Haas
Benjamin S. Litman
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222
pforlenza@pbwt.com
dwdykhouse@pbwt.com
ehaas@pbwt.com
blitman@pbwt.com

**09 CV 3106**

RECEIVED

MAR 31 2009

U.S.D.C. S.D.N.Y.
CASHIERS

*Attorneys for Syncora Guarantee Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SYNCORA GUARANTEE INC., formerly known  :
as XL CAPITAL ASSURANCE INC.,                          Index No. 09 Civ. _____
                                                                         :
                      Plaintiff,
                                                                         :
                  - against -                                           **COMPLAINT**
                                                                         :
EMC MORTGAGE CORPORATION,
                                                                         :
                      Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


Plaintiff Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc.

("Syncora"), by and through its attorneys, Patterson Belknap Webb & Tyler LLP, for its complaint

against Defendant EMC Mortgage Corporation ("EMC"), hereby alleges as follows:

## NATURE OF THE ACTION

1.        EMC, upon information and belief acting at all times at the behest and

under the control of its parent, The Bear Stearns Companies Inc. ("Bear Stearns"), leveraged its

reputation and dominance in mortgage finance to fuel and finance the origination of mortgage loans that, as is now apparent, borrowers could not afford, by sponsoring transactions known as "securitizations" that created a market for the defective loans. The securitizations involved the sale of mortgage loans to trusts, which in turn issued to investors securities that were to be paid down by the promised cash flows from the mortgage loans. To induce investors to purchase, and bond insurers like Syncora to insure, these securities, EMC made specific representations about the key attributes of the loans, including that the loans were *not* originated through improper means (*e.g.*, fraud, error, omission, misrepresentation, negligence, or similar occurrence on the part of any party, including the borrower), and agreed to accept the risk of loss in the event that its representations and warranties turned out to be untrue. By this negotiated risk-allocation arrangement between sophisticated parties, EMC, in the securitization at issue here, assured Syncora in explicitly worded contractual terms that Syncora need not be concerned about the risk that the loans would not conform to EMC's representations. Rather, pursuant to the agreement between the parties, EMC assumed the risk of the inaccuracy of its representations and warranties, while Syncora assumed the risk that pools of mortgage loans *conforming to EMC's representations* would not perform as expected. But after profiting handsomely from sponsoring this securitization, EMC now seeks to walk away from its explicit contractual representations and commitments as pervasive origination failures – and thus EMC's pervasive breaches – come to light. This action is required to address that wrong.

2.    Specifically, this contract action arises from EMC's extraordinary and material breach of the unambiguous terms and fundamental premise of its agreement with Syncora governing a mortgage-backed-securities transaction known as GreenPoint Mortgage Funding Trust 2007-HE1 (the "Transaction").

2

3.     EMC made two types of representations and warranties to induce Syncora

to issue its financial-guaranty insurance policy that covered certain payments on certain

mortgage-backed securities issued in the Transaction. First, EMC represented and warranted that

all of its written and electronic disclosures concerning its business and its loan portfolio

(including the disclosures made in the offering documents used to market the securities) were

accurate and complete, and that it was in compliance with all applicable laws. These broad

representations were part of the foundation of the parties' bargain because the accuracy, or

conversely the breach, of these representations necessarily would have a material effect on

(i) EMC's entire loan portfolio, from which the securitized loans were drawn, (ii) its financial

condition, (iii) its intent and ability to carry out its contractual obligations, and (iv) its general

suitability as the sponsor of the contemplated securitization. Second, EMC made numerous

express representations and warranties concerning the key attributes of the specific mortgage

loans that EMC transferred to the trust and that served as collateral for the subsequently issued

securities. EMC represented and warranted, among other things, that (i) the information that it

disclosed for each loan, such as the borrowers' "debt-to-income" ratio, was accurate, and (ii) the

loans were *not* originated through improper means (*e.g.*, fraud, error, omission,

misrepresentation, negligence, or similar occurrence on the part of any party, including the

borrower). These specific loan-level representations and warranties were designed to allow

Syncora to assess the market risk that the loans *bearing the attributes that EMC represented and

warranted* would not perform. This was the bargained-for risk that Syncora insured.

4.     Reflecting the centrality of the representations and warranties to the

parties' bargain, EMC expressly agreed that Syncora is entitled to pursue any remedy at law or in

equity to address a breach by EMC. In addition, to afford Syncora a contractual remedy for

3

breaches of EMC's loan-level representations and warranties, EMC expressly agreed to cure, repurchase, or provide adequate substitutes for each non-conforming mortgage loan identified. EMC's commitment to cure, repurchase, or substitute individual non-compliant loans was intended to address the aberrant breaching loan, not to be an alternative to EMC's obligation to make accurate and truthful representations and warranties. The contemplated and bargained-for agreement called for EMC to transfer to the trust loans that complied with its representations and warranties in exchange for Syncora's irrevocable insurance policy. As recent analysis of the loans has demonstrated, however, EMC gutted this bargain and materially breached the parties' agreement by transferring to the trust a mortgage-loan pool that was replete with loans that did not comply with both types of EMC's clear and unambiguous representations and warranties.

         5.     After observing initial signs of performance deterioration in the Transaction, Syncora hired a third-party consultant to review the documentation pertaining to an initial sample of 410 defaulted loans for compliance with EMC's representations and warranties. Having discovered widespread breaches of representations and warranties in almost 93% of the loans examined, with an aggregate principal balance of approximately $34 million, Syncora asked EMC to comply with its contractual obligation to cure, repurchase, or provide substitutes for the non-compliant loans. Soon thereafter, Syncora notified EMC of breaches of representations and warranties in more than 95% of an additional sample of 260 defaulted loans with an aggregate principal balance of approximately $20 million. In disregard of its contractual obligations, EMC refused and continues to refuse to cure, repurchase, or provide substitutes for all but a small handful of these loans. And even for this small handful with respect to which EMC has acknowledged breaches of representations and warranties, EMC has to date failed to actually repurchase the loans.

4

6.  In view of EMC's apparent complete disregard of its contractual obligations, Syncora directed the third-party consultant to assess the pervasiveness of EMC's breaches in the securitized pool as a whole. The consultant thus reviewed the documentation pertaining to a random sample of 400 loans from the securitized pool with an aggregate principal balance of approximately $28 million. The results of that review were astounding. A remarkable 85.5% of these randomly selected loans breached one or more of the representations and warranties that EMC had made to Syncora. The most prevalent and troubling of the breaches identified by Syncora involve (i) rampant misrepresentations about borrower income, employment, assets, and intentions to occupy the purchased properties and (ii) the loan originator's abject failure to adhere to proper and prudent mortgage-lending practices and its own underwriting guidelines.

