Exhibit 18

FILED: NEW YORK COUNTY CLERK 02/14/2012
NYSCEF DOC. NO. 1
INDEX NO. 650420/2012
RECEIVED NYSCEF: 02/14/2012
12-12020-mg    Doc 5115-18    Filed 09/19/13    Entered 09/19/13 15:39:29    Exhibit 18
Pg 2 of 67

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| SYNCORA GUARANTEE INC., formerly known as XL CAPITAL ASSURANCE INC., | Index No. _____ |
| Plaintiff, | SUMMONS |
| - against - | |
| EMC MORTGAGE LLC (formerly known as EMC Mortgage Corporation), BEAR, STEARNS & CO. INC., BEAR STEARNS ASSET BACKED SECURITIES I, LLC, J.P. MORGAN SECURITIES LLC (formerly known as BEAR, STEARNS & CO. INC.), and JPMORGAN CHASE BANK, N.A., | |
| Defendants. | |

To the above named Defendants:

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to submit answering papers, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of the venue is the residence of the plaintiff and agreement of the parties.

Dated: New York, New York
       February 14, 2012

VENABLE LLP

By: *William H. Devaney*
Edmund M. O'Toole
William H. Devaney
Doreen S. Martin
1270 Avenue of the Americas, 25th Floor
New York, New York 10020
Tel.: (212) 307-5500
Fax: (212) 307-5598
*Attorneys for Syncora Guarantee Inc.*

TO:

EMC MORTGAGE LLC (formerly known as EMC Mortgage Corporation)
2780 Lake Vista Drive
Lewisville, TX 75067

BEAR, STEARNS & CO. INC. ( c/o J.P. MORGAN SECURITIES LLC)
277 Park Avenue
New York, New York 10179

BEAR STEARNS ASSET BACKED SECURITIES I, LLC
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

J.P. MORGAN SECURITIES LLC (formerly known as BEAR, STEARNS & CO. INC.)
277 Park Avenue
New York, New York 10179

JP MORGAN CHASE BANK, N.A.
1111 Polaris Parkway
Columbus, OH 43240-2031

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| SYNCORA GUARANTEE INC., formerly known as XL CAPITAL ASSURANCE INC., <br><br> Plaintiff, <br><br> - against - <br><br> EMC MORTGAGE LLC (formerly known as EMC Mortgage Corporation), BEAR, STEARNS & CO. INC., BEAR STEARNS ASSET BACKED SECURITIES I, LLC, J.P. MORGAN SECURITIES LLC (formerly known as BEAR, STEARNS & CO. INC.), and JPMORGAN CHASE BANK, N.A., <br><br> Defendants. | Index No. _____ <br><br> COMPLAINT |

Plaintiff Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc.

("Syncora"), an insurance company formed under the laws of the State of New York, by its

attorneys, Venable LLP, for its complaint against defendants EMC Mortgage LLC ("EMC"),

Bear, Stearns & Co. Inc. ("Bear Stearns"), Bear Stearns Asset Backed Securities I, LLC

("BSABS"), J.P. Morgan Securities LLC ("JP Morgan"), as successor in interest to Bear Stearns,

and JPMorgan Chase Bank, N.A. ("JPMC Bank"), as successor in interest to EMC, hereby

alleges as follows:

I.    **NATURE OF THE ACTION**

1.    Syncora brings this suit against Bear Stearns, its affiliates EMC and BSABS, JP

Morgan, as successor in interest to Bear Stearns, and JPMC Bank, as successor in interest to

EMC, for breach of contract and fraud in connection with a mortgage-backed-securities

transaction known as SACO I Trust 2006-1 (the "Transaction"). The Transaction involved the

securitization of a pool of Home-Equity Line of Credit residential mortgage loans ("HELOCs")

with an aggregate principal balance of more than $310 million that served as collateral for the issuance of approximately $303 million in securities.

2.      To enhance the marketability of the securities and their return on the Transaction, Bear Stearns and EMC obtained a financial-guaranty insurance policy from Syncora pursuant to a February 28, 2006 Insurance and Indemnity Agreement (the "I&I Agreement").

3.      The I&I Agreement sets forth myriad representations and warranties made by BSABS and EMC about the quality of the loan pool and the individual loans, the Transaction, the soundness of Bear Stearns' and EMC's operations as a whole, and their due diligence practices. These representations are the bedrock of the parties' agreement and Syncora reasonably relied on these representations when deciding to insure the Transaction.

4.      Specifically, the I&I Agreement contains two types of representations: (1) transaction-level representations, which relate to Bear Stearns' and EMC's operations, due diligence, and the Transaction as a whole and (2) loan-level representations, which relate to the characteristics of the underlying loan pool and individual loans. The loan-level representations were made in the Mortgage Loan and Purchase Agreement, dated February 28, 2006 ("MLPA"), and the Sale and Servicing Agreement, dated February 28, 2006 ("SSA"), and were largely incorporated and restated in the I&I Agreement for Syncora's benefit.

5.      One of BSABS's and EMC's key representations in the I&I Agreement that Syncora relied on was that the information in the data tapes, which in turn contained the financial attributes of the loans in the pool, was true and accurate. In addition, Bear Stearns and EMC also represented and warranted that all of their practices, procedures, and policies were in compliance

-2-

with applicable laws and regulations, and that the Prospectuses[1] for the Transaction complied

with applicable securities laws and did not contain any material misstatements or omissions.

6.    Moreover, in order to further induce Syncora to insure the Transaction, Bear

Stearns and EMC incorporated into the I&I Agreement for Syncora's benefit the representations

and warranties made in Section 7 of the MLPA in which EMC makes 47 specific representations

about the attributes of the loan pool, the individual loans, and the practices used to originate,

underwrite, and service the loans.  Significantly, MPLA Section 7(j) states that "[w]ith respect to

the HELOCs . . . [n]o fraud, error, omission, misrepresentation, gross negligence or similar

occurrence with respect to a HELOC has taken place on the part of any Person, including

without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party

involved in the origination or servicing of the HELOC."  In addition, MLPA Section 7(kk) states

that "[n]o error, omission, misrepresentation, fraud or similar occurrence with respect to a

HELOC has taken place on the part of either Seller or the related Originator."[2]

7.    In addition to the above contractual representations, EMC and Bear Stearns also

induced Syncora to insure the Transaction by making other representations about their

securitization operations, seller approval processes, due diligence protocols and quality control

protocols to assure Syncora of the strength of the Transaction.  These representations were made

in marketing presentations, Prospectuses, and in oral communications.  Specific representations

about the key attributes of the loans were also sent to rating agencies.  All of the representations

---

[1] Prospectuses refer to the Prospectus, dated June 24, 2005 ("Prospectus"), the Prospectus Supplement, dated February 24, 2006 ("ProSupp" or "Prospectus Supplement"), and the Free Writing Prospectus, dated February 23, 2006 ("FWP").

[2] Seller is defined in the MLPA as EMC Mortgage Corporation.  The three principal Originators in this Transaction are MortgageIT Inc., Metrocities Mortgage LLC, and SouthStar Funding LLC.

-3-

were made to induce Syncora to insure the Transaction, and Bear Stearns and EMC knew that
Syncora would rely on these representations when assessing the risk associated with the
Transaction. These representations, however, were false, and Bear Stearns and EMC knew or
should have known that they were false at the time they were made.

8.    A loan level analysis conducted by an expert retained by Syncora's counsel
reveals that 81.9% of the loans in the pool had a material breach of one or more of the
representations contained in the MLPA (the "Material Breach Rate"). Those breaches and the
systemic fraud perpetrated by Bear Stearns and EMC, which led to this enormous breach rate, is
the focus of this litigation.

9.    As of September 30, 2011, only 653 of the 4,360 HELOCs initially sold to the
Trust are current and 1,394 are in default or have been liquidated. As of September 30, 2011, the
Transaction has experienced cumulative losses of $96,650,362.79, which has resulted in Syncora
paying over $51,964,147.00 in claim payments (net of reimbursements) to the insured
Noteholders.

10.    Accordingly, Syncora brings this action for breach of contract and fraud
stemming from EMC's and Bear Stearns' fraudulent actions in inducing Syncora to enter into the
I&I Agreement and issue the Financial Guaranty Insurance Policy No. CA02695A (the
"Policy"), and for EMC's and BSABS's subsequent and wholesale breaches of that Agreement,
which materially increased Syncora's risk.[3] JP Morgan and JPMC Bank are named as

---

[3] This lawsuit is one of many suits filed against the Defendants for breach of contractual representations and
warranties, fraud and/or gross negligence in connection with residential mortgage-backed securities, including but
not limited to the following federal and state cases: *Deutsche Zentral-Genossenschaftsbank AG, New York Branch
v. JPMorgan Chase & Co.*, No. 650293/2012 (Sup. Ct. N.Y. County, Jan. 30, 2012); *Sealink Funding Limited v.
Bear Stearns & Co. Inc.*, No. 652681/2011 (Sup. Ct. N.Y. County, Sept. 29, 2011); *Ambac Assurance Corp. v. EMC
Mortgage Corp.*, No. 650421/2011 (Sup. Ct., N.Y. County, July 18, 2011) (Ramos, J.); *Syncora Guarantee Inc. v.*

defendants in this action as successors in interest to Bear Stearns and EMC, and, therefore, are

liable for the conduct of those parties.

## II.    THE PARTIES

### A.    PLAINTIFF

11.    Syncora (previously known as XL Capital Assurance Inc.) changed its name to

Syncora Guarantee Inc. on August 4, 2008.  Syncora is a New York corporation with its

principal place of business in New York, New York.  Syncora is a New York licensed monoline

insurer which was previously engaged in the business of writing financial guaranty insurance.

### B.    DEFENDANTS

12.    Defendant EMC Mortgage LLC (defined above as "EMC") is organized under the

laws of the State of Delaware and its principal place of business is 2780 Lake Vista Drive,

Lewisville, Texas 75067.  EMC is a mortgage banking company that regularly transacts business

in New York and in this County.  EMC was a wholly owned subsidiary of The Bear Stearns

Companies Inc. ("The Bear Stearns Companies") and is an affiliate of Bear Stearns and BSABS.

Pursuant to a merger agreement effective May 30, 2008, JPMorgan Chase & Co. ("JPMorgan

Chase") acquired the assets and operations of The Bear Stearns Companies, including Bear

Stearns, EMC Mortgage Corporation and BSABS for nominal consideration in a transaction that

was financed in part by a $29 billion non-recourse loan made by taxpayers (the "Merger").

---

*J.P. Morgan Sec. LLC*, No. 651566/2011 (Sup. Ct., N.Y. County, June 6, 2011) (Ramos, J.); *Assured Guaranty Corp. v. EMC Mortgage LLC*, No. 10-CV-5367-NRB (S.D.N.Y. Nov. 18, 2011) (Buchwald, J.); *Federal Housing Finance Agency v. JPMorgan Chase & Co.*, No. 11-CV-06188-DLC (S.D.N.Y. Sept. 2, 2011) (Cote, J.); *Fort Worth Emp. Ret. Fund v. JPMorgan Chase & Co.*, No. 09-CV-03701-JPO (S.D.N.Y. July 8, 2010) (Oetken, J.); *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No. 09-CV-03106-PAC (S.D.N.Y. Mar. 31, 2009) (Crotty, J.).

Pursuant to the Merger, EMC Mortgage Corporation became wholly owned by JPMorgan Chase.[4] On or about March 31, 2011, EMC Mortgage Corporation underwent a change in form from a corporation to a limited liability company, and is now called EMC Mortgage LLC.

13.     Defendant JPMorgan Chase Bank, N.A. (defined above as "JPMC Bank") is a national banking association whose articles of association designate Columbus, Ohio as the location of its main office, and whose principal place of business is in New York, New York. On or about April 1, 2011, JPMC Bank acquired all or substantially all of EMC's assets, making EMC a shell entity. JPMC Bank is a continuation of EMC, as JPMC Bank succeeded to EMC's business and assumed EMC's obligations to service mortgage loans, including the Transaction, and JPMC Bank thus assumed the liabilities of EMC. JPMC Bank is a successor to EMC and is therefore liable for the conduct and obligations of EMC alleged herein.[5]

14.     Defendant Bear, Stearns & Co. Inc. (defined above as "Bear Stearns") is principally located at 383 Madison Avenue, New York, New York 10179. Bear Stearns was an SEC-registered broker dealer that served as the underwriter for the Transaction. Bear Stearns was a wholly-owned subsidiary of The Bear Stearns Companies. Pursuant to the Merger, Bear Stearns became a wholly owned subsidiary of JPMorgan Chase. Following the Merger, on or about October 1, 2008, Bear Stearns merged with an existing subsidiary of JPMorgan Chase known as J.P. Morgan Securities Inc., and the resulting entity was called J.P. Morgan Securities Inc. Effective September 1, 2010, J.P. Morgan Securities Inc. was converted from a corporation to a limited liability company and changed its name to J.P. Morgan Securities LLC.

---

[4] EMC's 7.1 Disclosure Statement filed April 21, 2009 in the action *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 09 Civ. 3106 (PAC) (S.D.N.Y.).

[5] *See also* MLPA § 23; SSA § 8.06; I&I Agreement § 4.04(a) (agreements addressing successor liability).

