Exhibit 19

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| SYNCORA GUARANTEE INC., formerly known as XL CAPITAL ASSURANCE INC., | Index No. _____ |
| Plaintiff, | SUMMONS |
| - against - | |
| EMC MORTGAGE LLC (formerly known as EMC Mortgage Corporation), BEAR, STEARNS & CO. INC., CMO HOLDINGS III LTD., J.P. MORGAN SECURITIES LLC (formerly known as BEAR, STEARNS & CO. INC.), and JPMORGAN CHASE BANK, N.A., | |
| Defendants. | |

To the above named Defendants:

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to submit answering papers, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of the venue is the residence of the plaintiff and agreement of the parties.

Dated: New York, New York
October 5, 2012

VENABLE LLP

By: _____
Edmund M. O'Toole
William H. Devaney
Doreen S. Martin
1270 Avenue of the Americas, 25th Floor
New York, New York 10020
Tel.: (212) 307-5500
Fax: (212) 307-5598
*Attorneys for Syncora Guarantee Inc.*

TO:

EMC MORTGAGE LLC (formerly known as EMC Mortgage Corporation)
2780 Lake Vista Drive
Lewisville, TX 75067

BEAR, STEARNS & CO. INC. ( c/o J.P. MORGAN SECURITIES LLC)
277 Park Avenue
New York, New York 10179

CMO HOLDINGS III LTD.
c/o Maples Finance Limited
PO Box 1093GT, Queensgate House, South Church Street
George Town, Grand Cayman, Grand Cayman Islands

J.P. MORGAN SECURITIES LLC (formerly known as BEAR, STEARNS & CO. INC.)
277 Park Avenue
New York, New York 10179

JP MORGAN CHASE BANK, N.A.
1111 Polaris Parkway
Columbus, OH 43240-2031

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| SYNCORA GUARANTEE INC., formerly known as XL CAPITAL ASSURANCE INC.,<br><br>       Plaintiff,<br><br>   - against -<br><br>EMC MORTGAGE LLC (formerly known as EMC Mortgage Corporation), BEAR, STEARNS & CO. INC., CMO HOLDINGS III LTD., J.P. MORGAN SECURITIES LLC (formerly known as BEAR, STEARNS & CO. INC.), and JPMORGAN CHASE BANK, N.A.,<br><br>       Defendants. | Index No. _____<br><br>COMPLAINT |

Plaintiff Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc. ("Syncora"), an insurance company formed under the laws of the State of New York, by its attorneys, Venable LLP, for its complaint against defendants EMC Mortgage LLC ("EMC"), Bear, Stearns & Co. Inc. ("Bear Stearns"), CMO Holdings III Ltd. ( "CMO"), J.P. Morgan Securities LLC ("JP Morgan"), as successor in interest to Bear Stearns, and JPMorgan Chase Bank, N.A. ("JPMC Bank"), as successor in interest to EMC (collectively, the "Defendants"), hereby alleges as follows:

## I.  NATURE OF THE ACTION

1.  Syncora brings this suit against the Defendants for breach of contract and fraud in connection with a mortgage-backed-securities transaction known as Bear Stearns Structured Products Trust 2007-R5 (the "Transaction"). The Transaction involves the resecuritization of Real Estate Mortgage Investment Conduits ("Re-REMICs"). This Re-REMIC consists of previously issued mortgage-backed securities from four fixed pools of residential mortgages

from 2006 Bear Stearns' transactions: (1) Bear Stearns Mortgage Funding Trust 2006-SL2 ("SL2"); (2) Bear Stearns Mortgage Funding Trust 2006-SL3 ("SL3"); (3) Bear Stearns Mortgage Funding Trust 2006-SL5 ("SL5"); and (4) Bear Stearns Mortgage Funding Trust 2006-SL6 ("SL6") (collectively, the "Underlying Transactions").

2.     To enhance the marketability and the return on the Transaction, Bear Stearns, EMC, and CMO obtained Financial-Guaranty Insurance Policy Number CA03917A (the "Policy") from Syncora pursuant to a July 31, 2007 Insurance and Indemnity Agreement (the "I&I").

3.     The I&I sets forth myriad representations and warranties made by Bear Stearns, EMC, and CMO about the quality of the loan pools and the individual loans, the Transaction, the soundness of Bear Stearns', EMC's, and CMO's operations as a whole, and their due diligence practices.  These representations are the bedrock of the parties' agreement, and Syncora reasonably relied on these representations when deciding to insure the Transaction.

4.     The I&I contains two types of representations:  (1) transaction-level representations, which are contained in the I&I, that relate to Bear Stearns', EMC's, and CMO's operations and due diligence, and the Transaction as a whole; and (2) loan-level representations, certain of which are specifically incorporated by reference from other documents into the I&I and restated therein for Syncora's benefit.  These representations relate to the characteristics of the Underlying Transactions' loan pools and individual loans.  The loan-level representations were made in the Mortgage Loan and Purchase Agreements ("MLPAs") and the Pooling and Servicing Agreements ("PSAs") for each of the Underlying Transactions.[1]

---

[1] The SL2 MLPA and PSA are dated August 30, 2006; the SL3 MLPA and PSA are dated September 29, 2006; the SL5 MLPA and PSA are dated November 30, 2006; and the SL6 MLPA and PSA are dated December 29, 2006.

5.      Among the key representations and warranties that Bear Stearns, EMC, and CMO
made in the I&I, and upon which Syncora relied, were that the information in the data tapes,
which contained the financial attributes of the loans in the pool, was true and accurate; that all of
their practices, procedures, and policies were in compliance with applicable laws and
regulations; and that the Operative Documents[2] for the Transaction did not contain any material
misstatements or omissions.[3]  In addition, Bear Stearns, EMC, and CMO incorporated into the
I&I for Syncora's benefit the representations and warranties made in Section 7 of the MLPAs in
which EMC makes between 25 to 38 specific representations, depending on the individual
MLPA, about the attributes of the loan pool, the individual loans, and the practices used to
originate, underwrite, and service the loans in each of the four Underlying Transactions.

6.      In addition to the above contractual representations, Bear Stearns, EMC, and
CMO also induced Syncora to insure the Transaction by making other representations about their
securitization operations, seller approval processes, due diligence protocols, and quality control
protocols to assure Syncora of the strength of the Transaction.  These representations were made
in marketing presentations, the Private Placement Memorandum, dated July 31, 2007 ("PPM"),
Prospectuses,[4] and in oral and written communications.  Bear Stearns and CMO also used the
PPM as well as other oral and written communications to encourage Syncora to rely on the

---

[2] Pursuant to Section 1.01 of the I&I, "Operative Documents" are defined as "this Insurance Agreement, the Indemnification Agreement, the Notes, the Asset Sale Agreement, the Deed of Covenant, the Fiscal Agency Agreement, the Note Purchase Agreement, the Administration Agreement, with respect to EMC only, the Underlying Pooling and Servicing Agreements and any other document contemplated by any of the foregoing to which the Issuer, the Seller, the Fiscal Agent, the Collateral Agent, the Administrator or EMC is a party."

[3] I&I §§ 2.01(l) & (m).

[4] Prospectuses refer to the Prospectus and Prospectus Supplement ("ProSupp") for each Underlying Transaction. The SL2 Prospectus is dated June 27, 2006, the SL3 Prospectus is dated September 5, 2006, the SL5 Prospectus is dated October 18, 2006, and the SL6 Prospectus is dated December 18, 2006.  The SL2 ProSupp is dated August 25, 2006, the SL3 ProSupp is dated September 28, 2006, the SL5 ProSupp is dated November 29, 2006, and the SL6 ProSupp is dated December 27, 2006.

ratings given by the ratings agencies in the Underlying Transactions. All of these representations were made to induce Syncora to insure the Transaction, and Bear Stearns, EMC, and CMO knew that Syncora would rely on these representations when assessing the risk associated with the Transaction.

7.    The above-referenced representations, however, were false, and Bear Stearns, EMC, and CMO knew that they were false at the time they were made.

8.    A loan level analysis conducted by an expert retained by Syncora's counsel reveals that 84.9% of the loans in the Re-REMIC pool had a material breach of one or more of the representations contained in the MLPAs and incorporated into the I&I (the "Material Breach Rate"). Those breaches, and the systemic fraud perpetrated by Bear Stearns, EMC, and CMO, are the focus of this litigation.

9.    As of Aug 25, 2012, the Transaction has experienced cumulative losses of $111,633,231.75, which has resulted in Syncora paying $94,059,025 in claims payments (net of reimbursements) to the insured Noteholders. Accordingly, Syncora brings this action for breach of contract and fraud.[5]

---

[5] This lawsuit is one of many suits filed against the Defendants for breach of contractual representations and warranties, fraud and/or gross negligence in connection with residential mortgage-backed securities, including but not limited to the following federal and state cases: *People of the State of New York v. J.P. Morgan Securities LLC,* (Sup. Ct. N.Y. County Oct. 1, 2012); *Federal Deposit Ins. Corp. v. Chase Mortgage Finance. Corp.,* No. 12-CV-6166 (S.D.N.Y. Aug. 10, 2012) (Stanton, J.); *Bank Hapoalim BM v. JPMorgan Chase & Co.,* No. 652799/2012 (Sup. Ct. N.Y. County, Aug. 10, 2012); *Royal Park Investments SA/NV vs. Merrill Lynch Pierce Fenner & Smith Inc.,* No. 652607/2012 (Sup. Ct. N.Y. County, July 27, 2012); *Phoenix Light SF Ltd. v. JP Morgan Securities LLC,* No. 651755/2012 (Sup. Ct. N.Y. County, May 22, 2012); *Syncora Guarantee Inc. v. EMC Mortgage Corp.,* No. 650420/2012 (Sup. Ct. N.Y. County, Feb. 14, 2012) (Ramos, J.); *Deutsche Zentral-Genossenschaftsbank AG, New York Branch v. JPMorgan Chase & Co.,* No. 650293/2012 (Sup. Ct. N.Y. County, Jan. 30, 2012) (Sherwood, J.); *Sealink Funding Limited v. Bear Stearns & Co. Inc.,* No. 12-CV-01397-LTS (S.D.N.Y. Feb. 24, 2012) (Swain, J. ); *Ambac Assurance Corp. v. EMC Mortgage Corp.,* No. 650421/2011 (Sup. Ct., N.Y. County, July 18, 2011) (Ramos, J.); *Syncora Guarantee Inc. v. J.P. Morgan Sec. LLC,* No. 651566/2011 (Sup. Ct., N.Y. County, June 6, 2011) (Ramos, J.); *Assured Guaranty Corp. v. EMC Mortgage LLC,* No. 10-CV-5367-NRB (S.D.N.Y. Nov. 18, 2011) (Buchwald, J.); *Federal Housing Finance Agency v. JPMorgan Chase & Co.,* No. 11-CV-06188-DLC (S.D.N.Y. Sept. 2, 2011) (Cote, J.); *Fort Worth Emp. Ret. Fund v. JPMorgan Chase & Co.,* No. 09-CV-03701-JPO (S.D.N.Y.

## II.   THE PARTIES

### A.   PLAINTIFF

10.   Syncora (previously known as XL Capital Assurance Inc.) changed its name to Syncora Guarantee Inc. on August 4, 2008.  Syncora is a New York corporation with its principal place of business in New York, New York.  Syncora is a New York licensed monoline insurer which was previously engaged in the business of writing financial guaranty insurance.

### B.   DEFENDANTS

11.   Defendant EMC Mortgage LLC (defined above as "EMC") is organized under the laws of the State of Delaware and its principal place of business is 2780 Lake Vista Drive, Lewisville, Texas 75067.  EMC is a mortgage banking company that regularly transacts business in New York and in this County.  EMC was a wholly-owned subsidiary of The Bear Stearns Companies Inc. ("The Bear Stearns Companies") and is an affiliate of Bear Stearns.  Pursuant to a merger agreement effective May 30, 2008, JPMorgan Chase & Co. ("JPMorgan Chase") acquired the assets and operations of The Bear Stearns Companies, including Bear Stearns and EMC Mortgage Corporation, for nominal consideration in a transaction that was financed, in part, by a $29 billion non-recourse loan made by taxpayers (the "Merger").  Pursuant to the Merger, EMC Mortgage Corporation became wholly-owned by JPMorgan Chase.[6]  On or about March 31, 2011, EMC Mortgage Corporation underwent a change in form from a corporation to a limited liability company, and is now called EMC Mortgage LLC.

---

July 8, 2010) (Oetken, J.); *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No. 09-CV-03106-PAC (S.D.N.Y. Mar. 31, 2009) (Crotty, J.).

[6]  EMC's 7.1 Disclosure Statement filed April 21, 2009 in the action *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, No. 09 Civ. 3106 (S.D.N.Y.).

12.     Defendant JPMorgan Chase Bank, N.A. (defined above as "JPMC Bank") is a national banking association whose articles of association designate Columbus, Ohio as the location of its main office, and whose principal place of business is in New York, New York. On or about April 1, 2011, JPMC Bank acquired all or substantially all of EMC's assets, rendering EMC a shell entity. EMC has ceased independent business operations. EMC's website now describes EMC as "a brand of JPMorgan Chase Bank, N.A."[7] JPMC Bank has retained EMC's management and personnel, as well as EMC's physical locations. JPMC Bank is a continuation of EMC, as JPMC Bank succeeded to EMC's business and assumed EMC's obligations to service mortgage loans, including the Transaction, and JPMC Bank thus assumed the liabilities of EMC. JPMC Bank is a successor to EMC and is therefore liable for the conduct and obligations of EMC alleged herein.[8]

13.     Defendant Bear, Stearns & Co. Inc. (defined above as "Bear Stearns") is principally located at 383 Madison Avenue, New York, New York 10179. Bear Stearns was an SEC-registered broker dealer that served as the underwriter for the Transaction. Bear Stearns was a wholly-owned subsidiary of The Bear Stearns Companies. Pursuant to the Merger, Bear Stearns became a wholly-owned subsidiary of JPMorgan Chase. Following the Merger, on or about October 1, 2008, Bear Stearns merged with an existing subsidiary of JPMorgan Chase known as J.P. Morgan Securities Inc., and the resulting entity was called J.P. Morgan Securities Inc. Effective September 1, 2010, J.P. Morgan Securities Inc. was converted from a corporation to a limited liability company and changed its name to J.P. Morgan Securities LLC.

---

[7] EMC Mortgage® A Brand of JPMorgan Chase Bank, N.A., https://www.emcmortgagecorp.com (last visited October 4, 2012).

[8] See also the MLPAs § 23; I&I § 4.04(a) (the obligations of the I&I and MLPA shall be binding upon the signatory party's successors and assigns).

-6-

14.    Defendant J.P. Morgan Securities LLC (defined above as "JP Morgan") is a Delaware limited liability company with its principal place of business at 277 Park Avenue, New York, New York 10017. JP Morgan is a SEC-registered broker-dealer that engages in investment banking activities in the United States. JP Morgan is a continuation of Bear Stearns, and JP Morgan assumed the liabilities of Bear Stearns. JP Morgan is the successor to Bear Stearns and is therefore liable for the conduct and obligations of Bear Stearns alleged herein.[9]

15.    CMO Holdings III Ltd. (defined above as "CMO") is a Cayman Islands limited liability company located at c/o Maples Finance Limited, P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands. CMO acted as the issuer in this Transaction.

III.    **JURISDICTION AND VENUE**

16.    This Court has personal jurisdiction over the defendants pursuant to N.Y. C.P.L.R. §§ 301, 302, and 311.

17.    Bear Stearns, EMC, and CMO also have expressly consented to the jurisdiction of this Court over this action pursuant to Section 6.05(a) of the I&I.

18.    Venue is proper in New York County pursuant to N.Y. C.P.L.R. §§ 503(a) and 503(c).

19.    Venue is also proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this County and because Bear Stearns, EMC, and CMO have expressly consented to venue in this County pursuant to Section 6.05(a) of the I&I.

---

[9] I&I § 4.04(a); MLPAs §23.

## IV.   FACTUAL BACKGROUND

### A.   BEARS STEARNS – A SECURITIZATION MACHINE

20.     Between 2003 and 2006, Bear Stearns churned out hundreds of transactions similar to the four Underlying Transactions that contributed to the loan pools for the Transaction at issue in this lawsuit. Bear Stearns was at or near the top of the charts for volume of issuances and the underwriting of residential mortgage-backed securities for many years.[10]

21.     In fact, from 2003 to 2006, The Bear Stearns Companies' revenue increased by 123.8% and its profit increased by 77.6%, driven in large part by mortgage finance and its securitization transactions.[11] In 2006, The Bear Stearns Companies' overall securitization volume rose from $95 billion in fiscal year 2005 to $113 billion, amounting to 11% of the overall U.S. mortgage-securities market.[12] Clearly, residential mortgage-backed securitizations were big business for Bear Stearns. However, in early 2008 with the collapse of the Bear Stearns Companies, the truth came to light. The Bear Stearns' securitization machine was nothing more than a house of cards, supported not by real value and sound practices, but by Bear Stearns' desire to securitize as many loans as possible in order to generate the maximum amount of fees, without regard to the quality of the loans in the securitizations or the consequences to the

---

[10] *See* Issuers of Worldwide Asset-and Mortgage-Backed Securities in 2006, *available at:* http://www.abalert.com/ranking.php?rid=72 (ranking Bear Stearns as the fifth-largest issuer of mortgage-backed securities in 2006); Issuers of Worldwide ABS/MBS in 2005, *available at:* http://www.abalert.com/ranking.php?rid=94 (ranking Bear Stearns as the third-largest issuer of mortgage-backed securities in 2005); Issuers of Worldwide ABS/MBS in 2004, *available at:* http://www.abalert.com/ranking.php?rid=113 (ranking Bear Stearns as the fourth-largest issuer of mortgage-backed securities in 2004); First Amended Complaint at ¶ 37 n.14, *Syncora Guarantee Inc. v. J.P. Morgan Securities LLC,* No. 651566/2011 (Sup. Ct., N.Y. County, June 24, 2011) ("Syncora GP2007 State Court Complaint") (stating that, for 2006, "Bear Stearns ranked as the number one underwriter of MBS Securities [mortgage-backed securities] as the Company's securitization volume rose to $113 billion from $95 billion in fiscal 2005, capturing 11% of the overall U.S. mortgage securities market.").

