Exhibit 20

FILED: NEW YORK COUNTY CLERK 06/06/2011
INDEX NO. 651566/2011
NYSCEF DOC. NO. 1
12-12020-mg    Doc 5115-20    Filed 09/19/13    Entered 09/19/13 15:39:29    Exhibit 20
RECEIVED NYSCEF: 06/06/2011
Pg 2 of 100

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SYNCORA GUARANTEE INC., formerly known  :
as XL CAPITAL ASSURANCE INC.,

                             Plaintiff,

               - against -

J.P. MORGAN SECURITIES LLC (formerly
known as BEAR, STEARNS & CO. INC.),

                         Defendant.

Index No. _____
Date Purchased: _____

**SUMMONS**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

To the above named Defendant:

        YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to submit answering papers, judgment will be taken against you by default for the relief demanded in the complaint.

        The basis of the venue is the residence of plaintiff and agreement of the parties.

Dated:  New York, New York
       June 6, 2011

                    PATTERSON BELKNAP WEBB & TYLER LLP
                    By _Philip R. Forlenza / mg_
                    Philip R. Forlenza
                    Erik Haas
                    1133 Avenue of the Americas
                    New York, NY  10036-6710
                    Telephone:  (212) 336-2000
                    Fax:  (212) 336-2222
                    _Attorneys for Syncora Guarantee Inc._

TO:    J.P. MORGAN SECURITIES LLC
       270 Park Avenue
       New York, NY, 10016

PATTERSON BELKNAP WEBB & TYLER LLP
Philip R. Forlenza (*prforlenza@pbwt.com*)
Erik Haas (*ehaas@pbwt.com*)
1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

*Attorneys for Syncora Guarantee Inc.*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| SYNCORA GUARANTEE INC., formerly known as XL CAPITAL ASSURANCE INC., | : | Index No. _____ |
|  | : |  |
| Plaintiff, | : |  |
|  | : | **COMPLAINT** |
| - against - | : |  |
|  | : |  |
| J.P. MORGAN SECURITIES LLC (formerly known as BEAR, STEARNS & CO. INC.), | : |  |
|  | : |  |
| Defendant. |  |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## TABLE OF CONTENTS

NATURE OF THE ACTION ....................................................................................................1

I.      THE PARTIES.................................................................................................9

II.     JURISDICTION AND VENUE .....................................................................9

III.    THE BEAR STEARNS MORTGAGE LOAN
        SECURITIZATION MACHINE ...................................................................10

        A.    BEAR STEARNS OVERSAW EVERY ASPECT OF THE
              SECURITIZATION PROCESS .........................................................11

        B.    BEAR STEARNS INCREASED LOAN VOLUME TO SUPPORT
              ITS SECURITIZATIONS BY SACRIFICING LOAN QUALITY .........................14

        C.    BEAR STEARNS EXECUTIVES DROVE BEAR STEARNS'
              SECURITIZATION MACHINE TO CREATE INORDINATE RISK
              FOR PERSONAL GAIN .........................................................19

        D.    JPMORGAN CHASE & CO. ACQUIRED BEAR STEARNS'
              SECURITIZATION MACHINE AT A FIRE SALE ..........................25

IV.     THE TRANSACTION....................................................................................26

        A.    BEAR STEARNS OBTAINED THE LOANS FOR
              SECURITIZATION FROM GREENPOINT....................................26

              1.    Bear Stearns' Longstanding Relationship With
                    GreenPoint .................................................................26

              2.    Bear Stearns Aggregated the GreenPoint Loans
                    and Pooled Them Into the Transaction ..........................29

        B.    BEAR STEARNS SOLICITED SYNCORA TO PARTICIPATE IN
              THE TRANSACTION .........................................................30

              1.    Bear Stearns' Marketing Presentations, Deal
                    Correspondence, and Oral Communications ..............31

              2.    Bear Stearns' Distribution of Mortgage Loan Tapes
                    and Other Collateral Data ...........................................35

              3.    Bear Stearns' Affirmative Representations to
                    Secure Rating Agency Ratings .....................................37

4.      Bear Stearns' Representations and Disclosures in the Offering Documents to Market and Sell the Notes ..................................................................................................40

C.      BEAR STEARNS EFFECTUATED THE TRANSACTION AND SOLD THE NOTES ......................................................................................43

D.      SYNCORA SECURED WARRANTIES RELATING TO THE HELOCs AND MORTGAGE LOAN OPERATIONS ......................................45

V.      BEAR STEARNS' FRAUDULENT INDUCEMENT........................................................46

A.      BEAR STEARNS' REPRESENTATIONS CONCERNING ITS DUE DILIGENCE WERE FALSE AND MISLEADING...................................46

B.      BEAR STEARNS' REPRESENTATIONS CONCERNING ITS QUALITY CONTROL PRACTICES WERE FALSE AND MISLEADING ......................................................................................57

1.      Bear Stearns Misrepresented the Scope of Its Quality Control Reviews Performed on the HELOCs..................................................................................59

2.      Bear Stearns Concealed a High Defect Rate for GreenPoint Loans Prior to Closing...........................................60

C.      BEAR STEARNS' REPRESENTATIONS CONCERNING ITS REPURCHASE PROTOCOLS WERE FALSE AND MISLEADING ..................................60

D.      BEAR STEARNS' REPRESENTATIONS CONCERNING THE ATTRIBUTES OF THE HELOCs WERE FALSE AND MISLEADING ......................................................................................66

1.      Bear Stearns Provided Materially False Loan Data to Syncora in Advance of the Transaction................................66

2.      Bear Stearns Misrepresented Underwriting and Loan Acquisition Standards........................................................68

3.      Bear Stearns Misrepresented and Concealed Material Information Regarding the "Scratch and Dent" HELOCs ..................................................................70

VI.     SYNCORA'S RELIANCE ON BEAR STEARNS' REPRESENTATIONS WAS REASONABLE AND CONSISTENT WITH THE PARTIES' RISK ALLOCATION..................................................................................74

VII.    JP MORGAN TORTIOUSLY INTERFERED WITH
EMC'S CONTRACTUAL OBLIGATIONS TO
SYNCORA ................................................................................................78

    A.    AFTER THE MERGER, JP MORGAN IMPLEMENTED
POLICIES TO REJECT WHOLESALE EMC'S REPURCHASE
OBLIGATIONS ..........................................................................80

        1.    JP Morgan Ordered EMC, "Do Not Repurchase
Any Loans" ..............................................................80

        2.    JP Morgan Directed EMC to Deny Syncora's
Repurchase  Demands While Simultaneously
Asserting Syncora's Breach Claims Against
GreenPoint ..............................................................83

    B.    JP MORGAN INTERFERED WITH EMC'S CONTRACTS  TO
MANIPULATE AND UNDERSTATE ACCOUNTING RESERVES ....................85

VIII.    HARM SUFFERED BY SYNCORA ..........................................................87

FIRST CAUSE OF ACTION ................................................................90

SECOND CAUSE OF ACTION .............................................................91

PRAYER FOR RELIEF .....................................................................93

Plaintiff Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc. ("Syncora"), by its attorneys, Patterson Belknap Webb & Tyler LLP, for its complaint against defendant Bear Stearns & Co. Inc. ("Bear Stearns"), now doing business as J.P. Morgan Securities LLC ("JP Morgan"), hereby alleges upon personal knowledge as to itself and as to its own conduct and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.        Each day the evidence continues to mount of the egregious, widespread fraud perpetrated by Bear Stearns in connection with its mortgage securitization business and the catastrophic consequences for the participants in the securitizations.  That evidence has affirmed the remarkable misconduct by Bear Stearns and its successor JP Morgan pertaining to a mortgage-backed securities transaction known as GreenPoint Mortgage Funding Trust 2007-HE1, executed on March 6, 2007 (the "Transaction"), which has inflicted grave harm on Syncora, as the insurer of the securities Bear Stearns issued.

2.        The Transaction is one of the hundreds of securitizations Bear Stearns effectuated from 2004 through 2007, before it collapsed from the exposure its executives imposed on the corporation to secure obscene compensation directly correlated with the volume of deals done. In the securitization process, Bear Stearns was the "Deal Manager" and "Underwriter" for the Transaction and made representations concerning the securitized mortgage loans and its operations to induce Syncora to insure payments due on certain securities issued in the Transaction.  Bear Stearns' affiliate EMC Mortgage Corp. ("EMC"), as the mortgage loan "Seller" and transaction "Sponsor," sold thousands of loans to a trust, which in turn issued to investors securities that were to be paid down by the promised cash flows from the mortgage loans.  EMC made contractual warranties concerning the attributes of each loan it securitized,

and expressly agreed to promptly disclose – and thereafter cure, repurchase, or provide adequate substitutes for – each mortgage loan that did not conform to its warranties.

3.    EMC's material breaches of contract in connection with the Transaction are the subject of federal litigation commenced on March 31, 2009, captioned *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, Index No. 09 Civ. 3106 (PAC) (S.D.N.Y.).  After bringing suit against EMC, Syncora uncovered dramatic evidence that Bear Stearns fraudulently induced Syncora to enter the Transaction by making false and misleading statements about the loans pooled into the Transaction and its mortgage securitization operations.  Had Syncora known the truth, it never would have participated in the Transaction.  As a result of its participation, Syncora has been greatly harmed.

4.    In light of the protective order in place in the federal litigation against EMC, Syncora has, at this time, avoided using in this Complaint any documents or testimony covered by that order.  Additional particularized allegations and evidentiary support will be added in an amended complaint upon production in this action of documents and deposition testimony produced in the federal action, or upon other resolution of Syncora's ability to use the documents and testimony in this action.

5.    To induce Syncora's participation in the Transaction, Bear Stearns made extensive misrepresentations to Syncora concerning (i) Bear Stearns' longstanding relationship with GreenPoint Mortgage Funding, Inc. ("GreenPoint"), the originator of the loans Bear Stearns securitized in the Transaction, (ii) the reasonable and prudent guidelines pursuant to which the GreenPoint loans purportedly were underwritten, and (iii) the quality and attributes of the mortgage loans.  Bear Stearns also falsely represented to Syncora that it implemented stringent "due diligence" and "seller monitoring" processes to ensure the quality and attributes of the

mortgage loans sold into the Transaction, and thorough "quality control" and "repurchase" protocols to identify and repurchase from the Transaction those loans that did not conform with its representations.  According to Bear Stearns, its controls provided a "foundation for solid performance expectations."

6.      In reality, Bear Stearns knowingly caused mortgage loans made to borrowers unable to pay their debts to slip past its purported control processes and into the Transaction. The first indication that something was awry with the Transaction was the extraordinary rate at which the securitized loans began to default, resulting in significant write-offs and thereby requiring Syncora to make huge payments under the financial guaranty insurance policy it issued in connection with the Transaction that guarantees payments to certain investors (the "Policy"). Slightly more than two years from its March 2007 closing, the Transaction already had suffered more than $221 million in losses, resulting in more than $168.6 million in unreimbursed insurance claims paid by Syncora.  The dramatically poor loan performance suggested that the *entire pool* of loans that Bear Stearns securitized in the Transaction was plagued by rampant fraud and an abdication of sound mortgage origination and underwriting practices.

7.      After observing this initial performance deterioration, Syncora retained an independent third-party consultant to reunderwrite samples of the securitized loans.  The consultant performed loan-level analyses of 1,431 mortgage loans in the Transaction, with an outstanding principal balance of $131 million.  The results evidence a staggering *92%* overall breach rate.  The 1,431 loans reviewed include 400 that Syncora's consultant randomly selected, regardless of their payment status, which had an outstanding principal balance of $28 million. The findings on the random sample were astounding; *85.5%* of these "random" loans breached one or more of the contractual warranties that EMC had made to Syncora.  The most prevalent

and troubling of the breaches identified by Syncora involve (i) rampant misrepresentations about borrower income, employment, assets, and intentions to occupy the purchased properties, and (ii) the loan originator's abject failure to adhere to proper and prudent mortgage-lending practices and its own underwriting guidelines. These pervasive breach findings were directly at odds with Bear Stearns' pre-transactional representations that it undertook thorough due diligence to prevent breaching loans from being sold into the Transaction, and quality control processes to identify and repurchase breaching loans from the pool.

8.    To start, Bear Stearns' internal correspondence shows it *knew* that its representations regarding the "due diligence" it commissioned were false and misleading. Bear Stearns asserted that its due diligence involved a thorough review and "reunderwriting" of loans before they are sold into securitizations to confirm the borrowers' ability to repay the debt. Its internal correspondence shows, however, that Bear Stearns determined in early 2006 that it was conducting "Bad Due Diligence." Nonetheless, Bear Stearns did not implement the requisite improvements suggested by its Vice President responsible for its due diligence operations. Thus, the due diligence remained deficient. And on February 23, 2007, nearly a year later and shortly before the Transaction closed, the same Vice President wrote to Bear Stearns' due diligence provider complaining that it was not catching defective loans that should have been caught. The concerns were so significant that, on March 6, 2007, the very closing date of the Transaction, the Vice President stated in no uncertain terms that "we need to completely revamp how we do [due] diligence," recommending that Bear Stearns implement the same changes he had proposed but that had been rejected a year before. By April 2007, just one month after the Transaction, the problems with the due diligence provider – Watterson Prime, LLC ("Watterson Prime") – had grown so severe that the due diligence Vice President directed his team to "temporarily cease

4

using them for due diligence services," a fact Bear Stearns did not disclose, but instead directed

its due diligence department to "make sure this stays within EMC only."  What Bear Stearns also

concealed, and an underwriter for Watterson Prime candidly admitted, is that the due diligence

provider routinely approved loans for EMC even if "there was a high chance that the loan would

go into default."

9.      It is now apparent that Bear Stearns deliberately disregarded its touted due

diligence processes to maintain its flow of loans from GreenPoint, one of Bear Stearns' largest

suppliers of loans.  This flow was particularly precious to Bear Stearns as the supply of loans for

its securitizations began to dwindle during late 2006, when Bear Stearns acquired the loans later

pooled into the Transaction.  As Bear Stearns knew full well, the "due diligence" it represented

was conducted before the loans were purchased was nothing more than a rubber stamp of

GreenPoint's decisions to grant the loans regardless of the borrowers' inability to pay.  Bear

Stearns deliberately concealed from Syncora that its longstanding relationship with GreenPoint

was based, not on a commitment to quality, but rather on the pursuit of volume.

10.     Bear Stearns likewise *knew* that its representations regarding the "quality control"

processes that it purportedly implemented for the benefit of the securitizations were false and

misleading.  Bear Stearns contended it conducted a thorough review of loans it securitized to

ensure compliance with EMC's warranties, and that it tracked the results over time to "monitor"

the quality of the loan sellers.  But in fact, quality control processes for the benefit of insurers

and investors were virtually non-existent before 2007, when the loans in the Transaction were

acquired, and entirely dysfunctional thereafter.  Moreover, Bear Stearns did not disclose to

Syncora or other counterparties the high breach rates Bear Stearns uncovered through the sparse

quality control it did perform.  Instead, Bear Stearns deliberately disregarded its purported

5

protocols in order to close additional deals for short-term gains and covertly clean out its

depreciating second-lien inventory in late 2006 through early 2007, when the Transaction closed.

11.    Bear Stearns also **_knew_** that its representations concerning its "repurchase

protocols" were false and misleading.  The Bear Stearns Managing Director for United States

Residential Mortgage Backed Securities Investor Relations admitted that Bear Stearns told

insurers that it had in place protocols that ensured loans that breached warranties made to the

securitization trusts were identified and repurchased from the securitized loan pools.  Contrary to

its representations, however, Bear Stearns did not analyze loans for potential breaches of

warranties.  Rather, through September 2007, Bear Stearns directed its personnel **_not_** to review

and repurchase securitized loans for breaches of its warranties **_unless_** the seller of the loan to

Bear Stearns first agreed to repurchase the loan.  Bear Stearns' refusal to implement a

securitization breach review protocol throughout most of 2007 was in knowing disregard of the

advice of its own external auditors and legal counsel, which had advised Bear Stearns that its

failure to do so was in breach of its obligations.

12.    Further, even when Bear Stearns identified loans in the Transaction as breaching

contractual warranties, it did not comply with its commitment to repurchase those loans.  Instead,

Bear Stearns left the defective loans in the Transaction fully appreciating the deleterious effect

the poor performance of the Transaction would inflict on Syncora as the insurer.  Indeed, in late

2007, Bear Stearns implemented a trading strategy to capitalize on the harm it predicted Syncora

would suffer from its malfeasance by betting on the decline in value of Syncora shares, and on

the decline of other companies whose valuations depended on Syncora's wherewithal.

Moreover, Bear Stearns' head RMBS trader boasted that he had devised the shorting scheme,

which he dubbed the "Texas Hedge," to further profit on the harm incurred by the insurers of Bear Stearns' securitizations.

13.    While it was implementing its secret shorting strategy, Bear Stearns actively attempted to suppress any indication of the true nature of the loans in its securitizations.  In late 2007, as the rating agencies began to adjust their ratings of Bear Stearns' mortgage-backed securities, Bear Stearns senior executives – including its Senior Managing Director – attempted to prop up those ratings with threats to withhold "every fee" due to the rating agencies that downgraded the Bear Stearns securities.  The same Senior Managing Director thereafter warned the Bear Stearns Co-President by email dated February 12, 2008 that any hint as to "how distressed we are as a firm could spil [sic] in to [sic] the market and make our problems turn into a death spiral."

14.    Bear Stearns' secret shorting strategy and efforts to conceal its defective securities could not save it from the exposure that its traders had assumed to prop up short-term gains and secure lucrative compensation.  In March 2008, under the weight of its mortgage positions, The Bear Stearns Companies collapsed and was acquired by JPMorgan Chase in a taxpayer-financed fire sale, with Bear Stearns thereafter merging into and with JP Morgan.

15.    In an egregious ploy to avoid recognition of Bear Stearns' liability relating to its securitizations, including the Transaction, JP Morgan has strictly enforced a strategy to reject all repurchase demands made by insurers unless JP Morgan had recourse against the originator of the loans to offset its obligations.  In May 2008, just days after assuming responsibility for the Bear Stearns securitizations, the JP Morgan executive director tasked with addressing insurers' repurchase demands slashed by fifty-six percent (56%) the breach findings already made by EMC, in order to make a corresponding reduction in the accounting reserves attributable to the

7

acquisition of Bear Stearns and EMC under the JPMorgan Chase umbrella.  The same director

then directed EMC employees:  "do not repurchase any loans," adding "[t]he only way a loan

can be repurchased from a deal is if I send an email."

16.    In the utmost duplicity, moreover, the same JP Morgan executive director

(i) denied Syncora's March 4, 2008 request to repurchase nearly all of the 379 loans identified by

its consultant as breaching EMC's warranties, while simultaneously (ii) demanding that

GreenPoint repurchase from EMC *the very same loans for the very same breaches identified by*

*Syncora.*   Syncora has thus far notified EMC of detailed breach findings for 1,313 Transaction

loans, and JP Morgan personnel have responded on behalf of EMC by refusing to repurchase *all*

*but 40 loans*.  JP Morgan's conduct simply is unconscionable, and its denial of the admittedly

valid repurchase claims to avoid recognizing its exposure to the Bear Stearns securitizations

constitutes blatant accounting fraud.

17.    The nature of this action is to redress the pervasive misconduct by Bear Stearns

relating to the Transaction.  Bear Stearns fraudulently induced Syncora to issue its financial

guaranty insurance policy for the Transaction, based on flagrant misrepresentations about the

loans and its processes that Bear Stearns knew were false.  Bear Stearns, doing business as JP

Morgan, then tortiously interfered with EMC's contractual obligations, and continues to frustrate

the fundamental purpose of the parties' agreement.  This gross malfeasance has resulted in

tremendous harm to Syncora.  Through June 2, 2011, the Transaction has suffered more than

$404 million in losses, and as a result, Syncora has paid more than $320.2 million in

unreimbursed insurance claims.  Syncora is entitled to be put in the position it would be in had it

not been fraudulently induced to enter into its insurance agreement and issue its Policy, which

includes the recovery of claims payments made and to be made thereunder.

## I.    <u>THE PARTIES</u>

18.    Syncora is a New York corporation with its principal place of business at 825 8th Avenue, 24th Floor, New York, New York 10019.  At all relevant times leading up to, and including, the Transaction closing date, Syncora was known as XL Capital Assurance Inc.

19.    Bear Stearns was an SEC-registered broker-dealer and a wholly-owned subsidiary of The Bear Stearns Companies principally located at 383 Madison Avenue, New York, NY 10179.  Bear Stearns served as the underwriter for the Transaction.  Pursuant to a merger agreement effective May 30, 2008, JPMorgan Chase acquired The Bear Stearns Companies Inc., including its subsidiaries Bear Stearns and EMC, for nominal consideration in a transaction that was financed in part by a $29 billion non-recourse loan made by taxpayers (the "Merger"). Following the Merger, on or about October 1, 2008, an existing subsidiary of JPMorgan Chase & Co. known as J.P. Morgan Securities Inc. merged with and into Bear Stearns, and the surviving entity was renamed J.P. Morgan Securities Inc.  Effective Sept. 1, 2010, JP Morgan Securities Inc. converted from a corporation to a limited liability company, and changed its name to J.P. Morgan Securities LLC (defined above as "JP Morgan").  Accordingly, all allegations against Bear Stearns are made against JP Morgan.  JP Morgan is an indirect wholly-owned subsidiary of JPMorgan Chase, which is an investment banking holding company incorporated in Delaware and principally located at 270 Park Avenue, New York, New York, 10016.

