Exhibit 21

XL CAPITAL ASSURANCE INC.,
as Insurer,

EMC MORTGAGE CORPORATION,
as Seller,

SACO I INC.,
as Depositor,

GMAC MORTGAGE, LLC,
as a Servicer

and

CITIBANK, N.A.,
as Trustee

# INSURANCE AND INDEMNITY AGREEMENT

BEAR STEARNS SECOND LIEN TRUST 2007-SV1

MORTGAGE-BACKED CERTIFICATES, SERIES 2007-SV1

Dated as of March 30, 2007

# TABLE OF CONTENTS

(This Table of Contents is for convenience of reference only and shall not be deemed to be part of this Agreement. All capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth in Article I of this Agreement.)

Page

### ARTICLE I
### DEFINITIONS

Section 1.01.   *Defined Terms* .......................................................................................................2
Section 1.02.   *Other Definitional Provisions* ...............................................................................5

### ARTICLE II
### REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 2.01.   *Representations and Warranties of EMC and the Depositor* ...............................6
Section 2.02.   *Affirmative Covenants of EMC and the Depositor* ...............................................9
Section 2.03.   *Negative Covenants of EMC and the Depositor* ................................................14
Section 2.04.   *Representations and Warranties of the GMACM.* .............................................15
Section 2.05.   *Representations, Warranties and Covenants of the Insurer* .............................17

### ARTICLE III
### THE POLICY; REIMBURSEMENT

Section 3.01.   *Issuance of the Policy* ........................................................................................17
Section 3.02.   *Payment of Fees and Premium.* ..........................................................................19
Section 3.03.   *Reimbursement Obligation* .................................................................................19
Section 3.04.   *Indemnification.* .................................................................................................20
Section 3.05.   *Payment Procedure* ............................................................................................24
Section 3.06.   *Joint and Several Liability* .................................................................................24
Section 3.07.   *Subrogation* ........................................................................................................24
Section 3.08   *Deductions* ...........................................................................................................28

### ARTICLE IV
### FURTHER AGREEMENTS

Section 4.01.   *Effective Date; Term of the Insurance Agreement* .............................................25
Section 4.02.   *Further Assurances and Corrective Instruments.* ...............................................25
Section 4.03.   *Obligations Absolute.* .........................................................................................25
Section 4.04.   *Assignments; Reinsurance; Third-Party Rights* .................................................27
Section 4.05.   *Liability of the Insurer* .......................................................................................27

### ARTICLE V
### DEFAULTS AND REMEDIES

Section 5.01.   *Defaults* ...............................................................................................................28

Page

Section 5.02.    *Remedies; No Remedy Exclusive.* ........................................................................29
Section 5.03.    *Waivers.* ..........................................................................................................30

## ARTICLE VI
## MISCELLANEOUS

Section 6.01.    *Amendments, Etc* ............................................................................................30
Section 6.02.    *Notices*..............................................................................................................30
Section 6.03.    *Severability* ......................................................................................................32
Section 6.04.    *Governing Law*.................................................................................................32
Section 6.05.    *Consent to Jurisdiction.* ..................................................................................32
Section 6.06.    *Consent of the Insurer*......................................................................................33
Section 6.07.    *Counterparts* ....................................................................................................33
Section 6.08.    *Headings* ..........................................................................................................33
Section 6.09.    *Trial by Jury Waived*.......................................................................................33
Section 6.10.    *Limited Liability*...............................................................................................34
Section 6.11.    *Entire Agreement*.............................................................................................34
Section 6.12.    *No Partnership*.................................................................................................34

INSURANCE AND INDEMNITY AGREEMENT (as may be amended, modified or supplemented from time to time, this "Insurance Agreement"), dated as of March 30, 2007, by and among XL CAPITAL ASSURANCE INC., as Insurer (the "Insurer"), EMC MORTGAGE CORPORATION ("EMC"), as Seller (the "Seller," or "EMC"), SACO I INC., as Depositor (the "Depositor"), GMAC MORTGAGE, LLC, as a Servicer ("GMACM" and together with PHH Mortgage Corporation ("PHH"), the "Servicers," each of GMACM and PHH being referred to herein as a "Servicer") and CITIBANK, N.A., as Trustee (the "Trustee") on behalf of BEAR STEARNS SECOND LIEN TRUST 2007-SV1 (the "Trust").

## RECITALS:

WHEREAS, pursuant to the Mortgage Flow Purchase, Sale & Servicing Agreement, dated as of April 19, 2002, among Sovereign Bank ("Sovereign"), PHH and Bishop's Gate Residential Mortgage Trust ("Bishop's Gate"), Sovereign purchased certain mortgage loans from PHH (the "PHH Mortgage Loans");

WHEREAS, pursuant to the Assignment Assumption and Recognition Agreement, dated as of March 20, 2007, among Sovereign, EMC, PHH and Bishop's Gate, EMC purchased from Sovereign the PHH Mortgage Loans;

WHEREAS, pursuant to the Amended and Restated Purchase, Warranties and Servicing Agreement, dated as of March 30, 2007, among EMC, PHH and Bishop's Gate, as amended by the Assignment, Assumption and Recognition Agreement dated as of March 30, 2007 among Sovereign, EMC, PHH and Bishop's Gate (collectively, the "PHH Servicing Agreement"), PHH agreed to service and administer the PHH Mortgage Loans;

WHEREAS, pursuant to the Mortgage Loan Purchase Agreement, dated as of March 20, 2007 by and between GMACM and Sovereign, GMACM purchased certain mortgage loans from Sovereign (the "GMACM Mortgage Loans," and together with the PHH Mortgage Loans, the "Mortgage Loans");

WHEREAS, pursuant to the Assignment, Assumption and Recognition Agreement, dated as of March 20, 2007, among GMACM, EMC and Sovereign, GMACM sold and EMC purchased the GMACM Mortgage Loans.

WHEREAS, pursuant to the Servicing Agreement, dated as of May 1, 2001 by and between EMC and GMACM, as amended by Amendment No. 1 to the Servicing Agreement, dated as of October 1, 2001, as further amended by Amendment No. 2 to the Servicing Agreement, dated as of July 31, 2002, as further amended by Amendment No. 3 to the Servicing Agreement, dated as of December 20, 2005, as further amended by the Assignment, Assumption and Recognition Agreement dated as of March 30, 2007 among EMC, GMACM and the Trustee (collectively, the "GMACM Servicing Agreement"), EMC purchased from GMACM the GMACM Mortgage Loans and GMACM agreed to service and administer the GMACM Mortgage Loans;

WHEREAS, pursuant to the Mortgage Loan Purchase Agreement, dated as of March 30, 2007 (the "Depositor Purchase Agreement"), by and between EMC and the Depositor, EMC sold and the Depositor purchased the Mortgage Loans;

WHEREAS, the Pooling and Servicing Agreement, dated as of March 30, 2007, (the "Pooling and Servicing Agreement"), among the Depositor, the Trustee, the Master Servicer, the Securities Administrator, the Seller, provides for, among other things, the sale of the Mortgage Loans from the Depositor to the Trust, the master servicing of the Mortgage Loans by the Master Servicer and the issuance of Bear Stearns Second Lien Trust 2007-SV1, Class A-1, Class A-2, Class A-3, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 Certificates (the "Certificates");

WHEREAS, the Certificates will represent in the aggregate the entire beneficial ownership interest in a trust fund;

WHEREAS, the Insurer has issued the Policy, pursuant to which it has agreed to pay in favor of the Trustee for the benefit of the Holders of the Insured Certificates (as defined herein), certain payments in respect of or related to the Mortgage Loans;

WHEREAS, the Insurer shall be paid a Premium as set forth herein and in the Premium Letter described herein; and

WHEREAS, each of EMC and the Depositor has undertaken certain obligations (including engaging each of the Servicers) in consideration for, among other things, the Insurer's issuance of its Policy.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01.**    *Defined Terms.*    Unless the context clearly requires otherwise, all capitalized terms used but not defined herein shall have the respective meanings assigned to them in the Policy described below or, if not defined therein, in the Pooling and Servicing Agreement. For purposes of this Insurance Agreement, the following terms shall have the following meanings:

"Certificate Purchase Agreement" means the Certificate Purchase Agreement, dated as of March 30, 2007, as supplemented by the related Terms Agreement, dated as of March 30, 2007, between the Initial Purchaser and the Depositor with respect to the offer and sale of the Certificates, as such may be amended, modified or supplemented from time to time.

"Certificates" has the meaning given such term in the Recitals section of this Agreement.

"Certificateholder" has the meaning given such term in the Pooling and Servicing Agreement.

2

"Closing Date" means March 30, 2007.

"Commission" means the Securities and Exchange Commission.

"Custodial Agreement" means that certain Custodial Agreement, dated as of March 30, 2007, by and among the Trustee, the Depositor, the Seller, and Wells Fargo Bank, N.A., as master servicer, securities administrator and as custodian.

"Custodian" means Wells Fargo Bank, N.A. and its successors and assigns.

"Cut-off Date" means the close of business on March 1, 2007.

"Data Tape" has the meaning assigned to such term in Section 2.02(c)(iii).

"Default" means any event which results, or which with the giving of notice or the lapse of time or both would result, in an Event of Default.

"Depositor Purchase Agreement" has the meaning given such term in the recitals hereof.

"Documents" has the meaning given such term in Section 2.01(l).

"EMC" has the meaning given such term in the recitals hereof.

"Event of Default" means any event of default specified in Section 5.01 of this Insurance Agreement.

"Financial Statements" means, with respect to EMC, its consolidated statements of financial condition as of November 30, 2006, November 30, 2005 and November 30, 2004 and the statements of operations, stockholders' equity and cash flows for each of the years in the three-year period ended November 30, 2006 (and the notes thereto).

"GMACM Servicer Information" means the information contained under the heading "Servicing of the Mortgage Loans - GMAC Mortgage, LLC" in the Offering Document.

"GMACM Event of Servicer Termination" means an "Event of Default" as defined in the GMAC Servicing Agreement.

"GMACM Side Letter Agreement" means that certain Side Letter Agreement dated as of March 30, 2007, by and between GMACM and the Insurer.

"Holder" has the meaning given such term in the Policy.

"Indemnification Agreement" means the Indemnification Agreement, dated as of March 30, 2007, between the Insurer and the Initial Purchaser.

"Initial Purchaser" means Bear, Stearns & Co. Inc.

"Insurance Agreement" has the meaning given such term in the initial paragraph hereof.

3

"Insured Certificates" means Bear Stearns Second Lien Trust 2007-SV1 Mortgage-Backed Certificates, Class A-2 and Class A-3 Certificates.

