Exhibit 22

SACO I INC.,

Depositor,

EMC MORTGAGE CORPORATION,

Seller,

WELLS FARGO BANK, NATIONAL ASSOCIATION,

Master Servicer and Securities Administrator,

and

CITIBANK, N.A.

Trustee

———————————

POOLING AND SERVICING AGREEMENT

Dated as of March 1, 2007

———————————————

BEAR STEARNS SECOND LIEN TRUST 2007-SV1

MORTGAGE-BACKED CERTIFICATES, SERIES 2007-SV1

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS

Section 1.01    Defined Terms. ...................................................................................8
Section 1.02    Allocation of Certain Interest Shortfalls. .........................................57

## ARTICLE II

### CONVEYANCE OF TRUST FUND REPRESENTATIONS AND WARRANTIES

Section 2.01    Conveyance of Trust Fund...............................................................59
Section 2.02    Acceptance of the Mortgage Loans. ................................................61
Section 2.03    Representations, Warranties and Covenants of the Master Servicer
and the Seller.....................................................................................64
Section 2.04    Representations and Warranties of the Depositor............................69
Section 2.05    Delivery of Opinion of Counsel in Connection with Substitutions
and Repurchases.................................................................................71
Section 2.06    Countersignature and Delivery of Certificates. ...............................71
Section 2.07    Purposes and Powers of the Trust.....................................................72
Section 2.08    Optional Purchase of Certain Mortgage Loans.................................73

## ARTICLE III

### [RESERVED]

## ARTICLE IV

### MASTER SERVICING OF MORTGAGE LOANS BY MASTER SERVICER

Section 4.01    Master Servicer. ...............................................................................75
Section 4.02    Monitoring of Servicers. ..................................................................76
Section 4.03    Fidelity Bond. ...................................................................................78
Section 4.04    Power to Act; Procedures...................................................................78
Section 4.05    Due-on-Sale Clauses; Assumption Agreements. ..............................79
Section 4.06    Documents, Records and Funds in Possession of Master Servicer and
Servicer To Be Held for Trustee. ......................................................79
Section 4.07    Presentment of Claims and Collection of Proceeds..........................80
Section 4.08    Realization Upon Defaulted Mortgage Loans. .................................80
Section 4.09    Compensation of the Master Servicer...............................................80
Section 4.10    REO Property.....................................................................................80
Section 4.11    UCC. ..................................................................................................81
Section 4.12    Reserve Fund; Payments to and from Swap Administrator;
Supplemental Interest Trust. .............................................................81
Section 4.13    [Reserved]..........................................................................................86

Section 4.14     Tax Treatment of Class IO Distribution Amounts in the Event
                 of Resecuritization of Class A, Class M or Class B Certificates. ...................86
Section 4.15     Standard Hazard Insurance and Flood Insurance Policies. ...............................86
Section 4.16     Annual Statement as to Compliance. ................................................................87
Section 4.17     Annual Independent Certified Public Accountants' Servicing Report.............88

## ARTICLE V

## ACCOUNTS

Section 5.01     Collection of Mortgage Loan Payments. ..........................................................89
Section 5.02     [Reserved]. ........................................................................................................90
Section 5.03     [Reserved]. ........................................................................................................90
Section 5.04     [Reserved]. ........................................................................................................90
Section 5.05     Protected Accounts. ..........................................................................................90
Section 5.06     Distribution Account. ........................................................................................92
Section 5.07     Permitted Withdrawals and Transfers from the Distribution Account. ...........93

## ARTICLE VI

## DISTRIBUTIONS AND ADVANCES

Section 6.01     Advances. ...........................................................................................................96
Section 6.02     Compensating Interest Payments. ....................................................................97
Section 6.03     REMIC Distributions. .......................................................................................97
Section 6.04     Distributions. .....................................................................................................98
Section 6.05     Allocation of Realized Losses. .......................................................................104
Section 6.06     Monthly Statements to Certificateholders. .....................................................106
Section 6.07     REMIC Designations and REMIC Distributions...........................................110
Section 6.08     Claims on the Policy; Policy Payments Account............................................112

## ARTICLE VII

## THE CERTIFICATES

Section 7.01     The Certificates. ..............................................................................................116
Section 7.02     Certificate Register; Registration of Transfer and Exchange
                 of Certificates. .................................................................................................117
Section 7.03     Mutilated, Destroyed, Lost or Stolen Certificates. ........................................125
Section 7.04     Persons Deemed Owners. ................................................................................125
Section 7.05     Access to List of Certificateholders' Names and Addresses. ........................126
Section 7.06     Book-Entry Certificates. .................................................................................126
Section 7.07     Notices to Depository. .....................................................................................127
Section 7.08     Definitive Certificates. ....................................................................................127
Section 7.09     Maintenance of Office or Agency....................................................................128

## ARTICLE VIII

## THE DEPOSITOR AND THE MASTER SERVICER

Section 8.01      Liabilities of the Depositor and the Master Servicer. ....................................129
Section 8.02      Merger or Consolidation of the Depositor or the Master Servicer. ...............129
Section 8.03      Indemnification of the Trustee, the Master Servicer and the
                  Securities Administrator. ................................................................129
Section 8.04      Limitations on Liability of the Depositor, the Master Servicer
                  and Others. ................................................................................130
Section 8.05      Master Servicer Not to Resign. .....................................................131
Section 8.06      Successor Master Servicer. ..........................................................131
Section 8.07      Sale and Assignment of Master Servicing. ........................................132

## ARTICLE IX

## DEFAULT; TERMINATION OF MASTER SERVICER

Section 9.01      Events of Default. ......................................................................133
Section 9.02      Trustee to Act; Appointment of Successor. ......................................135
Section 9.03      Notification to Certificateholders. .................................................136
Section 9.04      Waiver of Defaults. ....................................................................137

## ARTICLE X

## CONCERNING THE TRUSTEE AND THE SECURITIES ADMINISTRATOR

Section 10.01     Duties of Trustee and the Securities Administrator. ...........................138
Section 10.02     Certain Matters Affecting the Trustee and the Securities Administrator. .....140
Section 10.03     Trustee and Securities Administrator Not Liable for Certificates
                  or Mortgage Loans. ....................................................................143
Section 10.04     Trustee and Securities Administrator May Own Certificates. ................143
Section 10.05     Trustee's and Securities Administrator's Fees and Expenses...................143
Section 10.06     Eligibility Requirements for Trustee and Securities Administrator. ...........144
Section 10.07     Insurance. ................................................................................144
Section 10.08     Resignation and Removal of Trustee and Securities Administrator...........145
Section 10.09     Successor Trustee or Securities Administrator. ................................146
Section 10.10     Merger or Consolidation of Trustee or Securities Administrator. .............146
Section 10.11     Appointment of Co-Trustee or Separate Trustee. ..............................147
Section 10.12     Tax Matters. ............................................................................148
Section 10.13     REMIC-Related Covenants. ........................................................151
Section 10.14     Trustee Communications. ...........................................................152

## ARTICLE XI

## TERMINATION

Section 11.01     Termination upon Liquidation or Repurchase of all Mortgage Loans. .........153
Section 11.02     Final Distribution on the Certificates...............................................155
Section 11.03     Additional Termination Requirements. ...........................................156

## ARTICLE XII

### MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| Section 12.01 | Amendment. | 158 |
| Section 12.02 | Recordation of Agreement; Counterparts. | 160 |
| Section 12.03 | Governing Law. | 160 |
| Section 12.04 | Intention of Parties. | 160 |
| Section 12.05 | Notices. | 161 |
| Section 12.06 | Severability of Provisions. | 162 |
| Section 12.07 | Assignment. | 162 |
| Section 12.08 | Limitation on Rights of Certificateholders. | 162 |
| Section 12.09 | Inspection and Audit Rights. | 163 |
| Section 12.10 | Certificates Nonassessable and Fully Paid. | 163 |
| Section 12.11 | Third Party Rights. | 163 |
| Section 12.12 | Subrogation and Cooperation. | 164 |

## Exhibits

| | |
|---|---|
| Exhibit A-1 | Form of Class A Certificates |
| Exhibit A-2 | Form of Class M Certificates |
| Exhibit A-3 | Form of Class B Certificates |
| Exhibit A-4 | Form of Class C Certificates |
| Exhibit A-5 | Form of Class R Certificates |
| Exhibit A-6 | Form of Class X Certificates |
| Exhibit B | Mortgage Loan Schedule |
| Exhibit C-1 | Form of Transferee Affidavit |
| Exhibit C-2 | Form of Transferor Affidavit |
| Exhibit D | Form of Transferor Certificate |
| Exhibit E | Form of Investment Letter (Non-Rule 144A) |
| Exhibit F | Form of Rule 144A and Related Matters Certificate |
| Exhibit G | Form of Request for Release |
| Exhibit H | DTC Letter of Representations |
| Exhibit I | Schedule of Mortgage Loans with Lost Notes |
| Exhibit J | [Reserved] |
| Exhibit K | Form of Custodial Agreement |
| Exhibit L | Form of Mortgage Loan Purchase Agreement |
| Exhibit M | [Reserved] |
| Exhibit N | Swap Agreement |
| Exhibit O | [Reserved] |
| Exhibit P | [Reserved] |
| Exhibit Q | [Reserved] |
| Exhibit R-1 | Form of GMACM Servicing Agreement |
| Exhibit R-2 | Form of GMACM Assignment, Assumption and Recognition Agreement |
| Exhibit R-3 | Form of PHH Servicing Agreement |
| Exhibit R-4 | Form of PHH Assignment, Assumption and Recognition Agreement |
| Exhibit S | Policy |

POOLING AND SERVICING AGREEMENT, dated as of March 1, 2007, among SACO I INC, a Delaware corporation, as depositor (the "Depositor"), EMC MORTGAGE CORPORATION, a Delaware corporation, as seller (in such capacity, "EMC" or the "Seller"), WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, as master servicer (in such capacity, the "Master Servicer") and as securities administrator (in such capacity, the "Securities Administrator"), and CITIBANK, N.A., a national banking association, as trustee (the "Trustee").

## PRELIMINARY STATEMENT

The Depositor is the owner of the Trust Fund that is hereby conveyed to the Trustee in return for the Certificates. On or prior to the Closing Date, the Depositor acquired the Mortgage Loans from the Seller. On the Closing Date, the Depositor will sell the Mortgage Loans and certain other property to the Trust Fund and receive in consideration therefor Certificates evidencing the entire beneficial ownership interest in the Trust Fund.

## REMIC I

As provided herein, the Securities Administrator, on behalf of the Trustee will elect to treat the segregated pool of assets consisting of the Mortgage Loans and certain other related assets subject to this Agreement (other than the Reserve Fund, any Prepayment Charge Waiver Amounts and, for the avoidance of doubt, the Supplemental Interest Trust, the Swap Agreement, the Swap Account, the Credit Support Account and any rights or obligations in respect of the Swap Administration Agreement) as a REMIC (as defined herein) for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC I". The Class R-1 Certificates will represent the sole class of Residual Interests (as defined herein) in REMIC I for purposes of the REMIC Provisions (as defined herein). The following table irrevocably sets forth the designation, the Uncertificated REMIC I Pass-Through Rate, the initial Uncertificated Principal Balance and, for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC I Regular Interests (as defined herein). None of the REMIC I Regular Interests will be certificated.

| Designation | Uncertificated REMIC I Pass-Through Rate | Initial Uncertificated Principal Balance | Latest Possible Maturity Date [1] |
|---|---|---|---|
| I-1-A | Variable[2] | $ 21,627,632.83 | December 25, 2036 |
| I-1-B | Variable[2] | $ 21,627,632.83 | December 25, 2036 |
| I-2-A | Variable[2] | $ 20,974,567.80 | December 25, 2036 |
| I-2-B | Variable[2] | $ 20,974,567.80 | December 25, 2036 |
| I-3-A | Variable[2] | $ 20,341,061.13 | December 25, 2036 |
| I-3-B | Variable[2] | $ 20,341,061.13 | December 25, 2036 |
| I-4-A | Variable[2] | $ 19,726,530.36 | December 25, 2036 |
| I-4-B | Variable[2] | $ 19,726,530.36 | December 25, 2036 |
| I-5-A | Variable[2] | $ 19,130,410.47 | December 25, 2036 |
| I-5-B | Variable[2] | $ 19,130,410.47 | December 25, 2036 |
| I-6-A | Variable[2] | $ 18,552,153.18 | December 25, 2036 |
| I-6-B | Variable[2] | $ 18,552,153.18 | December 25, 2036 |
| I-7-A | Variable[2] | $ 17,991,226.45 | December 25, 2036 |
| I-7-B | Variable[2] | $ 17,991,226.45 | December 25, 2036 |

| I-8-A | Variable[2] | $ | 17,447,114.08 | December 25, 2036 |
| I-8-B | Variable[2] | $ | 17,447,114.08 | December 25, 2036 |
| I-9-A | Variable[2] | $ | 16,919,315.11 | December 25, 2036 |
| I-9-B | Variable[2] | $ | 16,919,315.11 | December 25, 2036 |
| I-10-A | Variable[2] | $ | 16,407,343.48 | December 25, 2036 |
| I-10-B | Variable[2] | $ | 16,407,343.48 | December 25, 2036 |
| I-11-A | Variable[2] | $ | 15,910,727.50 | December 25, 2036 |
| I-11-B | Variable[2] | $ | 15,910,727.50 | December 25, 2036 |
| I-12-A | Variable[2] | $ | 15,429,009.55 | December 25, 2036 |
| I-12-B | Variable[2] | $ | 15,429,009.55 | December 25, 2036 |
| I-13-A | Variable[2] | $ | 14,961,745.51 | December 25, 2036 |
| I-13-B | Variable[2] | $ | 14,961,745.51 | December 25, 2036 |
| I-14-A | Variable[2] | $ | 14,508,504.49 | December 25, 2036 |
| I-14-B | Variable[2] | $ | 14,508,504.49 | December 25, 2036 |
| I-15-A | Variable[2] | $ | 14,068,868.35 | December 25, 2036 |
| I-15-B | Variable[2] | $ | 14,068,868.35 | December 25, 2036 |
| I-16-A | Variable[2] | $ | 13,642,431.39 | December 25, 2036 |
| I-16-B | Variable[2] | $ | 13,642,431.39 | December 25, 2036 |
| I-17-A | Variable[2] | $ | 13,228,799.93 | December 25, 2036 |
| I-17-B | Variable[2] | $ | 13,228,799.93 | December 25, 2036 |
| I-18-A | Variable[2] | $ | 12,827,591.98 | December 25, 2036 |
| I-18-B | Variable[2] | $ | 12,827,591.98 | December 25, 2036 |
| I-19-A | Variable[2] | $ | 12,438,436.91 | December 25, 2036 |
| I-19-B | Variable[2] | $ | 12,438,436.91 | December 25, 2036 |
| I-20-A | Variable[2] | $ | 12,060,975.05 | December 25, 2036 |
| I-20-B | Variable[2] | $ | 12,060,975.05 | December 25, 2036 |
| I-21-A | Variable[2] | $ | 11,694,857.46 | December 25, 2036 |
| I-21-B | Variable[2] | $ | 11,694,857.46 | December 25, 2036 |
| I-22-A | Variable[2] | $ | 11,339,745.52 | December 25, 2036 |
| I-22-B | Variable[2] | $ | 11,339,745.52 | December 25, 2036 |
| I-23-A | Variable[2] | $ | 10,995,310.70 | December 25, 2036 |
| I-23-B | Variable[2] | $ | 10,995,310.70 | December 25, 2036 |
| I-24-A | Variable[2] | $ | 10,661,234.22 | December 25, 2036 |
| I-24-B | Variable[2] | $ | 10,661,234.22 | December 25, 2036 |
| I-25-A | Variable[2] | $ | 10,337,206.75 | December 25, 2036 |
| I-25-B | Variable[2] | $ | 10,337,206.75 | December 25, 2036 |
| I-26-A | Variable[2] | $ | 10,022,928.16 | December 25, 2036 |
| I-26-B | Variable[2] | $ | 10,022,928.16 | December 25, 2036 |
| I-27-A | Variable[2] | $ | 9,718,107.26 | December 25, 2036 |
| I-27-B | Variable[2] | $ | 9,718,107.26 | December 25, 2036 |
| I-28-A | Variable[2] | $ | 9,422,461.48 | December 25, 2036 |
| I-28-B | Variable[2] | $ | 9,422,461.48 | December 25, 2036 |
| I-29-A | Variable[2] | $ | 9,135,716.68 | December 25, 2036 |
| I-29-B | Variable[2] | $ | 9,135,716.68 | December 25, 2036 |
| I-30-A | Variable[2] | $ | 8,857,606.83 | December 25, 2036 |
| I-30-B | Variable[2] | $ | 8,857,606.83 | December 25, 2036 |
| I-31-A | Variable[2] | $ | 8,587,873.85 | December 25, 2036 |
| I-31-B | Variable[2] | $ | 8,587,873.85 | December 25, 2036 |
| I-32-A | Variable[2] | $ | 8,326,267.29 | December 25, 2036 |
| I-32-B | Variable[2] | $ | 8,326,267.29 | December 25, 2036 |
| I-33-A | Variable[2] | $ | 8,072,544.19 | December 25, 2036 |

2

| I-33-B | Variable[2] | $ | 8,072,544.19 | December 25, 2036 |
| I-34-A | Variable[2] | $ | 7,826,468.79 | December 25, 2036 |
| I-34-B | Variable[2] | $ | 7,826,468.79 | December 25, 2036 |
| I-35-A | Variable[2] | $ | 7,587,812.33 | December 25, 2036 |
| I-35-B | Variable[2] | $ | 7,587,812.33 | December 25, 2036 |
| I-36-A | Variable[2] | $ | 7,356,352.90 | December 25, 2036 |
| I-36-B | Variable[2] | $ | 7,356,352.90 | December 25, 2036 |
| I-37-A | Variable[2] | $ | 7,131,875.13 | December 25, 2036 |
| I-37-B | Variable[2] | $ | 7,131,875.13 | December 25, 2036 |
| I-38-A | Variable[2] | $ | 6,914,170.10 | December 25, 2036 |
| I-38-B | Variable[2] | $ | 6,914,170.10 | December 25, 2036 |
| I-39-A | Variable[2] | $ | 6,703,035.12 | December 25, 2036 |
| I-39-B | Variable[2] | $ | 6,703,035.12 | December 25, 2036 |
| I-40-A | Variable[2] | $ | 6,498,273.47 | December 25, 2036 |
| I-40-B | Variable[2] | $ | 6,498,273.47 | December 25, 2036 |
| I-41-A | Variable[2] | $ | 6,299,694.35 | December 25, 2036 |
| I-41-B | Variable[2] | $ | 6,299,694.35 | December 25, 2036 |
| I-42-A | Variable[2] | $ | 6,107,112.61 | December 25, 2036 |
| I-42-B | Variable[2] | $ | 6,107,112.61 | December 25, 2036 |
| I-43-A | Variable[2] | $ | 5,920,348.60 | December 25, 2036 |
| I-43-B | Variable[2] | $ | 5,920,348.60 | December 25, 2036 |
| I-44-A | Variable[2] | $ | 5,739,228.05 | December 25, 2036 |
| I-44-B | Variable[2] | $ | 5,739,228.05 | December 25, 2036 |
| I-45-A | Variable[2] | $ | 178,475,888.85 | December 25, 2036 |
| I-45-B | Variable[2] | $ | 178,475,888.85 | December 25, 2036 |

[1]  For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC I Regular Interest.

[2]  Calculated in accordance with the definition of "Uncertificated REMIC I Pass-Through Rate" herein.

## REMIC II

As provided herein, the Securities Administrator on behalf of the Trustee will elect to treat the segregated pool of assets consisting of the REMIC I Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC II". The Class R-2 Certificates will represent the sole class of Residual Interests in REMIC II for purposes of the REMIC Provisions. The following table irrevocably sets forth the designation, the Uncertificated REMIC II Pass-Through Rate, the initial Uncertificated Principal Balance and, for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC II Regular Interests (as defined herein). None of the REMIC II Regular Interests will be certificated.

| Designation | Uncertificated REMIC II Pass-Through Rate | | Initial Uncertificated Principal Balance | Latest Possible Maturity Date [1] |
|---|---|---|---|---|
| AA | Variable[2] | $ | 1,387,536,069.71 | December 25, 2036 |
| A-1 | Variable[2] | $ | 6,780,890.00 | December 25, 2036 |
| A-2 | Variable[2] | $ | 1,961,920.00 | December 25, 2036 |

| | | | | |
|------|---------------------------|----|----------------|--------------------|
| A-3  | Variable[2]               | $  | 1,600,000.00   | December 25, 2036  |
| M-1  | Variable[2]               | $  | 658,370.00     | December 25, 2036  |
| M-2  | Variable[2]               | $  | 453,070.00     | December 25, 2036  |
| M-3  | Variable[2]               | $  | 276,090.00     | December 25, 2036  |
| M-4  | Variable[2]               | $  | 254,850.00     | December 25, 2036  |
| M-5  | Variable[2]               | $  | 240,700.00     | December 25, 2036  |
| M-6  | Variable[2]               | $  | 240,700.00     | December 25, 2036  |
| B-1  | Variable[2]               | $  | 233,620.00     | December 25, 2036  |
| B-2  | Variable[2]               | $  | 212,380.00     | December 25, 2036  |
| B-3  | Variable[2]               | $  | 176,980.00     | December 25, 2036  |
| B-4  | Variable[2]               | $  | 176,980.00     | December 25, 2036  |
| ZZ   | Variable[2]               | $  | 15,050,512.65  | December 25, 2036  |
| IO   | [2]                       |    | [3]            | December 25, 2036  |

---

[1]    For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC II Regular Interest

[2]    Calculated in accordance with the definition of "Uncertificated REMIC II Pass-Through Rate" herein.

[3]    REMIC II Regular Interest IO will not have an Uncertificated Principal Balance but will accrue interest on its uncertificated notional amount calculated in accordance with the definition of "Uncertificated Notional Amount" herein.

## CERTIFICATES

As provided herein, the Securities Administrator on behalf of the Trustee will elect to treat the segregated pool of assets consisting of the REMIC II Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC III". The Class R-3 Certificates will represent the sole class of Residual Interests in REMIC III for purposes of the REMIC Provisions.

The following table irrevocably sets forth the designation, Pass-Through Rate, Initial Certificate Principal Balance (or initial Uncertificated Principal Balance, in the case of the Class C Interest and the Class IO Interest) and, for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each class of Certificates and interests that represents ownership of one or more of the Regular Interests in REMIC III created hereunder. The Trust Fund will also issue the Class X Certificates, as designated below, which will not represent a Regular Interest in any REMIC created hereunder.

Each Certificate, other than the Class C, Class X and Class R Certificates, represents ownership of one or more Regular Interests in REMIC III and also represents (i) the right to receive certain amounts specified herein in respect of Basis Risk Shortfall Carry Forward Amounts (as defined herein) and (ii) the obligation to pay Class IO Distribution Amounts (as defined herein). The entitlement to principal of each Regular Interest which corresponds to each Certificate shall be equal in amount and timing to the entitlement to principal of such Certificate.

4

| Designation | Pass-Through Rate | Initial Certificate or Uncertificated Principal Balance | Latest Possible Maturity Date [1] |
|---|---|---|---|
| A-1[2] | Variable[3] | 678,089,000.00 | December 25, 2036 |
| A-2[2] | Variable[3] | 196,192,000.00 | December 25, 2036 |
| A-3[2] | Variable[3] | 160,000,000.00 | December 25, 2036 |
| M-1[2] | Variable[3] | 65,837,000.00 | December 25, 2036 |
| M-2[2] | Variable[3] | 45,307,000.00 | December 25, 2036 |
| M-3[2] | Variable[3] | 27,609,000.00 | December 25, 2036 |
| M-4[2] | Variable[3] | 25,485,000.00 | December 25, 2036 |
| M-5[2] | Variable[3] | 24,070,000.00 | December 25, 2036 |
| M-6[2] | Variable[3] | 24,070,000.00 | December 25, 2036 |
| B-1[2] | Variable[3] | 23,362,000.00 | December 25, 2036 |
| B-2[2] | Variable[3] | 21,238,000.00 | December 25, 2036 |
| B-3[2] | Variable[3] | 17,698,000.00 | December 25, 2036 |
| B-4[2] | Variable[3] | 17,698,000.00 | December 25, 2036 |
| Class C Interest | Variable[3][4] | 89,198,132.36 | December 25, 2036 |
| Class IO Interest | [5] | [6] | December 25, 2036 |
| X | N/A | N/A | December 25, 2036 |

[1] For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC III Regular Interest (as defined herein).

[2] This Class of Certificates represents ownership of a Regular Interest in REMIC III. Any amount distributed on this Class of Certificates on any Distribution Date in excess of the amount distributable on the related Regular Interest in REMIC III on such Distribution Date shall be treated for federal income tax purposes as having been paid from the Reserve Fund or the Supplemental Interest Trust, as applicable, and any amount distributable on the related Regular Interest in REMIC III on such Distribution Date in excess of the amount distributable on such Class of Certificates on such Distribution Date shall be treated for such purposes as having been distributed to the Holders of such Certificates and then paid by such Holders to the Supplemental Interest Trust, all pursuant to and as further provided in Section 4.12 hereof.

[3] Calculated in accordance with the definition of "Pass-Through Rate" herein. Each Regular Interest in REMIC III which corresponds to a Class A, Class M or Class B Certificate will have the same Pass-Through Rate as such Certificate, except with respect to the related Net WAC Cap Rate. The Net WAC Cap Rate for each such Regular Interest in REMIC III and Certificate is specified in the definition of "Net WAC Cap Rate."

[4] The Class C Interest will not accrue interest on its Uncertificated Principal Balance, but will accrue interest on its uncertificated notional amount calculated in accordance with the definition of "Uncertificated Notional Amount" herein.

[5] For federal income tax purposes, the Class IO Interest will not have a Pass-Through Rate, but will be entitled to 100% of the amounts distributed on REMIC II Regular Interest IO.

[6] For federal income tax purposes, the Class IO Interest will not have an Uncertificated Principal Balance, but will have a notional amount equal to the Uncertificated Notional Amount of REMIC II Regular Interest IO.

## REMIC IV

As provided herein, the Securities Administrator on behalf of the Trustee will elect to treat the segregated pool of assets consisting of the Class C Interest as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC IV". The Class R-4 Interest represents the sole class of Residual Interests in REMIC IV for purposes of the REMIC Provisions.

The following table sets forth the Class designation, Pass-Through Rate, Initial Certificate Principal Balance and, for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for the indicated Class of Certificates that represents a Regular Interest in REMIC IV created hereunder. Each Class C Certificate represents ownership of a Regular Interest in REMIC IV and also represents (i) the obligation to pay certain amounts specified herein in respect of Basis Risk Shortfall Carry Forward Amounts and (ii) the right to receive Class IO Distribution Amounts.

| Class Designation | Pass-Through Rate | Initial Certificate Principal Balance | Latest Possible Maturity Date[1] |
|---|---|---|---|
| C | Variable[2] | 89,198,132.36 | December 25, 2036 |

---

[1]    For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for the Class C Certificates.

[2]    The Class C Certificates will not accrue interest on its Uncertificated Principal Balance, but will receive 100% of the amounts received in respect of the Class C Interest.

## REMIC V

As provided herein, the Securities Administrator on behalf of the Trustee shall elect to treat the segregated pool of assets consisting of the Class IO Interest as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC V". The Class R-5 Interest represents the sole class of Residual Interests in REMIC V for purposes of the REMIC Provisions.

The following table sets forth the designation, Pass-Through Rate, initial Uncertificated Principal Balance and, for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for the indicated class of interests that represents a Regular Interest in REMIC VI created hereunder:

| Designation | Pass-Through Rate | Initial Uncertificated Principal Balance | Latest Possible Maturity Date[1] |
|---|---|---|---|
| IO[2] | [3] | [4] | December 25, 2036 |

---

[1]    For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for REMIC V Regular Interest IO.

(2)    REMIC V Regular Interest IO will be held as an asset of the Supplemental Interest Trust.

(3)    REMIC V Regular Interest IO will not have a Pass-Through Rate, but will receive 100% of the amounts received in respect of the Class IO Interest.

(4)    REMIC V Regular Interest IO will not have an Uncertificated Principal Balance, but will have a notional amount equal to the Uncertificated Notional Amount of the Class IO Interest.

The Trust Fund shall be named, and may be referred to as, the "Bear Stearns Second Lien Trust 2007-SV1." The Certificates issued hereunder may be referred to as "Mortgage-Backed Certificates, Series 2007-SV1" (including for purposes of any endorsement or assignment of a Mortgage Note or Mortgage).

In consideration of the mutual agreements herein contained, the Depositor, the Master Servicer, the Securities Administrator, the Seller and the Trustee agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01    Defined Terms.

Whenever used in this Agreement, the following words and phrases, unless otherwise expressly provided or unless the context otherwise requires, shall have the meanings specified in this Article.

Accepted Master Servicing Practices: With respect to any Mortgage Loan, those customary mortgage master servicing practices of prudent mortgage master servicing institutions that master service mortgage loans, of the same type and quality as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located, to the extent applicable to the Master Servicer.

Account: The Distribution Account, the Credit Support Account, the Reserve Fund, the Swap Account and any Protected Account.

Accrual Period: With respect to the Class A, Class M and Class B Certificates and any Distribution Date, the period from and including the immediately preceding Distribution Date (or with respect to the first Accrual Period, the Closing Date) to and including the day prior to such Distribution Date. With respect to the Class C Certificates and the Class C Interest and any Distribution Date, the calendar month immediately preceding such Distribution Date. All calculations of interest on the Class A, Class M and Class B Certificates will be made on the basis of the actual number of days elapsed in the related Accrual Period. All calculations of interest on the Class C Certificates and the Class C Interest will be made on the basis of a 360-day year consisting of twelve 30-day months.

Advance: An advance of delinquent payments of principal and interest in respect of a Mortgage Loan required to be made by the Master Servicer as provided in Section 6.01(b) hereof and by each Servicer as provided in the related Servicing Agreement.

Affected Party: An "Affected Party" as defined in the Swap Agreement.

Agreement: This Pooling and Servicing Agreement and any and all amendments or supplements hereto made in accordance with the terms herein.

Annual Statement of Compliance: As defined in Section 4.16.

Applied Realized Loss Amount: With respect to any Distribution Date and any Class of Class A, Class M and Class B Certificates, the sum of the Realized Losses with respect to the Mortgage Loans that have been applied in reduction of the Certificate Principal Balance of a Class of Certificates pursuant to Section 6.05 of this Agreement which have not previously been reimbursed or reduced by any Subsequent Recoveries applied to such Applied Realized Loss Amount.

8

Appraised Value: With respect to any Mortgage Loan originated in connection with a refinancing, the appraised value of the Mortgaged Property based upon the appraisal made at the time of such refinancing or, with respect to any other Mortgage Loan, the lesser of (x) the appraised value of the Mortgaged Property based upon the appraisal made by a fee appraiser at the time of the origination of the related Mortgage Loan, and (y) the sales price of the Mortgaged Property at the time of such origination.

Assignment Agreement:   Shall mean any of the GMAC Assignment Agreement or the PHH Assignment Agreement.

Avoided Payment:  As defined in the Policy.

Basis Risk Shortfall Carry Forward Amount: With respect to any Distribution Date and any Class of Class A, Class M and Class B Certificates, an amount equal to the sum of (A) the excess, if any, of (a) the amount of Current Interest that such Class would have been entitled to receive on such Distribution Date had the Pass-Though Rate applicable to such Class been calculated at a per annum rate equal to lesser of (i) the related One-Month LIBOR Pass-Through Rate and (ii) 11.00% per annum, over (b) the amount of Current Interest that such Class received on such Distribution Date if the Pass-Through Rate is limited to the related Net WAC Cap Rate and (B) the Basis Risk Shortfall Carry Forward Amount for the previous Distribution Date not previously paid, together with interest thereon at a rate equal to the related Pass-Through Rate for the current Distribution Date.

Bankruptcy Code: Title 11 of the United States Code.

Book-Entry Certificates: Any of the Certificates that shall be registered in the name of the Depository or its nominee, the ownership of which is reflected on the books of the Depository or on the books of a person maintaining an account with the Depository (directly, as a "Depository Participant", or indirectly, as an indirect participant in accordance with the rules of the Depository and as described in Section 7.06). As of the Closing Date, each Class of Regular Certificates (other than the Class C Certificates) constitutes a Class of Book-Entry Certificates.

Business Day: Any day other than (i) a Saturday or a Sunday, or (ii) a day on which banking institutions in the City of New York, New York, Columbia, Maryland, Chicago, Illinois, Minneapolis, Minnesota or any city in which the Corporate Trust Office of the Trustee or the Securities Administrator or the principal office of the Master Servicer is located are authorized or obligated by law or executive order to be closed.

Certificate: Any one of the certificates of any Class executed and authenticated by the Securities Administrator in substantially the forms attached hereto as Exhibits A-1 through A-6.

Certificate Insurer:  XL Capital Assurance Inc.

Certificate Insurer Default:  The existence and continuance of any of the following: (a) a failure by the Certificate Insurer to make a payment required under the Policy in accordance with its terms; or (b) the Certificate Insurer (A) files any petition or commences any case or proceeding under any provision or chapter of the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization, (B)

9

makes a general assignment for the benefit of its creditors, or (C) has an order for relief entered against it under the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization which is final and nonappealable.

Certificate Margin: With respect to the Class A-1 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest A-1, 0.220% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 0.440% per annum in the case of each Distribution Date thereafter.

With respect to the Class A-2 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest A-2, 0.320% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 0.640% per annum in the case of each Distribution Date thereafter.

With respect to the Class A-3 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest A-3, 0.250% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 0.500% per annum in the case of each Distribution Date thereafter.

With respect to the Class M-1 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest M-1, 0.800% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 1.200% per annum in the case of each Distribution Date thereafter.

With respect to the Class M-2 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest M-2, 0.900% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 1.350% per annum in the case of each Distribution Date thereafter.

With respect to the Class M-3 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest M-3, 1.100% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 1.650% per annum in the case of each Distribution Date thereafter.

With respect to the Class M-4 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest M-4, 2.000% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 3.000% per annum in the case of each Distribution Date thereafter.

With respect to the Class M-5 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest M-5, 2.500% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 3.750% per annum in the case of each Distribution Date thereafter.

With respect to the Class M-6 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest M-6, 2.500% per annum in the

case of each Distribution Date through and including the first possible Optional Termination Date and 3.750% per annum in the case of each Distribution Date thereafter.

With respect to the Class B-1 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest B-1, 2.500% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 3.750% per annum in the case of each Distribution Date thereafter.

With respect to the Class B-2 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest B-2, 2.500% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 3.750% per annum in the case of each Distribution Date thereafter.

With respect to the Class B-3 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest B-3, 2.500% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 3.750% per annum in the case of each Distribution Date thereafter.

With respect to the Class B-4 Certificates, and for purposes of the definition of "One-Month LIBOR Pass-Through Rate", REMIC II Regular Interest B-4, 2.500% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 3.750% per annum in the case of each Distribution Date thereafter.

Certificate Notional Amount: With respect to the Class C Certificates and any Distribution Date, an amount equal to the Stated Principal Balance of the Mortgage Loans as of the beginning of the related Due Period. The initial Certificate Notional Amount of the Class C Certificates shall be $1,415,853,132.36. For federal income tax purposes, the Certificate Notional Amount for any Distribution Date shall be an amount equal to the Uncertificated Notional Amount for the Class C Interest for such Distribution Date

Certificate Owner: With respect to a Book-Entry Certificate, the Person that is the beneficial owner of such Book-Entry Certificate.

Certificate Principal Balance: As to any Certificate (other than any Class X, Class C and any Class R Certificate) and as of any Distribution Date, the Initial Certificate Principal Balance of such Certificate plus, in the case of a Class A, Class M or Class B Certificate, any Subsequent Recoveries added to the Certificate Principal Balance of such Certificate pursuant to Section 6.04(b), less the sum of (i) all amounts distributed with respect to such Certificate in reduction of the Certificate Principal Balance thereof on previous Distribution Dates pursuant to Section 6.04, and (ii) any Applied Realized Loss Amounts allocated to such Certificate on previous Distribution Dates. As to the Class C Certificates and as of any Distribution Date, an amount equal to the Uncertificated Principal Balance of the Class C Interest.

Certificate Register: The register maintained pursuant to Section 7.02 hereof.

Certificateholder or Holder: The person in whose name a Certificate is registered in the Certificate Register (initially, Cede & Co., as nominee for the Depository, in the case of any

11

Book-Entry Certificates), and, with respect to the Class A-2 Certificates and Class A-3 Certificates, the Certificate Insurer to the extent of any Reimbursement Amount.

Class: All Certificates bearing the same Class designation as set forth in Section 7.01 hereof.

Class A Certificates: The Class A-1, Class A-2 and Class A-3 Certificates.

Class A Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (x) the Principal Distribution Amount for such Distribution Date and (y) the excess, if any, of (i) the aggregate Certificate Principal Balance of the Class A Certificates immediately prior to such Distribution Date, over (ii) the lesser of (a) the product of (1) 46.10% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month), and (b) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month) minus the Overcollateralization Floor.

Class A-1 Certificate: Any Certificate designated as a "Class A-1 Certificate" on the face thereof, in the form of Exhibit A-1 hereto, representing the right to the Percentage Interest of distributions provided for the Class A-1 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class A-2 Certificate: Any Certificate designated as a "Class A-2 Certificate" on the face thereof, in the form of Exhibit A-1 hereto, representing the right to the Percentage Interest of distributions provided for the Class A-2 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class A-3 Certificate: Any Certificate designated as a "Class A-3 Certificate" on the face thereof, in the form of Exhibit A-1 hereto, representing the right to the Percentage Interest of distributions provided for the Class A-3 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class B Certificates: Any of the Class B-1, Class B-2, Class B-3 or Class B-4 Certificates.

Class B-1 Certificate: Any Certificate designated as a "Class B-1 Certificate" on the face thereof, in the form of Exhibit A-3 hereto, representing the right to its Percentage Interest of distributions provided for the Class B-1 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class B-1 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (x) the remaining Principal Distribution Amount for such Distribution Date after distribution of the Class A Principal Distribution Amount, the Class M-1 Principal Distribution Amount, the Class M-2 Principal Distribution Amount, the Class M-3 Principal Distribution Amount, the Class M-4 Principal Distribution Amount, the Class M-5 Principal Distribution Amount and the Class M-6 Principal Distribution Amount and (y) the excess, if any, of (a) the sum of (1) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (2) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such Distribution Date), (5) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such Distribution Date), (6) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount on such Distribution Date), (7) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account the distribution of the Class M-6 Principal Distribution Amount on such Distribution Date) and (8) the Certificate Principal Balance of the Class B-1 Certificates immediately prior to such Distribution Date, over (b) the lesser of (1) the product of (x) 79.40% and (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month), and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during prior calendar month) minus the Overcollateralization Floor.

Class B-2 Certificate: Any Certificate designated as a "Class B-2 Certificate" on the face thereof, in the form of Exhibit A-3 hereto, representing the right to its Percentage Interest of distributions provided for the Class B-2 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class B-2 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (x) the remaining Principal Distribution Amount for such Distribution Date after distribution of the Class A Principal Distribution Amount, the Class M-1 Principal Distribution Amount, the Class M-2 Principal Distribution Amount, the Class M-3 Principal Distribution Amount, the Class M-4 Principal Distribution Amount, the Class M-5 Principal Distribution Amount, the Class M-6 Principal Distribution Amount and the Class B-1 Principal Distribution Amount and (y) the excess, if any, of (a) the sum of (1) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount and on such Distribution Date), (2) the Certificate Principal

13

Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such Distribution Date), (5) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such Distribution Date), (6) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount on such Distribution Date), (7) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account the distribution of the Class M-6 Principal Distribution Amount on such Distribution Date), (8) the Certificate Principal Balance of the Class B-1 Certificates (after taking into account the distribution of the Class B-1 Principal Distribution Amount on such Distribution Date) and (9) the Certificate Principal Balance of the Class B-2 Certificates immediately prior to such Distribution Date, over (b) the lesser of (1) the product of (x) 82.40% and (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month), and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month) minus the Overcollateralization Floor.

Class B-3 Certificate: Any Certificate designated as a "Class B-3 Certificate" on the face thereof, in the form of Exhibit A-3 hereto, representing the right to its Percentage Interest of distributions provided for the Class B-3 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class B-3 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (x) the remaining Principal Distribution Amount for such Distribution Date after distribution of the Class A Principal Distribution Amount, the Class M-1 Principal Distribution Amount, the Class M-2 Principal Distribution Amount, the Class M-3 Principal Distribution Amount, the Class M-4 Principal Distribution Amount, the Class M-5 Principal Distribution Amount, the Class M-6 Principal Distribution Amount, the Class B-1 Principal Distribution Amount, and the Class B-2 Principal Distribution Amount and (y) the excess, if any, of (a) the sum of (1) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (2) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such Distribution

14

Date), (5) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such Distribution Date), (6) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount on such Distribution Date), (7) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account the distribution of the Class M-6 Principal Distribution Amount on such Distribution Date), (8) the Certificate Principal Balance of the Class B-1 Certificates (after taking into account the distribution of the Class B-1 Principal Distribution Amount on such Distribution Date), (9) the Certificate Principal Balance of the Class B-2 Certificates (after taking into account the distribution of the Class B-2 Principal Distribution Amount on such Distribution Date) and (10) the Certificate Principal Balance of the Class B-3 Certificates immediately prior to such Distribution Date, over (b) the lesser of (1) the product of (x) 84.90% and (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month), and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month) minus the Overcollateralization Floor.

Class B-4 Certificate: Any Certificate designated as a "Class B-4 Certificate" on the face thereof, in the form of Exhibit A-3 hereto, representing the right to its Percentage Interest of distributions provided for the Class B-4 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class B-4 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (x) the remaining Principal Distribution Amount for such Distribution Date after distribution of the Class A Principal Distribution Amount, the Class M-1 Principal Distribution Amount, the Class M-2 Principal Distribution Amount, the Class M-3 Principal Distribution Amount, the Class M-4 Principal Distribution Amount, the Class M-5 Principal Distribution Amount, the Class M-6 Principal Distribution Amount, the Class B-1 Principal Distribution Amount, the Class B-2 Principal Distribution Amount and the Class B-3 Principal Distribution Amount and (y) the excess, if any, of (a) the sum of (1) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (2) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such Distribution Date), (5) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such Distribution Date), (6) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account the distribution of the Class M-5

Principal Distribution Amount on such Distribution Date), (7) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account the distribution of the Class M-6 Principal Distribution Amount on such Distribution Date), (8) the Certificate Principal Balance of the Class B-1 Certificates (after taking into account the distribution of the Class B-1 Principal Distribution Amount on such Distribution Date), (9) the Certificate Principal Balance of the Class B-2 Certificates (after taking into account the distribution of the Class B-2 Principal Distribution Amount on such Distribution Date), (10) the Certificate Principal Balance of the Class B-3 Certificates (after taking into account the distribution of the Class B-3 Principal Distribution Amount on such Distribution Date) and (11) the Certificate Principal Balance of the Class B-4 Certificates immediately prior to such Distribution Date, over (b) the lesser of (1) the product of (x) 87.40% and (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month), and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month) minus the Overcollateralization Floor.

Class C Certificate: Any Certificate designated as a "Class C Certificate" on the face thereof, in the form of Exhibit A-4 hereto, representing the right to its Percentage Interest of distributions provided for the Class C Certificates herein and evidencing (i) a Regular Interest in REMIC IV, (ii) the obligation to pay Basis Risk Shortfall Carry Forward Amounts, (iii) the right to receive Class IO Distribution Amounts and (iv) the right to receive any Prepayment Charge Waiver Amounts.

Class C Distribution Amount: With respect to any Distribution Date, the sum of (i) the Current Interest for the Class C Interest for such Distribution Date, (ii) any Overcollateralization Release Amount for such Distribution Date and (iii) without duplication, any Subsequent Recoveries not distributed to the Class A, Class M and Class B Certificates on such Distribution Date; provided, however, that, on any Distribution Date after the Distribution Date on which the Certificate Principal Balances of the Class A, Class M and Class B Certificates have been reduced to zero, the Class C Distribution Amount shall include the Overcollateralization Amount.

Class C Interest: An uncertificated interest in the Trust Fund held by the Trustee on behalf of the Holders of the Class C Certificates, evidencing a Regular Interest in REMIC III for purposes of the REMIC Provisions.

Class IO Distribution Amount: As defined in Section 4.12 hereof. For purposes of clarity, the Class IO Distribution Amount for any Distribution Date shall equal the amount payable to the Swap Administrator on such Distribution Date pursuant to the first and second sentences of Section 4.12(c) in excess of the amount payable on REMIC V Regular Interest IO on such Distribution Date, all as further provided in Section 4.12 hereof.

Class IO Interest: An uncertificated interest in the Trust Fund held by the Trustee on behalf of the holders of REMIC V Regular Interest IO, evidencing a Regular Interest in REMIC III for purposes of the REMIC provisions.

Class M Certificates: Any of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5 and Class M-6 Certificates.

Class M-1 Certificate: Any Certificate designated as a "Class M-1 Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class M-1 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class M-1 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (x) the remaining Principal Distribution Amount for such Distribution Date after distribution of the Class A Principal Distribution Amount and (y) the excess, if any, of (a) the sum of (1) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date) and (2) the Certificate Principal Balance of the Class M-1 Certificates immediately prior to such Distribution Date, over (b) the lesser of (1) the product of (x) 55.40% and (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month), and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month) minus the Overcollateralization Floor.

Class M-2 Certificate: Any Certificate designated as a "Class M-2 Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class M-2 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class M-2 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (x) the remaining Principal Distribution Amount for such Distribution Date after distribution of the Class A Principal Distribution Amount and the Class M-1 Principal Distribution Amount and (y) the excess, if any, of (a) the sum of (1) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (2) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such Distribution Date) and (3) the Certificate Principal Balance of the Class M-2 Certificates immediately prior to such Distribution Date, over (b) the lesser of (1) the product of (x) 61.80% and (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled

17

payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month), and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month) minus the Overcollateralization Floor.

Class M-3 Certificate: Any Certificate designated as a "Class M-3 Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class M-3 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class M-3 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (x) the remaining Principal Distribution Amount for such Distribution Date after distribution of the Class A Principal Distribution Amount, the Class M-1 Principal Distribution Amount and the Class M-2 Principal Distribution Amount and (y) the excess, if any, of (a) the sum of (1) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (2) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such Distribution Date) and (4) the Certificate Principal Balance of the Class M-3 Certificates immediately prior to such Distribution Date, over (b) the lesser of (1) the product of (x) 65.70% and (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month), and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month) minus the Overcollateralization Floor.

Class M-4 Certificate: Any Certificate designated as a "Class M-4 Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class M-4 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class M-4 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (x) the remaining Principal Distribution Amount for such Distribution Date after distribution of the Class A Principal Distribution Amount, the Class M-1 Principal Distribution Amount, the Class M-2 Principal Distribution Amount and the Class M-3 Principal Distribution

Amount and (y) the excess, if any, of (a) the sum of (1) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (2) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such Distribution Date) and (5) the Certificate Principal Balance of the Class M-4 Certificates immediately prior to such Distribution Date, over (b) the lesser of (1) the product of (x) 69.30% and (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month), and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month) minus the Overcollateralization Floor.

Class M-5 Certificate: Any Certificate designated as a "Class M-5 Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class M-5 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class M-5 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (x) the remaining Principal Distribution Amount for such Distribution Date after distribution of the Class A Principal Distribution Amount, the Class M-1 Principal Distribution Amount, the Class M-2 Principal Distribution Amount, the Class M-3 Principal Distribution Amount and the Class M-4 Principal Distribution Amount and (y) the excess, if any, of (a) the sum of (1) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (2) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such Distribution Date), (5) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such Distribution Date) and (6) the Certificate Principal Balance of the Class M-5 Certificates immediately prior to such Distribution Date, over (b) the lesser of (1) the product of (x) 72.70% and (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related

Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month), and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month) minus the Overcollateralization Floor.

Class M-6 Certificate: Any Certificate designated as a "Class M-6 Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class M-6 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive Basis Risk Shortfall Carry Forward Amounts and (iii) the obligation to pay Class IO Distribution Amounts.

Class M-6 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (x) the remaining Principal Distribution Amount for such Distribution Date after distribution of the Class A Principal Distribution Amount, the Class M-1 Principal Distribution Amount, the Class M-2 Principal Distribution Amount, the Class M-3 Principal Distribution Amount, the Class M-4 Principal Distribution Amount and the Class M-5 Principal Distribution Amount and (y) the excess, if any, of (a) the sum of (1) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (2) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such Distribution Date), (5) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such Distribution Date), (6) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount on such Distribution Date) and (7) the Certificate Principal Balance of the Class M-6 Certificates immediately prior to such Distribution Date, over (b) the lesser of (1) the product of (x) 76.10% and (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month), and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month) minus the Overcollateralization Floor.

Class R Certificate: Any of the Class R-1, Class R-2, Class R-3 or Class RX Certificates.

Class R-1 Certificate: Any Certificate designated a "Class R-1 Certificate" on the face thereof, in the form set forth in Exhibit A-5 hereto, evidencing the Residual Interest in REMIC I

and representing the right to the Percentage Interest of distributions provided for the Class R-1 Certificates as set forth herein.

Class R-2 Certificate: Any Certificate designated a "Class R-2 Certificate" on the face thereof, in the form set forth in Exhibit A-5 hereto, evidencing the Residual Interest in REMIC II and representing the right to the Percentage Interest of distributions provided for the Class R-2 Certificates as set forth herein.

Class R-3 Certificate: Any Certificate designated a "Class R-3 Certificate" on the face thereof, in the form set forth in Exhibit A-5 hereto, evidencing the Residual Interest in REMIC III and representing the right to the Percentage Interest of distributions provided for the Class R-3 Certificates as set forth herein.

Class RX Certificate: Any Certificate designated a "Class RX Certificate" on the face thereof, in the form set forth in Exhibit A-5 hereto, evidencing the ownership of the Class R-4 Interest and Class R-5 Interest and representing the right to the Percentage Interest of distributions provided for the Class RX Certificates as set forth herein.

Class R-4 Interest: The uncertificated Residual Interest in REMIC IV.

Class R-5 Interest: The uncertificated Residual Interest in REMIC V.

Class X Certificate: Any Certificate designated as a "Class X Certificate" on the face thereof, in the form of Exhibit A-6 hereto.

Closing Date: March 30, 2007.

Code: The Internal Revenue Code of 1986, including any successor or amendatory provisions.

Combined Loan-to-Value Ratio: With respect to any Mortgage Loan and as of any date of determination, the fraction (expressed as a percentage) the numerator of which is the sum of (i) original principal balance of the related Mortgage Loan at such date of determination and (ii) the unpaid principal balance of the related first lien Mortgage Loan as of the date of origination of that Mortgage Loan and the denominator of which is the applicable Appraised Value of the related Mortgaged Property at origination.

Compensating Interest: With respect to any Distribution Date, (i) in the case of a Servicer, an amount, not to exceed the Servicing Fee, to be deposited in the Distribution Account by a Servicer with respect to the payment of a Prepayment Interest Shortfall (in the case of each Servicer, related to a prepayment as described in the applicable Servicing Agreement) on a Mortgage Loan subject to this Agreement and (ii) in the case of the Master Servicer, if a Servicer fails to make such payment, an amount not to exceed that portion of the Master Servicing Compensation payable to the Master Servicer to the extent provided in Section 6.02(c) hereof.

Corporate Trust Office: (i) With respect to the Trustee, the designated corporate trust office of the Trustee, currently located at Citibank, N.A., 388 Greenwich Street, 14th Floor, New York, New York 10013, and (ii) with respect to the Securities Administrator, the designated

office of the Securities Administrator currently located at 9062 Old Annapolis Road, Columbia, Maryland 21045 Attention: Corporate Trust Services – Bear Stearns Second Lien Trust 2007-SV1, except for purposes of certificate transfer purposes such term shall mean the office or agency of the Securities Administrator located at Wells Fargo Bank, N.A., Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479 Attention: Corporate Trust Services – Bear Stearns Second Lien Trust 2007-SV1, or at such other address as the Trustee or Securities Administrator, as applicable, may designate from time to time by notice to the Certificateholders, the Depositor, the Trustee, the Master Servicer, the Securities Administrator and the Seller or at the principal corporate trust office of any successor Trustee.

Corresponding Certificate: With respect to each REMIC II Regular Interest (other than REMIC II Regular Interest IO), the Certificate with the corresponding designation. With respect to each REMIC III Regular Interest (other than the Class C Interest and the Class IO Interest), the related Certificate representing an ownership therein.

Cumulative Realized Loss Percentage: With respect to the Certificates and any Distribution Date, the percentage obtained by dividing (x) the aggregate Realized Losses on the Mortgage Loans incurred since the related Cut-off Date through the end of the related Due Period by (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the related Cut-off Date.

Current Interest: As of any Distribution Date, with respect to the Certificates (other than the Class X Certificates and the Residual Certificates) and interests of each class (other than the Residual Interests), (i) the interest accrued on the Certificate Principal Balance, or Certificate Notional Amount or Uncertificated Notional Amount, as applicable, during the related Accrual Period at the applicable Pass-Through Rate, plus any amount previously distributed with respect to interest for such Certificate or interest that has been recovered as a voidable preference by a trustee in bankruptcy minus (ii) the sum of (a) any Prepayment Interest Shortfall for such Distribution Date, to the extent not covered by Compensating Interest and (b) any Relief Act Interest Shortfalls during the related Due Period, provided, however, that for purposes of calculating Current Interest for any such class, amounts specified in clause (ii) hereof for any such Distribution Date shall be allocated first to the Class C Certificates and the Class C Interest in reduction of amounts otherwise distributable to such Certificates and interest on such Distribution Date and then any excess shall be allocated to each Class of Class A, Class M and Class B Certificates *pro rata* based on the respective amounts of interest accrued pursuant to clause (i) hereof for each such Class on such Distribution Date.

Current Specified Enhancement Percentage: With respect to any Distribution Date, the percentage obtained by dividing (x) the sum of (i) the aggregate Certificate Principal Balance of the Class M Certificates and Class B Certificates and (ii) the Overcollateralization Amount, in each case prior to the distribution of the Principal Distribution Amount on such Distribution Date, by (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month).

Custodial Agreement: The Custodial Agreement, dated as of March 30, 2007, among the Depositor, the Seller, the Master Servicer, the Securities Administrator, the Trustee and the Custodian, relating to the Mortgage Loans identified in such Custodial Agreement.

Custodian: Wells Fargo, or any successor custodian appointed pursuant to the provisions hereof and the Custodial Agreement.

Cut-off Date: March 1, 2007.

Cut-off Date Principal Balance: As to any Mortgage Loan, the unpaid principal balance thereof as of the close of business on the Cut-off Date after application of all Principal Prepayments received prior to the Cut-off Date and scheduled payments of principal due on or before the Cut-off Date, whether or not received, but without giving effect to any installments of principal received in respect of Due Dates after the Cut-off Date. The aggregate Cut-off Date Principal Balance of the Mortgage Loans is $1,415,853,132.36.

Debt Service Reduction: With respect to any Mortgage Loan, a reduction by a court of competent jurisdiction in a proceeding under the Bankruptcy Code in the Scheduled Payment for such Mortgage Loan that became final and non-appealable, except such a reduction resulting from a Deficient Valuation or any other reduction that results in a permanent forgiveness of principal.

Defaulting Party: A "Defaulting Party" as defined in the Swap Agreement.

Deficiency Amount: As defined in the Policy.

Deficient Valuation: With respect to any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under such Mortgage Loan, or any reduction in the amount of principal to be paid in connection with any Scheduled Payment that results in a permanent forgiveness of principal, which valuation or reduction results from an order of such court that is final and non-appealable in a proceeding under the Bankruptcy Code.

Definitive Certificates: As defined in Section 7.06.

Deleted Mortgage Loan: A Mortgage Loan replaced or to be replaced by a Replacement Mortgage Loan.

Delinquent: The delinquency method used for calculations with respect to the Mortgage Loans will be in accordance with the methodology used by lenders regulated by the Office of Thrift Supervision. Under this method, a mortgage loan is considered "30 days or more Delinquent" if the borrower fails to make a scheduled payment prior to the close of business on the mortgage loan's first succeeding due date. For example, if a securitization had a closing date occurring in August and a cut-off date of August 1, a mortgage loan with a payment due on July 1 that remained unpaid as of the close of business on July 31 would not be described as 30 days delinquent as of the cut-off date. Such mortgage loan with a payment due on June 1 that remained unpaid as of the close of business on July 31 would be described as 30 days delinquent as of the cut-off date. A mortgage loan would be considered "60 days or more Delinquent" with

respect to such scheduled payment if such scheduled payment were not made prior to the close of business on the mortgage loan's second succeeding due date (or, in the preceding example, if the mortgage loan with a payment due on May 1 remained unpaid as of the close of business on July 31). Similarly for "90 days or more Delinquent" and so on. Unless otherwise specified, with respect to any date of determination, determinations of delinquency are made as of the last day of the prior calendar month. This method of determining delinquencies is referred to as the OTS method.

Denomination: With respect to each Certificate, the amount set forth on the face thereof as the "Initial Principal Balance or Initial Notional Amount of this Certificate".

Depositor: SACO I Inc., a Delaware corporation, or its successor in interest.

Depository: The initial Depository shall be The Depository Trust Company ("DTC"), the nominee of which is Cede & Co., or any other organization registered as a "clearing agency" pursuant to Section 17A of the Securities Exchange Act of 1934, as amended. The Depository shall initially be the registered Holder of the Book-Entry Certificates. The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(a)(5) of the Uniform Commercial Code of the State of New York.

Depository Agreement: With respect to the Class of Book-Entry Certificates, the agreement between the Issuing Entity and the initial Depository, dated as of the Closing Date, substantially in the form of Exhibit H.

Depository Participant: A broker, dealer, bank or other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

Designated Depository Institution: A depository institution (commercial bank, federal savings bank, mutual savings bank or savings and loan association) or trust company (which may include the Trustee, the Securities Administrator and the Master Servicer), the deposits of which are fully insured by the FDIC to the extent provided by law.

Determination Date: With respect to any Distribution Date, the 15th day of the month of such Distribution Date or, if such 15th day is not a Business Day, the immediately preceding Business Day.

Distribution Account: The segregated trust account or accounts created and maintained by the Securities Administrator pursuant to Section 5.06 in the name of the Trustee for the benefit of the Certificateholders and the Certificate Insurer, which shall be entitled "Wells Fargo Bank, National Association, as Securities Administrator, on behalf of Citibank, N.A., as Trustee, in trust for the registered holders of Bear Stearns Second Lien Trust 2007-SV1, Mortgage-Backed Certificates, Series 2007-SV1." The Distribution Account must be an Eligible Account.

Distribution Date: The 25th day of each calendar month after the initial issuance of the Certificates, or if such 25th day is not a Business Day, the next succeeding Business Day, commencing in April 2007.

Due Date: As to any Mortgage Loan, the date in each month on which the related Scheduled Payment is due, as set forth in the related Mortgage Note.

Due Period: With respect to any Distribution Date, the period from and including the second day of the calendar month preceding the calendar month in which such Distribution Date occurs through close of business on the first day of the calendar month in which such Distribution Date occurs.

Eligible Account: Any of (i) an account or accounts maintained with a federal or state chartered depository institution or trust company, the long-term unsecured debt obligations and short-term unsecured debt obligations of which (or, in the case of a depository institution or trust company that is the principal subsidiary of a holding company, the debt obligations of such holding company, so long as Moody's is not a Rating Agency) are rated by each Rating Agency in one of its two highest long-term and its highest short-term rating categories, respectively, at the time any amounts are held on deposit therein, or (ii) an account or accounts in a depository institution or trust company in which such accounts are insured by the FDIC (to the limits established by the FDIC) and the uninsured deposits in which accounts are otherwise secured such that, as evidenced by an Opinion of Counsel delivered to and satisfactory to the Trustee, the Securities Administrator, the Certificate Insurer and to each Rating Agency, the Certificateholders have a claim with respect to the funds in such account or a perfected first priority security interest against any collateral (which shall be limited to Permitted Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution or trust company in which such account is maintained, or (iii) a trust account or accounts maintained with the corporate trust department of a federal or state chartered depository institution or trust company having capital and surplus of not less than $50,000,000, acting in its fiduciary capacity or (iv) any other account acceptable to each Rating Agency, as evidenced in writing. Eligible Accounts may bear interest, and may include, if otherwise qualified under this definition, accounts maintained with the Trustee and the Securities Administrator.

EMC: EMC Mortgage Corporation, a Delaware corporation, and its successors and assigns.

ERISA: The Employee Retirement Income Security Act of 1974, as amended.

ERISA Restricted Certificates: Any of the Class C, Class X and Residual Certificates.

Estimated Swap Termination Payment: As specified in the Swap Agreement.

Event of Default: As defined in Section 9.01 hereof.

Excess Cashflow: With respect to any Distribution Date, an amount, if any, equal to the sum of (a) the Remaining Excess Spread for such Distribution Date and (b) the Overcollateralization Release Amount for such Distribution Date.

Excess Liquidation Proceeds: To the extent not required by law to be paid to the related Mortgagor, the excess, if any, of any Liquidation Proceeds with respect to a Mortgage Loan over the Stated Principal Balance of such Mortgage Loan and accrued and unpaid interest at the

related Mortgage Rate through the last day of the month in which the Mortgage Loan has been liquidated.

Exemption: Prohibited Transaction Exemption 90-30, as amended from time to time.

Excess Spread: With respect to any Distribution Date, the excess, if any, of (i) the Interest Funds for such Distribution Date over (ii) the sum of (A) the Premium payable to the Certificate Insurer for such Distribution Date, (B) the Current Interest on the Class A, Class M and Class B Certificates and Interest Carry Forward Amounts on the Class A Certificates (other than Interest Carry Forward Amounts paid pursuant to Section 6.04(a)(4)(A)), in each case for such Distribution Date, and (C) any Reimbursement Amounts payable to the Certificate Insurer for such Distribution Date.

Extra Principal Distribution Amount: With respect to any Distribution Date, the lesser of (i) the excess, if any, of the Overcollateralization Target Amount for such Distribution Date over the Overcollateralization Amount for such Distribution Date (after giving effect to distributions of principal on the Certificates other than any Extra Principal Distribution Amount) and (ii) the Excess Spread for such Distribution Date.

Fannie Mae: Fannie Mae (formerly, Federal National Mortgage Association), or any successor thereto.

FDIC: The Federal Deposit Insurance Corporation, or any successor thereto.

Final Certification: The certification by the Custodian substantially in the form of Exhibit Three to the Custodial Agreement.

Final Recovery Determination: With respect to any defaulted Mortgage Loan or any REO Property (other than a Mortgage Loan or REO Property purchased by the Seller pursuant to or as contemplated by Section 2.03(d) or Section 11.01), a determination made by the applicable Servicer pursuant to the related Servicing Agreement that all Insurance Proceeds, Liquidation Proceeds and other payments or recoveries which such Servicer, in its reasonable good faith judgment, expects to be finally recoverable in respect thereof have been so recovered. The Master Servicer shall maintain records, based solely on information provided by each Servicer, of each Final Recovery Determination made thereby.

Freddie Mac: Federal Home Loan Mortgage Corporation, or any successor thereto.

Global Certificate: Any Private Certificate registered in the name of the Depository or its nominee, beneficial interests in which are reflected on the books of the Depository or on the books of a Person maintaining an account with such Depository (directly or as an indirect participant in accordance with the rules of such depository).

GMAC Mortgage, LLC or GMACM: GMAC Mortgage, LLC and any successor thereto.

GMACM Assignment Agreement: The Assignment, Assumption and Recognition Agreement substantially in the form of Exhibit R-2, dated as of March 30, 2007, among EMC,

the Trustee and GMACM, evidencing the assignment of the GMACM Servicing Agreement to the Trust.

GMACM Loans: Those Mortgage Loans subject to this Agreement which were purchased by the Seller from GMACM pursuant to the GMACM Servicing Agreement.

GMACM Servicing Agreement: The Servicing Agreement, dated as of May 1, 2001, as amended by Amendment No. 1, dated as of October 1, 2001, Amendment No. 2, dated as of July 31, 2002 and Amendment No. 3, dated as of December 20, 2005 substantially in the form of Exhibit R-1, between EMC and GMACM.

Guarantor: As defined in Section 4.12.

Guaranty: As defined in Section 4.12.

Indemnified Persons: The Trustee, the Master Servicer, the Certificate Insurer, the Trust Fund and the Securities Administrator and their respective officers, directors, agents and employees and, with respect to the Trustee, any separate co-trustee and its officers, directors, agents and employees.

Individual Certificate: Any Private Certificate registered in the name of a Holder other than the Depository or its nominee.

Initial Certification: The certification by the Custodian substantially in the form of Exhibit One to the Custodial Agreement.

Initial Certificate Principal Balance: With respect to any Certificate (other than the Class X Certificates), the Certificate Principal Balance of such Certificate or any predecessor Certificate on the Closing Date.

Institutional Accredited Investor: Any Person meeting the requirements of Rule 501(a)(l), (2), (3) or (7) of Regulation D under the Securities Act or any entity all of the equity holders in which come within such paragraphs.

Insurance Agreement: The Insurance and Indemnity Agreement, dated as of March 30, 2007, among the Certificate Insurer, the Seller, the Depositor and the Trustee, including any amendments and supplements thereto in accordance with the terms thereof.

Insurance Policy: With respect to any Mortgage Loan included in the Trust Fund, any insurance policy, including all riders and endorsements thereto in effect with respect to such Mortgage Loan, including any replacement policy or policies for any Insurance Policies.

Insurance Proceeds: Proceeds paid in respect of the Mortgage Loans pursuant to any Insurance Policy and any other insurance policy covering a Mortgage Loan, to the extent such proceeds are payable to the mortgagee under the Mortgage, the related Servicer or the Trustee under the deed of trust and are not applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures that the related Servicer would

follow in servicing mortgage loans held for its own account, in each case other than any amount included in such Insurance Proceeds in respect of Insured Expenses.

Insured Amount: As defined in the Policy.

Insured Expenses: Expenses covered by any insurance policy with respect to the Mortgage Loans.

Insured Payments: As defined in the Policy.

Interest Carry Forward Amount: As of any Distribution Date and with respect to each Class of Certificates (other than the Class C Certificates and the Residual Certificates), the sum of (i) the excess of (a) the Current Interest for such Class with respect to such Distribution Date and any prior Distribution Dates over (b) the amount actually distributed to such Class of Certificates with respect to interest on such Distribution Dates and (ii) interest thereon (to the extent permitted by applicable law) at the applicable Pass-Through Rate for such Class for the related Accrual Period including the Accrual Period relating to such Distribution Date.

Interest Determination Date: Shall mean the second LIBOR Business Day preceding the commencement of each Accrual Period.

Interest Funds: With respect to any Distribution Date (1) the sum, without duplication, of (a) all scheduled interest during the related Due Period with respect to the Mortgage Loans less the Servicing Fee, if any, (b) all Advances relating to interest with respect to the Mortgage Loans made on or prior to the related Distribution Date, (c) all Compensating Interest with respect to the Mortgage Loans and required to be remitted by the Master Servicer pursuant to this Agreement and by each Servicer pursuant to the related Servicing Agreement with respect to such Distribution Date, (d) Liquidation Proceeds and Subsequent Recoveries with respect to the Mortgage Loans collected during the prior calendar month (to the extent such Liquidation Proceeds and Subsequent Recoveries relate to interest), (e) all amounts relating to interest with respect to each Mortgage Loan repurchased by the Seller pursuant to Sections 2.02 and 2.03, to the extent remitted by the Master Servicer to the Distribution Account pursuant to this Agreement and (f) the interest portion of any proceeds received from the exercise of an Optional Termination, minus (2)(i) all amounts relating to interest required to be reimbursed pursuant to Section 5.07 or as otherwise set forth in this Agreement and (ii) any Net Swap Payment or Swap Termination Payment (not due to a Swap Provider Trigger Event and other than to the extent already paid by the Swap Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) owed to the Swap Administrator for payment to the Swap Provider for such Distribution Date and any such payments remaining unpaid for any prior Distribution Dates.

Interim Certification: The certification by the Custodian substantially in the form of Exhibit Two to the Custodial Agreement.

Issuing Entity: The Trust designated as Bear Stearns Second Lien Trust 2007-SV1.

Last Scheduled Distribution Date: Solely for purposes of the face of the Certificates, the Distribution Date in January 2037.

28

Late Payment Rate:  As defined in the Insurance Agreement.

Latest Possible Maturity Date: The Distribution Date in the month following the final scheduled maturity date of the Mortgage Loan in the Trust Fund having the latest scheduled maturity date as of the Cut-off Date. For purposes of the Treasury regulations under Sections 860A through 860G of the Code, the latest possible maturity date of each Regular Interest issued by REMIC I, REMIC II, REMIC III, REMIC IV and REMIC V shall be the Latest Possible Maturity Date.

LIBOR Business Day: Shall mean a day on which banks are open for dealing in foreign currency and exchange in London and New York City.

Liquidated Loan: With respect to any Distribution Date, a defaulted Mortgage Loan that has been liquidated through deed-in-lieu of foreclosure, foreclosure sale, trustee's sale or other realization as provided by applicable law governing the real property subject to the related Mortgage and any security agreements and as to which the related Servicer has made a Final Recovery Determination with respect thereto.

Liquidation Proceeds: Amounts, other than Insurance Proceeds and Subsequent Recoveries, received in connection with the partial or complete liquidation of a Mortgage Loan, whether through trustee's sale, foreclosure sale or otherwise, or in connection with any condemnation or partial release of a Mortgaged Property and any other proceeds received with respect to an REO Property, less the sum of related unreimbursed Advances, Servicing Fees and Servicing Advances and all expenses of liquidation, including property protection expenses and foreclosure and sale costs, including court and reasonable attorneys fees.

Majority Class C Certificateholder: The Holder of a 50.01% or greater Percentage Interest in the Class C Certificates.

Marker Rate: With respect to the Class C Interest and any Distribution Date, a per annum rate equal to two (2) times the weighted average of the Uncertificated REMIC II Pass-Through Rates for the REMIC II Regular Interests (other than REMIC II Regular Interests AA and IO), with the rate on each such REMIC II Regular Interest (other than REMIC II Regular Interests A-2, A-3 and ZZ) subject to a cap equal to the least of (i) the One-Month LIBOR Pass-Through Rate for the Corresponding Certificate, (ii) 11.00% per annum and (iii) the Net WAC Cap Rate for the REMIC III Regular Interest the ownership of which is represented by the Corresponding Certificate for the purpose of this calculation for such Distribution Date, with the rate on each of the REMIC II Regular Interests A-2 and A-3 subject to a cap equal to the least of (i) the One-Month LIBOR Pass-Through Rate for the Corresponding Certificate, (ii) 11.00% per annum and (iii) the Net WAC Cap Rate for the REMIC III Regular Interest the ownership of which is represented by the Corresponding Certificate for the purpose of this calculation for such Distribution Date, in each case, plus the related Premium Percentage for the Corresponding Certificate, and with the rate on REMIC II Regular Interest ZZ subject to a cap of zero for the purpose of this calculation; provided, however, that solely for this purpose, the related cap with respect to each REMIC II Regular Interest (other than REMIC II Regular Interests AA, ZZ and IO) shall be multiplied by a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related Accrual Period.

Master Servicer: Wells Fargo Bank, National Association, in its capacity as master servicer, and its successors and assigns or any Successor Master Servicer appointed as herein provided.

Master Servicing Compensation: As defined in Section 4.09.

Master Servicing Officer: Any officer of the Master Servicer responsible for the master servicing of the Mortgage Loans.

Maximum Probable Exposure: With respect to each Distribution Date and the Swap Agreement, the amount calculated by the Depositor in accordance with the Seller's internal risk management process in respect of similar instruments, such calculation to be performed as agreed by the Securities Administrator and the Depositor.

Maximum Uncertificated Accrued Interest Deferral Amount: With respect to any Distribution Date, the excess of (i) accrued interest at the Uncertificated REMIC II Pass-Through Rate applicable to REMIC II Regular Interest ZZ for such Distribution Date on a balance equal to the Uncertificated Principal Balance of REMIC II Regular Interest ZZ minus the REMIC II Overcollateralization Amount, in each case for such Distribution Date, over (ii) the aggregate amount of Uncertificated Accrued Interest for such Distribution Date on the REMIC II Regular Interests (other than REMIC II Regular Interests AA, ZZ and IO), with the rate on each such REMIC II Regular Interest (other than REMIC II Regular Interests A-2 and A-3) subject to a cap equal to the least of (i) the One-Month LIBOR Pass-Through Rate for the Corresponding Certificate, (ii) 11.00% per annum and (iii) the Net WAC Cap Rate for the REMIC III Regular Interest the ownership of which is represented by the Corresponding Certificate for the purpose of this calculation for such Distribution Date, and with the rate on each of the REMIC II Regular Interests A-2 and A-3 subject to a cap equal to the least of (i) the One-Month LIBOR Pass-Through Rate for the Corresponding Certificate, (ii) 11.00% per annum and (iii) the Net WAC Cap Rate for the REMIC III Regular Interest the ownership of which is represented by the Corresponding Certificate for the purpose of this calculation for such Distribution Date, in each case, plus the related Premium Percentage for the Corresponding Certificate; provided, however, that solely for this purpose, the related cap with respect to each REMIC II Regular Interest (other than REMIC II Regular Interests AA, ZZ and IO) shall be multiplied by a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related Accrual Period.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS® System: The system of recording transfers of Mortgages electronically maintained by MERS.

MIN: The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS® System.

MOM Loan: With respect to any Mortgage Loan, MERS acting as the mortgagee of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

Monthly Statement: The statement prepared and delivered by the Securities Administrator pursuant to Section 6.06.

Moody's: Moody's Investors Service, Inc., and any successor thereto.

Mortgage: The mortgage, deed of trust or other instrument creating a second lien on or second priority ownership interest in an estate in fee simple in real property securing a Mortgage Note.

Mortgage File: The mortgage documents listed in Section 2.01 hereof pertaining to a particular Mortgage Loan and any additional documents delivered to the Custodian to be added to the Mortgage File pursuant to this Agreement and the Custodial Agreement.

Mortgage Loan Purchase Agreement: The Mortgage Loan Purchase Agreement, dated as of March 30, 2007, between the Seller and the Depositor as purchaser, in the form attached hereto as Exhibit L.

Mortgage Loan Purchase Price: The price, calculated as set forth in Section 11.01, to be paid in connection with the repurchase of the Mortgage Loans pursuant to Section 11.01.

Mortgage Loans: Such of the mortgage loans transferred and assigned to the Trustee pursuant to the provisions hereof, as from time to time are held as a part of the Trust Fund (including any REO Property), notwithstanding foreclosure or other acquisition of title of the related Mortgaged Property.

Mortgage Loan Schedule: The list of Mortgage Loans (as from time to time amended by the Master Servicer to reflect the deletion of Deleted Mortgage Loans and the addition of Replacement Mortgage Loans pursuant to the provisions of this Agreement) transferred to the Trustee as part of the Trust Fund and from time to time subject to this Agreement, the Mortgage Loan Schedule being attached hereto as Exhibit B, with respect to the Mortgage Loans and as amended from time to time to reflect the repurchase or substitution of Mortgage Loans pursuant to this Agreement or the Mortgage Loan Purchase Agreement, as the case may be, setting forth the following information with respect to each Mortgage Loan:

(a)     the city, state and zip code of the Mortgaged Property;

(b)     the property type;

(c)     the occupancy type;

(d)     the credit score of the Mortgagor;

(e)     the Mortgage Interest Rate;

(f)     the Servicing Fee Rate;

(g)     the Net Rate;

(h)     the maturity date;

(i)     the stated original term to maturity;

(j)     the stated remaining term to maturity;

(k)     the original Principal Balance;

(l)     the first payment date;

(m)     the principal and interest payment in effect as of the Cut-off Date;

(n)     the unpaid Principal Balance as of the Cut-off Date;

(o)     the Loan-to-Value Ratio at origination;

(p)     the insurer of any Primary Mortgage Insurance Policy;

(q)     the MIN with respect to each MOM Loan;

(r)     a code indicating whether the Mortgage Loan is negatively amortizing;

(s)     the Prepayment Charge, if any;

(t)     a code indicating whether the Mortgage Loan is has a balloon payment;

(u)     a code indicating whether the Mortgage Loan is an interest-only loan;

(v)     a code indicating whether such Mortgage Loan is a Simple Interest Loan;

(w)     the interest-only term, if applicable;

(x)     the mortgage loan seller; and

(y)     the original amortization term.

Such schedule also shall set forth for all of the Mortgage Loans, the total number of Mortgage Loans, the total of each of the amounts described under (m) and (n) above, the weighted average by principal balance as of the Cut-off Date of each of the rates described under (c) through (h) above, and the weighted average remaining term to maturity by unpaid principal balance as of the Cut-off Date.

Mortgage Note: The original executed note or other evidence of indebtedness of a Mortgagor under a Mortgage Loan.

Mortgage Rate: With respect to each Mortgage Loan, the rate set forth in the related Mortgage Note. With respect to each Mortgage Loan that becomes an REO Property, as of any date of determination, the annual rate determined in accordance with the immediately preceding sentence as of the date such Mortgage Loan became an REO Property.

Mortgaged Property: The underlying property securing a Mortgage Loan.

Mortgagor: The obligors on a Mortgage Note.

Net Mortgage Rate: As to each Mortgage Loan, and at any time, the per annum rate equal to the related Mortgage Rate less the Servicing Fee Rate.

32

Net Swap Payment: With respect to each Distribution Date, the net payment required to be made pursuant to the terms of the Swap Agreement by either the Swap Provider or the Swap Administrator, which net payment shall not take into account any Swap Termination Payment.

Net WAC Cap Rate: With respect to any Distribution Date and the Class A, Class M and Class B Certificates, the excess, if any, of (A) a per annum rate equal to the product of (x) the weighted average of the Net Mortgage Rates on the then outstanding Mortgage Loans, weighted based on the Stated Principal Balance of the Mortgage Loans as of the related Due Date prior to giving effect to any reduction in the Stated Principal Balances of the Mortgage Loans on such Due Date, minus, in the case of the Class A-2 Certificates and Class A-3 Certificates, the related Premium Percentage payable to the Certificate Insurer, and (y) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days elapsed in the related Accrual Period, over (B) an amount, expressed as a per annum rate, equal to the sum of (i) the Swap Payment payable to the Swap Provider on such Distribution Date and (ii) any Swap Termination Payment not due to a Swap Provider Trigger Event payable to the Swap Provider (other than to the extent already paid by the Swap Administrator from any upfront payment received pursuant to any related replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee), divided by the aggregate outstanding Stated Principal Balance of the Mortgage Loans as of the related Due Date prior to giving effect to any reduction in the Stated Principal Balances of such Mortgage Loans on such Due Date, multiplied by 12. For federal income tax purposes, with respect to each Regular Interest the ownership of which is represented by the Class A, Class M and Class B Certificates and any Distribution Date, a per annum rate equal to the weighted average (adjusted for the actual number of days elapsed in the related Accrual Period) of the Uncertificated REMIC II Pass-Through Rates for such Distribution Date for the REMIC II Regular Interests (other than REMIC II Regular Interest IO), weighted on the basis of the Uncertificated Principal Balances of each such REMIC II Regular Interest immediately prior to such Distribution Date, minus, in the case of the Regular Interests the ownership of which is represented by the Class A-2 Certificates and Class A-3 Certificates, the related Premium Percentage for the Corresponding Certificates.

Non-Book-Entry Certificate: Any Certificate other than a Book-Entry Certificate.

Nonrecoverable Advance: Any portion of an Advance previously made or proposed to be made by the Master Servicer pursuant to this Agreement or the related Servicer pursuant to the related Servicing Agreement that, in the good faith judgment of the Master Servicer or the related Servicer, will not or, in the case of a proposed advance, would not, be ultimately recoverable by it from the related Mortgagor, related Liquidation Proceeds, Insurance Proceeds or otherwise.

Notional Amount: With respect to each Distribution Date and the Swap Agreement, the notional amount for the related calculation period as set forth in the related schedule set forth in Exhibit N.

Offered Certificates: Any of the Class A, Class M and Class B Certificates.

Officer's Certificate: A certificate (i) signed by the Chairman of the Board, the Vice Chairman of the Board, the President, a Vice President (however denominated), an Assistant

Vice President, the Treasurer, the Secretary, or one of the assistant treasurers or assistant secretaries of the Depositor, the Seller or the Master Servicer (or any other officer customarily performing functions similar to those performed by any of the above designated officers and also to whom, with respect to a particular matter, such matter is referred because of such officer's knowledge of and familiarity with a particular subject) or (ii), if provided for in this Agreement, signed by a Servicing Officer, as the case may be, and delivered to the Depositor, the Seller, the Certificate Insurer, the Securities Administrator, the Master Servicer and/or the Trustee, as the case may be, as required by this Agreement.

One-Month LIBOR: With respect to any Accrual Period and the Class A, Class M and Class B Certificates, the rate determined by the Securities Administrator on the related Interest Determination Date on the basis of the rate for U.S. dollar deposits for one month that appears on Bloomberg Terminal Telerate Successor Page 3750 as of 11:00 a.m. (London time) on such Interest Determination Date. If such rate does not appear on such page (or such other page as may replace that page on that service, or if such service is no longer offered, such other service for displaying One-Month LIBOR or comparable rates as may be reasonably selected by the Securities Administrator), One-Month LIBOR for the applicable Accrual Period will be the Reference Bank Rate. If no such quotations can be obtained by the Securities Administrator and no Reference Bank Rate is available, One-Month LIBOR will be One-Month LIBOR applicable to the preceding Accrual Period. The establishment of One-Month LIBOR on each Interest Determination Date by the Securities Administrator and the Securities Administrator's calculation of the rate of interest applicable to the Class A, Class M and Class B Certificates for the related Accrual Period shall, in the absence of manifest error, be final and binding.

One-Month LIBOR Pass-Through Rate: With respect to each Class A, Class M and Class B Certificate, and for purposes of the definition of "Marker Rate" and "Maximum Uncertificated Accrued Interest Deferral Amount", each REMIC II Regular Interest (other than REMIC II Regular Interests AA, ZZ and IO), a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

Opinion of Counsel: A written opinion of counsel, who may be counsel for the Seller, the Depositor or the Master Servicer, reasonably acceptable to each addressee of such opinion; provided that with respect to Section 2.05, 8.05, 8.07 or 12.01, or the interpretation or application of the REMIC Provisions, such counsel must (i) in fact be independent of the Seller, the Depositor and the Master Servicer, (ii) not have any direct financial interest in the Seller, the Depositor or the Master Servicer or in any affiliate of either, and (iii) not be connected with the Seller, the Depositor or the Master Servicer as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

Optional Termination: The termination of the Trust created hereunder as a result of the purchase of all of the Mortgage Loans and any REO Property pursuant to Section 11.01 hereof.

Optional Termination Date: The Distribution Date on which the aggregate Stated Principal Balance of all of the Mortgage Loans is equal to or less than 20% of the aggregate Stated Principal Balance of all of the Mortgage Loans as of the Cut-off Date.

Original Value: The value of the property underlying a Mortgage Loan based, in the case of the purchase of the underlying Mortgaged Property, on the lower of an appraisal or the sales price of such property or, in the case of a refinancing, on an appraisal.

Outstanding: With respect to the Certificates as of any date of determination, all Certificates theretofore executed and authenticated under this Agreement except:

(a)      Certificates theretofore canceled by the Securities Administrator or delivered to the Securities Administrator for cancellation; and

(b)      Certificates in exchange for which or in lieu of which other Certificates have been executed and delivered by the Securities Administrator pursuant to this Agreement.

Outstanding Mortgage Loan: As of any date of determination, a Mortgage Loan with a Stated Principal Balance greater than zero that was not the subject of a Principal Prepayment in full, and that did not become a Liquidated Loan, prior to the end of the related Prepayment Period.

Overcollateralization Amount: With respect to any Distribution Date, the excess, if any, of the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month) over the aggregate Certificate Principal Balance of the Certificates (other than the Class C Certificates) on such Distribution Date (after taking into account the payment of principal other than any Extra Principal Distribution Amount on such Certificates).

Overcollateralization Floor: With respect to the Certificates, an amount equal to 0.50% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date.

Overcollateralization Release Amount: With respect to any Distribution Date, the lesser of (x) the Principal Funds for such Distribution Date and (y) the excess, if any, of (i) the Overcollateralization Amount for such Distribution Date (assuming that 100% of the Principal Funds is applied as a principal payment on such Distribution Date) over (ii) the Overcollateralization Target Amount for such Distribution Date (with the amount pursuant to clause (y) deemed to be $0 if the Overcollateralization Amount is less than or equal to the Overcollateralization Target Amount on that Distribution Date).

Overcollateralization Target Amount: With respect to any Distribution Date (a) prior to the Stepdown Date, 6.30% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date, (b) on or after the Stepdown Date and if a Trigger Event is not in effect, the greater of (i) the lesser of (1) 6.30% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date and (2) 12.60% of the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the prior calendar month) and (ii) the

Overcollateralization Floor or (c) on or after the Stepdown Date and if a Trigger Event is in effect, the Overcollateralization Target Amount for the immediately preceding Distribution Date.

Ownership Interest: As to any Certificate, any ownership interest in such Certificate including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial.

Pass-Through Rate: With respect to the Class A, Class M and Class B Certificates and any Distribution Date, a rate per annum equal to the least of (i) the related One-Month LIBOR Pass-Through Rate for such Distribution Date, (ii) 11.00% per annum and (iii) the related Net WAC Cap Rate for such Distribution Date.

With respect to the Class C Interest, a rate per annum equal to the percentage equivalent of a fraction, the numerator of which is (x) the sum of the amount determined for each REMIC II Regular Interest (other than REMIC II Regular Interest IO) equal to the product of (a) the excess, if any, of the Uncertificated REMIC II Pass-Through Rate for such REMIC II Regular Interest over the Marker Rate and (b) a notional amount equal to the Uncertificated Principal Balance of such REMIC II Regular Interest, and the denominator of which is (y) the aggregate Uncertificated Principal Balance of such REMIC II Regular Interests..

With respect to the Class C Certificate, the Class C Certificate shall not have a Pass-Through Rate, but Current Interest for such Certificate and each Distribution Date shall be an amount equal to 100% of the amounts distributable to the Class C Interest for such Distribution Date.

With respect to the Class IO Interest, Class IO Interest shall not have a Pass-Through Rate, but Current Interest for such interest and each Distribution Date shall be an amount equal to 100% of the amounts distributable to REMIC II Regular Interest IO for such Distribution Date.

With respect to REMIC V Regular Interest IO, REMIC V Regular Interest IO shall not have a Pass-Through Rate, but Current Interest for such Regular Interest and each Distribution Date shall be an amount equal to 100% of the amounts distributable to the Class IO Interest for such Distribution Date.

Pass-Through Transfer: Any transaction involving either (1) a sale or other transfer of mortgage loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans.

Percentage Interest: With respect to any Certificate of a specified Class, the Percentage Interest set forth on the face thereof or the percentage obtained by dividing the Denomination of such Certificate by the aggregate of the Denominations of all Certificates of such Class.

Permitted Investments: At any time, any one or more of the following obligations and securities:

(i)     obligations of the United States or any agency thereof, provided such obligations are backed by the full faith and credit of the United States;

(ii)    general obligations of or obligations guaranteed by any state of the United States or the District of Columbia receiving the highest long-term debt rating of each Rating Agency, or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the Certificates by each Rating Agency (determined without regard to the Policy), as evidenced in writing;

(iii)   commercial or finance company paper which is then receiving the highest commercial or finance company paper rating of each Rating Agency, or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the Certificates by each Rating Agency (determined without regard to the Policy), as evidenced in writing;

(iv)    certificates of deposit, demand or time deposits, or bankers' acceptances issued by any depository institution or trust company incorporated under the laws of the United States or of any state thereof and subject to supervision and examination by federal and/or state banking authorities (including the Trustee, the Master Servicer and the Securities Administrator in its commercial banking capacity), provided that the commercial paper and/or long term unsecured debt obligations of such depository institution or trust company are then rated one of the two highest long-term and the highest short-term ratings of each Rating Agency for such securities, or such lower ratings as will not result in the downgrading or withdrawal of the rating then assigned to the Certificates by each Rating Agency (determined without regard to the Policy), as evidenced in writing;

(v)     demand or time deposits or certificates of deposit issued by any bank or trust company or savings institution to the extent that such deposits are fully insured by the FDIC;

(vi)    guaranteed reinvestment agreements issued by any bank, insurance company or other corporation containing, at the time of the issuance of such agreements, such terms and conditions as will not result in the downgrading or withdrawal of the rating then assigned to the Certificates by each Rating Agency (determined without regard to the Policy), as evidenced in writing;

(vii)   repurchase obligations with respect to any security described in clauses (i) and (ii) above, in either case entered into with a depository institution or trust company (acting as principal) described in clause (v) above;

(viii)  securities (other than stripped bonds, stripped coupons or instruments sold at a purchase price in excess of 115% of the face amount thereof) bearing interest or sold at a discount issued by any corporation incorporated under

37

the laws of the United States or any state thereof which, at the time of such investment, have one of the two highest short term ratings of each Rating Agency (except if the Rating Agency is Moody's, such rating shall be the highest commercial paper rating of Moody's for any such securities), such lower rating as will not result in the downgrading or withdrawal of the rating then assigned to the Certificates by any Rating Agency, as evidenced by a signed writing delivered by each Rating Agency (determined without regard to the Policy);

(ix)    interests in any money market fund (including any such fund managed or advised by the Master Servicer or the Securities Administrator or any affiliate thereof) which at the date of acquisition of the interests in such fund and throughout the time such interests are held in such fund has the highest applicable short term rating by each Rating Agency rating such fund, such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the Certificates by each Rating Agency (determined without regard to the Policy), as evidenced in writing;

(x)    short term investment funds sponsored by any trust company or banking association incorporated under the laws of the United States or any state thereof (including any such fund managed or advised by the Trustee or the Master Servicer or the Securities Administrator or any affiliate thereof) which on the date of acquisition has been rated by each Rating Agency in their highest applicable rating category or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the Certificates by each Rating Agency (determined without regard to the Policy), as evidenced in writing; and

(xi)    such other investments having a specified stated maturity and bearing interest or sold at a discount acceptable to each Rating Agency and will not result in the downgrading or withdrawal of the rating then assigned to the Certificates by each Rating Agency, as evidenced by a signed writing delivered by each Rating Agency (determined without regard to the Policy);

provided, that no such instrument shall be a Permitted Investment if such instrument (i) evidences the right to receive interest only payments with respect to the obligations underlying such instrument, (ii) is purchased at a premium or (iii) is purchased at a deep discount; provided further that no such instrument shall be a Permitted Investment (A) if such instrument evidences principal and interest payments derived from obligations underlying such instrument and the interest payments with respect to such instrument provide a yield to maturity of greater than 120% of the yield to maturity at par of such underlying obligations, or (B) if it may be redeemed at a price below the purchase price (the foregoing clause (B) not to apply to investments in units of money market funds pursuant to clause (viii) above); provided further that no amount beneficially owned by any REMIC may be invested in investments (other than money market funds) treated as equity interests for federal income tax purposes, unless the Securities Administrator shall receive an Opinion of Counsel, at the expense of the Securities Administrator, to the effect that such investment will not adversely affect the status of any such REMIC as a REMIC under the Code or result in the imposition of a tax on any such REMIC.

Permitted Investments that are subject to prepayment or call may not be purchased at a price in excess of par.

Permitted Transferee: Any Person (x) other than (i) the United States, any State or political subdivision thereof, any possession of the United States or any agency or instrumentality of any of the foregoing, (ii) a foreign government, International Organization or any agency or instrumentality of either of the foregoing, (iii) an organization (except certain farmers' cooperatives described in section 521 of the Code) that is exempt from tax imposed by Chapter 1 of the Code (including the tax imposed by section 511 of the Code on unrelated business taxable income) on any excess inclusions (as defined in section 860E(c)(1) of the Code) with respect to any Residual Certificate, (iv) rural electric and telephone cooperatives described in section 1381(a)(2)(C) of the Code or (v) an electing large partnership within the meaning of Section 775(a) of the Code, (y) that is a citizen or resident of the United States, a corporation, partnership (other than a partnership that has any direct or indirect foreign partners) or other entity (treated as a corporation or a partnership for federal income tax purposes), created or organized in or under the laws of the United States, any State thereof or the District of Columbia, an estate whose income from sources without the United States is includible in gross income for United States federal income tax purposes regardless of its connection with the conduct of a trade or business within the United States, or a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have authority to control all substantial decisions of the trust or if it has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person and (z) other than any other Person so designated by the Securities Administrator based upon an Opinion of Counsel addressed to the Securities Administrator and the Trustee (which shall not be an expense of the Trustee or the Securities Administrator) that states that the Transfer of an Ownership Interest in a Residual Certificate to such Person may cause REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to fail to qualify as a REMIC at any time that any Certificates are Outstanding. The terms "United States," "State" and "International Organization" shall have the meanings set forth in section 7701 of the Code or successor provisions. A corporation will not be treated as an instrumentality of the United States or of any State or political subdivision thereof for these purposes if all of its activities are subject to tax and, with the exception of Freddie Mac, a majority of its board of directors is not selected by such government unit.

Person: Any individual, corporation, partnership, joint venture, association, joint- stock company, limited liability company, trust, unincorporated organization or government, or any agency or political subdivision thereof.

PHH: PHH Mortgage Corporation and any successor thereto.

PHH Assignment Agreement: The Assignment, Assumption and Recognition Agreement substantially in the form of Exhibit R-4, dated as of March 30, 2007, among EMC, the Trustee, PHH and Bishop's Gate Residential Mortgage Trust (formerly known as Cendant Mortgage Loan Trust), evidencing the assignment of the PHH Servicing Agreement to the Trust.

PHH Loans: Those Mortgage Loans subject to this Agreement which were purchased by the Seller from PHH pursuant to the PHH Servicing Agreement.

PHH Servicing Agreement: The Amended and Restated Purchase, Warranties and Servicing Agreement, dated as of March 20, 2007, among the Seller, PHH and Bishop's Gate Residential Mortgage Trust (formerly known as Cendant Mortgage Loan Trust).

Policy: The financial guaranty insurance policy (No. CA03636A) with respect to the Class A-2 Certificates and Class A-3 Certificates and all endorsements thereto, if any, dated the Closing Date, issued by the Certificate Insurer for the benefit of the Holders of the Class A-2 Certificates and Class A-3 Certificates only.

Policy Payments Account: The separate Eligible Account created and maintained by the Securities Administrator pursuant to Section 6.08 in the name of the Trustee for the benefit of the Holders of the Class A-2 Certificates and Class A-3 Certificates and designated "Citibank, N.A., as Trustee in trust for registered holders of Bear Stearns Second Lien Trust 2007-SV1, Mortgage-Backed Certificates, Series 2007-SV1, Class A-2 and Class A-3 Certificates." Funds in the Policy Payments Account shall be held in trust for the Holders of the Class A-2 Certificates and Class A-3 Certificates for the uses and purposes set forth in this Agreement and in the Insurance Agreement.

Premium: The premium due to the Certificate Insurer with respect to the Class A-2 Certificates and Class A-3 Certificates calculated based on the product of the related Premium Percentage and the Certificate Principal Balance of the Class A-2 Certificates or Class A-3 Certificates, as applicable, as of the immediately preceding Distribution Date, based on a 360-day year consisting of twelve 30-day months.

Premium Percentage: With respect to the Class A-2 Certificates, 0.130% per annum, and with respect to the Class A-3 Certificates, 0.110% per annum.

Prepayment Assumption: A prepayment rate for the Mortgage Loans of 35% CPR.

Prepayment Charge: Any prepayment premium, penalty or charge payable by a Mortgagor in connection with any Principal Prepayment on a Mortgage Loan pursuant to the terms of the related Mortgage Note.

Prepayment Charge Waiver Amount: Any amount paid by a Servicer to the Master Servicer pursuant to the related Servicing Agreement.

Prepayment Interest Shortfall: With respect to any Distribution Date, for each Mortgage Loan that was the subject of a partial Principal Prepayment during the related Prepayment Period, or a Principal Prepayment in full during the related Prepayment Period, or that became a Liquidated Loan during the prior calendar month, (other than a Principal Prepayment in full resulting from the purchase of a Mortgage Loan pursuant to Section 2.02, 2.03 or 11.01 hereof), the amount, if any, by which (i) one month's interest at the applicable Net Mortgage Rate on the Stated Principal Balance of such Mortgage Loan immediately prior to such Principal Prepayment (or liquidation) or in the case of a partial Principal Prepayment on the amount of such prepayment (or liquidation proceeds) exceeds (ii) the amount of interest paid or collected in connection with such Principal Prepayment or such liquidation proceeds less the Servicing Fee.

Prepayment Period: As to any Distribution Date and each Mortgage Loan, in accordance with the related Servicing Agreement.

Principal Distribution Amount: With respect to any Distribution Date, an amount equal to (x) the sum of (1) the Principal Funds for such Distribution Date and (2) any Extra Principal Distribution Amount for such Distribution Date minus (y) the amount of any Overcollateralization Release Amount for such Distribution Date.

Principal Funds: With respect to any Distribution Date, (1) the sum, without duplication, of (a) all scheduled principal collected on the Mortgage Loans during the related Due Period, (b) all Advances relating to principal with respect to the Mortgage Loans made on or before the Distribution Date, (c) Principal Prepayments exclusive of prepayment charges or penalties collected on the Mortgage Loans during the related Prepayment Period, (d) the Stated Principal Balance of each Mortgage Loan that was repurchased by the Seller pursuant to Sections 2.02, 2.03, (e) the aggregate of all Substitution Adjustment Amounts on the Mortgage Loans for the related Determination Date in connection with the substitution of any Mortgage Loans pursuant to Section 2.03(d), (f) all Liquidation Proceeds and Subsequent Recoveries collected on the Mortgage Loans during the prior calendar month (to the extent such Liquidation Proceeds and Subsequent Recoveries relate to principal), in each case to the extent remitted by the related Servicer to the Distribution Account pursuant to the related Servicing Agreement and (g) the principal portion of any proceeds received from the exercise of a Optional Termination, pursuant to Section 11.01, minus (2)(i) all amounts required to be reimbursed pursuant to Section 5.07 or as otherwise set forth in this Agreement and (ii) any Net Swap Payments or Swap Termination Payments (not due to a Swap Provider Trigger Event and other than to the extent already paid by the Swap Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) owed to the Swap Administrator for payment to the Swap Provider for such Distribution Date and any such payments remaining unpaid for any prior Distribution Dates, in each case to the extent not paid from Interest Funds.

Principal Prepayment: Any Mortgagor payment or other recovery of (or proceeds with respect to) principal on a Mortgage Loan (including loans purchased or repurchased under Sections 2.02, 2.03 and 11.01 hereof) that is received in advance of its scheduled Due Date and is not accompanied by an amount as to interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment. Partial Principal Prepayments shall be applied by the related Servicer, as appropriate, in accordance with the terms of the related Mortgage Note.

Private Certificates: Any of the Class A, Class M, Class B, Class X, Class C and Residual Certificates.

Private Placement Memorandum: The Confidential Private Placement Memorandum dated March 30, 2007, relating to the offering of the Offered Certificates.

Protected Account: Each account established by the related Servicer with respect to receipts on the Mortgage Loans and REO Property in accordance with the applicable Servicing Agreement. Each Protected Account shall be an Eligible Account.

41

PUD: A Planned Unit Development.

Purchase Price: With respect to any Mortgage Loan required to be purchased pursuant to the applicable provisions of this Agreement, an amount equal to the sum of (i) 100% of the principal remaining unpaid on such Mortgage Loan as of the date of purchase (including if a foreclosure has already occurred, the principal balance of the related Mortgage Loan at the time the Mortgaged Property was acquired), net of any Servicing Advances and Advances attributable to principal and payable to the purchaser of the Mortgage Loan if such purchaser is also the Servicer of such Mortgage Loan, (ii) accrued and unpaid interest thereon at the Mortgage Rate through and including the last day of the month of purchase, net of any portion of the Servicing Fee and any Servicing Advances and Advances attributable to interest that is payable to the purchaser of the Mortgage Loan if such purchaser is also the Servicer of such Mortgage Loan, plus and (iii) any costs and damages (if any) incurred by the Trust in connection with any violation of such Mortgage Loan of any anti-predatory lending laws.

QIB: A Qualified Institutional Buyer as defined in Rule 144A promulgated under the Securities Act.

Rating Agency: Each of S&P and Moody's. If any such organization or its successor is no longer in existence, "Rating Agency" shall be a nationally recognized statistical rating organization, or other comparable Person, designated by the Depositor, notice of which designation shall be given to the Trustee and the Securities Administrator. References herein to a given rating category of each Rating Agency shall mean such rating category without giving effect to any modifiers.

Realized Loss: With respect to each Mortgage Loan as to which a Final Recovery Determination has been made, an amount (not less than zero) equal to (i) the unpaid principal balance of such Mortgage Loan as of the commencement of the calendar month in which the Final Recovery Determination was made, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor or advanced through the end of the calendar month in which such Final Recovery Determination was made, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then accruing on such Mortgage Loan and (B) on a principal amount equal to the Stated Principal Balance of such Mortgage Loan as of the close of business on the Distribution Date during such calendar month, minus (iii) the proceeds, if any, received in respect of such Mortgage Loan during the calendar month in which such Final Recovery Determination was made, net of amounts that are payable therefrom to the related Servicer pursuant to the applicable Servicing Agreement which have not been previously reimbursed. With respect to each Mortgage Loan which is the subject of a Servicing Modification during the calendar month immediately preceding the related Distribution Date, the sum of (a) the total amount of interest and principal which is forgiven with respect to the related Mortgage Loan and (b) the amount of any Advances and Servicing Advances made by the Master Servicer with respect to such Mortgage Loan which are reimbursable from the Trust to the Master Servicer with respect to that Servicing Modification. In addition, to the extent the Master Servicer receives Subsequent Recoveries with respect to any Mortgage Loan, the amount of the Realized Loss with respect to that Mortgage Loan will be reduced to the extent such recoveries are distributed to any Class of Certificates or applied to increase Excess Spread on any Distribution Date pursuant to Section 6.04(b).

With respect to any REO Property as to which a Final Recovery Determination has been made, an amount (not less than zero) equal to (i) the unpaid principal balance of the related Mortgage Loan as of the date of acquisition of such REO Property on behalf of REMIC I, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor in respect of the related Mortgage Loan through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then accruing on the related Mortgage Loan and (B) on a principal amount equal to the Stated Principal Balance of the related Mortgage Loan as of the close of business on the Distribution Date during such calendar month, plus (iii) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such Final Recovery Determination was made, minus (iv) the aggregate of all unreimbursed Advances and Servicing Advances.

With respect to each Mortgage Loan which has become the subject of a Deficient Valuation, the difference between the principal balance of the Mortgage Loan outstanding immediately prior to such Deficient Valuation and the principal balance of the Mortgage Loan as reduced by the Deficient Valuation.

With respect to each Mortgage Loan which has become the subject of a Debt Service Reduction, the portion, if any, of the reduction in each affected Monthly Payment attributable to a reduction in the Mortgage Rate imposed by a court of competent jurisdiction. Each such Realized Loss shall be deemed to have been incurred on the Due Date for each affected Monthly Payment.

Record Date: With respect to any Distribution Date and the Class A, Class M and Class B Certificates, so long as such Classes of Certificates are Book-Entry Certificates, the Business Day preceding such Distribution Date, and otherwise, the close of business on the last Business Day of the month preceding the month in which such Distribution Date occurs. With respect to any Distribution Date and the Class C, Class X and Residual Certificates, the close of business on the last Business Day of the month preceding the month in which such Distribution Date occurs.

Reference Bank Rate: With respect to any Accrual Period shall mean the arithmetic mean, rounded upwards, if necessary, to the nearest whole multiple of 0.03125%, of the offered rates for United States dollar deposits for one month that are quoted by the Reference Banks as of 11:00 a.m., New York City time, on the related Interest Determination Date to prime banks in the London interbank market for a period of one month in an amount approximately equal to the aggregate Certificate Principal Balance of the Class A Certificates and Class M Certificates for such Accrual Period, provided that at least two such Reference Banks provide such rate. If fewer than two offered rates appear, the Reference Bank Rate will be the arithmetic mean, rounded upwards, if necessary, to the nearest whole multiple of 0.03125%, of the rates quoted by one or more major banks in New York City, selected by the Securities Administrator, as of 11:00 a.m., New York City time, on such date for loans in United States dollars to leading European banks for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the Class A Certificates and Class M Certificates for such Accrual Period.

Reference Banks: Shall mean leading banks selected by the Securities Administrator and engaged in transactions in Eurodollar deposits in the international Eurocurrency market (i) with an established place of business in London, (ii) which have been designated as such by the Securities Administrator and (iii) which are not controlling, controlled by, or under common control with, the Depositor, the Seller or the Master Servicer.

Regular Certificate: Any Certificate (other than a Residual Certificate or the Class X Certificate).

Regular Interest: A "regular interest" in a REMIC within the meaning of Section 860G(a)(1) of the Code.

Reimbursement Amount:  As of any Distribution Date, the sum of (x)(i) all Insured Payments and Avoided Payments paid by the Certificate Insurer, but for which the Certificate Insurer has not been reimbursed prior to such Distribution Date, plus (ii) interest accrued on such Insured Payments and Avoided Payments not previously paid calculated at the Late Payment Rate, from the date the Securities Administrator received the related Insured Payments or Avoided Payments, and (y) without duplication, (i) any amounts then due and owing to the Certificate Insurer under the Insurance Agreement or this Agreement but for which the Certificate Insurer has not been paid or reimbursed prior to such Distribution Date, plus (ii) interest on such amounts at the Late Payment Rate.

Relief Act: The Servicemembers Civil Relief Act, as amended, or any similar state or local law.

Relief Act Interest Shortfall: With respect to any Distribution Date and any Mortgage Loan, any reduction in the amount of interest collectible on such Mortgage Loan for the most recently ended Due Period as a result of the application of the Relief Act.

Remaining Excess Spread: With respect to any Distribution Date, the Excess Spread less any Extra Principal Distribution Amount.

REMIC: A "real estate mortgage investment conduit" within the meaning of section 860D of the Code.

REMIC I: The segregated pool of assets described in the Preliminary Statement and Section 6.07(a).

REMIC I Regular Interest: Any of the separate non-certificated beneficial ownership interests in REMIC I issued hereunder and designated as a Regular Interest in REMIC I. Each REMIC I Regular Interest shall accrue interest at the related Uncertificated REMIC I Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto. The designations for the respective REMIC I Regular Interests are set forth in the Preliminary Statement hereto.

REMIC II: The segregated pool of assets described in the Preliminary Statement and Section 6.07(a).

REMIC II Interest Loss Allocation Amount: With respect to any Distribution Date, an amount (subject to adjustment based on the actual number of days elapsed in the respective Accrual Period) equal to (a) the product of (i) the aggregate Stated Principal Balance of the Mortgage Loans and the related REO Properties then outstanding and (ii) the Uncertificated REMIC II Pass-Through Rate for REMIC II Regular Interest AA minus the Marker Rate, divided by (b) 12.

REMIC II Overcollateralization Amount: With respect to any date of determination, (i) 1.00% of the aggregate Uncertificated Principal Balance of the REMIC II Regular Interests (other than REMIC II Regular Interest IO) minus (ii) the aggregate Uncertificated Principal Balance of each REMIC II Regular Interest for which a Class A, Class M or Class B Certificates is a Corresponding Certificate, in each case as of such date of determination.

REMIC II Principal Loss Allocation Amount: With respect to any Distribution Date, an amount equal to the product of (i) the aggregate Stated Principal Balance of the Mortgage Loans and the related REO Properties then outstanding and (ii) 1 minus a fraction, the numerator of which is two (2) times the aggregate Uncertificated Principal Balance of each REMIC II Regular Interest for which a Class A, Class M or Class B Certificates is a Corresponding Certificate and the denominator of which is the aggregate Uncertificated Principal Balance of each REMIC II Regular Interest for which a Class A, Class M or Class B Certificates is a Corresponding Certificate and REMIC II Regular Interest ZZ.

REMIC II Regular Interest: Any of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. Each REMIC II Regular Interest shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and (other than REMIC II Regular Interest IO) shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto. The designations for the respective REMIC II Regular Interests are set forth in the Preliminary Statement hereto.

REMIC II Required Overcollateralization Amount: 1.00% of the Overcollateralization Target Amount.

REMIC III: The segregated pool of assets described in the Preliminary Statement and Section 6.07(a).

REMIC III Regular Interest: The Class C Interest, Class IO Interest or any Regular Interest in REMIC III the ownership of which is represented by any of the Class A, Class M and Class B Certificates.

REMIC IV: The segregated pool of assets consisting of the Class C Interest conveyed in trust to the Trustee, for the benefit of the Holders of the Class C Certificates and the Class RX Certificate (in respect of the Class R-4 Interest), with respect to which a separate REMIC election is to be made.

REMIC V: The segregated pool of assets consisting of the Class IO Interest conveyed in trust to the Trustee, for the benefit of the holders of REMIC V Regular Interest IO and the Class RX Certificate (in respect of the Class R-5 Interest), with respect to which a separate REMIC election is to be made.

REMIC Opinion: Shall mean an Opinion of Counsel to the effect that the proposed action will not cause any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to fail to qualify as a REMIC at any time that any Certificates are outstanding.

REMIC Provisions: Provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Sections 860A through 860G of the Code, and related provisions, and proposed, temporary and final regulations and published rulings, notices and announcements promulgated thereunder, as the foregoing may be in effect from time to time, as well as provisions of applicable state laws.

REMIC Regular Interests: The REMIC I Regular Interests and REMIC II Regular Interests.

Remittance Date: Shall mean the Business Day as specified in the related Servicing Agreement.

Remittance Report: Shall mean a report to the Securities Administrator in an electronic format (or by such other means as the Master Servicer and the Securities Administrator may agree from time to time) containing such data and information, as agreed to by the Master Servicer and the Securities Administrator such as to permit the Securities Administrator to prepare the Monthly Statement to Certificateholders.

REO Imputed Interest: As to any REO Property, for any calendar month during which such REO Property was at any time part of REMIC I, one month's interest at the applicable Net Mortgage Rate on the Stated Principal Balance of such REO Property (or, in the case of the first such calendar month, of the related Mortgage Loan, if appropriate) as of the close of business on the Distribution Date in such calendar month.

REO Property: A Mortgaged Property acquired by the related Servicer on behalf of the Trust Fund through foreclosure or deed-in-lieu of foreclosure in connection with a defaulted Mortgage Loan.

Replacement Mortgage Loan: A Mortgage Loan or Mortgage Loans in the aggregate substituted by the Seller for a Deleted Mortgage Loan, which must, on the date of such substitution, as confirmed in a Request for Release, (i) have a Stated Principal Balance, after deduction of the principal portion of the Scheduled Payment due in the month of substitution, not in excess of, and not less than 90% of, the Stated Principal Balance of the Deleted Mortgage Loan; (ii) have a fixed Mortgage Rate not less than or more than 1% per annum higher than the Mortgage Rate of the Deleted Mortgage Loan; (iii) have the same or higher credit quality characteristics than that of the Deleted Mortgage Loan; (iv) have a Combined Loan-to-Value Ratio no higher than that of the Deleted Mortgage Loan; (v) have a remaining term to maturity no greater than (and not more than one year less than) that of the Deleted Mortgage Loan; (vi) not permit conversion of the Mortgage Rate from a fixed rate to a variable rate; (vii) have the

same lien priority as the Deleted Mortgage Loan; (viii) constitute the same occupancy type as the Deleted Mortgage Loan or be owner occupied; (ix) comply with each representation and warranty set forth in Section 7 of the Mortgage Loan Purchase Agreement and (x) the Custodian has delivered a Final Certification noting no defects or exceptions.

Request for Release: The Request for Release to be submitted by the Seller, a Servicer or the Master Servicer to the Custodian substantially in the form of Exhibit G hereto or other form attached as an exhibit to the Custodial Agreement. Each Request for Release furnished to the Custodian by the Seller, a Servicer or the Master Servicer shall be in duplicate and shall be executed by an officer of such Person or a Servicing Officer (or, if furnished electronically to the Custodian, shall be deemed to have been sent and executed by an officer of such Person or a Servicing Officer) of the Seller, such Servicer or the Master Servicer, as applicable.

Required Insurance Policy: With respect to any Mortgage Loan, any insurance policy that is required to be maintained from time to time under this Agreement or the related Servicing Agreement.

Reserve Fund: Shall mean the separate trust account created and maintained by the Securities Administrator pursuant to Section 4.12 hereof.

Reserve Fund Deposit: With respect to the Reserve Fund, an amount equal to $5,000, which the Depositor shall initially deposit into the Reserve Fund pursuant to Section 4.12 hereof.

Residual Certificates: The Class R-1, Class R-2, Class R-3 and Class RX Certificates (representing ownership of the Class R-4 Interest and Class R-5 Interest), each evidencing the sole class of Residual Interests in the related REMIC.

Residual Interest: The sole class of Residual Interests in a REMIC within the meaning of Section 860G(a)(2) of the Code.

Responsible Officer: With respect to the Trustee and the Securities Administrator, any Vice President, any Assistant Vice President, the Secretary, any Assistant Secretary, or any Trust Officer in its respective Corporate Trust Office with specific responsibility for the transactions contemplated hereby, any other officer customarily performing functions similar to those performed by any of the above designated officers or other officers of the Trustee or the Securities Administrator as specified by the Trustee or the Securities Administrator, respectively, as to whom, with respect to a particular matter, such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

S&P: Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

Scheduled Payment: The scheduled monthly payment on a Mortgage Loan due on any Due Date allocable to principal and/or interest on such Mortgage Loan.

Securities Act: The Securities Act of 1933, as amended, and the rules and regulations thereunder.

Securities Administrator: Wells Fargo Bank, National Association, in its capacity as securities administrator, transfer agent and paying agent hereunder, and its successors and assigns.

Seller: EMC in its capacity as seller of the Mortgage Loans to the Depositor.

Senior Certificates: The Class A Certificates.

Servicer: GMACM or PHH.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable legal fees) incurred in the performance by the Servicers of their servicing obligations hereunder or under the related Servicing Agreement, including, but not limited to, the cost of (i) the preservation, restoration and protection of a Mortgaged Property, (ii) any enforcement or judicial proceedings, including foreclosures, and including any expenses incurred in relation to any such proceedings that result from the Mortgage Loan being registered in the MERS® System, and (iii) the management and liquidation of any REO Property (including, without limitation, realtor's commissions).

Servicing Agreement: Any of the GMACM Servicing Agreement or the PHH Servicing Agreement.

Servicing Fee: As to each Mortgage Loan and any Distribution Date, an amount equal to $1/12^{th}$ of the Servicing Fee Rate multiplied by the unpaid principal balance of each Mortgage Loan payable solely from interest collections, as of the Due Date in the month preceding the month in which such Distribution Date occurs.

Servicing Fee Rate: An amount ranging from 0.4000% per annum to 0.5000% per annum, each as set forth in the Mortgage Loan Schedule.

Servicing Modification: With respect to any Mortgage Loan that is in default or, in the reasonable judgment of the related Servicer, as to which default is reasonably foreseeable, any modification which is effected by the related Servicer in accordance with the terms of the applicable Servicing Agreement which results in any change in the outstanding Stated Principal Balance, any change in the Mortgage Rate or any extension of the term of such Mortgage Loan.

Servicing Officer: Any officer of a Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans, as to which evidence reasonably acceptable to the Master Servicer or the Trustee, of due authorization, by such party has been furnished from time to time to the Master Servicer or the Trustee.

Simple Interest Loans: The Mortgage Loans that provide for monthly payments to be allocated to principal and interest according to the daily simple interest method.

Simple Interest Shortfall Advance: Any Advance made by the related Servicer in connection with a Simple Interest Loan resulting from any shortfall in the amount of any Scheduled Payment applied to interest on the Simple Interest Loan due to the payment by the

related Mortgagor of the Scheduled Payment less than one month after payment of the preceding Scheduled Payment.

Sixty-Day Plus Delinquency Percentage: With respect to any Distribution Date, is the arithmetic average for each of the three successive Distribution Dates ending with the applicable Distribution Date of the percentage equivalent of a fraction, the numerator of which is the aggregate Stated Principal Balance of the Mortgage Loans that are 60 or more days Delinquent in the payment of principal or interest for the relevant Distribution Date, including any Mortgage Loans in foreclosure, REO and Mortgage Loans with a related Mortgagor subject to bankruptcy proceedings, and the denominator of which is the aggregate Stated Principal Balance of all of the Mortgage Loans immediately preceding such Distribution Date.

Seller: EMC.

Startup Day: The Startup Day for each REMIC formed hereunder shall be the Closing Date.

Stated Principal Balance: With respect to any Mortgage Loan or related REO Property and any Distribution Date, the Cut-off Date Principal Balance thereof minus the sum of (i) the principal portion of the Scheduled Payments due with respect to such Mortgage Loan during each Due Period ending prior to such Distribution Date (and irrespective of any delinquency in their payment), (ii) all Principal Prepayments with respect to such Mortgage Loan received prior to or during the related Prepayment Period (iii) all Liquidation Proceeds to the extent applied by the related Servicer as recoveries of principal in accordance with the applicable Servicing Agreement with respect to such Mortgage Loan, that were received by the related Servicer as of the close of business on the last day of the calendar month immediately preceding such Distribution Date and (iv) any Realized Losses on such Mortgage Loan incurred during the prior calendar month. The Stated Principal Balance of a Liquidated Loan equals zero.

Stepdown Date: The earlier to occur of, (I) the first Distribution Date following the Distribution Date for which the Certificate Principal Balance for each of the Class A Certificates has been reduced to zero, and (II) the later to occur of (a) the Distribution Date in April 2010 or (b) the first Distribution Date on which the Current Specified Enhancement Percentage is greater than or equal to 53.90%.

Subordinated Certificates: The Class M, Class B, Class C and Residual Certificates.

Subsequent Recoveries: Subsequent recoveries (including collections received after charge-off or liquidation except to the extent such Mortgage Loans have been removed from the Trust Fund), net of reimbursable expenses with respect to the related Mortgage Loan that has been previously liquidated and that resulted in a Realized Loss.

Substitution Adjustment Amount: The meaning ascribed to such term pursuant to Section 2.03(d).

Successor Master Servicer: The meaning ascribed to such term pursuant to Section 8.06.

<u>Supplemental Interest Trust</u>: The corpus of a trust created pursuant to Section 4.12 of this Agreement and designated as the "Supplemental Interest Trust," consisting of the Swap Agreement, the Swap Administration Agreement, the Swap Account and REMIC V Regular Interest IO. For the avoidance of doubt, the Supplemental Interest Trust, the Swap Agreement, the Swap Account and the Swap Administration Agreement do not constitute parts of the Trust Fund or any REMIC.

<u>Supplemental Interest Trust Trustee</u>: Wells Fargo Bank, National Association, not in its individual capacity but solely in its capacity as Supplemental Interest Trust Trustee and any successor thereto, and any corporation or national banking association resulting from or surviving any consolidation or merger to which it or its successors may be a party and any successor Supplemental Interest Trust Trustee as may from time to time be serving as successor Supplemental Interest Trust Trustee.

<u>Swap Account</u>: The separate trust account created and maintained by the Swap Administrator, and held within the Supplemental Interest Trust, pursuant to the Swap Administration Agreement.

<u>Swap Administrator</u>: Wells Fargo Bank, National Association, not in its individual capacity, but solely as swap administrator under the Swap Administration Agreement.

<u>Swap Administration Agreement</u>: The Swap Administration Agreement, dated March 30, 2007, pursuant to which the Swap Administrator will make payments to the Swap Provider and the Class A, Class M and Class B Certificateholders, and certain other payments, as such agreement may be amended or supplemented from time to time.

<u>Swap Agreement</u>: The interest rate swap agreement, dated as of March 30, 2007, between the Supplemental Interest Trust Trustee and the Swap Provider, including any schedule, confirmations, credit support annex or other credit support document relating thereto, and attached hereto as Exhibit N.

<u>Swap Credit Support Annex</u>:  The credit support annex, dated as of March 30, 2007, between the Supplemental Interest Trust Trustee and the Swap Provider, which is annexed to and forms part of the Swap Agreement.

<u>Swap LIBOR</u>: For any Distribution Date, a per annum rate equal to the Floating Rate Option (as defined in the Swap Agreement) for the related Calculation Period (as defined in the Swap Agreement).

<u>Swap Optional Termination Payment</u>: As defined in Section 11.01.

<u>Swap Provider</u>: The swap provider under the Swap Agreement. Initially, the Swap Provider shall be Wachovia Bank, National Association.

<u>Swap Provider Trigger Event</u>: With respect to any Distribution Date, (i) an Event of Default under the Swap Agreement with respect to which the Swap Provider is a Defaulting Party, (ii) a Termination Event under the Swap Agreement with respect to which the Swap

Provider is the sole Affected Party, or (iii) an Additional Termination Event under the Swap Agreement with respect to which the Swap Provider is the sole Affected Party.

Swap Termination Payment: Upon the designation of an "Early Termination Date" as defined in the Swap Agreement, the payment to be made by the Swap Administrator to the Swap Provider from payments from the Trust Fund, or by the Swap Provider to the Swap Administrator for payment to the Trust Fund, as applicable, pursuant to the terms of the Swap Agreement.

Tax Matters Person: The person designated as "tax matters person" in the manner provided under Treasury Regulation Sections 1.860F-4(d) and 301.6231(a)(7)-1T. The holder of the greatest Percentage Interest in a Class of Residual Certificates shall be the Tax Matters Person for the related REMIC. The Securities Administrator, or any successor thereto or assignee thereof, shall serve as tax administrator hereunder and as agent for the related Tax Matters Person.

Transfer: Any direct or indirect transfer or sale of any Ownership Interest in a Certificate.

Transferee Affidavit: As defined in Section 7.02(c)(ii).

Transferor Affidavit: As defined in Section 7.02(c)(ii)..

Trigger Event: With respect to any Distribution Date, a "Trigger Event" shall have occurred if any of the following tests is not satisfied: (i) the 60 Day Plus Delinquency Percentage is less than 14.84% of the Current Specified Enhancement Percentage, or (ii) (A) for any Distribution Date from and including the Distribution Date in April 2009 to and including the Distribution Date in March 2010, the Cumulative Realized Loss Percentage for such Distribution Date is less than 3.00% plus an additional 1/12th of 2.75% for each Distribution Date thereafter up to and including the Distribution Date in March 2010, (B) for any Distribution Date from and including the Distribution Date in April 2010 to and including the Distribution Date in March 2011, the Cumulative Realized Loss Percentage for such Distribution Date is less than 5.75% plus an additional 1/12th of 2.00% for each Distribution Date thereafter up to and including the Distribution Date in March 2011, (C) for any Distribution Date from and including the Distribution Date in April 2011 to and including the Distribution Date in March 2012, the Cumulative Realized Loss Percentage for such Distribution Date is less than 7.75% plus an additional 1/12th of 1.25% for each Distribution Date thereafter up to and including the Distribution Date in March 2012, (D) for any Distribution Date from and including the Distribution Date in April 2012 to and including the Distribution Date in March 2013, the Cumulative Realized Loss Percentage for such Distribution Date is less than 9.00% plus an additional 1/12th of 0.50% for each Distribution Date thereafter up to and including the Distribution Date in March 2013, and (E) for any Distribution Date thereafter, the Cumulative Realized Loss Percentage for such Distribution Date is less than 9.50%.

Trust: As defined in Section 2.07.

Trust Fund: The corpus of the trust created hereunder consisting of (i) the Mortgage Loans and all interest accruing and principal due with respect thereto after the Cut-off Date to the extent not applied in computing the Cut-off Date Principal Balance thereof; (ii) the Distribution

Account maintained by the Securities Administrator, the Reserve Fund, the Policy Payments Account and the Protected Accounts maintained by each Servicer and all amounts deposited therein pursuant to the applicable provisions of the Servicing Agreements; (iii) property that secured a Mortgage Loan and has been acquired by foreclosure, deed in lieu of foreclosure or otherwise; (iv) the mortgagee's rights under the Insurance Policies with respect to the Mortgage Loans; (v) the Servicing Agreements and the Assignment Agreements; (vi) the rights under the Swap Administration Agreement; (vii) the rights under the Mortgage Loan Purchase Agreement; (viii) for the benefit of the Class A-2 Certificates and Class A-3 Certificates only, the Policy; and (ix) all proceeds of the foregoing, including proceeds of conversion, voluntary or involuntary, of any of the foregoing into cash or other liquid property. The Reserve Fund shall constitute an asset of the Trust Fund but will not be included in REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V.

Trustee: Citibank, N.A., a national banking association, as trustee for the benefit of the Certificateholders and the Certificate Insurer under this Agreement, and any successor thereto, and any corporation or national banking association resulting from or surviving any consolidation or merger to which it or its successors may be a party and any successor trustee as may from time to time be serving as successor trustee hereunder.

Uncertificated Accrued Interest: With respect to each REMIC Regular Interest on each Distribution Date, an amount equal to one month's interest at the related Uncertificated Pass-Through Rate on the related Uncertificated Principal Balance or related Uncertificated Notional Amount of such REMIC Regular Interest. In each case, Uncertificated Accrued Interest will be reduced by any Prepayment Interest Shortfalls and Relief Act Interest Shortfalls (allocated to such REMIC Regular Interests as set forth in Section 1.02).

Uncertificated Notional Amount: With respect to REMIC III Regular Interest C and any Distribution Date, an amount equal to the aggregate Uncertificated Principal Balance of the REMIC II Regular Interests for such Distribution Date.

With respect to the Class C Interest and any Distribution Date, an amount equal to the aggregate Uncertificated Principal Balance of the REMIC II Regular Interests for such Distribution Date.

With respect to REMIC II Regular Interest IO and each Distribution Date listed below, the aggregate Uncertificated Principal Balance of the REMIC I Regular Interests ending with the designation "A" listed below:

| DISTRIBUTION DATE | REMIC I REGULAR INTERESTS |
|---|---|
| 1 | I-1-A THROUGH I-45-A |
| 2 | I-2-A THROUGH I-45-A |
| 3 | I-3-A THROUGH I-45-A |
| 4 | I-4-A THROUGH I-45-A |
| 5 | I-5-A THROUGH I-45-A |
| 6 | I-6-A THROUGH I-45-A |
| 7 | I-7-A THROUGH I-45-A |
| 8 | I-8-A THROUGH I-45-A |
| 9 | I-9-A THROUGH I-45-A |
| 10 | I-10-A THROUGH I-45-A |
| 11 | I-11-A THROUGH I-45-A |
| 12 | I-12-A THROUGH I-45-A |
| 13 | I-13-A THROUGH I-45-A |
| 14 | I-14-A THROUGH I-45-A |
| 15 | I-15-A THROUGH I-45-A |
| 16 | I-16-A THROUGH I-45-A |
| 17 | I-17-A THROUGH I-45-A |
| 18 | I-18-A THROUGH I-45-A |
| 19 | I-19-A THROUGH I-45-A |
| 20 | I-20-A THROUGH I-45-A |
| 21 | I-21-A THROUGH I-45-A |
| 22 | I-22-A THROUGH I-45-A |
| 23 | I-23-A THROUGH I-45-A |
| 24 | I-24-A THROUGH I-45-A |
| 25 | I-25-A THROUGH I-45-A |
| 26 | I-26-A THROUGH I-45-A |
| 27 | I-27-A THROUGH I-45-A |
| 28 | I-28-A THROUGH I-45-A |
| 29 | I-29-A THROUGH I-45-A |
| 30 | I-30-A THROUGH I-45-A |
| 31 | I-31-A THROUGH I-45-A |
| 32 | I-32-A THROUGH I-45-A |
| 33 | I-33-A THROUGH I-45-A |
| 34 | I-34-A THROUGH I-45-A |
| 35 | I-35-A THROUGH I-45-A |
| 36 | I-36-A THROUGH I-45-A |
| 37 | I-37-A THROUGH I-45-A |
| 38 | I-38-A THROUGH I-45-A |
| 39 | I-39-A THROUGH I-45-A |
| 40 | I-40-A THROUGH I-45-A |
| 41 | I-41-A THROUGH I-45-A |
| 42 | I-42-A THROUGH I-45-A |
| 43 | I-43-A THROUGH I-45-A |
| 44 | I-44-A THROUGH I-45-A |
| 45 | I-45-A |
| THEREAFTER | $0.00 |

With respect to the Class IO Interest and any Distribution Date, an amount equal to the Uncertificated Notional Amount of the REMIC II Regular Interest IO. With respect to REMIC V Regular Interest IO, an amount equal to the Uncertificated Notional Amount of the Class IO Interest.

Uncertificated Pass-Through Rate: The Uncertificated REMIC I Pass-Through Rate or Uncertificated REMIC II Pass-Through Rate.

Uncertificated Principal Balance: The amount of REMIC Regular Interests and Class C Interest outstanding as of any date of determination. As of the Closing Date, the Uncertificated

Principal Balance of each REMIC Regular Interest and Class C Interest shall equal the amount set forth in the Preliminary Statement hereto as its initial uncertificated principal balance. On each Distribution Date, the Uncertificated Principal Balance of the REMIC Regular Interests shall be reduced by all distributions of principal made on such REMIC Regular Interests on such Distribution Date pursuant to Section 6.07 and, if and to the extent necessary and appropriate, shall be further reduced on such Distribution Date by Realized Losses as provided in Section 6.05, and the Uncertificated Principal Balance of REMIC II Regular Interest ZZ shall be increased by interest deferrals as provided in Section 6.07(c)(1)(ii). The Uncertificated Principal Balance of each REMIC Regular Interest and Class C Interest shall never be less than zero. With respect to the Class C Interest as of any date of determination, an amount equal to the excess, if any, of (A) the then aggregate Uncertificated Principal Balance of the REMIC II Regular Interests over (B) the then aggregate Certificate Principal Balance of the Class A, Class M and Class B Certificates then outstanding.

Uncertificated REMIC I Pass-Through Rate: With respect to each REMIC I Regular Interest ending with the designation "A" and any Distribution Date, a per annum rate equal to the weighted average Net Mortgage Rate of the Mortgage Loans multiplied by 2, subject to a maximum rate of 9.8930%. With respect to each REMIC I Regular Interest ending with the designation "B" and any Distribution Date, the greater of (x) a per annum rate equal to the excess, if any, of (1) 2 multiplied by the weighted average Net Mortgage Rate of the Mortgage Loans over (2) 9.8930% and (y) 0.00% per annum.

Uncertificated REMIC II Pass-Through Rate: With respect to REMIC II Regular Interest AA, each REMIC II Regular Interest for which a Class A, Class M or Class B Certificate is a Corresponding Certificate and REMIC II Regular Interest ZZ, and any Distribution Date, a per annum rate equal to the weighted average of (x) the Uncertificated REMIC I Pass-Through Rates for the REMIC I Regular Interests ending with the designation "B" for such Distribution Date and (y) the rates listed below for the REMIC I Regular Interests ending with the designation "A" for such Distribution Date, in each case weighted on the basis of the Uncertificated Principal Balances of each such REMIC I Regular Interest for such Distribution Date:

| DISTRIBUTION DATE | REMIC I REGULAR INTEREST | RATE |
|---|---|---|
| 1 | I-1-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 2 | I-2-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 3 | I-3-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-2-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 4 | I-4-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-3-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 5 | I-5-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-4-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 6 | I-6-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-5-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 7 | I-7-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-6-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 8 | I-8-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-7-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 9 | I-9-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-8-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 10 | I-10-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-9-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 11 | I-11-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-10-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 12 | I-12-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-11-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 13 | I-13-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-12-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 14 | I-14-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-13-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 15 | I-15-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-14-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 16 | I-16-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-15-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 17 | I-17-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-16-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 18 | I-18-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-17-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 19 | I-19-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-18-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 20 | I-20-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-19-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 21 | I-21-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-20-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 22 | I-22-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| | I-1-A THROUGH I-21-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 23 | I-23-A THROUGH I-45-A | 2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |

| | | |
|---|---|---|
| 24 | I-1-A THROUGH I-22-A<br>I-24-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 25 | I-1-A THROUGH I-23-A<br>I-25-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 26 | I-1-A THROUGH I-24-A<br>I-26-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 27 | I-1-A THROUGH I-25-A<br>I-27-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 28 | I-1-A THROUGH I-26-A<br>I-28-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 29 | I-1-A THROUGH I-27-A<br>I-29-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 30 | I-1-A THROUGH I-28-A<br>I-30-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 31 | I-1-A THROUGH I-29-A<br>I-31-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 32 | I-1-A THROUGH I-30-A<br>I-32-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 33 | I-1-A THROUGH I-31-A<br>I-33-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 34 | I-1-A THROUGH I-32-A<br>I-34-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 35 | I-1-A THROUGH I-33-A<br>I-35-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 36 | I-1-A THROUGH I-34-A<br>I-36-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 37 | I-1-A THROUGH I-35-A<br>I-37-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 38 | I-1-A THROUGH I-36-A<br>I-38-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 39 | I-1-A THROUGH I-37-A<br>I-39-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 40 | I-1-A THROUGH I-38-A<br>I-40-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 41 | I-1-A THROUGH I-39-A<br>I-41-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 42 | I-1-A THROUGH I-40-A<br>I-42-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 43 | I-1-A THROUGH I-41-A<br>I-43-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 44 | I-1-A THROUGH I-42-A<br>I-44-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| 45 | I-1-A THROUGH I-43-A<br>I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>2 MULTIPLIED BY SWAP LIBOR, SUBJECT TO A MAXIMUM<br>RATE OF UNCERTIFICATED REMIC I PASS-THROUGH RATE |
| THEREAFTER | I-1-A THROUGH I-44-A<br>I-1-A THROUGH I-45-A | UNCERTIFICATED REMIC I PASS-THROUGH RATE<br>UNCERTIFICATED REMIC I PASS-THROUGH RATE |

56

With respect to REMIC II Regular Interest IO and any Distribution Date, a per annum rate equal to the excess, if any, of (x) the weighted average of the Uncertificated REMIC I Pass-Through Rates for the REMIC I Regular Interests ending with the designation "A" for such Distribution Date, over (y) the weighted average of 2 multiplied by Swap LIBOR on the REMIC I Regular Interests ending with the designation "A", subject to a maximum rate of the Uncertificated REMIC I Pass-Through Rate for each such REMIC I Regular Interest for such Distribution Date, in each case, weighted on the basis of the Uncertificated Principal Balances of each such REMIC I Regular Interest for such Distribution Date.

Unpaid Realized Loss Amount: With respect to the Class A Certificates and as to any Distribution Date is the excess of Applied Realized Loss Amounts with respect to such Class over the sum of all distributions in reduction of the Applied Realized Loss Amounts on all previous Distribution Dates. Any amounts distributed to the Class A Certificates in respect of any Unpaid Realized Loss Amount shall not be applied to reduce the Certificate Principal Balance of such Class.

Voting Rights: The portion of the voting rights of all the Certificates that is allocated to any Certificate for purposes of the voting provisions hereunder. Voting Rights shall be allocated (i) 92% to the Class A, Class M and Class B Certificates, (ii) 3% to the Class C Certificates until paid in full, (iii) 1% to each of the Class X, Class R-1, Class R-2, Class R-3 and Class RX Certificates, with the allocation among the Certificates (other than the Class X, Class C and Residual Certificates) to be in proportion to the Certificate Principal Balance of each Class relative to the Certificate Principal Balance of all other such Classes. Voting Rights will be allocated among the Certificates of each such Class in accordance with their respective Percentage Interests. The Certificate Insurer shall have the right to vote on behalf of the Class A-2 Certificates and Class A-3 Certificates for so long as there is no continuing Certificate Insurer Default.

Wells Fargo: Wells Fargo Bank, National Association, and any successor in interest.

Section 1.02    Allocation of Certain Interest Shortfalls.

For purposes of calculating the amount of Current Interest for the Class A, Class M, Class B and Class C Certificates for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the related Servicer pursuant to the related Servicing Agreement or the Master Servicer pursuant to Section 6.02) and any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated first, to the Class C Interest based on, and to the extent of, one month's interest at the then applicable Pass-Through Rate on the Uncertificated Notional Amount thereof, and thereafter, among the Class A, Class M and Class B Certificates, in each case on a *pro rata* basis based on, and to the extent of, one month's interest at the then applicable respective Pass-Through Rates on the respective Certificate Principal Balances of each such Certificate.

For purposes of calculating the amount of Uncertificated Accrued Interest for the REMIC I Regular Interests for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the related Servicer pursuant to the related Servicing Agreement or the Master Servicer pursuant to Section 6.02) and any Relief Act

57

Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated first, to REMIC Regular Interests ending with the designation "B", *pro rata*, based on, and to the extent of, one month's interest at the then applicable respective Uncertificated REMIC I Pass-Through Rates on the respective Uncertificated Principal Balances of each such REMIC I Regular Interest, and then, to REMIC I Regular Interests ending with the designation "A", *pro rata*, based on, and to the extent of, one month's interest at the then applicable respective Uncertificated REMIC I Pass-Through Rates on the respective Uncertificated Principal Balances of each such REMIC I Regular Interest.

For purposes of calculating the amount of Uncertificated Accrued Interest for the REMIC II Regular Interests (other than REMIC II Regular Interest IO) for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Master Servicer pursuant to Section 6.02) and any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated first, to Uncertificated Accrued Interest payable to REMIC II Regular Interest AA and REMIC II Regular Interest ZZ up to an aggregate amount equal to the REMIC II Interest Loss Allocation Amount, 98% and 2%, respectively, and thereafter, among REMIC II Regular Interest AA, each REMIC II Regular Interest for which a Class A, Class M or Class B Certificate is a Corresponding Certificate and REMIC II Regular Interest ZZ, *pro rata*, based on, and to the extent of, one month's interest at the then applicable respective Uncertificated REMIC II Pass-Through Rates on the respective Uncertificated Principal Balances of each such REMIC II Regular Interest.

## ARTICLE II

## CONVEYANCE OF TRUST FUND
## REPRESENTATIONS AND WARRANTIES

Section 2.01    Conveyance of Trust Fund.

Pursuant to the Mortgage Loan Purchase Agreement, the Seller sold, transferred, assigned, set over and otherwise conveyed to the Depositor, without recourse, all the right, title and interest of the Seller in and to the assets sold by it in the Trust Fund.

The Seller has entered into this Agreement in consideration for the purchase of the Mortgage Loans by the Depositor pursuant to the Mortgage Loan Purchase Agreement and has agreed to take the actions specified herein.

The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the use and benefit of the Certificateholders and the Certificate Insurer, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund.    In addition, on or prior to the Closing Date, the Depositor shall cause the Certificate Insurer to deliver the Policy to the Securities Administrator.

In connection with such sale, the Depositor has delivered to, and deposited with, or caused to be delivered to and deposited with, the Trustee or the Custodian, as its agent, the following documents or instruments with respect to each Mortgage Loan so assigned: (i) the original Mortgage Note, including any riders thereto, endorsed without recourse (A) in blank or to order of "Citibank, N.A., as Trustee for Certificateholders of Bear Stearns Second Lien Trust 2007-SV1, Mortgage-Backed Certificates, Series 2007-SV1," or (B) in the case of a loan registered on the MERS system, in blank and showing an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Trustee, (ii) the original Mortgage and, if the related Mortgage Loan is a MOM Loan, noting the presence of the MIN and language indicating that such Mortgage Loan is a MOM Loan, which shall have been recorded (or, for Mortgage Loans, if the original is not available, a copy), with evidence of such recording indicated thereon (or if clause (x) in the proviso below applies, shall be in recordable form), (iii) unless the Mortgage Loan is either a MOM Loan or has been assigned in the name of MERS®, the assignment (either an original or a copy, which may be in the form of a blanket assignment if permitted in the jurisdiction in which the Mortgaged Property is located) to the Trustee of the Mortgage with respect to each Mortgage Loan in the name of "Citibank, N.A., as Trustee for Certificateholders of Bear Stearns Second Lien Trust 2007-SV1, Mortgage-Backed Certificates, Series 2007-SV1," which shall have been recorded (or if clause (x) in the proviso below applies, shall be in recordable form), (iv) an original or a copy of all intervening assignments of the Mortgage, if any, with evidence of recording thereon, (v) except in the case where only title searches were conducted on the related Mortgaged Property, the original mortgagee policy of title insurance, including riders and endorsements thereto, or if the policy has not yet been issued, (a) a written commitment or interim binder for title issued by the title insurance or escrow company dated as of the date the related Mortgage Loan was funded, with a statement by the title insurance company, or closing attorney that the priority of the lien of the related Mortgage during the period between the date of the funding of the related Mortgage Loan and the date of

59

the related title policy (which title policy shall be dated the date of recording of the related Mortgage) is insured or (b) a preliminary title report issued by a title insurer in anticipation of issuing a title insurance policy which evidences existing liens and gives a preliminary opinion as to the absence of any encumbrance on title to the Mortgaged Property, except liens to be removed on or before purchase by the Mortgagor or which constitute customary exceptions acceptable to lenders generally, and (vi) originals or copies of all available assumption, modification or substitution agreements, if any; provided, however, that in lieu of the foregoing, the Seller may deliver the following documents, under the circumstances set forth below: (x) in lieu of the original Mortgage, assignment thereof to the Trustee or intervening assignments thereof have been delivered or are being delivered to recording offices for recording and have not been returned in time to permit their delivery as specified above, the Depositor may deliver, or cause to be delivered, a true copy thereof with a certification by such Seller or the title company issuing the commitment for title insurance, on the face of such copy, substantially as follows: "Certified to be a true and correct copy of the original, which has been transmitted for recording"; (y) in lieu of the original Mortgage, assignment to the Trustee or in blank or intervening assignments thereof, if the applicable jurisdiction retains the originals of such documents (as evidenced by a certification from the Depositor to such effect) the Depositor may deliver, or cause to be delivered, photocopies of such documents containing an original certification by the judicial or other governmental authority of the jurisdiction where such documents were recorded; and (z) in lieu of the Mortgage Notes relating to the Mortgage Loans identified in the list set forth in Exhibit I, the Depositor may deliver, or cause to be delivered, a lost note affidavit and indemnity and a copy of the original note, if available; and provided, further, however, that in the case of Mortgage Loans which have been prepaid in full after the Cut-off Date and prior to the Closing Date, the Depositor, in lieu of delivering the above documents, may deliver, or cause to be delivered, to the Trustee and the Custodian a certification of a Servicing Officer to such effect and in such case shall deposit all amounts paid in respect of such Mortgage Loans, in the Distribution Account on the Closing Date. In the case of the documents referred to in clause (x) above, the Depositor shall deliver, or cause to be delivered, such documents to the Trustee or the Custodian promptly after they are received. The Seller shall cause, at its expense, the Mortgage and intervening assignments, if any, and to the extent required in accordance with the foregoing, the assignment of the Mortgage to the Trustee to be submitted for recording promptly after the Closing Date; provided that the Seller need not cause to be recorded (a) any assignment in any jurisdiction under the laws of which, as evidenced by an Opinion of Counsel addressed to the Trustee delivered by the Seller to the Trustee, the Custodian, the Certificate Insurer and each Rating Agency, the recordation of such assignment is not necessary to protect the Trustee's interest in the related Mortgage Loan or (b) if MERS is identified on the Mortgage or on a properly recorded assignment of the Mortgage as the mortgagee of record solely as nominee for the Seller and its successors and assigns. In the event that either Seller, the Depositor or the Master Servicer or the Securities Administrator gives written notice to the Trustee that a court has recharacterized the sale of the Mortgage Loans as a financing, the Seller shall submit or cause to be submitted for recording as specified above each such previously unrecorded assignment to be submitted for recording as specified above at the expense of the Trust. In the event a Mortgage File is released to the related Servicer as a result of such Person having completed a Request for Release, the Custodian shall, if not so completed, complete the assignment of the related Mortgage in the manner specified in clause (iii) above.

In connection with the assignment of any Mortgage Loan registered on the MERS® System, the Seller further agrees that it will cause, at the Seller's own expense, within 30 days after the Closing Date, the MERS® System to indicate that such Mortgage Loans have been assigned by the Seller to the Depositor and by the Depositor to the Trustee in accordance with this Agreement for the benefit of the Certificateholders and the Certificate Insurer by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field "Pool Field" which identifies the series of the Certificates issued in connection with such Mortgage Loans. The Seller further agrees that it will not, and will not permit the Master Servicer to, and the Master Servicer agrees that it will not, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement or the Mortgage Loan Purchase Agreement.

All original documents relating to the Mortgage Loans that are not delivered to the Trustee or the Custodian on its behalf are and shall be held by or on behalf of the Seller or the Depositor, as the case may be, in trust for the benefit of the Trustee on behalf of the Certificateholders and the Certificate Insurer. Any such original document delivered to or held by the Depositor, shall be delivered promptly to the Custodian on the Trustee's behalf.

Whenever it is provided for in this Agreement that any document, evidence or information relating to a Mortgage Loan to be included in a Mortgage File be delivered or supplied to the Trustee, such delivery or supply shall be made to the Custodian pursuant to the Custodial Agreement.

Section 2.02    Acceptance of the Mortgage Loans.

(a)    Based on the Initial Certification received by it from the Custodian, the Trustee acknowledges receipt of, subject to the further review and exceptions reported by the Custodian pursuant to the procedures described below, the documents (or certified copies thereof) delivered to the Trustee or the Custodian on its behalf pursuant to Section 2.01 and declares that it holds and will continue to hold directly or through a custodian those documents and any amendments, replacements or supplements thereto and all other assets of the Trust Fund delivered to it in trust for the use and benefit of all present and future Holders of the Certificates and the Certificate Insurer. On the Closing Date, the Trustee or the Custodian on its behalf will deliver one or more Initial Certifications, each in the form of Exhibit One to the Custodial Agreement, to the parties indicated on such exhibit confirming whether or not it has received the Mortgage File for each Mortgage Loan, but without review of such Mortgage File, except to the extent necessary to confirm whether such Mortgage File contains the original Mortgage Note or a lost note affidavit and indemnity in lieu thereof. No later than 90 days after the Closing Date, the Trustee or the Custodian on its behalf shall, for the benefit of the Certificateholders and the Certificate Insurer, review each Mortgage File delivered to it and execute and deliver to the Seller and the Master Servicer, the Certificate Insurer and, if reviewed by the Custodian, to the Trustee, one or more Interim Certifications, each substantially in the form of Exhibit Two to the Custodial Agreement. In conducting such review, the Trustee or the Custodian on its behalf will ascertain whether all required documents have been executed and received and whether those documents relate, determined

on the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans identified in Exhibit B to this Agreement, as supplemented (provided, however, that with respect to those documents described in subclauses (iv) and (vi) of Section 2.01, such obligations shall extend only to documents actually delivered pursuant to such subclauses). In performing any such review, the Trustee and the Custodian may conclusively rely on the purported due execution and genuineness of any such document and on the purported genuineness of any signature thereon. If the Trustee or the Custodian on its behalf finds any document constituting part of the Mortgage File not to have been executed or received, or to be unrelated to the Mortgage Loans identified in Exhibit B or to appear to be defective on its face, the Trustee or the Custodian on its behalf shall include such information in the exception report attached to the Interim Certification. The Seller shall correct or cure any such defect or, if prior to the end of the second anniversary of the Closing Date, the Seller may substitute for the related Mortgage Loan a Replacement Mortgage Loan, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03 or shall deliver to the Securities Administrator, the Trustee and the Certificate Insurer an Opinion of Counsel addressed to the Trustee (such determination to be made without regard to the Policy) to the effect that such defect does not materially or adversely affect the interests of the Certificateholders in such Mortgage Loan within 90 days from the date of notice from the Trustee of the defect and if the Seller fails to correct or cure the defect or deliver such opinion within such period, the Seller will, subject to Section 2.03, purchase such Mortgage Loan at the Purchase Price; provided, however, that if such defect relates solely to the inability of the Seller to deliver the Mortgage, assignment thereof to the Trustee, or intervening assignments thereof with evidence of recording thereon because such documents have been submitted for recording and have not been returned by the applicable jurisdiction, the Seller shall not be required to purchase such Mortgage Loan if the Seller delivers such documents promptly upon receipt, but in no event later than 360 days after the Closing Date.

(b) No later than 180 days after the Closing Date, the Trustee or the Custodian on its behalf will review, for the benefit of the Certificateholders and the Certificate Insurer, the Mortgage Files and will execute and deliver or cause to be executed and delivered to the Seller, and the Master Servicer and, if reviewed by the Custodian, to the Trustee, one or more Final Certifications, each substantially in the form of Exhibit Three to the Custodial Agreement. In conducting such review, the Trustee or the Custodian on its behalf will ascertain whether each document required to be recorded has been returned from the recording office with evidence of recording thereon and the Trustee or the Custodian on its behalf has received either an original or a copy thereof, as required in Section 2.01 (provided, however, that with respect to those documents described in subclauses (iv) and (vi) of Section 2.01, such obligations shall extend only to documents actually delivered pursuant to such subclauses). If the Trustee or the Custodian on its behalf finds any document with respect to a Mortgage Loan has not been received, or to be unrelated, determined on the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans identified in Exhibit B or to appear defective on its face, the Trustee or the Custodian on its behalf shall note such defect in the exception report attached to the Final Certification and shall promptly notify the Seller. The Seller shall correct or cure any such defect or, if prior to the end of the second anniversary of the Closing Date, the Seller may substitute for the related Mortgage Loan a Replacement Mortgage Loan, which substitution shall be accomplished in the manner and subject to the

conditions set forth in Section 2.03 or shall deliver to the Trustee, the Securities Administrator and the Certificate Insurer an Opinion of Counsel addressed to the Trustee and the Securities Administrator to the effect that such defect does not materially or adversely affect the interests of Certificateholders in such Mortgage Loan (such determination to be made without regard to the Policy) within 90 days from the date of notice from the Trustee of the defect and if the Seller is unable within such period to correct or cure such defect, or to substitute the related Mortgage Loan with a Replacement Mortgage Loan or to deliver such opinion, the Seller shall, subject to Section 2.03, purchase such Mortgage Loan at the Purchase Price; provided, however, that if such defect relates solely to the inability of the Seller to deliver the Mortgage, assignment thereof to the Trustee or intervening assignments thereof with evidence of recording thereon, because such documents have not been returned by the applicable jurisdiction, the Seller shall not be required to purchase such Mortgage Loan, if the Seller delivers such documents promptly upon receipt, but in no event later than 360 days after the Closing Date. Notwithstanding anything to the contrary, the Trustee shall have no responsibility with respect to the custody or review of Mortgage Files, all of which shall be performed by the Custodian pursuant to the Custodial Agreement, and the Trustee is hereby authorized and directed to enter into the Custodial Agreement. Performance by the Custodian of its obligations under the Custodial Agreement shall satisfy all responsibilities for custody and review of Mortgage Files hereunder. The Trustee shall have no liability for the failure of the Custodian to perform its obligations under the Custodial Agreement.

(c)   In the event that a Mortgage Loan is repurchased by the Seller in accordance with subsections 2.02(a) or (b) above or Section 2.03, the Seller shall remit the applicable Purchase Price to the Securities Administrator for deposit in the Distribution Account and shall provide written notice to the Securities Administrator, the Trustee and, so long as no Certificate Insurer Default exists, the Certificate Insurer detailing the components of the Purchase Price, signed by a Servicing Officer. Upon deposit of the Purchase Price in the Distribution Account and upon receipt of a Request for Release with respect to such Mortgage Loan, the Custodian will release to the Seller the related Mortgage File and the Trustee shall execute and deliver all instruments of transfer or assignment, without recourse, representation or warranty furnished to it by the Seller, as are necessary to vest in the Seller title to and rights under the Mortgage Loan. Such purchase shall be deemed to have occurred on the date on which the deposit into the Distribution Account was made. The Securities Administrator shall promptly use its best efforts to notify each Rating Agency and, so long as no Certificate Insurer Default exists, the Certificate Insurer of such repurchase in accordance with Section 12.05. The obligation of the Seller to cure, repurchase or substitute for any Mortgage Loan as to which a defect in a constituent document exists shall be the sole remedies respecting such defect available to the Certificateholders, the Certificate Insurer or to the Trustee on their behalf.

(d)   The Seller shall deliver to the Trustee or the Custodian on its behalf, and Trustee agrees to accept the Mortgage Note and other documents constituting the Mortgage File with respect to any Replacement Mortgage Loan, which the Trustee or the Custodian will review as provided in subsections 2.02(a) and 2.02(b), provided, that the Closing Date referred to therein shall instead be the date of delivery of the Mortgage File with respect to each Replacement Mortgage Loan.

Section 2.03    Representations, Warranties and Covenants of the Master Servicer and the Seller.

(a)    [Reserved].

(b)    Wells Fargo Bank, National Association, in its capacity as Master Servicer and Securities Administrator hereby represents and warrants to the Seller, the Depositor, the Certificate Insurer and the Trustee as follows, as of the Closing Date:

(i)    It is a national banking association duly formed, validly existing and in good standing under the laws of the United States of America and is duly authorized and qualified to transact any and all business contemplated by this Agreement to be conducted by the Master Servicer and the Securities Administrator in any state in which a Mortgaged Property is located or is otherwise not required under applicable law to effect such qualification and, in any event, is in compliance with the doing business laws of any such state, to the extent necessary to ensure its ability to enforce each Mortgage Loan, to master service the Mortgage Loans in accordance with the terms of this Agreement and to perform any of its other obligations under this Agreement in accordance with the terms hereof or thereof;

(ii)    It has the full corporate power and authority to execute, deliver and perform, and to enter into and consummate the transactions contemplated by this Agreement and has duly authorized by all necessary corporate action on its part the execution, delivery and performance of this Agreement; and this Agreement, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except that (a) the enforceability hereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(iii)    The execution and delivery of this Agreement by it, the consummation of any other of the transactions contemplated by this Agreement, and the fulfillment of or compliance with the terms hereof are in its ordinary course of business and will not (A) result in a material breach of any term or provision of its charter or by-laws or (B) materially conflict with, result in a material breach, violation or acceleration of, or result in a material default under, the terms of any other material agreement or instrument to which it is a party or by which it may be bound, or (C) constitute a material violation of any statute, order or regulation applicable to it of any court, regulatory body, administrative agency or governmental body having jurisdiction over it; and it is not in breach or violation of any material indenture or other material agreement or instrument, or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it which

64

breach or violation may materially impair its ability to perform or meet any of its obligations under this Agreement.

(iv)    No litigation is pending or, to the best of its knowledge, threatened, against it that would materially and adversely affect the execution, delivery or enforceability of this Agreement or its ability to perform any of its other obligations under this Agreement in accordance with the terms hereof.

(v)    No consent, approval, authorization or order of any court or governmental agency or body is required for its execution, delivery and performance of, or compliance with, this Agreement or the consummation of the transactions contemplated hereby, or if any such consent, approval, authorization or order is required, it has obtained the same.

(c)    The Seller hereby represents and warrants to the Depositor, the Certificate Insurer and the Trustee as follows, as of the Closing Date:

(i)    The Seller is duly organized as a Delaware corporation and is validly existing and in good standing under the laws of the State of Delaware and is duly authorized and qualified to transact any and all business contemplated by this Agreement to be conducted by the Seller in any state in which a Mortgaged Property is located or is otherwise not required under applicable law to effect such qualification and, in any event, is in compliance with the doing business laws of any such state, to the extent necessary to ensure its ability to enforce each Mortgage Loan, to sell the Mortgage Loans in accordance with the terms of the Mortgage Loan Purchase Agreement and to perform any of its other obligations under this Agreement in accordance with the terms hereof.

(ii)    The Seller has the full corporate power and authority to sell each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate the transactions contemplated by this Agreement and has duly authorized by all necessary corporate action on the part of the Seller the execution, delivery and performance of this Agreement, assuming the due authorization, execution and delivery hereof by the other parties hereto or thereto, as applicable, constitutes a legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except that (a) the enforceability hereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(iii)    The execution and delivery of this Agreement by the Seller, the sale of the Mortgage Loans by the Seller under the Mortgage Loan Purchase Agreement, the consummation of any other of the transactions contemplated by this Agreement, and the fulfillment of or compliance with the terms hereof and thereof are in the ordinary course of business of the Seller and will not (A) result

in a material breach of any term or provision of the charter or by-laws of the Seller or (B) conflict with, result in a breach, violation or acceleration of, or result in a default under, the terms of any other material agreement or instrument to which the Seller is a party or by which it may be bound, or (C) constitute a violation of any statute, order or regulation applicable to the Seller of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Seller; and the Seller is not in breach or violation of any material indenture or other material agreement or instrument, or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it which breach or violation may materially impair the Seller's ability to perform or meet any of its obligations under this Agreement.

(iv)     The Seller is an approved seller of conventional mortgage loans for Fannie Mae and Freddie Mac and is a mortgagee approved by the Secretary of Housing and Urban Development pursuant to sections 203 and 211 of the National Housing Act.

(v)     No litigation is pending or, to the best of the Seller's knowledge, threatened, against the Seller that would materially and adversely affect the execution, delivery or enforceability of this Agreement or the ability of the Seller to sell the Mortgage Loans or to perform any of its other obligations under this Agreement in accordance with the terms hereof or thereof.

(vi)     No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of, or compliance by the Seller with, this Agreement or the consummation of the transactions contemplated hereby, or if any such consent, approval, authorization or order is required, the Seller has obtained the same.

(vii)     With respect to each Mortgage Loan as of the Closing Date (or such other date as may be specified in Section 7 of the Mortgage Loan Purchase Agreement), the Seller hereby remakes and restates each of the representations and warranties set forth in Section 7 of the Mortgage Loan Purchase Agreement to the Depositor and the Trustee to the same extent as if fully set forth herein.

(d)   Upon discovery by any of the parties hereto of a breach of a representation or warranty set forth in the Mortgage Loan Purchase Agreement with respect to the Mortgage Loans that materially and adversely affects the interests of the Certificateholders or the Certificate Insurer in any Mortgage Loan, the party discovering such breach shall give prompt written notice thereof to the other parties. Any breach of a representation or warranty contained in clauses (c), (q), (s), (z), (aa), (bb), (cc), (dd), (ee), (ff), (ii), (jj) and (kk) of Section 7 of the Mortgage Loan Purchase Agreement in respect of a Mortgage Loan shall be deemed to materially adversely affect the interests of the Certificateholders and the Certificate Insurer. The Seller hereby covenants with respect to the representations and warranties set forth in the Mortgage Loan Purchase Agreement with respect to the Mortgage Loans, that within 90 days

of the discovery of a breach of any representation or warranty set forth therein that materially and adversely affects the interests of the Certificateholders and the Certificate Insurer in any Mortgage Loan, it shall cure such breach in all material respects and, if such breach is not so cured, (i) if such 90 day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a "Deleted Mortgage Loan") from the Trust Fund and substitute in its place a Replacement Mortgage Loan, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below; provided that any such substitution pursuant to (i) above or repurchase pursuant to (ii) above shall not be effected prior to the delivery to the Trustee and the Securities Administrator of an Opinion of Counsel if required by Section 2.05 hereof and any such substitution pursuant to (i) above shall not be effected prior to the additional delivery to the Custodian of a Request for Release. The Seller shall, or cause the related Servicer to, furnish to the Securities Administrator and the Trustee the Officer's Certificate required under Section 2.03(e) relating to such cure. If the Trustee has received (or has given, as the case may be) written notice of such a breach of a representation or warranty, the Trustee shall give prompt written notice to the Master Servicer, the Securities Administrator and the Seller, if within 90 days of its receipt (or giving, as the case may be) of such notice of breach, the Trustee does not receive an Officer's Certificate as described in the preceding sentence certifying as to the cure of such breached representation or warranty. The Trustee shall give prompt written notice to the parties hereto of the Seller's failure to cure such breach as set forth in the preceding sentence. The Seller shall promptly reimburse the Master Servicer and the Trustee for any expenses reasonably incurred by the Master Servicer or the Trustee in respect of enforcing the remedies for such breach. To enable the Master Servicer to amend the Mortgage Loan Schedule, the Seller shall, unless it cures such breach in a timely fashion pursuant to this Section 2.03, promptly notify the Master Servicer and Trustee whether it intends either to repurchase, or to substitute for, the Mortgage Loan affected by such breach. With respect to the representations and warranties with respect to the Mortgage Loans that are made to the best of the Seller's knowledge, if it is discovered by any of the Depositor, the Master Servicer, the Seller, the Securities Administrator or the Trustee that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan, notwithstanding the Seller's lack of knowledge with respect to the substance of such representation or warranty, the Seller shall nevertheless be required to cure, substitute for or repurchase the affected Mortgage Loan in accordance with the foregoing.

With respect to any Replacement Mortgage Loan or Loans, the Seller shall deliver to the Trustee or the Custodian on its behalf for the benefit of the Certificateholders and the Certificate Insurer such documents and agreements as are required by Section 2.01. No substitution will be made in any calendar month after the Determination Date for such month. Notwithstanding the foregoing, such substitution must be done within two years of the Closing Date. Scheduled Payments due with respect to Replacement Mortgage Loans in the Due Period related to the Distribution Date on which such proceeds are to be distributed shall not be part of the Trust Fund and will be retained by the Seller. For the month of substitution, distributions to Certificateholders will include the Scheduled Payment due on any Deleted Mortgage Loan for the related Due Period and thereafter the Seller shall be entitled to retain all amounts received in respect of such Deleted Mortgage Loan. The Master Servicer shall amend the Mortgage Loan Schedule for the benefit of the Certificateholders and the Certificate Insurer to reflect the

removal of each such Deleted Mortgage Loan and the substitution of the Replacement Mortgage Loan or Loans and the Master Servicer shall deliver the amended Mortgage Loan Schedule to the Trustee, the Seller, the Securities Administrator, the Trustee and the Custodian. Upon such substitution, the Replacement Mortgage Loan or Loans shall be subject to the terms of this Agreement in all respects, and the Seller shall be deemed to have made with respect to such Replacement Mortgage Loan or Loans, as of the date of substitution, the representations and warranties set forth in Section 7 or Section 8 of the Mortgage Loan Purchase Agreement with respect to such Mortgage Loan. Upon any such substitution and the deposit into the Distribution Account of the amount required to be deposited therein in connection with such substitution as described in the following paragraph and receipt by the Custodian of a Request for Release for such Mortgage Loan, the Custodian shall release to the Seller the Mortgage File relating to such Deleted Mortgage Loan and held for the benefit of the Certificateholders and the Certificate Insurer and the Trustee shall execute and deliver at the Seller's direction such instruments of transfer or assignment as have been prepared by the Seller, in each case without recourse, representation or warranty as shall be necessary to vest in the Seller, or its respective designee, title to the Trustee's interest in any Deleted Mortgage Loan substituted for pursuant to this Section 2.03.

For any month in which the Seller substitutes one or more Replacement Mortgage Loans for a Deleted Mortgage Loan, the Master Servicer will determine the amount (if any) by which the aggregate principal balance of all the Replacement Mortgage Loans as of the date of substitution is less than the Stated Principal Balance (after application of the principal portion of the Scheduled Payment due in the month of substitution) of such Deleted Mortgage Loan. An amount equal to the aggregate of such deficiencies, described in the preceding sentence for any Distribution Date (such amount, the "Substitution Adjustment Amount") shall be deposited into the Distribution Account, by the Seller upon its delivering such Replacement Mortgage Loan on the Determination Date for the Distribution Date relating to the Prepayment Period during which the related Mortgage Loan became required to be purchased or replaced hereunder.

In the event that the Seller shall have repurchased a Mortgage Loan, the Purchase Price therefor shall be deposited into the Distribution Account maintained by the Securities Administrator, on the Determination Date for the Distribution Date in the month following the month during which the Seller became obligated to repurchase or replace such Mortgage Loan and upon such deposit of the Purchase Price, the delivery of an Opinion of Counsel if required by Section 2.05 and the receipt of a Request for Release, the Custodian shall release the related Mortgage File held for the benefit of the Certificateholders and the Certificate Insurer to the Seller, and the Trustee shall execute and deliver at such Person's direction the related instruments of transfer or assignment prepared by the Seller, in each case without recourse, representation or warranty, as shall be necessary to transfer title from the Trustee for the benefit of the Certificateholders and the Certificate Insurer and transfer the Trustee's interest to the Seller to any Mortgage Loan purchased pursuant to this Section 2.03. It is understood and agreed that the obligation under this Agreement of the Seller to cure, repurchase or replace any Mortgage Loan as to which a breach has occurred and is continuing shall constitute the sole remedies against the Seller respecting such breach available to the Certificateholders, the Depositor or the Trustee.

(e)    In connection with any repurchase or substitution of a Mortgage Loan or the cure of a breach of a representation or warranty set forth in Section 7 of the Mortgage Loan Purchase Agreement pursuant to this Section 2.03, the Seller shall, or cause the related Servicer to, promptly furnish to the Securities Administrator and the Trustee an Officer's Certificate, signed by a duly authorized officer of the Seller or the related servicer, as the case may be, to the effect that such repurchase, substitution or cure has been made in accordance with the terms and conditions of this Agreement and that all conditions precedent to such repurchase, substitution or cure have been satisfied, including the delivery to the Securities Administrator of the Purchase Price or Substitution Adjustment Amount, as applicable, for deposit into the Distribution Account, together with copies of any Opinion of Counsel required to be delivered pursuant to this Agreement and the related Request for Release, on which the Securities Administrator and the Trustee may rely. It is understood and agreed that the obligation under this Agreement of the Seller to cure the breach of a representation or warranty set forth in Section 7 of the Mortgage Loan Purchase Agreement or to repurchase or replace any Mortgage Loan as to which a breach has occurred and is continuing shall constitute the sole remedies against the Seller respecting such breach available to Certificateholders, the Depositor or the Trustee.

(f)    The representations and warranties set forth in this Section 2.03 hereof shall survive delivery of the respective Mortgage Loans and Mortgage Files to the Trustee or the Custodian for the benefit of the Certificateholders and the Certificate Insurer.

Section 2.04    Representations and Warranties of the Depositor.

The Depositor hereby represents and warrants to the Master Servicer, the Securities Administrator, the Certificate Insurer and the Trustee as follows, as of the date hereof and as of the Closing Date:

(i)    The Depositor is duly organized and is validly existing as a limited liability company in good standing under the laws of the State of Delaware and has full power and authority necessary to own or hold its properties and to conduct its business as now conducted by it and to enter into and perform its obligations under this Agreement.

(ii)    The Depositor has the full power and authority to execute, deliver and perform, and to enter into and consummate the transactions contemplated by, this Agreement and has duly authorized, by all necessary corporate action on its part, the execution, delivery and performance of this Agreement; and this Agreement, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of the Depositor, enforceable against the Depositor in accordance with its terms, subject, as to enforceability, to (i) bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally and (ii) general principles of equity, regardless of whether enforcement is sought in a proceeding in equity or at law.

69

(iii)    The execution and delivery of this Agreement by the Depositor, the consummation of the transactions contemplated by this Agreement, and the fulfillment of or compliance with the terms hereof and thereof are in the ordinary course of business of the Depositor and will not (A) result in a material breach of any term or provision of the certificate of formation or limited liability company agreement of the Depositor or (B) materially conflict with, result in a material breach, violation or acceleration of, or result in a material default under, the terms of any other material agreement or instrument to which the Depositor is a party or by which it may be bound or (C) constitute a material violation of any statute, order or regulation applicable to the Depositor of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Depositor; and the Depositor is not in breach or violation of any material indenture or other material agreement or instrument, or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it which breach or violation may materially impair the Depositor's ability to perform or meet any of its obligations under this Agreement.

(iv)    No litigation is pending, or, to the best of the Depositor's knowledge, threatened, against the Depositor that would materially and adversely affect the execution, delivery or enforceability of this Agreement or the ability of the Depositor to perform its obligations under this Agreement in accordance with the terms hereof or thereof.

(v)    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Depositor of, or compliance by the Depositor with this Agreement or the consummation of the transactions contemplated hereby or thereby, or if any such consent, approval, authorization or order is required, the Depositor has obtained the same.

The Depositor hereby represents and warrants to the Trustee and the Certificate Insurer as of the Closing Date, following the transfer of the Mortgage Loans to it by the Seller, the Depositor had good title to the Mortgage Loans and the related Mortgage Notes were subject to no offsets, claims, defenses or counterclaims.

It is understood and agreed that the representations and warranties set forth in this Section 2.04 shall survive delivery of the Mortgage Files to the Trustee or the Custodian for the benefit of the Certificateholders and the Certificate Insurer. Upon discovery by the Depositor, the Certificate Insurer or the Trustee of a breach of such representations and warranties, the party discovering such breach shall give prompt written notice to the others and to each Rating Agency and, so long as no Certificate Insurer Default exists, the Certificate Insurer.

Section 2.05    Delivery of Opinion of Counsel in Connection with Substitutions and Repurchases.

(a)    Notwithstanding any contrary provision of this Agreement, with respect to any Mortgage Loan that is not in default or as to which default is not reasonably foreseeable, no repurchase or substitution pursuant to Sections 2.02 or 2.03 shall be made unless the Seller delivers to the Trustee, the Certificate Insurer and the Securities Administrator an Opinion of Counsel, addressed to the Trustee, the Certificate Insurer and the Securities Administrator, to the effect that such repurchase or substitution would not (i) result in the imposition of the tax on "prohibited transactions" of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V or contributions after the Closing Date, as defined in Sections 860F(a)(2) and 860G(d) of the Code, respectively, or (ii) cause any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to fail to qualify as a REMIC at any time that any Certificates are outstanding. Any Mortgage Loan as to which repurchase or substitution was delayed pursuant to this paragraph shall be repurchased or the substitution therefor shall occur (subject to compliance with Sections 2.02 or 2.03) upon the earlier of (a) the occurrence of a default or a default becoming reasonably foreseeable with respect to such Mortgage Loan and (b) receipt by the Trustee and the Certificate Insurer of an Opinion of Counsel addressed to the Trustee and the Securities Administrator to the effect that such repurchase or substitution, as applicable, will not result in the events described in clause (i) or clause (ii) of the preceding sentence.

(b)    Upon discovery by the Depositor, the Seller, the Certificate Insurer, the Custodian or the Master Servicer that any Mortgage Loan does not constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code, the party discovering such fact shall promptly (and in any event within 5 Business Days of discovery) give written notice thereof to the other parties and the Trustee and the Securities Administrator. In connection therewith, the Seller shall either (i) substitute, if the conditions in Section 2.03 with respect to substitutions are satisfied, a Replacement Mortgage Loan for the affected Mortgage Loan, or (ii) repurchase the affected Mortgage Loan within 90 days of such discovery in the same manner as it would a Mortgage Loan for a breach of representation or warranty in accordance with Section 2.03. The Trustee shall reconvey to the Seller the Mortgage Loan to be released pursuant hereto (and the Custodian shall deliver the related Mortgage File) in the same manner, and on the same terms and conditions, as it would a Mortgage Loan repurchased for breach of a representation or warranty in accordance with Section 2.03.

Section 2.06    Countersignature and Delivery of Certificates.

(a)    The Trustee acknowledges the sale, transfer and assignment to it of the Trust Fund and, concurrently with such transfer and assignment, and the Securities Administrator has executed, countersigned and delivered, to or upon the order of the Depositor, the Certificates in authorized denominations evidencing the entire ownership of the Trust Fund. The Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates and the Certificate Insurer and to perform the duties set forth in this Agreement in accordance with its terms.

(b)    The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse all the

right, title and interest of the Depositor in and to the REMIC I Regular Interests and the other assets of REMIC II for the benefit of the holders of the REMIC II Regular Interests and the Class R-2 Certificates. The Trustee acknowledges receipt of the REMIC I Regular Interests (which are uncertificated) and the other assets of REMIC II and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the REMIC II Regular Interests and the Class R-2 Certificates.

(c)   The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse all the right, title and interest of the Depositor in and to the REMIC II Regular Interests and the other assets of REMIC III for the benefit of the holders of the Regular Certificates (other than the Class C Certificates), the Class C Interest, the Class IO Interest and the Class R-3 Certificates. The Trustee acknowledges receipt of the REMIC II Regular Interests (which are uncertificated) and the other assets of REMIC III and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the Regular Certificates (other than the Class C Certificates), the Class C Interest, the Class IO Interest and the Class R-3 Certificates.

(d)   The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse all the right, title and interest of the Depositor in and to the Class C Interest for the benefit of the Holders of the Class C Certificates and Class RX Certificates (in respect of the Class R-4 Interest). The Trustee acknowledges receipt of the Class C Interest (which is uncertificated) and declares that it holds and will hold the same in trust for the exclusive use and benefit of the Holders of the Class C Certificates and Class RX Certificates (in respect of the Class R-4 Interest).

(e)   The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse all the right, title and interest of the Depositor in and to the Class IO Interest for the benefit of the holders of the REMIC V Regular Interest IO and Class RX Certificates (in respect of the Class R-5 Interest). The Trustee acknowledges receipt of the Class IO Interest (which is uncertificated) and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the REMIC V Regular Interest IO and Class RX Certificates (in respect of the Class R-5 Interest).

Section 2.07   Purposes and Powers of the Trust.

The purpose of the common law trust, created hereunder (the "Trust"), is to engage in the following activities:

(a)   acquire and hold the Mortgage Loans and the other assets of the Trust Fund and the proceeds therefrom for the benefit of the Certificateholders and the Certificate Insurer;

(b)   to issue the Certificates sold to the Depositor in exchange for the Mortgage Loans and the other assets of the Trust Fund;

(c)   to make distributions on the Certificates;

72

(d)  to engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

(e)  subject to compliance with this Agreement, to engage in such other activities as may be required in connection with conservation of the Trust Fund and the making of distributions to the Certificateholders.

The Trust is hereby authorized to engage in the foregoing activities. The Trust shall not engage in any activity other than in connection with the foregoing or other than as required or authorized by the terms of this Agreement while any Certificate is outstanding.

Section 2.08    Optional Purchase of Certain Mortgage Loans.

With respect to any Mortgage Loan which as of the first day of a Fiscal Quarter is Delinquent in payment by 90 days or more or is an REO Property, EMC shall have the right to purchase any such Mortgage Loan or REO Property from the Trust at a price equal to the Purchase Price; provided however (i) that such Mortgage Loan is still 90 days or more Delinquent or is an REO Property as of the date of such purchase and (ii) this purchase option, if not theretofore exercised, shall terminate on the date prior to the last day of the related Fiscal Quarter. This purchase option, if not exercised, shall not be thereafter reinstated unless the delinquency is cured and the Mortgage Loan thereafter again becomes 90 days or more Delinquent or becomes an REO Property, in which case the option shall again become exercisable as of the first day of the related Fiscal Quarter. This right may be assigned by EMC to a third party, including a holder of a Class of Certificates.

In addition, EMC may, at its option, purchase any Mortgage Loan from the Trust for which the first Scheduled Payment due to the Trust after the Closing Date becomes thirty (30) days past due; provided, however, such Mortgage Loan was purchased by EMC or one of its affiliates from an originator pursuant to a loan purchase agreement that obligated such seller to repurchase such Mortgage Loan if one or more Scheduled Payments becomes 30 or more days delinquent (and such originator has agreed to repurchase such Mortgage Loan); provided, further, that such optional purchase shall be exercised no later than the 270th day after such Mortgage Loan is subject to such originator's repurchase obligation. Such purchase shall be made at a price equal to the Purchase Price.

Upon deposit of the Purchase Price in the Distribution Account and upon receipt of a Request for Release with respect to such Mortgage Loan, the Custodian will release to EMC the related Mortgage File and the Trustee shall execute and deliver all instruments of transfer or assignment, without recourse, representation or warranty furnished to it by EMC, as are necessary to vest in EMC title to and rights under the Mortgage Loan. Such assignment shall be an assignment outright and not for security. EMC will thereupon own such Mortgage, and all such security and documents, free of any further obligation to the Trustee, the Certificateholders or the Certificate Insurer with respect thereto.

ARTICLE III

[RESERVED]

ARTICLE IV

MASTER SERVICING OF MORTGAGE LOANS BY MASTER SERVICER

Section 4.01    Master Servicer.

The Master Servicer shall, beginning on the Closing Date, supervise, monitor and oversee the obligation of the Servicers to service and administer their respective Mortgage Loans (other than Simple Interest Loans) in accordance with the terms of this Agreement and the related Servicing Agreement, respectively, and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection with such master servicing. In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with Accepted Master Servicing Practices. Furthermore, the Master Servicer shall oversee and consult with the Servicers as necessary from time-to-time to carry out the Master Servicer's obligations hereunder, shall receive and review certain reports, information and other data provided to the Master Servicer by the Servicers and shall enforce the obligations, conditions and covenants of the Servicers to the extent set forth in the related Servicing Agreement. The Master Servicer shall monitor the Servicers' servicing activities with respect to each related Mortgage Loan, reconcile the results of such monitoring with such information described in the previous sentence and received by the Master Servicer on a monthly basis and coordinate corrective adjustments to the Servicers' and Master Servicer's records, and based on such reconciled and corrected information, the Master Servicer shall provide such information to the Securities Administrator as shall be necessary in order for it to prepare the statements specified in Section 6.06 and any other information and statements required hereunder. The Master Servicer shall reconcile the results of its Mortgage Loan monitoring with the actual remittances of the Servicers pursuant to the applicable Servicing Agreement. The Master Servicer shall be entitled to conclusively rely on the Mortgage Loan data provided by the Servicers and shall have no liability for any errors in such Mortgage Loan data.

Notwithstanding the foregoing or any other provision of this Agreement or any Servicing Agreement to the contrary, the Master Servicer shall have no duty or obligation to supervise, monitor or oversee the activities of or to enforce the obligation of any Servicer under a Servicing Agreement with respect to any Simple Interest Loan, including, without limitation, the collection of any amounts owing to the trust in respect thereof (unless and until the Master Servicer shall have assumed the obligations of the related Servicer as successor servicer under such Servicing Agreement, in which case, as successor servicer, it shall be bound to service and administer the Simple Interest Loans in accordance with the provisions of such Servicing Agreement).

In addition to the foregoing, in connection with a modification of any Mortgage Loan by a Servicer, if the Master Servicer is unable to enforce the obligations of the Servicer with respect to such modification, the Master Servicer shall notify the Depositor of such Servicer's failure to comply with the terms of the Servicing Agreement.  If the Servicing Agreement requires the approval of the Master Servicer for a modification to a Mortgage Loan, the Master Servicer shall approve such modification if, based upon its receipt of written notification from the related Servicer outlining the terms of such modification and appropriate supporting documentation, the Master Servicer determines that the modification is permitted under the terms of the Servicing Agreement and that any conditions to such modification set forth in the Servicing Agreement or

75

this Agreement have been satisfied. Furthermore, if the Servicing Agreement requires the oversight and monitoring of loss mitigation measures with respect to the related Mortgage Loans, the Master Servicer will monitor any loss mitigation procedure or recovery action related to a defaulted Mortgage Loan (to the extent it receives notice of such from the related Servicer) and confirm that such loss mitigation procedure or recovery action is initiated, conducted and concluded in accordance with any timeframes and any other requirements set forth in the Servicing Agreement, and the Master Servicer shall notify the Depositor in any case in which the Master Servicer believes that the related Servicer is not complying with such timeframes and/or other requirements.

The Master Servicer, the Trustee or the Custodian on its behalf and the Securities Administrator shall provide access to the records and documentation in possession of the Master Servicer, the Trustee or the Custodian on its behalf or the Securities Administrator regarding the related Mortgage Loans and REO Property to the Certificateholders, the Certificate Insurer the FDIC, and the supervisory agents and examiners of the FDIC, such access being afforded only upon reasonable prior written request and during normal business hours at the office of the Master Servicer, the Trustee, the Custodian or the Securities Administrator; provided, however, that, unless otherwise required by law, neither the Master Servicer, the Trustee, the Custodian nor the Securities Administrator shall be required to provide access to such records and documentation if the provision thereof would violate the legal right to privacy of any Mortgagor. The Master Servicer, the Trustee, the Custodian and the Securities Administrator shall allow representatives of the above entities to photocopy any of the records and documentation and shall provide equipment for that purpose at a charge that covers the Master Servicer's, the Trustee's, the Custodian's or the Securities Administrator's actual costs.

The Trustee shall execute and deliver to each Servicer or the Master Servicer, as applicable, any court pleadings, requests for trustee's sale or other documents necessary or desirable to (i) the foreclosure or trustee's sale with respect to a Mortgaged Property; (ii) any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or security instrument; (iii) obtain a deficiency judgment against the Mortgagor; or (iv) enforce any other rights or remedies provided by the Mortgage Note or security instrument or otherwise available at law or equity.

Section 4.02    Monitoring of Servicers.

(a)    In the review of the Servicers' activities, the Master Servicer may rely upon the Annual Statement of Compliance of the Servicers with regard to such Person's compliance with the terms of this Agreement or the applicable Servicing Agreement; provided that no such reliance will relieve the Master Servicer of its obligations pursuant to this Agreement. In the event that the Master Servicer, in its judgment, determines that the related Servicer should be terminated in accordance with the applicable Servicing Agreement, or that a notice should be sent pursuant to the applicable Servicing Agreement with respect to the occurrence of an event that, unless cured, would constitute grounds for such termination, the Master Servicer shall notify the Depositor and the Trustee thereof and the Master Servicer shall issue such notice or take such other action as it deems appropriate.

(b)     The Master Servicer, for the benefit of the Trustee, the Certificateholders and the Certificate Insurer, shall enforce the obligations of the Servicers under the related Servicing Agreement, and shall, in the event that a Servicer fails to perform its obligations in accordance with the applicable Servicing Agreement, subject to the preceding paragraph, terminate the rights and obligations of such Person thereunder, with the consent of the Certificate Insurer (so long as no Certificate Insurer Default exists) not to be unreasonably withheld, and act as servicer of the related Mortgage Loans or, with the consent of the Certificate Insurer (so long as no Certificate Insurer Default exists) not to be unreasonably withheld, to instruct the Trustee to enter into a new servicing agreement with a successor servicer selected by the Master Servicer; provided, however, it is understood and acknowledged by the parties hereto that there shall be a period of transition (not to exceed 90 days) before the actual servicing functions can be fully transferred to such successor servicer; provided further, if a Servicer has failed to advance or failed to make a payment so that the Master Servicer has had to advance its own funds, then the Master Servicer may terminate such Servicer. Such enforcement, including, without limitation, the legal prosecution of claims, termination of the applicable Servicing Agreement and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Master Servicer, in its good faith business judgment, would require were it the owner of the related Mortgage Loans. The Master Servicer shall pay the costs of such enforcement at its own expense, subject to its right of reimbursement pursuant to the provisions of this Agreement or the applicable Servicing Agreement, provided that the Master Servicer shall not be required to prosecute or defend any legal action except to the extent that the Master Servicer shall have received reasonable indemnity for its costs and expenses in pursuing such action.

(c)     To the extent that the costs and expenses of the Master Servicer related to any termination of a Servicer, appointment of a successor servicer or the transfer and assumption of servicing by the Master Servicer with respect to this Agreement or the applicable Servicing Agreement (including, without limitation, (i) all legal costs and expenses and all due diligence costs and expenses associated with an evaluation of the potential termination of a Servicer as a result of an alleged or actual breach of contract or an event of default by such Person and (ii) all costs and expenses associated with the complete transfer of servicing, including all servicing files and all servicing data and the completion, correction or manipulation of such servicing data as may be required by the successor servicer to correct any errors or insufficiencies in the servicing data or otherwise to enable the successor servicer to service the Mortgage Loans in accordance with this Agreement or the applicable Servicing Agreement) are not fully and timely reimbursed by the terminated Servicer, the Master Servicer shall be entitled to reimbursement of such costs and expenses from the Distribution Account.

(d)     The Master Servicer shall require each Servicer to comply with the remittance requirements and other obligations set forth in the applicable Servicing Agreement.

(e)     If the Master Servicer acts as a servicer, it will not assume liability for the representations and warranties of a Servicer, if any, that it replaces.

77

Section 4.03    Fidelity Bond.

The Master Servicer, at its expense, shall (i) maintain in effect a blanket fidelity bond and an errors and omissions insurance policy, affording coverage with respect to all directors, officers, employees and other Persons acting on such Master Servicer's behalf, and covering errors and omissions in the performance of the Master Servicer's obligations hereunder or (ii) self insure if Wells Fargo Bank maintains with any Rating Agency the equivalent of a long term unsecured debt rating of "A". The errors and omissions insurance policy and the fidelity bond referred to in (i) above shall be in such form and amount generally acceptable for entities serving as master servicers.

Section 4.04    Power to Act; Procedures.

The Master Servicer shall master service the Mortgage Loans and shall have full power and authority, subject to the REMIC Provisions and the provisions of Article XI hereof, to do any and all things that it may deem necessary or desirable in connection with the master servicing and administration of the Mortgage Loans, including but not limited to the power and authority (i) to execute and deliver, on behalf of the Certificateholders, the Trustee, the Securities Administrator and the Certificate Insurer, customary consents or waivers and other instruments and documents, (ii) to consent to transfers of any Mortgaged Property and assumptions of the Mortgage Notes and related Mortgages, (iii) to collect any Insurance Proceeds and Liquidation Proceeds, and (iv) to effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing any Mortgage Loan, in each case, in accordance with the provisions of this Agreement and the applicable Servicing Agreement, as applicable; provided, however, that the Master Servicer shall not (and, consistent with its responsibilities under Section 4.02, shall not permit a Servicer to) knowingly or intentionally take any action, or fail to take (or fail to cause to be taken) any action reasonably within its control and the scope of duties more specifically set forth herein, that, under the REMIC Provisions, if taken or not taken, as the case may be, would cause REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to fail to qualify as a REMIC or result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code) unless the Master Servicer has received an Opinion of Counsel (but not at the expense of the Master Servicer) to the effect that the contemplated action, or failure to take action, will not cause REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to fail to qualify as a REMIC or result in the imposition of a tax upon REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V, as the case may be.

The Trustee shall execute and deliver such other documents, as the Master Servicer may request, to enable the Master Servicer to master service and administer the Mortgage Loans and carry out its duties hereunder, in each case in accordance with Accepted Master Servicing Practices (and the Trustee shall have no liability for misuse of any such powers of attorney by the Master Servicer or the Servicers). If the Master Servicer or the Trustee has been advised that it is likely that the laws of the state in which action is to be taken prohibit such action if taken in the name of the Trustee or that the Trustee would be adversely affected under the "doing business" or tax laws of such state if such action is taken in its name, the Master Servicer shall join with the Trustee in the appointment of a co-trustee pursuant to Section 10.11 hereof. In the performance of its duties hereunder, the Master Servicer shall be an independent contractor and

78

shall not, except in those instances where it is taking action in the name of the Trustee, be deemed to be the agent of the Trustee.

Section 4.05    Due-on-Sale Clauses; Assumption Agreements.

To the extent provided in the applicable Servicing Agreement, to the extent Mortgage Loans contain enforceable due-on-sale clauses, the Master Servicer shall enforce the obligation of each Servicer to enforce such clauses in accordance with the applicable Servicing Agreement. If applicable law prohibits the enforcement of a due-on-sale clause or such clause is otherwise not enforced in accordance with the applicable Servicing Agreement, and, as a consequence, a Mortgage Loan is assumed, the original Mortgagor may be released from liability in accordance with the applicable Servicing Agreement.

Section 4.06    Documents, Records and Funds in Possession of Master Servicer and Servicer To Be Held for Trustee.

(a)    The Master Servicer shall transmit and a Servicer (to the extent required by the related Servicing Agreement) shall transmit to the Trustee or Custodian such documents and instruments coming into the possession of such Person from time to time as are required by the terms hereof, or in the case of each Servicer, the related Servicing Agreement, to be delivered to the Trustee or Custodian. Any funds received by the Master Servicer or by a Servicer in respect of any Mortgage Loan or which otherwise are collected by the Master Servicer or by a Servicer as Liquidation Proceeds or Insurance Proceeds in respect of any Mortgage Loan shall be held for the benefit of the Trustee, the Certificateholders and the Certificate Insurer subject to the Master Servicer's right to retain or withdraw from the Distribution Account, the Master Servicing Compensation and other amounts provided in this Agreement, and to the right of a Servicer to retain its Servicing Fee and other amounts as provided in this Agreement or the applicable Servicing Agreement. The Master Servicer shall, and (to the extent provided in this Agreement or the applicable Servicing Agreement) shall enforce the obligation of each Servicer to, provide access to information and documentation regarding the Mortgage Loans to the Trustee, and their respective agents and accountants at any time upon reasonable request and during normal business hours, and to Certificateholders that are savings and loan associations, banks or insurance companies, the Office of Thrift Supervision, the FDIC and the supervisory agents and examiners of such Office and Corporation or examiners of any other federal or state banking or insurance regulatory authority if so required by applicable regulations of the Office of Thrift Supervision or other regulatory authority, such access to be afforded without charge but only upon reasonable request in writing and during normal business hours at the offices of the Master Servicer designated by it. In fulfilling such a request the Master Servicer shall not be responsible for determining the sufficiency of such information.

(b)    All Mortgage Files and funds collected or held by, or under the control of, the Master Servicer, in respect of any Mortgage Loans, whether from the collection of principal and interest payments or from Liquidation Proceeds or Insurance Proceeds, shall be held by the Master Servicer for and on behalf of the Trustee, the Certificateholders and the Certificate Insurer and shall be and remain the sole and exclusive property of the Trustee; provided, however, that the Master Servicer and the Servicers shall be entitled to setoff against, and deduct

79

from, any such funds any amounts that are properly due and payable to the Master Servicer or the Servicers under this Agreement or the related Servicing Agreement.

Section 4.07    Presentment of Claims and Collection of Proceeds.

The Master Servicer shall (to the extent provided in this Agreement and the related Servicing Agreement) enforce the obligation of the Servicer to, prepare and present on behalf of the Trustee, the Certificateholders and the Certificate Insurer all claims under the Insurance Policies and take such actions (including the negotiation, settlement, compromise or enforcement of the insured's claim) as shall be necessary to realize recovery under such policies. Any proceeds disbursed to the Master Servicer (or disbursed to the related Servicer and remitted to the Master Servicer) in respect of such policies, bonds or contracts shall be promptly deposited in the Distribution Account upon receipt, except that any amounts realized that are to be applied to the repair or restoration of the related Mortgaged Property as a condition precedent to the presentation of claims on the related Mortgage Loan to the insurer under any applicable Insurance Policy need not be so deposited (or remitted).

Section 4.08    Realization Upon Defaulted Mortgage Loans.

The Master Servicer shall enforce any obligation of each Servicer (to the extent set forth under the related Servicing Agreement) to foreclose upon, repossess or otherwise comparably convert the ownership of Mortgaged Properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments, all in accordance with this Agreement or the applicable Servicing Agreement, as applicable.

Section 4.09    Compensation of the Master Servicer.

The Master Servicer will be entitled to all income realized from any investment of funds in the Distribution Account for the performance of its activities hereunder (the "Master Servicing Compensation"). The Master Servicer shall be required to pay all expenses incurred by it in connection with its activities hereunder and shall not be entitled to reimbursement therefor except as provided in this Agreement.

Section 4.10    REO Property.

(a)    In the event the Trust Fund acquires ownership of any REO Property in respect of any related Mortgage Loan, the deed or certificate of sale shall be issued to the Trustee, or to its nominee, on behalf of the related Certificateholders and the Certificate Insurer. The Master Servicer shall, to the extent provided in this Agreement and the related Servicing Agreement, as applicable, cause each Servicer to sell any REO Property as expeditiously as possible and in accordance with the provisions of this Agreement and the applicable Servicing Agreement, as applicable. The Master Servicer shall enforce any obligations of the related Servicer to protect and conserve, such REO Property in the manner and to the extent required by this Agreement or the applicable Servicing Agreement, in accordance with the REMIC Provisions and in a manner that does not result in a tax on "net income from foreclosure property" or cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code.

(b) The Master Servicer shall, to the extent required by this Agreement and the applicable Servicing Agreement, as applicable, enforce the obligation of the each Servicer, as applicable, to deposit all funds collected and received in connection with the operation of any REO Property in the related Protected Account.

(c) The Master Servicer or the related Servicer, upon the final disposition of any REO Property, shall be entitled to reimbursement for any related unreimbursed Advances and other unreimbursed advances as well as any unpaid Servicing Fees from Liquidation Proceeds received in connection with the final disposition of such REO Property; provided, that any such unreimbursed Monthly Advances as well as any unpaid Servicing Fees may be reimbursed or paid, as the case may be, prior to final disposition, out of any net rental income or other net amounts derived from such REO Property.

(d) To the extent provided in this Agreement or the related Servicing Agreement, the Liquidation Proceeds from the final disposition of the REO Property, net of any payment to the Master Servicer or the related Servicer as provided above shall be deposited in the Protected Account on or prior to the Determination Date in the month following receipt thereof and be remitted by wire transfer in immediately available funds to the Securities Administrator for deposit into the related Distribution Account on the next succeeding Remittance Date.

Section 4.11    UCC.

The Seller shall file any financing statements, continuation statements or amendments thereto required by any change in the Uniform Commercial Code.

Section 4.12    Reserve Fund; Payments to and from Swap Administrator; Supplemental Interest Trust.

(a) As of the Closing Date, the Supplemental Interest Trust shall be established and maintained in the name of the Supplemental Interest Trust Trustee, as a separate trust, the corpus of which shall be held by the Supplemental Interest Trust Trustee, for the benefit of the Holders of the Class A, Class M and Class B Certificates, and the Certificate Insurer and the Swap Provider. The Supplemental Interest Trust shall be governed by the laws of the State of New York and shall hold the Swap Agreement, the Swap Administration Agreement, the Swap Account and REMIC V Regular Interest IO. The Swap Account shall be an Eligible Account, and funds on deposit therein shall be held separate and apart from, and shall not be commingled with, any other moneys, including, without limitation, other moneys of the Securities Administrator held pursuant to this Agreement. Amounts in the Swap Account shall, at the written direction of the Majority Class C Certificateholder, be invested in Permitted Investments that mature no later than the Business Day prior to the next succeeding Distribution Date. All net income and gain from such investments shall be distributed to the Class C Certificateholders, pro rata, not as a distribution in respect of any interest in any REMIC, on such Distribution Date. In the absence of written instructions to the Securities Administrator, amounts on deposit in the Swap Account shall remain uninvested. All amounts earned on amounts on deposit in the Swap Account shall be taxable to the Class C Certificateholders. Any losses on such investments shall be deposited in the Swap Account by

the Class C Certificateholders, pro rata, out of their own funds immediately as realized. In performing its duties hereunder and under the Swap Agreement and the rights in respect of the Swap Administration Agreement, the Supplemental Interest Trust Trustee shall be entitled to the same rights, protections and indemnities as provided to the Securities Administrator hereunder.

(b)    On or before the Closing Date, the Securities Administrator shall establish a Reserve Fund on behalf of the Holders of the Certificates (other than the Class X Certificates) and the Certificate Insurer. On the Closing Date, the Depositor shall cause an amount equal to the Reserve Fund Deposit to be deposited into the Reserve Fund. The Reserve Fund must be an Eligible Account. The Reserve Fund shall be titled "Reserve Fund, Wells Fargo Bank, National Association, as Securities Administrator on behalf of Citibank, N.A. as Trustee for the benefit of holders of Bear Stearns Second Lien Trust 2007-SV1, Mortgage-Backed Certificates, Series 2007-SV1, Certificates and the Certificate Insurer". The Securities Administrator shall deposit in the Reserve Fund all payments received from the Swap Administrator that are payable to the Trust Fund pursuant to the Swap Administration Agreement. On each Distribution Date, the Securities Administrator shall remit such amounts received from the Swap Administrator to the Holders of the Class A, Class M and Class B Certificates in the manner provided in clause (d) below. In addition, on each Distribution Date as to which there is a Basis Risk Shortfall Carry Forward Amount payable to any Class of Class A, Class M or Class B Certificates, the Securities Administrator shall deposit the amounts distributable pursuant to clauses (C) and (D) of Section 6.04(a)(3) into the Reserve Fund, and the Securities Administrator has been directed by the Class C Certificateholder to distribute any amounts then on deposit in the Reserve Fund to the Holders of the Class A, Class M or Class B Certificates in respect of the Basis Risk Shortfall Carry Forward Amounts for each such Class in the priorities set forth in clauses (C) and (D) of Section 6.04(a)(3). Any amount paid to the Holders of Class A, Class M or Class B Certificates from amounts distributable pursuant to clauses (C) and (D) of Section 6.04(a)(3) pursuant to the preceding sentence in respect of Basis Risk Shortfall Carry Forward Amounts shall be treated as distributed to the Majority Class C Certificateholder in respect of the Class C Certificates and paid by the Majority Class C Certificateholder to the Holders of the Class A, Class M and Class B Certificates, as applicable. Any payments to the Holders of the Class A, Class M and Class B Certificates in respect of Basis Risk Shortfall Carry Forward Amounts, whether pursuant to the second preceding sentence or pursuant to clause (d) below, shall not be payments with respect to a Regular Interest in a REMIC within the meaning of Section 860G(a)(1) of the Code.

(c)    Net Swap Payments and Swap Termination Payments (other than Swap Termination Payments resulting from a Swap Provider Trigger Event and other than to the extent already paid by the Swap Administrator on behalf of the Supplemental Interest Trust Trustee from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) payable by the Swap Administrator, on behalf of the Supplemental Interest Trust Trustee, to the Swap Provider pursuant to the Swap Agreement shall be deducted from Interest Funds, and to the extent of any such remaining amounts due, from Principal Funds, prior to any distributions to the Certificateholders. On or before each Distribution Date, such amounts shall be remitted to the Swap Administrator, and deposited into the Swap Account, first to make any Net Swap

82

Payment owed to the Swap Provider pursuant to the Swap Agreement for such Distribution Date and for prior Distribution Dates, if any, and second to make any Swap Termination Payment (not due to a Swap Provider Trigger Event and other than to the extent already paid by the Swap Administrator on behalf of the Supplemental Interest Trust Trustee from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) owed to the Swap Provider pursuant to the Swap Agreement for such Distribution Date and for prior Distribution Dates, if any. For federal income tax purposes, such amounts paid to the Supplemental Interest Trust on each Distribution Date shall first be deemed paid to the Supplemental Interest Trust in respect of REMIC V Regular Interest IO to the extent of the amount distributable on such REMIC V Regular Interest IO on such Distribution Date, and any remaining amount shall be deemed paid to the Supplemental Interest Trust in respect of a Class IO Distribution Amount. Any Swap Termination Payment triggered by a Swap Provider Trigger Event owed to the Swap Provider pursuant to the Swap Agreement will be subordinated to distributions to the Holders of the Class A, Class M and Class B Certificates, and the Swap Administrator shall pay the amount set forth in Section 6.04(a)(3) to the Swap Provider. In addition, the Swap Administrator shall remit to the Swap Provider any Swap Optional Termination Payment paid as part of the Mortgage Loan Purchase Price and remitted to the Supplemental Interest Trust pursuant to Section 11.01.

(d)    On or before each Distribution Date, Net Swap Payments payable by the Swap Provider pursuant to the Swap Agreement to the Swap Administrator, on behalf of the Supplemental Interest Trust Trustee, will be deposited by the Swap Administrator, acting on behalf of the Supplemental Interest Trust Trustee, into the Swap Account pursuant to the Swap Administration Agreement. The Swap Administrator shall, to the extent provided in the Swap Administration Agreement, remit amounts on deposit in the Swap Account to the Securities Administrator for deposit into the Reserve Fund. On each Distribution Date, to the extent required, the Securities Administrator shall withdraw such amounts from the Reserve Fund to distribute to the Certificates in the following order of priority:

(i)    *first*, to the Class A Certificates, on a pro rata basis, to pay (a) Current Interest and any Interest Carry Forward Amount for each such Class to the extent due to the interest portion of a Realized Loss, in each case to the extent not fully paid pursuant to Section 6.04(a)(1) and (b) any Unpaid Realized Loss Amounts for such Class;

(ii)    *second*, sequentially to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 Certificates, in that order, to pay Current Interest to the extent not fully paid pursuant to Section 6.04(a)(1) and any Interest Carry Forward Amount, in each case to the extent due to the interest portion of a Realized Loss;

(iii)    *third*, to pay, first, to the Class A Certificates, any Basis Risk Shortfall Carry Forward Amount for each such Class for such Distribution Date, on a pro rata basis, based on the entitlement of each such Class, and second, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 Certificates, in that order, any Basis Risk Shortfall Carry Forward Amounts for each such Class for such Distribution Date; and

83

(iv)   *fourth*, to pay as principal to the Class A, Class M and Class B Certificates as part of the Extra Principal Distribution Amount payable under Section 6.04(a)(2) until the Overcollateralization Target Amount has been reached, to the extent not paid from Excess Cashflow pursuant to Section 6.04(a)(3) for such Distribution Date. For the avoidance of doubt, any amounts distributable pursuant to this clause (iv) shall be limited to rebuilding overcollateralization related to Loan to the extent overcollateralization has been reduced through Realized Losses related to Loan.

(e)   The Reserve Fund is an "outside reserve fund" within the meaning of Treasury Regulation Section 1.860G-2(h) and shall be an asset of the Trust Fund but not an asset of any REMIC. The Securities Administrator on behalf of the Trust shall be the nominal owner of the Reserve Fund. The Class C Certificateholders shall be the beneficial owners of the Reserve Fund, subject to the power of the Securities Administrator on behalf of the Securities Administrator to transfer amounts under Section 6.04. Amounts in the Reserve Fund shall, at the written direction of the Majority Class C Certificateholder to the Securities Administrator, be invested in Permitted Investments that mature no later than the Business Day prior to the next succeeding Distribution Date. All net income and gain from such investments shall be distributed to the Class C Certificateholders, pro rata, not as a distribution in respect of any interest in any REMIC, on such Distribution Date. In the absence of written instructions to the Securities Administrator, amounts on deposit in the Reserve Fund shall remain uninvested. All amounts earned on amounts on deposit in the Reserve Fund shall be taxable to the Class C Certificateholders. Any losses on such investments shall be deposited in the Reserve Fund by the Class C Certificateholders, pro rata, out of their own funds immediately as realized. The Swap Account, which is created and maintained by the Swap Administrator pursuant to the Swap Administration Agreement, is an "outside reserve fund" within the meaning of Treasury Regulation Section 1.860G-2(h) and shall not be an asset of any REMIC created hereunder. The beneficial owner of the Swap Account is identified, and other matters relating to the Swap Account are addressed, in the Swap Administration Agreement.

(f)   The Securities Administrator shall treat the Holders of Certificates (other than the Class C, the Class X and Class R Certificates) as having entered into a notional principal contract with respect to the Holders of the Class C Certificates. Pursuant to each such notional principal contract, all Holders of Certificates (other than the Class C, Class X and Class R Certificates) shall be treated as having agreed to pay, on each Distribution Date, to the Holder of the Class C Certificates an amount equal to the excess, if any, of (i) the amount payable on such Distribution Date on the REMIC III Regular Interest corresponding to such Certificates over (ii) the amount payable on such Certificates on such Distribution Date (such excess, a "Class IO Distribution Amount"). A Class IO Distribution Amount payable from interest collections shall be allocated *pro rata* among such Certificates based on the excess of, with respect to each such Certificate, (i) the amount of interest otherwise payable to the REMIC III Regular Interest relating to such Certificate over (ii) the amount of interest payable to such Certificate at a per annum rate equal to the related Net WAC Cap Rate, and a Class IO Distribution Amount payable from principal collections shall be allocated to the most subordinate Class of Regular Certificates with an outstanding principal balance to the extent of such balance. In addition, pursuant to such notional principal contract, the Holder of the Class C Certificates shall be treated as having agreed to pay Basis Risk Shortfall Carry Forward Amounts with respect to the Holders of the Certificates (other than the Class C, Class X and

Class R Certificates) in accordance with the terms of this Agreement. Any payments to the Certificates from amounts deemed received in respect of this notional principal contract shall not be payments with respect to a Regular Interest in a REMIC within the meaning of Code Section 860G(a)(1). However, any payment from the Certificates (other than the Class C, Class X and Class R Certificates) of a Class IO Distribution Amount shall be treated for tax purposes as having been received by the Holders of such Certificates in respect of their interests in REMIC III and as having been paid by such Holders to the Holders of the Class C Certificates pursuant to the notional principal contract. Thus, each Certificate (other than the Class R Certificates and Class X Certificates) shall be treated as representing not only ownership of Regular Interests in a REMIC, but also ownership of an interest in, and obligations with respect to, a notional principal contract.

(g)  Upon a Swap Early Termination other than in connection with the Optional Termination of the Trust, the Swap Administrator, pursuant to the Swap Administration Agreement, will use reasonable efforts to appoint a successor swap provider selected by the Depositor to enter into a new interest rate swap agreement on terms substantially similar to the Swap Agreement, with a successor swap provider meeting all applicable eligibility requirements. If the Swap Administrator receives a Swap Termination Payment from the Swap Provider in connection with such Swap Early Termination, the Swap Administrator will apply such Swap Termination Payment to any upfront payment required to appoint the successor swap provider. If the Swap Administrator is required to pay a Swap Termination Payment to the Swap Provider in connection with such Swap Early Termination, the Swap Administrator will apply any upfront payment received from the successor swap provider to pay such Swap Termination Payment. If the Swap Administrator is unable to appoint a successor swap provider selected by the Depositor within 30 days of the Swap Early Termination, then the Swap Administrator will deposit any Swap Termination Payment received from the original Swap Provider into a separate, non-interest bearing reserve account and will, on each subsequent Distribution Date, withdraw from the amount then remaining on deposit in such reserve account an amount equal to the Net Swap Payment, if any, that would have been paid to the Swap Administrator by the original Swap Provider calculated in accordance with the terms of the original Swap Agreement, and distribute such amount to the Holders of the Class A, Class M and Class B Certificates or for such other purpose specified in the Swap Administration Agreement in accordance with the terms thereof.

(h)  In the event that the Swap Provider fails to perform any of its obligations under the Swap Agreement (including, without limitation, its obligation to make any payment or transfer collateral), or breaches any of its representations and warranties thereunder, or in the event that an Event of Default, Termination Event, or Additional Termination Event (each as defined in the Swap Agreement) occurs with respect to the Swap Agreement, the Supplemental Interest Trust Trustee, upon receipt of a notification from the Swap Provider, shall immediately, but no later than the next Business Day following such failure, breach, or occurrence, notify the Depositor and send any notices and make any demands, on behalf of the Supplemental Interest Trust, in accordance with the Swap Agreement.

(i)  In the event that the Swap Provider's obligations are guaranteed by a third party under a guaranty relating to the Swap Agreement (such guaranty the "Guaranty" and such third party the "Guarantor"), then to the extent that the Swap Provider fails to make any

payment by the close of business on the day it is required to make payment under the terms of the Swap Agreement, the Supplemental Interest Trust Trustee shall, as soon as practicable, but no later than two (2) Business Days after the Swap Provider's failure to pay, demand that the Guarantor make any and all payments then required to be made by the Guarantor pursuant to such Guaranty; provided, however, that the Supplemental Interest Trust Trustee shall have been notified of the Guaranty made by the Guarantor in favor of the Swap Provider and received a copy of such Guaranty; provided further that, the Supplemental Interest Trust Trustee shall in no event be liable for any failure or delay in the performance by the Swap Provider or any Guarantor of its obligations hereunder or pursuant to the Swap Agreement and the Guaranty, nor for any special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits) in connection therewith.

(j)    The Supplemental Interest Trust Trustee shall cause any replacement swap provider to provide a copy of the replacement interest rate swap agreement to the Depositor.

Section 4.13    [Reserved].

Section 4.14    Tax Treatment of Class IO Distribution Amounts in the Event of Resecuritization of Class A, Class M or Class B Certificates.

In the event that any Class A, Class M or Class B Certificate is resecuritized in a REMIC (the "Resecuritization REMIC"), for federal income tax purposes, (i) payments on the REMIC III Regular Interest corresponding to such Class A, Class M or Class B Certificate shall, for the avoidance of doubt, be deemed to include the related Class IO Distribution Amount, and (ii) to the extent provided in the operative documents for the Resecuritization REMIC, (a) payments on the "regular interests" issued by the Resecuritization REMIC shall be deemed to include in the aggregate such Class IO Distribution Amount, and (b) such Class IO Distribution Amount shall be deemed paid to the Holder of the Class C Certificates pursuant to a notional principal contract entered into by the holders of one or more "regular interests" issued by the Resecuritization REMIC ("Resecuritization Holders") and the Holder of the Class C Certificates. In such event, Class IO Distribution Amounts deemed paid by Resecuritization Holders under clause (b) of the immediately preceding sentence shall be paid on behalf of such holders pursuant to Section 4.12(c) hereof.

Section 4.15    Standard Hazard Insurance and Flood Insurance Policies.

(a)    For each Mortgage Loan, the Master Servicer shall enforce any obligation of the related Servicer under this Agreement or the related Servicing Agreement to maintain or cause to be maintained standard fire and casualty insurance and, where applicable, flood insurance, all in accordance with the provisions of this Agreement or the related Servicing Agreement. It is understood and agreed that such insurance shall be with insurers meeting the eligibility requirements set forth in this Agreement and the related Servicing Agreement and that no earthquake or other additional insurance is to be required of any Mortgagor or to be maintained on property acquired in respect of a defaulted loan, other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance.

(b)  Pursuant to Section 5.01, any amounts collected by the Servicers or the Master Servicer, or by the Servicers, under any insurance policies (other than amounts to be applied to the restoration or repair of the property subject to the related Mortgage or released to the Mortgagor in accordance with this Agreement or the Servicing Agreements) shall be deposited by the related Servicer or the Master Servicer into the Distribution Account, subject to withdrawal pursuant to Section 5.05, as applicable. Any cost incurred by the Master Servicer or the related Servicer in maintaining any such insurance if the Mortgagor defaults in its obligation to do so shall be added to the amount owing under the Mortgage Loan where the terms of the Mortgage Loan so permit; provided, however, that the addition of any such cost shall not be taken into account for purposes of calculating the distributions to be made to Certificateholders and shall be recoverable by the Master Servicer or the related Servicer pursuant to Section 5.05.

Section 4.16    Annual Statement as to Compliance.

The Master Servicer shall deliver (or otherwise make available) to the Depositor and the Securities Administrator not later than March 15th of each calendar year beginning in 2008, an Officer's Certificate (an "Annual Statement of Compliance") stating, as to each signatory thereof, that (i) a review of the activities of each such party during the preceding calendar year and of its performance under this Agreement has been made under such officer's supervision and (ii) to the best of such officer's knowledge, based on such review, such party has fulfilled all of its obligations under this Agreement in all material respects throughout such year, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status of the cure provisions thereof.  Such Annual Statement of Compliance shall contain no restrictions or limitations on its use.  The Master Servicer shall enforce the obligations of each Servicer, to the extent set forth in the related Servicing Agreement, to deliver a similar Annual Statement of Compliance by that Servicer to the Depositor and the Securities Administrator as described above as and when required with respect to the Master Servicer.  In the event that certain servicing responsibilities with respect to any Mortgage Loan have been delegated by the Master Servicer or a Servicer to a subservicer or subcontractor, each such entity shall cause such subservicer or subcontractor (and with respect to each Servicer, the Master Servicer shall enforce the obligation of such Servicer to the extent required under the related Servicing Agreement) to deliver a similar Annual Statement of Compliance by such subservicer or subcontractor to the Depositor and the Securities Administrator as described above as and when required with respect to the Master Servicer or the related Servicer (as the case may be).

In the event the Master Servicer or any subservicer or subcontractor engaged by such party is terminated or resigns pursuant to the terms of the Agreement, or any other applicable agreement in the case of a subservicer or subcontractor, as the case may be, such party shall provide an Annual Statement of Compliance pursuant to this Section 4.16 or to the related section of such other applicable agreement, as the case may be, as to the performance of its obligations with respect to the period of time it was subject to this Agreement or any other applicable agreement, as the case may be notwithstanding any such termination or resignation.

Section 4.17    Annual Independent Certified Public Accountants' Servicing Report.

If the Master Servicer has, during the course of any fiscal year, directly serviced any of the Mortgage Loans, then the Master Servicer at its expense shall cause a nationally recognized firm of independent certified public accountants to furnish a statement (a "USAP Report") to the Issuing Entity, the Trustee and the Depositor on or before March 15 of each year, to the effect that, with respect to the most recently ended fiscal year, such firm has examined certain records and documents relating to the Master Servicer's performance of its servicing obligations under this Agreement and pooling and servicing and trust agreements in material respects similar to this Agreement and to each other and that, on the basis of such examination conducted substantially in compliance with the audit program for mortgages serviced for Freddie Mac or the Uniform Single Attestation Program for Mortgage Bankers, such firm is of the opinion that the Master Servicer's activities have been conducted in compliance with this Agreement, or that such examination has disclosed no material items of noncompliance except for (i) such exceptions as such firm believes to be immaterial, (ii) such other exceptions as are set forth in such statement and (iii) such exceptions that the Uniform Single Attestation Program for Mortgage Bankers or the Audit Program for Mortgages Serviced by Freddie Mac requires it to report. Copies of such statements shall be provided to any Certificateholder upon request by the Master Servicer, or by the Securities Administrator at the expense of the Master Servicer if the Master Servicer shall fail to provide such copies. If such report discloses exceptions that are material, the Master Servicer shall advise the Securities Administrator whether such exceptions have been or are susceptible of cure, and will take prompt action to do so.

ARTICLE V

ACCOUNTS

Section 5.01    Collection of Mortgage Loan Payments.

(a)    The Master Servicer shall make reasonable efforts in accordance with customary and usual standards of practice of prudent mortgage lenders in the respective states in which the Mortgaged Properties related to the Mortgage Loans are located to cause the related Servicer to collect all payments called for under the terms and provisions of the Mortgage Loans to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any related Required Insurance Policy. Consistent with the foregoing, the related Servicer may in its discretion (i) waive any late payment charge and (ii) extend the due dates for payments due on a Mortgage Note related to a Mortgage Loan for a period not greater than 125 days. In the event of any such arrangement, the related Servicer shall make Advances on the related Mortgage Loan during the scheduled period in accordance with the amortization schedule of such Mortgage Loan without modification thereof by reason of such arrangements, and shall be entitled to reimbursement therefor in accordance with Section 6.01. The related Servicer shall not be required to institute or join in litigation with respect to collection of any payment (whether under a Mortgage, Mortgage Note or otherwise or against any public or governmental authority with respect to a taking or condemnation) if it reasonably believes that enforcing the provision of the Mortgage or other instrument pursuant to which such payment is required is prohibited by applicable law. The Master Servicer shall not authorize the related Servicer to waive any Prepayment Charge related to a Mortgage Loan unless it is permitted pursuant to the related Servicing Agreement. Subject to the Master Servicer's recoverability determination, in the event that a Servicer fails to make a required Advance (other than any Simple Interest Shortfall Advance), the Master Servicer, as successor servicer, shall be required to remit the amount of such Advance to the Distribution Account. In the event that the Master Servicer fails to make a required Advance, the Trustee, as successor master servicer shall be required to remit the amount of such Advance to the Distribution Account.

(b)    In the event that the Master Servicer and Securities Administrator are no longer affiliated, the Master Servicer shall establish and maintain an account separate from the Distribution Account into which any funds remitted by the Servicers will be deposited. No later than noon New York time on the Business Day prior to each Distribution Date, the Master Servicer shall remit any such funds to the Securities Administrator for deposit in the Distribution Account. The Master Servicer shall make the following permitted withdrawals and transfers from such account:

(i)    The Master Servicer will, from time to time on demand of a Servicer or the Securities Administrator, make or cause to be made such withdrawals or transfers from the account as the Master Servicer has designated for such transfer or withdrawal pursuant to this Agreement and the related Servicing Agreement. The Master Servicer may clear and terminate the account pursuant to Section 11.01 and remove amounts from time to time deposited in error.

89

(ii)    On an ongoing basis, the Master Servicer shall withdraw from the account (i) any expenses, costs and liabilities recoverable by the Trustee, the Master Servicer or the Securities Administrator or the Custodian pursuant to Sections 4.03, 8.04 and 10.05 and (ii) any amounts payable to the Master Servicer as set forth in Section 4.14; provided, however, that the Master Servicer shall be obligated to pay from its own funds any amounts which it is required to pay under Section 8.03(a).

(iii)    In addition, on or before each Business Day prior to each Distribution Date, the Master Servicer shall deposit in the Distribution Account (or remit to the Securities Administrator for deposit therein) any Monthly Advances required to be made by the Master Servicer with respect to the Mortgage Loans.

(iv)    No later than noon New York time on each Business Day prior to each Distribution Date, the Master Servicer will transfer all Interest Funds and Principal Funds on deposit in the account with respect to the related Distribution Date to the Securities Administrator for deposit in the Distribution Account.

Section 5.02    [Reserved].

Section 5.03    [Reserved].

Section 5.04    [Reserved].

Section 5.05    Protected Accounts.

(a)    The Master Servicer shall enforce the obligation of each Servicer to establish and maintain a Protected Account in accordance with the related Servicing Agreement, with records to be kept with respect thereto on a Mortgage Loan by Mortgage Loan basis, into which accounts shall be deposited within one Business Day (or as of such other time specified in the applicable Servicing Agreement) of receipt and identification all collections of principal and interest on any Mortgage Loan and with respect to any REO Property received by the related Servicer, including Principal Prepayments, Insurance Proceeds, Liquidation Proceeds, Subsequent Recoveries, and advances made from the related Servicer's own funds (less servicing compensation as permitted by this Agreement or the applicable Servicing Agreement) and all other amounts to be deposited in the Protected Accounts. Each of the Servicers is hereby authorized to make withdrawals from and deposits to the related Protected Account for purposes required or permitted by this Agreement. To the extent provided in this Agreement or the applicable Servicing Agreement, the Protected Account shall be held in a Designated Depository Institution and segregated on the books of such institution in the name of the related Servicer, as applicable on behalf of the Trustee for the benefit of Certificateholders and the Certificate Insurer.

(b)    To the extent provided in this Agreement or the applicable Servicing Agreement, amounts on deposit in a Protected Account may be invested in Permitted Investments in the name of the Trustee for the benefit of Certificateholders and the Certificate Insurer and, except as provided in the preceding paragraph, not commingled with any other

funds, such Permitted Investments to mature, or to be subject to redemption or withdrawal, no later than the date on which such funds are required to be withdrawn for deposit in the Distribution Account, and shall be held until required for such deposit. The income earned from Permitted Investments made pursuant to this Section 5.05 shall be paid to the Servicers under this Agreement or the related Servicing Agreement, and the risk of loss of moneys required to be distributed to the Certificateholders resulting from such investments shall be borne by and be the risk of the Servicers, as the case may be. The related Servicer (to the extent provided in the applicable Servicing Agreement) shall deposit the amount of any such loss in the Protected Account within two Business Days of receipt of notification of such loss but not later than the second Business Day prior to the Distribution Date on which the moneys so invested are required to be distributed to the Certificateholders.

(c)     To the extent provided in this Agreement or the applicable Servicing Agreement and subject to this Article V, on or before 1:00 p.m. New York City time on each Remittance Date, the related Servicer shall withdraw or shall cause to be withdrawn from its Protected Account and shall immediately deposit or cause to be deposited in the Distribution Account amounts representing the following collections and payments (other than with respect to principal of or interest on the Mortgage Loans due on or before the Cut-off Date):

(i)     Scheduled Payments on the Mortgage Loans received or any related portion thereof advanced by the related Servicer pursuant to the applicable Servicing Agreement which were due on or before the related Due Date, net of the amount thereof comprising the Servicing Fees;

(ii)     Full Principal Prepayments received by the related Servicer (as described in the applicable Servicing Agreement) with respect to such Mortgage Loans in the related Prepayment Period, with scheduled interest for the related Due Period less the Servicing Fee, if any;

(iii)     Liquidation Proceeds received by the related Servicer with respect to such Mortgage Loans in the prior calendar month, with scheduled interest for the related Due Period less the Servicing Fee, if any;

(iv)     Partial Principal Prepayments received by the related Servicer for such Mortgage Loans in the related Prepayment Period, together with any related payments of Compensating Interest;

(v)     Any amount to be used as an Advance; and

(vi)     The amount of any Prepayment Charges collected with respect to the Mortgage Loans and the amount of any Prepayment Charges paid by the related Servicer in connection with the waiver of a Prepayment Charge in a manner that is not permitted under the applicable Servicing Agreement.

(d)     Withdrawals may be made from a Protected Account by the Master Servicer or the related Servicer only to make remittances as provided in Section 5.05(c) and 5.06; to reimburse the related Servicer for Advances (other than any Simple Interest Shortfall Advance) which have been recovered by subsequent collection from the related Mortgagor; to

remove amounts deposited in error; to remove fees, charges or other such amounts deposited on a temporary basis; or to clear and terminate the account at the termination of this Agreement in accordance with Section 11.01. To the extent provided in the related Servicing Agreement, certain amounts otherwise due to the related Servicer may be retained by such Servicer and need not be deposited in the Distribution Account.

Section 5.06    Distribution Account.

(a)    The Securities Administrator shall establish and maintain in the name of the Trustee, for the benefit of the Certificateholders and the Certificate Insurer, the Distribution Account as a segregated trust account or accounts.  The Distribution Account shall be an Eligible Account.  The Master Servicer or Servicers, as the case may be, will remit to the Securities Administrator for deposit in the Distribution Account the following amounts:

(i)    any Advance and any Compensating Interest Payments;

(ii)    any Insurance Proceeds, Liquidation Proceeds or Subsequent Recoveries received by or on behalf of the Master Servicer or which were not deposited in a Protected Account;

(iii)    the Purchase Price with respect to any Mortgage Loans purchased by the Seller pursuant to Section 2.02 or 2.03, and all proceeds of any Mortgage Loans or property acquired with respect thereto repurchased by the Seller or its designee pursuant to Section 11.01;

(iv)    any amounts required to be deposited with respect to losses on investments of deposits in the Distribution Account; and

(v)    any other amounts received by or on behalf of the Master Servicer or the Trustee and required to be deposited in the Distribution Account pursuant to this Agreement.

(b)    All amounts deposited to the Distribution Account shall be held by the Securities Administrator in the name of the Trustee in trust for the benefit of the Certificateholders and the Certificate Insurer in accordance with the terms and provisions of this Agreement. The requirements for crediting the Distribution Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of late payment charges or assumption, tax service, statement account or payoff, substitution, satisfaction, release and other like fees and charges, need not be credited by the Master Servicer or the related Servicer to the Distribution Account. In the event that the Master Servicer shall deposit or cause to be deposited to the Distribution Account any amount not required to be credited thereto, the Securities Administrator, upon receipt of a written request therefor signed by a Servicing Officer of the Master Servicer, shall promptly transfer such amount to the Master Servicer, any provision herein to the contrary notwithstanding.

(c)    The Distribution Account shall constitute a trust account of the Trust Fund segregated on the books of the Securities Administrator and held by the Securities Administrator and the Distribution Account and the funds deposited therein shall not be

92

subject to, and shall be protected from, all claims, liens, and encumbrances of any creditors or depositors of the Securities Administrator (whether made directly, or indirectly through a liquidator or receiver of the Securities Administrator). The amount at any time credited to the Distribution Account may be, as directed by the Master Servicer, held either uninvested in a trust or deposit account of the Securities Administrator with no liability for interest or other compensation thereof, except as otherwise agreed in writing with the Master Servicer, or invested in the name of the Trustee, in such Permitted Investments as may be selected by the Master Servicer on such direction which mature not later than the Business Day next preceding the succeeding Distribution Date, except if such Permitted Investment is an obligation of or is managed by the institution that maintains such fund or account, then such Permitted Investment shall mature not later than such Distribution Date. Permitted Investments in respect of the Distribution Account shall not be sold or disposed of prior to their maturity. All investment earnings on amounts on deposit in the Distribution Account or benefit from funds uninvested therein from time to time shall be for the account of the Master Servicer. The Master Servicer shall be permitted to receive distribution of any and all investment earnings from the Distribution Account on each Distribution Date. If there is any loss on a Permitted Investment or demand deposit, the Master Servicer shall deposit the amount of the loss in the Distribution Account. With respect to the Distribution Account and the funds deposited therein, the Securities Administrator shall take such action as may be necessary to ensure that the Certificateholders and the Certificate Insurer shall be entitled to the priorities afforded to such a trust account (in addition to a claim against the estate of the Trustee) as provided by 12 U.S.C. § 92a(e), and applicable regulations pursuant thereto, if applicable, or any applicable comparable state statute applicable to state chartered banking corporations.

Section 5.07    Permitted Withdrawals and Transfers from the Distribution Account.

(a)    The Securities Administrator will from time to time make or cause to be made such withdrawals or transfers from the Distribution Account as are designated for such transfer or withdrawal pursuant to this Agreement and the applicable Servicing Agreement (limited in the case of amounts due the Master Servicer to those not withdrawn from the Distribution Account in accordance with the terms of this Agreement; provided that the Securities Administrator shall not be responsible for such determination and may rely on the Master Servicer's instructions under this Section 5.07):

(i)    to reimburse the Master Servicer or the related Servicer for any unreimbursed Advance or Servicing Advance (in each case, other than any Simple Interest Shortfall Advance) of its own funds pursuant to this Agreement or the applicable Servicing Agreement, such right of the Master Servicer or the related Servicer to reimbursement pursuant to this subclause (i) being limited to amounts received on a particular Mortgage Loan (including, for this purpose, the Purchase Price therefor, Insurance Proceeds and Liquidation Proceeds) which represent late payments or recoveries of the principal of or interest on such Mortgage Loan respecting which such Advance or Servicing Advance was made;

(ii)    to reimburse the Master Servicer or the related Servicer from Insurance Proceeds or Liquidation Proceeds relating to a particular Mortgage Loan for unreimbursed amounts expended by the Master Servicer or the related Servicer in good faith in connection with the restoration of the related Mortgaged Property which was damaged by an uninsured cause or in connection with the liquidation of such Mortgage Loan;

(iii)    to reimburse the Master Servicer or the related Servicer from Insurance Proceeds relating to a particular Mortgage Loan for insured expenses incurred with respect to such Mortgage Loan and to reimburse the Master Servicer or the related Servicer from Liquidation Proceeds from a particular Mortgage Loan for Liquidation Expenses incurred with respect to such Mortgage Loan; provided that the Master Servicer shall not be entitled to reimbursement for Liquidation Expenses with respect to a Mortgage Loan to the extent that (i) any amounts with respect to such Mortgage Loan were paid as Excess Liquidation Proceeds pursuant to clause (x) of this Subsection (a) to the Master Servicer; and (ii) such Liquidation Expenses were not included in the computation of such Excess Liquidation Proceeds;

(iv)    to reimburse the Master Servicer or the related Servicer for any Advance or Servicing Advance (in each case, other than any Simple Interest Shortfall Advance), after a Realized Loss has been allocated with respect to the related Mortgage Loan if the Advance or Servicing Advance has not been reimbursed pursuant to clauses (i) through (iii);

(v)    to pay the Master Servicer as set forth in Section 4.09;

(vi)    to reimburse the Master Servicer for expenses, costs and liabilities incurred by and reimbursable to it pursuant to Sections 4.02, 8.04(c) and (d) and 12.02 or otherwise reimbursable to it pursuant to this Agreement;

(vii)    to pay to the Master Servicer, as additional master servicing compensation, any Excess Liquidation Proceeds to the extent not retained by the related Servicer;

(viii)    to reimburse or pay the related Servicer any such amounts as are due thereto under the applicable Servicing Agreement and have not been retained by or paid to the related Servicer, to the extent provided herein and in the applicable Servicing Agreement;

(ix)    to reimburse the Trustee, the Custodian or the Securities Administrator for expenses, costs and liabilities incurred by or reimbursable to it pursuant to this Agreement or the Custodial Agreement;

(x)    to remove amounts deposited in error;

94

(xi)    to make distributions to the Swap Administrator for payment to the Swap Provider as provided in this Agreement or the Swap Administration Agreement, as applicable; and

(xii)    to clear and terminate the Distribution Account pursuant to Section 11.01.

(b)    The Master Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of accounting for any reimbursement from the Distribution Account pursuant to subclauses (i) through (iv), inclusive, and (vi) or with respect to any such amounts which would have been covered by such subclauses had the amounts not been retained by the Master Servicer without being deposited in the Distribution Account under Section 5.06.

(c)    On each Distribution Date, the Securities Administrator shall distribute the related Interest Remittance Amount and Principal Distribution Amount to the extent of funds on deposit in the Distribution Account to the holders of the related Certificates in accordance with Section 6.04.

ARTICLE VI

DISTRIBUTIONS AND ADVANCES

Section 6.01    Advances.

(a)    The related Servicer shall make an Advance with respect to any Mortgage Loans serviced by it pursuant to the applicable Servicing Agreement. The related Servicer shall be obligated to make any such Advance only to the extent that such advance would not be a Nonrecoverable Advance. If the related Servicer shall have determined that it has made a Nonrecoverable Advance or that a proposed Advance or a lesser portion of such Advance would constitute a Nonrecoverable Advance, such Servicer, as the case may be, shall present an Officer's Certificate to the Depositor, the Master Servicer, each Rating Agency, the Certificate Insurer and the Trustee (i) stating that such Servicer elects not to make an Advance in a stated amount and (ii) detailing the reason it deems the advance to be a Nonrecoverable Advance. Subject to the Master Servicer's recoverability determination, in the event that a Servicer fails to make a required Advance (other than any Simple Interest Shortfall Advance), the Master Servicer, as successor servicer, shall be required to remit the amount of such Advance to the Distribution Account.

Notwithstanding any requirement in this section to the contrary, the related Servicer shall discontinue making advances with respect to any Mortgage Loan that becomes 90 days Delinquent without delivering an Officer's Certificate in connection with such discontinuation. In addition, subject to Section 4.08 of the Agreement, the related Servicer must charge off a Mortgage Loan at the time such  Mortgage Loan, as applicable, becomes 180 days Delinquent unless the related Servicer reasonably believes that it may be able to obtain a net recovery through foreclosure proceedings or other conversion of the related Mortgage Loan. Once a Mortgage Loan is charged off, the related Servicer shall not be entitled to any additional Servicing Fee for such Mortgage Loan, except to the extent of any unpaid Servicing Fees and expenses which shall be reimbursable from any recoveries on such Mortgage Loan, and the Mortgage Loan shall be treated as a Liquidated Loan giving rise to a Realized Loss. If the related Servicer determines that a significant net recovery is possible through foreclosure proceedings or other disposition of the related Mortgage Loan that becomes 90 days Delinquent, the related Servicer may continue making advances on such Mortgage Loan. To the extent the related Servicer determines that a proposed Advance would not be a Nonrecoverable Advance and in its sole discretion reinstates and subsequently makes additional Advances for such Mortgage Loan, such Advances shall be reimbursable from any Subsequent Recoveries or as otherwise provided for in this Agreement.

Unless specific Subsequent Recoveries are anticipated on a particular Mortgage Loan that is charged off as described in the preceding paragraph or the applicable Servicing Agreement, such charged off Mortgage Loan will be released from the Trust Fund, and will be transferred to the Class X Certificateholders. If any Subsequent Recoveries are anticipated on such charged off Mortgage Loans, the release of such Mortgage Loan from the Trust Fund will be delayed until the Distribution Date after receipt of such Subsequent Recoveries. After the release of any charged off Mortgage Loan, the Class X Certificateholders will be entitled to any amounts subsequently received in respect of any such released Mortgage Loans, subject to any fees or

96

expenses owed to the Master Servicer. Such Class X Certificateholder may designate any servicer to service any such released mortgage loan and the Class X Certificateholder may sell any such released Mortgage Loan to a third party. To the extent the servicing of such released Mortgage Loan is not transferred from the related Servicer, the servicing of such released Mortgage Loan and the fees therefor shall be governed by this Agreement or the applicable Servicing Agreement, as applicable.

(b)    If the Scheduled Payment on a Mortgage Loan that was due on a related Due Date and is delinquent other than as a result of application of the Relief Act and for which the related Servicer was required to make an Advance pursuant to the applicable Servicing Agreement exceeds the amount deposited in the Distribution Account which shall be used for an Advance with respect to such Mortgage Loan, the Master Servicer will deposit in the Distribution Account not later than the Business Day prior to the Distribution Date an amount equal to such required Advance to the extent not otherwise paid by the related Servicer, net of the Servicing Fee for such Mortgage Loan except to the extent the Master Servicer determines any such Advance to be nonrecoverable from Liquidation Proceeds, Insurance Proceeds or future payments on the Mortgage Loan for which such Advance was made. Subject to the foregoing, the Master Servicer shall continue to make such Advances through the date that the related Servicer is required to do so under the applicable Servicing Agreement, as applicable. If applicable, on the Business Day prior to the related Distribution Date, the Master Servicer shall present an Officer's Certificate to the Trustee (i) stating that the Master Servicer elects not to make an Advance in a stated amount and (ii) detailing the reason it deems the advance to be nonrecoverable. The Master Servicer may rely on any non-recoverability determination of the related Servicer.

Subject to and in accordance with the provisions of Article IX hereof, in the event the Master Servicer fails to make such Advance, then the Trustee, as Successor Master Servicer, shall be obligated to make such Advance, subject to the provisions of this Section 6.01.

Section 6.02    Compensating Interest Payments.

(a)    The Master Servicer shall enforce the obligation of the related Servicer under the applicable Servicing Agreement to remit any required Compensating Interest to the Distribution Account on the Remittance Date.

(b)    The Master Servicer shall be required to remit the amount of any such Prepayment Interest Shortfalls required to be paid by the related Servicer pursuant to Section 6.02(a), to the extent of the Master Servicing Compensation for such Distribution Date, in the event the related Servicer fails to do so.

Section 6.03    REMIC Distributions.

On each Distribution Date, the Securities Administrator shall be deemed to have allocated distributions to the REMIC Regular Interests and the REMIC III Regular Interests in accordance with Section 6.07 hereof.

Section 6.04   Distributions.

(a)   Subject to Section 4.12(c), on each Distribution Date, an amount equal to the Interest Funds and Principal Funds for such Distribution Date shall be withdrawn by the Securities Administrator to the extent of any such funds in the Distribution Account and distributed in the following order of priority:

(1)   Interest Funds shall be distributed in the following manner and order of priority:

(A)   To the Certificate Insurer, the current and any past due Premium due under the Policy;

(B)   To the Class A-1, Class A-2 and Class A-3 Certificates, the Current Interest and any Interest Carry Forward Amount for each such Class, on a *pro rata* basis based on the entitlement of each such Class; and;

(C)   From remaining Interest Funds, to the Certificate Insurer, as reimbursement for prior draws (including the applicable interest) made under the Policy; and

(D)   From remaining Interest Funds, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 Certificates, in that order, the Current Interest for each such Class.

Any Excess Spread to the extent necessary to meet a level of overcollateralization equal to the Overcollateralization Target Amount will be the Extra Principal Distribution Amount and will be included as part of the Principal Distribution Amount. Any Remaining Excess Spread together with any Overcollateralization Release Amount will be applied as Excess Cashflow and distributed pursuant to clauses (a)(3)(A) through (I) below.

On any Distribution Date, any Relief Act Interest Shortfalls and any related Prepayment Interest Shortfalls to the extent not covered by Compensating Interest will be allocated as set forth in the definition of "Current Interest" herein.

(2)   Principal Funds, including any Extra Principal Distribution Amount, shall be distributed in the following manner and order of priority:

(A)   For each Distribution Date (i) prior to the Stepdown Date or (ii) on which a Trigger Event is in effect:

(i)   To the Class A-1, Class A-2 and Class A-3 Certificates, the Principal Distribution Amount for such Distribution Date, concurrently, on a *pro rata basis*, based on (x) the aggregate Certificate Principal Balance of the Class A-1 Certificates and Class A-2 Certificates and (y) the Certificate Principal Balance of the Class A-3 Certificates, allocated within clauses (x) and (y), (i) sequentially, to the Class A-1 Certificates and Class A-2 Certificates, in that order, in each case until the Certificate Principal Balance thereof is reduced to

98

zero, and (ii) to the Class A-3 Certificates, until the Certificate Principal Balance thereof is reduced to zero;

(ii)    To the Certificate Insurer, as reimbursement for prior draws (including applicable interest) made under the Policy, to the extent not covered by the Interest Funds;

(iii)    To the Class M-1 Certificates, from any remaining Principal Funds for such Distribution Date, the remaining Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(iv)    To the Class M-2 Certificates, from any remaining Principal Funds for such Distribution Date, the remaining Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(v)    To the Class M-3 Certificates, from any remaining Principal Funds for such Distribution Date, the remaining Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(vi)    To the Class M-4 Certificates, from any remaining Principal Funds for such Distribution Date, the remaining Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(vii)    To the Class M-5 Certificates, from any remaining Principal Funds for such Distribution Date, the remaining Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(viii)    To the Class M-6 Certificates, from any remaining Principal Funds for such Distribution Date, the remaining Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(ix)    To the Class B-1 Certificates, from any remaining Principal Funds for such Distribution Date, the remaining Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(x)    To the Class B-2 Certificates, from any remaining Principal Funds for such Distribution Date, the remaining Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(xi)    To the Class B-3 Certificates, from any remaining Principal Funds for such Distribution Date, the remaining Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero; and

(xii)    To the Class B-4 Certificates, from any remaining Principal Funds for such Distribution Date, the remaining Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero.

(B)    For each Distribution Date on or after the Stepdown Date, so long as a Trigger Event is not in effect:

(i)    To the Class A-1, Class A-2 and Class A-3 Certificates, the Class A Principal Distribution Amount for such Distribution Date, concurrently, on a *pro rata basis*, based on (x) the aggregate Certificate Principal Balance of the Class A-1 Certificates and Class A-2 Certificates and (y) the Certificate Principal Balance of the Class A-3 Certificates, allocated within clauses (x) and (y), (i) sequentially, to the Class A-1 Certificates and Class A-2 Certificates, in that order, in each case until the Certificate Principal Balance thereof is reduced to zero and (ii) to the Class A-3 Certificates, until the Certificate Principal Balance thereof is reduced to zero;

(ii)    To the Certificate Insurer, as reimbursement for prior draws (including applicable interest) made under the Policy, to the extent not covered by the Interest Funds;

(iii)    To the Class M-1 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class M-1 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(iv)    To the Class M-2 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class M-2 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(v)    To the Class M-3 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class M-3 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(vi)    To the Class M-4 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class M-4 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(vii)    To the Class M-5 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class M-5 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(viii)    To the Class M-6 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class M-6 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(ix)    To the Class B-1 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class B-1 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(x)    To the Class B-2 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class B-2 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(xi)    To the Class B-3 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class B-3 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero; and

(xii)    To the Class B-4 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class B-4 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero.

(3)    Any Excess Cashflow shall be distributed in the following manner and order of priority:

(A)    To the Class A Certificates, (a) *first*, any remaining Interest Carry Forward Amount for such Classes, on a *pro rata basis*, in accordance with the Interest Carry Forward Amount due with respect to each such Class, to the extent not fully paid pursuant to clause (a)(1) above and Section 4.12(d), provided, however, any Excess Cashflow allocable to the Class A-2 Certificates and Class A-3 Certificates under this clause will be used to pay any prior draws owed to the Certificate Insurer, to the extent not previously reimbursed, prior to paying any Interest Carry Forward Amount to the Class A-2 Certificates and Class A-3 Certificates, and (b) *second*, any Unpaid Realized Loss Amounts for such Classes for such Distribution Date, on a *pro rata basis*, in accordance with the Applied Realized Loss Amount allocated to each such Class, to the extent not fully paid pursuant to Section 4.12(d);

(B)    From any remaining Excess Cashflow, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 Certificates, in that order, an amount equal to the Interest Carry Forward Amount for each such Class for such Distribution Date, to the extent not fully paid pursuant to Section 4.12(d);

(C)    From any remaining Excess Cashflow otherwise distributable to the Class C Interest and the Class C Certificates, to the Reserve Fund, (i) first, to pay to the Classes of Class A Certificates any Basis Risk Shortfall Carry Forward Amount for such Classes for such Distribution Date, if any, on a *pro rata* basis, based on the amount of the Basis Risk Shortfall Carry Forward Amount for each such

101

Class, to the extent not fully paid pursuant to Section 4.12(d) and to the extent such amount exceeds the amounts then on deposit in the Reserve Fund, and (ii) second, to maintain a balance in the Reserve Fund equal to the Reserve Fund Deposit;

(D)      From any remaining Excess Cashflow otherwise distributable to the Class C Interest and the Class C Certificates, to the Reserve Fund, (i) first, to pay to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 Certificates, sequentially in that order, any Basis Risk Shortfall Carry Forward Amount for each such Class for such Distribution Date, if any, to the extent not fully paid pursuant to Section 4.12(d) and to the extent such amount exceeds the amounts then on deposit in the Reserve Fund, and (ii) second, to maintain a balance in the Reserve Fund equal to the Reserve Fund Deposit;

(E)      From any remaining Excess Cashflow, first, to the Class A Certificates, on a *pro rata* basis, based on the entitlement of each such Class, and then sequentially to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 Certificates, in that order, the amount of Relief Act Shortfalls and any Prepayment Interest Shortfalls allocated to such Classes of Certificates, to the extent not previously reimbursed;

(F)      From any remaining Excess Cashflow, to pay the Certificate Insurer any amounts reimbursable to the Certificate Insurer pursuant to the Insurance Agreement, to the extent not previously reimbursed;

(G)      From any remaining Excess Cashflow, to the Swap Administrator for payment to the Swap Provider, any Swap Termination Payments due to a Swap Provider Trigger Event owed by the Trust Fund (other than to the extent already paid by the Swap Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee);

(H)      From any remaining Excess Cashflow, to the Class C Interest and Class C Certificates, an amount equal to the Class C Distribution Amount reduced by amounts distributed in clauses (C) and (D) above; and

(I)      From any remaining Excess Cashflow to each of the Class R-1, Class R-2, Class R-3, Class R-4 and Class RX Certificates, based on the related REMIC in which such amounts remain.

On each Distribution Date, all amounts in respect of Prepayment Charges shall be distributed to the Holders of the Class C Certificates, provided that such distributions shall not be in reduction of the principal balance thereof.

In addition, notwithstanding the foregoing clause (a)(2), to the extent a Class IO Distribution Amount is payable from principal collections, Principal Distribution Amounts will be deemed paid to the most subordinate Class of Regular Certificates, until the Certificate

Principal Balance thereof has been reduced to zero, and such amount will be paid pursuant to Section 4.12(f).

In addition, notwithstanding the foregoing, on any Distribution Date after the Distribution Date on which the Certificate Principal Balance of a Class of Class A, Class M or Class B Certificates has been reduced to zero, that Class of Certificates will be retired and will no longer be entitled to distributions, including distributions in respect of Prepayment Interest Shortfalls or Basis Risk Shortfall Carry Forward Amounts.

(b) In addition to the foregoing distributions, with respect to any Subsequent Recoveries, the related Servicer shall deposit such funds into the Protected Account pursuant to Section 5.01(b)(iii) or the applicable Servicing Agreement. If, after taking into account such Subsequent Recoveries, the amount of a Realized Loss is reduced, the amount of such Subsequent Recoveries will be applied to increase the Certificate Principal Balance of the related Class of Certificates with the highest payment priority to which Realized Losses have been allocated, but not by more than the amount of Realized Losses previously allocated to that Class of Certificates pursuant to Section 6.05; provided, however, to the extent that no reductions to a Certificate Principal Balance of any Class of Certificates currently exists as the result of a prior allocation of a Realized Loss, such Subsequent Recoveries will be applied as Excess Cashflow. The amount of any remaining Subsequent Recoveries will be applied to increase the Certificate Principal Balance of the Class of Certificates with the next highest payment priority, up to the amount of such Realized Losses previously allocated to that Class of Certificates pursuant to Section 6.05, and so on; provided, that if such reduction has otherwise been covered by the Policy, such Subsequent Recoveries shall be used to reimburse the Certificate Insurer. Holders of such Certificates will not be entitled to any payment in respect of Current Interest on the amount of such increases for any Interest Accrual Period preceding the Distribution Date on which such increase occurs. Any such increases shall be applied to the Certificate Principal Balance of each Certificate of such Class in accordance with its respective Percentage Interest.

(c) Subject to Section 11.02 hereof respecting the final distribution, on each Distribution Date the Securities Administrator shall make distributions to each Certificateholder of record on the preceding Record Date either by wire transfer in immediately available funds to the account of such Holder at a bank or other entity having appropriate facilities therefor, if such Holder has so notified the Securities Administrator at least 5 Business Days prior to the related Record Date, or, if not, by check mailed by first class mail to such Certificateholder at the address of such Holder appearing in the Certificate Register. Notwithstanding the foregoing, but subject to Section 11.02 hereof respecting the final distribution, distributions with respect to Certificates registered in the name of a Depository shall be made to such Depository in immediately available funds.

(d) Prior to each Distribution Date, or if the Master Servicer and the Securities Administrator are no longer affiliated, on or before 5:00 p.m. Eastern time on the fifth Business Day immediately preceding each Distribution Date, the Master Servicer shall deliver a report to the Securities Administrator in the form of a computer readable magnetic tape (or by such other means as the Master Servicer and the Securities Administrator may agree from time to time) containing such data and information, as agreed to by the Master Servicer and

the Securities Administrator such as to permit the Securities Administrator to prepare the Monthly Statement to Certificateholders and to direct the Securities Administrator in writing to make the required distributions for the related Distribution Date (the "Remittance Report").

Section 6.05    Allocation of Realized Losses.

(a)    All Realized Losses on the Mortgage Loans shall be allocated by the Securities Administrator on each Distribution Date as follows: first, to Excess Spread as part of the payment in respect of the Extra Principal Distribution Amount for such Distribution Date; second, to the Class C Interest and Class C Certificates, until the Certificate Principal Balance or Uncertificated Principal Balance thereof, as applicable, has been reduced to zero; third, to the Class B-4 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; fourth, to the Class B-3 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; fifth, to the Class B-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; sixth, to the Class B-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; seventh, to the Class M-6 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; eighth, to the Class M-5 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; ninth, to the Class M-4 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; tenth, to the Class M-3 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; eleventh, to the Class M-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; twelfth, to the Class M-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; thirteenth, to the Class A Certificates, on a *pro rata basis*, until the Certificate Principal Balances thereof have been reduced to zero, provided, however, any Realized Losses otherwise allocable to the Class A-2 Certificates and Class A-3 Certificates will be covered by the Policy. All Realized Losses to be allocated to the Certificate Principal Balances of all Classes on any Distribution Date shall be so allocated after the actual distributions to be made on such date as provided above. All references above to the Certificate Principal Balance of any Class of Certificates shall be to the Certificate Principal Balance of such Class immediately prior to the relevant Distribution Date, before reduction thereof by any Realized Losses, in each case to be allocated to such Class of Certificates, on such Distribution Date.

(b)    Any allocation of Realized Losses to a Class of Certificates or the Class C Interest on any Distribution Date shall be made by reducing the Certificate Principal Balance or Uncertificated Principal Balance thereof by the amount so allocated; any allocation of Realized Losses to the Excess Spread shall be made by reducing the amount otherwise payable in respect of the Class C Interest and the Class C Certificates pursuant to clause (H) of Section 6.04(a)(3).

Once Realized Losses have been allocated to a Class of Class A, Class M or Class B Certificates, such amounts with respect to such Certificates will no longer accrue interest nor will such amounts in respect of interest be reinstated thereafter, except with respect to the Class A-2 Certificates and Class A-3 Certificates and the Policy.

As used herein, an allocation of a Realized Loss on a "pro rata basis" among two or more specified Classes of Certificates means an allocation on a pro rata basis, among the various

Classes so specified, to each such Class of Certificates on the basis of their then outstanding Certificate Principal Balances prior to giving effect to distributions to be made on such Distribution Date. All Realized Losses and all other losses allocated to a Class of Certificates hereunder will be allocated among the Certificates of such Class in proportion to the Percentage Interests evidenced thereby.

(c)    (i)    All Realized Losses on the Mortgage Loans shall be allocated on each Distribution Date to REMIC I Regular Interest I-1-A through REMIC I Regular Interest I-45-B, starting with the lowest numerical denomination until the Uncertificated Principal Balance of each such REMIC I Regular Interest has been reduced to zero, provided that, for REMIC I Regular Interests with the same numerical denomination, such Realized Losses shall be allocated *pro rata* between such REMIC I Regular Interests.

(ii)    All Realized Losses on the Mortgage Loans shall be allocated on each Distribution Date to the following REMIC II Regular Interests in the following specified percentages: first, to Uncertificated Accrued Interest payable to REMIC II Regular Interest AA and REMIC II Regular Interest ZZ up to an aggregate amount equal to the REMIC II Interest Loss Allocation Amount (without duplication of shortfalls allocated pursuant to Section 1.02), 98.00% and 2.00%, respectively; second, to the Uncertificated Principal Balances of REMIC II Regular Interest AA and REMIC II Regular Interest ZZ up to an aggregate amount equal to the REMIC II Principal Loss Allocation Amount, 98.00% and 2.00%, respectively; third, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest B-4 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest B-4 has been reduced to zero; fourth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest B-3 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest B-3 has been reduced to zero; fifth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest B-2 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest B-2 has been reduced to zero; sixth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest B-1 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest B-1 has been reduced to zero; seventh, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest M-6 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest M-6 has been reduced to zero; eighth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest M-5 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest M-5 has been reduced to zero; ninth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest M-4 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest M-4 has been reduced to zero; tenth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest M-3 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest M-3 has been reduced to zero; eleventh, to the Uncertificated Principal Balances of REMIC II Regular

Interest AA, REMIC II Regular Interest M-2 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest M-2 has been reduced to zero; twelfth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest M-1 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest M-1 has been reduced to zero; and thirteenth, to the Uncertificated Principal Balance of REMIC II Regular Interest AA, 98.00%, to the Uncertificated Principal Balances of REMIC II Regular Interests A-1, A-2 and A-3, 1.00% on a *pro rata* basis, and to the Uncertificated Principal Balance of REMIC II Regular Interest ZZ, 1.00%, until the Uncertificated Principal Balances of such REMIC II Regular Interests A-1, A-2 and A-3 have been reduced to zero.

Section 6.06    Monthly Statements to Certificateholders.

(a)    Not later than each Distribution Date, the Securities Administrator shall prepare and make available to each Holder of Certificates, the Trustee, the Swap Provider, the Certificate Insurer, the Master Servicer and the Depositor a statement setting forth for the Certificates:

(i)    the applicable record dates, accrual periods, determination dates for calculating distributions and general distribution dates;

(ii)    the total cash flows received and the general sources thereof;

(iii)    the amount, if any, of fees or expenses accrued and paid, with an identification of the payee and the general purpose of such fees including the related amount of the Servicing Fees paid to or retained by the related Servicer for the related Due Period;

(iv)    the amount of the related distribution to Holders of the Class A, Class M and Class B Certificates (by class) allocable to principal, separately identifying (A) the aggregate amount of any Principal Prepayments included therein, (B) the aggregate of all scheduled payments of principal included therein and (C) the Extra Principal Distribution Amount (if any);

(v)    the amount of such distribution to Holders of the Class A, Class M and Class B Certificates allocable to interest and the portion thereof (if any), provided by the Swap Agreement and the amount of coverage remaining;

(vi)    the Interest Carry Forward Amounts and any Basis Risk Shortfall Carry Forward Amounts for the Class A, Class M and Class B Certificates (if any);

(vii)    the Pass-Through Rate for each Class of Class A, Class M and Class B Certificates with respect to the current Accrual Period, and, if applicable, whether such Pass-Through Rate was limited by the related Net WAC Cap Rate;

(viii)    the Certificate Principal Balance of the Class A, Class M and Class B Certificates before and after giving effect (i) to all distributions allocable to principal on such Distribution Date and (ii) the allocation of any Applied Realized Loss Amounts for such Distribution Date;

(ix)    the number and Stated Principal Balance of all the Mortgage Loans for such Distribution Date, together with updated pool composition information including the following:  weighted average mortgage rate and weighted average remaining term;

(x)    the aggregate amount of Advances included in the distribution on such Distribution Date (including the general purpose of such Advances), the aggregate amount of unreimbursed Advances as of the end of the Due Period, and the general source of funds for reimbursements;

(xi)    the number and aggregate Stated Principal Balance of the Mortgage Loans (A) Delinquent, exclusive of Mortgage Loans in foreclosure, (1) 30 days Delinquent, (2) 60 days Delinquent and (3) 90 days or more Delinquent, (B) in foreclosure and Delinquent (1) 30 days Delinquent, (2) 60 days Delinquent and (3) 90 days or more Delinquent, in each case as of the close of business on the last day of the calendar month preceding such Distribution Date and (C) in bankruptcy and delinquent (1) 30 days Delinquent, (2) 60 days Delinquent and (3) 90 days or more Delinquent, in each case as of the close of business on the last day of the calendar month preceding such Distribution Date;

(xii)    the amount of, if any, of excess cashflow or excess spread and the application of such excess cashflow;

(xiii)    with respect to any Mortgage Loan that was liquidated during the preceding calendar month, the aggregate Stated Principal Balance of, and Realized Loss on, such Mortgage Loans as of the end of the prior calendar month;

(xiv)    whether a Trigger Event exists;

(xv)    information on loss, delinquency or other tests used for determining early amortization, liquidation, stepdowns or other performance triggers as more completely described in the prospectus supplement and whether the trigger was met;

(xvi)    the total number and principal balance of any real estate owned or REO Properties as of the end of the prior calendar month;

(xvii)    the cumulative Realized Losses through the end of the preceding month;

(xviii)    the amount of the distribution made on such Distribution Date to the Holders of the Class C Certificates allocable to Prepayment Charges;

(xix)   the Sixty-Day Plus Delinquency Percentage;

(xx)   material modifications, extensions or waivers to Mortgage Loan terms, fees, penalties or payments during the preceding calendar month or that have become material over time;

(xxi)   material breaches of Mortgage Loan representations or warranties or transaction covenants;

(xxii)   the amount of the Prepayment Charges remitted by the master servicer and the amount on deposit in the reserve fund;

(xxiii)   the amount of any Net Swap Payment payable to the Trust, any Net Swap Payment payable to the Swap Provider, any Swap Termination Payment payable to the Trust and any Swap Termination Payment payable to the Swap Provider; and

(xxiv)   each Mortgage Loan that has been released to the Class X Certificateholder pursuant to Section 5.01.

The foregoing information and reports shall be prepared and determined by the Securities Administrator based solely on Mortgage Loan data provided to the Securities Administrator by the Master Servicer (in a format agreed to by the Securities Administrator and the Master Servicer) no later than four (4) Business Days (or at a time and date as is mutually agreed upon by the Securities Administrator and the Master Servicer), prior to the Distribution Date. In preparing or furnishing the foregoing information, the Securities Administrator shall be entitled to rely conclusively on the accuracy of the information or data regarding the Mortgage Loans and the related REO Property that has been provided to the Securities Administrator by the Master Servicer, and the Securities Administrator shall not be obligated to verify, recompute, reconcile or recalculate any such information or data. The Securities Administrator shall be entitled to conclusively rely on the Mortgage Loan data provided by the Master Servicer and shall have no liability for any errors in such Mortgage Loan data.

The Securities Administrator will make such statement (and, at its option, any additional files containing the same information in an alternative format) available each month to the parties hereto, the Certificateholders, the Certificate Insurer, the Swap Provider and each Rating Agency via the Securities Administrator's internet website. The Securities Administrator's internet website shall initially be located at www.ctslink.com. Assistance in using the website can be obtained by calling the Securities Administrator at (301) 815-6600. Parties that are unable to use the above distribution option are entitled to have a paper copy mailed to them via first class mail by calling the Securities Administrator and indicating such. The Securities Administrator shall have the right to change the way such statements are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Securities Administrator shall provide timely and adequate notification to all above parties regarding any such changes.

As a condition to access the Securities Administrator's internet website, the Securities Administrator may require registration and the acceptance of a disclaimer. The Securities

Administrator will not be liable for the dissemination of information in accordance with this Agreement.

(b) The Securities Administrator's responsibility for making the above information available to the Certificateholders is limited to the availability, timeliness and accuracy of the information derived from the Master Servicer and the Servicers. The Securities Administrator will make available a copy of each statement provided pursuant to this Section 6.06 to each Rating Agency on its website at www.ctslink.com.

(c) Within a reasonable period of time after the end of each calendar year, the Securities Administrator shall cause to be furnished upon written request to each Person who at any time during the calendar year was a Certificateholder, a statement containing the information set forth in clauses (a)(v) and (a)(vi) of this Section 6.06 aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder. Such obligation of the Securities Administrator shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Securities Administrator pursuant to any requirements of the Code as from time to time in effect.

(d) The Securities Administrator shall furnish quarterly to the Holders of the Residual Certificates each applicable Form 1066Q and shall respond promptly to written requests made not more frequently than quarterly by any Holder of a Residual Certificate with respect to the following matters:

(i) The original projected principal and interest cash flows on the Closing Date on each class of Regular Interests and Residual Interests created hereunder and on the related Mortgage Loans, based on the Prepayment Assumption;

(ii) The projected remaining principal and interest cash flows as of the end of any calendar quarter with respect to each class of Regular Interests and Residual Interests created hereunder and the related Mortgage Loans, based on the Prepayment Assumption;

(iii) The applicable Prepayment Assumption and any interest rate assumptions used in determining the projected principal and interest cash flows described above;

(iv) The original issue discount (or, in the case of the Mortgage Loans, market discount) or premium accrued or amortized through the end of such calendar quarter with respect to each class of Regular Interests or Residual Interests created hereunder and to the related Mortgage Loans, together with each constant yield to maturity used in computing the same;

(v) The treatment of losses realized with respect to the related Mortgage Loans or the Regular Interests created hereunder, including the timing and amount of any cancellation of indebtedness income of a REMIC with respect to such Regular Interests or bad debt deductions claimed with respect to the related Mortgage Loans;

(vi) The amount and timing of any non-interest expenses of a REMIC; and

(vii)    Any taxes (including penalties and interest) imposed on the REMIC, including, without limitation, taxes on "prohibited transactions," "contributions" or "net income from foreclosure property" or state or local income or franchise taxes.

The information pursuant to clauses (i), (ii), (iii) and (iv) above shall be provided by the Depositor pursuant to Section 10.12.

Section 6.07    REMIC Designations and REMIC Distributions.

(a)    The Securities Administrator on behalf of the Trustee shall elect that each of REMIC I, REMIC II, REMIC III, REMIC IV and REMIC V shall be treated as a REMIC under Section 860D of the Code. Any inconsistencies or ambiguities in this Agreement or in the administration of this Agreement shall be resolved in a manner that preserves the validity of such REMIC elections. The assets of REMIC I shall include the Mortgage Loans and all interest owing in respect of and principal due thereon, the Distribution Account, the Protected Accounts maintained by the Company and the related Servicer, any REO Property, any proceeds of the foregoing and any other assets related to the Mortgage Loans subject to this Agreement (other than the Reserve Fund, any Prepayment Charge Waiver Amounts and, for the avoidance of doubt, the Supplemental Interest Trust, the Swap Agreement, the Swap Account, the Credit Support Account and any rights or obligations in respect of the Swap Administration Agreement). The REMIC I Regular Interests shall constitute the assets of REMIC II. The REMIC II Regular Interests shall constitute the assets of REMIC III. The Class C Interest shall constitute the assets of REMIC IV.  The Class IO Interest shall constitute the assets of REMIC V.

(b)    (1)    On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC I to REMIC II on account of the REMIC I Regular Interests or withdrawn from the Distribution Account and distributed to the Holders of the Class R-1 Certificates, as the case may be:

(i)    from Interest Funds and Principal Funds, in each case determined without regard to the related clause (2)(ii) of the definitions thereof, to holders of each of the REMIC I Regular Interests I-1-A through I-45-B, *pro rata*, in an amount equal to (A) the Uncertificated Accrued Interest for such REMIC I Regular Interests for such Distribution Date, plus (B) any amounts payable in respect thereof remaining unpaid from previous Distribution Dates;

(ii)    to the extent of Interest Funds and Principal Funds, in each case determined without regard to the related clause (2)(ii) of the definitions thereof, remaining after the distribution made pursuant to clause (i) above, to REMIC I Regular Interests I-1-A through I-45-B, starting with the lowest numerical denomination, until the Uncertificated Principal Balances of each such REMIC I Regular Interest is reduced to zero; provided that, for REMIC I Regular Interests with the same numerical denomination, such payments of principal shall be allocated *pro rata* between such REMIC I Regular Interests; and

(iii)    any remaining amount to the Holders of the Class R-1 Certificates.

110

(2)    On each Distribution Date, amounts representing Prepayment Charges on the Mortgage loans shall be deemed distributed to the REMIC I Regular Interests, *pro rata*, provided that such amounts shall not reduce the Uncertificated Principal Balances of the REMIC I Regular Interests.

(c)    (1)    On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC II to REMIC III on account of the REMIC II Regular Interests or withdrawn from the Distribution Account and distributed to the Holders of the Class R-2 Certificates, as the case may be:

(i)    from Interest Funds and Principal Funds, in each case determined without regard to the related clause (2)(ii) of the definitions thereof, to the holders of REMIC II Regular Interest IO, in an amount equal to (A) the Uncertificated Accrued Interest for such REMIC II Regular Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates;

(ii)    to the extent of the Interest Funds and Principal Funds, in each case determined without regard to the related clause (2)(ii) of the definitions thereof, remaining after the distribution pursuant to clause (i), to the holders of each REMIC II Regular Interest (other than REMIC II Regular Interest IO), *pro rata*, in an amount equal to (A) the Uncertificated Accrued Interest for such REMIC II Regular Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates. Amounts payable as Uncertificated Accrued Interest in respect of REMIC II Regular Interest ZZ shall be reduced when the REMIC II Overcollateralization Amount is less than the REMIC II Required Overcollateralization Amount, by the lesser of (x) the amount of such difference and (y) the Maximum Uncertificated Accrued Interest Deferral Amount, and such amount will be payable to the holders of each REMIC II Regular Interest for which a Class A, Class M or Class B Certificate is a Corresponding Certificate in the same proportion as the Extra Principal Distribution Amount is allocated to the Corresponding Certificates for each such REMIC II Regular Interest, and the Uncertificated Principal Balance of REMIC II Regular Interest ZZ shall be increased by such amount;

(iii)    to the holders of REMIC II Regular Interests (other than REMIC II Regular Interest IO) in an amount equal to the remainder of the Interest Funds and Principal Funds, in each case determined without regard to the related clause (2)(ii) of the definitions thereof, for such Distribution Date after the distributions made pursuant to clauses (i), (ii) and (iii) above, allocated as follows:

(A)    98% of such remainder to the holders of REMIC II Regular Interest AA, until the Uncertificated Principal Balance of such REMIC II Regular Interest is reduced to zero;

(B)    2% of such remainder, first, to the holders of each REMIC II Regular Interest for which a Class A, Class M or Class B Certificate is a

Corresponding Certificate, in an aggregate amount equal to 1% of and in the same proportion as principal payments are allocated to the Corresponding Certificates for each such REMIC II Regular Interest, until the Uncertificated Principal Balances of such REMIC II Regular Interests are reduced to zero; and second, to the holders of REMIC II Regular Interest ZZ, until the Uncertificated Principal Balance of such REMIC II Regular Interest is reduced to zero; and

(C)    any remaining amount to the Holders of the Class R-2 Certificates.

(2)    On each Distribution Date, 100% of the Prepayment Charges deemed distributed on the REMIC I Regular Interests shall be distributed, *pro rata*, to the holders of the REMIC II Regular Interests (other than REMIC II Regular Interest IO), provided that such amounts shall not reduce the Uncertificated Principal Balances of the REMIC II Regular Interests.

(d)    On each Distribution Date, interest shall be deemed payable from REMIC III to the holders of each REMIC III Regular Interest the ownership of which is represented by the Class A, Class M and Class B Certificates at a pass-through rate equal to the lesser of (i) the Pass-Through Rate for the Corresponding Certificate determined without regard to the related Net WAC Cap Rate and (ii) the Net WAC Cap Rate for the REMIC III Regular Interest the ownership of which is represented by the Corresponding Certificate for such Distribution Date, in each case on a principal balance equal to the Certificate Principal Balance of the Corresponding Certificate for such Distribution Date. For the avoidance of doubt, principal shall be payable to, and shortfalls, losses and prepayments shall be allocable to, the REMIC III Regular Interests the ownership of which is represented by the Class A, Class M and Class B Certificates as such amounts are payable and allocable to the Corresponding Certificates.

(e)    On each Distribution Date, an amount equal to the aggregate amount distributed pursuant to Sections 6.04(a)(3)(C), (D) and (H) on such date shall be deemed distributed from REMIC III to REMIC IV in respect of the Class C Distribution Amount distributable to the Class C Interest, and 100% of the Prepayment Charges deemed distributed on the REMIC II Regular Interests shall be deemed distributed from REMIC III to REMIC IV in respect of the Class C Interest.

(f)    On each Distribution Date, 100% of the amounts deemed distributed on REMIC II Regular Interest IO on such date shall be deemed distributed by REMIC III to REMIC V in respect of the Class IO Interest. Such amounts shall be deemed distributed by REMIC V in respect of REMIC V Regular Interest IO for deposit into the Supplemental Interest Trust.

Section 6.08    Claims on the Policy; Policy Payments Account.

(a)    The Securities Administrator shall establish the Policy Payments Account. The Securities Administrator shall deposit upon receipt any amount paid under the Policy in the Policy Payments Account and use that amount only to pay the Class A-2 Certificates and Class A-3 Certificates the Insured Amounts for which a claim was made. Such amount may not be applied to satisfy any costs, expenses, or liabilities of the Master Servicer, the Securities

112

Administrator, the Trustee or the Servicers (other than payments of principal and interest on the Class A-2 Certificates and Class A-3 Certificates). Amounts paid under the Policy, to the extent needed to pay any Deficiency Amount, shall be transferred to the Distribution Account on the related Distribution Date, and the portion thereof representing the Deficiency Amount shall be disbursed by the Securities Administrator to the Holders of the Class A-2 Certificates and Class A-3 Certificates, in each case as if it were a payment to such Certificateholders pursuant to Section 6.04. Payments from draws on the Policy need not be made by checks or wire transfers separate from the checks or wire transfers used to pay other payments to the Holders of the Class A-2 Certificates and Class A-3 Certificates. However, the amount of any payment of principal of or interest on the Class A-2 Certificates and Class A-3 Certificates to be paid from funds transferred from the Policy Payments Account shall be noted as provided in paragraph (d) below and in the statement to be furnished to Holders of the Certificates pursuant to Section 6.06. Funds held in the Policy Payments Account shall not be invested. Any funds remaining in the Policy Payments Account on the first Business Day following the later of the Distribution Date and the Business Day after the day on which a payment on the Policy has been paid to the Holders of the Class A-2 Certificates and Class A-3 Certificates shall be returned to the Certificate Insurer, pursuant to the instructions of the Certificate Insurer, by the end of the Business Day.

(b)    If the Securities Administrator has determined that an Insured Amount is required to be paid under the Policy with respect to a Distribution Date, it shall deliver a notice of claim and certificate (substantially in the form of the Payment Notice under Financial Guaranty Insurance Policy No. CA03636A included as Exhibit A to the Policy) to the Certificate Insurer no later than 12:00 noon, New York, New York City time on the second Business Day preceding the Distribution Date and shall provide a copy of such notice to the Master Servicer at the time the Payment Notice is delivered to the Certificate Insurer. That notice (substantially in the form of the Payment Notice under Financial Guaranty Insurance Policy No. CA03636A included as Exhibit A to the Policy) shall constitute a claim for payment pursuant to the Policy.

(c)    If the Securities Administrator receives a certified copy of a final order of a court exercising jurisdiction in an Insolvency Proceeding (as defined in the Policy) (an "Order") that any prior payment made on the Class A-2 Certificates and Class A-3 Certificates constitutes an Avoided Payment (as defined in the Policy), the Securities Administrator shall so notify the Certificate Insurer, shall comply with the Policy to obtain payment by the Certificate Insurer of the Avoided Payment, and shall, at the time it provides notice to the Certificate Insurer, notify each Holder of the Class A-2 Certificates and Class A-3 Certificates by mail that, subject to the terms of the Policy, the Certificate Insurer will disburse the Avoided Payment directly to the receiver, conservator, debtor-in-possession, or trustee in bankruptcy named in the Order (unless a Holder of the Class A-2 Certificates or Class A-3 Certificates has provided evidence satisfactory to the Certificate Insurer that it has previously paid such amount to the receiver, conservator, debtor-in-possession or trustee in bankruptcy named in the Order, in which case such payment shall be disbursed to the Securities Administrator) by 2:00 P.M., New York City time on the Business Day following the delivery to the Securities Administrator on behalf of the related Certificateholder of (1) a certified copy of the Order to the effect that the Securities Administrator or such Certificateholder, as applicable, is required to return such Avoided Payment or portion thereof because such payment was avoided under applicable law, with respect to which order the appeal period has expired without an appeal having been filed, (2) an

113

assignment substantially in the form of Exhibit B to the Policy, properly completed and executed and delivered by a Holder of the Class A-2 Certificates or Class A-3 Certificates irrevocably assigning to the Certificate Insurer all rights and claims of such Holder relating to or arising under such Avoided Payment, and (3) a payment notice in the form of Exhibit A to the Policy appropriately completed and executed by the Securities Administrator. If the documents are received after 12:00 noon, New York City time, on a Business Day, they will be considered received on the following Business Day.

A copy of the Policy shall be made available to each affected Holder of the Class A-2 Certificates or Class A-3 Certificates through the Securities Administrator, and the Securities Administrator shall furnish to the Certificate Insurer a copy of its records evidencing the payments that have been made by the Securities Administrator in respect of any Avoided Payments paid by the Certificate Insurer and the dates on which the payments were made.

(d)     The Securities Administrator shall keep a complete and accurate record of the amount of interest and principal paid on the Class A-2 Certificates and Class A-3 Certificates from moneys received under the Policy.  The Certificate Insurer may inspect the records at reasonable times during normal business hours on two Business Days' notice to the Securities Administrator.

(e)     The Holders of the Class A-2 Certificates and Class A-3 Certificates are not entitled to institute proceedings directly against the Certificate Insurer. Each Holder of the Class A-2 Certificates and Class A-3 Certificates, by its purchase of the Class A-2 Certificates or Class A-3 Certificates, agrees that the Certificate Insurer may at any time during the continuation of any proceeding relating to an Avoided Payment, direct all matters relating to the Avoided Payment on its behalf, including the direction of any appeal of any order relating to the preference claim and the posting of any surety, supersedeas, or performance bond pending any appeal.

(f)     Any payments to the Certificate Insurer shall be made by wire transfer of immediately available funds to the following Federal Reserve Account (until the Certificate Insurer notifies the Securities Administrator of a change in the account information):

> Bank of America, N.A.
> 777 Main Street
> Hartford, CT 06115-2001
> ABA Number: 026009593
> For the Account of: XL Capital Assurance Inc.
> 1221 Avenue of the Americas, 31st Floor
> New York, NY 10020-1001
> Account #: 94278 35841
> Reference: Policy Number CA03636A

(g)     The Securities Administrator shall, upon retirement of the Class A-2 Certificates and Class A-3 Certificates, furnish to the Certificate Insurer a notice of the retirement, and, after

retirement of the Class A-2 Certificates and Class A-3 Certificates and the expiration of the term of the Policy, surrender the Policy to the Certificate Insurer for cancellation.

(h)    The Securities Administrator shall hold the Policy in trust as agent for the Holders of the Class A-2 Certificates and Class A-3 Certificates for the purpose of making claims on the Policy and distributing the proceeds of claims on the Policy. Neither the Policy nor the amounts paid on the Policy shall constitute part of the Trust Fund created by this Agreement. Each Holder of the Class A-2 Certificates or Class A-3 Certificates, by accepting its Class A-2 Certificate or Class A-3 Certificate, irrevocably appoints the Securities Administrator as attorney-in-fact to make claims on the Policy and to sign on its behalf any certification required with respect to any Payment Notice under the Policy.

(i)    Anything in this Agreement to the contrary notwithstanding, any payment with respect to principal of or interest on the Class A-2 Certificates and Class A-3 Certificates that is made with money received pursuant to the Policy shall not be considered payment of the Class A-2 Certificates and Class A-3 Certificates from the Trust Fund. The Depositor, the Master Servicer, the Trustee and the Securities Administrator acknowledge, and each Holder of the Class A-2 Certificates and Class A-3 Certificates by its acceptance of such Class A-2 Certificates and Class A-3 Certificates agrees that, without the need for any further action on the part of the Certificate Insurer, the Depositor, the Master Servicer, the Trustee or the Securities Administrator:

(i)    to the extent the Certificate Insurer makes payments, directly or indirectly, on account of principal of or interest on the Class A-2 Certificates or Class A-3 Certificates to the related Certificateholders, the Certificate Insurer shall be fully subrogated to, and each such Certificateholder hereby delegates and assigns to the Certificate Insurer, to the fullest extent permitted by law, the rights of such Certificateholders to receive such principal and interest from the Trust Fund, and

(ii)    the Certificate Insurer shall be paid such amounts from the sources and in the manner provided in this Agreement for the payment of such amounts and as provided in this Agreement until full reimbursement of all Insured Payments and Avoided Payments (together with interest thereon at the Late Payment Rate from the date paid by the Certificate Insurer until the date of their reimbursement).

The Securities Administrator and the Master Servicer shall cooperate in all respects with any reasonable request by the Certificate Insurer for action to preserve or enforce the Certificate Insurer's rights or interests under this Agreement (without limiting the rights or affecting the interests of the Holders of the Class A-2 Certificates and Class A-3 Certificates as otherwise provided in this Agreement).

ARTICLE VII

THE CERTIFICATES

Section 7.01    The Certificates.

The Certificates shall be substantially in the forms attached hereto as Exhibits A-1 through A-6. The Certificates shall be issuable in registered form, in the minimum dollar denominations, integral dollar multiples in excess thereof (except that one Certificate of each Class may be issued in a different amount which must be in excess of the applicable minimum dollar denomination) and aggregate dollar denominations as set forth in the following table:

| Class | Minimum Denomination | | Integral Multiple in Excess of Minimum | | Original Certificate Principal Balance or Notional Amount | |
|---|---|---|---|---|---|---|
| A-1 | $ | 100,000 | $ | 1.00 | $ | 678,089,000 |
| A-2 | $ | 100,000 | $ | 1.00 | $ | 196,192,000 |
| A-3 | $ | 100,000 | $ | 1.00 | $ | 160,000,000 |
| M-1 | $ | 100,000 | $ | 1.00 | $ | 65,837,000 |
| M-2 | $ | 100,000 | $ | 1.00 | $ | 45,307,000 |
| M-3 | $ | 100,000 | $ | 1.00 | $ | 27,609,000 |
| M-4 | $ | 100,000 | $ | 1.00 | $ | 25,485,000 |
| M-5 | $ | 100,000 | $ | 1.00 | $ | 24,070,000 |
| M-6 | $ | 100,000 | $ | 1.00 | $ | 24,070,000 |
| B-1 | $ | 100,000 | $ | 1.00 | $ | 23,362,000 |
| B-2 | $ | 100,000 | $ | 1.00 | $ | 21,238,000 |
| B-3 | $ | 100,000 | $ | 1.00 | $ | 17,698,000 |
| B-4 | $ | 100,000 | $ | 1.00 | $ | 17,698,000 |
| C | | 10% | $ | 1% | $ | 1,415,853,132.36 [1] |
| X | | 100% | $ | N/A | | N/A |
| R-1 | | 100% | $ | N/A | | N/A |
| R-2 | | 100% | $ | N/A | | N/A |
| R-3 | | 100% | $ | N/A | | N/A |
| R-4 | | 100% | $ | N/A | | N/A |
| RX | | 100% | $ | N/A | | N/A |

(1)    This is a Notional Amount.

The Class X Certificates will be issued as a single Certificate and will not have a have Certificate Principal Balance. The Certificates shall be executed by manual or facsimile signature on behalf of the Securities Administrator by an authorized officer. Certificates bearing the manual or facsimile signatures of individuals who were, at the time when such signatures were affixed, authorized to sign on behalf of the Securities Administrator shall bind the Securities Administrator, notwithstanding that such individuals or any of them have ceased to be so authorized prior to the authentication and delivery of such Certificates or did not hold such offices at the date of such authentication and delivery. No Certificate shall be entitled to any benefit under this Agreement, or be valid for any purpose, unless there appears on such Certificate the countersignature of the Securities Administrator by manual signature, and such countersignature upon any Certificate shall be conclusive evidence, and the only evidence, that

116

such Certificate has been duly countersigned and delivered hereunder. All Certificates shall be dated the date of their countersignature. On the Closing Date, the Securities Administrator shall authenticate the Certificates to be issued at the written direction of the Depositor, or any affiliate thereof.

The Depositor shall provide, or cause to be provided, to the Securities Administrator on a continuous basis, an adequate inventory of Certificates to facilitate transfers.

Section 7.02    Certificate Register; Registration of Transfer and Exchange of Certificates.

(a) The Securities Administrator shall maintain, or cause to be maintained in accordance with the provisions of Section 7.09 hereof, a Certificate Register for the Trust Fund in which, subject to the provisions of subsections (b) and (c) below and to such reasonable regulations as it may prescribe, the Securities Administrator shall provide for the registration of Certificates and of Transfers and exchanges of Certificates as herein provided. Upon surrender for registration of Transfer of any Certificate, the Securities Administrator shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of the same Class and of like aggregate Percentage Interest.

At the option of a Certificateholder, Certificates may be exchanged for other Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest upon surrender of the Certificates to be exchanged at the office or agency of the Securities Administrator. Whenever any Certificates are so surrendered for exchange, the Securities Administrator shall execute, authenticate, and deliver the Certificates that the Certificateholder making the exchange is entitled to receive. Every Certificate presented or surrendered for registration of Transfer or exchange shall be accompanied by a written instrument of Transfer in form satisfactory to the Securities Administrator duly executed by the holder thereof or his attorney duly authorized in writing.

No service charge to the Certificateholders shall be made for any registration of Transfer or exchange of Certificates, but payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any Transfer or exchange of Certificates may be required.

All Certificates surrendered for registration of Transfer or exchange shall be canceled and subsequently destroyed by the Securities Administrator in accordance with the Securities Administrator's customary procedures.

(b) Subject to Section 7.07 and, in the case of any Global Certificate or Private Certificate upon the satisfaction of the conditions set forth below, upon surrender for registration of transfer of any Certificate at any office or agency of the Securities Administrator maintained for such purpose, the Securities Administrator shall sign, countersign and shall deliver, in the name of the designated transferee or transferees, a new Certificate of a like Class and aggregate Percentage Interest, but bearing a different number.

(c) Subject to Section 7.02(g), so long as a Global Certificate of such Class is outstanding and is held by or on behalf of the Depository, transfers of beneficial interests in

such Global Certificate, or transfers by Holders of Individual Certificates of such Class to transferees that take delivery in the form of beneficial interests in the Global Certificate, may be made only in accordance with this Section 7.02(c) and in accordance with the rules of the Depository:

(i)    In the case of a beneficial interest in the Global Certificate being transferred to an Institutional Accredited Investor, such transferee shall be required to take delivery in the form of an Individual Certificate or Certificates and the Securities Administrator shall register such transfer only upon compliance with the provisions of Section 7.02(h).

(ii)    In the case of a beneficial interest in a Class of Global Certificates being transferred to a transferee that takes delivery in the form of an Individual Certificate or Certificates of such Class, except as set forth in clause (i) above, the Securities Administrator shall register such transfer only upon compliance with the provisions of Section 7.02(h).

(iii)    In the case of an Individual Certificate of a Class being transferred to a transferee that takes delivery in the form of a beneficial interest in a Global Certificate of such Class, the Securities Administrator shall register such transfer if the transferee has provided the Securities Administrator with a Rule 144A and Related Matters Certificate or comparable evidence as to its QIB status.

(iv)    No restrictions shall apply with respect to the transfer or registration of transfer of a beneficial interest in the Global Certificate of a Class to a transferee that takes delivery in the form of a beneficial interest in the Global Certificate of such Class; provided that each such transferee shall be deemed to have made such representations and warranties contained in the Rule 144A and Related Matters Certificate as are sufficient to establish that it is a QIB.

(d)    Subject to Section 7.02(g), an exchange of a beneficial interest in a Global Certificate of a Class for an Individual Certificate or Certificates of such Class, an exchange of an Individual Certificate or Certificates of a Class for a beneficial interest in the Global Certificate of such Class and an exchange of an Individual Certificate or Certificates of a Class for another Individual Certificate or Certificates of such Class (in each case, whether or not such exchange is made in anticipation of subsequent transfer, and, in the case of the Global Certificate of such Class, so long as such Certificate is outstanding and is held by or on behalf of the Depository) may be made only in accordance with this Section 7.02(d) and in accordance with the rules of the Depository:

(i)    A Holder of a beneficial interest in a Global Certificate of a Class may at any time exchange such beneficial interest for an Individual Certificate or Certificates of such Class.

(ii)    A Holder of an Individual Certificate or Certificates of a Class may exchange such Certificate or Certificates for a beneficial interest in the Global Certificate

of such Class if such holder furnishes to the Securities Administrator a Rule 144A and Related Matters Certificate or comparable evidence as to its QIB status.

(iii)    A Holder of an Individual Certificate of a Class may exchange such Certificate for an equal aggregate principal amount of Individual Certificates of such Class in different authorized denominations without any certification.

(e)    (i)    Upon acceptance for exchange or transfer of an Individual Certificate of a Class for a beneficial interest in a Global Certificate of such Class as provided herein, the Securities Administrator shall cancel such Individual Certificate and shall (or shall request the Depository to) endorse on the schedule affixed to the applicable Global Certificate (or on a continuation of such schedule affixed to the Global Certificate and made a part thereof) or otherwise make in its books and records an appropriate notation evidencing the date of such exchange or transfer and an increase in the certificate balance of the Global Certificate equal to the certificate balance of such Individual Certificate exchanged or transferred therefor.

(1)    (ii)    Upon acceptance for exchange or transfer of a beneficial interest in a Global Certificate of a Class for an Individual Certificate of such Class as provided herein, the Securities Administrator shall (or shall request the Depository to) endorse on the schedule affixed to such Global Certificate (or on a continuation of such schedule affixed to such Global Certificate and made a part thereof) or otherwise make in its books and records an appropriate notation evidencing the date of such exchange or transfer and a decrease in the certificate balance of such Global Certificate equal to the certificate balance of such Individual Certificate issued in exchange therefor or upon transfer thereof.

(f)    Any Individual Certificate issued in exchange for or upon transfer of another Individual Certificate or of a beneficial interest in a Global Certificate shall bear the applicable legends set forth in Exhibit A-2.

(g)    Subject to the restrictions on transfer and exchange set forth in this Section 7.02, the Holder of any Individual Certificate may transfer or exchange the same in whole or in part (in an initial certificate balance equal to the minimum authorized denomination set forth in Section 7.01 above or any integral multiple of $1.00 in excess thereof) by surrendering such Certificate at the Corporate Trust Office, or at the office of any transfer agent, together with an executed instrument of assignment and transfer satisfactory in form and substance to the Securities Administrator in the case of transfer and a written request for exchange in the case of exchange. The Holder of a beneficial interest in a Global Certificate may, subject to the rules and procedures of the Depository, cause the Depository (or its nominee) to notify the Securities Administrator in writing of a request for transfer or exchange of such beneficial interest for an Individual Certificate or Certificates. Following a proper request for transfer or exchange, the Securities Administrator shall, within five Business Days of such request made at the Corporate Trust Office, sign, countersign and deliver at the Corporate Trust Office, to the transferee (in the case of transfer) or Holder (in the case of exchange) or send by first class mail at the risk of the transferee (in the case of transfer) or Holder (in the case of exchange) to such address as the transferee or Holder, as applicable, may request, an Individual Certificate or Certificates, as the case may require, for a like aggregate Percentage Interest and in such

authorized denomination or denominations as may be requested. The presentation for transfer or exchange of any Individual Certificate shall not be valid unless made at the Corporate Trust Office by the registered Holder in person, or by a duly authorized attorney-in-fact.

(h)   No Transfer of a Private Certificate shall be made unless such Transfer is made pursuant to an effective registration statement under the Securities Act and any applicable state securities laws or is exempt from the registration requirements under the Securities Act and such state securities laws. In the event that a Transfer is to be made in reliance upon an exemption from the Securities Act and such laws, in order to assure compliance with the Securities Act and such laws, the Certificateholder desiring to effect such Transfer and such Certificateholder's prospective transferee shall each certify to the Trustee and the Securities Administrator in writing the facts (or shall be deemed to certify in the case of a Book-Entry Certificate) surrounding the Transfer by (x)(i) the delivery to the Securities Administrator by the Certificateholder desiring to effect such transfer of a certificate substantially in the form set forth in Exhibit D (the "Transferor Certificate") and (ii) the delivery by the Certificateholder's prospective transferee of (A) a letter in substantially the form of Exhibit E (the "Investment Letter") if the prospective transferee is an Institutional Accredited Investor or (B) a letter in substantially the form of Exhibit F (the "Rule 144A and Related Matters Certificate") if the prospective transferee is a QIB or (y) there shall be delivered to the Trustee and the Securities Administrator an Opinion of Counsel addressed to the Trustee and the Securities Administrator that such Transfer may be made pursuant to an exemption from the Securities Act, which Opinion of Counsel shall not be an expense of the Depositor, the Seller, the Master Servicer, the Securities Administrator or the Trustee; provided, however, that such representation letters will not be required in connection with any transfer of any such Certificate by the Depositor to an affiliate of the Depositor and the Trustee and the Securities Administrator shall be entitled to conclusively rely upon a representation (which, upon the request of the Trustee or the Securities Administrator, shall be a written representation) from the Depositor of the status of such transferee as an affiliate of the Depositor. Notwithstanding the provisions of the immediately preceding sentence, no restrictions shall apply with respect to the transfer or registration of transfer of a beneficial interest in any Certificate that is a Global Certificate of a Class to a transferee that takes delivery in the form of a beneficial interest in the Global Certificate of such Class provided that each such transferee shall be deemed to have made such representations and warranties contained in the Rule 144A and Related Matters Certificate as are sufficient to establish that it is a QIB. The Securities Administrator shall provide to any Holder of a Private Certificate and any prospective transferee designated by any such Holder, information regarding the Certificates and the Mortgage Loans and such other information as shall be necessary to satisfy the condition to eligibility set forth in Rule 144A(d)(4) for Transfer of any such Certificate without registration thereof under the Securities Act pursuant to the registration exemption provided by Rule 144A. The Trustee, the Securities Administrator and the Master Servicer shall cooperate with the Depositor in providing the Rule 144A information referenced in the preceding sentence, including providing to the Depositor such information regarding the Certificates, the Mortgage Loans and other matters regarding the Trust Fund as the Depositor shall reasonably request to meet its obligation under the preceding sentence. Each Holder of a Private Certificate desiring to effect such Transfer shall, and does hereby agree to, indemnify the Trustee, the Depositor, the Seller, the Securities Administrator and the Master Servicer against any liability that may

result if the Transfer is not so exempt or is not made in accordance with such federal and state laws.

No transfer of any Class C Certificate shall be made unless the proposed transferee of such Class C Certificate (1) provides to the Securities Administrator the appropriate tax certification form that would eliminate any withholding or deduction for taxes from amounts payable by the Swap Provider, pursuant to the Interest Rate Swap Agreement, to the Swap Administrator on behalf of the Supplemental Interest Trust (i.e., IRS Form W-9 or IRS Form W-8BEN, W-8IMY, W-8EXP or W-8ECI, as applicable (or any successor form thereto), together with any applicable attachments) and (2) agrees to update such form (a) upon expiration of any such form, (b) as required under then applicable U.S. Treasury regulations and (c) promptly upon learning that such form has become obsolete or incorrect, each as a condition to such transfer. In addition, no transfer of any Class C Certificate shall be made if such transfer would cause the Supplemental Interest Trust to be beneficially owned by two or more persons for federal income tax purposes, or continue to be so treated, unless (i) each proposed transferee of such Class C Certificate complies with the foregoing conditions and (ii) the proposed majority holder of the Class C Certificates (or each holder, if there is or would be no majority holder) (A) provides, or causes to be provided, on behalf of the Supplemental Interest Trust, if applicable, to the Securities Administrator, the appropriate tax certification form that would be required from the Supplemental Interest Trust to eliminate any withholding or deduction for taxes from amounts payable by the Swap Provider, pursuant to the Interest Rate Swap Agreement, to the Swap Administrator on behalf of the Supplemental Interest Trust (i.e., IRS Form W-9 or IRS Form W-8BEN, W-8IMY, W-8EXP or W-8ECI, as applicable (or any successor form thereto), together with any applicable attachments) and (B) agrees to update such form (x) upon expiration of any such form, (y) as required under then applicable U.S. Treasury regulations and (z) promptly upon learning that such form has become obsolete or incorrect. If, under applicable U.S. Treasury regulations, such tax certification form may only be signed by a trustee acting on behalf of the Supplemental Interest Trust, then the Supplemental Interest Trust Trustee shall sign such certification form if so requested by a holder of the Class C Certificates. Upon receipt of any tax certification form pursuant to the preceding conditions from a holder or proposed transferee of any Class C Certificate, the Securities Administrator shall forward such tax certification form to the Supplemental Interest Trust Trustee. The Supplemental Interest Trust Trustee shall forward such tax certification form provided to it to the Swap Provider. Each holder of a Class C Certificate and each transferee thereof shall be deemed to have consented to the Supplemental Interest Trust Trustee forwarding to the Swap Provider any tax certification form it has provided and updated in accordance with these transfer restrictions. Any purported sales or transfers of any Class C Certificate to a transferee which does not comply with the requirements of this paragraph shall be deemed null and void under this Agreement.

The Securities Administrator shall be entitled to rely conclusively on any certificate required by this Section 7.02 to be executed in connection with the transfer of any Certificate, and shall be entitled to presume conclusively the continuing accuracy thereof from time to time, in each case without further inquiry or investigation.

The Securities Administrator shall not be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the 1933 Act, applicable state securities laws, ERISA or the Code;

except that if a Certificate is required by the terms of this Section 7.02 to be provided to the Securities Administrator by a prospective transferor or transferee, the Securities Administrator shall examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section 7.02 and that if an opinion of counsel is provided, the Securities Administrator shall examine the same to determine whether it meets the requirements hereof.

No Transfer of an ERISA Restricted Certificate shall be made at any time unless either (i) the transferee of such Certificate provides a representation, or is deemed to represent in the case of a Global Certificate, to the Securities Administrator acceptable to and in form and substance satisfactory to the Securities Administrator to the effect that such transferee is not a Plan, or a Person acting on behalf of a Plan or using the assets of a Plan, or (ii) in the case of any such Certificate presented for registration in the name of a Plan, or a trustee of a Plan or any other person acting on behalf of a Plan, the Securities Administrator shall have received an Opinion of Counsel for the benefit of the Trustee, the Securities Administrator, the Master Servicer and the Certificate Insurer and on which they may rely, satisfactory to the Securities Administrator, to the effect that the purchase and holding of such Certificate are permissible under applicable law, will not result in any prohibited transactions under ERISA or Section 4975 of the Code and will not subject the Trustee, the Securities Administrator, the Master Servicer or the Depositor to any obligation in addition to those expressly undertaken in this Agreement, which Opinion of Counsel shall not be an expense of the Trustee, the Securities Administrator, the Master Servicer or the Depositor. Notwithstanding anything else to the contrary herein, any purported transfer of an ERISA Restricted Certificate to or on behalf of a Plan without the delivery of the Opinion of Counsel as described above shall be void and of no effect; provided that the restriction set forth in this sentence shall not be applicable if there has been delivered to the Trustee and the Securities Administrator an Opinion of Counsel meeting the requirements of clause (ii) of the first sentence of this paragraph. Neither the Trustee, the Securities Administrator nor the Master Servicer shall be required to monitor, determine or inquire as to compliance with the transfer restrictions with respect to any ERISA Restricted Certificate that is a Book-Entry Certificate, and neither the Trustee nor the Master Servicer shall have any liability for transfers of any such Book-Entry Certificates made through the book-entry facilities of any Depository or between or among participants of the Depository or Certificate Owners made in violation of the transfer restrictions set forth herein. Neither the Trustee, the Securities Administrator nor the Master Servicer shall be under any liability to any Person for any registration of transfer of any ERISA Restricted Certificate that is in fact not permitted by this Section 7.02(h) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement.

Prior to the termination of the related Supplemental Interest Trust, no Transfer of a related Class A, Class M or Class B Certificate shall be made unless either (i) the Securities Administrator shall have received a representation from the transferee of such Certificate acceptable to and in form and substance satisfactory to the Securities Administrator, or is deemed to represent in the case of a Global Certificate, that such transferee is not an employee benefit plan subject to Section 406 of ERISA or a plan subject to Section 4975 of the Code (either a "Plan"), or a Person acting on behalf of a Plan or using the assets a Plan, or (ii) the transferee provides a representation, or is deemed to represent in the case of the Global Certificate that (A) such plan is an accredited investor within the meaning of the Exemption and

122

(B) the proposed transfer or holding of such Certificate are eligible for exemptive relief under PTCE 95-60 or, except in the case of the Class M Certificate or Class B Certificate, PTCE 84-14, PTCE 91-38, PTCE 90-1 or PTCE 96-23.

Each beneficial owner of a related Class M or Class B Certificate or any interest therein shall be deemed to have represented, by virtue of its acquisition or holding of that certificate or interest therein, that either (i) it is not a Plan or investing with "Plan Assets" or (ii) (1) it is an insurance company, (2) the source of funds used to acquire or hold the certificate or interest therein is an "insurance company general account," as such term is defined in PTCE 95-60, and (3) the conditions in Sections I and III of PTCE 95-60 have been satisfied.

Neither the Trustee, the Securities Administrator nor the Master Servicer will be required to monitor, determine or inquire as to compliance with the transfer restrictions with respect to the Global Certificates. Any attempted or purported transfer of any Certificate in violation of the provisions of this Section 7.02 shall be void ab initio and such Certificate shall be considered to have been held continuously by the prior permitted Certificateholder. Any transferor of any Certificate in violation of such provisions, shall indemnify and hold harmless the Trustee, the Securities Administrator and the Master Servicer from and against any and all liabilities, claims, costs or expenses incurred by the Trustee, the Securities Administrator or the Master Servicer as a result of such attempted or purported transfer. Neither the Securities Administrator shall have any liability for transfer of any such Global Certificates in or through book-entry facilities of any Depository or between or among Depository Participants or Certificate Owners made in violation of the transfer restrictions set forth herein. The Securities Administrator shall be entitled, but not obligated, to recover from any Holder of any ERISA Restricted Certificate that was in fact a Plan or a Person acting on behalf of a Plan at the time it became a Holder or, at such subsequent time as it became a Plan or Person acting on behalf of a Plan, all payments made on such ERISA Restricted Certificate at and after either such time. Any such payments so recovered by the Securities Administrator shall be paid and delivered by the Securities Administrator to the last preceding Holder of such Certificate that is not a Plan or Person acting on behalf of a Plan.

(i)    Each Person who has or who acquires any Ownership Interest in a Residual Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions, and the rights of each Person acquiring any Ownership Interest in a Residual Certificate are expressly subject to the following provisions:

(i)    Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall be a Permitted Transferee and shall promptly notify the Securities Administrator of any change or impending change in its status as a Permitted Transferee.

(ii)    No Ownership Interest in a Residual Certificate may be registered on the Closing Date or thereafter transferred, and the Securities Administrator shall not register the Transfer of any Residual Certificate unless, in addition to the certificates required to be delivered to the Securities Administrator under subsection (b) above, the Securities Administrator shall have been furnished with an affidavit and agreement of the initial owner or the proposed transferee in the

form attached hereto as Exhibit C-1 (a "Transferee Affidavit") and an affidavit of the proposed transferor in the form attached hereto as Exhibit C-2 (a "Transferor Affidavit").

(iii)    Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall agree (A) to obtain a Transferee Affidavit from any other Person to whom such Person attempts to Transfer its Ownership Interest in a Residual Certificate, (B) to obtain a Transferee Affidavit from any Person for whom such Person is acting as nominee, trustee or agent in connection with any Transfer of a Residual Certificate, (C) not to Transfer its Ownership Interest in a Residual Certificate or to cause the Transfer of an Ownership Interest in a Residual Certificate to any other Person if it has actual knowledge that such Person is not a Permitted Transferee and (D) to provide the Securities Administrator with a Transferor Affidavit.

(iv)    Any attempted or purported Transfer of any Ownership Interest in a Residual Certificate in violation of the provisions of this Section 7.02(i) shall be absolutely null and void and shall vest no rights in the purported Transferee. If any purported transferee shall become a Holder of a Residual Certificate in violation of the provisions of this Section 7.02(i), then the last preceding Permitted Transferee shall be restored to all rights as Holder thereof retroactive to the date of registration of Transfer of such Residual Certificate. Neither the Securities Administrator nor the Trustee shall be under liability to any Person for any registration of Transfer of a Residual Certificate that is in fact not permitted by Section 7.02(h) and this Section 7.02(i) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement so long as the Transfer was registered after receipt of the related Transferee Affidavit and Transferor Affidavit. The Securities Administrator shall be entitled but not obligated to recover from any Holder of a Residual Certificate that was in fact not a Permitted Transferee at the time it became a Holder or, at such subsequent time as it became other than a Permitted Transferee, all payments made on such Residual Certificate at and after either such time. Any such payments so recovered by the Securities Administrator shall be paid and delivered by the Securities Administrator to the last preceding Permitted Transferee of such Certificate.

(v)    The Master Servicer shall make available within 60 days of written request from the Securities Administrator, all information necessary to compute any tax imposed under Section 860E(e) of the Code as a result of a Transfer of an Ownership Interest in a Residual Certificate to any Holder who is not a Permitted Transferee.

The restrictions on Transfers of a Residual Certificate set forth in this Section 7.02(i) shall cease to apply (and the applicable portions of the legend on a Residual Certificate may be deleted) with respect to Transfers occurring after delivery to the Securities Administrator and the Certificate Insurer of an Opinion of Counsel addressed to the Securities Administrator and the Certificate Insurer, which Opinion of Counsel shall not be an expense of the Trustee, the

Securities Administrator, the Seller, the Certificate Insurer or the Master Servicer to the effect that the elimination of such restrictions, or any Transfer of a Residual Certificate allowed by such elimination, will not cause REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V, as applicable, to fail to qualify as a REMIC at any time that the Certificates are outstanding or result in the imposition of any tax on the Trust Fund, a Certificateholder or another Person. Each Person holding or acquiring any Ownership Interest in a Residual Certificate hereby consents to any amendment of this Agreement that, based on an Opinion of Counsel addressed to the Securities Administrator and the Certificate Insurer and furnished to the Securities Administrator and the Certificate Insurer, is reasonably necessary (a) to ensure that the record ownership of, or any beneficial interest in, a Residual Certificate is not transferred, directly or indirectly, to a Person that is not a Permitted Transferee and (b) to provide for a means to compel the Transfer of a Residual Certificate that is held by a Person that is not a Permitted Transferee to a Holder that is a Permitted Transferee.

(j)    The preparation and delivery of all certificates and opinions referred to above in this Section 7.02 shall not be an expense of the Trust Fund, the Trustee, the Depositor, the Seller, the Securities Administrator or the Master Servicer.

Section 7.03    Mutilated, Destroyed, Lost or Stolen Certificates.

If (a) any mutilated Certificate is surrendered to the Securities Administrator, or the Securities Administrator receives evidence to its satisfaction of the destruction, loss or theft of any Certificate and of the ownership thereof and (b) there is delivered to the Securities Administrator (and, with respect to the Class A-2 Certificates and Class A-3 Certificates, the Certificate Insurer) such security or indemnity as may be required by them to save the Securities Administrator and the Trustee harmless, then, in the absence of notice to the Securities Administrator that such Certificate has been acquired by a bona fide purchaser, the Securities Administrator shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like Class, tenor and Percentage Interest. In connection with the issuance of any new Certificate under this Section 7.03, the Securities Administrator may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Securities Administrator) connected therewith. Any replacement Certificate issued pursuant to this Section 7.03 shall constitute complete and indefeasible evidence of ownership in the Trust Fund, as if originally issued, whether or not the lost, stolen or destroyed Certificate shall be found at any time. All Certificates surrendered to the Securities Administrator under the terms of this Section 7.03 shall be canceled and destroyed by the Securities Administrator in accordance with its standard procedures without liability on its part.

Section 7.04    Persons Deemed Owners.

The Securities Administrator, the Certificate Insurer and the Trustee and any agent of the Securities Administrator, the Certificate Insurer and the Trustee may treat the person in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions as provided in this Agreement and for all other purposes whatsoever, and neither the Securities Administrator, the Certificate Insurer, the Trustee, nor any agent of the Securities

Administrator, the Certificate Insurer or the Trustee shall be affected by any notice to the contrary.

Section 7.05    Access to List of Certificateholders' Names and Addresses.

If three or more Certificateholders, or in the case of Book-Entry Certificates, Certificate Owners (a) request such information in writing from the Securities Administrator, (b) state that such Certificateholders or Certificate Owners desire to communicate with other Certificateholders or Certificate Owners with respect to their rights under this Agreement or under the Certificates, and (c) provide a copy of the communication that such Certificateholders or Certificate Owners propose to transmit or if the Depositor, the Certificate Insurer or the Master Servicer shall request such information in writing from the Securities Administrator, then the Securities Administrator shall, within ten Business Days after the receipt of such request, provide the Depositor, the Certificate Insurer, the Master Servicer or such Certificateholders or Certificate Owners at such recipients' expense the most recent list of the Certificateholders of the Trust Fund held by the Securities Administrator, if any. The Depositor and every Certificateholder and Certificate Owner, by receiving and holding a Certificate, agree that the Securities Administrator shall not be held accountable by reason of the disclosure of any such information as to the list of the Certificateholders hereunder, regardless of the source from which such information was derived.

Section 7.06    Book-Entry Certificates.

The Regular Certificates (other than the Class C Certificates), upon original issuance, shall be issued in the form of one or more typewritten Certificates representing the Book-Entry Certificates, to be delivered to the Depository by or on behalf of the Depositor. Such Certificates shall initially be registered on the Certificate Register in the name of the Depository or its nominee, and no Certificate Owner of such Certificates will receive a definitive certificate representing such Certificate Owner's interest in such Certificates, except as provided in Section 7.08. Unless and until definitive, fully registered Certificates ("Definitive Certificates") have been issued to the Certificate Owners of such Certificates pursuant to Section 7.08:

(a)    the provisions of this Section shall be in full force and effect;

(b)    the Depositor, the Securities Administrator and the Trustee may deal with the Depository and the Depository Participants for all purposes (including the making of distributions) as the authorized representative of the respective Certificate Owners of such Certificates;

(c)    registration of the Book-Entry Certificates may not be transferred by the Securities Administrator except to another Depository;

(d)    the rights of the respective Certificate Owners of such Certificates shall be exercised only through the Depository and the Depository Participants and shall be limited to those established by law and agreements between the Owners of such Certificates and the Depository and/or the Depository Participants. Pursuant to the Depository Agreement, unless and until Definitive Certificates are issued pursuant to Section 7.08, the Depository will make

book-entry transfers among the Depository Participants and receive and transmit distributions of principal and interest on the related Certificates to such Depository Participants;

(e)   the Depository may collect its usual and customary fees, charges and expenses from its Depository Participants;

(f)   the Securities Administrator may rely and shall be fully protected in relying upon information furnished by the Depository with respect to its Depository Participants; and

(g)   to the extent that the provisions of this Section conflict with any other provisions of this Agreement, the provisions of this Section shall control.

For purposes of any provision of this Agreement requiring or permitting actions with the consent of, or at the direction of, Certificateholders evidencing a specified percentage of the aggregate unpaid principal amount of any Class of Certificates, such direction or consent may be given by Certificate Owners (acting through the Depository and the Depository Participants) owning Book-Entry Certificates evidencing the requisite percentage of principal amount of such Class of Certificates.

The Private Certificates shall initially be held in fully registered certificated form. If at any time the Holders of all of the Certificates of one or more such Classes request that the Securities Administrator cause such Class to become Global Certificates, the Depositor (with the assistance of the Securities Administrator) will take such action as may be reasonably required to cause the Depository to accept such Class or Classes for trading if it may legally be so traded. If at anytime there are to be Global Certificates, the Global Certificates shall be delivered to the Depository by the Depositor or deposited with the Securities Administrator as custodian for the Depository.

All transfers by Certificate Owners of such respective Classes of Book-Entry Certificates and any Global Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owners. Each Depository Participant shall only transfer Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures.

Section 7.07   Notices to Depository.

Whenever any notice or other communication is required to be given to Certificateholders of a Class with respect to which Book-Entry Certificates have been issued, unless and until Definitive Certificates shall have been issued to the related Certificate Owners, the Securities Administrator shall give all such notices and communications to the Depository.

Section 7.08   Definitive Certificates.

If, after Book-Entry Certificates have been issued with respect to any Certificates, (a) the Depositor or the Depository advises the Securities Administrator that the Depository is no longer willing or able to discharge properly its responsibilities under the Depository Agreement with respect to such Certificates and the Depositor is unable to locate a qualified successor or (b) the

Depositor, with the consent of Depository Participants, advises the Securities Administrator that it elects to terminate the book-entry system with respect to such Certificates through the Depository, then the Securities Administrator shall notify all Certificate Owners of such Certificates, through the Depository, of the occurrence of any such event and of the availability of Definitive Certificates to applicable Certificate Owners requesting the same. The Depositor shall provide the Securities Administrator with an adequate inventory of certificates to facilitate the issuance and transfer of Definitive Certificates. Upon surrender to the Securities Administrator of any such Certificates by the Depository, accompanied by registration instructions from the Depository for registration, the Securities Administrator shall countersign and deliver such Definitive Certificates. Neither the Depositor nor the Securities Administrator shall be liable for any delay in delivery of such instructions and each may conclusively rely on, and shall be protected in relying on, such instructions.

In addition, if an Event of Default has occurred and is continuing, each Certificate Owner materially adversely affected thereby may at its option request a Definitive Certificate evidencing such Certificate Owner's Voting Rights in the related Class of Certificates. In order to make such request, such Certificate Owner shall, subject to the rules and procedures of the Depository, provide the Depository or the related Depository Participant with directions for the Securities Administrator to exchange or cause the exchange of the Certificate Owner's interest in such Class of Certificates for an equivalent Voting Right in fully registered definitive form. Upon receipt by the Securities Administrator of instructions from the Depository directing the Securities Administrator to effect such exchange (such instructions to contain information regarding the Class of Certificates and the Certificate Principal Balance being exchanged, the Depository Participant account to be debited with the decrease, the registered holder of and delivery instructions for the definitive Certificate, and any other information reasonably required by the Securities Administrator), (i) the Securities Administrator shall instruct the Depository to reduce the related Depository Participant's account by the aggregate Certificate Principal Balance of the definitive Certificate, (ii) the Securities Administrator shall execute, authenticate and deliver, in accordance with the registration and delivery instructions provided by the Depository, a definitive Certificate evidencing such Certificate Owner's Voting Rights in such Class of Certificates and (iii) the Securities Administrator shall execute and authenticate a new Book-Entry Certificate reflecting the reduction in the Certificate Principal Balance of such Class of Certificates by the amount of the definitive Certificates.

Section 7.09    Maintenance of Office or Agency.

The Securities Administrator will maintain or cause to be maintained at its expense an office or offices or agency or agencies located at Wells Fargo Bank, National Association, Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479, Attn: Corporate Trust Services – Bear Stearns Second Lien Trust 2007-SV1, where Certificates may be surrendered for registration of transfer or exchange. The Securities Administrator initially designates its Corporate Trust Office, as the office for such purposes. The Securities Administrator will give prompt written notice to the Certificateholders and Certificate Insurer of any change in such location of any such office or agency.

ARTICLE VIII

THE DEPOSITOR AND THE MASTER SERVICER

Section 8.01    Liabilities of the Depositor and the Master Servicer.

Each of the Depositor and the Master Servicer shall be liable in accordance herewith only to the extent of the obligations specifically imposed upon and undertaken by it herein.

Section 8.02    Merger or Consolidation of the Depositor or the Master Servicer.

(a)    Each of the Depositor and the Master Servicer will keep in full force and effect its existence, rights and franchises as a limited liability company under the laws of the state of its formation, a corporation under the laws of the state of its incorporation or as a national banking association under federal law, as applicable, and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, the Certificates or any of the Mortgage Loans and to perform its duties under this Agreement.

(b)    Any Person into which the Depositor or the Master Servicer may be merged or consolidated, or any corporation resulting from any merger or consolidation to which the Depositor or the Master Servicer shall be a party, or any Person succeeding to the business of the Depositor or the Master Servicer, shall be the successor of the Depositor or the Master Servicer hereunder, without the execution or filing of any paper or further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 8.03    Indemnification of the Trustee, the Master Servicer and the Securities Administrator.

The Master Servicer agrees to indemnify the Indemnified Persons for, and to hold them harmless against, any loss, liability or expense (including reasonable legal fees and disbursements of counsel) incurred on their part that may be sustained in connection with, arising out of, or relating to, any claim or legal action (i) related to the Master Servicer's failure to perform its duties in compliance with this Agreement (except as any such loss, liability or expense shall be otherwise reimbursable pursuant to this Agreement) or (ii) incurred by reason of the Master Servicer's willful misfeasance, bad faith or gross negligence in the performance of its duties hereunder or by reason of reckless disregard of obligations and duties hereunder, provided, in each case, that with respect to any such claim or legal action (or pending or threatened claim or legal action), the affected Indemnified Person shall have given the Master Servicer and the Seller written notice thereof promptly after such Person shall have with respect to such claim or legal action knowledge thereof; provided, however that the failure to give such notice shall not relieve the Master Servicer of its indemnification obligations hereunder except to the extent the Master Servicer is prejudiced thereby. This indemnity shall survive the resignation or removal of the Trustee, Master Servicer or the Securities Administrator and the termination of this Agreement.

Section 8.04    Limitations on Liability of the Depositor, the Master Servicer and Others.

(a)    Subject to the obligation of the Master Servicer to indemnify the Indemnified Persons pursuant to Section 8.03, neither the Depositor, the Master Servicer nor any of the directors, officers, employees or agents of the Depositor and the Master Servicer shall be under any liability to the Indemnified Persons, the Trust Fund or the Certificateholders for taking any action or for refraining from taking any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Depositor, the Master Servicer or any such Person against any breach of warranties or representations made herein or any liability which would otherwise be imposed by reason of such Person's willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder.

(b)    The Depositor, the Master Servicer and the Securities Administrator and any of their respective directors, officers, employees or agents may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.

(c)    The Depositor, the Master Servicer, the Securities Administrator, the Trustee, the Custodian, the Certificate Insurer and any director, officer, employee or agent of the Depositor, the Master Servicer, the Securities Administrator, the Trustee, the Custodian and the Certificate Insurer shall be indemnified by the Trust and held harmless thereby against any loss, liability or expense (including reasonable legal fees and disbursements of counsel) incurred on their part that may be sustained in connection with, arising out of, or related to, any claim or legal action (including any pending or threatened claim or legal action) relating to, or the performance of their obligations under, this Agreement, the GMACM Assignment Agreement, the Custodial Agreement, the Insurance Agreements, the Certificates or the applicable Servicing Agreement, other than (i) in the case of the Master Servicer, the Securities Administrator or the Certificate Insurer, any such loss, liability or expense related to the Master Servicer's, Securities Administrator's or Certificate Insurer's failure to perform its respective duties in compliance with this Agreement or the Insurance Agreement, as applicable, or (ii) in the case of the Master Servicer or the Securities Administrator, any such loss, liability or expense incurred by reason of the Master Servicer's or the Securities Administrator's willful misfeasance, bad faith or gross negligence in the performance of duties hereunder, or by reason of reckless disregard of obligations and duties hereunder or under the Custodial Agreement, as applicable, or the Certificate Insurer's breach of a representation, warranty or covenant under the Insurance Agreement, or by reason of reckless disregard of obligations and duties hereunder or the Insurance Agreement, as applicable, (iii) in the case of the Trustee, any such loss, liability or expense incurred by reason of the Trustee's willful misfeasance, bad faith or negligence in the performance of its duties hereunder, or by reason of its reckless disregard of obligations and duties hereunder and (iv) in the case of the Custodian, any such loss, liability or expense incurred by reason of the Custodian's willful misfeasance, bad faith or negligence in the performance of its duties under the Custodial Agreement, or by reason of its reckless disregard of obligations and duties thereunder. Such indemnification shall survive termination of this Agreement.

(d)   None of the Depositor, the Master Servicer or the Securities Administrator shall be under any obligation to appear in, prosecute or defend any legal action that is not incidental to its duties under this Agreement and that in its opinion may involve it in any expense or liability; provided, however, the Master Servicer may in its discretion, undertake any such action which it may deem necessary or desirable with respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders hereunder. In such event, the legal expenses and costs of such action and any liability resulting therefrom (except any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder) shall be expenses, costs and liabilities of the Trust Fund, and the Master Servicer shall be entitled to be reimbursed therefor out of the Distribution Account as provided by Section 5.07. Nothing in this Subsection 8.04(d) shall affect the Master Servicer's obligation to master service the Mortgage Loans pursuant to Section 4.01.

(e)   In taking or recommending any course of action pursuant to this Agreement, unless specifically required to do so pursuant to this Agreement, the Master Servicer shall not be required to investigate or make recommendations concerning potential liabilities which the Trust might incur as a result of such course of action by reason of the condition of the Mortgaged Properties but shall give notice to the Trustee if it has notice of such potential liabilities.

(f)   The Master Servicer shall not be liable for any acts or omissions of the related Servicer.

(g)   The Master Servicer may perform any of its duties hereunder or exercise its rights hereunder either directly of through Affiliates, agents or attorneys.

Section 8.05    Master Servicer Not to Resign.

Except as provided in Section 8.07, the Master Servicer shall not resign from the obligations and duties hereby imposed on it except (i) with the prior consent of the Trustee and, so long as no Certificate Insurer Default exists, the Certificate Insurer (which consent shall not be unreasonably withheld or delayed) or (ii) upon a determination that any such duties hereunder are no longer permissible under applicable law and such impermissibility cannot be cured. Any such determination permitting the resignation of the Master Servicer shall be evidenced by an Opinion of Counsel, addressed to and delivered to, the Trustee and the Certificate Insurer. No such resignation by the Master Servicer shall become effective until the Trustee or a successor to the Master Servicer reasonably satisfactory to the Trustee and the Certificate Insurer shall have assumed the responsibilities and obligations of the Master Servicer in accordance with Section 9.02 hereof. The Trustee shall notify each Rating Agency and the Certificate Insurer of the resignation of the Master Servicer.

Section 8.06    Successor Master Servicer.

In connection with the appointment of any Successor Master Servicer or the assumption of the duties of the Master Servicer, the Seller or the Trustee may make such arrangements for the compensation of such Successor Master Servicer out of payments on the Mortgage Loans as

the Seller or the Trustee and such Successor Master Servicer shall agree. If the Successor Master Servicer does not agree that such market value is a fair price, such Successor Master Servicer shall obtain two quotations of market value from third parties actively engaged in the servicing of single-family mortgage loans. In no event shall the compensation of any Successor Master Servicer exceed that permitted the Master Servicer hereunder without the consent of all of the Certificateholders and, so long as no Certificate Insurer Default exists, the Certificate Insurer.

Section 8.07    Sale and Assignment of Master Servicing.

The Master Servicer may sell and assign its rights and delegate its duties and obligations in their entirety as Master Servicer under this Agreement and the Seller may terminate the Master Servicer without cause and select a new Master Servicer; provided, however, that: (i) the purchaser or transferee accepting such assignment and delegation (a) shall be a Person which shall be qualified to service mortgage loans for Fannie Mae or Freddie Mac; (b) shall have a net worth of not less than $15,000,000 (unless otherwise approved by each Rating Agency pursuant to clause (ii) below) and meets the eligibility requirements herein to serve as Master Servicer and Securities Administrator; (c) shall be reasonably satisfactory to the Trustee and the Certificate Insurer (as evidenced in a writing signed by the Trustee and the Certificate Insurer); and (d) shall execute and deliver to the Trustee and the Certificate Insurer an agreement, in form and substance reasonably satisfactory to the Trustee and the Certificate Insurer, which contains an assumption by such Person of the due and punctual performance and observance of each responsibility, covenant and condition of the Master Servicer and the Securities Administrator under this Agreement and the Custodial Agreement from and after the effective date of such assumption agreement; (ii) each Rating Agency and the Certificate Insurer shall be given prior written notice of the identity of the proposed successor to the Master Servicer and each Rating Agency's rating of the Certificates in effect immediately prior to such assignment, sale and delegation (determined without regard to the Policy) will not be downgraded, qualified or withdrawn as a result of such assignment, sale and delegation, as evidenced by a letter to such effect delivered to the Master Servicer, the Securities Administrator, the Certificate Insurer and the Trustee; (iii) the Master Servicer assigning and selling the master servicing shall deliver to the Trustee and the Certificate Insurer an Officer's Certificate and an Opinion of Counsel addressed to the Trustee and the Certificate Insurer, each stating that all conditions precedent to such action under this Agreement have been satisfied and such action is permitted by and complies with the terms of this Agreement; and (iv) in the event the Master Servicer is terminated without cause by the Seller, the Seller shall pay, from its own funds and without any right of reimbursement, the terminated Master Servicer a termination fee equal to 0.25% of the aggregate Stated Principal Balance of the Mortgage Loans at the time the master servicing of the Mortgage Loans is transferred to the successor Master Servicer. No such assignment or delegation shall affect any liability of the Master Servicer arising prior to the effective date thereof.

## ARTICLE IX

## DEFAULT; TERMINATION OF MASTER SERVICER

Section 9.01    Events of Default.

"Event of Default," wherever used herein, means any one of the following events:

(i)    any failure by the Master Servicer to remit to the Securities Administrator any amounts received or collected by the Master Servicer in respect of the Mortgage Loans and required to be remitted by it hereunder (other than any Advance), which failure shall continue unremedied for one Business Day after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Trustee and the Master Servicer by the Certificate Insurer or Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates (with the consent of the Certificate Insurer, so long as no Certificate Insurer Default exists); or

(ii)    other than with respect to clause (viii) below, any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement or any breach of a representation or warranty by the Master Servicer, which failure or breach shall continue unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Trustee and the Master Servicer by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates (with the consent of the Certificate Insurer, so long as no Certificate Insurer Default exists); or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Master Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 60 consecutive days; or

(iv)    the Master Servicer shall consent to the appointment of a receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Master Servicer or all or substantially all of the property of the Master Servicer; or

(v)    the Master Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of, or commence a voluntary case under, any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vi)    the Master Servicer assigns or delegates its duties or rights under this Agreement in contravention of the provisions permitting such assignment or delegation under Sections 8.05 or 8.07; or

(vii)    The Master Servicer fails to deposit or cause to be deposited in the Distribution Account any Advance required to be made by the Master Servicer (other than a Nonrecoverable Advance) by 5:00 p.m. New York City time on the first Business Day preceding the Distribution Date.

If an Event of Default shall occur, then, and in each and every such case, so long as such Event of Default shall not have been remedied, the Trustee may, and at the written direction of the Certificate Insurer or the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates (with the consent of the Certificate Insurer, so long as no Certificate Insurer Default exists) the Trustee shall in the case of any Event of Default described in clauses (i) through (vi) and clause (viii) above, by notice in writing to the Master Servicer and the Swap Provider, with a copy to each Rating Agency and the Certificate Insurer may, terminate all of the rights and obligations (but not the liabilities) of the Master Servicer (and the Securities Administrator if the Master Servicer and the Securities Administrator are the same entity) under this Agreement and in and to the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder. Notwithstanding anything to the contrary contained in this Agreement, the Trustee shall only terminate the Master Servicer for an Event of Default as described in clause (viii) above upon direction from the Depositor. On or after the receipt by the Master Servicer of such written notice, all authority and power of the Master Servicer (and, if applicable, the Securities Administrator) hereunder, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the Trustee, or any Successor Master Servicer appointed pursuant to Section 9.02 (a "Successor Master Servicer" and, if applicable, "Successor Securities Administrator"). Such Successor Master Servicer shall thereupon if such Successor Master Servicer is a successor to the Master Servicer, make any Advance required by Article IV, subject, in the case of the Trustee, to Section 9.02. The Trustee is hereby authorized and empowered to execute and deliver, on behalf of the terminated Master Servicer and, if applicable, the terminated Securities Administrator, as attorney- in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of any Mortgage Loans and related documents, or otherwise. Unless expressly provided in such written notice, no such termination shall affect any obligation of the Master Servicer to pay amounts owed pursuant to Article VIII or Article X. The Master Servicer and, if applicable, the Securities Administrator agrees to cooperate with the Trustee in effecting the termination of the Master Servicer's and, if applicable, the Securities Administrator's responsibilities and rights hereunder, including, without limitation, the transfer to the applicable Successor Master Servicer of all cash amounts which shall at the time be credited to the Distribution Account maintained pursuant to Section 5.06, or thereafter be received with respect to the applicable Mortgage Loans. The Trustee shall promptly notify each Rating Agency and the Certificate Insurer of the occurrence of an Event of Default actually known to a Responsible Officer of the Trustee.  The Securities Administrator shall promptly notify the Trustee in writing of the occurrence of an Event of Default under clauses (i) or (vii) above.

134

Notwithstanding any termination of the activities of the Master Servicer hereunder, the Master Servicer shall be entitled to receive, out of any late collection of a Scheduled Payment on a Mortgage Loan that was due prior to the notice terminating the Master Servicer's rights and obligations as Master Servicer hereunder and received after such notice, and to receive any other amounts payable to the Master Servicer hereunder the entitlement to which arose prior to the termination of its activities hereunder.

Notwithstanding the foregoing, if an Event of Default described in clause (vii) of this Section 9.01 shall occur, the Trustee shall, at the direction of the Depositor, by notice in writing to the Master Servicer, with a copy to the Certificate Insurer, which may be delivered by telecopy, immediately terminate all of the rights and obligations of the Master Servicer thereafter arising under this Agreement, but without prejudice to any rights it may have as a Holder of the Certificates or to reimbursement of monthly Advances and other advances of its own funds, and the Trustee shall act as provided in Section 9.02 to carry out the duties of the Master Servicer, including the obligation to make any monthly Advance the nonpayment of which was an Event of Default described in clause (vii) of this Section 9.01. Any such action taken by the Trustee must be prior to the distribution on the relevant Distribution Date.

Section 9.02    Trustee to Act; Appointment of Successor.

On and after the time the Master Servicer receives a notice of termination pursuant to Section 9.01 hereof the Trustee shall automatically become the successor to the Master Servicer with respect to the transactions set forth or provided for herein and after a transition period (not to exceed 90 days), shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Master Servicer by the terms and provisions hereof; provided, however that, pursuant to Article V hereof, the Trustee in its capacity as Successor Master Servicer shall be responsible for making any Advances required to be made by the Master Servicer immediately upon the termination of the Master Servicer and any such Advance shall be made on the Distribution Date on which such Advance was required to be made by the predecessor Master Servicer. Effective on the date of such notice of termination, as compensation therefor, the Trustee shall be entitled to all compensation, reimbursement of expenses and indemnification that the Master Servicer would have been entitled to if it had continued to act hereunder, provided, however, that the Trustee shall not be (i) liable for any acts or omissions of the Master Servicer, (ii) obligated to make Advances if it is prohibited from doing so under applicable law, (iii) responsible for expenses of the Master Servicer pursuant to Section 2.03 or (iv) obligated to deposit losses on any Permitted Investment directed by the Master Servicer. Notwithstanding the foregoing, the Trustee may, if it shall be unwilling to so act, or shall, if it is prohibited by applicable law from making Advances pursuant to Article VI or if it is otherwise unable to so act, appoint, or petition a court of competent jurisdiction to appoint, any established mortgage loan servicing institution the appointment of which does not adversely affect the then current rating of the Certificates by each Rating Agency (determined without regard to the Policy) as the successor to the Master Servicer (so long as no Certificate Insurer Default exists, with the prior written consent of the Certificate Insurer, which consent shall not be unreasonably withheld) hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Master Servicer hereunder. Any Successor Master Servicer shall (i) be an institution that is a Fannie Mae and Freddie Mac approved seller/servicer in good standing, that has a net worth of at least $15,000,000, and (ii) be willing to act as successor servicer of any Mortgage Loans under

the applicable Servicing Agreement with respect to which the related Servicer has been terminated as servicer, and shall have executed and delivered to the Depositor and the Trustee an agreement accepting such delegation and assignment, that contains an assumption by such Person of the rights, powers, duties, responsibilities, obligations and liabilities of the Master Servicer (other than any liabilities of the Master Servicer hereof incurred prior to termination of the Master Servicer under Section 9.01 or as otherwise set forth herein), with like effect as if originally named as a party to this Agreement, provided that each Rating Agency shall have acknowledged in writing that its rating of the Certificates in effect immediately prior to such assignment and delegation will not be qualified or reduced as a result of such assignment and delegation (without regard to the Policy). If the Trustee assumes the duties and responsibilities of the Master Servicer in accordance with this Section 9.02, the Trustee shall not resign as Master Servicer until a Successor Master Servicer has been appointed and has accepted such appointment. Pending appointment of a successor to the Master Servicer hereunder, the Trustee, unless the Trustee is prohibited by law from so acting, shall act in such capacity as hereinabove provided. In connection with such appointment and assumption, the Trustee may make such arrangements for the compensation of such successor out of payments on Mortgage Loans or otherwise as it and such successor shall agree; provided that no such compensation unless agreed to by the Certificateholders shall be in excess of that permitted the Master Servicer hereunder. The Trustee and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession. Neither the Trustee nor any other Successor Master Servicer shall be deemed to be in default hereunder by reason of any failure to make, or any delay in making, any distribution hereunder or any portion thereof or any failure to perform, or any delay in performing, any duties or responsibilities hereunder, in either case caused by the failure of the Master Servicer and the Securities Administrator to deliver or provide, or any delay in delivering or providing, any monies, information, documents or records to it.

The costs and expenses of the Trustee in connection with the termination of the Master Servicer, appointment of a Successor Master Servicer and, if applicable, any transfer of master servicing, including, without limitation, all costs and expenses associated with the complete transfer of all master servicing data and the completion, correction or manipulation of such master servicing data as may be required by the Trustee to correct any errors or insufficiencies in the master servicing data or otherwise to enable the Trustee or the Successor Master Servicer to master service the Mortgage Loans properly and effectively, to the extent not previously paid by the terminated Master Servicer, shall be payable to the Trustee pursuant to Section 10.05.

Section 9.03    Notification to Certificateholders.

(a)    Upon any termination of or appointment of a successor to the Master Servicer, the Trustee shall give prompt written notice thereof to Certificateholders, the Certificate Insurer, the Swap Provider and to each Rating Agency.

(b)    Within 60 days after the occurrence of any Event of Default, the Trustee shall transmit by mail to all Certificateholders, the Certificate Insurer and the Swap Provider notice of each such Event of Default hereunder actually known to a Responsible Officer of the Trustee, unless such Event of Default shall have been cured or waived.

Section 9.04    Waiver of Defaults.

The Trustee shall transmit by mail to all Certificateholders, the Certificate Insurer and the Swap Provider, within 60 days after the occurrence of any Event of Default actually known to a Responsible Officer of the Trustee, unless such Event of Default shall have been cured, notice of each such Event of Default hereunder known to the Trustee. The Holders of Certificates evidencing not less than 51% of the Voting Rights may, on behalf of all Certificateholders and the Certificate Insurer, waive any default by the Master Servicer in the performance of its obligations hereunder and the consequences thereof, except a default in the making of or the causing to be made of any required remittances to the Securities Administrator. Upon any such waiver of a past default, such default shall be deemed to cease to exist, and any Event of Default arising therefrom shall be deemed to have been timely remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived. The Trustee shall give notice of any such waiver to each Rating Agency and the Certificate Insurer.

ARTICLE X

CONCERNING THE TRUSTEE AND THE SECURITIES ADMINISTRATOR

Section 10.01  Duties of Trustee and the Securities Administrator.

(a)   The Trustee, prior to the occurrence of an Event of Default and after the curing or waiver of all Events of Default which may have occurred, and the Securities Administrator each undertake to perform such duties and only such duties as are specifically set forth in this Agreement as duties of the Trustee and the Securities Administrator, respectively. If an Event of Default has occurred and has not been cured or waived, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and the same degree of care and skill in their exercise, as a prudent person would exercise under the circumstances in the conduct of such Person's own affairs.

(b)   Upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments which are specifically required to be furnished to the Trustee or the Securities Administrator pursuant to any provision of this Agreement, the Trustee or the Securities Administrator, respectively, shall examine them to determine whether they are, on their face, in the form required by this Agreement; provided, however, that neither the Trustee nor the Securities Administrator shall be responsible for the accuracy or content of any resolution, certificate, statement, opinion, report, document, order or other instrument furnished by the Master Servicer or pursuant to any provision of this Agreement; provided, further, that neither the Trustee nor the Securities Administrator shall be responsible for the accuracy or verification of any calculation provided to it pursuant to this Agreement.

(c)   On each Distribution Date, the Securities Administrator shall make monthly distributions and the final distribution to the Certificateholders from funds in the Distribution Account as provided in Sections 6.04 and 11.01 herein based solely on the applicable Remittance Report.

(d)   No provision of this Agreement shall be construed to relieve the Trustee or the Securities Administrator from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided, however, that:

(i)   Prior to the occurrence of an Event of Default, and after the curing or waiver of all such Events of Default which may have occurred with respect to the Trustee and at all times with respect to the Securities Administrator, the duties and obligations of the Trustee and the Securities Administrator shall be determined solely by the express provisions of this Agreement, neither the Trustee nor the Securities Administrator shall be liable except for the performance of their respective duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee or the Securities Administrator and, in the absence of bad faith on the part of the Trustee or the Securities Administrator, respectively, the Trustee or the Securities Administrator, respectively, may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any

138

certificates or opinions furnished to the Trustee or the Securities Administrator, respectively, and conforming to the requirements of this Agreement;

(ii)     Neither the Trustee nor the Securities Administrator shall be liable in its individual capacity for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee or the Securities Administrator, respectively, unless it shall be proved that the Trustee or the Securities Administrator, respectively, was negligent in ascertaining the pertinent facts;

(iii)     Neither the Trustee nor the Securities Administrator shall be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the directions of the Holders of Certificates evidencing not less than 25% of the aggregate Voting Rights of the Certificates (or such other percentage as specifically set forth herein), or, to the extent it is entitled to provide such direction and so long as no Certificate Insurer Default exists, the Certificate Insurer, if such action or non-action relates to the time, method and place of conducting any proceeding for any remedy available to the Trustee or the Securities Administrator, respectively, or exercising any trust or other power conferred upon the Trustee or the Securities Administrator, respectively, under this Agreement;

(iv)     The Trustee shall not be required to take notice or be deemed to have notice or knowledge of any default or Event of Default unless a Responsible Officer of the Trustee shall have actual knowledge thereof. In the absence of such knowledge, the Trustee may conclusively assume there is no such default or Event of Default;

(v)     The Securities Administrator shall not in any way be liable by reason of any insufficiency in any Account held in the name of Trustee unless it is determined by a court of competent jurisdiction in a non-appealable judgment that the Securities Administrator's gross negligence or willful misconduct was the primary cause of such insufficiency (except to the extent that the Securities Administrator is obligor and has defaulted thereon);

(vi)     The Trustee shall not in any way be liable by reason of any insufficiency in any Account held in the name of Trustee unless it is determined by a court of competent jurisdiction in a non-appealable judgment that the Trustee's gross negligence or willful misconduct was the primary cause of such insufficiency (except to the extent that the Trustee is obligor and has defaulted thereon);

(vii)     Anything in this Agreement to the contrary notwithstanding, in no event shall the Trustee or the Securities Administrator be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee or the Securities Administrator,

respectively, has been advised of the likelihood of such loss or damage and regardless of the form of action; and

(viii)   None of the Securities Administrator, the Master Servicer, the Seller, the Depositor, the Trustee or the Custodian shall be responsible for the acts or omissions of the other, it being understood that this Agreement shall not be construed to render them partners, joint venturers or agents of one another.

Neither the Trustee nor the Securities Administrator shall be required to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it, and none of the provisions contained in this Agreement shall in any event require the Trustee or the Securities Administrator to perform, or be responsible for the manner of performance of, any of the obligations of the Master Servicer hereunder, GMACM under the GMACM Servicing Agreement or PHH under the PHH Servicing Agreement. The Trustee is hereby authorized and directed to enter into the GMACM Assignment Agreement and the PHH Assignment Agreement.

(e)   All funds received by the Securities Administrator and required to be deposited in the Distribution Account pursuant to this Agreement will be promptly so deposited by the Securities Administrator.

Section 10.02 Certain Matters Affecting the Trustee and the Securities Administrator.

(a)   Except as otherwise provided in Section 10.01:

(i)   The Trustee and the Securities Administrator may rely and shall be protected in acting or refraining from acting in reliance on any resolution or certificate of the Depositor, the Seller, the Certificate Insurer or the Master Servicer or the related Servicer, any certificates of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(ii)   The Trustee and the Securities Administrator may consult with counsel and any advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection with respect to any action taken or suffered or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(iii)   Neither the Trustee nor the Securities Administrator shall be under any obligation to exercise any of the trusts or powers vested in it by this Agreement, other than its obligation to give notices pursuant to this Agreement, or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders or the Certificate Insurer pursuant to the provisions of this Agreement, unless such

140

Certificateholders or the Certificate Insurer shall have offered to the Trustee or the Securities Administrator, as applicable, security or indemnity reasonable to it against the costs, expenses and liabilities which may be incurred therein or thereby. Nothing contained herein shall, however, relieve the Trustee or the obligation, upon the occurrence of an Event of Default of which a Responsible Officer of the Trustee has actual knowledge (which has not been cured or waived), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise, as a prudent person would exercise under the circumstances in the conduct of his own affairs;

(iv)    Neither the Trustee nor the Securities Administrator shall be liable in its individual capacity for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(v)    Neither the Trustee nor the Securities Administrator shall be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by Holders of Certificates evidencing not less than 25% of the aggregate Voting Rights of the Certificates and provided that the payment within a reasonable time to the Trustee or the Securities Administrator, as applicable, of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee or the Securities Administrator, as applicable, reasonably assured to the Trustee or the Securities Administrator, as applicable, by the security afforded to it by the terms of this Agreement. The Trustee or the Securities Administrator may require reasonable indemnity against such expense or liability as a condition to taking any such action. The reasonable expense of every such examination shall be paid by the Certificateholders requesting the investigation;

(vi)    The Trustee and the Securities Administrator may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or through Affiliates, agents or attorneys; provided, however, that the Trustee may not appoint any paying agent other than the Securities Administrator to perform any paying agent functions under this Agreement without the express written consent of the Master Servicer and, so long as no Certificate Insurer Default exists, the Certificate Insurer, which consents will not be unreasonably withheld. Neither the Trustee nor the Securities Administrator shall be liable or responsible for the misconduct or negligence of any of the Trustee's or the Securities Administrator's agents or attorneys or paying agent appointed hereunder by the Trustee or the Securities Administrator with due care and, when required, with the consent of the Master Servicer;

(vii)    Should the Trustee or the Securities Administrator deem the nature of any action required on its part to be unclear or ambiguous, the Trustee or the Securities Administrator, respectively, may require prior to such action that it be

141

provided by the Depositor with reasonable further instructions; the right of the Trustee or the Securities Administrator to perform any discretionary act enumerated in this Agreement shall not be construed as a duty, and neither the Trustee nor the Securities Administrator shall not be accountable for other than its negligence or willful misconduct in the performance of any such act;

(viii)   Neither the Trustee nor the Securities Administrator shall be required to give any bond or surety with respect to the execution of the trust created hereby or the powers granted hereunder, except as provided in Section 10.07; and

(ix)   Neither the Trustee nor the Securities Administrator shall have any duty to conduct any affirmative investigation as to the occurrence of any condition requiring the repurchase of any Mortgage Loan by any Person pursuant to this Agreement, or the eligibility of any Mortgage Loan for purposes of this Agreement.

(b)   The Securities Administrator is hereby directed by the Depositor to execute and deliver the Swap Administration Agreement (and any amendments or supplements to the Swap Administration Agreement as may be requested by the Majority Class C Certificateholder, regarding the distributions to be made to it or its designees thereunder). Amounts payable by the Securities Administrator on any Distribution Date to the Swap Administrator shall be paid by the Securities Administrator as provided herein. The Securities Administrator in its individual capacity shall have no responsibility for any of the undertakings, agreements or representations with respect to the Swap Agreement or the Swap Administration Agreement, including, without limitation, for making any payments thereunder.

It is acknowledged and agreed that the Person serving as Securities Administrator hereunder shall also serve as Swap Administrator under the Swap Administration Agreement and act as Supplemental Interest Trust Trustee under the Swap Agreement. The Securities Administrator, the Swap Administrator and the Supplemental Interest Trust Trustee are hereby directed by the Depositor to execute and deliver the Swap Administration Agreement (and any amendments or supplements to the Swap Administration Agreement as may be requested by the Majority Class C Certificateholder, regarding the distributions to be made to it or its designees thereunder) and the Supplemental Interest Trust Trustee is hereby directed to execute and deliver the Swap Agreement and to make the representations required therein. The Swap Administrator shall not have any liability for any failure or delay in payments to the Trust which are required under the Swap Administration Agreement where such failure or delay is due to the failure or delay of the Swap Provider in making such payment to the Swap Administrator. Wells Fargo Bank in its individual capacity and as Swap Administrator, the Securities Administrator and the Supplemental Interest Trust Trustee shall be entitled to be indemnified and held harmless by the Trust from and against any and all losses, claims, expenses or other liabilities that arise by reason of or in connection with the performance or observance by each of the Swap Administrator, the Securities Administrator and the Supplemental Interest Trust Trustee of its duties or obligations under the Swap Agreement or the Swap Administration Agreement, except to the extent that the same is due to the Swap Administrator's, the Securities Administrator's or the Supplemental

142

Interest Trust Trustee's gross negligence, willful misconduct or fraud. Any Person appointed as successor trustee pursuant to Section 9.02 shall also be required to serve as successor Swap Administrator and successor supplemental interest trust trustee under the Swap Agreement and the Swap Administration Agreement.

Section 10.03  Trustee and Securities Administrator Not Liable for Certificates or Mortgage Loans.

The recitals contained herein and in the Certificates (other than the signature and countersignature of the Securities Administrator on the Certificates) shall be taken as the statements of the Depositor, and neither the Trustee nor the Securities Administrator shall have any responsibility for their correctness. Neither the Trustee nor the Securities Administrator makes any representation as to the validity or sufficiency of, the Certificates (other than the signature and countersignature of the Securities Administrator on the Certificates), the Custodial Agreement or of any Mortgage Loan. The Securities Administrator's signature and countersignature (or countersignature of its agent) on the Certificates shall be solely in its capacity as Securities Administrator and shall not constitute the Certificates an obligation of the Securities Administrator in any other capacity. Neither the Trustee nor the Securities Administrator shall be accountable for the use or application by the Depositor of any of the Certificates or of the proceeds of such Certificates, or for the use or application of any funds paid to the Depositor with respect to the Mortgage Loans. Subject to Section 2.06, neither the Trustee nor the Securities Administrator shall be responsible for the legality or validity of this Agreement, the Custodial Agreement or any document or instrument relating to this Agreement, the validity of the execution of this Agreement or of any supplement hereto or instrument of further assurance, or the validity, priority, perfection or sufficiency of the security for the Certificates issued hereunder or intended to be issued hereunder. Neither the Trustee nor the Securities Administrator shall at any time have any responsibility or liability for or with respect to the legality, validity and enforceability of any Mortgage or any Mortgage Loan, or the perfection and priority of any Mortgage or the maintenance of any such perfection and priority, or for or with respect to the sufficiency of the Trust Fund or its ability to generate the payments to be distributed to Certificateholders, under this Agreement. Neither the Securities Administrator nor the Trustee shall be responsible for filing any financing or continuation statement in any public office at any time or to otherwise perfect or maintain the perfection of any security interest or lien granted to the Trustee hereunder or to record this Agreement.

Section 10.04  Trustee and Securities Administrator May Own Certificates.

Each of the Trustee and the Securities Administrator in its individual capacity or in any capacity other than as Trustee or the Securities Administrator hereunder may become the owner or pledgee of any Certificates with the same rights it would have if it were not the Trustee or the Securities Administrator, as applicable, and may otherwise deal with the parties hereto.

Section 10.05  Trustee's and Securities Administrator's Fees and Expenses.

The fees and expenses of the Trustee and the Securities Administrator shall be paid in accordance with a side letter agreement with the Master Servicer and at the expense of the Master Servicer. In addition, the Trustee and the Securities Administrator will be entitled to

recover from the Distribution Account pursuant to Section 5.07 all reasonable out-of-pocket expenses, disbursements and advances and the expenses of the Trustee and the Securities Administrator, respectively, incurred in the course of its respective engagement hereunder, including without limitation in connection with any Event of Default, any breach of this Agreement or any claim or legal action (including any pending or threatened claim or legal action) incurred or made by the Trustee or the Securities Administrator, respectively, in the administration of the trusts hereunder (including the reasonable compensation, expenses and disbursements of its counsel) except any such expense, disbursement or advance as may arise from its negligence or intentional misconduct or which is the responsibility of the Certificateholders or the Trust Fund hereunder. If funds in the Distribution Account are insufficient therefor, the Trustee and the Securities Administrator shall recover such expenses, disbursements or advances from the Seller and the Seller hereby agrees to pay such expenses, disbursements or advances upon demand. Such compensation and reimbursement obligation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust.

Section 10.06 Eligibility Requirements for Trustee and Securities Administrator.

The Trustee and any successor Trustee and the Securities Administrator and any successor Securities Administrator shall during the entire duration of this Agreement be a state bank or trust company or a national banking association organized and doing business under the laws of a state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus and undivided profits of at least $50,000,000, subject to supervision or examination by federal or state authority and rated "Baa2" or higher by Moody's with respect to any outstanding long-term unsecured unsubordinated debt, and, in the case of a successor Trustee or successor Securities Administrator other than pursuant to Section 10.10, rated in one of the two highest long-term debt categories by each Rating Agency or otherwise acceptable to each Rating Agency and the Certificate Insurer. The Trustee shall not be an Affiliate of the Master Servicer. If the Trustee publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 10.06 the combined capital and surplus of such corporation shall be deemed to be its total equity capital (combined capital and surplus) as set forth in its most recent report of condition so published. In case at any time the Trustee or the Securities Administrator, as applicable, shall cease to be eligible in accordance with the provisions of this Section 10.06, the Trustee or the Securities Administrator shall resign immediately in the manner and with the effect specified in Section 10.08.

Section 10.07 Insurance.

The Trustee and the Securities Administrator, at their own expense, shall at all times (A) maintain and keep in full force and effect: (i) fidelity insurance, (ii) theft of documents insurance and (iii) forgery insurance (which may be collectively satisfied by a "Financial Institution Bond" and/or a "Bankers' Blanket Bond") or (B) in the case of the Securities Administrator, self insure if Wells Fargo Bank, National Association maintains with any Rating Agency the equivalent of a long term unsecured debt rating of "A". All such insurance shall be in amounts, with standard coverage and subject to deductibles, as are customary for insurance typically maintained by banks or their affiliates which act as custodians for investor-owned mortgage pools. A certificate

of an officer of the Trustee or the Securities Administrator as to the Trustee's or the Securities Administrator's, respectively, compliance with this Section 10.07 shall be furnished to any Certificateholder and the Certificate Insurer upon reasonable written request.

Section 10.08   Resignation and Removal of Trustee and Securities Administrator.

The Trustee and the Securities Administrator may at any time resign (including, in the case of the Securities Administrator being affiliated with the Master Servicer, in connection with the resignation or termination of the Master Servicer) and be discharged from the Trust hereby created by giving written notice thereof to the Depositor, the Swap Provider, the Seller, the Securities Administrator (or the Trustee, if the Securities Administrator resigns) and the Master Servicer, with a copy to each Rating Agency and the Certificate Insurer. Upon receiving such notice of resignation, the Depositor shall promptly appoint a successor trustee or successor securities administrator, as applicable (so long as no Certificate Insurer Default exists, with the prior consent of the Certificate Insurer, which consent shall not be unreasonably withheld), (and in the case of the Securities Administrator's removal, the Trustee may appoint a successor securities administrator) by written instrument, in triplicate, one copy of which instrument shall be delivered to each of the resigning trustee or securities administrator, as applicable, and the successor trustee or securities administrator, as applicable. If no successor trustee or successor securities administrator shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation, the resigning Trustee or Securities Administrator may petition any court of competent jurisdiction for the appointment of a successor trustee or securities administrator.

If at any time (i) the Trustee or the Securities Administrator shall cease to be eligible in accordance with the provisions of Section 10.06 hereof and shall fail to resign after written request thereto by the Depositor, (ii) the Trustee or the Securities Administrator shall become incapable of acting, or shall be adjudged as bankrupt or insolvent, or a receiver of the Trustee or the Securities Administrator or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or the Securities Administrator or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, or (iii)(A) a tax is imposed with respect to the Trust Fund by any state in which the Trustee or the Securities Administrator or the Trust Fund is located, (B) the imposition of such tax would be avoided by the appointment of a different trustee or securities administrator and (C) the Trustee or the Securities Administrator, as applicable, fails to indemnify the Trust Fund against such tax, then the Depositor or the Master Servicer may remove the Trustee or the Securities Administrator , as applicable, (and in the case of the Securities Administrator's ineligibility, the Trustee may appoint a successor securities administrator) and appoint a successor trustee or successor securities administrator, as applicable, by written instrument, in multiple copies, a copy of which instrument shall be delivered to the Trustee, the Securities Administrator, the Master Servicer and the successor trustee or successor securities administrator, as applicable.

The Certificate Insurer or Holders evidencing at least 51% of the Voting Rights of each Class of Certificates (so long as no Certificate Insurer Default exists, with the prior written consent of the Certificate Insurer, which consent shall not be unreasonably withheld) may at any time remove the Trustee or Securities Administrator and appoint a successor trustee or securities administrator by written instrument or instruments, in multiple copies, signed by such Holders or

145

their attorneys-in-fact duly authorized, one complete set of which instruments shall be delivered by the successor trustee or successor securities administrator to each of the Master Servicer, the Trustee or Securities Administrator so removed and the successor trustee or securities administrator so appointed. Notice of any removal of the Trustee or Securities Administrator shall be given to each Rating Agency and the Certificate Insurer by the related successor.

Any resignation or removal of the Trustee or the Securities Administrator and appointment of a successor trustee or securities administrator pursuant to any of the provisions of this Section 10.08 shall become effective upon acceptance of appointment by the successor trustee or securities administrator as provided in Section 10.09 hereof.

Section 10.09  Successor Trustee or Securities Administrator.

Any successor trustee or securities administrator appointed as provided in Section 10.08 hereof shall execute, acknowledge and deliver to the Depositor, to its predecessor trustee or predecessor securities administrator, as applicable, and the Master Servicer and the Certificate Insurer an instrument accepting such appointment hereunder and thereupon the resignation or removal of the predecessor trustee or securities administrator shall become effective and such successor trustee or securities administrator without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee or securities administrator herein.

No successor trustee or securities administrator shall accept appointment as provided in this Section 10.09 unless at the time of such acceptance such successor trustee or securities administrator shall be eligible under the provisions of Section 10.07 hereof and its appointment shall not adversely affect the then current rating of the Certificates (determined without regard to the Policy) and shall be approved by the Certificate Insurer (so long as no Certificate Insurer Default exists).

Upon acceptance of appointment by a successor trustee or securities administrator as provided in this Section 10.09, the successor trustee or securities administrator shall mail notice of the succession of such trustee or securities administrator hereunder to all Holders of Certificates and the Certificate Insurer. If the successor trustee or securities administrator fails to mail such notice within ten days after acceptance of appointment, the Depositor shall cause such notice to be mailed at the expense of the Trust Fund.

Section 10.10  Merger or Consolidation of Trustee or Securities Administrator.

Any corporation, state bank or national banking association into which the Trustee or the Securities Administrator may be merged or converted or with which it may be consolidated or any corporation, state bank or national banking association resulting from any merger, conversion or consolidation to which the Trustee or the Securities Administrator shall be a party, or any corporation, state bank or national banking association succeeding to substantially all of the corporate trust business of the Trustee or of the business of the Securities Administrator, shall be the successor of the Trustee or the Securities Administrator hereunder, provided that such corporation shall be eligible under the provisions of Section 10.06 hereof without the execution

or filing of any paper or further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 10.11  Appointment of Co-Trustee or Separate Trustee.

Notwithstanding any other provisions of this Agreement, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Fund or property securing any Mortgage Note may at the time be located, the Master Servicer and the Trustee acting jointly shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by the Trustee to act as co-trustee or co-trustees jointly with the Trustee, or separate trustee or separate trustees, of all or any part of the Trust Fund, and to vest in such Person or Persons, in such capacity and for the benefit of the Certificateholders and the Certificate Insurer, such title to the Trust Fund or any part thereof, whichever is applicable, and, subject to the other provisions of this Section 10.11, such powers, duties, obligations, rights and trusts as the Master Servicer and the Trustee may consider necessary or desirable. If the Master Servicer shall not have joined in such appointment within 15 days after the receipt by it of a request to do so, or in the case an Event of Default shall have occurred and be continuing, the Trustee alone shall have the power to make such appointment. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 10.06 and no notice to Certificateholders of the appointment of any co-trustee or separate trustee shall be required under Section 10.09.

Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)      All rights, powers, duties and obligations conferred or imposed upon the Trustee, except for the obligation of the Trustee under this Agreement to advance funds on behalf of the Master Servicer, shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed (whether a Trustee hereunder or as a Successor Master Servicer hereunder), the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Trust Fund or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(ii)     No trustee hereunder shall be held personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)    The Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of

147

them. Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article X. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee and a copy thereof given to the Master Servicer and the Depositor.

Any separate trustee or co-trustee may, at any time, constitute the Trustee its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co- trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 10.12  Tax Matters.

It is intended that the Trust Fund shall constitute one or more REMICs, and that the affairs of the Trust Fund shall be conducted so that each REMIC formed hereunder qualifies as, a "real estate mortgage investment conduit" as defined in and in accordance with the REMIC Provisions. In furtherance of such intention, the Securities Administrator covenants and agrees that it shall act as agent for so long as it is also Master Servicer (and the Securities Administrator is hereby appointed to act as agent) on behalf of the Trust Fund. The Trustee and/or the Securities Administrator, as agent on behalf of the Trust Fund, shall do or refrain from doing, as applicable, the following: (a) the Securities Administrator shall prepare and file, or cause to be prepared and filed, in a timely manner, U.S. Real Estate Mortgage Investment Conduit Income Tax Returns (Form 1066 or any successor form adopted by the Internal Revenue Service) and prepare and file or cause to be prepared and filed with the Internal Revenue Service and applicable state or local tax authorities income tax or information returns for each taxable year with respect to each such REMIC containing such information and at the times and in the manner as may be required by the Code or state or local tax laws, regulations, or rules, and furnish, or cause to be furnished, to Certificateholders the schedules, statements or information at such times and in such manner as may be required thereby, provided, however, for the avoidance of doubt, the Trustee shall not be responsible for preparing and filing or causing to be prepared and filed any income tax or information returns with respect to the Class X Certificates; (b) the Securities Administrator shall apply for an employer identification number with the Internal Revenue Service via a Form SS-4 or other comparable method for each REMIC that is or becomes a taxable entity, and within thirty days of the Closing Date, furnish or cause to be furnished to the Internal Revenue Service, on Forms 8811 or as otherwise may be required by the Code, the name, title, address, and telephone number of the Person that the Holders of the Certificates may contact for tax information relating thereto, together with such additional information as may be required by such Form, and update such information at the time or times in the manner required by the Code for the Trust Fund; (c) the Securities Administrator on behalf of the Trustee shall make, or cause to be made elections, on behalf of each REMIC formed hereunder to be treated as a REMIC on the federal tax return of such REMIC for its first taxable year (and, if necessary, under applicable state law); (d) the Securities Administrator shall prepare

and forward, or cause to be prepared and forwarded, to the Certificateholders and to the Internal Revenue Service and, if necessary, state tax authorities, all information returns and reports as and when required to be provided to them in accordance with the REMIC Provisions, including without limitation, the calculation of any original issue discount using the Prepayment Assumption; (e) the Securities Administrator shall provide information necessary for the computation of tax imposed on the transfer of a Residual Certificate to a Person that is not a Permitted Transferee, or an agent (including a broker, nominee or other middleman) of a Person that is not a Permitted Transferee, or a pass-through entity in which a Person that is not a Permitted Transferee is the record holder of an interest (the reasonable cost of computing and furnishing such information may be charged to the Person liable for such tax); (f) each of the Securities Administrator and the Trustee shall, to the extent under its control, conduct the affairs of the Trust Fund at all times that any Certificates are outstanding so as to maintain the status of each REMIC formed hereunder as a REMIC under the REMIC Provisions; (g) neither the Trustee nor the Securities Administrator shall knowingly or intentionally take any action or omit to take any action that could (i) cause the termination of the REMIC status of any REMIC formed hereunder or (ii) result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code); (h) the Securities Administrator shall pay, from the sources specified in this Section 10.12, the amount of any federal, state and local taxes, including prohibited transaction taxes as described below, imposed on any REMIC formed hereunder prior to the termination of the Trust Fund when and as the same shall be due and payable (but such obligation shall not prevent the Trustee, the Securities Administrator at the written request of the Trustee, or any other appropriate Person from contesting any such tax in appropriate proceedings and shall not prevent the Securities Administrator from withholding payment of such tax, if permitted by law, pending the outcome of such proceedings); (i) the Trustee shall sign or cause to be signed federal, state or local income tax or information returns or any other document prepared by the Securities Administrator pursuant to this Section 10.12 requiring a signature thereon by the Trustee; (j) the Securities Administrator shall maintain records relating to each REMIC formed hereunder including but not limited to the income, expenses, assets and liabilities of each such REMIC and adjusted basis of the Trust Fund property determined at such intervals as may be required by the Code, as may be necessary to prepare the foregoing returns, schedules, statements or information; (k) the Securities Administrator shall, for federal income tax purposes, maintain books and records with respect to the REMICs on a calendar year and on an accrual basis; (l) none of the Trustee, the Master Servicer or the Securities Administrator shall enter into any arrangement not otherwise provided for in this Agreement by which the REMICs will receive a fee or other compensation for services nor permit the REMICs to receive any income from assets other than "qualified mortgages" as defined in Section 860G(a)(3) of the Code or "permitted investments" as defined in Section 860G(a)(5) of the Code; and (l) as and when necessary and appropriate, the Securities Administrator, at the expense of the Trust Fund, shall represent the Trust Fund in any administrative or judicial proceedings relating to an examination or audit by any governmental taxing authority, request an administrative adjustment as to any taxable year of any REMIC formed hereunder, enter into settlement agreements with any governmental taxing agency, extend any statute of limitations relating to any tax item of the Trust Fund, and otherwise act on behalf of each REMIC formed hereunder in relation to any tax matter involving any such REMIC.

In order to enable each of the Trustee and the Securities Administrator to perform its duties as set forth herein, the Depositor shall provide, or cause to be provided, to the Trustee or the Securities Administrator within 10 days after the Closing Date all information or data that the Trustee or the Securities Administrator requests in writing and determines to be relevant for tax purposes to the valuations and offering prices of the Certificates, including, without limitation, the price, yield, prepayment assumption and projected cash flows of the Certificates and the Mortgage Loans. Thereafter, the Depositor shall provide to the Trustee or the Securities Administrator promptly upon written request therefor, any such additional information or data that the Trustee or the Securities Administrator may, from time to time, request in order to enable the Trustee or the Securities Administrator to perform its duties as set forth herein. The Depositor hereby indemnifies each of the Trustee and the Securities Administrator for any losses, liabilities, damages, claims or expenses of the Trustee or the Securities Administrator arising from any errors or miscalculations of the Trustee or the Securities Administrator that result from any failure of the Depositor to provide, or to cause to be provided, accurate information or data to the Trustee or the Securities Administrator, as applicable, on a timely basis.

In the event that any tax is imposed on "prohibited transactions" of any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V as defined in Section 860F(a)(2) of the Code, on the "net income from foreclosure property" of the Trust Fund as defined in Section 860G(c) of the Code, on any contribution to any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V after the Startup Day pursuant to Section 860G(d) of the Code, or any other tax is imposed, including, without limitation, any federal, state or local tax or minimum tax imposed upon any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V, and is not paid as otherwise provided for herein, such tax shall be paid (i) by the Master Servicer or the Securities Administrator, if any such tax arises out of or results from a breach by the Master Servicer or the Securities Administrator of any of its obligations under this Agreement, provided, however, in no event shall the Master Servicer or the Securities Administrator have any liability (1) for any action or omission that is taken in accordance with and compliance with the express terms of, or which is expressly permitted by the terms of, this Agreement, (2) for any losses other than arising out of a negligent performance by the Master Servicer or the Securities Administrator of its duties and obligations set forth herein, or (3) for any special or consequential damages to Certificateholders (in addition to payment of principal and interest on the Certificates), (ii) by any party hereto (other than the Master Servicer or the Securities Administrator) to the extent any such tax arises out of or results from a breach by such other party of any of its obligations under this Agreement or (iii) in all other cases, or in the event that any liable party hereto fails to honor its obligations under the preceding clauses (i) or (ii), first, with amounts otherwise to be distributed to the Class R Certificateholders (pro rata), and second, with amounts otherwise to be distributed to the Holders of the following other Certificates in the following order of priority: first, to the Class B-4 Certificates, second, to the Class B-3 Certificates, third, to the Class B-2 Certificates, fourth, to the Class B-1 Certificates, fifth, to the Class M-6 Certificates, sixth, to the Class M-5 Certificates, seventh, to the Class M-4 Certificates, eighth, to the Class M-3 Certificates, ninth, to the Class M-2 Certificates, tenth, to the Class M-1 Certificates, and eleventh, to the Class A Certificates, on a pro rata basis. Notwithstanding anything to the contrary contained herein, to the extent that any taxes described in the preceding sentence are payable by the Holder of any such Certificates, the Securities Administrator is hereby authorized to retain on any Distribution Date from the Holders of the Class R Certificates (and, if necessary, second, from the Holders of the other relevant Certificates in the priority specified in the

preceding sentence), funds otherwise distributable to such Holders in an amount sufficient to pay such taxes. The Securities Administrator shall include in its Monthly Statement amounts allocated to the relevant Certificates, taking into account the priorities described in the second preceding sentence. The Securities Administrator shall promptly notify in writing the party liable for any such tax of the amount thereof and the due date for the payment thereof.

The Trustee, the Master Servicer and the Securities Administrator each agree that, in the event it should obtain any information necessary for the other party to perform its obligations pursuant to this Section 10.12, it will promptly notify and provide such information to such other party.

Notwithstanding the foregoing, with respect to the preparation and filing of tax returns in the event that the right to receive payments in respect of Basis Risk Shortfall Carry Forward Amounts could be treated as a partnership among the Holders of the Class A, Class M, Class B and Class C Certificates, the Securities Administrator shall not be required to prepare and file partnership tax returns on behalf of the Trust Fund or portion thereof unless it receives additional reasonable compensation for the preparation of such filings and written notification from either an officer or tax counsel for the Depositor recognizing the creation of a partnership for federal income tax purposes.

Notwithstanding any other provision of this Agreement, the Securities Administrator shall comply with all federal withholding requirements respecting payments to Certificateholders of interest or original issue discount that the Securities Administrator reasonably believes are applicable under the Code. The consent of Certificateholders shall not be required for such withholding. In the event the Securities Administrator does withhold any amount from interest or original issue discount payments or advances thereof to any Certificateholder pursuant to federal withholding requirements, the Securities Administrator shall indicate the amount withheld to such Certificateholders.

Notwithstanding anything to the contrary in this Agreement, the Securities Administrator shall not be obligated to perform any tax preparing, filing or reporting in connection with the Class X Certificates.

For the avoidance of doubt, notwithstanding anything stated to the contrary herein, none of the Supplemental Interest Trust Trustee, the Swap Administrator, the Trustee or the Securities Administrator shall have any responsibility for the entity-level tax filing or tax preparation of the Supplemental Interest Trust.

Section 10.13  REMIC-Related Covenants.

For as long as each REMIC shall exist, the Trustee and the Securities Administrator shall act in accordance herewith to assure continuing treatment of such REMIC as a REMIC, and the Trustee and the Securities Administrator shall comply with any directions of the Seller, the related Servicer or the Master Servicer to assure such continuing treatment. In furtherance, but not in limitation, of the foregoing, neither the Trustee nor the Securities Administrator shall (unless otherwise expressly permitted in this Agreement) (a) sell or permit the sale of all or any portion of the Mortgage Loans or of any investment of deposits in an Account unless such sale is

151

as a result of a repurchase of the Mortgage Loans pursuant to this Agreement or the Trustee and the Securities Administrator has received a REMIC Opinion addressed to the Securities Administrator and the Trustee prepared at the expense of the Trust Fund; (b) other than with respect to a substitution pursuant to the Mortgage Loan Purchase Agreement or Section 2.03 of this Agreement, as applicable, accept any contribution to any REMIC after the Startup Day without receipt of a REMIC Opinion; or (c) acquire any assets for any REMIC other than any REO Property after the Startup Day without receipt of a REMIC Opinion.

Section 10.14  Trustee Communications.

Notwithstanding anything to the contrary herein, any and all communications (both text and attachments) by or from the Trustee that the Trustee in its sole discretion deems to contain confidential, proprietary, and/or sensitive information and sent by electronic mail   will be encrypted. The recipient (the "Email Recipient") of the email communication will be required to complete a one-time registration process. Information and assistance on registering and using the email encryption technology can be found at the Trustee's secure website at www.citigroup.com/citigroup/citizen/privacy/email.htm or by calling (866) 535-2504 (in the U.S.) or (904) 954-6181 at any time.

ARTICLE XI

TERMINATION

Section 11.01 Termination upon Liquidation or Repurchase of all Mortgage Loans.

(i)    Subject to Section 11.03, the obligations and responsibilities of the Depositor, the Master Servicer, the Securities Administrator, the Seller and the Trustee created hereby with respect to the Trust Fund shall terminate upon the earlier of (a) the exercise by the Majority Class C Certificateholder of its right to purchase all of the Mortgage Loans (and REO Properties) remaining in the Trust Fund at a price (the "Mortgage Loan Purchase Price") equal to the sum of (i) 100% of the Stated Principal Balance of each Mortgage Loan (other than in respect of REO Property), (ii) accrued interest thereon at the applicable Mortgage Rate to, but not including, the first day of the month of such purchase, (iii) the appraised value of any REO Property in the Trust Fund (up to the Stated Principal Balance of the related Mortgage Loan), such appraisal to be conducted by an appraiser mutually agreed upon by the related Servicer and the Trustee and (iv) unreimbursed out-of pocket costs of the related Servicer or the Master Servicer, including unreimbursed Servicing Advances and the principal portion of any unreimbursed Advances made on the Mortgage Loans prior to the exercise of such repurchase right, (v) the amount of any Reimbursement Amount due to the Certificate Insurer, (vi) any unreimbursed costs and expenses of the Trustee and the Securities Administrator payable pursuant to Section 10.05 or of the Custodian pursuant to the Custodial Agreement and (vii) any Swap Termination Payment (which shall include any Net Swap Payment payable by the Trust Fund for the final Distribution Date) payable to the Swap Provider which remains unpaid or which is due to the exercise of such option (the "Swap Optional Termination Payment") and (b) the later of (i) the maturity or other liquidation (or any Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and the disposition of all REO Property and (ii) the distribution to Certificateholders and the Certificate Insurer of all amounts required to be distributed to them pursuant to this Agreement. In no event shall the Trust Fund created hereby continue beyond the earlier of (i) the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late Ambassador of the United States to the Court of St. James, living on the date hereof and (ii) the Latest Possible Maturity Date.

(ii)    The Majority Class C Certificateholder shall have the right to repurchase all Mortgage Loans and REO Properties at any time at which the aggregate Stated Principal Balance of all of the Mortgage Loans in the Trust Fund is less than or equal to 20% of the aggregate Cut-off Date Principal Balance of all of the Mortgage Loans. If the Majority Class C Certificateholder elects to terminate the Trust Fund pursuant to this Section 11.01 (such termination, an "Optional Termination"), the Majority Class C Certificateholder shall, at least 20 days prior to the last date on which notice of such Optional Termination is required to be mailed to the Certificateholders pursuant to Section 11.02(ii), notify in writing (which may be in electronic format) the Depositor, the Master Servicer, the Securities Administrator, the Trustee and the Swap Provider of the final Distribution Date on which the Majority Class C Certificateholder intends to terminate the Trust Fund. Upon termination of the Trust Fund, the Certificateholders shall present and surrender the related Certificates at the Corporate Office of the Securities Administrator, as further set forth in Section 11.02.

153

(iii)    In connection with any Optional Termination, four Business Days prior to the final Distribution Date specified in the notice required pursuant to the Section 11.01(ii), the Securities Administrator shall, no later than 4:00 pm New York City time on such day, request from the Swap Provider, in accordance with the provisions of the Swap Agreement, the amount of the Estimated Swap Termination Payment. The Swap Provider shall, no later than 2:00 pm on the following Business Day, notify in writing (which may be in electronic format) the Securities Administrator of the amount of the Estimated Swap Termination Payment, and the Securities Administrator shall promptly on the same day notify the Majority Class C Certificateholder of the amount of the Estimated Swap Termination Payment.

(iv)    Two Business Days prior to the final Distribution Date specified in the notice required pursuant to Section 11.01(ii), (i) the Majority Class C Certificateholder shall, no later than 1:00 pm New York City time on such Business Day, deposit funds in the Distribution Account in an amount equal to the sum of the Mortgage Loan Purchase Price (other than the Swap Optional Termination Payment) and the Estimated Swap Termination Payment, and (ii) if the Securities Administrator shall have determined that the aggregate Stated Principal Balance of all of the Mortgage Loans in the Trust Fund as of the related Determination Date is less than or equal to 20% of the aggregate Cut-off Date Principal Balance of all of the Mortgage Loans and that all other requirements of the Optional Termination have been met, including without limitation the deposit required pursuant to the immediately preceding clause (i) as well as the requirements specified in Section 11.03, then the Securities Administrator shall, on such Business Day, provide written notice to the Majority Class C Certificateholder, the Depositor, the Master Servicer, the Custodian and the Swap Provider confirming (a) its receipt of the Mortgage Loan Purchase Price (other than the Swap Optional Termination Payment) and the Estimated Swap Termination Payment and (b) that all other requirements of the Optional Termination have been met. Upon the Securities Administrator's providing the notice described in the preceding sentence, the Optional Termination shall become irrevocable, the notice to Certificateholders of such Optional Termination provided pursuant to Section 11.02(ii) shall become unrescindable, the Swap Provider shall determine the Swap Optional Termination Payment in accordance with the Swap Agreement, and the Swap Provider shall provide to the Securities Administrator written notice of the amount of the Swap Optional Termination Payment not later than one Business Day prior to the final Distribution Date specified in the notice required pursuant to Section 11.01(ii) and, in the event that the Securities Administrator fails to provide the notice described in the preceding sentence, any notice provided under Section 11.01(ii) shall be deemed rescinded.

(v)    In connection with any Optional Termination, only an amount equal to the Mortgage Loan Purchase Price less any Swap Optional Termination Payment shall be made available for distribution to the Regular Certificates. Any Estimated Swap Termination Payment deposited into the Distribution Account by the Majority Class C Certificateholder shall be withdrawn by the Securities Administrator from the Distribution Account on the final Distribution Date and distributed as follows: (i) to the Supplemental Interest Trust for payment to the Swap Provider in accordance with Section 4.12(c), an amount equal to the Swap Optional Termination Amount calculated pursuant to the Swap Agreement, provided that, in no event shall the amount distributed to the Swap Provider in respect of the Swap Optional Termination Amount exceed the Estimated Swap Termination Payment, and (ii) to the Majority Class C Certificateholder, an amount equal to the excess, if any, of the Estimated Swap Termination

154

Payment over the Swap Optional Termination Payment. The Swap Optional Termination Payment shall not be part of any REMIC and shall not be paid into any account which is part of any REMIC.

(vi)    Upon receipt by the Custodian of notice from the Securities Administrator pursuant to Section 11.01(iv) and the receipt by the Custodian of a Request for Release therefor, the Custodian shall promptly release to the Master Servicer, as applicable the Mortgage Files for the Mortgage Loans and the Trustee shall execute and deliver any documents prepared and delivered to it which are necessary to transfer any REO Property.

(vii)    Notwithstanding the foregoing, the provisions of Section 8.03 hereof shall survive the termination of this Agreement.

(viii)    Any termination of the Issuing Entity shall require the consent of the Certificate Insurer if it would result in a draw on the Policy or if amounts would remain owed to the Insurer pursuant to this Agreement or the Insurance Agreement.

Section 11.02  Final Distribution on the Certificates.

(i)    If on any Determination Date, (i) the Master Servicer determines that there are no Outstanding Mortgage Loans and no other funds or assets in the Trust Fund other than the funds in the Distribution Account, the Master Servicer shall direct the Securities Administrator to send a final distribution notice promptly to each Certificateholder and the Certificate Insurer or (ii) the Securities Administrator determines that a Class of Certificates shall be retired after a final distribution on such Class, the Securities Administrator shall notify the related Certificateholders (and the Certificate Insurer with respect to the Class A-2 Certificates and Class A-3 Certificates) within five (5) Business Days after such Determination Date that the final distribution in retirement of such Class of Certificates is scheduled to be made on the immediately following Distribution Date. Any final distribution made pursuant to the immediately preceding sentence shall be made only upon presentation and surrender of the Certificates at the Corporate Office of the Securities Administrator.

(ii)    Notice of any termination of the Trust Fund, specifying the Distribution Date on which Certificateholders may surrender their Certificates for payment of the final distribution and cancellation, shall be given promptly by the Securities Administrator by letter to Certificateholders and the Certificate Insurer mailed not later than two Business Days after the Determination Date in the month of such final distribution. Any such notice shall specify (a) the Distribution Date upon which final distribution on the Certificates shall be made upon presentation and surrender of Certificates at the office therein designated, (b) the amount of such final distribution, (c) the location of the office or agency at which such presentation and surrender must be made and (d) that the Record Date otherwise applicable to such Distribution Date is not applicable, distributions being made only upon presentation and surrender of the Certificates at the office therein specified. The Securities Administrator will give such notice to each Rating Agency at the time such notice is given to Certificateholders.

(iii)    Upon such receipt by the Custodian of a Request for Release therefor, the Custodian shall promptly release to the Master Servicer, as applicable the Mortgage Files for the

Mortgage Loans and the Trustee shall execute and deliver any documents prepared and delivered to it which are necessary to transfer any REO Property.

(iv)    Upon presentation and surrender of the Certificates, the Securities Administrator shall cause to be distributed to Certificateholders of each Class and the Certificate Insurer in accordance with the Remittance Report the amounts allocable to such Certificates and the Certificate Insurer held in the Distribution Account in the order and priority set forth in Section 6.04 hereof on the final Distribution Date and in proportion to their respective Percentage Interests.

(v)    In the event that any affected Certificateholders shall not surrender Certificates for cancellation within six months after the date specified in the above mentioned written notice, the Securities Administrator shall give a second written notice to the remaining Certificateholders to surrender their Certificates for cancellation and receive the final distribution with respect thereto. If within six months after the second notice all the applicable Certificates shall not have been surrendered for cancellation, the Securities Administrator may take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining Certificateholders concerning surrender of their Certificates, and the cost thereof shall be paid out of the funds and other assets that remain a part of the Trust Fund. If within one year after the second notice all related Certificates shall not have been surrendered for cancellation, the related Residual Certificateholders shall be entitled to all unclaimed funds and other assets of the Trust Fund that remain subject hereto.

Section 11.03  Additional Termination Requirements.

(a)    Upon exercise by the Majority Class C Certificateholder of its purchase option as provided in Section 11.01, the Trust Fund shall be terminated in accordance with the following additional requirements, unless each of the Trustee, the Certificate Insurer and the Securities Administrator have been supplied with an Opinion of Counsel addressed to the Trustee, the Certificate Insurer and the Securities Administrator, at the expense of the Majority Class C Certificateholder, to the effect that the failure of the Trust Fund to comply with the requirements of this Section 11.03 will not (i) result in the imposition of taxes on "prohibited transactions" of a REMIC, or (ii) cause a REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding:

(1)    The Majority Class C Certificateholder shall establish a 90-day liquidation period for REMIC I, REMIC II, REMIC III, REMIC IV and REMIC V and notify the Trustee and Securities Administrator thereof, and the Securities Administrator shall in turn specify the first day of such period in a statement attached to the tax returns for REMIC I, REMIC II, REMIC III, REMIC IV and REMIC V pursuant to Treasury Regulation Section 1.860F-1. The Majority Class C Certificateholder shall satisfy all the requirements of a qualified liquidation under Section 860F of the Code and any regulations thereunder with respect to each REMIC related to the terminated Trust Fund, as evidenced by an Opinion of Counsel addressed to the Securities Administrator and the Trustee obtained at the expense of the Majority Class C Certificateholder;

(2)       During such 90-day liquidation period, and at or prior to the time of making the final payment on the Certificates, the Securities Administrator on behalf of the Trustee shall sell all of the assets of REMIC I for cash; and

(3)       At the time of the making of the final payment on the Certificates, the Securities Administrator shall distribute or credit, or cause to be distributed or credited, to the Holders of the Residual Certificates all cash on hand (other than cash retained to meet claims), and REMIC I shall terminate at that time.

(4)       By their acceptance of the Certificates (other than the Class X Certificates), the Holders thereof hereby authorize the adoption of a 90-day liquidation period and plan of complete liquidation for the each related REMIC, which authorization shall be binding upon all successor Certificateholders.

(5)       The Securities Administrator, as agent for each REMIC, hereby agrees to adopt and sign such a plan of complete liquidation meeting the requirements for a qualified liquidation under Section 860F of the Code and any regulations thereunder upon the written request of the Majority Class C Certificateholder and the receipt of the Opinion of Counsel referred to in Section 11.03(a)(1), and to take such other action in connection therewith as may be reasonably requested by the Majority Class C Certificateholder.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

Section 12.01  Amendment.

This Agreement may be amended from time to time by parties hereto without the consent of any of the Certificateholders or the Certificate Insurer (unless such amendment would adversely affect the Certificate Insurer's interests as reasonably determined by the Certificate Insurer, in which case the consent of the Certificate Insurer shall not be unreasonably withheld or delayed) to cure any ambiguity, to correct or supplement any provisions herein (including to give effect to the expectations of investors), to comply with any changes in the Code, to revise any provisions to reflect the obligations of the parties to this Agreement as they relate to Regulation AB, to change the manner in which the Distribution Account maintained by the Securities Administrator is maintained or to make such other provisions with respect to matters or questions arising under this Agreement as shall not be inconsistent with any other provisions herein if such action shall not, as evidenced by an Opinion of Counsel addressed to the Trustee (which opinion shall be an expense of the party requesting such opinion but in any case shall not be an expense of the Trustee), adversely affect in any material respect the interests of any Certificateholder; provided that any such amendment shall be deemed not to adversely affect in any material respect the interests of the Certificateholders and no such Opinion of Counsel shall be required if the Person requesting such amendment obtains a letter from each Rating Agency stating that such amendment would not result in the downgrading or withdrawal of the respective ratings then assigned to the Certificates (determined without regard to the Policy).

Notwithstanding the foregoing, without the consent of the Certificateholders or the Certificate Insurer, the parties hereto may at any time and from time to time amend this Agreement to modify, eliminate or add to any of its provisions to such extent as shall be necessary or appropriate to maintain the qualification of any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V as a REMIC under the Code or to avoid or minimize the risk of the imposition of any tax on any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V pursuant to the Code that would be a claim against any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V at any time prior to the final redemption of the Certificates, provided that the Trustee, the Securities Administrator have been provided an Opinion of Counsel addressed to the Trustee and the Securities Administrator, which opinion shall be an expense of the party requesting such opinion but in any case shall not be an expense of the Trustee, the Securities Administrator or the Trust Fund, to the effect that such action is necessary or appropriate to maintain such qualification or to avoid or minimize the risk of the imposition of such a tax.

This Agreement may also be amended from time to time by the parties hereto with the consent of the Certificate Insurer and Holders of the Certificates evidencing over 50% of the Voting Rights, or, if applicable, Holders of each Class of Certificates affected thereby, evidencing over 50% of the Voting Rights of such Class or Classes,  for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Holders of Certificates; provided that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of,

payments required to be distributed on any Certificate without the consent of the Holder of such Certificate, (ii) cause any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to cease to qualify as a REMIC or (iii) reduce the aforesaid percentages of Certificates of each Class the Holders of which are required to consent to any such amendment without the consent of the Holders of all Certificates of such Class then outstanding or the Certificate Insurer.

Notwithstanding any contrary provision of this Agreement, the Trustee shall not consent to any amendment to this Agreement unless it and the Certificate Insurer shall have first received an Opinion of Counsel addressed to the Trustee, the Certificate Insurer and the Securities Administrator, which opinion shall be an expense of the party requesting such amendment but in any case shall not be an expense of the Trustee or the Securities Administrator, to the effect that such amendment will not (other than an amendment pursuant to clause (ii) of, and in accordance with, the preceding paragraph) cause the imposition of any tax on any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V or the Certificateholders or cause any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to cease to qualify as a REMIC at any time that any Certificates are outstanding. Further, nothing in this Agreement shall require the Trustee to enter into an amendment without receiving an Opinion of Counsel, satisfactory to the Trustee (i) that such amendment is permitted and is not prohibited by this Agreement and (ii) that all requirements for amending this Agreement (including any consent of the applicable Certificateholders) have been complied with.

Notwithstanding any of the other provisions of this Section 12.01, none of the parties to this Agreement shall enter into any amendment to this Agreement that could reasonably be expected to have a material adverse effect on the interests of  the Swap Provider hereunder (excluding, for the avoidance of doubt, any amendment to this Agreement that is entered into solely for the purpose of appointing a successor servicer, master servicer, securities administrator, trustee or other service provider) without the prior written consent of the Swap Provider, which consent shall not be unreasonably withheld, conditioned or delayed.

So long as no Certificate Insurer Default exists and notwithstanding any of the other provisions of this Section 12.01, none of the parties to this Agreement shall enter into any amendment to this Agreement that could reasonably be expected to have a material adverse effect on the interests of the Certificate Insurer (as reasonably determined by the Certificate Insurer) without the prior consent of the Certificate Insurer.

Promptly after the execution of any amendment to this Agreement requiring the consent of Certificateholders, the Securities Administrator shall furnish written notification of the substance of such amendment to each Certificateholder, the Certificate Insurer, the Swap Provider and each Rating Agency.

It shall not be necessary for the consent of Certificateholders under this Section to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

Section 12.02  Recordation of Agreement; Counterparts.

To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all of the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere. The Master Servicer shall effect such recordation at the Trust's expense upon the request in writing of a Certificateholder, but only if such direction is accompanied by an Opinion of Counsel (provided at the expense of the Certificateholder requesting recordation) to the effect that such recordation would materially and beneficially affect the interests of the Certificateholders or is required by law.

For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 12.03  Governing Law.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS WITHOUT REGARD TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAWS).**

Section 12.04  Intention of Parties.

It is the express intent of the parties hereto that the conveyance of the Mortgage Notes, Mortgages, assignments of Mortgages, title insurance policies and any modifications, extensions and/or assumption agreements and private mortgage insurance policies relating to the Mortgage Loans by the Seller to the Depositor, and by the Depositor to the Trustee be, and be construed as, an absolute sale thereof to the Depositor or the Trustee, as applicable. It is, further, not the intention of the parties that such conveyance be deemed a pledge thereof by the Seller to the Depositor, or by the Depositor to the Trustee. However, in the event that, notwithstanding the intent of the parties, such assets are held to be the property of the Seller or the Depositor, as applicable, or if for any other reason the Mortgage Loan Purchase Agreement or this Agreement is held or deemed to create a security interest in such assets, then (i) the Mortgage Loan Purchase Agreement and this Agreement shall each be deemed to be a security agreement within the meaning of the Uniform Commercial Code of the State of New York and (ii) the conveyance provided for in the Mortgage Loan Purchase Agreement from the Seller to the Depositor, and the conveyance provided for in this Agreement from the Depositor to the Trustee, shall be deemed to be an assignment and a grant by the Seller or the Depositor, as applicable, for the benefit of the Certificateholders and the Certificate Insurer of a security interest in all of the assets that constitute the Trust Fund, whether now owned or hereafter acquired.

160

The Depositor for the benefit of the Certificateholders and the Certificate Insurer shall, to the extent consistent with this Agreement, take such actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the assets of the Trust Fund, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of the Agreement.

Section 12.05 Notices.

(a)    The Securities Administrator shall use its best efforts to promptly provide notice to each Rating Agency, the Certificate Insurer and the Swap Provider with respect to each of the following of which a Responsible Officer of the Securities Administrator has actual knowledge:

(i)    Any material change or amendment to this Agreement;

(ii)    The occurrence of any Event of Default that has not been cured;

(iii)    The resignation or termination of the Master Servicer, the Securities Administrator or the Trustee and the appointment of any successor;

(iv)    The repurchase or substitution of Mortgage Loans pursuant to Sections 2.02, 2.03 and 11.01; and

(v)    The final payment to Certificateholders.

(b)    All directions, demands and notices hereunder shall be in writing and shall be deemed to have been duly given when delivered at or mailed by registered mail, return receipt requested, postage prepaid, or by recognized overnight courier, or by facsimile transmission to a number provided by the appropriate party if receipt of such transmission is confirmed to (i) in the case of the Depositor, SACO I Inc., 383 Madison Avenue, New York, New York 10179, Attention: Chief Counsel; (ii) in the case of the Seller, EMC Mortgage Corporation, 2780 Lake Vista Drive, Lewisville, Texas 75067 (Facsimile: (972) 444-2880), attention: President or General Counsel or such other address as may be hereafter furnished to the other parties hereto by the Master Servicer in writing; (iii) in the case of the Trustee, at its Corporate Trust Office or such other address as the Trustee may hereafter furnish to the other parties hereto, (iv) in the case of the Master Servicer or the Securities Administrator, P.O. Box 98, Columbia, Maryland 21046 (or, for overnight deliveries, 9062 Old Annapolis Road, Columbia, Maryland 21045, Attention: Corporate Trust Services – Bear Stearns Second Lien Trust 2007-SV1) or such other address as may be hereafter furnished to the other parties hereto by the Securities Administrator in writing, (v) in the case of Moody's, 99 Church Street, New York, New York 10007, Attention: Home Equity Monitoring, or such other address as may be hereafter furnished to the other parties hereto by Moody's in writing, (vi) in the case of Standard & Poor's, a division of The McGraw-Hill Companies, Inc., 55 Water Street, 41st Floor, New York, New York 10041 or such other address as may be hereafter furnished to the other parties hereto by Standard & Poor's in writing, (vii) in the case of the Swap Provider, Wachovia Bank, National Association, 301 South College Street, DC-8, Charlotte, North Carolina 28202-0600, Attention: Derivatives Documentation Group, and (viii) in the case of the Certificate Insurer, 1221 Avenue of the Americas, New York, New York 10020. Any notice delivered to the Seller, the Master Servicer, the Securities Administrator, the Swap

Provider or the Trustee under this Agreement shall be effective only upon receipt. Any notice required or permitted to be mailed to a Certificateholder, unless otherwise provided herein, shall be given by first-class mail, postage prepaid, at the address of such Certificateholder as shown in the Certificate Register; any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have been duly given, whether or not the Certificateholder receives such notice.

Section 12.06  Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Holders thereof.

Section 12.07  Assignment.

Notwithstanding anything to the contrary contained herein, except as provided pursuant to Section 8.02, this Agreement may not be assigned by the Master Servicer, the Seller or the Depositor.

Section 12.08  Limitation on Rights of Certificateholders.

The death or incapacity of any Certificateholder shall not operate to terminate this Agreement or the Trust Fund, nor entitle such Certificateholder's legal representative or heirs to claim an accounting or to take any action or commence any proceeding in any court for a petition or winding up of the Trust Fund, or otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

No Certificateholder shall have any right to vote (except as provided herein) or in any manner otherwise control the operation and management of the Trust Fund, or the obligations of the parties hereto, nor shall anything herein set forth or contained in the terms of the Certificates be construed so as to constitute the Certificateholders from time to time as partners or members of an association; nor shall any Certificateholder be under any liability to any third party by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee or the Securities Administrator, as appropriate, a written notice of an Event of Default and of the continuance thereof, as hereinbefore provided, the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made written request to the Trustee or the Securities Administrator, as appropriate to institute such action, suit or proceeding in its own name as Trustee or the Securities Administrator, as appropriate, hereunder and shall have offered to the Trustee or the Securities Administrator, as appropriate, such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee or the Securities Administrator, as appropriate, for 60 days after its receipt of such notice, request and offer of indemnity shall have neglected or refused to

institute any such action, suit or proceeding; it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates shall have any right in any manner whatever by virtue or by availing itself or themselves of any provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of all Certificateholders and the Certificate Insurer. For the protection and enforcement of the provisions of this Section 12.08, each and every Certificateholder, the Trustee or the Securities Administrator shall be entitled to such relief as can be given either at law or in equity.

Section 12.09  Inspection and Audit Rights.

The Master Servicer agrees that, on reasonable prior notice, it will permit any representative of the Depositor or the Trustee during the Master Servicer's normal business hours, to examine all the books of account, records, reports and other papers of the Master Servicer relating to the Mortgage Loans, to make copies and extracts therefrom, to cause such books to be audited by independent certified public accountants selected by the Depositor and the Trustee and to discuss its affairs, finances and accounts relating to such Mortgage Loans with its officers, employees and independent public accountants (and by this provision the Master Servicer hereby authorizes such accountants to discuss with such representative such affairs, finances and accounts), all at such reasonable times and as often as may be reasonably requested. Any out-of-pocket expense incident to the exercise by the Depositor or the Trustee of any right under this Section 12.09 shall be borne by the party requesting such inspection, subject to such party's right to reimbursement hereunder (in the case of the Trustee, pursuant to Section 10.05 hereof.

Section 12.10  Certificates Nonassessable and Fully Paid.

It is the intention of the Depositor that Certificateholders shall not be personally liable for obligations of the Trust Fund, that the interests in the Trust Fund represented by the Certificates shall be nonassessable for any reason whatsoever, and that the Certificates, upon due authentication thereof by the Securities Administrator pursuant to this Agreement, are and shall be deemed fully paid.

Section 12.11  Third Party Rights.

The Swap Provider shall be an express third-party beneficiary of this Agreement to the extent of its express rights to receive any payments under this Agreement or any other express rights of the Swap Provider explicitly stated in this Agreement, and shall have the right to enforce such rights under this Agreement as if it were a party hereto. The Swap Administrator shall be an express third-party beneficiary of this Agreement to the extent of its express rights to receive any payments under this Agreement or any other express rights of the Swap Administrator explicitly stated in this Agreement, and shall have the right to enforce such rights under this Agreement as if it were a party hereto.

Section 12.12  Subrogation and Cooperation.

(a)    The Securities Administrator and the Trustee acknowledge that (i) to the extent the Certificate Insurer makes payments under the Policy on account of principal of or interest on the Class A-2 Certificates or Class A-3 Certificates, the Certificate Insurer will be fully subrogated to the rights of such Holders to receive such principal and interest from the Trust Fund, and (ii) the Certificate Insurer shall be paid such principal and interest but only from the sources and in the manner provided herein and in the Insurance Agreement.

(b)    The Trustee shall, so long as it is indemnified to its satisfaction, cooperate in all respects with any reasonable written request by the Certificate Insurer for action to preserve or enforce the Certificate Insurer's rights or interest under this Agreement or the Insurance Agreement, consistent with this Agreement and without limiting the rights of the Certificateholders as otherwise set forth in the Agreement, including, without limitation, upon the occurrence and continuance of a default under the Insurance Agreement, a request to take any one or more of the following actions:

(i)    institute proceedings for the collection of all amounts then payable on the Class A-2 Certificates and Class A-3 Certificates, or under this Agreement in respect of the Class A-2 Certificates and Class A-3 Certificates and all amounts payable under the Insurance Agreement, enforce any judgment obtained and collect from the Trust Fund monies adjudged due;

(ii)    sell or cause to be sold the Trust Fund or any portion thereof or rights or interest therein, at one or more public or private sales called and conducted in any manner permitted by law;

(iii)    institute proceedings from time to time for the complete or partial foreclosure of this Agreement; and

(iv)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Certificate Insurer hereunder;

provided, however, action shall be taken pursuant to this Section 12.12 by the Trustee to preserve the Certificate Insurer's rights or interest under this Agreement or the Insurance Agreement only to the extent such action is available to the Class A-2 Certificates and Class A-3 Certificates or the Certificate Insurer under other provisions of this Agreement.

Notwithstanding any provision of this Agreement to the contrary, so long as no Certificate Insurer Default exists, the Certificate Insurer shall at all times be treated as if it were the exclusive owner of all Class A-2 Certificates and Class A-3 Certificates Outstanding for the purposes of all approvals, consents, waivers and the institution of any action and the written direction of all remedies, and the Securities Administrator and Trustee shall act in accordance with the written directions of the Certificate Insurer so long as they are indemnified therefor to its reasonable satisfaction and to the extent provided in this Agreement.

*  *  *

IN WITNESS WHEREOF, the Depositor, the Seller, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

SACO I INC.,
as Depositor

By: _____
Name: Barry Silverstein
Title: Vice President

EMC MORTGAGE CORPORATION,
as Seller

By: _____
Name:
Title:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Master Servicer and Securities Administrator

By: _____
Name:
Title:

CITIBANK, N.A.,
as Trustee

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Depositor, the Seller, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

SACO I INC.,
as Depositor


By: _____
Name:
Title:


EMC MORTGAGE CORPORATION,
as Seller

By: _____
Name: Steven Massey
Title: Senior Vice President

WELLS FARGO BANK, NATIONAL
ASSOCIATION,
as Master Servicer and Securities Administrator


By: _____
Name:
Title:


CITIBANK, N.A.,
as Trustee


By: _____
Name:
Title:

IN WITNESS WHEREOF, the Depositor, the Seller, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

SACO I INC.,
as Depositor

By: _____
Name:
Title:

EMC MORTGAGE CORPORATION,
as Seller

By: _____
Name:
Title:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Master Servicer and Securities Administrator

By: _____
Name:     Stacey M. Taylor
Title:     Vice President

CITIBANK, N.A.,
as Trustee

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Depositor, the Seller, the Master Service, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

SACO I INC.,
as Depositor


By: _____
Name:
Title:


EMC MORTGAGE CORPORATION,
as Seller


By: _____
Name:
Title:


WELLS FARGO BANK, NATIONAL
ASSOCIATION,
as Master Servicer and Securities Administrator


By: _____
Name:
Title:


CITIBANK, N.A.,
as Trustee


By: _____
Name:
Title:      **Cirino Emanuele**
              **Vice President**

STATE OF NEW YORK  )
          ) ss.:
COUNTY OF NEW YORK )

On this _30th_ day of March, 2007, before me, a notary public in and for said State, appeared _Baron Silverstein_ , personally known to me on the basis of satisfactory evidence to be an authorized representative of SACO I Inc., one of the companies that executed the within instrument, and also known to me to be the person who executed it on behalf of such limited liability company and acknowledged to me that such limited liability company executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

[Notarial Seal]

MICHELLE STERLING
Notary Public, State of New York
No. 02ST6066612
Qualified in Westchester County
Commission Expires November 19, 2009

STATE OF TEXAS            )
                         ) ss.:
COUNTY OF DALLAS         )


On this 30th day of March, 2007, before me, a notary public in and for said State, appeared __Steven Massey_____, personally known to me on the basis of satisfactory evidence to be an authorized representative of EMC Mortgage Corporation, one of the corporations that executed the within instrument, and also known to me to be the person who executed it on behalf of such corporation and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.



Notary Public

[Notarial Seal]

ALFIE D KEARNEY
Notary Public, State of Texas
My Commission Expires 12-14-2009

STATE OF MARYLAND      )
                       ) ss:
COUNTY OF HOWARD       )


On the 30th day of March, 2007 before me, a notary public in and for said State, personally appeared _Stacey Taylor_____, known to me to be a(n) _Vice President_____ of Wells Fargo Bank, National Association, a national banking association, one of the parties that executed the within instrument, and also known to me to be the person who executed it on behalf of said party, and acknowledged to me that such party executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

[Notarial Seal]        GRAHAM M. OGLESBY
                        NOTARY PUBLIC
                        BALTIMORE CITY
                        MARYLAND
                MY COMMISSION EXPIRES JANUARY 7  2009

STATE OF NEW YORK    )
                          ) ss.:
COUNTY OF NEW YORK   )

On this 30th day of March, 2007, before me, a notary public in and for said State, appeared Cirino Emanuele, personally known to me on the basis of satisfactory evidence to be an authorized representative of Citibank, N.A. that executed the within instrument, and also known to me to be the person who executed it on behalf of such national banking association, and acknowledged to me that such national banking association executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

ZENAIDA SANTIAGO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SA6152564
Qualified In Kings County
My Commission Expires September 11, 20 10

EXHIBIT A

FORM OF CLASS A CERTIFICATES

**SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE REPRESENTS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").**

**THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE WILL BE DECREASED BY THE PRINCIPAL PAYMENTS HEREON AND REALIZED LOSSES ALLOCABLE HERETO. ACCORDINGLY, FOLLOWING THE INITIAL ISSUANCE OF THE CERTIFICATES, THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE WILL BE DIFFERENT FROM THE DENOMINATION SHOWN BELOW. ANYONE ACQUIRING THIS CERTIFICATE MAY ASCERTAIN ITS CERTIFICATE PRINCIPAL BALANCE BY INQUIRY OF THE SECURITIES ADMINISTRATOR NAMED HEREIN.**

**PRIOR TO THE TERMINATION OF THE SUPPLEMENTAL INTEREST TRUST, ANY PERSON ACQUIRING A CERTIFICATE SHALL BE DEEMED TO HAVE MADE THE REPRESENTATIONS IN SECTION 7.02(h) OF THE POOLING AND SERVICING AGREEMENT.**

**UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE DEPOSITOR OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.**

**THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS CERTIFICATE, AGREES THAT THIS CERTIFICATE MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (1) PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A") TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A (A "QIB"), PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER**

TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (2) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR (3) IN CERTIFICATED FORM TO AN "INSTITUTIONAL ACCREDITED INVESTOR" WITHIN THE MEANING THEREOF IN RULE 501(a)(1), (2), (3) or (7) OF REGULATION D UNDER THE ACT OR ANY ENTITY IN WHICH ALL OF THE EQUITY OWNERS COME WITHIN SUCH PARAGRAPHS PURCHASING NOT FOR DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, SUBJECT TO (A) THE RECEIPT BY THE SECURITIES ADMINISTRATOR OF A LETTER SUBSTANTIALLY IN THE FORM PROVIDED IN THE AGREEMENT AND (B) THE RECEIPT BY THE SECURITIES ADMINISTRATOR OF SUCH OTHER EVIDENCE ACCEPTABLE TO THE SECURITIES ADMINISTRATOR THAT SUCH REOFFER, RESALE, PLEDGE OR TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS OR IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION.

Certificate No. 1

Adjustable Rate

Class A-[1][2][3]

| | |
|---|---|
| Date of Pooling and Servicing Agreement and Cut-off Date: March 1, 2007 | Aggregate Initial Certificate Principal Balance of this Certificate as of the Cut-off Date: $[_____] |
| First Distribution Date: April 25, 2007 | Initial Certificate Principal Balance of this Certificate as of the Cut-off Date: $[_____] |
| Master Servicer and Securities Administrator: Wells Fargo Bank, National Association | CUSIP: [_____] |

Last Scheduled Distribution Date:
[January] [December] 25, 2036

## BEAR STEARNS SECOND LIEN TRUST 2007-SV1
## MORTGAGE-BACKED CERTIFICATE
## SERIES 2007-SV1

evidencing a fractional undivided interest in the distributions allocable to the Class A-[1][2][3] Certificates with respect to a Trust Fund consisting primarily of a pool of conventional, closed-end, second lien, one- to four-family fixed interest rate mortgage loans sold by SACO I INC.

This Certificate is payable solely from the assets of the Trust Fund, and does not represent an obligation of or interest in SACO I Inc., the Master Servicer, the Securities Administrator or the Trustee referred to below or any of their affiliates or any other person. Neither this Certificate nor the underlying Mortgage Loans are guaranteed or insured by any governmental entity or by SACO I Inc., the Master Servicer, the Securities Administrator or the Trustee or any of their affiliates or any other person. None of SACO I Inc., the Master Servicer or any of their affiliates will have any obligation with respect to any certificate or other obligation secured by or payable from payments on the Certificates.

This certifies that Cede & Co. is the registered owner of the Percentage Interest evidenced hereby in the beneficial ownership interest of Certificates of the same Class as this Certificate in a trust (the "Trust Fund") generally consisting of conventional, closed-end, second lien, fixed rate mortgage loans secured by one- to four-family residences (collectively, the "Mortgage Loans") sold by SACO I Inc. ("SACO I"). The Mortgage Loans were sold by EMC

Mortgage Corporation ("EMC") to SACO I. Wells Fargo Bank, National Association will act as master servicer of the Mortgage Loans (in that capacity, the "Master Servicer," which term includes any successors thereto under the Agreement referred to below). The Trust Fund was created pursuant to the Pooling and Servicing Agreement, dated as of the Cut-off Date specified above (the "Agreement"), among SACO I, as depositor (the "Depositor"), EMC Mortgage Corporation as seller, Wells Fargo Bank, National Association, as Master Servicer and securities administrator (the "Securities Administrator"), and Citibank, N.A., as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, capitalized terms used herein shall have the meaning ascribed to them in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of its acceptance hereof assents and by which such Holder is bound.

Interest on this Certificate will accrue from and including the 25th day of the calendar month preceding the month in which a Distribution Date (as hereinafter defined) occurs to and including the 24th day of the calendar month in which that Distribution Date occurs on the Certificate Principal Balance hereof at a per annum rate equal to the Pass-Through Rate set forth above. The Securities Administrator will distribute on the 25th day of each month, or, if such 25th day is not a Business Day, the immediately following Business Day (each, a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered at the close of business on the Business Day immediately preceding such Distribution Date, an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount (of interest and principal, if any) required to be distributed to the Holders of Certificates of the same Class as this Certificate. The Last Scheduled Distribution Date is the Distribution Date in the month following the latest scheduled maturity date of any Mortgage Loan and is not likely to be the date on which the Certificate Principal Balance of this Class of Certificates will be reduced to zero.

Distributions on this Certificate will be made by the Securities Administrator by check mailed to the address of the Person entitled thereto as such name and address shall appear on the Certificate Register or, if such Person so requests by notifying the Securities Administrator in writing as specified in the Agreement, by wire transfer. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Securities Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Securities Administrator for that purpose and designated in such notice. The initial Certificate Principal Balance of this Certificate is set forth above. The Certificate Principal Balance hereof will be reduced to the extent of distributions allocable to principal hereon and any Realized Losses allocable hereto.

This Certificate is one of a duly authorized issue of Certificates designated as set forth on the face hereof (the "Certificates"). The Certificates, in the aggregate, evidence the entire beneficial ownership interest in the Trust Fund formed pursuant to the Agreement.

The Certificateholder, by its acceptance of this Certificate, agrees that it will look solely to the Trust Fund for payment hereunder and that neither the Trustee nor the Securities Administrator is liable to the Certificateholders for any amount payable under this Certificate or

the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

This Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced hereby, and the rights, duties and immunities of the Securities Administrator and the Trustee.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor and the rights of the Certificateholders and the Certificate Insurer under the Agreement from time to time by the parties thereto with the written consent of the Certificate Insurer and the consent of the Holders of the Certificates evidencing over 50% of the Voting Rights, or, if applicable, Holders of each Class of Certificates affected thereby evidencing over 50% of the Voting Rights of such Class or Classes. Any such written consent of the Certificate Insurer and any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable with the Securities Administrator upon surrender of this Certificate for registration of transfer at the offices or agencies maintained by the Securities Administrator for such purposes, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Securities Administrator duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates in authorized denominations representing a like aggregate Percentage Interest will be issued to the designated transferee.

Prior to the termination of the Supplemental Interest Trust, any transferee of this Certificate shall be deemed to make the representations in Section 7.02(h) of the Agreement.

The Certificates are issuable only as registered Certificates without coupons in the Classes and denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, this Certificate is exchangeable for one or more new Certificates evidencing the same Class and in the same aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made to the Certificateholders for any such registration of transfer, but the Securities Administrator may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Depositor, the Master Servicer, the Securities Administrator, the Trustee and any agent of any of them may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Securities Administrator, the Trustee or any such agent shall be affected by notice to the contrary.

A-1-5

The obligations created by the Agreement and the Trust Fund created thereby (other than the obligations to make payments to Certificateholders with respect to the termination of the Agreement) shall terminate upon the earlier of (i) the later of (A) the maturity or other liquidation (or Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (B) the remittance of all funds due under the Agreement, or (ii) the optional repurchase by the party named in the Agreement of all the Mortgage Loans and other assets of the Trust Fund in accordance with the terms of the Agreement. Such optional repurchase may be made only on or after the first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans is less than or equal to a certain percentage of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date as set forth in the Agreement. The exercise of such right will effect the early retirement of the Certificates. In no event, however, will the Trust Fund created by the Agreement continue beyond the earlier of (i) the expiration of 21 years after the death of certain persons identified in the Agreement and (ii) the Latest Possible Maturity Date (as defined in the Agreement).

Unless this Certificate has been countersigned by an authorized signatory of the Securities Administrator by manual signature, this Certificate shall not be entitled to any benefit under the Agreement, or be valid for any purpose.

IN WITNESS WHEREOF, the Securities Administrator has caused this Certificate to be duly executed.

Dated: March 30, 2007

WELLS FARGO BANK, NATIONAL ASSOCIATION, not in its individual capacity but solely as Securities Administrator

By: _____
                   Authorized Signatory

## CERTIFICATE OF AUTHENTICATION

This is one of the Class A-[1][2][3] Certificates referred to in the within-mentioned Agreement.

WELLS FARGO BANK, NATIONAL ASSOCIATION, Authorized signatory of Wells Fargo Bank, National Association , not in its
individual capacity but solely as Securities Administrator

By: _____
                   Authorized Signatory

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____ (Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Asset-Backed Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:

_____

_____

_____

Dated: _____                    _____
                                    Signature by or on behalf of assignor

                                    _____
                                    Signature Guaranteed

### DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

for the account of _____
account number _____ or, if mailed by check, to

_____
Applicable statements should be mailed to _____

_____

This information is provided by _____
assignee named above, or _____
its agent.

EXHIBIT A-2

FORM OF CLASS M CERTIFICATES

**THIS CERTIFICATE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE SENIOR CERTIFICATES [,] [THE CLASS M-1 CERTIFICATES] [,] [THE CLASS M-2 CERTIFICATES] [,] [THE CLASS M-3 CERTIFICATES] [,] [THE CLASS M-4 CERTIFICATES] [AND] [THE CLASS M-5 CERTIFICATES] AS DESCRIBED IN THE AGREEMENT (AS DEFINED BELOW).**

**SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE REPRESENTS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").**

**THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE WILL BE DECREASED BY THE PRINCIPAL PAYMENTS HEREON AND REALIZED LOSSES ALLOCABLE HERETO.  ACCORDINGLY, FOLLOWING THE INITIAL ISSUANCE OF THE CERTIFICATES, THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE WILL BE DIFFERENT FROM THE DENOMINATION SHOWN BELOW. ANYONE ACQUIRING THIS CERTIFICATE MAY ASCERTAIN ITS CERTIFICATE PRINCIPAL BALANCE BY INQUIRY OF THE SECURITIES ADMINISTRATOR NAMED HEREIN.**

**NO TRANSFER OF THIS CERTIFICATE SHALL BE MADE EXCEPT IN ACCORDANCE WITH THE REPRESENTATIONS SET FORTH IN SECTION 7.02(h) OF THE POOLING AND SERVICING AGREEMENT.**

**UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE DEPOSITOR OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.**

**THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS CERTIFICATE, AGREES THAT THIS CERTIFICATE MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (1) PURSUANT TO RULE 144A UNDER**

THE SECURITIES ACT ("RULE 144A") TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A (A "QIB"), PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (2) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR (3) IN CERTIFICATED FORM TO AN "INSTITUTIONAL ACCREDITED INVESTOR" WITHIN THE MEANING THEREOF IN RULE 501(a)(1), (2), (3) or (7) OF REGULATION D UNDER THE ACT OR ANY ENTITY IN WHICH ALL OF THE EQUITY OWNERS COME WITHIN SUCH PARAGRAPHS PURCHASING NOT FOR DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, SUBJECT TO (A) THE RECEIPT BY THE SECURITIES ADMINISTRATOR OF A LETTER SUBSTANTIALLY IN THE FORM PROVIDED IN THE AGREEMENT AND (B) THE RECEIPT BY THE SECURITIES ADMINISTRATOR OF SUCH OTHER EVIDENCE ACCEPTABLE TO THE SECURITIES ADMINISTRATOR THAT SUCH REOFFER, RESALE, PLEDGE OR TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS OR IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION.

Certificate No.1                              Adjustable Rate

Class M-[1][2][3][4][5][6] Subordinate

Date of Pooling and Servicing Agreement       Aggregate Initial Certificate Principal
and Cut-off Date:                             Balance of this Certificate as of the Cut-off
March 1, 2007                                  Date:
                                              $[_____]

First Distribution Date:                      Initial Certificate Principal Balance of this
April 25, 2007                                Certificate as of the Cut-off Date:
                                              $[_____]

Master Servicer and Securities Administrator: CUSIP: [_____]
Wells Fargo Bank, National Association

Last Scheduled Distribution Date:
January 25, 2036


## BEAR STEARNS SECOND LIEN TRUST 2007-SV1
## MORTGAGE-BACKED CERTIFICATE
### SERIES 2007-SV1

evidencing a fractional undivided interest in the distributions allocable to the Class M-[1][2][3][4][5][6] Certificates with respect to a Trust Fund consisting primarily of a pool of conventional, closed-end, second lien, one- to four-family fixed interest rate mortgage loans sold by SACO I INC.

This Certificate is payable solely from the assets of the Trust Fund, and does not represent an obligation of or interest in SACO I Inc., the Master Servicer, the Securities Administrator or the Trustee referred to below or any of their affiliates or any other person. Neither this Certificate nor the underlying Mortgage Loans are guaranteed or insured by any governmental entity or by SACO I Inc., the Master Servicer, the Securities Administrator or the Trustee or any of their affiliates or any other person. None of SACO I Inc., the Master Servicer or any of their affiliates will have any obligation with respect to any certificate or other obligation secured by or payable from payments on the Certificates.

This certifies that Cede & Co. is the registered owner of the Percentage Interest evidenced hereby in the beneficial ownership interest of Certificates of the same Class as this Certificate in a trust (the "Trust Fund") generally consisting of conventional, closed-end, second

lien, fixed rate mortgage loans secured by one- to four-family residences (collectively, the "Mortgage Loans") sold by SACO I Inc. ("SACO I"). The Mortgage Loans were sold by EMC Mortgage Corporation ("EMC") to SACO I. Wells Fargo Bank, National Association will act as master servicer of the Mortgage Loans (in that capacity, the "Master Servicer," which term includes any successors thereto under the Agreement referred to below). The Trust Fund was created pursuant to the Pooling and Servicing Agreement, dated as of the Cut-off Date specified above (the "Agreement"), among SACO I, as depositor (the "Depositor"), EMC Mortgage Corporation as seller, Wells Fargo Bank, National Association, as Master Servicer and securities administrator (the "Securities Administrator"), and Citibank, N.A., as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, capitalized terms used herein shall have the meaning ascribed to them in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of its acceptance hereof assents and by which such Holder is bound.

Interest on this Certificate will accrue from and including the 25th day of the calendar month preceding the month in which a Distribution Date (as hereinafter defined) occurs to and including the 24th day of the calendar month in which that Distribution Date occurs on the Certificate Principal Balance hereof at a per annum rate equal to the Pass-Through Rate set forth above. The Securities Administrator will distribute on the 25th day of each month, or, if such 25th day is not a Business Day, the immediately following Business Day (each, a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered at the close of business on the Business Day immediately preceding such Distribution Date, an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount (of interest and principal, if any) required to be distributed to the Holders of Certificates of the same Class as this Certificate. The Last Scheduled Distribution Date is the Distribution Date in the month following the latest scheduled maturity date of any Mortgage Loan and is not likely to be the date on which the Certificate Principal Balance of this Class of Certificates will be reduced to zero.

Distributions on this Certificate will be made by the Securities Administrator by check mailed to the address of the Person entitled thereto as such name and address shall appear on the Certificate Register or, if such Person so requests by notifying the Securities Administrator in writing as specified in the Agreement, by wire transfer. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Securities Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Securities Administrator for that purpose and designated in such notice. The initial Certificate Principal Balance of this Certificate is set forth above. The Certificate Principal Balance hereof will be reduced to the extent of distributions allocable to principal hereon and any Realized Losses allocable hereto.

This Certificate is one of a duly authorized issue of Certificates designated as set forth on the face hereof (the "Certificates"). The Certificates, in the aggregate, evidence the entire beneficial ownership interest in the Trust Fund formed pursuant to the Agreement.

The Certificateholder, by its acceptance of this Certificate, agrees that it will look solely to the Trust Fund for payment hereunder and that neither the Trustee nor the Securities Administrator is liable to the Certificateholders for any amount payable under this Certificate or the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

This Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced hereby, and the rights, duties and immunities of the Securities Administrator and the Trustee.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor and the rights of the Certificateholders and the Certificate Insurer under the Agreement from time to time by the parties thereto with the written consent of the Certificate Insurer and the consent of the Holders of the Certificates evidencing over 50% of the Voting Rights, or, if applicable, Holders of each Class of Certificates affected thereby evidencing over 50% of the Voting Rights of such Class or Classes. Any such written consent of the Certificate Insurer and any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable with the Securities Administrator upon surrender of this Certificate for registration of transfer at the offices or agencies maintained by the Securities Administrator for such purposes, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Securities Administrator duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates in authorized denominations representing a like aggregate Percentage Interest will be issued to the designated transferee.

No transfer of this certificate shall be made except in accordance with Section 7.02(h) of the Pooling and Servicing Agreement.

The Certificates are issuable only as registered Certificates without coupons in the Classes and denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, this Certificate is exchangeable for one or more new Certificates evidencing the same Class and in the same aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made to the Certificateholders for any such registration of transfer, but the Securities Administrator may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Depositor, the Master Servicer, the Securities Administrator, the Trustee and any agent of any of them may

treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Securities Administrator, the Trustee or any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby (other than the obligations to make payments to Certificateholders with respect to the termination of the Agreement) shall terminate upon the earlier of (i) the later of (A) the maturity or other liquidation (or Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (B) the remittance of all funds due under the Agreement, or (ii) the optional repurchase by the party named in the Agreement of all the Mortgage Loans and other assets of the Trust Fund in accordance with the terms of the Agreement. Such optional repurchase may be made only on or after the first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans is less than or equal to a certain percentage of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date as set forth in the Agreement. The exercise of such right will effect the early retirement of the Certificates. In no event, however, will the Trust Fund created by the Agreement continue beyond the earlier of (i) the expiration of 21 years after the death of certain persons identified in the Agreement and (ii) the Latest Possible Maturity Date (as defined in the Agreement).

Unless this Certificate has been countersigned by an authorized signatory of the Securities Administrator by manual signature, this Certificate shall not be entitled to any benefit under the Agreement, or be valid for any purpose.

IN WITNESS WHEREOF, the Securities Administrator has caused this Certificate to be duly executed.

Dated: March 30, 2007

WELLS FARGO BANK, NATIONAL ASSOCIATION, not in its individual capacity but solely as Securities Administrator

By: _____

Authorized Signatory

## CERTIFICATE OF AUTHENTICATION

This is one of the Class M-[1][2][3][4][5][6] Certificates referred to in the within-mentioned Agreement.

WELLS FARGO BANK, NATIONAL ASSOCIATION, Authorized signatory of Wells Fargo Bank, National Association , not in its
individual capacity but solely as Securities Administrator

By: _____

Authorized Signatory

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____ (Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Asset-Backed Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:

_____

_____

_____

Dated: _____

_____
Signature by or on behalf of assignor

_____
Signature Guaranteed

### DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

for the account of _____

account number _____ or, if mailed by check, to

_____

Applicable statements should be mailed to _____

_____

This information is provided by _____ assignee named above, or _____ its agent.

EXHIBIT A-3

FORM OF CLASS B CERTIFICATES

**THIS CERTIFICATE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE SENIOR CERTIFICATES, [AND] THE CLASS M CERTIFICATES [,] [AND] [THE CLASS B-1 CERTIFICATES] [,] [AND] [THE CLASS B-2 CERTIFICATES] [AND] [THE CLASS B-3 CERTIFICATES] AS DESCRIBED IN THE AGREEMENT (AS DEFINED BELOW).**

**SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE REPRESENTS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").**

**THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE WILL BE DECREASED BY THE PRINCIPAL PAYMENTS HEREON AND REALIZED LOSSES ALLOCABLE HERETO. ACCORDINGLY, FOLLOWING THE INITIAL ISSUANCE OF THE CERTIFICATES, THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE WILL BE DIFFERENT FROM THE DENOMINATION SHOWN BELOW. ANYONE ACQUIRING THIS CERTIFICATE MAY ASCERTAIN ITS CERTIFICATE PRINCIPAL BALANCE BY INQUIRY OF THE SECURITIES ADMINISTRATOR NAMED HEREIN.**

**NO TRANSFER OF THIS CERTIFICATE SHALL BE MADE EXCEPT IN ACCORDANCE WITH THE REPRESENTATIONS SET FORTH IN SECTION 7.02(h) OF THE POOLING AND SERVICING AGREEMENT.**

**UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE DEPOSITOR OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.**

**THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS CERTIFICATE, AGREES THAT THIS CERTIFICATE MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (1) PURSUANT TO RULE 144A UNDER**

THE SECURITIES ACT ("RULE 144A") TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A (A "QIB"), PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (2) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR (3) IN CERTIFICATED FORM TO AN "INSTITUTIONAL ACCREDITED INVESTOR" WITHIN THE MEANING THEREOF IN RULE 501(a)(1), (2), (3) or (7) OF REGULATION D UNDER THE ACT OR ANY ENTITY IN WHICH ALL OF THE EQUITY OWNERS COME WITHIN SUCH PARAGRAPHS PURCHASING NOT FOR DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, SUBJECT TO (A) THE RECEIPT BY THE SECURITIES ADMINISTRATOR OF A LETTER SUBSTANTIALLY IN THE FORM PROVIDED IN THE AGREEMENT AND (B) THE RECEIPT BY THE SECURITIES ADMINISTRATOR OF SUCH OTHER EVIDENCE ACCEPTABLE TO THE SECURITIES ADMINISTRATOR THAT SUCH REOFFER, RESALE, PLEDGE OR TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS OR IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION.

NOTWITHSTANDING THE PREVIOUS PARAGRAPH, A CERTIFICATION WILL NOT BE REQUIRED WITH RESPECT TO THE TRANSFER OF THIS CERTIFICATE TO A DEPOSITORY, OR FOR ANY SUBSEQUENT TRANSFER OF THIS CERTIFICATE FOR SO LONG AS THIS CERTIFICATE IS A BOOK-ENTRY CERTIFICATE. ANY TRANSFEREE OF THIS CERTIFICATE WILL BE DEEMED TO HAVE REPRESENTED BY VIRTUE OF ITS PURCHASE OR HOLDING OF THIS CERTIFICATE (OR INTEREST HEREIN) THAT SUCH TRANSFEREE IS A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF RULE 144A UNDER THE 1933 ACT.

Certificate No. 1

Adjustable Rate

Class B-[1][2][3][4] Subordinate

Date of Pooling and Servicing Agreement
and Cut-off Date:
March 1, 2007

Aggregate Initial Certificate Principal
Balance of this Certificate as of the Cut-off
Date:
$[_____]

First Distribution Date:
April 25, 2007

Initial Certificate Principal Balance of this
Certificate as of the Cut-off Date:
$[_____]

Master Servicer and Securities Administrator:
Wells Fargo Bank, National Association

CUSIP: [_____]

Last Scheduled Distribution Date:
January 25, 2036

BEAR STEARNS SECOND LIEN TRUST 2007-SV1
MORTGAGE-BACKED CERTIFICATE
SERIES 2007-SV1

evidencing a fractional undivided interest in the distributions allocable to the Class B-[1][2][3][4] Certificates with respect to a Trust Fund consisting primarily of a pool of conventional, closed-end, second lien, one- to four-family fixed interest rate mortgage loans sold by SACO I INC.

This Certificate is payable solely from the assets of the Trust Fund, and does not represent an obligation of or interest in SACO I Inc., the Master Servicer, the Securities Administrator or the Trustee referred to below or any of their affiliates or any other person. Neither this Certificate nor the underlying Mortgage Loans are guaranteed or insured by any governmental entity or by SACO I Inc., the Master Servicer, the Securities Administrator or the Trustee or any of their affiliates or any other person. None of SACO I Inc., the Master Servicer or any of their affiliates will have any obligation with respect to any certificate or other obligation secured by or payable from payments on the Certificates.

This certifies that Cede & Co. is the registered owner of the Percentage Interest evidenced hereby in the beneficial ownership interest of Certificates of the same Class as this Certificate in a trust (the "Trust Fund") generally consisting of conventional, closed-end, second lien, fixed rate mortgage loans secured by one- to four-family residences (collectively, the

"Mortgage Loans") sold by SACO I Inc. ("SACO I"). The Mortgage Loans were sold by EMC Mortgage Corporation ("EMC") to SACO I. Wells Fargo Bank, National Association will act as master servicer of the Mortgage Loans (in that capacity, the "Master Servicer," which term includes any successors thereto under the Agreement referred to below). The Trust Fund was created pursuant to the Pooling and Servicing Agreement, dated as of the Cut-off Date specified above (the "Agreement"), among SACO I, as depositor (the "Depositor"), EMC Mortgage Corporation as seller, Wells Fargo Bank, National Association, as Master Servicer and securities administrator (the "Securities Administrator"), and Citibank, N.A., as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, capitalized terms used herein shall have the meaning ascribed to them in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of its acceptance hereof assents and by which such Holder is bound.

Interest on this Certificate will accrue from and including the 25th day of the calendar month preceding the month in which a Distribution Date (as hereinafter defined) occurs to and including the 24th day of the calendar month in which that Distribution Date occurs on the Certificate Principal Balance hereof at a per annum rate equal to the Pass-Through Rate set forth above. The Securities Administrator will distribute on the 25th day of each month, or, if such 25th day is not a Business Day, the immediately following Business Day (each, a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered at the close of business on the Business Day immediately preceding such Distribution Date so long as such Certificate remains in book-entry form (and otherwise, the close of business on the last Business Day of the month immediately preceding the month of such Distribution Date), an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount (of interest and principal, if any) required to be distributed to the Holders of Certificates of the same Class as this Certificate. The Last Scheduled Distribution Date is the Distribution Date in the month following the latest scheduled maturity date of any Mortgage Loan and is not likely to be the date on which the Certificate Principal Balance of this Class of Certificates will be reduced to zero.

Distributions on this Certificate will be made by the Securities Administrator by check mailed to the address of the Person entitled thereto as such name and address shall appear on the Certificate Register or, if such Person so requests by notifying the Securities Administrator in writing as specified in the Agreement, by wire transfer. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Securities Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Securities Administrator for that purpose and designated in such notice. The initial Certificate Principal Balance of this Certificate is set forth above. The Certificate Principal Balance hereof will be reduced to the extent of distributions allocable to principal hereon and any Realized Losses allocable hereto.

[For the Class B-4 Certificates] [No transfer of this Class B-4 Certificate will be made unless such transfer is (i) exempt from the registration requirements of the Securities Act of 1933, as amended, and any applicable state securities laws or is made in accordance with said Act and laws and (ii) made in accordance with Section 7.02 of the Agreement. In the event that

such transfer is to be made the Securities Administrator shall register such transfer if, (i) made to a transferee who has provided the Securities Administrator with evidence as to its QIB status; or (ii) (A) the transferor has advised the Securities Administrator in writing that the Certificate is being transferred to an Institutional Accredited Investor and (B) prior to such transfer the transferee furnishes to the Securities Administrator an Investment Letter; provided that if based upon an Opinion of Counsel to the effect that (A) and (B) above are not sufficient to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and other applicable laws, the Securities Administrator shall as a condition of the registration of any such transfer require the transferor to furnish such other certifications, legal opinions or other information prior to registering the transfer of this Certificate as shall be set forth in such Opinion of Counsel.]

[For the Class B-4 Certificates] [Notwithstanding the foregoing, the certifications will not be required with respect to the transfer of this Certificate to a Depository, or for any subsequent transfer of this Certificate for so long as this Certificate is a Book-Entry Certificate.]

This Certificate is one of a duly authorized issue of Certificates designated as set forth on the face hereof (the "Certificates"). The Certificates, in the aggregate, evidence the entire beneficial ownership interest in the Trust Fund formed pursuant to the Agreement.

The Certificateholder, by its acceptance of this Certificate, agrees that it will look solely to the Trust Fund for payment hereunder and that neither the Trustee nor the Securities Administrator is liable to the Certificateholders for any amount payable under this Certificate or the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

This Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced hereby, and the rights, duties and immunities of the Securities Administrator and the Trustee.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor and the rights of the Certificateholders and the Certificate Insurer under the Agreement from time to time by the parties thereto with the written consent of the Certificate Insurer and the consent of the Holders of the Certificates evidencing over 50% of the Voting Rights, or, if applicable, Holders of each Class of Certificates affected thereby evidencing over 50% of the Voting Rights of such Class or Classes. Any such written consent of the Certificate Insurer and any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable with the Securities Administrator upon surrender of this Certificate for registration of transfer at the offices or agencies maintained by the Securities

A-3-5

Administrator for such purposes, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Securities Administrator duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates in authorized denominations representing a like aggregate Percentage Interest will be issued to the designated transferee.

No transfer of this certificate shall be made except in accordance with Section 7.02(h) of the Pooling and Servicing Agreement.

The Certificates are issuable only as registered Certificates without coupons in the Classes and denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, this Certificate is exchangeable for one or more new Certificates evidencing the same Class and in the same aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made to the Certificateholders for any such registration of transfer, but the Securities Administrator may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Depositor, the Master Servicer, the Securities Administrator, the Trustee and any agent of any of them may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Securities Administrator, the Trustee or any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby (other than the obligations to make payments to Certificateholders with respect to the termination of the Agreement) shall terminate upon the earlier of (i) the later of (A) the maturity or other liquidation (or Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and  disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (B) the remittance of all funds due under the Agreement, or (ii) the optional repurchase by the party named in the Agreement of all the Mortgage Loans and other assets of the Trust Fund in accordance with the terms of the Agreement. Such optional repurchase may be made only on or after the first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans is less than or equal to a certain percentage of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date as set forth in the Agreement. The exercise of such right will effect the early retirement of the Certificates. In no event, however, will the Trust Fund created by the Agreement continue beyond the earlier of (i) the expiration of 21 years after the death of certain persons identified in the Agreement and (ii) the Latest Possible Maturity Date (as defined in the Agreement).

Unless this Certificate has been countersigned by an authorized signatory of the Securities Administrator by manual signature, this Certificate shall not be entitled to any benefit under the Agreement, or be valid for any purpose.

IN WITNESS WHEREOF, the Securities Administrator has caused this Certificate to be duly executed.

Dated: March 30, 2007

WELLS FARGO BANK, NATIONAL ASSOCIATION, not in its individual capacity but solely as Securities Administrator

By: _____
          Authorized Signatory

## CERTIFICATE OF AUTHENTICATION

This is one of the Class B-[1][2][3][4] Certificates referred to in the within-mentioned Agreement.

WELLS FARGO BANK, NATIONAL ASSOCIATION, Authorized signatory of Wells Fargo Bank, National Association, not in its individual capacity but solely as Securities Administrator

By: _____
          Authorized Signatory

A-3-7

ASSIGNMENT

        FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____ (Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Asset-Backed Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:

_____

_____

_____

Dated: _____

                             _____

                             Signature by or on behalf of assignor

                             _____

                             Signature Guaranteed

DISTRIBUTION INSTRUCTIONS

        The assignee should include the following for purposes of distribution:

        Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

for the account of _____
account number _____ or, if mailed by check, to

Applicable statements should be mailed to _____

        This information is provided by _____
assignee named above, or _____
its agent.

EXHIBIT A-4

FORM OF CLASS C CERTIFICATES

**THIS CERTIFICATE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE SENIOR CERTIFICATES, THE CLASS M CERTIFICATES AND THE CLASS B CERTIFICATES AS DESCRIBED IN THE AGREEMENT (AS DEFINED BELOW).**

**SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE REPRESENTS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").**

**THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS CERTIFICATE, AGREES THAT THIS CERTIFICATE MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (1) PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A") TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A (A "QIB"), PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (2) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR (3) IN CERTIFICATED FORM TO AN "INSTITUTIONAL ACCREDITED INVESTOR" WITHIN THE MEANING THEREOF IN RULE 501(a)(1), (2), (3) or (7) OF REGULATION D UNDER THE ACT OR ANY ENTITY IN WHICH ALL OF THE EQUITY OWNERS COME WITHIN SUCH PARAGRAPHS PURCHASING NOT FOR DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, SUBJECT TO (A) THE RECEIPT BY THE SECURITIES ADMINISTRATOR OF A LETTER SUBSTANTIALLY IN THE FORM PROVIDED IN THE AGREEMENT AND (B) THE RECEIPT BY THE SECURITIES ADMINISTRATOR OF SUCH OTHER EVIDENCE ACCEPTABLE TO THE SECURITIES ADMINISTRATOR THAT SUCH REOFFER, RESALE, PLEDGE OR TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS OR IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION.**

**NO TRANSFER OF THIS CERTIFICATE SHALL BE MADE UNLESS THE PROPOSED TRANSFEREE OF SUCH CERTIFICATE (1) PROVIDES TO THE SECURITIES ADMINISTRATOR THE APPROPRIATE TAX CERTIFICATION FORM**

THAT WOULD ELIMINATE ANY WITHHOLDING OR DEDUCTION FOR TAXES FROM AMOUNTS PAYABLE BY THE SWAP PROVIDER, PURSUANT TO THE SWAP AGREEMENT, TO THE SWAP ADMINISTRATOR ON BEHALF OF THE SUPPLEMENTAL INTEREST TRUST (I.E., IRS FORM W-9 OR IRS FORM W-8BEN, W-8IMY, W-8EXP OR W-8ECI, AS APPLICABLE (OR ANY SUCCESSOR FORM THERETO), TOGETHER WITH ANY APPLICABLE ATTACHMENTS) AND (2) AGREES TO UPDATE SUCH FORM (A) UPON EXPIRATION OF ANY SUCH FORM, (B) AS REQUIRED UNDER THEN APPLICABLE U.S. TREASURY REGULATIONS AND (C) PROMPTLY UPON LEARNING THAT SUCH FORM HAS BECOME OBSOLETE OR INCORRECT, EACH AS A CONDITION TO SUCH TRANSFER. IN ADDITION, NO TRANSFER OF THIS CERTIFICATE SHALL BE MADE IF SUCH TRANSFER WOULD CAUSE THE SUPPLEMENTAL INTEREST TRUST TO BE BENEFICIALLY OWNED BY TWO OR MORE PERSONS FOR FEDERAL INCOME TAX PURPOSES, OR CONTINUE TO BE SO TREATED, UNLESS (I) EACH PROPOSED TRANSFEREE OF SUCH CERTIFICATE COMPLIES WITH THE FOREGOING CONDITIONS, AND (II) THE PROPOSED MAJORITY HOLDER OF THE CLASS C CERTIFICATES (OR EACH HOLDER, IF THERE IS OR WOULD BE NO MAJORITY HOLDER) (X) PROVIDES, OR CAUSES TO BE PROVIDED, ON BEHALF OF THE SUPPLEMENTAL INTEREST TRUST, IF APPLICABLE, TO THE SECURITIES ADMINISTRATOR, THE APPROPRIATE TAX CERTIFICATION FORM THAT WOULD BE REQUIRED FROM THE SUPPLEMENTAL INTEREST TRUST TO ELIMINATE ANY WITHHOLDING OR DEDUCTION FOR TAXES FROM AMOUNTS PAYABLE BY THE SWAP PROVIDER, PURSUANT TO THE RELATED SWAP AGREEMENT, TO THE SWAP ADMINISTRATOR ON BEHALF OF THE SUPPLEMENTAL INTEREST TRUST (I.E., IRS FORM W-9 OR IRS FORM W-8BEN, W-8IMY, W-8EXP OR W-8ECI, AS APPLICABLE (OR ANY SUCCESSOR FORM THERETO), TOGETHER WITH ANY APPLICABLE ATTACHMENTS) AND (Y) AGREES TO UPDATE SUCH FORM (A) UPON EXPIRATION OF SUCH FORM, (B) AS REQUIRED UNDER THEM APPLICABLE U.S. TREASURY REGULATIONS AND (C) PROMPTLY UPON LEARNING THAT SUCH FORM HAS BECOME OBSOLETE OR INCORRECT. UNDER THE AGREEMENT, UPON RECEIPT OF ANY TAX CERTIFICATION FORM PURSUANT TO THESE TRANSFER RESTRICTIONS FROM A HOLDER OR PROPOSED TRANSFEREE OF THIS CERTIFICATE, THE SECURITIES ADMINISTRATOR SHALL FORWARD SUCH TAX CERTIFICATION FORM TO THE SUPPLEMENTAL INTEREST TRUST TRUSTEE. THE SUPPLEMENTAL INTEREST TRUST TRUSTEE SHALL FORWARD SUCH TAX CERTIFICATION FORM PROVIDED TO IT TO THE SWAP PROVIDER. EACH HOLDER OF THIS CERTIFICATE AND EACH TRANSFEREE THEREOF SHALL BE DEEMED TO HAVE CONSENTED TO THE SUPPLEMENTAL INTEREST TRUST TRUSTEE FORWARDING TO THE SWAP PROVIDER ANY TAX CERTIFICATION FORM IT HAS PROVIDED AND UPDATED IN ACCORDANCE WITH THESE TRANSFER RESTRICTIONS. ANY PURPORTED SALES OR TRANSFERS OF THIS CERTIFICATE TO A TRANSFEREE WHICH DOES NOT COMPLY WITH THESE REQUIREMENTS SHALL BE DEEMED NULL AND VOID UNDER THE AGREEMENT.

NO TRANSFER OF THIS CERTIFICATE MAY BE MADE TO ANY PERSON, UNLESS THE TRANSFEREE PROVIDES EITHER A CERTIFICATION PURSUANT TO SECTION 7.02(h) OF THE AGREEMENT OR AN OPINION OF COUNSEL SATISFACTORY TO THE SECURITIES ADMINISTRATOR THAT THE PURCHASE AND HOLDING OF THIS CERTIFICATE ARE PERMISSIBLE UNDER APPLICABLE LAW, WILL NOT CONSTITUTE OR RESULT IN ANY NON-EXEMPT PROHIBITED TRANSACTIONS UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE SECURITIES ADMINISTRATOR, THE MASTER SERVICER OR THE DEPOSITOR TO ANY OBLIGATION OR LIABILITY IN ADDITION TO THOSE UNDERTAKEN IN THE AGREEMENT.

Certificate No.1                                      Percentage Interest: 100%

Class C

Date of Pooling and Servicing Agreement          Initial Certificate Notional Amount of this
and Cut-off Date:                                Certificate as of the Cut-off Date:
March 1, 2007                                     $[_____]

First Distribution Date:                          Aggregate Certificate Notional Amount of this
April 25, 2007                                    Certificate as of the Cut-off Date:
                                                 $[_____]

Master Servicer and Securities Administrator:     CUSIP: [_____]
Wells Fargo Bank, National Association

Last Scheduled Distribution Date:
January 25, 2036


### BEAR STEARNS SECOND LIEN TRUST 2007-SV1
### MORTGAGE-BACKED CERTIFICATE
### SERIES 2007-SV1

evidencing a fractional undivided interest in the distributions allocable to the Class C Certificates with respect to a Trust Fund consisting primarily of a pool of conventional, closed-end, second lien, one- to four-family fixed interest rate mortgage loans sold by SACO I INC.

This Certificate is payable solely from the assets of the Trust Fund, and does not represent an obligation of or interest in SACO I Inc., the Master Servicer, the Securities Administrator or the Trustee referred to below or any of their affiliates or any other person. Neither this Certificate nor the underlying Mortgage Loans are guaranteed or insured by any governmental entity or by SACO I Inc., the Master Servicer, the Securities Administrator or the Trustee or any of their affiliates or any other person. None of SACO I Inc., the Master Servicer or any of their affiliates will have any obligation with respect to any certificate or other obligation secured by or payable from payments on the Certificates.

This certifies that _____ is the registered owner of the Percentage Interest evidenced hereby in the beneficial ownership interest of Certificates of the same Class as this Certificate in a trust (the "Trust Fund") generally consisting of conventional, closed-end, second lien, fixed rate mortgage loans secured by one- to four-family residences (collectively, the "Mortgage Loans") sold by SACO I Inc. ("SACO I"). The Mortgage Loans were sold by

EMC Mortgage Corporation ("EMC") to SACO I. Wells Fargo Bank, National Association will act as master servicer of the Mortgage Loans (in that capacity, the "Master Servicer," which term includes any successors thereto under the Agreement referred to below). The Trust Fund was created pursuant to the Pooling and Servicing Agreement, dated as of the Cut-off Date specified above (the "Agreement"), among SACO I, as depositor (the "Depositor"), EMC Mortgage Corporation as seller, Wells Fargo Bank, National Association, as Master Servicer and securities administrator (the "Securities Administrator"), and Citibank, N.A., as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, capitalized terms used herein shall have the meaning ascribed to them in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of its acceptance hereof assents and by which such Holder is bound.

The Securities Administrator will distribute on the 25th day of each month, or, if such 25th day is not a Business Day, the immediately following Business Day (each, a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered at the close of business on the last day (or if such last day is not a Business Day, the Business Day immediately preceding such last day) of the calendar month immediately preceding the month in which the Distribution Date occurs, an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amounts required to be distributed to the Holders of Certificates of the same Class as this Certificate.

Distributions on this Certificate will be made by the Securities Administrator by check mailed to the address of the Person entitled thereto as such name and address shall appear on the Certificate Register or, if such Person so requests by notifying the Securities Administrator in writing as specified in the Agreement, by wire transfer. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Securities Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Securities Administrator for that purpose and designated in such notice.

No transfer of this Certificate shall be made unless the transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "1933 Act"), and an effective registration or qualification under applicable state securities laws, or is made in a transaction that does not require such registration or qualification. In the event that such a transfer of this Certificate is to be made without registration or qualification, the Securities Administrator shall require receipt of (i) if such transfer is purportedly being made in reliance upon Rule 144A under the 1933 Act, written certifications from the Holder of the Certificate desiring to effect the transfer, and from such Holder's prospective transferee, substantially in the forms attached to the Agreement as Exhibit D and either Exhibit E or Exhibit F, as applicable, and (ii) in all other cases, an Opinion of Counsel satisfactory to it that such transfer may be made without such registration or qualification (which Opinion of Counsel shall not be an expense of the Trust Fund or of the Depositor, the Securities Administrator, the Trustee, or the Master Servicer in their respective capacities as such), together with copies of the written certification(s) of the Holder of the Certificate desiring to effect the transfer and/or such

Holder's prospective transferee upon which such Opinion of Counsel is based. Neither the Depositor, the Trustee nor the Securities Administrator is obligated to register or qualify the Class of Certificates specified on the face hereof under the 1933 Act or any other securities law or to take any action not otherwise required under the Agreement to permit the transfer of such Certificates without registration or qualification. Any Holder desiring to effect a transfer of this Certificate shall be required to indemnify the Trustee, the Securities Administrator, the Depositor, the Seller and the Master Servicer against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

No transfer of this Class C Certificate will be made unless the Securities Administrator shall have received either (i) the opinion of counsel set forth in Section 7.02(h) of the Agreement or (ii) a representation letter under Section 7.02 of the Agreement, in the form as described by the Agreement, stating that the transferee is not an employee benefit or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code (a "Plan"), or any other person (including an investment manager, a named fiduciary or a trustee of any Plan) acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any Plan.

This Certificate is one of a duly authorized issue of Certificates designated as set forth on the face hereof (the "Certificates"). The Certificates, in the aggregate, evidence the entire beneficial ownership interest in the Trust Fund formed pursuant to the Agreement.

The Certificateholder, by its acceptance of this Certificate, agrees that it will look solely to the Trust Fund for payment hereunder and that neither the Trustee nor the Securities Administrator is liable to the Certificateholders for any amount payable under this Certificate or the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

This Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced hereby, and the rights, duties and immunities of the Trustee and Securities Administrator.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor and the rights of the Certificateholders and the Certificate Insurer under the Agreement from time to time by the parties thereto with the written consent of the Certificate Insurer and the consent of the Holders of the Certificates evidencing over 50% of the Voting Rights, or, if applicable, Holders of each Class of Certificates affected thereby evidencing over 50% of the Voting Rights of such Class or Classes. Any such written consent of the Certificate Insurer and any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable with the Securities Administrator upon surrender of this Certificate for registration of transfer at the offices or agencies maintained by the Securities Administrator for such purposes, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Securities Administrator duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates in authorized denominations representing a like aggregate Percentage Interest will be issued to the designated transferee.

The Certificates are issuable only as registered Certificates without coupons in the Classes and denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, this Certificate is exchangeable for one or more new Certificates evidencing the same Class and in the same aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made to the Certificateholders for any such registration of transfer, but the Securities Administrator may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Depositor, the Master Servicer, the Securities Administrator, the Trustee and any agent of any of them may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Securities Administrator, the Trustee or any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby (other than the obligations to make payments to Certificateholders with respect to the termination of the Agreement) shall terminate upon the earlier of (i) the later of (A) the maturity or other liquidation (or Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (B) the remittance of all funds due under the Agreement, or (ii) the optional repurchase by the party named in the Agreement of all the Mortgage Loans and other assets of the Trust Fund in accordance with the terms of the Agreement. Such optional repurchase may be made only on or after the first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans is less than or equal to a certain percentage of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date as set forth in the Agreement. The exercise of such right will effect the early retirement of the Certificates. In no event, however, will the Trust Fund created by the Agreement continue beyond the earlier of (i) the expiration of 21 years after the death of certain persons identified in the Agreement and (ii) the Latest Possible Maturity Date (as defined in the Agreement).

Unless this Certificate has been countersigned by an authorized signatory of the Securities Administrator by manual signature, this Certificate shall not be entitled to any benefit under the Agreement, or be valid for any purpose.

IN WITNESS WHEREOF, the Securities Administrator has caused this Certificate to be duly executed.

Dated: March 30, 2007

WELLS FARGO BANK, NATIONAL ASSOCIATION, not in its individual capacity but solely as Securities Administrator

By: _____
                    Authorized Signatory


## CERTIFICATE OF AUTHENTICATION

This is one of the Class C Certificates referred to in the within-mentioned Agreement.

WELLS FARGO BANK, NATIONAL ASSOCIATION, Authorized signatory of Wells Fargo Bank, National Association , not in its
individual capacity but solely as Securities Administrator

By: _____
                    Authorized Signatory

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____ (Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Asset-Backed Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:

_____

_____

_____

Dated:                                    _____
                                          Signature by or on behalf of assignor


                                          _____
                                          Signature Guaranteed

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

_____
for the account of _____
account number _____ or, if mailed by check, to

_____
Applicable statements should be mailed to _____

_____

This information is provided by _____
assignee named above, or _____
its agent.

EXHIBIT A-5

FORM OF CLASS R CERTIFICATES

**THIS CERTIFICATE MAY NOT BE HELD BY OR TRANSFERRED TO A NON-UNITED STATES PERSON OR A DISQUALIFIED ORGANIZATION (AS DEFINED BELOW).**

**SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE REPRESENTS A "RESIDUAL INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT" AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").**

**NO TRANSFER OF THIS CERTIFICATE MAY BE MADE TO ANY PERSON, UNLESS THE TRANSFEREE PROVIDES EITHER A CERTIFICATION PURSUANT TO SECTION 7.02(h) OF THE AGREEMENT OR AN OPINION OF COUNSEL SATISFACTORY TO THE SECURITIES ADMINISTRATOR THAT THE PURCHASE AND HOLDING OF THIS CERTIFICATE ARE PERMISSIBLE UNDER APPLICABLE LAW, WILL NOT CONSTITUTE OR RESULT IN ANY NON EXEMPT PROHIBITED TRANSACTIONS UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE SECURITIES ADMINISTRATOR, THE MASTER SERVICER OR THE DEPOSITOR TO ANY OBLIGATION OR LIABILITY IN ADDITION TO THOSE UNDERTAKEN IN THE AGREEMENT.**

**ANY RESALE, TRANSFER OR OTHER DISPOSITION OF THIS CERTIFICATE MAY BE MADE ONLY IF THE PROPOSED TRANSFEREE PROVIDES A TRANSFER AFFIDAVIT TO THE MASTER SERVICER AND SECURITIES ADMINISTRATOR THAT (1) SUCH TRANSFEREE IS NOT (A) THE UNITED STATES, ANY STATE OR POLITICAL SUBDIVISION THEREOF, ANY POSSESSION OF THE UNITED STATES, OR ANY AGENCY OR INSTRUMENTALITY OF ANY OF THE FOREGOING (OTHER THAN AN INSTRUMENTALITY WHICH IS A CORPORATION IF ALL OF ITS ACTIVITIES ARE SUBJECT TO TAX AND EXCEPT FOR FREDDIE MAC, A MAJORITY OF ITS BOARD OF DIRECTORS IS NOT SELECTED BY SUCH GOVERNMENTAL UNIT), (B) A FOREIGN GOVERNMENT, ANY INTERNATIONAL ORGANIZATION, OR ANY AGENCY OR INSTRUMENTALITY OF EITHER OF THE FOREGOING, (C) ANY ORGANIZATION (OTHER THAN CERTAIN FARMERS' COOPERATIVES DESCRIBED IN SECTION 521 OF THE CODE) WHICH IS EXEMPT FROM THE TAX IMPOSED BY CHAPTER 1 OF THE CODE UNLESS SUCH ORGANIZATION IS SUBJECT TO THE TAX IMPOSED BY SECTION 511 OF THE CODE (INCLUDING THE TAX IMPOSED BY SECTION 511 OF THE CODE ON UNRELATED BUSINESS TAXABLE INCOME), (D) RURAL ELECTRIC AND TELEPHONE COOPERATIVES DESCRIBED IN SECTION 1381(a)(2)(C) OF THE CODE, (E) AN ELECTING LARGE**

PARTNERSHIP UNDER SECTION 775(a) OF THE CODE (ANY SUCH PERSON DESCRIBED IN THE FOREGOING CLAUSES (A), (B), (C), (D) OR (E) BEING HEREIN REFERRED TO AS A "DISQUALIFIED ORGANIZATION"), OR (F) AN AGENT OF A DISQUALIFIED ORGANIZATION, (2) SUCH TRANSFEREE IS A UNITED STATES PERSON UNDER SECTION 7701 OF THE CODE, (3) NO PURPOSE OF SUCH TRANSFER IS TO IMPEDE THE ASSESSMENT OR COLLECTION OF TAX AND (4) SUCH TRANSFEREE SATISFIES CERTAIN ADDITIONAL CONDITIONS RELATING TO THE FINANCIAL CONDITION OF THE PROPOSED TRANSFEREE.   NOTWITHSTANDING   THE   REGISTRATION   IN   THE CERTIFICATE REGISTER OR ANY TRANSFER, SALE OR OTHER DISPOSITION OF THIS CERTIFICATE TO A DISQUALIFIED ORGANIZATION OR A NON-UNITED STATES PERSON OR AN AGENT OF A DISQUALIFIED ORGANIZATION OR A NON-UNITED STATES PERSON, SUCH REGISTRATION SHALL BE DEEMED TO BE OF NO LEGAL FORCE OR EFFECT WHATSOEVER AND SUCH PERSON SHALL NOT BE DEEMED TO BE A CERTIFICATEHOLDER FOR ANY PURPOSE HEREUNDER, INCLUDING, BUT NOT LIMITED TO, THE RECEIPT OF DISTRIBUTIONS   ON   THIS   CERTIFICATE.     EACH   HOLDER   OF   THIS CERTIFICATE BY ACCEPTANCE OF THIS CERTIFICATE SHALL BE DEEMED TO HAVE CONSENTED TO THE PROVISIONS OF THIS PARAGRAPH.

Certificate No.1

Class R[-1][-2][-3][X]                    Percentage Interest: 100%

Date of Pooling and Servicing Agreement
and Cut-off Date:
March 1, 2007

First Distribution Date:
April 25, 2007

Master Servicer and Securities Administrator:   CUSIP: [_____]
Wells Fargo Bank, National Association

Last Scheduled Distribution Date:
January 25, 2036

### BEAR STEARNS SECOND LIEN TRUST 2007-SV1
### MORTGAGE-BACKED CERTIFICATE
### SERIES 2007-SV1

evidencing a fractional undivided interest in the distributions allocable to the
Class R[-1][-2][-3][X] Certificates with respect to a Trust Fund consisting
primarily of a pool of conventional, closed-end second lien one- to four-family
fixed interest rate mortgage loans sold by SACO I INC.

This Certificate is payable solely from the assets of the Trust Fund, and does not
represent an obligation of or interest in SACO I Inc., the Master Servicer, the Securities
Administrator or the Trustee referred to below or any of their affiliates or any other person.
Neither this Certificate nor the underlying Mortgage Loans are guaranteed or insured by any
governmental entity or by SACO I Inc., the Master Servicer, the Securities Administrator or the
Trustee or any of their affiliates or any other person. None of SACO I Inc., the Master Servicer
or any of their affiliates will have any obligation with respect to any certificate or other
obligation secured by or payable from payments on the Certificates.

This certifies that Bear, Stearns Securities Corp is the registered owner of the
Percentage Interest evidenced hereby in the beneficial ownership interest of Certificates of the
same Class as this Certificate in a trust (the "Trust Fund") generally consisting of conventional,
closed-end, second lien, fixed rate mortgage loans secured by one- to four-family residences
(collectively, the "Mortgage Loans") sold by SACO I Inc. ("SACO I"). The Mortgage Loans
were sold by EMC Mortgage Corporation ("EMC") to SACO I. Wells Fargo Bank, National

A-5-3

Association will act as master servicer of the Mortgage Loans (in that capacity, the "Master Servicer," which term includes any successors thereto under the Agreement referred to below). The Trust Fund was created pursuant to the Pooling and Servicing Agreement, dated as of the Cut-off Date specified above (the "Agreement"), among SACO I, as depositor (the "Depositor"), EMC Mortgage Corporation as seller, Wells Fargo Bank, National Association, as Master Servicer and securities administrator (the "Securities Administrator") and Citibank, N.A., as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, capitalized terms used herein shall have the meaning ascribed to them in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of its acceptance hereof assents and by which such Holder is bound.

Each Holder of this Certificate will be deemed to have agreed to be bound by the restrictions set forth in the Agreement to the effect that (i) each person holding or acquiring any Ownership Interest in this Certificate must be a Permitted Transferee, (ii) the transfer of any Ownership Interest in this Certificate will be conditioned upon the delivery to the Securities Administrator of, among other things, an affidavit to the effect that it is a Permitted Transferee, (iii) any attempted or purported transfer of any Ownership Interest in this Certificate in violation of such restrictions will be absolutely null and void and will vest no rights in the purported transferee, and (iv) if any person other than a Permitted Transferee acquires any Ownership Interest in this Certificate in violation of such restrictions, then the Depositor will have the right, in its sole discretion and without notice to the Holder of this Certificate, to sell this Certificate to a purchaser selected by the Depositor, which purchaser may be the Depositor, or any affiliate of the Depositor, on such terms and conditions as the Depositor may choose.

The Securities Administrator will distribute on the 25th day of each month, or, if such 25th day is not a Business Day, the immediately following Business Day (each, a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered at the close of business on the last day (or if such last day is not a Business Day, the Business Day immediately preceding such last day) of the calendar month immediately preceding the month in which the Distribution Date occurs, an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amounts required to be distributed to the Holders of Certificates of the same Class as this Certificate.

Distributions on this Certificate will be made by the Securities Administrator by check mailed to the address of the Person entitled thereto as such name and address shall appear on the Certificate Register or, if such Person so requests by notifying the Securities Administrator in writing as specified in the Agreement, by wire transfer. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Securities Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Securities Administrator for that purpose and designated in such notice.

No transfer of this Class R[-1][-2][-3][X] Certificate will be made unless the Securities Administrator shall have received either (i) the opinion of counsel set forth in Section

A-5-4

7.02(h) of the Agreement or (ii) a representation letter under Section 7.02 of the Agreement, in the form as described by the Agreement, stating that the transferee is not an employee benefit or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code (a "Plan"), or any other person (including an investment manager, a named fiduciary or a trustee of any Plan) acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any Plan.

This Certificate is one of a duly authorized issue of Certificates designated as set forth on the face hereof (the "Certificates"). The Certificates, in the aggregate, evidence the entire beneficial ownership interest in the Trust Fund formed pursuant to the Agreement.

The Certificateholder, by its acceptance of this Certificate, agrees that it will look solely to the Trust Fund for payment hereunder and that neither the Trustee nor the Securities Administrator is liable to the Certificateholders for any amount payable under this Certificate or the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

This Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced hereby, and the rights, duties and immunities of the Securities Administrator and the Trustee.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor and the rights of the Certificateholders and the Certificate Insurer under the Agreement from time to time by the parties thereto with the written consent of the Certificate Insurer and the consent of the Holders of the Certificates evidencing over 50% of the Voting Rights, or, if applicable, Holders of each Class of Certificates affected thereby evidencing over 50% of the Voting Rights of such Class or Classes. Any such written consent of the Certificate Insurer and any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable with the Securities Administrator upon surrender of this Certificate for registration of transfer at the offices or agencies maintained by the Securities Administrator for such purposes, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Securities Administrator duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates in authorized denominations representing a like aggregate Percentage Interest will be issued to the designated transferee.

The Certificates are issuable only as registered Certificates without coupons in the Classes and denominations specified in the Agreement. As provided in the Agreement and

subject to certain limitations therein set forth, this Certificate is exchangeable for one or more new Certificates evidencing the same Class and in the same aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made to the Certificateholders for any such registration of transfer, but the Securities Administrator may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Depositor, the Master Servicer, the Securities Administrator, the Trustee and any agent of any of them may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Securities Administrator, the Trustee or any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby (other than the obligations to make payments to Certificateholders with respect to the termination of the Agreement) shall terminate upon the earlier of (i) the later of (A) the maturity or other liquidation (or Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (B) the remittance of all funds due under the Agreement, or (ii) the optional repurchase by the party named in the Agreement of all the Mortgage Loans and other assets of the Trust Fund in accordance with the terms of the Agreement. Such optional repurchase may be made only on or after the first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans is less than or equal to a certain percentage of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date as set forth in the Agreement. The exercise of such right will effect the early retirement of the Certificates. In no event, however, will the Trust Fund created by the Agreement continue beyond the earlier of (i) the expiration of 21 years after the death of certain persons identified in the Agreement and (ii) the Latest Possible Maturity Date (as defined in the Agreement).

Unless this Certificate has been countersigned by an authorized signatory of the Securities Administrator by manual signature, this Certificate shall not be entitled to any benefit under the Agreement, or be valid for any purpose.

IN WITNESS WHEREOF, the Securities Administrator has caused this Certificate to be duly executed.

Dated: March 30, 2007

WELLS FARGO BANK, NATIONAL ASSOCIATION, not in its individual capacity but solely as Securities Administrator

By:  _____
                    Authorized Signatory

## CERTIFICATE OF AUTHENTICATION

This is one of the Class R[-1][-2][-3][X] Certificates referred to in the within-mentioned Agreement.

WELLS FARGO BANK, NATIONAL ASSOCIATION, Authorized signatory of Wells Fargo Bank, National Association , not in its individual capacity but solely as Securities Administrator

By:  _____
                    Authorized Signatory

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____ (Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Asset-Backed Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:

_____

_____

_____

Dated: _____          _____

                                Signature by or on behalf of assignor

                               _____

                                Signature Guaranteed

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

_____

for the account of _____

account number _____ or, if mailed by check, to

_____

Applicable statements should be mailed to _____

_____

This information is provided by _____ assignee named above, or _____ its agent.

EXHIBIT A-6

FORM OF CLASS X CERTIFICATES

**THIS CERTIFICATE HAS NO PRINCIPAL BALANCE AND IS NOT ENTITLED TO ANY DISTRIBUTIONS IN RESPECT OF PRINCIPAL OR INTEREST.**

**THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS CERTIFICATE, AGREES THAT THIS CERTIFICATE MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (1) PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A") TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A (A "QIB"), PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (2) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR (3) IN CERTIFICATED FORM TO AN "INSTITUTIONAL ACCREDITED INVESTOR" WITHIN THE MEANING THEREOF IN RULE 501(a)(1), (2), (3) or (7) OF REGULATION D UNDER THE ACT OR ANY ENTITY IN WHICH ALL OF THE EQUITY OWNERS COME WITHIN SUCH PARAGRAPHS PURCHASING NOT FOR DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, SUBJECT TO (A) THE RECEIPT BY THE SECURITIES ADMINISTRATOR OF A LETTER SUBSTANTIALLY IN THE FORM PROVIDED IN THE AGREEMENT AND (B) THE RECEIPT BY THE SECURITIES ADMINISTRATOR OF SUCH OTHER EVIDENCE ACCEPTABLE TO THE SECURITIES ADMINISTRATOR THAT SUCH REOFFER, RESALE, PLEDGE OR TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS OR IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION.**

**NO TRANSFER OF THIS CERTIFICATE MAY BE MADE TO ANY PERSON, UNLESS THE TRANSFEREE PROVIDES EITHER A CERTIFICATION PURSUANT TO SECTION 7.02(h) OF THE AGREEMENT OR AN OPINION OF COUNSEL SATISFACTORY TO THE SECURITIES ADMINISTRATOR THAT THE PURCHASE AND HOLDING OF THIS CERTIFICATE ARE PERMISSIBLE UNDER APPLICABLE LAW, WILL NOT CONSTITUTE OR RESULT IN ANY NON-EXEMPT PROHIBITED TRANSACTIONS UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE SECURITIES ADMINISTRATOR, THE MASTER SERVICER OR THE DEPOSITOR TO ANY**

**OBLIGATION OR LIABILITY IN ADDITION TO THOSE UNDERTAKEN IN THE
AGREEMENT.**

Certificate No.1

Class X                                    Percentage Interest: 100%

Date of Pooling and Servicing Agreement
and Cut-off Date: March 1, 2007

Master Servicer and Securities Administrator:     CUSIP: [ _____ ]
Wells Fargo Bank, National Association

BEAR STEARNS SECOND LIEN TRUST 2007-SV1
MORTGAGE-BACKED CERTIFICATE
SERIES 2007-SV1

evidencing a fractional undivided interest in the distributions allocable to the Class X Certificates.

This Certificate is entitled to distributions with respect to certain Mortgage Loans that are initially assets of the Trust, and does not represent an obligation of or interest in SACO I Inc., the Master Servicer, the Securities Administrator or the Trustee referred to below or any of their affiliates or any other person. Neither this Certificate nor the underlying Mortgage Loans are guaranteed or insured by any governmental entity or by SACO I Inc., the Master Servicer, the Securities Administrator, the Trustee or any of their affiliates or any other person. None of SACO I Inc., the Master Servicer or any of their affiliates will have any obligation with respect to any certificate or other obligation secured by or payable from payments on the Certificates.

This certifies that _____ is the registered owner of the Percentage Interest evidenced hereby in the beneficial ownership interest of Certificates of the same Class as this Certificate in a trust (the "Trust Fund") generally consisting primarily of a pool of fixed rate mortgage loans that are secured by junior liens on one- to four-family residences (collectively, the "Mortgage Loans") sold by SACO I Inc. ("SACO I"). The Mortgage Loans were sold by EMC Mortgage Corporation ("EMC") to SACO I. Wells Fargo Bank, National Association will act as master servicer of the Mortgage Loans (in that capacity, the "Master Servicer," which term includes any successors thereto under the Agreement referred to below). The Trust Fund was created pursuant to the Pooling and Servicing Agreement, dated as of the Cut-off Date specified above (the "Agreement"), among SACO I, as depositor (the "Depositor"), EMC Mortgage Corporation as seller, Wells Fargo Bank, National Association as Master Servicer and securities administrator (the "Securities Administrator"), and Citibank, N.A., as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, capitalized terms used herein shall have the meaning ascribed to them in the

.

Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of its acceptance hereof assents and by which such Holder is bound.

No transfer of this Class X Certificate will be made unless the Securities Administrator shall have received either (i) the opinion of counsel set forth in Section 7.02(h) of the Agreement or (ii) a representation letter under Section 7.02 of the Agreement, in the form as described by the Agreement, stating that the transferee is not an employee benefit or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code (a "Plan"), or any other person (including an investment manager, a named fiduciary or a trustee of any Plan) acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any Plan.

This Certificate is one of a duly authorized issue of Certificates designated as set forth on the face hereof (the "Certificates"). The Certificates, in the aggregate, evidence the entire beneficial ownership interest in the Trust Fund formed pursuant to the Agreement.

The Certificateholder, by its acceptance of this Certificate agrees that neither the Trustee nor the Securities Administrator is liable to the Certificateholders for any amount payable under this Certificate or the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

This Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced hereby, and the rights, duties and immunities of the Securities Administrator and the Trustee.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor and the rights of the Certificateholders and the Certificate Insurer under the Agreement from time to time by the parties thereto with the written consent of the Certificate Insurer and the consent of the Holders of the Certificates evidencing over 50% of the Voting Rights, or, if applicable, Holders of each Class of Certificates affected thereby evidencing over 50% of the Voting Rights of such Class or Classes. Any such written consent of the Certificate Insurer and any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable with the Securities Administrator upon surrender of this Certificate for registration of transfer at the offices or agencies maintained by the Securities Administrator for such purposes, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Securities Administrator duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates

in authorized denominations representing a like aggregate Percentage Interest will be issued to the designated transferee.

The Certificates are issuable only as registered Certificates without coupons in the Classes and denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, this Certificate is exchangeable for one or more new Certificates evidencing the same Class and in the same aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made to the Certificateholders for any such registration of transfer, but the Securities Administrator may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Depositor, the Master Servicer, the Securities Administrator, the Trustee and any agent of any of them may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Securities Administrator, the Trustee or any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby (other than the obligations to make payments to Certificateholders with respect to the termination of the Agreement) shall terminate upon the earlier of (i) the later of (A) the maturity or other liquidation (or Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (B) the remittance of all funds due under the Agreement, or (ii) the optional repurchase by the party named in the Agreement of all the Mortgage Loans and other assets of the Trust Fund in accordance with the terms of the Agreement. Such optional repurchase may be made only on or after the first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans is less than or equal to a certain percentage of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date as set forth in the Agreement. The exercise of such right will effect the early retirement of the Certificates. In no event, however, will the Trust Fund created by the Agreement continue beyond the earlier of (i) the expiration of 21 years after the death of certain persons identified in the Agreement and (ii) the Latest Possible Maturity Date (as defined in the Agreement).

The Holder of This Certificate shall be entitled to the rights set forth under the Agreement. Unless this Certificate has been countersigned by an authorized signatory of the Securities Administrator by manual signature, this Certificate shall not be entitled to any benefit under the Agreement, or be valid for any purpose.

IN WITNESS WHEREOF, the Securities Administrator has caused this Certificate to be duly executed.

Dated: March 30, 2007

WELLS FARGO BANK, NATIONAL ASSOCIATION, not in its individual capacity but solely as Securities Administrator

By: _____
            Authorized Signatory

## CERTIFICATE OF AUTHENTICATION

This is one of the Class X Certificates referred to in the within-mentioned Agreement.

WELLS FARGO BANK, NATIONAL ASSOCIATION, Authorized signatory of Wells Fargo Bank, National Association, not in its individual capacity but solely as Securities Administrator

By: _____
            Authorized Signatory

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____ (Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Asset-Backed Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:

Dated: _____    _____
                             Signature by or on behalf of assignor


                             _____
                                        Signature Guaranteed

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____ for the account of _____ account number _____, or, if mailed by check, to _____. Applicable statements should be mailed to _____.

This information is provided by_____, the assignee named above, or _____, as its agent.

EXHIBIT B

MORTGAGE LOAN SCHEDULE

[PROVIDED UPON REQUEST]

EXHIBIT C-1

FORM OF TRANSFEREE AFFIDAVIT

> Affidavit pursuant to Section 860E(e)(4)
> of the Internal Revenue Code of 1986, as
> amended, and for other purposes

STATE OF NEW YORK   )
                    )   ss.:
COUNTY OF NEW YORK  )

The undersigned is the [Title of Officer] of [Name of Transferee] (the "Investor"), the proposed transferee of an Ownership Interest in the Bear Stearns Second Lien Trust 2007-SV1, Mortgage-Backed Certificates, Series 2007-SV1, Class [R-1][R-2][R-3][RX] Certificates (the "Certificates") issued pursuant to the Pooling and Servicing Agreement, dated as of March 1, 2007 (the "Agreement"), among SACO I Inc., as depositor (the "Depositor"), EMC Mortgage Corporation, as seller, Wells Fargo Bank, National Association, as master servicer and securities administrator (the "Securities Administrator"), and Citibank, N.A., as trustee (the "Trustee"), and makes this affidavit on behalf of the Investor for the benefit of the Depositor, the Securities Administrator and the Trustee. Capitalized terms used, but not defined herein, shall have the meanings ascribed to such terms in the Agreement.

1.      The Investor is, as of the date hereof, and will be, as of the date of the Transfer, a Permitted Transferee. The Investor is not acquiring its ownership interest in the Certificates for the account of a Person other than a Permitted Transferee.

2.      The Investor has been advised and understands that (i) a tax will be imposed on Transfers of the Certificates to Persons that are not Permitted Transferees; (ii) such tax will be imposed on the transferor, or, if such Transfer is through an agent (which includes a broker, nominee or middleman) for a Person that is not a Permitted Transferee, on the agent; and (iii) the Person otherwise liable for the tax shall be relieved of liability for the tax if a subsequent transferee furnishes to such Person an affidavit that such subsequent transferee is a Permitted Transferee, and at the time of Transfer, such Person does not have actual knowledge that the affidavit is false.

3.      The Investor has been advised and understands that a tax will be imposed on a "pass-through entity" holding the Certificates if at any time during the taxable year of the pass-through entity a Person that is not a Permitted Transferee is the record holder of an interest in such entity. The Investor understands that such tax will not be imposed for any period with respect to which the record holder furnishes to the pass-through entity an affidavit that such record holder is a Permitted Transferee and the pass-through entity does not have actual knowledge that such affidavit is false. (For this purpose, a "pass-through entity" includes a regulated investment company, a real estate investment trust or common trust fund, a partnership, trust or estate, and certain cooperatives and, except as may be provided in Treasury regulations, Persons holding interests in pass-through entities as a nominee for another Person.)

4.     The Investor has reviewed the provisions of Section 7.02(i) of the Agreement and understands the legal consequences of the acquisition of an Ownership Interest in the Certificates, including, without limitation, the restrictions on subsequent Transfers and the provisions regarding voiding any prohibited Transfers and mandatory sales.  The Investor expressly agrees to be bound by, and to abide by, such provisions of the Agreement and the restrictions noted on the face of the Certificates. The Investor understands and agrees that any breach of any of the representations included herein shall render the Transfer of the Certificates to the Investor contemplated hereby null and void. The Investor consents to any amendment of the Agreement that shall be deemed necessary by the Depositor (upon advice of nationally recognized counsel) to constitute a reasonable arrangement to ensure that the Certificates will not be owned directly or indirectly by a Person other than a Permitted Transferee.

5.     The Investor agrees not to Transfer the Certificates, or cause the Transfer of the Certificates by a Person for whom the Investor is acting as nominee, trustee or agent, in each case unless it has received an affidavit and agreement in substantially the same form as this affidavit and agreement containing these same representations and covenants from the subsequent transferee. In connection with any such Transfer by the Investor, the Investor agrees to deliver to the Trustee and the Depositor an affidavit substantially in the form set forth as Exhibit R to the Agreement to the effect that the Investor has no actual knowledge that the Person to which the Transfer is to be made is not a Permitted Transferee.

6.     The Investor has historically paid its debts as they have come due, intends to pay its debts as they come due in the future, and understands that the taxes associated with holder an ownership interest in the Certificates may exceed the cash flow with respect thereto in some or all periods and intends to pay such taxes as they become due. The Investor does not have the intention, and no purpose of the Transfer of the Certificates to the Investor is, to impede the assessment or collection of any tax legally required to be paid with respect to the Certificates.

7.     The Investor's U.S. taxpayer identification number is [_____].

8.     The Investor is a "United States person" within the meaning of Section 7701(a)(30) of the Code (a "United State Person").

9.     The Investor is aware that the Certificates may be a "noneconomic residual interest" within the meaning of Treasury regulations promulgated under Section 860E of the Code and that the transferor of a noneconomic residual interest will remain liable for any taxes due with respect to the income on such residual interest, unless no significant purpose of the transfer was to impede the assessment or collection of tax.

10.     The Investor will not cause income from the Certificates to be attributable to a foreign permanent establishment or fixed base, within the meaning of an applicable income tax treaty, of the Investor or any other United States Person.

11.     Check one of the following:

☐  The Transfer of the Certificates complies with U.S. Treasury Regulation Sections 1.860E-1(c)(7) and (8) and, accordingly:

(i)      the present value of the anticipated tax liabilities associated with holding the Certificates does not exceed the sum of:

(a)      the present value of any consideration given to the Investor to acquire such Certificates;

(b)      the present value of the expected future distributions on such Certificates; and

(c)      the present value of the anticipated tax savings associated with holding such Certificates as the related REMIC generates losses; and

(ii)     the Transfer of the Certificates will not result in such Certificates being held, directly or indirectly, by a foreign permanent establishment or fixed base, within the meaning of an applicable income tax treaty, of the Investor or any other United States Person.

For purposes of the calculation in clause (i) above, (x) the Investor is assumed to pay tax at the highest rate currently specified in Section 11(b)(1) of the Code (but the tax rate in Section 55(b)(1)(B) of the Code may be used in lieu of the highest rate specified in Section 11(b)(1) of the Code if the Investor has been subject to the alternative minimum tax under Section 55 of the Code in the preceding two years and will compute its taxable income in the current taxable year using the alternative minimum tax rate) and (y) present values are computed using a discount rate equal to the short-term Federal rate prescribed by Section 1274(d) of the Code for the month of the transfer and the compounding period used by the Investor.

☐ The Transfer of the Certificates complies with U.S. Treasury Regulation Sections 1.860E-1(c)(5) and (6) and, accordingly:

(i)      the Investor is an "eligible corporation," as defined in U.S. Treasury Regulation Section 1.860E-1(c)(6)(i), as to which income from the Certificates will only be taxed in the United States;

(ii)     at the time of the Transfer, and at the close of the Investor's two fiscal years preceding the fiscal year of the transfer, the Investor had gross assets for financial reporting purposes (excluding any obligation of a "related person" to the Investor within the meaning of U.S. Treasury Regulation Section 1.860E-1(c)(6)(ii) and any other asset the principal purpose of which is to permit the Investor to satisfy the condition of this clause (ii)) in excess of $100 million and net assets in excess of $10 million;

(iii)    the Investor will transfer the Certificates only to another "eligible corporation," as defined in U.S. Treasury Regulation Section 1.860E-1(c)(6)(i), in a transaction in which the requirements of U.S. Treasury Regulation Sections 1.860E-1(c)(4)(i), (ii) and (iii) and -1(c)(5) are satisfied and, accordingly, the subsequent transferee provides a similar affidavit with this box checked; and

(iv)    the Investor determined the consideration paid to it to acquire the Certificates based on reasonable market assumptions (including, but not limited to, borrowing and investment rates, prepayment and loss assumptions, expense and reinvestment assumptions, tax rates and other factors specific to the Investor) that it has determined in good faith and has concluded that such consideration, together with other assets of the Investor, will be sufficient to cover the taxes associated with the Certificates.

☐    None of the above.

IN WITNESS WHEREOF, the Investor has caused this instrument to be executed on its behalf, pursuant to authority of its Board of Directors, by its [Title of Officer] this _____ day of _____, 20__.

[NAME OF INVESTOR]

By:      _____
Name:  [Name of Officer]
Title:   [Title of Officer]
         [Address of Investor for receipt of distributions]

         Address of Investor for receipt of tax information:

Personally appeared before me the above-named [Name of Officer], known or proved to me to be the same person who executed the foregoing instrument and to be the [Title of Officer] of the Investor, and acknowledged to me that he/she executed the same as his/her free act and deed and the free act and deed of the Investor.

Subscribed and sworn before me this ___ day of _____, 20___.

NOTARY PUBLIC

COUNTY OF

STATE OF

My commission expires the ___ day of _____, 20___.

EXHIBIT C-2

FORM OF TRANSFEROR AFFIDAVIT

STATE OF NEW YORK          )
                           )    ss.:
COUNTY OF NEW YORK    )

    The undersigned is the [Title of Officer] of [Name of Transferor] (the "Owner"), the proposed transferor of an Ownership Interest in the Bear Stearns Second Lien Trust 2007-SV1, Mortgage-Backed Certificates, Series 2007-SV1, Class [R-1][R-2][R-3][RX] Certificates (the "Certificates") issued pursuant to the Pooling and Servicing Agreement, dated as of March 1, 2007 (the "Agreement"), among SACO I Inc., as depositor (the "Depositor"), EMC Mortgage Corporation, as seller, Wells Fargo Bank, National Association, as master servicer and securities administrator (the "Securities Administrator") and Citibank, N.A., as trustee (the "Trustee"), and makes this affidavit on behalf of the Owner for the benefit of the Depositor, the Securities Administrator and the Trustee.  Capitalized terms used, but not defined herein, shall have the meanings ascribed to such terms in the Agreement.

    1.  The Owner is not transferring the Certificate to impede the assessment or collection of any tax.

    2.  The Owner has no actual knowledge that the proposed transferee of the Certificate: (i) has insufficient assets to pay any taxes that would be owed by such transferee as Holder of the Certificate; (ii) may become insolvent or subject to a bankruptcy proceeding for so long as the Certificate remains outstanding; and (iii) is not a Permitted Transferee.

    3.  The Owner understands that the proposed transferee has delivered to the Trustee, the Securities Administrator and the Depositor a transfer affidavit and agreement in the form attached to the Agreement as Exhibit C.  The Owner does not know or believe that any representation contained therein is false.

    4.  At the time of transfer, the Owner has conducted a reasonable investigation of the financial condition of the proposed transferee as contemplated by Treasury Regulation Section 1.860E-1(c)(4)(i) and, as a result of that investigation, the Owner has determined that the proposed transferee has historically paid its debts as they became due and has found no significant evidence to indicate that the proposed transferee will not continue to pay its debts as they become due in the future. The Owner understands that the transfer of the Certificate may not be respected for U.S. federal income tax purposes (and the Owner may continue to be liable for U.S. federal income taxes associated therewith) unless the Owner has conducted such an investigation.

IN WITNESS WHEREOF, the Investor has caused this instrument to be executed on its behalf, pursuant to authority of its Board of Directors, by its [Title of Officer] this _____ day of _____, 20__.

[NAME OF OWNER]

By:      _____

Name:   [Name of Officer]

Title:   [Title of Officer]

Personally appeared before me the above-named [Name of Officer], known or proved to me to be the same person who executed the foregoing instrument and to be the [Title of Officer] of the Owner, and acknowledged to me that he/she executed the same as his/her free act and deed and the free act and deed of the Owner.

Subscribed and sworn before me this ___ day of _____, 20___.

NOTARY PUBLIC

COUNTY OF

STATE OF

My commission expires the ___ day of _____, 20___.

EXHIBIT D

FORM OF TRANSFEROR CERTIFICATE

_____, 200___

SACO I Inc.
383 Madison Avenue
New York, New York 10179

Wells Fargo Bank, National Association
Sixth Street and Marquette Avenue
Minneapolis, Minnesota 55479

Attention: Bear Stearns Second Lien Trust 2007-SV1

      Re:     Bear Stearns Second Lien Trust 2007-SV1, Mortgage-Backed
Certificates, Series 2007-SV1 (the "Certificates"), including the
Class [___] Certificates (the "Privately Offered Certificates")

Ladies and Gentlemen:

      In connection with the sale by _____ (the "Seller") to _____ (the "Purchaser") of $_____ Initial Certificate Principal Balance of Bear Stearns Second Lien Trust 2007-SV1 Mortgage-Backed Certificates, Series 2007-SV1, Class _____ (the "Certificates"), issued pursuant to the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of March 1, 2007, among SACO I Inc., as depositor (the "Depositor"), EMC Mortgage Corporation, as seller, Wells Fargo Bank, National Association as master servicer and securities administrator and Citibank, N.A., as trustee (the "Trustee"). The Seller hereby certifies, represents and warrants to, a covenants with, the Depositor and the Securities Administrator that:

      Neither the Seller nor anyone acting on its behalf (a) has offered, pledged, sold, disposed of or otherwise transferred any Certificate, any interest in any Certificate or any other similar security to any person in any manner, (b) has solicited any offer to buy or to accept a pledge, disposition or other transfer of any Certificate, any interest in any Certificate or any other similar security from any person in any manner, (c) has otherwise approached or negotiated with respect to any Certificate, any interest in any Certificate or any other similar security with any person in any manner, (d) has made any general solicitation by means of general advertising or in any other manner, or (e) has taken any other action, that (as to any of (a) through (e) above) would constitute a distribution of the Certificates under the Securities Act of 1933 (the "Act"), that would render the disposition of any Certificate a violation of Section 5 of the Act or any state securities law, or that would require registration or qualification pursuant thereto. The Seller will not act in any manner set forth in the foregoing sentence with respect to any Certificate. The Seller has not and will not sell or otherwise transfer any of the Certificates, except in compliance with the provisions of the Pooling and Servicing Agreement.

D-1

Very truly yours,

_____

(Seller)


By: _____
Name: _____
Title: _____

EXHIBIT E

FORM OF INVESTMENT LETTER (NON-RULE 144A)

[Date]

[SELLER]

SACO I Inc.
383 Madison Avenue
New York, New York 10179

Wells Fargo Bank, National Association
Sixth Street and Marquette Avenue
Minneapolis, Minnesota 55479

Re:    Bear Stearns Second Lien Trust 2007-SV1, Mortgage-Backed
       Certificates, Series 2007-SV1 (the "Certificates"), including the
       Class [   ] Certificates (the "Privately Offered Certificates")

Dear Ladies and Gentlemen:

In connection with our purchase of Privately Offered Certificates, we confirm that:

(i)    we understand that the Privately Offered Certificates are not being
       registered under the Securities Act of 1933, as amended (the "Act") or any
       applicable state securities or "Blue Sky" laws, and are being sold to us in a
       transaction that is exempt from the registration requirements of such laws;

(ii)   any information we desired concerning the Certificates, including the
       Privately Offered Certificates, the trust in which the Certificates represent
       the entire beneficial ownership interest (the "Trust") or any other matter
       we deemed relevant to our decision to purchase Privately Offered
       Certificates has been made available to us;

(iii)  we are able to bear the economic risk of investment in Privately Offered
       Certificates; we are an institutional "accredited investor" as defined in
       Section 501(a) of Regulation D promulgated under the Act and a
       sophisticated institutional investor;

(iv)   we are acquiring Privately Offered Certificates for our own account, not as
       nominee for any other person, and not with a present view to any
       distribution or other disposition of the Privately Offered Certificates;

(v)    we agree the Privately Offered Certificates must be held indefinitely by us
       (and may not be sold, pledged, hypothecated or in any way disposed of)
       unless subsequently registered under the Act and any applicable state
       securities or "Blue Sky" laws or an exemption from the registration

E-1

requirements of the Act and any applicable state securities or "Blue Sky" laws is available;

(vi)     we agree that in the event that at some future time we wish to dispose of or exchange any of the Privately Offered Certificates (such disposition or exchange not being currently foreseen or contemplated), we will not transfer or exchange any of the Privately Offered Certificates unless:

　　　　(A) (1) the sale is to an Eligible Purchaser (as defined below), (2) if required by the Pooling and Servicing Agreement (as defined below) a letter to substantially the same effect as either this letter or, if the Eligible Purchaser is a Qualified Institutional Buyer as defined under Rule 144A of the Act, the Rule 144A and Related Matters Certificate in the form attached to the Pooling and Servicing Agreement (as defined below) (or such other documentation as may be acceptable to the Trustee) is executed promptly by the purchaser and delivered to the addressees hereof and (3) all offers or solicitations in connection with the sale, whether directly or through any agent acting on our behalf, are limited only to Eligible Purchasers and are not made by means of any form of general solicitation or general advertising whatsoever; and

　　　　(B) if the Privately Offered Certificate is not registered under the Act (as to which we acknowledge you have no obligation), the Privately Offered Certificate is sold in a transaction that does not require registration under the Act and any applicable state securities or "blue sky" laws and, if Wells Fargo Bank, National Association (the "Securities Administrator") so requests, a satisfactory Opinion of Counsel is furnished to such effect, which Opinion of Counsel shall be an expense of the transferor or the transferee;

(vii)    we agree to be bound by all of the terms (including those relating to restrictions on transfer) of the Pooling and Servicing, pursuant to which the Trust was formed; we have reviewed carefully and understand the terms of the Pooling and Servicing Agreement;

(viii)   [In the case of the Class A Certificates]: So long as the Supplemental Interest Trust is in existence: (i) we are not acquiring such certificate directly or indirectly, by or on behalf of, an employee benefit plan or other retirement arrangement which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986 or (ii)(1) we are an accredited investor within the meaning of the Prohibited Transaction Exemption, or PTE 2007-05 and (2) such acquisition or holding is eligible for the exemptive relief available under Department of Labor Prohibited Transaction Class Exemption, or PTCE, 95-60 (for transactions by insurance company general accounts), PTCE 84-14 (for transactions by independent "qualified

E-2

professional asset managers"), 91-38 (for transactions by bank collective investment funds), 90-1 (for transactions by insurance company pooled separate accounts) or 96-23 (for transactions effected by "in-house asset managers").

[In the case of the Class M Certificates or Class B Certificates]: So long as the Supplemental Interest Trust is in existence: (i) we are not acquiring such certificate directly or indirectly, by or on behalf of, an employee benefit plan or other retirement arrangement which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986 or (ii)(1) we are an accredited investor within the meaning of the Prohibited Transaction Exemption, or PTE 2007-05 and (2)(a) such acquisition or holding is eligible for the exemptive relief available under Department of Labor Prohibited Transaction Class Exemption, or PTCE, 95-60 (for transactions by insurance company general accounts). After the termination of the Supplemental Interest Trust: (i) we are not acquiring such certificate directly or indirectly, by or on behalf of, an employee benefit plan or other retirement arrangement which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986 or (ii) (1) we are an insurance company, (2) the source of funds used to acquire or hold the certificate or interest therein is an "insurance company general account", as such term is defined in PTCE 95-60, and (3) the conditions in Sections I and III of PTCE 95-60 have been satisfied.

(ix)      We understand that each of the Privately Offered Certificates bears, and will continue to bear, a legend to substantiate the following effect: **THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS CERTIFICATE, AGREES THAT THIS CERTIFICATE MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (1) PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A") TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A (A "QIB"), PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (2) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144**

UNDER THE SECURITIES ACT (IF AVAILABLE) OR (3) IN
CERTIFICATED FORM TO AN "INSTITUTIONAL ACCREDITED
INVESTOR" WITHIN THE MEANING THEREOF IN RULE
501(a)(1), (2), (3) or (7) OF REGULATION D UNDER THE ACT OR
ANY ENTITY IN WHICH ALL OF THE EQUITY OWNERS COME
WITHIN SUCH PARAGRAPHS PURCHASING NOT FOR
DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT,
SUBJECT TO (A) THE RECEIPT BY THE SECURITIES
ADMINISTRATOR OF A LETTER SUBSTANTIALLY IN THE
FORM PROVIDED IN THE AGREEMENT AND (B) THE RECEIPT
BY THE SECURITIES ADMINISTRATOR OF SUCH OTHER
EVIDENCE        ACCEPTABLE        TO        THE        SECURITIES
ADMINISTRATOR THAT SUCH REOFFER, RESALE, PLEDGE
OR TRANSFER IS IN COMPLIANCE WITH THE SECURITIES
ACT AND OTHER APPLICABLE LAWS OR IN EACH CASE IN
ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS
OF THE UNITED STATES AND ANY OTHER APPLICABLE
JURISDICTION.

[In the case of the Class A Certificates]: **PRIOR TO THE
TERMINATION OF THE SUPPLEMENTAL INTEREST TRUST,
ANY PERSON ACQUIRING A CERTIFICATE SHALL BE
DEEMED TO HAVE MADE THE REPRESENTATIONS IN
SECTION 7.02(h) OF THE POOLING AND SERVICING
AGREEMENT.**

[In the case of the Class M Certificates and Class B Certificates]: **NO
TRANSFER OF THIS CERTIFICATE SHALL BE MADE EXCEPT
IN ACCORDANCE WITH THE REPRESENTATIONS SET FORTH
IN SECTION 7.02(h) OF THE POOLING AND SERVICING
AGREEMENT.**

[In the case of the Class C Certificates]: **NO TRANSFER OF ANY
CLASS C CERTIFICATE SHALL BE MADE UNLESS THE
TRANSFEREE OF SUCH CLASS C CERTIFICATE PROVIDES TO
THE SECURITIES ADMINISTRATOR THE APPROPRIATE TAX
CERTIFICATION FORM (I.E., IRS FORM W-9 OR IRS FORM W-
8BEN, W-8IMY, OR W-8ECI, AS APPLICABLE (OR ANY
SUCCESSOR FORM THERETO)), AS A CONDITION TO SUCH
TRANSFER AND AGREES TO UPDATE SUCH FORMS (I) UPON
EXPIRATION OF ANY SUCH FORM, (II) AS REQUIRED UNDER
THEN APPLICABLE U.S. TREASURY REGULATIONS AND (III)
PROMPTLY UPON LEARNING THAT ANY IRS FORM W-9 OR
IRS FORM W-8BEN, W-8IMY, OR W-8ECI, AS APPLICABLE (OR
ANY SUCCESSOR FORM THERETO), HAS BECOME OBSOLETE
OR INCORRECT. UPON RECEIPT OF ANY SUCH TAX**

CERTIFICATION FORM FROM A TRANSFEREE OF ANY CLASS C CERTIFICATE, THE SECURITIES ADMINISTRATOR SHALL PROVIDE A COPY OF SUCH TAX CERTIFICATION FORM TO THE SUPPLEMENTAL INTEREST TRUST TRUSTEE.   THE SUPPLEMENTAL INTEREST TRUST TRUSTEE SHALL PROVIDE A COPY OF ANY SUCH TAX CERTIFICATION FORM TO THE SWAP PROVIDER.

[In the case of the Class C, Class X and Class R Certificates]:   **NO TRANSFER OF THIS CERTIFICATE MAY BE MADE TO ANY PERSON, UNLESS THE TRANSFEREE PROVIDES EITHER A CERTIFICATION PURSUANT TO SECTION 7.02(h) OF THE AGREEMENT OR AN OPINION OF COUNSEL SATISFACTORY TO THE SECURITIES ADMINISTRATOR THAT THE PURCHASE AND HOLDING OF THIS CERTIFICATE ARE PERMISSIBLE UNDER APPLICABLE LAW, WILL NOT CONSTITUTE OR RESULT IN ANY NON-EXEMPT PROHIBITED TRANSACTIONS UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE SECURITIES ADMINISTRATOR, THE TRUSTEE, THE MASTER SERVICER OR THE DEPOSITOR TO ANY OBLIGATION OR LIABILITY IN ADDITION TO THOSE UNDERTAKEN IN THE AGREEMENT.**

"Eligible Purchaser" means a corporation, partnership or other entity which we have reasonable grounds to believe and do believe (i) can make representations with respect to itself to substantially the same effect as the representations set forth herein, and (ii) is either a Qualified Institutional Buyer as defined under Rule 144A of the Act or an institutional "Accredited Investor" as defined under Rule 501 of the Act.

Terms not otherwise defined herein shall have the meanings assigned to them in the Pooling and Servicing Agreement, dated as of March 1, 2007, among SACO I Inc., as depositor (the "Depositor"), EMC Mortgage Corporation, as seller, Wells Fargo Bank, National Association as master servicer and securities administrator, and Citibank, N.A., as Trustee (the "Pooling and Servicing Agreement").

If the Purchaser proposes that its Certificates be registered in the name of a nominee on its behalf, the Purchaser has identified such nominee below, and has caused such nominee to complete the Nominee Acknowledgment at the end of this letter.

Name of Nominee (if any):  _____

IN WITNESS WHEREOF, this document has been executed by the undersigned who is duly authorized to do so on behalf of the undersigned Eligible Purchaser on the ___ day of _____, 20___.

Very truly yours,

[PURCHASER]

By: _____
(Authorized Officer)

By: _____
(Attorney-in-fact)

Nominee Acknowledgment

The undersigned hereby acknowledges and agrees that as to the Certificates being registered in its name, the sole beneficial owner thereof is and shall be the Purchaser identified above, for whom the undersigned is acting as nominee.

[NAME OF NOMINEE]

By: _____
                                (Authorized Officer)

By: _____
                                (Attorney-in-fact)

EXHIBIT F

FORM OF RULE 144A AND RELATED MATTERS CERTIFICATE

[SELLER]

SACO I Inc.
383 Madison Avenue
New York, New York 10179

Wells Fargo Bank, National Association
Sixth Street and Marquette Avenue
Minneapolis, Minnesota 55479

Attn: Bear Stearns Second Lien Trust 2007-SV1

> Re: Bear Stearns Second Lien Trust 2007-SV1, Mortgage-Backed Certificates, Series 2007-SV1 (the "Certificates"), including the Class [__] Certificates (the "Privately Offered Certificates")

Dear Ladies and Gentlemen:

In connection with our purchase of Privately Offered Certificates, the undersigned certifies to each of the parties to whom this letter is addressed that it is a qualified institutional buyer (as defined in Rule 144A under the Securities Act of 1933, as amended (the "Act")) as follows:

1.  It owned and/or invested on a discretionary basis eligible securities (excluding affiliate's securities, bank deposit notes and CD's, loan participations, repurchase agreements, securities owned but subject to a repurchase agreement and swaps), as described below:

Date: _____, 20__ (must be on or after the close of its most recent fiscal year)

Amount: $ _____; and

2.  The dollar amount set forth above is:

a.  greater than $100 million and the undersigned is one of the following entities:

(1)    [__]    an insurance company as defined in Section 2(13) of the Act[1]; or

---

[1]    A purchase by an insurance company for one or more of its separate accounts, as defined by Section 2(a)(37) of the Investment Company Act of 1940, which are neither registered nor

(2)  [_]  an investment company registered under the Investment Company Act or any business development company as defined in Section 2(a)(48) of the Investment Company Act of 1940; or

(3)  [_]  a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; or

(4)  [_]  a plan (i) established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, the laws of which permit the purchase of securities of this type, for the benefit of its employees and (ii) the governing investment guidelines of which permit the purchase of securities of this type; or

(5)  [_]  a business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940; or

(6)  [_]  a corporation (other than a U.S. bank, savings and loan association or equivalent foreign institution), partnership, Massachusetts or similar business trust, or an organization described in Section 501(c)(3) of the Internal Revenue Code; or

(7)  [_]  a U.S. bank, savings and loan association or equivalent foreign institution, which has an audited net worth of at least $25 million as demonstrated in its latest annual financial statements; or

(8)  [_]  an investment adviser registered under the Investment Advisers Act; or

b.  [_]  greater than $10 million, and the undersigned is a broker-dealer registered with the SEC; or

c.  [_]  less than $10 million, and the undersigned is a broker-dealer registered with the SEC and will only purchase Rule 144A securities in transactions in which it acts as a riskless principal (as defined in Rule 144A); or

d.  [_]  less than $100 million, and the undersigned is an investment company registered under the Investment Company Act of

required to be registered thereunder, shall be deemed to be a purchase for the account of such insurance company.

1940, which, together with one or more registered investment companies having the same or an affiliated investment adviser, owns at least $100 million of eligible securities; or

e.    [ ]    less than $100 million, and the undersigned is an entity, all the equity owners of which are qualified institutional buyers.


The undersigned further certifies that it is purchasing a Privately Offered Certificate for its own account or for the account of others that independently qualify as "Qualified Institutional Buyers" as defined in Rule 144A. It is aware that the sale of the Privately Offered Certificates is being made in reliance on its continued compliance with Rule 144A. It is aware that the transferor may rely on the exemption from the provisions of Section 5 of the Act provided by Rule 144A. The undersigned understands that the Privately Offered Certificates may be resold, pledged or transferred only to (i) a person reasonably believed to be a Qualified Institutional Buyer that purchases for its own account or for the account of a Qualified Institutional Buyer to whom notice is given that the resale, pledge or transfer is being made in reliance in Rule 144A, or (ii) an institutional "accredited investor," as such term is defined under Rule 501 of the Act in a transaction that otherwise does not constitute a public offering.

The undersigned agrees that if at some future time it wishes to dispose of or exchange any of the Privately Offered Certificates, it will not transfer or exchange any of the Privately Offered Certificates to a Qualified Institutional Buyer without first obtaining a Rule 144A and Related Matters Certificate in the form hereof from the transferee and delivering such certificate to the addressees hereof. Prior to making any transfer of Privately Offered Certificates, if the proposed Transferee is an institutional "accredited investor," the transferor shall obtain from the transferee and deliver to the addressees hereof an Investment Letter in the form attached to the Pooling and Servicing Agreement, dated as of March 1, 2007, among SACO I Inc., as depositor (the "Depositor"), EMC Mortgage Corporation, as seller, Wells Fargo Bank, National Association as master servicer and securities administrator, and Citibank, N.A., as Trustee, pursuant to which the Certificates were issued.

The undersigned certifies that it either: (i) is not acquiring the Privately Offered Certificates directly or indirectly by, or on behalf of, an employee benefit plan or other retirement arrangement which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended, and/or section 4975 of the Internal Revenue Code of 1986, as amended, or (ii) has provided the Opinion of Counsel required by the Agreement or (iii) (A) for the Class A, Class M and Class B Certificates, so long as the Supplemental Interest Trust is in existence: (I) the undersigned is not acquiring such certificate directly or indirectly, by or on behalf of, an employee benefit plan or other retirement arrangement which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986 or (II)(1) the undersigned is an accredited investor within the meaning of the Prohibited Transaction Exemption, or PTE 2007-05 and (2) such acquisition or holding is eligible for the exemptive relief available under Department of Labor Prohibited Transaction Class Exemption, or PTCE, 95-60 (for transactions by insurance company general

accounts), PTCE 84-14 (for transactions by independent "qualified professional asset managers"), 91-38 (for transactions by bank collective investment funds), 90-1 (for transactions by insurance company pooled separate accounts) or 96-23 (for transactions effected by "in-house asset managers") and (B) for the Class M Certificates and Class B Certificates, after the termination of the Supplemental Interest Trust: (I) the undersigned is not acquiring such certificate directly or indirectly, by or on behalf of, an employee benefit plan or other retirement arrangement which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986 or (II) (1) the undersigned is an insurance company, (2) the source of funds used to acquire or hold the certificate or interest therein is an "insurance company general account", as such term is defined in PTCE 95-60, and (3) the conditions in Sections I and III of PTCE 95-60 have been satisfied.

If the Purchaser proposes that its Certificates be registered in the name of a nominee on its behalf, the Purchaser has identified such nominee below, and has caused such nominee to complete the Nominee Acknowledgment at the end of this letter.

Name of Nominee (if any): _____

IN WITNESS WHEREOF, this document has been executed by the undersigned who is duly authorized to do so on behalf of the undersigned Eligible Purchaser on the ____ day of _____, 20___.

Very truly yours,

[PURCHASER]

By: _____
(Authorized Officer)

By: _____
(Attorney-in-fact)

Nominee Acknowledgment

The undersigned hereby acknowledges and agrees that as to the Certificates being registered in its name, the sole beneficial owner thereof is and shall be the Purchaser identified above, for whom the undersigned is acting as nominee.

[NAME OF NOMINEE]

By: _____
(Authorized Officer)

By: _____
(Attorney-in-fact)

EXHIBIT G

FORM OF REQUEST FOR RELEASE

To:   Wells Fargo Bank, National Association
      1015 10th Avenue
      Minneapolis, Minnesota 55414

RE:   Custodial Agreement, dated as of March 30, 2007, among SACO I Inc., as depositor,
      EMC Mortgage Corporation, as seller, Wells Fargo Bank, National Association as
      master servicer, securities administrator and custodian, and Citibank, N.A., as trustee

      In connection with the administration of the Mortgage Loans held by you pursuant to the
above-captioned Custodial Agreement, we request the release, and hereby acknowledge receipt,
of the Mortgage File for the Mortgage Loan described below, for the reason indicated.

Mortgage Loan Number:

Mortgagor Name, Address & Zip Code:

Reason for Requesting Documents (check one):

    \_\_\_\_\_   1.   Mortgage Paid in Full and proceeds have been deposited into the
                             Custodial Account

    \_\_\_\_\_   2.   Foreclosure

    \_\_\_\_\_   3.   Substitution

    \_\_\_\_\_   4.   Other Liquidation

    \_\_\_\_\_   5.   Nonliquidation           Reason:_____

    \_\_\_\_\_   6.   California Mortgage Loan paid in full

By: _____
                    (authorized signer)


Issuer:   _____
Address:  _____

Date:     _____

EXHIBIT H

DTC LETTER OF REPRESENTATIONS

[Please see tab # 31]

## EXHIBIT I

## SCHEDULE OF MORTGAGE LOANS WITH LOST NOTES

[Provided Upon Request]

EXHIBIT J

[RESERVED]

EXHIBIT K

FORM OF CUSTODIAL AGREEMENT

[Please see tab # 10]

## EXHIBIT L

## FORM OF MORTGAGE LOAN PURCHASE AGREEMENT

[Please see tab # 9]

EXHIBIT M

[RESERVED]

## EXHIBIT N

## SWAP AGREEMENT

[Please see tabs # 13 & # 14]

EXHIBIT O

[RESERVED]

EXHIBIT P

[RESERVED]

EXHIBIT Q

[RESERVED]

# EXHIBIT R-1

## FORM OF GMACM SERVICING AGREEMENT

[Please see tab # 7]

## EXHIBIT R-2

## FORM OF GMACM ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT

[Please see tab # 7]

EXHIBIT R-3

FORM OF PHH SERVICING AGREEMENT

[Please see tab # 8]

EXHIBIT R-4

FORM OF PHH ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT

[Please see tab # 8]

EXHIBIT S

POLICY

[Please see tab # 21]