# Exhibit B

**Prospectus supplement dated December 27, 2005 (to prospectus dated August 25, 2005)**

# $549,541,100

# RALI Series 2005-QA13 Trust
### Issuer

# Residential Accredit Loans, Inc.
### Depositor

# Residential Funding Corporation
### Master Servicer

### Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA13

The trust will hold a pool of one- to four-family residential hybrid adjustable-rate first lien mortgage loans, divided into three loan groups.

The trust will issue these classes of certificates that are offered under this prospectus supplement:

- 6 classes of senior certificates

- 3 classes of subordinated certificates

Credit enhancement for all of these certificates will be provided by additional subordination.

> **You should consider carefully the risk factors beginning on page S-14 in this prospectus supplement.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

**The Attorney General of the State of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.**

Deutsche Bank Securities Inc. will offer nine classes of the offered certificates to the public at varying prices to be determined at the time of sale. The proceeds to the depositor from the sale of these underwritten certificates will be approximately 100.66% of the certificate principal balance of these underwritten certificates plus accrued interest, before deducting expenses.

# Deutsche Bank Securities

### Underwriter

### Important notice about information presented in this prospectus supplement and the prospectus

We provide information to you about the offered certificates in two separate documents that provide progressively more detail:

- the accompanying prospectus, which provides general information, some of which may not apply to your series of certificates; and

- this prospectus supplement, which describes the specific terms of your series of certificates.

If the description of your certificates in this prospectus supplement differs from the related description in the accompanying prospectus, you should rely on the information in this prospectus supplement.

The depositor's principal offices are located at 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437 and its telephone number is (952) 857-7000.

### European Economic Area

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive, each referred to in this prospectus supplement as a Relevant Member State, the underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State, referred to in this prospectus supplement as the Relevant Implementation Date, it has not made and will not make an offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time:

(a)    to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b)    to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(c)    in any other circumstances which do not require the publication by the issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of the preceding paragraph, (i) "offer of certificates to the public" in relation to any certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the certificates to be offered so as to enable an investor to decide to purchase or subscribe the certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member

State, and (ii) "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

### United Kingdom

The underwriter has represented and agreed that:

(a)     it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act, referred to in this prospectus supplement as FSMA) received by it in connection with the issue or sale of the certificates in circumstances in which Section 21(1) of the FSMA does not apply to the issuer; and

(b)     it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the certificates in, from or otherwise involving the United Kingdom.

# TABLE OF CONTENTS

SUMMARY ...............................................S-5
    The Trust .................................................S-9
RISK FACTORS ......................................S-14
INTRODUCTION ..................................S-22
DESCRIPTION OF THE MORTGAGE
    POOL .................................................S-22
    General S-22
    Compliance with Local, State and
        Federal Laws ...........................S-24
    Mortgage Rate Adjustment..................S-24
    Group I Loan Characteristics...............S-27
    Group II Loan Characteristics..............S-29
    Group III Loan Characteristics .............S-31
    Characteristics of the Mortgage
        Loans ......................................S-33
    Standard Hazard Insurance and
        Primary Mortgage
        Insurance.................................S-35
    The Program .......................................S-35
    Residential Funding ............................S-37
    Litigation ............................................S-37
    Additional Information.........................S-37
DESCRIPTION OF THE CERTIFICATES........S-38
    General  S-38
    Book-Entry Registration of Certain
        of the Offered Certificates.......S-39
    Glossary of Terms................................S-40
    Interest Distributions...........................S-47
    Principal Distributions on the
        Senior Certificates ..................S-48
    Principal Distributions on the Class
        M Certificates.........................S-50
    Allocation of Losses;
        Subordination..........................S-53
    Advances .............................................S-57
CERTAIN YIELD AND PREPAYMENT
    CONSIDERATIONS ............................S-58
    General  S-58
    Prepayment Considerations ..................S-58
    Allocation of Principal Payments..........S-60
    Realized Losses and Interest
        Shortfalls................................S-61
    Purchase Price......................................S-62
    Pass-Through Rates..............................S-63
    Assumed Final Distribution Date..........S-63
    Weighted Average Life ........................S-63
    Class M-2 and Class M-3
        Certificate Yield
        Considerations........................S-69
    Additional Yield Considerations
        Applicable Solely to the
        Residual Certificates...............S-72
POOLING AND SERVICING
    AGREEMENT....................................S-72
    General  ...............................................S-72

The Master Servicer.............................S-73
Servicing and Other Compensation
    and Payment of Expenses........S-77
Reports to Certificateholders................S-77
Voting Rights ......................................S-77
Termination.........................................S-78
MATERIAL FEDERAL INCOME TAX
    CONSEQUENCES............................S-79
    Special Tax Considerations
        Applicable to Residual
        Certificates ............................S-81
    Tax Return Disclosure and Investor
        List Requirements ..................S-83
    Penalty Protection................................S-83
USE OF PROCEEDS ................................S-83
METHOD OF DISTRIBUTION.......................S-83
LEGAL OPINIONS ..................................S-85
RATINGS.............................................S-85
LEGAL INVESTMENT......................................S-85
ERISA CONSIDERATIONS ............................S-86

## Summary

The following summary is a very general overview of the offered certificates and does not contain all of the information that you should consider in making your investment decision. To understand all of the terms of the offered certificates, you should read carefully this entire document and the prospectus.

| | |
|---|---|
| Issuer or Trust ............................. | RALI Series 2005-QA13 Trust. |
| Title of securities .......................... | Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA13. |
| Depositor...................................... | Residential Accredit Loans, Inc., an affiliate of Residential Funding Corporation. |
| Master servicer ............................. | Residential Funding Corporation. |
| Trustee ......................................... | Deutsche Bank Trust Company Americas. |
| Mortgage pool .............................. | 2,054 hybrid adjustable-rate mortgage loans with an aggregate principal balance of approximately $560,185,055 as of the cut-off date, secured by first liens on one- to four- family residential properties or an interest in shares issued by a cooperative apartment corporation and the related proprietary lease. |
| Cut-off date .................................. | December 1, 2005. |
| Closing date.................................. | On or about December 29, 2005. |
| Distribution dates ......................... | Beginning in January 2006 and thereafter on the 25th of each month or, if the 25th is not a business day, on the next business day. |
| Scheduled final distribution date | The distribution date in December 2035. The actual final distribution date could be substantially earlier. |
| Form of certificates....................... | Book-entry: Class I-A-1, Class I-A-2, Class II-A-1, Class III-A-1, Class III-A-2 and Class M Certificates. Physical: Class R Certificates. |
| | *See "Description of the Certificates—Book-Entry Registration of Certain of the Offered Certificates" in this prospectus supplement.* |
| Minimum denominations .............. | Class I-A-1, Class I-A-2, Class II-A-1, Class III-A-1, Class III-A-2 and Class M-1 Certificates: $25,000. Class M-2 Certificates and Class M-3 Certificates: $250,000. Class R Certificates: 20% percentage interests. |

Legal investment ........................... | When issued, the Class I-A-1, Class I-A-2, Class II-A-1, Class III-A-1, Class III-A-2, Class R and Class M-1 Certificates will, and the Class M-2 Certificates and Class M-3 Certificates will not, be "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984.

*See "Legal Investment" in this prospectus supplement and "Legal Investment Matters" in the prospectus.*

Certain ERISA Considerations ..... | Subject to the considerations described in this prospectus supplement, the Class I-A-1, Class I-A-2, Class II-A-1, Class III-A-1, Class III-A-2 and Class M Certificates may be considered eligible for purchase by persons investing assets of employee benefit plans or individual retirement accounts. Sales of the Class R Certificates to such plans or retirement accounts are prohibited, except as permitted under "ERISA Considerations" in this prospectus supplement.

*See "ERISA Considerations" in this prospectus supplement and in the prospectus.*

## Offered Certificates

| Class | Pass-Through Rate | Initial Certificate Principal Balance | Initial Rating (S&P/ Moody's) | Designations |
|-------|-------------------|---------------------------------------|-------------------------------|--------------|
| **Class A Certificates:** | | | | |
| I-A-1 | Variable Rate | $ 83,834,000 | AAA/Aaa | Senior/Super Senior/Variable Rate |
| I-A-2 | Variable Rate | $ 9,315,000 | AAA/Aaa | Senior/Senior Support/Variable Rate |
| II-A-1 | Variable Rate | $ 381,316,000 | AAA/Aaa | Senior/Variable Rate |
| III-A-1 | Variable Rate | $ 41,855,000 | AAA/Aaa | Senior/Super Senior/Variable Rate |
| III-A-2 | Variable Rate | $ 4,651,000 | AAA/Aaa | Senior/Senior Support/Variable Rate |
| Total Class A Certificates: | | $ 520,971,000 | | |
| **Class R Certificates:** | | | | |
| R | Variable Rate | $ 100 | AAA/Aaa | Senior/Residual/Variable Rate |
| Total senior certificates | | $ 520,971,100 | | |
| **Class M Certificates:** | | | | |
| M-1 | Variable Rate | $ 15,686,000 | AA/Aa2 | Mezzanine/Variable Rate |
| M-2 | Variable Rate | $ 8,403,000 | A/A2 | Mezzanine/Variable Rate |
| M-3 | Variable Rate | $ 4,481,000 | BBB/Baa2 | Mezzanine/Variable Rate |
| Total Class M Certificates: | | $ 28,570,000 | | |
| Total offered certificates: | | $ 549,541,100 | | |

## Non-Offered Certificates

| Class | Pass-Through Rate | Initial Certificate Principal Balance | Initial Rating (S&P/ Moody's) | Designations |
|-------|-------------------|---------------------------------------|-------------------------------|--------------|
| **Class B Certificates:** | | | | |
| B-1 | Variable Rate | $ 4,762,000 | BB/NA | Subordinate/Variable Rate |
| B-2 | Variable Rate | $ 3,641,000 | B/NA | Subordinate/Variable Rate |
| B-3 | Variable Rate | $ 2,240,955 | NA/NA | Subordinate/Variable Rate |
| Total Class B Certificates: | | $10,643,955 | | |
| Total offered and non-offered certificates: | | $ 560,185,055 | | |

**Other Information:**

**Class I-A-1, Class I-A-2, Class II-A-1, Class III-A-1, Class III-A-2 and Class R Certificates**:

The pass-through rate on the Class I-A-1, Class I-A-2, Class II-A-1, Class III-A-1, Class III-A-2 and Class R Certificates will be equal to the weighted average of the net mortgage rates on the related mortgage loans. The initial pass-through rate for the Class I-A-1, Class I-A-2, Class II-A-1, Class III-A-1, Class III-A-2 and Class R Certificates will be equal to approximately 5.7608%, 5.7608%, 5.8662%, 6.0895%, 6.0895% and 5.7608% per annum, respectively.

**Class M Certificates**:

The pass-through rate on the Class M-1, Class M-2 and Class M-3 Certificates will be equal to the weighted average of the weighted average net mortgage rates of the group I, group II and group III loans weighted in proportion to the results of subtracting from the aggregate principal balance of each related loan group the aggregate certificate principal balance of the senior certificates related to that loan group.  The initial pass-through rate for the Class M Certificates will be equal to approximately  5.8673% per annum.

## The Trust

The depositor will establish a trust with respect to the Series 2005-QA13 Certificates under a series supplement, dated as of December 1, 2005, to the standard terms of pooling and servicing agreement, dated as of August 1, 2004, among the depositor, the master servicer and the trustee. On the closing date, the depositor will deposit the pool of mortgage loans described in this prospectus supplement into the trust, which will be divided into three groups based on the characteristics described in this prospectus supplement. Each certificate will represent a partial ownership interest in the trust.

## The Mortgage Pool

The mortgage loans to be deposited into the trust consist of three loan groups. Loan group I consists of hybrid adjustable-rate mortgage loans with initial fixed periods of generally three years. Loan group II consists of hybrid adjustable-rate mortgage loans with initial fixed rate periods of generally five years. Loan group III consists of hybrid adjustable-rate mortgage loans with initial fixed rate periods of generally seven years.

The group I loans have the following characteristics as of the cut-off date, after deducting payments due during the month of the cut-off date:

## LOAN GROUP I

|  | Range | Weighted Average |
|---|---|---|
| Principal balance | $35,000 to $1,000,000 | $292,867* |
| Mortgage rate | 4.250% to 7.375% | 6.0652% |
| Remaining stated term to maturity (months) | 345 to 360 | 358 |

*Indicates average principal balance

The group II loans have the following characteristics as of the cut-off date, after deducting payments due during the month of the cut-off date:

## LOAN GROUP II

|  | Range | Weighted Average |
|---|---|---|
| Principal balance | $51,000 to $1,446,200 | $265,040* |
| Mortgage rate | 4.375% to 7.500% | 6.1679% |
| Remaining stated term to maturity (months) | 341 to 360 | 358 |

*Indicates average principal balance

The group III loans have the following characteristics as of the cut-off date, after deducting payments due during the month of the cut-off date:

## LOAN GROUP III

|  | Range | Weighted Average |
|---|---|---|
| Principal balance | $42,500 to $876,000 | $303,072* |
| Mortgage rate | 5.375% to 7.625% | 6.3895% |
| Remaining stated term to maturity (months) | 353 to 360 | 359 |

*Indicates average principal balance

The mortgage loans in the aggregate have the following characteristics as of the cut-off date, after deducting payments due during the month of the cut-off date:

## TOTAL POOL

|  | Range | Weighted Average |
|---|---|---|
| Principal balance | $35,000 to $1,446,200 | $272,729* |
| Mortgage rate | 4.250% to 7.625% | 6.1693% |
| Remaining stated term to maturity (months) | 341 to 360 | 358 |

*Indicates average principal balance

*For additional information regarding the mortgage pool see "Description of the Mortgage Pool" in this prospectus supplement.*

## Distributions on the Offered Certificates

*Amount available for monthly distribution.* On each monthly distribution date, the trustee will make distributions to investors. Except as provided in this prospectus supplement, the Class I-A-1 Certificates, the Class I-A-2 Certificates and the Class R Certificates will receive payments primarily from loan group I, the Class II-A-1 Certificates will receive payments primarily from loan group II, and the Class III-A-1 Certificates and Class III-A-2 Certificates will receive payments primarily from loan group III. The Class M Certificates and Class B Certificates will receive payments from all loan groups.

The amount available for distribution will include:

- collections of monthly payments on the mortgage loans in the related loan group, including prepayments and other unscheduled collections plus

- advances for delinquent payments on the mortgage loans in the related loan group minus

- the fees and expenses of the subservicers and the master servicer for the applicable loan group, including reimbursement for advances.

*See "Description of the Certificates— Glossary of Terms—Available Distribution Amount" in this prospectus supplement.*

*Priority of distributions.* Distributions on the offered certificates will be made from available amounts in each loan group as described in this prospectus supplement as follows:

- Distribution of interest to the related senior certificates

- Distribution of principal to the related senior certificates entitled to principal

- Payment to master servicer for certain unreimbursed advances

- Distribution to the Class M Certificates in the following order:

- Interest to the Class M-1 Certificates

- Principal to the Class M-1 Certificates

- Interest to the Class M-2 Certificates

- Principal to the Class M-2 Certificates

- Interest to the Class M-3 Certificates

- Principal to the Class M-3 Certificates

*Interest distributions.* The amount of interest accrued on each class of interest-bearing certificates on each distribution date will equal:

- the pass-through rate for that class of certificates multiplied by

- the certificate principal balance of that class of certificates as of the day immediately prior to the related distribution date multiplied by

- 1/12th, minus the share of some types of interest shortfalls allocated to that class.

*See "Description of the Certificates—Interest Distributions" in this prospectus supplement.*

*Allocations of principal.* Principal distributions on the certificates made from principal payments on the mortgage loans in the corresponding loan group will be allocated among the various classes of offered certificates as described in this prospectus supplement. Until the distribution date in January 2013, <u>all</u> principal prepayments on the mortgage loans in the related loan group will be distributed among the related senior certificates unless those senior certificates are no longer outstanding or the percentage of credit enhancement provided by the Class M Certificates and Class B Certificates has doubled from its initial percentage and certain loss and delinquency tests are met, all as described in this prospectus supplement.

*See "Description of the Certificates—Principal Distributions on the Senior Certificates" and "—Principal Distributions on the Class M Certificates" in this prospectus supplement.*

## Credit Enhancement

**Allocation of losses.** Most losses on the mortgage loans in each loan group will be allocated in full to the first class listed below with a certificate principal balance greater than zero:

- Class B-3

- Class B-2

- Class B-1

- Class M-3

- Class M-2

- Class M-1

When this occurs, the certificate principal balance of the class to which the loss is allocated is reduced, without a corresponding payment of principal.

If the aggregate certificate principal balance of the Class M Certificates and Class B Certificates has been reduced to zero, losses on the mortgage loans will be allocated proportionately among the senior certificates in accordance with their respective remaining certificate principal balances or accrued interest, but only with respect to losses in the related loan group, subject to the special rules mentioned below.

Not all losses will be allocated in the priority described in the third preceding paragraph. Losses due to natural disasters such as floods and earthquakes, fraud in the origination of the mortgage loan, or some losses related to the bankruptcy of a mortgagor will be allocated as described in the third preceding paragraph only up to specified amounts. These types of losses on mortgage loans in a loan group that are in excess of the specified amounts and losses due to other extraordinary events will be allocated among all outstanding classes of certificates related to that loan group, pro rata in proportion to their remaining certificate principal balances or accrued interest relating to that loan group. Therefore, the Class M Certificates and Class B Certificates do not act as credit enhancement for the related senior certificates for these losses.

In addition, if the certificate principal balances of the Class M Certificates and Class B Certificates have been reduced to zero, losses otherwise allocable to the Class I-A-1 Certificates will be allocated to the Class I-A-2 Certificates as long as the Class I-A-2 Certificates remain outstanding and losses otherwise allocable to the Class III-A-1 Certificates will be allocated to the Class III-A-2 Certificates as long as the Class III-A-2 Certificates remain outstanding.

*See "Description of the Certificates—Allocation of Losses; Subordination" in this prospectus supplement.*

**Priority of distributions.** All or a disproportionately large portion of principal prepayments and other unscheduled payments of principal on the mortgage loans in a loan group will be allocated to the related senior certificates as described in this prospectus supplement

during the first eleven years after the closing date, unless those senior certificates are no longer outstanding or the percentage of credit enhancement provided by the Class M Certificates and Class B Certificates has doubled from its initial percentage and certain loss and delinquency tests are met, all as described in this prospectus supplement. This provides additional credit enhancement for the senior certificates by reserving a greater portion of the certificate principal balances of the Class M Certificates and Class B Certificates for absorption of losses.

## Advances

For any month, if the master servicer does not receive the full scheduled payment on a mortgage loan, the master servicer will advance funds to cover the amount of the scheduled payment that was not made. However, the master servicer will advance funds only if it determines that the advance is likely to be recoverable from future payments or collections on that mortgage loan.

*See "Description of the Certificates—Advances" in this prospectus supplement.*

## Optional Termination

On any distribution date on which the aggregate principal balance of the mortgage loans is less than 10% of their aggregate stated principal balance as of the cut-off date, the master servicer will have the option to:

purchase from the trust all of the remaining mortgage loans, causing an early retirement of the certificates;

*or*

purchase all of the certificates.

Under either type of optional purchase, holders of the outstanding certificates are entitled to receive the outstanding certificate principal balance of the certificates in full with accrued interest as described in this prospectus supplement. However, any optional purchase of the remaining mortgage loans may result in a shortfall to the holders of the most subordinate

classes of certificates outstanding, if the trust then holds properties acquired from foreclosing upon defaulted loans. In either case, there will be no reimbursement of losses or interest shortfalls allocated to the certificates.

*See "Pooling and Servicing Agreement—Termination" in this prospectus supplement and "The Pooling and Servicing Agreement—Termination; Retirement of Certificates" in the prospectus.*

## Ratings

When issued, the offered certificates will receive ratings which are not lower than those listed in the table on page S-85 of this prospectus supplement. The ratings on the offered certificates address the likelihood that holders of the offered certificates will receive all distributions on the underlying mortgage loans to which they are entitled. A security rating is not a recommendation to buy, sell or hold a security and may be changed or withdrawn at any time by the assigning rating agency. The ratings also do not address the rate of principal prepayments on the mortgage loans. For example, the rate of prepayments, if different than originally anticipated, could adversely affect the yield realized by holders of the offered certificates.

*See "Ratings" in this prospectus supplement.*

## Legal Investment

When issued, the Class I-A-1, Class I-A-2, Class II-A-1, Class III-A-1, Class III-A-2, Class R and Class M-1 Certificates will, and the Class M-2 Certificates and Class M-3 Certificates will not, be "mortgage related securities" for purposes of SMMEA. You should consult your legal advisors in determining whether and to what extent the offered certificates constitute legal investments for you.

*See "Legal Investment" in this prospectus supplement for important information concerning possible restrictions on ownership of the offered certificates by regulated institutions.*

## ERISA Considerations

The Class I-A-1, Class I-A-2, Class II-A-1, Class III-A-1, Class III-A-2 and Class M Certificates may be considered eligible for purchase by persons investing assets of employee benefit plans or individual retirement accounts. Sales of the Class R Certificates to such plans or retirement accounts are prohibited, except as permitted under "ERISA Considerations" in this prospectus supplement.

*See "ERISA Considerations" in this prospectus supplement and in the prospectus.*

## Tax Status

For federal income tax purposes, the depositor will elect to treat the trust as two real estate mortgage investment conduits. The certificates, other than the Class R Certificates, will represent ownership of regular interests in the related real estate mortgage investment conduit and generally will be treated as representing ownership of debt for federal income tax purposes. You will be required to include in income all interest and original issue discount, if any, on such certificates in accordance with the accrual method of accounting regardless of your usual methods of accounting. For federal income tax purposes, the Class R Certificates will represent the sole residual interests in the real estate mortgage investment conduits.

*For further information regarding the federal income tax consequences of investing in the offered certificates, including important information regarding the tax treatment of the Class R Certificates, see "Material Federal Income Tax Consequences" in this prospectus supplement and in the prospectus.*

## Risk Factors

The offered certificates are not suitable investments for all investors. In particular, you should not purchase any class of offered certificates unless you understand the prepayment, credit, liquidity and market risks associated with that class.

The offered certificates are complex securities. You should possess, either alone or together with an investment advisor, the expertise necessary to evaluate the information contained in this prospectus supplement and the prospectus in the context of your financial situation and tolerance for risk.

You should carefully consider, among other things, the following factors in connection with the purchase of the offered certificates:

### Risk of Loss

**Underwriting standards may affect risk of loss on the mortgage loans.**

Generally, the mortgage loans have been originated using underwriting standards that are less stringent than the underwriting standards applied by certain other first lien mortgage loan purchase programs, such as those of Fannie Mae, Freddie Mac or the depositor's affiliate, Residential Funding Mortgage Securities I, Inc. Applying less stringent underwriting standards creates additional risks that losses on the mortgage loans will be allocated to certificateholders.

Examples include

- mortgage loans secured by non-owner occupied properties;

- mortgage loans with relatively high loan-to-value ratios (i.e., the amount of the loan at origination is 80% or more of the value of the mortgaged property);

- mortgage loans with loan-to-value ratios greater than 80% at origination with no mortgage insurance;

- mortgage loans made to borrowers who are United States citizens employed abroad or citizens and residents of a foreign country;

- mortgage loans made to borrowers who have high debt-to-income ratios (i.e., the amount of debt service on the other debt of the borrower represents a large portion of his or her income); and

- mortgage loans made to borrowers whose income is not required to be disclosed or verified.

*See "The Trusts—Underwriting Policies" and "Certain Legal Aspects of Mortgage Loans and Contracts" in the prospectus.*

**The return on your certificates could be reduced by shortfalls due to the Servicemembers Civil Relief Act.**

The Servicemembers Civil Relief Act, as amended, or Relief Act, provides relief to borrowers who enter active military service and to borrowers in reserve status who are called to active duty after the origination of their mortgage loan. Current or future military operations of the United States may increase the number of borrowers who are in active military service, including persons in reserve status who have been called or will be called to active duty. The Relief Act provides generally that a borrower who is covered by the Relief Act may not be charged interest on a mortgage loan in excess of 6% per annum during the period of the borrower's active duty. Any resulting interest shortfalls are not required to be paid by the borrower at any future time. The master servicer is not required to advance these shortfalls as delinquent payments, and the shortfalls are not covered by any form of credit enhancement on the certificates. Interest shortfalls on the mortgage loans due to the application of the Relief Act or similar legislation or regulations will be applied to reduce accrued interest on each class of the certificates on a pro rata basis.

The Relief Act also limits the ability of the servicer to foreclose on a mortgage loan during the borrower's period of active duty and, in some cases, during an additional three month period thereafter. As a result, there may be delays in payment and increased losses on the mortgage loans. Those delays and increased losses will be borne primarily by the class of certificates with a certificate principal balance greater than zero with the lowest payment priority.

We do not know how many mortgage loans have been or may be affected by the application of the Relief Act or similar legislation or regulations.

*See the definition of Accrued Certificate Interest under "Description of the Certificates—Glossary of Terms" in this prospectus supplement and "Certain Legal Aspects of Mortgage Loans—Servicemembers Civil Relief Act" in the prospectus.*

**The return on your certificates may be affected by losses on the mortgage loans, which could occur due to a variety of causes.**

Losses on the mortgage loans may occur due to a wide variety of causes, including a decline in real estate values, and adverse changes in the borrower's financial condition. A decline in real estate values or economic conditions nationally or in the regions where the mortgaged properties are concentrated may increase the risk of losses on the mortgage loans.

**The return on your certificates may be particularly sensitive to changes in real estate markets in specific regions.**

One risk of investing in mortgage-backed securities is created by any concentration of the related properties in one or more geographic regions. Approximately 35.7%, 31.9%, 37.0% and 33.0% of the cut-off date principal balance of the group I loans, group II loans, group III loans and mortgage loans in the aggregate, respectively, are located in California. In addition, approximately 11.8%, 12.7% and 11.9% of the cut-off date principal balance of the group I loans, group II loans and mortgage loans in the aggregate are located in Florida. If the regional economy or housing market weakens in California or Florida or in any other region having a significant concentration of properties underlying the mortgage loans, the

mortgage loans in that region may experience high rates of loss and delinquency, resulting in losses to certificateholders. A region's economic condition and housing market may be adversely affected by a variety of events, including natural disasters such as earthquakes, hurricanes, floods and eruptions, civil disturbances such as riots, disruptions such as ongoing power outages, or hostilities such as terrorist actions or acts of war. Several hurricanes, which struck Louisiana, Alabama, Mississippi, Texas and Florida in recent months, may have adversely affected mortgaged properties located in those states. Generally, the mortgage pool does not include mortgage loans secured by mortgaged properties located in the federal emergency management agency ("FEMA")- designated individual assistance zones. However, FEMA-designated individual assistance zones are subject to change from time to time by FEMA and, therefore, no assurance can be given that the mortgage pool is free of mortgage loans secured by mortgaged properties located in those areas. Further, mortgage loans in the mortgage pool may be secured by mortgaged properties in FEMA-designated public assistance areas, which also may include mortgaged properties in areas that were affected by the hurricanes. Residential Funding will make a representation and warranty that each mortgaged property is free of damage and in good repair as of the closing date. In the event that a mortgaged property is damaged as of the closing date and that damage materially and adversely affects the value of or the interests of the holders of the certificates in the related mortgage loan, Residential Funding will be required to repurchase the related mortgage loan from the trust. Any such repurchases may shorten the weighted average lives of the certificates. We do not know how many mortgaged properties have been or may be affected by the hurricanes and therefore whether the payment experience on any mortgage loan in the mortgage pool will be affected.

*See "Description of the Mortgage Pool—Mortgage Pool Characteristics—The Mortgage Pool" in this prospectus supplement.*

**The return on your certificates will be reduced if losses exceed the credit enhancement available to your certificates.**

The only credit enhancement for the senior certificates will be the subordination provided by the Class M Certificates and Class B Certificates and, with respect to the Class I-A-1 Certificates, the subordination provided by the Class I-A-2 Certificates, and with respect to the Class III-A-1 Certificates, the subordination provided by the Class III-A-2 Certificates. The only credit enhancement for the Class M Certificates will be the subordination provided by the Class B Certificates and by any class of Class M Certificates with a lower payment priority. You should also be aware that the credit enhancement provided for some types of losses is limited.

*See "Summary—Credit Enhancement" and "Description of the Certificates—Allocation of Losses; Subordination" in this prospectus supplement.*

**The value of your certificates may be reduced if losses are**

If the performance of the mortgage loans is substantially worse than assumed by the rating agencies, the ratings of any class of the certificates may be lowered in the future. This would probably reduce the value of

| | |
|---|---|
| higher than expected. | those certificates. Neither the depositor, the master servicer nor any other entity will have any obligation to supplement any credit enhancement, or to take any other action to maintain any rating of the certificates. |
| Some of the mortgage loans have an initial interest only period, which may increase the risk of loss and delinquency on these mortgage loans. | Approximately 10.5% and 74.7% of the group I loans have an interest only period of 3 years and 10 years, respectively. Approximately 10.5% and 74.5% of the group II loans have an initial interest only period of 5 years, and 10 years, respectively. Approximately 8.0%, and 75.1% of the group III loans have an initial interest only period of 7 years and 10 years, respectively. During this period, the payment made by the related borrower will be less than it would be if the mortgage loan amortized. In addition, the mortgage loan balance will not be reduced by the principal portion of scheduled monthly payments during this period. As a result, no principal payments will be made to the related certificates from these mortgage loans during their interest only period except in the case of a prepayment. |

After the initial interest only period, the scheduled monthly payment on these mortgage loans will increase, which may result in increased delinquencies by the related borrowers, particularly if interest rates have increased and the borrower is unable to refinance. In addition, losses may be greater on these mortgage loans as a result of the mortgage loan not amortizing during the early years of these mortgage loans. Although the amount of principal included in each scheduled monthly payment for a traditional mortgage loan is relatively small during the first few years after the origination of a mortgage loan, in the aggregate the amount can be significant.

Mortgage loans with an initial interest only period are relatively new in the mortgage marketplace. The performance of these mortgage loans may be significantly different than mortgage loans that fully amortize. In particular, there may be a higher expectation by these borrowers of refinancing their mortgage loans with a new mortgage loan, in particular one with an initial interest only period, which may result in higher or lower prepayment speeds than would otherwise be the case. In addition, the failure to build equity in the related mortgaged property by the related mortgagor may affect the delinquency and prepayment experience of these mortgage loans.

### Limited Obligations

| | |
|---|---|
| Payments on the mortgage loans are the sole source of payments on your certificates. | The certificates represent interests only in the RALI Series 2005-QA13 Trust. The certificates do not represent an ownership interest in or obligation of the depositor, the master servicer or any of their affiliates. If proceeds from the assets of the RALI Series 2005-QA13 Trust are not sufficient to make all payments provided for under the pooling and servicing agreement, investors will have no recourse to the depositor, the master servicer or any other entity, and will incur losses. |

**Liquidity Risks**

**You may have to hold your certificates to maturity if their marketability is limited.**

A secondary market for your certificates may not develop. Even if a secondary market does develop, it may not continue or it may be illiquid. Neither the underwriter nor any other person will have any obligation to make a secondary market in your certificates. Illiquidity means you may not be able to find a buyer to buy your securities readily or at prices that will enable you to realize a desired yield. Illiquidity can have a severe adverse effect on the market value of your certificates.

Any class of offered certificates may experience illiquidity, although generally illiquidity is more likely for classes that are especially sensitive to prepayment, credit or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors.

**Bankruptcy Risks**

**Bankruptcy proceedings could delay or reduce distributions on the certificates.**

The transfer of the mortgage loans from Residential Funding to the depositor is intended by the parties to be and has been documented as a sale. However, if Residential Funding were to become bankrupt, a trustee in bankruptcy could attempt to recharacterize the sale of the mortgage loans as a loan secured by the mortgage loans or to consolidate the mortgage loans with the assets of Residential Funding. Any such attempt could result in a delay in or reduction of collections on the mortgage loans available to make payments on the certificates.

**Special Yield and Prepayment Considerations**

**The yield on your certificates will vary depending on various factors.**

The yield to maturity on each class of offered certificates will depend on a variety of factors, including:

- the rate and timing of principal payments on the related mortgage loans, including prepayments, defaults and liquidations, and repurchases due to breaches of representations or warranties;

- the allocation of principal payments among the various classes of offered certificates;

- realized losses and interest shortfalls on the related mortgage loans;

- the pass-through rate for that class; and

- the purchase price of that class.

The rate of prepayments is one of the most important and least predictable of these factors.

In general, if you purchase a certificate at a price higher than its

outstanding certificate principal balance and principal distributions on your certificate occur faster than you assumed at the time of purchase, your yield will be lower than you anticipated. Conversely, if you purchase a certificate at a price lower than its outstanding certificate principal balance and principal distributions on that class occur more slowly than you assumed at the time of purchase, your yield will be lower than you anticipated.

|                                                                                                   |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                             |
| ------------------------------------------------------------------------------------------------- | --------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| **The rate of prepayments on the mortgage loans will vary depending on future market conditions and other factors.** | Since mortgagors, in most cases, can prepay their mortgage loans at any time, the rate and timing of principal distributions on the offered certificates are highly uncertain. Generally, when market interest rates increase, borrowers are less likely to prepay their mortgage loans. This could result in a slower return of principal to you at a time when you might have been able to reinvest your funds at a higher rate of interest than the pass-through rate on your class of certificates. On the other hand, when market interest rates decrease, borrowers are generally more likely to prepay their mortgage loans. In addition, when the mortgage rates on hybrid mortgage loans convert from fixed rates to adjustable rates, there may be an increase in prepayments. The factors described in the previous two sentences could result in a faster return of principal to you at a time when you might not be able to reinvest your funds at an interest rate as high as the pass-through rate on your class of certificates. |

Refinancing programs, which may involve soliciting all or some of the mortgagors to refinance their mortgage loans, may increase the rate of prepayments on the mortgage loans. These refinancing programs may be offered by the master servicer, any subservicer or their affiliates, and may include streamlined documentation programs as well as programs under which a mortgage loan is modified to reduce the interest rate.

*See "Certain Yield and Prepayment Considerations—Prepayment Considerations" in this prospectus supplement and "Maturity and Prepayment Considerations" in the prospectus.*

**The yield on your certificates will be affected by the specific terms that apply to that class, discussed below.**

The offered certificates of each class have different yield considerations and different sensitivities to the rate and timing of principal distributions. The following is a general discussion of yield considerations and prepayment sensitivities of each class.

*See "Certain Yield and Prepayment Considerations" in this prospectus supplement.*

**Class A and Class R Certificates**

The Class I-A-1, Class I-A-2 and Class R Certificates will receive distributions primarily from the group I loans. The Class II-A-1 Certificates will receive distributions primarily from the group II loans. The Class III-A-1 Certificates and Class III-A-2 Certificates will receive distributions primarily from the group III loans. Therefore, the yields on the Class A Certificates and Class R Certificates will be sensitive to the rate and timing of principal prepayments and defaults on the mortgage

loans in the related loan group.

*See "Description of the Certificates—Principal Distributions on the Senior Certificates" in this prospectus supplement.*

**Class I-A-2 Certificates**

Investors in the Class I-A-2 Certificates should be aware that, after the certificate principal balances of the Class M Certificates and Class B Certificates have been reduced to zero, most losses and other shortfalls on the group I loans otherwise allocable to the Class I-A-1 Certificates will be allocated to the Class I-A-2 Certificates as described in this prospectus supplement. Therefore, the yield to maturity on the Class I-A-2 Certificates will be extremely sensitive to losses otherwise allocable to the Class I-A-1 Certificates.

**Class III-A-2 Certificates**

Investors in the Class III-A-2 Certificates should be aware that, after the certificate principal balances of the Class M Certificates and Class B Certificates have been reduced to zero, most losses and other shortfalls on the group III loans otherwise allocable to the Class III-A-1 Certificates will be allocated to the Class III-A-2 Certificates as described in this prospectus supplement. Therefore, the yield to maturity on the Class III-A-2 Certificates will be extremely sensitive to losses otherwise allocable to the Class III-A-1 Certificates.

**Class M Certificates**

The yield to investors in each class of the Class M Certificates will be sensitive to the rate and timing of losses on the mortgage loans in all three groups, if those losses are not covered by a more subordinate class of Class M Certificates or the Class B Certificates.

It is not expected that the Class M Certificates will receive any distributions of principal prepayments on the mortgage loans from any loan group until the distribution date in January 2013, unless either:

- the aggregate certificate principal balance of the related senior certificates has been reduced to zero prior to that date, or

- the weighted average subordinate percentage for all three loan groups is equal to or greater than twice the initial weighted average subordinate percentage for all three loan groups,

and, in each case, provided further that certain delinquency and loss tests are satisfied.

Until the distribution date in January 2017, all or a disproportionately large portion of principal prepayments on the mortgage loans in each loan group may be allocated to the related senior certificates as described in this prospectus supplement, and none or a disproportionately small portion of principal prepayments on the mortgage loans in each loan group may be paid to the holders of the Class M Certificates and Class B Certificates, unless either:

- the aggregate certificate principal balance of the related senior certificates has been reduced to zero prior to that date, or

- the weighted average subordinate percentage for all three loan groups is equal to or greater than twice the initial weighted average subordinate percentage for all three loan groups,

and, in each case, provided further that certain delinquency and loss tests are satisfied.

As a result, the weighted average lives of the Class M Certificates may be longer than would otherwise be the case.

*See "Summary—Credit Enhancement—Allocation of Losses" and "Description of the Certificates—Allocation of Losses; Subordination" in this prospectus supplement.*

**The recording of mortgages in the name of MERS may affect the yield on the certificates.**

The mortgages or assignments of mortgage for some of the mortgage loans have been or may be recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, solely as nominee for the originator and its successors and assigns. Subsequent assignments of those mortgages are registered electronically through the MERS® System. However, if MERS discontinues the MERS® System and it becomes necessary to record an assignment of the mortgage to the trustee, then any related expenses shall be paid by the trust and will reduce the amount available to pay principal of and interest on the class or classes of certificates with certificate principal balances greater than zero with the lowest payment priorities.

The recording of mortgages in the name of MERS is a relatively new practice in the mortgage lending industry. Public recording officers and others in the mortgage industry may have limited, if any, experience with lenders seeking to foreclose mortgages, assignments of which are registered with MERS. Accordingly, delays and additional costs in commencing, prosecuting and completing foreclosure proceedings and conducting foreclosure sales of the mortgaged properties could result. Those delays and additional costs could in turn delay the distribution of liquidation proceeds to certificateholders and increase the amount of losses on the mortgage loans.

