# Exhibit C

# West Virginia Investment Management Board

# *Investment Policy Statement*

### (Revised May 10, 2010)

# *Table of Contents*

## *Investment Policy Statement*

| | | |
|---|---|---|
| I. | Statement of Purpose of Investment Policy | 1 |
| II. | Establishment and Authority | 2 |
| III. | Investment Philosophy | 3 |
| IV. | Investment Objectives | 4 |
| V. | Investment Responsibilities | 5 |
| VI. | Standard of Care | 9 |
| VII | Asset Allocation | 9 |
| VIII. | Measurement of Investment Objectives | 11 |
| IX. | Investment Guidelines and Limitations | 13 |

## *Appendix A — Participant Plan Descriptions*

| | |
|---|---|
| Deputy Sheriff's Retirement System | 1 |
| Judges' Retirement System | 2 |
| Public Employees' Retirement System | 3 |
| State Police Death, Disability and Retirement Fund | 4 |
| State Police Retirement System | 5 |
| Teachers' Retirement System | 6 |
| Emergency Medical Services Retirement System | 8 |
| Workers' Compensation Old Fund | 9 |
| Coal Workers' Pneumoconiosis Fund | 11 |
| Workers' Compensation Uninsured Employers' Fund | 12 |
| Workers' Compensation Self-Insured Guaranty Risk Pool | 13 |
| Wildlife Endowment Fund | 14 |
| WV Prepaid Tuition Trust Fund | 15 |
| Board of Risk and Insurance Management | 16 |
| Public Employees Insurance Agency | 17 |
| Revenue Shortfall Reserve Fund | 18 |
| Revenue Shortfall Reserve Fund – Part B | 20 |
| WV Retiree Health Benefit Trust Fund | 21 |
| AccessWV | 22 |

## *Appendix B — Permissible Investments*

## *Appendix C - Investment Pools*

| | |
|---|---|
| Short-Term Pool | 1 |
| Fixed Income Pool | 3 |
| Equity Pool | 6 |
| Alternatives Pool | 9 |
| Real Estate Pool | 13 |

### *Appendix D — Investment Manager Polices and Guidelines*

**Large Capitalization Domestic Equity Manager Policy**
- INTECH Investment Management LLC
- State Street Global Advisors – S&P 500 Index

**Non-Large Capitalization Domestic Equity Manager Policy**
- Aronson + Johnson + Ortiz
- Westfield Capital Management Company, LLC

**International Equity Manager Policy**
- Brandes Investment Partners, L.P.
- LSV Asset Management
- Silchester International Investors
- State Street Global Advisors – MSCI Emerging Markets Index
- Pictet Asset Management Limited

**Fixed Income Manager Policy**
- Dodge & Cox – Absolute Return
- JP Morgan – Core Fixe Income
- State Street Global Advisors – Aggregate Index
- State Street Global Advisors – (TIPS) Bond Index
- Western Asset Management

### *Appendix E — Implementation*

Trade Management Policy
Derivatives Use Policy
Investment Risk Management Policy
Manager Monitoring and Retention Policy
Performance Policy
Proxy-Voting
Rebalancing Policy
Repurchase Agreement Policy
Securities Lending

## *Legislative Citations*

Chapter 6B, Article 2-5 ...................................................West Virginia Code of Conduct
Chapter 11B, Article 2-20 .......................................... Revenue Shortfall Reserve Funds
Chapter 12, Article 6 ............................... West Virginia Investment Management Board
Chapter 18, Article 30 ........................................West Virginia Prepaid Tuition Trust Act
Chapter 44, Article 6A ........................ Uniform Management of Institutional Funds Act
Chapter 44, Article 6C .................................................... Uniform Prudent Investors Act

**West Virginia Investment Management Board**
*Investment Policy Statement*

I.    **Statement of Purpose of Investment Policy**

A.    Purpose

This document specifically outlines the investment philosophy and practices of the West Virginia Investment Management Board (WVIMB, Board). It has been developed to serve as a plan for the management of those assets entrusted to the Board for investment. The Board believes it is crucial that it adopt a long-term plan by which these assets will be maintained and enhanced through prudent investment. The Board has adopted this Investment Policy Statement to serve as that long-term plan, in order that:

- there be a clear understanding on the part of the Trustees, Staff, participants, beneficiaries and all outside service providers as to the objectives, goals and restrictions with regard to investment of assets;
- assets be structured and invested in a prudent manner; and
- there be a meaningful basis for the evaluation of asset classes, investment managers and strategies used to achieve the investment objectives.

**This is the official policy document of the West Virginia Investment Management Board. Deviation from this document is not permitted without prior, explicit, written permission from the WVIMB, provided such deviation does not violate West Virginia statute or Constitution.**

B.    Definition of Terms

For purposes of ease of administration and understanding of this Investment Policy Statement, the following terms are defined or clarified:

BOARD: The governing body for the West Virginia Investment Management Board, and any reference elsewhere to Board of Investments or West Virginia Trust Fund means the Board as defined herein.

WVIMB: The West Virginia Investment Management Board.

TRUSTEES: The Board of Trustees, either collectively or individually.

EXECUTIVE DIRECTOR: The Executive Director is the staff position as defined by *W.Va Code §12-6-4(c)* serving the Board as the chief executive officer of the WVIMB staff.

STAFF: The Executive Director of the Board and/or any WVIMB employee.

CONSULTANT: The investment consultant(s) retained by the Board.

PARTICIPANT PLAN(s): Any component system, fund, statutorily-defined plan

held in trust, or other grouping of similar assets invested with the West Virginia Investment Management Board.

## II.    Establishment and Authority

### A.    Creation of Entity

The West Virginia Investment Management Board was created during the 1997 legislative session and is cited as the West Virginia Investment Management Board Act. Selected portions of the enabling language are as follows:

*. .the West Virginia Investment Management Board may develop, implement and maintain an efficient and modern system for the investment and management of the state's money, except those moneys managed in accordance with article six-c [§§ 12-6C-1 et seq.] of this chapter. The Legislature further finds that in order to implement these sound fiscal policies, the West Virginia Investment Management Board shall operate as an independent board with its own full-time staff of financial professionals, immune to changing political climates, in order to provide a stable and continuous source of professional financial management. W.Va. Code §12-6-1b.*

*. . the West Virginia Investment Management Board, created and established by this article, is acting in all respects for the benefit of the state's public employees and ultimately the citizens of the state and the West Virginia Investment Management Board may act as trustee of the irrevocable trusts created by this article and to manage and invest other state funds. W.Va. Code §12-6-1f.*

*. . The board is created as a public body corporate.. W.Va. Code §12-6-3a.*

### B.    Management

*The board shall be governed by a board of trustees, consisting of thirteen members...W.Va. Code §12-6-3b.*

*The management and control of the board shall be vested solely in the trustees in accordance with the provisions of this article.  W.Va. Code §12-6-4a.*

In addition, there are representatives and committees for each Participant Plan who are entitled by statute to provide input concerning the drafting, review or modification of the written Investment Policy Statement as it relates to their Participant Plan. The trustees are required to meet quarterly and to hold an annual meeting before the start of the fiscal year. The Board has delegated the day-to-day management responsibilities to the Executive Director and his staff.

**West Virginia Investment Management Board**
*Investment Policy Statement*

C.   Assets Managed by the Board

*The Board shall be vested with ownership of all securities or other investments lawfully held by the Board of Investments or the West Virginia Trust Fund as of the effective date of this article. All obligations and assets of the Board of Investments and the West Virginia Trust Fund, Inc. shall be vested in the West Virginia Investment Management Board as of the effective date of this article. W.Va. Code §12-6-16.*

The Board manages a number of investment pools that are used to achieve specific Participant Plan asset allocations.

## III.   Investment Philosophy

The primary objective of each Participant Plan is to provide benefits to its participants and/or beneficiaries. Based on general beliefs about the investment returns available from a well-diversified, prudently invested portfolio, the Board has adopted specific investment objectives for each Participant Plan, which are described in the "Participant Plan Descriptions" section of the Appendix.

In order to achieve a specified real rate of return for each Participant Plan, the Board relies on the prevailing financial theory, which currently is an investment strategy utilizing an appropriate long-term diversified asset allocation model. A prudently allocated investment program possesses a certain level of diversification, which produces risk reduction. In terms of level of impact, diversification should be considered along the following lines: (i.) asset classes (stocks, bonds, cash, non-traditional, etc.), (ii.) geography/country, (iii.) industry, and (iv.) maturity. Asset allocation modeling should also take into consideration specific unique circumstances of each Participant Plan, such as the size, liquidity needs and financial condition (funded status) of each Participant Plan as well as general business conditions. The factors mentioned here are not intended to be limiting; rather, they are outlined as a general indication of the importance of diversification to proper asset allocation. The Board determines the proper allocation among asset classes and managers, based on advice and analysis provided by Staff and/or an external investment Consultant.

The Board recognizes that even though its investments may be subject to short-term volatility, it is critical that the Board maintain the appropriate time horizon for each Participant Plan. This prevents ad-hoc revisions to its philosophy and policies in reaction to either speculation or short-term market fluctuations. In order to preserve this view, the Board has adopted the following formal review schedule:

| Agenda Item | Review Schedule |
| --- | --- |
| Investment Performance | Quarterly |
| Investment Policy | Every Year |
| Strategic Asset Allocation | Every Three Years |
| Policy Asset Allocation | Every Three Years |
| Asset Allocation Review for Each Participant Plan | At Least Every Five Years |

The Board may hire investment Managers to implement its objectives; these Managers will be given specific tactical roles within the overall strategic investment plan. Depending on their assignments, the managers may be judged on some or all of the following: (i) consistency of philosophy, style and key personnel, (ii) performance relative to an appropriate index or proxy group, and (iii) ability to add incremental value after costs. The Board shall monitor performance and supervise all Managers.

Consistent with its fiduciary responsibilities and the concepts of Modern Portfolio Theory, the Board does not and will not systematically exclude or include any investments in companies, industries, countries, or geographic areas. External investment managers hired by the Board are hired, in part, for their respective investment philosophies and processes, and may systematically exclude or include investments in their portfolios pursuant to and in accordance with their respective investment philosophies and processes.

In determining its philosophy towards risk, the Board considers, in addition to its fiduciary obligations and statutory requirements, each entity's purpose and characteristics, financial condition, liquidity needs, sources and level of contributions, income and general business conditions. Based upon these many factors, the Board identifies where either a more aggressive or more conservative approach is warranted, on an individual plan-by-plan basis. Each Participant Plan's asset allocation targets and ranges are summarized in the "Participant Plan Descriptions" section of the Appendix.

## IV.    Investment Objectives

*The board, at the annual meeting...shall review, establish and modify, if necessary, the investment objectives of the individual participant plans, as incorporated in the investment policy statements of the respective trusts so as to provide for the financial security of the trust funds giving consideration to the following: (1) Preservation of Capital; (2) Diversification; (3) Risk Tolerance; (4) Rate of Return; (5) Stability; (6) Turnover; (7) Liquidity; and (8) Reasonable Cost of Fees. W.Va. Code §12-6-12-f.*

**West Virginia Investment Management Board**
*Investment Policy Statement*

Participant Plans

The Board's objective is to manage the Participant Plans' moneys in an efficient and economical manner, managing risk as it seeks to achieve the specific goals set out in each Participant Plans Description contained in the Appendix.

In addition, specific investment objectives for each investment pool are contained within the "Investment Pools" section of the Appendix.

## V.    Investment Responsibilities

The Board is responsible for the investment and administration of the Participant Plans, and the investment pools; as such its operational requirements are complex. In order to properly carry out its investment strategies, the Board relies heavily on both staff and outside service providers (e.g., professional Consultants, investment Managers and Custodians). Because of the number of parties involved, their roles as fiduciaries must be clearly identified to ensure operational efficiency, clear lines of communication, and accountability in all aspects of operation.

Board of Trustees

The Board has responsibility for establishing and maintaining broad policies and objectives for all aspects of WVIMB's operation. Central to this is the Board's responsibility for the prudent investment of all assets managed by the Board. The Board shall establish such broad policies and set direction, as set forth in this Investment Policy Statement.

The Board shall delegate the implementation of these policies and direction to the Investment Committee and Staff. In doing so, the Board shall maintain a "top-down" perspective, focusing on important policy level issues, maintaining the proper fiduciary perspective and time horizon for analysis of the progress of the assets and prudently use its time by evaluating/considering the most material issues.

Investment Committee

The primary objective of the Investment Committee is to ensure that sufficient assets are available to satisfy benefit payments or cash flow needs of the Plan Participants at the time they are needed or payable. As a secondary objective, the Investment Committee is responsible for achieving an optimum level of return within specified risk parameters and to do so effectively, prudently and in a cost efficient manner, in full compliance with applicable laws and regulations.

The Investment Committee shall have the following specific responsibilities, to be performed with the advice and assistance of Staff and investment Consultant, and shall make recommendations to the Board regarding:

- Determination of long-term policies for risk tolerance and asset mix;
- Determination of permissible assets (subject to statutory limitation);
- Evaluation, selection and termination of investment managers;
- Determination of allocation between asset classes in the Policy Allocation and the Strategy Allocation;
- Regular review and revision of this Investment Policy Statement;
- Evaluation of investment results to ensure compliance with investment guidelines and determine success of investment strategies implemented;
- Other investment related issues as necessary for the prudent and cost effective investment of Fund assets.

The Investment Committee shall meet prior to the regular meeting of the Board to address overall investment activities. The Committee shall be briefed by staff and consultant on any topic or issue pertinent to the Board's operations. The Committee shall make a report regarding investment activities to the Board and shall make recommendations for Board action as necessary.

Personnel Committee

The Personnel Committee's primary objective is to ensure that staffing is adequate to effectively and efficiently accomplish the goals of the Board in a professional manner. The Committee shall conduct an evaluation and review of the WVIMB Executive Director, Chief Investment Officer, and Chief Operating Officer as it regards their ability and effectiveness in carrying out the directives of the Board, properly and effectively communicating the current and prospective portfolio condition, working with and coordinating all outside relationships, and conveying confidence and knowledge in their roles as stewards of the investment program. The Personnel Committee shall also review and make recommendations to the Board, with advice and assistance of Staff, regarding compensation policies and staff structure. The role of the Personnel Committee is further outlined in the Personnel Review Policy.

Executive Director

The Executive Director is appointed by and serves at the pleasure of the Board. The Executive Director is responsible for planning, organizing, and administering the operations of the WVIMB under the broad policy guidance and direction of the Board. The Executive Director, with assistance of Staff, monitors the performance of the investments; ensures funds are invested in accordance with Board policies; studies, recommends and implements policy and operational procedures that will enhance the investment program of the WVIMB; and ensures that proper internal controls are developed to safeguard the assets of the WVIMB. In fulfilling these responsibilities, the Executive Director relies on internal Staff and the Consultants for information, advice

and technical support. All recommendations from the Executive Director regarding enhancements to the investment program shall be made to the Investment Committee.

Staff

The Staff provides internal investment and consulting services to the Board and the Executive Director. The primary functions of the internal Staff include: analyzing and rebalancing the overall asset allocation of the Participant Plans; providing technical advice; screening and monitoring external managers, serving as a liaison to the investment community; and informing and advising the Board and Executive Director on financial, economic and political developments that may affect the WVIMB. The Chairperson of the Investment Committee is to be notified of any rebalancing activity performed by the staff. The internal staff also works closely with the consultant in support of these duties.

External Investment Consultant

The external investment Consultant will be selected by and serve at the pleasure of the Board, based upon recommendations regarding retention/termination from the Investment Committee to the Board. The Consultant's duty is to work with the Board, Executive Director and Staff to help manage the investment process. This includes regular meetings with the Board and Investment Committee to provide an independent perspective on the issues facing the WVIMB, and each Participant Plans' goals, investment structures, investment performance and investment managers. The Consultant will review asset allocations and performance in conjunction with Staff, and make recommendations to the Board as appropriate. The Consultant will assist in the preparation of investment performance reporting and analysis on all investment managers. The Consultant will assist with external manager selection and will promptly inform the Board and Staff of any material issues concerning the investment managers and discuss the impact of such.

External Investment Managers

The external investment Managers will be selected by and serve at the pleasure of the Board, based upon recommendations regarding retention/termination from the Investment Committee to the Board. The Board will rely on the advice of and recommendations from the Investment Committee, Staff and Consultant in selecting and/or dismissing external investment Managers. External investment Managers will have demonstrated expertise with particular asset classes and/or management styles. Each Investment Manager shall be a registered adviser under the Investment Advisers Act of 1940 (or shall be appropriately exempt from registration). Managers will be given explicit written directions detailing their particular assignments, and will construct and manage investment portfolios that are consistent with the investment philosophy and disciplines for which they were hired. These guidelines, which are contained within the "Investment Manager Policies and Guidelines" section of the Appendix, will be specific as to the particular role of that external investment Manager's portfolio in the overall investment structure, and will address the following topics:

**West Virginia Investment Management Board**
*Investment Policy Statement*

- Permissible Investments
- Restrictions
- Style Adherence
- Diversification
- Portfolio Quality Requirements, if applicable
- Performance Objectives and Benchmarks

External investment Managers will select, buy, and sell specific securities within their guidelines and adhere to the Trade Management Policy detailed within the "Implementation – Trade Management Policy" section of the Appendix.

Any external investment Manager employed by the Board is expected to communicate, in writing, any developments that may impact the assets of the Board within five business days of occurrence. The external investment Manager should communicate these developments simultaneously to the Executive Director ,the Chief Investment Officer, and the Consultant. Examples of these events include, but are not limited to:

- Significant change in investment philosophy
- Loss of one or more key management personnel
- Assignment of a new portfolio manager to the WVIMB
- Change in the ownership structure of the investment management firm
- Any occurrence which might potentially impact the management, professionalism, integrity or financial position of the investment management firm

Discretion is delegated to the Managers to carry out investment actions as directed by the Board through the applicable contract and this Investment Policy Statement. Managers will provide performance reporting to the Board and Staff upon request utilizing standardized reporting formats. Specific responsibilities and operational information for each manager will be addressed at length in the "Investment Manager Policies and Guidelines" section of the Appendix.

<u>Custodian</u>

The Custodian(s) holds directly, through its agents, its sub-custodians, or designated clearing systems, assets as designated by the Board. The Custodian is accountable for registration of those designated assets in good delivery form, collection of income generated by those assets, and any corporate action notification. The Custodian(s) is responsible for delivery and receipt of securities and cash when notified by the Board or its designee, and tracking and reporting of the aforementioned transactions. The Board may opt to designate other duties to the Custodian(s).

VI.    **Standard of Care**

*Any investment made under this article shall be made in accordance with the provisions of the "Uniform Prudent Investor Act" codified as article six-c, chapter (forty-four) of this code and is further subject to the following requirements:*

    a)    *Trustees shall discharge their duties with respect to the 401(a) plans for the exclusive purpose of providing benefits to participants and their beneficiaries;*

    b)    *Trustees shall diversify fund investment so as to minimize the risk of large losses unless, under the circumstances, it is clearly prudent not to do so;*

    c)    *Trustees shall defray reasonable expenses of investing and operating the funds under management; and*

    d)    *Trustees shall discharge their duties in accordance with the documents and instruments governing the trusts or other funds under management insofar as the documents and instruments are consistent with the provisions of this article.*

    e)    *The duties of the board apply only with respect to those assets deposited with or otherwise held by it. W.Va. State Code §12-6-11.*

VII.    **Asset Allocation**

The investments of the WVIMB are divided into the following general asset classes: global equities, fixed income and cash. As stated in Section III, the Investment Policy Statement shall continue to be refined based upon prevailing financial theory. Currently, it is common practice to construct portfolios using combinations of asset classes in order to improve the risk/return profile. This concept is called diversification, and is discussed briefly in Section III. The asset allocation decision is generally regarded as the most important decision to be made in the investment management process. Studies have indicated that approximately 85 percent of the variability in an investment portfolio's return can be attributed to the asset allocation decision.

An asset/liability study is the basis for determining a portfolio's impact on important financial measures on both a short-term and long-term basis. This asset/liability analysis identifies the risk/return trade-off inherent within each portfolio, thus allowing the WVIMB to identify a specific policy asset allocation for each Participant Plan. The policy asset allocation for each Participant Plan is established by the Trustees based upon the Board's stated objectives for each Plan, the standard of care set forth in this Investment Policy Statement and the limitations imposed by statute. This Policy Allocation is defined as the allocation between the three major asset classes- global equity, fixed income, and cash- whose purpose is to serve as return generators, or

**West Virginia Investment Management Board**
*Investment Policy Statement*

diversifiers, or some combination of both. Based upon the criteria stated above, the Board has adopted a Policy Allocation for each Participant Plan as summarized within the "Participant Plan Descriptions" section of the Appendix.

It should be noted that West Virginia statute ultimately limits Participant Plan equity exposure to 75 percent of assets.

Within the three major asset classes, the Board may establish strategic allocations to secondary components of the classes, e.g. large cap, small cap, value, growth, etc. This will be defined as the Strategy Allocation and can be found in the "Investment Pools" section of the Appendix. The strategic allocations to these secondary components generally represent longer-term beliefs about the relative attractiveness between different segments within an asset class. They are also generally subject to higher return volatility than the major asset classes themselves, however, when aggregated together they allow for an additional level of diversification. As stated in Section III, a formal Board review of the Strategic Allocation together with a review of the Policy Allocation shall be conducted once every three years.

In November of 2003, the Board took additional steps to provide for flexibility to further refine the Strategy Allocation by delegating authority to the Allocation Committee (Executive Director, Chief Investment Officer, and Investment Consultant as approved by the Board only as individually named, which is reflected in the corresponding recorded minutes of the Board meeting on November 20, 2003) to collectively make allocation decisions based upon market conditions, including, but not limited to, valuation levels, market imbalances, and economic and market expectations. This flexibility allows the Plan(s) to take advantage of changing market conditions. The Board has placed ranges around the Strategy Allocation in order to maintain appropriate risk controls. Allocation decisions made by the Allocation Committee are defined as the Range Allocation. Any time this authority is exercised and Range Allocations are intentionally changed by vote of the three above-named individuals, the Board will receive written notice of the allocation change, the rationale, and the agreement or dissent of each voting party on the following business day. From time to time, a Range Allocation decision or other issue of clarification will necessitate that Staff revise individual manager guidelines located in Appendix D of this Investment Policy Statement. Any such change will be disclosed and communicated to the Board in this same written notice. A formal Board review of the Range Allocation will be conducted every three years, in conjunction with the Strategy Allocation and the Policy Allocation.

Cash equivalents held by managers can be disruptive to the allocation process. Equity managers are to be fully invested at all times, with the exception of brief periods between the sale of an existing security and the purchase of a replacement security. Fixed income managers are exempt from this because of the use of "barbell" strategies in constructing a fixed income portfolio. However, each fixed income manager accepts the Board's intention to avoid market timing and acknowledges that total portfolio performance (including cash) shall be compared to established performance objectives.

## VIII.    Measurement of Investment Objectives

A primary responsibility of any Board is the oversight and monitoring of its investment portfolio. The components of the evaluation of portfolio results shall include regular examination of the following benchmarks to aid in the monitoring of asset allocation processes and decision-making results:

A.    Actuarial Benchmark

The most important investment return objective to be considered when evaluating the Plan's performance is measured by a comparison of the Plan's return to the real rate of return that must be achieved in order for the Plans to meet their benefit obligations as determined by the Consolidated Pensions Retirement Board. While it is not critical to perform this comparison over shorter time periods (one to five years), the Plan's returns to the actuarial benchmark over longer time periods (five to thirty years) should be closely monitored.

B.    Policy Benchmark

The policy benchmark is the primary determinant and control mechanism of the risk and return expectations for each Plan and is determined after carefully considering the liability expectations of that Plan. It is the most permanent of all of the benchmarks listed here because it is established using long-term asset and long-term liability assumptions. The policy benchmark is intended to measure the broad investment opportunities existing in the liquid, public asset classes in which the Board has decided to invest.

The policy benchmark can only be changed upon Board approval, and must comply with all State laws, including, but not limited to, the *West Virginia Uniform Prudent Investor Act*

C.    Strategy Benchmark

The strategy benchmark is created to measure the Board's decisions to deliberately deviate from the broad, passive market indices within any asset class with a long-term perspective. A strategic decision is a decision not to be 100% passively invested in the broad market index as defined in the policy benchmark above, and is intended to be maintained over an extended period of time (at least 3-5 years).

The strategic benchmark will be determined by the Strategy Allocation as approved by the Board, and can and will be changed only upon Board approval, generally coinciding when Strategic Allocation changes occur as described in section VII. Asset Allocation.

D.    Allocation Benchmark

The allocation benchmark is created to measure the performance results of the allocation changes made at the sub-asset class level that has been delegated by the Board to named individuals on WVIMB Staff and the Investment Consultant. Those named individuals make up the Allocation Committee. To the extent that the allocation benchmark exceeds the strategy benchmark, sub-asset class range decisions have added value. Likewise, to the extent that the allocation benchmark is lower than the strategy benchmark, sub-asset class range decisions have detracted from performance. This method of calculating allows the Board to examine results of the sub-asset class decisions in isolation, without being impacted by individual investment manager's results.

Allocation benchmarks will change with each sub-asset class allocation change. A formal Board review of the sub-asset class allocation will be conducted every three years, as described in section VII. Asset Allocation.

E.    Implementation Benchmark

The implementation benchmark is created to measure the value added by the active management of assets, as well as the performance attributed to the hiring and termination decisions of individual, active investment managers as recommended by Staff and Investment Consultant and approved by the Board. The implementation benchmark will be calculated by subtracting the allocation benchmark from actual Plan total performance results.

The implementation benchmark will be reviewed each time the allocation benchmark is reviewed, or as deemed necessary by the Board

F.    Investment Managers' Benchmarks

Each individual investment manager's benchmark is created to measure the manager's ability to add value net of fees over a predetermined time period (usually long enough to cover a full market cycle), as well as provide a source of guidance to the manager about the WVIMB's intentions regarding the portfolio they have been hired to manage.  Each investment manager employed by WVIMB will have a specific benchmark assigned to it. The investment manager, WVIMB Staff, and Investment Consultant will unanimously agree to this benchmark before approaching the Board for hiring approval. Any subsequent changes to the benchmark will also need to be approved by unanimous decision by all parties and subsequently communicated to the Board.

Investment manager's benchmarks are reported regularly (at least quarterly) to the Board, with investment manager performance and individual benchmarks reviewed with the managers as appropriate. The reviews will be used to assess a manager's ongoing relevance in the context of the asset allocation.

G.    Peer Benchmark

While peer universe information can be a useful resource and tool from time to time, it has limited value as a relevant, consistent, long-term performance measure. This is primarily due to the fact that the constituents of peer universes (i.e., other public pension plans) all have very unique needs, as well as significant differences in demographics, resources, liabilities, and arbitrary statutory restrictions. The Board will compare its performance results to a peer universe from time to time to gauge differences and similarities with other public pension plans, but not as a primary evaluative measure of performance or achievement.

## IX.    Investment Guidelines and Limitations

A.    Permissible Investments

The Board recognizes that risk (i.e., the uncertainty of future events), volatility (i.e., the potential for variability of asset values), and the possibility of loss in purchasing power (due to inflation) are present to some degree in all types of investment vehicles. While high levels of risk are to be avoided, the assumption of risk is warranted as long as it is compensated. This allows the investment managers the opportunity to achieve satisfactory long-term results consistent with objectives and fiduciary character of each Participant Plan.

All assets selected for investment within a public market portfolio must have a readily attainable market value, and must be readily marketable. Listed within the "Permissible Investments" section of the Appendix are the investment vehicles specifically permitted under this Investment Policy, except for statutorily required investments.

B.    Statutory imposed guidelines and restrictions that apply across all portfolios are as follows:

(a)    *The board shall hold in non real-estate equity investments no more than seventy-five percent of the assets managed by the board and no more than seventy-five percent of the assets of any individual participant plan.*

(b)    *In addition to any investments the board may make pursuant to subsection (h)..., the board shall hold in real estate equity investments no more than twenty-five percent of the assets managed by the board and no more than twenty-five percent of the assets of any individual participant plan...*

(c)    *The board shall hold in international securities no more than thirty percent of the assets managed by the board and no more than thirty percent of the assets of any individual participant plan.*

(d)    *The board may not at the time of purchase hold more than five percent of the assets managed by the board in the non real-estate equity securities of any single company or association: Provided, That if a company or association has a market weighting of greater than five percent in the Standard & Poor's 500 index of companies, the board may hold securities of that non real-estate equity equal to its market weighting.*

(e)    *No security may be purchased by the board unless the type of security is on a list approved by the board. The board may modify the securities list at any time and shall give notice of that action ...*

(f)    *Notwithstanding the investment limitations set forth in this section, it is recognized that the assets managed by the board, or the assets of the participant plans, whether considered in the aggregate or individually, may temporarily exceed the investment limitations in this section due to market appreciation, depreciation and rebalancing limitations. Accordingly, the limitations on investments set forth in this section shall not be considered to have been violated if the board rebalances the assets...at least once every twelve months...*

(g)    *The board, at the annual meeting required in subsection (h), section three [§ 12-6-3] of this article, shall review, establish and modify, if necessary, the investment objectives of the individual participant plans as incorporated in the investment policy statements of the respective trusts so as to provide for the financial security of the trust funds giving consideration to the following:*

        *(1) Preservation of capital;*
        *(2) Diversification;*
        *(3) Risk tolerance;*
        *(4) Rate of return;*
        *(5) Stability;*
        *(6) Turnover;*
        *(7) Liquidity; and*
        *(8) Reasonable cost of fees.*

(h)    *...the board is expressly authorized to invest no more than twenty percent of the assets managed by the board, and no more than twenty percent of the assets of any individual participant plan, or any other endowment or other fund managed by the board, as measured at the time of the investment, in any one or more classes, styles or strategies of alternative investments suitable and appropriate for investment by the board...*

*W.Va. State Code §12-6-12.*

Because each Participant Plan has its own objectives, the Trustees have formed multiple pooled portfolios to meet the differing needs. The Trustees have delineated objectives and restrictions for each individual pool, as described within the "Investment Pools" section of the Appendix.

# *Participant Plan Descriptions*

# PARTICIPANT PLAN DESCRIPTIONS
## Defined Benefit Plans: *Deputy Sheriff's Retirement System*

### History

The Deputy Sheriff's Retirement System was created in 1998. As of July 1, 2009, DSRS covered a total of 1,354 members. Of these, 926 were active members, 248 were retirees or beneficiaries, receiving benefits and 180 were terminated members.

### Funded Status

As of July 1, 2009, the market value of assets was approximately $78 million (including member loans). The funded ratio of DSRS was 60.5 percent as of July 1, 2009.

### Liquidity Needs

The System currently has positive net cash flows.

### Investment Objectives

- Exceed the actuarial interest rate assumption of 7.5 percent per annum, net of fees.
- Preserve the current well-funded position while not subjecting the System to an undue level of risk.

### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the System. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 30.0% | 25.0% |
| International Equity | 30.0% | 25.0% |
| Private Equity | 0.0% | 10.0% |
| **Total Equity** | **60.0%** | **60.0%** |
| **Fixed Income** | **40.0%** | **20.0%** |
| Hedge Funds | 0.0% | 10.0% |
| Real Estate | 0.0% | 10.0% |
| **Cash** | **$250,000*** | |

*\*IMB Staff has authority to change target plus or minus 10%, as necessary, in consultation with appropriate representative(s) from the Plan.*

**West Virginia Investment Management Board**
*Investment Policy Statement*

# PARTICIPANT PLAN DESCRIPTIONS

## Defined Benefit Plans: *Judges' Retirement System*

### History

The Judges' Retirement System was created in 1949. As of July 1, 2009, the System covered a total of 132 members. Of these, 71 were active members, 58 were retirees or beneficiaries receiving benefits and 3 were terminated members. Eleven judges eligible for membership continue to participate in the Public Employees' Retirement System, but are eligible to elect to transfer into this System at any time.

### Funded Status

As of July 1, 2009, the market value of assets was approximately $88 million, with a funded ratio of 94.8 percent. The State has established a current objective of having the System fully funded by June 30, 2020. The System has been contributing in excess of the annual required contribution.

### Liquidity Needs

The System currently has a positive cash flow.

### Investment Objectives

- Exceed the actuarial interest rate assumption of 7.5 percent per annum, net of fees.
- Reduce the unfunded liability while maintaining adequate liquidity to satisfy benefit payments but not subjecting the System to an undue level of risk.

### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the System. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 30.0% | 25.0% |
| International Equity | 30.0% | 25.0% |
| Private Equity | 0.0% | 10.0% |
| **Total Equity** | **60.0%** | **60.0%** |
| **Fixed Income** | **40.0%** | **20.0%** |
| Hedge Funds | 0.0% | 10.0% |
| Real Estate | 0.0% | 10.0% |
| **Cash** | **$500,000*** | |

*\*IMB Staff has authority to change target plus or minus 10%, as necessary, in consultation with appropriate representative(s) from the Plan.*

**West Virginia Investment Management Board**
*Investment Policy Statement*

## PARTICIPANT PLAN DESCRIPTIONS

### Defined Benefit Plans: *Public Employees' Retirement System*

#### History

The Public Employees' Retirement System was created in 1961. As of July 1, 2009, the System covered a total of 72,339participants; comprised of 35,717 active members, 21,499 retirees and beneficiaries, and 15,123 terminated members.

#### Funded Status

As of July 1, 2009, the **actuarial** value of assets was approximately $3.9 billion, with a funded ratio of 79.7 percent. The State has established an objective of having the System fully funded by June 30, 2035. The employer contribution rate will increase from 11.0 percent to 12.5 percent effective July 1, 2010.

#### Liquidity Needs

The System is expected to have modest liquidity needs of approximately 1.0 percent to 2.0 percent per year for the foreseeable future.

#### Investment Objectives

- Exceed the actuarial interest rate assumption of 7.5 percent per annum, net of fees.
- Reduce the unfunded liability while maintaining adequate liquidity to satisfy benefit payments and not subjecting the System to an undue level of risk.

#### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the System. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 30.0% | 25.0% |
| International Equity | 30.0% | 25.0% |
| Private Equity | 0.0% | 10.0% |
| **Total Equity** | **60.0%** | **60.0%** |
| **Fixed Income** | **40.0%** | **20.0%** |
| Hedge Funds | 0.0% | 10.0% |
| Real Estate | 0.0% | 10.0% |
| **Cash** | **$19,000,000*** | |

*IMB Staff has authority to change target plus or minus 10%, as necessary, in consultation with appropriate representative(s) from the Plan.*

**West Virginia Investment Management Board**
*Investment Policy Statement*

## PARTICIPANT PLAN DESCRIPTIONS

### Defined Benefit Plans: *State Police Death, Disability and Retirement Fund (State Police Plan A)*

#### History

The Public Safety Death, Disability and Retirement Fund was created in 1925. As of July 1, 2009, the Fund covered a total of 839 members which was comprised of 163 active members, 669 retirees and beneficiaries, and 7 terminated members.

#### Funded Status

As of July 1, 2009, the market value of assets was approximately $363 million, with a funded ratio of 63.3 percent. The State has established an objective of having the Fund fully funded by June 30, 2025. During fiscal year 2006, the Legislature appropriated additional funding for the Fund to improve its funded ratio.

#### Liquidity Needs

The Fund is now a closed plan and is expected to experience an increasingly negative cash flow position in the near future.

#### Investment Objectives

- Exceed that actuarial interest rate assumption of 7.5 percent per annum, net of fees.
- Reduce the unfunded liability while maintaining adequate liquidity to satisfy benefit payments and not subjecting the Fund to an undue level of risk.

#### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the Fund. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 30.0% | 25.0% |
| International Equity | 30.0% | 25.0% |
| Private Equity | 0.0% | 10.0% |
| **Total Equity** | **60.0%** | **60.0%** |
| **Fixed Income** | **40.0%** | **20.0%** |
| Hedge Funds | 0.0% | 10.0% |
| Real Estate | 0.0% | 10.0% |
| **Cash** | **$2,500,000*** | |

*\*IMB Staff has authority to change target plus or minus 10%, as necessary, in consultation with appropriate representative(s) from the Plan.*

# PARTICIPANT PLAN DESCRIPTIONS

## Defined Benefit Plans: *State Police Retirement System (State Police Plan B)*

### History

The West Virginia State Police Retirement System was created in 1994. As of July 1, 2009, the System covered 587 members. Of these, 472 were active members, 14 were retirees and beneficiaries, and 101 were terminated members.

### Funded Status

As of July 1, 2009, the market value of assets was approximately $40.3 million, with a funded ratio of 65.4 percent. The State has established an objective of having the System fully funded by June 30, 2030. The employer contribution rate will increase from 15 percent to 19.5 percent effective July 1, 2010.

### Liquidity Needs

The System is expected to be in a positive net cash flow position for the foreseeable future.

### Investment Objectives

- Exceed the actuarial interest rate assumption of 7.5 percent per annum, net of fees.
- Reduce the unfunded liability while maintaining adequate liquidity to satisfy benefit payments and not subjecting the System to an undue level of risk.

### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the System. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 30.0% | 25.0% |
| International Equity | 30.0% | 25.0% |
| Private Equity | 0.0% | 10.0% |
| **Total Equity** | **60.0%** | **60.0%** |
| **Fixed Income** | **40.0%** | **20.0%** |
| Hedge Funds | 0.0% | 10.0% |
| Real Estate | 0.0% | 10.0% |
| Cash | $50,000* | |

*IMB Staff has authority to change target plus or minus 10%, as necessary, in consultation with appropriate representative(s) from the Plan.*

**West Virginia Investment Management Board**
*Investment Policy Statement*

# PARTICIPANT PLAN DESCRIPTIONS

## Defined Benefit Plans: *Teachers' Retirement System*

### History

The Teachers' Retirement System was created in 1941. As of July 1, 2009, the System covered a total of 67,786 members; comprised of 35,701 active members, 29,245 retirees and beneficiaries, and 2,840 terminated members. The System was closed to new members in 1991, but reopened to all first-time hires as of July 1, 2005. Employees hired from 1991 through June 30, 2005, joined the Teachers' Defined Contribution Plan. Members of the Teachers' Defined Contribution Plan voted in March 2006 to merge into the System, but that decision was found unconstitutional by the West Virginia Supreme Court and did not take place in 2006. Instead, the West Virginia Legislature allowed a one-time transfer election in 2008 for all Defined Contribution members to transfer to the System effective July 1, 2008. Those not electing remained in the Defined Contribution plan, which still exists today, and is administered by the Consolidated Public Retirement Board.

