# Exhibit D



# Subprime Mortgages

The U.S. Subprime Residential Mortgage market is making headlines worldwide. As delinquency and defaults on subprime loans increase, specialty subprime lenders are facing a liquidity crunch, causing many to halt subprime lending or even file bankruptcy. There are many questions on investors' minds, namely how will the subprime lending crisis affect delinquency and default rates, and how will these higher default rates translate into potential losses on subprime mortgage backed securities. Western Asset has closely followed the subprime market since its inception and has been concerned about the deteriorating underwriting standards over the past few years. Coupled with our concerns about the housing market, Western Asset has been limiting investments in residential mortgage backed securities to primarily highly rated securities that can withstand multiples of expected defaults and losses.

## Background on the Subprime Lending Market

Subprime mortgage lending has been around for many years beginning with specialty lenders such as Household Finance and Beneficial Finance. These specialty lenders catered to borrowers with tarnished or limited credit histories who could not borrow from traditional lenders. These specialty finance companies allowed these borrowers to extract equity from their homes, either in the form of a second lien or a new first mortgage (often referred to as a cash out refinance loan). Given that this type of "home equity" lending marked the beginning of the subprime market, industry participants often use the terms subprime and home equity interchangeably. Borrowers were able to use these loans for general cash flow needs or to consolidate existing consumer debt such as auto and credit card loans. Because the loans were backed by true equity in the home, they often carried lower interest rates, longer payment terms, and in some cases, were deductible for tax purposes. These home equity loans, or subprime loans, were first securitized and brought to the Asset Backed Securities (ABS) market in the 1980s. While a small number of loans were for a borrower to purchase a home (purchase loans), the vast majority of loans were cash out refinance loans.

As the ABS market grew rapidly and flourished in the mid 1990s, many new companies formed using the securitization market to fund their loan originations. During this period, the market also gravitated more to a first lien lending market with the origination of both fixed and adjustable rate loans. Many of these companies went public and relied on the equity capital markets as a source of funding for their subprime mortgage originations. In 1998 and 1999, however, there was a liquidity crunch in the subprime mortgage market somewhat similar to the crisis today. Prices for subprime loans fell sharply in the fall of 1998 during the Russian crisis, a period in which spreads on most fixed income securities widened dramatically. As capital became more difficult to obtain, many of these thinly capitalized subprime companies became insolvent, and those who survived looked for more stable funding models to fuel the next stages of growth.

This next phase of the subprime mortgage market began in the early 2000s when many Wall Street firms provided financing to the mortgage industry by either opening up their own origination channels or by purchasing loans from other mortgage originators (whole loans) and issuing subprime securitizations in their own name. This time, smaller mortgage originators sold their loans directly to Wall Street rather than utilizing their own capital which would have been required

WAMCO 009618

to issue their own securitizations. Mortgage originators prospered as they sold their newly created mortgages as "whole loans" to Wall Street for prices of 103 - 104% of the loan amount, with origination costs running at only 2% of the loan amount. Thus, originators who sold their loan production to the Street could make a quick 1- 2% profit without requiring much capital.

Many of the survivors from the 1990s grew rapidly in the early to mid 2000s and garnered large profits from their whole loan sales. The large profits made by lenders during the period from to 2003 – 2005 created incentives for originators to produce as many loans as possible. During this same time, home prices were rising rapidly in many parts of the United States, leading to excellent subprime mortgage credit performance as defaults and losses were the lowest in the history of the subprime mortgage market. This period also saw a dramatic increase in loans to borrowers purchasing homes, marking a significant departure from the historical practice of originating mostly cash out refinance loans.

Of course, good times don't last forever. In 2005, as short and long term interest rates rose in the United States, overall mortgage originations slowed. To keep loan production as high as possible, subprime lenders expanded the universe of borrowers they would lend to and created new, innovative products to make home ownership more affordable. Continuing into 2006, the competition among subprime lenders for loan volume kept loan rates artificially low even as interest rates rose, causing whole loan prices to come down to the 101 – 102% range. At the same time, decreasing loan volumes contributed to higher costs as fixed originations costs had to be spread over smaller loan origination volumes. The combination of lower loan prices and higher costs caused many lenders to lose money on their loan origination business. Meanwhile, home prices began falling in certain parts of the country in 2006. This, in conjunction with more aggressive lending, led to higher defaults, especially early payment defaults, which are defaults by borrowers within the first one to three months after origination. Almost all lenders provide assurances on the quality of their loans by providing representations and warranties on securitized loans, which require them to repurchase any loans that become delinquent shortly after origination out of a securitization at 100% of the loan amount. Thus, the increase in early payment defaults put additional stress on lenders, as many of them were forced to liquidate these repurchased loans at distressed prices, often 20% below the loan amount.

