**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, *et al.*,<br><br>        Debtors. | **FOR PUBLICATION**<br><br>Chapter 11<br>Case No. 12-12020 (MG)<br>Jointly Administered |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br>on behalf of the estates of the Debtors,<br><br>        Plaintiff,<br><br>        v.<br><br>UMB Bank, N.A., as successor indenture trustee under that certain Indenture, dated as of June 6, 2008; and WELLS FARGO BANK, N.A., third priority collateral agent and collateral control agent under that certain Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009,<br><br>        Defendants. | Adversary Proceeding<br>No. 13-01277(MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>,<br><br>        Plaintiffs,<br><br>        v.<br><br>UMB BANK, N.A., as successor indenture trustee under that certain Indenture, dated as of June 6, 2008; and WELLS FARGO BANK, N.A., third priority collateral agent and collateral control agent under that certain Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009,<br><br>        Defendants. | Adversary Proceeding<br>No. 13-01343 (MG) |

1

**MEMORANDUM OPINION DENYING WITHOUT PREJUDICE UMB BANK'S
MOTION TO DISMISS COUNTS 3 AND 5, AND GRANTING IN PART AND DENYING
IN PART THE COMMITTEE'S MOTION TO DISMISS CERTAIN JUNIOR SECURED
NOTEHOLDER COUNTERCLAIMS**

*A P P E A R A N C E S:*

AKIN GUMP STRAUSS HAUER & FELD LLP
*Special Counsel to UMB Bank, N.A.*
One Bryant Park
New York, NY 10036
By:    David M. Zensky, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel for the Official Creditors' Committee*
1177 Avenue of the Americas
New York, NY 10036
By:    Gregory A. Horowitz, Esq.
           Kenneth Eckstein, Esq.

WHITE & CASE LLLP
*Attorneys for Ad Hoc Group of Junior Secured Noteholders*
1155 Avenue of the Americas
New York, NY 10036
By:    J. Christopher Shore, Esq.

MORRISON & FOERSTER LLP
*Attorneys for Debtors*
1290 Avenue of the Americas
New York, NY 10104
By:    Jamie A. Levitt, Esq.

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
 *Conflicts Counsel to Debtors*
101 Park Avenue
New York, NY 10178
By:    Theresa Foudy, Esq.

2

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court are two motions: (1) *Defendants UMB Bank, N.A. and the Ad Hoc Group of Junior Secured Noteholders' Motion to Dismiss in Part the Debtors' First Amended Complaint to Determine Extent of Liens and for Declaratory Judgment* ("Claim Motion," ECF Doc. # 52)[1]; and (2) *Debtors' and Official Committee of Unsecured Creditors' Motion to Dismiss Certain of the Defendants' Counterclaims* ("Counterclaim Motion," ECF Doc. # 53). These motions relate to two Adversary Proceedings: the first, filed on February 28, 2013, by the Official Committee of Unsecured Creditors ("Committee") against UMB Bank, N.A., as successor indenture trustee ("UMB") under that certain Indenture, dated as of June 6, 2008 (the "Indenture"), and Wells Fargo Bank, N.A. ("Wells Fargo"), as third priority collateral agent and collateral control agent ("Collateral Agent") under an Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009 (the "JSN Pledge Agreement") ("Committee Adversary Proceeding," Adv. Pro. 13-01277 (MG)); the second, filed on May 3, 2013, by the Debtors against UMB and Wells Fargo ("Debtors' Adversary Proceeding," Adv. Pro. 13-01343 (MG)). On June 21, 2013, the Court consolidated the two cases. Following consolidation, UMB and the Ad Hoc Group of Junior Secured Noteholders (the "JSNs," and together with UMB, the "Defendants") filed counterclaims against the Debtors and the Committee.

In the Claim Motion, the Defendants seek dismissal of two of the six counts asserted in the Debtors' Amended Complaint. The Debtors and the Committee filed a joint objection to the Motion (ECF Doc. # 63), and the Defendants filed a reply (ECF Doc. # 75).

---

[1] All ECF numbers referenced herein refer to the docket for 13-01277 unless otherwise noted.

In the Counterclaim Motion, the Debtors and the Committee (collectively, the "Plaintiffs") seek dismissal of fourteen Counterclaims (5–6, 7, 9, 22–25, 26–30, and 35) in the Committee Adversary Proceeding (*Answer, Affirmative Defenses, and Counterclaims of Defendants UMB Bank, N.A. and the Ad Hoc Group of Junior Secured Noteholders to Debtors' First Amended Complaint to Determine Extent of Liens and for Declaratory Judgment*, "JSN Counterclaims", ECF Doc. # 49, filed under seal). The Defendants filed an objection to the Counterclaim Motion ("Objection," ECF Doc. # 64), and the Plaintiffs filed a reply (ECF Doc. # 76).

The Court heard argument on the motions on August 28, 2013. Because a Phase I trial of the consolidated cases was already scheduled for October 15, 2013, the Court provided a bottom line ruling on the motions from the bench at the conclusion of the arguments, followed by entry of a written order on August 29, 2013 (ECF Doc. # 94), amended by agreement in one respect by an order entered on September 18, 2013 (ECF Doc. # 98). During the bench ruling, the Court stated that a written opinion would follow explaining the reasoning for the decision. This Opinion provides that explanation.

## I.    BACKGROUND

### A.    Claim Motion Background

On or about June 6, 2008, Residential Capital, LLC ("ResCap") entered into various financing transactions in connection with the issuance of approximately $4 billion of 9.625% Junior Secured Guaranteed Notes Due 2015 ("Junior Secured Notes"). On December 30, 2009, ResCap and certain of its affiliates entered into the JSN Pledge Agreement (attached as Ex. C to *Adversary Complaint for Declaratory Judgment, Avoidance of Liens, and Disallowance of Claims*, "Compl.," ECF Doc. # 1), pursuant to which ResCap, GMAC Mortgage LLC ("GMACM"), Residential Funding Company, LLC ("RFC"), and certain other Debtor guarantors

ostensibly granted or guaranteed "all-asset" liens in favor of the JSNs (including liens on general

intangibles), subject to numerous exclusions and carve-outs that significantly limited the scope

of the grant. (*See First Amended Complaint to Determine Extent of Liens and for Declaratory

Judgment*, 13-01343, ECF Doc. # 8 ("Am. Compl.") ¶ 18; JSN Pledge Agreement §§ 2–5.)

In late 2008, Ally Financial, Inc. ("AFI"), as initial lender and lender agent, executed a

$430 million loan agreement with two ResCap subsidiaries as borrowers. (Am. Compl. ¶ 28.)

AFI executed another $370 million loan agreement in June 2009 with two ResCap subsidiaries as

borrowers. On December 30, 2009, these two credit facilities were merged into a $1.1 billion

loan facility by and among RFC, GMACM, as borrowers, ResCap and other affiliates as

guarantors, and AFI as agent and lender (the "AFI LOC"). (*Id.*)

Beginning in 2009, Wells Fargo, in its capacity as Collateral Agent for each of the AFI

Senior Secured Credit Facility and the Notes, executed releases of AFI's and the JSNs' liens on

the collateral in accordance with the terms prescribed by an Intercreditor Agreement[2] and the

JSN Indenture. The releases included all Pledged Mortgage Loans, all Subject Mortgage Loans,

and All Servicing Rights Collateral, among other assets. (JSN Counterclaims ¶ 77.) The

Collateral Agent had the authority to release whatever liens the JSNs had been granted under the

JSN Pledge Agreement because the agreement granted the security interests at issue "to the Third

Priority Collateral Agent." (JSN Pledge Agreement § 2, at 13.)

