# **Exhibit 1-B**

## **Foster Proof of Claim (Claim No. 2581)**

12-12020-mg    Pg 2 of 70

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | Claim #2581  Date Filed: 11/8/2012 |
|---|---|

**Name of Debtor and Case Number:** Residential Capital, LLC, Case No. 12-12020

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property):
John R. and Elizabeth Foster

☐ Check this box if this claim amends a previously filed claim.

**Name and address where notices should be sent:**
Heather Boone McKeever
MCKEEVER LAW OFFICES PLLC
P.O. Box 1181 Isle of Palms, SC 29451

**Court Claim Number:** _____
(*If known*)

Filed on: _____

Telephone number: 843-323-1174                email:

**Name and address where payment should be sent** (if different from above):
foreclosurefraud@insightbb.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Telephone number:                email:

**1. Amount of Claim as of Date Case Filed:** $    5,000,000.00
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Class action Fraud and forgery RICO
(See instruction #2)

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

| **3. Last four digits of any number by which creditor identifies debtor:** | **3a. Debtor may have scheduled account as:** Foster v. MERS (See instruction #3a) | **3b. Uniform Claim Identifier (optional):** Foster Class Action (See instruction #3b) |
|---|---|---|

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.
**Nature of property or right of setoff:** ☐ Real Estate ☐ Motor Vehicle ☐ Other
**Describe:**
**Value of Property:** $_____    **Annual Interest Rate**____% ☐ Fixed ☐ Variable
    (when case was filed)
**Amount of arrearage and other charges, as of the time case was filed, included in secured claim,**
**if any:** $_____    **Basis for perfection:** _____

**Amount of Secured Claim:** $_____    **Amount Unsecured:** $_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
    $_____ (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature:** (See instruction #9) Check the appropriate box.
☐ I am the creditor.    ☑ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor, or    ☐ I am a guarantor, surety,
    (Attach copy of power of attorney, if any.)    their authorized agent.    indorser, or other codebtor.
    (See Bankruptcy Rule 3004.)    (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Heather Mckeever
Title: Attorney
Company: MCKEEVER LAW OFFICE    *(Signature)*    *(Date)* 11-7-12
Address and telephone number (if different from notice address above):

Telephone number:                Email:

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

RECEIVED
NOV 0 8 2012
KURTZMAN CARSON CONSULTANTS
COURT USE ONLY

1212020121108000000000093

FILED US
US DISTRICT ~~~~ CLERK
WESTER~~ ~~~~~~~ OF KY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**    10 SEP 28  PM 4: 16
**LOUISVILLE DIVISION**
CASE NO.  3: 10 CV -611 -S

## CLASS ACTION COMPLAINT

ELIZABETH FOSTER;
JOHN R. FOSTER;                                    REPRESENTATIVE
                                                   CLASS PLAINTIFFS;
CONNIE WELLS;
ROYCE WELLS;                                       *on behalf of themselves*
                                                   *and others so situated*
                                                   *as putative class members*
AUGUSTA MASON;
BRIAN MASON;

SHERILL A. MOODY;
MARK MOODY, *and;*

CHARLOTTE A. WOODWARD

   v.

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC. AND,
MERSCORP,
*collectively as MERS;*

GMAC MORTGAGE LLC,
RESIDENTIAL ACCREDIT LOANS, INC., AND
RESIDENTIAL FUNDING COMPANY, LLC
*collectively as GMAC ;*

 DEUTSCHE BANK NATIONAL TRUST COMPANY;

NATIONSTAR MORTGAGE;

AURORA LOAN SERVICES;

BAC LOAN SERVICES;

CITIMORTGAGE;

US BANK;

LSR PROCESSING;

DOCX;

LENDER PROCESSING SERVICES;

LERNER SAMPSON & ROTHFUSS;

MANLEY DEAS KOCHALSKI PLLC;

DINSMORE & SHOHL LLP;

REISENFELD & ASSOCIATES, LPA, *and;*

MIDDLETON & REUTLINGER                    DEFENDANTS

*****************************

Come the Representative Plaintiffs, by counsel, on behalf of themselves and others so situated as putative class members pursuant to Fed. R. Civ. P. 23.   and for their Class Action Complaint against the name Defendants and yet to be named Defendants,  make their claim for treble and punitive damages,   costs and attorneys fees under 18 U.S.C. 1962 and 1964, otherwise known as the "racketeer Influenced and Corrupt Organizations Act," hereinafter ("RICO") and for all violations of law heretofore claimed.

An ongoing criminal investigation has been in place in the state of Florida by both the Florida Attorney General and the Justice Department.   Upon information and belief, a parallel investigation is ongoing in the state of Kentucky and at least three other states.

In September 2010, the national press began reporting that one of the Defendants, GMAC, had placed a moratorium nationwide on foreclosures, based on the illegalities in the policies, practices and procedures of their own employees and the law firms representing their interests in foreclosures.

2

On September 24, 2010, Members of Congress, Alan Grayson, Barney Frank and Corrine Brown wrote an open letter to Mr. Michael J. Williams, President and CEO of Fannie Mae, as to the egregious nature and Congressional hearings as to the issues which are the subject of this action.    Said letter is attached hereto as Exhibit "A."

Additionally, and as to the claims of the parties to this action, the legality of MERS on Deeds of Trust is being litigated in a Consolidated Class Action, *In Re MERS Litigation*, MDL 2119, United States District Court Arizona.1

## I.  THE PARTIES
### A.  THE PLAINTIFFS

1.        The named and representative Plaintiffs bring suit on behalf of themselves and the putative class, consisting of all putative members in the Commonwealth of Kentucky and through each and every state of the United States, the District of Columbia and all United States Territories .   They have standing to sue as they possess the same interest and have suffered or will suffer in the future, the same type of injury as the putative class members as the recorded owners in fee simple to property and/or are the Defendants to a foreclosure action relating to the property wherein a Mortgage was or is recorded in the name of MERS against the property.

The Representative Plaintiffs' lawsuits for which they are a Defendant are as follows:

2.        John R. and Elizabeth Foster are a married couple owning four properties in the County of Hardin.   The Foster property is currently in various stages of

---

1 Counsel of record in this case, while representing one of the Plaintiff/ Moody cases, was recently "transferred out" as a Tag-Along from the *In Re MERS Litigation*,  MDL 2119.   The MDL Panel ruled that the Arizona action will only include those cases filed in non-judicial foreclosure jurisdictions. Kentucky is a judicial foreclosure state and will not be included in the action.  The Order as to such is attached hereto as Exhibit. "B."

litigation, with one of their properties, liquidated in foreclosure and deeded by to the

Servicer, GMAC.  The owners of the Foster's loans remains unknown.

### Foster Loan #1
### Hardin Circuit 10-CI-00862
### GMAC Mortgage LLC Plaintiff
### Manley Deas Kochalski Counsel of Record

-2006 Promisory Note to Greenpoint Mortgage Funding, Inc.
-MERS Mortgage "acting solely as nominee for Greenbelt Mortgage Funding, Inc."
-2007 Lender Greenpoint Mortgage Funding, Inc. became extinct.
-2010 Assignment of Promissory Note as an allonge on behalf of the already extinct lender.
-Manley Deas Kochalski's, Crystal L Saresky, drafts Mortgage Assignment.
-Mortgage Assignment defective on its face pursuant to KRS 382.270 and 382.290.
-April 23, 2010, GMAC's Jeffrey Stephan, (alleged robo-signer,) executes Mortgage Assignment as Assignor and Assignee as Vice President of MERS and as an agent of the already extinct Lender Greenpoint Mortgage Lending, LLC.
-April 27, 2010, GMAC's Jeffrey Stephan, executes Affidavit as to Account Status and Defendants' Military Service.
-July 27, 2010, GMAC's Jeffrey Stephan executes and files second Affidavit filed as basis to attempt to obtain Summary Judgment and Order of Sale.

### Foster Loan #2
### Hardin Circuit 09-CI-02248
### GMAC Mortgage, LLC Plaintiff
### Lerner Sampson Rothfuss Counsel of Record

-2006 Promissory Note to Greenpoint Mortgage Funding, Inc.
-MERS Mortgage "acting solely as nominee for Greenbelt Mortgage Funding, Inc.    .
-No assignment of Promissory Note.
-No assignment of MERS Mortgage.
-2007 Lender Greenpoint Mortgage Funding, Inc. became extinct.
-May 17, 2010, GMAC's Jeffrey Stephan, (alleged robo-signer,) Affidavit filed and used as basis to obtain Judgment and Order of Sale.

### Foster Loan #3
### Hardin Circuit 09-CI-0209
### GMAC Mortgage LLC Plaintiff
### Manley Deas Kochalski Counsel of Record

4

-10/14/09 Foreclosure Filed with no Note or lost Note Affidavit. Regardless, Plaintiff and Plaintiff's counsel state in their First Claim for Relief, "Plaintiff is the holder and owner of the Note."

-MERS Mortgage "acting solely as nominee for Greenbelt Mortgage Funding, Inc.    Book 1610 Page 662.

-2007 Lender Greenpoint Mortgage Funding, Inc. became extinct. October 21, 2009, Counsel of Record for GMAC, Crystal L Saresky, drafts Mortgage Assignment.

-Mortgage Assignment defective on its face pursuant to KRS 382.270 and 382.290.

-October 21, 2009, GMAC's Jeffrey Stephan, (alleged robo-signer,) executes Mortgage Assignment as Assignor and Assignee as Vice President of MERS as nominee of extinct Lender Greenpoint Mortgage Lending, LLC.

-No reference to a Promissory Note in the Assignment. No Promissory Note is ever entered into the record.

-Mortgage Assignment defective on its face pursuant to KRS 382.270 and 382.290.

-Notary to the Mortgage Assignment illegible.

-November 3, 2009 GMAC's Brenda Staehle, (alleged GMAC robo-signer,) executes Affidavit as to Account Status and Defendants' Military Service.

-July 29, 2010, Property sold by Master Commissioner based on Motion for Default obtained without Notice to the homeowners while owners believed a repayment plan was in place. The property was purchased by GMAC.

**Foster Loan # 4**
**Hardin Circuit 10-CI-01862**
**GMAC Mortgage LLC Plaintiff**
**Lerner Sampson Rothfuss Counsel of Record**

-2006 Promissory Note to Greenpoint Mortgage Funding, Inc.

-MERS Mortgage "acting solely as nominee for Greenbelt Mortgage Funding, Inc."

-No assignment of Promissory Note to GMAC.

-No assignment of MERS Mortgage.

-2007 Lender Greenpoint Mortgage Funding, Inc. became extinct.

-Litigation pending.

3.      Connie and Wells  are a married couple who own a home in the County of Madison.   At the time a foreclosure was filed, the Wells believed the were in the process of a H.A.M.P. loan modification and were fraudulently led to believe that BAC was the owner of their loan.   The Wells property is currently under a Summary Order

from Judge William Clouse to be liquidated in foreclosure and the deed transferred to the

Servicer, BAC  The owner of the Wells' loan remains unknown.

**Wells**
**Madison Circuit 09-CI-1345**
**BAC Home Loan Servicing**
**Lerner Sampson Rothfuss Counsel of Record**

-Promissory Note to First Omni Mortgage Lending.
-No Assignment of Promissory Note to BAC.
-MERS Mortgage "acting solely as nominee for First Omni Lending."
-No Mortgage Assignment filed with Foreclosure.
-Mortgage Assignment recorded after Foreclosure and filed with Motion for
Default.
-Mortgage Assignment defective on its face pursuant to KRS 382.270 and
382.290
-Mortgage Assignment drafted by Richard Rothfuss II, partner in Lerner Sampson
Rothfuss.
-Mr.  Rothfuss' Secretary, Ms Shellie Hill, signed the Assignment as an
"Assistant Secretary and Vice President of MERS," claiming that she was acting
for MERS as nominee for First Omni Mortgage Lending, a Mortgage Broker in
Louisville, Kentucky .
-Summary Judgment Ordered by Judge William Clouse utilizing Order drafted by
LSR law firm.   (Judge Clouse refused to write his own opinion.)
-Master Commissioner, Hon. from Jessamine County appeared on behalf of LRS
at Default hearing.
-Appeal of Judge Clouse's Summary Judgment pending.

4.      Augusta and Brian Mason are a married couple who own a home in the

County of Jessamine.   At the time a foreclosure was filed, the Masons believed the were

in the process of a H.A.M.P. loan modification and were fraudulently led to believe that

Nationstar, was the owner of their loan.   The Mason's property is currently in litigation.

The owner of the Mason's loan remains unknown.

**Mason**
**Jessamine Circuit 09-CI-362**
**Nationstar Mortgage Plaintiff**
**Manly Deas Kochalski Counsel of Record Nationstar**
**Dinsmore & Shohl Counsel of Record GMAC and Homecomings Financial**

-No Promissory Note.

