property has ever been encumbered by a mortgage in the name Mortgage
Electronic Registration Systems.

### Existence of an Identifiable Class Fed. R. Civ. P. 23.01(a):

217.    The Representaive Plaintiffs to this action fulfill the prerequisites of a
class action to represent the interests of the putative class members.    The proposed Class
definition is sufficiently definite so that it is administratively feasible for the Court to
determine whether a particular individual is a member by Court records, public mortgage
records, land records and the records in the hands of the Defendants.

### Numerosity of the Class Fed. Civ. P. 23.01(a)(1):

218.    The class consists of individuals throughout all 120 Counties of the
Commonwealth of Kentucky, and every state and US Territory, making joinder
impractical, and in satisfaction of Fed. R. Civ. P. 23.01(a)(1.)    Class members are
predicted to number in the tens of thousands.    The precise number of class members in
unknown at this time, but can easily be obtained through public record and the electronic
databases of the Defendants.    Class members can be notified of the pendency of this
action based on the public record utilized by the Defendants to serve the property owners
with a Complaint in Foreclosure.    The disposition of the claims of the Class members in
a single Class Action will provide substantial benefits to all parties and to the Court.

### The Existence of Common Questions of Fact or Law Fed. R. Civ. P. 23.01(a)(2):

219.    The Class Representatives allege that the questions of law and fact
relating to their claims predominate over any questions affecting solely individual
members in satisfaction of Fed. R. Civ. P. 23.01(a)(2):

67

220.    There are questions of law or fact common to the class including, but not limited to:

a.)    Whether filing a foreclosure without standing and without the right or ability to obtain and record a Mortgage and/or Assignment of Mortgage, or Assignment of the original Promissory Note for which the claim is based, constitutes false, misleading deceptive, fraudulent, criminal or other wise illegal conduct under the law;

b.)    Whether filing and pursuing a foreclosure suit using and publicly recording a false Promissory Note, Note Assignment, Mortgage, affidavit, or Mortgage Assignment with forged signatures, erroneous information regarding the authority of the signors, and/or erroneous information regarding the date the transfer actually occurred constitutes false, misleading, deceptive, fraudulent, criminal or otherwise illegal conduct under the law.

c.)    Whether a criminal and civil conspiracy existed and continues to exist in regards to the Defendants actions.

d.)    Whether mortgages recorded in the name of MERS are illegal and unenforceable.

e.)    Whether Plaintiffs and Class Members have been damaged or injured by Defendants' conduct;

f.)    Whether Plaintiffs and Class Members are entitled to compensatory damages, and the amount of such damages;

g.)    Whether Plaintiffs and Class Members are entitled to statutory damages,

common law damages and treble damages under the law as well as costs and

attorneys fees and the amount of such damages; and

h.)    Whether Plaintiffs and Class Members are entitled to punitive damages and

the amount of such damages.

### Typicality Fed. R. Civ. P. 23.01(a)(3):

221.    Plaintiffs' claims are typical of the claims of the Class as the

Defendants in collusion with each other initiated loans, filed mortgages, recorded and

illegally transferred mortgages and initiated  Complaints in foreclosure, stole the

Plaintiffs' property by foreclosing against the Plaintiffs' property illegally; wherein all

mortgages in question having been originally recorded in the name of the Defendant

MERS or subsequently assigned to MERS.

### Adequacy Fed. R. Civ. P. 23.01(a)(4)::

222.    The Plaintiffs are adequate representatives of the Class because their

interests overlap and are not in conflict with the interests of the Class.   The Plaintiffs, as

represented by qualified counsel, intend to prosecute the action vigorously and behalf of

the  Class and indirectly on behalf of the taxpayers and property owners across the

Commonwealth of Kentucky and the nation who may not be members of the Class, but

will benefit from the Class when the Defendants actions in illegal foreclosure cases cease

and desist by Court Order.   Further, the Class is adequate to protect and preserve the

deeds and title to land for future generations as the illegal foreclosure already performed

have "dirtied" the title for any and all property liquidated by Court Order since 2006, or

for which property is currently encumbered in the public record by a mortgage in the name of MERS.

### Class Action Maintainable Fed. R. Civ. P. 23.01(b) and Certification Fed. R. Civ. P. 23.01(c):

223.    The Prerequisites of Fed. R. Civ. P. 23.01(a) having been satisfied. The Class may be Maintained  as the prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct and punishment for Defendants and/or because adjudications respecting individual members would, as a practical matter, be dispositive of the interests of the other members or would risk substantially impairing or impending their ability to prosecute their interests.

224.    The Class should be maintained and certified is appropriate because Defendants have acted or refused to act on grounds generally applicable to all members of the class, thereby making final injunctive relief or declaratory relief as a whole appropriate.  Plaintiffs and member of the class have suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.

225.    The Class may be certified as a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a Class Action, most, if not all members of the Class would likely find the cost of litigating their claims costly and beyond their means.  Therefore, the Class Members have no effective individual remedy at law.  The Class treatment of common questions of law or fact is also superior to multiple piece meal litigation in that it conserves the resources of the Courts and the litigants and promotes consistency and efficiency of adjudication.

**<u>Appointment of Class Counsel Fed. Rule Civ. P. 23(g.):</u>**

226.    Counsel of Record has served as the representative Plaintiffs in Kentucky state actions and in Federal Court.    Counsel of record could not possibly logistically represent the hundreds of putative class members who have contacted said counsel since 2008 to seek representation.

227.    An expert document expert has already been procured on behalf of the class.    Said expert is currently working with the Justice Department's criminal investigation, which parallels the allegations of this action.

228.    Counsel of record has been informally summoned by the Federal Bureau of Investigation and the Kentucky Department of Financial Institutions in an information and advisory position to the parallel criminal investigation.

229.    Counsel of record has served as an instructor for Continuing Legal Education in the state of California for the issues which are the subject of this action.

### VIII.  CAUSES OF ACTION
### COUNT I.

**<u>A.    Violation of 18 U.S.C. §1962 [c]</u>**
**<u>The Law Offices and the Document Processing Companies</u>**

230.    Plaintiffs re-alleges and affirms each and every preceding paragraph of this Complaint and incorporate such as if alleged anew.

231.    By engaging in a pattern of racketeering activity, specifically "mail or wire fraud," the Defendants subject to this Count participated in a criminal enterprise affecting interstate commerce.

232.    A separate count of Mail Fraud took place each and every time a fraudulent pleading, Affidavit, Promissory Note Assignment, mortgage or mortgage

assignment was sent by a Defendant through the use of the US mail. Likewise is true for any documents sent via electronic mail as would be the case as part of a Federal action electronically filed with the Court. Such would constitute a separate act of wire fraud.

233.    By sending the fraudulent affidavits, assignments and pleadings to the clerks of court, judges, attorneys, and defendants in foreclosure cases. These Defendants intentionally participated in a scheme to defraud others, including the Plaintiff and the other Class Members,   They utilized the U.S. Mail and the internet to do so.

234.    The criminal enterprise affects interstate commerce in numerous ways. It is used to conceal the true ownership of mortgage loans from the general public, including investors, borrowers, the SEC, the IRS and the Courts.

235.    But for the Conspiracy, investors would be enabled to have a clearer picture of the assets and debts of large banking and financial institutions in which they may consider investing.

236.    The entire American economy has been affected by the conspiracy described in this Complaint, which is exemplified by the MERS enterprise. The foreclosure crisis and larger economic downturn were substantially contributed to, and are believed

237.    to have been caused, by the MERS enterprise and underlying conspiracy as it related to the fraud involved with the securitization of mortgage loans and the issuance of unregulated derivative contracts.

238.    The "predicate acts" of fraud, which were accomplished through the U.S. Mail,  and the internet, and which are specifically attributable to the Defendants subject to this Count, are:

a.) Bringing suit on behalf of entities which were not the real parties in interest, and which had no standing to sue. This involved, and involves, the use of the MERS artifice.

b.) Actively concealing the plaintiffs' lack of standing in their standard complaints for foreclosure.

c.) The drafting, by DOCX/LPS and LSR Processing of the fraudulent affidavits and documents and the subsequent execution of the documents be robo-signers and employees of the document company, servicer or Defendant Law Firm, and the filing of fraudulent and forged affidavits as to loan ownership by robo-signers and employees of the Defendant Law Firms, servicers and LPS and LSR Processing.

239.    The Defendant Law Firms attached to these fraudulent complaints the mortgage containing the MERS provisions quoted above. While the title of the standard complaint makes reference to "unavailable" loan documents, the Defendant Law Firm alleges that the plaintiff is the "owner and holder" of the note and mortgage."

240.    The documents on their face contradict this statement.    A forged mortgage assignment is often attached as an Exhibit to a Motion for Default.    Other times, the Default or Summary Judgment is granted based on the perjured affidavit of one of the Conspirators employees while the mortgage is still in the name of MERS.

241.    Documents executed by an alleged MERS "Assistant Secretary" or "Vice President,"

242.    By persons working for the foreclosing entity with no knowledge whatsoever of the truth of their contents.

243.    These predicate acts are related. They share the common purpose of defrauding the

244.      Class Members and other borrowers of their money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

245.      The predicate acts satisfy the RICO continuity requirement: they extend from in or

246.      Beginning in 1998 and continuing unabated, the scheme meets the definition of "open-ended" continuity. The threat of continued criminal activity as part of this enterprise in, without question, still looming over the American economy.6 Alternatively, closed-ended continuity is present because the scheme occurred over a period in excess of ten years.

247.      As the result of the RICO enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes. The measure of the damages for the Class Members is the average of the accelerated amounts demanded from the Class Members by the Defendant Firm in the subject complaints to foreclose property and to enforce non-existent Loan Documents.   Since any real parties in interest have already been paid, the mortgages were truly not subject to being foreclosed upon, and the fair market value of the properties at the time of foreclosure is for this reason the measure of the damages suffered by the Class Members. To provide an example, if the average value of the properties was $250,000.00, and the Class is

---

6 Herein lies an alleged quote from David Stern, one of the attorneys under criminal investigation in the state of Florida:  "One of my favorite questions from one of my believers, one of my investors on the first call-in, "What inning are we in? If this was a baseball game, what inning are we in?" And my response is, we're only in the 2nd inning. We still have 3 innings of foreclosures left, and after the foreclosures, we have 3 innings of REO liquidation and as the REO liquidations pan out, we get into the re-fi and we get into the origination. [ . . . ]  So yeah, we're in the 2nd inning, but guess what - when we get to the 9th inning, it's going to be a doubleheader and we got a second game coming. So when people say, "Oh my God, the economy is bad!" I'm like, "Oh my God, it's great." *See.* Www.americansunitedforjustice.org/stern.html.

comprised of 10,000 persons, the initial damages to which the Class is entitled by law would be $2,500,000,000.00, or 2.5 billion dollars. This amount is then tripled by operation of the RICO law, so that, without reference to attorney fees and costs, the total damages awarded would be 7,500,000,000.00, or 7.5 billion dollars.

