1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 12-12020-mg

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    RESIDENTIAL CAPITAL, LLC, et al.,

9

10                Debtors.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                September 11, 2013

19                10:05 AM

20

21    B E F O R E:

22    HON. MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25

2

1

2  (CC: Doc# 4603) Motion for Objection to Claim(s) Number: 4760

3  (Proof of Claim of PNC Bank, N.A.) (Claim No. 4760)

4  See Agenda for update

5

6  (CC: Doc# 4718) Debtors Motion Under Section 365 of the

7  Bankruptcy Code to Assume and Assign Servicing-Related

8  Agreements for Trusts Insured by Syncora Guarantee Inc. to

9  Ocwen Loan Servicing, LLC.

10  See Agenda for Status.

11

12  (CC: Doc No 4420) Third Interim Application of Dorsey & Whitney

13  LLP as Special Securitization and Investigatory Counsel for the

14  Debtors for Compensation and Reimbursement of Expenses Incurred

15  for the Period January 1, 2013 through April 30, 2013 for

16  Dorsey and Whitney LLP, Special Counsel.

17

18  (CC: Doc# 4455) Third Interim Application of Towers Watson

19  Delaware Inc. as Human Resources Consultant for the Debtors for

20  Compensation and Reimbursement of Expenses Incurred for the

21  Period January 1, 2013 through April 30, 2013 for Towers Watson

22  Delaware Inc., Consultant, period: 1/1/2013 to 4/30/2013,

23  fee:$7,308.10, expenses: $0.00.

24

25

1  (CC: Doc no. 4458, 4514) Third Application for Interim

2  Professional Compensation for Severson & Werson, PC, Debtor's

3  Attorney, period: 1/1/2013 to 4/30/2013, fee:$513,814.80,

4  expenses: $44,994.41.

5

6  (CC: Doc no. 4507) Third Application for Interim Professional

7  Compensation for Locke Lord LLP, Special Counsel, period:

8  1/1/2013 to 4/30/2013, fee:$259725.40, expenses: $2788.67.

9

10 (CC: Doc# 4511) Third Interim Fee Application of Deloitte &

11 Touche LLP for Compensation for Services Rendered and

12 Reimbursement of Expenses as Independent Auditor and Attest

13 Service Provider to the Debtors for the Period from January 1,

14 2013 through April 30, 2013 for Deloitte & Touche LLP, Auditor,

15 period: 1/1/2013 to 4/30/2013, fee:$2,984,455.50, expenses:

16 $0.00.

17

18 (CC: Doc# 4512) Third Fee Application of KPMG LLP, as Tax

19 Compliance Professionals and Information Technology Advisors to

20 the Debtors and Debtors in Possession, for Interim Allowance

21 and Compensation for Professional Services Rendered and

22 Reimbursement of Actual and Necessary Expenses Incurred from

23 January 1, 2013 through April 30, 2013 for KPMG LLP, Other

24 Professional, period: 1/1/2013 to 4/30/2013, fee:$290,753.90,

25 expenses: $60.00.

4

1

2  (CC: Doc# 4513) Third Interim Application of Bradley Arant

3  Boult Cummings LLP as Special Litigation and Compliance Counsel

4  for the Debtors for Compensation and Reimbursement of Expenses

5  Incurred for the Period from January 1, 2013 through April 30,

6  2013 for Bradley Arant Boult Cummings LLP, Special Counsel,

7  period: 1/1/2013 to 4/30/2013, fee:$2,416,978.11, expenses:

8  $144,016.28.

9

10  (CC: Doc no. 4521) Second Interim Application of Pepper

11  Hamilton LLP as Special Foreclosure Review Counsel for

12  Bankruptcy Issues for the Debtors for Compensation and

13  Reimbursement of Expenses Incurred for the Period January 1,

14  2013 Through April 30, 2013 for Pepper Hamilton LLP, Special

15  Counsel.

16

17  (CC: Doc# 4523) Third Interim Application of Rubenstein

18  Associates, Inc. as Corporate Communications Consultant for the

19  Debtors for Compensation and Reimbursement of Expenses Incurred

20  for the Period January 1, 2013 through April 30, 2013 for

21  Rubenstein Associates, Inc., Consultant, period: 1/1/2013 to

22  4/30/2013, fee:$2,317.50, expenses: $2,749.75.

23

24  (CC: Doc no. 4526) First Application for Interim Professional

25  Compensation for Ernst & Young LLP, Accountant.

5

1

2  (CC: Doc# 4527) Third Interim Application of Morrison Cohen LLP

3  for Allowance of Interim Compensation for Professional Services

4  Rendered and Expenses Incurred During the Period January 1,

5  2013 through April 30, 2013 for Morrison Cohen LLP, Other

6  Professional, period: 1/1/2013 to 4/30/2013, fee:$1,318,943.00,

7  expenses: $42,792.26.

8

9  (CC: Doc# 4528) Third Interim Application of Centerview

10  Partners LLC as Investment Banker for the Debtors for

11  Compensation and Reimbursement of Expenses Incurred for the

12  Period January 1, 2013 through April 30, 2013 for Centerview

13  Partners LLC, Other Professional, period: 1/1/2013 to

14  4/30/2013, fee:$1,200,000.00, expenses: $12,630.14.

15

16  (cc: Doc no. 4529) Third Application for Interim Professional

17  Compensation for Orrick, Herrington & Sutcliffe LLP, Special

18  Counsel

19

20

21

22

23

24

25

6

1

2 (CC: Doc# 4532) Third Application for Interim Professional

3 Compensation /Third Interim Application of Curtis, Mallet-

4 Prevost, Colt & Mosle LLP, as Conflicts Counsel to the Debtors

5 and Debtors in Possession, for Allowance and Payment of

6 Compensation for Professional Services Rendered and for

7 Reimbursement of Actual and Necessary Expenses Incurred from

8 January 1, 2013 Through and Including April 30, 2013 for

9 Curtis, Mallet-Prevost, Colt & Mosle LLP, Debtor's Attorney,

10 period: 1/1/2013 to 4/30/2013, fee:$1,480,650, expenses:

11 $3,085.90.

12

13 (cc: Doc# 4533) First Interim Application of Perkins Coie LLP

14 as Special Insurance Coverage Counsel to the Debtors for

15 Compensation and Reimbursement of Expenses Incurred for the

16 Period March 20, 2013 through April 30, 2013 for Perkins Coie

17 LLP, Special Counsel, period: 3/20/2013 to 4/30/2013,

18 fee:$441,806.00, expenses: $795.62.

19

20 (CC: Doc# 4542) Third Interim Application of FTI Consulting,

21 Inc., as Financial Advisor for the Debtors for Compensation and

22 Reimbursement of Expenses Incurred for the Period January 1,

23 2013 through April 30, 2013 for FTI Consulting, Inc., Other

24 Professional, period: 1/1/2013 to 4/30/2013, fee:$5,501,118.50,

25 expenses: $227,254.30.

(CC: Doc# 4547) Third Application for Interim Professional Compensation for Troutman Sanders LLP, Other Professional, period: 1/1/2013 to 4/30/2013, fee:$333,753.00, expenses: $4,115.63.

(CC: Doc# 4551) Third Interim Application of Morrison & Foerster LLP as Bankruptcy Counsel for the Debtors for Compensation and Reimbursement of Expenses Incurred for the Period January 1, 2013 through April 30, 2013 for Morrison & Foerster LLP, Debtor's Attorney, period: 1/1/2013 to 4/30/2013, fee:$22,790,342.6, expenses: $350,910.44.

(cc: Doc# 4557) Third Application for Interim Professional Compensation for Carpenter Lipps & Leland LLP, Special Counsel, period: 1/1/2013 to 4/30/2013, fee:$1,659,806.00, expenses: $977,371.77.

(CC: Doc# 4558) Third Application for Interim Professional Compensation for Mercer (US) Inc., Other Professional, period: 1/1/2013 to 4/30/2013, fee:$135661.17, expenses: $14,951.86.

(CC: Doc# 4534) Second Application for Interim Professional Compensation for Pachulski Stang Ziehl & Jones LLP, Creditor Comm. Aty, period: 1/1/2013 to 4/30/2013, fee:$349099.50, expenses: $13706.60.(related document(s)3162)

8

1

2  (CC: Doc# 4537) First Application for Interim Professional

3  Compensation /First Interim Fee Application of Wilmer Cutler

4  Pickering Hale and Dorr LLP, as Special Counsel for Certain

5  Regulatory Matters to the Official Committee of Unsecured

6  Creditors of Residential Capital, LLC, et al. for Interim

7  Allowance of Compensation and for the Reimbursement of Expenses

8  for Services Rendered During the Period From December 12, 2012

9  Through April 30, 2013 for Wilmer Cutler Pickering Hale and

10  Dorr LLP, Creditor Comm. Aty, period: 12/12/2012 to 4/30/2013,

11  fee:$504,670.50, expenses: $2,231.33.

12

13  (CC: Doc# 4538) Second Interim Application of SilvermanAcampora

14  LLP, Special Counsel to Official Committee of Unsecured

15  Creditors, for Interim Allowance of Compensation for

16  Professional Services Rendered and for Reimbursement of Actual

17  and Necessary Expenses Incurred from January 1, 2013 through

18  April 30, 2013 for SilvermanAcampora LLP, Special Counsel,

19  period: 1/1/2013 to 4/30/2013, fee:$315,950.00, expenses:

20  $1,613.51.

21

22

23

24

25

9

1

2  (CC: Doc# 4561) Second Interim Application of Epiq Bankruptcy

3  Solutions, LLC, as Information Agent for the Official Committee

4  of Unsecured Creditors, for Allowance and Payment of

5  Compensation for Professional Services Rendered and for

6  Reimbursement of Actual and Necessary Expenses Incurred From

7  January 1, 2013 Through April 30, 2013 for Epiq Bankruptcy

8  Solutions, LLC, Other Professional, period: 1/1/2013 to

9  4/30/2013, fee:$39,644.20, expenses: $15,647.79.

10

11  (CC: Doc# 4563) Third Interim Application of AlixPartners, LLP,

12  Financial Advisor to the Official Committee of Unsecured

13  Creditors, for Compensation and Reimbursement of Expenses for

14  the Period January 1, 2013 Through April 30, 2013 for

15  AlixPartners, LLP, Other Professional, period: 1/1/2013 to

16  4/1/2013, fee:$4,379,636.25, expenses: $22,586.38.

17

18  (CC: Doc# 4564) Third Interim Application of Moelis & Company

19  LLC for Compensation for Professional Services Rendered and

20  Reimbursement of Actual and Necessary Expenses Incurred as

21  Investment Banker to the Official Committee of Unsecured

22  Creditors for the Period From January 1, 2013 Through April 30,

23  2013 for Moelis & Company LLC, Other Professional, period:

24  1/1/2013 to 4/1/2013, fee:$2,100,000.0, expenses: $15,805.11.

25

1

2   (CC: Doc# 4569) Second Application J F. Morrow, Consultant to

3   the Official Committee of Unsecured Creditors, for Interim

4   Allowance of Compensation for Professional Services Rendered

5   and for Reimbursement of Actual and Necessary Expenses Incurred

6   From January 1, 2013 Through April 30, 2013 for J.F. Morrow,

7   Consultant, period: 1/1/2013 to 4/1/2013, fee:$107,400.00,

8   expenses: $0.00.

9

10   (CC: Doc# 4570) Second Interim Application of Coherent

11   Economics, LLC as Consultant to the Official Committee of

12   Unsecured Creditors for Compensation and Reimbursement of

13   Expenses Incurred for the Period January 1, 2013 Through April

14   30, 2013 for Coherent Economics LLC, Consultant, period:

15   1/1/2013 to 4/30/2013, fee:$133,247.00, expenses: $3,601.98.

16

17   (CC: Doc no. 4571) Second Application of Analytic Focus, LLC,

18   Consultant to the Official Committee of Unsecured Creditors,

19   for Interim Allowance of Compensation for Professional Services

20   Rendered and for Reimbursement of Actual and Necessary Expenses

21   Incurred From January 1, 2013 Through April 30, 2013 for

22   Analytic Focus, LLC, Consultant.

23

24

25

1

2   (CC: Doc #4572) Second Interim Application of San Marino

3   Business Partners LLC as Consultant to the Official Committee

4   of Unsecured Creditors for Compensation and Reimbursement of

5   Expenses Incurred for the Period January 1, 2013 Through April

6   30, 2013 for San Marino Business Partners LLC, Consultant.

7

8   (cc: Doc no. 4573) Third Application of Kramer Levin Naftalis &

9   Frankel LLP, Counsel for the Official Committee of Unsecured

10  Creditors, for Interim Allowance of Compensation for

11  Professional Services Rendered and for Reimbursement of Actual

12  and Necessary Expenses Incurred From January 1, 2013 Through

13  April 30, 2013 for Kenneth H. Eckstein, Creditor's Attorney.

14

15  (CC: Doc# 4559) Application for Interim Professional

16  Compensation First Interim Application of Leonard, Street and

17  Deinard Professional Association, Special Minnesota Counsel to

18  the Examiner, for Allowance of Compensation and Reimbursement

19  of Expenses for the Period from April 15, 2013 Through and

20  Including April 30, 2013 for Leonard, Street and Deinard

21  Professional Association, Other Professional, period: 4/15/2013

22  to 4/30/2013, fee:$88,103.00, expenses: $2,345.00.

23

24

25

12

1

2 (CC: Doc# 4560) Second Application for Interim Professional

3 Compensation Second Interim Fee Application of Wolf Haldenstein

4 Adler Freeman & Herz LLP, Conflicts Counsel to the Examiner,

5 for Allowance of Compensation and Reimbursement of Expenses for

6 the Period from January 1, 2013 Through and Including April 30,

7 2013 for Wolf Haldenstein Adler Freeman & Herz LLP, Other

8 Professional, period: 1/1/2013 to 4/30/2013, fee:$77,787.00,

9 expenses: $1,623.06.

10

11 (CC: Doc# 4562) Third Application for Interim Professional

12 Compensation Third Interim Fee Application of Mesirow Financial

13 Consulting, LLC for Compensation and Reimbursement of Expenses

14 as Financial Advisor to the Examiner for the Period January 1,

15 2013 Through April 30, 2013 for Mesirow Financial Consulting,

16 LLC, Other Professional, period: 1/1/2013 to 4/30/2013,

17 fee:$23,210,644, expenses: $299,682.

18

19 (CC: Doc# 4565) Third Application for Interim Professional

20 Compensation Third Interim Fee Application of Chadbourne &

21 Parke LLP, Counsel to the Examiner, for Allowance of

22 Compensation and Reimbursement of Expenses for the Period

23 January 1, 2013 Through and Including April 30, 2013 for

24 Chadbourne & Parke LLP, Other Professional, period: 1/1/2013 to

25 4/30/2013, fee:$23771407.75, expenses: $1528915.11.

1

2   (CC: Doc# 4566) Third Application for Interim Professional

3   Compensation Third Interim Fee Application of Arthur J.

4   Gonzalez, as Chapter 11 Examiner, for Allowance of Compensation

5   and Reimbursement of Expenses for the Period January 1, 2013

6   Through and Including April 30, 2013 for Arthur J. Gonzalez,

7   Examiner, Other Professional, period: 1/1/2013 to 4/30/2013,

8   fee:$321,975.00, expenses: $0.00.

9

10  (CC: Doc# 4147) Adj. Hrg. Re: Motion for Omnibus Objection to

11  Claim(s) /Debtors Thirteenth Omnibus Objection to Claims (No

12  Liability - Books and Records Tax Claims).

13  The hearing as it relates to (i) Rose Plympton, Treasurer in

14  and for the County of Elmore, Idaho, and (ii) the Butte County

15  Tax Collector has been adjourned to October 23, 2013 at 10:00

16  am.

17

18  (CC: Doc# 4151) Adj. Hearing RE: Motion for Omnibus Objection

19  to Claim(s) /Debtors Seventeenth Omnibus Objection to Claims

20  (Misclassified Borrower Claims).

21  The hearing on this matter as it relates to Michelle R.

22  Strickland, Perry Goerner and Anthony Davide will be going

23  forward. The response of James D. Derouin has been withdrawn.

24

25

1

2  (CC: Doc# 4154) Adj. Hearing RE: Motion for Omnibus Objection

3  to Claim(s) /Debtors Eighteenth Omnibus Objection to Claims

4  (Borrower Claims with Insufficient Documentation).

5  The hearing on this matter as it relates to Brian Edmond Bath

6  and Ailette Cornelius will be going forward.

7

8  (CC: Doc# 4155) Adj. Hearing RE: Motion for Omnibus Objection

9  to Claim(s) /Debtors Nineteenth Omnibus Objection to Claims

10 (Borrower Claims with Insufficient Documentation)

11 The hearing on this matter as it relates to Gary T. Harper and

12 Julie L. Franklin-Harper and Joan Johnson will be going

13 forward. The hearing on this matter as it relates to Julian

14 Ortiz and Frances Soto-Ortiz has been adjourned to September

15 24, 2013.

16

17 (CC: Doc# 4156) Motion for Omnibus Objection to Claim(s)

18 /Debtors Twentieth Omnibus Objection to Claims (Borrower Claims

19 with Insufficient Documentation).

20 Hearing on this matter as it relates to Patricio Sulit, Ariel

21 Barel and Lucious Hughes will be going forward. The hearing on

22 this matter as it relates to Mark Ragonese is adjourned to

23 September 24, 2013.

24

25

1

2   (CC: Doc# 4158) Adj. Hearing RE: Motion for Omnibus Objection

3   to Claim(s) /Debtors Twenty-First Omnibus Objection to Claims

4   (Borrower Claims with Insufficient Documentation).

5   Hearing on this matter as it relates to Tom Franklin, the

6   Harleston Law Firm and Sonya Anthony Curry will be going

7   forward.

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:   Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

16

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8  BY:    LORENZO MARINUZZI, ESQ.

9        NORMAN S. ROSENBAUM, ESQ.

10        JORDAN A. WISHNEW, ESQ.

11        MERYL L. ROTHCHILD, ESQ.

12

13

14  MORRISON & FOERSTER LLP

15        Attorneys for Debtors

16        200 Pennsylvania Avenue, NW

17        Suite 5500

18        Washington, DC 20006

19

20  BY:    ALEXANDRA STEINBERG-BARRAGE, ESQ.

21

22

23

24

25

17

1

2  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

3        Conflicts Counsel to Debtors

4        101 Park Avenue

5        New York, NY 10178

6

7  BY:   MARYANN GALLAGHER, ESQ.

8        JONATHAN WALSH, ESQ.

9        MICHAEL A. COHEN, ESQ.

10

11

12  BRYAN CAVE LLP

13        Special Counsel to Debtors

14        560 Mission Street

15        25th Floor

16        San Francisco, CA 94105

17

18  BY:   LEE MARSHALL, ESQ.

19

20

21

22

23

24

25

18

1  PERKINS COIE LLP

2          Insurance Counsel to Debtors

3          700 Thirteenth Street, N.W.

4          Suite 600

5          Washington, DC 20005

6

7  BY:   SELENA J. LINDE, ESQ.

8

9

10  PERKINS COIE LLP

11          Insurance Counsel to Debtors

12          30 Rockefeller Plaza

13          25th Floor

14          New York, NY 10112

15

16  BY:   SCHUYLER G. CARROLL, ESQ.

17

18

19  SEVERSON & WERSON, P.C.

20          Special CA Counsel to Debtors

21          One Embarcadero Center

22          26th Floor

23          San Francisco, CA 94111

24

25  BY:   DONALD H. CRAMM, III, ESQ.

19

1

2    CARPENTER LIPPS & LELAND LLP

3          Special Counsel to Debtors

4          280 North High Street

5          Suite 1300

6          Columbus, OH 43215

7

8    BY:    DAVID A. BECK, ESQ.

9

10

11   LOCKE LORD LLP

12          Litigation Counsel to Debtors

13          111 South Wacker Drive

14          Chicago, IL 60606

15

16   BY:    BRIAN A. RAYNOR, ESQ.

17

18

19   DORSEY & WHITNEY LLP

20          Special Counsel for the Debtors

21          51 West 52nd Street

22          New York, NY 10019

23

24   BY:    JESSICA MIKHAILEVICH, ESQ.

25

20

1

2  UNITED STATES DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        201 Varick Street

5        Suite 1006

6        New York, NY 10014

7

8  BY:    BRIAN S. MASUMOTO, ESQ.

9

10

11  KRAMER LEVIN NAFTALIS & FRANKEL LLP

12        Attorneys for Official Creditors' Committee

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16  BY:    KENNETH H. ECKSTEIN, ESQ.

17        PHILIP BENTLEY, ESQ.

18        RACHAEL RINGER, ESQ.

19

20

21

22

23

24

25

21

1

2    WILMER CUTLER PICKERING HALE AND DORR LLP

3           Special Counsel to the Creditors' Committee

4           7 World Trade Center

5           250 Greenwich Street

6           New York, NY 10007

7

8    BY:    WILLIAM J. PERLSTEIN, ESQ.

9

10

11    SILVERMANACAMPORA LLP

12           Special Counsel to the Creditors' Committee

13           100 Jericho Quadrangle

14           Suite 300

15           Jericho, NY 11753

16

17    BY:    ROBERT D. NOSEK, ESQ.

18           RONALD J. FRIEDMAN, ESQ.

19

20

21

22

23

24

25

22

1

2   POLSINELLI SHUGHART

3         Attorneys for Kessler Class

4         900 Third Avenue

5         Suite 2100

6         New York, NY 10022

7

8   BY:   DAN FLANIGAN, ESQ.

9

10

11   ALSTON & BIRD LLP

12         Attorneys for Wells Fargo Bank

13         90 Park Avenue

14         New York, NY 10016

15

16   BY:   MICHAEL E. JOHNSON, ESQ.

17

18

19   COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

20         Attorneys for FTI Consulting Inc.

21         900 Third Avenue

22         16th Floor

23         New York, NY 10022

24

25   BY:   JOHN H. DRUCKER, ESQ.

23

1

2   SEWARD & KISSEL LLP

3        Attorneys for U.S. Bank, N.A. as Trustee for Greenpoint

4        One Battery Park Plaza

5        New York, NY 10004

6

7   BY:   ARLENE R. ALVES, ESQ.

8        MARK D. KOTWICK, ESQ.

9

10

11  CLEARY GOTTLIEB STEEN & HAMILTON LLP

12       Attorneys for Wilmington Trust

13       One Liberty Plaza

14       New York, NY 10006

15

16  BY:   MARK A. LIGHTNER, ESQ.

17

18

19  WEIL, GOTSHAL & MANGES LLP

20       Attorneys for Syncora Guarantee Inc.

21       767 Fifth Avenue

22       New York, NY 10153

23

24  BY:   SARA COELHO, ESQ.

25       RONIT J. BERKOVICH, ESQ.

24

1

2   CHADBOURNE & PARKE LLP

3          Attorneys for the Examiner

4          30 Rockefeller Plaza

5          New York, NY 10112

6

7   BY:   HOWARD SEIFE, ESQ.

8          DOUGLAS E. DEUTSCH, ESQ.

9

10

11   LEONARD, STREET AND DEINARD

12          Attorneys for the Examiner

13          150 South 5th Street

14          Suite 2300

15          Minneapolis, MN 55402

16

17   BY:   ROBERT T. KUGLER, ESQ. (TELEPHONICALLY)

18

19

20   MORRISON COHEN LLP

21          Attorneys for Independent Directors

22          909 Third Avenue

23          New York, NY 10022

24

25   BY:   JOSEPH T. MOLDOVAN, ESQ.

1

2    DELOITTE LLP

3         30 Rockefeller Plaza

4         New York, NY 10112

5

6    BY:    ROLAND S. YOUNG, ESQ.

7

8

9    LATHAM & WATKINS LLP

10        Attorneys for Moelis & Co. LLC

11        885 Third Avenue

12        New York, NY 10022

13

14   BY:    MICHAEL RIELA, ESQ.

15

16

17   CLIFFORD CHANCE US LLP

18        Attorneys for Ocwen Loan Servicing

19        31 West 52nd Street

20        New York, NY 10023

21

22   BY:    JENNIFER DEMARCO, ESQ.

23

24

25

26

1

2   MUNGER TOLLES & OLSON LLP

3          Attorneys for Berkshire Hathaway Inc.

4          355 South Grand Ave.

5          35th Floor

6          Los Angeles, CA 90071

7

8   BY:    THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

9

10

11   BRADLEY ARANT BOULT CUMMINGS LLP

12          Attorneys for Residential Capital

13          1819 Fifth Avenue North

14          Birmingham, AL 35203

15

16   BY:    JAY R. BENDER, ESQ. (TELEPHONICALLY)

17

18

19   FREEBORN & PETERS LLP

20          Attorneys for Mercer

21          311 South Wacker Drive

22          Suite 300

23          Chicago, IL 60606

24

25   BY:    DEVON J. EGGERT, ESQ. (TELEPHONICALLY)

27

1

2  PACHULSKI STANG ZIEHL & JONES

3       Conflicts Counsel to Creditors' Committee

4       780 Third Avenue

5       36th Floor

6       New York, NY 10017

7

8  BY:   ROBERT FEINSTEIN, ESQ. (TELEPHONICALLY)

9

10

11  ORRICK, HERRINGTON & SUTCLIFFE LLP

12       Attorneys for Residential Capital

13       1152 15th Street, N.W.

14       Washington, DC 20005

15

16  BY:   DEBRA FELDER, ESQ. (TELEPHONICALLY)

17

18

19  PEPPER HAMILTON, LLP

20       Attorneys for Residential Capital

21       4000 Town Center

22       Suite 1800

23       Southfield, MI 48075

24

25  BY:   DEBORAH KOVSKY-APAP, ESQ. (TELEPHONICALLY)

28

1

2    FOLEY & LARDNER, LLP

3          Attorneys for Ernst & Young

4          150 East Gilman Street

5          Madison, WI 53703

6

7    BY:    MATTHEW D. LEE, ESQ. (TELEPHONICALLY)

8

9

10   TROUTMAN SANDERS LLP

11          222 Central Park Avenue

12          Suite 2000

13          Virginia Beach, VA 23462

14

15   BY:    JASON MANNING, ESQ. (TELEPHONICALLY)

16

17

18   JONES DAY

19          Attorneys for FGIC

20          555 South Flower Street

21          50th Floor

22          Los Angeles, CA 90071

23

24   BY:    RICHARD L. WYNNE, ESQ. (TELEPHONICALLY)

25

29

BALLARD SPAHR, LLP

     Attorneys for PNC

     1735 Market Street

     51st Floor

     Philadelphia, PA 19103


BY:   VINCENT J. MARRIOTT, III, ESQ.

     SARAH SCHINDLER-WILLIAMS, ESQ.




ALSO PRESENT: (TELEPHONICALLY)

     ANTHONY L. DAVIDE, Pro Se

     LAURA J. EISELE, AlixPartners

     ALAN FRANKEL, Coherent Economics

     PERRY E. GOERNER, Pro Se

     LUCIOUS L. HUGHES, Pro Se

     J.F. MORROW, Pro Se

     JACOB THOMSON, Towers Watson

     TODD WUERTZ, Epiq Bankruptcy Solutions, LLC

**RESIDENTIAL CAPITAL, LLC, ET AL.**

30

1                      P R O C E E D I N G S

2              THE COURT:  Please be seated.  All right, we're here

3     in Residential Capital, number 12-12020.  Mr. Marinuzzi

4              MR. MARINUZZI:  Good morning, Your Honor.  For the

5     record, Lorenzo Marinuzzi, Morrison & Foerster, on behalf of

6     the debtors.  Your Honor, if it's okay with the Court, I would

7     ask that we begin the presentation with the interim fee

8     applications?

9              THE COURT:  That's fine.

10             MR. MARINUZZI:  Thank you, Your Honor.  Your Honor,

11    the interim fee applications have been summarized, as well as

12    resolutions to the U.S. Trustee's objection, in a chart that

13    hopefully Your Honor has in front of him.  If not, I'll be

14    happy to bring up a copy.

15             THE COURT:  Why don't you bring me up a copy.

16             If you're on the phone, you need to put your phone on

17    mute.

18             Thank you.

19             MR. MARINUZZI:  Your Honor, we found this useful for

20    the last interim hearing, and hopefully Your Honor will find it

21    useful today as well.

22             Your Honor, there was one objection filed to the

23    interim fee applications, and it was the objection from the

24    United States Trustee's Office.  And I'm pleased to report that

25    the objection --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

31

1          THE COURT:  I thought there was a second objection

2     filed as to the -- there was a pro se objection filed as to one

3     of the applications.  But go ahead.  I mean, there was.

4          MR. MARINUZZI:  Okay, Your Honor.  I'm sorry.  With

5     respect to the Severson firm, and they're here in court.

6          The U.S. Trustee's objection has been resolved, and

7     the resolutions set forth in the chart.  Your Honor, we've

8     arranged the chart, as we did the amended agenda, in

9     alphabetical order, broken down by debtor professional,

10    committee professional, and examiner and examiner

11    professionals.

12         THE COURT:  Right.

13         MR. MARINUZZI:  So if it's okay with the Court, I'd

14    like to just proceed in the order in which they're listed in

15    the chart.

16         THE COURT:  Okay.

17         MR. MARINUZZI:  All right.  Your Honor, the first

18    application is the application from Bradley Arant Boult and

19    (sic) Cummings, requesting fees of $2,416,978.11 and expenses

20    of $144,016.28.  After discussions with the U.S. Trustee's

21    Office, the agreed-upon fee settlement award is $2,412,909.93,

22    and the agreed-upon expenses are $141,270.88.

23         THE COURT:  Mr. Masumoto.

24         MR. MASUMOTO:  That's correct, Your Honor.

25         THE COURT:  I have some questions.  And this really is

**RESIDENTIAL CAPITAL, LLC, ET AL.**

32

1   important to applications going forward.  With respect to the

2   Bradley Arant application, I'm going to approve it with the

3   adjustment agreed upon with the U.S. Trustee.  The questions I

4   had -- and this is really intended as future guidance that will

5   facilitate my chambers' review of the applications.  This

6   primarily relates to expenses.

7          Let me find what I'm looking for here.

8          UNIDENTIFIED SPEAKER:  And Your Honor, Bradley Arant

9   is on the line.

10         THE COURT:  Yes, okay.  Just bear with me a second.

11      (Pause)

12         THE COURT:  I thought I had marked something earlier,

13  and I guess I didn't.  Just bear with me.

14      (Pause)

15         THE COURT:  With respect to the Bradley Arant

16  application, there were meal expenses of almost 7,000 dollars.

17  And the application doesn't state whether the meals comply with

18  what I'll refer to as the 8 p.m. restriction -- whether it's a

19  meal after 8 p.m., and also the twenty-dollar limit.

20          This really applies to everybody.  This a recurring

21  issue.  In the certification or otherwise, you need to

22  indicate -- if you've included meal expenses, you really need

23  to indicate whether they comply with the Court's guidelines for

24  reimbursement of expenses.  It shouldn't just be the

25  responsibility of the U.S. Trustee to have to dig out the

1    additional information.

2            As I say with respect to -- and here, I mean, the

3    total is a substantial sum.  With the reduction that's been

4    agreed upon with the U.S. Trustee, I'm going to go ahead and

5    approve the application.  But for everybody going forward, I

6    expect to see on things -- this really goes to travel expenses,

7    meal expenses.  It's not enough to just simply list the item

8    when there are limitations or restrictions that the Court

9    imposes on when they'll be reimbursed.

10           So with respect to the Bradley Arant application, I'm

11   going to go ahead and approve the application as adjusted with

12   the agreed amount with the U.S. Trustee.

13           Go ahead, Mr. Marinuzzi.

14           MR. MARINUZZI:  Thank you, Your Honor.  That brings us

15   to Carpenter Lipps, docket number 4557, requesting fees of

16   $1,659,806 and expenses of $977,371.77.  After discussions with

17   the United States Trustee's Office, they've reduced the amount

18   of requested fees to $1,658,311 and expenses -- actually the

19   objection has been withdrawn with respect to the expenses.

20           MR. MASUMOTO:  That's correct, Your Honor.

21           THE COURT:  All right.  Here, again, with respect to

22   the Carpenter Lipps, there's over 2,000 dollars in meal

23   expenses without any indication whether it complies with the

24   Court's restrictions on when meals are reimbursable.  You need

25   to supply that information.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

34

1          MR. MARINUZZI:  Your Honor --

2          THE COURT:  Let me --

3          MR. MARINUZZI:  Sorry.

4          THE COURT:  -- there's -- the application included a

5   request for reimbursement of $885,095.16 for "litigation

6   support vendors", but the invoices that accompanied it include

7   documentation only supporting $797,752.66.  Is there an

8   explanation for that?  Mr. Masumoto, were you able to get the

9   detail?  You'd objected on this ground.

10          MR. MASUMOTO:  My understanding, Your Honor, is that

11   there --

12          THE COURT:  Just, you're going to have to go up to

13   the -- I apologize, you can pull a microphone closer, just

14   so -- you can stay over there.  That's fine.

15          MR. MASUMOTO:  Your Honor, to my knowledge, I thought

16   we did confirm the amounts that were at issue.

17          THE COURT:  Okay.  Can I get an explanation?

18          MR. BECK:  Yes, Your Honor.  For the record, David

19   Beck; Carpenter Lipps & Leland, on behalf of the applicant.

20   The difference had to do with a -- we had attached -- based on

21   the U.S. Trustee's previous request, we had attached all of the

22   portion of litigation support vendors that was for contract

23   attorneys.  We had an invoice for an expert witness and a very

24   small invoice for local counsel to file, suggested to say that

25   they hadn't previously asked us to file the supporting

**RESIDENTIAL CAPITAL, LLC, ET AL.**

35

1    documentation.  We did provide that when they requested.  And

2    we will provide that in the future.

3            THE COURT:  Okay.  All right.  So as understand it,

4    there's a reduction -- you agreed on a reduction of fees of

5    1,495 dollars.  Is that correct?

6            MR. BECK:  Yes.

7            THE COURT:  All right.  So the Carpenter Lipps

8    application is approved with the adjustment agreed upon with

9    the U.S. Trustee.

10            MR. BECK:  Thank you, Your Honor.

11            THE COURT:  Thank you.

12            MR. MARINUZZI:  Your Honor, that brings us to

13    Centerview Partners, docket number 4528, requesting fees of

14    $1,200,000 and expenses of $12,630.14.  There was no objection

15    to the fee.  But the agreed -- there's a settlement with

16    respect to the expenses, which are now reduced to $12,173.

17            THE COURT:  Again, on meal expenses, insufficient

18    information is provided to the Court.  Don't -- I want the

19    detail.  There are limitations on when meals are reimbursable.

20    There's a twenty-dollar per-person limit, and also the hours

21    have to be after 8 p.m. or demonstration that it was a working

22    meeting.

23            Mr. Masumoto?

24            MR. MASUMOTO:  That's correct.  Your Honor.  We did

25    have an adjustment with respect to the expenses.  I believe we

1    tried to make sure that the twenty-dollar limit had been

2    imposed.

3            THE COURT:  All right.  And there also -- with

4    respect, there was over 2,000 dollar in transportation

5    expenses.

6            MR. MASUMOTO:  I --

7            THE COURT:  Go ahead, Mr. Masumoto.

8            MR. MASUMOTO:  I believe that with respect to

9    transportation, included in the adjustment, there was a

10   withdrawal of certain expenses for taxi; and I believe from the

11   additional documentations, all of the adjustments are embodied

12   in the chart.

13           THE COURT:  All right.  I'm going to approve it with

14   the adjustment agreed upon with the U.S. Trustee.

15           Thank you, Mr. Masumoto.  Go ahead, Mr. Marinuzzi.

16           MR. MARINUZZI:  Thank you, Your Honor.  That brings us

17   to Curtis Mallet, requesting fees of $1,480,650 and expenses of

18   $3,085.90.  That's docket number 4532.  They've agreed to

19   reduce the amount of their fees to $1,474,121.50.  No objection

20   with respect to the expenses.

21           MR. MASUMOTO:  That's correct, Your Honor.  We did

22   have discussions with them regarding various vague time

23   entries.  They provided some additional backup.  And based on

24   the backup, we agreed upon the settled amount.

25           THE COURT:  All right.  You were satisfied, Mr.

1    Masumoto --

2         MR. MASUMOTO:  Yes.

3         THE COURT:  -- with respect -- because there were

4    vague time entries.

5         MR. MASUMOTO:  That's correct, Your Honor.  Based upon

6    their responses, we reached an agreement.

7         THE COURT:  All right.  That's the reduction of

8    $6,528.50.  Is that correct?

9         MR. MASUMOTO:  That's correct, Your Honor.

10        THE COURT:  All right.  All right.  I'll approve it

11   with the adjustment.

12        MR. MARINUZZI:  Thank you, Your Honor.  That brings us

13   to Deloitte & Touche requesting total fees of $2,984,455.50.

14   No requested expenses.  They've agreed to reduce the amount of

15   their fees to $2,978,657.

16        MR. MASUMOTO:  Your Honor, based upon a --

17        THE COURT:  Hang on just a second.  If you're on the

18   phone, you need to put your phone on mute.  Somebody is

19   rustling papers against the phone.  Or you're going to get cut

20   off.

21        Go ahead.

22        MR. MASUMOTO:  Your Honor, based upon their responses

23   to our objections, particularly with respect to the fee app

24   procedure -- the fee application review and time entry

25   reductions as well as with respect to transitory timekeepers,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

38

1    we agreed upon the settled reduction amount.

2          THE COURT:  All right.  I'm going to go ahead and

3    approve it with the reduction agreed upon with the U.S.

4    Trustee.

5          MR. MARINUZZI:  Thank you, Your Honor.  That brings us

6    to Dorsey & Whitney, docket number 4420, requesting fees of

7    $88,902.90 and expenses of $288.  There was no objection to

8    this application.

9          THE COURT:  All right.  The --

10          Okay.  This is the last warning.  You're on the phone,

11   you're rustling papers.  You're going to be cut off.  Is the

12   CourtCall operator on the line?

13          OPERATOR:  How do you do?

14          THE COURT:  Okay.  There is somebody who keeps

15   rustling their papers against the phone.  I don't know who it

16   is.  The next time it happens, I will tell you -- can you

17   identify who it is?

18          OPERATOR:  I've muted the lines.

19          THE COURT:  Okay, thank you.

20          OPERATOR:  Thank you.

21          THE COURT:  All right.  The Dorsey application

22   included $1,101.60 to respond to and attend a hearing regarding

23   the UST's objection to their prior fee application.

24   Additionally, Dorsey charged $6,696 to draft its fee

25   application, which is seven and a half percent of the total

**RESIDENTIAL CAPITAL, LLC, ET AL.**

39

1    requested.  Is anybody from Dorsey present or on the phone?

2           MR. MARINUZZI:  Yes, Your Honor.  Ms. Mikhailevich is

3    in the court today.

4           THE COURT:  I'd like you to address those specific

5    issues.  I don't permit reimbursement for defending objections

6    to a fee application.  And I also generally limit how much can

7    be reimbursed for preparation of fee applications.  But do you

8    want to go ahead and address that?

9           MS. MIKHAILEVICH:  Good morning, Your Honor.  Jessica

10   Mikhailevich on behalf of Dorsey & Whitney.  I'm happy to have

11   those removed pursuant to the Court's instructions and

12   guidelines.

13          THE COURT:  All right.  I'm going to reduce -- approve

14   the Dorsey application and reduce it by 3,300 dollars.  And

15   those adjustments are for responding to the prior objection and

16   for an amount in excess of what I believe is reasonable

17   compensation for preparation of fee applications.

18          As I've written in several cases before, the -- while

19   expense for preparing fee applications is compensable, the

20   general limits that I approve is in the range of three to five

21   percent, while that's not a hard and fixed number, looking at

22   the specific circumstances.  So that'll be the -- I'll approve

23   it with that reduction.  All right.

24          MS. MIKHAILEVICH:  Understood.  Thank you, Your Honor.

25          THE COURT:  Thank you.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

40

1          MR. MARINUZZI:  Your Honor, that brings us to page 2

2     of the chart, Ernst & Young, docket number 4526, requesting

3     fees of $98,380 and expenses of $229.41.  There was no

4     objection to this application.

5          THE COURT:  All right.  It's approved.

6          MR. MARINUZZI:  Thank you, Your Honor.  That brings us

7     to FTI Consulting, docket number 4542, requesting fees of

8     $5,501,118.50 plus a rollover amount of $1,614,064.75 and

9     expenses of $227,254.30.  The U.S. Trustee filed an objection

10    to this application, and it's been resolved by a reduction in

11    both fees with respect to the rollover amount and expenses.

12    And the agreed-upon fee amount remains at $5,501,118.50, but

13    the rollover amount is reduced to $1,581,398.75.  And the

14    expenses are reduced to $199,687.47.

15         THE COURT:  Mr. Masumoto, do you want address this?

16    This is obviously a very substantial --

17         MR. MASUMOTO:  Your Honor, that's correct.

18         THE COURT:  -- application.

19         MR. MASUMOTO:  Your Honor, the amounts are correct.  I

20    guess they're somewhat obscured by the rollover characteristic.

21    But we did reach agreement on reduction in transitory

22    timekeeper time, fee application preparation.  With respect to

23    redacted time entries, the unredacted time was provided and

24    reviewed by the U.S. Trustee.  A duplicate expense amount was

25    reduced.  And the travel expenses for the prior period

**RESIDENTIAL CAPITAL, LLC, ET AL.**

41

1   documentation was provided, along with the corresponding time

2   entries, and we did verify them.  Nevertheless, FTI took a

3   modest reduction with respect to those expenses.

4         Finally, there was a significant reduction with

5   respect to the travel time for professionals traveling to New

6   York.

7         THE COURT:  Okay.  All right.  It's approved with the

8   reduction with the U.S. Trustee.

9         MR. MARINUZZI:  Your Honor, I realize I misspoke when

10   this hearing started.  There's still a pending objection to

11   Hudson Cook's application.

12         THE COURT:  Yes, that's being adjourned.

13         MR. MARINUZZI:  It's being adjourned.

14         THE COURT:  Yes, I understand that.

15         MR. MARINUZZI:  Which brings us to KPMG, requesting

16   fees of -- and it's docket number 4512 -- requesting fees of

17   $290,753.90 and expenses of $60.  There was no objection to

18   this application.

19         THE COURT:  Yes, and I've reviewed it.  It's approved.

20         MR. MARINUZZI:  Next is Locke Lord, docket number

21   4507, requesting fees of $259,725.40 and expenses of $2,788.67.

22   There was no objection to this application.

23         THE COURT:  All right, it's approved.

24         MR. MARINUZZI:  Next is Mercer, Inc., docket number

25   4558, requesting fees of $135,661.17 and expenses of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

42

1   $14,951.86.  They have agreed, after discussions with the U.S.

2   Trustee's Office, to reduce the fees to $134,933.22 and

3   expenses to $14,943.63.

4           MR. MASUMOTO:  That's correct, Your Honor.

5           THE COURT:  All right, it's approved.

6           MR. MARINUZZI:  Next is Morrison Cohen, docket number

7   4527, requesting fees of $1,318,943 and expenses of $42,792.26.

8   In consultation with the U.S. Trustee's and in order to resolve

9   the U.S. Trustee's objection, they've resolved the -- I'm

10  sorry, reduced the requested fees to $1,303,943 and the

11  objections remain the same as the objection was -- the fees

12  remain the same -- I'm sorry -- the expenses remain the same as

13  the objection's been withdrawn.

14          THE COURT:  Is someone from Morrison Cohen here?

15          MR. MOLDOVAN:  Yes, Your Honor.

16          THE COURT:  Could you come on up?

17          Okay, whoever's on the phone, and you're rustling

18  papers against the phone, you're going to be cut off.  You

19  don't seem to be listening.

20          Is the CourtCall operator on the line?

21          OPERATOR:  I'm here, sir.

22          THE COURT:  Do you know whose phone that is?

23          OPERATOR:  Yes, I just muted their line.

24          THE COURT:  Okay.

25          MR. MOLDOVAN:  Joe Moldovan, Your Honor, with Morrison

 1    Cohen.

 2            THE COURT:  Okay.  The question I have is, you have a

 3    very substantial bill.  The U.S. Trustee initially filed an

 4    objection.  There were numerous board meetings where more than

 5    two attorneys attended.  I need to know why that was

 6    appropriate.  And I know what -- you've agreed on a reduction

 7    with the U.S. Trustee of 15,000 dollars, which frankly, seems

 8    to be resolving it much too cheaply.

 9            MR. MOLDOVAN:  Your Honor, the total number of -- the

10    total amount of actual fees that related to any kind of meeting

11    or preparation session involving more than two attorneys was

12    190-some-odd thousand dollars.  The total number of actual --

13    and those included, Your Honor, mediation preparation sessions,

14    deposition preparation sessions, the sessions relating to the

15    RMBS litigation, the sessions relating to the examiner.  So you

16    had multiple Morrison Cohen attorneys.  When I say multiple,

17    you had between two and four attorneys.

18            At board meetings, you had attorneys who specialize in

19    corporate governance or bankruptcy or litigation.  And at some

20    times you had all three.  When you eliminate the number of

21    meetings where there were, I believe it was, three attorneys

22    present, you come to 19,000 dollars.  That is the actual amount

23    of true dollars from the application relating to any kind of a

24    meeting where more than three attorneys were present.  Of the

25    19,000 dollars, in order to accommodate the U.S. Trustee, we

**RESIDENTIAL CAPITAL, LLC, ET AL.**

44

1    agreed to take a 15,000-dollar discount off of that.

2            The problem is, Your Honor, that when the U.S. Trustee

3    filed its initial application, it certainly appeared that the

4    objection was based upon, I would imagine, much more than there

5    actually was.  As I said, approximately 190,000 dollars

6    represents the total of all meetings where parties were

7    present.  And we went over that with the U.S. Trustee and

8    provided the U.S. Trustee with detail with respect to that.

9    When you then reduce that amount by the number of meetings

10   where there were three attorneys present, you come to 19,000

11   dollars.

12           And as to the three attorneys, Your Honor, I

13   probably -- I personally probably was at most meetings.  It's

14   important, of course, to recognize that the bulk of the

15   examiner's report and the bulk of the RMBS litigation concerned

16   the approval process by the independent directors of the RMBS

17   settlement.  The bulk of the mediation related to the

18   resolution of the various claims that might be asserted against

19   Ally, the directors, and the directors themselves.

20           Morrison Cohen, unlike virtually every other

21   participant -- professional participant in this case, has

22   represented this board since 2009.  Morrison Cohen was involved

23   in virtually all of the transactions that were at issue in the

24   mediation, in the RMBS settlement.  So you had corporate

25   attorneys who needed to be present both in order to provide

**RESIDENTIAL CAPITAL, LLC, ET AL.**

45

 1   guidance on the corporate governance side and to provide detail

 2   and information, both factual and legal, to the directors, with

 3   respect to what had happened during the various meetings where

 4   we represented those directors.  That's the basis for having,

 5   at times two attorneys, and at times having four.

 6          There was never an attorney present, Your Honor, who

 7   overlapped with another attorney in terms of area of

 8   competence.  You would have a tax attorney, perhaps a

 9   litigator, a corporate governance attorney, and typically I

10   would be there as well as the restructuring counsel.

11          THE COURT:  Mr. Masumoto?

12          MR. MASUMOTO:  Your Honor, based on our discussions

13   and the documents provided, we did agree to the 15,000.  We

14   thought that was appropriate under the circumstances.

15          THE COURT:  And let me ask, without going into all the

16   details of your discussions, I was concerned about this because

17   of the number of attorneys that would attend meetings.  Is the

18   U.S. Trustee satisfied that the agreed-upon adjustment

19   appropriately reflects a view as to whether the matter was --

20   and the events in the matter were properly staffed?

21          MR. MASUMOTO:  Yes, Your Honor.  And we also did

22   indicate that going forward that the -- that Your Honor's

23   ruling in a number of cases regarding attendance at meetings,

24   would be strictly enforced.

25          MR. MOLDOVAN:  And --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

46

1          MR. MASUMOTO:  And that we would --

2          THE COURT:  Pause.

3          MR. MASUMOTO:  -- we would want that -- as a general

4   matter, Your Honor, one thing I did want to say as to everyone

5   was that when -- as Your Honor indicated, Your Honor addressed

6   the issues that we were concerned about -- when they certify,

7   they should be certifying not only the guidelines, but Your

8   Honor's ruling in other cases which our office seeks to apply

9   to all of the fee applications.

10          So with -- although the guidelines do not specifically

11   address number of attendees, we have attempted to employ Your

12   Honor's ruling on that matter to all the applicants.  And we

13   ask that the applicants, when they certify, that they're also

14   certifying that they're complying with the Court's rulings with

15   respect to attendance at hearings as well as meetings.

16          In addition, if I may, because it did, in fact --

17   although we didn't have an actual reduction here with respect

18   to meals -- we tried to advise the applicants that just what

19   Your Honor had indicated.  They must comply with the

20   guidelines, indicating the 8 o'clock rule before and after, the

21   one-and-a-half hour requirement, if it's before 8 o'clock, and

22   it must be reflected.

23          Additionally, since it's a practice amongst some of

24   the professionals to have a single timekeeper request multiple

25   reimbursements --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

47

1          THE COURT:  They've got to put the people down.

2          MR. MASUMOTO:  -- they have to identify those

3   individuals and also confirm that these individuals actually

4   are entitled, that they're complying with the guidelines.

5          THE COURT:  Thank you, Mr. Masumoto.

6          MR. MASUMOTO:  Thank you.

7          THE COURT:  All right.  I'm going to go -- with that

8   explanation from Morrison Cohen and Mr. Masumoto's response,

9   I'm going to go ahead and approve the applications.

10          MR. MOLDOVAN:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MR. MARINUZZI:  Your Honor, that brings us to Morrison

13   & Foerster, docket number 4551 requesting total fees of

14   $22,790,342.60, and expenses of $350,910.44.  After discussions

15   with the United States Trustee's Office, Morrison & Foerster

16   has reduced the total fee request to $22,750,816.10, and the

17   expenses remain as requested.

18          MR. MASUMOTO:  Your Honor, that's correct.  Based upon

19   the responses and our discussions, I believe we did reach an

20   accommodation on the various objections raised.

21          THE COURT:  So one of the -- Mr. Marinuzzi, among the

22   questions I have -- this has come up before -- and I understand

23   that necessarily you have a lot of attorneys working on the

24   matter, but there were quite a few entries for air fare from

25   D.C. to New York.  I assume it's because you had lawyers from

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    the D.C. office working on the matter.

2            MR. MARINUZZI:  That's correct.  Our regulatory

3    practice is based in Washington, D.C.  So with respect to the

4    discussions with the Fed, strategizing with respect to the

5    consent order, it's advice that's based in Washington.

6            THE COURT:  And I want to be consistent with what I've

7    done in the past, which is namely, if for convenience you are

8    staffing the matter which is in the court in New York with

9    lawyers from other offices, be it California or Washington, I

10   consider their travel expenses, hotel and air fare, to

11   appropriately be considered as part of overhead, and not

12   appropriately charged to the estate.

13           There were some other expense entries that raised

14   questions in my mind.  Again, it relates to, for example, a New

15   York hotel.  This issue has come up before.

16           MR. MARINUZZI:  Correct, Your Honor.  We have not --

17   it came up with respect to, in particular, Darryl Rains, who --

18           THE COURT:  It did.

19           MR. MARINUZZI:  -- was heavily involved in the RMBS

20   settlement, and he was --

21           THE COURT:  Right.

22           MR. MARINUZZI:  -- flying in on a regular basis,

23   weekly.  We're not charging the estate for any time spent by

24   Darryl traveling to New York and staying in New York hotels.

25   To the extent an issue arises and it's an isolated instance

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**49**

1  where an attorney is required to travel into New York for a

2  meeting -- and sometimes people have to travel to Minneapolis,

3  because that's where --

4          THE COURT:  I understand the Minne -- we don't have to

5  go into the --

6          MR. MARINUZZI:  Right, okay.

7          THE COURT:  -- Minneapolis.  I understand the issues

8  about Minneapolis.  Okay?  So I'm focusing on travel to New

9  York, hotels in New York.

10          MR. MARINUZZI:  Understood.  And we wrote off a lot of

11  hotel charges, especially with respect to attorneys that made

12  regular appearances during the application period into New

13  York.

14          We did not write off all hotel charges for isolated

15  instances where there was a meeting that required somebody from

16  D.C. to come up and stay in New York or a hearing.  To the

17  extent the Court is going to rule that we're not permitted to

18  charge the estate for those charges, we'll write them off.

19          THE COURT:  Okay.  Mr. Masumoto?

20          MR. MASUMOTO:  Your Honor, this issue obviously came

21  up with other applicants.  Unfortunately, we're not able to

22  catch every one.  We tried to reach accommodations after

23  discussions determining whether or not, as Your Honor

24  indicated, the travel was for the convenience of the firm, and

25  we reached appropriate resolutions, I thought, in those cases.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

50

1    I'll defer to the Court on --

2              THE COURT:  Well, here's what -- I don't know what --

3    the chart shows, Mr. Marinuzzi, an adjustment of slightly less

4    than 40,000 dollars in fees and I guess none in expenses,

5    right?

6              MR. MARINUZZI:  That's correct.

7              THE COURT:  Okay.

8              MR. MARINUZZI:  That's correct, Your Honor.  There was

9    no objection to the expenses.

10             THE COURT:  Right.  Well, there is from me.

11             MR. MARINUZZI:  There is -- that's a fair point, Your

12   Honor.

13             THE COURT:  And I try to be consistent from one period

14   to the next.  I thought I had made it clear that where you're

15   staffing the matter with lawyers from other offices, whether

16   it's Washington or California, you -- expenses:  air fare,

17   hotel, meals, other than after 8 -- meals after 8 p.m., as

18   would apply to anybody else, is, as far as I'm concerned, part

19   of overhead.

20             And I want you to go back -- and I don't know whether

21   I've caught all of them.  I have a list of them.  I don't --

22   actually in the memo I have, I don't have the dates and stuff.

23   But I would like you to go back and make a further reduction on

24   the expenses for the travel expenses --

25             MR. MARINUZZI:  To New York.

1          THE COURT:  -- to New York.  I understand the

2     Minneapolis under the issues --

3          MR. MARINUZZI:  That's fine, Your Honor.  We'll do

4     that.  And we've categorized in summary sheets for each of the

5     months, the total expenses relating to hotel and air fare, so

6     it shouldn't be too hard to do.  But we'll do that.

7          THE COURT:  Let me just see whether I had any other

8     issues.  I mean, it's an appropriately large -- when I say

9     "appropriate", I fully understand the size of the application.

10    It was an enormous amount of work that went into the matter.  I

11    consider these things nits, but nevertheless, I try to be

12    consistent with all counsel throughout the case.

13          Let me just go back over my notes and see whether I

14    Have some other items.

15     (Pause)

16          THE COURT:  Mr. Masumoto, do you have any other --

17          MR. MASUMOTO:  Not at this time, Your Honor.

18    Although, Your Honor, I did want to ask, perhaps, for Your

19    Honor's direction.  With respect to meals, one of the --

20    unfortunately, given the large size of these applications, our

21    office had to actually -- requested assistance of other

22    attorneys in the program.  And sometimes we may not have had

23    complete uniformity in terms of our approach.  But with respect

24    to meals, I personally have been applying a rule where if an

25    applicant is not billing more than -- is billing less than four

**RESIDENTIAL CAPITAL, LLC, ET AL.**

52

1    hours a day, it raises a question as to whether or not a meal

2    is appropriate.

3            I'm not sure if that cutoff is -- other judges have

4    used different cutoffs --

5            THE COURT:  I think that's appropriate, Mr. Masumoto.

6            MR. MASUMOTO:  And that's fine, Your Honor.  And I

7    would like to make sure that all of the applicants take that

8    into account, again, when they certify.

9            Unfortunately, there's no way for us to check every

10   meal expense, but we do expect the applicants --

11           THE COURT:  Nor is it possible for me to check every

12   meal expense, but I appreciate your efforts, and I really have

13   to rely on counsel in doing this.  I don't like to have to go

14   through and find these items.

15           In the context of the overall fee application, Mr.

16   Marinuzzi, these amounts are very small.  And I don't -- I

17   always try to be careful where there's been an agreed

18   reduction, not to penalize people for it.  Since there was no

19   reduction in expenses, this was pretty clear to me.  Okay?

20           MR. MARINUZZI:  I don't consider it penalizing, Your

21   Honor.

22           THE COURT:  All right.  Go ahead.  Just review the

23   further reductions with Mr. Masumoto, and I'll approve the

24   application with the agreed reduction, with a further reduction

25   in expenses to take care of the items that I've identified.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

53

1    Okay?

2          MR. MARINUZZI:  Thank you, Your Honor.

3          MR. MASUMOTO:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          MR. MARINUZZI:  That brings us to Orrick, Herrington &

6    Sutcliffe, docket number 4869, requesting fees of

7    $241,619.73 --

8          THE COURT:  With the agreed reduction, it's approved.

9    The agreed reduction --

10         MR. MARINUZZI:  Thank you.

11         THE COURT:  -- as I understand it, is $794.37?

12         MR. MARINUZZI:  That's correct?

13         THE COURT:  Okay.

14         MR. MARINUZZI:  Next, Your Honor, is Pepper Hamilton,

15   requesting fees of $1,919,909.50 and expenses of $24,752.12.

16   The U.S. Trustee filed an objection, and the agreed-upon

17   reduction in fees brings it down to $1,909,909.50 and the

18   expenses actually --

19         THE COURT:  Well, that's -- I do have a question on

20   this.  Because according to the chart and my notes, there was

21   no adjustment for expenses.  It's the same issue.  Pepper

22   Hamilton staffed the matter with lawyers from offices outside

23   of New York and charged -- there was over 5,000 dollars in

24   travel expenses from the West Coast and Philadelphia to New

25   York.  And I won't reimburse for it.  It's as simple as that.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

54

1          MR. MARINUZZI:  Your Honor, I don't know if anybody

2     from Pepper Hamilton is here.

3          THE COURT:  Is anybody from Pepper Hamilton present

4     either in court or --

5          MS. KOVSKY-APAP:  Yes, Your Honor.  This is Deborah

6     Kovsky-Apap on the phone.

7          THE COURT:  Okay, could you --

8          MS. KOVSKY-APAP:  If I may address that.  Your Honor,

9     as you're aware, Pepper Hamilton is not really bankruptcy

10    counsel in these Chapter 11 cases.  We were working as

11    independent legal consultants with the Fed on the independent

12    foreclosure review, which -- work that started prior to the

13    bankruptcy.  And that was when we staffed the case, before we

14    knew that there would be a bankruptcy.

15         We were not traveling into New York, but rather into

16    Fort Washington, Pennsylvania, where we were in meetings with

17    the debtors, with the Fed, with the independent consultant.

18    The vast majority of the lawyers that were staffed on the case

19    either worked entirely remotely or it was staffed out of our

20    Philadelphia office, which is closest to Fort Washington.

21         But the person who started this project, Gary Apfel,

22    who started it before he even came to Pepper, and had done

23    substantial work laying the groundwork for a very complicated

24    process, he happened to be in LA.  He's a person that the

25    debtors chose long before there was even a bankruptcy on the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

55

1   horizon.  And to have lost his institutional knowledge and the

2   work that he had already done, would have constituted a pretty

3   big expense to the estate.

4          We believe under the unique circumstances of the

5   situation, we think that the limited travel that we did do on

6   this matter, is appropriate.

7          THE COURT:  All right, Mr. Masumoto?

8          MR. MASUMOTO:  Your Honor, that is correct.  We had

9   that discussion, in fact.  Counsel reminded me when we filed

10  this objection that we had raised it on the last objection and

11  did -- as well as this time.  But based upon the explanation,

12  we thought that this created a special circumstance.

13         But in that regard, Your Honor, I did want to ask, I

14  think that Pepper Hamilton had a unique role in this case.  But

15  we sometimes have bankruptcy professionals who are sometimes

16  retained by a debtor prior to the filing.  And part of the

17  issue regarding Your Honor's direction regarding this out-of-

18  town travel, is that prior to bankruptcy, sometimes there are

19  personnel from the professionals who are ultimately retained

20  post-petition who have been working with the debtor and been

21  traveling from other cities.

22         So once the bankruptcy files, there's an issue as to

23  whether or not we should penalize the estate by saying that

24  these professionals which have been used pre-petition would now

25  have to forego the cost of traveling into New York.  And

**RESIDENTIAL CAPITAL, LLC, ET AL.**

56

1  frankly, some of our settlements reflected the uncertainty as

2  to how Your Honor would rule on it.

3          If Your Honor would want to indicate that

4  notwithstanding any pre-petition relationship and/or travel,

5  that once the bankruptcy files that out-of-town professionals

6  would have to absorb as overhead their travel time, that would

7  make it clear as to how to apply it.

8          THE COURT:  Let me deal with Pepper Hamilton first.

9  And I'm satisfied with the explanation that's been provided.

10  The independent foreclosure review, which has fortunately come

11  to an end, does create unique circumstances.  So I'm satisfied

12  with the explanation that counsel for Pepper Hamilton has

13  given.  So I'm going to go ahead with -- there is an agreed

14  reduction of 10,000 dollars in the fees.  I'm going to go ahead

15  and approve the application with that in mind.

16          With the broader issue that you raise, Mr. Masumoto, I

17  think I'd like to deal with it in a specific -- with a specific

18  case.  I'm not prepared to give more general guidance.  I need

19  to think about it.  I want to think about that some more.  If

20  you raise -- don't hesitate to raise an objection.  If you work

21  it out, that's one thing.  If you don't, I'll deal with it.

22  Okay?

23          MR. MASUMOTO:  Very well, Your Honor.  Thank you very

24  much.

25          THE COURT:  Thank you.  All right.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

57

1           MS. KOVSKY-APAP:  Thank you, Your Honor.

2           THE COURT:  Thank you.

3           MR. MARINUZZI:  Your Honor, that brings us to Perkins

4    Coie, docket number 4533, requesting fees of $441,806 and

5    expenses of $795.62.

6           THE COURT:  All right, as I understand it, there's an

7    agreed reduction of $18,377.75 on fees.  Is that correct?

8           MR. MARINUZZI:  That's correct, Your Honor.

9           THE COURT:  All right.  With that, it's approved.

10          MR. MARINUZZI:  Next, Your Honor is Rubenstein

11   Associates, docket number 4523, requesting fees of $2,317.50

12   and --

13          THE COURT:  Approved.

14          MR. MARINUZZI:  Thank you.  Next, Your Honor, is

15   Severson & Werson, requesting fees of $513,800 -- I'm sorry --

16   $513,814.80 and expenses of $44,994.41.  They have agreed to

17   satisfy the U.S. Trustee's objection by reducing their fee

18   request to $508,948 and reduce their expenses to $44,973.

19          THE COURT:  All right.  Is Erlinda Abibas Aniel

20   present in court or on the telephone?  She's a pro se who filed

21   an objection to the Severson application.

22          All right.  The Aniel objection is overruled.  The

23   Severson & Werson application is approved with the reduction

24   agreed upon with the U.S. Trustee.

25          MR. MARINUZZI:  Thank you, Your Honor.  That brings us

**RESIDENTIAL CAPITAL, LLC, ET AL.**

58

1    to Towers Watson, docket number 4455.  There was no objection

2    to this application.

3              THE COURT:  It's approved.

4              MR. MARINUZZI:  And finally, on behalf of the debtors,

5    Troutman Sanders, requesting total fees of $333,753, expenses

6    of $4,115.63.  There was no objection to this application.

7              THE COURT:  Is anybody from Troutman Sanders present?

8              MR. MANNING:  Yes, Your Honor.  Jason Manning from

9    Troutman Sanders.

10              THE COURT:  All right.  And I understand that the --

11   there's an agreed reduction of 949 dollars in fees.  My concern

12   was, there were multiple invoices that described the attorney

13   work as "develop discovery strategies", without indicating

14   further what that was about.  And there was at least one

15   invoice that had potentially duplicative fee entries for

16   "develop hearing strategy".  And that same entry was entered on

17   consecutive days, and each entry for exactly 2.1 hours.  That

18   was on invoice number 1482875.  And there were multiple

19   invoices for work billed -- performed in January on matters in

20   Georgia for "updating case law regarding laches defense".  And

21   there were at least three invoices with that same entry.

22              Let me ask Mr. Masumoto.  I mean, I was -- I wasn't

23   satisfied when I reviewed this application.  I was surprised

24   that the reduction was only 949 dollars.

25              MR. MASUMOTO:  Actually, Your Honor, that reduction

**RESIDENTIAL CAPITAL, LLC, ET AL.**

59

1  reflected a voluntary reduction pursuant -- dealing with the

2  transitory time keepers.  Unfortunately, our review did not

3  uncover the deficiencies Your Honor noted.

4         THE COURT:  I hate to burden you and your office, Mr.

5  Masumoto, but let me give you a list of -- can I give you a

6  list of invoice numbers?

7         MR. MASUMOTO:  Sure.

8         THE COURT:  I'm going to reserve decision with respect

9  to the Troutman Sanders application.  I would ask for you to

10  review and discuss with Troutman Sanders these specific items.

11  As I say, there were multiple invoices for "develop discovery

12  strategies".  I can only give you one invoice number on this:

13  1476172.  There was one invoice that listed potentially

14  duplicative entries for "develop hearing strategy".  That's

15  invoice 1482875.  There were these multiple invoices for

16  "updating case law regarding laches defense".  Those are

17  invoices 1482890, 1482895, 1482897.  There are two invoices

18  that list expenses for "associate counsel fees and expenses",

19  and provide the law firm vendor, but neither invoice describes

20  the services provided by the law firm.  Those are invoices

21  1477270 and 1483026.  There's one invoice that appears to list

22  charges that should have been moved to another matter.  It's

23  1488969.

24         So I'm not satisfied with respect to Troutman Sanders.

25  I don't want to have to hold an evidentiary hearing to sort all

**RESIDENTIAL CAPITAL, LLC, ET AL.**

60

1    this out.  So I would request, Mr. Masumoto, that you or

2    someone in your office seek to resolve these issues.  If you're

3    able to reach a resolution, submit a consent form of order

4    approving their application.

5            MR. MASUMOTO:  Very well, Your Honor.

6            THE COURT:  If not, I'll have to schedule another

7    hearing.  Okay?

8            MR. MASUMOTO:  Very well, Your Honor.

9            THE COURT:  Thank you very much.

10           MR. MARINUZZI:  Thank you, Your Honor.

11           That brings us to the professionals for the official

12   committee of unsecured creditors --

13           THE COURT:  Okay.

14           MR. MARINUZZI:  -- and I'll let Ms. Ringer present on

15   those applications.

16           MS. RINGER:  Good morning, Your Honor.  Rachael Ringer

17   from Kramer Levin.

18           THE COURT:  Good morning.

19           MS. RINGER:  I am also pleased to inform the Court

20   that all of the committee -- or all of the U.S. Trustee's

21   objections to the committee professionals' fee applications

22   were resolved.  If Your Honor would like, I can walk through

23   each one.  To the extent you have specific questions,

24   representatives from each professional are either on the phone

25   or here in the courtroom.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

61

1          THE COURT:  Why don't you start.  Go ahead with

2    AlixPartners first and describe it.

3          MS. RINGER:  Sure.  The first is AlixPartners, docket

4    number 4563.  They requested fees in the amount of

5    $4,379,636.25 and expenses in the amount of $22,586.38.  After

6    discussions with the U.S. Trustee, they agreed to reduce their

7    fees to $4,356,992.10 and their expenses remain the same.

8          THE COURT:  Mr. Masumoto?

9          MR. MASUMOTO:  That's correct, Your Honor.  I believe

10   the response -- the omnibus response reflects the breakdown

11   with respect to the reductions.

12         THE COURT:  All right.  It's approved.

13         MS. RINGER:  The next is Analytic Focus, docket number

14   4571, requesting fees in the amount of $14,135 and expenses in

15   the amount of $138.93.

16         THE COURT:  All right, it's approved.

17         MS. RINGER:  The next is Coherent Economics, docket

18   number 4570, requesting fees in the amount of $133,247 and

19   expenses in the amount $3,601.98.

20         THE COURT:  Okay.  The time -- and there was no

21   objection from the U.S. Trustee.

22         MR. MASUMOTO:  That's correct.

23         THE COURT:  The time expenses appear appropriate.  But

24   with respect to expenses, I do have questions.

25         MS. RINGER:  Your Honor, I believe Alan Frankel should

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    be on the phone for Coherent.

2            THE COURT:  Mr. Frankel, are you on the phone?  Mr.

3    Frankel?

4            MR. FRANKEL:  Yes.

5            THE COURT:  Okay.  So there are -- invoice 224 lists

6    air fare charges from Chicago to New York and Boston -- and

7    Boston to New York; Chicago to New York and Boston to New York.

8    890 -- the entry specifically -- $891.80, $673.90, $839.40.

9    The invoice shows that the $891.80 was for first class and

10   business class seats.  That's according to the receipt Coherent

11   submitted.  The second, $673.90, is a charge for a one-way

12   ticket, which may also have been first or business class.  The

13   third, $839.40 for Boston to New York, that appears to be too

14   high for coach for a round trip New York to Boston.  You listed

15   the air fare as coach in the invoice, but the backup, as I

16   said, on some of them, indicates first class.  Can you explain?

17           MR. FRANKEL:  Yes, Your Honor.  I will check into the

18   Boston air fare.  Our practice has been to charge the coach air

19   fare and pay ourselves for upgrades, or if there was a lower

20   first-class air fare than the coach air fares we took those.

21           THE COURT:  You should only be so lucky.

22           MR. FRANKEL:  Well, that actually has occurred often

23   on United Airlines for alternative times.

24           THE COURT:  All right.  Mr. Masumoto, I'd just like

25   to -- and I don't want to overburden your office, but these did

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    catch our eye and --

2          MR. MASUMOTO:  We will review.

3          THE COURT:  -- again with respect to Coherent, I

4    didn't have a problem on the fees.  On the expenses, see if you

5    can satisfactorily resolve the issue.  If they're correct that

6    these were all coach fare or first-class that was below the

7    coach fare, they can go ahead and submit it.  If you can't

8    resolve the issue, then it'll have to come back to me.  Okay?

9          MR. MASUMOTO:  Very well, Your Honor.

10         THE COURT:  Thank you very much.

11         Go ahead, Ms. Ringer.

12         MS. RINGER:  Next is Epiq Bankruptcy Solutions, docket

13    number 4561, requesting fees in the amount of $39,644.20 and

14    expenses in the amount of $15,647.79.  After discussions with

15    the U.S. Trustee, they agreed to reduce their fees to

16    $28,358.21 and expenses remain the same.

17         THE COURT:  Mr. Masumoto?

18         MR. MASUMOTO:  That's correct, Your Honor.

19         THE COURT:  All right, it's approved.

20         MS. RINGER:  Next is Mr. J.F. Morrow, docket number

21    4569, requesting fees in the amount of 107,400 dollars, and no

22    expenses.

23         THE COURT:  Approved.

24         MS. RINGER:  Next is Kramer Levin, docket number 4573,

25    requesting fees in the amount of $15,197,547 and expenses in

**RESIDENTIAL CAPITAL, LLC, ET AL.**

64

1  the amount of $806,168.59.  After discussing with the U.S.

2  Trustee, Kramer Levin agreed to reduce its fees to

3  $15,154,566.50, and its expenses to $802,679.24.

4         THE COURT:  I had a couple of questions.  January

5  25th, 2013, there's a $12,477.68 charge for a conference call?

6         MS. RINGER:  Your Honor, it's possible.  Sometimes all

7  of the conference calls are aggregated --

8         THE COURT:  And -- let me -- and on March 25th, 2013,

9  there's a $25,556.02 charge for a conference call?  Not plural,

10  single -- singular.

11        MS. RINGER:  Your Honor, what often happens is if

12  there are multiple conference calls on a day or that are

13  submitted together they occasionally are aggregated and appear

14  as one charge in the backup detail.  If Your Honor would like

15  additional breakdown of those conference calls, we can provide

16  that to the Court.

17        THE COURT:  Mr. Masumoto, is this something that

18  you've looked at at all?

19        MR. MASUMOTO:  Not specifically, Your Honor.  We'd be

20  happy to examine the invoices.

21        THE COURT:  Okay.  It just -- it was a giant red flag.

22  And review it with the U.S. Trustee, if you would.

23        I think in the future, you ought to provide the detail

24  or the breakdown.  If you're going to lump them all together as

25  a single call, I mean --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

65

1          MS. RINGER:  Understood, Your Honor.

2          THE COURT:  If -- Mr. Masumoto, if you're satisfied

3    with it, I'll go ahead and approve it.  If there's an issue

4    about it, bring it back to me.  Okay?

5          MR. MASUMOTO:  Very well, Your Honor.  Thank you.

6          THE COURT:  Okay.  Other than -- let me see whether

7    there was any other issue.  With respect to the fees, with

8    respect to the -- with the agreed reduction with the U.S.

9    Trustee, it's approved.

10         MS. RINGER:  Thank you, Your Honor.

11         THE COURT:  Hopefully you can resolve this quickly, so

12   your application isn't held up, okay?

13         MS. RINGER:  Thanks.  Next is Moelis & Co., docket

14   number 4564, requesting fees in the amount of $2.1 million and

15   expenses in the amount of $15,805.11.  There was no objection.

16         THE COURT:  I thought there was an adjustment in

17   expenses, no?  It's not on the chart, but I --

18         MR. MASUMOTO:  I don't believe so -- well, I don't

19   believe we filed an objection with respect to Moelis.

20         THE COURT:  Okay.

21         MR. MASUMOTO:  I think, Your Honor, apparently there

22   was a photocopy charge adjustment.  I think of 342 -- 344 --

23         THE COURT:  $344.32

24         MR. MASUMOTO:  Right.  To reflect, I guess, an

25   overcharge on compliance with the guidelines with the --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

66

1        THE COURT:  All right.  That should be included in the

2  chart.

3        MR. MASUMOTO:  Yes.  I believe so.

4        MR. RIELA:  Your Honor, Michael Riela of Latham &

5  Watkins for the record -- R-I-E-L-A is the last -- spelling of

6  the last name.  That is correct, Your Honor.  There is a

7  reduction in the amount of $344.32 with respect to photocopying

8  charges.  That should be reflected as a reduction in the

9  expenses.

10        THE COURT:  Okay.  I had a couple other questions.

11        MR. RIELA:  Sure.

12        THE COURT:  There were some timekeepers that were

13  billing seven hours of phone calls in one day, when they

14  actually spent significantly less time on the phone.  For

15  example, on January 2, there are entries on page 37 of Moelis'

16  application.

17        MR. RIELA:  Um-hum.  I'm sorry, what page are you

18  looking at, Your Honor?

19        THE COURT:  Page 37.

20        MR. RIELA:  37, thank you.  So I don't see any time

21  entries for seven hours of telephone calls.  I may be missing

22  it as I'm looking through it here.  I see a number of one-hour,

23  one-and-a-half-hour, two-hour calls.  And given the Court's

24  orders with respect to retention, Moelis can keep time in half-

25  hour entries for --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

67

1          THE COURT:  Yes, that I understand.

2          MR. RIELA:  Okay.  But I could -- I will check back

3    with my client with respect to -- to the particular charges.

4    Again, Moelis is charging a flat fee for its work.

5          THE COURT:  I understand.

6          MR. RIELA:  But I'll make sure, obviously, that's --

7          THE COURT:  I understand that.  All right, let me ask

8    that -- I'm going to go ahead and approve the application.

9    Just on some of them -- even though it's a flat fee, some of

10   these could use more detail, okay?

11         MR. RIELA:  Understood, Your Honor.

12         THE COURT:  All right.

13         MR. RIELA:  Yes.

14         THE COURT:  Thank you.  I am approving the

15   application.

16         MR. RIELA:  Thank you.

17         THE COURT:  With that $344.32 was not in the chart.

18   But go ahead, Ms. Ringer.

19         MS. RINGER:  Next, Your Honor, is Pachulski Stang,

20   docket number 4534, requesting fees in the amount of

21   $349,099.50 and expenses in the amount of $13,706.60.  After

22   resolving the U.S. Trustee's objection, Pachulski reduced their

23   fees to $347,570.50 and expenses to $13,234.90.

24         MR. MASUMOTO:  That's correct, Your Honor.

25         THE COURT:  All right, it's approved.

1          MS. RINGER:  Next is San Marino Business Partners,

2    docket number 4572, requesting fees in the amount of $43,342.50

3    and expenses in the amount of $73.32.  After resolving the U.S.

4    Trustee's objection, San Marino agreed to reduce its fees to

5    $31.127.11 and its expenses remain the same.

6          THE COURT:  Mr. Masumoto, let me ask you.  Their --

7    again, when you -- where you've agreed on a lump-sum reduction,

8    I don't know what went into it.  I had questions about the

9    amount of time they spent preparing fee applications.  You may

10   well have dealt with that in the fee reduction.

11         MR. MASUMOTO:  And that was -- that was the substance

12   or the thrust of our objection regarding applying the Mesa fee

13   standard to their fee app prep time.

14         THE COURT:  All right, it's approved.

15         MS. RINGER:  Next is SilvermanAcampora, docket number

16   4538, requesting fees in the amount of $315,950 and expenses in

17   the amount of $1,613.51.  After resolving the U.S. Trustee's

18   objection, they agreed to reduce their fees to $300,092.50 and

19   expenses to $1,448.11.

20         THE COURT:  Mr. Masumoto?

21         MR. MASUMOTO:  That's correct, Your Honor.

22         THE COURT:  All right, it's approved.

23         MS. RINGER:  Finally is Wilmer Cutler Pickering Hale

24   and Dorr, docket number 4537, requesting fees in the amount of

25   $504,670.50 and expenses in the amount of $2,231.33.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

69

1          THE COURT:  Is there somebody from Wilmer Hale who's

2     here?  Come on up.

3          So --

4          MR. PERLSTEIN:  Good morning, Your Honor.  William

5     Perlstein, Wilmer Hale.

6          THE COURT:  The issue that I have, and I know the U.S.

7     Trustee didn't file an objection, is that it appears that you

8     spent a significant amount of time reviewing conflicts reports

9     and identifying potential conflicts with the representation.

10    For example, invoice 2218702, two Wilmer Hale attorneys spent a

11    combined eight and a half hours for reviewing the conflicts

12    report, including one of those lawyers billing at 750 dollars

13    an hour.

14         Another attorney billed 6.9 hours for drafting a list

15    of supervising attorneys on potentially conflicting matters and

16    e-mailing those same attorneys.  I won't go through -- I mean,

17    I consider -- you know, clearing conflicts is part of your

18    overhead.  You want to take on the work?  Fine.  You don't want

19    to take on the work?  Don't do it.  If it takes -- if you've

20    got to review -- it's extremely burdensome to review your

21    conflicts reports; you need to do it.  You have any authority

22    that says that's compensable?  Because I don't.  I can't

23    remember ever compensating for reviewing conflicts -- clearing

24    conflicts.

25         MR. PERLSTEIN:  Your Honor, this was the initial fee

**RESIDENTIAL CAPITAL, LLC, ET AL.**

70

1    application.

2             THE COURT:  That's fine, but it's still -- there is a

3    significant -- okay.  In January you billed 101 hours on

4    "fee/employment applications" at a cost of $56,050.50.  What's

5    the justification?

6             MR. PERLSTEIN:  That was the initial -- we were

7    retained in December of 2012.  That cost was entirely with

8    respect to the initial clearance coming in quite late in this

9    case.

10            THE COURT:  I don't think that answers my question.

11   Do you have any case authority that says you should properly --

12   that that isn't overhead?  Why should you be reimbursed by the

13   estate for doing a conflicts check to determine whether you're

14   going to get hired?

15            MR. PERLSTEIN:  My understanding of the U.S. Trustee

16   guidelines, Your Honor, is that the normal requirements of

17   complying with the Court's guidelines on retention is

18   compensable, so long as it is reasonable.  That is what our

19   understanding has been with respect to the initial retention.

20   I did look at the costs --

21            THE COURT:  Preparing the application -- preparing

22   your retention application, I will approve compensation for.

23            Mr. Masumoto, what's your -- I don't want to -- if the

24   office policy, which I'd ask you -- what is the office policy

25   with respect to reimbursing counsel for doing a conference

**RESIDENTIAL CAPITAL, LLC, ET AL.**

71

1   check?

2          MR. MASUMOTO:  We have a similar position to Your
3   Honor; we do believe it's part of overhead.  We oftentimes get
4   feedback or objections by the applicant indicating that the
5   U.S. Trustee may have raised issues that the Court hadn't
6   raised in that regard, and sometimes that's an issue as to
7   whether or not it's compensable or not.  But we do believe, as
8   a general policy that, as Your Honor indicated, whatever it
9   takes to be retained is part of -- should be part of the
10  overhead.

11         THE COURT:  All right.  Some of the time, and I can't
12  tell you exactly how much, was spent on preparing the
13  disclosure affidavit for purposes of the retention.  That I
14  consider to be appropriate, okay?  You've got to do the
15  application.  Case law does permit reimbursement for doing the
16  application.  I consider doing your conflicts check -- most of
17  the time went into that -- as overhead.

18         So what I'm going to do is I'm going to approve the
19  fees with a reduction of $42,037.50, which represents a 75
20  percent reduction of Wilmer Hale's fees for "fee/employment
21  applications".

22         MR. PERLSTEIN:  Okay.  Thank you, Your Honor.

23         THE COURT:  Okay.

24         MS. RINGER:  Your Honor, I believe that's all for the
25  committee professionals.

1              THE COURT:  Mr. Seife?

2              MR. SEIFE:  Good morning, Your Honor.  Howard Seife,

3   Chadbourne & Parke, counsel for the examiner.  I'm here for the

4   professionals retained by the examiner for the examiner

5   himself.

6              The first fee application is that for Chadbourne &

7   Parke, docket number 4565, requesting fees of $23,771,407.75,

8   expenses of $1,528,915.11.  Based on an objection and

9   discussions with the U.S. Trustee, there's an agreement to

10  reduce the fees to $23,687,407.75.  There was no objection to

11  the expenses.

12             THE COURT:  Let me ask you this.  On the expenses --

13  this really goes to how you were staffing the matter -- did you

14  staff with people from Los Angeles?

15             MR. SEIFE:  We had a partner in Los Angeles, Robin

16  Ball, who is a senior litigator, who was intimately familiar

17  with derivatives, that was heavily involved in the

18  investigation.

19             THE COURT:  Okay.  As I did earlier, you need to go

20  back; I'm not going to reimburse for travel air fare, hotels,

21  for lawyers from other than your New York office who travel to

22  New York.  There were -- I'm not sure I captured all of them,

23  but there were a handful of entries.  I mean, it's perfectly

24  appropriate, in my view, for you to decide, for expertise or

25  whatever reason, to staff the matter with lawyers from other

**RESIDENTIAL CAPITAL, LLC, ET AL.**

73

1    offices.

2              MR. SEIFE:  Right.

3              THE COURT:  But you're going to eat the travel

4    expense, hotel, airfare, if you do that.  Consider it part of

5    overhead.

6              MR. SEIFE:  For clarification, if he was traveling to

7    Chicago or Minneapolis for an interview, I assume that's

8    compensable?

9              THE COURT:  Yeah, I'm talking about travel to New

10   York.

11             MR. SEIFE:  To New York.

12             THE COURT:  Okay?  I agree.  And I was looking, and I

13   think we did flag some of those.  There was travel to

14   Minneapolis; I understand what that was about.

15             MR. SEIFE:  Right.

16             THE COURT:  I'm just talking about travel to New York

17   when -- okay.  So --

18             MR. SEIFE:  We'll make that adjustment, Your Honor.

19             THE COURT:  -- talk to Mr. Masumoto about it, and make

20   sure he's -- make sure you're satisfied, Mr. Masumoto.  Okay.

21             MR. MASUMOTO:  I will.

22             THE COURT:  So reduce the expenses by the expenses for

23   your out-of-town attorneys.

24             MR. SEIFE:  We'll do that.

25             THE COURT:  Let me just see whether I had anything

**RESIDENTIAL CAPITAL, LLC, ET AL.**

74

1    else.  I'm satisfied with the fee reduction you agreed upon

2    with the U.S. Trustee, so I'll approve it, subject to working

3    out the expense items.

4            MR. SEIFE:  Thank you, Your Honor.

5            THE COURT:  Thank you.

6            MR. SEIFE:  The next application is of the examiner

7    Arthur J. Gonzalez, docket number 4566, requested fees of

8    321,975 dollars, and no requested expenses.  There was no

9    objection from the U.S. Trustee.

10           THE COURT:  Mr. Masumoto?

11           MR. MASUMOTO:  That's correct, no objection, Your

12   Honor.

13           THE COURT:  All right.  It's approved.

14           MR. SEIFE:  Next is Leonard, Street, docket number

15   4559, requesting fees of 88,103 dollars, expenses of 2,345

16   dollars.  No objection by the U.S. Trustee.

17           MR. MASUMOTO:  That's correct, Your Honor.

18           THE COURT:  It's approved.

19           MR. SEIFE:  Mesirow Financial Consulting, docket

20   number 4562, seeking fees of 23,210,644 dollars, expenses of

21   299,682 dollars.  There was an objection launched by the U.S.

22   Trustee, and there was agreed upon a settlement reducing the

23   fee amount to 23,108,667 dollars, and reducing the fees to

24   235,261 dollars.

25           THE COURT:  Mr. Masumoto?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

75

1          MR. MASUMOTO:  That's correct, Your Honor.

2          THE COURT:  All right.  With the agreed reductions,

3    it's approved.

4          MR. SEIFE:  Wolf Haldenstein, docket number 4560,

5    seeking fees of $77,787, expenses of $1,623.06.  There was an

6    objection to the fees by the U.S. Trustee, and agreed upon

7    reduced amount of $73,468.35; no objection to expenses.

8          THE COURT:  All right.  It's approved.

9          MR. MASUMOTO:  That's correct.

10         MR. SEIFE:  Thank you, Your Honor.

11         MR. MARINUZZI:  Your Honor, that concludes the

12   presentation of the fee applications with --

13         THE COURT:  Anyone who was here just for the fee

14   applications is certainly excused.

15         MR. MARINUZZI:  Your Honor, just one minor point,

16   before they leave, that I neglected to mention.  Our

17   application requests, and I'm sure others do as well --

18         THE COURT:  A holdback.

19         MR. MARINUZZI:  Correct.

20         THE COURT:  I want to hear from Mr. Masumoto on that,

21   because whatever I do is going to apply across the board to

22   everybody.

23         MR. MARINUZZI:  Correct.

24         MR. MASUMOTO:  We believe that the prior holdback

25   should continue.  I'm not sure if they're asking for a payment

**RESIDENTIAL CAPITAL, LLC, ET AL.**

76

1  of some of the earlier holdback of the --

2        THE COURT:  They are, is what I understood.

3        MR. MARINUZZI:  Yes, Your Honor.

4        THE COURT:  They're asking that it be reduced going

5  forward, and I believe --

6        MR. MARINUZZI:  There's ten percent being held for the

7  first ten percent, still for the second, and I'm assuming ten

8  percent will be held back for the third.

9        MR. MASUMOTO:  As long as going forward there's a

10 continued holdback, I don't think we have any objection to

11 reducing some of the earlier holdback.  I mean, currently

12 they're being paid the eighty/twenty percent.

13        THE COURT:  Yes.

14        MR. MASUMOTO:  At the award, I believe Your Honor has

15 been reducing that holdback amount to ten percent in the prior

16 application.  So going forward, as long as they maintain the

17 payment -- the monthly payment of eighty/twenty, I believe that

18 should keep, at least until the next application, a sufficient

19 holdback to allow Your Honor, at your discretion, to reduce any

20 of the ten percent holdbacks from the prior period.

21        THE COURT:  All right.  So let me -- be clear for me

22 what it is you're asking me to do with respect to the holdback.

23        MR. MARINUZZI:  Your Honor, we're asking for release

24 of the ten percent holdback relating to the first

25 application --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Prior to the -- okay.

2          MR. MARINUZZI:  -- as well as the ten percent holdback

3  remaining for the second application.

4          THE COURT:  All right.  And --

5          MR. MARINUZZI:  With respect to the third --

6          THE COURT:  Go ahead.

7          MR. MARINUZZI:  -- we understand there'll be a ten

8  percent holdback at the end of this hearing.

9          THE COURT:  All right.  Is that satisfactory to you,

10 Mr. Masumoto?

11         MR. MASUMOTO:  That is, and I was just wondering if

12 counsel has managed to calculate, on the eighty/twenty portion

13 that's currently, how much has not been paid?

14         MR. MARINUZZI:  What I'm told is with respect to the

15 first and second, the total amount being held back for the

16 professionals is fifteen million dollars.

17         MR. MASUMOTO:  Okay.  That's fine, Your Honor.

18         THE COURT:  Does anybody else wish to be heard with

19 respect to the issue of the holdback?

20         All right.  I'm going to go ahead and approve your

21 request.   I want you to go over with the U.S. Trustee

22 carefully the precise amounts for each professional, from the

23 prior holdback, that's going to be paid to them now, so it's

24 clear.  I don't have that clearly in mind.

25         MR. MARINUZZI:  We'll do that, Your Honor.  It'll be

**RESIDENTIAL CAPITAL, LLC, ET AL.**

78

1  set forth in the order that we present to chambers --

2           THE COURT:  Mr. Eckstein --

3           MR. MARINUZZI:  -- and if there are any questions --

4           THE COURT:  -- did you want to be heard?

5           MR. ECKSTEIN:  Your Honor, I'm assuming this is going

6  to apply --

7           THE COURT:  Across the board.

8           MR. ECKSTEIN:  -- across the board.

9           THE COURT:  Absolutely.

10          MR. ECKSTEIN:  We obviously would like to see the

11 chart and have a chance to just understand what amounts will

12 continue to be held back and, sort of, what the balance is in

13 terms of -- there are policy issues and these are important

14 issues for the firms, and so I appreciate what Mr. Marinuzzi is

15 proposing from the standpoint of not taking on too much of a

16 burden.

17          THE COURT:  Does the committee want to object to

18 reducing the holdback, Mr. Eckstein?

19          MR. ECKSTEIN:  I'm not prepared, Your Honor, to raise

20 an objection, but I'd like to see the chart, and then if we

21 have any comments we'll indicate it at the time.

22          THE COURT:  Okay.  So I've approved the fees, subject

23 to the ones where I flagged issues.  With respect to the

24 holdback, prepare a chart, share it with Mr. Eckstein and any

25 other counsel who want to see it and with the U.S. Trustee.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    And before I sign an order, I want to be sure.  If there are

2    going to be -- if there are remaining objections, please let me

3    know, and we'll try and resolve it promptly.  It's a lot of

4    money.

5         MR. MARINUZZI:  Will do, Your Honor.  Thank you very

6    much.

7         THE COURT:  Okay.

8         MR. MARINUZZI:  And on behalf of, I'm sure, all of the

9    applicants, noting the pile of binders on your desk, we really

10    want to thank the Court and chambers and the U.S. Trustee's

11    Office for their efforts in reviewing the applications.

12         THE COURT:  Okay.  Thank you.  And I would -- I want

13    to make clear, I greatly appreciate the effort that that U.S.

14    Trustee's Office spends on reviewing quite voluminous fee

15    applications.

16         MR. ECKSTEIN:  Your Honor --

17         THE COURT:  Mr. Eckstein?

18         MR. ECKSTEIN:  -- one more observation, just on the

19    question.  And I don't think it's intended that the release of

20    the holdback is in any way altering whatever issues people want

21    to deal with at final fee applications.

22         THE COURT:  It's not.

23         MR. ECKSTEIN:  And so I think, with that caveat --

24         THE COURT:  Nobody's fees are being approved on a

25    final basis.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

80

1          MR. ECKSTEIN:  That was the point I was making.

2          THE COURT:  And until they're approved on a final

3   basis, they're subject to disgorgement, they're subject to all

4   the usual rights that remain.

5          MR. ECKSTEIN:  I appreciate that clarification.

6          THE COURT:  All right.

7          MR. MARINUZZI:  Of course, Your Honor.

8          MR. ECKSTEIN:  Thank you, Your Honor.

9          MR. MARINUZZI:  Your Honor, if it's acceptable to the

10  Court, I think we'll go to page 5 of the agenda and begin the

11  contested matters.

12         THE COURT:  I think what we'll do is we'll take a ten-

13  minute recess --

14         MR. MARINUZZI:  Very well.

15         THE COURT:  -- and anybody who doesn't need to remain

16  for it is free to leave.  Okay?

17         IN UNISON:  Thank you, Your Honor.

18      (Recess from 11:19 a.m. until 11:33 a.m.)

19         THE COURT:  All right.  Please be seated.

20         Mr. Marinuzzi?

21         MR. MARINUZZI:  Good morning, Your Honor.  We're on

22  page 5 of the agenda for today's hearing, and it's item 1 under

23  contested matters, and it's the debtors' objection to the proof

24  of claim of PNC Bank, N.A.  I'm going to turn over the podium

25  to John Walsh of Curtis, Mallet; he'll be handling it on behalf

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    of the debtors.

2         MR. WALSH:  Good morning, Your Honor.  John Walsh for

3    the debtor.

4         We're here, Your Honor, on the debtors' motion --

5    rather, objection on the PNC claim.  We filed an objection

6    based on 502(b)(1), and in the alternative, 502(e), but the

7    primary thrust of our motion is based on 502(b)(1), that there

8    is no right to contribution or indemnity, which is the basis of

9    this claim.

10        THE COURT:  So what if the judge in Pittsburg decides

11   there is?  I mean, there's no statutory right to contribution,

12   but whether there's a common law right -- I mean, this issue

13   came up when I was asked to give preliminary approval to the

14   class action settlement, which I ultimately did give

15   preliminary approval, and it was the issue about the judgment

16   reduction provision that was -- because originally the proposed

17   settlement said applicable law, and the Second Circuit says

18   that's not good enough.  So the debtor, in its infinite wisdom

19   and hard negotiating, adopted a provision on judgment reduction

20   that is certainly going to result in objections at the time of

21   final approval.

22        And so I'm not -- I'll tell you right now, I'm not

23   prepared to decide, in the context of your objection to the

24   claim, that there is no right to indemnity or contribution.  I

25   said at the time I gave preliminary approval -- or at the

1    hearing I actually gave the approval in an order, but at the

2    time of the hearing on preliminary approval, I was most

3    concerned about whether it was supposed to be me or the federal

4    district court judge in Pittsburg, who would make a

5    determination whether there was a right to contribution, and

6    what the applicable rule would be.  I said then that I wanted

7    to talk -- I wasn't going to make any decision until I talked

8    to the judge.  I did speak with the district judge, and the

9    issue is open.  The issue is open as to whether there's a right

10   to contribution and what the standard is.

11          MR. WALSH:  Your Honor, the PNC response to our

12   objection provided no basis for contribution or indemnity, so

13   there's nothing before Your Honor --

14          THE COURT:  Well, neither side has briefed the merits,

15   really, of whether there's a -- there's no statutory right,

16   okay?  I agree, and they don't argue otherwise.

17          MR. WALSH:  And no contractual right, and they don't

18   argue otherwise.

19          THE COURT:  Okay.  And the issue is under -- these are

20   all federal -- these are all statutory causes of action, and to

21   me, the issue is not clear whether there's a right to

22   contribution.  And I think it's going to be the judge in

23   Pittsburg who's probably going to wind up being the one to

24   decide it.  If there's an adverse judgment against PNC, he's

25   going to have to decide whether there's a right to contribution

1    and whether he's satisfied with the standard that was written

2    into the proposed settlement.  I mean, I -- I don't want to

3    pre-judge it; I'm sure I'm going to get a PNC objection at the

4    time of the hearing on final approval of the class action

5    settlement.

6            So 502(e) is a different issue, okay?  502(b), I'm

7    not -- I'm making it crystal clear I am not deciding today that

8    there is no right to contribution.  That's a separate issue

9    than the 502(e)(1).  So you want to argue that, go ahead and

10   argue that.

11           MR. WALSH:  Well, Your Honor, the issue in 502(b) is

12   before the Court because they are seeking --

13           THE COURT:  Are you hearing what I'm saying?

14           MR. WALSH:  Your Honor --

15           THE COURT:  I told you --

16           MR. WALSH:  Well, let me respond to 502(e).

17           THE COURT:  Look, if you had -- this would be a

18   nonissue if you had negotiated a different judgment reduction

19   provision, because PNC wouldn't be exposed.  And I said at the

20   time I had the hearing that -- I had a hearing, I refused to

21   rule, you came back the next day, and I basically said that,

22   okay, you adopted a rule that's the -- I don't know what the

23   right term to use -- it certainly would be the least generous

24   to PNC, whether -- it may be appropriate, okay?  It may be

25   appropriate.  Final approval may be given.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          But I also made a comment then that -- I asked the

2     question had they filed a proof of claim, and I was told they

3     had.   And I said, well, it may be a different issue at the time

4     the Court is asked to determine their claim for contribution,

5     because it may be a different standard than what you wrote into

6     the settlement agreement.   Okay.   I view this as, in part, a

7     self-inflicted wound, you know?   You should have negotiated

8     harder and this would clearly be a nonissue.

9          MR. WALSH:   Your Honor, there may be an opportunity

10    down the road, even after this hearing, to negotiate with PNC

11    and the plaintiffs a different judgment credit and a different

12    settlement bar.   The parties may even decide to withdraw the

13    request for a settlement bar before this Court and let the

14    Court in Pittsburg address that issue.

15         THE COURT:   But that's not what I have.   I have your

16    objection to the claim.   And with respect to 502(b),

17    specifically as to 502(b)(1), I am not determining -- it is not

18    possible for me to determine, on the briefing that I have

19    before me, that their claim for contribution is unenforceable

20    under applicable law.   The issue is -- I think I asked the

21    question at the --

22         MR. WALSH:   Let me address 502(b).

23         THE COURT:   -- at the last hearing as to whether there

24    was any case law specifically as to these causes of action.

25    The statutes don't have a provision for contribution; that's

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    not the end of the discussion.

2            MR. WALSH:  Well, Your Honor, the RICO statute, and

3    cases following RICO, have determined that there is no right to

4    contribution under RICO.  That case law is well developed.

5            With respect to HOEPA and TILA, there isn't case law,

6    but we think that you can infer from the RICO cases, and the

7    other cases interpreting the PSLRA, that when a statute is

8    silent with respect to contribution --

9            THE COURT:  You want to argue 502(e)(1) now?

10            MR. WALSH:  I'm happy to address 502(e), Your Honor,

11    just --

12            THE COURT:  No, why don't you sit down and wait --

13            MR. WALSH:  502(e) --

14            THE COURT:  -- until your --

15            MR. WALSH:  Let me address --

16            THE COURT:  -- your turn.

17            MR. WALSH:  Well, let me at least raise one other

18    issue, Your Honor.  On 502(e), the PNC's response has requests

19    to withdraw the claim based on 502(e).  The parties remaining

20    dispute then, if it is based on 502(e), the Court's

21    determination is that that withdrawal should be with prejudice.

22    I'll allow PNC's counsel to address that request.

23            THE COURT:  I don't know any authority for withdrawing

24    it without prejudice.  I mean, that --

25            MR. WALSH:  You're right, Your Honor.  That is our

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  point, that if it's withdrawn, it should be withdrawn with

2  prejudice, so that the debtor, in this situation, will have

3  peace of mind with respect to this claim that at this point is

4  outstanding and is a claim for, purportedly, a billion dollars.

5  There should be some finality with respect to the claim, at

6  least in this proceeding, Your Honor.  If the claim is

7  withdrawn under 502(e), we ask that it be withdrawn with

8  prejudice, such that it could not be reasserted at a later

9  date.  And as I said, I'll cede the podium to PNC's counsel to

10  address that.

11          Your Honor, to belabor the point, our briefs to

12  address the 502(b) issue and do cite case law on RICO and the

13  arguments in favor.

14          THE COURT:  Move on to your next point.  How many

15  times do I have to say I am not determining today --

16          MR. WALSH:  I accept that, Your Honor.

17          THE COURT:  -- that there is no right to contribution

18  on the claims that are asserted in the complaint.  You want me

19  to make a decision, and I know what's going to happen when the

20  matter goes forward before the district court in Pittsburg,

21  okay?

22          MR. WALSH:  Pardon, Your Honor.

23          THE COURT:  In my view, this is a self-inflicted issue

24  under 502(b).  You could have solved this problem.  There would

25  be no claim for contribution if PNC was assured that if there's

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    a right to contribution they'd get judgment reduction for the

2    full amount permitted.  But that's -- you know.

3            MR. WALSH:  Well, I appreciate that, Your Honor.  That

4    may color the parties' negotiations.  I'll cede the podium to

5    PNC.

6            MR. MARRIOTT:  Good morning, Your Honor.

7            THE COURT:  It's still morning.

8            MR. MARRIOTT:  Just making sure.  Vince Marriott of

9    Ballard Spahr, on behalf of PNC.  I'm here with my colleague,

10   Sarah Schindler-Williams.

11           We concede that the claim is subject to disallowance

12   under 502(e)(1)(B).

13           THE COURT:  I don't see any authority, whatsoever,

14   that if I sustain the objection under 502(e)(1) that it's

15   without prejudice.

16           MR. MARRIOTT:  Well, Your Honor, that confused me too,

17   and I discussed with the debtor, out in the hallway, what the

18   prejudice or without prejudice issue really is.  And apparently

19   it's a 502(j) issue.  502 --

20           THE COURT:  Unless you come back another time.

21           MR. MARRIOTT:  502(j) allows for reconsideration for

22   cause.  It's not limited to 502(e)(1)(B).  It applies to any

23   allowance or disallowance of a claim --

24           THE COURT:  I've had this 502(j) issue come up in

25   other -- in actually, Chapter 13 cases.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

88

1          MR. MARRIOTT:  On any basis.  It's not our view that,

2     by consent to disallowance under 502(e)(1)(B), that we also

3     have to waive whatever rights we might have under 502(j).

4          THE COURT:  Well, look, I -- your first statement --

5     and I think this is in your papers -- you concede that under

6     502(e)(1) your claim for contribution can be disallowed --

7          MR. MARRIOTT:  Correct.

8          THE COURT:  -- correct?  Okay.

9          MR. MARRIOTT:  And we have no objection --

10         THE COURT:  And that's my ruling, okay?

11         MR. MARRIOTT:  And we have no objection to an order to

12    that effect.

13         THE COURT:  Well, that's -- I'm -- you know, whether

14    you have a right to come back under 502(j) or not is premature

15    for me to say.

16         MR. MARRIOTT:  Agreed.

17         THE COURT:  Okay?  I'm not saying -- I'm going to

18    sustain the objection under 502(e)(1), period, full stop.  And

19    if I have a motion under 502(j), I have a motion under 502(j),

20    and you'll fight it out then.  I'm not deciding today more than

21    I have to decide.  You've conceded that the claim is properly

22    disallowed under 502(e)(1), and that's true.  The real answer

23    is: Go negotiate.  I mean, I view this as self-inflicted on the

24    debtors' part.  And maybe the plaintiffs were unwilling to do

25    anything more, but I was amazed that within -- before the end

**RESIDENTIAL CAPITAL, LLC, ET AL.**

89

1   of the hearing, when I said no, I'm not approving on a

2   preliminary basis, to come back and say, oh, we've worked this

3   out, Your Honor.  And sure, but I made a point of saying then,

4   that isn't necessarily what's going to be binding on me, for

5   example, if there would have been a proof of claim, which there

6   have been, and you can come back and assert it later.

7         I have a contract now and it says this is the

8   following judgment reduction provision.  Okay?  And that may

9   be -- there may be no right to contribution; we'll see.  And

10  I'm not sure whether it's me or the judge in Pittsburg who is

11  ultimately going to decide it, but for today the ruling is I

12  sustain the debtors' objection to the claim solely on the basis

13  of 502(e)(1), period, full stop.

14        MR. MARRIOTT:  Thank you, Your Honor.

15        THE COURT:  Okay?  Next matter.  And debtors' counsel

16  should submit an order to that effect.

17        MR. MARINUZZI:  Your Honor, that brings us --

18        UNIDENTIFIED SPEAKER:  May I be excused, Your Honor?

19        THE COURT:  You're excused, absolutely.

20        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

21        THE COURT:  Thank you.

22        MR. MARINUZZI:  Your Honor, that brings us to item

23  number 2 on page 5, which is the debtors' motion under Section

24  365 to assume and assign servicing related agreements for

25  trusts ensured by Syncora Guarantee, Inc. to Ocwen Loan

1    Servicing, LLC.

2              Your Honor, my colleague, Alexandra Barrage, will

3    present the debtors' objection -- the debtors' motion; I'm

4    sorry.  I would like to --

5              THE COURT:  I'm completely confused by this matter,

6    I've got to tell you.

7              MR. MARINUZZI:  Okay, but it's an important matter,

8    Your Honor, and I'd like to spend a minute just setting an

9    overview, try to set the stage for the motion and why it's so

10   important to the debtors and to their constituents in the case.

11             Your Honor is well aware there is a plan on file,

12   proposed by the debtors and proposed by the creditors'

13   committee, and we hope to have a confirmation hearing begin in

14   approximately two months.  And to say that the plan settles a

15   whole host of complicated intra-debtor, intra-creditor and

16   third party claims is really an understatement.  What was

17   achieved over the months of mediation, to resolve that many

18   disputes, still, frankly, when I think about where this case

19   was a year ago, I'm still amazed.  We've got to get to

20   confirmation; we know that.  We know we're going to have some

21   issues, and we think we've done a pretty good job, with Your

22   Honor's help, of identifying the key issues.  And we

23   anticipated, as part of the mediation process under Judge Peck,

24   that ran for months, what challenges we thought we would face.

25   And we weren't able to resolve everything, and so we know, and

1   everybody understood and accepted that we have issues for

2   confirmation with respect to the JSNs and with respect to the

3   FHFA.   No secret.

4          But by and large, the mediation process was driven by

5   some fundamental assumptions.   One of the fundamental

6   assumptions is that people comply with the Court's orders.   And

7   so in reliance on this, there were a number of assumptions

8   carefully vetted by the participants in the mediation regarding

9   assets, claims, negotiations regarding AFI's possible liability

10  on certain claims.   I mean, people really were well informed,

11  and people drilled down on these estimates and assumptions.

12  And I think parties relied, as they participated in these

13  mediation sessions, that they had a pretty good grasp, albeit

14  conservative, of what the universe of claims were in this case.

15  And again, it was fundamentally formed by the claims bar date

16  having passed, the cure bar date having passed, negotiations

17  with creditors, creditors who said we believe our claim is X;

18  at least you can negotiate when somebody tells you their claim

19  is X.

20          THE COURT:  Did you build into that, though, when you

21  initially have a schedule for assumption of contracts, and you

22  have Syncora on it, and then you withdraw it from the schedule,

23  and only later, now try to assume the contract?

24          I mean, that's -- when I say I'm really confused with

25  this, I understand you say, oh, it was a month after the bar

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**92**

1   date when we did this, but you remove -- are you assuming it or

2   are you not assuming it?  How many times can you change your

3   mind?  What are the consequences of doing that?

4           I don't see any -- I mean, why don't I take it as of

5   the time you withdrew it from the schedule on assumption?  I

6   guess Ocwen decided they really do want it.

7           Okay.  It raises the whole issue about cure claim, and

8   why doesn't the time for filing a cure claim run from when you

9   really say we want to assume it, which is the second time, not

10  the first time?  I really am confused by this.

11          MR. MARINUZZI:  Your Honor -- and I think I would be

12  doing a disservice if I tried to explain the Court's confusion

13  as well as Ms. Barrage will explain it --

14          THE COURT:  Well, then she'll explain it to me.

15          MR. MARINUZZI:  -- and the history.  But I think --

16          THE COURT:  It isn't that --

17          MR. MARINUZZI:  -- the key --

18          THE COURT:  I'm sorry Mr. Marinuzzi.  The history of

19  the case doesn't solve this problem for me.  Okay.  I live the

20  history of this case every day.  All right.  I understand the

21  history of the case.  I understand the importance of everything

22  that goes on in the case.

23          Let's -- let me deal with the specific issue I have to

24  deal with.

25          MR. MARINUZZI:  That's fine, Your Honor.  Cede the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

93

1  podium to Ms. Barrage.  Thank you.

2          MS. BARRAGE:  Thank you, Your Honor.  Alexandra

3  Barrage of Morrison & Foerster, on behalf of the debtors.  Your

4  Honor, I want to erect -- excuse me, I want to address your

5  direct question on the confusion on the issue.  And I think

6  Your Honor is really touching on the point that Syncora makes

7  in its papers about subsequent to the cure deadline being taken

8  off the assumed contract list.

9          Your Honor, when Ocwen and the debtors convened prior

10  to the sale hearing, it was determined that the Syncora deals

11  be taken off the list in full adherence to this Court's sale

12  procedures order and to the asset purchase agreement.  The

13  sales procedures order was very clear that the debtors always

14  had the ability, in consultation with our purchaser, who at the

15  time was Ocwen, to take agreements off the list.

16          However, those agreements were temporarily taken off

17  the list, Your Honor.  And that was made very clear to Syncora,

18  and if I may --

19          THE COURT:  Is there something in the order that talks

20  about temporarily taking things off the list?

21          MS. BARRAGE:  Your Honor, there is something in the

22  transcript that I'd like to read into the record --

23          THE COURT:  Go ahead.

24          MS. BARRAGE:  -- if I may; I have copies of the

25  transcript.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Thank you.

2          MS. BARRAGE:  Your Honor, for the record, I've just

3    handed up a copy of the November 19th, 2012 hearing transcript,

4    which came from the first day sale hearing.

5          Your Honor, if you please would take a look at, first,

6    page 75 of the transcript.

7          THE COURT:  Okay.

8          MS. BARRAGE:  It starts at line 5.  There's a colloquy

9    between Your Honor and Mr. Coelho for Syncora.  This touches on

10   the point of the temporary aspect I just raised, if I may.

11         "Your Honor, I'm Sara Coelho from Weil.  We're counsel

12   for Syncora Guarantee.  Let me start by saying that if we are

13   indeed removed from the sale permanently, then our objection is

14   resolved.

15         "However, what the debtors have told us is not that.

16   What the debtors have told us is that they may seek to assume

17   and assign the contracts at a later date, pursuant to a

18   separate but similar order and on the same terms as under the

19   Ocwen APA."

20         Your Honor, there was no mystery here.  We never

21   waived our ability to try and get these deals and resolve our

22   issues --

23         THE COURT:  Yeah, but the issue for me --

24         MS. BARRAGE:  -- with Syncora --

25         THE COURT:  -- is -- that's all well and good.  They

1  knew you might try and later assume the contract.  The issue

2  for me is when you take them off, does the original bar date

3  for cure claims apply once you take it off?  Or once you

4  decide -- you took it off and you decide later, no, Ocwen wants

5  it; we're going to make a motion to assume it.

6        So the issue is then, what's the bar date for cure

7  claims when you put it back?  That's what I don't see

8  adequately addressed.

9        MS. BARRAGE:  Your Honor, two responses.  The first is

10  your sale procedures order was very clear.  It said there was a

11  cure deadline of September 28th.

12        There was also on the same date a deadline to object

13  to the sale; Syncora objected to the sale on that date.  That

14  objection said nothing about cure amounts or the fact that they

15  had any issue with us scheduling them at zero.  We assumed, and

16  until last week assumed, that there was not a cure issue here.

17        Secondly, Your Honor, we think there's really no need

18  to look beyond your sale order.  And we think that parties in

19  similar procedural postures like FGIC and MBIA, they complied

20  with that deadline.  And the reason that we're here today,

21  having --

22        THE COURT:  Did FGIC and MBIA, did you put them on a

23  list and take them off a list?

24        MS. BARRAGE:  Only with respect to MBIA, Your Honor,

25  we did.  They were taken off a list; that was referenced

12-12020-mg   Doc 5164   Filed 09/12/13   Entered 09/23/13 11:28:07   Main Document
Pg 96 of 174
**RESIDENTIAL CAPITAL, LLC, ET AL.**

96

1   directly in our reply.  And subsequently, we resolved our

2   issues with MBIA as we did with FGIC.

3           THE COURT:  Well, when you --

4           MS. BARRAGE:  And that was our hope --

5           THE COURT:  -- when you resolve an issue, that's not

6   precedent for -- that doesn't determine the outcome where you

7   don't resolve the issue.

8           MS. BARRAGE:  Understood.  I think the bigger point

9   here, Your Honor, is we've always tried to resolve our issues

10  with Syncora.  We think the cure deadline was clear.  We think

11  there was no mystery about how we were proceeding in our

12  negotiations.  We were proceeding in our negotiations to get

13  them comfortable on adequate assurance.  We were not dealing

14  with potential 212 million dollars of servicing breach claims.

15  That wasn't the tenor of our discussions.

16          So in large part, it's really not just follow the

17  deadline, it's also tell us.  If you really thought you had a

18  cure claim back in September --

19          THE COURT:  All right.  You're telling me that never

20  once, in words or in substance, did Syncora tell you they think

21  they had a cure claim.

22          MS. BARRAGE:  No, I'm not saying that, Your Honor.  I

23  think our position is this.  We're taking a reasonable approach

24  here.  We're saying to the extent --

25          THE COURT:  Let me stop you.  Did anybody from

**RESIDENTIAL CAPITAL, LLC, ET AL.**

97

1    Syncora, in words or in substance, tell you that they believed

2    they had a cure claim?

3             MS. BARRAGE:  As part of our discussions to try and

4    raise these issues, no.  As part of their subsequent filings

5    and footnotes, they raised the specter of potential hundreds of

6    millions of dollars of claims.  We never got any detail on that

7    until last week.

8             So I think our approach is reasonable here, Your

9    Honor.  We're not saying no cure claims.  We're saying, after

10    that deadline, tell us what you think those cure claims are and

11    we'll look at them.  So we're asking your Court to simply draw

12    a line in the sand.

13             Apart from this motion, there is a claims objection

14    pending.  That -- those issues and the alleged -- no, the --

15    excuse me --

16             THE COURT:  Why --

17             MS. BARRAGE:  -- the amended --

18             THE COURT:  Yeah.  And one question I have is --

19             MS. BARRAGE:  Sure.

20             THE COURT:  -- is why I should hear this outside of

21    the context of that claim objection; let me --

22             MS. BARRAGE:  Because --

23             THE COURT:  -- hear the whole thing as one ball of

24    wax, and decide?

25             MS. BARRAGE:  Your Honor, those -- the issues in the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

98

1   claims objection are directly linked to this cure claim

2   deadline.

3           THE COURT:  That's why I ought to hear it together.

4           MS. BARRAGE:  And we're asking Your Honor to draw a

5   line in the sand and tell us --

6           THE COURT:  When is that scheduled for?

7           MS. BARRAGE:  I believe it's scheduled -- our reply is

8   due the 19th, Your Honor.  But the parties are in discussions

9   about scheduling a future hearing on the merits and the

10  procedural issues with respect to that objection.

11          But Your Honor's -- to the extent Your Honor is

12  inclined to decide this cure claim issue, I think it's going to

13  directly affect potential and burdensome discovery on our claim

14  objection.  Because if we go down the discovery road, we could

15  potentially be opening ourselves up to discovery preceding the

16  September 20th, 2012 --

17          THE COURT:  Okay.  Let me ask you this.

18          MS. BARRAGE:  -- deadline.

19          THE COURT:  Do you have any cases that directly deal

20  with the issue of the deadline for cure claims where a debtor

21  has removed contracts from an assumption schedule and later

22  puts it back on?

23          MS. BARRAGE:  Your Honor, we do not.  I think the

24  closest analogue in the cases are really the line of cases

25  beginning with Drexel on bar date type -- strictly adhering to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    bar dates.  I don't think that this is exactly that.  We

2    don't --

3            THE COURT:  It's not exactly that.  I understand --

4    I -- the Second Circuit law on bar dates is, I think, quite

5    clear.  Okay.  But this has thrown a real -- when I say I'm

6    confused by the whole thing, this has thrown a real monkey

7    wrench into it.

8            If you hadn't removed them from the schedule, I think

9    the answer would be clear.  There was a bar date deadline.

10   They were listed on the schedule for assumption.  They didn't

11   file a cure claim within the time provided.  Too late, to bad.

12   Okay.

13           But there's the twist here.  The twist is the debtor

14   removed them from the schedule.  You essentially -- hang on.

15   The transcript you point to, Ms. Coelho's statement about, "Let

16   me start by saying that if we are indeed removed from the sale

17   permanently, then our objection is resolved."  Okay.

18           Well, it doesn't say that remove us now, put us back

19   later, the objection isn't there.  What I don't have is clear

20   case authority to support your position that having once

21   removed them, now seeking to assume that you can stand on the

22   bar date that applied previously.

23           I understand there is this -- it was a month after the

24   bar date ran.  I mean, did -- let me ask you this.  What

25   will -- what do you anticipate the facts would show at any

**RESIDENTIAL CAPITAL, LLC, ET AL.**

100

1    contested hearing as to whether you told Syncora's counsel that

2    you were going to remove them from the schedule of assumed

3    contracts?  Were they told that before the bar date and it just

4    took until a month after before it actually happened?

5           MS. BARRAGE:  No, Your Honor.  We did not tell them

6    that before the bar date.  We told them that several days

7    before the sale hearing.  I have a cite, if Your Honor will

8    give me just a minute.

9           And the notice to Syncora on that point was as part of

10   our omnibus response to the sale objections.  It's cited in our

11   reply, and I'm sorry; I'm just -- okay.

12          So if Your Honor turns to our reply --

13          THE COURT:  I have too much paper up here; you're

14   going to have to --

15          MS. BARRAGE:  Sorry, Your Honor.

16          THE COURT:  -- read it to me.

17          MS. BARRAGE:  Paragraph 6, footnote 7, in our omnibus

18   reply to objections to the debtors' sale motion at docket

19   number 2135, we noted that both MBIA and Syncora's agreements

20   would be removed from the schedule.  So this was approximately

21   a month after the cure deadline.

22          THE COURT:  And you never told them before that that

23   you were going to remove them from the schedules?

24          MS. BARRAGE:  No, Your Honor, we did not.

25          THE COURT:  Like I say, I'm confused.  I don't know.

1    Mr. Eckstein?

2            MR. ECKSTEIN:  Your Honor, I'm not sure I can

3    significantly -- I can't respond to the case question, but I

4    think it's important to have a little context here.

5            The -- as of September there's no -- there's no

6    debate.  There were -- there are handful of important monolines

7    in this case.  They all were very, very well aware of the case.

8    They're all experienced in these types of situations, well

9    represented.  They all did two things.  They expressed whether

10   or not they did or didn't have objections to the sale.  And

11   they expressed whether they had pre-petition cure claims.  And

12   everybody did that.

13           Syncora did not assert any cure claims, because if

14   they had cure claims, they would have asserted cure claims.

15   They didn't assert a cure claim.

16           We, therefore, had the following facts on the ground.

17   We had -- in the case of Syncora, they had significant

18   objection to the sale and they had no cure claims.  The

19   judgment was, at that -- at the time, the estate was deciding

20   whether or not taking Syncora out was, from a business

21   standpoint, sensible.  Because it might have turned out that

22   the Syncora transactions were so small relative to the

23   transaction that it wasn't it worth the candle.  But we worked

24   with the assumption that we had no cure claims.

25           Now, at the time, we decided to take them out, because

**RESIDENTIAL CAPITAL, LLC, ET AL.**

102

1  we were debating whether or not it made sense as a business

2  matter.  It was not to reconsider whether there were pre-

3  petition cure claims.  It was to make a business decision with

4  Ocwen and with Syncora whether or not there were servicing

5  adjustments that would get made.  But it was all based upon a

6  playing field.

7        Now, for better or for worse, for reasons that,

8  frankly, I can't even speak to, it hasn't gotten resolved.  But

9  the fact of the matter is we're prepared to go forward and let

10 Ocwen take over the transactions and deal with the objections

11 to the sale that Syncora raises.  And we're not asking for the

12 Court today to overrule those objections.

13       The problem we're having right now is that all of a

14 sudden, frankly, nine months after all of that happened, or

15 even almost a year after that happened, instead of we had zero

16 pre-petition cure claims, all of a sudden, several hundred

17 million of pre-petition cure claims.  That's not a de minimis

18 problem given the fact that we have a disclosure statement out.

19 And that's the reason why this is important.

20       THE COURT:  Well --

21       MR. ECKSTEIN:  There's no reason why they all of a

22 sudden should have do over on a pre-petition cure claim.  They

23 knew exactly what they had to do then.

24       THE COURT:  What's the proof of claim they filed?  Ms.

25 Barrage, what's it for?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MS. BARRAGE:  Pardon me, Your Honor.  What is it?

2          THE COURT:  Yes.

3          MS. BARRAGE:  Well, the first proof of claim that was

4    filed was a proof of claim against GMACM in an unliquidated

5    amount for servicing-related breaches.

6          THE COURT:  Are the -- what's your argument to expunge

7    the claim?  Is it -- was it timely filed?

8          MS. BARRAGE:  The argument on the original proof of

9    claim -- we don't take any issue that it was not timely filed.

10   There are a number both procedural and substantive issues, and

11   I might cede the podium to my colleague, or --

12         MR. ECKSTEIN:  Syncora filed claims against GMACM.

13   They didn't file claims against RFC based upon transactions.

14   The debtor didn't issue the Syncora transaction.  So it's a --

15   it was sort of a --

16         THE COURT:  You're saying they filed against the wrong

17   entity.

18         MR. ECKSTEIN:  They now want to assert a claim against

19   other debtors.  That's, per se, not appropriate at this

20   stage --

21         THE COURT:  Well --

22         MR. ECKSTEIN:  -- of the case.

23         THE COURT:  -- it may get knocked out.

24         MR. ECKSTEIN:  They knew they were on multiple

25   debtors.  They could have filed them against multiple debtors;

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    they didn't.  It's not complicated with markets.

2              THE COURT:  Let me hear from Syncora's counsel.

3              MS. BARRAGE:  Okay.

4              MS. COELHO:  Good afternoon, Your Honor.  I'm Sara

5    Coelho from Weil.  We represent Syncora Guarantee, Inc.  Before

6    I address my own arguments, I'd like to respond to some of the

7    things that the debtors and the committee have -- had said.

8              First of all, they have framed this up as some kind of

9    plan or confirmation issue.  This is not a confirmation issue.

10   This is an issue of whether or not Syncora can assert a cure

11   claim with respect to a -- what in this case is a very small

12   sale.  And if Syncora prevails in asserting a large cure claim,

13   one of two things will happen.  Either Syncora will have to

14   agree to compromise that claim, or the debtors will end up

15   walking away from the sale.

16             So first of all, what is being decided here today will

17   have --

18             THE COURT:  Well, they can decide --

19             MS. COELHO:  Well, and Syncora would have to prove out

20   the cure claim.

21             THE COURT:  They can simply just reject the

22   contract --

23             MS. COELHO:  That's right.

24             THE COURT:  -- they'll just reject the contract.

25             MS. COELHO:  That's right.  And they will have to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

105

1    consider, if they reject the contract, whether there are

2    rejection damages; I expect there will be substantial ones.

3           THE COURT:  Your unsecured rejection damage claim is

4    going to get paid at a fraction of what you could negotiate a

5    cure claim.  Okay.  But that's your problem.

6           MS. COELHO:  That's right.  And we understand all of

7    that.  And all of those issues are for another day.  But I

8    think it's important to keep the --

9           THE COURT:  So why didn't you file --

10           MS. COELHO:  -- to keep the record clear what the

11    focus is today.

12           THE COURT:  Why didn't you file a cure claim by the

13    bar date?

14           MS. COELHO:  We -- when we looked at the sale -- at

15    the sale that was proposed last summer, it was a very defective

16    sale with a severe severance of contracts that proceeded in a

17    way that was very novel and unusual.  And we made an assessment

18    of how to proceed in objecting.  And we decided at that time --

19           THE COURT:  Everybody files a protective claim.

20           MS. COELHO:  -- to object.

21           THE COURT:   I mean, any --

22           MS. COELHO:  We decided at that time to file an

23    objection.  We vigorously file -- we vigorously objected.  We

24    did, in the second objection deadline, assert a cure claim, and

25    the debtors --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1           THE COURT:  It's not a proof of claim.

2           MS. COELHO:  -- responded.  And I --

3           THE COURT:  It's not a claim.

4           MS. COELHO:  The debtors responded by --

5           THE COURT:  Putting a footnote --

6           MS. COELHO:  -- removing us.

7           THE COURT:  -- in a brief is not a claim.

8           MS. COELHO:  The debtors were well aware of that claim

9    and they respond -- instead of objecting to that claim, and

10   instead of objecting --

11          THE COURT:  You didn't file a claim.  They didn't have

12   to object to a claim.  You put a footnote in a brief; you

13   didn't file a claim.

14          Do you have any authority that says after a contract

15   is removed from a schedule for assumption and rejection, and

16   the debtor later decided to file a motion to assume, that a

17   different bar date applies?  Do you have any case -- I want --

18   I don't -- I didn't find anything.

19          I asked Ms. Barrage and she doesn't have any.  I'm

20   asking you specifically.  I want a direct answer to this

21   question.  Do you have any authority that says that a different

22   bar date would apply when a contract is later sought to be

23   assumed?

24          MS. COELHO:  The authority for bar -- bar dates have

25   to be set very clearly --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

107

1          THE COURT:  Could you answer my question?  Do you have

2     any --

3          MS. COELHO:  I --

4          THE COURT:  -- case --

5          MS. COELHO:  I --

6          THE COURT:  -- authority dealing with this situation?

7          MS. COELHO:  I --

8          THE COURT:  Yes or no?  Yes or no?

9          MS. COELHO:  This particular --

10         THE COURT:  Yes.

11         MS. COELHO:  -- fact pattern --

12         THE COURT:  Yes.

13         MS. COELHO:  I have not found a case --

14         THE COURT:  Okay.

15         MS. COELHO:  -- on this particular --

16         THE COURT:  All right.

17         MS. COELHO:  -- fact pattern.

18         THE COURT:  Thank you for answering my question.

19         MS. COELHO:  I don't --

20         THE COURT:  Stop.

21         MS. COELHO:  -- say that there --

22         THE COURT:  Stop.  When I ask a direct question, I

23    expect a direct answer.  Once I get the answer, I will allow

24    counsel to continue to argue.  I will continue to interrupt you

25    until you answer a direct question that I ask.  Do you

**RESIDENTIAL CAPITAL, LLC, ET AL.**

108

1   understand that?

2          MS. COELHO:  I do.

3          THE COURT:  Do you have any authority directly on

4   point?

5          MS. COELHO:  Directly --

6          THE COURT:  Yes or no?

7          MS. COELHO:  -- on this fact pattern --

8          THE COURT:  Yes.

9          MS. COELHO:  -- no.

10         THE COURT:  Okay.  Go ahead and give us your argument.

11         MS. COELHO:  So it is very clear today that what we

12  are arguing over is simply whether Syncora can assert a cure

13  claim.

14         THE COURT:  Simple?

15         MS. COELHO:  We're not arguing over -- we are not

16  arguing over what assumptions people made in a mediation that

17  we were not a part of.  I would just say that --

18         THE COURT:  This has got nothing to do with --

19         MS. COELHO:  -- there was a proof a claim --

20         THE COURT:  -- mediation.

21         MS. COELHO:  -- there were schedules --

22         THE COURT:  This has --

23         MS. COELHO:  -- per Duff & Phelps.

24         THE COURT:  Mr. Coelho --

25         MS. COELHO:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1       THE COURT:  Stop.  This has nothing to do with

2  mediation.  I don't want to hear about mediation.

3       MS. COELHO:  Okay.  I agree.  Thank you.

4       I want to clarify some of the facts on what happened

5  at the sale last year.  Because what happened at the sale was

6  not that the debtors reserved their rights to continue the

7  Syncora -- litigating over the Syncora objections as though it

8  was an adjourned objection.

9       What the debtors did at the sale was withdrew their

10  motion as to the Syncora contracts entirely.  And I think the

11  record is very clear on that point.  The transcript that Ms.

12  Barrage gave Your Honor is very clear on that point.  Both the

13  debtors and the committee said that if they were to assume the

14  contracts later, it would be by separate motion.

15       I have written confirmation from Ms. Barrage that they

16  were initially removing the contracts from the sale entirely

17  and that they would not be sold to Ocwen.  They did, then,

18  later add the contracts back into the sale and then removed

19  them again, because they didn't want our objection to be heard

20  at the sale hearing.

21       So I think that we have a lot of evidence on the

22  record that both the debtors and the committee and, certainly,

23  Syncora all thought that these contracts were not being -- the

24  dispute with respect to these contracts was not being

25  adjourned; it was being -- the con -- the motion was being

1    withdrawn with respect to these contracts.

2          The sale procedures order is very clear that it sets a

3    deadline only with respect to assumed contracts.  And it

4    defines assumed contracts.  And it uses -- and it says at

5    paragraph 22 that assumed con -- that contracts fail to be

6    assumed --

7          THE COURT:  So stop for a second.  What Ms. Barrage

8    has argued in her papers is that this contract was on a

9    schedule for assumption until the bar date had come and gone --

10   the bar date for cure claims had come and gone.  It's only a

11   month after that that they removed it.  Do you agree with that?

12         MS. COELHO:  Yes, I do agree with that.

13         THE COURT:  Okay.

14         MS. COELHO:  They removed it after --

15         THE COURT:  So the consequence -- what's the

16   consequence?  The issue is, it was -- this contract was listed

17   on the schedule for assumption.  There was a bar date set for

18   filing cure claims.  No claim was filed by the bar date.  It

19   was only after that that this contract was removed.  So what's

20   the consequence of that?

21         MS. COELHO:  Pursuant to the terms of that order,

22   setting that bar date, once the contract is removed, that bar

23   date does not apply.

24         THE COURT:  Where is that in the order?

25         MS. COELHO:  That is -- if you read paragraph 22(d) --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  What does it day?

2          MS. COELHO:  Excuse me; 21(d) has the definitions for

3    cure amounts in assumed contracts.  I have copy of the order.

4    Would you like me to bring it --

5          THE COURT:  No; why don't you just --

6          MS. COELHO:  -- the bench?

7          THE COURT:  -- read me that paragraph?

8          MS. COELHO:  Okay.  22(d) says, "On or before" -- this

9    is where the definitions are located. -- "On or before July

10   25th, the debtor shall file a schedule (the schedule) of

11   contracts that Nationstar has designated to be assumed and

12   assigned" -- defined as the Assumed Contracts -- "including the

13   cure amounts related to such assumed contracts" -- defined the

14   Cure Amounts.  And then it goes on to talk about service of

15   that schedule.

16          The next paragraph, paragraph 22 says, "Subject to

17   certain exceptions expressly provided for in the Nationstar

18   APA, Nationstar shall be entitled to remove any assumed

19   contract from the relevant schedule until two business days

20   prior to the closing date, in which case, the contract release

21   shall cease to be an Assumed Contract."  And there it uses --

22   it capitalizes the A, it capitalizes the C, and uses the

23   defined the defined term for assumed contract used throughout

24   the order.

25          Paragraph 28 establishes the consequences for failure

1    to file a cure claim by the deadline.  It says, "Any Contract

2    Objection" -- capital C, capital O -- "that challenges a Cure

3    Amount" -- as -- using the defined term; capital C, capital

4    A -- "or otherwise asserts that there exist outstanding

5    defaults under an Assumed Contract" -- again, the defined

6    term -- "must set forth with specificity the Cure Amount" -- as

7    defined using the defined term -- "being claimed by the

8    objecting party, or the nature of the asserted default, as

9    applicable.  It must include appropriate documentation in

10   support thereof, satisfactory to the debtors and Nationstar or

11   BH, as applicable.

12          "If no objection to the cure amount or the proposed

13   assumption and assignment of an Assumed Contract" -- using the

14   defined term -- "is timely filed and served, the pertinent

15   debtor may assume and assign the assumed contract to Nationstar

16   or BH, or, alternatively, to the successful bidder for the

17   applicable purchased assets, and the Cure Amount" -- defined

18   term, again -- "set forth in the assumption and assignment

19   notice, shall be binding on all non-debtor parties to the

20   Assumed Contracts" -- defined term, again -- "any known third-

21   party beneficiaries to such Assumed Contracts" -- defined term

22   again -- "all trustees, certificate holders, investors, rating

23   agencies, mortgage insurers, and any parties to any pooling and

24   servicing agreements, assignment, assumption, and recognition

25   agreements, servicing agreements, sub-servicing agreements, or

**RESIDENTIAL CAPITAL, LLC, ET AL.**

113

1    similar agreements, collectively the Assumption Notice Parties,

2    for all purposes in such debtors' Chapter 11 case.

3              "The respective Assumption Notice Parties shall be

4    forever barred from (1) objecting to the assumption and

5    assignment of the relevant Assumed Contract" -- using the

6    defined term -- "and or Cure Amount" -- using the defined

7    term -- "and (2) asserting at any time, any condition to

8    assignment default claims, obligations, or breach, or any

9    additional cure damage or other amount with respect to the

10   respective Assumed Contracts" -- using the defined term --

11             THE COURT:  So I don't see anything in what you've --

12   I don't hear anything in what you've read me that gives you a

13   do over if your contract is listed on a schedule; the bar

14   date -- you clearly got notice of the bar date for cure claims;

15   you didn't file one.  I don't -- nothing that you've read to

16   me -- and I'm going to back and see it -- says you get a do

17   over, which is what you're asking for.

18             MS. COELHO:  What I am saying is that this order does

19   not establish a bar date with respect to contracts that are not

20   ultimately assumed and assigned.

21             THE COURT:  I don't read it that -- I don't --

22             MS. COELHO:  It's not a --

23             THE COURT:  I don't --

24             MS. COELHO:  -- do over.

25             THE COURT:  I don't understand it that way at all.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

114

1    But here's what -- stop.

2            MS. COELHO:  It's a new motion.

3            THE COURT:  Stop.  I'm adjourning this matter until I

4    hear the objection to the claim.  At that time, I'll decide how

5    to proceed.  Whether it's a contested matter -- I mean,

6    because, Ms. Barrage, you're -- you've objected to the claim

7    and are seeking to have it expunged because you believe there

8    is no pre-petition cure claim, right?

9            MS. BARRAGE:  That's correct, Your Honor.  We -- may I

10   just say, we have a reply due, because last week Syncora filed

11   amendments to its original proof of claim.  And so those

12   arguments will be baked into our reply.

13           THE COURT:  Okay.  All right.  I'm going to hear this

14   all together.  I mean, it seems to me -- they're interesting

15   arguments.  I don't find Weil's position particularly

16   sympathetic, frankly.  The cure -- the bar date for cure claims

17   was quite clear.  Lots of other parties did exactly that.  And

18   as is typical, a decision whether to assume or reject a

19   contract, ultimately, is frequently based on what do they say

20   the cure claim is?

21           Maybe you sit down and you negotiate and decide

22   whether it's not with the candle; we're not going to assume

23   that contract; the buyer's not going to assume it.

24           And what do they do?  How do they decide that?  They

25   decide it by looking at the cure claims, in part, that are

**RESIDENTIAL CAPITAL, LLC, ET AL.**

115

1    filed.  All right.  Because that sort of lays -- that puts the

2    landscape down for here, for Ocwen to decide, ah, this is nuts;

3    it's going to cost too much to try and resolve this; I'm not

4    going to do it.  So they say, hey, there is no cure claim

5    that's been timely filed.

6            So I don't -- from a policy standpoint, I have a lot

7    of problems with your arguments, Ms. Coelho.  But I'm not

8    deciding any of it today.  I want to hear this all together.  I

9    want to look at -- if you filed a proof of claim against the

10   wrong debtor, I don't know why Ocwen wants to even bother with

11   this one at this point.  It may just be simpler for them to

12   say, not worth doing this.  Okay.

13           I would suggest you spend your time seeing if you can

14   negotiate this out.  You stand on your rights, and you may wind

15   up with no rights at the end of the day.  Okay.

16           So I'm adjourning this matter.  What I would like

17   is -- I want to know when this is back on the calendar.  And it

18   is --

19           MS. BARRAGE:  Your Hon --

20           THE COURT:  -- because we got a really crowded

21   calendar.

22           MS. BARRAGE:  Understood, Your Honor.

23           THE COURT:  This is an important enough matter that I

24   don't want it coming on when I got thirty other matters on the

25   calendar.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

116

1        MS. BARRAGE:  Understood.  Does Your Honor have a

2   preference for a particular date?

3        THE COURT:  I don't --

4        MS. BARRAGE:  We'll work --

5        THE COURT:  -- at this point.

6        MS. BARRAGE:  -- around your schedule.

7        THE COURT:  Get some dates from Deanna and I -- before

8   it's finally set, I want to know.  Because this is not a run of

9   the mill dispute.

10        MS. BARRAGE:  Understood.

11        THE COURT:  I want to be able to spend sufficient time

12   on it.

13        MS. BARRAGE:  Okay.

14        THE COURT:  Okay.

15        MS. BARRAGE:  Thank you, Your Honor.

16        THE COURT:  Thank you very much.

17        MS. COELHO:  Thank you.

18        MR. MARINUZZI:  Your Honor, thank you.  I believe that

19   brings us to the omnibus claims objections --

20        THE COURT:  Yeah.

21        MR. MARINUZZI:  -- which begin on page 20 of the

22   agenda.

23        THE COURT:  All right.

24        MR. MARINUZZI:  And Jordan Wishnew from my office will

25   be handing those matters.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

117

1           THE COURT:  Okay.

2           MR. MARINUZZI:  Thank you.

3           THE COURT:  Thank you.

4           MR. ECKSTEIN:  Your Honor, may I be excused?

5           THE COURT:  Absolutely, Mr. Eckstein.  Thank you.

6    Anybody who wants be excused can be excused.

7           Go ahead.

8           MR. WISHNEW:  Thank you, Your Honor.  Jordan Wishnew,

9    Morrison & Foerster, counsel for the debtors.  We're here, Your

10   Honor, in regards to (VI), omnibus claims objections, beginning

11   on page 20 of today's agenda.

12          The first few matters are adjourned.  Those would be

13   matters 1 which deals with the first omnibus claims objection

14   and is getting carried to October 2nd.

15          The matter number 2, the tenth omnibus claims

16   objection that is getting carried to September 24th.

17          Item 3, the eleventh omnibus objection, that is

18   getting carried to October 23rd, although I understand that

19   will actually be adjourned further because of preexisting

20   scheduling, I think, with the JSN matter.

21          And then the item number 4, the thirteenth omni, that

22   has large -- has been resolved as to one matter, and is --

23   again -- will get kicked into late October.

24          So that brings us to matter number 5, the seventeenth

25   omnibus objection, misclassified borrower claims.  With respect

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    to this matter, I'm going to cede the podium to my colleague,

2    Meryl Rothchild, who will address this matter, and then I will

3    pick back up on matter number 6, the eighteenth omni.

4            THE COURT:  Thank you.

5            MS. ROTHCHILD:  Good afternoon, Your Honor.  Meryl

6    Rothchild of Morrison & Foerster, on behalf of the debtors.  As

7    Mr. Wishnew stated, next on the agenda is the debtors'

8    seventeenth omnibus objection to claims, misclassified borrower

9    claims, filed at docket number 4151.

10           Through the seventeenth omnibus claims objection, the

11   debtors seek to reclassify certain borrower claims that

12   improperly asserted either a security interest or a priority

13   claim against the debtors -- excuse me -- under Section 503,

14   506, or 507 of the Bankruptcy Code, for all or a portion of

15   those claims.

16           Last week the Court entered an order granting the

17   relief sought through this objection as to uncontested matters,

18   which was entered at docket number 4953.  Today the debtors

19   request that the Court extend this relief as to the claims of

20   the respondents who filed responses to the objection, of which

21   there are four.

22           While only two of these matters are going forward, for

23   the record, I'll list all four responses.  These include the

24   response filed by Mr. Perry Goerner, which hit the docket twice

25   at docket numbers 4469 and 4579, in connection with claim

1    number 3515.  This matter will be going forward.

2            The objection filed Mr. Anthony Davide at docket

3    number 4651 in connection with claim number 482.  This matter

4    will also be going forward.

5            The response filed by Mr. and Mrs. James Derouin at

6    docket number 4752 in connection with claim number 4750.  This

7    response was withdrawn as reflected by the notice of withdrawal

8    filed by SilvermanAcampora on behalf of the Derouins at docket

9    number 4964.

10           And lastly, the response filed by Ms. Michelle Renee

11   Strickland at docket number 4338 in connection with claim

12   number 2371.  And, Your Honor, this response expressly states

13   that Ms. Strickland does not oppose the debtors' proposed

14   reclassification of her claim as a general unsecured claim.

15           The debtors addressed these responses in their reply

16   in support of the seventeenth omnibus claims objection filed at

17   docket number 4843.  As stated in the objection and the reply

18   as well, the debtors are not seeking to expunge these claims,

19   but merely reclassify them on the claims register.

20           If it pleases the Court, we can address the two

21   remaining objections going forward --

22           THE COURT:  Sure.  Go ahead.

23           MS. ROTHCHILD:  -- in the order in which they're

24   listed.

25           THE COURT:  Yeah.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

120

1              MR. WISHNEW:  Okay.  That would lead us to begin with

2    Mr. Goerner.  So I'll leave it to Mr. Goerner to explain the

3    basis of his proof of claim and his asserted secured claim.

4    But as set forth in the objection and the reply, the debtors

5    have reviewed the proof of claim, the response and the

6    supporting documentation.  And the claim, as an initial matter,

7    appears to be based on alleged pre-petition general unsecured

8    liabilities.

9              In addition, the proofs of claim -- the proof of

10   claim, apologies -- does not include documents that evidence

11   the asserted secured status.  The Bankruptcy Rules, the proof

12   of claim form itself and the bar date order all require that

13   such documentation be provided.

14             As stated before, the debtors are not seeking to

15   expunge Mr. Goerner's claim or challenge the merits at this

16   point in time; we are simply seeking to reclassify it so that

17   its proper nature and priority are reflected on the claims

18   register.

19             So at this point, if Mr. Goerner is in attendance,

20   possibly telephonically --

21             THE COURT:  Let me ask, is Mr. Goerner present in

22   court or on the telephone?

23             MR. GOERNER:  On the telephone, I'm Perry Goerner.

24             THE COURT:  Go ahead, Mr. Goerner, let me hear your

25   argument.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

121

1          MR. GOERNER:  Okay.  I sent them other documents

2   because I didn't have -- I'm mentally disabled, I'm very slow,

3   so please bear with me.  I didn't have any other documents at

4   the time because they weren't available to me.  But when I

5   when Ocwen had bought the mortgage, they sent me copies that

6   GMAC had given them that were produced in January of 2011.  I

7   don't know if you have all of these documents in front of you

8   that I sent into the Court, it was over 180 documents.  Do you

9   have those or no?

10          THE COURT:  I have access to them.

11          MR. GOERNER:  I don't know if you do.

12          THE COURT:  I have --

13          MR. GOERNER:  I have exhibits that are 180 pages that

14   I sent to the Court.

15          THE COURT:  Yeah.  Mr. Goerner, the issue --

16          MR. GOERNER:  Yes.

17          THE COURT:  -- as I understand it --

18          MR. GOERNER:  Okay.

19          THE COURT:  -- is whether you have a secured claim.

20   This is not an objection seeking to expunge your claim, which

21   would basically totally deny it for any purpose, but seek to

22   reclassify what you filed as a secured claim as a general

23   unsecured claim.  That's really the issue I have before me

24   today.  That doesn't mean that the debtor won't come back at

25   another time and argue that your claim should be expunged in

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    its entirety.

2        As I understand the basis for your claim, you argue

3    that GMAC Mortgage, through their fraudulent and predatory

4    mortgage servicing practices, is obligated to you, and you seek

5    to void the mortgage note and make it unenforceable.  But I

6    don't -- what I don't understand is why you think you have a

7    secured claim as opposed -- you may have an unsecured claim, I

8    don't know, that's not the issue for today.

9        MR. GOERNER:  Okay.  The only reason why I put it in

10   as a secured claim, is because this is a mortgage note, it's a

11   secured note on my house.  I'm trying to save my house.  The

12   mortgage company took a fraudulent mortgage; they made up

13   income that I did not have; I haven't worked since eleven

14   months before I got the mortgage.  I told the closing person I

15   could not afford the mortgage; I did not have the income to

16   make this mortgage work; that I was permanently disabled and

17   I'm disabled up until now.  I don't work.  I'm dizzy every day,

18   I have ringing in my ears.  And at the time of the closing I

19   was on medication because he was two and half hours late for

20   the closing.  I didn't take any medication, but after he was

21   late, I really needed it.  I did not drive to the closing; I

22   could not drive.

23        So when he came in, he presented me with fifty-seven

24   pages of papers.  I started to sign, I asked for it to be

25   stopped, because I couldn't read any of these papers.  I had

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   never seen them before.  And he continued to close, I stopped

2   signing and left the closing room.

3          I'm saying that I have a claim, a secured claim,

4   because I'm now in foreclosure.  They've started -- Ocwen has

5   started foreclosure proceedings against me.  This mortgage

6   company did a wrong to me by making up numbers for my income

7   and altering the mortgage papers.  They signed papers that I

8   did not sign.  They should be held responsible for their

9   actions.  I don't want them to be -- I want to be able to do

10  something against these people.  I've been to the Sussex County

11  attorneys and -- for my disability, and they don't have the

12  money for an attorney.  I cannot get an attorney.  And if I

13  don't protect my claim in this bankruptcy case, I'm afraid I

14  could lose my foreclosure defense in State Court if this

15  complaint is discharged from bankruptcy court.

16         THE COURT:  Well, the issue today -- and I understand

17  the arguments you're making -- but the issue today is not

18  whether your claim is disallowed and expunged, but whether it

19  should be reclassified as a general unsecured claim.  To have a

20  secured claim --

21         MR. GOERNER:  But it -- I'm sorry, go ahead.

22         THE COURT:  No -- to have a secured claim, you have to

23  be able to show some documentation that would support -- I

24  understand that you believe you have serious issues to raise,

25  but that doesn't -- that in and of itself does not make it a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   secured claim.

2           Let me ask you first, have you -- did you have any

3   conversations the creditors' committee's special borrowers'

4   counsel about your circumstances and the claim you're

5   asserting?

6           MR. GOERNER:  No, I don't even know what that is.

7           THE COURT:  Okay.  The -- Mr. Nosek, do you know

8   whether anybody in your office -- I'm going to let one of the

9   other lawyers from SilvermanAcampora who's special borrowers'

10  counsel.  He -- special borrowers counsel was counsel that was

11  appointed as counsel to the creditors' committee to deal with

12  borrowers' issues, and in many circumstances --

13          MR. GOERNER:  Well, I think --

14          THE COURT:  Hold on, stop.

15          MR. GOERNER:  Okay.

16          THE COURT:  Mr. Goerner, stop.  In many circumstances,

17  and I thought here, that they had spoken with borrowers who've

18  asserted claims.  Mr. Nosek are you able to shed any light on

19  this?

20          MR. NOSEK:  Your Honor, I am.  Robert Nosek,

21  SilvermanAcampora, special borrower counsel to the committee.

22  On August 2nd, 2013 Brian Powers, an attorney in our office

23  who's under my supervision, reached out by e-mail to Mr.

24  Goerner.  He also -- Mr. Powers also spoke on August 5th of

25  this year, as well as August 19th of this year with Mr. Goerner

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**125**

1  in an attempt to figure out what was the basis for this -- the

2  claim as a secured claim.  Again, not as whether or not he had

3  a claim but whether it was a secured claim or not.  We were

4  unable to resolve that issue with him.

5         THE COURT:  Okay, but there was a conversation.

6         MR. NOSEK:  There was two separate conversations.  The

7  second conversation, Ms. Rothchild was also on the phone with

8  Mr. Powers.

9         THE COURT:  All right.  Mr. Goerner, is it correct

10 that you did have a conversation with Mr. Powers?

11        MR. GOERNER:  Yes, I didn't understand what you said.

12        THE COURT:  That's fine.

13        MR. GOERNER:  But, I never received an e-mail, because

14 they don't have my e-mail address.  Also I did talk to Mr.

15 Powers --

16        THE COURT:  Yes.

17        MR. GOERNER:  -- and I pointed out the Exhibit number

18 9 where there were alterations on it.  Then the one that he

19 gave me is not the copy of the same mortgage.  I never received

20 any signed copies; all I had were blank copies to take home

21 with me because I asked for another appointment.  Now when I

22 said this to Mr. Silverman -- no, it was Powers --

23        THE COURT:  Yes.

24        MR. GOERNER:  -- he brought up the documents that he

25 had in front of him from the Ocwen and he didn't have the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  document in front of him that was altered.  That was the same

2  one that Ocwen had, which is Exhibit number 29.  So Exhibit

3  number 9 is the altered mortgage that was actually recorded in

4  the Sussex County records.  That's the ones that's recorded and

5  does not have a signature page at all.

6          THE COURT:  Okay.

7          MR. GOERNER:  So, I'm saying that this mortgage should

8  be secured because of my claims against it.

9          THE COURT:  Okay.

10         MR. GOERNER:  So it should be a secured mortgage so

11 that --

12         THE COURT:  All right.

13         MR. GOERNER:  -- they can't get away with this.

14         THE COURT:  All right, what I'm going to do is --

15         MR. GOERNER:  That's all I'm saying, that's all.

16         THE COURT:  Okay.

17         MR. GOERNER:  I don't know if I'm right or wrong --

18         THE COURT:  Okay.

19         MR. GOERNER:  -- but I'd really --

20         THE COURT:  I --

21         MR. GOERNER:  Go ahead.

22         THE COURT:  I'm going to take the matter under

23 submission and I'll enter an appropriate order.  I want to

24 think about this some, Mr. Goerner.  Thank you very much for

25 participating by telephone.  And an order will be entered; and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    I request that the debtors counsel make sure that the copy of

2    whatever order I enter be served by mail on Mr. Goerner.  Okay?

3            MS. ROTHCHILD:  Absolutely.

4            MR. GOERNER:  Thank you very much.

5            THE COURT:  Thank you very much, Mr. Goerner.

6            MR. GOERNER:  Listening to you all today, this has

7    been fantastic.

8            THE COURT:  Okay.

9            MR. GOERNER:  Thank you.

10            THE COURT:  Thank you.

11            MR. GOERNER:  Bye-bye.

12            THE COURT:  All right, so that one is under

13    submission.

14            MS. ROTHCHILD:  Thank you, Your Honor.  Next is the

15    objection filed by Mr. Davide.  If he's in attendance

16    telephonically, I defer to him.

17            THE COURT:  All right, Mr. Davide, are you on the

18    telephone?  Any representative of Mr. Davide in court or on the

19    telephone?  All right, why don't you briefly address this one

20    if you would?

21            MS. ROTHCHILD:  Absolutely, Your Honor.  So, in

22    connection with Mr. Davide's claim, the debtors as well as

23    SilvermanAcampora reviewed the proof of claim as well as the

24    response and the filed statements and supporting documentation

25    to that proof of claim.  Again similar to Mr. Goerner's issues,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    but -- sorry, not similar -- similar to the extent that these

2    claims appear to be for alleged pre-petition general unsecured

3    liabilities, we are not, again, address --

4            THE COURT:  The allegation by Mr. Davide here is that

5    GMAC Mortgage improperly applied funds to his mortgage account,

6    as loan or escrow payments.  They did not segregate the funds

7    pursuant to an arrangement which he claims was ordered by the

8    Florida Court.  Is that correct?

9            MS. ROTHCHILD:  Yes, that is correct, Your Honor.

10           THE COURT:  All right.

11           MS. ROTHCHILD:  And there were no documents appended

12   to either the proof of claim or response purporting to show

13   that the claimant had a lien against the debtors or a valid

14   security interest in any way --

15           THE COURT:  All right.

16           MS. ROTHCHILD:  -- in connection with this matter.

17           THE COURT:  All right.  The objection is sustained,

18   and claim 482 by Anthony Davide is reclassified as a general

19   unsecured claim.

20           MS. ROTHCHILD:  Thank you, Your Honor.  And that is

21   all for the --

22           THE COURT:  Thank you very much

23           MS. ROTHCHILD:  -- seventeenth omnibus objection.

24   Thank you.

25           MR. WISHNEW:  For the record, Your Honor, again,

12-12020-mg   Doc 5164   Filed 09/12/13   Entered 09/23/13 11:28:07   Main Document
Pg 129 of 174
**RESIDENTIAL CAPITAL, LLC, ET AL.**

129

1    Jordon Wishnew, Morrison & Foerster for the debtors.

2    Continuing with the agenda, matter 6 on page 23, the eighteenth

3    omnibus objection.  I'll try and address this in more of a

4    summary matter since the basis for the objection for omnis 18,

5    19, 20, and 21 are all similar, that is, insufficient

6    documentation in support of the claims.

7           These objections were carried over originally from the

8    late August hearing dates.  In the interim the Court has

9    entered orders as to those matters that were unopposed.  And so

10   there are only seven claims going forward today with regards to

11   these four omnibus objections.  Specifically, with regards to

12   the eighteenth omnibus, the claim of Brian Edmond Bath, claim

13   1138 and the claim of Ailette Cornelius, claim 5286.

14          THE COURT:  All right, is Mr. Bath or Ms. Cornelius on

15   the telephone?

16          So with respect to Bath, as I understand it, he argues

17   that GMAC failed to comply with loan modification requirements.

18   And --

19          MR. WISHNEW:  If I may, Your Honor, not to interrupt

20   your thoughts.

21          THE COURT:  No, go -- I'm searching through my notes,

22   I need some help here, but I understand he's asserting a claim

23   under the Fair Credit Reporting Act.

24          MR. WISHNEW:  So we have -- what has led to these

25   objections is an extensive, let's call it, informal discovery

**RESIDENTIAL CAPITAL, LLC, ET AL.**

130

1  process that we've undertaken in connection with our claims

2  objection reconciliation process.  As provided for in our

3  claims objection orders, with regards to borrower claims, we

4  haven't just gone straight to an objection.  We've -- our --

5  the company has taken the step in consultation with Mr. Nosek's

6  firm and Kramer Levin to prepare somewhat customized letters

7  to --

8          THE COURT:  I -- look, let me just say, I underst --

9  I'm only cutting you off because I reviewed the procedures

10  order.

11          MR. WISHNEW:  Right.

12          THE COURT:  I reviewed the form of the communication

13  that gets sent to the borrowers; and we're now dealing with

14  borrowers who responded.

15          MR. WISHNEW:  Right.

16          THE COURT:  As to those who didn't respond, I've

17  already entered orders, okay.

18          MR. WISHNEW:  And the only reason for trying to

19  provide some of that background was that in this regard to

20  the -- for Mr. Bath we just -- we have no information from him.

21  The informal request letter, we didn't get a response to.  The

22  information he's given in connection with his response still

23  doesn't trigger anything in our books and records that shows we

24  have a responsibility or a liability to him.  So --

25          THE COURT:  Well, let me ask you this.  Did -- I'm

1    particularly sensitive with respect to claims that relate to

2    requested loan modifications.  And don't take it personally,

3    it's got nothing to do with this debtor, but having lived

4    through the Chapter 13 calendar for two and half years, I can't

5    tell you how many times lenders would say we never got the

6    request; it was incomplete.  And borrowers are saying I've sent

7    it to them four times and I've got FedEx receipts, I've got

8    registered mail receipts.  And this has been this giant

9    divide --

10             MR. WISHNEW:  Um-hmm.

11             THE COURT:  -- where again, not -- this might not

12   apply to ResCap -- but --

13             MR. WISHNEW:  May I propose the following?

14             THE COURT:  It's a recurring problem.  And so it

15   doesn't apply to these specifically.  When I get an affidavit

16   from a lender that we have a books and record objection, we

17   have nothing in our books and records, an it doesn't say

18   whether -- what search was done, whether there was a loan

19   modification request, whether the borrower was put on a trial

20   modification and whether there a decision denying a

21   modification, et cetera.  So, forgive me, but I'm very

22   skeptical when I just get -- I am -- look, a procedures order

23   got entered.

24             MR. WISHNEW:  Yes.

25             THE COURT:  It required they do certain things.  Some

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   of them did nothing, those have gotten sustained.

2          MR. WISHNEW:  Right.

3          THE COURT:  Okay.  But once a borrower does file

4   something, it may -- and they don't have lawyers, it may not be

5   the most coherent piece of paper that anybody's ever filed.  So

6   I need to know what was done with respect to Bath and Cornelius

7   specifically.

8          MR. WISHNEW:  Sure.  Let me -- I'll defer the podium

9   to Mr. Nosek.

10         THE COURT:  Okay.  Mr. Nosek?

11         MR. NOSEK:  Your Honor, with regard to Mr. Bath, after

12   his objection or his response was filed, the debtors reached

13   out to us and Mr. Powers of our firm reached out by phone

14   message to Mr. Bath.  We were then subsequently advised that he

15   wished to only commit -- communicate by e-mail.  Which on

16   August 5th, Mr. Powers wrote an e-mail to him explaining who we

17   were and that we would like to work with him in an attempt to

18   resolve the claim objection.  His response was, "Brian, how do

19   you -- how does your client wish to resolve my claim?  I have

20   been putting my complaint together against GMAC with your

21   client will be added for fraud defamation, violations of FCRA,

22   FDCPA to name a few counts.  I would prefer to communicate via

23   e-mail."

24         At that point we believed that it would not be

25   appropriate continue to communicate.  Basically he was just

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    going to sue anybody and everybody and that any further

2    communications with him would not produce anything and that if

3    wanted to defend his claim, he should come to the Court to do

4    so.

5            THE COURT:  Let's move on to Cornelius.  Can you

6    address Cornelius, Mr. Nosek?

7            MR. NOSEK:  Yes, Your Honor.  With regard to Mr.

8    Cornel -- or --

9            THE COURT:  It's a woman, I think.

10           MR. NOSEK:  Ms. Cornelius, I believe.

11           THE COURT:  Yes.

12           MR. NOSEK:  On August 19th of this year, Brian Powers

13   spoke with the claimant where we gave our mailing address and

14   suggested that she mail him any information she may have to

15   support her claim.  On 8/28 we called again and provided

16   information with regard to CourtCall information.  On September

17   4th of this year, Mr. Powers again spoke with the claimant who

18   had stated that she had spoken with Ms. Rothchild about the

19   matter.  But we were, I don't want to go into the notes of what

20   she said --

21           THE COURT:  Yes.

22           MR. NOSEK:  -- in response --

23           THE COURT:  Right.

24           MR. NOSEK:  But she did -- she indicated that she --

25   that Brian indicated to me that she believed she had a claim,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

134

1  so we were unable to resolve this.  So we did have several

2  communications with the claimant and were unable to resolve

3  this particular objection.

4          THE COURT:  Okay.

5          MR. NOSEK:  But again, also on 9/4 we again sent the

6  CourtCall information for today's hearing.

7          THE COURT:  All right.  Do -- can you shed -- somebody

8  shed light on where does Mr. Bath or Ms. Cornelius live?

9          MR. WISHNEW:  One minute, Your Honor.

10          MR. NOSEK:  For Ms. Cornelius, I have an address in

11  Hartford, Connecticut.

12          THE COURT:  Okay, and Mr. Bath?

13          MR. NOSEK:  With Mr. Bath, we have an address in

14  Naples, Florida.

15          THE COURT:  Okay.  All right.  What I'm going to do

16  with respect to Bath and Cornelius -- I'm determining that both

17  of them raised contested matters, and I want to set a hearing

18  not -- you can set both of them -- there may be some more --

19  not for an omnibus date.  You'll have to get a date from

20  Deanna.  And I would like the debtors in consultation with

21  special borrowers' counsel to prepare a procedures order for

22  the contested matters that should set dates for the exchange of

23  any documents in support of or opposition to the claim.

24          MR. WISHNEW:  If I may I ask a question, Your Honor?

25          THE COURT:  Go ahead.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

135

1        MR. WISHNEW:  So with regards to this procedures

2   order, is this something you would like for us to implement

3   going forward for all borrower claims?

4        THE COURT:  We'll see whether we do this for -- it's

5   not going to be all borrowers, no.  Right now we're dealing

6   only with ones who filed something in response.

7        MR. WISHNEW:  Well that -- right, that's my question.

8        THE COURT:  No, it's -- it isn't going to be -- you'll

9   see as we go through these, there are some where I am prepared

10  to rule and there are some where I'm not.

11        MR. WISHNEW:  Okay.

12        THE COURT:  Okay?

13        MR. WISHNEW:  Very good.

14        THE COURT:  So the procedures order -- and you can

15  lump these two together -- it's going to require an appearance

16  in person by the borrower, not by telephone.  So the procedures

17  order should -- they have to appear in person, they have to

18  provide any documents in support of, and you've got to provide

19  any documents in opposition to the claim by date certain, at

20  least two weeks in advance of the hearing.  And any doc -- the

21  order should provide -- the procedures order should provide any

22  documents not exchanged in advance will not be considered by

23  the Court at the hearing.

24        Provide for a memorandum of law, or we'll call it

25  statement of position, these are people without lawyers,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

136

1  likewise exchanged and filed by that date two weeks before.

2  I'm trying to -- what I'm trying do is come up with simplified

3  procedures, because we're dealing with pro se's; and the order

4  should provide failure to appear at the hearing will result in

5  sustaining of the objection to the claim.  You can prepare --

6  confer with committee's counsel, submit a proposed order, I'll

7  review it.  And I'm not trying to create a monster of a

8  hearing, but I believe these people are entitled to, having

9  filed a response -- it may not be crystal clear.  If it relates

10  to a loan modification, the debtor better search its records

11  and find out whether it has any record of a borrower filing an

12  application for a loan modification and any communications

13  relating to it.  That's -- Bath is complaining about -- appears

14  to be complaining about having sought a loan modification.

15  Whether he did or not, I don't know.

16          MR. WISHNEW:  If I could just say in that regards,

17  Your Honor?

18          THE COURT:  Go ahead.

19          MR. WISHNEW:  That has, in terms of searching our

20  servicing records, that is absolutely the practice that we have

21  been following.  And the only issue, which I think is unique to

22  Mr. Bath is because we never got a loan number from him and the

23  Experian credit statement that he attached to his response

24  didn't give us any information; nothing tripped anything in our

25  records.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

137

1          THE COURT:  So --

2          MR. WISHNEW:  So hopefully this will --

3          THE COURT:  Okay.

4          MR. WISHNEW:  -- give us the information we need to do

5    that more thorough books and records search.

6          THE COURT:  So, and along with exchanging the

7    documents, put in a -- from the debtors, submit a declaration

8    specifically as to what was done with respect to Bath, okay?

9          MR. WISHNEW:  Yup.

10         THE COURT:  And at the time of the hearing I'll

11   consider admitting that.  You don't have to sort of -- but I

12   want a simplified procedure.  Whether people are going to show

13   up or not, I don't know.  We can lump a group of these

14   together.  Bath and Cornelius, at least, we'll put together.

15         MR. WISHNEW:  Okay.

16         THE COURT:  Okay.

17         MR. WISHNEW:  The next contest --

18         THE COURT:  Harper's adjourned, I gather.

19         MR. WISHNEW:  Harper is adjourned, that's correct,

20   Your Honor.

21         THE COURT:  Right.  Joan Johnson?

22         MR. WISHNEW:  Joan Johnson, the nineteenth omni, that

23   at this point is going forward.  Ms. Johnson -- and I'm not

24   speaking for Mr. Nosek, but my understanding is Mr. Nosek's

25   office spoke with Ms. Johnson.  She expressed to them that she

1  misunderstood what the proof of claim was for, that was simply

2  putting in a claim for the principal balance of her mortgage

3  but otherwise didn't have a claim against the debtors.  And at

4  least our understanding was that she would be withdrawing her

5  claim.  That hasn't happened up until now, so we think the

6  objection is appropriate.

7         THE COURT:  Mr. Nosek, can you shed some light on it?

8         MR. NOSEK:  Yes, Your Honor.  We've had multiple

9  contacts with Ms. Johnson at our office.  On August 6th, Brian

10  Powers again, left a voicemail for Ms. Johnson and she returned

11  the phone call.  And the notes are that the matter was resolved

12  and Mr. Powers sent her -- we have a form notice of withdrawal

13  that you've seen entered on the docket.  She received that,

14  then there was several follow up e-mails and phone calls with

15  her, and apparently Ms. Johnson forwarded an unsigned

16  withdrawal to KCC.

17         THE COURT:  Okay.

18         MR. NOSEK:  So what this looks like to us is --

19         THE COURT:  All right.

20         MR. NOSEK:  -- she agreed to withdraw and just didn't

21  sign the document.

22         THE COURT:  The objection to the Johnson claim is

23  sustained.

24         MR. NOSEK:  Thank you, Your Honor.

25         THE COURT:  Thank you.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    MR. WISHNEW:  Your Honor, with regards to the

2  twentieth omnibus objection the two matters going forward today

3  are Leilani Sulit and Lucious Hughes.

4          THE COURT:  Yes.

5          MR. WISHNEW:  Leilani Sulit, claim number 1397, Mr.

6  Hughes, claim number 2554.  With regards to Ms. Sulit, again,

7  the claim on its face appears to be simply --

8          THE COURT:  Are you just trying to reclassify this

9  one?

10          MR. WISHNEW:  No, we're trying to expunge this, Your

11  Honor.

12          THE COURT:  Expunge.  All right, go ahead.

13          MR. WISHNEW:  The claim is basic -- appears to be the

14  principal balance of her mortgage, so we sent out the letter

15  asking to her to substantiate that; got no response.  No

16  response to the claims objection.  We got a response from her

17  husband, who is on the mortgage, but not on the notes.  He is

18  not financially liable to the investors or to the servicer in

19  this regards -- alleging forgery of his signature.  There's

20  nothing -- this is the first time that we have actually heard

21  of this.  They have been regularly making payments on their

22  mortgage, but at this point we don't believe that this amounts

23  to a claim that should stand against the debtor, and so we've

24  asked for that matter to be expunged.

25          THE COURT:  Mr. Nosek?

12-12020-mg   Doc 5164   Filed 09/12/13   Entered 09/23/13 11:28:07   Main Document
Pg 140 of 174
**RESIDENTIAL CAPITAL, LLC, ET AL.**

140

1           MR. NOSEK:  Your Honor, with regard to the Sulit

2    claim, on July 25th and again on August 2nd Brian Powers of our

3    office left phone messages with someone at Mr. Sulit's

4    office -- must have been the only phone number we had for

5    him -- and no we have received -- we got no contact back from

6    him.  So we did make the effort to reach out to him to see if

7    we could work this out and there was no response to our office.

8           THE COURT:  So assume the Sulit contention that his

9    signature was forged, does that give rise -- that doesn't give

10   rise to a claim?

11          MR. WISHNEW:  I don't believe so Your Honor, because

12   the only person who's financially liable to the debtor right

13   now is Leilani Sulit, not Patricio Sulit.

14          THE COURT:  So there's no consequence whatsoever.

15   Let's assume they were able to offer proof that an agent of the

16   debtor intentionally forged Mr. Sulit's name.  That wouldn't

17   give rise to a defense by Leilani Sulit?

18          MR. WISHNEW:  I'm not sure how, again with regards to

19   the --

20          THE COURT:  Okay, I'm determining this is a contested

21   matter, and this should go in the same hearing.  Look, I'm not

22   wild about going forward with hearing on these, but I also --

23   it's not the first time I've heard about forgery being done in

24   connection with loan documents.  Okay, and your defense that it

25   doesn't matter whether his name was forged, he's not on the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

141

1  note -- well maybe that's -- that may be right.

2          MR. WISHNEW:  I --

3          THE COURT:  I'm not ruling against you on it.  But I

4  want to give -- I'm going to give Sulit a chance.

5          MR. WISHNEW:  Okay, I'll just say one -- just for the

6  record in that regards. as set forth in Exhibit A to our reply,

7  the forgery pre-dates when GMAC Mortgage began servicing the

8  mortgage.  So --

9          THE COURT:  We'll let Mr. Su -- we'll let the Sulit's

10  come in.

11          MR. WISHNEW:  Okay.

12          THE COURT:  Okay.  The procedures order also

13  specifically should require the borrowers to provide evidence

14  of their damages.  That has to be exchanged.  We're not going

15  to walk into a hearing and hear for the first time -- I'm not

16  going to consider any evidence they don't provide.

17          MR. WISHNEW:  I think that's fair and appropriate,

18  Your Honor, thank you.

19          THE COURT:  Okay.  Barel is adjourned.

20          Lucious Hughes.

21          MR. WISHNEW:  Lucious Hughes, again.  This is -- based

22  on the most recent submission by Mr. Hughes, this appears to be

23  a matter between Mr. Hughes and Green Tree.  It is not a matter

24  between GMAC Mortgage and Mr. Hughes.  The escrow that is at

25  issue is currently being held and administrated by Green Tree.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**142**

1   The letter he attaches to his response talks about Green Tree

2   requiring documents of Mr. Hughes.  At this point GMAC Mortgage

3   doesn't hold funds owing to Mr. Hughes, and any responsibility

4   relating to this is now with Green Tree.  So --

5            THE COURT:  All right, sustained.

6            MR. WISHNEW:  Thank you, Your Honor.  The only two

7   really remaining matters are the twenty-first omnibus

8   objection.

9            THE COURT:  All right.

10           MR. WISHNEW:  Tom Franklin and the Harleston Law Firm.

11  Again, with regards to Mr. Franklin, similar to Ms. Cornelius

12  and others, this appears to be the face amount of a mortgage.

13  He simply asserts I don't owe any money.  We've gone -- in

14  addition to -- after we got his response to the omnibus

15  objection our team went back, looked at the books and records

16  and confirmed that we don't -- are not aware of a specific

17  liability; and the claimant has not voiced and specified a

18  liability.

19           THE COURT:  What was the relationship with the debtors

20  and Franklin?

21           MR. WISHNEW:  I believe he was a borrower whose

22  mortgage we serviced?  Yes.

23           THE COURT:  Mr. Nosek?

24           MR. NOSEK:  With regard to this one, Your Honor, we

25  had called back in late August, Mr. Franklin, on multiple

**RESIDENTIAL CAPITAL, LLC, ET AL.**

143

1    occasions, but were unable to leave a voicemail, whatever

2    number wasn't set up.  We did send an e-mail on 8/23, sent a

3    contact request letter on September 4th.  Finally on the 9th,

4    two days ago, we did receive a short form page letter that just

5    says, "Please be advised of the following:  I have a valid

6    claim against you and the debtor that you represent" -- and

7    this is addressed to Mr. Powers.  "The debtor has filed an

8    unreasonable objection to my claim, even knowing that the

9    federal courts have filed and obtained a court order decree

10   against them.  Please be advised that I intend to pursue this

11   claim to the fullest extent of the law".

12           THE COURT:  All right.  Is Mr. Franklin on the

13   telephone?  Any representative of Mr. Franklin on the

14   telephone?  Objection sustained.

15           MR. WISHNEW:  Thank you, Your Honor.

16           MR. NOSEK:  Thank you, Your Honor.

17           MR. WISHNEW:  And the last matter is the claim filed

18   by Harleston Law Firm, claim number 1899.  Simply, they've

19   submitted a claim -- they say, well you've poorly scheduled our

20   claims so there must be liability.  Again, we -- in response

21   to --

22           THE COURT:  Did you schedule a claim?

23           MR. WISHNEW:  No, Your Honor, we did not.  I checked

24   the first -day petition -- I'm not quite sure -- now, again,

25   there could be --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

144

1        THE COURT:  Did you put in an affi -- did someone put

2    in an affidavit saying there was no scheduled claim for

3    Harleston Law Firm?

4        MR. WISHNEW:  We can certainly do that to supplement

5    the record, Your Honor.  But --

6        THE COURT:  Is there anybody from Harleston Law Firm

7    present on the telephone?

8        Okay.  Mr. Nosek?

9        MR. NOSEK:  Your Honor, so the record's complete, Mr.

10   Powers actually did speak with the claimant on 9/9 and the

11   claimant still adamantly asserts that they were scheduled.  But

12   as we're hearing from the debtors, they weren't.  And our

13   review of the schedules --

14       THE COURT:  You've looked at the schedules and you

15   can't find them?

16       MR. NOSEK:  We can't find them either.

17       THE COURT:  Okay.  I want an affidavit -- a

18   declaration from a competent witness that schedules and any

19   amended schedules have been searched and no liability to

20   Harleston Law Firm was listed in the debtors' schedules.  If

21   it's listed as disputed, tell me that.  If you submit the

22   declaration and it establishes that there was -- it was not

23   scheduled, submit an order sustaining the -- with it, submit an

24   order sustaining the objection.

25       MR. WISHNEW:  Absolutely, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

145

1          THE COURT:  Okay.

2          MR. WISHNEW:  Yup.

3          THE COURT:  I just --

4          MR. WISHNEW:  That concludes item number 10 on the

5    agenda under omnibus claim objections, which brings -- I'm

6    sorry that item 9.  Items 10 and 11 are the twenty-second and

7    twenty-third omnibus objections.  The twenty-second is being

8    carried to September 24th, and the twenty-third is being

9    carried to October 2nd.  So I believe with that Your Honor,

10   we've completed today's agenda, and greatly appreciate Your

11   Honor's time and patience.

12         THE COURT:  Okay, anything else anybody else wants

13   raised?

14         MR. NOSEK:  No, Your Honor.  Thank you, again.

15         THE COURT:  All right, let's go off the record.

16      (Whereupon these proceedings were concluded at 1:00 PM)

17

18

19

20

21

22

23

24

25

1

2                                    I N D E X

3

4                                    RULINGS

5                                                        Page      Line

6    Bradley Arant fee application is approved      32        3

7    as amended on the record.

8    Carpenter Lipps' interim fee application is   35        8

9    Approved as amended on the record.

10   Centerview's interim fee application approved 36       14

11   as amended on the record.

12   Curtis Mallet's interim fee application        37       11

13   approved as amended on the record.

14   Deloitte & Touche interim fee application      38        3

15   approved as amended on the record.

16   Dorsey & Whitney's interim fee application     39       14

17   approved as amended on the record.

18   Ernst & Young's interim fee application is     40        6

19   approved.

20   FTI Consulting's interim fee application       41        8

21   approved as amended on the record.

22   KPMG's interim fee application is approved.    41       20

23   Locke Lord's interim fee application is        41       24

24   approved.

25

147

| | | | Page | Line |
|---|---|---|---|---|
| 1 | | RULINGS | | |
| 2 | | | Page | Line |
| 3 | Mercer's interim fee application is approved | | 42 | 6 |
| 4 | as amended on the record. | | | |
| 5 | Morrison Cohen's interim fee application is | | 47 | 8 |
| 6 | approved as amended on the record. | | | |
| 7 | Morrison & Foerster's interim fee application | | 52 | 24 |
| 8 | is approved as amended on the record. | | | |
| 9 | Expenses will be approved after further | | | |
| 10 | reduction. | | | |
| 11 | Orrick, Herrington & Sutcliffe's interim fee | | 53 | 9 |
| 12 | application is approved as amended on the | | | |
| 13 | record. | | | |
| 14 | Pepper Hamilton's interim fee application is | | 56 | 14 |
| 15 | approved as amended on the record. | | | |
| 16 | Perkins Coie's interim fee application is | | 57 | 10 |
| 17 | approved as amended on the record. | | | |
| 18 | Rubenstein Associates' interim fee | | 57 | 14 |
| 19 | application is approved. | | | |
| 20 | Severson & Werson's interim fee application | | 57 | 23 |
| 21 | is approved as amended on the record. | | | |
| 22 | Towers Watson's interim fee application is | | 58 | 4 |
| 23 | approved. | | | |
| 24 | AlixPartners' interim fee application is | | 61 | 13 |
| 25 | approved as amended on the record. | | | |

| | | Page | Line |
|---|---|---|---|
| 1 | RULINGS | | |
| 2 | | Page | Line |
| 3 | Analytic Focus' interim fee application is | 61 | 17 |
| 4 | approved. | | |
| 5 | Coherent Economics' interim fee application | 63 | 4 |
| 6 | is approved.  Decision reserved on expense | | |
| 7 | application | | |
| 8 | Epiq's interim fee application is approved as | 63 | 20 |
| 9 | amended on the record. | | |
| 10 | J.F. Morrow's interim fee application is | 63 | 24 |
| 11 | approved. | | |
| 12 | Kramer Levin's interim fee application is | 65 | 8 |
| 13 | approved as amended on the record.  Ruling | | |
| 14 | regarding expenses is reserved. | | |
| 15 | Moelis' interim fee application is approved | 67 | 9 |
| 16 | as amended on the record. | | |
| 17 | Pachulski's interm fee application is | 67 | 26 |
| 18 | approved as amended on the record. | | |
| 19 | San Marino's interim fee application is | 68 | 15 |
| 20 | approved as amended on the record. | | |
| 21 | SilvermanAcampora's interim fee application | 68 | 23 |
| 22 | is approved as amended on the record | | |
| 23 | Wilmer Cutler Pickering Hale and Dorr's | 71 | 18 |
| 24 | interim fee application is approved | | |
| 25 | as amended on the record | | |

RULINGS

|  | Page | Line |
|---|---|---|
| Chadbourne & Parke's interim fee application is approved as amended on the record | 74 | 1 |
| Examiner Arthur J. Gonzalez's interim fee application is approved | 74 | 13 |
| Leonard, Street and Deinard's interim fee application is approved | 74 | 18 |
| Mesirow Financial Consulting's interim fee application is approved as amended on the record. | 75 | 2 |
| Wolf Haldenstein Adler Freeman & Herz's interim fee application is approved | 75 | 8 |
| Release of holdback approved | 77 | 20 |
| Debtors' objection to PNC Bank's proof of claim is sustained | 89 | 11 |
| Objection to claim by Anthony Davide sustained.  Claim 482 is reclassified. | 128 | 17 |
| Objection to claim by Joan Johnson sustained. | 138 | 22 |
| Objection to claim by Lucious Hughes sustained. | 142 | 5 |
| Objection to claim by Tom Franklin sustained | 143 | 14 |

150

1

2                        C E R T I F I C A T I O N

3

4   I, Penina Wolicki, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9

10

_____

11

PENINA WOLICKI

12

AAERT Certified Electronic Transcriber CET**D-569

13

14

eScribers

15

700 West 192nd Street, Suite #607

16

New York, NY 10040

17

18

Date:  September 12, 2013

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020-mg

September 11, 2013

## #

**#4572 (1)**
11:2
**#607 (1)**
15:22

## $

**$0.00 (4)**
2:23;3:16;10:8;
13:8
**$1,101.60 (1)**
38:22
**$1,200,000 (1)**
35:14
**$1,303,943 (1)**
42:10
**$1,318,943 (1)**
42:7
**$1,448.11 (1)**
68:19
**$1,474,121.50 (1)**
36:19
**$1,480,650 (1)**
36:17
**$1,528,915.11 (1)**
72:8
**$1,581,398.75 (1)**
40:13
**$1,613.51 (2)**
8:20;68:17
**$1,614,064.75 (1)**
40:8
**$1,623.06 (1)**
12:9;75:5
**$1,658,311 (1)**
33:18
**$1,659,806 (1)**
33:16
**$1,909,909.50 (1)**
53:17
**$1,919,909.50 (1)**
53:15
**$12,173 (1)**
35:16
**$12,477.68 (1)**
64:5
**$12,630.14 (2)**
5:14;35:14
**$13,234.90 (1)**
67:23
**$13,706.60 (1)**
67:21
**$133,247 (1)**
61:18
**$134,933.22 (1)**
42:2
**$135,661.17 (1)**
41:25
**$13706.60related (1)**
7:25

**$138.93 (1)**
61:15
**$14,135 (1)**
61:14
**$14,943.63 (1)**
42:3
**$14,951.86 (2)**
7:20;42:1
**$141,270.88 (1)**
31:22
**$144,016.28 (2)**
4:8;31:20
**$15,154,566.50 (1)**
64:3
**$15,197,547 (1)**
63:25
**$15,647.79 (2)**
9:9;63:14
**$15,805.11 (2)**
9:24;65:15
**$1528915.11 (1)**
12:25
**$18,377.75 (1)**
57:7
**$199,687.47 (1)**
40:14
**$2,231.33 (2)**
8:11;68:25
**$2,317.50 (1)**
57:11
**$2,345.00 (1)**
11:22
**$2,412,909.93 (1)**
31:21
**$2,416,978.11 (1)**
31:19
**$2,749.75 (1)**
4:22
**$2,788.67 (1)**
41:21
**$2,978,657 (1)**
37:15
**$2,984,455.50 (1)**
37:13
**$2.1 (1)**
65:14
**$22,586.38 (2)**
9:16;61:5
**$22,750,816.10 (1)**
47:16
**$22,790,342.60 (1)**
47:14
**$227,254.30 (2)**
6:25;40:9
**$229.41 (1)**
40:3
**$23,687,407.75 (1)**
72:10
**$23,771,407.75 (1)**
72:7
**$24,752.12 (1)**
53:15
**$241,619.73 (1)**

**53:7**
**$25,556.02 (1)**
64:9
**$259,725.40 (1)**
41:21
**$2788.67 (1)**
3:8
**$28,358.21 (1)**
63:16
**$288 (1)**
38:7
**$290,753.90 (1)**
41:17
**$299,682 (1)**
12:17
**$3,085.90 (2)**
6:11;36:18
**$3,601.98 (2)**
10:15;61:19
**$300,092.50 (1)**
68:18
**$31.127.11 (1)**
68:5
**$315,950 (1)**
68:16
**$333,753 (1)**
58:5
**$344.32 (3)**
65:23;66:7;67:17
**$347,570.50 (1)**
67:23
**$349,099.50 (1)**
67:21
**$350,910.44 (2)**
7:11;47:14
**$39,644.20 (1)**
63:13
**$4,115.63 (2)**
7:4;58:6
**$4,356,992.10 (1)**
61:7
**$4,379,636.25 (1)**
61:5
**$42,037.50 (1)**
71:19
**$42,792.26 (2)**
5:7;42:7
**$43,342.50 (1)**
68:2
**$44,973 (1)**
57:18
**$44,994.41 (2)**
3:4;57:16
**$441,806 (1)**
57:4
**$5,501,118.50 (2)**
40:8,12
**$504,670.50 (1)**
68:25
**$508,948 (1)**
57:18
**$513,800 (1)**
57:15

**$513,814.80 (1)**
57:16
**$56,050.50 (1)**
70:4
**$6,528.50 (1)**
37:8
**$6,696 (1)**
38:24
**$60 (1)**
41:17
**$60.00 (1)**
3:25
**$673.90 (2)**
62:8,11
**$73,468.35 (1)**
75:7
**$73.32 (1)**
68:3
**$77,787 (1)**
75:5
**$794.37 (1)**
53:11
**$795.62 (2)**
6:18;57:5
**$797,752.66 (1)**
34:7
**$802,679.24 (1)**
64:3
**$806,168.59 (1)**
64:1
**$839.40 (2)**
62:8,13
**$88,902.90 (1)**
38:7
**$885,095.16 (1)**
34:5
**$891.80 (2)**
62:8,9
**$977,371.77 (2)**
7:16;33:16
**$98,380 (1)**
40:3

## /

**/Debtors (6)**
13:11,19;14:3,9,
18;15:3
**/First (1)**
8:3
**/Third (1)**
6:3

## A

**Abibas (1)**
57:19
**ability (2)**
93:14;94:21
**able (9)**
34:8;49:21;60:3;
90:25;116:11;123:9,
23;124:18;140:15

**Absolutely (7)**
78:9;89:19;117:5;
127:3,21;136:20;
144:25
**absorb (1)**
56:6
**accept (1)**
86:16
**acceptable (1)**
80:9
**accepted (1)**
91:1
**access (1)**
121:10
**accommodate (1)**
43:25
**accommodation (1)**
47:20
**accommodations (1)**
49:22
**accompanied (1)**
34:6
**according (2)**
53:20;62:10
**account (2)**
52:8;128:5
**Accountant (1)**
4:25
**achieved (1)**
90:17
**across (3)**
75:21;78:7,8
**Act (1)**
129:23
**action (4)**
81:14;82:20;83:4;
84:24
**actions (1)**
123:9
**Actual (12)**
3:22;6:7;8:16;9:6,
20;10:5,20;11:11;
43:10,12,22;46:17
**actually (16)**
33:18;44:5;47:3;
50:22;51:21;53:18;
58:25;62:22;66:14;
82:1;87:25;100:4;
117:19;126:3;
139:20;144:10
**adamantly (1)**
144:11
**add (1)**
109:18
**added (1)**
132:21
**addition (3)**
46:16;120:9;
142:14
**additional (5)**
33:1;36:11,23;
64:15;113:9
**Additionally (2)**

38:24;46:23
**address (24)**
  39:4,8;40:15;
  46:11;54:8;84:14,22;
  85:10,15,22;86:10,
  12;93:4;104:6;118:2;
  119:20;125:14;
  127:19;128:3;129:3;
  133:6,13;134:10,13
**addressed (4)**
  46:5;95:8;119:15;
  143:7
**adequate (1)**
  96:13
**adequately (1)**
  95:8
**adherence (1)**
  93:11
**adhering (1)**
  98:25
**Adj (5)**
  13:10,18;14:2,8;
  15:2
**adjourned (12)**
  13:15;14:14,22;
  41:12,13;109:8,25;
  117:12,19;137:18,19;
  141:19
**adjourning (2)**
  114:3;115:16
**adjusted (1)**
  33:11
**adjustment (12)**
  32:3;35:8,25;36:9,
  14;37:11;45:18;50:3;
  53:21;65:16,22;
  73:18
**adjustments (3)**
  36:11;39:15;102:5
**Adler (2)**
  12:4,7
**administrated (1)**
  141:25
**admitting (1)**
  137:11
**adopted (2)**
  81:19;83:22
**advance (2)**
  135:20,22
**adverse (1)**
  82:24
**advice (1)**
  48:5
**advise (1)**
  46:18
**advised (3)**
  132:14;143:5,10
**Advisor (3)**
  6:21;9:12;12:14
**Advisors (1)**
  3:19
**affect (1)**
  98:13

**affi (1)**
  144:1
**affidavit (4)**
  71:13;131:15;
  144:2,17
**afford (1)**
  122:15
**AFI's (1)**
  91:9
**afraid (1)**
  123:13
**afternoon (2)**
  104:4;118:5
**again (32)**
  33:21;35:17;48:14;
  52:8;63:3;67:4;68:7;
  91:15;109:19;112:5,
  18,20,22;117:23;
  125:2;127:25;128:3,
  25;131:11;133:15,
  17;134:5,5;138:10;
  139:6;140:2,18;
  141:21;142:11;
  143:20,24;145:14
**against (23)**
  37:19;38:15;42:18;
  44:18;82:24;103:4,
  12,13,16,18,25;
  115:9;118:13;123:5,
  10;126:8;128:13;
  132:20;138:3;
  139:23;141:3;143:6,
  10
**agencies (1)**
  112:23
**Agenda (11)**
  2:4,10;31:8;80:10,
  22;116:22;117:11;
  118:7;129:2;145:5,
  10
**Agent (2)**
  9:3;140:15
**aggregated (2)**
  64:7,13
**ago (2)**
  90:19;143:4
**agree (7)**
  45:13;73:12;82:16;
  104:14;109:3;
  110:11,12
**agreed (37)**
  32:3;33:4,12;35:4,
  8,15;36:14,18,24;
  37:14;38:1,3;42:1;
  43:6;44:1;52:17,24;
  53:8,9;56:13;57:7,16,
  24;58:11;61:6;63:15;
  64:2;65:8;68:4,7,18;
  74:1,22;75:2,6;
  88:16;138:20
**agreed-upon (5)**
  31:21,22;40:12;
  45:18;53:16

**agreement (5)**
  37:6;40:21;72:9;
  84:6;93:12
**Agreements (10)**
  2:8;89:24;93:15,
  16;100:19;112:24,25,
  25,25;113:1
**ah (1)**
  115:2
**ahead (32)**
  31:3;33:4,11,13;
  36:7,15;37:21;38:2;
  39:8;47:9;52:22;
  56:13,14;61:1;63:7,
  11;65:3;67:8,18;
  77:6,20;83:9;93:23;
  108:10;117:7;
  119:22;120:24;
  123:21;126:21;
  134:25;136:18;
  139:12
**Ailette (2)**
  14:6;129:13
**air (11)**
  47:24;48:10;50:16;
  51:5;62:6,15,18,18,
  20,20;72:20
**airfare (1)**
  73:4
**Airlines (1)**
  62:23
**al (2)**
  8:6;26:14
**ALAN (2)**
  29:16;61:25
**albeit (1)**
  91:13
**Alexandra (2)**
  90:2;93:2
**AlixPartners (5)**
  9:11,15;29:15;
  61:2,3
**allegation (1)**
  128:4
**alleged (3)**
  97:14;120:7;128:2
**alleging (1)**
  139:19
**allow (3)**
  76:19;85:22;
  107:23
**Allowance (14)**
  3:20;5:3;6:5;8:7,
  15;9:4;10:4,19;
  11:10,18;12:5,21;
  13:4;87:23
**allows (1)**
  87:21
**Ally (1)**
  44:19
**almost (2)**
  32:16;102:15
**along (2)**

41:1;137:6
**alphabetical (1)**
  31:9
**ALSTON (1)**
  22:11
**alterations (1)**
  125:18
**altered (2)**
  126:1,3
**altering (2)**
  79:20;123:7
**alternative (2)**
  62:23;81:6
**alternatively (1)**
  112:16
**although (4)**
  46:10,17;51:18;
  117:18
**ALVES (1)**
  23:7
**always (3)**
  52:17;93:13;96:9
**amazed (2)**
  88:25;90:19
**amended (3)**
  31:8;97:17;144:19
**amendments (1)**
  114:11
**Americas (1)**
  20:13
**among (1)**
  47:21
**amongst (1)**
  46:23
**amount (53)**
  33:12,17;36:19,24;
  37:14;38:1;39:16;
  40:8,11,12,13,24;
  43:10,22;44:9;51:10;
  61:4,5,14,15,18,19;
  63:13,14,21,25;64:1;
  65:14,15;66:7;67:20,
  21;68:2,3,9,16,17,24,
  25;69:8;74:23;75:7;
  76:15;77:15;87:2;
  103:5;112:3,6,12,17;
  113:6,9;142:12
**amounts (10)**
  34:16;40:19;52:16;
  77:22;78:11;95:14;
  111:3,13,14;139:22
**analogue (1)**
  98:24
**Analytic (3)**
  10:17,22;61:13
**and/or (1)**
  56:4
**Angeles (4)**
  26:6;28:22;72:14,
  15
**Aniel (2)**
  57:19,22
**Anthony (5)**

13:22;15:6;29:14;
  119:2;128:18
**anticipate (1)**
  99:25
**anticipated (1)**
  90:23
**APA (2)**
  94:19;111:18
**Apart (1)**
  97:13
**Apfel (1)**
  54:21
**apologies (1)**
  120:10
**apologize (1)**
  34:13
**app (2)**
  37:23;68:13
**apparently (2)**
  65:21;87:18;
  138:15
**appear (5)**
  61:23;64:13;128:2;
  135:17;136:4
**appearance (1)**
  135:15
**appearances (1)**
  49:12
**appeared (1)**
  44:3
**appears (9)**
  59:21;62:13;69:7;
  120:7;136:13;139:7,
  13;141:22;142:12
**appended (1)**
  128:11
**applicable (6)**
  81:17;82:6;84:20;
  112:9,11,17
**applicant (3)**
  34:19;51:25;71:4
**applicants (7)**
  46:12,13,18;49:21;
  52:7,10;79:9
**Application (98)**
  2:12,18;3:1,6,10,
  18;4:2,10,17,24;5:2,
  9,16;6:2,3,13,20;7:1,
  6,13,18,22;8:2,3,13;
  9:2,11,18;10:2,10,17;
  11:2,8,15,16;12:2,3,
  11,12,19,20;13:2,3;
  31:18,18;32:2,16,17;
  33:5,10,11;34:4;
  35:8;37:24;38:8,21,
  23,25;39:6,14;40:4,
  10,18,22;41:11,18,
  22;43:23;44:3;49:12;
  51:9;52:15,24;56:15;
  57:21,23;58:2,6,23;
  59:9;60:4;65:12;
  66:16;67:8,15;70:1,
  21,22;71:15,16;72:6;

12-12020-mg    Doc 5164    Filed 09/12/13    Entered 09/23/13 11:28:07    Main Document

RESIDENTIAL CAPITAL, LLC, et al.    Pg 153 of 174

Case No. 12-12020-mg    September 11, 2013

74:6;75:17;76:16,18,
25;77:3;136:12
**applications (22)**
30:8,11,23;31:3;
32:1,5;39:7,17,19;
46:9;47:9;51:20;
60:15,21;68:9;70:4;
71:21;75:12,14;
79:11,15,21
**applied (2)**
99:22;128:5
**applies (3)**
32:20;87:22;
106:17
**apply (10)**
46:8;50:18;56:7;
75:21;78:6;95:3;
106:22;110:23;
131:12,15
**applying (2)**
51:24;68:12
**appointed (1)**
124:11
**appointment (1)**
125:21
**appreciate (6)**
52:12;78:14;79:13;
80:5;87:3;145:10
**approach (3)**
51:23;96:23;97:8
**appropriate (18)**
43:6;45:14;49:25;
51:9;52:2,5;55:6;
61:23;71:14;72:24;
83:24,25;103:19;
112:9;126:23;
132:25;138:6;141:17
**appropriately (4)**
45:19;48:11,12;
51:8
**approval (9)**
44:16;81:13,15,21,
25;82:1,2;83:4,25
**approve (18)**
32:2;33:5,11;
36:13;37:10;38:3;
39:13,20,22;47:9;
52:23;56:15;65:3;
67:8;70:22;71:18;
74:2;77:20
**approved (26)**
35:8;40:5;41:7,19,
23;42:5;53:8;57:9,
13,23;58:3;61:12,16;
63:19,23;65:9;67:25;
68:14,22;74:13,18;
75:3,8;78:22;79:24;
80:2
**approving (3)**
60:4;67:14;89:1
**approximately (3)**
44:5;90:14;100:20
**April (29)**

2:15,21;3:14,23;
4:5,14,20;5:5,12;6:8,
16,23;7:9;8:9,18;9:7,
14,22;10:6,13,21;
11:5,13,19,20;12:6,
15,23;13:6
**Arant (8)**
4:2,6;26:11;31:18;
32:2,8,15;33:10
**area (1)**
45:7
**argue (8)**
82:16,18;83:9,10;
85:9;107:24;121:25;
122:2
**argued (1)**
110:8
**argues (1)**
129:16
**arguing (3)**
108:12,15,16
**argument (4)**
103:6,8;108:10;
120:25
**arguments (6)**
86:13;104:6;
114:12,15;115:7;
123:17
**Ariel (1)**
14:20
**arises (1)**
48:25
**ARLENE (1)**
23:7
**around (1)**
116:6
**arranged (1)**
31:8
**arrangement (1)**
128:7
**Arthur (3)**
13:3,6;74:7
**aspect (1)**
94:10
**assert (7)**
89:6;101:13,15;
103:18;104:10;
105:24;108:12
**asserted (8)**
44:18;86:18;
101:14;112:8;
118:12;120:3,11;
124:18
**asserting (4)**
104:12;113:7;
124:5;129:22
**asserts (3)**
112:4;142:13;
144:11
**assessment (1)**
105:17
**asset (1)**
93:12

**assets (2)**
91:9;112:17
**Assign (4)**
2:7;89:24;94:17;
112:15
**assigned (2)**
111:12;113:20
**assignment (5)**
112:13,18,24;
113:5,8
**assistance (1)**
51:21
**associate (1)**
59:18
**Associates (3)**
4:18,21;57:11
**Association (2)**
11:17,21
**Assume (18)**
2:7;47:25;73:7;
89:24;91:23;92:9;
94:16;95:1,5;99:21;
106:16;109:13;
112:15;114:18,22,23;
140:8,15
**assumed (24)**
93:8;95:15,16;
100:2;106:23;110:3,
4,5,6;111:3,11,12,13,
18,21,23;112:5,13,
15,20,21;113:5,10,20
**assuming (4)**
76:7;78:5;92:1,2
**assumption (14)**
91:21;92:5;98:21;
99:10;101:24;
106:15;110:9,17;
112:13,18,24;113:1,
3,4
**assumptions (5)**
91:5,6,7,11;108:16
**assurance (1)**
96:13
**assured (1)**
86:25
**attached (3)**
34:20,21;136:23
**attaches (1)**
142:1
**attempt (2)**
125:1;132:17
**attempted (1)**
46:11
**attend (2)**
38:22;45:17
**attendance (4)**
45:23;46:15;
120:19;127:15
**attended (1)**
43:5
**attendees (1)**
46:11
**Attest (1)**

3:12
**Attorney (14)**
3:3;6:9;7:10;
11:13;45:6,7,8,9;
49:1;58:12;69:14;
123:12,12;124:22
**Attorneys (41)**
20:12;22:3,12,20;
23:3,12,20;24:3,12,
21;25:10,18;26:3,12,
20;27:12,20;28:3,19;
29:3;34:23;43:5,11,
16,17,18,21,24;
44:10,12,25;45:5,17;
47:23;49:11;51:22;
69:10,15,16;73:23;
123:11
**Aty (2)**
7:24;8:10
**Auditor (2)**
3:12,14
**August (9)**
124:22,24,25;
129:8;132:16;
133:12;138:9;140:2;
142:25
**authority (10)**
69:21;70:11;85:23;
87:13;99:20;106:14,
21,24;107:6;108:3
**available (1)**
121:4
**Ave (1)**
26:4
**Avenue (11)**
17:4;20:13;22:4,
13,21;23:21;24:22;
25:11;26:13;27:4;
28:11
**award (2)**
31:21;76:14
**aware (5)**
54:9;90:11;101:7;
106:8;142:16
**away (2)**
104:15;126:13

**B**

**back (27)**
50:20,23;51:13;
63:8;65:4;67:2;
72:20;76:8;77:15;
78:12;83:21;87:20;
88:14;89:2,6;95:7;
96:18;98:22;99:18;
109:18;113:16;
121:24;140:5;
142:15,25
**background (1)**
130:19
**backup (4)**

36:23,24;62:15;
64:14
**bad (1)**
99:11
**baked (1)**
114:12
**balance (3)**
78:12;138:2;
139:14
**Ball (2)**
72:16;97:23
**BALLARD (2)**
29:2;87:9
**Bank (2)**
2:3;22:12;23:3;
80:24
**Banker (2)**
5:10;9:21
**Bankruptcy (20)**
2:7;4:12;7:7;9:2,7;
29:21;43:19;54:9,13,
14,25;55:15,18,22;
56:5;63:12;118:14;
120:11;123:13,15
**bar (31)**
84:12,13;91:15,16,
25;95:2,6;98:25;
99:1,4,9,22,24;100:3,
6;105:13;106:17,22,
24,24;110:9,10,17,
18,22,22;113:13,14,
19;114:16;120:12
**Barel (2)**
14:21;141:19
**Barrage (47)**
90:2;92:13;93:1,2,
3,21,24;94:2,8,24;
95:9,24;96:4,8,22;
97:3,17,19,22,25;
98:4,7,18,23;100:5,
15,17,24;102:25;
103:1,3,8;104:3;
106:19;109:12,15;
110:7;114:6,9;
115:19,22;116:1,4,6,
10,13,15
**barred (1)**
113:4
**based (21)**
34:20;36:23;37:5,
16,22;44:4;45:12;
47:18;48:3,5;55:11;
72:8;81:6,7;85:19,
20;102:5;103:13;
114:19;120:7;141:21
**basic (1)**
139:13
**basically (3)**
83:21;121:21;
132:25
**basis (13)**
45:4;48:22;79:25;
80:3;81:8;82:12;

12-12020-mg    Doc 5164    Filed 09/12/13    Entered 09/23/13 11:28:07    Main Document

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg
Pg 154 of 174
September 11, 2013

**88:**1;89:2,12;120:3;
122:2;125:1;129:4
**Bath (16)**
14:5;129:12,14,16;
130:20;132:6,11,14;
134:8,12,13,16;
136:13,22;137:8,14
**Battery (1)**
23:4
**Beach (1)**
28:13
**bear (3)**
32:10,13;121:3
**BECK (5)**
19:8;34:18,19;
35:6,10
**began (1)**
141:7
**begin (5)**
30:7;80:10;90:13;
116:21;120:1
**beginning (2)**
98:25;117:10
**behalf (10)**
30:5;34:19;39:10;
58:4;79:8;80:25;
87:9;93:3;118:6;
119:8
**belabor (1)**
86:11
**below (1)**
63:6
**bench (1)**
111:6
**BENDER (1)**
26:16
**beneficiaries (1)**
112:21
**BENTLEY (1)**
20:17
**BERKOVICH (1)**
23:25
**Berkshire (1)**
26:3
**better (2)**
102:7;136:10
**beyond (1)**
95:18
**BH (2)**
112:11,16
**bidder (1)**
112:16
**big (1)**
55:3
**bigger (1)**
96:8
**bill (1)**
43:3
**billed (3)**
58:19;69:14;70:3
**billing (4)**
51:25,25;66:13;
69:12

**billion (1)**
86:4
**binders (1)**
79:9
**binding (2)**
89:4;112:19
**BIRD (1)**
22:11
**Birmingham (1)**
26:14
**blank (1)**
125:20
**board (6)**
43:4,18;44:22;
75:21;78:7,8
**Books (6)**
13:12;130:23;
131:16,17;137:5;
142:15
**Borrower (16)**
13:20;14:4,10,18;
15:4;117:25;118:8,
11;124:21;130:3;
131:19;132:3;135:3,
16;136:11;142:21
**borrowers (7)**
124:10,17;130:13,
14;131:6;135:5;
141:13
**borrowers' (4)**
124:3,9,12;134:21
**Boston (6)**
62:6,7,7,13,14,18
**both (9)**
40:11;44:25;45:2;
100:19;103:10;
109:12,22;134:16,18
**bother (1)**
115:10
**bought (1)**
121:5
**Boult (4)**
4:3,6;26:11;31:18
**Bradley (8)**
4:2,6;26:11;31:18;
32:2,8,15;33:10
**breach (2)**
96:14;113:8
**breaches (1)**
103:5
**breakdown (2)**
61:10;64:15,24
**Brian (10)**
14:5;19:16;20:8;
124:22;129:12;
132:18;133:12,25;
138:9;140:2
**brief (2)**
106:7,12
**briefed (1)**
82:14
**briefing (1)**
84:18

**briefly (1)**
127:19
**briefs (1)**
86:11
**bring (4)**
30:14,15;65:4;
111:4
**brings (19)**
33:14;35:12;36:16;
37:12;38:5;40:1,6;
41:15;47:12;53:5,17;
57:3,25;60:11;89:17,
22;116:19;117:24;
145:5
**broader (1)**
56:16
**broken (1)**
31:9
**brought (1)**
125:24
**BRYAN (1)**
17:12
**build (1)**
91:20
**bulk (3)**
44:14,15,17
**burden (2)**
59:4;78:16
**burdensome (2)**
69:20;98:13
**Business (9)**
11:3,6;62:10,12;
68:1;101:20;102:1,3;
111:19
**Butte (1)**
13:14
**buyer's (1)**
114:23
**Bye-bye (1)**
127:11

### C

**CA (5)**
17:16;18:20,23;
26:6;28:22
**calculate (1)**
77:12
**calendar (4)**
115:17,21,25;
131:4
**California (2)**
48:9;50:16
**call (6)**
64:5,9,25;129:25;
135:24;138:11
**called (2)**
133:15;142:25
**calls (7)**
64:7,12,15;66:13,
21,23;138:14
**came (7)**
48:17;49:20;54:22;

**81:**13;83:21;94:4;
122:23
**can (36)**
34:13,14,17;38:16;
39:6;59:5,12;60:22;
62:16;63:5,7;64:15;
65:11;66:24;85:6;
88:6;89:6;91:18;
92:2;99:21;101:2;
104:10,18,21;108:12;
115:13;117:6;
119:20;133:5;134:7,
18;135:14;136:5;
137:13;138:7;144:4
**candle (2)**
101:23;114:22
**Capital (9)**
8:6;26:12;27:12,
20;30:3;112:2,2,3,3
**capitalizes (2)**
111:22,22
**captured (1)**
72:22
**care (1)**
52:25
**careful (1)**
52:17
**carefully (2)**
77:22;91:8
**Carpenter (6)**
7:14;19:2;33:15,
22;34:19;35:7
**carried (6)**
117:14,16,18;
129:7;145:8,9
**CARROLL (1)**
18:16
**case (35)**
44:21;51:12;54:13,
18;55:14;56:18;
58:20;59:16;70:9,11;
71:15;84:24;85:4,5;
86:12;90:10,18;
91:14;92:19,20,21,
22;99:20;101:3,7,7,
17;103:22;104:11;
106:17;107:4,13;
111:20;113:2;123:13
**cases (12)**
39:18;45:23;46:8;
49:25;54:10;85:3,6,
7;87:25;98:19,24,24
**catch (2)**
49:22;63:1
**categorized (1)**
51:4
**caught (1)**
50:21
**cause (1)**
87:22
**causes (2)**
82:20;84:24
**CAVE (1)**

17:12
**caveat (1)**
79:23
**CC (44)**
2:2,6,12,18;3:1,6,
10,18;4:2,10,17,24;
5:2,9,16;6:2,13,20;
7:1,6,13,18,22;8:2,
13;9:2,11,18;10:2,10,
17;11:2,8,15;12:2,11,
19;13:2,10,18;14:2,8,
17;15:2
**cease (1)**
111:21
**cede (5)**
86:9;87:4;92:25;
103:11;118:1
**Center (3)**
18:21;21:4;27:21
**Centerview (3)**
5:9,12;35:13
**Central (1)**
28:11
**Certain (7)**
8:4;36:10;91:10;
111:17;118:11;
131:25;135:19
**certainly (6)**
44:3;75:14;81:20;
83:23;109:22;144:4
**certificate (1)**
112:22
**certification (1)**
32:21
**certify (3)**
46:6,13;52:8
**certifying (2)**
46:7,14
**cetera (1)**
131:21
**Chadbourne (5)**
12:20,24;24:2;
72:3,6
**challenge (1)**
120:15
**challenges (2)**
90:24;112:2
**chambers (2)**
78:1;79:10
**chambers' (1)**
32:5
**CHANCE (3)**
25:17;78:11;141:4
**change (1)**
92:2
**Chapter (5)**
13:4;54:10;87:25;
113:2;131:4
**characteristic (1)**
40:20
**charge (2)**
49:18;62:11,18;
64:5,9,14;65:22

12-12020-mg    Doc 5164    Filed 09/12/13    Entered 09/23/13 11:28:07    Main Document

RESIDENTIAL CAPITAL, LLC, et al.
Pg 155 of 174

Case No. 12-12020-mg

September 11, 2013

**charged (3)**
38:24;48:12;53:23
**charges (7)**
49:11,14,18;59:22;
62:6;66:8;67:3
**charging (2)**
48:23;67:4
**chart (14)**
30:12;31:7,8,15;
36:12;40:2;50:3;
53:20;65:17;66:2;
67:17;78:11,20,24
**cheaply (1)**
43:8
**check (7)**
52:9,11;62:17;
67:2;70:13;71:1,16
**checked (1)**
143:23
**Chicago (5)**
19:14;26:23;62:6,
7;73:7
**chose (1)**
54:25
**Circuit (2)**
81:17;99:4
**circumstance (1)**
55:12
**circumstances (7)**
39:22;45:14;55:4;
56:11;124:4,12,16
**cite (2)**
86:12;100:7
**cited (1)**
100:10
**cities (1)**
55:21
**Claim (147)**
2:3,3;80:24;81:5,9,
24;84:2,4,16,19;
85:19;86:3,4,5,6,25;
87:11,23;88:6,21;
89:5,12;91:17,18;
92:7,8;96:18,21;97:2,
21;98:1,12,13;99:11;
101:15;102:22,24;
103:3,4,7,9,18;
104:11,12,14,20;
105:3,5,12,19,24;
106:1,3,7,8,9,11,12,
13;108:13,19;
110:18;112:1;114:4,
6,8,11,20;115:4,9;
118:13,25;119:3,6,
11,14,14;120:3,3,5,6,
9,10,12,15;121:19,
20,22,23,25;122:2,7,
7,10;123:3,3,13,18,
19,20,22;124:1,4;
125:2,2,3,3;127:22,
23,25;128:12,18,19;
129:12,12,13,13,22;
132:18,19;133:3,15,
25;134:23;135:19;
136:5;138:1,2,3,5,22;
139:5,6,7,13,23;
140:2,10;143:6,8,11,
17,18,19,22;144:2;
145:5
**claimant (7)**
128:13;133:13,17;
134:2;142:17;
144:10,11
**claimed (1)**
112:7
**Claims (80)**
2:2;13:11,11,12,19,
19,20;14:3,3,4,9,9,10,
17,18,18;15:3,3,4;
44:18;86:18;90:16;
91:9,10,14,15;95:3,7;
96:14;97:6,9,10,13;
98:1,20;101:11,13,
14,14,18,24;102:3,
16,17;103:12,13;
110:10,18;113:8,14;
114:16,25;116:19;
117:10,13,15,25;
118:8,9,10,11,15,19;
119:16,18,19;120:17;
124:18;126:8;128:2,
7;129:6,10;130:1,3,3;
131:1;135:3;139:16;
143:20
**clarification (2)**
73:6;80:5
**clarify (1)**
109:4
**Class (7)**
22:3;62:9,10,12,
16;81:14;83:4
**clear (22)**
50:14;52:19;56:7;
76:21;77:24;79:13;
82:21;83:7;93:13,17;
95:10;96:10;99:5,9,
19;105:10;108:11;
109:11,12;110:2;
114:17;136:9
**clearance (1)**
70:8
**clearing (2)**
69:17,23
**clearly (4)**
77:24;84:8;106:25;
113:14
**CLEARY (1)**
23:11
**client (3)**
67:3;132:19,21
**CLIFFORD (1)**
25:17
**close (1)**
123:1
**closer (1)**
34:13
**closest (2)**
54:20;98:24
**closing (6)**
111:20;122:14,18,
20,21;123:2
**Co (2)**
25:10;65:13
**coach (6)**
62:14,15,18,20;
63:6,7
**Coast (1)**
53:24
**Code (2)**
2:7;118:14
**COELHO (53)**
23:24;94:9,11;
104:4,5,19,23,25;
105:6,10,14,20,22;
106:2,4,6,8,24;107:3,
5,7,9,11,13,15,17,19,
21;108:2,5,7,9,11,15,
19,21,23,24,25;
109:3;110:12,14,21,
25;111:2,6,8;113:18,
22,24;114:2;115:7;
116:17
**Coelho's (1)**
99:15
**Cohen (11)**
5:2,5;17:9;24:20;
42:6,14;43:1,16;
44:20;47:8;47:8
**Coherent (8)**
10:10,14;29:16;
61:17;62:1,10;63:3;
132:5
**Coie (5)**
6:13,16;18:1,10;
57:4
**COLE (1)**
22:19
**colleague (4)**
87:9;90:2;103:11;
118:1
**collectively (1)**
113:1
**Collector (1)**
13:15
**colloquy (1)**
94:8
**color (1)**
87:4
**Colt (3)**
6:4,9;17:2
**Columbus (1)**
19:6
**combined (1)**
69:11
**comfortable (1)**
96:13
**coming (2)**
70:8;115:24
**Comm (2)**
7:24;8:10
**comment (1)**
84:1
**comments (1)**
78:21
**commit (1)**
132:15
**Committee (26)**
8:5,14;9:3,12,21;
10:3,11,18;11:3,9;
20:12;21:3,12;27:3;
31:10;60:12,20,21;
71:25;78:17;90:13;
104:7;109:13,22;
124:11,21
**committee's (2)**
124:3;136:6
**common (1)**
81:12
**communicate (3)**
132:15,22,25
**communication (1)**
130:12
**Communications (4)**
4:18;133:2;134:2;
136:12
**Company (5)**
9:18,23;122:12;
123:6;130:5
**compensable (5)**
39:19;69:22;70:18;
71:7;73:8
**compensating (1)**
69:23
**Compensation (45)**
2:14,20;3:2,7,11,
21;4:4,12,19,25;5:3,
11,17;6:3,6,15,21;
7:2,8,14,19,23;8:3,7,
15;9:5,13,19;10:4,12,
19;11:4,10,16,18;
12:3,5,12,13,20,22;
13:3,4;39:17;70:22
**competence (1)**
45:8
**competent (1)**
144:18
**complaining (2)**
136:13,14
**complaint (3)**
86:18;123:15;
132:20
**complete (2)**
51:23;144:9
**completed (1)**
145:10
**completely (1)**
90:5
**Compliance (3)**
3:19;4:3;65:25
**complicated (5)**
54:23;90:15;104:1
**complied (1)**
**complies (1)**
33:23
**comply (5)**
32:17,23;46:19;
91:6;129:17
**complying (3)**
46:14;47:4;70:17
**compromise (1)**
104:14
**con (2)**
109:25;110:5
**concede (2)**
87:11;88:5
**conceded (1)**
88:21
**concern (1)**
58:11
**concerned (5)**
44:15;45:16;46:6;
50:18;82:3
**concluded (1)**
145:16
**concludes (2)**
75:11;145:4
**condition (1)**
113:7
**confer (1)**
136:6
**conference (6)**
64:5,7,9,12,15;
70:25
**confirm (2)**
34:16;47:3
**confirmation (6)**
90:13,20;91:2;
104:9,9;109:15
**confirmed (1)**
142:16
**conflicting (1)**
69:15
**Conflicts (13)**
6:4;12:4;17:3;
27:3;69:8,9,11,17,21,
23,24;70:13;71:16
**confused (6)**
87:16;90:5;91:24;
92:10;99:6;100:25
**confusion (2)**
92:12;93:5
**Connecticut (1)**
134:11
**connection (9)**
118:25;119:3,6,11;
127:22;128:16;
130:1,22;140:24
**consecutive (1)**
58:17
**consent (3)**
48:5;60:3;88:2
**consequence (3)**
110:15,16,20;
140:14

**95:19**

**consequences (2)**
92:3;111:25

**conservative (1)**
91:14

**consider (10)**
48:10;51:11;52:20;
69:17;71:14,16;73:4;
105:1;137:11;141:16

**considered (2)**
48:11;135:22

**consistent (3)**
48:6;50:13;51:12

**constituents (1)**
90:10

**constituted (1)**
55:2

**Consultant (13)**
2:19,22;4:18,21;
10:2,7,11,14,18,22;
11:3,6;54:17

**consultants (1)**
54:11

**consultation (4)**
42:8;93:14;130:5;
134:20

**Consulting (7)**
6:20,23;12:13,15;
22:20;40:7;74:19

**contact (2)**
140:5;143:3

**contacts (1)**
138:9

**contention (1)**
140:8

**contest (1)**
137:17

**contested (7)**
80:11,23;100:1;
114:5;134:17,22;
140:20

**context (4)**
52:15;81:23;97:21;
101:4

**continue (6)**
75:25;78:12;
107:24,24;109:6;
132:25

**continued (2)**
76:10;123:1

**Continuing (1)**
129:2

**contract (26)**
34:22;89:7;91:23;
93:8;95:1;104:22,24;
105:1;106:14,22;
110:8,16,19,22;
111:19,20,21,23;
112:1,5,13,15;113:5,
13;114:19,23

**contracts (23)**
91:21;94:17;98:21;
100:3;105:16;
109:10,14,16,18,23,
24;110:1,3,4,5;111:3,
11,12,13;112:20,21;
113:10,19

**contractual (1)**
82:17

**contribution (19)**
81:8,11,24;82:5,10,
12,22,25;83:8;84:4,
19,25;85:4,8;86:17,
25;87:1;88:6;89:9

**convened (1)**
93:9

**convenience (2)**
48:7;49:24

**conversation (3)**
125:5,7,10

**conversations (2)**
124:3;125:6

**Cook's (1)**
41:11

**copies (4)**
93:24;121:5;
125:20,20

**copy (6)**
30:14,15;94:3;
111:3;125:19;127:1

**Cornel (1)**
133:8

**Cornelius (12)**
14:6;129:13,14;
132:6;133:5,6,10;
134:8,10,16;137:14;
142:11

**Corporate (5)**
4:18;43:19;44:24;
45:1,9

**corresponding (1)**
41:1

**cost (4)**
55:25;70:4,7;115:3

**costs (1)**
70:20

**Counsel (60)**
2:13,16;3:7:4:3,6,
11,15:5:18;6:4,14,17;
7:7,14;8:4,14,18;
11:9,17;12:4,21;17:3,
13;18:2,11,20;19:3,
12,20;21:3,12;27:3;
34:24;45:10;51:12;
52:13;54:10;55:9;
56:12;59:18;70:25;
72:3;77:12;78:25;
85:22;86:9;89:15;
94:11;100:1;104:2;
107:24;117:9;124:4,
10,10,10,11,21;
127:1;134:21;136:6

**counts (1)**
132:22

**County (4)**
13:14,14;123:10;
126:4

**couple (2)**
64:4;66:10

**course (2)**
44:14;80:7

**COURT (454)**
30:2,6,9,15;31:1,5,
12,13,16,23,25;
32:10,12,15;33:8;21;
34:2,4,12,17;35:3,7,
11,17,18;36:3,7,13,
25;37:3,7,10,17;38:2,
9,14,19,21;39:3,4,13,
25;40:5,15,18;41:7,
12,14,19,23;42:5,14,
16,22,24;43:2;45:11,
15;46:2;47:1,5,7,11,
21;48:6,8,18,21;49:4,
7,17,19;50:1,2,7,10,
13;51:1,7,16;52:5,11,
22;53:4,8,11,13,19;
54:3,4,7;55:7;56:8,
25;57:2,6,9,13,19,20;
58:3,7,10;59:4,8;
60:6,9,13,18,19;61:1,
8,12,16,20,23;62:2,5,
21,24;63:3,10,17,19,
23;64:4,8,16,17,21;
65:2,6,11,16,20,23;
66:1,10,12,19;67:1,5,
7,12,14,17,25;68:6,
10,21;71:5,11,23;
72:1,12,19;73:3,9,12,
16,19,22,25;74:5,10,
13,18,25;75:2,8,13,
18,20;76:2,4,13,21;
77:1,4,6,9,18;78:2,4,
7,9,17,22;79:7,10,12,
17,22,24;80:2,6,10,
12,15,19;81:10;82:4,
14,19;83:12,13,15,
17;84:4,13,14,15,23;
85:9,12,14,16,23;
86:14,17,20,23;87:7,
13,20,24;88:4,8,10,
13,17;89:15,19,21;
90:5;91:20;92:14,16,
18;93:19,23;94:1,7,
23,25;95:22;96:3,5,
19,25;97:11,16,18,
20,23;98:3,6,17,19;
99:3;100:13,16,22,
25;102:12,20,24;
103:2,6,16,21,23;
104:2,18,21,24;
105:3,9,12,19,21;
106:1,3,5,7,11;107:1,
4,6,8,10,12,14,16,18,
20,22;108:3,6,8,10,
14,18,20,22,24;
109:1;110:7,13,15,
24;111:1,5,7;113:11,
21,23,25;114:3,13;

115:20,23;116:3,5,7,
11,14,16,20,23;
117:1,3,5;118:4,16,
19;119:20,22,25;
120:21,22,24;121:8,
10,12,14,15,17,19;
123:14,15,16,22;
124:7,14,16;125:5,9,
12,16,23;126:6,9,12,
14,16,18,20,22;
127:5,8,10,12,17,18;
128:4,8,10,15,17,22;
129:8,14,21;130:8,
12,16,25;131:11,14,
25;132:3,10;133:3,5,
9,11,21,23;134:4,7,
12,15,25;135:4,8,12,
14,23;136:18;137:1,
3,6,10,16,18,21;
138:7,17,19,22,25;
139:4,8,12,25;140:8,
14,20;141:3,9,12,19;
142:5,9,19,23;143:9,
12,22;144:1,6,14,17;
145:1,3,12,15

**CourtCall (4)**
38:12;42:20;
133:16;134:6

**courtroom (1)**
60:25

**courts (1)**
143:9

**Court's (10)**
32:23;33:24;39:11;
46:14;66:23;70:17;
85:20;91:6;92:12;
93:11

**Coverage (1)**
6:14

**CRAMM (1)**
18:25

**create (2)**
56:11;136:7

**created (1)**
55:12

**credit (3)**
84:11;129:23;
136:23

**Creditor (2)**
7:23;8:10

**Creditors (13)**
8:6,15;9:4,13,22;
10:3,12,18;11:4,10;
60:12;91:17,17

**Creditors' (7)**
20:12;21:3,12;
27:3;90:12;124:3,11

**Creditor's (1)**
11:13

**crowded (1)**
115:20

**crystal (2)**
83:7;136:9

**Cummings (4)**
4:3,6;26:11;31:19

**cure (57)**
91:16;92:7,8;93:7;
95:3,6,11,14,16;
96:10,18,21;97:2,9,
10;98:1,12,20;99:11;
100:21;101:11,13,14,
14,15,18,24;102:3,
16,17,22;104:10,12,
20;105:5,12,24;
108:12;110:10,18;
111:3,13,14;112:1,2,
6,12,17;113:6,9,14;
114:8,16,16,20,25;
115:4

**currently (3)**
76:11;77:13;
141:25

**Curry (1)**
15:6

**Curtis (5)**
6:3,9;17:2;36:17;
80:25

**customized (1)**
130:6

**cut (3)**
37:19;38:11;42:18

**Cutler (4)**
8:3,9;21:2;68:23

**cutoff (1)**
52:3

**cutoffs (1)**
52:4

**cutting (1)**
130:9

**D**

**damage (2)**
105:3;113:9

**damages (2)**
105:2;141:14

**DAN (1)**
22:8

**Darryl (2)**
48:17,24

**date (35)**
86:9;91:15,16;
92:1;94:17;95:2,6,12,
13;98:25;99:9,22,24;
100:3,6;105:13;
106:17,22;110:9,10,
17,18,22,23;111:20;
113:14,14,19;114:16;
116:2;120:12;
134:19,19;135:19;
136:1

**dates (7)**
50:22;99:1,4;
106:24;116:7;129:8;
134:22

**DAVID (2)**

12-12020-mg    Doc 5164    Filed 09/12/13    Entered 09/23/13 11:28:07    Main Document
Pg 157 of 174

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

September 11, 2013

19:8;34:18
**Davide (8)**
13:22;29:14;119:2;
127:15,17,18;128:4,
18
**Davide's (1)**
127:22
**DAY (12)**
28:18;52:1;64:12;
66:13;83:21;92:20;
94:4;105:7;111:1;
115:15;122:17;
143:24
**days (4)**
58:17;100:6;
111:19;143:4
**DC (6)**
18:5;27:14;47:25;
48:1,3;49:16
**de (1)**
102:17
**deadline (15)**
93:7;95:11,12,20;
96:10,17;97:10;98:2,
18,20;99:9;100:21;
105:24;110:3;112:1
**deal (9)**
56:8,17,21;79:21;
92:23,24;98:19;
102:10;124:11
**dealing (6)**
59:1;96:13;107:6;
130:13;135:5;136:3
**deals (3)**
93:10;94:21;
117:13
**dealt (1)**
68:10
**Deanna (2)**
116:7;134:20
**debate (1)**
101:6
**debating (1)**
102:1
**DEBORAH (2)**
27:25;54:5
**DEBRA (1)**
27:16
**debtor (22)**
31:9;55:16,20;
81:3,18;86:2;87:17;
98:20;99:13;103:14;
106:16;111:10;
112:15;115:10;
121:24;131:3;
136:10;139:23;
140:12,16;143:6,7
**Debtors (67)**
2:6,14,19;3:13,20,
20;4:4,12,19;5:10;
6:4,5,14,21;7:7;17:3,
13;18:2,11,20;19:3,
12,20;30:6;54:17,25;

58:4;81:1;90:10,12;
93:3,9,13;94:15,16;
103:19,25,25;104:7,
14;105:25;106:4,8;
109:6,9,13,22;
112:10;117:9;118:6,
11,13,18;119:15,18;
120:4,14;127:1,22;
128:13;129:1;
132:12;134:20;
137:7;138:3;142:19;
144:12
**debtors' (13)**
80:23;81:4;88:24;
89:12,15,23;90:3,3;
100:18;113:2;118:7;
119:13;144:20
**Debtor's (3)**
3:2;6:9;7:10
**December (2)**
8:8;70:7
**decide (17)**
72:24;81:23;82:24,
25;84:12;88:21;
89:11;95:4,4;97:24;
98:12;104:18;114:4,
21,24,25;115:2
**decided (6)**
92:6;101:25;
104:16;105:18,22;
106:16
**decides (1)**
81:10
**deciding (4)**
83:7;88:20;101:19;
115:8
**decision (6)**
59:8;82:7;86:19;
102:3;114:18;131:20
**declaration (3)**
137:7;144:18,22
**decree (1)**
143:9
**defamation (1)**
132:21
**default (2)**
112:8;113:8
**defaults (1)**
112:5
**defective (1)**
105:15
**defend (1)**
133:3
**defending (1)**
39:5
**defense (5)**
58:20;59:16;
123:14;140:17,24
**defer (3)**
50:1;127:16;132:8
**deficiencies (1)**
59:3
**defined (15)**

111:12,13,23,23;
112:3,5,7,7,14,17,20,
21;113:6,6,10
**defines (1)**
110:4
**definitions (2)**
111:2,9
**Deinard (3)**
11:17,20;24:11
**Delaware (2)**
2:19,22
**Deloitte (4)**
3:10,14;25:2;37:13
**DEMARCO (1)**
25:22
**demonstration (1)**
35:21
**deny (1)**
121:21
**denying (1)**
131:20
**DEPARTMENT (1)**
20:2
**deposition (1)**
43:14
**derivatives (1)**
72:17
**Derouin (2)**
13:23;119:5
**Derouins (1)**
119:8
**describe (1)**
61:2
**described (1)**
58:12
**describes (1)**
59:19
**designated (1)**
111:11
**desk (1)**
79:9
**detail (8)**
34:9;35:19;44:8;
45:1;64:14,23;67:10;
97:6
**details (1)**
45:16
**determination (2)**
82:5;85:21
**determine (4)**
70:13;84:4,18;96:6
**determined (2)**
85:3;93:10
**determining (5)**
49:23;84:17;86:15;
134:16;140:20
**DEUTSCH (1)**
24:8
**develop (4)**
58:13,16;59:11,14
**developed (1)**
85:4
**DEVON (1)**

26:25
**difference (1)**
34:20
**different (9)**
52:4;83:6,18;84:3,
5,11,11;106:17,21
**dig (1)**
32:25
**direct (5)**
93:5;106:20;
107:22,23,25
**direction (2)**
51:19;55:17
**directly (6)**
96:1;98:1,13,19;
108:3,5
**Directors (6)**
24:21;44:16,19,19;
45:2,4
**disability (1)**
123:11
**disabled (3)**
121:2;122:16,17
**disallowance (3)**
87:11,23;88:2
**disallowed (3)**
88:6,22;123:18
**discharged (1)**
123:15
**disclosure (2)**
71:13;102:18
**discount (1)**
44:1
**discovery (6)**
58:13;59:11;98:13,
14,15;129:25
**discretion (1)**
76:19
**discuss (1)**
59:10
**discussed (1)**
87:17
**discussing (1)**
64:1
**discussion (2)**
55:9;85:1
**discussions (16)**
31:20;33:16;36:22;
42:1;45:12,16;47:14,
19;48:4;49:23;61:6;
63:14;72:9;96:15;
97:3;98:8
**disgorgement (1)**
80:3
**dispute (3)**
85:20;109:24;
116:9
**disputed (1)**
144:21
**disputes (1)**
90:18
**disservice (1)**
92:12

**district (3)**
82:4,8;86:20
**divide (1)**
131:9
**dizzy (1)**
122:17
**Doc (10)**
2:12;3:1,6;4:10,24;
5:16;10:17;11:2,8;
135:20
**Doc# (35)**
2:2,6,18;3:10,18;
4:2,17;5:2,9;6:2,13,
20;7:1,6,13,18,22;
8:2,13;9:2,11,18;
10:2,10;11:11;12:2,
11,19;13:2,10,18;
14:2,8,17;15:2
**docket (42)**
33:15;35:13;36:18;
38:6;40:2,7;41:16,20,
24;42:6;47:13;53:6;
57:4,11;58:1;61:3,13,
17;63:12,20,24;
65:13;67:20;68:2,15,
24;72:7;74:7,14,19;
75:4;100:18;118:9,
18,24,25;119:2,6,8,
11,17;138:13
**document (2)**
126:1;138:21
**Documentation (13)**
14:4,10,19;15:4;
34:7;35:1;41:1;
112:9;120:6,13;
123:23;127:24;129:6
**documentations (1)**
36:11
**documents (15)**
45:13;120:10;
121:1,3,7,8;125:24;
128:11;134:23;
135:18,19,22;137:7;
140:24;142:2
**documents3162 (1)**
7:25
**dollar (1)**
36:4
**dollars (29)**
32:16;33:22;35:5;
39:14;43:7,12,22,23,
25;44:5,11;50:4;
53:23;56:14;58:11,
24;63:21;69:12;74:8,
15,16,20,21,23,24;
77:16;86:4;96:14;
97:6
**DONALD (1)**
18:25
**done (8)**
48:7;54:22;55:2;
90:21;131:18;132:6;
137:8;140:23

**Dorr (4)**
8:4,10;21:2;68:24
**Dorsey (9)**
2:12,16;19:19;
38:6,21,24;39:1,10,
14
**DOUGLAS (1)**
24:8
**down (9)**
31:9;47:1;53:17;
84:10;85:12;91:11;
98:14;114:21;115:2
**draft (1)**
38:24
**drafting (1)**
69:14
**draw (2)**
97:11;98:4
**Drexel (1)**
98:25
**drilled (1)**
91:11
**Drive (4)**
19:13;26:21;
122:21,22
**driven (1)**
91:4
**DRUCKER (1)**
22:25
**due (2)**
98:8;114:10
**Duff (1)**
108:23
**duplicate (1)**
40:24
**duplicative (2)**
58:15;59:14
**During (4)**
5:4;8:8;45:3;49:12

**E**

**earlier (4)**
32:12;72:19;76:1,
11
**ears (1)**
122:18
**East (1)**
28:4
**eat (1)**
73:3
**Eckstein (25)**
11:13;20:16;78:2,
5,8,10,18,19,24;
79:16,17,18,23;80:1,
5,8;101:1,2;102:21;
103:12,18,22,24;
117:4,5
**Economics (4)**
10:11,14;29:16;
61:17
**Edmond (2)**
14:5;129:12

**effect (2)**
88:12;89:16
**effort (2)**
79:13;140:6
**efforts (2)**
52:12;79:11
**EGGERT (1)**
26:25
**eight (1)**
69:11
**Eighteenth (4)**
14:3;118:3;129:2,
12
**eighty/twenty (3)**
76:12,17;77:12
**EISELE (1)**
29:15
**either (7)**
54:4,19;60:24;
104:13;118:12;
128:12;144:16
**eleven (1)**
122:13
**eleventh (1)**
117:17
**eliminate (1)**
43:20
**Elmore (1)**
13:14
**else (5)**
50:18;74:1;77:18;
145:12,12
**e-mail (4)**
124:23;125:13,14;
132:15,16,23;143:2
**e-mailing (1)**
69:16
**e-mails (1)**
138:14
**Embarcadero (1)**
18:21
**embodied (1)**
36:11
**employ (1)**
46:11
**end (6)**
56:11;77:8;85:1;
88:25;104:14;115:15
**enforced (1)**
45:24
**enormous (1)**
51:10
**enough (3)**
33:7;81:18;115:23
**ensured (1)**
89:25
**enter (2)**
126:23;127:2
**entered (8)**
58:16;118:16,18;
126:25;129:9;
130:17;131:23;
138:13

**entirely (4)**
54:19;70:7;109:10,
16
**entirety (1)**
122:1
**entitled (3)**
47:4;111:18;136:8
**entity (1)**
103:17
**entries (12)**
36:23;37:4;40:23;
41:2;47:24;48:13;
58:15;59:14;66:15,
21,25;72:23
**entry (5)**
37:24;58:16,17,21;
62:8
**Epiq (4)**
9:2,7;29:21;63:12
**erect (1)**
93:4
**Erlinda (1)**
57:19
**Ernst (3)**
4:25;28:3;40:2
**eScribers (1)**
15:21
**escrow (2)**
128:6;141:24
**especially (1)**
49:11
**ESQ (43)**
17:7,8,9,18;18:7,
16,25;19:8,16,24;
20:8,16,17,18;21:8,
17,18;22:8,16,25;
23:7,8,16,24,25;24:7,
8,17,25;25:6,14,22;
26:8,16,25;27:8,16,
25;28:7,15,24;29:8,9
**essentially (1)**
99:14
**establish (1)**
113:19
**establishes (2)**
111:25;144:22
**estate (7)**
48:12,23;49:18;
55:3,23;70:13;
101:19
**estimates (1)**
91:11
**et (2)**
8:6;131:21
**even (10)**
54:22,25;67:9;
84:10,12;102:8,15;
115:10;124:6;143:8
**events (1)**
45:20
**everybody (7)**
32:20;33:5;75:22;
91:1;101:12;105:19;

133:1
**everyone (1)**
46:4
**evidence (4)**
109:21;120:10;
141:13,16
**evidentiary (1)**
59:25
**exactly (6)**
58:17;71:12;99:1,
3;102:23;114:17
**examine (1)**
64:20
**Examiner (15)**
11:18;12:4,14,21;
13:4,7;24:3,12;31:10,
10;43:15;72:3,4,4;
74:6
**examiner's (1)**
44:15
**example (4)**
48:14;66:15;69:10;
89:5
**exceptions (1)**
111:17
**excess (1)**
39:16
**exchange (1)**
134:22
**exchanged (3)**
135:22;136:1;
141:14
**exchanging (1)**
137:6
**excuse (4)**
93:4;97:15;111:2;
118:13
**excused (6)**
75:14;89:18,19;
117:4,6,6
**Exhibit (4)**
125:17;126:2,2;
141:6
**exhibits (1)**
121:13
**exist (1)**
112:4
**expect (4)**
33:6;52:10;105:2;
107:23
**expense (8)**
39:19;40:24;48:13;
52:10,12;55:3;73:4;
74:3
**Expenses (144)**
2:14,20,23;3:4,8,
12,15,22,25;4:4,7,13,
19,22;5:4,7,11,14;
6:7,10,15,18,22,25;
7:3,8,11,15,20,25;
8:7,11,17,19;9:6,9,
13,16,20,24;10:5,8,
13,15,20;11:5,12,19,

22;12:5,9,13,17,22,
25;13:5,8;31:19,22;
32:6,16,22,24;33:6,7,
16,18,19,23;35:14,
16,17,25;36:5,10,17,
20;37:14;38:7;40:3,
9,11,14,25;41:3,17,
21,25;42:3,7,12;
47:14,17;48:10;50:4,
9,16,24,24;51:5;
52:19,25;53:15,18,
21,24;57:5,16,18;
58:5;59:18,18;61:5,7,
14,19,23,24;63:4,14,
16,22,25;64:3;65:15,
17;66:9;67:21,23;
68:3,5,16,19,25;72:8,
11,12;73:22,22;74:8,
15,20;75:5,7
**Experian (1)**
136:23
**experienced (1)**
101:8
**expert (1)**
34:23
**expertise (1)**
72:24
**explain (5)**
62:16;92:12,13,14;
120:2
**explaining (1)**
132:16
**explanation (6)**
34:8,17;47:8;
55:11;56:9,12
**exposed (1)**
83:19
**expressed (3)**
101:9,11;137:25
**expressly (2)**
111:17;119:12
**expunge (6)**
103:6;119:18;
120:15;121:20;
139:10,12
**expunged (4)**
114:7;121:25;
123:18;139:24
**extend (1)**
118:19
**extensive (1)**
129:25
**extent (7)**
48:25;49:17;60:23;
96:24;98:11;128:1;
143:11
**extremely (1)**
69:20
**eye (1)**
63:1

**F**

**face (3)**
90:24;139:7;
142:12
**facilitate (1)**
32:5
**fact (8)**
46:16;55:9;95:14;
102:9,18;107:11,17;
108:7
**facts (3)**
99:25;101:16;
109:4
**factual (1)**
45:2
**fail (1)**
110:5
**failed (1)**
129:17
**failure (2)**
111:25;136:4
**fair (3)**
50:11;129:23;
141:17
**familiar (1)**
72:16
**fantastic (1)**
127:7
**far (1)**
50:18
**fare (12)**
47:24;48:10;50:16;
51:5;62:6,15,18,19,
20;63:6,7;72:20
**fares (1)**
62:20
**Fargo (1)**
22:12
**favor (1)**
86:13
**FCRA (1)**
132:21
**FDCPA (1)**
132:22
**Fed (3)**
48:4;54:11,17
**federal (3)**
82:3,20;143:9
**FedEx (1)**
131:7
**Fee (42)**
3:10,18;8:3;12:3,
12,20;13:3;30:7,11,
23;31:21;35:15;
37:23,24;38:23,24;
39:6,7,17,19;40:12,
22;46:9;47:16;52:15;
57:17;58:15;60:21;
67:4,9;68:9,10,12,13;
69:25;72:6;74:1,23;
75:12,13;79:14,21
**fee$1,200,000.00 (1)**
5:14
**fee$1,318,943.00 (1)**

5:6
**fee$1,480,650 (1)**
6:10
**fee$1,659,806.00 (1)**
7:15
**fee$107,400.00 (1)**
10:7
**fee$133,247.00 (1)**
10:15
**fee$135661.17 (1)**
7:20
**fee$2,100,000.0 (1)**
9:24
**fee$2,317.50 (1)**
4:22
**fee$2,416,978.11 (1)**
4:7
**fee$2,984,455.50 (1)**
3:15
**fee$22,790,342.6 (1)**
7:11
**fee$23,210,644 (1)**
12:17
**fee$23771407.75 (1)**
12:25
**fee$259725.40 (1)**
3:8
**fee$290,753.90 (1)**
3:24
**fee$315,950.00 (1)**
8:19
**fee$321,975.00 (1)**
13:8
**fee$333,753.00 (1)**
7:3
**fee$349099.50 (1)**
7:24
**fee$39,644.20 (1)**
9:9
**fee$4,379,636.25 (1)**
9:16
**fee$441,806.00 (1)**
6:18
**fee$5,501,118.50 (1)**
6:24
**fee$504,670.50 (1)**
8:11
**fee$513,814.80 (1)**
3:3
**fee$7,308.10 (1)**
2:23
**fee$77,787.00 (1)**
12:8
**fee$88,103.00 (1)**
11:22
**fee/employment (2)**
70:4;71:20
**feedback (1)**
71:4
**fees (66)**
31:19;33:15,18;
35:4,13;36:17,19;
37:13,15;38:6;40:3,7,

11;41:16,16,21,25;
42:2,7,10,11;43:10;
47:13;50:4;53:6,15,
17;56:14;57:4,7,11,
15;58:5,11;59:18;
61:4,7,14,18;63:4,13,
15,21,25;64:2;65:7,
14;67:20,23;68:2,4,
16,18,24;71:19,20;
72:7,10;74:7,15,20,
23;75:5,6;78:22;
79:24
**FEINSTEIN (1)**
27:8
**FELDER (1)**
27:16
**few (3)**
47:24;117:12;
132:22
**FGIC (4)**
28:19;95:19,22;
96:2
**FHFA (1)**
91:3
**field (1)**
102:6
**fifteen (1)**
77:16
**Fifth (2)**
23:21;26:13
**fifty-seven (1)**
122:23
**fight (1)**
88:20
**figure (1)**
125:1
**file (17)**
34:24,25;69:7;
90:11;99:11;103:13;
105:9,12,22,23;
106:11,13,16;111:10;
112:1;113:15;132:3
**filed (44)**
30:22;31:2,2;40:9;
43:3;44:3;53:16;
55:9;57:20;65:19;
81:5;84:2;102:24;
103:4,7,9,12,16,25;
110:18;112:14;
114:10;115:1,5,9;
118:9,20,24;119:2,5,
8,10,16;121:22;
127:15,24;132:5,12;
135:6;136:1,9;143:7,
9,17
**files (3)**
55:22;56:5;105:19
**filing (4)**
55:16;92:8;110:18;
136:11
**filings (1)**
97:4
**final (6)**

79:21,25;80:2;
81:21;83:4,25
**finality (1)**
86:5
**Finally (5)**
41:4;58:4;68:23;
116:8;143:3
**Financial (6)**
6:21;9:12;12:12,
14,15;74:19
**financially (2)**
139:18;140:12
**find (8)**
30:20;32:7;52:14;
106:18;114:15;
136:11;144:15,16
**fine (9)**
30:9;34:14;51:3;
52:6;69:18;70:2;
77:17;92:25;125:12
**Firm (12)**
15:6;31:5;49:24;
59:19,20;130:6;
132:13;142:10;
143:18;144:3,6,20
**firms (1)**
78:14
**First (30)**
4:24;6:13;8:2;
11:16;31:17;56:8;
61:2,3;62:9,12,16;
72:6;76:7,24;77:15;
88:4;92:10;94:4,5;
95:9;103:3;104:8,16;
117:12,13;124:2;
139:20;140:23;
141:15;143:24
**first-class (2)**
62:20;63:6
**five (1)**
39:20
**fixed (1)**
39:21
**flag (2)**
64:21;73:13
**flagged (1)**
78:23
**FLANIGAN (1)**
22:8
**flat (2)**
67:4,9
**Floor (8)**
17:15;18:13,22;
22:22;26:5;27:5;
28:21;29:5
**Florida (2)**
128:8;134:14
**Flower (1)**
28:20
**flying (1)**
48:22
**Focus (4)**
10:17,22;61:13;

105:11
**focusing (1)**
49:8
**Foerster (9)**
7:7,10;30:5;47:13,
15;93:3;117:9;118:6;
129:1
**FOLEY (1)**
28:2
**follow (2)**
96:16;138:14
**following (6)**
85:3;89:8;101:16;
131:13;136:21;143:5
**footnote (3)**
100:17;106:5,12
**footnotes (1)**
97:5
**Foreclosure (6)**
4:11;54:12;56:10;
123:4,5,14
**forego (1)**
55:25
**forever (1)**
113:4
**forged (3)**
140:9,16,25
**forgery (3)**
139:19;140:23;
141:7
**forgive (1)**
131:21
**form (5)**
60:3;120:12;
130:12;138:12;143:4
**FORMAN (1)**
22:19
**formed (1)**
91:15
**Fort (2)**
54:16,20
**forth (6)**
31:7;78:1;112:6,
18;120:4;141:6
**fortunately (1)**
56:10
**forward (22)**
13:23;14:6,13,21;
15:7;32:1;33:5;
45:22;76:5,9,16;
86:20;102:9;118:22;
119:1,4,21;129:10;
135:3;137:23;139:2;
140:22
**forwarded (1)**
138:15
**found (2)**
30:19;107:13
**four (7)**
43:17;45:5;51:25;
118:21,23;129:11;
131:7
**fraction (1)**

105:4
**framed (1)**
104:8
**Frances (1)**
14:14
**Francisco (2)**
17:16;18:23
**Frankel (9)**
11:9;20:11;29:16;
61:25;62:2,3,4,17,22
**Franklin (7)**
15:5;142:10,11,20,
25;143:12,13
**Franklin-Harper (1)**
14:12
**frankly (6)**
43:7;56:1;90:18;
102:8,14;114:16
**fraud (1)**
132:21
**fraudulent (2)**
122:3,12
**free (1)**
80:16
**FREEBORN (1)**
26:19
**Freeman (2)**
12:4,7
**frequently (1)**
114:19
**FRIEDMAN (1)**
21:18
**front (4)**
30:13;121:7;
125:25;126:1
**FTI (5)**
6:20,23;22:20;
40:7;41:2
**full (4)**
87:2;88:18;89:13;
93:11
**fullest (1)**
143:11
**fully (1)**
51:9
**fundamental (2)**
91:5,5
**fundamentally (1)**
91:15
**funds (3)**
128:5,6;142:3
**further (6)**
50:23;52:23,24;
58:14;117:19;133:1
**future (4)**
32:4;35:2;64:23;
98:9

### G

**GALLAGHER (1)**
17:7
**Gary (2)**

14:11;54:21
**gather (1)**
137:18
**gave (5)**
81:25;82:1;109:12;
125:19;133:13
**general (10)**
39:20;46:3;56:18;
71:8;119:14;120:7;
121:22;123:19;
128:2,18
**generally (1)**
39:6
**generous (1)**
83:23
**Georgia (1)**
58:20
**gets (1)**
130:13
**giant (2)**
64:21;131:8
**Gilman (1)**
28:4
**given (7)**
51:20;56:13;66:23;
83:25;102:18;121:6;
130:22
**gives (1)**
113:12
**GMAC (8)**
121:6;122:3;128:5;
129:17;132:20;
141:7,24;142:2
**GMACM (2)**
103:4,12
**Goerner (43)**
13:22;29:17;
118:24;120:2,2,19,
21,23,23,24;121:1,
11,13,15,16,18;
122:9;123:21;124:6,
13,15,16,24,25;
125:9,11,13,17,24;
126:7,10,13,15,17,19,
21,24;127:2,4,5,6,9,
11
**Goerner's (2)**
120:15;127:25
**goes (5)**
33:6;72:13;86:20;
92:22;111:14
**Gonzalez (3)**
13:4,6;74:7
**Good (16)**
30:4;39:9;60:16,
18;69:4;72:2;80:21;
81:2,18;87:6;90:21;
91:13;94:25;104:4;
118:5;135:13
**GOTSHAL (1)**
23:19
**GOTTLIEB (1)**
23:11

**governance (3)**
43:19;45:1,9
**Grand (1)**
26:4
**granting (1)**
118:16
**grasp (1)**
91:13
**greatly (2)**
79:13;145:10
**Green (4)**
141:23,25;142:1,4
**Greenpoint (1)**
23:3
**Greenwich (1)**
21:5
**ground (2)**
34:9;101:16
**groundwork (1)**
54:23
**group (1)**
137:13
**Guarantee (5)**
2:8;23:20;89:25;
94:12;104:5
**guess (5)**
32:13;40:20;50:4;
65:24;92:6
**guidance (1)**
32:4;45:1;56:18
**guidelines (9)**
32:23;39:12;46:7,
10,20;47:4;65:25;
70:16,17

### H

**Haldenstein (3)**
12:3,7;75:4
**Hale (7)**
8:4,9;21:2;68:23;
69:1,5,10
**Hale's (1)**
71:20
**half (4)**
38:25;69:11;
122:19;131:4
**half- (1)**
66:24
**hallway (1)**
87:17
**Hamilton (12)**
4:11,14;23:11;
27:19;53:14,22;54:2,
3,9;55:14;56:8,12
**handed (1)**
94:3
**handful (2)**
72:23;101:6
**handing (1)**
116:25
**handling (1)**
80:25

**Hang (2)**
37:17;99:14
**happen (2)**
86:19;104:13
**happened (8)**
45:3;54:24;100:4;
102:14,15;109:4,5;
138:5
**happens (2)**
38:16;64:11
**happy (4)**
30:14;39:10;64:20;
85:10
**hard (3)**
39:21;51:6;81:19
**harder (1)**
84:8
**Harleston (6)**
15:6;142:10;
143:18;144:3,6,20
**Harper (2)**
14:11;137:19
**Harper's (1)**
137:18
**Hartford (1)**
134:11
**hate (1)**
59:4
**Hathaway (1)**
26:3
**hear (12)**
75:20;97:20,23;
98:3;104:2;109:2;
113:12;114:4,13;
115:8;120:24;141:15
**heard (5)**
77:18;78:4;109:19;
139:20;140:23
**hearing (51)**
13:13,18,21;14:2,5,
8,11,13,20,21;15:2,5;
30:20;38:22;41:10;
49:16;58:16;59:14,
25;60:7;77:8;80:22;
82:1,2;83:4,13,20,20;
84:10,23;89:1;90:13;
93:10;94:3,4;98:9;
100:1,7;109:20;
129:8;134:6,17;
135:20,23;136:4,8;
137:10;140:21,22;
141:15;144:12
**hearings (1)**
46:15
**heavily (1)**
48:19;72:17
**held (7)**
65:12;76:6,8;
77:15;78:12;123:8;
141:25
**help (2)**
90:22;129:22
**here's (2)**

50:2;114:1
**Herrington (3)**
5:17;27:11;53:5
**Herz (2)**
12:4,7
**hesitate (1)**
56:20
**hey (1)**
115:4
**High (2)**
19:4;62:14
**himself (1)**
72:5
**hired (1)**
70:14
**history (4)**
92:15,18,20,21
**hit (1)**
118:24
**HOEPA (1)**
85:5
**hold (3)**
59:25;124:14;
142:3
**holdback (16)**
75:18,24;76:1,10,
11,15,19,22,24;77:2,
8,19,23;78:18,24;
79:20
**holdbacks (1)**
76:20
**holders (1)**
112:22
**home (1)**
125:20
**Hon (1)**
115:19
**Honor (241)**
30:4,6,10,10,13,19,
20,22;31:4,7,17,24;
32:8;33:14,20;34:1,
10,15,18;35:10,12,
24;36:16,21;37:5,9,
12,16,22;38:5;39:2,9,
24;40:1,6,17,19;41:9;
42:4,15,25;43:9,13;
44:2,12;45:6,12,21;
46:4,5,5,19;47:10,12,
18;48:16;49:20,23;
50:8,12;51:3,17,18;
52:6,21;53:2,3,14;
54:1,5,8;55:8,13;
56:2,3,23;57:1,3,8,
10,14,25;58:8,25;
59:3;60:5,8,10,16,22;
61:9;25;62:17;63:9,
18;64:6,11,14,19;
65:1,5,10,21;66:4,6,
18;67:11,19,24;
68:21;69:4,25;70:16;
71:3,8,22,24;72:2;
73:18;74:4,12,17;
75:1,10,11,15;76:3,

14,19,23;77:17,25;
78:5,19;79:5,16;80:7,
8,9,17,21;81:2,4;
82:11,13;83:11,14;
84:9;85:2,10,18,25;
86:6,11,16,22;87:3,6,
16;89:3,14,17,18,20,
22;90:2,8,11;92:11,
25;93:2,4,6,9,17,21;
94:2,5,9,11,20;95:9,
17,24;96:9,22;97:9,
25;98:4,8,11,23;
100:5,7,12,15,24;
101:2;103:1;104:4;
109:12;114:9;
115:22;116:1,15,18;
117:4,8,10;118:5;
119:12;124:20;
127:14,21;128:9,20,
25;129:19;132:11;
133:7;134:9,24;
136:17;137:20;
138:8,24;139:1,11;
140:1,11;141:18;
142:6,24;143:15,16,
23;144:5,9,25;145:9,
14

**Honor's (8)**
45:22;46:8,12;
51:19;55:17;90:22;
98:11;145:11
**hope (2)**
90:13;96:4
**hopefully (4)**
30:13,20;65:11;
137:2
**horizon (1)**
55:1
**host (1)**
90:15
**hotel (7)**
48:10,15;49:11,14;
50:17;51:5;73:4
**hotels (3)**
48:24;49:9;72:20
**hour (3)**
46:21;66:25;69:13
**hours (9)**
35:20;52:1;58:17;
66:13,21;69:11,14;
70:3;122:19
**house (2)**
122:11,11
**HOWARD (2)**
24:7;72:2
**Hrg (1)**
13:10
**Hudson (1)**
41:11
**Hughes (11)**
14:21;29:18;139:3,
6;141:20,21,22,23,
24;142:2,3

**Human (1)**
2:19
**hundred (1)**
102:16
**hundreds (1)**
97:5
**husband (1)**
139:17

## I

**I'm (1)**
88:20
**Idaho (1)**
13:14
**identified (1)**
52:25
**identify (2)**
38:17;47:2
**identifying (2)**
69:9;90:22
**ii (1)**
13:14
**III (2)**
18:25;29:8
**IL (2)**
19:14;26:23
**imagine (1)**
44:4
**implement (1)**
135:2
**importance (1)**
92:21
**important (10)**
32:1;44:14;78:13;
90:7,10;101:4,6;
102:19;105:8;115:23
**imposed (1)**
36:2
**imposes (1)**
33:9
**improperly (2)**
118:12;128:5
**Inc (14)**
2:8,19,22;4:18,21;
6:21,23;7:19;22:20;
23:20;26:3;41:24;
89:25;104:5
**inclined (1)**
98:12
**include (4)**
34:6;112:9;118:23;
120:10
**included (6)**
32:22;34:4;36:9;
38:22;43:13;66:1
**Including (7)**
6:8;11:20;12:6,23;
13:6;69:12;111:12
**income (3)**
122:13,15;123:6
**incomplete (1)**
131:6

**Incurred (20)**
2:14,20;3:22;4:5,
13,19;5:4,11;6:7,15,
22;7:8;8:17;9:6,20;
10:5,13,21;11:5,12
**indeed (2)**
94:13;99:16
**indemnity (3)**
81:8,24;82:12
**Independent (7)**
3:12;24:21;44:16;
54:11,11,17;56:10
**indicate (5)**
32:22,23;45:22;
56:3;78:21
**indicated (6)**
46:5,19;49:24;
71:8;133:24,25
**indicates (1)**
62:16
**indicating (3)**
46:20;58:13;71:4
**indication (1)**
33:23
**individuals (2)**
47:3,3
**infer (1)**
85:6
**infinite (1)**
81:18
**inform (1)**
60:19
**informal (2)**
129:25;130:21
**Information (14)**
3:19;9:3;33:1,25;
35:18;45:2;130:20,
22;133:14,16,16;
134:6;136:24;137:4
**informed (1)**
91:10
**initial (6)**
44:3;69:25;70:6,8,
19;120:6
**initially (3)**
43:3;91:21;109:16
**instance (1)**
48:25
**instances (1)**
49:15
**instead (3)**
102:15;106:9,10
**institutional (1)**
55:1
**instructions (1)**
39:11
**Insufficient (6)**
14:4,10,19;15:4;
35:17;129:5
**Insurance (3)**
6:14;18:2,11
**Insured (1)**
2:8

**insurers (1)**
112:23
**intend (1)**
143:10
**intended (2)**
32:4;79:19
**intentionally (1)**
140:16
**interest (2)**
118:12;128:14
**interesting (1)**
114:14
**Interim (51)**
2:12,18;3:1,6,10,
20;4:2,10,17,24;5:2,
3,9,16;6:2,3,13,20;
7:1,6,13,18,22;8:2,3,
6,13,15;9:2,11,18;
10:3,10,19;11:2,10,
15,16;12:2,3,11,12,
19,20;13:2,3;30:7,11,
20,23;129:8
**interpreting (1)**
85:7
**interrupt (2)**
107:24;129:19
**interview (1)**
73:7
**intimately (1)**
72:16
**into (23)**
45:15;49:1,5,12;
51:10;52:8;54:15,15;
55:25;62:17;68:8;
71:17;83:2;84:5;
91:20;93:22;99:7;
109:18;114:12;
117:23;121:8;
133:19;141:15
**intra-creditor (1)**
90:15
**intra-debtor (1)**
90:15
**investigation (1)**
72:18
**Investigatory (1)**
2:13
**Investment (2)**
5:10;9:21
**investors (2)**
112:22;139:18
**invoice (14)**
34:23,24;58:15,18;
59:6,12,13,15,19,21;
62:5,9,15;69:10
**invoices (10)**
34:6;58:12,19,21;
59:11,15,17,17,20;
64:20
**involved (3)**
44:22;48:19;72:17
**involving (1)**
43:11

**isolated (2)**
48:25;49:14
**issue (61)**
32:21;34:16;44:23;
48:15,25;49:20;
53:21;55:17,22;
56:16;63:5,8;65:3,7;
69:6;71:6;77:19;
81:12,15;82:9,9,19,
21;83:6,8,11;84:3,14,
20;85:18;86:12,23;
87:18,19,24;92:7,23;
93:5;94:23;95:1,6,15,
16;96:5,7;98:12,20;
103:9,14;104:9,9,10;
110:16;121:15,23;
122:8;123:16,17;
125:4;136:21;141:25
**Issues (27)**
4:12;39:5;46:6;
49:7;51:2,8;60:2;
71:5;78:13,14,23;
79:20;90:21,22;91:1;
94:22;96:2,9;97:4,14,
25;98:10;103:10;
105:7;123:24;
124:12;127:25
**item (7)**
33:7;80:22;89:22;
117:17,21;145:4,6
**items (6)**
51:14;52:14,25;
59:10;74:3;145:6

## J

**JACOB (1)**
29:20
**James (2)**
13:23;119:5
**January (30)**
2:15,21;3:13,23;
4:5,13,20;5:4,12;6:8,
22;7:9;8:17;9:7,14,
22;10:6,13,21;11:5,
12;12:6,14,23;13:5;
58:19;64:4;66:15;
70:3;121:6
**JASON (2)**
28:15;58:8
**JAY (1)**
26:16
**JENNIFER (1)**
25:22
**Jericho (2)**
21:13,15
**JESSICA (2)**
19:24;39:9
**JF (3)**
10:6;29:19;63:20
**Joan (3)**
14:12;137:21,22
**job (1)**

90:21

**Joe (1)**
42:25

**JOHN (3)**
22:25;80:25;81:2

**Johnson (10)**
14:12;22:16;
137:21,22,23,25;
138:9,10,15,22

**JONATHAN (1)**
17:8

**Jones (3)**
7:23;27:2;28:18

**Jordan (2)**
116:24;117:8

**Jordon (1)**
129:1

**JOSEPH (1)**
24:25

**JSN (1)**
117:20

**JSNs (1)**
91:2

**judge (7)**
81:10;82:4,8,8,22;
89:10;90:23

**judges (1)**
52:3

**judgment (8)**
81:15,19;82:24;
83:18;84:11;87:1;
89:8;101:19

**Julian (1)**
14:13

**Julie (1)**
14:12

**July (2)**
111:9;140:2

**JUSTICE (1)**
20:2

**justification (1)**
70:5

## K

**KCC (1)**
138:16

**keep (4)**
66:24;76:18;105:8,
10

**keepers (1)**
59:2

**keeps (1)**
38:14

**Kenneth (2)**
11:13;20:16

**Kessler (1)**
22:3

**key (2)**
90:22;92:17

**kicked (1)**
117:23

**kind (3)**

43:10,23;104:8

**KISSEL (1)**
23:2

**knew (4)**
54:14;95:1;102:23;
103:24

**knocked (1)**
103:23

**knowing (1)**
143:8

**knowledge (2)**
34:15;55:1

**known (1)**
112:20

**KOTWICK (1)**
23:8

**KOVSKY-APAP (5)**
27:25;54:5,6,8;
57:1

**KPMG (3)**
3:18,23;41:15

**Kramer (6)**
11:8;20:11;60:17;
63:24;64:2;130:6

**KUGLER (1)**
24:17

## L

**LA (1)**
54:24

**laches (2)**
58:20;59:16

**landscape (1)**
115:2

**LARDNER (1)**
28:2

**large (6)**
51:8,20;91:4;
96:16;104:12;117:22

**last (13)**
30:20;38:10;55:10;
66:5,6;84:23;95:16;
97:7;105:15;109:5;
114:10;118:16;
143:17

**lastly (1)**
119:10

**late (7)**
70:8;99:11;117:23;
122:19,21;129:8;
142:25

**later (12)**
86:8;89:6;91:23;
94:17;95:1,4;98:21;
99:19;106:16,22;
109:14,18

**LATHAM (2)**
25:9;66:4

**launched (1)**
74:21

**LAURA (1)**
29:15

**Law (21)**
15:6;58:20;59:16,
19,20;71:15;81:12,
17;84:20,24;85:4,5;
86:12;99:4;135:24;
142:10;143:11,18;
144:3,6,20

**lawyers (11)**
47:25;48:9;50:15;
53:22;54:18;69:12;
72:21,25;124:9;
132:4;135:25

**laying (1)**
54:23

**lays (1)**
115:1

**lead (1)**
120:1

**least (10)**
58:14,21;76:18;
83:23;85:17;86:6;
91:18;135:20;
137:14;138:4

**leave (4)**
75:16;80:16;120:2;
143:1

**led (1)**
129:24

**LEE (2)**
17:18;28:7

**left (3)**
123:2;138:10;
140:3

**legal (2)**
45:2;54:11

**Leilani (4)**
139:3,5;140:13,17

**Leland (3)**
7:14;19:2;34:19

**lender (1)**
131:16

**lenders (1)**
131:5

**Leonard (5)**
11:16,20;22:19;
24:11;74:14

**less (3)**
50:3;51:25;66:14

**letter (5)**
130:21;139:14;
142:1;143:3,4

**letters (1)**
130:6

**Levin (6)**
11:8;20:11;60:17;
63:24;64:2;130:6

**liabilities (2)**
120:8;128:3

**Liability (5)**
13:12;91:9;130:24;
142:17,18;143:20;
144:19

**liable (2)**

139:18;140:12

**Liberty (1)**
23:13

**lien (1)**
128:13

**light (3)**
124:18;134:8;
138:7

**LIGHTNER (1)**
23:16

**likewise (1)**
136:1

**limit (3)**
32:19;35:20;36:1;
39:6

**limitations (2)**
33:8;35:19

**limited (2)**
55:5;87:22

**limits (1)**
39:20

**LINDE (1)**
18:7

**line (8)**
32:9;38:12;42:20,
23;94:8;97:12;98:5,
24

**lines (1)**
38:18

**linked (1)**
98:1

**Lipps (6)**
7:14;19:2;33:15,
22;34:19;35:7

**list (16)**
33:7;50:21;59:5,6,
18,21;69:14;93:8,11,
15,17,20;95:23,23,
25;118:23

**listed (9)**
31:14;59:13;62:14;
99:10;110:16;
113:13;119:24;
144:20,21

**listening (2)**
42:19;127:6

**lists (1)**
62:5

**litigating (1)**
109:7

**Litigation (7)**
4:3;19:12;34:5,22;
43:15,19;44:15

**litigator (2)**
45:9;72:16

**little (1)**
101:4

**live (2)**
92:19;134:8

**lived (1)**
131:3

**LLC (20)**
2:9;5:10,13;8:6;

9:3,8,19,23;10:11,14,
17,22;11:3,6;12:13,
16;15:21;25:10;
29:21;90:1

**LLP (62)**
2:13,16;3:7,11,14,
18,23;4:3,6,11,14,25;
5:2,5,17;6:4,9,13,17;
7:2,7,10,14,23;8:4,
10,14,18;9:11,15;
11:9;12:4,7,21,24;
17:2,12;18:1,10;19:2,
11,19;20:11;21:2,11;
22:11;23:2,11,19;
24:2,20;25:2,9,17;
26:2,11,19;27:11,19;
28:2,10;29:2

**Loan (12)**
2:9;25:18;89:25;
128:6;129:17;131:2,
18;136:10,12,14,22;
140:24

**local (1)**
34:24

**located (1)**
111:9

**Locke (3)**
3:7;19:11;41:20

**long (4)**
54:25;70:18;76:9,
16

**look (10)**
70:20;83:17;88:4;
94:5;95:18;97:11;
115:9;130:8;131:22;
140:21

**looked (4)**
64:18;105:14;
142:15;144:14

**looking (6)**
32:7;39:21;66:18,
22;73:12;114:25

**looks (1)**
138:18

**Lord (3)**
3:7;19:11;41:20

**Lorenzo (1)**
30:5

**Los (4)**
26:6;28:22;72:14,
15

**lose (1)**
123:14

**lost (1)**
55:1

**lot (5)**
47:23;49:10;79:3;
109:21;115:6

**Lots (1)**
114:17

**lower (1)**
62:19

**Lucious (5)**

14:21;29:18;139:3;
141:20,21
**lucky (1)**
  62:21
**lump (3)**
  64:24;135:15;
  137:13
**lump-sum (1)**
  68:7

## M

**Madison (1)**
  28:5
**mail (3)**
  127:2;131:8;
  133:14
**mailing (1)**
  133:13
**maintain (1)**
  76:16
**majority (1)**
  54:18
**makes (1)**
  93:6
**making (6)**
  80:1;83:7;87:8;
  123:6,17;139:21
**Mallet (2)**
  36:17;80:25
**Mallet- (1)**
  6:3
**Mallet-Prevost (2)**
  6:9;17:2
**managed (1)**
  77:12
**MANGES (1)**
  23:19
**MANNING (3)**
  28:15;58:8,8
**many (6)**
  86:14;90:17;92:2;
  124:12,16;131:5
**March (2)**
  6:16;64:8
**Marino (4)**
  11:2,6;68:1,4
**Marinuzzi (89)**
  30:3,4,5,10,19;
  31:4,13,17;33:13,14;
  34:1,3;35:12;36:15,
  16;37:12;38:5;39:2;
  40:1,6;41:9,13,15,20,
  24;42:6;47:12,21;
  48:2,16,19,22;49:6,
  10;50:3,6,8,11,25;
  51:3;52:16,20;53:2,5,
  10,12,14;54:1;57:3,8,
  10,14,25;58:4;60:10,
  14;75:11,15,19,23;
  76:3,6,23;77:2,5,7,
  14,25;78:3,14;79:5,8;
  80:7,9,14,20,21;

89:17,22;90:7;92:11,
15,17,18,25;116:18,
21,24;117:2
**Mark (3)**
  14:22;23:8,16
**marked (1)**
  32:12
**Market (1)**
  29:4
**markets (1)**
  104:1
**MARRIOTT (12)**
  29:8;87:6,8,8,16,
  21;88:1,7,9,11,16;
  89:14
**MARSHALL (1)**
  17:18
**MARYANN (1)**
  17:7
**MASUMOTO (91)**
  20:8;31:23,24;
  33:20;34:8,10,15;
  35:23,24;36:6,7,8,15,
  21;37:1,2,5,9,16,22;
  40:15,17,19;42:4;
  45:11,12,21;46:1,3;
  47:2,5,6,18;49:19,20;
  51:16,17;52:5,6,23;
  53:3;55:7,8;56:16,
  23;58:22,25;59:5,7;
  60:1,5,8;61:8,9,22;
  62:24;63:2,9,17,18;
  64:17,19;65:2,5,18,
  21,24;66:3;67:24;
  68:6,11,20,21;70:23;
  71:2;73:19,20,21;
  74:10,11,17,25;75:1,
  9,20,24;76:9,14;
  77:10,11,17
**Masumoto's (1)**
  47:8
**matter (53)**
  13:21;14:5,11,13,
  20,22;15:5;45:19,20;
  46:4,12;47:24;48:1,
  8;50:15;51:10;53:22;
  55:6;59:22;72:13,25;
  86:20;89:15;90:5,7;
  102:2,9;114:3,5;
  115:16,23;117:15,20,
  22,24;118:1,2,3;
  119:1,3;120:6;
  126:22;128:16;
  129:2,4;133:19;
  138:11;139:24;
  140:21,25;141:23,23;
  143:17
**Matters (16)**
  8:5;58:19;69:15;
  80:11,23;115:24;
  116:25;117:12,13;
  118:17,22;129:9;
  134:17,22;139:2;

142:7
**MATTHEW (1)**
  28:7
**may (38)**
  46:16;51:22;54:8;
  62:12;66:21;68:9;
  71:5;83:24,24,25;
  84:3,5,9,12;87:4;
  89:8,9,18;93:18,24;
  94:10,16;103:23;
  112:15;114:9;
  115:11,14;117:4;
  122:7;129:19;
  131:13;132:4,4;
  133:14;134:18,24;
  136:9;141:1
**maybe (3)**
  88:24;114:21;
  141:1
**MBIA (5)**
  95:19,22,24;96:2;
  100:19
**meal (9)**
  32:16,19,22;33:7,
  22;35:17;52:1,10,12
**meals (8)**
  32:17;33:24;35:19;
  46:18;50:17,17;
  51:19,24
**mean (21)**
  31:3;33:2;51:8;
  58:22;64:25;69:16;
  72:23;76:11;81:11,
  12;83:2;85:24;88:23;
  91:10,24;92:4;99:24;
  105:21;114:5,14;
  121:24
**mediation (12)**
  43:13;44:17,24;
  90:17,23;91:4,8,13;
  108:16,20;109:2,2
**medication (1)**
  122:19,20
**meeting (5)**
  35:22;43:10,24;
  49:2,15
**meetings (11)**
  43:4,18,21;44:6,9,
  13;45:3,17,23;46:15;
  54:16
**MEISEL (1)**
  22:19
**memo (1)**
  50:22
**memorandum (1)**
  135:24
**mentally (1)**
  121:2
**mention (1)**
  75:16
**Mercer (3)**
  7:19;26:20;41:24
**merely (1)**

119:19
**merits (3)**
  82:14;98:9;120:15
**Meryl (2)**
  118:2,5
**Mesa (1)**
  68:12
**Mesirow (3)**
  12:12,15;74:19
**message (1)**
  132:14
**messages (1)**
  140:3
**MI (1)**
  27:23
**MICHAEL (4)**
  17:9;22:16;25:14;
  66:4
**Michelle (2)**
  13:21;119:10
**microphone (1)**
  34:13
**might (5)**
  44:18;88:3;95:1;
  101:21;103:11;
  131:11
**MIKHAILEVICH (5)**
  19:24;39:2,9,10,24
**mill (1)**
  116:9
**million (4)**
  65:14;77:16;96:14;
  102:17
**millions (1)**
  97:6
**mind (5)**
  48:14;56:15;77:24;
  86:3;92:3
**minimis (1)**
  102:17
**Minne (1)**
  49:4
**Minneapolis (7)**
  24:15;49:2,7,8;
  51:2;73:7,14
**Minnesota (1)**
  11:17
**minor (1)**
  75:15
**minute (4)**
  80:13;90:8;100:8;
  134:9
**Misclassified (3)**
  13:20;117:25;
  118:8
**missing (1)**
  66:21
**Mission (1)**
  17:14
**misspoke (1)**
  41:9
**misunderstood (1)**
  138:1

**MN (1)**
  24:15
**modest (1)**
  41:3
**modification (7)**
  129:17;131:19,20,
  21;136:10,12,14
**modifications (1)**
  131:2
**Moelis (7)**
  9:18,23;25:10;
  65:13,19;66:24;67:4
**Moelis' (1)**
  66:15
**MOLDOVAN (7)**
  24:25;42:15,25,25;
  43:9;45:25;47:10
**money (3)**
  79:4;123:12;
  142:13
**monkey (1)**
  99:6
**monolines (1)**
  101:6
**monster (1)**
  136:7
**month (5)**
  91:25;99:23;100:4,
  21;110:11
**monthly (1)**
  76:17
**months (6)**
  51:5;90:14,17,24;
  102:14;122:14
**more (14)**
  43:4,11,24;44:4;
  51:25;56:18,19;
  67:10;79:18;88:20,
  25;129:3;134:18;
  137:5
**morning (10)**
  30:4;39:9;60:16,
  18;69:4;72:2;80:21;
  81:2;87:6,7
**Morrison (19)**
  5:2,5;7:6,9;24:20;
  30:5;42:6,14,25;
  43:16;44:20,22;47:8,
  12,15;93:3;117:9;
  118:6;129:1
**Morrow (4)**
  10:2,6;29:19;63:20
**mortgage (29)**
  112:23;121:5;
  122:3,4,5,10,12,12,
  14,15,16;123:5,7;
  125:19;126:3,7,10;
  128:5,5;138:2;
  139:14,17,22;141:7,
  8,24;142:2,12,22
**Mosle (3)**
  6:4,9;17:2
**most (5)**

44:13;71:16;82:2;
132:5;141:22
**Motion (23)**
2:2,6;13:10,18;
14:2,8,17;15:2;81:4,
7;88:19,19;89:23;
90:3,9;95:5;97:13;
100:18;106:16;
109:10,14,25;114:2
**Move (2)**
86:14;133:5
**moved (1)**
59:22
**Mrs (1)**
119:5
**much (17)**
39:6;43:8;44:4;
56:24;60:9;63:10;
71:12;77:13;78:15;
79:6;100:13;115:3;
116:16;126:24;
127:4,5;128:22
**multiple (12)**
43:16,16;46:24;
58:12,18;59:11,15;
64:12;103:24,25;
138:8;142:25
**MUNGER (1)**
26:2
**must (6)**
46:19,22;112:6,9;
140:4;143:20
**mute (2)**
30:17;37:18
**muted (2)**
38:18;42:23
**mystery (2)**
94:20;96:11

**N**

**NA (3)**
2:3;23:3;80:24
**Naftalis (2)**
11:8;20:11
**name (4)**
66:6;132:22;
140:16,25
**namely (1)**
48:7
**Naples (1)**
134:14
**Nationstar (5)**
111:11,17,18;
112:10,15
**nature (2)**
112:8;120:17
**necessarily (2)**
47:23;89:4
**Necessary (8)**
3:22;6:7;8:17;9:6,
20;10:5,20;11:12
**need (14)**

30:16;32:21,22;
33:24;37:18;43:5;
56:18;69:21;72:19;
80:15;95:17;129:22;
132:6;137:4
**needed (2)**
44:25;122:21
**neglected (1)**
75:16
**negotiate (6)**
84:10;88:23;91:18;
105:4;114:21;115:14
**negotiated (2)**
83:18;84:7
**negotiating (1)**
81:19
**negotiations (5)**
87:4;91:9,16;
96:12,12
**neither (2)**
59:19;82:14
**Nevertheless (2)**
41:2;51:11
**New (48)**
15:23;17:5;18:14;
19:22;20:6,14;21:6;
22:6,14,23;23:5,14,
22;24:5,23;25:4,12,
20;27:6;41:5;47:25;
48:8,14,24,24;49:1,8,
9,12,16;50:25;51:1;
53:23,24;54:15;
55:25;62:6,7,7,13,
14;72:21,22;73:9,11,
16;114:2
**next (27)**
38:16;41:20,24;
42:6;50:14;53:14;
57:10,14;61:3,17;
63:12,20,24;65:13;
67:19;68:1,15;74:6,
14;76:18;83:21;
86:14;89:15;111:16;
118:7;127:14;137:17
**nine (1)**
102:14
**Nineteenth (2)**
14:9;137:22
**nits (1)**
51:11
**Nobody's (1)**
79:24
**non-debtor (1)**
112:19
**none (1)**
50:4
**nonissue (2)**
83:18;84:8
**Nor (1)**
52:11
**normal (1)**
70:16
**North (2)**

19:4;26:13
**NOSEK (33)**
21:17;124:7,18,20,
20;125:6;132:9,10,
11;133:6,7,10,12,22,
24;134:5,10,13;
137:24;138:7,8,18,
20,24;139:25;140:1;
142:23,24;143:16;
144:8,9,16;145:14
**Nosek's (2)**
130:5;137:24
**note (4)**
122:5,10,11;141:1
**noted (2)**
59:3;100:19
**notes (6)**
51:13;53:20;
129:21;133:19;
138:11;139:17
**notice (7)**
100:9;112:19;
113:1,3,14;119:7;
138:12
**noting (1)**
79:9
**notwithstanding (1)**
56:4
**novel (1)**
105:17
**November (1)**
94:3
**Number (73)**
2:2;30:3;33:15;
35:13;36:18;38:6;
39:21;40:2,7;41:16,
20,24;42:6;43:9,12,
20;44:9;45:17,23;
46:11;47:13;53:6;
57:4,11;58:1,18;
59:12;61:4,13,18;
63:13,20,24;65:14;
66:22;67:20;68:2,15,
24;72:7;74:7,14,20;
75:4;89:23;91:7;
100:19;103:10;
117:15,21,24;118:3,
9,18;119:1,3,3,6,6,9,
11,12,17;125:17;
126:2,3;136:22;
139:5,6;140:4;143:2,
18;145:4
**numbers (3)**
59:6;118:25;123:6
**numerous (1)**
43:4
**nuts (1)**
115:2
**NW (2)**
18:3;27:13
**NY (20)**
15:23;17:5;18:14;
19:22;20:6,14;21:6,

15;22:6,14,23;23:5,
14,22;24:5,23;25:4,
12,20;27:6

**O**

**object (4)**
78:17;95:12;
105:20;106:12
**objected (4)**
34:9;95:13;105:23;
114:6
**objecting (5)**
105:18;106:9,10;
112:8;113:4
**Objection (128)**
2:2;13:10,11,18,
19;14:2,3,8,9,17,18;
15:2,3;30:12,22,23,
25;31:1,2,6;33:19;
35:14;36:19;38:7,23;
39:15;40:4,9;41:10,
17,22;42:9,11;43:4;
44:4;50:9;53:16;
55:10,10;56:20;
57:17,21,22;58:1,6;
61:21;65:15,19;
67:22;68:4,12,18;
69:7;72:8,10;74:9,11,
16,21;75:6,7;76:10;
78:20;80:23;81:5,5,
23;82:12;83:3;84:16;
87:14;88:9,11,18;
89:12;90:3;94:13;
95:14;97:13,21;98:1,
10,14;99:17,19;
101:18;105:23,24;
109:8,19;112:2,12;
114:4;117:13,16,17,
25;118:8,10,17,20;
119:2,16,17;120:4;
121:20;127:15;
128:17,23;129:3,4;
130:2,3,4;131:16;
132:12,18;134:3;
136:5;138:6,22;
139:2,16;142:8,15;
143:8,14;144:24
**objections (22)**
37:23;39:5;42:11;
47:20;60:21;71:4;
79:2;81:20;100:10,
18;101:10;102:10,
12;109:7;116:19;
117:10;119:21;
129:7,11,25;145:5,7
**objection's (1)**
42:13
**obligated (1)**
122:4
**obligations (1)**
113:8
**obscured (1)**

15;22:6,14,23;23:5,
14,22;24:5,23;25:4,
12,20;27:6
**O**
**object (4)**
78:17;95:12;
105:20;106:12
**objected (4)**
34:9;95:13;105:23;
114:6
[partial column]

40:20
**observation (1)**
79:18
**obtained (1)**
143:9
**obviously (4)**
40:16;49:20;67:6;
78:10
**occasionally (1)**
64:13
**occasions (1)**
143:1
**occurred (1)**
62:22
**o'clock (2)**
46:20,21
**October (5)**
13:15;117:14,18,
23;145:9
**Ocwen (17)**
2:9;25:18;89:25;
92:6;93:9,15;94:19;
95:4;102:4,10;
109:17;115:2,10;
121:5;123:4;125:25;
126:2
**off (19)**
37:20;38:11;42:18;
44:1;49:10,14,18;
93:8,11,15,16,20;
95:2,3,4,23,25;130:9;
145:15
**offer (2)**
140:15
**Office (26)**
20:3;30:24;31:21;
33:17;42:2;46:8;
47:15;48:1;51:21;
54:20;59:4;60:2;
62:25;70:24,24;
72:21;79:11,14;
116:24;124:8,22;
137:25;138:9;140:3,
4,7
**offices (4)**
48:9;50:15;53:22;
73:1
**Official (12)**
8:5;14:9;3,12,21;
10:3,11,18;11:3,9;
20:12;60:11
**often (2)**
62:22;64:11
**oftentimes (1)**
71:3
**OLSON (1)**
26:2
**omni (3)**
117:21;118:3;
137:22
**Omnibus (34)**
13:10,11,18,19;
14:2,3,8,9,17,18;

15:2,3;61:10;100:10,
17;116:19;117:10,13,
15,17,25;118:8,10;
119:16;128:23;
129:3,11,12;134:19;
139:2;142:7,14;
145:5,7
**omnis (1)**
129:4
**once (9)**
55:22;56:5;95:3,3;
96:20;99:20;107:23;
110:22;132:3
**One (39)**
18:21;23:4,13;
30:22;31:2;46:4;
47:21;49:22;50:13;
51:19;56:21;58:14;
59:12,13,21;60:23;
64:14;66:13;69:12;
75:15;79:18;82:23;
85:17;91:5;97:18,23;
104:13;113:15;
115:11;117:22;
124:8;125:18;126:2;
127:12,19;134:9;
139:9;141:5;142:24
**one-and-a-half (1)**
46:21
**one-and-a-half-hour (1)**
66:23
**one-hour (1)**
66:22
**ones (4)**
78:23;105:2;126:4;
135:6
**one-way (1)**
62:11
**only (21)**
34:7;46:7;58:24;
59:12;62:21;91:23;
95:24;110:3,10,19;
118:22;122:9;
129:10;130:9,18;
132:15;135:6;
136:21;140:4,12;
142:6
**open (2)**
82:9,9
**opening (1)**
98:15
**operations@escribersnet (1)**
15:25
**operator (7)**
38:12,13,18,20;
42:20,21,23
**opportunity (1)**
84:9
**oppose (1)**
119:13
**opposed (1)**
122:7
**opposition (2)**

134:23;135:19
**order (44)**
31:9,14;42:8;
43:25;44:25;48:5;
60:3;78:1;79:1;82:1;
88:11;89:16;93:12,
13,19;94:18;95:10,
18;110:2,21,24;
111:3,24;113:18;
118:16;119:23;
120:12;126:23,25;
127:2;130:10;
131:22;134:21;
135:2,14,17,21,21;
136:3,6;141:12;
143:9;144:23,24
**ordered (1)**
128:7
**orders (5)**
66:24;91:6;129:9;
130:3,17
**original (3)**
95:2;103:8;114:11
**originally (2)**
81:16;129:7
**Orrick (3)**
5:17;27:11;53:5
**Ortiz (1)**
14:14
**others (2)**
75:17;142:12
**otherwise (5)**
32:21;82:16,18;
112:4;138:3
**ought (2)**
64:23;98:3
**ourselves (2)**
62:19;98:15
**out (24)**
32:25;54:19;56:21;
60:1;74:3;87:17;
88:20;89:3;101:20,
21,25;102:18;
103:23;104:19;
115:14;124:23;
125:1,17;132:13,13;
136:11;139:14;
140:6,7
**outcome (1)**
96:6
**out-of- (1)**
55:17
**out-of-town (2)**
56:5;73:23
**outside (2)**
53:22;97:20
**outstanding (2)**
86:4;112:4
**over (20)**
33:22;34:14;36:4;
44:7;51:13;53:23;
77:21;80:24;90:17;
102:10,22;108:12,15,

16;109:7;113:13,17,
24;121:8;129:7
**overall (1)**
52:15
**overburden (1)**
62:25
**overcharge (1)**
65:25
**overhead (9)**
48:11;50:19;56:6;
69:18;70:12;71:3,10,
17;73:5
**overlapped (1)**
45:7
**overrule (1)**
102:12
**overruled (1)**
57:22
**overview (1)**
90:9
**owe (1)**
142:13
**owing (1)**
142:3
**own (1)**
104:6

## P

**PA (2)**
22:19;29:6
**Pachulski (4)**
7:23;27:2;67:19,22
**page (13)**
40:1;66:15,17,19;
80:10,22;89:23;94:6;
116:21;117:11;
126:5;129:2;143:4
**pages (2)**
121:13;122:24
**paid (4)**
76:12;77:13,23;
105:4
**paper (2)**
100:13;132:5
**papers (11)**
37:19;38:11,15;
42:18;88:5;93:7;
110:8;122:24,25;
123:7,7
**Paragraph (7)**
100:17;110:5,25;
111:7,16,16,25
**Pardon (2)**
86:22;103:1
**Park (4)**
17:4;22:13;23:4;
28:11
**Parke (5)**
12:21,24;24:2;
72:3,7
**part (17)**
48:11;50:18;55:16;

69:17;71:3,9,9;73:4;
84:6;88:24;90:23;
96:16;97:3,4;100:9;
108:17;114:25
**participant (2)**
44:21,21
**participants (1)**
91:8
**participated (1)**
91:12
**participating (1)**
126:25
**particular (6)**
48:17;67:3;107:9,
15;116:2;134:3
**particularly (3)**
37:23;114:15;
131:1
**parties (11)**
44:6;84:12;85:19;
91:12;95:18;98:8;
112:19,23;113:1,3;
114:17
**parties' (1)**
87:4
**partner (1)**
72:15
**Partners (6)**
5:10,13;11:3,6;
35:13;68:1
**party (3)**
90:16;112:8,21
**passed (2)**
91:16,16
**past (1)**
48:7
**patience (1)**
145:11
**Patricio (2)**
14:20;140:13
**pattern (3)**
107:11,17;108:7
**Pause (4)**
32:11,14;46:2;
51:15
**pay (1)**
62:19
**Payment (5)**
6:5;9:4;75:25;
76:17,17
**payments (2)**
128:6;139:21
**PC (2)**
3:2;18:19
**peace (1)**
86:3
**Peck (1)**
90:23
**penalize (2)**
52:18;55:23
**penalizing (1)**
52:20
**pending (2)**

41:10;97:14
**Penina (1)**
15:20
**Pennsylvania (1)**
54:16
**people (13)**
47:1;49:2;52:18;
72:14;79:20;91:6,10,
11;108:16;123:10;
135:25;136:8;137:12
**Pepper (12)**
4:10,14;27:19;
53:14,21;54:2,3,9,22;
55:14;56:8,12
**per (2)**
103:19;108:23
**percent (12)**
38:25;39:21;71:20;
76:6,7,8,12,15,20,24;
77:2,8
**perfectly (1)**
72:23
**performed (1)**
58:19
**perhaps (2)**
45:8;51:18
**Period (56)**
2:15,21,22;3:3,7,
13,15,24;4:5,7,13,20,
21;5:4,6,12,13;6:10,
16,17,22,24;7:3,9,10,
15,19,24,24;8:8,10,19;
9:8,14,15,22,23;10:7,
13,14;11:5,19,21;
12:6,8,14,16,22,24;
13:5,7;40:25;49:12;
50:13;76:20;88:18;
89:13
**Perkins (5)**
6:13,16;18:1,10;
57:3
**PERLSTEIN (7)**
21:8;69:4,5,25;
70:6,15;71:22
**permanently (3)**
94:13;99:17;
122:16
**permit (1)**
39:5;71:15
**permitted (2)**
49:17;87:2
**per-person (1)**
35:20
**Perry (4)**
13:22;29:17;
118:24;120:23
**person (6)**
54:21,24;122:14;
135:16,17;140:12
**personally (3)**
44:13;51:24;131:2
**personnel (1)**
55:19

**pertinent (1)**
112:14
**PETERS (1)**
26:19
**petition (2)**
102:3;143:24
**Phelps (1)**
108:23
**Philadelphia (3)**
29:6;53:24;54:20
**PHILIP (1)**
20:17
**phone (23)**
30:16,16;37:18,18,
19;38:10,15;39:1;
42:17,18,22;54:6;
60:24;62:1,2;66:13,
14;125:7;132:13;
138:11,14;140:3,4
**photocopy (1)**
65:22
**photocopying (1)**
66:7
**pick (1)**
118:3
**Pickering (4)**
8:4,9;21:2;68:23
**piece (1)**
132:5
**pile (1)**
79:9
**Pittsburg (6)**
81:10;82:4,23;
84:14;86:20;89:10
**plaintiffs (2)**
84:11;88:24
**plan (3)**
90:11,14;104:9
**playing (1)**
102:6
**Plaza (5)**
18:12;23:4,13;
24:4;25:3
**Please (7)**
30:2;79:2;80:19;
94:5;121:3;143:5,10
**pleased (2)**
30:24;60:19
**pleases (1)**
119:20
**plural (1)**
64:9
**plus (1)**
40:8
**Plympton (1)**
13:13
**pm (5)**
32:18,19;35:21;
50:17;145:16
**PNC (13)**
2:3;29:3;80:24;
81:5;82:11,24;83:3,
19,24;84:10;86:25;

87:5,9
**PNC's (3)**
85:18,22;86:9
**podium (7)**
80:24;86:9;87:4;
93:1;103:11;118:1;
132:8
**point (24)**
50:11;75:15;80:1;
86:1,3,11,14;89:3;
93:6;94:10;96:8;
99:15;100:9;108:4;
109:11,12;115:11;
116:5;120:16,19;
132:24;137:23;
139:22;142:2
**pointed (1)**
125:17
**policy (5)**
70:24,24;71:8;
78:13;115:6
**POLSINELLI (1)**
22:2
**pooling (1)**
112:23
**poorly (1)**
143:19
**portion (3)**
34:22;77:12;
118:14
**position (5)**
71:2;96:23;99:20;
114:15;135:25
**Possession (2)**
3:20;6:5
**possible (4)**
52:11;64:6;84:18;
91:9
**possibly (1)**
120:20
**post-petition (1)**
55:20
**postures (1)**
95:19
**potential (4)**
69:9;96:14;97:5;
98:13
**potentially (4)**
58:15;59:13;69:15;
98:15
**Powers (15)**
124:22,24;125:8,
10,15,22;132:13,16;
133:12,17;138:10,12;
140:2;143:7;144:10
**practice (4)**
46:23;48:3;62:18;
136:20
**practices (1)**
122:4
**pre- (1)**
102:2
**precedent (1)**

96:6
**preceding (1)**
98:15
**precise (1)**
77:22
**pre-dates (1)**
141:7
**predatory (1)**
122:3
**preexisting (1)**
117:19
**prefer (1)**
132:22
**preference (1)**
116:2
**pre-judge (1)**
83:3
**prejudice (7)**
85:21,24;86:2,8;
87:15,18,18
**preliminary (5)**
81:13,15,25;82:2;
89:2
**premature (1)**
88:14
**prep (1)**
68:13
**preparation (6)**
39:7,17;40:22;
43:11,13,14
**prepare (4)**
78:24;130:6;
134:21;136:5
**prepared (5)**
56:18;78:19;81:23;
102:9;135:9
**preparing (5)**
39:19;68:9;70:21,
21;71:12
**pre-petition (9)**
55:24;56:4;101:11;
102:16,17,22;114:8;
120:7;128:2
**PRESENT (16)**
29:13;39:1;43:22,
24;44:7,10,25;45:6;
54:3;57:20;58:7;
60:14;78:1;90:3;
120:21;144:7
**presentation (2)**
30:7;75:12
**presented (1)**
122:23
**pretty (4)**
52:19;55:2;90:21;
91:13
**prevails (1)**
104:12
**previous (1)**
34:21
**previously (2)**
34:25;99:22
**Prevost (1)**

6:4
**primarily (1)**
32:6
**primary (1)**
81:7
**principal (2)**
138:2;139:14
**prior (5)**
38:23;39:15;40:25;
54:12;55:16,18;
75:24;76:15,20;77:1,
23;93:9;111:20
**priority (2)**
118:12;120:17
**Pro (7)**
29:14,17,18,19;
31:2;57:20;136:3
**probably (3)**
44:13,13;82:23
**problem (8)**
44:2;63:4;86:24;
92:19;102:13,18;
105:5;131:14
**problems (1)**
115:7
**procedural (3)**
95:19;98:10;
103:10
**procedure (2)**
37:24;137:12
**procedures (13)**
93:12,13;95:10;
110:2;130:9;131:22;
134:21;135:1,14,16,
21;136:3;141:12
**proceed (3)**
31:14;105:18;
114:5
**proceeded (1)**
105:16
**proceeding (3)**
86:6;96:11,12
**proceedings (2)**
123:5;145:16
**process (6)**
44:16;54:24;90:23;
91:4;130:1,2
**produce (1)**
133:2
**produced (1)**
121:6
**Professional (45)**
3:2,6,21,24;4:24;
5:3,6,13,16;6:2,6,24;
7:1,2,13,18,19,22;
8:2,16;9:5,8,15,19,
23;10:4,19;11:1,15,
17,21,21;12:2,8,11,
16,19,24;13:2,7;31:9,
10;44:21;60:24;
77:22
**Professionals (12)**
3:19;31:11;41:5;

46:24;55:15,19,24;
56:5;60:11;71:25;
72:4;77:16
**professionals' (1)**
60:21
**program (1)**
51:22
**project (1)**
54:21
**promptly (1)**
79:3
**Proof (21)**
2:3;80:23;84:2;
89:5;102:24;103:3,4,
8;106:1;108:19;
114:11;115:9;120:3,
5,9,11;127:23,25;
128:12;138:1;140:15
**proofs (1)**
120:9
**proper (1)**
120:17
**properly (1)**
45:20;70:11;88:21
**propose (1)**
131:13
**proposed (8)**
81:16;83:2;90:12,
12;105:15;112:12;
119:13;136:6
**proposing (1)**
78:15
**protect (1)**
123:13
**protective (1)**
105:19
**prove (1)**
104:19
**provide (16)**
35:1,2;44:25;45:1;
59:19;64:15,23;
130:19;135:18,18,21,
21,24;136:4;141:13,
16
**provided (14)**
35:18;36:23;40:23;
41:1;44:8;45:13;
56:9;59:20;82:12;
99:11;111:17;
120:13;130:2;133:15
**Provider (1)**
3:13
**provision (5)**
81:16,19;83:19;
84:25;89:8
**PSLRA (1)**
85:7
**pull (1)**
34:13
**purchase (1)**
93:12
**purchased (1)**
112:17

**purchaser (1)**
93:14
**purportedly (1)**
86:4
**purporting (1)**
128:12
**purpose (1)**
121:21
**purposes (2)**
71:13;113:2
**pursuant (5)**
39:11;59:1;94:17;
110:21;128:7
**pursue (1)**
143:10
**put (13)**
30:16;37:18;47:1;
95:7,22;99:18;
106:12;122:9;
131:19;137:7,14;
144:1,1
**puts (2)**
98:22;115:1
**Putting (3)**
106:5;132:20;
138:2

**Q**

**Quadrangle (1)**
21:13
**quickly (1)**
65:11
**quite (6)**
47:24;70:8;79:14;
99:4;114:17;143:24

**R**

**RACHAEL (2)**
20:18;60:16
**Ragonese (1)**
14:22
**Rains (1)**
48:17
**raise (7)**
56:16,20,20;78:19;
85:17;97:4;123:24
**raised (9)**
47:20;48:13;55:10;
71:5,6;94:10;97:5;
134:17;145:13
**raises (3)**
52:1;92:7;102:11
**ran (2)**
90:24;99:24
**range (1)**
39:20
**rather (2)**
54:15;81:5
**rating (1)**
112:22
**RAYNOR (1)**

19:16
**Re (5)**
13:10,18;14:2,8;
15:2
**reach (5)**
40:21;47:19;49:22;
60:3;140:6
**reached (5)**
37:6;49:25;124:23;
132:12,13
**read (8)**
93:22;100:16;
110:25;111:7;
113:12,15,21;122:25
**real (3)**
88:22;99:5,6
**realize (1)**
41:9
**really (27)**
31:25;32:4,20,22;
33:6;52:12;54:9;
72:13;79:9;82:15;
87:18;90:16;91:10,
24;92:6,9,10;93:6;
95:17;96:16,17;
98:24;115:20;
121:23;122:21;
126:19;142:7
**reason (6)**
72:25;95:20;
102:19,21;122:9;
130:18
**reasonable (4)**
39:16;70:18;96:23;
97:8
**reasons (1)**
102:7
**reasserted (1)**
86:8
**receipt (1)**
62:10
**receipts (2)**
131:7,8
**receive (1)**
143:4
**received (4)**
125:13,19;138:13;
140:5
**recent (1)**
141:22
**recess (2)**
80:13,18
**reclassification (1)**
119:14
**reclassified (2)**
123:19;128:18
**reclassify (5)**
118:11;119:19;
120:16;121:22;139:8
**recognition (1)**
112:24
**recognize (1)**
44:14

**reconciliation (1)**
130:2
**reconsider (1)**
102:2
**reconsideration (1)**
87:21
**record (15)**
30:5;34:18;66:5;
93:22;94:2;105:10;
109:11,22;118:23;
128:25;131:16;
136:11;141:6;144:5;
145:15
**recorded (2)**
126:3,4
**Records (9)**
13:12;126:4;
130:23;131:17;
136:10,20,25;137:5;
142:15
**record's (1)**
144:9
**recurring (2)**
32:20;131:14
**red (1)**
64:21
**redacted (1)**
40:23
**reduce (15)**
36:19;37:14;39:13,
14;42:2;44:9;57:18;
61:6;63:15;64:2;
68:4,18;72:10;73:22;
76:19
**reduced (10)**
33:17;35:16;40:13,
14,25;42:10;47:16;
67:22;75:7;76:4
**reducing (6)**
57:17;74:22,23;
76:11,15;78:18
**reduction (42)**
33:3;35:4,4;37:7;
38:1,3;39:23;40:10,
21;41:3,4,8;43:6;
46:17;50:23;52:18,
19,24,24;53:8,9,17;
56:14;57:7,23;58:11,
24,25;59:1;65:8;
66:7,8;68:7,10;71:19,
20;74:1;81:16,19;
83:18;87:1;89:8
**reductions (4)**
37:25;52:23;61:11;
75:2
**refer (1)**
32:18
**referenced (1)**
95:25
**reflect (1)**
65:24
**reflected (6)**
46:22;56:1;59:1;

66:8;119:7;120:17
**reflects (2)**
45:19;61:10
**refused (1)**
83:20
**regard (8)**
55:13;71:6;130:19;
132:11;133:7,16;
140:1;142:24
**regarding (10)**
36:22;38:22;45:23;
55:17,17;58:20;
59:16;68:12;91:8,9
**regards (12)**
117:10;129:10,11;
130:3;135:1;136:16;
139:1,6,19;140:18;
141:6;142:11
**register (2)**
119:19;120:18
**registered (1)**
131:8
**regular (2)**
48:22;49:12
**regularly (1)**
139:21
**Regulatory (2)**
8:5;48:2
**reimbursable (2)**
33:24;35:19
**reimburse (2)**
53:25;72:20
**reimbursed (3)**
33:9;39:7;70:12
**Reimbursement (31)**
2:14,20;3:12,22;
4:4,13,19;5:11;6:7,
15,22;7:8;8:7,16;9:6,
13,20;10:5,12,20;
11:4,11,18;12:5,13,
22;13:5;32:24;34:5;
39:5;71:15
**reimbursements (1)**
46:25
**reimbursing (1)**
70:25
**reject (4)**
104:21,24;105:1;
114:18
**rejection (3)**
105:2,3;106:15
**relate (1)**
131:1
**related (4)**
43:10;44:17;89:24;
111:13
**relates (11)**
13:13,21;14:5,11,
13,20,22;15:5;32:6;
48:14;136:9
**relating (7)**
43:14,15,23;51:5;
76:24;136:13;142:4

**relationship (2)**
56:4;142:19
**relative (1)**
101:22
**release (3)**
76:23;79:19;
111:20
**relevant (2)**
111:19;113:5
**reliance (1)**
91:7
**relied (1)**
91:12
**relief (2)**
118:17,19
**rely (1)**
52:13
**remain (9)**
42:11,12,12;47:17;
61:7;63:16;68:5;
80:4,15
**remaining (5)**
77:3;79:2;85:19;
119:21;142:7
**remains (1)**
40:12
**remember (1)**
69:23
**reminded (1)**
55:9
**remotely (1)**
54:19
**remove (5)**
92:1;99:18;100:2,
23;111:18
**removed (14)**
39:11;94:13;98:21;
99:8,14,16,21;
100:20;106:15;
109:18;110:11,14,19,
22
**removing (2)**
106:6;109:16
**Rendered (11)**
3:11,21;5:4;6:6;
8:8,16;9:5,19;10:4,
20;11:11
**Renee (1)**
119:10
**reply (11)**
96:1;99:8;100:11,
12,18;114:10,12;
119:15,17;120:4;
141:6
**report (3)**
30:24;44:15;69:12
**Reporting (1)**
129:23
**reports (2)**
69:8,21
**represent (2)**
104:5;143:6
**representation (1)**

69:9
**representative (2)**
127:18;143:13
**representatives (1)**
60:24
**represented (3)**
44:22;45:4;101:9
**represents (2)**
44:6;71:19
**request (15)**
34:5,21;46:24;
47:16;57:18;60:1;
77:21;84:13;85:22;
118:19;127:1;
130:21;131:6,19;
143:3
**requested (11)**
33:18;35:1;37:14;
39:1;42:10;47:17;
51:21;61:4;74:7,8;
131:2
**requesting (32)**
31:19;33:15;35:13;
36:17;37:13;38:6;
40:2,7;41:15,16,21,
25;42:7;47:13;53:6,
15;57:4,11,15;58:5;
61:14,18;63:13,21,
25;65:14;67:20;68:2,
16,24;72:7;74:15
**requests (2)**
75:17;85:18
**require (3)**
120:12;135:15;
141:13
**required (3)**
49:1,15;131:25
**requirement (1)**
46:21
**requirements (2)**
70:16;129:17
**requiring (1)**
142:2
**ResCap (1)**
131:12
**reserve (1)**
59:8
**reserved (1)**
109:6
**Residential (5)**
8:6;26:12;27:12,
20;30:3
**resolution (2)**
44:18;60:3
**resolutions (3)**
30:12;31:7;49:25
**resolve (18)**
42:8;60:2;63:5,8;
65:11;79:3;90:17,25;
94:21;96:5,7,9;
115:3;125:4;132:18,
19;134:1,2
**resolved (10)**

31:6;40:10;42:9;
60:22;94:14;96:1;
99:17;102:8;117:22;
138:11
**resolving (4)**
43:8;67:22;68:3,17
**Resources (1)**
2:19
**respect (69)**
31:5;32:1,15;33:2,
10,19,21;35:16,25;
36:4,8,20;37:3,23,25;
40:11,22;41:3,5;
44:8;45:3;46:15,17;
48:3,4,17;49:11;
51:19,23;59:8,24;
61:11,24;63:3;65:7,8,
19;66:7,24;67:3;
70:8,19,25;76:22;
77:5,14,19;78:23;
84:16;85:5,8;86:3,5;
91:2,2;95:24;98:10;
104:11;109:24;
110:1,3;113:9,19;
117:25;129:16;
131:1;132:6;134:16;
137:8
**respective (2)**
113:3,10
**respond (6)**
38:22;83:16;101:3;
104:6;106:9;130:16
**responded (2)**
106:2,4;130:14
**respondents (1)**
118:20
**responding (1)**
39:15
**response (30)**
13:23;47:8;61:10,
10;82:11;85:18;
100:10;118:24;
119:5,7,10,12;120:5;
127:24;128:12;
130:21,22;132:12,18;
133:22;135:6;136:9,
23;139:15,16,16;
140:7;142:1,14;
143:20
**responses (7)**
37:6,22;47:19;
95:9;118:20,23;
119:15
**responsibility (3)**
32:25;130:24;
142:3
**responsible (1)**
123:8
**restriction (1)**
32:18
**restrictions (2)**
33:8,24
**restructuring (1)**

45:10
**result (2)**
81:20;136:4
**retained (5)**
55:16,19;70:7;
71:9;72:4
**retention (5)**
66:24;70:17,19,22;
71:13
**returned (1)**
138:10
**Review (14)**
4:11;32:5;37:24;
52:22;54:12;56:10;
59:2,10;63:2;64:22;
69:20,20;136:7;
144:13
**reviewed (7)**
40:24;41:19;58:23;
120:5;127:23;130:9,
12
**reviewing (5)**
69:8,11,23;79:11,
14
**RFC (1)**
103:13
**RICHARD (1)**
28:24
**RICO (5)**
85:2,3,4,6;86:12
**RIELA (11)**
25:14;66:4,4,11,17,
20;67:2,6,11,13,16
**R-I-E-L-A (1)**
66:5
**right (115)**
30:2;31:12,17;
33:21;35:3,7;36:3,13,
25;37:7,10,10;38:2,9,
21;39:13,23;40:5;
41:7,23;42:5;47:7;
48:21;49:6;50:5,10;
52:22;55:7;56:25;
57:6,9,19,22;58:10;
61:12,16;62:24;
63:19;65:24;66:1;
67:7,12,25;68:14,22;
71:11;73:2,15;74:13;
75:2,8;76:21;77:4,9,
20;80:6,19;81:8,11,
12,22,24;82:5,9,15,
17,21,25;83:8,23;
85:3,25;86:17;87:1;
88:14;89:9;92:20;
96:19;102:13;
104:23,25;105:6;
107:16;114:8,13;
115:1;116:23;125:9;
126:12,14,17;127:12,
17,19;128:10,15,17;
129:14;130:11,15;
132:2;133:23;134:7,
15;135:5,7;137:21;

138:19;139:12;
140:12;141:1;142:5,
9;143:12;145:15
**rights (5)**
80:4;88:3;109:6;
115:14,15
**RINGER (24)**
20:18;60:14,16,16,
19;61:3,13,17,25;
63:11,12,20,24;64:6,
11;65:1,10,13;67:18,
19;68:1,15,23;71:24
**ringing (1)**
122:18
**rise (3)**
140:9,10,17
**RMBS (5)**
43:15;44:15,16,24;
48:19
**road (2)**
84:10;98:14
**ROBERT (4)**
21:17;24:17;27:8;
124:20
**Robin (1)**
72:15
**Rockefeller (3)**
18:12;24:4;25:3
**ROLAND (1)**
25:6
**role (1)**
55:14
**rollover (4)**
40:8,11,13,20
**RONALD (1)**
21:18
**RONIT (1)**
23:25
**room (1)**
123:2
**Rose (1)**
13:13
**Rothchild (14)**
118:2,5,6;119:23;
125:7;127:3,14,21;
128:9,11,16,20,23;
133:18
**round (1)**
62:14
**Rubenstein (3)**
4:17,21;57:10
**rule (8)**
46:20;49:17;51:24;
56:2;82:6;83:21,22;
135:10
**Rules (1)**
120:11
**ruling (6)**
45:23;46:8,12;
88:10;89:11;141:3
**rulings (1)**
46:14
**run (2)**

92:8;116:8
**rustling (4)**
37:19;38:11,15;
42:17

**S**

**sale (27)**
93:10,11;94:4,13;
95:10,13,13,18;
99:16;100:7,10,18;
101:10,18;102:11;
104:12,15;105:14,15,
16;109:5,5,9,16,18,
20;110:2
**sales (1)**
93:13
**same (15)**
42:11,12,12;53:21;
58:16,21;61:7;63:16;
68:5;69:16;94:18;
95:12;125:19;126:1;
140:21
**San (6)**
11:2,6;17:16;
18:23;68:1,4
**sand (2)**
97:12;98:5
**Sanders (8)**
7:2;28:10;58:5,7,9;
59:9,10,24
**SARA (3)**
23:24;94:11;104:4
**SARAH (2)**
29:9;87:10
**satisfactorily (1)**
63:5
**satisfactory (2)**
77:9;112:10
**satisfied (10)**
36:25;45:18;56:9,
11;58:23;59:24;65:2;
73:20;74:1;83:1
**satisfy (1)**
57:17
**save (1)**
122:11
**saying (17)**
55:23;83:13;88:17;
89:3;94:12;96:22,24;
97:9,9;99:16;103:16;
113:18;123:3;126:7,
15;131:6;144:2
**schedule (20)**
60:6;91:21,22;
92:5;98:21;99:8,10,
14;100:2,20;106:15;
110:9,17;111:10,10,
15,19;113:13;116:6;
143:22
**scheduled (6)**
98:6,7;143:19;
144:2,11,23

**schedules (7)**
100:23;108:21;
144:13,14,18,19,20
**scheduling (3)**
95:15;98:9;117:20
**SCHINDLER-WILLIAMS (2)**
29:9;87:10
**SCHOTZ (1)**
22:19
**SCHUYLER (1)**
18:16
**Se (7)**
29:14,17,18,19;
31:2;57:20;103:19
**search (3)**
131:18;136:10;
137:5
**searched (1)**
144:19
**searching (2)**
129:21;136:19
**seated (2)**
30:2;80:19
**seats (1)**
62:10
**Second (23)**
4:10;7:22;8:13;
9:2;10:2,10,17;11:2;
12:2,3;31:1;32:10;
37:17;62:11;76:7;
77:3,15;81:17;92:9;
99:4;105:24;110:7;
125:7
**Secondly (1)**
95:17
**secret (1)**
91:3
**Section (3)**
2:6;89:23;118:13
**secured (15)**
120:3,11;121:19,
22;122:7,10,11;
123:3,20,22;124:1;
125:2,3;126:8,10
**Securitization (1)**
2:13
**security (2)**
118:12;128:14
**seeing (1)**
115:13
**seek (5)**
60:2;94:16;118:11;
121:21;122:4
**seeking (9)**
74:20;75:5;83:12;
99:21;114:7;119:18;
120:14,16;121:20
**seeks (1)**
46:8
**seem (1)**
42:19
**seems (2)**
43:7;114:14

**segregate (1)**
128:6
**SEIFE (17)**
24:7;72:1,2,2,15;
73:2,6,11,15,18,24;
74:4,6,14,19;75:4,10
**SELENA (1)**
18:7
**self-inflicted (3)**
84:7;86:23;88:23
**send (1)**
143:2
**senior (1)**
72:16
**sense (1)**
102:1
**sensible (1)**
101:21
**sensitive (1)**
131:1
**sent (10)**
121:1,5,8,14;
130:13;131:6;134:5;
138:12;139:14;143:2
**separate (4)**
83:8;94:18;109:14;
125:6
**September (10)**
14:14,23;95:11;
96:18;98:16;101:5;
117:16;133:16;
143:3;145:8
**serious (1)**
123:24
**served (2)**
112:14;127:2
**Service (2)**
3:13;111:14
**serviced (1)**
142:22
**servicer (1)**
139:18
**Services (12)**
3:11,21;5:3;6:6;
8:8,16;9:5,19;10:4,
19;11:11;59:20
**Servicing (11)**
2:9;25:18;89:24;
90:1;96:14;102:4;
112:24,25;122:4;
136:20;141:7
**Servicing-Related (2)**
2:7;103:5
**se's (1)**
136:3
**session (1)**
43:11
**sessions (5)**
43:13,14,14,15;
91:13
**set (14)**
31:7;78:1;90:9;
106:25;110:17;

**112:6,18;116:8;**
120:4;134:17,18,22;
141:6;143:2
**sets (1)**
110:2
**setting (2)**
90:8;110:22
**settled (2)**
36:24;38:1
**settlement (13)**
31:21;35:15;44:17,
24;48:20;74:22;
81:14,17;83:2,5;84:6,
12,13
**settlements (1)**
56:1
**settles (1)**
90:14
**seven (4)**
38:25;66:13,21;
129:10
**Seventeenth (6)**
13:19;117:24;
118:8,10;119:16;
128:23
**several (5)**
39:18;100:6;
102:16;134:1;138:14
**severance (1)**
105:16
**severe (1)**
105:16
**Severson (6)**
3:2;18:19;31:5;
57:15,21,23
**SEWARD (1)**
23:2
**shall (5)**
111:10,18,21;
112:19;113:3
**share (1)**
78:24
**shed (4)**
124:18;134:7,8;
138:7
**sheets (1)**
51:4
**short (1)**
143:4
**show (4)**
99:25;123:23;
128:12;137:12
**shows (3)**
50:3;62:9;130:23
**SHUGHART (1)**
22:2
**sic (1)**
31:19
**side (2)**
45:1;82:14
**sign (4)**
79:1;122:24;123:8;
138:21

**signature (3)**
126:5;139:19;
140:9
**signed (2)**
123:7;125:20
**significant (4)**
41:4;69:8;70:3;
101:17
**significantly (2)**
66:14;101:3
**signing (1)**
123:2
**silent (1)**
85:8
**Silverman (1)**
125:22
**SilvermanAcampora (8)**
8:13,18;21:11;
68:15;119:8;124:9,
21;127:23
**similar (9)**
71:2;94:18;95:19;
113:1;127:25;128:1,
1;129:5;142:11
**simple (2)**
53:25;108:14
**simpler (1)**
115:11
**simplified (2)**
136:2;137:12
**simply (9)**
33:7;97:11;104:21;
108:12;120:16;
138:1;139:7;142:13;
143:18
**single (3)**
46:24;64:10,25
**singular (1)**
64:10
**sit (2)**
85:12;114:21
**situation (3)**
55:5;86:2;107:6
**situations (1)**
101:8
**size (2)**
51:9,20
**skeptical (1)**
131:22
**slightly (1)**
50:3
**slow (1)**
121:2
**small (4)**
34:24;52:16;
101:22;104:11
**sold (1)**
109:17
**solely (1)**
89:12
**Solutions (4)**
9:3,8;29:21;63:12
**solve (1)**

**92:19**
**solved (1)**
86:24
**Somebody (6)**
37:18;38:14;49:15;
69:1;91:18;134:7
**someone (4)**
42:14;60:2;140:3;
144:1
**sometimes (7)**
49:2;51:22;55:15,
15,18;64:6;71:6
**somewhat (2)**
40:20;130:6
**Sonya (1)**
15:6
**sorry (13)**
31:4;34:3;42:10,
12;57:15;66:17;90:4;
92:18;100:11,15;
123:21;128:1;145:6
**sort (5)**
59:25;78:12;
103:15;115:1;137:11
**Soto-Ortiz (1)**
14:14
**sought (3)**
106:22;118:17;
136:14
**South (5)**
19:13;24:13;26:4,
21;28:20
**Southfield (1)**
27:23
**SPAHR (2)**
29:2;87:9
**speak (3)**
82:8;102:8;144:10
**SPEAKER (3)**
32:8;89:18,20
**speaking (1)**
137:24
**Special (27)**
2:13,16;3:7;4:3,6,
11,14;5:17;6:14,17;
7:14;8:4,14,18;
11:17;17:13;18:20;
19:3,20;21:3,12;
55:12;124:3,9,10,21;
134:21
**specialize (1)**
43:18
**specific (8)**
39:4,22;56:17,17;
59:10;60:23;92:23;
142:16
**specifically (11)**
46:10;62:8;64:19;
84:17,24;106:20;
129:11;131:15;
132:7;137:8;141:13
**specificity (1)**
112:6

**specified (1)**
142:17
**specter (1)**
97:5
**spelling (1)**
66:5
**spend (3)**
90:8;115:13;
116:11
**spends (1)**
79:14
**spent (6)**
48:23;66:14;68:9;
69:8,10;71:12
**spoke (4)**
124:24;133:13,17;
137:25
**spoken (2)**
124:17;133:18
**staff (2)**
72:14,25
**staffed (5)**
45:20;53:22;54:13,
18,19
**staffing (3)**
48:8;50:15;72:13
**stage (2)**
90:9;103:20
**stand (3)**
99:21;115:14;
139:23
**standard (4)**
68:13;82:10;83:1;
84:5
**standpoint (3)**
78:15;101:21;
115:6
**Stang (3)**
7:23;27:2;67:19
**start (3)**
61:1;94:12;99:16
**started (7)**
41:10;54:12,21,22;
122:24;123:4,5
**starts (1)**
94:8
**state (2)**
32:17;123:14
**stated (4)**
118:7;119:17;
120:14;133:18
**statement (5)**
88:4;99:15;102:18;
135:25;136:23
**statements (1)**
127:24
**STATES (6)**
20:2,3;30:24;
33:17;47:15;119:12
**Status (2)**
2:10;120:11
**statute (2)**
85:2,7

**statutes (1)**
84:25
**statutory (3)**
81:11;82:15,20
**stay (2)**
34:14;49:16
**staying (1)**
48:24
**STEEN (1)**
23:11
**step (1)**
130:5
**still (8)**
41:10;70:2;76:7;
87:7;90:18,19;
130:22;144:11
**stop (11)**
88:18;89:13;96:25;
107:20,22;109:1;
110:7;114:1,3;
124:14,16
**stopped (2)**
122:25;123:1
**straight (1)**
130:4
**strategies (2)**
58:13;59:12
**strategizing (1)**
48:4
**strategy (2)**
58:16;59:14
**Street (17)**
11:16,20;15:22;
17:14;18:3;19:4,21;
20:4;21:5;24:11,13;
25:19;27:13;28:4,20;
29:4;74:14
**Strickland (3)**
13:22;119:11,13
**strictly (2)**
45:24;98:25
**stuff (1)**
50:22
**Su (1)**
141:9
**subject (6)**
74:2;78:22;80:3,3;
87:11;111:16
**submission (3)**
126:23;127:13;
141:22
**submit (8)**
60:3;63:7;89:16;
136:6;137:7;144:21,
23,23
**submitted (3)**
62:11;64:13;
143:19
**subsequent (2)**
93:7;97:4
**subsequently (2)**
96:1;132:14
**sub-servicing (1)**

112:25
**substance (3)**
68:11;96:20;97:1
**substantial (5)**
33:3;40:16;43:3;
54:23;105:2
**substantiate (1)**
139:15
**substantive (1)**
103:10
**successful (1)**
112:16
**sudden (3)**
102:14,16,22
**sue (1)**
133:1
**sufficient (2)**
76:18;116:11
**suggest (1)**
115:13
**suggested (2)**
34:24;133:14
**Suite (10)**
15:22;18:4;19:5;
20:5;21:14;22:5;
24:14;26:22;27:22;
28:12
**Sulit (10)**
14:20;139:3,5,6;
140:1,8,13,13,17;
141:4
**Sulit's (3)**
140:3,16;141:9
**sum (1)**
33:3
**summarized (1)**
30:11
**summary (2)**
51:4;129:4
**summer (1)**
105:15
**supervising (1)**
69:15
**supervision (1)**
124:23
**supplement (1)**
144:4
**supply (1)**
33:25
**support (10)**
34:6,22;99:20;
112:10;119:16;
123:23;129:6;
133:15;134:23;
135:18
**supporting (4)**
34:7,25;120:6;
127:24
**supposed (1)**
82:3
**sure (25)**
36:1;52:3,7;59:7;
61:3;66:11;67:6;

72:22;73:20,20;
75:17,25;79:1,8;
83:3;87:8;89:3,10;
97:19;101:2;119:22;
127:1;132:8;140:18;
143:24
**surprised (1)**
58:23
**Sussex (2)**
123:10;126:4
**sustain (3)**
87:14;88:18;89:12
**sustained (5)**
128:17;132:1;
138:23;142:5;143:14
**sustaining (3)**
136:5;144:23,24
**Sutcliffe (3)**
5:17;27:11;53:6
**sympathetic (1)**
114:16
**Syncora (34)**
2:8;23:20;89:25;
91:22;93:6,10,17;
94:9,12,24;95:13;
96:10,20;97:1;100:9;
101:13,17,20,22;
102:4,11;103:12,14;
104:5,10,12,13,19;
108:12;109:7,7,10,
23;114:10
**Syncora's (3)**
100:1,19;104:2

---

**T**

**talk (4)**
73:19;82:7;111:14;
125:14
**talked (1)**
82:7
**talking (2)**
73:9,16
**talks (2)**
93:19;142:1
**Tax (4)**
3:18;13:12,15;45:8
**taxi (1)**
36:10
**team (1)**
142:15
**Technology (1)**
3:19
**telephone (12)**
57:20;66:21;
120:22,23;126:25;
127:18,19;129:15;
135:16;143:13,14;
144:7
**TELEPHONICALLY (13)**
24:17;26:8,16,25;
27:8,16,25;28:7,15,
24;29:13;120:20;

127:16
**telling (1)**
96:19
**tells (1)**
91:18
**temporarily (1)**
93:16,20
**temporary (1)**
94:10
**ten (8)**
76:6,7,7,15,20,24;
77:2,7
**ten- (1)**
80:12
**tenor (1)**
96:15
**tenth (1)**
117:15
**term (12)**
83:23;111:23;
112:3,6,7,14,18,20,
21;113:6,7,10
**terms (6)**
45:7;51:23;78:13;
94:18;110:21;136:19
**Thanks (1)**
65:13
**that'll (1)**
39:22
**therefore (1)**
101:16
**there'll (1)**
77:7
**thereof (1)**
112:10
**Third (35)**
2:12,18;3:1,6,10,
18;4:2,17;5:2,9,16;
6:2,20;7:1,6,13,18;
9:11,18;11:8;12:11,
12,19,20;13:2,3;22:4,
21;24:22;25:11;27:4;
62:13;76:8;77:5;
90:16
**third- (1)**
112:20
**Thirteenth (3)**
13:11;18:3;117:21
**thirty (1)**
115:24
**THOMAS (1)**
26:8
**THOMSON (1)**
29:20
**thorough (1)**
137:5
**though (3)**
67:9;91:20;109:7
**thought (12)**
31:1;32:12;34:15;
45:14;49:25;50:14;
55:12;65:16;90:24;
96:17;109:23;124:17

**thoughts (1)**
129:20
**thousand (1)**
43:12
**three (7)**
39:20;43:20,21,24;
44:10,12;58:21
**throughout (2)**
51:12;111:23
**thrown (2)**
99:5,6
**thrust (2)**
68:12;81:7
**ticket (1)**
62:12
**TILA (1)**
85:5
**timekeeper (2)**
40:22;46:24
**timekeepers (2)**
37:25;66:12
**timely (4)**
103:7,9;112:14;
115:5
**times (8)**
43:20;45:5,5;
62:23;86:15;92:2;
131:5,7
**today (20)**
30:21;39:3;83:7;
86:15;88:20;89:11;
95:20;102:12;
104:16;105:11;
108:11;115:8;
118:18;121:24;
122:8;123:16,17;
127:6;129:10;139:2
**today's (4)**
80:22;117:11;
134:6;145:10
**TODD (1)**
29:21
**together (9)**
64:13,24;98:3;
114:14;115:8;
132:20;135:15;
137:14,14
**told (10)**
77:14;83:15;84:2;
94:15,16;100:1,3,6,
22;122:14
**TOLLES (1)**
26:2
**Tom (2)**
15:5;142:10
**took (5)**
41:2;62:20;95:4;
100:4;122:12
**total (12)**
33:3;37:13;38:25;
43:9,10,12;44:6;
47:13,16;51:5;58:5;
77:15

**totally (1)**
121:21
**Touche (3)**
3:11,14;37:13
**touches (1)**
94:9
**touching (1)**
93:6
**Towers (4)**
2:18,21;29:20;58:1
**Town (2)**
27:21;55:18
**Trade (1)**
21:4
**transaction (2)**
101:23;103:14
**transactions (4)**
44:23;101:22;
102:10;103:13
**Transcribed (1)**
15:20
**transcript (6)**
93:22,25;94:3,6;
99:15;109:11
**transitory (3)**
37:25;40:21;59:2
**transportation (2)**
36:4,9
**travel (20)**
33:6;40:25;41:5;
48:10;49:1,2,8,24;
50:24;53:24;55:5,18;
56:4,6;72:20,21;73:3,
9,13,16
**traveling (4)**
41:5;48:24;54:15;
55:21,25;73:6
**Treasurer (1)**
13:13
**Tree (4)**
141:23,25;142:1,4
**trial (1)**
131:19
**tried (5)**
36:1;46:18;49:22;
92:12;96:9
**trigger (1)**
130:23
**trip (1)**
62:14
**tripped (1)**
136:24
**Troutman (8)**
7:2;28:10;58:5,7,9;
59:9,10,24
**true (2)**
43:23;88:22
**Trust (1)**
23:12
**Trustee (38)**
20:3;23:3;32:3,25;
33:4,12;35:9;36:14;
38:4;40:9,24;41:8;

43:3,7,25;44:2,7,8;
45:18;53:16;57:24;
61:6,21;63:15;64:2,
22;65:9;69:7;70:15;
71:5;72:9;74:2,9,16,
22;75:6;77:21;78:25
**trustees (1)**
112:22
**Trustee's (17)**
30:12,24;31:6,20;
33:17;34:21;42:2,8,
9;47:15;57:17;60:20;
67:22;68:4,17;79:10,
14
**Trusts (2)**
2:8;89:25
**try (11)**
50:13;51:11;52:17;
79:3;90:9;91:23;
94:21;95:1;97:3;
115:3;129:3
**trying (7)**
122:11;130:18;
136:2,2,7;139:8,10
**turn (4)**
80:24;85:16
**turned (1)**
101:21
**turns (1)**
100:12
**Twentieth (2)**
14:18;139:2
**twenty-dollar (1)**
32:19;35:20;36:1
**Twenty-First (2)**
15:3;142:7
**twenty-second (2)**
145:6,7
**twenty-third (2)**
145:7,8
**twice (1)**
118:24
**twist (2)**
99:13,13
**two (22)**
43:5,11,17;45:5;
59:17;69:10;90:14;
95:9;101:9;104:13;
111:19;118:22;
119:20;122:19;
125:6;131:4;135:15,
20;136:1;139:2;
142:6;143:4
**two-hour (1)**
66:23
**type (1)**
98:25
**types (1)**
101:8
**typical (1)**
114:18
**typically (1)**
45:9

**U**

**ultimately (5)**
55:19;81:14;89:11;
113:20;114:19
**Um-hmm (1)**
131:10
**Um-hum (1)**
66:17
**unable (4)**
125:4;134:1,2;
143:1
**uncertainty (1)**
56:1
**uncontested (1)**
118:17
**uncover (1)**
59:3
**Under (30)**
2:6;45:14;51:2;
55:4;80:22;82:19;
84:20;85:4;86:7,24;
87:12,14;88:2,3,5,14,
18,19,19,22;89:23;
90:23;94:18;112:5;
118:13;124:23;
126:22;127:12;
129:23;145:5
**underst (1)**
130:8
**understatement (1)**
90:16
**Understood (10)**
39:24;49:10;65:1;
67:11;76:2;91:1;
96:8;115:22;116:1,
10
**undertaken (1)**
130:1
**unenforceable (2)**
84:19;122:5
**Unfortunately (4)**
49:21;51:20;52:9;
59:2
**UNIDENTIFIED (3)**
32:8;89:18,20
**uniformity (1)**
51:23
**unique (4)**
55:4,14;56:11;
136:21
**UNISON (1)**
80:17
**UNITED (6)**
20:2,3;30:24;
33:17;47:15;62:23
**universe (1)**
91:14
**Unless (1)**
87:20
**unlike (1)**
44:20

**unliquidated (1)**
103:4
**unopposed (1)**
129:9
**unreasonable (1)**
143:8
**unredacted (1)**
40:23
**Unsecured (19)**
8:5,14;9:4,12,21;
10:3,12,18;11:4,9;
60:12;105:3;119:14;
120:7;121:23;122:7;
123:19;128:2,19
**unsigned (1)**
138:15
**unusual (1)**
105:17
**unwilling (1)**
88:24
**up (30)**
30:14,15;34:12;
42:16;47:22;48:15,
17;49:16,21;65:12;
69:2;81:13;82:23;
87:24;94:3;98:15;
100:13;104:8,14;
115:15;118:3;
122:12,17;123:6;
125:24;136:2;
137:13;138:5,14;
143:2
**update (1)**
2:4
**updating (2)**
58:20;59:16
**upgrades (1)**
62:19
**upon (19)**
32:3;33:4;35:8;
36:14,24;37:5,16,22;
38:1,3;44:4;47:18;
55:11;57:24;74:1,22;
75:6;102:5;103:13
**use (2)**
67:10;83:23
**used (3)**
52:4;55:24;111:23
**useful (2)**
30:19,21
**uses (3)**
110:4;111:21,22
**using (6)**
112:3,7,13;113:5,6,
10
**UST's (1)**
38:23
**usual (1)**
80:4

**V**

**VA (1)**

28:13
**vague (2)**
36:22;37:4
**valid (2)**
128:13;143:5
**Varick (1)**
20:4
**various (4)**
36:22;44:18;45:3;
47:20
**vast (1)**
54:18
**vendor (1)**
59:19
**vendors (2)**
34:6,22
**verify (1)**
41:2
**vetted (1)**
91:8
**VI (1)**
117:10
**via (1)**
132:22
**view (6)**
45:19;72:24;84:6;
86:23;88:1,23
**vigorously (2)**
105:23,23
**Vince (1)**
87:8
**VINCENT (1)**
29:8
**violations (1)**
132:21
**Virginia (1)**
28:13
**virtually (2)**
44:20,23
**voiced (1)**
142:17
**voicemail (2)**
138:10;143:1
**void (1)**
122:5
**voluminous (1)**
79:14
**voluntary (1)**
59:1

**W**

**Wacker (2)**
19:13;26:21
**wait (1)**
85:12
**waive (1)**
88:3
**waived (1)**
94:21
**walk (2)**
60:22;141:15
**walking (1)**

104:15
**WALPER (1)**
26:8
**WALSH (20)**
17:8;80:25;81:2,2;
82:11,17;83:11,14,
16;84:9,22;85:2,10,
13,15,17,25;86:16,
22;87:3
**wants (4)**
95:4;115:10;117:6;
145:12
**warning (1)**
38:10
**Washington (8)**
18:5;27:14;48:3,5,
9;50:16;54:16,20
**WATKINS (2)**
25:9;66:5
**Watson (4)**
2:18,21;29:20;58:1
**wax (1)**
97:24
**way (5)**
52:9;79:20;105:17;
113:25;128:14
**week (4)**
95:16;97:7;114:10;
118:16
**weekly (1)**
48:23
**weeks (2)**
135:20;136:1
**WEIL (3)**
23:19;94:11;104:5
**Weil's (1)**
114:15
**Wells (1)**
22:12
**weren't (3)**
90:25;121:4;
144:12
**Werson (4)**
3:2;18:19;57:15,23
**West (4)**
15:22;19:21;25:19;
53:24
**What's (10)**
70:4,23;86:19;
89:4;95:6;102:24,25;
103:6;110:15,19
**whatsoever (2)**
87:13;140:14
**Whereupon (1)**
145:16
**Whitney (5)**
2:12,16;19:19;
38:6;39:10
**whoever's (1)**
42:17
**whole (4)**
90:15;92:7;97:23;
99:6

**who's (5)**
69:1;82:23;124:9,
23;140:12
**whose (2)**
42:22;142:21
**who've (1)**
124:17
**WI (1)**
28:5
**wild (1)**
140:22
**WILLIAM (2)**
21:8;69:4
**Wilmer (5)**
8:3,9;21:2;68:23;
69:1,5,10;71:20
**Wilmington (1)**
23:12
**wind (2)**
82:23;115:14
**wisdom (1)**
81:18
**wish (2)**
77:18;132:19
**wished (1)**
132:15
**Wishnew (53)**
116:24;117:8,8;
118:7;120:1;128:25;
129:1,19,24;130:11,
15,18;131:10,13,24;
132:2,8;134:9,24;
135:1,7,11,13;
136:16,19;137:2,4,9,
15,17,19,22;139:1,5,
10,13;140:11,18;
141:2,5,11,17,21;
142:6,10,21;143:15,
17,23;144:4,25;
145:2,4
**withdraw (4)**
84:12;85:19;91:22;
138:20
**withdrawal (5)**
36:10;85:21;119:7;
138:12,16
**withdrawing (2)**
85:23;138:4
**withdrawn (9)**
13:23;33:19;42:13;
86:1,1,7,7;110:1;
119:7
**withdrew (2)**
92:5;109:9
**within (2)**
88:25;99:11
**without (7)**
33:23;45:15;58:13;
85:24;87:15,18;
135:25
**witness (2)**
34:23;144:18
**Wolf (3)**

12:3,7;75:4
**Wolicki (1)**
15:20
**woman (1)**
133:9
**wondering (1)**
77:11
**words (2)**
96:20;97:1
**work (15)**
51:10;54:12,23;
55:2;56:20;58:13,19;
67:4;69:18,19;116:4;
122:16,17;132:17;
140:7
**worked (4)**
54:19;89:2;101:23;
122:13
**working (6)**
35:21;47:23;48:1;
54:10;55:20;74:2
**World (1)**
21:4
**worse (1)**
102:7
**worth (2)**
101:23;115:12
**wound (1)**
84:7
**wrench (1)**
99:7
**write (2)**
49:14,18
**written (3)**
39:18;83:1;109:15
**wrong (4)**
103:16;115:10;
123:6;126:17
**wrote (3)**
49:10;84:5;132:16
**WUERTZ (1)**
29:21
**WYNNE (1)**
28:24

**Y**

**year (7)**
90:19;102:15;
109:5;124:25,25;
133:12,17
**years (1)**
131:4
**York (47)**
15:23;17:5;18:14;
19:22;20:6,14;21:6;
22:6,14,23;23:5,14,
22;24:5,23;25:4,12,
20;27:6;41:6;47:25;
48:8,15,24,24;49:1,9,
9,13,16;50:25;51:1;
53:23,25;54:15;
55:25;62:6,7,7,7,13,

14;72:21,22;73:10,
11,16
**Young (4)**
4:25;25:6;28:3;
40:2
**Yup (2)**
137:9;145:2

**Z**

**zero (2)**
95:15;102:15
**Ziehl (2)**
7:23;27:2

**1**

**1 (28)**
2:15,21;3:13,23;
4:5,13,20;5:4,12;6:8,
22;7:9;8:17;9:7,14,
22;10:6,13,21;11:5,
12;12:6,14,23;13:5;
80:22;113:4;117:13
**1,495 (1)**
35:5
**1/1/2013 (26)**
2:22;3:3,8,15,24;
4:7,21;5:6,13;6:10,
24;7:3,10,15,20,24;
8:19;9:8,15,24;10:7,
15;12:8,16,24;13:7
**1:00 (1)**
145:16
**10 (2)**
145:4,6
**10,000 (1)**
56:14
**10:00 (1)**
13:15
**100 (1)**
21:13
**10004 (1)**
23:5
**10006 (1)**
23:14
**10007 (1)**
21:6
**10014 (1)**
20:6
**10016 (1)**
22:14
**10017 (1)**
27:6
**10019 (1)**
19:22
**10022 (4)**
22:6,23;24:23;
25:12
**10023 (1)**
25:20
**10036 (1)**
20:14

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

September 11, 2013

**10040 (1)**
15:23
**1006 (1)**
20:5
**101 (2)**
17:4;70:3
**10112 (3)**
18:14;24:5;25:4
**10153 (1)**
23:22
**10178 (1)**
17:5
**107,400 (1)**
63:21
**11 (4)**
13:4;54:10;113:2;
145:6
**11:19 (1)**
80:18
**11:33 (1)**
80:18
**111 (1)**
19:13
**1138 (1)**
129:13
**1152 (1)**
27:13
**11753 (1)**
21:15
**1177 (1)**
20:13
**12 (1)**
8:8
**12/12/2012 (1)**
8:10
**12-12020 (1)**
30:3
**13 (2)**
87:25;131:4
**1300 (1)**
19:5
**1397 (1)**
139:5
**1476172 (1)**
59:13
**1477270 (1)**
59:21
**1482875 (2)**
58:18;59:15
**1482890 (1)**
59:17
**1482895 (1)**
59:17
**1482897 (1)**
59:17
**1483026 (1)**
59:21
**1488969 (1)**
59:23
**15 (1)**
11:19
**15,000 (2)**
43:7;45:13

**15,000-dollar (1)**
44:1
**150 (2)**
24:13;28:4
**15th (1)**
27:13
**16th (1)**
22:22
**1735 (1)**
29:4
**18 (1)**
129:4
**180 (2)**
121:8,13
**1800 (1)**
27:22
**1819 (1)**
26:13
**1899 (1)**
143:18
**19 (1)**
129:5
**19,000 (3)**
43:22,25;44:10
**190,000 (1)**
44:5
**190-some-odd (1)**
43:12
**19103 (1)**
29:6
**192nd (1)**
15:22
**19th (4)**
94:3;98:8;124:25;
133:12

**2**

**2 (5)**
40:1;66:15;89:23;
113:7;117:15
**2,000 (2)**
33:22;36:4
**2,345 (1)**
74:15
**2.1 (1)**
58:17
**20 (4)**
6:16;116:21;
117:11;129:5
**2000 (1)**
28:12
**20005 (2)**
18:5;27:14
**2009 (1)**
44:22
**201 (1)**
20:4
**2011 (1)**
121:6
**2012 (4)**
8:8;70:7;94:3;
98:16

**2013 (61)**
2:15,15,21,21;3:14,
14,23,23;4:5,6,14,14,
20,20;5:5,5,12,12;
6:8,8,16,16,23,23;
7:9,9;8:9,17,18;9:7,7,
14,14,22,23;10:6,6,
13,14,21,21;11:5,6,
12,13,19,20;12:6,7,
15,15,23,23;13:5,6,
15;14:15,23;64:5,8;
124:22
**20th (1)**
98:16
**21 (1)**
129:5
**2100 (1)**
22:5
**212 (1)**
96:14
**2135 (1)**
100:19
**21d (1)**
111:2
**22 (2)**
110:5;111:16
**2218702 (1)**
69:10
**222 (1)**
28:11
**224 (1)**
62:5
**22d (2)**
110:25;111:8
**23 (2)**
13:15;129:2
**23,108,667 (1)**
74:23
**23,210,644 (1)**
74:20
**2300 (1)**
24:14
**23462 (1)**
28:13
**235,261 (1)**
74:24
**2371 (1)**
119:12
**23rd (1)**
117:18
**24 (2)**
14:15,23
**24th (2)**
117:16;145:8
**250 (1)**
21:5
**2554 (1)**
139:6
**25th (6)**
17:15;18:13;64:5,
8;111:10;140:2
**26th (1)**
18:22

**28 (1)**
111:25
**280 (1)**
19:4
**28th (1)**
95:11
**29 (1)**
126:2
**299,682 (1)**
74:21
**2nd (4)**
117:14;124:22;
140:2;145:9

**3**

**3 (1)**
117:17
**3,300 (1)**
39:14
**3/20/2013 (1)**
6:17
**30 (31)**
2:15,21;3:14,23;
4:5,14,20;5:5,12;6:8,
16,23;7:9;8:9,18;9:7,
14,22;10:6,14,21;
11:6,13,20;12:6,15,
23;13:6;18:12;24:4;
25:3
**300 (2)**
21:14;26:22
**31 (1)**
25:19
**311 (1)**
26:21
**321,975 (1)**
74:8
**342 (1)**
65:22
**344 (1)**
65:22
**3515 (1)**
119:1
**35203 (1)**
26:14
**355 (1)**
26:4
**35th (1)**
26:5
**365 (2)**
2:6;89:24
**36th (1)**
27:5
**37 (3)**
66:15,19,20

**4**

**4 (1)**
117:21
**4/1/2013 (3)**
9:16,24;10:7

**4/15/2013 (1)**
11:21
**4/30/2013 (26)**
2:22;3:3,8,15,24;
4:7,22;5:6,14;6:10,
17,24;7:3,10,15,20,
24;8:10,19;9:9;
10:15;11:22;12:8,16,
25;13:7
**40,000 (1)**
50:4
**4000 (1)**
27:21
**4147 (1)**
13:10
**4151 (2)**
13:18;118:9
**4154 (1)**
14:2
**4155 (1)**
14:8
**4156 (1)**
14:17
**4158 (1)**
15:2
**43215 (1)**
19:6
**4338 (1)**
119:11
**4420 (2)**
2:12;38:6
**4455 (2)**
2:18;58:1
**4458 (1)**
3:1
**4469 (1)**
118:25
**4507 (2)**
3:6;41:21
**4511 (1)**
3:10
**4512 (2)**
3:18;41:16
**4513 (1)**
4:2
**4514 (1)**
3:1
**4521 (1)**
4:10
**4523 (2)**
4:17;57:11
**4526 (1)**
4:24;40:2
**4527 (2)**
5:2;42:7
**4528 (2)**
5:9;35:13
**4529 (1)**
5:16
**4532 (2)**
6:2;36:18
**4533 (2)**
6:13;57:4

**4534 (2)**
7:22;67:20
**4537 (2)**
8:2;68:24
**4538 (2)**
8:13;68:16
**4542 (2)**
6:20;40:7
**4547 (1)**
7:1
**4551 (2)**
7:6;47:13
**4557 (2)**
7:13;33:15
**4558 (2)**
7:18;41:25
**4559 (2)**
11:15;74:15
**4560 (2)**
12:2;75:4
**4561 (2)**
9:2;63:13
**4562 (2)**
12:11;74:20
**4563 (2)**
9:11;61:4
**4564 (2)**
9:18;65:14
**4565 (2)**
12:19;72:7
**4566 (2)**
13:2;74:7
**4569 (2)**
10:2;63:21
**4570 (2)**
10:10;61:18
**4571 (2)**
10:17;61:14
**4572 (1)**
68:2
**4573 (2)**
11:8;63:24
**4579 (1)**
118:25
**4603 (1)**
2:2
**4651 (1)**
119:3
**4718 (1)**
2:6
**4750 (1)**
119:6
**4752 (1)**
119:6
**4760 (2)**
2:2,3
**48075 (1)**
27:23
**482 (2)**
119:3;128:18
**4843 (1)**
119:17
**4869 (1)**

53:6
**4953 (1)**
118:18
**4964 (1)**
119:9
**4th (2)**
133:17;143:3

**5**

**5 (5)**
80:10,22;89:23;
94:8;117:24
**5,000 (1)**
53:23
**502 (1)**
87:19
**502b (6)**
83:6,11;84:16,22;
86:12,24
**502b1 (3)**
81:6,7;84:17
**502e (9)**
81:6;83:6,16;
85:10,13,18,19,20;
86:7
**502e1 (7)**
83:9;85:9;87:14;
88:6,18,22;89:13
**502e1B (3)**
87:12,22;88:2
**502j (7)**
87:19,21,24;88:3,
14,19,19
**503 (1)**
118:13
**506 (1)**
118:14
**507 (1)**
118:14
**50th (1)**
28:21
**51 (1)**
19:21
**51st (1)**
29:5
**5286 (1)**
129:13
**52nd (2)**
19:21;25:19
**53703 (1)**
28:5
**55402 (1)**
24:15
**555 (1)**
28:20
**560 (1)**
17:14
**5th (3)**
24:13;124:24;
132:16

**6**

**6 (3)**
100:17;118:3;
129:2
**6.9 (1)**
69:14
**600 (1)**
18:4
**60606 (2)**
19:14;26:23
**6th (1)**
138:9

**7**

**7 (2)**
21:4;100:17
**7,000 (1)**
32:16
**700 (2)**
15:22;18:3
**75 (2)**
71:19;94:6
**750 (1)**
69:12
**767 (1)**
23:21
**780 (1)**
27:4

**8**

**8 (7)**
32:18,19;35:21;
46:20,21;50:17,17
**8/23 (1)**
143:2
**8/28 (1)**
133:15
**88,103 (1)**
74:15
**885 (1)**
25:11
**890 (1)**
62:8

**9**

**9 (3)**
125:18;126:3;
145:6
**9/4 (1)**
134:5
**9/9 (1)**
144:10
**90 (1)**
22:13
**900 (2)**
22:4,21
**90071 (2)**
26:6;28:22

**909 (1)**
24:22
**94105 (1)**
17:16
**94111 (1)**
18:23
**949 (2)**
58:11,24
**973406-2250 (1)**
15:24
**9th (1)**
143:3