7.  Loss and delinquency patterns experienced by the Transaction in the last several months have been consistent with these recent revelations. The loans that EMC securitized have defaulted at an extraordinary rate, resulting in significant write-offs and thereby requiring Syncora to make significant payments with respect to its insurance policy. Slightly more than two years from closing, the Transaction already has suffered more than $221 million in losses, resulting in more than $168.6 million in insurance claims paid by Syncora. The dramatically poor loan performance corroborates Syncora's findings that the *entire pool* of loans that EMC securitized in the Transaction is plagued by rampant fraud and an abdication of sound mortgage-origination and underwriting practices.

8.  But, as noted, to induce Syncora to participate in the Transaction, EMC expressly represented and warranted that such fraud and failings did not exist, and assumed all risk of loss in the event that these representations and warranties proved untrue. EMC's

5

representations and warranties (and its acceptance of the risk of loss if those representations and warranties proved untrue) were essential consideration and prerequisites for Syncora's issuance of its insurance policy.

9.      EMC fundamentally frustrated the parties' bargain by its material and pervasive breaches of its representations and warranties, its contractual repurchase obligation, and the parties' contract as a whole. EMC's breaches have inflicted and continue to inflict tremendous harm on Syncora. In addition to the hundreds of millions of dollars in claims that Syncora has paid and will pay, EMC's flagrant and willful breaches, and its refusal to cover a risk of loss that it expressly assumed, have significantly damaged Syncora's capital position, reputation, and credit rating. Syncora brings this action to address this harm.

## THE PARTIES

10.      Syncora is a New York corporation with its principal place of business at 1221 Avenue of the Americas, New York, New York 10020.

11.      Upon information and belief, EMC is organized under the laws of the State of Delaware and its principal place of business is at 2780 Lake Vista Drive, Lewisville, Texas 75067. Upon information and belief, EMC is, or was at all relevant times herein, a wholly owned subsidiary of Bear Stearns.

## JURISDICTION AND VENUE

12.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

13.      This Court has personal jurisdiction over EMC, and venue in this judicial district is proper, pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or

6

omissions giving rise to Syncora's claims occurred, and EMC is currently subject to personal jurisdiction, in the Southern District of New York. In addition, in its agreement with Syncora, EMC irrevocably submitted to the "non-exclusive jurisdiction of the United States District Court for the Southern District of New York." Insurance and Indemnity Agreement dated as of March 6, 2007 ("I&I Agreement") § 6.05(a). EMC also "waive[d] and agree[d] not to assert by way of motion, as a defense or otherwise in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such court[], that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that the related documents or the subject matter thereof may not be litigated in or by such court[]." *Id.*

## BACKGROUND

### A. The Bear Stearns Securitization "Machine"

14. This action arises from EMC's breaches of the representations and warranties that it made in connection with a securitization of mortgage loans that it sponsored in March 2007. A securitization involves the pooling and sale of mortgage loans to a trust, which issues debt securities of varying seniority with payments dependent on, or "backed" by, the cash flow from the pooled loans. That is, the cash flow received from the mortgage loans – borrowers' principal and interest payments – is to be used to pay down the securities issued by the trust.

15. At the time the transaction at issue in this litigation was consummated, Bear Stearns had long been a leader in all facets of mortgage-loan securitization, at or near the top of the charts for issuance and underwriting of mortgage-backed securities for 17 years running.[1] Through its well-engineered network of affiliates, Bear Stearns controlled every step

---

[1] *See, e.g.*, Asset-Backed Alert, Dec. 31, 2006, *available at:*
http://www.abalert.com/Public/MarketPlace/Ranking/index.cfm?files=disp&article_id=1044674725

7

in the mortgage-loan-securitization chain: from the origination and servicing of loans that provided the cash flow for the mortgage-backed securities; to the "warehousing" or temporary financing of large pools of "whole loans" pending their pooling and securitization into mortgage-backed securities; to the underwriting and distribution of the mortgage-backed securities that provided permanent financing to EMC with respect to the mortgage loans; to the management of hedge funds that Bear Stearns caused to buy the mortgage-backed securities.

16. EMC played a crucial role within the Bear Stearns securitization machine. Bear Stearns established EMC in 1990 as its mortgage-banking arm to facilitate the purchase and servicing of mortgage loans as a complement to Bear Stearns's own loan originations.[2] Since its inception, EMC has contributed greatly to Bear Stearns's rise to the very top of the mortgage-finance industry by purchasing over \$100 billion in residential whole loans and servicing rights.[3] Bear Stearns, through EMC and other subsidiaries, thus acted both as an "originator" and an "aggregator" of an enormous volume of residential mortgage loans, "with the ultimate strategy of securitization [of the loans] into an array of Bear Stearns'[s] securitizations."[4] EMC repeatedly executed on that strategy, in many cases retaining the rights to act as servicer of the mortgage loans that it securitized. In its role as aggregator, EMC set loan-origination standards and approved the underwriting guidelines of a large number of mortgage lenders that constituted its vast originator network and whose loan-origination activities it thus helped finance.

---

(ranking Bear Stearns as the fifth-largest issuer of mortgage-backed securities); Q4 2006 Bear Stearns Earnings Conference Call, Dec. 14, 2006 (stating that, for 2006, "Bear Stearns ranked as the number one underwriter of MBS Securities [mortgage-backed securities] as the Company's securitization volume rose to \$113 billion from \$95 billion in fiscal 2005, capturing 11% of the overall U.S. mortgage securities market").

[2] *See* Prospectus Supplement to Transaction, dated March 5, 2007 ("ProSupp"), at 32.

[3] *Id.*

[4] *Id.*

8

17.     Another Bear Stearns affiliate frequently acted as lead underwriter for the EMC-sponsored securities offerings. And, frequently, it was a Bear Stearns affiliate that purchased or retained a financial interest in a portion of the securities issued in these transactions to repackage into other securities known as "collateralized debt obligations" ("CDOs"). Finally, Bear Stearns also provided financial research for residential mortgage-backed securities and related structured products that it created and sold. As Bear Stearns reported to Thompson Financial in 2006, "Our vertically integrated franchise allows us to access every step of the mortgage process, including origination, securitization, distribution and servicing."

18.     The product of this machine was a successful and extraordinarily profitable enterprise, which further solidified and enhanced Bear Stearns's sterling reputation and tremendous sway in all areas of mortgage finance. Bear Stearns recorded gains and earned fees at every step in this chain: (i) loan-origination fees, (ii) servicing fees, (iii) gains on sale of the mortgages to the securitization trusts, (iv) fees from underwriting mortgage-backed securities, (v) gains and fees from CDOs into which these securities were repackaged, (vi) gains and fees from trading in these securities and from interests in the CDOs into which they were placed, and (vii) management fees and carried interests from hedge funds and other investment vehicles that invested in the vast array of securities and financial products structured by Bear Stearns that ultimately were backed by residential mortgage loans.