15.    Defendant J.P. Morgan Securities LLC (defined above as "JP Morgan") is a Delaware corporation with its principal place of business at 277 Park Avenue, New York, New York 10017. JP Morgan is a SEC-registered broker-dealer that engages in investment banking activities in the United States. JP Morgan is a continuation of Bear Stearns, and JP Morgan assumed the liabilities of Bear Stearns. JP Morgan is the successor to Bear Stearns and is therefore liable for the conduct and obligations of Bear Stearns alleged herein.

16.    Upon information and belief, Defendant Bear Stearns Asset Backed Securities I, LLC (defined above as "BSABS") maintained its principal offices at 383 Madison Avenue, New York, New York 10179, until mid-2008. BSABS's principal offices are now located at 270 Park Avenue, New York, New York 10017. BSABS served as the purchaser/depositor for the Transaction. BSABS was a wholly-owned subsidiary of The Bear Stearns Companies and is an affiliate of Bear Stearns and EMC. Pursuant to the Merger, BSABS became a wholly owned subsidiary of JPMorgan Chase.

## III.    JURISDICTION AND VENUE

17.    This Court has personal jurisdiction over the defendants pursuant to N.Y. C.P.L.R. §§ 301, 302, and 311.

18.    BSABS and EMC also have expressly consented to the jurisdiction of this Court over this action pursuant to Section 6.05(a) of the I&I Agreement.

19.    Venue is proper in New York County pursuant to N.Y. C.P.L.R. §§ 503(a) and 503(c).

20.    Venue is also proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this County and because BSABS and EMC have expressly consented to venue in this County pursuant to Section 6.05(a) of the I&I Agreement.

-7-

## IV.    FACTUAL BACKGROUND

### A.    BEARS STEARNS – A SECURITIZATION MACHINE

21.    Between 2003 and 2007, Bear Stearns churned out hundreds of transactions similar to the Transaction that is the subject of this lawsuit. It was at or near the top of the charts for volume of issuances and the underwriting of residential mortgage-backed securities for many years.[6]

22.    In fact, from 2003 to 2006, The Bear Stearns Companies' revenue increased by 123.8% and its profit increased by 77.6%, driven in large part by mortgage finance and its securitization transactions.[7] In 2006, The Bear Stearns Companies' overall securitization volume rose from $95 billion in fiscal year 2005 to $113 billion, amounting to 11% of the overall U.S. mortgage-securities market.[8] Clearly, residential mortgage-backed securitizations was big business for Bear Stearns. However, in 2008 the truth came to light. The Bear Stearns' securitization machine was really a house of cards, supported not by real value and sound practices, but by Bear Stearns' desire to securitize as many loans as possible in order to generate the maximum amount of fees, without regard to the quality of the loans in the securitizations or

---

[6] *See* Issuers of Worldwide Asset- and Mortgage-Backed Securities in 2006, *available at:*
http://www.abalert.com/ranking.php?rid=72 (ranking Bear Stearns as the fifth-largest issuer of mortgage-backed securities in 2006); Issuers of Worldwide ABS/MBS in 2005, *available at:*
http://www.abalert.com/ranking.php?rid=94 (ranking Bear Stearns as the third-largest issuer of mortgage-backed securities in 2005); Issuers of Worldwide ABS/MBS in 2004, *available at:*
http://www.abalert.com/ranking.php?rid=113 (ranking Bear Stearns as the fourth-largest issuer of mortgage-backed securities in 2004); Complaint at ¶ 33 n.11, *Syncora Guarantee Inc. v. J.P. Morgan Securities LLC*, No. 651566/2011 (Sup. Ct., N.Y. County, June 6, 2011) ("Syncora GP2007 State Court Complaint") (stating that, for 2006, "Bear Stearns ranked as the number one underwriter of MBS Securities [mortgage-backed securities] as the Company's securitization volume rose to $113 billion from $95 billion in fiscal 2005, capturing 11% of the overall U.S. mortgage securities market.").

[7] The Bear Stearns Companies Inc., Annual Report (Form 10-K), at 79 (Nov. 30, 2006); The Bear Stearns Companies Inc., Annual Report (Form 10-K), at 77 (Nov. 30, 2005).

[8] Syncora GP2007 State Court Complaint, ¶ 33 n.11.

the consequences to the Noteholders and others.  In the end, Bear Stearns sacrificed quality for

greed in an effort to keep up with market demands, which eventually led to its very public

demise.

### 1.  Bear Stearns Controlled Every Aspect Of The Securitization Process

23.     Bear Stearns essentially controlled every aspect of the securitization process.

This securitization process entails the pooling and sale of mortgage loans within a trust, which

then issues debt securities of varying seniority with payments dependent on, or "backed" by, the

cash flow received from the pooled mortgage loans.

24.     The cash flow received from the mortgage loans is the mortgage borrowers'

principal and interest payments, and this cash flow is then used to pay the investors who acquired

rights to income flow by purchasing securities issued by the trust.  To ensure that investor

payments are made, there needs to be a consistent cash flow, which requires a pool of loans

performing at predicted levels of compliance.

25.     Specifically, Bear Stearns and/or its conduit EMC controlled:  (i) the origination,

and financing of the origination, of enormous volumes of loans that flowed into the pools,

providing the cash flow for the mortgage-backed securities; (ii) the "warehousing" or temporary

financing of large numbers of loans pending their pooling and sale into mortgage-backed

securities; (iii) the decisions regarding the due diligence, quality control, and loan repurchase

protocols to be followed (or not followed) by EMC in relation to the mortgage-backed securities;

(iv) the solicitation of the rating agencies to rate the mortgage-backed securities and financial

guarantors such as Syncora to insure the mortgage-backed securities; (v) the underwriting,

-9-

offering and sale of the mortgage-backed securities; and (vi) the servicing of loan pools to ensure

the continued cash flow needed to make payments under the mortgage-backed securities.

26.    As Bear Stearns' parent, The Bear Stearns Companies touted in its 2006 Annual

Report that this "vertically integrated franchise allows us access to every step of the mortgage

process, including origination, securitization, distribution and servicing."[9]

27.    EMC was integral to Bear Stearns in this process.  From 2003 through 2005,

EMC securitized about $143 billion of residential mortgage loans.[10]

28.    In its capacity as the sponsor of the securitization of the loans and in conjunction

with Bear Stearns, EMC would determine the structure of each securitization, initiate the

securitization, purchase the mortgage loans to be securitized, review the loans to ensure,

supposedly, their quality, and provide information to the credit rating agencies to secure

investment grade ratings.  In some instances, such as in this Transaction, EMC acted as

"servicer" for a large number of the securitized loans with, among other things, the obligation to

collect payments and other amounts due from the borrowers for the benefit of the trusts.

29.    By controlling every step of the process, Bear Stearns, itself and through EMC,

could and did make money every step of the way.  Bear Stearns recorded gains on: (i) loan-

origination fees on loans originated by Bear Stearns' affiliates; (ii) the proceeds of the sale of

notes and certificates to investors as consideration for conveying securitized mortgage pools to

the securitization trusts; (iii) fees from underwriting mortgage-backed securities; (iv) fees from

servicing the securitized loans by EMC; (v) fees from CDOs into which these securities were

---

[9] The Bear Stearns Companies Inc., 2006 Annual Report, at 11 (2007), *available at*
http://fliiby.com/file/198887/t028w7i05t.html.

[10] First Amended Complaint at ¶ 56, *Ambac Assurance Corp. v. EMC Mortgage Corp.*, No. 650421/2011 (Sup. Ct.,
N.Y. County July 18, 2011) ("Ambac Complaint").

repackaged; (vi) gains and fees from trading in these securities and interests in the CDOs into

which they were placed; (vii) gains from taking "short" positions in entities who were adversely

affected by Bear Stearns' securitization activities; and (viii) management fees and carried

interests from proprietary hedge funds and other investment vehicles that invested in the vast

array of securities and financial products structured by Bear Stearns and its affiliates that

ultimately were backed by residential mortgage loans.

### 2.    Bear Stearns Drives Securitization Volume

30.    As market demand for mortgage-backed securities increased, Bear Stearns

increased the number of loans it purchased for securitization.  To increase origination and

securitization volume, Bear Stearns, EMC, and the lenders they funded, actively expanded their

use of "reduced documentation" or "no documentation" loan programs.  Indeed, a Bear Stearns'

February 28, 2006 internal audit report ("2006 Internal Audit Report") found that Bear Stearns

systematically issued reduced documentation loans to borrowers who misrepresented their

income, assets, employment, and intentions to occupy purchased properties.[11]  The reduced

documentation programs allowed Bear Stearns to remain willfully blind of the inability of the

borrowers to repay their loans, which allowed them to close loans that they otherwise would

never be able to close.  This allowed for a vastly increased pipeline of mortgages for

securitization.

31.    To further increase origination and securitization volume, Bear Stearns and EMC

also added second-lien loans and HELOCs to its portfolio of mortgage products, many of which

were also made on a reduced documentation or no documentation basis.

---

[11] Complaint at ¶ 422, *Federal Housing Finance Agency v. JPMorgan Chase & Co.*, No. 11-CV-06188-DLC
(S.D.N.Y. Sept. 2, 2011) ("FHFA Complaint").

32.    Bear Stearns' and EMC's HELOC business began in 2005 with over 9,300 loans
valued at more than $509 million and grew to more than 18,000 loans valued at over $1.2 billion
by the end of 2006.[12]  The growth in its second-lien business was meteoric, with purchase
volume skyrocketing from approximately 15,000 loans valued at approximately $660 million at
the end of 2004 to approximately 116,500 loans valued at approximately $6.7 billion at the end
of 2006.[13]

33.    As the number of reduced documentation programs and second-lien products
grew, Bear Stearns did not take the necessary steps to ensure the quality of the products
promised to Syncora and investors.  Instead, Bear Stearns engaged in systemic fraud by
concealing material facts regarding its actual securitization practices and internal protocols.[14]

34.    The Bear Stearns 2006 Internal Audit Report disclosed that Bear Stearns reduced
the number of loans it reviewed during the due diligence process, conducted due diligence only
after loans were purchased, eliminated internal reports on defective loans, and conducted no due
diligence if such due diligence would interfere with mortgage loan pools being securitized.[15]
Indeed, Bear Stearns Vice President Robert Durden ("Durden") ultimately admitted that loans
were being securitized without conducting appropriate due diligence.[16]

---

[12] Pro-Supp. at S-34; Prospectus Supplement to Bear Stearns ALT-A Trust 2007-3, dated April 25, 2007, at 44.

[13] Pro-Supp. at S-34; Prospectus Supplement to Bear Stearns ALT-A Trust 2007-3, dated April 25, 2007, at 44.

[14] *See Bear Naked Lenders,* Wall St. J., March 18, 2008, at A22 ("Bear took particular pride in its risk management, but it let its standards slide in the hunt for higher returns during the mortgage mania earlier this decade.").

[15] FHFA Complaint, ¶ 415.

[16] FHFA Complaint, ¶ 234 ("I agree the flow loans were not flagged appropriately and we securitized many of them which are still to this day not cleared.  I think the ball was dropped big time on the flow processes involved in the post close [due diligence], from start to finish.").

35.    The reduction in due diligence directly led to an increase in the inclusion of loans that breached representations and warranties as to the quality and accuracy of the information in the underlying loan files. For example, in *Ambac Assurance Corp. v. EMC Mortg. Corp.*, No. 650421/2011 (Sup. Ct., N.Y. County), Ambac found that 90% of the 6,309 HELOCs it reviewed in the SACO 2005-10, SACO 2006-2, SACO 2006-8, and the BSSLT 2007-1 transactions had a breach of EMC's representations and warranties. These defects include "rampant fraud," failure to disclose borrower's liabilities, "inflated and fraudulent appraisals," and "pervasive violations of the loan originators' own underwriting guidelines and prudent mortgage-lending practices."[17] In *Syncora Guarantee Inc. v. J.P. Morgan Securities LLC,* No. 651566-2011 (Sup. Ct. N.Y. County), Syncora found that 85.5% of the loans reviewed in the GreenPoint Mortgage Funding Trust 2007-HE1 ("GPMF 2007 HE-1") transaction breached one or more of the contractual warranties EMC made to Syncora.[18]

36.    This reduction in due diligence was so severe that a Bear Stearns deal manager in the SACO 2006-8 securitization referred to the quality of the underlying loans in the deal as a "shit breather" and "a sack of shit."[19]

37.    By neglecting origination and due diligence standards, Bear Stearns and EMC knowingly, or with reckless disregard, marketed and sold in connection with the Transaction hundreds of millions of dollars worth of securities backed by mortgage loans that did not

---

[17] Ambac Complaint, ¶ 280.

[18] Syncora GP2007 State Court Complaint, ¶7.

[19] Abigail Field, *Did Bear Stearns Know Its Mortgage Securities Were a House of Cards,* (Jan. 28, 2011), *available at* http://www.dailyfinance.com/2011/01/28/bear-stearns-mortgage-backed-securities-lawsuit-fraud-wells-fargo/; Ambac Complaint, ¶ 1.

conform to its warranties, representations, and disclosures. These practices have substantially

contributed not only to the demise of Bear Stearns and the mortgage lenders it funded, but also to

the crippling of the financial guaranty insurance business and the extraordinary collapse of the

residential-housing market, not to mention the resultant turmoil currently gripping financial

markets all over the world.