[11] The Bear Stearns Companies Inc., Annual Report (Form 10-K), at 79 (November 30, 2006); The Bear Stearns Companies Inc., Annual Report (Form 10-K), at 77 (November 30, 2005).

[12] Syncora GP2007 Complaint, ¶ 37 n.14.

noteholders, the insurers, and others.  In the end, Bear Stearns sacrificed quality for greed, eventually leading to its very public demise.

### 1.  Bear Stearns Controlled Every Aspect of the Securitization Process

22.    Bear Stearns essentially controlled every aspect of the securitization process. This process entails the pooling and sale of mortgage loans within a trust, which then issues debt securities of varying seniority with payments dependent on, or "backed" by, the cash flow received from the pooled mortgage loans.

23.    The cash flow received from the mortgage loans is the mortgage borrowers' principal and interest payments, and this cash flow is then used to pay the investors who acquired rights to income flow by purchasing securities issued by the trust.  To ensure that investor payments are made, there needs to be a consistent cash flow from the mortgages.

24.    Specifically, Bear Stearns and/or its conduit, EMC, controlled:  (i) the origination and financing of the origination of enormous volumes of loans that flowed into the pools, (providing the cash flow for the mortgage-backed securities); (ii) the "warehousing" or temporary financing of large numbers of loans pending their pooling and sale into mortgage-backed securities; (iii) the due diligence, quality control, and loan repurchase protocols to be followed (or not followed) by EMC in relation to the mortgage-backed securities; (iv) the solicitation of the rating agencies to rate the mortgage-backed securities and financial guarantors such as Syncora to insure the mortgage-backed securities; (v) the underwriting, offering and sale of the mortgage-backed securities; (vi) the servicing of loan pools to ensure the continued cash flow needed to make payments under the mortgage-backed securities; and (vii) in certain instances, such as this Transaction, the repurchasing of certain securities, their resecuritizations and the subsequent sales of those resecuritizations.

25.    As Bear Stearns' parent, The Bear Stearns Companies, touted in its 2006 Annual Report that this "vertically integrated franchise allows us access to every step of the mortgage process, including origination, securitization, distribution and servicing."[13]

26.    EMC was integral to Bear Stearns in this process. From 2003 through 2005, EMC securitized about $143 billion in residential mortgage loans.[14]

27.    In its capacity as the sponsor of the securitization of the loans, and in conjunction with Bear Stearns, EMC would determine the structure of each securitization, initiate the securitization, purchase the mortgage loans to be securitized, review the loans, supposedly, to ensure their quality, and provide information to the credit rating agencies to secure investment grade ratings. In some instances, such as in this Transaction, EMC acted as "servicer" for a large number of the securitized loans requiring it to, among other things, collect payments and other amounts due from the borrowers for the benefit of the trusts.

28.    By controlling every step of the process, Bear Stearns, itself and through EMC, could and did make money every step of the way. Bear Stearns recorded gains on: (i) loan-origination fees on loans originated by Bear Stearns' affiliates; (ii) the proceeds of the sale of notes and certificates to investors as consideration for conveying securitized mortgage pools to the securitization trusts; (iii) fees from underwriting mortgage-backed securities; (iv) fees from servicing the securitized loans through EMC; (v) repurchase settlements; (vi) fees from resecuritizations into which these securities were repackaged; (vii) gains and fees from trading in these securities and interests in the resecuritizations into which they were placed; and (viii)

---

[13] The Bear Stearns Companies Inc., 2006 Annual Report, at 11 (2007), *available at* http://fliiby.com/file/198887/t028w7i05t.html.

[14] First Amended Complaint at ¶ 56, *Ambac Assurance Corp. v. EMC Mortgage Corp.*, No. 650421/2011 (Sup. Ct., N.Y. County July 18, 2011) ("Ambac Complaint").

management fees and carried interests from proprietary hedge funds and other investment
vehicles that invested in the vast array of securities and financial products structured by Bear
Stearns and its affiliates that ultimately were backed by residential mortgage loans.

### 2. Bear Stearns Drives Securitization Volume

29.    As market demand for mortgage-backed securities increased, Bear Stearns
increased the number of loans it purchased for securitization. To increase origination and
securitization volume, Bear Stearns, EMC, and the lenders they funded actively expanded their
use of "reduced documentation" or "no documentation" loan programs. Indeed, a Bear Stearns
February 28, 2006 internal audit report ("2006 Internal Audit Report") found that Bear Stearns
systematically issued reduced documentation loans to borrowers who misrepresented their
income, assets, employment, and intentions to occupy purchased properties.[15] The reduced
documentation programs allowed Bear Stearns to remain willfully blind to the inability of the
borrowers to repay their loans, which allowed them to close loans that they otherwise would
never be able to close. This allowed for a vastly increased pipeline of mortgages for
securitization.

30.    As the number of reduced documentation programs and second-lien products
grew, Bear Stearns did not take the necessary steps to ensure the quality of the products
promised to Syncora and investors. Instead, Bear Stearns engaged in systemic fraud by
concealing material facts regarding its actual securitization practices and internal protocols.[16]

---

[15] Complaint at ¶ 422, *Federal Housing Finance Agency v. JPMorgan Chase & Co.*, No. 11-CV-06188-DLC
(S.D.N.Y. Sept. 2, 2011) ("FHFA Complaint").

[16] *See Bear Naked Lenders*, Wall St. J., March 18, 2008, at A22 ("Bear took particular pride in its risk management,
but it let its standards slide in the hunt for higher returns during the mortgage mania earlier this decade.").

31.    A Bear Stearns 2006 Internal Audit Report disclosed that Bear Stearns reduced

the number of loans it reviewed during the due diligence process, eliminated internal reports on

defective loans, and conducted no due diligence if such due diligence would interfere with the

mortgage loan pools being securitized.[17]  Indeed, Bear Stearns Vice President Robert Durden

("Durden") ultimately admitted that loans were being securitized without conducting appropriate

due diligence.[18]

32.    The reduction in due diligence directly led to an increase in the inclusion of loans

that breached representations and warranties as to the quality and accuracy of the information in

the underlying loan files.  For example, in *Ambac Assurance Corp. v. EMC Mortg. Corp.*, No.

650421/2011 (Sup. Ct., N.Y. County), Ambac found that 90% of the 6,309 loans it reviewed in

the SACO 2005-10, SACO 2006-2, SACO 2006-8, and the BSSLT 2007-1 transactions had a

breach of EMC's representations and warranties.  These defects include "rampant fraud," failure

to disclose borrower's liabilities, "inflated and fraudulent appraisals," and "pervasive violations

of the loan originators' own underwriting guidelines and prudent mortgage-lending practices."[19]

In *Syncora Guarantee Inc. v. J.P. Morgan Securities LLC,* No. 651566/2011 (Sup. Ct. N.Y.

County), Syncora found that 85.5% of the loans reviewed in the GreenPoint Mortgage Funding

Trust 2007-HE1 ("GPMF 2007 HE-1") transaction breached one or more of the contractual

representations EMC made to Syncora.[20]  Finally, in *Syncora Guarantee Inc. v. EMC Mortgage

LLC,* No. 650420/2012 (Sup. Ct. N.Y. County), Syncora found that 81.9% of the loans reviewed

---

[17] FHFA Complaint, ¶ 415.

[18] FHFA Complaint, ¶ 234 (citing March 2006 email from Robert Durden: "I agree the flow loans were not flagged appropriately and we securitized many of them which are still to this day not cleared.  I think the ball was dropped big time on the flow processes involved in the post close [due diligence], from start to finish.").

[19] Ambac Complaint, ¶ 280.

[20] Syncora GP2007 State Court Complaint, ¶ 6.

in the SACO I Trust 2006-1 transaction had a material breach of one or more of the representations EMC made to Syncora.[21]

33.    This reduction in due diligence was so severe that a Bear Stearns deal manager in the SACO 2006-8 securitization referred to the quality of the underlying loans in the deal as a "shit breather" and "a sack of shit." [22]

34.    By neglecting origination and due diligence standards, Bear Stearns and EMC knowingly marketed and sold billions of dollars worth of securities in connection with these transactions which were backed by mortgage loans that did not conform to its warranties, representations, and disclosures. As such, it is no surprise that Bear Stearns took short positions, beginning at least as early as Fall 2007, betting against securitization counterparties, including financial guarantors such as Syncora, which it knew were vulnerable given that they had insured securitizations loaded with defective loans.[23]

3.    **Resecuritization Transactions**

35.    As a result of these inadequate origination and due diligence practices, the securitizations marketed and sold by Bear Stearns and EMC performed well below expectations. In response, Bear Stearns and EMC began resecuritizing some of the existing securitizations to appease current investors, to induce further investment, and to maintain the high profits and large transactional volumes they had grown accustomed to.

---

[21] Complaint at ¶ 110, *Syncora Guarantee Inc. v. EMC Mortgage LLC*, No. 650420/2012 (Sup. Ct. N.Y. County, Februaury 14, 2012).

[22] Abigail Field, *Did Bear Stearns Know Its Mortgage Securities Were a House of Cards*, (January 28, 2011), *available at* http://www.dailyfinance.com/2011/01/28/bear-stearns-mortgage-backed-securities-lawsuit-fraud-wells-fargo/; Ambac Complaint, ¶ 1.

[23] Syncora GP 2007 State Court Complaint, ¶ 34.

36.    These resecuritizations, or RE-REMICs, are structured by taking existing

securities backed by pools of assets that already received ratings from the rating agencies and re-

pooling them to create a new security.

37.    In these resecuritizations, a junior tranche that would not be insured is created to

protect the insurer against the weakest loans.  By doing so, Bear Stearns and EMC create an

allegedly more secure senior tranche of loans that can more easily be insured via a financial

guaranty insurance policy.  The insurance policy further increases the attractiveness of the senior

tranche of loans to investors.

38.    The end result of a resecuritization is that the underperforming tranches of loans

are resecuritized into a new security in which a large percentage of the total assets are

characterized as senior tranches of loans that are expected to perform on par with highly rated

loan pools and would have a higher payment priority.  However, despite the new senior

designations and Bear Stearns' and EMC's false representations to the contrary, the underlying

assets of the senior tranche of loans in the Transaction retained all the same problems that caused

the underperformance prior to the resecuritization.  Pitched as a solution for underperforming

loan pools, in reality the resecuritization in the Transaction was just a mask hiding and

aggravating the problems prevalent in the Bear Stearns' securitization machine — the ignoring

of origination and due diligence standards for the sake of maximizing loan volume and profit.

**B.    BEAR STEARNS SOLICITED SYNCORA TO
ISSUE FINANCIAL GUARANTY POLICIES**

39.    In early 2005, Bear Stearns began to solicit Syncora to issue financial guaranty

insurance policies for its mortgage-backed securities transactions.  As part of its regular

marketing routine, Bear Stearns hosted "Investor Day" Presentations for investors and insurers to

learn more about Bear Stearns' securitization practices, and to introduce EMC as Bear Stearns' mortgage loan conduit.

40.    Syncora attended an "Investor Day" Presentation in July 2005 and shortly thereafter, Bear Stearns began soliciting Syncora's participation in mortgage backed securities transactions. From July 2005 through July 2007, when this Transaction closed, Bear Stearns regularly solicited Syncora's involvement in such transactions.

41.    As set forth in detail below, in order to induce Syncora to insure the Transaction, Bear Stearns: (1) provided marketing presentations to Syncora and had multiple conversations with Syncora about Bear Stearns' securitization operations; (2) prepared and distributed data tapes, with allegedly updated FICO scores, and claimed that the tapes contained accurate representations about the key attributes of the individual loans in the proposed securitization pool; (3) promoted the AAA ratings secured in the Underlying Transactions from Standard & Poor's ("S&P") and Moody's Corporation ("Moody's"); and (4) sent Syncora a PPM, incorporating previously filed Prospectuses, MLPAs, and PSAs for the Underlying Transactions setting forth additional representations about the safety and soundness of the loan pool and the securitization process, as well as the associated risks of the Transaction.

42.    All of these representations were made to inspire confidence and trust in Bear Stearns' operations and to induce Syncora to insure the Transaction. However, Bear Stearns knew that the representations were false at the time they made them.

### 1. Marketing Presentations

43.    Bear Stearns routinely distributed power point presentations to investors and insurers, including Syncora, that were contemplating participating in a securitization transaction. These presentations (also known as marketing decks) contained numerous representations to

-15-

assure investors and insurers about the sound quality of Bear Stearns' securitization protocols and due diligence procedures and were designed to induce Syncora and others to participate in the transactions. In fact, Mary Haggerty ("Haggerty"), a Bear Stearns Senior Managing Director, confirmed that Bear Stearns understood that the information contained in the presentations "would contribute to the investor's decision to invest in the securitizations," and were made to "solicit their participation in transactions."[24]

44.    After forwarding the presentations to potential investors and insurers, Bear Stearns would follow up with phone calls and emails. The purpose of these communications was to reinforce what was contained in the presentations and give further assurances about the sound quality of the transaction at issue, in order to induce both investors' and insurers' participation.

45.    For example, on December 14, 2005 Cheryl Glory ("Glory"), Bear Stearns Managing Director, Mortgage Finance, sent an "Investor Presentation" to Linda Kobrin ("Kobrin"), Syncora Managing Director, Consumer ABS.[25]

46.    The Investor Presentation included the following representations:

- Skin in the Game: Bear Stearns represented that it "retained Back-End Interests in the Deals" or "Skin in the Game."

- Seller Approval and Monitoring: Bear Stearns lauded its purported processes for screening and monitoring the originators from which it purchased loans for its securitizations.

- Due Diligence: Bear Stearns described the "due diligence" protocols it purported to have implemented to prevent defective mortgage loans from entering the securitizations and remarked that "[u]nderstanding our risk upfront, through intensive due diligence provides a foundation for solid performance expectations."

---

[24] Syncora GP2007 State Court Complaint, ¶ 80 (citing January 29, 2010 Haggerty Rule 30(b)(6) Deposition Tr. at 113, 121).

[25] Email from Glory to Kobrin dated December 14, 2005, attaching Investor Presentation, dated October 17, 2005 ("Investor Presentation").

- **Quality Control**: Bear Stearns touted the quality control processes that it allegedly conducted after the securitization closed to identify and flush out any defective loans that may have circumvented its due diligence protocols.

- **Repurchase Processes**: Bear Stearns conveyed that it had an entire "conduit team" devoted to asserting breach-of-representation-and-warranty claims, on behalf of the securitization participants, for the repurchase of breaching loans through the quality control process.

- **Historical Performance**: Finally, Bear Stearns provided appendices with extensive data regarding the historical performance of its prior securitizations and the loans therein.

47.    Bear Stearns made these representations in the presentations, even though it knew they were false and misleading, because Bear Stearns knew that the investors and insurers, like Syncora, would rely on the information when assessing the inherent risk related to the Transaction.

48.    Two days later, on December 16, 2005, Kobrin, Glory and two other Bear Stearns executives participated in a conference call to review the representations made in the Investor Presentation and to specifically discuss EMC's Seller Approval Process.[26]

49.    On that call, Bear Stearns further represented that EMC conducts a comprehensive background check on all loan originators, and that it evaluates originators based on established criteria to weed out any originators that are considered too risky. Bear Stearns represented that the background check includes a review of the company's audited financials, underwriting guidelines, and policies and procedures. Only those originators who meet Bear Stearns' threshold requirements would be approved.[27]

---

[26] Contemporaneous notes of December 16, 2005 telephone call between Kobrin, Glory, Judy Duffek ("Duffek"), EMC Mortgage Corporation Associate Vice President, Seller Review & Approval, and Stephen Golden ("Golden"), Bear Stearns Managing Director, Warehouse and EMC Residential Mortgage President.

[27] *Id.*

50.    Next, Bear Stearns touted its ongoing review of the sellers that qualified for approval. Bear Stearns represented that its quality control department reviewed a statistical sample of all loans EMC acquired each month from every seller, which "usually [was] 10% of seller's total volume monthly."[28] Bear Stearns assured Syncora that its monthly quality control sample was stratified to ensure coverage of each of its various loan acquisition channels. In addition, Bear Stearns specifically represented that if any loan was 90 days delinquent, Bear Stearns would conduct a full re-underwriting of the loan, looking for signs of fraud.[29]

51.    These steps and assurances regarding Bear Stearns' and EMC's review processes were especially important to insurers such as Syncora when evaluating transactions sourced from multiple originators, such as in this Transaction.

52.    Furthermore, Bear Stearns represented that its quality control and repurchase processes were in place to identify defective loans and remove them from the pool. Specifically, Bear Stearns said that "its buyback procedure applies even after the loans are securitized."[30]

53.    Incredibly, as discussed in more detail in Section VI, Bear Stearns made all of these representations knowing full well that many of its practices and procedures related to its seller approval process, ongoing due diligence of the loans, and quality control reviews were flawed and needed a complete overhaul. Yet, Bear Stearns continued to make these representations anyway, hoping to continue to lure investors and insurers to participate in its transactions.

---

[28] *Id.*

[29] *Id.* ("Internal Post-Closing Q.C. - Any loan that goes 90 days delinquent gets full re-underwriting looking for fraud putbacks.").

[30] *Id.*

-18-

### 2. Data Tapes

54.     Bear Stearns' efforts to induce Syncora to insure the Transaction did not end with marketing presentations and oral communications. Bear Stearns and EMC also provided Syncora with mortgage data tapes purporting to list the precise data metrics pertaining to the critical attributes of the loans in the proposed securitization pool. To give Syncora further comfort, Bear Stearns and EMC warranted that the data tapes contained true and accurate information as to the underlying loans.[31] The provisions of the data tape and the representations as to its truth and accuracy obviated the need for Syncora to review the individual loan files themselves.