## II.    <u>JURISDICTION AND VENUE</u>

20.    This Court has personal jurisdiction over the Defendant pursuant to N.Y. C.P.L.R. §§ 301 and 311-a.

21.    Defendant also is subject to personal jurisdiction in this Court because it is authorized to do business within New York and regularly transacts business within the State. Defendant participated in negotiations and other activities within the State that led to the

Transaction that gives rise to the claims in this complaint, and the Transaction itself occurred within the State.

22.　　Venue is proper in New York County pursuant to N.Y. C.P.L.R. §§ 503(a).

## III.　THE BEAR STEARNS MORTGAGE LOAN SECURITIZATION MACHINE

23.　　This action arises from the material misrepresentations and omissions in the disclosures made by Bear Stearns to induce Syncora to participate in the Transaction, and Bear Stearns' unjustified procurement of EMC's breach of its covenant to repurchase Transaction loans breaching the contractual warranties made by EMC in the agreements effectuating the Transaction.

24.　　By way of background, the securitization process involves the pooling and sale of mortgage loans to a trust, which issues debt securities of varying seniority with payments dependent on, or "backed" by, the cash flow received from the pooled loans. That is, the cash flow received from the mortgage loans – borrowers' principal and interest payments – is to be used to pay investors who purchased the securities issued by the trust. Mortgage-backed securitizations often are structured to include several types of credit enhancement. One type is an insurance policy issued by a financial guarantor (in this case, Syncora) guaranteeing certain payments to investors in specified classes of securities. The insurer is bound by its policy to make up shortfalls in cash flow from principal and interest payments by borrowers so that certain investors receive guaranteed payments on their securities. The Transaction closed in March 2007, underwritten by Bear Stearns and enhanced by Syncora's Policy. It was among hundreds of transactions that the Bear Stearns securitization machine churned out from 2004 to 2007.

A.    BEAR STEARNS OVERSAW EVERY
ASPECT OF THE SECURITIZATION PROCESS

25.    Through its well-engineered network of affiliates, Bear Stearns oversaw every

link in the mortgage-loan securitization chain, including (i) the origination, and financing of the

origination, of enormous volumes of loans to provide the cash flow for the mortgage-backed

securities, (ii) the "warehousing" or temporary financing of large pools of loans pending their

pooling and securitization into mortgage-backed securities, (iii) the underwriting, offering, and

sale of the mortgage-backed securities, and (iv) the servicing of loan pools to ensure the

continued payment of principal and interest needed to pay investors in mortgage-backed

securities.  As Bear Stearns' parent, The Bear Stearns Companies, reported in its 2006 Annual

Report, this "vertically integrated franchise allows us access to every step of the mortgage

process, including origination, securitization, distribution and servicing."[1]  Bear Stearns'

affiliates (separate entities owned by The Bear Stearns Companies) implemented each of these

components of the mortgage securitization process.[2]

26.    EMC acted as the mortgage-loan "conduit" that generated the flow of loans into

the securitization pipeline from which the mortgage-backed securities issued.[3]  Mary Haggerty,

who was the Senior Managing Director responsible for the conduit's creation in 2001, explained

that EMC acquired mortgage loans for the purpose of securitizing them:  "[I]f you think of a

pipe, water comes in and water goes out as opposed to a pipe leading to a reservoir that's going

---

[1] The Bear Stearns Companies Inc., 2006 Annual Report, at 11 (2007).

[2] 4/26/2010 Golden Deposition Tr. at 12-13, 52-53 (stating that the "reporting relationship was to New York" and noting that approximately 50 to 60 individuals had dual titles at Bear Stearns and an EMC entity); 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 45; 1/22/2010 Megha Rule 30(b)(6) Deposition Tr. at 71-73; 4/15/2010 Gray Deposition Tr. at 48; 5/28/2010 Sears Deposition Tr. at 247-48.

[3] 4/19/2010 Glory Deposition Tr. at 93-95 (Bear Stearns Managing Director testified that references to the "Bear Stearns Subprime Mortgage Conduit" meant the conduit was housed at EMC); EMC Investor Presentation dated July 26, 2006, EMC-AMB 010838314-413 at 315 (EMC's conduit operations were headquartered in Dallas, Texas).

to be held."[4]  EMC thus supplied the Bear Stearns securitization machine with mortgage loans

that Bear Stearns had no intention of ever holding in its own inventory.

27.    EMC's role was to (i) acquire the mortgage loans to be securitized, (ii) sponsor

the securitizations by selling loan pools to the trusts that issued the securities, and (iii) in some

cases, act as "servicer" for a large number of the securitized loans, which included the obligation

to collect amounts from the borrowers for the benefit of the trusts.

28.    EMC financed, purchased, and originated an enormous volume of mortgage loans

"with the ultimate strategy of securitization into an array of Bear Stearns' securitizations."[5]  The

majority of loans EMC acquired for securitization were purchased from large third-party

originators such as GreenPoint, which originated all of the loans pooled in the Transaction at

issue here.

29.    Bear Stearns acted as lead underwriter and designated its employees as the deal

managers to broker the EMC-sponsored securities offerings.  It solicited the rating agencies to

rate, financial guarantors such as Syncora to insure, and investors to purchase these mortgage-

backed securities.[6]  Thus, Bear Stearns (i) structured the Transaction,[7] (ii) took the lead in

coordinating the flow of documents and information among the rating agencies and parties to the

Transaction, and (iii) as underwriter, purchased, offered and sold the Notes to investors.[8]  The

---

[4] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 21.

[5] Prospectus Supplement for the Transaction, dated March 5, 2007 (the "GPMF 2007-HE1 ProSupp") at S-32.

[6] 4/19/2010 Glory Deposition Tr. at 49-55, 57-59 (testimony regarding EMC's and Bear Stearns' separate roles).

[7] *See, e.g.*, GPMF 2007-HE1 ProSupp at S-32 ("Subsequent to purchase by the sponsor, performing loans are pooled together by product type and credit parameters and structured into RMBS, with the assistance of Bear Stearns' Financial Analytics and Structured Transactions group, for distribution into the primary market.").

[8] In connection with the Transaction, Bear, Stearns & Co. and the Depositor, Bear Stearns Asset Backed Securities I LLC, entered into an Underwriting Agreement, dated April 13, 2006, and Terms Agreement,

Bear Stearns trading organization – reporting to Senior Managing Director Thomas Marano –
also made the decisions on the securitizations to effectuate; likewise, the volume of loans being
acquired by the conduit was "highly controlled by the [Bear Stearns] trading desk."[9]  And, as
discussed further below, Bear Stearns executives made decisions and representations regarding
the due diligence, quality control, and repurchase protocols to be followed (or not followed) in
relation to securitized loans.

30.    Bear Stearns and its affiliates also frequently purchased or retained a financial
interest in a portion of the securities issued in securitization transactions, which Bear Stearns
often repackaged and sold into securities known as "collateralized debt obligations" ("CDOs").
Moreover, Bear Stearns took short positions betting against securitization counterparties,
including financial guarantors such as Syncora, which it knew were vulnerable given they had
insured securitizations loaded with defective loans.[10]  Finally, Bear Stearns provided financial
research in structuring the residential mortgage-backed securities and related structured products
that it created and sold.

31.    Through Bear Stearns and its affiliates, The Bear Stearns Companies recorded
gains and earned fees at every step in this chain:  (i) loan-origination fees on loans originated by

---

dated March 6, 2007, providing that:  "Underwriter agrees, subject to the terms and provisions of the
above-referenced Underwriting Agreement, which is incorporated herein in its entirety and made a part
hereof, to purchase the respective principal amounts of the Classes of the above-referenced Series of
Notes as set forth herein."  The Underwriting Agreement further provides:  "It is understood that each
Underwriter proposes to offer and/or solicit offers for the Certificates to be purchased by it for sale to the
public as set forth in the Prospectus . . . ."

[9] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 86-87.

[10] *See* Email from Jeffrey Verschleiser (Bear Stearns & Co. Senior Managing Director, Head of ABS &
Wholeloan Desk), dated November 20, 2007, EMC-AMB 009600760-63 ("At the end of October [2007],
while presenting to the risk committee on our business I told them that a ***few financial guarantors were
vulnerable*** to potential write downs in the CDO and MBS market and ***we should be short*** a multiple of 10
of the shorts I had put on . . . In less than three weeks we made approximately $55 million on just these
two trades.") (emphasis added).

its subsidiaries, (ii) the proceeds of the sale of notes and certificates to investors as consideration for conveying securitized mortgage pools to the securitization trusts, (iii) fees from underwriting mortgage-backed securities, (iv) fees from servicing securitized loans serviced by EMC, (v) fees from structuring CDOs into which these securities were repackaged, (vi) fees from trading the securities and positions in CDOs into which they were placed, (vii) gains from taking "short" positions in entities, such as Syncora, who were adversely affected by Bear Stearns' securitization activities; and (viii) management fees and carried interests from hedge funds and other investment vehicles that invested in the vast array of securities and financial products structured by Bear Stearns and its affiliates that ultimately were backed by residential mortgage loans.

32.      As discussed below, the benefit from the fees generated by mortgage-backed transactions flowed to Bear Stearns' executives, who obtained substantial compensation in exchange for short-term gains despite putting at risk Bear Stearns' ultimate wherewithal.  These executives' reckless pursuit of personal profit without the requisite checks and controls came at a severe cost to Syncora, and eventually to their own firm.

### B.      BEAR STEARNS INCREASED LOAN VOLUME TO SUPPORT ITS SECURITIZATIONS BY SACRIFICING LOAN QUALITY

33.      At the time the Transaction was consummated, The Bear Stearns Companies had long been a leader in all facets of mortgage-loan securitization, at or near the top of the charts for volume of issuance and underwriting of mortgage-backed securities for 17 years running.[11]  The

---

[11] *See, e.g.*, Asset-Backed Alert, Dec. 31, 2006, *available at:* http://www.abalert.com/Public/MarketPlace/Ranking/index.cfm?files=disp&article_id=1044674725 (ranking Bear Stearns as the fifth-largest issuer of mortgage-backed securities); Q4 2006 The Bear Stearns Companies Earnings Conference Call, Dec. 14, 2006 (stating that, for 2006, "Bear Stearns ranked as the number one underwriter of MBS Securities [mortgage-backed securities] as the Company's securitization volume rose to $113 billion from $95 billion in fiscal 2005, capturing 11% of the overall U.S. mortgage securities market").

Bear Stearns Companies built this once-stellar reputation on the securitization of large, high-quality loans referred to as "jumbo prime," which was the business it maintained until 2001.[12]

34.     The Bear Stearns Companies then established the mortgage-loan conduit at EMC, which initially focused on the securitization of "Alt-A" loans that were made to those borrowers who were generally considered more risky than prime borrowers.  The profits from the securitizations grew year after year, but took off in 2003, when Bear Stearns began to securitize "subprime" mortgage loans, which it never squarely defined, but that generally constitute loans issued to borrowers with limited incomes or relatively low FICO credit scores due to poor credit history.[13]

35.     From 2003 to 2006, The Bear Stearns Companies' revenue and profit increased by 123.8% and 77.6%, respectively, driven in large part by mortgage finance and its securitization machine.[14]  For 2006, The Bear Stearns Companies' overall securitization volume rose to $113 billion from $95 billion in fiscal year 2005, amounting to 11% of the overall U.S. mortgage-securities market.[15]  Consistently, the volume of Bear Stearns' securitizations grew markedly over the same period.  In 2003, Bear Stearns securitized 86,000 loans valued at approximately $20 billion.  That number nearly tripled in 2004 to 230,000 loans valued at $48

---

[12] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 28, 30.

[13] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 32-33 (EMC began purchasing subprime loans for securitization); *see also* 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 29-30 (unable to provide a definition distinguishing Alt-A loans from subprime); 4/15/2010 Glory Deposition Tr. at 178-79 (testifying she had no knowledge of whether the definition of subprime changed over time); 5/28/2010 Sears Deposition Tr. at 36-37 (defining a subprime loan as one given to a borrower with "less than pristine" credit history); 6/2/2010 Smith Deposition Tr. at 93 ("I don't believe there was a definition [of subprime]").

[14] The Bear Stearns Companies Inc., Annual Report (Form 10-K), at 79 (Nov. 30, 2006); The Bear Stearns Companies Inc., Annual Report (Form 10-K), at 77 (Nov. 30, 2005).

[15] Q4 2006 Bear Stearns Earnings Conference Call, Dec. 14, 2006.

billion.[16]  In 2005, the number jumped to 389,000 loans valued at nearly $75 billion.[17]  And through September 2006, Bear Stearns had securitized another 272,000 loans valued at $54.6 billion.[18]  All told, from 2003 to 2007, Bear Stearns securitized just under one million mortgage loans originally valued in excess of $212 billion.[19]

36.    Critical to Bear Stearns' perpetuation of this successful enterprise was an increasing supply of mortgage loans.  As investor demand for mortgage-backed securities created and sold by Bear Stearns grew (due to their higher yield relative to other securities and their erroneously perceived relative safety), so did the need for ever-increasing numbers of loans to securitize.  With a corporate objective of increasing origination and securitization volume in this investor-driven market, Bear Stearns and the lenders it funded actively expanded their use of "reduced documentation" or "no documentation" loan programs.  While these programs bear various names (*e.g.*, "Stated Income," "No Ratio," "Stated Income Stated Asset," or "SISA"), they share the common characteristic of requiring less documentation from the borrower than traditional full documentation loan programs.  Accordingly, the reduced or no documentation programs were designed to be offered only to certain types of pre-qualified borrowers (*e.g.*, self-employed individuals with very strong credit and substantial equity in the mortgaged property), and the originators approving those loans were required to use alternative means of assessing the borrowers' ability to repay the loans.  However, over time, Bear Stearns and its stable of originators like GreenPoint expanded these programs to riskier categories of borrowers in order to increase loan volume.

---

[16] GPMF 2007-HE1 ProSupp at S-32.

[17] GPMF 2007-HE1 ProSupp at S-32.

[18] GPMF 2007-HE1 ProSupp at S-32.

[19] GPMF 2007-HE1 ProSupp at S-32.

37.     In addition, to keep Bear Stearns' pipeline full, EMC added second-lien loans and home-equity lines of credit ("HELOCs") to its portfolio of mortgage products, many of which were also made on a low-documentation or no-documentation basis.  HELOCs, which are the type of loans at issue in this action, provide to the borrower a revolving line of credit that is generally secured by a second-lien mortgage.  EMC's HELOC business began in 2005 with over 9,300 loans valued at more than $509 million and grew to more than 18,000 loans valued at over $1.2 billion by the end of 2006.[20]  The growth in its second-lien business was meteoric, with purchase volume skyrocketing from approximately 15,000 loans valued at approximately $660 million at the end of 2004 to approximately 116,500 loans valued at approximately $6.7 billion at the end of 2006.[21]

38.     The reduced documentation programs and second-lien products Bear Stearns exploited had been in use in residential mortgage lending for some time, and were not at the time considered problematic in and of themselves.  Rather, the programs and products were appropriate sources of loans *so long as* commensurate controls were implemented and followed to ensure the quality of the securitized loans.

39.     The other key to the Bear Stearns securitization machine was investor demand for its mortgage-backed securities.  As discussed in detail below, Bear Stearns made extensive representations in advance of and at the closing of its securitizations to convince financial guarantors, including Syncora, that it had implemented and was applying the controls required to ensure the quality of securitized loans.  The Bear Stearns Companies underscored the purported commitment to loan quality to assuage potential concerns regarding the pace of its growth:

---

[20] Prospectus Supplement to Bear Stearns ALT-A Trust 2007-3, dated April 25, 2007, at 44.

[21] Prospectus Supplement to Bear Stearns ALT-A Trust 2007-3, dated April 25, 2007, at 44.

17

> [O]ur [origination and] conduit business . . . saw a significant
> increase in origination volume over the course of the year and
> that's important not only because it secures a direct pipeline of
> product for securitization and thereby allows us to maintain and
> increase share, but also it has a lot to do with the quality of the
> product that we're able to put out in the nonagency space.[22]

40.    The Bear Stearns Companies' pitch was persuasive and it worked.  Bear Stearns'

representations induced Syncora to insure payments due on securities issued from the Bear

Stearns securitization pipeline, and induced investors to purchase those securities.

41.    Bear Stearns did not implement the requisite controls and actively concealed

material facts regarding its actual securitization practices and internal protocols.[23]  What has only

recently come to light is that Bear Stearns' expanded securitization of reduced documentation

second-lien products, including the HELOCs securitized in the Transaction, was *not*

accompanied by the implementation – but rather by the abandonment – of controls required to

ensure the quality of the securitized loans.

42.    By secretly abandoning appropriate underwriting and due diligence to increase

loan volume (in contravention of its pre-closing representations to Syncora), Bear Stearns

knowingly securitized in the Transaction a loan pool that was replete with loans that did not

comply with the requisite underwriting guidelines and were made to borrowers who did not have

the ability to repay them.  As a result, Bear Stearns knowingly, or with reckless disregard,

marketed and sold in connection with the Transaction hundreds of millions of dollars worth of

securities backed by mortgage loans that did not conform to its representations and disclosures.

---

[22] The Bear Stearns Companies Investor Conference Call regarding Q4 2005 Earnings, Dec. 15, 2005.

[23] *See Bear Naked Lenders*, Wall St. J., March 18, 2008, at A22 ("Bear took particular pride in its risk management, but let its standards slide in the hunt for higher returns during the mortgage mania earlier this decade.").

43.    The inclusion of unvetted, imprudently underwritten loans in securitizations like the Transaction created huge risks of loss to the investors and insurers, and ultimately to the shareholders of The Bear Stearns Companies (as Bear Stearns acquired more loans and offered more mortgage-backed bonds than it could sell).  Yet the securitization business generated extraordinary compensation for Bear Stearns' executives that was directly correlated with the volume of securitizations done.  This divergence of interests is what led to the fall of Bear Stearns, and to the instant action.

### C.    BEAR STEARNS EXECUTIVES DROVE BEAR STEARNS' SECURITIZATION MACHINE TO CREATE INORDINATE RISK FOR PERSONAL GAIN

44.    Bear Stearns' top executives were the key decision-makers who drove the Bear Stearns securitization machine.  They were responsible for Bear Stearns' failure to implement the requisite controls relating to its securitizations, and for its fraudulent scheme of inducing financial guarantors like Syncora to participate in those securitizations.  Investor presentations disseminated by Bear Stearns to Syncora and others to induce participation in its securitizations identify, in their official capacities, the senior executives within Bear Stearns' Residential Mortgage Backed Securities Team as follows:[24]

---

[24] *See, e.g.*, Bear Stearns RMBS Platform, www.emcmortgagecorp.com, EMC-SYN 00537506, at p. 5.



45.     From their respective positions in the upper echelons of Bear Stearns' executive management, Cayne, Greenberg, Spector, and Schwartz directed or encouraged the very policies and procedures undertaken to expand securitization volume for the sake of maximizing short-term profitability, with intentional or reckless disregard for the fraudulent disclosures used to market and sell the securities issued in connection with Bear Stearns' residential mortgage-backed securitization transactions.  The upper management of Bear Stearns thus enabled and encouraged all of its executives and managers to implement and perpetuate Bear Stearns' fraudulent scheme.

46.     In the words of a former Bear Stearns executive, Senior Managing Directors Marano, Nierenberg, and Verschleiser acted as the "decision-makers" during the relevant time frame who "were actively involved in running the mortgage business, which included servicing conduit, trading, etc."[25]  Senior Managing Director and Co-head of Mortgage Finance Mary

---

[25] 4/26/2010 Golden Deposition Tr. at 252.

Haggerty explained Marano's role as the Senior Managing Director and Global Head of

Mortgage-Back Securities and Asset-Backed Securities:  "[d]ecisions about how much risk to put

on would have been made by the trading organization, which reported up to Tom Marano," and

he "would have been well aware of the amount of risk that was being taken on in terms of

acquiring assets and . . . the activities with respect to securitization[.]"[26]  Marano reported

directly to Co-head of Fixed Income, Jeffrey Mayer.[27]

47.    As the Co-heads of Mortgage Trading, Senior Managing Directors Nierenberg

and Verschleiser directly supervised the Co-heads of Mortgage Finance, Haggerty and

Silverstein, and had oversight in all aspects of Bear Stearns' mortgage-finance operations.

Verschleiser was the primary trader responsible for acquiring mortgage loans for securitization,

and put inordinate pressures on staff to meet volume objectives at the expense of prudent

underwriting standards.[28]  As an underwriting manager wrote to her staff:

> I refuse to receive any more emails from JV [Jeff Verschleiser] (or
> anyone else) questioning why we're not funding more loans each
> day. . . .  [I]f we have 500+ loans in this office *we MUST find a
> way to underwrite them and buy them*.  . . .  I was not happy when
> I saw the funding numbers and I knew that NY would NOT BE
> HAPPY. . . .  I expect to see 500+ each day.  . . .  *I'll do whatever
> is necessary* to mare sure you're successful in meeting this
> objective.

In addition to the personnel acquiring loans for securitization, Bear Stearns traders responsible

for determining which loans to package and securitize in the Transaction reported to

Verschleiser.[29]  Nierenberg and Verschleiser, in turn, each reported to Marano.

---

[26] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 84-85, 91-92.

[27] 4/26/2010 Golden Deposition Tr. at 252.

[28] *See* Email from Jo-Karen Whitlock (EMC Mortgage Corporation Senior Vice President, Conduit
Operations), to loan acquisition staff, dated April 14, 2006, EMC-SYN 00596927-928 (emphasis added,
capitalization in original).

[29] 6/2/2010 Smith Deposition Tr. at 122-23.

48.　　As the Co-heads of Bear Stearns' Mortgage Finance Department, Haggerty and Silverstein each had oversight responsibilities that allowed for, and encouraged, the acquisition of defective mortgage loans by EMC to be pooled into the Transaction, and the management of the purported review of the loans before they were securitized.