"Insurer" means XL Capital Assurance Inc., or any successor thereto, as issuer of the Policy.

"Insurer Information" has the meaning given such term in Section 3.04(a)(v).

"Investment Company Act" means the Investment Company Act of 1940, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Late Payment Rate" means the lesser of (a) the greater of (i) the prime rate as published in the Wall Street Journal (or if no such rate is published thereby, in a publication selected by the Insurer) (any change in such rate of interest to be effective on the date such change is published) plus 2%, and (ii) the weighted average of the then applicable Pass-Through Rates on the Insured Certificates and (b) the maximum rate permissible under applicable usury or similar laws limiting interest rates. The Late Payment Rate shall be computed on the basis of the actual number of days elapsed over a year of 360 days for any Distribution Date.

"Master Servicer" means Wells Fargo Bank, N.A. and its successors and assigns.

"Material Adverse Change" means, in respect of any Person, a material adverse change in the ability of such Person to perform its obligations under any of the Operative Documents, including any material adverse change in the business, financial condition, results of operations or properties of such Person on a consolidated basis with its subsidiaries which might have such effect.

"Moody's" means Moody's Investors Service, Inc., and any successor thereto.

"Offering Document" means the Preliminary Private Placement Memorandum, dated March 19, 2007 and the Private Placement Memorandum, dated March 30, 2007 in respect of , in respect of the Certificates and any amendment or supplement thereto, and any other offering document in respect of the Certificates prepared by or on behalf of the Depositor that makes reference to the Policy.

"Operative Documents" means this Insurance Agreement, the Indemnification Agreement, the Certificates, the Pooling and Servicing Agreement, the PHH Servicing Agreement, the GMACM Servicing Agreement, the Custodial Agreement, the Depositor Purchase Agreement and each other document contemplated by any of the foregoing to which the Depositor, the Master Servicer, either Servicer, the Trustee or the Trust is a party.

"Person" means an individual, joint stock company, trust, unincorporated association, joint venture, corporation, business or owner trust, partnership, limited liability company or other organization or entity (whether governmental or private).

"PHH" means PHH Mortgage Corporation and its successors and assigns.

4

"Policy" means the Financial Guaranty Insurance Policy No. CA03636A, together with all endorsements thereto, issued by the Insurer in favor of the Trustee, for the benefit of the Certificateholders.

"Pooling and Servicing Agreement" has the meaning given such term in the recitals.

"Premium" means the premium payable in accordance with this Insurance Agreement, which shall be payable as "Premium Amounts" pursuant to the Premium Letter and payable in accordance with the Pooling and Servicing Agreement.

"Premium Letter" means the letter agreement among the Insurer, the Trustee, EMC and the Depositor dated the date hereof in respect of the Premium payable in consideration of the issuance of the Policy.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"Securities Act" means the Securities Act of 1933, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Securities Administrator" means Wells Fargo Bank, N.A. and its successors and assigns.

"Securities Exchange Act" means the Securities Exchange Act of 1934, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Seller" has the meaning given such term in the recitals hereof.

"Servicer" has the meaning given such term in the recitals hereof.

"Servicing Agreement" means the PHH Servicing Agreement or the GMACM Servicing Agreement, as applicable.

"Transaction" means the transactions contemplated by the Operative Documents, including the transactions described in the Offering Document.

"Trust" means Bear Stearns Second Lien Trust 2007-SV1 Trust created pursuant to the Pooling and Servicing Agreement.

"Trust Indenture Act" means the Trust Indenture Act of 1939, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Trustee" means Citibank, N.A., a national banking association, as Trustee under the Pooling and Servicing Agreement, and any successor thereto under the Pooling and Servicing Agreement.

**Section 1.02.**    *Other Definitional Provisions.*    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Insurance Agreement shall refer to

this Insurance Agreement as a whole and not to any particular provision of this Insurance Agreement, and Section, subsection, Schedule and Exhibit references are to this Insurance Agreement unless otherwise specified. The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."

## ARTICLE II
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 2.01.**    *Representations and Warranties of EMC and the Depositor.*    Each of EMC and the Depositor, in each case with respect to itself, represents and warrants as of the Closing Date, as follows:

(a)    *Due Organization and Qualification.*    EMC is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware and the Depositor is a limited liability company, duly organized, validly existing and in good standing under the laws of Delaware. Each of EMC and the Depositor is, or shall become, duly qualified to do business, is, or shall be, in good standing and has obtained, or shall obtain, all necessary licenses, permits, charters, registrations and approvals (together, "approvals") necessary for the conduct of its business as currently conducted and as described in the Offering Document and the performance of its obligations under the Operative Documents to which it is a party in each jurisdiction in which the failure to be so qualified or to obtain such approvals would render any Operative Document unenforceable in any respect or would have a material adverse effect upon the Transaction.

(b)    *Power and Authority.*    Each of EMC and the Depositor has all necessary power and authority to conduct its business as currently conducted and as described in the Offering Document, to execute, deliver and perform its obligations under the Operative Documents to which it is a party and to consummate the Transaction.

(c)    *Due Authorization.*    The execution, delivery and performance of the Operative Documents by each of EMC and the Depositor has been duly authorized by all necessary action and does not require any additional approvals or consents, or other action by or any notice to or filing with any Person, including any governmental entity or any of the stockholders or beneficial owners, as applicable, of EMC or the Depositor, which have not previously been obtained or given by EMC or the Depositor.

(d)    *Noncontravention.*    The execution and delivery by each of EMC and the Depositor of the Operative Documents to which it is a party, the consummation of the Transaction and the satisfaction of the terms and conditions of the Operative Documents do not and will not:

(i)    conflict with or result in any breach or violation of any provision of the applicable organizational documents of EMC or the Depositor or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award currently in effect having applicability to EMC or the Depositor or any of their respective material properties, including regulations issued by any administrative agency or other governmental authority having supervisory powers over EMC or the Depositor, which

6

conflict, breach or violation reasonably could be expected to result in a Material Adverse Change;

(ii)    constitute a default by EMC or the Depositor under, result in the acceleration of any obligation under, or breach any provision of any loan agreement, mortgage, indenture or other agreement or instrument to which EMC or the Depositor is a party or by which any of their respective properties is or may be bound or affected, which default, acceleration or breach reasonably could result in a Material Adverse Change; or

(iii)    result in or require the creation of any lien upon or in respect of any assets of EMC or the Depositor, which lien could reasonably be expected to result in a Material Adverse Change.

(e)    *Legal Proceedings.* There is no action, proceeding or investigation by or before any court, governmental or administrative agency or arbitrator against or affecting EMC or the Depositor or any of their respective subsidiaries, any properties or rights of EMC or the Depositor or any of their respective subsidiaries or any of the Mortgage Loans pending or, to EMC's or the Depositor's knowledge after reasonable inquiry, threatened, which, in any case, if decided adversely to EMC or the Depositor or any such subsidiary could result in a Material Adverse Change with respect to EMC or the Depositor.

(f)    *No Default.* Neither EMC nor the Depositor is in default under or with respect to any of its contractual obligations in any respect which could have a material adverse effect on the rights, interests or remedies of the Insurer hereunder or under the other Operative Documents or on its ability to perform its obligations hereunder or under the other Operative Documents to which it is a party. No Default or Event of Default has occurred and is continuing.

(g)    *Valid and Binding Obligations.* The Operative Documents (other than the Certificates), when executed and delivered by EMC or the Depositor, will constitute the legal, valid and binding obligations of each of EMC and the Depositor, enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equitable principles and public policy considerations as to rights of indemnification for violations of federal securities laws. The Certificates, when executed, authenticated and delivered in accordance with the Pooling and Servicing Agreement, will be validly issued and outstanding and entitled to the benefits of the Pooling and Servicing Agreement. Each of EMC and the Depositor will not at any time in the future deny that the Operative Documents to which it is a party constitute the legal, valid and binding obligations of EMC or the Depositor, as applicable.

(h)    *Financial Statements.* The Financial Statements of EMC, copies of which have been furnished to the Insurer, (i) are, as of the dates and for the periods referred to therein, complete and correct in all material respects, (ii) present fairly the financial condition and results of operations of EMC as of the dates and for the periods indicated and (iii) have been prepared in accordance with generally accepted accounting principles consistently applied, except as noted therein (subject as to interim statements to normal year-end adjustments). Since the date of the most recent Financial Statements, there has been no Material Adverse Change in respect of EMC or the Depositor. Except as disclosed in the Financial Statements, none of EMC or the Depositor

7

is subject to any contingent liabilities or commitments that, individually or in the aggregate, have a material possibility of causing a Material Adverse Change in respect of EMC or the Depositor.

(i)     *Compliance with Law, etc.*  No practice, procedure or policy employed or proposed to be employed by EMC or the Depositor in the conduct of its business violates any law, regulation, judgment, agreement, order or decree applicable to it which, if enforced, could reasonably be expected to result in a Material Adverse Change with respect to it or have a material adverse effect on the Transaction.

(j)     *Good Title; Absence of Liens or Security Interest.*  The Trustee on behalf of the Trust is the owner of, and has good and marketable title to, all of the Collateral free and clear of all liens and all such substitutions therefor and additions thereto delivered under the Pooling and Servicing Agreement.

(k)     *Taxes.*  Each of EMC and the Depositor has filed (or caused to be filed) prior to the date hereof all federal and state tax returns that are required to be filed and has paid all taxes, including any assessments received by it that are not being contested in good faith, to the extent that such taxes have become due, except with respect to any failures to file or pay that, individually or in the aggregate, would not result in a Material Adverse Change with respect to EMC or the Depositor. Any taxes, fees and other governmental charges payable by EMC or the Depositor in connection with the Transaction, the execution and delivery of the Operative Documents and the issuance of the Certificates have been paid or shall have been paid at or prior to the Closing Date if such taxes, fees or other governmental charges were due on or prior to the Closing Date.

(l)     *Accuracy of Information.*  Neither the Operative Documents nor other material information relating to the Mortgage Loans, the operations of EMC or the Depositor or the financial condition of EMC or the Depositor (collectively, the "Documents"), as amended, supplemented or superseded, furnished to the Insurer in writing or in electronic form by EMC or the Depositor contains any statement of a material fact which was untrue or misleading in any material respect when made. Neither EMC nor the Depositor has any knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to EMC, the Trust or the Depositor. Since the furnishing of the Documents, there has been no change nor any development or event involving a prospective change known to EMC or the Depositor that would render any of the Documents untrue or misleading in any material respect. Without limiting the generality of the foregoing, the information in the Data Tape with respect to each Mortgage Loan is true and correct as of the Cut-off Date.