*For additional information regarding MERS and the MERS® System, see "Description of the Mortgage Pool—Mortgage Pool Characteristics" and "Certain Yield and Prepayment Considerations" in this prospectus supplement and "Description of the Certificates—Assignment of Mortgage Loans" in the prospectus.*

## Introduction

The depositor will establish a trust with respect to Series 2005-QA13 on the closing date, under a series supplement, dated as of December 1, 2005, to the standard terms of pooling and servicing agreement, dated as of August 1, 2004, among the depositor, the master servicer and the trustee, taken together referred to herein as the pooling and servicing agreement. On the closing date, the depositor will deposit into the trust a mortgage pool of mortgage loans secured by first liens on one-to four-family residential properties. The mortgage pool will be divided into the following three loan groups: loan group I, loan group II and loan group III.

Some capitalized terms used in this prospectus supplement have the meanings given below under "Description of the Certificates—Glossary of Terms" or in the prospectus under "Glossary."

## Description of the Mortgage Pool

### General

The mortgage pool will consist of 2,054 hybrid adjustable-rate mortgage loans with an aggregate unpaid principal balance of $560,185,055 as of the cut-off date after deducting payments of principal due during the month of the cut-off date. The mortgage loans are secured by first liens on fee simple interests or leaseholds in one- to four-family residential properties or in the case of 0.2% of the mortgage loans in group II, an interest in shares issued by a cooperative apartment corporation and the related proprietary lease.

The mortgage pool will consist of three groups of mortgage loans, referred to as the Group I Loans, Group II Loans and Group III Loans.

Two of the mortgage loans, representing 0.1% of the mortgage pool, have a due date other than the first of each month. The mortgage loans will consist of mortgage loans with terms to maturity of not more than 30 years.

With respect to mortgage loans which have been modified, references in this prospectus supplement to the date of origination shall be deemed to be the date of the most recent modification. As of the cut-off date none of the mortgage loans have been modified. All percentages of the mortgage loans described in this prospectus supplement are approximate percentages determined as of the cut-off date after deducting payments of principal due during the month of the cut-off date, unless otherwise indicated.

All of the mortgage loans were purchased by the depositor through its affiliate, Residential Funding, from unaffiliated sellers as described in this prospectus supplement and in the prospectus, except in the case of 29.2% of the mortgage loans, which were purchased by the depositor through Residential Funding, from HomeComings Financial Network, Inc., or HomeComings, a wholly-owned subsidiary of the master servicer. Approximately 26.1% and 14.6% of the mortgage loans were purchased from First National Bank of Nevada and American Mortgage Network Inc., each an unaffiliated seller. Except as described in the preceding sentence, no unaffiliated seller sold more than 5.4% of the mortgage loans to Residential Funding. Approximately 93.8% of the mortgage loans are being subserviced by HomeComings.

The depositor and Residential Funding will make certain limited representations and warranties regarding the mortgage loans as of the date of issuance of the certificates. The depositor and Residential Funding will be required to repurchase or substitute for any mortgage loan as to which a breach of its

representations and warranties with respect to such mortgage loan occurs, if such breach materially and adversely affects the interests of the certificateholders in any such mortgage loan. However, neither the depositor nor Residential Funding will be required to repurchase or substitute for any mortgage loan in the event of a breach of its representations and warranties with respect to such mortgage loan if the substance of any such breach also constitutes fraud in the origination of such affected mortgage loan. In addition, Residential Funding will not assign to the depositor, and consequently the depositor will not assign to the trustee for the benefit of the certificateholders, any of the representations and warranties made by the mortgage collateral sellers or the right to require the related mortgage collateral seller to repurchase any such mortgage loan if a breach of any of its representations and warranties occurs, unless (x) the substance of the representation and warranty also constitutes fraud in the origination of the mortgage loan or (y) the mortgage collateral seller has made a representation and warranty that it had no actual knowledge of the presence of, nor reasonable grounds to suspect the presence of, any toxic materials or other environmental hazards that could affect the mortgaged property. Accordingly, the only representations and warranties regarding the mortgage loans that will be made for the benefit of the certificateholders will be the limited representations and warranties made by Residential Funding and the depositor and the representations and warranties made by the mortgage collateral sellers to the limited extent described in this paragraph. See "The Trusts—Representations with Respect to Mortgage Collateral" in the prospectus.

The original mortgages for some of the mortgage loans have been, or in the future may be, at the sole discretion of the master servicer, recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, solely as nominee for the originator and its successors and assigns, and subsequent assignments of those mortgages have been, or in the future may be, at the sole discretion of the master servicer, registered electronically through the MERS® System. In some other cases, the original mortgage was recorded in the name of the originator of the mortgage loan, record ownership was later assigned to MERS, solely as nominee for the owner of the mortgage loan, and subsequent assignments of the mortgage were, or in the future may be, at the sole discretion of the master servicer, registered electronically through the MERS® System. With respect to each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan. As of the cut-off date, approximately 93.5%, 97.7%, and 94.8% of the Group I, Group II and Group III Loans, respectively, were recorded in the name of MERS. For additional information regarding the recording of mortgages in the name of MERS see "Yield and Prepayment Considerations—General" in this prospectus supplement and "Description of the Certificates—Assignment of Mortgage Loans" in the prospectus.

Approximately 16.6%, 44.1% and 7.9% of the Group I, Group II and Group III Loans, respectively, provide for payment of a prepayment charge. With respect to some of these mortgage loans, the prepayment charge provisions provide for payment of a prepayment charge for partial prepayments and full prepayments made within up to five years following the origination of that mortgage loan, in an amount not to exceed the maximum amount permitted by state law. Prepayment charges received on the mortgage loans may be waived and in any case will not be available for distribution on the offered certificates. See "Certain Legal Aspects of Mortgage Loans and Contracts—Default Interest and Limitations on Prepayments" in the prospectus.

As used in this prospectus supplement, a loan is considered to be "30 to 59 days" or "30 or more days" delinquent when a payment due on any due date remains unpaid as of the close of business on the last business day immediately prior to the next following monthly due date. The determination as to whether a loan falls into this category is made as of the close of business on the last business day of each month.

## Compliance with Local, State and Federal Laws

Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

- Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti predatory lending laws.

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994. None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees. See "Certain Legal Aspects of the Mortgage Loans-The Mortgage Loans-Homeownership Act and Similar State Laws" in the prospectus.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the Group I Loans, Group II Loans or Group III Loans contain prepayment penalties that extend beyond five years after the date of origination.

Residential Funding will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan. Residential Funding maintains policies and procedures that are designed to ensure that it does not purchase mortgage loans subject to the Homeownership Act. However, there can be no assurance that these policies and procedures will assure that each and every mortgage loan complies with all applicable origination laws in all material respects.

Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires that each subservicer accurately and fully report its borrower credit files to credit repositories in a timely manner.

See "Certain Legal Aspects of Mortgage Loans and Contracts" in the prospectus.

## Mortgage Rate Adjustment

The mortgage rates on 33.2% of the Group I Loans will remain fixed for a period of three years and thereafter will adjust semi-annually to a rate equal to the sum of the Six-Month LIBOR Index and the note margin set forth in the related mortgage note, subject to the limitations described in this prospectus supplement. The mortgage rates on 51.3% of the Group II Loans will remain fixed for a period of five years and thereafter will generally adjust semi-annually to a rate equal to the sum of the Six-Month LIBOR Index and the note margin set forth in the related mortgage note, subject to the limitations described in this prospectus supplement. The mortgage rates on 9.6% of the Group III Loans will remain fixed for a period of seven years and thereafter will adjust semi-annually to a rate equal to the sum of the Six-Month LIBOR Index and the note margin set forth in the related mortgage note, subject to the limitations described in this prospectus supplement. The Six-Month LIBOR Index will generally be a per annum rate equal to the average of interbank offered rates for six-month U.S. dollar-denominated deposits

in the London market based on quotations of major banks as published in The Wall Street Journal or as posted by Fannie Mae and most recently available as of the first business day of the month immediately preceding the month in which the adjustment date occurs or the most recently available as of the date 45 days prior to the adjustment date.

The mortgage rates on 66.8% of the Group I Loans will remain fixed for a period of three years and thereafter will adjust annually to a rate equal to the sum of the One-Year LIBOR Index and the note margin set forth in the related mortgage note, subject to the limitations described in this prospectus supplement. The mortgage rates on 48.6% of the Group II Loans will remain fixed for a period of five years and thereafter will adjust annually to a rate equal to the sum of the One-Year LIBOR Index and the note margin set forth in the related mortgage note, subject to the limitations described in this prospectus supplement. The mortgage rates on 90.4% of the Group III Loans will remain fixed for a period of seven years and thereafter will adjust annually to a rate equal to the sum of the One-Year LIBOR Index and the note margin set forth in the related mortgage note, subject to the limitations described in this prospectus supplement.

The One-Year LIBOR Index will generally be a per annum rate equal to the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market based on quotations of major banks as published in The Wall Street Journal and most recently available as of the date that is generally 45 days prior to the adjustment date.

The mortgage rates on 0.1% of the Group II Loans will remain fixed for a period of five years and thereafter will adjust annually to a rate equal to the sum of the One-Year U.S. Treasury Index and the note margin set forth in the related mortgage note, subject to the limitations described in this prospectus supplement.

The One-Year U.S. Treasury Index will be based on the yield on U.S. Treasury securities adjusted to a constant maturity of one year as reported by the Federal Reserve Board in statistical Release No. H. 15(519), or the Release, as calculated and adjusted in the manner specified in the related mortgage note.

In the event that the related index specified in a mortgage note is no longer available, an index reasonably acceptable to the trustee that is based on comparable information will be selected by the master servicer.

The amount of the monthly payment on each mortgage loan will generally be adjusted semi-annually or annually, as applicable, on the due date of the month following the month in which the adjustment date occurs to equal the amount necessary to pay interest at the then-applicable mortgage rate and to fully amortize the outstanding stated principal balance of each mortgage loan over its remaining term to stated maturity. As of the cut-off date, none of the mortgage loans will have reached their first adjustment date. The mortgage loans will have various adjustment dates, note margins and limitations on the mortgage rate adjustments, as described below.

The initial mortgage rate in effect on a mortgage loan generally will be lower, and may be significantly lower, than the mortgage rate that would have been in effect based on the related index and note margin. Therefore, unless the related index declines after origination of a mortgage loan, the related mortgage rate will generally increase on the first adjustment date following origination of the mortgage loan subject to the periodic rate cap. The repayment of the mortgage loans will be dependent on the ability of the mortgagors to make larger monthly payments following adjustments of the mortgage rate. Mortgage loans that have the same initial mortgage rate may not always bear interest at the same mortgage rate because these mortgage loans may have different adjustment dates, and the mortgage rates

therefore may reflect different related index values, note margins, maximum mortgage rates and minimum mortgage rates. The Net Mortgage Rate with respect to each mortgage loan as of the cut-off date will be set forth in the related mortgage loan schedule attached to the pooling and servicing agreement.

Because of the periodic rate caps and the generally lower initial mortgage rates on the mortgage loans, in a rising interest rate environment the mortgage rate on the adjustable rate mortgage loans may be lower than prevailing mortgage rates for an extended period of time and therefore the Group I Net WAC Rate, the Group II Net WAC Rate, the Group III Net WAC Rate or the Class M Net WAC Rate, as applicable, will initially be less than it would be had all of the related mortgage loans already adjusted to their fully-indexed rate.

**Group I Loan Characteristics**

The Group I Loans will have the following characteristics as of the cut-off date, after deducting payments of principal due in the month of the cut-off date:

Number of Group I Loans ................................. 342

Net Mortgage Rates:

Weighted average................................... 5.7608%
Range................................................... 3.825% to 7.075%

Mortgage Rates:

Weighted average................................... 6.0652%
Range................................................... 4.250% to 7.375%

Note Margins:

Weighted average................................... 2.8044%
Range................................................... 1.875% to 3.500%

Minimum Mortgage Rates:

Weighted average................................... 2.8142%
Range................................................... 1.875% to 6.125%

Minimum Net Mortgage Rates:

Weighted average................................... 2.5098%
Range................................................... 1.575% to 5.825%

Maximum Mortgage Rates:

Weighted average................................... 12.0637%
Range................................................... 10.250% to 13.375%

Maximum Net Mortgage Rates:

Weighted average................................... 11.7594%
Range................................................... 9.825% to 13.075%

Periodic Caps:

Weighted average................................... 1.8169%
Range................................................... 1.000% to 2.000%

Weighted average months to next interest rate
    adjustment date................................................................34

The Group I Loans will have the following additional characteristics:

- The Group I Loans have an aggregate principal balance as of the cut-off date, after deducting payments of principal due in the month of the cut-off date, of approximately $100,160,509.

- The Group I Loans had individual principal balances at origination of at least $35,000 but not more than $1,000,000, with an average principal balance at origination of approximately $293,524.

- Approximately 10.1%, of the Group I Loans were purchased from Pinnacle Financial Corporation. Except as described in the preceding sentence, no non-affiliate of Residential Funding sold more than approximately 7.9% of the Group I Loans to Residential Funding. HomeComings Financial Network, Inc., a wholly-owned subsidiary of Residential Funding, sold approximately 50.0% of the Group I Loans to Residential Funding.

- None of the Group I Loans will have been originated prior to August 30, 2004, or will have a maturity date later than December 1, 2035.

- No Group I Loans have a remaining term to stated maturity as of the cut-off date of less than 345 months.

- The weighted average remaining term to stated maturity of the Group I Loans as of the cut-off date will be approximately 358 months. The weighted average original term to maturity of the Group I Loans as of the cut-off date will be approximately 360 months.

- As of the cut-off date, none of the Group I Loans are currently 30 or more days delinquent in payment of principal and interest.

- None of the Group I Loans are Buy-Down Loans.

- Approximately 99.8% of the Group I Loans are secured by first liens on fee simple interests in one- to four-family residential properties, and approximately 0.2% of the Group I Loans are secured by an interest in shares issued by a cooperative apartment corporation and the related proprietary lease.

- With respect to approximately 10.5% and 74.7% of the Group I Loans, the related mortgage note provides for an initial interest only period not to exceed 3 years and 10 years, respectively.

- No Group I Loan provides for deferred interest or negative amortization.

- No Group I Loan provides for conversion from an adjustable rate to a fixed rate.

- None of the Group I Loans are Balloon Loans.

- None of the Group I Loans have been made to international borrowers.

The Group I Loans are generally assumable in accordance with the terms of the related mortgage note. See "Maturity and Prepayment Considerations" in the prospectus.

Set forth in Annex I of this prospectus supplement is a description of additional characteristics of the Group I Loans as of the cut-off date, except as otherwise indicated. All percentages of the Group I Loans are approximate percentages by aggregate principal balance of the Group I Loans as of the cut-off date, except as otherwise indicated. Unless otherwise specified, all principal balances of the Group I Loans are as of the cut-off date, after deducting payments of principal due during the month of the cut-off date, and are rounded to the nearest dollar.

## Group II Loan Characteristics

The Group II Loans will have the following characteristics as of the cut-off date, after deducting payments of principal due in the month of the cut-off date:

Number of Group II Loans ................................ 1,547

Net Mortgage Rates:

      Weighted average.................................... 5.8662%
      Range.................................................... 4.075% to 7.200%

Mortgage Rates:

      Weighted average.................................... 6.1679%
      Range.................................................... 4.375% to 7.500%

Note Margins:

      Weighted average.................................... 2.6696%
      Range.................................................... 1.875% to 5.000%

Minimum Mortgage Rates:

      Weighted average.................................... 2.6893%
      Range.................................................... 1.875% to 7.500%

Minimum Net Mortgage Rates:

      Weighted average.................................... 2.3876%
      Range.................................................... 1.575% to 7.200%

Maximum Mortgage Rates:

      Weighted average.................................... 11.8222%
      Range.................................................... 9.375% to 13.125%

Maximum Net Mortgage Rates:

      Weighted average.................................... 11.5204%
      Range.................................................... 9.075% to 12.825%

Periodic Caps:

      Weighted average.................................... 1.6149%
      Range.................................................... 1.000% to 2.000%

Weighted average months to next interest rate
      adjustment date................................................................58

The Group II Loans will have the following additional characteristics:

- The Group II Loans have an aggregate principal balance as of the cut-off date, after deducting payments of principal due in the month of the cut-off date, of approximately $410,017,627.

- The Group II Loans had individual principal balances at origination of at least $51,000 but not more than $1,446,200, with an average principal balance at origination of approximately $265,410.

- Approximately 33.8% and 17.8% of the Group II Loans were purchased from First National Bank of Nevada and American Mortgage Network, Inc, respectively. Except as described in the preceding sentence, no non-affiliate of Residential Funding sold more than 5.3% of the Group II Loans to Residential Funding. HomeComings Financial Network, Inc., a wholly-owned subsidiary of Residential Funding, sold 18.1% of the Group II Loans to Residential Funding.

- None of the Group II Loans will have been originated prior to April 14, 2004, or will have a maturity date later than December 1, 2035.

- No Group II Loans have a remaining term to stated maturity as of the cut-off date of less than 341 months.

- The weighted average remaining term to stated maturity of the Group II Loans as of the cut off date will be approximately 358 months. The weighted average original term to maturity of the Group II Loans as of the cut-off date will be approximately 360 months.

- As of the cut-off date, none of the Group II Loans are currently 30 or more days delinquent in payment of principal and interest.

- None of the Group II Loans are Buy-Down Loans.

- All of the Group II Loans are secured by first liens on fee simple interests or leaseholds in one- to four-family residential properties.

- With respect to approximately 10.5% and 74.5% of the Group II Loans, the related mortgage note provides for an initial interest only period not to exceed 5 years and 10 years, respectively.

- No Group II Loan provides for deferred interest or negative amortization.

- No Group II Loan provides for conversion from an adjustable rate to a fixed rate.

- None of the Group II Loans are Balloon Loans.

- Two of the Group II Loans representing 0.1% of the pool have been made to international borrowers.

The Group II Loans are generally assumable in accordance with the terms of the related mortgage note. See "Maturity and Prepayment Considerations" in the prospectus.

Set forth in Annex I of this prospectus supplement is a description of additional characteristics of the Group II Loans as of the cut-off date, except as otherwise indicated. All percentages of the Group II Loans are approximate percentages by aggregate principal balance of the Group II Loans as of the cut-off date, except as otherwise indicated. Unless otherwise specified, all principal balances of the Group II Loans are as of the cut-off date, after deducting payments of principal due during the month of the cut-off date, and are rounded to the nearest dollar.

**Group III Loan Characteristics**

The Group III Loans will have the following characteristics as of the cut-off date, after deducting payments of principal due in the month of the cut-off date:

Number of Group III Loans ............................... 165

Net Mortgage Rates:

      Weighted average................................... 6.0895%
      Range................................................... 5.075% to 7.325%

Mortgage Rates:

      Weighted average................................... 6.3895%
      Range................................................... 5.375% to 7.625%

Note Margins:

      Weighted average................................... 3.0182%
      Range................................................... 1.875% to 3.748%

Minimum Mortgage Rates:

      Weighted average................................... 3.0182%
      Range................................................... 1.875% to 3.748%

Minimum Net Mortgage Rates:

      Weighted average................................... 2.7182%
      Range................................................... 1.575% to 3.448%

Maximum Mortgage Rates:

      Weighted average................................... 12.2690%
      Range................................................... 10.375% to 13.625%

Maximum Net Mortgage Rates:

      Weighted average................................... 11.9690%
      Range................................................... 10.075% to 13.325%

Periodic Caps:

      Weighted average................................... 1.9151%
      Range................................................... 1.000% to 2.000%

Weighted average months to next interest rate
    adjustment date................................................................83

The Group III Loans will have the following additional characteristics:

- The Group III Loans have an aggregate principal balance as of the cut-off date, after deducting payments of principal due in the month of the cut-off date, of approximately $50,006,919.

- The Group III Loans had individual principal balances at origination of at least $42,500 but not more than $876,000, with an average principal balance at origination of approximately $303,099.

- No non-affiliate of Residential Funding sold more than approximately 5.2% of the Group III Loans to Residential Funding. HomeComings Financial Network, Inc., a wholly-owned subsidiary of Residential Funding, sold approximately 78.3% of the Group III Loans to Residential Funding.

- None of the Group III Loans will have been originated prior to April 19, 2005 or will have a maturity date later than December 1, 2035.

- No Group III Loans have a remaining term to stated maturity as of the cut-off date of less than 353 months.

- The weighted average remaining term to stated maturity of the Group III Loans as of the cut-off date will be approximately 359 months. The weighted average original term to maturity of the Group III Loans as of the cut-off date will be approximately 360 months.

- As of the cut-off date, none of the Group III Loans are currently 30 or more days delinquent in payment of principal and interest.

- None of the Group III Loans are Buy-Down Loans.

- All of the Group III Loans are secured by first liens on fee simple interests in one- to four-family residential properties.

- With respect to approximately 8.0% and 75.1% of the Group III Loans, the related mortgage note provides for an initial interest only period not to exceed 7 years and 10 years, respectively.

- No Group III Loan provides for deferred interest or negative amortization.

- No Group III Loan provides for conversion from an adjustable rate to a fixed rate.

- None of the Group III Loans are Balloon Loans.

- None of the Group III Loans have been made to international borrowers.

The Group III Loans are generally assumable in accordance with the terms of the related mortgage note. See "Maturity and Prepayment Considerations" in the prospectus.

Set forth in Annex I of this prospectus supplement is a description of additional characteristics of the Group III Loans as of the cut-off date, except as otherwise indicated. All percentages of the Group III Loans are approximate percentages by aggregate principal balance of the Group III Loans as of the cut-off date, except as otherwise indicated. Unless otherwise specified, all principal balances of the Group III Loans are as of the cut-off date, after deducting payments of principal due during the month of the cut-off date, and are rounded to the nearest dollar.

**Characteristics of the Mortgage Loans**

The mortgage loans will have the following characteristics as of the cut-off date, after deducting payments of principal due in the month of the cut-off date:

Number of Mortgage Loans ............................. 2,054

Net Mortgage Rates:

    Weighted average.................................. 5.8673%
    Range.................................................... 3.825% to 7.325%

Mortgage Rates:

    Weighted average.................................. 6.1693%
    Range.................................................... 4.250% to 7.625%

Note Margins:

    Weighted average.................................. 2.7248%
    Range.................................................... 1.875% to 5.000%

Minimum Mortgage Rates:

    Weighted average.................................. 2.7410%
    Range.................................................... 1.875% to 7.500%

Minimum Net Mortgage Rates:

    Weighted average.................................. 2.4389%
    Range.................................................... 1.575% to 7.200%

Maximum Mortgage Rates:

    Weighted average.................................. 11.9053%
    Range.................................................... 9.375% to 13.625%

Maximum Net Mortgage Rates:

    Weighted average.................................. 11.6032%
    Range.................................................... 9.075% to 13.325%

Periodic Caps:

    Weighted average.................................. 1.6779%
    Range.................................................... 1.000% to 2.000%

Weighted average months to next interest rate
    adjustment date.................................................................56

The mortgage loans will have the following additional characteristics:

- The mortgage loans have an aggregate principal balance as of the cut-off date, after deducting payments of principal due in the month of the cut-off date, of approximately $560,185,055.

- The mortgage loans have individual principal balances at origination of at least $35,000 but not more than $1,446,200, with an average principal balance at origination of approximately $273,118.

- Approximately 26.1 % and 14.6% of the mortgage loans were purchased from First National Bank of Nevada and American Mortgage Network, Inc., respectively.  Except as described in the preceding sentence, no non-affiliate of Residential Funding sold more than approximately 5.4% of the mortgage loans to Residential Funding. HomeComings Financial Network, Inc., a wholly-owned subsidiary of Residential Funding, sold approximately 29.2% of the mortgage loans to Residential Funding.

- None of the mortgage loans will have been originated prior to April 14, 2004 or will have a maturity date later than December 1, 2035.

- No mortgage loan has a remaining term to stated maturity as of the cut-off date of less than 341 months.

- The weighted average remaining term to stated maturity of the mortgage loans as of the cut–off date will be approximately 358 months. The weighted average original term to maturity of the mortgage loans as of the cut-off date will be approximately 360 months.

- As of the cut-off date, none of the mortgage loans are currently 30 days or more delinquent in payment of principal and interest.

- None of the mortgage loans are Buy-Down Loans.

- With respect to approximately 1.9%, 7.7%, 0.7%, and 74.6% of the mortgage loans, the related mortgage note provides for an initial interest only period not to exceed 3 years, 5 years, 7 years, and 10 years, respectively.

- Approximately 99.9% of the mortgage loans are secured by first liens on fee simple interests or leaseholds in one- to four-family residential properties and approximately 0.1% of the mortgage loans are secured by an interest in shares issued by a cooperative apartment corporation and the related proprietary lease.

- No mortgage loan provides for deferred interest or negative amortization.

- No mortgage loan provides for conversion from an adjustable rate to a fixed rate.

- None of the mortgage loans are Balloon Loans.

- Two of the mortgage loans, representing 0.1% of the pool, have been made to international borrowers.

The mortgage loans are generally assumable in accordance with the terms of the related mortgage note. See "Maturity and Prepayment Considerations" in the prospectus.

Set forth in Annex I of this prospectus supplement is a description of additional characteristics of the mortgage loans as of the cut-off date, except as otherwise indicated. All percentages of the mortgage loans are approximate percentages by aggregate principal balance of the mortgage loans as of the cut-off date, except as otherwise indicated. Unless otherwise specified, all principal balances of the mortgage

loans are as of the cut-off date, after deducting payments of principal due during the month of the cut-off date, and are rounded to the nearest dollar.

## Standard Hazard Insurance and Primary Mortgage Insurance

Each mortgage loan is required to be covered by a standard hazard insurance policy. In addition, to the best of the depositor's knowledge, except in the case of three mortgage loans, representing 0.1% of the mortgage pool, each mortgage loan with an LTV ratio at origination in excess of 80% will be insured by a primary mortgage insurance policy, which is referred to as a primary insurance policy, covering at least 35% of the balance of the mortgage loan at origination if the LTV ratio is between 100.00% and 95.01%, at least 30% of the balance of the mortgage loan at origination if the LTV ratio is between 95.00% and 90.01%, at least 25% of the balance of the mortgage loan at origination if the LTV ratio is between 90.00% and 85.01%, and at least 12% of the balance of the mortgage loan at origination if the LTV ratio is between 85.00% and 80.01%.

All of the primary insurance policies were issued by General Electric Mortgage Insurance Corporation, Mortgage Guaranty Insurance Corporation, Triad Guaranty, United Guaranty Residential Insurance Company, PMI Mortgage Insurance Company, Radian Guaranty Inc. or Republic Mortgage Insurance Company which collectively are the primary insurers. Each primary insurer has a claims paying ability currently acceptable to the rating agencies that have been requested to rate the certificates; however, there is no assurance as to the actual ability of any primary insurer to pay claims. See "Insurance Policies on Mortgage Loans or Contracts" in the prospectus.

## The Program

General. Residential Funding, under its Expanded Criteria Program, or the program, purchases mortgage loans that may not qualify for other first mortgage purchase programs such as those run by Fannie Mae or Freddie Mac or by Residential Funding in connection with securities issued by the depositor's affiliate, Residential Funding Mortgage Securities I, Inc. However, a portion of the mortgage loans under the program may qualify for the Fannie Mae or Freddie Mac programs. Examples of mortgage loans that may not qualify for such programs include mortgage loans secured by non-owner occupied properties, mortgage loans made to borrowers whose income is not required to be provided or verified, mortgage loans with high LTV ratios or mortgage loans made to borrowers whose ratios of debt service on the mortgage loan to income and total debt service on borrowings to income are higher than for those other programs. Borrowers may be international borrowers. The mortgage loans also include mortgage loans secured by smaller or larger parcels of land, mortgage loans with higher LTV ratios than in those other programs, and mortgage loans with LTV ratios over 80% that do not require primary mortgage insurance. See "—Program Underwriting Standards" below. The inclusion of those mortgage loans may present certain risks that are not present in those other programs. The program is administered by Residential Funding on behalf of the depositor.

Qualifications of Program Sellers. Each Expanded Criteria Program Seller has been selected by Residential Funding on the basis of criteria described in Residential Funding's Expanded Criteria Seller Guide, or the Seller Guide. See "The Trusts—Qualifications of Sellers" in the prospectus.

Program Underwriting Standards. In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the

borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also be required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of non-owner occupied properties, income derived from the mortgaged property may be considered for underwriting purposes. For mortgaged property consisting of a vacation or second home, generally no income derived from the property is considered for underwriting purposes.

Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, must equal no more than specified percentages of the prospective mortgagor's gross income. The originator may also consider the amount of liquid assets available to the mortgagor after origination.

Certain of the mortgage loans have been originated under "reduced documentation" or "no stated income" programs, which require less documentation and verification than do traditional "full documentation" programs. Generally, under a "reduced documentation" program, no verification of a mortgagor's stated income is undertaken by the originator. Under a "no stated income" program, certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a "no income/no asset" program, no verification of a mortgagor's income or assets is undertaken by the originator. The underwriting for those mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination.

The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide. Appraisers may be staff appraisers employed by the originator. The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed. The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property, or replacement cost analysis based on the current cost of constructing or purchasing a similar property. In certain instances, the LTV ratio is based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator.

Prior to assigning the mortgage loans to the depositor, Residential Funding will have reviewed the underwriting information provided by the mortgage collateral sellers for most of the mortgage loans and, in those cases, determined that the mortgage loans were generally originated in accordance with or in a manner generally consistent with the underwriting standards described in the Seller Guide. With regard to a material portion of these mortgage loans, this review of underwriting information by Residential Funding was performed using an automated underwriting system. Any determination described above using an automated underwriting system will only be based on the information entered into the system and the information the system is programmed to review. See "The Trusts—Underwriting Policies—Automated Underwriting" in the prospectus.

Because of the program criteria and underwriting standards described above, the mortgage loans may experience greater rates of delinquency, foreclosure and loss than mortgage loans required to satisfy more stringent underwriting standards.

**Residential Funding**

Residential Funding will be responsible for master servicing the mortgage loans. Residential Funding's responsibilities will include the receipt of funds from subservicers, the reconciliation of servicing activity with respect to the mortgage loans, investor reporting, remittances to the trustee to accommodate distributions to certificateholders, follow up with subservicers with respect to mortgage loans that are delinquent or for which servicing decisions may need to be made, management and liquidation of mortgaged properties acquired by foreclosure or deed in lieu of foreclosure, notices and other responsibilities as detailed in the pooling and servicing agreement. Residential Funding has not had sufficient experience master servicing the types of mortgage loans comprising the mortgage pool to provide meaningful disclosure of its delinquency and loss experience with respect to comparable mortgage loans.

Residential Funding and its affiliates are active purchasers of non-conforming mortgage loans and have sold a substantial amount of mortgage loans that do not present some of the special risk factors presented by the mortgage loans as described in this prospectus supplement. Residential Funding serves as the master servicer for transactions backed by most of these mortgage loans. As a result of the program criteria and underwriting standards of the mortgage loans, however, the mortgage loans may experience rates of delinquency, foreclosure and loss that are higher than those experienced by other pools of mortgage loans for which Residential Funding acts as master servicer.

**Litigation**

Residential Funding and HomeComings are parties to various legal proceedings arising from time to time in the ordinary course of their businesses, some of which purport to be class actions. Based on information currently available, it is the opinion of Residential Funding and HomeComings that the eventual outcome of any currently pending legal proceedings will not have a material adverse affect on their ability to perform their obligations in relation to the trust or the mortgage loans. However, no assurance can be given that the final outcome of these legal proceedings, if unfavorable, either individually or in the aggregate, would not have a material adverse impact on Residential Funding or HomeComings.

**Additional Information**

The description in this prospectus supplement of the mortgage pool and the mortgaged properties is based upon the mortgage pool as of the cut-off date after deducting payments due during the month of the cut-off date, except as otherwise noted. Prior to the issuance of the certificates, mortgage loans may be removed from the mortgage pool as a result of incomplete documentation or otherwise, if the depositor deems that removal is necessary or appropriate. A limited number of other mortgage loans may be added to the mortgage pool prior to the issuance of the certificates. The depositor believes that the information in this prospectus supplement will be substantially representative of the characteristics of the mortgage pool as it will be constituted at the time the certificates are issued although the range of mortgage rates and maturities and some other characteristics of the mortgage loans in the mortgage pool may vary.

A Current Report on Form 8-K will be available to purchasers of the certificates and will be filed, together with the pooling and servicing agreement, with the Securities and Exchange Commission within fifteen days after the initial issuance of the offered certificates. In the event mortgage loans are removed from or added to the mortgage pool as described in the preceding paragraph, that removal or addition will be noted in the Current Report on Form 8-K.

## Description of the Certificates

### General

The Series 2005-QA13 Mortgage Asset-Backed Pass-Through Certificates will include the following six classes of Senior Certificates:

- Class I-A-1 Certificates;

- Class I-A-2 Certificates;

- Class II-A-1 Certificates, or the Group II Senior Certificates;

- Class III-A-1 Certificates, and together with the Class I-A-1 Certificates, the Super Senior Certificates;

- Class III-A-2 Certificates, and together with the Class III-A-1 Certificates, the Group III Senior Certificates and together with the Class I-A-2 Certificates, the Senior Support Certificates;

- Class R Certificates, or the Residual Certificates, and together with the Class I-A-1 Certificates and the Class I-A-2 Certificates, the Group I Senior Certificates.

Distributions of interest and principal on (i) the Class I-A-1 Certificates, Class I-A-2 Certificates and Residual Certificates, (ii) the Class II-A-1 Certificates and (iii) the Class III-A-1 Certificates and Class III-A-2 Certificates will be based on interest and principal received or advanced with respect to the Group I Loans, Group II Loans and Group III Loans, respectively, except under the limited circumstances described in this prospectus supplement. In addition to the Senior Certificates, the Series 2005-QA13 Mortgage Pass-Through Certificates will also include six classes of subordinate certificates which are designated as the Class M-1 Certificates, Class M-2 Certificates, Class M-3 Certificates, Class B-1 Certificates, Class B-2 Certificates and Class B-3 Certificates. Distributions of principal and interest on the six classes of subordinate certificates will be based on principal and interest received or advanced with respect to the mortgage loans in all loan groups. Only the Senior Certificates and Class M Certificates are offered hereby. See "Glossary" in the prospectus for the meanings of capitalized terms and acronyms not otherwise defined in this prospectus supplement.

The certificates will evidence the entire beneficial ownership interest in the trust. The trust will consist of:

- the mortgage loans;

- the assets as from time to time are identified as deposited in respect of the mortgage loans in the Custodial Account and in the Certificate Account and belonging to the trust;

- property acquired by foreclosure of the mortgage loans or deed in lieu of foreclosure;

- any applicable primary insurance policies and standard hazard insurance policies; and

- all proceeds of any of the foregoing.

The Senior Certificates will evidence in the aggregate an initial beneficial ownership interest of approximately 93.00% in the trust. The Class M-1, Class M-2, Class M-3, Class B-1, Class B-2 and

Class B-3 Certificates will each evidence in the aggregate an initial beneficial ownership interest of approximately 2.80%, 1.50%, 0.80%, 0.85%, 0.65% and 0.40%, respectively, in the trust.

The Senior Certificates, other than the Residual Certificates, and the Class M Certificates will be available only in book-entry form through facilities of The Depository Trust Company, and are collectively referred to as the DTC registered certificates. The DTC registered certificates will be issued, maintained and transferred on the book-entry records of DTC and its participants. The DTC registered certificates will be issued in minimum denominations of $25,000, or $250,000 in the case of the Class M-2 Certificates and Class M-3 Certificates, and integral multiples of $1 in excess thereof. The Residual Certificates will be issued in registered, certificated form in minimum denominations of a 20% percentage interest, except, in the case of one Class R Certificate, as otherwise described in this prospectus supplement under "Material Federal Income Tax Consequences."

The DTC registered certificates will be represented by one or more certificates registered in the name of the nominee of DTC. The depositor has been informed by DTC that DTC's nominee will be Cede & Co. No beneficial owner will be entitled to receive a certificate of any class in fully registered form, or a definitive certificate, except as described in this prospectus supplement under "—Book-Entry Registration of Certain of the Offered Certificates—Definitive Certificates." Unless and until definitive certificates are issued for the DTC registered certificates under the limited circumstances described in this prospectus supplement:

- all references to actions by certificateholders with respect to the DTC registered certificates shall refer to actions taken by DTC upon instructions from its participants; and

- all references in this prospectus supplement to distributions, notices, reports and statements to certificateholders with respect to the DTC registered certificates shall refer to distributions, notices, reports and statements to DTC or Cede & Co., as the registered holder of the DTC registered certificates, for distribution to beneficial owners by DTC in accordance with DTC procedures.

## Book-Entry Registration of Certain of the Offered Certificates

*General.* Beneficial owners that are not participants or indirect participants but desire to purchase, sell or otherwise transfer ownership of, or other interests in, the DTC registered certificates may do so only through participants and indirect participants. In addition, beneficial owners will receive all distributions of principal of and interest on the related DTC registered certificates from the paying agent through DTC and participants. Payments on the certificates will be made to the persons in the names of which such certificates are registered at the close of business on the related Record Date. Accordingly, beneficial owners may experience delays in their receipt of payments. Unless and until definitive certificates are issued for the DTC registered certificates, it is anticipated that the only registered certificateholder of the DTC registered certificates will be Cede & Co., as nominee of DTC. Beneficial owners will not be recognized by the trustee or the master servicer as certificateholders, as the term is used in the pooling and servicing agreement, and beneficial owners will be permitted to receive information furnished to certificateholders and to exercise the rights of certificateholders only indirectly through DTC, its participants and indirect participants.

Under the rules, regulations and procedures creating and affecting DTC and its operations, DTC is required to make book-entry transfers of DTC registered certificates among participants and to receive and transmit distributions of principal of, and interest on, the DTC registered certificates. Participants and indirect participants with which beneficial owners have accounts with respect to the DTC registered certificates similarly are required to make book-entry transfers and receive and transmit distributions on behalf of their respective beneficial owners. Accordingly, although beneficial owners will not possess

physical certificates evidencing their interests in the DTC registered certificates, DTC's rules provide a mechanism by which beneficial owners, through their participants and indirect participants, will receive distributions and will be able to transfer their interests in the DTC registered certificates.