### Funded Status

As of July 1, 2009, the market value of assets was approximately $3.6 billion, with a funded ratio of 41.3 percent. The State has established an objective of having the System fully funded by June 30, 2034.

### Liquidity Needs

The System has a very dynamic net cash flow position, which is attributable to: 1) a current positive net cash flow position, and 2) substantial liquidity needs of at least 10 percent per year beginning in plan year 2014.

### Investment Objectives

- Exceed the actuarial interest rate assumption of 7.5 percent per annum, net of fees.
- Reduce the unfunded liability while maintaining adequate liquidity to satisfy benefit payments, and not subjecting the System to an undue level of risk.

### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the System. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|

**West Virginia Investment Management Board**
*Investment Policy Statement*

| | | |
|---|---|---|
| Domestic Equity | 30.0% | 25.0% |
| International Equity | 30.0% | 25.0% |
| Private Equity | 0.0% | 10.0% |
| **Total Equity** | **60.0%** | **60.0%** |
| **Fixed Income** | **40.0%** | **20.0%** |
| Hedge Funds | 0.0% | 10.0% |
| Real Estate | 0.0% | 10.0% |
| **Cash** | $25,000,000* | |

*IMB Staff has authority to change target plus or minus 10%, as necessary, in consultation with appropriate representative(s) from the Plan.*

**Appendix A — *Participant Plan Descriptions***

**West Virginia Investment Management Board**
*Investment Policy Statement*

# PARTICIPANT PLAN DESCRIPTIONS

## Defined Benefit Plans:
### *Emergency Medical Services Retirement System*

### History

The Emergency Medical Services Retirement System (EMSRS) was created under the Emergency Medical Services Retirement System Act effective January 1, 2008, under *West Virginia Code §16-5V-4*. EMSRS members with benefits earned in the Public Employees Retirement System (PERS) transfer their full membership and benefits under PERS to EMSRS on the effective date. As of July 1, 2009, the System covered a total of 583 members; comprised of 511 active members, 0 retirees and beneficiaries, and 72 terminated members.

### Funded Status

As of June 30, 2009, the market value of assets was approximately $17.2 million, with a funded ratio of 63.7 percent.

### Liquidity Needs

The System is expected to have a positive net cashflow position. Retirements are delayed until 2011, resulting in minimal payouts until then. In fiscal year 2012, cash distributions may commence, but liquidity needs are still expected to be minimal.

### Investment Objectives

- Exceed the actuarial interest rate assumption of 7.5 percent per annum, net of fees.
- Maintain adequate liquidity to satisfy benefit payments and not subject the System to an undue level of risk.

### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the System. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 30.0% | 25.0% |
| International Equity | 30.0% | 25.0% |
| Private Equity | 0.0% | 10.0% |
| **Total Equity** | **60.0%** | **60.0%** |
| **Fixed Income** | **40.0%** | **20.0%** |
| Hedge Funds | 0.0% | 10.0% |
| Real Estate | 0.0% | 10.0% |
| **Cash** | **$0** | |

**West Virginia Investment Management Board**
*Investment Policy Statement*

# PARTICIPANT PLAN DESCRIPTIONS

## Insurance Plans: *Workers' Compensation Old Fund*

### History

Formed in January 2006, the Workers' Compensation Old Fund (Old Fund) assumed responsibility for payment of all workers' compensation claims and liabilities incurred by the former West Virginia Workers' Compensation Commission prior to July 1, 2005. After July 1, 2005 and until the private market in West Virginia opened, any workers' compensation claims or liabilities incurred were to be covered by BrickStreet Mutual Insurance Company, a private, for-profit employers' mutual insurance company in West Virginia. The private market in West Virginia opened as of July 1, 2008 and now the private market (which includes BrickStreet) is responsible for workers' compensation claims.

### Funded Status

As of July 1, 2009, Fund assets were valued at approximately $671 million.

### Liquidity Needs

The Brick Street Surplus Note that formerly provided cash inflows into the Fund has been paid in full. Statutorily pledged personal income tax, policy surcharges, and severance transfers appear to be sufficient to pay expected claims and claim-related expenses. For this reason, the Old Fund should maintain a flat to slightly positive net cash flow position until it is fully funded (at which time, pledged legislative transfers will cease, resulting in a sharp decline in net cash inflows). Liquidity needs for short-term cash (amount necessary for approximately 12 months worth of anticipated claims) will continue to be reviewed annually with appropriate staff from the West Virginia Offices of the Insurance Commissioner. Currently, a cash balance is held in the Plan in an amount equal to: 10% of the Plan's asset value **or** $50 million, whichever is **greater**, in anticipation of a potential settlement program payout.

### Investment Objectives

- Preservation of principal and minimization of volatility, while still achieving some investment earnings growth adjusted for inflation.
- Provide adequate liquidity to meet cash flow requirements.

**West Virginia Investment Management Board**
*Investment Policy Statement*

## Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following asset allocation guidelines for the assets managed for the Fund. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 5.0% | 5.0% |
| International Equity | 5.0% | 5.0% |
| Private Equity | 0.0% | 0.0% |
| **Total Equity** | **10.0%** | **10.0%** |
| **Fixed Income** | **90.0%** | **80.0%** |
| Hedge Funds | 0.0% | 0.0% |
| Real Estate | 0.0% | 0.0% |
| **Cash** | **0%*** | **10.0%** |

*Cash levels to be reviewed as needed, at least annually, collaboratively with management staff
from the West Virginia Offices of the Insurance Commissioner.

West Virginia Investment Management Board
*Investment Policy Statement*

# PARTICIPANT PLAN DESCRIPTIONS
## Insurance Plans: *Coal Workers' Pneumoconiosis Fund*

### History

The Coal Workers' Pneumoconiosis Fund was formed in 1974 to provide for insurance coverage to coal operators for their potential liability under the Federal Coal Mine Health and Safety Act of 1969. Upon termination of the Workers' Compensation Commission, the assets and liabilities of the Coal Workers' Pneumoconiosis remained with the State for administration of the run-off of the liabilities incurred during the years of operation. Effective January 1, 2006, insurance coverage for liabilities incurred under the Federal Coal Mine Health and Safety Act will be provided by BrickStreet and other private insurance carriers, and will no longer be available through the State.

### Funded Status

As of July 1, 2009, Fund assets were valued at approximately $224 million.

### Liquidity Needs

The liquidity needs are actuarially determined based on the run-off of liabilities, which are assessed annually.

### Investment Objectives

- Exceed the actuarial interest rate assumption of 5.0 percent per annum, net of fees.
- Preserve the current surplus position.

### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the Fund. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 10.0% | 10.0% |
| International Equity | 10.0% | 10.0% |
| Private Equity | 0.0% | 0.0% |
| **Total Equity** | **20.0%** | **20.0%** |
| **Fixed Income** | **75.0%** | **55.0%** |
| Hedge Funds | 0.0% | 20.0% |
| Real Estate | 0.0% | 0.0% |
| **Cash** | **5%** | **5%** |

**West Virginia Investment Management Board**
*Investment Policy Statement*

## PARTICIPANT PLAN DESCRIPTIONS

### Insurance Plans: *Workers' Compensation Uninsured Employers' Fund*

#### History

The Workers' Compensation Uninsured Employers' Fund (Uninsured Fund) was established January 1, 2006, under Senate Bill 1004 to provide for the benefit of injured workers whose employers failed to provide mandatory workers' compensation coverage. The Fund received initial funding of $5,000,000 by proclamation of the Governor.

#### Funded Status

As of July 1, 2009, Fund assets were valued at approximately $8.5 million. No valuation of the potential liabilities is currently available.

#### Liquidity Needs

During the early years of the Fund, the liquidity needs will be high as the cash flows are difficult to predict until the frequency of claim activity is established.

#### Investment Objectives

- Provide adequate liquidity to meet the cash flow requirements.
- Exceed the actuarial interest rate assumption, which is not expected to exceed 5.0 percent per annum, net of fees, *once established*.

#### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the Fund. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation |
|---|---|
| Domestic Equity | 0.0% |
| International Equity | 0.0 % |
| **Total Equity** | **0.0%** |
| **Total Fixed Income** | **0.0%** |
| **Cash** | **100.0%** |

## PARTICIPANT PLAN DESCRIPTIONS

### Insurance Plans: *Workers' Compensation Self-Insured Guaranty Risk Pool*

#### History

The purpose of the Self-Insured Guaranty Risk Pool (Self-Insured Pool) was established on January 1, 2006 for the purpose of paying the workers' compensation claims of defaulted self-insured employers occurring on or after July 1, 2004.   It consists of those funds transferred, and any future funds collected, under the authority of Senate Bill 1004.

#### Funded Status

As of July 1, 2009, Pool assets were valued at approximately $6.8 million.  No valuation of the current or potential liabilities is currently available.

#### Liquidity Needs

As all current and active self-insured employers are required to provide a bond, security, or other collateral to the West Virginia Offices of the Insurance Commissioner in the event of a deteriorating financial condition, it is anticipated that the liquidity position of the Pool should remain stable.

#### Investment Objectives

- Provide adequate liquidity to meet the cash flow requirements.
- Exceed the actuarial interest rate assumption, which is not expected to exceed 5.0 percent per annum, net of fees, *once established*.

#### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the Pool.  (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation |
|---|---|
| Domestic Equity | 0.0% |
| International Equity | 0.0 % |
| **Total Equity** | **0.0%** |
| **Total Fixed Income** | **0.0%** |
| **Cash** | **100.0%** |

West Virginia Investment Management Board
*Investment Policy Statement*

# PARTICIPANT PLAN DESCRIPTIONS

## Endowment Funds: *Wildlife Endowment Fund*

### History

The Wildlife Endowment Fund was created in 1986 to supplement the Division of Natural Resources' annual budget in support of various statewide projects.

### Asset Value

As of July 1, 2009, Fund assets were valued at approximately $30 million.

### Liquidity Needs

The liquidity needs of the Fund will be set on an annual basis and determined by a separate Wildlife Endowment Board as established by the Division of Natural Resources.

### Investment Objectives

- Achieve a total rate of return of at least 6.0 percent per annum, net of fees.
- Provide adequate liquidity to meet cash flow requirements.

### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the Fund. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 30.0% | 25.0% |
| International Equity | 30.0% | 25.0% |
| Private Equity | 0.0% | 10.0% |
| **Total Equity** | **60.0%** | **60.0%** |
| **Fixed Income** | **40.0%** | **20.0%** |
| Hedge Funds | 0.0% | 10.0% |
| Real Estate | 0.0% | 10.0% |
| **Cash** | **$0** | |

**West Virginia Investment Management Board**
*Investment Policy Statement*

# PARTICIPANT PLAN DESCRIPTIONS

## Endowment Funds: *West Virginia Prepaid Tuition Trust Fund*

### History

The Prepaid Tuition Trust Fund (Trust Fund) was established in 1997 with the objective of enhancing and improving higher education in the State. This is accomplished by providing individuals and organizations a means for paying future college tuition and fees in advance at a rate set at current levels.

Effective March 2003, the Fund was closed to new contracts unless or until the Legislature authorizes the Fund to reopen.

### Asset Value

As of July 1, 2009, Trust Fund investments were valued at approximately $73 million.

### Liquidity Needs

There are rising liquidity needs for the Trust Fund starting in calendar year 2005 and going forward. Benefits and expenses will exceed receipts from participants' monthly payments on prepaid tuition contracts starting in 2005 and will rise at an increasing rate in future years.

### Investment Objectives

- Meet or exceed the actuarial interest rate assumption of 7.25 percent per annum, net of fees.
- Generate long term, net of fee, returns that exceed the Plan's liquidity needs.
- Build and maintain an actuarial surplus at a level recommended by the actuaries.

### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the Trust Fund. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 36.0% | 36.0% |
| International Equity | 19.0% | 19.0% |
| Private Equity | 0.0% | 0.0% |
| **Total Equity** | **55.0%** | **55.0%** |
| **Core Fixed Income** | **45.0%** | **45.0%** |
| Hedge Funds | 0.0% | 0.0% |
| Real Estate | 0.0% | 0.0% |
| **Cash** | **$1,000,000*** | |

*\*IMB Staff has authority to change target plus or minus 10%, as necessary, in consultation with appropriate representative(s) from the Plan.*

# PARTICIPANT PLAN DESCRIPTIONS

## Insurance Plans: *Board of Risk and Insurance Management*

### History

The Board of Risk and Insurance Management (BRIM) is a State entity charged with providing insurance coverage to all State agencies, as well as, cities, counties, and non-profit organizations throughout West Virginia under the provisions of Senate Bill 3. BRIM also provides a coal mine subsidence reinsurance program that allows homeowners and businesses to obtain insurance coverage up to $75,000 for collapses and damage caused by underground coal mines.

### Asset Value

As of July 1, 2009, BRIM investments were valued at approximately $105 million.

### Liquidity Needs

There are no current liquidity needs for BRIM since cash inflows from operations are currently sufficient to pay claims and expenses. BRIM requires a cash reserve account for collateral purposes amounting to approximately 15 percent of the funds for investment. This amount is held in the Consolidated Fund, which is administered by the West Virginia Board of Treasury Investments and utilized at BRIM's discretion.

### Investment Objectives

- Achieve a total rate of return of at least 4.9 percent per annum, net of fees.

### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for BRIM. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 10.0% | 10.0% |
| International Equity | 10.0% | 10.0% |
| Private Equity | 0.0% | 0.0% |
| **Total Equity** | **20.0%** | **20.0%** |
| **Fixed Income** | **80.0%** | **60.0%** |
| Hedge Funds | 0.0% | 20.0% |
| Real Estate | 0.0% | 0.0% |
| **Cash** | **0%** | |

# PARTICIPANT PLAN DESCRIPTIONS

## Insurance Plans: *Public Employees Insurance Agency*

### History

The Public Employees' Insurance Agency (PEIA) is a State entity charged with providing health insurance coverage to current and retired public employees.

### Asset Value

As of July 1, 2009, PEIA investments were valued at approximately $115 million.

### Liquidity Needs

PEIA projects net cash outflows from operations every year going forward. Net cash outflows as a percentage of assets invested increases dramatically in fiscal years 2008 and 2009, and presumably, going forward. This anticipated high liquidity need within a three-year time horizon indicates a substantial allocation to cash would be appropriate. PEIA currently manages part of its cash allocation and invests this amount in the Consolidated Fund administered by the West Virginia Board of Treasury Investments. The IMB staff collaborates with management at PEIA to monitor combined cash levels.

### Investment Objectives

- Achieve a total rate of return of at least 5.4 percent per annum, net of fees.

### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for PEIA. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 7.5% | 7.5% |
| International Equity | 7.5% | 7.5% |
| Private Equity | 0.0% | 0.0% |
| **Total Equity** | **15.0%** | **15.0%** |
| **Fixed Income** | **85.0%** | **65.0%** |
| Hedge Funds | 0.0% | 20.0% |
| Real Estate | 0.0% | 0.0% |
| **Cash** | **0%** | |

*\*IMB Staff has authority to change target plus or minus 10%, as necessary, in consultation with appropriate representative(s) from the Plan. Not all cash is invested with the IMB.*

# PARTICIPANT PLAN DESCRIPTIONS
## Endowment Funds: *Revenue Shortfall Reserve Fund*

### History

The Revenue Shortfall Reserve Fund (Reserve Fund) was created as a result of legislation passed in the 2006 regular legislative session under *West Virginia Code §11B-2-20*. It is to be funded from State surplus revenues accrued, if any, during the most recent fiscal year. The first 50 percent of all such surplus revenues will be deposited into the Reserve Fund within 60 days of the end of each fiscal year. The Reserve Fund is not required to be additionally funded if, or when, its balance meets or exceeds 10 percent of the State's General Revenue Fund budget for the fiscal year just ended. The West Virginia Legislature is authorized and may make an appropriation from the Reserve Fund for revenue shortfalls, for emergency revenue needs caused by acts of God or natural disasters, or for other fiscal needs as determined solely by the West Virginia Legislature.

### Asset Value

As of July 1, 2009, Fund investments invested with the IMB were valued at approximately $164 million. This does not include any amounts invested with the West Virginia Board of Treasury Investments.

### Liquidity Needs

The Reserve Fund is intended to be co-managed between the IMB and the West Virginia Board of Treasury Investments. A cash account of $100,000,000 must be invested throughout the life of the Fund in cash with the West Virginia Board of Treasury Investments. Any assets in excess of $100,000,000 will be invested with the IMB. The West Virginia State Budget Office will monitor these asset balances and will direct both the IMB and the West Virginia Board of Treasury Investments when the transfer of funds is necessary from one to the other.

Cash outflows are uncertain. The assets may be withdrawn, in whole or in part, at any time as directed by the West Virginia State Legislature or by executive order. Historically, cash outflows in similar state Funds created for similar purposes have had any such withdrawals reimbursed by the State within each fiscal year.

### Investment Objectives (for the assets managed by the IMB only)

- The investment objective is to provide for preservation of principal and minimization of volatility. There is no specifically identified rate of return target, as the Reserve Fund is perpetual and endowment-like with no anticipated or scheduled liabilities.

**West Virginia Investment Management Board**
*Investment Policy Statement*

### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the Fund. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 0.0% | 0.0% |
| International Equity | 0.0% | 0.0% |
| Private Equity | 0.0% | 0.0% |
| **Total Equity** | **0.0%** | **0.0%** |
| **Fixed Income** | **100.0%** | **100.0%** |
| Hedge Funds | 0.0% | 0.0% |
| Real Estate | 0.0% | 0.0% |
| **Cash** | **0%** | |

*Statutory cash requirement of $100,000,000 will be invested by the West Virginia Board of Treasury Investments.*

**West Virginia Investment Management Board**
*Investment Policy Statement*

# PARTICIPANT PLAN DESCRIPTIONS
## Endowment Funds: *Revenue Shortfall Reserve Fund – Part B*

### History

The Revenue Shortfall Reserve Fund – Part B (Reserve Fund – Part B) created by legislation passed in the 2006 regular legislative session under *West Virginia Code §11B-2-20*, was funded using the entire balance of the assets in the former Tobacco Settlement Medical Trust Fund. The West Virginia Legislature is authorized and may make expenditures from the Reserve Fund – Part B for the purposes set forth in *West Virginia Code §4-11A-3* or in instances of revenue shortfalls or fiscal emergencies of an extraordinary nature.

### Asset Value

As of July 1, 2009, Fund investments invested with the IMB were valued at approximately $238 million.

### Liquidity Needs

The Reserve Fund – Part B is intended to experience no cash outflows, but this is not entirely certain, as the West Virginia Legislature may appropriate a qualified expenditure as noted above. Cash inflows are expected to be minimal and emanate from loan repayments from the Physician's Mutual Insurance Company (*West Virginia Code §33-20F*), as well as other insurance tax payments.

### Investment Objectives

The investment objective is to provide for stable, long-term growth of assets, while seeking to minimize risk of loss. There is no specifically identified rate of return target, as the Reserve Fund – Part B is perpetual and endowment-like with no anticipated or scheduled liabilities.

### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the Fund. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 15.0% | 15.0% |
| International Equity | 15.0% | 15.0% |
| Private Equity | 0.0% | 0.0% |
| **Total Equity** | **30.0%** | **30.0%** |
| **Fixed Income** | **70.0%** | **70.0%** |
| Hedge Funds | 0.0% | 0.0% |
| Real Estate | 0.0% | 0.0% |
| **Cash** | **0%** | |

**West Virginia Investment Management Board**
*Investment Policy Statement*

## PARTICIPANT PLAN DESCRIPTIONS

### Insurance Plans:
### *West Virginia Retiree Health Benefit Trust Fund*

#### History

The West Virginia Retiree Health Benefit Trust Fund was created under *West Virginia Code §5-16D* for the purpose of providing for and administering retiree post-employment health care benefits, and the respective revenues and costs of those benefits as a cost sharing multiple employer plan.

#### Funded Status

As of June 30, 2009, the market value of assets was approximately $200.5 million

#### Liquidity Needs

The Trust is expected to have minimal liquidity needs until fiscal year 2011, upon which time annual liquidity needs will become high.

#### Investment Objectives

The investment objective is to provide for stable, long-term growth of assets, while seeking to minimize risk of loss. There is no specifically identified rate of return target.

#### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the System. (Policy targets have been established on a market value basis.)

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 2.5% | 2.5% |
| International Equity | 2.5% | 2.5% |
| Private Equity | 0.0% | 0.0% |
| **Total Equity** | **5.0%** | **5.0%** |
| **Fixed Income** | **95.0%** | **95.0%** |
| Hedge Funds | 0.0% | 0.0% |
| Real Estate | 0.0% | 0.0% |
| **Cash** | **0%** | |

*Cash levels to be reviewed as needed, at least annually, collaboratively with management staff from PEIA.*

**West Virginia Investment Management Board**
*Investment Policy Statement*

# PARTICIPANT PLAN DESCRIPTIONS
## Insurance Plans:
### *AccessWV*

#### History

AccessWV is a health plan created by West Virginia statute to provide health insurance to West Virginians who have been unable to find or who have been denied health insurance in the private market because of a medical condition. It also serves those who have guaranteed access to coverage ("portability rights") through the federal Health Insurance Portability and Accountability Act (HIPAA) as well as those who are eligible for the federal Health Coverage Tax Credit (HCTC) program.

Overall direction and management of AccessWV is the responsibility of the Board of Directors and the Executive Director. The AccessWV program office is part of the West Virginia Offices of the Insurance Commissioner. AccessWV contracts with the Public Employees Insurance Agency (PEIA) for Plan Administrator services.

AccessWV is financed through premiums paid by members of the plan and by special assessments made by all hospitals that are based in West Virginia. No public or state funds are used to support the plan.

#### Funded Status

As of December 31, 2009, the market value of assets of the plan was approximately $12 million, of which approximately $2 million is directed to be invested with the WVIMB on or around March 1, 2010.

#### Liquidity Needs

AccessWV began operations in July 2005. The plan is expected to have no liquidity needs from the WVIMB portion of their reserve funds at any time in the next five years.

#### Investment Objectives

The investment objective is to provide for stable, long-term growth of assets, while seeking to minimize risk of loss. There is no specifically identified rate of return target.

#### Asset Allocation

Based upon a determination of the appropriate risk tolerance, the Board adopted the following broad asset allocation guidelines for the assets managed for the System. (Policy targets have been established on a market value basis.)

**West Virginia Investment Management Board**
*Investment Policy Statement*

| Asset Class | Policy Allocation | Strategic Allocation |
|---|---|---|
| Domestic Equity | 25.0% | 25.0% |
| International Equity | 25.0% | 25.0% |
| Private Equity | 0.0% | 0.0% |
| **Total Equity** | **50.0%** | **50.0%** |
| **Fixed Income** | **50.0%** | **50.0%** |
| Hedge Funds | 0.0% | 0.0% |
| Real Estate | 0.0% | 0.0% |
| **Cash** | **0%** | |

Appendix A — *Participant Plan Descriptions*

# *Permissible Investments*

**West Virginia Investment Management Board**
*Investment Policy Statement*

# PERMISSIBLE INVESTMENTS

### Equities:

- U.S. Common Stocks and Preferred Stocks
- Non-U.S. Common Stocks and Preferred Stocks
- American Depository Receipts (ADRs)
- Commingled Funds
- Real Estate Investment Trusts (REITs)
- Stock Warrants and Rights
- Stock Index Futures
- Exchange Traded Funds (ETFs)
- Securities registered under Rule 144A of the Securities Act of 1933 are permissible and will be classified into the appropriate security class as authorized above

### Fixed Income:

- U.S. Government and Agency Securities and Government Instrumentalities
- Corporate Fixed Income Securities (Investment and Non-Investment Grade)
- Taxable Municipal Bonds
- Asset-Backed Securities
- Mortgage-Backed Securities
- Convertible Bonds
- Trust Preferred Securities
- Yankee Bonds and Global Euro Bonds
- Bank Loan Debt Obligations
- Non-U.S. Government and Government Agency Securities (Investment and Non-Investment Grade)
- Commingled Funds
- Securities registered under Rule 144A of the Securities Act of 1933 are permissible and will be classified into the appropriate security class as authorized above
- Other types of bonds not specifically listed here that are included in the Barclays Capital Universal Bond Index

**West Virginia Investment Management Board**
*Investment Policy Statement*

**Derivatives:**

- Derivatives and derivative use specifically authorized in the WVIMB Derivative Use Policy for any investment manager

- Derivatives and derivative use not specifically authorized in the WVIMB Derivative Use Policy for an investment manager that has obtained written authorization from the Board to be exempt from the Derivative Use Policy.

**Cash Equivalents:**

- Cash

- U.S. Government and Agency Securities and Government Instrumentalities

- Commercial Paper

- Certificates of Deposit

- Repurchase Agreements

- Agency Discount Notes

- Bank Short-Term Investment Funds (STIF)

- Money Market Funds

- Securities that comply with the SEC's Rule 2a7 of the Investment Company Act of 1940, as amended.

- Securities registered under Rule 144A of the Securities Act of 1933 are permissible and will be classified into the appropriate security class as authorized above

**Private Investments:**

Private investments and private commingled funds are permitted to the extent such investment complies with the statutory provisions detailed in West Virginia State Code 12-6-12 subsections (b) and (h).

# *Investment Pools*

# INVESTMENT POOLS
## *Short-Term Pool*

### Objectives

The Short-Term Pool was created to maintain sufficient liquidity to meet the daily disbursements requested by the Participant Plans and to invest any contributions until the time the money is transferred to other asset classes without sustaining capital losses while earning a small return above inflation.  The portfolio is structured as a money market fund where the goal is a stable dollar value per share, thus preserving principal.  The risk factor on this portfolio is low and managed through numerous maturity restrictions, diversification guidelines, and credit limits.

### Benchmarks

- For purposes of complying with the exposure limits set forth for this Pool, and for purposes of evaluating investment returns (net of external management fees), the following benchmark will be utilized:  the Salomon 90-day T-bill Index + 15 basis points.

- For purposes of guiding investment strategy, external managers should also consider the portfolio's comparison to the following benchmarks: The Money Fund Report First Tier Institutional median return, the U.S Effective Federal Funds Rate, and the inflation rate as defined by the annualized U.S. real GDP deflator (all net of external management fees).

### Permissible Investments

Permitted holdings are listed in the Permissible Investments section of this Policy Statement under the heading "Cash Equivalents".

(Liquidity and quality will be the dominant characteristics of the holdings. Generally, the Short-Term Pool will be dominated by money market type securities issued by the U.S. Government, its agencies, and U.S. based corporations.)

### Maturity Restrictions

The weighted average maturity of the Short-Term Pool shall not exceed 60 days.  The portfolio shall at all times maintain sufficient liquidity to meet daily withdrawals.  Aside from any maturity restrictions specifically established for any particular security type, herein, the remaining maturity of individual securities must be no greater than 397 calendar days. Maturities may be determined based on standards established pursuant to SEC Rule 2a7 under the Investment Company Act of 1940, as amended.

**West Virginia Investment Management Board**
*Investment Policy Statement*

## Quality and Other Restrictions

1. All restrictions are based upon percentage of the portfolio holdings on an amortized cost basis.

2. At all times at least 15.0 percent of the portfolio must consist of Treasury securities.

3. No more than 75.0 percent of the portfolio may be invested in corporate securities.

4. No more than 5.0 percent of the portfolio may be invested in any one corporate name.

5. No more than 10.0 percent of the portfolio may be invested in Yankee issues.

6. No more than 3.0 percent of the portfolio may be invested in any one Yankee name.

7. All domestic corporate and Yankee securities must be rated AA- or higher (or its equivalent).

8. No more than 75.0 percent of the portfolio may be invested in floating rate notes.

9. Floating rate notes shall be based on a money market index. US Government backed floating rate notes shall not have a final maturity longer than 731 days. Floating rate notes not guaranteed by the US Government shall not have a final maturity longer than 397 days.

10. No more than 75.0 percent of the portfolio shall be invested in commercial paper , with a maximum of 50.0 percent of the 75.0 percent restriction in asset-backed commercial paper (max in ABCP =50%*75%=37.5% of portfolio).

11. Commercial paper purchase will be limited to commercial paper with a minimum rating of A1 by Standard & Poor's and P1 by Moody's. The final maturity on commercial paper will be 185 days or less from the date of purchase.

12. No more than 75.0 percent of the portfolio shall be invested in certificates of deposit and the credit rating of the issuing bank must be rated A1/P1 by Standard & Poor's and Moody's.

13. Repurchase agreements must be 102 percent collateralized and may only be executed with primary dealers or top tier banks.

14. A maximum of 37.5 percent of the portfolio may be invested in asset-backed securities and asset-backed commercial paper **combined**, with no more than 20.0 percent of the portfolio invested in asset-backed securities. Asset-backed securities must have a minimum rating of AAA or A1/P1 by Standard and Poor's and Moody's. Furthermore, a maximum of 10.0 percent of the portfolio may be invested in any single issuer name and no more than 5.0 percent may be invested in any single issue. Additionally, for purposes of calculating the weighted average maturity of the portfolio, the average life of the asset-backed security shall be used.

15. Securities that fall out of compliance may be held to maturity unless the holding violates state statute or other regulatory guidelines. The Board may require the manager to sell non-compliant assets when the portfolio changes composition.

16. The portfolio may not buy unregistered securities or private placements with the exception of those securities issued pursuant to the SEC Rule 144A and commercial paper issued pursuant to rule 4(2) of the Securities Act of 1933. No more than 37.5 percent of the portfolio will be invested in 144A securities and commercial paper issued pursuant to Rule 4(2) **combined**.

17. The portfolio may not invest in inverse floaters or be leveraged in any manner.

**West Virginia Investment Management Board**
*Investment Policy Statement*

# INVESTMENT POOLS

## *Fixed Income Pool*

### Objectives

The main objective for the Fixed Income Pool is to generate investment income, provide stability, and enhance diversification but not at the expense of total return.

With regard to the Fixed Income Pool the approved Strategic Range within which the Allocation Committee can operate is twenty-five (25) % above or below the approved Strategic Allocation for public Fixed Income.

Each Participant Plan has its own unique Strategic Allocation as referenced in Appendix A of this Investment Policy Statement, so the example below is for clarification purposes only:

*EXAMPLE:*

|  | Strategic Allocation (as a percentage of the total Plan allocation) | Strategic Range |
|---|---|---|
| Core Fixed Income Pool | -- | -- |
| Total Return Fixed Income Pool | -- | -- |
| Fixed Income Pool | 20.0% | +/- 5 (15% - 25%) |

Additionally, the neutral target and ranges around the strategic asset class sub-components that the Allocation Committee may operate within are outlined below:

| Strategic Asset Class Sub-Components | Neutral Target* | Allocation Range |
|---|---|---|
| Core Fixed Income | 50% | +/- 20 (Minimum 30% to Maximum 70%) |
| Total Return Fixed Income | 50% | +/- 20 (Minimum 30% to Maximum 70%)<br>Sum must equal 100% of the Fixed Income allocation |

*\*The Neutral Target is approved by the Board.*

*Note:  The combined allocation of the international equity, international fixed income, and international real estate components may not exceed 30% of the Total Plan allocation, as mandated by statute.*

West Virginia Investment Management Board
*Investment Policy Statement*

## Benchmarks

- The performance of the Total Return Fixed Income Pool will be measured against the Barclays Capital Universal Index, and the Pool is expected to outperform this benchmark over three and five year periods, net of external investment management fees.
- The performance of the Core Fixed Income Pool will be measured against the Barclays Capital U.S. Aggregate Index, and the Pool is expected to outperform this benchmark over three and five year periods, net of external investment management fees.
- The performance of the Fixed Income Pool will be measured against the Barclays Capital Universal Index, and the Pool is expected to outperform this benchmark over three and five year periods, net of external investment management fees.
- The Fixed Income Pool shall also seek investment performance that would place it above median versus comparable funds, measured over three and five year periods.

## Permissible Investments

Permitted holdings are listed in the Permissible Investments section of this Policy Statement under the headings, "Fixed Income", "Derivatives", and "Cash Equivalents".

(Generally, the Fixed Income Pool will be dominated by fixed income securities issued by the U.S. Government, its agencies, and U.S.-based corporations.)

## Quality and Other Restrictions

1. All restrictions are based upon the percentage of holdings on a market value basis at the time of the security's purchase.
2. No more than 5.0 percent of may be invested in any one corporate name.
3. If more than 3.0 percent is invested in a single corporate name, the security must be an investment grade credit rated BBB- or higher (or its equivalent).
4. No more than 50.0 percent may be invested in asset-backed securities,
5. The Fixed Income Pool will be evaluated as an investment grade portfolio. Individually managed portfolios may vary from this requirement as outlined under the manager investment guidelines.
6. For mutual funds and commingled funds that are not rated, the average-weighted credit rating of the underlying securities must be within the top six ratings (at least B3 by Moody's, B- by S&P and Fitch). . For split rated securities, if rated by three NRSROs, the rating determination shall be the middle rating from Moody's, S&P, and Fitch (remove the high and remove the low); if rated by only two, take the lower; if rated by only one, take that one.
7. No more than 10.0 percent may be invested in convertible bonds.
8. Equity securities are not permitted, which includes convertible bonds that have converted to equity securities.

**West Virginia Investment Management Board**
*Investment Policy Statement*

9. Securities that fall out of compliance may be held to maturity unless the holding violates state statute or other regulatory guidelines. The Board may require any manager to sell non-compliant assets when the portfolio changes composition.

10. Non-investment grade securities and non-U.S. dollar denominated securities are prohibited from purchase in the Core Fixed Income Pool. The Total Return Fixed Income Pool may invest no more than 50% combined in high yield, bank loans, emerging market, and non-U.S. dollar denominated securities.

11. Each Manager is further restricted by any specific guideline that may pertain to them, as outlined in their individual investment manager guidelines contained in Appendix D.

# INVESTMENT POOLS

## *Equity Pool*

### Objectives

The main objective for the Equity Pool is to provide for long-term growth for all participants. The Equity Pool is comprised of separate strategic asset classes, which when taken in aggregate enable adequate diversification.

With regard to the Equity Pool the approved Strategic Ranges within which the Allocation Committee can operate are:  twenty (20) % above or below the approved US Equity Strategic Allocation, twenty (20) % above or below the approved International Equity Strategic Allocation, and ten (10) % above or below the approved public Equity Strategic Allocation.

Each Participant Plan has its own unique Strategic Allocation as referenced in Appendix A of this Investment Policy Statement, so the example below is for clarification purposes only:

### *EXAMPLE:*

|  | **Strategic Allocation (as a percentage of the total Plan allocation)** | **Strategic Range** |
|---|---|---|
| US Equity | 25.0% | +/- 5 (20% - 30%) |
| International Equity | 25.0% | +/- 5 (20% - 30%) |
| Total Equity Pool | 50.0% | +/- 5 (45% - 55%) |

Additionally, the neutral target and ranges around the strategic asset class sub-components that the Allocation Committee may operate within are outlined below:

| **Strategic Asset Class Sub-Components** | **Neutral Target*** | **Allocation Range** | **Sample Ratio as of 6/30/09** |
|---|---|---|---|
| US Large Cap vs. US Non-Large Cap | Non-Large = Russell 2500/Russell 3000  Large = 1 minus Non-Large | 0.5 to 2.5 times benchmark weight  Sum must equal 100% of Domestic Equity allocation | 84/16 |
| US Non-Large Value vs. US Non-Large Growth | Value vs. Growth  percentage in Russell 2500 | 0.5 to 2.5 times benchmark weight  Sum must equal 100% of Non-Large Cap Domestic Equity allocation | 50/50 |

**West Virginia Investment Management Board**
*Investment Policy Statement*

| International Large vs. International Small vs. Emerging Markets | Large vs. Small vs. Emerging percentage in MSCI ACWI ex US | 0.5 to 2.5 times benchmark weight Sum must equal 100% of International Equity allocation | 70/9/21 |
|---|---|---|---|

\* *The Neutral Target is established based on the listed indices and is re-set, subject to Allocation Committee decisions, based on these index weights every June 30.*

> Note: The combined allocation of the international developed equity, international small cap, emerging markets equity, international fixed income, and international real estate components may not exceed 30% of the Total Plan allocation, as mandated by statute.

## Benchmarks

The objective of the Equity pool is to outperform a customized equity benchmark over a full market cycle (3 to 5 years), net of external investment management fees. The customized benchmark will be comprised of 50 percent Russell 3000, and 50 percent MSCI ACWI – ex U.S. *In addition, the Equity Pool shall seek investment performance that would place it above median versus comparable funds, measured over three and five year periods.*

The objective of the Large Cap component is to equal or exceed the large capitalization equity market (net of external investment management fees) as measured by the S&P 500 Stock Index over a full market cycle (3 to 5 years). Given the belief that the large capitalization equity market is very efficient, a significant portion of this Component will be passively or enhanced-passively managed. The Large Cap Component may also have an active component, in which advisors manage active portfolios in an attempt to increase the return of the Large Cap Component.

The objective of the Non-Large Cap component is to outperform the small capitalization equity market (net of external investment management fees) as measured by the Russell 2500 Index over a full market cycle (3 to 5 years). Given the belief that inefficiencies exist within the small cap market, a significant portion of this Component will be actively managed.

The objective of the International Equity component is to outperform the international equity market (net of external investment management fees) as measured by the MSCI ACWI ex-U.S. Index (capitalization weighted) over a full market cycle (3 to 5 years). Given the belief that substantial inefficiencies exist within the international equity market, it is anticipated that the International Component will be actively managed. Furthermore, a portion of the International Component may be invested in the emerging markets.

> In the absence of a statutory definition for the term "international," the Board has adopted the following definition:

---

*Appendix C — Investment Pools*

**West Virginia Investment Management Board**
*Investment Policy Statement*

An "international security" means a security, the trading of which occurs neither in whole nor in part in United States currency.

Each equity component will be diversified according to economic sector, industry, number of holdings and other investment characteristics. However, it is recognized that in order to achieve its investment objective, the actively managed portion of each component may not be fully diversified.

## Permissible Investments

Permitted holdings are listed in the Permissible Investments section of this Policy Statement under the headings, "Equities", "Derivatives", and "Cash Equivalents".