All of these developments have led us to where we are today. Whole loan prices for subprime mortgages have fallen to around 97 – 99% of loan amount while production costs have risen above 102% as the volume of loan origination has declined. Given a gross profit margin of negative 4% or more, it is not surprising that many subprime originators have recently become insolvent. Further exacerbating the situation is Wall Street's concerns about financing subprime mortgage originators' loans. As the price of loans declines and the fear of a subprime crisis spreads, Wall Street firms are asking for more capital on lending facilities to the subprime mortgage originators. This combination of mortgage originator losses and margin calls has caused many originators to file bankruptcy including Mortgage Lender's Network, Ownit, and Resmae and left others such as Ameriquest and New Century teetering on the edge.

### Affordability Products and Deteriorating Underwriting Standards

At the inception of the subprime mortgage market, lenders would require greater equity in a property as an offset for the weaker credit of the borrower. While the cutoff for a subprime loan is not well defined, a credit score (often referred to

as a FICO score) below 660 usually qualifies the borrower as subprime versus the national average score of closer to 700 for all borrowers. The average loan to value ratio (LTV), or loan amount divided by property value, for a mid 1990s subprime securitization was typically in the 60s to 70s percent range. The vast majority of these subprime loans were cash out refinances and borrowers usually provided full documentation of income and assets (tax returns, pay stubs, and bank statements). Loans were made for 15-year and 30-year terms with standard full amortization of principal similar to the prime mortgage market. The interest rates on the loans were either fixed or adjustable. For adjustable rate loans, the lender often used the fully indexed loan rate when checking to see if the borrower's income was sufficient to service the interest and principal payments (debt to income ratio). Historically, the maximum debt to income ratio (DTI) on prime quality loans was 36%, which means that the sum of all debt payments (auto, credit card, mortgage, personal loans, and student loans) cannot exceed 36% of a borrower's income. For subprime borrowers, the maximum DTI was often 40 – 50% depending on the borrower's credit and LTV ratio.

As home prices outpaced income growth in many parts of the U.S. in the early 2000s, many prospective homeowners had difficulty qualifying for a prime mortgage based on traditional DTI and down payment requirements. To offset this problem, many lenders, especially subprime lenders, began expanding their underwriting guidelines to relax down payment and income requirements.

Exhibit 1 illustrates the trend towards more aggressive underwriting by subprime lenders. This loosening of underwriting standards helped subprime lenders gain overall market share, with subprime mortgage originations growing from 8% of total loan originations to 23% in the short period from 2003 – 2006. As an active participant in the residential mortgage market for more than 25 years, Western Asset was aware of these trends through our frequent dialogue with loan brokers, lenders, and other industry professionals.

**Exhibit 1**

*Overall Subprime Originations*

| Period | % Mortgage Market | % Floating-Rate | CLTV | % IO | % 40 yr | % Stated Doc | % Silent Seconds |
|---|---|---|---|---|---|---|---|
| 2002 | 8% | 83% | 81 | 0 | 0 | 34 | 2 |
| 2003 | 9% | 84% | 82 | 2 | 0 | 34 | 6 |
| 2004 | 19% | 95% | 84 | 12 | 0 | 38 | 14 |
| 2005 | 21% | 95% | 85 | 27 | 3 | 40 | 23 |
| 2006 | 23% | 96% | 87 | 17 | 23 | 42 | 28 |