The Collateral Agent also filed UCC financing statement amendments listing various

categories of collateral being released. (*See* ECF Doc. # 8, Ex. F.) Shortly thereafter, some or

all of the released collateral was pledged to support the AFI LOC. (Am. Compl. ¶ 30.) The

---

[2]    The Intercreditor Agreement, dated June 6, 2008, was an agreement between (i) Wells Fargo, as first
priority collateral agent for AFI, (ii) Wells Fargo, as second priority collateral agent for senior secured noteholders,
(iii) Wells Fargo, as third priority collateral agent for junior secured noteholders, (iv) AFI, as agent for the lenders
under an AFI credit facility, (v) U.S. Bank, as trustee under the indenture governing the senior secured notes, and
(vi) U.S. Bank, as trustee under the JSN Indenture. (13-01343, ECF Doc. # 8-4.)

JSNs do not allege that they ever challenged the collateral releases before May 14, 2012 (the "Petition Date").

On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, and on May 16, 2012, the United States Trustee for the Southern District of New York appointed nine members to the Committee. Also on the Petition Date, the Debtors filed a motion seeking to use cash collateral to continue operating their businesses, a request that the Court granted on June 25, 2012 ("Cash Collateral Order," 12-12020, ECF Doc. # 491). Pursuant to the Cash Collateral Order, the Debtors stipulated to the validity of liens and security interests on all assets constituting "Collateral" under the Junior Secured Notes Documents. (*Id.* ¶ 5.) These stipulations ("Stipulations") provided the Committee with a time period to challenge the validity of the liens and security interests granted to the Secured Parties. (*Id.* ¶ 28.)

The Debtors' Complaint challenges certain liens and security interests stipulated to in the Cash Collateral Order and alleges that the JSNs are not oversecured under Bankruptcy Code section 506. The Complaint asserts six counts against the Defendants. The Defendants request that the Court dismiss the following counts:

- Count III: A declaratory judgment that the JSNs are not entitled to a lien on the assets that secure the AFI LOC or any other collateral that was released by the collateral agent under the JSN Indenture.

- Count V: A declaratory judgment that Defendants are undersecured because (i) to be oversecured, Defendants must be oversecured at any individual Debtor entity that has assets against which the Defendants assert liens, without reference to collateral at other Debtor entities; and (ii) Defendants are not oversecured at any individual Debtor entity against whose assets Defendants assert liens.

### A.    Counterclaim Motion Background

After the Court entered the Cash Collateral Order, the Committee conducted an

investigation and identified a $1.1 billion discrepancy in the Debtors' prepetition and post-

petition disclosures regarding Debtors' grants of liens on and security interests in certain of their

assets to the Collateral Agent ("Notes Collateral").  The Debtors' audited financial statements for

the year ended December 31, 2011, and unaudited financial statements for the quarter ended

March 31, 2012 (the most recent statements before the Petition Date), describe the Junior

Secured Notes as secured by the same $1.3 billion in collateral that purportedly secures the AFI

LOC.  (Compl. ¶ 22.)  According to the Debtors' Stipulations pursuant to the Cash Collateral

Order, the Notes Collateral includes $1.3 billion of assets listed in a column labeled "Ally

Revolver" *and* an additional $1.1 billion of assets listed in a "Blanket" column on Exhibit A to

the Cash Collateral Order.  (*Id*. ¶ 23.)  The Committee claims that before the Petition Date, the

Debtors' internal collateral tracking database identified only approximately $1.3 billion in

collateral securing the Junior Secured Notes and the AFI Revolver; nearly all of the "Blanket"

collateral was identified as "Unpledged."  (*Id*. ¶¶ 24–25.)  The Committee also alleges that the

Debtors failed to independently verify whether the Secured Parties had liens on the assets

comprising "Blanket" property or whether any "Blanket" assets constitute Excluded Assets

under the Notes Security Agreement.  (*Id*. ¶ 26.)  On December 26, 2012, the Court granted the

Committee's motion (12-12020, ECF. Doc. # 1546), granting it standing to pursue the claims in

its adversary complaint.  (12-12020, ECF Doc. # 2518.)

On June 20, 2012, the Court directed that an examiner be appointed (12-12020, ECF Doc.

# 454).  On July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner ("Examiner")

(12-12020, ECF Doc. # 674), and on June 26, 2013, the *Report of Arthur J. Gonzalez, as Examiner* ("Examiner's Report") was made publicly available (ECF Doc. # 3698).

On May 13, 2013, the Debtors, AFI, the Committee, and other claimants entered into a Plan Support Agreement containing a global settlement. Under the global settlement, in exchange for broad estate and third-party releases, AFI has agreed to pay $2.1 billion to the Debtors ("Ally Contribution"). The JSNs contend that their purported liens entitle them to the proceeds or recoveries resulting from the settlement of several prepetition claims or causes of actions. (*See, e.g*., Objection at 16 n.11.)

Through the Committee Adversary Proceeding, the Committee seeks to determine (1) the extent of the liens securing the Junior Secured Notes, (2) whether the JSNs are oversecured and entitled to post-petition interest, and (3) the appropriate rate for any interest if applicable.

The Defendants assert that they had a secured claim in the amount of $2.223 billion as of the Petition Date, including principal and accrued prepetition interest. Arguing that the JSNs are undersecured, the Committee estimates the value of the collateral securing the Junior Secured Notes at approximately $1.69 billion. (*Memorandum of Law in Support of the Debtors' and the Official Committee of Unsecured Creditors' Motion to Dismiss Certain of the Defendants' Counterclaims*, ECF Doc. # 53 at 3.)

Whether the JSNs are oversecured or undersecured depends in part on what is included in their collateral. This, in turn, depends heavily on whether the prepetition release of collateral by the Collateral Agent was effective. The Debtors and the Committee assert that the JSN Pledge Agreement clearly states that Defendant Wells Fargo, as Collateral Agent, had the authority to release certain collateral, which it exercised with respect to some or all of the collateral at issue.[3]

---

[3]    Consistent with the JSN Pledge Agreement, the original Uniform Commercial Code ("UCC") financing statements recording the liens identified Wells Fargo as the secured party. (*See* ECF Doc. # 54, Ex. 1.)

Aside from the provisions discussed above, the Cash Collateral Order also authorized the Debtors to use the JSNs' Cash Collateral for certain purposes, and in exchange, the JSNs were provided with an adequate protection lien to the extent of any "aggregate diminution in value" of their collateral.  (Cash Collateral Order ¶ 16.)  The parties dispute whether there has been any such diminution in value.

The Committee argues that certain JSN assertions in their Counterclaims can be resolved as a matter of law.