6

-MERS Mortgage "acting solely as nominee for Homecomings Financial."
-No Mortgage Assignment filed with Foreclosure.
-2009 Mortgage Assignment recorded after Foreclosure.
-Mortgage Assignment defective on its face pursuant to KRS 382.270 and
382.290.
-Mortgage Assignment drafted by Crystal L. Ford of Manley Deas Kochalski.
-Mortgage Assignment executed by Christine Odom, an employee of Nationstar
(alleged robo-signer) as a "Vice President of MERS," claiming that she was
acting for both MERS and Homecomings Financial LLC for the benefit of her
employer, Nationstar.
-Mortgage Assignment notarized by Dionne Stevenson in the state of Texas.
-Dinsmore & Shohl Attorney of Record for Homecomings Financial LLC and
GMAC LLC.

5.      Charlotte Woodward is the owner of a home in the County of Boone.

At the time a foreclosure was filed, Ms. Woodward was in the process of a applying for a

H.A.M.P. loan modification.      She was fraudulently led to believe that GMAC, the

servicer, is the owner of a mortgage loan.      Ms. Woodward's property is currently in

litigation. The owner of the loan remains unknown.

**Woodward**
**Boone Circuit 10-2057**
**M & I Bank FSB Plaintiff**
**Lerner Sampson Rothfuss Counsel of Record**
**GMAC Servicer**

-Promissory Note to M & I Bank FSB.
-No Promissory Note Assignment.
-MERS Mortgage recorded as "nominee" for M & I Bank, FSB.
-GMAC continues to hold itself out in writing as the creditor in relationship to
the mortgage loan.
-Owner and holder of Promissory Note unknown.
-No Mortgage Assignment.
-Litigation and Class Action Counter/Cross Claim pending in Boone Circuit.

6.      Sherrill and Mark Moody are a married couple owning    properties in

the Counties of Fayette and Madison.    The Moody's properties are currently in various

stages of litigation.  The owners of the Moody's loans. remains unknown.

**Moody Loan #1**
**Madison Circuit 09-CI-1323**
**Deutsche Bank National Trust Company Plaintiff**
**Jerry R. Howard Reisenfeld & Associates Original Counsel of Record**
**Dinsmore & Shohl Current Counsel of Record**
**Middleton Reutlinger Counsel of Record for MERS**

-Promissory Note to American Home Mortgage Acceptance, Inc.
-No Promissory Note Assignment.
-2/09 American Home Mortgage Liquidated in Bankruptcy.   Extinct entity.
-MERS Mortgage "acting solely as nominee for American Home Mortgage."
-No Mortgage Assignment filed with Foreclosure.
-9/1/09 Mortgage Assignment recorded after Foreclosure and filed with Motion
for Default.
-Mortgage Assignment defective on its face pursuant to KRS 382.270 and
382.290.
-Mortgage Assignment drafted by Jerry R. Howard, partner Reisenfeld &
Associates.
-Mortgage Assignment executed in the state of Florida by Lender Processing
Services employee, Michelle Halyard, (alleged robo-signer,) as "Signature and
Title of Officer," claiming she was simultaneously acting on behalf of MERS, and
the bankrupt/extinct entity, American Home Mortgage, as grantors for the benefit
of their client, the grantee, Deutsche Bank.
-Lender Processing Services employee, Gerhard v. Heckerman, Notary.
-Litigation pending.

**Moody Loan #2**
**Madison Circuit 09-CI-1592**
**Deutsche Bank National Trust Company as Trustee Plaintiff**
**Jerry R. Howard Reisenfeld & Associates Original Counsel of Record**
**Dinsmore & Shohl Current Counsel of Record**

-Promissory Note to American Home Mortgage Acceptance, Inc.
-No Promissory Note Assignment.
-2/09 American Home Mortgage Liquidated in Bankruptcy.   Extinct entity.
-MERS Mortgage "acting solely as nominee for American Home Mortgage."
-No Mortgage Assignment filed with Foreclosure.
-10/21/09 Mortgage Assignment recorded after Foreclosure and filed with Motion
for Default.
-Mortgage Assignment defective on its face pursuant to KRS 382.270 and
382.290.
-Mortgage Assignment drafted by Jerry R. Howard, partner Reisenfeld &
Associates.
-Mortgage Assignment executed in the state of Florida by Lender Processing
Services employee, Michelle Halyard, (alleged robo-signer,) as "Signature and
Title of Officer," claiming she was simultaneously acting on behalf of MERS, and

8

the bankrupt/extinct entity, American Home Mortgage, as grantors for the benefit
of their client, the grantee, Deutsche Bank.
-Lender Processing Services employee, Gerhard v. Heckerman, Notary.
-Litigation pending.

**Moody Loan #3**
**Madison Circuit 09-CI-1522**
**Citimortgage, Inc. Plaintiff**
**Manley Deas Kochalski Counsel of Record**

-Promissory Note to American Home Mortgage Acceptance, Inc.
-No Promissory Note Assignment.
-MERS Mortgage "acting solely as nominee for American Home Mortgage."
- American Home Mortgage.   Assets were sold in Bankruptcy 8/5/08.   2/23/09
liquidated in Bankruptcy.   Extinct entity.
-10/1/09 Mortgage Assignment recorded.
- Mortgage Assignment defective on its face pursuant to KRS 382.270 and
382.290.
-Mortgage Assignment drafted by Counsel of Record, Manley Deas Kochalski.
-Mortgage Assignment executed in the state of Missouri by CitiMortgage
employee, Scott Scheiner (alleged robo-signer,) as "Vice President" of MERS
claiming he was simultaneously acting on behalf of MERS, and the
bankrupt/extinct entity, American Home Mortgage, as grantors for the benefit of
his employer, the grantee, CitiMortgage.
  -CitiMortgage employee, Alex Crossman, Notary.
  -Litigation pending.

**Moody Loan #4**
**Madison County 09-CI-1300**
**Deutsche Bank National Trust Company as Indenture Trustee Plaintiff**
**Lerner Sampson Rothfuss Original Counsel of Record**
**Dinsmore & Shohl Current Counsel of Record**
**Middleton Reutlinger Counsel of Record for MERS**

  No Promissory Note
-MERS Mortgage "acting solely as nominee for American Home Mortgage
Acceptance, Inc."
-    American Home Mortgage.   Assets were sold in Bankruptcy 8/5/08.   2/23/09
liquidated in Bankruptcy.   Extinct entity.
-No Mortgage Assignment filed with Foreclosure.
-No Mortgage Assignment.
-Litigation pending.

**Moody Loan #5**
**Madison Circuit 09-CI-1293**
**Deutsche Bank National Trust Company as Indenture Trustee Plaintiff**

9

**Lerner Sampson Rothfuss Original Counsel of Record**
**Dinsmore & Shohl Current Counsel of Record**
**Middleton Reutlinger Counsel of Record for MERS**

-Promissory Note to American Home Mortgage Acceptance, Inc.
-No Promissory Note Assignment.
-MERS Mortgage "acting solely as nominee for American Home Mortgage
Acceptance Inc."
- American Home Mortgage.   Assets were sold in Bankruptcy 8/5/08.   2/23/09
liquidated in Bankruptcy.   Extinct entity.
-No Mortgage Assignment filed with Foreclosure.
-No Mortgage Assignment served with Motion for Default and Summary Judgment.
-11/09/09 Motion for Default and Summary Judgment Denied and Overruled by
Judge Logue.
-Litigation pending.


**Moody Loan #6**
**Madison Circuit 09-CI-1297**
**Deutsche Bank National Trust Company as Indenture Trustee Plaintiff**
**Lerner Sampson Rothfuss Original Counsel of Record**
**Dinsmore & Shohl Current Counsel of Record**
**Middleton Reutlinger Counsel of Record for MERS**

-No Promissory Note.
-MERS Mortgage "acting solely as nominee for American Home Mortgage
Acceptance Inc."
- American Home Mortgage.   Assets were sold in Bankruptcy 8/5/08.   2/23/09
liquidated in Bankruptcy.   Extinct entity.
-No Mortgage Assignment filed with Foreclosure.
-No Mortgage Assignment.
-Litigation pending.


**Moody Loan #7**
**Madison Circuit 09-CI-1410**
**Aurora Loan Services Plaintiff**
**Manley Deas Kochalski Counsel of Record**

-Promissory Note to American Home Mortgage Acceptance, Inc.
-No Promissory Note Assignment.
-MERS Mortgage "acting solely as nominee for American Home Mortgage."
-American Home Mortgage.   Assets were sold in Bankruptcy 8/5/08.
    2/23/09 liquidated in Bankruptcy.   Extinct entity.
    -10/1/09 Mortgage Assignment recorded.
    -Mortgage Assignment defective on its face pursuant to KRS 382.270 and
    382.290.
    -Mortgage Assignment drafted by Counsel of Record, Manley Deas Kochalski.


10

-Mortgage Assignment executed in the state of Nebraska by Aurora Loan Services employee, Theodore Schultz (alleged robo-signer,) as "Vice President" of MERS claiming he was simultaneously acting on behalf of MERS, and the bankrupt/extinct entity, American Home Mortgage, as grantors for the benefit of his employer, the grantee, Aurora Loan Services.

-Aurora Loan Services employee, Darlene Dietz (alleged robo-signer,) Notary.

-Litigation pending.   Motion for Summary Judgment and Order for Sale set aside.

-Attached as a Tag-Along to MDL 2119, *In Re Mers Litigation,* and subsequently transferred back, based on the decision of the MDL Panel that MDL 2119 will only include cases taking place in states which allow non-judicial foreclosure.   Kentucky is a judicial foreclosure jurisdiction.

### Moody Loan #8
### Madison Circuit 09-CI-1922
### Deutsche Bank National Trust Company as Indenture Trustee Plaintiff
### Lerner Sampson Rothfuss Original Counsel of Record
### Dinsmore & Shohl Current Counsel of Record

Promissory Note to American Home Mortgage.

-No Assignment of Promissory Note.

-MERS Mortgage "acting solely as nominee for American Home Mortgage."

-    American Home Mortgage.   Assets were sold in Bankruptcy 8/5/08. 2/23/09 liquidated in Bankruptcy.   Extinct entity.

-No Mortgage Assignment filed with Foreclosure.

-No Mortgage Assignment.

-Litigation pending.

### Moody Loan #9
### Fayette Circuit 09-CI-4463
### Deutsche Bank National Trust Company as Indenture Trustee Plaintiff
### Lerner Sampson Rothfuss Original Counsel of Record
### Dinsmore & Shohl Current Counsel of Record
### Middleton Reutlinger Counsel of Record for MERS

-No Promissory Note

-MERS Mortgage "acting solely as nominee for American Home Mortgage Acceptance, Inc."

-American Home Mortgage.   Assets were sold in Bankruptcy 8/5/08.   2/23/09 liquidated in Bankruptcy.   Extinct entity.

-No Mortgage Assignment filed with Foreclosure.

-No Mortgage Assignment.

### Moody Loan #10
### Fayette Circuit 09-CI-4513
### U.S. Bank Association as Indenture Trustee Plaintiff

**Lerner Sampson Rothfuss Original Counsel of Record**
**Dinsmore & Shohl Current Counsel of Record**
**Middleton Reitlinger Counsel of Record for MERS**

-Promissory Note to American Home Mortgage Acceptance, Inc.
-No Promissory Note Assignment.
-2/09 American Home Mortgage Liquidated in Bankruptcy.   Extinct entity.
-MERS Mortgage "acting solely as nominee for American Home Mortgage."
-No Mortgage Assignment filed with Foreclosure.
-9/1/09 Mortgage Assignment recorded after Foreclosure and filed with Motion
for Default.
-Mortgage Assignment defective on its face pursuant to KRS 382.270 and
382.290.
-Mortgage Assignment drafted by DOCX employee, Ron Meharg.
-Mortgage Assignment executed by DOCX employees, Tywanna Thomas,
(alleged robo-signer,) and Linda Green (alleged robo-signer,) as "Assistant
Secretary and Vice President of MERS," claiming that they were
simultaneously acting on behalf of MERS, the bankrupt/extinct entity,
American Home Mortgage, as grantors for the benefit of their client, the
grantee, U.S. Bank as Indenture Trustee.
-DOCX employee, Diane Miskell, Notary.
-Litigation pending.

**Moody Loan #11**
**Fayette Circuit 09-CI-6675**
**U.S. Bank Association as Indenture Trustee Plaintiff**
**Jerry R. Howard Reisenfeld & Associates Original Counsel of Record**
**Dinsmore & Shohl Current Counsel of Record**
**Middleton Reitlinger Counsel of Record for MERS**

- 2005 Promissory Note to American Home Mortgage Acceptance, Inc.
-MERS Mortgage "acting solely as nominee for American Home Mortgage
Acceptance, Inc."
-American Home Mortgage.   Assets were sold in Bankruptcy 8/5/08.   2/23/09
liquidated in Bankruptcy.   Extinct entity.
-No Mortgage Assignment filed with Foreclosure.
-No Mortgage Assignment.
-Litigation pending.