248.    The Class Members are entitled to judgment in the amount of three times their actual damages, which should be arrived in the manner indicated in the preceding paragraph. plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964[c].

### B.    Violation of 18 U.S.C. §1962 [c]
### Defendant Merscorp, Inc. and Its Shareholders

249.    Plaintiffs re-alleges and affirms each and every preceding paragraph of this Complaint and incorporate such as if alleged anew.

250.    Merscorp, Inc. was created in or about 1998, and its purpose, from the outset, was to enact the fraudulent scheme/RICO enterprise herein complained.

251.    Its overt acts include the following: a.)  Creation of the MERS artifice; b.)  Planning, designing, and enacting the MERS criminal enterprise of which Plaintiff complains herein; c.)  Arranging for the use of the MERS as "mortgagee" in the standard mortgages at issue; d.)  Drafting of the standard MERS language to be included in such mortgages; e.)  Entering into one or more "agreements for signing authority" which purported to allow employees of the  other conspirators to execute assignments in which the "assignor" and "assignee" are strawmen actually not possessed of the capacity stated, and of which the person executing the document has no knowledge; f.)  Creation and maintenance of an acceptable public image for MERS; g.)  Owning and maintaining the registration and licensure of the MERS entity, Mortgage Electronic Registration Systems,

Inc, with the necessary state agencies, plus other ministerial acts designed to maintain the corporate shield and to mimic the actions expected of normal corporations so as to fraudulently disguise its true nature, and; h.)  Facilitating the use of the MERS artifice by other participants in the conspirators' scheme.

252.    These predicate acts are related. They share a common purpose, defrauding the Class Members and other borrowers of their money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

253.    The predicate acts satisfy the RICO continuity requirement: they extend from in or about 1998 through and continue unabated at the present time, which meets the definition of "open-ended" continuity. In the alternative, the participants in the RICO enterprise engaged in a pattern of racketeering activities continuously for a period of time exceeding ten years in duration, which as a matter of law suffices to establish "closed-ended" continuity.

254.    As the result of the RICO enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes. The measure of the damages for the Class Members is the average of the accelerated amounts demanded from the Class Members in the subject Complaints to Foreclose on the class members property.  The real parties in interest to the loan have already been paid.  The MERS mortgages were and are not enforceable.  The mortgage loans possessed by the Plaintiffs and putative class were not subject to being foreclosed upon, and the mortgage amount recorded in the pubic record of the properties is the measure of the damages

suffered by the Class Members in relation to MERS. The manner in which damages should be calculated is set forth in Count I.A. and is incorporated here by reference.

255.    The Class Members are entitled to judgment in the amount of three times their actual damages, which should be arrived at using the formula set forth in said paragraph, plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964[c].

### C.  Violation of 18 U.S.C. §1962[d].
### All Named Defendants Now and in the Future

256.    Plaintiffs re-allege and affirm each and every preceding paragraph of this Complaint and incorporate such as if alleged anew.

257.    The Defendants have conspired together to violate 18 U.S.C. §1962[d], by committing fraud and utilizing the US Mail and the internet.    The Defendants agreed upon the same criminal objective to wit:    the theft of real property through illegal foreclosures.    Each conspirator is reasonable for the actions of the others and the results of the conspiracy as a whole.

258.    Those who provide support for an illegal enterprise are liable for the actions of those who commit the criminal acts, regardless of whether they participated in that particular criminal act.

259.    Additionally, each and every shareholder in MERS shall so too be responsible for the acts of the other players to the conspiracy.

260.    The class members are entitled to judgment in the amount of three times their actual damages, plus costs and attorneys' fees under 18 U.S.C. §1964[c].

### COUNT II.
### Conspiracy and KRS 506.040

261.    Plaintiff incorporates by this reference each and every paragraph of

77

this Complaint as if set forth fully herein.

### Introduction of the Claim:

262.    At all times relevant hereto, agreements were made by and between the original Lender the foreclosure Plaintiff and MERS to deceive the Homeowners; and to break Kentucky and Federal law. The entities colluded together to achieve unlawful aims by unlawful means.  The entities, as co-conspirators, took overt steps to accomplish their illegal acts and have clearly demonstrated their intention to break the law; thereby "breathing together" in their fraudulent and illegal acts.

263.    The Plaintiff and MERS' conduct constitutes a pattern of corrupt activity.  They have maintained more than two and perhaps thousands of foreclosures in Kentucky under the fraudulent and misleading circumstances as fully outlined in this Claim.

264.    Through the filing of foreclosure under false pretenses and the filing of a Post-Foreclosure fraudulent and forged Mortgage Assignment, in violation of Kentucky and Federal law, the Plaintiff with the assistance of its co-conspirators, the original Lender, MERS KRS 506.040.  Thousands of other Kentucky homeowners have been injured through the improper loss of title to their property, loss of the equity in their property, through penalties, court costs and attorneys fees charged against their accounts on lawsuits filed under false and misleading circumstances, and from other incidental and consequential costs and expenses attendant to being disposed of the property illegally.

265.    Defendant MERS, the wholly owned subsidiary of Merscorp, Inc., is an unregistered entity created in or about 1998 by conspirators from the largest banks in the United States in order to undermine and eventually eviscerate long-standing

78

principles of real property law, such as the requirement that any person or entity who

seeks to foreclose upon a parcel of real property: 1) be in possession of the original note

and mortgage and 2) possess a written assignment giving he, she or it actual rights to the

payments due from the borrower pursuant to the mortgage and note.    Merscorp, Inc.,

claims to be the sole shareholder in an entity by the name of Mortgage Electronic

Registrations Systems, Inc.,

266.    MERS is the enterprise and is the primary innovation through which the

267.    conspirators, including the Defendants, have accomplished their illegal

objectives as detailed throughout this Complaint.

268.    In and about the years 1998 and 1999, the mortgage industry introduced

new "products" into the American marketplace, known as Mortgage Backed Securities

("MBS".) These products included "non-documentation loans" and adjustable rate

mortgages, known as "ARMS." Mortgage lenders, acting in coordination with one

another, relaxed their standards for lending, which made an entirely new class of lower-

income individuals eligible to receive loans. This, in turn, drove up property "values." As

part and parcel of this scheme, banks and other lenders "accepted" appraisals

"documenting" the new, higher values, and approved hundreds of thousands of

applications for financing, most of which would normally have been declined.

269.    Unbeknownst to the borrowers and the public, the billions of dollars

spent to fund these loans were expended to "prime the pump." The big institutions and

the conspirators were making an investment, but the expected return was NOT the

interest they pretended to anticipate receiving as borrowers paid the mortgages. The

lenders knew that the new loans were "bad paper;" this was of little concern to them

because they intended to realize profits so great as to render such interest, even if it had been received, negligible by comparison. Part of the reason this fraudulent scheme has gone largely unnoticed for such an extended period of time is that its sophistication is beyond the imagination of average persons. Similarly beyond the imagination of most persons is and was the scope of the dishonesty of the lenders the investment banks and the principal owners of MERS and those acting in furtherance of the scheme, including the present Defendants.

270.    Through the present time, persons acting within the ambit of this conspiracy, most particularly including the Defendants herein, have continued to operate consistent with the core principles of dishonesty and obscurantism engendered by the original conspirators.

271.    These dark influences have spread throughout the financial services, lending and banking industries into the national economy and beyond, threatening the economic stability of the United States and the world as a whole. This Court is urged in the strongest possible way to apply a presumption of falsity when reviewing any documentary evidence filed in this Court by one or more of the Defendants. Such a presumption is not just warranted; it is  indeed compelled by the extent to which the Defendants and those with which they are associated have long acted in a malicious and wanton manner evincing complete contempt for the judicial process and the rights of persons having interests contrary to their own. This is particularly true because the Defendants' contempt for due process is compounded by their specific intention to obviate the requirement that documents prepared for legal use be truthful, authentic, and legitimate.

272.    There is one sort of lie that, when later discovered, constitutes the strongest possible proof of a person's malicious intentions. What is it? A lie about one's name or identity.

273.    Many such lies are present in this instance. The whole purpose of MERS is to allow "servicers" to pretend as if they are someone else: the "owners" of the mortgage, or the real parties in interest. In fact they are not. The standard MERS held mortgage Complaint contains a lie about this very subject. While the title of the standard complaint makes reference to "loan documents," in the body of the standard complaint, the Defendant Firm alleges that the plaintiff is the "owner and holder" of the note and mortgage. Both cannot be true unless the words used are given new legal meanings.

274.    In the years leading up to the introduction of the new loan "products," the conspirators laid the groundwork which would grow into a new mortgage lending infrastructure: a new paradigm in which the ratios of risk to reward were dramatically altered in favor of these conspirators.    To date, no individual players have yet to be convicted of their felonious acts and imprisoned.[7]

### The Use of the term "nominee" :

275.    On many mortgages, MERS call itself the "nominee" for the lender listed on the Promissory Note.   However, this allows for another "nominee;" one which could apparently coexist with MERS.

276.    When the Note has been table funded, meaning the lender on the Note never lent any money and therefore never had any rights in the Note, MERS has become

---

7 Upon information and belief, there are multiple ongoing criminal investigations in the state of Florida, New York and here in Kentucky by the Justice Department.

the "nominee" for an entity with absolutely no pecuniary interest in the Note from the moment of Note's execution.

277.    The Mortgage states that MERS "is" the nominee for the lender.   "Is" is present tense - - this seems to indicate that as of the time of execution of the mortgage, MERS was performing some unknown service for both lender and its "successors and assigns" even though ostensibly the mortgage had not as of execution been assigned. Upon assignment, it would seem to be impossible for MERS to act as "nominee" for the original lender. This phrase also tacitly acknowledges that the mortgage will be assigned.

278.    A "mortgagee" is the person or business making a loan that is secured by the real property of the person (mortgagor) who owes him/her/it money.