19.     From 2003 to 2006, Bear Stearns's revenue and profit increased by 123.8% and 77.6%, respectively, driven in large part by mortgage finance and its securitization machine.[5] Consistently, the volume of EMC's securitizations grew markedly over the same period. In 2003, EMC securitized approximately 86,000 loans valued at more than $20 billion.

---

[5] *Id.*; Bear Stearns Companies Inc., Annual Report (Form 10-K), Nov. 30, 2006, at 79; Bear Stearns Companies Inc., Annual Report (Form 10-K), Nov. 30, 2005, at 77.

9

That number nearly tripled in 2004 to more than 230,000 loans valued at more than $48 billion.[6] In 2005, the number jumped to approximately 389,000 loans valued at nearly $75 billion.[7] And in 2006, EMC securitized more than 345,000 loans valued at approximately $69 billion.[8] All told, from 2003 to 2007, EMC purchased and securitized more than one-million mortgage loans originally valued in excess of $212 billion.[9] For 2006, Bear Stearns's overall securitization volume rose to $113 billion from $95 billion in fiscal year 2005, amounting to 11% of the overall U.S. mortgage-securities market.[10]

20.     Critical to Bear Stearns's perpetuation of this successful enterprise was an increasing supply of mortgage loans. As investor demand for mortgage-backed securities created and sold by Bear Stearns grew (due to their higher yield relative to other securities and their erroneously perceived relative safety), so did the need for ever-increasing numbers of loans to securitize. With a corporate objective of increasing origination and securitization volume in this investor-driven market, Bear Stearns affiliates and the lenders it funded actively expanded the use of "stated income," "no ratio," "low doc," and "no doc" loans that required less (or no) documentation to corroborate the borrowers' and brokers' representations. Bear Stearns also frequently provided lenders with warehouse lines of credit to generate – to EMC's specifications – the ever-increasing volume of loans for EMC to purchase and securitize.

21.     In addition, to keep the pipeline full, EMC added second-lien loans and home-equity lines of credit ("HELOCs") to its portfolio of mortgage products, many of which were also made on a low-doc or no-doc basis. HELOCs, which are the type of loans at issue in

---

[6] ProSupp at 32.

[7] *Id.*

[8] Prospectus Supplement to Bear Stearns ALT-A Trust 2007-3, dated April 25, 2007, at 44.

[9] *Id.*

[10] Q4 2006 Bear Stearns Earnings Conference Call, Dec. 14, 2007.

10

this action, provide to the borrower a revolving line of credit that is generally secured by a second-lien mortgage. EMC's HELOC business began in 2005 with over 9,300 loans valued at more than \$509 million and grew to more than 18,000 loans valued at over \$1.2 billion by the end of 2006.[11] The growth in its second-lien business was meteoric, with volume skyrocketing from approximately 15,000 loans valued at approximately \$660 million at the end of 2004 to approximately 116,500 loans valued at approximately \$6.7 billion at the end of 2006.[12] Many of these second-lien loans were "sub-prime" mortgage loans, which are generally issued to borrowers with limited incomes or FICO credit scores below 580 (on a scale that ranges from 300 to 850). Others, like the loans in the Transaction, were "Alt-A" loans, which were made to borrowers with much stronger credit scores and were also represented by EMC as having been originated pursuant to sound underwriting practices – representations that recently have been demonstrated false with respect to many loans.

22.     Many of these products had been in use in residential mortgage lending for some time, and had not been considered problematic in and of themselves. But what only very recently has come to light is that EMC's expanded securitization of these products was accompanied by a marked decline in the standards followed to originate them. As discussed in detail below, this decline directly contravened EMC's contemporaneous representations concerning the underwriting practices that had been followed.

23.     The other key to the Bear Stearns securitization machine was investor demand for its mortgage-backed securities. Bear Stearns generated this demand by convincing investors that the securities it sold were a safe and profitable investment, despite the fact that, unbeknownst to Syncora and the market at large, those securities were backed by unjustifiably

---

[11] Prospectus Supplement to Bear Stearns ALT-A Trust 2007-3, dated April 25, 2007, at 44.
[12] *Id.*

11

risky loans. This scheme took many forms. First, Bear Stearns touted its experience, expertise, analytic prowess, and sales and distribution channels. Second, EMC represented that it had conducted due diligence of the securitized mortgage-loan pools to ensure the integrity of their origination and to confirm the accuracy of their terms.[13] Third, EMC made numerous express representations and warranties to investors and insurers about the risk attributes of the loans that it was securitizing, and agreed to repurchase those loans if the representations and warranties proved untrue. Bear Stearns thus assured purchasers and insurers of these securities that EMC would stand behind the securities it marketed. Finally, EMC obtained financial-guaranty insurance policies to provide investors with greater comfort and to enhance the marketability of the securities. Under the terms of the agreements governing these insurance policies, which are discussed below, EMC assumed the risk that the loans did not conform to its representations and warranties, while the insurers agreed to assume the risk that loan pools *conforming to EMC's representations* would not perform as anticipated.

24.  Bear Stearns thus continued to expand its loan generation[14] to fuel its securitizations and, at the same time, reassured the market that it would maintain the "quality" of its securitizations. In late 2005, Bear Stearns told investors:

> [O]ur [origination and] conduit business . . . saw a significant increase in origination volume over the course of the year and that's important not only because it secures a direct pipeline of product for securitization and thereby allows us to maintain and

---

[13] In numerous filings with the U.S. Securities and Exchange Commission in connection with the issuance of mortgage-backed securities backed by those loans, EMC indicated that it had conducted due diligence of those loans. *See, e.g.*, ProSupp at 32 (stating that the diligence included reviewing loan portfolios for "credit, data integrity, appraisal valuation, documentation, as well as compliance with certain laws").

[14] Q4 2006 Bear Stearns Earnings Conference Call, Dec. 14, 2006 (Bear Stearns significantly expanded captive origination volumes in 2006, more than doubling 2005 levels).

12

increase share, but also it has a lot to do with the quality of the
product that we're able to put out in the nonagency space.[15]

25. But Bear Stearns did not take steps to ensure the "quality of the product."

Quite to the contrary, as has recently become clear, Bear Stearns pushed for increased loan

volumes at the expense of underwriting standards.[16] As has recently been learned, EMC's

inventory of mortgage loans consequently was replete with loans (i) originated by fraud, material

misrepresentations, or omissions and (ii) underwritten without regard to prudent standards or the

fundamental principles of mortgage lending, which require a good-faith assessment of the

borrower's ability and willingness to repay the loan.

26. The truth is now apparent. The Bear Stearns securitization machine was a

house of cards, supported not by real value and sound practices but by Bear Stearns's appetite for

loans and disregard for the risks that those loans presented. As has only recently come to light,

Bear Stearns's expanded acceptance and financing of no-doc and low-doc loan products

corresponded with a marked and dangerous decline in the rigor and discipline with which Bear

Stearns and the mortgage lenders it financed approached loan origination and underwriting. It is

now apparent that mortgage loans were extended in staggering volume to borrowers who simply

could not pay, or had no intention of paying, the amounts due. And rather than conducting the

rigorous due diligence it touted as the hallmark of its model, Bear Stearns sacrificed review and

rigor for volume and profit. With the collapse of the housing market, the borrowers' inability to

---

[15] Bear Stearns Investor Conference Call regarding Q4 2005 Earnings, Dec. 15, 2005.