### B.    BEAR STEARNS SOLICITED SYNCORA TO ISSUE FINANCIAL GUARANTY POLICIES

38.    In early 2005, Bear Stearns began to solicit Syncora to issue financial guaranty

insurance policies for its mortgage-backed securities transactions. As part of its regular

marketing routine, Bear Stearns hosted "Investor Day" Presentations for investors and insurers to

learn more about Bear Stearns' securitization practices, and to introduce EMC as Bear Stearns'

mortgage loan conduit.

39.    Syncora attended an "Investor Day" Presentation in July 2005 and a few months

later, in September 2005, Bear Stearns asked Syncora to bid on the transaction now known as

SACO I Trust 2006-1 (previously defined as the "Transaction").

40.    As set forth in detail below, in order to induce Syncora's insurance of the

Transaction, Bear Stearns: (1) forwarded marketing presentations to Syncora that contained

representations about Bear Stearns' securitization operations; (2) prepared and distributed data

tapes to Syncora and the rating agencies that purportedly contained true and accurate

representations about the key attributes of the individual loans in the proposed securitization

pool; (3) secured shadow and final ratings from rating agencies such as Standard & Poor's

("S&P") and Moody's Corporation ("Moody's"); and (4) filed Prospectuses that made additional

representations about the loan pool and the associated risks of the Transaction.

-14-

41.      All of these representations were made to inspire confidence and trust in Bear
Stearns' operations and to induce Syncora to insure the Transaction.  However, Bear Stearns
knew or should have known that the representations were false.

### 1.  Marketing Presentations

42.      Bear Stearns routinely distributed power point presentations to investors and
insurers that were contemplating participating in a securitization transaction.  These
presentations (also known as marketing decks) contained numerous representations to assure
investors and insurers about the sound quality of Bear Stearns' securitization protocols and
procedures and were designed to induce them to participate in the transactions.  In fact, Mary
Haggerty ("Haggerty"), a Bear Stearns Senior Managing Director, confirmed that Bear Stearns
understood that the information contained in the presentations "would contribute to the investor's
decision to invest in the securitizations," and were made to "solicit their participation in
transactions."[20]

43.      After forwarding the presentations to potential investors and insurers, Bear
Stearns would routinely follow up with phone calls and emails.  The purpose of these
communications was to reinforce what was contained in the presentations and give further
assurances about the sound quality of the transaction at issue, in order to induce both investors'
and insurers' participation.  That is exactly what happened here with respect to this Transaction.

44.      On December 14, 2005, two months before the anticipated close of the
Transaction, Cheryl Glory ("Glory"), Bear Stearns Managing Director, Mortgage Finance, sent

---

[20] Syncora GP2007 State Court Complaint, ¶ 74.

an "Investor Presentation" to Linda Kobrin ("Kobrin"), Syncora Managing Director, Consumer

ABS.[21]

45.    The Investor Presentation included the following representations:

- Skin in the Game: Bear Stearns represented that it "retained Back-End Interests in the Deals" or "Skin in the Game."

- Seller Approval and Monitoring:  Bear Stearns lauded its purported processes for screening and monitoring the originators from which it purchased loans for its securitizations.

- Due Diligence: Bear Stearns described the "due diligence" protocols it purported to have implemented to prevent defective mortgage loans from entering the securitizations and remarked that "[u]nderstanding our risk upfront, through intensive due diligence provides a foundation for solid performance expectations."

- Quality Control:  Bear Stearns touted the quality control processes that it allegedly conducted after the securitization closed to identify and flush out any defective loans that may have circumvented its due diligence protocols.

- Repurchase Processes: Bear Stearns conveyed that it had an entire "conduit team" devoted to asserting breach-of-representation-and-warranty claims, on behalf of the securitization participants, for the repurchase of breaching loans through the quality control process.

- Historical Performance:  Finally, Bear Stearns provided appendices with extensive data regarding the historical performance of its prior securitizations and the loans therein.

46.    Bear Stearns made these representations in the presentations, even though they

were false and misleading, because Bear Stearns knew that the investors would rely on the

information when assessing the inherent risk related to the Transaction.

---

[21] Email from Glory to Kobrin dated December 14, 2005, attaching Investor Presentation, dated October 17, 2005 ("Investor Presentation").

47.    Two days later, on December 16, 2005, Kobrin, Glory and two other Bear

Stearns executives participated in a conference call to review the representations made in the

Investor Presentation and to specifically discuss EMC's Seller Approval Process.[22]

48.    On that call, Bear Stearns further represented that EMC conducts a

comprehensive background check on all loan originators, and that it evaluates originators based

on an established criteria to weed out any originators that are considered too risky.  Bear Stearns

represented that the background check includes a review of the company's audited financials,

underwriting guidelines, and policies and procedures.  Only those originators who meet Bear

Stearns' threshold requirements would be approved. [23]

49.    Next, Bear Stearns touted its ongoing review of the sellers that qualified for

approval.  Bear Stearns represented that its quality control department reviewed a statistical

sample of all loans EMC acquired each month from every seller, which "usually [was] 10% of

seller's total volume monthly."[24]  Bear Stearns assured Syncora that its monthly quality control

sample was stratified to ensure coverage of each of its various loan acquisition channels.  In

addition, Bear Stearns specifically represented that if any loan was 90 days delinquent, Bear

Stearns would conduct a full re-underwriting of the loan looking for signs of fraud.[25]

---

[22] Contemporaneous notes of 12/16/2005 telephone call between Kobrin, Glory, Judy Duffek, EMC Mortgage Corporation Associate Vice President, Seller Review & Approval ("Duffek"), and Stephen Golden, Bear Stearns Managing Director, Warehouse and EMC Residential Mortgage President ("Golden").

[23] *Id.*

[24] *Id.*

[25] *Id.* ("Internal Post-Closing Q.C. -- Any loan that goes 90 days delinquent gets full re-underwriting looking for fraud putbacks.").

50.    In addition, to further induce Syncora to insure the Transaction, which solely contains HELOCs,[26] Bear Stearns discussed the HELOC securitization processes. Bear Stearns represented that it had put in additional controls to govern HELOC purchases that were above and beyond the protocols for other loan products. Bear Stearns executives represented that Bear Stearns had established a separate task force of "HELOC experts" to approve the purchase of HELOCs by, among other things, applying Bear Stearns' own underwriting criteria and evaluating the HELOC sellers' origination operations.[27]

51.    Furthermore, Bear Stearns represented that its quality control and repurchase processes were in place to identify defective loans and remove them from the pool. Specifically, Bear Stearns said that "its buyback procedure applies even after the loans are securitized."[28]

52.    Incredibly, as discussed in more detail in Section VI, Bear Stearns made all of these representations knowing full well that many of its practices and procedures related to its seller approval process, ongoing due diligence of the loans, and quality control reviews were flawed and needed a complete overhaul. Yet, Bear Stearns continued to make these representations anyway, hoping to continue to lure investors and insurers to participate in its transactions.

---

[26] HELOCs are riskier than other loans from an investor's standpoint because they have high CLTVs, and thus are virtually unsecured. Furthermore, the borrower has little or no equity in his or her home after securing a HELOC loan, and therefore a decrease in real estate value can easily lead to negative equity. The borrower would then lose his or her incentive to continue payments.

[27] Contemporaneous notes of December 16, 2005 telephone call between Kobrin, Duffek, Golden, and Glory. ("HELOCs→add'l approvals required. . . another dept. of HELOC experts must approve as well <HELOC task force>").

[28] *Id.*

-18-

### 2. Data Tapes

53.    Bear Stearns' efforts to induce Syncora to insure the transaction did not end with marketing presentations and oral communications.  Bear Stearns and EMC also provided Syncora with mortgage data tapes purporting to list the precise data metrics pertaining to the critical attributes of the loans in the proposed securitization pool.  To give Syncora further comfort, Bear Stearns warranted that the data tapes contained true and accurate information as to the underlying loans.[29]

54.    The data tapes contained the following key metrics that Bear Stearns and EMC knew Syncora would rely on when evaluating the Transaction: (i) the combined loan to value ratio (CLTV) for each loan, which measures the total amount of mortgage debt that encumbers a property against the value of the property; (ii) the credit score (FICO) for each borrower, which is a statistical measure that predicts the likelihood a given borrower will make timely payments; (iii) the debt-to-income ratio (DTI) or back-end ratio for each borrower, which compares payments due on a borrower's monthly debts to a borrower's income; (iv) the occupancy status for each borrower, indicating whether the property is the borrower's primary or secondary residence, or an investment property (borrowers are more likely to make payments on their primary residence so as to avoid losing their home); and (v) the "doc type" for each loan, explaining the program from which the loan was originated and the required information that the borrower disclosed concerning their income, employment, and assets, as well as how such information would be verified (fraud is more likely for loans that require less information).  All

---

[29] *See* I&I Agreement § 2.01(k).

of this information is critical when evaluating a borrower's ability and likelihood of satisfying their loan obligations.

55.     As expected, Syncora relied on the warranted veracity of the data reflected in the data tapes as a critical component in its decision to provide insurance for the Transaction. Syncora used the data on the tape as fixed inputs to its models and in analyzing the loan metrics, which were essential steps in assessing the risk associated with the loan pool and predicting the expected rates of default by the borrower and severity of loss on the related mortgages. Although Bear Stearns represented that the data tapes contained true and accurate information, the loan level review undertaken by Syncora demonstrates that the information contained on the tapes was, in fact, false and misleading. The information contained on the data tapes induced Syncora to enter into the I&I Agreement. Had the data tapes contained true and accurate information about the loan pool, Syncora would have refused to issue its Policy.

### 3.  Rating Agencies

56.     As required, Bear Stearns secured "shadow ratings"[30] and "final ratings"[31] from rating agencies such as S&P and Moody's.

57.     Bear Stearns knew that Syncora and other investors would rely on these ratings in determining whether to participate in the Transaction. In fact, Section 3.01(h) of the I&I Agreement specifically required that: "The Insurer shall have received confirmation that the risk

---

[30] A shadow rating is a rating given by the rating agencies to the insurer, which is an assessment of the value or risk of a mortgage-backed security without consideration of the protection afforded by the financial guaranty insurance policy.

[31] A final rating is an assessment of the value or risk of the security taking into consideration the financial guaranty policy.

secured by the Policy constitutes at least a 'A' risk by S&P and a 'A2' risk by Moody's and that

the Notes, when issued, will be rated 'AAA' by S&P and 'Aaa' by Moody's."

58.    Similarly, Bear Stearns knew that the investors and insurers relied on the ratings

because the Prospectus Supplement specifically states that: "It is a condition of the issuance of

the Offered Notes that each class of Offered Notes be assigned at least the rating designated

below by Standard & Poor's and Moody's."[32]

59.    Upon information and belief, to secure the shadow ratings and the final ratings

from the rating agencies, Bear Stearns provided the rating agencies with the same false and

misleading data tapes that it provided to Syncora.

60.    Relying on the purported truth and accuracy of the information contained in the

loan tapes, S&P sent a shadow rating of "A+" for the Transaction to Bear Stearns and Syncora

on February 26, 2006 – two days before the close of the Transaction – and issued a final rating of

"AAA" on February 28, 2006.  The letter from S&P to Bear Stearns specifically stated that the

final ratings were "based on information supplied to us by [Bear Stearns] or by [Bear Stearns']

agents," and reiterated that "Standard and Poor's relies on . . . the accuracy and completeness of

the information submitted in connection with the rating."[33]

61.    Relying on the purported truth and accuracy of the information contained in the

loan tapes, Moody's sent a shadow rating of "A2" for the Transaction to Bear Stearns and

Syncora on February 28, 2006 and issued a final rating of "Aaa" on February 28, 2006.  Moody's

issued the rating letters for the Transaction based on the information provided by Bear Stearns.

---

[32] ProSupp, at S-92.

[33] Email dated February 26, 2006 from Errol Arne, S&P Director, to Kobrin attaching the proposed February 28,
2006 Letter from S&P's Ratings Services to Sally Kawana, Bear Stearns Associate Director, Home Equity Group.

62.    S&P issued a "AAA" rating and Moody's issued a "Aaa" final rating for the Transaction. Had the data tapes contained true and accurate information, S&P and Moody's ratings likely would have been very different, and Syncora would not have insured the Transaction.

### 4.    Prospectuses

63.    Bear Stearns and EMC also used the Prospectus, Prospectus Supplement and the FWP to induce Syncora to insure the Transaction. These documents were filed with the SEC pursuant to the Securities Act of 1933. As a matter of law, Bear Stearns was required to: (i) disclose all material facts concerning the securities offered; (ii) not make any untrue statement of material fact concerning the securities; and (iii) not omit to state a material fact necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. Given these requirements, Syncora rightfully relied upon the truth and accuracy of the representations in the Prospectus, Prospectus Supplement and the FWP.

64.    Prior to the closing of the Transaction, Bear Stearns sent Syncora drafts of the Prospectus Supplement and FWP.[34] Bear Stearns sent these drafts to Syncora knowing that Syncora would review them in advance of the close of the Transaction and rely on the representations contained therein in assessing the risk associated with the Transaction.