55.     The data tapes contained the following key metrics that Bear Stearns and EMC knew Syncora would rely on when evaluating the Transaction: (i) the combined loan to value ratio (CLTV) for each loan (which measures the total amount of mortgage debt that encumbers a property against the value of the property); (ii) the credit score (FICO) for each borrower (which is a statistical measure that predicts the likelihood a given borrower will make timely payments); (iii) the purpose of the loan; (iv) the pay history of the loan; (v) the "doc type" for each loan (explaining the program from which the loan was originated and the required information that the borrower disclosed concerning income, employment, and assets, as well as how such information would be verified, as fraud is more likely for loans that require less information); (vi) the zip code for each loan; and (vii) the seller/originator for each loan-all of which is critical when evaluating a borrower's ability and likelihood of satisfying the borrower's loan obligations.

---

[31] *See* I&I § 2.01(l).

56.    In addition, prior to closing this Transaction, the data tapes for the Underlying

Transactions were updated after the loans had several months to perform, or "season," and sent

to Syncora for analysis.

57.    As expected, Syncora relied on the warranted veracity of the data reflected in the

data tapes as a critical component in its decision to provide insurance for the Transaction.

Syncora used the data on the updated tapes as fixed inputs to its models and in analyzing the loan

metrics, which were essential steps in conducting its due diligence and assessing the risk

associated with the loan pool, including the expected rates of default by the borrower and

severity of loss on the related mortgages.

58.    Although Bear Stearns represented that the data tapes contained true and accurate

information, the loan level review since undertaken by Syncora demonstrates that the

information contained on the tapes was, in fact, false and misleading. The information contained

on the data tapes induced Syncora to enter into the I&I and issue the Policy. Had the data tapes

contained true and accurate information about the underlying loan pools, revealing the

substantial weaknesses of the pool, Syncora would have refused to enter into the I&I and to issue

its Policy.

### 3. Rating Agencies

59.    Bear Stearns did not secure new ratings from rating agencies such as S&P and

Moody's for the Transaction. Bear Stearns and EMC did, however, promote and induce

investors and insurers to rely on the 'AAA/Aaa' ratings that had previously been secured for the

Underlying Transactions.

60.    Bear Stearns and EMC knew that the investors and insurers relied on the ratings

for the Underlying Transactions in assessing the risk of this Transaction because the PPM

specifically states that each Underlying Certificate for the Underlying Transactions is rated 'AAA' by S&P and 'Aaa' by Moody's.[32]  Further, Bear Stearns was specifically aware that Syncora would not insure the Transaction, unless the Underlying Transaction had a 'AAA/Aaa' rating, because in a telephone conversation between Linda Kobrin (previously defined as "Kobrin"), Syncora Managing Director, Consumer ABS, and Jerome Thomas ("Thomas") of Bear Stearns, Kobrin explicitly informed Thomas that "we could only do AAAs."

61.    Additionally, the PPM further induced investor and insurer reliance on the 'AAA/Aaa' rating by referring prospective investors and insurers to the Prospectuses for the Underlying Transactions for information regarding the characteristics and structure of each of the Underlying Transactions.   Specifically, each of the Prospectus Supplements for the Underlying Transactions affirms that: "It is a condition of the issuance of the Offered Notes that each class of Offered Notes be assigned at least the rating designated below by Standard & Poor's and Moody's."[33]  This includes a 'AAA/Aaa' rating for the certificates securitized for this Transaction.

62.    S&P issued a 'AAA' rating and Moody's issued a 'Aaa' final rating for the Underlying Transactions, which were the published ratings on July 31, 2007 when Syncora agreed to insure the Transaction.

63.    These ratings were clearly based on false and misleading information as further evinced by the rapid downgrade shortly after the close of the Transaction.  Moody's downgraded the Underlying Transactions from a 'Aaa' rating to a 'Aa2' rating on August 16, 2007, just sixteen days after the close of the Transaction, and  S&P downgraded the Underlying

---

[32] Private Placement Memorandum, at iii.

[33] SL2 ProSupp, at 95; SL3 ProSupp, at 88; SL5 ProSupp, at 97; SL6 ProSupp, at 99.

Transactions from a "AAA" rating to a 'AAA-' on November 16, 2007. Approximately one year

later, the Underlying Transactions had been downgraded even further with S&P issuing a "junk"

'D' rating on November 24, 2008 and Moody's issuing a "junk" 'Ca' rating on October 8, 2008

for each of the Underlying Transactions. Based on the 84.9% material breach rate, and the rapid

downgrade of the Underlying Transactions, it is evident that the ratings for the Underlying

Transactions and the information contained on the data tapes on which they were secured were

not reliable despite Bear Stearns' and EMC's repeated representations to the contrary.

### 4.    Private Placement Memorandum

64.    Bear Stearns and CMO also used the Private Placement Memorandum (previously

defined as "PPM") to induce Syncora to insure the Transaction. The PPM summarizes the

Transaction, including but not limited to explanations of the parties involved, their roles, the

characteristics of the underlying loans, tax consequences, and the payment structure. The PPM

also specifically requests that the potential investors review the related Prospectuses for each of

the Underlying Transactions in conjunction with the PPM.

65.    Each of the Prospectuses for the Underlying Transactions were filed with the SEC

pursuant to the Securities Act of 1933. As a matter of law, Bear Stearns was required to: (i)

disclose all material facts concerning the securities offered; (ii) not make any untrue statement of

material fact concerning the securities; and (iii) not omit to state a material fact necessary to

make the statements made therein, in light of the circumstances in which they were made, not

misleading. Given these requirements, Syncora rightfully relied upon the truth and accuracy of

the representations in the Prospectuses related to each of the Underlying Transactions.

66.    The Prospectuses set forth the underwriting guidelines under which all of the

loans were initially originated. Depending on the transaction, between 75.48% to 78.94% of the

loans in the Underlying Transactions were purchased by EMC from various originators and were originated pursuant to General Underwriting Guidelines,[34] and between 20.92% to 24.30% of the loans in the Underlying Transactions were originated by Bear Stearns Residential Mortgage Corporation ("BSRM") pursuant to the BSRM Underwriting Guidelines.[35]

67.     Specifically, the Prospectuses touted that the General Underwriting Guidelines "are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan."[36]  The General Underwriting Guidelines require a credit report on each applicant from a credit reporting company.  In addition, the originator must review an applicant's source of income, calculate the amount of income from all sources indicated, review the credit history of the applicant, calculate the debt service to income ratio, if required, to determine the applicant's ability to repay the loan, and review the appraisal of the property.[37]

68.     Similarly the BSRM Underwriting Guidelines are "intended to make sure that (i) the loan terms relate to the borrower's ability to repay and that (ii) the value and marketability of the property are acceptable."[38]  Pursuant to the BSRM Underwriting Guidelines, all of the loans originated by BSRM are based on a loan application package completed by the applicant that includes information about the applicant's liabilities, income, credit history, and employment history, as well as certain other personal information.  The mortgage loan files also must contain a credit report on each applicant from an approved credit reporting company.  Finally, BSRM

---

[34] SL2 ProSupp at 29; SL3 ProSupp at 26; SL5 ProSupp at 29; SL6 ProSupp at 31.

[35] Id.

[36] SL2 ProSupp at 29-30; SL3 ProSupp at 26-27; SL5 ProSupp at 29-31; SL6 ProSupp at 31-32.

[37] Id.

[38] SL2 ProSupp at 30-32; SL3 ProSupp at 27-29; SL5 ProSupp at 31-33; SL6 ProSupp at 32-34.

represented that the BSRM Underwriting Guidelines are applied in accordance with a procedure that complies with all applicable federal and state laws and regulations.[39]

69.    In addition, the Prospectuses also contained detailed appendices purporting to represent the key attributes of the loan pool – information that was critical to assess the risk related to the Transaction such as CLTV ratios, DTI ratios, credit scores, property ownership characteristics, and document-types for each securitized loan.  Again, these representations were made to induce Syncora to insure the Transaction, as Bear Stearns knew that Syncora would rely on these important factors.

70.    Syncora did, in fact, rely upon these representations and had no reason to believe that the originators were not originating loans in accordance with their stated guidelines, that Bear Stearns misrepresented compliance with these guidelines, or that it failed to disclose flaws and lapses in its due diligence protocols about which it was aware.  The Material Breach Rate of 84.9%, however, demonstrates that the originators ignored their own standards in many instances, and that Bear Stearns' due diligence protocols were flawed in the first instance and then ignored entirely.

71.    Based on all of the above representations and factors, each of which was independently critical to Syncora's evaluation, Syncora decided to insure the Transaction.

## C.    THE TRANSACTION

72.    As noted previously, the Transaction involved the resecuritization of the Class A or the Class I-A certificates, depending on the terminology used in the Underlying Transaction, of pools of four outstanding 'AAA/Aaa' rated bonds backed by Alt. A, and sub-prime fixed-rate, closed-end loans secured by junior liens on residential property.

---

[39] *Id.*

-24-

73.     Loan performance was poor in the Underlying Transactions, which contained loans originated by BSRM and loans purchased by EMC from various originators through its conduit channels, and certain classes of bonds issued as part of the Underlying Transactions were put on negative watch in or around June 2007.  In response, Bear Stearns chose to resecuritize the loan pools so that the new security would contain loans expected to perform at a high level, and thus would be more easily insured.  With insurance, the cash stream to investors would be guaranteed, and Bear Stearns could more easily sell the Transaction.

74.     On or about July 31, 2007, Bear Stearns and CMO, the party that issued the Notes for the Transaction, entered into an Asset Sale Agreement, whereby Bear Stearns agreed to sell the Class A and Class I-A certificates from the four Underlying Transactions to CMO.

75.     Also, on or about July 31, 2007, CMO executed a Deed of Covenant which created from the Class A and Class I-A certificates from the Underlying Transactions, the Class A-1 Notes having an initial balance of $157,789,853.00 and Class A-2 Notes having an initial balance of $17,532,206.00 (the Class A-1 Notes together with the Class A-2 Notes constitute the "Notes").  The Notes consist of the senior most tranches from the Underlying Transactions that had the greatest amount of loss protection.

76.     Also, on or about July 31, 2007, CMO entered into a Fiscal Agency Agreement with The Bank of New York (London Office) ("BONY (London)"), as "Fiscal Agent," and the Bank of New York ("BONY"), as "Collateral Agent," whereby CMO agreed to issue the Notes. Bear Stearns marketed the Notes to investors by means of, *inter alia*, the PPM, the Fiscal Agency Agreement, the Prospectuses, other Operative Documents, and the certificates for the Underlying Transactions.  Investors who purchased the Notes are entitled to receive a portion of the cash flow realized by CMO from the certificates in the Underlying Transactions.

-25-

77.    Also, on or about July 31, 2007, Syncora entered into the I&I with Bear Stearns, as "Seller," EMC, as "Underlying Master Servicer," CMO, as "Issuer," BONY (London), as "Fiscal Agent," and BONY as "Collateral Agent." Under the I&I, Bear Stearns, EMC, and CMO represented and warranted that the information related to the Operative Documents, the certificates from the Underlying Transactions, the PSAs from the Underlying Transactions, and Bear Stearns', EMC's, and CMO's operations as a whole was true and accurate. The I&I also incorporated by reference the representations and warranties that EMC extended regarding the quality of the loans through the PSAs and MLPAs for each Underlying Transaction.[40]

78.    As noted above, in order to enhance the marketability of the securities, Bear Stearns sought to obtain a financial-guaranty insurance policy from Syncora. Relying on Bear Stearns' pre-contractual written and oral representations, the PPM, and the Prospectuses, and having secured Bear Stearns', EMC's, and CMO's additional representations and warranties in the I&I, Syncora agreed to issue the Policy insuring payments of interest and principal with respect to the Class A-1 Notes.

## D.    THE AGREEMENTS UNDERLYING THE TRANSACTION

79.    The Operative Documents govern the rights and obligations of the various parties to the Transaction. The principal Operative Documents are: (1) the I&I; (2) each of the four PSAs in the Underlying Transactions; and (3) each of the four MLPAs in the Underlying Transactions.

---

[40] I&I § 2.01(l).

80.    Each Operative Document has a different combination of parties and serves different purposes. Syncora is a direct party only to the I&I and is a specific third-party beneficiary of each of the MLPAs and PSAs in the Underlying Transactions.[41]

### 1. Insurance and Indemnity Agreement

81.    The parties to the I&I are Syncora, as "Insurer," EMC, as "Underlying Master Servicer," Bear Stearns, as "Seller," CMO, as "Issuer," BONY (London), as "Fiscal Agent," and BONY, as "Collateral Agent." The I&I is the only document governing the rights and obligations of the insurer and the rights and obligations to the insurer of the other parties to the I&I.

82.    Under the I&I, Syncora committed to issue the Policy guaranteeing certain payments of interest payable on the Class A-1 Notes and realized losses allocated to the Class A-1 Notes to BONY (London) for the benefit of the owners of the insured notes.

### a. Representations and Warranties Made by Bear Stearns, EMC, and CMO in the I&I

83.    The representations made by Bear Stearns, EMC, and CMO in the I&I contain two types of representations: loan-level representations and transaction-level representations.

84.    First, the I&I specifically reconfirms and rewarrants, as of the date of the I&I, the veracity of the representations Bear Stearns, EMC, and CMO made in the MLPAs and PSAs, as well as incorporates by reference for the benefit of Syncora the representations that EMC extended to Bear Stearns Asset Backed Securities I LLC ("BSABS"), as "Depositor," and to

---

[41] I&I §§ 2.01(n) & 2.02(j).

LaSalle Bank National Association, as "Trustee," in the PSAs; and to BSABS, as "Purchaser" in

the MLPAs.[42]

> I&I § 2.01(n): *"Operative Documents.* Each of the representations
> and warranties of EMC, the Seller [Bear Stearns], and the Issuer
> [CMO] contained in the applicable Operative Documents is true
> and correct in all material respects and each of EMC, the Seller
> and the Issuer hereby makes each such representation and warranty
> to, and for the benefit of, the Insurer as if the same were set forth
> in full herein. Each of EMC, the Seller and the Issuer will not at
> any time in the future deny that the Operative Documents to which
> it is a party constitute the legal, valid and binding obligations of
> EMC, the Seller and the Issuer, as applicable."

85.    Further, EMC's representations in the PSAs, made part of the I&I by § 2.01(n)

above, specifically incorporate by reference the representations that EMC made in Section 7 of

the MLPAs.[43] These representations pertain to the quality of the loan pool and the individual

loans (the "loan-level representations").

86.    As noted, the I&I also provides that Syncora is a third-party beneficiary of the

Operative Documents, with all rights afforded thereunder, including the representations,

warranties, and covenants that EMC made in each of the four Underlying Transactions' MLPAs

and PSAs:

> I&I § 2.02(j): *"Third-Party Beneficiary.* Each of the Seller [Bear
> Stearns], the Issuer [CMO] and EMC agrees that the Insurer shall
> have all rights provided to the Insurer in the Operative Documents
> and that the Insurer shall constitute a third-party beneficiary with
> respect to such rights in respect of the Operative Documents and
> hereby incorporates and restates its representations, warranties, and
> covenants as set forth therein for the benefit of the Insurer. The
> Insurer agrees that the rights it shall have as a third-party
> beneficiary under the Fiscal Agency Agreement shall be limited to
> the rights granted to it and to the Noteholders in the Fiscal Agency
> Agreement."

---

[42] Pursuant to Section 1.01 of the I&I the PSA is an Operative Document.

[43] *See* PSAs § 2.03(b)(vii).

87.    Second, the I&I contains transaction-level representations.  These representations deal directly with the information that Bear Stearns provided to Syncora in order to assess the risk associated with the Transaction.  These representations provide Syncora with broader representations and warranties than those contained in the Underlying Transactions' MLPAs and PSAs, and provide Syncora with even greater remedies for breaches of those commitments than those EMC had extended in the Underlying Transactions' MLPAs and PSAs.

88.    For example, Bear Stearns, EMC, and CMO represent and warrant that the Transaction information such as the data tape, Bear Stearns', EMC's, and CMO's operations as a whole, and the due diligence protocols, were true and accurate, and comply with industry regulations and standards:

> I&I § 2.01(l): "*Accuracy of Information.*  Neither the Operative Documents nor other material information relating to the Underlying Certificates, the Underlying Mortgage Loans, the operations of EMC, the Seller [Bear Stearns] or the Issuer [CMO] or the financial condition of EMC, the Seller or the Issuer (collectively, the "Documents"), as amended, supplemented or superseded, furnished to the Insurer in writing or in electronic form by EMC, the Seller or the Issuer contains any statement of a material fact which was untrue or misleading in any material respect when made. . . . Without limiting the generality of the foregoing, EMC represents that the information in the Data Tape with respect to each Underlying Mortgage Loan is true and correct as of the Closing Date."

> I&I § 2.01(m): "*Compliance with Securities Laws.* . . . [T]he Offering Document does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading . . . ."

-29-

### b. Syncora's Remedies Under the I&I

89.    The I&I also provides Syncora with certain broad remedies to address breaches by Bear Stearns, EMC, and CMO of their contractual obligations, including breaches of the representations and warranties made in the I&I.

90.    Pursuant to Section 5.02(a) of the I&I, Bear Stearns, EMC, and CMO agreed that upon the occurrence of an "Event of Default," which includes breaches of the loan-level representations in the MLPAs or PSAs, incorporated into the I&I, as well as the transaction-level representations in the I&I, Syncora may "take whatever action at law or in equity as may appear necessary or desirable in its judgment to collect the amounts, if any, then due under this Insurance Agreement . . . or to enforce performance and observance of any obligation, agreement or covenant of EMC or the Issuer under this Insurance Agreement or any other Operative Documents." In addition, Section 5.02(b) of the I&I provides that any and all remedies existing at law and in equity – including those available in the Operative Documents – are available to Syncora on a non-exclusive and cumulative basis.