49.　　Bear Stearns' top executives adopted and succumbed to a compensation structure that created perverse incentives for Bear Stearns to purchase and securitize loans regardless of their quality in order to secure massive compensation payouts.  Indeed, based on publicly available information, CEO James Cayne, Executive Committee Chairman Alan Greenberg, Co-President Alan Schwartz, and Co-President Warren Spector earned an aggregate total of over *$1 billion* in salary, bonus, and stock benefits since 2001, during the years preceding Bear Stearns' collapse in 2008.  Even after accounting for the drop in stock value resulting from Bear Stearns' colossal failure, these top executives made an aggregate *net payoff exceeding $650 million*.  Meanwhile, the firm disintegrated, its shareholders' investments evaporated, and the loans it funded and securitized – and the mortgage-backed securities and other financial products linked to them – have wreaked unprecedented harm on financial guarantors, borrowers, investors, and the economy as a whole.

50.　　The compensation packages for Bear Stearns' top executives are analyzed in a Yale Journal on Regulation article discussing the "moral hazard" risk resulting from the perverse incentives Bear Stearns' executives had to enhance their individual wealth by taking excessive risks with other peoples' money.  The article concludes that paying out enormous performance-based salaries and bonuses created incentives to seek short-term profits by taking excessive risks that ultimately led to Bear Stearns' failure in 2008:

> [T]he design provided executives with substantial opportunities (of which they made considerable use) to take large amounts of compensation based on short-term gains off the table and retain it even after the drastic reversal of [Bear Stearns'] fortune[]. . . . *Such a design of bonus compensation provides executives with incentives to seek improvements in short-term earnings figures even at the cost of maintaining an excessively high risk of large losses down the road*.[30]

51.    Bear Stearns awarded each of its top executives extraordinarily high compensation tied to the expansion of Bear Stearns' securitization machine.   Bear Stearns also handsomely compensated its trading desks for increasing the volume and pace at which loans were fed into the securitization pipeline.

52.    Consistent with the moral hazard risk of Bear Stearns' compensation structure, Bear Stearns made false representations to its shareholders to obscure the reckless expansion of its securitization machine.   More particularly, in February 2007, just weeks before the Transaction closed, Bear Stearns represented to the SEC and The Bear Stearns Companies shareholders that its practice was to sell its retained positions in Bear Stearns securitizations "shortly after the settlement of a securitization."[31]   What Bear Stearns failed to clarify to its shareholders was that, in the pursuit of expansion and short term gains, it had underwritten more mortgage-backed bonds than it could sell and was stuck holding long-term positions in the unsafe assets.

---

[30] *See* Lucian A. Bebchuk, Alma Cohen & Holger Spamann, *The Wages of Failure:  Executive Compensation at Bear Stearns and Lehman 2000-2008*, 27 YALE J. ON REG. 257, 274 (2010) (emphasis added).

[31] The Bear Stearns Companies, Inc. 2006 Annual Report to Stockholders, filed February 13, 2007, at 94, *available at http://www.sec.gov/Archives/edgar/data/777001/000091412107000335/be7368933-ex13.txt* (emphasis added).  *See also* Email from Michael Sinapi (Bear Stearns & Co.), Managing Director to Michael Nierenberg (Bear Stearns & Co. Senior Managing Director, Head of ARM and CDO Desk) and Jeffrey Verschleiser (Bear Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk), among others, dated October 5, 2006, EMC-AMB 001496565-567 ("Bear told the SEC that our intent is to sell, not hold, our securities after securitization.").

53.    Documents and testimonial statements recently publicized by the FCIC further

expose the reckless disregard for managing risk at Bear Stearns in connection with mortgage

securitization and related businesses.  The FCIC materials reveal, among other things, that Bear

Stearns never even squarely faced the issue of risk management because business personnel

dominated its internal audit process.  As the SEC concluded from its Risk Management Review

of Bear Stearns in connection with the CSE program:

> IAD's [Internal Audit Department's] procedures appear to permit
> senior management of the business audited to have *undue
> influence* in the draft Audit Report and to require the approval of
> the Audit Report be obtained from auditee senior management
> before its issuance.  The staff is concerned that such procedures
> appear to permit *business personnel rather than the independent
> audit team to make a determination on findings*.[32]

54.    And at the May 5, 2010 FCIC hearings, Commissioner Georgiou asked former

Bear Stearns Chairman and CEO James Cayne and former CEO Alan Schwartz if "everybody's

due diligence along the [mortgage securitization] process here might have been better" had

parties taken more of a stake in long-term performance.  James Cayne candidly admitted, "*I think

you're right*."  Alan Schwartz concurred − "I think you're on to a very good point."  But by then,

it was far too late.

55.    At the time of the Transaction, the means and the motivation for Bear Stearns'

executives were the same – money, and lots of it – to churn out securitizations regardless of the

consequences.[33]  As a result, while Bear Stearns executives reaped enormous personal

---

[32] Information Memorandum Non-Public, CSE Examination of Bear, Stearns & Co. Inc., November 4, 2005, SEC_TM_FCIC_1053369, at 3371 (emphases added).

[33] In May 2007, only two months after the Transaction closed, Bear Stearns began to acknowledge what it already knew but failed to disclose:  its securitizations were doomed to fail.  *See, e.g.*, Email from Thomas Marano (Bear Stearns & Co. Senior Managing Director, Head of MBS, ABS, CMBS) to Michael Nierenberg (Bear Stearns & Co. Senior Managing Director, Head of ARM and CDO Desk) and Jeffrey Verschleiser (Bear Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk), among

compensation (which they have retained to this day), their actions caused the company's sudden

collapse in 2008, and destroyed the livelihoods of millions of Americans (including those

individuals that obtained loans that never should have been approved, and those whose

retirement plans invested in Bear Stearns' securitizations).

### D.    JPMORGAN CHASE & CO. ACQUIRED BEAR STEARNS' SECURITIZATION MACHINE AT A FIRE SALE

56.    Following its unprecedented collapse in the spring of 2008, The Bear Stearns

Companies and its subsidiaries – including Bear Stearns and EMC – were acquired by JPMorgan

Chase in a fire sale for only $10 a share, which was funded, in part, through a $29 billion non-

recourse loan from the American taxpayers.

57.    After JPMorgan Chase acquired Bear Stearns for nominal consideration, its

subsidiary, JP Morgan, began deliberately frustrating investors' and insurers' rights in the Bear

Stearns securitizations to avoid having to account for Bear Stearns' massive exposure related to

its securitizations on its consolidated financial statements.  Most significantly, JP Morgan

implemented a bad faith strategy to reject without justification insurers' and investors' legal

remedies, demands, and other claims relating to the toxic loans backing Bear Stearns

securitizations.

---

others, dated May 11, 2007, EMC-AMB 003501771-772 ("You guys need to get a hit team on blowing
the retained interest bonds out asap.  This is the biggest source of balance sheet problems.").

## IV.    THE TRANSACTION

### A.    BEAR STEARNS OBTAINED THE LOANS FOR SECURITIZATION FROM GREENPOINT

#### 1.    Bear Stearns' Longstanding Relationship With GreenPoint

58.    GreenPoint was the originator of all of the loans in the Transaction.  EMC purchased the loans in the Transaction from GreenPoint in four separate bulk loan purchase transactions, or "subdeals," between October and December 2006.

59.    As of 2006, GreenPoint was one of the country's largest mortgage lenders, and responsible for the origination of a large percentage of the loans EMC acquired and Bear Stearns securitized.  As one of its largest originators, GreenPoint had significant leverage to demand concessions from Bear Stearns, particularly as the supply of loans Bear Stearns required for its securitization machine tightened in late 2006.

60.    Those concessions were manifested in EMC's approval of GreenPoint's ever-loosening origination guidelines.  EMC provided Bear Stearns with a steady flow of GreenPoint loans by accepting without limitation in 2006 GreenPoint's increasingly loosened guidelines, and in particular with respect to the underwriting guidelines applicable to the HELOCs in the Transaction.[34]

61.    Moreover, once in house, the "due diligence" Bear Stearns conducted was tantamount to almost no due diligence at all.  Indeed, in 2007, Bear Stearns *reduced* the size of the GreenPoint loan samples it subjected to due diligence.[35]  Both changes reduced the

---

[34] By way of example, in 2006 GreenPoint began offering concurrent funding or "piggyback" loans for all products, and expanded no income disclosure documentation from primary residences only to second homes and investment properties.

[35] *See* May 29, 2007 email from Baron Silverstein (Bear Stearns & Co. Senior Managing Director, Co-head, Mortgage Finance), EMC-SYN 00416564.

effectiveness of the diligence and were designed to ensure the continued flow of defective loans into Bear Stearns' securitization machine.

62.     Further still, Bear Stearns undertook minimal quality control over GreenPoint loans and concealed from counterparties, including Syncora, the disconcerting results of the sparse quality control it did perform on GreenPoint loans through a third-party vendor.  The quality control Bear Stearns performed on GreenPoint loans was superficial.

63.     Rather than taking steps to reduce the defect rates in the loans it acquired from GreenPoint and ensure the quality of its securitized products, Bear Stearns pursued so-called "early payment default" rights to secure confidential settlements from GreenPoint while simultaneously and knowingly pooling its inventory of defective GreenPoint loans into securitizations.  That is, Bear Stearns demanded that GreenPoint repurchase loans that defaulted shortly after purchase, during the early payment default ("EPD") period, based on GreenPoint's contractual obligation to repurchase a loan that defaults within the first thirty, sixty, or ninety days after Bear Stearns' purchase – regardless of whether the loan had been securitized.  But rather than hold GreenPoint to its obligation to repurchase, it often settled the repurchase claims.

64.     Although Bear Stearns settled repurchase claims at deep discounts as a further concession to GreenPoint, EMC often did not repurchase from the securitizations the loans on which it had recovered settlements.  Indeed, while Bear Stearns admits early payment defaults were red flags of fraud,[36] Bear Stearns conducted no inquiry to assess whether those loans breached the contractual warranties EMC made to securitization counterparties, in contravention of Bear Stearns' representations to Syncora touting its repurchase process as a benefit to insurers.

---

[36] Bear Stearns' Senior Managing Director Baron Silverstein acknowledged in his deposition that loans that miss a payment shortly after the loan origination (*i.e.*, within the EPD period) raise "red flags" that the loans never should have been issued in the first instance.  6/4/2010 Silverstein Deposition Tr. at 178.

65.    By early 2007, Bear Stearns had been advised by its outside auditor and counsel that its failure to promptly review for repurchase the defected and defaulted loans was a breach of its obligations to the securitizations.[37]  Instead, after feeling this outside pressure, Bear Stearns cut back on its claims against GreenPoint and took no action to identify the defective loans it was securitizing, since it could not continue to pocket settlement recoveries.  In other words, Bear Stearns knew a high percentage of GreenPoint loans were defective and would likely default and strip the securitizations of necessary cash flow, but did nothing in order to preserve its source of loans and continue to consummate deals.

66.    Shortly after the Transaction at issue closed in March 2007, GreenPoint faced a wave of lawsuits alleging that it had engaged in a pattern of fraudulent and otherwise improper lending practices.[38]  In August 2007, GreenPoint's parent, Capital One Financial Corporation, shut down GreenPoint's mortgage-origination operations.[39]  In what amounts to an admission that lax underwriting practices had fueled GreenPoint's productivity, a GreenPoint spokesperson and Capital One's chairman both offered the same explanation for GreenPoint's demise: tightened underwriting standards in the lending industry.[40]

---

[37] *See* Section V.C., below.

[38] *See Steinmetz v. GreenPoint Mortgage Funding, Inc.*, Case No. 08-civ-5367 (S.D.N.Y. June 11, 2008); *Ferguson v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 0:08-CV-60854-WPD (S.D. Fla. June 5, 2008); *Lewis v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 1:08-cv-00567-TSE-TCB (E.D. Va. June 3, 2008); *Ouziz v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 3:08-cv-02201-WHA (N.D. Cal. Apr. 29, 2008); *Perez v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 5:08-cv-01972-JW (N.D. Cal. Apr. 15, 2008); *Ramirez v. GreenPoint Mortgage Funding, Inc.*, Case No. 3:08-cv-00369-EDL (N.D. Cal. Jan. 18, 2008); *Knapp v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. CIV 466080 (Cal. Super. Ct. Sept. 14, 2007); *Feinstein v. GreenPoint Mortgage Funding, Inc. et al.* (E.D. Pa. May 7, 2007).

[39] Valerie Bauerlein, *Capital One Shuts Down GreenPoint Mortgage Unit*, WALL ST. J., Aug. 22, 2007.

[40] *See* Jed Moss, *Alt-A Mortgage Lender Closes Up Shops*, MORTGAGE FOUND., June 9, 2007 (citing GreenPoint spokesperson Julie Rakes); Bauerlein, *Capital One Shuts Down GreenPoint Mortgage Unit* (citing a memo circulated by Capital One Chairman and Chief Executive Richard D. Fairbanks).

67.     Despite warnings not to do so, even after GreenPoint's parent company ceased its mortgage operations, EMC continued to purchase loans from its mainstay GreenPoint, to satisfy Bear Stearns' appetite, right up to the bitter end.

### 2.     Bear Stearns Aggregated the GreenPoint Loans and Pooled Them Into the Transaction

68.     Bear Stearns aggregated and securitized in the Transaction 9,871 GreenPoint loans with an aggregate principal balance of approximately $666 million ("the HELOCs"). All but two of the HELOCs were second-lien loans, *i.e.*, second mortgages obtained by borrowers in the form of a revolving line of credit. Greenpoint continued to service the HELOCs after securitization.

69.     Because the Transaction was backed almost entirely by second-lien HELOCs, in the event of default, any recoveries obtained through foreclosure on the collateral were limited to whatever was remaining, if anything, after the first mortgage had been paid in full. Accordingly, Bear Stearns emphasized and specifically represented (in its pre-contractual disclosures and through EMC's express contractual warranties in the Transaction) that proper controls were in place to ensure the borrowers' ability to repay their debts.[41]

70.     Bear Stearns' representations that it had properly assessed borrowers' ability to repay the securitized HELOCs also were critical because the overwhelming majority of the HELOCs (over 91%) were originated and approved pursuant to "stated income" documentation programs. To afford comfort in that regard, Bear Stearns asserted that these programs were

---

[41] *See, e.g.*, Section V.A. below (Bear Stearns represented in marketing materials that it performed "intensive" due diligence to provide "solid performance expectations"); Section V.D. below (Bear Stearns disclosed in the Prospectus Supplement that underwriting guidelines were applied to assess borrowers' ability to repay).

"generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion."[42]  Bear Stearns' representations were false.

71.    In addition to making material representations about the underwriting of the GreenPoint HELOCs, Bear Stearns selected the pool of HELOCs from its inventory to securitize in the Transaction, and provided Syncora, rating agencies, and potential investors data regarding that pool of HELOCs in advance of closing.  Bear Stearns provided the loan-level data:  (i) with knowledge that originators like GreenPoint did not follow prudent underwriting standards; (ii) with knowledge that its "bad due diligence" did not catch and fix data problems; and (iii) with the intent to sacrifice data accuracy in order to close a large volume of deals quickly.  As a result, much of the loan data Bear Stearns provided in advance of a securitization was materially false and inaccurate.  In connection with the Transaction in particular, the loan data provided to Syncora, rating agencies, and investors was in fact materially false and inaccurate.  Nonetheless, Bear Stearns' data on the Transaction loans was relied upon by:  the rating agencies, to formulate loss coverage levels and to assign ratings for the various classes of securities; and Syncora, to model the Transaction's potential performance, evaluate the level of additional credit enhancement it required to issue its Policy and, more generally, to decide whether to participate.

**B.    BEAR STEARNS SOLICITED SYNCORA TO PARTICIPATE IN THE TRANSACTION**

72.    In advance of closing the Transaction, Bear Stearns made myriad representations and disclosures directly to Syncora induce its participation in Transaction.  <u>First</u>, Bear Stearns made marketing presentations and disclosures to Syncora concerning its securitization operations and the particular transaction contemplated, which it reinforced through email and oral communications.  <u>Second</u>, Bear Stearns provided to Syncora mortgage loan "tapes" (data files

---

[42] *See* GPMF 2007 HE-1 ProSupp, at S-29.

with key information for each loan proposed for securitization) that Bear Stearns represented contained true and accurate loan attributes critical to assess the risks associated with the loans to be securitized.  Third, Bear Stearns secured ratings on various classes of securities to be issued in the contemplated transaction from the rating agencies.  Fourth, Bear Stearns disseminated draft and final Offering Documents to Syncora purporting to describe the transaction and its associated risks.

### 1. Bear Stearns' Marketing Presentations, Deal Correspondence, and Oral Communications

73.    During the relevant time periods leading up to the Transaction, Bear Stearns routinely made presentations to investors and financial guarantors to induce their participation in Bear Stearns' securitizations.[43]  The presentations were made at Bear Stearns "Investor Days," and were supplemented by direct communications with securitization participants in advance of particular transactions.  Bear Stearns' investor relations department and deal managers disseminated these presentations based on information assembled by, and in conjunction with, employees from its mortgage-loan conduit.[44]  As part of the presentations, Bear Stearns provided investors and financial guarantors with information (*e.g.*, PowerPoint presentations known as "marketing decks") concerning the Bear Stearns mortgage-loan conduit and its purported securitization practices.[45]

74.    Cheryl Glory – the Bear, Stearns & Co. Managing Director for United States Residential Mortgage Backed Securities ("RMBS") Investor Relations – acknowledged that the representations were intended to convey to investors and financial guarantors that Bear Stearns

---

[43] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 121.

[44] 4/19/2010 Glory Deposition Tr. at 69-71.

[45] 4/19/2010 Glory Deposition Tr. at 166-67 (testifying that it was Bear Stearns' practice to provide marketing packages in advance of securitizations).

implemented stringent protocols to ensure that the securitizations contained quality loans for the benefit of the investors and financial guarantors.[46]  The Co-head of Mortgage Finance, Mary Haggerty, also confirmed that Bear Stearns made these presentations understanding that the information "would contribute to the investor's decision to invest in the securitizations," and in order to "solicit their participation in transactions."[47]

75.    In 2005, Bear Stearns began to solicit Syncora to issue financial guaranty insurance for mortgage-backed securities transactions.  Bear Stearns initially provided Syncora a marketing deck on December 14, 2005.[48]  The presentation followed a standardized format and contained numerous representations intended to convince Syncora that it would benefit from controls and policies purportedly in place to ensure the quality of securitized loans:

- "Skin in the Game":  Bear Stearns represented that it "retain[ed] Back-End Interests in the Deals," or "Skin in the Game."[49]

- Seller Approval and Monitoring:  Bear Stearns lauded its purported processes for screening and monitoring the originators from which it acquired loans for its securitizations.

- Due Diligence:  Bear Stearns described the "due diligence" protocols it purported to have implemented to prevent defective mortgage loans from entering the securitizations.

---

[46] 4/19/2010 Glory Deposition Tr. at 109-10 (Bear Stearns intended investors and financial guarantors to believe they benefited from the quality control processes), 110-119 (Bear Stearns intended investors and financial guarantors to rely on the benefits from the seller approval and monitoring processes).

[47] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 113, 121.

[48] Email from Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance) to Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), December 14, 2005, SYN-EMC00087682-801 (attaching Investor Presentation).

[49] In a November 7, 2006 memorandum prepared in connection with the SEC's Risk Management Reviews of Consolidated Entities, The SEC explained:  "Residual interests are generally the most difficult pieces of the capital structure for investment banks to sell, for instance because purchasers of other securitized product look for the organizing back to hold these pieces of the capital structure *as a profession of confidence in the deal* . . . ." (emphasis added).

- Quality Control:  Bear Stearns touted the quality control processes that it purportedly conducted after the securitizations closed to identify and flush out defective loans that may have circumvented its due diligence protocols.

- Repurchase Processes:  Bear Stearns conveyed that it had an entire "conduit team" devoted to asserting breach-of-representation-and-warranty claims, on behalf of the securitization participants, for the repurchase of breaching loans identified through the quality control process.

- Historical Performance:  Finally, Bear Stearns provided appendices with extensive data regarding the historical performance of its prior securitizations and the loans therein.

76.    From December 2005 and leading up to March 2007 when the Transaction closed,

Bear Stearns continued its campaign to solicit Syncora's business through email and oral

communications that further reinforced the disclosures in the marketing decks regarding the

purported thoroughness of its securitization processes and the quality of its products.  In those

communications, Bear Stearns made various representations to Syncora to make Syncora

comfortable with Bear Stearns' securitizations.

- HELOC Securitization Processes:  On December 16, 2005, Bear Stearns represented to Syncora that it put in place additional controls to govern HELOC purchases that were above and beyond the protocols for other loan products. Specifically, Bear Stearns executives made specific representations claiming that Bear Stearns established a separate task force of "HELOC experts," to approve the purchase of HELOCs by, among other things, applying Bear Stearns' own underwriting criteria and evaluating the HELOC seller's origination operations.[50]

- Seller Approval, Quality Control and Due Diligence:  During telephone conferences on December 16, 2005 and January 10, 2006, Bear Stearns made representations to Syncora attesting to the thoroughness of its seller approval process, as well as the scope and purpose of reviewing loans as part of Bear Stearns' due diligence and quality control processes.[51]  Bear Stearns had

---

[50] Contemporaneous notes of December 16, 2005 telephone call among Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), and Judy Duffek (EMC Mortgage Corporation Associate Vice President, Seller Review & Approval), Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), and Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance) ("HELOCs → add'l approvals required . . . another dep't of HELOC experts must approve as well <HELOC task force>.").