(m)     *Compliance With Securities Laws.*  Assuming the Initial Purchaser's compliance with its obligations pursuant to the Certificate Purchase Agreement, the offer of the Certificates complies or shall comply in all material respects with all requirements of law. Without limiting the foregoing, the Offering Document does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; *provided, however,* that no representation is made with respect to the information in the Offering Document regarding the Insurer set forth under the captions "The Certificate Insurer" and "The Policy" or the financial statements of the Insurer as included in the Offering Document, the

8

GMACM Servicer Information and the Initial Purchaser Information. Based upon advice of legal counsel, the Trust is not required to be registered as an "investment company" under the Investment Company Act.

(n)     *Operative Documents.* Each of the representations and warranties of EMC and the Depositor contained in the applicable Operative Documents is true and correct in all material respects and each of EMC and the Depositor hereby makes each such representation and warranty to, and for the benefit of, the Insurer as if the same were set forth in full herein. Each of EMC and the Depositor will not at any time in the future deny that the Operative Documents to which it is a party constitute the legal, valid and binding obligations of EMC and the Depositor, as applicable.

(o)     *Solvency; Fraudulent Conveyance.* Each of EMC and the Depositor is solvent and shall not be rendered insolvent by the Transaction and, after giving effect to the Transaction, neither EMC nor the Depositor shall be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business, and each of EMC and the Depositor does not intend to incur, or believe that it has incurred, debts beyond its ability to pay as they mature. Neither EMC nor the Depositor contemplates the commencement of insolvency, liquidation or consolidation proceedings or the appointment of a receiver, liquidator, conservator, trustee or similar official in respect of EMC or the Depositor or any of their respective assets. The amount of consideration being received by the Depositor upon the transfer of the Mortgage Loans to the Trust constitutes reasonably equivalent value and fair consideration for ownership interest evidenced by the Mortgage Loans. The amount of consideration being received by the Trust upon the sale of the Certificates constitutes reasonably equivalent value and fair consideration for the ownership and/or debt interest evidenced by the Certificates. EMC is not transferring the Mortgage Loans to the Depositor, the Depositor is not transferring the Mortgage Loans to the Trust, nor is the Trust selling the Certificates, as provided in the Operative Documents, with any intent to hinder, delay or defraud any of EMC's, the Trust's or the Depositor's creditors.

(p)     *Security Interest in the Loans.* In the event that the conveyance of such assets to the Trust is characterized by a court as not a sale, then the Trustee on behalf of the Trust has on the Closing Date, and shall have at all times thereafter, a first priority perfected security interest in the Mortgage Loans and all other assets included in the Trust Fund (as defined in the Pooling and Servicing Agreement).

**Section 2.02.**     *Affirmative Covenants of EMC and the Depositor.* Each of EMC and the Depositor hereby agrees that during the term of this Insurance Agreement, unless the Insurer shall otherwise expressly consent in writing:

(a)     *Compliance With Agreements and Applicable Laws.* Each of EMC and the Depositor shall comply in all material respects with the terms and conditions of and perform its obligations under the Operative Documents to which it is a party in all cases in which failure to so comply or perform would result in a default thereunder and shall comply with all requirements of any law, rule or regulation applicable to it in all circumstances where non-compliance reasonably could be expected to result in a Material Adverse Change.

9

(b)    *Corporate Existence.*  Each of EMC and the Depositor and their respective successors and permitted assigns shall maintain its corporate or trust existence, as applicable, and shall at all times continue to be duly organized under the laws of their formation and duly qualified and duly authorized (as described in subsections 2.01(a), (b) and (c) hereof) and shall conduct its business in accordance with the terms of its applicable organizational documents.

(c)    *Financial Statements; Accountants' Reports; Other Information.*  Each of EMC and the Depositor shall keep or cause to be kept in reasonable detail books and records of account of its assets and business relating to the Transaction, and shall, as applicable, clearly reflect therein the sale of the Mortgage Loans to the Depositor, the sale of the Mortgage Loans by the Depositor to the Trustee on behalf of the Trust and the sale of the Certificates, respectively, as a sale of the Mortgage Loans by EMC to the Depositor, and a sale of the Mortgage Loans by the Depositor to the Trustee on behalf of the Trust.  EMC shall furnish or cause to be furnished to the Insurer:

(i)    *Annual Financial Statements of EMC.*  As soon as available, and in any event within 120 days after the close of each fiscal year of EMC, the audited consolidated statement of financial condition of EMC and its subsidiaries as of the end of such fiscal year and the related audited consolidated statements of operations, stockholders' equity and cash flows for such fiscal year, all in reasonable detail, prepared in accordance with generally accepted accounting principles, consistently applied, and accompanied by the audit opinion of EMC's independent accountants (which shall be a nationally recognized independent public accounting firm or otherwise acceptable to the Insurer).

(ii)    *Quarterly Financial Statements.*  Immediately following the earlier to occur of (i) a Material Adverse Change of EMC of which an authorized officer of EMC has actual knowledge or (ii) upon the request of the Insurer following any Material Adverse Change of EMC, but in any event within 45 days after the occurrence of, or knowledge of, such Material Adverse Change, the unaudited consolidated statement of financial condition of EMC and its subsidiaries as of the end of the first three quarters of each fiscal year of EMC and the related unaudited consolidated statements of operations, stockholders' equity and cash flows for the portion of the fiscal year then ended, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the preceding fiscal year, prepared in accordance with generally accepted accounting principles consistently applied (subject to normal year-end adjustments); each delivery of quarterly financial statements shall be accompanied by a certificate of one (or more) corporate officers stating that the quarterly financial statements are correct in all material respects and present fairly the financial condition and results of operations of EMC and its subsidiaries as of the dates and for the periods indicated, in accordance with generally accepted accounting principles consistently applied (subject to normal year-end adjustments).  Promptly following the delivery of these quarterly financial statements, EMC shall cause its Chief Financial Officer or Treasurer (or other responsible officer, provided that EMC shall cause its Chief Financial Officer or Treasurer to be available if such other officer is unable to answer the Insurer's questions to the Insurer's satisfaction) to be available for a conference call with the Insurer, during normal business hours and upon reasonable prior request from the Insurer.

10

(iii)    *Mortgage Loan Data.*  (A) On or before the Closing Date, EMC will provide a copy of a magnetic tape (the "Data Tape") setting forth, as to each Mortgage Loan, the information required under the definition of "Mortgage Loan Schedule" in the Pooling and Servicing Agreement and information for each Mortgage Loan for each of the following data fields:

- FICO score
- documentation type
- pay history
- debt to income ratio
- loan purpose; and
- originator

(B)    on each Distribution Date, Wells Fargo Bank, N.A. will make available to the Insurer at the website www.ctslink.com (i) the loan level information used by the Securities Administrator for the generation of the monthly statements to the Certificateholders and (ii) any other information reasonably requested by the Insurer to the extent that the Master Servicer has received such information from the Servicers.

(iv)    *Other Information.*  (A) Promptly upon receipt thereof, copies of all schedules, financial statements or other similar reports delivered to or by EMC, the Depositor or the Trustee pursuant to the terms of any of the Operative Documents, including all reports provided to either the Trustee or any Certificateholder pursuant to the Pooling and Servicing Agreement, (B) promptly upon request, such other data as the Insurer may reasonably request and (C) all information required to be furnished to the Trustee or the Certificateholders simultaneously with the furnishing thereof to the Trustee or the Certificateholders, as the case may be.

All financial statements specified in clauses (i) and (ii) of this subsection (c) shall be furnished in consolidated form for EMC and all of its subsidiaries in the event that EMC shall consolidate its financial statements with its subsidiaries.

The information supplied pursuant to clauses (iii) and (iv) above will be in Excel or Word format or another form of an electronic data file accessible by the Insurer by means of standard application software; *provided, however*, that the information required to be furnished pursuant to Section 2.02(c)(iii)(B) may be made available on EMC's internet website.

(d)    *Access to Records; Discussions with Officers and Accountants.*  Once in each calendar year, or at any time following any withdrawal, reduction or qualification of any rating assigned to any of the Certificates (without regard to the Policy) (a "Ratings Event"), following the occurrence of any Default or Event of Default that has not been waived or cured, at any time following the occurrence of a Trigger Event, EMC and the Depositor shall, upon the reasonable request of the Insurer, permit the Insurer or its authorized agents:

11

(i)      to inspect the books and records of EMC and the Depositor as they may relate to the Mortgage Loans, the Certificates, the obligations of EMC and the Depositor under the Operative Documents to which it is a party and the Transaction;

(ii)      to discuss the affairs, finances and accounts of EMC as they relate to the Mortgage Loans, the Transaction or EMC's ability to perform its obligations under the Operative Documents with an officer of EMC; and

(iii)      if the Insurer reasonably believes that a Material Adverse Change may have occurred and with EMC's consent, which consent shall not be unreasonably withheld or delayed, to discuss the affairs, finances and accounts of EMC with EMC's independent accountants; *provided, however,* that an officer of EMC shall have the right to be present during such discussions.

Such inspections and discussions shall be conducted during normal business hours and shall not unreasonably disrupt the business of EMC or the Depositor. The books and records of EMC and the Depositor shall be maintained at the address of EMC designated herein for receipt of notices, unless EMC shall otherwise advise the parties hereto in writing.

All of the inspections, discussions and due diligence referred to in this Section 2.02(d) shall be at the expense of the Insurer; *provided, however*, that any such undertaking following a Ratings Event, a Trigger Event or the occurrence of a Default or Event of Default, that remains uncured and unwaived, shall be at the expense of EMC.

(e)      *Notice of Material Events.*   Each of EMC and the Depositor shall be obligated (which obligation shall be satisfied as to each of EMC and the Depositor if performed by EMC or the Depositor) promptly to inform the Insurer in writing of the occurrence of any of the following:

(i)      the submission of any claim or the initiation or threat of any legal process, litigation or administrative or judicial investigation, or rule making or disciplinary proceeding by or against it that (A) would be required to be disclosed to the Commission or its shareholders that relates to the Mortgage Loans, the Transaction or its ability to perform its obligations under the Operative Documents or (B) could result in a Material Adverse Change with respect to it or a material adverse effect on the Transaction, or to the best of the knowledge of EMC or the Depositor, the initiation of any proceeding or the promulgation of any proceeding or any proposed or final rule which would likely result in a Material Adverse Change with respect to it or any of its respective subsidiaries or a material adverse effect on the Transaction;

(ii)      any change in the location of the principal office or jurisdiction of formation of it or any of its respective subsidiaries;

(iii)      the occurrence of any Default or Event of Default or any Material Adverse Change in respect of it;

(iv)      the commencement of any proceedings by or against it under any applicable bankruptcy, reorganization, liquidation, rehabilitation, insolvency or other

12

similar law now or hereafter in effect or of any proceeding in which a receiver, liquidator, conservator, trustee or similar official shall have been, or may be, appointed or requested for it or any of its respective assets; or

     (v)    the receipt of notice that (A) it is being placed under regulatory supervision, (B) any license, permit, charter, registration or approval necessary for the conduct of its business is to be, or may be, suspended or revoked or (C) it is to cease and desist any practice, procedure or policy employed by it in the conduct of its respective business, and such suspension, revocation or cessation may reasonably be expected to result in a Material Adverse Change with respect to it or a material adverse effect on the Transaction.