None of the depositor, the master servicer or the trustee will have any liability for any actions taken by DTC or its nominee, including, without limitation, actions for any aspect of the records relating to or payments made on account of beneficial ownership interests in the DTC registered certificates held by Cede & Co., as nominee for DTC, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

*Definitive Certificates.* Definitive certificates will be issued to beneficial owners or their nominees, respectively, rather than to DTC or its nominee, only under limited conditions. Definitive certificates will be issued to certificateholders or their nominees, rather than to DTC, if (i) the depositor advises the trustee in writing that DTC is no longer willing or able to properly discharge its responsibilities as a depository with respect to book-entry certificates and the depositor is unable to locate a qualified successor, or (ii) the depositor notifies DTC of its intent to terminate the book-entry system and, upon receipt of a notice of intent from DTC, the participants holding beneficial interests in the book-entry certificates agree to initiate a termination. Upon the occurrence of one of the foregoing events, the trustee is required to notify, through DTC, participants who have ownership of DTC registered certificates as indicated on the records of DTC of the availability of definitive certificates for their DTC registered certificates. Upon surrender by DTC of the definitive certificates representing the DTC registered certificates and upon receipt of instructions from DTC for re-registration, the trustee will reissue the DTC registered certificates as definitive certificates issued in the respective principal amounts owned by individual beneficial owners, and thereafter the trustee and the master servicer will recognize the holders of the definitive certificates as certificateholders under the pooling and servicing agreement.

For additional information regarding DTC, and the certificates, see "Description of the Certificates—Form of Certificates" in the prospectus.

## Glossary of Terms

The following terms are given the meanings shown below to help describe the cash flows on the certificates:

**Accrued Certificate Interest** — With respect to any distribution date, an amount equal to, in the case of each class of offered certificates, interest accrued during the related Interest Accrual Period on the Certificate Principal Balance of the certificates of that class immediately prior to that distribution date at the related pass-through rate on that class for that distribution date; in each case less interest shortfalls, if any, allocated thereto for that distribution date to the extent not covered, with respect to the Senior Certificates, by the subordination provided by the Class B Certificates and Class M Certificates and, with respect to the Class M Certificates to the extent not covered by the subordination provided by the Class B Certificates and any class or classes of Class M Certificates having a lower payment priority, including in each case

    (i)    any Prepayment Interest Shortfall for the related loan group to the extent not covered by the master servicer as described in this prospectus supplement under "Description of the Certificates—Interest Distributions";

    (ii)    the interest portions of Realized Losses for the related loan group, including Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses and Extraordinary Losses not allocated through subordination;

(iii)    the interest portion of any Advances that were made with respect to delinquencies for the related loan group that were ultimately determined to be Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses or Extraordinary Losses; and

(iv)    any other interest shortfalls for the related loan group not covered by subordination provided by the Class M Certificates or Class B Certificates, including interest shortfalls relating to the Servicemembers Civil Relief Act, as amended, or Relief Act, or similar legislation or regulations, all allocated as described below.

The Group I Senior Percentage of such reductions in the case of the Group I Loans will be allocated among the holders of the Group I Senior Certificates in proportion to the respective amounts of Accrued Certificate Interest that would have been payable from the Group I Loans on that distribution date absent these reductions.  The Group II Senior Percentage of such reductions in the case of the Group II Loans will be allocated to the holders of the Group II Senior Certificates.  The Group III Senior Percentage of such reductions in the case of the Group III Loans will be allocated to the holders of Group III Senior Certificates in proportion to the respective amounts of the Accrued Certificate Interest that would have been payable from the Group III Loans on that distribution date absent these reductions. The remainder of these reductions will be allocated among the holders of the Class M Certificates and Class B Certificates in proportion to the respective amounts of Accrued Certificate Interest that would have been payable on that distribution date absent these reductions.  In the case of each class of Class M Certificates, Accrued Certificate Interest on that class will be further reduced by the allocation of the interest portion of certain losses thereto, if any, as described below under "—Allocation of Losses; Subordination." Accrued Certificate Interest on each class of Senior Certificates will be distributed on a pro rata basis.  Accrued Certificate Interest on each class of certificates is calculated on the basis of a 360-day year consisting of twelve 30-day months.

**Advance** — As to any mortgage loan and any distribution date, an amount equal to the scheduled payment of principal and interest on that mortgage loan due during the related Due Period which was not received as of the close of business on the business day preceding the related determination date.

**Available Distribution Amount**—With respect to any distribution date and each loan group as determined separately for each loan group, an amount equal to the aggregate of:

- the aggregate amount of scheduled payments on the mortgage loans in the related loan group due during the related Due Period and received on or prior to the related determination date, after deduction of the related master servicing fees and any subservicing fees, which are collectively referred to as the servicing fees;

- all unscheduled payments on the mortgage loans in the related loan group, including mortgagor prepayments, Insurance Proceeds, Liquidation Proceeds, Subsequent Recoveries and proceeds from repurchases of and substitutions for the mortgage loans in the related loan group occurring during the preceding calendar month or, in the case of mortgagor prepayments in full, during the related Prepayment Period;

- all Advances made for that distribution date for the related loan group, in each case net of amounts reimbursable therefrom to the master servicer and any subservicer; and

- any additional amounts to be included in the Available Distribution Amount with respect to such loan group pursuant to the first paragraph of clause (d) under "—Principal Distributions on the Senior Certificates".

In addition to the foregoing amounts, with respect to unscheduled collections, not including mortgagor prepayments, the master servicer may elect to treat such amounts as included in the related Available Distribution Amount for the distribution date in the month of receipt, but is not obligated to do so. As described in this prospectus supplement under "—Principal Distributions on the Senior Certificates," any amount with respect to which such election is so made shall be treated as having been received on the last day of the preceding calendar month for the purposes of calculating the amount of principal and interest distributions to any class of certificates. With respect to any distribution date, the determination date is the second business day prior to that distribution date.

**Capitalization Reimbursement Amount**—With respect to any distribution date and each loan group as determined separately for each loan group, the amount of Advances or Servicing Advances that were added to the outstanding principal balance of the mortgage loans in the related loan group during the preceding calendar month and reimbursed to the master servicer or subservicer on or prior to such distribution date, plus the related Capitalization Reimbursement Shortfall Amount remaining unreimbursed from any prior distribution date and reimbursed to the master servicer or subservicer on or prior to such distribution date. The master servicer or subservicer will be entitled to be reimbursed for these amounts only from the principal collections on the mortgage loans in the related loan group.

**Capitalization Reimbursement Shortfall Amount**— With respect to any distribution date and each loan group as determined separately for each loan group, the amount, if any, by which the amount of Advances or Servicing Advances that were added to the principal balance of the mortgage loans in the related loan group during the preceding calendar month exceeds the amount of principal payments on the mortgage loans included in the related Available Distribution Amount for that distribution date.

**Certificate Group**—With respect to (i) loan group I, the Class I-A-1, Class I-A-2 and Residual Certificates, (ii) loan group II, the Class II-A-1 Certificates, and (iii) loan group III, the Class III-A-1 Certificates and Class III-A-2 Certificates.

**Certificate Principal Balance** — For any offered certificate, as of any date of determination, an amount equal to the initial Certificate Principal Balance of that certificate, reduced by the aggregate of (a) all amounts allocable to principal previously distributed with respect to that certificate and (b) any reductions in the Certificate Principal Balance of that certificate deemed to have occurred in connection with allocations of Realized Losses in the manner described in this prospectus supplement, provided that, after the Certificate Principal Balances of the Class B Certificates have been reduced to zero, the Certificate Principal Balance of any certificate of the class of Class M Certificates outstanding with the highest payment priority to which Realized Losses, other than Excess Special Hazard Losses, Excess Bankruptcy Losses, Excess Fraud Losses and Extraordinary Losses, have been allocated shall be increased by the percentage interest evidenced thereby multiplied by the amount of any Subsequent Recoveries not previously allocated, but not by more than the amount of Realized Losses previously allocated to reduce the Certificate Principal Balance of that certificate, and the Certificate Principal Balance of any certificate of the class of certificates with a Certificate Principal Balance greater than zero with the lowest payment priority shall be further reduced by an amount equal to the percentage interest evidenced thereby multiplied by the excess, if any, of (i) the then-aggregate Certificate Principal Balance of all other classes of certificates then outstanding over (ii) the then-aggregate Stated Principal Balance of all of the mortgage loans.

**Class M Net WAC Rate**—With respect to any distribution date and the Class M Certificates, a per annum rate equal to the weighted average of the Group I Net WAC Rate, Group II Net WAC Rate and Group III Net WAC Rate, weighted on the basis of the Subordinate Component for the related loan group.

**Credit Support Depletion Date** — The first distribution date on which the aggregate Certificate Principal Balance of the Class M Certificates and the Class B Certificates has been reduced to zero.

**Due Date** —With respect to any distribution date and any mortgage loan, the date during the related Due Period on which scheduled payments are due.

**Due Period** — With respect to any distribution date, the calendar month in which the distribution date occurs.

**Excess Bankruptcy Losses** —Bankruptcy Losses in excess of the Bankruptcy Amount.

**Excess Fraud Losses** — Fraud Losses in excess of the Fraud Loss Amount.

**Excess Special Hazard Losses** —Special Hazard Losses in excess of the Special Hazard Amount.

**Final Disposition** — With respect to a defaulted mortgage loan, a Final Disposition is deemed to have occurred upon a determination by the master servicer that it has received all Insurance Proceeds, Liquidation Proceeds and other payments or cash recoveries which the master servicer reasonably and in good faith expects to be finally recoverable with respect to the mortgage loan.

**Group I Net WAC Rate, Group II Net WAC Rate, or Group III Net WAC Rate**—With respect to any distribution date and loan group, the weighted average of the Net Mortgage Rates of the mortgage loans in the related loan group as of the end of the calendar month immediately preceding the month in which such distribution date occurs.

**Group I Senior Accelerated Distribution Percentage, Group II Senior Accelerated Distribution Percentage, or Group III Senior Accelerated Distribution Percentage**— For any distribution date occurring prior to the distribution date in January 2013, 100%. The Group I Senior Accelerated Distribution Percentage, Group II Senior Accelerated Distribution Percentage and Group III Senior Accelerated Distribution Percentage will also be referred to in this prospectus supplement as the related Senior Accelerated Distribution Percentage. The related Senior Accelerated Distribution Percentage for any distribution date occurring after the first seven years following the closing date will be as follows:

- for any distribution date during the eighth year after the closing date, the related Senior Percentage for that distribution date plus 70% of the related Subordinate Percentage for that distribution date;

- for any distribution date during the ninth year after the closing date, the related Senior Percentage for that distribution date plus 60% of the related Subordinate Percentage for that distribution date;

- for any distribution date during the tenth year after the closing date, the related Senior Percentage for that distribution date plus 40% of the related Subordinate Percentage for that distribution date;

- for any distribution date during the eleventh year after the closing date, the related Senior Percentage for that distribution date plus 20% of the related Subordinate Percentage for that distribution date; and

- for any distribution date thereafter, the related Senior Percentage for that distribution date.

Any scheduled reduction to the Group I Senior Accelerated Distribution Percentage, Group II Senior Accelerated Distribution Percentage or Group III Senior Accelerated Distribution Percentage described in the preceding paragraph shall not be made as of any distribution date unless:

(a)    the outstanding principal balance of the mortgage loans in all three loan groups delinquent 60 days or more averaged over the last six months, as a percentage of the aggregate outstanding Certificate Principal Balance of the Class M Certificates and Class B Certificates, is less than 50%, and

(b)    Realized Losses on the mortgage loans in all three loan groups to date for that distribution date, if occurring during the eighth, ninth, tenth, eleventh or twelfth year, or any year thereafter, after the closing date, are less than 30%, 35%, 40%, 45% or 50%, respectively, of the sum of the initial Certificate Principal Balances of the Class M Certificates and Class B Certificates.

Notwithstanding the foregoing, if the weighted average of the Subordinate Percentages for all three loan groups is equal to or in excess of twice the initial weighted average of the Subordinate Percentages for all three loan groups and

- the outstanding principal balance of mortgage loans in all three loan groups delinquent 60 days or more averaged over the last six months, as a percentage of the aggregate outstanding Certificate Principal Balance of the Class M Certificates and Class B Certificates, does not exceed 50% and

- prior to the distribution date in January 2009, cumulative Realized Losses on the mortgage loans in all three loan groups do not exceed 20% of the sum of the initial Certificate Principal Balances of the Class M Certificates and Class B Certificates, and thereafter, cumulative Realized Losses on the mortgage loans in all three loan groups do not exceed 30% of the sum of the initial Certificate Principal Balances of the Class M Certificates and Class B Certificates,

then on any distribution date prior to the distribution date in January 2009, each Senior Accelerated Distribution Percentage for that distribution date will equal the related Senior Percentage for that distribution date plus 50% of the related Subordinate Percentage for that distribution date, and on any distribution date on or after the distribution date in January 2009, each Senior Accelerated Distribution Percentage for that distribution date will equal the related Senior Percentage for that distribution date.

Notwithstanding the foregoing, if on any distribution date the weighted average of the Senior Percentages for all three loan groups, weighted on the basis of the Stated Principal Balances of the mortgage loans in the related loan groups, exceeds the weighted average of the initial Senior Percentages, calculated on such basis, each of the Senior Accelerated Distribution Percentages for that distribution date will once again equal 100%.

Notwithstanding the foregoing, upon reduction of the Certificate Principal Balances of the related Senior Certificates to zero, the Group I Senior Accelerated Distribution Percentage, Group II Senior Accelerated Distribution Percentage or Group III Senior Accelerated Distribution Percentage, as the case may be, will equal 0%.

**Group I Senior Percentage, Group II Senior Percentage or Group III Senior Percentage—** As of each distribution date, the percentage equal to the aggregate Certificate Principal Balance of the related Senior Certificates immediately prior to that distribution date divided by the aggregate Stated Principal Balance of all of the mortgage loans in the related loan group immediately prior to that distribution date. The Group I Senior Percentage, Group II Senior Percentage and Group III Senior

Percentage will each initially equal approximately 93.00%, and will in no event exceed 100%. The Group I Senior Percentage, Group II Senior Percentage and Group III Senior Percentage also will be referred to in this prospectus supplement as the related Senior Percentage.

**Group I Senior Principal Distribution Amount, Group II Senior Principal Distribution Amount or Group III Senior Principal Distribution Amount—** With respect to any distribution date, the lesser of (a) the balance of the related Available Distribution Amount remaining after the related Senior Interest Distribution Amount has been distributed and (b) the sum of:

(i)    the product of (A) the then-applicable related Senior Percentage and (B) the aggregate of the following amounts:

(1)    the principal portion of all scheduled monthly payments on the related mortgage loans due during the related Due Period, whether or not received on or prior to the related determination date, less the principal portion of Debt Service Reductions which together with other Bankruptcy Losses are in excess of the Bankruptcy Amount;

(2)    the principal portion of all proceeds of the repurchase of a mortgage loan in the related loan group or, in the case of a substitution, amounts representing a principal adjustment, as required by the pooling and servicing agreement during the preceding calendar month; and

(3)    the principal portion of all other unscheduled collections received in respect of the mortgage loans in the related loan group, including Subsequent Recoveries, received during the preceding calendar month, other than full and partial mortgagor prepayments and any amounts received in connection with a Final Disposition of a mortgage loan in the related loan group described in clause (ii) below, to the extent applied as recoveries of principal;

(ii)    in connection with the Final Disposition of a mortgage loan in the related loan group (x) that occurred in the preceding calendar month and (y) that did not result in any Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses or Extraordinary Losses, an amount equal to the lesser of:

(1)    the then-applicable related Senior Percentage of the Stated Principal Balance of that mortgage loan; and

(2)    the then-applicable related Senior Accelerated Distribution Percentage of the related unscheduled collections, including Insurance Proceeds and Liquidation Proceeds, to the extent applied as recoveries of principal;

(iii)    the then-applicable related Senior Accelerated Distribution Percentage of the aggregate of all partial mortgagor prepayments made in respect of the mortgage loans in the related loan group during the preceding calendar month and mortgagor prepayments in full made during the related Prepayment Period in respect of the mortgage loans in the related loan group;

(iv)    any additional amounts from the other loan groups to be included in the Senior Principal Distribution Amount with respect to such loan group pursuant to the first paragraph of clause (d) under "—Principal Distributions on the Senior Certificates"; and

S-45

(v)    any amounts allocable to principal for any previous distribution date calculated pursuant to clauses (i) through (iii) above that remain undistributed to the extent that any of those amounts are not attributable to Realized Losses which were allocated to the Class M Certificates or Class B Certificates; minus

(vi)    the related Capitalization Reimbursement Amount for such distribution date, multiplied by a fraction, the numerator of which is the related Senior Principal Distribution Amount, without giving effect to this clause (v), and the denominator of which is the sum of the principal distribution amounts for all classes of certificates derived from the related Available Distribution Amount, without giving effect to any reductions for the related Capitalization Reimbursement Amount.

**Interest Accrual Period** — For all classes of certificates, the calendar month preceding the month in which the distribution date occurs.

**Record Date** — With respect to each distribution date and each class of certificates, the close of business on the last business day of the month next preceding the month in which the related distribution date occurs.

**Senior Accelerated Distribution Percentage** — With respect to (i) loan group I, the Group I Senior Accelerated Distribution Percentage, (ii) loan group II, the Group II Senior Accelerated Distribution Percentage and (iii) loan group III, the Group III Senior Accelerated Distribution Percentage.

**Senior Interest Distribution Amount** — For each group of certificates and with respect to any distribution date, the aggregate amount of Accrued Certificate Interest to be distributed to the holders of the related group of Senior Certificates for that distribution date.

**Senior Percentage** — With respect to (i) loan group I, the Group I Senior Percentage, (ii) loan group II, the Group II Senior Percentage and (iii) loan group III, the Group III Senior Percentage.

**Senior Principal Distribution Amount** — With respect to (i) loan group I, the Group I Senior Principal Distribution Amount, (ii) loan group II, the Group II Senior Principal Distribution Amount and (iii) loan group III, the Group III Senior Principal Distribution Amount.

**Stated Principal Balance** — With respect to any mortgage loan and as of any distribution date, (a) the sum of (i) the principal balance thereof as of the cut-off date after payment of all scheduled principal payments due during the month of the cut-off date and (ii) any amount by which the outstanding principal balance thereof has been increased pursuant to a servicing modification, minus (b) the sum of (i) the aggregate of the principal portion of the scheduled monthly payments due with respect to that mortgage loan during each due period commencing on the first due period after the cut-off date and ending with the due period related to the previous distribution date which were received or with respect to which an advance was made, (ii) all principal prepayments with respect to such mortgage loan and all Liquidation Proceeds and Insurance Proceeds, to the extent applied by the master servicer as recoveries of principal, in each case which were distributed on any previous distribution date, and (iii) any Realized Loss allocated to the trust with respect to that mortgage loan for any previous distribution date.

**Subordinate Component** — With respect to each loan group and any distribution date, the aggregate Stated Principal Balance of the mortgage loans in that loan group for that distribution date minus the aggregate Certificate Principal Balance of the related Senior Certificates immediately prior to that distribution date.

**Subordinate Percentage** — For any loan group and as of any date of determination, a percentage equal to 100% minus the related Senior Percentage as of that date.

**Subsequent Recoveries** — Subsequent recoveries, net of reimbursable expenses, with respect to mortgage loans in the related loan group that have been previously liquidated and that resulted in a Realized Loss.

**Super Senior Optimal Percentage**—As to any distribution date on and after the Credit Support Depletion Date and any class of Super Senior Certificates, a percentage expressed as a fraction, the numerator of which is the Certificate Principal Balance of that class of Super Senior Certificates immediately prior to that distribution date and the denominator of which is the aggregate Certificate Principal Balance of the related Certificate Group immediately prior to that distribution date.

**Super Senior Optimal Principal Distribution Amount**—As to any distribution date on and after the Credit Support Depletion Date and any class of Super Senior Certificates, an amount equal to the product of (a) the then-applicable Super Senior Optimal Percentage for that class of Super Senior Certificates and (b) the amounts described in clause (b) of the definition of Senior Principal Distribution Amount with respect to the related loan group.

## Interest Distributions

Holders of each class of Senior Certificates will be entitled to receive interest distributions in an amount equal to the Accrued Certificate Interest on that class on each distribution date, to the extent of the related Available Distribution Amount for that distribution date, commencing on the first distribution date in the case of all classes of Senior Certificates entitled to interest distributions.

Holders of each class of Class M Certificates will be entitled to receive interest distributions in an amount equal to the Accrued Certificate Interest on that class on each distribution date, to the extent of the Available Distribution Amount for that distribution date after distributions of interest and principal to the applicable Senior Certificates, reimbursements for some Advances to the master servicer and distributions of interest and principal to any class of Class M Certificates having a higher payment priority.

As described in the definition of "Accrued Certificate Interest," Accrued Certificate Interest on each class of certificates is subject to reduction in the event of specified interest shortfalls allocable thereto.

Prepayment Interest Shortfalls will result because interest on prepayments in full is paid by the related mortgagor only to the date of prepayment, and because no interest is distributed on prepayments in part, as these prepayments in part are applied to reduce the outstanding principal balance of the related mortgage loans as of the Due Date in the month of prepayment.

However, with respect to any distribution date, any Prepayment Interest Shortfalls resulting from prepayments in full or prepayments in part made during the preceding calendar month that are being distributed to the certificateholders on that distribution date will be offset by the master servicer, but only to the extent those Prepayment Interest Shortfalls do not exceed an amount equal to the lesser of (a) one-twelfth of 0.125% of the Stated Principal Balance of the mortgage loans immediately preceding that distribution date and (b) the sum of the master servicing fee payable to the master servicer for its master servicing activities and reinvestment income received by the master servicer on amounts payable with respect to that distribution date. No assurance can be given that the master servicing compensation available to cover Prepayment Interest Shortfalls will be sufficient therefor. Any Prepayment Interest Shortfalls which are not covered by the master servicer on any distribution date will not be reimbursed on

any future distribution date. See "Pooling and Servicing Agreement—Servicing and Other Compensation and Payment of Expenses" in this prospectus supplement.

If on any distribution date the Available Distribution Amount with respect to a loan group is less than the Accrued Certificate Interest on the Senior Certificates payable from that loan group, the shortfall will be allocated among the holders of the related Senior Certificates in proportion to the respective amounts of Accrued Certificate Interest payable from that loan group for that distribution date. In addition, the amount of any such interest shortfalls that are covered by subordination, specifically, interest shortfalls not described in clauses (i) through (iv) in the definition of Accrued Certificate Interest, will be unpaid Accrued Certificate Interest and will be distributable to holders of the certificates of those classes entitled to those amounts on subsequent distribution dates, in each case to the extent of available funds for the related loan group after interest distributions as described in this prospectus supplement.

These interest shortfalls could occur, for example, if delinquencies on the mortgage loans in a loan group were exceptionally high and were concentrated in a particular month and Advances by the master servicer did not cover the shortfall. Any amounts so carried forward will not bear interest.

Any interest shortfalls will not be offset by a reduction in the servicing compensation of the master servicer or otherwise, except to the limited extent described in the third preceding paragraph with respect to Prepayment Interest Shortfalls.

The pass-through rate on each class of the Group I Senior Certificates equals the Group I Net WAC Rate. The pass-through rate on each class of the Group I Senior Certificates with respect to the first distribution date is expected to be approximately 5.7608% per annum.

The pass-through rate on the Group II Senior Certificates equals the Group II Net WAC Rate. The pass-through rate on the Group II Senior Certificates with respect to the first distribution date is expected to be approximately 5.8662% per annum.

The pass-through rate on each class of the Group III Senior Certificates equals the Group III Net WAC Rate. The pass-through rate on each class of the Group III Senior Certificates with respect to the first distribution date is expected to be approximately 6.0895% per annum.

The pass-through rate on each class of the Class M Certificates on any distribution date equals the Class M Net WAC Rate. The pass-through rate on each class of the Class M Certificates with respect to the first distribution date is expected to be approximately 5.8673% per annum.

As described in this prospectus supplement, the Accrued Certificate Interest allocable to each class of certificates is based on the Certificate Principal Balance of that class.

## Principal Distributions on the Senior Certificates

The holders of the Senior Certificates will be entitled to receive on each distribution date, in the priority described in this prospectus supplement and to the extent of the portion of the related Available Distribution Amount remaining after the distribution of the related Senior Interest Distribution Amount, a distribution allocable to principal equal to the related Senior Principal Distribution Amount.

Distributions of principal on each group of Senior Certificates on each distribution date will be made, after distribution of the related Senior Interest Distribution Amount, as follows:

        (a)     The Group I Senior Principal Distribution Amount shall be distributed as follows:

(i) to the Class R Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and

(ii) any remaining amount, to the Class I-A-1 Certificates and Class I-A-2 Certificates, on a pro rata basis, in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances of the Class I-A-1 Certificates and Class I-A-2 Certificates have been reduced to zero.

(b)     The Group II Senior Principal Distribution Amount shall be distributed to the Class II-A-1 Certificates until the Certificate Principal Balance thereof has been reduced to zero.

(c)     The Group III Senior Principal Distribution Amount shall be distributed to the Class III-A-1 Certificates and the Class III-A-2 Certificates, on a pro rata basis, in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances of the Class III-A-1 Certificates and Class III-A-2 Certificates have been reduced to zero.

(d)     On any distribution date prior to the occurrence of the Credit Support Depletion Date that occurs after the reduction of the aggregate Certificate Principal Balance of the Senior Certificates of any Certificate Group to zero, the outstanding Senior Certificates of the other Certificate Groups will be entitled to receive 100% of the mortgagor prepayments on the mortgage loans in the loan group related to Senior Certificates that have been fully paid, which amount shall be allocated, pro rata, between those Certificate Groups based on the aggregate Certificate Principal Balance of the related Senior Certificates. Such amounts allocated to Senior Certificates shall be treated as part of the related Available Distribution Amount and distributed as part of the related Senior Principal Distribution Amount in accordance with the priorities set forth in clauses (a) through (c) above, in reduction of the Certificate Principal Balances thereof. Notwithstanding the foregoing, remaining Senior Certificates will not be entitled to receive mortgagor prepayments on the mortgage loans in a loan group related to Senior Certificates that have been fully paid if the following two conditions are satisfied: (1) the weighted average of the Subordinate Percentages for all loan groups for such distribution date, weighted on the basis of the Stated Principal Balances of the mortgage loans in the related loan group, is at least two times the weighted average of the initial Subordinate Percentages for all loan groups, calculated on that basis and (2) the outstanding principal balance of the mortgage loans in all loan groups delinquent 60 days or more days averaged over the last six months, as a percentage of the aggregate outstanding Certificate Principal Balance of the Class M Certificates and Class B Certificates, is less than 50%.

In addition, on any distribution date prior to the occurrence of the Credit Support Depletion Date on which the aggregate Certificate Principal Balance of the Senior Certificates of any Certificate Group is greater than the aggregate Stated Principal Balance of the mortgage loans in the related loan group in each case after giving effect to distributions to be made on such distribution date, (1) 100% of the mortgagor prepayments otherwise allocable to the Class M Certificates and Class B Certificates on the mortgage loans in the other loan groups will be distributed to such undercollateralized Senior Certificates in accordance with the priorities set forth in clauses (a) through (c) above, in reduction of the Certificate Principal Balances thereof, until the aggregate Certificate Principal Balance of such Senior Certificates equals the aggregate Stated Principal Balance of the mortgage loans in the related loan group and (2) an amount equal to one month's interest at the pass-through rate for such undercollateralized Senior Certificates on the amount of such difference will be distributed, pro rata, from the Available Distribution Amount for the other loan groups otherwise allocable to the Class M Certificates and Class B Certificates, based on such amounts otherwise allocable to the Class M Certificates and Class B

Certificates, as follows: first to pay any unpaid interest on such undercollateralized Senior Certificates and then to pay principal on those certificates in the manner described in (1) above. If more than one group of Senior Certificates is undercollateralized on a distribution date, amounts distributable to such groups pursuant to the preceding sentence will be allocated among such groups, pro rata, based upon the amount by which the aggregate Certificate Principal Balance of each such group exceeds the aggregate Stated Principal Balance of the mortgage loans in the related loan group.

(e)     On or after the occurrence of the Credit Support Depletion Date, all priorities relating to distributions in clauses (a)(ii) and (c) above relating to principal among the Group I Senior Certificates or Group III Senior Certificates, as applicable, will be disregarded. Instead, until the reduction of the Certificate Principal Balance of the Class I-A-2 Certificates to zero, the aggregate amount distributable to the Class I-A-1 Certificates and Class I-A-2 Certificates in respect of the aggregate Accrued Certificate Interest thereon and in respect of their aggregate pro rata portion of the Group I Senior Principal Distribution Amount will be distributed among those certificates in the following priority: first, to the Class I-A-1 Certificates, up to an amount equal to the Accrued Certificate Interest on the Class I-A-1 Certificates; second, to the Class I-A-1 Certificates, up to an amount equal to the Super Senior Optimal Principal Distribution Amount for the Class I-A-1 Certificates, in reduction of the Certificate Principal Balance thereof, until the Certificate Principal Balance thereof has been reduced to zero; third, to the Class I-A-2 Certificates, up to an amount equal to the Accrued Certificate Interest thereon; and fourth, to the Class I-A-2 Certificates, the remainder, until the Certificate Principal Balance thereof has been reduced to zero. In addition, until the reduction of the Certificate Principal Balance of the Class III-A-2 Certificates to zero, the aggregate amount distributable to the Class III-A-1 Certificates and Class III-A-2 Certificates in respect of the aggregate Accrued Certificate Interest thereon and in respect of their aggregate pro rata portion of the Group III Senior Principal Distribution Amount will be distributed between those certificates in the following priority: first, to the Class III-A-1 Certificates, up to an amount equal to the Accrued Certificate Interest on the Class III-A-1 Certificates; second, to the Class III-A-1 Certificates, up to an amount equal to the Super Senior Optimal Principal Distribution Amount for the Class III-A-1 Certificates, in reduction of the Certificate Principal Balance thereof, until the Certificate Principal Balance thereof has been reduced to zero; third, to the Class III-A-2 Certificates, up to an amount equal to the Accrued Certificate Interest thereon; and fourth, to the Class III-A-2 Certificates, the remainder, until the Certificate Principal Balance thereof has been reduced to zero.

(f)     After reduction of the Certificate Principal Balances of the Senior Certificates in a Certificate Group to zero but prior to the Credit Support Depletion Date, such class of Senior Certificates will be entitled to no further distributions of principal and the related Available Distribution Amount will be paid, subject to clause (d) above, solely to the holders of the Class M Certificates and Class B Certificates, in each case as described in this prospectus supplement.

**Principal Distributions on the Class M Certificates**

Holders of each class of the Class M Certificates will be entitled to receive on each distribution date, to the extent of the portion of the Available Distribution Amount for each loan group remaining after:

- the sum of the Senior Interest Distribution Amounts and Senior Principal Distribution Amounts is distributed;

- reimbursement is made to the master servicer for some Advances remaining unreimbursed following the final liquidation of the related mortgage loan to the extent described below under "—Advances";

- the aggregate amount of Accrued Certificate Interest and principal required to be distributed to any class of Class M Certificates having a higher payment priority on that distribution date is distributed to that class of Class M Certificates; and

- the aggregate amount of Accrued Certificate Interest required to be distributed to that class of Class M Certificates on that distribution date is distributed to those Class M Certificates, a distribution allocable to principal in the sum of the following:

>    (i)    such class's pro rata share, based on the Certificate Principal Balance of each class of Class M Certificates and Class B Certificates then outstanding, of the aggregate of the following amounts to the extent not included in the Senior Principal Distribution Amount for the related loan group:

>>    (1)    the principal portion of all scheduled monthly payments on the mortgage loans in the related loan group due during the related Due Period, whether or not received on or prior to the related determination date, less the principal portion of Debt Service Reductions, which together with other Bankruptcy Losses are in excess of the Bankruptcy Amount;

>>    (2)    the principal portion of all proceeds of the repurchase of a related mortgage loan or, in the case of a substitution, amounts representing a principal adjustment, as required by the pooling and servicing agreement during the preceding calendar month; and

>>    (3)    the principal portion of all other unscheduled collections received in respect of the mortgage loans in the related loan group, including Subsequent Recoveries, received during the preceding calendar month, other than full and partial mortgagor prepayments and any amounts received in connection with a Final Disposition of a related mortgage loan described in clause (ii) below, to the extent applied as recoveries of principal;

>    (ii)    that class's pro rata share, based on the Certificate Principal Balance of each class of Class M Certificates and Class B Certificates then outstanding, of all amounts received in connection with the Final Disposition of a related mortgage loan (x) that occurred during the preceding calendar month and (y) that did not result in any Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses or Extraordinary Losses, to the extent applied as recoveries of principal and to the extent not otherwise payable to the related Senior Certificates;

>    (iii)    the portion of mortgagor prepayments in full in the related loan group made by the respective mortgagors during the related Prepayment Period and the portion of partial mortgagor prepayments in the related loan group made by the respective mortgagors during the preceding calendar month allocable to that class of Class M Certificates as described in the third succeeding paragraph; and

>    (iv)    any amounts allocable to principal for any previous distribution date calculated pursuant to clauses (i) through (iii) above that remain undistributed to the extent that any of those amounts are not attributable to Realized Losses which were allocated to any class of Class M Certificates with a lower payment priority or the Class B Certificates; minus

(v)    the related Capitalization Reimbursement Amount for such distribution date multiplied by a fraction, the numerator of which is the principal distribution amount for such class of Class M Certificates, without giving effect to this clause (v), and the denominator of which is the sum of the principal distribution amounts for all classes of certificates derived from the related Available Distribution Amount without giving effect to any reductions for the related Capitalization Reimbursement Amount.

References in this prospectus supplement to "payment priority" of the Class M Certificates refer to a payment priority among those classes of certificates as follows: first, to the Class M-1 Certificates; second, to the Class M-2 Certificates; and third, to the Class M-3 Certificates.

As to each class of Class M Certificates, on any distribution date, any Accrued Certificate Interest thereon remaining unpaid from any previous distribution date will be distributable to the extent of available funds.  Notwithstanding the foregoing, if the Certificate Principal Balances of the Class B Certificates have been reduced to zero, on any distribution date, with respect to the class of Class M Certificates outstanding on that distribution date with a Certificate Principal Balance greater than zero with the lowest payment priority, Accrued Certificate Interest thereon remaining unpaid from any previous distribution date, except in the limited circumstances provided in the pooling and servicing agreement, will not be distributable.

All mortgagor prepayments not otherwise distributable to the Senior Certificates will be allocated on a pro rata basis among the class of Class M Certificates with the highest payment priority then outstanding with a Certificate Principal Balance greater than zero and each other class of Class M Certificates and Class B Certificates for which certain loss levels established for that class in the pooling and servicing agreement have not been exceeded.  The related loss level on any distribution date would be satisfied as to any Class M-2, Class M-3 or Class B Certificates, respectively, only if the sum of the current percentage interests in the mortgage pool evidenced by that class and each class, if any, subordinate thereto were at least equal to the sum of the initial percentage interests in the mortgage pool evidenced by that class and each class, if any, subordinate thereto.

As stated above under "—Principal Distributions on the Senior Certificates," each Senior Accelerated Distribution Percentage will be 100% during the first seven years after the closing date, unless

- the Certificate Principal Balances of the related Senior Certificates are reduced to zero before the end of that seven year period or

- the weighted average of the Subordinate Percentages for all three loan groups has doubled as described in the definition of "Senior Accelerated Distribution Percentage" and the related loss and delinquency conditions are met,

and will thereafter equal 100% whenever the weighted average of the Senior Percentages for all three loan groups, weighted on the basis of the Stated Principal Balances of the mortgage loans in the related loan groups, exceeds the weighted average of the initial Senior Percentages, calculated on such basis. Furthermore, as described in this prospectus supplement, subject to the events described above, each Senior Accelerated Distribution Percentage may exceed the related Senior Percentage during the eighth through eleventh years following the closing date, and scheduled reductions to each Senior Accelerated Distribution Percentage may be postponed due to the loss and delinquency experience of the mortgage loans in all three loan groups. Accordingly, each class of the Class M Certificates will not be entitled to any mortgagor prepayments for at least the first seven years after the closing date, unless the weighted average of the Subordinate Percentages for all three loan groups has doubled and the related loss and

delinquency conditions are met, or the Certificate Principal Balances of the related Senior Certificates have been reduced to zero before the end of such period and the mortgagor prepayments from the related loan group are not payable to the holders of the Senior Certificates relating to the other loan groups as described in clause (d) under "—Principal Distributions on the Senior Certificates" above, and may receive no mortgagor prepayments or a disproportionately small portion of mortgagor prepayments relative to the related Class M Percentage during certain periods after this seven year period. See "—Principal Distributions on the Senior Certificates" in this prospectus supplement.

## Allocation of Losses; Subordination

The subordination provided to the Senior Certificates by the Class B Certificates and Class M Certificates and the subordination provided to each class of Class M Certificates by the Class B Certificates and by any class of Class M Certificates subordinate thereto will cover Realized Losses on the mortgage loans that are Defaulted Mortgage Losses, Fraud Losses, Bankruptcy Losses and Special Hazard Losses. Any Realized Losses which are not Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses or Extraordinary Losses will be allocated as follows:

- *first*, to the Class B Certificates;

- *second*, to the Class M-3 Certificates;

- *third*, to the Class M-2 Certificates; and

- *fourth*, to the Class M-1 Certificates

in each case until the Certificate Principal Balance of that class of certificates has been reduced to zero; and thereafter, among all the remaining classes of related Senior Certificates on a pro rata basis; provided, however, that such losses otherwise allocable to the Class I-A-1 Certificates will be allocated to the Class I-A-2 Certificates until the Certificate Principal Balance of the Class I-A-2 Certificates has been reduced to zero; and such losses otherwise allocable to the Class III-A-1 Certificates will be allocated to the Class III-A-2 Certificates until the Certificate Principal Balance of the Class III-A-2 Certificates has been reduced to zero.

On any distribution date, Realized Losses will be allocated as described in this prospectus supplement after distributions of principal as described in this prospectus supplement.

Investors in the Senior Certificates should be aware that because the Class M Certificates and Class B Certificates represent interests in all three loan groups, the Certificate Principal Balances of the Class M Certificates and Class B Certificates could be reduced to zero as a result of a disproportionate amount of Realized Losses on the mortgage loans in one or more loan groups. Therefore, notwithstanding that Realized Losses on the mortgage loans in a loan group may only be allocated to the related Senior Certificates, the allocation to the Class M Certificates and Class B Certificates of Realized Losses on the mortgage loans in the other loan groups will reduce the subordination provided to such Senior Certificates by the Class M Certificates and Class B Certificates and increase the likelihood that Realized Losses on the mortgage loans in the related loan group may be allocated to any class of Senior Certificates.