## Quality and Other Restrictions

1. Decisions as to individual security selection, security size and quality, number of industries and holdings, current income levels, and turnover are left to broad manager discretion. This discretion is subject to the usual standards of fiduciary prudence and quality and other restrictions as set forth in the "Investment Manager Policies and Guidelines" section of the Appendix. Furthermore, the following broad restrictions apply to the Equity Pool:

   a. Cash shall be "swept" into a predetermined vehicle.
   b. A maximum of 5.0 percent of an Investment Manager's portfolio may be invested in any one Company, unless specifically authorized otherwise.
   c. Investment Managers may invest in cash equivalents, adjustable rate preferred stocks or convertible bonds, with the understanding that performance will be measured against the benchmark stock index. Domestic Managers are limited to 3.0 percent, and International Managers are limited to 5.0 percent, or less, by Contract.
   d. The use of derivatives will be restricted to hedging purposes only, as outlined in the WVIMB Derivatives Use Policy. Leveraged derivatives and derivatives used for speculative investments are prohibited.

2. Each Manager is further restricted by any specific guideline that may pertain to them, as outlined in their individual investment manager guidelines contained in Appendix D.

**West Virginia Investment Management Board**
*Investment Policy Statement*

# INVESTMENT POOLS
## *Alternatives Pool*

A.    **Objective**

The main objective for the Alternatives pool is to provide diversification and risk-reduction benefits for its participants' assets.  Secondarily, the pool should provide for long-term growth of participants' assets.

B.    **Management Structure**

The Alternatives pool is comprised of one asset class, Private Equity, and one management style, Hedge Funds.  Both are intended to enhance diversification when added to the total portfolio.

Private Equity is comprised of the following categories and target allocations:

|  | Target Range |
|---|---|
| Corporate Finance[1] | 90-100% |
| Venture Capital | 0-10% |

The IMB anticipates that the Private Equity program will not reach its mature allocation range until a future date and recognizes that, until such time, the actual allocations of committed and/or invested capital may not meet and likely will not meet the mature target allocation. To the extent the IMB has not fully deployed its assets to the targets in the mature allocation range, it has done so and will continue to do so in reliance upon information and recommendations provided by its private equity specialty consultant. The pacing strategy implemented to achieve the mature target allocation likewise has been and will continue to be undertaken in reliance upon information and advice of the private equity special consultant.

Hedge Funds are comprised of the following categories and target allocations:

|  | Target Range | Maximum |
|---|---|---|
| Relative Value | 25-55% | 60% |
| Event Driven | 20-40% | 50% |
| Long-Short Equity | 15-35% | 40% |
| Directional | 0-20% | 25% |

---

[1] Includes buyout, growth capital, mezzanine debt, distressed debt and turnaround strategies

**Appendix C —** *Investment Pools*

**West Virginia Investment Management Board**
*Investment Policy Statement*

C.    **Investment Performance**

The IMB calculates total rates of return using the time-weighted rate of return methodology. The time-weighted method determines the rate of return exclusive of the effects of participant contributions or withdrawals.

In addition, the IMB receives additional returns using the internal rate of return (IRR) methodology for any private investment. The IRR method is the return rate that equates the present value of cash outflows with the present value of cash inflows. The IRR method considers both cash flow timing and size and is the preferred performance measure for private market funds.

D.    **Benchmarks**

Private Equity:
Tactical (Short-term) benchmark: Venture Economics vintage year (buyout, venture, U.S. & Western Europe)

Strategic (Long-term) benchmark:   S&P 500 + 500 basis points

For purposes of calculating and reporting performance benchmarks, the actual return of the program will be used as opposed to the tactical or strategic benchmark listed above for the first five (5) years of the program (until 6/30/2013), as early returns from an immature private equity program are not meaningful.

Hedge Funds:
Tactical (Short-term) benchmark:   Hedge Funds Research, Inc. Fund-of-Funds Composite Index

Strategic (Long-term) benchmark:   LIBOR + 400 basis points

E.    **Restrictions**

The Board is expressly authorized to invest no more than twenty percent (20%) of the assets managed by the Board, and no more than twenty percent (20%) of the assets of any individual participant plan, as measured at the time of the investment, in the Alternatives Pool.

Private Equity:
- Investments representing direct equity ownership in individual companies or other business entities, without the benefit of an intermediate partnership or other indirect ownership structure are prohibited. However, this exception shall not include direct equity ownership which results from the distribution of securities from partnerships to the Plan.

**West Virginia Investment Management Board**
*Investment Policy Statement*

- Investment plans which in substance will use proceeds for natural resource exploration and development projects which lack reliable information on proven accessible resources or deposits are prohibited.

- Investment funds which plan to invest in a single asset that will comprise more than 40% of the fully invested fund are prohibited.

- Investment funds which plan to invest in less than three unrelated private companies are prohibited.

- Investment funds in which the Board's interest is more than 40% of the fund's assets at the time of purchase or final closing are prohibited.

- Investment funds in which the combined investment of institutional investors, other public sector entities, and educational institutions and their endowments and foundations in the fund is less than 50% of the Board's total investment in the fund, at the time of acquisition are prohibited.

- Absent a compelling reason, any investment with any fund, investment manager, or partner that does not provide audited financial statements and a formal valuation policy is prohibited. A SAS 70 report is encouraged, if applicable.

Hedge Funds:

- No investment with any single manager can represent more than 10% of the hedge fund portfolio.

- Forecast and realized annualized volatility will be between 3% and 5%.

- Forecast and realized beta to MSCI World will be less than 25%.

- No more than 20% of the total hedge fund portfolio forecast risk (as measured by individual fund contribution to forecast Value at Risk) may be derived from any single manager.

- After being fully invested for one year, at least 20% of the portfolio shall be available for withdrawal on a quarterly basis. Including notice period, this would translate into a maximum 180 days.

- Side pockets will be no more than 15% of the overall hedge fund portfolio.

- No leverage may be used at the portfolio level.

**West Virginia Investment Management Board**
*Investment Policy Statement*

- Investment funds which plan to invest in a single asset that will comprise more than 40% of the fully invested fund are prohibited.

- Investment funds which plan to invest in less than three unrelated private companies are prohibited.

- Investment funds in which the Board's interest is more than 40% of the fund's assets at the time of purchase or final closing are prohibited.

- Investment funds in which the combined investment of institutional investors, other public sector entities, and educational institutions and their endowments and foundations in the fund is less than 50% of the Board's total investment in the fund, at the time of acquisition are prohibited.

- Absent a compelling reason, any investment with any fund, investment manager, or partner that does not provide audited financial statements and a formal valuation policy is prohibited. A SAS 70 report is encouraged, if applicable.

F.    Diversification

To strengthen the diversification goals of these investments, several diversification criteria will be utilized when evaluating each opportunity. These criteria include, but are not limited to, geographic location of the investment, industry orientation of the partnership, financial funding stage of the partnership, source of the partnership's deal flow, vintage year, and investment size.

G.    Sub-Committee Duties

Sub-committees have been established and charged with the responsibility of decision-making for all private equity and hedge fund related matters, including, but not limited to, the approval of investment managers or partners and commitment amounts, *provided*, that any such investment be made only upon the recommendation by a professional, third-party fiduciary investment adviser registered with the Securities and Exchange Commission under the Investment Advisors Act of 1940, as amended.

Meetings are formally noticed and minutes are recorded and on file subsequent to every meeting. Formal notification of any new commitment is provided to all Board Trustees, Representatives, and Committee Members within five business days of the signing of the final commitment documents. Any dissenting opinions within the sub-committee shall be explained in that notice.

H.    Post-Distribution Management (If Applicable)

In order to effectively manage the liquidation of in-kind distributions received from its investments, an existing manager or a manager specializing in distribution management may be utilized. Once a security has become public, that security is no longer required to be held in the Alternatives Pool.

# INVESTMENT POOLS
## *Real Estate Pool*

A.    **Objectives**

The main objective for the Real Estate pool is to provide diversification and risk-reduction benefits for its participants' assets.  Secondarily, the pool should provide for long-term growth of participants' assets.

B.    **Management Structure**

The Real Estate pool is comprised of three categories.  The target allocations are as follows:

|  | Target | Range |
|---|---|---|
| Core | 50% | +/- 20 (Minimum 30% to Maximum 70%) |
| Value-Added | 30% | +/- 20 (Minimum 10% to Maximum 50%) |
| Opportunistic | 20% | +/- 10 (Minimum 10% to Maximum 30%) |

The IMB anticipates that the Real Estate pool will not reach its mature allocation range until a future date and recognizes that, until such time, the actual allocations of committed and/or invested capital may not meet and likely will not meet the mature target allocation. To the extent the IMB has not fully deployed its assets to the targets in the mature allocation range, it has done so and will continue to do so in reliance upon information and recommendations provided by its real estate specialty consultant. The pacing strategy implemented to achieve the mature target allocation likewise has been and will continue to be undertaken in reliance upon information and advice of the real estate specialty consultant.

C.    **Investment Performance**

The IMB calculates total rates of return using the time-weighted rate of return methodology.  The time-weighted method determines the rate of return exclusive of the effects of participant contributions or withdrawals.

In addition, the IMB receives additional returns using the internal rate of return (IRR) methodology for any private investment.  The IRR method is the return rate that equates the present value of cash outflows with the present value of cash inflows.  The IRR method considers both cash flow timing and size and is the preferred performance measure for private market funds.

D.    **Benchmarks**

Tactical (Short-term) benchmark:  NCREIF

Strategic (Long-term) benchmark:  NCREIF + 100 basis points

**West Virginia Investment Management Board**
*Investment Policy Statement*

For purposes of calculating and reporting performance benchmarks, the actual return of the program will be used as opposed to the tactical or strategic benchmark listed above for the first five (5) years of the program (until 6/30/2013), as early returns from an immature private real estate program are not meaningful.

E.      **Restrictions**

The Board is expressly authorized to invest no more than twenty-five percent (25%) of the assets managed by the Board, and no more than twenty-five percent (25%) of the assets of any individual participant plan, as measured at the time of investment, in the Real Estate Pool.

- Investment funds which plan to invest in a single asset that will comprise more than 40% of the fully invested fund are prohibited.

- Investment funds which plan to invest in less than three unrelated private companies are prohibited.

- Investment funds in which the Board's interest is more than 40% of the fund's assets at the time of purchase or final closing are prohibited.

- Investment funds in which the combined investment of institutional investors, other public sector entities, and educational institutions and their endowments and foundations in the fund is less than 50% of the Board's total investment in the fund, at the time of acquisition are prohibited.

- Absent a compelling reason, any investment with any fund, investment manager, or partner that does not provide audited financial statements and a formal valuation policy is prohibited.  A SAS 70 report is encouraged, if applicable.

F.      **Diversification**

To strengthen the diversification goals of these investments, several diversification criteria will be utilized when evaluating each opportunity. These criteria include, but are not limited to, geographic location of the investment, industry orientation, property type, vintage year, and investment size.

G.      **Sub-Committee Duties**

Sub-committees have been established and charged with the responsibility of decision-making for all real estate related matters, including, but not limited to, the approval of investment managers or partners and commitment amounts, *provided*, that any such investment be made only upon the recommendation by a professional, third-party fiduciary investment adviser

registered with the Securities and Exchange Commission under the Investment Advisors Act of 1940, as amended.

Meetings are formally noticed and minutes are recorded and on file subsequent to every meeting. Formal notification of any new commitment is provided to all Board Trustees, Representatives, and Committee Members within five business days of the signing of the final commitment documents. Any dissenting opinions within the sub-committee shall be explained in that notice.

## H.    **Post-Distribution Management (If Applicable)**

In order to effectively manage the liquidation of in-kind distributions received from its real estate investments, an existing manager or a manager specializing in distribution management may be utilized. Once a security has become public, that security is no longer required to be held in the Real Estate Pool.

# *Investment Manager Policies and Guidelines*

**West Virginia Investment Management Board**
*Investment Policy Statement*

# LARGE CAPITALIZATION DOMESTIC
# EQUITY MANAGER POLICY

## Investment Manager Policies and Guidelines
### *INTECH Investment Management LLC*

**Policy:**

The portfolio under the supervision of Enhanced Investment Technologies, LLC (Intech) intended to be a U.S. equity oriented portfolio. Intech has been selected to pursue an investment style that the Board defines as a large capitalization, U.S. equity, quantitative approach. This approach is different, yet complementary to the investment styles followed by the other domestic equity managers.

Intech is expected to maintain its assigned style orientation over time in order to preserve the structure of the domestic equity component of the equity portfolio. Intech is expected to produce investment returns that exceed the S&P 500 Index by 180 basis points on an annualized basis over rolling three-to-five year periods, net of fees.

**Guidelines:**

A.   The portfolio is to be a large cap domestic equity-oriented portfolio. Intech may purchase short-term cash equivalent instruments, which for the purpose of measurement, will be treated as equity reserves, not as fixed income securities.

B.   It is Intech's decision as to whether or not to utilize the Short-Term Investment Fund offered by the Fund's custodian, or another cash equivalent vehicle, and in doing so, is responsible for assessing the credit worthiness and relative return attractiveness of each cash equivalent fund used.

C.   The portfolio will be adequately diversified regarding individual securities and sectors to avoid the undue risk inherent in non-diversified holdings. In addition, Intech will adhere to the following limitations.

1. INT ECH's mathematical investment process does not involve analysis of fundamental data, such as market capitalization. For unrestricted portfolios, all securities within the benchmark index are eligible for purchase in an INTECH portfolio. Stocks deleted by S&P Corporation may be subsequently deleted from the portfolio in an orderly fashion. Stocks added to the index are included in the permitted universe in regularly scheduled updates. These techniques may result in temporary holding of stocks in the process of entering or exiting the index.

2. All equity investments should emphasize quality companies with verifiable operating history and good marketability.

3. Market capitalization should be at least $100 million for each security held.

**West Virginia Investment Management Board**
*Investment Policy Statement*

4. Securi  ty weightings may not differ by more than 100 basis points from the weighting of that security in the S&P 500 Index at the time of purchase.

5. In   vestments in any corporation may not exceed 5.0 percent of the outstanding shares of that corporation.

6. No   more than 50.0 percent of the portfolio may be invested in a single economic sector.

7. In or   der to produce a fully invested portfolio and/or provide immediate market exposure or cash liquidity for monthly rebalancing cash flows, the portfolio may hold up to 10% of its value in S&P 500 futures contracts or S&P 500 SPDRs, unless the client contributes or withdraws more than 10% of the fund's value, in which case the fund may fully hedge that exposure until the transaction is complete.

8. No   more than 5.0 percent of the portfolio may be invested in cash, as measured over any rolling thirty-day period.

9. T   he portfolio shall be invested only in securities within the S&P 500.

D.  The portfolio performance will be measured on a total return basis that includes both income and change in market value.

E.  Intech will be reviewed quarterly based on the following characteristics:

1. Adherence   to style risk assignment.

2. Value   added over the S&P 500 Index, net of fees.

3. T   he value added over similar investment managers,

F.  The following investment activities are prohibited in the Intech portfolio:

1. Sho   rt sales, margin purchases or borrowing,

2. Pr   ivate placements or restricted securities, except those under Rule 144A,

3. Warrants   or other options except when acquired as part of purchased security,

4. Comm   odities,

5. Direct purchas   es of real estate, and

G.  The portfolio will comply with all federal and state laws and any restrictions imposed by this Board.

**West Virginia Investment Management Board**
*Investment Policy Statement*

These guidelines are not to be construed as restrictive to Intech's ability to follow the strategies they consider are the most appropriate given the Board's directive, but rather as an exercise of the Board's fiduciary responsibility. If at any time Intech feels that these instructions are unrealistic, or may be a hindrance in pursuing their investment style, Staff and the Board are to be notified immediately in writing.

**Reporting Requirements:**

    A.    Written summary reports of transactions, month-end market values, and monthly rates of return are to be provided to Staff within seven business days after the close of each month's business activity.

        1.For separate accounts, it is the responsibility of the investment manager to reconcile any pricing discrepancies between the manager's pricing service and the pricing services utilized by the West Virginia Investment Management Board. If pricing discrepancies have not been reconciled by the first business day following month-end, West Virginia Investment Management Board's pricing service shall be used in calculating performance.

        2.Int ech shall notify the Board should the portfolio's allocation to ADRs or foreign securities listed on U.S. exchanges ever exceed 10.0 percent.

    B.    Significant changes in strategy are to be reported to Staff in writing before they occur. A significant change is defined as follows.

        1.An allocation to cash or cash equivalents that exceeds 3.0 percent over any rolling thirty-day period, excluding any cash or cash equivalent investment necessary to maintain an S&P 500 futures position allowable in Section C above.

        2.A meaningful deviation from the investment guidelines communicated to the Board at the time of hiring or from the guidelines herein.

The investment manager hereby acknowledges that it is a fiduciary and accepts delegation of fiduciary duty by the Board to the Manager with respect to the Plan's assets under its discretion or control.

**Investment Manager:**      Intech

**Representative:**      _____

**Title:**      _____

**Date:**      _____

# LARGE CAPITALIZATION DOMESTIC
# EQUITY INDEX MANAGER POLICY

## Investment Manager Policies and Guidelines
### State Street Global Advisors,
### a division of State Street Bank & Trust Company

<u>**Policy:**</u>

The portfolio under the supervision of State Street Global Advisors is intended to be a domestic equity portfolio. State Street has been hired to pursue an investment style that the Board has defined as a large cap domestic equity index. State Street is expected to produce investment returns that match as closely as possible the performance of the S&P 500 on an annualized basis over rolling three-year to 5-year periods, gross of fees. As it is not always practical or possible to hold every stock in the index, or in the exact percentage as the index, State Street may employ a sampling and/or optimization technique to facilitate replication.

The portfolio may at times purchase or sell futures contracts on the Index, or options on those futures, or engage in other transactions involving the use of derivatives, in lieu of investing directly in the securities. SSgA may buy or sell securities not currently in the index, in anticipation of their addition or removal. To the extent derivatives are used in the portfolio, State Street will comply with the WVIMB Derivatives Use Policy.

<u>**Guidelines:**</u>

  A.  The portfolio is to be a large cap domestic equity index portfolio. State Street may purchase short-term cash equivalent instruments, which for the purpose of measurement, will be treated as equity reserves, not as fixed income securities.

  B.  It is State Street's decision as to whether or not to utilize the Short-Term Investment Fund offered by the Fund's custodian, or another cash equivalent vehicle, and in doing so, is responsible for assessing the credit worthiness and relative return attractiveness of each cash equivalent fund used.

  C.  The portfolio performance will be measured on a total return basis that includes both income and change in market value.

  D.  State Street will be reviewed quarterly based on the following characteristics:

   1. Adherence  to style risk assignment.

   2. T he predicted tracking error versus the S&P 500 Index should typically be less than 10 basis points over three to five year periods.

**West Virginia Investment Management Board**
*Investment Policy Statement*

    E.    The portfolio will comply with all federal and state laws and any restrictions imposed by this Board.

These guidelines are not to be construed as restrictive to State Street's ability to follow the strategies they consider are the most appropriate given the Board's directive, but rather as an exercise of the Board's fiduciary responsibility. If at any time State Street feels that these instructions are unrealistic, or may be a hindrance in pursuing their investment style, Staff and the Board are to be notified immediately in writing.

## Reporting Requirements:

    A.    Written summary reports of holdings and month-end market values are to be provided to Staff within three business days after the close of each month's business activity.

        1.For  separate accounts, it is the responsibility of the investment manager to reconcile any pricing discrepancies between the manager's pricing service and the pricing services utilized by the West Virginia Investment Management Board. If pricing discrepancies have not been reconciled by the first business day following month-end, West Virginia Investment Management Board's pricing service shall be used in calculating performance.

    B.    Significant changes in strategy are to be reported to Staff in writing before they occur. A significant change is defined as follows.

        1.An  allocation to cash or cash equivalents that exceeds 3.0 percent over any rolling thirty-day period, excluding any cash or cash equivalent investment necessary to maintain an S&P 500 futures position.

        2.A  meaningful deviation from the investment guidelines communicated to the Board at the time of hiring or from the guidelines herein.

The investment manager hereby acknowledges that it is a fiduciary and accepts delegation of fiduciary duty by the Board to the Manager with respect to the Plan's assets under its discretion or control.

**Investment Manager:**    State Street Global Advisors

**Representative:**    _____

**Title:**    _____

**Date:**    _____

West Virginia Investment Management Board
*Investment Policy Statement*

# NON-LARGE CAPITALIZATION DOMESTIC EQUITY MANAGER POLICY

## Investment Manager Policies and Guidelines
### *Aronson + Johnson + Ortiz*

**Policy:**

The portfolio under the supervision of Aronson + Johnson + Ortiz is intended to be a domestic equity portfolio. It is the Board of Trustees' policy to allocate a portion of the domestic, non-large capitalization component of the Equity Pool to actively managed portfolios.

Aronson + Johnson + Ortiz is one of the active non-large cap managers employed by the Fund. Aronson + Johnson + Ortiz has been hired to pursue an investment style which the Board has defined as a non-large cap relative value domestic equity style. Aronson + Johnson + Ortiz is expected to produce investment returns that exceed the Russell 2500 Value Index by 200 basis points on an annualized basis over rolling three-to-five year periods, net of fees.

**Guidelines:**

A.  The portfolio is to be a non-large cap domestic equity-oriented portfolio. Aronson + Johnson + Ortiz may purchase short-term cash equivalent instruments which, for the purpose of measurement, will be treated as equity reserves, not as fixed income securities. Convertibles are also permissible, however, they will be treated as equities as well.

B.  It is Aronson + Johnson + Ortiz's decision as to whether or not to utilize the Short-Term Investment Fund offered by the Fund's custodian, or another cash equivalent vehicle, and in doing so, is responsible for assessing the credit worthiness and relative return attractiveness of each cash equivalent fund used.

C.  The portfolio will be adequately diversified according to the internal policies established by Aronson + Johnson + Ortiz regarding individual securities and industries to avoid the undue risk inherent in non-diversified holdings.

  1. All equity investments should emphasize quality, income-producing companies of good marketability.

  2. Market capitalization should be at least $50 million for each security held, at the time of purchase.

  3. No more than 10.0 percent of the portfolio shall have a market capitalization in excess of the largest capitalization stock within the benchmark.

  4. No more than 5.0 percent of the equity portfolio may be invested in securities of any one issuing corporation at the time of purchase.

  5. Investments in any corporation may not exceed 5.0 percent of the outstanding shares of that corporation at the time of purchase.

  6. The portfolio's allocation to any sector may not exceed the greater of 40.0 percent of the portfolio or 110.0 percent of the benchmark's sector allocation.

D.    Aronson + Johnson + Ortiz may use exchange-traded funds for the purpose of short-term equitization of unused funds, including cash in the account due to a contribution or a pending withdrawal.

E.    The portfolio performance will be measured on a total return basis, which includes both income and change in market value.

F.    Aronson + Johnson + Ortiz will be reviewed quarterly based on the following characteristics:

   1.    Adherence to style risk assignment.

   2.    Value-added over the Russell 2500 Value Index, net of external investment management fees.

   3.    The value-added over similar investment managers.

G.    The following investment activities are prohibited in the Aronson + Johnson + Ortiz portfolio:

   1.    Short sales, margin purchases or borrowing,

   2.    Private placements or restricted securities, except those under Rule 144A,

   3.    Futures, options, except those used for bona fide hedging purposes.

   4.    Warrants or other options except when acquired as part of purchased security,

   5.    Commodities,

   6.    Direct purchases of real estate, and

   7.    Foreign securities, unless they are listed or registered on a domestic exchange and are denominated in U.S. Dollars.    A maximum of 10.0 percent of the portfolio value may be invested in ADRs or foreign securities listed on U.S. exchanges.

H.    The portfolio will comply with all federal and state laws and any restrictions imposed by this Board.

These guidelines are not to be construed as restrictive to Aronson + Johnson + Ortiz's ability to follow the strategies they consider are the most appropriate given the Board's directive, but rather as an exercise of the Board's fiduciary responsibility.  If at any time Aronson + Johnson + Ortiz feels that these instructions are unrealistic, or may be a hindrance in pursuing their investment style, Staff and the Board are to be notified immediately in writing.

**West Virginia Investment Management Board**
*Investment Policy Statement*

### Reporting Requirements:

A.  Written summary reports of transactions, month-end market values, and monthly rates of return are to be provided to Staff within seven business days after the close of each month's business activity.

   1.  For separate accounts, it is the responsibility of the investment manager to reconcile any pricing discrepancies between the manager's pricing service and the pricing services utilized by the West Virginia Investment Management Board. If pricing discrepancies have not been reconciled by the first business day following month-end, West Virginia Investment Management Board's pricing service shall be used in calculating performance.

B.  Significant changes in strategy are to be reported to Staff in writing as they occur. A significant change is defined as follows.

   1.  An allocation to cash or cash equivalents that exceeds 3.0 percent over any rolling thirty-day period.

   2.  A meaningful deviation from the investment guidelines communicated to the Board at the time of hiring or from the guidelines herein.

The investment manager hereby acknowledges that it is a fiduciary and accepts delegation of fiduciary duty by the Board to the Manager with respect to the Plan's assets under its discretion or control.

**Investment Manager:**    Aronson + Johnson + Ortiz

**Representative:**    _____

**Title:**    _____

**Date:**    _____

**West Virginia Investment Management Board**
*Investment Policy Statement*

## NON-LARGE CAPITALIZATION DOMESTIC EQUITY MANAGER POLICY

### Investment Manager Policies and Guidelines
### *Westfield Capital Management Company, LLC*

**Policy:**

The portfolio under the supervision of Westfield Capital Management Company, LLC is intended to be a domestic equity portfolio. It is the Board of Trustees' policy to allocate a portion of the domestic, non-large capitalization component of the Equity Pool to actively managed portfolios.

Westfield Capital Management Company, LLC is one of the active non-large managers employed by the Fund. Westfield Capital Management Company, LLC has been hired to pursue an investment style which the Board has defined as a small/mid cap growth domestic equity style. Westfield Capital Management Company, LLC is expected to produce investment returns that exceed the Russell 2500 Growth Index by 200 basis points on an annualized basis over rolling three-to-five year periods, net of fees.

**Guidelines:**

A. The portfolio is to be a small/mid cap domestic equity-oriented portfolio. Westfield Capital Management Company, LLC may purchase short-term cash equivalent instruments that, for the purpose of measurement, will be treated as equity reserves, not as fixed income securities. Convertibles are also permissible, however, they will be treated as equities as well.

B. It is Westfield Capital Management Company, LLC's decision as to whether or not to utilize the Short-Term Investment Fund offered by the Fund's custodian, or another cash equivalent vehicle, and in doing so, is responsible for assessing the credit worthiness and relative return attractiveness of each cash equivalent fund used.

C. The portfolio will be adequately diversified according to the internal policies established by Westfield Capital Management Company, LLC regarding individual securities and industries, seeking to avoid the undue risk inherent in non-diversified holdings.

    1. All equity investments should emphasize quality and good liquidity.

    2. Market capitalization should be at least $50 million for each security held, at the time of purchase.

    3. No m ore than 5.0 percent of the equity portfolio may be invested in securities of any one issuing corporation at the time of purchase.

    4. In vestments in any corporation may not exceed 5.0 percent of the outstanding shares of that corporation at the time of purchase.

**West Virginia Investment Management Board**
*Investment Policy Statement*

      5. No m   ore than 40.0 percent of the portfolio may be invested in a single sector
          as defined by GICS.

D.  The portfolio performance will be measured on a total return basis that includes both
    income and change in market value.

E.    Westfield Capital Management Company, LLC will be reviewed quarterly based
    on the following characteristics:

    1. Adherence   to style risk assignment.

    2. Value-added ov   er the Russell 2500 Growth Index, net of external investment
       management fees.

    3. T   he value-added over similar investment managers.

F.    The following investment activities are prohibited in the Westfield Capital
    Management Company, LLC portfolio:

    1.    Short sales, margin purchases or borrowing,

    2.    Private placements or restricted securities, except those under Rule 144A,

    3.    Futures, options, or any other derivative security.

    4.    Warrants or other options except when acquired as part of purchased
        security,

    5.    Commodities,

    6.    Direct purchases of real estate, and

    7.    Foreign securities, unless they are listed or registered on a domestic
        exchange and are denominated in U.S. Dollars.  A maximum of 15.0
        percent of the portfolio value may be invested in ADRs or foreign
        securities listed on U.S. exchanges.

G.  The portfolio will comply with all federal and state laws and any restrictions imposed in
    writing by this Board.

H.  Significant changes in strategy are to be reported to Staff in writing as they occur.  A
    significant change is defined as follows:

    1. An   allocation to cash or cash equivalents that exceeds 3.0 percent over any
       rolling thirty-day period.

    2. A   meaningful deviation from the investment guidelines communicated to the
       Board at the time of hiring or from the guidelines herein.

These guidelines are not to be construed as restrictive to Westfield Capital Management Company, LLCs ability to follow the strategies it considers are the most appropriate given the Board's directive, but rather as an exercise of the Board's fiduciary responsibility. If at any time Westfield Capital Management Company, LLC feels that these instructions are unrealistic, or may be a hindrance in pursuing their investment style, Staff and the Board are to be notified immediately in writing.

The Manager hereby acknowledges that it is a fiduciary and accepts delegation of fiduciary duty by the Board to the Manager with respect to IMB's assets under its discretion or control.

**Investment Manager:**        Westfield Capital Management Company, LLC

**Representative:**            _____

**Title:**                    _____

**Date:**                     _____

**West Virginia Investment Management Board**
*Investment Policy Statement*

# INTERNATIONAL EQUITY MANAGER POLICY

## Investment Manager Policies and Guidelines
### *Brandes Investment Partners, L.P.*

<u>Policy:</u>

The portfolio under the supervision of Brandes is intended to be a non-U.S. equity oriented portfolio. Brandes has been selected to pursue an investment style that the Board defines as an emerging markets, bottom-up, value oriented approach.  This approach is different, yet complementary to the investment styles followed by the other international equity managers.

Brandes is expected to maintain its assigned style orientation over time in order to preserve the structure of the international equity component of the equity portfolio. Brandes is expected to produce investment returns that exceed the MSCI Emerging Markets Free Index by 300 basis points on an annualized basis over rolling three-to-five year periods, net of fees. IMB acknowledges that Brandes does not guarantee the repayment of capital or the performance of the portfolio or make any representation concerning any of these matters.  Brandes' failure to meet or exceed any performance goals listed in this Investment Management Agreement (the "Agreement") or these Investment Manager Policies and Guidelines shall not constitute a breach or violation of the Agreement or these Investment Manager Policies and Guidelines.

<u>Guidelines:</u>

A.    The portfolio is to consist of non-U.S. equity securities.  Brandes may purchase short-term cash equivalent instruments which, for the purpose of measurement, will be treated as equity reserves, not as fixed income securities.

B.    It is Brandes' decision as to whether or not to utilize the Short-Term Investment Fund offered by the Fund's custodian, or another cash equivalent vehicle, and in doing so, is responsible for assessing the credit worthiness and relative return attractiveness of each cash equivalent fund used.

C.    The portfolio will be adequately diversified according to the internal policies established by Brandes regarding individual securities, industries and countries to avoid the undue risk inherent in non-diversified holdings. In addition, Brandes will adhere to the following limitations:

    1.  All restrictions are based upon percentage of the portfolio holdings on a market value basis at the time of the security's purchase.

    2.  Market capitalization should be at least $100 million, at time of purchase, for each security held.

    3.  No more than 5.0 percent of the equity portfolio may be invested in securities of any one issuing corporation at the time of purchase.

**West Virginia Investment Management Board**
*Investment Policy Statement*

    4. Investments in any corporation by the portfolio may not exceed 5.0 percent of the outstanding shares of that corporation.

    5. No more than 50.0 percent of the portfolio may be invested in a single economic sector (as defined by MSCI).

    6. No more than 50.0 percent of the portfolio may be invested in a single country.

    7. No more than 25.0 percent of the portfolio may be invested in non-emerging markets (as defined my MSCI).

    8. No more than 5.0 percent of the portfolio may be invested in cash, as measured over any rolling thirty-day period.

D.    The portfolio performance will be measured on a total return basis, which includes both income and change in market value.

E.    Brandes will be reviewed quarterly based on the following characteristics:

    1. Adherence to style risk assignment.  Style risk assignment is defined as an emerging markets, bottom-up, value oriented, non-US equity portfolio.

    2. Value-added over the MSCI Emerging Markets Free Index, net of fees.

    3. The value-added over similar investment managers.

F.    The following investment vehicles are permissible in the Brandes portfolio:

    1. Common stock,

    2. Preferred stock,

    3. Warrants,

    4. Stock index futures, pursuant to the WVIMB Derivatives Use Policy,

    5. Foreign exchange forwards and swaps, pursuant to the WVIMB Derivatives Use Policy

    6. Closed end country funds, and

    7. GDRs and ADRs, if they are registered on domestic exchanges or traded on the OTC.

    8. Defensive country hedging is permissible; speculative cross hedging is prohibited, pursuant to the WVIMB Derivatives Use Policy.

    9. 144A securities.  Allowable 144A securities are available only to Qualified Institutional Buyers ("QIBs") in the US.

Any investment vehicle not listed above will be considered prohibited.  Brandes should contact WVIMB staff if they would like to hold an investment vehicle not listed here and may hold that security only upon prior written approval by WVIMB.

**West Virginia Investment Management Board**
*Investment Policy Statement*

G.    The portfolio will comply with all federal and state laws and any restrictions imposed by this Board.

These guidelines are not to be construed as restrictive to Brandes' ability to follow the strategies they consider are most appropriate given the Fund's directive, but rather as an exercise of the Board's fiduciary responsibility.   If at any time Brandes feels that these instructions are unrealistic, or may be a hindrance in pursuing their investment style, Staff and the Board are to be notified immediately in writing.

Significant changes in strategy are to be reported to Staff in writing as they occur.  A significant change is defined as follows:

1.    An allocation to cash or cash equivalents that exceeds 5.0 percent over any rolling thirty-day period.

Any violation of any restriction in Section C.
2.    A meaningful deviation from the investment guidelines communicated to the Board at the time of hiring or from the guidelines herein.

The investment manager hereby acknowledges that it is a fiduciary and accepts delegation of fiduciary duty by the Board to the Manager with respect to the Plan's assets under its discretion or control.

**Investment Manager:**    Brandes Investment Partners, L.P.

**Representative:**    _____

**Title:**    _____

**Date:**    _____

## INTERNATIONAL EQUITY MANAGER POLICY

### Investment Manager Policies and Guidelines
### *LSV Asset Management*

**Policy:**

The portfolio under the supervision of LSV Asset Management (LSV) intended to be a non-U.S. equity oriented portfolio. It is the Board of Trustees' policy to allocate up to 60 percent of the fund assets to equity investments and up to 20 percent to non-U.S. assets. LSV has been selected to pursue an investment style that the Board defines as a non-U.S. equity, quantitative value oriented approach with limited exposure to emerging markets. This approach is different, yet complementary to the investment styles followed by the other international equity managers.

LSV is expected to maintain its assigned style orientation over time in order to preserve the structure of the international equity component of the equity portfolio. LSV is expected to produce investment returns that exceed the MSCI All Country World ex-US Index by 300 basis points on an annualized basis over rolling three-to-five year periods, net of fees with an expected tracking error of 5-7%.

**Guidelines:**

A.  The portfolio is to consist of non-U.S. equity securities. LSV may purchase short-term cash equivalent instruments which, for the purpose of measurement, will be treated as equity reserves, not as fixed income securities.

B.  It is LSV's decision as to whether or not to utilize the Short-Term Investment Fund offered by the Fund's custodian, or another cash equivalent vehicle, and in doing so, is responsible for assessing the credit worthiness and relative return attractiveness of each cash equivalent fund used.

C.  The portfolio will be adequately diversified according to the internal policies established by LSV regarding individual securities, industries and countries to avoid the undue risk inherent in non-diversified holdings. In addition, LSV will adhere to the following limitations:

1. All restrictions are based upon percentage of the portfolio holdings on a market value basis at the time of the security's purchase.

2. All equity investments should be in companies with verifiable operating history and adequate marketability.

3. Market capitalization should be at least $100 million for each security held.

4. No more than 5.0 percent of the equity portfolio may be invested in securities of any one issuing corporation at the time of purchase.

**West Virginia Investment Management Board**
*Investment Policy Statement*

    5. In vestments in any corporation may not exceed 5.0 percent of the outstanding shares of that corporation.

    6. No more than 50.0 percent of the portfolio may be invested in a single economic sector.

    7. No more than 50.0 percent of the portfolio may be invested in a single country.

    8. E merging markets exposure is limited to the percentage weight plus five (5.0) percentage points of the MSCI All Country World ex-US Index (other than on a temporary or transitional basis).

    9. No more than 5.0 percent of the portfolio may be invested in cash, as measured over any rolling thirty-day period.

D.    The portfolio performance will be measured on a total return basis, which includes both income and change in market value.

E.    LSV will be reviewed quarterly based on the following characteristics:

    1. Adherence to style risk assignment.

    2. Value-added ov er the MSCI All Country World ex-US Index, net of fees.

    3. T he value-added over similar investment managers.

F.    The following investment vehicles are permissible in the LSV portfolio:

    1. Common stock,

    2. Pr eferred stock,

    3. Warr ants,

    4. St ock index futures, pursuant to the WVIMB Derivatives Use Policy,

    5. For eign exchange forwards and swaps, pursuant to the WVIMB Derivatives Use Policy,

    6. Closed end country funds, and

    7. ADRs , if they are registered on domestic exchanges or traded on the OTC.

    8. Def ensive country hedging is permissible; speculative cross hedging is prohibited, pursuant to the WVIMB Derivatives Use Policy.

G.    The portfolio will comply with all federal and state laws and any restrictions imposed by this Board.

**West Virginia Investment Management Board**
*Investment Policy Statement*

These guidelines are not to be construed as restrictive to LSV's ability to follow the strategies they consider are most appropriate given the Fund's directive, but rather as an exercise of the Board's fiduciary responsibility. If at any time LSV feels that these instructions are unrealistic, or may be a hindrance in pursuing their investment style, Staff and the Board are to be notified immediately in writing.

Significant changes in strategy are to be reported to Staff in writing as they occur. A significant change is defined as follows:

1. An allocation to cash or cash equivalents that exceeds 5.0 percent over any rolling thirty-day period.

2. A meaningful deviation from the investment guidelines communicated to the Board at the time of hiring or from the guidelines herein.

The investment manager hereby acknowledges that it is a fiduciary and accepts delegation of fiduciary duty by the Board to the Manager with respect to the Plan's assets under its discretion or control.