Source: Lehman Brothers, Inside B&C Lending, Loan Performance

*Subprime Purchase Loan Originations*

| Orig Yr | % Subprime Market | CLTV | % IO | % 40 Yr | % Low Doc | % Silent Seconds | DTI |
|---|---|---|---|---|---|---|---|
| 1998 | 22% | 82 | 0 | 0 | 25 | 0 | 36 |
| 1999 | 25% | 82 | 0 | 0 | 21 | 1 | 37 |
| 2000 | 32% | 82 | 0 | 0 | 23 | 3 | 39 |
| 2001 | 30% | 85 | 0 | 0 | 27 | 9 | 39 |
| 2002 | 29% | 86 | 2 | 0 | 35 | 8 | 40 |
| 2003 | 29% | 89 | 9 | 0 | 41 | 22 | 41 |
| 2004 | 37% | 92 | 27 | 0 | 44 | 36 | 41 |
| 2005 | 44% | 93 | 35 | 6 | 50 | 48 | 42 |
| 2006 (3rd Qtr) | 47% | 95 | 22 | 23 | 51 | 51 | 42 |

Source: UBS, Loan Performance

The relaxation of underwriting standards was particularly acute with respect to purchase loans. First, lenders alleviated the need for the standard 20% down payment on purchase loans by increasing the Loan to Value (LTV) limits above the traditional 80% level. Some lenders increased the maximum LTV on a purchase loan to 90%, 95%, or even 100%. More commonly, lenders began offering a combination of a first lien and second lien mortgage together. These "simultaneous" first and second liens allowed a borrower to finance up to 80% with a first lien mortgage and up to an additional 20% with a second mortgage for a combined LTV (CLTV) of 100%. Often, lenders would sell the first lien and second lien mortgages separately to different whole loan buyers and the two liens would end up in different securitizations. These simultane-

ous second lien mortgages are often referred to as "silent" seconds because in situations like the above where the first and second liens are sold separately, the purchaser of the first lien often does not disclose the existence of a second mortgage. Western Asset became increasingly concerned beginning in 2003 about the trend towards first lien mortgages with "silent" seconds. When comparing a traditional 80% LTV purchase mortgage where the borrower has contributed a 20% down payment to a simultaneous 80% LTV first mortgage and a 20% second mortgage purchase transaction, Western Asset views the latter transaction where the borrower has no equity (100% CLTV) as having a significantly higher risk of default. We became increasingly concerned that the lack of disclosure regarding "silent" seconds was leading to an underestimation of defaults and losses by both investors and the rating agencies. Thus, beginning in 2003, Western Asset began requesting disclosure of "silent" seconds and Combined Loan to Value (CLTV) statistics for all prospective transactions. We sought to avoid these transactions where, in our view, the true credit risk was underestimated.

Second, lenders engineered more aggressive loan products to offset affordability issues due to rising home prices. New loan offerings included longer loan terms such as 40-years, introductory interest-only periods (IO loans), and lower start or "teaser" rates. By extending the loan amortization term from the traditional maximum 30-years to 40-years, lenders could offer a borrower a lower payment through decreased principal amortization in the early years. Through the introduction of interest-only periods for the first two, five, or ten years of the loan, the borrower's initial payment was further reduced. Finally, by offering a "teaser" rate, most commonly for the first two years of the adjustable rate mortgage, the initial payment was lowered further. Traditionally, mortgage lenders measured a borrower's ability to manage their debt payments by calculating a DTI based on a fully amortizing payment (principal and interest) and in the case of adjustable rate mortgages, the higher of the initial mortgage rate or the fully indexed adjustable mortgage rate. However, the subprime mortgage industry shifted over time to qualifying a borrower at the initial, usually lower start rate on adjustable rate mortgages and the interest only payment on IO loans. While these changes helped borrowers to qualify for larger mortgages, they also introduced greater "payment shock" risk down the road as the borrower's payments would reset upwards and they would experience a slower pace of equity buildup in the property.

A third area where affordability has been enhanced is with the stated or low documentation product. In the prime mortgage market, it is common for the lender to waive the requirement that the borrower fully document income and assets, especially if the borrower has a high credit score, clean payment history, and reasonable LTV ratio. In this situation, the borrower pays the same interest rate whether the loan is full documentation or stated (also called reduced) documentation. In the subprime market, it is almost always the borrower's decision to state their income and assets. Unlike the prime borrower, the subprime borrower must pay a higher interest rate to state and not fully document their income and assets. Historically, stated documentation in subprime mortgages were used primarily for self-employed borrowers who under-reported their income for tax purposes. However, it has become increasingly common for salaried workers with verifiable income to take out stated documentation loans. The widely held industry belief is that salaried wage earners who decide to take out a stated documentation loan are choosing to do so because their actual income and assets are insufficient to qualify for the loan. Given our concerns about borrowers increasingly overstating their

incomes, in recent years Western Asset has sought to avoid transactions with high concentrations of stated documentation loans.