Most of the JSNs' counterclaims seek a declaratory judgment.  The Counterclaim Motion asks the Court to dismiss fourteen of these counterclaims, including:

- Counterclaim **Five**:  Declaration that the collateral is sufficient to pay all interest at the default interest rate;

- Counterclaim **Six**:  Declaration that the JSNs are entitled to post-petition interest at the default rate;

- Counterclaim **Seven**:  Declaration that settlement recoveries by Debtors constitute JSN collateral;

- Counterclaim **Nine**:  Declaration that proceeds of prepetition state law avoidance claims held by Debtor Obligors constitute JSN collateral;

- Counterclaim **Twenty-two**:  Declaration that purported lien releases breached the JSN Indenture and JSN Pledge Agreement;

- Counterclaim **Twenty-three**:  Declaration that purported lien releases on the purportedly released Mortgage Loans were ineffective releases of collateral in violation of the N.Y. UCC;

- Counterclaim **Twenty-four**:  Declaration that the invalidation of any purported lien release renders the purportedly released collateral subject to legal or equitable liens in favor of the Junior Secured Notes;

- Counterclaim **Twenty-five**:  Declaration that the Debtors must trace each existing unpledged asset to the purportedly released collateral;

- Counterclaim **Twenty-six**:  Declaration that use of cash collateral results in diminution in the collateral's value;

- Counterclaim **Twenty-seven**:  Enforcement of the Debtors' section 506(c) waiver to bar unauthorized attempts to recover costs of collateral collection;

- Counterclaim **Twenty-eight**:  Declaration as to the exact quantum of the direct costs of liquidating collateral;

- Counterclaim **Twenty-nine**:  Declaration determining the amount of the JSNs' adequate protection liens;

- Counterclaim **Thirty**:  Reallocation of administrative expenses; and

- Counterclaim **Thirty-five**:  Declaration as to Certain Claims Identified by the Examiner.

## II.    DISCUSSION

### A.    Legal Standard

Rule 12(b)(6) allows a party to move to dismiss a cause of action for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Rule 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Bankruptcy Rule 7012 makes Rule 12(b)(6) applicable to adversary proceedings.

Courts deciding motions to dismiss must accept all factual allegations as true and draw all inferences in favor of the non-moving party.  *See Hilaturas Miel, S.L. v. Republic of Iraq*, 573 F. Supp. 2d 781, 797 (S.D.N.Y. 2008).  The Court must also limit its review to facts and allegations contained in (1) the complaint, (2) documents either incorporated into the complaint by reference

or attached as exhibits, and (3) matters of which the court may take judicial notice. *See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Additionally, Courts may consider documents not attached to the complaint or incorporated by reference, but "upon which the complaint *solely* relies and which *[are] integral to the complaint*." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotation marks omitted; emphasis in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)); *see also Kalin v. Xanboo, Inc.*, No. 04 Civ. 5931(RJS), 2009 WL 928280, at *4 (S.D.N.Y. Mar. 30, 2009); *Grubin v. Rattet (In re Food Mgmt. Grp.)*, 380 B.R. 677, 690 (Bankr. S.D.N.Y. 2008) (concluding that court may consider documents that have "not been incorporated by reference where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint") (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, the Court's objective is not to determine whether the claimant will succeed in her claim, but instead whether the claimant is entitled to support her claim by offering evidence. *Hilaturas,* 573 F. Supp. 2d at 797. Following the Supreme Court's decision in *Ashcroft v. Iqbal*, courts use a two-prong approach when considering a motion to dismiss. *See, e.g.*, *Weston v. Optima Commc'ns Sys., Inc.*, No. 09 Civ. 3732(DC), 2009 WL 3200653, at *2 (S.D.N.Y. Oct. 7, 2009) (acknowledging a "two-pronged" approach to deciding motions to dismiss); *S. Ill. Laborers' and Emp'rs Health and Welfare Fund v. Pfizer, Inc.*, No. 08 CV 5175(KMW), 2009 WL 3151807, at *3 (S.D.N.Y. Sept. 30, 2009) (same); *Inst. for Dev. of Earth Awareness v. People for the Ethical Treatment of Animals*, No. 08 Civ. 6195(PKC), 2009 WL 2850230, at *3 (S.D.N.Y. Aug. 28, 2009) (same). First, the court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in

factual garb.  *See Iqbal*, 556 U.S. at 678; *Boykin v. Keycorp*, 521 F.3d 202, 204 (2d Cir. 2008).

Second, the court must determine if these well-pleaded factual allegations state a "plausible

claim for relief."  *Iqbal*, 556 U.S. at 679.

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense."  *Id*.  A

claim is plausible when the factual allegations permit "the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at

556).  Meeting the plausibility standard requires a complaint to plead facts that show "more than

a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).

A complaint that only pleads facts that are "merely consistent with a defendant's liability" does

not meet the plausibility requirement.  *Id.* (internal quotation marks omitted).  "A pleading that

offers labels and conclusions or a formulaic recitation of the elements of a cause of action will

not do."  *Id.* (internal quotation marks omitted).  "Threadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550

U.S. at 555).

### B.  The Court Declines to Rule on the Claim Motion until after Holding an Evidentiary Hearing.

Through the Claim Motion, the Defendants seek dismissal of Counts III and V of the

Debtors' First Amended Complaint which, respectively, request a declaratory judgment that

(i) the JSNs are not entitled to a lien on collateral that was released by the Collateral Agent, and

(ii) the JSNs are undersecured because Defendants are not oversecured at any one Debtor entity.

1.  *The Court Declines to Determine the Validity of Count III until a Fuller Factual Record is Developed*

The Cash Collateral Order, which is a final order, provides the following stipulation

("Stipulation") by the Debtors:

> [T]he liens and security interests granted to secure the Junior Secured Parties pursuant to the Junior Secured Notes Documents and in connection with the Junior Secured Notes [] are valid, binding, perfected, and enforceable first priority liens on and security interests in the personal and real property constituting "Collateral" under, and as defined in, the Junior Secured Notes Documents[.]

(Cash Collateral Order ¶ 5(g).)

The Junior Secured Notes Documents are defined as "[the JSN Indenture], together with

the Junior Secured Notes, the Security Documents (as defined in the Indenture) and all other

documents executed in connection therewith."  (*Id.* ¶ (I)(d).)  And the JSN Indenture defines

"Security Documents" as:

> the [JSN Pledge Agreement], any mortgages, the Intercreditor Agreement and all of the security agreements, pledges, collateral assignments, mortgages, deeds of trust, trust deeds or other instruments evidencing or creating or purporting to create any security interests in favor of the Collateral Agent or the Collateral Control Agent for its benefit and for the benefit of the Trustee and the Holders of the Notes.

(JSN Indenture § 1.01.)

The Defendants argue that, pursuant to the Cash Collateral Order and the governing

documents, the JSNs have a lien on any asset that constituted "Collateral" under the Junior

Secured Notes Documents when they were executed.  The Debtors contend that the JSNs do not

have a lien on assets that once were "Collateral" under the Junior Secured Notes Documents, but

that were released by the Collateral Agent in 2009.

The Defendants have not shown as a matter of law that the JSNs retained a security
interest in assets that were previously part of its Collateral but that were subsequently released,
and the Stipulation does not clearly state that the JSNs are entitled to such interest.  In the
*Memorandum Opinion Granting in Part and Denying in Part UMB Bank's Motion to Dismiss*
(ECF Doc. # 74) (*see Official Committee of Unsecured Creditors v. UMB Bank, N.A. (In re
Residential Capital, LLC)*, 495 B.R. 215 (Bankr. S.D.N.Y. 2013)), the Court refused to dismiss
two counts asserted by the Committee against the Defendants in the Committee Adversary
Proceeding because the Court could not determine based only on the pleadings whether the JSNs
had a lien on collateral that had previously been released.  Here, too, the Court would benefit
from a greater factual record on this issue and therefore the Defendants' request to dismiss Count
III is **DENIED** without prejudice.