**Moody Loan #12**
**Fayette Circuit 09-CI-4465**
**Deutsche Bank National Trust Company as Indenture Trustee Plaintiff**
**Lerner Sampson Rothfuss Original Counsel of Record**
**Dinsmore & Shohl Current Counsel of Record**
**Middleton Reitlinger Counsel of Record for MERS**

-Promissory Note to American Home Mortgage Acceptance, Inc.
-No Promissory Note Assignment.
-MERS Mortgage "acting solely as nominee for American Home Mortgage."
-Mortgage attached as Exhibit "B" is for a loan unrelated to the Promissory Note.
- American Home Mortgage.   Assets were sold in Bankruptcy 8/5/08.   2/23/09 liquidated in Bankruptcy.   Extinct entity.
-No Mortgage Assignment filed with Foreclosure.
-9/1/09 Mortgage Assignment recorded for a Mortgage unrelated to the Promissory Note and filed after Foreclosure with Motion for Default.
-Mortgage Assignment defective on its face pursuant to KRS 382.270 and 382.290.
-Mortgage Assignment drafted by DOCX employee, Ron Meharg.
-Mortgage Assignment executed in Georgia by DOCX employees, Tywanna Thomas, (alleged robo-signer,) and Linda Green (alleged robo-signer,) as "Assistant Secretary and Vice President of MERS," claiming that they were simultaneously acting on behalf of MERS, the bankrupt/extinct entity, American Home Mortgage, as grantors for the benefit of their client, the grantee, U.S. Bank as Indenture Trustee.
-DOCX employee, Chris M. Ivey, Notary.
-Litigation pending.

## II.B.  THE DEFENDANTS

### Mortgage Electronic Registration Systems, Inc., MERSCORP, hereinafter collectively ("MERS") and the MERS Shareholders:

7.        Defendant Merscorp, Inc., is a foreign corporation created in or about

1998 by conspirators from the largest banks in the United States in order to undermine

and eventually eviscerate long-standing principles of real property law, such as the

requirement that any person or entity who seeks to foreclose upon a parcel of real

property: 1) be in possession of the original note, 2) Have a publicly recorded mortage in

the name of the party for whom the underlying debt is actually owed and who is the

holder of the original Promissory Note with legally binding assignments, and 3) possess a

written assignment giving he, she or it actual rights to the payments due from the

borrower pursuant to both the mortgage and note.

8.        Defendant Merscorp, Inc., claims to be the sole shareholder in an entity

by the name of Mortgage Electronic Registrations Systems, Inc., ("MERS"). MERS is the

13

RICO enterprise and is the primary innovation through which the conspirators, including the Defendants, have accomplished their illegal objectives as detailed throughout this Complaint.

9.    For the purposes of this action, MERS shall also refer to each and every shareholder of MERSCORP, who will be named as their identities are revealed.

10.    The Complaint names the entity, Mortgage Electronic Registration Systems, Inc., hereinafter, ("MERS").    MERS is the mortgage holder of record for the Class Plaintiff's second mortgage.    The lender to the second mortgage is M & I Bank FSB.    It is this second mortgage, which is the subject of this action.

11.    MERS is not the original lender for any of the class members loans. MERS is not the creditor, beneficiary of the underlying debt or an assignee under the terms of the Promissory Notes of the class members.    MERS does not hold the original of the Promissory Note, nor has it ever held the Promissory Notes of the class members.

12.    The Mortgagee, MERS, is a owned by the company, MERSCORP, which is in turn owned by a group of Wall Street investment Banks.

13.    MERS is unregistered and unlicensed to conduct mortgage lending or any other type of business in the Commonwealth of Kentucky and has been and continues to knowingly and intentionally illegally and fraudulently record mortgages and conduct business in Kentucky on a large scale and systematic fashion..

14.    No promissory Note or other evidence exists which could ever make the Plaintiffs and the class members indebted to MERS in any way.

14

15.     MERS never had nor will it ever have standing to enforce the illegal and fraudulent mortgage it filed against the properties in question.   MERS never had nor will it ever have the authority to assign the Mortgage to any entity.

16.     MERS has never possessed a pecuniary or financial interest in the Notes of the Plaintiffs and the class members.

17.     MERS has never had any right to collect on the Note or enforce the Mortgage, nor has it had a right to hold, enforce or collect upon any of the thousands of Mortgages it has fraudulently recorded throughout the Commonwealth of Kentucky, in the 50 states, the District of Columbia and all other US Territories.

### The Law Firms:

18.     In or about the last decade, the Defendant Firms joined with Defendant Merscorp, Inc., and other conspirators in the fraudulent scheme and RICO enterprise herein complained. . The employees of the Defendant Firms, including many licensed attorneys, have become skilled in using the artifice of MERS to sabotage the judicial process to the detriment of borrowers, and, over the past several years, have routinely relied upon MERS to accomplish illegal acts.

19.     Manley Deas Kochalski PLLC, is a law firm with its principal place of business in the state of Ohio.   Herein after ("MDK",) the firm is one of the regional foreclosure mills.

20.     Dinsmore & Shohl LLP, is a law firm with its principal place of business in the state of Ohio.   Herein after ("D&S",) the firm is one of the regional foreclosure mills, and the regional corporate counsel for GMAC.

15

21.    Lerner Sampson & Rothfuss, is a law firm with its principal place of business in the state of Ohio.    Herein after ("LSR",) the firm is one of the regional foreclosure mills, and the Kentucky counterpart to Florida's Stern Law Group in that the partners of LSR own their own document processing company, LSR Processing LLC, to generate loan and mortgage documents.    LSR has a pattern and practice on drafting missing mortgage and loan documents and in turn, having them executed by their own employees.

22.    Jerry R. Howard Reisenfeld & Associates, LPA, is a law firm with its principal place of business in the state of Ohio.    Herein after ("R&A" ,) the firm is one of the regional foreclosure mills.

23.    Middleton & Reutlinger, is a Kentucky based law firm and serves as MERS regional counsel.

## The Document Processing Defendants:

24.    LSR Processing LLC, is a document processing company, based in the state of Ohio to generate loan and mortgage documents.    Upon information and belief it is owned by one or more of the partners of LSR law firm.    LSR Processing was created in order to facilitate the conspiratorial acts of the Defendants in relation to the creation of fraudulent Promissory Notes, Note Assignments, Affidavits and Mortgage Assignments LSR Processing has a pattern and practice of drafting missing mortgage and loan documents and in turn, having them executed by their own employees.

25.    DOCX LLC, hereinafter ("DOCX".)    Defendant, DOCX, is a Georgia Corporation with its principal place of business in Irvine, California.    Although DOCX is

doing business in the state of Kentucky, it is not registered to engage in business in the state of Kentucky.

26.    Defendant Lender Processing Services, Inc. ("LPS") is a Delaware Corporation, with its principal place of business in Jacksonville, Florida.    Although LPS is doing business in the state of Kentucky, it is not registered to engage in business in the state of Kentucky.    At all times relevant hereto, LPS was the parent company of DOCX. Together they are referred to as ("LPS/DOCX.")

### The Servicers and MBS "Trusts"[2]:

27.    GMAC Mortgage and GMAC Residential Funding Corporation, collectively hereinafter ("GMAC",) is a foreign business entity, which according to the MERS internet web site, www.mersinc.org, is a shareholder in MERS.    GMAC serves as a servicer on tens of thousands of Mortgage loans.

28.    The Deutsche Bank as "Trustee" is a generic term for an entity not incorporated or registered to do business in any of the United States in order to facilitate illegal property foreclosures.

29.    CitiMortgage is a foreign business entity, which according to the MERS internet web site, www.mersinc.org, is a shareholder in MERS.

30.    Aurora Loan Services is thought to be a foreign corporation, but is not registered to conduct business in the state of Kentucky.

31.    Nationstar Mortgage is thought to be a foreign corporation, but is not registered to conduct business in the state of Kentucky.

---

2 Other loan Servicers and MBS "Trustee" Defendants shall be named as their identities are revealed.    The underwriters and originators of the MBS "Trusts" shall be named as their identities are revealed.    It is anticipated that they will include, bu in no way be limited to Bear Stearns, Lehman Brothers, RFC Financial and Goldman Sachs.

32.     Us Bank is thought to be a foreign corporation, but is not registered to conduct business in the state of Kentucky.

33.     BAC Loan Servicing, is a foreign business entity, which according to the MERS internet web site, www.mersinc.org, is a shareholder in MERS.

34.     M & I Bank FSB is believed to be a financial services company. According to the records of the Kentucky Secretary of State, it is not registered in the state of Kentucky as a Bank or any other type of business entity.

## II. JURISDICTION AND VENUE

35.     The Court has original and subject matter jurisdiction over the Plaintiffs' statutory and common law violations of RICO, Kentucky, and common law.

36.     Venue is proper in this Judicial District as two of the lead Plaintiffs' properties are located in Hardin County, Kentucky.    Defendants have conducted business, albeit illegally in this County and throughout the one hundred twenty (120) Counties in Kentucky and throughout the United States by filing tens of thousands of fabricated, illegal and unenforceable Promissory Notes, Assignments of Promissory Notes, Affidavits as to loan ownership and Status of Accounts, Mortgages and Assignments of Mortgages.

## III.  INTRODUCTION

37.     This case arises due to the fact that for the Class Plaintiff and the members of this putative class, their Mortgages and in some cases, the foreclosures that followed,  were and will be based upon a mortgage and a note in the mortgage that are not  held by the same entity or party and are based upon a mortgage that was flawed at the date of origination of the loan because Mortgage Electronic Registration Systems

18

("MERS") was named as the beneficiary or nominee of the lender on the mortgage or an

assignee and because the naming of MERS as the beneficiary was done for the purpose of

deception, fraud, harming the borrower and the theft of revenue from in all one hundred

(120) Kentucky Counties through the illegal avoidance of mortgage recording fees.

      38.     This action includes class members from each and every Federal

jurisdiction, whether or not the individual state allows the foreclosure of the homes in its

state without the owner of the home ever having the opportunity to defend itself in a

Court of law, (the non-judicial foreclosure states.)   Therefore, for purposes of this action

the term "Mortgage" shall include the term "Deed of Trust."

      39.     In the case where a foreclosure has been filed, the entity filing the

foreclosure has no pecuniary in the mortgage loan.   The foreclosing entity is a third

party.   The entity lacks standing, and most times, the capacity to foreclose.   The entity

has no first hand knowledge of the loan, no authority to testify or file affidavits as to the

validity of the loan documents or the existence of the loan.   The entity has no legal

authority to draft mortgage assignments relating to the loan.   The foreclosing entity and

its agents regularly commit perjury in relation to their testimony.

      40.     The "lender," on the original Promissory Note was not the lender.   The

originators of the loan immediately and simultaneously securitized the note.   The

beneficial interest in the note was never in the lender.   MERS, acting as the mortgagee or

mortgage assignee, was never intended to be the lender nor did it represent the true lender

of the funds for the mortgage. The Servicer, like GMAC Mortgage, or some party has or

is about to declare the default, is not in privity with the lender.   The true owner or

beneficiary of the mortgage loan has not declared a default and usually no longer have an

19

interest in the note. The Servicer is not in privity nor does it have the permission of the beneficial owners of the Note to file suit on their behalf.

41.    The obligations reflected by the note allegedly secured by the MERS mortgage have been satisfied in whole or in part because the investors who furnished the funding for these loans have been paid to the degree that extinguishment of the debts has occurred with the result that there exists no obligations on which to base any foreclosure on the property owned by the Class Plaintiffs. Defendants have and will cloud the title and illegally collect payments and attempt to foreclose upon the property of the Plaintiffs when they do not have lawful rights to foreclose, are not holders in due course of the notes.

42.    Any mortgage loan with a Mortgage recorded in the name of MERS, is at most, an unsecured debt. The only parties entitled to collect on the unsecured debt would be the holders in due and beneficial owners of the original Promissory Note.

43.    The loan agreements were predatory and the Defendants made false representations to the Class Plaintiffs which induced the Class Plaintiffs to enter into the loans and the Defendants knew the representations were false when they were made.

44.    This is a Class Action brought for violations of Kentucky and Federal law. It is brought by one or more classes of mortgagors who have been sued for either in foreclosure or Declaratory Judgments for Truth in Lending Act ("TILA") Regulation Z Rescissions, by entities lacking capacity (fake Trusts), to file suit in Kentucky and who lack standing as a real party in interest to the underlying debt; which would exist in the form of a negotiable instrument, a Promissory Note. The class members also consist of any and all mortgagors in the state of Kentucky whose mortgages are or were ever

publicly recorded in the name of MERS, regardless of whether there is a suit in foreclosure against the property.

45.    Although the loan transactions in question contain dozens of violations of federal and state statutes and common law torts, which have been perpetrated against Kentucky recording clerks, the Kentucky Revenue Cabinet and property owners, this Class Action concerns to violations of law pertaining to the improper and illegal drafting, execution and public recording of Affidavits, Mortgages and Assignment of Mortgages used to illegally divest and the continued illegal attempts to divest property owners of title to their property.