279.    In order to further the goals of the conspiracy, and to perpetuate this new paradigm was the inclusion in new mortgages of intentionally ambiguous and infinitely malleable provisions pertaining to MERS. As is the case with most of the written documents

280.    As routinely used in the scheme, with mortgage assignments and complaints for foreclosure, each word concerning MERS in these standardized mortgages is carefully crafted so as to allow those relying upon it to infinitely recede in their positions and to be moving targets virtually unreachable by standard legal means.

281.    The standard mortgage is a form entitled "KENTUCKY-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT-MERS," or some slight variation thereof. Upon reading the standard mortgage clauses pertaining to MERS, even persons of high intelligence will have a sense that they should, but do not quite, comprehend them.

82

### The false "Transfer" of Rights in the Property:

282.    This Security Instrument secures to Lender: (i) the repayment of the

Loan, and all renewals, extensions and modifications of the Note; and (ii) the

performance of Borrower's covenants.    There is no "purpose" stated in the preceding

sentence.

283.    How can the borrower simultaneously "convey" the property to: (1)

MERS as nominee

284.    for lender; (2) MERS as nominee for lender's successors and assigns;

and (3) MERS's *own* successors and assigns? Furthermore, who *are* such successors and

assigns? No assignment could have existed as of the moment the mortgage was executed

by the borrowers, and if somehow same did exist, it should have been disclosed as a

fundamental and material aspect of the transaction. If the assignment occurred prior to the

mortgage, the mortgage itself is void because the lender had no interest to secure.

285.    A mortgage is **not** a conveyance of property by operation of Kentucky

law.

286.    What "interests" does this passage refer to, and to *whom* were they

granted?   No "law or custom" could possibly necessitate action by MERS, as opposed to

action by the original lender.

287.    Before the ink on the new mortgages was dry, and before the loan

would be considered "dry" by industry standards; while the loan was still "wet" and in

many cases non-existent legally, the lenders promptly sold the loans, in secretive

transactions, to "investors" for some percentage or fraction of what had been the alleged

value of the mortgage and the property by which it was secured just days or weeks

earlier. In some cases, the loan was listed inside a MBS and sold before the loan was even consummated. Most were sold without the Note ever being in the possession of the MBS. All loans, for purposes of this action, were securitized and sold with the mortgage recorded in the name of MERS   The unsuspecting investors were in fact buying nothing.[8]

288. The quick sale by the lender of its interest, at what appears to be a loss, would have at first seemed inexplicable, but when considered with the benefit of hindsight, proof of these quick transfers would have been evidence that the lender knew in advance that property values would soon decline.   Additionally, the securitizers/underwriters, hedged their bets beforehand with multiple collateral contracts, far in excess of their original investment, thereby banking on and benefiting on the fact that the MBS would eventually fail.

## **Concealed Identity:**

289. By changing "servicers" on these loans, and by sending out notices of such changes drafted also in intentionally ambiguous verbiage, the bankers behind the scenes cooperated in obscuring the truth as to who had the right to receive the proceeds of the loans, and to foreclose in the event of non-payment. The loans were grouped into "pools" and sold multiple times, thereby increasing profits for the wrongdoers. These "securitized debt pools" were sold on the stock market and elsewhere, and in this manner affected interstate commerce. The real parties in interest also in many instances collected mortgage insurance upon "default."

---

8 A review of the Pacer record reveals that the duped investors have begun en mass to also file their own class actions against the entities which sold them the phony securities.

290.    Another part of the scheme was the use of words in ways inconsistent with their traditional meanings, and the creation of new terms which could be used to blur important distinctions between parties and their interests. The revolutionary ways in which words were utilized all shared one characteristic: they made it more difficult to determine who had the right to receive and utilize for their own purposes the payments made on the loan by the borrower. For example, "mortgagee" began to have a meaning other than "lender." "Servicer" arose to prominence and was and is used to further obscure important truths. Specifically, the "servicer" does not hold the true beneficial interest in the mortgage.

291.    Typically, the Defendants will not release any further information on the subject, whether it is requested in discovery in a foreclosure action or in any other context.

292.    With the oversight of Defendant MERS/Merscorp and its yet to be named unknown principals, the MERS artifice and enterprise evolved into an "ultra-fictitious" entity.   To perpetuate the scheme, MERS was and is used in a way so that to the average consumer, or even legal professional, can never determine who or what was or is ultimately receiving the benefits of any mortgage payments. The conspirators set about to confuse everyone as to who owned what. They created a truly effective smokescreen which has left the public and most of the judiciary operating "in the dark" through the present time.

293.    Although the putative class of this Class Action does not include every American citizen, it can be concluded that reasoned contemplation of the available facts leads to a stunning realization: the mortgage crisis and resulting economic downturn with

which the United States is currently afflicted was planned in advance by certain scions of Wall Street.

294.    In addition to the other incriminating facts set forth in this Complaint the Judge and Jury in this case may also consider this: On its website, www.mersinc.org, Defendant MERS/Merscorp lists the shareholders of "MERS," which is defined on a separate page of the site as "Mortgage Electronic Registration Systems, Inc." Among the shareholders of MERS, according to the site, are the following institutions: Bank of America, Chase, CitiMortgage, Inc., Fannie Mae, Freddie Mac, HSBC, SunTrust, and Wells Fargo. These are many of the same institutions the law firm in this action represents. This is no coincidence, as these entities are co-conspirators in the MERS scheme herein described.9

295.    The conspirators intended to maintain an absolute stranglehold on the American economy for many decades, if not centuries, into the future. This could only be accomplished if the scheme was able to evolve over time in a changing regulatory and consumer environment. The point is that the conspirators adjusted the American lending system and the legal system governing it in a way designed to most effectively gratify their greed motivated crimes over the longest period of time.

296.    Through this revolution in the use of words and ephemeral concepts such as the "corporation," the conspirators, including the present Defendants, have by-and-large been successful in changing the paradigm so that the rights of individuals are

---

9    In contradiction with the ownership proclamation contained on www.mersinc.com and as previously addressed, the parties make the representation that MERS is owned entirely by Merscorp, Inc. However, the owners of MERS will be named officially to this action upon the receipt of the information through verified discovery.

no longer afforded the safeguards which have been carefully maintained in place since the colonies became a nation.

297.    As the conspirators and present Defendants have long intended, certain important terms in the mortgages and other legal documents are devolving into a state of meaninglessness.    Even the names of the mortgage and lending institutions are tinkered with and interchanged so often that it is difficult to keep track of the constantly shifting parameters of the series of alleged mergers, assertions of subsidiary relationships, "divisions," and the like with which the American economy and consumer populace are deluged in advertisements and mortgage documents. This is not some random trend which resulted from the mortgage crisis. It is, instead, just another tactic in the vast scheme which ultimately caused it. The end result of the continued actions is that the mortgages and associated documents come to mean whatever their proponents wish them to mean.

298.    The conspirators of course did not want there to be any documentation which could incriminate them or later potentially be used as evidence of their crimes and evidence to the investors of the MBS or the IRS that the loans were illegitimate.

299.    They did not want to pay the fees associated with recording mortgages and they did not want to be bothered with the trouble of keeping track of the originals. That is the significance of the word 'Electronic' in Mortgage Electronic Registration Systems, Inc. The conspirators, through this exceptionally sophisticated legerdemain, made over the American judicial system's long-honored requirements for mortgages and foreclosures to serve their own criminal interests and to minimize the possibilities of the victims obtaining any meaningful redress through the courts. They undermined long-

established rights and sabotaged the judicial process itself by de-emphasizing the importance of, and eventually eliminating, "troublesome" documentation requirements. If a conversion to electronic loan documentation is ever implemented, it is the PEOPLE, by and through their elected representatives, who could ultimately bring about this transition through duly enacted Kentucky state legislation.   Most importantly, these changes are to be made BY THE STATES themselves, and not a system implemented nationwide by any Federal body.

300.    The preparation and filing of MERS mortgages and assignments, and prosecution of the complaints to Foreclose on the MERS mortgages on these properties were each predicate acts in the pattern of racketeering activity complained of herein, and were actions taken in furtherance of the MERS enterprise. The actions could not have been brought by the Defendant Firm without the MERS artifice and the ability to generate any necessary "assignment" which flowed from it. Just like MERS, the assignments were meaningless shells designed to pull the wool over the eyes of the judiciary and ease the burden upon the unknown real parties in interest. The practice of "non-documentation" can be seen as a common thread weaving all of the complained-of conduct into an undeniable tapestry of a criminal enterprise proscribed the Kentucky statute.

## COUNT III.
### KRS 434.155 Filing Illegal Liens

301.    Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

302.    A person is guilty of filing an illegal lien when he files a document or lien that he knows or should have known was forged, groundless, contained a material misstatement, or was a false claim.

303.    Filing an illegal lien is a Class D felony for the first offense, a Class C felony for any second offense, and a Class B felony for any subsequent offense.

304.    The Defendants filed an illegal lien in the way of an Assignment of Mortgage against the Plaintiffs' and Class Members property.

305.    Since 2007, the Defendants have filed thousands of forged, groundless, materially misstated or false claims against the Class Members property in the way of illegal Assignments of Mortgages.    From the third offense forward, each and every illegal lien filed constitutes a Class B Felony.    The individuals responsible for the violations, can be ascertained from the public record for criminal prosecution.    Restitution to the Plaintiffs and to the Class Members is warranted.

306.    All parties taking part in or who conspired with those who participated in the acts or practices in question are jointly and severally liable to the Class Members.

## COUNT IV.
### Common Law Fraud and Injurious Falsehood

307.    Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

### Fraud:

308.    Fraud occurs generally where there is an intentional deception made for personal gain or to damage another.    For a civil verses a criminal claim under Kentucky law, there are six elements: 1) a "material misrepresentation;" 2) "which is false;" 3) which Defendant knew "to be false or made recklessly;" 4) which was made in order to

89

induce Plaintiff to act in a certain manner; 5) that Plaintiff so acted in reliance on the
misrepresentation; and, 6) that Plaintiff was injured as a result of this reliance. Common
law fraud may be proved in Kentucky based solely on circumstantial evidence.