[16] *See Bear Naked Lenders*, WALL ST. J., March 18, 2008, at A22 ("Bear took particular pride in its risk
management, but let its standards slide in the hunt for higher returns during the mortgage mania earlier
this decade."); *see also* Michael Corkery, *Fraud Seen as Driver in Wave of Foreclosures – Atlanta Ring
Scams Bear Stearns, Getting $6.8 Million in Loans*, WALL ST. J., Dec. 21, 2007, at A1 ("During its first
full year of business in 2006, Bear Stearns Residential Mortgage originated 19,715 mortgages for a
combined $4.37 billion, according to data compiled by the Federal Reserve and analyzed by The Wall
Street Journal. Bear Stearns Residential Mortgage rejected about 13% of applications, compared with an
average denial rate of 29% nationally, according to the Fed data.").

13

pay no longer could be concealed by providing refinancing based on inflated home valuations. The Bear Stearns engine ground to a halt, and the losses mounted.

27. EMC's inventory of mortgage loans thus was replete with loans originated by fraud or underwritten pursuant to imprudent or non-existent standards. Despite their representations regarding the integrity of their due diligence, Bear Stearns and EMC, upon information and belief, instructed the third-party due-diligence firms that they hired to vet these loans to look the other way. In fact, one of the more prominent of these due-diligence firms instructed its employees never to mention the word "fraud."[17]

28. Other entities that fed the Bear Stearns securitization machine similarly have had to face the music, including many of the country's largest mortgage lenders. Shortly after the Transaction at issue closed in March 2007, GreenPoint Mortgage Funding, Inc. ("GreenPoint"), the originator of the loans, faced a wave of lawsuits alleging that it had engaged in a pattern of fraudulent and otherwise improper lending practices.[18] In August 2007, GreenPoint's parent, Capital One Financial Corporation, shut down GreenPoint's mortgage-origination operations.[19] In what amounts to an admission that lax underwriting practices had fueled GreenPoint's productivity, a GreenPoint spokesperson and Capital One's chairman both

---

[17] PAUL MUOLO & MATHEW PADILLA, CHAIN OF BLAME: HOW WALL STREET CAUSED THE MORTGAGE AND CREDIT CRISIS 232-33 (2008).

[18] *See Steinmetz v. GreenPoint Mortgage Funding, Inc.*, Case No. 08-civ-5367 (S.D.N.Y. June 11, 2008); *Ferguson v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 0:08-CV-60854-WPD (S.D. Fla. June 5, 2008); *Lewis v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 1:08-cv-00567-TSE-TCB (E.D. Va. June 3, 2008); *Ouziz v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 3:08-cv-02201-WHA (N.D. Cal. Apr. 29, 2008); *Perez v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 5:08-cv-01972-JW (N.D. Cal. Apr. 15, 2008); *Ramirez v. GreenPoint Mortgage Funding, Inc.*, Case No. 3:08-cv-00369-EDL (N.D. Cal. Jan. 18, 2008); *Knapp v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. CIV 466080 (Cal. Super. Ct. Sept. 14, 2007); *Feinstein v. GreenPoint Mortgage Funding, Inc. et al.* (E.D. Pa. May 7, 2007).

[19] Valerie Bauerlein, *Capital One Shuts Down GreenPoint Mortgage Unit*, WALL ST. J., Aug. 22, 2007.

14

offered the same explanation for GreenPoint's demise: tightened underwriting standards in the lending industry.[20]

29.    In short, EMC and Bear Stearns knowingly or recklessly sold tens of billons of dollars of mortgage loans – a harrowing percentage of which are now defaulted – into securitization trusts such as the trust created as part of the Transaction. These practices have substantially contributed not only to the demise of Bear Stearns and the mortgage lenders it funded, but also to the extraordinary collapse of the residential-housing market and the resultant turmoil currently gripping financial markets all over the world.

## B.    The Transaction

30.    The Transaction at issue is a securitization of HELOCs that was effectuated in March 2007. As the Sponsor/Seller in the Transaction, EMC, upon information and belief acting at all times at the direction and under the control of Bear Stearns, pooled and securitized approximately 9,871 HELOCs, with an aggregate principal balance of more than $666 million, that EMC had previously purchased from the now-defunct GreenPoint mortgage-origination unit in two transactions that occurred in late 2006. These HELOCs served as collateral for the issuance of approximately $664 million in securities.

31.    The Transaction closed on March 6, 2007 and was effectuated through the following series of agreements executed by EMC and its affiliates that governed, among other things, the rights and obligations of the various parties with respect to the HELOCs and the securities that resulted from their securitization.

---

[20] *See* Jed Moss, *Alt-A Mortgage Lender Closes Up Shops*, MORTGAGE FOUND., June 9, 2007 (citing GreenPoint spokesperson Julie Rakes); Bauerlein, *Capital One Shuts Down GreenPoint Mortgage Unit* (citing a memo circulated by Capital One Chairman and Chief Executive Richard D. Fairbanks).

15

32. EMC, acting as HELOC Seller, sold and assigned its entire interest in the
HELOCs to its affiliate Bear Stearns Asset Backed Securities I LLC ("BSABS") pursuant to a
Mortgage Loan Purchase Agreement dated as of March 6, 2007 ("MLPA"). Under the MLPA,
EMC made numerous detailed representations and warranties concerning the HELOCs. BSABS,
in turn, sold its interest in the HELOCs to the GreenPoint Mortgage Funding Trust 2007-HE1
(the "Trust") pursuant to a Sale and Servicing Agreement dated as of March 6, 2007 ("SSA").
The Trust then issued various classes of mortgage-backed securities (the "Notes"), the most
senior of which were registered with the U.S. Securities and Exchange Commission and
underwritten and marketed to investors by Bear, Stearns & Co. by means of the related
Prospectus and Prospectus Supplement. In order to enhance the marketability of the securities
and its return on the Transaction, EMC sought to obtain a financial-guaranty insurance policy
from Syncora.

33. As an inducement to issue the policy, EMC entered into the I&I
Agreement with Syncora, whereby, among other things, EMC made numerous representations
and warranties to Syncora with respect to the Transaction, including that the representations and
warranties that EMC had made in the MLPA were true and correct in all material respects, and
agreed to indemnify Syncora in the event that EMC's representations and warranties proved to
be untrue. The other parties to the I&I Agreement are BSABS, the Trust, GreenPoint, as
Servicer, LaSalle Bank National Association, as Master Servicer and Securities Administrator,
and Citibank, N.A., as Indenture Trustee.