65.    The Prospectuses outlined the underwriting guidelines used by each of the principal originators. Significantly, the Prospectus Supplement stated that all of the HELOCs

---

[34] *See e.g.*, January 25, 2006 email from Eugene Solomonov (Thacher Proffitt & Wood LLP, counsel for Bear Stearns) ("Solomonov") (forwarding draft of the FWP); February 24, 2006 email from Solomonov (forwarding draft of the Prospectus Supplement).

were originated generally in accordance with the originators' underwriting guidelines.[35]  The

Prospectuses also made further representations about the quality of the standards that each of the

originators used to assess the borrowers.  For example:

- **MortgageIT Inc.:**  Underwriting standards were "primarily intended to make sure that (i) the loan terms relate to the borrower's ability to repay and (ii) the value and marketability of the property are acceptable.  Exceptions to the Underwriting Standards are considered with reasonable compensating factors on a case-by-case basis and at the sole discretion of senior management."[36]

- **Metrocities Mortgage LLC:**  Underwriting standards were "primarily intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."[37] ". . . [I]n order to be eligible for a limited or no documentation program, the mortgaged property must have a loan-to-value ratio that supports the amount of the mortgage loan and the prospective borrower must have a credit history that demonstrates an established ability to repay indebtness in a timely fashion."[38]

- **SouthStar Funding LLC:**  Underwriting guidelines "evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made by SouthStar."[39]  "The approval process generally requires that the applicant have good credit history and a total debt-to-income ("DTI") that generally does not exceed 45%; however, this limit may be raised if the borrower demonstrates satisfactory disposable income and/or other mitigating factors are present."[40]

66.    Syncora relied upon these representations and had no reason to believe that the

originators were not originating loans in accordance with their stated guidelines, nor that Bear

Stearns misrepresented compliance with these guidelines or failed to disclose flaws and lapses in

---

[35] ProSupp, at S-25, S-28, S-30

[36] ProSupp, at S-25 – S-26.

[37] ProSupp, at S-29.

[38] ProSupp, at S-29.

[39] ProSupp, at S-30.

[40] ProSupp, at S-31.

its due diligence protocols.  The Material Breach Rate of 81.9%, however, demonstrates that the originators ignored their own standards in many instances, and that Bear Stearns' due diligence protocols were flawed in the first instance and then ignored entirely.

67.    In addition, the Prospectuses also contained detailed appendices purporting to represent the key attributes of the loan pool – information that was critical to assess the risk related to the Transaction such as CLTV ratios, DTI ratios, credit scores, property ownership characteristics, and document-types for each of the HELOCs in the loan pool.  Again, these representations were made to induce Syncora to insure the Transaction, as Bear Stearns knew that Syncora would rely on these important factors.

68.    Based on all of the above representations and factors, each of which was independently critical to Syncora's evaluation, Syncora decided to insure the Transaction.

## C.    THE TRANSACTION

69.    The SACO I Trust 2006-1 Transaction involved the securitization of a pool of residential mortgage loans called Home-Equity Lines of Credit (defined above as "HELOC")[41] that serve as the collateral for the issuance of approximately $303 million in securities.

70.    Defendant EMC was the Sponsor of the Transaction.  EMC pooled and securitized approximately 4,360 HELOCs, with an aggregate principal balance of $310,097,406.60.

---

[41] HELOCs are a hybrid of a mortgage and a credit card.  The lines of credit in this securitization allow draws for a period of ten years from the loan origination date (with 3% of the HELOCs in total having a 5 or 15 year draw period).  During the draw period, the borrower can draw, pay down, and re-draw the line up to his credit limit as desired.  During the draw period, the minimum payments are accrued interest only.  After the draw period, the borrower is required to make full payment.  In most cases, the term of the loan does not exceed 25 years.

71.     Prior to the Transaction closing date, EMC purchased the HELOCs for the Transaction from three principal originators: MortgageIT, Inc., accounting for 30.86% of the HELOCs; Metrocities Mortgage LLC, accounting for approximately 27.33% of the HELOCs; and SouthStar Funding, LLC and Opteum Financial Services, LLC collectively, accounting for 25.51% of the HELOCs.  The remainder of the HELOCs EMC purchased for the Transaction were originated by various originators, none of which originated more than 10% of the HELOCs.[42]

72.     The Transaction closed on February 28, 2006 and was effectuated through the following series of events and a network of agreements (the "Operative Documents")[43] that governed the rights and obligations of the various parties to the Transaction.

73.     EMC, as Sponsor of the Transaction, sold and assigned its entire interest in the HELOCs to BSABS, pursuant to the MLPA.

74.     BSABS then established SACO I Trust 2006-1, a Delaware statutory trust (the "Issuer" or the "Trust") pursuant to a Short Form Trust Agreement, dated August 29, 2005, as amended and restated on February 28, 2006 (the "Trust Agreement").

75.     BSABS in turn sold its interest in the HELOCs to the Trust pursuant to the Sale and Servicing Agreement dated February 28, 2006 (the "SSA").

---

[42] ProSupp, at S-25.

[43] The I&I Agreement defines Operative Documents as this Insurance Agreement (also known as the I&I Agreement), the Securities, the Sale and Servicing Agreement, the Custodial Agreement, the Purchase Agreement (also known as the Mortgage Loan Purchase Agreement or "MLPA"), the Assignment Agreement, the Trust Agreement, the Administration Agreement and the Indenture.

-25-

76.     The Trust, pursuant to an Indenture, dated February 28, 2006, issued SACO I Trust 2006-1, Class A, Class M-1, Class M-2, Class M-3 and Class M-4 Notes (the "Notes") representing the indebtedness of the Trust.

77.     The Notes were underwritten and Bear Stearns marketed the Notes to investors by means of, *inter alia*, the related Prospectuses. Investors who purchased the Notes are entitled to receive a portion of the income realized by the Trust from the HELOCs.

78.     In order to enhance the marketability of the securities, Bear Stearns sought to obtain a financial-guaranty insurance policy from Syncora.

79.     On February 28, 2006, Syncora, BSABS, EMC, and others entered into the I&I Agreement. Under the I&I Agreement, BSABS and EMC represented and warranted that the Transaction information and Bear Stearns' and EMC's operations as a whole were true and accurate and complied with industry standards. The I&I Agreement also specifically incorporated by reference the representations and warranties that EMC extended to the Trust and Noteholders regarding the quality of the loans through the Operating Documents, including specifically the MLPA.

80.     Relying on Bear Stearns' pre-contractual representations, and having secured BSABS's and EMC's representations and warranties in the I&I Agreement, the MLPA, and SSA, Syncora issued its Policy. Under its Policy, Syncora agreed to insure payments of interest and principal with respect to the Class A Notes (the "Insured Notes").

### D.     THE AGREEMENTS UNDERLYING THE TRANSACTION

81.     As noted above, the Operative Documents govern the rights and obligations of the various parties to the Transaction. The principal Operative Documents are: (1) the I&I Agreement and (2) the MLPA.

-26-

82.     Each of the Agreements has a different combination of parties and serves different purposes. Syncora is a direct party only to the I&I Agreement and is a specific third-party beneficiary of the MLPA.[44]

### 1. Insurance and Indemnity Agreement

83.     The parties to the I&I Agreement are Syncora, as "Insurer," EMC, as "Sponsor," BSABS, as "Depositor," SACO I Trust 2006-1, as "Issuer," LaSalle Bank National Association, as "Master Servicer and Securities Administrator," and Citibank, N.A., as "Indenture Trustee."

84.     Under the I&I Agreement, Syncora committed to issue an irrevocable insurance policy guaranteeing certain payments of interest and principal due on securities sponsored by EMC. Syncora is obligated to pay insured security holders for certain shortfalls in cash flow from the underlying loans and any payments necessary to maintain parity between the balance of the notes and the value of the underlying collateral.

### a. Representations and Warranties Made by BSABS and EMC in the I&I Agreement

85.     The representations and warranties made by BSABS and EMC in the I&I Agreement contain two types of representations: loan-level warranties and transaction-level warranties.

86.     First, the I&I Agreement specifically incorporates by reference the representations that EMC extended to the Trust and Noteholders in the MLPA. These representations pertain to the quality of the loan pool and the individual loans (the "loan-level warranties") (these representations are specifically stated in Section 7 of the MLPA).

---

[44] I&I Agreement §§ 2.01(m) & 2.02(j).

-27-

> I&I Agreement § 2.01(m): "*Operative Documents.* Each of
> the representations and warranties of EMC, the Issuer and the
> Depositor contained in the applicable Operative Documents is true
> and correct in all material respects and each of EMC, the Issuer
> and the Depositor hereby makes each such representation and
> warranty to, and for the benefit of, the Insurer as if the same were
> set forth in full herein. Each of EMC, the Issuer and the Depositor
> will not at any time in the future deny that the Operative
> Documents to which it is a party constitute the legal, valid and
> binding obligations of EMC, the Issuer and the Depositor, as
> applicable."

87.     As noted, the I&I Agreement also provides that Syncora is a third-party

beneficiary of the other principal Operative Documents, with all rights afforded thereunder,

including the representations, warranties, and covenants that EMC made in the MLPA:

> I&I Agreement § 2.02(j): "*Third-Party Beneficiary.* Each
> of EMC, the Issuer and the Depositor agrees that the Insurer shall
> have all rights provided to the Insurer in the Operative Documents
> and that the Insurer shall constitute a third-party beneficiary with
> respect to such rights in respect of the Operative Documents and
> hereby incorporates and restates its representations, warranties, and
> covenants as set forth therein for the benefit of the Insurer. The
> Insurer agrees that the rights it shall have as a third-party
> beneficiary under the Indenture shall be limited to the rights
> granted to it and to the Noteholders in the Indenture."

88.     Second, the I&I Agreement contains transaction-level warranties. These

warranties deal directly with the information that Bear Stearns provided to Syncora in order to

assess the risk associated with the Transaction. These representations provide Syncora with

broader representations and warranties than those contained in the MLPA, and provide Syncora

with even greater remedies for breaches of those commitments than those EMC had extended to

the Trust and Noteholders in the MLPA.

-28-

89.     For example, EMC represents and warrants that the Transaction information such

as the data tape, Bear Stearns' and EMC's operations as a whole, and the due diligence protocols

were true and accurate, and comply with industry regulations:

> I&I Agreement § 2.01(k): *"Accuracy of Information.*
> Neither the Operative Documents nor other material information
> relating to the HELOCs, the operations of EMC, the Issuer or the
> Depositor or the financial condition of EMC, the Issuer or the
> Depositor (collectively, the "Documents"), as amended,
> supplemented or superseded, furnished to the Insurer in writing or
> in electronic form by EMC, the Issuer or the Depositor contains
> any statement of a material fact which was untrue or misleading in
> any material respect when made. . . . Without limiting the
> generality of the foregoing, the information in the Data Tape with
> respect to each HELOC is true and correct as of the Cut-off Date."

> I&I Agreement § 2.01(l): *"Compliance with Securities
> Laws.* . . . [T]he Offering Document does not contain any untrue
> statement of a material fact and does not omit to state a material
> fact necessary to make the statements made therein, in light of the
> circumstances under which they were made, not misleading . . . ."

90.     These representations and warranties contained in the I&I Agreement clearly

delineate the parties bargained-for agreement – Syncora would rely on BSABS's and EMC's

representations and warranties and BSABS and EMC would bear the risk of loss in the event the

representations and warranties were false.

**b. Syncora's Remedies Under the I&I Agreement**

91.     The I&I Agreement also provides Syncora certain remedies to address breaches

by BSABS and EMC of their contractual obligations, including breaches of the representations

and warranties made in the I&I Agreement.

92.     Pursuant to Section 5.02(a) of the I&I Agreement, BSABS and EMC agreed that

upon the occurrence of an "Event of Default," which event includes  EMC's breaches of the

loan-level warranties in the MLPA and BSABS's and EMC's breaches of the  transaction-level

warranties in the I&I Agreement, Syncora may "take whatever action at law or in equity as may

appear necessary or desirable in its judgment to collect the amounts, if any, then due under this

Insurance Agreement . . . or to enforce performance and observance of any obligation, agreement

or covenant of EMC, the Issuer or the Depositor under this Insurance Agreement or any other

Operative Documents." In addition, Section 5.02(b) of the I&I Agreement provides that any and

all remedies existing at law and in equity – including those available in the Operative Documents

– are available to Syncora on a non-exclusive and cumulative basis.

93.    The I&I Agreement also provides Syncora with a remedy of indemnification for

any claims, losses, or demands arising out of or relating to, among other things, any breach of a

representation or warranty made by BSABS and EMC:  Specifically, Section 3.04 of the I&I

Agreement states:

> "EMC, the Issuer and the Depositor agree to pay, and to protect,
> indemnify and save harmless, the Insurer . . . from and against any
> and all claims, losses, liabilities (including penalties), actions,
> suits, judgments, demands, damages, costs or expenses (including
> reasonable fees and expenses of attorneys, consultants, and
> auditors and reasonable costs of investigations) of any nature
> arising out of or relating to the breach by EMC, the Issuer or the
> Depositor of any of the representations or warranties contained in
> Section 2.01 or arising out of or relating to the transactions
> contemplated by the Operative Documents by reason of: . . . the
> misfeasance or malfeasance of, or negligence or theft committed
> by, any director, officer, employee or agent of EMC, the
> Depositor. . . in connection with any Transaction arising from or
> relating to the Operative Documents; the breach by EMC, the
> Issuer or the Depositor of any representation, warranty or covenant
> under any of the Operative Documents . . . ; any untrue statement
> or alleged untrue statement of a material fact contained in the
> Offering Document or the Registration Statement or any omission
> or alleged omission to state therein a material fact required to be
> stated therein or necessary to make the statements therein, in light
> of the circumstances under which they were made, not misleading.
> . . ."