91.    The I&I also provides Syncora with a remedy of indemnification for any claims, losses, or demands arising out of or relating to, among other things, any breach of a representation or warranty made by Bear Stearns, EMC, or CMO. Specifically, Section 3.04(a) of the I&I states:

> ". . . [E]ach of the Seller [Bear Stearns] and EMC, severally and
> not jointly, agree to pay, and to protect, indemnify and save
> harmless, the Insurer . . . from and against any and all claims,
> losses, liabilities (including penalties), actions, suits, judgments,
> demands, damages, costs or expenses (including reasonable fees
> and expenses of attorneys, consultants, and auditors and reasonable
> costs of investigations) of any nature arising out of or relating to
> the breach by it, or, with respect to EMC, the Issuer [CMO], of any
> of the representations or warranties contained in Section 2.01 or
> arising out of or relating to the transactions contemplated by the

Operative Documents by reason of: . . . the misfeasance or malfeasance of, or negligence, bad faith, willful misconduct or theft committed by, any director, officer, employee or agent of it, or, with respect to EMC, the Issuer, in connection with any Transaction arising from or relating to the Operative Documents; . . . the breach by it, or with respect to EMC, the Issuer, of any representation, warranty or covenant under any of the Operative Documents . . . ; any untrue statement or alleged untrue statement of a material fact contained in the Offering Document or any omission or alleged omission to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. . . ."

92.     Further, the I&I provides Syncora with the right to reimbursement for any

payments made under the Policy arising as a result of Bear Stearns' failure to substitute for, or

deposit an amount in respect of, any defective loan.  Specifically, Section 3.03(b) of the I&I

states:

". . . [T]he Seller [Bear Stearns] agrees to pay to the Insured, and the Insurer [Syncora] shall be entitled to reimbursement from the Seller [Bear Stearns] and shall have full recourse against the Seller [Bear Stearns] for any payment made under the Policy arising as a result of the Seller's [Bear Stearns'] failure to substitute for or deposit an amount in respect of any defective Underlying Mortgage Loan as required pursuant to the Underlying Pooling and Servicing Agreements, together with interest on any and all such amounts remaining unreimbursed . . . from the date such amounts became due until paid in full . . . ."

93.     Finally, the I&I provides Syncora with the right to reimbursement of any

expenses, including attorneys' fees, incurred by Syncora in enforcing EMC's obligations under

the Operative Documents.  Specifically, Section 3.03(c) of the I&I states:

"EMC agrees to pay to the Insurer [Syncora] any and all charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including reasonable attorneys' and accountants' fees and expenses, in connection with (i) the enforcement, defense or preservation of any rights in respect of any of the Operative Documents, including defending, monitoring or participating in any litigation or proceeding (including any insolvency proceeding in respect of any Transaction participant or any affiliate thereof)

relating to any of the Operative Documents, any party to any of the Operative Documents (in its capacity as such a party) or the Transaction . . . ."

## 2. The Pooling and Service Agreements

94.    The parties to the PSAs in the Underlying Transactions are BSABS as "Depositor," EMC as "Seller and Master Servicer," and Lasalle Bank National Association as "Trustee." The I&I makes Syncora a third party beneficiary of all Operative Documents, which includes the PSAs.[44]

95.    The purpose of the PSAs is the transfer of the trusts, containing the pool of loans, from the Depositor to the Trustee. In exchange, the Depositor receives certificates evidencing the entire beneficial ownership interest in the trusts.

### a. Representations and Warranties Made by EMC in the PSAs in Each of the Underlying Transactions

96.    Section 2.03(b)(vii) of the PSAs incorporates by reference the representations that EMC extended in Section 7 of the MLPAs. These representations are "loan level" representations pertaining to the quality of the loan pool and the individual loans:

> "With respect to each Mortgage Loan as of the Closing Date (or such other date as may be specified in Section 7 of the Mortgage Loan Purchase Agreement), the Seller [EMC] herby remakes and restates each of the representations and warranties set forth in Section 7 of the Mortgage Loan Purchase Agreement to the Depositor [BSABS] and the Trustee [Lasalle Bank National Association] to the same extent as if fully set forth herein."

### b. Prompt Notice of Breaches and the Repurchase Provision

97.    In further assurance that the loans in the pool complied with the numerous representations and warranties that EMC made in the MLPAs, the PSAs also require that all

---

[44] I&I §§ 2.01(n) & 2.02(j).

securitization participants promptly disclose any loan found to have been included in the Transaction in violation of any of those representations and warranties. Specifically, Section 2.03(c) of the PSAs provide, in pertinent part, as follows:

> "Upon discovery by any of the parties hereto of a breach or warranty set forth in the Mortgage Loan Purchase Agreement with respect to the Mortgage Loans that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt written notice thereof to the other parties."

98.     EMC also agreed that, should any of its loan-level representations and warranties made in the MLPAs prove untrue, it would either cure the breach(es), or remove or repurchase the breaching loan(s) from the pool. Specifically, Section 2.03(c) of the PSAs provides, in pertinent part, as follows:

> "The Seller [EMC] hereby covenants, with respect to the representations and warranties set forth in the Mortgage Loan Purchase Agreement with respect to the Mortgage Loans, that within 90 days of the discovery of a breach of any representation or warranty set forth therein that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, it shall cure such breach in all material respects and, if such breach is not so cured, (i) if such 90 day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan . . . from the Trust Fund and substitute in its place a Replacement Mortgage Loan . . . or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price . . . ."

**3.    Mortgage Loan Purchase Agreements**

99.     The parties to the MLPAs in the Underlying Transactions are EMC, in its capacity as the "Mortgage Loan Seller," and BSABS, in its capacity as "Purchaser."

100.    The purpose of the MLPAs is the sale of the pool of loans in the Underlying Transactions from the Mortgage Loan Seller to Purchaser, so that the loans can ultimately be securitized.

101.   EMC's extensive representations and warranties pertaining to the specific mortgage loans it pooled for each of the Underlying Transactions are set forth in the MLPAs and are specifically incorporated by reference in the PSAs and thus into the I&I for Syncora's benefit.[45]

### a. Representations and Warranties Made by EMC in the MLPAs in Each of the Underlying Transactions

102.   Section 7 of the MLPAs contains myriad representations and warranties by EMC, including representations and warranties about the underlying mortgage loans and about the business and practices of EMC as a Mortgage Loan Seller. Depending on the Underlying Transaction, EMC made between 25 to 38 representations regarding the loans in the pool. The representations listed below are among those that were breached by EMC:

> MLPA § 7(a): "the information set forth in the Mortgage Loan Schedule hereto is true and correct in all material respects;"
>
> MLPA § 7(c): "each Mortgage Loan at the time it was made complied in all material respects with all applicable local, state, and federal laws and regulations, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and all applicable predatory abusive and fair lending laws;"
>
> MLPA § 7(d): "there is no monetary default existing under any Mortgage or the related Mortgage Note and there is no material event, which, with the passage of time or with notice and the expiration of any grace period or cure period, would constitute a default, breach or event of acceleration;"
>
> MLPA § 7(f): "no selection procedure reasonably believed by the Mortgage Loan Seller [EMC] to be adverse to the interests of the Certificateholders was utilized in selecting the Mortgage Loans;"
>
> MLPA § 7(g): "each Mortgage is a valid and enforceable junior lien on the property securing the related Mortgage Note and each Mortgaged Property is owned by the Mortgagor in fee simple . . .

---

[45] I&I §§ 2.01(n) & 2.02(j).

-34-

or by leasehold for a term longer than the term of the related
Mortgage, subject only to (i) the lien of current real property taxes
and assessments, (ii) covenants, conditions and restrictions, rights
of way, easements and other matters of public record as of the date
of recording of such Mortgage, such exceptions being acceptable
to mortgage lending institutions generally or specifically reflected
in the appraisal obtained in connection with the origination of the
related Mortgage Loan or referred to in the lender's title insurance
policy delivered to the originator of the related Mortgage Loan and
(iii) other matters to which like properties are commonly subject
which do not materially interfere with the benefits of the security
intended to be provided by such Mortgage;"

MLPA § 7(j): "there is no valid offset, defense or counterclaim to
any Mortgage Note or Mortgage, including the obligation of the
Mortgagor to pay the unpaid principal and interest on such
Mortgage Note;"

MLPA § 7(n): "at the time of origination, each Mortgaged
Property was the subject of an appraisal which conformed to the
underwriting requirements of the originator of the Mortgage Loan
and, the appraisal is in a form acceptable to Fannie Mae or Freddie
Mac;"

MLPA § 7(o): "the improvements of each Mortgaged Property
securing a Mortgage Loan are insured . . . against loss by fire and
such hazards as are covered under a standard extended coverage
endorsement in the locale in which the Mortgaged Property is
located. . .."

MLPA § 7(q): "none of the Mortgage Loans are (a) loans subject
to 12 CFR Part 226.31, 12 CFR Part 226.32 or 12 CFR Part 226.34
of Regulation Z, the regulation implementing TILA, which
implements the Home Ownership and Equity Protection Act of
1994, as amended or (b) 'high cost home,' 'covered' (excluding
home loans defined as 'covered home loans' in the New Jersey
Home Ownership Security Act of 2002 that were originated
between November 26, 2003 and July 7, 2004), 'high risk home' or
'predatory' loans under any applicable state, federal or local law
(or a similarly classified loan using different terminology under a
law imposing heightened regulatory scrutiny or additional legal
liability for residential mortgage loans having high interest rates,
points and/or fees);"

MLPA§ 7(s): "no Mortgage Loan (a) is a 'high cost loan' or
'covered loan' as applicable as such terms are defined in the then

current Standard & Poor's LEVELS® Glossary, which is now
Version 5.7, Appendix E, attached hereto as Exhibit 6 or (b) was
originated on or after October 1, 2002 through March 6, 2003 and
is governed by the Georgia Fair Lending Act;"

MLPA§ 7(t): "each Mortgage Loan was originated in accordance
with the underwriting guidelines of the related originator;"

103.   In addition to the representations and warranties discussed above, which are

common to all four of the Underlying Transactions, EMC made the following additional

representation and warranty in the SL2 and SL3 MLPAs:

MLPA§ 7(m): "a lender's title insurance policy (on an ALTA
or CLTA form) or binder, or other assurance of title customary
in the relevant jurisdiction therefore in a form acceptable to
Fannie Mae or Freddie Mac, was issued on the date that each
Mortgage Loan was created by a title insurance company . . ."

104.   Similarly, EMC made the following additional representations and warranties

regarding insurance in the SL5 and SL6 MLPAs:

MLPA§ 7(m): "a lender's title insurance policy or binder, or
other assurance of title customary in the relevant jurisdiction
therefore in a form acceptable to Fannie Mae or Freddie Mac,
was issued on the date that each Mortgage Loan was created by
a title insurance company . . ."

MLPA § 7(z): "no refinance or purchase money mortgage loan
has an APR or total points and fees that exceed the thresholds set
by the Home Ownership and Equity Protection Act of 1994
('HOEPA') and its implementing regulations, including CFR §
226.32(a)(1)(i) and (ii)."

MLPA § 7(dd): "the methodology used . . . did not rely solely on
the extent of the borrower's equity in the collateral as the principal
determining factor in approving such extension of credit. The
methodology employed objective criteria such as the borrower's
income, assets and liabilities, to the proposed mortgage payment
and, based on such methodology, the Mortgage Loan's originator
made a reasonable determination that at the time of origination the
borrower had the ability to make timely payments on the Mortgage
Loan."

-36-

### b. Prompt Notice of Breaches and the Repurchase Provision

105.    In further assurance that the loans in the pool complied with the numerous representations and warranties, the MLPAs, like the PSAs, require that all securitization participants promptly disclose any loan found to have been included in the Transaction in violation of any of those representations and warranties.

106.    Specifically, Section 7 of the MLPAs provide, in pertinent part, as follows:

> "Upon discovery or receipt of notice by the Mortgage Loan Seller [EMC], the Purchaser [BSABS] or the Trustee [LaSalle Bank National Association] of a breach of any representation or warranty of the Mortgage Loan Seller set forth in this Section 7 which materially and adversely affects the value of the interests of the Purchaser, the Certificateholders or the Trustee in any of the Mortgage Loans delivered to the Purchaser pursuant to this Agreement, the party discovering or receiving notice of such breach shall give prompt written notice to the others."[46]

107.    EMC also agreed that, should any of its loan-level representations and warranties prove untrue, it would cure the breach(es) or remove the breaching loan(s) from the pool.

108.    Specifically, Section 7 of the MLPAs provide, in pertinent part, as follows:

> "In the case of any such breach of a representation or warranty set forth in this Section 7, within 90 days from the date of discovery by the Mortgage Loan Seller [EMC], or the date the Mortgage Loan Seller is notified by the party discovering or receiving notice of such breach (whichever occurs earlier), the Mortgage Loan Seller will (i) cure such breach in all material respects, (ii) purchase the affected Mortgage Loan at the applicable Purchase Price or (iii) if within two years of the Closing Date, substitute a qualifying Replacement Mortgage Loan in exchange for such Mortgage Loan . . . ."

---

[46] On March 14, 2012, Syncora provided written notice of the breaches of the representations and warranties identified in the Transaction Sample.

-37-

**E.   REPRESENTATIONS AND WARRANTIES IN THE I&I
REFLECT THE BARGAINED-FOR RISK ALLOCATION**

109.   The fundamental premise of the Transaction – evidenced by the extensive

representations and warranties made in the I&I and in the incorporated portions of the MLPAs

and PSAs – was that Bear Stearns, EMC, and CMO intended that Syncora would rely on the

representations and warranties in the I&I and Bear Stearns, EMC, and CMO would bear the risk

of loss in the event those representations were false.

110.   This bargained-for agreement was reasonable because Bear Stearns, EMC, and

CMO were the parties in the position to dictate the parameters of the loans included in the

Underlying Transactions, including their attributes and the guidelines pursuant to which they

were underwritten.  Bear Stearns also had the ability to conduct due diligence and purported to

conduct the requisite due diligence before, and quality control after, the loans were acquired.

Bear Stearns also had recourse against the originators in the event any loan was determined to be

defective or failed to comply with the represented attributes.

111.   As such, Bear Stearns, EMC, CMO, and Syncora each assumed different risks in

accordance with their respective roles in the Transaction.  Bear Stearns, as the sponsor and seller

(through EMC), and as the underwriter and deal manager, and CMO as the issuer, accepted the

origination and underwriting risk that the loans did not conform to the represented attributes and

underwriting guidelines.

112.   Syncora, as the insurer, in turn, agreed to bear the credit risk that loans with the

represented attributes and underwritten to the applicable guidelines would not perform due to

market risks or macro-economic changes that would impact the quality of the underlying loan

pools—as represented.  Typically, the credit risks that Syncora knowingly assumes for loans

bearing the represented attributes and underwritten to the applicable guidelines when issuing a

-38-

financial guaranty policy are: (i) changes in borrowers' creditworthiness over time; (ii) adverse macroeconomic developments; and (iii) geographic concentration. Syncora can measure and quantify these risks to a certain degree, and they are not subject to the control of the originators and EMC. Other default risks, such as misrepresentations in loan attributes, fraud, or abject failures in origination and underwriting practices, depend directly on the controls, due diligence protocols, and practices of the originators and EMC, and are peculiarly within their knowledge. These risks are not reasonably measurable or quantifiable by Syncora. As such, Syncora must rely on the representations and warranties of the originators and EMC. Consistent with this bargained-for and reasonable risk allocation between the parties, Syncora justifiably relied on Bear Stearns', EMC's, and CMO's representations and warranties, practices, and due diligence protocols.

113. Significantly, Syncora relied on the representations and warranties made in the I&I with respect to the accuracy of all the information on the updated data tapes that Syncora analyzed to gain comfort with the collateral, as well as Bear Stearns', EMC's, and CMO's representations as to their practices and due diligence protocols. In addition, Syncora was entitled to, and did, rely on the representations and warranties incorporated into the I&I from the MLPAs and PSAs of the Underlying Transactions that pertained to the quality of the loan pools and individual loans. Syncora was aware that this Transaction was a resecuritization, and, therefore, aware that the Underlying Transactions were underperforming, and it conducted its due diligence and measured its risks accordingly. Syncora, however, was not aware, and could not have been aware, that Bear Stearns had made myriad material misrepresentations about its securitization practices and due diligence protocols, and that the information on the data tape was in large parts inaccurate.

-39-

V.    **EMC'S PERVASIVE BREACHES**
      **OF ITS REPRESENTATIONS AND WARRANTIES**

114.    The loans sold to the trust in connection with the Transaction have failed miserably. As of August 25, 2012, only 2,050 of the 18,000 loans initially sold to the trust are current and 13,684 are in default or have been liquidated.

115.    The Transaction has experienced cumulative losses of $111,633,231.75 which has resulted in Syncora paying $94,059,025 in claim payments (net of reimbursements) to the insured Noteholders.

116.    To date, Syncora, through its pre-litigation analysis, has reviewed a total of 258 loans in the Transaction ("Transaction Sample"). The loans chosen for review constitute a representative sample of the loans in the pool for statistical purposes. The sample includes loans from the Transaction that include both defaulted loans and loans still current in payments.

117.    An analysis of the 258 loans in the Transaction Sample reveals that 219 loans, or 84.9% of the loans, had a material breach of one or more of the representations made in Section 7 of the respective MLPAs. The average loan with a material breach had 2.85 breaches, resulting in a total of 624 material breaches in the Transaction Sample. Since the Transaction Sample was statistically representative of the entire pool, the Transaction Sample breach rate is reflective of the breach rate of the entire pool. Based upon the statistical sample, there is a 95% probability that between 80.5% and 89.3% of the loans for the entire loan pool have at least one material breach.