[51] Contemporaneous notes of December 16, 2005 and January 10, 2006 telephone conferences including, among others, Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), and Judy

previously discussed its "diligence process" and "reps + warranties" during a November 3, 2005 conference call with Syncora.[52] In a June 21, 2006 telephone conference, Bear Stearns' executives, including the "Head of Due Diligence," made further disclosures to Syncora regarding Bear Stearns' "conservative" due diligence approach, which included credit, compliance and valuation reviews.[53] On August 20, 2006, Bear Stearns' deal manager continued to represent Bear Stearns' "loan level Due Diligence."[54] And, during an October 4, 2006 telephone conference, Bear Stearns' executives represented that Bear Stearns' "QC looks at every loan that goes 90 days [delinquent] for repurchase potential."[55]

77.     By February 2007, the same Bear Stearns executives began to solicit Syncora's participation in the Transaction based on, among other things, Bear Stearns' previous representations about its seller approval, seller monitoring, due diligence, quality control, and repurchase practices. For example, on February 14, 2007, Bear Stearns executives participated in a telephone conference with Syncora "educating bond insurers" and soliciting Syncora's participation in upcoming transactions.[56] On February 20 and 21, 2007, representatives of Bear Stearns and Syncora participated in telephone conferences to discuss the Transaction, including

Duffek (EMC Mortgage Corporation Associate Vice President, Seller Review & Approval), Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), and Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance).

[52] Contemporaneous notes of November 3, 2005 telephone conference between Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), and Sally Kawana (Bear, Stearns & Co. Associate Director).

[53] Contemporaneous notes of June 21, 2006 telephone conference between Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), and Nicholas Smith (Bear, Stearns & Co. Vice President, Home Equity Primary).

[54] Contemporaneous notes of August 20, 2006 telephone conference between Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS) and Nicholas Smith (Bear, Stearns & Co. Vice President, Home Equity Primary).

[55] Contemporaneous notes of October 4, 2006 telephone conference between Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS) and Nicholas Smith (Bear, Stearns & Co. Vice President, Home Equity Primary), Keith Lind (Bear, Stearns & Co. Managing Director, Trading), and Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance).

[56] Contemporaneous notes of February 14, 2007 telephone conference between Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS) and Baron Silverstein (Bear Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance), Robert Durden (Bear, Stearns & Co. Deal Manager), Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance), and Jen Schneider (Bear, Stearns & Co. Managing Director, MBS Banking).

the quality and characteristics of the HELOCs that GreenPoint originated, how Bear Stearns selected those HELOCs, and the scope of Bear Stearns' purported due diligence practices.[57]

78.    In connection with its marketing of the Transaction, Bear Stearns never informed Syncora that its securitization practices had changed in any material way from the previous disclosures, communications and investor presentations provided to Syncora.  Syncora therefore reasonably expected that Bear Stearns would live up to its representations concerning its securitization policies and practices in prior communications.  In fact, around the time of the Transaction, Bear Stearns continued to disseminate marketing decks to potential investors and financial guaranty insurers to induce their participation in Bear Stearns' securitizations that contained virtually the same information regarding its securitization practices that had been disseminated in 2005 and 2006.  The representations contained in Bear Stearns' marketing decks and oral communications to investors and insurers were materially false and misleading.  As described in detail below,[58] Bear Stearns' actual securitization practices did not resemble those touted in its representations and were in fact designed to fuel deal volume at the expense of quality and to obtain additional compensation from sellers at the expense of securitizations.

### 2.    Bear Stearns' Distribution of Mortgage Loan Tapes and Other Collateral Data

79.    As part of its initial solicitation to participants in a contemplated securitization, Bear Stearns distributed by email material information concerning the contemplated transaction structure and the loans proposed for securitization.  In its initial distributions to the financial

---

[57] Contemporaneous notes of February 20, 2007 telephone conference between Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS) and Nicholas Smith (Bear, Stearns & Co. Vice President, Home Equity Primary); and of February 21, 2007 telephone conference between Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS) and John Mongelluzzo (Bear, Stearns & Co. Due Diligence Manager).

[58] *See* Sections V.A-V.C. below.

guarantors and rating agencies, Bear Stearns included the mortgage loan tape listing the data metrics pertaining to critical attributes of the loans in a proposed securitization pool.

80.    Consistent with this practice, in the weeks leading up to the March 6, 2007 closing of the Transaction, Bear Stearns sent to Syncora material information about the HELOCs that was set forth in: (i) preliminary loan tapes[59] and then a "final" loan tape[60] of the HELOCs; and (ii) statistical data of stratified segments of the HELOCs (often referred to as "strats").[61] Bear Stearns knew that Syncora and the rating agencies would rely, and intended that they rely, on the veracity of the tape data to evaluate the intended securitization and assess the "market risks" pertaining to the loans.[62]

81.    The following were some of the key metrics included on the loan tape that Bear Stearns disseminated to Syncora in the Transaction:

- the CLTV for each loan, which measures the total amount of mortgage debt that encumbers a property against the value of the property;

- the FICO (or credit) score for each borrower;

- the DTI, also referred to as the back ratio, for each borrower, which compared payments due on a borrower's monthly debts to a borrower's income;

- the occupancy status of the property, which listed whether the property was the borrower's primary or secondary residence, or an investment property;

---

[59] *See, e.g.*, email from Charles Mehl (Bear Stearns & Co. Analyst, Mortgage Finance) to Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), dated February 1, 2007, SYN-EMC00088482-485 ("Attached is a loan tape of the preliminary collateral for this month's Greenpoint HELOC securitization.").

[60] *See* email from Chales Mehl (Bear Stearns & Co. Analyst, Mortgage Finance) to Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), dated March 5, 2007, SYN-EMC00623683-685 ("Attached is the final file for GPMF.").

[61] *See e.g.*, email from Chales Mehl (Bear Stearns & Co. Analyst, Mortgage Finance) to Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), dated February 1, 2007, SYN-EMC00088505-526 (attaching, among other collateral data, stratified data on the HELOCs).

[62] 6/2/2010 Smith Deposition Tr. at 67-72, 83; 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 213-15; 4/19/2010 Glory Deposition Tr. at 65.

- the "doc-type" of each loan, which described the program pursuant to which the loan was originated, and which specified the information borrowers were required to disclose concerning their income, employment, and assets, and how such information would be verified; and

- the amount of each borrower's monthly payment, which is critical for purposes of Syncora's and rating agencies' cash flow modeling.

82.    Syncora required the mortgage loan tape and relied on the veracity of the data reflected therein as a critical component in its decision of whether to provide insurance for the deal.  Syncora used the data on the tape as fixed inputs to its models, and analyzed the loan metrics, which were central to assessing the risk associated with the loan pool and predicting the expected rates and severity of defaults by the borrowers.  The rating agencies also required and relied on the tape data as a critical component in determining the ratings to be assigned to each class of securities being issued.  As described below,[63] Bear Stearns' internal documents and employee testimonials evince that the loan-level data Bear Stearns provided to Syncora and rating agencies was false and misleading.

### 3.    Bear Stearns' Affirmative Representations to Secure Rating Agency Ratings

83.    Bear Stearns provided information to rating agencies, such as Standard & Poor's and Moody's, to secure "shadow ratings" and "final ratings" required to induce financial guarantors to insure the securities issued in connection with its securitizations, including in the Transaction at issue.  A shadow rating is a rating given by the rating agencies to the insurer, which is an assessment of the value or risk of a mortgage-backed securitization transaction without consideration of the protection afforded by a financial guaranty insurance policy.[64]  A

---

[63] *See* Sections V.D.-V.E. below.

[64] 4/19/2010 Glory Deposition Tr. at 55-56 ("It's only upon wrapped transactions where the wrapper does not necessarily need to have a rating issued for it to be sold because you're relying on the wrapper's rating."); 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 204. ("A shadow rating is a rating which is

final rating is an assessment of the value or risk of the security taking into consideration the financial guaranty policy.

84.    Bear Stearns knew that Syncora used the shadow rating in deciding whether to participate in the Transaction.  In fact, Syncora expressly conditioned the issuance of its financial guaranty insurance policy on the ability to secure a specified shadow rating and a final rating for the Transaction.  Syncora "agreed to issue the Policy . . . subject to satisfaction of the conditions precedent," including that Syncora "shall have received confirmation that the risk secured by the Policy constitutes at least a 'BBB' risk by S&P and a 'A3' risk by Moody's, and that the Notes that are rated, when issued, will be rated 'AAA' by S&P and 'Aaa' by Moody's."[65]

85.    Bear Stearns similarly knew that investors relied, and intended that they rely, on the rating agency ratings in deciding whether to purchase the securities issued in the Transaction. It was for that reason that the Offering Documents used to market the Notes expressly stated that a final rating was a condition precedent to Bear Stearns' offering of the securities.[66]

86.    To secure the shadow ratings and thus the final ratings, Bear Stearns disseminated the same data to the rating agencies that it provided to insurers like Syncora, including loan tapes and Offering Documents.  As a Bear Stearns Managing Director characterized the process:

> So there is a process when you request a rating agency to look at or engage in a specific transaction. You provide them a pool of collateral and you provide them structure. As a result of them providing you [get] back ratings and a rating agency gets picked for a transaction, you will then go down the path of providing to them marketing materials, such as the term sheet and a pro supp,

---

not necessarily published . . . it is an expected rating given that certain set of criteria or circumstances are met.").

[65] GPMF 2007-HE1 I&I Agreement § 3.01(h).

[66] *See* GPMF 2007-HE1 ProSupp at S-90.

for them to sign off and understand and then there is a PSA that
they will review and provide comments on.[67]

87.    In connection with the Transaction, Bear Stearns, as underwriter, disseminated the

mortgage loan data required by the rating agencies.  This data that Bear Stearns disclosed to the

rating agencies was the same data that it provided to Syncora.  According to Bear Stearns, the

rating agencies used the loan data to model the risk and generate the ratings for the

securitizations.  The rating agencies developed models to evaluate "the expected loss or expected

probabilities of default for various rating standards," which "took as a given the veracity of the

attributes and metrics on the mortgage loan file provided to them."[68]  As described below, the

loan-level data Bear Stearns provided to the rating agencies in connection with the Transaction

was materially false and inaccurate.[69]

88.    Bear Stearns also gave the rating agencies marketing presentations similar to

those provided to Syncora, which touted Bear Stearns' broader securitization practices and

controls purportedly in place to ensure the quality of the loans it securitized.[70]

89.    On March 6, 2007, Standard & Poor's issued to Syncora a shadow rating derived

from the information and data that Bear Stearns disseminated to the rating agencies in advance of

the Transaction.[71]  Bear Stearns also solicited and obtained from the rating agencies *final* ratings

---

[67] 4/19/2010 Glory Deposition Tr. at 61-62; *see also id.* at 40-55; *see also* 12/11/2009 Durden Rule
30(b)(6) Deposition Tr. at 195-97 (same).

[68] 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 196, 200.  Bear Stearns & Co. Senior Managing
Director Mary Haggerty also confirmed that the "[r]ating agencies typically received collateral
information on the individual pools that they were being asked to rate in connection with a transaction
and there would be discussion with the rating agencies about the overall platform in general."  1/29/2010
Haggerty Rule 30(b)(6) Deposition Tr. at 117-18.

[69] *See* Section V.D. below.

[70] 4/19/2010 Glory Deposition Tr. at 63-64.

[71] Letter from Standard & Poor's Ratings Services to Seleena Baijnauth (Syncora Guarantee Inc. Assistant
Vice President, Consumer ABS), dated March 6, 2007, SYN-EMC00175204-208 at 204.

of the certificates issued in the Transaction, which took into account Syncora's financial

guaranty insurance policies.[72]  Accordingly, on March 6, 2007, Standard & Poor's issued a rating

letter to Bear Stearns assigning final ratings "based on information supplied to us by you or by

your agents," and stating that "Standard and Poor's relies on the issuer and its counsel,

accountants, and other experts for the accuracy and completeness of the information submitted in

connection with rating."[73]

### 4. Bear Stearns' Representations and Disclosures in the Offering Documents to Market and Sell the Notes

90.     Bear Stearns marketed the securities issued in the Transaction pursuant to

Offering Documents[74] that it publicly filed with the SEC pursuant to the Securities Act of 1933.

As a matter of law, in the Offering Documents, Bear Stearns was required to (i) disclose all

material facts concerning the securities offered, (ii) not make any untrue statement of material

fact concerning the securities, and (iii) not omit to state a material fact necessary to make the

statements made therein, in light of the circumstances in which they were made, not misleading.

91.     Bear Stearns filed the Registration Statement and Free Writing Prospectus with

the SEC several days in advance of the contemplated closing date for a securitization; it then

filed the ProSupp with the SEC at or around the closing date.  The ProSupp filed in connection

with the Transaction states that "Bear, Stearns & Co. Inc., as the underwriter, will offer the notes

listed above at varying prices to be determined at the time of sale."[75]

---

[72] 4/19/2010 Glory Deposition Tr. at 55.

[73] Letter from Standard & Poor's to Jeffrey Maggard (Bear, Stearns & Co. Managing Director), dated March 6, 2007, SYN-EMC00061968-971.  Moody's Investor Service, Inc. also issued a rating letter for the Transaction addressed to Jeffrey Maggard (Bear, Stearns & Co. Managing Director).  *See* SYN-EMC00061967.

[74] The Offering Documents are defined above to include the Registration Statements, Free Writing Prospectuses, Prospectuses, and Prospectus Supplements.

[75] GPMF 2007-HE1 ProSupp at S-1.

92.     In advance of the closing date of the Transaction, Bear Stearns also prepared and sent to Syncora drafts of the FWP and the ProSupp to induce its participation in the Transaction. Bear Stearns knew and intended that Syncora would rely on these drafts and final Offering Documents in assessing whether to participate in the Transaction.  That was the very purpose for which Bear Stearns created and disseminated the documents.

93.     The Offering Documents sent by Bear Stearns to Syncora and filed with the SEC in connection with the Transaction contained disclosures regarding the originator GreenPoint's loan origination business and products.[76]  Bear Stearns' ProSupp contained numerous statements purporting to describe the underwriting standards that GreenPoint applied to assess borrowers' ability to repay their debts and to ensure the quality of the loans in the Transaction.  For example, the ProSupp disclosed that the loans were originated pursuant to "GreenPoint underwriting guidelines [that] are *designed to evaluate the borrower's credit standing and repayment ability* and the value and adequacy of the mortgaged property as collateral."[77]  Bear Stearns also represented in the ProSupp that "GreenPoint's underwriting guidelines are applied in accordance with applicable federal and state laws and regulations."[78]

94.     The Offering Documents also disclosed that reduced documentation and no documentation loan programs, which accounted for a significant number of the loans in the Transaction, were used for those borrowers that demonstrated their creditworthiness through other means.  For instance, the ProSupp disclosed that limited documentation programs "are generally limited to borrowers with credit histories that demonstrate *an established ability to repay indebtedness* in a timely fashion," and that no documentation programs "are generally

---

[76] GPMF 2007 HE-1 ProSupp, at S-27.

[77] GPMF 2007 HE-1 ProSupp, at S-28.

[78] GPMF 2007 HE-1 ProSupp, at S-29.

limited to borrowers with favorable credit histories and who satisfy other standards for limited documentation programs."[79]  Moreover, Bear Stearns used the ProSupp to assure Syncora and investors that "[p]ermitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are *generally more restrictive* than mortgage loans originated with full documentation requirements."[80]

95.    As an added layer of protection attesting to the quality of GreenPoint's origination standards, Bear Stearns represented in the ProSupp that "[p]erforming loans purchased will have been originated pursuant to the sponsor's underwriting guidelines or the originator's underwriting guidelines that are acceptable to the sponsor."[81]  And, to ensure adherence to those guidelines, Bear Stearns further represented that "performing loans acquired by [EMC]" would be subject to due diligence "prior to purchase" and that due diligence included a review of "credit, data integrity, appraisal valuation, documentation, as well as compliance with certain laws."[82]

96.    The Offering Documents also contained detailed appendices purporting to represent critical statistical data for stratified segments of the loan pools, including CLTV ratios, DTI ratios, credit scores, property ownership characteristics, and document-types.[83]  These characteristics were used by Syncora to evaluate the risks and expected performance of the underlying loan pools for the securities issued in the Transaction.

---

[79] GPMF 2007 HE-1 ProSupp, at S-29.

[80] GPMF 2007 HE-1 ProSupp, at S-29.

[81] GPMF 2007-HE1 ProSupp at S-32.

[82] GPMF 2007-HE1 ProSupp at S-32 (emphasis added).

[83] *See* GP 2007-HE1 ProSupp, at Schedule A.

97.    The Offering Documents provided that "[i]t is a condition to the issuance of the Notes that each class of Notes be assigned at least the ratings designated" in the ProSupp.[84]  The rating agencies assigned ratings of "AAA" (Standard & Poor's), and "Aaa" (Moody's) for the Notes that had the benefit of Syncora's Policy.[85]  These ratings were given in reliance on Syncora's insurance policy,[86] which was obtained by virtue of the "shadow rating" for the Transaction.

98.    As shown in detail below,[87] the myriad disclosures by Bear Stearns in the Offering Documents regarding underwriting guidelines purportedly followed to ensure borrowers' ability to repay, due diligence protocols supposedly in place to ensure loan quality, and the characteristics of the securitized HELOCs were materially false and misleading.

### C.    BEAR STEARNS EFFECTUATED THE TRANSACTION AND SOLD THE NOTES

99.    Bear Stearns securitized approximately 9,871 HELOCs, with an aggregate principal balance of more than $666 million, that EMC had previously purchased from GreenPoint.  These HELOCs served as collateral for the issuance of approximately $664 million in securities.

100.    The Transaction closed on March 6, 2007 and was effectuated through the following series of agreements executed by EMC and other Bear Stearns affiliates that governed, among other things, the rights and obligations of the various parties with respect to the HELOCs and the Notes issued from their securitization.

---

[84] GP 2007-HE1 ProSupp, at S-90.

[85] *See* GPMF 2007-HE1 ProSupp at S-92.

[86] *See* GPMF 2007-HE1 ProSupp at S-22 ("Class A Notes Ratings Are Based Primarily on the Financial Strength of the Note Insurer.").

[87] *See* Sections V.A-V.E. below.

101.     EMC, acting as HELOC Seller, sold and assigned its entire interest in the HELOCs to its affiliate Bear Stearns Asset Backed Securities I LLC ("BSABS") pursuant to a Mortgage Loan Purchase Agreement dated as of March 6, 2007 ("MLPA").  Under the MLPA, EMC made numerous contractual warranties concerning the HELOCs, which were modeled after and were equally as broad as the warranties made by GreenPoint to EMC in connection with EMC's acquisition of the loans.

102.     BSABS, in turn, sold its interest in the HELOCs to the GreenPoint Mortgage Funding Trust 2007-HE1 (the "Trust") pursuant to a Sale and Servicing Agreement dated as of March 6, 2007 ("SSA").  In turn, the Trust then issued various classes of mortgage-backed securities (the "Notes") under an Indenture dated March 6, 2007 among the Trust, LaSalle Bank National Association, as Securities Administrator, and Citibank, N.A., as Indenture Trustee (the "Indenture").  The most senior Notes were registered with the U.S. Securities and Exchange Commission and underwritten and marketed to investors by Bear Stearns by means of the related Prospectus and Prospectus Supplement.

103.     In order to enhance the marketability of the securities and its return on the Transaction, Bear Stearns sought to obtain a financial guaranty insurance policy from Syncora. Relying on Bear Stearns' pre-contractual representations and having secured EMC's representations, warranties, covenants, and indemnities contained in and encompassed by the Insurance and Indemnity ("I&I") Agreement, the MLPA, and the SSA, Syncora issued Financial Guaranty Insurance Policy No. CA03607A (the "Policy").  Under the Policy, Syncora agreed to insure certain payments of interest and principal with respect to the most senior, or investment-grade, classes of Notes (the "Insured Notes").  The Insured Notes were purchased, underwritten and marketed, and sold to investors (the "Note Purchasers") by Bear Stearns.

44

### D.    SYNCORA SECURED WARRANTIES RELATING TO THE HELOCS AND MORTGAGE LOAN OPERATIONS

104.    In connection with its participation in the Transaction, Syncora demanded and obtained from Transaction counterparties and Bear Stearns' affiliates warranties concerning the attributes of the HELOCs and Bear Stearns' mortgage loan operations.

105.    The warranties concerning the HELOCs covered loan attributes affecting risk of default and borrowers' ability and willingness to repay.  For example, Syncora secured the warranty that no fraud, error, omission, misrepresentation, negligence or similar occurrence took place on the part of any party involved in the origination or sale of the HELOCs.  Syncora also obtained warranties that each HELOC was originated in accordance with the underwriting guidelines of the originator, GreenPoint, and in turn that the methodology used in underwriting the HELOCs confirmed that the borrower had a reasonable ability to make timely payments. The warranties provided, in addition, that each HELOC complied with applicable laws, and that no default, breach violation or event of acceleration existed under any HELOC or its related Mortgage Note.

106.    With respect to Bear Stearns' mortgage securitization operations, Syncora secured warranties that the material information disseminated to Syncora concerning the stringent protocols Bear Stearns purported to have in place to ensure the quality of securitized loans was not untrue or misleading in any material respect when made.

107.    Pursuant to the MLPA and the SSA, EMC has the obligation to cure, repurchase, or substitute any HELOC in the Transaction that breaches EMC's warranties (the "Repurchase Protocol").  The Repurchase Protocol affords Syncora a non-exclusive remedy for any breaching HELOC that circumvented the stringent pre-closing diligence Bear Stearns represented it conducted.  It requires EMC, upon notice or upon independent discovery of a breaching HELOC,

to give prompt written notice to Syncora and other parties and to cure or repurchase the

breaching HELOC within 90 days from the date of discovery or from the date EMC received

notice of the breach.