     (f)    *Financing Statements and Further Assurances.* EMC shall cause to be filed all necessary financing statements or other instruments, and any amendments or continuation statements relating thereto, necessary to be kept and filed in such manner and in such places as may be required by law to preserve and protect fully the interest of the Trustee in the Trust Estate. Each of EMC and the Depositor shall, upon the reasonable request of the Insurer, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, within ten days of such request, such amendments hereto and such further instruments and take such further action as may be reasonably necessary to effectuate the intention, performance and provisions of the Operative Documents. In addition, each of EMC and the Depositor agrees to cooperate with S&P and Moody's in connection with any review of the Transaction that may be undertaken by S&P and Moody's after the date hereof.

     (g)    *Maintenance of Licenses.* Each of EMC and the Depositor, and any successors thereof, shall maintain all licenses, permits, charters and registrations the loss or suspension of which could result in a Material Adverse Change.

     (h)    *Retirement of Certificates.* EMC and the Depositor shall instruct the Securities Administrator, upon a retirement or other payment of the Insured Certificates, to surrender the Policy to the Insurer for cancellation.

     (i)    *Disclosure Document.* It will not use, or distribute to any Person for use, any information relating to the Insurer unless such information has been furnished by the Insurer and the use or distribution of such information has been approved by the Insurer in writing. The Insurer hereby consents to the inclusion of the information in respect of the Insurer included as of the date hereof in the Offering Document. Any Offering Document delivered with respect to the Certificates shall clearly disclose that the Policy is not covered by the property/casualty insurance security fund specified in Article 76 of the New York Insurance Law.

     (j)    *Third-Party Beneficiary.* Each of EMC and the Depositor agrees that the Insurer shall have all rights provided to the Insurer in the Operative Documents and that the Insurer shall constitute a third-party beneficiary with respect to such rights in respect of the Operative Documents and hereby incorporates and restates its representations, warranties and covenants as set forth therein for the benefit of the Insurer. The Insurer agrees that the rights it shall have as a third-party beneficiary under the Pooling and Servicing Agreement shall be

limited to the rights granted to it and to the Certificateholders in the Pooling and Servicing Agreement.

        (k)    *Corporate Formalities.* Each of EMC and the Depositor shall observe all the formalities necessary to preserve its corporate or trust existence, as applicable, under the laws of the State of its formation, including, as applicable, (i) the obligation to hold annual meetings of its beneficial owners, shareholders or its board of directors and (ii) the obligation to prepare and file annual income, franchise and other tax returns.

        (l)    *Closing Documents.* EMC and the Depositor shall provide or cause to be provided to the Insurer an executed original copy of each document executed in connection with the Transaction within 30 days after the Closing Date.

        (m)    *Servicing of Mortgage Loans.* All Mortgage Loans will be serviced in compliance with the terms of the GMACM Servicing Agreement.

    **Section 2.03.**    *Negative Covenants of EMC and the Depositor.* Each of EMC and the Depositor hereby agrees that during the term of this Insurance Agreement, unless the Insurer shall otherwise expressly consent in writing:

        (a)    *Impairment of Rights.* Neither EMC nor the Depositor shall take any action, or fail to take any action, if such action or failure to take action may result in a Material Adverse Change with respect to EMC or the Depositor, nor interfere in any material respect with the enforcement of any rights of the Insurer under or with respect to any of the Operative Documents or the Policy. EMC and the Depositor shall give the Insurer written notice of any such action or, to the best of the knowledge of any of EMC or the Depositor, any such failure to act on the earlier of: (i) the date upon which any publicly available filing or release is made with respect to such action or failure to act and (ii) promptly prior to the date of consummation of such action or failure to act. Each of EMC and the Depositor shall furnish to the Insurer all information reasonably requested by the Insurer that is necessary to determine compliance with this paragraph.

        (b)    *Waiver, Amendments, Etc.* Neither EMC nor the Depositor shall modify, waive or amend, or consent to any modification, waiver or amendment of, any of the terms, provisions or conditions of the Operative Documents to which it is a party (other than any amendment to the Offering Document required by law) without the prior written consent of the Insurer thereto, which consent shall not be unreasonably withheld, conditioned or delayed.

        (c)    *Limitation on Mergers, Etc.* Neither EMC nor the Depositor shall consolidate with or merge with or into any Person or transfer all or substantially all of its assets to any Person or liquidate or dissolve except as provided in the Operative Documents or as permitted hereby. Each of EMC and the Depositor shall furnish to the Insurer all information requested by the Insurer that is reasonably necessary to determine compliance with this paragraph.

        (d)    *Successors.* Neither EMC nor the Depositor shall terminate or designate, or consent to the termination or designation of, any successor Paying Agent, Servicer, Custodian or Trustee without the prior written approval of the Insurer.

(e)     *Bankruptcy Remoteness of the Depositor.*  Neither EMC nor the Depositor shall cause the Depositor to fail to maintain its status as a bankruptcy remote entity.

**Section 2.04.**     *Representations and Warranties of GMACM.*  GMACM represents and warrants as of the Closing Date with respect to itself as follows:

(a)     *Due Organization and Qualification.*  GMACM is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.  GMACM is duly qualified to do business, is in good standing and has obtained all necessary licenses, permits, charters, registrations and approvals (together, "approvals") necessary for the conduct of its business as currently conducted and as described in the Offering Document and the performance of its obligations under the Operative Documents to which it is a party in each jurisdiction in which the failure to be so qualified or to obtain such approvals would render any Operative Document to which it is a party unenforceable in any respect or would have a material adverse effect upon the Transaction.

(b)     *Power and Authority.*  GMACM has all necessary power and authority to conduct its business as currently conducted and as described in the Offering Document, to execute, deliver and perform its obligations under the Operative Documents to which it is a party and to consummate the Transaction.

(c)     *Due Authorization.*  The execution, delivery and performance of the Operative Documents to which GMACM is a party have been duly authorized by all necessary action and do not require any additional approvals or consents, or other action by or any notice to or filing with any Person, including any governmental entity or any of the stockholders or beneficial owners, as applicable, of GMACM , which have not previously been obtained or given by GMACM .

(d)     *Valid and Binding Obligations.*  The Operative Documents  to which it is a party, when executed and delivered by GMACM will constitute the legal, valid and binding obligations of GMACM, enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equitable principles and public policy considerations as to rights of indemnification for violations of federal securities laws.

(e)     *Representation regarding the GMACM Servicer Information.*  GMACM represents that the GMACM Servicer Information, included in the Offering Document does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

(f)     *Servicing of Mortgage Loans.*  GMACM will service the GMACM Mortgage Loans in compliance with the GMACM Servicing Agreement.

(g)     *Access to Records; Discussions with Officers and Accountants.*  GMACM shall permit the Insurer access to records and to allow discussions with servicing officers in accordance with the terms specified in the GMACM Side Letter Agreement.

**Section 2.05.**   *Representations, Warranties and Covenants of the Insurer.*  The Insurer represents and warrants as of the Closing Date, and, in the case of Section 2.05(g) below, covenants during the term of this Insurance Agreement, to the Initial Purchaser, EMC, GMACM and the Depositor as follows:

(a)   *Organization and Licensing.*  The Insurer is a duly incorporated and existing New York stock insurance company licensed to do business in the State of New York and is in good standing under the laws of such state.

(b)   *Corporate Power.*  The Insurer has the corporate power and authority to issue the Policy, execute and deliver this Insurance Agreement and perform all of its obligations hereunder and thereunder.

(c)   *Authorization; Approvals; No Conflicts.*  The issuance of the Policy and the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate proceedings and will not result in any violation of (i) any law, regulation, rule or order applicable to the Insurer, (ii) the Insurer's organizational documents or (iii) any material indenture, contract or other agreement to which the Insurer is a party.  No further approvals or filings of any kind, including, without limitation, any further approvals of or further filings with any governmental agency or other governmental authority, or any approval of the Insurer's board of directors or stockholders, are necessary for the Policy and this Insurance Agreement to constitute the legal, valid and binding obligations of the Insurer.

(d)   *Enforceability.*  The Policy, when issued, and this Insurance Agreement will each constitute a legal, valid and binding obligation of the Insurer, enforceable in accordance with its terms, subject to applicable laws affecting the enforcement of creditors' rights generally.

(e)   *Insurer Information.*  The Insurer Information in the Offering Document, is limited due only to the fact that the Insurer is not the issuer under the Securities Act of 1933 in the transaction described in the Offering Document and, therefore, does not purport to provide the scope of disclosure required to be included in a prospectus under the Securities Act of 1933, in connection with the offer and the sale of securities of the Insurer, if Insurer were the issuer. Within such limited scope of disclosure, as of the date of each Offering Document and as of the Closing Date, the Insurer Information does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(f)   *No Litigation.*  There are no actions, suits, proceedings or investigations pending or, to the best of the Insurer's knowledge, threatened against it at law or in equity or before or by any court, governmental agency, board or commission or any arbitrator which should reasonably be expected to materially and adversely affect its ability to perform its obligations under the Policy or this Insurance Agreement.