Any allocation of a Realized Loss, other than a Debt Service Reduction, to a certificate will be made by reducing:

- its Certificate Principal Balance, in the case of the principal portion of the Realized Loss, in each case until the Certificate Principal Balance of that class has been reduced to zero, provided that no

reduction shall reduce the aggregate Certificate Principal Balance of the certificates below the aggregate stated principal balance of the mortgage loans; and

- the Accrued Certificate Interest thereon, in the case of the interest portion of the Realized Loss, by the amount so allocated as of the distribution date occurring in the month following the calendar month in which the Realized Loss was incurred.

In addition, any allocation of a Realized Loss to a Class M Certificate may also be made by operation of the payment priority to the Senior Certificates described under "—Principal Distributions on the Senior Certificates" and any class of Class M Certificates with a higher payment priority.

As used in this prospectus supplement, subordination refers to the provisions discussed above for the sequential allocation of Realized Losses among the various classes, as well as all provisions effecting those allocations including the priorities for distribution of cash flows in the amounts described in this prospectus supplement.

In instances in which a mortgage loan is in default or if default is reasonably foreseeable, and if determined by the master servicer to be in the best interest of the certificateholders, the master servicer or subservicer may permit servicing modifications of the mortgage loan rather than proceeding with foreclosure, as described under "Description of the Certificates—Servicing and Administration of Mortgage Collateral" in the prospectus. However, the master servicer's and the subservicer's ability to perform servicing modifications will be subject to some limitations, including but not limited to the following. Advances and other amounts may be added to the outstanding principal balance of a mortgage loan only once during the life of a mortgage loan. Any amounts added to the principal balance of the mortgage loan, or capitalized amounts added to the mortgage loan, will be required to be fully amortized over the remaining term of the mortgage loan. All capitalizations are to be implemented in accordance with Residential Funding's program guide and may be implemented only by subservicers that have been approved by the master servicer for that purpose. The final maturity of any mortgage loan shall not be extended beyond the assumed final distribution date. No servicing modification with respect to a mortgage loan will have the effect of reducing the mortgage rate below one-half of the mortgage rate as in effect on the cut-off date, but not less than the servicing fee rate. Further, the aggregate current principal balance of all mortgage loans subject to modifications can be no more than five percent (5%) of the aggregate principal balance of the mortgage loans as of the cut-off date, but this limit may increase from time to time with the consent of the rating agencies.

Any Advances made on any mortgage loan will be reduced to reflect any related servicing modifications previously made. The mortgage rate and Net Mortgage Rate as to any mortgage loan will be deemed not reduced by any servicing modification, so that the calculation of Accrued Certificate Interest payable on the offered certificates will not be affected by the servicing modification.

Allocations of the principal portion of Debt Service Reductions to each class of Class M Certificates and Class B Certificates will result from the priority of distributions of the related Available Distribution Amount as described in this prospectus supplement, which distributions shall be made first to the related Senior Certificates, second to the Class M Certificates in the order of their payment priority and third to the Class B Certificates. An allocation of the interest portion of a Realized Loss as well as the principal portion of Debt Service Reductions will not reduce the level of subordination, as that term is defined in this prospectus supplement, until an amount in respect thereof has been actually disbursed to the applicable Senior Certificateholders or the Class M Certificateholders, as applicable.

The holders of the offered certificates will not be entitled to any additional payments with respect to Realized Losses from amounts otherwise distributable on any classes of certificates subordinate

thereto. Accordingly, the subordination provided to the Senior Certificates and to each class of Class M Certificates by the respective classes of certificates subordinate thereto with respect to Realized Losses allocated on any distribution date will be effected primarily by increasing the related Senior Percentage, or the respective Class Certificates allocable share, of future distributions of principal of the remaining mortgage loans. Thus, the Senior Certificates will bear the entire amount of losses on the mortgage loans in the

related group that are not allocated to the Class M Certificates and Class B Certificates, which losses will be allocated among all classes of certificates in the related Certificate Group as described in this prospectus supplement.

Any Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses, Extraordinary Losses or other losses of a type not covered by subordination will be allocated on a pro rata basis as follows: (a) in the case of a Group I Loan, among the Group I Senior Certificates, the Class M Certificates and the Class B Certificates, (b) in the case of a Group II Loan, among the Group II Senior Certificates, the Class M Certificates and the Class B Certificates and (c) in the case of a Group III Loan, among the Group III Senior Certificates, the Class M Certificates and the Class B Certificates. The related Senior Percentage of those losses will be allocated among the related Senior Certificates on a pro rata basis. The related Subordinate Percentage of those losses will be allocated among the Class M-1, Class M-2, Class M-3, Class B-1, Class B-2 and Class B-3 Certificates on a pro rata basis.

An allocation of a Realized Loss on a "pro rata basis" among two or more classes of certificates means an allocation to each of those classes of certificates on the basis of its then outstanding Certificate Principal Balance prior to giving effect to distributions to be made on that distribution date in the case of an allocation of the principal portion of a Realized Loss, or based on the Accrued Certificate Interest thereon payable from the related loan group in respect of that distribution date in the case of an allocation of the interest portion of a Realized Loss.

In order to maximize the likelihood of distribution in full of the Senior Interest Distribution Amounts and Senior Principal Distribution Amounts, on each distribution date, holders of Senior Certificates have a right to distributions of the related Available Distribution Amount that is prior to the rights of the holders of the Class M Certificates and Class B Certificates, to the extent necessary to satisfy the related Senior Interest Distribution Amount and Senior Principal Distribution Amount. Similarly, holders of the Class M Certificates have a right to distributions of the related Available Distribution Amount prior to the rights of holders of the Class B Certificates and holders of any class of Class M Certificates with a lower payment priority. In addition, holders of the Class I-A-1 Certificates will have a right, on each distribution date occurring on or after the Credit Support Depletion Date, to that portion of the Available Distribution Amount otherwise allocable to the Class I-A-2 Certificates to the extent necessary to satisfy the Accrued Certificate Interest on the Class I-A-1 Certificates and the related Super Senior Optimal Principal Distribution Amount; and holders of the Class III-A-1 Certificates will have a right, on each distribution date occurring on or after the Credit Support Depletion Date, to that portion of the Available Distribution Amount otherwise allocable to the Class III-A-2 Certificates to the extent necessary to satisfy the Accrued Certificate Interest on the Class III-A-1 Certificates and the related Super Senior Optimal Principal Distribution Amount

The application of the related Senior Accelerated Distribution Percentage, when it exceeds the related Senior Percentage, to determine the applicable Senior Principal Distribution Amount will accelerate the amortization of the related Senior Certificates in the aggregate relative to the actual amortization of the mortgage loans in the related loan group. To the extent that the Senior Certificates in the aggregate are amortized faster than the mortgage loans in their respective loan groups, in the absence of offsetting Realized Losses allocated to the Class M Certificates and Class B Certificates, the

percentage interest evidenced by the Senior Certificates in the related loan group will be decreased, with a corresponding increase in the interest in the trust evidenced by the Class M Certificates and Class B Certificates, thereby increasing, relative to their respective Certificate Principal Balances, the subordination afforded the Senior Certificates by the Class M Certificates and Class B Certificates collectively. In addition, if losses on the mortgage loans exceed the amounts described in this prospectus supplement under "—Principal Distributions on the Senior Certificates," a greater percentage of full and partial mortgagor prepayments will be allocated to the Senior Certificates in the aggregate than would otherwise be the case, thereby accelerating the amortization of the Senior Certificates relative to the Class M Certificates and Class B Certificates.

Prior to the occurrence of the Credit Support Depletion Date but after the reduction of the Certificate Principal Balances of the Group I Senior Certificates, Group II Senior Certificates or Group III Senior Certificates to zero, the remaining Group I Senior Certificates, Group II Senior Certificates and Group III Senior Certificates, as applicable, will be entitled to receive, in addition to any mortgagor prepayments related to such certificates' respective loan group, 100% of the mortgagor prepayments on the mortgage loans in the loan groups related to the Senior Certificates that have been reduced to zero, subject to certain conditions as described under "—Principal Distributions on the Senior Certificates," thereby accelerating the amortization of such Senior Certificates relative to the Class M-1, Class M-2, Class M-3, Class B-1, Class B-2 and Class B-3 Certificates.

The priority of payments, including principal prepayments, among the Class M Certificates, as described in this prospectus supplement, also has the effect during some periods, in the absence of losses, of decreasing the percentage interest evidenced by any class of Class M Certificates with a higher payment priority, thereby increasing, relative to its Certificate Principal Balance, the subordination afforded to that class of the Class M Certificates by the Class B Certificates and any class of Class M Certificates with a lower payment priority.

The Special Hazard Amount shall initially be equal to $5,601,851. As of any date of determination following the cut-off date, the Special Hazard Amount shall equal $5,601,851 less the sum of (A) any amounts allocated through subordination relating to Special Hazard Losses and (B) the Adjustment Amount. The Adjustment Amount will be equal to an amount calculated under the terms of the pooling and servicing agreement.

The Fraud Loss Amount shall initially be equal to $16,805,552. As of any date of determination after the cut-off date, the Fraud Loss Amount shall equal an amount calculated under the terms of the pooling and servicing agreement.

The Bankruptcy Amount will initially be equal to $246,761. As of any date of determination prior to the first anniversary of the cut-off date, the Bankruptcy Amount will equal $246,761 less the sum of any amounts allocated through subordination for such losses up to such date of determination. As of any date of determination on or after the first anniversary of the cut-off date, the Bankruptcy Amount will equal the excess, if any, of (1) the lesser of (a) the Bankruptcy Amount as of the business day next preceding the most recent anniversary of the cut-off date and (b) an amount calculated under the terms of the pooling and servicing agreement, which amount as calculated will provide for a reduction in the Bankruptcy Amount, over (2) the aggregate amount of Bankruptcy Losses allocated solely to the Class M Certificates or Class B Certificates through subordination since that anniversary.

Notwithstanding the foregoing, the provisions relating to subordination will not be applicable in connection with a Bankruptcy Loss so long as the master servicer has notified the trustee in writing that:

- the master servicer is diligently pursuing any remedies that may exist in connection with the representations and warranties made regarding the related mortgage loan; and

  either:
- the related mortgage loan is not in default with regard to payments due thereunder; or

- delinquent payments of principal and interest under the related mortgage loan and any premiums on any applicable standard hazard insurance policy and any related escrow payments relating to that mortgage loan are being advanced on a current basis by the master servicer or a subservicer.

The Special Hazard Amount, Fraud Loss Amount and Bankruptcy Amount may be further reduced as described in the prospectus under "Subordination."

## Advances

Prior to each distribution date, the master servicer is required to make Advances of payments which were due on the mortgage loans on the Due Date in the related Due Period and not received on the business day next preceding the related determination date.

These Advances are required to be made only to the extent they are deemed by the master servicer to be recoverable from related late collections, Insurance Proceeds, Liquidation Proceeds or amounts otherwise payable to the holders of the Class B Certificates or Class M Certificates. The purpose of making these Advances is to maintain a regular cash flow to the certificateholders, rather than to guarantee or insure against losses. The master servicer will not be required to make any Advances with respect to reductions in the amount of the monthly payments on the mortgage loans due to Debt Service Reductions or the application of the Relief Act or similar legislation or regulations. Any failure by the master servicer to make an Advance as required under the pooling and servicing agreement will constitute an event of default thereunder, in which case the trustee, as successor master servicer, will be obligated to make any Advance, in accordance with the terms of the pooling and servicing agreement.

All Advances will be reimbursable to the master servicer on a first priority basis from either (a) late collections, Insurance Proceeds and Liquidation Proceeds from the mortgage loan as to which such unreimbursed Advance was made or (b) as to any Advance that remains unreimbursed in whole or in part following the final liquidation of the related mortgage loan, from any amounts otherwise distributable on any of the Class B Certificates or Class M Certificates; provided, however, that any Advances that were made with respect to delinquencies which ultimately were determined to be Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses or Extraordinary Losses are reimbursable to the master servicer out of any funds in the Custodial Account with respect to the related loan group prior to distributions on any of the certificates and the amount of those losses will be allocated as described in this prospectus supplement.

The effect of these provisions on any class of the Class M Certificates is that, with respect to any Advance which remains unreimbursed following the final liquidation of the related mortgage loan, the entire amount of the reimbursement for that Advance will be borne first by the holders of the Class B Certificates or any class of Class M Certificates having a lower payment priority to the extent that the reimbursement is covered by amounts otherwise distributable to those classes, and then by the holders of that class of Class M Certificates, except as provided above, to the extent of the amounts otherwise distributable to them. In addition, if the Certificate Principal Balances of the Class M Certificates and Class B Certificates have been reduced to zero, any Advances previously made which are deemed by the master servicer to be nonrecoverable from related late collections, Insurance Proceeds and Liquidation

Proceeds may be reimbursed to the master servicer out of any funds in the Custodial Account with respect to the related loan group prior to distributions on the Senior Certificates.

The pooling and servicing agreement provides that the master servicer may enter into a facility with any person which provides that such person, or the advancing person, may directly or indirectly fund Advances and/or Servicing Advances, although no such facility will reduce or otherwise affect the master servicer's obligation to fund these Advances and/or Servicing Advances. No facility will require the consent of the certificateholders or the trustee. Any Advances and/or Servicing Advances made by an advancing person would be reimbursed to the advancing person under the same provisions pursuant to which reimbursements would be made to the master servicer if those advances were funded by the master servicer, but on a priority basis in favor of the advancing person as opposed to the master servicer or any successor master servicer, and without being subject to any right of offset that the trustee or the trust might have against the master servicer or any successor master servicer.

## Certain Yield and Prepayment Considerations

### General

The yield to maturity on each class of offered certificates will be primarily affected by the following factors:

- the rate and timing of principal payments on the mortgage loans in the related loan group or groups, including prepayments, defaults and liquidations, and repurchases due to breaches of representations or warranties;

- the allocation of principal payments among the various classes of offered certificates;

- realized losses and interest shortfalls on the mortgage loans in the related loan group or groups;

- the pass-through rate on the offered certificates; and

- the purchase price paid for the offered certificates.

For additional considerations relating to the yields on the offered certificates, see "Yield Considerations" and "Maturity and Prepayment Considerations" in the prospectus.

### Prepayment Considerations

The yields to maturity and the aggregate amount of distributions on each class of the offered certificates will be affected by the rate and timing of principal payments on the mortgage loans in the related loan group or groups. The yields may be adversely affected by a higher or lower than anticipated rate of principal payments on the mortgage loans in the related loan group or groups. The rate of principal payments on the mortgage loans will in turn be affected by the amortization schedules of the mortgage loans, the rate and timing of mortgagor prepayments on the mortgage loans, liquidations of defaulted mortgage loans and purchases of mortgage loans due to breaches of some representations and warranties.

The timing of changes in the rate of prepayments, liquidations and purchases of the mortgage loans may significantly affect the yield to an investor, even if the average rate of principal payments experienced over time is consistent with an investor's expectation. In addition, the rate of prepayments of the mortgage loans and the yields to investors on the certificates may be affected by refinancing

programs, which may include general or targeted solicitations, as described under "Maturity and Prepayment Considerations" in the prospectus. Since the rate and timing of principal payments on the mortgage loans will depend on future events and on a variety of factors, as described in this prospectus supplement and in the prospectus under "Yield Considerations" and "Maturity and Prepayment Considerations", no assurance can be given as to the rate or the timing of principal payments on the offered certificates. The yields to maturity and rate and timing of principal payments on the Senior Certificates will only be affected by the rate and timing of payments on the mortgage loans in the related loan group, except under the limited circumstances described in this prospectus supplement.

The mortgage loans in most cases may be prepaid by the mortgagors at any time without payment of any prepayment fee or penalty, although approximately 16.6%, 44.1%, and 7.9% of the Group I Loans, Group II Loans and Group III Loans, respectively, by aggregate principal balance provide for payment of a prepayment charge, which may have a substantial effect on the rate of prepayment of those mortgage loans. See "Description of the Mortgage Pool—Mortgage Pool Characteristics" in this prospectus supplement.

Some state laws restrict the imposition of prepayment charges even when the mortgage loans expressly provide for the collection of those charges. It is possible that prepayment charges and late fees may not be collected even on mortgage loans that provide for the payment of these charges In any case, these amounts will not be available for distribution on the offered certificates. See "Certain Legal Aspects of Mortgage Loans and Contracts—Default Interest and Limitations on Prepayments" in the prospectus.

Prepayments, liquidations and purchases of the mortgage loans will result in distributions to holders of the related offered certificates of principal amounts which would otherwise be distributed over the remaining terms of the mortgage loans. Factors affecting prepayment, including defaults and liquidations, of mortgage loans include changes in mortgagors' housing needs, job transfers, unemployment, mortgagors' net equity in the mortgaged properties, changes in the value of the mortgaged properties, mortgage market interest rates, solicitations and servicing decisions. In addition, if prevailing mortgage rates fell significantly below the mortgage rates on the mortgage loans, the rate of prepayments, including refinancings, would be expected to increase. Also, when the mortgage rates on hybrid mortgage loans convert from fixed rates to adjustable rates, there may be an increase in prepayments, particularly if the new adjustable rate is higher than the fixed rate. Conversely, if prevailing mortgage rates rose significantly above the mortgage rates on the mortgage loans, the rate of prepayments on the mortgage loans would be expected to decrease.

The rate of defaults on the mortgage loans will also affect the rate and timing of principal payments on the mortgage loans. In general, defaults on mortgage loans are expected to occur with greater frequency in their early years. As a result of the program criteria and underwriting standards applicable to the mortgage loans, the mortgage loans may experience rates of delinquency, foreclosure, bankruptcy and loss that are higher than those experienced by mortgage loans that satisfy the standards applied by Fannie Mae and Freddie Mac first mortgage loan purchase programs, or by Residential Funding for the purpose of acquiring mortgage loans to collateralize securities issued by Residential Accredit Loans, Inc. For example, the rate of default on mortgage loans that are secured by non-owner occupied properties, mortgage loans made to borrowers whose income is not required to be provided or verified, mortgage loans made to borrowers with high debt-to-income ratios, and mortgage loans with high LTV ratios, may be higher than for other types of mortgage loans. See "Description of the Mortgage Pool—The Program" in this prospectus supplement. Furthermore, the rate and timing of prepayments, defaults and liquidations on the mortgage loans will be affected by the general economic condition of the region of the country in which the related mortgaged properties are located. The risk of delinquencies and loss is greater and prepayments are less likely in regions where a weak or deteriorating economy exists, as

may be evidenced by, among other factors, increasing unemployment or falling property values. See "Maturity and Prepayment Considerations" in the prospectus.

The mortgage loans typically are assumable under some circumstances if, in the sole judgment of the master servicer or the applicable subservicer, the prospective purchaser of a mortgaged property is creditworthy and the security for the mortgage loan is not impaired by the assumption.

Most of the mortgage loans contain due-on-sale clauses. The terms of the pooling and servicing agreement generally require the master servicer or any subservicer, as the case may be, to enforce any due-on-sale clause to the extent it has knowledge of the conveyance or the proposed conveyance of the underlying mortgaged property and to the extent permitted by applicable law, except that any enforcement action that would impair or threaten to impair any recovery under any related insurance policy will not be required or permitted.

Investors in the Class M Certificates should also be aware that on any distribution date on which the Senior Accelerated Distribution Percentage with respect to a loan group equals 100%, the Class M Certificates will not be entitled to distributions of mortgagor prepayments with respect to the related loan group for that distribution date and the weighted average lives of the Class M Certificates could be significantly affected thereby. In addition, under the circumstances described in clause (g) under the heading "Description of the Certificates—Principal Distributions on the Senior Certificates" in this prospectus supplement, mortgagor prepayments from a loan group otherwise distributable to the holders of the Class M Certificates will be distributed to the holders of the Senior Certificates related to the other loan groups, increasing the weighted average lives of the Class M Certificates.

## Allocation of Principal Payments

The yields to maturity on the offered certificates will be affected by the allocation of principal payments among the offered certificates. As described under "Description of the Certificates—Principal Distributions on the Senior Certificates" and "—Principal Distributions on the Class M Certificates" in this prospectus supplement, during specified periods all or a disproportionately large percentage of principal prepayments on the mortgage loans will be allocated among the related Senior Certificates and during specified periods no principal prepayments or, relative to the related pro rata share, a disproportionately small portion of principal prepayments on the mortgage loans will be distributed to each class of Class M Certificates. In addition to the foregoing, if on any distribution date, the loss level established for the Class M-2 Certificates or Class M-3 Certificates is exceeded and a class of Class M Certificates having a higher payment priority is then outstanding with a Certificate Principal Balance greater than zero, the Class M-2 Certificates or Class M-3 Certificates, as the case may be, will not receive distributions relating to principal prepayments on that distribution date.

Approximately 10.5% and 74.7% of the group I loans have an initial interest only period of three years and ten years, respectively. Approximately 10.5% and 74.5% of the group II loans have an initial interest only period of five years and ten years, respectively. Approximately 8.0%, and 75.1%, of the group III loans have an initial interest only period of seven years and ten years, respectively. During this period, the payment made by the related borrower will be less than it would be if the mortgage loan amortized. In addition, the mortgage loan balance will not be reduced by the principal portion of scheduled monthly payments during this period. As a result, no principal payments will be made to the related certificates from these mortgage loans during their interest only period except in the case of a prepayment.

*Certificates with Subordination Features*: After the Certificate Principal Balances of the Class B Certificates have been reduced to zero, the yield to maturity on the class of Class M Certificates with a

Certificate Principal Balance greater than zero with the lowest payment priority will be extremely sensitive to losses on the mortgage loans and the timing of those losses because the entire amount of losses that are covered by subordination will be allocated to that class of Class M Certificates. See "-Class M-2 and Class M-3 Certificate Yield Considerations" below. After the Credit Support Depletion Date, the yields to maturity of the Senior Support Certificates will be extremely sensitive to losses on the mortgage loans in the related loan group, and the timing thereof, because the entire amount of losses that would be allocable to the Class I-A-1 Certificates will be allocated to the Class I-A-2 Certificates, and the entire amount of losses that would be allocable to the Class III-A-1 Certificates will be allocated to the Class III-A-2 Certificates.

## Realized Losses and Interest Shortfalls

The yields to maturity and the aggregate amount of distributions on the offered certificates will be affected by the timing of mortgagor defaults resulting in Realized Losses on the related mortgage loans. The timing of Realized Losses on the mortgage loans and the allocation of Realized Losses to the related offered certificates could significantly affect the yield to an investor in the offered certificates. In addition, Realized Losses on the mortgage loans may affect the market value of the offered certificates, even if these losses are not allocated to the offered certificates.

After the Certificate Principal Balances of the Class B Certificates have been reduced to zero, the yield to maturity on the class of Class M Certificates then outstanding with a Certificate Principal Balance greater than zero with the lowest payment priority will be extremely sensitive to losses on the mortgage loans and the timing of those losses because the entire amount of losses that are covered by subordination will be allocated to that class of Class M Certificates. See "—Class M-2 and Class M-3 Certificate Yield Considerations" below. Furthermore, because principal distributions are paid to some classes of Senior Certificates and Class M Certificates before other classes, holders of classes having a later priority of payment bear a greater risk of losses than holders of classes having earlier priority for distribution of principal.

Investors in the Senior Certificates should be aware that because the Class M Certificates and Class B Certificates represent interests in all three loan groups, the Certificate Principal Balances of the Class M Certificates and Class B Certificates could be reduced to zero as a result of a disproportionate amount of Realized Losses on the mortgage loans in one or more loan groups. Therefore, notwithstanding that Realized Losses on the mortgage loans in one loan group may only be allocated to the related Senior Certificates, the allocation to the Class M Certificates and Class B Certificates of Realized Losses on the mortgage loans in the other loan groups will increase the likelihood that Realized Losses may be allocated to such Senior Certificates.

As described under "Description of the Certificates—Allocation of Losses; Subordination" and "—Advances," amounts otherwise distributable to holders of one or more classes of the Class M Certificates may be made available to protect the holders of the Senior Certificates and holders of any Class M Certificates with a higher payment priority against interruptions in distributions due to some mortgagor delinquencies, to the extent not covered by Advances. These delinquencies may affect the yields to investors on those classes of the Class M Certificates, and, even if subsequently cured, may affect the timing of the receipt of distributions by the holders of those classes of Class M Certificates. Similarly, if the Certificate Principal Balances of the Class M Certificates and Class B Certificates are reduced to zero, delinquencies on the mortgage loans to the extent not covered by Advances will affect the yields to investors on the Senior Support Certificates more than otherwise anticipated because the amount of any shortfall resulting from such delinquencies and otherwise attributable to a class of Super Senior Certificates will be borne by the related Senior Support Certificates to the extent those certificates are then outstanding as described in this prospectus supplement. In addition, a higher than expected rate

of delinquencies or losses will also affect the rate of principal payments on one or more classes of the Class M Certificates if it delays the scheduled reduction of the related Senior Accelerated Distribution Percentage or affects the allocation of prepayments among the Class M Certificates and Class B Certificates.

The amount of interest otherwise payable to holders of the offered certificates will be reduced by any interest shortfalls with respect to the related loan group or groups to the extent not covered by subordination or the master servicer, as described in this prospectus supplement, including Prepayment Interest Shortfalls and, in the case of each class of the Class M Certificates, the interest portions of Realized Losses allocated solely to that class of certificates. These shortfalls will not be offset by a reduction in the servicing fees payable to the master servicer or otherwise, except as described in this prospectus supplement with respect to Prepayment Interest Shortfalls. See "Yield Considerations" in the prospectus and "Description of the Certificates—Interest Distributions" in this prospectus supplement for a discussion of the effect of principal prepayments on the mortgage loans on the yield to maturity of the offered certificates and possible shortfalls in the collection of interest.

The yields to investors in the offered certificates will be affected by Prepayment Interest Shortfalls allocable thereto in the month preceding any distribution date to the extent that those shortfalls exceed the amount offset by the master servicer. See "Description of the Certificates—Interest Distributions" in this prospectus supplement.

The recording of mortgages in the name of MERS is a relatively new practice in the mortgage lending industry. While the depositor expects that the master servicer or applicable subservicer will be able to commence foreclosure proceedings on the mortgaged properties, when necessary and appropriate, public recording officers and others in the mortgage industry, however, may have limited, if any, experience with lenders seeking to foreclose mortgages, assignments of which are registered with MERS. Accordingly, delays and additional costs in commencing, prosecuting and completing foreclosure proceedings, defending litigation commenced by third parties and conducting foreclosure sales of the mortgaged properties could result. Those delays and additional costs could in turn delay the distribution of liquidation proceeds to the certificateholders and increase the amount of Realized Losses on the mortgage loans. In addition, if, as a result of MERS discontinuing or becoming unable to continue operations in connection with the MERS® System, it becomes necessary to remove any mortgage loan from registration on the MERS® System and to arrange for the assignment of the related mortgages to the trustee, then any related expenses shall be reimbursable by the trust to the master servicer, which will reduce the amount available to pay principal of and interest on the outstanding class or classes of certificates with a Certificate Principal Balance greater than zero with the lowest payment priorities. For additional information regarding the recording of mortgages in the name of MERS see "Description of the Mortgage Pool—Mortgage Pool Characteristics" in this prospectus supplement and "Description of the Certificates—Assignment of Trust Assets" in the prospectus.

**Purchase Price**

In addition, the yield to maturity on each class of the offered certificates will depend on, among other things, the price paid by the holders of the offered certificates and the related pass-through rate. The extent to which the yield to maturity of an offered certificate is sensitive to prepayments will depend, in part, upon the degree to which it is purchased at a discount or premium. In general, if a class of offered certificates is purchased at a premium and principal distributions thereon occur at a rate faster than assumed at the time of purchase, the investor's actual yield to maturity will be lower than anticipated at the time of purchase. Conversely, if a class of offered certificates is purchased at a discount and principal distributions thereon occur at a rate slower than assumed at the time of purchase, the investor's actual yield to maturity will be lower than anticipated at the time of purchase.

**Pass-Through Rates**

The Pass-Through Rates on each class of offered certificates is based on the weighted average of the Net Mortgage Rates of the related mortgage loans. Consequently, the prepayment of mortgage loans with higher mortgage rates may result in a lower Pass-Through Rate on those classes of offered certificates.

**Assumed Final Distribution Date**

The assumed final distribution date with respect to each class of the offered certificates is the distribution date in December 2035, which is the distribution date immediately following the latest scheduled maturity date for any mortgage loan. No event of default, change in the priorities for distribution among the various classes or other provisions under the pooling and servicing agreement will arise or become applicable solely by reason of the failure to retire the entire Certificate Principal Balance of any class of certificates on or before its assumed final distribution date.

**Weighted Average Life**

Weighted average life refers to the average amount of time that will elapse from the date of issuance of a security to the date of distribution to the investor of each dollar distributed in reduction of principal of the security. The weighted average life of the offered certificates will be influenced by, among other things, the rate at which principal of the mortgage loans is paid, which may be in the form of scheduled amortization, prepayments or liquidations.

Prepayments on mortgage loans are commonly measured relative to a prepayment standard or model. The model used in this prospectus supplement, CPR, represents a constant rate of prepayment each month relative to the then outstanding principal balance of a pool of mortgage loans. A 25% CPR assumes a constant prepayment rate of 25% per annum of the then outstanding principal balance of the mortgage loans. CPR does not purport to be a historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of mortgage loans, including the mortgage loans in this mortgage pool.

The table captioned "Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of CPR" has been prepared on the basis of assumptions as listed in this paragraph regarding the weighted average characteristics of the mortgage loans that are expected to be included in the trust as described in Annex I of this prospectus supplement and their performance. The table assumes, among other things, that: (i) as of the date of issuance of the offered certificates, the mortgage loans consist of the 54 following hypothetical mortgage loans:

## Mortgage Loan Assumptions

| Loan Number | Loan Group | Index | Mortgage Rate (%) | Net Mortgage Rate (%) | Principal Balance ($) | Remaining Term (Months) | Original Term to Maturity (Months) | Months to Next Rate Adjustment Date | Rate Adjustment Frequency (Months) | Gross Margin (%) | Minimum Mortgage Rate (%) | Maximum Mortgage Rate (%) | Initial Periodic Mortgage Rate Cap (%) | Subsequent Periodic Mortgage Rate Cap (%) | Original Interest Only Perio (Months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | I | 1 YEAR LIBOR | 6.133847183 | 5.833847183 | 6,960,740.96 | 359 | 360 | 35 | 12 | 3.073 | 3.073 | 12.134 | 2.000 | 2.000 | 0 |
| 2 | I | 1 YEAR LIBOR | 5.875000000 | 5.575000000 | 298,767.51 | 356 | 360 | 32 | 12 | 2.250 | 2.25 | 11.875 | 3.000 | 2.000 | 0 |
| 3 | I | 1 YEAR LIBOR | 5.927173162 | 5.627173162 | 7,824,595.34 | 358 | 360 | 34 | 12 | 2.376 | 2.376 | 11.927 | 2.000 | 2.000 | 36 |
| 4 | I | 1 YEAR LIBOR | 6.375000000 | 6.075000000 | 207,200.00 | 360 | 360 | 36 | 12 | 2.250 | 2.25 | 12.375 | 2.000 | 2.000 | 36 |
| 5 | I | 1 YEAR LIBOR | 6.179990567 | 5.879990567 | 50,151,196.67 | 359 | 360 | 35 | 12 | 2.765 | 2.765 | 12.180 | 2.481 | 2.000 | 120 |
| 6 | I | 1 YEAR LIBOR | 6.131542501 | 5.831542501 | 1,489,377.00 | 358 | 360 | 34 | 12 | 2.250 | 2.25 | 12.132 | 5.624 | 2.000 | 120 |
| 7 | I | 6 MONTH LIBOR | 5.371806363 | 5.005223471 | 6,204,349.88 | 355 | 360 | 31 | 6 | 2.848 | 2.848 | 11.322 | 3.419 | 1.273 | 0 |
| 8 | I | 6 MONTH LIBOR | 5.875000000 | 5.575000000 | 99,692.62 | 357 | 360 | 33 | 6 | 2.250 | 2.25 | 11.875 | 3.000 | 1.000 | 0 |
| 9 | I | 6 MONTH LIBOR | 6.028285079 | 5.728285079 | 1,287,585.96 | 356 | 360 | 32 | 6 | 3.443 | 3.443 | 12.318 | 5.385 | 1.774 | 0 |
| 10 | I | 6 MONTH LIBOR | 6.264851918 | 5.964851918 | 1,478,278.89 | 359 | 360 | 35 | 6 | 2.864 | 2.864 | 12.265 | 2.123 | 1.000 | 36 |
| 11 | I | 6 MONTH LIBOR | 5.875000000 | 5.575000000 | 511,300.00 | 356 | 360 | 32 | 6 | 3.250 | 3.25 | 11.875 | 3.000 | 1.000 | 36 |
| 12 | I | 6 MONTH LIBOR | 6.183962264 | 5.883962264 | 477,000.00 | 356 | 360 | 32 | 6 | 2.722 | 4.769 | 12.184 | 3.000 | 1.000 | 36 |
| 13 | I | 6 MONTH LIBOR | 5.902952644 | 5.600872240 | 10,875,288.96 | 358 | 360 | 34 | 6 | 2.533 | 2.533 | 11.884 | 4.512 | 1.330 | 120 |
| 14 | I | 6 MONTH LIBOR | 6.190362432 | 5.890362432 | 5,230,458.67 | 359 | 360 | 35 | 6 | 3.352 | 3.352 | 12.190 | 6.000 | 1.802 | 120 |
| 15 | I | 6 MONTH LIBOR | 6.278817299 | 5.978817299 | 2,266,000.00 | 357 | 360 | 33 | 6 | 2.971 | 2.971 | 12.279 | 4.676 | 1.000 | 120 |
| 16 | I | 6 MONTH LIBOR | 5.965649368 | 5.665649368 | 4,658,677.00 | 358 | 360 | 34 | 6 | 3.444 | 3.444 | 11.966 | 5.718 | 1.948 | 120 |
| 17 | I | 6 MONTH LIBOR | 5.625000000 | 5.325000000 | 140,000.00 | 359 | 360 | 35 | 6 | 2.750 | 2.75 | 11.625 | 6.000 | 1.000 | 120 |
| 18 | II | 1 YEAR LIBOR | 6.290272750 | 5.990272750 | 19,686,308.44 | 359 | 360 | 59 | 12 | 2.846 | 2.846 | 11.322 | 4.885 | 2.000 | 0 |
| 19 | II | 1 YEAR TRESURY | 6.625000000 | 6.325000000 | 552,000.00 | 358 | 360 | 60 | 12 | 2.750 | 2.75 | 11.625 | 5.000 | 2.000 | 0 |
| 20 | II | 1 YEAR LIBOR | 6.604061770 | 6.304061770 | 621,577.72 | 357 | 360 | 57 | 12 | 2.250 | 2.25 | 11.833 | 4.312 | 2.000 | 0 |
| 21 | II | 1 YEAR LIBOR | 6.300499471 | 6.000499471 | 897,686.97 | 355 | 360 | 55 | 12 | 2.703 | 2.703 | 11.417 | 5.116 | 2.000 | 0 |
| 22 | II | 1 YEAR LIBOR | 6.188974604 | 5.888974604 | 25,880,536.84 | 358 | 360 | 58 | 12 | 2.518 | 2.518 | 11.311 | 4.655 | 2.000 | 60 |
| 23 | II | 1 YEAR LIBOR | 6.114435262 | 5.814435262 | 10,918,517.93 | 357 | 360 | 57 | 12 | 2.559 | 2.777 | 11.801 | 4.853 | 2.000 | 60 |
| 24 | II | 1 YEAR LIBOR | 6.000000000 | 5.700000000 | 200,000.00 | 356 | 360 | 56 | 12 | 4.000 | 4 | 11.000 | 5.000 | 2.000 | 60 |
| 25 | II | 1 YEAR LIBOR | 6.223638044 | 5.923638044 | 116,631,855.14 | 359 | 360 | 59 | 12 | 2.643 | 2.643 | 11.662 | 5.432 | 2.000 | 120 |
| 26 | II | 1 YEAR LIBOR | 6.329975198 | 6.029975198 | 608,006.47 | 358 | 360 | 58 | 12 | 2.250 | 2.25 | 11.555 | 5.225 | 2.000 | 120 |
| 27 | II | 1 YEAR LIBOR | 6.041815421 | 5.741815421 | 23,809,205.68 | 358 | 360 | 58 | 12 | 2.294 | 2.294 | 11.713 | 5.669 | 2.000 | 120 |
| 28 | II | 6 MONTH LIBOR | 6.287326144 | 5.987326144 | 17,741,568.25 | 358 | 360 | 58 | 6 | 2.527 | 2.586 | 12.187 | 5.828 | 1.435 | 0 |
| 29 | II | 6 MONTH LIBOR | 6.000000000 | 5.700000000 | 174,474.75 | 357 | 360 | 57 | 6 | 3.250 | 3.25 | 11.000 | 5.000 | 1.000 | 0 |
| 30 | II | 6 MONTH LIBOR | 6.036729419 | 5.736729419 | 5,913,394.93 | 357 | 360 | 57 | 6 | 2.873 | 2.873 | 11.980 | 5.944 | 1.052 | 0 |
| 31 | II | 6 MONTH LIBOR | 5.974847908 | 5.607786036 | 2,918,433.42 | 356 | 360 | 56 | 6 | 2.904 | 2.904 | 11.788 | 5.813 | 1.102 | 0 |
| 32 | II | 6 MONTH LIBOR | 5.986521619 | 5.682206836 | 11,117,154.44 | 357 | 360 | 57 | 6 | 2.697 | 2.697 | 11.928 | 5.891 | 1.497 | 0 |
| 33 | II | 6 MONTH LIBOR | 5.923987214 | 5.623987214 | 1,850,329.04 | 357 | 360 | 57 | 6 | 2.711 | 2.711 | 11.846 | 5.922 | 1.000 | 0 |
| 34 | II | 6 MONTH LIBOR | 6.053878575 | 5.753878575 | 1,337,825.49 | 356 | 360 | 56 | 6 | 2.434 | 2.986 | 11.421 | 5.368 | 1.561 | 60 |
| 35 | II | 6 MONTH LIBOR | 5.666213200 | 5.366213200 | 540,789.09 | 355 | 360 | 55 | 6 | 2.669 | 2.669 | 11.001 | 5.335 | 1.335 | 60 |
| 36 | II | 6 MONTH LIBOR | 6.250000000 | 5.950000000 | 300,700.00 | 355 | 360 | 55 | 6 | 2.250 | 2.25 | 11.250 | 5.000 | 1.000 | 60 |
| 37 | II | 6 MONTH LIBOR | 6.096962503 | 5.796962503 | 3,496,607.46 | 356 | 360 | 56 | 6 | 2.738 | 2.813 | 11.295 | 4.981 | 1.198 | 60 |
| 38 | II | 6 MONTH LIBOR | 6.127249357 | 5.827249357 | 466,800.00 | 357 | 360 | 57 | 6 | 2.250 | 3.332 | 11.127 | 5.000 | 1.000 | 60 |
| 39 | II | 6 MONTH LIBOR | 6.181698184 | 5.881698184 | 47,327,583.32 | 358 | 360 | 58 | 6 | 2.561 | 2.561 | 11.972 | 5.714 | 1.334 | 120 |
| 40 | II | 6 MONTH LIBOR | 5.750000000 | 5.450000000 | 171,900.00 | 359 | 360 | 59 | 6 | 2.250 | 2.25 | 11.750 | 6.000 | 2.000 | 120 |
| 41 | II | 6 MONTH LIBOR | 6.146902269 | 5.838897699 | 41,303,280.32 | 357 | 360 | 57 | 6 | 2.879 | 2.879 | 12.142 | 5.995 | 1.179 | 120 |
| 42 | II | 6 MONTH LIBOR | 6.085752710 | 5.785752710 | 11,942,775.94 | 357 | 360 | 57 | 6 | 2.732 | 2.877 | 12.049 | 5.964 | 1.000 | 120 |
| 43 | II | 6 MONTH LIBOR | 6.129283547 | 5.826403938 | 50,820,942.98 | 357 | 360 | 57 | 6 | 2.859 | 2.878 | 12.117 | 5.951 | 1.263 | 120 |
| 44 | II | 6 MONTH LIBOR | 6.093576140 | 5.793576140 | 12,787,372.06 | 357 | 360 | 57 | 6 | 2.709 | 2.747 | 12.005 | 5.912 | 1.009 | 120 |
| 45 | III | 1 YEAR LIBOR | 6.546903406 | 6.246903406 | 8,359,435.25 | 359 | 360 | 83 | 12 | 3.184 | 3.184 | 12.480 | 5.934 | 2.000 | 0 |
| 46 | III | 1 YEAR LIBOR | 6.097423390 | 5.797423390 | 3,103,826.00 | 358 | 360 | 82 | 12 | 2.452 | 2.452 | 11.238 | 5.141 | 2.000 | 84 |
| 47 | III | 1 YEAR LIBOR | 6.393188966 | 6.093188966 | 32,105,557.59 | 359 | 360 | 83 | 12 | 3.118 | 3.118 | 12.343 | 5.950 | 2.000 | 120 |

| 48 | III | 1 YEAR LIBOR | 6.429227941 | 6.129227941 | 1,632,000.00 | 359 | 360 | 83 | 12 | 2.250 | 2.25 | 12.429 | 6.000 | 2.000 | 120 |
| 49 | III | 6 MONTH LIBOR | 6.125000000 | 5.825000000 | 111,200.00 | 360 | 360 | 84 | 6 | 2.250 | 2.25 | 11.125 | 5.000 | 1.000 | 0 |
| 50 | III | 6 MONTH LIBOR | 6.750000000 | 6.450000000 | 474,500.00 | 360 | 360 | 84 | 6 | 2.750 | 2.75 | 12.750 | 6.000 | 1.000 | 84 |
| 51 | III | 6 MONTH LIBOR | 5.500000000 | 5.200000000 | 400,000.00 | 355 | 360 | 79 | 6 | 3.748 | 3.748 | 10.500 | 5.000 | 1.000 | 84 |
| 52 | III | 6 MONTH LIBOR | 6.026227562 | 5.726227562 | 1,916,400.00 | 358 | 360 | 82 | 6 | 2.423 | 2.423 | 11.665 | 5.639 | 1.293 | 120 |
| 53 | III | 6 MONTH LIBOR | 6.625000000 | 6.325000000 | 876,000.00 | 358 | 360 | 82 | 6 | 2.750 | 2.75 | 12.625 | 6.000 | 1.000 | 120 |
| 54 | III | 6 MONTH LIBOR | 6.500000000 | 6.200000000 | 1,028,000.00 | 358 | 360 | 82 | 6 | 2.750 | 2.75 | 12.500 | 6.000 | 1.000 | 120 |

S-65

(ii) the scheduled monthly payment for each mortgage loan has been based on its outstanding balance, mortgage rate and remaining term to maturity, so that the mortgage loan will amortize in amounts sufficient for its repayment over its remaining term to maturity, except in the case of hypothetical loan numbers for which the scheduled monthly payment up to these loans' remaining interest only period will be equal to the amount of interest due thereon at the respective mortgage rate only, and thereafter will amortize in amounts sufficient for repayment over their remaining term to maturity; (iii) none of the unaffiliated sellers, Residential Funding or the depositor will repurchase any mortgage loan, as described under "Mortgage Loan Program—Representations with Respect to Mortgage Loans" and "Description of the Certificates—Assignment of the Trust Assets" in the prospectus, and the master servicer does not exercise any option to purchase the mortgage loans and thereby cause a termination of the trust; (iv) there are no delinquencies or Realized Losses on the mortgage loans, and principal payments on the mortgage loans will be timely received together with prepayments, if any, at the respective constant percentages of CPR set forth in the table; (v) there is no Prepayment Interest Shortfall or any other interest shortfall in any month; (vi) payments on the certificates will be received on the 25th day of each month, commencing in January 2006; (vii) payments on the mortgage loans earn no reinvestment return; (viii) there are no additional ongoing trust expenses payable out of the trust; (ix) the certificates will be purchased on December 29, 2005; and (x) the One-Year LIBOR Index, the Six-Month LIBOR Index and the One-Year U.S. Treasury Index remain constant at 4.8100%, 4.6669% and 4.3200%, respectively. Clauses (i) through (x) above are collectively referred to as the structuring assumptions.