**Investment Manager:**      LSV Asset Management

**Representative:**      _____

**Title:**      _____

**Date:**      _____

## INTERNATIONAL EQUITY MANAGER POLICY

### Investment Manager Policies and Guidelines
#### *Silchester International Investors*

**Policy:**

The portfolio under the supervision of Silchester is intended to be a non-U.S. equity oriented portfolio. Silchester is one of the international equity investment managers employed by the Trustees. Silchester has been selected to pursue an investment style that the Board defines as a developed country, non-U.S. equity, bottom-up value oriented approach with limited exposure to emerging markets. This approach is different, yet complementary to the investment styles followed by the other international equity managers.

Silchester is expected to maintain its assigned style orientation over time in order to preserve the structure of the international equity component of the equity portfolio. Silchester is expected to produce investment returns that exceed the EAFE Index by 200 basis points on an annualized basis over rolling three-to-five year periods, net of fees.

**Guidelines:**

A.      The portfolio is to consist of non-U.S. equity securities. Silchester may purchase short-term cash equivalent instruments which, for the purpose of measurement, will be treated as equity reserves, not as fixed income securities.

B.      It is Silchester's decision as to whether or not to utilize the Short-Term Investment Fund offered by the Silchester trusts' custodian, or another cash equivalent vehicle, and in doing so, is responsible for assessing the credit worthiness and relative return attractiveness of each cash equivalent fund used.

C.      The portfolio will be adequately diversified according to the internal policies established by Silchester as contained in their Subscription Agreement regarding individual securities, industries and countries to avoid the undue risk inherent in non-diversified holdings. In addition, Silchester will adhere to the following limitations:

     1.     All restrictions are based upon percentage of the portfolio holdings on a market value basis at the time of the security's purchase.

     2.     All equity investments should emphasize quality companies with verifiable operating history and good marketability.

     3.     Market capitalization should be at least $100 million for each security held.

     4.     No more than 5.0 percent of the equity portfolio may be invested in securities of any one issuing corporation at the time of purchase.

**West Virginia Investment Management Board**
*Investment Policy Statement*

      5.  Investments in any corporation may not exceed 5.0 percent of the outstanding shares of that corporation.

      6.  No more than 50.0 percent of the portfolio may be invested in a single economic sector.

      7.  No more than 50.0 percent of the portfolio may be invested in a single country.

      8.  No more than 10.0 percent of the portfolio may be invested in emerging markets.

      9.  No more than 5.0 percent of the portfolio may be invested in cash, as measured over any rolling thirty-day period.

D.    The portfolio performance will be measured on a total return basis, which includes both income and change in market value.

E.    Silchester will be reviewed quarterly based on the following characteristics:

      1.  Adherence to style risk assignment.

      1.  Value-added over the EAFE Index, net of fees.

      2.  The value-added over similar investment managers.

F.    The following investment vehicles are permissible in the Silchester portfolio:

      1.  Common stock,

      2.  Preferred stock,

      3.  Warrants,

      4.  Stock index futures,

      5.  Foreign exchange forwards and swaps,

      6.  Closed end country funds, and

      7.  ADRs or similar instruments, if they are registered on domestic exchanges or traded on the OTC.

      8.  Defensive country hedging is permissible; speculative cross hedging is prohibited.

G.  The portfolio will comply with all federal and state laws and any restrictions imposed by this Board. In addition, the portfolio is subject to the terms and conditions of the then current registration statement for the portfolio.

These guidelines are not to be construed as restrictive to Silchester's ability to follow the strategies they consider are most appropriate given the Fund's directive, but rather as an exercise of the Board's fiduciary responsibility. If at any time Silchester feels that these instructions are unrealistic, or may be a hindrance in pursuing their investment style, Staff and the Board are to be notified immediately in writing.

**West Virginia Investment Management Board**
*Investment Policy Statement*

**Reporting Requirements:**

    A.    Trade instructions are to be communicated to Staff at the same time they are communicated to the custodian.

    B.    Written summary reports of transactions, month-end market values, and monthly rates of return are to be provided to Staff within seven business days after the close of each month's business activity.

        1.   For separate accounts, it is the responsibility of the investment manager to reconcile any pricing discrepancies between the manager's pricing service and the pricing services utilized by the West Virginia Investment Management Board. If pricing discrepancies have not been reconciled by the first business day following month-end, West Virginia Investment Management Board's pricing service shall be used in calculating performance.

    C.    Significant changes in strategy are to be reported to Staff in writing as they occur. A significant change is defined as follows:

        1.   An allocation to cash or cash equivalents that exceeds 5.0 percent over any rolling thirty-day period.

        2.   A meaningful deviation from Silchester's internal investment guidelines communicated to the Board at the time of hiring or from the guidelines herein.

The investment manager hereby acknowledges that it is a fiduciary and accepts delegation of fiduciary duty by the Board to the Manager with respect to the Plan's assets under its discretion or control.

**Investment Manager:**    Silchester International Investors

**Representative:**    _____

**Title:**    _____

**Date:**    _____

## EMERGING MARKETS INTERNATIONAL
## EQUITY INDEX MANAGER POLICY

### Investment Manager Policies and Guidelines
### *State Street Global Advisors,*
### *a division of State Street Bank & Trust Company*

<u>**Policy:**</u>

The portfolio under the supervision of State Street Global Advisors is intended to be an emerging markets international equity portfolio. State Street has been hired to pursue an investment style that the Board has defined as an international emerging markets equity index. The index currently encompasses 22 countries and over 700 securities. State Street is expected to produce investment returns that match as closely as possible the performance of the MSCI Emerging Markets (capitalization weighted) Index on an annualized basis over rolling three-year to 5-year periods, gross of fees. As it is not always practical or possible to hold every stock in the index, due to high transactions costs and liquidity constraints, State Street may employ a sampling and/or optimization technique to facilitate replication. This strategy may also involve ADRs, GDRs, country funds, and swaps.

To the extent derivatives are used in the portfolio, State Street will comply with the WVIMB Derivatives Use Policy.

<u>**Guidelines:**</u>

A.    The portfolio is to be an emerging markets international equity index portfolio. State Street may purchase short-term cash equivalent instruments, which for the purpose of measurement, will be treated as equity reserves, not as fixed income securities.

B.    It is State Street's decision as to whether or not to utilize the Short-Term Investment Fund offered by the Fund's custodian, or another cash equivalent vehicle, and in doing so, is responsible for assessing the credit worthiness and relative return attractiveness of each cash equivalent fund used.

C.    The portfolio performance will be measured on a total return basis that includes both income and change in market value.

D.    State Street will be reviewed quarterly based on the following characteristics:

1. Adherence   to style risk assignment.
2. T he predicted tracking error versus the MSCI Emerging Markets Index (capitalization weighted) should typically be less than 50 basis points over a three to five year period.

**West Virginia Investment Management Board**
*Investment Policy Statement*

    E.      The portfolio will comply with all federal and state laws and any restrictions imposed by this Board.

These guidelines are not to be construed as restrictive to State Street's ability to follow the strategies they consider are the most appropriate given the Board's directive, but rather as an exercise of the Board's fiduciary responsibility. If at any time State Street feels that these instructions are unrealistic, or may be a hindrance in pursuing their investment style, Staff and the Board are to be notified immediately in writing.

**Reporting Requirements:**

    A.      Written summary reports of holdings and month-end market values are to be provided to Staff within six business days after the close of each month's business activity.

            1.For   separate accounts, it is the responsibility of the investment manager to reconcile any pricing discrepancies between the manager's pricing service and the pricing services utilized by the West Virginia Investment Management Board. If pricing discrepancies have not been reconciled by the first business day following month-end, West Virginia Investment Management Board's pricing service shall be used in calculating performance.

    B.      Significant changes in strategy are to be reported to Staff in writing before they occur. A significant change is defined as follows.

            1.An   allocation to cash or cash equivalents that exceeds 3.0 percent over any rolling thirty-day period, excluding any cash or cash equivalent investment necessary to maintain a futures position.

            2.A   meaningful deviation from the investment guidelines communicated to the Board at the time of hiring or from the guidelines herein.

The investment manager hereby acknowledges that it is a fiduciary and accepts delegation of fiduciary duty by the Board to the Manager with respect to the Plan's assets under its discretion or control.

**West Virginia Investment Management Board**
*Investment Policy Statement*

**Investment Manager:**    State Street Global Advisors

**Representative:**    _____

**Title:**    _____

**Date:**    _____

**West Virginia Investment Management Board**
*Investment Policy Statement*

# INTERNATIONAL EQUITY MANAGER POLICY

## Investment Manager Policies and Guidelines
### Pictet Asset Management Limited

### Policy:

The portfolio under the supervision of Pictet Asset Management is intended to be a non-U.S. equity oriented portfolio. Pictet Asset Management has been selected to pursue an investment style that the Board defines as a non-US small-cap equity approach. This approach is different, yet complementary to the investment styles followed by the other international equity managers.

Pictet Asset Management is expected to maintain its assigned style orientation over time in order to preserve the structure of the international equity component of the equity portfolio. Pictet Asset Management is expected to produce investment returns that exceed the MSCI EAFE Small Cap Index by 300 basis points on an annualized basis over rolling three-to-five year periods, net of investment manager and all transaction fees with an expected tracking error of approximately 6%.

### Guidelines:

A. The portfolio is to consist of non-U.S. equity securities. Pictet Asset Management may purchase short-term cash equivalent instruments which, for the purpose of measurement, will be treated as equity reserves, not as fixed income securities.

B. Pictet Asset Management will utilize the Short-Term Investment Fund offered by the Fund's custodian.

C. The portfolio will be adequately diversified according to the internal policies established by Pictet Asset Management regarding individual securities, industries and countries to avoid the undue risk inherent in non-diversified holdings. In addition, Pictet Asset Management will adhere to the following limitations:

1. All restrictions are based upon percentage of the portfolio holdings on a market value basis at the time of the security's purchase.

2. All equity investments should emphasize quality companies with verifiable operating history and good marketability.

3. No more than 10.0 percent of the equity portfolio may be invested in securities with market capitalization below $50 million.

4. No more than 5.0 percent of the equity portfolio may be invested in securities of any one issuing corporation at the time of purchase.

5. Investments in any corporation may not exceed 5.0 percent of the outstanding shares of that corporation.

---

*Pictet Asset Management Limited*          **Appendix D — Investment Manager Policies and Guidelines**

**West Virginia Investment Management Board**
*Investment Policy Statement*

6.No   more than 50.0 percent of the portfolio may be invested in a single economic sector.

7.No   more than 50.0 percent of the portfolio may be invested in a single country.

8.No   more than 25.0 percent of the portfolio may be invested in emerging markets.

9.No   more than 5.0 percent of the portfolio may be invested in cash, as measured over any rolling thirty-day period.

D.   The portfolio performance will be measured on a total return basis, which includes both income and change in market value.

E.   Pictet Asset Management will be reviewed quarterly based on the following characteristics:

1.Adherence   to style risk assignment.

2.Value-added ov  er the  MSCI EAFE Small Cap Index, net of fees.

3.T  he value-added over similar investment managers.

F.   The following investment vehicles are permissible in the Pictet Asset Management portfolio:

1.Common stock,    including publicly traded REITS,

2.Pr  eferred stock,

3.Warr  ants,

4.St  ock index futures and exchange traded funds, pursuant to the WVIMB Derivatives Use Policy,

5.For  eign exchange forwards and swaps, pursuant to the WVIMB Derivatives Use Policy,

6.Closed   end country funds, and

7.GDRs    and ADRs, if they are registered on domestic exchanges or traded on the OTC.

8.Def  ensive country hedging is permissible; speculative cross hedging is prohibited, pursuant to the WVIMB Derivatives Use Policy.

9.144A s   ecurities. Allowable 144A securities are available only to Qualified Institutional Buyers ("QIBs") in the US.

Any investment vehicle not listed above will be considered prohibited. Pictet Asset Management should contact WVIMB staff if they would like to hold an

---

**West Virginia Investment Management Board**
*Investment Policy Statement*

> investment vehicle not listed here and may hold that security only upon prior
> written approval by WVIMB.

G.    The portfolio will comply with all federal and state laws and any restrictions
imposed by this Board.

These guidelines are not to be construed as restrictive to Pictet Asset Management's ability to
follow the strategies they consider are most appropriate given the Fund's directive, but rather as
an exercise of the Board's fiduciary responsibility. If at any time Pictet Asset Management feels
that these instructions are unrealistic, or may be a hindrance in pursuing their investment style,
Staff and the Board are to be notified immediately in writing.

Significant changes in strategy are to be reported to Staff in writing as they occur. A significant
change is defined as follows:

1.    An allocation to cash or cash equivalents that exceeds 5.0 percent over any rolling
thirty-day period.

2.    Any violation of any restriction in Section C above based upon current market
valuations.

3.    A meaningful deviation from the investment guidelines communicated to the Board
at the time of hiring or from the guidelines herein.

The investment manager hereby acknowledges that it is a fiduciary and accepts delegation of
fiduciary duty by the Board to the Manager with respect to the Plan's assets under its discretion
or control.

**Investment Manager:**    Pictet Asset Management Limited

**Representative:**    _____

**Title:**    _____

**Date:**    _____

**West Virginia Investment Management Board**
*Investment Policy Statement*

# FIXED INCOME MANAGER POLICY

## Investment Manager Policies and Guidelines
## Dodge & Cox

The account is intended to be an active fixed income portfolio with the following style criteria:

    a.   The Account will be constructed to earn superior returns with low volatility by actively investing in the fixed income market;

    b.   The Barclays Capital U.S. Aggregate Bond index is used as the IMB fixed income benchmark for reporting and objective purposes.

Investment Manager:          Dodge & Cox

Fixed Income Style:          Core plus bond

Objective:                To exceed the total return of the Barclays Capital U.S. Aggregate Bond Index by 50 basis points over a normal market cycle (typically a 3-5 year period)

**Investment Guidelines:**

Dodge & Cox will have full discretion over the assets assigned to them within the following investment guidelines and restrictions. Diversification of securities by maturity, duration, quality, sector, and coupon, except as prescribed in these guidelines, is the responsibility of Dodge & Cox. Investment guidelines and restrictions apply at the time of purchase.

**Eligible Securities:**

Dodge & Cox will select investments from the broad taxable fixed income securities market. Investments will be comprised of U.S. dollar-denominated securities, including:

- U.S. Government securities, including: U.S. Treasuries, Treasury inflation-indexed securities, Federal Agencies, and Government Sponsored Enterprises (GSEs);

- Mortgage-related securities, including: Federal Agency, GSE-guaranteed and private label mortgage pass-through securities, Real Estate Mortgage Investment Conduits (REMICs), collateralized mortgage obligations (CMOs) and other structured mortgage securities, to-be-announced (TBA) mortgages (provided they are backed by cash or cash equivalent collateral), and commercial mortgage-backed securities (CMBS);

- Corporate obligations, including: capital securities, pass-through certificates, and equipment trust certificates;

- Real Estate Investment Trust (REIT) debt obligations;

- Taxable municipal securities;

- Securities issued under SEC Rule 144A and other private placement securities;

- Asset-backed securities (ABS);

- U.S. dollar-denominated debt of non-US issuers, including: corporate, sovereign, foreign agencies, foreign local government entities, and supranationals;

- Derivatives, including futures, options, and swaps, subject to the West Virginia Investment Management Board's Derivative Use Policy and any other restrictions listed herein;

- All security types included in the Benchmark, as well as other securities deemed suitable under these guidelines;

- Securities received in exchange offers or other situations are not subject to the prohibitions herein, but Dodge & Cox shall notify Client of any such occurrences.

**Credit Quality:** At least 85% of the portfolio shall be invested in fixed income securities with a quality rating of investment grade by one or more nationally recognized statistical rating organizations (NRSRO), such as Moody's, Standard & Poor's, or Fitch. Dodge & Cox may also purchase securities that are unrated, if deemed to be of suitable quality for the portfolio. In this case, Dodge & Cox shall assign an internal rating for purposes of determining compliance with quality guidelines. The weighted-average quality of the portfolio under Dodge & Cox's management shall be maintained at a minimum quality of A+[*]. Where ratings differ among rating agencies, Dodge & Cox shall use the middle of the Moody's, Standard & Poor's and Fitch ratings to determine compliance with quality guidelines, so long as all three ratings exist. If two ratings are provided, the lower (more conservative) rating shall be used. If only one rating is provided, that rating shall be used.

**Concentration Limits:** The following concentration limits shall apply to the portfolio at the time of purchase:

- Securities issued or guaranteed by the U.S. Government, its Agencies, or GSEs, or collateralized by loans or securities issued or guaranteed by the U.S. Government, its Agencies or GSEs may be held without limit

- 5% per corporate issuer (including all subsidiaries for parent/subsidiary relationships)

- 5% per CMBS, ABS, or non-GSE mortgage security

- 25% per corporate industry (defined as "Barclays Capital Index Issuer Class 4")

- 10% private placements (in aggregate), not including securities issued under Rule 144A with registration rights

**Portfolio Duration:** Dodge & Cox shall maintain the effective duration of the portfolio in a range of 75% to 125% of the effective duration of the Barclays Capital Aggregate Bond Index.

---

[*] *In calculating average quality for the portfolio, Dodge & Cox assigns ratings to cash, U.S. Treasury, agency, and government-related securities that are higher than those assigned to securities rated AAA.*

**West Virginia Investment Management Board**
*Investment Policy Statement*

**Derivatives:** Derivative instruments are permitted for the purposes of both risk management and the implementation of active investment decisions. The gross notional amount of all derivative positions with a commitment to purchase must be backed by cash and/or cash equivalents (defined as securities with a duration of one year or less). The contribution to portfolio risk from derivatives, when combined with the contribution to portfolio risk from all other investments, must not breach any other investment guidelines herein. Derivatives usage is subject to the WVIMB Derivative Use Policy.

**Cash Equivalents:** The portfolio will be fully invested under normal circumstances; cash and cash equivalents (net of TBA mortgages or other purchases with delayed settlement) typically will not exceed 10% of the fixed income portfolio. Cash will typically be invested in short-term investment vehicles (e.g., STIF accounts) or money market funds offered by the Client's custodian bank and subject to their constituent offering documents. Other high-quality, cash equivalent investments are permitted, including: commercial paper, certificates of deposit, discount notes, bankers acceptance notes, Treasury Bills, floating-rate notes, and collateralized repurchase agreements. To be considered high-quality, a security generally must carry a short-term rating of at least A-2 by Standard & Poor's, P-2 by Moody's or F-2 by Fitch.

**Remedy to Compliance Issues:** If a downgrade, cashflow, fluctuations in market prices, abnormal market conditions, or any other reason outside the control of the Investment Manager, there shall be a deviation from the specific guidelines described herein, the Investment Manager shall not be in breach of these guidelines so long as it takes such actions over such period of time as the Investment Manager determines are prudent and in the interests of the client to return the investments to compliance with these guidelines. [subject to prompt written notification to the Client].

**The Manager acknowledges it is a fiduciary within the meaning of ERISA with respect to IMB. Also, that it shall discharge its duties with respect to the IMB Account solely in the interest of IMB (1) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent expert acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (2) in accordance with the standard of care and other requirements of West Virginia Code Chapter 12, Article 6 and Chapter 44, Article 6C and the Investment Policy Statement.**

|                | IMB                        |         | Manager |
|----------------|----------------------------|---------|---------|
| By:            |                            | By:     |         |
| Name:          | H. Craig Slaughter         | Name:   |         |
| Title:         | Executive Director         | Title:  |         |
| Date:          |                            | Date:   |         |

# FIXED INCOME MANAGER POLICY

## Investment Manager Policies and Guidelines
## JP Morgan (Columbus Core Fixed Income)

The account is intended to be an active fixed income portfolio with the following style criteria:

a. The Account will be constructed to earn superior returns with low volatility by actively investing in the fixed income market;
b. The Barclays Capital U.S. Aggregate Bond index is used as the IMB fixed income benchmark for reporting and objective purposes.

| | |
|---|---|
| Investment Manager: | J.P. Morgan Investment Management Inc. |
| Fixed Income Style: | Core Bond (Investment Grade) - Columbus |
| Objective: | To exceed the total return of the Barclays Capital U.S. Aggregate Bond Index by 25 basis points over a normal market cycle (typically a 3-5 year period), while maintaining total return risk similar to that of the index. |

Investment Guidelines:

### Eligible Investments by Type

Portfolio investments are limited to US Dollar denominated fixed income securities. The term "fixed income security" is defined to include instruments with fixed, floating, variable, adjustable, auction-rate, zero or other coupon features. Eligible investments include:

1. US Treasury debt securities and coupon and principal strips (Treasuries).
2. US Agency and Government-Sponsored Enterprises (GSE) debt securities, including strips.
3. US Agency and GSE backed mortgages, including single family pass-through pools, pass-through coupon and principal strips, collateralized mortgage obligations (CMOs/REMICs) and other home equity and multi-family pass-through securities (US Agency MBS).
4. US Agency and GSE mortgage dollar rolls consistent with the goals, objectives and other portfolio constraints.
5. CMOs and other residential mortgage securities issued by non-US Agency organizations (Non-Agency MBS).
6. Debt securities of foreign governments and supranational organizations (Other Government).
7. Debt obligations of corporations, including medium term notes and US dollar issues of foreign corporations (Yankees).  Securities issued under rule 144a or other private placements will be eligible investments if the client meets the QIB (qualified institutional buyer) qualifications.
8. Deposits (TDs, CDs) and insurance contracts (GICs) having structural characteristics similar to the above approved fixed income securities (generally to be classified as Corporates).

9. Asset-backed debt securities, including transactions backed by credit card, auto, home equity, recreational vehicle, manufactured housing, equipment and other loans, debt securities or lease payments (Asset-Backed Securities, ABS).
10. Commercial property mortgages and Commercial Mortgage Backed Securities (CMBS).
11. Money market securities issued by any of the above listed entities, including repurchase agreements and deposits, or funds established to invest in such securities (Money Market).
12. Shares of mutual funds, exchange traded funds or other commingled investment products having goals, objectives and investment strategies generally consistent with this policy, including those client approved products managed by the Investment Manager.

This policy is not intended to prevent investment in a debt security not explicitly described above so long as that security has structural and risk characteristics similar to these explicitly approved investments.

## Minimum Credit Standards

The intent of this policy is to invest in securities falling into an "investment grade" classification.

1. Purchases are limited to issues rated Baa3, BBB-, or BBB- (generically BBB-) or better by Moody's, Standard & Poors, or Fitch, i.e. by one or more Nationally Recognized Statistical Rating Organizations.
2. Any security held in the portfolio that falls below the minimum investment grade rating should be reviewed for prudence with respect to future additional risk the issue may present to the overall portfolio.   The Investment Manager is authorized to use its discretion to retain the security if the security represents 1% or less of the market value of the portfolio (with authorization from the client).    Otherwise, the Investment Manager should review circumstances with the client as it determines the appropriate course of action relative retention or sale.
3. The dollar weighted average quality of the portfolio must be A or above.
4. The portfolio may invest in unrated securities for up to 5% of the portfolio, which in the opinion of the Investment Manager meet the quality standards specified above. In the case of unrated securities, unless explicitly stated otherwise, the Investment Manager will assign such unrated securities a rating determined by it in its sole discretion in accordance with the Investment Manager's internal rating system, in which case such ratings will be deemed to be those of a nationally recognized rating agency.
5. No more than 10% of the portfolio may be invested in convertible bonds.
6. No more than 50% of the portfolio may be invested in asset-backed securities.

## Diversification

Issuer concentrations are limited to 5% per issuer and 5% per specific issue of the total market value of the portfolio (excludes shares of mutual funds, exchange traded funds or commingled investment products). If more than 3% of the portfolio is invested in any single, corporate name, the security must be rated AA- or higher (or its equivalent).  If more than 3% of the portfolio is invested in any single corporate name, the security must be rated AA- or higher (or its equivalent).  Obligations of the US Treasury, US Agencies and US GSEs are exempted from the

**West Virginia Investment Management Board**
*Investment Policy Statement*

issuer diversification limit. Obligations of the U.S. Treasury are exempted from the specific issue diversification limit.

No sector concentration within the portfolio should exceed the weight of that sector in the benchmark index plus 30%.

### Duration

The weighted average duration of the portfolio is targeted to within +/-20% of the benchmark.

### Subsequent Events

If at any time, due to major fluctuations in market prices, abnormal market conditions, or any other reason outside the control of the Investment Manager, there shall be a deviation from the specific guidelines described herein, the Investment Manager shall not be in breach of these guidelines so long as it takes such actions over such period of time as the Investment Manager determines are prudent and in the interests of the client to return the investments to compliance with these guidelines.

**The Manager acknowledges it is a fiduciary within the meaning of ERISA with respect to IMB. Also, that it shall discharge its duties with respect to the IMB Account solely in the interest of IMB (1) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent expert acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (2) in accordance with the standard of care and other requirements of West Virginia Code Chapter 12, Article 6 and Chapter 44, Article 6C and the Investment Policy Statement.**

|  IMB |  Manager |
|---|---|
| By:_____ | By:_____ |
| Name:____H. Craig Slaughter___ | Name:_____ |
| Title:____Executive Director___ | Title:_____ |
| Date:_____ | Date:_____ |

# U.S. AGGREGATE BOND INDEX
# MANAGER POLICY

## Investment Manager Policies and Guidelines
### *State Street Global Advisors,*
### *a division of State Street Bank & Trust Company*

**Policy:**

The portfolio under the supervision of State Street Global Advisors is intended to be a domestic fixed income portfolio. State Street has been hired to pursue an investment style that the Board has defined as a domestic fixed income index. State Street is expected to produce investment returns that match as closely as possible the performance of the Barclay's Capital U.S. Aggregate Bond Index on an annualized basis over rolling three-year to 5-year periods, gross of fees. The portfolio may attempt to invest in securities in the same proportions as the index. However, due to the diverse composition of securities in the index and the fact that many of the securities that comprise the index may not be available for purchase, it may not be possible for the portfolio to purchase some of the securities comprising the index. In such a case, State Street will select securities they expect will provide a return comparable to that of the index.

State Street expects that it will replicate index returns with other investments in the "cash" markets - actual holdings of debt securities and other instruments - rather than through "notional" or "synthetic" positions achieved through the use of derivatives, such as futures contracts or swap transactions. However, in unusual cases, State Street may believe that derivatives use is necessary to achieve exposures not readily available through the cash markets. To the extent derivatives are used in the portfolio, State Street will comply with the WVIMB Derivatives Use Policy.

**Guidelines:**

A.   The portfolio is to be a core domestic fixed income portfolio. State Street may purchase short-term cash equivalent instruments, which for the purpose of measurement, will be treated as reserves, not as fixed income securities.

B.   It is State Street's decision as to whether or not to utilize the Short-Term Investment Fund offered by the Fund's custodian, or another cash equivalent vehicle, and in doing so, is responsible for assessing the credit worthiness and relative return attractiveness of each cash equivalent fund used.

C.   The portfolio performance will be measured on a total return basis that includes both income and change in market value.

D.   State Street will be reviewed quarterly based on the following characteristics:

1. Adherence   to style risk assignment.

West Virginia Investment Management Board
*Investment Policy Statement*

---

2.T he predicted tracking error versus the Barclay's Capital U.S. Aggregate Bond Index should typically be less than 25 basis points over three to five year periods.

E.    The portfolio will comply with all federal and state laws and any restrictions imposed by this Board.

These guidelines are not to be construed as restrictive to State Street's ability to follow the strategies they consider are the most appropriate given the Board's directive, but rather as an exercise of the Board's fiduciary responsibility. If at any time State Street feels that these instructions are unrealistic, or may be a hindrance in pursuing their investment style, Staff and the Board are to be notified immediately in writing.

## Reporting Requirements:

A.    Written summary reports of holdings and month-end market values are to be provided to Staff within three business days after the close of each month's business activity.

1.For  separate accounts, it is the responsibility of the investment manager to reconcile any pricing discrepancies between the manager's pricing service and the pricing services utilized by the West Virginia Investment Management Board. If pricing discrepancies have not been reconciled by the first business day following month-end, West Virginia Investment Management Board's pricing service shall be used in calculating performance.

B.    Significant changes in strategy are to be reported to Staff in writing before they occur. A significant change is defined as follows.

1.An  allocation to cash or cash equivalents that exceeds 3.0 percent over any rolling thirty-day period, excluding any cash or cash equivalent investment necessary to maintain a futures position.

2.A  meaningful deviation from the investment guidelines communicated to the Board at the time of hiring or from the guidelines herein.

The investment manager hereby acknowledges that it is a fiduciary and accepts delegation of fiduciary duty by the Board to the Manager with respect to the Plan's assets under its discretion or control.

**West Virginia Investment Management Board**
*Investment Policy Statement*

**Investment Manager:**       State Street Global Advisors

**Representative:**       _____

**Title:**       _____

**Date:**       _____

# U.S. TREASURY INFLATION PROTECTED
# SECURITES (TIPS) INDEX MANAGER POLICY

## Investment Manager Policies and Guidelines
### State Street Global Advisors,
### a division of State Street Bank & Trust Company

**Policy:**

The portfolio under the supervision of State Street Global Advisors is intended to be a US TIPS fixed income portfolio. State Street has been hired to pursue an investment style that the Board has defined as a US TIPS fixed income index. State Street is expected to produce investment returns that match as closely as possible the performance of the Barclay's Capital U.S. Treasury Inflation Protected Securities (TIPS) Bond Index on an annualized basis over rolling three-year to 5-year periods, gross of fees. The portfolio may attempt to invest in securities in the same proportions as the index. However, due to the diverse composition of securities in the index and the fact that many of the securities that comprise the index may not be available for purchase, it may not be possible for the portfolio to purchase some of the securities comprising the index. In such a case, State Street will select securities they expect will provide a return comparable to that of the index.

State Street expects that it will replicate index returns with other investments in the "cash" markets - actual holdings of debt securities and other instruments - rather than through "notional" or "synthetic" positions achieved through the use of derivatives, such as futures contracts or swap transactions. However, in unusual cases, State Street may believe that derivatives use is necessary to achieve exposures not readily available through the cash markets. To the extent derivatives are used in the portfolio, State Street will comply with the WVIMB Derivatives Use Policy.

**Guidelines:**

A. The portfolio is to be a US TIPS fixed income portfolio. State Street may purchase short-term cash equivalent instruments, which for the purpose of measurement, will be treated as reserves, not as fixed income securities.

B. It is State Street's decision as to whether or not to utilize the Short-Term Investment Fund offered by the Fund's custodian, or another cash equivalent vehicle, and in doing so, is responsible for assessing the credit worthiness and relative return attractiveness of each cash equivalent fund used.

C. The portfolio performance will be measured on a total return basis that includes both income and change in market value.

D. State Street will be reviewed quarterly based on the following characteristics:

**West Virginia Investment Management Board**
*Investment Policy Statement*

      1.Adherence   to style risk assignment.

      2.T he predicted tracking error versus the Barclay's Capital U.S. Treasury Inflation Protected Securities (TIPS) Bond Index should typically be less than 25 basis points over three to five year periods.

E.    The portfolio will comply with all federal and state laws and any restrictions imposed by this Board.

These guidelines are not to be construed as restrictive to State Street's ability to follow the strategies they consider are the most appropriate given the Board's directive, but rather as an exercise of the Board's fiduciary responsibility.  If at any time State Street feels that these instructions are unrealistic, or may be a hindrance in pursuing their investment style, Staff and the Board are to be notified immediately in writing.

**Reporting Requirements:**

A.    Written summary reports of holdings and month-end market values are to be provided to Staff within three business days after the close of each month's business activity.

      1.For   separate accounts, it is the responsibility of the investment manager to reconcile any pricing discrepancies between the manager's pricing service and the pricing services utilized by the West Virginia Investment Management Board.  If pricing discrepancies have not been reconciled by the first business day following month-end, West Virginia Investment Management Board's pricing service shall be used in calculating performance.

B.    Significant changes in strategy are to be reported to Staff in writing before they occur.  A significant change is defined as follows.

      1.An   allocation to cash or cash equivalents that exceeds 3.0 percent over any rolling thirty-day period, excluding any cash or cash equivalent investment necessary to maintain a futures position.

      2.A   meaningful deviation from the investment guidelines communicated to the Board at the time of hiring or from the guidelines herein.

The investment manager hereby acknowledges that it is a fiduciary and accepts delegation of fiduciary duty by the Board to the Manager with respect to the Plan's assets under its discretion or control.

**West Virginia Investment Management Board**
*Investment Policy Statement*

| | |
|---|---|
| **Investment Manager:** | State Street Global Advisors |
| **Representative:** | _____ |
| **Title:** | _____ |
| **Date:** | _____ |

West Virginia Investment Management Board
*Investment Policy Statement*

# FIXED INCOME MANAGER POLICY

## Investment Manager Policies and Guidelines
## Western Asset Management
## Absolute Return Strategy

### *Objectives*

1) This portfolio managed by Western Asset Management is intended to be a Core fixed income portfolio with the following style criteria:
    a. The portfolio will be constructed to earn superior returns with low volatility by actively investing in the extended fixed income market;
2) Potential investments will be evaluated through disciplined, thorough investment analysis and due diligence.
3) The Manager shall have full discretion to direct and manage the investment and reinvestment of the assets allocated to the portfolio in accordance with this executed Contract and applicable federal or state statutes and regulations.
4) The Manager shall adhere to the portfolio management/construction concepts and the principles that were in use as of the effective date of this Contract.
5) The return objectives over complete market cycles (generally 3 to 5 years) include the following:
- LIBOR + 200 basis points
- Lehman Brothers Universal + 150 basis points

### *Eligible Securities*

Any of the following fixed income securities and their futures or options derivatives, individually or in commingled vehicles, subject to credit, diversification and marketability guidelines below, may be held outright and under resale agreement.
1) Obligations issued or guaranteed by the U.S. Federal Government, U.S. Federal agencies or U.S. government-sponsored corporations and agencies;
2) Obligations of U.S. and non-U.S. corporations such as mortgage bonds, convertible and nonconvertible notes and debentures, commercial paper, certificates of deposit and bankers acceptances issued by industrial, utility, finance, commercial banking or bank holding company organizations;
3) Mortgage-backed and asset-backed securities (including collateralized loan obligations and collateralized debt obligations);
4) Obligations, including the securities of emerging market issuers, denominated in U.S. dollars or foreign currencies of international agencies, supranational entities and foreign governments (or their subdivisions or agencies), as well as foreign currency exchange-related securities, warrants, and forward contracts;
5) Bank loan obligations;
6) Obligations issued or guaranteed by U.S. local, city and state governments and agencies;
7) Swaps, forwards, options on swaps, options on forwards, option and swaps;

---

8) Securities defined under Rule 144A and Commercial Paper defined under Section 4(2) of the Securities Act of 1933;
9) Repo & Reverse Repo;
10) Municipal Securities;
11) All securities or other holdings in the Account shall be readily marketable; and
12) All securities or other holdings in the Account shall have the ability to be priced on a monthly basis by an outside vendor, 1MB's Custodian, or by the Manager, and the Manager will use commercially reasonable efforts to assist in the independent verification by 1MB's Custodian.

## *Duration Exposure*

The average weighted duration of portfolio security holdings including futures positions must be maintained between -5 to +10 years.

## *Credit Quality*

Western Asset Management will invest the portfolio in a prudent manner and avoid exposure to fixed income securities of any company with deteriorating quality features or questionable business and/or financial practices. The weighted average credit quality of the portfolio will not fall below investment grade credit ratings ("BBB" or equivalent). The rating determination shall be as follows: If rated by three NRSROs, take the middle rating (remove the high and remove the low); if rated by two, take the lower; if rated by only one, take that one. Holdings are subject to the following limitations:
1) Rated Securities: At least 50% of the portfolio will be of "investment grade", i.e. rated as high as or higher than the following standards or their equivalent by one or more nationally recognized statistical rating organizations (NRSRO):   Standard & Poor's BBB-, or A-2, or Moody's Baa3, or Prime-2, or Fitch BBB-, or F-2
2) Other Unrated Securities: Securities not covered by the standards in (1) above will normally be, in the judgment of Western Asset Management, at least equal in credit quality to the criteria implied in those standards.
3) Downgraded Securities: In the event downgraded securities cause a breach of the maximum percentage allocation permitted in below investment grade, the client will be consulted on the appropriate course of action.
4) Securities Inside 270 Days: For securities with legal final maturities of 270 days or less, Western Asset Management may use the underlying credit's short-term ratings as proxy for establishing the minimum credit requirement.
5)  If more than 3.0 percent of the portfolio is invested in a single corporate name, the security must be an investment grade rated credit (BBB- or higher, or its equivalent).
6) For mutual funds and commingled funds that are not rated, the average-weighted credit rating of the underlying securities must be within the top six ratings (at least B3 by Moody's, B- by S&P and Fitch). For split rated securities, if rated by three NRSOs, the rating determination shall be the middle rating from Moody's, S&P, and Fitch (remove the high and remove the low); if rated by only two, take the lower; if rated by only one, take that one.

**West Virginia Investment Management Board**
*Investment Policy Statement*

## *Diversification*

1) Maturity: Securities covering the full range of available maturities are acceptable.
2) Sector: The portfolio will at all times be diversified among the major market sectors, subject to the following limitations:

  a) Up to 15% of the portfolio may be invested in non-dollar denominated securities (investment grade and below investment grade combined).

  b) Up to 50% of the portfolio may be invested in dollar denominated securities rated below investment grade.

  c) Up to 50% of the portfolio may be invested in high yield, bank loans, non-dollar denominated securities, and emerging market issues, combined.

3) Issuer: Holdings are subject to the following limitations:

  a) Obligations issued or guaranteed by the U.S. government, U.S. agencies, U.S. government-sponsored corporations and its agencies; and obligations of G-7 countries are eligible without limit.

  b) Obligations of other national governments are limited to 10% per issuer.

  c) Private mortgage-backed and asset-backed securities are limited to 10% per issuer, unless the collateral is credit-independent of the issuer and the security's credit enhancement is generated internally, in which case the limit is 25% per issuer.

  d) Obligations of other issuers are subject to a 5% per issuer limit excluding investments in commingled vehicles.