### The Effect on Subprime Mortgage Securities

The combination of more aggressive lending and a weaker housing market is leading to higher delinquency and default rates on subprime mortgages. Subprime mortgages originated in 2006 are showing the highest delinquency and default rates of recent vintages, with numbers most comparable to 2000 subprime originations (which has been the worst performing vintage and has expected losses around 7%). Whereas 2003 originated subprime mortgages may experience a cumulative lifetime loss of only 2.5% percent of the original issued balance, the cumulative loss rate on 2006 originated subprime may equal or surpass the losses on 2000 originations.

While the 2006 vintage of subprime originations are performing worse than earlier vintages, performance varies greatly by product. Cash out refinance loans are performing better than purchase loans, fixed rate loans are performing better than adjustable rate loans, and loans with full documentation are performing better than those with stated documentation. The worst performing loans have some combination of all of these characteristics, such as 100% CLTV adjustable rate, stated documentation, and purchase. This particular loan type has seen the greatest increase in relative delinquencies while the 80% CLTV fixed rate, full documentation, cash out refinance loan has seen only modest deterioration in performance relative to earlier vintages.

It is important to note that almost all mortgage securities (including subprime) are issued in bankruptcy remote transactions meaning that if the lender who originates the loans files bankruptcy, there would be no direct impact on the securities. In addition, most subprime mortgage backed securities are carved into several tranches of securities with various levels of credit enhancement to achieve original ratings of AAA, AA, A, BBB, and BB. For a typical subprime mortgage transaction issued in 2006, the above rated securities are structured to withstand cumulative lifetime loan pool losses of approximately 28%, 19.5%, 14%, 10.5%, and 7.5% respectively before each class suffers a loss of principal. Assuming an average loan loss severity of 40% on each defaulted loan, the above classes could withstand lifetime loan pool default rates of 70%, 49%, 35%, 26%, and 19% respectively. Given the riskier loan characteristics of the 2006 subprime vintage along with the effect of the weaker housing market, lifetime pool losses of 7 – 10% is not an unreasonable assumption.

Given the weak loss coverage on the lower rated subprime classes issued in 2006, we expect to see significant ratings downgrades and a high likelihood of losses on many of the BBB and BB rated classes. However, we believe that AAA rated securities are well protected and can hold up to significant home price and employment shocks. The dual concerns of weaker housing prices coupled with aggressive lending practices has led Western Asset to limit investments in residential mortgage backed securities to primarily the highest rated securities that could withstand multiples of expected defaults and losses. In fact, in many cases, Western Asset has purchased "super" AAA bonds (often referred to as super senior bonds) as a way to protect against the more aggressive lending discussed above. In these cases, we gave up a small amount of yield spread in return for credit enhancement levels that are substantially higher than the AAA levels required by the rating agencies.

WAMCO 009622

Subprime Mortgages

With the market dislocation this year, spreads on many of the lower rated classes from recently issued subprime transactions, primarily the BBB and BB rated classes, have widened by hundreds of basis points and prices have dropped in many cases by 20 points or more. By contrast, AAA rated securities have seen modest spread widening of 5 – 10 basis points and price declines of well under one point. Relative to other high quality bonds in other sectors, some AAA rated subprime bonds may offer attractive relative value and we are looking for opportunities to add to our exposure. We hold a similar view on some of the better structured AA and A rated securities backed by loans with more conservative loan characteristics. For the lower rated classes, BBB and BB, we are still cautious as many of these securities suffer significant impairment under scenarios of home price declines and higher unemployment. Given further anticipated spread widening as these lower rated securities are downgraded, we expect BBB and BB rated securities to present attractive investment opportunities over the coming years.

*This publication reflects current opinions of Western Asset Management and is for educational purposes only. Information contained herein, including data supplied by others, is believed to be accurate, but cannot be guaranteed. Opinions represented are neither a recommendation nor an offer of securities and statements in this material should not be considered investment advice. Employees and/or clients of Western Asset Management may have a position in the securities mentioned. This material may not be reproduced in any form without written permission.*

*For more information on Western Asset visit our website at www.westernasset.com*