### 2.  *The Court Cannot Rule on Count V Based Solely on the Pleadings*

The Defendants argue that Count V should be dismissed for three reasons.  First,
according to the Defendants, every court that has applied section 506(b) in a multi-debtor case
has done so by looking to the aggregate value of the property securing a creditor's claim at all
affiliated debtor entities.  Second, section 506 provides that a secured creditor is entitled to post-
petition interest, fees, costs, and charges where the value of the property securing the creditor's
claim is greater than the claim itself, and section 102(7) of the Bankruptcy Code explicitly
provides that "the singular includes the plural."  11 U.S.C. § 102(7).  Based on this provision, the
Defendants argue, courts in multi-debtor cases should treat the Code provisions that refer to a
single debtor as referring to all debtors.  Last, Defendants offer policy reasons in support of their
argument.

Section 506(a) of the Code describes the extent to which an allowed claim is to be treated
as a secured claim and how a secured claim is to be valued.  It provides, in pertinent part:

> An allowed claim of a creditor secured by a lien on property in
> which the estate has an interest . . . is a secured claim to the extent
> of the value of such creditor's interest in the estate's interest in such
> property . . .  and is an unsecured claim to the extent that the value
> of such creditor's interest . . . is less than the amount of such
> allowed claim. . . .

11 U.S.C. § 506(a)(1).

Section 506(b), in turn, provides that an oversecured creditor is entitled to post-petition

interest, fees costs and charges.  It states:

> To the extent that an allowed secured claim is secured by property
> the value of which, after any recovery under subsection (c) of this
> section, is greater than the amount of such claim, there shall be
> allowed to the holder of such claim, interest on such claim, and any
> reasonable fees, costs, or charges provided for under the agreement
> or State statute under which such claim arose.

11 U.S.C. § 506(b).  The secured creditor bears the burden of proving, by a preponderance of the

evidence, that it is oversecured.  *See* 4-506 COLLIER ON BANKRUPTCY ¶ 506.03[9] (16th ed. rev.

2013).

Section 506(a)(1) provides that in valuing a secured creditor's claim, "[s]uch value shall

be determined in light of the purpose of the valuation and of the proposed disposition or use of

such property."  11 U.S.C. § 506(a)(1).  The legislative history shows that Congress intended

courts to apply this provision on a case-by-case basis depending on the facts of the situation:

"'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor

does it always imply a full going concern value.  Courts will have to determine value on a case-

by-case basis, taking into account the facts of each case and the competing interests in the case."

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 356 (1977), *reprinted in* 5 U.S. Code Cong. &

Admin. News 5787, 6312 (1978).  "While courts will have to determine value on a case-by-case

basis, the subsection makes it clear that valuation is to be determined in light of the purpose of

the valuation and the proposed disposition or use of the subject property."  S. Rep. No. 95-989,

95th Cong., 2nd Sess. 68 (1978), *reprinted in* 5 U.S. Code Cong. & Admin. News 5854 (1978);

*see also In re Fiberglass Indus., Inc.,* 74 B.R. 738, 741–42 (Bankr. N.D.N.Y. 1987) ("The

legislative history of Code § 506(a) makes it clear that no fixed approach to valuation is intended

. . . .  Where, as under the present plan, the debtors propose retention and continued use of the

collateral, a forced-sale or liquidation value of the collateral is inappropriate.  The essential

inquiry is what 'value' does the collateral have to the estate.").

　　　　Section 506 does not specify whether debtors' various estates should be aggregated for

purposes of valuing a secured creditors' collateral.  Although many courts have indeed

aggregated the estates for this purpose, albeit often in the context of debtors that have been

substantively consolidated or where all creditors will be paid in full, aggregation has occurred

only (1) after an in-depth evidentiary hearing, where the court determined that aggregation of the

estates was appropriate in the circumstances, or (2) where undisputed facts made an evidentiary

hearing unnecessary.  *See, e.g., In re Gen. Growth Props., Inc*., No. 09-11977 (ALG), 2011 WL

2974305, *1 n.3 (Bankr. S.D.N.Y. July 20, 2011) (noting that parties stipulated to amounts owed

to creditor and did not dispute whether creditor was oversecured); *In re Urban Communicators*

*PCS Ltd. P'ship*, 379 B.R. 232, 236 (Bankr. S.D.N.Y. 2007), *aff'd in part and rev'd in part on*

*other grounds*, 394 B.R. 325 (S.D.N.Y.2008) (finding no need for evidentiary hearing

unnecessary where facts were undisputed); *In re Westpoint Stevens,* 333 B.R. 30, 36 (S.D.N.Y.

2005), *aff'd in part and rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010) (bankruptcy

court conducted a four day hearing); *In re Fiberglass Indus., Inc.,* 74 B.R. 738, 740 (Bankr.

N.D.N.Y. 1987) (court conducted a nine day hearing); *In re SW Hotel Venture, LLC*, 460 B.R. 4,

26 (Bankr. D. Mass. 2011), *aff'd in part and rev'd on other grounds sub nom. Prudential Ins.*

*Co. of Am. v. City of Boston (In re SW Boston Hotel Venture, LLC),* 479 B.R. 210 (B.A.P. 1st

Cir. 2012) (court conducted a full trial); *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 490, 501

(Bankr D. Del. 2010) (court conducted a four day evidentiary hearing).  In fact, in both cases

relied on by the Debtors in response to the Defendants' argument, the bankruptcy courts

conducted extensive trials to value the creditors' collateral.  *See DeNofa v. Nat'l Loan Investors*

*L.P. (In re DeNofa)*, 124 F. App'x 729, 730 (3d Cir. 2005) (noting multiple proceedings before

bankruptcy and district courts that preceded ruling on entitlement to post-petition interest);

*Official Comm. of Unsecured Creditors of Toy King Distribs., Inc. v. Liberty Sav. Bank (In re*

*Toy King Distribs., Inc.)*, 256 B.R. 1, 35 (Bankr. M.D. Fla. 2000) (bankruptcy court conducted a

seventeen day trial).  This case-by-case analysis appears proper in light of the legislative history

and section 506(a)'s mandate that a court's valuation of a secured creditor's claim must be

determined in connection with the purpose of the valuation.

Here, after a full trial on the valuation of the JSNs' claims, the Court may find it

appropriate to aggregate the Debtors' estates for the purposes of section 506(b).  At this point,

though, there is an insufficient factual record to dismiss Count V because the Court has not yet

determined, and cannot determine based only on the pleadings, the appropriate method for

valuing the JSNs' claims.  Therefore, Defendant's request to dismiss Count V is **DENIED**

without prejudice.

### C.   Certain of the JSNs' Counterclaims Are Dismissed in Whole with Prejudice, Others Are Dismissed in Part with Prejudice, and Others Are Dismissed without Prejudice.