46.    In addition to damages, the violations have created and continue to create a permanent cloud on Kentucky and nationwide titles and land records in relation to the titles illegally divested.   This cloud potentially affects every resident of Kentucky and the United States as all have the potential to be the title holders of the clouded property.

47.    Since 2007, and going forward, many property owners found themselves defending a foreclosure action during the pendency of a Declaratory action to loan rescission under TILA's Regulation Z.    Often, the Declaratory Judgment and Foreclosure would be filed by different parties.    Other property owners found themselves served with a foreclosure action while in the middle of a loan modification with an entity they were led to believe was a bank and their lender.    Others were foreclosed upon due to an involuntary default due to a substantial and insurmountable increase in their adjustable rate mortgage.    While still others were foreclosed during a voluntary default made at the request of a loan Servicer, whom the borrower believed to

be a Bank and their lender. This was a lie. These voluntary defaults were obtained by the third party loan Servicer under the guise that the voluntary 60 day default was necessary in order for the homeowner to qualify for a Government sponsored loan modification program.

48.    The property owners find that they have been sued in Declaratory Judgment and/or foreclosure by a third party Loan Servicing Agent for "Trustee for the _____Trust" or by a fourth party Sub-Servicer. The Servicers have absolutely no legal rights or legal connection to the mortgage loan.    In other cases the "Trust" themselves will come to Court.

49.    The pattern and practice of the Servicers, MBS Trusts, the document processing companies and law firms was to procure fraudulent and forged documents for the sole purpose of creating a fraud in the public record in order to illegally take property in foreclosure.

50.    Certain individuals who were the employees of the Servicer, document processing company and even the employees of the law firms executed and notarized forged documents as to the ownership of the loan. The affiants have committed wide-spread and counts of fraud, perjury and forgery in the tens of thousands. These forgers have been referred in the press with the vernacular term "robo-signers."

51.    In these cases, the property could be foreclosed by default, sold and transferred without ANY real party in interest havening ever come to Court and with out the name of the "Trust" or the owners of the mortgage loan, ever having been revealed. Many times the Servicer will fraudulently keep the proceeds of the foreclosure sale under the terms of a Pooling and Servicing Agreement as the "Trust" no longer exists or has

been paid off. The Court and the property owner will never know that the property was literally stolen.

52.    After the property is disposed of in foreclosure, the real owners of the mortgage loan are still free to come to Court and lay claim to the mortgage loan for a second time. These parties who may actually be owed money on the loan are now also the victims of the illegal foreclosure. The purchaser of the property in foreclosure has a bogus and clouded title, as well as all other unsuspecting buyers down the line. Title Insurance would be impossible to write on the property.

53.    The "Trusts" coming to Court are actually Mortgage Backed Securities ("MBS"). The Servicers, like GMAC, are merely administrative entities which collect the mortgage payments and escrow funds. The MBS have signed themselves up under oath with the Securities and Exchange Commission ("SEC,") and the Internal Revenue Service ("IRS,") as mortgage asset "pass through" entities wherein they can never own the mortgage loan assets in the MBS. This allows them to qualify as a Real Estate Mortgage Investment Conduit ("REMIC") rather than an ordinary Real Estate Investment Trust ("REIT"). As long as the MBS is a qualified REMIC, no income tax will be charged to the MBS. For purposes of this action, "Trust" and MBS are interchangeable.

## Real Estate Mortgage Investment Conduit (REMIC):

54.    Although the Plaintiffs attempting to foreclosure refer to themselves as "Trustees" of a "Trust," the entities are not "Trustees" nor "Trusts" as defined by Kentucky law. Neither are the entities registered as Business Trusts or Business Trustees as required by Kentucky law. In every case, where one of these MBS have come to a Kentucky Court the entity foreclosing lacked capacity sue to file suit in the

State of Kentucky.   There is no "Trust Agreement" in existence.   The entity filing has

utilized a Kentucky legal term it has no right to use for the sole purpose of misleading the

Court.

55.    Although the "Trust" listed may be registered with the Securities and

Exchange Commission ("SEC") and the Internal Revenue Service ("IRS") as a Real

Estate Mortgage Investment Conduit ("REMIC"), more often than it is not properly

registered in any state of the union as a Corporation, Business Trust, or any other type of

corporate entity.   Therefore, the REMIC does not legally exist for purposes of capacity

for filing a law suit in Kentucky or any other State.

56.    REMICS were newly invented in 1987 as a tax avoidance measure by

Investment Banks.   To file as a REMIC, and in order to avoid one hundred percent

(100%) taxation by the IRS and the Kentucky Revenue Cabinet, an MBS REMIC could

not engage in any prohibited action.   The "Trustee" can not own the assets of the

REMIC.  A REMIC Trustee could never claim it owned a mortgage loan.  Hence, it can

never be the owner of a mortgage loan.

57.    Additionally, and important to the issues presented with this particular

action, is the fact that  in order to keep its tax status and to fund the "Trust" and legally

collect money from investors, who bought into the REMIC, the "Trustee" or the more

properly named, Custodian of the REMIC, had to have possession of ALL the original

blue ink Promissory Notes and original allonges and assignments of the Notes, showing a

complete paper chain of title.

58.    Most importantly for this action, the "Trustee"/Custodian   MUST have

the mortgages recorded in the investors name as the beneficiaries of a MBS in the year

the MBS "closed."    Every mortgage in the MBS should have been publicly recorded in

the Kentucky County where the property was located with a mortgage in the name similar

to "2006 ABC REMIC Trust on behalf of the beneficiaries of the 2006 ABC REMIC

Trust."    The mortgages in the referenced example would all have had to been publicly

recorded in the year 2006.

59.    As previously pointed out, the "Trusts" were never set up or registered

as Trusts.    The Promissory Notes were never obtained and the mortgages never obtained

or recorded.

60.    The "Trust" engaged in a plethora of "prohibited activities" and sold

the investors certificates and Bonds with phantom mortgage backed assets.    There are

now nationwide, numerous Class actions filed by the beneficiaries (the owners/investors)

of the "Trusts" against the entities who sold the investments as REMICS based on a

bogus prospectus.

61.    In the above scenario, even if the attorney for the servicer who is

foreclosing on behalf of the Trustee (who is in turn acting for the securitized trust)

produces a copy of a note, or even an alleged original, the mortgage loan was not

conveyed into the trust under the requirements of the prospectus for the trust or the

REMIC requirements of the IRS.

62.    As applied to the Class Members in this action, the end result would be

that the required MBS asset, or any part thereof (mortgage note or security interest),

would not have been legally transferred to the trust to allow the trust to ever even  be

considered a "holder" of a  mortgage loan.    Neither the "Trust" or the Servicer would

ever be  entitled  to bring a foreclosure or declaratory action.    The Trust will never have

standing or be a real party in interest.    They will never be the proper party to appear
before the Court.

63.    The transfer of mortgage loans into the trust after the "cut off date" (in
the example 2006), destroys the trust's REMIC tax exempt status, and these "Trusts" (and
potentially the financial entities who created them) would owe millions of dollars to the
IRS and the Kentucky Revenue Cabinet as the income would be taxed at of one hundred
percent (100%).

64.    Subsequent to the "cut off date" listed in the prospectus, whereby the
mortgage notes and security for these notes had to be identified, and Note and Mortgages
transferred,    and    thereafter, the pool is permanently closed to future transfers of
mortgage assets.

65.    All Class members have mortgage loans which were recorded in the
name of MERS and/or for which were attempted through a Mortgage Assignment to be
transferred into a REMIC after that REMIC's "cut off" and "closing dates."

66.    In all cases, the lack of acquisition of the Class Members' mortgage
loans violates the prospectus presented to the investors and the IRS REMIC
requirements.

67.    If an MBS Trust was audited by the IRS and was found to have violated
any of the REMIC requirements, it would lose its REMIC status and all back taxes would
be due and owing to the IRS as well as the state of Kentucky.    As previously stated, one
hundred percent (100%) of the income will be taxed.

26

68.    As the Class Members are identified and the identity of the MBS REMICs revealed through this action, the individual "Trusts"/ MBS REMICs will be turned over to the IRS for auditing.

69.    Upon information and belief, it is asserted that the IRS is aware that a list of alleged "unqualified" REMICs is forthcoming through the identity of the Class Members' mortgage loan "Trusts" in this action.

## Securitization and Standing:

70.    To the judges throughout the Commonwealth and to the homeowners, the foreclosing Plaintiff, a servicing company or "Trust" entity appears to be a bank or lender.    This falsity is due to its name in the style of the case.    They are not banks or lenders to the loan.    They are not a beneficiaries under the loan.    They do not possess a Mortgage in the property.    They will never have a right to posses a mortgage in the property.    It would have been a more honest representation for the foreclosing entity to called itself something like "Billy Bob's Bill Collectors,"

71.    In such cases, the "trustee" filing the foreclosure complaint is not known to the homeowner.    The very first time the homeowners learns that their home was put up as collateral for a publicly traded and sold home loan REMIC (a federally regulated Security) is at the time they are served with a foreclosure complaint.

72.    These "trusts" are actually Mortgage Backed Securities (MBS).    An MBS is an investment vehicle, defined and regulated as "Security" by the Security and Exchange Commission (SEC.)

73.    At the time the homeowners signed a Promissory Note and Mortgage, they were unknowingly converting their property into an asset of a MBS.    The

27

homeowners were never informed of the nature of the scheme.    They were deliberately

induced into signing a Negotiable Instrument which was never intended as such, but was

intended as collateral for a MBS.

74.    The fact that the loan was meant to fund a MBS was a "material

disclosure" which was deliberately and intentionally undisclosed.    The failure to disclose

the identity of the true lender at closing was also a "material disclosure;" the nature of

which would make the contract voidable under Kentucky contract law.

75.    From the time of the Great Depression up and until 1999, the

conversion of loans into MBS was illegal. The Banking Act of 1933 established the

Federal Deposit Insurance Corporation (FDIC) in the United States and introduced

banking reforms, some of which were designed to control speculation of the exact nature

of what has taken place in the last several years.    It was commonly known as the Glass–

Steagall Act.    Over the years provisions of the Act were eroded little by little, until the

Act was finally killed with the last repeal of the section which prohibited  a bank holding

company from owning other financial companies.    This was accomplished with the

Gramm–Leach Act.

76.    The repeal of the Glass-Steagall Act of 1933 effectively removed the

separation that previously existed between Wall Street investment banks and depository

banks and has been blamed for creating the damage caused by the collapse of the

subprime mortgage market that led to the <u>Financial crisis of 2008</u>–present day.    The

repeal opened the door for an interpretation which would supposedly allow securitization

of mortgage loans.  This interpretation has yet to be challenged, is ripe for such, but must

be left for another day.

77.    Mostly beginning in 2004, hundreds of thousands of residential mortgages were bundled together (often in groups of 5,000 mortgages), and investors were offered the opportunity to buy shares of each bundle, an MBS.    Some of the bundles were offered as Bond Certificates, guaranteeing a rate of return.    Many of these Bond MBS were funded by large private and governmental pension funds and in some cases, as the case with Greece, by foreign governments

78.    Investments were made in the MBS, based on a prospectus, which had to be filed with the SEC.    The MBS would always be rated "AAA" by Moody's or Standard & Poors in order to invoke a sense of confidence for the investors.    The rating agencies were hired and compensated by the underwriter/salesman of the MBS.    The rating Agencies are currently under investigation by the Justice Department for their role in the financial meltdown.

79.    The prospectus was created, the MBS rated and the investors money was pledged and collected long before the homeowner ever even applied for a loan.

80.    In other words, the MBS was created first.    The loans fitting the description of those found in the prospectus had to then be created and originated.    Each MBS/Trust was required to keep a list of the individual loans they had allegedly recruited for the MBS.    This list has to be publicly recorded with the SEC.    However, the SEC did not require any proof that the loans actually existed or were possessed by the MBS.    For the tax man and in order to qualify as a REMIC, the Notes and mortgages listed with the SEC had to be held, and mortgages recorded ON THE DATE THE MBS CLOSED.

81.    Each such MBS bundle was given a name, such as "ABC Home Loan Trust 2006 ABC-8."    The name indicates information about the particular trust, such as

29

the year it was created and closed and its reference name and number for the SEC and IRS.

82.    As required by the SEC, each MBS/Trust has a Pooling and Servicing Agreement ("PSA") which must be publicly filed.    The only purpose for the PSA is for the administration and distribution of funds to the investors and the obligation of the so-called Trustee in administering the MBS.    The investors who put up the money for the MBS and who received the MBS Certificates or Bonds, are not parties to the PSA.

83.    The PSA merely sets forth what happens after the mortgages are bundled together.    However, the PSA also sets forth a Cut Off Date.    The Cut Off Date is the date on which all mortgage loans in the MBS/Trust must be identified and set out in the SEC required list of mortgage loans.    Often, these loans were identified and listed for the SEC and the investors, regardless of whether the loan existed or had been closed. Some loans were listed in SEC filings in multiple MBS.