309.    The forged and publicly filed "false" mortgage assignments are the
key element to the Defendants being able to perpetrate the fraudulent foreclosures. The
Defendants conspired together and "knew" the "material representations were "false."
The material representations to the Court and to the property owners was made so that the
Court and the property owners would believe that the Defendants had legitimate claims in
the property. The property owners and Judges across Kentucky relied on such and the
property owners were injured as a result with the entering of a judgment or the facing of
foreclosure litigation. There could possibly be no more serious injury to a Kentuckian
than the illegal divestment of his private property.

## Injurious Falsehood:

310.    One who publishes a false statement harmful to the interests of another
is subject to liability for pecuniary loss resulting to the other if (a) he intends for
publication of the statement to result in harm to interests of the other having a pecuniary
value, or either recognizes or should recognize that it is likely to do so, and (b) he knows
that the statement is false or acts in reckless disregard of its truth or falsity.

311.    The Mortgage Asignments were published false statements intended to do
harm in which the Defendants clearly recognized would divest the pproperty owner to title.
The Defendants knew the foreclosures and declaratory judgments were filed with false
statements as to the Defendants' standing to file suit and status as Mortgagee. The
Defendants are subject to liability for the pecuniary loss by the property owners. The

pecuniary loss to the Property owners under injurious falsehood is the fair market value of the property and costs associated thereto.

## Count V.
## Slander/Defamation of Title and Quiet Title KRS 411.120

312.    Plaintiffs incorporate each and every paragraph of this Complaint as if fully set forth in this claim.

313.    KRS 411.120 states:

> Any person having both the legal title and possession of land may prosecute suit, by petition in equity, in the circuit court of the county where the land or some part of it lies, against any other person setting up a claim to it. If the plaintiff establishes his title to the land the court shall order the defendant to release his claim to it and to pay the plaintiff his costs, unless the defendant by his answer disclaims all title to the land and offers to give such release to the plaintiff, in which case the plaintiff shall pay the defendant's costs, unless for special reasons the court decrees otherwise respecting the costs.

314.    Based on this Petition in Equity, the property owners are entitled to have clear title restored and the Court should Order the Clerks of the Counties to release all mortgages and strike all mortgage assignments filed in the name of the Defendants as to the Class Members.

## Slander of Title:

315.    The Defendants have knowingly and maliciously communicated, in writing, a false statement which has the effect of disparaging the plaintiff's title to property.    The proeprty owners have incurred special damage as a result.

316.    MERS was illegally and fraudulently listed in the public record as a Mortgagee, having no pecuniary interest in said property and no standing to ever collect upon or enforce a debt connected to the property.    The Post-Foreclosure Mortgage Assignment  was drafted by a partner at the law firm filing this action. The Assignment was signed by an employee of that law firm and her signature notarized by an employee

91

of the law firm.    The Post-Foreclosure Assignments from MERS to the Plaintiff are a legal nullity and if placed in the public record, were based in fraud and subject to prosecution.

317.    MERS has no legally enforceable claim, interest or standing to sue as to the Note or Mortgage in question and the claim is a cloud on the Defendants' title and should be quieted as against MERS under Kentucky law.

318.    Plaintiffs are the rightful owner of the properties known as each have stated herein above.

319.    The Plaintiffs are the legal title holder of their respective properties.

320.    MERS has caused to be recorded against the title of the Plaintiffs' properties and sent notices of default, filed foreclosures and served and filed mortgage documents that claim an interest in the properties of the Plaintiffs.

321.    As alleged herein, any purported transfer of any interest in the Plaintiff's d real estate was wrongful and invalid because the mortgages, foreclosures or purported foreclosures were invalid and were not conducted in accordance with the laws of Kentucky.   MERS knew or should have known that such transfers were wrongful and invalid.  Any publication of an ownership interest in any of the Plaintiff's properties is, therefore false.

322.    The recording of the mortgages published the information to third parties.

323.    As a result of said wrongful publication of an ownership interest in the Plaintiff's properties, Plaintiffs have incurred damages in excess of the amount of their

92

individual publicly recorded mortgages and will continue to incur attorneys' fees and costs related to this litigation, in an amount to be proven at trial.

**(Declaratory Relief)**

324.    As alleged in Plaintiff's claims regarding Defendants' wrongful filing of mortgages, foreclosure, unjust enrichment and conspiracy, Plaintiff's rights have been violated.

325.    Defendants have filed mortgages, threatened foreclosure or have foreclosed against Plaintiffs for which Defendants are not owed any payments, have no lawful right to foreclose and have unlawfully deprived or attempted to deprive Plaintiff of their home and further have failed to notify the Plaintiffs of the discharge of their obligations on the notes associated with their mortgage.

326.    Plaintiffs seek a declaratory judgment against Defendants stating that Defendants have violated Plaintiff's rights and that the Defendants had and have no right to hold mortgages in the name of MERS and/or foreclose on the Plaintiffs' property and that the Defendants are entitled to no further payments from the Plaintiffs or recognition in Plaintiffs' Title to their property.

**(Reformation)**

327.    Plaintiffs have been intentionally misled about the terms and conditions of the agreements entered into with the Defendants, MERS and all other yet to be named lenders, who originated loans or who have attempted or have successfully foreclosed on the Plaintiffs.

328.    The Plaintiffs are entitled to a reformation of these agreements and notes as unsecured notes or as partially or wholly discharged notes and a right to

93

reformation of the contracts with the persons or entities who are owed obligations because of funding of the loans of the Plaintiffs.

**(Quiet Title)**

329.    The Plaintiffs are entitled to have their properties as referred to herein quieted in their names until and unless some party comes forward in this litigation who has a right to enforce the loans upon their houses free and clear of all encumbrances.

330.    As alleged in the above paragraphs, the loans on these home were specifically designed to result in equity stripping by loaning funds at the same time to these Plaintiffs as to other borrowers that were intended to fail.

331.    The originators of the loans were brokers of loans and intended to place the loans but to never be the "lenders" that they purported to be.

332.    The originators of the loans, were, in fact, a means by which MERS and the Defendants could insulate themselves from liability for the breach of contract, the violation of lending and recording laws, and for all the reasons stated in the allegations of this Complaint.

333.    The Defendants have not loaned any money to the Plaintiffs.

334.    The Defendants have no contractual relationship with the Plaintiffs.

335.    The Defendants are not the holders in due course of the promissory notes on the Plaintiff's properties.

336.    No one who has an interest in the Plaintiff's properties has made any claim of that interest.

337.    The Plaintiffs are entitled to have the titles to the properties quieted in their names as to the Defendants, where a mortgage was ever recorded in the name of

94

MERS.

338.     Plaintiffs have been required to retain counsel in this matter to protect their rights and seek these remedies and have incurred attorneys' fees and costs in this matter.

### Count VI.
### Fraud by Misrepresentation

339.     Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

340.     The deceptive acts of the the original Lender(s), and MERS as to the inducement of the borrower to enter the transaction and as to a multitude of misrepresentations in the execution of such; including, but not limited to the true identity of the Lender and fraudulent misrepresentation as to the Mortgagee, MERS. The record shows, by clear and convincing evidence, that there existed in the inducement and execution, material representations which were false, were known to be false or made recklessly, which were made with inducement to be acted upon; that the Defendants acted in reliance thereon and has suffered injury due to such.   The facts as attested herein, and the documentary evidence shows that the deceptive acts of the Lender, the Plaintiff and MERS constitute fraudulent misrepresentation and the parties in question are jointly and severally liable for their acts of fraud by their misrepresentation and all damages stemming from such, including punitive damages and attorney's fees.

### Count VII.
### Fraud by Omission and Inducement

341.     Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

342.    The Lender conspired to fraudulently conceal the "True Lender" at closing, and the Note may have been securitized and converted into an investment vehicle within a Special Purpose Vehicle.    The Lender, the Plaintiff and MERS had a duty to disclose material facts, failed to disclose those facts; and that failure induced the Defendants to act, and they have suffered actual damages due to the fraudulent omissions.    The parties had a duty to disclose the true nature of their relationship and the fact that the Lender was merely a "Pretender Lender" and thus, the agent for the Concealed and Unknown Lender.    The failure to disclose the material facts, induced the Defendants to enter into a loan with unknown and unrevealed entities and he has suffered actual damages as a direct result of Fraud by Omission.    The plaintiff and MERS are jointly and severally liable for their acts of Fraud by Omission and all damages stemming from such.

### COUNT VIII.
### Conspiracy to Commit Fraud by the Creation, Operation and Use of MERS System

343.    Plaintiff incorporates by this reference and re-alleges the allegations contained in all the paragraphs above as if set forth fully herein.

344.    Upon information and belief, Defendants and each of them, did knowingly and willfully conspire and agree among themselves to engage in a conspiracy to promote, encourage, facilitate and actively engage in fraudulent and predatory lending practices perpetrated on Plaintiff as alleged herein and the actions of the Defendant conspirators were taken as part of the business policies and practices of each Defendant conspirator in participating in the MERS system.

345.    Upon information and belief, the Defendant conspirators are or have

been members of and participants in the MERS system, and, through their employees and agents, served as members of MERSCORP, Inc. and/or MERS, Inc., and participated in the design and coordination of the MERS system described in this complaint.

346.    Defendants' participation as shareholders, directors, operators, or members of MERSCORP, Inc. and/or MERS, Inc. are as follows:

347.    MERSCORP, Inc. is the operating company that owns and operates the MERS System described herein, and is the parent company of Mortgage Electronic Registration Systems, Inc. ("MERS, Inc.").

348.    Defendants are shareholders, members or representatives of MERS, Inc.

349.    Whenever this Complaint refers to any corporation's act, deed, or transaction, it means that such corporation engaged in the act, deed, or transaction by or through its members, officers, directors, agents, employees, or other representatives while they actively were engaged in the management, direction, control, or transaction of its business or affairs.

350.    Beginning at a time unknown to the Plaintiffs, prior to 2004, and continuing through at least the present, the Defendant co-conspirators engaged in a conspiracy to unlawfully deprive borrower-homeowners of property in numerous States through issuing predatory loans as described herein, and through securitization and subsequent processes described herein.

351.    MERS, Inc. and/or MERSCORP, Inc. arranged for bilateral and multilateral meetings, bilateral and multilateral teleconferences, and bilateral internet communications with potential Shareholders, actual Shareholders, candidates for

Membership, and Members.