34. In connection with its solicitation of Syncora's insurance policy, EMC
provided to Syncora, in the form of a "tape," certain key information regarding the loans
proposed for securitization. The tape contained numerous fields of information about each loan

16

in the pool, including appraised value, loan-to-value ratio, debt-to-income ratio, FICO score, and occupancy type. EMC was aware that the information contained in this tape would be one of the key pieces of information used by Syncora to determine the premium for issuing its policy, to evaluate and model the risk of the proposed transaction, and to determine levels of structural protections known as "credit enhancement."

35.     Relying on EMC's representations, warranties, covenants, and indemnities contained in and encompassed by the I&I Agreement, the MLPA, and the SSA, Syncora issued Financial Guaranty Insurance Policy No. CA03607A (the "Policy"). Under the Policy, Syncora agreed to insure certain payments of interest and principal with respect to the most senior, or investment-grade, classes of Notes.

## C.     EMC's Representations and Warranties Reflect
## the Bargained-For Risk Allocation

36.     Under the deal documents, the principal and interest payments from the loans were to provide the cash flow necessary to make the monthly principal and interest payments on the Notes. Syncora's Policy required it to make payments to insured Noteholders to the extent that there was a shortfall of cash flow available from the loans and once the protection provided by subordinated classes of securities and other credit enhancement had been eroded. Syncora was also liable for payments to maintain parity between the outstanding principal balance of the underlying mortgages, or the collateral for the Notes, and the principal balance of the Notes in the event that defaults and write-offs of loans caused the loan balance to decline below the Note balance. Syncora's ability to accurately determine the premium for its Policy and to evaluate the risk of the Transaction and the adequacy of structural protections therefore depended on its ability to assess and control for the risk of default on the securitized loans.

17

37. Certain default risk – *e.g.*, due to changes in interest rates, changes in
borrowers' creditworthiness over time, adverse macroeconomic developments, and geographic
concentration – is not subject to the control of originators or sponsors, is measurable and
quantifiable to an acceptable degree, and is the type of risk that Syncora knowingly assumes
when it insures these types of transactions in exchange for a premium. Other default risk – *e.g.*,
due to misrepresented loan attributes, fraud, or abject failures in origination and underwriting
practices – depends directly on the controls, protocols, and practices of the originators and
sponsors, and is not reasonably measurable or quantifiable by investors in the mortgage-backed
securities or by Syncora.

38. Consequently, from the perspective of the Trust and the Noteholders, and
Syncora as the insurer standing in their shoes, the key provisions of the deal documents were the
representations and warranties that allocated to EMC the risk of loss due to such
misrepresentations, fraud, or other failures.

**D. EMC's Representations and Warranties in the MLPA**

39. EMC made myriad representations and warranties in the MLPA regarding,
among other things, the attributes of the loans and the practices used to originate, underwrite, and
service the loans. As demonstrated by their number, scope, and particularity, the representations
and warranties were designed to convey absolute confidence that EMC was standing behind the
quality of the loans and, specifically, accepting the risk of loss should any of the loans be found
to have been included in the Transaction in violation of any representation or warranty. Indeed,
EMC's extensive representations and warranties regarding the loans go on for more than 12
single-spaced typed pages. Among them, EMC represented and warranted as to each of the
HELOCs in the pool that:

18

MLPA § 7(a): "[T]he information set forth in the Mortgage Loan Schedule hereto is true and correct in all material respects; all information supplied by, on behalf of, or concerning the Mortgagor is true, accurate and complete and does not contain any statement that is or will be inaccurate or misleading in any material respect."

MLPA § 7(c): "No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Revolving Credit Loan has taken place on the part of Seller or the Mortgagor, or, on the part of any other party involved in the origination of the Revolving Credit Loan."

MLPA § 7(e): "[E]ach HELOC at the time it was made complied in all material respects with all applicable local, state and federal laws and regulations, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and all applicable predatory, abusive and fair lending laws; and each HELOC has been serviced in all material respects in accordance with all applicable local, state and federal laws and regulations, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and all applicable anti-predatory lending laws and the terms of the related Mortgage Note, the Mortgage and other loan documents."

MLPA § 7(g): "[T]here is no default, breach, violation or event of acceleration existing under any Mortgage or the related Mortgage Note and there is no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach or event of acceleration; and neither the HELOC Seller, any of its affiliates nor any servicer of any related HELOC has taken any action to waive any default, breach, violation or event of acceleration; and no foreclosure action is threatened or has been commenced with respect to any HELOC."

MLPA § 7(x): "[T]he Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the final approval of the Revolving Credit Loan application by a Qualified Appraiser, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Revolving Credit Loan, and the appraisal and appraiser both satisfy the requirements of Fannie Mae and Freddie Mac and Title XI of FIRREA and the regulations promulgated thereunder, all as in effect on the date the Revolving Credit Loan was originated. The appraisal is in a form acceptable to Fannie Mae or Freddie Mac."

19

MLPA § 7(kkk): "[N]o Revolving Credit Loan has an LTV [loan-to-value ratio] or CLTV [combined loan-to-value ratio], as applicable, in excess of 100% and no second lien Revolving Credit Loan has an Equity LTV in excess of 100%."

MLPA § 7(ooo): "[T]he methodology used in underwriting the extension of credit for each Revolving Credit Loan . . . confirmed that at the time of origination, the Mortgagor had a reasonable ability to make timely payments on the Revolving Credit Loan."

40.   To further assure the deal participants that the loans that EMC was selling

to the Trust complied with these and other representations and warranties, EMC also committed

in the MLPA that, should any of its representations and warranties prove untrue, EMC would

cure the breach(es) or remove the breaching loan(s) from the pool. To this end, Section 7 of the

MLPA provides, in pertinent part, as follows:

Upon discovery or receipt of notice . . . of a breach of any representation or warranty of [EMC] set forth in this Section 7 which materially and adversely affects the value of the interests of [the parties] in any of the HELOCs . . . or which adversely affects the interests of the Note Insurer . . . . within 90 days . . . [EMC] will either (i) cure such breach in all material respects, (ii) repurchase the affected HELOC at the applicable Purchase Price[21] or (iii) if within two years of the Closing Date, substitute a qualifying [loan] in exchange for such HELOC . . . .[22]

41.   The parties intended these contractual remedies to address EMC's

inadvertent inclusion in the Transaction of the aberrant non-compliant loan; they were not

designed to be applied to a large percentage of the loan pool for the wholesale failure to comply

---

[21] The MLPA defines "Purchase Price" as "an amount equal to the sum of (i) 100% of the principal remaining unpaid on such HELOC as of the date of repurchase (including if a foreclosure has already occurred, the principal balance of the related HELOC at the time the Mortgaged Property was acquired), net of any Servicing Advances attributable to principal and payable to the HELOC Seller if the HELOC Seller is also the servicer of such HELOC, (ii) accrued and unpaid interest thereon at the Mortgage Interest Rate through and including the last day of the month of purchase, net of any portion of the Servicing Fee and any Servicing Advances attributable to interest that is payable to the HELOC Seller if the HELOC Seller is also the servicer of such HELOC and (iii) any costs and damages (if any) incurred by the Trust in connection with any violation of the terms of such HELOC of any anti-predatory lending laws."