-30-

94.     Further, the I&I Agreement provides Syncora with the right to reimbursement of

any expenses, including attorneys' fees, incurred by Syncora in enforcing EMC's obligations

under the Operative Documents:  Section 3.03(c), specifically states:

> "EMC agrees to pay to the Insurer any and all charges, fees, costs
> and expenses that the Insurer may reasonably pay or incur,
> including reasonable attorneys' and accountants' fees and
> expenses, in connection with (i) the enforcement, defense or
> preservation of any rights in respect of any of the Operative
> Documents, including defending, monitoring or participating in
> any litigation or proceeding (including any insolvency  proceeding
> in respect of any Transaction participant or any affiliate thereof)
> relating to any of the Operative Documents, any party to any of the
> Operative Documents (in its capacity as such a party) or the
> Transaction . . . ."

## 2.  Mortgage Loan Purchase Agreement

95.     The MLPA is the sales agreement between EMC, in its capacity as "HELOC

Seller," and BSABS, in its capacity as "Purchaser."  The purpose of the agreement is the transfer,

by sale of the pool of loans in the Transaction from the HELOC Seller to Purchaser, so that the

loans can ultimately be deposited into the Trust.

96.     EMC's extensive representations and warranties pertaining to the specific

mortgage loans it pooled for the Transaction are set forth in the MLPA and are specifically

incorporated by reference in the I&I Agreement for Syncora's benefit.[45]

### a.  Representations & Warranties Made By EMC in the MLPA

97.     Section 7 of the MLPA contains myriad representations and warranties by EMC,

including representations and warranties about the underlying HELOCs and about the business

---

[45] I&I Agreement §§ 2.01(m) & 2.02(j).

and practices of EMC as a HELOC seller.  EMC made a total of 47 representations regarding the

HELOCs in the loan pool.  Those listed below are among those that were breached by EMC:

> MLPA § 7(a): "The information set forth in the Mortgage Loan
> Schedule on the Closing Date is complete, true and correct."

> MLPA § 7(i): " Except with respect to taxes, insurance and other
> amounts previously advanced by a prior servicer with respect to
> any HELOC, there are no delinquent taxes, water charges, sewer
> rents, assessments, insurance premiums, leasehold payments,
> including assessments payable in future installments, or other
> outstanding charges affecting the related Mortgaged Property."

> MLPA § 7(j): " With respect to the HELOCs . . . [n]o fraud, error,
> omission, misrepresentation, gross negligence or similar
> occurrence with respect to a HELOC has taken place on the part of
> any Person, including without limitation, the Mortgagor, any
> appraiser, any builder or developer, or any other party involved in
> the origination or servicing of the HELOC."

> MLPA § 7(l): "The Mortgage Note and the Mortgage are not
> subject to any right of rescission, set-off, counterclaim or defense,
> including the defense of usury, nor will the operation of any of the
> terms of the Mortgage Note and the Mortgage, or the exercise of
> any right thereunder, render the Mortgage unenforceable, in whole
> or in part, or subject to any right of rescission, set-off,
> counterclaim or defense, including the defense of usury and no
> such right of rescission, set-off, recoupment, counterclaim or
> defense has been asserted with respect thereto."

> MLPA § 7(m): "All buildings upon, or comprising part of, the
> Mortgaged Property are insured by an insurer acceptable to Fannie
> Mae and Freddie Mac against loss by fire, hazards of extended
> coverage and such other hazards as are customary in the area
> where the Mortgaged Property is located, and such insurer is
> licensed to do business in the state where the Mortgaged Property
> is located."

> MLPA § 7(n): "Each loan at the time it was made complied in all
> material respects with applicable local, state, and federal laws,
> including, but not limited to, all applicable anti-predatory lending
> laws."

-32-

MLPA § 7(w): "Except as provided in clause (f), immediately prior to the Cut-off Date, there was no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and there was no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the Seller has not waived any default, breach, violation or event of acceleration."

MLPA § 7(x): "There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) affecting the related Mortgaged Property which are or may be liens prior to or equal with, the lien of the related Mortgage."

MLPA § 7(y): "At the time of origination, each Mortgaged Property was the subject of an appraisal which conformed to the underwriting requirements of the originator of the HELOC and, the appraisal is in a form acceptable to Fannie Mae or Freddie Mac."

MLPA § 7(z): "The origination, servicing and collection practices with respect to each Mortgage Note and Mortgage, . . . have been conducted in all respects in accordance with the terms of Mortgage Note and in compliance with all applicable laws and regulations . . . ."

MLPA § 7(ee): "The Mortgagor has received all disclosure materials required by applicable law with respect to the making of the HELOC."

MLPA § 7(jj): "Each HELOC at the time of origination was underwritten in general in accordance with guidelines not inconsistent with the guidelines set forth in Prospectus Supplement and generally accepted credit underwriting guidelines."

MLPA § 7(kk): "No error, omission, misrepresentation, fraud or similar occurrence with respect to a HELOC has taken place on the part of either Seller or the related Originator."

MLPA § 7(ll): "None of the HELOCs are (a) loans subject to 12 CFR Part 226.31, 12 CFR Part 226.32 or 12 CFR Part 226.34 of Regulation Z, the regulation implementing TILA, which implements the Home Ownership and Equity Protection Act of 1994 ('HOEPA') or (b) classified and/or defined as a 'high cost home loan' (or a similarly classified loan using different

-33-

terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees) under any federal, state, or local law, rule, regulation or ordinance, including, but not limited to, the States of Georgia or North Carolina."

### b.    Prompt Notice of Breaches and the Repurchase Provision

98.    In further assurance that the loans in the pool complied with the numerous representations and warranties, the MLPA provides ongoing obligations on all securitization participants to promptly disclose any loan found to have been included in the Transaction in violation of any of those representations and warranties.

99.    Specifically, Section 7 of the MLPA provides, in pertinent part, as follows:

Upon discovery or receipt of notice by the Seller, the Purchaser, the Issuer, the Note Insurer or the Indenture Trustee, of a breach of any representation or warranty of the Seller set forth in this Section 7 which materially and adversely affects the value of the interests of the Purchaser, the Issuer, the Note Insurer, the Noteholders, or the Indenture Trustee in any of the HELOCs . . . or which adversely affects the interests of the Note Insurer, the party discovering or receiving notice of such breach shall give prompt written notice to the others.[46]

100.    EMC also agreed that, should any of its loan-level representations and warranties prove untrue, it would cure the breach(es) or remove the breaching loan(s) from the pool.

101.    Specifically, Section 7 of the MLPA provides, in pertinent part, as follows:

In the case of any such breach of a representation or warranty set forth in this Section 7, within 90 days from the date of discovery by the Seller, or the date the Seller is notified by the party discovering or receiving notice of such breach (whichever occurs earlier), the Seller will (i) cure such breach in all material respects, (ii) purchase the affected HELOC at the applicable Purchase Price, or (iii) if within

---

[46] On February 3, 2012, Syncora provided written notice of the breaches of the representations and warranties identified in the Transaction Sample.

two years of the Closing Date, substitute a qualifying Substitute
HELOC in exchange for such HELOC . . .

**E.    REPRESENTATIONS AND WARRANTIES IN THE I&I AGREEMENT
REFLECT THE BARGAINED FOR RISK ALLOCATION**

102.    The fundamental premise of the Transaction – evidenced by the extensive

representations and warranties made in the I&I Agreement and the MLPA – was that Bear

Stearns, BSABS, and EMC intended that Syncora would rely on the representations and

warranties in the I&I Agreement and Bear Stearns, BSABS, and EMC would bear the risk of loss

in the event those representations were false.

103.    This bargained-for agreement was reasonable because Bear Stearns and EMC

were the parties in the position to dictate the parameters of the HELOCs purchased, including

their attributes and the guidelines pursuant to which they were underwritten. Bear Stearns also

had the ability to conduct due diligence and purported to conduct the requisite due diligence

before, and quality control after, the HELOCs were acquired. Bear Stearns also had recourse

against the originators in the event any HELOC was determined to be defective or failed to

comply with the represented attributes. In contrast, Syncora never owned the loans or the loan

files, and was not in privity with, and did not have recourse against, the loan originators for any

defective loans.

104.    As such, Bear Stearns, BSABS, EMC, and Syncora each assumed different risks

and undertook due diligence in accordance with their respective roles in the Transaction. Bear

Stearns, as the sponsor and seller (through EMC), and as the underwriter and deal manager

(through Bear Stearns), thus accepted the origination and underwriting risk that the HELOCs did

not conform to the represented attributes and actual and prudent underwriting guidelines.

-35-

105.    Syncora, as the insurer, in turn, agreed to bear the credit risk that HELOCs bearing the represented attributes and underwritten to the applicable guidelines would not perform. Typically, the credit risks that Syncora knowingly assumes when issuing a financial guaranty policy are: (i) changes in borrowers' creditworthiness over time; (ii) adverse macroeconomic developments; and (iii) geographic concentration. Syncora can measure and quantify these risks to a certain degree, and they are not subject to the control of the originators and EMC. Other default risks, such as misrepresentations in loan attributes, fraud or abject failures in origination and underwriting practices, depend directly on the controls, due diligence protocols and practices of the originators and EMC. These risks are not reasonably measurable or quantifiable by Syncora. As such, Syncora must rely on the representations and warranties of the originators and EMC. Consistent with this bargained-for and reasonable risk allocation between sophisticated parties, Syncora justifiably relied on Bear Stearns', BSABS's, and EMC's representations and warranties, practices and due diligence protocols, and undertook its due diligence with the risks it agreed to assume in the Transaction.

106.    Significantly, Syncora relied on the strength of the representations and warranties made in the I&I Agreement, including the fraud representation that covered occurrences of fraud anywhere along the origination chain by any party. In addition, Syncora relied on the fact that Bear Stearns, BSABS and EMC warranted to the accuracy of all the information on the data tape that Syncora analyzed to gain comfort with the collateral, as well as Bear Stearns' and EMC's representations as to its practices and due diligence protocols.

-36-

## V.    EMC'S PERVASIVE BREACHES
## OF ITS REPRESENTATIONS AND WARRANTIES

107.    The loans sold to the Trust in connection with the Transaction have failed miserably. As of September 30, 2011, only 653 of the 4,360 HELOCs initially sold to the Trust are current and 1,394 are in default or have been liquidated.

108.    The Transaction has experienced cumulative losses of $96,650,362.79 which has resulted in Syncora paying $51,964,147.00 in claim payments (net of reimbursements) to the insured Noteholders.

109.    To date, Syncora, through its pre-litigation analysis, has reviewed a total of 331 HELOCs in the Transaction ("Transaction Sample"). The HELOCs chosen for review constitute a representative sample of the loans in the pool for statistical purposes. The sample includes loans from the Transaction that include both defaulted loans and loans still current in payments.

110.    An analysis of the 331 loans in the Transaction Sample reveals that 271 loans, or 81.9% of the loans, had a material breach of one or more of the representations made in Section 7 of the MLPA. The average loan with a material breach had 3.17 breaches, accounting for a total of 859 material breaches in the Transaction Sample. Since the Transaction Sample was statistically representative of the entire pool, the Transaction Sample breach rate is reflective of the breach rate of the entire pool. In fact, based upon the statistical sample, there is a 95% probability that greater than 78.35% of the loans for the entire loan pool have a material breach.

111.    The reviewed loans contain one or, in most cases as noted above, multiple defects that constitute a breach of one or more of the numerous representations and warranties made by EMC in the MLPA. These defects include:

- Misrepresentations contained on the loan tape including inaccurate CLTV and DTI ratios; inflated FICO scores; misrepresentations regarding the borrower's debt obligations, income, employment, and occupancy intentions.

- Pervasive breaches of the originators' own underwriting guidelines including: loans extended to borrowers who did not meet the DTI guidelines; failure to verify employment; stated income was not reasonable; failure to obtain housing history; failure to obtain qualified appraisals; and failure to obtain final Uniform Residential Loan Applications.

112. Each of the defects described above that were identified through Syncora's loan level analysis constitute a breach of one or more of EMC's loan-level representations and warranties as stated in the MLPA that materially and adversely affects Syncora's interest in the loan pool. These loan-level representations and warranties, made in the MLPA, were also made part of the I&I Agreement, and, therefore, their breach also constitutes a breach of the transactional-level representations and warranties made in the I&I Agreement. Moreover, the defects also constitute material breaches of BSABS's and EMC's broader, transaction-level representations and warranties about the absence of material misstatements or omissions in the information provided to Syncora regarding Bear Stearns', BSABS's, and EMC's mortgage lending practices, and consequently, constitutes a material breach of the I&I Agreement as a whole.

## VI.   BEAR STEARNS AND EMC FRAUDULENTLY INDUCED SYNCORA TO INSURE THE TRANSACTION

113. Bear Stearns made materially false and misleading representations to Syncora to induce Syncora to insure the Transaction. As discussed previously in Section IV.B., in marketing presentations, Prospectuses, and oral communications, Bear Stearns routinely touted its due diligence protocols and quality control efforts to assuage any concerns about the quality of the loans in the Transaction and to induce Syncora to insure the Transaction.