118.    The reviewed loans contain one or, in most cases as noted above, multiple defects that constitute a breach of one or more of the numerous representations and warranties made by EMC in the PSAs and MLPAs. These defects include:

-40-

- Misrepresentations contained on the loan tape, including: (a) inaccurate CLTV; (b) inaccurate DTI ratios; (c) inflated FICO scores; (d) misrepresentations regarding the borrower's debt obligations; (e) misrepresentations regarding the borrower's income; (f) misrepresentations regarding the borrower's employment; and (g) misrepresentations regarding the borrower's occupancy intentions.

- Pervasive breaches of the underwriting guidelines, including: (a) loans extended to borrowers who did not meet the DTI guidelines; (b) loans extended to borrowers who did not meet the CLTV guidelines; (c) failure to verify employment; (d) stated income was not reasonable; (e) failure to obtain housing history; (f) failure to obtain qualified appraisals; (g) failure to obtain final Uniform Residential Loan Applications; (h) failure to demonstrate ability of borrowers to repay the loans; (i) the underlying assets were not seasoned; (j) failure to obtain required documentation; (k) failure to obtain required insurance documents; (l) insufficient credit history, reserves, or asset documentation; and (m) the transaction was not arms-length.

119.    Each of the defects described above that were identified through Syncora's loan level analysis constitute a breach of one or more of EMC's loan-level representations and warranties as stated in the PSAs and MLPAs that materially and adversely affect Syncora's interest in the loan pool. These loan-level representations and warranties, made in the PSAs and MLPAs, were also made part of the I&I, and, therefore, their breach also constitutes a breach of the transactional-level representations and warranties made in the I&I. Moreover, the defects additionally constitute material breaches of EMC's broader, transaction-level representations and warranties about the absence of material misstatements or omissions in the information provided to Syncora regarding Bear Stearns' and EMC's mortgage lending practices, and consequently, constitutes a further material breach of the I&I.

-41-

## VI.  BEAR STEARNS AND EMC FRAUDULENTLY INDUCED SYNCORA TO INSURE THE TRANSACTION

120.    As noted above, Bear Stearns and EMC repeatedly made materially false and misleading representations to Syncora to induce Syncora to insure the Transaction.  As discussed previously in Section IV, in marketing presentations, the PPM, Prospectuses, and in oral and written communications, Bear Stearns and EMC routinely touted their due diligence protocols and quality control efforts to assuage any concerns about the quality of the loans in the Transaction and to induce Syncora to insure the Transaction.

121.    In reality, these representations were false.  Bear Stearns did not engage in the extensive due diligence and quality control efforts it regularly detailed to Syncora, as is evidenced, *inter alia*, by the 84.9% Material Breach Rate in the Transaction.  Instead, without disclosing it to Syncora, Bear Stearns reduced its due diligence efforts and abandoned quality control measures – all in order to securitize more loans and in contrast to what it was representing to investors and insurers in external communications.

122.    The failure to conduct the extensive due diligence and quality control efforts that Bear Stearns and EMC routinely promoted to insurers and investors is a systemic failure that infected the entire Bear Stearns' securitization machine, including this Transaction.  As demonstrated below, Bear Stearns knew about this systemic failure and fraudulently concealed it.

### A.  BEAR STEARNS' REPRESENTATIONS REGARDING DUE DILIGENCE WERE FALSE AND MISLEADING

123.    Bear Stearns' representations regarding its due diligence protocols were materially false and misleading because Bear Stearns did not disclose, among other things, that it: (i) knew its due diligence protocols were flawed, but chose not to correct them; (ii) chose to ignore its due diligence protocols so as to securitize the maximum number of loans as quickly as

-42-

possible; and (iii) knew the loans it accepted from third party originators failed to meet underwriting guidelines.

### 1. Bear Stearns Knew Its Due Diligence Protocols Were Flawed

124.    At about the same time that Bear Stearns was outwardly making representations to Syncora about the quality of its due diligence protocols, individuals at Bear Stearns were internally sounding alarms about the due diligence protocols and recommending significant changes.  Those warnings were ignored.

125.    Starting in or about April 2005, Bear Stearns Vice President of Due Diligence, John Mongelluzzo ("Mongelluzzo"), attempted to persuade his supervisors to modify and improve the due diligence process in order to prevent the purchase and securitization of defective loans.  Upon information and belief, he made these recommendations because it was known within Bear Stearns at the time that the due diligence protocols in place were not effective in screening out defective loans from the securitizations.

126.    For example, in May 2005, Mongelluzzo proposed changes that would increase the level of scrutiny on loans that were considered high risk before the due diligence review was ever conducted.  Specifically, Mongelluzzo proposed that EMC "identify the top 25% of loans with the sample that we feel pose the largest risk potential.  Both Clayton and [PricewaterhouseCoopers] upon having those loans tagged/identified can place their most seasoned underwriters to review the loans and also perform additional QC on the loans.  Both of these processes are ones that we can use to market our process to investors and the rating agencies going forward."[47]  This proposal was ignored by Bear Stearns.

---

[47] Syncora GP2007 State Court Complaint, ¶ 124 n. 123 (citing email from Mongelluzzo to Mary Haggerty (previously defined as "Haggerty"), Bear Stearns Senior Managing Director, and Baron Silverstein ("Silverstein"), Bear Stearns Senior Managing Director, Co-head, Mortgage Finance, dated May 11, 2005).

127.    Mongelluzzo made the same proposal again two years later, demonstrating that
these deficiencies remained uncorrected and that Bear Stearns was still failing to screen out
defective loans at the time of the Transaction. Specifically, on March 6, 2007, Mongelluzzo
informed his supervisor that "I think we need to completely revamp how we do due diligence,"
recommending that "based on that risk score we would determine the type of diligence to be
done. The highest level of risk would get the most comprehensive review." [48] Mongelluzzo's
second attempt to revamp Bear Stearns' due diligence protocol was similarly ignored. A Bear
Stearns Senior Managing Director, Co-head, Mortgage Finance, Baron Silverstein (previously
defined as "Silverstein") later characterized Mongelluzzo's proposed change as "significant" and
not mere "incremental Darwinian creep" in the evolution of due diligence processes. [49]

128.    Also, in May 2005, Mongelluzzo made an additional proposal to track and
monitor the results of Bear Stearns' decisions to override and include in securitization pools
certain loans that third-party diligence firms, which  review and re-underwrite loans, such as
Clayton Holdings LLC ("Clayton"), Watterson Prime, and PricewaterhouseCoopers ("PWC") [50]
had deemed to be too risky to be included in the securitization. Specifically, Mongelluzzo
proposed "to track loans that are overridden by our due diligence managers and track the
performance of those loans." [51] Individuals in Bear Stearns' due diligence department advised
Mary Haggerty (previously defined as "Haggerty"), a Bear Stearns Senior Managing Director,
that Bear Stearns should keep and review the due diligence firms' analysis, thereby allowing

---

[48] Ambac Complaint, ¶ 123 n. 148 (citing email from Mongelluzzo to Haggerty and Silverstein, dated March 6, 2007).

[49] Syncora GP2007 State Court Complaint, ¶ 124 (citing June 4, 2010 Silverstein Deposition Tr. at 178; April 21, 2010 Mongelluzzo Deposition Tr. at 172).

[50] PWC acquired Watterson Prime in 2001.

[51] Syncora GP2007 State Court Complaint, ¶ 125 (citing email from Mongelluzzo to Haggerty and Silverstein, dated May 11, 2005).

-44-

Bear Stearns to track "trends in the reason for rejection" and for "trades that actually turn into deals [to] determine how different credit performance is for loans that had been flagged as 'exceptions'[52] vs. those that were not."[53] By tracking this information, Bear Stearns could effectively monitor the credit performance of its loans to more successfully make decisions evaluating the credit risk of riskier loans.

129.    This proposal was similarly ignored, despite the fact that Mongelluzzo was one of the Bear Stearns employees who was most involved with the due diligence process.[54] Bear Stearns did not review the third-party due diligence reports, instead, Bear Stearns' underwriting managers were instructed to "[p]urge all of the older reports on the trade leaving only the final reports."[55] Pursuant to this policy, copies of "daily reports" submitted by the due diligence firms were discarded.[56] By systematically discarding the daily reports, Bear Stearns was destroying evidence of audit trails concerning the frequent occasions when Bear Stearns overrode third-party due diligence recommendations to exclude certain loans in securitizations because they were too risky.

130.    As Bear Stearns was internally questioning its due diligence protocols and making suggestions to change its policies, executives were publicly extolling the very same due diligence protocols and asking Syncora to rely on them.

---

[52] Exceptions are those loans that did not meet underwriting guidelines but were included in the securitization anyway.

[53] Syncora GP2007 State Court Complaint, ¶ 125 (citing Haggerty email, dated April 25, 2005).

[54] Syncora GP2007 State Court Complaint, ¶ 124 (citing April 21, 2010 Mongelluzzo Deposition Tr. at 175).

[55] Syncora GP2007 State Court Complaint, ¶ 126 (citing EMC Conduit Manual, Bulk Underwriting Chapter, dated April 30, 2005, at 524).

[56] Id.

## 2. Bear Stearns' Due Diligence Protocols Were Ignored, so as to Ensure Maximum Securitization of Loans

131.    Not only did Bear Stearns refuse to improve its due diligence protocols, it did not even adhere to its existing protocols. This was done so that it could increase the volume and rate at which loans were securitized.

132.    Bear Stearns implemented due diligence protocols whereby "[d]ue diligence reviewers were directed not to spend too much time on a loan (or not to 'get married to' the loan), and were rewarded for reviewing loans quickly. They were reminded that the loans were already 'closed,' and that the borrowers had already moved into their homes. In other words, due diligence reviewers were made to understand that because the loans could not be undone, a thorough reevaluation of loan quality was unnecessary and even pointless."[57]

133.    As early as February 11, 2005, Haggerty e-mailed Mongelluzzo with instructions to reduce the amount of due diligence conducted "in order to make us more competitive on bids with larger sub-prime sellers."[58] Indeed, Haggerty conceded that reducing due diligence was an accommodation to the suppliers to ensure a steady supply of mortgage loans for Bear Stearns to securitize.[59]

134.    Throughout 2005, Bear Stearns further weakened its securitization process by ignoring its established guideline that it would securitize only those loans that were beyond the 30-to-90 day early payment default ("EPD") period. According to its internal guidelines, loans in which payments were missed within the EPD period, were likely to "contain some form of

---

[57] Complaint at ¶ 51, *People of the State of New York v. J.P. Morgan Securities LLC* (Sup. Ct., N.Y. County October 1, 2012) ("NY Attorney General Complaint").

[58] FHFA Complaint, ¶ 413.

[59] Syncora GP2007 State Court Complaint, ¶ 136 (citing January 29, 2010 Haggerty Rule 30(b)(6) Deposition Tr. at 194).

misrepresentations and should not have been made."[60] However, beginning in 2005, Bear Stearns encouraged EMC to securitize loans before the expiration of the 30-to 90-day EPD period, contrary to its prior policy.[61]

135.    By securitizing loans as quickly as possible after acquisition and before the EPD period expired, EMC avoided the possibility of a default or delinquency within this 30-to 90-day window, which would otherwise have rendered the loans unsecuritizable. This allowed EMC to enhance earnings by increasing the volume of its securitizations.[62] The implementation of this new "rapid securitization" policy was later encouraged by Chris Scott ("Scott"), a Bear Stearns Senior Managing Director from the Trading Desk, who told Robert Durden (previously defined as "Durden"), Bear Stearns Vice President, and Keith Lind ("Lind"), another Bear Stearns Senior Managing Director from the Trading Desk, that he "want[s] to see everything regardless of EPDs" in response to an inquiry as to whether to keep the policy in place of holding loans through EPD protection period.[63]

136.    Jeffrey Verschleiser ("Verschleiser"), Bear Stearns Managing Director, Head of the ABS & Whole Loan Desk, also encouraged this rapid and intentionally lax securitization process. In or about December 2005, Verschleiser ordered Bear Stearns' deal managers and traders to start securitizing all "the subprime loans closed in December for the conduit" by January, well before the expiration of the EPD period.[64] By June 2006, Verschleiser told Bear

---

[60] FHFA Complaint, ¶ 232.

[61] FHFA Complaint, ¶ 231.

[62] FHFA Complaint, ¶ 232.

[63] Ambac Complaint, ¶ 141 (citing email from Scott to, among others, Durden and Lind, dated January 3, 2006).

[64] FHFA Complaint, ¶ 233.

-47-

Stearns' deal managers that Bears Stearns should "be certain we can securitize the loans with 1

month epd before the epd period expires."[65]

137.    On April 4, 2006, pursuant to Verschleiser's orders, Jo-Karen Whitlock

("Whitlock"), EMC's Senior Vice President of Conduit Operations, pressured her staff to fund at

least 500 loans every day:

> I refuse to receive any more emails from [Verschleiser] (or anyone
> else) questioning why we're not funding more loans each day. I'm
> holding each of you responsible for making sure we fund at least
> 500 each and every day. . . . [I]f we have 500+ loans in this office
> we MUST find a way to underwrite them and buy them. . . . I was
> not happy when I saw the funding numbers and I knew that NY
> would NOT BE HAPPY. I expect to see 500+ each day. . . . I'll
> do whatever is necessary to make sure you're successful in
> meeting this objective.[66]

138.    In September 2006, Bear Stearns executives decreed that $2 billion in mortgage

loans must be purchased and underwritten in a single month.  To execute that order, Whitlock

demanded that her staff work overtime to meet the $2 billion September target, stating that she

didn't "understand that with weekend overtime why we didn't purchase more loans today

(Monday) . . . Our funding needs to be $2 billion this month . . . I expect to see ALL employees

working overtime this week to make sure we hit the target number."[67]  "Multiple confidential

witnesses, former employees of EMC, have confirmed Defendants' 'whatever is necessary'

approach to achieve aggressive volume goals."[68]

139.    In addition to securitizing loans before the EPD period lapsed, Bear Stearns also

rushed EMC analysts to conduct their loan analysis in only one to three days so that Bear Stearns

---

[65] Ambac Complaint, ¶ 142 (citing email from Verschleiser to Haggerty, among others, dated June 13, 2006).

[66] Ambac Complaint, ¶ 136 (citing email from Whitlock to her staff, dated April 14, 2006).

[67] Ambac Complaint, ¶ 136 (citing email from Whitlock to her staff, dated September 26, 2006).

[68] NY Attorney General Complaint, ¶ 57.

did not have to incur the cost of carrying the loans on its books. To conduct such rapid analysis, EMC analysts were told to take shortcuts. For example, EMC analysts were encouraged to fabricate data such as FICO scores if the lenders they purchased loans from did not promptly provide such missing data.[69] In other cases, when EMC analysts did not know if loans should be classified as "no documentation" or "full documentation" loans, Bear Stearns would make a "snap decision" on classification without in-depth research regarding the documentation.[70] The discrepancy between the data tapes and the mortgage files with respect to FICO scores and documentation levels in the Transactions is likely a result of these falsifications and snap decisions.

140.    In general, Bear Stearns put profit before quality by making the loan type "fit" a proposed securitization rather than focusing on the quality of the loan and the information it received about the loan. According to an EMC analyst, Bear Stearns' rationale was that, "we didn't want to overpay for the loans, but we don't want to waste the resources on deep investigation: that's not how the company makes money. That's not our competitive advantage—it eats into profits."[71] Accordingly, analysts were instructed to revise loan types to less risky classifications by manipulating data such as documentation type.[72]

141.    Bear Stearns' watered down due diligence policies were laid out in a February 28, 2006 Internal Audit Report. The report stated that Bear Stearns reduced the number of loans in the loan samples that were reviewed as part of the due diligence process, eliminated internal

---

[69] Teri Buhl, *More Corruption: Bear Stearns Falsified Information as Raters Shrugged*, The Atlantic, May 14, 2010, *available at* http://www.theatlantic.com/business/archive/2010/05/more-corruption-bear-stearns-falsified-information-as-raters-shrugged/56753/.

[70] *Id.*

[71] *Id.*

[72] Syncora GP2007 State Court Complaint, ¶ 137 (citing email from Matthew Van Leeuwen, Bear Stearns Analyst, Trade Support, to Dylan Hoyt, Bear Stearns Due Diligence Underwriter, dated May 16, 2005).

reports on defective loans, and conducted no due diligence if such due diligence would interfere with mortgage loan pools being securitized.[73] Bear Stearns also systematically issued reduced documentation loans to borrowers who misrepresented their income, assets, employment, and intentions to occupy purchased properties.[74] By following these risky policies, Bear Stearns was ignoring clear red flags and closing loans that never should have been made at all, let alone included in securitizations.

142. Haggerty, in an interview with the Financial Crisis Inquiry Commission, further affirmed that Bear Stearns' underwriting standards declined from 2003 to 2007. She explained that during this time, the maximum accepted loan to value ratio increased, and more and more loans were accepted with reduced documentation.[75]

143. In March 2006, Durden admitted in an email that many previous loans purchased by EMC were securitized without any due diligence clearance: "I agree the flow loans were not flagged appropriately and we securitized many of them which are still to this day not cleared. I think the ball was dropped big time on the flow processes involved in the post close [due diligence], from start to finish."[76]

144. Other Bear Stearns executives similarly acknowledged the failures of its due diligence process. When Bear Stearns Chairman and CEO, James Cayne ("Cayne"), was pointedly asked during the Financial Crisis Inquiry Commission hearings if he thought that ". . . due diligence along the [mortgage securitization] process . . . might have been better" had the

---

[73] FHFA Complaint, ¶ 415.

[74] FHFA Complaint, ¶ 422.

[75] FCIC Staff Interview with Mary Haggerty, Bear Stearns (August 17, 2010), *available at* http://fcic.law.stanford.edu/resource/interviews.