108.    As addressed further below, the contractual warranties Syncora secured affirm the

reasonableness of its reliance on Bear Stearns' material representations made to secure Syncora's

participation in the Transaction.

## V.    BEAR STEARNS' FRAUDULENT INDUCEMENT

109.    Bear Stearns made material misrepresentations and omitted material facts to

induce Syncora to participate in the Transaction.  The affirmative representations and disclosures

Bear Stearns made concerning its purported securitization policies and practices to ensure the

quality of the loans were materially false and misleading in that they markedly diverged from

Bear Stearns' actual practices.  Likewise, Bear Stearns affirmatively misrepresented and

concealed material information regarding the true attributes and its assessment of the HELOCs it

acquired from GreenPoint and securitized in the Transaction.  Bear Stearns failed to disclose, and

affirmatively concealed, that Bear Stearns implemented policies and abandoned controls to churn

out securitizations—including the Transaction—replete with loans that did not conform with the

represented attributes.  Because it knowingly abandoned these controls, Bear Stearns knew, or

recklessly disregarded, that the loans pooled into the Transaction were originated in total

disregard of actual or prudent underwriting standards, and were made without regard to

borrowers' ability to repay.

### A.    BEAR STEARNS' REPRESENTATIONS CONCERNING ITS
### DUE DILIGENCE WERE FALSE AND MISLEADING

110.    In advance of the Transaction, and to induce Syncora to provide the Policy, Bear

Stearns knowingly made materially false and misleading statements about the scope and integrity

of the due diligence protocols purportedly in place to prevent defective loans from entering into

Bear Stearns' securitizations, and into the Transaction in particular.

111.    In marketing presentations made to Syncora, for example, Bear Stearns touted its

"intensive" due diligence protocols, which it contended could be relied on to assess the "risk"

and expected "performance" of the securitized loans:  "Understanding our risk upfront, through

intensive due diligence provides a foundation for solid performance expectations."[88]  To add a

false veneer of integrity to the process, Bear Stearns' marketing presentations emphasized that it

retained third-party due diligence firms to review the loans.[89]

112.    Similarly, the Offering Documents Bear Stearns drafted and distributed to market

the Transaction and sell the Notes represented that the HELOCs would be subject to due

diligence "prior to purchase."[90]

113.    Bear Stearns reinforced its purported due diligence protocols in its direct

communications with Syncora leading up to the Transaction.  On February 20, 2007, a Bear

Stearns analyst sent Syncora what purported to be the "final due diligence files" associated with

the HELOCs acquired from GreenPoint.[91]  The next day, on February 21, 2007, Bear Stearns

called on John Mongelluzzo, the Vice President of Due Diligence at Bear Stearns responsible for

the diligence performed on the loans in the Transaction, to aggressively pitch the thoroughness

of Bear Stearns' due diligence processes and the purportedly high quality of GreenPoint's

---

[88] Email from Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance) to Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), dated December 14, 2005, SYN-EMC00087682-801 (attaching Investor Presentation).

[89] *See* Email from Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance) to Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), dated December 14, 2005, SYN-EMC00087682-801 (attaching Investor Presentation).

[90] GPMF 2007-HE1 ProSupp at S-32.

[91] *See* Email from Charles Mehl (Bear Stearns & Co. Analyst, Mortgage Finance) to Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), dated February 20, 2007, SYN-EMC00071356 (attaching "final due diligence files for each of the 4 whole loan purchase [sic].").

origination practices.[92]  Among other things, Mongelluzzo informed Syncora's Managing

Director of the following:

- GreenPoint was a "good counterparty," based on past due diligence results.

- The "kick rate," or percentage of due diligence removals from a loan pool, was "up from 2005-06" for the loans securitized in the Transaction.

- Bear Stearns did not allow as many guidelines exceptions as in the past, and required "exceptional compensating factors" to make such exceptions.

- Bear Stearns did not uncover "big issues" during due diligence review of the loans in the Transaction, because big issues generally have "not been on GreenPoint."

- Bear Stearns found "no significant compliance issue" and "nothing systematic" in its due diligence reviews of the HELOCs.

- Bear Stearns' due diligence vendors "use salary.com, etc. for income reasonableness" and remove from the pool all loans to borrowers with unreasonable stated incomes.[93]

114.    These assurances from Bear Stearns' Vice President of Due Diligence were in

addition to his earlier representations to Syncora concerning Bear Stearns' due diligence

protocols.  In a June 2006 call with the same Syncora executive, for example, Mongelluzzo

represented to Syncora that Bear Stearns applied a "conservative" approach to due diligence

---

[92] Contemporaneous notes of February 21, 2007 telephone conference between John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence) and Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS).

[93] In 2008, when Syncora notified EMC of HELOCs in the Transaction that breached representations and warranties due to "Unreasonable Stated Income," citing salary.com and equivalent web-based salary search engines, EMC refused to repurchase, claiming in nearly 300 instances that these websites were "not reliable sources of income verification."  Bear Stearns' endorsement of these sources of income verification just one year prior in inducing Syncora's participation in the Transaction reveals the baselessness of EMC's rejections of Syncora's put-backs, which JP Morgan procured via directions not to repurchase even the loans that EMC had previously determined should be repurchased.

because it refused to purchase (for securitization) loans suffering from legal compliance failures.[94]

115.   Bear Stearns knew that financial guaranty insurers, including Syncora, relied on its due diligence disclosures.[95]   Moreover, unlike Bear Stearns, Syncora was not in privity with loan sellers and therefore did not own or have access to loan files directly from originator counterparties.

116.   Bear Stearns made the above representations and disclosures regarding its due diligence protocols with knowledge, or reckless disregard, that they were false and materially misleading when made.   Contrary to the representations and disclosures described above, Bear Stearns intentionally adopted certain due diligence protocols and deliberately rejected others to appease its trading desk's demands for increased loan volume for its securitizations, thereby "trading" loan quality for loan volume – which was lucrative for its executives but greatly detrimental to those who relied on its representations.   Their profit was another's loss.

117.   Bear Stearns' disclosures and representations regarding its due diligence were materially false and misleading because Bear Stearns did not disclose, among other things, that it (i) knew its internal protocols were deeply flawed, and rejected repeated recommendations to address the flaws, (ii) knew the due diligence firms it retained were not screening out defective loans but did not replace the firms, despite recommendations that it do so, (iii) routinely overrode

---

[94] Contemporaneous notes of June 21, 2006 telephone conference between Linda Kobrin (Syncora Guaranty Inc. Managing Director, Consumer ABS) and Nicholas Smith (Bear, Stearns & Co. Vice President, Home Equity Primary).

[95] Email from Ernest Calabrese, Jr. (Bear, Stearns & Co. Managing Director, Mortgage Finance) to John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) among others, dated September 14, 2005, EMC-AMB 001699864-865 ("These parties have been either performing there [sic] own due diligence (usually not enough time) or piggybacking off of the Clayton/Price results.").   Bear Stearns & Co. Senior Managing Director Mary Haggerty also confirmed that securitization participants relied on Bear Stearns' disclosures as to the scope of due diligence that was performed.   1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 155.

the defective loan findings the due diligence firms did make and, instead of tracking those overrides as was proposed by the head of its due diligence department, deleted the audit trail relating to those override decisions, (iv) knowingly falsified mortgage loan data to avoid defective loan findings, and (v) agreed, as an accommodation to its suppliers in order to secure additional loans, to conduct due diligence *after* purchasing loan pools, at which point Bear Stearns had even less incentive to identify and remove defective loans.

118.    On March 6, 2007, the closing date of the Transaction, Mongelluzzo informed his supervisors that "***we need to completely revamp how we do diligence***."[96]  Mongelluzzo urged the due diligence protocols to be "completely revamped" because it was well known *within* Bear Stearns that the existing diligence protocols were not screening defective loans from the securitizations.

119.    Mongelluzzo admitted that his March 2007 proposal was the *same* proposal he made in 2005 that was rejected by his superiors.  Indeed, starting as early as April 2005, Mongelluzzo made repeated entreaties to the co-heads of Bear Stearns' mortgage finance department (Senior Managing Directors Haggerty and Silverstein) to revise due diligence protocols.[97]  Recognizing that the existing protocols allowed the purchase and securitization of defective loans, Mongelluzzo proposed to rank loans slotted for due diligence by risk criteria and

---

[96] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Mary Haggerty (Bear Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance) and Baron Silverstein (Bear Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance), among others, dated March 6, 2007, EMC-AMB 001431086 ("Based on that risk score we would determine the type of diligence to be done.  The highest level of risk would get the most comprehensive review.") (emphasis added); 4/21/2010 Mongelluzzo Deposition Tr. at 174-75.

[97] *See*, *e.g.*, Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Mary Haggerty (Bear Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance) and Baron Silverstein (Bear Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance), dated April 26, 2005, EMC-AMB 001597507-508 (Proposing "New Due Diligence Processes" including "Identify higher risk loans within sample to DD firms so that more seasoned UW's are reviewing the loans.").

apply incremental resources to the review of each successive gradation of loan.[98]  As Silverstein

conceded, this proposed change was "significant" and not mere "incremental Darwinian creep"

in the evolution of a diligence process.[99]  However, as Mongelluzzo and other Bear Stearns

executives testified, Bear Stearns did not implement any significant changes to its due diligence

protocols prior to the Transaction, despite repeated urging from its employee closest to the

process.[100]

120.    Revealing of its actual motivation, *i.e.*, to allow the free flow of loans into its

securitizations regardless of quality, Bear Stearns also rejected Mongelluzzo's proposal made as

early as May 2005 "to track loans that are overridden by our due diligence managers and track

the performance of those loans."[101]  Haggerty previously had been advised by the due diligence

department that maintaining the documentation of the due diligence firms' analysis would allow

Bear Stearns to track "trends in the reasons for rejection" and for "trades that actually turn into

deals determine how different credit performance is for loans that had been flagged as

'exceptions' vs. those that were not."[102]  But the particular reasons for its overrides and the

---

[98] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Mary Haggerty (Bear Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance) and Baron Silverstein (Bear Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance), dated May 11, 2005, EMC-AMB 001597504 ("We should also identify the top 25% of loans with the sample that we feel pose the largest risk potential.  Both Clayton and PWC upon having those loans tagged/identified can place their most seasoned underwriters to review the loans and also perform additional QC on the loans.  Both of these processes are ones that we can use to market our process to investors and the rating agencies going forward.").

[99] 6/4/2010 Silverstein Deposition Tr. at 178; 4/21/2010 Mongelluzzo Deposition Tr. at 172.

[100] 4/21/2010 Mongelluzzo Deposition Tr. at 175.  In fact, his proposal for improving due diligence was never fully implemented, but only on a test-case basis later in 2007.

[101] Email from John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence) to Mary Haggerty (Bear Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance) and Baron Silverstein (Bear Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance), dated May 11, 2005, EMC-AMB 001597504.

[102] Email from Mary Haggerty (Bear Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance), dated April 25, 2005, EMC-AMB 001699079-080.

"exceptions" it made to underwriting guidelines to allow defective loans to be purchased were exactly what Bear Stearns did *not* want to be tracked.

121.    Thus, Bear Stearns did not implement Mongelluzzo's proposal; instead, it did the exact opposite, implementing and maintaining a policy that directed EMC's underwriting managers communicating with the due diligence firms to "purg[e] all of the older reports on the trade leaving only the final reports."[103]  A Bear Stearns due diligence manager confirmed that, pursuant to this policy, she did not retain the "daily reports" submitted by the due diligence firms.[104]  Bear Stearns' policy therefore spoliated evidence of the audit trails concerning the high incidence of Bear Stearns' overrides and waivers leading up to its final purchase decisions.[105]

122.    Consistent with its undisclosed policy to eliminate the due diligence audit trail, Bear Stearns knowingly disseminated "final" due diligence reports to Syncora on February 20, 2007 that omitted material information about defects and other failings in the HELOC loans.

123.    Mongelluzzo's proposals to "completely revamp" Bear Stearns' concededly insufficient due diligence protocols were just some of the many significant due diligence improvements that were rejected by Bear Stearns' executive management.  Bear Stearns also knew prior to the Transaction that Watterson Prime, the due diligence firm hired to review the GreenPoint HELOCs, was providing inadequate due diligence services.  In early 2006, Mongelluzzo proposed that the entire due diligence process be taken away from both Watterson

---

[103] *See* EMC Conduit Manual, Bulk Underwriting Chapter, dated April 30, 2005, EMC-AMB 004416520-525, at 524.

[104] *See* EMC Conduit Manual, Bulk Underwriting Chapter, dated April 30, 2005, EMC-AMB 004416520-525, at 524.

[105] *See* EMC Conduit Manual, Bulk Underwriting Chapter, dated April 30, 2005, EMC-AMB 004416520-525, at 524.

Prime and Clayton and be brought in-house because he knew that the diligence firms were not screening out defective loans from the pools purchased for securitization.[106]

124.    Bear Stearns senior executives shared the due diligence department's views regarding the inadequacies of the due diligence firms.  In response to Mongelluzzo's March 2006 recitation of the failings of due diligence firms including Watterson Prime, Bear Stearns Senior Managing Director Jeff Verschleiser stated in no uncertain terms that "*we are wasting way too much money on Bad Due Diligence*."[107]  But Bear Stearns nonetheless rejected Mongelluzzo's proposal and kept the due diligence firms in place.

125.    In its disclosures and communications with Syncora leading up to the Transaction, Bear Stearns never disclosed that Bear Stearns' Vice President of Due Diligence recommended moving its entire due diligence process in-house due to the vendors' unsatisfactory reviews.

126.    By April 2007, just one month after the Transaction, the problems with Watterson Prime had grown so severe that Mongelluzzo advised his team that Bear Stearns "will temporarily cease using them for due diligence services."[108]

127.    Due to Watterson Prime's long history of bad due diligence, in July 2008 the due diligence manager who was the point of contact with Watterson Prime advised that the firm not be hired in the future, explaining: "I think Watterson~Prime tells you what you want to hear and

---

[106] Email from Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk) to, among others, Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director, Head of ARM and CDO Desk), dated March 23, 2006, EMC-AMB 001542438-439 (responding to Mongelluzzo's proposal); 4/21/2010 Mongelluzzo Deposition Tr. at 195-96; 6/4/2010 Silverstein Deposition Tr.  at 116-17 ("evaluating bringing in-house our due diligence efforts versus outsourcing to Clayton and Prime and other due diligence firms").

[107] Email from Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk) to Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director, Head of ARM and CDO Desk), among others, dated March 23, 2006, EMC-AMB 001542438-439.

[108] E-mail from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to, among others, Pattie Sears (EMC Mortgage Corporation, Due Diligence Manager) and Jose Carrion (EMC Mortgage Corporation, Subprime Underwriting Manager), dated April 13, 2007, EMC-AMB 001747707-708.

does not always deliver.  The slick salesman syndrome.  ***Our major issues***, ARM issues, prepayment penalty issues, etc, ***were always WP***."[109]  As a former Watterson Prime consultant that conducted due diligence on Bear Stearns loans confirmed, "the vast majority of the time the loans that were rejected were still put in the pool and sold."[110]

128.    Bear Stearns did not disclose to Syncora or the other securitization participants its deep-rooted concerns regarding the failings of its due diligence firms, nor did Bear Stearns adopt Mongelluzzo's proposal to bring the due diligence function in-house to address the failings.  At his deposition, Co-Head of Mortgage Finance Baron Silverstein contended that Bear Stearns rejected the significant change to its diligence structure "because there weren't significant cost savings associated with bringing it in-house."[111]  But Bear Stearns' own internal analysis showed a potential cost savings in the year of implementation, $3.6 million in savings in the second year, and $6.7 million annual savings by the fifth year.[112]  These escalating cost savings were purportedly not "significant" enough for Bear Stearns to move away from the *internally*-berated but *publicly*-praised due diligence firms.  The truth is that Bear Stearns rejected Mongelluzzo's proposal to bring the due diligence function in-house because the third party due diligence firms

[109] Email from Pattie Sears (EMC Mortgage Corporation Due Diligence Manager) to Debbie Rich (EMC Mortgage Corporation, Quality Control), dated July 16, 2008, EMC-AMB 006177517.  *See also* 5/28/2010 Sears Deposition Tr. at 181-188.

[110] 8/25/2010 Warren Deposition Tr. at 51.  *See also* Chris Arnold, *Auditor: Supervisors Covered Up Risky Loans*, National Public Radio, dated May 27, 2008, http://www.npr.org/templates/story/story.php?storyId=90840958; Email from Anthony Neske (Watterson Prime LLC) to John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence), dated May 29, 2008, EMC-AMB 005964024-025 (discussing the Watterson Prime employee's public admissions).

[111] 6/4/2010 Silverstein Deposition Tr. at 120-21.

[112] Due Diligence – "Build Initiative" Presentation, dated May 1, 2006, EMC-SYN 00597826-828.  *See also* Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk) and Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director, Head of ARM and CDO Desk), among others, dated February 15, 2006, EMC-AMB 001542438-439 ("I ultimately think if we brought all of the DO in house we would run savings of about $6MM annually based on our current DO spend.").

provided the false veneer of credibility to the process that Bear Stearns marketed to Syncora and other securitization participants.

129.    A former Watterson Prime consultant who reviewed loans for Bear Stearns, Tracy Warren, confirmed that Watterson Prime's due diligence review was nothing more than a rubber stamp of originators' findings to satisfy the "client" Bear Stearns' objective of purchasing a large volume of loans for securitization.  Ms. Warren's testimony brought to the fore Bear Stearns' misrepresentations regarding its due diligence policies and practices that were made to induce Syncora's participation in the Transaction.  For example, Bear Stearns represented to Syncora in February 2007 that its due diligence vendors used salary.com and other web-based tools to assess the reasonableness of borrower incomes, and that loans made to borrowers with unreasonable stated incomes were "kicked" from pools and *not* purchased for securitization.[113]  Ms. Warren's testimony revealed that Bear Stearns' representations regarding this process were false.  For one, Ms. Warren explained that when she raised the issue to her supervisors that the borrower did not have a reasonable ability to repay, her supervisors instructed her to approve the loan.[114]  In addition, Ms. Warren confirmed that "the vast majority of the time the loans that were rejected were still put in the pool and sold."[115]

_____

[113] Contemporaneous notes of February 21, 2007 telephone conference between John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence) and Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS).

[114] *See* 8/25/2010 Warren Deposition Tr. at 36-37.  In addition to revealing that the due diligence Bear Stearns actually contracted Watterson Prime to perform did not resemble what Bear Stearns had represented to Syncora and investors, Ms. Warren's testimony also indicates that Bear Stearns knowingly or recklessly allowed to be pooled into the Trust loans that breached EMC's representations and warranties.  That is, Bear Stearns' due diligence underwriters provided no assurance of the truth of EMC's warranty that "[T]he methodology used in underwriting the extension of credit for each Revolving Credit Loan . . . *confirmed* that at the time of origination, the Mortgagor had a *reasonable ability to make timely payments* on the Revolving Credit Loan."  MLPA § 7(ooo) (emphasis added).  *See also* Section VII.C.1. below (discussing EMC's loan-level representations and warranties).

[115] 8/25/2010 Warren Deposition Tr. at 46.

130.    The common rationale pervading Bear Stearns' due diligence decisions was to ensure that the diligence protocols did not impede but rather facilitated the free flow of loans for securitization.  This directive was set early and enforced firmly.  Thus, as early as February 2005, Bear Stearns' Co-Head of Mortgage Finance, Mary Haggerty, issued the strong directive to *reduce* the due diligence Bear Stearns conducted "in order to make us more competitive on bids with larger sub-prime sellers."[116]  As she conceded, reducing due diligence was an accommodation to the suppliers that ensured the flow of mortgage loans that Bear Stearns securitized.[117]

131.    The pressure to increase securitization volume at the expense of quality is confirmed by Bear Stearns' internal documents, which reveal that its analysts were instructed by due diligence managers to manipulate data, such as documentation type, that were key metrics of the riskiness of a loan.[118]  Consistent with the documents, a former Bear Stearns employee revealed that at certain times when Bear Stearns was not sure of the documentation type on a given loan, it would report the loan on data tapes as a full documentation loan.

132.    As a result of the foregoing internal practices and policies, Bear Stearns furthered its fraudulent scheme by secretly pooling large volumes of loans into the Transaction without their having been subject to anything remotely close to the due diligence protocols publicly touted to Syncora to solicit its participation in the Transaction.  The consequences were and continue to be grave.

---

[116] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President of Due Diligence) conveying instructions from Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance) to reduce due diligence, dated February 11, 2005, EMC-AMB 001718713-714.

[117] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 194.

[118] *See* Email from Matthew Van Leeuwen (Analyst, Trade Support) to Dylan Hoyt (Due Diligence Underwriter), dated May 16, 2005, EMC-AMB 001718661 (confirming that the analyst was instructed to revise the loan type to a less risky classification).

**B.     BEAR STEARNS' REPRESENTATIONS CONCERNING ITS QUALITY
CONTROL PRACTICES WERE FALSE AND MISLEADING**

133.    Bear Stearns represented to Syncora, rating agencies, and potential investors that

the securitization participants would benefit from Bear Stearns' "quality control" operations,

which reunderwrote loans "post settlement," after EMC purchased and Bear Stearns securitized

those loans.[119]   In particular, Bear Stearns represented to Syncora that its quality control

department reviewed a statistical sample of all loans EMC acquired each month, which "usually

[was] *10%* of seller's total volume monthly."[120]   Bear Stearns also told Syncora that its monthly

quality control sample was stratified to ensure coverage of each of its various loan acquisition

channels.[121]   In addition to its monthly quality control review, Bear Stearns represented directly

to Syncora that "Any loan that goes 90 days delinquent gets full reunderwriting looking for fraud

putbacks."[122]   Bear Stearns thus represented to Syncora that the scope of its quality control was

expansive.