(g)   *Confidential Information.*  The Insurer agrees that it and its shareholders, directors, agents, accountants and attorneys shall keep confidential any information provided to the Insurer pursuant to or in connection with this Insurance Agreement or the issuance of the

Policy or otherwise related to the Transaction, including any matter of which it becomes aware during the inspections conducted or discussions had pursuant to Section 2.02(d), unless such information is readily available from public sources or except as may be otherwise required by regulation, law or court order or requested by appropriate governmental authorities or as necessary to preserve its rights or security under or to enforce the Operative Documents or the Policy; *provided, however,* that the foregoing shall not limit the right of the Insurer to make such information available to its regulators, securities rating agencies, reinsurers, credit and liquidity providers, counsel and accountants. If the Insurer is requested or required (by oral questions, interrogatories, requests for information or documents subpoena, civil investigative demand or similar process) to disclose information provided to the Insurer pursuant to or in connection with this Insurance Agreement or the issuance of the Policy or otherwise related to the Transaction, including any information of which it becomes aware through such inspections or discussions, the Insurer will promptly notify EMC of such request(s) so that EMC may seek, at its own expense, an appropriate protective order and/or waive the Insurer's compliance with the provisions of this Insurance Agreement. If, in the absence of a protective order or the receipt of a waiver hereunder, the Insurer is, nonetheless, in the opinion of its counsel, compelled to disclose such information to any tribunal or else stand liable for contempt or suffer other censure or significant penalty, the Insurer may disclose such information to such tribunal that the Insurer is compelled to disclose; *provided, however,* that a copy of all information disclosed is provided to EMC promptly upon such disclosure.

(h)     *Compliance with Law, Etc.* No practice, procedure or policy employed, or proposed to be employed, by the Insurer in the conduct of its business violates any law, regulation, judgment, agreement, order or decree applicable to the Insurer that, if enforced, could result in a Material Adverse Change with respect to the Insurer.

(i)     *Policy Exempt from Registration.* The Policy is exempt from registration under the Securities Act.

## ARTICLE III
## THE POLICY; REIMBURSEMENT

**Section 3.01.**     *Issuance of the Policy.* The Insurer agrees to issue the Policy on the Closing Date subject to satisfaction of the conditions precedent set forth below on or prior to the Closing Date:

(a)     *Payment of Premium and Expenses; Premium Letter.* The Insurer shall have been paid, by or on behalf of EMC, the initial nonrefundable payment of the Premium, if applicable, specified in the Premium Letter and shall have been reimbursed for other fees and expenses identified in the Premium Letter or in Section 3.02 below as payable at closing, unless otherwise agreed to in writing between the Depositor and the Insurer;

(b)     *Operative Documents.* The Insurer shall have received a copy of each of the Operative Documents, in form and substance reasonably satisfactory to the Insurer, duly authorized, executed and delivered by each party thereto;

(c)     *Representations and Warranties.* The representations and warranties of EMC, the Depositor and GMACM dated the Closing Date set forth or incorporated by reference in this Insurance Agreement shall be true and correct on and as of the Closing Date as if made on the Closing Date;

(d)     *Opinions of Counsel.* The Insurer shall have received all opinions of counsel addressed to any of Moody's, S&P, the Trustee, EMC, the Depositor and the Initial Purchaser, in respect of EMC and the Depositor or any other parties to the Operative Documents and the Transaction dated the Closing Date in form and substance reasonably satisfactory to the Insurer, addressed to the Insurer and addressing such matters as the Insurer may reasonably request, and the counsel providing each such opinion shall have been instructed by its client to deliver such opinion to the addressees thereof;

(e)     *No Litigation, Etc.* No suit, action or other proceeding, investigation or injunction, or final judgment relating thereto, shall be pending or threatened before any court, governmental or administrative agency or arbitrator in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with any of the Operative Documents or the consummation of the Transaction;

(f)     *Legality.* No statute, rule, regulation or order shall have been enacted, entered or deemed applicable by any government or governmental or administrative agency or court that would make the Transaction illegal or otherwise prevent the consummation thereof;

(g)     *Satisfaction of Conditions of the Certificate Purchase Agreement.* All conditions in the Certificate Purchase Agreement relating to the Initial Purchaser's obligation, if any, to purchase the Offered Certificates shall have been satisfied, without taking into account any waiver by the Initial Purchaser of any condition unless such waiver has been approved by the Insurer. The Insurer shall have received copies of each of the documents, and shall be entitled to rely on each of the documents, required to be delivered to the Initial Purchaser pursuant to the Certificate Purchase Agreement;

(h)     *Issuance of Ratings.* The Insurer shall have received confirmation that the risk secured by the Policy constitutes at least a "AAA" risk by S&P and a "Aaa" risk by Moody's, without regard to the Policy, and that the Certificates that are rated, when issued, will be rated "AAA" by S&P and "Aaa" by Moody's;

(i)     *No Default.* No Default or Event of Default shall have occurred;

(j)     *Satisfactory Documentation.* The Insurer and its counsel shall have reasonably determined that all documents, certificates and opinions to be delivered in connection with the Certificates conform to the terms of the Pooling and Servicing Agreement, the Offering Document and this Insurance Agreement; and

(k)     *Delivery of Mortgage Documents.* The Insurer shall have received evidence satisfactory to it that (i) delivery has been made to the Trustee or a custodian of the Mortgage File required to be so delivered pursuant to Section 2.01 of the Pooling and Servicing Agreement and (ii) each Mortgage Note is endorsed as provided in Section 2.01 of the Pooling and Servicing Agreement.

**Section 3.02.**    *Payment of Fees and Premium.*

(a)    *Rating Agency Fees.*  EMC will pay the initial fees of the Rating Agencies with respect to the Transaction contemplated hereby in full on the Closing Date, or otherwise provided for to the satisfaction of Insurer.  All periodic and subsequent fees of the Rating Agencies with respect to, and directly allocable to, the Certificates shall be for the account of, and shall be billed to, the Seller.  Under no circumstances shall the Insurer have any obligation to pay any fees of the Rating Agencies.  Notwithstanding the foregoing, the fees for any other rating agency shall be paid by the party requesting such other agency's rating, unless such other agency is a substitute for any of the Rating Agencies in the event that any of the Rating Agencies is no longer rating the Certificates, in which case the cost for such agency shall be paid by the Seller.

(b)    *Legal, Accounting and Due Diligence Fees.*  EMC shall pay or cause to be paid to the Insurer, at the Closing Date, legal fees, due diligence expenses and accounting fees incurred by the Insurer in connection with the issuance of the Policy amounts and as described in the Premium Letter.

(c)    *Premium.*  In consideration of the issuance by the Insurer of the Policy, the Insurer shall be paid the Premium in Premium Amounts in accordance with the terms of the Premium Letter and Section  of the Pooling and Servicing Agreement.  The Premium Amounts paid hereunder and pursuant to the Operative Documents and the Premium Letter shall be nonrefundable without regard to whether the Insurer makes any payment under the Policy or any other circumstances relating to the Certificates or provision being made for payment of the Certificates prior to maturity.  All payments of Premium Amounts shall be made by wire transfer to an account designated from time to time by the Insurer by written notice to the Securities Administrator.  Although the Premium is fully earned by the Insurer as of the date of issuance, the Premium shall be payable in periodic installments of Premium Amounts as provided in the Premium Letter.  The Premium Amount for each period shall be calculated based on a 360-day year consisting of twelve 30-day months.

**Section 3.03.**    *Reimbursement Obligation.*

(a)    As and when due in accordance with and from the funds specified in Section 6.08 of the Pooling and Servicing Agreement, the Insurer shall be entitled to reimbursement for any payment made by the Insurer under the Policy (including any portion of any amounts that are payable with Insured Amounts under the Policy paid as a result of the nonpayment of Premium Amounts to the Insurer), which reimbursement shall be due and payable on the date that any amount is paid thereunder, in an amount equal to the amount to be so paid and all amounts previously paid that remain unreimbursed, together with interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate.

(b)    Anything in this Insurance Agreement to the contrary notwithstanding, EMC agrees to pay to the Insurer, and the Insurer shall be entitled to reimbursement from EMC

19

and shall have full recourse against EMC for, (i) any payment made under the Policy arising as a result of EMC's failure to substitute for or deposit an amount in respect of any defective Mortgage Loan as required pursuant to Section 2.02 and Section 2.03 of the Pooling and Servicing Agreement, together with interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any such unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate, and (ii) any payment made under the Policy arising as a result of the Master Servicer's or a Servicer's failure to pay or deposit any amount required to be paid or deposited pursuant to the Operative Documents, together with interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect to any such unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate.

(c)     EMC agrees to pay to the Insurer any and all charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including reasonable attorneys' and accountants' fees and expenses, in connection with (i) the enforcement, defense or preservation of any rights in respect of any of the Operative Documents, including defending, monitoring or participating in any litigation or proceeding (including any insolvency proceeding in respect of any Transaction participant or any affiliate thereof) relating to any of the Operative Documents, any party to any of the Operative Documents (in its capacity as such a party) or the Transaction or (ii) any amendment, waiver or other action with respect to, or related to, any Operative Document, whether or not executed or completed. Provided that three Business Days written notice of the intended payment or incurrence shall have been given to EMC by the Insurer, such reimbursement shall be due on the dates on which such charges, fees, costs or expenses are paid or incurred by the Insurer.

(d)     EMC agrees to pay to the Insurer interest (without duplication) on any and all amounts described in subsections 3.03(b), 3.03(c) and 3.03(e) and Sections 3.02 and 3.04 from the date such amounts become due or, in the case of subsections 3.02(c) or 3.03(c) or Section 3.04, are incurred or paid by the Insurer until payment thereof in full (after as well as before judgment), at the Late Payment Rate.

(e)     EMC agrees to pay to the Insurer as follows: any payments made by the Insurer on behalf of, or advanced to, EMC or the Depositor, other than any payments made by the Insurer pursuant to the terms of the Policy (except as otherwise provided in Section 3.03(b)), on the date any such payment is made or advanced by the Insurer. Notwithstanding the foregoing, in no event shall the Insurer have any recourse under this subsection against EMC or the Depositor with respect to any payments the Insurer has made in respect of principal or interest distributions on the Insured Certificates.

(f)     The Insurer shall have no right to set-off payments to be made under the Policy against payments to be made to the Insurer by EMC or the Depositor (or any person or organization acting on their behalf), the Trust, the Trustee or any Certificateholder or any affiliate, officer or director of any of them.