The actual characteristics and performance of the mortgage loans will differ from the assumptions used in constructing the table below, which is hypothetical in nature and is provided only to give a general sense of how the principal cash flows might behave under varying prepayment scenarios. For example, it is very unlikely that the mortgage loans will prepay at a constant level of CPR until maturity or that all of the mortgage loans will prepay at the same level of CPR. Moreover, the diverse remaining terms to maturity and mortgage rates of the mortgage loans could produce slower or faster principal distributions than indicated in the table at the various constant percentages of CPR specified, even if the weighted average remaining term to maturity and weighted average mortgage rate of the mortgage loans are as assumed. Any difference between the assumptions and the actual characteristics and performance of the mortgage loans, or actual prepayment or loss experience, will affect the percentages of initial Certificate Principal Balances outstanding over time and the weighted average lives of the classes of offered certificates.

In accordance with the foregoing discussion and assumptions, the following table indicates the weighted average life of each class of offered certificates, other than the Residual Certificates, and sets forth the percentages of the initial Certificate Principal Balance of each class of offered certificates, other than the Residual Certificates, that would be outstanding after each of the distribution dates at the various percentages of CPR shown.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of CPR**

| Distribution Date | Class I-A-1 and Class I-A-2 | | | | | Class II-A-1 | | | | | Class III-A-1 and Class III-A-2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 10% | 20% | 25% | 35% | 50% | 10% | 20% | 25% | 35% | 50% | 10% | 20% | 25% | 35% | 50% |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| December 25, 2006 | 89 | 78 | 73 | 62 | 46 | 89 | 78 | 73 | 62 | 46 | 89 | 78 | 73 | 62 | 46 |
| December 25, 2007 | 79 | 61 | 53 | 38 | 21 | 79 | 61 | 53 | 38 | 21 | 79 | 61 | 53 | 38 | 21 |
| December 25, 2008 | 70 | 47 | 38 | 24 | 9 | 70 | 47 | 38 | 24 | 9 | 70 | 47 | 38 | 24 | 9 |
| December 25, 2009 | 62 | 37 | 29 | 15 | 5 | 63 | 37 | 29 | 15 | 5 | 62 | 37 | 29 | 15 | 5 |
| December 25, 2010 | 55 | 30 | 21 | 10 | 2 | 55 | 30 | 21 | 10 | 2 | 55 | 30 | 21 | 10 | 2 |
| December 25, 2011 | 49 | 24 | 16 | 6 | 1 | 49 | 24 | 16 | 6 | 1 | 49 | 24 | 16 | 6 | 1 |
| December 25, 2012 | 43 | 19 | 12 | 4 | 1 | 43 | 19 | 12 | 4 | 1 | 43 | 19 | 12 | 4 | 1 |
| December 25, 2013 | 39 | 15 | 9 | 3 | * | 39 | 15 | 9 | 3 | * | 39 | 15 | 9 | 3 | * |
| December 25, 2014 | 35 | 12 | 7 | 2 | * | 35 | 12 | 7 | 2 | * | 35 | 12 | 7 | 2 | * |
| December 25, 2015 | 31 | 10 | 5 | 1 | * | 31 | 10 | 5 | 1 | * | 31 | 10 | 5 | 1 | * |
| December 25, 2016 | 27 | 7 | 4 | 1 | * | 27 | 7 | 4 | 1 | * | 28 | 8 | 4 | 1 | * |
| December 25, 2017 | 24 | 6 | 3 | * | * | 24 | 6 | 3 | * | * | 24 | 6 | 3 | * | * |
| December 25, 2018 | 21 | 5 | 2 | * | * | 21 | 5 | 2 | * | * | 21 | 5 | 2 | * | * |
| December 25, 2019 | 18 | 4 | 1 | * | * | 18 | 4 | 1 | * | * | 18 | 4 | 1 | * | * |
| December 25, 2020 | 16 | 3 | 1 | * | * | 16 | 3 | 1 | * | * | 16 | 3 | 1 | * | * |
| December 25, 2021 | 14 | 2 | 1 | * | * | 14 | 2 | 1 | * | * | 14 | 2 | 1 | * | * |
| December 25, 2022 | 12 | 2 | 1 | * | * | 12 | 2 | 1 | * | * | 12 | 2 | 1 | * | * |
| December 25, 2023 | 10 | 1 | * | * | * | 10 | 1 | * | * | * | 10 | 1 | * | * | * |
| December 25, 2024 | 9 | 1 | * | * | * | 9 | 1 | * | * | * | 9 | 1 | * | * | * |
| December 25, 2025 | 7 | 1 | * | * | * | 7 | 1 | * | * | * | 7 | 1 | * | * | * |
| December 25, 2026 | 6 | 1 | * | * | * | 6 | 1 | * | * | * | 6 | 1 | * | * | * |
| December 25, 2027 | 5 | * | * | * | * | 5 | * | * | * | * | 5 | * | * | * | * |
| December 25, 2028 | 4 | * | * | * | * | 4 | * | * | * | * | 4 | * | * | * | * |
| December 25, 2029 | 3 | * | * | * | * | 3 | * | * | * | * | 3 | * | * | * | * |
| December 25, 2030 | 3 | * | * | * | * | 3 | * | * | * | * | 3 | * | * | * | * |
| December 25, 2031 | 2 | * | * | * | * | 2 | * | * | * | * | 2 | * | * | * | * |
| December 25, 2032 | 1 | * | * | * | * | 1 | * | * | * | * | 1 | * | * | * | * |
| December 25, 2033 | 1 | * | * | * | * | 1 | * | * | * | * | 1 | * | * | * | * |
| December 25, 2034 | * | * | * | * | * | * | * | * | * | * | * | * | * | * | 0 |
| December 25, 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years) | 7.9 | 4.2 | 3.3 | 2.2 | 1.3 | 7.9 | 4.2 | 3.3 | 2.2 | 1.3 | 7.9 | 4.2 | 3.3 | 2.2 | 1.3 |

\*    Indicates a number that is greater than zero but less than 0.5%.
\*\*   The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

**This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the mortgage loans which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.**

*(Table continued on next page.)*

### Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of CPR

| Distribution Date | Class M-1, Class M-2 and Class M-3 | | | | |
|---|---|---|---|---|---|
| | 10% | 20% | 25% | 35% | 50% |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| December 25, 2006 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2007 | 100 | 100 | 100 | 93 | 73 |
| December 25, 2008 | 99 | 99 | 91 | 75 | 52 |
| December 25, 2009 | 99 | 82 | 68 | 48 | 26 |
| December 25, 2010 | 99 | 66 | 51 | 31 | 13 |
| December 25, 2011 | 99 | 52 | 38 | 20 | 6 |
| December 25, 2012 | 94 | 42 | 29 | 13 | 3 |
| December 25, 2013 | 84 | 33 | 21 | 9 | 2 |
| December 25, 2014 | 75 | 26 | 16 | 6 | 1 |
| December 25, 2015 | 67 | 21 | 12 | 4 | * |
| December 25, 2016 | 59 | 16 | 9 | 2 | * |
| December 25, 2017 | 52 | 13 | 6 | 1 | * |
| December 25, 2018 | 46 | 10 | 5 | 1 | * |
| December 25, 2019 | 40 | 8 | 3 | 1 | * |
| December 25, 2020 | 34 | 6 | 2 | * | * |
| December 25, 2021 | 30 | 5 | 2 | * | * |
| December 25, 2022 | 26 | 4 | 1 | * | * |
| December 25, 2023 | 22 | 3 | 1 | * | * |
| December 25, 2024 | 19 | 2 | 1 | * | * |
| December 25, 2025 | 16 | 2 | * | * | * |
| December 25, 2026 | 13 | 1 | * | * | * |
| December 25, 2027 | 11 | 1 | * | * | * |
| December 25, 2028 | 9 | 1 | * | * | * |
| December 25, 2029 | 7 | * | * | * | * |
| December 25, 2030 | 5 | * | * | * | * |
| December 25, 2031 | 4 | * | * | * | * |
| December 25, 2032 | 3 | * | * | * | * |
| December 25, 2033 | 2 | * | * | * | * |
| December 25, 2034 | 1 | * | * | * | * |
| December 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years) | 13.7 | 7.5 | 6.1 | 4.6 | 3.3 |

\* Indicates a number that is greater than zero but less than 0.5%.

\*\* The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from any date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

**This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the mortgage loans which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.**

(Table continued from previous page.)

## Class M-2 and Class M-3 Certificate Yield Considerations

If the aggregate Certificate Principal Balance of the Class B Certificates is reduced to zero, the yield to maturity on the Class M-3 Certificates will become extremely sensitive to losses on the mortgage loans and the timing of those losses that are covered by subordination, because the entire amount of those losses will be allocated to the Class M-3 Certificates.

The aggregate initial Certificate Principal Balance of the Class B Certificates is equal to approximately 1.90% of the aggregate principal balance of the mortgage loans in all three loan groups as of the cut-off date, after deducting payments of principal due during the month of the cut-off date. If the Certificate Principal Balances of the Class B Certificates and Class M-3 Certificates have been reduced to zero, the yield to maturity on the Class M-2 Certificates will become extremely sensitive to losses on the mortgage loans and the timing of those losses that are covered by subordination, because the entire amount of those losses will be allocated to the Class M-2 Certificates. The aggregate initial Certificate Principal Balance of the Class M-3 Certificates and Class B Certificates is equal to approximately 2.70% of the aggregate principal balance of the mortgage loans in all three groups as of the cut-off date, after deducting payments of principal due during the month of the cut-off date.

Defaults on mortgage loans may be measured relative to a default standard or model. The model used in this prospectus supplement, the standard default assumption, represents an assumed rate of default each month relative to the then outstanding performing principal balance of a pool of new mortgage loans. A default assumption of 100% SDA assumes constant default rates of 0.02% per annum of the then outstanding principal balance of the mortgage loans in the first month of the life of the mortgage loans and an additional 0.02% per annum in each month thereafter until the 30th month. Beginning in the 30th month and in each month thereafter through the 60th month of the life of the mortgage loans, 100% SDA assumes a constant default rate of 0.60% per annum each month. Beginning in the 61st month and in each month thereafter through the 120th month of the life of the mortgage loans, 100% SDA assumes that the constant default rate declines each month by 0.0095% per annum, and that the constant default rate remains at 0.03% per annum in each month after the 120th month. For the purposes of the tables below, it is assumed that there is no delay between the default and liquidation of the mortgage loans. As used in the table below, "0% SDA" assumes default rates equal to 0% of SDA—no defaults. Correspondingly, "200% SDA" assumes default rates equal to 200% of SDA, and so forth. SDA does not purport to be a historical description of default experience or a prediction of the anticipated rate of default of any pool of mortgage loans, including the mortgage loans in this mortgage pool.

The following tables indicate the sensitivity of the pre-tax yields to maturity on the Class M-2 Certificates and Class M-3 Certificates to various rates of prepayment and varying levels of aggregate Realized Losses by projecting the monthly aggregate cash flows on the Class M-2 Certificates and Class M-3 Certificates and computing the corresponding pre-tax yields to maturity on a corporate bond equivalent basis. The tables are based on the structuring assumptions, except assumption (iv), including the assumptions regarding the characteristics and performance of the mortgage loans, which differ from their actual characteristics and performance, and assuming further that:

- final liquidation of each mortgage loan occurs on the last day of the month after the related default at the respective SDA percentages set forth in the tables;

- each liquidation results in a Realized Loss allocable to principal equal to the percentage indicated, the loss severity percentage, multiplied by the principal balances of the mortgage loans assumed to be liquidated;

- there are no delinquencies on the mortgage loans, and principal payments on the mortgage loans, other than those on mortgage loans assumed to be liquidated, will be timely received together with prepayments, if any, at the respective constant percentages of CPR set forth in the table;

- there are no Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses or Extraordinary Losses;

- clause (a) in the definition of the Senior Accelerated Distribution Percentage is not applicable;

- clause (2) in the last sentence of the first paragraph of clause (d) under "Description of Certificates-Principal Distribution on the Senior Certificates" does not apply; and

- the purchase prices of the Class M-2 Certificates and Class M-3 Certificates will be approximately $8,336,309 and $4,351,440, respectively, including accrued interest.

Investors should also consider the possibility that aggregate losses incurred may not in fact be materially reduced by higher prepayment speeds because mortgage loans that would otherwise ultimately default and be liquidated may be less likely to be prepaid. In addition, investors should be aware that the following tables are based upon the assumption that the Class M-2 Certificates and Class M-3 Certificates are priced at a discount. Since prepayments will occur at par, the yields on the Class M-2 Certificates and Class M-3 Certificates may increase due to those prepayments, even if losses occur. Any differences between the assumptions and the actual characteristics and performance of the mortgage loans and of the certificates may result in yields different from those shown in the tables. Discrepancies between assumed and actual characteristics and performance underscore the hypothetical nature of the tables, which are provided only to give a general sense of the sensitivity of yields in varying Realized Loss and prepayment scenarios.

### Sensitivity of Pre-Tax Yield to Maturity of the Class M-2 Certificates and Class M-3 Certificates to Prepayments and Realized Losses

### Class M-2 Certificates

| Percentage of SDA | Loss Severity Percentage | Percentage of CPR | | | | |
|---|---|---|---|---|---|---|
| | | 10% | 20% | 25% | 35% | 50% |
| 0%.................. | N/A | 6.77% | 6.55% | 6.48% | 6.40% | 6.36% |
| 100%............ | 30% | 6.78% | 6.55% | 6.47% | 6.39% | 6.36% |
| 200%............ | 30% | 6.79% | 6.55% | 6.47% | 6.39% | 6.36% |
| 300%............ | 30% | 6.79% | 6.56% | 6.48% | 6.39% | 6.36% |
| 400%............ | 30% | 6.13% | 6.56% | 6.47% | 6.38% | 6.35% |

### Class M-3 Certificates

| Percentage of SDA | Loss Severity Percentage | Percentage of CPR | | | | |
|---|---|---|---|---|---|---|
| | | 10% | 20% | 25% | 35% | 50% |
| 0%............... | N/A | 7.02% | 6.93% | 6.93% | 6.96% | 7.12% |
| 100%............ | 30% | 7.02% | 6.93% | 6.93% | 6.96% | 7.12% |
| 200%............ | 30% | 7.03% | 6.93% | 6.92% | 6.97% | 7.12% |
| 300%............ | 30% | 4.66% | 6.93% | 6.93% | 6.97% | 7.13% |
| 400%............ | 30% | (23.95)% | 6.94% | 6.92% | 6.96% | 7.13% |

Each pre-tax yield to maturity listed in the preceding tables was calculated by determining the monthly discount rate which, when applied to the assumed stream of cash flows to be paid on the Class M-2 Certificates or Class M-3 Certificates, as applicable, would cause the discounted present value of the assumed stream of cash flows to equal the assumed purchase price referred to above, and converting that rate to a corporate bond equivalent yield. Accrued interest is included in the assumed purchase price and is used in computing the corporate bond equivalent yields shown. These yields do not take into account the different interest rates at which investors may be able to reinvest funds received by them as distributions on the Class M-2 Certificates or Class M-3 Certificates, and thus do not reflect the return on any investment in the Class M-2 Certificates or Class M-3 Certificates when any reinvestment rates other than the discount rates set forth in the preceding tables are considered.

The following table sets forth the amount of Realized Losses that would be incurred with respect to the certificates in the aggregate under each of the scenarios in the preceding tables, expressed as a percentage of the aggregate outstanding principal balance of the mortgage loans as of the cut-off date, after deducting payments of principal due during the month of the cut-off date:

### Aggregate Realized Losses

| Percentage of SDA | Loss Severity Percentage | Percentage of CPR | | | | |
|---|---|---|---|---|---|---|
| | | 10% | 20% | 25% | 35% | 50% |
| 100%............ | 30% | 0.75% | 0.48% | 0.39% | 0.26% | 0.14% |
| 200%............ | 30% | 1.47% | 0.95% | 0.77% | 0.51% | 0.28% |
| 300%............ | 30% | 2.17% | 1.41% | 1.14% | 0.76% | 0.42% |
| 400%............ | 30% | 2.86% | 1.86% | 1.51% | 1.01% | 0.55% |

Notwithstanding the assumed percentages of SDA, loss severity and prepayment reflected in the preceding table, it is highly unlikely that the mortgage loans will be prepaid or that Realized Losses will be incurred according to one particular pattern. For this reason, and because the timing of cash flows is critical to determining yields, the actual pre-tax yields to maturity on the Class M-2 Certificates and Class M-3 Certificates are likely to differ from those shown in the tables. There can be no assurance that the mortgage loans will prepay at any particular rate or that Realized Losses will be incurred at any particular level or that the yields on the Class M-2 Certificates or Class M-3 Certificates will conform to the yields described in this prospectus supplement. Moreover, the various remaining terms to maturity and mortgage rates of the mortgage loans could produce slower or faster principal distributions than indicated in the preceding tables at the various constant percentages of CPR specified, even if the weighted average remaining term to maturity and weighted average mortgage rate of the mortgage loans are as assumed.

S-71

Investors are urged to make their investment decisions based on their determinations as to anticipated rates of prepayment and Realized Losses under a variety of scenarios. Investors in the Class M-2 Certificates and particularly in the Class M-3 Certificates should fully consider the risk that Realized Losses on the mortgage loans could result in the failure of those investors to fully recover their investments. For additional considerations relating to the yields on the certificates, see "Yield Considerations" and "Maturity and Prepayment Considerations" in the prospectus.

## Additional Yield Considerations Applicable Solely to the Residual Certificates

The Residual Certificateholders' after-tax rate of return on their Residual Certificates will reflect their pre-tax rate of return, reduced by the taxes required to be paid with respect to the Residual Certificates. Holders of Residual Certificates may have tax liabilities with respect to their Residual Certificates during the early years of the trust's term that substantially exceed any distributions payable thereon during any such period. In addition, holders of Residual Certificates may have tax liabilities with respect to their Residual Certificates the present value of which substantially exceeds the present value of distributions payable thereon and of any tax benefits that may arise with respect thereto. Accordingly, the after-tax rate of return on the Residual Certificates may be negative or may otherwise be significantly adversely affected. The timing and amount of taxable income attributable to the Residual Certificates will depend on, among other things, the timing and amounts of prepayments and losses experienced on the mortgage loans in the related loan group.

The Residual Certificateholders should consult their tax advisors as to the effect of taxes and the receipt of any payments made to those holders in connection with the purchase of the Residual Certificates on after-tax rates of return on the Residual Certificates. See "Material Federal Income Tax Consequences" in this prospectus supplement and "Material Federal Income Tax Consequences" in the prospectus.

# Pooling and Servicing Agreement

## General

The certificates will be issued under a series supplement, dated as of December 1, 2005, to the standard terms of pooling and servicing agreement, dated as of August 1, 2004, together referred to as the pooling and servicing agreement, among the depositor, the master servicer, and Deutsche Bank Trust Company Americas, as trustee. Reference is made to the prospectus for important information in addition to that described herein regarding the terms and conditions of the pooling and servicing agreement and the offered certificates. The trustee will appoint Wells Fargo Bank, National Association to serve as custodian for the mortgage loans. The offered certificates will be transferable and exchangeable at the corporate trust office of the trustee, which will serve as certificate registrar and paying agent. The depositor will provide a prospective or actual certificateholder without charge, on written request, a copy, without exhibits, of the pooling and servicing agreement. Requests should be addressed to the President, Residential Accredit Loans, Inc., 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437.

Under the pooling and servicing agreement, transfers of Residual Certificates are prohibited to any non-United States person. Transfers of the Residual Certificates are additionally restricted as described in the pooling and servicing agreement. See "Material Federal Income Tax Consequences" in this prospectus supplement and "Material Federal Income Tax Consequences —REMICs—Taxation of Owners of REMIC Residual Certificates—Tax and Restrictions on Transfers of REMIC Residual Certificates to Certain Organizations" and "—Noneconomic REMIC Residual Certificates" in the

prospectus. In addition to the circumstances described in the prospectus, the depositor may terminate the trustee for cause under specified circumstances. See "The Pooling and Servicing Agreement—The Trustee" in the prospectus.

**The Master Servicer**

Residential Funding, an indirect wholly-owned subsidiary of GMAC Mortgage and an affiliate of the depositor, will act as master servicer for the certificates under the pooling and servicing agreement. For a general description of Residential Funding and its activities, see "Residential Funding Corporation" in the prospectus and "Description of the Mortgage Pool—Residential Funding" herein.

The following tables set forth information concerning the delinquency experience, including pending foreclosures, on one- to four-family residential mortgage loans that generally complied with Residential Funding's Expanded Criteria Program at the time of purchase by Residential Funding and were being master serviced by Residential Funding on December 31, 2000, December 31, 2001, December 31, 2002, December 31, 2003, December 31, 2004 and September 30, 2005. Until December 31, 2004, substantially all of the mortgage loans reflected in the tables below were fixed rate loans, which may experience a rate of delinquencies, foreclosures and losses that is different from adjustable rate loans.

As used in this prospectus supplement, a loan is considered to be "30 to 59 days" or "30 or more days" delinquent when a payment due on any due date remains unpaid as of the close of business on the last business day immediately prior to the next following monthly due date. The determination as to whether a loan falls into this category is made as of the close of business on the last business day of each month. Delinquency information presented in this prospectus supplement as of the cut-off date is determined and prepared as of the close of business on the last business day immediately prior to the cut-off date.

## Expanded Criteria Mortgage Program Delinquency Experience[1]

| | At December 31, 2000 | | At December 31, 2001 | | At December 31, 2002 | | At December 31, 2003 | | At December 31, 2004 | | At September 30, 2005 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | By No. of Loans | By Dollar Amount of Loans | By No. of Loans | By Dollar Amount of Loans | By No. of Loans | By Dollar Amount of Loans | By No. of Loans | By Dollar Amount of Loans | By No. of Loans | By Dollar Amount of Loans | By No. of Loans | By Dollar Amount of Loans |
| | | (Dollar Amounts in Thousands) | | (Dollar Amounts in Thousands) | | (Dollar Amounts in Thousands) | | (Dollar Amounts in Thousands) | | (Dollar Amounts in Thousands) | | (Dollar Amounts in Thousands) |
| Total Loan Portfolio | 104,820 | $12,512,690 | 101,210 | $12,635,058 | 99,386 | $12,962,473 | 101,112 | $14,114,861 | 106,211 | $15,669,395 | 127,525 | $21,671,650 |
| Period of Delinquency | | | | | | | | | | | | |
| 30 to 59 days | 2,082 | 244,557 | 2,324 | 289,263 | 2,147 | 280,302 | 2,182 | 284,482 | 2,032 | 282,672 | 2,405 | 389,927 |
| 60 to 89 days | 372 | 44,459 | 477 | 64,448 | 488 | 63,986 | 526 | 70,816 | 409 | 51,071 | 480 | 73,571 |
| 90 days or more[2] | 409 | 44,171 | 516 | 62,039 | 644 | 84,033 | 696 | 94,223 | 555 | 70,963 | 484 | 64,417 |
| Foreclosures Pending | 446 | 55,203 | 602 | 81,640 | 769 | 102,671 | 787 | 103,707 | 747 | 88,396 | 607 | 75,235 |
| Total Delinquent Loans | 3,309 | $388,390 | 3,919 | $497,389 | 4,048 | $530,992 | 4,191 | $553,228 | 3,743 | $493,102 | 3,976 | 603,150 |
| Percent of Loan Portfolio | 3.157% | 3.104% | 3.872% | 3.937% | 4.073% | 4.096% | 4.145% | 3.919% | 3.524% | 3.147% | 3.118% | 2.783% |

[1] The table relates only to the mortgage loans referred to above.

[2] Does not include foreclosures pending.

## Expanded Criteria Mortgage Program Reduced Documentation Delinquency Experience[1]

| | At December 31, 2000 | | At December 31, 2001 | | At December 31, 2002 | | At December 31, 2003 | | At December 31,2004 | | At September 30, 2005 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | By No. of Loans | By Dollar Amount of Loans | By No. of Loans | By Dollar Amount of Loans | By No. of Loans | By Dollar Amount of Loans | By No. of Loans | By Dollar Amount of Loans | By No. of Loans | By Dollar Amount of Loans | By No. of Loans | By Dollar Amount of Loans |
| | | (Dollar Amounts in Thousands) | | (Dollar Amounts in Thousands) | | (Dollar Amounts in Thousands) | | (Dollar Amounts in Thousands) | | (Dollar Amounts in Thousands) | | (Dollar Amounts in Thousands) |
| Total Loan Portfolio | 44,520 | $6,234,461 | 45,103 | $6,477,882 | 45,867 | $6,776,784 | 51,824 | $8,071,748 | 56,271 | $9,191,522 | 72,230 | $13,520,126 |
| Period of Delinquency | | | | | | | | | | | | |
| 30 to 59 days | 742 | 104,823 | 901 | 131,032 | 893 | 131,270 | 934 | 142,682 | 946 | 161,218 | 1,221 | 221,233 |
| 60 to 89 days | 118 | 17,904 | 185 | 29,788 | 216 | 33,636 | 216 | 35,031 | 186 | 26,348 | 223 | 41,490 |
| 90 days or more[2] | 123 | 17,598 | 165 | 27,231 | 206 | 37,139 | 258 | 43,618 | 225 | 34,430 | 205 | 36,305 |
| Foreclosures Pending | 113 | 19,378 | 198 | 34,074 | 251 | 41,335 | 279 | 44,333 | 268 | 42,461 | 260 | 40,731 |
| Total Delinquent Loans | 1,096 | $159,703 | 1,449 | $222,125 | 1,566 | $243,380 | 1,687 | $265,664 | 1,625 | $264,457 | 1,909 | 339,758 |
| Percent of Loan Portfolio | 2.462% | 2.562% | 3.213% | 3.429% | 3.414% | 3.591% | 3.255% | 3.291% | 2.888% | 2.877% | 2.643% | 2.513% |

[1] The table relates only to the mortgage loans referred to above.

[2] Does not include foreclosures pending.

The following tables set forth information concerning foreclosed mortgage loans and loan loss experience of Residential Funding as of December 31, 2001, December 31, 2002, December 31, 2003, December 31, 2004 and September 30, 2005 with respect to the mortgage loans referred to above. For purposes of the following table, Average Portfolio Balance for the period indicated is based on end of month balances divided by the number of months in the period indicated, the Foreclosed Loans Ratio is equal to the aggregate principal balance of Foreclosed Loans divided by the Total Loan Portfolio at the end of the indicated period, and the Gross Loss Ratios and Net Loss Ratios are computed by dividing the Gross Loss or Net Loss respectively during the period indicated by the Average Portfolio Balance during that period.

### Total Expanded Criteria Loan Portfolio Foreclosure Experience[1]

| | At or for the year ended December 31, 2001 (Dollar Amounts in Thousands) | At or for the year ended December 31, 2002 (Dollar Amounts in Thousands) | At or for the year ended December 31, 2003 (Dollar Amounts in Thousands) | At or for the year ended December 31, 2004 (Dollar Amounts in Thousands) | At or for the nine month period ending September 30, 2005 (Dollar Amounts in Thousands) |
|---|---|---|---|---|---|
| Total Loan Portfolio | $12,635,058 | $12,962,473 | $14,114,861 | $15,669,395 | $21,671,650 |
| Average Portfolio Balance | $12,595,460 | $12,766,543 | $13,571,185 | $14,501,837 | $18,799,555 |
| Foreclosed Loans (2) | $25,780 | $30,927 | $41,603 | $21,136 | $19,959 |
| Liquidated Foreclosed Loans (3) | $53,695 | $55,962 | $66,561 | $79,979 | $37,105 |
| Foreclosed Loans Ratio | 0.204% | 0.239% | 0.295% | 0.135% | 0.092% |
| Gross Loss (4) | $13,602 | $12,292 | $12,855 | $16,637 | $7,401 |
| Gross Loss Ratio | 0.108% | 0.096% | 0.095% | 0.115% | 0.039% |
| Covered Loss (5) | $12,467 | $11,047 | $12,246 | $13,872 | $6,060 |
| Net Loss (6) | $1,136 | $1,245 | $609 | $2,764 | $1,342 |
| Net Loss Ratio | 0.009% | 0.010% | 0.004% | 0.019% | 0.007% |
| Excess Recovery (7) | $12 | $158 | $256 | $320 | $174 |

### Total Expanded Criteria Reduced Documentation Loan Portfolio Foreclosure Experience[1]

| | At or for the year ended December 31, 2001 (Dollar Amounts in Thousands) | At or for the year ended December 31, 2002 (Dollar Amounts in Thousands) | At or for the year ended December 31, 2003 (Dollar Amounts in Thousands) | At or for the year ended December 31, 2004 (Dollar Amounts in Thousands) | At or for the nine month period ending September 30, 2005 (Dollar Amounts in Thousands) |
|---|---|---|---|---|---|
| Total Loan Portfolio | $6,477,882 | $6,776,784 | $8,071,748 | $9,191,522 | $13,520,126 |
| Average Portfolio Balance | $6,381,137 | $6,558,513 | $7,440,182 | $8,435,449 | $11,390,428 |
| Foreclosed Loans (2) | $9,602 | $10,406 | $15,104 | $6,440 | $8,241 |
| Liquidated Foreclosed Loans (3) | $12,232 | $16,202 | $17,127 | $23,050 | $10,540 |
| Foreclosed Loans Ratio | 0.148% | 0.154% | 0.187% | 0.070% | 0.061% |
| Gross Loss (4) | $3,815 | $3,652 | $3,765 | $4,198 | $1,927 |
| Gross Loss Ratio | 0.060% | 0.056% | 0.051% | 0.050% | 0.017% |
| Covered Loss (5) | $2,899 | $3,426 | $3,648 | $3,011 | $1,699 |
| Net Loss (6) | $915 | $226 | $117 | $1,186 | $228 |
| Net Loss Ratio | 0.014% | 0.003% | 0.002% | 0.014% | 0.002% |
| Excess Recovery (7) | $0 | $0 | $25 | $87 | $82 |

*(Footnotes on next page)*

*(Footnotes relate to tables on previous pages)*

(1)  The tables relate only to the mortgage loans referred to above.

(2)  For purposes of these tables, Foreclosed Loans includes the principal balance of mortgage loans secured by mortgaged properties the title to which has been acquired by Residential Funding, by investors or by an insurer following foreclosure or delivery of a deed in lieu of foreclosure and which had not been liquidated by the end of the period indicated.

(3)  Liquidated Foreclosed Loans is the sum of the principal balances of the foreclosed loans liquidated during the period indicated.

(4)  Gross Loss is the sum of gross losses less net gains (Excess Recoveries) on all mortgage loans liquidated during the period indicated. Gross Loss for any mortgage loan is equal to the difference between (a) the principal balance plus accrued interest plus all liquidation expenses related to such mortgage loan and (b) all amounts received in connection with the liquidation of the related mortgaged property, excluding amounts received from mortgage pool or special hazard insurance or other forms of credit enhancement, as described in footnote (5) below.  Net gains from the liquidation of mortgage loans are identified in footnote (7) below.

(5)  Covered Loss, for the period indicated, is equal to the aggregate of all proceeds received in connection with liquidated mortgage loans from mortgage pool insurance, special hazard insurance (but not including primary mortgage insurance, hazard insurance or other insurance available for specific mortgaged properties) or other insurance as well as all proceeds received from or losses borne by other credit enhancement, including subordinate certificates.

(6)  Net Loss is determined by subtracting Covered Loss from Gross Loss.  As is the case in footnote (4) above, Net Loss indicated here may reflect Excess Recovery (see footnote (7) below).  Net Loss includes losses on mortgage loan pools which do not have the benefit of credit enhancement.

(7)  Excess Recovery is calculated only with respect to defaulted mortgage loans as to which the liquidation of the related mortgaged property resulted in recoveries in excess of the principal balance plus accrued interest thereon plus all liquidation expenses related to such mortgage loan.  Excess recoveries are not applied to reinstate any credit enhancement, and generally are not allocated to holders of Certificates.

There can be no assurance that the delinquency and foreclosure experience set forth above will be representative of the results that may be experienced with respect to the mortgage loans included in the trust.

## Servicing and Other Compensation and Payment of Expenses

The servicing fees for each mortgage loan are payable out of the interest payments on that mortgage loan. The servicing fees relating to each mortgage loan will be between 0.300% and 1.090% per annum of the outstanding principal balance of that mortgage loan, with a weighted average as of the cut-off date of approximately 0.3021% per annum. The servicing fees consist of (a) servicing fees payable to the master servicer in respect of its master servicing activities and (b) subservicing and other related compensation payable to the subservicer, including any payment due to prepayment charges on the related mortgage loans and such compensation paid to the master servicer as the direct servicer of a mortgage loan for which there is no subservicer.

The primary compensation to be paid to the master servicer for its master servicing activities will be its servicing fee equal to 0.05% per annum of the outstanding principal balance of each mortgage loan. As described in the prospectus, a subservicer is entitled to servicing compensation in an amount of at least 0.25% per annum of the outstanding principal balance of each mortgage loan serviced by it. The master servicer is obligated to pay some ongoing expenses associated with the trust and incurred by the master servicer in connection with its responsibilities under the pooling and servicing agreement. See "The Pooling and Servicing Agreement—Servicing Compensation and Payment of Expenses" in the prospectus for information regarding other possible compensation to the master servicer and subservicers and for information regarding expenses payable by the master servicer.