4) No more than 50% of the portfolio may be invested in asset-backed securities.
5) No more than 10% of the portfolio may be invested in convertible bonds.
6) Derivatives: No more than 5% of the portfolio will be invested in original futures margin and option premiums, exclusive of any in-the-money portion of the premiums. Short (sold) options positions will generally be hedged with cash, cash equivalents, current portfolio security holdings, or other options or futures positions. The purpose of the use of derivatives is to improve liquidity, hedge risk, reduce transactions costs, or gain temporary exposure to a particular security group of securities prior to purchasing the underlying securities directly. Any purchase of derivatives that does not involve the full cash payment of the exposure underlying the derivative position will be supported by cash, cash equivalents, offsetting derivatives, or liquid assets in the portfolio.

## *Marketability*

All holdings will be of sufficient size and held in issues that are traded actively enough to facilitate transactions at minimum cost and accurate market valuation.
Futures and options contracts will be limited to liquid instruments actively traded on major exchanges or, if over-the-counter for options, executed with major dealers.

**West Virginia Investment Management Board**
*Investment Policy Statement*

## *Leverage*

No leverage may be used in order to generate return in the Account. More specifically, Western Asset Management is prohibited from using any, form of investment strategy or derivative security that effectively leverages the portfolio.

These guidelines are not to be construed as restrictive to Western's ability to follow the strategies they consider are the most appropriate given the portfolio's directive, but rather as an exercise of the Board's fiduciary responsibility. If at any time Western feels that these instructions are unrealistic, or may be a hindrance in pursuing their investment style, Staff and the Board are to be notified immediately in writing. The portfolio shall be well diversified, in terms of industry, sectors, and individual issues.

**The Manager acknowledges it is a fiduciary within the meaning of ERISA with respect to IMB. Also, that it shall discharge its duties with respect to the IMB Account solely in the interest of IMB (1) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent expert acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (2) in accordance with the standard of care and other requirements of West Virginia Code Chapter 12, Article 6 and Chapter 44, Article 6C and the Investment Policy Statement.**

|  IMB |  Manager |
|---|---|
| By: _____ | By: _____ |
| Name:____ H. Craig Slaughter_____ | Name:_____ |
| Title:____ Executive Director_____ | Title:_____ |
| Date:_____ | Date:_____ |

# *Implementation*

**West Virginia Investment Management Board**
*Investment Policy Statement*

# Trade Management Policy
## *(Replaces Brokerage Policy May 2004)*

### Objective

This policy deals with the management of the buying and selling of the securities held by the WVIMB. It directly applies to all funds that are managed in a separate account. Although the Board cannot set policy for funds that are in a commingled or mutual fund, the managers of those funds are required to seek best execution. The U.S. Securities and Exchange Commission (SEC) has stated that fiduciaries have a duty to seek the most favorable execution terms reasonably available given the specific circumstances of each trade. This policy specifies how the WVIMB defines best execution and will monitor the managers in achievement of these standards.

### Definition of Best Execution

The SEC has stated, "a money manager should consider the full range and quality of a Broker's services in placing brokerage including, among other things, the value of research provided as well as execution capability, commission rate, financial responsibility, and responsiveness to the money manager."

In deciding how best to execute a trade, an investment manager must consider a variety of factors: the size of the transaction relative to the normal trading volume of that security, the conviction of the new idea vs. the current portfolio, the commission rate and the broker's capability to handle the trade. Many of the factors are not easily quantified. However, achievement of best execution can be inferred by reviewing the trade processes, procedures and outcomes. Best execution does not necessarily imply the lowest commission rates but the judicious balancing of the commissions with the trade's impact on the price of the security and the opportunity cost of not being invested in what the manager has determined to be a better portfolio. Different situations will call for different responses but over time, a conclusion can be drawn as to whether the manager has acted in the best interests of the portfolio.

The Board expects its managers to always seek best execution. In doing so, the following outcomes are expected.

- **Brokerage Commissions**

  The following will be the average commission rates the equity managers are to achieve over a one-year period:

  > Domestic equity managers: 2.5 cents per share traded
  > International equity managers: 0.2 percent of principal traded.

---

**West Virginia Investment Management Board**
*Investment Policy Statement*

It is the manager's discretion as to how they achieve these goals. Shown below are some options that could be utilized to reduce commission rates:

o  Electronic crossing networks with brokers
o  Electronic crossing networks with other managers
o  Market on close trades
o  Commission recapture programs as instituted by Staff.

Whereas fixed income trading is done on a bid-ask spread and the brokers do not divulge the spread to the managers, no specific brokerage goal is set for the fixed income managers. However, it is anticipated that all reasonable steps will be taken to ensure WVIMB pays as little spread as possible. Possible options that could be utilized to ensure this are bundling of securities across accounts to generate a larger total position to trade, using electronic networks to verify the best price available and polling of several brokers to ensure the best available price.

The Board expects its managers to also consider the value of the research purchased through trades in relation to its direct benefit to the WVIMB portfolio.

- **Soft Dollars**

  All soft dollars generated by the plan are assets of the plan and not the investment managers. However, the Board recognizes the "Safe Harbor" provision of the Securities and Exchange Act of 1934 allows investment managers to use the soft dollars generated in order to directly benefit the plan assets. The Board therefore requires its equity managers to provide accounting of soft dollar transactions involving securities of the WVIMB. The Board believes it is possible to make a reasonable, though admittedly imprecise, allocation of these commission dollars across manager accounts. These reports should be provided to Staff periodically upon request and shall include number of shares traded, dollar amount of the soft dollar commissions, the brokerage firms to which they were directed, and an explanation of the goods or services received.

  Although fixed income managers do not generate soft dollars per se, they receive "gratis" services from brokers through which they trade. For the purposes of this policy, these services are considered a result of the trades placed with that broker and an accounting of those services similar to that required of the equity managers described above is required.

The Board expects its managers to fulfill the less quantifiable portions of best execution. To that end, reasonable, executable trade polices and practices should be established and followed by each investment manager. The Association for Investment Management and

**West Virginia Investment Management Board**
*Investment Policy Statement*

Research has developed and published the *AIMR Trade Management Guidelines* (found on the Internet at http://www.aimr.org/pdf/standards/trademgmt_guidelines.pdf).

The AIMR Trade Management Guidelines encourage firms to:

- Establish trade-management policies and procedures that seek to maximize the value of a client's portfolio, within that client's investment objectives and constraints.
- Establish clear firm-wide guidelines on broker selection and development of an approved brokers list.
- Establish controls to monitor and evaluate broker performance and execution quality.
- Ensure that all clients are treated fairly in the execution of orders and allocation of trades.
- Disclose their trade-management practices as well as their actual and potential trading-related conflicts of interests to all current and prospective clients.
- Maintain accurate and complete trading records documenting the firm's efforts to achieve best execution.

The Board believes these are reasonable and valuable practices. Therefore, WVIMB managers are encouraged to implement the AIMR Guidelines as policy, or use them as a guide in developing similar processes and procedures for trade management within their firm.


**Monitoring and Reporting**

The Quarterly Attestation Certificate process requires all WVIMB investment managers to detail any incident of non-compliance for the most recent quarter, which would include violation of equity brokerage commission rate goals for Domestic and International Equity Managers over a one-year period as of the most recent quarter-end date.

WVIMB Staff will annually report to the Board on the attainment of the equity brokerage commission rate goals.

As part of the annual due diligence on each manager, WVIMB Staff will review the appropriateness of the soft dollar purchases and services received "gratis" from the brokers used by the WVIMB managers. Additionally, all investment managers' trade management policies will be compared to the AIMR Guidelines as paraphrased above during the annual due diligence review with each manager. Staff will monitor both violations of the managers' trade management policies and differences between those policies and the suggested AIMR guidelines. Staff will address any significant concerns in the due diligence summaries provided to the Board.

---

**West Virginia Investment Management Board**
*Investment Policy Statement*

## Manager Transitions

Trade management is particularly important in the specific case when the Board hires, terminates, or replaces an investment manager. In effect, the Board is stating that the portfolio should be transitioned to the new allocation as quickly as is practical given the constraints of the market. Therefore, the brokerage commission goals stated above will be suspended for the transition period. However, steps should be taken to lower the brokerage rates and minimize transaction costs during this period on a "best efforts" basis. These include, but are not limited to:

- o Transferring assets directly to the new manager's account from the replaced manager's account with no broker involvement (In-kind transfer)
- o Electronic crossing networks with brokers
- o Electronic crossing networks with other managers
- o Market on close or open trade programs
- o Commission recapture programs as instituted by Staff.

To effect the transition, Staff will consider a number of methods:

- o Utilizing the manager being replaced
- o Utilizing the new manager
- o Utilizing a separate WVIMB manager
- o Utilizing the custodian
- o Utilizing a broker-dealer
- o Utilizing a third-party transition management firm

The choice of which method or combination of methods will be based upon the perceived ability to accomplish the transition quickly with as little market impact and as low commission rates as possible. The method chosen may differ in different transitions due to asset class and other considerations.

**West Virginia Investment Management Board**
*Investment Policy Statement*

# Derivatives Use Policy

*It is understood that any derivative transaction shall be used as a means to efficiently access desired markets and to control and manage portfolio risk. At no time shall the Manager engage in a derivative transaction that exposes the portfolio to any risk outside of the Manager's mandate and guidelines for the WVIMB. Any reference to "portfolio" in this document is defined as the individual Manager's portfolio, not the total WVIMB portfolio.*

**_At the time of purchase, every derivative transaction evaluated for inclusion in the portfolio is subject to the following limitations_**: 1) the resultant portfolio is not leveraged in any way, 2) for fixed income managers, the resultant duration of the portfolio is not affected by more than one year when including all derivative types in the portfolio's calculation, and 3) at no time will the combined absolute "notional value" of all derivative positions exceed *30%* of the Manager's total portfolio (with the exclusion of forward foreign currency exchange contracts used for hedging purposes). Manager is expected to monitor ongoing compliance with the guidelines as set forth in this Policy and immediately notify WVIMB personnel of any violations.

## FUTURES

- The Manager may utilize interest rate, currency, or index futures that have recognized liquidity and are actively traded on major exchanges, or if over-the-counter, are executed with major dealers. The net position of non-US futures contracts shall be subject to, and included in, the current limitation on non-US securities in accordance with investment guidelines.

## OPTIONS

- The Manager may buy and sell equity, bond, currency, or index options that have recognized liquidity and are actively traded on major exchanges, or if over-the-counter, are executed with major dealers. The following types of options strategies may be employed:

  Purchase of Call Options

  Purchase of Put Options – When purchasing put options, the portfolios must hold the underlying asset in the portfolio to cover the notional amount of the option purchased.

  Sale of Call Options – When selling call options, the portfolio must hold the underlying asset in the portfolio to cover the notional amount of the option sold.

  Sale of Put Options – When selling put options, cash equal to the notional value of the options position must be held in the portfolio.

**West Virginia Investment Management Board**
*Investment Policy Statement*

## FORWARDS

- The Manager may utilize inter-bank spot and forward foreign exchange contracts. At no time shall currencies of countries be sold in which there is no underlying investment exposure. If there is no underlying investment exposure, forward foreign exchange contracts may be purchased up to the Manager's benchmark weighting. At no time shall the market value of forward foreign exchange contracts sold short in a specific currency (after netting against all forward foreign exchange purchases of the same currency) exceed 100% of the market value of the underlying assets being hedged (both in local terms). The net exposure to any currency in local terms (whether from spot or forward contracts) is subject to the current limitation on non-US exposure in domestic portfolios and the current limitation on cash holdings in all portfolios as detailed in the investment manager guidelines.

## SWAPS

- The Manager may enter into interest rate, currency, or index swap agreements with the understanding that no exchange in principal occurs. In addition, collateral agreements will be in place to trigger margin movement whenever WVIMB's current mark-to-market amount to be received from a counterparty exceeds USD$250,000. The amount to be paid to the counterparty by WVIMB when the mark-to-market amount exceeds $250,000 will be at the discretion of the investment manager and counterparty.

## MORTGAGE DERIVATIVES

- Collateralized mortgage obligations issued by non-governmental agencies are limited to 20.0 % of the portfolio and 5.0 % by issue.

## CREDITWORTHINESS

- The Manager is authorized to utilize derivative securities- only to the extent detailed in preceding guidelines- only with counterparties on the Manager's approved list. Creditworthiness of all counterparties to transactions must be monitored by the Manager using current industry standards on a regular basis and the manager should take all reasonable steps to protect the underlying assets in the event of adverse changes to counterparty creditworthiness.

## RESTRICTED DERIVATIVE INVESTMENTS

- Any derivative not explicitly mentioned in the preceding guidelines or Manager-specific guidelines (including, but not limited to, swaptions, credit default swaps, etc.) shall be considered **restricted**. "Linked" securities are restricted to the extent that the principal value or interest rate is tied to anything not specifically allowed as permissible investments. In addition, purchasing any derivative for which a market quotation cannot be reasonable obtained is restricted. If the Manager wishes to discuss a restricted investment or a potential derivative transaction not detailed in the written guidelines, the Manager should contact WVIMB and the transaction will be considered on a case-by-case basis. Any allowance of such transactions would have to be approved in writing by WVIMB.

## CONFLICTING GUIDELINES

In instances where commingled funds are utilized and a policy conflict exists in the use of derivatives, the commingled fund's derivatives use policy takes precedence over this policy.

**West Virginia Investment Management Board**
*Investment Policy Statement*

# Investment Risk
# Management Policy

The objective of the WVIMB Investment Risk Management Policy is to identify, manage and, to the extent possible, control investment risks. Investing is inherently risky. WVIMB's investment program faces numerous risks; however, the primary risk to WVIMB is that system assets will not support system liabilities over long periods of time. In order to control for this risk and numerous other risks that face the system, the Board has taken the following steps to help protect the system assets on an ongoing basis:

- Actuarial valuations of the public pension defined benefit plans are performed each year to ensure the system is on track to meet the funding objectives of the plan. These valuations are performed externally by the Consolidated Public Retirement Board, and reviewed by the WVIMB every year. In addition, WVIMB Staff meets with the CPRB actuary every year to discuss these reports as well as other matters affecting the current and future liabilities of the plans.

- Asset/liability studies are conducted at least once every five years by the WVIMB Staff with the assistance of the general consultant. The purpose of this study is to ensure that the current portfolio design is structured to meet the liabilities. Investment assumptions and expectations are reexamined accordingly.

- An Investment Policy Statement that incorporates investment limitations is in place to ensure that Board policies are clearly identified. It is the sole responsibility of the Board of Trustees to approve the Investment Policy Statement, and any subsequent modifications. This policy statement outlines desired outcomes, allocates responsibility among principals, and provides details as to how the outcomes will be measured by the Board. Reporting requirements are clearly identified to ensure appropriate checks and balances are in place. In addition, performance processes and returns are independently verified by WVIMB's consultant to ensure the measurement tools and methodologies being utilized to gauge performance are suitable.

- An internal audit process is conducted continuously throughout the year on all critical processes of the organization. Critical investment processes are identified, documented, reviewed, and enhanced, when necessary. Compliance within each of the investment processes is subsequently tested on a scheduled basis. Additionally, an external audit process is conducted once a year at fiscal year-end. The external auditor considers controls in place when developing their audit plan of the WVIMB's financial statements.

- "Trust, but verify" is the approach that has been adopted with regard to relationships with public markets investment managers. The assets of the WVIMB are 100 percent externally managed, and the belief is that the managers themselves are in the best position to conduct pre- and post- trade, as well as overall portfolio, compliance of their directed guidelines in the public market universe. Verification of public markets

---

**West Virginia Investment Management Board**
*Investment Policy Statement*

investment managers' actual implementation of compliance testing, as well as their
ability and willingness to do so, is the duty and responsibility of IMB Staff and is
conducted through pre-hire interviews, annual due diligence reviews, and quarterly
compliance attestation statements signed by each investment manager.

- External investment managers in the Alternatives program and Real Estate program are
  selected only upon recommendation by a professional, third-party fiduciary investment
  adviser whom has, in the appropriate Sub-Committee's opinion, conducted thorough and
  complete due diligence to support its recommendation, as well as reasonably considered
  any implementation and/or operational issues. These managers are also subject to annual
  due diligence reviews by IMB Staff, as well as ongoing due diligence by the third-party
  fiduciary investment adviser that originally made the recommendation.

- Statutory law restrictions are incorporated into each investment manager's guidelines
  (maximum 5% in any single company rule,, etc.[1]). Exposure restrictions within statute
  (75% maximum on non-real-estate equity, 30% maximum on international, 20% in
  alternative investments, 25% in real estate equity, etc.[1]) are monitored monthly through
  the rebalancing process.

In conclusion, the objective of the WVIMB Investment Risk Management Policy is not to
eliminate all investment risks, for according to modern portfolio theory, without assuming some
investment risk, the system's actuarial requirement for investment return cannot be met. The
Investment Risk Management Policy is structured to minimize negative outcomes by identifying
and managing controllable risks.

---

[1] Applicable on the date of this writing in May 2010. Specific statutory restrictions may have subsequently
changed.

# Manager Monitoring
# and Retention Policy

## I.  POLICY OBJECTIVES AND PRINCIPLES

Investment manager retention and termination decisions have high costs, whether it is the decision to retain unskilled managers for too long, or the decision to terminate a skilled manager prematurely.  Not only are the costs of redeploying assets considerable, but the variability of most manager returns complicates straightforward evaluations of manager skill. Without reliable assessments of manager skill, the IMB has little assurance that the manager we hire today will perform better than the manager we terminated yesterday.

This manager monitoring and retention policy provides a *systematic*, *consistent*, and *rational* framework, for manager retention and termination decisions, thereby avoiding untimely and haphazard actions that may adversely impact fund returns. In addition, the policy is intended to:

*   Foster a *long-term* approach to manager evaluations;
*   Provide a *logical* and *consistent* framework to evaluate manager skill;
*   Improve client/manager communication by *apprising* each manager of the quantitative and qualitative standards by which they will be judged, and the near-term and long-term consequences of failing to meet these standards;
*   Promote *timely* and *appropriate* responses to actual and potential performance issues; and
*   Provide *flexibility* to allow application across all asset classes, management styles, and market environments.

This policy shall apply to all IMB managers, except for managers that are engaged by contractual partnership agreements that obligate the IMB assets for a contracted period of time (e.g. private equity partnerships, hedge funds, and private real estate partnerships).

Although quantitative assessments of manager success are useful in judging whether managers have been successful in the past, they can be poor predictors of future success. Since the IMB's goal is to determine the likelihood of *future* success, it is critical that the ultimate retention/termination decision focus on the qualitative aspects of each manager relationship, as well as quantitative assessments of past performance.

Staff will utilize quantitative tools such as cumulative and rolling excess return analysis to *identify* performance shortfalls, while qualitative assessments of organization, personnel and investment approach will be used to diagnose the *source* of the shortfall. Regular qualitative assessments are also valuable in flagging *potential* problems by drawing attention to developments that might lead to future poor performance.

In addition to identifying existing and potential problems, an important purpose of the manager monitoring and retention policy is to outline how and when the IMB will address specific issues

and events. Depending on the significance of the issue or event, staff will select one of three possible courses of action: do nothing and continue to monitor the situation, initiate a Comprehensive Review, or, under extraordinary circumstances, request an emergency Board meeting and recommend termination of the manager immediately without a Comprehensive Review.

Inevitably, each retention/termination decision will be unique. Accordingly, it is intended that this manager monitoring and retention policy be flexible enough to account for specific manager, asset class, and market-related factors, but it is also intended that exceptions to this policy be rare.

## II. MANAGER MONITORING

### A. Manager Meeting Frequency and Content

Staff will meet with each investment manager not less than once every twelve months, and staff shall meet with each manager at their place of business not less than once every twenty-four months. Each meeting will include a review of the manager's near-term and long-term performance, their current investment strategy and capital market outlook, and any other pertinent issues related to the manager's organization, personnel, or investment process. The frequency, content, and timing of specific manager presentations will be subject to staff and the Board's discretion, and will include written responses to a due diligence questionnaire created by staff and/or investment consultant.

### B. Qualitative Assessments

The qualitative aspects of each manager relationship will be monitored through frequent oral and written contacts by staff with each manager and IMB consultants, and, when appropriate, through quarterly evaluations utilizing attribution, style and peer universe analyses. Qualitative assessments will focus on organizational and staff stability, adherence to investment philosophy and process, asset/client turnover, and the quality of client service.

A significant and potentially adverse event related to, but not limited to, any of the following qualitative issues or events may cause staff to initiate a Comprehensive Review, depending on the perceived significance of the event or issue in light of surrounding circumstances:

- A significant change in firm ownership and/or structure;
- The loss of one or several *key* personnel;
- A significant loss of clients and/or assets under management;
- A shift in the firm's philosophy or process which may be evidenced by style drift, increases or decreases in tracking error, or value-added coming from an unexpected source, etc;
- A significant and persistent lack of responsiveness to client requests;
- A significant decrease in the quality or volume of deal flow and/or a marked change in the investment types or deal terms negotiated by or available to the manager;
- Consistent failure to meet investment allocation targets; or

**West Virginia Investment Management Board**
*Investment Policy Statement*

- Violation of IMB investment guidelines.

## C. Quantitative Assessments

In order to evaluate manager skill, cumulative and rolling assessments of excess return will be calculated for each external manager. Sections II.C.1.a., II.C.1.b., and II.C.2., below, describe in detail the methodologies employed for public manager performance evaluations.

Judgments as to whether a manager has achieved IMB investment objectives, and judgments as to whether a manager will achieve IMB investment objectives in the future, ultimately rest with IMB staff and Board. Accordingly, IMB staff and the Board reserve the right under this policy to pursue, at any time, any course of action in response to absolute, relative, historic or perceived future investment performance. Notwithstanding the foregoing, the following decision rules will generally apply to quantitative assessments of manager performance:

> **Public Market Managers -** Because of the large degree of variability in manager returns, it is often very difficult to assess whether a manager's over/under performance is the product of randomness or true investment skill. IMB's quantitative skill analysis considers the *variability* of a manager's excess return, in addition to the absolute *magnitude* of the excess return, when making judgments about manager skill relative to investment style.
>
> Skilled managers often have periods of under performance, just as unskilled managers often experience periods of out-performance. Over long time periods, however, skilled managers will produce a *larger* average excess return more *frequently* than their unskilled peers.

> **1.Active Managers -** Cumulative and rolling returns will be utilized as follows:
>
> If the manager's rolling, three-year or five-year excess return plots below the benchmark for four (4) consecutive quarters, the manager may be subject to a Comprehensive Review.
>
> If the manager's cumulative or rolling excess return plots cause concern for any other reason, the manager may be subject to a Comprehensive Review.

> **2.   Passive Managers -** The skill analysis methodology applied to IMB active management strategies is inappropriate for passive management strategies due to the low variability of manager returns and a zero alpha expectation. Therefore, IMB shall utilize the annual performance ranges outlined in each manager's investment contract to monitor passive manager performance.

West Virginia Investment Management Board
*Investment Policy Statement*

### D. Reporting

On an annual basis, staff shall prepare for each of IMB managers, a comprehensive relationship and performance review in accordance with the IMB annual due diligence program. Annually, staff shall also prepare, or cause to be prepared, reports to support the qualitative assessments including style measurement reports, attribution analysis, tracking error reports, and peer universe comparisons.

## III. COURSES OF ACTION

### A. No Formal Review, but Continue to Monitor the Situation

Staff continues to diligently monitor the manager(s) as ascribed in this document and keep Board notified of significant developments regularly at Sub-Committee, Committee, and Board meetings, as appropriate.

### B. Comprehensive Review

A Comprehensive Review of a manager will be undertaken as a result of serious under performance of a manager relative to its benchmark per section II.C. or as the result of a *significant* and *adverse* change to the manager's organization, personnel, or investment process per section II.B. These categories of events cause Staff to seriously question the firm's ability to achieve IMB investment objectives in the future. A Comprehensive Review is a thorough, in-depth due diligence effort which explores all elements of a manager's organization, personnel, and investment philosophy and process.
Comprehensive Reviews will be completed within 90 days of notification to the Board.

In undertaking a Comprehensive Review, staff is ultimately deciding whether the firm should be "re-hired" today given the current events and prevailing circumstances. **Thus, the outcome of a Comprehensive Review is a decision to retain or terminate the manager.** The nature of certain investment vehicles may severely restrict or prohibit the immediate withdrawal of funds and/or the transfer of assets to another manager. In such cases, the decision to terminate a manager is not feasible and, therefore, IMB actions may be limited to filing a withdrawal request with the manager and waiting until the investments can be liquidated in a prudent manner, or seek other disposition strategies.

The Comprehensive Review will focus on whether the firm currently embodies enough of the following characteristics to provide reasonable assurance that IMB investment objectives in the future will be achieved. The list below represents characteristics that IMB believes are important to the success of a manager's investment program.

Organization:
- Stable ownership structure
- Experienced, dynamic leadership
- Clearly delineated lines of authority and responsibility
- Sound financial condition

- Controlled growth
- Strong compliance and internal control systems

Personnel:
- Investment staff is experienced and competent
- Low turnover in key positions
- Employees are highly motivated to meet client objectives
- Sufficient back-up and on-going training

Investment Process and Philosophy:
- Well-articulated philosophy as to how value is added in a particular market
- Investment process is systematic, focused and consistent
- Investment process exploits a perceived competitive advantage
- Investment process has been successfully applied in different market environments
- High quality research base
- Investment process/style can be benchmarked
- Strong trading capabilities

The Comprehensive Review shall also address whether the problem can be resolved within the scope of the existing relationship, and if not, how and to whom the assets should be redeployed. A decision to "re-hire" a manager may also be subject to the manager satisfying specified conditions and include a probationary period.

### C. Emergency Board Meeting (or Sub-Committee Meeting) to Recommend Termination without Comprehensive Review

This course of action would be reserved for the most urgent and dire of circumstances, when staff believes the IMB assets are being compromised beyond what may occur in the ordinary course of business or the ordinary scope of risks inherent to the investment program.

## IV. OTHER TERMINATION CONDITIONS

This policy depicts circumstances where IMB may elect to terminate a manager for cause. However, all IMB investment management contracts permit IMB to terminate the manager, with or without cause, after no more than thirty-day (30) written notice. The investment management contracts also permit IMB to terminate a manager *immediately* upon learning of a breach of duty or confidentiality.

## V. DOCUMENT CONFLICTS; MODIFICATIONS

Nothing herein shall be construed or interpreted as a modification or amendment to any Contract between the IMB and any Manager. In the event of a conflict between any provision of any such Contract and this policy, the provisions of the Contract shall prevail.

---

# Performance Policy

## I. Performance Measurement

All performance calculations are computed and presented in accordance with the AIMR Performance Presentation Standards (AIMR-PPS) by IMB Staff. The Time-Weighted Modified Dietz method is used for computation. Cash flows are assumed to occur at the beginning of the day. Portfolio returns are computed for periods consistent with participant contributions and/or withdrawals. For example, for a portfolio that allows participants to buy in or sell out each day, returns are computed daily. Likewise, for a portfolio that only allows participant activity once a month, returns are computed monthly. However, if a significant cash flow occurs, defined as ten percent or greater, the portfolio is re-priced as of that day and the return is computed linking returns for both the time period prior to the significant cash flow and the time period after the significant cash flow.

## II. Performance Evaluation

The performance of each Investment Manager and Investment Pool is measured against several relevant benchmarks and, if available, a comparable universe over various cycles on a quarterly basis. This evaluation looks at the performance of both the Manager and the effect the portfolio's restrictions have on the return. The Board also evaluates the performance of each Participant Plan and compares the return against the Plan's actuarial assumption in light of its objectives.

IMB Staff will review investment manager, benchmark, and Plan returns across multiple time periods, both short-term and longer-term on a monthly basis. Results will be evaluated to review progress toward longer-term objectives as individually defined in the IMB Investment Policy Statement by Plan (Appendix A) and by investment Manager (Appendix D). It is understood that there are likely to be intermittent periods when portfolio performance deviates from market indexes and/or performance objectives. During such times, evaluation of Managers will continue in accordance with the IMB's Manager Monitoring and Retention Policy.

IMB Staff will also monitor any performance return differences calculated between the IMB and the Managers for the one-month and twelve-month time period. Any difference deemed to be material by an IMB Investment Officer would be investigated by IMB Staff with the appropriate personnel at the Manager.

IMB Staff will monitor and evaluate performance objective progress in comparison to the appropriate benchmarks as described in the Investment Policy Statement, Section VIII, *"Measurement of Investment Objectives"*.

## III. Performance Reporting and Review

Performance reviews are a critical part of the portfolio management process. The Board will rely on its external Investment Managers, Consultant, Custodian, and Staff to provide the information necessary for and presentation of periodic performance reviews.

Managers: Shall, as directed by the Staff, provide periodic performance reports utilizing a standardized reporting format specified by the Board. Managers may provide their standard

**West Virginia Investment Management Board**
*Investment Policy Statement*

performance information in a different format as supplemental information only, at their discretion. Managers will be expected to make periodic performance presentations to the Staff.

Staff: Shall be responsible for ensuring that performance reports are prepared and delivered in a timely manner, and will provide continual supervision of the performance reporting on the portfolio. At regular Board meetings, the Staff will be responsible for presenting an executive summary of the performance reports. The executive summary will include, but not necessarily be limited to, information for the most recently available month, quarter, year, 3 years, 5 years, and 10 years. The Board may provide direction regarding the specific format and content of the performance reports.

Consultant: Shall be responsible for assisting Staff in its ongoing evaluation process of Managers, including performance returns against performance objectives. Consultant shall also be responsible for completing a detailed performance measurement report on a quarterly basis and make this report available to the Board for review. Consultant shall also be responsible for independently verifying the performance calculations and reported returns of Staff. Consultants hired specifically for their specialty and expertise in the private markets (private equity and private real estate) will also be responsible for reporting performance of all private investments in IRR format.

**West Virginia Investment Management Board**
*Investment Policy Statement*

# Proxy-Voting

The Board, as part of their duties and responsibilities, shall have the right to vote any and all proxies solicited in connection with securities held by WVIMB. The Board may delegate to the investment Managers who invest the WVIMB's assets the responsibility to vote any and all proxies. The Board and/or investment Manager, as applicable, has the responsibility to vote solely in the interest of WVIMB and to protect the value of the securities within the portfolio. If delegated to a Manager, the Manager will be required to establish a proxy-voting program in coordination with the Staff. Investment Managers shall keep accurate records of all proxies voted and shall submit a summary report of same to the Staff on an annual basis. A review will be coordinated with each Manager to confirm consistency with the Board's position, if one exists. The Board reserves the right to provide additional proxy-voting direction to its Managers at any time.

# Rebalancing

The Board is responsible for asset allocation decisions and will periodically review its target allocations to confirm or adjust the targets, as described in Section III of the Investment Policy. Until such time as the Board changes the asset allocation ranges, it will be necessary to periodically rebalance the portfolio as a result of market value fluctuations. The Board has delegated to staff the duty of implementing the following systematic and cost-effective approach to rebalancing.

Once a Participant Plan has reached either end of its Strategic Range, as defined within the Equity and Fixed Income Pools, the Participant Plan shall be rebalanced back toward its Strategic Allocation target (or adjusted target set by the Allocation Committee within its expressed authority, if different) utilizing cash flows and crossing opportunities no less frequently than annually.

The Alternatives Pool will be monitored monthly during the rebalancing process to determine its weighting within the context of each Participant Plan. If the weighting of the Alternatives Pool exceeds 20% of the total Plan, the weighting must be rebalanced below 20% before any new investments may be authorized by the IMB Private Equity Sub-Committee or the IMB Hedge Fund Sub-Committee in that Pool.

The Real Estate Pool will be monitored monthly during the rebalancing process to determine its weighting within the context of each Participant Plan. If the weighting of the Real Estate Pool exceeds 25% of the total Plan, the weighting must be rebalanced below 25% before any new investments may be authorized by the IMB Real Estate Sub-Committee in that Pool.

Staff will report rebalancing activity to the Chair of the Investment Committee monthly.

West Virginia Investment Management Board
*Investment Policy Statement*

# Repurchase Agreements Policy
Revised October 6, 2000

### Statutory Citations:

*§12-6-9h. Securities handling.*

*In financial transactions whereby securities are purchased by the board under an agreement providing for the resale of such securities to the original seller at a stated price, the board shall take physical possession of the securities, directly, by its custodian bank or through a neutral third party: Provided, That an agreement with a neutral third party may not waive liability for the*

*handling of the securities: Provided, however, That when the board is unable to take possession, directly, by its custodian bank or through a mutual third party, the board may leave securities in a segregated account with the original seller, provided the amount of the securities with any one seller may not exceed one hundred fifty million dollars.*

### Authorized Counterparties:

| Counterparty | Contact | Phone Number |
|---|---|---|
| Merrill Lynch | Jim Harris | 304-347-2525 |
| MSDW | Casey Robinson | 304-357-4587 |
| Bank of America | Herb Fanning | 800-999-4360 |

To become and remain an Authorized Counterparty an entity must be rated "Investment Grade".

### Authorized Limits:

The principal value for Repurchase Agreements purchased by the WVIMB trading desk shall be limited to $150 million per counterparty for both the Consolidated Pension Fund and the Consolidated Fund.

If a counterparty is at the Authorized Limit and is successful in winning the bid on two or more consecutive days, the interest may be "rolled" over in the new Repurchase Agreement provided that the interest "rolled" does not exceed 1% of the original principal value of the Repurchase Agreement.

# Securities Lending

*(Approved May 22, 2003)*

The Board has elected to participate in securities lending and has set forth the following policy related to this activity. The objective of this program is to generate incremental income for the Plan, while not materially changing the risk profile of the Plan. In the event the Executive Director, Chief Investment Officer and the Consultant are in agreement that the risks' inherent in lending WVIMB securities have increased to a point that the risk/return tradeoff is no longer acceptable, the program may be temporarily suspended without Board consent. Following such a suspension, the Board will be notified and at the next regularly scheduled meeting, a decision will be made by the Board to either reinstate the program or continue suspension indefinitely.

- The lending program may be implemented through the use of agent lender(s), as determined by the Board. Any agent lender selected must agree in writing to comply with the WVIMB Securities Lending Policy.
- The agent lender(s) may lend financial securities including, but not limited to, U.S. and non-U.S. equities, corporate bonds, and U.S. and non-U.S. government securities.
- Any Agent shall have full discretion over the selection of borrowers and shall continually review the creditworthiness of potential borrowers through extensive analysis of publicly available information and any other material available to them.
- All loans shall be fully collateralized with cash, government securities or irrevocable bank letters of credit.
- Cash collateral received from securities borrowers will be deposited upon receipt in a pre-approved short-term investment vehicle or vehicles. Each pre-approved vehicle must comply with the following key objectives: safeguarding principal, assuring all cash collateral is invested in a timely manner, maintaining a diversified portfolio of investments, and maintaining adequate liquidity to meet the anticipated needs of the WVIMB.
- Collateralization of loans shall be at least 102% of the market value of loaned domestic securities plus accrued income and 105% for non-U.S. loans, respectively.
- The amount loaned to any one borrower shall not exceed $225 million USD across the total program except for securities subject to separate agreement that are made available to a specific borrower under an exclusive principal arrangement for a specified term. This dollar limitation will be reviewed, and possibly adjusted, annually during the due diligence review.
- Securities on loan should be marked-to-market on a daily basis to assess adequacy of collateralization.
- The agent lender(s) shall provide periodically, and WVIMB staff will review, reports including, but not limited to, earnings schedules, performance and holdings within the loan program, performance and holdings within the collateral reinvestment program, collateralization detail, borrower detail, et al.
- The Securities Lending program should in no way inhibit the portfolio management activities of the other managers of the Plan.
- WVIMB staff shall be responsible for making an annual report to the Board on the securities lending program.
- WVIMB staff will monitor the agent lender(s) of the Securities Lending program in accordance with the WVIMB Manager Oversight and Retention Policy, verifying compliance quarterly, and conducting due diligence reviews annually equivalent to processes conducted on other external investment managers.

*Legislative Citations*

# West Virginia Code of Conduct

**A. *Persons subject to section.***

The provisions of this section apply to all elected and appointed public officials and public employees, whether full or part time, in state, county, municipal governments and their respective boards, agencies, departments and commissions and in any other regional or local governmental agency, including county school boards.

**B. *Use of public office for private gain.***

1. A public official or public employee may not knowingly and intentionally use his or her office or the prestige of his or her office for his or her own private gain or that of another person. Incidental use of equipment or resources available to a public official or public employee by virtue of his or her position for personal or business purposes resulting in de minimis private gain does not constitute use of public office for private gain under this subsection. The performance of usual and customary duties associated with the office or position or the advancement of public policy goals or constituent services, without compensation, does not constitute the use of prestige of office for private gain.

2. Notwithstanding the general prohibition against use of office for private gain, public officials and public employees may use bonus points acquired through participation in frequent traveler programs while traveling on official government business; provided that the official's or employee's participation in such program, or acquisition of such points, does not result in additional costs to the government.

3. The Legislature, in enacting this subsection, recognizes that there may be certain public officials or public employees who bring to their respective offices or employment their own unique personal prestige which is based upon their intelligence, education, experience, skills and abilities, or other personal gifts or traits. In many cases, these persons bring a personal prestige to their office or employment which inures to the benefit of the State and its citizens. Those persons may, in fact, be sought by the State to serve in their office or employment because, through their unusual gifts or traits, they bring stature and recognition to their office or employment and to the State itself. While the office or employment held or to be held by those persons may have its own inherent prestige, it would be unfair to those individuals and against the best interests of the citizens of this State to deny those persons the right to hold public office or to be publicly employed on the grounds that they would, in addition to the emoluments of their office or employment, be in a position to benefit financially from the personal prestige which otherwise inheres to them. Accordingly, the commission is directed, by legislative rule, to establish categories of public officials and public employees, identifying them generally by the office or employment held, and offering persons who fit within those categories the opportunity to apply for an exemption from the application of the provisions of this subsection. Exemptions may be granted by the commission, on a case-by-case basis, when it is shown that: (A) The public office held or the public employment

engaged in is not such that it would ordinarily be available or offered to a substantial number of the citizens of this State; (B) the office held or the employment engaged in is such that it normally or specifically requires a person who possesses personal prestige; and (C) the person's employment contract or letter of appointment provides or anticipates that the person will gain financially from activities which are not a part of his or her office or employment.