#### 1.   *The JSNs Do Not Have Liens on Commercial Tort Claims or Avoidance Actions against Ally, but They May Have Liens on Other Causes of Action*

In Counterclaim Seven, the Defendants seek a declaratory judgment to rebut the Debtors'

position that none of the recoveries by a Debtor obligor on prepetition causes of action against

Ally, including the Ally Contribution, constitute collateral securing the JSNs' claims.  According

to the Defendants, all of the recoveries by each Debtor obligor on account of prepetition causes of action against Ally, including the Ally Contribution, constitute additional JSN collateral.

Further, Counterclaim Nine seeks a declaratory judgment to rebut the Debtors' position that prepetition state law avoidance claims are not subject to JSN liens because any transfer avoided under the Code is preserved for the benefit of the estate and considered after-acquired property.[4]  The Defendants contend that their collateral includes recoveries of prepetition avoidance actions resulting from intercompany claims between a Debtor obligor and another Debtor.

On the other hand, the Plaintiffs argue that the JSNs' liens do not attach to avoidance actions because (1) under sections 550, 551, and 552 of the Code, recovery on avoidance actions constitutes after-acquired property that is not subject to prepetition liens and is intended for the benefit of the estate, and (2) for liens to attach to commercial tort claims, including avoidance actions, those claims must be listed in the security documents with specificity, which was not the case here.

> a.   <u>Avoidance Actions Are After-Acquired Property Belonging to the Debtors' Estate</u>

Section 552 of the Code states that "[e]xcept as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."  11 U.S.C. § 552(a).

Avoidance actions, including those arising under state law, can only be brought by the trustee after the petition is filed under the trustee's section 554(b) rights.  These claims, therefore, arise post-petition and must be considered after-acquired property belonging to the

---

[4]      Based on the JSNs' reading of the Examiner's Report, they contend that the Debtors would likely recover approximately $800 million in claims based on avoidance actions.

estate.  Further, because the Debtor does not own the right to pursue a fraudulent transfer action

in bankruptcy (since that action belongs to the trustee post-petition under section 554(b)), the

Debtor could not have encumbered or assigned that right prepetition.  *See Myers v. First Source*

*Fin., LLP (In re Demma Fruit Co.)*, 2002 Bankr. Lexis 1781, at *11 (Bankr. D. Neb. May 28,

2002) (stating that "[t]he debtor did not own the right to pursue a fraudulent transfer action . . .

and therefore could not have encumbered or assigned that right"); *Hutson v. First-Citizen Bank*

*& Trust Co. (In re Nat'l Gas Distribs., LLC)*, No. 06-00031-8-AP, 2007 Bankr. Lexis 4703, at

*21–22 (Bankr. E.D.N.C. July 24, 2007) (concluding that trustee's preference and fraudulent

transfer recovery theories constitute post-petition property of the estate not subject to prepetition

security interest).  Collier provides further support for this position:

> Once a bankruptcy case commences, however, because all
> recoveries under the avoiding powers are property of the
> estate, administered almost exclusively by the trustee for the
> benefit of the estate as a whole rather than for any creditor
> individually, it is difficult to see how such recoveries can be other
> than "after-acquired property" within the meaning of section
> 552(a), rather than proceeds of prepetition collateral under section
> 552(b)(1). This is true for fraudulent transfers as well as
> preferences, and no persuasive distinction seems possible along
> these lines.

5-552 COLLIER ON BANKRUPTCY ¶ 552.02[5][d].

    At oral argument, the JSNs appeared to concede that not all property recovered by

avoidance actions is subject to JSN liens, and instead argued that they may retain some priority

security interest in any proceeds of avoidance actions if the JSNs had a prepetition lien on the

subject property.  To support this point, the JSNs cite section 552(b) and *In re Figearo*, 79 B.R.

914, 917 (Bankr. D. Nev. 1987), where the court distinguished between the right to set aside a

prepetition transfer (which clearly belongs to the trustee as after-acquired property) and whether

the prepetition security interest could attach to the property recovered by the trustee.  The

*Figearo* court held that the secured creditor's interest still attached to the property after it was transferred prepetition, and attached postposition to the avoidance recoveries obtained by the trustee. *Id*. at 918.

The Plaintiffs contend that all property returned to the estate by an avoidance action is free and clear of any liens. *See, e.g.*, *In re Tek-Aids Indus., Inc.*, 145 B.R. 253, 256 (Bankr. N.D. Ill. 1992) (rejecting argument that prepetition security interest reached preference actions).[5] And the Plaintiffs also argue that *Figearo* is inapposite because the court's decision was premised on equitable considerations, not the language of the Bankruptcy Code, and the Supreme Court has since made clear that bankruptcy courts should render decisions based on the language of the Code, not on policy considerations.[6] The Court restricts its analysis to Counterclaim Nine as pled, which seeks a declaration that proceeds of avoidance actions constitute additional collateral for the JSNs and are subject to the JSNs' liens. This Counterclaim fails because the proceeds of avoidance actions belong to the estate and are not JSN collateral.

### b.   The JSNs Do Not Have Liens on Commercial Torts against Ally

New York UCC §§ 9-108(a) and (e)(1) provide that collateral in security agreements must be described with sufficient particularity, including commercial tort claims. The Debtors and the Committee assert that the JSN Pledge Agreement does not adequately identify commercial tort actions for those actions to constitute JSN collateral. The JSNs do not disagree; instead, they contend that the actions on which they seek liens are not actually commercial tort actions. At oral argument, the JSNs conceded that they do not have a lien on commercial tort actions. While the parties may disagree about the nature of the actions upon which the JSNs

---

[5]     The Defendants argue that the Court's decision in *In re PRC LLC*, No. 08-10239 (Bankr. S.D.N.Y. Feb. 27, 2008), allowed liens on avoidance actions, but in that matter, the Court addressed post-petition liens granted as part of adequate protection, not prepetition liens similar to the ones the Defendants assert here.

[6]     The Court notes that in *In re Schick*, 246 B.R. 41, 47 n.9 (Bankr. S.D.N.Y. 2001), Judge Bernstein reasoned that an aggrieved party whose property was improperly transferred during the preference period may retain some equitable remedy in any avoidance recovery by a trustee.

asserts liens, the Court concludes that the JSNs do not have liens on any commercial tort actions

against Ally.  What is a commercial tort remains an issue that may require later determination.

Given that the JSNs have no lien against avoidance actions or commercial tort actions,

the Court **GRANTS IN PART** the Plaintiffs' motion to dismiss Counterclaims Seven and

Thirty-five.  These Counterclaims are **DISMISSED** with prejudice only with respect to

avoidance actions and commercial torts.  The Court also **GRANTS** the Plaintiffs' motion to

dismiss Counterclaim Nine in its entirety, and the Counterclaim is **DISMISSED** with prejudice.

> **2.** *The JSNs Do Not Have Liens on Any Collateral Released by the Collateral Agent*

In various Counterclaims, the Defendants seek a declaration that (1) the purported release

of JSN collateral was ineffective (Counterclaim Twenty-three), (2) the purported releases

breached the JSN Indenture and JSN Pledge Agreement (Counterclaim Twenty-two), (3) the

JSNs retained either legal or equitable liens in the collateral that was purportedly released

(Counterclaim Twenty-four), and (4) JSNs' liens extend to the proceeds of the purportedly

released collateral (Counterclaim Twenty-five).  To support their Counterclaims, the Defendants

argue that the purported releases violated the New York UCC along with the JSN Indenture and

JSN Pledge Agreement, rendering them void or at the least entitling the Defendants to an

equitable lien because the collateral was allegedly released due to some misconduct.  The

Defendants also argue that since the releases were void, the Debtors must trace the subject

collateral.