84.    Like the Cut Off Date, each MBS/Trust had a Closing Date.    The Closing Date is the date that the individual identified mortgages were to be transferred through the Custodian for the benefit of the investors.    The Trust Custodian must certify that for each mortgage loan, the Trust Custodian has possession of the original Promissory Note, all original endorsements and assignments transferring the Note and proof that the ownership of the Note has been transferred for the benefit of the shareholder/investors.    Further proof of the ownership of a mortgage loan is required by a public recording of the Mortgage or Assignment of the Mortgage itself.    This MUST have occurred by the closing date.

85.    The Servicers worked to collect money for the MBS from the individual loans and collected and distributed escrow funds.    The "Trustees" were Custodians, akin to administrators.

86.    Typically, and contrary to Kentucky law, the Trust would include equivalent language regarding the handling of these required Assignments: "Assignments of the Mortgage Loans to the Trustee (or its nominee) will not be recorded in any jurisdiction, but will be delivered to the Trustee in recordable form, so that they can be recorded in the event recordation is necessary in connection with the servicing of a Mortgage Loan."    This publicly recorded provision to deliberately keep the transfers out of the public record, violates the Mortgage recording Statute of almost every State of the Union.

87.    While attempting to circumvent Kentucky recording Statutes, the MBS Trust created for itself a situation wherein it had no legally recognizable interest in the loans for the benefit of the investors.    The investors were invested in nothing.    The MBS possessed nothing on the date the REMIC closed and perpetrated a fraud on the investors and the American taxpayer through its fraudulent qualification as a REMIC with the SEC.

88.    No bank, lending institution or "Trustee" ever pledged or put up the money for the Homeowners' loans.    The foreclosing entities had or have no pecuniary, ownership stake or beneficial interest in the homeowners' loans.

89.    A review of the foreclosures filed by the Servicers and "Trusts" typically states that the "Trustee" is the "Holder" of the homeowners' Note.    The

Complaint in foreclosure never states that the "Trustee is the owner of the homeowners' Note.

90.    More often than not, the statement that the foreclosing entity "holds" the original Promissory Note is an untruth.    The majority of the securitized Notes no longer exist, having been deliberately destroyed or disposed.    At the time the feeding frenzy of securitization occurred (mostly between 2004 and 2008,) paperwork was of little consequence as the goal of the originators was to fill and securitize as many loans as possible in order to create the loan number list for the SEC.    Likewise, whether or not the loans were ever repaid was of absolutely no consequence as the Servicers and "Trusts" had nothing to loose; the loans having been funded by the investors and were insured by multiple derivative contracts.

91.    Often, and contrary to Kentucky law, the Servicer would have a provision in its Pooling and Servicing Agreement which would allow it to collect and keep the proceeds of any foreclosures it could accomplish after the MBS Trust was paid off by derivatives and closed.    Often, a Servicer will show up in a Kentucky Court to foreclose on behalf of a Trustee who administers a MBS Trust which no longer exists.

92.    In addition, in order to make the Cut Off date to fill the SEC required loan number list, the appraisals for the loan were deliberately inflated as many of the investor Prospectus stated that  all the loans in the bundle met certain criteria, including and most significantly specific loan to value ratios.

93.    When the scheme was originated and implemented en mass (mostly between the years 2004 and 2007), what was not planned for or counted upon was the immediate 2008 massive real estate market collapse and the thousands of voluntary and

32

involuntary defaults and TILA loan rescissions of mortgage loans.   At the same time, the fair market value of housing dropped by as much as  fifty percent (50%) in some parts of the country.

94.     No legal plan was in place for such a wide spread loss of the assets. No legal plan was ever in place to deal with the fact that the original Prospectus to the shareholder/investors was a myth.     No legal plan was ever in place for the shareholder/investors to come to Court in an attempt to collect on the assets of the MBS they purchased.

95.     Most importantly for Kentucky foreclosures and Declaratory actions, the investors or beneficiaries did not have contracts with the Trusts, Servicers,  or Trustees to act on their behalf in a law suit in foreclosure or otherwise.

96.     In order to collect on the mortgage loans and divest Americans of their homes, Servicers and "Trustees" have had to mislead the Courts as to their standing in foreclosure.   They have had to create, forge and fabricate phony documents in order to obtain an Order of Sale in Foreclosure.

### The Creation and Use of Fraudulent Affidavits and Mortgage Assignments:

97.     In a foreclosure, the MBS/Trustee claims to be acting on behalf of the MBS/Trust and claims that it has acquired the loan from the originator.   The multiple transfers of title of the mortgage loan in between the originator and the MBS/Trust is simply ignored as it can never be proved or shown to the Court.   As previously stated, when a Servicer is foreclosing, an additional break in the chain occurs as the Servicer is often never the mortgagee of record under a Mortgage Assignment and has absolutely no

legal tie to the investors in the MBS. The "Trust" or Servicer can never hold or transfer a Mortgage in the property on behalf of the investors.

98.     In many of the cases, the originator is no longer in business and/or has been dissolved in bankruptcy. The MBS/Trustee never mentions the intervening transfers to the other parties or the shareholder/investors or to the Court. The MBS/Trustee never proves that such transfers lawfully occurred.

99.     In the rush to create these trusts and sell shares to investors as fast and in as large a quantity as possible, the loans, Mortgages and Assignments were never prepared, filed or recorded. This means that the entity seeking to foreclose can NEVER prove the chain of ownership.

100.     When a Servicer shows up in a Kentucky Circuit Court, it is even one more step removed from the ownership of the underlying debt and Mortgage and would NEVER have an ownership claim. The Homeowner has no idea that it is making payments to, corresponding with and applying for a modification with a mortgage loan servicer instead of a mortgage loan owner or that the Servicer is keeping part or all of proceeds of the mortgage payments without the knowledge or permission of the investors.

101.     In Wall Street's massive feeding frenzy and rush to transform Notes and Mortgages (negotiable instruments) into asset-backed securities, the necessary documents were never prepared or executed from the original lender to the MBS originator, to the Depositor to the Underwriter through the Securitized MBS/Trust to the only possible beneficiaries under the loans, the shareholder/investors.

34

102.    MBS/Trustees and their lawyers discovered in the foreclosure process that the Note and Mortgage Assignments would never be located because they never existed.    They also discovered that states did no allow blank Assignments or Assignments with retroactive effective dates.    To solve the problem of the missing and non-existent Assignments, the MBS/Trustees, their attorneys and their Servicing Agents, decided to fabricate Assignments from thin air and then quietly record the fabricated Assignments.    If a Promissory Note Assignment is presented to the Court, it deliberately do not state the date the promissory Note was assigned.    It was procured after the fact and is based in fraud and in violation of MBS Trusts' tax status requirements.    The dateless Promissory Note Assignment or allonge is then affixed to a copy of the Promissory Note as the original Promissory Note simply does not exist.    The fabricated Promissory Note Assignments are affixed to Motions for Default or Summary Judgment.

103.    The Assignments of the Mortgage were signed and notarized many years after the actual date of the loan and the date listed with the SEC and IRS as the "Closing" of the REMIC.    In every one of these cases, the MBS Trust has been operating illegally as a tax exempt REMIC.    The federal government is in turn, owed billions of dollars in income tax from these entities.    The individual states of the union has causes of action on behalf of their citizens for the unpaid state tax.

104.    Incredibly, most times, the Mortgage Assignments are dated after the filing of the foreclosure.    Most foreclosures are filed without an Assignment at all and the Mortgage attached as the Exhibit is in the name of the original lender or a third nominal party like Mortgage Electron Registration Systems, Inc. ("MERS".)    The

35

foreclosures are invalid on their face.    The recording statutes of every state in the union
have been violated.

105.    The fabricated Assignments were prepared by specially selected law
firms and companies that solely specialized in providing "mortgage default services" to
the MBS/Trusts and their Servicers.    In Kentucky, it is estimated that over ninety percent
(90%) of the filed Mortgage Assignments in the last three years were prepared,
fabricated, and filed by the same five or six law firms and default processing companies.

106.    In most cases, the Note and Mortgage were severed or bifurcated at the
closing table with the Mortgage being recorded in the name of MERS as "nominee" for
the original lender.    However, the original lender never actually loaned any money to the
homeowner.    The original lender was never owed or paid any money under the terms of
the Note.    There the Mortgage sat for years in the name of an entity, MERS, for which
the homeowner owed no money and which would never be beneficiary under the Note.
As previously set out, often the MERS held the Mortgage as "nominee" for a lender who
was out of business and/or liquidated in bankruptcy.    There could be no party legally
able to Assign the Mortgage on behalf of the dissolved lender.    The only party who could
authorize the Mortgage Assignment for a bankrupt lender would be the Bankruptcy
Trustee.    In these cases where a MERS mortgage has been assigned on behalf of a
bankrupt entity, a criminal violation of the bankruptcy code had occurred.

107.    When MERS did not appear as the original Mortgagee, two such
Assignments had to be prepared, executed  and filed by the "Trust," its Servicer, a
document processing company and/or a foreclosure mill law firm.    The first was
prepared in the name of MERS from the original lender; who as previously stated, may

be extinct or bankrupt.    A second bogus Assignment would then have to prepared and filed wherein an agent and sometimes an employee for the entity filing the foreclosure, or an employee of the law firm which filed the foreclosure, would forge the name of or hold themselves out as a Vice-President or executive of MERS.    By drafting, Executing and notarizing the Affidavit or Mortgage Assignment, the forger claimed that they had Mortgage Assignment authority for both MERS and the extinct original lender.

108.    An Assignment from MERS was a legal nullity.    MERS never had a interest in the Note or Mortgage.

109.    Often, the foreclosure mill law firm will sue MERS as a co-defendant with the property owner and then turn around and represent MERS as a Vice-President with the drafting and execution of an affidavit and/or mortgage assignment on MERS behalf.    In other words, the law firm claims to work for MERS, at the same time they are suing MERS.

110.    Often, the same half a dozen names appear on the Mortgage Assignments, which have been filed by the thousands.    Upon information and belief, the printed names on the Mortgage Assignments were not signed by the person whose name appears.    Not only were the robo-signers committing forgery and fraud, it would be physically impossible for them to have signed the tens of thousands of documents filed in Kentucky court and county clerks offices and in the courts and clerks offices across the nation.

111.    In all these cases, the Assignment is prepared to conceal the actual date that the property was to have "passed through" the MBS/Trust to the shareholder/investors.    Note Assignments for non-existent Notes and    Mortgage

37

Assignment were prepared and filed years after the mortgages and notes were actually fictionally assigned for the benefit of the shareholder/investors prior to the Closing Date of the MBS/Trust.  While exact Closing Dates can only be determined by looking at the MBS/Trust documents, filed with the SEC and IRS, any MBS/Trust that includes the year 2005 in its title closed in 2005.

112.    If a Mortgage Assignment is dated, notarized and filed in a year after the year set forth in the name of the grantee trust, it was an Assignment fraudulently made for the sole purpose of facilitating an illegal foreclosure or to use as evidence as standing in an action to challenge a homeowner's TILA Rescission.

113.    These Specially-Made Assignments have created havoc in the Courts and were done with the specific purpose of perpetrating a fraud on the Court.

114.    In many cases, the foreclosing entities did not even bother to request that the Specially-Made fabricated Assignment be prepared prior to the filing of the foreclosure.  In more cases than not, the Assignments are prepared and filed AFTER the foreclosure action has been initiated.  The MBS/Trust (who has no beneficial interest in the loan and probably is not in possession of the original Note) files a foreclosure and then attempts to make it appear to the Court that the MBS/Trust magically knew prior to the Assignment that it would acquire the defaulting property several weeks or months after the foreclosure is filed.

115.    Courts have repeatedly asked the MBS/Trustee  to explain why they were acquiring non-performing loans and whether such acquisition was a violation of the Trustee's fiduciary duty the beneficiaries under the MBS/Trust.  No MBS/Trustee has ever come forth and explained tat MBS/Trust actually listed the loan in its SEC loan list

without possessing the loan and that the loan was "acquired" years before the Assignment.    As a result, there are many decisions with observations similar to this observation by Judge Arthur M. Schack of Kings County, New York, in *HSBC Bank v. Valentin*, 21 Misc. 3d 1124 [A]:    "Further, according to plaintiff's application, the default of defendants Valentin and Ruiz began with the nonpayment of principal and interest due on January 1, 2007.    Yet four months later, plaintiff HSCB was willing to take an assignment of the instant nonperforming loan, four months in arrears?"

116.    In *Deutsche Bank National Trust Co. v. Harris*, Judge Arthur M. Schack, Kings, New York, Index No. 39192/2007 (05 FEB 2008) opined again: "Further, the Court requires an explanation from an officer of plaintiff DEUTSCHE BANK as to why, in the middle of our national sub-prime mortgage crisis, DEUTSCHE BANK would purchase a non-performing loan from [bankrupt and now dissolved] INDYMAC...."