352.    Upon information and belief, the Defendant conspirators have conspired among themselves and with other unknown parties to:

a.    Develop a system of earning profits from the origination and securitization of residential loans without regard for the rights of Plaintiffs, and others similarly situated, by engaging in predatory and deceptive residential lending practices as alleged in this complaint above; and

b.    In furtherance of the system referred to immediately above, the Defendant conspirators intentionally created, managed, operated and controlled the Defendants MERSCORP, Inc. and MERS, Inc. for    the specific purpose of MERS, Inc. being designated as a sham "beneficiary" in the original deeds of trust securing those loans, including the loans made to Plaintiffs and other similarly situated individuals by the "lenders"; and

c.    Defendant conspirators intentionally created, managed, operated and controlled the MERS system with the unlawful intent and for    the unlawful purpose of making it difficult or impossible for Plaintiffs and other victims of such industry-wide predatory policies and practices to identify and hold responsible the persons and entities responsible for the unlawful actions of Defendants and their co-conspirators because MERS did not track the transfers but relied upon the members to report the transfers when a foreclosure was initiated.

353.    Upon information and belief, Defendant conspirators, through creation of the MERS system alleged herein, adopted and implemented residential lending underwriting guidelines for use in Kentucky and in other states which:

a.   were intended to, and did, generate unprecedented profits for the Defendant conspirators and their co-conspirators at the expense of Plaintiff and other persons who were fraudulently induced by the Defendant conspirators and their co-conspirators into taking out residential loans that were known by the Defendant conspirators and their co-conspirators, at the time the loans were originated, and,

b.   were likely to result in foreclosure on those loans and loss by Plaintiff and other borrowers of their home, with reckless disregard and intentional indifference by the Defendant conspirators and their co-conspirators of the likelihood of such foreclosure.

354.    Removing the transfers from the recording process and failure to record a real estate transaction on the public record maintained by the county clerks prevents oversight of real estate transactions by the public and by public officials.

355.    MERSCORP, Inc. informed its co-conspirators that using the MERS system would remove transaction records from the public record.

356.    MERSCORP, Inc. and/or MERS, Inc. have publicly stated the following:

357.    "MERS eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans."

a.   "With the recording of the security instrument(s), MERS becomes the mortgagee in the county land records and no assignments are required during a subsequent sale and transfer of the loan between MERS members."

b.   "There is no dependency on the corporate name you use on closing documents and the corresponding corporate name on the MERS System because the MERS System is not the legal system of record of ownership of mortgage loans."

358.    Upon information and belief, the MERS system was created for the unlawful purpose of hiding and insulating the brokers and originators of predatory toxic loans from accountability and liability by creating an entity which simultaneously informed all lenders who originated loans that named MERS as the beneficiary of the following:

359.    MERS would never own or acquire any actual beneficial interest in any loan in which it was named as beneficiary under the deed of trust, and that

360.    MERS could be named as beneficiary for purposes of public notice and notice to the borrower and would act in that capacity if so designated by the lender who originated the loan.

361.    Upon information and belief, the intent and purpose of the Defendant conspirators and their co-conspirators in the creation, management, operation and control of MERS was, without limitation, to make it impossible for the borrowers, their attorneys, the courts, the government, and anyone other than the Defendant conspirators who created and controlled MERS to identify the actual beneficial owner of any particular loan or the property which was the collateral securing that loan until such time, if any, that foreclosure action was initiated.    As a result, Plaintiffs were deprived of the right to modify their toxic loan even though the Defendant America's Servicing Company did not provide the right to modify the loan and the true beneficial owners were intentionally hidden from Plaintiffs and the transfers that occurred of the note of the Plaintiff have also been hidden from them.

362.    MERSCORP, Inc.'s marketing materials also promise Members with assistance with foreclosures. MERSCORP, Inc. and/or MERS, Inc. have publicly stated:

"MERS has assembled a Foreclosure Manual to provide a state-by-state guideline for our Members to follow when foreclosing a mortgage loan in the name of MERS."

363.    Upon information and belief, the Defendant conspirators' actions in creating the MERS system, which was dependent on fraudulent and deceptive practices that included, but were not limited to, making loans to consumers such as Plaintiff using underwriting guidelines that were wildly divergent from the guidelines that had been used to give loans in this country for decades, created a system to unlawfully deprive Plaintiffs of their interest in their home and loaned money to the Plaintiffs for these home with the intention of foreclosing.

364.    MERSCORP, Inc. and/or MERS, Inc. offered Members increased profit. MERSCORP, Inc. has publicly stated:

a.    "The MERS web site enables you to target directly your MERS® Ready products and services to MERS members."

b.    "Commercial originators and issuers save hundreds to thousands of dollars (in the case of cross-collateralized loans) in preparing and recording assignments. Where the originator has not recorded a MERS as Original Mortgagee (MOM) security instrument, the issuer saves the costs of assigning to the Trust by having the originator assign to MERS."

c.    "It will reduce risk and generate more profits for lenders because the Notes registered on it will be in electronic format. It shortens the timeframe between the closing and the securitization of the loan, enabling the Note to move instantly, creating faster funding."

365.    MERSCORP, Inc.'s rules and by-laws, to which MERS Members

agree, require the following:

366.   BY COMPLETING, SIGNING, AND SUBMITTING THIS APPLICATION, THE APPLICANT IS AGREEING TO BE A MERS MEMBER. THE APPLICANT HEREBY AGREES TO PAY ALL FEES AND EXPENSES SET FORTH IN THE MERS RESIDENTIAL FEE SCHEDULE, WHICH MAY CHANGE FROM TIME TO TIME; ABIDE BY ALL EXISTING MERS RULES AND PROCEDURES, WHICH ARE INCORPORATED HEREIN BY REFERENCE AND MAY BE AMENDED FROM TIME TO TIME; AND COMPLY WITH THE TERMS AND CONDITIONS SET FORTH IN THE ATTACHED ADDENDUM ENTITLED TERMS AND CONDITIONS. (Emphasis in original).

367.   The MERSCORP, Inc. rules and by-laws, to which MERS Members agree, cannot be carried out lawfully because they require the following:

a.   MERS, which shall include MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc., and the Member shall abide by these Terms and Conditions, the Rules and Procedures (collectively, the "Governing Documents"), copies of which will be supplied upon request. The Governing Documents shall be a part of the terms and conditions of every transaction that the Member may make or have with MERS or the MERS® System either directly or through a third party. The Member shall be bound by any amendment to any of the Governing Documents.

b.   The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a

nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law. . . .

MERS and the Member agree that: (i) the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans, (ii) transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the mortgage loans, and (iii) membership in MERS or use of the MERS® System shall not modify or supersede any agreement between or among the Members having interests in mortgage loans registered on the MERS® System."

368.     The times, dates, and locations of the various meetings and communications among and between the conspirators are solely within the knowledge of the conspirators and have not been made public by MERS or its co-conspirators.

369.     In addition to the allegations made related to the director, and creator and user conspirators, the MERS system conspiracy consisted of:

370.     The Lender conspirators, including the entities who were named on the deed of trust as lender, Soma Financial, Inc., who agreed to procure loans by means of violation of state laws, as further described in the previous claims for relief, and the Trustees, Western Title Company, who allowed their names to be used as Trustee for

103

"lender" who did not lend any money and the beneficiary MERS who disclaimed to have any beneficial interest;

371.    MERS, the Lender, Securitizer and Servicer conspirators, who agreed to use the MERS system unlawfully and in violation of state laws to deceive homeowners and securities purchasers by misleading them to believe that the conspirators had legal authority to foreclose when, in fact, the conspirators do not have legal authority to foreclose on loans which were made part of the MERS system, as further described in the previous claims for relief.

372.    The Securitizer conspirator(s), who were aware of these violations of law during procurement and agreed to purchase the loans knowing that the law had been violated.

373.    The Securitizer conspirator(s) who, upon information and belief, packaged and sold loans knowing that such loans were based on deeds of trust that had been split from the notes, and based on loans that had been sold as part of the securitization process before the loans were finalized with the borrowers. Thereafter, the purported interests in the obligations, the notes as evidence of the obligations, and the security interest for the obligations were transferred multiple times without recording the change in ownership of an interest in real property in the appropriate county records. This was accomplished by the creation of the private parallel record keeping service known as the MERS system, whereby MERS, Inc. is named in the deed of trust which is supposed to be the security for the underlying loan obligation. MERS is named as the nominee of the lender, but not as the holder of the note or the actual lender. Rather,

MERS is named as beneficiary for the purpose of deceiving the borrower and the clerk's office where the deed of trust is recorded.

374.    A securitization process that was based on loans that were made based on residential loan underwriting guidelines that were designed to generate as many loans as possible to fuel the securitization process to feed the demand for mortgage-backed securities, the faulty and toxic nature of which loans was hidden by the MERS system. As a result of MERS being named the beneficiary, and through the processes described herein, the note and deed of trust are "split." When the note is split from the deed of trust, then the note becomes unsecured and a person holding only the note lacks the power to foreclose and a person holding only a deed of trust suffers no default because only the holder of the note is entitled to payment on it. The monetary effect of utilizing the MERS system, in addition to the allegations set forth otherwise herein, was to hide profits and fees that were not disclosed to the borrower or to the investor in the note, which, in some cases, upon information and belief, were in excess of the principal value stated on the note.

375.    The Securitizer conspirator(s) who violated state and Federal securities laws through their descriptions of the financial derivatives created by the conspiracy demonstrated their fraudulent intent by their pattern of business practices;

376.    The Lender conspirators who agreed to supply borrowers to the Securitizers despite knowledge that the Securitizers would sell the borrowers' promissory notes in violation of the law.

377.    The Servicer conspirator who agreed to unlawfully foreclose on loans despite the separation of the loan from the deed of trust which made the foreclosure unlawful because the debt was no longer secured.

378.    All of the conspirators agreed to the participation of the other conspirators in their individual roles in the conspiracy. The loan files of each of the loans disclose the legal violations and document that the Lenders agreed to purchase loans from third party originators and to sell them to the Securitizers. The Securitizers agreed to purchase the loans and pool them with full knowledge of the contents of the loan files. The Servicers agreed to foreclose with full knowledge of the loan file for each loan.

379.    All of the conspirators continued to agree to the conspiracy over the course of tens of thousands of transactions.