[22] Section 2.03 of the SSA contains similar language.

20

with EMC's express representations and warranties. EMC thwarted the contractual intent both by selling to the Trust a large volume of non-compliant loans and, thereafter, by refusing to comply with the contractual remedies.

**E.    EMC's Representations and Warranties in the I&I Agreement**

42.    In the I&I Agreement, EMC extended to Syncora the representations and warranties that EMC had made in the MLPA, and made directly to Syncora additional and broader representations and warranties to reinforce the parties' negotiated risk-allocation arrangement. In addition, EMC expressly agreed that Syncora was entitled (i) to seek any remedy, without exclusion, at law or in equity in the event that EMC breached its representations and warranties, and (ii) to enforce EMC's obligation to cure, repurchase, or substitute loans that did not comply with the representations in the MLPA. In extending and expanding the representations and warranties, and affording Syncora even greater remedies for breaches of those commitments than those that EMC had extended to the Trust and Noteholders in the operative documents, EMC conveyed to Syncora EMC's blanket commitment that the loans that EMC had sold to the Trust conformed to EMC's representations and warranties and therefore, among other things, were not tainted by fraud, error, omission, misrepresentation, negligence, or similar occurrence in their origination or underwriting. EMC thus assured Syncora that EMC would bear the risk of loss in the event that any of its disclosures, representations, or warranties proved inaccurate.

43.    EMC's broad representations and warranties, and its commitment to bear the risk of their inaccuracy, are clearly and unambiguously stated in the I&I Agreement. First, the I&I Agreement explicitly extends to Syncora the numerous representations and warranties that EMC made in the MLPA:

21

> I&I Agreement § 2.01(n): "*Operative Documents.* Each of the
> representations and warranties of EMC, the Issuer and the
> Depositor contained in the applicable Operative Documents[23] is
> true and correct in all material respects and each of EMC, the
> Issuer and the Depositor hereby makes each such representation
> and warranty to, and for the benefit of, the Insurer as if the same
> were set forth in full herein. Each of EMC, the Issuer and the
> Depositor will not at any time in the future deny that the Operative
> Documents to which it is a party constitute the legal, valid and
> binding obligations of EMC, the Issuer and the Depositor, as
> applicable."

44. Second, the I&I Agreement provides that Syncora is a third-party

beneficiary of the underlying transaction documents, with all rights afforded thereunder,

including the representations, warranties, and covenants that EMC made in the key operative

documents:

> I&I Agreement § 2.02(j): "*Third-Party Beneficiary.* Each of
> EMC, the Issuer, the Depositor and the Servicer agrees that the
> Insurer shall have all rights provided to the Insurer in the Operative
> Documents and that the Insurer shall constitute a third-party
> beneficiary with respect to such rights in respect of the Operative
> Documents and hereby incorporates and restates its
> representations, warranties and covenants as set forth therein for
> the benefit of the Insurer."

*See also* MLPA § 27; SSA § 8.16.

45. Third, the I&I Agreement adds for Syncora's benefit new representations

and warranties not found in the underlying transaction documents, including EMC's promise as

to the truthfulness of the information that it provided to Syncora about the Transaction and its

operations as a whole:

> I&I Agreement § 2.01(l): "*Accuracy of Information.* Neither the
> Operative Documents nor other material information relating to the
> HELOCs, the operations of EMC, the Issuer or the Depositor or
> the financial condition of EMC, the Issuer or the Depositor
> (collectively, the "Documents"), as amended, supplemented or

---

[23] The I&I Agreement defines "Operative Documents" to include, among other documents, the I&I
Agreement, the MLPA, and the SSA.

22

superseded, furnished to the Insurer in writing or in electronic form
by EMC, the Issuer or the Depositor contains any statement of a
material fact which was untrue or misleading in any material
respect when made. . . . Without limiting the generality of the
foregoing, the information in the Data Tape with respect to each
HELOC is true and correct as of the Cut-off Date."

I&I Agreement § 2.01(m): *Compliance With Securities Laws*.
"[T]he Offering Document[24] does not contain any untrue statement
of a material fact and does not omit to state a material fact
necessary to make the statements made therein, in light of the
circumstances under which they were made, not misleading."

46.     EMC's assurance to Syncora in Section 2.01(m) of the I&I Agreement is

significant. The Prospectus and Prospectus Supplement used to market the Notes to investors in

connection with the Transaction, for example, contained disclosures pertaining to the loan

attributes, the underwriting and due diligence conducted, and the risks associated with the

Transaction. In making this representation about the Offering Document, which was material

and incremental to the representations and warranties made in the MLPA, EMC sought to

provide further comfort to Syncora about the accuracy and completeness of the total mix of

information about the Transaction that EMC had made available. EMC thus again assumed the

risk that the disclosures misstated or omitted material facts. In fact, as discussed below, the

disclosures contained false and misleading information because they materially misrepresented,

on a pool-wide basis, key loan metrics and the origination, underwriting, and due diligence

performed on the loans, and contained material omissions because they failed to disclose the

abysmal origination, underwriting, and due-diligence practices and procedures that account for

the incredible incidence of fraud and gross underwriting failings plaguing these loans.

---

[24] The I&I Agreement defines the "Offering Document" to include "the Prospectus, dated December 18,
2006, as supplemented by the Prospectus Supplement, dated March 5, 2007, as supplemented by the Free
Writing Prospectus, dated March 2, 2007 in respect of the Notes and any amendment or supplement
thereto, and any other offering document in respect of the Securities prepared by or on behalf of the
Depositor that makes reference to the Policy."