-38-

114.    In reality, these representations were false.  Bear Stearns did not engage in the
extensive due diligence and quality control efforts it regularly detailed to Syncora, as is
evidenced by the enormous 81.9% Material Breach Rate of the loans in the Transaction.  Instead,
Bear Stearns reduced its due diligence efforts and abandoned quality control measures – all in
order to securitize more loans.

115.    The failure to conduct the extensive due diligence and quality control efforts that
Bear Stearns routinely promoted to insurers and investors is a systemic failure that infected the
entire Bear Stearns' securitization machine, including this Transaction.  As demonstrated below,
Bear Stearns knew about this systemic failure and fraudulently concealed it.

## A.    BEAR STEARNS' REPRESENTATIONS REGARDING DUE DILIGENCE WERE FALSE AND MISLEADING

116.    Bear Stearns' representations regarding its due diligence protocols were
materially false and misleading because Bear Stearns did not disclose, among other things, that
it: (i) knew its due diligence protocols were flawed but chose not to correct its protocols; (ii)
chose to ignore its due diligence protocols so as to securitize the maximum number of loans as
quickly as possible; and (iii) knew the loans it accepted from third party due diligence firm
Clayton Holdings LLC ("Clayton") failed to meet underwriting guidelines.

### 1. Bear Stearns Knew Its Due Diligence Protocols Were Flawed

117.    At about the same time that Bear Stearns was outwardly making representations
to Syncora about the quality of its due diligence protocols, individuals at Bear Stearns were
internally sounding alarms about the due diligence protocols and recommending significant
changes.  Those alarms were ignored.

-39-

118.    Starting in April 2005, almost a year before the Transaction, Bear Stearns Vice

President of Due Diligence, John Mongelluzzo ("Mongelluzzo"), internally attempted to

persuade his supervisors to modify and improve the due diligence process in order to prevent the

purchase and securitization of defective loans.  Upon information and belief, he made these

recommendations because it was known within Bear Stearns, at the time, that the due diligence

protocols in place were not effective in screening out defective loans from the securitizations.

119.    For example, Mongelluzzo proposed changes that would increase the level of

scrutiny on loans that were considered high risk before the due diligence review was ever

conducted.  Specifically, Mongelluzzo proposed that EMC "identify the top 25% of loans with

the sample that we feel pose the largest risk potential.  Both Clayton and

[PricewaterhouseCoopers] upon having those loans tagged/identified can place their most

seasoned underwriters to review the loans and also perform additional QC on the loans.  Both of

these processes are ones that we can use to market our process to investors and the rating

agencies going forward."[47]  This proposal was ignored by Bear Stearns.

120.    Mongelluzzo made the same proposal again two years later demonstrating that

these deficiencies remained uncorrected and that Bear Stearns was still failing to screen out

defective loans at the time of the Transaction.  Specifically, on March 6, 2007, Mongelluzzo

informed his supervisor that "I think we need to completely revamp how we do due diligence."[48]

Mongelluzzo's second attempt to revamp Bear Stearns' due diligence protocol was ignored.

---

[47] Syncora GP2007 State Court Complaint, ¶ 119 n. 98 (citing email from Mongelluzzo to Haggerty and Silverstein, dated May 11, 2005).

[48] Ambac Complaint, ¶ 123 n. 148 (citing email from Mongelluzzo to Haggerty and Silverstein, dated March 6, 2007 ("Based on that risk score we would determine the type of diligence to be done.  The highest level of risk would get the most comprehensive review.")).

-40-

Baron Silverstein, a Bear Stearns Senior Managing Director, Co-head, Mortgage Finance, characterized this proposed change as "significant" and not mere "incremental Darwinian creep" in the evolution of a due diligence process.[49]

121.    Similarly, in May 2005, Mongelluzzo made an additional proposal to track and monitor Bear Stearns' decisions to override and include in securitization pools certain loans that had been deemed too risky to be included in the securitization by third-party diligence firms such as Clayton and PricewaterhouseCoopers ("PWC"). Specifically, Mongelluzzo proposed "to track loans that are overridden by our due diligence managers and track the performance of those loans."[50] Individuals in Bear Stearns' due diligence department advised Haggerty that Bear Stearns should keep and review the due diligence firms' analysis allowing Bear Stearns to track "trends in the reason for rejection" and for "trades that actually turn into deals determine how different credit performance is for loans that had been flagged as 'exceptions' vs. those that were not."[51] By tracking this information, Bear Stearns could effectively monitor the credit performance of its loans to more successfully make decisions evaluating the credit risk of riskier loans.

122.    This proposal was similarly ignored, despite the fact that Mongelluzzo was the employee who was closest to the due diligence process.[52] Rather than review the due diligence reports, Bear Stearns' underwriting managers were instructed to "[p]urge all of the older reports

---

[49] Syncora GP2007 State Court Complaint, ¶ 119 (citing 6/4/2010 Silverstein Deposition Tr. at 178; 4/21/2010; Mongelluzzo Deposition Tr. at 172).

[50] Syncora GP2007 State Court Complaint, ¶ 120 (citing email from Mongelluzzo to Haggerty and Silverstein, dated May 11, 2005).

[51] Syncora GP2007 State Court Complaint, ¶ 120 (citing email from Haggerty, dated April 25, 2005).

[52] Syncora GP2007 State Court Complaint, ¶ 119 (citing 4/21/2010 Mongelluzzo Deposition Tr. at 175).

on the trade leaving only the final reports."[53]  Pursuant to this policy, copies of "daily reports" submitted by the due diligence firms were gutted.[54]  By systematically purging reports, Bear Stearns was destroying evidence of audit trails concerning the high number of times that Bear Stearns overrode due diligence recommendations and included loans that had been already deemed too risky for inclusion in securitizations.

123.    As Bear Stearns was internally questioning its due diligence protocols and making suggestions to change its policies, executives were publicly extolling the very same due diligence protocols and asking Syncora to rely on these protocols.

### 2. Bear Stearns' Due Diligence Protocols Were Ignored So As To Ensure Maximum Securitization of Loans

124.    Not only did Bear Stearns ignore suggestions to improve its due diligence protocols, it also ignored established protocols that were in place to weed out defective loans. These established protocols were ignored so that Bear Stearns could increase the volume and rate at which loans were securitized.

125.    As early as February 11, 2005, a year before the Transaction, Haggerty e-mailed Mongelluzzo with instructions to reduce the amount of due diligence conducted "in order to make us more competitive on bids with larger sub-prime sellers."[55]  Indeed, Haggerty conceded that reducing due diligence was an accommodation to the suppliers to ensure a steady supply of mortgage loans for Bear Stearns to securitize.[56]

---

[53] Syncora GP2007 State Court Complaint, ¶ 121 (citing EMC Conduit Manual, Bulk Underwriting Chapter, dated April 30, 2005, at 524).

[54] Id.

[55] FHFA Complaint, ¶ 413.

[56] Syncora GP2007 State Court Complaint, ¶ 130 (citing 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 194).

126.    Throughout 2005, Bear Stearns further weakened its due diligence protocols by ignoring established protocols to securitize only those loans that were beyond the 30-to-90 day early payment default period ("EPD").  By securitizing loans that were past the early payment default period Bear Stearns was able to filter out loans that, according to its internal guidelines, were likely to "contain some form of misrepresentations and should not have been made."[57] However, in 2005, Bear Stearns encouraged EMC to securitize loans before the expiration of the 30-to 90-day early payment default period, contrary to prior policy.[58]  By securitizing loans as quickly as possible after acquisition, EMC avoided the possibility of a default or delinquency within this 3 month window, which would otherwise have rendered the loans unsecuritizable. This allowed EMC to enhance earnings by increasing the volume of its securitizations.[59]

127.    Jeffrey Verschleiser ("Verschleiser"), Bear Stearns Managing Director, Head of the ABS & Whole Loan Desk, encouraged this rapid and intentionally lax securitization process. In or about December 2005, Verschleiser ordered Bear Stearns' deal managers and traders to start securitizing all "the subprime loans closed in December for the conduit" by January, well before the expiration of the early payment default period.[60]  The Transaction closed in February 2006.

128.    In addition to securitizing loans before the early payment default period lapsed, Bear Stearns also rushed EMC analysts to conduct its loan analysis in only one to three days so that Bear Stearns did not have to incur the cost of carrying the loans on its books.  To conduct

---

[57] FHFA Complaint, ¶ 232.

[58] FHFA Complaint, ¶ 231.

[59] FHFA Complaint, ¶ 232.

[60] FHFA Complaint, ¶ 233.

such rapid analysis, EMC analysts were encouraged to take shortcuts. For example, EMC

analysts were encouraged to just make up data such as FICO scores if the lenders they purchased

loans from did not promptly provide such missing data.[61] In other cases, EMC analysts did not

know if loans should be classified as "no documentation" or "full documentation" loans, and

would then seek guidance from Bear Stearns. Bear Stearns would make a "snap decision" on

classification without in-depth research of the lender's documentation standards.[62] The

discrepancy between the data tape and the mortgage files with respect to FICO scores and

documentation levels is likely a result of falsifications and 'snap decisions' that occurred in the

Transaction.

129.    In general, Bear Stearns focused on making the loan type "fit" a proposed

securitization rather than focusing on the quality of the loan and the information it received about

the loan. According to an EMC analyst, Bear Stearns' rationale was that, "we didn't want to

overpay for the loans, but we don't want to waste the resources on deep investigation: that's not

how the company makes money. That's not our competitive advantage -- it eats into profits."[63]

Accordingly, analysts were instructed to revise loan types to less risky classifications by

manipulating data such as documentation type.[64]

130.    On the same day the Transaction closed, Bear Stearns' weakening policies were

laid out in the 2006 Internal Audit Report. The report stated that Bear Stearns reduced the

---

[61] Teri Buhl, *More Corruption: Bear Stearns Falsified Information as Raters Shrugged*, The Atlantic, May 14, 2010, *available at* http://www.theatlantic.com/business/archive/2010/05/more-corruption-bear-stearns-falsified-information-as-raters-shrugged/56753/.

[62] *Id.*

[63] *Id.*

[64] Syncora GP2007 State Court Complaint, ¶ 131 (citing email from Matthew Van Leeuwen (Analyst, Trade Support) to Dylan Hoyt (Due Diligence Underwriter), dated May 16, 2005).

number of loans in the loan samples that were reviewed as part of the due diligence process, conducted due diligence only after the loans were purchased, eliminated internal reports on defective loans, and conducted no due diligence if such due diligence would interfere with mortgage loan pools being securitized.[65]  Bear Stearns also systematically issued reduced documentation loans to borrowers who misrepresented their income, assets, employment, and intentions to occupy purchased properties. [66]  By following such risky policies, Bear Stearns was able to ignore red flags and close loans that never should have been made at all, let alone included in securitizations.

131.    Haggerty, in an interview with the Financial Crisis Inquiry Commission, further affirmed that Bear Stearns' underwriting standards declined from 2003 to 2007.  She explained that during this time, the maximum accepted loan to value ratio increased, and more and more loans were accepted with reduced documentation.[67]

132.    In March 2006, the month after the Transaction closed, Durden admitted in an email that many previous loans purchased by EMC were securitized without any due diligence clearance:  "I agree the flow loans were not flagged appropriately and we securitized many of them which are still to this day not cleared.  I think the ball was dropped big time on the flow processes involved in the post close [due diligence], from start to finish."[68]

---

[65] FHFA Complaint, ¶ 415.

[66] FHFA Complaint, ¶ 422.

[67] FCIC Staff Interview with Mary Haggerty, Bear, Stearns & Co. (August 17, 2010), *available at* http://fcic.law.stanford.edu/resouce/interviews.

[68] FHFA Complaint, ¶ 234.

### 3. Bear Stearns Hid Problems With Due Diligence Firm Clayton

133.    In addition to Bear Stearns' due diligence being conducted well-below the level

being represented to Syncora, Bear Stearns was also aware, and failed to disclose, that its third-

party due diligence firm, Clayton, was performing well below expectations, partially because

Bear Stearns was directing Clayton to disregard its normal practices and protocols. Syncora

relied on the fact that third parties conducted due diligence on the loans. In reality, however,

these firms were not effective in screening out defective loans and Bear Stearns had knowledge

of this but failed to disclose it to Syncora.

134.    As early as November 1, 2005, Bear Stearns was aware that Clayton was

conducting deficient due diligence and began to keep a record of the material issues that Clayton

was missing in its review. Specifically, Verschleiser requested that EMC "start logging loans

that [EMC] believe[s] Clayton or PWC missed material issues on . . . start the list with the loans

from yesterday and let's keep it on the shared drive."[69]

135.    That Clayton was missing material issues in its underwriting, was explained by

former Clayton president D. Keith Johnson ("Johnson"). Johnson stated that initially Clayton's

focus during its due diligence was on whether a loan would perform or not. That changed,

however, and the focus became whether or not a loan met the guidelines, without any regard for

whether the guidelines were worthwhile. This change in focus led to a change in loan

performance.[70]

---

[69] Ambac Complaint, ¶ 124 n.151.