[76] FHFA Complaint, ¶ 234.

parties taken more of a stake in long-term performance, he responded by saying "I think you're right." When former Bear Stearns CEO, Alan Schwartz, was asked the same question he concurred with Cayne by stating "I think you're on to a very good point."[77]

### 3. Bear Stearns Hid Problems with Its Due Diligence Firms and Ignored Their Findings

145.    Clayton, Watterson, and PWC were the primary firms that Bear Stearns utilized to conduct third-party due diligence.[78]  Syncora relied on the fact that these third parties conducted due diligence on the loans.  In reality, however, these firms were not effective in screening out defective loans, in part because Bear Stearns directed them to disregard their normal practices and protocols, and in part because Bear Stearns often ignored their findings.  Moreover, Bear Stearns had knowledge of the due diligence firms' ineffectiveness and failed to disclose it to Syncora.

### a.  Bear Stearns Had Knowledge of the Due Diligence Firms' Deficiencies

146.    As early as November 1, 2005, Bear Stearns was aware that its due diligence firms were conducting deficient due diligence and began to keep a record of the material issues that they were missing in their reviews.  Specifically, Verschleiser requested that EMC "start logging loans that [EMC] believe[s] Clayton or PWC missed material issues on . . . start the list with the loans from yesterday and let's keep it on the shared drive."[79]

---

[77] Syncora GP2007 State Court Complaint, ¶ 59.

[78] FCIC Staff Interview with Mary Haggerty, Bear Stearns (August 17, 2010), *available at* http://fcic.law.stanford.edu/resource/interviews.

[79] Ambac Complaint, ¶ 124 n.151 (citing email from Stephen Golden, Bear Stearns Managing Director, Warehouse and EMC Residential Mortgage President (previously defined as "Golden"), dated November 1, 2005).

147.    By March 2006, the due diligence firms' performance had suffered so much that Mongelluzzo proposed that the entire due diligence process be brought in-house.[80]

148.    Verschleiser agreed with Mongelluzzo and even went so far as to assert that Bear Stearns was "wasting way too much money on Bad Due Diligence."[81]

149.    When asked whether Clayton assessed the reasonableness of borrowers' incomes between 2004 and 2006, Mongelluzzo admitted that Clayton "looked at it back then but not as hard."[82]

150.    Bear Stearns was also well aware of Watterson Prime's inability to adequately conduct due diligence.[83] Pattie Sears ("Sears"), an EMC due diligence manager who served as the point of contact with Watterson Prime, recommended to Debbie Rich ("Rich"), EMC Mortgage Corporation, Quality Control, that the firm not be hired in the future as it "does not always deliver."[84]

151.    In fact, Watterson Prime's due diligence performance became so deficient that in April 2007, Mongelluzzo made the decision to stop using Watterson Prime for due diligence services.[85] EMC manager Jose Carrion, however, did not want investors to know that EMC was no longer using Watterson Prime for due diligence because he believed that it would call into

---

[80] Ambac Complaint, ¶ 124 (citing email from Verschleiser to, among others, Michael Nierenberg ("Nierenberg"), Bear Stearns Senior Managing Director, Head of ARM and CDO Desk, dated March 23, 2006) (responding to Mongelluzzo's proposal).

[81] Ambac Complaint, ¶ 125 (citing email from Verschleiser to, among others, Nierenberg, dated March 23, 2006).

[82] Ambac Complaint, ¶ 126 (citing email from Mongelluzzo to Glory, dated August 30, 2007).

[83] Ambac Complaint, ¶ 127 (citing email from Jose Carrion ("Carrion"), EMC, Subprime Underwriting Manager, to, among others, Haggerty, Silverstein, and Whitlock, dated December 19, 2006 ("Due to a back log on receiving reports and failure to meet deadlines until further notice, do not assign any new trades to Watterson-Prime without my prior approval.")).

[84] Ambac Complaint, ¶ 127 (citing email from Sears to Rich, dated July 16, 2008).

[85] Ambac Complaint, ¶ 127 (citing email from Mongelluzzo to, among others, Sears and Carrion, dated April 13, 2007).

question the quality of the loans underwritten by Watterson Prime, and so he instructed the due diligence department to "make sure this stays within EMC only."[86]

### b. Bear Stearns Ignored Its Due Diligence Firms' Findings

152.    Bear Stearns further contributed to its due diligence firms' ineffectiveness by weakening and ignoring underwriting guidelines that the due diligence firms were instructed to apply, and by ignoring the due diligence firms' findings.

153.    Clayton president D. Keith Johnson ("Johnson") stated that initially Clayton's focus during its due diligence was on whether a loan would perform or not. That changed, however, and pursuant to Bear Stearns' directives the focus became whether or not a loan met the guidelines, without any regard for whether the guidelines were worthwhile: "Old due diligence was good loan/bad loan . . . We think the money is going to be paid on this loan to where diligence migrated to does it meet the guidelines or not meet the guidelines? Forget if the guidelines are crap . . . And that's a major distinction . . . ."[87] This change in focus led to a change in loan performance.

154.    Furthermore, Clayton's Vice President, Vicki Beal, testified that Bear Stearns was made fully aware on a regular basis that a significant percentage of its loans failed to meet even Bear Stearns' weakened underwriting guidelines, but Bear Stearns accepted these loans anyway.[88]

155.    According to Clayton, Bear Stearns included loans in the securitizations that fell outside the underwriting guidelines and involved "[l]oan Characteristics [that] do not match any

---

[86] Ambac Complaint, ¶ 127 (citing email from Carrion to, among others, Whitlock and Sears, dated April 13, 2007).

[87] FCIC Interview with D. Keith Johnson, Clayton Holdings, LLC (September 2, 2010), *available at* http://fcic.law.stanford.edu/resource/interviews.

[88] FHFA Complaint, ¶ 392.

available program."[89]   The top five loan defects waived by Bear Stearns related to

Terms/Guidelines, Credit History, Assets, Income/Employment and Appraisal; defects that are

material and should not have been waived.[90]

156.    Tracey Warren ("Warren"), a consultant who performed due diligence at both

Watterson Prime and Clayton, stated that in order to comply with Bear Stearns' directives for a

limited review, Watterson Prime instructed its reviewers to include loans for securitizations, even

if the reviewer reasonably believed that the borrower did not have the ability to repay the loan or

if the stated income seemed unreasonable.[91]   When Warren attempted to exclude a loan from

securitization because the borrower's income seemed unreasonable and was unlikely to repay the

loan, her supervisors instructed her to approve the loan anyway.[92]   Bear Stearns, however, had

specifically represented that its due diligence firms used web-based tools to assess the

reasonableness of borrower incomes and that loans made to borrowers with unreasonable stated

incomes were not purchased for securitization.[93]

157.    Warren estimated that of the loans Watterson Prime reviewed, 75% were

defective and should have been rejected by Bear Stearns and EMC.  Nevertheless these loans

were put in the loan pool.[94]

---

[89] Ambac Complaint, ¶ 132.

[90] Id.

[91] Ambac Complaint, ¶ 127 (citing August 28, 2010 Warren Deposition Tr. at 46).

[92] Syncora GP2007 State Court Complaint, ¶ 135 (citing August 25, 2010 Warren Deposition Tr. at 41-43, 45-46);
Chris Arnold, *Auditor: Supervisors Covered Up Risky Loans*, National Public Radio (May 27, 2008), *available at*
http://www.npr.org/templates/story/story.php?storyId=90840958.

[93] Contemporaneous notes of February 21, 2007 telephone conference between Mongelluzzo and Kobrin.

[94] Chris Arnold, *Auditor: Supervisors Covered Up Risky Loans*, National Public Radio (May 27, 2008), *available at*
http://www.npr.org/templates/story/story.php?storyId=90840958.

158.    Shockingly, Bear Stearns used its knowledge that many of the loans failed to meet underwriting guidelines to negotiate lower loan purchase prices for itself and thus increase its profits.  Former Clayton president D. Keith Johnson stated: "I don't think that we added any value to the investor, the end investor, to get down to your point.  I think our only value was done in negotiating the purchase between the seller and securitizer.  Perhaps the securitizer was able to negotiate a lower price, and could maximize the line.  We added no value to the investor, to the rating agencies."[95]

159.    Despite extensive knowledge of its due diligence firms' deficiencies, and knowledge that a large percentage of the securitized loans failed to meet the underwriting guidelines, Bear Stearns never disclosed this information to Syncora.

**B.    BEAR STEARNS MADE RAMPANT MISREPRESENTATIONS REGARDING QUALITY CONTROL**

160.    Bear Stearns' representations regarding its quality control protocols were similarly materially false and misleading because Bear Stearns did not: (i) conform with its own seller approval and monitoring procedures; (ii) conduct quality control reviews of the accepted loans; and (iii) comply with its repurchase obligations.

**1.    Bear Stearns Did Not Comply With Its Own Representations as to the Seller Approval Process and Ongoing Monitoring of Those Sellers**

161.    Bear Stearns made numerous representations about its sellers, its robust seller approval process, and its quality control protocols to monitor the sellers.  These representations were made in the PPM, Prospectuses, investor presentations, and in oral communications to

---

[95] FCIC Staff Interview with D. Keith Johnson, Clayton Holdings, LLC (September 2, 2010), *available at* http://fcic.law.stanford.edu/resource/interviews.

Syncora to instill confidence in the quality of the originators selling loans to Bear Stearns for securitization.

162.    Each Prospectus in the Underlying Transactions, which were specifically incorporated into the PPM, touted the strength of underwriting guidelines employed by the originators of the securitized loans.

163.    Specifically, the Prospectuses stated that between 75.48% to 78.94% of the loans in the Underlying Transactions were purchased by EMC from various originators and were originated pursuant to General Underwriting Guidelines, and that between 20.92% to 24.30% of the loans in the Underlying Transactions were originated by BSRM pursuant to the BSRM Underwriting Guidelines.

164.    The General Underwriting Guidelines, applicable to non-BSRM originated loans, required that each loan have a credit report from a credit reporting company, and that an originator review an applicant's source of income, calculate the amount of income from the sources indicated, review the credit history of the applicant, calculate the debt service to income ratio, if required, to determine the applicant's ability to repay the loan, and review the appraisal of the mortgage property.[96]

165.    The BSRM Underwriting Guidelines required that each loan have: a loan application package that includes information about the applicant's liabilities, income, credit history and employment history, as well as certain other personal information; and have a mortgage loan file that contains a credit report on each applicant from an approved credit reporting company.[97]

---

[96] SL2 ProSupp at 29-30; SL3 ProSupp at 26-27; SL5 ProSupp at 29-31; SL6 ProSupp at 31-32.

[97] SL2 ProSupp at 30-32; SL3 ProSupp at 27-29; SL5 ProSupp at 31-33; SL6 ProSupp at 32-34.

166.    In addition, an Investor Presentation sent to Syncora in December 2005 contained representations intended to convince Syncora that it would benefit from the controls and policies that were purportedly in place to ensure the quality of the securitized loans. For example, the Investor Presentation stated that Bear Stearns: (i) reviews and approves seller underwriting guidelines; (ii) conducts a monthly seller review meeting where breaches of representations and warranties, repurchase activity, and quality control of the sellers' production are monitored; and (iii) conducts 100% quality control on deliveries from new sellers.

167.    Specifically, in the Investor Presentation and in oral communications, Bear Stearns and EMC additionally represented that it:

- Conducts an operation review with the seller's management focusing on the source of the product, third party originator approval and monitoring, underwriting, appraisal review, fraud protection, compliance, post-closing, and quality control;[98]

- Reviews six months of third party quality control reports that re-underwrite at least 10% of the seller's production to ensure that loans are being originated in accordance with stated underwriting guidelines and meet all regulatory requirements;[99]

- Requires each mortgage loan seller to have at least two years of experience in the mortgage banking business;[100]

- Conducts detailed review of the seller's underwriting guidelines for conformity with Bear Stearns' and industry standard guidelines;

- Monitors the seller's performance through annual re-certifications and requires updated fidelity bonds, E&O insurance and financials;[101] and

- Monitors and reviews purchased loans for early payment defaults, delinquencies, quality controls findings and repurchases.[102]

---

[98] Investor Presentation.

[99] Contemporaneous notes of December 16, 2005 telephone call between Kobrin, Duffek, Golden, and Glory.

[100] Investor Presentation.

[101] *Id.*

168.    Bear Stearns' and EMC's representations regarding the seller screening process and monitoring of sellers' loan performance were intended to assure investors and insurers that the originators could be trusted to provide loans that were unlikely to default. However, Bear Stearns' and EMC's representations regarding the seller approval process and monitoring were false, as evidenced by the 84.9% material breach rate in the Transaction Sample, reflecting a total of 624 material breaches found in 219 loans in the 258 loan sample.

169.    Given the extraordinarily high rate of breaches, particularly of the underwriting guidelines, it is inconceivable that the originators followed the stated underwriting guidelines. It is also inconceivable that Bear Stearns took any steps to monitor implementation of the guidelines, ensure conformity with the guidelines, or monitor the sellers' loans for early payment defaults, delinquencies, quality control findings, or repurchases. Had Bear Stearns taken these steps, which it represented it would, the breach rate in the Transaction Sample could not be so high.

**2.    Bear Stearns Did Not Conduct Adequate Quality Control Of Securitized Loans**

170.    In addition to its inadequate monitoring of the originators, Bear Stearns also falsely represented the scope of the quality control conducted on the securitized loans. First, as discussed in Section IV, Bear Stearns made numerous representations to Syncora in both the Investor Presentation and during phone conferences about the quality control reviews on the purchased loans that were ultimately securitized. These representations were made in order to

---

[102] *Id.*

convince Syncora that it would benefit from controls and policies purportedly in place to ensure the quality of the securitized loans.

171.    Specifically, Bears Stearns represented that it conducted quality control reviews, which involved re-underwriting loans that EMC purchased and Bear Stearns had securitized.[103]

172.    Bear Stearns also asserted that it took steps to guard against fraud.  Bear Stearns said that "[a]ny loan that goes delinquent in 90 days gets full re-underwriting looking for fraud putbacks;" certain sellers are monitored on a monthly basis for fraud; and, all flow loans go through a data integrity program to detect fraud.[104]

173.    On January 10, 2006, representatives of Bear Stearns and EMC had a conference call with Syncora regarding the quality control process for loans.  Bear Stearns represented that it "look[s] at key data items for integrity."  For example, in addition to the quality control check that is done on 10% of the entire loan pool, Bear Stearns stated that if there are less than 100 loans in a deal from one originator, then there is a quality control check on 100% of the loans.  If there are more than 100 loans in a deal, then there is a quality control check on 20% of the loans. However, if the error rate exceeds 5%, then there is a quality control check on 100% of the loans regardless of the number of loans in the deal.[105]

174.    Bear Stearns' representations to Syncora in the Investor Presentation and on conference calls were materially misleading.  The Material Breach Rate of 84.9% makes clear

---

[103] *Id.* (stating that quality control is a "Post Settlement" review); Syncora GP2007 State Court Complaint, ¶ 139 n. 148 (citing January 29, 2010 Haggerty Rule 30(b)(6) Deposition Tr. at 179 (confirming that due diligence "was done prior to the settlement of the purchase of the loans, whereas, the quality control reviews were done after EMC settled the purchase of the – of the loan."); April 26, 2010 Golden Deposition Tr. at 17 (confirming that quality control refers to the "post-purchase review of loans that EMC and Bear Stearns securitized").

[104] Contemporaneous notes of December 16, 2005 telephone call between Kobrin, Duffek, Golden, and Glory.

[105] Contemporaneous notes of January 10, 2006 telephone call between Kobrin, Stephanie Courtney, Bear Stearns Loan Borrowing, Nancy Nixon, Randy Longalia, Trish Longhenbeck, Keith Price, Golden, and Glory.

that Bear Stearns could not possibly have been following the quality control protocols as
represented to Syncora.

175.    This failure is systemic and is not unique to this Transaction.  A review of other
lawsuits filed against Bear Stearns reveals that Bear Stearns made similar representations
regarding quality control procedures in other transactions that it securitized, and failed to adhere
to those representations.  These actions reveal that Bear Stearns made it a practice to not follow
its quality control protocols.

176.    For example, Bear Stearns asserted that it conducted certain quality control
procedures for the GPMF 2007 HE-1 transaction so as to assure Syncora that there were
measures in place to protect against the risk of securitization of defective loans in the transaction.
The poor performance of the GPMF 2007 HE-1 transaction indicates that Bear Stearns failed to
follow its quality control protocols.  Bear Stearns did not review, or cause third parties to review,
10% of the monthly volume it acquired from GreenPoint, the originator for the GPMF 2007 HE-
1 transaction, as it represented it would.[106]  Also, contrary to its representations, Bear Stearns did
not review or conduct full reunderwriting of all loans with 90-day delinquencies.[107]  Bear
Stearns' failure to comply with its quality control protocols was a misrepresentation of the scope
and quality of review it conducted in that transaction.[108]

### 3.    Bear Stearns' and EMC's Representations Regarding Its Repurchase Obligations Were Not Adhered to

177.    To further induce Syncora to insure the Transaction, Bear Stearns and EMC made
several representations regarding its practices concerning the repurchase of defective loans.

---

[106] Syncora GP2007 State Court Complaint, ¶ 144.

[107] Syncora GP2007 State Court Complaint, ¶ 146.

[108] Syncora GP2007 State Court Complaint, ¶ 148.