---

[119] *See* Marketing Deck distributed to Syncora and other potential participants, SYN-EMC00087682-801
(stating that quality control is a "Post Settlement" review, which includes a "[c]onduit team dedicated to
claims of breaches of reps and warrants discovered by the Quality Control group investigations");
1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 179 (confirming that due diligence "was done prior
to the settlement of the purchase of the loans, whereas, the quality control reviews were done after EMC
settled the purchase of the – of the loan."); 4/26/2010 Golden Deposition Tr. at 17 (confirming that
quality control refers to the "post-purchase review of loans that EMC and Bear Stearns securitized").

[120] Contemporaneous notes of December 16, 2006 telephone call among Linda Kobrin (Syncora
Guarantee Inc. Managing Director, Consumer ABS), and Judy Duffek (EMC Mortgage Corporation
Associate Vice President, Seller Review & Approval), Stephen Golden (Bear, Stearns & Co. Managing
Director, Warehouse and EMC Residential Mortgage President), and Cheryl Glory (Bear, Stearns & Co.
Managing Director, Mortgage Finance) (emphasis added).

[121] Contemporaneous notes of December 16, 2006 telephone call among Linda Kobrin (Syncora
Guarantee Inc. Managing Director, Consumer ABS), and Judy Duffek (EMC Mortgage Corporation
Associate Vice President, Seller Review & Approval), Stephen Golden (Bear, Stearns & Co. Managing
Director, Warehouse and EMC Residential Mortgage President), and Cheryl Glory (Bear, Stearns & Co.
Managing Director, Mortgage Finance).

[122] Contemporaneous notes of December 16, 2006 telephone call among Linda Kobrin (Syncora
Guarantee Inc. Managing Director, Consumer ABS), and Judy Duffek (EMC Mortgage Corporation
Associate Vice President, Seller Review & Approval), Stephen Golden (Bear, Stearns & Co. Managing
Director, Warehouse and EMC Residential Mortgage President), and Cheryl Glory (Bear, Stearns & Co.

134.    Importantly, Bear Stearns represented to Syncora that its quality control and corresponding repurchase processes were in place for the benefit of the securitizations.  In marketing decks disseminated to Syncora, Bear Stearns touted its "conduit team dedicated to claims of breaches of reps and warrants discovered by the Quality Control group investigations."[123]  Bear Stearns also represented to Syncora in oral communications that its quality control and repurchase processes were in place to review, identify, and remove defective loans from securitizations.[124]  Bear Stearns' Managing Director responsible for investor relations testified that these representations were intended to convey to insurers such as Syncora that Bear Stearns implemented stringent quality control protocols for the benefit of the investors and insurers.[125]

135.    Bear Stearns' representations to Syncora about its quality control practices were false and misleading in material respects.  First, Bear Stearns performed quality control on the HELOCs in the Transaction that was far more limited in scope than what Bear Stearns represented.  Second, the sparse quality control on GreenPoint loans in other pools Bear Stearns performed prior to the Transaction revealed a nearly one-in-three unacceptable defect rate that was never disclosed to Syncora; to the contrary, Bear Stearns touted the quality of GreenPoint's loans and assured Syncora that there were no systemic problems.  Third, Bear Stearns concealed

---

Managing Director, Mortgage Finance) ("Internal post-closing Q.C. – Any loan that goes 90 days delinquent gets full re-underwriting looking for fraud putbacks.").

[123] Email from Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance) to Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), December 14, 2005, SYN-EMC00087682-801 (attaching Investor Presentation).

[124] Contemporaneous notes of December 16, 2006 call between Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), and Judy Duffek (EMC Mortgage Corporation Associate Vice President, Seller Review & Approval), Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), and Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance). ("Buyback procedure applies even after loans are securitized.").

[125] 4/19/2010 Glory Deposition Tr. at 109-10 (Bear Stearns intended investors and financial guarantors to believe they benefited from the quality control processes).

58

from Syncora that the purpose of its quality control and repurchase operations was to identify

and pursue Bear Stearns' claims against loan sellers, *not* to comply with its obligations to the

securitization trusts.  And finally, Bear Stearns knowingly concealed and disregarded advice

from its outside auditors and counsel concerning material failings in its protocols for reviewing

and repurchasing breaching loans from its securitizations.

### 1. Bear Stearns Misrepresented the Scope of Its Quality Control Reviews Performed on the HELOCs

136.    Bear Stearns' representations to Syncora regarding the scope of its quality control

practices were false.  Contrary to its representations to Syncora, Bear Stearns reviewed nowhere

near 10% of the monthly volume it acquired from GreenPoint.

137.    In contravention of its representations to Syncora that loans with 90-day

delinquencies "get full reunderwriting," between 2002 and the date of the Transaction, Bear

Stearns subjected to quality control review only an inconsequential number of 90-day delinquent

GreenPoint loans.

138.    Bear Stearns fraudulently misrepresented the scope of its quality control review as

being robust and comprehensive to give Syncora the false impression that Bear Stearns did

business only with those sellers producing high quality loans, and to deceptively convince

Syncora that its quality control provided an extra layer of protection against the risk of defective

loans securitized in the Transaction.

139.    Contrary to Bear Stearns' representations to Syncora, its *de minimis* quality

control practices did not provide any meaningful mechanism for reviewing and removing

defective loans from the Transaction.  As a result, Bear Stearns knowingly, or with reckless

disregard, made materially false statements about the scope of its quality control to induce

Syncora's participation in the Transaction.

> **2.      Bear Stearns Concealed a High Defect Rate for
> GreenPoint Loans Prior to Closing**

140.     Bear Stearns' public expressions of confidence in GreenPoint as a provider of

securitization collateral was an essential inducement to Syncora's participation in the

Transaction.  Specifically, Syncora's Credit Memorandum presented to its Credit Committee in

connection with its approval of the Transaction states:  "Bear Stearns purchased the collateral

pool via a series of whole loan trades with GreenPoint. . . .  We spoke directly with the

underwriters for these loan purchases who indicated that they *continue to be comfortable with

GreenPoint* underwriting and compliance . . . ."[126]  This explicit endorsement of GreenPoint by

Bear Stearns was incremental to comprehensive representations made concerning the broad

scope of Bear Stearns' quality control sampling and review of delinquent loans.  That is, Bear

Stearns represented that GreenPoint loans had passed both due diligence and quality control.

141.     In fact, however, Bear Stearns' quality control of GreenPoint loans revealed an

unacceptably high defect rate that was never shared with Syncora.  A high defect rate was

unquestionably material information that would have influenced Syncora's decision to issue the

Policy.  Bear Stearns' motivation was clear – to continue the lucrative "originate to distribute"

relationship with GreenPoint and, hopefully, sell enough insured bonds to unwitting investors

that the bulk of losses were passed downstream to insurers and investors.

> **C.      BEAR STEARNS'  REPRESENTATIONS CONCERNING ITS
> REPURCHASE PROTOCOLS WERE FALSE AND MISLEADING**

142.     To solicit Syncora's participation in its securitizations including the Transaction,

Bear Stearns represented that it had in place protocols to identify post-closing loans breaching

EMC's warranties and to repurchase those loans from securitization trusts for the benefit of

---

[126] GPMF 2007-HE1 Credit Memo at 12.

insurers and investors. Bear Stearns' Investor Presentations touted its "Conduit team dedicated

to claims of breaches of reps and warrants" on behalf of securitization participants, its

"repurchase activity," and its "ongoing portfolio performance" monitoring, including monitoring

of "quality control findings" and "repurchases."[127] During a conference call just months before

the Transaction closed, Bear Stearns' executives made additional representations to Syncora

regarding the practice of its quality control group to "look at every loan that goes 90 days

[delinquent] for repurchase potential."[128] Bear Stearns intended that financial guarantors rely on

its representations regarding the benefits of its repurchase protocols, and to believe they

benefitted from the quality control and repurchase processes.[129]

143.    Bear Stearns knew that its representations regarding its repurchase protocols were

false and misleading. At the time of the Transaction, Bear Stearns did not even have a formal

policy for repurchasing breaching loans from securitization trusts.[130] Contrary to its

representations, when Bear Stearns discovered loans that were defective so as to breach

representations to securitizations, it concealed its quality control findings and allowed the

defective loans to remain in the trusts and cause losses to investors and insurers as Bear Stearns

pursued and settled claims against the sellers of the defective loans.

---

[127] Email from Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance) to Linda
Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), December 14, 2005, SYN-
EMC00087682-801 (attaching Investor Presentation).

[128] Contemporaneous notes of October 4, 2006 telephone conference between Linda Kobrin (Syncora
Guarantee Inc. Managing Director, Consumer ABS) and Nicholas Smith (Bear, Stearns & Co. Vice
President, Home Equity Primary), Keith Lind (Bear, Stearns & Co. Managing Director, Trading), and
Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance).

[129] See 4/19/2010 Glory Deposition Tr. at 109-119 (Bear Stearns intended investors and financial
guarantors to rely on the benefits of its quality control, repurchase, and seller monitoring processes).

[130] See 5/20/2010 Serrano Deposition Tr. at 47; see also id. at 44 (noting that as of September 2006, Bear
Stearns' securitization breach review "was not something that was executed correctly").

144.    The purpose of Bear Stearns' repurchase operations was not to find and remove defective loans from securitizations, but to secure for Bear Stearns additional consideration from the sellers that supplied defective loans.  That is, when a securitized loan defaulted during the EPD period or Bear Stearns identified a breach of representations made *to* EMC by a loan seller, Bear Stearns would attempt to negotiate a settlement with the loan seller under which the seller paid Bear Stearns a fraction of the amount due on the loan in lieu of repurchasing the loan from Bear Stearns.  Bear Stearns would then pocket this partial recovery without assessing whether the loan also breached its affiliate's representations to the securitization or notifying securitization counterparties.

145.    Bear Stearns' undisclosed purpose of its repurchase process is confirmed by an August 15, 2007 version of Bear Stearns' policy governing the review and repurchase of loans from securitizations, which states:  "No loan(s) will be added to the Conduit Buy out Log . . . without confirmation of repurchase funds received or a firm commitment from the seller to repurchase or the funding of a down-bid."[131]  (The Conduit Buy-out Log is the file Bear Stearns used to track loans that were to be repurchased from a securitization under its repurchase commitments.)  That is, Bear Stearns directed its employees that the repurchase of loans from a securitization was not even to be considered unless and until there was a recovery from the seller of that loan.

146.    But Bear Stearns knew that the breaches of warranties made by loan sellers and early payment defaults, used as the bases for claims against loan sellers, constituted breaches, or

---

[131] EMC-AMB 002571130-132 at 131 (emphasis added).  A separate internal Bear Stearns policy manual from August 10, 2007 sets out a similar procedure and explains that the Repurchase Log manual explains that, like the "Conduit Buy Out Log," the Repurchase Log is maintained to facilitate the buy-out of loans in securities, but that this process beings only "[w]hen a Seller commits to repurchasing a loan[.]"  EMC-AMB1 000001343-1346.

red flags of breaches, of warranties made to its securitization counterparties.  Nonetheless, Bear

Stearns deliberately decided not to review those loans subject to claims against sellers for

breaches of representations made to the securitizations unless the suppliers tendered full

repurchase funds.  Confidential settlements with the sellers, and in some cases the cancellation of

claims in the interests of relationship preservation, were the more common results of Bear

Stearns' sham repurchase process.  Having settled with the seller for cents on the dollar, Bear

Stearns had no economic incentive – and indeed an economic disincentive – to assess whether

the same loan breached representations made to securitization counterparties, in which case it

would have to repurchase the loan at full price and, thus, at a loss.

147.    Bear Stearns knew, but actively concealed from Syncora, that its repurchase

practices contravened contractual commitments, investors' expectations, and industry standards.

As early as August 2006, immediately before EMC first started acquiring the HELOCs Bear

Stearns securitized in the Transaction, Bear Stearns' external auditor PricewaterhouseCoopers

("PWC") advised Bear Stearns that its failure to promptly review the loans identified as

defaulting or defective was a breach of its obligations to the securitizations.[132]  PWC advised

Bear Stearns to begin the "[i]mmediate processing of the buy-out if there is a clear breach in the

PSA agreement to match common industry practices, the expectation of investors and to comply

with the provisions in the PSA agreement."[133]  PWC explained that the effect of its proposal "in

the Claims work processing flow, is to effectively reverse the current processing order by ***first***

considering whether there is a breach of contractual warranties in the PSA agreement and ***then***

---

[132] *See* "UPB Break Repurchase Project – August 31, 2006," EMC-AMB 006803201-277.

[133] "UPB Break Repurchase Project – August 31, 2006," EMC-AMB 006803201-277, at p. 21 (emphasis added).

*pursue the claim* against the original seller of the loan."[134]  The auditor further advised Bear

Stearns to promptly remedy its "*[l]ack of repurchase related policies and procedures* in the

Claims, G/L Control and Investor Accounting departments" to comply with SEC regulations.[135]

148.    Bear Stearns' legal counsel reinforced PWC's assessment and advised Bear

Stearns that it had to revise its improper practices.  Co-Head of Mortgage Finance Mary

Haggerty confirmed that, in early 2007, Bear Stearns' counsel advised Bear Stearns that it was

required to assess whether defective loans breached EMC's  warranties made in its

securitizations.[136]  Bear Stearns' Executive Director and Assistant General Counsel also

confirmed that, before the legal department intervened in 2007, no documentation existed setting

forth the protocol for disclosing securitization breaches to investors or insurers, such as

Syncora.[137]

149.    Instead of making the requisite disclosures and undertaking the appropriate cures

in early 2007, Bear Stearns disregarded the advice given to it by its outside auditor and its legal

counsel and concealed the true nature of its internal operations to induce Syncora to participate

in the Transaction.

150.    It was not until September 2007, subsequent to the Transaction, that Bear Stearns

for the first time "implemented the policy of *fully honoring our obligations* to pro-actively

---

[134] "UPB Break Repurchase Project – August 31, 2006," EMC-AMB 006803201-277, at p. 26 (emphasis added).

[135] *See* "UPB Break Repurchase Project – August 31, 2006," EMC-AMB 006803201-277, at p. 26 (making reference to Regulation AB, effective January 1, 2006).  PWC recognized the incongruity and impropriety of Bear Stearns submitting repurchase demands to suppliers for loans it did not own (*i.e.*, were in the securitizations), but yet had no intention of repurchasing from the securitizations.  *See id.*

[136] 2/3/2010 Haggerty Deposition Tr. 455-63, 510.

[137] 1/7/2010 Mesuk Rule 30(b)(6) Deposition Tr. at 115-18.

review defective loans for potential PSA breach."[138] ( "PSA Breach" meant the breach of

securitization warranties.[139]) The new policy stated that "*going forward* all defective loans are

reviewed for a securitization breach concurrent with the QC review."[140] As the Securitization

Breach department manager explained at that time, "[r]ather than the current process which

occurs when the claim results in a repurchase by the Seller or a settlement by the Seller, it will

now happen in the front end. . . . This will happened [sic] potentially even before you file a

claim with the Seller."[141]

151.     But when Bear Stearns finally implemented a policy for repurchasing breaching

loans from securitizations, the repurchase operations were understaffed and dysfunctional.

Moreover, the loans identified as defective under the new process merely accumulated on an

unenforced Security Breach Log. As a May 2008 Bear Stearns Internal Audit Report concluded:

"[t]he 'security breach log', an Excel spreadsheet, indicated *loans that should be repurchased*

*from the deal* but records indicated *not all the loans had been repurchased*."[142]

152.     In connection with the Transaction, Bear Stearns has maintained its improper

practices of both concealing breaching loans it discovers and refusing to repurchase breaching

loans where it has not recovered from the now-defunct seller, GreenPoint. In March 2008, when

Syncora notified EMC of 379 Transaction loans breaching securitization warranties, Bear

Stearns directed EMC to reject all but a handful of Syncora's claims and instead used Syncora's

---

[138] Email from Leslie Rodriguez (EMC Residential Mortgage Managing Director), dated September 14, 2007, EMC-AMB 006870106-110 at 108, 107 (emphasis added) (acknowledging that "further discussion as to how Reps and Warrants, Conduit QC and Security Breach QC interact in this manner may definitely be warranted.").

[139] *See* Securitization Breach Quality Control Review, EMC-AMB 011688246-249, at 248.

[140] Securitization Breach Quality Control Review, EMC-AMB 011688248-249 (emphasis added).

[141] Email from Fernando Serrano (EMC Mortgage Corporation Quality Control Manager) dated September 10, 2007, EMC-AMB 010725797-799 (discussing the "9/5/07 QC Minutes/Overview").

[142] *Id.* (emphasis added).

breach findings to assert claims against GreenPoint.  Unable to recover against the failed lender,

Bear Stearns has attempted to pass the harm caused by its securitization of breaching loans down

the line to Syncora.  As these developments show, Bear Stearns' repurchase protocols, which it

touted pre-closing as an inducement to participate in its securitizations, have in practice provided

no benefits to Syncora.

### D.    BEAR STEARNS' REPRESENTATIONS CONCERNING THE ATTRIBUTES OF THE HELOCs WERE FALSE AND MISLEADING

153.    In addition to making material misrepresentations and omissions regarding the

protocols supposedly in place to ensure the quality of securitized loan pools, Bear Stearns also

employed individualized misrepresentations and omissions regarding the particular HELOCs

pooled into the Transaction, which show a pattern of deception illustrative of its practices and its

fraudulent intent.  Moreover, Bear Stearns' practices of knowingly manipulating loan data and

securitizing loans not underwritten to prudent and proper guidelines signalled to GreenPoint that

Bear Stearns willingly accepted the defective loans it sold, and provided the perverse incentive

encouraging and feeding GreenPoint's degenerating underwriting standards.  Employing these

fraudulent practices, Bear Stearns made disclosures to Syncora, investors, and rating agencies

concerning the HELOCs in the Transaction that were materially false and inaccurate.

### 1.    *Bear Stearns Provided Materially False Loan Data to Syncora in Advance of the Transaction*

154.    Bear Stearns knowingly, and with intent to defraud, provided to Syncora[143] and to

rating agencies loan-level data and stratified data on the Transaction loans in advance of closing

that were materially false and misleading.

---

[143] *See, e.g.*, Email from Chales Mehl (Bear Stearns & Co. Analyst, Mortgage Finance) to Linda Kobrin
(Syncora Guarantee Inc. Managing Director, Consumer ABS), dated March 5, 2007, SYN-
EMC00623683-685 ("Attached is the final file for GPMF."); Email from Charles Mehl (Bear Stearns &
Co. Analyst, Mortgage Finance) to Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer

155.    Former employees have revealed the pervasive fraud at Bear Stearns with respect

to the integrity of the data disseminated to securitization counterparties, rating agencies and

investors.  Among other abuses, Bear Stearns' analysts were directed to "fill in the holes" when

faced with outstanding data issues, and to include false credit score and loan documentation type

data in Bear Stearns' disclosures.  As a former employee explained:

> [A] snap decision would be made up there (in NY) to code a
> documentation type without in-depth research of the lender's
> documentation standards. . . . [W]e don't want to waste the
> resources on deep investigation: that's not how the company makes
> money, that's not our competitive advantage, it eats into profits,
> etc. If a documentation type, as given by a lender, is erroneous,
> Bear can point the finger at the lender thanks to indemnification
> agreements. With that type of protection in this kind of situation, a
> minimal level of scrutiny is required−and thus **why worry too
> much about it? The loans will be off the books soon enough.**[144]

156.    At Bear Stearns, "the pressure was pretty great for everybody to just churn the

mortgages on through the system."[145]  Bear Stearns' *intended* to sacrifice data accuracy in order

to close a large volume of deals quickly and, as a result, provided to Syncora, rating agencies,

and investors false and misleading data regarding the attributes of Transaction loans.

---

ABS), dated February 1, 2007, SYN-EMC00088482-485 ("Attached is a loan tape of the preliminary
collateral for this month's Greenpoint HELOC securitization."); Email from Chales Mehl (Bear Stearns &
Co. Analyst, Mortgage Finance) to Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer
ABS), dated February 1, 2007, SYN-EMC00088505-526 (attaching, among other collateral data,
stratified data on the HELOCs); email from Charles Mehl (Bear, Stearns & Co. Analyst, Mortgage
Finance) to Syncora, dated February 1, 2007, SYN-EMC00088505-526 (attaching spreadsheet of the
Scratch and Dent HELOCs); email from Charles Mehl (Bear, Stearns & Co. Analyst, Mortgage Finance)
to Syncora, dated February 4, 2007, SYN-EMC00097606-634 (attaching stratified data on the Scratch and
Dent HELOCs).

[144] Email from Matthew Van Leeuwen (Analyst, Trade Support) to Teri Buhl (author of More Corruption:
Bear Stearns Falsified Information as Raters Shrugged, The Atlantic, May 14, 2010), dated May 13, 2010
(emphases in original removed, emphasis added).

[145] Email from Matthew Van Leeuwen (Analyst, Trade Support) to Nick Verbitsky (Blue Chip Films),
dated March 30, 2009.

### 2. *Bear Stearns Misrepresented Underwriting and Loan Acquisition Standards*

157.    In the Offering Documents, Bear Stearns represented that the HELOCs securitized in the Transaction have "been originated pursuant to the sponsor's underwriting guidelines or [GreenPoint]'s underwriting guidelines that are acceptable to the sponsor," and that "[e]xceptions to the guidelines are permitted where compensating factors are present."[146]  In addition, as noted above, the Offering Documents presented data metrics that Bear Stearns represented accurately reflected the attributes of the securitized HELOCs, and ratings from the rating agencies that Bear Stearns secured for the Transaction based on information provided to the rating agencies by Bear Stearns.