**Section 3.04.**     *Indemnification.*

20

(a)     In addition to any and all of the Insurer's rights of reimbursement, indemnification, subrogation and to any other rights of the Insurer pursuant hereto or under law or in equity, EMC and the Depositor agree to pay, and to protect, indemnify and save harmless, the Insurer and its officers, directors, shareholders, employees, agents and each Person, if any, who controls the Insurer within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act, from and against any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out of or relating to the breach by EMC or the Depositor of any of the representations or warranties contained in Section 2.01 or arising out of or relating to the transactions contemplated by the Operative Documents by reason of:

(i)     any omission or action (other than of or by the Insurer) in connection with the offering, issuance or delivery of the Certificates by EMC, the Depositor or the Trustee;

(ii)     the misfeasance or malfeasance of, or negligence, bad faith, willful misconduct or theft committed by, any director, officer, employee or agent of EMC, the Depositor or the Trustee in connection with any Transaction arising from or relating to the Operative Documents;

(iii)     the violation or alleged violation by EMC or the Depositor of any domestic or foreign law, rule or regulation, or any judgment, order or decree applicable to it;

(iv)     the breach by EMC or the Depositor of any representation, warranty or covenant under any of the Operative Documents or the occurrence, in respect of EMC or the Depositor, under any of the Operative Documents of any "event of default" or any event which, with the giving of notice or the lapse of time or both, would constitute any "event of default"; or

(v)     any untrue statement or alleged untrue statement of a material fact contained in the Offering Document or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, except insofar as such claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact or omission or alleged omission of a material fact in information included in the Offering Document and either furnished by or approved by the Insurer in writing expressly for use therein (all such information so furnished being referred to herein as "Insurer Information"), (it being understood that, in respect of the Offering Document which relates to the Certificates, the Insurer Information is limited to the information with respect to the Insurer included under the captions "The Policy" and "The Certificate Insurer" and any Insurer Financial Statements of the Insurer specifically referred to in the Offering Document, and shall include any information in any amendment or supplement

21

to the Offering Document furnished by the Insurer in writing expressly for use therein that amends or supplements such information), or such information constituting GMACM Servicer Information with respect to GMACM, or Initial Purchaser Information with respect to the Initial Purchaser, as such terms are defined in the Indemnification Agreement.

(b)    In addition to any and all of the Insurer's rights of reimbursement, indemnification, subrogation and to any other rights of the Insurer pursuant hereto or under law or in equity, GMACM agrees to pay, and to protect, indemnify and save harmless, the Insurer and its officers, directors, shareholders, employees, agents and each Person, if any, who controls the Insurer within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act, from and against any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including, without limitation, reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out of or relating to the breach by GMACM of any of the representations or warranties contained in Section 2.04 or arising out of or relating to the transactions contemplated by the Operative Documents by reason of:

(i)    the misfeasance or malfeasance of, or negligence, bad faith, willful misconduct or theft committed by, any director, officer, employee or agent of GMACM in connection with any Transaction arising from or relating to the Operative Documents;

(ii)    the violation or alleged violation by GMACM of any domestic or foreign law, rule or regulation, or any judgment, order or decree applicable to it; or

(iii)    the breach by GMACM of any representation, warranty or covenant under any of the Operative Documents to which it is a party or the occurrence, in respect of GMACM under any of the Operative Documents of any "event of default" or any event which, with the giving of notice or the lapse of time or both, would constitute any "event of default;" or

(iv)    any losses resulting from any untrue statement or alleged untrue statement of a material fact contained in the Offering Documents or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, to the extent that such claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact or omission or alleged omission of a material fact contained in the GMACM Servicer Information.

(c)    The Insurer agrees to pay, and to protect, indemnify and save harmless, EMC, the Trustee, GMACM, the Depositor and their respective officers, directors, shareholders, employees, agents and each Person, if any, who controls EMC, the Trustee, GMACM and the Depositor within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act from and against, any and all claims, losses, liabilities (including

penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out of or by reason of (i) any untrue statement or alleged untrue statement of a material fact contained in the Insurer Information or any omission or alleged omission to state in the Insurer Information a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (ii) any failure of the Insurer to make a payment required to be made under the Policy or (iii) a breach of any of the representations and warranties of the Insurer contained in Section 2.05.

(d)     If any action or proceeding (including any governmental investigation) shall be brought or asserted against any Person (individually, an "Indemnified Party" and, collectively, the "Indemnified Parties") in respect of which the indemnity provided in Section 3.04(a), (b) or (c) may be sought from EMC, the Depositor or GMACM on the one hand, or the Insurer, on the other (each, an "Indemnifying Party") hereunder, each such Indemnified Party shall promptly notify the Indemnifying Party in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all expenses. The omission so to notify the Indemnifying Party will not relieve it from any liability which it may have to any Indemnified Party except to the extent the Indemnifying Party is prejudiced thereby. The Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof at the expense of the Indemnified Party; provided, however, that the fees and expenses of such separate counsel shall be at the expense of the Indemnifying Party if (i) the Indemnifying Party has agreed to pay such fees and expenses, (ii) the Indemnifying Party shall have failed within a reasonable period of time to assume the defense of such action or proceeding and employ counsel reasonably satisfactory to the Indemnified Party in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified Party and the Indemnifying Party, and the Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the Indemnifying Party (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action or proceeding on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time (in addition to local counsel) for the Indemnified Parties, which firm shall be designated in writing by the Indemnified Party and shall be reasonably satisfactory to the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such action or proceeding effected without its written consent, which consent shall not be unreasonably withheld, conditioned or delayed, but, if settled with its written consent, or if there is a final judgment for the plaintiff in any such action or proceeding with respect to which the Indemnifying Party shall have received notice in accordance with this subsection (c), the Indemnifying Party agrees to indemnify and hold the Indemnified Parties harmless from and against any loss or liability by reason of such settlement or judgment. Notwithstanding anything in this paragraph to the contrary, the consent of such Indemnified Party shall not be required if such settlement fully

23

discharges, with prejudice against the plaintiff, the claim or action against such Indemnified Party.

(e) To provide for just and equitable contribution if the indemnification provided by the Indemnifying Party is determined to be unavailable or insufficient to hold harmless any Indemnified Party (other than due to application of this Section), each Indemnifying Party shall contribute to the losses incurred by the Indemnified Party on the basis of the relative fault of the Indemnifying Party, on the one hand, and the Indemnified Party, on the other hand; *provided, however*, that no party who is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who is not guilty of such fraudulent misrepresentation.

**Section 3.05.**   *Payment Procedure.*   In the event of any payment by the Insurer, EMC and the Depositor agree to accept the voucher or other evidence of payment as prima facie evidence of the propriety thereof and the liability, if any, described in Section 3.03 therefor to the Insurer. All payments to be made to the Insurer under this Insurance Agreement shall be made to the Insurer in lawful currency of the United States of America in immediately available funds at the notice address for the Insurer as specified in the Pooling and Servicing Agreement (except as otherwise specified in accordance with Section 3.02(c) hereof) on the date when due or as the Insurer shall otherwise direct by written notice to the other parties hereto. In the event that the date of any payment to the Insurer or the expiration of any time period hereunder occurs on a day that is not a Business Day, then such payment or expiration of time period shall be made or occur on the next succeeding Business Day with the same force and effect as if such payment was made or time period expired on the scheduled date of payment or expiration date.

**Section 3.06.**   *Joint and Several Liability.*   EMC and the Depositor shall be jointly and severally liable for all amounts due and payable by the Depositor to the Insurer hereunder.

**Section 3.07.**   *Subrogation.*   Subject only to the priority of payment provisions of the Pooling and Servicing Agreement and not in limitation of the Insurer's equitable right of subrogation, the parties hereto acknowledge that, to the extent of any payment made by the Insurer pursuant to the Policy for which the Insurer has not been reimbursed, the Insurer is to be fully subrogated to the extent of such payment and any additional interest due on any late payment, to the rights of the Holders of the Certificates to any moneys paid or payable in respect of the Certificates under the Operative Documents or otherwise. The parties hereto agree to such subrogation and, further, agree to execute such instruments and to take such actions as, in the sole judgment of the Insurer, are necessary to evidence such subrogation and to perfect the rights of the Insurer to receive any moneys paid or payable in respect of the Certificates under the Operative Documents or otherwise.

**Section 3.08.**   *Deductions.*   All payments made to the Insurer in respect of this Article III shall be made without any deduction or withholding for or on account of any tax, levy, impost, duty, charge, assessment or fee of any nature unless such deduction or withholding is required by applicable law, as modified by practice of any relevant governmental revenue authority, then in effect. If a payor is required to deduct or withhold, then such payor shall (a) promptly notify the Insurer of such requirement, (b) pay to the Insurer, in addition to the amount to which the Insurer is otherwise entitled, such additional amount as is necessary to ensure that

24

the net amount actually received by the Insurer (free and clear of any taxes, whether assessed against the payor or the Insurer) will equal the full amount the Insurer would have received had no such deduction or withholding been required and (c) pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid to the Insurer pursuant to foregoing clause (b)).

## ARTICLE IV
## FURTHER AGREEMENTS

**Section 4.01.**    *Effective Date; Term of the Insurance Agreement.*    This Insurance Agreement shall take effect on the Closing Date and shall remain in effect until the later of (a) such time as the Insurer is no longer subject to a claim under the Policy and the Policy shall have been surrendered to the Insurer for cancellation and (b) all amounts payable to the Insurer by EMC, the Depositor or the Servicers hereunder or from any other source hereunder or under the Operative Documents or the Policy and all amounts payable under the Insured Certificates have been paid in full; provided, however, that the provisions of Sections 3.02, 3.03 and 3.04 hereof shall survive any termination of this Insurance Agreement.

**Section 4.02.**    *Further Assurances and Corrective Instruments.*

(a)    Except at such times as a default in payment under the Policy shall exist or shall have occurred, none of EMC, the Trustee or the Depositor shall grant any waiver of rights under any of the Operative Documents to which any of them is a party without the prior written consent of the Insurer, which shall not be unreasonably withheld, conditioned or delayed and any such waiver without prior written consent of the Insurer shall be null and void and of no force or effect.

(b)    To the extent permitted by law, each of EMC, the Trustee and the Depositor agrees that it will, from time to time, following good faith negotiations in connection therewith, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such supplements hereto and such further instruments as the Insurer may reasonably request and as may be required in the Insurer's reasonable judgment to effectuate the intention of or facilitate the performance of this Insurance Agreement.

**Section 4.03.**    *Obligations Absolute.*

(a)    The obligations of EMC, the Trustee, the Depositor and GMACM hereunder shall be absolute and unconditional and shall be paid or performed strictly in accordance with this Insurance Agreement under all circumstances irrespective of:

(i)    any lack of validity or enforceability of, or any amendment or other modifications of, or waiver, with respect to any of the Operative Documents or the Certificates that have not been approved by the Insurer;

(ii)    any exchange or release of any other obligations hereunder;

(iii)    the existence of any claim, setoff, defense, reduction, abatement or other right that EMC, the Trustee, the Depositor or GMACM may have at any time against the Insurer or any other Person;

(iv)    any document presented in connection with the Policy proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(v)    any payment by the Insurer under the Policy against presentation of a certificate or other document that does not strictly comply with terms of the Policy;

(vi)    any failure of EMC or the Depositor to receive the proceeds from the sale of the Certificates;

(vii)    any other circumstances, other than payment in full, that might otherwise constitute a defense available to, or discharge of, EMC, the Trustee, the Depositor or GMACM in respect of any Operative Document;

(viii)    the bankruptcy or insolvency of the Insurer or any other party;

(ix)    any default or alleged default of the Insurer under the Policy; or

(x)    the inaccuracy or alleged inaccuracy of any notice or certificate upon which a claim under the Policy is based.