## Reports to Certificateholders

On each distribution date, a distribution date statement will be made available to each certificateholder setting forth certain information with respect to the composition of the payment being made, the Certificate Principal Balance of an individual certificate following the payment and certain other information relating to the certificates and the mortgage loans.  The trustee will make the distribution date statement, and, at its option, any additional files containing the same information in an alternative format, available each month to certificateholders and other parties to the pooling and servicing agreement via the trustee's internet website, which can be obtained by contacting the trustee at (800) 735-7777. The trustee may modify these distribution procedures if the modified procedures are no less convenient for the certificateholders.  The trustee will provide prior notification to the master servicer and the certificateholders of any such modification.

## Voting Rights

There are actions specified in the prospectus that may be taken by holders of certificates evidencing a specified percentage of all undivided interests in the trust and may be taken by holders of certificates entitled in the aggregate to that percentage of the voting rights.  99% of all voting rights will be allocated among all holders of the certificates, other than the Residual Certificates, in proportion to their then outstanding Certificate Principal Balances, and 1.0% of all voting rights will be allocated among the holders of the Residual Certificates in proportion to the percentage interests evidenced by their respective certificates.  The pooling and servicing agreement may be amended without the consent of the holders of the Residual Certificates in specified circumstances.

**Termination**

The circumstances under which the obligations created by the pooling and servicing agreement will terminate relating to the offered certificates are described under "The Pooling and Servicing Agreement —Termination; Retirement of Certificates" in the prospectus. The master servicer will have the option, on any distribution date on which the aggregate Stated Principal Balance of the mortgage loans in all three loan groups is less than 10% of the aggregate principal balance of the mortgage loans in all three loan groups as of the cut-off date after deducting payments of principal due during the month of the cut-off date, either to purchase all remaining mortgage loans and other assets in the trust, thereby effecting early retirement of the offered certificates or to purchase, in whole but not in part, the certificates. Any such purchase of mortgage loans and other assets of the trust shall be made at a price equal to the sum of (a) 100% of the unpaid principal balance of each mortgage loan or the fair market value of the related underlying mortgaged properties with respect to defaulted mortgage loans as to which title to such mortgaged properties has been acquired if such fair market value is less than such unpaid principal balance, net of any unreimbursed Advance attributable to principal, as of the date of repurchase plus (b) accrued interest thereon at the Net Mortgage Rate to, but not including, the first day of the month in which the repurchase price is distributed. The optional termination price paid by the master servicer will also include certain amounts owed by Residential Funding as seller of the mortgage loans, under the terms of the agreement pursuant to which Residential Funding sold the mortgage loans to the depositor, that remain unpaid on the date of the optional termination.

Distributions on the certificates relating to any optional termination will be paid, first, to the Senior Certificates, second, to the Class M Certificates in the order of their payment priority and, third, to the Class B Certificates. The proceeds of any such distribution may not be sufficient to distribute the full amount to each class of certificates if the purchase price is based in part on the fair market value of the underlying mortgaged property and the fair market value is less than 100% of the unpaid principal balance of the related mortgage loan. Any such purchase of the certificates will be made at a price equal to 100% of their Certificate Principal Balance plus the Accrued Certificate Interest thereon for the immediately preceding Interest Accrual Period at the then-applicable pass-through rate and any previously unpaid Accrued Certificate Interest. Promptly after the purchase of such certificates, the master servicer shall terminate the trust in accordance with the terms of the pooling and servicing agreement.

Upon presentation and surrender of the offered certificates in connection with the termination of the trust or a purchase of certificates under the circumstances described in the two preceding paragraphs, the holders of the offered certificates will be entitled to receive an amount equal to the Certificate Principal Balance of that class plus Accrued Certificate Interest thereon for the immediately preceding Interest Accrual Period at the then-applicable pass-through rate, plus any previously unpaid Accrued Certificate Interest. However, any Prepayment Interest Shortfalls previously allocated to the certificates will not be reimbursed. In addition, distributions to the holders of the most subordinate class of certificates outstanding with a Certificate Principal Balance greater than zero will be reduced, as described in the preceding paragraph, in the case of the termination of the trust resulting from a purchase of all the assets of the trust.

## Material Federal Income Tax Consequences

Upon the issuance of the certificates, Orrick, Herrington & Sutcliffe LLP, counsel to the depositor, will render an opinion to the effect that, assuming compliance with all provisions of the pooling and servicing agreement, for federal income tax purposes, the trust will qualify as two REMICs under the Internal Revenue Code, which shall be referred to in this prospectus supplement as REMIC I and REMIC II.

For federal income tax purposes:

- the Class R Certificates will represent ownership of the sole class of "residual interests" in REMIC I;

- each class of Senior Certificates, other than the Residual Certificates, and the Class M Certificates and the Class B Certificates will represent ownership of "regular interests" in REMIC II and will generally be treated as debt instruments of REMIC II; and

- the Class R Certificates will represent ownership of the sole class of "residual interests" in REMIC II.

See "Material Federal Income Tax Consequences—REMICs" in the prospectus.

For federal income tax purposes, the Class I-A-1 Certificates and Class I-A-2 Certificates will, the Class II-A-1, Class III-A-1, Class III-A-2 Certificates will not, and the Class M-1, Class M-2 and Class M-3 Certificates may be treated as having been issued with original issue discount. The prepayment assumption that will be used in determining the rate of accrual of original issue discount, market discount and premium, if any, for federal income tax purposes will be based on the assumption that, subsequent to the date of any determination the mortgage loans will prepay at a rate equal to 25% CPR. No representation is made that the mortgage loans will prepay at that rate or at any other rate. The use of a zero prepayment assumption may be required in calculating the amortization of premium. See "Material Federal Income Tax Consequences—General" and "—REMICs—Taxation of Owners of REMIC Regular Certificates—Original Issue Discount" in the prospectus.

The holders of the offered certificates will be required to include in income interest on their certificates in accordance with the accrual method of accounting.

If the method for computing original issue discount described in the prospectus results in a negative amount for any period with respect to a certificateholder, the amount of original issue discount allocable to that period would be zero and the certificateholder will be permitted to offset that negative amount only against future original issue discount, if any, attributable to those certificates.

In some circumstances the OID regulations permit the holder of a debt instrument to recognize original issue discount under a method that differs from that used by the issuer. Accordingly, it is possible that the holder of a certificate may be able to select a method for recognizing original issue discount that differs from that used by the master servicer in preparing reports to the certificateholders and the Internal Revenue Service, or IRS.

Some of the classes of offered certificates may be treated for federal income tax purposes as having been issued at a premium. Whether any holder of one of those classes of certificates will be treated as holding a certificate with amortizable bond premium will depend on the certificateholder's purchase price and the distributions remaining to be made on the certificate at the time of its acquisition

by the certificateholder. The use of a zero prepayment assumption may be required in calculating the amortization of premium. Holders of those classes of certificates should consult their tax advisors regarding the possibility of making an election to amortize such premium. See "Material Federal Income Tax Consequences—REMICs—Taxation of Owners of REMIC Regular Certificates" and "—Premium" in the prospectus.

The IRS proposed regulations on August 24, 2004 concerning the accrual of interest income by the holders of REMIC regular interests. The proposed regulations would create a special rule for accruing OID on REMIC regular interests providing for a delay between record and payment dates, such that the period over which OID accrues coincides with the period over which the holder's right to interest payment accrues under the governing contract provisions rather than over the period between distribution dates. If the proposed regulations are adopted in the same form as proposed, taxpayers would be required to accrue interest from the issue date to the first record date, but would not be required to accrue interest after the last record date. The proposed regulations are limited to REMIC regular interests with delayed payment for periods of fewer than 32 days. The proposed regulations are proposed to apply to any REMIC regular interest issued after the date the final regulations are published in the Federal Register. The proposed regulations provide automatic consent for the holder of a REMIC regular interest to change its method of accounting for OID under the final regulations. The change is proposed to be made on a cut-off basis and, thus, does not affect REMIC regular interests issued before the date the final regulations are published in the Federal Register.

The IRS issued a notice of proposed rulemaking on the timing of income and deductions attributable to interest-only regular interests in a REMIC on August 24, 2004. In this notice, the IRS and Treasury requested comments on whether to adopt special rules for taxing regular interests in a REMIC that are entitled only to a specified portion of the interest in respect of one or more mortgage loans held by the REMIC, or REMIC IOs, high-yield REMIC regular interests, and apparent negative-yield instruments. The IRS and Treasury also requested comments on different methods for taxing the foregoing instruments, including the possible recognition of negative amounts of OID, the formulation of special guidelines for the application of Code Section 166 to REMIC IOs and similar instruments, and the adoption of a new alternative method applicable to REMIC IOs and similar instruments. It is uncertain whether the IRS actually will propose any regulations as a consequence of the solicitation of comments and when any resulting new rules would be effective.

The offered certificates will be treated as assets described in Section 7701(a)(19)(C) of the Internal Revenue Code and "real estate assets" under Section 856(c)(4)(A) of the Internal Revenue Code generally in the same proportion that the assets of the REMIC underlying the certificates would be so treated. In addition, interest on the offered certificates, other than the Class R Certificates, and income allocated to the Class R Certificates will be treated as "interest on obligations secured by mortgages on real property" under Section 856(c)(3)(B) of the Internal Revenue Code generally to the extent that the offered certificates are treated as "real estate assets" under Section 856(c)(4)(A) of the Internal Revenue Code. Moreover, the offered certificates, other than the Class R Certificates, will be "qualified mortgages" within the meaning of Section 860G(a)(3) of the Internal Revenue Code if transferred to another REMIC on its startup day in exchange for a regular or residual interest in that REMIC. However, prospective investors in offered certificates that will be generally treated as assets described in Section 860G(a)(3) of the Internal Revenue Code should note that, notwithstanding that treatment, any repurchase of a certificate pursuant to the right of the master servicer to repurchase the offered certificates may adversely affect any REMIC that holds the offered certificates if the repurchase is made under circumstances giving rise to a prohibited transaction tax under the Internal Revenue Code. See "The Pooling and Servicing Agreement—Termination" in this prospectus supplement and "Material Federal Income Tax Consequences—REMICs— Characterization of Investments in REMIC Certificates" in the prospectus.

For further information regarding federal income tax consequences of investing in the offered certificates, see "Material Federal Income Tax Consequences—REMICs" in the prospectus.

## Special Tax Considerations Applicable to Residual Certificates

The IRS has issued REMIC regulations under the provisions of the Internal Revenue Code that significantly affect holders of Residual Certificates. The REMIC regulations impose restrictions on the transfer or acquisition of some residual interests, including the Residual Certificates. The pooling and servicing agreement includes other provisions regarding the transfer of Residual Certificates, including:

- the requirement that any transferee of a Residual Certificate provide an affidavit representing that the transferee:

  - is not a disqualified organization;

  - is not acquiring the Residual Certificate on behalf of a disqualified organization; and

  - will maintain that status and will obtain a similar affidavit from any person to whom the transferee shall subsequently transfer a Residual Certificate;

- a provision that any transfer of a Residual Certificate to a disqualified organization shall be null and void; and

- a grant to the master servicer of the right, without notice to the holder or any prior holder, to sell to a purchaser of its choice any Residual Certificate that shall become owned by a disqualified organization despite the first two provisions above.

In addition, under the pooling and servicing agreement, the Residual Certificates may not be transferred to non-United States persons.

The REMIC regulations also provide that a transfer to a United States person of "noneconomic" residual interests will be disregarded for all federal income tax purposes, and that the purported transferor of "noneconomic" residual interests will continue to remain liable for any taxes due with respect to the income on the residual interests, unless "no significant purpose of the transfer was to impede the assessment or collection of tax." Based on the REMIC regulations, the Residual Certificates may constitute noneconomic residual interests during some or all of their terms for purposes of the REMIC regulations and, accordingly, unless no significant purpose of a transfer is to impede the assessment or collection of tax, transfers of the Residual Certificates may be disregarded and purported transferors may remain liable for any taxes due relating to the income on the Residual Certificates. All transfers of the Residual Certificates will be restricted in accordance with the terms of the pooling and servicing agreement that are intended to reduce the possibility of any transfer of a Residual Certificate being disregarded to the extent that the Residual Certificates constitute noneconomic residual interests. See "Material Federal Income Tax Consequences —REMICs—Taxation of Owners of REMIC Residual Certificates—Noneconomic REMIC Residual Certificates" in the prospectus.

The IRS has issued final REMIC regulations that add to the conditions necessary to assure that a transfer of a non-economic residual interest would be respected. The additional conditions require that in order to qualify as a safe harbor transfer of a residual, the transferee represent that it will not cause the income "to be attributable to a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of the transferee or another U.S. taxpayer" and either (i) the amount received by the transferee be no less on a present value basis than the present value of the net tax

detriment attributable to holding the residual interest reduced by the present value of the projected payments to be received on the residual interest or (ii) the transfer is to a domestic taxable corporation with specified large amounts of gross and net assets and that meets certain other requirements where agreement is made that all future transfers will be to taxable domestic corporations in transactions that qualify for the same "safe harbor" provision. Eligibility for the safe harbor requires, among other things, that the facts and circumstances known to the transferor at the time of transfer not indicate to a reasonable person that the taxes with respect to the residual interest will not be paid, with an unreasonably low cost for the transfer specifically mentioned as negating eligibility. The regulations generally apply to transfers of residual interests occurring on or after February 4, 2000, although certain of their provisions apply only to transfers of residual interests occurring on or after August 19, 2002. See "Material Federal Income Tax Consequences —REMICs—Taxation of Owners of REMIC Residual Certificates—Noneconomic REMIC Residual Certificates" in the prospectus.

The Residual Certificateholders may be required to report an amount of taxable income with respect to the earlier accrual periods of the terms of the REMICs that significantly exceeds the amount of cash distributions received by the Residual Certificateholders from the related REMIC with respect to those periods. Furthermore, the tax on that income may exceed the cash distributions with respect to those periods. Consequently, Residual Certificateholders should have other sources of funds sufficient to pay any federal income taxes due in the earlier years of each REMIC's term as a result of their ownership of the Residual Certificates. In addition, the required inclusion of this amount of taxable income during the REMICs' earlier accrual periods and the deferral of corresponding tax losses or deductions until later accrual periods or until the ultimate sale or disposition of a Residual Certificate, or possibly later under the "wash sale" rules of Section 1091 of the Internal Revenue Code, may cause the Residual Certificateholders' after-tax rate of return to be zero or negative even if the Residual Certificateholders' pre-tax rate of return is positive. That is, on a present value basis, the Residual Certificateholders' resulting tax liabilities could substantially exceed the sum of any tax benefits and the amount of any cash distributions on the Residual Certificates over their life.

The rules for accrual of OID with respect to certain classes of certificates are subject to significant complexity and uncertainty. Because OID on the certificates will be deducted by the related REMIC in determining its taxable income, any changes required by the IRS in the application of those rules to the certificates may significantly affect the timing of OID deductions to the related REMIC and therefore the amount of the related REMIC's taxable income allocable to holders of the Residual Certificates.

An individual, trust or estate that holds, whether directly or indirectly through pass-through entities, a Residual Certificate, may have significant additional gross income with respect to, but may be limited on the deductibility of, servicing and trustee's fees and other administrative expenses properly allocable to the related REMIC in computing the certificateholder's regular tax liability and will not be able to deduct those fees or expenses to any extent in computing the certificateholder's alternative minimum tax liability. See "Material Federal Income Tax Consequences— REMICs—Taxation of Owners of REMIC Residual Certificates—Possible Pass-Through of Miscellaneous Itemized Deductions" in the prospectus.

On May 11, 2004, the IRS issued final regulations relating to the federal income tax treatment of "inducement fees" received by transferees of non-economic REMIC residual interests, adopting without change the proposed regulations as described in the prospectus. See "Material Federal Income Tax Consequences—REMICS—Taxation of Owners of REMIC Residual Certificates—General" in the prospectus. These regulations are effective for taxable years ending on or after May 11, 2004. Holders of Residual Certificates should consult their tax advisors regarding the effect of these regulations.

The IRS has issued proposed regulations that, if adopted as final regulations, would cause the question of whether a transfer of residual interests will be respected for federal income tax purposes to be determined in the audits of the transferee and transferor rather than an item to be determined as a partnership item in the audit of the REMIC's return.

Residential Funding will be designated as the "tax matters person" with respect to each REMIC as defined in the REMIC Provisions, as defined in the prospectus, and in connection therewith will be required to hold not less than 0.01% of the Residual Certificates.

Purchasers of the Residual Certificates are strongly advised to consult their tax advisors as to the economic and tax consequences of investment in the Residual Certificates.

For further information regarding the federal income tax consequences of investing in the Residual Certificates, see "Certain Yield and Prepayment Considerations—Additional Yield Considerations Applicable Solely to the Residual Certificates" in this prospectus supplement and "Material Federal Income Tax Consequences—REMICs—Taxation of Owners of REMIC Residual Certificates" in the prospectus.

## Tax Return Disclosure and Investor List Requirements

Recent Treasury pronouncements directed at abusive tax shelter activity appear to apply to transactions not conventionally regarded as tax shelters. Regulations require taxpayers to report certain disclosures on IRS form 8886 if they participate in a "reportable transaction." Organizers and sellers of the transaction are required to maintain records including investor lists containing identifying information and to furnish those records to the IRS upon demand. A transaction may be a "reportable transaction" based upon any of several indicia, including the existence of book-tax differences common to financial transactions, one or more of which may be present with respect to your investment in the certificates. Congress has enacted provisions that impose significant penalties for failure to comply with these disclosure requirements. Investors in Residual Certificates should consult their own tax advisers concerning any possible disclosure obligation with respect to their investment, and should be aware that the issuer and other participants in the transaction intend to comply with such disclosure and investor list maintenance requirements as they determine apply to them with respect to this transaction.

## Penalty Protection

If penalties were asserted against purchasers of the offered certificates in respect of their treatment of the offered certificates for tax purposes, the summary of tax considerations contained, and the opinions stated, herein and in the prospectus may not meet the conditions necessary for purchasers' reliance on that summary and those opinions to exculpate them from the asserted penalties.

## Use of Proceeds

The net proceeds from the sale of the offered certificates to the underwriter will be paid to the depositor. The depositor will use the proceeds to purchase the mortgage loans or for general corporate purposes. See "Method of Distribution" in this prospectus supplement.

## Method of Distribution

In accordance with the terms and conditions of an underwriting agreement, dated December 27, 2005, Deutsche Bank Securities Inc. will serve as the underwriter and has agreed to purchase and the depositor has agreed to sell the offered certificates, except that a de minimis portion of the Residual

Certificates will be retained by Residential Funding, and that portion is not offered hereby. The certificates being sold to Deutsche Bank Securities Inc. are referred to as the underwritten certificates. It is expected that delivery of the underwritten certificates, other than the Residual Certificates, will be made only in book-entry form through the Same Day Funds Settlement System of DTC, and that the delivery of the Residual Certificates will be made at the offices of Deutsche Bank Securities Inc., New York, New York, on or about December 29, 2005 against payment therefor in immediately available funds.

In connection with the underwritten certificates, the underwriter has agreed, in accordance with the terms and conditions of the underwriting agreement, to purchase all of the underwritten certificates if any of the underwritten certificates are purchased thereby.

The underwriting agreement provides that the obligation of the underwriter to pay for and accept delivery of its underwritten certificates is subject to, among other things, the receipt of legal opinions and to the conditions, among others, that no stop order suspending the effectiveness of the depositor's registration statement shall be in effect, and that no proceedings for that purpose shall be pending before or threatened by the Securities and Exchange Commission.

The distribution of the underwritten certificates by the underwriter maybe effected from time to time in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. Proceeds to the depositor from the sale of the underwritten certificates, before deducting expenses payable by the depositor, will be approximately 100.66% of the aggregate Certificate Principal Balance of the underwritten certificates plus accrued interest thereon from the cut-off date.

The underwriter may effect these transactions by selling the underwritten certificates to or through dealers, and those dealers may receive compensation in the form of underwriting discounts, concessions or commissions from the underwriter for whom they act as agent. In connection with the sale of the underwritten certificates, the underwriter may be deemed to have received compensation from the depositor in the form of underwriting compensation. The underwriter and any dealers that participate with the underwriter in the distribution of the underwritten certificates may be deemed to be underwriters and any profit on the resale of the underwritten certificates positioned by them may be deemed to be underwriting discounts and commissions under the Securities Act.

The underwriting agreement provides that the depositor will indemnify the underwriter, and that under limited circumstances the underwriter will indemnify the depositor, against some liabilities under the Securities Act, or contribute to payments required to be made in respect thereof.

There is currently no secondary market for the offered certificates. The underwriter intends to make a secondary market in the underwritten certificates but is not obligated to do so. There can be no assurance that a secondary market for the offered certificates will develop or, if it does develop, that it will continue. The offered certificates will not be listed on any securities exchange.

The primary source of information available to investors concerning the offered certificates will be the monthly statements discussed in the prospectus under "Description of the Certificates—Reports to Certificateholders" and in this prospectus supplement under "Pooling and Servicing Agreement—Reports to Certificateholders," which will include information as to the outstanding principal balance of the offered certificates. There can be no assurance that any additional information regarding the offered certificates will be available through any other source. In addition, the depositor is not aware of any source through which price information about the offered certificates will be available on an ongoing basis. The limited nature of this information regarding the offered certificates may adversely affect the

liquidity of the offered certificates, even if a secondary market for the offered certificates becomes available.

## Legal Opinions

Certain legal matters relating to the certificates will be passed upon for the depositor by Orrick, Herrington & Sutcliffe LLP, New York, New York and for Deutsche Bank Securities Inc. by Thacher Proffitt & Wood LLP, New York, New York.

## Ratings

It is a condition of the issuance of the Senior Certificates (other than the Class R Certificates), that they be rated "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., Standard & Poor's or S&P, and "Aaa" by Moody's Investors Service, Inc. or Moody's. It is a condition of issuance that the Class R Certificates be rated "AAA" by Standard & Poor's. It is a condition of the issuance of the Class M-1, Class M-2 and Class M-3 Certificates that they be rated not lower than "AA," "A" and "BBB," respectively, by Standard & Poor's, and "Aa2," "A2" and "Baa2," respectively, by Moody's.

Standard & Poor's ratings on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of payments required under the pooling and servicing agreement. Standard & Poor's ratings take into consideration the credit quality of the mortgage pool, structural and legal aspects associated with the certificates, and the extent to which the payment stream in the mortgage pool is adequate to make payments required under the certificates. Standard & Poor's rating on the certificates does not, however, constitute a statement regarding frequency of prepayments on the mortgages. See "Certain Yield and Prepayment Considerations" in this prospectus supplement. The rating on the Residual Certificates only addresses the return of its Certificate Principal Balance and interest on the Residual Certificates at the related pass-through rate.

The rating assigned by Moody's to the offered certificates address the likelihood of the receipt by the offered certificateholders of all distributions to which they are entitled under the pooling and servicing agreement. Moody's ratings reflect its analysis of the riskiness of the mortgage loans and the structure of the transaction as described in the pooling and servicing agreement. Moody's ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the mortgage loans.

The depositor has not requested a rating on the offered certificates by any rating agency other than Standard & Poor's and Moody's. However, there can be no assurance as to whether any other rating agency will rate the Senior Certificates or Class M Certificates, or, if it does, what rating would be assigned by any other rating agency. A rating on the certificates by another rating agency, if assigned at all, may be lower than the ratings assigned to the offered certificates by Standard & Poor's and Moody's.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be evaluated independently of any other security rating. In the event that the ratings initially assigned to the offered certificates are subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to the offered certificates.

## Legal Investment

The Senior Certificates and the Class M-1 Certificates will constitute "mortgage related securities" for purposes of SMMEA so long as they are rated in at least the second highest rating category

by one of the rating agencies, and, as such, are legal investments for some entities to the extent provided in SMMEA. SMMEA provides, however, that states could override its provisions on legal investment and restrict or condition investment in mortgage related securities by taking statutory action on or prior to October 3, 1991. Some states have enacted legislation which overrides the preemption provisions of SMMEA. The Class M-2 Certificates and Class M-3 Certificates will not constitute "mortgage related securities" for purposes of SMMEA.

One or more classes of the offered certificates may be viewed as "complex securities" under TB 73a and TB 13a, which apply to thrift institutions regulated by the OTS.

The depositor makes no representations as to the proper characterization of any class of the offered certificates for legal investment or other purposes, or as to the ability of particular investors to purchase any class of the offered certificates under applicable legal investment restrictions. These uncertainties may adversely affect the liquidity of any class of offered certificates. Accordingly, all institutions whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their legal advisors in determining whether and to what extent any class of the offered certificates constitutes a legal investment or is subject to investment, capital or other restrictions.

See "Legal Investment Matters" in the prospectus.

## ERISA Considerations

A fiduciary of any ERISA plan, any insurance company, whether through its general or separate accounts, or any other person investing ERISA plan assets of any ERISA plan, as defined under "ERISA Considerations—ERISA Plan Asset Regulations" in the prospectus, should carefully review with its legal advisors whether the purchase or holding of offered certificates could give rise to a transaction prohibited or not otherwise permissible under ERISA or Section 4975 of the Internal Revenue Code. The purchase or holding of the Class I-A-1, Class I-A-2, Class II-A-1, Class III-A-1 and Class III-A-2 Certificates, as well as the Class M Certificates, by or on behalf of, or with ERISA plan assets of, an ERISA plan may qualify for exemptive relief under the RFC exemption, as described under "ERISA Considerations—Prohibited Transaction Exemption" in the prospectus provided those certificates are rated at least "BBB-" (or its equivalent) by Standard & Poor's, Moody's or Fitch Ratings, or Fitch, at the time of purchase. The RFC exemption contains a number of other conditions which must be met for the RFC exemption to apply, including the requirement that any ERISA plan must be an "accredited investor" as defined in Rule 501(a)(1) of Regulation D under the Securities Act.

The Department of Labor issued Prohibited Transaction Exemption, or PTE, 2002-41, 67 Fed. Reg. 54487 (August 22, 2002) which amended the RFC exemption and similar exemptions issued to other underwriters. This allows the trustee to be affiliated with the underwriters despite the restriction in PTE 2000-58 to the contrary.

Each beneficial owner of Class M Certificates or any interest therein shall be deemed to have represented, by virtue of its acquisition or holding of that certificate or interest therein, that either (i) it is not an ERISA plan investor; (ii) it has acquired and is holding such Class M Certificates in reliance on the RFC exemption, and that it understands that there are certain conditions to the availability of the RFC exemption, including that the Class M Certificates must be rated, at the time of purchase, not lower than "BBB-" (or its equivalent) by Standard & Poor's, Fitch or Moody's; or (iii) (1) it is an insurance company, (2) the source of funds used to acquire or hold the certificate or interest therein is an "insurance company general account," as such term is defined in Section V(e) of Prohibited Transaction Class

Exemption, or PTCE, 95-60, and (3) the conditions in Sections I and III of PTCE 95-60 have been satisfied.

If any Class M Certificate or any interest therein is acquired or held in violation of the conditions described in the preceding paragraph, the next preceding permitted beneficial owner will be treated as the beneficial owner of that Class M Certificate, retroactive to the date of transfer to the purported beneficial owner. Any purported beneficial owner whose acquisition or holding of any such certificate or interest therein was effected in violation of the conditions described in the preceding paragraph shall indemnify and hold harmless the depositor, the trustee, the master servicer, any subservicer, the underwriters and the trust from and against any and all liabilities, claims, costs or expenses incurred by those parties as a result of that acquisition or holding.

Because the exemptive relief afforded by the RFC exemption or any similar exemption that might be available will not likely apply to the purchase, sale or holding of the Residual Certificates, transfers of those certificates to any ERISA plan investor will not be registered by the trustee unless the transferee provides the depositor, the trustee and the master servicer with an opinion of counsel satisfactory to those entities, which opinion will not be at the expense of those entities, that the purchase of those certificates by or on behalf of the ERISA plan investor:

- is permissible under applicable law;

- will not constitute or result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Internal Revenue Code; and

- will not subject the depositor, the trustee or the master servicer to any obligation in addition to those undertaken in the pooling and servicing agreement.

Any fiduciary or other investor of ERISA plan assets that proposes to acquire or hold the offered certificates on behalf of or with ERISA plan assets of any ERISA plan should consult with its counsel with respect to: (i) whether the specific and general conditions and the other requirements in the RFC exemption would be satisfied, or whether any other prohibited transaction exemption would apply, and (ii) the potential applicability of the general fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of the Internal Revenue Code to the proposed investment. See "ERISA Considerations" in the prospectus.

The sale of any of the offered certificates to an ERISA plan is in no respect a representation by the depositor or the underwriters that such an investment meets all relevant legal requirements relating to investments by ERISA plans generally or any particular ERISA plan, or that such an investment is appropriate for ERISA plans generally or any particular ERISA plan.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## ANNEX I
## MORTGAGE LOAN STATISTICAL INFORMATION

### Credit Score Distribution of the Group I Loans

| Credit Score Range | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|
| 620 – 639 ...................... | 15 | $4,867,933 | 4.86% | $324,529 | 77.29% |
| 640 – 659 ...................... | 11 | 3,184,942 | 3.18 | 289,540 | 72.23 |
| 660 – 679 ...................... | 30 | 7,582,644 | 7.57 | 252,755 | 74.44 |
| 680 – 699 ...................... | 68 | 19,666,401 | 19.63 | 289,212 | 76.75 |
| 700 – 719 ...................... | 57 | 15,657,997 | 15.63 | 274,702 | 78.68 |
| 720 – 739 ...................... | 49 | 14,731,869 | 14.71 | 300,650 | 79.63 |
| 740 – 759 ...................... | 44 | 14,258,677 | 14.24 | 324,061 | 77.47 |
| 760 – 779 ...................... | 31 | 8,997,252 | 8.98 | 290,234 | 77.41 |
| 780 – 799 ...................... | 24 | 8,079,143 | 8.07 | 336,631 | 74.76 |
| 800 or greater ............... | 13 | 3,133,653 | 3.13 | 241,050 | 73.77 |
| Total Average or Weighted Average ......... | 342 | $100,160,509 | 100.00% | $292,867 | 77.09% |

As of the cut-off date, the weighted average credit score of the Group I Loans will be approximately 719.

### Original Mortgage Loan Principal Balances of the Group I Loans

| Original Mortgage Loan Balance ($) | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 100,000 or less............... | 9 | $753,383 | 0.75% | $83,709 | 706 | 62.36% |
| 100,001 to 200,000 ........ | 111 | 17,081,223 | 17.05 | 153,885 | 720 | 77.19 |
| 200,001 to 300,000 ........ | 83 | 20,223,332 | 20.19 | 243,655 | 715 | 77.89 |
| 300,001 to 400,000 ........ | 64 | 22,153,687 | 22.12 | 346,151 | 712 | 77.78 |
| 400,001 to 500,000 ........ | 43 | 19,455,024 | 19.42 | 452,442 | 723 | 78.33 |
| 500,001 to 600,000 ........ | 17 | 9,244,971 | 9.23 | 543,822 | 727 | 74.57 |
| 600,001 to 700,000 ........ | 7 | 4,452,720 | 4.45 | 636,103 | 735 | 79.85 |
| 700,001 to 800,000 ........ | 3 | 2,280,939 | 2.28 | 760,313 | 732 | 80.00 |
| 800,001 to 900,000 ........ | 3 | 2,519,000 | 2.51 | 839,667 | 676 | 73.64 |
| 900,001 to 1,000,000 ..... | 2 | 1,996,230 | 1.99 | 998,115 | 784 | 60.51 |
| Total, Average or Weighted Average ......... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

## Net Mortgage Rates of the Group I Loans

| Net Mortgage Rates (%) | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 3.500 – 3.999................. | 1 | $450,911 | 0.45% | $450,911 | 727 | 80.00% |
| 4.000 – 4.499................. | 8 | 2,983,121 | 2.98 | 372,890 | 772 | 75.00 |
| 4.500 – 4.999................. | 13 | 3,794,763 | 3.79 | 291,905 | 728 | 75.63 |
| 5.000 – 5.499................. | 64 | 18,832,613 | 18.80 | 294,260 | 721 | 77.63 |
| 5.500 – 5.999................. | 145 | 44,651,720 | 44.58 | 307,943 | 721 | 77.12 |
| 6.000 – 6.499................. | 79 | 20,778,430 | 20.75 | 263,018 | 711 | 76.60 |
| 6.500 – 6.999................. | 23 | 6,376,128 | 6.37 | 277,223 | 711 | 78.09 |
| 7.000 – 7.499................. | 9 | 2,292,821 | 2.29 | 254,758 | 698 | 78.36 |
| Total, Average or Weighted Average......... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

As of the cut-off date, the weighted average Net Mortgage Rate of the Group I Loans will be approximately 5.7608% per annum.

## Mortgage Rates of the Group I Loans

| Mortgage Rates (%) | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 4.000 – 4.499................. | 1 | $450,911 | 0.45% | $450,911 | 727 | 80.00% |
| 4.500 – 4.999................. | 8 | 2,983,121 | 2.98 | 372,890 | 772 | 75.00 |
| 5.000 – 5.499................. | 21 | 5,554,685 | 5.55 | 264,509 | 716 | 76.94 |
| 5.500 – 5.999................. | 101 | 31,533,566 | 31.48 | 312,214 | 719 | 77.34 |
| 6.000 – 6.499................. | 137 | 39,599,959 | 39.54 | 289,051 | 723 | 77.00 |
| 6.500 – 6.999................. | 57 | 15,420,454 | 15.40 | 270,534 | 707 | 76.72 |
| 7.000 – 7.499................. | 17 | 4,617,813 | 4.61 | 271,636 | 711 | 78.63 |
| Total, Average or Weighted Average......... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

As of the cut-off date, the weighted average mortgage rate of the Group I Loans will be approximately 6.0652% per annum.

I-2

## Original Loan-to-Value Ratios of the Group I Loans

| Original Loan-to-Value Ratio (%) | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score |
|---|---|---|---|---|---|
| 00.01 - 50.00 .............. | 6 | $1,539,507 | 1.54% | $256,585 | 728 |
| 50.01 - 55.00 .............. | 5 | 820,368 | 0.82 | 164,074 | 685 |
| 55.01 - 60.00 .............. | 6 | 2,436,213 | 2.43 | 406,035 | 755 |
| 60.01 - 65.00 .............. | 16 | 5,550,495 | 5.54 | 346,906 | 720 |
| 65.01 - 70.00 .............. | 20 | 6,220,629 | 6.21 | 311,031 | 703 |
| 70.01 - 75.00 .............. | 23 | 5,763,783 | 5.75 | 250,599 | 705 |
| 75.01 - 80.00 .............. | 250 | 74,106,968 | 73.99 | 296,428 | 721 |
| 85.01 – 90.00.............. | 12 | 2,936,890 | 2.93 | 244,741 | 725 |
| 90.01 - 95.00 .............. | 4 | 785,658 | 0.78 | 196,414 | 736 |
| Total, Average or Weighted Average ..... | 342 | $100,160,509 | 100.00% | $292,867 | 719 |

The weighted average loan-to-value ratio at origination of the Group I Loans will be approximately 77.09%.

### Geographic Distribution of Mortgaged Properties of the Group I Loans

| State | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Alaska | 3 | $524,372 | 0.52% | $174,791 | 690 | 77.43% |
| Alabama | 3 | 784,000 | 0.78 | 261,333 | 708 | 80.00 |
| Arizona | 20 | 4,844,746 | 4.84 | 242,237 | 702 | 75.18 |
| California | 88 | 35,739,544 | 35.68 | 406,131 | 721 | 76.60 |
| Colorado | 21 | 4,479,208 | 4.47 | 213,296 | 708 | 79.35 |
| Connecticut | 3 | 820,000 | 0.82 | 273,333 | 739 | 80.00 |
| District of Columbia | 4 | 1,336,616 | 1.33 | 334,154 | 707 | 75.39 |
| Florida | 49 | 11,863,167 | 11.84 | 242,105 | 741 | 74.55 |
| Georgia | 8 | 1,887,150 | 1.88 | 235,894 | 712 | 78.09 |
| Hawaii | 1 | 314,900 | 0.31 | 314,900 | 686 | 79.00 |
| Idaho | 5 | 655,520 | 0.65 | 131,104 | 728 | 74.63 |
| Illinois | 4 | 809,247 | 0.81 | 202,312 | 713 | 83.29 |
| Kentucky | 2 | 715,660 | 0.71 | 357,830 | 757 | 64.58 |
| Louisiana | 1 | 190,000 | 0.19 | 190,000 | 790 | 87.00 |
| Massachusetts | 6 | 1,619,210 | 1.62 | 269,868 | 706 | 73.09 |
| Maryland | 10 | 2,913,396 | 2.91 | 291,340 | 719 | 80.21 |
| Michigan | 6 | 1,287,216 | 1.29 | 214,536 | 676 | 79.48 |
| Minnesota | 7 | 1,106,465 | 1.10 | 158,066 | 709 | 77.58 |
| Missouri | 4 | 663,200 | 0.66 | 165,800 | 681 | 79.38 |
| Montana | 1 | 142,500 | 0.14 | 142,500 | 806 | 95.00 |
| North Carolina | 3 | 945,600 | 0.94 | 315,200 | 704 | 80.00 |
| Nebraska | 1 | 118,400 | 0.12 | 118,400 | 706 | 88.00 |
| New Hampshire | 1 | 279,920 | 0.28 | 279,920 | 692 | 80.00 |
| New Jersey | 12 | 4,030,231 | 4.02 | 335,853 | 722 | 76.37 |
| New Mexico | 1 | 284,000 | 0.28 | 284,000 | 730 | 80.00 |
| Nevada | 9 | 2,038,659 | 2.04 | 226,518 | 728 | 77.79 |
| New York | 1 | 194,405 | 0.19 | 194,405 | 796 | 77.00 |
| Ohio | 3 | 351,800 | 0.35 | 117,267 | 774 | 77.21 |
| Oklahoma | 1 | 127,903 | 0.13 | 127,903 | 678 | 80.00 |
| Oregon | 1 | 224,000 | 0.22 | 224,000 | 707 | 80.00 |
| Pennsylvania | 1 | 134,862 | 0.13 | 134,862 | 789 | 65.00 |
| Rhode Island | 2 | 391,200 | 0.39 | 195,600 | 732 | 80.00 |
| South Carolina | 4 | 1,793,079 | 1.79 | 448,270 | 742 | 78.28 |
| Texas | 1 | 622,720 | 0.62 | 622,720 | 760 | 80.00 |
| Utah | 4 | 586,728 | 0.59 | 146,682 | 673 | 77.82 |
| Virginia | 29 | 10,010,895 | 9.99 | 345,203 | 713 | 78.02 |
| Vermont | 2 | 468,086 | 0.47 | 234,043 | 722 | 80.00 |
| Washington | 18 | 4,539,787 | 4.53 | 252,210 | 706 | 80.27 |
| West Virginia | 2 | 322,117 | 0.32 | 161,059 | 700 | 80.00 |
| Total, Average or Weighted Average | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

No more than 1.3% of all of the mortgage loans will be secured by mortgaged properties located in any one zip code area in California and no more than 1.2% of the mortgage loans will be secured by mortgaged properties located in any one zip code area outside California.