## C. *Gifts.*

1. A public official or public employee may not solicit any gift unless the solicitation is for a charitable purpose with no resulting direct pecuniary benefit conferred upon the official or employee or his or her immediate family: Provided, That no public official or public employee may solicit for a charitable purpose any gift from any person who is also an official or employee of the State and whose position is subordinate to the soliciting official or employee: Provided, however, That nothing herein shall prohibit a candidate for public office from soliciting a lawful political contribution. No official or employee may knowingly accept any gift, directly or indirectly, from a lobbyist or from any person whom the official or employee knows or has reason to know:

    (A) Is doing or seeking to do business of any kind with his or her agency;
    (B) Is engaged in activities which are regulated or controlled by his or her agency; or
    (C) Has financial interest which may be substantially and materially affected, in a manner distinguishable from the public generally, by the performance or nonperformance of his official duties.

2. Notwithstanding the provisions of subdivision (1) of this subsection, a person who is a public official or public employee may accept a gift described in this subdivision, and there shall be a presumption that the receipt of such gift does not impair the impartiality and independent judgment of the person. This presumption may be rebutted only by direct objective evidence that the gift did impair his or her impartiality and independent judgment. The provisions of subdivision (1) of this subsection do not apply to:

    (A) Meals and beverages;
    (B) Ceremonial gifts or awards which have insignificant monetary value;
    (C) Unsolicited gifts of nominal value or trivial items of informational value;
    (D) Reasonable expenses for food, travel and lodging of the official or employee for a meeting at which the official or employee participates in a panel or speaking engagement at the meeting;
    (E) Gifts of tickets or free admission extended to a public official or public employee to attend charitable, cultural or political events, if the purpose of such gift or admission is a courtesy or ceremony customarily extended to the office;
    (F) Gifts that are purely private and personal in nature; or

      (G) Gifts from relatives by blood or marriage, or a member of the same household.

3. The commission shall, through legislative rule promulgated pursuant to chapter twenty-nine-a [§ 29A-1-1 et seq.] of this code, establish guidelines for the acceptance of a reasonable honorarium by public officials and elected officials. The rule promulgated shall be consistent with this section. Any elected public official may accept an honorarium only when:

      (A) That official is a part-time elected public official;

      (B) The fee is not related to the official's public position or duties;

      (C) The fee is for services provided by the public official that are related to the public official's regular, nonpublic trade, profession, occupation, hobby or avocation; and

      (D) The honorarium is not provided in exchange for any promise or action on the part of the public official.

4. Nothing in this section shall be construed so as to prohibit the giving of a lawful political contribution as defined by law.

5. The Governor or his designee may, in the name of the State of West Virginia, accept and receive gifts from any public or private source. Any gift so obtained shall become the property of the State and shall, within thirty days of the receipt thereof, be registered with the commission and the Division of Culture and History.

6. Upon prior approval of the Joint Committee on Government and Finance, any member of the Legislature may solicit donations for a regional or national legislative organization conference or other legislative organization function to be held in the State for the purpose of deferring costs to the State for hosting of the conference or function. Legislative organizations are bipartisan regional or national organizations in which the Joint Committee on Government and Finance authorizes payment of dues or other membership fees for the Legislature's participation and which assist this and other state legislatures and their staff through any of the following:

      (A) Advancing the effectiveness, independence and integrity of legislatures in the states of the United States;

      (B) Fostering interstate cooperation and facilitating information exchange among state legislatures;

      (C) Representing the states and their legislatures in the American federal system of government;

      (D) Improving the operations and management of state legislatures and the effectiveness of legislators and legislative staff, and to encourage the practice of high standards of conduct by legislators and legislative staff;

      (E) Promoting cooperation between state legislatures in the United States and legislatures in other countries.

The solicitations may only be made in writing. The legislative organization may act as fiscal agent for the conference and receive all donations. In the alternative, a bona fide banking institution may act as the fiscal agent. The official letterhead of the Legislature may not be used by the legislative member in conjunction with the fund raising or solicitation effort. The legislative organization for which solicitations are being made shall

**West Virginia Investment Management Board**
*Investment Policy Statement*

file with the Joint Committee on Government and Finance and with the Secretary of State for publication in the State Register as provided in article two [§ 29A-2-1 et seq.] of chapter twenty-nine-a of the code, copies of letters, brochures and other solicitation documents, along with a complete list of the names and last known addresses of all donors and the amount of donations received. Any solicitation by a legislative member shall contain the following disclaimer:

"This solicitation is endorsed by [name of member]. This endorsement does not imply support of the soliciting organization, nor of the sponsors who may respond to the solicitation. A copy of all solicitations are on file with the West Virginia Legislature's Joint Committee on Government and Finance, and with the Secretary of State and are available for public review."

7.    Upon written notice to the commission, any member of the Board of Public Works may solicit donations for a regional or national organization conference or other function related to the office of the member to be held in the state for the purpose of deferring costs to the state for hosting of the conference or function. The solicitations may only be made in writing. The organization may act as fiscal agent for the conference and receive all donations. In the alternative, a bona fide banking institution may act as the fiscal agent. The official letterhead of the office of the Board of Public Works member may not be used in conjunction with the fund raising or solicitation effort. The organization for which solicitations are being made shall file with the Joint Committee on Government and Finance, with the Secretary of State for publication in the State Register as provided in article two [§ 29A-2-1 et seq.] of chapter twenty-nine-a of the code and with the commission, copies of letters, brochures and other solicitation documents, along with a complete list of the names and last known addresses of all donors and the amount of donations received. Any solicitation by a member of the Board of Public Works shall contain the following disclaimer: "This solicitation is endorsed by (name of member of Board of Public Works.) This endorsement does not imply support of the soliciting organization, nor of the sponsors who may respond to the solicitation. Copies of all solicitations are on file with the West Virginia Legislature's Joint Committee on Government and Finance, with the West Virginia Secretary of State and with the West Virginia Ethics Commission and are available for public review." Any moneys in excess of those donations needed for the conference or function shall be deposited in the Capitol Dome and Capitol Improvement Fund established in section two [§ 5A-4-2], article four of chapter five-a of this code.

**D.**    *Interests in public contracts.*

1.    In addition to the provisions of section fifteen [§ 61-10-15], article ten, chapter sixty-one of this code, no elected or appointed public official or public employee or member of his or her immediate family or business with which he or she is associated may be a party to or have an interest in the profits or benefits of a contract which the official or employee may have direct authority to enter into, or over which he or she may have control: Provided, That nothing herein shall be construed to prevent or make unlawful the employment of any person with any governmental body: Provided, however, That nothing herein shall be construed to prohibit a member of the Legislature from entering into a contract with any

governmental body, or prohibit a part-time appointed public official from entering into a contract which the part-time appointed public official may have direct authority to enter into or over which he or she may have control when the official has not participated in the review or evaluation thereof, has been recused from deciding or evaluating and has been excused from voting on the contract and has fully disclosed the extent of his or her interest in the contract.

2.    In the absence of bribery or a purpose to defraud, an elected or appointed public official or public employee or a member of his or her immediate family or a business with which he or she is associated shall not be considered as having a prohibited financial interest in a public contract when such a person has a limited interest as an owner, shareholder or creditor of the business which is awarded a public contract. A limited interest for the purposes of this subsection is:

    (A)    An interest which does not exceed one thousand dollars in the profits or benefits of the public contract or contracts in a calendar year;

    (B)    An interest as a creditor of a public employee or official who exercises control over the contract, or a member of his or her immediate family, if the amount is less than five thousand dollars.

3.    If a public official or employee has an interest in the profits or benefits of a contract, then he or she may not make, participate in making, or in any way attempt to use his office or employment to influence a government decision affecting his or her financial or limited financial interest. Public officials shall also comply with the voting rules prescribed in subsection (j) of this section.

4.    Where the provisions of subdivisions (1) and (2) of this subsection would result in the loss of a quorum in a public body or agency, in excessive cost, undue hardship, or other substantial interference with the operation of a state, county, municipality, county school board or other governmental agency, the affected governmental body or agency may make written application to the Ethics Commission for an exemption from subdivisions (1) and (2) of this subsection.

**E. *Confidential information.***

No present or former public official or employee may knowingly and improperly disclose any confidential information acquired by him or her in the course of his or her official duties nor use such information to further his or her personal interests or the interests of another person.

### F. *Prohibited representation.*

No present or former elected or appointed public official or public employee shall, during or after his or her public employment or service, represent a client or act in a representative capacity with or without compensation on behalf of any person in a contested case, rate-making proceeding, license or permit application, regulation filing or other particular matter involving a specific party or parties which arose during his or her period of public service or employment and in which he or she personally and substantially participated in a decision-making, advisory or staff support capacity, unless the appropriate government agency, after consultation, consents to such representation. A staff attorney, accountant or other professional employee who has represented a government agency in a particular matter shall not thereafter represent another client in the same or substantially related matter in which that client's interests are materially adverse to the interests of the government agency, without the consent of the government agency: Provided, That this prohibition on representation shall not apply when the client was not directly involved in the particular matter in which the professional employee represented the government agency, but was involved only as a member of a class. The provisions of this subsection shall not apply to legislators who were in office and legislative staff who were employed at the time it originally became effective on the first day of July, one thousand nine hundred eighty-nine, and those who have since become legislators or legislative staff and those who shall serve hereafter as legislators or legislative staff.

### G. *Limitation on practice before a board, agency, commission or department.*

Except as otherwise provided in section three [§8A-2-3], four [§A-2-4] or five [§8A-2-5], article two, chapter eight-a of this code:

1. No elected or appointed public official and no full-time staff attorney or accountant shall, during his or her public service or public employment or for a period of one year after the termination of his or her public service or public employment with a governmental entity authorized to hear contested cases or promulgate or propose rules, appear in a representative capacity before the governmental entity in which he or she serves or served or is or was employed in the following matters:

    (A) A contested case involving an administrative sanction, action or refusal to act;

    (B) To support or oppose a proposed rule;

    (C) To support or contest the issuance or denial of a license or permit;

    (D) A rate-making proceeding; and

    (E) To influence the expenditure of public funds.

2.  As used in this subsection, represent includes any formal or informal appearance before, or any written or oral communication with, any public agency on behalf of any person: Provided, That nothing contained in this subsection shall prohibit, during any period, a former public official or employee from being retained by or employed to represent, assist or act in a representative capacity on behalf of the public agency by which he or she was employed or in which he or she served. Nothing in this subsection shall be construed to prevent a former public official or employee from representing another state, county, municipal or other governmental entity before the governmental entity in which he or she served or was employed within one year after the termination of his or her employment or service in the entity.

3.  A present or former public official or employee may appear at any time in a representative capacity before the Legislature, a county commission, city or town council or county school board in relation to the consideration of a statute, budget, ordinance, rule, resolution or enactment.

4.  Members and former members of the Legislature and professional employees and former professional employees of the Legislature shall be permitted to appear in a representative capacity on behalf of clients before any governmental agency of the state or of county or municipal governments, including county school boards.

5.  An elected or appointed public official, full-time staff attorney or accountant who would be adversely affected by the provisions of this subsection may apply to the Ethics Commission for an exemption from the one year prohibition against appearing in a representative capacity, when the person's education and experience is such that the prohibition would, for all practical purposes, deprive the person of the ability to earn a livelihood in this state outside of the governmental agency. The Ethics Commission shall by legislative rule establish general guidelines or standards for granting an exemption or reducing the time period, but shall decide each application on a case-by-case basis.

## H. *Employment by regulated persons.*

1.  No full-time official or full-time public employee may seek employment with, be employed by, or seek to purchase, sell or lease real or personal property to or from any person who:

> (A)  Had a matter on which he or she took, or subordinate is known to have taken, regulatory action within the preceding twelve months; or
>
> (B)  Has a matter before the agency on which he or she is working or a subordinate is known by him or her to be working.
>
> (C)  Is a vendor to the agency where the official serves or public employee is employed and the official or public employee, or a subordinate of the official or public employee, exercises authority or control over a public contract with such vendor, including, but not limited to:

    (i.)    Drafting bid specifications or requests for proposals;

    (ii)    Recommending selection of the vendor;

    (iii)    Conducting inspections or investigations;

    (iv)    Approving the method or manner of payment to the vendor;

    (v)    Providing legal or technical guidance on the formation, implementation or execution of the contract; or

    (vi)    Taking other nonministerial action which may affect the financial interests of the vendor.

2    Within the meaning of this section, the term employment includes professional services and other services rendered by the public official or public employee, whether rendered as employee or as an independent contractor; seek employment includes responding to unsolicited offers of employment as well as any direct or indirect contact with a potential employer relating to the availability or conditions of employment in furtherance of obtaining employment; and subordinate includes only those agency personnel over whom the public official or public employee has supervisory responsibility..

3    A full-time public official or full-time public employee who would be adversely affected by the provisions of this subsection may apply to the Ethics Commission for an exemption from the prohibition contained in subdivision (1) of this subsection.

    (A)    The Ethics Commission shall by legislative rule establish general guidelines or standards for granting an exemption, but shall decide each application on a case-by-case basis;

    (B)    A person adversely affected by the restriction on the purchase of personal property may make such purchase after seeking and obtaining approval from the commission or in good faith reliance upon an official guideline promulgated by the commission, written advisory opinions issued by the commission, or a legislative rule.

    (C)    The commission may establish exceptions to the personal property purchase restrictions through the adoption of guidelines, advisory opinions or legislative rule.

4    A full-time public official or full-time public employee may not take personal regulatory action on a matter affecting a person by whom he or she is employed or with whom he or she is seeking employment or has an agreement concerning future employment.

5    A full-time public official or full-time public employee may not personally participate in a decision, approval, disapproval, recommendation, rendering advice, investigation, inspection or other substantial exercise of nonministerial administrative discretion

**West Virginia Investment Management Board**
*Investment Policy Statement*

involving a vendor with whom he or she is seeking employment or has an agreement concerning future employment.

6   A full-time public official or full-time public employee may not receive private compensation for providing information or services that he or she is required to provide in carrying out his or her public job responsibilities.

**I.** *Members of the Legislature required to vote.*

Members of the Legislature who have asked to be excused from voting or who have made inquiry as to whether they should be excused from voting on a particular matter and who are required by the presiding officer of the House of Delegates or Senate of West Virginia to vote under the rules of the particular house shall not be guilty of any violation of ethics under the provisions of this section for a vote so cast.

**J.** *Limitations on voting.*

1   Public officials, excluding members of the Legislature who are governed by subsection (i) of this section, may not vote on a matter:

(A)   In which they, an immediate family member, or a business with which they or an immediate family member is associated have a financial interest. Business with which they are associated means a business of which the person or an immediate family member is a director, officer, owner, employee, compensated agent, or holder of stock which constitutes five percent or more of the total outstanding stocks of any class.

(B)   If a public official is employed by a financial institution and his or her primary responsibilities include consumer and commercial lending, the public official may not vote on a matter which directly affects the financial interests of a customer of the financial institution if the public official is directly involved in approving a loan request from the person or business appearing before the governmental body or if the public official has been directly involved in approving a loan for that person or business within the past 12 months: Provided, That this limitation only applies if the total amount of the loan or loans exceeds fifteen thousand dollars.

(C)   A personnel matter involving the public official's spouse or relative;

(D)   The appropriations of public moneys or the awarding of a contract to a nonprofit corporation if the public official or an immediate family member is employed by the nonprofit.

2   A public official may vote:

(A)   If the public official, his or her spouse, immediate family members or relatives or business with which they are associated are affected as a member of, and to no greater extent than any other member of a

**West Virginia Investment Management Board**
*Investment Policy Statement*

      profession, occupation, class of persons or class of businesses. A class shall consist of not fewer than five similarly situated persons or businesses; or

  (B)  If the matter affects a publicly traded company when:

    (i)  The public official, or dependent family members individually or jointly own less than five percent of the issued stock in the publicly traded company and the value of the stocks individually or jointly owned is less than ten thousand dollars; and

    (ii)  Prior to casting a vote the public official discloses his or her interest in the publicly traded company.

3  For a public official's recusal to be effective, it is necessary to excuse him or herself from participating in the discussion and decision-making process by physically removing him or herself from the room during the period, fully disclosing his or her interests, and recusing him or herself from voting on the issue.

**K.  *Limitations on participation in licensing and rate-making proceedings.***

No public official or employee may participate within the scope of his or her duties as a public official or employee, except through ministerial functions as defined in section three [§6B-1-3], article one of this chapter, in any license or rate-making proceeding that directly affects the license or rates of any person, partnership, trust, business trust, corporation or association in which the public official or employee or his or her immediate family owns or controls more than ten percent. No public official or public employee may participate within the scope of his or her duties as a public official or public employee, except through ministerial functions as defined in section three, article one of this chapter, in any license or rate-making proceeding that directly affects the license or rates of any person to whom the public official or public employee or his or her immediate family, or a partnership, trust, business trust, corporation or association of which the public official or employee, or his or her immediate family, owns or controls more than ten percent, has sold goods or services totaling more than one thousand dollars during the preceding year, unless the public official or public employee has filed a written statement acknowledging such sale with the public agency and the statement is entered in any public record of the agency's proceedings. This subsection shall not be construed to require the disclosure of clients of attorneys or of patients or clients of persons licensed pursuant to article three [§30-3-1 et seq.], eight [§30-8-1 et seq.], fourteen [§30-14-1 et seq.], fourteen-a [§30-14A-1 et seq.], fifteen [§30-15-1 et seq.], sixteen [§30-16-1 et seq.], twenty [§30-20-1 et seq.], twenty-one [§30-21-1 et seq.] or thirty-one [§30-31-1 et seq.], chapter thirty of this code.

**L.  *Certain compensation prohibited.***

1  A public employee may not receive additional compensation from another publicly-funded state, county or municipal office or employment for working the same hours, unless:

**West Virginia Investment Management Board**
*Investment Policy Statement*

(A)    The public employee's compensation from one public employer is reduced by the amount of compensation received from the other public employer;

(B)    The public employee's compensation from one public employer is reduced on a pro rata basis for any work time missed to perform duties for the other public employer;

(C)    The public employee uses earned paid vacation, personal or compensatory time or takes unpaid leave from his or her public employment to perform the duties of another public office or employment; or

(D)    A part-time public employee who does not have regularly scheduled work hours or a public employee who is authorized by one public employer to make up, outside of regularly scheduled work hours, time missed to perform the duties of another public office or employment maintains time records, verified by the public employee and his or her immediate supervisor at least once every pay period, showing the hours that the public employee did, in fact, work for each public employer. The public employer shall submit these time records to the Ethics Commission on a quarterly basis.

2    This section does not prohibit a retired public official or public employee from receiving compensation from a publicly-funded office or employment in addition to any retirement benefits to which the retired public official or public employee is entitled.

**M.** *Certain expenses prohibited.*

No public official or public employee shall knowingly request or accept from any governmental entity compensation or reimbursement for any expenses actually paid by a lobbyist and required by the provisions of this chapter to be reported, or actually paid by any other person.

**N.**    Any person who is employed as a member of the faculty or staff of a public institution of higher education and who is engaged in teaching, research, consulting or publication activities in his or her field of expertise with public or private entities and thereby derives private benefits from such activities shall be exempt from the prohibitions contained in subsections (b), (c) and (d) of this section when the activity is approved as a part of an employment contract with the governing board of the institution or has been approved by the employee's department supervisor or the president of the institution by which the faculty or staff member is employed.

**West Virginia Investment Management Board**
*Investment Policy Statement*

**O.** Except as provided in this section, a person who is a public official or public employee may
not solicit private business from a subordinate public official or public employee whom he or
she has the authority to direct, supervise or control. A person who is a public official or
public employee may solicit private business from a subordinate public official or public
employee whom he or she has the authority to direct, supervise or control when:

   (A)   The solicitation is a general solicitation directed to the public at large through the
          mailing or other means of distribution of a letter, pamphlet, handbill, circular or
          other written or printed media; or

   (B)   The solicitation is limited to the posting of a notice in a communal work area; or

   (C)   The solicitation is for the sale of property of a kind that the person is not regularly
          engaged in selling; or

   (D)   The solicitation is made at the location of a private business owned or operated by
          the person to which the subordinate public official or public employee has come on
          his or her own initiative.

**P.** The commission may, by legislative rule promulgated in accordance with chapter twenty-
nine-a [§29A-1-1 et seq.] of this code, define further exemptions from this section as
necessary or appropriate.

# ARTICLE 2.
# DEPARTMENT OF REVENUE
# STATE BUDGET OFFICE.

### §11B-2-20. Reduction of appropriations; powers of Governor; Re-venue Shortfall Reserve Fund and permissible expenditures therefrom.

(a)  Notwithstanding any provision of this section, the Governor may reduce appropriations according to any of the methods set forth in sections twenty-one [§ 11B-2-21] and twenty-two [§ 11B-2-22] of this article. The Governor may, in lieu of imposing a reduction in appropriations, request an appropriation by the Legislature from the Revenue Shortfall Reserve Fund established in this section.

(b)  A Revenue Shortfall Reserve Fund is hereby continued within the State Treasury. The Revenue Shortfall Reserve Fund shall be funded as set forth in this subsection from surplus revenues, if any, in the State Fund, General Revenue, as the surplus revenues may accrue from time to time. Within sixty days of the end of each fiscal year, the secretary shall cause to be deposited into the Revenue Shortfall Reserve Fund the first fifty percent of all surplus revenues, if any, determined to have accrued during the fiscal year just ended. The Revenue Shortfall Reserve Fund shall be funded continuously and on a revolving basis in accordance with this subsection up to an aggregate amount not to exceed ten percent of the total appropriations from the State Fund, General Revenue, for the fiscal year just ended. If at the end of any fiscal year the Revenue Shortfall Reserve Fund is funded at an amount equal to or exceeding ten percent of the State's General Revenue Fund budget for the fiscal year just ended, then there shall be no further obligation of the secretary under the provisions of this section to apply any surplus revenues as set forth in this subsection until that time the Revenue Shortfall Reserve Fund balance is less than ten percent of the total appropriations from the state fund, general revenue.

(c)  Not earlier than the first day of November of each calendar year, if the state's fiscal circumstances are such as to otherwise trigger the authority of the Governor to reduce appropriations under this section or section twenty-one [§ 11B-2-21] or section twenty-two [§ 11B-2-22] of this article, then in that event the Governor may notify the presiding officers of both houses of the Legislature in writing of his or her intention to convene the Legislature pursuant to section nineteen, article VI of the Constitution of West Virginia for the purpose of requesting the introduction of a supplementary appropriation bill or to request a supplementary appropriation bill at the next preceding regular session of the Legislature to draw money from the surplus Revenue Shortfall Reserve Fund to meet any anticipated revenue shortfall. If the Legislature fails to enact a supplementary appropriation from the Revenue Shortfall Reserve Fund during any special legislative session called for the purposes set forth in this section or during the next preceding regular session of the Legislature, then the Governor may proceed with a reduction of appropriations pursuant to sections twenty-one and twenty-two of this article. Should any amount drawn from the Revenue Shortfall Reserve Fund pursuant to an appropriation made by the Legislature prove insufficient to address any anticipated shortfall, then the Governor may also proceed with a reduction of appropriations pursuant to sections twenty-one and twenty-two of this article.

(d)  Upon the creation of the fund, the Legislature is authorized and may make an appropriation from the Revenue Shortfall Reserve Fund for revenue shortfalls, for emergency

revenue needs caused by acts of God or natural disasters or for other fiscal needs as determined solely by the Legislature.

(e)   Prior to the thirty-first day of October, in any fiscal year in which revenues are inadequate to make timely payments of the state's obligations, the Governor may by executive order, after first notifying the presiding officers of both houses of the Legislature in writing, borrow funds from the Revenue Shortfall Reserve Fund. The amount of funds borrowed under this subsection shall not exceed one and one-half percent of the general revenue estimate for the fiscal year in which the funds are to be borrowed, or the amount the Governor determines is necessary to make timely payment of the state's obligations, whichever is less. Any funds borrowed pursuant to this subsection shall be repaid, without interest, and redeposited to the credit of the Revenue Shortfall Reserve Fund within ninety days of their withdrawal.

(f)   There is hereby created in the State Treasury the "Revenue Shortfall Reserve Fund - Part B." The Revenue Shortfall Reserve Fund - Part B shall consist of moneys transferred from the West Virginia Tobacco Settlement Medical Trust Fund pursuant to the provisions of section two [§ 4-11A-2], article eleven-a, chapter four of this code, repayments made of the loan from the West Virginia Tobacco Settlement Medical Trust Fund to the physician's mutual insurance company pursuant to the provisions of article twenty-f [§§ 33-20F-1 et seq.], chapter thirty-three of this code, and all interest and other return earned on the moneys in the Revenue Shortfall Reserve Fund - Part B. Moneys in the Revenue Shortfall Reserve Fund - Part B may be expended solely for the purposes set forth in subsection (d) of this section, subject to the following conditions:

(1)   No moneys in the Revenue Shortfall Reserve Fund - Part B nor any interest or other return earned thereon may be expended for any purpose unless all moneys in the Revenue Shortfall Reserve Fund described in subsection (b) of this section have first been expended, except that the interest or other return earned on moneys in the Revenue Shortfall Reserve Fund - Part B may be expended as provided in subdivision (2) of this subsection; and

(2)   Notwithstanding any other provision of this section to the contrary, the Legislature may appropriate any interest and other return earned thereon that may accrue on the moneys in the Revenue Shortfall Reserve Fund - Part B after the thirtieth day of June, two thousand twenty-five, for expenditure for the purposes set forth in section three [§ 4-11A-3], article eleven-a, chapter four of this code; and

(3)   Any appropriation made from Revenue Shortfall Reserve Fund - Part B shall be made only in instances of revenue shortfalls or fiscal emergencies of an extraordinary nature.

(g)   Subject to the conditions upon expenditures from the Revenue Shortfall Reserve Fund - Part B prescribed in subsection (f) of this section, in appropriating moneys pursuant to the provisions of this section, the Legislature may in any fiscal year appropriate from the Revenue Shortfall Reserve Fund and the Revenue Shortfall Reserve Fund - Part B a total amount up to, but not exceeding, ten percent of the total appropriations from the State Fund, General Revenue, for the fiscal year just ended.

(h)   (1) Of the moneys in the Revenue Shortfall Reserve Fund, one hundred million dollars, or such greater amount as may be certified as necessary by the director of the budget for the purposes of subsection (e) of this section, shall be made available to the West Virginia Board of Treasury Investments for management and investment of the moneys in accordance with the provisions of article six-c [§§ 12-6C-1 et seq.], chapter twelve of this code. All other moneys in the Revenue Shortfall Reserve Fund shall be made available to the West Virginia Investment Management Board for management and investment of the moneys in accordance with the

provisions of article six [§§ 12-6-1 et seq.], chapter twelve of this code. Any balance of the Revenue Shortfall Reserve Fund including accrued interest and other return earned thereon at the end of any fiscal year shall not revert to the general fund but shall remain in the Revenue Shortfall Reserve Fund for the purposes set forth in this section.

(2)    All of the moneys in the Revenue Shortfall Reserve Fund - Part B shall be made available to the West Virginia Investment Management Board for management and investment of the moneys in accordance with the provisions of article six [§§ 12-6-1 et seq.], chapter twelve of this code. Any balance of the Revenue Shortfall Reserve Fund - Part B, including accrued interest and other return earned thereon at the end of any fiscal year, shall not revert to the general fund but shall remain in the Revenue Shortfall Reserve Fund - Part B for the purposes set forth in this section.

History

History. 2004, c. 239; 2006, c. 194.

Annotations

Effect of amendment of 2006. — Acts 2006, c. 194, effective June 9, 2006, substituted "ten percent" for "five percent" in three places in (b); added (f), (g), and (h); and made minor stylistic changes.

# ARTICLE 6.
# WEST VIRGINIA INVESTMENT MANAGEMENT BOARD

### §12-6-1.  Purposes and objects; how article cited.

This article, which may be cited as the "West Virginia Investment Management Act", is enacted to modernize the procedures for the investment of funds of the state and its political subdivisions for the purpose of increasing the investment return of those funds.
[1967, c. 162; 1978, c. 58; 1997, c. 95.]

### §12-6-1a.  Legislative findings.

(a) The Legislature hereby finds and declares that all the public employees covered by the Public Employees Retirement System, the Teachers Retirement System, the West Virginia State Police Retirement System, the Death, Disability and Retirement Fund of the Division of Public Safety, the Judges' Retirement System and the Deputy Sheriffs Retirement System should benefit from a prudent and conscientious staff of financial professionals dedicated to the administration, investment and management of those employees and employers financial contributions and that an independent board and staff should be immune to changing political climates and should provide a stable and continuous source of professional financial investment and management.

(b) The Legislature finds and declares that teachers and other public employees throughout the state are experiencing economic difficulty and that in order to reduce this economic hardship on these dedicated public employees and to help foster sound financial practices, the West Virginia Investment Management Board may develop, implement and maintain an efficient and modern system for the investment and management of the state's money, except those moneys managed in accordance with article six-c [§§ 12-6C-1 et seq.] of this chapter. The Legislature further finds that in order to implement these sound fiscal policies, the West Virginia Investment Management Board shall operate as an independent board with its own full-time staff of financial professionals, immune to changing political climates, in order to provide a stable and continuous source of professional financial management.

(c) The Legislature hereby finds and declares further that experience has demonstrated that prudent investment provides diversification and beneficial return not only for public employees but for all citizens of the state and that in order to have access to this sound fiscal policy, public employee and employer contributions to the 401(a) plans are declared to be made to an irrevocable trust on behalf of each plan, available for no use or purpose other than for the benefit of those public employees.

(d) The Legislature hereby finds and declares further that the Workers' Compensation Fund and Coal-Workers' Pneumoconiosis Fund are trust funds to be used exclusively for those workers, miners and their beneficiaries who have sacrificed their health in the performance of their jobs and further finds that the assets available to pay awarded benefits should be prudently invested so that awards may be paid.

(e) The Legislature hereby finds and declares further that an independent public body corporate with appropriate governance is the best means of assuring prudent financial management of these funds under rapidly changing market conditions and regulations.

(f) The Legislature hereby finds and declares further that in accomplishing this purpose, the West Virginia Investment Management Board, created and established by this article, is acting in all respects for the benefit of the state's public employees and ultimately the citizens of the state and the West Virginia Investment Management Board may act as trustee of the irrevocable trusts created by this article and to manage and invest other state funds.

(g) The Legislature hereby finds and declares further that the standard of care and prudence applied to trustees, the conduct of the affairs of the irrevocable trusts created by this article and the investment of other state funds is intended to be that applied to the investment of funds as described in the "Uniform Prudent Investor Act" codified as article six-c [§§ 44-6C-1 et seq.], chapter forty-four of this code and as described in section eleven [§ 12-6-11] of this article.

(h) The Legislature further finds and declares that the West Virginia Supreme Court of Appeals declared the West Virginia Trust Fund Act unconstitutional in its decision rendered on the twenty-eighth day of March, one thousand nine hundred ninety-seven, to the extent that it authorized investments in corporate stock, but the court also recognized that there were other permissible constitutional purposes of the West Virginia Trust Fund Act and that it is the role of the Legislature to determine those purposes consistent with the court's decision and the Constitution of West Virginia.

(i) The Legislature hereby further finds and declares that it is in the best interests of the state and its citizens to create a new investment management board in order to: (1) Be in full compliance with the provisions of the Constitution of West Virginia; and (2) protect all existing legal and equitable rights of persons who have entered into contractual relationships with the West Virginia Board of Investments and the West Virginia Trust Fund.

[1990, 3rd Ex. Sess., c. 5; 1997, c. 95; 2001, c. 171; 2005, c. 190.]


## §12-6-2.  Definitions.

As used in this article, unless a different meaning clearly appears from the context:

(1)  Beneficiaries means those individuals entitled to benefits from the participant plans;

(2)  Board means the governing body for the West Virginia Investment Management Board and any reference elsewhere in this code to board of investments or West Virginia Trust Fund means the board as defined in this subdivision;

(3)  401(a) plan means a plan which is described in section 401(a) of the Internal Revenue Code of 1986, as amended, and with respect to which the board has been designated to hold assets of the plan in trust pursuant to the provisions of section nine-a [ 12-6-9a] of this article;

(4)  Local government funds means the moneys of a political subdivision, including policemen's pension and relief funds, firemen's pension and relief funds and volunteer fire departments, transferred to the board for deposit;

(5)  Participant plan means any plan or fund subject now or hereafter to subsection (a), section nine-a [ 12-6-9a] of this article;

(6)  Political subdivision means and includes a county, municipality or any agency, authority, board, county board of education, commission or instrumentality of a county or municipality and regional councils created pursuant to the provisions of section five [ 8-25-5], article twenty-five, chapter eight of this code;

(7)  Trustee means any member serving on the West Virginia Investment Management Board: Provided, That in section nine-a [ 12-6-9a] of this article in which the terms of the trusts are set forth, trustee means the West Virginia Investment Management Board;

(8)  Securities means all bonds, notes, debentures or other evidences of indebtedness and other lawful investment instruments; and

(9)  State funds means all moneys of the state which may be lawfully invested except the school fund established by section four, article XII of the state constitution.

**History.** 1967, c. 162; 1978, c. 58; 1979, c. 65; 1981, cc. 135, 167; 1983, c. 123; 1990, 3rd Ex. Sess., c. 8; 1996, c. 258; 1997, c. 95; 1998, c. 89; 2001, c. 171; 2007, c. 209.

### §12-6-3. West Virginia investment management board continued; body corporate; trust fund board; trustees; nomination and appointment of trustees, qualifications and terms of appointment, advice and consent; annual and meetings; designation of representatives and committees; board meetings with committees regarding investment policy statement required; open meetings, qualifications.

(a)  There is hereby continued the West Virginia investment management board. The board is created as a public body corporate and established to provide prudent fiscal administration, investment and management for the funds of the participant plans and any other funds managed by the board.

(b)  The board shall be governed by a board of trustees, consisting of thirteen members:

(1)  Nominations made to the West Virginia trust fund board and the West Virginia board of investments shall remain in effect and are hereby specifically reauthorized and those members shall be members of the investment management board and shall serve out the remainder of their respective terms subject to the advice and consent of the Senate: Provided, That prior appointments which have been confirmed by the Senate are hereby specifically reauthorized without further action of the Senate.

(2)  Any appointment is effective immediately upon appointment by the governor with respect to voting, constituting a quorum, receiving compensation and expenses and all other rights and privileges of the trustee position. All appointees shall have experience in pension management, institutional management or financial markets and one trustee shall be an attorney experienced in finance and investment matters and one trustee shall be a certified public accountant.

(3)  The governor, the state auditor and the state treasurer or their designees shall serve as members of the board. They shall serve by virtue of their office and are not entitled to compensation under the provisions of this article. The governor, the auditor and the treasurer or their designees are subject to all duties, responsibilities and requirements of the provisions of this article, including, but not limited to, the provisions of subsections (e) and (f), section four [§ 12-6-4] of this article.

(c)  At the end of each trustee's term, the governor may reappoint or appoint a successor who

shall serve for a term ending on the thirty-first day of January in the sixth year following the year of his or her appointment: Provided, That for all terms ending in the year two thousand one, two appointments shall be for two-year terms; two appointments shall be for three-year terms; one shall be for a four-year term; and two shall be for six-year terms. Except for vacancy appointments made pursuant to subsection (d) of this section, all subsequent appointments shall be for terms ending on the thirty-first day of January in the sixth year following the year of appointment. No more than six of the ten appointed trustees may belong to the same political party.

(d) In the event of a vacancy among the trustees, an appointment shall be made by the governor to fill the unexpired term.

(e) The governor may remove any trustee, other than trustees who serve by virtue of their elective office, in case of gross negligence or misfeasance and may declare that position vacant and may appoint a person for the vacancy as provided in subsection (d) of this section.

(f) Each trustee, other than those enumerated in subsection (b), subdivision (3) of this section, is entitled to receive and, at the trustee's option, the board shall pay to the trustee compensation in the amount of five thousand dollars per year and additional compensation in the amount of five hundred dollars per meeting attended by the trustee in excess of the four quarterly meetings required by this section. In addition, all trustees shall receive reasonable and necessary expenses actually incurred in discharging trustee duties pursuant to this article.

(g) The board shall meet quarterly and may include in the bylaws procedures for the calling and holding of additional meetings. For any quarterly or additional meeting in which the board shall review or modify its securities list or its investment objectives pursuant to subsection (f), section twelve [§ 12-6-12] of this article, the board shall give ten days' notice in writing to the designated representative of each participant plan selected pursuant to subdivision (1), subsection (i) of this section and the meeting shall be open to the members and beneficiaries of the participant plans for that portion of the meeting in which the board undertakes the review or modification.

(h) The board shall hold an annual meeting before the start of the fiscal year. The annual meeting may also serve as a quarterly meeting. The annual meeting shall be open to the public and the board shall receive oral and written comments from representatives, members and beneficiaries of the participant plans and from other citizens of the state. At the annual meeting, the board shall adopt a fee schedule and a budget reflecting fee structures for the year.

(i) Pursuant to subsection (j) of this section, the board shall meet with committees representing the participant plans to discuss the board's drafting, reviewing or modifying the written investment policy of the trust with respect to that committee's participant plan pursuant to section twelve of this article. Representatives and committees shall be designated as follows:

(1) The West Virginia consolidated public retirement board shall promulgate procedural rules by which each 401(a) plan for which the board is trustee, shall designate an individual representative of each 401(a) plan and the West Virginia workers' compensation commission shall promulgate procedural rules by which the pneumoconiosis fund and the workers' compensation fund shall designate an individual representative of each fund.

(2) On or before the first day of June of each year, the consolidated public retirement board shall submit in writing to the board the names of the six designated representatives of the 401(a) plans and the workers' compensation commission shall submit the names of the two representatives.

(3) Each designated representative shall provide to the board his or her current address, updated each year on or before the first day of July, to which address the board shall provide notice of meetings of the board pursuant to subsection (g) of this section.

(4) Each designated representative shall submit in writing to the board on or before the first day

of July of each year the names of no more than three persons comprising a committee representing the beneficiaries of that representative's participant plan.

(j) At its annual meeting, the board shall meet with each of the seven committees, formed pursuant to subdivision (1), subsection (i) of this section, for the purpose of receiving input from the committees regarding the board's drafting, reviewing or modifying its written investment policy statement for investment of the funds of the participant plans. In developing the investment policy statement, the trustees shall receive each committee's stated objectives and policies regarding the risk tolerances and return expectations of each participant plan, with attention to the factors enumerated in, section twelve of this article, in order to provide for the continuing financial security of the trusts and its participant plans. The board may meet with the committees or any of them at its quarterly and additional meetings for the same purpose.