The Plaintiffs move to dismiss these Counterclaims, arguing that the Defendants cannot

plausibly contest that Wells Fargo, in its capacity as Collateral Agent for the JSNs, (1) executed

releases that, as written, terminated the JSNs' security interest in the disputed collateral that was

subsequently re-pledged in connection with other secured financing or otherwise disposed of,

and (2) filed UCC-3 amendments to their existing financing statements removing the JSNs'

original perfected liens on the disputed collateral, reflecting the releases granted by the Collateral

Agent.  The Plaintiffs also argue that to the extent the Defendants challenge the releases as being

in violation of the JSN Indenture and JSN Pledge Agreement, the Defendants have no claim

against the Plaintiffs because the Collateral Agent had the authority to release the Collateral.

The Defendants may have a claim against Wells Fargo as Collateral Agent, but not against the

Debtors or Committee.  Finally, the Plaintiffs argue that the elements required to create a valid

perfected equitable lien have not been satisfied.

> a.  <u>The Collateral Agent Had Authority to Release the Collateral, and the
> Releases Were Effective</u>

Contrary to the JSNs' arguments, the Collateral Agent effectively released certain of the

JSNs' collateral.  Although the JSNs argue that the effectiveness of the releases hinges on factual

questions not appropriate for a motion to dismiss, the Court may look to the contents of the

releases and the UCC-3 filings under its authority discussed above to consider the contents of

documents integral to or incorporated by reference into the Counterclaims.  Upon examining the

executed releases and UCC-3 filings, the Court determines as a matter of law that the filings are

entitled to enforcement, and no further inquiry is required.

First, the releases show that the Collateral Agent intended to release the collateral—they

explicitly say as much.  The Collateral Agent signed the releases, the releases describe the liens

and security interests terminated by the releases, and the releases state that the Collateral Agent

intends to release those liens and interests.  Agreements should be "construed in accord with the

parties' intent."  *Northwestern Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines

Inc.)*, 608 F.3d 139, 146 (2d Cir. 2010).  Case law commands that an "unambiguous contract

must be enforced according to the plain meaning of its terms."  *MBIA Inc. v. Fed. Ins. Co.*, 652

F.3d 152, 171 (2d Cir. 2011).  Here, the releases are unambiguous and plainly indicate the

secured party's intent to release the collateral.  The Defendants do not argue that the Collateral

Agent did not intend to release the collateral, or that the language of the releases is ambiguous.

Instead, the Defendants claim that the releases breached the JSN Indenture and JSN Pledge

Agreement.  But that argument is irrelevant here because it only implicates a potential claim

against the Collateral Agent, not a claim against the Plaintiffs that would somehow render the

releases ineffective.[7]  Thus, the releases will be enforced.

Second, the Collateral Agent was the secured party of record and filed the UCC-3s in that

capacity.  To challenge the effect of the UCC-3 filings, the Defendants assert that the Court must

conduct a "fact-intensive examination of whether the relevant agents could reasonably have

expected or understood the release of such liens to have been authorized."  (Objection at 18.)

But the Defendants do not contest that the Collateral Agent was the secured party, which was

established in both the JSN Pledge Agreement and in the financing statements recording the

liens.  Rather, the Defendants cite case law involving purported releases executed by

unauthorized parties who were not the secured parties.  *See Official Comm. Of Unsecured

Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation

Co.)*, 486 B.R. 596, 617–18 (Bankr. S.D.N.Y. 2013) (considering effect of termination statement

filed by party with only limited authority granted by the secured party); *Nisselson v. Softbank

AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 404–05 (Bankr. S.D.N.Y. 2007)

(determining effect of release executed by debtor board member who may have resigned before

executing release).  Here, though, the UCC-3 filings were executed by the secured party itself,

rendering the Defendants' case law inapposite.

---

[7]     The Court expresses no opinion about the potential merits of any cause of action against the Collateral
Agent.

New York UCC § 9-509 defines the parties entitled to execute certain UCC filings. Subsection (d) provides that a party "may file an amendment other than an amendment that adds collateral covered by a financing statement or an amendment that adds a debtor to a financing statement only if . . . the secured party of record authorizes the filing . . . ." The secured party is authorized to delete collateral from a financing statement by filing an amendment to the statement. Section 9-510(a) provides that a record will not be effective unless filed by someone authorized under section 9-509, such as a secured party for purposes of section 9-509(d). Aside from these provisions, when defining who may delete collateral from a financing statement by filing an amendment, section 9-512(a) incorporates section 9-509, which again includes secured parties for the types of filings discussed in section 9-509(d). Given that the Collateral Agent, who was the secured party here, filed the UCC-3 amendments falling under section 9-509(d), the Court concludes that the Collateral Agent had the authority to execute the UCC-3s in question.

   b.   The UCC-3s Put the JSNs on Notice to Inquire Further about the Removal
        of the Perfection on the Collateral

The Defendants did not protest the UCC-3 filings when they were executed. These filings put the Defendants on notice that perfection of the liens had been removed; the Defendants cannot plausibly argue that they lacked proper notice. The UCC employs a notice filing system. *See* Official Cmt. to N.Y. U.C.C. LAW § 9-502 (Consol. 2013). The official commentary to the UCC states that the code "adopts the system of 'notice filing' . . . [requiring] only a simple record providing a limited amount of information." *Id.* That record puts parties on notice to inquire further to ascertain "the complete state of affairs." *Id.* This system has proved helpful to the economy by facilitating financing in various industries. *See id.* The notice filing regime protects the interests of "reasonable diligent searcher[s]." *CLC Equip. Co. v. Brewer (In re Value-Added Commc'ns.)*, 139 F.3d 543, 546 n.5 (5th Cir. 1998) (quoting 4 JAMES J. WHITE &

ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 208 (4th ed. 1995)).  Here, the Defendants

either chose not to inquire further about the UCC-3 filings when they were executed, or they did

not perform reasonably diligent searches on the filings affecting their security interests.

Allowing the Defendants to challenge the filings years later, after other creditors already relied

on those filings, would undermine one of the fundamental purposes of UCC Article 9, which is

"to provide a simple and unified structure within which the immense variety of present-day

secured financing transactions can go forward with less cost and with greater certainty."  Official

Cmt. to N.Y. U.C.C. LAW § 9-101; *see also Platte Valley Bank v. Tetra Fin. Grp., LLC*, 682

Fl.3d 1078, 1087 (8th Cir. 2012) (stating that primary purpose of Article 9 is "to simplify and

lend certainty to procedures for establishing security interests to facilitate efficient and effective

financing") (internal quotation omitted); *Hong Kong & Shanghai Banking Corp. v. HFH USA

Corp.*, 805 F. Supp. 133, 141 (W.D.N.Y. 1992) ("[One] fundamental purpose of New York's

U.C.C. Article 9 [is] to create commercial certainty and predictability by allowing third party

creditors to rely on the specific perfection and priority rules . . . of Article 9.") (internal quotation

omitted).