117.    In cases where the Trust failed to get a valid Assignment, whether before or after the foreclosure, is further complicated by the actual parties participating as Assignors.    Most of the major loan originators, listed on the Mortgages or listed as a "nominee" of MERS on the original Promissory Notes, have been sold, closed or dissolved in bankruptcy.    These include, but are not limited to; American Home Mortgage, Option One Mortgage, Countrywide Home Loans, and INDYMAC.

118.    When these mortgage companies filed for bankruptcy, the Trusts did not claim an interest in the assets (loan lists.)    Years later, when Note and Mortgage Assignments were required for the MBS/Trust or Servicer to attempt foreclosure, a bankruptcy Court's permission  was needed to assign billions of dollars in Notes and

39

Mortgages.    Knowing that permission would not be granted, permission was NEVER

sought in any of the aforementioned bankruptcies.    Hence, the need arose to invent and

forge Affidavits and Assignments on behalf of the bankrupt entities.

119.    The similar issue occurs when a Servicer of an MBS/Trust needs to

invent an assignment, when the Mortgage is held by the "nominee" MERS.    Like the

third-party default service companies, the Servicer fabricates and executes the

Assignment on behalf of the Mortgagee MERS.    A double forgery takes place when the

Assignor purports to act on behalf of a non-existent or bankrupt entity.

120.    In lieu of valid Promissory Notes, Mortgages and Mortgage

Assignments, MBS/Trusts relied and continue to rely on these fabricated documents

produced and executed by their own law firms, Servicers and third-party default service

companies.

121.    Although the greatest risk of fraud from the fraudulently produced

assignments is imposed on the homeowners, this scheme poses a great risk in the

exposure of the Title Companies that guaranteed the clear and correct transfer of

ownership.    Additional risk is imposed on both homeowner and the Title Company due

to the fact that the loans were never owned by the MBS/Trust, making the clear and

correct transfer of title impossible.    The MBS/Trust or Servicer has come to the

foreclosure asserting standing when it is neither the owner of the underlying debt or the

valid Mortgagee.

122.    The MBS/Trustees have been on notice for several years that the faulty

Assignments were likely to jeopardize the claims of ownership and the ability of any

entity to foreclosure.    They have continually failed to disclose this information to the share/holder investors and to the SEC.

123.    Defendants, and other entities such as M&I Bank, Regions Mortgage, Deutsche Bank, U.S. National Bank Association, Bank of America, J.P. Morgan Chase, CITI,    MERS, and Servicing Agents such as GMAC, Aurora Loan Services, CitiMortgage and Nationstar Mortgage, have filed thousands of foreclosure actions in the State of Kentucky and throughout the United States, including against the Class Plaintiffs, under false pretenses, without the legal authority to bring such suits.

124.    Other parties including DOCX, LLC, Lender Processing Services, Inc., in Florida, LSR Processing in Cincinnati, Ohio and the foreclosure mill law firms have facilitated, aided and abetted the Defendants in filing thousands of residential Mortgages and Mortgage Assignments under false pretenses and without legal authority.

### The Double and Triple Dip and Derivative Contracts:

125.    Many of the MBS/Trusts were covered by an insurance policy, commonly referred to as a Derivative or Collateral Contract.    These Derivative Contracts are not recorded or regulated by the SEC.    Upon information and belief, the Defendants have attempted to receive distribution, fees  or proceeds or have received distributions from the liquidation of the Plaintiffs or the putative class members homes, when the actual beneficiaries under the homeowners' loans, the shareholder/investors have been made whole by a Derivative Contract.    In other instances, the MBS has been "closed" months or years prior.    Funds collected from the loans allegedly within the MBS, ar no longer being paid to the investors, but are an unearned windfall to the servicer. Additionally, there is no contract between the investors and the foreclosing entity which

41

would allow them so act as a Plaintiff in a Foreclosure even when the MBS is not shut down.

126.    Likewise, the MBS/Trusts themselves became parties to Derivative Contracts.  Most times, the actual Derivative contract is for more, up to ten times (10x), the face value of the MBS.  More often than not, multiple insurance policies were taken and traded on the MBS.

127.    The "double dip" or double compensation of the MBS/Trustee, or Sericer is improper in its own right.  The offense is patently egregious when it is viewed in light of the fact that the MBS/Trustee or Servicer.  The bogus entities have no standing to foreclose, yet they came and continue to come to the Courts with the fabricated and forged documents.

## Unjust Enrichment:

128.    The Defendants and MERS have illegally filed suit, as parties and counsel of record, in actions against the Plaintiffs and the putative class members, and have received distributions from the sale of their properties, while engaging in one or more of the following illegal practices:

129.    Defendants have filed foreclosures throughout the State of Kentucky and the United States of America knowing that they were not the "owners" or beneficiaries of the loan they filed foreclosure upon.  They knowingly and intentionally set out to deceive the Courts as to this fact and had full knowledge of the fact that they lacked Constitutionally defined "Standing" and capacity to file suit;

130.    The Defendants and MERS have drafted, executed and filed, or caused to be filed, false and fabricated Promissory Notes, Mortgages, and Assignments of

42

Mortgages, prepared by LPS, by and through DOCX, LSR Processing, employees of foreclosure law firm and employees of the Servicer, in order to foreclose upon properties.

131.    These MERS Mortgages and Assignments were prepared by an agreement between the Defendants.    These Defendants used false information regarding the individuals executing such Mortgages and Assignments, holding such individuals out to be officers of various banks, mortgage companies and mortgage servicing companies and MERS.    At the time the Assignments were executed, many of these companies no longer existed and/or had been dissolved in bankruptcy;

132.    Defendants used these MERS Mortgages and Assignments as Exhibits to foreclosures and filed these Assignments in the public record in all one hundred twenty (120) Counties in the State of Kentucky.    In all such cases and public recording, essential documentation to prove chain of title    had not been obtained.    The essential documentation to prove chain of title does not exist.

133.    Defendants filed or caused to be filed MERS Mortgages and Assignments of Mortgages prepared by Defendants with forged signatures of individuals purported to be officers of the entity, such as MERS or bank or mortgage company making the assignment;

134.    Defendants repeatedly filed foreclosure and declaratory judgment actions on TILA Rescissions months and sometimes over a year before they acquired any legal interest in the subject property through a fraudulent Assignment of a Mortgage. They have repeatedly claimed and continue to falsely claim that they owned the note executed with the mortgage on the property;

135.   Defendants repeatedly filed foreclosures and continue to file foreclosure actions claiming that they have lost the Promissory Note, Mortgage and other necessary documentation or that the documentation is "unavailable."   They falsely lead the Court to believe by inference or actual testimony, that the documentation is missing SUBSEQUENT to the acquisition of the documents, when in fact they have never possessed such documents;

136.   Defendants have filed other altered or fabricated documents in many foreclosure cases to support their claims of ownership, including fabricating and filing multiple Assignments in blank with no dates on copies of the Promissory Notes (many times from non-existent  or bankruptcy dissolved entities) and multiple Mortgage Assignments with different dates, bank officers signatures, witnesses and notaries for the same residential property.   Often, the same individuals appear as the signatory for multiple banks and mortgage companies at the same time and simultaneously act as a signatory for the entity MERS;

137.   Defendants have repeatedly filed and continue to file foreclosure actions as a  Trustee for a SEC registered MBS/trust where the chain of title has not and can not be established by Defendants and/or the MBS no longer exists and was never qualified to be a REMIC.

138.   The Defendants in many cases have filed and continue to file foreclosure actions where the individual loan in question was never on the SEC loan list submitted on behalf of the MBS/Trust.   In other instances, the individual loan number appear on multiple loan lists inside multiple MBS/Trusts  or has been removed from the

44

list of the MBS/Trust.    While in others, the individual loan number is listed with a

MBS/Trust which has been closed or no longer exists.

139.    In this action, Plaintiffs seek to recover actual and statutory damages, as

well as attorneys' fees and costs as permitted by law.

## IV.  THE CONSPIRATORS' BUSINESS MODEL

140.    In and about the years 1998 and 1999, with the final desecration of the

Glass-Steagall Act, the mortgage industry introduced new "products" into the American

marketplace in order to create massive amounts of mortgage loan "lists" to be listed as

the assets of Mortgage Backed Securities, ("MBS".)    The borrowers taking out these

loans were unaware of the fact that their loan was never a true negotiable instrument, but

securitized and sold prior to them ever reaching the closing table.    These products

included "non-documentation loans" and adjustable rate mortgages, known as "ARMS."

Mortgage lenders, acting in coordination with one another, relaxed their standards for

lending, which made an entirely new class of lower-income individuals eligible to receive

loans. This, in turn, artificially drove up property "values." As part and parcel of this

scheme, investment "banks" and other lenders accepted appraisals "documenting" the

new, higher values, and approved hundreds of thousands of applications for financing,

most of which would normally have been declined.

141.    Unbeknownst to the borrowers and the public, the billions of dollars

spent to fund these loans were expended to "prime the pump."    The big institutions and

the conspirators were making an investment, but the expected return was not the interest

they pretended to anticipate receiving as borrowers paid the mortgages. The lenders knew

that the new loans were "bad paper;" this was of little concern to them because they

intended to realize profits so great as to render such interest, even if it had been received, negligible by comparison.

142.    Part of the reason this fraudulent scheme has gone largely unnoticed for such an extended period of time is that its sophistication is beyond the imagination of average persons. Similarly beyond the imagination of most persons is and was the scope of the dishonesty of the lenders and the investment Banks and those acting in furtherance of the scheme, including the present Defendants. Through the present time, persons acting within the ambit of this conspiracy, have continued to operate consistent with the core principles of dishonesty and fraud engendered by the original conspirators.

143.    These corrupt influences have spread throughout the financial services, lending and banking industries into the national economy and beyond, threatening the economic stability of the United States and the world as a whole. This Court is urged in the strongest possible way to apply a presumption of falsity when reviewing any documentary evidence filed in this Court by one or more of the Defendants. Such a presumption is not just warranted; it is t indeed compelled by the extent to which the Defendants and those with which they are associated have long acted in a malicious and wanton manner evincing complete contempt for the judicial process and the rights of persons having interests contrary to their own.

144.    This is particularly true because the Defendants' contempt for due process is compounded by their specific intention to obviate the requirement that documents prepared for legal use be truthful, authentic, and legitimate.

145.    There is one sort of lie that, when later discovered, constitutes the strongest possible proof of a person's malicious intentions, that is to say, the lie about one's name or identity in relation to whether a person owes money.

146.    Many such lies are present in this instance. The whole purpose of MERS is to allow "servicers" to pretend as if they are someone else: the "owners" of the mortgage, or the real parties in interest. In fact they are not. The standard MERS Mortgage Complaint contains at least one to three lies as to the identity of the parties.

147.    While the title of the standard foreclosure Complaint makes reference to "unavailable" Promissory Notes in the body of the Complaint, the Defendant Firm alleges that the plaintiff is the "owner and holder" of the note and mortgage.

148.    In the years leading up to the introduction of the new loan "products," and securitized mortgage loans, the conspirators laid the groundwork which would grow into a new mortgage lending infrastructure: a new paradigm in which the ratios of risk to reward were dramatically altered in favor of these Wall Street interests and to the detriment of common consumers.

149.    One material bulwark in the support for this new paradigm was the inclusion in new mortgages of intentionally ambiguous and infinitely malleable provisions pertaining to MERS.[3]    As is the case with most of the written documents routinely used in the scheme, such as "assignments" and complaints for foreclosure, each word concerning MERS in these standardized mortgages is carefully crafted so as to

---

[3] This allows for another "nominee;" one which could apparently coexist with MERS. "Is" is present tense - - this seems to indicate that as of the time of execution of the mortgage, MERS was performing some unknown service for both lender and its "successors and assigns" even though ostensibly the mortgage had not as of execution been assigned. Upon assignment, it would seem to be impossible for MERS to act as "nominee" for the original lender. This phrase also tacitly acknowledges that the mortgage will be assigned. Bypassing Black's Law Dictionary, "mortgagee: n. the person or business making a loan that is secured by the real property of the person (mortgagor) who owes him/her/it money." *See.* www.law.dictionary.com

allow those relying upon it to infinitely recede in their positions and to be moving targets virtually unreachable by standard legal means.

150.    Upon reading the standard mortgage clauses pertaining to MERS, even persons of high intelligence will have a sense that they should, but do not quite, comprehend them. Consider these:

151.    "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a₃ nominee for Lender and Lender's successors and assigns.    MERS is the mortgagee under the security instrument.    This Security Instrument secures to Lender: (1) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (2) the performance of Borrower's covenants.    There is no "purpose" stated in the preceding sentence.    This begs the question as to the following:    How can the borrower simultaneously "convey" the property to: (1) MERS as nominee for lender; (2) MERS as nominee for lender's successors and assigns; and (3) MERS's *own* successors and assigns? Furthermore, who are the successors and assigns to an entity with absolutely no interest in the Promissory Note for which the mortgage was allegedly based?    No assignment could have existed as of the moment the mortgage was executed by the borrowers, and if somehow same did exist, it should have been disclosed as a fundamental and material aspect of the transaction. If the assignment occurred prior to the mortgage, the mortgage itself is void.