380.    Defendants has acted as players in the conspiracy.

381.    Defendants have acted as Securitizers or the agents of securitizers in the conspiracy.

382.    For the purpose of forming and effectuating this conspiracy, Defendants and co-conspirators did the following things, among others:

383.    The "lender" with the knowledge of the servicer, acting as Lender described above systematically and repeatedly violated state laws in order to originate mortgages, as described in the previous claims for relief;

384.    The unknown entity with the knowledge of the servicers and "lender" allowed their names to be designated as trustee for "lender" on the deed of trust for the Plaintiffs when the trustees knew that the "lender" was not loaning any money to the Plaintiffs.

106

385.     The Defendants acting as Securitizers knowingly and by agreement serviced the unlawfully obtained mortgage;

386.     The Defendants, acting as Lenders, Securitizers and Servicers utilized and benefited from the MERS system as a means of preventing detection by law enforcement or by the public and as a means of unlawful foreclosure to the detriment of homeowners;

387.     All Defendants named herein as co-conspirators profited from their respective roles in originating loans, selling them, and pooling their MERS registered home loans together in large bundles which were sold and turned into financial derivative instruments;

388.     The mortgage securitization process became known in financial industry parlance as "slicing and dicing." The slicing and dicing results in a pool of mortgages which have lost their individual characteristics but which have a high value to those who create them;

389.     The Defendants acting as Securitizers named herein obtained mortgages from the Defendants acting as Lenders named herein for securitization;

390.     The Defendants named as Securitizers herein sold the securitized and pooled mortgages as asset backed financial derivatives with affirmative claims that Defendants were unaware of any legal issues which would affect the value of the assets backing the securities, which was untrue, as Defendants actually knew that the mortgages were unlawfully obtained and subject to rescission, and knew that the mortgage and promissory notes had been split and, therefore, the note holders no longer had the right to foreclose, assuming that they ever did;

391.    The Defendants described herein as Servicers have and will attempt to unlawfully foreclose on the homeowner property. The Servicers will misrepresent the legal right to foreclose, when, in fact, they have no right to foreclose. The Servicers' foreclosure will illegally deprive the Plaintiffs of the legal title to their home if allowed to proceed;

392.    All Defendants named as MERS members agreed to promote MERS, an ostensibly lawful business, and to utilize MERS in an unlawful manner to deprive Plaintiffs and those similarly situated of property.

393.    The securitization process took distinct loans, deeds of trust, and mortgages, and pooled them together in such a manner that they lost their unique identity. Hundreds of such financial derivative instruments were created by the co-conspirators. The co-conspirators all profited from their respective roles in the process, including, but not limited to, the following pooling agreements. These pooling agreements are examples of the type of pooling agreements utilized by the Defendants:

394.    Upon information and belief, Plaintiff's loan was securitized, "sliced and diced" and pooled into mortgage pools such as the ones described herein as part of the conspiracy related to the creation and operation of the MERS system, and Defendants, and each of them, profited from same and are liable for their acts and the acts of their co-conspirators in creating the MERS system, including, but not limited to, the use of MERS-approved and created documents to establish the loans (including, but not limited to, the form of deed of trust), and in participating in the securitization process described herein, thus, involving the Plaintiffs in this fraud upon the investors without their knowledge.

395.     Upon information and belief, Defendant conspirators utilized funds received as part of the Troubled Asset Relief Program payouts and payouts from the Federal Reserve or the FDIC to further the conspiracy to defraud Plaintiffs to deprive them of their money, to deprive them of their property and any equity in their properties, to unlawfully initiate foreclosure on their house and, by that foreclosure, ruin their credit and credit rating and standing in the community, to pay investors in the mortgage-backed securities which were comprised of the loan made to Plaintiffs and others similarly situated, and to pay bonuses to employees and officers of the Defendant conspirators based on their devising the subprime mortgage-backed products which were securitized by loans of the type issued to Plaintiffs, and collateralizing and selling such products in the United States and abroad.

396.     As a result of Defendant conspirators' conspiracy described herein, Plaintiffs have suffered injuries which include mental anguish, emotional distress, embarrassment, humiliation, loss of reputation and a decreased credit rating which has, or will, impair Plaintiff's ability to obtain credit at a more favorable rate than before the decrease in credit rating, the loss or anticipated loss of their Residence and other financial losses according to proof, and Plaintiffs have incurred attorneys' fees and costs in this matter.

397.     Defendant conspirators' actions were wanton, willful and reckless, and justify an award of punitive damages against Defendant conspirators, and each of them.

## COUNT IX.
### Conspiracy to Commit Wrongful Foreclosure by the Creation, Operation and Use of the MERS System

398.     Plaintiff incorporates by this reference each and every paragraph of this

109

Complaint as if set forth fully herein.

399.    Upon information and belief, Defendants and each of them, did knowingly and willfully conspire and agree among themselves to engage in a conspiracy to promote, encourage, facilitate and actively engage in and benefit from wrongful foreclosures perpetrated on Plaintiffs as alleged herein, specifically in the First Claim for Relief, and the actions of the Defendant conspirators were taken as part of the business policies and practices of each Defendant conspirator in participating in the MERS system.

400.    The MERS system was known by Defendant conspirators as being used by the Defendant co-conspirators named in the first, second and third Claims for relief to facilitate the wrongful foreclosures complained of herein.

401.    Specifically, the MERS system was designed to remove the need for recordation of transfers of deeds of trust as alleged herein. This component of the design of the MERS System facilitated the wrongful foreclosures complained of herein by making it easier to transfer

402.    Defendants for purposes of this as the "Defendant conspirators", and each of them, did knowingly and willfully conspire and agree among themselves to engage in a conspiracy to promote, encourage, facilitate and actively engage in and benefit from collecting mortgage payments and wrongful foreclosures perpetrated on Plaintiffs as alleged herein. The actions of the Defendant conspirators were taken as part of the business policies and practices of each Defendant conspirator in participating in the MERS system.

403.    The MERS system was known by Defendant conspirators as being used

by the Defendant co-conspirators to facilitate a fraud on the public records and the wrongful foreclosures complained of herein.

404.    Specifically, the MERS system was designed to remove the need for recordation of transfers of deeds of trust as alleged herein. This component of the design of the MERS System facilitated the illegal mortgage registration, transfer and wrongful foreclosures, by making it easier to transfer the purported beneficial interest in a mortgage and for the purpose of foreclosing on a property, despite the fact that the mortgage no longer provided security for a note as a result of the note having been separated from the deed of trust as alleged herein.

405.    The MERS system does not track the transfer of the notes nor to what entity the notes were transferred.

406.    The MERS system does not track the identity of the holders of the note on the Plaintiff's properties.

407.    Upon information and belief, the Defendant conspirators are or have been creators and/or directors of MERSCORP, Inc., MERS, Inc. and/or members of the MERS system, and, as to Defendant conspirators, and participated in the design and coordination of the MERS system described in this complaint.

408.    Yet to be named Defendants' participation as shareholders, directors, operators, or members of MERSCORP, Inc. and/or MERS, Inc. are as follows:

409.    MERSCORP, Inc. is the operating company that owns and operates the MERS System described herein, and is the parent company of Mortgage Electronic Registration Systems, Inc. ("MERS, Inc.").

410.    Defendants are members and/or shareholders of MERS or the agents of such.

411.    Whenever this Complaint refers to any corporation's act, deed, or transaction, it means that such corporation engaged in the act, deed, or transaction by or through its members, officers, directors, agents, employees, or other representatives while they actively were engaged in the creation, management, direction, control, or transaction of its business or affairs.

412.    The illegal use of the Mail, and the internet and which are specifically attributable to the Defendants subject to this Count, are:

413.    Bringing suit on behalf of entities which were not the real parties in interest, and which had no standing to sue. This involved, and involves, the use of the MERS artifice.

414.    Actively concealing the plaintiffs' lack of standing in their standard complaints for foreclosure, usually entitled, "Complaint to Foreclose Mortgage and to Enforce Lost

415.    Loan Documents." It is believed that in 80% or more of these mortgages held and foreclosure complaints filed by the Defendants, the original loan documents do not exist.

416.    Although MERS is the mortgagee of record, it has never been the "owner" or "holder" of the Note.   Most importantly, MERS is never the agent of the actual holder in due course or the owner of the Note.   MERS works for the servicing agent, which, as with MERS, is not the holder in due course or the owner of the Note. MERS never has a relationship with the owners of the Note.

112

417.    Alternatively, closed-ended continuity is present because the scheme occurred over a period in excess of ten years.

418.    As the result of the enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes and/or make a mortgage payment to a servicing entity not entitle to the proceeds of the Note.   All Class members, regardless of whether they are in foreclosure, have the title to their property clouded by the listing of MERS as mortgagee in the public record.

419.    The measure of the damages for the Class Members is the average of the accelerated amounts demanded from the Class Members by foreclosing entity in the subject foreclosure Complaints.   Members not currently in foreclosure are entitled to damages in the amount of the MERS illegal publicly recorded mortgage.

420.    Since the real parties in interest are not parties to the foreclosures or Mortgagees of record, the mortgages were truly not subject to being foreclosed upon. 10

421.    The fair market value of the properties at the time of foreclosure is for this reason the measure of the damages suffered by the Class Members. The illustrive example is as follows:

422.    The average value of the properties was $250,000.00, and the Class is comprised of 10,000 persons.

423.    The initial damages to which the Class is entitled by law would be $2,500,000,000.00, or 2.5 billion dollars.

---

10 In most instances, the "real parties in interest" have already been paid, either by a CDS and/or through the T.A.R.P.; and the MBS "Fund" or "Trust" the Note was securitized for is no longer in existence.   Many of the MBS holding securitized collateral in Kentucky property, have been covered by Maiden Lane LLC, Maiden Lane II or Maiden Lane III; the corporation formed to pay off the debts of Bear Stearns.

424.    This amount is then tripled by operation of the Kentucky's conspiracy law. Without reference to attorney fees and costs, the total damages awarded would be 7,500,000,000.00, or 7.5 billion dollars.

425.    The Class Members are entitled to judgment in the amount of three times their actual damages, which should be arrived in the manner indicated in the preceding paragraph. plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964[c],

**MERS/Merscorp, Inc.:**

426.    MERS/Merscorp, Inc. was created in or about 1998, and its purpose, from the outset, was to enact the fraudulent scheme enterprise herein complained.