23

47.    Lastly, the I&I Agreement affords Syncora broad remedies to address

breaches by EMC of its representations and warranties and other contractual commitments:

> *All remedies available at law and equity:* While other parties to
> the Transaction are limited to the remedies set forth in the MLPA
> and SSA, Syncora is not. Section 5.02 of the I&I Agreement
> provides that any and all remedies at law and in equity – including
> those available in the Operative Documents – are available to
> Syncora on a non-exclusive and cumulative basis.
>
> *Loan level cure, repurchase, and/or substitution:* In Section 5.02
> of the I&I Agreement, EMC agreed that Syncora may enforce the
> cure, repurchase, and/or substitution provisions of the MLPA (§ 7)
> and SSA (§§ 2.02-2.04).
>
> *Reimbursement:* EMC separately agreed to reimburse Syncora for
> any payments resulting from, among other things, EMC's failure to
> comply with the remedial provisions of the SSA. Specifically, in
> Section 3.03(b) of the I&I Agreement, "EMC agree[d] to pay
> [Syncora], and [Syncora] shall be entitled to reimbursement from
> EMC and shall have full recourse against EMC for, (i) any
> payment made under the Policy arising as a result of EMC's failure
> to substitute for or deposit an amount in respect of any defective
> HELOC as required pursuant to Section 2.04 of the Sale and
> Servicing Agreement, together with interest on any and all such
> amounts remaining unreimbursed."
>
> *Payment and indemnification:* Pursuant to Section 3.04(a) of the
> I&I Agreement, EMC also agreed to pay and indemnify Syncora
> for any claims, losses, or demands arising out of or relating to,
> among other things, any breach of a representation or warranty
> made by EMC. In particular, Section 3.04(a) states that EMC
> agrees "to pay, and to protect, indemnify and save harmless,
> [Syncora] from and against any and all claims, losses, liabilities
> (including penalties), actions, suits, judgments, demands, damages,
> costs or expenses (including reasonable fees and expenses of
> attorneys, consultants and auditors and reasonable costs of
> investigations) of any nature arising out of or relating to the breach
> by EMC . . . of any of the representations or warranties contained
> in Section 2.01 or arising out of or relating to the transactions
> contemplated by the Operative Documents by reason of: . . . (iv)
> the breach by EMC . . . of any representation, warranty or covenant
> under any of the Operative Documents or the occurrence, in
> respect of EMC . . . under any of the Operative Documents of any
> 'event of default' or any event which, with the giving of notice or
> the lapse of time or both, would constitute any 'event of default.'"

24

> ***Recovery of fees, costs, expenses, and interest:*** EMC agreed that
> it would pay Syncora any expenses incurred in enforcing EMC's
> obligations under the transaction documents. To that end, Section
> 3.03(c) of the I&I Agreement states that "EMC agrees to pay
> [Syncora] any and all charges, fees, costs and expenses that
> [Syncora] may reasonably pay or incur, including reasonable
> attorneys' and accountants' fees and expenses, in connection with
> (i) the enforcement, defense or preservation of any rights in respect
> of any of the Operative Documents." Moreover, Section 3.03(d) of
> the I&I Agreement entitles Syncora to collect interest on any and
> all amounts recovered as reimbursement or any and all amounts
> expended in enforcing or preserving its rights under the I&I
> Agreement.

48.     The representations, warranties, and remedies that EMC provided to

Syncora in these provisions were fundamental consideration for Syncora's agreement to issue its

Policy. Syncora required these provisions because its decision of whether to provide insurance

depended on the accuracy of the information that EMC had provided. The stated agreement was

that Syncora was to assume the risk that the loans in the pool would default provided – *and only*

*to the extent* – that the information that EMC had represented and warranted concerning those

loans was correct and complete. EMC assumed the risk that the information was incorrect,

misleading, or incomplete. This risk allocation was the bargain that the parties struck, and the

bargain that EMC has now gutted.

## F.     EMC's Material Breach

49.     The loans that EMC sold to the Trust in connection with the Transaction

have failed miserably. More than 45% of the HELOCs either have been written off as total

losses or are severely delinquent. As of March 13, 2009, the Transaction had experienced

cumulative losses of more than $221 million. Syncora's resulting claim payments to the insured

Noteholders have exceeded $168.6 million.

50.     When the Transaction first began showing signs of potential performance

deterioration, Syncora hired third-party consultants to review the files created during the

25

origination of 410 of the securitized HELOCs that had defaulted. The consultants found

breaches of EMC's representations and warranties in a remarkable 380, or nearly 93%, of the

loans with an aggregate principal balance of approximately $34 million.

51.     These loans contained one or, in most cases, more than one defect that

constituted a breach of one or more of the numerous representations and warranties made by

EMC in the MLPA and that materially altered the loans' risk profile. These defects include:

- rampant fraud, primarily involving misrepresentation of the
  borrower's income, assets, employment, or intent to occupy the
  property as the borrower's residence (rather than as an
  investment), and subsequent failure to so occupy the property;

- failure by the borrower to accurately disclose his or her
  liabilities, including multiple other mortgage loans taken out to
  purchase additional investment property;

- inflated and fraudulent appraisals; and

- pervasive violations of GreenPoint's own underwriting
  guidelines and prudent mortgage-lending practices, including
  loans made to borrowers (i) who made unreasonable claims as
  to their income, (ii) with multiple, unverified social-security
  numbers, (iii) with credit scores below the required minimum,
  (iv) with debt-to-income and/or loan-to-value ratios above the
  allowed maximum, or (v) with relationships to GreenPoint or
  other non-arm's-length relationships.

52.     Each of these breaches adversely affected Syncora's interests, or

materially and adversely affected the value of Syncora's interests in the identified HELOCs.

Loans subject to fraud, that were not originated and underwritten pursuant to prudent and proper

practices, or the key attributes of which are otherwise misrepresented, are markedly more risky

and therefore less valuable than loans not suffering from such shortcomings.

53.     Consequently, by letter dated March 4, 2008, Syncora gave notice to EMC

of the particular breaches that Syncora had discovered with respect to each of the HELOCs in the

sample it had reviewed. Syncora demanded that EMC comply with Section 7 of the MLPA and

Section 2.03 of the SSA by curing, repurchasing, or providing substitutes for the affected HELOCs. Syncora also demanded that EMC pay Syncora its fees and expenses incurred in connection with identifying these breaches and enforcing its rights, pursuant to Sections 3.03(c)(i) and 3.04(a)(iv) of the I&I Agreement. The letter further reserved any and all of Syncora's rights to assert additional claims or demands with respect to indemnification, reimbursements, breaches, and other claims. EMC refused to comply with its contractual obligations, agreeing by letter dated August 4, 2008 to repurchase only 15, or less than 4%, of the loans. To date, however, EMC has not repurchased even those 15 loans.

54.     Following review of additional HELOCs, on June 19, 2008 Syncora gave notice to EMC that 248 more HELOCs breached its representations and warranties. Syncora again particularized the breaches, which were substantially identical to those previously identified. And Syncora again demanded payments for its costs incurred in identifying these breaches. EMC asked for, and received from Syncora, an extension of time to respond, but to date has still not provided any formal response whatsoever.

55.     Given the rampant breaches identified by Syncora with respect to these loans, Syncora recently undertook a further review based on a random and, for statistical purposes, therefore representative sample of the HELOCs in the pool. The sample included both defaulted loans and loans still current in payments. Of this sample of 400 loans, Syncora has identified breaches of representations and warranties in 342 loans, a staggering 85.5%. The breaches identified evince gross malfeasance, misconduct, and negligence in connection with the origination and underwriting of the loans that EMC pooled, and a wholesale abandonment of any attempt to gauge the ability and willingness of borrowers to repay their obligations. The analysis demonstrates at a very high (95%) confidence interval that breaches of EMC's representations

27

and warranties exist in a comparable percentage of loans *in the total loan pool* for the
Transaction.