[70] FCIC Interview with D. Keith Johnson, Clayton Holdings, LLC (September 2, 2010), *available at*
http://fcic.law.stanford.edu/resource/interviews ("Old due diligence was good loan/bad loan . . . We think the money
is going to be paid on this loan to where diligence migrated to does it meet the guidelines or not meet the guidelines?
Forget if the guidelines are crap . . . And that's a major distinction . . . .").

136.    Pursuant to an agreement with the New York Attorney General to provide documents and testimony, Clayton informed the New York Attorney General "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."[71]

137.    Clayton's Vice President Vicki Beal testified that Bear Stearns was made fully aware on a regular basis that a significant percentage of its loans failed to meet stated underwriting guidelines, but Bear Stearns accepted these loans anyway.[72]

138.    Shockingly, Bear Stearns used the fact that many of the loans failed to meet underwriting guidelines to negotiate lower prices for the loans and thus increase its profits. Johnson stated: "I don't think that we added any value to the investor, the end investor, to get down to your point.  I think our only value was done in negotiating the purchase between the seller and securitizer.  Perhaps the securitizer was able to negotiate a lower price, and could maximize the line.  We added no value to the investor, to the rating agencies."[73]

## B.    BEAR STEARNS MADE RAMPANT MISREPRESENTATIONS REGARDING QUALITY CONTROL

139.    Bear Stearns' representations regarding its quality control protocols were materially false and misleading because Bear Stearns: (i) did not conform with its own seller approval and monitoring procedures; (ii) did not conduct quality control review of the accepted loans; and (iii) did not comply with its repurchase obligations.

---

[71] Jenny Anderson & Vikas Bajaj, *Loan Reviewer Aiding Inquiry Into Big Banks*, The New York Times (Jan. 27, 2008) *available at:* http://www.nytimes.com/2008/01/27/business/27subprime.html?pagewanted=all.

[72] FHFA Complaint, ¶ 392.

[73] FCIC Staff Interview with D. Keith Johnson, Clayton Holdings, LLC (September 2, 2010), *available at* http://fcic.law.stanford.edu/resouce/interviews.

### 1. Bear Stearns Did Not Comply With Its Own Representations As To The Seller Approval Process And Ongoing Monitoring of Those Sellers

140.    Bear Stearns made numerous representations about its sellers, its robust seller approval process, and its quality control protocols in place to monitor the sellers. These representations were made in the investor presentations, the Prospectuses and in oral communications to Syncora to instill confidence in the quality of the originators selling loans to Bear Stearns for securitization.

141.    An Investor Presentation sent to Syncora in December 2005 contained representations intended to convince Syncora that it would benefit from the controls and policies that were purportedly in place to ensure the quality of the securitized loans. For example, the presentation stated that Bear Stearns: (i) reviews and approves seller underwriting guidelines; (ii) conducts a monthly seller review meeting where breaches of representations and warranties, repurchase activity, and quality control of sellers' production are monitored; and (iii) conducts 100% quality control on deliveries from new sellers.

142.    In addition, the Prospectus Supplement touted the strength of underwriting guidelines employed by the originators of the securitized loans. Bear Stearns represented that all three of the primary originators in the Transaction -- MortgageIT, Metrocities, and SouthStar -- maintain underwriting standards that evaluate the borrower's ability to repay the loan and insure that the value and marketability of the property are acceptable.[74] Bear Stearns also assured Syncora that there was an increased level of scrutiny for loans that are classified as exceptions to the underwriting standards or are reduced documentation loans.[75]

---

[74] ProSupp, at S-25 – S-30.
[75] ProSupp, at S-26 – S-31.

143.    Bear Stearns also made assurances that the originators' underwriting guidelines were not only consistent with its own standards, but that the originators adhered to the underwriting guidelines as well. "Performing loans purchased will have been originated pursuant to the sponsor's underwriting guidelines or the originator's underwriting guidelines that are acceptable to the sponsor."[76]   The Prospectus Supplement states that the loans originated by MortgageIT were "generally" in accordance with Bear Stearns' underwriting standards; 80% of Metrocities' loans were in accordance with Bear Stearns' underwriting standards; and 100% of SouthStar's loans were in accordance with Bear Stearns' underwriting standards.[77]

144.    To ensure compliance with these guidelines, Bear Stearns assured Syncora that the performing loans would be subject to due diligence prior to purchase and will be reviewed for "credit, data integrity, appraisal valuation, documentation, as well as compliance with certain laws."[78]

145.    In addition to the representations regarding the quality of the originator's underwriting guidelines, Bear Stearns also made further representations regarding the strength of its seller approval process and annual review of approved originators. Bear Stearns represented that the seller approval process includes a review of the financial situation, capitalization, and loan performance of the originators. The top three originators in this Transaction -- MortgageIT, SouthStar, and Metrocities -- were all Bear Stearns' approved originators.[79]

---

[76] ProSupp, at S-33.

[77] ProSupp, at S-25 – S-30.

[78] ProSupp, at S-33.

[79] *Id.*

146.    Bear Stearns represented that EMC puts each new seller through a rigorous approval process including: (i) conducting a financial analysis; (ii) checking public records and references; (iii) performing operational diligence; and (iv) reviewing collateral equity. Bear Stearns explained that each seller must submit a "robust" application, submitting all licenses, two or more years of audited financials, internal policies and procedures, and its most recent quality control reports. EMC further asserted that it conducts its own additional diligence by checking all references and researching the seller through Mortgage Asset Research Institute, Factiva, Google and Dow Jones Interactive.[80] Bear Stearns also gave assurances to Kobrin about its review of originators by stating that high net worth sellers are reviewed annually, medium net worth sellers are reviewed semiannually and risky sellers are reviewed quarterly.[81]

147.    In the Investor Presentation and oral communications, Bear Stearns and EMC additionally represented that it:

- Conducts an operation review with the seller's management focusing on the source of the product, third party originator approval and monitoring, underwriting, appraisal review, fraud protection, compliance, post-closing, and quality control;[82]

- Reviews six months of 3rd party quality control reports that re-underwrite at least 10% of the seller's production to ensure that loans are being originated in accordance with stated underwriting guidelines and meet all regulatory requirements;[83]

- Requires each mortgage loan seller to have at least two years of experience in the mortgage banking business;[84]

---

[80] *Id.*
[81] Contemporaneous notes of December 16, 2005 telephone call between Kobrin, Duffek, Golden and Glory.
[82] Investor Presentation.
[83] Contemporaneous notes of December 16, 2005 telephone call between Kobrin, Duffek, Golden, and Glory.
[84] Investor Presentation.

- Conducts detailed review of the seller's underwriting guidelines for conformity with Bear Stearns' and industry standard guidelines;

- Monitors the seller's performance through annual re-certifications and requires updated fidelity bonds, E&O insurance and financials;[85] and

- Monitors and reviews purchased loans for early payment defaults, delinquencies, quality controls findings and repurchases;[86]

148.    Bear Stearns' and EMC's representations regarding the seller screening process and monitoring of sellers' loan performance were intended to assure investors and insurers that the originators could be trusted to provide loans that were unlikely to default. However, Bear Stearns' and EMC's representations regarding the seller approval process and monitoring were false.

149.    Analysis of the 331 loans in the Transaction Sample reveals that 271 loans, or 81.9% of the total loans, had a material breach.  Of these 331 loans, the underwriting guidelines were materially breached 859 times.

150.    Given the extraordinarily high rate of breaches, particularly of the underwriting guidelines, it is virtually impossible that the originators followed underwriting guidelines that were in conformity with represented Bear Stearns' or industry standards, and that Bear Stearns took any steps to monitor effectuation of the guidelines and ensure conformity.  It also is virtually impossible that Bear Stearns continued to monitor the sellers' loans for early payment defaults, delinquencies, quality control findings, and repurchases.  If they had taken the steps they represented they would, the breach rate in the Transaction Sample could not be so high.

---

[85] *Id.*

[86] *Id.*

## 2. Bear Stearns Did Not Conduct Adequate Quality Control Of Securitized Loans

151.    In addition to its inadequate monitoring of the originators, Bear Stearns also falsely represented the scope of the quality control conducted on the securitized loans. First, as discussed in Section IV.B., Bear Stearns made numerous representations to Syncora about the quality control reviews on the purchased loans that were ultimately securitized in both the Investor Presentation and during phone conferences to convince Syncora that it would benefit from controls and policies purportedly in place to ensure the quality of the securitized loans.

152.    Specifically, Bears Stearns represented that it conducted quality control reviews, which involved re-underwriting loans that EMC purchased and Bear Stearns had securitized.[87]

153.    Bear Stearns also asserted that it took steps to guard against fraud. Bear Stearns said that "[a]ny loan that goes delinquent in 90 days gets full re-underwriting looking for fraud putbacks;" certain sellers are monitored on a monthly basis for fraud; and, all flow loans go through a data integrity program to detect fraud.[88]

154.    On January 10, 2006, a month before the Transaction, representatives of Bear Stearns and EMC had a conference call with Syncora regarding the process of setting up loans. Bear Stearns represented that it "look[s] at key data items for integrity." For example, Bear Stearns stated that if there are less than a 100 loans in a deal from one originator, then there is a quality control check on a 100% of the loans. If there are more than a 100 loans in a deal, then

---

[87] Investor Presentation (stating that quality control is a "Post Settlement" review); Syncora GP2007 State Court Complaint, ¶ 133 n. 119 (citing 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 179 (confirming that due diligence "was done prior to the settlement of the purchase of the loans, whereas, the quality control reviews were done after EMC settled the purchase of the – of the loan."); 4/26/2010 Golden Deposition Tr. at 17 (confirming that quality control refers to the "post-purchase review of loans that EMC and Bear Stearns securitized")).

[88] Contemporaneous notes of December 16, 2005 telephone call between Kobrin, Duffek, Golden, and Glory.

there is a quality control check on 20% of the loans. However, if the error rate exceeds 5%, then there is a quality control check on 100% of the loans regardless of the number of loans in the deal.[89]

155.    Bear Stearns' representations to Syncora in the investor presentation and conference calls were materially misleading. The Material Breach Rate of 81.9% makes clear that Bear Stearns could not possibly have been following the quality control protocols as represented to Syncora.

156.    This failure is systemic. It is not unique to this Transaction. A review of other lawsuits filed against Bear Stearns reveals that Bear Stearns made similar representations regarding quality control procedures in other transactions that it securitized. These actions reveal that Bear Stearns made it a practice to not follow its quality control protocols.

157.    For example, the outcome of the GPMF 2007 HE-1 transaction indicates that Bear Stearns did not follow its quality control protocols there. Upon information and belief, Bear Stearns did not review, or cause third parties to review, 10% of the monthly volume it acquired from GreenPoint, the originator for the GPMF 2007 HE-1 transaction.[90] Also, Bear Stearns did not review or conduct full reunderwriting of all loans with 90-day delinquencies.[91] Bear Stearns asserted that it conducted certain quality control procedures for the GPMF 2007 HE-1 transaction so as to assure Syncora that there were measures in place to protect against the risk of securitization of defective loans in the transaction. Bear Stearns' failure to comply with its

---

[89] Contemporaneous notes of January 10, 2006 telephone call between Kobrin, Stephanie Courtney, Bear Stearns Loan Borrowing, Nancy Nixon, Randy Longalia, Trish Longhenbeck, Keith Price, Golden, and Glory.

[90] Syncora GP2007 State Court Complaint, ¶ 136.

[91] Syncora GP2007 State Court Complaint, ¶ 137.

quality control protocols was a misrepresentation of the scope and quality of review it conducted.[92]

158.    Bear Stearns' failure to follow its stated quality control protocols for the GPMF 2007 HE-1 transaction is not an aberration. Rather, it evidences a pattern prevalent throughout the Bear Stearns' securitization machine. As evidenced by the staggering and systemic breach rates across the loans sampled in Syncora's pre-litigation analysis of the Transaction, Bear Stearns also failed to follow quality control protocols for the Transaction.

159.    Indeed, the Material Breach Rate of 81.9% is evidence that Bear Stearns did not conduct its purported quality control measures. Had Bear Stearns implemented its represented quality control protocols, it would or should have discovered the deficient loans and removed them from the loan pool. Accordingly, there is scant possibility that Bear Stearns engaged in any of the represented quality control measures with respect to the Transaction.

### 3. Bear Stearns' Representations Regarding Repurchase Obligations Were Not Followed

160.    To further induce Syncora to insure the Transaction Bear Stearns made several representations regarding the repurchase of defective loans. Specifically, Bear Stearns asserted that it had an entire "conduit team" devoted to asserting breach-of-representation-and-warranty claims on behalf of the securitization participants and monitoring "ongoing portfolio performance," "quality control findings," and "repurchases."[93]

161.    Bear Stearns also represented to Syncora that its quality control and repurchase processes were in place to review, identify, and remove defective loans from securitizations, and

---

[92] Syncora GP2007 State Court Complaint, ¶ 138.

[93] Investor Presentation.