178.    Bear Stearns asserted that it had an entire "conduit team" devoted to asserting breach-of-representation-and-warranty claims on behalf of the securitization participants and monitoring "ongoing portfolio performance," "quality control findings," and "repurchases."[109]

179.    Bear Stearns also represented to Syncora that its quality control and repurchase processes were in place to review, identify, and remove defective loans from securitizations, and that these procedures would be in place even after the loans were securitized.[110]  These representations were intended to assure investors and insurers that Bear Stearns had implemented stringent quality control measures.[111]

180.    Bear Stearns' representations regarding its repurchase obligations, however, were materially false and misleading.  Indeed, at the time of the Transaction in July 2007, Bear Stearns did not even have a formal policy for repurchasing breaching loans from securitization trusts, and did not implement such a policy until September 2007, two to three months after the Transaction.[112]

181.    Upon discovery of an EPD, or a breach or suspected breach of a representation made by a loan seller to Bear Stearns, rather than follow a formal repurchase policy with the seller, investors, and/or insurers, Bear Stearns typically attempted to reach a settlement with the seller of the defective loan.  Despite the fact that suspected breaches by the loan seller and early defaults were red flags, Bear Stearns did not review the defective loans for potential breaches of Bear Stearns' representations and warranties to investors or insurers unless the seller tendered the full repurchase amount.  This was Bear Stearns' normal procedure because a determination

---

[109] Investor Presentation.

[110] Contemporaneous notes of December 16, 2005 telephone call between Kobrin, Duffek, Golden, and Glory.

[111] Syncora GP2007 State Court Complaint, ¶ 141 (citing April 19, 2010 Glory Deposition Tr. at 109-10).

[112] Ambac Complaint, ¶ 166.

that a loan breached representations made to investors or insurers would result in a contractual

obligation for Bear Stearns to repurchase the loan at full price, regardless of whether Bear

Stearns received the full price from the seller. As such, Bear Stearns had a pecuniary interest in

simply settling matters and pocketing the settlement amount.[113]

182. Bear Stearns' lack of a formal policy can be explained by the fact that the purpose

of the repurchase protocols was not to actually repurchase defective loans from securitizations,

but to provide Bear Stearns with cash settlements whenever defective loans were identified.

Whenever a securitized loan defaulted during the EPD period, or Bear Stearns identified a

seller's breach of representations to EMC, the seller would simply pay Bear Stearns a settlement

amount, rather than repurchasing the loan. Bear Stearns accepted the payment, but then

neglected to notify any investors or insurers of the default or breach, share the proceeds with

them, or repurchase the loan as they were obligated to do.[114]

183. Bear Stearns' policy for the repurchase of loans was clarified in a policy manual.

It stated: "No loan(s) will be added to the Conduit Buy-out Log[115] . . . without confirmation of

repurchase funds received or a firm commitment from the seller to repurchase or funding of a

down-bid." Thus in August 2007, Bear Stearns' policy, despite its contractual obligations, was

that it should not repurchase a loan unless and until there was a full recovery from the seller of

that loan.[116]

---

[113] Syncora GP2007 State Court Complaint, ¶ 157.

[114] Syncora GP2007 State Court Complaint, ¶ 155.

[115] The Conduit Buy-out Log is the file Bear Stearns used to track loans that were to be repurchased pursuant to its repurchase obligations.

[116] Syncora GP2007 State Court Complaint, ¶ 156.

184.    Bear Stearns continues to employ this practice of refusing to repurchase breaching loans. In the GPMF 2007 HE-1 transaction, Syncora notified EMC of 379 loans that breached securitization representations and warranties. Bear Stearns directed EMC to reject most of Syncora's claims, however, Bear Stearns used the breach findings to assert claims against Greenpoint, the seller of the defective loans.[117]

185.    In at least three instances, EMC came to settlement agreements with originators but never repurchased loans for the benefit of investors and insurers: (i) on January 30, 2007, an originator agreed to pay EMC over $2.5 million; (ii) on December 18, 2007, an originator agreed to pay EMC almost $12 million; and (iii) on October 1, 2007, an originator agreed to pay EMC $1 million.[118]

186.    According to an internal Bear Stearns' presentation, EMC received $1.9 billion from April 2006 to April 2007 in claim resolutions, with most resolutions being settlements. Sometimes Bear Stearns would accept discounts on future loan purchases instead of immediate cash settlements. These discounts were valued at $367 million for the period beginning in 2007 through the first quarter of 2008.[119]

187.    Stephen Golden, Bear Stearns Managing Director, Warehouse and EMC Residential Mortgage President (previously defined as "Golden"), recognized the enormous benefit of these practices to Bear Stearns and stated that "filing these claims hasn't won us any popularity contests but it has saved the firm 100's of millions of dollars in the past."[120]

---

[117] Syncora GP2007 State Court Complaint, ¶ 163.

[118] FHFA Complaint, ¶ 419.

[119] Id.

[120] Ambac Complaint, ¶ 147 (citing email from Golden to, among others, Leslie Rodriguez, EMC Residential Mortgage Managing Director, and Whitney Long, EMC Residential Mortgage, Vice President of Risk Management and Claims, dated September 15, 2007).

188.    These funds should have been passed to the trusts, however, Bear Stearns did not disclose its repurchase settlements with the investors or insurers in the trust. Bear Stearns Vice President, Robert Durden, could not identify a single "instance in which EMC or Bear Stearns disclosed to . . . investors that it was recovering on EPDs from originators with respect to securitized mortgage loans, pocketing the money and not putting it into the trust."[121]

189.    Strikingly, Bear Stearns' rapid fire loan securitization program overwhelmed its quality control and claims department to the extent that it could not process its claims against the entities from which it purchased the loans. Indeed, a February 28, 2006 internal audit report noted "a significant backlog for collecting from and submitting claims to sellers" consisting of more than 9,000 outstanding claims worth over $720 million, and noting that the procedures in place to process, collect, resolve, and monitor such claims were inadequate or non-existent.[122] The February 28, 2006 internal audit report also indicates Bear Stearns' knowledge of the large number of failed loans in its securitizations. Subsequent internal audit reports issued on September 22, 2006 and February 26, 2007 reported that many of the issues that needed to be corrected in early 2006 had yet to be rectified.[123]

190.    Bear Stearns' failure to exercise its repurchase rights and obligations is especially egregious because in August 2006, Bear Stearns retained PWC to review its procedures and PWC specifically told Bear Stearns that its failure to promptly review loans identified as defaulting or defective was a breach of its obligations to the securitizations. Among other things,

---

[121] FHFA Complaint, ¶ 420 (citing to December 11, 2009 Durden Deposition).
[122] Ambac Complaint, ¶ 159.
[123] Ambac Complaint, ¶ 160.

PWC instructed Bear Stearns to modify its review and repurchase process so as to comply with industry practices, expectations of investors, agreements, and SEC regulations.[124]

191.    Bear Stearns' own legal counsel echoed PWC's assessment by asserting that Bear Stearns could not keep the monetary recoveries obtained on its EPD period and other claims relating to securitized loans, and that it was required to review the loans for which it obtained recoveries to assess whether the loans breached EMC's representations and warranties made in its own securitizations.[125]

192.    Bear Stearns ignored PWC and its own counsel's advice until two to three months after the Transaction in September 2007, when it finally implemented a policy to promptly review defaulting or defective loans.  However, Bear Stearns still has not fully proffered to the securitization trusts the recoveries Bear Stearns obtained on its EPD period and other claims.[126]

193.    In the Transaction Sample, the Material Breach Rate of 84.9% indicates that deficient loans were not being removed from the loan pool.  Moreover, none of these loans were repurchased by Bear Stearns or EMC.

## VII.    JP MORGAN TORTIOUSLY INTERFERED WITH EMC'S CONTRACTUAL OBLIGATION TO SYNCORA

### A.    JP MORGAN CHASE & CO. ACQUIRED BEAR STEARNS' SECURITIZATION MACHINE

194.    Bear Stearns collapsed in the spring of 2008. The Bear Stearns Companies and its subsidiaries — including Bear Stearns and EMC — were acquired thereafter by JPMorgan Chase

---

[124] Ambac Complaint, ¶ 163.

[125] Ambac Complaint, ¶ 164.

[126] Ambac Complaint, ¶ 166.

& Co. at a bargain basement price of $10 a share, which was funded, in part, through a $29

billion non-recourse U.S. government loan.

195.    Immediately upon assuming control of what was left of Bear Stearns for this

nominal consideration, JPMorgan Chase & Co. subsidiary, JP Morgan, began deliberately

frustrating insurers' rights in the Bear Stearns securitizations to avoid having to account for Bear

Stearns' massive exposure related to its securitizations on its consolidated financial statements.

Most significantly, JP Morgan implemented a bad-faith strategy to reject without justification

insurers' legal remedies, demands, and other claims relating to the failed loans backing Bear

Stearns securitizations. As a result, JP Morgan interfered with EMC's contractual obligations

including those owed to Syncora and other insurers and investors.

**B.    AFTER THE MERGER, JP MORGAN IMPLEMENTED POLICIES TO
REJECT WHOLESALE CLAIMS FOR BREACHING LOANS**

196.    Following its acquisition of Bear Stearns in March 2008, JP Morgan assumed

EMC's operations, policies, and procedures, including those concerning EMC's responses to

claims against EMC for breaches of contractual warranties. As soon as it took control, JP

Morgan implemented an across-the-board moratorium on the repurchase of breaching loans from

securitizations.

197.    Specifically, on May 16, 2008, Alison Malkin ("Malkin"), the Executive Director

of JP Morgan's Securitized Products division, sent an email alerting EMC employees

*"IMPORTANT: Please do not repurchase any loans"* because "JPM is evaluating processes and

has put a temporary hold until they have finished."[127]

---

[127] Complaint filed in *Assured Guaranty Corp. v. EMC Mortgage LLC*, No. 650805/2012, (Sup. Ct. N.Y. County
March 15, 2012) ("Assured Complaint") ¶ 278 (citing email from Malkin to Ashley Poole (EMC Analyst,
Representations and Warranties Department) and Whitney Long (EMC Residential Mortgage Vice President, Risk
Management and Claims), dated May 16, 2008, EMC-AMB 007165488-490 at 489) (emphasis added).

198.    In evaluating EMC's processes, JP Morgan caused EMC to take new positions that were inconsistent with, and contravened, EMC's own interpretation of its obligations prior to JP Morgan's takeover.

199.    Specifically, in May 2008, with "less than a month on the job," Malkin told EMC that "its own breach determinations with respect to its own loans in its own securitizations are incorrect," and, as an EMC witness conceded, due to Malkin's direct orders "the [repurchase] recommendations were changed."[128] Accordingly, at JP Morgan's directive, EMC canceled the repurchase of loans that "we have previously added to the Repurchase Log, but we need to re-address using our *updated* standards."[129] (emphasis added).

200.    JP Morgan's interpretations of EMC's repurchase obligations, however, denied logic and contravened EMC's and Bear Stearns' contracts.   For example, JP Morgan took the position that the following were not breaches warranting the repurchase of loans from the securitization: (i) the absence of key documentation from the loan file (without which the loan could be rescinded) and (ii) a finding that the borrower's stated income was not reasonable. The head of EMC's securitization breach team was properly baffled by those positions: "The idea that missing certain significant docs is not a security breach issue is a fairly foreign concept that I have just not gotten my mind around yet. The stated income issue is very similar, in that *the*

[128] Assured Complaint, ¶ 290 (citing January 22, 2010 Joanna Megha ("Megha") Rule 30(b)(6) Deposition Tr. at 190-92. In her initial review alone, conducted on or about May 5, 2008, Malkin "disagreed with 56% of EMC/Bear Stearns findings." *See* Email from Whitney Long (EMC Residential Mortgage Vice President of Risk Management and Claims) to Malkin, dated May 5, 2008, EMC-AMB 007173918-919; September 29, 2011 Tamara Jewell ("Jewell") Deposition Tr. at 250-54 (as of May 2008 "loans that Bear Stearns had previously determined should have been bought out of the securitizations were re-reviewed by Alison Malkin" who had "ultimate authority" to change Bear Stearns' prior breach determinations), 325-30 (with respect to loans previously determined by Bear Stearns as having a securitization breach, "Alison Malkin was responsible for reviewing these loans and making a final determination as to whether or not EMC would accept or reject the PSA breach claim" because "she was in charge of the group, so ultimately it's her final call.").

[129] *Id.* (citing email from Michael Peacock ("Peacock") (EMC Securitization Breach Team), dated May 14, 2008, EMC-AMB 009119930-931 at EMC-AMB 009119931) (emphasis added).

*reasonableness test was a requirement in virtually all the guidelines* from the various lenders that we obtained loans from."[130] Post-Merger, however, "ultimately the authority to resolve any debate sat with JPMorgan."[131]

201.    On July 14, 2008, Malkin reinforced JP Morgan's prior directives, stating that "*[t]he only way a loan can be repurchased from a deal is if I send an email.*"[132] With this moratorium in place, JP Morgan immediately began (i) cancelling the repurchase of large volumes of loans that EMC previously determined had to be repurchased, and (ii) rejecting wholesale subsequent demands by insurers, including Syncora, to repurchase breaching loans from EMC's and Bear Stearns' securitizations.

202.    Underscoring its improper interference, as JP Morgan was directing EMC to reject financial guarantors' demands to repurchase breaching loans, JP Morgan simultaneously advanced the breach claims asserted by the financial guarantors against originators of loans in an attempt to recover funds for itself.

---

[130] Assured Complaint, ¶ 292 (citing email from Peacock to Jewell (EMC Vice President and Manager of Quality Control), dated May 8, 2008, EMC-AMB 007173931-932) (emphasis added).

[131] *Id.* (citing June 10, 2010 Peacock Deposition Tr. at 254-56).

[132] Assured Complaint, ¶ 278 (citing email from Malkin to Gary Lyles (Bear Stearns Internal Audit Department), dated July 14, 2008, EMC-AMB 010858522-524 (emphasis added). *See also*, September 29, 2011, Jewell Deposition Tr. at 249-52 (confirming "that when JP Morgan came in after the merger, that it put a hold on buying out loans from securitizations that EMC or Bear Stearns had determined to have material PSA breaches" and identifying Malkin as "the person at JP Morgan that was responsible and that directed Bear Stearns and EMC" with respect to the review and repurchase of loans from securitizations)).

203.    JP Morgan first carried out this scheme in connection with other securitization

transactions insured by Syncora and Ambac Assurance Corporation ("Ambac"). Those

transactions involve mortgage loans of similar type and vintage as those included in the

Transaction. With respect to loans in the Syncora-and Ambac-insured transactions, JP Morgan

directed EMC to deny the financial guarantors' demands for repurchase while simultaneously

demanding that the originators of those loans repurchase the same loans for the same defects

identified by Syncora and Ambac.

204.    For example, on March 4, 2008, Syncora gave formal notice to EMC of 380

securitized loans that breached one or more of EMC's representations and warranties.[133] Within

days after receiving Syncora's notice, on March 11, Bear Stearns Managing Director of claims

issued a repurchase demand on EMC's behalf to GreenPoint, the entity that sold those loans to

EMC prior to securitization, asserting that the same breaches identified by Syncora constituted

breaches of GreenPoint's representations and warranties under its agreement with EMC.[134]

EMC's letter to GreenPoint stated unqualifiedly: "The breaches under the Securitization MLPA

[*i.e.*, contract between EMC and Syncora] also constitute breaches under the Agreement [*i.e.*,

contract between EMC and GreenPoint]."[135] In response, GreenPoint refused to repurchase the

loans because, among other things, EMC had not repurchased any of those loans from the

securitization and, thus, suffered no loss.[136] Thereafter, on June 26, 2008, JP Morgan's Executive

---

[133] Assured Complaint, ¶ 283 (citing letter from XL Capital Assurance, Inc. to EMC, dated March 4, 2008, EMC-SYN 000002855-58).

[134] Assured Complaint, ¶ 283 (citing letter from Golden (Bear Stearns Managing Director, Warehouse and EMC Residential Mortgage, President) to GreenPoint Mortgage Funding, Inc., dated March 11, 2008, EMC-SYN 00283796-99).

[135] *Id.*

[136] *Id.* (citing letter from Rose Medina ("Medina") (GreenPoint Vice President, Representation and Warranty) to Golden, undated, EMC-SYN 00283794-95 (responding to Golden's March 11, 2008 letter)).

Director, Alison Malkin, continued to pursue EMC's claims against GreenPoint, adamantly

asserting *"that it is EMC's position that these breaches materially and adversely affect the value

of the [loans]."*[137] But at the same time as JP Morgan was attempting to recover from

GreenPoint based on Syncora's breach positions, Malkin took diametrically opposing positions

in repeatedly refusing to comply with all but 4% of Syncora's repurchase demands.[138] Similarly,

in this Transaction, EMC has offered to repurchase only approximately 3% of Syncora's

repurchase demands.

205.    JP Morgan has acted similarly with respect to financial guarantor Ambac. That

is, while simultaneously refusing to repurchase breaching loans identified by Ambac, JP

Morgan advanced those same positions in an attempt to recover funds for itself from originators

that supplied the loans to EMC.[139] JP Morgan also rebuffed Ambac's breach claims and barred

EMC's repurchase of loans even where Bear Stearns had previously asserted repurchase claims

against originators pertaining to the same defects that Ambac subsequently identified in the

same loans (including claims that Bear Stearns agreed to settle in exchange for monetary

payments from the seller that it pocketed in lieu of repurchasing the breaching loans from the

securitizations).[140]

---

[137] *Id.* (citing letter from Malkin to Medina, dated June 26, 2008, EMC-SYN 000003048; January 22, 2010 Megha
30(b)(6) Deposition Tr. 257-58 ("Q: So there's no ambiguity whatsoever that as of June 26, 2008, EMC was taking
the position that the breaches that Syncora identified materially and adversely affected the value of the revolving
credit lines, correct? . . A: (Perusing) This letter reads that, yes. Q: Thank you. And you see no ambiguity
whatsoever in that statement, do you? A: No, I don't.")).

[138] *Id.* (citing letter from Jackie Oliver (EMC Senior Vice President, Chief Servicing Counsel) to XL Capital
Assurance, Inc., dated June 4, 2008, EMC-SYN 000002859-2914; letter from Malkin to XL Capital Assurance, Inc.,
dated August 4, 2008, EMC-SYN 00620317-343).

[139] Ambac Complaint, ¶¶ 207-08.

[140] *Id.* ¶ 209.