158.    Leading up to the Transaction closing, in an effort to secure Syncora's comfort and participation, Bears Stearns aggressively marketed the quality of the HELOCs originated by GreenPoint, claiming that GreenPoint was a "good counterparty."  Bear Stearns further represented to Syncora that its affiliate, EMC, had recently tightened its underwriting standards, and that Bear Stearns insisted on "exceptional compensating factors" when acquiring HELOCs originated pursuant to guidelines exceptions.[147]

159.    Bear Stearns' representations to Syncora were materially false and misleading because Bear Stearns knew from even the limited due diligence, quality control and selling monitoring it undertook that the HELOCs had in fact been originated and underwritten pursuant to deficient practices that did not make adequate assessments regarding the borrowers' ability to repay the loans.

---

[146] GPMF 2007-HE1 ProSupp at S-28.

[147] GPMF 2007-HE1 Credit Memo at 12.

160.    In fact, at the time of the Transaction, Bear Stearns implemented a broad policy to securitize HELOCs and other second lien loans in inventory before losses materialized – losses Bear Stearns already secretly expected as the result of its abandoning controls in exchange for volume.  Consistent with this chronology of events, the SEC noted in a memorandum prepared in connection with its Risk Management Review of Bear Stearns just five days before the Transaction closed that Bear Stearns was marking down its second-lien inventory due to its intimate knowledge of the risks associated with second-lien loans.[148]  But Bear Stearns concealed from Syncora the same material information it was using to change strategy and clean its inventory before losses materialized.  Instead, Bear Stearns misrepresented in direct communications with Syncora that it "remained comfortable" with GreenPoint and there were not systematic issues with second-lien GreenPoint loans.[149]

161.    Around the time of the Transaction, Bear Stearns was by no means "comfortable" with the underwriting of the loans in its inventory. As of April 2007, one month after the Transaction, a Bear Stearns trading analyst inquired regarding a contemporaneous securitization of second lien loans:  "*Is this a going out of business sale?*"[150]  And in May 2007 Verschleiser demanded to know, in terms that evince longstanding Bear Stearns policy predating the Transaction:  "*why we are taking losses on 2nd lien loans from 2005 when they could have been securitized?????*"[151]

---

[148] Memorandum, Risk Management Reviews of Consolidated Supervised Entities, March 1, 2007, SEC_TM_FCIC_002452.

[149] GPMF 2007-HE1 Credit Memo at 12.

[150] Email from Charles Mehl (Bear, Stearns & Co. Analyst, Mortgage Finance) to Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated April 5, 2007, EMC-AMB 002075468.

[151] Email from Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated May 5, 2007,  EMC-AMB 002283474-475.

162.    A loan-level review undertaken by Syncora approximately one year after the Transaction closed further confirms Bear Stearns' materially false and misleading statements regarding the HELOCs and underwriting standards applied in the origination process.  As discussed further below, Syncora's review has revealed that, in fact, a significant number of the HELOCs were originated pursuant to guidelines exceptions *without* compensating factors, and *did* suffer from systemic underwriting and compliance violations.  As these analyses show, the HELOCs were of much poorer credit quality and much more likely to default than Syncora reasonably expected based on Bear Stearns' representations and disclosures.

### 3.    Bear Stearns Misrepresented and Concealed Material Information Regarding the "Scratch and Dent" HELOCs

163.    In the ProSupp, Bear Stearns disclosed to Syncora and to investors that 653 of the HELOCs were "Scratch and Dent HELOCs."[152]  According to Bear Stearns, these HELOCs were considered "scratch and dent" because they were either repurchased by GreenPoint during late 2005 and early 2006 due to an early payment default, or were removed from previous HELOC pools at the discretion of the buyer.[153]  Bear Stearns' representations to Syncora, investors and rating agencies about the Scratch and Dent HELOCs were materially false and misleading.

164.    Though the Scratch and Dent HELOCs were relatively few in number, given their inherent risk of default, it was material to Syncora's participation in the Transaction that Syncora understand well the quality of the Scratch and Dent HELOCs before issuing its Policy.  Syncora made significant efforts in its communications with Bear Stearns and other parties, and internally, to gain this understanding, including (i) asking detailed questions on repeated email

---

[152] GPMF 2007-HE1 ProSupp at A-10.

[153] GPMF 2007-HE1 Credit Memo at 7.

and telephone communications with Bear Stearns,[154] (ii) participating in discussions with the

rating agencies regarding their assessments of the Scratch and Dent HELOCs based on the data

provided by Bear Stearns,[155] and (iii) intensively scrutinizing and, eventually, approving the

Transaction based in part on Bear Stearns' representations regarding the Scratch and Dent

HELOCs.[156]  Indeed, the Credit Memo providing an overview of the Transaction for approval by

the Credit Committee places heavy emphasis on Bear Stearns' assurances that the Scratch and

Dent HELOCs did not present an unacceptable credit risk.[157]

165.    First, Bear Stearns represented to Syncora in February 2007 that over 90% of the

Scratch and Dent HELOCs were considered scratch and dent only because the borrowers had

suffered prior early payment defaults but had resumed payment, and that only 8% of the Scratch

---

[154] *See, e.g.*, Contemporaneous notes of 2/1/2007 telephone conversation between Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS) and Jeffrey Maggard (Bear, Stearns & Co. Managing Director) (discussing $50 million scratch and dent pool securitized in the Transaction, including representation by Bear Stearns that prior EPD was the reason why 91% of the Scratch and Dent HELOCs were considered scratch and dent); Email from Linda Kobrin to Nicholas Smith, among others, dated February 21, 2007, SYN-EMC00087652 ("*I remember that we had some unanswered questions about the scratch and dent loans*.") (emphasis added); Email from Linda Kobrin to Nicholas Smith (Bear, Stearns & Co. Vice President, Home Equity Primary), dated February 22, 2007, SYN-EMC00071356 ("Please let me know the results of your conversation with Charlie regarding the delinquency status of the S&D [scratch and dent] (and other loans if the same situation exists)."); Email from Linda Kobrin to Charles Mehl (Bear Stearns & Co. collateral analyst), Jeffrey Maggard, among others, dated February 22, 2007, SYN-EMC00124814-815 ("We were on a call yesterday with the deal team when *they explained that Keith only bought S&D loans from GP that had been current for at least 6 months* prior to purchase.") (emphasis added).

[155] *See* Contemporaneous notes of 2/5/2007 telephone conversation between Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS) and Moody's Investor Services; Contemporaneous notes of 2/5/2007 telephone conversation between Linda Kobrin and Standard & Poor's.

[156] *See, e.g.*, Email from Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS) to members of Syncora's Credit Committee, subject: "Credit Committee Required – Greenpoint HELOC Transaction," dated February 22, 2007, SYN-EMC00031881 ("The special credit issue on this pool is that approximately 6% of the loans are scratch and dent, i.e., they were pulled from earlier Greenpoint whole loan sales or securitizations, primarily due to early pay defaults.  These loans have all been fully scrubbed and have been current for at least 6 months, and we have substantial additional protection on them as well.").

[157] *See* GPMF 2007-HE1 Transaction Credit Memo at S-8 ("The [Scratch and Dent HELOCs] were hand picked by Bear Stearns from a larger pool and 100% of them were re-underwritten according to Bear Stearns' diligence guidelines based on updated FICOs."); *see also id.* at 10-11, 12.

and Dent HELOCs had been removed from previous loan pools for other reasons such as owner occupancy and compliance problems.[158]  Throughout February 2007, Bear Stearns reiterated to Syncora its representation that the reason why over 90% of the Scratch and Dent HELOCs were considered scratch and dent loan products was because they had faced prior EPDs.[159]  Syncora was made to believe through Bear Stearns' representations that prior EPD was the only defect Bear Stearns identified on these Scratch and Dent HELOCs, and that there were *not* additional substantive defects with the HELOCs.

166.    Bear Stearns buttressed its representation that there was only one defect on each Scratch and Dent HELOC by providing to Syncora a spreadsheet listing one particular defect on each of these loans.  On February 1, 2007, a Bear Stearns collateral analyst, Charles Mehl, disseminated to Syncora an Excel spreadsheet featuring the purported "Scratch and Dent Reason" for each Scratch and Dent HELOC.  The spreadsheet Bear Stearns sent to Syncora contained for each Scratch & Dent HELOC *one* "Scratch & Dent Reason," which was represented to be "early payment default" for all but 8% of the loans.[160]  Throughout February, Bear Stearns continued to send to Syncora by email additional disclosures about the Scratch and Dent HELOCs that also featured only *one* scratch and dent reason for each Scratch and Dent HELOC, and concealed additional defects on those same HELOCs.[161]

---

[158] GPMF 2007-HE1 Credit Memo at 7.

[159] Contemporaneous notes of February 1, 2007 telephone conference between Jeffrey Maggard (Bear, Stearns & Co. Managing Director) and Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS).

[160] *See* email from Charles Mehl (Bear, Stearns & Co. Analyst, Mortgage Finance) to Syncora, dated February 1, 2007, SYN-EMC00088505-526 (attaching spreadsheet of the Scratch and Dent HELOCs).

[161] *See, e.g.*, email from Charles Mehl (Bear, Stearns & Co. Analyst, Mortgage Finance) to Syncora, dated February 4, 2007, SYN-EMC00097606-634 (attaching stratified data on the Scratch and Dent HELOCs).

167.    Likewise, in the ProSupp dated March 5, 2007, Bear Stearns represented to Syncora and investors that 587 of the Scratch and Dent HELOCs were designated as scratch and dent due solely to "Delinquency," and that very few of the Scratch and Dent HELOCs had problems such as false appraisals, compliance violations, and occupancy problems.[162]

168.    In addition to its representations regarding "Scratch and Dent Reasons," Bear Stearns also represented to Syncora that it had not performed *any* reappraisals of mortgaged properties backing the HELOCs.[163]  (A reappraisal is a later assessment of the value of the mortgaged property after the origination of the loan.)  Moreover, the due diligence reports Bear Stearns distributed to Syncora on the HELOCs did not include the results of reappraisal work.[164]

169.    In a concerted effort to gain Syncora's comfort with the Transaction notwithstanding its inclusion of the Scratch and Dent HELOCs, Bear Stearns also made representations to Syncora about its selection process for purchasing the Scratch and Dent HELOCs.  For example, Bear Stearns claimed that GreenPoint offered a pool of scratch and dent HELOCs totalling approximately $75 million, but that Bear Stearns "hand picked" only two of every three offered and purchased only $45 million of the loans.[165]  In approving the Transaction, Syncora's Credit Committee relied on Bear Stearns' representations that it culled a full one-third of the scratch and dent HELOCs offered by GreenPoint based on a review of

---

[162] GPMF 2007-HE1 ProSupp at A-10.

[163] GPMF 2007-HE1 Credit Memo at 12.

[164] Email from Charles Mehl (Bear, Stearns & Co. Analyst, Mortgage Finance) to Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), dated February 21, 2007, SYN-EMC00072109-115 (attaching "final due diligence files for each of the 4 whole loan purchase [sic]").

[165] GPMF 2007-HE1 Credit Memo at 8, 10-11, 12 ("On the Scratch and Dent pool, they verified that the loans did have the 'blemish' indicated at the time of purchase, and fully reviewed each loan, accepting only 2 out of each 3 reviewed.").

updated FICO scores and other credit and compliance characteristics, ensuring a scratch and dent

pool with "blemishes" but with "mitigate[d] further default risks."[166]

170.    Bear Stearns' representations to Syncora, rating agencies, and investors regarding

the Scratch and Dent HELOCs in the Transaction were materially false and misleading.  Bear

Stearns made these misrepresentations knowingly and with intent to defraud.  This bad faith

conduct was in line with Bear Stearns' practice of pushing defective loans into securitizations

while concealing knowledge of the loans' weaknesses.

## VI.    SYNCORA'S RELIANCE ON BEAR STEARNS' REPRESENTATIONS WAS REASONABLE AND CONSISTENT WITH THE PARTIES' RISK ALLOCATION

171.    Bear Stearns knowingly and with intent to induce reliance thereon made material

misrepresentations to and actively concealed material information from Syncora.  Syncora

reasonably relied to its detriment on the material misrepresentations and omissions Bear Stearns

made to induce Syncora's participation in the Transaction.

172.    As particularized in the preceding sections, Bear Stearns made false and

misleading representations and omitted material information concerning, among other things, (i)

the quality and attributes of the HELOCs, as set forth in loan tapes and described in the Offering

Documents, (ii) the material failings in GreenPoint's origination practices and underwriting

guidelines, (iii) its internal policies and practices relating to its securitization operations such as

its seller monitoring, due diligence, quality control and repurchase protocols, (iv) the purportedly

high standards by which Bear Stearns would select the HELOCs for securitization, and (v) Bear

---

[166] GPMF 2007-HE1 Credit Memo at 11 ("GreenPoint resolved as many of the problems as possible on these loans, let them season on their books for an average of 14 months, and then offered a pool of approximately $75 million for sale.  Bear Stearns updated FICOs on the pool, performed a complete loan by loan due diligence for credit and compliance, and opted to buy about $45 million of the loans.").

Stearns' wherewithal and intent to stand behind the warranties that EMC made in the Transaction Documents.

173.    Bear Stearns' misrepresentations and omissions concerned matters that Bear Stearns had knowledge of, and/or the ability to dictate, evaluate and manage.  That is, Bear Stearns' affiliate was the purchaser and the initial owner of the HELOCs and the corresponding loan files.  As such, Bear Stearns had the ability to dictate the parameters of the HELOCs purchased, including their attributes and the guidelines pursuant to which they were underwritten.  Bear Stearns also had the ability and purported to conduct the requisite due diligence in advance, and quality control after, the HELOCs were acquired.  Finally, Bear Stearns' affiliate had recourse against GreenPoint in the event any HELOC was determined to be defective, or failed to comply with the represented attributes.  In contrast, Syncora (i) never owned the loans or the loan files, (ii) did not have the opportunity to reunderwrite the HELOCs before deciding whether to participate in the Transaction, as Bear Stearns concedes, and (iii) was not in privity with and did not have recourse against GreenPoint for any defective loans.

174.    It was therefore understood, and the fundamental premise of the Transaction was, that Syncora would rely on Bear Stearns' representations concerning the HELOCs and Bear Stearns' mortgage loan operations, and Bear Stearns' affiliate would bear the risk of loss in the event those representations were false.  Lacking the accurate depiction of Bear Stearns' practices and procedures, Syncora's reliance on Bear Stearns' disclosures and representations was consistent with the industry practice and the parties' reasonable expectations.

175.    As was the general practice, Bear Stearns and Syncora each assumed different risks and undertook due diligence in accordance with their respective roles in the Transaction. Bear Stearns, as the underwriter and deal manager, thus accepted the origination and

underwriting risk that the HELOCs conformed to the loan attributes it represented to Syncora in

advance of closing, and to actual and prudent underwriting guidelines Bear Stearns represented

in the Prospectus Supplement had been followed.  Syncora, as the insurer, in turn agreed to bear

the market risk that HELOCs *bearing the represented attributes* and underwritten to the

applicable guidelines would perform.

176.    Consistent with this reasoned risk allocation between sophisticated parties,

Syncora justifiably relied on Bear Stearns' representations, and undertook due diligence

commensurate with the risk it agreed to assume in the Transaction.  Syncora's reliance and

diligence was also contemporaneously documented in the Credit Memo Syncora prepared to

obtain internal approval from its Credit Committee for the Transaction.

177.    Thus, among other things, the Credit Memorandum reflects that Syncora used the

HELOC attributes Bear Stearns provided on the initial and final mortgage loan tapes to model

and assess the market risk of loss on the Transaction.  Based on data from the initial tape,

Syncora's Credit Committee voted to approve and bid on the Transaction in February 2007.[167]

Syncora then used the information on the final mortgage loan tape provided by Bear Stearns,

which was false and misleading, to assess on the eve of the Transaction's closing whether the

loan pool "looks like what [Syncora] bid on."[168]

---

[167] *See e.g.*, email from Seleena Baijnauth (Syncora Guarantee Inc. Assistant Vice President, Consumer ABS) to John Keane (Syncora Guarantee Inc. Vice President, Quantitative Analytics Group), dated February 5, 2007, SYN-EMC00142113-142 (forwarding collateral data provided by Bear Stearns for internal analysis); Email from John Keane to Linda Kobrin (Syncora Guarantee Inc. Managing Director, Consumer ABS), dated February 2, 2007, SYN-EMC00097527-597 (attaching stratified data on the HELOCs).

[168] Email from John Keane (Syncora Guarantee Inc. Vice President, Quantitative Analytics Group) to Seleena Baijnauth (Syncora Guarantee Inc. Assistant Vice President, Consumer ABS), dated March 5, 2007, SYN-EMC00097743-797.

178.    Syncora further secured and scrutinized Bear Stearns' representations concerning its institutional competence and prior deals, processes and protocols for approving sellers, conducting due diligence and quality control, and for repurchasing defective HELOCs from its securitizations.   The Credit Memorandum reflects that Syncora relied on Bear Stearns' representations concerning the due diligence it purportedly conducted on the securitized HELOCs.  Syncora also performed and updated its own diligence on "Bear Stearns' re-underwriting process."  Based on Bear Stearns' representations, and Syncora's own diligence, the Credit Memorandum states:  "We are comfortable with [Bear Stearns'] process, and noted a tightening of their loan purchase standards . . . [Bear Stearns is] much less likely to accept loans that are underwritten as exceptions to stated underwriting guidelines, only accepting those that have 'exceptional' compensating factors."  With respect to EMC's purchase of the HELOCs from GreenPoint, the Credit Memorandum emphasizes that Syncora "spoke directly with the underwriters for these loan purchases who indicated that they continue to be comfortable with GreenPoint underwriting and compliance, and have not found any systematic problems with the collateral."

179.    As to the portion of the loan pool consisting of the Scratch and Dent HELOCs, the Credit Memorandum reflects Bear Stearns' representations that the vast majority of those HELOCs had suffered only from early payment delinquencies, and that "Bear individually selected the S&D loans," and "completed a full re-underwriting on the loans and made their own kicks, resulting in a relatively clean pool."

180.    Finally, and significantly, Syncora demanded and received, as a condition precedent to issuing the Policy, EMC's contractual warranties concerning, among other things, the HELOC attributes, the guidelines pursuant to which the HELOCs were originated and

underwritten, and the operations relating to the screening and review of the HELOCs.  The

contractual warranties that Syncora secured from EMC, and on which Syncora reasonably relied

in issuing its Policy, were the means by which the parties memorialized and allocated the

respective risks in the Transaction.[169]

## VII.   JP MORGAN TORTIOUSLY INTERFERED WITH EMC'S CONTRACTUAL OBLIGATIONS TO SYNCORA

181.    The loans that Bear Stearns sold to the Trust in connection with the Transaction

have failed miserably.  Only 2,191 of the 9,871 HELOCs initially sold to the Trust are current as

of May 13, 2011.[170]  A loan-level review and analysis undertaken by Syncora's independent

consultants (at enormous effort and expense) has revealed that a staggering percentage of the

HELOCs in the Transaction breach one or more of EMC's extensive loan-level warranties due to

rampant misrepresentations and fraud occurring during origination, GreenPoint's abject failure to

adhere to its own underwriting guidelines, and other materially false statements regarding the

key loan characteristics.  To date, Syncora, through its independent consultant, has reviewed a

total of 1,431 HELOCs in the Transaction.  Syncora's loan-level analyses revealed that at least

1,313 of these HELOCs breached one or more of EMC's contractual warranties, evidencing a

staggering 92% breach rate.

182.    These loans contain one or, in most cases, multiple defects that constitute a breach

of one or more of the numerous warranties made by EMC in the MLPA, materially altering the

loans' risk profile.  These defects include:

---

[169] When asked whether "EMC deemed it important to make representations and warranties in order to persuade the RMBS investors to purchase from Bear Stearns," Mary Haggerty testified that "Bear Stearns was marketing the certificates.  It was viewed as a positive that EMC was making the reps and warranties."  1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 131.

[170] GreenPoint Mortgage Funding Trust 2007-HE1 Electronic Data Files, May 13, 2011, *available at* www.etrustee.net.

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated and fraudulent appraisals; and,

- Pervasive violations of GreenPoint's own underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum; (iv) with debt-to-income and loan-to-value ratios above the allowed maximums, or (v) with relationships to the applicable originator or other non-arm's-length relationships.

183.    Each of these breaches adversely affected Syncora's interests, or materially and adversely affected the value of Syncora's interests, in the identified HELOC.  Loans subject to fraud, that were originated without regard for GreenPoint's own underwriting guidelines and prudent and proper lending practices, or the key attributes of which are otherwise misrepresented, are markedly more risky and therefore less valuable than loans not suffering from such shortcomings.  EMC has the obligation to repurchase loans suffering from these breaches under the Repurchase Protocol.

184.    Thus far, Syncora has requested that EMC repurchase the 1,313 Transaction loans it has discovered breach contractual warranties pursuant to the Repurchase Protocol.  In its formal responses to Syncora's breach notices, EMC has agreed to repurchase only 40 of these loans, and has contributed funds to the trust for only 32 of the 40 loans it agrees should be repurchased.  EMC's wholesale breach of its repurchase obligations has been fraudulently or improperly procured by JP Morgan, in order to understate its repurchase-related accounting reserves.

185.    Upon taking over EMC's operations, JP Morgan directed EMC not to repurchase any loans, including those put back by Syncora. Instead, JP Morgan used Syncora's particularized breach notices to pursue repurchase demands against GreenPoint, while simultaneously taking contradictory positions vis-à-vis Syncora.