(b)    EMC and the Depositor and any and all others who are now or may become liable for all or part of the obligations of EMC or the Depositor under this Insurance Agreement renounce the right to assert as a defense to the performance of their respective obligations each of the following: (i) to the extent permitted by law, any and all redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness and obligations evidenced by any Operative Document or by any extension or renewal thereof; (ii) presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor and notice of protest; (iii) all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default or enforcement of any payment hereunder, except as required by the Operative Documents; and (iv) all rights of abatement, diminution, postponement or deduction, or to any defense other than payment, or to any right of setoff or recoupment arising out of any breach under any of the Operative Documents, by any party thereto or any beneficiary thereof, or out of any obligation at any time owing to EMC or the Depositor.

(c)    EMC and the Depositor and any and all others who are now or may become liable for all or part of the obligations of EMC or the Depositor under this Insurance Agreement agree to be bound by this Insurance Agreement and (i) agree that its liabilities hereunder shall be unconditional and without regard to any set-off, counterclaim or the liability of any other Person for the payment hereof; (ii) agree that any consent, waiver or forbearance hereunder with respect to an event shall operate only for such event and not for any subsequent event; (iii) consent to any and all extensions of time that may be granted by the Insurer with respect to any payment hereunder or other provisions hereof and to the release of any security at

26

any time given for any payment hereunder, or any part thereof, with or without substitution, and to the release of any Person or entity liable for any such payment; and (iv) consent to the addition of any and all other makers, endorsers, guarantors and other obligors for any payment hereunder, and to the acceptance of any and all other security for any payment hereunder, and agree that the addition of any such obligors or security shall not affect the liability of the parties hereto for any payment hereunder.

(d)     Nothing herein shall be construed as prohibiting EMC or the Depositor from pursuing any rights or remedies it may have against any Person in a separate legal proceeding.

**Section 4.04.**     *Assignments; Reinsurance; Third-Party Rights.*

(a)     This Insurance Agreement shall be a continuing obligation of the parties hereto and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. None of EMC, the Trustee, the Depositor or GMACM may assign its rights under this Insurance Agreement, or delegate any of its duties hereunder, without the prior written consent of the Insurer, which consent shall not be unreasonably withheld. Any assignments made in violation of this Insurance Agreement shall be null and void.

(b)     The Insurer shall have the right to give participations in its rights under this Insurance Agreement and to enter into contracts of reinsurance with respect to the Policy upon such terms and conditions as the Insurer may in its discretion determine; *provided, however,* that no such participation or reinsurance agreement or arrangement shall relieve the Insurer of any of its obligations hereunder or under the Policy, nor shall EMC, the Trustee or the Depositor be required to deal directly with any such parties.

(c)     In addition, the Insurer shall be entitled to assign or pledge to any bank or other lender providing liquidity or credit with respect to the Transaction or the obligations of the Insurer in connection therewith any rights of the Insurer under the Operative Documents or with respect to any real or personal property or other interests pledged to the Insurer, or in which the Insurer has a security interest, in connection with the Transaction; *provided* that the Insurer shall notify EMC in writing upon any such assignment.

(d)     Except as provided herein with respect to participants and reinsurers, nothing in this Insurance Agreement shall confer any right, remedy or claim, express or implied, upon any Person, including, particularly, any Holder, other than the Insurer against EMC, the Depositor or GMACM, or EMC, the Depositor or GMACM against the Insurer and all the terms, covenants, conditions, promises and agreements contained herein shall be for the sole and exclusive benefit of the parties hereto and their successors and permitted assigns. Neither the Trustee nor any Holder shall have any right to payment from any Premiums paid or payable hereunder or under the Pooling and Servicing Agreement or from any amounts paid by EMC pursuant to Sections 3.02 or 3.03.

**Section 4.05.**     *Liability of the Insurer.*  Neither the Insurer nor any of its officers, directors or employees shall be liable or responsible for: (a) the use that may be made of the Policy by the Trustee or for any acts or omissions of the Trustee in connection therewith; (b) the

27

validity, sufficiency, accuracy or genuineness of documents delivered to the Insurer in connection with any claim under the Policy, or of any signatures thereon, even if such documents or signatures should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged (unless the Insurer shall have actual knowledge thereof) or (c) any acts or omissions of a Servicer, the Master Servicer, the Depositor or the Trustee in connection with the Transaction or the Operative Documents to which it is a party. In furtherance and not in limitation of the foregoing, the Insurer may accept documents that appear on their face to be in order, without responsibility for further investigation.

## ARTICLE V
## DEFAULTS AND REMEDIES

**Section 5.01.**    *Defaults.*   The occurrence of any of the following shall constitute an Event of Default hereunder:

(a)    Any representation or warranty made by EMC, the Depositor, or either Servicer hereunder or under the Operative Documents, or in any certificate furnished hereunder or under the Operative Documents, shall prove to be untrue or incomplete in any material respect, unless remedied under the Operative Documents;

(b)    (i)    GMACM, EMC, the Trust or the Depositor shall fail to pay when due any amount payable by GMACM, EMC, the Trust or the Depositor hereunder or (ii) a legislative body has enacted any law that declares or a court of competent jurisdiction shall find or rule that this Insurance Agreement or any other Operative Document is not valid and binding on GMACM, EMC, the Trustee or the Depositor, provided that, with respect to any law or judicial action within the scope of this clause (ii), GMACM, EMC, the Trustee and the Depositor shall have 30 days to reinstate the binding effect of this Insurance Agreement or any other Operative Document; the Insurer agrees to take such actions as may be reasonably requested of it to facilitate the reinstatement of such binding effect;

(c)    The occurrence and continuance of an "event of default" or "Event of Servicer Termination" under any Operative Document; provided, however, that any failure to maintain a perfected first lien security interest in any of the Collateral shall constitute an Event of Default hereunder;

(d)    Any failure on the part of EMC, the Trustee, the Depositor or GMACM duly to observe or perform in any material respect any other of the covenants or agreements on the part of EMC, the Trustee, the Depositor or GMACM contained in this Insurance Agreement which continues unremedied for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to EMC, the Trustee, the Depositor or GMACM by the Insurer (with a copy to the Trustee);

(e)    A decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator or other similar official in any bankruptcy, insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation

of its affairs, shall have been entered against EMC or the Depositor and such decree or order shall have remained in force undischarged or unstayed for a period of 90 consecutive days;

(f)     EMC or the Depositor shall consent to the appointment of a conservator or receiver or liquidator or other similar official in any bankruptcy, insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to EMC or the Depositor or of or relating to all or substantially all of their respective property;

(g)     EMC or the Depositor shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of or otherwise voluntarily commence a case or proceeding under any applicable bankruptcy, insolvency, reorganization or other similar statute, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations; or

(h)     The Trust shall become subject to an entity level tax or to registration as an investment company under the Investment Company Act.

Section 5.02.    *Remedies; No Remedy Exclusive.*

(a)     Upon the occurrence of an Event of Default and so long as no Certificate Insurer Default shall have occurred and shall have continued beyond any period of cure applicable thereto, the Insurer may exercise any one or more of the rights and remedies set forth below:

(i)     declare all indebtedness of every type or description then owed by EMC, the Trust, the Depositor or GMACM to the Insurer with respect to this Bear Stearns Second Lien Trust 2007-SV1 Mortgage-Backed Certificates transaction to be immediately due and payable, and the same shall thereupon be immediately due and payable;

(ii)    exercise any rights and remedies under the Pooling and Servicing Agreement in accordance with the terms thereof;

(iii)   exercise any rights and remedies under either Servicing Agreement in accordance with the terms thereof or direct the applicable Servicer to exercise such remedies in accordance with the terms of the Servicing Agreement; or

(iv)    take whatever action at law or in equity as may appear necessary or desirable in its judgment to collect the amounts, if any, then due under this Insurance Agreement or any other Operative Document or to enforce performance and observance of any obligation, agreement or covenant of EMC or the Depositor under this Insurance Agreement or any other Operative Documents.

Notwithstanding that a Certificate Insurer Default has occurred and has continued beyond the period of cure applicable thereto, the Insurer shall be entitled to exercise all rights and remedies with respect to any funds owed to the Insurer by EMC, the Trust or the Depositor pursuant to this Agreement or the Policy.

29

(b)     Unless otherwise expressly provided, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Insurance Agreement, the Pooling and Servicing Agreement or existing at law or in equity. No delay or omission to exercise any right or power accruing under this Insurance Agreement or the Pooling and Servicing Agreement upon the happening of any event set forth in Section 5.01 shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle the Insurer to exercise any remedy reserved to the Insurer in this Article, it shall not be necessary to give any notice, other than such notice as may be required by this Article.

**Section 5.03.**     *Waivers.*

(a)     No failure by the Insurer to exercise, and no delay by the Insurer in exercising, any right hereunder shall operate as a waiver thereof. The exercise by the Insurer of any right hereunder shall not preclude the exercise of any other right, and the remedies provided herein to the Insurer are declared in every case to be cumulative and not exclusive of any remedies provided by law or equity.

(b)     The Insurer shall have the right, to be exercised in its complete discretion, to waive any Event of Default hereunder, by a writing setting forth the terms, conditions and extent of such waiver signed by the Insurer and delivered to the Master Servicer. Unless such writing expressly provides to the contrary, any waiver so granted shall extend only to the specific event or occurrence which gave rise to the Event of Default so waived and not to any other similar event or occurrence which occurs subsequent to the date of such waiver.

## ARTICLE VI
## MISCELLANEOUS

**Section 6.01.**     *Amendments, Etc.* This Insurance Agreement may be amended, modified, supplemented or terminated only by written instrument or written instruments signed by the parties hereto. EMC agrees to provide a copy of any amendment to this Insurance Agreement promptly to the Trustee and the rating agencies maintaining a rating on any of the Certificates. No act or course of dealing shall be deemed to constitute an amendment, modification, supplement or termination hereof.