### Mortgage Loan Purpose of the Group I Loans

| Loan Purpose | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Purchase ......................... | 192 | $57,019,820 | 56.93% | $296,978 | 727 | 79.51% |
| Rate/Term Refinance....... | 60 | 16,494,337 | 16.47 | 274,906 | 710 | 74.88 |
| Equity Refinance............. | 90 | 26,646,352 | 26.60 | 296,071 | 709 | 73.29 |
| Total, Average or Weighted Average.......... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

### Mortgage Loan Documentation Types of the Group I Loans

| Documentation Type | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Full Documentation......... | 134 | $35,952,493 | 35.89% | $268,302 | 712 | 77.90% |
| Reduced Documentation . | 208 | 64,208,016 | 64.11 | 308,692 | 724 | 76.64 |
| Total, Average or Weighted Average.......... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

No more than 42.2% of such reduced loan documentation Group I Loans will be secured by mortgaged properties located in California. For purposes of the above table, reduced documentation includes mortgage loans which were underwritten under a no stated income or no income/no asset program.

### Occupancy Types of the Group I Loans

| Occupancy | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Primary Residence ......... | 274 | $84,472,016 | 84.34% | $308,292 | 716 | 78.17% |
| Second/Vacation............. | 13 | 3,702,899 | 3.70 | 284,838 | 769 | 74.44 |
| Non-Owner Occupied .... | 55 | 11,985,595 | 11.97 | 217,920 | 729 | 70.30 |
| Total, Average or Weighted Average ......... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

### Mortgaged Property Types of the Group I Loans

| Property Type | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Single-family detached........................... | 205 | $57,040,713 | 56.95% | $278,247 | 721 | 77.02% |
| Planned Unit Developments (detached). | 61 | 22,061,269 | 22.03 | 361,660 | 713 | 77.80 |
| Condo Low-Rise (less than 5 stories).... | 40 | 10,405,551 | 10.39 | 260,139 | 723 | 75.21 |
| Planned Unit Developments (attached) . | 15 | 4,186,793 | 4.18 | 279,120 | 722 | 80.56 |
| Two-to-four family units ...................... | 9 | 3,238,094 | 3.23 | 359,788 | 720 | 74.69 |
| Townhouse............................................ | 5 | 1,043,975 | 1.04 | 208,795 | 722 | 76.09 |
| Condo High-Rise (9 stories or more)..... | 3 | 1,020,810 | 1.02 | 340,270 | 738 | 84.10 |
| Condo Mid-Rise (5 to 8 stories)............ | 3 | 968,900 | 0.97 | 322,967 | 725 | 72.16 |
| Cooperative Units................................. | 1 | 194,405 | 0.19 | 194,405 | 796 | 77.00 |
| Total, Average or Weighted Average... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

### Note Margins of the Group I Loans

| Note Margins (%) | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.875 ............................. | 1 | $255,286 | 0.25% | $255,286 | 707 | 80.00% |
| 2.250 ............................. | 148 | 44,301,052 | 44.23 | 299,331 | 720 | 78.02 |
| 2.750 ............................. | 15 | 4,847,221 | 4.84 | 323,148 | 717 | 77.14 |
| 3.250 ............................. | 147 | 40,979,517 | 40.91 | 278,772 | 714 | 76.13 |
| 3.500 ............................. | 31 | 9,777,434 | 9.76 | 315,401 | 739 | 76.83 |
| Total, Average or Weighted Average......... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

As of the cut-off date, the weighted average note margin of the Group I Loans will be approximately 2.8044% per annum.

### Maximum Mortgage Rates of the Group I Loans

| Maximum Mortgage Rates (%) | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 10.000 - 10.999 ................. | 11 | $3,949,818 | 3.94% | $359,074 | 757 | 75.83% |
| 11.000 - 11.999................. | 120 | 36,572,465 | 36.51 | 304,771 | 719 | 77.29 |
| 12.000 - 12.999................. | 194 | 55,020,413 | 54.93 | 283,610 | 718 | 76.92 |
| 13.000 - 13.999................. | 17 | 4,617,813 | 4.61 | 271,636 | 711 | 78.63 |
| Total, Average or Weighted Average.......................... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

As of the cut-off date, the weighted average maximum mortgage rate of the Group I Loans will be approximately 12.0637% per annum.

I-6

## Minimum Mortgage Rates of the Group I Loans

| Minimum Mortgage Rates (%) | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.000 - 1.999................. | 1 | $255,286 | 0.25% | $255,286 | 707 | 80.00% |
| 2.000 - 2.999................. | 162 | 48,896,273 | 48.82 | 301,829 | 720 | 77.97 |
| 3.000 - 3.999................. | 178 | 50,756,951 | 50.68 | 285,151 | 719 | 76.26 |
| 6.000 - 6.999................. | 1 | 252,000 | 0.25 | 252,000 | 687 | 70.00 |
| Total, Average or Weighted Average.......... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

As of the cut-off date, the weighted average minimum mortgage rate of the Group I Loans will be approximately 2.8142% per annum.

## Next Interest Rate Adjustment Dates of the Group I Loans

| Next Interest Rate Adjustment Date | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| September 2007............ | 1 | $568,742 | 0.57% | $568,742 | 712 | 65.00% |
| January 2008 ................ | 1 | 140,000 | 0.14 | 140,000 | 810 | 80.00 |
| March 2008 .................. | 1 | 180,000 | 0.18 | 180,000 | 679 | 80.00 |
| April 2008 ................... | 3 | 1,515,308 | 1.51 | 505,103 | 759 | 69.10 |
| May 2008 .................... | 10 | 2,948,161 | 2.94 | 294,816 | 752 | 70.77 |
| June 2008 .................... | 3 | 512,511 | 0.51 | 170,837 | 724 | 80.00 |
| July 2008.................... | 5 | 1,469,807 | 1.47 | 293,961 | 724 | 76.83 |
| August 2008 ................ | 13 | 5,068,576 | 5.06 | 389,890 | 740 | 67.92 |
| September 2008............. | 12 | 3,008,477 | 3.00 | 250,706 | 751 | 77.09 |
| October 2008............... | 28 | 8,061,792 | 8.05 | 287,921 | 726 | 78.10 |
| November 2008............. | 172 | 50,276,986 | 50.20 | 292,308 | 718 | 78.71 |
| December 2008............. | 92 | 26,219,049 | 26.18 | 284,990 | 707 | 76.87 |
| January 2009 ................ | 1 | 191,100 | 0.19 | 191,100 | 726 | 70.00 |
| Total, Average or Weighted Average.......... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

As of the cut-off date, the weighted average months to the Next Interest Rate Adjustment Date of the Group I Loans will be approximately 34 month.

## Indices of the Group I Loans

| Index | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1 YR LIBOR ................ | 239 | $66,931,877 | 66.82% | $280,050 | 714 | 77.90% |
| 6 MO LIBOR ............... | 103 | 33,228,632 | 33.18 | 322,608 | 730 | 75.46 |
| Total, Average or Weighted Average.......... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

## Remaining Term to Maturity of the Group I Loans

| Remaining Term (months) | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 345 | 1 | $568,742 | 0.57% | $568,742 | 712 | 65.00% |
| 349 | 1 | 140,000 | 0.14 | 140,000 | 810 | 80.00 |
| 351 | 1 | 180,000 | 0.18 | 180,000 | 679 | 80.00 |
| 352 | 3 | 1,515,308 | 1.51 | 505,103 | 759 | 69.10 |
| 353 | 10 | 2,948,161 | 2.94 | 294,816 | 752 | 70.77 |
| 354 | 3 | 512,511 | 0.51 | 170,837 | 724 | 80.00 |
| 355 | 5 | 1,469,807 | 1.47 | 293,961 | 724 | 76.83 |
| 356 | 14 | 5,258,854 | 5.25 | 375,632 | 739 | 68.35 |
| 357 | 12 | 3,219,303 | 3.21 | 268,275 | 757 | 77.28 |
| 358 | 27 | 7,610,781 | 7.60 | 281,881 | 723 | 77.99 |
| 359 | 172 | 50,326,894 | 50.25 | 292,598 | 718 | 78.71 |
| 360 | 93 | 26,410,149 | 26.37 | 283,980 | 707 | 76.82 |
| Total, Average or Weighted Average | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

## First Interest Rate Cap of the Group I Loans

| First Interest Rate Cap (%) | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 2.000 | 234 | $64,472,734 | 64.37% | $275,525 | 715 | 77.73% |
| 3.000 | 29 | 8,894,438 | 8.88 | 306,705 | 717 | 72.68 |
| 6.000 | 78 | 25,797,108 | 25.76 | 330,732 | 729 | 77.83 |
| 6.375 | 1 | 996,230 | 0.99 | 996,230 | 813 | 56.00 |
| Total, Average or Weighted Average | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

## Periodic Rate Caps of the Group I Loans

| Periodic Rate Cap (%) | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.000 | 56 | $18,335,454 | 18.31% | $327,419 | 726 | 74.45% |
| 2.000 | 286 | 81,825,055 | 81.69 | 286,102 | 718 | 77.68 |
| Total, Average or Weighted Average | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

I-8

## Amortization Type of the Group I Loans

| Amortization Type | Number of Group I Loans | Principal Balance | Percentage of Group I Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Fully Amortizing............. | 55 | $14,851,137 | 14.83% | $270,021 | 730 | 72.78% |
| Initial Interest Only Period-3 Years................ | 33 | 10,498,374 | 10.48 | 318,133 | 720 | 77.71 |
| Initial Interest Only Period-10 Years.............. | 254 | 74,810,998 | 74.69 | 294,531 | 717 | 77.86 |
| Total, Average or Weighted Average ......... | 342 | $100,160,509 | 100.00% | $292,867 | 719 | 77.09% |

## Credit Score Distribution of the Group II Loans

| Credit Score Range | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|
| 620 – 639 ........................ | 34 | $9,816,952 | 2.39% | $288,734 | 74.72% |
| 640 – 659 ........................ | 84 | 22,155,671 | 5.40 | 263,758 | 74.92 |
| 660 – 679 ........................ | 223 | 56,861,637 | 13.87 | 254,985 | 75.78 |
| 680 – 699 ........................ | 273 | 73,334,214 | 17.89 | 268,623 | 77.05 |
| 700 – 719 ........................ | 246 | 66,351,182 | 16.18 | 269,720 | 77.43 |
| 720 – 739 ........................ | 228 | 59,201,702 | 14.44 | 259,657 | 78.11 |
| 740 – 759 ........................ | 196 | 51,010,644 | 12.44 | 260,258 | 78.17 |
| 760 – 779 ........................ | 155 | 41,758,910 | 10.18 | 269,412 | 75.83 |
| 780 – 799 ........................ | 92 | 25,580,084 | 6.24 | 278,044 | 75.44 |
| 800 or greater ................. | 14 | 3,662,162 | 0.89 | 261,583 | 72.20 |
| Subtotal with Credit Score | 1,545 | $409,733,158 | 99.93% | $265,199 | 76.79% |
| Not Available ................. | 2 | 284,469 | 0.07 | 142,234 | 74.13 |
| Total Average or Weighted Average .......... | 1,547 | $410,017,627 | 100.00% | $265,040 | 76.79% |

As of the cut-off date, the weighted average credit score of the Group II Loans will be approximately 715.

Group II Loans indicated as having a credit score that is "Not Available" include certain Group II Loans where the credit score was not provided by the related seller and Group II Loans where no credit history can be obtained for the related mortgagor.

## Original Mortgage Loan Principal Balances of the Group II Loans

| Original Mortgage Loan Balance ($) | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 100,000 or less............... | 77 | $6,445,520 | 1.57% | $83,708 | 716 | 75.30% |
| 100,001 to 200,000 ........ | 573 | 88,204,599 | 21.51 | 153,935 | 716 | 77.84 |
| 200,001 to 300,000 ........ | 431 | 106,238,388 | 25.91 | 246,493 | 711 | 77.12 |
| 300,001 to 400,000 ........ | 233 | 79,451,272 | 19.38 | 340,993 | 715 | 77.34 |
| 400,001 to 500,000 ........ | 106 | 47,864,059 | 11.67 | 451,548 | 718 | 77.74 |
| 500,001 to 600,000 ........ | 66 | 36,128,922 | 8.81 | 547,408 | 720 | 76.57 |
| 600,001 to 700,000 ........ | 38 | 23,944,789 | 5.84 | 630,126 | 719 | 75.90 |
| 700,001 to 800,000 ........ | 5 | 3,769,612 | 0.92 | 753,922 | 716 | 74.16 |
| 800,001 to 900,000 ..... | 5 | 4,259,800 | 1.04 | 851,960 | 709 | 70.51 |
| 900,001 to 1,000,000 ..... | 10 | 9,684,466 | 2.36 | 968,447 | 726 | 70.70 |
| 1,200,001 to 1,300,000 .. | 2 | 2,580,000 | 0.63 | 1,290,000 | 680 | 51.04 |
| 1,400,001 to 1,500,000 .. | 1 | 1,446,200 | 0.35 | 1,446,200 | 683 | 65.00 |
| Total, Average or Weighted Average ......... | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

## Net Mortgage Rates of the Group II Loans

| Net Mortgage Rates (%) | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 4.000 – 4.499 | 4 | $854,286 | 0.21% | $213,572 | 732 | 60.63% |
| 4.500 – 4.999 | 18 | 5,097,446 | 1.24 | 283,191 | 728 | 68.66 |
| 5.000 – 5.499 | 220 | 58,240,045 | 14.20 | 264,727 | 718 | 75.39 |
| 5.500 – 5.999 | 750 | 203,617,728 | 49.66 | 271,490 | 717 | 76.79 |
| 6.000 – 6.499 | 492 | 128,591,740 | 31.36 | 261,365 | 711 | 77.40 |
| 6.500 – 6.999 | 46 | 10,228,074 | 2.49 | 222,349 | 710 | 79.40 |
| 7.000 – 7.499 | 17 | 3,388,307 | 0.83 | 199,312 | 726 | 85.68 |
| Total, Average or Weighted Average | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

As of the cut-off date, the weighted average Net Mortgage Rate of all mortgage loans will be approximately 5.8662% per annum.

## Mortgage Rates of the Group II Loans

| Mortgage Rates (%) | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 4.000 – 4.499 | 1 | $222,700 | 0.05% | $222,700 | 690 | 39.00% |
| 4.500 – 4.999 | 4 | 803,586 | 0.20 | 200,897 | 736 | 62.64 |
| 5.000 – 5.499 | 34 | 10,193,674 | 2.49 | 299,814 | 722 | 71.64 |
| 5.500 – 5.999 | 382 | 96,862,296 | 23.62 | 253,566 | 720 | 76.08 |
| 6.000 – 6.499 | 748 | 202,920,578 | 49.49 | 271,284 | 714 | 77.08 |
| 6.500 – 6.999 | 343 | 91,615,672 | 22.34 | 267,101 | 711 | 77.39 |
| 7.000 – 7.499 | 20 | 4,662,812 | 1.14 | 233,141 | 692 | 76.98 |
| 7.500 – 7.999 | 15 | 2,736,309 | 0.67 | 182,421 | 738 | 85.83 |
| Total, Average or Weighted Average | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

As of the cut-off date, the weighted average mortgage rate of all mortgage loans will be approximately 6.1679% per annum.

## Original Loan-to-Value Ratios of the Group II Loans

| Original Loan-to-Value Ratio (%) | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score |
|---|---|---|---|---|---|
| 00.01 - 50.00 ............... | 30 | $6,772,257 | 1.65% | $225,742 | 714 |
| 50.01 - 55.00 ............... | 10 | 3,231,109 | 0.79 | 323,111 | 734 |
| 55.01 - 60.00 ............... | 31 | 10,284,674 | 2.51 | 331,764 | 731 |
| 60.01 - 65.00 ............... | 66 | 21,253,583 | 5.18 | 322,024 | 716 |
| 65.01 - 70.00 ............... | 90 | 28,397,665 | 6.93 | 315,530 | 701 |
| 70.01 - 75.00 ............... | 141 | 38,120,067 | 9.30 | 270,355 | 711 |
| 75.01 - 80.00 ............... | 1,111 | 287,747,584 | 70.18 | 258,999 | 716 |
| 80.01 - 85.00 ............... | 12 | 2,892,758 | 0.71 | 241,063 | 698 |
| 85.01 - 90.00 ............... | 35 | 7,459,190 | 1.82 | 213,120 | 722 |
| 90.01 – 95.00.............. | 17 | 3,184,164 | 0.78 | 187,304 | 739 |
| 95.01 – 100.00............ | 4 | 674,576 | 0.16 | 168,644 | 745 |
| Total, Average or Weighted Average ......... | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 |

The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 76.79%.

## Geographic Distribution of Mortgaged Properties of the Group II Loans

| State | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Alaska | 2 | $331,920 | 0.08% | $165,960 | 765 | 80.00% |
| Alabama | 4 | 493,616 | 0.12 | 123,404 | 732 | 76.65 |
| Arkansas | 2 | 990,142 | 0.24 | 495,071 | 674 | 72.12 |
| Arizona | 136 | 30,219,632 | 7.37 | 222,203 | 707 | 77.59 |
| California | 348 | 130,703,328 | 31.88 | 375,584 | 720 | 74.27 |
| Colorado | 76 | 13,199,195 | 3.22 | 173,674 | 724 | 79.72 |
| Connecticut | 30 | 8,101,339 | 1.98 | 270,045 | 703 | 77.59 |
| District of Columbia | 5 | 1,972,450 | 0.48 | 394,490 | 734 | 81.51 |
| Delaware | 4 | 1,205,300 | 0.29 | 301,325 | 743 | 79.51 |
| Florida | 230 | 51,898,737 | 12.66 | 225,647 | 709 | 77.26 |
| Georgia | 28 | 4,663,406 | 1.14 | 166,550 | 699 | 79.60 |
| Hawaii | 3 | 1,362,900 | 0.33 | 454,300 | 756 | 72.96 |
| Iowa | 1 | 104,000 | 0.03 | 104,000 | 721 | 80.00 |
| Idaho | 8 | 1,237,684 | 0.30 | 154,710 | 731 | 76.46 |
| Illinois | 56 | 12,217,549 | 2.98 | 218,171 | 708 | 77.30 |
| Indiana | 11 | 1,502,176 | 0.37 | 136,561 | 733 | 77.66 |
| Kansas | 2 | 206,400 | 0.05 | 103,200 | 710 | 80.00 |
| Kentucky | 2 | 217,200 | 0.05 | 108,600 | 678 | 80.00 |
| Louisiana | 4 | 652,170 | 0.16 | 163,043 | 720 | 87.12 |
| Massachusetts | 15 | 3,653,968 | 0.89 | 243,598 | 727 | 76.56 |
| Maryland | 55 | 16,359,122 | 3.99 | 297,439 | 712 | 78.68 |
| Maine | 1 | 440,000 | 0.11 | 440,000 | 660 | 68.00 |
| Michigan | 19 | 3,159,094 | 0.77 | 166,268 | 686 | 78.67 |
| Minnesota | 46 | 10,471,144 | 2.55 | 227,634 | 706 | 78.61 |
| Missouri | 6 | 1,499,793 | 0.37 | 249,965 | 752 | 77.79 |
| Montana | 3 | 665,382 | 0.16 | 221,794 | 771 | 80.00 |
| North Carolina | 11 | 1,867,162 | 0.46 | 169,742 | 719 | 79.14 |
| Nebraska | 2 | 480,708 | 0.12 | 240,354 | 673 | 80.00 |
| New Jersey | 45 | 15,240,674 | 3.72 | 338,682 | 725 | 78.63 |
| New Mexico | 7 | 1,672,781 | 0.41 | 238,969 | 714 | 81.16 |
| Nevada | 57 | 15,448,400 | 3.77 | 271,025 | 705 | 77.93 |
| New York | 39 | 12,277,077 | 2.99 | 314,797 | 720 | 78.13 |
| Ohio | 16 | 2,532,798 | 0.62 | 158,300 | 713 | 77.72 |
| Oklahoma | 1 | 380,000 | 0.09 | 380,000 | 726 | 80.00 |
| Oregon | 47 | 8,814,689 | 2.15 | 187,547 | 718 | 79.83 |
| Pennsylvania | 9 | 1,279,944 | 0.31 | 142,216 | 715 | 79.94 |
| Rhode Island | 3 | 709,806 | 0.17 | 236,602 | 721 | 77.33 |
| South Carolina | 16 | 2,807,399 | 0.68 | 175,462 | 716 | 80.12 |
| South Dakota | 2 | 208,078 | 0.05 | 104,039 | 755 | 72.31 |
| Tennessee | 7 | 1,536,700 | 0.37 | 219,529 | 740 | 77.36 |
| Texas | 12 | 2,081,682 | 0.51 | 173,473 | 712 | 79.14 |
| Utah | 23 | 3,576,715 | 0.87 | 155,509 | 713 | 77.90 |
| Virginia | 81 | 26,166,228 | 6.38 | 323,040 | 710 | 78.36 |
| Washington | 64 | 13,131,457 | 3.20 | 205,179 | 715 | 77.99 |
| Wisconsin | 4 | 546,576 | 0.13 | 136,644 | 720 | 77.57 |
| West Virginia | 1 | 84,778 | 0.02 | 84,778 | 623 | 80.00 |
| Wyoming | 3 | 1,646,329 | 0.40 | 548,776 | 715 | 53.57 |
| Total, Average or Weighted Average | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

No more than 0.5% of all of the mortgage loans will be secured by mortgaged properties located in any one zip code area in Virginia and no more than 0.4% of the mortgage loans will be secured by mortgaged properties located in any one zip code area outside Virginia.

I-13

## Mortgage Loan Purpose of the Group II Loans

| Loan Purpose | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Purchase ......................... | 1,016 | $259,997,235 | 63.41% | $255,903 | 722 | 78.94% |
| Rate/Term Refinance....... | 155 | 39,161,485 | 9.55 | 252,655 | 705 | 74.46 |
| Equity Refinance.............. | 376 | 110,858,906 | 27.04 | 294,838 | 704 | 72.55 |
| Total, Average or Weighted Average.......... | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

## Mortgage Loan Documentation Types of the Group II Loans

| Documentation Type | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Full Documentation......... | 419 | $98,284,747 | 23.97% | $234,570 | 707 | 78.79% |
| Reduced Documentation . | 1,128 | 311,732,880 | 76.03 | 276,359 | 718 | 76.15 |
| Total, Average or Weighted Average.......... | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

No more than 35.5% of such reduced loan documentation Group II Loans will be secured by mortgaged properties located in California. For purposes of the above table, reduced documentation includes mortgage loans which were underwritten under a no stated income or no income/no asset program.

## Occupancy Types of the Group II Loans

| Occupancy | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Primary Residence......... | 1,261 | $344,776,874 | 84.09% | $273,415 | 712 | 77.74% |
| Second/Vacation............. | 64 | 16,617,932 | 4.05 | 259,655 | 722 | 72.39 |
| Non-Owner Occupied .... | 222 | 48,622,820 | 11.86 | 219,022 | 734 | 71.55 |
| Total, Average or Weighted Average.......... | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

## Mortgaged Property Types of the Group II Loans

| Property Type | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Single-family detached | 889 | $234,875,607 | 57.28% | $264,202 | 712 | 76.47% |
| Planned Unit Developments (detached) | 328 | 94,693,057 | 23.09 | 288,698 | 710 | 77.87 |
| Condo Low-Rise (less than 5 stories) | 185 | 41,382,632 | 10.09 | 223,690 | 727 | 77.66 |
| Two-to-four family units | 72 | 22,017,350 | 5.37 | 305,797 | 735 | 74.35 |
| Planned Unit Developments (attached) | 44 | 9,585,041 | 2.34 | 217,842 | 736 | 77.93 |
| Townhouse | 15 | 3,059,833 | 0.75 | 203,989 | 720 | 72.98 |
| Condo Mid-Rise (5 to 8 stories) | 8 | 2,331,270 | 0.57 | 291,409 | 707 | 74.08 |
| Condo High-Rise (9 stories or more) | 5 | 1,672,837 | 0.41 | 334,567 | 737 | 74.10 |
| Leasehold | 1 | 400,000 | 0.10 | 400,000 | 757 | 80.00 |
| Total, Average or Weighted Average | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

## Note Margins of the Group II Loans

| Note Margins (%) | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.875 | 10 | $2,613,188 | 0.64% | $261,319 | 727 | 79.53% |
| 2.250 | 577 | 172,239,026 | 42.01 | 298,508 | 718 | 76.07 |
| 2.350 | 2 | 476,000 | 0.12 | 238,000 | 715 | 80.00 |
| 2.375 | 2 | 356,800 | 0.09 | 178,400 | 786 | 80.00 |
| 2.450 | 3 | 1,154,350 | 0.28 | 384,783 | 747 | 80.00 |
| 2.500 | 2 | 296,550 | 0.07 | 148,275 | 680 | 90.02 |
| 2.750 | 559 | 137,393,700 | 33.51 | 245,785 | 709 | 77.30 |
| 2.875 | 10 | 1,768,242 | 0.43 | 176,824 | 714 | 80.42 |
| 3.000 | 4 | 1,039,473 | 0.25 | 259,868 | 713 | 73.20 |
| 3.250 | 290 | 67,015,422 | 16.34 | 231,088 | 720 | 77.74 |
| 3.375 | 1 | 225,145 | 0.05 | 225,145 | 710 | 95.00 |
| 3.500 | 72 | 19,951,186 | 4.87 | 277,100 | 721 | 77.32 |
| 3.750 | 1 | 110,184 | 0.03 | 110,184 | 690 | 70.00 |
| 3.922 | 1 | 156,240 | 0.04 | 156,240 | 769 | 80.00 |
| 4.000 | 11 | 4,699,955 | 1.15 | 427,269 | 682 | 67.36 |
| 4.250 | 1 | 332,686 | 0.08 | 332,686 | 654 | 70.00 |
| 5.000 | 1 | 189,479 | 0.05 | 189,479 | 659 | 81.00 |
| Total, Average or Weighted Average | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

As of the cut-off date, the weighted average note margin of the Group II Loans will be approximately 2.6696% per annum.

## Maximum Mortgage Rates of the Group II Loans

| Maximum Mortgage Rates (%) | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 9.000 - 9.999 ...................... | 4 | $911,302 | 0.22% | $227,825 | 720 | 57.45% |
| 10.000 - 10.999 ................... | 142 | 40,473,117 | 9.87 | 285,022 | 722 | 76.12 |
| 11.000 - 11.999 ................... | 625 | 160,675,440 | 39.19 | 257,081 | 715 | 76.54 |
| 12.000 - 12.999 ................... | 773 | 206,918,520 | 50.47 | 267,682 | 714 | 77.18 |
| 13.000 - 13.999 ................... | 3 | 1,039,247 | 0.25 | 346,416 | 712 | 80.00 |
| Total, Average or Weighted Average.......................... | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

As of the cut-off date, the weighted average maximum mortgage rate of the Group II Loans will be approximately 11.8222% per annum.

## Minimum Mortgage Rates of the Group II Loans

| Minimum Mortgage Rates (%) | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.000 - 1.999 ...................... | 10 | $2,613,188 | 0.64% | $261,319 | 727 | 79.53% |
| 2.000 - 2.999 ...................... | 1,149 | 312,248,104 | 76.15 | 271,756 | 714 | 76.68 |
| 3.000 - 3.999 ...................... | 368 | 87,937,650 | 21.45 | 238,961 | 720 | 77.61 |
| 4.000 - 4.999 ...................... | 12 | 5,032,642 | 1.23 | 419,387 | 680 | 67.53 |
| 5.000 - 5.999 ...................... | 1 | 306,984 | 0.07 | 306,984 | 689 | 82.00 |
| 6.000 - 6.999 ...................... | 6 | 1,319,058 | 0.32 | 219,843 | 695 | 74.77 |
| 7.000 - 7.999 ...................... | 1 | 560,000 | 0.14 | 560,000 | 707 | 80.00 |
| Total, Average or Weighted Average............. | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

As of the cut-off date, the weighted average minimum mortgage rate of the Group II Loans will be approximately 2.6893% per annum.

### Next Interest Rate Adjustment Dates of the Group II Loans

| Next Interest Rate Adjustment Date | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| May 2009 | 1 | $222,700 | 0.05% | $222,700 | 690 | 39.00% |
| September 2009 | 3 | 441,936 | 0.11 | 147,312 | 695 | 78.49 |
| October 2009 | 1 | 369,846 | 0.09 | 369,846 | 685 | 76.00 |
| December 2009 | 3 | 499,074 | 0.12 | 166,358 | 723 | 80.00 |
| January 2010 | 1 | 263,082 | 0.06 | 263,082 | 718 | 95.00 |
| February 2010 | 1 | 189,479 | 0.05 | 189,479 | 659 | 81.00 |
| March 2010 | 3 | 477,990 | 0.12 | 159,330 | 661 | 76.19 |
| April 2010 | 2 | 434,869 | 0.11 | 217,434 | 757 | 68.77 |
| May 2010 | 11 | 2,792,717 | 0.68 | 253,883 | 709 | 75.00 |
| June 2010 | 17 | 3,344,670 | 0.82 | 196,745 | 710 | 79.67 |
| July 2010 | 207 | 53,227,992 | 12.98 | 257,140 | 710 | 77.88 |
| August 2010 | 123 | 30,309,190 | 7.39 | 246,416 | 706 | 75.92 |
| September 2010 | 78 | 18,887,013 | 4.61 | 242,141 | 713 | 76.91 |
| October 2010 | 258 | 69,253,733 | 16.89 | 268,425 | 716 | 75.85 |
| November 2010 | 594 | 162,347,108 | 39.60 | 273,312 | 718 | 76.50 |
| December 2010 | 244 | 66,956,226 | 16.33 | 274,411 | 717 | 77.95 |
| Total, Average or Weighted Average | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

As of the cut-off date, the weighted average months to the next interest rate adjustment date of the Group II Loans will be approximately 58 month.

### Indices of the Group II Loans

| Index | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1 YR LIBOR | 723 | $199,253,695 | 48.60% | $275,593 | 718 | 76.63% |
| 6 MO LIBOR | 823 | 210,211,931 | 51.27 | 255,422 | 713 | 76.93 |
| One-Year Treasury | 1 | 552,000 | 0.13 | 552,000 | 684 | 80.00 |
| Total, Average or Weighted Average | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

## Remaining Term to Maturity of the Group II Loans

| Remaining Term (months) | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 341 | 1 | $222,700 | 0.05% | $222,700 | 690 | 39.00% |
| 345 | 3 | 441,936 | 0.11 | 147,312 | 695 | 78.49 |
| 346 | 1 | 369,846 | 0.09 | 369,846 | 685 | 76.00 |
| 348 | 3 | 499,074 | 0.12 | 166,358 | 723 | 80.00 |
| 349 | 1 | 263,082 | 0.06 | 263,082 | 718 | 95.00 |
| 350 | 1 | 189,479 | 0.05 | 189,479 | 659 | 81.00 |
| 351 | 3 | 477,990 | 0.12 | 159,330 | 661 | 76.19 |
| 352 | 2 | 434,869 | 0.11 | 217,434 | 757 | 68.77 |
| 353 | 10 | 2,707,725 | 0.66 | 270,773 | 709 | 75.22 |
| 354 | 15 | 2,969,062 | 0.72 | 197,937 | 712 | 80.02 |
| 355 | 210 | 53,688,592 | 13.09 | 255,660 | 710 | 77.86 |
| 356 | 123 | 30,309,190 | 7.39 | 246,416 | 706 | 75.92 |
| 357 | 78 | 18,887,013 | 4.61 | 242,141 | 713 | 76.91 |
| 358 | 258 | 69,253,733 | 16.89 | 268,425 | 716 | 75.85 |
| 359 | 594 | 162,347,108 | 39.60 | 273,312 | 718 | 76.50 |
| 360 | 244 | 66,956,226 | 16.33 | 274,411 | 717 | 77.95 |
| Total, Average or Weighted Average | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

## First Interest Rate Cap of the Group II Loans

| First Interest Rate Cap (%) | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.000 | 1 | $616,000 | 0.15% | $616,000 | 730 | 80.00% |
| 2.000 | 23 | 7,762,513 | 1.89 | 337,501 | 709 | 77.69 |
| 3.000 | 2 | 417,168 | 0.10 | 208,584 | 689 | 78.83 |
| 5.000 | 526 | 139,826,757 | 34.10 | 265,830 | 715 | 77.09 |
| 5.875 | 1 | 359,650 | 0.09 | 359,650 | 683 | 64.00 |
| 6.000 | 994 | 261,035,539 | 63.66 | 262,611 | 716 | 76.61 |
| Total, Average or Weighted Average | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

## Periodic Rate Caps of the Group II Loans

| Periodic Rate Cap (%) | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.000 | 633 | $157,879,440 | 38.51% | $249,415 | 710 | 77.28% |
| 2.000 | 914 | 252,138,186 | 61.49 | 275,862 | 719 | 76.48 |
| Total, Average or Weighted Average | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

## Amortization Type of the Group II Loans

| Amortization Type | Number of Group II Loans | Principal Balance | Percentage of Group II Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Fully Amortizing | 267 | $61,472,928 | 14.99% | $230,236 | 712 | 76.42% |
| Initial Interest Only Period-5 Years | 147 | 43,141,777 | 10.52 | 293,481 | 710 | 76.15 |
| Initial Interest Only Period-10 Years | 1,133 | 305,402,922 | 74.49 | 269,552 | 716 | 76.95 |
| Total, Average or Weighted Average | 1,547 | $410,017,627 | 100.00% | $265,040 | 715 | 76.79% |

I-19

### Credit Score Distribution of the Group III Loans

| Credit Score Range | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|
| 620 – 639 ...................... | 5 | $1,417,283 | 2.83% | $283,457 | 77.43% |
| 640 – 659 ...................... | 5 | 2,444,515 | 4.89 | 488,903 | 75.51 |
| 660 – 679 ...................... | 17 | 5,149,983 | 10.30 | 302,940 | 77.87 |
| 680 – 699 ...................... | 40 | 13,537,850 | 27.07 | 338,446 | 75.32 |
| 700 – 719 ...................... | 25 | 6,731,051 | 13.46 | 269,242 | 77.06 |
| 720 – 739 ...................... | 16 | 5,100,661 | 10.20 | 318,791 | 74.92 |
| 740 – 759 ...................... | 20 | 5,241,804 | 10.48 | 262,090 | 77.18 |
| 760 – 779 ...................... | 21 | 6,285,026 | 12.57 | 299,287 | 75.77 |
| 780 – 799 ...................... | 13 | 3,591,589 | 7.18 | 276,276 | 72.53 |
| 800 or greater ................ | 3 | 507,157 | 1.01 | 169,052 | 78.61 |
| Total Average or Weighted Average ......... | 165 | $50,006,919 | 100.00% | $303,072 | 75.93% |

As of the cut-off date, the weighted average credit score of the Group III Loans will be approximately 714.

### Original Mortgage Loan Principal Balances of the Group III Loans

| Original Mortgage Loan Balance ($) | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 100,000 or less............... | 10 | $854,034 | 1.71% | $85,403 | 737 | 70.01% |
| 100,001 to 200,000 ........ | 42 | 6,199,755 | 12.40 | 147,613 | 720 | 79.74 |
| 200,001 to 300,000 ........ | 40 | 9,870,282 | 19.74 | 246,757 | 721 | 76.67 |
| 300,001 to 400,000 ........ | 33 | 11,527,134 | 23.05 | 349,307 | 710 | 75.64 |
| 400,001 to 500,000 ........ | 21 | 9,387,469 | 18.77 | 447,022 | 717 | 77.26 |
| 500,001 to 600,000 ........ | 9 | 4,901,410 | 9.80 | 544,601 | 715 | 75.07 |
| 600,001 to 700,000 ........ | 5 | 3,313,636 | 6.63 | 662,727 | 695 | 65.32 |
| 700,001 to 800,000 ........ | 4 | 3,077,200 | 6.15 | 769,300 | 713 | 76.18 |
| 800,001 to 900,000 ........ | 1 | 876,000 | 1.75 | 876,000 | 655 | 80.00 |
| Total, Average or Weighted Average ......... | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

## Net Mortgage Rates of the Group III Loans

| Net Mortgage Rates (%) | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 5.000 – 5.499 | 10 | $3,803,832 | 7.61% | $380,383 | 705 | 73.15% |
| 5.500 – 5.999 | 56 | 17,046,388 | 34.09 | 304,400 | 720 | 74.24 |
| 6.000 – 6.499 | 68 | 20,138,988 | 40.27 | 296,162 | 712 | 76.13 |
| 6.500 – 6.999 | 28 | 8,410,445 | 16.82 | 300,373 | 712 | 79.45 |
| 7.000 – 7.499 | 3 | 607,264 | 1.21 | 202,421 | 699 | 85.31 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

As of the cut-off date, the weighted average Net Mortgage Rate of the Group III Loans will be approximately 6.0895% per annum.

## Mortgage Rates of the Group III Loans

| Mortgage Rates (%) | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 5.000 – 5.499 | 1 | $562,800 | 1.13% | $562,800 | 695 | 80.00% |
| 5.500 – 5.999 | 23 | 7,353,052 | 14.70 | 319,698 | 721 | 73.17 |
| 6.000 – 6.499 | 57 | 18,108,915 | 36.21 | 317,700 | 721 | 73.69 |
| 6.500 – 6.999 | 69 | 19,874,492 | 39.74 | 288,036 | 704 | 78.28 |
| 7.000 – 7.499 | 14 | 3,885,996 | 7.77 | 277,571 | 719 | 77.92 |
| 7.500 – 7.999 | 1 | 221,664 | 0.44 | 221,664 | 746 | 95.00 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

As of the cut-off date, the weighted average mortgage rate of the Group III Loans will be approximately 6.3895% per annum.