(k) All meetings of the board shall be open to the representatives of the participant plans as appointed pursuant to subdivision (1), subsection (i) of this section. The representatives are subject to any rules, bylaws, guidelines, requirements and standards promulgated by the board. The representatives shall observe standards of decorum established by the board. The representatives are subject to the same code of conduct applicable to the trustees and are subject to all board rules and bylaws. The representatives are also subject to any requirements of confidentiality applicable to the trustees. Each representative is liable for any act which he or she undertakes which violates any rule, bylaw or statute governing ethical standards, confidentiality or other standard of conduct imposed upon the trustees or the representatives. Any meeting of the board may be closed, upon adoption of a motion by any trustee, when necessary to preserve the attorney-client privilege, to protect the privacy interests of individuals, to review personnel matters or to maintain confidentiality when confidentiality is in the best interest of the beneficiaries of the trusts.

[1967, c. 162; 1978, c. 58; 1989, c. 106; 1996, c. 258; 1997, c. 95; 1999, c. 147; 2001, c. 171.]

## §12-6-4. Management and control of fund; officers; staff; fiduciary or surety bonds for trustees; liability of trustees.

(a) The management and control of the board shall be vested solely in the trustees in accordance with the provisions of this article.

(b) The Governor shall be the chairman of the board and the trustees shall elect a vice chairman who may not be a constitutional officer or his or her designee to serve for a term of two years. Effective with any vacancy in the vice chairmanship, the board shall elect a vice chairman to a new two-year term. The vice chairman shall preside at all meetings in the absence of the chairman. Annually, the trustees shall elect a secretary, who need not be a member of the board, to keep a record of the proceedings of the board.

(c) The trustees shall appoint a chief executive officer of the board and shall fix his or her duties and compensation. The chief executive officer shall have five years' experience in investment management with public or private funds within the ten years next preceding the date of appointment. The chief executive officer additionally shall have academic degrees, professional designations and other investment management or investment oversight or institutional investment experience in a combination the trustees consider necessary to carry out the responsibilities of the chief executive officer position as defined by the trustees.

(d) The trustees shall retain an internal auditor to report directly to the trustees and shall fix his or her compensation. The internal auditor shall be a certified public accountant with at least three years' experience as an auditor. The internal auditor shall develop an internal audit plan, with board approval, for the testing of procedures and the security of transactions.

(e) The board shall procure and maintain in effect commercially customary property, liability, crime and other insurance to cover risks of loss from its operations. The types and amounts of the insurance coverages shall be determined by the board, from time to time, in its reasonable discretion, with reference to the types and amounts of insurance coverages purchased or maintained by other public institutions performing functions similar to those performed by the board: Provided, That the board shall purchase a blanket bond for the faithful performance of its duties in the amount of at least ten million dollars. The board may require that appropriate types and amounts of insurance be procured and maintained by, or a fiduciary or surety bond from a surety company qualified to do business in this state for, any person who has charge of, or access to, any securities, funds or other moneys held by the board and the amount of the fiduciary or surety bond shall be fixed by the board. The premiums payable on any insurance or fiduciary or surety bonds that the board may require, from time to time, shall be an expense of the board. In connection with the duties of the board under this subsection, the board may establish, fund and maintain a self-insurance account. If established, the board shall deposit and maintain moneys in the self-insurance account in amounts as may be determined by the board in consultation with one or more qualified insurance or actuarial consultants, and all moneys in any self-insurance account may be used only for the purpose of providing self-insurance, establishing reserves in connection with insurance deductibles, self-insured retentions or self-insurance, or helping to defray the costs of insurance procured under this subsection, and for no other purpose. The board may procure any and all insurance coverages and bonds deemed appropriate by the board or required by the provisions of this article, either through the state Board of Risk and Insurance Management or in the commercial markets, in the discretion of the board.

(f) The trustees and employees of the board are not liable personally, either jointly or severally, for any debt or obligation created by the board: Provided, That the trustees and employees of the board are liable for acts of misfeasance or gross negligence.

(g) The board is exempt from the provisions of sections seven [§12-3-7] and eleven [§ 12-3-11], article three of this chapter and article three [§ 5A-3-1 et seq.], chapter five-a of this code: Provided, That the trustees and employees of the board are subject to purchasing policies and procedures which shall be promulgated by the board. The purchasing policies and procedures may be promulgated as emergency rules pursuant to section fifteen [§ 29A-3-15], article three, chapter twenty-nine-a of this code.

(h) Any employee of the West Virginia Trust Fund who previously was an employee of another state agency may return to the Public Employees Retirement System pursuant to section eighteen [§ 5-10-18], article ten, chapter five of this code and may elect to either: (1) Transfer to the Public Employees Retirement System his or her employee contributions, with accrued interest and, if vested, his or her employer contributions, with accrued interest and retain as credited state service all time served as an employee of the West Virginia Trust Fund; or (2) retain all employee contributions with accrued interest and, if vested, his or her employer contributions with interest and forfeit all service credit for the time served as an employee of the West Virginia Trust Fund.

**History.** 1967, c. 162; 1978, c. 58; 1989, c. 106; 1990, c. 181; 1990, 3rd Ex. Sess., c. 5; 1997, c. 95; 2001, c. 171; 2007, c. 209.

### §12-6-5a.  Legislative findings and limitation on certain board actions.

(a) The Legislature hereby finds and declares that, during the period beginning the first day of August, one thousand nine hundred eighty-four, and ending on the thirty-first day of January, one thousand nine hundred eighty-nine, certain overapportionments or overpayments of interest earnings were made by the board of investments to local government participants in the consolidated investment fund local government account.

The Legislature also finds and declares that said participants were not at fault for any losses incurred by the consolidated fund during the aforesaid period, and that the participants were justified in accepting and using the overapportionments or overpayments of interest earnings credited to their accounts.

The Legislature further finds and declares that attempts by the board of investments, the state or any other state officer or agency to recover the overapportionments or overpayments would harm the public good and create economic hardship for local governments, and, therefore, said overapportionments or overpayments ought not to be subject to recovery by the board or any other state officer or agency.

(b) Neither the state, the board of investments nor any other state officer or agency may expend any funds or permit any personnel to seek, or attempt to recover, from participants in the consolidated fund local government account any moneys received by such participants solely as a result of erroneous allocation of interest earnings to the participants' account during the period of time beginning the first day of August, one thousand nine hundred eighty-four, and ending on the thirty-first day of January, one thousand nine hundred eighty-nine, unless authorized to do so by enactment of a separate and specific statute.

(c) This section shall not apply to any attempt by the board; the state or any other state officer or agency to recover moneys due for any other reason.

[1990, c. 34.]

### § 12-6-6.  Annual audits; reports and information to constitutional and legislative officers, council of finance and administration, consolidated public retirement board, workers' compensation fund and coal-workers' pneumoconiosis fund; statements and reports open for inspection.

(a) The board shall cause an annual financial and compliance audit of the assets managed by the board to be made by a certified public accounting firm which has a minimum staff of ten certified public accountants and which is a member of the American institute of certified public accountants and, if doing business in West Virginia, a member of the West Virginia society of certified public accountants. The financial and compliance audit shall be made of the board's books, accounts and records with respect to its receipts, disbursements, investments, contracts and all other matters relating to its financial operations. Copies of the audit report shall be furnished to the governor, state treasurer, state auditor, president of the Senate, speaker of the House of Delegates, council of finance and administration and consolidated public retirement board.

(b) The board shall produce monthly financial statements for the assets managed by the board and cause them to be delivered to each member of the board and the executive secretary of the consolidated public retirement board as established in sections one [§ 5-10D-1] and two [§ 5-10D-2], article ten-d, chapter five of this code and to the executive director of the workers' compensation commission as administrator of the workers' compensation fund and coal-workers' pneumoconiosis fund as provided in section one-b [§ 23-1-1b], article one, chapter twenty-three of this code and section one [§ 23-3-1], article three of said chapter and section seven [§ 23-4B-7], article four-b of said chapter.

(c) The board shall deliver in each quarter to the council of finance and administration and the consolidated public retirement board a report detailing the investment performance of the 401(a) plans.

(d) The board shall cause an annual audit of the reported returns of the assets managed by the board to be made by an investment consulting or a certified public accounting firm meeting the criteria set out in subsection (a) of this section. The board shall furnish copies of the audit report to the governor, state treasurer, state auditor, president of the Senate, speaker of the House of Delegates, council of finance and administration and consolidated public retirement board.

(e) The board shall provide any other information requested in writing by the council of finance and administration.

(f) All statements and reports with respect to participant plans required in this section shall be available for inspection by the members and beneficiaries and designated representatives of the participant plans.

[1997, c. 95; 1999, c. 148; 2001, c. 171; 2003, 2nd Ex. Sess., c. 27.]


## §12-6-7. Legal status of agencies and boards continued.

Except as otherwise provided in this article, every state agency or board shall continue to have all of the powers and shall exercise all of the functions and duties vested in or imposed upon it by law, as to any fund, and shall continue to be constituted as provided by existing law.

[1967, c. 162; 1978, c. 58.]


## §12-6-8. Investment funds established; management thereof.

(a) There is continued a special investment fund designated as the Consolidated Fund. Effective the thirtieth day of June, two thousand five, the power and authority of the Board as to the consolidated fund terminates. On the first day of July, two thousand five, the Board shall transfer the consolidated fund, all moneys, obligations, assets, securities and other investments of the consolidated fund and all records, properties and any other document or item pertaining to the consolidated fund in its possession or under its control to the West Virginia Board of Treasury Investments established in article six-c [§§ 12-6C-1 et seq.] of this chapter.

(b) Each board, commission, department, official or agency charged with the administration of state funds may request the State Treasurer to make moneys available to the Board for investment.

(c) Each political subdivision of this state through its treasurer or equivalent financial officer may enter into agreements with the State Treasurer for the investment of moneys of the political subdivision. Any political subdivision may enter into an agreement with a state spending unit from which it receives funds to request transfer of the funds to their investment account with the

Investment Management Board or the West Virginia Board of Treasury Investments.

(d) Moneys held in the various funds and accounts administered by the Board shall be invested as permitted by this article and subject to the restrictions contained in this article. The Board shall report the earnings on the various funds under management to the State Treasurer at the times determined by the State Treasurer. The Board shall also establish rules for the administration of the various funds and accounts established by this section as it considers necessary for the administration of the funds and accounts, including, but not limited to: (1) The specification of amounts which may be deposited in any fund or account and minimum periods of time for which deposits will be retained; and (2) creation of reserves for losses: Provided, That in the event any moneys made available to the Board may not lawfully be combined for investment or deposited in the consolidated funds established by this section, the Board may create special accounts and may administer and invest those moneys in accordance with the restrictions specially applicable to those moneys.

(e) Notwithstanding any provision of this code to the contrary, the funds, pools and securities maintained or invested in by the board in accordance with this article are authorized investments for all local government funds.

[1978, c. 58; 1983, c. 123; 1996, c. 258; 1997, c. 95; 2001, c. 171; 2005, c. 190; 2008, c. 183.]

## §12-6-9. Fees for service.

The board may charge fees, which may be subtracted from the total return, for the reasonable and necessary expenses incurred by the investment management board in rendering services. All fees which are dedicated or identified or readily identifiable to an entity, plan or fund shall be charged to that entity, plan or fund and all other fees shall be charged as a percentage of assets under management. At its annual meeting, the board shall adopt a fee schedule and a budget reflecting fee structures.
[1997, c. 95; 2001, c. 171.]

## §12-6-9a. Trust indenture.

The provisions of the trust indenture entered into by the governor on the first day of July, one thousand nine hundred ninety-six, with the West Virginia trust fund, inc., acting as the trustee, are superseded by the following provisions:

(a) The board shall continue to hold each of the participant plans specified by this article in a separate irrevocable trust as trustee pursuant to the terms and provisions set forth in this section and with the earnings and losses accounted for and charged individually to each participant plan and trust: Provided: That the board shall be authorized to invest the assets held in each participant plan in any investment fund even though the board may also invest non-401(a) moneys in the investment fund. Participant plans, each declared by this section to be held in a separate irrevocable trust, include, but are not limited to, the following and any other plans that may be added to this section or otherwise designated by the Legislature from time to time:

(1) The public employees' retirement system;

(2) The teachers' retirement system;

(3) The West Virginia state police retirement system;

(4) The death, disability and retirement fund of the division of public safety;

(5) The judges' retirement system;

(6) The deputy sheriffs' retirement system;

(7) The pneumoconiosis fund;

(8) The workers' compensation fund; and

(9) The wildlife endowment fund.

(b) The Legislature hereby reserves the following rights and powers:

(1) The right by supplemental agreement to amend, modify or alter the terms of the trusts established by this section without consent of the trustee, or any beneficiary, except that no amendment to a trust which holds any 401(a) plan moneys may be made which allows at any time for any part of the corpus or income (other than the part that is required to pay taxes and administration expenses) to be used for, or diverted to, purposes other than for the exclusive benefit of the employees or their beneficiaries in accordance with the requirements of section 401(a) (2) [26 USCS § 401] of the Internal Revenue Code, as it may be amended from time to time; and

(2) The right to request and receive additional information from the trustee at any time.

(c) In the administration of the trusts created by this article, the trustee has the following powers:

(1) To purchase, retain, hold, transfer and exchange and to sell, at public or private sale, the whole or any part of the trust estate upon such terms and conditions as it considers advisable;

(2) To invest and reinvest the trust estate or any part of the trust estate, in any kind of property, real or personal, including, but not limited to, mortgage or mortgage participations, common stocks, preferred stocks, common trust funds, investment funds established by the board, bonds, notes or other securities, notwithstanding the provisions of articles five and six [§§ 44-5-1 et seq. and 44-6-1 et seq.], chapter forty-four of this code;

(3) To carry the securities and other property held in trust either in the name of the trustee or in the name of its nominee;

(4) To vote, in person or by proxy, all securities held in trust, to join in or to dissent from and oppose the reorganization, recapitalization, consolidation, merger, liquidation or sale of corporations or property; to exchange securities for other securities issued in connection with or resulting from any transaction; to pay any assessment or expense which the trustee considers advisable for the protection of its interest as holder of the securities; to deposit securities in any voting trust or with any protective or like committee or with a trustee depository; to exercise any option    appurtenant to any securities for the conversion of any securities into other securities; and to exercise or sell any rights issued upon or with respect to the securities of any corporation, all upon terms the trustee considers advisable;

(5) To prosecute, defend, compromise, arbitrate or otherwise adjust or settle claims in favor of or against the trustee or other trust estate;

(6) To employ and pay from the trusts legal and investment counsel, brokers and any other assistants and agents the trustee considers advisable; and

(7) To develop, implement and modify an asset allocation plan for each participant plan. The asset allocation plans shall be implemented within the management and investment of the individual trusts.

(d) All trust income shall be free from anticipation, alienation, assignment or pledge by, and free from attachment, execution, appropriation or control by or on behalf of, any and all creditors of any beneficiary by any proceeding at law, in equity, in bankruptcy or insolvency.

(e) Notwithstanding any other provision of this article, in the case of a trust which holds any 401(a) plan's money, it is impermissible at any time for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than the exclusive benefit of the employees and their beneficiaries in accordance with the requirements of section 401(a) (2) [26 USCS § 401] of the Internal Revenue Code, as it may be amended from time to time.

(f) The trustee may receive any other property, real or personal, tangible or intangible, of any kind whatsoever, that may be granted, conveyed, assigned, transferred, devised, bequeathed or made payable to the applicable trust and all the properties shall be held, managed, invested and administered by the trustee as provided in this article.

(g) The trustee shall promptly cause to be paid to the state from the applicable trust the amounts certified by the governor as necessary for the monthly payment of benefits to the beneficiaries of the trust.

(h) The trustee shall render an annual accounting to the governor not more than one hundred twenty days following the close of the fiscal year of each trust.

(i) No trust shall be invalid by reason of any existing law or rule against perpetuities or against accumulations or against restraints upon the power of alienation, but each trust shall continue for the time necessary to accomplish the purposes for which it is established.
[1997, c. 95; 1999, c. 147; 2001, c. 171.]


**§12-6-9b.**

Repealed.
Acts, 1996 Reg. Sess., Ch. 258.

## §12-6-9c. Authorization of additional investments.

Notwithstanding the restrictions which may otherwise be provided by law with respect to the investment of funds, all administrators, custodians or trustees of pension funds other than the board, each political subdivision of this state and each county board of education may invest funds in the securities of or any other interest in any investment company or investment trust registered under the Investment Company Act of 1940, 15 U. S. C. 80a, the portfolio of which is limited: (i) To obligations issued by or guaranteed as to the payment of both principal and interest by the United States of America or its agencies or instrumentalities; and (ii) to repurchase agreements fully collateralized by obligations of the United States government or its agencies or instrumentalities: Provided, That the investment company or investment trust takes delivery of the collateral either directly or through an authorized custodian: Provided, however, That the investment company or investment trust is rated within one of the top two rating categories of any nationally recognized rating service such as Moody's or Standard & Poor's.

**History.** 1989, c. 106; 1990, c. 181; 1994, c. 81; 1997, c. 95; 2007, c. 209.

**§12-6-9d.**
    Repealed.
Acts, 1996 Reg. Sess., Ch. 258.

### §12-6-9e.  Legislative findings; loans for industrial development; availability of funds and interest rates.

    (a) The Legislature hereby finds and declares that the citizens of the state benefit from the creation of jobs and businesses within the state; that a business and industrial development loan program provides for economic growth and stimulation within the state; that loans from pools established in the consolidated fund will assist in providing the needed capital to assist business and industrial development; and that time constraints relating to business and industrial development projects prohibit duplicative review by both the board and the West Virginia economic development authority board. The Legislature further finds and declares that an investment in the West Virginia enterprise capital fund, LLC, of moneys in the consolidated fund as hereinafter provided will assist in creating jobs and businesses within the state and providing the needed risk capital to assist business and industrial development. This section is enacted in view of these findings.

    (b) The board shall make available, subject to cash availability, in the form of a revolving loan, up to one hundred seventy-five million dollars from the consolidated fund to loan the West Virginia economic development authority for business or industrial development projects authorized by section seven [§ 31-15-7], article fifteen, chapter thirty-one of this code and to consolidate existing loans authorized to be made to the West Virginia economic development authority pursuant to this section and pursuant to section twenty [§ 31-15-20], article fifteen, chapter thirty-one of this code which authorizes a one hundred fifty million dollar revolving loan, and article eighteen-b [§§ 31-18B-1 et seq.], chapter thirty-one of this code which authorizes a fifty million dollar investment pool: Provided, That the West Virginia economic development authority may not loan more than fifteen million dollars for any one business or industrial development project. The revolving loan authorized by this subsection must be secured by one note at a variable interest rate equal to the twelve-month average of the board's yield on its cash liquidity pool. The rate must be set on the first day of July and the rate must be adjusted annually on the same date. The maximum annual adjustment may not exceed one percent. Monthly payments made by the West Virginia economic development authority to the board must be calculated on a one hundred twenty-month amortization. The revolving loan must be secured by a security interest that pledges and assigns the cash proceeds of collateral from all loans under this revolving loan pool. The West Virginia economic development authority may also pledge as collateral certain revenue streams from other revolving loan pools which source of funds does not originate from federal sources or from the board.

The outstanding principal balance of the revolving loan from the board to the West Virginia economic development authority may at no time exceed one hundred three percent of the aggregate outstanding principal balance of the business and industrial loans from the West Virginia economic development authority to economic development projects funded from this revolving loan pool. This

provision must be certified annually by an independent audit of the West Virginia economic development authority financial records.

(c) The interest rates and maturity dates on the loans made by the West Virginia economic development authority for business and industrial development projects authorized by section seven [§ 31-15-7], article fifteen, chapter thirty-one of this code must be at competitive rates and maturities as determined by the West Virginia economic development authority board.

(d) Any and all outstanding loans made by the board, or any predecessor entity, to the West Virginia economic development authority must be refunded by proceeds of the revolving loan contained in this section and no loans may be made hereafter by the board to the West Virginia economic development authority pursuant to section twenty [§ 31-15-20], article fifteen, chapter thirty-one of this code or article eighteen-b [§§ 31-18B-1 et seq.] of said chapter.

(e) The trustees of the board bear no fiduciary responsibility as provided in section eleven [§ 12-6-11] of this article with specific regard to the revolving loan contemplated in this section.

(f) Subject to cash availability, the board shall make available to the West Virginia economic development authority from the consolidated fund a nonrecourse loan in an amount up to twenty-five million dollars, for the purpose of the West Virginia economic development authority making a loan or loans from time to time to the West Virginia enterprise advancement corporation, an affiliated nonprofit corporation of the West Virginia economic development authority. The respective loans authorized by this subsection by the board to the West Virginia economic development authority and by the West Virginia economic development authority to the West Virginia enterprise advancement corporation must each be evidenced by one note and must each bear interest at the rate of three percent per annum. The proceeds of any and all loans made by the West Virginia economic development authority to the West Virginia enterprise advancement corporation pursuant to this subsection must be invested by the West Virginia enterprise advancement corporation in the West Virginia enterprise capital fund, LLC, the manager of which is the West Virginia enterprise advancement corporation. The loan to West Virginia economic development authority authorized by this subsection must be nonrevolving, and advances thereunder must be made at times and in amounts as may be requested or directed by the West Virginia economic development authority, upon reasonable notice to the board, the loan authorized by this subsection is not subject to or included in the limitations set forth in subsection (b) of this section with respect to the fifteen million dollar limitation for any one business or industrial development project and limitation of one hundred three percent of outstanding loans, and may not be included in the revolving fund loan principal balance for purposes of calculating the loan amortization in subsection (b) of this section. The loan authorized by this subsection to the West Virginia economic development authority must be classified by the board as a long-term, fixed income investment, must bear interest on the outstanding principal balance thereof at the rate of three percent per annum payable annually on or before the thirtieth day of June of each year, and the principal of which must be repaid no later than the thirtieth day of June, two thousand twenty-two, in annual installments due on or before the thirtieth day of June of each year, which annual installments must commence no later than the thirtieth day of June, two thousand three, in annual principal amounts as may be agreed upon between the board and the West Virginia economic development authority, and which annual installments need not be equal. The loan authorized by this subsection must be nonrecourse and must be payable by the West Virginia economic development authority solely from amounts or returns received by the West Virginia economic development authority in respect of the loan authorized by this subsection to the West Virginia enterprise advancement corporation, whether in the form of interest, dividends, realized capital gains, return of capital or otherwise, in all of which the board must have a security interest to

secure repayment of the loan to the West Virginia economic development authority authorized by this subsection. Any and all loans from the West Virginia economic development authority to the West Virginia enterprise advancement corporation made pursuant to this subsection must also bear interest on the outstanding principal balance thereof at the rate of three percent per annum payable annually on or before the thirtieth day of June of each year, must be nonrecourse and must be payable by the West Virginia enterprise advancement corporation solely from amounts of returns received by the West Virginia enterprise advancement corporation in respect of its investment in the West Virginia enterprise capital fund, LLC, whether in the form of interest, dividends, realized capital gains, return of capital or otherwise, in all of which the board must have a security interest to secure repayment of the loan to the West Virginia economic development authority authorized by this subsection. In the event the amounts or returns received by the West Virginia enterprise advancement corporation in respect of its investment in the West Virginia enterprise capital fund, LLC, are not adequate to pay when due the principal or interest installments, or both, with respect to the loan from the West Virginia economic development authority and, as a result thereof, the West Virginia economic development authority is unable to pay the principal or interest installments, or both, with respect to the loan authorized by this subsection by the board to the West Virginia economic development authority, the principal or interest, or both, as the case may be due on the loan made to the West Virginia economic development authority pursuant to this subsection must be deferred, and any and all of these past-due principal and interest payments must promptly be paid to the fullest extent possible upon receipt by the West Virginia enterprise advancement corporation of moneys in respect of its investments in the West Virginia enterprise capital fund, LLC. The trustees or the board bear no fiduciary responsibility as provided in section eleven [§ 12-6-11] of this article with regard to the loan authorized by this subsection.
[1993, c. 83; 1997, c. 95; 2001, c. 171; 2002, c. 104; 2003, 2nd Ex. Sess., c. 16.]


### §12-6-9f.
        Repealed.
Acts, 1996 Reg. Sess., Ch. 258.


### §12-6-9g.
        Repealed.
Acts, 1997 Reg. Sess., Ch. 95.


### §12-6-9h. Securities handling.

In financial transactions whereby securities are purchased by the board under an agreement providing for the resale of such securities to the original seller at a stated price, the board shall take physical possession of the securities, directly, by its custodian bank or through a neutral third party: *Provided*, That an agreement with a neutral third party may not waive liability for the handling of the securities: *Provided*, however, That when the board is unable to take possession, directly, by its custodian bank or through a mutual third party, the board may leave securities in a segregated account with the original seller, provided the amount of the securities with any one seller may not exceed one hundred fifty million dollars.
[1996, c. 154.]

### §12-6-10. Restrictions On Investments

Repealed.
Acts, 2005 Reg. Sess., Ch. 190

### §12-6-11. Standard of care.

Any investments made under this article shall be made in accordance with the provisions of the "Uniform Prudent Investor Act" codified as article six-c [§§ 44-6C-1 et seq.], chapter forty-four of this code and is further subject to the following requirements:

(a) Trustees shall discharge their duties with respect to the 401(a) plans for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b) Trustees shall diversify fund investment so as to minimize the risk of large losses unless, under the circumstances, it is clearly prudent not to do so;

(c) Trustees shall defray reasonable expenses of investing and operating the funds under management; and

(d) Trustees shall discharge their duties in accordance with the documents and instruments governing the trusts or other funds under management insofar as the documents and instruments are consistent with the provisions of this article.

(e) The duties of the board apply only with respect to those assets deposited with or otherwise held by it.
[1997, c. 95; 2001, c. 171.]

### §12-6-12. Investment restrictions.

(a) The board shall hold in nonreal estate equity investments no more than seventy-five percent of the assets managed by the board and no more than seventy-five percent of the assets of any individual participant plan.

(b) In addition to any investments the board may make pursuant to subsection (h) of this section, the board shall hold in real estate equity investments no more than twenty-five percent of the assets managed by the board and no more than twenty-five percent of the assets of any individual participant plan: Provided, That any such investment be only made upon the recommendation by a professional, third-party fiduciary investment adviser registered with the Securities and Exchange Commission under the Investment Advisors Act of 1940, as amended, upon the approval of the board or a committee designated by the board, and upon the execution of the transaction by a third-party investment manager: Provided, however, That the board's ownership interest in any fund is less than forty percent of the fund's assets at the time of purchase: Provided further, That the combined investment of institutional investors, other public sector entities and educational institutions and their endowments and foundations in the fund is in an amount equal to or greater than fifty percent of the board's total investment in the fund at the time of acquisition. For the purposes of this subsection, fund means a real estate investment trust traded on a major exchange of the United States of America, or a partnership, limited partnership, limited liability company or other entity holding or investing in related or unrelated real estate investments, at least three of which are unrelated and the largest of which is not greater than forty percent of the entity's holdings, at the time of purchase.

(c) The board shall hold in international securities no more than thirty percent of the assets managed by the board and no more than thirty percent of the assets of any individual participant plan.

(d) The board may not at the time of purchase hold more than five percent of the assets managed by the board in the nonreal estate equity securities of any single company or association: Provided, That if a company or association has a market weighting of greater than five percent in the Standard & Poor's 500 index of companies, the board may hold securities of that nonreal estate equity equal to its market weighting.

(e) No security may be purchased by the board unless the type of security is on a list approved by the board. The board may modify the securities list at any time and shall give notice of that action pursuant to subsection (g), section three [§12-6-3] of this article and shall review the list at its annual meeting.

(f) Notwithstanding the investment limitations set forth in this section, it is recognized that the assets managed by the board or the assets of the participant plans, whether considered in the aggregate or individually, may temporarily exceed the investment limitations in this section due to market appreciation, depreciation and rebalancing limitations. Accordingly, the limitations on investments set forth in this section shall not be considered to have been violated if the board rebalances the assets it manages or the assets of the participant plans, whichever is applicable, to comply with the limitations set forth in this section at least once every twelve months based upon the latest available market information and any other reliable market data that the board considers advisable to take into consideration, except for those assets authorized by subsections (b) and (h) of this section for which compliance with the percentage limitations shall be measured at such time as the investment is made.

(g) The board, at the annual meeting required in subsection (h), section three [§ 12-6-3] of this article, shall review, establish and modify, if necessary, the investment objectives of the individual participant plans as incorporated in the investment policy statements of the respective trusts so as to provide for the financial security of the trust funds giving consideration to the following:

(1) Preservation of capital;

(2) Diversification;

(3) Risk tolerance;

(4) Rate of return;

(5) Stability;

(6) Turnover;

(7) Liquidity; and

(8) Reasonable cost of fees.

(h) In addition to any and all other investments the board may make under this article and all investment authority granted to the board by this article, the board is expressly authorized to invest no more than twenty percent of the assets managed by the board and no more than twenty percent of the

assets of any individual participant plan, or any other endowment or other fund managed by the board, as measured at the time of the investment, in any one or more classes, styles or strategies of alternative investments suitable and appropriate for investment by the board. A suitable and appropriate alternative investment is a private equity fund such as a venture capital, private real estate or buy-out fund; commodities fund; distressed debt fund; mezzanine debt fund; hedge fund; put or call on an individual security purchased for the purpose of hedging an authorized investment position; or fund consisting of any combination of private equity, distressed or mezzanine debt, hedge funds, private real estate, commodities and other types and categories of investment permitted under this article: Provided, That any such investment be only made upon the recommendation by a professional, third-party fiduciary investment adviser registered with the Securities and Exchange Commission under the Investment Advisors Act of 1940, as amended, upon the approval of the board or a committee designated by the board and upon the execution of the transaction by a third-party investment manager: Provided, however, That if the standard confidentiality agreements, policies or procedures of any firm, company or organization through which the board invests in securities prohibit, restrict or limit the disclosure of information pertaining to the securities, the information shall be exempt from disclosure, under the provisions of chapter twenty-nine-b [§ 29B-1-1 et seq.] of this code or otherwise, to the extent of the prohibitions, restrictions or limitations: Provided further, That the board's ownership interest in any fund is less than forty percent of the fund's assets at the time of purchase: And provided further, That the combined investment of institutional investors, other public sector entities, and educational institutions and their endowments and foundations in the fund is in an amount equal to or greater than fifty percent of the board's total investment in the fund at the time of acquisition. For the purposes of this subsection, fund means a partnership, limited partnership, limited liability company or other form of entity holding or investing in a collection of related or unrelated investments, at least three of which are unrelated and the largest of which is not greater than forty percent of the fund's composition at the time of purchase. To facilitate access to markets, control, manage or diversify portfolio risk, or enhance performance or efficiency in connection with investments in alternative investments and all other types and categories of investment permitted under this article, the board may enter into commercially customary and prudent market transactions consistent with the laws of the state: And provided further, That neither the purpose nor the effect of such transactions may materially increase market risk or market exposure of the total portfolio of investments as adjusted, from time to time, by the board. The investments described in this subsection are subject to the requirements, limitations and restrictions set forth in this subsection and the standard of care set forth in section eleven [ 12-6-11] of this article, but are not subject to any other limitations or restrictions set forth elsewhere in this article or code.

History. 1967, c. 162; 1978, c. 58; 1996, c. 258; 1997, c. 95; 2001, c. 171; 2007, c. 209.

## § 12-6-13. Board as agency for investments; exceptions.

All duties vested by law in any agency, commission, official or other board of the state relating to the investment of moneys, and the acquisition, sale, exchange or disposal of securities or any other investment are hereby transferred to the Board: Provided, That neither this section nor any other section of this article applies to the duties vested by law in any agency, commission, official or other board of the state relating to the investment of moneys and the acquisition, sale, exchange or disposal of securities or any other investment by the West Virginia Board of Treasury Investments pursuant to

article six-c [§§ 12-6C-1 et seq.] of this chapter, to the Board of the School Fund or to the School Fund established by section 4, article XII of the State Constitution: *Provided*, however, That funds under the control of the Municipal Bond Commission may, in the discretion of the Commission, be made available to the Board for investment by the Commission as provided in article three [§§ 13-3-1 et seq.], chapter thirteen of this code.

[1967, c. 162; 1978, c. 58; 1979, c. 65; 1996, c. 258; 1997, c. 95; 2005, c. 190.]

### §12-6-14. Reports of board; legislative audits, reviews and studies.

(a)  The board shall prepare annually, or more frequently if considered necessary by the board, a report of its operations and the performance of the various funds administered by it. The report shall include all operational costs, including, but not limited to, investment advisor fees, transaction costs, custody fees, and administrative salaries and costs.

(b)  A copy shall be furnished to the chief financial officer of each participant.

(c)  Within the first seven calendar days of each calendar year, the board shall file the annual report with the Joint Committee on Government and Finance, with copies to the President of the Senate, Speaker of the House and Legislative Auditor.

(d)  Upon request, the report shall be made available to any legislative committee, any banking institution or state or federal savings and loan association in this state and any member of the news media. The report shall be kept available for inspection by any citizen of this state.

(e)  The board shall cooperate with any legislative audits, performance and consultant reviews and studies of the board as may be directed by the Joint Committee on Government and Finance.

**History.** 1967, c. 162; 1978, c. 58; 2007, c. 209.

### §12-6-15. Consolidated fund audits.

Repealed.
Acts, 2005 Reg. Sess., Ch. 190.

### §12-6-16. Existing investments.

The board shall be vested with ownership of all securities or other investments lawfully held by the board of investments or the West Virginia trust fund as of the effective date of this article. All obligations and assets of the board of investments and the West Virginia Trust Fund, Inc., shall be vested in the West Virginia investment management board as of the effective date of this article.

[1978, c. 58; 1997, c. 95.]

## §12-6-17. Severability of provisions.

If any provision of this article, or the applicability thereof to any person or circumstance, is held invalid, the remainder of this article and the applicability thereof and of such provision to other persons or circumstances shall not be affected thereby.
[1967, c. 162; 1978, c. 58.]

## §12-6-18.

This article, being necessary to secure the public health, safety, convenience and welfare of the citizens of this state, shall be liberally construed to effect the public purposes of this article. The powers granted to the board in this article, including, without limitation, those granted in section five [§12-6-5] of this article, are intended to be broad and shall be construed broadly so as to vest in the board the power and authority necessary or appropriate to carry out and effectuate its corporate purposes in the financial markets of the world, as the same may evolve, from time to time, at all times in a fashion consistent with the prudent investor standard as provided by the West Virginia Uniform Prudent Investor Act, codified as article six-c [§44-6C-1 et seq.], chapter forty-four of this code and section eleven [§12-6-11] of this article.

**History.** 2007, c. 209.

## §12-6-19. Authorization for loans by the board.

(a) The board, upon request of the state building commission, shall transfer moneys as a loan to the state building commission in an amount not to exceed in the aggregate twenty-one million dollars for the purposes of financing or refinancing the projects specified in subsections (b) and (d), section eight [§ 5-6-8(b) and (d)], article six, chapter five of this code. The money borrowed shall bear interest during the term of the loan at a fixed rate not to exceed the interest rate on treasury notes, bills or bonds of the same term as the term of the loan the week of closing on the loan as reported by the treasury of the United States. Loans made under this subsection shall be repaid in regular monthly or semiannual payments, or as funds are made available by the budget office of department of administration, and shall be paid in full not later than twenty-five years from the date the loans are made with terms and conditions mutually agreed upon by the state building commission and the investment management board.

(b) The investment management board shall upon request of the state building commission transfer moneys as a loan to the state building commission in an amount not to exceed in the aggregate one hundred thirty-seven million dollars for the purposes of financing construction of regional jails, correctional facilities or building extensions or improvements to regional jails and correctional facilities. Prior to the expenditure of any loan proceeds, the regional jail and correctional facility authority shall certify a list of projects to the state building commission and the joint committee on government and finance that shall be funded from loan proceeds. This certified list cannot thereafter be altered or amended other than by legislative enactment. The state building commission shall borrow money as needed by the regional jail and correctional facility authority. The investment management board shall transfer loan proceeds to the authority for expenditure. The money borrowed shall bear interest during the term of the loan at a fixed rate not to exceed the interest rate on treasury notes, bills or bonds of the same term as the term of the loan the week of

closing on the loan as reported by the treasury of the United States.

(c) The regional jail and correctional facility authority shall expend the loan proceeds received under the provisions of subsection (b) of this section to proceed with the projects included in the letter submitted to the joint committee on government and finance dated the fifteenth day of January, one thousand nine hundred ninety-seven: Provided, That the letter shall not be construed to prioritize any project or projects which are included in the letter: Provided, however, That the authority may also expend loan proceeds for any expansion to any existing regional jail or any expansion to a regional jail under construction upon the effective date of this section.

(d) Loans made under this section for the projects specified in subsection (b) of this section and in subsection (d), section eight, article six, chapter five of this code, shall be repaid in annual payments of not less than twelve million dollars per year by appropriation of the Legislature to the board. The amount transferred for loans under subsection (a) or (b) of this section shall not exceed that amount which the board determines is reasonable given the cash flow needs of the consolidated fund. The board shall make transfers for loans first for the project specified in subsection (d), section eight, article six, chapter five of this code, second for the projects specified in subsection (b) of this section and third for projects specified in subsection (b), section eight, article six, chapter five of this code, which are in imminent danger of default in payment. The board shall take the steps necessary to increase the liquidity of the consolidated fund over a period of the next five years to allow for the loans provided in this section without increasing the risk of loss in the consolidated fund.
[1996, c. 78; 1997, c. 95; 1997, 1st Ex. Sess., c. 19.]

## §12-6-20.  Continuation of board. (Superceded by Chapter 4-10-4)

The West Virginia investment management board shall continue to exist, pursuant to the provisions of article ten [§§ 4-10-1 et seq.], chapter four of this code, until the first day of July, two thousand five, unless sooner terminated, continued or reestablished pursuant to the provisions of that article.
[1998, c. 264; 1999, c. 245; 2000, c. 228; 2002, c. 281; 2003, c. 207.]