> c.  The Collateral Descriptions Meet the UCC's Requirements, Making the
>      Filings Effective

Next, the Defendants argue that the parties must conduct discovery to evaluate whether

the UCC-3s adequately described the collateral being released.  But the Court need not determine

precisely what collateral is described by the exhibits to the UCC-3 filings to determine the

effectiveness of those filings.  To be effective, those filings need only meet the UCC's bare

requirements, which establish that the exhibits will be sufficient if they "reasonably identif[y]"

the collateral described.  *See* N.Y. U.C.C. LAW § 9-108(a).  A party reasonably identifies

collateral by providing a "(1) specific listing, (2) category, (3) . . . type of collateral . . .

(4) quantity, (5) computational or allocation formula or procedure, or (6) [unless supergeneric], any other method, if the identity of the collateral is objectively determinable." *Id.* at 9-108(b). Given this lenient standard, the Court finds that the exhibits to the UCC-3s comport with the UCC's requirements and are therefore valid.[8]  The mere possibility that the exhibits do not capture all of the disputed collateral does not render the instruments ineffective.

Given that the releases were effective, and the UCC-3s were properly filed by the Collateral Agent, the Court **GRANTS** the motion to dismiss Counterclaims Twenty-two and Twenty-three, and those Counterclaims are **DISMISSED** with prejudice.  The dismissal of Counterclaims Twenty-two and Twenty-three also makes it unnecessary for the Court to address Counterclaims Twenty-four and Twenty-five, each of which depended on the viability of the Defendants' assertion that the releases were somehow ineffective.  The Court therefore **GRANTS** the motion to dismiss Counterclaims Twenty-four and Twenty-five, and those Counterclaims are **DISMISSED** with prejudice as well.

3.  *The JSNs Are Not Entitled to a Declaration Seeking Further Adequate Protection or an Accounting of the Debtors' Costs of Liquidating Collateral*

The Plaintiffs move to dismiss several Counterclaims addressing the Debtors' use of cash collateral.  Counterclaim Twenty-six seeks a declaratory judgment stating that the Debtors' use of cash collateral, other than for acquiring or creating replacement collateral, constitutes *per se* diminution in the value of the JSNs' collateral.  In Counterclaims Twenty-seven and Twenty-

---

[8]      The New York UCC provides that merely listing "commercial tort claim" as a type of collateral is insufficient (*see* N.Y. U.C.C. LAW § 9-108(e)(1)), but here, the exhibits list "Commercial Tort Claims . . . if and to the extent related to the Repo Loans."  This description suffices under section 9-108.  *See* Official Cmt. 5 to N.Y. U.C.C. LAW § 9-108 ("[A] description such as 'all tort claims arising out of the explosion of debtor's factory' would suffice, even if the exact amount of the claim, the theory on which it may be based, and the identity of the tortfeasor(s) are not described.").  If the JSNs were unclear about the claims being described, they should have inquired because the filing put them on notice to ask for further detail.  *See ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.*, 558 F.3d 809, 814 (8th Cir. 2009) ("Where a description can reasonably be interpreted in one of two ways—one of which may cover the collateral at issue and one of which does not—notice filing has served its purpose . . . .").

eight, the Defendants seek determinations that the section 506(c) waiver in the Cash Collateral

Order bars any direct or indirect attempt by the Debtors to recover costs of collateral collection

as an offset against collateral, and to the extent the Debtors are permitted to allocate any

administrative expense to the collateral, the Debtors must provide an accounting of an exact

quantum of those expenses representing the direct cost of preserving and monetizing the

collateral on a debtor-by-debtor basis.  Counterclaim Twenty-nine seeks a declaration

determining the amount of the JSNs' adequate protection liens by incorporating the purported

*per se* diminution in value of the JSNs' collateral caused by the Debtors' use of cash collateral

into the value of the liens.  And the Defendants seek a reallocation of the administrative expenses

so that expenses are allocated based upon the total fair market value of all of the Debtors' assets,

including the value of the claims against Ally (Counterclaim Thirty).

The Plaintiffs concede that whether the Defendants are entitled to an adequate protection

claim for the diminution in the value of their collateral is a question of fact.  Still, the Plaintiffs

contend that certain of the declarations that the Defendants seek may be disposed of as a matter

of law.  For example, the Plaintiffs argue that the Defendants are not entitled to a declaration that

every dollar that the Debtors spend from the JSNs' cash collateral constitutes a *per se* diminution

in value of the collateral, entitling the JSNs to a corresponding lien.  The Defendants counter that

recent case law establishes that the Debtors' use of cash collateral, even if used to enhance the

value of other collateral, obliged the Debtors to provide the JSNs with adequate protection for

the cash expenses.  According to the Defendants, the cash collateral should be protected

separately from other collateral to protect from the diminution in value of either form of

collateral.  The Defendants' underlying concern appears to be that if the value of non-cash

collateral increases, the Debtors should not be able to benefit from that increase by then spending

cash collateral to offset the increase in value of the other form of collateral without providing the Defendants with adequate protection.

According to the Plaintiffs, though, the Debtors cannot freely use cash collateral to benefit from the rise in value of non-cash collateral. Instead, the Debtors are restricted in their use of the cash collateral by the terms of the Cash Collateral Order, which the Defendants agreed to. That Order included a detailed, agreed budget that (1) limits how the Debtors may use cash collateral, and (2) defines diminution in value of collateral by referring to the value of the JSNs' cash and non-cash collateral *combined*.

At oral argument, the Plaintiffs emphasized the difference between the (1) adequate protection that a debtor must provide to a lender at the outset of a bankruptcy case to protect the lender from the possibility that the use of collateral might result in a decrease in its value, and (2) an adequate protection claim that a lender may assert if a diminution in value of collateral actually occurs. Here, the Defendants seek a declaration entitling them to adequate protection liens—they do not assert an adequate protection claim because no diminution in value has been established. The Court agrees with the Plaintiffs that because the Cash Collateral Order controls and limits how the Debtors may use the cash collateral and also provides the JSNs with agreed-upon adequate protection, the JSNs are not entitled to any further protections concerning use of the cash collateral. Contrary to the Defendants' position, not every use of Cash Collateral constitutes a *per se* diminution in the value of the JSNs' collateral. *See In re South Side House, LLC*, 474 B.R. 391, 412 (Bankr. E.D.N.Y. 2012) (concluding that use of cash collateral pursuant to cash collateral order would adequately protect creditor so long as use satisfies requirements of Bankruptcy Code sections 361, 363, and 552). If the value of the JSNs' collateral actually diminishes, then the JSNs may assert an adequate protection claim. But here, the declaration that

28

the Defendants seek is unwarranted.  The Defendants caution against establishing new rules on

adequate protection and valuation, but the Court's decision is premised on the terms of the Cash

Collateral Order, which the JSNs helped negotiate.  That Order provided the JSNs with

bargained-for adequate protection.

Given that the Cash Collateral Order restricts permissible uses of the JSNs' collateral, the

Defendants are not entitled to a declaration of the "exact quantum of the direct costs of

liquidating collateral."  That relief would burden the Debtors' estate with a needless expense

aimed at reviewing the Debtors' administration of collateral even though the Cash Collateral

Order already establishes the permissible means for the Debtors to administer the collateral.  *See*

Cash Collateral Order ¶¶ 14–15.  The JSNs have not alleged that the Debtors' cash collateral use

did not conform to the approved budget.