152.    because the lender had no interest to secure.    No "law or custom" could possibly necessitate action by MERS, as opposed to action by the original lender.

153.    A mortgage is not a conveyance of property by operation of Kentucky law.    It is merely the public evidence of a lien in property.    Furthermore since an entity

48

can not assign something it had no rights in the first place, any and all Mortgage
assignment from MERS to a third party are null and void.

154.    Beginning soon after the "ink" on the new mortgages was "dry," and in
many cases prior to the loan even closing, the lenders promptly sold the loans, in
secretive transactions, to "investors" for some percentage or fraction of what had been the
alleged value of the mortgage and the property by which it was secured just days or
weeks earlier.    In most cases, the Lender did not advance any funds as to the loan,
serving as a strawman, thereby negating the validity of each and every one of the required
TILA disclosures.

155.    Another part of the scheme was the use of words in ways inconsistent
with their traditional meanings, and the creation of new terms which could be used to blur
important distinctions between parties and their interests. The revolutionary ways in
which words were utilized all shared one characteristic: they made it more difficult to
determine who had the right to receive and utilize for their own purposes the payments
made on the loan by the borrower. For example, "mortgagee" began to have a meaning
other than "lender."  "Servicer," which has no legal definition, arose to prominence and
was and is used to further obscure important truths.    Specifically, the "servicer" does not
hold the true beneficial interest in the mortgage.    The Defendants will not release any
further information on the subject, whether it is requested in discovery in a foreclosure
action or in any other context.

156.    Attorneys have been told in open Court by the counsel of record for the
foreclosing Servicer, that "it is none of the borrowers business" who owns or in the case
of a closed MBS, who owned their loan before the MBS REMIC became extinct.

49

157.    With the oversight of Defendant Merscorp and its principals, the MERS artifice and enterprise evolved into an "ultra-fictitious" entity.    To perpetuate the scheme, MERS was and is used in a way so that to the average consumer, or even legal professional, can never determine who or what was or is ultimately receiving the benefits of any mortgage payments. The conspirators set about to confuse everyone as to who owned what. They created a truly effective smokescreen which has left the public and most of the judiciary operating "in the dark" through the present time.

158.    On its website, www.mersinc.org, Defendant Merscorp lists the shareholders of "MERS," which is defined on a separate page of the site as "Mortgage Electronic Registration Systems, Inc." Among the shareholders of MERS, according to the site, are the following institutions: Bank of America, Chase, CitiMortgage, Inc., Fannie Mae, Freddie Mac, HSBC, SunTrust, and Wells Fargo. These entities are co-conspirators in the MERS scheme herein described.

159.    The conspirators intended to maintain an absolute stranglehold on the American economy for many decades into the future. This could only be accomplished if the scheme was able to evolve over time in a changing regulatory and consumer environment.

160.    The conspirators adjusted the American lending system and the legal system governing it in a way designed to most effectively gratify their greedy interests over the longest period of time.

161.    Through this revolution in the use of words and ephemeral concepts such as the "nominee," "servicer" and "Trustee," the conspirators, including the present Defendants, have by-and-large been successful in changing the paradigm so that the

rights of individuals are no longer afforded the safeguards which have been carefully maintained in place since the formation of the United States.

162.    As the conspirators and present Defendants have long intended, certain important terms in the mortgages and other legal documents are devolving into a state of meaninglessness.    Even the names of the mortgage and lending institutions are tinkered with and interchanged so often that it is difficult to keep track of the constantly shifting parameters of the series of alleged mergers, assertions of subsidiary relationships.

163.    This is not some random trend which resulted from the mortgage crisis. It is, instead, the calculated tactic and conspiracy which ultimately caused it. The end result of the continued actions is that the mortgages and associated documents come to mean whatever their proponents wish them to mean.

164.    The conspirators did not want there to be any documentation which could later potentially be used as evidence of their crimes. They did not want to pay the fees associated with recording mortgages, robbing the County clerks across the nation of billions of dollars in statutorily mandated Recording Fees. They did not want to be bothered with the trouble of keeping track of the originals pf Promissory Notes as they have felt at all times that they are above the law. This is the significance of the word 'Electronic' in Mortgage Electronic Registration Systems, Inc. The conspirators, through this exceptionally sophisticated legerdemain, made over the American judicial system's long-honored requirements for mortgages and foreclosures to serve their interests and to minimize the possibilities of the victims obtaining any meaningful redress through the courts.

165.    They have so far, undermined long-established rights and sabotaged the judicial process itself by de-emphasizing the importance of, and eventually eliminating, "troublesome" documentation requirements which in all jurisdictions of the United States MUST BE IN WRITING.    If a conversion to electronic loan documentation is ever implemented, it would be the voting public, by and through their elected representatives through duly enacted constitutional legislation.

## The Creation and Use of Fraudulent Promissory Notes and Mortgage Assignments:

166.    In these remarkable and totally fraudulent Affidavits and "assignments" as to loan ownership, the following irregularities usually appeared:    The assignor, MERS, had the same address as the assignee (the plaintiff); they were executed by a person having the title of "Vice President or Assistant Secretary of MERS;" and the document would have an "effective date" well prior to the date upon which it was executed, so as to retroactively give standing to the plaintiff.

167.    It has now come to light that the persons signing these assignments as "Assistant Secretary," and "Vice President" of MERS actually were never officers or employees of MERS.    Rather, they employees of the foreclosing "servicer" or incredibly, the Servicer's Law Firm.

168.    The preparation, filing, and prosecution of the complaints to Foreclose and to Enforce loan without any documents were each predicate acts in the pattern of racketeering activity

169.    In furtherance of the MERS enterprise. The actions could not have been brought by the Defendants without the MERS artifice and the ability to generate any necessary affidavits or "assignment" which flowed from it.

(Part 1)    Pg 57 of 70

170.    As with MERS model itself, the affidavits and "assignments" were meaningless shells designed to pull the wool over the eyes of the judiciary and ease the burden upon the unknown real parties in interest. The practice of "non-documentation" can be seen as a common thread weaving all of the complained-of conduct into an undeniable tapestry of a criminal enterprise proscribed by RICO.

## V.    STATEMENT OF RELEVANT KENTUCKY LAW AND THE UNIFORM COMMERCIAL CODE

171.    The alleged Notes in question, started their life as negotiable instruments. They were similar to a check. The negotiation and enforceability of both notes and checks are governed by Article Three (3) of the Uniform Commercial Code. To enforce a negotiable instrument, a person must be a holder of the note. KRS 355.3-301. To meet the definition of a "holder," the person must possess the note, and the note must be issued or endorsed to him or to his order or to bearer or in blank. KRS 355.1-201(2)(u). The record reflects that Plaintiff is not the "holder" or "owner" of the Note. Neither does it appear in the record of this case to be any evidence that the Plaintiff will ever be the "Bearer" of the Note, under KRS 355.1-201(2)(u), wherein the Plaintiff could ever be "a person in possession of a negotiable instrument, document of title, or certificated security that is payable to bearer or indorsed in blank." KRS 355.1-201(2)(e). The Plaintiff is not in possession of the original negotiable instrument with any legally binding original endorsement.

172.    If the Party, at a later date, attempts to claim that the original documentation was somehow "lost," the Note will never be enforceable, as made obvious by official comments to the UCC § 355.3-203, that read as follows: " X signs a document conveying all of X's right, title, and interest in the instrument to Y.    Although

the document may be effective to give Y a claim to ownership of the instrument, Y is not

a person entitled to enforce the instrument until Y obtains possession of the instrument.

No transfer of the instrument occurs under Section 3-203(a) until it is delivered to Y."

173.    Based on the record in the Plaintiffs' cases, and the class members'

loans, the Note and the Mortgage were bifurcated at inception and were and remain

unenforceable as a Secured Transaction under the Uniform Commercial Code and

Kentucky law.  The most the Plaintiff could ever be is an unsecured creditor.

174.    Upon information and belief, the Note, the Note was "securitized," was

paid off in excess of the principal balance and is no longer enforceable as a Secured

Negotiable Instrument.

175.    If an enforceable transaction can be proven, the Defendants were

deceived into such transaction without notice that they were encumbering the property as

a "Security" under the Rules and regulations of the Securities and Exchange

Commission.

176.    The Party does not hold, bear or own the original Note, is not a

Mortgagee and has no legally enforceable interest in the loan or standing to file this

action.

177.    There is no assignment of the Promissory Note to the foreclosing Party.

The endorsement stamped on the copy of the Note as Exhibit "A" to the Complaint, bears

no signature and is invalid.

178.    The alleged Affidavits of ownership and Account Status and the

Assignment of the Mortgage are believed to be forged instruments.  Those forged

instruments have been uttered or published into the public record,  Mortgage Fraud and

Forgery violations have occurred.

179.    It is asserted that the Law Firm initiating this action and the Plaintiff,

have conspired with each other and their other agents and principals to file a false and

fraudulent Foreclosure Action and to later create a false and forged Mortgage

Assignment.  It is asserted that such action is part of the Law Firm's regular practice and

procedure, whereby it engages in systemic fraud across the Commonwealth of Kentucky,

in conspiracy with its clients.

180.    During the origination of the loan, the Lender, MERS, the Broker, the

Plaintiff (if it funded the loan and was the "true lender"), and the Title Company

conspired together commit illegal acts pursuant Federal and State law.

181.    Moreover, the so-called "bogus note" submitted with this Complaint

and "lost  note"  Complaints, filed by the thousands in the past three (3) years in

Kentucky,  present issues of  more interest than the basic enforcement of the Uniform

Commercial Code.    When a Court Orders the Foreclosure and Order of Sale on

Kentucky real estate, based solely on sham pleadings, the entire community is affected as

well as the home owner.    If a Kentucky citizen sat through the average foreclosure

chocked Circuit Court Motion docket, in any given County, he would see that very few,

foreclosures are defended.    Therefore, most Kentucky families lose their property and

their homes by default, regardless of whether the foreclosing entity has any rights in the

debt.4

---

4  Since Foreclosure defense has not proved financially lucrative for attorneys, most property owners are
left out in the cold and without legal representation.

182.    In other jurisdictions, such as Ohio, New York and Florida, the judiciary has taken upon itself to recognize its duty to protect its property owners and communities from illegal Foreclosures, especially when the property owner is not represented by counsel and a Foreclosure by Default has been requested. The Florida Attorney General   and the United States Attorney in Florida both have public investigations against a   Foreclosure Factory law firm and a Document Processing Corporation as to the Post- Foreclosure Mortgage Assignments forgery issues identical in this case.

183.    In today's environment, in which mortgage notes are freely traded, and serve as collateral for various investment vehicles this "owner of the claim issue" is more important than ever to a defendant: a.)    to determine whether the Note and Mortgage have been bifurcated and issued to separate entities, making  neither enforceable; b.)   to determine whether a real "holder"  or "bearer" of the Note even exists; c.)   to determine whether the debt has been paid in a credit default swap (Insurance Policy) a derivative contract, or by the Servicer under a Pooling Agreement; d.)    if the Note was in fact "securitized," hence becoming a  "Security" it was no longer a Negotiable Instrument/Mortgage Note and under Kentucky law, was paid in full, has been satisfied and is no longer enforceable as a Mortgage Note; e.)   to have Mortgages declared void and titles quieted whenever mortgages have been recorded in the name of the entity MERS.

## VI.  NATIONAL HISTORIC BACKGROUND AND SIGNIFICANCE

184.    In the United States, home purchases are typically financed by mortgages or loans that are secured by a mortgage (in judicial foreclosure states) or deed

of trust ( in non-judicial foreclosure states) and a note which, when executed on behalf of the same entity and held by the same entity as a "note and deed of trust", entitle the holder of the note and deed of trust to foreclose on the property of the borrower if the borrower is in default without legal excuse or recourse.

185.    According to CNNmoney.com, beginning in 2008, U.S. foreclosure filings spiked by more than 81% in one year, a record in the United States.    Foreclosures were  up 225% compared with 2006 figures.    A reported excess of ten (10) million foreclosures have occurred in the U.S. since 2008.    The peak in foreclosures is not predicted to occur until the end of 2011.

186.    From 2003 through 2008, the Defendants entered into mortgages with mortgages deeds of trust and notes nationwide that were intentionally separated after the execution of the mortgage, the note was warehoused and alleged to have been sold to an investor who literally and actually provided the funds for the loan given to the borrower, and the note was in whole or in part allegedly conveyed to that investor by means of deposit in a mortgage backed security pool ("MBS."). In essence, prior to the contract being signed by the borrower, the note was funded by a party other than the originator or servicer of the loan.    The MBS was literally created and funded prior to the borrower ever taking out a loan.    Therefore, the MBS underwriter/originator or servicer (in GMAC's case they are one in the same,) had to go create loans after the fact which loosely matched the description of the prospectus used to entice investors into the MBS. Most times, the ratings Agency, such as Moody's would give the MBS its AAA rating even thought the loans had yet to be created or originated.

187.    Most importantly, for purposes of the nationwide foreclosure frenzy,

57

the investors, do not attempt to call defaults upon the borrowers nor do the investors threatened to foreclose or foreclose.    The entity filing foreclosure has absolutely NO financial stake in the mortgage loan.    If they did, the MBS would lose its REMIC pass through tax status.    Most importantly the foreclosing entities have NO agreement with the Trust or Servicer to act on their behalf.    In fact, the Pooling and Servicing Agreements forbid the Trustees or Servicers from filing actions on the investors behalf.

188.    Nationwide, the mortgages and Deed of Trusts, name a party as the "lender" who did not fund the mortgage and had no intention of funding the mortgage; yet, that "lender" who had no beneficial interest named MERS as the beneficiary and MERS had no beneficial interest nor did MERS represent any party to the deed of trust who had a beneficial interest. Each mortgage and deed of trust was, therefore, void upon execution because the statements contained therein were untrue and the failure to disclose these facts to the borrower acted to the borrower's detriment and there was no meeting of the minds, no consideration and an utter failure to create a security instrument.

189.    Nationwide, borrowers execute the note and then separately execute the mortgage or deed of trust naming MERS as the beneficiary and/or nominee of the beneficiary/lender.    At inception, the note was separated from the mortgage or deed of trust.

190.    This concept was unheard of in state property law in every state and territory of the union until these Defendants created these fictional documents and these fictional beneficial interests, and fictional lenders.

191.    After the execution of the documents, with the note being allegedly transferred to investors whose money had funded the loans taken out by the

58

12-12020-mg   Doc 5163-2   Filed 09/20/13   Entered 09/20/13 23:55:53   Exhibit 1-B
(Part 1)   Pg 63 of 70

Plaintiffs/borrowers, the failed mortgage or deed of trust was kept with MERS listed as the beneficiary, but the notes were transferred to parties outside the MERS system in violation of the rules and policies adopted by MERS.

192.     It is predicted that in at least seventy percent (70%) of the nationwide mortgages and Deeds of Trust registered to MER in America, the "lender" that MERS claims to be a "nominee" for is no longer in business and/or has been liquidated in bankruptcy.     MERS, at the moment of the note's transfer to another party, or the "lender's" demise, MERS could not possibly have an agency/beneficiary/nominee status with the "lender." There is no further authority to substitute a mortgagee or trustee or transfer any other interest in the mortgage or deed of trust to any party.  No party that has initiated foreclosure or intends to initiate foreclosure on any MERS mortgage has any authority to and holds, at most, an unsecured note in favor of the real parties in interest of the note, the investor/owners; if and only if they can prove they have an agency relationship with the owners and if they can show that they owners have not already been made whole by a derivative contract.

193.     Simultaneously with or immediately after the loans were taken out by borrowers nationwide, the obligations reflected by the notes were satisfied by monies provided by the investors who then obtained ownership of and right to payments under the terms of the note. These investors are the only parties to whom any obligation arose after the loan was securitized, and are the only proper parties, but these parties have no recorded interest in the mortgage or deed of trust, which was never delivered to the Trustee for the mortgage backed security pool and, therefore, the note itself, is at best unsecured rights to payment.

194.    The note, that had been executed with the mortgages or deed of trust were separated from the mortgages and deed of trust in that the note became part of a pool of mortgages; thereby losing its individual identity as a note between a lender and a borrower.    The note instead merged with other unknown notes as a total obligation due to the investor or investors.    The note is no longer a negotiable instrument, but collateral for a Federally regulated Security under the confines of the SEC.

195.    MERS was created by its owners to work with investment banks and "lenders" as co-conspirators in relation to the MERS system with the specific intent that MERS would be named the beneficiary and/or as the nominee of the lender on the mortgages and deeds of trust which borrowers nationwide were induced into signing.

196.    However, MERS was not the "nominee" for the lenders, but was the agent for the servicers.    The true lenders were investors who had provided the funds for the loans through mortgage backed security pools which were held as trusts.    This fact was known to MERS and the purported lender and the subsequent assignee of any and all rights purported to have been assigned by MERS at the time the note and mortgage or deed of trust was signed by borrowers at the time of each and every such later purported assignment by MERS of any interest in the note and deed of trust.

197.    The foreclosures filed in the past, present and in the future bearing a recorded mortgage or deed of trust in MERS name have been and continue to be initiated nationwide by parties who have no right to declare default, have failed to provide an accounting of the amounts due and owing to the true beneficiary, who are the only parties with the right to declare such default.

198.    The Servicers, such as GMAC, did not fund the loans of the nation's

60

borrowers with any of its own assets and is not owed any of the funds to be repaid by the

nations' borrowers.   The Servicers and MERS do not stand to suffer any loss should they

be enjoined from foreclosing on real estate nationwide and have no right to foreclose on

behalf of unknown investors because of a lack of agency, lack of authority and lack of

knowledge of whether the note has been discharged.5

199.     All Defendants knew that prior to the time that the loan was taken out

by the nation's borrowers, a loan which named MERS on the mortgage was securitized or

intended to be securitized prior to the preparation of the note and mortgage reflecting the

loan.  Defendants also knew that the scheme employed by all Defendants involved in the

origination, aggregation and securitization of mortgage-backed loans originated from

2003 through 2009 and secured by real property in the United States included financial

incentives which were designed to result in the loans being written on terms which were

likely or certain to result in foreclosure, and that the scheme described herein included

financial incentives designed to motivate appraisers, mortgage brokers, lenders,

aggregator banks and securitizing banks to steer borrowers into loans they could not

afford and could not repay so that the loans would go into default and the Defendants

involved in servicing, aggregating and securitizing those loans could make yet more

profits from default, foreclosure and selling the properties after foreclosure.

200.     The financial incentives mentioned in the previous paragraph included

without limitation the hiring of appraisers who had financial incentive to appraise

properties at a value that would justify the loan requested, the payment to mortgage

---

5 The logical question raised is "what does the Servicer, like GMAC have to gain by foreclosing."  The
Answer comes from the plain language of the standard Prospectus and Pooling and Service Agreements,
which allow the Servicers to keep the proceeds of the foreclosures when the MBS has been closed or the
investors paid off.

brokers of higher fees for sub-prime and sub-sub-prime loans than for prime loans and the use of novel and unprecedented underwriting criteria such as stated income and 100% or more financing of the purchase price, and the purchase of loans from lenders by aggregators and servicers of loans at more than face value if the loans were sub-prime or sub-sub-prime and if such loans also included an adjustable interest rate and/or a pre-payment penalty. In the case of many of the nation's borrowers the loans were advanced based upon the value of the house itself and not the income of the borrower. Also, in this case, the equity in the house itself was used to secure more loans based upon the value of the home when that value was exaggerated by the market manipulated by the Defendants and which is clearly not in the interest of the borrowers for an initial purchase or refinancing of property.

201.    The Defendants who originated, serviced, aggregated and/or securitized the loans knew or should have known at the time of those actions by Defendants that the financial incentives described in the previous paragraph herein were not disclosed to the investor or to the nation's borrowers, and that the Defendants who originated, serviced, aggregated and/or securitized the Plaintiff's loan also purchased credit default swaps which were essentially bets that the Plaintiff's loan would fail, resulting in multiple payments to those Defendants of the face amount of the loan, and knew or should have known that fact was also concealed from the investors and Plaintiffs who were instead intentionally misled by Defendants to believe that the Plaintiffs qualified for the loans under residential loan underwriting standards used in the industry.

202.    All Defendants who originated, serviced, aggregated and/or securitized the Plaintiff's loan knew or should have known at the time of those actions by

Defendants that the more likely or certain the loans were to fail, the more likely that failure was to cause the entire mortgage-backed security pool, to fail, and the more profitable those events would be to Defendants.

203.    The investors and the borrowers were entitled to information regarding all of the profits, payments, kick-backs, fees and insurance and credit default swaps related to the transactions which included the identity of the investors providing the funds loaned to the borrowers, and the concealment of those facts by all the Defendants who originated, serviced, aggregated and/or securitized the loans was an intentional misrepresentation and/or intentional material omission of fact by those Defendants for the purpose of using the borrowers' signature on a note and deed of trust to defraud the investors and the borrowers. These Defendants, upon information and belief, falsely told the FDIC or the federal government or the federal reserve that the Defendants were in dire need of trillions of dollars in federal funds due to "toxic assets" being allegedly on the books of Defendants and those "toxic assets" included the loan to the borrowers for which they were not qualified, but were encouraged and induced by the Defendants to enter into the loan and to default on the loan in order for the Defendants to foreclose.

204.    All Defendants participated in a conspiracy to cause borrowers to enter into instruments that would result in the foreclosure on their home and the loss of their investment and to initiate and complete foreclosure on the borrower's house without the lawful right to do so or to commence and advance foreclosure against the borrowers with knowledge that the borrowers had been deceived by having not been informed that the loan they took out was intended to result in foreclosure and consequently more profits to the Defendants. As a proximate and direct result, soon to be named Defendant servicers,

63

such as GMAC, have been unjustly enriched by the payments of the Plaintiffs on the note and by the profits earned by Defendants from the declarations of default, the commencement and advancement of foreclosure on the borrower's property and will be unjustly enriched if allowed to keep the property of the Plaintiff.

205.    The lenders and investors in mortgage-backed securities, including some of the Defendants, have obtained bailout money from the United States Treasury and the Federal Reserve in the amount of trillions of dollars for the stated purpose of compensating the lenders and investors for losses sustained due to the alleged default on residential mortgage loans including those of Plaintiffs.

206.    The lenders, servicers and investors in mortgage backed securities, have used those funds to repay investors who funded loans and/or to settle the lawsuits of those investors against the securitizing banks for fraud, with such use of those funds having extinguished the obligations reflected by the note that was executed by the borrowers and thus have no right to collect on the note, and had no right to initiate the foreclosure on all borrower's homes bearing a mortgage or deed of trust in the name of MERS.

207.    The nationwide Class have mortgages or deed of trust that states that the beneficiary and/or beneficiary as the nominee of the lender is MERS.    Some of the Class members have been have been declared in default by parties not entitled to declare the default.    Even though the Borrowers/Plaintiffs did pay the payments agreed in the "Note," and, in fact, invested their savings in the home based upon the representations of the Defendants, the Defendants have foreclosed and intend to foreclose and take the Plaintiff's property without stating who holds the note and to whom payment is due on

the note and what amount is due on the note.

208.    Defendants' use of MERS created the method to defraud the Home Purchaser, the nationwide Class herein, because MERS was not the holder of the Note and MERS was not a transferee in possession entitled to the rights of a holder or had authority under State law to act for the holder. Neither does MERS have the authority to appoint a successor "nominee.".

209.    The entities that have foreclosed or will attempt to give notice that they will foreclose on the home of the nationwide class are not MERS and are not the parties that funded the loan of the borrowers.

210.    The nationwide class of borrowers executed notes and mortgages on their property under circumstances that were predatory lending and all the defendants herein are now in a position to have taken advantage of the predatory lending or are now in a position of taking advantage of the predatory lending and, thus, all are liable for the predatory lending.

211.    Defendants knew that the business practices in which they were engaged would result in driving the market for housing into unnaturally high demand which would cause the prices on home to escalate beyond their normal and reasonable value and further knew that lending money to persons who were not qualified in such large numbers would cause the market to eventually crash. The Defendants believed this to the extent that the Defendants purchased credit default swaps, in essence, side bets that bet that the Plaintiffs and other loans given in the same time frame and under the same circumstances would fail.

## VII.  CLASS ALLEGATIONS

### The Class Defined:

212.     This Class Action is being filed by the Plaintiffs, pursuant to the Federal Rules of Civil Procedure 23, on behalf of themselves and other similarly situated.

213.     Plaintiffs bring the action on behalf of themselves and all other persons similarly situated as proposed Plaintiff Class.  The Plaintiff Class is defined as:

214.     All persons holding the deed to any property in the Commonwealth of Kentucky and nationwide who since 2006, are currently in foreclosure or  TILA Regulation Z litigation, with pending litigation, or have been foreclosed upon and lost title to their property, since 2006, by judicial or non-judicial methods, who have been damaged and/or are entitled to Injunctive Relief and monetary damages against the Defendants, when the Defendants filed the foreclosure, were involved in the drafting, executing and filing of Promissory Note, Promissory Note Assignment, a Mortgage in the name of MERS, or where an fraudulent and forged affidavit or Mortgage Assignment were filed in the public record, to obtain the foreclosure, or;

215.     The Foreclosure was filed and has been dismissed or is pending by or with the involvement of any or all of the Defendants either in their own behalf or as a Servicer or third party "nominee," or "Trustee" and MERS is  or ever was a recorded Mortgagee, or Mortgagor or;

216.     There is a recorded mortgage in the public record, naming MERS as a Mortgagee regardless of whether there is any litigation in the public record as to the property.   In other words, the class consists of all persons whose

66