427.    Its overt acts include the following:

a.    Creation of the MERS artifice;

b.    Planning, designing, and enacting the MERS criminal enterprise of which Plaintiff complains herein;

c.    Arranging for the use of the MERS as "mortgagee" in the standard mortgages at issue;

d.    Drafting of the standard MERS language to be included in such mortgages;

e.    Entering into one or more "agreements for signing authority" which purported to allow employees of Servicing Agents and foreclosure mill law firms to execute assignments in which the "assignor" and "assignee" are straw men actually not possessed of the capacity stated, and of which the person executing the document has no knowledge;

f.    Creation and maintenance of an acceptable public image for MERS;

114

g. Owning and maintaining the registration and licensure of the MERS entity, Mortgage Electronic Registration Systems, Inc, with the necessary state agencies, plus other ministerial acts designed to maintain the corporate shield and to mimic the actions expected of normal corporations so as to fraudulently disguise its true nature;

h. Facilitating the use of the MERS artifice by other participants in the scheme.

428.    These predicate acts are related. They share a common purpose, defrauding the Class Members and other borrowers of their money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

429.    The predicate acts satisfy the continuity requirement: they extend from in or about 1998 through and continue unabated at the present time, which meets the definition of "open-ended" continuity. In the alternative, the participants in the RICO enterprise engaged in a pattern of racketeering activities continuously for a period of time exceeding ten years in duration, which as a matter of law suffices to establish "closed-ended" continuity.

430.    As the result of the enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes. The measure of the damages for the Class Members is the average of the accelerated amounts demanded from the Class Members by the Defendant Firm in the subject complaints "to Foreclose Mortgage and to Enforce Lost Loan Documents." Since the real parties in interest had already been paid, the mortgages were truly not subject to being foreclosed upon, and the fair market value of the properties for this reason is the measure of the

damages suffered by the Class Members. The manner in which damages should be calculated is set forth herein.

431.    The Class Members are entitled to judgment in the amount of three times their actual damages, which should be arrived at using the formula set forth in said paragraph, plus costs and a reasonable attorneys' fee under Kentucky law.

## Count X.
## Violations of the Kentucky Residential Mortgage Fraud Act KRS 286.8-990

432.    Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

433.    KRS 286.8-990 states that ANY of the actions as set out in the statute constitute a violation of the Act:

A person is guilty of residential mortgage fraud when, with the intent to defraud, that person does any of the following in connection with the mortgage lending process:

434.    The original Lender, the MBS originators, servicers/trustees and MERS conspired together and acted in concert under the facts as previously set out in both the fraudulent inducement of the original transaction. Their fraudulent attempt to enforce such is an act of fraud and a violation of the Act as to sections (2)(a-h).

## COUNT XI.
## Unjust Enrichment

435.    Plaintiffs incorporate each and every paragraph of this Complaint as if fully set forth in this claim.

436.    Defendants' deceptive scheme as alleged herein will unjustly enrich Defendants, and each of them, to the detriment of Plaintiffs, by causing Defendants, and each of them, to receive monetary payments from the mortgage payments, and/or the sale

116

of Plaintiffs' properties through illegal foreclosures.  The Defendants were not entitled to

the mortgage payments or proceeds of a foreclosure.  The Defendants did not fund the

loans of the Plaintiffs.

437.    Specifically, Plaintiffs have been injured in their property and will lose

their cash and personal investment in the home and right to peaceful enjoyment of their

home in a variety of ways, including but not limited to:  All borrowers who were targeted

for and lured into the mortgages sold by Defendants were kept from knowing the true

purpose of the securitization and the use of the funds of the investors.  This constituted a

misrepresentation that caused Plaintiffs to make their monthly payments of what

represented the equity in their homes to the Defendants and their Servicers.  The result is

that the Plaintiffs assumed financial burdens that they would not otherwise had assumed,

and paid Defendants funds to which the Defendants were not entitled or owed.

438.    The loans made to Plaintiffs were then repackaged, reassigned, and/or

resold, each with a margin of profit for the assignee/buyer that would not otherwise have

existed had Plaintiffs not been deceived by the original terms of the loans and/or the lack

of disclosures as alleged herein, along with all the similarly situated loans going on at the

same time and in the same manner.  Likewise, Plaintiffs would not have continued to

make payments on the loans if the Defendants had properly disclosed the discharge in

whole or in part of the obligations on the notes to the investors or that those obligations

would be discharged by other means upon foreclosure and that the servicers would be

given the houses without having invest any money into the loans to the Plaintiffs.

Likewise the Plaintiffs would have continued to make some payments on their loans had

the Defendant Servicers not instructed them to stop making payments in order to seek

117

modifications of their loans.

439.    Plaintiffs have paid inflated interest rates that, upon information and belief, would not have been agreed to but for the failure to understand the documents and otherwise disclose the true terms and costs of the loans, tangential services, and out-of-pocket costs and that the housing market would not, as represented by the Defendants and their agents, the "lenders" continue to increase in value but would, because of the acts of the Defendants, crash and cause catastrophic loss of value in the real estate market.

440.    Upon information and belief, Defendants, and each of them, retained and continue to retain these ongoing and escalating profits to the detriment of Plaintiffs, contrary to the fundamental principals of fairness, justice, and good conscience and reasonable business practices.

441.    Upon information and belief, all payments made to the Defendants servicing the Plaintiff's mortgages or holding the Plaintiff's home are not due to the Defendants who are making demands for collection.

442.    The Defendants who have serviced the loans and now hold the home of the Plaintiffs did not fund the loans, did not loan any money to the Plaintiffs, and are not the holders in due course of the notes of the Plaintiffs and have no lawful right to foreclose upon Plaintiff's houses.

443.    Upon information and belief, all sums advanced to Plaintiffs for loans by investors has been repaid, settled, satisfied or otherwise are no longer outstanding.

444.    Accordingly, Defendants, and each of them, should be ordered to return all funds obtained as a result of their deceptive scheme on Plaintiff.

445.    MERS, an entity not licensed to engage in the practice of mortgage lending, committed forgery as to both subsections (1)(a) and (1)(b) when it placed a Mortgage into the records of the County clerk for which it had no pecuniary right rights or interest in the Mortgage Note.

446.    The Plaintiff and Lerner Sampson & Rothfuss violated both sections of the act   when Lerner drafted and  forged a Post-Foreclosure Mortgage Assignment on behalf of both MERS and the original Lender.

## COUNT XII.
### KRS 516.030 Kentucky Forgery in the Second Degree

447.    Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

448.    A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument which is or purports to be or which is calculated to become or to represent when completed:
    (a) A deed, will, codicil, contract, assignment, commercial instrument, credit card or other instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status; or
    (b) A public record or an instrument filed or required or authorized by law to be filed in or with a public office or public employee; or
    (2) Forgery in the second degree is a Class D felony.

449.    The forgery on the Assignment was an "Unauthorized Signature" under Kentucky's Uniform Commercial Code, meaning "a signature made without actual, implied, or apparent authority." KRS 355.1-201(2)(ao).    Nor is the Assignment "Genuine" meaning "free of forgery or counterfeiting." KRS 355.1-201(2)(s).    The Assignment is null and void.    It is unenforceable.

450.    The acts of the Defendants in forging the mortgage assignments and the subsequent filing of such with the County Clerks across Kentucky violates both sections (1)(a) and (1)(b.)  Each mortgage assignment executed and filed since 2007 constitutes a

separate violation of the act and a separate Class D felony, illustrating a systematic

pattern and partnership.

## COUNT XIII.
### KRS 516.060 Criminal Possession of a Forged Instrument

451.     Plaintiff incorporates by this reference each and every paragraph of this

Complaint as if set forth fully herein.

(1) A person is guilty of criminal possession of a forged instrument in the
second degree when, with knowledge that it is forged and with intent to defraud,
deceive or injure another, he utters or possesses any forged instrument of a kind
specified in KRS 516.030.
(2) Criminal possession of a forged instrument in the second degree is a Class
D felony.

452.     Each mortgage assignment executed and filed constitutes a separate

violation of the act and a separate Class D felony, illustrating a systematic pattern and

partnership.

453.     The Defendants worked together to create the forge Mortgage

Assignments.   Therefore knowledge of the forgery is irrefutable.   The Defendants both

possessed and uttered the forgeries in to the land records across Kentucky.   All parties

taking part in or who conspired with those who participated in the acts or practices in

question are jointly and severally liable to the Class Members.

## COUNT XIV.
### KRS 378.010 and 378.030 Fraudulent Conveyance

454.     Plaintiff incorporates by this reference each and every paragraph of this

Complaint as if set forth fully herein.

455.     KRS 378.010 Fraudulent conveyances and encumbrances -- Void as to
whom -- Exception.:

Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real
or personal, or right or thing in action, or any rent or profit thereof, made with the intent to
delay, hinder or defraud creditors, purchasers or other persons, and every bond or other

120

evidence of debt given, action commenced or judgment suffered, with like intent, shall be void as against such creditors, purchasers and other persons. This section shall not affect the title of a purchaser for a valuable consideration, unless it appears that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

456.    KRS 378.030 Action on fraudulent conveyance or encumbrance of real property -- Proceedings.

Any party aggrieved by the fraudulent conveyance, transfer or mortgage of real property may file a petition in equity against the parties thereto or their representatives or heirs, alleging the facts showing his right of action, alleging the fraud or the facts constituting it and describing the property. When this petition is filed a lis pendens shall be created upon the property described, and the suit shall progress and be determined as other suits in equity and as though it had been brought on a return of nulla bona.

457.    The parties are aggrieved by the transfer of mortgage of their real property.    This action serves as a Petition in Equity against the Defendants.    A lis pendens "suit pending" and notice to the world is now created upon the parties' property and a lis pendens shall exist on each and every piece of Kentucky property owned by the members of this Class Action.

458.    All parties taking part in or who conspired with those who participated in the acts or practices in question are jointly and severally liable to the Class Members.

## VIII.  CONCLUSION

459.    Upon information and belief, the Defendants, did not and cannot legally obtain foreclosures and/or file an Assignment of the Notes or Mortgages of the representative Plaintiffs or the putative Class Members.    Neither the Defendants or MERS had capacity or standing to file suit or foreclose on property.    In conspiracy with each other, the Defendants, filed fraudulent mortgages, affidavits, and mortgage assignments,  filed sham pleadings and committed and continue to commit fraud on the recording clerks and the Courts.

121

460.    These violations as aforementioned entitle the Plaintiffs and putative

Class members to recover the actual damages they have sustained as a result of the

improper filing of foreclosure suits and the improper filing of the Mortgage Assignments;

statutory damages as permitted by law; restitution under for the violations of the criminal

acts, treble damages as allowed by the acts, punitive damages, and cost and attorneys fees

incurred.    The Plaintiffs are entitled to equitable relief as to the clearing and quieting of

the title to their properties in relation to the filing of false Note and Mortgage

Assignments.

461.    MERS should be enjoined from this day forward from drafting,

executing and filing Mortgages and Mortgage Assignments and should be further

enjoined from filing Complaints in Foreclosure based in fraud and further be enjoined

from prosecuting all pending cases.

## IX.  JURY TRIAL AND DEMAND FOR RELIEF

WHEREFORE, the Plaintiffs on their own behalf and on behalf of the putative

Class Members, request the this Court enter judgment against the Defendants jointly and

severally and award all damages, costs and any other  relief the Court deems proper on

behalf of the Class Members, demands judgment against the Defendants, jointly and

severally, for the total damages sustained by the Class, plus costs, attorneys' fees, and

such additional relief as the Court or jury may deem just and proper, including imposition

of liability on the members of the conspiracy not presently named as Defendants in this

action. as follows:

1. Certification of the action or common issues herein as a Class Action, and the

designation of any sub-classes, for any and all claims and issues, under the applicable

class action provisions and appointment of counsel of record as the appointed class counsel for any and all proceedings relating to this action.

2. Such coordination and cooperation as may be appropriate between this Court and other Courts that may exercise subject matter jurisdiction over the subject of this litigation, but with other Class Actions filed against other Defendants.

3. A determination of common issues and claims in unitary consolidated Class Action

4. An award of actual and compensatory damages, statutory damages as permitted by law; restitution under for the violations of the criminal acts, treble damages as allowed by the acts, punitive damages, and cost and attorneys fees incurred and equitable relief as to the clearing and quieting of the title to their properties in relation to the filing of false Note and Mortgage Assignments.

5. An Injunction halting from this day forward, the filing of new foreclosure or Declaratory Judgments, or the prosecution of existing law suits, and an Order which punishes severely and sanctions any violation of said Injunction by any of the Defendants.

6. A trial by jury.

7. Any other relief legal and/or equitable to which the Plaintiffs and the putative Class Members are entitled at law or for which the Court deems proper, including, according to proof, exemplary or punitive damages as may be necessary and appropriate to punish the past and present and deter future reprehensible misconduct.

Dated September 28, 2010

Most respectfully submitted,

/s/ Heather McKeever

Heather Boone McKeever
McKEEVER LAW OFFICES PLLC
3250 Delong Road
Lexington, Kentucky 40515
Tel:  859-552-7388
Fax:  859-327-3277
kentuckyforeclosuredefense@insightbb.com
ATTORNEY FOR CLASS PLAINTIFFS AND
THE MEMBERS OF THE PUTATIVE CLASS

124

# EXHIBIT A

# Congress of the United States
## Washington, DC 20515

September 24, 2010

Michael J. Williams
President and Chief Executive Officer
Fannie Mae
3900 Wisconsin Avenue, N.W.
Washington, D.C. 20016

Dear Mr. Williams,

We are disturbed by the increasing reports of predatory 'foreclosure mills' in Florida working for Fannie Mae servicers. Foreclosure mills are law firms representing lenders that specialize in speeding up the foreclosure process, often without regard to process, substance, or legal propriety. According to the New York Times, four of these mills are both among the busiest of the firms and are under investigation by the Attorney General of Florida for fraud. The firms have been accused of fabricating or backdating documents, as well as lying to conceal the true owner of a note.

Several of the busiest of these mills show up as members of Fannie Mae's Retained Attorney Network, a set of legal contractors on whom Fannie relies to represent its interests as a note-holder. The network also serves as a pool of legal talent that represents Fannie in its pre-filing mediation program, a program designed to facilitate communication between borrowers and servicers prior to foreclosure. In other words, Fannie Mae seems to specifically delegate its foreclosure avoidance obligations out to lawyers who specialize in kicking people out of their homes.

The legal pressure to foreclose at all costs is leading to a situation where servicers are foreclosing on properties on which they do not even own the note. This practice is blessed by a legal system overwhelmed with foreclosure cases and unable to sort out murky legal details, and a set of law firms who mass produce filings to move foreclosures as quickly as possible. At the very least, we would encourage you to remove foreclosure mills under investigation for document fraud from the Fannie Mae's Retained Attorney Network. We also believe that Fannie should have guidelines allowing servicers to proceed on a foreclosure only when its legal entitlement to foreclose is clearly documented. In addition, these charges raise a number of questions for us about the foreclosure process as it pertains to Fannie Mae's holdings.

Why is Fannie Mae using lawyers that are accused of regularly engaging in fraud to kick people out of their homes? Given that Fannie Mae is at this point a government entity, and it is the policy of the government that foreclosures are a costly situation best avoided if there are any lower cost alternatives, what steps is Fannie Mae taking to avoid the use of foreclosure mills? What additional steps is Fannie Mae going to take to ensure that foreclosures are done only when

necessary and only in accordance with recognized law? How do your servicer guidelines take into account the incentives for fraud in the fee structure of foreclosure attorneys and others engage in the foreclosure process? What mechanisms do you employ to monitor legal outsourcing?

We look forward to your responses and to understanding more about these disturbing dynamics in future hearings.

Sincerely,

Alan Grayson
Member of Congress

Barney Frank
Member of Congress

Corrine Brown
Member of Congress

FINANCIAL SERVICES COMMITTEE
SUBCOMMITTEE ON CAPITAL MARKETS,
INSURANCE, AND GOVERNMENT
SPONSORED ENTERPRISES

SUBCOMMITTEE ON
OVERSIGHT AND INVESTIGATIONS

SCIENCE AND TECHNOLOGY
COMMITTEE
SUBCOMMITTEE ON
SPACE AND AERONAUTICS

SUBCOMMITTEE ON
INVESTIGATIONS AND OVERSIGHT

WASHINGTON DC OFFICE:

1605 LONGWORTH HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-2176

DISTRICT OFFICE:

455 NORTH GARLAND AVENUE
SUITE 402
ORLANDO, FL 32801
(407) 841-1757

## Alan Grayson
# Congress of the United States
### 8th District, Florida

September 20, 2010

Chief Justice Charles T. Canady
Florida Supreme Court
500 South Duval Street
Tallahassee, FL 32399-1900

Dear Chief Justice Canady,

I am disturbed by the increasing reports of predatory 'foreclosure mills' in Florida. *The New York Times* and *Mother Jones* have both recently reported on the rampant and widespread practices of document fraud and forgery involved in mortgage assignments. My staff has spoken with multiple foreclosure specialists and attorneys in Florida who confirm these reports.

Three foreclosure mills - the Law Offices of Marshall C. Watson, Shapiro & Fishman, and the Law Offices of David J. Stern - constitute roughly 80% of all foreclosure proceedings in the state of Florida. All are under investigation by Attorney General Bill McCollum. If the reports I am hearing are true, the illegal foreclosures taking place represent the largest seizure of private property ever attempted by banks and government entities. This is lawlessness.

I respectfully request that you abate all foreclosures involving these firms until the Attorney General of the state of Florida has finished his investigations of those firms for document fraud.

I have included a court order, in which Chase, WAMU, and Shapiro and Fishman are excoriated by a judge for document fraud on the court. In this case, Chase attempted to foreclose on a home, when the mortgage note was actually owned by Fannie Mae.

Taking someone's home should not be done lightly. And it should certainly be done in accordance with the law.

Thank you for your consideration of this request.

Sincerely,

Alan Grayson
Member of Congress

# EXHIBIT B

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**UNITED STATES JUDICIAL PANEL**
**on**
**MULTIDISTRICT LITIGATION**

**Aug 09, 2010**

**FILED**
**CLERK'S OFFICE**

IN RE: MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS (MERS) LITIGATION

Aurora Loan Services, LLC v. Mark B. Moody, et al.,    )
E.D. Kentucky, C.A. No. 5:10-122    )    MDL No. 2119

## ORDER VACATING CONDITIONAL TRANSFER ORDER

**Before the entire Panel**[*]: Defendant Mortgage Electronic Registration Systems, Inc. (MERS) in an action (*Aurora*) pending in the Eastern District of Kentucky has moved pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), asking the Panel to vacate its order conditionally transferring certain claims in the action to the District of Arizona for inclusion in MDL No. 2119. No party in *Moody* responded to the motion to vacate.

After considering all argument of counsel, we find that *Aurora* does not share sufficient questions of fact with previously centralized actions to warrant inclusion in MDL No. 2119. The centralized proceedings concern the formation and/or operation of the MERS system, an electronic mortgage registration system and clearinghouse that tracks beneficial ownership interests in, and servicing rights to, mortgage loans. Plaintiffs are homeowners who allege that the members and/or shareholders of MERSCORP, Inc., and its subsidiary MERS conspired to establish the MERS system as a means by which to intentionally hide from plaintiffs the true identity of the actual beneficial owners of negotiable promissory notes. Claims unrelated to the formation and/or operation of the MERS system, i.e., such as claims regarding loan origination and/or collection practices, were separated and simultaneously remanded to the transferor court. *See In Re: Mortgage Electronic Registration Systems (MERS) Litigation*, 659 F.Supp.2d 1368 (J.P.M.L. 2009). Unlike all of the centralized actions, *Aurora* arose in Kentucky, which is a judicial foreclosure state. We are of the view that expanding the scope of MDL No. 2119 by including actions arising in judicial foreclosure states would hinder the efficient conduct of MDL No. 2119.

Should the need arise in this action, alternatives to transfer exist that can minimize any possibilities of duplicative discovery and/or inconsistent pretrial rulings between this action and the actions in MDL No. 2119. *See, e.g., In re Eli Lilly and Company (Cephalexin Monohydrate) Patent Litigation*, 446 F.Supp. 242, 244 (J.P.M.L. 1978); *see also Manual for Complex Litigation (Fourth)*, § 20.14 (2004).

---

[*]    Judge Heyburn did not participate in the decision of this matter.

- 2 -

IT IS THEREFORE ORDERED that our conditional transfer order designated as "CTO-5" is vacated insofar as it relates to this action.

PANEL ON MULTIDISTRICT LITIGATION

Robert L. Miller, Jr.
Acting Chairman

John G. Heyburn II, Chairman*          Kathryn H. Vratil
David R. Hansen                        W. Royal Furgeson, Jr.
Frank C. Damrell, Jr.                  Barbara S. Jones