56.     Contrary to EMC's assurance in Section 2.01(m) of the I&I Agreement,
moreover, the Offering Documents that EMC prepared to market the Notes that Syncora insured
(and the same documents that EMC filed with the SEC) did not adequately or accurately disclose
the true attributes of the loans (*e.g.*, the weighted average combined loan-to-value ratio,
occupancy status, or debt-to-income ratio), the level of fraud and underwriting failings
permeating the EMC loan pool, the grossly deficient origination and underwriting practices of
GreenPoint (the originator of the loans), or EMC's due-diligence practices.

57.     The pervasive breaches of EMC's representations and warranties, revealed
by the loan-file reviews and supported by the dismal loan performance of the Transaction, pierce
the very heart of the bargain struck by the parties. As has only recently become clear, EMC did
not sell to the Trust the contemplated portfolio of loans with the represented attributes. Rather,
EMC transferred a pool in which the overwhelming majority of loans did not comply with
expectations and, in fact, bore little resemblance at all to the loans that EMC had expressly
represented would comprise the pool.

58.     EMC's conduct has greatly harmed Syncora, its capital position, stock
price, reputation, and credit rating by requiring Syncora to pay out hundreds of millions of
dollars in claim payments to date, and hundreds of millions of dollars in the future, to cover the
defaults caused by these non-compliant loans. EMC's deliberate frustration of the contractual
cure-repurchase-or-substitution remedy, which was designed to address the inadvertent and
sporadic breach, further compounds the harm.

28

12-12020-mg Doc 5135-67 Filed 09/19/13 Entered 09/31/03 Page 29 of 52 Exhibit 17
Case 1:09-cv-03106-PAC Document 1 Filed 09/19/13 Page 29 of 52
Pg 30 of 33

## FIRST CAUSE OF ACTION

### (Breach of Representations and Warranties)

59.     Syncora realleges and incorporates by reference paragraphs 1 through 58
of this Complaint.

60.     The I&I Agreement is a valid and binding agreement between Syncora
and EMC.

61.     Syncora has performed all of its obligations under the I&I Agreement.

62.     EMC has materially breached its representations and warranties under
Section 7 of the MLPA and Section 2.01 of the I&I Agreement.

63.     Syncora has been damaged and will continue to be damaged in an amount
to be determined at trial.

## SECOND CAUSE OF ACTION

### (Breach of Cure-Repurchase-or-Substitute Obligation)

64.     Syncora realleges and incorporates by reference paragraphs 1 through 63
of this Complaint.

65.     EMC has materially breached its obligations under Section 7 of the MLPA
and Section 2.03 of the SSA by refusing to cure, repurchase, or provide substitutes for the
HELOCs that breached EMC's representations and warranties and with respect to which notice
of breach has been provided by Syncora to EMC by letters dated March 4, 2008 and June 19,
2008.

66.     Syncora has been damaged and will continue to be damaged in an amount
to be determined at trial.

## THIRD CAUSE OF ACTION

### (Material Breach of the I&I Agreement)

67.     Syncora realleges and incorporates by reference paragraphs 1 through 66 of the Complaint.

68.     EMC induced Syncora to enter into the I&I Agreement and to issue its Policy by making extensive representations and warranties concerning the HELOCs that EMC caused to be sold to the Trust, and by agreeing to broad remedies for breaches of those representations and warranties.

69.     EMC's representations and warranties and related remedial commitments were material to Syncora's decision to insure the Transaction, and Syncora was induced thereby to enter into the I&I Agreement and perform its obligations thereunder.

70.     EMC has materially breached the I&I Agreement, and the loan-by-loan cure-repurchase-or-substitution remedy not only is inadequate to address the magnitude and pervasiveness of the breaches identified, but is being frustrated by EMC's wholesale failure to comply with it.

71.     Syncora has been damaged and will continue to be damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Indemnification)

72.     Syncora realleges and incorporates by reference paragraphs 1 through 71 of this Complaint.

73.     Pursuant to Section 3.04(a) of the I&I Agreement, Syncora is entitled to be indemnified for all claims, losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or relating to the breach by EMC of any of the representations or warranties

30

contained in Section 2.01 of the I&I Agreement or arising out of or relating to the transactions contemplated by the Operative Documents by reason of, among other things, a breach by EMC of any representation, warranty, or covenant contained in the Operative Documents.

74.    EMC has breached numerous representations, warranties, and covenants, and those breaches have caused Syncora to pay claims and incur losses, costs, and expenses, and will continue to cause Syncora to pay claims and incur losses, costs, and expenses in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Attorneys' Fees and Costs)

75.    Syncora realleges and incorporates by reference paragraphs 1 through 74 of this Complaint.

76.    Pursuant to Section 3.03(c) of the I&I Agreement, EMC agreed to reimburse Syncora for any and all charges, fees, costs, and expenses paid or incurred in connection with, among other things, enforcing, defending, or preserving Syncora's rights under the Operative Documents.

77.    Syncora has incurred numerous expenses, including attorneys' fees and expert fees, in order to enforce, defend, and preserve its rights under the relevant agreements.

## PRAYER FOR RELIEF

**WHEREFORE**, Syncora respectfully prays for the following relief:

A.    For an award of compensatory, consequential, and/or equitable damages, and any other damages to be proven at trial, for EMC's pervasive and material breaches of its representations and warranties and its related contractual remedial obligations, constituting a material breach of the I&I Agreement and frustration of the parties' bargain;

31

**B.** For an order compelling EMC to comply with its obligations under MLPA § 7 and SSA § 2.03 to cure, repurchase, or substitute the HELOCs that breach its representations and warranties;

**C.** For an order of indemnification for the claim payments and other losses and expenses that Syncora has paid or will pay in the future that were caused by EMC's breaches of its representations, warranties, or covenants, pursuant to I&I Agreement § 3.04(a);

**D.** For an order awarding reimbursement of Syncora's attorneys' fees and other costs and expenses incurred in enforcing, defending, and preserving its rights under the Operative Documents, pursuant to I&I Agreement § 3.03(c).

**E.** For an order of prejudgment interest; and

**F.** For an order awarding Syncora such other and further relief as the Court deems just and proper.

Dated:     New York, New York
          March 31, 2009

                    Respectfully submitted,

                    PATTERSON BELKNAP WEBB & TYLER LLP


                    Philip R. Forlenza
                    David W. Dykhouse
                    Erik Haas
                    Benjamin S. Litman
                    1133 Avenue of the Americas
                    New York, NY 10036-6710
                    Telephone: (212) 336-2000
                    Fax: (212) 336-2222
                    pforlenza@pbwt.com
                    dwdykhouse@pbwt.com
                    ehaas@pbwt.com
                    blitman@pbwt.com

                    *Attorneys for Syncora Guarantee Inc.*