-54-

that these procedures would be in place even after the loans were securitized.[94]

162.    These representations were intended to assure investors and insurers that Bear
Stearns had implemented stringent quality control measures.[95]

163.    Bear Stearns' representations regarding its repurchase obligations were materially
false and misleading.

164.    At the time of the Transaction, Bear Stearns did not even have a formal policy for
repurchasing breaching loans from securitization trusts.[96]

165.    The lack of a formal policy can be explained by the fact that the purpose of the
repurchase operations was not to actually repurchase defective loans from securitizations, but to
provide Bear Stearns with cash settlements whenever defective loans were identified.  Whenever
a securitized loan defaulted during the early payment default period, or Bear Stearns identified a
seller's breach of representations to EMC, instead of Bear Stearns repurchasing the loan, the
seller would simply pay Bear Stearns a settlement amount.  Bear Stearns would take this
payment, but then neglect to notify any securitization counterparties or assess whether the loan
also breached EMC's representations to the other securitization parties.[97]

166.    Despite the fact that breaches of warranties and early defaults were red flags of
potential breaches to securitization counterparties, Bear Stearns did not review those loans unless
the supplier tendered full repurchase funds.  This was Bear Stearns' normal procedure because a
determination that a loan breached representations made to securitization counterparties would

---

[94] Contemporaneous notes of December 16, 2005 telephone call between Kobrin, Duffek, Golden, and Glory.

[95] Syncora GP2007 State Court Complaint, ¶ 134 (citing 4/19/2010 Glory Deposition Tr. at 109-10).

[96] Syncora GP2007 State Court Complaint, ¶ 143 (citing 5/20/2010 Serrano Deposition Tr. at 44, 47).

[97] Syncora GP2007 State Court Complaint, ¶ 144.

result in an obligation to repurchase the loan at full price. Bear Stearns had a pecuniary interest in simply settling matters and taking settlement payments from the sellers.[98]

167.    Bear Stearns' policy for the repurchase of loans was clarified in a policy manual which states: "No loan(s) will be added to the Conduit Buy-out Log . . . without confirmation of repurchase funds received or a firm commitment from the seller to repurchase or funding of a down-bid." The Conduit Buy-out Log is the file Bear Stearns used to track loans that were to be repurchased pursuant to its repurchase obligations. Thus, Bear Stearns' policy was that repurchase of a loan was not to be considered unless and until there was a recovery from the seller of that loan.[99]

168.    Bear Stearns continues to employ its practice of refusing to repurchase breaching loans. In the GPMF 2007 HE-1 transaction, Syncora notified EMC of 379 loans that breached securitization warranties. Bear Stearns directed EMC to reject most of Syncora's claims, however, Bear Stearns used the breach findings to assert claims against Greenpoint, the seller of the defective loans.[100]

169.    EMC also came to at least three settlement agreements in lieu of exercising its repurchase obligations: (i) on January 30, 2007, an originator agreed to pay EMC over $2.5 million; (ii) on December 18, 2007, an originator agreed to pay EMC almost $12 million; and (iii) on October 1, 2007, an originator agreed to pay EMC $1 million. According to an internal Bear Stearns' presentation, EMC received $1.9 billion from April 2006 to April 2007 in claim resolutions, with most resolutions being settlements. Sometimes Bear Stearns would accept

---

[98] Syncora GP2007 State Court Complaint, ¶ 146.

[99] Syncora GP2007 State Court Complaint, ¶ 145.

[100] Syncora GP2007 State Court Complaint, ¶ 152.

discounts on future loan purchases instead of immediate cash settlements. Upon information and belief, these discounts were valued at $367 million for the period beginning in 2007 through the first quarter of 2008.[101]

170.    Upon information and belief, these funds should have been passed to the trusts but Bear Stearns did not disclose its repurchase settlements with certificate holders in the trust. Durden could not identify a single "instance in which EMC or Bear Stearns disclosed to . . . investors that it was recovering on EPDs from originators with respect to securitized mortgage loans, pocketing the money and not putting it into the trust."[102]

171.    Even if Bear Stearns followed its policy regarding repurchase obligations, it still would be unable to adequately repurchase loans because of the massive number of loans that need to be repurchased. Bear Stearns' rapid fire loan securitization program overwhelmed its quality control and claims department to the extent that it could not process its claims against the entities from which it purchased the loans. Indeed, a February 28, 2006 internal audit report noted "a significant backlog for collecting from and submitting claims to sellers" consisting of more than 9,000 outstanding claims worth over $720 million, and noting that the procedures in place to process, collect, resolve, and monitor such claims were inadequate or non-existent.[103]

172.    In the Transaction Sample, the Material Breach Rate of 81.9% indicates that deficient loans were not being removed from the loan pool. However, none of these loans were repurchased. Thus, Bear Stearns and EMC breached their representations and warranties regarding their repurchase obligations.

---

[101] FHFA Complaint, ¶ 419.

[102] FHFA Complaint, ¶ 420 (citing to December 11, 2009 deposition of Durden).

[103] Ambac Complaint, ¶ 159.

## FIRST CAUSE OF ACTION
### (Material Breach of the I&I Agreement)

173.    Syncora realleges and incorporates by reference paragraphs 1 through 172 of this Complaint as if fully set forth herein.

174.    Bear Stearns and EMC induced Syncora to enter into the I&I Agreement and to issue its Policy by making extensive representations and warranties concerning the loans that EMC caused to be sold to the Trust, and by agreeing to broad remedies for breaches of those representations and warranties.

175.    Syncora has performed its obligations under the I&I Agreement.

176.    BSABS's and EMC's representations and warranties were material to Syncora's decision to insure the Transaction, and Syncora was induced thereby to enter into the I&I Agreement and perform its obligations thereunder.

177.    BSABS and EMC have materially breached the I&I Agreement, as evidenced by the Material Breach Rate of 81.9%, and the loan-by-loan cure-repurchase-or-substitution remedy is inadequate to address the magnitude and pervasiveness of the breaches identified.

178.    BSABS's and EMC's material breaches of the I&I Agreement materially increased the risk of loss and damage within coverage of the I&I Agreement.  Had Syncora known the true and accurate facts it would not have agreed to issue its Policy.

179.    Plaintiff has been damaged and will continue to be damaged by this breach in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Fraudulent Inducement)

180.    Syncora realleges and incorporates by reference paragraphs 1 through 179 of this Complaint.

-58-

181.    As set forth above, Bear Stearns and EMC  made materially false public statements, and omitted material facts, with the intent to defraud the public and Syncora.

182.    Bear Stearns and EMC made materially false statements and omitted material facts with the intent to defraud Syncora in pre-contractual communications between Syncora and Bear Stearns' and EMC's officers.

183.    Bear Stearns and EMC, knowingly and with the intent to defraud, delivered to Syncora materially false and misleading documentation, including collateral data, investor presentations, data tapes, Prospectuses, and fraudulently-induced ratings by the rating agencies.

184.    Syncora reasonably relied on Bear Stearns' and EMC's statements and omissions when it entered into the I&I Agreement and issued its Policy.  As a result of Bear Stearns' and EMC's statements and omissions, Syncora insured securities issued in the Transaction backed by pools of loans that had a risk profile far higher than Bear Stearns and EMC led Syncora to understand.

185.    Had Syncora known of the true and accurate facts, it would not have agreed to issue its Policy.  As a result of Bear Stearns' and EMC's false and misleading statements and omissions, Plaintiff has suffered, and will continue to suffer, damages.

186.    As a result of Bear Stearns' and EMC's false and misleading statements and omissions, investors purchased securities that were backed by pools of loans that had a risk profile far higher than Defendants led the investors to understand.  Consequently, the general public has suffered, and will continue to suffer, damages.

187.    Plaintiff has been damaged and will continue to be damaged by this breach in an amount to be determined at trial.

188.    Because Bear Stearns and EMC committed these acts and omissions maliciously, wantonly, oppressively, and with knowledge that they would affect the general public, Syncora is entitled to punitive damages.

### THIRD CAUSE OF ACTION
(Indemnification)

189.    Syncora realleges and incorporates by reference paragraphs 1 through 188 of this Complaint.

190.    Pursuant to Section 3.04 of the I&I Agreement, Syncora is entitled to be indemnified for any and all claims, losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or relating to the transactions contemplated by the Operative Documents by reason of, among other things:

    (i)    the misfeasance, malfeasance, negligence, bad faith, willful misconduct, or theft committed by any director, officer, employee or agent of BSABS and EMC;

    (ii)    the breach by BSABS and EMC of any of the representations, warranties, or covenants contained in the Operative Documents; and

    (iii)    any untrue statement or alleged untrue statement of material fact contained in the Prospectuses or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

191.    By reason of the foregoing, Bear Stearns, BSABS, and EMC have caused Plaintiff to pay claims and incur losses, costs, and expenses, and will continue to cause Plaintiff to pay claims and incur losses, costs, and expenses.

192.    Syncora has been damaged and will continue to be damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
(Reimbursement)

193.    Syncora realleges and incorporates by reference paragraphs 1 through 192 of this Complaint

194.    Pursuant to Section 3.03(b) of the I&I Agreement, EMC agreed to reimburse Syncora for any payment made under its Policy arising as a result of EMC's failure to substitute for, or deposit an amount in respect of, any defective HELOC, with interest on any and all such amounts remaining unreimbursed from the date such amounts became due until paid in full.

195.    As is evidenced by the Material Breach Rate of 81.9%, not to mention the disregard of their own underwriting and due diligence guidelines, Bear Stearns and EMC were on constructive notice of the defective HELOCs in the loan pool and should have repurchased those HELOCs.

196.    Syncora has made payments under its Policy arising as a result of EMC's failure to substitute for or deposit an amount in respect of defective HELOCs.

197.    Syncora has been damaged and will continue to be damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
(Attorneys' fees and costs)

198.    Plaintiff realleges and incorporates by reference paragraphs 1 through 197 of this
Complaint.

199.    Pursuant to Section 3.03(c) of the I&I Agreement, EMC agreed to reimburse
Syncora for any and all charges, fees, costs, and expenses paid or incurred in connection with,
among other things, enforcing, defending, or preserving Syncora's rights under the Operative
Documents.

200.    Plaintiff has incurred numerous expenses, including attorneys' fees and expert
fees, in order to enforce, defend, and preserve its rights under the relevant agreements in an
amount to be determined at trial.

201.    Syncora has been damaged and will continue to be damaged in an amount to be
determined at trial.

## SIXTH CAUSE OF ACTION
(Successor Liability)

202.    Plaintiff realleges and incorporates by reference paragraphs 1 through 201 of this
Complaint.

203.    JP Morgan is the successor to Bear Stearns.  JP Morgan is liable for Bear
Stearns' wrongdoing, in its entirety because: (i) on October 1, 2008 Bear Stearns merged and/or
consolidated with J.P. Morgan Securities Inc., which was renamed J.P. Morgan Securities LLC
(defined above as "JP Morgan"); (ii) JP Morgan has expressly or impliedly assumed Bear
Stearns' liabilities; and (iii) JP Morgan is a mere continuation of Bear Stearns.  This action is
thus brought against JP Morgan as successor to Bear Stearns.

-62-

204.    JPMC Bank is the successor to EMC. JPMC Bank is liable for EMC's wrongdoing, in its entirety because: (i) pursuant to an April 1, 2011 asset transfer JPMC Bank acquired all of EMC's assets and the two entities effectively merged and/or consolidated; (ii) JPMBC Bank has expressly or impliedly assumed EMC's liabilities, including its liabilities and obligations under the Operative Documents; and (iii) JPMC Bank is a mere continuation of EMC given that JPMC Bank assumed all the operations of EMC. This action is thus brought against JPMC Bank as successor to EMC.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

205.    For an award of damages for BSABS's and EMC's material breach of its representations and warranties under MLPA § 7 and I&I Agreement § 2.01; and against JPMC Bank as successor in interest to EMC;

206.    For an award of all legal, equitable, and punitive damages, to be proven at trial, against Bear Stearns and EMC, for their fraudulent inducement of Syncora's insurance of the Transaction and issuance of its Policy; and against JP Morgan and JPMC Bank as successors in interest to Bear Stearns and EMC respectively;

207.    For an award of damages based on losses incurred by Syncora in an amount as yet to be determined;

208.    For an award of compensatory, consequential, and/or rescissory damages, including all of Plaintiff's claims payments made and to be made in the future, and any other present and future damages to be proven at trial for BSABS's and EMC's willful, wanton, and malicious material breaches of its contracts with Syncora; and against JPMC Bank as successor in interest to EMC;

-63-

209.    For an order of indemnification for the claim payments and other losses and
expenses Plaintiff has paid or will pay in the future pursuant to I&I Agreement § 3.04(a);

210.    For an order awarding reimbursement of Plaintiff's payments under its Policy
arising as a result of EMC's failure to substitute for or deposit an amount in respect to defective
HELOCs pursuant to I&I Agreement § 3.03(b);

211.    For an order awarding reimbursement of Plaintiff's attorneys' fees, and other
costs and expenses incurred in enforcing, defending, or preserving their rights under the
Transaction documents pursuant to I&I Agreement § 3.03(c);

212.    For an order of prejudgment interest; and,

213.    For an order awarding Plaintiff such other and further relief as the Court deems
just and proper.

Dated: February 14, 2012
       New York, New York

                                        Respectfully Submitted,

                                        _William H. Devaney_

                                        Edmund M. O'Toole
                                        William H. Devaney
                                        Doreen S. Martin
                                        Venable LLP
                                        1270 Avenue of the Americas, 25th Floor
                                        New York, New York 10020
                                        Tel.: (212) 307-5500
                                        Fax: (212) 307-5598

                                        *Attorneys for Syncora Guarantee Inc.*