206.   JP Morgan's duplicity was part and parcel of a bad-faith corporate policy, which directly interfered with Syncora's contractual right to have EMC repurchase breaching loans.

207.   Following JP Morgan's policy, EMC improperly rejected Syncora's requests that EMC repurchase breaching loans in the Transaction. EMC refused to comply with Syncora's repurchase demands for the breaching loans. On June 8, 2012, a Vice President of EMC formally responded to Syncora's March 14, 2012 breach notices and rejected Syncora's repurchase requests for all of but seven breaching loans. This amounts to approximately 3% of the loans containing material breaches that Syncora submitted for repurchase. In doing so, JP Morgan tortiously interfered with the parties' contractual repurchase remedies.

## VIII.   EMC BREACHED ITS CONTRACTUAL OBLIGATIONS BY IMPROPERLY TRANSFERRING ITS ASSETS

208.   On or about April 1, 2011, JPMorgan Chase & Co. effectuated an intercompany asset sale whereby EMC transferred to its affiliate JPMC Bank all of EMC's servicing-related assets (the "Asset Transfer"). (The mortgage-servicing business entails, among other things, processing payments from the mortgage loan borrowers and distributing the proceeds to the trusts, as well as pursuing delinquent borrowers and bringing foreclosure actions.).

209.   At the time of the Transaction, servicing was one of EMC's several business operations, and one that Bear Stearns featured prominently in its discussions with Syncora. But by the time of the Asset Transfer in early 2011, JPMorgan Chase & Co. had shut down EMC's mortgage-loan acquisition and securitization operations. As such, servicing was EMC's last remaining business operation, and its servicing business constituted EMC's last remaining substantial asset. Without this last substantial asset, EMC has become, in essence, a shell.

-71-

210.    Pursuant to the terms of express negative covenants in the I&I, EMC agreed not to, without Syncora's express written consent, "merge with or into any Person or transfer all or substantially all of its assets to any Person," I&I § 2.03(c), and not to "interfere in any material respect with the enforcement of any rights of [Syncora] under or with respect to any of the Operative Documents or the Policy," *id.* § 2.03(a), among other things.

211.    The restrictions on EMC's ability to merge or transfer all or substantially all of its assets, and to interfere with Syncora's enforcement rights, were critical contractual protections for Syncora. Syncora required assurances that EMC, and others, had the continuing financial wherewithal to stand behind their obligations, as detailed throughout this complaint, to cure or repurchase defective loans in the Transaction, and reimburse and indemnify Syncora, as required by the I&I.

212.    EMC, together with JPMorgan Chase & Co., however, ignored these contractual obligations, and, without obtaining Syncora's express written consent, completed the Asset Transfer that stripped EMC of its sole remaining operating asset.

213.    Syncora has been harmed by EMC's breach of contract in effectuating the Asset Transfer without Syncora's consent because EMC has been left without the wherewithal to satisfy its ongoing contractual obligations to Syncora.

### FIRST CAUSE OF ACTION
(Material Breach of the I&I by all Defendants)

214.    Syncora realleges and incorporates by reference paragraphs 1 through 213 of this Complaint.

215.    Bear Stearns, EMC, and CMO induced Syncora to enter into the I&I and to issue its Policy by making extensive representations and warranties concerning the securitized loans in the Transaction and in the Underlying Transactions, and by agreeing to broad remedies for

-72-

breaches of those representations and warranties, as more fully set forth in paragraphs 39-42, 47,

53, 58, 89-93, and 113 herein.

216.    Bear Stearns', EMC's, and CMO's representations and warranties were material

to Syncora's decision to insure the Transaction, and Syncora was induced thereby to enter into

the I&I and perform its obligations thereunder.

217.    Syncora has performed its obligations under the I&I.

218.    Bear Stearns, EMC, and CMO have materially breached the I&I, as evidenced by

the Material Breach Rate of 84.9%, and the loan-by-loan cure-repurchase-or-substitution remedy

is inadequate to address the magnitude and pervasiveness of the breaches identified.

219. Bear Stearns', EMC's, and CMO's material breaches of the I&I materially

increased the risk of loss and damage within coverage of the I&I. Had Syncora known the true

and accurate facts it would not have agreed to issue its Policy.

220.    Additionally, pursuant to New York Insurance Law §§3105 and 3106, these

representations and warranties were material to Syncora's decision to enter into the I&I and

agree to insure the Transaction, and Bear Stearns, EMC, and CMO had a duty to provide

accurate information to Syncora.  Syncora would not have agreed to insure the Transaction had it

known that the representations and warranties were false and misleading, and the breaches of the

representations and warranties, as evidenced, *inter alia*, by Syncora's losses alleged herein,

materially increased Syncora's risk of loss, damage and injury .

221.    Syncora has been damaged and will continue to be damaged by this breach in an

amount to be determined at trial.

## SECOND CAUSE OF ACTION
(Fraudulent Inducement by Bear Stearns, EMC, JP Morgan, and JPMC Bank)

222.   Syncora realleges and incorporates by reference paragraphs 1 through 221 of this Complaint.

223.   As set forth above, Bear Stearns and EMC made materially false public statements, and omitted material facts, with the intent to defraud the public and Syncora as more fully set forth in paragraphs 38, 42, 47, 53 and 58 herein.

224.   Bear Stearns and EMC made materially false statements and omitted material facts with the intent to defraud Syncora in pre-contractual communications between Syncora and Bear Stearns' and EMC's employees.

225.   Bear Stearns and EMC, knowingly and with the intent to defraud, delivered to Syncora materially false and misleading documentation, including collateral data, investor presentations, data tapes, the PPM, Prospectuses, and fraudulently-induced ratings by the rating agencies.

226.   Syncora reasonably relied on Bear Stearns' and EMC's statements and omissions when it entered into the I&I and issued its Policy.  As a result of Bear Stearns' and EMC's statements and omissions, Syncora insured securities issued in the Transaction backed by pools of loans that had a risk profile far higher than Bear Stearns and EMC led Syncora to understand.

227.   Had Syncora known of the true and accurate facts, which was peculiarly within Bear Stearns' and EMC's knowledge, it would not have agreed to issue its Policy.  As a result of Bear Stearns' and EMC's false and misleading statements and omissions, Syncora has suffered, and will continue to suffer, damages.

228.   As a result of Bear Stearns' and EMC's false and misleading statements and omissions, investors purchased securities that were backed by pools of loans that had a risk

-74-

profile far higher than Bear Stearns and EMC led the investors to understand. Consequently, the general public has suffered, and will continue to suffer, damages.

229.    Additionally, pursuant to New York Insurance Law §3105, these representations were material to Syncora's decision to enter into the I&I and agree to insure the Transaction. Bear Stearns and EMC had a duty to provide Syncora with accurate information. Syncora would not have agreed to insure the Transaction had it known that the representations were false and misleading.

230.    Syncora has been damaged and will continue to be damaged by this breach in an amount to be determined at trial.

231.    Because Bear Stearns and EMC committed these acts and omissions maliciously, wantonly, oppressively, and with knowledge that they would affect the general public, Syncora is entitled to punitive damages.

### THIRD CAUSE OF ACTION
(Breach of Repurchase Obligation by all Defendants)

232.    Syncora realleges and incorporates by reference paragraphs 1 through 231 of this Complaint.

233.    Syncora, Bear Stearns, EMC, and CMO were all parties to the I&I.

234.    Bear Stearns, EMC, and CMO incorporated the representations and warranties from the Operative Documents, including the MLPAs and PSAs, into the I&I for Syncora's benefit. I&I § 2.01(n).

235.    Syncora has performed its obligations under the I&I.

236.    In Section 7 of the MLPAs, EMC represented that within 90 days of the earlier of its own discovery or its receipt of written notice of a breach of a representation or warranty set

-75-

forth in this Section 7 of the MLPA, EMC would cure such breach in all material respects, purchase the affected mortgage loan, or substitute a qualifying replacement mortgage loan.

237.    In Section 2.03(c) of the PSAs, EMC represented that within 90 days of the earlier of its own discovery or its receipt of written notice of a breach of a representation or warranty set forth in this Section 7 of the MLPA, EMC would cure such breach in all material respects, purchase the affected mortgage loan, or substitute a qualifying replacement mortgage loan.

238.    The Defendants have actual and constructive notice of the material breaches of the representations and warranties set forth in this Section 7 of the MLPAs, including a March 14, 2012 letter from Syncora providing written notice of the material breaches of the representations and warranties set forth in this Section 7 of the MLPAs for loans identified in the Transaction Sample.

239.    On June 8, 2012, EMC responded by refusing to cure, repurchase or substitute all but seven of the 219 loans identified in the March 14, 2012 letter, which, as alleged herein, are a statistical sample of pool-wide breaches.

240.    Syncora has been damaged and will continue to be damaged by Defendants' breaches of its repurchase obligations in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
(Indemnification Against Bear Stearns, EMC, JP Morgan, and JPMC Bank)

241.    Syncora realleges and incorporates by reference paragraphs 1 through 240 of this Complaint.

242.    Pursuant to Section 3.04 of the I&I, Syncora is entitled to be indemnified for any and all claims, losses, liabilities, demands, damages, costs, or expenses, including attorneys'

fees, of any nature arising out of or relating to the Transaction contemplated by the Operative

Documents by reason of, among other things:

> (i)  the misfeasance, malfeasance, negligence, bad faith, willful
>
>      misconduct, or theft committed by any director, officer, employee or
>
>      agent of Bear Stearns, EMC, or CMO;
>
> (ii)  the breach by Bear Stearns, EMC, or CMO of any of the
>
>      representations, warranties, or covenants contained in the Operative
>
>      Documents; and
>
> (iii)  any untrue statement or alleged untrue statement of material fact
>
>      contained in the Prospectuses or any omission or alleged omission to
>
>      state therein a material fact required to be stated therein or necessary
>
>      to make the statements therein, in light of the circumstances under
>
>      which they were made, not misleading.

243.    By reason of the foregoing, as set forth in paragraphs 114 to 119, Bear Stearns

and EMC have caused Syncora to pay claims and incur losses, costs, and expenses, and will

continue to cause Syncora to pay claims and incur losses, costs, and expenses.

244.    Syncora has been damaged and will continue to be damaged in an amount to be

determined at trial.

## FIFTH CAUSE OF ACTION
### (Reimbursement Against Bear Stearns, EMC, JP Morgan, and JPMC Bank)

245.    Syncora realleges and incorporates by reference paragraphs 1 through 244 of this

Complaint

246.    Pursuant to Section 3.03(b) of the I&I, Bear Stearns agreed to reimburse Syncora

for any payment made under its Policy arising as a result of Bear Stearns' failure to substitute

-77-

for, or deposit an amount in respect of, any defective loan, with interest on any and all such amounts remaining unreimbursed from the date such amounts became due until paid in full.

247.    Pursuant to Section 2.03(c) of the PSA and Section 7 of the MLPA, agreements to which Syncora is a third-party beneficiary of pursuant to Sections 2.01(n) and 2.02(j) of the I&I, EMC agreed to reimburse Syncora for any payment made under its Policy arising as a result of EMC's failure to substitute for, or deposit an amount in respect of, any defective loan, with interest on any and all such amounts remaining unreimbursed from the date such amounts became due until paid in full.

248.    Bear Stearns and EMC had actual and constructive notice of the defects in the loan pool and should have repurchased those loans.

249.    Syncora has made payments under its Policy arising as a result of Bear Stearns', EMC's, and CMO's failure to substitute for or deposit an amount in respect of defective loans.

250.    Syncora has been damaged and will continue to be damaged in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
(Attorneys' Fees and Costs Against Bear Stearns, EMC, JP Morgan, and JPMC Bank)

251.    Syncora realleges and incorporates by reference paragraphs 1 through 250 of this Complaint.

252.    Pursuant to Section 3.03(c) of the I&I, EMC agreed to reimburse Syncora for any and all charges, fees, costs, and expenses paid or incurred in connection with, among other things, enforcing, defending, or preserving Syncora's rights under the Operative Documents.

253.    Syncora has incurred numerous expenses, including attorneys' fees and expert fees, in order to enforce, defend, and preserve its rights under the relevant agreements in an amount to be determined at trial.

-78-

254.   Syncora has been damaged and will continue to be damaged in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
(Against Defendant JP Morgan for Tortious Interference with Contractual Relationship)

255.   Syncora realleges and incorporates by reference paragraphs 1 through 254 of this Complaint.

256.   Syncora, EMC, Bear Stearns, and CMO are parties to the I&I, which incorporates by reference Section 7 of the MLPAs and Section 2.03 of the PSAs, which requires EMC to cure, repurchase, or provide substitutes for loans that breached EMC's representations and warranties in the MLPAs and PSAs.

257.   After EMC and Bear Stearns were acquired by JPMorgan Chase & Co., JP Morgan had notice and knowledge of such contractual obligations to Syncora.

258.   As a direct and proximate result of JP Morgan's intentional procurement of breaches and deliberate interference with EMC's and Bear Stearns' contractual obligations to Syncora, which are continuing, EMC and Bear Stearns breached their contractual obligations to Syncora, including their duty to repurchase breaching loans, and are continuing to do so.

259.   JP Morgan has procured, and continues to procure, EMC's and Bear Stearns' breaches of contract without justification or privilege.

260.   As a direct and proximate result of the conduct described herein, Syncora has been damaged, and continues to be damaged, in its trade or business. Syncora has suffered, and will continue to suffer, monetary loss that it would not have suffered but for JP Morgan's tortious conduct, and is threatened with continuous and irreparable damage and/or loss.

## EIGHTH CAUSE OF ACTION
(Against Defendants EMC and JPMC Bank for Breach of Contract – the Asset Transfer)

261.     Syncora realleges and incorporates by reference paragraphs 1 through 260 of this Complaint.

262.     EMC has consolidated with, merged into, or transferred all or substantially all of its assets to JPMC Bank without Syncora's express written consent, in violation of the I&I.

263.     As a result of EMC's breach, Syncora has been and will continue to be damaged in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
(Successor Liability Against JP Morgan and JPMC Bank)

264.     Syncora realleges and incorporates by reference paragraphs 1 through 263 of this Complaint.

265.     JP Morgan is the successor to Bear Stearns. JP Morgan is liable for Bear Stearns' wrongdoing, in its entirety because: (i) on October 1, 2008 Bear Stearns merged and/or consolidated with J.P. Morgan Securities Inc., which was renamed J.P. Morgan Securities LLC (defined above as "JP Morgan"); (ii) JP Morgan has expressly or impliedly assumed Bear Stearns' liabilities; and (iii) JP Morgan is a mere continuation of Bear Stearns. This action is thus brought against JP Morgan as successor to Bear Stearns.

266.     JPMC Bank is the successor to EMC. JPMC Bank is liable for EMC's wrongdoing, in its entirety because: (i) pursuant to an April 1, 2011 asset transfer JPMC Bank acquired all of EMC's assets and the two entities effectively merged and/or consolidated; (ii) JPMC Bank has expressly or impliedly assumed EMC's liabilities, including its liabilities and obligations under the Operative Documents; and (iii) JPMC Bank is a mere continuation of EMC

given that JPMC Bank assumed all the operations of EMC. This action is thus brought against JPMC Bank as successor to EMC.

## PRAYER FOR RELIEF

WHEREFORE, Syncora respectfully prays for the following relief:

267.   For an award of damages against Bear Stearns, EMC, and CMO for their material breach of the I&I, including with respect to the material breach of representations and warranties under the Underlying Transactions' MLPAs § 7, incorporated into the I&I; and against JP Morgan as successor in interest to Bear Stearns; and against JPMC Bank as successor in interest to EMC;

268.   For an award of all legal, equitable, and punitive damages, to be proven at trial, against Bear Stearns and EMC for their fraudulent inducement of Syncora's insurance of the Transaction and issuance of its Policy; against JP Morgan as successor in interest to Bear Stearns; and against JPMC Bank as successor in interest to EMC;

269.   For an award of compensatory, consequential, and/or rescissory damages, including all of Syncora's claims payments made and to be made in the future, and any other present and future damages to be proven at trial against Bear Stearns, CMO, and EMC for their willful, wanton, and malicious material breaches of the I&I; against JP Morgan as successor in interest to Bear Stearns; and against JPMC Bank as successor in interest to EMC;

270.   For an order of indemnification against Bear Stearns and EMC for the claim payments and other losses and expenses, including attorneys' fees and costs, Syncora has paid or will pay in the future pursuant to I&I § 3.04(a); against JP Morgan as successor in interest to Bear Stearns; and against JPMC Bank as successor in interest to EMC;

271.    For an order against Bear Stearns and EMC awarding reimbursement of Syncora's payments under its Policy arising as a result of Bear Stearns' and EMC's failure to substitute for or deposit an amount in respect to defective loans pursuant to I&I § 3.03(b) and MLPA § 7 and PSA § 2.03(c); and against JP Morgan and JPMC Bank as successor in interest to Bear Stearns;

272.    For an order against EMC and Bear Stearns awarding reimbursement of Syncora's attorneys' fees, and other costs and expenses incurred in enforcing, defending, or preserving their rights under the Transaction documents pursuant to I&I § 3.03(c); and against JPMC Bank as successor in interest to EMC; and against JP Morgan as successor in interest to Bear Stearns;

273.    For an order against EMC awarding damages for breach of its covenant not to transfer assets, and against JPMC Bank as successor in interest to EMC;

274.    For an order of prejudgment interest; and,

275.    For an order awarding Syncora such other and further relief as the Court deems just and proper.

Dated: October 5, 2012
       New York, New York

                                  Respectfully Submitted,


                                  _____
                                  Edmund M. O'Toole
                                  William H. Devaney
                                  Doreen S. Martin
                                  Venable LLP
                                  1270 Avenue of the Americas, 25th Floor
                                  New York, New York 10020
                                  Tel.: (212) 307-5500
                                  Fax: (212) 307-5598

                                  *Attorneys for Syncora Guarantee Inc.*

                                  -82-