### A.    AFTER THE MERGER, JP MORGAN IMPLEMENTED POLICIES TO REJECT WHOLESALE EMC'S REPURCHASE OBLIGATIONS

#### 1.    *JP Morgan Ordered EMC, "Do Not Repurchase Any Loans"*

186.    EMC's rejection of all but a handful of Syncora's repurchase requests on breaching Transaction loans was a direct result of JP Morgan's deliberate and tortious interference with and frustration of EMC's repurchase obligations.  When the Bear Stearns Companies' house of cards collapsed in the spring of 2008, Bear Stearns and its affiliates (including EMC) were acquired by JP Morgan Chase in a fire sale for $10 a share.[171]  This acquisition was accompanied by JP Morgan's takeover of EMC's operations, policies, and procedures, including procedures for responding to claims against EMC for breaches of contractual warranties.  To Syncora's detriment, JP Morgan's takeover resulted in tortious interference with Syncora's contractual repurchase remedies with EMC.

187.    As an across-the-board policy, JP Morgan deliberately frustrated investors' and insurers' rights in the Bear Stearns securitizations, to avoid properly recognizing on its consolidated financial statements the massive exposure related to securitizations that it inherited from Bear Stearns and EMC.  Most significantly, JP Morgan implemented a bad faith strategy to reject without justification insurers' and investors' demands for the repurchase of breaching loans.  JP Morgan's bad-faith strategies materialized in and caused EMC's repudiation of the repurchase obligations for which Syncora contracted.

---

[171] JP Morgan also received a cash infusion of a $29 billion non-recourse loan from American taxpayers.

188.    JP Morgan's improper interference began shortly after taking control of EMC's operations in March 2008 when JP Morgan implemented a moratorium on the repurchase of breaching loans from securities.  On May 16, 2008, the Executive Director of JP Morgan's Securitized Products division (Alison Malkin) issued an email alerting EMC employees "**IMPORTANT: Please do not repurchase any loans**" because "JPM is evaluating processes and has put a temporary hold until they have finished."[172]  On July 14, 2008, Malkin reinforced the absolute nature of JP Morgan's directive, stating that "***[t]he only way a loan can be repurchased from a deal is if I send an email***."[173]  With the moratorium in place, JP Morgan immediately began (i) cancelling the repurchase of large volumes of loans that EMC previously determined had to be repurchased, and (ii) arbitrarily denying subsequent demands by investors and insurers to repurchase breaching loans from Bear Stearns' securitizations.

189.    In May 2008, with "less than a month on the job," Malkin told EMC that "its own breach determinations with respect to its own loans in its own securitizations are incorrect," and, as an EMC witness conceded, due to Malkin's direct orders "the [repurchase] recommendations were changed."[174]  In her initial review alone, conducted on or about May 5, 2008, Malkin "disagreed with **56%** of EMC/Bear Stearns findings."[175]  In an effort to justify its reversal of repurchase determinations, JP Morgan caused EMC to take newfound positions as to

---

[172] Email from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to Ashley Poole (EMC Mortgage Corporation Analyst, Representations and Warranties Department) and Whitney Long (EMC Residential Mortgage Vice President, Risk Management and Claims), dated May 16, 2008, EMC-AMB 007165488-490 at 489 (emphasis added).

[173] Email from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to Gary Lyles (Bear Stearns & Co. Internal Audit Department), dated July 14, 2008, EMC-AMB 010858522-524.

[174] 1/22/2010 Megha Rule 30(b)(6) Deposition Tr. at 190-92.

[175] Email from Whitney Long (EMC Residential Mortgage Vice President of Risk Management and Claims) to Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products), dated May 5, 2008, EMC-AMB 007173918-919 (emphasis added).

81

circumstances in which loans must be repurchased from a securitization that were inconsistent

with, and contravened, EMC's own interpretation of its obligations prior to May 2008.  JP

Morgan's interpretations of EMC's repurchase obligations were contrived.  For instance, JP

Morgan took the position that the following were not breaches warranting the repurchase of

loans from the securitization:  (i) the absence of key documentation from the loan file (without

which the loan could be rescinded) and (ii) a finding that the borrower's stated income was

unreasonable for the loan given.  The head of EMC's securitization breach team was properly

baffled by those positions:  "The idea that missing certain significant docs is not a security

breach issue is a fairly foreign concept that I have just not gotten my mind around yet.  The

stated income issue is very similar, in that *the reasonableness test was a requirement in

virtually all the guidelines* from the various lenders that we obtained loans from."[176]

Nonetheless, there was nothing the former EMC executive could do, as post-Merger "ultimately

the authority to resolve any debate sat with JPMorgan."[177]  Thus, at JP Morgan's directive, on

May 14, 2008, the EMC executive canceled the repurchase of loans that "we have previously

added to the Repurchase Log, but we need to re-address using our *updated* standards."[178]

190.    Yet another form of JP Morgan's improper interference with EMC's repurchase

obligations was preventing EMC from repurchasing breaching loans put back by investors and

insurers where JP Morgan could not recoup its losses from the sellers of those breaching loans.

An EMC witness who performed claims analysis for EMC until the JP Morgan takeover, and for

JP Morgan thereafter, confirmed that, upon the takeover of EMC's operations, JP Morgan

---

[176] Email from Michael Peacock (EMC Mortgage Corporation Securitization Breach Team) to Tamara Jewell (EMC Residential Mortgage Project Manager), dated May 8, 2008, EMC-AMB 007173931-932 (emphasis added).

[177] 6/10/2010 Peacock Deposition Tr. at 254-56.

[178] Email from Michael Peacock (EMC Mortgage Corporation Securitization Breach Team), dated May 14, 2008, EMC-AMB 009119930-931 at 931 (emphasis added).

conditioned EMC's acknowledgement of breaches on whether there was recourse to the seller of the loan.[179]

191.    JP Morgan departed from its recourse economics only when it came to repurchase demands made by government-sponsored entities.  JP Morgan's wholesale denial of the claims made by Syncora and other financial guarantors and private investors is in stark contrast to the significantly higher reserves percentages for breaching loans identified by government-sponsored entities such as Fannie Mae and Freddie Mac.  To avoid disqualification of the right to continue to do business with the government-sponsored entities, and with the weight of the federal government behind their demands, JP Morgan took markedly divergent positions with respect to the government-sponsored entities' loans than it did with respect to similar defects identified by Syncora.

192.    JP Morgan has employed fraudulent and deceptive practices to prevent EMC from honoring its repurchase obligations to securitization counterparties, including Syncora, without any justification and without regard for EMC's financial interest (which was severely compromised by the blatant contractual breaches).  JP Morgan's actions were motivated by concern for its own financial health and it acted in its own self-interest, not out of concern for EMC.

### 2.    JP Morgan Directed EMC to Deny Syncora's Repurchase Demands While Simultaneously Asserting Syncora's Breach Claims Against GreenPoint

193.    As it effects Syncora's contractual rights, perhaps nowhere is JP Morgan's fraudulent and improper interference more evident than in its direction to EMC to reject

---

[179] 9/25/2010 Lu Deposition Tr. at 131-38 ("Q.  So to sum it up a little more clearly, Alison Malkin instructed Ashley Poole to add analysis of recourse to seller to the claims against analysis?  (over objection)  A.  Based on this e-mail, yes.  Q.  Okay.  And in turn Ms. Poole instructed you to fulfill that request, correct?  A.  Yes.").

Syncora's positions and refuse to repurchase breaching loans, while simultaneously advancing those very same breach positions against GreenPoint in an attempt to recover funds for itself.  To start, on March 4, 2008, Syncora notified EMC regarding 379 HELOCs with an aggregate principal balance of approximately $34 million that breached EMC's contractual warranties, and described the breaches affecting each loan with specificity.[180]  Syncora asked EMC to comply with its contractual obligation to cure, repurchase, or provide substitutes for the non-compliant HELOCs.[181]  Thereafter, EMC turned around all of Syncora's putback requests to GreenPoint, asserting the same breaches that Syncora had identified.  Notably, because Syncora secured warranties from EMC that mirror those that EMC received from GreenPoint in acquiring the HELOCs, EMC's repurchase demands to GreenPoint constitute admissions by EMC as to the existence and materiality of the breaching HELOCs in the Transaction.

194.     On June 4, 2008, EMC formally responded to Syncora's first breach notice, rejecting 323 of the 379 HELOCs and requested additional time to review the other 56 HELOCs.[182]  Meanwhile, on June 26, 2008, JP Morgan's Executive Director Alison Malkin continued to pursue EMC's claims against GreenPoint *with respect to the same 379 HELOCs*. Malkin's June 26, 2008 letter to GreenPoint was unequivocal regarding the existence of the breaches and their effect on the loans:  "*it is EMC's position that these breaches materially and adversely affect the value of the [HELOCs]*."[183]  Yet remarkably, Malkin took diametrically

[180] Letter from XL Capital Assurance, Inc. to EMC Mortgage Corp., dated March 4, 2008, EMC-SYN 000002855-58.

[181] Syncora hired a third-party consultant to reunderwrite the loan files of 410 defaulted Transaction loans and discovered that 379 loans, or 93% of the loans examined, breached EMC's representations and warranties.

[182] Letter from Jackie Oliver (EMC Mortgage Corporation Senior Vice President, Chief Servicing Counsel) to XL Capital Assurance, Inc., dated June 4, 2008, EMC-SYN 00002859-2914.

[183] Letter from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to Rose Medina (GreenPoint Vice President, Rep & Warranty Department), dated June 26, 2008, EMC-SYN

opposing positions in correspondence to Syncora under her signature.  In her August 4, 2008

letter responding to the then-outstanding 56 HELOCs from Syncora's first putback notice,

Malkin refused to acknowledge breaches on all but 15 of the HELOCs.[184]  But by this time, JP

Morgan had already asserted to GreenPoint that the same breaches asserted by Syncora with

respect to the same HELOCs "materially and adversely affect the value of" those HELOCs.  That

is, JP Morgan fraudulently and improperly advanced Syncora's positions in attempting to

recover from GreenPoint, while simultaneously rejecting Syncora's positions in denying its

repurchase demands on the very same HELOCs.

### B.    JP MORGAN INTERFERED WITH EMC'S CONTRACTS TO MANIPULATE AND UNDERSTATE ACCOUNTING RESERVES

195.    JP Morgan's rationale and motivation for preventing EMC from repurchasing

breaching loans is to artificially lower repurchase-related accounting reserves on JPMorgan

Chase's consolidated balance sheet in an improper attempt to hide the massive liabilities

inherited from Bear Stearns and EMC.  The evidence of this improper motivation is clear.  As

explained above, JP Morgan cut EMC's securitization breach findings by over half within days

of assuming control of the repurchase process.  The motivation for JP Morgan's reversals was

not lost on the EMC executive responsible for cancelling the repurchases, who observed that

"[f]rom *a reserves standpoint* . . . the number has dropped from $31M/-$13.9M to $17M/-

---

000003048; 1/22/2010 Megha 30(b)(6) Deposition Tr. 257-58 (Q: So there's no ambiguity whatsoever that as of June 26, 2008, EMC was taking the position that the breaches that Syncora identified materially and adversely affected the value of the revolving credit lines, correct? . . . A.  (Perusing) This letter reads that, yes.  Q.  Thank you.  And you see no ambiguity whatsoever in that statement, do you?  A.  No, I don't.").

[184] Letter from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to XL Capital Assurance, Inc., dated August 4, 2008, EMC-SYN 00620317-343.

$7.6M."[185]  In other words, of the loans with $31 million in unpaid balance previously found by

EMC to warrant repurchase from securitizations, JP Morgan's reversals left only $17 million to

be repurchased.  And JP Morgan's reversals reduced "exposure" to these loans from $13.9

million to $7.6 million.  Thus, within days of assuming control of the repurchase process, JP

Morgan slashed EMC's breach findings in order to reduce by a corresponding amount JPMorgan

Chase's accounting reserves.  JP Morgan has engaged in the same interference with respect to

Syncora's demands that EMC repurchase Transaction loans.

196.    As the extreme positions JP Morgan is taking to avoid its repurchase allegations

are being discovered, its reserving practices for repurchase obligations are now attracting the

scrutiny of financial regulators.[186]  In January 2010, the SEC issued a comment letter following

an 8-K filing by JPMorgan Chase seeking substantial additional disclosures concerning its

repurchase reserves.  The SEC requested a detailed explanation as to how JP Morgan

"establish[es] repurchase reserves for various representations and warranties . . . made to . . .

GSE's, monoline insurers and any private loan purchasers," including "the specific methodology

employed to estimate the allowance related to various representations and warranties, including

any differences that may result depending on the type of counterparty to the contract."[187]  A full

inquiry of JP Morgan's repurchase practices and policies necessarily will demonstrate its

---

[185] Email from Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims) to Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products), dated May 5, 2008, EMC-AMB 007173918-919.

[186] Menal Mehta, *The SEC Just Demanded More Information on JPMorgan Repurchase Liabilities*, Bus. Insider, June 24, 2010, *available at* http://www.businessinsider.com/sec-jpmorgan-reserves-liabilities-2010-6.

[187] Letter from Amit Pande (SEC Accounting Branch Chief) to Michael J. Cavanaugh (JPMorgan Chase & Co. Chief Financial Officer) dated January 29, 2010 at pp.1-2 (emphasis added), *available at* http://www.scribd.com/doc/33507476/SEC-Letter-to-JPM-Re-More-Disclosure-on-Buybacks-Jun-17-2010.

improper rejection of its repurchase obligations to manipulate JPMorgan Chase's accounting reserves.

197.    The reasoning JPMorgan Chase has given the public for its low repurchase reserves fails to explain its reserves and repurchase positions in connection with the Transaction. In November 2010, JPMorgan Chase disseminated announcements in the public sphere indicating that it continues to reserve minimal amounts to cover EMC's repurchase exposure, in part because "[t]ypically [deal documents] do not warrant that loans are free from borrower fraud."[188]  This reasoning does not hold true for the Transaction, as several representations and warranties precisely to that effect were made by EMC to Syncora in connection with the Transaction.  EMC has a continuing obligation to repurchase the breaching loans in the Transaction that Syncora put back to it, and in turn, JPMorgan Chase has a significant accounting liability it inherited when it acquired Bear Stearns and EMC that it must recognize. But JP Morgan has interfered, and continues to interfere, with EMC's contractual obligations to Syncora through fraudulent, illegal, and improper means in order to hide its parent's accounting liabilities.

## VIII.    HARM SUFFERED BY SYNCORA

198.    The Transaction that Bear Stearns marketed and effectuated based on its materially false and misleading representations and disclosures has failed miserably.  An overwhelming percentage of the loans that Bear Stearns securitized in the Transaction either have been written off as total losses or are severely delinquent causing massive shortfalls in the cash-flows of principal and interest needed to pay down the securities.  As a result, the Note

---

[188] JPMorgan Chase & Co., *BancAnalysts Association of Boston Conference*, Charlie Scharf, CEO, Retail Financial Services, at 33 (Nov. 4, 2010) (online at files.shareholder.com/downloads/ONE/967802442x0x415409/c88f9007-6b75-4d7c-abf6-846b90dbc9e3/BAAB_Presentation_Draft_11-03-10_FINAL_PRINT.pdf).

Purchasers have incurred severe losses that have been passed on to Syncora as the financial
guarantor.

199.    As of June 2, 2011, the Transaction has experienced cumulative losses of more
than $404.4 million, and 60.9% of the original principal balance of the HELOCs has been
charged off.

200.    The severe losses realized by the Transaction have resulted in Syncora having to
make substantial claims payments to insured Note Purchasers.  Since making the first claims
payment in March 2008, as of June 2, 2010, Syncora has paid unreimbursed claims of more than
$320.2 million.

201.    Due to the high rate of expected defaults, future claims payments by Syncora are
inevitable.  Therefore, in addition to the substantial claims payments already made by Syncora
under the Policy, Syncora is expecting to pay tens of millions of dollars in future claims based on
the expectation of future shortfalls affecting the Transaction.

202.    As discussed above, the pervasive breaches of representations and warranties in
the Transaction loan pool supported by the dismal loan performance in the Transaction, pierce
the very heart of the bargain struck by the parties.  As has only recently become clear, Bear
Stearns did not sell to the Trust the contemplated portfolio of loans with the represented
attributes.  Rather, Bear Stearns transferred pools where the overwhelming majority of loans did
not bear any resemblance to the loans EMC represented and warranted would comprise the
pools.  In doing so, Bear Stearns induced Syncora into insuring the Transaction based upon
materially false and misleading information.

203.    Bear Stearns' representations to Syncora in marketing decks and direct
communications, and in the Offering Documents that Bear Stearns prepared to market the Notes

that Syncora insured (the same documents that it filed with the SEC) contained material misrepresentations and omissions.  In these representations and disclosures, Bear Stearns did not adequately or accurately disclose the true attributes of the HELOCs (*e.g.*, the weighted average combined loan-to-value ratio, occupancy status, or debt-to-income ratio), the level of fraud and underwriting failings permeating the Transaction loan pool, the grossly deficient origination practices of the originator of the HELOCs, Bear Stearns' dismal due-diligence practices, the duplicitous role of its quality control department, or its scheme to clear out its inventory of defective loans by securitizing them in the Transaction.  Syncora would never have issued its Policy or agreed to participate in the Transaction had it known the true facts.

204.    EMC's refusal, directed by JP Morgan, to repurchase the overwhelming majority of the loans Syncora put back violates its contractual obligations and has deprived Syncora of the benefit of the contract for which it bargained.  If not for JP Morgan's fraudulent and improper interference, EMC's wholesale breach of its contractual obligation would not have occurred.  In procuring EMC's wholesale evisceration of the repurchase protocol, JP Morgan's tortious interference with Syncora's valid contractual rights for repurchase of the loans that pervasively and systematically breached EMC's representations and warranties, entitles Syncora to all compensatory, legal and punitive damages.

205.    At the very least, this relief requires the payment to Syncora by JP Morgan and EMC of all claims payments made to date and all future claim payments required to be made under the Policy.

## **FIRST CAUSE OF ACTION**

### **(For Fraudulent Inducement)**

206.    Plaintiff realleges and incorporates by reference paragraphs 1 through 205 of this Complaint.

207.    As set forth above, Defendant made materially false public statements and materially false statements directly to Syncora, and omitted material facts in public statements and in statements directly to Syncora, knowingly and with the intent to defraud Syncora.

208.    Defendant, knowingly made materially false statements and omitted material facts with the intent to defraud Syncora in pre-contractual communications between Syncora and Defendant's officers.

209.    Defendant, knowingly and with the intent to defraud, delivered to Syncora materially false and misleading documentation, including collateral data, investor presentations, loan tapes, and Offering Documents, and fraudulently-induced ratings by the rating agencies.

210.    Syncora reasonably relied on Defendant's statements and omissions when it entered into the I&I Agreement and issued its Policy.

211.    As a result of Defendant's statements and omissions, Syncora insured securities issued in the Transaction backed by pools of loans that had a risk profile far higher than Defendant led Syncora to understand.

212.    As a result of Defendant's false and misleading statements and omissions, Plaintiff has suffered, and will continue to suffer, damages.

213.    Because Defendant committed these acts and omissions maliciously, wantonly, oppressively, and with knowledge that they would affect Syncora – which they have – Plaintiff is entitled to punitive damages.

## SECOND CAUSE OF ACTION

### (For Tortious Interference
### with Contractual Relationship)

214.    Plaintiff realleges and incorporates by reference paragraphs 1 through 213 of this

Complaint.

215.    Under Section 7 of the MLPA and Section 2.02 of the SSA, EMC is required to

cure, repurchase, or provide substitutes for loans that breached EMC's representations and

warranties.

216.    Defendant at all relevant times had notice and knowledge of this contractual

relationship between Syncora and EMC.

217.    As a direct and proximate result of Defendant's actions, which are continuing,

EMC breached its contractual agreements with Syncora, and will continue to do so in the future.

218.    Defendant has procured, and continues to procure, EMC's breaches of contract

without justification.

219.    Defendant's procurement of EMC's breaches of contract is without regard for

EMC's financial interest and not for the purpose of protecting EMC.

220.    Defendant has procured EMC's breaches of contract through fraudulent, illegal,

or improper means.

221.    Defendant engaged in actions with the conscious, malicious, willful, wrongful,

tortious, illegal, and wanton intent to injure Syncora in its trade or business.  Defendant's actions

have no legitimate purpose and are without any privilege, justification, or economic interest.

222.    As a direct and proximate result of the conduct described herein, Plaintiff has

been damaged, and continues to be damaged, in its trade or business.  Plaintiff has suffered, and

will continue to suffer, monetary loss that Plaintiff would not have suffered but for Defendant's

tortious conduct, and is threatened with continuous and irreparable damage and/or loss.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for the following relief:

- For an award of all legal, equitable, and punitive damages, to be proven at trial, against Defendant for its fraudulent inducement of Syncora's participation in the Transaction and issuance of its Policy;

- For an award of damages for JP Morgan's intentional procurement of EMC's material breach of its obligation to cure, repurchase, or substitute the loans that breach its representations and warranties pursuant to the remedial provisions of MLPA § 7, and SSA § 2.03, in an amount to be proven at trial;

- For an order of prejudgment interest; and,

- For an Order awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated:        New York, New York
              June 6, 2011

                                    Respectfully Submitted,

                                    *Philip R. Forlenza*

                                    Philip R. Forlenza (*prforlenza@pbwt.com*)
                                    Erik Haas (*ehaas@pbwt.com*)
                                    PATTERSON BELKNAP WEBB & TYLER LLP
                                    1133 Avenue of the Americas
                                    New York, NY  10036-6710
                                    Telephone:  (212) 336-2000
                                    Fax:  (212) 336-2222

                                    *Attorneys for Syncora Guarantee Inc.*

93