**Section 6.02.**     *Notices.* All demands, notices and other communications to be given hereunder shall be in writing (except as otherwise specifically provided herein) and shall be mailed by registered mail or personally delivered and telecopied to the recipient as follows:

(a)     To the Insurer:

XL Capital Assurance Inc.
1221 Avenue of the Americas
New York, New York  10021-1001
Attention:  Surveillance
Facsimile:  (212) 478-3587
Confirmation:  (212) 478-3400

(in each case in which notice or other communication to the Insurer refers to an
Event of Default, a claim on the Policy or with respect to which failure on the part of
the Insurer to respond shall be deemed to constitute consent or acceptance, then a
copy of such notice or other communication should also be sent to the attention of
the general counsel of each of the Insurer, EMC, the Depositor, each Servicer and
the Trustee and, in all cases, both any original and all copies shall be marked to
indicate "URGENT MATERIAL ENCLOSED.")

(b)     To the Depositor or EMC:

(i) To the Depositor:

SACO I Inc.
383 Madison Avenue
New York, New York 10179
Attention:  General Counsel

(ii) To EMC:

EMC Mortgage Corporation
2780 Lake Vista Drive
Lewisville, Texas 75067
Facsimile: (469) 759-4714
Attention: General Counsel

(in each case in which notice or other communication to EMC or the Depositor
refers to an Event of Default, a claim against EMC or the Depositor or with respect
to which failure on the part of EMC or the Depositor to respond shall be deemed to
constitute consent or acceptance, then a copy of such notice or other communication
should also be sent to the attention of the general counsel of each of the Insurer,
EMC and the Trustee and, in all cases, both any original and all copies shall be
marked to indicate "URGENT MATERIAL ENCLOSED.").

(c)    To the Trustee:

Citibank, N.A.
388 Greenwich Street, 14th Floor
New York, New York 10013
Attention: Structured Finance, Agency and Trust-Bear Stearns Second Lien
        Trust 2007-SV1

(d)    To the Servicers:

GMAC Mortgage, LLC
500 Enterprise Road
Horsham, PA 19044

PHH Mortgage Corporation
3000 Leadenhall Road
Mt. Laurel, New Jersey 08054

A party may specify an additional or different address or addresses by writing mailed or delivered to the other parties as aforesaid. All such notices and other communications shall be effective upon receipt.

**Section 6.03.**    *Severability.*    In the event that any provision of this Insurance Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, the parties hereto agree that such holding shall not invalidate or render unenforceable any other provision hereof. The parties hereto further agree that the holding by any court of competent jurisdiction that any remedy pursued by any party hereto is unavailable or unenforceable shall not affect in any way the ability of such party to pursue any other remedy available to it.

**Section 6.04.**    *Governing Law.*    This Insurance Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the conflict of laws provisions thereof).

**Section 6.05.**    *Consent to Jurisdiction.*

(a)    The parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and any court in the State of New York located in the City and County of New York, and any appellate court from any thereof, in any action, suit or proceeding brought against it and to or in connection with any of the Operative Documents, the Policy or the Transaction or for recognition or enforcement of any judgment, and the parties hereto hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding may be heard or determined in such New York state court or, to the extent permitted by law, in such federal court. The parties hereto agree that a final unappealable judgment in any such action, suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any

32

other manner provided by law. To the extent permitted by applicable law, the parties hereto hereby waive and agree not to assert by way of motion, as a defense or otherwise in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that the related documents or the subject matter thereof may not be litigated in or by such courts.

(b)     To the extent permitted by applicable law, the parties hereto shall not seek and hereby waive the right to any review of the judgment of any such court by any court of any other nation or jurisdiction which may be called upon to grant an enforcement of such judgment.

(c)     Service on GMACM, the Trustee, EMC or the Depositor may be made by mailing or delivering copies of the summons and complaint and other process which may be served in any suit, action or proceeding to such party at the address specified in Section 6.02 hereunder. Such address may be changed by the applicable party or parties by written notice to the other parties hereto. The provision of notice to change the address set forth in Section 6.02 shall constitute notice for purposes of the preceding sentence, unless such notice shall expressly state to the contrary.

(d)     Nothing contained in this Insurance Agreement shall limit or affect any party's right to serve process in any other manner permitted by law or to start legal proceedings relating to any of the Operative Documents or the Policy against any other party or its properties in the courts of any jurisdiction.

**Section 6.06.**     *Consent of the Insurer.*  In the event that the consent of the Insurer is required under any of the Operative Documents, the determination whether to grant or withhold such consent shall be made by the Insurer in its sole discretion without any implied duty towards any other Person, except as otherwise expressly provided therein.

**Section 6.07.**     *Counterparts.*  This Insurance Agreement may be executed in counterparts by the parties hereto, and all such counterparts shall constitute one and the same instrument.

**Section 6.08.**     *Headings.*  The headings of Articles and Sections and the Table of Contents contained in this Insurance Agreement are provided for convenience only. They form no part of this Insurance Agreement and shall not affect its construction or interpretation.

**Section 6.09.**     *Trial by Jury Waived.*  Each party hereby waives, to the fullest extent permitted by law, any right to a trial by jury in respect of any litigation arising directly or indirectly out of, under or in connection with any of the Operative Documents or the Policy or any of the transactions contemplated thereunder. Each party hereto (A) certifies that no representative, agent or attorney of any party hereto has represented, expressly or otherwise, that it would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it has been induced to enter into the Operative Documents to which it is a party (or, in the case of the Policy, the Insurer so acknowledges) by, among other things, this waiver.

33

**Section 6.10.**     (a) *Limited Liability.*  No recourse under any Operative Document or the Certificate Purchase Agreement shall be had against, and no personal liability shall attach to, any officer, employee, director, affiliate or shareholder of any party hereto, as such, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute or otherwise in respect of any of the Operative Documents or the Certificate Purchase Agreement, the Certificates or the Policy, it being expressly agreed and understood that each Operative Document, the Policy and the Certificate Purchase Agreement is solely a corporate obligation of each party hereto, and that any and all personal liability, either at common law or in equity, or by statute or constitution, of every such officer, employee, director, affiliate or shareholder for breaches of any party hereto of any obligations under any Operative Document, the Policy or the Certificate Purchase Agreement is hereby expressly waived as a condition of and in consideration for the execution and delivery of this Insurance Agreement.

(b) *Limitation of Liability.*  Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Citibank, N.A., not individually or personally but solely as Trustee, in the exercise of the powers and authority conferred and vested in it under the Pooling and Servicing Agreement, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by Citibank but is made and intended for the purpose for binding only the Trust and (c) under no circumstances shall Citibank be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or the other related documents, as to all of which recourse shall be had solely to the assets of the Trust in accordance with the terms of the Pooling and Servicing Agreement.

**Section 6.11.**     *Entire Agreement.*  This Insurance Agreement and the Policy set forth the entire agreement between the parties with respect to the subject matter hereof and thereof, and this Insurance Agreement supersedes and replaces any agreement or understanding that may have existed between the parties prior to the date hereof in respect of such subject matter.

**Section 6.12.**     *No Partnership.*  Nothing in this Insurance Agreement or any other agreement entered into in connection with the Transaction shall be deemed to constitute the Insurer a partner, co-venturer or joint owner of property with any other entity.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

34

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

XL CAPITAL ASSURANCE INC.,
as Insurer

By:_____

Name: Catherine R. Lau
Title:   Managing Director, Group Head

EMC MORTGAGE CORPORATION,
as Seller

By:_____
    Name:_____
    Title:_____

SACO I INC.,
as Depositor

By:_____
    Name:_____
    Title:_____

GMAC MORTGAGE, LLC,
as a Servicer

By:_____
    Name:_____
    Title:_____

CITIBANK, N.A.,
not in its individual capacity but solely as Trustee
under the Pooling and Servicing Agreement

By:_____
    Name:_____
    Title:_____

*(Signature Page One to the Insurance and Indemnity Agreement - BSSLT 2007-SV1)*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

XL CAPITAL ASSURANCE INC.,
as Insurer

By:_____
    Name:
    Title:

EMC MORTGAGE CORPORATION,
as Seller

By:_____
    Name:    Jacqueline Oliver
    Title:    Senior Vice President

SACO I INC.,
as Depositor

By:_____
    Name:_____
    Title:_____

GMAC MORTGAGE, LLC,
as a Servicer

By:_____
    Name:_____
    Title:_____

CITIBANK, N.A.,
not in its individual capacity but solely as Trustee
under the Pooling and Servicing Agreement

By:_____
    Name:_____
    Title:_____

*(Signature Page to the Insurance and Indemnity Agreement - BSSLT 2007-SV1)*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

XL CAPITAL ASSURANCE INC.,
as Insurer

By:_____
    Name:
    Title:

EMC MORTGAGE CORPORATION,
as Seller

By:_____
    Name:_____
    Title:_____

SACO I INC.,
as Depositor

By:_____
    Name:_____
    Title:_____

GMAC MORTGAGE, LLC,
as a Servicer

By:_____
    Name:_____
    Title:_____

CITIBANK, N.A.,
not in its individual capacity but solely as Trustee
under the Pooling and Servicing Agreement

By:_____
    Name:_____
    Title:_____

*(Signature Page to the Insurance and Indemnity Agreement - BSSLT 2007-SV1)*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

XL CAPITAL ASSURANCE INC.,
as Insurer

By:_____
   Name:
   Title:

EMC MORTGAGE CORPORATION,
as Seller

By:_____
   Name:_____
   Title:_____

SACO I INC.,
as Depositor

By:_____
   Name:_____
   Title:_____

GMAC MORTGAGE, LLC,
as a Servicer

By:_____
   Name:___**Sandy Blitzer**_____
   Title:___**Vice President**_____

CITIBANK, N.A.,
not in its individual capacity but solely as Trustee
under the Pooling and Servicing Agreement

By:_____
   Name:_____
   Title:_____

*(Signature Page to the Insurance and Indemnity Agreement - BSSLT 2007-SV1)*

65041.000043 RICHMOND 2004749v4

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

XL CAPITAL ASSURANCE INC.,
as Insurer

By:_____
    Name:
    Title:

EMC MORTGAGE CORPORATION,
as Seller

By:_____
    Name:_____
    Title:_____

SACO I INC.,
as Depositor

By:_____
    Name:_____
    Title:_____

GMAC MORTGAGE, LLC,
as a Servicer

By:_____
    Name:_____
    Title:_____

CITIBANK, N.A.,
not in its individual capacity but solely as Trustee
under the Pooling and Servicing Agreement

By:_____
    Name:____Cirino Emanueln_____
    Title:_____Vice President_____

*(Signature Page to the Insurance and Indemnity Agreement - BSSLT 2007-SV1)*