## Original Loan-to-Value Ratios of the Group III Loans

| Original Loan-to-Value Ratio (%) | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score |
|---|---|---|---|---|---|
| 00.01 - 50.00 .............. | 6 | $1,507,215 | 3.01% | $251,203 | 745 |
| 50.01 - 55.00 .............. | 2 | 702,500 | 1.40 | 351,250 | 685 |
| 55.01 - 60.00 .............. | 7 | 2,239,500 | 4.48 | 319,929 | 716 |
| 60.01 - 65.00 .............. | 10 | 3,502,236 | 7.00 | 350,224 | 719 |
| 65.01 - 70.00 .............. | 8 | 2,667,700 | 5.33 | 333,463 | 722 |
| 70.01 - 75.00 .............. | 20 | 7,907,011 | 15.81 | 395,351 | 698 |
| 75.01 - 80.00 .............. | 98 | 27,967,870 | 55.93 | 285,386 | 716 |
| 80.01 - 85.00 .............. | 1 | 396,500 | 0.79 | 396,500 | 635 |
| 85.01 - 90.00 .............. | 6 | 1,619,077 | 3.24 | 269,846 | 740 |
| 90.01 – 95.00.............. | 7 | 1,497,309 | 2.99 | 213,901 | 711 |
| Total, Average or Weighted Average......... | 165 | $50,006,919 | 100.00% | $303,072 | 714 |

The weighted average loan-to-value ratio at origination of the Group III Loans will be approximately 75.93%.

## Geographic Distribution of Mortgaged Properties of the Group III Loans

| State | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Alaska | 1 | $261,900 | 0.52% | $261,900 | 701 | 90.00% |
| Alabama | 2 | 679,359 | 1.36 | 339,680 | 713 | 78.07 |
| Arizona | 13 | 4,455,714 | 8.91 | 342,747 | 694 | 77.74 |
| California | 44 | 18,481,409 | 36.96 | 420,032 | 713 | 73.85 |
| Colorado | 9 | 1,743,540 | 3.49 | 193,727 | 761 | 74.16 |
| Connecticut | 1 | 500,000 | 1.00 | 500,000 | 751 | 65.00 |
| District of Columbia | 2 | 814,200 | 1.63 | 407,100 | 752 | 65.89 |
| Florida | 13 | 2,720,973 | 5.44 | 209,306 | 710 | 78.42 |
| Georgia | 4 | 1,258,136 | 2.52 | 314,534 | 737 | 77.22 |
| Idaho | 4 | 580,500 | 1.16 | 145,125 | 723 | 70.80 |
| Illinois | 3 | 826,500 | 1.65 | 275,500 | 706 | 78.14 |
| Indiana | 2 | 187,910 | 0.38 | 93,955 | 749 | 80.00 |
| Kansas | 1 | 184,000 | 0.37 | 184,000 | 705 | 90.00 |
| Kentucky | 3 | 301,200 | 0.60 | 100,400 | 711 | 85.21 |
| Maryland | 1 | 312,000 | 0.62 | 312,000 | 696 | 80.00 |
| Michigan | 6 | 1,175,434 | 2.35 | 195,906 | 681 | 78.71 |
| Minnesota | 2 | 384,881 | 0.77 | 192,441 | 759 | 59.16 |
| Missouri | 3 | 898,264 | 1.80 | 299,421 | 687 | 79.83 |
| Montana | 1 | 107,200 | 0.21 | 107,200 | 691 | 67.00 |
| North Carolina | 3 | 679,693 | 1.36 | 226,564 | 653 | 80.00 |
| Nebraska | 1 | 155,866 | 0.31 | 155,866 | 778 | 80.00 |
| New Hampshire | 1 | 270,000 | 0.54 | 270,000 | 715 | 64.00 |
| New Jersey | 6 | 1,956,121 | 3.91 | 326,020 | 706 | 68.39 |
| Nevada | 2 | 664,550 | 1.33 | 332,275 | 752 | 80.00 |
| New York | 2 | 398,913 | 0.80 | 199,457 | 685 | 61.73 |
| Ohio | 1 | 332,000 | 0.66 | 332,000 | 697 | 80.00 |
| Oregon | 1 | 175,200 | 0.35 | 175,200 | 754 | 80.00 |
| Pennsylvania | 1 | 160,650 | 0.32 | 160,650 | 739 | 90.00 |
| Rhode Island | 1 | 228,000 | 0.46 | 228,000 | 778 | 80.00 |
| South Carolina | 3 | 1,152,950 | 2.31 | 384,317 | 694 | 76.99 |
| Texas | 7 | 1,814,566 | 3.63 | 259,224 | 688 | 85.81 |
| Utah | 3 | 844,800 | 1.69 | 281,600 | 722 | 80.00 |
| Virginia | 4 | 1,644,250 | 3.29 | 411,063 | 730 | 81.66 |
| Washington | 13 | 3,473,776 | 6.95 | 267,214 | 730 | 77.35 |
| Wisconsin | 1 | 182,462 | 0.36 | 182,462 | 707 | 94.00 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

No more than 2.4% of all of the mortgage loans will be secured by mortgaged properties located in any one zip code area in California and no more than 1.8% of the mortgage loans will be secured by mortgaged properties located in any one zip code area outside California.

### Mortgage Loan Purpose of the Group III Loans

| Loan Purpose | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Purchase | 82 | $23,419,987 | 46.83% | $285,610 | 722 | 79.70% |
| Rate/Term Refinance | 25 | 6,097,522 | 12.19 | 243,901 | 703 | 77.28 |
| Equity Refinance | 58 | 20,489,409 | 40.97 | 353,266 | 709 | 71.22 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

### Mortgage Loan Documentation Types of the Group III Loans

| Documentation Type | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Full Documentation | 50 | $14,088,262 | 28.17% | $281,765 | 713 | 79.54% |
| Reduced Documentation | 115 | 35,918,657 | 71.83 | 312,336 | 714 | 74.51 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

No more than 39.1% of such reduced loan documentation Group III Loans will be secured by mortgaged properties located in California. For purposes of the above table, reduced documentation includes mortgage loans which were underwritten under a no stated income or no income/no asset program.

### Occupancy Types of the Group III Loans

| Occupancy | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Primary Residence | 120 | $37,955,068 | 75.90% | $316,292 | 708 | 77.07% |
| Second/Vacation | 6 | 2,151,866 | 4.30 | 358,644 | 732 | 76.52 |
| Non-Owner Occupied | 39 | 9,899,985 | 19.80 | 253,846 | 732 | 71.44 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

### Mortgaged Property Types of the Group III Loans

| Property Type | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Single-family detached | 100 | $29,295,669 | 58.58% | $292,957 | 713 | 75.63% |
| Planned Unit Developments (detached) | 28 | 9,796,140 | 19.59 | 349,862 | 706 | 78.79 |
| Two-to-four family units | 16 | 5,094,132 | 10.19 | 318,383 | 729 | 69.04 |
| Condo Low-Rise (less than 5 stories) | 16 | 4,381,259 | 8.76 | 273,829 | 717 | 79.42 |
| Condo High-Rise (9 stories or more) | 2 | 735,200 | 1.47 | 367,600 | 705 | 76.19 |
| Planned Unit Developments (attached) | 2 | 592,623 | 1.19 | 296,311 | 736 | 76.21 |
| Townhouse | 1 | 111,896 | 0.22 | 111,896 | 692 | 80.00 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

### Note Margins of the Group III Loans

| Note Margins (%) | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.875 | 2 | $834,143 | 1.67% | $417,072 | 743 | 76.04% |
| 2.250 | 28 | 8,934,663 | 17.87 | 319,095 | 713 | 78.97 |
| 2.750 | 8 | 3,422,200 | 6.84 | 427,775 | 707 | 74.70 |
| 3.250 | 126 | 36,415,913 | 72.82 | 289,015 | 715 | 75.29 |
| 3.748 | 1 | 400,000 | 0.80 | 400,000 | 678 | 77.00 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

As of the cut-off date, the weighted average note margin of the Group III Loans will be approximately 3.0182% per annum.

### Maximum Mortgage Rates of the Group III Loans

| Maximum Mortgage Rates (%) | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 10.000 - 10.999 | 8 | $2,988,343 | 5.98% | $373,543 | 712 | 77.79% |
| 11.000 - 11.999 | 27 | 7,516,732 | 15.03 | 278,397 | 727 | 73.41 |
| 12.000 - 12.999 | 116 | 35,842,184 | 71.67 | 308,984 | 710 | 76.02 |
| 13.000 - 13.999 | 14 | 3,659,660 | 7.32 | 261,404 | 725 | 78.70 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

As of the cut-off date, the weighted average maximum mortgage rate of the Group III Loans will be approximately 12.2690% per annum.

### Minimum Mortgage Rates of the Group III Loans

| Minimum Mortgage Rates (%) | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.000 - 1.999 | 2 | $834,143 | 1.67% | $417,072 | 743 | 76.04% |
| 2.000 - 2.999 | 36 | 12,356,863 | 24.71 | 343,246 | 711 | 77.78 |
| 3.000 - 3.999 | 127 | 36,815,913 | 73.62 | 289,889 | 714 | 75.31 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

As of the cut-off date, the weighted average minimum mortgage rate of the Group III Loans will be approximately 3.0182% per annum.

### Next Interest Rate Adjustment Dates of the Group III Loans

| Next Interest Rate Adjustment Date | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| May 2012 | 1 | $348,000 | 0.70% | $348,000 | 704 | 80.00% |
| June 2012 | 1 | 184,000 | 0.37 | 184,000 | 705 | 90.00 |
| July 2012 | 2 | 800,000 | 1.60 | 400,000 | 694 | 78.50 |
| October 2012 | 7 | 2,366,572 | 4.73 | 338,082 | 702 | 80.00 |
| November 2012 | 88 | 27,631,136 | 55.25 | 313,990 | 716 | 76.57 |
| December 2012 | 66 | 18,677,211 | 37.35 | 282,988 | 713 | 74.15 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

As of the cut-off date, the weighted average months to the next interest rate adjustment date of the Group III Loans will be approximately 83 month.

### Indices of the Group III Loans

| Index | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1 YR LIBOR | 153 | $45,200,819 | 90.39% | $295,430 | 715 | 75.71% |
| 6 MO LIBOR | 12 | 4,806,100 | 9.61 | 400,508 | 704 | 77.98 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

### Remaining Term to Maturity of the Group III Loans

| Remaining Term (months) | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 353 | 1 | $348,000 | 0.70% | $348,000 | 704 | 80.00% |
| 354 | 1 | 184,000 | 0.37 | 184,000 | 705 | 90.00 |
| 355 | 2 | 800,000 | 1.60 | 400,000 | 694 | 78.50 |
| 358 | 7 | 2,366,572 | 4.73 | 338,082 | 702 | 80.00 |
| 359 | 88 | 27,631,136 | 55.25 | 313,990 | 716 | 76.57 |
| 360 | 66 | 18,677,211 | 37.35 | 282,988 | 713 | 74.15 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

### First Interest Rate Cap of the Group III Loans

| First Interest Rate Cap (%) | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 5.000 | 20 | $6,025,566 | 12.05% | $301,278 | 719 | 77.92% |
| 6.000 | 145 | 43,981,353 | 87.95 | 303,320 | 713 | 75.66 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

### Periodic Rate Caps of the Group III Loans

| Periodic Rate Cap (%) | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.000 | 10 | $4,245,450 | 8.49% | $424,545 | 702 | 77.33% |
| 2.000 | 155 | 45,761,469 | 91.51 | 295,235 | 715 | 75.80 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

### Amortization Type of the Group III Loans

| Amortization Type | Number of Group III Loans | Principal Balance | Percentage of Group III Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Fully Amortizing | 38 | $8,470,635 | 16.94% | $222,911 | 707 | 75.57% |
| Initial Interest Only Period-7 Years | 11 | 3,978,326 | 7.96 | 361,666 | 707 | 76.78 |
| Initial Interest Only Period-10 Years | 116 | 37,557,958 | 75.11 | 323,775 | 716 | 75.92 |
| Total, Average or Weighted Average | 165 | $50,006,919 | 100.00% | $303,072 | 714 | 75.93% |

### Credit Score Distribution of the Mortgage Loans

| Credit Score Range | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|
| 620 – 639 | 54 | $16,102,168 | 2.87% | $298,188 | 75.74% |
| 640 – 659 | 100 | 27,785,127 | 4.96 | 277,851 | 74.67 |
| 660 – 679 | 270 | 69,594,264 | 12.42 | 257,757 | 75.79 |
| 680 – 699 | 381 | 106,538,465 | 19.02 | 279,629 | 76.78 |
| 700 – 719 | 328 | 88,740,230 | 15.84 | 270,549 | 77.62 |
| 720 – 739 | 293 | 79,034,232 | 14.11 | 269,741 | 78.19 |
| 740 – 759 | 260 | 70,511,124 | 12.59 | 271,197 | 77.95 |
| 760 – 779 | 207 | 57,041,188 | 10.18 | 275,561 | 76.07 |
| 780 – 799 | 129 | 37,250,817 | 6.65 | 288,766 | 75.01 |
| 800 or greater | 30 | 7,302,972 | 1.30 | 243,432 | 73.32 |
| Subtotal with Credit Score | 2,052 | $559,900,586 | 99.95% | $272,856 | 76.77% |
| Not Available | 2 | 284,469 | 0.05 | 142,234 | 74.13 |
| Total Average or Weighted Average | 2,054 | $560,185,055 | 100.00% | $272,729 | 76.77% |

As of the cut-off date, the weighted average credit score of the mortgage loans will be approximately 716.

Mortgage Loans indicated as having a credit score that is "Not Available" include certain Mortgage Loans were the credit score was not provided by the related seller and Mortgage Loans where no credit history can be obtained for the related mortgagor.

### Original Mortgage Loan Principal Balances of the Mortgage Loans

| Original Mortgage Loan Balance ($) | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 100,000 or less | 96 | $8,052,937 | 1.44% | $83,885 | 717 | 73.53% |
| 100,001 to 200,000 | 726 | 111,485,577 | 19.90 | 153,561 | 717 | 77.84 |
| 200,001 to 300,000 | 554 | 136,332,001 | 24.34 | 246,087 | 712 | 77.20 |
| 300,001 to 400,000 | 330 | 113,132,093 | 20.20 | 342,825 | 714 | 77.25 |
| 400,001 to 500,000 | 170 | 76,706,551 | 13.69 | 451,215 | 719 | 77.83 |
| 500,001 to 600,000 | 92 | 50,275,303 | 8.97 | 546,471 | 721 | 76.06 |
| 600,001 to 700,000 | 50 | 31,711,145 | 5.66 | 634,223 | 719 | 75.35 |
| 700,001 to 800,000 | 12 | 9,127,751 | 1.63 | 760,646 | 719 | 76.30 |
| 800,001 to 900,000 | 9 | 7,654,800 | 1.37 | 850,533 | 692 | 72.63 |
| 900,001 to 1,000,000 | 12 | 11,680,696 | 2.09 | 973,391 | 736 | 68.96 |
| 1,200,001 to 1,300,000 | 2 | 2,580,000 | 0.46 | 1,290,000 | 680 | 51.04 |
| 1,400,001 to 1,500,000 | 1 | 1,446,200 | 0.26 | 1,446,200 | 683 | 65.00 |
| Total, Average or Weighted Average | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

### Net Mortgage Rates of the Mortgage Loans

| Net Mortgage Rates (%) | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 3.500 – 3.999 | 1 | $450,911 | 0.08% | $450,911 | 727 | 80.00% |
| 4.000 – 4.499 | 12 | 3,837,408 | 0.69 | 319,784 | 763 | 71.80 |
| 4.500 – 4.999 | 31 | 8,892,209 | 1.59 | 286,845 | 728 | 71.63 |
| 5.000 – 5.499 | 294 | 80,876,490 | 14.44 | 275,090 | 718 | 75.80 |
| 5.500 – 5.999 | 951 | 265,315,837 | 47.36 | 278,986 | 718 | 76.68 |
| 6.000 – 6.499 | 639 | 169,509,159 | 30.26 | 265,273 | 711 | 77.15 |
| 6.500 – 6.999 | 97 | 25,014,648 | 4.47 | 257,883 | 711 | 79.08 |
| 7.000 – 7.499 | 29 | 6,288,393 | 1.12 | 216,841 | 713 | 82.97 |
| Total, Average or Weighted Average | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

As of the cut-off date, the weighted average Net Mortgage Rate of the mortgage loans will be approximately 5.8673% per annum.

### Mortgage Rates of the Mortgage Loans

| Mortgage Rates (%) | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 4.000 – 4.499 | 2 | $673,611 | 0.12% | $336,806 | 715 | 66.45% |
| 4.500 – 4.999 | 12 | 3,786,708 | 0.68 | 315,559 | 764 | 72.38 |
| 5.000 – 5.499 | 56 | 16,311,159 | 2.91 | 291,271 | 719 | 73.73 |
| 5.500 – 5.999 | 506 | 135,748,914 | 24.23 | 268,278 | 720 | 76.21 |
| 6.000 – 6.499 | 942 | 260,629,451 | 46.53 | 276,677 | 716 | 76.84 |
| 6.500 – 6.999 | 469 | 126,910,618 | 22.66 | 270,598 | 710 | 77.45 |
| 7.000 – 7.499 | 51 | 13,166,620 | 2.35 | 258,169 | 707 | 77.84 |
| 7.500 – 7.999 | 16 | 2,957,973 | 0.53 | 184,873 | 739 | 86.52 |
| Total, Average or Weighted Average | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

As of the cut-off date, the weighted average mortgage rate of the mortgage loans will be approximately 6.1693% per annum.

### Original Loan-to-Value Ratios of the Mortgage Loans

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score |
|---|---|---|---|---|---|
| 00.01 - 50.00 ............... | 42 | $9,818,979 | 1.75% | $233,785 | 721 |
| 50.01 - 55.00 ............... | 17 | 4,753,977 | 0.85 | 279,646 | 718 |
| 55.01 - 60.00 ............... | 44 | 14,960,387 | 2.67 | 340,009 | 733 |
| 60.01 - 65.00 ............... | 92 | 30,306,314 | 5.41 | 329,416 | 717 |
| 65.01 - 70.00 ............... | 118 | 37,285,993 | 6.66 | 315,983 | 703 |
| 70.01 - 75.00 ............... | 184 | 51,790,860 | 9.25 | 281,472 | 708 |
| 75.01 - 80.00 ............... | 1,459 | 389,822,422 | 69.59 | 267,185 | 717 |
| 80.01 - 85.00 ............... | 13 | 3,289,258 | 0.59 | 253,020 | 691 |
| 85.01 - 90.00 ............... | 53 | 12,015,157 | 2.14 | 226,701 | 725 |
| 90.01 – 95.00 ............... | 28 | 5,467,131 | 0.98 | 195,255 | 731 |
| 95.01 – 100.00 ........... | 4 | 674,576 | 0.12 | 168,644 | 745 |
| Total, Average or Weighted Average ......... | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 |

The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 76.77%.

### Geographic Distribution of Mortgaged Properties of the Mortgage Loans

| State | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Alaska | 6 | $1,118,192 | 0.20% | $186,365 | 715 | 81.14% |
| Alabama | 9 | 1,956,975 | 0.35 | 217,442 | 716 | 78.48 |
| Arkansas | 2 | 990,142 | 0.18 | 495,071 | 674 | 72.12 |
| Arizona | 169 | 39,520,092 | 7.05 | 233,847 | 705 | 77.31 |
| California | 480 | 184,924,281 | 33.01 | 385,259 | 720 | 74.68 |
| Colorado | 106 | 19,421,943 | 3.47 | 183,226 | 723 | 79.14 |
| Connecticut | 34 | 9,421,339 | 1.68 | 277,098 | 709 | 77.13 |
| District of Columbia | 11 | 4,123,266 | 0.74 | 374,842 | 729 | 76.44 |
| Delaware | 4 | 1,205,300 | 0.22 | 301,325 | 743 | 79.51 |
| Florida | 292 | 66,482,877 | 11.87 | 227,681 | 715 | 76.82 |
| Georgia | 40 | 7,808,692 | 1.39 | 195,217 | 708 | 78.85 |
| Hawaii | 4 | 1,677,800 | 0.30 | 419,450 | 743 | 74.09 |
| Iowa | 1 | 104,000 | 0.02 | 104,000 | 721 | 80.00 |
| Idaho | 17 | 2,473,704 | 0.44 | 145,512 | 728 | 74.65 |
| Illinois | 63 | 13,853,296 | 2.47 | 219,894 | 708 | 77.70 |
| Indiana | 13 | 1,690,086 | 0.30 | 130,007 | 734 | 77.92 |
| Kansas | 3 | 390,400 | 0.07 | 130,133 | 708 | 84.71 |
| Kentucky | 7 | 1,234,060 | 0.22 | 176,294 | 732 | 72.33 |
| Louisiana | 5 | 842,170 | 0.15 | 168,434 | 736 | 87.09 |
| Massachusetts | 21 | 5,273,178 | 0.94 | 251,104 | 720 | 75.50 |
| Maryland | 66 | 19,584,519 | 3.50 | 296,735 | 712 | 78.93 |
| Maine | 1 | 440,000 | 0.08 | 440,000 | 660 | 68.00 |
| Michigan | 31 | 5,621,744 | 1.00 | 181,347 | 682 | 78.86 |
| Minnesota | 55 | 11,962,490 | 2.14 | 217,500 | 708 | 77.89 |
| Missouri | 13 | 3,061,257 | 0.55 | 235,481 | 717 | 78.73 |
| Montana | 5 | 915,082 | 0.16 | 183,016 | 767 | 80.81 |
| North Carolina | 17 | 3,492,455 | 0.62 | 205,439 | 702 | 79.54 |
| Nebraska | 4 | 754,973 | 0.13 | 188,743 | 700 | 81.25 |
| New Hampshire | 2 | 549,920 | 0.10 | 274,960 | 703 | 72.14 |
| New Jersey | 63 | 21,227,026 | 3.79 | 336,937 | 723 | 77.26 |
| New Mexico | 8 | 1,956,781 | 0.35 | 244,598 | 716 | 80.99 |
| Nevada | 68 | 18,151,609 | 3.24 | 266,935 | 710 | 77.99 |
| New York | 42 | 12,870,396 | 2.30 | 306,438 | 720 | 77.60 |
| Ohio | 20 | 3,216,598 | 0.57 | 160,830 | 718 | 77.90 |
| Oklahoma | 2 | 507,903 | 0.09 | 253,951 | 714 | 80.00 |
| Oregon | 49 | 9,213,889 | 1.64 | 188,039 | 719 | 79.84 |
| Pennsylvania | 11 | 1,575,456 | 0.28 | 143,223 | 724 | 79.69 |
| Rhode Island | 6 | 1,329,006 | 0.24 | 221,501 | 734 | 78.57 |
| South Carolina | 23 | 5,753,428 | 1.03 | 250,149 | 719 | 78.92 |
| South Dakota | 2 | 208,078 | 0.04 | 104,039 | 755 | 72.31 |
| Tennessee | 7 | 1,536,700 | 0.27 | 219,529 | 740 | 77.36 |
| Texas | 20 | 4,518,968 | 0.81 | 225,948 | 709 | 81.94 |
| Utah | 30 | 5,008,242 | 0.89 | 166,941 | 710 | 78.24 |
| Virginia | 114 | 37,821,373 | 6.75 | 331,766 | 712 | 78.41 |
| Vermont | 2 | 468,086 | 0.08 | 234,043 | 722 | 80.00 |
| Washington | 95 | 21,145,020 | 3.77 | 222,579 | 716 | 78.37 |
| Wisconsin | 5 | 729,038 | 0.13 | 145,808 | 716 | 81.69 |
| West Virginia | 3 | 406,895 | 0.07 | 135,632 | 684 | 80.00 |
| Wyoming | 3 | 1,646,329 | 0.29 | 548,776 | 715 | 53.57 |
| Total, Average or Weighted Average | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

No more than 0.6% of the of the mortgage loans will be secured by mortgaged properties located in any one zip code area in Virginia and no more than 0.4% of the mortgage loans will be secured by mortgaged properties located in any one zip code area outside Virginia.

### Mortgage Loan Purpose of the Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Purchase ......................... | 1,290 | $340,437,042 | 60.77% | $263,905 | 723 | 79.09% |
| Rate/Term Refinance....... | 240 | 61,753,345 | 11.02 | 257,306 | 706 | 74.85 |
| Equity Refinance............. | 524 | 157,994,668 | 28.20 | 301,517 | 705 | 72.51 |
| Total, Average or Weighted Average.......... | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

### Mortgage Loan Documentation Types of the Mortgage Loans

| Documentation Type | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Full Documentation......... | 603 | $148,325,501 | 26.48% | $245,979 | 709 | 78.65% |
| Reduced Documentation . | 1,451 | 411,859,554 | 73.52 | 283,845 | 718 | 76.09 |
| Total, Average or Weighted Average.......... | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

No more than 36.8% of such reduced loan documentation mortgage loans will be secured by mortgaged properties located in California. For purposes of the above table, reduced documentation includes mortgage loans which were underwritten under a no stated income or no income/no asset program.

### Occupancy Types of the Mortgage Loans

| Occupancy | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Primary Residence......... | 1,655 | $467,203,958 | 83.40% | $282,298 | 713 | 77.76% |
| Second/Vacation............ | 83 | 22,472,697 | 4.01 | 270,755 | 731 | 73.12 |
| Non-Owner Occupied .... | 316 | 70,508,400 | 12.59 | 223,128 | 733 | 71.32 |
| Total, Average or Weighted Average......... | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

## Mortgaged Property Types of the Mortgage Loans

| Property Type | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Single-family detached............................ | 1,194 | $321,211,989 | 57.34% | $269,022 | 714 | 76.49% |
| Planned Unit Developments (detached) .. | 417 | 126,550,466 | 22.59 | 303,478 | 710 | 77.93 |
| Condo Low-Rise (less than 5 stories)...... | 241 | 56,169,442 | 10.03 | 233,068 | 726 | 77.34 |
| Two-to-four family units ........................ | 97 | 30,349,576 | 5.42 | 312,882 | 732 | 73.50 |
| Planned Unit Developments (attached) ... | 61 | 14,364,456 | 2.56 | 235,483 | 732 | 78.62 |
| Townhouse ............................................. | 21 | 4,215,704 | 0.75 | 200,748 | 720 | 73.94 |
| Condo High-Rise (9 stories or more) ...... | 10 | 3,428,847 | 0.61 | 342,885 | 731 | 77.53 |
| Condo Mid-Rise (5 to 8 stories).............. | 11 | 3,300,170 | 0.59 | 300,015 | 713 | 73.52 |
| Leasehold.............................................. | 1 | 400,000 | 0.07 | 400,000 | 757 | 80.00 |
| Cooperative Units .................................. | 1 | 194,405 | 0.03 | 194,405 | 796 | 77.00 |
| Total, Average or Weighted Average... | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

## Note Margins of the Mortgage Loans

| Note Margins (%) | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.875 | 13 | $3,702,617 | 0.66% | $284,817 | 729 | 78.78% |
| 2.250 | 753 | 225,474,741 | 40.25 | 299,435 | 718 | 76.57 |
| 2.350 | 2 | 476,000 | 0.08 | 238,000 | 715 | 80.00 |
| 2.375 | 2 | 356,800 | 0.06 | 178,400 | 786 | 80.00 |
| 2.450 | 3 | 1,154,350 | 0.21 | 384,783 | 747 | 80.00 |
| 2.500 | 2 | 296,550 | 0.05 | 148,275 | 680 | 90.02 |
| 2.750 | 582 | 145,663,121 | 26.00 | 250,280 | 709 | 77.23 |
| 2.875 | 10 | 1,768,242 | 0.32 | 176,824 | 714 | 80.42 |
| 3.000 | 4 | 1,039,473 | 0.19 | 259,868 | 713 | 73.20 |
| 3.250 | 563 | 144,410,852 | 25.78 | 256,502 | 717 | 76.66 |
| 3.375 | 1 | 225,145 | 0.04 | 225,145 | 710 | 95.00 |
| 3.500 | 103 | 29,728,620 | 5.31 | 288,627 | 727 | 77.16 |
| 3.748 | 1 | 400,000 | 0.07 | 400,000 | 678 | 77.00 |
| 3.750 | 1 | 110,184 | 0.02 | 110,184 | 690 | 70.00 |
| 3.922 | 1 | 156,240 | 0.03 | 156,240 | 769 | 80.00 |
| 4.000 | 11 | 4,699,955 | 0.84 | 427,269 | 682 | 67.36 |
| 4.250 | 1 | 332,686 | 0.06 | 332,686 | 654 | 70.00 |
| 5.000 | 1 | 189,479 | 0.03 | 189,479 | 659 | 81.00 |
| Total, Average or Weighted Average | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

As of the cut-off date, the weighted average note margin of the mortgage loans will be approximately 2.7248% per annum.

## Maximum Mortgage Rates of the Mortgage Loans

| Maximum Mortgage Rates (%) | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 9.000 – 9.999 | 4 | $911,302 | 0.16% | $227,825 | 720 | 57.45% |
| 10.000 - 10.999 | 161 | 47,411,279 | 8.46 | 294,480 | 724 | 76.20 |
| 11.000 – 11.999 | 772 | 204,764,637 | 36.55 | 265,239 | 716 | 76.56 |
| 12.000 - 12.999 | 1,083 | 297,781,117 | 53.16 | 274,959 | 714 | 76.99 |
| 13.000 – 13.999 | 34 | 9,316,721 | 1.66 | 274,021 | 717 | 78.81 |
| Total, Average or Weighted Average | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

As of the cut-off date, the weighted average maximum mortgage rate of the mortgage loans will be approximately 11.9053% per annum.

## Minimum Mortgage Rates of the Mortgage Loans

| Minimum Mortgage Rates (%) | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.000 - 1.999 | 13 | $3,702,617 | 0.66% | $284,817 | 729 | 78.78% |
| 2.000 - 2.999 | 1,347 | 373,501,240 | 66.67 | 277,284 | 715 | 76.88 |
| 3.000 - 3.999 | 673 | 175,510,514 | 31.33 | 260,788 | 719 | 76.74 |
| 4.000 - 4.999 | 12 | 5,032,642 | 0.90 | 419,387 | 680 | 67.53 |
| 5.000 - 5.999 | 1 | 306,984 | 0.05 | 306,984 | 689 | 82.00 |
| 6.000 - 6.999 | 7 | 1,571,058 | 0.28 | 224,437 | 693 | 74.00 |
| 7.000 - 7.999 | 1 | 560,000 | 0.10 | 560,000 | 707 | 80.00 |
| Total, Average or Weighted Average | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

As of the cut-off date, the weighted average minimum mortgage rate of the mortgage loans will be approximately 2.7410% per annum.

## Next Interest Rate Adjustment Dates of the Mortgage Loans

| Next Interest Rate Adjustment Date | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| September 2007 | 1 | $568,742 | 0.10% | $568,742 | 712 | 65.00% |
| January 2008 | 1 | 140,000 | 0.02 | 140,000 | 810 | 80.00 |
| March 2008 | 1 | 180,000 | 0.03 | 180,000 | 679 | 80.00 |
| April 2008 | 3 | 1,515,308 | 0.27 | 505,103 | 759 | 69.10 |
| May 2008 | 10 | 2,948,161 | 0.53 | 294,816 | 752 | 70.77 |
| June 2008 | 3 | 512,511 | 0.09 | 170,837 | 724 | 80.00 |
| July 2008 | 5 | 1,469,807 | 0.26 | 293,961 | 724 | 76.83 |
| August 2008 | 13 | 5,068,576 | 0.90 | 389,890 | 740 | 67.92 |
| September 2008 | 12 | 3,008,477 | 0.54 | 250,706 | 751 | 77.09 |
| October 2008 | 28 | 8,061,792 | 1.44 | 287,921 | 726 | 78.10 |
| November 2008 | 172 | 50,276,986 | 8.98 | 292,308 | 718 | 78.71 |
| December 2008 | 92 | 26,219,049 | 4.68 | 284,990 | 707 | 76.87 |
| January 2009 | 1 | 191,100 | 0.03 | 191,100 | 726 | 70.00 |
| May 2009 | 1 | 222,700 | 0.04 | 222,700 | 690 | 39.00 |
| September 2009 | 3 | 441,936 | 0.08 | 147,312 | 695 | 78.49 |
| October 2009 | 1 | 369,846 | 0.07 | 369,846 | 685 | 76.00 |
| December 2009 | 3 | 499,074 | 0.09 | 166,358 | 723 | 80.00 |
| January 2010 | 1 | 263,082 | 0.05 | 263,082 | 718 | 95.00 |
| February 2010 | 1 | 189,479 | 0.03 | 189,479 | 659 | 81.00 |
| March 2010 | 3 | 477,990 | 0.09 | 159,330 | 661 | 76.19 |
| April 2010 | 2 | 434,869 | 0.08 | 217,434 | 757 | 68.77 |
| May 2010 | 11 | 2,792,717 | 0.50 | 253,883 | 709 | 75.00 |
| June 2010 | 17 | 3,344,670 | 0.60 | 196,745 | 710 | 79.67 |
| July 2010 | 207 | 53,227,992 | 9.50 | 257,140 | 710 | 77.88 |
| August 2010 | 123 | 30,309,190 | 5.41 | 246,416 | 706 | 75.92 |
| September 2010 | 78 | 18,887,013 | 3.37 | 242,141 | 713 | 76.91 |
| October 2010 | 258 | 69,253,733 | 12.36 | 268,425 | 716 | 75.85 |
| November 2010 | 594 | 162,347,108 | 28.98 | 273,312 | 718 | 76.50 |
| December 2010 | 244 | 66,956,226 | 11.95 | 274,411 | 717 | 77.95 |
| May 2012 | 1 | 348,000 | 0.06 | 348,000 | 704 | 80.00 |
| June 2012 | 1 | 184,000 | 0.03 | 184,000 | 705 | 90.00 |
| July 2012 | 2 | 800,000 | 0.14 | 400,000 | 694 | 78.50 |

| | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| October 2012................. | 7 | 2,366,572 | 0.42 | 338,082 | 702 | 80.00 |
| November 2012............. | 88 | 27,631,136 | 4.93 | 313,990 | 716 | 76.57 |
| December 2012.............. | 66 | 18,677,211 | 3.33 | 282,988 | 713 | 74.15 |
| Total, Average or Weighted Average ......... | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

As of the cut-off date, the weighted average months to the next interest rate adjustment date of the mortgage loans will be approximately 56 month.

### Indices of the Mortgage Loans

| Index | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1 YR LIBOR ................. | 1,115 | $311,386,392 | 55.59% | $279,270 | 717 | 76.77% |
| 6 MO LIBOR ................ | 938 | 248,246,663 | 44.32 | 264,655 | 715 | 76.75 |
| One-Year Treasury ........ | 1 | 552,000 | 0.10 | 552,000 | 684 | 80.00 |
| Total, Average or Weighted Average ......... | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

### Remaining Term to Maturity of the Mortgage Loans

| Remaining Term (months) | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 341 ................................... | 1 | $222,700 | 0.04% | $222,700 | 690 | 39.00% |
| 345 ................................... | 4 | 1,010,678 | 0.18 | 252,669 | 705 | 70.90 |
| 346 ................................... | 1 | 369,846 | 0.07 | 369,846 | 685 | 76.00 |
| 348 ................................... | 3 | 499,074 | 0.09 | 166,358 | 723 | 80.00 |
| 349 ................................... | 2 | 403,082 | 0.07 | 201,541 | 750 | 89.79 |
| 350 ................................... | 1 | 189,479 | 0.03 | 189,479 | 659 | 81.00 |
| 351 ................................... | 4 | 657,990 | 0.12 | 164,498 | 666 | 77.23 |
| 352 ................................... | 5 | 1,950,177 | 0.35 | 390,035 | 758 | 69.03 |
| 353 ................................... | 21 | 6,003,886 | 1.07 | 285,899 | 729 | 73.31 |
| 354 ................................... | 19 | 3,665,573 | 0.65 | 192,925 | 713 | 80.52 |
| 355 ................................... | 217 | 55,958,399 | 9.99 | 257,873 | 710 | 77.84 |
| 356 ................................... | 137 | 35,568,044 | 6.35 | 259,621 | 711 | 74.80 |
| 357 ................................... | 90 | 22,106,316 | 3.95 | 245,626 | 719 | 76.97 |
| 358 ................................... | 292 | 79,231,087 | 14.14 | 271,339 | 716 | 76.18 |
| 359 ................................... | 854 | 240,305,138 | 42.90 | 281,388 | 718 | 76.97 |
| 360 ................................... | 403 | 112,043,586 | 20.00 | 278,024 | 714 | 77.05 |
| Total, Average or Weighted Average ......... | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

### First Interest Rate Cap of the Mortgage Loans

| First Interest Rate Cap (%) | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.000 | 1 | $616,000 | 0.11% | $616,000 | 730 | 80.00% |
| 2.000 | 257 | 72,235,247 | 12.89 | 281,071 | 714 | 77.72 |
| 3.000 | 31 | 9,311,605 | 1.66 | 300,374 | 716 | 72.96 |
| 5.000 | 546 | 145,852,323 | 26.04 | 267,129 | 715 | 77.12 |
| 5.875 | 1 | 359,650 | 0.06 | 359,650 | 683 | 64.00 |
| 6.000 | 1,217 | 330,813,999 | 59.05 | 271,827 | 716 | 76.58 |
| 6.375 | 1 | 996,230 | 0.18 | 996,230 | 813 | 56.00 |
| Total, Average or Weighted Average | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

### Periodic Rate Caps of the Mortgage Loans

| Periodic Rate Cap (%) | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| 1.000 | 699 | $180,460,345 | 32.21% | $258,169 | 711 | 77.00% |
| 2.000 | 1,355 | 379,724,710 | 67.79 | 280,240 | 718 | 76.66 |
| Total, Average or Weighted Average | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |

### Amortization Type of the Mortgage Loans

| Amortization Type | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score | Weighted Average Loan-to-Value Ratio |
|---|---|---|---|---|---|---|
| Fully Amortizing | 360 | $84,794,700 | 15.14% | $235,541 | 715 | 75.70% |
| Initial Interest Only Period-3 Years | 33 | 10,498,374 | 1.87 | 318,133 | 720 | 77.71 |
| Initial Interest Only Period-5 Years | 147 | 43,141,777 | 7.70 | 293,481 | 710 | 76.15 |
| Initial Interest Only Period-7 Years | 11 | 3,978,326 | 0.71 | 361,666 | 707 | 76.78 |
| Initial Interest Only Period-10 Years | 1,503 | 417,771,878 | 74.58 | 277,959 | 717 | 77.02 |
| Total, Average or Weighted Average | 2,054 | $560,185,055 | 100.00% | $272,729 | 716 | 76.77% |