## §12-6-21.  Investment with regional jail and correctional facility authority.

(a) The Legislature finds and declares:

(1) That the supreme court of appeals has determined and ordered that the constitution of this state imposes a duty on behalf of the state to make significant improvements in the jail and correctional facility system, including the duty to make capital improvements to facilities and to pay for the cost of those improvements;

(2) That construction of capital improvements requires that the cost of the facilities be financed over time; that capital improvements cannot be funded out of the current year appropriations of the Legislature; and that section fifty-one, article six of the constitution prohibits the Legislature amending the budget bill so as to create a deficit;

(3) That while the supreme court of appeals is empowered to interpret the laws, including the constitution of the state, section one, article ten of the constitution grants to the Legislature the power of taxation; section fifty-one, article six of the constitution grants to the Legislature the power of appropriation; and section one, article five of the constitution prohibits any branch of government from exercising powers properly belonging to another;

(4) That the enacting of new taxes, or the diversion of revenues from other essential departments and functions of government, in order to support capital improvements in jails and correctional facilities, is not in the interests of the people of the state represented in the Legislature, and is specifically rejected by the Legislature in its exercise of its legitimate constitutional powers;

(5) That the decision of the supreme court of appeals, imposing a duty on the state to construct and pay for capital improvements to jails and correctional facilities arising out of the Bill of Rights of the United States constitution declared ratified in the year one thousand seven hundred ninety-one, and the state constitution of the year one thousand eight hundred sixty-three, constitutes a prior liability of the state within the meaning of section four, article ten of the constitution and an exception to the constitutional limitation on contracting state debt;

(6) That the construction of capital improvements of jail and correctional facilities may be funded through funds available for investment through the West Virginia investment management board, invested in such a manner as to be assured as high a rate of return as would be earned if these funds were otherwise invested, and repaid by the state as provided in this article.

(b) The investment management board shall upon request of the regional jail and correctional facility authority transfer moneys as an investment, from funds available for investment from the public employees retirement system, to the regional jail and correctional facility authority. The amount transferred may not exceed one hundred fifty million dollars in the aggregate and shall be used for the purposes of financing construction of regional jails, correctional facilities, juvenile detention facilities, juvenile correctional facilities, or extensions, renovations, improvements or additions thereto, or for the replacement or renovation of existing facilities. If the board has loaned money to the state building commission under subsection (b), section nineteen [§ 12-6-19] of this article, the total amount loaned shall be repaid to the board from funds made available under the investment made pursuant to this section. Prior to the expenditure of any of the funds, the regional jail and correctional facility authority shall certify to the joint committee on government and finance a list of projects that are to be funded from the invested funds. This certified list may not thereafter be altered or amended other than by legislative enactment. Funds shall be invested with the regional jail and correctional facility authority as requested by the regional jail and correctional facility authority. The money invested shall earn a return at a rate equal to the annualized rate of return earned by the core fixed-income portfolio of the public employees retirement system over the previous five years, plus one tenth of one percent: Provided, That in all events this rate of return may not be less than five percent per annum. The monthly rate of return shall be calculated every quarter. The manner and timing of the investment shall be determined by the board. The total of the amounts invested may not exceed a total of one hundred fifty million dollars during fiscal year one thousand nine hundred ninety-eight, and fiscal year one thousand nine hundred ninety-nine, cumulatively. The authority to make the investment authorized by this section expires on the thirtieth day of June, one thousand nine hundred ninety-nine.

(c) There is created in the state treasury a regional jail and correctional facility investment fund dedicated to the payment of investment earnings and the return of capital invested under this section. The treasurer shall administer the fund. The fund is an interest-bearing account with interest earned credited to and deposited back into the fund. The fund consists of amounts required to be deposited by section fourteen [§ 33-3-14], article three, chapter thirty-three of this code.

(d) The treasurer shall, monthly, transfer amounts from the regional jail and correctional facility investment fund to the board that are sufficient to allow investment earnings to be paid and the capital invested returned in substantially equal amounts by the thirty-first day of August, two thousand twenty-three: Provided, That the amount of investment earnings paid and the capital

invested returned during the fiscal year beginning the first day of July, one thousand nine hundred ninety-eight, may not exceed ten million dollars. Payment representing investment earnings and the return of capital invested shall begin six months from the date the initial funds are invested, or by the tenth day of January, one thousand nine hundred ninety-nine, whichever is later.

(e) The board shall calculate the amount of the projected annual investment earnings to be paid and the capital invested to be returned and certify the amount to the treasurer on the first day of December of each year, until all investment earnings are paid and the total capital invested is returned.

(f) As a condition precedent to the transfer and investment of moneys by the investment management board pursuant to subsection (b) of this section, either the investment management board or the regional jail and correctional authority shall have first caused a judicial determination to be made by an appropriate action initiated in the West Virginia supreme court of appeals regarding the transfer of moneys by the investment management board to the regional jail and correctional facility authority as an investment from funds available for investment from the public employees retirement system, and to otherwise determine the constitutionality of the provisions of Enrolled House Bill 4702, as enacted by the Legislature in the year one thousand nine hundred ninety-eight. This judicial determination shall be brought as soon as practicable, but not later than thirty days following the effective date of the amendments to this section made by the Legislature in the year one thousand nine hundred ninety-eight.

(g) The Legislature recognizes the fiduciary liability and responsibility imposed on the board by this article and by article six, chapter forty-four of this code. The board, its trustees and employees, have no liability, either personally or corporately with respect to the investment provided for in this section and the loans made under section nineteen [§ 12-6-19] of this article, if the investment and loans are made in accordance with the respective provisions of this section and section nineteen of this article.

(h) The regional jail and correctional facility authority shall expend the funds invested under the provisions of this section to proceed with the projects identified pursuant to subsection (b) of this section.

(i) The regional jail and correctional facility authority may return the total remaining capital invested upon thirty days written notice to the board and at the time of such return shall pay the investment earnings accrued to the return date.

[1998, c. 95; 2001, c. 66.]

# Article 30
# West Virginia College Prepaid Tuition and Savings Program Act

### §18-30-1. Title.

This article is known and cited as the "West Virginia College Prepaid Tuition and Savings Program Act".
[2001, c. 111.]

### §18-30-2. Legislative findings and purpose.

The Legislature hereby finds and determines that enhancing the accessibility and affordability of higher education for all citizens of West Virginia will promote a well-educated and financially secure population to the ultimate benefit of all citizens of West Virginia, and that assisting individuals and families in planning for future educational expenses by making the tax incentives in 26 U.S.C. § 529 available to West Virginians are proper governmental functions and purposes of the state.

The Legislature also finds that continuation of the prepaid tuition plan and creation of a savings plan will further those governmental functions and purposes. It is, therefore, the legislative intent of this article to continue the prepaid tuition plan and to enhance the plan by authorizing the creation of a savings plan so that more students may attend eligible higher education institutions.
[2001, c. 111.]

### §18-30-3. Definitions.

For the purposes of this article, the following terms have the meanings ascribed to them, unless the context clearly indicates otherwise or as otherwise provided in 26 U.S.C. § 529:

(a) "Account" means a prepaid tuition account or a savings plan account established in accordance with this article.

(b) "Account owner" means the individual, corporation, association, partnership, trust or other legal entity who enters into a prepaid tuition contract and is obligated to make payments in accordance with the prepaid tuition contract or who enters into a savings plan contract and invests money in a savings plan account.

(c) "Beneficiary" means the individual designated as a beneficiary at the time an account is established, the individual designated as the beneficiary when beneficiaries are changed, the individual entitled to receive distributions from an account, and any individual designated by the account owner, his or her agent or his or her estate in the event the beneficiary is unable or unwilling to receive distributions under the terms of the contract.

(d) "Board" means the board of trustees of the college prepaid tuition and savings program as provided in section four of this article.

(e) "Distribution" means any disbursement from an account in accordance with 26 U.S.C. § 529.

(f) "Eligible educational institution" means an institution of higher education that qualifies under 26 U.S.C. § 529 as an eligible educational institution.

(g) "Prepaid tuition account" means an account established by an account owner pursuant to this article in order for the beneficiary to apply distributions in accordance with the prepaid tuition plan.

(h) "Prepaid tuition contract" means a contract entered into by the board and an account owner establishing a prepaid tuition account.

(i) "Prepaid tuition plan" means the plan that contractually guarantees payment of tuition at a West Virginia public eligible educational institution.

(j) "Program" means the West Virginia college prepaid tuition and savings program established under this article.

(k) "Qualified higher education expenses" mean higher education expenses permitted under 26 U.S.C. § 529 for enrollment or attendance of a beneficiary at an eligible educational institution.

(l) "Savings plan" means the plan that allows account distributions for qualified higher educational expenses.

(m) "Savings plan account" means an account established by an account owner pursuant to this article in order for the beneficiary to apply distributions toward qualified higher education expenses at eligible educational institutions.

(n) "Savings plan contract" means a contract entered into by the board or its agent, if any, and an account owner establishing a savings plan account.

(o) "Treasurer" means the West Virginia state treasurer.

(p) "Tuition" means the quarter, semester or term undergraduate charges imposed by an eligible educational institution and all mandatory fees required as a condition of enrollment by all students for full-time attendance.
[2001, c. 111.]

## §18-30-4. Creation of program; board; members; terms; compensation; proceedings generally.

(a) The West Virginia College Prepaid Tuition and Savings Program is continued. The program consists of a prepaid tuition plan and a savings plan.

(b) The board of the College Prepaid Tuition and Savings Program is continued and all powers, rights and responsibilities of the board of trustees of the Prepaid Tuition Trust Fund are vested in the board of the College Prepaid Tuition and Savings Program.

(c) The board consists of nine members and includes the following:

(1) The Secretary of Education and the Arts, or his or her designee;

(2) The State Treasurer, or his or her designee;

(3) Two representatives of the Higher Education Policy Commission, who may or may not be members of the Higher Education Policy Commission, appointed by the Commission who serve as voting members of the board, one of whom shall represent the interests of the universities of West Virginia and the state colleges and one of whom shall represent the interests of community and technical colleges of West Virginia;

(4) Five other members, appointed by the Governor, with knowledge, skill and experience in an academic, business or financial field, to be appointed as follows:

(A) Two private citizens not employed by, or an officer of, the state or any political subdivision of the state;

(B) One member representing the interests of private institutions of higher education located in this state appointed from one or more nominees of the West Virginia Association of Private

Colleges; and

(C) Two members representing the public.

(d) The public members and the member representing the interests of private institutions of higher education are appointed by the Governor with the advice and consent of the Senate.

(e) Only state residents are eligible for appointment to the board.

(f) Members appointed by the Governor serve a term of five years and are eligible for reappointment at the expiration of their terms. In the event of a vacancy among appointed members, the Governor shall appoint a person representing the same interests to fill the unexpired term.

(g) Members of the board serve until the later of the expiration of the term for which the member was appointed or the appointment of a successor. Members of the board serve without compensation. The Treasurer may pay all expenses, including travel expenses, actually incurred by board members in the conduct of their official duties. Expense payments are made from the College Prepaid Tuition and Savings Program administrative account, and are made at the same rate paid to state employees.

(h) The Treasurer may provide support staff and office space for the board.

(i) The Treasurer is the chairman and presiding officer of the board, and may appoint the employees the board considers advisable or necessary. A majority of the members of the board constitute a quorum for the transaction of the business of the board.

[2001, c. 111; 2004, c. 256.]

## §18-30-5. Powers of the board.

In addition to the powers granted by any other provision of this article, the board has the powers necessary or appropriate to carry out the provisions and objectives of this article, other methods of financing post-secondary education as relate to the program, and the powers delegated by any other law of the state or any executive order of the state. The board may also:

(a) Adopt and amend bylaws;

(b) Sue and be sued;

(c) Execute contracts and other instruments for necessary goods and services, employ necessary personnel and engage the services of private consultants, actuaries, auditors, counsel, managers, trustees, and any other contractor or professional needed. Selection of these services is not subject to the provisions of article three [§§ 5A-3-1 et seq.], chapter five-a of this code;

(d) Operate a prepaid tuition plan in accordance with this article and 26 U.S.C. § 529;

(e) Operate a savings plan in accordance with this article and 26 U.S.C. § 529;

(f) Develop and impose any requirements, policies, procedures and guidelines to implement and manage the program;

(g) Impose reasonable requirements for residency for beneficiaries at the time of purchase of a prepaid tuition contract. However, nothing in this subdivision establishes residency requirements for matriculation at state eligible educational institutions;

(h) Assess, collect and expend administrative fees, charges and penalties;

(i) Authorize the assessment, collection and retention of fees and charges against the amounts paid into and the earnings on the trust funds by a financial institution, investment manager, fund manager, West Virginia investment management board, or other professional managing or investing the trust funds and accounts;

(j) Invest and reinvest any of the funds and accounts under the board's control with a financial institution, an investment manager, a fund manager, the West Virginia investment management board

or other professional investing the funds and accounts. Investments made under this article shall be made in accordance with the provisions of article six-c [§§ 44-6C-1 et seq.], chapter forty-four of this code, the West Virginia uniform prudent investor act. No board member, nor any person, financial institution, investment manager, fund manager or the West Virginia investment management board to whom the board delegates any of its investment authority who acts within the standard of care set forth in this section is personally liable for losses suffered by the program on investments made pursuant to this article;

(k) Solicit and accept gifts, including bequests or other testamentary gifts made by will, trust or other disposition, grants, loans, aid, and property, real or personal of any nature and from any source, or to participate in any other way in any federal, state or local governmental programs in carrying out the purposes of this article. The board shall use the property received to effectuate the desires of the donor, and shall convert the property received into cash within ninety days of receipt;

(l) Propose legislative rules for promulgation in accordance with the provisions of article three-a [§§ 29A-3A-1 et seq.], chapter twenty-nine-a of this code;

(m) Make all necessary and appropriate arrangements with eligible educational institutions in order to fulfill its obligations under the prepaid tuition contracts and the savings plan contracts; and

(n) Establish a direct-support organization which is a West Virginia corporation, not for profit, organized and operated to receive, hold, invest and administer property and make expenditures to or for the benefit of the purposes of this article, if the board determines a need for the organization exists. The board may authorize the direct-support organization to use program facilities and property, except money. The board may invest funds of the direct-support organization.
[2001, c. 111.]


## §18-30-6. West Virginia prepaid tuition trust.

(a) The "Prepaid Tuition Trust Fund" is continued within the accounts held by the State Treasurer for administration by the board.

(b) The Prepaid Tuition Trust Fund shall continue to receive all payments from account owners on behalf of beneficiaries of prepaid tuition contracts or from any other source, public or private. Earnings derived from the investment of moneys in the Prepaid Tuition Trust Fund shall remain in the Prepaid Tuition Trust Fund held in trust in the same manner as payments, except as refunded, applied for purposes of the beneficiaries, and applied for purposes of maintaining and administering the prepaid tuition plan.

(c) The corpus, assets and earnings of the Prepaid Tuition Trust Fund do not constitute public funds of the state and are available solely for carrying out the purposes of this article. Any contract entered into by or any obligation of the board on behalf of and for the benefit of the prepaid tuition plan does not constitute a debt of the state, but is solely an obligation of the Prepaid Tuition Trust Fund. The state has no obligation to any designated beneficiary or any other person as a result of the prepaid tuition plan. All amounts payable from the Prepaid Tuition Trust Fund are limited to amounts available in the Prepaid Tuition Trust Fund.

(d) Nothing in this article or in any prepaid tuition contract is a promise or guarantee of admission to, continued enrollment in, or graduation from an eligible educational institution.

(e) The requirements of the provisions of chapter thirty-two [§§ 32-1-1 et seq.] of this code do not apply to the sale of a prepaid tuition contract by the board, its employees and agents.

(f) The prepaid tuition plan and the Prepaid Tuition Trust Fund shall continue in existence until terminated by the Legislature as it determines or by the board upon determining that continued

operation is infeasible. Upon termination of the plan and after payment of all fees, charges, expenses and penalties, the assets of the Prepaid Tuition Trust Fund are paid to current account owners, to the extent possible, on a pro rata basis as their interests may appear, and any assets presumed abandoned are reported and remitted to the unclaimed property administrator in accordance with the Uniform Unclaimed Property Act in article eight [§§ 36-8-1 et seq.], chapter thirty-six of this code. Any assets then remaining in the Prepaid Tuition Trust Fund shall revert to the state General Revenue Fund.

(g)  Effective the eighth day of March, two thousand three, the prepaid tuition plan is closed to new contracts until the Legislature authorizes the plan to reopen. Closing the plan to new contracts shall not mean the prepaid tuition plan is closed and shall not affect any prepaid tuition plan contracts in effect on the eighth day of March, two thousand three. All contract owners shall continue to pay any amounts due, including without limitation monthly installments, penalties and fees. Earnings derived from the investment of moneys in the Prepaid Tuition Trust Fund shall continue to accrue to the fund until the fund is closed in accordance with this article.

(h)  The board shall continue to have the actuarial soundness of the Prepaid Tuition Trust Fund evaluated annually.

(i)  (1) On or before the first day of December, two thousand three, and each year thereafter, the chairman of the board shall submit to the Governor, the President of the Senate, the Speaker of the House of Delegates, Joint Committee on Government and Finance and the unclaimed property administrator a report certified by an actuary of the actuarial status of the Prepaid Tuition Trust Fund at the end of the fiscal year immediately preceding the date of the report. In the event the report for fiscal year two thousand three states there is a projected unfunded liability in the Prepaid Tuition Trust Fund, the report shall also state the amount needed for the next fiscal year to eliminate the projected unfunded liability in equal payments over a period of ten fiscal years, concluding the thirtieth day of June, two thousand thirteen. In the event the projected unfunded liability of the Prepaid Tuition Trust Fund increases in subsequent reports, the actuary shall calculate the amount needed, less any amount in the prepaid tuition trust escrow fund, to eliminate the projected unfunded liability over a period the actuary determines is fiscally responsible.

(2)  The Prepaid Tuition Trust Escrow Fund is hereby created in the State Treasury to guarantee payment of prepaid tuition plan contracts. The board shall invest the Prepaid Tuition Trust Escrow Fund in accordance with the provisions of this article in fixed income securities, and all earnings of the escrow fund shall remain in the escrow fund.

(3)  In the event the actuary determines an unfunded liability exists in the Prepaid Tuition Trust Fund, the report shall certify the amount of money needed for the next fiscal year to eliminate the projected unfunded liability pursuant to the provisions of subdivision (1) of this subsection. The certified amount may not exceed one million dollars each year. On or before the fifteenth day of December in which the chairman submitted a report stating the amount needed for the next fiscal year to eliminate a projected unfunded liability, the unclaimed property administrator shall transfer the amount requested, not to exceed one million dollars each year, from the Unclaimed Property Trust Fund to the Prepaid Tuition Trust Escrow Fund.

(4)  In the event the money in the Prepaid Tuition Trust Fund is insufficient to cover the amount of money needed to meet the current obligations of the Prepaid Tuition Trust Fund, the board may withdraw from the Prepaid Tuition Trust Escrow Fund the amount of money needed to meet current obligations of the Prepaid Tuition Trust Fund.

(5)  Notwithstanding any provision of this code to the contrary, the Governor, after consultation with the budget office of the Department of Revenue, may request an appropriation to the board in the amount of the deficiency to meet the current obligations of the Prepaid Tuition Trust

Fund, in the budget presented to the next session of the Legislature for its consideration. The Legislature is not required to make any appropriation pursuant to this subsection, and the amount of the deficiency is not a debt or a liability of the state.

(6) As used in this section, "current obligations of the Prepaid Tuition Trust Fund" means amounts required for the payment of contract distributions or other obligations of the Prepaid Tuition Trust Fund, the maintenance of the fund, and operating expenses for the current fiscal year.

(7) Nothing in this subsection creates an obligation of state general revenue funds or requires any level of funding by the Legislature.

(8) After the Prepaid Tuition Trust Fund has been closed and all moneys paid in accordance with this section, any moneys remaining in the prepaid tuition trust escrow fund shall be transferred to the General Revenue Fund and the account closed.

(j) To fulfill the charitable and public purpose of this article, neither the earnings nor the corpus of the Prepaid Tuition Trust Fund is subject to taxation by the state or any of its political subdivisions.

(k) Notwithstanding any provision of this code to the contrary, money in the Prepaid Tuition Trust Fund is exempt from creditor process and not subject to attachment, garnishment or other process; is not available as security or collateral for any loan, or otherwise subject to alienation, sale, transfer, assignment, pledge, encumbrance or charge; and is not subject to seizure, taking, appropriation or application by any legal or equitable process or operation of law to pay any debt or liability of any account owner, beneficiary or successor in interest.

(l) The provisions of this section may not be construed to interfere with the operation of the savings plan authorized under this article.

History. 2001, c. 111; 2003, c. 173; 2006, c. 79.

Annotations

Effect of amendment of 2003. — Acts 2003, c. 173, effective March 16, 2003, inserted "continue to" in the first sentence of (b); in (f), substituted "assets presumed abandoned are reported and remitted to the unclaimed property administrator" for "unclaimed assets in the program shall revert to the state" in the second sentence, and added the final sentence; rewrote (g) through (i); substituted "purpose" for "purposes" in (j); and added (l ).

Effect of amendment of 2006. — Acts 2006, c. 79, effective July 1, 2006, in (i), substituted "Prepaid Tuition Trust Escrow Fund" for "prepaid tuition trust escrow account" in the first and second sentences in (i)(2), substituted "escrow fund" for "escrow account" twice in the second sentence in (i)(2), substituted "one million dollars" for "five hundred thousand dollars" in the second and third sentences in (i)(3), substituted "escrow fund" for "escrow account" in the third sentence in (i)(3), substituted "Prepaid Tuition Trust Escrow Fund" for "prepaid tuition trust escrow account" in (i)(4), substituted "budget office of the Department of Revenue" for "budget section of the finance division of the department of administration" in (i)(5), and substituted "escrow fund" for "escrow account" in (i)(8); and made minor stylistic changes.

## § 18-30-7. West Virginia savings plan trust.

(a)  The board may establish a savings plan trust, and may establish a savings plan trust fund account, titled the "Savings Plan Trust Fund", within the accounts held by the treasurer or with a financial institution, an investment manager, a fund manager, the West Virginia investment management board or any other person for the purpose of managing and investing the trust fund. Assets of the savings plan trust are held in trust for account owners and beneficiaries.

(b)  The savings plan trust fund shall receive all moneys from account owners on behalf of beneficiaries of savings plan contracts or from any other source, public or private. Earnings derived from the investment of the moneys in the college savings trust fund shall remain in the fund, held in trust in the same manner as contributions, except as refunded, applied for purposes of the beneficiaries, and applied for purposes of maintaining and administering the savings plan.

(c)  The corpus, assets and earnings of the savings plan trust fund do not constitute public funds of the state and are available solely for carrying out the purposes of this article. Any contract entered into by or any obligation of the board on behalf of and for the benefit of the savings plan does not constitute a debt or obligation of the state, but is solely an obligation of the savings plan trust fund. The state has no obligation to any designated beneficiary or any other person as a result of the savings plan. All amounts payable from the savings plan trust fund are limited to amounts available in the fund.

(d)  Nothing in this article or in any savings plan contract is a promise or guarantee that the distributions available for a beneficiary will cover the cost of qualified higher education expenses at an eligible educational institution, or as a promise or guarantee of admission to, continued enrollment in, or graduation from an eligible higher education institution.

(e)  The requirements of the provisions of chapter thirty-two [§§ 32-1-1 et seq.] of this code do not apply to the sale of a savings plan contract by the board, its employees and agents.

(f)  The savings plan and any savings plan trust fund shall continue in existence until terminated by the Legislature as it determines or by the board upon determining that continued operation is infeasible. Upon termination of the plan, the balances of savings plan accounts, less any distributions, refunds, fees, charges and penalties, are sent to account owners, to the extent possible, and any unclaimed assets in the program shall revert to the state in accordance with the uniform unclaimed property act in article eight [§§ 36-8-1 et seq.], chapter thirty-six of this code.

(g)  The state pledges to account owners and beneficiaries of the savings plans that the state will not limit or alter the rights under this article which are vested until the obligations are met and discharged. However, nothing in this subsection prohibits the Legislature from discontinuing or terminating a savings plan.

(h)  In order to fulfill the charitable and public purposes of this article, neither the earnings nor the corpus of the savings plan trust fund is subject to taxation by the state or any of its political subdivisions.

(i)  Notwithstanding any provision of this code to the contrary, money in the savings plan trust fund is exempt from creditor process and not subject to attachment, garnishment, or other process; is not available as security or collateral for any loan, or otherwise subject to alienation, sale, transfer, assignment, pledge, encumbrance or charge; and is not subject to seizure, taking, appropriation or application by any legal or equitable process or operation of law to pay any debt or liability of any account owner, beneficiary or successor in interest.

History. 2001, c. 111.

### §18-30-8.  College prepaid tuition and savings program administrative account.

There is hereby created a separate account within the state treasurer's office titled the "college prepaid tuition and savings program administrative account" for the purposes of implementing, operating and maintaining the trust funds and program created by this article. On the effective date of this section, all moneys in the prepaid tuition trust fund administrative account are hereby transferred to the college prepaid tuition and savings program administrative account.

The administrative account shall receive all fees, charges and penalties collected by the board. Expenditures from the fund are authorized from collections subject to appropriations made by the Legislature.
[2001, c. 111.]

### §18-30-9.  Income tax deduction for purchasers.

As provided in section twelve-a [§ 11-21-12a], article twenty-one, chapter eleven of this code, any payment made under a prepaid tuition contract or other college savings plan administered by the board, pursuant to the provisions of this article, is eligible for a tax deduction.
[2001, c. 111.]

### §18-30-10.  Reports and account; annual audit.

(a) In addition to any other requirements of this article, the board shall:

(1) Provide annually summary information on the financial condition of the prepaid tuition trust fund and statements on the savings plan accounts to the respective account owners;

(2) Prepare, or have prepared, a quarterly report on the status of the program, including the trust funds and the administrative account, and provide a copy of the report to the joint committee on government and finance and the legislative oversight commission on education accountability; and

(3) Prepare, or have prepared, an annual actuarial report of the prepaid tuition trust fund and transmit a copy of the report to the governor, the president of the Senate, the speaker of the House of Delegates and the legislative oversight commission on education accountability.

(b) All accounts of the board, including the trust funds, are subject to an annual external audit by an accounting firm, selected by the board, of which all members or partners assigned to head the audit are members of the American institute of certified public accountants. The audit shall comply with the requirements of section thirty-three [§ 5A-2-33], article two, chapter five-a of this code.
[2001, c. 111.]

### §18-30-11.  Financial aid eligibility.

The calculations of a beneficiary's eligibility for state student financial aid for higher education may not include or consider the value of distributions available in a prepaid tuition account or the value of distributions available in a savings plan account.
[2001, c. 111.]

### §18-30-12. Confidentiality.

Any information that would tend to disclose the identity of a beneficiary, account owner or donor is exempt from the provisions of chapter twenty-nine-b [§§ 29B-1-1 et seq.] of this code. Nothing in this section prohibits disclosure or publication of information in a statistical or other form which does not identify the individuals involved or provide personal information. Account owners are permitted access to their own personal information.
[2001, c. 111.]

### §18-30-13. Board of trustees; authorization of rules.

The legislative rules filed in the state register on the thirtieth day of September, one thousand nine hundred ninety-seven, modified by the board of trustees of the West Virginia prepaid tuition trust fund to meet the objections of the legislative oversight commission on education accountability and refiled in the state register on the thirtieth day of January, one thousand nine hundred ninety-eight, relating to the West Virginia prepaid tuition trust fund (rules for the West Virginia prepaid tuition trust fund), are authorized.
[2001, c. 111.]

# ARTICLE 6A.
# UNIFORM MANAGEMENT OF INSTITUTIONAL FUNDS ACT.

### §44-6A-1. Short title.

This article shall be known as the "Uniform Management of Institutional Funds Act."

### §44-6A-2. Definitions.

The following words or phrases as used in this article shall have the meanings ascribed to them in this section, unless the context of this article clearly indicates otherwise:

(a) "Endowment fund" means an institutional fund, or any part thereof, not wholly expendable by the institution on a current basis under the terms of the applicable gift instrument;

(b) "Gift instrument" means a will, deed, trust agreement, grant, conveyance, agreement, memorandum, writing or other governing document (including the terms of any institutional solicitations from which an institutional fund resulted) that was executed or in effect before or after the effective date of this article under which property is transferred to, or held by or on behalf of, an institution as an institutional fund;

(c) "Governing board" means the body responsible for the management of an institution or of an institutional fund;

(d) "Historic dollar value" means the aggregate fair value in dollars of: (i) An endowment fund at the time it became an endowment fund; (ii) each subsequent donation to the fund at the time it is made; and (iii) each accumulation made pursuant to a direction in the applicable gift instrument at the time the accumulation is added to the fund. The determination of historic dollar value made in good faith by the institution is conclusive;

(e) "Institution" means an incorporated or unincorporated organization organized and operated exclusively for educational, religious, charitable or other eleemosynary purpose, a governmental organization to the extent that it holds funds exclusively for any of these purposes, or a community foundation or community trust;

(f) "Institutional fund" means a fund held by an institution for its exclusive use, benefit or purposes, but does not include (i) A fund held for an institution by a trustee that is not an institution, unless the fund is held exclusively for the benefit of either a community foundation or community trust by a bank, a trust company or another fiduciary that is a trustee of the community foundation or community trust; or (ii) a fund in which a beneficiary that is not an institution has an interest, other than possible rights that could arise upon violation or failure of the purposes of the fund;

(g) "Community foundation" or community trust" means an institution that has been established to attract contributions of a capital or endowment nature for the benefit of a particular community or area whose contributions are often received and maintained in the form of separate trusts or funds which are subject to varying degrees of control by the governing body of the community foundation or community trust and which the governing body in good faith believes meets the requirements of the regulations issued by the internal revenue service, United States department of treasury, presently codified as 26 CFR 1.170A-9(e)(10) and (11), to qualify as a "publicly supported" organization and to be treated as a "single entity" rather than as an aggregation of separate funds.

### §44-6A-3.    Appropriation of appreciation; rule of   construction.

(a) The governing board may appropriate for expenditure for the uses and purposes for which an endowment fund is established so much of the net appreciation, realized and unrealized, in the fair value of the assets of an endowment fund over the historic dollar value of the fund as is prudent under the standard established by section six of this article. This section does not limit the authority of the governing board to expend funds as permitted under other law, the terms of the applicable gift instrument, or the charter of the institution.

(b) Subsection (a) of this section does not apply if the applicable gift instrument indicates the donor's intention that net appreciation shall not be expended. A restriction upon the expenditure of net appreciation may not be implied from a designation of a gift as an endowment, or from a direction    or    authorization    in    the    applicable    gift    instrument    to    use    only "income,""interest,""dividends," or "rents, issues or profits," or "to preserve the principal intact," or a direction which contains other words of similar import. This rule of construction applies to gift instruments executed or in effect before or after the effective date of this article.

### §44-6A-4.  Investment authority.

In addition to an investment otherwise authorized by law or by the applicable gift instrument, and without restriction to investments a fiduciary may make, the governing board, subject to any specific limitations set forth in the applicable gift instrument or in the applicable law other than law relating to investments by a fiduciary, may:

(a) Invest and reinvest an institutional fund in any real or personal property deemed advisable by the governing board, whether or not it produces a current return, including mortgages, stocks, bonds, debentures and other securities of profit or nonprofit corporations, shares in or obligations of associations, partnerships or individuals, and obligations of any government or subdivision or instrumentality thereof;

(b) Retain property contributed by a donor to an institutional fund for as long as the governing board deems advisable;

(c) Include all or any part of an institutional fund in any pooled or common fund maintained by the institution; and

(d) Invest all or any part of an institutional fund in any other pooled or common fund available for investment, including shares or interests in regulated investment companies, mutual funds, common trust funds, investment partnerships, real estate investment trusts or similar organizations in which funds are commingled and investment determinations are made by persons other than the governing board.

### §44-6A-5.  Delegation of investment management.

Except as otherwise provided by the applicable gift instrument or by applicable law relating to governmental institutions or funds, the governing board may (1) delegate to its committees, officers or employees of the institution or the fund, or agents, including investment counsel, the authority to act in place of the board in investment and reinvestment of institutional funds, (2) contract with independent investment advisors, investment counsel or managers, banks or trust

companies, so to act, and (3) authorize the payment of compensation for investment advisory or management services.

## §44-6A-6.  Standard of conduct.

In the administration of the powers to appropriate appreciation, to make and retain investments, and to delegate investment management of institutional funds, members of a governing board shall exercise ordinary business care and prudence under the facts and circumstances prevailing at the time of the action or decision.  In so doing they shall consider long and short term needs of the institution in carrying out its educational, religious, charitable or other eleemosynary purposes, its present and anticipated financial requirements, expected total return on its investments, price level trends and general economic conditions.

### §44-6A-7. Release of restrictions on use or investment;  application of cy pres doctrine.

(a) With the written consent of the donor, the governing board may release, in whole or in part, a restriction imposed by the applicable gift instrument on the use or investment of an institutional fund.

(b) If written consent of the donor cannot be obtained by reason of his death, disability, unavailability or impossibility of identification, the governing board may apply in the name of the institution to the circuit court of the county in which the institution is located for release of a restriction imposed by the applicable gift instrument on the use or investment of an institutional fund.  The attorney general shall be notified of the application and shall be given an opportunity to be heard.  If the court finds that the restriction is obsolete, inappropriate or impracticable, it may by order release the restriction in whole or in part.  A release under this subsection may not change an endowment fund to a fund that is not an endowment fund.

(c) A release under this section may not allow a fund to be used for purposes other than the educational, religious, charitable or other eleemosynary purposes of the institution affected.

(d) This section does not limit the application of the doctrine of cy pres.

### §44-6A-8.  Uniformity of application; construction.

This article shall be so applied and construed as to effectuate its general purpose to make uniform the law with respect to the subject of this act among those states which enact it.

# ARTICLE 6C.
# UNIFORM PRUDENT INVESTOR ACT.

### §44-6C-1. Prudent investor rule.

(a) Notwithstanding the provisions of section two, article six of this chapter, and except as otherwise provided in subsection (b) of this section, a trustee who invests and manages trust assets owes a duty to the beneficiaries of the trust to comply with the prudent investor rule set forth in this article.

(b) The prudent investor rule, a default rule, may be expanded, restricted, eliminated or otherwise altered by the provisions of a trust. A trustee is not liable to a beneficiary to the extent that the trustee acted in reasonable reliance on the provisions of the trust.

### §44-6C-2. Standard of care; portfolio strategy; risk and return objectives.

(a) A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill and caution.

(b) A trustee's investment and management decisions respecting individual assets must be evaluated not in isolation but in the context of the trust portfolio as a whole and as a part of an overall investment strategy having risk and return objectives reasonably suited to the trust.

(c) Among circumstances that a trustee shall consider in investing and managing trust assets are such of the following as are relevant to the trust or its beneficiaries:

(1) General economic conditions;

(2) The possible effect of inflation or deflation;

(3) The expected tax consequences of investment decisions or strategies;

(4) The role that each investment or course of action plays within the overall trust portfolio, which may include financial assets, interests in closely held enterprises, tangible and intangible personal property and real property;

(5) The expected total return from income and the appreciation of capital;

(6) Other resources of the beneficiaries;

(7) Needs for liquidity, regularity of income and preservation or appreciation of capital; and

(8) An asset's special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries.

(d) A trustee shall make a reasonable effort to verify facts relevant to the investment and management of trust assets.

(e) A trustee may invest in any kind of property or type of investment consistent with the standards of this article.

(f) A trustee who has special skills or expertise, or is named trustee in reliance upon the trustee's representation that the trustee has special skills or expertise, has a duty to use those special skills or expertise.

### §44-6C-3.  Diversification.

A trustee shall diversify the investments of the trust unless the trustee reasonably determines that, because of special circumstances, the purposes of the trust are better served without diversifying.

### §44-6C-4.  Duties at inception of trusteeship.

Within a reasonable time after accepting a trusteeship or receiving trust assets, a trustee shall review the trust assets and make and implement decisions concerning the retention and disposition of assets, in order to bring the trust portfolio into compliance with the purposes, terms, distribution requirements and other circumstances of the trust, and with the requirements of this article.

### §44-6C-5.  Loyalty.

A trustee shall invest and manage the trust assets solely in the interest of the beneficiaries.

### §44-6C-6.  Impartiality.

If a trust has two or more beneficiaries, the trustee shall act impartially in investing and managing the trust assets, taking into account any differing interests of the beneficiaries.

### §44-6C-7.  Investment costs.

In investing and managing trust assets, a trustee may only incur costs that are appropriate and reasonable in relation to the assets, the purposes of the trust and the skills of the trustee.

### §44-6C-8.  Reviewing compliance.

Compliance with the prudent investor rule is determined in light of the facts and circumstances existing at the time of a trustee's decision or action and not by hindsight.

### §44-6C-9.  Delegation of investment and management functions.

(a) A trustee may delegate investment and management functions that a prudent trustee of comparable skills could properly delegate under the circumstances.  The trustee shall exercise reasonable care, skill and caution in:
(1) Selecting an agent;
(2) Establishing the scope and terms of the delegation, consistent with the purposes and terms of the trust; and
(3) Periodically reviewing the agent's actions in order to monitor the agent's performance and compliance with the terms of the delegation.
(b) In performing a delegated function, an agent owes a duty to the trust to exercise reasonable care to comply with the terms of the delegation.

(c) A trustee who complies with the requirements of subsection (a) of this section is not liable to the beneficiaries or to the trust for the decisions or actions of the agent to whom the function was delegated.

(d) By accepting the delegation of a trust function from the trustee of a trust that is subject to the law of this state, an agent submits to the jurisdiction of the courts of this state.

### §44-6C-10.  Language invoking standard of article.

The following terms or comparable language in the provisions of a trust, unless otherwise limited or modified, authorizes any investment or strategy permitted under this article: "investments permissible by law for investment of trust funds", "legal investments", "authorized investments", "using the judgment and care under the circumstances then prevailing that persons of prudence, discretion, and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital", "prudent man rule", "prudent trustee rule", "prudent person rule" and "prudent investor rule".

### §44-6C-11.  Application to existing trusts.

This article applies to trusts existing on and created after its effective date.  As applied to trusts existing on its effective date, this article governs only decisions or actions occurring after that date.

### §44-6C-12.  Uniformity of application and construction.

This article shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this article among the states enacting it.

### §44-6C-13.  Short title.

This article may be cited as the "West Virginia Uniform Prudent Investor Act".

### §44-6C-14.  Severability.

If any provision of this article or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this article which can be given effect without the invalid provision or application, and to this end the provisions of this article are severable.

### §44-6C-15.  Effective date.

This article takes effect on the first day of July, one thousand nine hundred ninety-six.