Accordingly, the Court **GRANTS** the motion to dismiss Counterclaims Twenty-six and

Twenty-eight, and those counterclaims are **DISMISSED** with prejudice.  The Court **DENIES**

the motion to dismiss Counterclaim Twenty-nine without prejudice, however.  The Plaintiffs

may renew the motion to dismiss that Counterclaim if they establish that the value of the JSNs'

collateral has not diminished.

> ### 4. *The Twenty-seventh Counterclaim Is Premature and Should Only Be Alleged If the JSNs Can Show a Diminution in Value of Their Collateral*

The Plaintiffs also seek to dismiss Counterclaim Twenty-seven, which requests

enforcement of the Debtors' 506(c) waiver that prevents the Debtors from charging the JSNs for

the costs and expenses of preserving or disposing of the JSNs' Collateral.  This Counterclaim is

premised on Paragraph 22 of the Cash Collateral Order, providing that the Debtors will not

charge expenses for "administration of the Chapter 11 cases . . . including liquidation" against

the JSNs' collateral.  This clause operates to waive the provisions of section 506(c), which

ordinarily makes the costs and expenses of preserving or disposing of secured property for the benefit of the holder of the claim (e.g., property taxes) recoverable from that secured property.

Here, since the Debtors waived the right to recover costs and expenses under section 506(c), the Defendants argue that the Debtors cannot now use cash collateral to administer the JSNs' collateral without giving the JSNs corresponding adequate protection.  The Plaintiffs argue that this Counterclaim should be dismissed because it would only be cognizable after a finding of diminution in the value of the JSNs' collateral.  According to the Plaintiffs, the Debtors have not been using cash collateral pursuant to section 506(c)'s provisions, but instead have been using cash collateral subject to adequate protection in accordance with the Cash Collateral Order.

In *Sec. Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC),* 314 B.R. 436 (B.A.P. 9th Cir. 2004), the Bankruptcy Appellate Panel considered whether a bankruptcy court may allow the use of cash collateral pursuant to section 363 without considering whether the requirements for a § 506(c) surcharge were met.  The debtor moved to use cash collateral to pay operating expenses, attorney fees, a valuation expert and an accountant.  The secured creditor consented to the use of cash collateral for the operating expenses but not for professional fees, and argued that the debtor was seeking to use a cash collateral motion brought under section 363 to effectuate a surcharge under section 506(c).  In its order approving the use of cash collateral, the bankruptcy court wrote that "[a]nalytically, if the creditor's interest is adequately protected, then, by definition, there is no surcharge and section 506(c) does not come into play." *Id.* at 439. The BAP affirmed, holding that even if the requirements of section 506(c) are not met, the Debtor may use the cash collateral for the purposes stated so long as the creditor's position is adequately protected.  *Id.* at 444–45; *see also In re Gen. Auto Bldg.*, LLC, 2012 WL 6737741, at

30

*2 (Bankr. D. Or. Dec. 28, 2012) ("Debtor seeks to pay its appraiser from [the lender's] cash

collateral, which is governed by § 363, not § 506(c).  Section 363 requires adequate protection,

not benefit to the creditor.") (internal citation omitted); *In re Coventry Commons Assocs.,* 149

B.R. 109, 114 (Bankr. E.D. Mich. 1992) ("[U]se of [creditor's] cash collateral to pay the debtor's

professional fees does not constitute a surcharge.  The debtor is not asking [creditor] to pay for

the debtor's professional fees.  If [creditor's] interest is adequately protected, then by definition

there will be no impairment of [creditor's] interest in the nature of a surcharge, or of any other

nature.").

The Defendants argue that *In re ProAlert* undermines the Plaintiffs' theory because in

that case, the court stated that the "use of cash collateral . . . may be allowed over the objection

of the secured creditor so long as the creditor's interest is adequately protected."  314 B.R. at

439.  According to the Defendants, this means that the Debtors can either use cash collateral

while providing adequate protection liens corresponding to any diminution in value, or file a

motion seeking to surcharge the JSNs under section 506(c), which the Debtors waived the right

to do.  But this argument assumes a premise that the Court rejects in this opinion—namely that

the JSNs are entitled to further adequate protection liens even though they are protected by the

terms of the Cash Collateral Order.  Since the Court has found that the JSNs are adequately

protected so long as the Debtors only use cash collateral pursuant to the Cash Collateral Order,

"by definition, there is no surcharge and section 506(c) does not come into play."  *Id.*

Since the JSNs may demonstrate that the value of their collateral has diminished, entitling

them to an adequate protection claim, the JSNs may bring this Counterclaim at a later date.  But

as of now, the Counterclaim is premature.  Accordingly, the Court **GRANTS** the motion to

dismiss Counterclaim Twenty-seven and **DISMISSES** that Counterclaim without prejudice.

Issues regarding a 506(c) surcharge are not ripe for determination.  And since Counterclaim

Thirty relates to the use of cash collateral for administrative expenses, the Court **DISMISSES**

that Counterclaim without prejudice as well.

5. *Counterclaims Relating to Default Interest Rates Are Not Ripe for Determination*

Counterclaims Five and Six seek declarations that (1) the JSNs' collateral is sufficient to

pay all interest at the default rate, and (2) the JSNs are entitled to postpetition interest at the

default rate.  These Counterclaims seek relief that would only be applicable if the Court finds

that the JSNs are oversecured.  The Plaintiffs challenge these claims on various grounds.  Since

the Court has not yet determined whether the JSNs are oversecured, the merits of these

Counterclaims are not yet ripe for determination.  The Court therefore **DENIES** the motion to

dismiss Counterclaims Five and Six without prejudice.  The Plaintiffs may renew their dismissal

motion if the Court finds that the JSNs are not oversecured.

## III.    CONCLUSION

### A.  The Claim Motion

The Defendants' Claim Motion is premature.  The Court will decide the issues that the

Claim Motion raises on a full evidentiary record.  The Defendants' Motion to dismiss Counts

Three and Five is **DENIED** without prejudice.

### B.  Counterclaim Motion

The Plaintiffs challenged fourteen of the Defendants' Counterclaims.  Some of these

challenges have merit, while others are premature.  And some Counterclaims do not state a cause

for relief at this time, but they may do so if brought at a later date.  The Court therefore grants

the following relief:

- The Counterclaim Motion is **GRANTED** as to Counterclaims Nine, Twenty-two, Twenty-three, Twenty-four, Twenty-five, Twenty-xix, Twenty-eight, and these Counterclaims are **DISMISSED** with prejudice.

- The Counterclaim Motion is **GRANTED** as to Counterclaims Twenty-seven and Thirty, and these Counterclaims are **DISMISSED** without prejudice because issues regarding a 506(c) surcharge are not ripe for determination.

- The Counterclaim Motion is **GRANTED IN PART** as to Counterclaims Seven and Thirty-five.  These Counterclaims are **DISMISSED** with prejudice only with respect to avoidance actions and commercial torts.

- The Counterclaim Motion is **DENIED** without prejudice as to Counterclaims Five, Six, and Twenty-nine.

Dated:    September 20, 2013
          New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge