FILED: NEW YORK COUNTY CLERK 08/20/2013

NYSCEF DOC. NO. 1

INDEX NO. 652921/2013

RECEIVED NYSCEF: 08/20/2013

12-12020-mg    Doc 5204-1    Filed 09/25/13    Entered 09/25/13 16:23:25    Exhibit A:
Phoenix Light SF Limited    et al v. JPMorgan Chase & Co.    et al.    Pg 1 of 503

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

———————————————————— X

| | |
|---|---|
| PHOENIX LIGHT SF LIMITED, BLUE HERON FUNDING II LTD., BLUE HERON FUNDING V LTD., BLUE HERON FUNDING VI LTD., BLUE HERON FUNDING VII LTD., BLUE HERON FUNDING IX LTD., SILVER ELMS CDO II LIMITED and KLEROS PREFERRED FUNDING V PLC, | Index No. <br><br> SUMMONS |

Plaintiffs,

vs.

JPMORGAN CHASE & CO., J.P. MORGAN
SECURITIES LLC, J.P. MORGAN
MORTGAGE ACQUISITION CORP.,
CHASE HOME FINANCE LLC, J.P.
MORGAN ACCEPTANCE CORPORATION
I, CHASE MORTGAGE FINANCE
CORPORATION, THE BEAR STEARNS
COMPANIES LLC, EMC MORTGAGE LLC,
BEAR STEARNS ASSET BACKED
SECURITIES I LLC and STRUCTURED
ASSET MORTGAGE INVESTMENTS II
INC.,

Defendants.

———————————————————— X

866457_1

TO:    JPMorgan Chase & Co.                    Chase Mortgage Finance Corporation
       c/o A. Robert Pietrzak                  c/o A. Robert Pietrzak
       Dorothy J. Spenner                      Dorothy J. Spenner
       Daniel A. McLaughlin                    Daniel A. McLaughlin
       Denae M. Thomas                         Denae M. Thomas
       Sidley Austin LLP                       Sidley Austin LLP
       787 Seventh Avenue                      787 Seventh Avenue
       New York, NY 10019                      New York, NY 10019

       J.P. Morgan Securities LLC              The Bear Stearns Companies
       c/o A. Robert Pietrzak                  c/o A. Robert Pietrzak
       Dorothy J. Spenner                      Dorothy J. Spenner
       Daniel A. McLaughlin                    Daniel A. McLaughlin
       Denae M. Thomas                         Denae M. Thomas
       Sidley Austin LLP                       Sidley Austin LLP
       787 Seventh Avenue                      787 Seventh Avenue
       New York, NY 10019                      New York, NY 10019

       J.P. Morgan Mortgage Acquisition Corp.  EMC Mortgage LLC
       c/o A. Robert Pietrzak                  c/o A. Robert Pietrzak
       Dorothy J. Spenner                      Dorothy J. Spenner
       Daniel A. McLaughlin                    Daniel A. McLaughlin
       Denae M. Thomas                         Denae M. Thomas
       Sidley Austin LLP                       Sidley Austin LLP
       787 Seventh Avenue                      787 Seventh Avenue
       New York, NY 10019                      New York, NY 10019

       Chase Home Finance LLC                  Bear Stearns Asset Backed Securities I LLC
       c/o A. Robert Pietrzak                  c/o A. Robert Pietrzak
       Dorothy J. Spenner                      Dorothy J. Spenner
       Daniel A. McLaughlin                    Daniel A. McLaughlin
       Denae M. Thomas                         Denae M. Thomas
       Sidley Austin LLP                       Sidley Austin LLP
       787 Seventh Avenue                      787 Seventh Avenue
       New York, NY 10019                      New York, NY 10019

       J.P. Morgan Acceptance Corporation I    Structured Asset Mortgage Investments II Inc.
       c/o A. Robert Pietrzak                  c/o A. Robert Pietrzak
       Dorothy J. Spenner                      Dorothy J. Spenner
       Daniel A. McLaughlin                    Daniel A. McLaughlin
       Denae M. Thomas                         Denae M. Thomas
       Sidley Austin LLP                       Sidley Austin LLP
       787 Seventh Avenue                      787 Seventh Avenue
       New York, NY 10019                      New York, NY 10019

## TO:    THE ABOVE NAMED DEFENDANTS

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a

copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on plaintiffs' attorneys within 20 days after the service of this summons, exclusive

866457_1

of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiffs designate New York County as the place of trial. Venue is proper because the defendants do business in or derive substantial revenue from activities carried out in this County, and many of the wrongful acts alleged herein occurred in this County.

DATED: August 20, 2013

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
WILLIAM J. GEDDISH


s/ SAMUEL H. RUDMAN
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
ARTHUR C. LEAHY
SCOTT H. SAHAM
LUCAS F. OLTS
NATHAN R. LINDELL
CAROLINE M. ROBERT
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

866457_1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————— X

PHOENIX LIGHT SF LIMITED, BLUE
HERON FUNDING II LTD., BLUE HERON
FUNDING V LTD., BLUE HERON
FUNDING VI LTD., BLUE HERON
FUNDING VII LTD., BLUE HERON
FUNDING IX LTD., SILVER ELMS CDO
PLC, SILVER ELMS CDO II LIMITED and
KLEROS PREFERRED FUNDING V PLC,

                    Plaintiffs,

     vs.

JPMORGAN CHASE & CO., J.P. MORGAN
SECURITIES LLC, J.P. MORGAN
MORTGAGE ACQUISITION CORP.,
CHASE HOME FINANCE LLC, J.P.
MORGAN ACCEPTANCE CORPORATION
I, CHASE MORTGAGE FINANCE
CORPORATION, THE BEAR STEARNS
COMPANIES LLC, EMC MORTGAGE LLC,
BEAR STEARNS ASSET BACKED
SECURITIES I LLC and STRUCTURED
ASSET MORTGAGE INVESTMENTS II
INC.,

                    Defendants.

Index No.

COMPLAINT

DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE ACTION ............................................................................1

II.    PARTIES ........................................................................................................3

    A.    Plaintiffs ..............................................................................................3

    B.    The "JPMorgan Defendants" ..............................................................8

III.    JURISDICTION AND VENUE ....................................................................12

IV.    BACKGROUND ON RMBS OFFERINGS IN GENERAL AND
DEFENDANTS' INVOLVEMENT IN THE PROCESS ................................14

    A.    The Mortgage-Backed Securities Market ..........................................14

    B.    Organizations and Defendant Entities Involved in the Securitization
Process ..............................................................................................14

    C.    To Market the Certificates, Defendants Registered Them with the SEC on
"Investment Grade" Shelves ..............................................................18

V.    C.P.L.R. §3016 PARTICULARITY ALLEGATIONS ..................................19

    A.    Each of the Offering Documents Omitted Material Information...........19

    B.    Each of the Offering Documents Contained Material Misrepresentations............22

        1.    The CHASE 2006-S3 Certificates ..........................................22

            a.    Underwriting Guidelines..............................................22

            b.    Loan-to-Value Ratios..................................................24

            c.    Owner Occupancy Rates..............................................25

            d.    Credit Ratings ............................................................26

            e.    Transfer of Title ..........................................................28

        2.    The BSMF 2006-AR3 Certificates ..........................................29

            a.    Underwriting Guidelines..............................................29

            b.    Loan-to-Value Ratios..................................................32

- i -

**Page**

|  |  | c. | Owner Occupancy Rates | 32 |
|  |  | d. | Credit Ratings | 33 |
|  |  | e. | Transfer of Title | 34 |
|  | 3. | The BSMF 2006-SL1 Certificates | | 35 |
|  |  | a. | Underwriting Guidelines | 35 |
|  |  | b. | Loan-to-Value Ratios | 37 |
|  |  | c. | Credit Ratings | 38 |
|  |  | d. | Transfer of Title | 39 |
|  | 4. | The BSMF 2006-SL4 Certificates | | 40 |
|  |  | a. | Underwriting Guidelines | 40 |
|  |  | b. | Loan-to-Value Ratios | 43 |
|  |  | c. | Credit Ratings | 43 |
|  |  | d. | Transfer of Title | 45 |
|  | 5. | The BSMF 2007-AR3 Certificates | | 45 |
|  |  | a. | Underwriting Guidelines | 46 |
|  |  | b. | Loan-to-Value Ratios | 49 |
|  |  | c. | Owner Occupancy Rates | 50 |
|  |  | d. | Credit Ratings | 50 |
|  |  | e. | Transfer of Title | 52 |
|  | 6. | The BSMF 2007-AR5 Certificates | | 52 |
|  |  | a. | Underwriting Guidelines | 53 |
|  |  | b. | Loan-to-Value Ratios | 57 |

864087_1

**Page**

|   |   | c. | Owner Occupancy Rates | 58 |
|---|---|---|---|---|
|   |   | d. | Credit Ratings | 59 |
|   |   | e. | Transfer of Title | 60 |
| 7. |   | The BSMF 2007-SL1 Certificates | | 60 |
|   |   | a. | Underwriting Guidelines | 61 |
|   |   | b. | Loan-to-Value Ratios | 63 |
|   |   | c. | Credit Ratings | 64 |
|   |   | d. | Transfer of Title | 65 |
| 8. |   | The CBASS 2006-CB7 Certificates | | 66 |
|   |   | a. | Underwriting Guidelines | 66 |
|   |   | b. | Loan-to-Value Ratios | 70 |
|   |   | c. | Credit Ratings | 70 |
|   |   | d. | Transfer of Title | 71 |
| 9. |   | The ARSI 2006-M2 Certificates | | 72 |
|   |   | a. | Underwriting Guidelines | 73 |
|   |   | b. | Loan-to-Value Ratios | 74 |
|   |   | c. | Owner Occupancy Rates | 75 |
|   |   | d. | Credit Ratings | 76 |
|   |   | e. | Transfer of Title | 77 |
| 10. |   | The BALTA 2005-7 Certificates | | 78 |
|   |   | a. | Underwriting Guidelines | 79 |
|   |   | b. | Loan-to-Value Ratios | 83 |

**Page**

c.      Owner Occupancy Rates................................................................84

d.      Credit Ratings ............................................................................84

e.      Transfer of Title ........................................................................86

11.     The BALTA 2005-8 Certificates ..............................................86

        a.      Underwriting Guidelines..................................................87

        b.      Loan-to-Value Ratios.......................................................90

        c.      Owner Occupancy Rates..................................................91

        d.      Credit Ratings ..................................................................92

        e.      Transfer of Title ..............................................................93

12.     The BALTA 2006-2 Certificates ..............................................94

        a.      Underwriting Guidelines..................................................94

        b.      Loan-to-Value Ratios.......................................................98

        c.      Owner Occupancy Rates..................................................99

        d.      Credit Ratings ..................................................................99

        e.      Transfer of Title ............................................................101

13.     The BALTA 2006-3 Certificates ............................................101

        a.      Underwriting Guidelines................................................102

        b.      Loan-to-Value Ratios.....................................................104

        c.      Owner Occupancy Rates................................................105

        d.      Credit Ratings ................................................................106

        e.      Transfer of Title ............................................................107

14.     The BSABS 2005-AC4 Certificates ........................................107

- iv -

**Page**

a.      Underwriting Guidelines...........................................................108

b.      Loan-to-Value Ratios................................................................110

c.      Owner Occupancy Rates...........................................................110

d.      Credit Ratings .........................................................................111

e.      Transfer of Title ......................................................................112

15.     The BSABS 2006-HE9 Certificates.......................................................113

a.      Underwriting Guidelines...........................................................113

b.      Loan-to-Value Ratios................................................................116

c.      Owner Occupancy Rates...........................................................117

d.      Credit Ratings .........................................................................117

e.      Transfer of Title ......................................................................119

16.     The BSABS 2006-HE10 Certificates.....................................................119

a.      Underwriting Guidelines...........................................................120

b.      Loan-to-Value Ratios................................................................122

c.      Owner Occupancy Rates...........................................................123

d.      Credit Ratings .........................................................................124

e.      Transfer of Title ......................................................................125

17.     The BSABS 2006-IM1 Certificates.......................................................126

a.      Underwriting Guidelines...........................................................126

b.      Loan-to-Value Ratios................................................................128

c.      Owner Occupancy Rates...........................................................129

d.      Credit Ratings .........................................................................129

864087_1

**Page**

|     | e.  | Transfer of Title .................................................................. | 131 |
| 18. |     | The BSABS 2007-HE1 Certificates ........................................ | 131 |
|     | a.  | Underwriting Guidelines ...................................................... | 132 |
|     | b.  | Loan-to-Value Ratios ........................................................... | 134 |
|     | c.  | Credit Ratings ..................................................................... | 135 |
|     | d.  | Transfer of Title .................................................................. | 136 |
| 19. |     | The JPALT 2006-A7 Certificates .......................................... | 137 |
|     | a.  | Underwriting Guidelines ...................................................... | 138 |
|     | b.  | Loan-to-Value Ratios ........................................................... | 142 |
|     | c.  | Credit Ratings ..................................................................... | 143 |
|     | d.  | Transfer of Title .................................................................. | 144 |
| 20. |     | The JPALT 2007-A1 Certificates .......................................... | 145 |
|     | a.  | Underwriting Guidelines ...................................................... | 145 |
|     | b.  | Loan-to-Value Ratios ........................................................... | 149 |
|     | c.  | Credit Ratings ..................................................................... | 149 |
|     | d.  | Transfer of Title .................................................................. | 151 |
| 21. |     | The JPMAC 2006-HE3 Certificates ...................................... | 151 |
|     | a.  | Underwriting Guidelines ...................................................... | 152 |
|     | b.  | Loan-to-Value Ratios ........................................................... | 155 |
|     | c.  | Owner Occupancy Rates ...................................................... | 156 |
|     | d.  | Credit Ratings ..................................................................... | 157 |
|     | e.  | Transfer of Title .................................................................. | 158 |

864087_1

**Page**

22.    The JPMAC 2006-NC1 Certificates ......................................................159

    a.    Underwriting Guidelines...........................................................159

    b.    Loan-to-Value Ratios...............................................................161

    c.    Owner Occupancy Rates..........................................................162

    d.    Credit Ratings .........................................................................162

    e.    Transfer of Title ......................................................................164

23.    The JPMAC 2006-NC2 Certificates ......................................................164

    a.    Underwriting Guidelines...........................................................165

    b.    Loan-to-Value Ratios...............................................................167

    c.    Owner Occupancy Rates..........................................................167

    d.    Credit Ratings .........................................................................168

    e.    Transfer of Title ......................................................................169

24.    The JPMAC 2006-RM1 Certificates ......................................................170

    a.    Underwriting Guidelines...........................................................171

    b.    Loan-to-Value Ratios...............................................................172

    c.    Owner Occupancy Rates..........................................................172

    d.    Credit Ratings .........................................................................173

    e.    Transfer of Title ......................................................................174

25.    The JPMAC 2006-WMC3 Certificates....................................................175

    a.    Underwriting Guidelines...........................................................176

    b.    Loan-to-Value Ratios...............................................................177

    c.    Owner Occupancy Rates..........................................................178

864087_1

**Page**

|  |  |  |  |
|---|---|---|---|
| | d. | Credit Ratings | 179 |
| | e. | Transfer of Title | 180 |
| 26. | | The JPMAC 2006-WMC4 Certificates | 181 |
| | a. | Underwriting Guidelines | 181 |
| | b. | Loan-to-Value Ratios | 183 |
| | c. | Owner Occupancy Rates | 183 |
| | d. | Credit Ratings | 184 |
| | e. | Transfer of Title | 185 |
| 27. | | The JPMMT 2006-S4 Certificates | 186 |
| | a. | Underwriting Guidelines | 186 |
| | b. | Loan-to-Value Ratios | 189 |
| | c. | Owner Occupancy Rates | 190 |
| | d. | Credit Ratings | 191 |
| | e. | Transfer of Title | 192 |
| 28. | | The CARR 2006-NC3 Certificates | 193 |
| | a. | Underwriting Guidelines | 193 |
| | b. | Loan-to-Value Ratios | 195 |
| | c. | Owner Occupancy Rates | 196 |
| | d. | Credit Ratings | 196 |
| | e. | Transfer of Title | 197 |
| 29. | | The CARR 2006-NC5 Certificates | 198 |
| | a. | Underwriting Guidelines | 199 |

**Page**

|   |   |   |
|---|---|---|
| b. | Loan-to-Value Ratios | 200 |
| c. | Owner Occupancy Rates | 201 |
| d. | Credit Ratings | 202 |
| e. | Transfer of Title | 203 |
| 30. | The CARR 2007-FRE1 Certificates | 203 |
| a. | Underwriting Guidelines | 204 |
| b. | Loan-to-Value Ratios | 206 |
| c. | Owner Occupancy Rates | 206 |
| d. | Credit Ratings | 207 |
| e. | Transfer of Title | 208 |
| 31. | The IMM 2005-6 Certificates | 209 |
| a. | Underwriting Guidelines | 210 |
| b. | Loan-to-Value Ratios | 213 |
| c. | Owner Occupancy Rates | 214 |
| d. | Credit Ratings | 215 |
| e. | Transfer of Title | 216 |
| 32. | The IMSA 2006-1 Certificates | 216 |
| a. | Underwriting Guidelines | 217 |
| b. | Loan-to-Value Ratios | 220 |
| c. | Owner Occupancy Rates | 220 |
| d. | Credit Ratings | 221 |
| e. | Transfer of Title | 223 |

- ix -

**Page**

33.    The IMSA 2006-4 Certificates...................................................................223

    a.    Underwriting Guidelines............................................224

    b.    Loan-to-Value Ratios.................................................228

    c.    Owner Occupancy Rates............................................228

    d.    Credit Ratings ...........................................................229

    e.    Transfer of Title .......................................................230

34.    The IMSA 2006-5 Certificates...................................................................231

    a.    Underwriting Guidelines............................................232

    b.    Loan-to-Value Ratios.................................................235

    c.    Owner Occupancy Rates............................................236

    d.    Credit Ratings ...........................................................237

    e.    Transfer of Title .......................................................238

35.    The IMSA 2007-2 Certificates...................................................................239

    a.    Underwriting Guidelines............................................239

    b.    Loan-to-Value Ratios.................................................242

    c.    Owner Occupancy Rates............................................243

    d.    Credit Ratings ...........................................................243

    e.    Transfer of Title .......................................................244

36.    The IMSA 2007-3 Certificates...................................................................245

    a.    Underwriting Guidelines............................................246

    b.    Loan-to-Value Ratios.................................................248

    c.    Owner Occupancy Rates............................................249

864087_1

**Page**

|   |   |   |   |
|---|---|---|---|
| | d. | Credit Ratings ........................................................................ | 250 |
| | e. | Transfer of Title ..................................................................... | 251 |
| 37. | | The INDX 2006-AR29 Certificates ............................................. | 252 |
| | a. | Underwriting Guidelines......................................................... | 252 |
| | b. | Loan-to-Value Ratios .............................................................. | 254 |
| | c. | Owner Occupancy Rates.......................................................... | 254 |
| | d. | Credit Ratings ........................................................................ | 255 |
| | e. | Transfer of Title ..................................................................... | 256 |
| 38. | | The LUM 2005-1 Certificates ................................................... | 257 |
| | a. | Underwriting Guidelines......................................................... | 258 |
| | b. | Loan-to-Value Ratios .............................................................. | 261 |
| | c. | Owner Occupancy Rates.......................................................... | 262 |
| | d. | Credit Ratings ........................................................................ | 263 |
| | e. | Transfer of Title ..................................................................... | 264 |
| 39. | | The NAA 2007-3 Certificates ................................................... | 264 |
| | a. | Underwriting Guidelines......................................................... | 265 |
| | b. | Loan-to-Value Ratios .............................................................. | 266 |
| | c. | Owner Occupancy Rates.......................................................... | 267 |
| | d. | Credit Ratings ........................................................................ | 268 |
| | e. | Transfer of Title ..................................................................... | 269 |
| 40. | | The OPMAC 2006-1 Certificates .............................................. | 269 |
| | a. | Underwriting Guidelines......................................................... | 270 |

- xi -

**Page**

|   |   | b. | Loan-to-Value Ratios | 272 |
|   |   | c. | Owner Occupancy Rates | 273 |
|   |   | d. | Credit Ratings | 274 |
|   |   | e. | Transfer of Title | 275 |
| 41. | The PCHLT 2005-4 Certificates | | | 276 |
|   |   | a. | Underwriting Guidelines | 276 |
|   |   | b. | Loan-to-Value Ratios | 278 |
|   |   | c. | Owner Occupancy Rates | 278 |
|   |   | d. | Credit Ratings | 279 |
|   |   | e. | Transfer of Title | 280 |
| 42. | The SACO 2005-7 Certificates | | | 281 |
|   |   | a. | Underwriting Guidelines | 281 |
|   |   | b. | Loan-to-Value Ratios | 285 |
|   |   | c. | Credit Ratings | 285 |
|   |   | d. | Transfer of Title | 287 |
| 43. | The SACO 2005-8 Certificates | | | 287 |
|   |   | a. | Underwriting Guidelines | 288 |
|   |   | b. | Loan-to-Value | 290 |
|   |   | d. | Transfer of Title | 292 |
| 44. | The SACO 2006-5 Certificates | | | 292 |
|   |   | a. | Underwriting Guidelines | 293 |
|   |   | b. | Loan-to-Value Ratios | 295 |

864087_1

**Page**

|  |  |  |  |
|---|---|---|---|
| | d. | Transfer of Title | 297 |
| 45. | | The SGMS 2006-FRE2 Certificates | 297 |
| | a. | Underwriting Guidelines | 298 |
| | b. | Loan-to-Value Ratios | 299 |
| | c. | Owner Occupancy Rates | 300 |
| | d. | Credit Ratings | 301 |
| | e. | Transfer of Title | 302 |
| 46. | | The WFMBS 2006-12 Certificates | 303 |
| | a. | Underwriting Guidelines | 303 |
| | b. | Loan-to-Value Ratios | 305 |
| | c. | Owner Occupancy Rates | 306 |
| | d. | Credit Ratings | 306 |
| | e. | Transfer of Title | 308 |
| 47. | | The WFMBS 2007-2 Certificates | 309 |
| | a. | Underwriting Guidelines | 309 |
| | b. | Loan-to-Value Ratios | 311 |
| | c. | Owner Occupancy Rates | 312 |
| | d. | Credit Ratings | 312 |
| | e. | Transfer of Title | 313 |
| VI. | | DEFENDANTS' STATEMENTS AND OMISSIONS WERE MATERIALLY FALSE AND MISLEADING | 314 |
| | A. | Defendants' Statements that the Loan Underwriting Guidelines Were Designed to Assess a Borrower's Ability to Repay the Loan and to | |

864087_1

**Page**

Evaluate the Adequacy of the Property as Collateral for the Loan Were
Materially False and Misleading..............................................................314

1.    The Loan Originators Had Systematically Abandoned the
      Underwriting Guidelines Set Forth in the JPMorgan Offering
      Documents ....................................................................................315

2.    The Offering Documents Misrepresented the New Century
      Originators' Underwriting Guidelines .......................................322

3.    The Offering Documents Misrepresented Countrywide's
      Underwriting Standards ..............................................................328

4.    The Offering Documents Misrepresented WMC's Underwriting
      Guidelines ....................................................................................334

5.    The Offering Documents Misrepresented Fremont's Underwriting
      Standards......................................................................................339

6.    The Offering Documents Misrepresented Ameriquest's
      Underwriting Guidelines..............................................................343

7.    The Offering Documents Misrepresented EMC Mortgage's, Bear
      Stearns Residential's and Encore's Underwriting Standards..................347

8.    The Offering Documents Misrepresented Impac's Underwriting
      Guidelines ....................................................................................359

9.    The Offering Documents Misrepresented AHM's Underwriting
      Standards......................................................................................362

10.   The Offering Documents Misrepresented GreenPoint's
      Underwriting Standards ...............................................................365

11.   The Offering Documents Misrepresented NovaStar's Underwriting
      Standards......................................................................................367

12.   The Offering Documents Misrepresented Aames's Underwriting
      Standards......................................................................................371

13.   The Offering Documents Misrepresented Argent's Underwriting
      Standards......................................................................................376

864087_1

**Page**

14.   The Offering Documents Misrepresented PHH's Underwriting Standards ..........................................................380

15.   The Offering Documents Misrepresented ResMAE's Underwriting Standards ..........................................................383

16.   The Offering Documents Misrepresented Wells Fargo's Underwriting Standards .............................................388

17.   The Offering Documents Misrepresented JPMorgan Chase's Underwriting Standards .............................................392

18.   The Offering Documents Misrepresented IndyMac's Underwriting Guidelines ........................................................396

19.   The Offering Documents Misrepresented Fieldstone's Underwriting Standards .............................................399

20.   The Offering Documents Misrepresented People's Choice's Underwriting Standards .............................................401

21.   Clayton's Findings Confirm that the Offering Documents Were False and Misleading ....................................402

B.   Defendants Made Material Misrepresentations Regarding the Underlying Loans' LTV Ratios ............................................405

C.   Defendants Made Material Misrepresentations Regarding the Underlying Loans' Owner Occupancy Rates.......................................408

D.   Defendants Made Material Misrepresentations Regarding the Credit Ratings for the Certificates ...................................410

E.   Defendants Materially Misrepresented that Title to the Underlying Loans Was Properly and Timely Transferred..................................414

VII.   THE JPMORGAN DEFENDANTS KNEW THAT THE REPRESENTATIONS IN THE OFFERING DOCUMENTS WERE FALSE AND MISLEADING ................420

1.   JPMorgan's Due Diligence Confirmed that the Certificates' Underlying Loans Were Not Adequately Underwritten and Were Defective ...................................................421

- xv -

**Page**

2.      Bear Stearns Knew Its Representations Were False and Was
        Willing to Capitalize on Its Unique Knowledge at the Expense of
        Investors .................................................................................................... 426

3.      JPMorgan Defendants' Scienter with Respect to the Certificates'
        Credit Ratings ........................................................................................... 439

4.      The JPMorgan Defendants  Knowingly Misrepresented that Title
        to the Certificates' Underlying Loans Was Properly and Timely
        Transferred ................................................................................................ 441

VIII.   DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS WERE MADE
        FOR THE PURPOSE OF INDUCING PLAINTIFFS TO RELY ON THEM AND
        PLAINTIFFS ACTUALLY AND JUSTIFIABLY RELIED ON DEFENDANTS'
        MISREPRESENTATIONS AND OMISSIONS ............................................................ 442

        A.      The Brightwater-Managed Entities Actually and Justifiably Relied on the
                False Information that Defendants Used to Sell the Subject Certificates ........... 443

                1.      Portfolio-Level Screening ....................................................... 444

                2.      RMBS-Level Screening ........................................................... 444

        B.      Plaintiff Kleros V Actually and Justifiably Relied on the False Information
                that Defendants Used to Sell the Subject Certificates ......................................... 446

                1.      Portfolio-Level Screening ....................................................... 446

                2.      RMBS-Level Screening ........................................................... 447

        C.      Plaintiff Silver Elms Actually and Justifiably Relied on the False
                Information that Defendants Used to Sell the Subject Certificates ................... 450

                1.      Portfolio-Level Screening ....................................................... 450

                2.      RMBS-Level Screening ........................................................... 451

        D.      Plaintiff Silver Elms II Actually and Justifiably Relied on the False
                Information that Defendants Used to Sell the Subject Certificates ................... 453

                1.      Portfolio-Level Screening ....................................................... 453

                2.      RMBS-Level Screening ........................................................... 454

**Page**

|   |   |   |   |
|---|---|---|---|
| E. | WestLB Actually and Justifiably Relied on the False Information that Defendants Used to Sell the Subject Certificates ................................................456 |

|   |   |   |
|---|---|---|
| 1. | Portfolio-Level Screening ......................................................457 |
| 2. | RMBS-Level Screening ...........................................................457 |

|   |   |
|---|---|
| F. | All of the Assignors and Plaintiffs Were Reasonable and Could Not Have Discovered the Fraud Alleged Herein.................................................459 |

IX.    DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS CAUSED INJURY TO PLAINTIFFS.............................................................461

|   |   |
|---|---|
| A. | The Relationship Between Original LTV Ratios, Owner Occupancy Data and RMBS Performance ..........................................................461 |
| B. | The Relationship Between Credit Ratings and RMBS Performance..................463 |
| C. | The Relationship Between Underwriting and RMBS Performance ....................464 |
| D. | The Relationship Between Proper and Timely Transfer of Title and Plaintiffs' Damages..........................................................................466 |

FIRST CAUSE OF ACTION ...........................................................................466

  (Common Law Fraud Against All Defendants)..............................................466

SECOND CAUSE OF ACTION ......................................................................468

  (Fraudulent Inducement Against All Defendants)..........................................468

THIRD CAUSE OF ACTION .........................................................................470

  (Aiding and Abetting Fraud Against All Defendants)....................................470

FOURTH CAUSE OF ACTION .......................................................................472

  (Negligent Misrepresentation Against All Defendants) ................................472

FIFTH CAUSE OF ACTION ...........................................................................476

  (Rescission Based upon Mutual Mistake Against J.P. Morgan Securities LLC (including Bear Stearns Co.)) ..............................................................476

- xvii -

**Page**

PRAYER FOR RELIEF ...........................................................................................................477

JURY DEMAND .....................................................................................................................478

Plaintiffs Phoenix Light SF Limited ("Phoenix"), Blue Heron Funding II Ltd. ("Blue Heron II"), Blue Heron Funding V Ltd. ("Blue Heron V"), Blue Heron Funding VI Ltd. ("Blue Heron VI"), Blue Heron Funding VII Ltd. ("Blue Heron VII"), Blue Heron Funding IX Ltd. ("Blue Heron IX"), Silver Elms CDO PLC ("Silver Elms"), Silver Elms CDO II Limited ("Silver Elms II") and Kleros Preferred Funding V PLC ("Kleros V"), by their attorneys Robbins Geller Rudman & Dowd LLP, for their complaint herein against defendants JPMorgan Chase & Co., J.P. Morgan Securities LLC, J.P. Morgan Mortgage Acquisition Corp., Chase Home Finance LLC, J.P. Morgan Acceptance Corporation I, Chase Mortgage Finance Corporation, The Bear Stearns Companies LLC, EMC Mortgage LLC, Bear Stearns Asset Backed Securities I LLC and Structured Asset Mortgage Investments II Inc. (collectively, "defendants" or "JPMorgan"), allege, on information and belief, except as to plaintiffs' own actions, as follows:

## I.    SUMMARY OF THE ACTION

1.    This action arises out of plaintiffs' purchases of more than $1.78 billion worth of residential mortgage-backed securities ("RMBS").[1]  The specific RMBS at issue are generally referred to as "certificates."  The certificates are essentially bonds backed by a large number of residential real estate loans, which entitle their holders to receive monthly distributions derived from the payments made on those loans.  The claims at issue herein arise from 74 separate certificate purchases made in 47 different offerings (the "JPMorgan Offerings"), all of which were structured, marketed, and sold by defendants during the period from 2005 through 2007.  *See* Appendix A.

---

[1]    As further explained *infra*, at §II.A, some of plaintiffs' purchases consisted of purchases by plaintiffs (including their agents) directly from defendants or others.  However, in other cases, plaintiffs obtained their claims through assignment.  That is, for some of the certificate purchases alleged herein, the certificates were initially purchased by third parties, but all rights, title, interest and causes of action in and related to the certificates were assigned to plaintiffs.  Accordingly, all references herein to plaintiffs' purchases of certificates include both plaintiffs' direct purchases as well as plaintiffs' claims arising by assignment.

- 1 -

2.      Defendants used U.S. Securities and Exchange Commission ("SEC") forms, such as registration statements, prospectuses and prospectus supplements, as well as other documents – such as pitch books, term sheets, loan tapes, offering memoranda, draft prospectus supplements, "red," "pink" and "free writing" prospectuses and electronic summaries of such materials – to market and sell the certificates to plaintiffs.  In addition, defendants also disseminated the key information in these documents to third parties – such as the rating agencies (the "Credit Rating Agencies"), broker-dealers and analytics firms, like Intex Solutions, Inc. ("Intex") – for the express purpose of marketing the certificates to plaintiffs and other investors.  Collectively, all of the documents and information disseminated by defendants for the purpose of marketing and/or selling the certificates to plaintiffs are referred to herein as the "Offering Documents."  Each purchase at issue herein was made in direct reliance on the information contained in the Offering Documents.[2]

3.      As further detailed herein, the Offering Documents were materially false and misleading at the time they were issued by defendants and relied on by plaintiffs and/or their assignors.   Specifically, the Offering Documents both failed to disclose and affirmatively misrepresented material information regarding the very nature and credit quality of the certificates and their underlying loans.  The Offering Documents further failed to disclose that, at the same time JPMorgan was offering the certificates for sale to plaintiffs, the bank was privately betting that the same and similar certificates would soon default at significant rates.  Defendants used these Offering Documents to defraud plaintiffs and their assignors into purchasing supposedly "investment grade" certificates at falsely inflated prices.  Plaintiffs' certificates are now all rated at junk status or below,

---

[2]      As further detailed *infra*, at §V.B, some of the purchase decisions at issue herein were made prior to the date of the final prospectus supplements for the offerings in which such certificates were purchased.  On information and belief, however, all such purchases were made in direct reliance upon draft prospectus supplements that were distributed by defendants and were identical in all material respects to the final prospectus supplements for such offerings.

864087_1

and are essentially worthless investments,  while defendants, on the other hand, have profited handsomely – both from their roles in structuring, marketing and selling the certificates, and from their massive "short" bets against the certificates they, themselves, sold to plaintiffs.

## II.   PARTIES

### A.   Plaintiffs

4.   Plaintiff Phoenix is a limited liability company incorporated in Ireland, with its principal place of business in Dublin, Ireland.  Phoenix brings its claims against defendants as an assignee of claims regarding securities that were initially purchased by four separate and distinct legal entities that collapsed or nearly collapsed as a direct result of defendants' misconduct, as alleged herein.  The four assignors are identified below:

(a)   Harrier Finance Limited ("Harrier") is a Cayman Islands limited liability company, which maintains its principal place of business in George Town, Cayman Islands, and is controlled by an independent board of directors.  Harrier is a structured investment vehicle that issued debt and income securities to numerous external investors.  Numerous external investors currently hold long-term income notes issued by Harrier, which are currently in defeasance due in large part to the conduct of defendants.  During the relevant time period, Harrier was an independent company that invested in RMBS and other securities, and which hired a professional asset manager in New York to make its investments.  The investment manager did business as Brightwater Capital Management ("Brightwater"), a business division of WestLB Asset Management (US) LLC, which was a Delaware limited liability company.  As further set forth *infra*, Harrier purchased certificates at issue herein, which were subsequently assigned to Phoenix, along with all associated rights, title, interest, causes of action and claims in and related to such certificates, including all claims at issue herein.

- 3 -

(b)     Kestrel Funding P.L.C. ("Kestrel") is a limited liability company incorporated in Ireland, which maintains its principal place of business in Dublin, Ireland, and is controlled by an independent board of directors. Kestrel is a structured investment vehicle that issued debt and income securities to numerous external investors. Numerous external investors currently hold long-term income notes issued by Kestrel, although the company has ceased to do business actively. During the relevant time period, Kestrel was an independent company that invested in RMBS and other securities, and hired Brightwater to conduct investment activities on its behalf. As further set forth *infra*, Kestrel purchased certificates at issue herein, which were subsequently assigned to Phoenix, along with all associated rights, title, interest, causes of action and claims in and related to such certificates, including all claims at issue herein.

(c)     During the relevant time period, WestLB AG ("WestLB") was a German corporation with its principal place of business in Düsseldorf, Germany. On July 1, 2012, WestLB underwent a restructuring, pursuant to which WestLB transferred the majority of its remaining assets to a public winding-up agency known as Erste Abwicklungsanstalt ("EAA"). As a result of the restructuring measures, WestLB discontinued its banking business and now operates solely as a global provider of portfolio management services, under the name of Portigon AG. As further set forth *infra*, WestLB purchased certificates at issue herein, which were subsequently assigned to Phoenix, along with all associated rights, title, interest, causes of action and claims in and related to such certificates, including all claims at issue herein.

(d)     During the relevant time period, Greyhawk Funding LLC ("Greyhawk") was a Delaware limited liability company, which maintained its principal place of business in Delaware and was controlled by an independent board of directors. Greyhawk was an asset-backed commercial paper program, which issued commercial paper to numerous external investors. Greyhawk was subsequently liquidated and is no longer active. During the relevant time period,

- 4 -

Greyhawk was an independent company that invested in RMBS and other securities, and hired Brightwater to manage such investments. As further set forth *infra*, Greyhawk purchased certificates at issue herein, which were subsequently assigned to Phoenix, along with all associated rights, title, interest, causes of action and claims in and related to such certificates, including all claims at issue herein.

5.      Phoenix acquired the legal claims at issue in this case in exchange for rescue financing and other good and valuable consideration. The certificates at issue in this case were severely damaged on or before the day they were transferred to Phoenix, and continue to be damaged, in an amount to be proven at trial. Phoenix has standing to sue defendants to recover those damages as an assignee of all rights, title, interest, causes of action and claims regarding securities initially purchased by the four assignors identified above. As a result, use of the term "Phoenix" herein shall also refer to each of the above-identified assignors.

6.      Plaintiff Blue Heron II is a Cayman Islands company with its principal place of business in George Town, Cayman Islands. Blue Heron II is a fully independent special purpose vehicle with a board of directors who controls its operations. Blue Heron II has numerous investors holding debt and income securities issued by the company. Blue Heron II was organized for the purpose of investing in RMBS and other securities. Each of the claims asserted herein by Blue Heron II relates to certificates that were purchased by Blue Heron II in accordance with investment parameters developed by Blue Heron II's external agents and professional investors.

7.      Plaintiff Blue Heron V is a Cayman Islands company with its principal place of business in George Town, Cayman Islands. Blue Heron V is a fully independent special purpose vehicle with a board of directors who controls its operations and numerous investors holding securities issued by the company. Blue Heron V was organized for the purpose of investing in RMBS and other securities. Each of the claims asserted herein by Blue Heron V relates to

- 5 -

certificates that were purchased by Blue Heron V in accordance with investment parameters developed by Blue Heron V's external agents and professional investors.

8.        Plaintiff Blue Heron VI is a Cayman Islands company with its principal place of business in George Town, Cayman Islands.  Blue Heron VI is a fully independent special purpose vehicle with a board of directors who controls its operations and numerous investors holding securities issued by the company.  Blue Heron VI was organized for the purpose of investing in RMBS and other securities.  Each of the claims asserted herein by Blue Heron VI relates to certificates that were purchased by Blue Heron VI in accordance with investment parameters developed by Blue Heron VI's external agents and professional investors.

9.        Plaintiff Blue Heron VII is a Cayman Islands company with its principal place of business in George Town, Cayman Islands.  Blue Heron VII is a fully independent special purpose vehicle with a board of directors who controls its operations and numerous investors holding securities issued by the company.  Blue Heron VII was organized for the purpose of investing in RMBS and other securities.  Each of the claims asserted herein by Blue Heron VII relates to certificates that were purchased by Blue Heron VII in accordance with investment parameters developed by Blue Heron VII's external agents and professional investors.

10.        Plaintiff Blue Heron IX is a Cayman Islands company with its principal place of business in George Town, Cayman Islands.  Blue Heron IX is a fully independent special purpose vehicle with a board of directors who controls its operations and numerous investors holding securities issued by the company.  Blue Heron IX was organized for the purpose of investing in RMBS and other securities.  Each of the claims asserted herein by Blue Heron IX relates to certificates that were purchased by Blue Heron IX in accordance with investment parameters developed by Blue Heron IX's external agents and professional investors.

11.     Plaintiff Silver Elms is a public limited company incorporated under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Silver Elms is a fully independent company with a board of directors who controls its operations.  Silver Elms has numerous investors holding debt and income securities issued by the company.  Silver Elms was organized for the purpose of investing in RMBS and other securities.  Each of the claims asserted herein by Silver Elms relates to certificates that were purchased by Silver Elms, or, as further set forth *infra*, relates to certificates assigned to Silver Elms that were initially purchased by Paradigm Funding LLC ("Paradigm").  Paradigm was a Delaware limited liability company during the relevant time period, but is now defunct.  The certificates initially purchased by Paradigm were assigned to Silver Elms, along with all associated rights, title, interest, causes of action and claims in and related to such certificates, including all claims at issue herein.

12.     Plaintiff Silver Elms II is a public limited company incorporated under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Silver Elms II is a fully independent company with a board of directors who controls its operations.  Silver Elms II has numerous investors holding debt and income securities issued by the company.  Silver Elms II asserts its claims herein as an assignee of certificates that were initially purchased by other entities and were subsequently assigned to Silver Elms II, along with all associated rights, title, interest, causes of action and claims in and related to such certificates, including all claims at issue herein.  As further set forth *infra*, the certificates assigned to Silver Elms II were initially purchased by WestLB and Paradigm.

13.     Plaintiff Kleros V is a public limited company organized under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Kleros V is a fully independent special purpose vehicle with a board of directors who controls its operations.  Kleros V was organized for the purpose of investing in RMBS and other securities and has numerous investors holding debt and

- 7 -

income securities issued by the company. Kleros V asserts claims herein both as an initial purchaser and as an assignee of certificates purchased by WestLB. The certificates initially purchased by WestLB were assigned to Kleros V, along with all associated rights, title, interest, causes of action and claims in and related to such certificates, including all claims at issue herein. The certificates initially purchased by Kleros V were acquired in accordance with investment parameters developed by Kleros V's external agents and professional investors.

14.     All of these entities are collectively referred to herein as "plaintiffs," except where there are differences in the methods that they employed to make the subject investments. Moreover, unless otherwise noted, all references herein to plaintiffs' purchases of certificates include both plaintiffs' direct purchases as well as plaintiffs' claims arising by assignment.

**B.     The "JPMorgan Defendants"**

15.     As further set forth below, each of the following defendants (the "JPMorgan Defendants") was actively involved with and/or liable for some or all of the JPMorgan Offerings at issue herein. *See* §V, *infra*. Additional detailed information concerning each JPMorgan Offering is also set forth in Appendix A, attached hereto.

16.     Defendant JPMorgan Chase & Co. is a Delaware financial holding company with its principal place of business in New York, New York. JPMorgan Chase & Co. is a global financial services firm and one of the largest banking institutions in the United States. JPMorgan Chase & Co. is the sole owner of co-defendant J.P. Morgan Securities LLC and is the ultimate owner of co-defendants J.P. Morgan Mortgage Acquisition Corp. and J.P. Morgan Acceptance Corporation I. JPMorgan Chase & Co. is also the owner of and successor-in-interest to co-defendant The Bear Stearns Companies LLC (formerly known as The Bear Stearns Companies, Inc., collectively referred to herein as "The Bear Stearns Companies"). In 2008, JPMorgan Chase & Co. acquired The Bear Stearns Companies, resulting in co-defendant The Bear Stearns Companies LLC and its subsidiaries

- 8 -

becoming subsidiaries of JPMorgan Chase & Co. JPMorgan Chase & Co. owned and controlled all of the other JPMorgan Defendants identified herein.

17.    Defendant J.P. Morgan Securities LLC is a Delaware limited liability company, with its principal place of business in New York, New York. J.P. Morgan Securities LLC is an SEC-registered broker-dealer, which engages in investment banking activities in the United States and is a primary non-bank subsidiary of defendant JPMorgan Chase & Co. J.P. Morgan Securities LLC was formerly known as J.P. Morgan Securities, Inc. before being converted into a limited liability company on or about September 1, 2010. As a result of the JPMorgan Chase & Co./The Bear Stearns Companies merger in 2008, Bear Stearns & Co., Inc. ("Bear Stearns Co."), an underwriter of certain of the JPMorgan Offerings alleged herein, was merged with J.P. Morgan Securities, Inc. and is now doing business as J.P. Morgan Securities LLC.[3] As the successor-in-interest to Bear Stearns Co., J.P. Morgan Securities LLC is liable for the Bear Stearns Co. conduct at issue herein. Accordingly, unless otherwise noted, use of the term "J.P. Morgan Securities" herein refers collectively to J.P. Morgan Securities LLC, J.P. Morgan Securities, Inc. and Bear Stearns Co. J.P. Morgan Securities was an underwriter and broker-dealer for each of the JPMorgan Offerings alleged herein. Of the 74 certificates plaintiffs purchased in the JPMorgan Offerings at issue herein, 63 were purchased directly from J.P. Morgan Securities in its capacity as an underwriter for the JPMorgan Offerings. As an underwriter, J.P. Morgan Securities was intimately involved in the JPMorgan Offerings alleged herein and participated in the investigation of the loans, and the drafting and dissemination of the Offering Documents by which the certificates were sold to plaintiffs.

---

[3]    Because of the merger between JPMorgan Chase & Co. and The Bear Stearns Companies, RMBS offerings by Bear Stearns Co. are also included within the JPMorgan Offerings alleged herein.

18.    Defendant J.P. Morgan Mortgage Acquisition Corp. ("JPMMAC") is a Delaware corporation with its principal place of business in New York, New York.  JPMMAC was the sponsor for nine of the JPMorgan Offerings at issue herein.  In its capacity as the sponsor for such offerings, JPMMAC organized and initiated the deals by acquiring the mortgage loans to be securitized, negotiating the principal securitization transaction documents and working with the securities underwriters to structure the offerings.  JPMMAC is an indirect wholly-owned subsidiary of co-defendant JPMorgan Chase & Co.

19.    Defendant Chase Home Finance LLC ("CHF") was a Delaware limited liability company and was a sponsor for one of the JPMorgan Offerings alleged herein.  In its capacity as the sponsor for such offering, CHF organized and initiated the deal by acquiring and aggregating the mortgage loans to be securitized, negotiating the principal securitization transaction documents and working with the securities underwriters to structure the offering.  In 2011, CHF merged with a subsidiary of co-defendant JPMorgan Chase & Co. and ceased to exist.  Accordingly, defendant JPMorgan Chase & Co. is the ultimate successor in interest to CHF and is therefore liable for its conduct alleged herein.

20.    Defendant J.P. Morgan Acceptance Corporation I ("JPMAC") is a Delaware corporation with its principal place of business in New York, New York.  JPMMAC is an indirect, wholly-owned subsidiary of co-defendant JPMorgan Chase & Co.  JPMMAC was a depositor and issuer for nine of the certificates sold to plaintiffs in the JPMorgan Offerings at issue herein.  The depositor is considered an "issuer" of the certificates within the meaning of §2(a)(4) of the Securities Act of 1933, 15 U.S.C. §77b(a)(4), and in accordance with §11(a), 15 U.S.C. §77(a).

21.    Defendant Chase Mortgage Finance Corporation ("CMFC") is a Delaware corporation and is an indirect wholly-owned subsidiary of co-defendant JPMorgan Chase & Co.  CMFC was a depositor and issuer for one of the JPMorgan Offerings at issue herein.  As set forth

- 10 -

above, the depositor is considered an "issuer" of the certificates within the meaning of the U.S. securities laws.

22.    Defendant The Bear Stearns Companies is a Delaware limited liability company with its principal place of business in  New York, New York.  The Bear Stearns Companies was, at all relevant times, a holding company that provided investment banking, securities, and derivatives trading services to its clients through its subsidiaries.  At all relevant times, The Bear Stearns Companies was the owner of co-defendants Bear Stearns Asset Backed Securities I LLC, EMC Mortgage LLC and Structured Asset Mortgage Investments II Inc., which were its direct or indirect wholly-owned subsidiaries (collectively "Bear Stearns").  As a result of the merger between JPMorgan Chase & Co. and The Bear Stearns Companies in 2008, all of these defendants became direct or indirect wholly-owned subsidiaries of JPMorgan Chase & Co.

23.    Defendant EMC Mortgage LLC is a Delaware limited liability company and was, at all relevant times, a wholly-owned subsidiary of co-defendant The Bear Stearns Companies.  As a result of the merger between Bear Stearns and JPMorgan Chase Co., EMC Mortgage LLC became a wholly-owned indirect subsidiary of defendant JPMorgan Chase & Co.  EMC Mortgage LLC was formerly known as EMC Mortgage Corporation before being converted into a limited liability company on or about March 31, 2011.  Unless otherwise noted, use of the term "EMC Mortgage" herein refers collectively to both EMC Mortgage LLC and EMC Mortgage Corporation.  EMC Mortgage, which was organized for the purpose of acquiring, holding, servicing, and securitizing mortgage loans and mortgage securities, was the sponsor for 18 of the JPMorgan Offerings at issue here.  In its capacity as the sponsor for such offerings, EMC Mortgage organized and initiated the deals by acquiring the mortgage loans to be securitized, negotiating the principal securitization transaction documents and working with the securities underwriters to structure the offerings.

- 11 -

24.     Defendant Bear Stearns Asset Backed Securities I LLC ("BSABS") is a Delaware limited liability company with its principal place of business in New York, New York.  At all relevant times, BSABS was a wholly-owned subsidiary of co-defendant The Bear Stearns Companies.  BSABS was a depositor for 11 of the JPMorgan Offerings at issue herein.  Under the U.S. securities laws, BSABS, as depositor, is considered an "issuer" of the certificates.

25.     Defendant Structured Asset Mortgage Investments II Inc. ("Structured Asset Mortgage") was, at all relevant times, a Delaware corporation with its principal place of business in New York, New York.  Structured Asset Mortgage was a wholly-owned subsidiary of The Bear Stearns Companies.  As a result of the merger between Bear Stearns and JPMorgan Chase & Co., Structured Asset Mortgage became a wholly-owned direct subsidiary of co-defendant JPMorgan Chase & Co.  Structured Asset Mortgage was the depositor (and thus, also the "issuer" under the U.S. securities laws) for eight of the JPMorgan Offerings at issue herein.

26.     Defendants JPMorgan Chase & Co., J.P. Morgan Securities, JPMMAC, CHF, JPMAC, CMFC, The Bear Stearns Companies, EMC Mortgage, BSABS and Structured Asset Mortgage are collectively referred to herein as either the "JPMorgan Defendants" or "JPMorgan."

## III.    JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action pursuant to Article VI, §7 of the New York State Constitution, which authorizes it to serve as a court of "general [and] original jurisdiction in law and equity."  The amount in controversy exceeds the minimum threshold of $150,000 pursuant to §202.70(a) of the Uniform Civil Rules of the New York Supreme Court.

28.     The Court's personal jurisdiction over defendants is founded upon C.P.L.R. §§301 and 302 as each defendant transacts business within the State of New York within the meaning of C.P.L.R. §302(a)(1), and each of them committed a tortious act inside the State of New York within the meaning of C.P.L.R. §302(a)(2).

- 12 -

29.    Defendants regularly and systematically transact business within the State of New York and derive substantial revenue from activities carried out in New York. A majority of defendants' acts pertaining to the securitization of the RMBS giving rise to the causes of action alleged herein occurred in New York. Each defendant was actively involved in the creation, solicitation and/or sale of the subject certificates to plaintiffs in the State of New York. Specifically, defendants originated and/or purchased the loans at issue, prepared, underwrote, negotiated, securitized and marketed the offerings, and sold and/or marketed the certificates to plaintiffs, in substantial part, in New York County, New York.

30.    Since numerous witnesses with information relevant to the case and key documents are located within the State of New York, any burdens placed on defendants by being brought under the State's jurisdiction will not violate fairness or substantial justice.

31.    This Court also has personal jurisdiction over many of the defendants based on consent under C.P.L.R. §301 due to their unrevoked authorization to do business in the State of New York and their designations of registered agents for service of process in New York.

32.    This Court has personal jurisdiction over any foreign defendants because they transact business within the State of New York either directly or through their wholly-owned subsidiaries, by selling securities in the State, and/or maintaining offices in the State. Any subsidiaries, affiliates and/or agents of such foreign defendants conducting business in this State are organized and operated as instrumentalities and/or alter egos of such foreign defendants. Such foreign defendants are the direct or indirect holding companies that operate through their subsidiaries, affiliates and/or agents in this State.

33.    Venue is proper in this Court pursuant to C.P.L.R. §503(c) because most of the defendants maintain their principal place of business in New York County, and pursuant to C.P.L.R. §503(a) as designated by plaintiffs. Many of the alleged acts and transactions, including the

- 13 -

preparation and dissemination of the Offering Documents, also occurred in substantial part in New York County, New York.

## IV.    BACKGROUND ON RMBS OFFERINGS IN GENERAL AND DEFENDANTS' INVOLVEMENT IN THE PROCESS

### A.    The Mortgage-Backed Securities Market

34.    This case involves securities that are supported by residential mortgages.  Residential mortgages are loans made to homeowners that are secured by a piece of collateral – a residence.  The loans generate specific, periodic payments, and the related collateral interest gives the lender the right to "foreclose" on the loan by seizing and selling the property to recover the amount of money that was loaned.

35.    The mortgage-backed securities market has existed for decades.  In 1980, the market's size was about $100 billion.  By 2004, the size of that market had reached over $4.2 trillion. To place this figure in context, in 2004 the total size of the U.S. corporate debt market was $4.6 trillion.  Investors from all over the world purchased mortgage-backed securities, and that demand drove down mortgage borrowing costs in the United States.

36.    Creating RMBS involves a process called "securitization."

### B.    Organizations and Defendant Entities Involved in the Securitization Process

37.    The securitization process requires a number of parties, including: (1) mortgage originators; (2) borrowers; (3) RMBS sponsors (or "sellers"); (4) mortgage depositors; (5) securities underwriters; (6) trusts that issue certificates backed by mortgages; (7) Nationally Recognized Statistical Rating Organizations ("NRSROs"), three of which are the Credit Rating Agencies; and (8) investors.  Following is a description of their roles in order.

38.    ***Mortgage originators*** accept mortgage applications and other information from prospective borrowers.  They set borrowing standards, purport to evaluate a borrower's ability to

- 14 -

repay, and appraise the value of the collateral supporting the borrower's obligations. This process is called "underwriting" a mortgage. The key mortgage originators at issue herein are set forth in §VI.

39.    **Borrowers** who purport to satisfy the originators' underwriting criteria sign documentation memorializing the terms and conditions of the mortgages. Those documents typically include a promissory note and lien securing repayment – which together form what is known as the mortgage. Originators are then able to sell such mortgages to securitization sponsors in a large secondary market.

40.    **Sponsors** (or "sellers") typically organize and initiate the securitization aspect of the process by acquiring large numbers of mortgages, aggregating them, and then selling them through an affiliated intermediary into an issuing trust. In this case, the sponsors for many of the RMBS offerings at issue herein were defendants EMC Mortgage and JPMMAC. EMC Mortgage and JPMMAC were generally responsible for pooling the mortgage loans to be securitized by the depositors, negotiating the principal securitization transaction documents and participating with the underwriters to structure the RMBS offerings.

41.    **Depositors** typically buy the pools of mortgages from the sponsors (or "sellers"), settle the trusts, and deposit the mortgages into those trusts in exchange for the certificates to be offered to investors, which the depositors in turn sell to the underwriters, for ultimate sale to investors. Under the U.S. securities laws, depositors are technically considered "issuers" of the securities and are strictly liable for material misrepresentations and omissions in any registration statement under the Securities Act of 1933. Defendant JPMAC acted as depositor in many of the RMBS offerings at issue herein. A more detailed summary of the role of that JPMAC performed in connection with plaintiffs' certificates follows:

(a)    First, JPMAC acquired discrete pools of mortgages from the offering's "sponsor," in many cases, JPMMAC. The sponsor typically transferred those mortgages to the

- 15 -

864087_1

depositor via written mortgage purchase agreements that typically contained written representations and warranties about the mortgages ("Mortgage Purchase Agreements").

(b)    Second, the depositor settled the issuing trusts, and "deposited" the discrete pools of mortgages acquired from the offering sponsor, along with their rights under the Mortgage Purchase Agreements, into the issuing trusts, in exchange for the certificates, which were then transferred to the underwriter for ultimate sale to investors such as plaintiffs.  The sponsor was responsible for making sure title to the mortgage loans was properly and timely transferred to the trusts and/or trustees of the trusts.  The mortgages and their rights, among other things, constitute the trusts' res.  The trusts – their res, trustee and beneficiaries – are defined by a written pooling and servicing agreement ("Pooling Agreement").

(c)    Third, the depositor, who is technically the "issuer" under the U.S. securities laws, filed a "shelf" registration statement with the SEC, which enabled the depositor to issue securities rapidly in "shelf take-downs."  In order to be offered through this method, it was necessary for the certificates to be deemed "investment grade" quality by the NRSRO processes described herein.

42.    *Securities underwriters* purchase the certificates from the depositors and resell them to investors, such as plaintiffs.  The terms of a particular underwriter's liabilities and obligations in connection with the purchase, sale and distribution of RMBS certificates are typically set forth in a written agreement between the depositor and the underwriter ("Underwriting Agreement").  Moreover, the underwriters also have obligations and responsibilities placed upon them by U.S. securities laws, including, without limitation, that they investigate the loans and ensure representations about the loans in the offering documents are true and correct.  The "underwriter defendants" at issue herein are Bear Stearns Co. and J.P. Morgan Securities, which served as underwriters in all of the RMBS offerings at issue herein.

- 16 -

43.    ***Issuing trusts*** hold the mortgages and all accompanying rights under the Mortgage Purchase Agreements.  Pursuant to the terms of the Pooling Agreements, the issuing trusts issue the certificates to the depositors for ultimate sale to investors by the securities underwriters.  The certificates entitle the investors to principal and interest payments from the mortgages held by the trusts.  Trustees voluntarily agree to administer the trusts and voluntarily agree to satisfy contractual and common law duties to trust beneficiaries – the plaintiff certificate investors in this case.

44.    ***NRSROs***, which include the Credit Rating Agencies herein, analyze performance data on mortgage loans of every type and use that information to build software programs and models that are ultimately used to assign credit ratings to RMBS.  These computer models generate various "levels" of subordination and payment priorities that are necessary to assign "investment grade" credit ratings to the certificates that the RMBS trusts issue.  The rules generated by the NRSRO models are then written into the Pooling Agreements drafted by the sponsor and the securities underwriter(s).  As alleged above, in order to be issued pursuant to a "shelf take-down," the certificates must receive "investment grade" credit ratings from the NRSROs.

45.    ***Investors***, like plaintiffs, purchase the RMBS certificates, and thus, provide the funding that compensates all of the securitization participants identified above.

46.    The illustration below further summarizes the roles of the various parties in an RMBS securitization.  In this illustration, the green arrows – moving from investors to home buyers or borrowers – illustrate funds flow, and the grey cells identify certain defendant entities in the context of their roles in the securitization process:



### C.     To Market the Certificates, Defendants Registered Them with the SEC on "Investment Grade" Shelves

47.     Receiving strong credit ratings assigned to a particular RMBS is what enables securities dealers, like defendants, to register those securities on a "shelf" with the SEC.  Issuing securities in this way involves two steps.  First, an issuer must file a "shelf" registration statement with the SEC, governing potentially dozens of individual issuances of securities, or "shelf take-downs," that the issuer plans to conduct in the future.  Second, to market a particular issuance, the issuer must file a prospectus "supplement" to the registration statement.  The registration statement describes the shelf program in general, while the prospectus supplement and other offering documents describe in detail the particular securities offered to investors at that time.

864087_1

48.    Many of the securities at issue in this case were "taken down" from shelves that defendants created, in most cases, a process that never would have been possible without investment grade ratings from the Credit Rating Agencies.

## V.    C.P.L.R. §3016 PARTICULARITY ALLEGATIONS

49.    As detailed immediately below, all of the Offering Documents distributed by defendants and relied on by plaintiffs and/or their assignors were materially false and misleading, as they omitted and affirmatively misrepresented material information regarding the certificates and their underlying loans.  Moreover, as set forth *infra*, defendants were well aware of each of the following material misrepresentations and omissions.  *See* §VII, *infra*.

### A.    Each of the Offering Documents Omitted Material Information

50.    The Offering Documents for each of the 47 offerings at issue herein failed to disclose critical information within defendants' possession regarding the certificates and their underlying loans.  Specifically, prior to selling the certificates to plaintiffs, defendants hired Clayton Holdings, Inc. ("Clayton") and/or other due diligence providers to re-underwrite samples of the loans underlying each of the specific certificates purchased by plaintiffs. [4]  For each of the 47 offerings, Clayton and/or the other due diligence providers determined that a significant percentage of the loans had been defectively underwritten and/or were secured by inadequate collateral, and were thus likely to default.  In aggregate, during 2006 and 2007 – the time period during which the vast majority of offerings at issue herein occurred – Clayton determined that ***26.7% of all loans it reviewed for JPMorgan were defective***, and ***16.3% of all loans it reviewed for Bear Stearns were***

---

[4]    During the relevant time frame, Clayton reviewed loan samples for approximately 50% to 70% of all RMBS offerings brought to market by third-party investment banks, including the JPMorgan Defendants.  Based upon Clayton's re-underwriting of sampled loans, the due diligence firm was able to establish, at a 95% confidence level, the overall defect rate for the specific pool of loans underlying the offerings at issue.

864087_1

*defective.* This information was directly provided to the defendants prior to the offerings, but defendants affirmatively chose *not* to include it in the Offering Documents, even though Clayton expressly recommended that it be so included.

51.    The Offering Documents also failed to disclose what defendants did with the material, undisclosed information they received from Clayton and/or their other due diligence providers. Specifically, with regard to the test samples of loans that were reviewed by Clayton, JPMorgan actually "waived" back into the purchase pools for its offerings approximately *30% of the specific loans that had been affirmatively identified as defective*, while Bear Stearns waived back *41.8% of the specific loans that had been identified as defective*.  In addition, former employees of Bohan Group ("Bohan"), another firm who performed due diligence on loans securitized in the JPMorgan Offerings at issue herein, have confirmed that from 2005 through 2007, JPMorgan and Bear Stearns ignored Bohan's findings that loans did not meet underwriting guidelines, exerted constant pressure to stop Bohan underwriters from removing defective loans from pools, and would even alter underwriting guidelines to allow more defective loans into loan pools.  One former Bohan due diligence underwriter from 2005 through 2007 who reviewed loans purchased by both JPMorgan and Bear Stearns stated that 50% of the loans she reviewed were defective, that "you would have to be an idiot not to know that the loans were no good," and that the Wall Street banks – including JPMorgan and Bear Stearns – knew they were purchasing defective loans because they received daily reports summarizing the due diligence findings.

52.    With regard to the unsampled portion of the purchase pools – *i.e.*, the vast majority of the loans – defendants simply purchased the loans in their entirety, *sight unseen*.  Moreover, on information and belief, defendants also used the significant, undisclosed material defect rates uncovered by their due diligence providers as leverage to force their loan suppliers to accept lower purchase prices for the loans, without passing the benefits of such discounts onto plaintiffs and other

- 20 -

investors. None of the foregoing information was disclosed in the Offering Documents relied on by plaintiffs and their assignors, making such documents materially misleading.

53. It has recently been discovered that Clayton's statistics about the number of defective loans included in the offerings were actually ***understated***, as the deposition of a former Clayton employee revealed that Bear Stearns actually instructed Clayton to designate defective loans as non-defective, concealing the true, much higher number of loans that did not comply with the stated underwriting guidelines. A former underwriter for both Clayton and Watterson-Prime ("Watterson") (another due diligence firm utilized by Bear Stearns) has testified in a pending case titled *Ambac Assurance Corp. v. EMC Mortgage LLC, et al.*, No. 650421/2011 (N.Y. Sup. Ct., N.Y. Cty.) that Bear Stearns instructed both Clayton and Watterson to "approve loans ***that often did not satisfy the underwriting guidelines***," to ignore defects in loan applications, to code defective loans as non-defective and to change many of the grades on loans that were coded as defective to reflect that they were non-defective. For example, the former Clayton and Watterson employee testified that Clayton and Watterson underwriters were directed by Bear Stearns to overlook defects and to grade defective loans as non-defective, not to look for fraud in the loan files and to overlook any fraudulent documents, to grade loans as non-defective even where the underwriters determined that the borrowers' incomes listed on loan applications were unreasonable, and utilize "compensating factors" that were not supported by the data in the loan files. The Clayton underwriters used the phrase "Bear don't care" to describe Bear Stearns' attitude towards the due diligence underwriting review process. *See* §VII.2, *infra*.

54. The Offering Documents also failed to disclose that the JPMorgan Defendants were not only were aware that the loans did not comply with underwriting guidelines, but that ***defendants honestly and frankly described nearly identical securities as many at issue here as "DOG[S]" and "SACK[S] OF SHIT."*** These internal assessments of the actual quality of the securities, along with

- 21 -

the due diligence information that defendants had which demonstrated the true risk associated with the JPMorgan Offerings, was never disclosed in the Offering Documents distributed to and relied on by plaintiffs, making such documents materially misleading.  *See* §VII, *infra*.

**B.    Each of the Offering Documents Contained Material Misrepresentations**

**1.    The CHASE 2006-S3 Certificates**

55.    The Chase Mortgage Finance Trust Series 2006-S3, Multi-Class Mortgage Pass-Through Certificates, Series 2006-S3 ("CHASE 2006-S3 Certificates") were issued pursuant to a Prospectus Supplement dated October 24, 2006.  The following defendants played critical roles in the fraudulent structuring, offering and sale of the CHASE 2006-S3 Certificates: CMFC (depositor); CHF (sponsor); J.P. Morgan Securities, Inc. (underwriter).

56.    Plaintiffs and/or their assignors purchased the following CHASE 2006-S3 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|--------------------|--------------------|-------|---------------|----------------------|----------------|
| Kleros V | WestLB | 1A2 | 16162XAB3 | 10/6/2006 | $12,000,000 | J.P. Morgan Securities |

57.    The above purchase was made by WestLB's investment manager, Strategos Capital Management LLC ("Strategos"), in direct reliance upon the CHASE 2006-S3 Offering Documents, including draft and/or final CHASE 2006-S3 Prospectus Supplements.  Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

**a.    Underwriting Guidelines**

58.    The CHASE 2006-S3 Offering Documents disclosed that 100% of the CHASE 2006-S3 Certificates' underlying loans were acquired by the sponsor, CHF, from loan originator JPMorgan Chase Bank, N.A. ("JPMorgan Chase").  *See* CHASE 2006-S3 Pros. Supp. at S-8-S-71.

59.    The CHASE 2006-S3 Offering Documents represented that the JPMorgan Chase loans were originated using the underwriting guidelines of the sponsor, CHF.  *Id.* at S-71.  The

- 22 -

CHASE 2006-S3 Offering Documents represented that the JPMorgan Chase loans were originated

pursuant to underwriting guidelines under which "a determination is made as to whether the

prospective borrower has sufficient monthly income available to meet the borrower's monthly

obligations on the proposed loan and other expenses related to the residence (such as property taxes

and insurance) as well as to meet other financial obligations and monthly living expenses." *Id.* The

CHASE 2006-S3 Offering Documents also represented that:

> For loans with a loan-to-value ratio of 80% or less, CHF's lending guidelines require
> that all current fixed obligations of the borrower (including mortgage payments
> based on CHF's mortgage rates at the time of the application and other expenses
> related to the residence) generally may not exceed 40% of the borrower's gross
> income in the case of a borrower with income of under $75,000, 42% of the
> borrower's gross income in the case of a borrower with income of between $75,000
> and $150,000 and 44% of the borrower's gross income in the case of a borrower with
> income in excess of $150,000. For interest-only mortgage loans with a loan-to-value
> ratio between 80.01% and 90%, CHF's lending guidelines require that the mortgage
> payments (based on CHF's mortgage rates at the time of application) plus applicable
> real property taxes, any condominium common charges and hazard insurance, as well
> as all other monthly obligations (revolving debt, car payments, etc.), generally may
> not exceed 40% of the borrower's gross income. For fixed rate fully amortizing
> mortgage loans with a loan-to-value ratio between 80.01% and 90%, CHF's lending
> guidelines require that the mortgage payments (based on CHF's mortgage rates at the
> time of application) plus applicable real property taxes, any condominium common
> charges and hazard insurance, generally may not exceed 33% of the borrower's gross
> income and that all monthly payments, including those mentioned above and other
> fixed obligations, such as car payments, generally may not exceed 38% of the
> borrowers gross income. For fixed rate fully amortizing loans with a loan-to-value
> ratio between 90.01% and 95%, CHF's lending guidelines require that the mortgage
> payments (based on CHF's mortgage rates at the time of application) plus applicable
> real property taxes, any condominium common charges and hazard insurance,
> generally may not exceed 28% of the borrowers gross income and that all monthly
> payments, including those mentioned above and other fixed obligations, such as car
> payments, generally may not exceed 36% of the borrower's gross income.

*Id.* at S-71-S-72. The CHASE 2006-S3 Offering Documents further represented that "CHF requires

an appraisal (which in certain circumstances may be a confirmation of an existing appraisal) to be

made of each property to be financed." *Id.* at S-72. As further detailed *infra*, these representations

were false and misleading at the time they were made. Contrary to defendants' affirmative

- 23 -

representations, the truth was that JPMorgan Chase had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, **without** any regard for its borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.17, *infra*.

60.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, one borrower obtained a loan for $444,000 in 2006 which was contained within the CHASE 2006-S3 offering. The loan was originated through JP Morgan Chase, the loan originator identified in the Offering Documents. This borrower had income in 2006 of $2,439 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $4,791, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

61.    The CHASE 2006-S3 Offering Documents also made certain misrepresentations regarding the loan-to-value ("LTV") ratios associated with the loans supporting the CHASE 2006-S3 Certificate purchased by plaintiffs and/or their assigning entities.[5]  Specifically, the CHASE 2006-S3 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs'

---

[5]    For the reasons set forth *infra*, LTV ratios are very important to RMBS investors.  *See* §§VI.B and IX.A, *infra*.

CHASE 2006-S3 Certificate had LTV ratios over 80%, and that **none** of the loans supporting plaintiffs' CHASE 2006-S3 Certificate had LTV ratios over 100%.

62.     Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' CHASE 2006-S3 Certificate, which reveals that the LTV ratio percentages stated in the CHASE 2006-S3 Offering Documents were materially false **at the time they were made**. The following chart summarizes the LTV ratio percentages stated in the CHASE 2006-S3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:[6]

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 1A2 | 16162XAB3 | All | 0.23% | 43.23% | 0.00% | 11.67% |

### c.     Owner Occupancy Rates

63.     The CHASE 2006-S3 Offering Documents also made certain misrepresentations regarding the owner occupancy rates ("OOR" or "Primary Residence Percentages") associated with the loans supporting the CHASE 2006-S3 Certificate purchased by plaintiffs and/or their assigning entities.[7] Specifically, the CHASE 2006-S3 Offering Documents represented that a large percentage of the loans supporting plaintiffs' CHASE 2006-S3 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

---

[6]     Consistent with defendants' representations in the Offering Documents, all LTV ratio percentages herein are stated as a percentage of the aggregate outstanding loan balance of the supporting loan group or groups at issue.

[7]     For the reasons set forth *infra*, OOR percentages are very important to RMBS investors. *See* §§VI.C and IX.A, *infra*.

- 25 -

64.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' CHASE 2006-S3 Certificate, which reveals that the OOR percentages stated in the CHASE 2006-S3 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the OOR percentages stated in the CHASE 2006-S3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:[8]

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 1A2 | 16162XAB3 | All | 91.80% | 79.12% | 16.02% |

### d.    Credit Ratings

65.    The CHASE 2006-S3 Offering Documents also represented that the CHASE 2006-S3 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by Standard & Poor's ("S&P") and Moody's Investor Services ("Moody's"), indicating that the security was a very strong, safe investment with an extremely low probability of default.[9] Specifically, the CHASE 2006-S3 Offering Documents represented that plaintiffs' CHASE 2006-S3 Certificate had been assigned a AAA/Aaa rating – the highest, safest credit rating available, which is in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.[10]

---

[8]    Consistent with defendants' representations in the Offering Documents, all Primary Residence Percentages herein are stated as a percentage of the aggregate outstanding loan balance of the supporting loan group or groups at issue.

[9]    For the reasons set forth *infra*, credit ratings are very important to RMBS investors.  *See* §§VI.D and IX.B, *infra*.

[10]    As explained *infra*, "[t]raditionally, investments holding AAA ratings have had ***a less than 1% probability of incurring defaults*."  *See* §VI.D, *infra* (citing Carl Levin & Tom Coburn, *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse*, Majority and Minority Staff Report, Permanent Subcommittee on Investigations, United States Senate, 112th Congress (Apr. 13, 2011) ("Levin-Coburn Report"), at 6.

- 26 -

66.     These representations, however, were false and misleading when made.  In truth, plaintiffs' CHASE 2006-S3 Certificate should not have received AAA/Aaa credit ratings, because it was ***not*** a safe, "investment grade" security with "a less than 1% probability of incurring defaults." Rather, as defendants were well aware, plaintiffs' CHASE 2006-S3 Certificate was an extremely risky, speculative grade "junk" bond, or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' CHASE 2006-S3 Certificate was because defendants had fed them falsified information regarding the CHASE 2006-S3 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower debt-to-income ("DTI") ratios, and false OOR percentages.

67.     The falsity of the credit ratings set forth in the CHASE 2006-S3 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 20%[11] of the loans supporting plaintiffs' CHASE 2006-S3 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.[12]  Moreover, plaintiffs' "investment grade" CHASE 2006-S3 Certificate is now rated at "junk" status or below.  Clearly, plaintiffs' CHASE 2006-S3 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The evidence supporting the falsity of the CHASE 2006-S3 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

---

[11]     The default rates for all offerings at issue were obtained from trustee reports which were generally issued in or about May 2013, unless otherwise noted.

[12]     When used herein to describe the status of a loan or group of loans, the terms "in default," "into default" or "defaulted" are defined to include any loan or group of loans that is delinquent, in bankruptcy, foreclosed or bank owned.

864087_1

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 1A2 | 16162XAB3 | All | 20.61% | Aaa | Caa3 | AAA | D |

### e.    Transfer of Title

68.    The CHASE 2006-S3 Offering Documents also represented that the loans underlying the CHASE 2006-S3 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.[13]  Specifically, the CHASE 2006-S3 Offering Documents stated that "[t]he Depositor will cause the Mortgage Loans to be assigned to the Trustee, together with the rights to all principal and interest due on or with respect to the Mortgage Loans after the Cut-off Date."  *See* CHASE 2006-S3  Pros. Supp. at S-73.  The CHASE 2006-S3 Offering Documents also represented that "[i]n addition, the Depositor will, as to each Mortgage Loan (other than a Co-op Loan), deliver or cause to be delivered to the Custodian on behalf of the Trustee the Mortgage Note (together with all amendments and modifications thereto) endorsed without recourse to the Trustee or its designee, the original or a certified copy of the mortgage (together with all amendments and modifications thereto) with evidence of recording indicated thereon and an original or certified copy of an assignment of the mortgage in recordable form."  *Id.*  These statements were false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

---

[13]    For the reasons set forth *infra*, transfer of title of the underlying loans was very important to RMBS investors.  *See* §§VI.E and IX.D, *infra*.

864087_1

## 2. The BSMF 2006-AR3 Certificates

69.    The Bear Stearns Mortgage Funding Trust 2006-AR3, Mortgage Pass-Through Certificates, Series 2006-AR3 ("BSMF 2006-AR3 Certificates") were issued pursuant to a Prospectus Supplement dated October 30, 2006.  The following defendants played critical roles in the fraudulent structuring, offering and sale of the BSMF 2006-AR3 Certificates: Structured Asset Mortgage (depositor); EMC Mortgage (sponsor); Bear Stearns Co. (underwriter).

70.    Plaintiffs and/or their assignors purchased the following BSMF 2006-AR3 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Silver Elms II | WestLB | 1B2 | 07400HAG8 | 12/15/2006 | $8,229,000 | Bear Stearns Co. |
| Silver Elms II | WestLB | 1B3 | 07400HAH6 | 12/15/2006 | $3,032,000 | Bear Stearns Co. |

71.    Each of the above purchases was made by WestLB's investment manager, Eiger Capital ("Eiger"), in direct reliance upon the BSMF 2006-AR3 Offering Documents, including draft and/or final BSMF 2006-AR3 Prospectus Supplements.  Eiger's diligent investment processes are described in great detail in §VIII.D, *infra*.

### a. Underwriting Guidelines

72.    The BSMF 2006-AR3 Offering Documents disclosed that approximately 38.24% of the loans underlying plaintiffs' BSMF 2006-AR3 Certificates were acquired by the sponsor, EMC Mortgage, from loan originator Bear Stearns Residential Mortgage Corp. ("Bear Stearns Residential"); and approximately 61.76% of the loans underlying plaintiffs' BSMF 2006-AR3 Certificates were originated or acquired by the sponsor, EMC Mortgage from "various sellers."  *See* BSMF 2006-AR3 Pros. Supp. at S-4, S-33.

- 29 -

73.    With regard to the loans originated or acquired by EMC Mortgage loans from "various sellers," the BSMF 2006-AR3 Offering Documents represented that they were originated "in accordance with the underwriting guidelines established by [EMC Mortgage] as set forth below." *Id.* at S-33.  The BSMF 2006-AR3 Offering Documents also represented that "[EMC Mortgage's] underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *Id.* at S-34. The BSMF 2006-AR3 Offering Documents also represented that "[i]n determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers . . . the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income." *Id.*  The BSMF 2006-AR3 Offering Documents further represented that "[e]ach mortgaged property related to an EMC mortgage loan has been appraised by a qualified independent appraiser who is approved by each lender." *Id.* at S-35.  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that EMC Mortgage had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for its borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.7, *infra*.

74.    With regard to the Bear Stearns Residential loans, the BSMF 2006-AR3 Offering Documents represented that "[Bear Stearns Residential's] Alt-A Underwriting Guidelines are intended to ensure that (i) the loan terms relate to the borrower's willingness and ability to repay and (ii) the value and marketability of the property are acceptable." *See* BSMF 2006-AR3 Pros. Supp. at S-36.  The BSMF 2006-AR3 Offering Documents also represented that "[d]uring the underwriting

- 30 -

process, [Bear Stearns Residential] calculates and verifies the loan applicant's sources of income

. . . , reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the

applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the

[Bear Stearns Residential] Underwriting Guidelines." *Id.*   The BSMF 2006-AR3 Offering

Documents further represented that Bear Stearns Residential's underwriting guidelines are applied in

accordance with a procedure that "requires (i) an appraisal of the mortgaged property that conforms

to the Uniform Standards of Professional Appraisal Practice . . . and (ii) a review of such appraisal

. . . conducted by a [Bear Stearns Residential] underwriter." *Id.* at S-39.   As further detailed *infra*,

these representations were false and misleading at the time they were made.   Contrary to defendants'

affirmative representations, the truth was that Bear Stearns Residential had completely abandoned its

stated underwriting guidelines and was simply seeking to originate as many loans as possible,

***without*** any regard for its borrowers' actual repayment ability or the true value and adequacy of the

mortgaged properties to serve as collateral.   *See* §VI.A.7, *infra*.

75.    The following example, based upon public bankruptcy filings and other sources,

provides further specificity with respect to how the originators' failure to comply with underwriting

guidelines resulted in loans being issued to borrowers who could not afford to repay them.

Specifically, one borrower obtained a loan for $520,000 in 2006 that was contained within the

BSMF 2006-AR3 offering.   The loan was originated by either EMC Mortgage or Bear Stearns

Residential, the two loan originators identified in the BSMF 2006-AR3 Offering Documents. ***This***

***borrower had no income whatsoever in 2006***, according to the borrower's sworn bankruptcy filings.

***However, the borrower's monthly debt payments were at least $3,247, far in excess of the***

***borrower's monthly income of zero dollars***.   The borrower's monthly debt payments were in

addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care,

transportation and the like.   Clearly, this borrower could not afford to repay the loan.   This is

- 31 -

confirmed by the fact that the borrower declared bankruptcy after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

76.    The BSMF 2006-AR3 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BSMF 2006-AR3 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the BSMF 2006-AR3 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs' BSMF 2006-AR3 Certificates had LTV ratios over 80%, and that *none* of the loans supporting plaintiffs' BSMF 2006-AR3 Certificates had LTV ratios over 100%.

77.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BSMF 2006-AR3 Certificates, which reveals that the LTV ratio percentages stated in the BSMF 2006-AR3 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the LTV ratio percentages stated in the BSMF 2006-AR3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 1B2 | 07400HAG8 | Group I | 3.54% | 49.48% | 0.00% | 7.97% |
| 1B3 | 07400HAH6 | Group I | 3.54% | 49.48% | 0.00% | 7.97% |

### c.    Owner Occupancy Rates

78.    The BSMF 2006-AR3 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the BSMF 2006-AR3 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the BSMF 2006-AR3 Offering Documents represented that a large percentage of the loans supporting plaintiffs'

BSMF 2006-AR3 Certificates were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

79.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' BSMF 2006-AR3 Certificates, which reveals that the OOR percentages stated in the BSMF 2006-AR3 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the Primary Residence Percentages stated in the BSMF 2006-AR3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 1B2 | 07400HAG8 | Group I | 92.79% | 88.35% | 5.02% |
| 1B3 | 07400HAH6 | Group I | 92.79% | 88.35% | 5.02% |

### d.    Credit Ratings

80.    The BSMF 2006-AR3 Offering Documents also represented that the BSMF 2006-AR3 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.  Specifically, the BSMF 2006-AR3 Offering Documents represented that plaintiffs' BSMF 2006-AR3 Certificates had been assigned AA/Aa1 and AA-/Aa1 ratings – signifying that they were extremely safe and stable securities.

81.    These representations, however, were false and misleading when made.  In truth, plaintiffs' BSMF 2006-AR3 Certificates should not have received AA/Aa1 and AA-/Aa1 credit ratings, because they were ***not*** safe, "investment grade" securities with a low probability of incurring defaults.  Rather, as defendants were well aware, plaintiffs' BSMF 2006-AR3 Certificates were

- 33 -

extremely risky, speculative grade "junk" bonds or worse, backed by low credit quality, extremely

risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high

ratings to plaintiffs' BSMF 2006-AR3 Certificates was because defendants had fed them falsified

information regarding the BSMF 2006-AR3 Certificates' underlying loans, including, without

limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false

borrower DTI ratios, and false OOR percentages.

82.    The falsity of the credit ratings set forth in the BSMF 2006-AR3 Offering Documents

is confirmed by subsequent events.  Specifically, ***more than 34% of the loans supporting plaintiffs'***

***BSMF 2006-AR3 Certificates are currently in default*** because they were made to borrowers who

either could not afford them or never intended to repay them.  Moreover, each of plaintiffs'

"investment grade" BSMF 2006-AR3 Certificates is now rated at "junk" status or below.  Clearly,

plaintiffs' BSMF 2006-AR3 Certificates were not the highly rated, "investment grade" securities

defendants represented them to be.  The evidence supporting the falsity of the BSMF 2006-AR3

Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the

following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 1B2 | 07400HAG8 | Group I | 34.27% | Aa1 | WR | AA | D |
| 1B3 | 07400HAH6 | Group I | 34.27% | Aa1 | WR | AA- | D |

### e.    Transfer of Title

83.    The BSMF 2006-AR3 Offering Documents also represented that the loans underlying

the BSMF 2006-AR3 Certificates would be timely transferred to the issuing trust, so that the trust

would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the

BSMF 2006-AR3 Offering Documents stated that "[a]t the time of issuance of the Certificates, the

- 34 -

Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the trust." BSMF 2006-AR3 Pros. Supp. at S-87. This statement was false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 3.    The BSMF 2006-SL1 Certificates

84.    The Bear Stearns Mortgage Funding Trust 2006-SL1, Mortgage-Backed Certificates, Series 2006-SL1 ("BSMF 2006-SL1 Certificates") were issued pursuant to a Prospectus Supplement dated July 27, 2006. The following defendants played critical roles in the fraudulent structuring, offering and sale of the BSMF 2006-SL1 Certificates: BSABS (depositor); EMC Mortgage (sponsor); Bear Stearns Co. (underwriter).

85.    Plaintiffs and/or their assignors purchased the following BSMF 2006-SL1 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|--------------------|--------------------|-------|---------------|----------------------|----------------|
| Phoenix | Harrier | M2 | 07400WAC4 | 7/20/2006 | $12,015,000 | Bear Stearns Co. |
| Phoenix | Harrier | M5 | 07400WAF7 | 7/20/2006 | $9,776,000 | Bear Stearns Co. |

86.    Each of the above purchases was made by Harrier's investment manager, Brightwater, in direct reliance upon the BSMF 2006-SL1 Offering Documents, including draft and/or final BSMF 2006-SL1 Prospectus Supplements. Brightwater's diligent investment processes are described in great detail in §VIII.A, *infra*.

### a.    Underwriting Guidelines

87.    The BSMF 2006-SL1 Offering Documents disclosed that approximately 13.30% of the BSMF 2006-SL1 Certificates' underlying loans were acquired by the sponsor, EMC Mortgage, from loan originator Bear Stearns Residential; and approximately 86.70% of the BSMF 2006-SL1

- 35 -

Certificates' underlying loans were acquired by the sponsor, EMC Mortgage, "from various originators through the conduit correspondent channel." *See* BSMF 2006-SL1 Pros. Supp. at "*The Mortgage Pool – The Originators*."

88.    With regard to all of the BSMF 2006-SL1 Certificates' underlying loans, the BSMF 2006-SL1 Offering Documents represented that they were originated in accordance with underwriting guidelines that "are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. *Id.* at "*The Mortgage Pool – General Underwriting Guidelines.*" The BSMF 2006-SL1 Offering Documents further represented that: "Under each of the programs, the originator reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service to income ratio, if required, to determine the applicant's ability to repay the loan, and reviews the appraisal. In determining the ability of the applicant to repay the loan a qualifying rate has been created under the underwriting guidelines that generally is equal to the interest rate on that loan." *Id.* The BSMF 2006-SL1 Offering Documents further stated that "properties that are to secure [these] mortgage loans generally are appraised by qualified independent appraisers." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Bear Stearns Residential and EMC Mortgage had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for their borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.7, *infra*.

89.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with underwriting

- 36 -

guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a second-lien loan for $95,000 in 2006 that was contained within the BSMF 2006-SL1 offering.  The loan was acquired by the sponsor, EMC Mortgage, either through the conduit correspondent channel or from Bear Stearns Residential, one of the loan originators identified in the BSMF 2006-SL1 Offering Documents.  ***This borrower had monthly income of only $645 in 2006***, according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $6,173, nearly ten times the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation and the like. Clearly, this borrower could not afford to repay the loan.  This is confirmed by the fact that the borrower declared bankruptcy after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

90.    The BSMF 2006-SL1 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BSMF 2006-SL1 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the BSMF 2006-SL1 Offering Documents represented that ***none*** of the loans supporting plaintiffs' BSMF 2006-SL1 Certificates had LTV ratios over 100%.

91.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BSMF 2006-SL1 Certificates, which reveals that the LTV ratio percentages stated in the BSMF 2006-SL1 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the BSMF 2006-SL1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|
| M2 | 07400WAC4 | All | 0.00% | 31.34% |
| M5 | 07400WAF7 | All | 0.00% | 31.34% |

c.    **Credit Ratings**

92.    The BSMF 2006-SL1 Offering Documents also represented that the BSMF 2006-SL1 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default. Specifically, the BSMF 2006-SL1 Offering Documents represented that plaintiffs' BSMF 2006-SL1 Certificates had been assigned AA/Aa2 and A/A2 ratings – signifying that they were extremely safe and stable securities.

93.    These representations, however, were false and misleading when made. In truth, plaintiffs' BSMF 2006-SL1 Certificates should not have received AA/Aa2 and A/A2 credit ratings, because they were **not** safe, "investment grade" securities with a low probability of incurring defaults. Rather, as defendants were well aware, plaintiffs' BSMF 2006-SL1 Certificates were extremely risky, speculative grade "junk" bonds or worse**,** backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BSMF 2006-SL1 Certificates was because defendants had fed them falsified information regarding the BSMF 2006-SL1 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores and false borrower DTI ratios.

94.    The falsity of the credit ratings set forth in the BSMF 2006-SL1 Offering Documents is confirmed by subsequent events. Specifically, ***more than 14% of the loans supporting plaintiffs'***

- 38 -

**BSMF 2006-SL1 Certificates are currently in default** because they were made to borrowers who either could not afford them or never intended to repay them. Moreover, after initially being rated as "investment grade," plaintiffs' BSMF 2006-SL1 Certificates are no longer rated at all. Clearly, plaintiffs' BSMF 2006-SL1 Certificates were not the highly rated, "investment grade" securities that defendants represented them to be. The evidence supporting the falsity of the BSMF 2006-SL1 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M2 | 07400WAC4 | All | 14.25% | Aa2 | WR | AA | NR |
| M5 | 07400WAF7 | All | 14.25% | A2 | WR | A | NR |

### d.    Transfer of Title

95.    The BSMF 2006-SL1 Offering Documents also represented that the loans underlying the BSMF 2006-SL1 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the BSMF 2006-SL1 Offering Documents stated that "[a]t the time of issuance of the securities . . . , the depositor will transfer, convey and assign to the related trust fund all right, title and interest of the depositor in the primary assets [*i.e.* the mortgage loans] and other property to be transferred to the trust fund [and] [t]his assignment will include all principal and interest due on or with respect to the primary assets." BSMF 2006-SL1 Pros. Supp. at "*Assignment of Primary Assets – General*." The BSMF 2006-SL1 Offering Documents also represented that "[t]he depositor will deliver to the trustee . . . as to each Residential Loan and Home Equity Loan, the related note endorsed without recourse to the order of the trustee or in blank, the original mortgage, deed of trust or other security instrument with evidence of recording indicated thereon . . . and an assignment of the mortgage in

- 39 -

recordable form." *Id.* These statements were false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 4.    The BSMF 2006-SL4 Certificates

96.    The Bear Stearns Mortgage Funding Trust 2006-SL4, Mortgage-Backed Certificates, Series 2006-SL4 ("BSMF 2006-SL4 Certificates") were issued pursuant to a Prospectus Supplement dated November 8, 2006. The following defendants played critical roles in the fraudulent structuring, offering and sale of the BSMF 2006-SL4 Certificates: BSABS (depositor); EMC Mortgage (sponsor); Bear Stearns Co. (underwriter).

97.    Plaintiffs and/or their assignors purchased the following BSMF 2006-SL4 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|--------------------|--------------------|-------|---------------|----------------------|----------------|
| Kleros V | WestLB | M2 | 07401GAC8 | 11/3/2006 | $7,474,000 | J.P. Morgan Securities |

98.    The above purchase was made by WestLB's investment manager, Strategos, in direct reliance upon the BSMF 2006-SL4 Offering Documents, including draft and/or final BSMF 2006-SL4 Prospectus Supplements. Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.    Underwriting Guidelines

99.    The BSMF 2006-SL4 Offering Documents disclosed that approximately 24.12% of the BSMF 2006-SL4 Certificates' underlying loans were acquired by the sponsor, EMC Mortgage, from loan originator Bear Stearns Residential; and approximately 75.88% of the BSMF 2006-SL4 Certificates' underlying loans were acquired by the sponsor, EMC Mortgage, "from various originators through the conduit correspondent channel." *See* BSMF 2006-SL4 Pros. Supp. at S-32.

100.    With regard to the EMC Mortgage loans, the BSMF 2006-SL4 Offering Documents represented that they were originated according to underwriting guidelines that "are primarily

- 40 -

intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan." *Id.* The BSMF 2006-SL1 Offering Documents also represented that, "[w]hile the originator's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio as well as the type and use of the mortgaged property." *Id.* The BSMF 2006-SL1 Offering Documents further stated that "[u]nder each of the programs, the originator reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, [and] calculates the debt service to income ratio, if required, to determine the applicant's ability to repay the loan, and reviews the appraisal [of the mortgaged property]." *Id.* at S-33.  The BSMF 2006-SL1 Offering Documents further stated that "[m]ortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers." *Id.* at S-32.  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that EMC Mortgage had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for its borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.7, *infra*.

101.    With regard to the Bear Stearns Residential loans, the BSMF 2006-SL4 Offering Documents represented that "[Bear Stearns Residential's] Underwriting Guidelines are intended to make sure that (i) the loan terms relate to the borrower's ability to repay and (ii) the value and marketability of the property are acceptable." *See* BSMF 2006-SL4 Pros. Supp. at S-34.  The BSMF 2006-SL4 Offering Documents further stated that "[d]uring the underwriting process, [Bear Stearns Residential] reviews and verifies the loan applicant's sources of income . . . , calculates the amount

- 41 -

of income from all such sources indicated on the loan application, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the [Bear Stearns Residential] Underwriting Guidelines." *Id.* at S-35. The BSMF 2006-SL4 Offering Documents also represented that Bear Stearns Residential's underwriting guidelines are applied in accordance with a procedure that "requires (i) an appraisal of the mortgaged property that conforms to the Uniform Standards of Professional Appraisal Practice . . . and (ii) a review of such appraisal . . . conducted by a representative of [Bear Stearns Residential]." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Bear Stearns Residential had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for its borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.7, *infra*.

102.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with underwriting guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a second-lien loan for $93,829 in 2006 that was contained within the BSMF 2006-SL4 offering. The loan was acquired or originated by either EMC Mortgage or Bear Stearns Residential, the two originators identified in the BSMF 2006-SL4 Offering Documents. ***This borrower had monthly income of $3,757 in 2006***, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $7,220, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation and the like. Clearly, this borrower could not afford to repay the loan. This is

- 42 -

confirmed by the fact that the borrower declared bankruptcy after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

103.    The BSMF 2006-SL4 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BSMF 2006-SL4 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BSMF 2006-SL4 Offering Documents represented that ***none*** of the loans supporting plaintiffs' BSMF 2006-SL4 Certificate had an LTV ratio over 100%.

104.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BSMF 2006-SL4 Certificate, which reveals that the LTV ratio percentages stated in the BSMF 2006-SL4 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the BSMF 2006-SL4 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|
| M2 | 07401GAC8 | All | 0.00% | 30.06% |

### c.    Credit Ratings

105.    The BSMF 2006-SL4 Offering Documents also represented that the BSMF 2006-SL4 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the BSMF 2006-SL4 Offering Documents

- 43 -

represented that plaintiffs' BSMF 2006-SL4 Certificate had been assigned ratings of AA/Aa2 –

signifying an extremely safe and stable security.

106.    These representations, however, were false and misleading when made.  In truth,

plaintiffs' BSMF 2006-SL4 Certificate should not have received Aa2/AA credit ratings, because it

was **not** a safe, "investment grade" security with a low probability of default.  Rather, as defendants

were well aware, plaintiffs' BSMF 2006-SL4 Certificate was an extremely risky, speculative grade

"junk" bond or worse**,** backed by low credit quality, extremely risky loans.  Indeed, one of the

primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BSMF 2006-

SL4 Certificate was because defendants had fed them falsified information regarding the BSMF

2006-SL4 Certificate's underlying loans, including, without limitation, false loan underwriting

guidelines, false LTV ratios, false borrower FICO scores and false borrower DTI ratios.

107.    The falsity of the credit ratings set forth in the BSMF 2006-SL4 Offering Documents

is confirmed by subsequent events.  Specifically, ***more than 13% of the loans supporting plaintiffs'***

***BSMF 2006-SL4 Certificate are currently in default*** because they were made to borrowers who

either could not afford them or never intended to repay them.  Moreover, after initially being rated as

"investment grade," plaintiff's BSMF 2006-SL4 Certificate is no longer rated.  Clearly, plaintiffs'

BSMF 2006-SL4 Certificate was not the highly rated, "investment grade" security that defendants

represented it to be.  The evidence supporting the falsity of the BSMF 2006-SL4 Certificate's credit

ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M2 | 07401GAC8 | All | 13.63% | Aa2 | WR | AA | NR |

#### d.    Transfer of Title

108.    The BSMF 2006-SL4 Offering Documents also represented that the loans underlying the BSMF 2006-SL4 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the BSMF 2006-SL4 Offering Documents represented that, "[a]t the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due with respect to such mortgage loans after the cut-off date to be sold to the trust."  BSMF 2006-SL4 Pros. Supp. at S-29. The BSMF 2006-SL4 Offering Documents also represented that "[i]n addition, the depositor will deposit with Wells Fargo Bank, National Association, as custodian and agent for the trustee, for the benefit of the certificateholders, the following documents with respect to each mortgage loan: (a) the original mortgage note . . . ; (b) the original recorded mortgage. . . ; (c) a duly executed assignment of the mortgage in blank or without recourse to [the trustee] . . . ; [and] (d) all interim recorded assignments of such mortgage."  *Id.* at S-29-S-30.  These statements were false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

#### 5.    The BSMF 2007-AR3 Certificates

109.    The Bear Stearns Mortgage Funding Trust 2007-AR3, Mortgage Pass-Through Certificates, Series 2007-AR3 ("BSMF 2007-AR3 Certificates") were issued pursuant to a Prospectus Supplement dated March 29, 2007.  The following defendants played critical roles in the fraudulent structuring, offering and sale of the BSMF 2007-AR3 Certificates: Structured Asset Mortgage (depositor); EMC Mortgage (sponsor); Bear Stearns Co. (underwriter).

110.    Plaintiffs and/or their assignors purchased the following BSMF 2007-AR3 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Phoenix | Harrier | 1A1 | 07401VAA9 | 2/23/2007 | $58,300,000 | Bear Stearns Co. |

111.    The above purchase was made by Harrier's investment manager, Brightwater, in direct reliance upon the BSMF 2007-AR3 Offering Documents, including draft and/or final BSMF 2007-AR3 Prospectus Supplements.  Brightwater's diligent investment processes are described in great detail in §VIII.A, *infra*.

### a.    Underwriting Guidelines

112.    The BSMF 2007-AR3 Offering Documents disclosed that approximately 64.01% of the loans underlying plaintiffs' BSMF 2007-AR3 Certificate were originated or acquired by the sponsor, EMC Mortgage, "from various sellers"; approximately 23.04% of the loans underlying plaintiffs' BSMF 2007-AR3 Certificate were acquired by the sponsor, EMC Mortgage, from loan originator Bear Stearns Residential; approximately 9.71% of the loans underlying plaintiffs' BSMF 2007-AR3 Certificate were acquired by the sponsor, EMC Mortgage, from loan originator SouthStar Funding, LLC ("SouthStar"); and the remainder of the loans underlying plaintiffs' BSMF 2007-AR3 Certificate were acquired by the sponsor, EMC Mortgage, from "various loan originators, none of which have originated more than 10% of the mortgage loans of either Loan Group of Sub Loan Group." *See* BSMF 2007-AR3 Pros. Supp. at S-32.

113.    With regard to the loans originated or acquired by EMC Mortgage loans from "various sellers," the BSMF 2007-AR3 Offering Documents represented that they were originated "in accordance with the . . . underwriting guidelines established by [EMC Mortgage]." *Id.* at S-32. The BSMF 2007-AR3 Offering Documents represented that "[EMC Mortgage's] underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *Id.* at S-33.  The BSMF 2007-

AR3 Offering Documents also represented that, "[i]n determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers . . . the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income." *Id.* at S-34. The BSMF 2007-AR3 Offering Documents further represented that "[e]ach mortgaged property relating to an EMC mortgage loan has been appraised by a qualified independent appraiser who is approved by each lender." *Id.* at S-35. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that EMC Mortgage had completely abandoned its stated underwriting guidelines and was simply seeking to originate or acquire as many loans as possible, ***without*** any regard for its borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.7, *infra*.

114.    With regard to the Bear Stearns Residential loans, the BSMF 2007-AR3 Offering Documents represented that "[Bear Stearns Residential's] Alt-A Underwriting Guidelines are intended to ensure that (i) the loan terms relate to the borrower's willingness and ability to repay and (ii) the value and marketability of the property are acceptable." *See* BSMF 2007-AR3 Pros. Supp. at S-36. The BSMF 2007-AR3 Offering Documents also represented that "[d]uring the underwriting process, [Bear Stearns Residential] calculates and verifies the loan applicant's sources of income . . . , reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the [Bear Stearns Residential] Underwriting Guidelines." *Id.* at S-37. The BSMF 2007-AR3 Offering Documents further represented that Bear Stearns Residential's underwriting guidelines are applied in accordance with a procedure that "requires (i) an appraisal of the mortgaged property that conforms

- 47 -

to the Uniform Standards of Professional Appraisal Practice . . . and (ii) a review of such appraisal . . . conducted by a [Bear Stearns Residential] underwriter." *Id*. at S-39. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Bear Stearns Residential had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, *without* any regard for its borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.7, *infra*.

115.    With regard to the loans originated by SouthStar and "various loan originators," the BSMF 2007-AR3 Offering Documents represented that these loans were "originated generally in accordance with the [EMC Mortgage and Bear Stearns Residential underwriting] guidelines described . . . in [the] prospectus supplement." *See* BSMF 2007-AR3 Pros. Supp. at S-25. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that SouthStar and the "various loan originators" had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, *without* any regard for their borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.1, *infra*.

116.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with underwriting guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one married couple obtained a loan for $650,000 in 2007 that was contained within the BSMF 2007-AR3 offering. The loan was originated by Bear Stearns Residential, one of the loan originators identified in the BSMF 2007-AR3 Offering Documents. ***These borrowers had a joint monthly income of $4,377 in 2007***, according to their sworn bankruptcy filings. ***However, their***

- 48 -

*monthly debt payments were at least $12,142, nearly three times their joint monthly income*.

These borrowers' monthly debt payments were in addition to their monthly expenses for things such

as taxes, utilities, groceries, health care, transportation and the like. Clearly, these borrowers could

not afford to repay their loan. This is confirmed by the fact that they declared bankruptcy shortly

after obtaining the loan at issue, in 2008.

### b.    Loan-to-Value Ratios

117.    The BSMF 2007-AR3 Offering Documents also made certain misrepresentations

regarding the LTV ratios associated with the loans supporting the BSMF 2007-AR3 Certificate

purchased by plaintiffs and/or their assigning entities. Specifically, the BSMF 2007-AR3 Offering

Documents represented that only a very small percentage of the loans supporting plaintiffs' BSMF

2007-AR3 Certificate had LTV ratios over 80%, and that *none* of the loans supporting plaintiffs'

BSMF 2007-AR3 Certificate had LTV ratios over 100%.

118.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis

on the actual loans underlying plaintiffs' BSMF 2007-AR3 Certificate, which reveals that the LTV

ratio percentages stated in the BSMF 2007-AR3 Offering Documents were materially false *at the

time they were made*. The following chart summarizes the LTV ratio percentages stated in the

BSMF 2007-AR3 Offering Documents, and the actual percentages that should have been stated

according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 1A1 | 07401VAA9 | Group I | 2.41% | 57.97% | 0.00% | 13.86% |

### c.    Owner Occupancy Rates

119.    The BSMF 2007-AR3 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the BSMF 2007-AR3 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BSMF 2007-AR3 Offering Documents represented that a large percentage of the loans supporting plaintiffs' BSMF 2007-AR3 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

120.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' BSMF 2007-AR3 Certificate, which reveals that the OOR percentages stated in the BSMF 2007-AR3 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the Primary Residence Percentages stated in the BSMF 2007-AR3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 1A1 | 07401VAA9 | Group I | 89.11% | 84.54% | 5.39% |

### d.    Credit Ratings

121.    The BSMF 2007-AR3 Offering Documents also represented that the BSMF 2007-AR3 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the BSMF 2007-AR3 Offering Documents represented that plaintiffs' BSMF 2007-AR3 Certificate had been assigned AAA/Aaa ratings – the

- 50 -

highest, safest credit ratings available, which are in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.

122.    These representations, however, were false and misleading when made.  In truth, plaintiffs' BSMF 2007-AR3 Certificate should not have received AAA/Aaa credit ratings, because it was *not* a safe, "investment grade" security with "a less than 1% probability of incurring defaults." Rather, as defendants were well aware, plaintiffs' BSMF 2007-AR3 Certificate was an extremely risky, speculative grade "junk" bond**,** backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BSMF 2007-AR3 Certificate was because defendants had fed them falsified information regarding the BSMF 2007-AR3 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

123.    The falsity of the credit ratings set forth in the BSMF 2007-AR3 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 43% of the loans supporting plaintiffs' BSMF 2007-AR3 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" BSMF 2007-AR3 Certificate is now rated at "junk" status.  Clearly, plaintiffs' BSMF 2007-AR3 Certificate was not the highly rated, "investment grade" security that defendants represented it to be.  The evidence supporting the falsity of the BSMF 2007-AR3 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 1A1 | 07401VAA9 | Group I | 43.54% | Aaa | Caa3 | AAA | CCC |

e.    **Transfer of Title**

124.    The BSMF 2007-AR3 Offering Documents also represented that the loans underlying the BSMF 2007-AR3 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the BSMF 2007-AR3 Offering Documents stated that "[a]t the time of issuance of the Certificates, the Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the Trust." BSMF 2007-AR3 Pros. Supp. at S-113.  This statement was false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

6.    **The BSMF 2007-AR5 Certificates**

125.    The Bear Stearns Mortgage Funding Trust 2007-AR5, Mortgage Pass-Through Certificates, Series 2007-AR5 ("BSMF 2007-AR5 Certificates") were issued pursuant to a Prospectus Supplement dated June 28, 2007.  The following defendants played critical roles in the fraudulent structuring, offering and sale of the BSMF 2007-AR5 Certificates: Structured Asset Mortgage (depositor); EMC Mortgage (sponsor); Bear Stearns Co. (underwriter).

126.    Plaintiffs and/or their assignors purchased the following BSMF 2007-AR5 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Blue Heron IX | Blue Heron IX | 2A1 | 07400NAS9 | 9/13/2007 | $15,000,000 | Bear Stearns Co. |
| Blue Heron V | Blue Heron V | 2A1 | 07400NAS9 | 9/13/2007 | $15,000,000 | Bear Stearns Co. |
| Blue Heron VI | Blue Heron VI | 2A1 | 07400NAS9 | 9/13/2007 | $5,000,000 | Bear Stearns Co. |
| Blue Heron VII | Blue Heron VII | 2A1 | 07400NAS9 | 9/13/2007 | $5,000,000 | Bear Stearns Co. |

127.    The above purchases were made by Blue Heron IX's, Blue Heron V's, Blue Heron VI's, and Blue Heron VII's investment manager, Brightwater, in direct reliance upon the BSMF 2007-AR5 Offering Documents, including draft and/or final BSMF 2007-AR5 Prospectus Supplements.  Brightwater's diligent investment processes are described in great detail in §VIII.A, *infra*.

### a.    Underwriting Guidelines

128.    The BSMF 2007-AR5 Offering Documents disclosed that approximately 25.10% of the BSMF 2007-AR5 Certificate's underlying loans were acquired by the sponsor, EMC Mortgage, from loan originator Bear Stearns Residential; approximately 34.79% of the BSMF 2007-AR5 Certificate's underlying loans were originated or acquired by the sponsor, EMC Mortgage, "from various sellers"; approximately 17.58% of the BSMF 2007-AR5 Certificate's underlying loans were acquired by the sponsor, EMC Mortgage, from loan originator Quicken Loans Inc. ("Quicken Loans"); and the remainder of the BSMF 2007-AR5 Certificate's underlying loans were acquired by the sponsor, EMC Mortgage, from "various originators, none of which have originated more than 10% of the mortgage loans in the aggregate of either Loan Group."  *See* BSMF 2007-AR5 Pros. Supp. at S-5, S-35.

129.    With regard to the loans originated or acquired by the sponsor, EMC Mortgage, "from various sellers," the BSMF 2007-AR5 Offering Documents represented that they "were originated

- 53 -

generally in accordance with the underwriting guidelines established by the Sponsor [EMC Mortgage]," which "are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *Id.* at S-35-S-36. The BSMF 2007-AR5 Offering Documents also represented that "[i]n determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers . . . the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income." *Id.* at S-36. The BSMF 2007-AR5 Offering Documents further represented that, "[e]ach mortgaged property relating to an EMC mortgage loan has been appraised by a qualified independent appraiser who is approved by each lender." *Id.* at S-38. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that EMC Mortgage had completely abandoned its stated underwriting guidelines and was simply seeking to originate or acquire as many loans as possible, ***without*** any regard for its borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.7, *infra*.

130.    With regard to the Bear Stearns Residential loans, the BSMF 2007-AR5 Offering Documents represented that "[Bear Stearns Residential's] Alt-A Underwriting Guidelines are intended to ensure that (i) the loan terms relate to the borrower's willingness and ability to repay and (ii) the value and marketability of the property are acceptable." *See* BSMF 2007-AR5 Pros. Supp. at S-40. The BSMF 2007-AR5 Offering Documents also represented that "[d]uring the underwriting process, [Bear Stearns Residential] calculates and verifies the loan applicant's sources of income . . . , reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the

- 54 -

[Bear Stearns Residential] Underwriting Guidelines." *Id.*  The BSMF 2007-AR5 Offering Documents further represented that Bear Stearns Residential's underwriting guidelines required "(i) an appraisal of the mortgaged property that conforms to the Uniform Standards of Professional Appraisal Practice . . . and (ii) a review of such appraisal . . . conducted by a [Bear Stearns Residential] underwriter." *Id.* at S-43.  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that Bear Stearns Residential had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for its borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.7, *infra*.

131.    With regard to the loans originated by Quicken Loans, the BSMF 2007-AR5 Offering Documents represented that Quicken Loans' applicable underwriting guidelines were "intended to evaluate the borrower's credit standing, repayment ability, and the value and adequacy of the proposed mortgaged property as collateral." *See* BSMF 2007-AR5 Pros. Supp. at S-44.  The BSMF 2007-AR5 Offering Documents also represented that borrowers must generally have, *inter alia*, "[a] debt-to-income ratio of 45% or less." *Id.* at S-45.  The BSMF 2007-AR5 Offering Documents further stated that "[i]n determining the adequacy of the home proposed as collateral, an independent mortgage loan appraisal is obtained for each property considered for financing," and that "[t]he value and type of the property indicated in the appraisal obtained by Quicken Loans must support the initial loan amount in accordance with the program's loan-to-value requirements at the time the loan is originated." *Id.* at S-46.  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that Quicken Loans had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment

- 55 -

ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.1, *infra*.

132.     With regard to all of the loans underlying the BSMF 207-AR5 Certificates, the BSMF 2007-AR5 Offering Documents represented that they "will have been originated in accordance with underwriting standards described [in the prospectus]," which "are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan." *See* BSMF 2007-AR5 Prospectus at 17. The BSMF 2007-AR5 Offering Documents also represented that: "The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the Loan-to-Value Ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations." *Id.* at 18. The BSMF 2007-AR5 Offering Documents further represented that "[m]ortgaged properties generally will be appraised by licensed appraisers or through an automated valuation system." *Id.* at 19. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Bear Stearns Residential, EMC Mortgage, Quicken Loans and the "various originators" had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, *without* any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.7, *infra*.

- 56 -

133.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with underwriting guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a loan for $492,000 in 2007 that was contained within the BSMF 2007-AR5 offering.  The loan was originated by Bear Stearns Residential, one of the loan originators identified in the BSMF 2007-AR5 Offering Documents. ***This borrower had a monthly income of $1,773 at the time that the borrower obtained the loan***, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $2,260, far in excess of the borrower's monthly income***.  This borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation and the like.  Clearly, this borrower could not afford to repay the loan.  This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

134.    The BSMF 2007-AR5 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BSMF 2007-AR5 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BSMF 2007-AR5 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs' BSMF 2007-AR5 Certificate had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' BSMF 2007-AR5 Certificate had LTV ratios over 100%.

135.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BSMF 2007-AR5 Certificate, which reveals that the LTV ratio percentages stated in the BSMF 2007-AR5 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the

- 57 -

BSMF 2007-AR5 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 2A1 | 07400NAS9 | Group II | 5.31% | 54.70% | 0.00% | 15.51% |

### c.    Owner Occupancy Rates

136.    The BSMF 2007-AR5 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the BSMF 2007-AR5 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BSMF 2007-AR5 Offering Documents represented that a large percentage of the loans supporting plaintiffs' BSMF 2007-AR5 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

137.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' BSMF 2007-AR5 Certificate, which reveals that the OOR percentages stated in the BSMF 2007-AR5 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the Primary Residence Percentages stated in the BSMF 2007-AR5 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 2A1 | 07400NAS9 | Group II | 85.47% | 80.85% | 5.71% |

- 58 -

## d.    Credit Ratings

138.    The BSMF 2007-AR5 Offering Documents also represented that the BSMF 2007-AR5 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the BSMF 2007-AR5 Offering Documents represented that plaintiffs' BSMF 2007-AR5 Certificate had been assigned AAA/Aaa ratings – the highest, safest credit ratings available, which are in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.

139.    These representations, however, were false and misleading when made.  In truth, plaintiffs' BSMF 2007-AR5 Certificate should not have received AAA/Aaa credit ratings, because it was **not** a safe, "investment grade" security with "a less than 1% probability of incurring defaults." Rather, as defendants were well aware, plaintiffs' BSMF 2007-AR5 Certificate was an extremely risky, speculative grade "junk" bond**,** backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BSMF 2007-AR5 Certificate was because defendants had fed them falsified information regarding the BSMF 2007-AR5 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

140.    The falsity of the credit ratings set forth in the BSMF 2007-AR5 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 34% of the loans supporting plaintiffs' BSMF 2007-AR5 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" BSMF 2007-AR5 Certificate is now rated at "junk" status.  Clearly, plaintiffs' BSMF 2007-AR5 Certificate was not the highly rated, "investment grade" security that defendants represented it

- 59 -

to be.  The evidence supporting the falsity of the BSMF 2007-AR5 Certificate's credit ratings is set

forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 2A1 | 07400NAS9 | Group II | 34.59% | Aaa | Caa1 | AAA | CCC |

### e.    Transfer of Title

141.    The BSMF 2007-AR5 Offering Documents also represented that the loans underlying

plaintiffs' BSMF 2007-AR5 Certificate would be timely transferred to the issuing trust, so that the

trust would obtain good title to the mortgage loans comprising the pool for the offering.

Specifically, the BSMF 2007-AR5 Offering Documents stated that "[a]t the time of issuance of the

Certificates, the Depositor will cause the mortgage loans, together with all principal and interest due

on or with respect to such mortgage loans after the Cut-off Date, to be sold to the Trust."  BSMF

2007-AR5 Pros. Supp. at S-79.  This statement was false and misleading.  Defendants failed to

legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E.,

*infra*.

### 7.    The BSMF 2007-SL1 Certificates

142.    The Bear Stearns Mortgage Funding Trust 2007-SL1, Mortgage-Backed Certificates,

Series 2007-SL1 ("BSMF 2007-SL1 Certificates") were issued pursuant to a Prospectus Supplement

dated January 24, 2007.  The following defendants played critical roles in the fraudulent structuring,

offering and sale of the BSMF 2007-SL1 Certificates: BSABS (depositor); EMC Mortgage

(sponsor); Bear Stearns Co. (underwriter).

143.    Plaintiffs and/or their assignors purchased the following BSMF 2007-SL1 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|-------------------|-------------------|-------|---------------|---------------------|----------------|
| Kleros V | Kleros V | M2 | 07401PAD6 | 1/18/2007 | $6,000,000 | Bear Stearns Co. |

144.    The above purchase was made by Kleros V's investment manager, Strategos, in direct reliance upon the BSMF 2007-SL1 Offering Documents, including draft and/or final BSMF 2007-SL1 Prospectus Supplements.  Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.    Underwriting Guidelines

145.    The BSMF 2007-SL1 Offering Documents disclosed that approximately 27.20% of the BSMF 2007-SL1 Certificates' underlying loans were acquired by the sponsor, EMC Mortgage, from loan originator Bear Stearns Residential; and approximately 72.80% of the BSMF 2007-SL1 Certificates' underlying loans were acquired by the sponsor, EMC Mortgage, "from various originators through the conduit correspondent channel." *See* BSMF 2007-SL1 Pros. Supp. at S-4.

146.    With regard to the loans acquired by the sponsor, EMC Mortgage, "from various originated through the conduit correspondent channel," the BSMF 2007-SL1 Offering Documents represented that they were originated "pursuant to [EMC Mortgage's] underwriting guidelines," which "are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan." *Id.* at S-35.  The BSMF 2006-SL1 Offering Documents also represented that, "[w]hile the originator's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio as well as the type and use of the mortgaged property."  *Id.* at S-35-S-36. The BSMF 2006-SL1 Offering Documents further represented that "[u]nder each of the programs, the originator reviews the applicant's source of

- 61 -

income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service to income ratio, if required, to determine the applicant's ability to repay the loan, and reviews the appraisal." *Id.* at 36. The BSMF 2006-SL1 Offering Documents further stated that "[m]ortgaged properties that are to secure [these] mortgage loans generally are appraised by qualified independent appraisers." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that EMC Mortgage had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.7, *infra*.

147.    With regard to the Bear Stearns Residential loans, the BSMF 2007-SL1 Offering Documents represented that "[Bear Stearns Residential's] Underwriting Guidelines are intended to make sure that (i) the loan terms relate to the borrower's ability to repay and (ii) the value and marketability of the property are acceptable." *See* BSMF 2007-SL1 Pros. Supp. at S-38. The BSMF 2007-SL1 Offering Documents also represented that "[d]uring the underwriting process, [Bear Stearns Residential] reviews and verifies the loan applicant's sources of income . . . , calculates the amount of income from all such sources indicated on the loan application, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the [Bear Stearns Residential] Underwriting Guidelines." *Id.* at S-39. The BSMF 2007-SL1 Offering Documents further represented that Bear Stearns Residential's underwriting guidelines required "(i) an appraisal of the mortgaged property that conforms to the Uniform Standards of Professional Appraisal Practice . . . and (ii) a review of such appraisal . . . conducted by a representative of [Bear Stearns Residential]." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were

made.    Contrary to defendants' affirmative representations, the truth was that Bear Stearns Residential had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.    *See* §VI.A.7, *infra*.

148.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with underwriting guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one married couple obtained a second-lien loan for $175,800 in 2006 that was contained within the BSMF 2007-SL1 offering.    The loan was acquired or originated by either EMC Mortgage or Bear Stearns Residential, the two originators identified in the BSMF 2007-SL1 Offering Documents. ***These borrowers had a joint monthly income of $2,708 in 2006***, according to the borrowers' sworn bankruptcy filings.    ***However, the borrowers' monthly debt payments were at least $8,542, more than three times their joint monthly income***.    The borrowers' monthly debt payments were in addition to their monthly expenses for things such as taxes, utilities, groceries, health care, transportation and the like.    Clearly, these borrowers' could not afford to repay their loan.    This is confirmed by the fact that they declared bankruptcy shortly after obtaining the loan, in 2007.

### b.    Loan-to-Value Ratios

149.    The BSMF 2007-SL1 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BSMF 2007-SL1 Certificate purchased by plaintiffs and/or their assigning entities.    Specifically, the BSMF 2007-SL1 Offering Documents represented that ***none*** of the loans supporting plaintiffs' BSMF 2007-SL1 Certificate had an LTV ratio over 100%.

- 63 -

150.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BSMF 2007-SL1 Certificate, which reveals that the LTV ratio percentages stated in the BSMF 2007-SL1 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the LTV ratio percentages stated in the BSMF 2007-SL1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|
| M2 | 07401PAD6 | All | 0.00% | 35.49% |

### c.    Credit Ratings

151.    The BSMF 2007-SL1 Offering Documents also represented that the BSMF 2007-SL1 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the BSMF 2007-SL1 Offering Documents represented that plaintiffs' BSMF 2007-SL1 Certificate had been assigned AA/Aa2 ratings – signifying an extremely stable and safe security.

152.    These representations, however, were false and misleading when made.  In truth, plaintiffs' BSMF 2007-SL1 Certificate should not have received AA/Aa2 credit ratings, because it was *not* a safe, "investment grade" security with a low probability of default.  Rather, as defendants were well aware, plaintiffs' BSMF 2007-SL1 Certificate was an extremely risky, speculative grade "junk" bond**,** backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BSMF 2007-SL1 Certificate was because defendants had fed them falsified information regarding the BSMF 2007-

- 64 -

SL1 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores and false borrower DTI ratios.

153.    The falsity of the credit ratings set forth in the BSMF 2007-SL1 Offering Documents is confirmed by subsequent events.    Specifically, ***approximately 17% of the loans supporting plaintiffs' BSMF 2007-SL1 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, after initially being rated as "investment grade," plaintiff's BSMF 2007-SL1 Certificate is no longer rated at all.    Clearly, plaintiffs' BSMF 2007-SL1 Certificate was not the highly rated, "investment grade" security that defendants represented it to be.    The evidence supporting the falsity of the BSMF 2007-SL1 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M2 | 07401PAD6 | All | 16.83% | Aa2 | WR | AA | NR |

### d.    Transfer of Title

154.    The BSMF 2007-SL1 Offering Documents also represented that the loans underlying the BSMF 2007-SL1 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.    Specifically, the BSMF 2007-SL1 Offering Documents stated that, "[a]t the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due with respect to such mortgage loans after the cut-off date to be sold to the trust."    *See* BSMF 2007-SL1 Pros. Supp. at S-33.    The BSMF 2007-SL1 Offering Documents also represented that "[i]n addition, the depositor will deposit with Wells Fargo Bank, National Association, as custodian and agent for the trustee, for the benefit of the certificateholders, the following documents with respect to each

- 65 -

mortgage loan: (a) the original mortgage note . . . ; (b) the original recorded mortgage . . . ; (c) a duly executed assignment of the mortgage in blank or [to the trustee] . . . ; [and] (d) all interim recorded assignments of such mortgage." *Id.* These statements were false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 8.    The CBASS 2006-CB7 Certificates

155.    The C-BASS 2006-CB7 Trust, C-BASS Mortgage Loan Asset-Backed Certificates, Series 2006-CB7 ("CBASS 2006-CB7 Certificates") were issued pursuant to a Prospectus Supplement dated October 2, 2006. J.P. Morgan Securities, as the lead managing underwriter, played a critical role in the fraudulent structuring, offering and sale of the CBASS 2006-CB7 Certificates.

156.    Plaintiffs and/or their assignors purchased the following CBASS 2006-CB7 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Kleros V | WestLB | M6 | 12479DAL2 | 10/2/2006 | $2,500,000 | J.P. Morgan Securities |

157.    The above purchase was made by WestLB's investment manager, Strategos, in direct reliance upon the CBASS 2006-CB7 Offering Documents, including draft and/or final CBASS 2006-CB7 Prospectus Supplements. Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.    Underwriting Guidelines

158.    The CBASS 2006-CB7 Offering Documents disclosed that Ameriquest Mortgage Company ("Ameriquest") originated approximately 28.84% of the loans underlying the CBASS 2006-CB7 Certificates; New Century Mortgage Corporation ("New Century") originated

- 66 -

approximately 25.61% of the loans underlying the CBASS 2006-CB7 Certificates; and the remainder of the loans underlying the CBASS 2006-CB7 Certificates were originated by unnamed "mortgage loan originators that each originated less than 20% of the Mortgage Loans." *See* CBASS 2006-CB7 Pros. Supp. at S-19.

159.    With regard to the Ameriquest loans, the CBASS 2006-CB7 Offering Documents represented that "[t]he Ameriquest Underwriting Guidelines are primarily intended to evaluate: (1) the applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged property as collateral." *Id.* at S-63.  The CBASS 2006-CB7 Offering Documents also represented that "[d]uring the underwriting process, each Ameriquest Loan Seller . . . calculates the amount of income from all such sources indicated on the loan application, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Ameriquest Underwriting Guidelines." *Id.* at S-63-S-64.  The CBASS 2006-CB7 Offering Documents further represented that the "Ameriquest Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires (i) an appraisal of the mortgage property which conforms to the Uniform Standards of Professional Appraisal Practice . . . and (ii) a review of such appraisal." *Id.* at S-64.  As further detailed *infra*, these representations were false and misleading at the time they were made.    Contrary to defendants' affirmative representations, the truth was that Ameriquest had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.6, *infra*.

160.    With regard to the New Century loans, the CBASS 2006-CB7 Offering Documents represented that the "New Century Underwriting Guidelines are primarily intended to assess the

- 67 -

borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan." *See* CBASS 2006-CB7 Pros. Supp. at S-68. The CBASS 2006-CB7 Offering Documents also represented that "[w]hile New Century's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, New Century also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property." *Id.* The CBASS 2006-CB7 Offering Documents further represented that "[m]ortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that New Century had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.2, *infra*.

161.    With regard to all of the loans underlying the CBASS 2006-CB7 Certificates, the CBASS 2006-CB7 Offering Documents represented that "[t]he sponsor [Credit-Based Asset Servicing and Securitization LLC] or a loan reviewer has reviewed a majority of the files related to the mortgage loans in connection with the acquisition of the mortgage loans by the sponsor for credit and compliance considerations," and that "[i]n its review, the sponsor evaluates the mortgagor's credit standing, repayment ability and willingness to repay debt." *See* CBASS 2006-CB7 Pros. Supp. at S-62. The CBASS 2006-CB7 Offering Documents also represented that "[a] mortgagor's ability and willingness to repay debts (including the mortgage loans) in a timely fashion is determined by the sponsor by reviewing the quality, quantity and durability of income history, history of debt management, history of debt repayment and net worth accumulation of the mortgagor to the extent such information is available." *Id.* The CBASS 2006-CB7 Offering Documents further

- 68 -

represented that "[i]n determining the adequacy of the property as collateral at origination, an independent appraisal was made of each property considered for financing." *Id.* The CBASS 2006-CB7 Offering Documents further represented that with regard to all of the loans underlying the CBASS 2006-CB7 Certificates, "[u]nderwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property . . . as collateral." *See* CBASS 2006-CB7 Prospectus at 28. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Ameriquest, New Century and the unnamed originators had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, **without** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §§VI.A.6 and VI.A.2, *infra*.

162.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, a borrower obtained a loan for $526,500 in 2006 which was contained within the CBASS 2006-CB7 offering.  The loan was originated through New Century, one of the loan originators identified in the Offering Documents.  This borrower had income in 2006 of between $0 and $2,000 per month, according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $7,582, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay the loan.  This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

- 69 -

### b.    Loan-to-Value Ratios

163.    The CBASS 2006-CB7 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the CBASS 2006-CB7 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the CBASS 2006-CB7 Offering Documents represented that less than 50% of the loans supporting plaintiffs' CBASS 2006-CB7 Certificate had LTV ratios over 80%, and that *none* of the loans supporting plaintiffs' CBASS 2006-CB7 Certificate had LTV ratios over 100%.

164.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' CBASS 2006-CB7 Certificate, which reveals that the LTV ratio percentages stated in the CBASS 2006-CB7 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the LTV ratio percentages stated in the CBASS 2006-CB7 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M6 | 12479DAL2 | All | 48.61% | 56.79% | 0.00% | 12.29% |

### c.    Credit Ratings

165.    The CBASS 2006-CB7 Offering Documents also represented that the CBASS 2006-CB7 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the CBASS 2006-CB7 Offering Documents represented that plaintiffs' CBASS 2006-CB7 Certificate had been assigned A-/A2 ratings – signifying an extremely safe and stable security.

- 70 -

166.    These representations, however, were false and misleading when made.  In truth, plaintiffs' CBASS 2006-CB7 Certificate should not have received A-/A2 credit ratings, because it was **not** a safe, "investment grade" security.  Rather, as defendants were well aware, plaintiffs' CBASS 2006-CB7 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such a high rating to plaintiffs' CBASS 2006-CB7 Certificate was because defendants had fed them falsified information regarding the CBASS 2006-CB7 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, and false borrower DTI ratios.

167.    The falsity of the credit ratings set forth in the CBASS 2006-CB7 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 34% of the loans supporting plaintiffs' CBASS 2006-CB7 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" CBASS 2006-CB7 Certificate is now rated at "junk" status or below.  Clearly, plaintiffs' CBASS 2006-CB7 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The evidence supporting the falsity of the CBASS 2006-CB7 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M6 | 12479DAL2 | All | 34.38% | A2 | WR | A- | D |

d.    **Transfer of Title**

168.    The CBASS 2006-CB7 Offering Documents also represented that the loans underlying the CBASS 2006-CB7 Certificates would be timely transferred to the issuing trust, so

- 71 -

that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the CBASS 2006-CB7 Offering Documents stated that "[o]n the closing date, [the depositor] Bond Securitization, L.L.C. will assign all of its interest in the mortgage loans to the trustee for the benefit of the certificateholders." CBASS 2006-CB7 Pros. Supp. at S-3. The CBASS 2006-CB7 Offering Documents also stated that "[a]t the time of issuance of the securities of a series, and except as otherwise specified in the related prospectus supplement, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee, without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to those loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement." *See* CBASS 2006-CB7 Prospectus at 79. The CBASS 2006-CB7 Offering Documents further stated that "the depositor, or the seller of the related loans to the depositor, will be required to deliver or cause to be delivered to the trustee or to the trustee's custodian as to each mortgage loan or home equity loan, among other things: (1) the mortgage note . . . ; (2) the mortgage, deed of trust or similar instrument . . . ; (3) an assignment of the mortgage to the trustee . . . ; [and] (4) the other security documents." *Id.* These statements were false and misleading. Defendant failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 9.    The ARSI 2006-M2 Certificates

169.    The Argent Securities Trust 2006-M2, Asset-Backed Pass-Through Certificates, Series 2006-M2 ("ARSI 2006-M2 Certificates") were issued pursuant to a Prospectus Supplement dated August 17, 2006. J.P. Morgan Securities, as the primary underwriter, played a critical role in the fraudulent structuring, offering and sale of the ARSI 2006-M2 Certificates.

170.    Plaintiffs and/or their assignors purchased the following ARSI 2006-M2 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Phoenix | WestLB | A2D | 04013BAD4 | 8/29/2006 | $22,080,000 | J.P. Morgan Securities |
| Silver Elms II | Paradigm | M2 | 04013BAF9 | 8/18/2006 | $7,000,000 | J.P. Morgan Securities |
| Silver Elms II | Paradigm | M3 | 04013BAG7 | 8/18/2006 | $5,000,000 | J.P. Morgan Securities |

171.    The above purchases were made by WestLB's investment manager, Dynamic Credit

Partners ("DCP"), and Paradigm's investment manager, Eiger, in direct reliance upon the ARSI

2006-M2 Offering Documents, including draft and/or final ARSI 2006-M2 Prospectus Supplements.

DCP's and Eiger's diligent investment processes are described in great detail in §§VIII.E and

VIII.D, *infra*.

### a.    Underwriting Guidelines

172.    The ARSI 2006-M2 Offering Documents disclosed that approximately 90.74% of the

ARSI 2006-M2 Certificates' underlying loans were originated by Argent Mortgage Company, LLC

("Argent"); and approximately 9.26% of the ARSI 2006-M2 Certificates' underlying loans were

originated by Ameriquest.  *See* ARSI 2006-M2 Pros. Supp. at S-25, S-29.

173.    The ARSI 2006-M2 Offering Documents represented that the Argent and Ameriquest

loans were originated in accordance with guidelines that "are primarily intended to evaluate: (1) the

applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged

property as collateral." *Id.* at S-29.  The ARSI 2006-M2 Offering Documents also represented that

"[d]uring the underwriting process, each Originator . . . calculates the amount of income from all

such sources indicated on the loan application, reviews the credit history of the applicant, calculates

the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the

mortgaged property for compliance with the Underwriting Guidelines." *Id.* at S-30.  The ARSI

2006-M2 Offering Documents further represented that "[p]roperties that are to secure mortgage

- 73 -

loans have a valuation obtained by an appraisal performed by either (1) a qualified and licensed appraiser who is an independent appraiser who is in good standing with the related Originator's in-house appraisal department or (2) subject to the Ameriquest's Underwriting Guidelines, an insured automated valuation model." *Id.* at S-31. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Argent and Ameriquest had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, without any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §§VI.A.6 and VI.A.13, *infra*.

174.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a loan for $485,000 in 2006 which was contained within the ARSI 2006-M2 offering. The loan was originated through Argent, one of the loan originators identified in the Offering Documents. This borrower had income in 2006 of $1,766 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $3,410, far in excess of the borrower's monthly income.*** The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

175.    The ARSI 2006-M2 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the ARSI 2006-M2 Certificates

purchased by plaintiffs and/or their assigning entities.  Specifically, the ARSI 2006-M2 Offering

Documents represented that approximately 45% of the loans supporting plaintiffs' ARSI 2006-M2

Certificates had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' ARSI 2006-

M2 Certificates had LTV ratios over 100%.

176.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis

on the actual loans underlying plaintiffs' ARSI 2006-M2 Certificates, which reveals that the LTV

ratio percentages stated in the ARSI 2006-M2 Offering Documents were materially false ***at the time***

***they were made***.  The following chart summarizes the LTV ratio percentages stated in the ARSI

2006-M2 Offering Documents, and the actual percentages that should have been stated according to

plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| A2D | 04013BAD4 | All | 45.23% | 57.14% | 0.00% | 16.87% |
| M2 | 04013BAF9 | All | 45.23% | 57.14% | 0.00% | 16.87% |
| M3 | 04013BAG7 | All | 45.23% | 57.14% | 0.00% | 16.87% |

### c.    Owner Occupancy Rates

177.    The ARSI 2006-M2 Offering Documents also made certain misrepresentations

regarding the OOR percentages associated with the loans supporting the ARSI 2006-M2 Certificates

purchased by plaintiffs and/or their assigning entities.  Specifically, the ARSI 2006-M2 Offering

Documents represented that a large percentage of the loans supporting plaintiffs' ARSI 2006-M2

Certificates were issued to borrowers that actually lived in the properties serving as collateral for

their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

178.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers,

loans and properties underlying plaintiffs' ARSI 2006-M2 Certificates, which reveals that the OOR

percentages stated in the ARSI 2006-M2 Offering Documents were materially false *at the time they were made*. The following chart summarizes the Primary Residence Percentages stated in the ARSI 2006-M2 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| A2D | 04013BAD4 | All | 92.07% | 84.34% | 9.16% |
| M2 | 04013BAF9 | All | 92.07% | 84.34% | 9.16% |
| M3 | 04013BAG7 | All | 92.07% | 84.34% | 9.16% |

### d.    Credit Ratings

179.    The ARSI 2006-M2 Offering Documents also represented that the ARSI 2006-M2 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default. Specifically, the ARSI 2006-M2 Offering Documents represented that plaintiffs' ARSI 2006-M2 Certificates had been assigned AAA/Aaa, AA/Aa2 and AA-/Aa3 ratings – signifying that they were extremely safe "investment grade" securities.

180.    These representations, however, were false and misleading when made. In truth, plaintiffs' ARSI 2006-M2 Certificates should not have received high "investment grade" credit ratings, because they were not safe, "investment grade" securities. Rather, as defendants were well aware, plaintiffs' ARSI 2006-M2 Certificates were extremely risky, speculative grade "junk" bonds or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' ARSI 2006-M2 Certificates was because defendants had fed them falsified information regarding the ARSI 2006-M2 Certificates'

underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

181.    The falsity of the credit ratings set forth in the ARSI 2006-M2 Offering Documents is confirmed by subsequent events.    Specifically, ***approximately 38% of the loans supporting plaintiffs' ARSI 2006-M2 Certificates are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, each of plaintiffs' "investment grade" ARSI 2006-M2 Certificates are now rated at "junk" status or below. Clearly, plaintiffs' ARSI 2006-M2 Certificates were not the highly rated, "investment grade" securities defendants represented them to be.    The evidence supporting the falsity of the ARSI 2006-M2 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| A2D | 04013BAD4 | All | 37.97% | Aaa | Ca | AAA | CCC |
| M2 | 04013BAF9 | All | 37.97% | Aa2 | WR | AA | D |
| M3 | 04013BAG7 | All | 37.97% | Aa3 | WR | AA- | D |

### e.    Transfer of Title

182.    The ARSI 2006-M2 Offering Documents also represented that the loans underlying the ARSI 2006-M2 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.    Specifically, the ARSI 2006-M2 Offering Documents stated that "the Depositor will convey the Mortgage Loans to the Trust in exchange for and concurrently with the delivery of the Certificates."    *See* ARSI 2006-M2 Pros. Supp. at S-24.    The ARSI 2006-M2 Offering Documents also stated that at the time of the closing, "[t]he Depositor will deliver to the Trustee (or to a custodian on the Trustee's behalf) with respect to each Mortgage Loan (i) the mortgage note endorsed without recourse in blank to reflect

- 77 -

the transfer of the Mortgage Loan, (ii) the original mortgage with evidence of recording indicated thereon and (iii) an assignment of the mortgage in recordable form endorsed in blank without recourse, reflecting the transfer of the Mortgage Loan." *Id.* at S-89. These statements were false and misleading. Defendant failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 10.    The BALTA 2005-7 Certificates

183.    The Bear Stearns Alt-A Trust, Mortgage Pass-Through Certificates, Series 2005-7 ("BALTA 2005-7 Certificates") were issued pursuant to a Prospectus Supplement dated July 27, 2005. The following defendants played critical roles in the fraudulent structuring, offering and sale of the BALTA 2005-7 Certificates: Structured Asset Mortgage (depositor); EMC Mortgage (seller); Bear Stearns Co. (underwriter).

184.    Plaintiffs and/or their assignors purchased the following BALTA 2005-7 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Phoenix | Harrier | 11A2 | 07386HVH1 | 8/12/2005 | $9,055,000 | Bear Stearns Co. |
| Phoenix | Greyhawk | 12A2 | 07386HVK4 | 8/12/2005 | $30,570,000 | Bear Stearns Co. |
| Phoenix | Harrier | 12A3 | 07386HVL2 | 8/12/2005 | $24,569,000 | Bear Stearns Co. |
| Phoenix | Harrier | 1M1 | 07386HVM0 | 8/5/2005 | $25,619,000 | Bear Stearns Co. |

185.    The above purchases were made by Harrier's and Greyhawk's investment manager, Brightwater, in direct reliance upon the BALTA 2005-7 Offering Documents, including draft and/or final BALTA 2005-7 Prospectus Supplements. Brightwater's diligent investment processes are described in great detail in §VIII.A, *infra*.

a.       **Underwriting Guidelines**

186.    The BALTA 2005-7 Offering Documents disclosed that approximately 3.55% and 4.18% of the BALTA 2005-7 Certificates' sub-loan group I-1 and sub-loan group I-2 underlying loans, respectively, were acquired by the seller, EMC Mortgage, from loan originator Countrywide Home Loans, Inc. ("Countrywide"); approximately 55.16% and 31.55% of the BALTA 2005-7 Certificates' sub-loan group I-1 and sub-loan group I-2 underlying loans, respectively, were originated or acquired by the seller, EMC Mortgage, from "various sellers"; approximately 13.76% and 27.66% of the BALTA 2005-7 Certificates' sub-loan group I-1 and sub-loan group I-2 underlying loans, respectively, were acquired by the seller, EMC Mortgage, from loan originator GreenPoint Mortgage Funding, Inc. ("GreenPoint"); and the remainder of the BALTA 2005-7 Certificates' group I loans were acquired by the seller, EMC Mortgage, from "various originators, none of which originated more than 10% of the mortgage loans in the aggregate." *See* BALTA 2005-7 Pros. Supp. at S-46, S-52.

187.    With regard to the Countrywide loans, the BALTA 2005-7 Offering Documents represented that "Countrywide's underwriting standards are applied by or on behalf of Countrywide to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *Id.* at S-47.  The BALTA 2005-7 Offering Documents also represented that "a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." *Id.* The BALTA 2005-7 Offering Documents further represented that "[e]xcept with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide obtains

- 79 -

appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans." *Id.* at S-48.  The BALTA 2005-7 Offering Documents further stated that "[u]nder its Standard Underwriting Guidelines, Countrywide generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%," and that "[u]nder its Expanded Underwriting Guidelines, Countrywide generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively." *Id.* at S-49, S-51.  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that Countrywide had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.3, *infra*.

188.    With regard to the loans originated by or acquired by EMC Mortgage from "various sellers," the BALTA 2005-7 Offering Documents represented that they were originated "in accordance with the . . . underwriting guidelines established by EMC." *See* BALTA 2005-7 Pros. Supp. at S-52.  The BALTA 2005-7 Offering Documents represented that "[EMC's] underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *Id.* at S-53.  The BALTA 2005-7  Offering Documents further represented that "[i]n determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers . . . the ratio of such

amounts to the proposed borrower's acceptable stable monthly gross income." *Id.* at S-54.  As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that the loans originated or acquired by EMC Mortgage were originated by lenders that had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.7, *infra*.

189.    With regard to the GreenPoint loans, the BALTA 2005-7 Offering Documents represented that "GreenPoint['s] underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  *See* BALTA 2005-7 Pros. Supp. at S-54.  The BALTA 2005-7 Offering Documents also represented that "[i]n determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers . . . the ratio of those amounts to the proposed borrower's monthly gross income."  *Id*. at S-55.  The BALTA 2005-7 Offering Documents further represented that "[i]n the determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing."  *Id.*  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that GreenPoint had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.10, *infra*.

190.    With regard to all of the loans underlying the BALTA 2006-7 Certificates, the BALTA 2005-7 Offering Documents represented that "[t]he underwriting standards to be used in

originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan." *See* BALTA 2005-7 Prospectus at 12. The BALTA 2005-7 Offering Documents also represented that "[t]he primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the Loan-to-Value Ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations." *Id.* The BALTA 2005-7 Offering Documents further represented that "[m]ortgaged properties generally will be appraised by licensed appraisers or through an automated valuation system." *Id.* at 13. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Countrywide, EMC Mortgage, GreenPoint and the "various originators" had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A, *infra*.

191.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, a borrower obtained a loan for $320,000 in 2005 which was contained within the BALTA 2005-7 offering. ***This borrower had income in 2005 of only $151 per month***, according to the borrower's

sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $2,906,
far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in
addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care,
transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is
confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan, in 2006.

### b.    Loan-to-Value Ratios

192.    The BALTA 2005-7 Offering Documents also made certain misrepresentations
regarding the LTV ratios associated with the loans supporting the BALTA 2005-7 Certificates
purchased by plaintiffs and/or their assigning entities.  Specifically, the BALTA 2005-7 Offering
Documents represented that only a very small percentage of the loans supporting plaintiffs' BALTA
2005-7 Certificates had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs'
BALTA 2005-7 Certificates had LTV ratios over 100%.

193.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis
on the actual loans underlying plaintiffs' BALTA 2005-7 Certificates, which reveals that the LTV
ratio percentages stated in the BALTA 2005-7 Offering Documents were materially false ***at the time
they were made***.  The following chart summarizes the LTV ratio percentages stated in the BALTA
2005-7 Offering Documents, and the actual percentages that should have been stated according to
plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 11A2 | 07386HVH1 | Group I-1 | 9.92% | 36.13% | 0.00% | 9.07% |
| 12A2 | 07386HVK4 | Group I-2 | 4.34% | 32.01% | 0.00% | 4.67% |
| 12A3 | 07386HVL2 | Group I-2 | 4.34% | 32.01% | 0.00% | 4.67% |
| 1M1 | 07386HVM0 | Group I | 8.54% | 35.15% | 0.00% | 8.02% |

- 83 -

### c.    Owner Occupancy Rates

194.    The BALTA 2005-7 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the BALTA 2005-7 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the BALTA 2005-7 Offering Documents represented that a large percentage of the loans supporting plaintiffs' BALTA 2005-7 Certificates were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

195.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' BALTA 2005-7 Certificates, which reveals that the OOR percentages stated in the BALTA 2005-7 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the Primary Residence Percentages stated in the BALTA 2005-7 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 11A2 | 07386HVH1 | Group I-1 | 74.83% | 65.42% | 14.38% |
| 12A2 | 07386HVK4 | Group I-2 | 83.46% | 72.58% | 15.00% |
| 12A3 | 07386HVL2 | Group I-2 | 83.46% | 72.58% | 15.00% |
| 1M1 | 07386HVM0 | Group I | 76.96% | 67.10% | 14.70% |

### d.    Credit Ratings

196.    The BALTA 2005-7 Offering Documents also represented that the BALTA 2005-7 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.  Specifically, the BALTA 2005-7 Offering Documents represented that plaintiffs' BALTA 2005-7 Certificates had been assigned AAA/Aaa, AAA/Aaa,

- 84 -

AAA/Aaa and AA/Aa2 ratings – signifying that they were extremely safe "investment grade" securities.

197.    These representations, however, were false and misleading when made.  In truth, plaintiffs' BALTA 2005-7 Certificates should not have received high "investment grade" credit ratings, because they were not safe, "investment grade" securities.  Rather, as defendants were well aware, plaintiffs' BALTA 2005-7 Certificates were extremely risky, speculative grade "junk" bonds or worse**,** backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BALTA 2005-7 Certificates was because defendants had fed them falsified information regarding the BALTA 2005-7 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

198.    The falsity of the credit ratings set forth in the BALTA 2005-7 Offering Documents is confirmed by subsequent events.  Specifically, ***approximately 22% or more of the loans supporting each of plaintiffs' BALTA 2005-7 Certificates are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, certain of plaintiffs' "investment grade" BALTA 2005-7 Certificates are now rated at "junk" status or below. Clearly, plaintiffs' BALTA 2005-7 Certificates were not the highly rated, "investment grade" securities defendants represented them to be.  The evidence supporting the falsity of the BALTA 2005-7 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

- 85 -

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 11A2 | 07386HVH1 | Group I-1 | 21.97% | Aaa | Ca | AAA | BB- |
| 12A2 | 07386HVK4 | Group I-2 | 22.67% | Aaa | Caa1 | AAA | BBB |
| 12A3 | 07386HVL2 | Group I-2 | 22.67% | Aaa | Ca | AAA | BB- |
| 1M1 | 07386HVM0 | Group I | 22.14% | Aa2 | C | AA | D |

### e.    Transfer of Title

199.    The BALTA 2005-7 Offering Documents also represented that the loans underlying the BALTA 2005-7 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the BALTA 2005-7 Offering Documents stated "[a]t the time of issuance of the Certificates, the Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the trust."  *See* BALTA 2005-7 Pros. Supp. at S-106.  This statement was false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 11.    The BALTA 2005-8 Certificates

200.    The Bear Stearns Alt-A Trust, Mortgage Pass-Through Certificates, Series 2005-8 ("BALTA 2005-8 Certificates") were issued pursuant to a Prospectus Supplement dated August 29, 2005.  The following defendants played critical roles in the fraudulent structuring, offering and sale of the BALTA 2005-8 Certificates: Structured Asset Mortgage (depositor); EMC Mortgage (seller); Bear Stearns Co. (underwriter).

201.    Plaintiffs and/or their assignors purchased the following BALTA 2005-8 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Phoenix | Greyhawk | 11A1 | 07386HWR8 | 8/10/2005 | $98,823,000 | Bear Stearns Co. |

| Phoenix | Harrier | 11A2 | 07386HWS6 | 8/10/2005 | $69,743,000 | Bear Stearns Co. |
| Phoenix | Harrier | 1M1 | 07386HWV9 | 9/1/2005 | $21,193,000 | Bear Stearns Co. |

202.    The above purchases were made by Harrier's and Greyhawk's investment manager, Brightwater, in direct reliance upon the BALTA 2005-8 Offering Documents, including draft and/or final BALTA 2005-8 Prospectus Supplements.  Brightwater's diligent investment processes are described in great detail in §VIII.A, *infra*.

### a.    Underwriting Guidelines

203.    The BALTA 2005-8 Offering Documents disclosed that approximately 56.05% and 31.71% of the BALTA 2005-8 Certificates' sub-loan group I-1 and sub-loan group I-2 underlying loans, respectively, were originated or acquired by the seller, EMC Mortgage, from "various sellers"; approximately 39.10% and 61.21% of the BALTA 2005-8 Certificates' sub-loan group I-1 and sub-loan group I-2 underlying loans were acquired by the seller, EMC Mortgage, from loan originator GreenPoint; and the remainder of the BALTA 2005-8 Certificates' group I underlying loans were acquired by the seller, EMC Mortgage, from "various originators, none of which have originated more than 10% of the mortgage loans in the aggregate." *See* BALTA 2005-8 Pros. Supp. at S-4, S-33.

204.    With regard to the loans originated by or acquired by EMC Mortgage from "various sellers," the BALTA 2005-8 Offering Documents represented that they were originated "in accordance with the . . . underwriting guidelines established by EMC." *Id.* at S-33. The BALTA 2005-8 Offering Documents represented that "[EMC's] underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *Id.*  The BALTA 2005-8 Offering Documents further represented that "[i]n determining whether a prospective borrower has sufficient monthly

- 87 -

income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers . . . the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income." *Id*. at S-34.   As further detailed *infra*, these representations were false and misleading at the time they were made.   Contrary to defendants' affirmative representations, the truth was that the loans originated or acquired by EMC Mortgage were originated by lenders that had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.7, *infra*.

205.    With regard to the GreenPoint loans, the BALTA 2005-8 Offering Documents represented that "GreenPoint['s] underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  *See* BALTA 2005-8 Pros. Supp. at S-35.  The BALTA 2005-8 Offering Documents also represented that "[i]n determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers . . . the ratio of those amounts to the proposed borrower's monthly gross income." *Id*. at S-35.  The BALTA 2005-8 Offering Documents further represented that "[i]n the determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing," and that "GreenPoint's Underwriting Guidelines require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values." *Id.* at S-36.  As further detailed *infra*, these representations were false and misleading at the

- 88 -

time they were made. Contrary to defendants' affirmative representations, the truth was that GreenPoint had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, *without* any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.10, *infra*.

206.    With regard to all of the loans underlying the BALTA 2005-8 Certificates, the BALTA 2005-8 Offering Documents represented that "[t]he underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan." *See* BALTA 2005-8 Prospectus at 12. The BALTA 2005-8 Offering Documents also represented that:

> The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the Loan-to-Value Ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations.

*Id.* The BALTA 2005-8 Offering Documents further represented that "[m]ortgaged properties generally will be appraised by licensed appraisers or through an automated valuation system." *Id.* at 13. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that EMC Mortgage, GreenPoint and the "various originators" had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, *without* any regard for

- 89 -

the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §§VI.A.7 and VI.A.10, *infra*.

207.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, a borrower obtained a loan for $1,155,000 in 2005 which was contained within the BALTA 2005-8 offering. This borrower had income in 2005 of $2,935 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $19,633, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan, in 2006.

### b.    Loan-to-Value Ratios

208.    The BALTA 2005-8 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BALTA 2005-8 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the BALTA 2005-8 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs' BALTA 2005-8 Certificates had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' BALTA 2005-8 Certificates had LTV ratios over 100%.

209.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BALTA 2005-8 Certificates, which reveals that the LTV ratio percentages stated in the BALTA 2005-8 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the BALTA

2005-8 Offering Documents, and the actual percentages that should have been stated according to

plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 11A1 | 07386HWR8 | Group I-1 | 1.68% | 31.4% | 0.00% | 6.47% |
| 11A2 | 07386HWS6 | Group I-1 | 1.68% | 31.4% | 0.00% | 6.47% |
| 1M1 | 07386HWV9 | Group I | 1.83% | 31.4% | 0.00% | 6.47% |

### c.    Owner Occupancy Rates

210.    The BALTA 2005-8 Offering Documents also made certain misrepresentations

regarding the OOR percentages associated with the loans supporting the BALTA 2005-8 Certificates

purchased by plaintiffs and/or their assigning entities.  Specifically, the BALTA 2005-8 Offering

Documents represented that a large percentage of the loans supporting plaintiffs' BALTA 2005-8

Certificates were issued to borrowers that actually lived in the properties serving as collateral for

their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

211.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers,

loans and properties underlying plaintiffs' BALTA 2005-8 Certificates, which reveals that the OOR

percentages stated in the BALTA 2005-8 Offering Documents were materially false *at the time they*

*were made*.  The following chart summarizes the Primary Residence Percentages stated in the

BALTA 2005-8 Offering Documents, and the actual percentages that should have been stated

according to plaintiffs' investigation:

- 91 -

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 11A1 | 07386HWR8 | Group I-1 | 70.05% | 61.68% | 13.57% |
| 11A2 | 07386HWS6 | Group I-I | 70.05% | 61.68% | 13.57% |
| 1M1 | 07386HWV9 | Group I | 71.10% | 61.68% | 15.27% |

### d.    Credit Ratings

212.    The BALTA 2005-8 Offering Documents also represented that the BALTA 2005-8 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.  Specifically, the BALTA 2005-8 Offering Documents represented that plaintiffs' BALTA 2005-8 Certificates had been assigned AAA/Aaa, AAA/Aaa and AA/Aa2 ratings – signifying that they were extremely safe and stable securities.

213.    These representations, however, were false and misleading when made.  In truth, plaintiffs' BALTA 2005-8 Certificates should not have received high "investment grade" credit ratings, because they were not safe, "investment grade" securities.  Rather, as defendants were well aware, plaintiffs' BALTA 2005-8 Certificates were extremely risky, speculative grade "junk" bonds or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BALTA 2005-8 Certificates was because defendants had fed them falsified information regarding the BALTA 2005-8 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

214.    The falsity of the credit ratings set forth in the BALTA 2005-8 Offering Documents is confirmed by subsequent events.  Specifically, *more than 28% of the loans supporting each of plaintiffs' BALTA 2005-8 Certificates are currently in default* because they were made to

borrowers who either could not afford them or never intended to repay them. Moreover, each of plaintiffs' "investment grade" BALTA 2005-8 Certificates are now rated at "junk" status or below. Clearly, plaintiffs' BALTA 2005-8 Certificates were not the highly rated, "investment grade" securities defendants represented them to be. The evidence supporting the falsity of the BALTA 2005-8 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 11A1 | 07386HWR8 | Group I-1 | 28.31%[14] | Aaa | Caa3 | AAA | CCC |
| 11A2 | 07386HWS6 | Group I-I | 28.31% | Aaa | Ca | AAA | CCC |
| 1M1 | 07386HWV9 | Group I | 28.31% | Aa2 | C | AA | D |

### e.    Transfer of Title

215.    The BALTA 2005-8 Offering Documents also represented that the loans underlying the BALTA 2005-8 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the BALTA 2005-8 Offering Documents stated "[a]t the time of issuance of the Certificates, the Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the trust." *See* BALTA 2005-8 Pros. Supp. at S-73. This statement was false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

---

[14]    The default rate stated herein is for the BALTA 2005-8 Certificates' group I underlying loans. The BALTA 2005-8 May 2013 Trustee Report does not provide default rates for the BALTA 2005-8 Certificates' sub-loan group I-1 underlying loans.

### 12.    The BALTA 2006-2 Certificates

216.    The Bear Stearns Alt-A Trust, Mortgage Pass-Through Certificates, Series 2006-2 ("BALTA 2006-2 Certificates") were issued pursuant to a Prospectus Supplement dated March 28, 2006.  The following defendants played critical roles in the fraudulent structuring, offering and sale of the BALTA 2006-2 Certificate: Structured Asset Mortgage (depositor); EMC Mortgage (sponsor); Bear Stearns Co. (underwriter).

217.    Plaintiffs and/or their assignors purchased the following BALTA 2006-2 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|-------------------|-------------------|-------|---------------|----------------------|----------------|
| Silver Elms | Paradigm | 2B2 | 07386HG70 | 3/8/2006 | $3,835,000 | Bear Stearns Co. |

218.    The above purchase was made by Paradigm's investment manager, Structured Finance Advisors ("SFA"), in direct reliance upon the BALTA 2006-2 Offering Documents, including draft and/or final BALTA 2006-2 Prospectus Supplements.  SFA's diligent investment processes are described in great detail in §VIII.C, *infra*.

### a.    Underwriting Guidelines

219.    The BALTA 2006-2 Offering Documents disclosed that approximately 40.40%, 90.50%, 71.00% and 21.98% of the BALTA 2006-2 Certificates' sub-loan group II-1, sub-loan group II-2, sub-loan group II-3 and sub-loan group II-4 underlying loans, respectively, were originated or acquired by the sponsor, EMC Mortgage; approximately 37.94%, 13.60% and 39.95% of the BALTA 2006-2 Certificates' sub-loan group II-1, sub-loan group II-3 and sub-loan group II-4 underlying loans, respectively, were acquired by the sponsor, EMC Mortgage, from loan originator Countrywide; approximately 1.13%, 7.35%, 5.44% and 4.13% of the BALTA 2006-2 Certificates' sub-loan group II-1, sub-loan group II-2, sub-loan group II-3 and sub-loan group II-4 underlying loans, respectively were acquired by the sponsor, EMC Mortgage from loan originator Bear Stearns

- 94 -

Residential; and the remainder of the BALTA 2006-2 Certificates' group II underlying loans were acquired by the sponsor, EMC Mortgage, from "various originators, none of which have originated more than 10% of the mortgage loans in the aggregate." *See* BALTA 2006-2 Pros. Supp. at S-6, S-51.

220.    With regard to the loans originated by or acquired by EMC Mortgage loans from "various sellers," the BALTA 2006-2 Offering Documents represented that they were originated "in accordance with the following underwriting guidelines established by [EMC Mortgage]." *Id.* at S-51. The BALTA 2006-2 Offering Documents represented that "[EMC Mortgage's] underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *Id.* at S-52. The BALTA 2006-2 Offering Documents also represented that "[i]n determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers . . . the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income." *Id*. at S-53. The BALTA 2006-2 Offering Documents further represented that "[e]ach mortgaged property relating to an EMC mortgage loan has been appraised by a qualified independent appraiser who is approved by each lender." *Id.* at S-54. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that the loans originated or acquired by EMC Mortgage were originated by lenders that had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.7, *infra*.

221.    With regard to the Countrywide loans, the BALTA 2006-2 Offering Documents represented that "Countrywide['s] underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *See* BALTA 2006-2 Pros. Supp. at S-55. The BALTA 2006-2 Offering Documents also represented that "a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." *Id.* at S-55-S-56. The BALTA 2006-2 Offering Documents further represented that "[e]xcept with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans." *Id.* at S-57. The BALTA 2006-2 Offering Documents further represented that "[u]nder its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%," and that "[u]nder its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively." *Id.* at S-58, S-60. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Countrywide

- 96 -

had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.3, *infra*.

222.    With regard to all of the loans underlying the BALTA 2006-2 Certificate, the BALTA 2006-2 Offering Documents represented that "[t]he underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan." *See* BALTA 2006-2 Prospectus at 17. The BALTA 2006-2 Offering Documents also represented that: "The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the Loan-to-Value Ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations." *Id.* The BALTA 2006-2 Offering Documents further represented that "[m]ortgaged properties generally will be appraised by licensed appraisers or through an automated valuation system." *Id.* at 18. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that EMC Mortgage, Countrywide, Bear Stearns Residential and the "various originators" had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §§VI.A.7 and VI.A.3, *infra*.

- 97 -

223.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, a borrower obtained a loan for $511,600 in 2006 which was contained within the BALTA 2006-2 offering. This borrower had income in 2006 of $3,503 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $5,105, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

224.    The BALTA 2006-2 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BALTA 2006-2 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BALTA 2006-2 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs' BALTA 2006-2 Certificate had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' BALTA 2006-2 Certificate had LTV ratios over 100%.

225.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BALTA 2006-2 Certificate, which reveals that the LTV ratio percentages stated in the BALTA 2006-2 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the BALTA 2006-2 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

- 98 -

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 2B2 | 07386HG70 | Group II | 1.41% | 30.25% | 0.00% | 7.58% |

### c.    Owner Occupancy Rates

226.    The BALTA 2006-2 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the BALTA 2006-2 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BALTA 2006-2 Offering Documents represented that a large percentage of the loans supporting plaintiffs' BALTA 2006-2 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

227.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' BALTA 2006-2 Certificate, which reveals that the OOR percentages stated in the BALTA 2006-2 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the Primary Residence Percentages stated in the BALTA 2006-2 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 2B2 | 07386HG70 | Group II | 79.07% | 69.20% | 14.26% |

### d.    Credit Ratings

228.    The BALTA 2006-2 Offering Documents also represented that the BALTA 2006-2 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an

- 99 -

extremely low probability of default. Specifically, the BALTA 2006-2 Offering Documents represented that plaintiffs' BALTA 2006-2 Certificate had been assigned a A/A2 rating – signifying that it was an extremely safe and stable security.

229.    These representations, however, were false and misleading when made. In truth, plaintiffs' BALTA 2006-2 Certificate should not have received a high "investment grade" credit rating, because it was not a safe, "investment grade" security. Rather, as defendants were well aware, plaintiffs' BALTA 2006-2 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BALTA 2006-2 Certificate was because defendants had fed them falsified information regarding the BALTA 2006-2 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

230.    The falsity of the credit ratings set forth in the BALTA 2006-2 Offering Documents is confirmed by subsequent events. Specifically, ***more than 33% of the loans supporting plaintiffs' BALTA 2006-2 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them. Moreover, plaintiffs' "investment grade" BALTA 2006-2 Certificate is now rated at below "junk" status or below. Clearly, plaintiffs' BALTA 2006-2 Certificate was not the highly rated, "investment grade" security defendants represented it to be. The evidence supporting the falsity of the BALTA 2006-2 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 2B2 | 07386HG70 | Group II | 33.22% | A2 | C | A | NR |

e.        **Transfer of Title**

231.        The BALTA 2006-2 Offering Documents also represented that the loans underlying the BALTA 2006-2 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the BALTA 2006-2 Offering Documents stated "[a]t the time of issuance of the Certificates, the Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the trust."  *See* BALTA 2006-2 Pros. Supp. at S-110.  This statement was false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

## 13.        The BALTA 2006-3 Certificates

232.        The Bear Stearns Alt-A Trust, Mortgage Pass-Through Certificates, Series 2006-3 ("BALTA 2006-3 Certificates") were issued pursuant to a Prospectus Supplement dated April 27, 2006.  The following defendants played critical roles in the fraudulent structuring, offering and sale of the BALTA 2006-3 Certificates: Structured Asset Mortgage (depositor); EMC Mortgage (sponsor); Bear Stearns Co. (underwriter).

233.        Plaintiffs and/or their assignors purchased the following BALTA 2006-3 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Phoenix | Harrier | 1M1 | 07386HK42 | 4/27/2006 | $15,000,000 | Bear Stearns Co. |
| Silver Elms | Paradigm | 2B1 | 07386HM32 | 4/18/2006 | $5,750,000 | Bear Stearns Co. |

234.        The above purchases were made by Harrier's investment manager, Brightwater, and Paradigm's investment manager, SFA, in direct reliance upon the BALTA 2006-3 Offering Documents, including draft and/or final BALTA 2006-3 Prospectus Supplements.  Brightwater's and SFA's diligent investment processes are described in great detail in §§VIII.A and VIII.C, *infra*.

### a.    Underwriting Guidelines

235.    The BALTA 2006-3 Offering Documents disclosed that approximately 66.67%, 80.71%, 82.52%, 65.05% and 49.94% of the BALTA 2006-3 Certificates' group I, sub-loan group II-1, sub-loan group II-2, sub-loan group II-3 and sub-loan group II-4 underlying loans, respectively, were originated or acquired by the sponsor, EMC Mortgage, from "various sellers"; approximately 4.81%, 6.55%, 7.74%, 9.07% and 0.68% of the BALTA 2006-3 Certificates' group I, sub-loan group II-1, sub-loan group II-2, sub-loan group II-3 and sub-loan group II-4 underlying loans, respectively, were acquired by the sponsor, EMC Mortgage, from loan originator Bear Stearns Residential; and the remainder of the BALTA 2006-3 Certificates' group I and group II loans were acquired by the seller from "various originators, none of which have originated more than 10% of the mortgage loans in the aggregate." *See* BALTA 2006-3 Pros. Supp. at S-7, S-66.

236.    With regard to the loans originated by or acquired by EMC Mortgage from "various sellers," the BALTA 2006-3 Offering Documents represented that they were originated "in accordance with the following underwriting guidelines established by [EMC Mortgage]." *Id.* The BALTA 2006-3 Offering Documents represented that "[t]he EMC mortgage loans . . . were generally underwritten . . . to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *Id.* The BALTA 2006-3 Offering Documents also represented that "[i]n determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers . . . the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income." *Id*. at S-67. The BALTA 2006-3 Offering Documents further represented that "[e]ach mortgaged property relating to an EMC mortgage loan has been appraised by a qualified independent appraiser who is approved by each

864087_1

lender." *Id.* at S-68.  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that the loans originated or acquired by EMC Mortgage were originated by lenders that had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, **without** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.7, *infra*.

237.    With regard to all of the loans underlying the BALTA 2006-3 Certificates, the BALTA 2006-3 Offering Documents represented that "[t]he underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan." *See* BALTA 2006-3 Prospectus at 17.  The BALTA 2006-3 Offering Documents also represented that: "The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the Loan-to-Value Ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations." *Id.*  The BALTA 2006-3 Offering Documents further represented that "[m]ortgaged properties generally will be appraised by licensed appraisers or through an automated valuation system." *Id.* at 18. As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that EMC Mortgage, Bear Stearns Residential and the "various originators" had completely abandoned their stated

- 103 -

underwriting guidelines and were simply seeking to originate as many loans as possible, **_without_** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.7, *infra*.

238.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, a borrower obtained a loan for $579,652 in 2006 which was contained within the BALTA 2006-3 offering. **_This borrower had no income in 2006_**, according to the borrower's sworn bankruptcy filings. **_However, the borrower's monthly debt payments were at least $5,392, far in excess of the borrower's monthly income_**. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2006.

**b.    Loan-to-Value Ratios**

239.    The BALTA 2006-3 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BALTA 2006-3 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the BALTA 2006-3 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs' BALTA 2006-3 Certificates had LTV ratios over 80%, and that **_none_** of the loans supporting plaintiffs' BALTA 2006-3 Certificates had LTV ratios over 100%.

240.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BALTA 2006-3 Certificates, which reveals that the LTV ratio percentages stated in the BALTA 2006-3 Offering Documents were materially false **_at the time they were made_**.  The following chart summarizes the LTV ratio percentages stated in the BALTA

- 104 -

2006-3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 1M1 | 07386HK42 | Group I | 2.72% | 33.09% | 0.00% | 9.80% |
| 2B1 | 07386HM32 | Group II | 1.14% | 30.38% | 0.00% | 9.27% |

### c.    Owner Occupancy Rates

241.    The BALTA 2006-3 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the BALTA 2006-3 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the BALTA 2006-3 Offering Documents represented that a large percentage of the loans supporting plaintiffs' BALTA 2006-3 Certificates were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

242.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' BALTA 2006-3 Certificates, which reveals that the OOR percentages stated in the BALTA 2006-3 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the Primary Residence Percentages stated in the BALTA 2006-3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 1M1 | 07386HK42 | Group I | 58.27% | 49.19% | 18.44% |
| 2B1 | 07386HM32 | Group II | 72.19% | 62.13% | 16.19% |

- 105 -

### d.    Credit Ratings

243.    The BALTA 2006-3 Offering Documents also represented that the BALTA 2006-3 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.    Specifically, the BALTA 2006-3 Offering Documents represented that plaintiffs' BALTA 2006-3 Certificates had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.    The Offering Documents further indicated that each of plaintiffs' BALTA 2006-3 Certificates had been assigned AA/Aa2 ratings – signifying that they were extremely safe "investment grade" securities.

244.    These representations, however, were false and misleading when made.    In truth, plaintiffs' BALTA 2006-3 Certificates should not have received high "investment grade" credit ratings, because they were not safe, "investment grade" securities.    Rather, as defendants were well aware, plaintiffs' BALTA 2006-3 Certificates were extremely risky, speculative grade "junk" bonds or worse, backed by low credit quality, extremely risky loans.    Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BALTA 2006-3 Certificates was because defendants had fed them falsified information regarding the BALTA 2006-3 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

245.    The falsity of the credit ratings set forth in the BALTA 2006-3 Offering Documents is confirmed by subsequent events.    Specifically, ***more than 41% and more than 33% of the group I and group II loans, respectively,  supporting each of plaintiffs' BALTA 2006-3 Certificates are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, each of plaintiffs' "investment grade" BALTA 2006-3

- 106 -

Certificates are now rated at "junk" status or below.  Clearly, plaintiffs' BALTA 2006-3 Certificates were not the highly rated, "investment grade" securities defendants represented them to be.  The evidence supporting the falsity of the BALTA 2006-3 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 1M1 | 07386HK42 | Group I | 41.46% | Aa2 | WR | AA | D |
| 2B1 | 07386HM32 | Group II | 33.15% | Aa2 | C | AA | D |

### e.      Transfer of Title

246.    The BALTA 2006-3 Offering Documents also represented that the loans underlying the BALTA 2006-3 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the BALTA 2006-3 Offering Documents stated "[a]t the time of issuance of the Certificates, the Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the trust."  *See* BALTA 2006-3 Pros. Supp. at S-144.  This statement was false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 14.      The BSABS 2005-AC4 Certificates

247.    The Bear Stearns Asset Backed Securities I Trust 2005-AC4, Asset-Backed Certificates, Series 2005-AC4 ("BSABS 2005-AC4 Certificates") were issued pursuant to a Prospectus Supplement dated June 16, 2005.  The following defendants played critical roles in the fraudulent structuring, offering and sale of the BSABS 2005-AC4 Certificates: BSABS (depositor); EMC Mortgage (seller); Bear Stearns Co. (underwriter).

248.    Plaintiffs and/or their assignors purchased the following BSABS 2005-AC4 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Silver Elms II | Paradigm | M3 | 0738979YK8 | 4/4/2006 | $4,842,000 | Citigroup |

249.    The above purchase was made by Paradigm's investment manager, Eiger, in direct reliance upon the BSABS 2005-AC4 Offering Documents, including draft and/or final BSABS 2005-AC4 Prospectus Supplements. Eiger's diligent investment processes are described in great detail in §VIII.D, *infra*.

### a.    Underwriting Guidelines

250.    The BSABS 2005-AC4 Offering Documents disclosed that approximately 59.82% of the BSABS 2005-AC4 Certificates' underlying loans were acquired by the seller, EMC Mortgage, from loan originator Waterfield Mortgage Company, Inc. ("Waterfield"); approximately 1.76% of the BSABS 2006-AC4 Certificates' underlying loans were acquired by the seller, EMC Mortgage, from loan originator Bear Stearns Residential; and the remainder of the BSABS 2005-AC4 Certificates' underlying loans "were originated by various originators, none of which have originated more than 10% of the mortgage loans." *See* BSABS 2005-AC4 Pros. Supp. at S-4, S-26, S-30.

251.    With regard to all of the loans underlying the BSABS 2005-AC4 Certificates, the BSABS 2005-AC4 Offering Documents represented that the underlying loans were originated in accordance with guidelines that "are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *See* BSABS 2005-AC4 Pros. Supp. at S-30. The BSABS 2005-AC4 Offering Documents also represented that "[i]n determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to

- 108 -

meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers . . . the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income." *Id.* at S-31.  The BSABS 2005-AC4  Offering Documents further represented that "[e]ach mortgaged property has been appraised by a qualified independent appraiser who is approved by each lender." *Id.* at S-32.  As further detailed *infra*, these representations were false and misleading at the time they were made.   Contrary to defendants' affirmative representations, the truth was that Waterfield, Bear Stearns Residential and the "various originators" had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §§VI.A.1 and VI.A.7, *infra*.

252.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, a borrower obtained a loan for $237,592 in 2005 which was contained within the BSABS 2005-AC4 offering. The borrower had income in 2005 of $3,666 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $3,761, more than the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2006.

## b.    Loan-to-Value Ratios

253.    The BSABS 2005-AC4 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BSABS 2005-AC4 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BSABS 2005-AC4 Offering Documents represented that less than 10% of the loans supporting plaintiffs' BSABS 2005-AC4 Certificate had LTV ratios over 80%, and that *none* of the loans supporting plaintiffs' BSABS 2005-AC4 Certificate had LTV ratios over 100%.

254.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BSABS 2005-AC4 Certificate, which reveals that the LTV ratio percentages stated in the BSABS 2005-AC4 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the LTV ratio percentages stated in the BSABS 2005-AC4 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M3 | 073879YK8 | All | 9.45% | 41.97% | 0.00% | 9.30% |

## c.    Owner Occupancy Rates

255.    The BSABS 2005-AC4 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the BSABS 2005-AC4 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BSABS 2005-AC4 Offering Documents represented that a large percentage of the loans supporting plaintiffs' BSABS 2005-AC4 Certificate were issued to borrowers that actually lived in the properties serving

- 110 -

as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

256.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' BSABS 2005-AC4 Certificate, which reveals that the OOR percentages stated in the BSABS 2005-AC4 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the Primary Residence Percentages stated in the BSABS 2005-AC4 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M3 | 073879YK8 | All | 78.45% | 68.78% | 14.05% |

### d.    Credit Ratings

257.    The BSABS 2005-AC4 Offering Documents also represented that the BSABS 2005-AC4 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the BSABS 2005-AC4 Offering Documents represented that plaintiffs' BSABS 2005-AC4 Certificate had been assigned A/A3 ratings – signifying that it was an extremely safe and stable security.

258.    These representations, however, were false and misleading when made.  In truth, plaintiffs' BSABS 2005-AC4 Certificate should not have received high "investment grade" credit ratings, because it was not a safe, "investment grade" security.  Rather, as defendants were well aware, plaintiffs' BSABS 2005-AC4 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary

reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BSABS 2005-AC4 Certificate was because defendants had fed them falsified information regarding the BSABS 2005-AC4 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

259.    The falsity of the credit ratings set forth in the BSABS 2005-AC4 Offering Documents is confirmed by subsequent events.    Specifically, ***approximately 26% of the loans supporting plaintiffs' BSABS 2005-AC4 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, plaintiffs' "investment grade" BSABS 2005-AC4 Certificate is now rated at "junk" status or below. Clearly, plaintiffs' BSABS 2005-AC4 Certificate was not the highly rated, "investment grade" security defendants represented it to be.    The evidence supporting the falsity of the BSABS 2005-AC4 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M3 | 073879YK8 | All | 25.89% | A3 | C | A | D |

**e.    Transfer of Title**

260.    The BSABS 2005-AC4 Offering Documents also represented that the loans underlying the BSABS 2005-AC4 Certificate would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the BSABS 2005-AC4 Offering Documents stated "[a]t the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the cut-off date to be sold to the trust."    *See* BSABS 2005-AC4 Pros. Supp. at S-28.    The BSABS 2005-AC4 Offering Documents also stated that "[i]n

- 112 -

addition, the depositor will deposit with Wells Fargo Bank, National Association, as custodian and agent for the trustee, the following documents with respect to each mortgage loan: (a) the original mortgage note . . . ; (b) the original recorded mortgage . . . ; (c) a duly executed assignment of the mortgage to [the trustee] . . . ; [and] (d) all interim recorded assignments of such mortgage." *Id.* These statements were false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 15.   The BSABS 2006-HE9 Certificates

261.   The Bear Stearns Asset Backed Securities I Trust 2006-HE9, Asset-Backed Certificates, Series 2006-HE9 ("BSABS 2006-HE9 Certificates") were issued pursuant to a Prospectus Supplement dated November 29, 2006. The following defendants played critical roles in the fraudulent structuring, offering and sale of the BSABS 2006-HE9 Certificates: BSABS (depositor); EMC Mortgage (sponsor); Bear Stearns Co. (underwriter).

262.   Plaintiffs and/or their assignors purchased the following BSABS 2006-HE9 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|--------------------|--------------------|-------|---------------|----------------------|----------------|
| Kleros V | WestLB | M5 | 07389MAK3 | 11/3/2006 | $5,000,000 | J.P. Morgan Securities |

263.   The above purchase was made by WestLB's investment manager, Strategos, in direct reliance upon the BSABS 2006-HE9 Offering Documents, including draft and/or final BSABS 2006-HE9 Prospectus Supplements. Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.   Underwriting Guidelines

264.   The BSABS 2006-HE9 Offering Documents disclosed that approximately 66.10% of the BSABS 2006-HE9 Certificates' underlying loans were acquired by the sponsor, EMC Mortgage,

from loan originator Encore Credit Corp. ("Encore"); approximately 19.85% of the BSABS 2006-

HE9 Certificates' underlying loans were acquired by the sponsor, EMC Mortgage, from loan

originator Fieldstone Mortgage Company ("Fieldstone"); and approximately 14.05% of the BSABS

2006-HE9 Certificates' underlying loans were acquired by the sponsor, EMC Mortgage, from

"various originators, none of which have originated more than 10% of the mortgage loans in the

aggregate." *See* BSABS 2006-HE9 Pros. Supp. at S-5, S-38.

265.    With regard to the Encore loans, the BSABS 2006-HE9 Offering Documents

represented that "Encore's internal underwriting guidelines are designed to help it evaluate a

borrower's credit history, capacity, willingness and ability to repay the loan, and the value and

adequacy of the collateral." *Id.* at S-41.  The BSABS 2006-HE9  Offering Documents also

represented that "Encore's guidelines are primarily intended to (1) determine that the borrower has

the ability to repay the mortgage loan in accordance with its terms and (2) determine that the related

mortgaged property will provide sufficient value to recover the investment if the borrower defaults."

*Id.*  The BSABS 2006-HE9 Offering Documents further represented that "[a]n assessment of the

adequacy of the real property as collateral for the loan is primarily based upon an appraisal of the

property and a calculation of the LTV ratio of the loan applied for and the combined LTV to the

appraised value of the property at the time of origination." *Id.* at S-43.  As further detailed *infra*,

these representations were false and misleading at the time they were made.  Contrary to defendants'

affirmative representations, the truth was that Encore had completely abandoned its stated

underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any

regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged

properties to serve as collateral.  *See* §VI.A.7, *infra*.

266.    With regard to the Fieldstone loans and the loans originated by the "various

originators," the BSABS 2006-HE9 Offering Documents represented that they were originated in

accordance with guidelines that "are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the mortgaged property as collateral for the related mortgage loan." *See* BSABS 2006-HE9 Pros. Supp. at S-38. The BSABS 2006-HE9 Offering Documents also represented that "[w]hile the originator's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio as well as the type and use of the mortgaged property." *Id.* The BSABS 2006-HE9 Offering Documents further represented that "[m]ortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers." *Id.* The BSABS 2006-HE9 Offering Documents further represented that "[u]nder each of the programs, the originator reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service to income ratio, if required, to determine the applicant's ability to repay the loan, and reviews the appraisal." *Id.* at S-39. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Fieldstone and the "various originators" had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.19, *infra*.

267.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, a borrower obtained a loan for $473,000 in 2006 which was contained within the BSABS 2006-HE9 offering. The loan was originated through Fieldstone, one of the loan originators identified in the

Offering Documents. This borrower had income in 2006 of $1,025 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $4,251, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

268.    The BSABS 2006-HE9 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BSABS 2006-HE9 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BSABS 2006-HE9 Offering Documents represented that approximately 50% of the loans supporting plaintiffs' BSABS 2006-HE9 Certificate had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' BSABS 2006-HE9 Certificate had LTV ratios over 100%.

269.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BSABS 2006-HE9 Certificate, which reveals that the LTV ratio percentages stated in the BSABS 2006-HE9 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the BSABS 2006-HE9 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M5 | 07389MAK3 | All | 53.30% | 63.40% | 0.00% | 16.42% |

- 116 -

### c.    Owner Occupancy Rates

270.    The BSABS 2006-HE9 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the BSABS 2006-HE9 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BSABS 2006-HE9 Offering Documents represented that a large percentage of the loans supporting plaintiffs' BSABS 2006-HE9 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

271.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' BSABS 2006-HE9 Certificate, which reveals that the OOR percentages stated in the BSABS 2006-HE9 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the Primary Residence Percentages stated in the BSABS 2006-HE9 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M5 | 07389MAK3 | All | 95.28% | 87.47% | 8.93% |

### d.    Credit Ratings

272.    The BSABS 2006-HE9 Offering Documents also represented that the BSABS 2006-HE9 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the BSABS 2006-HE9 Offering Documents

- 117 -

represented that plaintiffs' BSABS 2006-HE9 Certificate had been assigned A/A2 ratings – signifying that it was an extremely safe and stable security.

273.    These representations, however, were false and misleading when made.  In truth, plaintiffs' BSABS 2006-HE9 Certificate should not have received high "investment grade" credit ratings, because it was not a safe, "investment grade" security.  Rather, as defendants were well aware, plaintiffs' BSABS 2006-HE9 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BSABS 2006-HE9 Certificate was because defendants had fed them falsified information regarding the BSABS 2006-HE9 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

274.    The falsity of the credit ratings set forth in the BSABS 2006-HE9 Offering Documents is confirmed by subsequent events.  Specifically, *approximately 50%[15] of the loans supporting plaintiffs' BSABS 2006-HE9 Certificate are currently in default* because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" BSABS 2006-HE9 Certificate is now rated at below "junk" status or below.  Clearly, plaintiffs' BSABS 2006-HE9 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The evidence supporting the falsity of the BSABS 2006-HE9 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

---

[15]    The default rate for plaintiffs' BSABS 2009-HE9 Certificate stated herein was obtained from the latest trustee report dated April 2013.

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M5 | 07389MAK3 | All | 49.76% | A2 | WR | A | D |

### e.    Transfer of Title

275.    The BSABS 2006-HE9 Offering Documents also represented that the loans underlying the BSABS 2006-HE9 Certificate would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the BSABS 2006-HE9 Offering Documents stated "[a]t the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the cut-off date to be sold to the trust." *See* BSABS 2006-HE9 Pros. Supp. at S-35. The BSABS 2006-HE9 Offering Documents also represented that "[i]n addition, the depositor will deposit with [the trustee], for the benefit of the certificateholders, the following documents with respect to each mortgage loan: (a) the original mortgage note . . . ; (b) the original recorded mortgage . . . ; (c) a duly executed assignment of the mortgage in blank, or to [the trustee] . . . ; [and] (d) all interim recorded assignments of such mortgage." *Id.* at S-35-S-36. These statements were false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 16.    The BSABS 2006-HE10 Certificates

276.    The Bear Stearns Asset Backed Securities I Trust 2006-HE10, Asset-Backed Certificates, Series 2006-HE10 ("BSABS 2006-HE10 Certificates") were issued pursuant to a Prospectus Supplement dated December 28, 2006. The following defendants played critical roles in the fraudulent structuring, offering and sale of the BSABS 2006-HE10 Certificates: BSABS (depositor); EMC Mortgage (sponsor); Bear Stearns Co. (underwriter).

- 119 -

277.    Plaintiffs and/or their assignors purchased the following BSABS 2006-HE10 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Kleros V | WestLB | 2M6 | 07389RAY2 | 12/19/2006 | $11,845,000 | Bear Stearns Co. |

278.    The above purchase was made by WestLB's investment manager, Strategos, in direct reliance upon the BSABS 2006-HE10 Offering Documents, including draft and/or final BSABS 2006-HE10 Prospectus Supplements.  Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.    Underwriting Guidelines

279.    The BSABS 2006-HE10 Offering Documents disclosed that approximately 84.23% of the BSABS 2006-HE10 Certificates' group II loans were acquired by the sponsor, EMC Mortgage, from loan originator Encore; and the remainder of the BSABS 2006-HE10 Certificates' group II loans were acquired from the sponsor, EMC Mortgage, from "various originators, none of which have originated more than 10% of the [plaintiffs'] mortgage loans." *See* BSABS 2006-HE10 Pros. Supp. at S-4, S-45.

280.    With regard to the Encore loans, the BSABS 2006-HE10 Offering Documents represented that "Encore's internal underwriting guidelines are designed to help it evaluate a borrower's credit history, capacity, willingness and ability to repay the loan, and the value and adequacy of the collateral." *Id.* at S-48.  The BSABS 2006-HE10  Offering Documents also represented that "Encore's guidelines are primarily intended to (1) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (2) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults." *Id*.  The BSABS 2006-HE10 Offering Documents further represented that "[a]n assessment of the

adequacy of the real property as collateral for the loan is primarily based upon an appraisal of the property and a calculation of the LTV ratio of the loan applied for and the combined LTV to the appraised value of the property at the time of origination." *Id.* S-49. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Encore had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.7, *infra*.

281.    With regard to the loans originated by "various originators," the BSABS 2006-HE10 Offering Documents represented that they were originated according to "underwriting guidelines [that] are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the mortgaged property as collateral for the related mortgage loan." *See* BSABS 2006-HE10 Pros. Supp. at S-45. The BSABS 2006-HE10 Offering Documents also represented that "[w]hile the originator's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio as well as the type and use of the mortgaged property." *Id.* The BSABS 2006-HE10 Offering Documents further represented that "[m]ortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers." *Id.* The BSABS 2006-HE10 Offering Documents further represented that "[u]nder each of the programs, the originator reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service to income ratio, if required, to determine the applicant's ability to repay the loan, and reviews the appraisal." *Id.* at S-46. As further detailed *infra*, these representations were false and misleading

- 121 -

at the time they were made. Contrary to defendants' affirmative representations, the truth was that the "various originators" had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.1, *infra*.

282.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, a borrower obtained a loan for $454,000 in 2006 which was contained within the BSABS 2006-HE10 offering. The loan was originated through Encore, one of the loan originators identified in the Offering Documents. This borrower had income in 2006 of $1,545 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $6,206, far in excess of the borrower's monthly income.*** The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan, in 2007.

### b.    Loan-to-Value Ratios

283.    The BSABS 2006-HE10 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BSABS 2006-HE10 Certificate purchased by plaintiffs and/or their assigning entities. Specifically, the BSABS 2006-HE10 Offering Documents represented that less than 50% of the loans supporting plaintiffs' BSABS 2006-HE10

Certificate had LTV ratios over 80%, and that *none* of the loans supporting plaintiffs' BSABS 2006-HE10 Certificate had LTV ratios over 100%.

284.     Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BSABS 2006-HE10 Certificate, which reveals that the LTV ratio percentages stated in the BSABS 2006-HE10 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the LTV ratio percentages stated in the BSABS 2006-HE10 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 2M6 | 07389RAY2 | Group II | 47.56% | 60.53% | 0.00% | 17.94% |

### c.     Owner Occupancy Rates

285.     The BSABS 2006-HE10 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the BSABS 2006-HE10 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BSABS 2006-HE10 Offering Documents represented that a large percentage of the loans supporting plaintiffs' BSABS 2006-HE10 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

286.     Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' BSABS 2006-HE10 Certificate, which reveals that the OOR percentages stated in the BSABS 2006-HE10 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the Primary Residence Percentages stated in

the BSABS 2006-HE10 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 2M6 | 07389RAY2 | Group II | 94.40% | 87.44% | 7.96% |

### d.    Credit Ratings

287.    The BSABS 2006-HE10 Offering Documents also represented that the BSABS 2006-HE10 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the BSABS 2006-HE10 Offering Documents represented that plaintiffs' BSABS 2006-HE10 Certificate had been assigned A-/A3 ratings – signifying that it was an extremely safe and stable security.

288.    These representations, however, were false and misleading when made.  In truth, plaintiffs' BSABS 2006-HE10 Certificate should not have received high "investment grade" credit ratings, because it was not a safe, "investment grade" security.  Rather, as defendants were well aware, plaintiffs' BSABS 2006-HE10 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BSABS 2006-HE10 Certificate was because defendants had fed them falsified information regarding the BSABS 2006-HE10 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

- 124 -

289.    The falsity of the credit ratings set forth in the BSABS 2006-HE10 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 50% of the loans supporting plaintiffs' BSABS 2006-HE10 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" BSABS 2006-HE10 Certificate is now rated at "junk" status or below.  Clearly, plaintiffs' BSABS 2006-HE10 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The evidence supporting the falsity of the BSABS 2006-HE10 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 2M6 | 07389RAY2 | Group II | 50.80% | A3 | C | A- | D |

### e.    Transfer of Title

290.    The BSABS 2006-HE10 Offering Documents also represented that the loans underlying the BSABS 2006-HE10 Certificate would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the BSABS 2006-HE10 Offering Documents stated "[a]t the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the cut-off date to be sold to the trust."  *See* BSABS 2006-HE10 Pros. Supp. at S-42.  The BSABS 2006-HE10 Offering Documents also stated that "[i]n addition, the depositor will deposit with [the trustee], for the benefit of the certificateholders, the following documents with respect to each mortgage loan: (a) the original mortgage note . . . ; (b) the original recorded mortgage . . . ; (c) a duly executed assignment of the mortgage in blank, or to [the trustee] . . . ; [and] (d) all interim recorded assignments of such mortgage."  *Id.*  These statements

were false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 17.    The BSABS 2006-IM1 Certificates

291.    The Bear Stearns Asset Backed Securities I Trust 2006-IM1, Asset-Backed Certificates, Series 2006-IM1 ("BSABS 2006-IM1 Certificates") were issued pursuant to a Prospectus Supplement dated April 21, 2006.  The following defendants played critical roles in the fraudulent structuring, offering and sale of the BSABS 2006-IM1 Certificates: BSABS (depositor); EMC Mortgage (sponsor); Bear Stearns Co. (underwriter).

292.    Plaintiffs and/or their assignors purchased the following BSABS 2006-IM1 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|-------------------|-------------------|-------|---------------|---------------------|----------------|
| Silver Elms | Paradigm | M6 | 07387UFL0 | 2/14/2006 | $2,267,000 | Bear Stearns Co. |

293.    The above purchase was made by Paradigm's investment manager, SFA, in direct reliance upon the BSABS 2006-IM1 Offering Documents, including draft and/or final BSABS 2006-IM1 Prospectus Supplements.  SFA's diligent investment processes are described in great detail in §VIII.C, *infra*.

### a.    Underwriting Guidelines

294.    The BSABS 2006-IM1 Offering Documents disclosed that  all of the BSABS 2006-IM1 Certificates' underlying loans were acquired by the sponsor, EMC Mortgage, from loan originator Impac Funding Corporation ("Impac").  *See* BSABS 2006-IM1 Pros. Supp. at S-4, S-33-S-34.

295.    The BSABS 2006-IM1 Offering Documents represented that approximately 90.90% of the BSABS 2006-IM1 Certificates' underlying loans were originated pursuant to Impac's

"Progressive Series Program," which guidelines "are intended to assess the borrower's ability and willingness to repay the mortgage loan obligation and to assess the adequacy of the mortgaged property as collateral for the mortgage loan." *Id.* at S-34, S-35. The BSABS 2006-IM1 Offering Documents also represented that approximately 9.10% of the BSABS 2006-IM1 Certificates' underlying loans were originated pursuant to Impac's Progressive Express Program, which concept "is to underwrite the loan focusing on the borrower's Credit Score, ability and willingness to repay the mortgage loan obligation, and assess the adequacy of the mortgaged property as collateral for the loan." *Id.* at S-40. The BSABS 2006-IM1 Offering Documents further represented that "[w]ith respect to the Originator's Progressive Series Program or Progressive Express™ Program in general one full appraisal is required on each loan." *Id*. at S-35. The BSABS 2006-IM1 Offering Documents further represented that "the debt-to-service-to income ratio[s]" are required to be "within the range of 45% to 60% calculated on the basis of monthly income and depending on the loan-to-value ratio of the mortgage loan" in connection with most Progressive Series Program and are "not to exceed 50%" in connection with "loans that exceed a 97% loan-to-value ratio to a maximum of a 100% loan-to-value ratio" under the Progressive Express Program. *Id.* at S-36, S-38, S-41. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Impac had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.8, *infra*.

296.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, a borrower obtained a loan for $647,500 in 2006 which was contained within the BSABS 2006-IM1

offering. This borrower had income in 2006 of $4,286 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $6,359, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

297.    The BSABS 2006-IM1 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BSABS 2006-IM1 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BSABS 2006-IM1 Offering Documents represented that ***none*** of the loans supporting plaintiffs' BSABS 2006-IM1 Certificate had LTV ratios over 100%.

298.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BSABS 2006-IM1 Certificate, which reveals that the LTV ratio percentages stated in the BSABS 2006-IM1 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the BSABS 2006-IM1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|
| M6 | 07387UFL0 | All | 0.00% | 13.53% |

### c.    Owner Occupancy Rates

299.    The BSABS 2006-IM1 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the BSABS 2006-IM1 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BSABS 2006-IM1 Offering Documents represented that a large percentage of the loans supporting plaintiffs' BSABS 2006-IM1 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

300.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' BSABS 2006-IM1 Certificate, which reveals that the OOR percentages stated in the BSABS 2006-IM1 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the Primary Residence Percentages stated in the BSABS 2006-IM1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M6 | 07387UFL0 | All | 77.11% | 68.54% | 12.49% |

### d.    Credit Ratings

301.    The BSABS 2006-IM1 Offering Documents also represented that the BSABS 2006-IM1 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the BSABS 2006-IM1 Offering Documents

- 129 -

represented that plaintiffs' BSABS 2006-IM1 Certificate had been assigned A-/A3 ratings – signifying that it was an extremely safe and stable security.

302.    These representations, however, were false and misleading when made.  In truth, plaintiffs' BSABS 2006-IM1 Certificate should not have received high "investment grade" credit ratings, because it was not a safe, "investment grade" security.  Rather, as defendants were well aware, plaintiffs' BSABS 2006-IM1 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BSABS 2006-IM1 Certificate was because defendants had fed them falsified information regarding the BSABS 2006-IM1 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

303.    The falsity of the credit ratings set forth in the BSABS 2006-IM1 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 43% of the loans supporting plaintiffs' BSABS 2006-IM1 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, after initially being rates as "investment grade," plaintiffs' BSABS 2006-IM1 Certificate is no longer rated at all.  Clearly, plaintiffs' BSABS 2006-IM1 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The evidence supporting the falsity of the BSABS 2006-IM1 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M6 | 07387UFL0 | All | 43.21% | A3 | WR | A- | NR |

### e.    Transfer of Title

304.    The BSABS 2006-IM1 Offering Documents also represented that the loans underlying the BSABS 2006-IM1 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the BSABS 2006-IM1 Offering Documents stated "[a]t the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due with respect to such mortgage loans after the cut-off date to be sold to the trust." *See* BSABS 2006-IM1 Pros. Supp. at S-31. The BSABS 2006-IM1 Offering Documents also stated that "[i]n addition, the depositor will deposit with [the trustee], for the benefit of the certificateholders, the following documents with respect to each mortgage loan: (a) the original mortgage note . . . ; (b) the original recorded mortgage . . . ; (c) a duly executed assignment of the mortgage to [the trustee]. . . ; [and] (d) all interim recorded assignments of such mortgage." *Id.* at S-31-S-32.  These statements were false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 18.    The BSABS 2007-HE1 Certificates

305.    The Bear Stearns Asset Backed Securities I Trust 2007-HE1, Asset-Backed Certificates, Series 2007-HE1 ("BSABS 2007-HE1 Certificates") were issued pursuant to a Prospectus Supplement dated January 29, 2007.  The following defendants played critical roles in the fraudulent structuring, offering and sale of the BSABS 2007-HE1 Certificates: BSABS (depositor); EMC Mortgage (sponsor); Bear Stearns Co. (underwriter).

306.    Plaintiffs and/or their assignors purchased the following BSABS 2007-HE1 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|

| Phoenix | Harrier | 21A2 | 07389UAP4 | 1/23/2007 | $20,000,000 | Bear Stearns Co. |
|---------|---------|------|-----------|-----------|-------------|------------------|

307.    The above purchase was made by Harrier's investment manager, Brightwater, in direct reliance upon the BSABS 2007-HE1 Offering Documents, including draft and/or final BSABS 2007-HE1 Prospectus Supplements.  Brightwater's diligent investment processes are described in great detail in §VIII.A, *infra*.

### a.    Underwriting Guidelines

308.    The BSABS 2007-HE1 Offering Documents disclosed that approximately 78.00% of the loans underlying plaintiffs' BSABS 2007-HE1 Certificate were acquired by the sponsor, EMC Mortgage, from loan originator Encore; and the remainder of the loans underlying plaintiffs' BSABS 2007-HE1 Certificate were acquired by the sponsor, EMC Mortgage, from "various originators, none of which originated more than 10% of the mortgage loans in Loan Group II."  *See* BSABS 2007-HE1 Pros. Supp. at S-4, S-46.

309.    With regard to the Encore loans, the BSABS 2007-HE1 Offering Documents represented that "Encore's internal underwriting guidelines are designed to help it evaluate a borrower's credit history, capacity, willingness and ability to repay the loan, and the value and adequacy of the collateral."  *Id.* at S-52.  The BSABS 2007-HE1  Offering Documents also represented that "Encore's guidelines are primarily intended to (1) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (2) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults." *Id*.  The BSABS 2007-HE1 Offering Documents further represented that "[a]n assessment of the adequacy of the real property as collateral for the loan is primarily based upon an appraisal of the property and a calculation of the LTV ratio of the loan applied for and the combined LTV to the appraised value of the property at the time of origination." *Id.* at S-54.  As further detailed *infra*,

- 132 -

these representations were false and misleading at the time they were made.  Contrary to defendants'
affirmative representations, the truth was that Encore had completely abandoned its stated
underwriting guidelines and was simply seeking to originate as many loans as possible, *without* any
regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged
properties to serve as collateral.  *See* §VI.A.7, *infra*.

310.    With regard to the loans originated by "various originators," the BSABS 2007-HE1
Offering Documents represented that they were underwritten according to "guidelines [that] are
primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of
the mortgaged property and to evaluate the adequacy of the mortgaged property as collateral for the
related mortgage loan."  *See* BSABS 2007-HE1 Pros. Supp. at S-46.  The BSABS 2007-HE1
Offering Documents also represented that "[w]hile the originator's primary consideration in
underwriting a mortgage loan is the value of the mortgaged property, the originator also considers,
among other things, a mortgagor's credit history, repayment ability and debt service to income ratio
as well as the type and use of the mortgaged property."  *Id.*  The BSABS 2007-HE1 Offering
Documents further represented that "[u]nder each of the programs, the originator reviews the
applicant's source of income, calculates the amount of income from sources indicated on the loan
application or similar documentation, reviews the credit history of the applicant, calculates the debt
service to income ratio, if required, to determine the applicant's ability to repay the loan, and reviews
the appraisal."  *Id.* at S-47.  The BSABS 2007-HE1 Offering Documents further represented that
"[m]ortgaged properties that are to secure mortgage loans generally are appraised by qualified
independent appraisers."  *Id.*  As further detailed *infra*, these representations were false and
misleading at the time they were made.  Contrary to defendants' affirmative representations, the
truth was that the "various originators" had completely abandoned their stated underwriting
guidelines and were simply seeking to originate as many loans as possible, *without* any regard for

- 133 -

864087_1

the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.1, *infra*.

311.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, a borrower obtained a loan for $389,500 in 2007 which was contained within the BSABS 2007-HE1 offering. This loan was originated through either EMC Mortgage, Bear Stearns Residential or Encore, the originators identified in the Offering Documents.  This borrower had income in 2007 of $4,016 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $3,726, giving this borrower a DTI ratio of over 92%. This borrower's DTI ratio was far in excess of the maximum DTI ratios of 50% to 55% set forth in the underwriting guidelines described in the Offering Documents***. Moreover, this borrower's DTI ratio was far in excess of the 50% DTI one prominent Wall Street bank stated "le[ft] little for the borrower to pay other expenses," particularly in this borrower's case since she was a single mother with three dependent minor children to support. Moreover, the borrower's monthly debt payments were in addition to the borrower's and her three dependent children's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan, in 2007.

### b.    Loan-to-Value Ratios

312.    The BSABS 2007-HE1 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the BSABS 2007-HE1 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the BSABS 2007-HE1 Offering Documents represented that less than 50% of the loans supporting plaintiffs' BSABS 2007-HE1

Certificate had LTV ratios over 80%, and that *none* of the loans supporting plaintiffs' BSABS 2007-HE1 Certificate had LTV ratios over 100%.

313.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' BSABS 2007-HE1 Certificate, which reveals that the LTV ratio percentages stated in the BSABS 2007-HE1 Offering Documents were materially false *at the time they were made*. The following chart summarizes the LTV ratio percentages stated in the BSABS 2007-HE1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 21A2 | 07389UAP4 | Group II | 48.13% | 66.68% | 0.00% | 19.70% |

c.    **Credit Ratings**

314.    The BSABS 2007-HE1 Offering Documents also represented that the BSABS 2007-HE1 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default. Specifically, the BSABS 2007-HE1 Offering Documents represented that plaintiffs' BSABS 2007-HE1 Certificate had been assigned AAA/Aaa ratings – the highest, safest credit ratings available, which are in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.

315.    These representations, however, were false and misleading when made. In truth, plaintiffs' BSABS 2007-HE1 Certificate should not have received high "investment grade" credit ratings, because it was not a safe, "investment grade" security with "a less than 1% probability of incurring defaults." Rather, as defendants were well aware, plaintiffs' BSABS 2007-HE1 Certificate

- 135 -

was an extremely risky, speculative grade "junk" bond, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' BSABS 2007-HE1 Certificate was because defendants had fed them falsified information regarding the BSABS 2007-HE1 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores and false borrower DTI ratios.

316. The falsity of the credit ratings set forth in the BSABS 2007-HE1 Offering Documents is confirmed by subsequent events. Specifically, ***approximately 49%[16] of the loans supporting plaintiffs' BSABS 2007-HE1 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them. Moreover, plaintiffs' "investment grade" BSABS 2007-HE1 Certificate is now rated at "junk" status. Clearly, plaintiffs' BSABS 2007-HE1 Certificate was not the highly rated, "investment grade" security defendants represented it to be. The evidence supporting the falsity of the BSABS 2007-HE1 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 21A2 | 07389UAP4 | Group II | 48.73% | Aaa | Caa3 | AAA | CCC |

### d.    Transfer of Title

317. The BSABS 2007-HE1 Offering Documents also represented that the loans underlying the BSABS 2007-HE1 Certificate would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.

---

[16]    The default rate stated herein was obtained from the latest BSABS 2007-HE1 trustee report dated December 2012.

Specifically, the BSABS 2007-HE1 Offering Documents stated "[a]t the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due with respect to such mortgage loans after the cut-off date to be sold to the trust." *See* BSABS 2007-HE1 Pros. Supp. at S-43. the BSABS 2007-HE1 Offering Documents also stated that "[i]n addition, the depositor will deposit with [the trustee], for the benefit of the certificateholders, the following documents with respect to each mortgage loan: (a) the original mortgage note . . . ; (b) the original recorded mortgage . . . ; [and] (c) a duly executed assignment of the mortgage in blank, or to [the trustee]." *Id.* These statements were false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 19.    The JPALT 2006-A7 Certificates

318.    The J.P. Morgan Alternative Loan Trust 2006-A7, Mortgage Pass-Through Certificates, Series 2006-A7 ("JPALT 2006-A7 Certificates") were issued pursuant to a Prospectus Supplement dated November 28, 2006. The following defendants played critical roles in the fraudulent structuring, offering and sale of the JPALT 2006-A7 Certificates: JPMAC (depositor); JPMMAC (sponsor); J.P. Morgan Securities (underwriter).

319.    Plaintiffs and/or their assignors purchased the following JPALT 2006-A7 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|--------------------|--------------------|-------|---------------|----------------------|----------------|
| Phoenix | WestLB | 1A4 | 466286AD3 | 11/30/2006 | $9,239,000 | J.P. Morgan Securities |

320.    The above purchase was made by WestLB's investment manager, DCP, in direct reliance upon the JPALT 2006-A7 Offering Documents, including draft and/or final JPALT 2006-A7 Prospectus Supplements. DCP's diligent investment processes are described in great detail in §VIII.E, *infra*.

### a.    Underwriting Guidelines

321.    The JPALT 2006-A7 Offering Documents disclosed that approximately 49.98% of

the loans underlying plaintiffs' JPALT 2006-A7 Certificate were acquired by the sponsor,

JPMMAC, from loan originator Flagstar Bank, F.S.B. ("Flagstar"); approximately 19.97% of the

loans underlying plaintiffs' JPALT 2006-A7 Certificate were acquired by the sponsor, JPMMAC,

from loan originator Countrywide; approximately 17.38% of the loans underlying plaintiffs' JPALT

2006-A7 Certificate were acquired by the sponsor, JPMMAC, from JPMorgan Chase together with

CHF (the "Chase" originators); and the remainder of the loans underlying plaintiffs' JPALT 2006-

A7 Certificate were acquired by the sponsor, JPMMAC, from other unnamed originators, none of

which "originated or acquired more than 10% of [plaintiffs'] mortgage loans." *See* JPALT 2006-A7

Pros. Supp. at S-4, S-23.

322.    With regard to the Flagstar loans, the JPALT 2006-A7 Offering Documents

represented that Flagstar's underwriting guidelines "are designed to evaluate the applicant's ability

to repay the loan, their prior credit history, and availability of funds required for closing and cash

reserves, as well as to evaluate the acceptability of the property to be mortgaged as collateral." *Id.* at

S-34. The JPALT 2006-A7 Offering Documents also represented that: "As an integral part of the

underwriting review, the underwriter will evaluate the intent and willingness of an applicant to repay

the mortgage loan in a timely manner, again assisted by Fannie Mae's Desktop Underwriter or

Freddie Mac's LP system for loans with an original principal balance of up to $650,000. In general,

the intent is evaluated based on the applicant's past credit performance. Flagstar Bank utilizes credit

scoring provided by credit reporting agencies to assist in the analysis of an applicant's credit history.

Flagstar Bank may also consider a mortgage/rent payment history, in addition to the applicant's

credit history and credit scoring as maintained at credit reporting agencies." *Id.* The JPALT 2006-

A7 Offering Documents further represented that "[i]n order to determine the marketability of a

- 138 -

property, a property valuation must be obtained from a Flagstar Bank-approved appraiser for all loans." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Flagstar had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.1, *infra*.

323.    With regard to the Countrywide loans, the JPALT 2006-A7 Offering Documents represented that Countrywide underwriting standards "evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *See* JPALT 2006-A7 Pros. Supp. at S-27. The JPALT 2006-A7 Offering Documents also represented that "[u]nder those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." *Id.* The JPALT 2006-A7 Offering Documents also represented that "[e]xcept with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans." *Id.* at S-28. The JPALT 2006-A7 Offering Documents further represented that "[u]nder its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%," and that "[u]nder its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income

ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively." *Id.* at S-29-S-30. As further detailed *infra*, this representation was false and misleading at the time it was made. Contrary to defendants' affirmative representations, the truth was that Countrywide had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.3, *infra*.

324.    With regard to 65.90% of the Chase loans, the JPALT 2006-A7 Offering Documents represented that they were originated in accordance with the Chase underwriting policies described in the prospectus supplement. *See* JPALT 2006-A7 Pros. Supp. at S-32. The JPALT 2006-A7 Offering Documents represented that "[u]nder the CHF Alternative A Underwriting Policies . . . [a]s part of the description of the borrower's financial condition, each borrower is required to furnish information (which may have been supplied solely in such application) with respect to its assets, liabilities, income… credit history and employment history." *Id.* The JPALT 2006-A7 Offering Documents further represented that "[p]ursuant to CHF's 'Streamlined Refinance Program' . . . the borrower's most recent 12 month mortgage history (24 months for purchase transactions) with CHF must verify document that the account has been paid as agreed with no delinquency greater than 30 days past due." *Id.* The JPALT 2006-A7 Offering Documents further represented that CHF "requires an appraisal to be made of each property to be financed." *Id.* at S-33. As further detailed *infra*, this representation was false and misleading at the time it was made. Contrary to defendants' affirmative representations, the truth was that the Chase originators had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible,

- 140 -

*without* any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.17, *infra*.

325.    With regard to 34.10% of the Chase loans and the loans acquired by other unnamed originators, the JPALT 2006-A7 Offering Documents represented that they were "underwritten substantially in accordance" with underwriting guidelines that "evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral." *See* JPALT 2006-A7 Pros. Supp. at S-24. The JPALT 2006-A7 Offering Documents also represented that:

> Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination.

*Id.* at S-24.  The JPALT 2006-A7 Offering Documents further represented that "[t]he adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. *Id.* at S-25. As further detailed *infra*, this representation was false and misleading at the time it was made.  Contrary to defendants' affirmative representations, the truth was that the Chase originators and the other unnamed originators had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, *without* any regard for the borrowers' actual repayment

ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.17, *infra*.

326.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, two borrowers obtained a loan for $1,162,500 in 2006 which was contained within the JPALT 2006-A7 offering.  The loan was originated through Countrywide, one of the loan originators identified in the Offering Documents.  These borrowers had income in 2006 of $2,960 per month, according to the borrowers' sworn bankruptcy filings.  ***However, the borrowers' monthly debt payments were at least $11,915, far in excess of the borrowers' monthly income***.  The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, these borrowers could not afford to repay the loan.  This is confirmed by the fact that the borrowers declared bankruptcy shortly after obtaining the loan, in 2007, and in 2008.

### b.    Loan-to-Value Ratios

327.    The JPALT 2006-A7 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the JPALT 2006-A7 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the JPALT 2006-A7 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs' JPALT 2006-A7 Certificate had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' JPALT 2006-A7 Certificate had LTV ratios over 100%.

328.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' JPALT 2006-A7 Certificate, which reveals that the LTV ratio percentages stated in the JPALT 2006-A7 Offering Documents were materially false ***at the***

*time they were made*.  The following chart summarizes the LTV ratio percentages stated in the

JPALT 2006-A7 Offering Documents, and the actual percentages that should have been stated

according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 1A4 | 466286AD3 | Group I | 4.61% | 45.25% | 0.00% | 11.54% |

### c.    Credit Ratings

329.    The JPALT 2006-A7 Offering Documents also represented that the JPALT 2006-A7

Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings

by S&P and Moody's, indicating that the security was a very strong, safe investment with an

extremely low probability of default.  Specifically, the JPALT 2006-A7 Offering Documents

represented that plaintiffs' JPALT 2006-A7 Certificate had been assigned AAA/Aaa ratings – the

highest, safest credit ratings available, which are in fact the same as, or even higher than, the current

credit rating of U.S. Treasury debt.

330.    These representations, however, were false and misleading when made.  In truth,

plaintiffs' JPALT 2006-A7 Certificate should not have received AAA/Aaa credit ratings, because it

was *not* a safe, "investment grade" security with a " less than 1% probability of incurring defaults."

Rather, as defendants were well aware, plaintiffs' JPALT 2006-A7 Certificate was an extremely

risky, speculative grade "junk" bond, backed by low credit quality, extremely risky loans.  Indeed,

one of the primary reasons that S&P and Moody's had assigned such a high rating to plaintiffs'

JPALT 2006-A7 Certificate was because defendants had fed them falsified information regarding the

JPALT 2006-A7 Certificate's underlying loans, including, without limitation, false loan

- 143 -

underwriting guidelines, false LTV ratios, false borrower FICO scores, and false borrower DTI ratios.

331.    The falsity of the credit ratings set forth in the JPALT 2006-A7 Offering Documents is confirmed by subsequent events. Specifically, ***more than 34% of the loans supporting plaintiffs' JPALT 2006-A7 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them. Moreover, plaintiffs' "investment grade" JPALT 2006-A7 Certificate is now rated at "junk" status. Clearly, plaintiffs' JPALT 2006-A7 Certificate was not the highly rated, "investment grade" security defendants represented it to be. The evidence supporting the falsity of the JPALT 2006-A7 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 1A4 | 466286AD3 | Group I | 34.26% | Aaa | Ca | AAA | NR |

### d.    Transfer of Title

332.    The JPALT 2006-A7 Offering Documents also represented that the loans underlying the JPALT 2006-A7 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the JPALT 2006-A7 Offering Documents stated that "[p]ursuant to a Pooling and Servicing Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Issuing Entity, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations)." *See* JPALT 2006-A7 Pros. Supp. at S-22. The JPALT 2006-A7 Offering Documents also stated that "the depositor, or the seller of the related loans to the depositor, will be required to deliver or cause to be delivered to the trustee or to the trustee's custodian as to each mortgage loan or

home equity loan, among other things: (1) the mortgage note . . . ; (2) the mortgage, deed of trust or similar instrument . . .; (3) an assignment of the mortgage to the trustee . . .; [and] (4) the other security documents." *See* JPALT 2006-A7 Prospectus at 62-63. These statements were false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 20.    The JPALT 2007-A1 Certificates

333.    The J.P. Morgan Alternative Loan Trust 2007-A1, Mortgage Pass-Through Certificates, Series 2007-A1 ("JPALT 2007-A1 Certificates") were issued pursuant to a Prospectus Supplement dated February 26, 2007. The following defendants played critical roles in the fraudulent structuring, offering and sale of the JPALT 2007-A1 Certificates: JPMAC (depositor); JPMMAC (sponsor); J.P. Morgan Securities (underwriter).

334.    Plaintiffs and/or their assignors purchased the following JPALT 2007-A1 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Phoenix | Harrier | 1A1A | 466287AA7 | 2/15/2007 | $25,000,000 | J.P. Morgan Securities |

335.    The above purchase was made by Harrier's investment manager, Brightwater, in direct reliance upon the JPALT 2007-A1 Offering Documents, including draft and/or final JPALT 2007-A1 Prospectus Supplements. Brightwater's diligent investment processes are described in great detail in §VIII.A., *infra*.

### a.    Underwriting Guidelines

336.    The JPALT 2007-A1 Offering Documents disclosed that approximately 41.89% of the loans underlying plaintiffs' JPALT 2007-A1 Certificate were acquired by the sponsor, JPMMAC, from the JPMorgan Chase together with CHF; approximately 38.90% of the loans underlying plaintiffs' JPALT 2007-A1 Certificate were acquired by the sponsor, JPMMAC, from

loan originator GreenPoint; approximately 12.82% of the loans underlying plaintiffs' JPALT 2007-A1 Certificate were acquired by the sponsor, JPMMAC, from loan originator Countrywide; and the remainder of the loans underlying plaintiffs' JPALT 2007-A1 Certificate were acquired by other unnamed originators, none of which "originated or acquired more than 10% of [plaintiffs'] [m]ortgage [l]oans." *See* JPALT 2007-A1 Pros. Supp. at S-6, S-35, S-37.

337.    With regard to 61.76% of the Chase loans, the JPALT 2007-A1 Offering Documents represented that they were originated in accordance with the Chase underwriting policies described in the prospectus supplement. *Id.* at S-37. The JPALT 2007-A1 Offering Documents also represented that "[u]nder the CHF Alternative A Underwriting Policies . . . [a]s part of the description of the borrower's financial condition, each borrower is required to furnish information (which may have been supplied solely in such application) with respect to its assets, liabilities, income . . . credit history and employment history." *Id.* at S-38. The JPALT 2006-A7 Offering Documents further represented that Chase "requires an appraisal to be made of each property to be financed." *Id.* at S-39. As further detailed *infra*, this representation was false and misleading at the time it was made. Contrary to defendants' affirmative representations, the truth was that the Chase originators had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.17, *infra*.

338.    With regard to the GreenPoint loans, the JPALT 2007-A1 Offering Documents represented that "the  GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *See* JPALT 2007-A1 Pros. Supp. at S-40. The JPALT 2007-A1 Offering Documents also  represented that: "In determining whether a prospective borrower has sufficient

- 146 -

monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers the ratio of those amounts to the proposed borrower's monthly gross income. These ratios vary depending on a number of underwriting criteria, including loan-to-value ratios ('LTV'), and are determined on a loan-by-loan basis. The ratios generally are limited to 40% but may be extended to 50% with adequate compensating factors, such as disposable income, reserves, higher FICO credit score, or lower LTV's." *Id.* The JPALT 2007-A1 Offering Documents further represented that "[i]n determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing." *Id.* at S-41. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that GreenPoint had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, **without** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.10, *infra*.

339.    With regard to 38.24% of the Chase loans, the Countrywide loans and the loans originated by unnamed originators, the JPALT 2007-A1 Offering Documents represented that they were "underwritten substantially in accordance" with underwriting guidelines that "evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral." *See* JPALT 2007-A1 Pros. Supp. at S-35. The JPALT 2007-A1 Offering Documents also represented that: "Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing

- 147 -

expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination." *Id.* at S-36. The JPALT 2007-A1 Offering Documents further represented that "[t]he adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator." *Id.* at S-37. As further detailed *infra*, this representation was false and misleading at the time it was made. Contrary to defendants' affirmative representations, the truth was that Countrywide, Chase and the unnamed originators had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §§VI.A.3 and VI.A.17, *infra*.

340.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, a borrower obtained a loan for $799,992 in 2006 which was contained within the JPALT 2007-A1 offering. This loan was originated through Countrywide, one of the originators identified in the Offering Documents. This borrower had income in 2006 of $5,581 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $15,152, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses such as taxes, utilities, groceries,

health care, transportation, and the like.  Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan, in 2007.

### b.    Loan-to-Value Ratios

341.    The JPALT 2007-A1 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the JPALT 2007-A1 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the JPALT 2007-A1 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs' JPALT 2007-A1 Certificate had LTV ratios over 80%, and that **none** of the loans supporting plaintiffs' JPALT 2007-A1 Certificate had LTV ratios over 100%.

342.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' JPALT 2007-A1 Certificate, which reveals that the LTV ratio percentages stated in the JPALT 2007-A1 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the JPALT 2007-A1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 1A1A | 466287AA7 | Group I | 2.73% | 45.73% | 0.00% | 9.43% |

### c.    Credit Ratings

343.    The JPALT 2007-A1 Offering Documents also represented that the JPALT 2007-A1 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an

extremely low probability of default.  Specifically, the JPALT 2007-A1 Offering Documents represented that plaintiffs' JPALT 2007-A1 Certificate had been assigned AAA/Aaa ratings – the highest, safest credit ratings available, which are in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.

344.    These representations, however, were false and misleading when made.  In truth, plaintiffs' JPALT 2007-A1 Certificate should not have received AAA/Aaa credit ratings, because it was *not* a safe, "investment grade" security with "a less than 1% probability of incurring defaults." Rather, as defendants were well aware, plaintiffs' JPALT 2007-A1 Certificate was an extremely risky, speculative grade "junk" bond, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' JPALT 2007-A1 Certificate was because defendants had fed them falsified information regarding the JPALT 2007-A1 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, and false borrower DTI ratios.

345.    The falsity of the credit ratings set forth in the JPALT 2007-A1 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 41% of the loans supporting plaintiffs' JPALT 2007-A1 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" JPALT 2007-A1 Certificate is now rated at "junk" status.  Clearly, plaintiffs' JPALT 2007-A1 Certificate was not the highly rated, "investment grade" security defendants represented it to be. The evidence supporting the falsity of the JPALT 2007-A1 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

- 150 -

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 1A1A | 466287AA7 | Group I | 41.36% | Aaa | Ca | AAA | NR |

### d.    Transfer of Title

346.    The JPALT 2007-A1 Offering Documents also represented that the loans underlying the JPALT 2007-A1 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the JPALT 2007-A1 Offering Documents stated that "[p]ursuant to a Pooling and Servicing Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Issuing Entity, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations)."  JPALT 2007-A1 Pros. Supp. at S-33.  The JPALT 2007-A1 Offering Documents also stated that "the depositor, or the seller of the related loans to the depositor, will be required to deliver or cause to be delivered to the trustee or to the trustee's custodian as to each mortgage loan or home equity loan, among other things: (1) the mortgage note . . .; (2) the mortgage, deed of trust or similar instrument . . .; (3) an assignment of the mortgage to the trustee . . .; [and] (4) the other security documents."  *See* JPALT 2007-A1 Prospectus at 62-63.  These statements were false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 21.    The JPMAC 2006-HE3 Certificates

347.    The J.P. Morgan Mortgage Acquisition Trust 2006-HE3, Asset-Backed Pass Through Certificates, Series 2006-HE3 ("JPMAC 2006-HE3 Certificates") were issued pursuant to a Prospectus Supplement dated October 27, 2006.  The following defendants played critical roles in

- 151 -

the fraudulent structuring, offering and sale of the JPMAC 2006-HE3 Certificates: JPMAC (depositor); JPMMAC (sponsor); J.P. Morgan Securities (underwriter).

348.    Plaintiffs and/or their assignors purchased the following JPMAC 2006-HE3 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|-------------------|-------------------|-------|---------------|---------------------|----------------|
| Kleros V | WestLB | M5 | 46629VAK1 | 10/27/2006 | $3,500,000 | J.P. Morgan Securities |

349.    The above purchase was made by WestLB's investment manager, Strategos, in direct reliance upon the JPMAC 2006-HE3 Offering Documents, including draft and/or final JPMAC 2006-HE3 Prospectus Supplements.  Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

a.    **Underwriting Guidelines**

350.    The JPMAC 2006-HE3 Offering Documents disclosed that approximately 59.75% of the JPMAC 2006-HE3 Certificates' underlying loans were acquired by the sponsor, JPMMAC, from loan originator ResMAE Mortgage Corp. ("ResMAE"); approximately 22.05% of the JPMAC 2006-HE3 Certificates' underlying loans were acquired by the sponsor, JPMMAC, from loan originator NovaStar Mortgage, Inc. ("NovaStar"); approximately 16.16% of the JPMAC 2006-HE3 Certificates' underlying loans were acquired by the sponsor, JPMMAC, from loan originator Fieldstone; and the remainder of the JPMAC 2006-HE3 Certificates' underlying loans "were originated by various originators, each of which has originated less than 10.00% of the mortgage loans in . . . the aggregate pool as of the cut-off date."  *See* JPMAC 2006-HE3 Pros. Supp. at S-3, S-25, S-60.

351.    With regard to the ResMAE loans, the JPMAC 2006-HE3 Offering Documents represented that "[t]he underwriting standards of ResMAE are primarily intended to assess the

ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan." *Id.* at S-62. The JPMAC 2006-HE3 Offering Documents also represented that "ResMAE considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio . . ., as well as the value, type and use of the mortgaged property." *Id.* The JPMAC 2006-HE3 Offering Documents further represented that "[t]he underwriting guidelines of ResMAE . . . generally require an appraisal of the mortgaged property." *Id.* at S-63. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that ResMAE had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, **without** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.15, *infra*.

352.    With regard to the NovaStar loans, the JPMAC 2006-HE3 Offering Documents represented that "[t]he underwriting guidelines of NovaStar are intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan." *See* JPMAC 2006-HE3 Pros. Supp. at S-66. The JPMAC 2006-HE3 Offering Documents further represented that "[a]n appraisal is also required on all loans and in many cases a review appraisal or second appraisal may be required depending on the value of the property and the underwriter's comfort with the original valuation." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that NovaStar had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, **without** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.11, *infra*.

- 153 -

353.    With regard to all of the loans underlying the JPMAC 2006-HE3 Certificates, the JPMAC 2006-HE3 Offering Documents represented that "[t]he originators' underwriting standards are primarily intended to assess the value of the mortgaged property and to evaluate the adequacy of that property as collateral for the mortgage loan and the applicant's credit standing and ability to repay." *See* JPMAC 2006-HE3 Pros. Supp. at S-11.  The JPMAC 2006-HE3 Offering Documents also represented that "[w]hile the primary consideration in underwriting a mortgage loan is the value and adequacy of the mortgaged property as collateral, the originators also consider, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property." *Id.*  The JPMAC 2006-HE3 Offering Documents further represented that "[b]ased on the data provided in the application and certain verifications (if required), a determination will have been made by the original lender that the mortgagor's monthly income (if required to be stated) should be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the mortgaged property (such as property taxes, standard hazard insurance and other fixed obligations other than housing expenses)." *Id.* at S-61. The JPMAC 2006-HE3 Offering Documents further represented that "[t]he adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator." *Id.*  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that ResMAE, NovaStar, Fieldstone and the various originators had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §§VI.A.11, VI.A.15 and VI.A.19, *infra*.

354.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, a borrower obtained a loan for $716,000 in 2006 which was contained within the JPMAC 2006-HE3 offering.  The loan was originated through NovaStar, one of the loan originators identified in the Offering Documents.  This borrower had income in 2006 of $3,500 per month, according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $8,235, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay the loan.  This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

355.    The JPMAC 2006-HE3 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the JPMAC 2006-HE3 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the JPMAC 2006-HE3 Offering Documents represented that less than 50% of the loans supporting plaintiffs' JPMAC 2006-HE3 Certificate had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' JPMAC 2006-HE3 Certificate had LTV ratios over 100%.

356.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' JPMAC 2006-HE3 Certificate, which reveals that the LTV ratio percentages stated in the JPMAC 2006-HE3 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the

- 155 -

JPMAC 2006-HE3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M5 | 46629VAK1 | All | 49.87% | 66.27% | 0.00% | 21.49% |

### c.    Owner Occupancy Rates

357.    The JPMAC 2006-HE3 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the JPMAC 2006-HE3 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the JPMAC 2006-HE3 Offering Documents represented that a large percentage of the loans supporting plaintiffs' JPMAC 2006-HE3 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

358.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' JPMAC 2006-HE3 Certificate, which reveals that the OOR percentages stated in the JPMAC 2006-HE3 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the OOR percentages stated in the JPMAC 2006-HE3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M5 | 46629VAK1 | All | 94.18% | 84.85% | 11.00% |

### d.    Credit Ratings

359.    The JPMAC 2006-HE3 Offering Documents also represented that the JPMAC 2006-HE3 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the JPMAC 2006-HE3 Offering Documents represented that plaintiffs' JPMAC 2006-HE3 Certificate had been assigned A/A2 ratings – signifying an extremely safe and stable security.

360.    These representations, however, were false and misleading when made.  In truth, plaintiffs' JPMAC 2006-HE3 Certificate should not have received A/A2 credit ratings, because it was *not* a safe, "investment grade" security.  Rather, as defendants were well aware, plaintiffs' JPMAC 2006-HE3 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' JPMAC 2006-HE3 Certificate was because defendants had fed them falsified information regarding the JPMAC 2006-HE3 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

361.    The falsity of the credit ratings set forth in the JPMAC 2006-HE3 Offering Documents is confirmed by subsequent events.  Specifically, *more than 40% of the loans supporting plaintiffs' JPMAC 2006-HE3 Certificate are currently in default* because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" JPMAC 2006-HE3 Certificate is now rated at "junk" status or below.  Clearly, plaintiffs' JPMAC 2006-HE3 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The evidence supporting the falsity of the JPMAC 2006-

- 157 -

HE3 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M5 | 46629VAK1 | All | 40.18% | A2 | WR | A | D |

### e.    Transfer of Title

362.    The JPMAC 2006-HE3 Offering Documents also represented that the loans underlying the JPMAC 2006-HE3 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the JPMAC 2006-HE3 Offering Documents stated that the "Depositor . . . will establish the Trust and will be the party that deposits, sells or otherwise conveys the Trust Fund assets [*i.e.* the underlying mortgage loans] to the Trust." *See* JPMAC 2006-HE3 Pros. Supp. at S-58.  The JPMAC 2006-HE3 Offering Documents also stated that "[p]ursuant to the Pooling Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment, Assumption and Recognition Agreement (including the right to enforce the Originators' repurchase obligations)."  *Id.* at S-95. The JPMAC 2006-HE3 Offering Documents further stated that "[i]n connection with such transfer and assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee or its custodian, among other things, the original promissory note . . . , the original instrument creating a first or second lien on the related Mortgaged Property (the "Mortgage"). . . , all recorded intervening assignments of the Mortgage." *Id.*  These statements were false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

- 158 -

### 22.    The JPMAC 2006-NC1 Certificates

363.    The J.P. Morgan Mortgage Acquisition Trust 2006-NC1, Asset-Backed Pass-Through Certificates, Series 2006-NC1 ("JPMAC 2006-NC1 Certificates") were issued pursuant to a Prospectus Supplement dated April 5, 2006.  The following defendants played critical roles in the fraudulent structuring, offering and sale of the JPMAC 2006-NC1 Certificates: JPMAC (depositor); JPMMAC (sponsor); J.P. Morgan Securities (underwriter).

364.    Plaintiffs and/or their assignors purchased the following JPMAC 2006-NC1 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Silver Elms II | Paradigm | M6 | 46626LJW1 | 4/11/2006 | $2,492,000 | J.P. Morgan Securities |

365.    The above purchase was made by Paradigm's investment manager, Eiger, in direct reliance upon the JPMAC 2006-NC1 Offering Documents, including draft and/or final JPMAC 2006-NC1 Prospectus Supplements.  Eiger's diligent investment processes are described in great detail in §VIII.D, *infra*.

### a.    Underwriting Guidelines

366.    The JPMAC 2006-NC1 Offering Documents disclosed that 100% of the JPMAC 2006-NC1 Certificates' underlying loans were acquired by the sponsor, JPMMAC, from loan originator New Century.  *See* JPMAC 2006-NC1 Pros. Supp. at S-3, S-54.

367.    With regard to the New Century loans, the JPMAC 2006-NC1 Offering Documents represented that "[t]he New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan." *Id.* at S-55.  The JPMAC 2006-NC1 Offering Documents also represented that "[w]hile New Century's primary

- 159 -

consideration in underwriting a mortgage loan is the value of the mortgaged property, New Century also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property." *Id.* The JPMAC 2006-NC1 Offering Documents further represented that: "Under each of the programs, New Century reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property. In determining the ability of the applicant to repay the loan, a qualifying rate has been created under the New Century Underwriting Guidelines that generally is equal to the interest rate on that loan." *Id.* at S-56. The JPMAC 2006-NC1 Offering Documents further represented that "[m]ortgaged properties that are to secure mortgaged loans generally are appraised by qualified independent appraisers," and that "[t]he New Century Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires New Century's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal, currently supports the outstanding loan balance." *Id.* at S-55, S-56. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that New Century had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.2, *infra*.

368.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, a

- 160 -

husband and wife obtained a loan for $588,000 in 2005 which was contained within the JPMAC

2006-NC1 offering. The loan was originated through New Century, one of the loan originators

identified in the Offering Documents. ***The borrowers had income in 2005 of only $826 per month***,

according to the borrowers' sworn bankruptcy filings. ***However, the borrowers' monthly debt***

***payments were at least $6,478, far in excess of the borrowers' monthly income***. The borrowers'

monthly debt payments were in addition to the borrowers' monthly expenses such as taxes, utilities,

groceries, health care, transportation, and the like. Clearly, these borrowers could not afford to repay

the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining

the loan at issue, in 2006.

### b.    Loan-to-Value Ratios

369.    The JPMAC 2006-NC1 Offering Documents also made certain misrepresentations

regarding the LTV ratios associated with the loans supporting the JPMAC 2006-NC1 Certificate

purchased by plaintiffs and/or their assigning entities. Specifically, the JPMAC 2006-NC1 Offering

Documents represented that less than 40% of the loans supporting plaintiffs' JPMAC 2006-NC1

Certificate had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' JPMAC 2006-

NC1 Certificate had LTV ratios over 100%.

370.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis

on the actual loans underlying plaintiffs' JPMAC 2006-NC1 Certificate, which reveals that the LTV

ratio percentages stated in the JPMAC 2006-NC1 Offering Documents were materially false ***at the***

***time they were made***. The following chart summarizes the LTV ratio percentages stated in the

JPMAC 2006-NC1 Offering Documents, and the actual percentages that should have been stated

according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M6 | 46626LJW1 | All | 36.88% | 58.80% | 0.00% | 17.36% |

### c.    Owner Occupancy Rates

371.    The JPMAC 2006-NC1 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the JPMAC 2006-NC1 Certificate purchased by plaintiffs and/or their assigning entities. Specifically, the JPMAC 2006-NC1 Offering Documents represented that a large percentage of the loans supporting plaintiffs' JPMAC 2006-NC1 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

372.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' JPMAC 2006-NC1 Certificate, which reveals that the OOR percentages stated in the JPMAC 2006-NC1 Offering Documents were materially false *at the time they were made*. The following chart summarizes the OOR percentages stated in the JPMAC 2006-NC1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M6 | 46626LJW1 | All | 88.77% | 79.42% | 11.77% |

### d.    Credit Ratings

373.    The JPMAC 2006-NC1 Offering Documents also represented that the JPMAC 2006-NC1 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit

- 162 -

ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default. Specifically, the JPMAC 2006-NC1 Offering Documents represented that plaintiffs' JPMAC 2006-NC1 Certificate had been assigned A-/A3 ratings – signifying an extremely safe and stable security.

374.    These representations, however, were false and misleading when made. In truth, plaintiffs' JPMAC 2006-NC1 Certificate should not have received A-/A3 credit ratings, because it was ***not*** a safe, "investment grade" security. Rather, as defendants were well aware, plaintiffs' JPMAC 2006-NC1 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' JPMAC 2006-NC1 Certificate was because defendants had fed them falsified information regarding the JPMAC 2006-NC1 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

375.    The falsity of the credit ratings set forth in the JPMAC 2006-NC1 Offering Documents is confirmed by subsequent events. Specifically, ***approximately 39% of the loans supporting plaintiffs' JPMAC 2006-NC1 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them. Moreover, plaintiffs' "investment grade" JPMAC 2006-NC1 Certificate is now rated at "junk" status or below. Clearly, plaintiffs' JPMAC 2006-NC1 Certificate was not the highly rated, "investment grade" security defendants represented it to be. The evidence supporting the falsity of the JPMAC 2006-NC1 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M6 | 46626LJW1 | All | 38.73% | A3 | WR | A- | D |

### e.    Transfer of Title

376.    The JPMAC 2006-NC1 Offering Documents also represented that the loans underlying the JPMAC 2006-NC1 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the JPMAC 2006-NC1 Offering Documents stated that "[p]ursuant to the Pooling Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations)."  *See* JPMAC 2006-NC1 Pros. Supp. at S-89.  The JPMAC 2006-NC1 Offering Documents also stated that "[i]n connection with such transfer and assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee or its custodian, among other things, the original promissory note . . . , the original instrument . . . , an assignment in recordable form of the Mortgage, all recorded intervening assignments of the Mortgage and any modifications to such Mortgage Note and Mortgage."  *Id.* at S-90.  These statements were false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 23.    The JPMAC 2006-NC2 Certificates

377.    The J.P. Morgan  Mortgage Acquisition Trust 2006-NC2, Asset-Backed Pass Through Certificates, Series 2006-NC2 ("JPMAC 2006-NC2 Certificates") were issued pursuant to a Prospectus Supplement dated August 18, 2006.  The following defendants played critical roles in the

- 164 -

fraudulent structuring, offering and sale of the JPMAC 2006-NC2 Certificates: JPMAC (depositor);

JPMMAC (sponsor); J.P. Morgan Securities (underwriter).

378.     Plaintiffs and/or their assignors purchased the following JPMAC 2006-NC2

Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Silver Elms II | Paradigm | M2 | 46629FAF7 | 8/14/2006 | $5,500,000 | J.P. Morgan Securities |

379.     The above purchase was made by Paradigm's investment manager, Eiger, in direct

reliance upon the JPMAC 2006-NC2 Offering Documents, including draft and/or final JPMAC

2006-NC2 Prospectus Supplements.  Eiger's diligent investment processes are described in great

detail in §VIII.D, *infra*.

### a.     Underwriting Guidelines

380.     The JPMAC 2006-NC2 Offering Documents disclosed that 100% of the JPMAC

2006-NC2 Certificates' underlying loans were acquired by the sponsor, JPMMAC, from loan

originator New Century.  *See* JPMAC 2006-NC2 Pros. Supp. at S-3, S-57.

381.     The JPMAC 2006-NC2 Offering Documents represented that "[t]he New Century

Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related

Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the

property as collateral for the Mortgage Loan."  *Id.* at S-58.  The JPMAC 2006-NC2 Offering

Documents also represented that "[w]hile New Century's primary consideration in underwriting a

mortgage loan is the value of the mortgaged property, New Century also considers, among other

things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as

the type and use of the mortgaged property."  *Id.*  The JPMAC 2006-NC2 Offering Documents

further represented that "[m]ortgaged properties that are to secure mortgage loans generally are

- 165 -

appraised by qualified independent appraisers." *Id.* The JPMAC 2006-NC2 Offering Documents further represented that: "Under each of the programs, New Century reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property. In determining the ability of the applicant to repay the loan, a qualifying rate has been created under the New Century Underwriting Guidelines that generally is equal to the interest rate on that loan." *Id.* at S-59. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that New Century had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.2, *infra*.

382.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, a husband and wife obtained a loan for $482,400 in 2006 which was contained within the JPMAC 2006-NC2 offering. The loan was originated through New Century, one of the loan originators identified in the Offering Documents. The borrowers had income in 2006 of $4,368 per month, according to the borrowers' sworn bankruptcy filings. ***However, the borrowers' monthly debt payments were at least $4,537, more than the borrowers' monthly income***. The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, these borrowers could not afford to repay the loan.

This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

383.    The JPMAC 2006-NC2 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the JPMAC 2006-NC2 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the JPMAC 2006-NC2 Offering Documents represented that less than 43% of the loans supporting plaintiffs' JPMAC 2006-NC2 Certificate had LTV ratios over 80%, and that *none* of the loans supporting plaintiffs' JPMAC 2006-NC2 Certificate had LTV ratios over 100%.

384.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' JPMAC 2006-NC2 Certificate, which reveals that the LTV ratio percentages stated in the JPMAC 2006-NC2 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the LTV ratio percentages stated in the JPMAC 2006-NC2 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M2 | 46629FAF7 | All | 42.80% | 61.51% | 0.00% | 21.10% |

### c.    Owner Occupancy Rates

385.    The JPMAC 2006-NC2 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the JPMAC 2006-NC2 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the JPMAC 2006-NC2 Offering Documents represented that a large percentage of the loans supporting plaintiffs'

JPMAC 2006-NC2 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

386.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' JPMAC 2006-NC2 Certificate, which reveals that the OOR percentages stated in the JPMAC 2006-NC2 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the OOR percentages stated in the JPMAC 2006-NC2 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M2 | 46629FAF7 | All | 89.95% | 80.30% | 12.02% |

### d.    Credit Ratings

387.    The JPMAC 2006-NC2 Offering Documents also represented that the JPMAC 2006-NC2 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the JPMAC 2006-NC2 Offering Documents represented that plaintiffs' JPMAC 2006-NC2 Certificate had been assigned AA/Aa2 ratings – signifying an extremely safe and stable security.

388.    These representations, however, were false and misleading when made.  In truth, plaintiffs' JPMAC 2006-NC2 Certificate should not have received AA/Aa2 credit ratings, because it was *not* a safe, "investment grade" security.  Rather, as defendants were well aware, plaintiffs' JPMAC 2006-NC2 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P

and Moody's had assigned such high ratings to plaintiffs' JPMAC 2006-NC2 Certificate was because defendants had fed them falsified information regarding the JPMAC 2006-NC2 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

389.    The falsity of the credit ratings set forth in the JPMAC 2006-NC2 Offering Documents is confirmed by subsequent events.    Specifically, ***more than 43% of the loans supporting plaintiffs' JPMAC 2006-NC2 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, plaintiffs' "investment grade" JPMAC 2006-NC2 Certificate is now rated at "junk" status or below. Clearly, plaintiffs' JPMAC 2006-NC2 Certificate was not the highly rated, "investment grade" security defendants represented it to be.    The evidence supporting the falsity of the JPMAC 2006-NC2 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M2 | 46629FAF7 | All | 43.51% | Aa2 | C | AA | CC |

### e.    Transfer of Title

390.    The JPMAC 2006-NC2 Offering Documents also represented that the loans underlying the JPMAC 2006-NC2 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the JPMAC 2006-NC2 Offering Documents stated that "[p]ursuant to the Pooling Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment, Assumption and Recognition Agreement (including the

- 169 -

right to enforce the Originators' purchase obligations)." JPMAC 2006-NC2 Pros. Supp. at S-90.

The JPMAC 2006-NC2 Offering Documents also stated that "[i]n connection with such transfer and

assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee

or its custodian, among other things, the original promissory note . . . , the original instrument

creating a first or second lien on the related Mortgaged Property (the "Mortgage") . . . , an

assignment in recordable form of the Mortgage, all recorded intervening assignments of the

Mortgage and any modifications to such Mortgage Note and Mortgage." *Id.* These statements were

false and misleading. Defendants failed to legally and properly transfer the promissory notes and

security instruments to the trusts. *See* §VI.E, *infra*.

## 24.    The JPMAC 2006-RM1 Certificates

391.    The J.P. Morgan Mortgage Acquisition Trust 2006-RM1, Asset-Backed Pass Through

Certificates, Series 2006-RM1 ("JPMAC 2006-RM1 Certificates") were issued pursuant to a

Prospectus Supplement dated September 21, 2006. The following defendants played critical roles in

the fraudulent structuring, offering and sale of the JPMAC 2006-RM1 Certificates: JPMAC

(depositor); JPMMAC (sponsor); J.P. Morgan Securities (underwriter).

392.    Plaintiffs and/or their assignors purchased the following JPMAC 2006-RM1

Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|--------------------|-------------------|-------|---------------|----------------------|----------------|
| Kleros V | WestLB | M4 | 46629NAK9 | 9/21/2006 | $8,549,000 | J.P. Morgan Securities |

393.    The above purchase was made by WestLB's investment manager, Strategos, in direct

reliance upon the JPMAC 2006-RM1 Offering Documents, including draft and/or final JPMAC

2006-RM1 Prospectus Supplements. Strategos's diligent investment processes are described in great

detail in §VIII.B, *infra*.

a.    **Underwriting Guidelines**

394.    The JPMAC 2006-RM1 Offering Documents disclosed that 100% of the JPMAC 2006-RM1 Certificates' underlying loans were acquired by the sponsor, JPMMAC, from loan originator ResMAE.  *See* JPMAC 2006-RM1 Pros. Supp. at S-3, S-24.

395.    The JPMAC 2006-RM1 Offering Documents represented that the "underwriting standards of ResMAE are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan."  *Id.* at S-53.  The JPMAC 2006-RM1 Offering Documents also represented that "ResMAE considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio . . . as well as the value, type and use of the mortgaged property."  *Id.*  The JPMAC 2006-RM1 Offering Documents further represented that "[t]he underwriting guidelines of ResMAE . . . generally require an appraisal of the mortgaged property."  *Id.* at S-54.  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that ResMAE had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.15, *infra*.

396.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, a borrower obtained a loan for $237,600 in 2006 which was contained within the JPMAC 2006-RM1 offering.  This loan was originated through ResMAE, one of the originators identified in the Offering Documents.  This borrower had income in 2006 of $1,762 per month, according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $2,631,***

- 171 -

*far in excess of the borrower's monthly income*.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay the loan.  This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan, in 2007.

### b.    Loan-to-Value Ratios

397.    The JPMAC 2006-RM1 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the JPMAC 2006-RM1 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the JPMAC 2006-RM1 Offering Documents represented that less than 40% of the loans supporting plaintiffs' JPMAC 2006-RM1 Certificate had LTV ratios over 80%, and that **none** of the loans supporting plaintiffs' JPMAC 2006-RM1 Certificate had LTV ratios over 100%.

398.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' JPMAC 2006-RM1 Certificate, which reveals that the LTV ratio percentages stated in the JPMAC 2006-RM1 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the JPMAC 2006-RM1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M4 | 46629NAK9 | All | 37.03% | 56.83% | 0.00% | 15.13% |

### c.    Owner Occupancy Rates

399.    The JPMAC 2006-RM1 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the JPMAC 2006-RM1

- 172 -

Certificate purchased by plaintiffs and/or their assigning entities. Specifically, the JPMAC 2006-RM1 Offering Documents represented that a large percentage of the loans supporting plaintiffs' JPMAC 2006-RM1 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

400.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' JPMAC 2006-RM1 Certificate, which reveals that the OOR percentages stated in the JPMAC 2006-RM1 Offering Documents were materially false *at the time they were made*. The following chart summarizes the OOR percentages stated in the JPMAC 2006-RM1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M4 | 46629NAK9 | All | 95.77% | 86.53% | 10.67% |

### d.    Credit Ratings

401.    The JPMAC 2006-RM1 Offering Documents also represented that the JPMAC 2006-RM1 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default. Specifically, the JPMAC 2006-RM1 Offering Documents represented that plaintiffs' JPMAC 2006-RM1 Certificate had been assigned A+/A1 ratings – signifying an extremely safe and stable security.

402.    These representations, however, were false and misleading when made. In truth, plaintiffs' JPMAC 2006-RM1 Certificate should not have received A+/A1 credit ratings, because it was *not* a safe, "investment grade" security. Rather, as defendants were well aware, plaintiffs'

- 173 -

JPMAC 2006-RM1 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' JPMAC 2006-RM1 Certificate was because defendants had fed them falsified information regarding the JPMAC 2006-RM1 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

403.    The falsity of the credit ratings set forth in the JPMAC 2006-RM1 Offering Documents is confirmed by subsequent events.  Specifically, ***approximately 38% of the loans supporting plaintiffs' JPMAC 2006-RM1 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" JPMAC 2006-RM1 Certificate is now rated at "junk" status or below. Clearly, plaintiffs' JPMAC 2006-RM1 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The evidence supporting the falsity of the JPMAC 2006-RM1 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M4 | 46629NAK9 | All | 37.71% | A1 | WR | A+ | D |

e.    **Transfer of Title**

404.    The JPMAC 2006-RM1 Offering Documents also represented that the loans underlying the JPMAC 2006-RM1 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the JPMAC 2006-RM1 Offering Documents stated that "[p]ursuant to the Pooling Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise

- 174 -

convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage

Loans and its rights under the Assignment, Assumption and Recognition Agreement (including the

right to enforce the Originators' purchase obligations)." JPMAC 2006-RM1 Pros. Supp. at S-85.

The JPMAC 2006-RM1 Offering Documents also stated that "[i]n connection with such transfer and

assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee

or its custodian, among other things, the original promissory note (the "Mortgage Note") . . . , the

original instrument creating a first or second lien on the related Mortgaged Property (the

"Mortgage") . . . , an assignment in recordable form of the Mortgage, all recorded intervening

assignments of the Mortgage and any modifications to such Mortgage Note and Mortgage." *Id.*

These statements were false and misleading. Defendants failed to legally and properly transfer the

promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 25.    The JPMAC 2006-WMC3 Certificates

405.    The J.P. Morgan Mortgage Acquisition Trust 2006-WMC3, Asset-Backed Pass

Through Certificates, Series 2006-WMC3 ("JPMAC 2006-WMC3 Certificates") were issued

pursuant to a Prospectus Supplement dated August 22, 2006. The following defendants played

critical roles in the fraudulent structuring, offering and sale of the JPMAC 2006-WMC3 Certificates:

JPMAC (depositor); JPMMAC (sponsor); J.P. Morgan Securities (underwriter).

406.    Plaintiffs and/or their assignors purchased the following JPMAC 2006-WMC3

Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|-------------------|-------------------|-------|---------------|---------------------|----------------|
| Silver Elms II | Paradigm | M4 | 46629KAK5 | 8/22/2006 | $2,000,000 | J.P. Morgan Securities |
| Silver Elms II | Paradigm | M6 | 46629KAM1 | 8/22/2006 | $2,500,000 | J.P. Morgan Securities |

407.    Each of the above purchases was made by Paradigm's investment manager, Eiger, in direct reliance upon the JPMAC 2006-WMC3 Offering Documents, including draft and/or final JPMAC 2006-WMC3 Prospectus Supplements.  Eiger's diligent investment processes are described in great detail in §VIII.D, *infra*.

### a.    Underwriting Guidelines

408.    The JPMAC 2006-WMC3 Offering Documents disclosed that 100% of the JPMAC 2006-WMC3 Certificates' underlying loans were acquired by the sponsor, JPMMAC, from loan originator WMC Mortgage Corp. ("WMC").  *See* JPMAC 2006-WMC3 Pros. Supp. at S-3, S-24.

409.    The JPMAC 2006-WMC3 Offering Documents represented that WMC's underwriting guidelines "are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults."  *Id.* at S-52.  The JPMAC 2006-WMC3 Offering Documents also represented that "WMC verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the [debt-to-income ratio] to determine the applicant's ability to repay the loan." *Id.* at S-53.  The JPMAC 2006-WMC3 Offering Documents further represented that WMC's underwriting guidelines "requires, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice." *Id.*  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that WMC had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, *without* any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.4, *infra*.

- 176 -

410.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, a borrower obtained a loan for $330,400 in 2006 which was contained within the JPMAC 2006-WMC3 offering.  This loan was originated through WMC, one of the originators identified in the Offering Documents.  This borrower had income in 2006 of $1,203 per month, according to the borrower's sworn bankruptcy filings.  ***However, the borrower's monthly debt payments were at least $3,803, far in excess of the borrower's monthly income***.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan, in 2008.

### b.    Loan-to-Value Ratios

411.    The JPMAC 2006-WMC3 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the JPMAC 2006-WMC3 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the JPMAC 2006-WMC3 Offering Documents represented that less than 30% of the loans supporting plaintiffs' JPMAC 2006-WMC3 Certificates had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' JPMAC 2006-WMC3 Certificates had LTV ratios over 100%.

412.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' JPMAC 2006-WMC3 Certificates, which reveals that the LTV ratio percentages stated in the JPMAC 2006-WMC3 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the

JPMAC 2006-WMC3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M4 | 46629KAK5 | All | 27.30% | 63.37% | 0.00% | 17.75% |
| M6 | 46629KAM1 | All | 27.30% | 63.37% | 0.00% | 17.75% |

### c.    Owner Occupancy Rates

413.    The JPMAC 2006-WMC3 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the JPMAC 2006-WMC3 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the JPMAC 2006-WMC3 Offering Documents represented that a large percentage of the loans supporting plaintiffs' JPMAC 2006-WMC3 Certificates were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

414.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' JPMAC 2006-WMC3 Certificates, which reveals that the OOR percentages stated in the JPMAC 2006-WMC3 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the OOR percentages stated in the JPMAC 2006-WMC3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M4 | 46629KAK5 | All | 95.31% | 84.14% | 13.27% |
| M6 | 46629KAM1 | All | 95.31% | 84.14% | 13.27% |

- 178 -

### d.    Credit Ratings

415.    The JPMAC 2006-WMC3 Offering Documents also represented that the JPMAC 2006-WMC3 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.    Specifically, the JPMAC 2006-WMC3 Offering Documents represented that plaintiffs' JPMAC 2006-WMC3 Certificates had been assigned A+/A1 and A/A3 ratings – signifying extremely safe and stable securities.

416.    These representations, however, were false and misleading when made.    In truth, plaintiffs' JPMAC 2006-WMC3 Certificates should not have received A+/A1 and A-/A3 credit ratings, because they were *not* safe, "investment grade" securities.    Rather, as defendants were well aware, plaintiffs' JPMAC 2006-WMC3 Certificates were extremely risky, speculative grade "junk" bonds or worse, backed by low credit quality, extremely risky loans.    Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' JPMAC 2006-WMC3 Certificates was because defendants had fed them falsified information regarding the JPMAC 2006-WMC3 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

417.    The falsity of the credit ratings set forth in the JPMAC 2006-WMC3 Offering Documents is confirmed by subsequent events.    Specifically, ***more than 42% of the loans supporting plaintiffs' JPMAC 2006-WMC3 Certificates are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, plaintiffs' "investment grade" JPMAC 2006-WMC3 Certificates are now rated at "junk" status or below.    Clearly, plaintiffs' JPMAC 2006-WMC3 Certificates were not the highly rated, "investment grade" securities defendants represented them to be.    The evidence supporting the falsity of the

- 179 -

JPMAC 2006-WMC3 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M4 | 46629KAK5 | All | 42.65% | A1 | WR | A+ | D |
| M6 | 46629KAM1 | All | 42.65% | A3 | WR | A- | D |

### e.    Transfer of Title

418.    The JPMAC 2006-WMC3 Offering Documents also represented that the loans underlying the JPMAC 2006-WMC3 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the JPMAC 2006-WMC3 Offering Documents stated that "[p]ursuant to the Pooling Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment, Assumption and Recognition Agreement (including the right to enforce the Originators' purchase obligations)." JPMAC 2006-WMC3 Pros. Supp. at S-93. The JPMAC 2006-WMC3 Offering Documents also stated that "[i]n connection with such transfer and assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee or its custodian, among other things, the original promissory note (the "Mortgage Note") . . . , the original instrument creating a first or second lien on the related Mortgaged Property (the "Mortgage") . . . , an assignment in recordable form of the Mortgage, all recorded intervening assignments of the Mortgage and any modifications to such Mortgage Note and Mortgage." *Id.* These statements were false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

26.    **The JPMAC 2006-WMC4 Certificates**

419.    The J.P. Morgan Mortgage Acquisition Trust 2006-WMC4, Asset-Backed Pass

Through Certificates, Series 2006-WMC4 ("JPMAC 2006-WMC4 Certificates") were issued

pursuant to a Prospectus Supplement dated December 15, 2006.  The following defendants played

critical roles in the fraudulent structuring, offering and sale of the JPMAC 2006-WMC4 Certificates:

JPMAC (depositor); JPMMAC (sponsor); J.P. Morgan Securities (underwriter).

420.    Plaintiffs and/or their assignors purchased the following JPMAC 2006-WMC4

Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|--------------------|--------------------|-------|---------------|---------------------|----------------|
| Kleros V | WestLB | M6 | 46630BAM8 | 12/15/2006 | $10,224,000.00 | J.P. Morgan Securities |

421.    The above purchase was made by WestLB's investment manager, Strategos, in direct

reliance upon the JPMAC 2006-WMC4 Offering Documents, including draft and/or final JPMAC

2006-WMC4 Prospectus Supplements.  Strategos's diligent investment processes are described in

great detail in §VIII.B, *infra*.

a.    **Underwriting Guidelines**

422.    The JPMAC 2006-WMC4 Offering Documents disclosed that 100% of the JPMAC

2006-WMC4 Certificates' underlying loans were acquired by the sponsor, JPMMAC, from loan

originator WMC.  *See* JPMAC 2006-WMC4 Pros. Supp. at S-24.

423.    With regard to the WMC loans, the JPMAC 2006-WMC4 Offering Documents

represented that WMC's underwriting guidelines "are primarily intended to (a) determine that the

borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine

that the related mortgaged property will provide sufficient value to recover the investment if the

borrower defaults."  *Id.* at S-62-S-73.  The JPMAC 2006-WMC4 Offering Documents also

- 181 -

represented that "WMC verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the [debt-to-income ratio] to determine the applicant's ability to repay the loan." *Id.* The JPMAC 2006-WMC4 Offering Documents further represented that WMC's underwriting guidelines "require[s], among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that WMC had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.4, *infra*.

424.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, a husband and wife obtained a loan for $304,000 in 2006 which was contained within the JPMAC 2006-WMC4 Offering. The loan was originated through WMC, one of the loan originators identified in the Offering Documents. ***These borrowers had no income in 2006***, according to the borrowers' sworn bankruptcy filings. ***However, the borrowers' monthly debt payments were at least $4,717, far in excess of the borrowers' monthly income***. The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, these borrowers could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2008.

### b.    Loan-to-Value Ratios

425.    The JPMAC 2006-WMC4 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the JPMAC 2006-WMC4 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the JPMAC 2006-WMC4 Offering Documents represented that less than 30% of the loans supporting plaintiffs' JPMAC 2006-WMC4 Certificate had LTV ratios over 80%, and that **none** of the loans supporting plaintiffs' JPMAC 2006-WMC4 Certificate had LTV ratios over 100%.

426.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' JPMAC 2006-WMC4 Certificate, which reveals that the LTV ratio percentages stated in the JPMAC 2006-WMC4 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the LTV ratio percentages stated in the JPMAC 2006-WMC4 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M6 | 46630BAM8 | All | 28.88% | 61.13% | 0.00% | 18.35% |

### c.    Owner Occupancy Rates

427.    The JPMAC 2006-WMC4 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the JPMAC 2006-WMC4 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the JPMAC 2006-WMC4 Offering Documents represented that a large percentage of the loans supporting plaintiffs' JPMAC 2006-WMC4 Certificate were issued to borrowers that actually lived in the properties

- 183 -

serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

428.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' JPMAC 2006-WMC4 Certificate, which reveals that the OOR percentages stated in the JPMAC 2006-WMC4 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the OOR percentages stated in the JPMAC 2006-WMC4 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M6 | 46630BAM8 | All | 96.59% | 85.12% | 13.47% |

### d.    Credit Ratings

429.    The JPMAC 2006-WMC4 Offering Documents also represented that the JPMAC 2006-WMC4 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the JPMAC 2006-WMC4 Offering Documents represented that plaintiffs' JPMAC 2006-WMC4 Certificate had been assigned A/A3 ratings – signifying an extremely safe and stable security.

430.    These representations, however, were false and misleading when made.  In truth, plaintiffs' JPMAC 2006-WMC4 Certificate should not have received A/A3 credit ratings, because it was *not* a safe, "investment grade" security.  Rather, as defendants were well aware, plaintiffs' JPMAC 2006-WMC4 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' JPMAC 2006-WMC4 Certificate was

because defendants had fed them falsified information regarding the JPMAC 2006-WMC4 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

431.    The falsity of the credit ratings set forth in the JPMAC 2006-WMC4 Offering Documents is confirmed by subsequent events.    Specifically, ***more than 43% of the loans supporting plaintiffs' JPMAC 2006-WMC4 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, plaintiffs' "investment grade" JPMAC 2006-WMC4 Certificate is now rated at "junk" status or below.    Clearly, plaintiffs' JPMAC 2006-WMC4 Certificate was not the highly rated, "investment grade" security defendants represented it to be.    The evidence supporting the falsity of the JPMAC 2006-WMC4 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M6 | 46630BAM8 | All | 43.68% | A3 | WR | A | D |

### e.    Transfer of Title

432.    The JPMAC 2006-WMC4 Offering Documents also represented that the loans underlying the JPMAC 2006-WMC4 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the JPMAC 2006-WMC4 Offering Documents stated that "[p]ursuant to the Pooling Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment, Assumption and Recognition Agreement (including the right to enforce the Originators' repurchase obligations)."    *See* JPMAC 2006-WMC4 Pros. Supp. at

- 185 -

S-99-S-101.  The JPMAC 2006-WMC4 Offering Documents also stated that "[i]n connection with such transfer and assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee or its custodian, among other things, the original promissory note (the 'Mortgage Note') . . . , the original instrument creating a first or second lien on the related Mortgaged Property (the 'Mortgage') . . . ,  an assignment in recordable form of the Mortgage, all recorded intervening assignments of the Mortgage and any modifications to such Mortgage Note and Mortgage."  *Id.*  These statements were false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 27.    The JPMMT 2006-S4 Certificates

433.    The J.P. Morgan Mortgage Trust 2006-S4, Mortgage Pass-Through Certificates, Series 2006-S4 ("JPMMT 2006-S4 Certificates") were issued pursuant to a Prospectus Supplement dated December 21, 2006.  The following defendants played critical roles in the fraudulent structuring, offering and sale of the JPMMT 2006-S4 Certificates: JPMAC (depositor); JPMMAC (sponsor); J.P. Morgan Securities (underwriter).

434.    Plaintiffs and/or their assignors purchased the following JPMMT 2006-S4 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|-------------------|-------------------|-------|---------------|---------------------|----------------|
| Kleros V | Kleros | A4 | 46629SAD4 | 1/19/2007 | $8,417,000 | J.P. Morgan Securities |

435.    The above purchase was made by Kleros's investment manager, Strategos, in direct reliance upon the JPMMT 2006-S4 Offering Documents, including draft and/or final JPMMT 2006-S4 Prospectus Supplements.  Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.    Underwriting Guidelines

436.    The JPMMT 2006-S4 Offering Documents disclosed that approximately 20.98% of the JPMMT 2006-S4 Certificates' underlying loans were acquired by the sponsor, JPMMAC, from

loan originator American Home Mortgage Corp. ("AHM"); approximately 18.35% of the JPMMT

2006-S4 Certificates' underlying loans were acquired by the sponsor, JPMMAC, from loan

originator Flagstar; approximately 17.72% of the JPMMT 2006-S4 Certificates' underlying loans

were acquired by the sponsor, JPMMAC, from the Chase originators; approximately 15.20% of the

JPMMT 2006-S4 Certificates' underlying loans were acquired by the sponsor, JPMMAC, from loan

originator Indymac Bank, F.S.B. ("IndyMac"); and the remaining loans underlying the JPMMT

2006-S4 Certificates were acquired by the sponsor, JPMMAC from unnamed originators, none of

which "originated or acquired more than 10% of the mortgage loans." *See* JPMMT 2006-S4 Pros.

Supp. at S-5, S-25.

437.    With regard to the AHM loans, the JPMMT 2006-S4 Offering Documents

represented that AHM's "underwriting philosophy is to weigh all risk factors inherent in the loan

file, giving consideration to the individual transaction, borrower profile, the level of documentation

provided and the property used to collateralize the debt." *Id.* at S-28.  The JPMMT 2006-S4

Offering Documents also represented that AHM "underwrites a borrower's creditworthiness based

solely on information that [AHM] believes is indicative of the applicant's willingness and ability to

pay the debt they would be incurring." *Id.*  The JPMMT 2006-S4 Offering Documents also

represented that "[i]n addition to reviewing the borrower's credit history and credit score, the

Originator underwriters closely review the borrower's housing payment history." *Id.*  at S-29.  The

JPMMT 2006-S4 Offering Documents further represented:

> For manually underwritten loans, the underwriter must ensure that the borrower's
> income will support the total housing expense on an ongoing basis.  Underwriters
> may give consideration to borrowers who have demonstrated an ability to carry a
> similar or greater housing expense for an extended period.  In addition to the monthly
> housing expense, the underwriter must evaluate the borrower's ability to manage all
> recurring payments on all debts, including the monthly housing expense.  When
> evaluating the ratio of all monthly debt payments to the borrower's monthly income
> (debt-to-income ratio), the underwriter should be aware of the degree and frequency
> of credit usage and its impact on the borrower's ability to repay the loan.  For

864087_1

example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

*Id.* The JPMMT 2006-S4 Offering Documents further represented that "[e]very mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that AHM had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, **without** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.9, *infra*.

438.    With regard to the Flagstar, Chase and IndyMac loans, as well as the loans originated or acquired by unnamed originators, the JPMMT 2006-S4 Certificates represented that "[u]nderwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral." *See* JPMMT 2006-S4 Pros. Supp. at S-25. The JPMMT 2006-S4 Offering Documents also represented that "[b]ased on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses." *Id.* at S-26. The JPMMT 2006-S4 Offering Documents further represented that "[l]oans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion." *Id.* The JPMMT 2006-S4 Offering Documents further represented that "[t]he adequacy of the mortgaged property as security for

- 188 -

repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Flagstar, Chase, IndyMac and the unnamed originators had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §§VI.A.17 and VI.A.18, *infra*.

439.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, two borrowers obtained a loan for $768,000 in 2006 which was contained within the JPMMT 2006-S4 offering. These borrowers had income in 2006 of $4,220 per month, plus the borrowers took an IRA distribution of $65,390, according to the borrowers' sworn bankruptcy filings. Thus, the borrowers had a total of $9,669 per month with which to pay their debts and expenses. ***The borrowers' monthly debt payments were at least $7,589, plus the borrowers had monthly recurring expenses such as taxes, utilities, groceries, health care, transportation, and the like. The borrowers' DTI ratio was 78.5%. According to a prominent Wall Street investment bank, a "DTI [ratio] . . . beyond 50% leav[es] little for the borrower to pay other expenses," demonstrating that these borrowers, with a DTI ratio of 78.5% could not afford to repay the loan***. This is confirmed by the fact that the borrowers declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

440.    The JPMMT 2006-S4 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the JPMMT 2006-S4 Certificate

purchased by plaintiffs and/or their assigning entities.  Specifically, the JPMMT 2006-S4 Offering

Documents represented that only a very small percentage of the loans supporting plaintiffs' JPMMT

2006-S4 Certificate had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs'

JPMMT 2006-S4 Certificate had LTV ratios over 100%.

      441.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis

on the actual loans underlying plaintiffs' JPMMT 2006-S4 Certificate, which reveals that the LTV

ratio percentages stated in the JPMMT 2006-S4 Offering Documents were materially false ***at the***

***time they were made***.  The following chart summarizes the LTV ratio percentages stated in the

JPMMT 2006-S4 Offering Documents, and the actual percentages that should have been stated

according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| A4 | 46629SAD4 | All | 2.34% | 43.16% | 0.00% | 14.75% |

### c.    Owner Occupancy Rates

      442.    The JPMMT 2006-S4 Offering Documents also made certain misrepresentations

regarding the OOR percentages associated with the loans supporting the JPMMT 2006-S4

Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the JPMMT 2006-S4

Offering Documents represented that a large percentage of the loans supporting plaintiffs' JPMMT

2006-S4 Certificate were issued to borrowers that actually lived in the properties serving as

collateral for their loans, significantly decreasing the likelihood that those borrowers would default

on their loans.

      443.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers,

loans and properties underlying plaintiffs' JPMMT 2006-S4 Certificate, which reveals that the OOR

percentages stated in the JPMMT 2006-S4 Offering Documents were materially false *at the time they were made*. The following chart summarizes the OOR percentages stated in the JPMMT 2006-S4 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| A4 | 46629SAD4 | All | 91.71% | 82.06% | 11.76% |

### d.    Credit Ratings

444.    The JPMMT 2006-S4 Offering Documents also represented that the JPMMT 2006-S4 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default. Specifically, the JPMMT 2006-S4 Offering Documents represented that plaintiffs' JPMMT 2006-S4 Certificate had been assigned AAA/Aa1 ratings – signifying that they were extremely stable and safe securities.

445.    These representations, however, were false and misleading when made. In truth, plaintiffs' JPMMT 2006-S4 Certificate should not have received AAA/Aa1 credit ratings, because it was *not* a safe, "investment grade" security. Rather, as defendants were well aware, plaintiffs' JPMMT 2006-S4 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' JPMMT 2006-S4 Certificate was because defendants had fed them falsified information regarding the JPMMT 2006-S4 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

- 191 -

446.    The falsity of the credit ratings set forth in the JPMMT 2006-S4 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 18% of the loans supporting plaintiffs' JPMMT 2006-S4 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" JPMMT 2006-S4 Certificate is now rated at "junk" status or below.  Clearly, plaintiffs' JPMMT 2006-S4 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The evidence supporting the falsity of the JPMMT 2006-S4 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| A4 | 46629SAD4 | All | 18.44% | Aa1 | C | AAA | D |

### e.    Transfer of Title

447.    The JPMMT 2006-S4 Offering Documents also represented that the loans underlying the JPMMT 2006-S4 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the JPMMT 2006-S4 Offering Documents stated that "[p]ursuant to the Pooling and Servicing Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Issuing Entity, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations)."  JPMMT 2006-S4 Pros. Supp. at S-24.  The JPMMT 2006-S4 Offering Documents also stated that "the depositor, or the seller of the related loans to the depositor, will be required to deliver or cause to be delivered to the trustee or to the trustee's custodian as to each mortgage loan or home equity loan, among other things: (1) the mortgage note . . . ; (2) the mortgage, deed of trust or similar instrument . . . , (3) an assignment of the mortgage to the trustee

- 192 -

. . . ; [and] (4) the other security instruments." *See* JPPMT 2006-S4 Prospectus at 62-63. These statements were false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 28.    The CARR 2006-NC3 Certificates

448.    The Carrington Mortgage Loan Trust, Series 2006-NC3, Asset-Backed Pass-Through Certificates ("CARR 2006-NC3 Certificates") were issued pursuant to a Prospectus Supplement dated August 7, 2006. The following defendant played a critical role in the fraudulent structuring, offering and sale of the CARR 2006-NC3 Certificates: Bear Stearns Co. (underwriter).

449.    Plaintiffs and/or their assignors purchased the following CARR 2006-NC3 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Kleros V | WestLB | M4 | 144528AH9 | 8/2/2006 | $12,000,000 | Bear Stearns Co. |

450.    The above purchase was made by WestLB's investment manager, Strategos, in direct reliance upon the CARR 2006-NC3 Offering Documents, including draft and/or final CARR 2006-NC3 Prospectus Supplements. Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.    Underwriting Guidelines

451.    The CARR 2006-NC3 Offering Documents disclosed that 100% of the CARR 2006-NC3 Certificates' underlying loans were acquired by the sponsor, Carrington Securities, LP, from loan originators New Century and Home123 Corporation ("Home123"). *See* CARR 2006-NC3 Pros. Supp. at S-75.

452.    The CARR 2006-NC3 Offering Documents represented that the New Century and Home123 loans were originated pursuant to "underwriting guidelines [that] are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged

property and to evaluate the adequacy of the property as collateral for the mortgage loan," and that "[w]hile the originators' primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originators also consider, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property." *Id.* The CARR 2006-NC3 Offering Documents also represented that:

> Under each of the programs, the originator reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property. In determining the ability of the applicant to repay the loan, a qualifying rate has been created under the underwriting guidelines that generally is equal to the interest rate on that loan.

*Id.* at S-76. The CARR 2006-NC3 Offering Documents further represented that "[m]ortgaged properties that are to secure mortgage loans are appraised by qualified independent appraisers." *Id*. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that New Century and Home123 had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.2, *infra*.

453.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a loan for $560,000 in 2006 which was contained within the CARR 2006-NC3 offering. The loan was originated by New Century, one of the loan originators identified in the Offering Documents. This borrower had income in 2006 of $2,416 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least***

- 194 -

*$6,238, far in excess of the borrower's monthly income*. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2006, and again, in 2007.

### b.    Loan-to-Value Ratios

454.    The CARR 2006-NC3 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the CARR 2006-NC3 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the CARR 2006-NC3 Offering Documents represented that less than 40% of the loans supporting plaintiffs' CARR 2006-NC3 Certificate had LTV ratios over 80%, and that *none* of the loans supporting plaintiffs' CARR 2006-NC3  Certificate had LTV ratios over 100%.

455.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' CARR 2006-NC3  Certificate, which reveals that the LTV ratio percentages stated in the CARR 2006-NC3 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the LTV ratio percentages stated in the CARR 2006-NC3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M4 | 144528AH9 | All | 38.07% | 57.64% | 0.00% | 13.96% |

### c.    Owner Occupancy Rates

456.    The CARR 2006-NC3 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the CARR 2006-NC3 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the CARR 2006-NC3 Offering Documents represented that a large percentage of the loans supporting plaintiffs' CARR 2006-NC3 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

457.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' CARR 2006-NC3 Certificate, which reveals that the OOR percentages stated in the CARR 2006-NC3 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the OOR percentages stated in the CARR 2006-NC3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M4 | 144528AH9 | All | 92.22% | 75.05% | 22.88% |

### d.    Credit Ratings

458.    The CARR 2006-NC3 Offering Documents also represented that the CARR 2006-NC3 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the CARR 2006-NC3 Offering Documents represented that plaintiffs' CARR 2006-NC3 Certificate had been assigned A+/A1 ratings – signifying an extremely safe and stable security.

- 196 -

459.    These representations, however, were false and misleading when made.  In truth, plaintiffs' CARR 2006-NC3 Certificate should not have received A+/A1 credit ratings, because it was *not* a safe, "investment grade" security.  Rather, as defendants were well aware, plaintiffs' CARR 2006-NC3 Certificate was an extremely risky, speculative grade "junk" bond, or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' CARR 2006-NC3 Certificate was because defendants had fed them falsified information regarding the CARR 2006-NC3 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

460.    The falsity of the credit ratings set forth in the CARR 2006-NC3 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 40% of the loans supporting plaintiffs' CARR 2006-NC3 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" CARR 2006-NC3  Certificate is now rated "junk" status or below.  Clearly, plaintiffs' CARR 2006-NC3 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The evidence supporting the falsity of the CARR 2006-NC3 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M4 | 144528AH9 | All | 40.45% | A1 | WR | A+ | D |

### e.    Transfer of Title

461.    The CARR 2006-NC3 Offering Documents also represented that the loans underlying the CARR 2006-NC3 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the

- 197 -

CARR 2006-NC3 Offering Documents stated "[t]he pooling and servicing agreement provides that the depositor assigns to the trustee for the benefit of the certificateholders without recourse all the right, title and interest of the depositor in and to the mortgage loans." *See* CARR 2006-NC3 Pros. Supp. at S-35. The CARR 2006-NC3 Offering Documents also represented that "[i]n addition, except as described in the accompanying prospectus supplement, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, a set of legal documents relating to each mortgage loan that are in possession of the depositor, including: the mortgage note . . . ; the mortgage . . . ; [and] an assignment in recordable form of the mortgage." *See* CARR 2006-NC3 Prospectus at 28. These statements were false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 29.    The CARR 2006-NC5 Certificates

462.    The Carrington Mortgage Loan Trust, Series 2006-NC5, Asset-Backed Pass-Through Certificates ("CARR 2006-NC5 Certificates") were issued pursuant to a Prospectus Supplement dated December 14, 2006. The following defendant played a critical role in the fraudulent structuring, offering and sale of the CARR 2006-NC5 Certificates: J.P. Morgan Securities (underwriter).

463.    Plaintiffs and/or their assignors purchased the following CARR 2006-NC5 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Kleros V | Kleros V | M1 | 144539AF0 | 5/9/2007 | $309,000 | Lehman Bros. |

464.    The above purchase was made by Kleros V's investment manager, Strategos, in direct reliance upon the CARR 2006-NC5 Offering Documents, including draft and/or final CARR 2006-

NC5 Prospectus Supplements. Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.    Underwriting Guidelines

465.    The CARR 2006-NC5 Offering Documents disclosed that 100% of the CARR 2006-NC5 Certificates' underlying loans were acquired by the sponsor, Carrington Securities, LP, from loan originators New Century and Home123. *See* CARR 2006-NC5 Pros. Supp. at S-79.

466.    The CARR 2006-NC5 Offering Documents represented that all of the CARR 2006-NC5 Certificates' underlying loans were originated pursuant to "underwriting guidelines [that] are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan," and that "[w]hile the originators' primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originators also consider, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property." *Id.* at S-80. The CARR 2006-NC5 Offering Documents also represented that "[m]ortgaged properties that are to secure mortgage loans are appraised by qualified independent appraisers." *Id.* The CARR 2006-NC5 Offering Documents further represented:

> Under each of the programs, the originator reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property. In determining the ability of the applicant to repay the loan, a qualifying rate has been created under the underwriting guidelines that generally is equal to the interest rate on that loan.

*Id.* at S-81. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that New Century and Home123 had completely abandoned their stated underwriting guidelines and were

- 199 -

simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.2, *infra*.

467.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, one borrower obtained a loan for $497,250 in 2006 which was contained within the CARR 2006-NC5 offering. The loan was originated by New Century, one of the loan originators identified in the Offering Documents. This borrower had income in 2006 of $7,775 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $12,065, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

468.    The CARR 2006-NC5 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the CARR 2006-NC5 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the CARR 2006-NC5 Offering Documents represented that less than 45% of the loans supporting plaintiffs' CARR 2006-NC5 Certificate had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' CARR 2006-NC5 Certificate had LTV ratios over 100%.

469.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' CARR 2006-NC5 Certificate, which reveals that the LTV

ratio percentages stated in the CARR 2006-NC5 Offering Documents were materially false *at the time they were made*. The following chart summarizes the LTV ratio percentages stated in the CARR 2006-NC5 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M1 | 144539AF0 | All | 43.83% | 59.75% | 0.00% | 17.29% |

### c.    Owner Occupancy Rates

470.    The CARR 2006-NC5 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the CARR 2006-NC5 Certificate purchased by plaintiffs and/or their assigning entities. Specifically, the CARR 2006-NC5 Offering Documents represented that a large percentage of the loans supporting plaintiffs' CARR 2006-NC5 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

471.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' CARR 2006-NC5 Certificate, which reveals that the OOR percentages stated in the CARR 2006-NC5 Offering Documents were materially false *at the time they were made*. The following chart summarizes the OOR percentages stated in the CARR 2006-NC5 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M1 | 144539AF0 | All | 90.62% | 82.05% | 10.45% |

### d.    Credit Ratings

472.    The CARR 2006-NC5 Offering Documents also represented that the CARR 2006-NC5 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P & Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default. Specifically, the CARR 2006-NC5 Offering Documents represented that plaintiffs' CARR 2006-NC5 Certificate had been assigned AA+/Aaa1 ratings – signifying an extremely safe and stable security.

473.    These representations, however, were false and misleading when made. In truth, plaintiffs' CARR 2006-NC5 Certificate should not have received AA+/Aa1 credit ratings, because it was *not* a safe, "investment grade" security. Rather, as defendants were well aware, plaintiffs' CARR 2006-NC5 Certificate was an extremely risky, speculative grade "junk" bond, or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' CARR 2006-NC5 Certificate was because defendants had fed them falsified information regarding the CARR 2006-NC5 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

474.    The falsity of the credit ratings set forth in the CARR 2006-NC5 Offering Documents is confirmed by subsequent events. Specifically, ***more than 43% of the loans supporting plaintiffs' CARR 2006-NC5 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them. Moreover, plaintiffs' "investment grade" CARR 2006-NC5 Certificate is now rated at "junk" status or below. Clearly, plaintiffs'

- 202 -

CARR 2006-NC5 Certificate was not the highly rated, "investment grade" security defendants

represented it to be.  The evidence supporting the falsity of the CARR 2006-NC5 Certificate's credit

ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M1 | 144539AF0 | All | 43.26% | Aa1 | C | AA+ | CC |

### e.    Transfer of Title

475.    The CARR 2006-NC5 Offering Documents also represented that the loans underlying

the CARR 2006-NC5 Certificates would be timely transferred to the issuing trust, so that the trust

would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the

CARR 2006-NC5 Offering Documents stated "[t]he pooling and servicing agreement provides that

the depositor assigns to the trustee for the benefit of the certificateholders without recourse all the

right, title and interest of the depositor in and to the mortgage loans."  *See* CARR 2006-NC5  Pros.

Supp. at S-35.  The CARR 2006-NC5 Offering Documents also represented that "[i]n addition,

except as described in the accompanying prospectus supplement, the depositor will, as to each

mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee,

or to the custodian, a set of legal documents relating to each mortgage loan that are in possession of

the depositor, including: the mortgage note . . . ; the mortgage . . . ; [and] an assignment in

recordable form of the mortgage."  *See* CARR 2006-NC5 Prospectus at 28.  These statements were

false and misleading.  Defendants failed to legally and properly transfer the promissory notes and

security instruments to the trusts.  *See* §VI.E, *infra*.

### 30.    The CARR 2007-FRE1 Certificates

476.    The Carrington Mortgage Loan Trust, Series 2007-FRE1, Asset-Backed Pass-

Through Certificates ("CARR 2007-FRE1 Certificates") were issued pursuant to a Prospectus

Supplement dated April 4, 2007. The following defendant played a critical role in the fraudulent structuring, offering and sale of the CARR 2007-FRE1 Certificates: J.P. Morgan Securities (underwriter).

477. Plaintiffs and/or their assignors purchased the following CARR 2007-FRE1 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Silver Elms I | Silver Elms I | M2 | 144527AF5 | 4/5/2007 | $5,178,000 | J.P. Morgan Securities |
| Kleros V | Kleros V | M3 | 144527AG3 | 5/22/2007 | $200,000 | J.P. Morgan Securities |

478. Each of the above purchases was made by Kleros V's investment manager, Strategos, and Silver Elms I's investment manager, Princeton Advisory Group, Inc. ("Princeton"), in direct reliance upon the CARR 2007-FRE1 Offering Documents, including draft and/or final CARR 2007-FRE1 Prospectus Supplements. Strategos's and Princeton's diligent investment processes are described in great detail in §§VIII.B and VIII.D, *infra*.

### a.    Underwriting Guidelines

479. The CARR 2007-FRE1 Offering Documents disclosed that 100% of the CARR 2007-FRE1 Certificates' underlying loans were acquired by the sponsor, Carrington Securities, LP, from loan originator Fremont Investment & Loan ("Fremont"). *See* CARR 2007-FRE1 Pros. Supp. at S-87.

480. The CARR 2007-FRE1 Offering Documents represented that Fremont's "underwriting guidelines were primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan," and "assessed the risk of default by using credit scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on

- 204 -

bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment." *Id.* The CARR 2007-FRE1 Offering Documents also represented that "Fremont's underwriting guidelines . . . required an appraisal of the mortgaged property, and if appropriate, a review appraisal." *Id*. at S-89. The CARR 2007-FRE1 Offering Documents further represented: "Fremont's underwriting guidelines under the Scored Programs with respect to each rating category generally required: debt to income ratios of 55% or less on mortgage loans with loan-to-value ratios of 95% or less, however, debt to income ratios of 50% or less are required on loan-to-value ratios greater than 95% . . . ." *Id.* at S-90. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Fremont had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.5, *infra*.

481.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a loan for $452,500 in 2006 which was contained within the CARR 2007-FRE1 offering. The loan was originated through Fremont, the loan originator identified in the Offering Documents. This borrower had income in 2006 of $2,148 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $3,489, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is

confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

482.    The CARR 2007-FRE1 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the CARR 2007-FRE1 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the CARR 2007-FRE1 Offering Documents represented that less than 40% of the loans supporting plaintiffs' CARR 2007-FRE1 Certificates had LTV ratios over 80%, and that *none* of the loans supporting plaintiffs' CARR 2007-FRE1 Certificates had LTV ratios over 100%.

483.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' CARR 2007-FRE1 Certificates, which reveals that the LTV ratio percentages stated in the CARR 2007-FRE1 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the LTV ratio percentages stated in the CARR 2007-FRE1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M2 | 144527AF5 | All | 39.95% | 62.33% | 0.00% | 18.43% |
| M3 | 144527AG3 | All | 39.95% | 62.33% | 0.00% | 18.43% |

### c.    Owner Occupancy Rates

484.    The CARR 2007-FRE1 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the CARR 2007-FRE1 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the CARR 2007-FRE1 Offering Documents represented that a large percentage of the loans supporting plaintiffs'

CARR 2007-FRE1 Certificates were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

485.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' CARR 2007-FRE1 Certificates, which reveals that the OOR percentages stated in the CARR 2007-FRE1 Offering Documents were materially false **at the time they were made**.  The following chart summarizes the Primary Residence Percentages stated in the CARR 2007-FRE1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M2 | 144527AF5 | All | 93.97% | 86.66% | 8.43% |
| M3 | 144527AG3 | All | 93.97% | 86.66% | 8.43% |

### d.    Credit Ratings

486.    The CARR 2007-FRE1 Offering Documents also represented that the CARR 2007-FRE1 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.  Specifically, the CARR 2007-FRE1 Offering Documents represented that plaintiffs' CARR 2007-FRE1 Certificates had been assigned AA/Aa2 and AA-/Aa3 ratings – signifying extremely safe and stable securities.

487.    These representations, however, were false and misleading when made.  In truth, plaintiffs' CARR 2007-FRE1 Certificates should not have received AA/Aa2 and AA-/Aa3 credit ratings, because they were **not** safe, "investment grade" securities.  Rather, as defendants were well aware, plaintiffs' CARR 2007-FRE1 Certificates were extremely risky, speculative grade "junk"

bonds, or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' CARR 2007-FRE1 Certificates was because defendants had fed them falsified information regarding the CARR 2007-FRE1 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

488.    The falsity of the credit ratings set forth in the CARR 2007-FRE1 Offering Documents is confirmed by subsequent events. Specifically, ***approximately 55% of the loans supporting plaintiffs' CARR 2007-FRE1 Certificates are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them. Moreover, each of plaintiffs' "investment grade" CARR 2007-FRE1 Certificates is now rated at "junk" status or below. Clearly, plaintiffs' CARR 2007-FRE1 Certificates were not the highly rated, "investment grade" securities defendants represented them to be. The evidence supporting the falsity of the CARR 2007-FRE1 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| M2 | 144527AF5 | All | 54.75% | Aa2 | C | AA | CCC |
| M3 | 144527AG3 | All | 54.75% | Aa3 | C | AA- | CC |

### e.    Transfer of Title

489.    The CARR 2007-FRE1 Offering Documents also represented that the loans underlying the CARR 2007-FRE1 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the CARR 2007-FRE1 Offering Documents stated "[t]he pooling and servicing

864087_1

agreement provides that the depositor assigns to the trustee for the benefit of the certificateholders without recourse all the right, title and interest of the depositor in and to the mortgage loans." *See* CARR 2007-FRE1 Pros. Supp. at S-38. The CARR 2007-FRE1 Offering Documents also represented that "[i]n addition, except as described in the accompanying prospectus supplement, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, a set of legal documents relating to each mortgage loan that are in possession of the depositor, including: the mortgage note . . . ; the mortgage . . . ; [and] an assignment in recordable form of the mortgage." *See* CARR 2007-FRE1 Prospectus at 28. These statements were false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 31.    The IMM 2005-6 Certificates

490.    The Impac CMB Trust Series 2005-6, Collateralized Asset-Backed Bonds, Series 2005-6 ("IMM 2005-6 Certificates") were issued pursuant to a Prospectus Supplement dated September 8, 2005. The following defendant played a critical role in the fraudulent structuring, offering and sale of the IMM 2005-6 Certificates: Bear Stearns Co. (underwriter).

491.    Plaintiffs and/or their assignors purchased the following IMM 2005-6 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Blue Heron II | Blue Heron II | 1A1 | 45254NQG5 | 9/2/2005 | $11,000,000 | Merrill Lynch |
| Blue Heron IX | Blue Heron IX | 1A1 | 45254NQG5 | 9/2/2005 | $24,000,000 | Merrill Lynch |
| Blue Heron V | Blue Heron V | 1A1 | 45254NQG5 | 9/2/2005 | $20,000,000 | Merrill Lynch |

492.    Each of the above purchases was made by Blue Heron II's, Blue Heron IX's and Blue Heron V's investment manager, Brightwater, in direct reliance upon the IMM 2005-6 Offering

- 209 -

Documents, including draft and/or final IMM 2005-6 Prospectus Supplements.  Brightwater's

diligent investment processes are described in great detail in §VIII.A, *infra*.

### a.    Underwriting Guidelines

493.    The IMM 2005-6 Offering Documents disclosed that approximately 13.71% of the

IMM 2005-6 Certificates' "sample" underlying loans in Loan Group 1 were originated or acquired

by the seller, Impac, and "were underwritten pursuant to, or in accordance with, the standards of the

Seller's Progressive Series Program"; approximately 1.20% of the IMM 2005-6 Certificates'

"sample" underlying loans in Loan Group 1 were originated or acquired by the seller, Impac, and

"were underwritten pursuant to, or in accordance with, the standards of the Progressive Express™

Program"; approximately 85.04% of the IMM 2005-6 Certificates' "sample" underlying loans in

Loan Group 1 were acquired by the seller, Impac, "in bulk purchases from third-party originators,"

whose underwriting standards "are generally similar to the underwriting standards of the Seller"; and

approximately 24% of the IMM 2005-6 Certificates' "sample" underlying loans in Loan Group 1

were acquired by the seller, Impac, from loan originator Finance America, LLC ("Finance

America").  *See* IMM 2005-6 Pros. Supp. at S-59, S-72.

494.    With regard to the Impac loans, the IMM 2005-6 Offering Documents represented

that "[t]he underwriting guidelines utilized in the Progressive Series Program, as developed by the

Seller, are intended to assess the borrower's ability and willingness to repay the mortgage loan

obligation and to assess the adequacy of the mortgaged property as collateral for the mortgage loan."

*Id.* at S-60.  The IMM 2005-6 Offering Documents also represented that "[t]he concept of the

Progressive Express™ Program is to underwrite the loan focusing on the borrower's Credit Score,

ability and willingness to repay the mortgage loan obligation, and assess the adequacy of the

mortgaged property as collateral for the loan."  *Id.* at S-65.  The IMM 2005-6 Offering Documents

further represented that "[w]ith respect to the Seller's Progressive Series Program or Progressive

- 210 -

Express™ Program in general one full appraisal is required on each loan." *Id*. at S-60.  The IMM

2005-6 Offering Documents further represented that "the debt service-to income ratios" are required

to be "within the range of 45% to 60% calculated on the basis of monthly income and depending on

the loan-to-value ratio of the mortgage loan" in connection with most of the Progressive Series

Program and are "not to exceed 50%" "[f]or loans that exceed a 97% loan-to-value ratio to a

maximum of a 100% loan-to-value ratio," in connection with the Progressive Express Program. *Id.*

at S-61, S-65.  As further detailed *infra*, these representations were false and misleading at the time

they were made.  Contrary to defendants' affirmative representations, the truth was that Impac had

completely abandoned its stated underwriting guidelines and was simply seeking to originate as

many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true

value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.8, *infra*.

495.    With regard to the Finance America loans, the IMM 2005-6 Offering Documents

represented that, under the underwriting guidelines, "Finance America's risk-scoring process begins

with the risk matrix and utilizes three key risk factors that drive performance to develop a base risk

score.  The three key loan factors are mortgage pay history, the borrower's Credit Bureau Score . . .

and loan-to-value," and that "[a]dditional risk factors include . . . CLTV greater than 95%, debt-to-

income percentages greater than 45% or 50%, cash out, no previous mortgage history and various

bankruptcy history."  IMM 2005-6 Pros. Supp. at S-72.  The IMM 2005-6 Offering Documents also

represented that "[t]he applicant's past and present payment history, employment and income, assets,

liabilities and property value are all factors considered during the underwriting review process." *Id.*

at S-73.  The IMM 2005-6 Offering Documents further represented that "Finance America's

guidelines are applied in accordance with a procedure that generally requires an appraisal of the

Mortgaged Property that conforms to Fannie Mae and Freddie Mac standards." *Id*. at S-75.  As

further detailed *infra*, these representations were false and misleading at the time they were made.

864087_1

Contrary to defendants' affirmative representations, the truth was that Finance America had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, **without** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.1, *infra*.

496.    With regard to all of the IMM 2005-6 Certificates' underlying loans, the IMM 2005-6 Offering Documents represented that "[t]he mortgage loans will have been originated or acquired by the Seller in accordance with the underwriting criteria described in [the] prospectus supplement." *See* IMM 2005-6 Pros. Supp. at S-2, S-59 (citing the underwriting guidelines for the Impac and Finance America loans). With regard to all the loans, the IMM 2005-6 also represented that "[t]he underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan." *See* IMM 2005-6 Prospectus at 10. The IMM 2005-6 Offering Documents also represented:

> The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the loan-to-value ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations.

*Id.* The IMM 2005-6 Offering Documents further represented that "[m]ortgaged properties generally will be appraised by licensed appraisers." *Id.* at 11. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Impac, Finance America and the "third-party originators" had completely abandoned their stated underwriting guidelines and were simply seeking to originate as

many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.1, *infra*.

497.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, one borrower obtained a loan for $416,000 in 2005 which was contained within the IMM 2005-6 offering.  The loan was originated through Finance America, one of the loan originators identified in the Offering Documents. This borrower had income in 2005 of $2,922 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $4,251, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2006.

### b.    Loan-to-Value Ratios

498.    The IMM 2005-6 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the IMM 2005-6 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the IMM 2005-6 Offering Documents represented that less than 20% of the loans supporting plaintiffs' IMM 2005-6 Certificates had LTV ratios over 80%, and that almost ***none*** of the loans supporting plaintiffs' IMM 2005-6 Certificates had LTV ratios over 100%.

499.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' IMM 2005-6 Certificates, which reveals that the LTV ratio percentages stated in the IMM 2005-6 Offering Documents were materially false ***at the time they***

*were made*.  The following chart summarizes the LTV ratio percentages stated in the IMM 2005-6

Offering Documents, and the actual percentages that should have been stated according to plaintiffs'

industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 1A1 | 45254NQG5 | Group I | 16.84% | 38.78% | 0.004% | 8.25% |

### c.    Owner Occupancy Rates

500.    The IMM 2005-6 Offering Documents also made certain misrepresentations

regarding the OOR percentages associated with the loans supporting the IMM 2005-6 Certificates

purchased by plaintiffs and/or their assigning entities.  Specifically, the IMM 2005-6 Offering

Documents represented that a large percentage of the loans supporting plaintiffs' IMM 2005-6

Certificates were issued to borrowers that actually lived in the properties serving as collateral for

their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

501.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers,

loans and properties underlying plaintiffs' IMM 2005-6 Certificates, which reveals that the OOR

percentages stated in the IMM 2005-6 Offering Documents were materially false *at the time they*

*were made*.  The following chart summarizes the Primary Residence Percentages stated in the IMM

2005-6 Offering Documents, and the actual percentages that should have been stated according to

plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 1A1 | 45254NQG5 | Group I | 84.77% | 74.83% | 13.29% |

- 214 -

#### d.    Credit Ratings

502.    The IMM 2005-6 Offering Documents also represented that the IMM 2005-6 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.    Specifically, the IMM 2005-6 Offering Documents represented that plaintiffs' IMM 2005-6 Certificates had been assigned AAA/Aaa ratings – the highest, safest credit ratings available, which are in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.

503.    These representations, however, were false and misleading when made.    In truth, plaintiffs' IMM 2005-6 Certificates should not have received AAA/Aaa credit ratings, because they were **not** safe, "investment grade" securities with "a less than 1% probability of incurring defaults." Rather, as defendants were well aware, plaintiffs' IMM 2005-6 Certificates were extremely risky, speculative grade "junk" bonds backed by low credit quality, extremely risky loans.    Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' IMM 2005-6 Certificates was because defendants had fed them falsified information regarding the IMM 2005-6 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

504.    The falsity of the credit ratings set forth in the IMM 2005-6 Offering Documents is confirmed by subsequent events.    Specifically, ***more than 24% of the loans supporting plaintiffs' IMM 2005-6 Certificates are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, each of plaintiffs' "investment grade" IMM 2005-6 Certificates is now rated at "junk" status.    Clearly, plaintiffs' IMM 2005-6 Certificates were not the highly rated, "investment grade" securities defendants represented them to

864087_1

be.  The evidence supporting the falsity of the IMM 2005-6 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 1A1 | 45254NQG5 | Group I | 24.32% | Aaa | Caa2 | AAA | CC |

### e.    Transfer of Title

505.    The IMM 2005-6 Offering Documents also represented that the loans underlying the IMM 2005-6 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the IMM 2005-6 Offering Documents stated "[t]he company [depositor] will convey the mortgage loans to the trust on the Closing Date pursuant to the Trust Agreement."  *See* IMM 2005-6  Pros. Supp. at S-25.  The IMM 2005-6 Offering Documents further stated that "[i]n addition, the company will, as to each mortgage loan, other than mortgage loans underlying any mortgage securities and other than Contracts, deliver, or cause to be delivered, to the related trustee (or to the custodian described below) the following documents: the mortgage note endorsed, without recourse, either in blank or to the order of the trustee (or its nominee), the mortgage . . . , an assignment of the mortgage in blank or to the trustee (or its nominee) . . . , [and] any intervening assignments of the mortgage."  *See* IMM 2005-6 Prospectus at 29.  These statements were false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 32.    The IMSA 2006-1 Certificates

506.    The Impac Secured Assets Corp. Mortgage Pass-Through Certificates, Series 2006-1 ("IMSA 2006-1 Certificates") were issued pursuant to a Prospectus Supplement dated March 29, 2006.  The following defendant played a critical role in the fraudulent structuring, offering and sale of the IMSA 2006-1 Certificates: Bear Stearns Co. (underwriter).

507.    Plaintiffs and/or their assignors purchased the following IMSA 2006-1 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Phoenix | Harrier | 1A2B | 45254TTL8 | 3/29/2006 | $75,706,000 | Bear Stearns Co. |
| Silver Elms | Paradigm | 1A2C | 45254TTM6 | 3/29/2006 | $4,999,999 | Bear Stearns Co. |

508.    Each of the above purchases was made by Harrier's investment manager, Brightwater, and Paradigm's investment manager, SFA, in direct reliance upon the IMSA 2006-1 Offering Documents, including draft and/or final IMSA 2006-1 Prospectus Supplements. Brightwater's and SFA's diligent investment processes are described in great detail in §§VIII.A and VIII.C, *infra*.

### a.    Underwriting Guidelines

509.    The IMSA 2006-1 Offering Documents disclosed that approximately 80.64% of the IMSA 2006-1 Certificates' "sample" underlying loans in Loan Group 1 were originated or acquired by the sponsor, Impac, and "were underwritten pursuant to, or in accordance with, the standards of the Originator's Progressive Series Program"; approximately 19.36% of the IMSA 2006-1 Certificates' "sample" underlying loans in Loan Group 1 were originated or acquired by the sponsor, Impac, and "were underwritten pursuant to, or in accordance with, the standards of the Progressive Express™ Program"; approximately 7.79% of the IMSA 2006-1 Certificates' "sample" underlying loans in Loan Group 1 were acquired by the seller, Impac, "in bulk purchases from third-party originators," whose underwriting standards "are generally similar to the underwriting standards of the Seller." *See* IMSA 2006-1 Pros. Supp. at S-84.

510.    With regard to the Impac loans, the IMSA 2006-1 Offering Documents represented that "[t]he underwriting guidelines utilized in the Progressive Series Program, as developed by the Originator, are intended to assess the borrower's ability and willingness to repay the mortgage loan

obligation and to assess the adequacy of the mortgaged property as collateral for the mortgage loan."
*Id.* at S-86.  The IMSA 2006-1 Offering Documents also represented that "[t]he concept of the
Progressive Express™ Program is to underwrite the loan focusing on the borrower's Credit Score,
ability and willingness to repay the mortgage loan obligation, and assess the adequacy of the
mortgaged property as collateral for the loan." *Id.* at S-91.  The IMSA 2006-1 Offering Documents
further represented that "[w]ith respect to the Originator's Progressive Series Program or Progressive
Express™ Program in general one full appraisal is required on each loan." *Id*. at S-85.  The IMM
2005-6 Offering Documents further represented that "the debt-to-service-to income ratio" is required
to be "within the range of 45% to 60% calculated on the basis of monthly income and depending on
the loan-to-value ratio of the mortgage loan" in connection with most Progressive Series Program
and is "not to exceed 50%" "[f]or loans that exceed a 97% loan to value ratio to a maximum of a
100% loan to value ratio" in connection with the Progressive Express Program. *Id.* at S-86, S-91.
As further detailed *infra*, these representations were false and misleading at the time they were made.
Contrary to defendants' affirmative representations, the truth was that Impac had completely
abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as
possible, ***without*** any regard for borrowers' actual repayment ability or the true value and adequacy
of the mortgaged properties to serve as collateral. *See* §VI.A.8, *infra*.

511.    With regard to all of the IMSA 2006-1 underlying loans, the IMSA 2006-1 Offering
Documents represented that "[t]he mortgage loans will have been originated or acquired by the
Sponsor in accordance with the underwriting criteria described in [the IMSA 2006-1] prospectus
supplement." *See* IMSA 2006-1 Pros. Supp. at S-26, S-84 (citing the underwriting guidelines for the
Impac loans).  With regard to all of the loans, the IMSA 2006-1 Offering Documents represented
that "[t]he underwriting standards to be used in originating the mortgage loans are primarily intended
to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the

adequacy of the property as collateral for the mortgage loan." *See* IMSA 2006-1 Prospectus at 11.

The IMSA 2006-1 Offering Documents also represented:

> The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the loan-to-value ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations.

*Id*. The IMSA 2006-1 Offering Documents further represented that "[m]ortgaged properties generally will be appraised by licensed appraisers." *Id.* at 12. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Impac and the "third-party originators" had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, *without* any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.8, *infra*.

512.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a loan for $636,000 in 2006 which was contained within the IMSA 2006-1 offering. The loan was originated through Impac, the loan originator identified in the Offering Documents. This borrower had income in 2006 of $3,000 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $12,333, far in excess of the borrower's monthly income***. This borrower therefore had a DTI ratio of over 411%. The borrower's monthly debt payments were in addition to the borrower's monthly expenses

for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

513.    The IMSA 2006-1 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the IMSA 2006-1 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the IMSA 2006-1 Offering Documents represented that only a small percentage of the loans supporting plaintiffs' IMSA 2006-1 Certificates had LTV ratios over 80%, and that *none* of the loans supporting plaintiffs' IMSA 2006-1 Certificates had LTV ratios over 100%.

514.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' IMSA 2006-1 Certificates, which reveals that the LTV ratio percentages stated in the IMSA 2006-1 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the LTV ratio percentages stated in the IMSA 2006-1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 1A2B | 45254TTL8 | Group I-A-2 | 12.34% | 40.26% | 0.00% | 9.11% |
| 1A2C | 45254TTM6 | Group I-A-2 | 12.34% | 40.26% | 0.00% | 9.11% |

### c.    Owner Occupancy Rates

515.    The IMSA 2006-1 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the IMSA 2006-1 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the IMSA 2006-1 Offering

Documents represented that a large percentage of the loans supporting plaintiffs' IMSA 2006-1 Certificates were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

516.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' IMSA 2006-1 Certificates, which reveals that the OOR percentages stated in the IMSA 2006-1 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the Primary Residence Percentages stated in the IMSA 2006-1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 1A2B | 45254TTL8 | Group I-A-2 | 69.50% | 57.48% | 20.90% |
| 1A2C | 45254TTM6 | Group I-A-2 | 69.50% | 57.48% | 20.90% |

### d.    Credit Ratings

517.    The IMSA 2006-1 Offering Documents also represented that the IMSA 2006-1 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.  Specifically, the IMSA 2006-1 Offering Documents represented that plaintiffs' IMSA 2006-1 Certificates had each been assigned AAA/Aaa ratings – the highest, safest credit ratings available, which are in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.

518.    These representations, however, were false and misleading when made.  In truth, plaintiffs' IMSA 2006-1 Certificates should not have received AAA/Aaa credit ratings, because they were ***not*** safe, "investment grade" securities with "a less than 1% probability of incurring defaults."

864087_1

Rather, as defendants were well aware, plaintiffs' IMSA 2006-1 Certificates were extremely risky, speculative grade "junk" bonds, or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' IMSA 2006-1 Certificates was because defendants had fed them falsified information regarding the IMSA 2006-1 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

519.    The falsity of the credit ratings set forth in the IMSA 2006-1 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 27% of the loans supporting plaintiffs' IMSA 2006-1 Certificates are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, each of plaintiffs' "investment grade" IMSA 2006-1 Certificates is now rated at "junk" status or below.  Clearly, plaintiffs' IMSA 2006-1 Certificates were not the highly rated, "investment grade" securities defendants represented them to be.  The evidence supporting the falsity of the IMSA 2006-1 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 1A2B | 45254TTL8 | Group I-A-2 | 27.56%[17] | Aaa | Caa3 | AAA | D |
| 1A2C | 45254TTM6 | Group I-A-2 | 27.56% | Aaa | Caa3 | AAA | D |

---

[17]    The default rate stated herein represents the delinquency rate for group I loans.  The IMSA 2006-1 May 2013 trustee report does not have the delinquency rate for the IMSA 2006-1 Certificates' group I-A-2 loans.

864087_1

e.      **Transfer of Title**

520.      The IMSA 2006-1 Offering Documents also represented that the loans underlying the

IMSA 2006-1 Certificates would be timely transferred to the issuing trust, so that the trust would

obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the IMSA

2006-1 Offering Documents stated "[t]he Sponsor will convey the mortgage loans to the Depositor

on the Closing Date pursuant to the Mortgage Loan Purchase Agreement and the Depositor will

convey the mortgage loans to the trust on the Closing Date pursuant to the Agreement." *See* IMSA

2006-1 Pros. Supp. at S-26.  The IMSA 2006-1 Offering Documents also stated that "[t]he Depositor

will deliver to the Trustee with respect to each mortgage loan (1) the mortgage note endorsed

without recourse to the Trustee to reflect the transfer of the mortgage loan, (2) the original mortgage

with evidence of recording indicated thereon and (3) an assignment of the mortgage in recordable

form to the Trustee, reflecting the transfer of the mortgage loan." *Id.* at S-155.  These statements

were false and misleading.  Defendants failed to legally and properly transfer the promissory notes

and security instruments to the trusts.  *See* §VI.E, *infra*.

## 33.      The IMSA 2006-4 Certificates

521.      The Impac Secured Assets Corp. Mortgage Pass-Through Certificates, Series 2006-4

("IMSA 2006-4 Certificates") were issued pursuant to a Prospectus Supplement dated November 15,

2006.  The following defendant played a critical role in the fraudulent structuring, offering and sale

of the IMSA 2006-4 Certificates: Bear Stearns Co. (underwriter).

522.      Plaintiffs and/or their assignors purchased the following IMSA 2006-4 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Phoenix | WestLB | A2C | 45257BAD2 | 11/16/2006 | $30,000,000 | Bear Stearns Co. |
| Silver Elms II | WestLB | M5 | 45257BAK6 | 11/3/2006 | $1,925,000 | Bear Stearns Co. |
| Silver Elms II | WestLB | M6 | 45257BAL4 | 11/3/2006 | $1,750,000 | Bear Stearns Co. |

523.    Each of the above purchases was made by WestLB's investment managers, DCP and Eiger, in direct reliance upon the IMSA 2006-4 Offering Documents, including draft and/or final IMSA 2006-4 Prospectus Supplements.  DCP's and Eiger's diligent investment processes are described in great detail in §§VIII.E and VIII.D, *infra*.

### a.    Underwriting Guidelines

524.    The IMSA 2006-4 Offering Documents disclosed that approximately 80% of the IMSA 2006-4 Certificates' underlying loans were originated or acquired by the sponsor, Impac, and "were underwritten pursuant to, or in accordance with, the standards of Impac Funding's Progressive Series Program and Progressive Express™ Program," or "were acquired in a bulk purchase from a third-party originator, the underwriting standards of whom . . . are generally similar to the underwriting standards of the Seller"; approximately 30% of the IMSA 2006-4 Certificates' underlying loans were acquired by the sponsor, Impac, from loan originator AHM; and approximately 5% of the IMSA 2006-4 Certificates' underlying loans were acquired by the sponsor, Impac, from loan originator GMAC Mortgage, LLC ("GMAC").  *See* IMSA 2006-4 Pros. Supp. at S-40-S-41.

525.    With regard to the loans originated or acquired by the sponsor, Impac, the IMSA 2006-4 Offering Documents represented that "[t]he underwriting guidelines utilized in the Progressive Series Program, as developed by Impac Funding, are intended to assess the borrower's ability and willingness to repay the mortgage loan obligation and to assess the adequacy of the

- 224 -

mortgaged property as collateral for the mortgage loan." *Id.* at S-42. The IMSA 2006-4 Offering

Documents also represented that "[t]he concept of the Progressive Express™ Program is to

underwrite the loan focusing on the borrower's Credit Score, ability and willingness to repay the

mortgage loan obligation, and assess the adequacy of the mortgaged property as collateral for the

loan." *Id.* at S-47. The IMSA 2006-4 Offering Documents further represented that "[w]ith respect

to Impac Funding's Progressive Series Program or Progressive Express™ Program in general one

full appraisal is required on each loan." *Id.* at S-41. The IMSA 2006-4 Offering Documents further

represented that "the debt service to income ratios" are required to be "within the range of 45% to

60% calculated on the basis of monthly income and depending on the loan to value ratio of the

mortgage loan" in connection with most Progressive Series Program. *Id.* at S-42. As further

detailed *infra*, these representations were false and misleading at the time they were made. Contrary

to defendants' affirmative representations, the truth was that Impac had completely abandoned its

stated underwriting guidelines and was simply seeking to originate as many loans as possible,

***without*** any regard for borrowers' actual repayment ability or the true value and adequacy of the

mortgaged properties to serve as collateral. *See* §VI.A.8, *infra*.

526.    With regard to the AHM loans, the IMSA 2006-4 Offering Documents represented

that "[AHM's] underwriting philosophy is to weigh all risk factors inherent in the loan file, giving

consideration to the individual transaction, borrower profile, the level of documentation provided

and the property used to collateralize the debt," and that "[AHM] underwrites a borrower's

creditworthiness based solely on information that [AHM] believes is indicative of the applicant's

willingness and ability to pay the debt they would be incurring." *See* IMSA 2006-4 Pros. Supp. at S-

52. The IMSA 2006-4 Offering Documents also represented that "[e]very mortgage loan is secured

by a property that has been appraised by a licensed appraiser." *Id.* at S-53. The IMSA 2006-4

Offering Documents further represented that "[i]n addition to reviewing the borrower's credit history

and credit score, [AHM] underwriters closely review the borrower's housing payment history." *Id.*

The IMSA 2006-1 Offering Documents further represented:

> For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

*Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that AHM had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.9, *infra*.

527.    With regard to all of the loans underlying the IMSA 2006-4 Certificates, the IMSA 2006-4 Offering Documents represented that "[t]he mortgage loans will have been originated or acquired by the Sponsor in accordance with the underwriting criteria described in [the IMSA 2006-4] prospectus supplement." *See* IMSA 2006-4 Pros. Supp. at S-20 (citing the underwriting guidelines for the Impac and AHM loans). With regard to all of the IMSA 2006-4 Certificates' underlying loans, the IMSA 2006-4 Offering Documents represented that "[t]he underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan." *See* IMSA 2006-4 Prospectus at 11. The IMSA 2006-4 Offering Documents also represented:

> The primary considerations in underwriting a mortgage loan are the mortgagor's
> employment stability and whether the mortgagor has sufficient monthly income
> available (1) to meet the mortgagor's monthly obligations on the proposed mortgage
> loan (generally determined on the basis of the monthly payments due in the year of
> origination) and other expenses related to the home (including property taxes and
> hazard insurance) and (2) to meet monthly housing expenses and other financial
> obligations and monthly living expenses.  However, the loan-to-value ratio of the
> mortgage loan is another critical factor.  In addition, mortgagor's credit history and
> repayment ability, as well as the type and use of the mortgaged property, are also
> considerations.

*Id.* at 12.  the IMSA 2006-4 Offering Documents further represented that "[m]ortgaged properties generally will be appraised by licensed appraisers."  *Id.* at 13.  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that GMAC, Impac, AHM and the third-party originators had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, *without* any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §§VI.A.8 and VI.A.9, *infra*.

528.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, one borrower obtained a loan for $340,000 in 2006 which was contained within the IMSA 2006-4 offering.  This borrower had income in 2006 of $2,900 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $3,635, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is

- 227 -

confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.      Loan-to-Value Ratios

529.     The IMSA 2006-4 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the IMSA 2006-4 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the IMSA 2006-4 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs' IMSA 2006-4 Certificates had LTV ratios over 80%, and that **none** of the loans supporting plaintiffs' IMSA 2006-4 Certificates had LTV ratios over 100%.

530.     Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' IMSA 2006-4 Certificates, which reveals that the LTV ratio percentages stated in the IMSA 2006-4 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the IMSA 2006-4 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| A2C | 45257BAD2 | All | 5.41% | 38.35% | 0.00% | 6.80% |
| M5 | 45257BAK6 | All | 5.41% | 38.35% | 0.00% | 6.80% |
| M6 | 45257BAL4 | All | 5.41% | 38.35% | 0.00% | 6.80% |

### c.      Owner Occupancy Rates

531.     The IMSA 2006-4 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the IMSA 2006-4 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the IMSA 2006-4 Offering

Documents represented that a large percentage of the loans supporting plaintiffs' IMSA 2006-4 Certificates were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

532.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' IMSA 2006-4 Certificates, which reveals that the OOR percentages stated in the IMSA 2006-4 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the Primary Residence Percentages stated in the IMSA 2006-4 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| A2C | 45257BAD2 | All | 78.05% | 65.93% | 18.38% |
| M5 | 45257BAK6 | All | 78.05% | 65.93% | 18.38% |
| M6 | 45257BAL4 | All | 78.05% | 65.93% | 18.38% |

### d.    Credit Ratings

533.    The IMSA 2006-4 Offering Documents also represented that the IMSA 2006-4 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.    Specifically, the IMSA 2006-4 Offering Documents represented that plaintiffs' IMSA 2006-4 Certificates had been assigned AAA/Aaa, A+/A2 and A/A3 ratings – signifying extremely safe and stable securities.

534.    These representations, however, were false and misleading when made.    In truth, plaintiffs' IMSA 2006-4 Certificates should not have received AAA/Aaa, A+/A2 and A/A3 credit ratings, because they were *not* safe, "investment grade" securities.  Rather, as defendants were well

864087_1

aware, plaintiffs' IMSA 2006-4 Certificates were extremely risky, speculative grade "junk" bonds, or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' IMSA 2006-4 Certificates was because defendants had fed them falsified information regarding the IMSA 2006-4 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

535.    The falsity of the credit ratings set forth in the IMSA 2006-4 Offering Documents is confirmed by subsequent events. Specifically, *approximately 34% of the loans supporting plaintiffs' IMSA 2006-4 Certificates are currently in default* because they were made to borrowers who either could not afford them or never intended to repay them. Moreover, after initially being rated as "investment grade," plaintiffs' IMSA 2006-4 Certificates are now rated at "junk" status or no longer rated at all. Clearly, plaintiffs' IMSA 2006-4 Certificates were not the highly rated, "investment grade" securities defendants represented them to be. The evidence supporting the falsity of the IMSA 2006-4 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| A2C | 45257BAD2 | All | 33.89% | Aaa | Ca | AAA | NR |
| M5 | 45257BAK6 | All | 33.89% | A2 | WR | A+ | NR |
| M6 | 45257BAL4 | All | 33.89% | A3 | WR | A | NR |

### e.    Transfer of Title

536.    The IMSA 2006-4 Offering Documents also represented that the loans underlying the IMSA 2006-4 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the IMSA

- 230 -

2006-4 Offering Documents stated "[t]he Sponsor will convey the mortgage loans to the depositor on the Closing Date pursuant to the Mortgage Loan Purchase Agreement and the depositor will convey the mortgage loans to the Issuing Entity on the Closing Date pursuant to the Agreement." *See* IMSA 2006-4 Pros. Supp. at S-20. The IMSA 2006-4 Offering Documents further stated that "[t]he Depositor will deliver to the Trustee with respect to each mortgage loan (1) the mortgage note endorsed without recourse to the Trustee to reflect the transfer of the mortgage loan, (2) the original mortgage with evidence of recording indicated thereon and (3) an assignment of the mortgage in recordable form to the Trustee, reflecting the transfer of the mortgage loan." *Id.* at S-110. These statements were false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 34. The IMSA 2006-5 Certificates

537. The Impac Secured Assets Corp. Mortgage Pass-Through Certificates, Series 2006-5 ("IMSA 2006-5 Certificates") were issued pursuant to a Prospectus Supplement dated December 20, 2006. The following defendant played a critical role in the fraudulent structuring, offering and sale of the IMSA 2006-5 Certificates: Bear Stearns Co. (underwriter).

538. Plaintiffs and/or their assignors purchased the following IMSA 2006-5 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|-------------------|-------------------|-------|---------------|----------------------|----------------|
| Phoenix | Kestrel | 1M2 | 45257EAG9 | 12/20/2006 | $4,570,000 | Bear Stearns Co. |
| Phoenix | Kestrel | 1M3 | 45257EAH7 | 12/20/2006 | $1,400,000 | Bear Stearns Co. |

539. Each of the above purchases was made by Kestrel's investment manager, Brightwater, in direct reliance upon the IMSA 2006-5 Offering Documents, including draft and/or final IMSA 2006-5 Prospectus Supplements. Brightwater's diligent investment processes are described in great detail in §VIII.A, *infra*.

- 231 -

###### a.    Underwriting Guidelines

540.    The IMSA 2006-5 Offering Documents disclosed that approximately 60.56% of the

IMSA 2006-5 Certificates' "statistical Group 1" underlying loans were originated or acquired by the

sponsor, Impac; approximately 29.66% of the IMSA 2006-5 Certificates' "statistical Group 1"

underlying loans were acquired by the sponsor, Impac, from loan originator AHM; the remainder of

the IMSA 2006-5 Certificates' "statistical Group 1" underlying loans were originated or acquired by

the sponsor, Impac, from "various originators," including, but not limited to, GMAC, "none of

which have originated more than 10% of the statistical mortgage loans in Loan Group 1"; and all of

the IMSA 2006-5 certificates' "statistical Group 2" underlying loans were acquired by Impac from

loan originator IMPAC Commercial Capital Corporation ("ICCC").  *See* IMSA 2006-5 Pros. Supp.

at S-60-S-61, S-71.

541.    With regard to the loans originated or acquired by the sponsor, Impac, the IMSA

2006-5 Offering Documents represented that "[a]pproximately 80.63% of the mortgage loans in

Loan Group 1 were underwritten pursuant to, or in accordance with, the standards of Impac

Funding's Progressive Series Program and Progressive Express™ Program," or "were acquired in a

bulk purchase from a third-party originator, the underwriting standards of whom were reviewed for

acceptability by the Master Servicer and are generally similar to the underwriting standards of the

Seller."  *Id.* at S-61.  The IMSA 2006-5 Offering Documents also represented that "[t]he

underwriting guidelines utilized in the Progressive Series Program, as developed by Impac Funding,

are intended to assess the borrower's ability and willingness to repay the mortgage loan obligation

and to assess the adequacy of the mortgaged property as collateral for the mortgage loan."  *Id.* at S-

62.  The IMSA 2006-5 Offering Documents further represented that "[t]he concept of the

Progressive Express™ Program is to underwrite the loan focusing on the borrower's Credit Score,

ability and willingness to repay the mortgage loan obligation, and assess the adequacy of the

- 232 -

mortgaged property as collateral for the loan." *Id.* at S-67-S-68.  The IMSA 2006-5 Offering

Documents also represented that "[w]ith respect to Impac Funding's Progressive Series Program or

Progressive Express™ Program in general one full appraisal is required on each loan." *Id*. at S-62.

The IMSA 2006-5 Offering Documents further represented that the "debt service to income ratios"

are required to be "within the range of 45% to 60% calculated on the basis of monthly income and

depending on the loan to value ratio of the mortgage loan" in connection with most Progressive

Series Program loans. *Id.* at S-63.  As further detailed *infra*, these representations were false and

misleading at the time they were made.  Contrary to defendants' affirmative representations, the

truth was that Impac had completely abandoned its stated underwriting guidelines and was simply

seeking to originate as many loans as possible, **without** any regard for the borrowers' actual

repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.

*See* §VI.A.8, *infra*.

542.    With regard to the AHM loans, the IMSA 2006-5 Offering Documents represented

that "[AHM]'s underwriting philosophy is to weigh all risk factors inherent in the loan file, giving

consideration to the individual transaction, borrower profile, the level of documentation provided

and the property used to collateralize the debt," and that "[AHM] underwrites a borrower's

creditworthiness based solely on information that [AHM] believes is indicative of the applicant's

willingness and ability to pay the debt they would be incurring." *See* IMSA 2006-5 Pros. Supp. at S-

82*.*  The IMSA 2006-5 Offering Documents also represented:

> For manually underwritten loans, the underwriter must ensure that the borrower's
> income will support the total housing expense on an ongoing basis.  Underwriters
> may give consideration to borrowers who have demonstrated an ability to carry a
> similar or greater housing expense for an extended period.  In addition to the monthly
> housing expense, the underwriter must evaluate the borrower's ability to manage all
> recurring payments on all debts, including the monthly housing expense. When
> evaluating the ratio of all monthly debt payments to the borrower's monthly income
> (debt-to-income ratio), the underwriter should be aware of the degree and frequency
> of credit usage and its impact on the borrower's ability to repay the loan.  For

- 233 -

> example, borrowers who lower their total obligations should receive favorable
> consideration and borrowers with a history of heavy usage and a pattern of slow or
> late payments should receive less flexibility.

*Id.* at S-83. The IMSA 2006-5 Offering Documents further represented that "[e]very mortgage loan

is secured by a property that has been appraised by a licensed appraiser." *Id.* As further detailed

*infra*, these representations were false and misleading at the time they were made. Contrary to

defendants' affirmative representations, the truth was that AHM had completely abandoned its stated

underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any

regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged

properties to serve as collateral. *See* §VI.A.9, *infra*.

543.    With regard to all of the loans underlying the IMSA 2006-5 Certificates, the IMSA

2006-5 Offering Documents represented that "[t]he mortgage loans will have been originated or

acquired by the Sponsor in accordance with the underwriting criteria described in [the IMSA 2006-

5] prospectus supplement." *See* IMSA 2006-5 Pros. Supp. at S-28 (citing the underwriting standards

for the Impac loans). With regard to all of the IMSA 2005-6 Certificates' underlying loans, the

IMSA 2005-6 Offering Documents represented that "[t]he underwriting standards to be used in

originating the mortgage loans are primarily intended to assess the creditworthiness of the

mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the

mortgage loan." *See* IMSA 2006-5 Prospectus at 10. The IMSA 2006-5 Offering Documents also

represented:

> The primary considerations in underwriting a mortgage loan are the
> mortgagor's employment stability and whether the mortgagor has sufficient monthly
> income available (1) to meet the mortgagor's monthly obligations on the proposed
> mortgage loan (generally determined on the basis of the monthly payments due in the
> year of origination) and other expenses related to the home (including property taxes
> and hazard insurance) and (2) to meet monthly housing expenses and other financial
> obligations and monthly living expenses. However, the loan-to-value ratio of the
> mortgage loan is another critical factor. In addition, a mortgagor's credit history and

- 234 -

repayment ability, as well as the type and use of the mortgaged property, are also considerations.

*Id*.  The IMSA 2006-5 Offering Documents further represented that "[m]ortgaged properties generally will be appraised by licensed appraisers."  *Id.* at 11.  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that Impac, GMAC, AHM, the "various originators" and ICCC had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §§VI.A.8 and VI.A.9, *infra*.

544.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, one borrower obtained a loan for $302,400 in 2006 which was contained within the IMSA 2006-5 Offering. This borrower had joint (with his wife) income in 2006 of $6,516 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $19,580, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy after obtaining the loan at issue, in 2008.

### b.    Loan-to-Value Ratios

545.    The IMSA 2006-5 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the IMSA 2006-5 Certificates

purchased by plaintiffs and/or their assigning entities. Specifically, the IMSA 2006-5 Offering

Documents represented that only a very small percentage of the loans supporting plaintiffs' IMSA

2006-5 Certificates had LTV ratios over 80%, and that **none** of the loans supporting plaintiffs'

IMSA 2006-5 Certificates had LTV ratios over 100%.

546.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis

on the actual loans underlying plaintiffs' IMSA 2006-5 Certificates, which reveals that the LTV ratio

percentages stated in the IMSA 2006-5 Offering Documents were materially false ***at the time they***

***were made***. The following chart summarizes the LTV ratio percentages stated in the IMSA 2006-5

Offering Documents, and the actual percentages that should have been stated according to plaintiffs'

industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 1M2 | 45257EAG9 | All | 5.46% | 40.16% | 0.00% | 7.54% |
| 1M3 | 45257EAH7 | All | 5.46% | 40.16% | 0.00% | 7.54% |

### c.    Owner Occupancy Rates

547.    The IMSA 2006-5 Offering Documents also made certain misrepresentations

regarding the OOR percentages associated with the loans supporting the IMSA 2006-5 Certificates

purchased by plaintiffs and/or their assigning entities. Specifically, the IMSA 2006-5 Offering

Documents represented that a large percentage of the loans supporting plaintiffs' IMSA 2006-5

Certificates were issued to borrowers that actually lived in the properties serving as collateral for

their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

548.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers,

loans and properties underlying plaintiffs' IMSA 2006-5 Certificates, which reveals that the OOR

percentages stated in the IMSA 2006-5 Offering Documents were materially false ***at the time they***

*were made*.  The following chart summarizes the Primary Residence Percentages stated in the IMSA 2006-5 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 1M2 | 45257EAG9 | All | 59.08% | 54.51% | 8.38% |
| 1M3 | 45257EAH7 | All | 59.08% | 54.51% | 8.38% |

### d.    Credit Ratings

549.    The IMSA 2006-5 Offering Documents also represented that the IMSA 2006-5 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.   Specifically, the IMSA 2006-5 Offering Documents represented that plaintiffs' IMSA 2006-5 Certificates had been assigned AA+/Aa2 and AA/Aa3 ratings – signifying extremely safe and stable securities.

550.    These representations, however, were false and misleading when made.  In truth, plaintiffs' IMSA 2006-5 Certificates should not have received AA+/Aa2 and AA/Aa3 credit ratings, because they were *not* safe, "investment grade" securities.  Rather, as defendants were well aware, plaintiffs' IMSA 2006-5 Certificates were extremely risky, speculative grade "junk" bonds, or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' IMSA 2006-5 Certificates was because defendants had fed them falsified information regarding the IMSA 2006-5 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

- 237 -

551.    The falsity of the credit ratings set forth in the IMSA 2006-5 Offering Documents is confirmed by subsequent events.    Specifically, ***approximately 25% of the loans supporting plaintiffs' IMSA 2006-5 Certificates are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, each of plaintiffs' "investment grade" IMSA 2006-5 Certificates is now rated at "junk" status or below.    Clearly, plaintiffs' IMSA 2006-5 Certificates were not the highly rated, "investment grade" securities defendants represented them to be.    The evidence supporting the falsity of the IMSA 2006-5 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 1M2 | 45257EAG9 | All | 24.90% | Aa2 | WR | AA+ | D |
| 1M3 | 45257EAH7 | All | 24.90% | Aa3 | WR | AA | D |

### e.    Transfer of Title

552.    The IMSA 2006-5 Offering Documents also represented that the loans underlying the IMSA 2006-5 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.    Specifically, the IMSA 2006-5 Offering Documents stated "the Depositor will convey the mortgage loans to the Issuing Entity [*i.e*., the Trustee] on the Closing Date pursuant to the Agreement."    *See* IMSA 2006-5  Pros. Supp. at S-28.    The IMSA 2006-5 Offering Documents further stated that "[t]he Depositor will deliver to the Trustee with respect to each mortgage loan (1) the mortgage note endorsed without recourse to the Trustee to reflect the transfer of the mortgage loan, (2) the original mortgage with evidence of recording indicated thereon and (3) an assignment of the mortgage in recordable form to the Trustee, reflecting the transfer of the mortgage loan."    *Id.* at S-163.    These statements were false

- 238 -

and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 35.    The IMSA 2007-2 Certificates

553.    The Impac Secured Assets Corp. Mortgage Pass-Through Certificates, Series 2007-2 ("IMSA 2007-2 Certificates") were issued pursuant to a Prospectus Supplement dated March 29, 2007.  The following defendant played a critical role in the fraudulent structuring, offering and sale of the IMSA 2007-2 Certificates: Bear Stearns Co. (underwriter).

554.    Plaintiffs and/or their assignors purchased the following IMSA 2007-2 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|--------------------|--------------------|-------|----------------|-----------------------|-----------------|
| Phoenix | Harrier | 1A1B | 452570AB0 | 3/27/2007 | $40,000,000 | Bear Stearns Co. |

555.    The above purchase was made by Harrier's investment manager, Brightwater, in direct reliance upon the IMSA 2007-2 Offering Documents, including draft and/or final IMSA 2007-2 Prospectus Supplements.  Brightwater's diligent investment processes are described in great detail in §VIII.A, *infra*.

### a.    Underwriting Guidelines

556.    The IMSA 2007-2 Offering Documents disclosed that "[s]ubstantially all" of the IMSA 2007-2 Certificates' underlying loans in "statistical Group 1" were originated or acquired by the sponsor, Impac, and "were underwritten pursuant to, or in accordance with, the standards of Impac Funding's Progressive Series Program and Progressive Express™ Program," or "were acquired in a bulk purchase from a third-party originator, the underwriting standards of whom . . . are generally similar to the underwriting standards of the Seller"; and  "[t]he remainder of the statistical mortgage loans in Loan Group 1 were originated or acquired by various originators, none of which have originated more than 10% of the statistical mortgage loans in Loan Group 1."  *See* IMSA 2007-2 Pros. Supp. at S-66.

- 239 -

557.    With regard to the loans originated or acquired by the sponsor, Impac, the IMSA 2007-2 Offering Documents represented that "[t]he underwriting guidelines utilized in the Progressive Series Program, as developed by Impac Funding, are intended to assess the borrower's ability and willingness to repay the mortgage loan obligation and to assess the adequacy of the mortgaged property as collateral for the mortgage loan." *Id.* at S-67.  The IMSA 2007-2 Offering Documents also represented that "[t]he concept of the Progressive Express™ Program is to underwrite the loan focusing on the borrower's Credit Score, ability and willingness to repay the mortgage loan obligation, and assess the adequacy of the mortgaged property as collateral for the loan." *Id.* at S-73.  The IMSA 2007-2 Offering Documents further represented that "[w]ith respect to Impac Funding's Progressive Series Program or Progressive Express™ Program in general one full appraisal is required on each loan." *Id*. at S-67.  The IMSA 2007-2 Offering Documents further represented that the "debt service to income ratios" are required to be "within the range of 45% to 60% calculated on the basis of monthly income and depending on the loan to value ratio of the mortgage loan" in connection with the Progressive Series Program.  *Id.*  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that Impac had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.8, *infra*.

558.    With regard to all of the loans underlying the IMSA 2007-2 Certificates, the IMSA 2007-2 Offering Documents represented that "[t]he mortgage loans will have been originated or acquired by the Sponsor in accordance with the underwriting criteria described in [the IMSA 2007-2] prospectus supplement."  *See* IMSA 2007-2 Pros. Supp. at S-31 (citing the underwriting guidelines of the Impac loans).  With regard to all of the IMSA 2007-2 Certificates' underlying

loans, the IMSA 2007-2 Offering Documents represented that "[t]he underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan." *See* IMSA 2007-2 Prospectus at "*The Mortgage Pools – Underwriting Standard*." The IMSA 2007-2 Offering Documents also represented:

> The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the loan-to-value ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations."

*Id.* The IMSA 2007-2 Offering Documents further represented that "[m]ortgaged properties generally will be appraised by licensed appraisers." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Impac and the third-party originators had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, **without** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.8, *infra*.

559. The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a loan for $478,400 in 2007 which was contained within the IMSA 2007-2 offering. The loan was originated through Impac, the loan originator identified in the Offering Documents. This borrower had income in 2007 of $2,916 per month, according to the borrower's

- 241 -

sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $5,064,***

***far in excess of the borrower's monthly income***. This borrower therefore had a DTI ratio of over

173%. The borrower's monthly debt payments were in addition to the borrower's monthly expenses

for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this

borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared

bankruptcy after obtaining the loan at issue, in 2009.

### b.    Loan-to-Value Ratios

560.    The IMSA 2007-2 Offering Documents also made certain misrepresentations

regarding the LTV ratios associated with the loans supporting the IMSA 2007-2 Certificate

purchased by plaintiffs and/or their assigning entities. Specifically, the IMSA 2007-2 Offering

Documents represented that only a very small percentage of the loans supporting plaintiffs' IMSA

2007-2 Certificate had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' IMSA

2007-2 Certificate had LTV ratios over 100%.

561.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis

on the actual loans underlying plaintiffs' IMSA 2007-2 Certificate, which reveals that the LTV ratio

percentages stated in the IMSA 2007-2 Offering Documents were materially false ***at the time they***

***were made***. The following chart summarizes the LTV ratio percentages stated in the IMSA 2007-2

Offering Documents, and the actual percentages that should have been stated according to plaintiffs'

industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 1A1B | 452570AB0 | Group I | 6.06% | 40.85% | 0.00% | 7.66% |

### c.    Owner Occupancy Rates

562.    The IMSA 2007-2 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the IMSA 2007-2 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the IMSA 2007-2 Offering Documents represented that a large percentage of the loans supporting plaintiffs' IMSA 2007-2 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

563.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' IMSA 2007-2 Certificate, which reveals that the OOR percentages stated in the IMSA 2007-2 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the OOR percentages stated in the IMSA 2007-2 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| 1A1B | 452570AB0 | Group I | 79.11% | 70.98% | 11.46% |

### d.    Credit Ratings

564.    The IMSA 2007-2 Offering Documents also represented that the IMSA 2007-2 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the IMSA 2007-2 Offering Documents represented that plaintiffs' IMSA 2007-2 Certificate had been assigned AAA/Aaa ratings – the highest, safest credit ratings available, which are in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.

- 243 -

565.    These representations, however, were false and misleading when made.  In truth, plaintiffs' IMSA 2007-2 Certificate should not have received AAA/Aaa credit ratings, because it was **not** a safe, "investment grade" security with "a less than 1% probability of incurring defaults." Rather, as defendants were well aware, plaintiffs' IMSA 2007-2 Certificate was an extremely risky, speculative grade "junk" bond backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' IMSA 2007-2 Certificate was because defendants had fed them falsified information regarding the IMSA 2007-2 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

566.    The falsity of the credit ratings set forth in the IMSA 2007-2 Offering Documents is confirmed by subsequent events.  Specifically, ***approximately 32% of the loans supporting plaintiffs' IMSA 2007-2 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" IMSA 2007-2 Certificate is now rated at "junk" status.  Clearly, plaintiffs' IMSA 2007-2 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The evidence supporting the falsity of the IMSA 2007-2 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 1A1B | 452570AB0 | Group I | 31.82% | Aaa | Caa2 | AAA | CC |

### e.    Transfer of Title

567.    The IMSA 2007-2 Offering Documents also represented that the loans underlying the IMSA 2007-2 Certificates would be timely transferred to the issuing trust, so that the trust would

obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the IMSA 2007-2 Offering Documents stated "[t]he Sponsor will convey the mortgage loans to the Depositor on the Closing Date pursuant to the Mortgage Loan Purchase Agreement and the Depositor will convey the mortgage loans to the Issuing Entity on the Closing Date pursuant to the Agreement." *See* IMSA 2007-2 Pros. Supp. at S-31.  The IMSA 2007-2 Offering Documents further stated that "[t]he Depositor will deliver to the Trustee with respect to each mortgage loan (1) the mortgage note endorsed without recourse to the Trustee to reflect the transfer of the mortgage loan, (2) the original mortgage with evidence of recording indicated thereon and (3) an assignment of the mortgage in recordable form to the Trustee, reflecting the transfer of the mortgage loan." *Id.* at S-166.  These statements were false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 36.    The IMSA 2007-3 Certificates

568.    The Impac Secured Assets Corp. Mortgage Pass-Through Certificates, Series 2007-3 ("IMSA 2007-3 Certificates") were issued pursuant to a Prospectus Supplement dated April 27, 2007.  The following defendant played a critical role in the fraudulent structuring, offering and sale of the IMSA 2007-3 Certificates: Bear Stearns Co. (underwriter).

569.    Plaintiffs and/or their assignors purchased the following IMSA 2007-3 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|-------------------|-------------------|-------|---------------|---------------------|----------------|
| Phoenix | Harrier | A1B | 45257VAB2 | 4/20/2007 | $25,000,000 | Bear Stearns Co. |

570.    The above purchase was made by Harrier's investment manager, Brightwater, in direct reliance upon the IMSA 2007-3 Offering Documents, including draft and/or final IMSA 2007-3 Prospectus Supplements.  Brightwater's diligent investment processes are described in great detail in §VIII.A, *infra*.

- 245 -

## a.      Underwriting Guidelines

571.     The IMSA 2007-3 Offering Documents disclosed that "[s]ubstantially all" of the IMSA 2007-3 Certificates' underlying "statistical mortgage loans" were originated or acquired by the sponsor, Impac, and "were underwritten pursuant to, or in accordance with, the standards of Impac Funding's Progressive Series Program and Progressive Express™ Program," or "were acquired in a bulk purchase from a third-party originator, the underwriting standards of whom . . . are generally similar to the underwriting standards of the Seller"; and the remaining IMSA 2007-3 Certificates' underlying loans were acquired by Impac from third-party originators none of which "contributed more than 10% of the mortgage loans."  *See* IMSA 2007-3 Pros. Supp. at S-46.

572.     With regard to the loans originated or acquired by the sponsor, Impac, the IMSA 2007-3 Offering Documents represented that "[t]he underwriting guidelines utilized in the Progressive Series Program, as developed by Impac Funding, are intended to assess the borrower's ability and willingness to repay the mortgage loan obligation and to assess the adequacy of the mortgaged property as collateral for the mortgage loan." *Id.* at S-47.  The IMSA 2007-3 Offering Documents also represented that "[t]he concept of the Progressive Express™ Program is to underwrite the loan focusing on the borrower's Credit Score, ability and willingness to repay the mortgage loan obligation, and assess the adequacy of the mortgaged property as collateral for the loan." *Id.* at S-53.  The IMSA 2007-3 Offering Documents further represented that "[w]ith respect to Impac Funding's Progressive Series Program or Progressive Express™ Program in general one full appraisal is required on each loan." *Id.* at S-47.  The IMSA 2007-2 Offering Documents further represented that the "debt service to income ratios" are required to be "within the range of 45% to 60% calculated on the basis of monthly income and depending on the loan to value ratio of the mortgage loan" in connection with most Progressive Series Program. *Id.* at S-48-S-50. As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary

- 246 -

to defendants' affirmative representations, the truth was that Impac had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, **without** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.8, *infra*.

573.    With regard to all of the loans underlying the IMSA 2007-3 Certificates, the IMSA 2007-3 Offering Documents represented that "[t]he mortgage loans will have been originated or acquired by the Sponsor in accordance with the underwriting criteria described in [the IMSA 2007-3] prospectus supplement."  *See* IMSA 2007-3 Prospectus Supp. at S-25 (citing the underwriting guidelines for the Impac loans).  With regard to all of the IMSA 2007-3 Certificates' underlying loans, the IMSA 2007-3 Offering Documents represented that "[t]he underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan."  *See* IMSA 2007-3 Prospectus at 10.  The IMSA 2007-3 Offering Documents also represented:

> The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses.  However, the loan-to-value ratio of the mortgage loan is another critical factor.  In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations.

*Id.*  The IMSA 2007-3 Offering Documents further represented that "[m]ortgaged properties generally will be appraised by licensed appraisers."  *Id.* at 11. As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that Impac and the third-party originators had completely

abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.8, *infra*.

574.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, a husband and wife obtained a loan for $366,700 in 2007 which was contained within the IMSA 2007-3 offering. These borrowers had income in 2007 of $5,083 per month, according to the borrowers' sworn bankruptcy filings. ***However, the borrowers' monthly debt payments were at least $4,626, giving these borrowers a DTI ratio of 91%.  The borrowers' DTI ratio was far in excess of the 45% to 60% DTI ratio maximums allowed by the underwriting guidelines described in the Offering Documents***.  The borrowers' DTI ratio was also far in excess of the 50% DTI ratio which prominent Wall Street investment bank Deutsche Bank stated "le[ft] little for the borrower to pay other expenses." The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, these borrowers could not afford to repay the loan. This is confirmed by the fact that the borrowers declared bankruptcy shortly after obtaining the loan at issue, in 2008.

### b.        Loan-to-Value Ratios

575.    The IMSA 2007-3 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the IMSA 2007-3 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the IMSA 2007-3 Offering Documents represented that only a small percentage of the loans supporting plaintiffs' IMSA 2007-3 Certificate had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' IMSA 2007-3 Certificate had LTV ratios over 100%.

- 248 -

576. Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' IMSA 2007-3 Certificate, which reveals that the LTV ratio percentages stated in the IMSA 2007-3 Offering Documents were materially false *at the time they were made*. The following chart summarizes the LTV ratio percentages stated in the IMSA 2007-3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| A1B | 45257VAB2 | All | 16.19% | 47.22% | 0.00% | 10.79% |

### c.    Owner Occupancy Rates

577. The IMSA 2007-3 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the IMSA 2007-3 Certificate purchased by plaintiffs and/or their assigning entities. Specifically, the IMSA 2007-3 Offering Documents represented that a large percentage of the loans supporting plaintiffs' IMSA 2007-3 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

578. Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' IMSA 2007-3 Certificate, which reveals that the OOR percentages stated in the IMSA 2007-3 Offering Documents were materially false *at the time they were made*. The following chart summarizes the OOR percentages stated in the IMSA 2007-3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

- 249 -

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| A1B | 45257VAB2 | All | 76.50% | 71.16% | 7.51% |

### d.    Credit Ratings

579.    The IMSA 2007-3 Offering Documents also represented that the IMSA 2007-3 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.    Specifically, the IMSA 2007-3 Offering Documents represented that plaintiffs' IMSA 2007-3 Certificate had been assigned AAA/Aaa ratings – the highest, safest credit ratings available, which are in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.

580.    These representations, however, were false and misleading when made.    In truth, plaintiffs' IMSA 2007-3 Certificate should not have received AAA/Aaa credit ratings, because it was *not* a safe, "investment grade" security with "a less than 1% probability of incurring defaults." Rather, as defendants were well aware, plaintiffs' IMSA 2007-3 Certificate was an extremely risky, speculative grade "junk" bond, backed by low credit quality, extremely risky loans.    Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' IMSA 2007-3 Certificate was because defendants had fed them falsified information regarding the IMSA 2007-3 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

581.    The falsity of the credit ratings set forth in the IMSA 2007-3 Offering Documents is confirmed by subsequent events.    Specifically, ***more than 30% of the loans supporting plaintiffs' IMSA 2007-3 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, plaintiffs' "investment grade"

IMSA 2007-3 Certificate is now rated at "junk" status. Clearly, plaintiffs' IMSA 2007-3 Certificate

was not the highly rated, "investment grade" security defendants represented it to be. The evidence

supporting the falsity of the IMSA 2007-3 Certificate's credit ratings is set forth in further detail in

§VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| A1B | 45257VAB2 | All | 30.07% | Aaa | Caa2 | AAA | CCC |

### e.    Transfer of Title

582.    The IMSA 2007-3 Offering Documents also represented that the loans underlying the

IMSA 2007-3 Certificates would be timely transferred to the issuing trust, so that the trust would

obtain good title to the mortgage loans comprising the pool for the offering. Specifically, the IMSA

2007-3 Offering Documents stated "[t]he Sponsor will convey the initial mortgage loans to the

Depositor on the Closing Date pursuant to the Mortgage Loan Purchase Agreement and the

Depositor will convey the mortgage loans to the Issuing Entity on the Closing Date pursuant to the

Agreement." *See* IMSA 2007-3 Pros. Supp. at S-25. The IMSA 2007-3 Offering Documents also

stated that "[t]he Depositor will deliver to the Trustee with respect to each mortgage loan (1) the

mortgage note endorsed without recourse to the Trustee to reflect the transfer of the mortgage loan,

(2) the original mortgage with evidence of recording indicated thereon and (3) an assignment of the

mortgage in recordable form to the Trustee, reflecting the transfer of the mortgage loan." *Id.* at S-

113. These statements were false and misleading. Defendants failed to legally and properly transfer

the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

864087_1

### 37.    The INDX 2006-AR29 Certificates

583.    The IndyMac INDX Mortgage Loan Trust 2006-AR29, Mortgage Pass-Through Certificates, Series 2006-AR29 ("INDX 2006-AR29 Certificates") were issued pursuant to a Prospectus Supplement dated September 28, 2006.  The following defendant played a critical role in the fraudulent structuring, offering and sale of the INDX 2006-AR29 Certificates: J.P. Morgan Securities (underwriter).

584.    Plaintiffs and/or their assignors purchased the following INDX 2006-AR29 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|--------------------|--------------------|-------|---------------|----------------------|----------------|
| Phoenix | WestLB | A4 | 45662DAD7 | 9/26/2006 | $19,396,000 | J.P. Morgan Securities |
| Silver Elms II | Paradigm | M6 | 45662DAM7 | 9/26/2006 | $4,178,000 | J.P. Morgan Securities |

585.    The above purchases were made by WestLB's investment manager, DCP, and Paradigm's investment manager, Eiger, in direct reliance upon the INDX 2006-AR29 Offering Documents, including draft and/or final INDX 2006-AR29 Prospectus Supplements.  DCP's and Eiger's diligent investment processes are described in great detail in §VIII.D, *infra*.

#### a.    Underwriting Guidelines

586.    The INDX 2006-AR29 Offering Documents disclosed that 100% of the INDX 2006-AR29 Certificates' underlying loans were originated or acquired by the sponsor, IndyMac, "according to [IndyMac's] underwriting guidelines."  *See* INDX 2006-AR29 Pros. Supp. at S-45.

587.    The INDX 2006-AR29 Offering Documents represented that "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral."  *Id.*  The INDX 2006-AR29 Offering Documents also represented that, under

- 252 -

IndyMac's underwriting guidelines, "[t]o determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice." *Id*. at S-46. The INDX 2006-AR29 Offering Documents further represented:

> Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the Property such as property taxes and hazard insurance).

*See* INDX 2006-AR29 Prospectus at 35-36. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that IndyMac had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.18, *infra*.

588. The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a loan for $512,000 in 2006 which was contained within the INDX 2006-AR29 offering. The loan was originated through IndyMac, the loan originator identified in the Offering Documents. This borrower had income in 2006 of $3,149 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $8,224, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is

- 253 -

confirmed by the fact that the borrower declared bankruptcy after obtaining the loan at issue, in 2008.

### b.    Loan-to-Value Ratios

589.    The INDX 2006-AR29 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the INDX 2006-AR29 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the INDX 2006-AR29 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs' INDX 2006-AR29 Certificates had LTV ratios over 80%, and that **none** of the loans supporting plaintiffs' INDX 2006-AR29 Certificates had LTV ratios over 100%.

590.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' INDX 2006-AR29 Certificates, which reveals that the LTV ratio percentages stated in the INDX 2006-AR29 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the INDX 2006-AR29 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| A4 | 45662DAD7 | All | 1.32% | 37.11% | 0.00% | 6.36% |
| M6 | 45662DAM7 | All | 1.32% | 37.11% | 0.00% | 6.36% |

### c.    Owner Occupancy Rates

591.    The INDX 2006-AR29 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the INDX 2006-AR29 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the INDX 2006-AR29 Offering Documents represented that a large percentage of the loans supporting plaintiffs'

- 254 -

INDX 2006-AR29 Certificates were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

592.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' INDX 2006-AR29 Certificates, which reveals that the OOR percentages stated in the INDX 2006-AR29 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the Primary Residence Percentages stated in the INDX 2006-AR29 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| A4 | 45662DAD7 | All | 88.59% | 78.08% | 13.46% |
| M6 | 45662DAM7 | All | 88.59% | 78.08% | 13.46% |

### d.    Credit Ratings

593.    The INDX 2006-AR29 Offering Documents also represented that the INDX 2006-AR29 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.  Specifically, the INDX 2006-AR29 Offering Documents represented that plaintiffs' INDX 2006-AR29 Certificates had been assigned AAA/Aaa and A-/A1 ratings – signifying extremely safe and stable securities.

594.    These representations, however, were false and misleading when made.  In truth, plaintiffs' INDX 2006-AR29 Certificates should not have received AAA/Aaa and A-/A1 credit ratings, because they were ***not*** safe, "investment grade" securities.  Rather, as defendants were well aware, plaintiffs' INDX 2006-AR29 Certificates were extremely risky, speculative grade "junk"

bonds, or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary

reasons that S&P and Moody's had assigned such high ratings to plaintiffs' INDX 2006-AR29

Certificates was because defendants had fed them falsified information regarding the INDX 2006-

AR29 Certificates' underlying loans, including, without limitation, false loan underwriting

guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR

percentages.

595. The falsity of the credit ratings set forth in the INDX 2006-AR29 Offering

Documents is confirmed by subsequent events. Specifically, ***approximately 29% of the loans

supporting plaintiffs' INDX 2006-AR29 Certificates are currently in default*** because they were

made to borrowers who either could not afford them or never intended to repay them. Moreover,

after initially being rated "investment grade," plaintiffs' INDX 2006-AR29 Certificates are now

either rated at "junk" status or no longer rated at all. Clearly, plaintiffs' INDX 2006-AR29

Certificates were not the highly rated, "investment grade" securities defendants represented them to

be. The evidence supporting the falsity of the INDX 2006-AR29 Certificates' credit ratings is set

forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| A4 | 45662DAD7 | All | 28.72% | Aaa | Caa3 | AAA | NR |
| M6 | 45662DAM7 | All | 28.72% | A1 | WR | A- | NR |

### e.    Transfer of Title

596. The INDX 2006-AR29 Offering Documents also represented that the loans

underlying the INDX 2006-AR29 Certificates would be timely transferred to the issuing trust, so that

the trust would obtain good title to the mortgage loans comprising the pool for the offering.

Specifically, the INDX 2006-AR29 Offering Documents stated that "[p]ursuant to the pooling and

864087_1

servicing agreement, on the closing date the depositor will assign without recourse to the trustee in trust for the benefit of the certificateholders all interest of the depositor in each Mortgage Loan and all interest in all other assets included in IndyMac INDX Mortgage Loan Trust 2006-AR29." *See* INDX 2006-AR29 Pros. Supp. at S-43. The INDX 2006-AR29 Offering Documents also stated that "[i]n addition, the depositor will deliver or cause to be delivered to the trustee (or to the custodian) for each mortgage loan[:] the mortgage note endorsed without recourse in blank or to the order of the trustee . . . , the mortgage, deed of trust or similar instrument . . . , an assignment of the mortgage to the trustee in recordable form and any other security documents." *See* INDX 2006-AR29 Prospectus at 64-65. These statements were false and misleading. Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts. *See* §VI.E, *infra*.

### 38.    The LUM 2005-1 Certificates

597.    The Luminent Mortgage Trust 2005-1, Mortgage-Backed Notes, Series 2005-1 ("LUM 2005-1 Certificates") were issued pursuant to a Prospectus Supplement dated November 1, 2005. The following defendants played critical roles in the fraudulent structuring, offering and sale of the LUM 2005-1 Certificates: Structured Asset Mortgage (depositor); Bear Stearns Co. (underwriter).

598.    Plaintiffs and/or their assignors purchased the following LUM 2005-1 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Phoenix | Harrier | A2 | 550279AB9 | 11/2/2005 | $37,057,000 | Bear Stearns Co. |

599.    The above purchase was made by Harrier's investment manager, Brightwater, in direct reliance upon the LUM 2005-1 Offering Documents, including draft and/or final LUM 2005-1 Prospectus Supplements. Brightwater's diligent investment processes are described in great detail in §VIII.A, *infra*.

- 257 -

### a.    Underwriting Guidelines

600.    The LUM 2005-1 Offering Documents disclosed that loan originator Countrywide

originated approximately 10.83% of the LUM 2005-1 Certificates' underlying loans; loan originator

EMC Mortgage originated approximately 61.00% of the LUM 2005-1 Certificates' underlying loans;

and loan originator PHH Mortgage Corporation ("PHH") originated approximately 28.17% of the

LUM 2005-1 Certificates' underlying loans.  *See* LUM 2005-1 Pros. Supp. at S-35.

601.    With regard to the Countrywide loans, the LUM 2005-1 Offering Documents

represented that "Countrywide's underwriting standards are applied by or on behalf of

[Countrywide] to evaluate the prospective borrower's credit standing and repayment ability and the

value and adequacy of the mortgaged property as collateral."  *Id.* at S-36.  The LUM 2005-1

Offering Documents also represented that "[u]nder those standards, a prospective borrower must

generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal

and interest on the proposed mortgage loan and, as applicable, the related monthly portion of

property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income

and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are

within acceptable limits."  *Id.*  The LUM 2005-1 Offering Documents further represented that

"[u]nder its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-

to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-

income ratio based on the borrower's total monthly debt of up to 38%," and that "[u]nder its

Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income

ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio

based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-

Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%,

respectively."  *Id.* at S-38, S-40.  The LUM 2005-1 Offering Documents further represented that

- 258 -

"[e]xcept with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans." *Id.* at S-37. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Countrywide had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.3, *infra*.

602.    With regard to the EMC Mortgage loans, the LUM 2005-1 Offering Documents represented that EMC Mortgage's "underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." *See* LUM 2005-1 Pros. Supp. at S-41. The LUM 2005-1 Offering Documents also represented:

> In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income.

*Id.* at S-42. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that EMC Mortgage had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.7, *infra*.

603.    With regard to the PHH loans, the LUM 2005-1 Offering Documents represented that "PHH's underwriting guidelines are applied to evaluate an applicant's credit standing, financial

- 259 -

condition, and repayment ability, as well as the value and adequacy of the mortgaged property as

collateral for any loan made." *See* LUM 2005-1 Pros. Supp. at S-43.  The LUM 2005-1 Offering

Documents also represented that "[t]he application of the underwriting standards represent a

balancing of several factors that may affect the ultimate recovery of the loan amount, including but

not limited to, the applicant's credit standing and ability to repay the loan, as well as the value and

adequacy of the mortgaged property as collateral." *Id.* at S-42-S-43.  The LUM 2005-1 Offering

Documents also represented:

> In evaluating the applicant's ability and willingness to repay the proposed
> loan, PHH reviews the applicant's credit history and outstanding debts, as reported
> on the credit report.  If an existing mortgage or other significant debt listed on the
> loan application is not adequately reported on the credit report, PHH may request a
> written or oral verification of the balance and payment history of such debt from the
> servicer of such debt.

*Id.* at S-43.  The LUM 2005-1 Offering Documents further represented that "[i]n determining the

adequacy of the property as collateral for a first lien mortgage loan, a Fannie Mae/Freddie Mac

conforming appraisal of the property is performed by an independent appraiser selected by PHH,

except as noted below." *Id.* at S-44.  The LUM 2005-1 Offering Documents further represented that

in connection with its "Full Documentation Standards," "[in] determining whether a prospective

borrower has sufficient monthly income available to meet the borrower's monthly obligation on the

proposed mortgage loan, and to meet monthly housing expenses and other financial obligations

including the borrower's monthly obligations on the proposed mortgage loan, PHH generally applies

debt service-to-income ratios of up to 50% of the proposed borrower's acceptable stable monthly

gross income" and that most of its "Other Documentation Standards" "are generally limited to

borrowers who have demonstrated an established ability and willingness to repay the mortgage loans

in a timely fashion." *Id.* at S-45.  As further detailed *infra*, this representation was false and

misleading at the time it was made.  Contrary to defendants' affirmative representations, the truth

- 260 -

was that PHH had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, *without* any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.14, *infra*.

604.   The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, a borrower obtained a loan for $485,100 in 2005 which was contained within the LUM 2005-1 offering. ***This borrower had no income in 2005***, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $5,630, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan, in 2007.

### b.   Loan-to-Value Ratios

605.   The LUM 2005-1 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the LUM 2005-1 Certificate purchased by plaintiffs and/or their assigning entities. Specifically, the LUM 2005-1 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs' LUM 2005-1 Certificate had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' LUM 2005-1 Certificate had LTV ratios over 100%.

606.   Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' LUM 2005-1 Certificate, which reveals that the LTV ratio percentages stated in the LUM 2005-1 Offering Documents were materially false ***at the time they***

*were made*.  The following chart summarizes the LTV ratio percentages stated in the LUM 2005-1

Offering Documents, and the actual percentages that should have been stated according to plaintiffs'

industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| A2 | 550279AB9 | All | 4.34% | 28.29% | 0.00% | 6.96% |

### c.     Owner Occupancy Rates

607.    The LUM 2005-1 Offering Documents also made certain misrepresentations

regarding the OOR percentages associated with the loans supporting the LUM 2005-1 Certificate

purchased by plaintiffs and/or their assigning entities.  Specifically, the LUM 2005-1 Offering

Documents represented that a large percentage of the loans supporting plaintiffs' LUM 2005-1

Certificate were issued to borrowers that actually lived in the properties serving as collateral for their

loans, significantly decreasing the likelihood that those borrowers would default on their loans.

608.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers,

loans and properties underlying plaintiffs' LUM 2005-1 Certificate, which reveals that the OOR

percentages stated in the LUM 2005-1 Offering Documents were materially false *at the time they*

*were made*.  The following chart summarizes the OOR percentages stated in the LUM 2005-1

Offering Documents, and the actual percentages that should have been stated according to plaintiffs'

investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| A2 | 550279AB9 | All | 88.34% | 80.11% | 10.28% |

### d.    Credit Ratings

609.    The LUM 2005-1 Offering Documents also represented that the LUM 2005-1 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.    Specifically, the LUM 2005-1 Offering Documents represented that plaintiffs' LUM 2005-1 Certificate had been assigned AAA/Aaa ratings – the highest, safest credit ratings available, which are in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.

610.    These representations, however, were false and misleading when made.  In truth, plaintiffs' LUM 2005-1 Certificate should not have received AAA/Aaa credit ratings, because it was *not* a safe, "investment grade" security with "a less than 1% probability of incurring defaults." Rather, as defendants were well aware, plaintiffs' LUM 2005-1 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' LUM 2005-1 Certificate was because defendants had fed them falsified information regarding the LUM 2005-1 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

611.    The falsity of the credit ratings set forth in the LUM 2005-1 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 23% of the loans supporting plaintiffs' LUM 2005-1 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" LUM 2005-1 Certificate is now rated at "junk" status or below. Clearly, plaintiffs' LUM 2005-1 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The

- 263 -

evidence supporting the falsity of the LUM 2005-1 Certificate's credit ratings is set forth in further

detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| A2 | 550279AB9 | All | 23.31% | Aaa | C | AAA | CCC |

### e.    Transfer of Title

612.    The LUM 2005-1 Offering Documents also represented that the loans underlying the

LUM 2005-1 Certificates would be timely transferred to the issuing trust, so that the trust would

obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the LUM

2005-1 Offering Documents stated "[a]t the time of issuance of the notes, the Depositor will cause

the mortgage loans, together with all principal and interest due on or with respect to such mortgage

loans after the Cut-off Date, to be sold to the trust."  LUM 2005-1 Pros. Supp. at S-73.  This

statement was false and misleading.  Defendants failed to legally and properly transfer the

promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 39.    The NAA 2007-3 Certificates

613.    The Nomura Asset Acceptance Corporation, Alternative Loan Trust, Series 2007-3,

Mortgage Pass-Through Certificates, Series 2007-3 ("NAA 2007-3 Certificates") were issued

pursuant to a Prospectus Supplement dated July 6, 2007.  Defendant Bear Stearns Co., as the primary

underwriter, played a critical role in the fraudulent structuring, offering and sale of the NAA 2007-3

Certificates.

614.    Plaintiffs and/or their assignors purchased the following NAA 2007-3 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|-------------------|-------------------|-------|---------------|---------------------|----------------|
| Phoenix | Harrier | A2 | 65537UAB4 | 6/29/2007 | $24,035,000 | Bear Stearns Co. |
| Phoenix | Harrier | A4 | 65537UAD0 | 6/29/2007 | $20,903,000 | Bear Stearns Co. |

615.    Each of the above purchases was made by Harrier's investment manager, Brightwater, in direct reliance upon the NAA 2007-3 Offering Documents, including draft and/or final NAA 2007-3 Prospectus Supplements.  Brightwater's diligent investment processes are described in great detail in §VIII.A, *infra*.

### a.    Underwriting Guidelines

616.    The NAA 2007-3 Offering Documents disclosed that approximately 14.18% of the NAA 2007-3 Certificates' underlying loans were originated by AHM; approximately 12.09% of the NAA 2007-3 Certificates' underlying loans were originated by Brooks America Mortgage Corporation ("Brooks America"); and the remaining loans were originated by "various originators, none of which originated 10% or more of the Mortgage Loans."  *See* NAA 2007-3 Pros. Supp. at S-2, S-49.

617.    The NAA 2007-3 Offering Documents represented that all of the NAA 2007-3 Certificates' underlying loans were originated generally in accordance with the underwriting standards, pursuant to which:

> Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.

*Id.* at S-50.  The NAA 2007-3 Offering Documents also represented that "[t]he adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been

- 265 -

determined by an appraisal." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that AHM, Brooks America and the "various originators" had completely abandoned the stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §§VI.A.1 and VI.A.9, *infra*.

618.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how and the originators' failure to comply with underwriting guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a loan for $928,000 in 2007 that was contained within the NAA 2007-3 offering. ***This borrower had a monthly income of $6,964 in 2007***, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $8,042, far in excess of the borrower's monthly income.*** The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

619.    The NAA 2007-3 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the NAA 2007-3 Certificates purchased by plaintiffs and/or their assigning entities. Specifically, the NAA 2007-3 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs' NAA 2007-3 Certificates had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' NAA 2007-3 Certificates had LTV ratios over 100%.

- 266 -

620.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' NAA 2007-3 Certificates, which reveals that the LTV ratio percentages stated in the NAA 2007-3 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the NAA 2007-3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| A2 | 65537UAB4 | All | 2.58% | 58.89% | 0.00% | 18.41% |
| A4 | 65537UAD0 | All | 2.58% | 58.89% | 0.00% | 18.41% |

### c.    Owner Occupancy Rates

621.    The NAA 2007-3 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the NAA 2007-3 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the NAA 2007-3 Offering Documents represented that a large percentage of the loans supporting plaintiffs' NAA 2007-3 Certificates were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

622.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' NAA 2007-3 Certificates, which reveals that the OOR percentages stated in the NAA 2007-3 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the Primary Residence Percentages stated in the NAA 2007-3 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| A2 | 65537UAB4 | All | 71.53% | 66.74% | 7.19% |
| A4 | 65537UAD0 | All | 71.53% | 66.74% | 7.19% |

### d.    Credit Ratings

623.    The NAA 2007-3 Offering Documents also represented that the NAA 2007-3 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.    Specifically, the NAA 2007-3 Offering Documents represented that plaintiffs' NAA 2007-3 Certificates had each been assigned AAA/Aaa ratings – the highest, safest credit ratings available, which are in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.

624.    These representations, however, were false and misleading when made.  In truth, plaintiffs' NAA 2007-3 Certificates should not have received AAA/Aaa credit ratings because they were ***not*** safe, "investment grade" securities with "a less than 1% probability of incurring defaults." Rather, as defendants were well aware, plaintiffs' NAA 2007-3 Certificates were extremely risky, speculative grade "junk" bonds**,** backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' NAA 2007-3 Certificates was because defendants had fed them falsified information regarding the NAA 2007-3 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

625.    The falsity of the credit ratings set forth in the NAA 2007-3 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 50% of the loans supporting plaintiffs' NAA 2007-3 Certificates are currently in default*** because they were made to borrowers who either

- 268 -

could not afford them or never intended to repay them.  Moreover, each of plaintiffs' "investment grade" NAA 2007-3 Certificates is now rated at "junk" status.  Clearly, plaintiffs' NAA 2007-3 Certificates were not the highly rated, "investment grade" securities defendants represented them to be.  The evidence supporting the falsity of the NAA 2007-3 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| A2 | 65537UAB4 | All | 50.17% | Aaa | Ca | AAA | NR |
| A4 | 65537UAD0 | All | 50.17% | Aaa | Ca | AAA | NR |

### e.    Transfer of Title

626.    The NAA 2007-3 Offering Documents also represented that the loans underlying the NAA 2007-3 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the NAA 2007-3 Offering Documents stated that "[o]n the Closing Date, the depositor will transfer to the trust all of its right, title and interest in and to each Mortgage Loan . . . , the related mortgage note, mortgage, assignment of mortgage in recordable form to the trustee and other related documents."  NAA 2007-3 Pros. Supp. at S-122.  This statement was false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 40.    The OPMAC 2006-1 Certificates

627.    The Opteum Mortgage Acceptance Corporation Asset-Backed Pass-Through Certificates, Series 2006-1 ("OPMAC 2006-1 Certificates") were issued pursuant to a Prospectus Supplement dated March 23, 2006.  Defendant Bear Stearns Co., as the primary underwriter, played a critical role in the fraudulent structuring, offering and sale of the OPMAC 2006-1 Certificates.

628.    Plaintiffs and/or their assignors purchased the following OPMAC 2006-1 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Phoenix | WestLB | IA1B | 68383NDV2 | 3/20/2006 | $55,000,000 | Bear Stearns Co. |
| Silver Elms | Paradigm | IAC1 | 68383NDW0 | 3/20/2006 | $5,000,000 | Bear Stearns Co. |
| Silver Elms | Paradigm | M5 | 68383NEF6 | 3/20/2006 | $2,179,000 | Bear Stearns Co. |
| Silver Elms | Paradigm | M6 | 68383NEG4 | 3/20/2006 | $1,803,000 | Bear Stearns Co. |

629.    The above purchases were made by WestLB's and Paradigm's investment manager, SFA, in direct reliance upon the OPMAC 2006-1 Offering Documents, including draft and/or final OPMAC 2006-1 Prospectus Supplements.  SFA's diligent investment processes are described in great detail in §VIII.C, *infra*.

### a.    Underwriting Guidelines

630.    The OPMAC 2006-1 Offering Documents disclosed that approximately 53.95% of the OPMAC 2006-1 Certificates' underlying loans were originated or acquired by the sponsor, Opteum Financial Services, LLC ("Opteum"); and the remainder of the OPMAC 2006-1 Certificates' underlying loans "were originated by various originators, none of which have originated 10% or more (measured by aggregate principal balance) of the mortgage loans in the aggregate." *See* OPMAC 2006-1 Pros. Supp. at S-6.

631.    With regard to the loans originated by the sponsor, Opteum, the OPMAC 2006-1 Offering Documents represented that approximately 72.80% of the mortgage loans were underwritten pursuant to or in accordance with the standards of Opteum's "Five Star Series™" program guidelines, which underwriting standards were "intended to evaluate an applicant's credit

score, credit history, financial condition, and repayment ability as well as to evaluate the adequacy of the mortgaged property as collateral for the loan." *Id.* at S-59, S-61. The OPMAC 2006-1 Offering Documents also represented that approximately 8.48% of the OPMAC 2006-1 Certificates' underlying loans were underwritten by the sponsor, Opteum, pursuant to or in accordance with the standards of Opteum's "Five Star Expanded™" program guidelines, which underwriting standards were "intended to evaluate an applicant's credit standing and repayment ability as well as evaluate the adequacy of the mortgaged property as collateral for the loan." OPMAC 2006-1 Pros. Supp. at S-59, S-65. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' representations, the truth was that Opteum had completely abandoned its stated underwriting guidelines and was simply seeking to originate and acquire as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.1, *infra*.

632.    With regard to the loans originated by "various originators," the OPMAC 2006-1 Offering Documents represented that "[s]ubstantially all of the mortgage loans were underwritten in accordance with non-conforming underwriting standards as described in this prospectus supplement or other similar programs." OPMAC 2006-1 Pros. Supp. at S-7 (citing the underwriting guidelines for the Opteum loans). As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' representations, the truth was that the "various originators" had completely abandoned their stated underwriting guidelines and were simply seeking to originate and acquire as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.1, *infra*.

633.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how Opteum's failure to comply with underwriting

guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a loan for $650,000 in 2005 that was contained within the OPMAC 2006-1 offering. ***This borrower had a monthly income of $4,391 in 2005***, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $4,412.81, which was more than the borrower's monthly income***. The borrower's monthly debt payments were ***in addition to*** the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan at issue, in 2007.

**b. Loan-to-Value Ratios**

634. The OPMAC 2006-1 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the OPMAC 2006-1 Certificates purchased by plaintiffs and/or their assigning entities. Specifically, the OPMAC 2006-1 Offering Documents represented that only a small percentage of the loans supporting plaintiffs' OPMAC 2006-1 Certificates had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' OPMAC 2006-1 Certificates had LTV ratios over 100%.

635. Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' OPMAC 2006-1 Certificates, which reveals that the LTV ratio percentages stated in the OPMAC 2006-1 Offering Documents were materially false ***at the time they were made***. The following chart summarizes the LTV ratio percentages stated in the OPMAC 2006-1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| IA1B | 68383NDV2 | Group I | 10.13% | 61.82% | 0.00% | 13.14% |
| IAC1 | 68383NDW0 | Group I | 10.13% | 61.84% | 0.00% | 13.10% |
| M5 | 68383NEF6 | All | 8.88% | 56.43% | 0.00% | 12.37% |
| M6 | 68383NEG4 | All | 8.88% | 56.43% | 0.00% | 12.37% |

### c.    Owner Occupancy Rates

636.    The OPMAC 2006-1 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the OPMAC 2006-1 Certificates purchased by plaintiffs and/or their assigning entities.  Specifically, the OPMAC 2006-1 Offering Documents represented that a large percentage of the loans supporting plaintiffs' OPMAC 2006-1 Certificates were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

637.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' OPMAC 2006-1 Certificates, which reveals that the OOR percentages stated in the OPMAC 2006-1 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the Primary Residence Percentages stated in the OPMAC 2006-1 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| IA1B | 68383NDV2 | Group I | 88.75% | 81.72% | 8.60% |
| IAC1 | 68383NDW0 | Group I | 88.75% | 81.72% | 8.60% |
| M5 | 68383NEF6 | All | 89.32% | 83.17% | 7.40% |
| M6 | 68383NEG4 | All | 89.32% | 83.17% | 7.40% |

- 273 -

### d.    Credit Ratings

638.    The OPMAC 2006-1 Offering Documents also represented that the OPMAC 2006-1 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the securities were very strong, safe investments with an extremely low probability of default.    Specifically, the OPMAC 2006-1 Offering Documents represented that plaintiffs' Tranche IA1B, IAC1, M5 and M6 Certificates had each been assigned AAA/Aaa, AAA/Aaa, A/A2 and A-/A3 ratings, respectively – signifying extremely safe and stable securities.

639.    These representations, however, were false and misleading when made.    In truth, plaintiffs' OPMAC 2006-1 Certificates should not have received such high credit ratings because they were **not** safe, "investment grade" securities with a low probability of incurring defaults. Rather, as defendants were well aware, plaintiffs' OPMAC 2006-1 Certificates were extremely risky, speculative grade "junk" bonds or worse**,** backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' OPMAC 2006-1 Certificates was because defendants had fed them falsified information regarding the OPMAC 2006-1 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

640.    The falsity of the credit ratings set forth in the OPMAC 2006-1 Offering Documents is confirmed by subsequent events.    Specifically, ***more than 20% of the loans supporting each of plaintiffs' OPMAC 2006-1 Certificates are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, each of plaintiffs' "investment grade" OPMAC 2006-1 Certificates is now rated at "junk" status or below. Clearly, plaintiffs' OPMAC 2006-1 Certificates were not the highly rated, "investment grade"

- 274 -

securities defendants represented them to be.  The evidence supporting the falsity of the OPMAC

2006-1 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the

following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| IA1B | 68383NDV2 | Group I | 20.01% | Aaa | Caa1 | AAA | D |
| IAC1 | 68383NDW0 | Group I | 20.01% | Aaa | Caa2 | AAA | CCC |
| M5 | 68383NEF6 | All | 21.04% | A2 | WR | A | D |
| M6 | 68383NEG4 | All | 21.04% | A3 | WR | A- | D |

### e.    Transfer of Title

641.    The OPMAC 2006-1 Offering Documents also represented that the loans underlying

the OPMAC 2006-1 Certificates would be timely transferred to the issuing trust, so that the trust

would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the

OPMAC 2006-1 Offering Documents stated that "[a]t the time of issuance of [the OPMAC 2006-1

Certificates], the [depositor] will assign, or cause to be assigned, to the related trustee (or its

nominee), without recourse, the mortgage loans or mortgage securities being included in the related

trust fund." OPMAC 2006-1 Prospectus at 30. The OPMAC 2006-1 Offering Documents further

represented that the depositor would "deliver, or cause to be delivered, to the related trustee . . . the

mortgage note endorsed, without recourse . . . , the mortgage with evidence of recording . . . , an

assignment of the mortgage in blank or to the trustee . . . , any intervening assignments . . . , . . . any

riders or modifications to the mortgage note and mortgage, and any other [related] documents." *Id.*

at 30-31.  These statements were false and misleading.  Defendants failed to legally and properly

transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 41.    The PCHLT 2005-4 Certificates

642.    The People's Choice Home Loan Securities Trust Series 2005-4, Mortgage-Backed Notes, Series 2005-4 ("PCHLT 2005-4 Certificates") were issued pursuant to a Prospectus Supplement dated October 24, 2005.  Defendant Bear Stearns Co., as the primary underwriter, played a critical role in the fraudulent structuring, offering and sale of the PCHLT 2005-4 Certificates.

643.    Plaintiffs and/or their assignors purchased the following PCHLT 2005-4 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|--------------------|-------------------|-------|---------------|----------------------|----------------|
| Kleros V | WestLB | M4 | 71085PDK6 | 12/12/2006 | $8,000,000 | Lehman Bros. |

644.    The above purchase was made by WestLB's investment manager, Strategos, in direct reliance upon the PCHLT 2005-4 Offering Documents, including draft and/or final PCHLT 2005-4 Prospectus Supplements.  Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.    Underwriting Guidelines

645.    The PCHLT 2005-4 Offering Documents disclosed that ***100%*** of the PCHLT 2005-4 Certificates' underlying loans were originated by People's Choice Home Loan, Inc. ("People's Choice").  *See* PCHLT 2005-4 Pros. Supp. at S-57.

646.    The PCHLT 2005-4 Offering Documents represented that all of the PCHLT 2005-4 Certificates' underlying loans were originated in in accordance with underwriting standards which "thoroughly review[ed] all credit, income, character and collateral information provided by the [mortgage] broker for completeness, accuracy and authenticity." *Id.*  The PCHLT 2005-4 Offering Documents also represented that "[l]oan applications [were] evaluated according to certain characteristics including, but not limited to: condition of the collateral, credit history of the applicant,

- 276 -

ability to [repay the loan], loan-to-value ratio ('LTV') and general stability of the applicant in terms of employment history and time in residence." *Id.* The PCHLT 2005-4 Offering Documents further represented that "[t]he Underwriting Guidelines require . . . the [loan] underwriters to be satisfied that the value of the property being financed, as reflected by an appraisal and a review of the appraisal, supports the outstanding loan balance at [the] time of loan funding." *Id.* at S-58. As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that People's Choice had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.20, *infra*.

647.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how People's Choice failure to comply with underwriting guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one married couple obtained a loan for $668,000 in 2005 that was contained within the PCHLT 2005-4 offering. The loan was originated by People's Choice, the only loan originator identified in the PCHLT 2005-4 Offering Documents. ***These borrowers had a joint monthly income of $7,216 in 2005***, according to their sworn bankruptcy filings. ***However, their monthly debt payments were at least $17,363, more than double their joint monthly income***. These borrowers' monthly debt payments were in addition to their monthly expenses for things such as taxes, utilities, groceries, health care, transportation and the like. Clearly, these borrowers could not afford to repay their loan. This is confirmed by the fact that they declared bankruptcy shortly after obtaining the loan at issue, in 2006.

### b.    Loan-to-Value Ratios

648.    The PCHLT 2005-4 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the PCHLT 2005-4 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the PCHLT 2005-4 Offering Documents represented that less than 40% of the loans supporting plaintiffs' PCHLT 2005-4 Certificate had LTV ratios over 80%, and that **none** of the loans supporting plaintiffs' PCHLT 2005-4 Certificate had LTV ratios over 100%.

649.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' PCHLT 2005-4 Certificate, which reveals that the LTV ratio percentages stated in the PCHLT 2005-4 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the LTV ratio percentages stated in the PCHLT 2005-4 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M4 | 71085PDK6 | All | 36.16% | 54.36% | 0.00% | 15.13% |

### c.    Owner Occupancy Rates

650.    The PCHLT 2005-4 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the PCHLT 2005-4 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the PCHLT 2005-4 Offering Documents represented that a large percentage of the loans supporting plaintiffs' PCHLT 2005-4 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

- 278 -

651.   Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' PCHLT 2005-4 Certificate, which reveals that the OOR percentages stated in the PCHLT 2005-4 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the Primary Residence Percentages stated in the PCHLT 2005-4 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M4 | 71085PDK6 | All | 89.98% | 81.73% | 10.10% |

### d.   Credit Ratings

652.   The PCHLT 2005-4 Offering Documents also represented that the PCHLT 2005-4 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P, Moody's and Fitch Ratings ("Fitch"), indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the PCHLT 2005-4 Offering Documents represented that plaintiffs' PCHLT 2005-4 Certificate had been assigned AA/A1/AA- ratings – signifying an extremely safe and stable security.

653.   These representations, however, were false and misleading when made.  In truth, plaintiffs' PCHLT 2005-4 Certificate should not have received AA/A1/AA- credit ratings, because it was *not* a safe, "investment grade" security with a low probability of default.  Rather, as defendants were well aware, plaintiffs' PCHLT 2005-4 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P, Moody's and Fitch had assigned such high ratings to plaintiffs' PCHLT 2005-4 Certificate was because defendants had fed them falsified information regarding the PCHLT

2005-4 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

654.    The falsity of the credit ratings set forth in the PCHLT 2005-4 Offering Documents is confirmed by subsequent events.    Specifically, ***approximately 33% of the loans supporting plaintiffs' PCHLT 2005-4 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, plaintiffs' "investment grade" PCHLT 2005-4 Certificate is now rated at "junk" status or below.    Clearly, plaintiffs' PCHLT 2005-4 Certificate was not the highly rated, "investment grade" security that defendants represented it to be.    The evidence supporting the falsity of the PCHLT 2005-4 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche | CUSIP | Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | | Fitch Ratings | |
|---------|-------|------------|-----------------------------------------------------------|-----------------|---------|---------------|---------|---------------|---------|
| | | | | Initial | Current | Initial | Current | Initial | Current |
| M4 | 71085PDK6 | All | 32.98% | A1 | C | AA | D | AA- | C |

e.    **Transfer of Title**

655.    The PCHLT 2005-4 Offering Documents also represented that the loans underlying the PCHLT 2005-4 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.    Specifically, the PCHLT 2005-4 Offering Documents stated that "[the PCHLT 2005-4 Certificates] will be issued by the trust, the assets of which on the Closing Date will consist of . . . all of the [depositor's] right, title and interest in and to the mortgage loans, the related mortgage notes, mortgages and other related documents."    PCHLT 2005-4 Pros. Supp. at S-63.    This statement was false and misleading.    The

depositor failed to legally and properly transfer the promissory notes and security instruments to the trust. *See* §VI.E, *infra*.

### 42.    The SACO 2005-7 Certificates

656.    The SACO I Trust, 2005-7, Mortgage Backed Certificates, Series 2005-7 ("SACO 2005-7 Certificates") were issued pursuant to a Prospectus Supplement dated September 28, 2005. The following defendants played critical roles in the fraudulent structuring, offering and sale of the SACO 2005-7 Certificates: BSABS (depositor); EMC Mortgage (seller); Bear Stearns Co. (underwriter).

657.    Plaintiffs and/or their assignors purchased the following SACO 2005-7 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|--------------------|--------------------|-------|---------------|-----------------------|----------------|
| Kleros V | WestLB | M3 | 785778KP5 | 10/02/2006 | $3,000,000 | J.P. Morgan Securities |

658.    The above purchase was made by WestLB's investment manager, Strategos, in direct reliance upon the SACO 2005-7 Offering Documents, including draft and/or final SACO 2005-7 Prospectus Supplements. Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.    Underwriting Guidelines

659.    The SACO 2005-7 Offering Documents disclosed that approximately 14.25% of the SACO 2005-7 Certificates' underlying loans were acquired by the seller, EMC Mortgage, from loan originator Finance America; approximately 13.77% of the SACO 2005-7 Certificates' underlying loans were acquired by the seller, EMC Mortgage, from loan originator AHM; approximately 12.30% of the SACO 2005-7 Certificates' underlying loans were acquired by the seller, EMC Mortgage, from Opteum; and the remainder of the SACO 2005-7 Certificates' underlying loans were

- 281 -

acquired by the seller, EMC Mortgage, from "various originators, none of which has originated more than 10% of the mortgage loans." *See* SACO 2005-7 Pros. Supp. at S-4, S-28.

660.    With regard to the AHM loans, the SACO 2005-7 Offering Documents represented that "[AHM's] underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt," and that AHM "underwrites a borrower's creditworthiness based solely on information that [AHM] believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring," and that AHM "closely review[s] the borrower's housing payment history." *Id*. at S-29.  The SACO 2005-7 Offering Documents also represented that "[i]n addition to reviewing the borrower's credit history and credit score, [AHM] underwriters closely review the borrower's housing payment history."  *Id.* The SACO 2005-7 Offering Documents further represented:

> For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis.  Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period.  In addition to the monthly housing expense the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan.

*Id*. at S-30.  The SACO 2005-7 Offering Documents further represented that "[e]very AHM mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation."  *Id.*  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that AHM had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as

- 282 -

possible, *without* any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.9, *infra*.

661.    With regard to the Finance America loans, the SACO 2005-7 Offering Documents represented that Finance America utilized "three key loan factors [which] are mortgage pay history, the borrower's Credit Bureau Score . . . and loan-to-value," and that "[t]he applicant's past and present payment history, employment and income, assets, liabilities and property value are all factors considered during the underwriting review process." *See* SACO 2005-7 Pros. Supp. at S-31-S-32. The SACO 2005-7 Offering Documents also represented that "Finance America's guidelines are applied in accordance with a procedure that generally requires an appraisal of the Mortgaged Property." *Id.* at S-34.  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that Finance America had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, *without* any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.1, *infra*.

662.    With regard to the Opteum loans, the SACO 2005-7 Offering Documents represented that "Opteum reviews a borrower's credit history, repayment ability and debt service-to-income ratio and as well as loan-to-value ratio." *See* SACO 2005-7 Pros. Supp. at S-35.  The SACO 2005-7 Offering Documents also represented that "[i]n addition all appraisals conform to the current Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation." *Id.* at S-36.  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that Opteum had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, *without* any regard for the borrowers' actual

- 283 -

repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.1, *infra*.

663.    With regard to all of the SACO 2005-7 Certificates' underlying loans, the SACO 2005-7 Offering Documents represented that they "will have been originated in accordance with the underwriting criteria specified in the related prospectus supplement." *See* SACO 2005-7 Prospectus at 27 (namely the underwriting standards for the AHM, Finance America and Opteum loans).  As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that the "various originators," AHM, Finance America and Opteum, had completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.9, *infra*.

664.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, one borrower obtained a second-lien loan for $122,850 in 2005 which was contained within the SACO 2005-7 offering. This borrower had income in 2005 of $1,900 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $5,918, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan, in 2005.

- 284 -

### b.      Loan-to-Value Ratios

665.    The SACO 2005-7 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the SACO 2005-7 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the SACO 2005-7 Offering Documents represented that ***none*** of the loans supporting plaintiffs' SACO 2005-7 Certificate had LTV ratios over 100%.

666.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' SACO 2005-7 Certificate, which reveals that the LTV ratio percentages stated in the SACO 2005-7 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the SACO 2005-7 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|
| M3 | 785778KP5 | All | 0.00% | 32.38% |

### c.      Credit Ratings

667.    The SACO 2005-7 Offering Documents also represented that the SACO 2005-7 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P, Moody's and Fitch, indicating that the security was a very strong, safe investment with an extremely low probability of default.   Specifically, the SACO 2005-7 Offering Documents represented that plaintiffs' SACO 2005-7 Certificate had been assigned A+/A1/A+ ratings – signifying an extremely safe and stable security.

- 285 -

668.    These representations, however, were false and misleading when made.  In truth, plaintiffs' SACO 2005-7 Certificate should not have received A+/A1/A+ credit ratings, because it was *not* a safe, "investment grade" security.  Rather, as defendants were well aware, plaintiffs' SACO 2005-7 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P, Moody's and Fitch had assigned such high ratings to plaintiffs' SACO 2005-7 Certificate was because defendants had fed them falsified information regarding the SACO 2005-7 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores and false borrower DTI ratios.

669.    The falsity of the credit ratings set forth in the SACO 2005-7 Offering Documents is confirmed by subsequent events.  Specifically, ***approximately 10% of the loans supporting plaintiffs' SACO 2005-7 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" SACO 2005-7 Certificate is now rated at "junk" status or below.  Clearly, plaintiffs' SACO 2005-7 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The evidence supporting the falsity of the SACO 2005-7 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | | Fitch's Rating | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current | Initial | Current |
| M3 | 785778KP5 | All | 9.47% | A1 | WR | A+ | D | A+ | D |

### d.    Transfer of Title

670.    The SACO 2005-7 Offering Documents also represented that the loans underlying the

SACO 2005-7 Certificates would be timely transferred to the issuing trust, so that the trust would

obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the SACO

2005-7 Offering Documents stated that "[a]t the time of issuance of the certificates, the depositor

will cause the mortgage loans, together with all principal and interest due with respect to such

mortgage loans after the cut-off date to be sold to the trust," and that  "[i]n addition, the depositor

will deposit with Wells Fargo Bank, National Association and LaSalle Bank National Association, as

custodians and agents for the trustee, for the benefit of the certificateholders, the following

documents with respect to each mortgage loan:  the original mortgage note . . . ; the original recorded

mortgage . . . ; [and] a duly executed assignment of the mortgage to [the Trustee]."  SACO 2005-7

Pros. Supp. at S-26.  These statements were false and misleading.  Defendants failed to legally and

properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 43.    The SACO 2005-8 Certificates

671.    The SACO I Trust, 2005-8, Mortgage-Backed Certificates, Series 2005-8 ("SACO

2005-8 Certificates") were issued pursuant to a Prospectus Supplement dated October 27, 2005.  The

following defendants played critical roles in the fraudulent structuring, offering and sale of the

SACO 2005-8 Certificates:  BSABS (depositor); EMC Mortgage (seller); Bear Stearns Co.

(underwriter).

672.    Plaintiffs and/or their assignors purchased the following SACO 2005-8 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|-------------------|-------------------|-------|---------------|---------------------|----------------|
| Kleros V  | WestLB            | M3                | 785778LF6 | 10/2/2006 | $2,000,000 | J.P. Morgan Securities |

673.    The above purchase was made by WestLB's investment manager, Strategos, in direct

reliance upon the SACO 2005-8 Offering Documents, including draft and/or final SACO 2005-8

Prospectus Supplements. Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.    Underwriting Guidelines

674.    The SACO 2005-8 Offering Documents disclosed that approximately 12.74% of the SACO 2005-8 Certificates' underlying loans were acquired by the seller, EMC Mortgage, from loan originator SouthStar; approximately 1.42% of the SACO 2005-8 Certificates' underlying loans were acquired by the seller, EMC Mortgage, from loan originator Bear Stearns Residential; and the remainder of the SACO 2005-8 Certificates' underlying loans were acquired by the seller from "various originators, none of which has originated more than 10% of the mortgage loans." *See* SACO 2005-8 Pros. Supp. at S-4, S-29.

675.    With regard to the SouthStar loans, the SACO 2005-8 Offering Documents represented that "SouthStar's Underwriting Guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made by SouthStar." *Id.* at S-29. The SACO 2005-8 Offering Documents also represented that "[i]n evaluating the applicant's ability and willingness to repay the proposed loan, SouthStar reviews the applicant's credit history and outstanding debts, as reported on the credit report," and that "SouthStar also evaluates the applicant's income to determine its stability, probability of continuation, and adequacy to service the proposed SouthStar debt payment." *Id.* The SACO 2005-8 Offering Documents further represented that "[i]n determining adequacy of the property as collateral for the loan, a Fannie Mae/Freddie Mac URAR appraisal of the property is performed by an independent appraiser approved by SouthStar." *Id.* at S-30. The SACO 2005-8 Offering Documents further represented:

> Once sufficient employment, credit and property information is obtained, the decision as to whether to approve the loan is based on the applicant's income and credit history, the status of time to the mortgaged property and the appraised value of

the property.  SouthStar also reviews the level of an applicant's liquid assets as an
indication of creditworthiness.  The approval process generally requires that the
applicant have good credit history and a total debt-to-income ("DTI") that generally
does not exceed 38%; however, this limit may be raised if the borrower demonstrates
satisfactory disposable income and/or other mitigating factors are present.  The DTI
ratio is calculated as the ratio of the borrower's total monthly debt obligations,
divided by the borrower's total verified monthly income.  In general, it is SouthStar's
belief that the DTI ratio is only one of several factors, such as loan-to-value ("LTV"),
credit history and reserves, that should be considered in making a determination of an
applicant's ability to repay the proposed loan.

*Id.*  As further detailed *infra*, these representations were false and misleading at the time they were

made.  Contrary to defendants' affirmative representations, the truth was that SouthStar had

completely abandoned its stated underwriting guidelines and was simply seeking to originate as

many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true

value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.1, *infra*.

676.    With regard to all of the loans underlying the SACO 2005-8 Certificates, the SACO

2005-8 Offering Documents represented that they were "originated in accordance with the

underwriting criteria specified in the related prospectus supplement."  *See* SACO 2005-8 Prospectus

at 27 (citing the underwriting guidelines for the SouthStar loans).  As further detailed *infra*, these

representations were false and misleading at the time they were made.  Contrary to defendants'

affirmative representations, the truth was that SouthStar, Bear Stearns Residential and the "various

originators" had completely abandoned their stated underwriting guidelines and were simply seeking

to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment

ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See*

§VI.A.7, *infra*.

677.    The following example, based upon public bankruptcy filings and other sources,

provides further specificity with respect to how the originators' failure to comply with guidelines

resulted in loans being issued to borrowers who could not afford to repay them.  Specifically, a

husband and wife obtained a second-lien loan for $117,000 in 2005 which was contained within the SACO 2005-8 offering. These borrowers had income in 2005 of $9,404, per month, according to the borrowers' sworn bankruptcy filings. ***However, the borrowers' monthly debt payments were at least $10,303, more than the borrowers' monthly income***. The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, these borrowers could not afford to repay the loan. This is confirmed by the fact that the borrowers declared bankruptcy shortly after obtaining the loan, in 2006.

### b.    Loan-to-Value

678.    The SACO 2005-8 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the SACO 2005-8 Certificate purchased by plaintiffs and/or their assigning entities. Specifically, the SACO 2005-8 Offering Documents represented that ***none*** of the loans supporting plaintiffs' SACO 2005-8 Certificate had LTV ratios over 100%.

679.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' SACO 2005-8 Certificate, which reveals that the LTV ratio percentages stated in the SACO 2005-8 Offering Documents were materially false ***at the time they were made***. The following chart summarizes the LTV ratio percentages stated in the SACO 2005-8 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|
| M3 | 785778LF6 | All | 0.00% | 33.21% |

### c.    The Credit Ratings

680.    The SACO 2005-8 Offering Documents also represented that the SACO 2005-8 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P, Moody's and Fitch, indicating that the security was a very strong, safe investment with an extremely low probability of default.    Specifically, the SACO 2005-8 Offering Documents represented that plaintiffs' SACO 2005-8 Certificate had been assigned A+/A1/A+ ratings – signifying an extremely safe and stable security.

681.    These representations, however, were false and misleading when made.    In truth, plaintiffs' SACO 2005-8 Certificate should not have received A+/A1/A+ credit ratings, because it was ***not*** a safe, "investment grade" security.    Rather, as defendants were well aware, plaintiffs' SACO 2005-8 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.    Indeed, one of the primary reasons that S&P, Moody's and Fitch had assigned such high ratings to plaintiffs' SACO 2005-8 Certificate was because defendants had fed them falsified information regarding the SACO 2005-8 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores and false borrower DTI ratios.

682.    The falsity of the credit ratings set forth in the SACO 2005-8 Offering Documents is confirmed by subsequent events.    Specifically, ***approximately 10% of the loans supporting plaintiffs' SACO 2005-8 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.    Moreover, plaintiffs' "investment grade" SACO 2005-8 Certificate is now rated at "junk" status or below.    Clearly, plaintiffs' SACO 2005-8 Certificate was not the highly rated, "investment grade" security defendants represented it to be.    The evidence supporting the falsity of the SACO 2005-8 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

- 291 -

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | | Fitch's Rating | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current | Initial | Current |
| M3 | 785778LF6 | All | 9.57% | A1 | WR | A+ | D | A+ | D |

### d.    Transfer of Title

683.    The SACO 2005-7 Offering Documents also represented that the loans underlying the

SACO 2005-7 Certificates would be timely transferred to the issuing trust, so that the trust would

obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the SACO

2005-7 Offering Documents stated that "[a]t the time of issuance of the certificates, the depositor

will cause the mortgage loans, together with all principal and interest due with respect to such

mortgage loans after the cut-off date to be sold to the trust," and that "[i]n addition, the depositor

will deposit with Wells Fargo Bank, National Association and LaSalle Bank National Association, as

custodians and agents for the trustee, for the benefit of the certificateholders, the following

documents with respect to each mortgage loan: the original mortgage note . . . ; the original recorded

mortgage . . . ; [and] a duly executed assignment of the mortgage to [the Trustee]."  SACO 2005-7

Pros. Supp. at S-27.  These statements were false and misleading.  Defendants failed to legally and

properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 44.    The SACO 2006-5 Certificates

684.    The SACO I Trust 2006-5, Mortgage-Backed Certificates, Series 2006-5 ("SACO

2006-5 Certificates") were issued pursuant to a Prospectus Supplement dated April 26, 2006.  The

following defendants played critical roles in the fraudulent structuring, offering and sale of the

SACO 2006-5 Certificates: BSABS (depositor); EMC Mortgage (sponsor/seller); Bear Stearns Co.

(underwriter).

685.    Plaintiffs and/or their assignors purchased the following SACO 2006-5 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|-------------------|-------------------|-------|---------------|---------------------|----------------|
| Kleros V | WestLB | 2M4 | 785811AP5 | 10/2/2006 | $2,361,000 | J.P. Morgan Securities |

686.    The above purchase was made by WestLB's investment manager, Strategos, in direct reliance upon the SACO 2006-5 Offering Documents, including draft and/or final SACO 2006-5 Prospectus Supplements.  Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.    Underwriting Guidelines

687.    The SACO 2006-5 Offering Documents disclosed that approximately 28.06% of the SACO 2006-5 Certificates' group I loans were acquired by the sponsor/seller, EMC Mortgage, from loan originator Aames Capital Corporation ("Aames"); approximately 15.89% of the SACO 2006-5 Certificates' group I loans were acquired by the sponsor/seller, EMC Mortgage, from loan originator, First Horizon Home Loan Corporation ("First Horizon"); approximately 15.64% of the SACO 2006-5 Certificates' group I loans were acquired by the sponsor/seller, EMC Mortgage, from loan originator SouthStar; approximately 5.41% of the SACO 2006-5 Certificates' group II loans were acquired by the sponsor/seller, EMC Mortgage, from loan originator Bear Stearns Residential; and the remainder of the SACO 2006-5 Certificates' underlying loans were acquired by the sponsor/seller from "various originators, none of which has originated more than 10% of the mortgage loans."  *See* SACO 2006-5 Pros. Supp. at S-32, S-36.

688.    With regard to the Aames loans, the SACO 2006-5 Offering Documents represented that Aames' "underwriting guidelines are designed to help it evaluate a borrower's history of payments on his prior mortgage credit history, capacity, willingness, and ability to repay the loan, and the value and adequacy of the collateral."  *Id*. at S-37.  The SACO 2006-5 Offering Documents also represented that "[a]n assessment of the adequacy of the real property as collateral for the loan

- 293 -

is primarily based upon an appraisal of the property and a calculation of the LTV of the loan applied for and of all mortgages existing on the property, including the loan applied for (the CLTV) to the appraised value of the property at the time of origination." *Id.* at S-38. The SACO 2006-5 Offering Documents further represented that Aames' "Super Aim guidelines generally permit a maximum debt-to-income ratio ('DTI') of 50%," "[f]or full documentation or limited documentation loans with LTVs of 85% or less, the maximum DTI is 55%," and "[i]nterest-only loans . . . have a . . . maximum DTI of 50%." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Aames had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.12, *infra*.

689.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, a borrower obtained a second-lien loan for $108,000 in 2006 which was contained within the SACO 2006-5 offering. This borrower had income in 2006 of $6,992 per month, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $17,613, far in excess of the borrower's monthly income.*** The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy shortly after obtaining the loan, in 2006.

### b.      Loan-to-Value Ratios

690.    The SACO 2006-5 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the SACO 2006-5 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the SACO 2006-5 Offering Documents represented that ***none*** of the loans supporting plaintiffs' SACO 2006-5 Certificate had LTV ratios over 100%.

691.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' SACO 2006-5 Certificate, which reveals that the LTV ratio percentages stated in the SACO 2006-5 Offering Documents were materially false ***at the time they were made***.  The following chart summarizes the LTV ratio percentages stated in the SACO 2006-5 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|
| 2M4 | 785811AP5 | Group II | 0.00% | 31.12% |

### c.      The Credit Ratings

692.    The SACO 2006-5 Offering Documents also represented that the SACO 2006-5 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the SACO 2006-5 Offering Documents represented that plaintiffs' SACO 2006-5 Certificate had been assigned A+/A1 ratings – signifying an extremely safe and stable security.

- 295 -

693.    These representations, however, were false and misleading when made.  In truth, plaintiffs' SACO 2006-5 Certificate should not have received A+/A1 credit ratings, because it was **not** a safe, "investment grade" security.  Rather, as defendants were well aware, plaintiffs' SACO 2006-5 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that S&P and Moody's had assigned such high ratings to plaintiffs' SACO 2006-5 Certificate was because defendants had fed them falsified information regarding the SACO 2006-5 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores and false borrower DTI ratios.

694.    The falsity of the credit ratings set forth in the SACO 2006-5 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 12%[18] of the loans supporting plaintiffs' SACO 2006-5 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, after initially being rated "investment grade," plaintiffs' SACO 2006-5 Certificate is no longer rated at all.  Clearly, plaintiffs' SACO 2006-5 Certificate was not the highly rated, "investment grade" security defendants represented it to be.  The evidence supporting the falsity of the SACO 2006-5 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 2M4 | 785811AP5 | Group II | 12.54% | A1 | WR | A+ | NR |

---

[18]    The default rate stated herein was obtained from the latest SACO 2006-5 trustee report dated January 2013.

- 296 -

### d.    Transfer of Title

695.    The SACO 2006-5 Offering Documents also represented that the loans underlying the SACO 2006-5 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the SACO 2006-5 Offering Documents stated that "[a]t the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due with respect to such mortgage loans after the cut-off date to be sold to the trust," and that "[i]n addition, the depositor will deposit with Wells Fargo Bank, National Association and LaSalle Bank National Association, as custodians and agents for the trustee, for the benefit of the certificateholders, the following documents with respect to each mortgage loan: the original mortgage note . . . ; the original recorded mortgage . . . ; [and] a duly executed assignment of the mortgage in blank or to [the Trustee]."  SACO 2006-5 Pros. Supp. at S-34.  These statements were false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 45.    The SGMS 2006-FRE2 Certificates

696.    The SG Mortgage Securities Trust 2006-FRE2, Asset-Backed Certificates, Series 2006-FRE2 ("SGMS 2006-FRE2 Certificates") were issued pursuant to a Prospectus Supplement dated July 7, 2006.  Defendant Bear Stearns Co., as the primary underwriter, played a critical role in the fraudulent structuring, offering and sale of the SGMS 2006-FRE2 Certificates.

697.    Plaintiffs and/or their assignors purchased the following SGMS 2006-FRE2 Certificates:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|---|---|---|---|---|---|---|
| Blue Heron VI | Blue Heron VI | M6 | 784208AL4 | 7/7/2006 | $2,500,000 | Soc. Gen. |
| Blue Heron VII | Blue Heron VII | M6 | 784208AL4 | 7/7/2006 | $2,500,000 | Soc. Gen. |

698.    Each of the above purchases was made by Blue Heron VI's and Blue Heron VII's investment manager, Brightwater, in direct reliance upon the SGMS 2006-FRE2 Offering Documents, including draft and/or final SGMS 2006-FRE2 Prospectus Supplements.  Brightwater's diligent investment processes are described in great detail in §VIII.A, *infra*.

a.    **Underwriting Guidelines**

699.    The SGMS 2006-FRE2 Offering Documents disclosed that 100% of the SGMS 2006-FRE2 Certificates' underlying loans were originated or acquired by Fremont.  *See* SGMS 2006-FRE2 Pros. Supp. at S-35.

700.    The SGMS 2006-FRE2 Offering Documents represented that "Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan." *Id*.  The SGMS 2006-FRE2 Offering Documents also represented that "Fremont's underwriting guidelines . . . require an appraisal of the mortgaged property, and if appropriate, a review appraisal." *Id.* at S-36.  The SGMS 2006-FRE2 Offering Documents further represented that "Fremont currently has two programs for the origination of second lien mortgage loans," both of which are "limited to borrowers with . . . debt to income ratios not greater than 50%" and that "Fremont recently discontinued an additional second lien mortgage program" that was also "limited to borrowers in . . . debt ratios not greater than 50%." *Id.* at S-37.  The SGMS 2006-FRE2 Offering Documents further represented that "Fremont's underwriting guidelines under the Scored Programs

- 298 -

with respect to each rating category generally require: debt to income ratios of 55% or less on mortgage loans with loan-to-value ratios of 90% or less, however, debt to income ratios of 50% or less are required on loan-to-value ratios greater than 90%." *Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Fremont had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.5, *infra*.

701.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a loan for $870,000 in 2006 which was contained within the SGMS 2006-FRE2 offering. The loan was originated through Fremont, the loan originator identified in the Offering Documents. This borrower had income in 2006 of $1,250 per month, plus unemployment benefits averaging $271 per month in 2006, according to the borrower's and her husband's sworn bankruptcy filings. Therefore, this borrower had $1,521 per month with which to meet her debts and expenses. ***However, the borrower's monthly debt payments were at least $6,976, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower and her husband declared bankruptcy after obtaining the loan, in 2007.

### b.    Loan-to-Value Ratios

702.    The SGMS 2006-FRE2 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the SGMS 2006-FRE2 Certificates

- 299 -

purchased by plaintiffs and/or their assigning entities. Specifically, the SGMS 2006-FRE2 Offering Documents represented that less than a third of the loans supporting plaintiffs' SGMS 2006-FRE2 Certificates had LTV ratios over 80%, and that **none** of the loans supporting plaintiffs' SGMS 2006-FRE2 Certificates had LTV ratios over 100%.

703.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' SGMS 2006-FRE2 Certificates, which reveals that the LTV ratio percentages stated in the SGMS 2006-FRE2 Offering Documents were materially false ***at the time they were made***. The following chart summarizes the LTV ratio percentages stated in the SGMS 2006-FRE2 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage Of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| M6 | 784208AL4 | All | 30.04% | 78.47% | 0.00% | 36.30% |

### c.    Owner Occupancy Rates

704.    The SGMS 2006-FRE2 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the SGMS 2006-FRE2 Certificates purchased by plaintiffs and/or their assigning entities. Specifically, the SGMS 2006-FRE2 Offering Documents represented that a large percentage of the loans supporting plaintiffs' SGMS 2006-FRE2 Certificates were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

705.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' SGMS 2006-FRE2 Certificates, which reveals that the

- 300 -

OOR percentages stated in the SGMS 2006-FRE2 Offering Documents were materially false *at the time they were made*. The following chart summarizes the Primary Residence Percentages stated in the SGMS 2006-FRE2 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| M6 | 784208AL4 | All | 92.68% | 82.30% | 12.61% |

### d.    Credit Ratings

706.    The SGMS 2006-FRE2 Offering Documents also represented that the SGMS 2006-FRE2 Certificates purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by S&P, Moody's and Fitch, indicating that the securities were very strong, safe investments with an extremely low probability of default. Specifically, the SGMS 2006-FRE2 Offering Documents represented that plaintiffs' SGMS 2006-FRE2 Certificates had each been assigned A/A3/A ratings – signifying extremely safe and stable securities.

707.    These representations, however, were false and misleading when made. In truth, plaintiffs' SGMS 2006-FRE2 Certificates should not have received A/A3/A credit ratings, because they were *not* safe, "investment grade" securities. Rather, as defendants were well aware, plaintiffs' SGMS 2006-FRE2 Certificates were extremely risky, speculative grade "junk" bonds or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that S&P, Moody's and Fitch had assigned such high ratings to plaintiffs' SGMS 2006-FRE2 Certificates was because defendants had fed them falsified information regarding the SGMS 2006-FRE2 Certificates' underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

708.    The falsity of the credit ratings set forth in the SGMS 2006-FRE2 Offering

Documents is confirmed by subsequent events.    Specifically, ***more than 58% of the loans***

***supporting plaintiffs' SGMS 2006-FRE2 Certificates are currently in default*** because they were

made to borrowers who either could not afford them or never intended to repay them.    Moreover,

plaintiffs' "investment grade" SGMS 2006-FRE2 Certificates are now rated at "junk" status or

below.    Clearly, plaintiffs' SGMS 2006-FRE2 Certificates were not the highly rated, "investment

grade" securities defendants represented them to be.    The evidence supporting the falsity of the

SGMS 2006-FRE2 Certificates' credit ratings is set forth in further detail in §VI.D, *infra*, and

summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | S&P's Ratings | | Fitch Ratings | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current | Initial | Current |
| M6 | 784208AL4 | All | 58.69% | A3 | WR | A | D | A | D |

**e.    Transfer of Title**

709.    The SGMS 2006-FRE2 Offering Documents also represented that the loans

underlying the SGMS 2006-FRE2 Certificates would be timely transferred to the issuing trust, so

that the trust would obtain good title to the mortgage loans comprising the pool for the offering.

Specifically, the SGMS 2006-FRE2 Offering Documents stated that "[o]n the Closing Date, the

Depositor will transfer to the Trust all of its right, title and interest in and to each Mortgage Loan, the

related mortgage note, Mortgage, assignment of Mortgage in recordable form in blank or to the

Trustee and other related documents (collectively, the 'Related Documents'), including all scheduled

payments with respect to each such Mortgage Loan due after the Cut-off Date."    *See* SGMS 2006-

FRE2 Pros. Supp. at S-46-S-47.    This statement was false and misleading.    Defendants failed to

legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

### 46.    The WFMBS 2006-12 Certificates

710.    The Wells Fargo Mortgage Backed Securities 2006-12 Trust, Mortgage Pass-Through Certificates, Series 2006-12 ("WFMBS 2006-12 Certificates") were issued pursuant to a Prospectus Supplement dated September 27, 2006.  Defendant Bear Stearns Co., as the primary underwriter, played a critical role in the fraudulent structuring, offering and sale of the WFMBS 2006-12 Certificates.

711.    Plaintiffs and/or their assignors purchased the following WFMBS 2006-12 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|--------------------|--------------------|-------|---------------|----------------------|----------------|
| Kleros V | WestLB | A3 | 94984HAC9 | 10/5/2006 | $12,000,000 | Bear Stearns Co. |

712.    The above purchase was made by WestLB's investment manager, Strategos, in direct reliance upon the WFMBS 2006-12 Offering Documents, including draft and/or final WFMBS 2006-12 Prospectus Supplements.  Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

### a.    Underwriting Guidelines

713.    The WFMBS 2006-12 Offering Documents disclosed that 100% of the WFMBS 2006-12 Certificates' underlying loans were originated or acquired by the sponsor, Wells Fargo Bank N.A. ("Wells Fargo").  *See* WFMBS 2006-12 Pros. Supp. at S-8, S-41.

714.    The WFMBS 2006-12 Offering Documents represented that "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral."  *See* WFMBS 2006-12 Prospectus at 32.  The WFMBS 2006-12 Offering

Documents also represented that "[t]he underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history." *Id.* The WFMBS 2006-12 Offering Documents further represented that "[v]erifications of employment, income, assets or mortgages may be used to supplement the loan application and the credit report in reaching a determination as to the applicant's ability to meet his or her monthly obligations of the proposed mortgage loan, as well as his or her other mortgage payments (if any), living expenses and financial obligations," and that "[a] mortgage verification involves obtaining information regarding the borrower's payment history with respect to any existing mortgage the applicant may have." *Id.* at 33.  The WFMBS 2006-12 Offering Documents further represented:

> In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level.  Such maximum level varies depending on a number of factors including Loan-to-Value Ratio, a borrower's credit history, a borrower's liquid net worth, the potential of a borrower for continued employment advancement or income growth, the ability of the borrower to accumulate assets or to devote a greater portion of income to basic needs such as housing expense, a borrower's Mortgage Score and the type of loan for which the borrower is applying.

*Id.* at 34.  As further detailed *infra*, these representations were false and misleading at the time they were made.  Contrary to defendants' affirmative representations, the truth was that Wells Fargo had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral.  *See* §VI.A.16, *infra*.

715.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines

- 304 -

resulted in loans being issued to borrowers who could not afford to repay them. Specifically, one borrower obtained a loan for $508,000 in 2006 which was contained within the WFMBS 2006-12 offering. The loan was originated through Wells Fargo, the loan originator identified in the Offering Documents. This borrower had monthly income in 2006 of $2,430, according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $3,864.09, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy after obtaining the loan at issue, in 2008.

### b.    Loan-to-Value Ratios

716.    The WFMBS 2006-12 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the WFMBS 2006-12 Certificate purchased by plaintiffs and/or their assigning entities. Specifically, the WFMBS 2006-12 Offering Documents represented that only a very small percentage of the loans supporting plaintiffs' WFMBS 2006-12 Certificate had LTV ratios over 80%, and that ***none*** of the loans supporting plaintiffs' WFMBS 2006-12 Certificate had LTV ratios over 100%.

717.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' WFMBS 2006-12 Certificate, which reveals that the LTV ratio percentages stated in the WFMBS 2006-12 Offering Documents were materially false ***at the time they were made***. The following chart summarizes the LTV ratio percentages stated in the WFMBS 2006-12 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

- 305 -

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| A3 | 94984HAC9 | All | 1.16% | 30.55% | 0.00% | 8.08% |

### c.    Owner Occupancy Rates

718.    The WFMBS 2006-12 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the WFMBS 2006-12 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the WFMBS 2006-12 Offering Documents represented that a large percentage of the loans supporting plaintiffs' WFMBS 2006-12 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

719.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' WFMBS 2006-12 Certificate, which reveals that the OOR percentages stated in the WFMBS 2006-12 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the OOR percentages stated in the WFMBS 2006-12 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| A3 | 94984HAC9 | All | 96.41% | 82.90% | 16.30% |

### d.    Credit Ratings

720.    The WFMBS 2006-12 Offering Documents also represented that the WFMBS 2006-12 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit

- 306 -

ratings by Fitch and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default. Specifically, the WFMBS 2006-12 Offering Documents represented that plaintiffs' WFMBS 2006-12 Certificate had been assigned AAA/Aaa ratings – the highest, safest credit ratings available, which are in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.

721.    These representations, however, were false and misleading when made. In truth, plaintiffs' WFMBS 2006-12 Certificate should not have received AAA/Aaa credit ratings, because it was **not** a safe, "investment grade" security with "a less than 1% probability of incurring defaults." Rather, as defendants were well aware, plaintiffs' WFMBS 2006-12 Certificate was an extremely risky, speculative grade "junk" bond or worse, backed by low credit quality, extremely risky loans. Indeed, one of the primary reasons that Fitch and Moody's had assigned such high ratings to plaintiffs' WFMBS 2006-12 Certificate was because defendants had fed them falsified information regarding the WFMBS 2006-12 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

722.    The falsity of the credit ratings set forth in the WFMBS 2006-12 Offering Documents is confirmed by subsequent events. Specifically, ***more than 15% of the loans supporting plaintiffs' WFMBS 2006-12 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them. Moreover, plaintiffs' "investment grade" WFMBS 2006-12 Certificate is now rated at "junk" status or below. Clearly, plaintiffs' WFMBS 2006-12 Certificate was not the highly rated, "investment grade" security defendants represented it to be. The evidence supporting the falsity of the WFMBS 2006-12 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | Fitch's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| A3 | 94984HAC9 | All | 15.47% | Aaa | Caa1 | AAA | D |

### e.        Transfer of Title

723.    The WFMBS 2006-12 Offering Documents also represented that the loans underlying the WFMBS 2006-12 Certificates would be timely transferred to the issuing trust, so that the trust would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the WFMBS 2006-12 Offering Documents stated that "[o]n the closing date the sponsor will sell the mortgage loans to the depositor, who will in turn deposit them into a common law trust, which is the issuing entity," and that "[t]he Mortgage Loans will be deposited by the Depositor into the Trust under the Pooling and Servicing Agreement."  *See* WFMBS 2006-12 Pros. Supp. at S-8, S-23.  The WFMBS 2006-12 Offering Documents further represented:

> At the time of issuance of each Series of Certificates, the Mortgage Loans in the related Trust Estate will, pursuant to the applicable Pooling and Servicing Agreement, be assigned to the Trustee, together with all principal and interest received on or with respect to such Mortgage Loans after the applicable Cut-Off Date other than principal and interest due and payable on or before such Cut-Off Date and interest attributable to the Fixed Retained Yield on such Mortgage Loans, if any.

*See* WFMBS 2006-12 Prospectus at 79.  The WFMBS 2006-12 Offering Documents also stated:

> In addition, with respect to each Mortgage Loan in a Trust Estate, the mortgage or other promissory note or a lost note affidavit executed by the applicable Servicer, any assumption, consolidation, modification or conversion to fixed interest rate agreement and, a mortgage assignment in recordable form (or other documents as are required under applicable law to create perfected security interest in the Mortgaged Property in favor of the Trustee) will be delivered to the Trustee or, if indicated in the applicable prospectus supplement, to a custodian, which may be the Sponsor.

*Id.*  These statements were false and misleading.  Defendants failed to legally and properly transfer the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

- 308 -

47.    **The WFMBS 2007-2 Certificates**

724.    The Wells Fargo Mortgage Backed Securities 2007-2 Trust, Mortgage Pass-Through Certificates, Series 2007-2 ("WFMBS 2007-2 Certificates") were issued pursuant to a Prospectus Supplement dated February 26, 2007.  Defendant Bear Stearns Co., as the primary underwriter, played a critical role in the fraudulent structuring, offering and sale of the WFMBS 2007-2 Certificates.

725.    Plaintiffs and/or their assignors purchased the following WFMBS 2007-2 Certificate:

| Plaintiff | Original Purchaser | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Purchased From |
|-----------|-------------------|-------------------|-------|---------------|----------------------|----------------|
| Kleros V | Kleros V | 3A2 | 94984XBC3 | 4/12/2007 | $10,000,000 | Bear Stearns Co. |

726.    The above purchase was made by Kleros V's investment manager, Strategos, in direct reliance upon the WFMBS 2007-2 Offering Documents, including draft and/or final WFMBS 2007-2 Prospectus Supplements.  Strategos's diligent investment processes are described in great detail in §VIII.B, *infra*.

a.    **Underwriting Guidelines**

727.    The WFMBS 2007-2 Offering Documents disclosed that 100% of the WFMBS 2007-2 Certificates' underlying loans were originated or acquired by the sponsor, Wells Fargo.  *See* WFMBS 2007-2 Pros. Supp. at S-8, S-56.

728.    The WFMBS 2007-2 Offering Documents represented that "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral."  *See* WFMBS 2007-2 Prospectus at 33. The WFMBS 2007-2 Offering Documents also represented that "[t]he underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the

lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history." *Id.* The WFMBS 2007-2 Offering Documents further represented that "[v]erifications of employment, income, assets or mortgages may be used to supplement the loan application and the credit report in reaching a determination as to the applicant's ability to meet his or her monthly obligations of the proposed mortgage loan, as well as his or her other mortgage payments (if any), living expenses and financial obligations," and that "[a] mortgage verification involves obtaining information regarding the borrower's payment history with respect to any existing mortgage the applicant may have." *Id.* at 34. The WFMBS 2007-2 Offering Documents further represented:

> In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level. Such maximum level varies depending on a number of factors including Loan-to-Value Ratio, a borrower's credit history, a borrower's liquid net worth, the potential of a borrower for continued employment advancement or income growth, the ability of the borrower to accumulate assets or to devote a greater portion of income to basic needs such as housing expense, a borrower's Mortgage Score and the type of loan for which the borrower is applying.

*Id.* As further detailed *infra*, these representations were false and misleading at the time they were made. Contrary to defendants' affirmative representations, the truth was that Wells Fargo had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, ***without*** any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral. *See* §VI.A.16, *infra*.

729.    The following example, based upon public bankruptcy filings and other sources, provides further specificity with respect to how the originators' failure to comply with guidelines resulted in loans being issued to borrowers who could not afford to repay them. Specifically, a borrower obtained a loan for $438,409 in 2006 which was contained within the WFMBS 2007-2 offering. This borrower had income in 2006 of $5,424 per month, according to the borrower's sworn

bankruptcy filings. *However, the borrower's monthly debt payments were at least $5,313, giving this borrower a DTI ratio of over 97%, far in excess of any DTI ratio indicating an ability to repay the loan*. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay the loan. This is confirmed by the fact that the borrower declared bankruptcy after obtaining the loan at issue, in 2007.

### b.    Loan-to-Value Ratios

730.    The WFMBS 2007-2 Offering Documents also made certain misrepresentations regarding the LTV ratios associated with the loans supporting the WFMBS 2007-2 Certificate purchased by plaintiffs and/or their assigning entities. Specifically, the WFMBS 2007-2 Offering Documents represented that only a small percentage of the loans supporting plaintiffs' WFMBS 2007-2 Certificate had LTV ratios over 80%, and that *none* of the loans supporting plaintiffs' WFMBS 2007-2 Certificate had LTV ratios over 100%.

731.    Plaintiffs, however, have performed an industry-accepted historical valuation analysis on the actual loans underlying plaintiffs' WFMBS 2007-2 Certificate, which reveals that the LTV ratio percentages stated in the WFMBS 2007-2 Offering Documents were materially false *at the time they were made*. The following chart summarizes the LTV ratio percentages stated in the WFMBS 2007-2 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' industry-accepted analysis:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Stated Percentage of Loans Having LTV Ratios Over 80% | Actual Percentage of Loans Having LTV Ratios Over 80% | Stated Percentage of Loans Having LTV Ratios Over 100% | Actual Percentage of Loans Having LTV Ratios Over 100% |
|---|---|---|---|---|---|---|
| 3A2 | 94984XBC3 | All | 2.25% | 33.84% | 0.00% | 9.41% |

### c.    Owner Occupancy Rates

732.    The WFMBS 2007-2 Offering Documents also made certain misrepresentations regarding the OOR percentages associated with the loans supporting the WFMBS 2007-2 Certificate purchased by plaintiffs and/or their assigning entities.  Specifically, the WFMBS 2007-2 Offering Documents represented that a large percentage of the loans supporting plaintiffs' WFMBS 2007-2 Certificate were issued to borrowers that actually lived in the properties serving as collateral for their loans, significantly decreasing the likelihood that those borrowers would default on their loans.

733.    Plaintiffs, however, have performed an in-depth investigation of the actual borrowers, loans and properties underlying plaintiffs' WFMBS 2007-2 Certificate, which reveals that the OOR percentages stated in the WFMBS 2007-2 Offering Documents were materially false *at the time they were made*.  The following chart summarizes the OOR percentages stated in the WFMBS 2007-2 Offering Documents, and the actual percentages that should have been stated according to plaintiffs' investigation:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Primary Residence Percentage Stated in the Offering Documents | Actual Primary Residence Percentage | Percent Overstatement of Actual Primary Residence Percentage |
|---|---|---|---|---|---|
| A2D | 94984XBC3 | All | 94.43% | 88.30% | 6.94% |

### d.    Credit Ratings

734.    The WFMBS 2007-2 Offering Documents also represented that the WFMBS 2007-2 Certificate purchased by plaintiffs had been assigned certain high "investment grade" credit ratings by Fitch and Moody's, indicating that the security was a very strong, safe investment with an extremely low probability of default.  Specifically, the WFMBS 2007-2 Offering Documents represented that plaintiffs' WFMBS 2007-2 Certificate had been assigned AAA/Aaa ratings – the highest, safest credit ratings available, which are in fact the same as, or even higher than, the current credit rating of U.S. Treasury debt.

- 312 -

735.    These representations, however, were false and misleading when made.  In truth, plaintiffs' WFMBS 2007-2 Certificate should not have received AAA/Aaa credit ratings, because it was ***not*** a safe, "investment grade" security with "a less than 1% probability of incurring defaults." Rather, as defendants were well aware, plaintiffs' WFMBS 2007-2 Certificate was an extremely risky, speculative grade "junk" bond, backed by low credit quality, extremely risky loans.  Indeed, one of the primary reasons that Fitch and Moody's had assigned such high ratings to plaintiffs' WFMBS 2007-2 Certificate was because defendants had fed them falsified information regarding the WFMBS 2007-2 Certificate's underlying loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR percentages.

736.    The falsity of the credit ratings set forth in the WFMBS 2007-2 Offering Documents is confirmed by subsequent events.  Specifically, ***more than 13% of the loans supporting plaintiffs' WFMBS 2007-2 Certificate are currently in default*** because they were made to borrowers who either could not afford them or never intended to repay them.  Moreover, plaintiffs' "investment grade" WFMBS 2007-2 Certificate is now rated at "junk" status.  Clearly, plaintiffs' WFMBS 2007-2 Certificate was not the highly rated, "investment grade" security defendants represented it to be. The evidence supporting the falsity of the WFMBS 2007-2 Certificate's credit ratings is set forth in further detail in §VI.D, *infra*, and summarized by the following chart:

| Tranche Purchased | CUSIP | Applicable Supporting Loan Group | Current Percentage of Outstanding Loan Balance in Default | Moody's Ratings | | Fitch's Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | Initial | Current | Initial | Current |
| 3A2 | 94984XBC3 | All | 13.43% | Aaa | B1 | AAA | CCC |

e.    **Transfer of Title**

737.    The WFMBS 2007-2 Offering Documents also represented that the loans underlying the WFMBS 2007-2 Certificates would be timely transferred to the issuing trust, so that the trust

would obtain good title to the mortgage loans comprising the pool for the offering.  Specifically, the

WFMBS 2007-2 Offering Documents stated that "[o]n the closing date the sponsor will sell the

mortgage loans to the depositor, who will in turn deposit them into a common law trust, which is the

issuing entity," and that "[t]he Mortgage Loans will be deposited by the Depositor into the Trust

under the Pooling and Servicing Agreement."  *See* WFMBS 2007-2 Pros. Supp. at S-8, S-28.  The

WFMBS 2007-2 Offering Documents further represented:

> At the time of issuance of each Series of Certificates, the Mortgage Loans in the related Trust Estate will, pursuant to the applicable Pooling and Servicing Agreement, be assigned to the Trustee, together with all principal and interest received on or with respect to such Mortgage Loans after the applicable Cut-Off Date other than principal and interest due and payable on or before such Cut-Off Date and interest attributable to the Fixed Retained Yield on such Mortgage Loans, if any.

*See* WFMBS 2007-2 Prospectus at 82.  The WFMBS 2007-2 Offering Documents further stated

> In addition, with respect to each Mortgage Loan in a Trust Estate, the mortgage or other promissory note or a lost note affidavit executed by the applicable Servicer, any assumption, consolidation, modification or conversion to fixed interest rate agreement and, a mortgage assignment in recordable form (or other documents as are required under applicable law to create perfected security interest in the Mortgaged Property in favor of the Trustee) will be delivered to the Trustee or, if indicated in the applicable prospectus supplement, to a custodian, which may be the Sponsor.

*Id.*  These statements were false and misleading.  Defendants failed to legally and properly transfer

the promissory notes and security instruments to the trusts.  *See* §VI.E, *infra*.

## VI.    DEFENDANTS' STATEMENTS AND OMISSIONS WERE MATERIALLY FALSE AND MISLEADING

### A.    Defendants' Statements that the Loan Underwriting Guidelines Were Designed to Assess a Borrower's Ability to Repay the Loan and to Evaluate the Adequacy of the Property as Collateral for the Loan Were Materially False and Misleading

738.    As set forth above in §V, the Offering Documents for each JPMorgan Offering

represented that the underlying loans were originated pursuant to specific, prudent, underwriting

guidelines, which the Offering Documents represented were generally intended to: (1) assess the

borrowers' creditworthiness and/or ability to repay the loans; and/or (2) evaluate the adequacy of the underlying properties to serve as security for the loans.

739.    These representations were incredibly material to plaintiffs because they confirmed that, regardless of the technical guidelines being applied, the certificates' underlying loans were generally being originated on the basis of a valid determination that the borrower would be able to repay his or her loans and that the property serving as collateral would provide adequate security in the event of a default.  In other words, these representations assured plaintiffs that the loans supporting their investments were unlikely to default, and further, unlikely to incur a loss in the unlikely event of default.  As such, they were material to plaintiffs' investment decision.

740.    Unfortunately for plaintiffs, however, defendants' material representations regarding the underwriting guidelines purportedly being used to originate the certificates' underlying loans were false and misleading at the time defendants made them.  As set forth immediately below, the originators of the certificates' underlying loans had, in fact, completely abandoned their stated underwriting guidelines and were simply seeking to originate as many loans as possible, ***without*** any regard for borrowers' actual repayment abilities or the true value and adequacy of mortgaged properties to serve as collateral.

### 1.    The Loan Originators Had Systematically Abandoned the Underwriting Guidelines Set Forth in the JPMorgan Offering Documents

741.    The representations in the Offering Documents for the JPMorgan Offerings concerning the loan originators' underwriting guidelines were false and misleading when made.  In reality, the loan originators at issue herein were ***not*** originating loans in accordance with their stated underwriting guidelines and were ***not*** evaluating their borrowers' true repayment ability or assessing the actual value of the property serving as collateral.  Instead, during the relevant time period, 2004-2007 – when the loans underlying the offerings at issue herein were originated – the loan originators

identified herein had abandoned their stated underwriting guidelines, and were simply making loans to nearly anyone they could, without regard for the borrowers' repayment ability or the adequacy of the mortgaged property as collateral. These lenders made loans as fast as they possibly could and ignored borrowers' true repayment ability because they knew defendants would purchase the loans *regardless* of whether the lenders had given any consideration to the borrowers' ability to repay, and *regardless* of whether the loans otherwise complied with the lenders' stated underwriting guidelines. This was the case because the demand for RMBS was skyrocketing during the relevant time period and defendants were making billions of dollars by satisfying that demand. Thus, defendants were scrambling to buy as many loans as they could, as fast as they could, so that they could quickly bundle the loans into RMBS offerings like those at issue herein, and sell them to unsuspecting investors like plaintiffs.

742.    Defendants knew that, contrary to their affirmative representations in the Offering Documents, the certificates' underlying loans had not been originated pursuant to underwriting guidelines that were designed to evaluate borrowers' ability to repay or assess the adequacy of the mortgaged property to serve as collateral. Defendants also knew, as a result, that the loans were not likely to be repaid. Defendants, however, failed to disclose any of this information. Instead, they simply packaged the defective loans as quickly as they could, concealed them within the offerings, and passed the risk of their repayment on to plaintiffs.

743.    Contrary to their affirmative representations in the Offering Documents, defendants knew that the loan originators had, in fact, implemented loan underwriting policies that were simply designed to extend mortgages to as many borrowers as possible, regardless of whether those borrowers could actually repay them. These policies included, among other things:

- Falsifying borrowers' incomes and/or coaching borrowers to misstate their income on loan applications to qualify them for loans they could not afford to repay, while making it appear the loans complied with the stated underwriting guidelines;

- Coaching borrowers to omit or understate debts and expenses on loan applications to qualify them for loans they could not afford to repay, while making it appear the loans complied with the stated underwriting guidelines;

- Steering borrowers to loans that exceeded their borrowing capacity;

- Approving borrowers based on "teaser rates" for loans, despite knowing that the borrower would not be able to afford the fully indexed rate when the loan rate adjusted; and

- Approving non-qualifying borrowers for loans under "exceptions" to the originators' underwriting standards based on purported "compensating factors," when no such compensating factors ever existed.

744. Further, the loan originators and their agents had become so aggressive at improperly approving and funding mortgage loans that many of the loans at issue herein were made to borrowers who had either not submitted required documents or had falsely altered the required documentation. In many instances, required income/employment verifications were improperly performed because the lenders' clerical staff either did not have adequate verification skills or did not care to exercise such skills, and oftentimes verifications were provided by inappropriate contacts at a borrower's place of employment (*e.g.*, a friend of the borrower would complete the verification instead of the human resources department at the borrower's employer). In this way, many suspect and false income verifications and loan applications were accepted by the originators at issue herein.

745. In addition, borrowers who submitted "stated income" loan applications were routinely approved on the basis of stated income levels that were inflated to extreme levels relative to their stated job titles, in order to give the appearance of compliance with stated underwriting guidelines. In many cases, the loan originators herein actually coached the borrowers to falsely inflate their stated incomes in order to qualify under the originators' underwriting guidelines. Inflation of stated income was so rampant that a study cited by Mortgage Asset Research Institute later found that almost ***all*** stated income loans exaggerated the borrower's actual income by 5% or more, ***and more than half overstated income by at least 50%***.

746.    This type of income inflation was a direct result of the loan originators' abandonment of their stated underwriting guidelines and their complete disregard for the borrowers' true repayment ability.  For instance, many "stated income" borrowers were actually wage earners who could have supplied Internal Revenue Service ("IRS") Forms W-2 or other income-verifying documentation, but were not required to do so.  Instead, they were steered to stated income loans by the lenders at issue herein, who then helped the borrowers "state" falsely inflated incomes. Originators also routinely issued loans without requiring the borrower to execute an IRS Form 4506, which would have allowed the lender to access such borrower's tax returns from the IRS, because the originators simply did not want to know that the borrower's true income level was less than the income level reported on the loan application.  In other cases, lenders removed documentation of a borrower's income from loan files, because such documentation revealed that the borrower's stated income was falsely inflated.  The falsification of income levels by the borrowers and the loan originators at issue herein was rampant.

747.    The originators at issue herein also routinely violated their stated underwriting guidelines by using falsely inflated appraisals and other valuations – which, in turn, resulted in falsely understated LTV ratios – in order to approve loans that otherwise would have never been made.  The U.S. Government's Financial Crisis Inquiry Commission ("FCIC") investigation confirmed that, during the time the loans underlying plaintiffs' certificates were originated, the lenders at issue herein were regularly pressuring appraisers to falsely inflate their appraisals in order to meet or exceed the amount needed for the subject loans to be approved.  This was especially true for loans, such as those at issue here, which were originated by lenders with the intention of being pooled and sold to defendants for eventual re-sale to investors like plaintiffs, who would ultimately bear the risk of default.

748.    The constant pressure appraisers routinely faced from originators such as those at issue herein was described by Jim Amorin, President of the Appraisal Institute, who stated in his April 23, 2009 FCIC testimony that "*[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again*. . . . *[T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice*.'"    This complete lack of independence by appraisers was also noted by Alan Hummel, Chair of the Appraisal Institute, in his testimony before the U.S. Senate, where Hummel noted that the dynamic between lenders and appraisers created a "terrible conflict of interest" by which *appraisers "experience[d] systemic problems with coercion" and were "ordered to doctor their reports" or else they would never "see work from those parties again" and were placed on "'exclusionary appraiser lists*.'"    Testimony on "Legislative Proposals on Reforming Mortgage Practices" presented by Alan E. Hummel before the House Committee on Financial Services, at 5 (Oct. 24, 2007).

749.    As a result of such pressures, appraisers routinely provided the originators at issue herein with falsely inflated appraisals that had no reasonable basis in fact, in direct contravention of the Offering Documents' false and misleading representations that the certificates' underlying loans had been originated pursuant to underwriting guidelines that required the lenders to evaluate the adequacy of the mortgaged properties to serve as collateral for the loans.    Moreover, the falsely inflated property values also resulted in artificially understated LTV ratios, which caused the loans and certificates to appear to plaintiffs to be of much higher credit quality and to be much less risky than they actually were.

750.    Following below are detailed allegations demonstrating that the loan originators for the offerings at issue herein did not comply with the loan underwriting guidelines stated in the Offering Documents, thereby rendering the Offering Documents false and misleading.    While the

- 319 -

allegations concerning these originators cover most of the offerings, plaintiffs have not provided

such allegations for every originator at issue herein, in an attempt to streamline the allegations.

Nonetheless, on information and belief, plaintiffs allege that *all* of the loan originators at issue herein

engaged in similar conduct, and that such allegations are factually supported by both the

investigations of the FCIC and the U.S. Senate, each of which concluded, after extensive

investigations, that the breakdown in residential loan underwriting standards alleged herein was

systemic in the lending industry during the relevant time period (2004-2007). *See* Financial Crisis

Inquiry Report ("FCIC Report") at 125 ("***Lending standards collapsed, and there was a significant***

***failure of accountability and responsibility throughout each level of the lending system***."); Levin-

Coburn Report at 12 (One of four major causes of worldwide financial collapse was that "***[l]enders***

***introduced new levels of risk into the U.S. financial system by selling . . . home loans with . . . poor***

***underwriting***."); *id.* at 50 ("***The Subcommittee investigation indicates that*** *" there were "a host of*

***financial institutions that knowingly originated, sold, and securitized billions of dollars in high***

***risk, poor quality home loans***.").

      751.    In fact, in 2005, federal examiners and agencies conducted a "confidential . . . study

of mortgage practices at six companies that together had originated . . . almost half the national total"

of mortgages in that year. ***The study "'showed a very rapid increase in the volume of these***

***irresponsible, very risky loans***,'" according to Sabeth Siddique, then head of credit risk at the

Federal Reserve Board's Division of Banking Supervision and Regulation. ***For "[a] large***

***percentage of the[] loans" reviewed, "the underwriting standards . . . had deteriorated***." FCIC

Report at 172.

      752.    In addition, on December 30, 2007, *The Kansas City Star* published an article titled

"American Dreams Built on a Shaky Foundation of Subprime Loans," analyzing the Nation's

mortgage meltdown and the reasons behind it. The news article painted a picture of systematic

- 320 -

abandonment of underwriting guidelines by lenders during the relevant time period (2004-2007). Kurt Eggert, a law professor and member of the Federal Reserve's Consumer Advisory Panel was quoted: "'*Originators were making loans based on quantity rather than quality. . . . They made loans even when they didn't make sense from an underwriting standpoint*.'" The news article further stated: "Mark Duda, a research affiliate at Harvard University's Joint Center for Housing Studies, said that because *brokers were so intent to quickly sell off loans to investors, they had little incentive to make sure the loans were suitable for borrowers. 'They were setting people up to fail*,' Duda said." A news article in the *San Diego Union-Tribune* on November 16, 2008 echoed these sentiments, stating: "Bankruptcy specialists say part of what led to the housing market collapse *was systemic. Lenders set themselves up for problems by not requiring buyers to prove they could afford the loans* . . . ."

753.    At a March 11, 2009 hearing of the U.S. House of Representatives Subcommittee investigating the Nation's mortgage meltdown, Representative Jeb Hensarling from the State of Texas was even more blunt about the pervasive abandonment of underwriting guidelines: "*Mortgage fraud ran rampant for a decade, on the lenders' side and on the borrower side . . . . We know that mortgage fraud ran rampant* . . . ."

754.    The systemic abandonment of stated underwriting guidelines by all of the originators identified herein during the period 2004-2007, which included the originators' complete failure to evaluate borrowers' repayment ability, is further corroborated by the following allegations, which demonstrate that the abandonment of loan underwriting guidelines was rampant, pervasive and commonplace in the residential lending industry during 2004-2007.

### 2.    The Offering Documents Misrepresented the New Century Originators' Underwriting Guidelines

755.    New Century Mortgage Corporation and Home 123 Corporation, companies that originated loans for the offerings at issue herein.  Both companies were subsidiaries of New Century Financial Corporation.  New Century Mortgage Corporation and Home123 Corporation originated and/or acquired loans directly and sold them to the sponsors for the offerings at issue herein.  Because New Century Mortgage Corporation and Home 123 Corporation all operated under the dominion and control of New Century Financial Corporation, and because the loans they contributed to the trusts at issue herein were all products of the same dubious loan origination practices, these originators are collectively referred to hereafter as "New Century."

756.    As detailed *supra*, defendants' Offering Documents purported to describe the underwriting guidelines that were supposedly used by New Century in originating loans underlying plaintiffs' certificates.  *See* §V.  For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them.  In truth, New Century had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

757.    The U.S. Senate investigation found that New Century "w[as] known for issuing poor quality subprime loans," but "[d]espite [its] reputation[] for poor quality loans, leading investment banks [such as the JP Morgan Defendants] continued to do business with [New Century] and helped [it and other lenders] sell or securitize hundreds of billions of dollars in home mortgages."  Levin-Coburn Report at 21.

758.    In 2007, New Century went into bankruptcy.  An examiner was appointed by the bankruptcy court to investigate New Century and its collapse.  After reviewing "a large volume of

864087_1

documents" from numerous sources, including New Century, and interviewing over 100 fact witnesses, the bankruptcy examiner filed a detailed report concerning New Century. *See* Final Report of Michael J. Missal, *In re: New Century TRS Holdings, Inc.*, No. 07-10416 (D. Del. Feb. 29, 2008) ("Examiner's Report") at 14, 16. The examiner confirmed that New Century routinely failed to follow its stated underwriting guidelines when originating loans during the relevant time period. The examiner, after his comprehensive fact-gathering process, "conclude[d] that New Century engaged in a number of significant improper and imprudent practices related to its loan originations." *Id.* at 2. Among other things, the examiner found that:

- *"New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy . . . and trained mortgage brokers to originate New Century loans in the aptly named 'CloseMore University.'" Id.* at 3.

- *"The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007." Id.*

- *"New Century . . . layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers." Id.*

- *A New Century employee had informed the company's senior management in 2005 that, under New Century's underwriting guidelines, "'we are unable to actually determine the borrowers' ability to afford a loan.'"* Id.

- *"New Century also made frequent [unmerited] exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan," so much so that a senior officer of New Century warned internally that the "'number one issue is exceptions to guidelines.'" Id.* at 3-4.

- *New Century's Chief Credit Officer had noted as early as 2004 that New Century had "'no standard for loan quality.'" Id.* at 4 *"'[L]oan quality'" referred to "New Century's loan origination processes, which were supposed to ensure that New Century loans met its own internal underwriting guidelines . . . ."* Id. at 109.

- *"Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of [New Century's] Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be sold or securitized . . . ." Id.* at 4.

- 323 -

- *A large number of New Century's loans did not meet its underwriting guidelines, suffering from defects such as "defective appraisals, incorrect credit reports and missing documentation."* Id. at 109.

- *From 2003 forward, New Century's Quality Assurance and Internal Audit departments identified "significant flaws in New Century's loan origination processes."* Id. at 110.

- *Notwithstanding all the foregoing facts, New Century's Board of Directors and Senior Management did little to nothing to remedy the company's abandonment of its stated underwriting guidelines.* Id.

759.    The FCIC found that New Century "ignored early warnings that its own loan quality was deteriorating and stripped power from two risk-control departments that had noted the evidence." FCIC Report at 157. The FCIC reported that New Century's Quality Assurance staff "had found severe underwriting errors," while New Century's Internal Audit department had "identified numerous deficiencies in loan files," with seven out of nine reviews of the company's loan production department resulting in "'unsatisfactory'" ratings. *Id.* New Century's senior management's reaction to the revelation of this information – establishing that New Century was not complying with its underwriting guidelines – was not what one would expect. Instead of making efforts designed to bring the company into compliance with its underwriting guidelines, New Century's management directed that the negative results be removed from the company's loan tracking performance, that the Quality Assurance department be dissolved, and that the Internal Audit department's budget be cut. *Id.*

760.    New Century thereafter continued making numerous loans in violation of the company's stated underwriting guidelines, and then sold them to defendants. Indeed, New Century had a practice during the relevant time period whereby if a loan it attempted to sell to one securitizer was rejected because it was found not to comply with New Century's underwriting guidelines, New Century would put that defective loan into a subsequent pool of loans and sell it to another RMBS securitizer, *i.e.*, another defendant herein.

- 324 -

761.    Patricia Lindsay ("Lindsay"), a former fraud specialist for New Century, told the FCIC that New Century's definition of a "good" loan changed during the relevant time period: "'The definition of a good loan changed from "one that pays" to "one that could be sold."'" FCIC Report at 105.  The import of this statement was that New Century no longer cared if the loan met its stated underwriting guideline of determining whether the borrower could afford to repay the loan.  Rather, the guideline was ignored, as it only mattered if defendants would purchase the loan.  As will become more evident, defendants did buy huge quantities of such loans – even when the borrowers could not afford to repay them – and defendants did so knowingly.  In fact, Lindsay pointed out that defendants, *i.e.*, "'Wall Street[,] was very hungry for our product.  We had loans sold three months in advance, ***before they were even made at one point***.'"  FCIC Report at 117.  Given that defendants bought New Century's defective loans ***before*** they were even made, and thus could not possibly have determined whether the loans met the stated underwriting guidelines, it is evident that defendants did not bother to determine whether the statements in the Offering Documents were true.  In any event, as alleged more fully below, ***defendants did in fact know that the Offering Documents were false***.

762.    Lindsay also confirmed to the FCIC that New Century subjected its appraisers to the pressures described above.  Specifically, Lindsay stated that New Century's appraisers "fear[ed]" for their "livelihoods," and therefore cherry picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."  Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5.

763.    The Attorney General for the Commonwealth of Massachusetts ("Attorney General") similarly found that New Century originated numerous loans to borrowers who could not afford them, and which were illegal and not in compliance with New Century's purported underwriting guidelines.  On June 24, 2010, the Attorney General announced a settlement with Morgan Stanley

related to its purchase, financing and securitization of New Century loans. Morgan Stanley agreed to

pay $102 million to settle charges that it assisted New Century in making and securitizing awful

loans to borrowers who could not afford to repay them. In announcing the settlement, the Attorney

General also released the findings of its investigation. The Attorney General found the following

with respect to New Century's loans:

- The Attorney General found that *New Century was making unfair and illegal loans to borrowers in Massachusetts who could not afford to repay them*. The Attorney General found that New Century unlawfully qualified borrowers for adjustable rate mortgages by using "teaser" rates, instead of using the "fully indexed rates," as required by law. By using teaser rates, New Century was able to calculate artificially low DTI ratios to qualify borrowers for loans they could not afford. The Attorney General found that if the borrowers' DTI ratios had been properly calculated, 41% of the loans Morgan Stanley purchased from New Century were to borrowers who could not afford them. Assurance of Discontinuance at 13, *In re: Morgan Stanley & Co. Incorporated*, No. 10-2538 (Mass. Super. Ct., Suffolk Cty. June 24, 2010).

- The Attorney General found that, by late 2005, New Century engaged in "*sloppy underwriting for many loans and stretching of underwriting guidelines to encompass or approve loans not written in accordance with the guidelines*." *Id.* at 9.

- The Attorney General found that *New Century successfully pressured Morgan Stanley into buying loans which both parties knew did not comply with the underwriting guidelines*. In March 2006, New Century complained to Morgan Stanley that it was rejecting too many loans and further pressured Morgan Stanley to buy more loans, by suggesting that it would begin shifting its business to other buyers if Morgan Stanley did not buy more loans. *The very next month, in April 2006, Morgan Stanley's senior bankers purchased hundreds of New Century loans that Morgan Stanley's due diligence team had rejected*. In addition, "Morgan Stanley's due diligence teams began to be more responsive to New Century's desire to include additional [defective] loans in the purchase pools." *Id.* at 10.

- The Attorney General found that *the majority of loans Morgan Stanley purchased from New Century and securitized in 2006 and 2007 did not comply with the underwriting guidelines*. According to the Attorney General, Clayton was hired to determine whether samples of New Century's loans "complied with the originator's underwriting guidelines and whether the loans were in compliance with applicable laws. When Clayton's examination uncovered loans that were in violation of guidelines or law in any respect, it graded the loans as 'exceptions.'" *The Attorney General's investigation found that "[i]n Morgan Stanley's 2006-2007 New Century [loan] pools, the large majority of the loans reviewed by Clayton were identified by Clayton as having some type of exception. Most loans had multiple exceptions."*

*The Attorney General further found that "[d]uring 2006 and 2007, Morgan Stanley waived exceptions on and purchased a large number of the loans found by Clayton to violate guidelines without sufficient compensating factors. In the last three quarters of 2006, Morgan Stanley waived more than half of all material exceptions found by Clayton . . . and purchased a substantial number of New Century loans found by Clayton to violate guidelines without sufficient compensating factors.*" *Id*.

- The Attorney General also found that New Century "*loans with certain exceptions such as high DTI ratios or high LTV or CLTV ratios that were in excess of underwriting guidelines but within a tolerance found acceptable to Morgan Stanley were purchased without a review by Clayton for compensating factors.*" *Id*.

- *The Attorney General found that large numbers of New Century's loans had LTV ratios exceeding 100%, contrary to representations in the offering documents*. In the offering documents, defendants represented that pursuant to the underwriting guidelines, almost none of the loans had LTV ratios over 100%. However, the Attorney General found that "*31% of the New Century loans on properties checked via BPOs . . . and securitized by Morgan Stanley in 2006 and 2007 had []LTV ratios . . . that were greater than 100%.*" *Id*. at 13.

- The Attorney General found that *New Century's "stated income" loans contained falsely inflated borrower incomes*. The Attorney General found that "*[a]s early as October 2005, Morgan Stanley's diligence team determined . . . that the stated income on a number of New Century loans was unreasonable. In early 2006, a Morgan Stanley employee commented that stated income credit was not adequately evaluated by New Century. . . . On average, the stated income of these borrowers was approximately 42% higher than the income of fully documented borrowers.*" *Id*. at 13-14.

- *The Attorney General found that New Century's deficient and illegal lending practices went on unabated throughout the relevant time period*. The Attorney General found that "*[n]otwithstanding the problems identified above, Morgan Stanley continued to . . . purchase and securitize New Century's subprime mortgages through 2006 and the first half of 2007.*" *Id*. at 14.

764.    New Century also made the U.S. Government's Office of the Comptroller of the Currency's ("OCC") "Worst Ten in the Worst Ten" list of lenders, which identified the lenders with the highest number of foreclosures in the ten metropolitan areas with the highest foreclosure rates.

*Indeed, New Century was the worst of all the lenders – New Century's loans had more foreclosures than any other lender's loans originated during the 2005-2007 time period*. This

corroborates the fact that New Century did not determine whether borrowers could afford to repay the loans, thereby rendering the Offering Documents false and misleading.

### 3.    The Offering Documents Misrepresented Countrywide's Underwriting Standards

765.    As detailed *supra*, defendants' Offering Documents purported to describe the underwriting guidelines that were supposedly used by Countrywide in originating loans underlying plaintiffs' certificates. *See* §V. For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them. In truth, Countrywide had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

766.    During the relevant time period, Countrywide was the largest independent mortgage lender and loan originator for RMBS offerings in the United States. Unfortunately for plaintiffs, it was also one of the worst, as it repeatedly originated loans in violation of its stated loan underwriting guidelines and routinely extended loans to borrowers without any regard for such borrowers' true repayment ability, oftentimes relying on falsely inflated appraisals (and thus false LTV ratios), falsified occupancy data and other false information to do so.

767.    In June 2009, the SEC initiated a securities fraud action in the United States District Court for the Central District of California against former Countrywide executives Angelo Mozilo ("Mozilo"), David Sambol ("Sambol") and Eric Sieracki ("Sieracki"). On September 16, 2010, the court denied the Countrywide executives' motions for summary judgment and held that ***the SEC had raised genuine issues of fact*** as to whether the defendants had misrepresented the quality of Countrywide's underwriting processes from 2005-2007. Specifically, the court held that ***the SEC presented evidence that Countrywide "routinely ignored its official underwriting guidelines to***

such an extent that Countrywide would underwrite <u>any</u> loan it could sell into the secondary mortgage market," and that "a significant percentage (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines." *SEC v. Mozilo*, No. CV 09-3994-JFW (MANx), 2010 U.S. Dist. LEXIS 98203, at *33-*34 (C.D. Cal. Sept. 16, 2010). **The court held that the evidence presented was such that "a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines.**" *Id*. at *35. In 2010, Mozilo, Sambol and Sieracki paid over $73.1 million to settle the SEC action.

768.    The testimony and documents only recently made available to plaintiffs by way of the SEC's investigation confirm that Countrywide was systematically abusing "exceptions" and low-documentation processes in order to circumvent its own underwriting guidelines. For example, in an April 13, 2006 e-mail, Mozilo, who was Countrywide's co-founder and Chief Executive Officer ("CEO"), wrote to Sieracki and others that he was concerned that certain subprime loans had been originated "**with serious disregard for process [and] compliance with guidelines**," resulting in the delivery of loans "with deficient documentation." Mozilo further stated that "**I have personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]**."

769.    The testimony and documents produced in the SEC action also show that, on June 28, 2005, Sieracki attended a Corporate Credit Risk Committee meeting, "in which he was informed that **1/3 of the loans which were referred from CLUES [Countrywide's automated underwriting system] violated 'major' underwriting guidelines and 1/3 violated 'minor' guidelines**." At a similar meeting on March 12, 2007, "Risk Management reported that 12% of the loans reviewed through Countrywide's internal quality control process were rated **severely unsatisfactory** or high

- 329 -

risk, and that one of *the principal causes for such a rating was that loans had debt-to-income, loan to value, or FICO scores outside Countrywide's underwriting guidelines*."

770.    A separate False Claims Act lawsuit brought by the U.S. Government against Countrywide and appraisal firm Land Safe Appraisal Services, Inc. ("Land Safe") confirms that Countrywide routinely violated its stated underwriting guidelines by using falsely inflated appraisals. *See* Complaint, *United States, ex rel. Kyle W. Lagow v. Countrywide Fin. Corp.*, No. 1:09-cv-02040-RJD-JMA (E.D.N.Y. May 13, 2009) ("*Lagow* Complaint").  According to the allegations of this action, which are based on the testimony of Kyle Lagow, a former Land Safe employee, Countrywide and Land Safe conspired together to systematically inflate appraisals.  According to Lagow, Countrywide and Land Safe systematically inflated appraisals for Countrywide loans by, among other things: (a) paying above-market fees to appraisers who provided inflated appraisals; (b) rewarding appraisers that provided inflated appraisals with significant amounts of additional work; (c) black-listing, retaliating against and firing appraisers that refused to provide inflated appraisals; (d) improperly requiring appraisers to rely on information outside the relevant market that justified inflated appraisals; (e) providing appraisers with false information concerning "comparable" properties that led to inflated appraisals; and (f) retaliating against anyone who questioned or criticized Countrywide and Land Safe's appraisal inflation scheme.  *Lagow* Complaint, ¶9.  This action was settled, as part of a global $1 billion settlement, with Countrywide's parent company, Bank of America Corp.

771.    In addition, the FCIC's final report, which was issued in January 2011, also set forth, *inter alia*, findings regarding Countrywide's key role in the financial crisis and the lender's general failure to evaluate its borrowers' repayment abilities.  Specifically, the FCIC Report stated:

*Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were*

*originating could result in "catastrophic consequences." Less than a year later,
they noted that certain high-risk loans they were making could result not only in
foreclosures but also in "financial and reputational catastrophe" for the firm. But
they did not stop.*

*See* FCIC Report at xxii.

772.     According to evidence in the FCIC Report, Countrywide's loan products were simply

not designed to evaluate borrowers' repayment abilities.    Indeed, one of Countrywide's loan

products was described as "***poison***" by the lender's own co-founder and CEO, Mozilo, who stated in

an April 17, 2006 e-mail: "'***In all my years in the business I have never seen a more toxic

[product]*** . . . .'" FCIC Report at 20.  According to information contained in the FCIC Report, the

reason Countrywide was willing to offer such products was because its sole focus was "'originating

what was salable in the secondary market,'" *i.e.*, to Wall Street banks such as defendants.  *Id.* at 105.

According to the FCIC Report, Countrywide "sold or securitized 87% of the $1.5 trillion in

mortgages it originated between 2002 and 2005."  *Id.*

773.     Moreover, former Countrywide employee Eileen Foster ("Foster") confirmed, in an

interview with the FCIC, that fraud was rampant in connection with Countrywide's origination of

loans.  Foster worked as a mortgage fraud investigator at Countrywide, and confirmed that loans that

Countrywide's fraud investigators or underwriters rejected due to fraud or non-conformance with the

underwriting guidelines were routinely overruled and approved by Countrywide's sales unit, as "***the

rules were bent and broken and twisted regularly and it was . . . an accepted mode of doing

business***." July 30, 2010 FCIC Staff Interview of Eileen Foster.  Foster further stated that "all of the

fraud that may have been taking place [was] being managed out by the sales units," or in other

words, "'***concealed***.'"  *Id.*  She suspected that "there was quite a bit of fraud taking place" in

connection with Countrywide's loan originations, which her audit manager "confirmed to [her]."  *Id.*

774.    In fact, according to the FCIC, Countrywide had tens of thousands of internal company referrals of potentially fraudulent activity in connection with its mortgage business during the period from 2005-2007.  FCIC Report at 162.

775.    Other former Countrywide employees have confirmed that Countrywide originated loans that did not comply with its stated underwriting criteria because its employees were incentivized to increase the number of loan originations without concern for borrowers' repayment ability.  Instead of evaluating repayment ability, ***Countrywide's Sales Training Facilitator Guide instructed originators to "look for ways to make the loan rather than turn it down***."

776.    According to another former Countrywide manager, the mindset at the company was "***if you had a pulse, Countrywide gave you a loan***."

777.    Countrywide's loan originators would "coach" borrowers as to the level of falsely inflated incomes they should claim in order to qualify for loans they could not otherwise afford. Countrywide itself also falsified borrowers' incomes, or facilitated falsified incomes by steering otherwise ineligible borrowers to "stated income" loans.  According to a former Countrywide account manager, the company was "infested" with employees that ignored the company's underwriting guidelines.

778.    Former Countrywide employees have revealed that as many as 80% of the loans originated by a Countrywide office in Florida did not meet loan underwriting guidelines.  According to another former Countrywide employee, approximately 90% of all reduced documentation loans sold out of a Chicago office had falsely inflated incomes and one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrowers' income on stated income mortgage applications in order to qualify borrowers for loans they could not afford.

779.    Moreover, even in the cases when Countrywide employees actually obtained written income documentation (*i.e.*, a Form W-2) demonstrating that the borrower did not qualify for a loan, the documentation was ignored by Countrywide and the loan was re-submitted as a stated income loan with an inflated income number so as to obtain approval of the loan – a loan which the borrower could not afford to repay.  These problems were systemic within Countrywide at the time the loans in the offerings at issue herein were originated.

780.    Countrywide's general abandonment of its stated underwriting guidelines has also been the subject of numerous civil complaints and investigations by state attorneys general, each of which have alleged facts supporting plaintiffs' allegations here that Countrywide's underwriting practices were not intended to evaluate borrowers' repayment abilities.  *See*, *e.g.*, *In re Countrywide Fin. Corp. Derivative Litig.*, No. 07-CV-06923-MRP (MANx) (C.D. Cal.); *In re Countrywide Fin. Corp. Sec. Litig.*, No. 07-CV-05295 MRP (MANx) (C.D. Cal.); *The People of the State of Illinois v. Countrywide Fin. Corp.*, No. 2008-CH-22994 (Cook Cty. Cir. Ct., Ch. Div. Ill.); *The People of the State of California v. Countrywide Fin. Corp.*, No. LC081846 (Cal. Super. Ct., Los Angeles Cty.); *State of Connecticut, et al. v. Countrywide Fin. Corp., et al.*, No. 08-cv-01301 (D. Conn.) (originally filed in Conn. Super. Ct., Hartford Jud. Dist.); *MBIA Ins. Corp. v. Countrywide*, No. 602825/2008 (N.Y. Sup. Ct., N.Y. Cty.).  The sheer volume of the lawsuits, all alleging that Countrywide systematically abandoned its underwriting guidelines, is strong evidence that that is what in fact occurred.

781.    Countrywide, unsurprisingly, made the list of the "Worst Ten in the Worst Ten" report by the U.S. Government's OCC, which identified the lenders with the highest number of foreclosures for loans originated between 2005 and 2007 in the ten metropolitan areas with the highest rates of foreclosures.  The extremely high foreclosure rates for Countrywide's loans corroborate that the company did ***not*** comply with its purported underwriting guideline to evaluate

- 333 -

borrowers' repayment ability. In addition, the U.S. Senate confirmed that Countrywide had abandoned its purported underwriting guidelines stated in the Offering Documents: ***Countrywide and other "lenders issued billions of dollars in high risk, poor quality home loans***." Levin-Coburn Report at 239.

### 4. The Offering Documents Misrepresented WMC's Underwriting Guidelines

782. As detailed *supra*, defendants' Offering Documents purported to describe the underwriting guidelines that were supposedly used by WMC in originating loans underlying plaintiffs' certificates. *See* §V. For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them. In truth, WMC had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

783. Like many other lenders during the relevant time period (2004-2007), WMC had a culture of deception and fraud as the basis of its lending operations. According to a news article published by the *iWatch News* in January 2012, which was based on interviews of eight former WMC employees, ***WMC's mantra was "Fraud pays***." The article described a company, during the period from 2004-2007 (the timeframe when the loans at issue herein were originated), that routinely disregarded its purported underwriting guidelines and instead "***embraced fraud as a tool for pushing through loans that borrowers couldn't afford***." Sales managers were making upwards of $1-$2 million a year and were incentivized to make as many loans as possible. ***Therefore, they ignored WMC's underwriting guidelines and "used falsified paperwork, bogus income documentation and other tricks to get loans approved and sold off to Wall Street investors," i.e., the defendants***.

- 334 -

784.    The *iWatch News* article quoted former WMC Compliance Manager Dave Riedel ("Riedel"), who worked at WMC from 2004 until it was closed by its parent company, General Electric, Inc. ("GE"), in 2007.  Riedel was a quality control manager for WMC and was responsible for detecting fraud in the company's loan applications.  Riedel started working for WMC immediately after it was acquired by GE in 2004.  Riedel had previously worked as a real estate appraiser, loan underwriter, and most recently, as a mortgage fraud investigator manager for Washington Mutual Bank, another originator that was similarly engaged in fraudulent lending practices that ignored company lending guidelines.

785.    Riedel supervised a team of people at WMC who watched over WMC's lending activities in southern California.  *iWatch News* reported that Riedel's team "found ***many examples of fraud committed by in-house staffers or the independent mortgage brokers who helped bring in customers to the lender.  These included faking proofs of loan applicants' employment and faking verifications that would-be home buyers had been faithfully paying rent for years rather than, say, living with their parents."  It also included "creating bogus W-2 tax forms," with some employees doing it the "old-school" way, by "cutting and pasting numbers from one photocopy to another," while the more modern fraudsters "had software on their computers that allowed them to create W-2s from scratch***."  Such widespread practices obviously did not comply with WMC's stated underwriting guidelines.

786.    Riedel told *iWatch News* that in 2005 he investigated a WMC sales manager who oversaw hundreds of loan originations per month.  Riedel's audit of these loans "found that many of the deals showed evidence of fraud or other defects such as missing documents."  Riedel reported the discrepancies to a GE compliance officer.  Rather than reprimanding the sales manager or disciplining him, according to Riedel, "'nothing changed.'"  However, GE's/WMC's response to Riedel was swift and sure – Riedel was stripped of his title and staff and given nothing more to do.

According to a former WMC executive, Riedel was thereafter "'branded as a whistleblower and not a team player. . . . They just marginalized him and he really didn't have anything to do'" subsequently.

787.    Notwithstanding the above, in 2006 Riedel was trying to rebuild his career within WMC. He was involved in meetings with GE officials, trying to give GE a sense of how serious WMC's fraud problems were. Riedel recalled an audit of a group of loans during that time period that indicated 78% of the loans were fraudulent, containing either falsified incomes or employment. Moreover, Riedel was also working on a computer program designed to detect fraud in WMC's loans. Riedel told *iWatch News* that the program detected fraudulent loans but that WMC never regularly used the program. It was at a meeting about this computer program that Riedel attended where a WMC executive declared "Fraud pays."

788.    Riedel's experience was not an isolated incident. The *iWatch News* article also quoted Gail Roman, a former WMC loan auditor in New York. ***iWatch News reported that Roman revealed that she and her colleagues "dug up persuasive evidence of inflated borrower incomes and other deceptions on loan applications," but that WMC's "[m]anagement ignored their reports and approved the loans anyway." Roman stated: "'They didn't want to hear what you found . . . [e]ven if you had enough documentation to show that there was fraud or questionable activity.'" Roman further reported that such fraudulent activity occurred the entire time she was at WMC during the period from 2004-2006***.

789.    Former WMC risk analyst Victor Argueta confirmed to *iWatch News* the complete abandonment of WMC's underwriting guidelines taking place at the company during the relevant time period. Argueta reported that ***one of WMC's top salespersons was never reprimanded or disciplined for using his computer to create fake documents to get borrowers' loans approved, even though this salesperson's fraudulent activities were well known within the company.***

- 336 -

*Argueta stated the following concerning this salesperson's fabrication of documents: "'Bank Statements, W-2s, you name it, pretty much anything that goes into a file, . . . [a]nything to make the loan look better than what was the real story'" was created by this salesperson*.

790.   Glen Pizzolorusso was interviewed for a National Public Radio broadcast. Pizzolorusso, a former WMC Area Sales Manager, discussed the horrible loans WMC made to borrowers: "'We looked at loans, these people didn't have a pot to piss in. . . . [T]hey could barely make the car payment, and now we're giving them a $300,000 to $400,000 house."

791.   WMC's conduct led to having a Statement of Charges filed against it by the Washington State Department of Financial Institutions, Division of Consumer Services in 2008, *see* Statement of Charges, No. C-07-557-08-SC01, June 4, 2008, for deceptive and unfair lending practices.  The Statement of Charges alleged that the Washington State regulator reviewed 86 loans extended by WMC and found that 76 of them were defective or otherwise violated Washington State law.  WMC subsequently entered into a consent order with the State of Washington.  In addition, according to the *Los Angeles Times*, the Federal Bureau of Investigation and the Department of Justice were looking into potentially criminal business practices at WMC.  The government was investigating the very conduct at issue in this case: whether WMC used falsified paperwork, overstated income and other tactics to push through questionable loans, according to sources cited by the *Los Angeles Times*.  The probe focused on whether senior managers condoned improper practices that enabled fraudulent loans to be sold to investors, according to the *Los Angeles Times*.

792.   Further proof that WMC did not comply with the underwriting guidelines stated in the Offering Documents is found in a lawsuit against WMC and another originator, EquiFirst Corporation ("EquiFirst").  *See* Complaint, *MASTR Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp., et al.*, No. 11-CV-02542-PAM-TNV (D. Minn. Sept. 2, 2011) ("*WMC Complaint*").  In that action, the trustee of an RMBS trust alleged that loans within that trust acquired

- 337 -

from WMC and EquiFirst were fraudulent, did not comply with the stated underwriting guidelines, and did not determine properly whether the borrowers could afford to repay their loans.  A sample of 200 loans within the trust were reviewed and it was found that 150 of those loans were either fraudulent, not originated pursuant to the underwriting guidelines, and/or did not have a proper determination made of whether the borrower could afford to repay the loan.  ***In other words, a stunning 75% of the loans did not comply with the underwriting guidelines***.  Given WMC's culture, as described above, such a statistic is understandable.  The complaint in the action gave examples of loans that were made even though they did not comply with the underwriting guidelines.  For example, WMC extended a loan to a borrower that claimed in his loan application that he earned $14,782 per month performing "account analysis," when in fact his tax returns showed he actually earned $1,548 per month driving a taxi.  The borrower also did not disclose in his loan application thousands of dollars per month in debt payments that he had, thus concealing his true DTI ratio, which was in violation of the lending guidelines.  He further misrepresented that he would occupy the property as his primary residence when in fact he did not.  *WMC* Complaint, ¶24.

793.    Another loan was extended by WMC to a borrower that claimed in her loan application that she made $9,200 per month as a billing manager when in fact she made only $2,405 per month as an optometric technician.  This borrower also did not disclose all of her debts, thus concealing that she had an unacceptable DTI ratio.  Her co-borrower also misrepresented his income and occupation to be $8,800 per month earned as a "grade check" rather than the actual $2,843 per month he earned as a laborer.  *Id.*, ¶25.  These examples are stunningly similar to the examples of borrowers alleged herein at §V.

794.    In addition, the U.S. Government's Federal Housing Finance Agency ("FHFA") sued GE and others in 2011 concerning the ***exact*** type of conduct at issue herein.  *See FHFA v. General Electric Company, et al.*, No. 652439/2011 (N.Y. Sup. Ct., N.Y. Cty.).  In the *FHFA* action, FHFA

- 338 -

sued GE and others for misrepresentations in offering documents for other RMBS offerings, and

alleged, as here, that there were misrepresentations in the offering documents that WMC originated

loans pursuant to underwriting guidelines designed to assess the borrower's repayment ability and

the adequacy of the property as collateral for the loan. In the *FHFA* action, as here, it is alleged that

WMC did not originate loans pursuant to such guidelines but instead abandoned its guidelines.

795.    Further corroborating that WMC did not comply with its purported guidelines, is the

fact that WMC made the OCC's "Worst Ten in the Worst Ten" list of lenders with the most

foreclosures on loans originated between 2005 and 2007. WMC was not the worst lender, but it was

close – WMC was fourth "worst" of all lenders. Such high foreclosure rates further demonstrate

that, contrary to defendants' representations, WMC was not actually attempting to determine

whether borrowers could afford to repay their loans.

### 5.    The Offering Documents Misrepresented Fremont's Underwriting Standards

796.    As detailed *supra*, defendants' Offering Documents purported to describe the

underwriting guidelines that were supposedly used by Fremont in originating loans underlying

plaintiffs' certificates. *See* §V. For the reasons set forth immediately below, these representations

were false and misleading at the time defendants made them. In truth, Fremont had completely

abandoned its stated underwriting guidelines and was routinely originating loans without any regard

for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve

as collateral.

797.    The U.S. Senate investigation found that Fremont "became known inside the industry

for issuing high risk, poor quality loans yet during the years leading up to the financial crisis

[Fremont was] able to securitize and sell [its] home loans with few problems." Levin-Coburn Report

at 21. Moreover, "[d]espite [Fremont's] reputation[] for poor quality loans, leading investment

banks [such as the JP Morgan Defendants] continued to do business with [Fremont] and helped [it] sell or securitize hundreds of billions of dollars in home mortgages." *Id.*

798.    In March 2007, the Federal Deposit Insurance Corporation ("FDIC") issued a "cease and desist" order against Fremont (the "FDIC March 7 Order"), requiring the lender to end its subprime loan business due to "'unsafe and unsound banking practices and violations of law,'" including operating with "'a large volume of poor quality loans'"; "'unsatisfactory lending practices'"; "'excessive risk'"; and "inadequate capital." Levin-Coburn Report at 238; FDIC March 7 Order at 2-3.    The FDIC determined that Fremont lacked effective risk management practices, lacked adequate mortgage underwriting criteria, and was "'approving loans with loan to-value ratios approaching or exceeding 100 percent of the value of the collateral.'" Levin-Coburn Report at 238; FDIC March 7 Order at 4.    In addition, the FDIC concluded that Fremont had been engaging in unsatisfactory lending practices, by "***marketing and extending [ARM] products to subprime borrowers in an unsafe and unsound manner" that "greatly increase[d] the risk that borrowers will default***." FDIC March 7 Order at 3.    The FDIC further found that Fremont was "***approving borrowers without considering appropriate documentation and/or verification of their income . . . [and] making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms***." *Id.* at 3-4.

799.    In addition, on October 4, 2007, the Massachusetts Attorney General brought an enforcement action against Fremont.    The action was for "unfair and deceptive business conduct" "on a broad scale" against Fremont.    Complaint, *Commonwealth of Mass. v. Fremont Investment & Loan, et al.*, No. SUCV2007-4373 (Mass. Super. Ct., Suffolk Cty. Oct. 4, 2007) (the "*Fremont* Complaint").    According to the *Fremont* Complaint, ***Fremont (a) "approve[ed] borrowers without considering or verifying the relevant documentation related to the borrower's credit qualifications, including the borrower's income"; (b) "approv[ed] borrowers for loans with***

- 340 -

*inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses"; (c) "failed to meaningfully account for [ARM] payment adjustments in approving and selling loans"; (d) "approved borrowers for these ARM loans based only on the initial fixed 'teaser' rate, without regard for borrowers' ability to pay after the initial two year period"; (e) "consistently failed to monitor or supervise brokers' practices or to independently verify the information provided to Fremont by brokers"; and (f) "ma[de] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores*." *Fremont* Complaint, ¶¶24-25, 35, 139.

800.    On December 9, 2008, a Massachusetts appeals court affirmed the lower court's order enjoining Fremont from foreclosing on thousands of its loans issued to Massachusetts residents.  The court found that the ***factual record*** supported the lower court's conclusions that "***Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'***" and that "***Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow***." *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556, 558 (Mass. 2008).  The terms of the preliminary injunction were made permanent by a settlement reached on June 9, 2009.

801.    In addition, the FCIC found that Fremont had a company policy whereby any loan that was rejected by a securitizer because it did not comply with Fremont's underwriting guidelines was nonetheless put into a subsequent pool of Fremont loans and offered for sale to another securitizer.  These defective loans remained in the pools offered for sale until they were either sold or were rejected by securitizers at least three times.  D. Keith Johnson, the former president of

Clayton, the firm that sampled such loan pools for defendants, called this practice the "'three strikes, you're out rule.'"  FCIC Report at 168.

802.    In another instance, the FCIC reported on the case of a real estate appraiser in Bakersfield, California who had discovered multiple instances of lending fraud.  When he contacted a quality assurance officer at Fremont to inform them of the fraudulent activity he was told: "'Don't put your nose where it doesn't belong.'"  *Id*. at 14-15.

803.    The findings of the Levin-Coburn Report, the FDIC, the FCIC, and the Commonwealth of Massachusetts are confirmed by statements from former Fremont employees in several complaints alleging that Fremont disregarded its established underwriting guidelines in order to increase the volume of its loan originations.  For example, in *Teachers Insurance & Annuity Ass'n v. Deutsche Bank AG, et al.*, No. 11-cv-6141 (S.D.N.Y. Aug. 1, 2011) (the "*TIAA* Complaint"), the plaintiffs cited statements from a senior underwriter for Fremont from September 2002 to August 2007.  This former underwriter reported that Fremont engaged in unsatisfactory lending practices, and that its primary concern was increasing the volume of mortgage loans that it issued and sold to Wall Street, *regardless of the borrowers' ability to repay*.  The senior underwriter further revealed that exceptions to Fremont's stated underwriting guidelines were a "'standing joke'" and "'the exception was the rule.'"  *TIAA* Complaint, ¶98 n.8.  Another former underwriter at Fremont's Anaheim, California, office from May 2005 until March 2007, stated exceptions to the underwriting guidelines "'were done on a daily basis'" and estimated that 30% of Fremont's loans contained some sort of exception.  *Id.*  The *TIAA* Complaint also cites to another Fremont employee who stated that outright fraud occurred at Fremont from at least 2002-2007, including instances where Fremont brokers would cut and paste bank statements and forge letters of reference for prospective borrowers.  According to this witness, *the fraud was so blatant that "'you ha[d] to be brain dead if you didn't see it,'"* and that *Fremont was "'just giv[ing] anyone a loan who wants one*.'"  *Id.*, ¶¶5, 99.  In

864087_1

addition, in another case, *Dexia SA/NV, et al. v. Deutsche Bank AG, et al.*, No. 11-05672 (S.D.N.Y.), these same former Fremont employees are cited to support other claims that Fremont did not comply with its stated underwriting guidelines.

804.    Fremont also made the OCC's "Worst Ten in the Worst Ten" list of originators with the most foreclosures.  Fremont had the fifth-highest number of foreclosures on loans originated between 2005 and 2007.  This corroborates that Fremont had abandoned its purported underwriting guidelines, which were supposedly designed to evaluate its borrowers' repayment ability.

805.    Indeed, the U.S. Senate confirmed as much in its report: "*[L]enders [such as Fremont] issued billions of dollars in high risk, poor quality home loans*."  Levin-Coburn Report at 239.

### 6.    The Offering Documents Misrepresented Ameriquest's Underwriting Guidelines

806.    As detailed *supra*, defendants' Offering Documents purported to describe the underwriting guidelines that were supposedly used by Ameriquest in originating loans underlying plaintiffs' certificates.  *See* §V.  For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them.  In truth, Ameriquest had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

807.    The FCIC documented how Ameriquest has long been one of the worst lenders in the United States.  Rampant fraudulent lending practices occurred at Ameriquest both before and during the relevant time period.  The FCIC obtained testimony from the former attorney general from Illinois, Lisa Madigan, who along with a coalition of 49 states and the District of Columbia, investigated and sued Ameriquest for its abusive lending practices, ultimately settling with the

company in 2006 for $325 million.  Madigan's FCIC testimony revealed that Ameriquest routinely disregarded its borrowers' true repayment ability and violated its own stated underwriting guidelines by, among other things, "inflating home appraisals" and using other "fraudulent [lending] practices." FCIC Report at 12.

808.    Ed Parker, the former head of Ameriquest's Fraud Investigations Department, told the FCIC that he detected lending fraud at the company within one month of joining it in January 2003. He sent reports to Ameriquest's senior management but they did nothing.  He also heard that other company departments were complaining that he "'looked too much'" into the loans.  *Id.* at 12.  His efforts to point out fraudulent lending practices at Ameriquest eventually led first to a demotion, and then subsequently to him being laid off by Ameriquest in May 2006.  ***Parker reported that "fraudulent loans were very common at the company***" during his tenure at Ameriquest.  *Id.* at 161. Ameriquest's dubious lending practices were so bad that the former president of the National Association of Mortgage Brokers told the FCIC that Ameriquest was "'***absolutely' corrupt***."  *Id.* at 14.

809.    ***The FCIC further found that "Ameriquest . . . originated vast numbers of high-risk, nontraditional mortgages that were . . . often beyond borrowers' ability to repay." Id. at 418. The FCIC also found that Ameriquest made loans "that would probably never be repaid***."  *Id.* at 424.

810.    Other former Ameriquest employees have confirmed that the company had a culture of deception that ignored the underwriting guidelines even before the relevant time period.  For example, Tyson Russum ("Russum"), a former Ameriquest Loan Officer, told a news reporter for National Public Radio in May 2007 that when he began work at Ameriquest in 2003, his first day consisted of watching a training video: "I think when I showed up for my first day there was three of us that were all new hires that came together and told us to go into the conference room and watch a

- 344 -

couple of videos.  Well, the first video they threw in was a movie called "'Boiler Room.'"  Boiler Room was a movie about corrupt stockbrokers selling stock in bogus companies.  Russum stated that "[t]he impression I got was that they were trying to get across to us that it's basically *make the sale at any cost*.  And that kind of set the, I guess, set the mood for the next 11 to 12 months that I was with the organization."

811.    Russum revealed that *Ameriquest employees would white out income numbers on borrowers' Forms W-2 and bank statements and then fill in larger amounts to qualify borrowers for loans they could not afford*.  He stated that the practice was known within the company as taking the loan documents to the "art department."  Russum also witnessed the forging of signatures on loan documents.  In addition, he witnessed the use of "bait-and-switch tactics," such as having borrowers unwittingly sign fake fixed-rate loan documents, thereby making the borrower believe he or she was obtaining a fixed-rate loan, but also including in the stack of papers the borrower was signing adjustable rate loan documents which the borrower then unknowingly signed.  After the loan was extended, the faked fixed-rate loan documents were thrown away, locking the borrower into an adjustable rate loan that he or she did not want.

812.    In addition, in other cases, Russum reported that Ameriquest managers encouraged loan officers to conceal from borrowers the actual cost and interest rates on loans and to lie to borrowers, putting the borrowers into loans they could not afford.  For some loans made by Ameriquest, which had fixed payments for the first two years and then adjusted sharply upwards thereafter, managers instructed Russum to lie to the borrowers and tell them that the payments would be "fixed for as long as they need[ed] it to be," when in fact that was not true.

813.    Ameriquest borrower Dianna Quartelli confirmed that such practices occurred, and also that Ameriquest put borrowers into loans they could not afford.  She stated that Ameriquest initially told her that her loan payments would not increase.  Subsequently, however, she received a

letter advising her that her monthly payment of $849 was increasing to $1,200.  Quartelli stated:

"*[The letter] said now the mortgage [payment] was going to go up to $1,200.  And also in that same letter, in six months, it was going up again, guaranteed not to go down.  Well, we couldn't afford the $849 we were dealing [with]*."

814.    Russum reported that Ameriquest personnel also routinely lied to borrowers by telling them that prepayment penalties on the loans would be waived, when in fact they were not.  Some borrowers were required to pay more than $10,000 when they refinanced their loans early.  Borrower Quartelli confirmed that Ameriquest had lied to her in this way also.  Russum reported that one borrower got so mad when he had been deceived in this way that he "threatened to come up and shoot us all in the head."

815.    Russum confirmed that Ameriquest ignored its purported underwriting guidelines through the following statement that was reported by the American News Project in May 2009:

"*[T]he entire system [at Ameriquest] [wa]s built to do whatever you can to close as many loans at the highest fee amount as possible*."

816.    Former Ameriquest Loan Officer Omar Khan confirmed that the company falsified borrower incomes to qualify borrowers for loans they could not afford.  In a news report from the American News Project in May 2009, Khan recalled situations where "*the borrower felt uncomfortable about signing the stated income letter*" – the portion of the loan application where the borrower was to report his income – "*because they didn't want to lie." Nonetheless, "the stated income letter would be filled out later on by the processing staff" at Ameriquest, and the loan was thereafter funded*.  Khan also recalled "bait-and-switch" tactics at Ameriquest and said they occurred "because you could never get them [the borrowers] to the table if you were honest."

817.    Ameriquest's systemic abandonment of its stated underwriting guidelines, and its use of fraudulent loan practices, has led to the filing of numerous lawsuits against the company by its

borrowers.  The borrowers alleged that Ameriquest used faked documents, forged signatures, and

falsified incomes to put borrowers into loans they did not want and which they could not afford.

818.    That Ameriquest did not originate loans pursuant to its stated underwriting guidelines

is corroborated by the fact that the company made the OCC's "Worst Ten in the Worst Ten" list of

lenders with the highest numbers of foreclosures on loans originated between 2005 and 2007.  Had

Ameriquest actually followed its underwriting guidelines of determining whether borrowers could

repay their loans, it would not have incurred so many foreclosures.

### 7.    The Offering Documents Misrepresented EMC Mortgage's, Bear Stearns Residential's and Encore's Underwriting Standards

819.    Defendant The Bear Stearns Companies, prior to being acquired by JPMorgan Chase

& Co., was a "vertically integrated" RMBS securitizer.  That is, Bear Stearns was involved in all

levels of the RMBS securitization process, owning lenders that originated loans, sponsors that

bought and sold loans for securitization purposes, depositors that transferred those loans into

securitization trusts and underwriters that sold RMBS certificates to investors.  During the relevant

period, Bear Stearns acquired or held an ownership interest in at least three residential mortgage

lenders, in order to ensure that it had a steady supply of mortgage loans to securitize.  Those three

lenders were co-defendant EMC Mortgage, Bear Stearns Residential and Encore.[19]  Bear Stearns

called these three lenders its "origination platform."

820.    As detailed *supra*, defendants' Offering Documents purported to describe the

underwriting guidelines that were supposedly used by EMC Mortgage, Bear Stearns Residential

and/or Encore in originating loans underlying plaintiffs' certificates.  *See* §V.  For the reasons set

forth immediately below, these representations were false and misleading at the time defendants

---

[19]    In October 2006, Encore was acquired by Bear Stearns Residential.

- 347 -

made them.  In truth, EMC Mortgage, Bear Stearns Residential and/or Encore had completely abandoned their stated underwriting guidelines and were routinely originating loans without any regard for the borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

821.    Numerous sources have confirmed that EMC Mortgage, Bear Stearns Residential and Encore did *not* originate loans that complied with their stated underwriting guidelines, and in fact, did *not* evaluate their prospective borrowers' true repayment ability.  For example, former Bear Stearns (now part of JPMorgan) employee Nicholas Smith, who worked on various Bear Stearns RMBS offerings, e-mailed Bear Stearns colleagues on August 11, 2006, and discussed Bear Stearns' SACO 2006-8 offering, which contained loans originated by EMC Mortgage.[20]  In discussing the SACO 2006-8 offering, his e-mail called it "*SACK OF SHIT 8*," an obvious reference to the deal's name and the awful loans in it.  In the e-mail, he tells his colleagues: "I hope your [sic] making a lot of money off this trade."  Another former Bear Stearns employee, John Tokarczyk, e-mailed Bear Stearns colleagues on April 30, 2007, discussing another Bear Stearns' RMBS offering containing EMC Mortgage loans.  He stated the following about the offering: "*LET'S CLOSE THIS DOG*."

822.    *These Bear Stearns insiders, who were aware that the loans did not comply with EMC Mortgage's underwriting guidelines, honestly and frankly described, albeit bluntly, the true nature of the loans – loans that were "DOG[S]" and "SACK[S] OF SHIT*."

823.    Former EMC Mortgage employees have also confirmed that EMC Mortgage did not comply with its stated underwriting guidelines and did not truly evaluate its borrowers' repayment ability.  According to a May 2010 news article in the *The Atlantic*, former EMC Mortgage employee Matt Van Leeuwen, a mortgage analyst at the company from 2004-2006, and another former EMC

---

[20]    Plaintiffs purchased certificates in several of the Bear Stearns' "SACO" offerings.  Plaintiffs purchased certificates in the SACO 2005-7, SACO 2005-8 and SACO 2006-5 offerings.

Mortgage employee both revealed that EMC Mortgage routinely provided false information about its loans and told employees to make up loan data. They reported that EMC Mortgage concocted borrower FICO scores and provided false information about the loan types (*i.e.*, whether the loans were full documentation loans or low documentation or other type loans). The article quoted one of the former EMC Mortgage analysts as stating that employees falsified data because the company did not "'want to waste the resources on deep investigation,'" in the rush to securitize the loans. The *Atlantic* article further confirmed that Bear Stearns and EMC Mortgage also provided falsified loan data to the Credit Rating Agencies, just as alleged in this complaint: "After they prepped the ratings agencies for what they 'thought' the loans would look like, they would buy loans in bulk, and then **spend a day scrubbing them**," removing negative loan data, thereby misleading the Credit Rating Agencies and fraudulently obtaining investment grade ratings for the certificates.

824.    EMC Mortgage "originated" nearly all of its loans by purchasing them from other lenders. In many of the offerings in which EMC Mortgage was identified as the originator, Bear Stearns Residential and Encore actually originated the loans and then transferred them to EMC Mortgage. In addition, the majority of the remainder of loans purchased by EMC Mortgage were from dubious lenders who did not comply with any underwriting guidelines. EMC Mortgage purchased many of its loans from AHM, Impac and GreenPoint, all of which are discussed herein, and none of which actually employed underwriting practices designed to evaluate the borrowers' true repayment ability.

825.    As a result, according to a Bear Stearns "Internal Audit Department Escalation Memo" dated February 26, 2007, addressed to EMC Mortgage's CEO, Mary Haggerty, who was also a Senior Managing Director of Bear Stearns, **by October 31, 2005, EMC Mortgage had accumulated "a significant backlog" of claims against these originators for loans that did not comply with the underwriting guidelines** and/or which breached representations and warranties

made by the lenders.  ***All, or nearly all, of such loans had already been sold to Wall Street banks like defendants and included into RMBS offerings like those sold to plaintiffs***.

826.    EMC Mortgage's President, Stephen Golden, confirmed that EMC Mortgage had an "overwhelming" number of such loans in both 2005 and 2006.  Golden was deposed in 2010 in connection with a lawsuit by an insurer against EMC Mortgage, alleging, as here, that EMC Mortgage did not comply with its underwriting guidelines.  ***Golden was asked, under oath, whether he recalled "being overwhelmed with the magnitude" of such problem loans in 2005 and 2006, and he answered "I would say yes, there was a lot of them."  Golden also confirmed under oath that the majority of such problem loans were "EPD" loans, or "early payment default" loans, meaning that the borrowers had missed a payment soon after the loans were extended.  Within the lending industry it is a well-accepted fact that EPD loans are almost always loans that either were not originated pursuant to the underwriting guidelines, or were fraudulently obtained.  Golden confirmed in his sworn deposition testimony that EMC Mortgage was securitizing its EPD loans. That is, EMC Mortgage was including such defective loans in RMBS offerings sold to the investing public – loans that did not comply with the underwriting guidelines***.

827.    Bear Stearns Residential and EMC Mortgage hired Clayton to test samples of the loans they were originating and/or purchasing to determine whether the loans complied with their underwriting guidelines.  During 2006 and 2007, Clayton found that large numbers of loans that Bear Stearns Residential and EMC Mortgage originated, or purchased from other lenders, did not comply with Bear Stearns Residential's or EMC Mortgage's underwriting guidelines.  Nonetheless, Bear Stearns Residential and EMC Mortgage "waived" large percentages of such defective loans into the JPMorgan Offerings sold by Bear Stearns.

828.    In an internal Clayton report sent on April 13, 2007, ***Clayton noted that in the first quarter of 2006, EMC Mortgage waived into the Bear Stearns JPMorgan Offerings 43% of the***

*loans that Clayton had found did not comply with EMC Mortgage's underwriting guidelines. Clayton further found that in the second quarter of 2006, EMC Mortgage waived into the offerings 45% of the defective loans identified by Clayton. In the third quarter of 2006, it became even worse – EMC Mortgage waived into the offerings 65% of the defective loans identified by Clayton, and in the fourth quarter of 2006, EMC Mortgage waived 60% of the defective loans into the JPMorgan Offerings sold by Bear Stearns. The fact that JPMorgan/Bear Stearns/EMC Mortgage allowed loans into their RMBS offerings which were not in compliance with the underwriting guidelines obviously rendered the offering documents false and misleading.*

829.    *Bear Stearns Residential was no better. In the first quarter of 2006, Bear Stearns Residential waived in 26% of the defective loans that Clayton had identified into the Bear Stearns/JPMorgan Offerings. In the second quarter of 2006, Bear Stearns Residential waived 35% of the defective loans into the offerings. In the third quarter of 2006, Bear Stearns Residential waived 56% of the defective loans identified by Clayton into offerings sold to the investing public. Finally, in the fourth quarter of 2006, Bear Stearns Residential waived 25% of the defective loans into the offerings.*

830.    Like Clayton, a company called Watterson-Prime was also hired by Bear Stearns to test samples of the loans it was originating or purchasing and identify the loans which did not comply with the underwriting guidelines. In a National Public Radio interview in May of 2008, former Watterson employee Tracy Warren stated that Watterson's largest customer was Bear Stearns. She recounted obvious fraudulent loan applications where hotel workers claimed $15,000 per month in income. She stated that whenever she would reject deficient loan files, her supervisors would usually overrule her and approve the loans. She recalled loans to borrowers with terrible credit scores and falsified incomes which she rejected, only to be overruled by her supervisors who

- 351 -

would say "'Oh, it's fine. Don't worry about it.'" Warren stated that about 75% of the loans which should have been rejected were purchased nonetheless.

831.    A former underwriter for both Clayton and Watterson was deposed and testified under oath in *Ambac Assurance Corp. v. EMC Mortgage LLC, et al.*, No. 650421/2011 (N.Y. Sup. Ct., N.Y. Cty.), that Bear Stearns instructed both Clayton and Watterson to "approve loans ***that often did not satisfy the underwriting guidelines***," to ignore defects in loan applications, to code defective loans as non-defective and to change many of the grades on loans that were coded as defective to reflect that they were non-defective. For example, the former underwriter testified:

- During the due diligence process, Clayton and Watterson underwriters were directed to overlook defects and to grade defective loans as non-defective. These instructions came from Bear Stearns and were conveyed to underwriters by their supervisors.

- Clayton and Watterson underwriters were directed by Bear Stearns not to look for fraud in the loan files and to overlook any fraudulent documents.

- Clayton and Watterson underwriters were directed by Bear Stearns to grade loans as non-defective, even where the underwriters determined the borrowers' incomes listed on loan applications were unreasonable.

- Clayton and Watterson performed "1003/1008 underwriting," a practice whereby an underwriter does not verify the information on the borrower's loan application, when reviewing loans for Bear Stearns.

- Clayton and Watterson were instructed by Bear Stearns to grade defective loans as non-defective by utilizing "compensating factors" that were not supported by the data in the loan files.

- Clayton underwriters used the phrase "Bear don't care" to describe Bear Stearns' attitude towards the due diligence underwriting review process.

832.    ***Notwithstanding the fact that both Clayton and Watterson found many loans did not comply with the underwriting guidelines, internal EMC Mortgage e-mails confirm that EMC Mortgage did absolutely no due diligence to check if the loans complied with EMC Mortgage's underwriting guidelines***. In a series of e-mails sent and received on March 24, 2006, EMC Mortgage employees informed EMC Mortgage's President Golden that numerous loans purchased

- 352 -

through the "flow side" channel, and which were then securitized, had absolutely no investigation done on them to see if they complied with the underwriting guidelines.  On March 24, 2006, Golden received an e-mail from EMC Mortgage employee Robert Durden, in which he stated the following concerning such loans: "*we securitized many of them which are still to this day not cleared*."

833.    Various JPMorgan Defendants, including EMC Mortgage, have been sued repeatedly by insurers, trustees and investors, all claiming that EMC Mortgage, Bear Stearns Residential and/or Encore misrepresented that they originated loans pursuant to their stated underwriting guidelines. *See, e.g.*, *Deutsche Zentral-Genossenschaftsbank AG, et al. v. JPMorgan Chase & Co., et al.*, No. 650293/2012 (N.Y. Sup. Ct., N.Y. Cty.); *Sealink Funding Limited v. Bear Stearns & Co. Inc., et al.*, No. 652681/2011 (N.Y. Sup. Ct., N.Y. Cty.); *Ambac Assurance Corp. v. EMC Mortgage LLC, et al..*, No. 650421/2011 (N.Y. Sup. Ct., N.Y. Cty.); *Syncora Guarantee Inc. v. J.P. Morgan Sec. LLC*, No. 651566/2011 (N.Y. Sup. Ct., N.Y. Cty.); *Assured Guaranty Corp. v. EMC Mortgage LLC et al.*, No. 10-CV-5367-NRB (S.D.N.Y.); *Federal Housing Finance Agency v. JPMorgan Chase & Co., et al.*, No. 11-CV-06188 (S.D.N.Y.); *Fort Worth Emps. Ret. Fund v. JPMorgan Chase & Co., et al.*, No. 09-CV-03701-JPO (S.D.N.Y.); *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No. 09-CV-03106-PAC (S.D.N.Y.).

834.    In a complaint filed in July 2011 by an insurer, Ambac Assurance Corporation ("Ambac"), against EMC Mortgage and some of the JPMorgan Defendants, Ambac alleged that it had reviewed 6,309 loans originated through EMC Mortgage, and that "*a staggering 90%" of the reviewed loans had defects which violated EMC Mortgage's underwriting guidelines*. *See* First Amended Complaint, ¶280, *Ambac Assurance Corp. v. EMC Mortgage LLC, et al.*, No. 650421/2011 (N.Y. Sup. Ct., N.Y. Cty. July 18, 2011).  In particular, Ambac found the following defects in the loans:

- 353 -

- *rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property*;

- *failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property*;

- *inflated and fraudulent appraisals*; and,

- *pervasive violations of the loan originators' own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with debt-to-income and loan-to-value ratios above the allowed maximum, or (v) with relationships to the applicable originator or other non-arm's-length relationships*.

*Id.*

835.    But these were not the only defective EMC Mortgage loans Ambac found.  In 2012, Ambac filed a second lawsuit against EMC Mortgage and some of the JPMorgan Defendants.  *See* First Amended Complaint, *Ambac Assurance Corp., et al. v. EMC Mortgage LLC, et al.*, No. 651013/2012 (N.Y. Sup. Ct., N.Y. Cty. Aug. 14, 2012).  In this second lawsuit, ***Ambac alleged that EMC Mortgage systematically ignored its underwriting guidelines and was "[d]riven by management's 'Bear don't care' mentality." Ambac alleged that EMC Mortgage and the other JPMorgan Defendants "perpetrated a massive fraud that deceived investors and financial guarantors, such as Ambac, into believing that the mortgage loans backing [Bear Stearns/JPMorgan] securitizations were originated pursuant to established underwriting guidelines and were therefore of good quality*." *Id.*, ¶1.  Ambac alleged that it had reviewed loans from two separate offerings to determine whether they complied with the stated underwriting guidelines and/or complied with representations and warranties EMC Mortgage had made about the loans.  ***Ambac found that an astounding 90% of the loans in one offering were defective and that***

- 354 -

*an equally surprising 80% of loans in the other offering were defective*. *Id.*, ¶19. *Ambac found*

*the following pervasive underwriting guideline violations in EMC Mortgage's loans*:

- *rampant fraud, primarily involving misrepresentation of the borrower's income, liabilities, employment, or intent to occupy the property as the borrower's primary residence*;

- *inadequately supported property values*; and

- *pervasive violations of the applicable underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income or otherwise clearly had no ability to repay their loans, (ii) with credit scores below the required minimum, (iii) with LTV ratios above the allowed maximum, or (iv) with relationships to the lender or originator or other non-arm's-length relationships*.

*Id.*, ¶210.

836.    Ambac concluded that its review of EMC Mortgage's loans "***confirm[ed] that the***

***abandonment of underwriting guidelines and the misrepresentation of key loan characteristics***

***were systematic and affected a large percentage of the loans included in the Transactions.  In***

***sum, the loans included in the Transactions bore no resemblance to their represented***

***characteristics*.**" *Id.*, ¶211.

837.    Ambac was not the only insurer finding that EMC Mortgage originated loans that did

not comply with its underwriting guidelines.  In 2012, Syncora Guarantee Inc. ("Syncora") sued

EMC Mortgage and other JPMorgan Defendants.  *See* Complaint, *Syncora Guarantee Inc. v. EMC*

*Mortgage LLC, et al.*, No. 650420/2012 (N.Y. Sup. Ct., N.Y. Cty. Feb. 14, 2102).  ***Syncora found***

***that 81.9% of the EMC Mortgage loans it reviewed breached representations and warranties EMC***

***Mortgage had made about the loans.  Id., ¶8.  Those representations and warranties included a***

***promise that the statements in the offering documents for the offering at issue (which stated that***

***the loans were originated pursuant to EMC Mortgage's underwriting guidelines) were not false***.

838.    This was not the first time Syncora found defective EMC Mortgage loans.  Indeed, in 2011, *Syncora sued JPMorgan after it found that 85.5% of the loans that were reviewed breached various contractual warranties made by EMC Mortgage, including that there was no fraud in the underwriting process and that loans were originated pursuant to certain underwriting guidelines*. *See* Complaint, ¶7, *Syncora Guarantee Inc. v. J.P. Morgan Securities LLC, et al*., No. 651566/2011 (N.Y. Sup. Ct., N.Y. Cty. June 6, 2011).

839.    A third insurer sued EMC Mortgage and other JPMorgan Defendants in 2012, also for massive failures to adhere to the stated underwriting guidelines.  In March 2012, Assured Guaranty Corp. ("Assured") sued EMC Mortgage, alleging that it, *inter alia*, failed to adhere to its loan underwriting guidelines.  *See* Complaint, *Assured Guaranty Corp. v. EMC Mortgage LLC, et al*., No. 650805/2012 (N.Y. Sup. Ct., N.Y. Cty. Mar. 15, 2012).  *Assured's review of loans originated through EMC Mortgage found that 88.5% of the loans breached representations and warranties and otherwise failed to comply with the stated underwriting guidelines*. *Id*., ¶223. *Assured found the following violations of the underwriting guidelines in the loans*:

- *Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property*;

- *Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property*;

- *Inflated and fraudulent appraisals*; and

- *Pervasive violations of [the stated] underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage-lending practices, including, for example, HELOCs made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum, (iv) with DTI, LTV, and CLTV ratios above the allow maximums, or (v) with relationships to GreenPoint or other non-arm's-length relationships*.

- 356 -

*Id.*, ¶270.  Assured summed up EMC Mortgage's/Bear Stearns' conduct as follows: "***Simply put,
Bear Stearns [through EMC Mortgage] acquired loans it knew were defective and sold them at a
profit into securitizations before they could default***."  *Id.*, ¶5.

840.    In addition, a trustee of an RMBS trust containing loans originated through EMC
Mortgage and Bear Stearns Residential sued EMC Mortgage in 2011 and requested declaratory
relief.  *See* Verified Complaint, *Bear Stearns Mortgage Funding Trust 2007-AR2 v. EMC Mortgage
Corp.*, No. 6132 (Del. Chan. Ct. Jan. 18, 2011).  The trustee sought a declaratory judgment that it
was entitled to obtain and access the loan files from EMC Mortgage due to issues concerning
whether EMC Mortgage had breached representations and warranties it had made concerning the
loans.  Prior to instituting the lawsuit, an investor in the trust undertook an investigation of loans
contained within the trust that were originated by EMC Mortgage and Bear Stearns Residential.
Particular attention was paid to whether inflated appraisals in violation of the underwriting
guidelines had been used during the origination process.  In addition, the investigation also focused
on whether there were misrepresentations made concerning whether the loans were for primary
residences.  On August 3, 2010, an attorney representing an investor in the trust sent a letter to the
trustee, setting out the results of the investigation. *Id.*, ¶25.  The investigation involved the review of
1,317 loans within the trust. ***The review of the loans revealed that a huge number of them – 938
loans – breached representations and warranties that EMC Mortgage had made about the loans***.
*Id*. ***In other words, over 71% of the loans reviewed did not comply with EMC Mortgage's
underwriting guidelines.  The investigation found large numbers of loans with inflated appraisals
and understated LTV ratios.  In addition, large numbers of loans had misrepresented primary
occupancy statuses, that is, they were not owner occupied as represented***.

841.    Encore was just as bad as, if not worse than, EMC Mortgage and Bear Stearns
Residential in terms of ignoring its stated underwriting guidelines and failing to evaluate its

- 357 -

borrowers' true repayment ability.  As illustrated in a news article published in *The Oregonian* on February 5, 2008, Encore ignored its stated underwriting guidelines, falsified incomes, did not determine whether the borrowers could afford to repay their loans, forged documents, and put borrowers into loans they obviously could not afford to repay.  *The Oregonian* recounted the story of borrower Paul Hoffhine Jr., a mentally disabled man who subsisted on Social Security payments of $624 per month.  Hoffhine had inherited a house from his parents in the 1980s that was completely paid for.  In February 2004, Encore cold-called Hoffhine and talked him into taking out a loan on the property so that Hoffhine could take equity out of the property in the form of cash.  The loan had monthly payments of $489.46.  Thus, Hoffhine's DTI ratio was over 78% based ***solely*** on the mortgage loan extended by Encore (the $489.46 loan payment divided by Hoffhine's monthly $624 Social Security payment equals 78.4%).  Hoffhine's other debts were not used to calculate the 78+% DTI ratio above, and therefore, if he had other debts, his DTI ratio would have been even higher.  However, in the offering documents describing Encore's underwriting guidelines, it was stated that the maximum DTI ratios allowed under Encore's guidelines were only 50%-55%.  Clearly, Encore did not follow its underwriting guidelines for DTI ratios.

842.    Even worse, according to *The Oregonian*, a few months later, in December 2004, Encore persuaded Hoffhine to refinance and take out a new loan.  The monthly payment on the new loan increased to $617 per month, just $7 less than Hoffhine's entire monthly income, thus generating a DTI ratio of over 98%.  Thus, on the second loan, Encore again ignored its stated underwriting guidelines requiring DTI ratios of 55% or less, and gave Hoffhine a loan which generated a DTI ratio of over 98%, far in excess of the stated DTI ratio maximums under Encore's underwriting guidelines, and far beyond Hoffhine's ability to repay.

843.    Even more disturbing was the fact that Encore engaged in fraudulent activity related to the loan.  *The Oregonian* reported that, in Hoffhine's loan file, there was "a document claiming

- 358 -

that Hoffhine was earning $3,500 a month as a handyman . . . '[u]nderneath [which was] a scrawled

signature – Paul Hauck Hoffhine Jr.'"  The news article reported that Hoffhine denied making the

statement or signing the document, which was an obvious forgery containing fraudulent information.

The article quoted Hoffhine as follows on the document: "'***They forged my signature, [and] they***

***inflated my income***.'"  After being threatened with a lawsuit, Encore quickly and quietly settled with

Hoffhine.

844.    The sheer number of lawsuits and news reports, coupled with internal Bear Stearns

and EMC Mortgage documents,  establishes that the Offering Documents were false.  In addition,

the nearly identical nature of the allegations in every lawsuit – that EMC Mortgage, Bear Stearns

Residential and Encore simply ignored their underwriting guidelines and routinely failed to evaluate

their borrowers' true repayment ability – further corroborates that the Offering Documents contained

misrepresentations regarding these three originators' underwriting practices.

### 8.    The Offering Documents Misrepresented Impac's Underwriting Guidelines

845.    As detailed *supra*, Impac Mortgage Holdings, Inc.'s or its subsidiary, Impac Funding

Corporation's (collectively, "Impac") supposed underwriting guidelines were described by

defendants in the Offering Documents.  *See* §V.  For the reasons set forth immediately below, these

representations were false and misleading at the time defendants made them.  In truth, Impac had

completely abandoned its stated underwriting guidelines and was routinely originating loans without

any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged

properties to serve as collateral.

846.    Former Impac employees have confirmed that Impac violated and ignored its stated

underwriting guidelines.  For example, according to a former Impac Team Leader and Senior

Account Executive, who worked for the company from 2000 through 2005, in late 2004 or early

2005, Impac brought in new management at his lending division.  The new management was from infamous lender Countrywide (discussed *supra*), and Impac's standards immediately went from originating only high quality loans to originating as many loans as possible without regard to quality.  According to this former employee, Impac's new management's attitude  was "make exceptions" to the underwriting guidelines (even where no compensating factors existed) and do "whatever it takes to get deals done."

847.    According to this former Impac employee, Impac began producing high volumes of risky loans and considered it irrelevant whether the loans complied with Impac's underwriting guidelines.  As a result, many loans were made which did not comply with the guidelines.  In fact, "many exceptions needed to be made" to the underwriting guidelines in order to approve the loans.  So many defective loans were approved that they flooded Impac's processing pipeline causing delays, according to this former employee.

848.    This former Impac employee resigned in 2005 because he simply "couldn't stay in an outfit" in which the culture had become "too pushy, not nice, and all they cared about was making money" by selling defective loans.  The former Impac employee could no longer deal with the shady lending practices, stating: "I d[id not] want to be any part of it."

849.    The foregoing demonstrates that Impac abandoned its stated underwriting guidelines during the relevant time period (2004-2007).  However, further corroboration follows.

850.    In October 2008, shareholders of Impac Mortgage Holdings, Inc. filed a Third Amended Consolidated Class Action Complaint against Impac Mortgage Holdings, Inc. and its officers and directors, alleging that Impac Mortgage Holdings, Inc. and its executives committed securities fraud by lying about the company's financial results and operations.  *See* Third Amended Class Action Complaint, *Pittleman v. Impac Mortgage Holdings, Inc., et al.*, No. SACV07-970 AG (MLGx) (C.D. Cal. Oct. 27, 2008).  In the complaint, the shareholders cited to five former Impac

- 360 -

employees that recounted events at the company during the relevant time period (2004-2007). The former employees confirmed that Impac routinely originated and sold loans which did not comply with its stated underwriting guidelines during the relevant time period. Those former employees reported the following:

- *According to a former Impac underwriting manager for bulk loan purchases from October 2003 until July 2006, Impac originated many of its loans by buying them in bulk from other lenders. The former Impac employee provided due diligence on the bulk loan purchases and he reported that even when the bulk loans did not comply with Impac's underwriting guidelines, Impac regularly purchased them anyway and then sold them to "investors," i.e., Wall Street banks like defendants. He recalled that the majority of loans he recommended rejecting because they did not comply with Impac's underwriting guidelines were regularly approved for purchase and resale to investors. According to this former employee, Impac regularly purchased loans from dubious lenders like Countrywide and AHM, which subsequently led to tens of millions of dollars in repurchase demands to Impac by the purchasers of the defective loans. He recalled one instance where he recommended rejecting a pool of loans from a seller who was known to originate fraudulent loans, but that he was overruled by the President of Impac, William Ashmore, and the loans were purchased by Impac nonetheless. The former employee stated that Ashmore and other top Impac executives were well aware that Impac was buying and selling bad or fraudulent loans. Id., ¶¶46-55.*

- *A former employee that worked at Impac from January 2005 through October 2007 reported that Impac routinely approved loans where borrowers had insufficient incomes or unacceptable credit scores. This former employee reported that Impac repeatedly inflated the incomes of borrowers to make them appear to qualify for loans. Id., ¶¶56-57.*

- *A former Impac Quality Control employee from May 2004 through October 2007 reported that the overstating of borrowers' incomes "made everyone happy" at Impac, and that management encouraged the making of loans to borrowers that "should not have been eligible" for the loans. Id., ¶¶59-60.*

- *A former underwriter at Impac from June 1997 through July 2007 stated that Impac "did not abide by its stated underwriting guidelines." This former employee stated that all underwriting guidelines except one – credit score – were routinely ignored and overridden by Impac management. He stated that he "'saw it all the time where we'd deny it [a loan] and they [management] say, yeah, we could do this.'" Id., ¶65.*

- 361 -

851.    By the end of 2007, Impac's systematic abandonment of its underwriting guidelines had resulted in it facing over $155 million in repurchase demands from hundreds of buyers of its loans, because Impac's loans were not originated pursuant to its stated underwriting guidelines.

### 9.    The Offering Documents Misrepresented AHM's Underwriting Standards

852.    As detailed *supra*, AHM's supposed underwriting guidelines were described by defendants in the Offering Documents.  *See* §V.  For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them.  In truth, AHM had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

853.    The SEC instituted fraud charges against the former top executives of AHM's parent company, American Home Investment Corp. ("American Home Investment"), for their role in misleading investors regarding AHM's systematic disregard of sound underwriting standards and risky lending practices that ultimately led to the lender's bankruptcy on August 6, 2007.  "'These senior executives did not just occupy a front row seat to the mortgage meltdown – they were part of the show,'" said Robert Khuzami, Director of the SEC's Division of Enforcement in a press release.[21]  *The SEC charged that AHM was not the "prime" lender it claimed to be, but rather routinely issued high-risk loans to borrowers with poor credit in order to drive growth and capture additional market share*.  American Home Investment's former CEO paid $2.5 million to settle the SEC's fraud charges.

---

[21]    SEC Press Release 2009-92, "SEC Charges Former American Home Mortgage Executives for Misleading Investors About Company's Financial Condition"(Apr. 28, 2009).

854.    Numerous statements from former AHM employees confirm that, in order to increase the volume of loan originations, AHM disregarded its stated underwriting guidelines, failing to evaluate its borrowers' true repayment ability and failing to obtain appraisals that complied with AHM's stated appraisal standards. A former Wholesale Account Executive, who worked at AHM from January 2005 through July 2007, stated that *at AHM "anybody could buy a house with zero percent down and no proof of ability to pay [the loan] back*." According to this former employee, AHM regularly extended loans that are now classified as predatory. Likewise, a former Operations Manager in the lending division from 2002 through December 2006 stated that *a borrower's ability to repay the loan was not a consideration at AHM*.

855.    Moreover, another former AHM Vice President from March 2003 through May 2007 confirmed that appraisal fraud was commonplace at AHM. Specifically, this former Vice President recounted how loan officers regularly pressured appraisers to falsely inflate their valuations in order to come up with the "right number." As a result, the appraisals upon which AHM's loans were based, as well as their resultant LTV ratios, falsely misrepresented the true level of risk associated with such loans.

856.    Contrary to AHM's stated underwriting policy, AHM was not weighing all risk factors inherent in a loan file. Instead, according to former underwriters who worked at AHM, loans that were initially rejected for failing to comply with the underwriting guidelines were frequently approved by AHM's automated underwriting software.

857.    According to former AHM loan underwriters during the relevant time period, AHM used automated underwriting software provided by Wall Street banks like defendants that approved loans that would not have been approved under AHM's stated underwriting guidelines. According to a former Level 5 Underwriter who worked at AHM from 2004 until December 2006, AHM's initial rejections of loans because they did not comply with the stated underwriting guidelines were

- 363 -

864087_1

frequently overridden by defendants' automated underwriting software.  Defendants' "guidelines" were based on what they could ultimately resell regardless of quality.  This Underwriter pointed to a number of instances where the automated program approved loans that made no financial sense and were not likely to be paid back.  As a result, AHM management routinely approved risky loans.  This situation caused the underwriter to "lose respect" for AHM, as the underwriter believed that an underwriter's role was to look at the totality of the information in the loan application and ask "Does it fit?" and "Is it logical?"  The Underwriter said that many of the loans approved by the automated underwriting software were loans on which he "would not have lent a dime."

858.    In addition, although AHM's underwriting guidelines for stated income applications allowed for loans where there were "other compensating factors," such as higher credit scores or lower LTV ratios, in fact: (i) AHM allowed credit scores to be manipulated by the borrower, who would become an approved user on another person's credit card or other account who had better credit ratings; and (ii) AHM had no reasonable basis to believe that lower LTV ratios were accurate because AHM was aware that the appraisals being used by the company were inflated (thus leading to false, lower LTV ratios).  Further, in order to achieve desired loan production, *AHM was as a matter of course granting exceptions to its underwriting guidelines, even where actual "compensating factors" did not exist*.  Because AHM's business was dependent on continually increasing volume, *AHM granted exceptions as a matter of course, even when no real exception existed*.

859.    In an effort to keep loan volume up despite a slowdown in activity, AHM's brokers became so aggressive that borrowers were given loans with different terms than they were originally promised.  Borrowers have, in fact, complained that loans were switched on them by AHM, leaving them with mortgages they could not pay.  Further evidence of AHM's poor underwriting practices appeared when IndyMac hired over 1,400 of AHM's former employees.  According to a former

- 364 -

Senior IndyMac Underwriter, some of the AHM employees that IndyMac took in operated a "fraud shop" within IndyMac.

860.    AHM also landed on the OCC's "Worst Ten in the Worst Ten" list of lenders with the highest numbers of foreclosures, further confirming that AHM did not originate loans pursuant to underwriting guidelines designed to evaluate repayment ability, as represented in the Offering Documents.

### 10.    The Offering Documents Misrepresented GreenPoint's Underwriting Standards

861.    As detailed *supra*, defendants' Offering Documents purported to describe the underwriting guidelines that were supposedly used by GreenPoint in originating loans underlying plaintiffs' certificates.  *See* §V.  For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them.  In truth, GreenPoint had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

862.    GreenPoint's underwriting guidelines were not applied to evaluate a prospective borrower's credit standing, repayment ability, or the value and adequacy of the mortgaged property as collateral.  Rather, GreenPoint systematically ignored its stated underwriting guidelines and instead used guidelines which were unsound and failed to truly evaluate the borrowers' repayment ability or the value and adequacy of the loans' collateral.  ***As a former GreenPoint VP/Wholesale Branch Operations Manager – who worked for GreenPoint from July 2003 to January 2008 – explained, from GreenPoint's perspective repayment ability was irrelevant as long as a loan met the guidelines provided by the investment bank***.

863.     GreenPoint's Wall Street-based underwriting guidelines were woefully inadequate. As described by a former GreenPoint Account Executive – who worked in the Queens, New York branch from July 2003 through September 2007 – beginning in 2005, GreenPoint's underwriting standards became increasingly lenient, especially towards higher-risk borrowers.  This Account Executive characterized GreenPoint's underwriting guidelines as "loose" and becoming progressively "looser" during the 2005-2006 timeframe.   This Account Executive attributed GreenPoint's loosening of its underwriting standards to its desire to remain competitive in the lending market, explaining that as other lenders relaxed their loan underwriting standards and began extending loans to people who were unlikely to repay their loans, GreenPoint had to do the same in order to remain competitive.   GreenPoint began to significantly relax the requirements that borrowers would have to satisfy to qualify for a given loan program, including relaxing requirements involving documentation of repayment ability, maximum LTV ratios and minimum credit scores.

864.     Additionally, GreenPoint did not limit its granting of exceptions to circumstances where actual compensating factors existed.  Rather, it was systematically granting exceptions even in the absence of any real compensating factors.  Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any degree of realistic control or supervision.  Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first ninety days of work.  This lack of monitoring was particularly problematic because, as noted by many regulators, brokers were interested mainly in generating upfront fees triggered by making the loans, and did not determine whether borrowers were actually qualified for the loans or whether there were exceptions to the guidelines due to compensating factors.

865.     GreenPoint did not verify the income of borrowers as represented and cut corners on loan underwriting.  In addition, many of GreenPoint's loans were actually subprime loans in

- 366 -

disguise, a practice later copied by others.  GreenPoint's practice of disguising subprime loans was confirmed by the former GreenPoint Account Executive mentioned above.  This former Account Executive stated that GreenPoint offered loans it represented to be of higher quality even though their qualifying requirements were those of "junk" loans.

866.    Additional corroboration of the fact that GreenPoint did not originate loans pursuant to its stated underwriting guidelines and failed to evaluate its borrowers' true repayment ability comes from a lawsuit filed in February 2009 by U.S. Bank against GreenPoint.  *See* Complaint, *U.S. Bank, N.A., et al. v. GreenPoint Mortgage Funding, Inc.*, No. 600352/2009 (N.Y. Sup. Ct., N.Y. Cty. Feb. 5, 2009).  In that case, the trustee of an RMBS trust sued GreenPoint alleging that the loans in the trust, which were originated by GreenPoint, were not originated pursuant to GreenPoint's underwriting guidelines, as previously represented.  A sample of GreenPoint's loans were reviewed in this case and it was found that an astounding ***93% of the loans primarily contained underwriting defects***.  *Id.*, ¶2.

867.    That GreenPoint was not complying with the underwriting guidelines set forth in the Offering Documents is further confirmed by the fact that GreenPoint was one of the lenders on the OCC's "Worst Ten in the Worst Ten" foreclosure list.  If GreenPoint was truly evaluating its borrowers' repayment ability, it would not have had so many foreclosures.

### 11.    The Offering Documents Misrepresented NovaStar's Underwriting Standards

868.    As detailed *supra*, defendants' Offering Documents purported to describe the underwriting guidelines that were supposedly used by NovaStar in originating loans underlying plaintiffs' certificates.  *See* §V.  For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them.  In truth, NovaStar had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard

- 367 -

for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

869.    NovaStar's underwriting guidelines were applied unevenly and subjectively, and were interpreted differently by each of NovaStar's regional operations centers.    NovaStar's loan underwriters were pressured by management to approve loans and were encouraged to "think outside the box," *i.e.*, find ways to approve loans that did not meet the underwriting guidelines.    This conduct was condoned at the highest levels of the company, in an effort to have NovaStar make as many loans as possible.

870.    Promotional materials that NovaStar sent to its network of brokers expressly indicated that NovaStar ignored its underwriting guidelines.    For example, brokers were sent a memo that stated "Did You Know NovaStar Offers to Completely Ignore Consumer Credit!," an obvious concession that NovaStar would not evaluate whether borrowers could afford to repay their loans. Another memo similarly stated: "Ignore the Rules and Qualify More Borrowers with our Credit Score Override Program!"

871.    According to a former NovaStar employee in Ohio, who worked for the company from April 2002 until March 2007, and held several positions – first in NovaStar's Pre-Closing Quality Control/Fraud Audit Department, then as an Account Manager, and then ultimately as an Underwriter from 2003 until he was laid off in March 2007 – *he approved loans that did not comply with the underwriting guidelines by granting "exceptions" without even seeing the loan file*.    He was instructed by the Vice President of Sales to be aggressive in granting exceptions to loans that did not meet the underwriting guidelines so that company Account Executives could bring in more business.    Consequently, this former employee granted exceptions most of the time because NovaStar wanted to build up its business.

- 368 -

872.    This former Underwriter confirmed that NovaStar routinely ignored all but one of its stated underwriting guidelines – a borrower's credit score – with exceptions being routinely granted to all of the rest of NovaStar's underwriting guidelines.  This former employee stated that NovaStar treated its underwriting guidelines as simple parameters, with the actual "unspoken law" being to approve loans.

873.    This former NovaStar employee described two particularly risky loan products that NovaStar sold in which fraudulent loan information was frequently used.  One was called a "TIN" loan, which was made to resident aliens who lacked social security numbers but had "tax identification numbers" (hence, the acronym "TIN").  These borrowers typically had little or no credit histories and were allowed to "state" their incomes.  He saw loans approved under this program where house cleaners and landscapers were falsely claiming to make $7,000 per month.

874.    The other risky loan product that this former Underwriter saw at NovaStar was called a "Condex" loan.  These loans were for a certain type of condominium.  This Underwriter stated that these loans ran counter to NovaStar's underwriting guidelines, violating a number of the guidelines, and underwriters were supposed to deny such loans.  Yet NovaStar continued making these types of loans.  He stated these loans were horrendous.

875.    In addition to the foregoing, the former Underwriter saw many other instances of loans that violated the underwriting guidelines.  He recalled an example of a loan he denied because of an inflated appraisal, only to see his denial overturned and the loan approved by his Regional Operations Supervisor.  He further recalled examples where borrowers' incomes were at a level that caused their DTI ratios to be too high to qualify for a loan under the underwriting guidelines.  Later, the same borrowers were resubmitted, but this time the borrowers' incomes had been falsely increased, just enough so that the borrowers' DTI ratios now fell within the underwriting guidelines, qualifying them for the loans.  He also recalled examples where borrowers were switched from full

- 369 -

documentation loans to stated income loans, because the borrowers' bank statements showed the borrowers made, for example, only $700 per month.  Later, the same borrowers were switched to stated income loans, which now falsely "stated" that the borrowers' incomes were significantly higher.  The former Underwriter stated that company Underwriting Supervisors sometimes threw out the bank statement page that showed the lower income, and that his Regional Supervisor did this "a lot."  He also stated that NovaStar improperly allowed borrowers' family members to verify borrowers' incomes and rent histories.

876.    This former Underwriter noted that NovaStar did not make an example of brokers that made large numbers of loans even though it was known within NovaStar that they engaged in improper conduct, simply because they brought in a lot of business.  He also confirmed that NovaStar Account Executives routinely made gifts to underwriters of cash, drugs and other things.  Some underwriters approved loans because of the gifts.  In summary, this former Underwriter stated that NovaStar lost its morals as the company grew.

877.    Another former NovaStar employee who worked in various positions at the company – as an Account Manager and Underwriter from 2003 until May 2007 – confirmed that the company routinely approved loans which did not comply with the company's underwriting guidelines.  This former NovaStar employee stated that he frequently "butted heads" with one of the company's "big dog" Account Executives, who wanted to get his loans approved.  This former NovaStar employee would not approve the Account Executive's loans because they did not comply with NovaStar's underwriting guidelines.  Accordingly, the "big dog" Account Executive went over the former employee's head, to the company's Vice President of Operations, and got the loans approved.  This happened frequently to this former NovaStar employee.  The loans that this Account Executive had approved by upper management included loans in obvious violation of NovaStar's underwriting guidelines.

- 370 -

878.    This former NovaStar employee also recalled seeing loan files with fabricated employment information and misrepresentations about whether the loan was for a primary residence or an investment property.

### 12.    The Offering Documents Misrepresented Aames's Underwriting Standards

879.    Aames Capital Corporation ("Aames") was a California-based lender that originated loans for one of the offerings at issue herein.  In May 2006, Aames was acquired by Accredited Home Lenders, Inc. ("Accredited"), another California-based lender.  As a result of these lenders' consolidation during the period at issue herein, plaintiffs' allegations regarding both Accredited's and Aames's conduct are set forth in the same section.

880.    As detailed *supra*, defendants' Offering Documents purported to describe the underwriting guidelines that were supposedly used by Aames in originating loans underlying plaintiffs' certificates.  *See* §V.  For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them.  In truth, Accredited had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

881.    Accredited faced stiff competition from other lenders in a market that was rapidly expanding.  As a result, in order to gain market share, the company deviated from its stated underwriting guidelines and disregarded both its borrowers' true repayment ability and the adequacy of the properties to serve as collateral.  According to a former Accredited Regional Manager, who worked for the company from 2003 through 2005, the constant refrain that he heard from Accredited's account executives was "if we don't do [the loan] somebody else will."  He stated that the mortgage market "was screaming for new loans," and that Accredited's competitors, such as

- 371 -

Argent and New Century, "were ready to fund the deal" no matter the quality of the loan. This created great pressures on Accredited's account executives to find ways to have their loans approved.

882.    As a result, Accredited engaged in lending fraud. According to a former Senior Underwriter, who worked at Accredited's Austin, Texas branch from July 2006 through March 2007, the company originated numerous stated income loans with falsified incomes. According to the former Senior Underwriter, ***Accredited had a pattern and practice, on stated income loan applications, of falsely adjusting borrowers' incomes upward so that the borrowers would appear to qualify for the loans under the company's underwriting guidelines.*** This Senior Underwriter's manager routinely asked the Senior Underwriter to falsely increase borrowers' incomes. In fact, the Senior Underwriter's manager hosted a tour for visiting outside mortgage brokers at Accredited's Austin branch. The purpose of the tour was to attempt to have these independent mortgage brokers do business with Accredited, that is, to bring borrowers to Accredited. According to the former Senior Underwriter, during this tour, ***the Senior Underwriter's manager told the brokers that "unlike other originators [Accredited] will adjust stated incomes if necessary***." In addition, on another occasion, at a branch meeting for the operations team, the former Senior Underwriter recalled that a new employee had questioned the practice of allowing Accredited employees to adjust stated incomes. ***Accredited Operations Manager Will Shipp publicly responded: "It is common practice to change the stated income, but we will talk about that later***." The former Senior Underwriter found Accredited's practices involving stated income to be so objectionable that she resigned from the company.

883.    The underwriting system at Accredited allowed loan processors, account executives and underwriters to adjust loan applications. Thus, according to the former Senior Underwriter, the underwriting system lacked any security feature, and therefore any employee was allowed to view

- 372 -

and adjust loan applications. This left Accredited's loan applications open to manipulation, which was frequently done. The Senior Underwriter recalled situations where she had rejected a loan only to later learn her rejection had been overridden and the loan approved.

884.    According to a former Accredited Regional Manager, account executives would often bypass him and go over his head to seek approval for rejected loans and loans with unmet conditions from Lance Burt, Accredited's Divisional Manager for Southern California. The former Regional Manager stated that Burt had the final authority to approve loans and in fact "made the final approval of all loans." He described Burt's authority as "carte blanche" to approve any loans that he (Burt) wanted. The former Regional Manager joked that Burt had "the magic pen" and could make loans happen. He stated that Burt "routinely signed off" on rejected loans, approving them. The former Regional Manager also stated that he believed that Burt also approved non-compliant loans from high-producing independent mortgage brokers in order to maintain the business relationship between the company and the brokers. In other words, the decision to approve defective loans in these circumstances became a "business decision," according to the former Regional Manager.

885.    The former Regional Manager recalled a situation where an Accredited account executive was terminated because the account executive had committed fraud with at least 10-15 funded loans. However, Accredited never reported the incident to law enforcement or anyone else in order to avoid negative publicity and a potential decline in the company's stock price. He noted that the fired account executive began working at Countrywide within a few days.

886.    According to a former Corporate Underwriter in Accredited's Orange, California, office, who worked for the company from 1995 until 2007, there were many problems in Accredited's loans. For example, the former Corporate Underwriter saw issues such as stated "income[s] [that were] out of whack" with the stated profession, and paystubs that appeared to be fraudulent. In other cases, she questioned whether or not the applicant actually "lived in the house"

- 373 -

listed on the application as the current residence. ***This former Corporate Underwriter reported that Divisional Manager Burt also routinely overrode her rejections of loans, as he had done with the former Regional Manager. This former Corporate Underwriter stated that "[a] lot of loans" were approved by Burt which she believed lacked any credible basis for approval***.

887.    According to the former Corporate Underwriter, there were instances of account executives manipulating closing documents after loan approval with the assistance of document "drawers." She recalled an account executive "paying off" a document drawer "to turn the other way" while the account executive manipulated and falsified the loan documents on the document drawer's computer.

888.    Further corroboration that Accredited routinely ignored its stated underwriting guidelines comes from a former Accredited Underwriter who worked in one of Accredited's Florida offices from 2005 until 2006. The former Underwriter stated that, rather than following its stated underwriting guidelines, ***if the borrower came close to meeting the guidelines, Accredited approved the loan application***. Moreover, the former Underwriter reported that his Operations Manager regularly issued overrides for loans that did not comply with the underwriting guidelines, and approved them anyway.

889.    A lawsuit filed against Accredited in late August 2007 confirms the accounts of the foregoing former Accredited employees that Accredited ignored its underwriting guidelines. In late August 2007, shareholders of Accredited's parent company, Accredited Home Lenders Holding Co., filed a complaint against the company and its officers and directors, alleging that they committed securities fraud by lying about the company's financial condition. *See* Corrected Consolidated Class Action Complaint, *Atlas v. Accredited Home Lenders Holding Co., et al.*, No. 07-cv-488-H (RBB) (S.D. Cal. Aug. 24, 2007) (the "*Atlas* Complaint"). In the *Atlas* Complaint, the plaintiffs cited to reports from at least 12 former Accredited and Aames employees. Those former employees reported

- 374 -

a pervasive and systematic disregard by Accredited of its underwriting guidelines, including the

following:

- *According to a former Corporate Underwriter who worked at Accredited between June 2004 and March 2005, "the Company approved risky loans that did not comply with its underwriting guidelines"; his rejections of loans "were frequently overridden by managers on the sales side of the business"; and his overridden loan rejections involved loans containing improper "'straw borrower[s],'" employment that could not be verified, inflated incomes, and violations of Accredited's DTI, credit score, LTV and employment history requirements*. *Id*., ¶¶48-49.

- *According to a former Accredited employee from 1998 until December 2006, pressure to approve loans, regardless of quality, was especially bad from mid-2005 until the time she left the company at the end of 2006, and Accredited's growing issues with problem loans was due to management's overrides of the underwriting and appraisal processes*. *Id*., ¶¶50-51.

- *According to a former Corporate Underwriter at Accredited from August 2003 until February 2006, her decisions to reject loans were constantly overridden by management, and such overrides "were rampant."* *Id*., ¶¶56-57.

- *According to a former Accredited Regional Manager who worked at the company throughout 2005, "the Company's underwriting guidelines were frequently overridden by senior management."* *Id*., ¶¶58-60.

- *According to other former Accredited employees who worked at the company during the relevant time period (2004-2007), management frequently overrode underwriters' decisions to reject loans that did not comply with the underwriting guidelines. According to one underwriter, when underwriters challenged the overrides they were told by management: ""You have to go forward with it."' If you made a big stink about it, they would raise their eyebrows and say "'Do you want a job?"'" Other former employees recounted loan applications that were approved with inflated incomes, inflated appraisals, and suspicious verifications of employment*. *Id*., ¶67.

- *Several former Accredited employees who worked with appraisals reported that the company management overrode licensed appraisers' decisions and approved many loans based on inflated appraisals*. *Id*., ¶77.

- *A former Aames and Accredited employee reported that both Aames and Accredited frequently made exceptions to their underwriting guidelines. According to this former employee, while Aames' violations of the underwriting guidelines were limited to one exception per loan, at Accredited it was common to see multiple exceptions per loan*. *Id*., ¶83.

890.    Accredited ultimately paid $22 million to settle the shareholders' lawsuit in 2010.

### 13.    The Offering Documents Misrepresented Argent's Underwriting Standards

891.    As detailed *supra*, defendants' Offering Documents purported to describe the underwriting guidelines that were supposedly used by Argent in originating loans underlying plaintiffs' certificates. *See* §V. For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them. In truth, Argent had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

892.    Argent was a unit of Ameriquest, another of the originators at issue herein and discussed above. *See* §VI.A.6, *supra*. Like its parent company Ameriquest, Argent also had a corrupt culture and ignored its stated underwriting guidelines. Argent engaged in all the same deviations from its stated underwriting guidelines that Ameriquest did, *see id.,* and also engaged in the following additional conduct demonstrating that it did not originate loans pursuant to its stated underwriting guidelines.

893.    The FCIC noted in its investigation that Argent went even further astray from its underwriting guidelines than Ameriquest did, with one of Argent's high-level executives engaging in not only fraudulent lending conduct but also ***criminal*** lending conduct. Starting in 2004, when some of the loans at issue herein were being originated, and continuing for "years" thereafter, when most of the rest of the loans at issue herein were being originated, Florida law enforcement investigated Argent's New York-based Vice President Orson Benn and others, concerning a scheme involving fraudulent mortgages. ***Argent's Vice President Benn and his accomplices "would prepare fraudulent loan documents . . . filled with information about invented employment and falsified salaries, and take out home equity loans" in others' names. FCIC Report at 164. "Benn, at***

*Argent, received a $3,000 kickback for each loan he helped secure." Id. Benn eventually was convicted of his conduct flouting Argent's underwriting guidelines, and was sentenced to 18 years in prison.*

894.    In December 2008, the *Miami Herald* published a detailed article on Argent's lending practices in Florida, a state in which Argent originated loans that were included in the offerings at issue herein. The *Miami Herald* article was based on interviews of borrowers, some of Benn's co-conspirators, and others. It was also based on the newspaper's review of 129 Argent loan files that the *Miami Herald* had obtained. The *Miami Herald* article disclosed that Benn was in charge of all Argent lending in the state of Florida and approved more than $550 million in loans. The *Miami Herald*'s review of the loan files and interviews of relevant persons revealed the following deviations from Argent's underwriting guidelines:

- *A borrower that claimed to work for a company that did not exist obtained a $170,000 loan;*

- *A borrower that claimed to work at a job that did not exist obtained loans to buy four houses;*

- *Phony backdated deeds were created and used;*

- *At least 24 applications contained bogus telephone numbers for work references;*

- *Three applications contained the telephone number of one of Benn's co-conspirators as a work reference number;*

- *An application contained a bogus telephone number for a phony reference bank where the applicant purportedly had $63,000 on deposit;*

- *Borrowers' actual incomes on applications had been fraudulently quintupled in at least one case without the borrowers' knowledge;*

- *A former Argent employee obtained two mortgage loans on one home, one to pay for the property, while the other was illegally pocketed;*

- *A borrower who was a clerk at a 7-11 convenience store showed a $55,000 increase in her net worth in just 20 days; and*

- 377 -

- ***Of the 129 loan files reviewed, 103 of them contained "red flags" such as "non-existent employers, grossly inflated salaries and sudden, dramatic increases in the borrower's net worth***."

895.    The *Miami Herald* reported that ***Benn testified at his criminal trial that the accuracy of loan applications was not a priority at Argent***.    In addition, Benn was not the only Argent employee involved in the fraud.    Co-conspirator Sam Green, an Argent Account and Regional Production Manager, was also involved.    Green was the former Argent employee that took out two mortgage loans for one property, and improperly pocketed the proceeds of one loan.    Green was convicted and sentenced to nine years in prison for his part in the fraudulent scheme.

*896.*    Argent's deviation from its loan underwriting guidelines went far beyond Benn's and Green's fraudulent scheme.    Former Argent "Loan Closer" Tamara Loatman-Clark, who was based in New Jersey, also revealed to the American News Project in May 2009 that Argent did not comply with its stated underwriting guidelines.    Loatman-Clark's job at Argent was to bundle and sell Argent's risky loans to Wall Street investment banks, *i.e.,* the defendants herein.    In discussing the fraudulent practices occurring at Argent, Loatman-Clark stated: "***I mean, you did what you had to do, and again, if that meant manipulating [loan] documents, so that you can get them out, so that they could conform, that's what you did***."

897.    Loatman-Clark further stated that Wall Street banks like the defendants wanted to buy Argent's loans very badly, and Argent wanted to get the loans off its books as quickly as possible.    Therefore, when loan files were missing information or required documents, or contained errors, ***at Argent there was a great deal of "pressure" to make the loans quickly and, according to Loatman-Clark, "the incentive was to do whatever you needed to do to get the[] [loans] out, and that sometimes meant you manipulated documents to get them out" for sale to defendants***.    Loatman-Clark estimated that in ***90% or more*** of the Argent loans she was aware of the borrowers were either

having difficulty making the loan payments or were facing foreclosure due to Argent's dubious practices.

898.    In May 2008, the *Cleveland Plain Dealer* published a news article on mortgage fraud in which it reported that "***[i]ndustry insiders say low echelon employees of companies like Argent actively participated in the fraud***." The article contained quotes from former Argent underwriter and account manager Jacqulyn Fishwick concerning Argent's lending practices. The article quoted Fishwick's characterization of her Argent colleagues' lending practices as "fast and loose," and she said she witnessed account managers removing documents from loan files and creating new documents by "cutting and pasting them." Said Fishwick: "I personally saw some stuff I didn't agree with."

899.    In addition, Argent's failure to truly assess the value and adequacy of the properties serving as collateral for its loans was the subject of a May 2010 report in *The Investigative Fund*. Specifically, the article provided an account from Steve Jernigan, a fraud investigator at Argent, who stated that he once went to check on a subdivision for which Argent had made loans, and the property addresses turned out to be in the middle of a cornfield. According to Jernigan, the appraisals had all been fabricated, with the same fake property picture being included in each file. Michael W. Hudson, *Silencing the Whistle-blowers*, The Investigative Fund, May 10, 2010.

900.    ***Argent had the third-highest number of foreclosures of all lenders listed on the OCC's "Worst Ten in the Worst Ten" report of lenders with the highest numbers of foreclosures on loans originated between 2005 and 2007***. Had Argent been following its stated underwriting guidelines and actually attempting to determine whether its borrowers could afford to repay their loans, it would not have experienced such a remarkably high foreclosure rate.

- 379 -

### 14.    The Offering Documents Misrepresented PHH's Underwriting Standards

901.    As detailed *supra*, PHH's supposed underwriting guidelines were described by defendants in the Offering Documents. *See* §V. For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them. In truth, PHH had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

902.    PHH systematically disregarded its underwriting standards, granted exceptions in the absence of compensating factors, required less documentation, and granted no or limited-documentation loans to individuals without good credit histories. In addition, PHH consistently inflated appraisals on mortgaged properties and informed new appraisers that if they appraised under certain levels they would not be hired by PHH again. ***In its SEC Form 10-Q filed August 8, 2008, PHH admitted to making "loans with origination flaws"*** and that the demand for its mortgages in the secondary market had therefore declined.

903.    The fact that PHH did not follow its own underwriting standards when originating the loans was confirmed by a former PHH Manager and Vice President of Trading and Structured Finance, who worked out of PHH's headquarters in New Jersey and who worked for PHH for over 15 years. This former PHH employee had direct knowledge of PHH's underwriting practices, was directly involved in PHH's structured finance and mortgage securitizations from 1996-2007, and witnessed PHH's origination, closing and funding of high-risk mortgages used to collateralize RMBS. This former PHH employee stated that for at least one RMBS offering in which PHH was the loan originator, the mortgage loan collateral underlying the offering was "very weak," as the loans were made to borrowers who qualified by having only a "***heartbeat and a pen***," and that "this

- 380 -

was all the qualification [PHH required] to get a mortgage." ***PHH did this because it was not interested in whether the borrower could repay the loans***. Rather, PHH's objective was simply to maximize the value of the loans it could sell.  This former employee also stated that virtually all of the loans underlying the particular offering were "liar loans" for which PHH did not require any documentation of the borrowers' income or assets.  This former PHH employee stated that the collateral for the offering was "not right" and that "the fall would come," and he expressed his opinion to the members of PHH management ultimately responsible for overseeing the assembly of the loan pools for the offerings.  The warnings, however, were ignored.

904.    PHH's improper and fraudulent lending practices were also documented in the complaint filed in the action titled *Federal Home Loan Bank of Boston v. Ally Fin. Inc.*, No. 11-cv-10952-GAO (D. Mass.) (removed from Massachusetts Superior Court, original case number 11-1533, filed April 20, 2011) (the "*FHLB* Complaint").  The *FHLB* Complaint cites statements from a former loan counselor and junior underwriter at PHH from 1997 until October 2007 who revealed that: (1) PHH employees faced intense pressure to close loans at any cost; (2) PHH increasingly approved risky, low or no-documentation loans without adequate review; and (3) PHH employees manipulated data in order to close loans.  *FHLB* Complaint, Appendix IX, ¶116, at 37 (Dkt. No. 1-10, at 39).  The *FHLB* Complaint cited this former PHH employee as stating:

- "[She] worked directly with borrowers and financial advisors to process loans. When she became an underwriter in May 2005, she transitioned to evaluating high-risk mortgage loan applications to determine whether the loans met PHH Mortgage's guidelines.  Loan officers at PHH Mortgage received commissions based on the number of loans closed. As a result, employees were pressured to value quantity over quality."  *Id.*, ¶117, at 37.

- "[S]he underwrote loans that clearly contained inflated income values.  She knew that the values were inflated because the stated incomes seemed unreasonable; for example, a hairstylist would be making a lot more money per month than was typical for someone in that industry."  *Id.*, ¶118, at 37.

- 381 -

- "[She] said that she looked at the loans and thought, 'There's no way.'  Nevertheless, [the witness] approved the loans because the income was 'stated and we had to take [the borrower's] word for it.'"  *Id.*

- "PHH Mortgage had a policy which prohibited underwriters from investigating the veracity of stated income.  Consequently, underwriters at PHH Mortgage did not use any tools like Salary.com to verify the borrowers' income.  Between 2005 and 2007, [the former employee] explained that it was common practice across the mortgage industry to accept stated income without further investigation.  'They called them liar loans for a reason,' said [the former employee], 'It was the nature of the beast back then.'"  *Id.*, ¶119, at 38.

- "[The former employee] also reviewed loan documents that she knew had been altered by the borrower or a loan officer at PHH Mortgage because 'the data did not match up.'  As an example, [the former employee] recalled situations in which the borrower's bank statements did not agree with other documents in the loan file."  *Id.*, ¶120, at 38.

905.    The fact that PHH did not follow its own underwriting guidelines is confirmed by statements from former PHH employees in another lawsuit, *Allstate Bank v. JPMorgan Chase Bank, NA*, No. 650398/2011 (N.Y. Sup. Ct., N.Y. Cty.) (the "*Allstate* Complaint").  The *Allstate* Complaint alleges that ***PHH employees revealed that they "faced intense pressure to close loans at any cost***, primarily because their commissions were based on the number of loans they closed."  *Allstate* Complaint, ¶331.  The *Allstate* Complaint further alleges that "***PHH employees manipulated data in order to close loans, and knowingly included false information and inflated values in loan applications."  The PHH employees further stated that "PHH had a policy that prohibited underwriters from investigating the veracity of the income stated on loan applications[ ]; and PHH increasingly approved risky, low- or no-documentation loans without adequate review***."  *Id.* The *Allstate* Complaint also alleges that:

> PHH's defective underwriting practices have been confirmed by extensive empirical studies of mortgage loans made and sold into securitizations during this period. For example, economists at the University of Michigan and elsewhere have found that the number of loans relating to PHH or its affiliates that suffered from a particular performance problem – 60 or more days delinquent as of six months after origination – skyrocketed beginning in mid-2006, *i.e.*, around the exact time many of the mortgage loans at issue here were being originated and securitized.

- 382 -

*Id.*, ¶332.

906.    PHH did not follow its own underwriting guidelines and instead of making only occasional and justified exceptions to the guidelines, variance from the stated standards was the normal practice.  Quantity of loans was emphasized over quality, and most loans were made with little-to-no underwriting or effort to evaluate the borrowers' ability to repay.

### 15.    The Offering Documents Misrepresented ResMAE's Underwriting Standards

907.    As detailed *supra*, defendants' Offering Documents purported to describe the underwriting guidelines that were supposedly used by ResMAE in originating loans underlying plaintiffs' certificates.  *See* §V.  For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them.  In truth, ResMAE had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

908.    ResMAE was a wholesale subprime lender that originated loans through outside independent mortgage brokers.  Those brokers brought loan applications to ResMAE, and ResMAE underwrote and funded the loans.  Thereafter, ResMAE would sell the loans to Wall Street banks like defendants.  ***ResMAE's ignoring of borrowers' creditworthiness and repayment ability was a function of ResMAE following the underwriting guidelines supplied to it by defendants.  ResMAE followed guidelines provided by a number of Wall Street banks.  Accordingly, defendants also knew that creditworthiness and repayment ability were not considered since they had supplied ResMAE with the underwriting guidelines that ResMAE used***.

909.    According to former ResMAE employees, during the period from 2004 through early 2007, the same time period within which plaintiffs' purchases of RMBS containing ResMAE loans

occurred, ResMAE was ignoring its stated underwriting guidelines. ResMAE was not evaluating its borrowers' repayment ability as represented in the Offering Documents. Instead, it was focused only on originating loans defendants were willing to purchase, and defendants' lax purchasing requirements did not require a focus on repayment ability. As a result, ResMAE originated extremely risky loans.

910.    According to a former ResMAE Director of Secondary Marketing/Capital Markets, who worked at the company from early 2006 until early 2008 when the company was finally shut down, ResMAE "underwrote [loans pursuant] to the investment bank guidelines" and "the specifications they gave" ResMAE. Therefore, rather than following the underwriting guidelines stated in the Offering Documents, ResMAE "created pools [of loans] that would satisfy the contractual requirements of the investment banks" that bought its loans. As a result, according to this former employee, ***ResMAE originated very risky loans with multiple "layer[s] of risk*.**" This meant that ResMAE's loans – which were based on Wall Street's reckless underwriting guidelines rather than those stated in the Offering Documents – had multiple risky features built into each loan. ResMAE's loans contained multiple risky features, such as extremely low minimum FICO score requirements, much less required documentation, and much higher acceptable LTV and DTI ratios, according to this former employee.

911.    Contrary to ResMAE's stated underwriting guidelines, ResMAE did not evaluate the repayment ability of its borrowers. According to the former Director of Secondary Marketing/Capital Markets, ***at ResMAE the "creditworthiness of the borrower was not the primary goal*.**" Rather, the emphasis at ResMAE was on whether ResMAE could sell the loans to defendants at a profit. Accordingly, ***ResMAE did not focus on whether borrowers could repay their loans, according to this former employee; instead the focus was on how much ResMAE could profit by selling the loans to defendants. And, as the former Director of Secondary Marketing/Capital***

*Markets acknowledged, defendants were similarly not focused on the repayment ability of borrowers in deciding to purchase ResMAE's loans, and instead were only concerned about their ability to resell the loans to investors like plaintiffs, at a profit.*

912.    The former ResMAE Director of Secondary Marketing/Capital Markets recalled a conversation he had with ResMAE's CEO, Ed Resendez, wherein the former employee asked Resendez why ResMAE was originating such risky loans.  Resendez responded with words to the effect of: "***Don't ask any questions.  If the investment bank wants to buy the loans, then it is okay. Don't ask questions, if they want to buy them, let them***."

913.    A former ResMAE Quality Control & Audit Manager, who worked at the company from 2003 until November or December 2007, confirmed that ResMAE made numerous loans that that did not comply with both its stated-income loan underwriting guidelines and other loan underwriting guidelines and the even more lax guidelines supplied by defendants.  This former employee performed audits of ResMAE loans that had already been funded, and in some cases sold to Wall Street banks, such as JPMorgan, to determine whether the loans had been properly originated.  This former employee stated that the post-funding audits revealed that ***ResMAE had made many loans that "should not have been funded*.**"  She recalled finding a variety of violations of the underwriting guidelines.  She found some funded loans that did not comply with ResMAE's policies and procedures, loan files that had missing documentation, files containing applications with inaccurate or potentially fraudulent information, loan files with altered documents in them, loans that had deficiencies and discrepancies concerning appraisal amounts and procedures, loans that had questionable borrower income amounts and proof of such amounts, loans with credit disclosure discrepancies, and loans that were made via questionable "exceptions" to the guidelines.

914.    This former ResMAE Quality Control & Audit Manager reported that because of all the foregoing violations found in ResMAE's loans that were already funded, in early 2007, before

plaintiffs bought their certificates with underlying ResMAE loans, ResMAE began performing *pre*-funding audits of its loan files, in an attempt to alleviate the funding of loans that did not meet its underwriting guidelines.

915.    A former ResMAE Senior Quality Control Auditor, who worked for the company from 2005 until February 2008, confirmed that there were numerous loans made by ResMAE before early 2007 that did not comply with the underwriting guidelines.   The former ResMAE Senior Quality Control Auditor reported that many of the loans ResMAE originated were stated income loans and such loans were very problematic.  This former employee conducted "an ad hoc review of the stated-income loans" at ResMAE and discovered they had a much higher rate of early payment defaults, or EPDs, compared to other loans.   EPDs are an indicator that the loans were not originated pursuant to the underwriting guidelines.  Because of this, Bonnie Kerivan, the head of Post-Funding Audits at ResMAE, complained to ResMAE CEO Resendez about ResMAE's laxness in adhering to the underwriting guidelines for stated income loans.

916.    *The former ResMAE Senior Quality Control Auditor reported that ResMAE's laxness in adhering to the underwriting guidelines, and ResMAE's senior management's constant overruling of underwriters' decisions to reject loans, resulted in ResMAE originating "bad loans [that] were obvious, predictable, and foreseeable." The former employee stated that senior management "made decisions that overturned the underwriting decisions made by underwriters within their guidelines to not fund certain loans," and thereby "took it [ResMAE] beyond the limit*."

917.    During the relevant time period, appraisal inflation was rampant.  As alleged more fully elsewhere, appraisers were either being bribed or strong-armed into providing inflated property appraisals.  Because appraisals were determined in large part based on "comps," or comparable properties that were recently sold, and because many of the "comps" were based on "appraisals that

were inflated by the frenzy of the boiling up of values," during the 2005-2006 time period, appraisals

rose at "an alarming rate," and were in fact "incredible," in that there was no reasonable explanation

for such steep escalations in value, according to a former Chief Appraiser at ResMAE from 2003

until September 2007. According to this former employee, "the comps were the problem, because

the comps established the value." Because there were unjustifiably inflated comps being used as a

basis for subsequent unjustifiably inflated appraisals, "[i]t was a dog chasing its tail," according to

the former employee, describing the vicious cycle of ever escalating appraisals.

918.    The former Chief Appraiser reported that ResMAE was subjected to great pressure by

both mortgage brokers and the Wall Street banks to approve appraisals so that the loans could be

funded. According to this former employee, if ResMAE withheld approval, the mortgage brokers

would take their loan applications to other lenders, and the Wall Street banks, such as JPMorgan,

would go to other sources to purchase loans. In fact, according to this former employee, the

defendants "were ok with increasing appraisal values, based on comps, because that would reduce

the [calculated] LTV and permit more loans to be approved." As a result, ***according to this former

Chief Appraiser, inflated appraisals "slipped through the cracks" and "got through" at ResMAE***.

919.    Moreover, this former employee stated that ResMAE's lending policies continued to

become more and more lax over time, because "if our guidelines [we]re too tight, we los[t]

business." This resulted in very risky loans, where little consideration was given to whether the

property value would cover the loan amount, due to the inflated appraisals, and further, little

consideration was given to whether borrowers could afford to repay the loans, according to this

former employee. This former employee singled out stated income loans as particularly egregious,

stating that such loans were "crazy [and] did not make sense, because it was so difficult for

underwriters to verify the stated income."

- 387 -

920.    ResMAE made the OCC's list of lenders with the most foreclosures on loans originated between 2005-2007. ResMAE was ranked tenth by the OCC. Obviously, if ResMAE had not been ignoring its underwriting guidelines and instead had attempted to determine whether its borrowers could afford to repay their loans, ResMAE would not have had so many foreclosures.

### 16.    The Offering Documents Misrepresented Wells Fargo's Underwriting Standards

921.    As detailed *supra*, Wells Fargo's supposed underwriting guidelines were described by defendants in the Offering Documents. *See* §V. For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them. In truth, Wells Fargo had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

922.    Wells Fargo was well aware that it was extending loans to borrowers whose applications contained falsified information (be it from the borrowers themselves or Wells Fargo loan underwriters). Darcy Parmer, a former quality assurance and fraud analyst for Wells Fargo, reported to the FCIC that she was aware of "'***hundreds and hundreds and hundreds of fraud cases***'" in Wells Fargo's home equity loan division. FCIC Report at 162. She also told the FCIC that "'***at least half of the loans she flagged for fraud were nevertheless funded, over her objections***.'" *Id*.

923.    In fact, a former Wells Fargo loan wholesaler admitted to *Bloomberg Businessweek* that "he regularly used the copiers at a nearby Kinko's to alter borrowers' pay stubs and bank account statements. He would embellish job titles – turning a gardener, for instance, into an owner of a landscaping company – and inflate salaries." This former Wells Fargo employee told the news outlet: "'I knew how to work the system.'"

- 388 -

924.    Wells Fargo's abandonment of its underwriting standards and fraudulent loans are the subject of substantial litigation.  For example, there is the lawsuit styled *Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A. et al.*, No. 08-cv-00062-JFM (D. Md. 2008).  There, like here, the City of Baltimore alleged that Wells Fargo extended loans without regard to "the borrower's ability to repay."  Third Amended Complaint, *City of Baltimore*, ¶3.  Also, there, like here, it is alleged that falsified borrower incomes are at issue.

925.    In addition, in April 2010, the City of Memphis filed its First Amended Complaint in *City of Memphis v. Wells Fargo Bank N.A.*, No. 09-cv-02857-STA-CGE (W.D. Tenn. Dec. 30, 2009), alleging that Wells Fargo "fail[ed] to underwrite African-American borrowers properly." *Id.*, ¶7.

926.    The *City of Memphis* and *City of Baltimore* complaints include sworn declarations from many former Wells Fargo employees which provide evidence of predatory lending and abandonment of underwriting guidelines.  For instance, Camille Thomas, a loan processor at Wells Fargo from January 2004 to January 2008, stated under oath that loans were granted based on inflated appraisals, which allowed borrowers to get larger loans than they could otherwise qualify for due to the inflated appraisals' impacts on the LTV ratio calculations.  Thomas also stated that some loans were granted based on falsified income documents.  Similarly, another affidavit by Doris Dancy, a credit manager at Wells Fargo from July 2007 to January 2008, stated that managers put pressure on employees to convince people to apply for loans, even if the person could not afford the loan or did not qualify for it.  She was also aware that loan applications contained false data, used to qualify customers for loans.

927.    In addition, in a lawsuit styled *Wells Fargo Bank, N.A. v. Quicken Loans Inc.*, No. 08-cv-12408-SJM-SDP (E.D. Mich. 2008), it is alleged that Wells Fargo expected that its borrowers

- 389 -

would overstate their income on "stated income" loan applications and that these borrowers would

not have the ability to make their monthly mortgage loan payments.

928.    Moreover, in an action alleging similar activities by Wells Fargo with regard to its

loan underwriting practices, styled *In re Wells Fargo Mortg. Backed Certificates Litig.*, No. C 09-

01376 SI (N.D. Cal.) ("*Wells Fargo*"), on April 22, 2010, the court denied defendants' motion to

dismiss the complaint, which alleged a company-wide series of reckless lending practices at Wells

Fargo, which, as here, were not disclosed in the offering documents.

929.    As the court found:

Plaintiffs allege that the Offering Documents contained numerous false and
misleading statements and omissions.  First, plaintiffs state that the documents
misstated Wells Fargo's underwriting process and loan standards.  According to
plaintiffs, Wells Fargo often extended loans to borrowers who did not meet its
creditworthiness standards, resulting in a low-quality mortgage pool.  *Id.*, ¶¶70, 76.
Plaintiffs cite statements by several confidential witnesses ("CWs") who assert that
Wells Fargo placed "intense pressure" on its loan officers to close loans, including by
coaching borrowers to provide qualifying income information, accepting blatantly
implausible or falsified income information, and lowering its standards near the end
of the calendar year.  *Id.*, ¶¶83-88.  Plaintiffs allege that the third-party loan
originators disregarded Wells Fargo's stated underwriting standards "in order to
approve as many mortgages as possible." *Id.*, ¶94.

. . . One of plaintiff's CWs states that approximately 70% of the loans he
signed off on while working as a Wells Fargo underwriter involved mortgages worth
more than 95% of the home's value. *Id.*, ¶108.

*        *        *

Plaintiffs allege, in other words, that the true loan-to-value ratio frequently exceeded
100% because the homes were actually worth far less than their stated appraisal
value. *Id.*, ¶100.

Plaintiffs again support their allegations primarily with statements from
confidential witnesses.  *Id.* ¶103 ("CW 2 confirmed that, at Wells Fargo  Home
Mortgage, representatives constantly pushed the appraisers they worked with to
inflate the value of the real estate underlying the mortgage loans"); ¶107 ("CW 1
remarked that 'appraisals were very inflated,' and observed that the retail officers
'always managed to get the value they wanted'"); ¶108 (CW7, a former Senior
Underwriter with Wells Fargo  Home Mortgage, "estimated that 70% of the loans
CW7 worked with had an LTV over 95%").  Plaintiffs additionally cite to a 2007
survey which "found that 90% of appraisers reported that mortgage brokers and

- 390 -

others pressured them to raise property valuations to enable deals to go through," and to congressional testimony in which Alan Hummel, Chair of the Appraisal Institute, stated that loan appraisers had "experience[d] systemic problems of coercion." *Id*. ¶¶104-05. Plaintiffs' allegations concerning the allegedly improper appraisal practices are sufficiently specific to state a claim with respect to the securities at issue in this case. In particular, plaintiffs have alleged that Wells Fargo's practices permitted the pervasive and systematic use of inflated appraisals, affecting all types of mortgages.

Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, *Wells Fargo*, at 2-3,

16-17. In May 2011, Wells Fargo agreed to pay $125 million to settle the claims alleged in the case.

930.    A separate lawsuit filed against Wells Fargo, *Sound Appraisal and Savage Appraisal*

*Services, Inc. v. Wells Fargo Bank, N.A.*, No. 09-CV-01630 CW (N.D. Cal. Apr. 14, 2009), further

confirms the offering documents' false and misleading statements regarding Wells Fargo's purported

underwriting practices, by confirming Wells Fargo's regular practice of pressuring and intimidating

appraisers into providing falsely inflated appraisals that met the bank's objectives. Specifically, the

complaint in that action alleges:

> As part of its corporate objective to abandon underwriting standards in order to maximize market share and profits, Wells Fargo and Rels Valuation have together engaged in a practice of pressuring and intimidating appraisers into using appraisal techniques that produce appraisals that meet Wells Fargo's business objectives even if the use of such appraisal techniques is improper and in violation of industry and regulatory standards. If appraisers fail to "play ball" as Wells Fargo demands, Wells Fargo, through Rels Valuation, removes the appraiser from the list of approved appraisers, which essentially "blacklists" the appraiser. Once an appraiser is blacklisted, Wells Fargo and Rels Valuation will no longer request appraisals or accept appraisals from these persons and companies.

*Id.*, ¶7.

931.    In fact, Wells Fargo acknowledged its deficient loan underwriting practices in its

2007 Annual Report. In a section entitled "Credit Quality: What We Did Wrong," Wells Fargo

admitted:

> ***We made some mistakes*** . . . . ***Too many of our home equity loans had 'loan-to-value' ratios that were too high*** . . . . Sometimes we did not require full documentation for these home equity loans we purchased from brokers because these

were prime borrowers who had high credit scores with lower expected risk of default. . . .

> *We should not have offered such lenient loan terms* . . . , and *we made the mistake of taking on too much risk*.  We should have known better.

932.    Corroborating the fact that Wells Fargo failed to comply with its underwriting guidelines, thereby rendering the Offering Documents false and misleading, is the fact that Wells Fargo appeared on the OCC's list of lenders with the highest numbers of foreclosures on loans it originated between 2005 and 2007.  If Wells Fargo was actually attempting to determine whether its borrowers could afford to repay their loans, it would not have had so many foreclosures.

### 17.    The Offering Documents Misrepresented JPMorgan Chase's Underwriting Standards

933.    As detailed *supra*, defendants' Offering Documents purported to describe the underwriting guidelines that were supposedly used by JPMorgan Chase Bank, N.A. ("JPMorgan Chase") in originating loans underlying plaintiffs' certificates.  *See* §V.  For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them.  In truth, JPMorgan Chase had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

934.    According to a former Wholesale Account Executive with CHF from 2002-2008, JPMorgan Chase's underwriting guidelines were abused by brokers who purposely originated loans for people they knew could not repay them.  Additionally, JPMorgan Chase's proprietary automated underwriting system had extremely loose guidelines and was easily and often overridden.  The former Account Executive acknowledged that had the automated system requirements not been so loose, or if other measures had been taken in the underwriting process, the loans JPMorgan Chase approved would otherwise not have seen the light of day.

- 392 -

935.    Additionally, a former Mortgage Loan Officer at JPMorgan Chase from 2003 through March 2007 confirmed that JPMorgan Chase's business model was to pursue "foot traffic" in the retail branch offices and to qualify applications even for obviously unqualified people with very poor credit and little ability to repay loans.  Another former Mortgage Loan Officer with JPMorgan Chase from 2005 through 2008 described his team as a bunch of cowboys working the phones to write "B" and "C" loans for customers they identified in internal databases as having trouble meeting their current JPMorgan Chase mortgage obligations.  He admitted their lending efforts left these individual borrowers "worse off" than before the refinance since they were not even able to repay the previously existing loan.  These loans were underwritten despite the fact that there was no evidence that the applicant's financial circumstances had improved.

936.    According to a former Regional Underwriting Manager for JPMorgan Chase, who was employed from October 2005 to December 2008, *"anyone" at JPMorgan Chase* who saw the loans knew they were not going to perform, due to a number of sloppy or fraudulent underwriting practices and policies, or because of deliberate ignorance of the stated underwriting guidelines.  This former employee further stated that, for most of the loans originated by the JPMorgan Chase originators, *the borrower's actual ability to repay the loan was simply not considered.*  This obviously led to many borrowers obtaining loans they could not afford to repay.  In addition, the former Underwriting Manager further confirmed that JPMorgan Chase's automated loan underwriting approval system could not and did not evaluate the reasonableness or truthfulness of information borrowers provided.  As a result, according to this former employee, the reasonableness of borrowers' stated incomes were never evaluated.

937.    This same Underwriting Manager further reported that JPMorgan Chase's account executives actively and intentionally supplied false information about borrowers in order to qualify them for loans for which they otherwise would not have qualified.  According to this former

employee, efforts were made by account executives to keep income documentation out of the loan files that would disqualify borrowers. He also stated that he believed that account executives influenced or directed loan officers and processors to keep certain information out of the file that would prevent approval of loans. He stated that he believed that account executives even went so far as to assist with creating fake leases for borrowers. He said that a fake lease would be submitted for the property the borrower was currently living in, in order to claim additional bogus income needed to qualify for a loan on a new property for which the borrower would otherwise not have qualified.

938.    The former Regional Underwriting Manager also stated that underwriters were instructed to "not over-condition" loans – that is, underwriters were essentially instructed not to scrutinize loan applications in order to make loan approvals easier. The instructions to "not over-condition" came directly from this former Regional Underwriting Manager's boss at JPMorgan Chase, and were due to complaints from sales personnel or from his boss's managers, *i.e.*, from upper management at JPMorgan Chase. This former employee provided a couple of examples where underwriters reasonably requested information necessary to determine whether borrowers could afford to repay their loans, only to be told by management to stop such activities. The former employee recounted the situation where underwriters were instructed to not obtain verification of a borrower's rental payment history when the borrower had minimal credit. As another example, the former employee stated that the underwriting guidelines might require one year of personal tax returns and the underwriter wanted to request corporate tax returns for the borrower to confirm that his company was making a profit. He said these types of conditions were discouraged by management.

939.    This same former employee also recounted situations where JPMorgan Chase was making loans to persons who simply could not afford them. He recalled the situation of a retired person with a fixed income, receiving $1,500 a month in Social Security, being considered for a loan

with an $800 monthly payment.[22]  The former employee "battled" with JPMorgan Chase sales representatives over many such loans because the former employee did not want to put "grandma" into a position where she could not afford to make her loan payments.

940.    The former Regional Underwriting Manager also reported on numerous bogus appraisals in connection with JPMorgan Chase loans.  The former employee noted that there were many cases where the appraiser likely provided whatever value was requested by the loan broker. When he had these concerns, he reported it to his manager, but said that it was difficult to remove an approved appraiser from the JPMorgan Chase list, no matter what he found.  In another instance, he was informed of an appraiser that used bogus comparables on appraisals and reported it to his superiors.  Nothing was done in response.

941.    Internal JPMorgan documents and testimony of JPMorgan employees recently made public in the *Dexia SA/NV, et al. v. Bear Stearns & Co, Inc., et al.,* No. 1:12-cv-04761 (S.D.N.Y), litigation further demonstrate that JPMorgan Chase did not comply with underwriting guidelines. An internal JPMorgan report tracking originator performance and quality, dated May 2007, assigned each loan originator a grade based on the quality of the loans originated.  JPMorgan Chase was given the lowest rating, *i.e.* "poor," and "common issues" were that loans originated by JPMorgan Chase were that "Appraisal/Value Not Supported," "Does Not Meet Guidelines," "Occupancy status not supported by file documentation," and "Assets are not sufficient to close."  These facts clearly demonstrate that JPMorgan Chase was originating loans that did not comply with their own underwriting guidelines.

---

[22]    This loan alone generated a DTI ratio for this borrower of over 53% ($800/$1500 = 53.3%), and that assumed the borrower had no other debts that would increase her DTI ratio even more.  The former employee reported that the acceptable DTI ratios at JPMorgan Chase during his tenure were within the 45%-50% range.  Obviously, this loan violated those underwriting guidelines.

### 18. The Offering Documents Misrepresented IndyMac's Underwriting Guidelines

942.    As detailed *supra*, defendants' Offering Documents purported to describe the underwriting guidelines that were supposedly used by IndyMac in originating loans underlying plaintiffs' certificates. *See* §V.  For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them.  In truth, IndyMac had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

943.    IndyMac's concerted efforts to fund as many loans as possible led it to become one of the country's largest and fastest-growing mortgage lenders from 2003-2006.  Indeed, during this period, IndyMac's loan volume tripled, going from $29 billion to $90 billion in three short years.  By 2008, however, IndyMac's reckless lending practices finally caught up with it, causing the bank to experience excessive losses that ultimately led to its undoing.  On July 11, 2008, IndyMac was closed by the Office of Thrift Supervision ("OTS") and taken under the control of the FDIC.[23]

944.    On June 30, 2008, the Center for Responsible Lending ("CRL") issued a report by Mike Hudson, entitled "IndyMac: What Went Wrong? How an 'Alt-A' Lender Fueled its Growth with Unsound and Abusive Mortgage Lending" (the "CRL Report").  The CRL Report, which was based on information obtained from 19 former IndyMac employees, concluded that IndyMac "engaged in ***unsound and abusive lending***" and "***routinely [made] loans without regard to borrowers' ability to repay***."  CRL Report at 2.

---

[23]    On March 19, 2009, the FDIC completed the sale of IndyMac's "assuming institution"– IndyMac Federal Bank, F.S.B. – to OneWest Bank, F.S.B.

945.    According to the CRL Report, IndyMac's regular practice of originating loans that disregarded borrowers' ability to repay and failed to comply with the bank's stated underwriting and appraisal guidelines was ***not*** "caused by rogue brokers or by borrowers who lied." *Id*. at 1.  Instead, this institutionalized practice was "spawned by top-down pressures that valued short-term growth over protecting borrowers and shareholders' interests over the long haul." *Id.*  Indeed, the CRL Report describes the atmosphere at IndyMac as one "where the hunger to close loans ruled." *Id*. at 2.  According to the CRL Report, this "hunger" led IndyMac to routinely "push[] through loans based on ***bogus appraisals*** and income data that ***exaggerated borrowers' finances***." *Id.*

946.    The CRL Report details several accounts from former IndyMac employees which clearly demonstrate the bank's institutional disregard for its own stated underwriting and appraisal guidelines and borrowers' ability to repay their loans.  Among other things, the CRL Report provides the following information:

- Audrey Streater, a former underwriter and underwriting team leader for IndyMac in New Jersey, stated in an interview: "'I would reject a loan and the insanity would begin . . . It would go to upper management and the next thing you know it's going to closing. . . .  I'm like, "What the Sam Hill? There's nothing in there to support this loan."'"  *Id.* at 3.

- According to a former IndyMac vice president, former IndyMac CEO Michael Perry ("Perry") and other top managers "focused on increasing loan volume 'at all costs,' putting pressure on subordinates to disregard company policies and simply 'push loans through.'"  *Id.*

- According to another former IndyMac employee, Perry once told him "'business guys rule'" and "'[expletive deleted] you to compliance guys,'" from which this former employee concluded that IndyMac was about "'production and nothing else.'"  *Id.* at 4.

- According to Wesley E. Miller, a former underwriter for IndyMac in California, "when he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed." *Id.* at 9.

- According to Scott Montilla, a former underwriter for IndyMac in Arizona, "when salespeople went over his head to complain about loan denials, higher-ups overruled his decisions roughly half of the time." *Id.*

- 397 -

- Montilla further stated in an interview: "'I would tell them: "If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it" . . . . There were some loans that were just blatantly overstated.'" *Id*. at 10.

947. On February 26, 2009, the Office of Inspector General ("OIG") of the U.S. Department of Treasury issued a report entitled "Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the "OIG Report"). The OIG Report found that "IndyMac's business model was to produce as many loans as possible and sell them in the secondary market," *i.e.*, to banks such as defendants. OIG Report at 21. According to the OIG Report, "[t]o facilitate this level of [loan] production . . . IndyMac often did not perform adequate underwriting." *Id*. Indeed, IndyMac frequently made loans with "little, if any, review of borrower qualifications, including income, assets, and employment." *Id*. at 11. As a result, the OIG concluded that IndyMac's loans "were made to many borrowers who simply could not afford to make their payments." *Id*. at 2.

948. Moreover, according to the OIG Report, "[a]ppraisals obtained by IndyMac on underlying collateral were often questionable as well." *Id*. The OIG Report found that "IndyMac officials accepted appraisals that were not in compliance with [the industry standard,] the Uniform Standard of Professional Appraisal Practice," and in some instances, IndyMac even "allowed the borrowers to select the appraiser" and/or accepted "appraisals where the property valuation was made without physical site inspection of the subject property or comparable properties." *Id*. at 12, 26.

949. IndyMac's improper and fraudulent lending practices were also documented in a separate action, *Fin. Guar. Ins. Co. v. IndyMac Bank, F.S.B.*, No. 08-CV-06010-LAP (S.D.N.Y. July 1, 2008) (the "*Fin. Guar.* Complaint"), where the complaint relied on the following information from former IndyMac employees:

- According to a former IndyMac central banking group vice president, IndyMac concocted "exceptions to its own underwriting guidelines that allowed IndyMac to make and approve mortgage loans that should have been denied under the actual

- 398 -

guidelines and that direct fraud by IndyMac loan sales representatives was rampant in the mortgage loan origination process at IndyMac." *Fin. Guar.* Complaint, ¶37(b)(i).

- According to a former IndyMac loan underwriter, IndyMac's loan origination process had evolved into organized chaos where, at management's direction, any concessions or adjustments were made in order to close loans that would not normally be made, including inflating appraisals to make the loan work. *Id.*

- According to a former IndyMac vice president in IndyMac's mortgage banking segment, "in order to keep pace with its competition, IndyMac greatly loosened its underwriting guidelines in order to bring in more loans." *Id.*, ¶37(b)(iii).

- According to a former IndyMac senior auditor in IndyMac's central mortgage operations, "an increasing number of loans were made through apparently fraudulent or misrepresented documentation and there was an increase in defaults because of": (1) "these misrepresentations in the underwriting process"; (2) "the relaxation of the underwriting guidelines"; and (3) "approval of borderline loans." *Id.*, ¶37(b)(iv).

- According to a former IndyMac senior loan processor, "the increase in the number of IndyMac originated delinquent loans was due to misrepresentations and fraud occurring in the mortgage loan origination process." *Id.*, ¶37(b)(vi) [sic].

950. That IndyMac was not following its underwriting guidelines and attempting to determine whether its borrowers could actually afford to repay their loans is further corroborated by the fact that IndyMac made the OCC's "Worst Ten in the Worst Ten" list. If, as defendants represented, IndyMac was actually attempting to determine whether its borrowers could afford to repay their loans, the lender would not have experienced so many loan foreclosures.

### 19. The Offering Documents Misrepresented Fieldstone's Underwriting Standards

951. As detailed *supra*, defendants' Offering Documents purported to describe the underwriting guidelines that were supposedly used by Fieldstone in originating loans underlying plaintiffs' certificates. *See* §V. For the reasons set forth immediately below, these representations were false and misleading at the time defendants made them. In truth, Fieldstone had completely abandoned its stated underwriting guidelines and was routinely originating loans without any regard

- 399 -

for its borrowers' true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

952.    The fact that Fieldstone did not follow its own underwriting guidelines was confirmed by a former Fieldstone underwriter who worked at the company's Irvine, California, office from 2002 through 2007. According to this former underwriter, Fieldstone made loans to borrowers they "could not afford" and Fieldstone management "stretch[ed] the imagination" to approve, close and fund loans that the underwriter declined to approve.  The former underwriter stated that Fieldstone's "basic practice was to make it work," that is, "do what is necessary to close the loan."  According to this underwriter, in those circumstances where the underwriter would reject a loan, the underwriter was repeatedly overruled by superiors.

953.    In addition, this former underwriter stated that Fieldstone would overstate a borrower's income to manipulate the debt-to-income ratio to keep it under the maximum allowable amount, since the overstatement of stated income would reduce the calculated DTI.  In this connection, the underwriter stated that in his experience, Fieldstone brokers colluded with borrowers to "literally write up [falsely increase] the income to get the DTI down," so that it would pass the guideline, and then fight the battle over the stated income amount.

954.    Fieldstone ignored its statement that no loans to borrowers with DTI ratios in excess of 60% were included in the certificates, and instead routinely made loans to borrowers with DTI ratios far higher than 60%.  For example, as set forth in §V, *supra*, Fieldstone originated loans to borrowers in the BSABS 2006-HE9 Offering even though the borrower's DTI ratio was ***414%***, clearly indicating an inability to afford the loan.

955.    The foregoing demonstrates that during the relevant time period (2004-2007), Fieldstone abandoned its stated underwriting guidelines and failed to evaluate both the true

repayment abilities of its borrowers and the adequacy of the properties used as collateral for its

loans.

## 20.    The Offering Documents Misrepresented People's Choice's Underwriting Standards

956.    As detailed *supra*, defendants' Offering Documents for the PCHLT 2005-4 offering

purported to describe the underwriting guidelines that were supposedly used by People's Choice

Home Loan, Inc. ("People's Choice")  in originating loans underlying plaintiffs' certificates.  *See*

§V.  For the reasons set forth immediately below, these representations were false and misleading at

the time defendants made them.  In truth, People's Choice had completely abandoned its stated

underwriting guidelines and was routinely originating loans without any regard for its borrowers'

true repayment ability or the actual adequacy of the mortgaged properties to serve as collateral.

957.    In the PCHLT 2005-4 Offering Documents, defendants represented that People's

Choice's underwriting guidelines were designed to evaluate, among other things, the borrower's

repayment ability and ensure that the value of the property being financed was sufficient to support

the loan.  These statements were false and misleading when made, for the following reasons.

958.    In 2004 and 2005, People's Choice originated more than $5 billion in mortgages per

year.  There have been numerous reports indicating failures by People's Choice to adhere to its

underwriting guidelines, including: (i) a lack of quality control, which led mortgage brokers to

manipulate documents and allowed borrowers to get away with lying on their loan applications; (ii)

borrowers missing one or more of their first three payments, indicating poor underwriting; and (iii)

approving borrowers without the income levels required by People's Choice's own underwriting

guidelines, because mortgage brokers forged and/or falsified borrowers' bank statements, signatures

and income.  For instance, an investigation by NBC in 2009 revealed that borrowers included a

massage therapist who claimed an income of $180,000 per year and a manicurist who claimed an

income of over $200,000 per year.  *See* Richard Greenberg & Chris Hanson, "If You Had A Pulse, We Gave You A Loan" (Dateline NBC Mar. 22, 2009), *available at* http://www.msnbc.msn.com/id/ 29827248/ns/dateline_nbc_the_hansen_files_with_chris_hansen/t/if-you-had-a-pulse-we-gave-you-loan/.

959.    Former People's Choice COO James LaLiberte has stated that he tried to implement more controls over the loan origination process, but ran into resistance.  According to NBC's investigation, other former People's Choice employees have stated that: (i) underwriters felt pressured by sales staff to approve questionable loan applications; (ii) underwriters would challenge some loans – in one case, as many as one-third of all loans – but would be overruled by company executives the vast majority of the time; and (iii) "'there was a lot of "keep your mouth shut" going on, meaning you just didn't ask questions about things you knew were wrong.'"  *See id.*

960.    As part of a plan to take People's Choice public in 2005, the company hired auditors to conduct an "Ethical Climate Survey."  *Id.*  Nearly three-quarters of respondents said that they were expected to do what they were told "'no matter what.'"  *Id.*  Nearly half stated that while they cared about ethics, "'they act differently.'"  *Id.*  One-third said they had witnessed "'breaches of applicable laws and regulations.'"  *Id.*  In 2009, former CEO Neil Kornswiet admitted to NBC through a spokesperson that "'management and the Board were dismayed by what they read.'"  *Id.*

### 21.    Clayton's Findings Confirm that the Offering Documents Were False and Misleading

961.    As previously alleged, defendants hired Clayton, an independent third-party due diligence provider, to assess the quality of the loans underlying plaintiffs' certificates.  Specifically, Clayton was tasked with testing small samples of the loans underlying plaintiffs' certificates in order to determine whether the loans: (i) complied with their stated underwriting guidelines, or were subject to compensating factors that would merit an exception to such guidelines; (ii) were supported

- 402 -

by valid appraisals/valuations; and (iii) had other valid characteristics.  Clayton generally provided its findings to defendants in the form of written reports and updates, which were delivered to defendants on a daily basis throughout the duration of a typical due diligence project.  This was first made public in late September 2010, when the FCIC released testimony and documents from Clayton.

962.    In September 2010, Clayton provided to the FCIC trending reports it had created that summarized its work for various Wall Street banks, including the JPMorgan Defendants at issue herein.  Among other things, these reports established that, during the period from January 1, 2006 through June 30, 2007 – when the vast majority of the loans at issue herein were originated, and when most of the certificates were being sold to plaintiffs – Clayton determined that ***26.7% of the mortgage loans it tested for JPMorgan and 16.3% of the loans tested for Bear Stearns did not comply with their stated underwriting guidelines, nor did they possess adequate compensating factors to warrant an exception to such guidelines.***  The same reports also established that, during the same time period, JPMorgan  actually "waived" back into the purchase pools for its offerings approximately ***30% of the specific loans that had been affirmatively identified as defective***, while Bear Stearns waived back ***41.8% of the specific loans that had been identified as defective***.  *See* Clayton Trending Reports, *available at* http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisis-sacramento#documents (last visited June 24, 2013).

963.    The forgoing information from Clayton undisputedly establishes that defendants' representations in the Offering Documents – namely that the certificates' underlying loans complied with the stated underwriting guidelines – were false and misleading at the time defendants made them.

964.    Moreover, defendants not only knowingly included in the offerings loans that had been affirmatively identified as defective, they also ***did no further testing on the vast majority of***

- 403 -

*unsampled loans*, even in the face of Clayton's reports indicating – at a 95% confidence level – that such loans were subject to the same *26.7% and 16.3% defect rates* uncovered by Clayton's samples. In fact, defendants, fully aware of the situation, turned a blind eye to the information, did no further testing, and then *included these defective loans into the offerings*, thereby rendering the Offering Documents materially false and misleading.  As the FCIC later pointed out, "*one could reasonably expect [the untested loans] to have many of the same deficiencies, and at the same rate, as the sampled loans,*" and that defendants' failure to do any further testing or disclose Clayton's findings "*rais[ed] the question of whether" the Offering Documents "were materially misleading, in violation of the securities laws*."  FCIC Report at 170.

965.    Moreover, recently discovered evidence establishes that the above Clayton defect rates and numbers of defective loans that were "waived" into defendants' offerings were actually *understated*.  In a lawsuit entitled *Ambac Assurance Corp. v. EMC Mortgage LLC, et al*., No. 650421/2011 (N.Y. Sup. Ct., N.Y. Cty.), excerpts of a deposition transcript of a former Clayton employee were recently filed.  The former Clayton employee (whose identity was redacted) testified that *all* of Clayton's Wall Street clients (including JPMorgan and Bear Stearns, both clients of Clayton's) *instructed Clayton to ignore defective loans, to code defective loans as non-defective, and to change loans that had been graded as defective to non-defective*.  The essence of the former Clayton employee's testimony was that defendants instructed Clayton to fraudulently change defective, non-complying loans into compliant loans.  The effect of such efforts was that Clayton's reports *understated* the number of loans that were defective and which were included in defendants' offerings.

**B.      Defendants Made Material Misrepresentations Regarding the
Underlying Loans' LTV Ratios**

966.    As set forth *supra*, defendants' Offering Documents affirmatively misrepresented the
LTV ratios associated with the certificates' underlying loans.  *See* §V.  For the reasons set forth
immediately below, these misrepresentations were material to plaintiffs' investments in the
certificates.

967.    An LTV ratio is calculated by dividing the loan amount into the value of the
mortgaged property.  LTV ratios are extremely important to both investors and the Credit Rating
Agencies, because they are indicative of the credit quality and safety of a particular loan or group of
loans.   Generally speaking, a lower LTV ratio indicates a higher credit quality, safer loan.
Conversely, a higher LTV ratio indicates a lower quality, riskier loan.

968.    To explain, the mortgaged property serves as collateral and security for the repayment
of the loan.  If the borrower defaults on the loan, foreclosure occurs and the property is sold, with the
proceeds of the sale going toward paying the outstanding loan balance, but only after all other
expenses are paid.  If there is insufficient collateral, *i.e.*, the sale proceeds (minus all expenses) are
less than the outstanding loan balance, the investor suffers a loss.  A low LTV ratio indicates that
there is more collateral, or security, for the loan in the event of a foreclosure.  In other words, the
investor is less likely to face a situation where the sale proceeds net of expenses are less than the
outstanding loan amount, and therefore the investor is less likely to suffer a loss.  In addition, a lower
LTV ratio indicates that the borrower has more "equity" committed to the property, and is thus less
likely to default on the loan compared to a borrower with little or less equity, who consequently has
less financial incentive to avoid defaulting on the loan.  As a result, the lower the LTV ratio, the
more likely it is the borrower will repay the loan, and the more likely it is that there will be sufficient

security to make the investor whole, and avoid a loss, in the event of a default and/or a decline in real estate values.

969.    In any case, an investor *never* wants a group of loans with a large number of loans with LTV ratios over 100%, as that implies a *certain loss* in the event of foreclosure.  Moreover, a group of loans with a high number of loans with LTV ratios over 100% is highly susceptible to default, because the borrowers have little financial incentive to continue making payments if their financial circumstances change or the value of the properties decline.  An understanding of the true LTV ratios associated with the loans underlying a given RMBS is thus essential to an investor, as it allows the investor to properly gauge the risk associated with the investment.

970.    Because LTV ratios are critically important to the risk analysis for a given RMBS, they also constitute one of the critical pieces of information used by the Credit Rating Agencies' computerized rating models to determine what credit ratings should be assigned to RMBS certificates.  Generally, the lower the LTV ratios, the higher the ratings the Credit Rating Agencies assign to the certificates.  Moreover, the lower the LTV ratios, the less credit enhancement the Credit Rating Agencies generally require to obtain "investment grade" credit ratings.  And the less credit enhancement that is required, the less costly, and more profitable, the RMBS offering is to the entities structuring, marketing and selling the RMBS (*i.e.*, defendants here).[24]

971.    Defendants were very aware of the foregoing.  Accordingly, defendants affirmatively misrepresented the actual percentages of the certificates' underlying loans that had LTV ratios in excess of 80% and 100%.  These representations were intended to convey that there was sufficient

---

[24]    "Credit enhancements" can take numerous forms, but one common form is to require the sellers (defendants in this case) to include additional collateral, *i.e.*, additional loans or better credit quality loans, in the offering to help ensure the expected cash flow.  Either way, the practical effect is that additional credit enhancements represent additional costs and/or decreased profit margins to the entities responsible for the offering.

- 406 -

protection against losses in the event of defaults, and that the loans (and therefore the certificates) were of high credit quality, and were safe, solid investments. Unfortunately for plaintiffs, defendants' representations concerning the LTV ratios associated with the certificates' underlying loans were false and misleading when made. *See* §V, *supra.*

972.    Defendants accomplished their deception by using false and inflated appraisals and valuations for the relevant properties, as alleged above. Because false and inflated appraisals were used, defendants were able to generate artificially understated LTV ratios, which were then included in the Offering Documents.

973.    The appraisers knew that their appraisals were false and inaccurate, and did not believe them to be true. The appraisers, and others providing valuations, were being strong-armed into providing inflated valuations by the lenders, who threatened the appraisers with being black-balled in the industry and excluded from future work unless the inflated valuations were provided. In other instances, appraisers were being bribed into providing inflated valuations by lenders who paid the appraisers above-market fees for inflated valuations and/or rewarded appraisers with substantial additional work for inflated appraisals. In yet other instances, lenders intentionally provided appraisers with false sales information designed to generate inflated appraisals and valuations. Lenders also required appraisers to rely on information outside the relevant market to support inflated valuations. Lenders and some appraisers further retaliated against any appraisers that questioned or criticized their corrupt practices.

974.    Defendants were well aware that the appraisal valuation process was being actively manipulated by loan originators and appraisers, and therefore also knew that the reported property valuations and LTV ratios for the loans did not reflect accurate information. Defendants learned such facts when they performed due diligence on the loans, as well as through Clayton, and by virtue of their participation in originating the loans, and through their ownership and control of lenders and

- 407 -

their close relationships with them.  Defendants had little incentive to correct the inflated appraisals

– and did not – because inflated appraisals led to larger loan amounts, thereby increasing the size of

defendants' RMBS offerings, and decreased credit enhancement requirements, all of which, in turn,

increased defendants' compensation and profits.  Accordingly, defendants knew that the LTV ratios

reported in the Offering Documents were not accurate or reliable indicators of the credit quality of

the loans, and that such LTV ratios had no reasonable basis in fact.

### C.    Defendants Made Material Misrepresentations Regarding the Underlying Loans' Owner Occupancy Rates

975.    As set forth *supra*, the Offering Documents misrepresented the OOR percentages, or

Primary Residence Percentages, associated with the loan groups supporting plaintiffs' certificates.

*See* §V.  For the reasons set forth immediately below, these misrepresentations were material to

plaintiffs' investments in the certificates.

976.    The purpose behind disclosing the OOR percentages associated with a particular

group of loans supporting RMBS is to identify the percentage of such loans that are owner occupied

or primary residences – that is, the percentage of loans issued to borrowers who purportedly lived in

the mortgaged properties.  Primary Residence Percentages are extremely important to investors like

plaintiffs, because borrowers are much less likely to default on loans secured by their primary

homes, as opposed to loans secured by investment properties or second homes.  Accordingly, higher

Primary Residence Percentages indicate safer loans, and thus safer RMBS certificates, while lower

Primary Residence Percentages indicate riskier loans, and thus lower credit quality certificates.

977.    Because Primary Residence Percentages are critically important to the risk analysis

for a given RMBS, they also constitute one of the critical pieces of information used by the Credit

Rating Agencies' computerized rating models to determine what credit ratings should be assigned to

RMBS certificates.  Generally, the higher the Primary Residence Percentages, the higher the ratings

the Credit Rating Agencies assign to the certificates.  Moreover, the higher the Primary Residence Percentages, the less credit enhancement the Credit Rating Agencies generally require to obtain "investment grade" credit ratings.  And the less credit enhancement that is required, the less costly, and more profitable, the RMBS offering is to the entities responsible for structuring, marketing and selling the RMBS (*i.e.*, defendants here).

978.    Well aware of this dynamic, defendants systematically overstated the Primary Residence Percentages associated with plaintiffs' certificates, as set forth *supra*.  As a result, defendants created the false impression that the loans and certificates were of higher credit quality than they in fact were.  Indeed, in most instances, defendants materially overstated the actual Primary Residence Percentages by double-digit percentages.  *See* §V, *supra*.

979.    Defendants knew, based on their due diligence of the loans, Clayton's reports and their own active role in the loan origination process, that the Primary Residence Percentages for the certificates' underlying loans were being actively manipulated by loan originators and borrowers.  Specifically, defendants were well aware that borrowers were misrepresenting their residency status in order to obtain lower interest rates and/or eligibility for higher LTV or DTI ratio loans.  Defendants were further aware that the originators were also actively manipulating the Primary Residence Percentages in order to receive higher prices when selling their loans.  Even though defendants were aware that the Primary Residence Percentages were falsely inflated, they did not challenge them or change them to reflect the true OORs because defendants knew that higher Primary Residence Percentages for the loans would result in higher credit ratings from the Credit Rating Agencies and less additional credit enhancement requirements for their offerings, thereby increasing defendants' profits in selling the certificates.  As a result of the foregoing, defendants knew that the Primary Residence Percentages stated in the Offering Documents were false and had no reasonable basis in fact.

- 409 -

**D.    Defendants Made Material Misrepresentations Regarding the Credit
Ratings for the Certificates**

980.    As set forth *supra*, in each of the Offering Documents at issue herein, defendants represented that the certificates plaintiffs were purchasing had or would have certain high, safe, "investment grade" credit ratings from at least two of the three major Credit Rating Agencies (S&P, Moody's and/or Fitch).  *See* §V, *supra*.  For the reasons set forth *supra* and immediately below, these representations were both material and false.

981.    Credit ratings are extremely important to investors in assessing the quality and safety of RMBS certificates.  Credit ratings on such securities indicate how reliable and safe the investments are, and are used to predict the likelihood that they will perform, *i.e.*, pay, as expected and return the investor's principal at the end of the lending term.  The credit ratings of the certificates were very important to plaintiffs, as they were required to purchase only certificates that were rated "investment grade" by the Credit Rating Agencies.  Indeed, many of the certificates purchased by plaintiffs received the highest, safest credit ratings available – "Aaa" by Moody's or "AAA" by S&P and Fitch.  These credit ratings indicated that the certificates were the "safest of the safe," as such ratings were *the same as, or even higher than, the current credit rating of U.S. Treasury debt*.  Indeed, "[t]raditionally, investments holding AAA ratings have had a *less than 1% probability of incurring defaults*."  Levin-Coburn Report at 6.  Below is a chart setting forth the Credit Rating Agencies' credit grading systems, denoting the various investment grade and speculative grade ratings they provided:

| Moody's Grades | S&P's Grades | Fitch's Grades |
| --- | --- | --- |
| Aaa | AAA | AAA |
| Aa1 | AA+ | AA+ |
| Aa2 | AA | AA |
| Aa3 | AA- | AA- |
| A1 | A+ | A+ |
| A2 | A | A |
| A3 | A- | A- |

- 410 -

| | | |
|---|---|---|
| Baa1 | BBB+ | BBB+ |
| Baa2 | BBB | BBB |
| Baa3 | BBB- | BBB- |
| ↑**Investment Grade** | | |
| **Speculative Grade↓** | | |
| Ba1 | BB+ | BB+ |
| Ba2 | BB | BB |
| Ba3 | BB- | BB- |
| B1 | B+ | B+ |
| B2 | B | B |
| B3 | B- | B- |
| Caa1 | CCC+ | CCC+ |
| Caa2 | CCC | CCC |
| Caa3 | CCC- | CCC- |
| Ca | CC | CC |
| C | C | C |
| | D | D |

982.    As previously discussed, the certificates never should have received the safe, "investment grade" ratings touted by defendants in the Offering Documents.  In truth, the certificates were anything but safe, "investment grade" securities, as defendants well knew.   In fact, the certificates were exactly the opposite – extremely risky, speculative grade "junk" bonds or worse, backed by low credit quality, extremely risky loans.  As defendants were well aware, the certificates were each backed by numerous loans that had not been originated pursuant to their stated underwriting guidelines, with many loans being made without any regard for the borrowers' true repayment ability, and/or on the basis of falsely inflated incomes and property values, as alleged above.  Moreover, as also alleged above, the LTV ratios and Primary Residence Percentages for the loans had been falsified so as to make the loans (and thus, the certificates) appear to be of much higher credit quality than they actually were.

983.    In order to obtain "investment grade" credit ratings for the certificates, defendants were required to work with the Credit Rating Agencies.  Specifically, defendants were required to provide the Credit Rating Agencies with information concerning the underlying loans, which the Credit Rating Agencies then put into their computerized ratings models to generate the credit ratings.

- 411 -

In order to procure the falsely inflated ratings defendants desired for the certificates, defendants fed the Credit Rating Agencies falsified information on the loans, including, without limitation, false loan underwriting guidelines, false LTV ratios, false borrower FICO scores, false borrower DTI ratios, and false OOR or Primary Residence Percentages.  Among other things, defendants falsely represented to the Credit Rating Agencies that none of the loans in any of the offerings had LTV ratios in excess of 100%.  Defendants also misrepresented and underreported the numbers of loans that had LTV ratios in excess of 80% in many cases.  Defendants further misrepresented that the loans had much higher Primary Residence Percentages than they actually did.  Defendants also concealed from the Credit Rating Agencies that most of the loans were not originated pursuant to the underwriting guidelines stated in the Offering Documents and/or were supported by falsely inflated incomes, appraisals and valuations.  Defendants also never informed the Credit Rating Agencies that Clayton had detected defect rates of 26.7% in the samples of loans it tested for JPMorgan, and 16.3% for Bear Stearns, or that JPMorgan had put 30% of those identifiably defective loans into the offerings, while Bear Stearns had put back 41.8%.  Defendants also never told the Credit Rating Agencies that defendants did no further testing on the vast majority of loans, despite their awareness that there were significant numbers of defective loans detected by the test samples.

984.    That the credit ratings stated in the Offering Documents were false and misleading is confirmed by subsequent events, as set forth *supra*.  Specifically, after the sales of the certificates to plaintiffs were completed, staggering percentages of the loans underlying the certificates began to go into default because they had been made to borrowers who either could not afford them or never intended to pay them.  Indeed, ***in a majority of the loan groups at issue herein, at least 30% of the loans currently in the trusts are in default***.  ***A substantial number of loan groups have default rates above 40%, with a few hovering at 60%.***

- 412 -

985.    *The average default rate for all the certificates at issue herein currently hovers at around 35%*.  In other words, over three in ten loans currently in the trusts are in default.  It is also important to understand that these reported default rates are for loans that are *currently* still in the trusts.  Any *prior* loans that were in default and which had been previously liquidated or sold, and thus written off and taken out of the trusts, have not been included in the calculations.  Therefore, the foregoing default rates do not include earlier defaults, and thus *understate* the cumulative default rates for all of the loans that were originally part of the trusts.

986.    Further proving that the credit ratings stated in the Offering Documents were false and misleading is the fact that *all* of the certificates have since been downgraded to reflect their true credit ratings, now that the true credit quality (or more accurately, lack of quality) and riskiness of their underlying loans is known.  Indeed, *65 of plaintiffs' 74 certificates have now been downgraded to speculative "junk" status or below, and nine certificates are no longer rated at all*.  Moreover, *39 of plaintiffs' 74 certificates now have a credit rating of "D" by S&P and/or "C" by Moody's, indicating that they are in "default*," and reflecting that they have suffered losses and/or writedowns, and/or have completely stopped paying.  In other words, approximately *53% of plaintiffs' certificates are in default*.  This is strong evidence that defendants lied about the credit ratings.  This is so because the high, "investment grade" credit ratings assigned to plaintiffs' certificates had a probability of default of between "less than 1%" (Levin-Coburn Report at 6) for the highest rated certificates and 2.6% (according to Moody's) for certificates rated even lower than plaintiffs'.  The huge discrepancy in the actual default rates (53%) and the historically expected default rates (less than 2.6%) demonstrates the falsity of defendants' statements regarding the credit ratings.

987.    These massive downgrades – in many cases, from "safest of the safe" "AAA" ratings to "junk" (anything below Baa3 or BBB-) – show that, due to defendants' knowing use of bogus

- 413 -

864087_1

loan data, the initial ratings for the certificates, as stated in the Offering Documents, were false. Indeed, the fact that *88%* of the certificates are now rated at "junk" status or below, and *approximately 53% of the certificates are now in default*, is compelling evidence that the initial high ratings touted by defendants in the Offering Documents were grossly overstated and false.

### E.    Defendants Materially Misrepresented that Title to the Underlying Loans Was Properly and Timely Transferred

988.    An essential aspect of the mortgage securitization process is that the issuing trust for each RMBS offering must obtain good title to the mortgage loans comprising the pool for that offering.  This is necessary in order for plaintiffs and the other certificate holders to be legally entitled to enforce the mortgage and foreclose in case of default.  Accordingly, at least two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or a deed of trust).

989.    The rules for these transfers are governed by the law of the state where the property is located, by the terms of the pooling and servicing agreement ("PSA") for each securitization, and by the law governing the issuing trust (with respect to matters of trust law).  Generally, state laws and the PSAs require that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default.

990.    In addition, in order to preserve the bankruptcy-remote status of the issuing trusts in RMBS transactions, the notes and security instruments are generally not transferred directly from the mortgage loan originators to the trusts.  Rather, the notes and security instruments are generally initially transferred from the originators to the sponsors of the RMBS offerings.  After this initial transfer to the sponsor, the sponsor in turn transfers the notes and security instruments to the depositor.  The depositor then transfers the notes and security instruments to the issuing trust for the

particular securitization. This is done to protect investors from claims that might be asserted against a bankrupt originator. Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

991.    Moreover, the PSAs generally require the transfer of the mortgage loans to the trusts to be completed within a strict time limit – three months – after formation of the trusts in order to ensure that the trusts qualify as tax-free real estate mortgage investment conduits ("REMICs"). In order for the trust to maintain its tax free status, the loans must have been transferred to the trust no later than three months after the "startup day," *i.e.*, the day interests in the trust are issued. *See* Internal Revenue Code §860D(a)(4). That is, the loans must generally have been transferred to the trusts within at least three months of the "closing" dates of the offerings. In this action, all of closing dates occurred in 2005, 2006 or 2007, as the offerings were sold to the public. If loans are transferred into the trust after the three-month period has elapsed, investors are injured, as the trusts lose their tax-free REMIC status and investors like plaintiffs may face several adverse draconian tax consequences, including: (1) the trust's income becoming subject to corporate "double taxation"; (2) the income from the late-transferred mortgages being subject to a 100% tax; and (3) if late-transferred mortgages are received through contribution, the value of the mortgages being subject to a 100% tax. *See* Internal Revenue Code §§860D, 860F(a), 860G(d).

992.    In addition, applicable state trust law generally requires strict compliance with the trust documents, including the PSAs, so that failure to strictly comply with the timeliness, endorsement, physical delivery, and other requirements of the PSAs with respect to the transfers of the notes and security instruments means the transfers would be void and the trust would ***not*** have good title to the mortgage loans.

993.    To this end, all of the Offering Documents relied upon by plaintiffs stated that the loans would be timely transferred to the trusts. *See* §V, *supra.* For example, the JPMAC 2006-HE3

Offering Documents represented that "on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans."  JPMAC 2006-HE3 Pros. Supp. at S-95.  The Offering Documents for each of the offerings at issue herein contained either the same or very similar language, uniformly representing that defendants would ensure that the proper transfer of title to the mortgage loans to the trusts occurred in a timely fashion.  *See* §V, *supra.*

994.    However, defendants' statements were materially false and misleading when made. Contrary to defendants' representations that they would legally and properly transfer the promissory notes and security instruments to the trusts, defendants in fact systematically failed to do so.  This failure was driven by defendants' desire to complete securitizations as fast as possible and maximize the fees they would earn on the deals they closed.  Because ensuring the proper transfer of the promissory notes and mortgages hindered and slowed defendants' securitizations, defendants deliberately chose to disregard their promises to do so to plaintiffs.

995.    Defendants' failure to ensure proper transfer of the notes and the mortgages to the trusts at closing has already resulted in damages to investors in securitizations underwritten by defendants.  Trusts are unable to foreclose on loans because they cannot prove they own the mortgages, due to the fact that defendants never properly transferred title to the mortgages at the closing of the offerings.  Moreover, investors are only now becoming aware that, while they thought they were purchasing "***mortgaged-backed***" securities, in fact they were purchasing ***non***-mortgaged-backed securities.

996.    In fact, Attorneys General from 49 states have investigated foreclosure practices after the discovery that mortgage servicers used faulty or falsified paperwork to improperly seize homes from borrowers.  The investigation culminated in a huge settlement of $25 billion with five large banks.

- 416 -

997.    Facts disclosed in recent news reports and uncovered through government investigations and home owner foreclosure litigation over defendants' securitizations confirm widespread problems with defendants' failure to ensure proper transfer of the required mortgage documents, and highlight the damage that failure has caused to plaintiffs' investments.  In an interview on *60 Minutes*, Lynn Szymoniak, a lawyer and fraud investigator who has uncovered instances in which banks appear to have manufactured mortgage documentation, explained the issue as follows:

> "When you could make a whole lotta money through securitization.  And every other aspect of it could be done electronically, you know, key strokes.  This was the only piece where somebody was supposed to actually go get documents, transfer the documents from one entity to the other.  And it looks very much like they just eliminated that stuff all together."

998.    As part of its exposé, *60 Minutes* interviewed Chris Pendley, a temporary employee of a company called Docx.  Pendley was paid $10 per hour to sign the name "Linda Green," who, on paper, purportedly served as vice president of at least 20 different banks at one time, to thousands of mortgage documents that were later used in foreclosure actions.  Pendley said he and other employees of Docx were expected to sign at least 350 documents per hour using the names of other individuals on documents used to establish valid title.  Asked if he understood what these documents were, Pendley said, "[n]ot really."  He then explained that he signed documents as a "vice president" of five to six different banks per day.  Purported transfers bearing the signature of "Linda Green" were used to transfer mortgages from major originators to the depositors.

999.    Further illustrating the falsity of defendants' representations in the Offering Documents regarding proper transfer of the mortgage documents to the issuing trusts is attorney Szymoniak's letter to the SEC (the "SEC Letter").  In the SEC Letter, Szymoniak detailed the fraudulent alteration and manufacture of mortgage documents by employees of Lender Processing Services, Inc. ("LPS").  LPS is a mortgage default company located in Jacksonville, Florida, that,

- 417 -

according to Szymoniak, "produced several missing Mortgage Assignments, using its own employees to sign as if they were officers of the original lenders." Szymoniak observed instances of mortgage transfers prepared by LPS employees that contained forged signatures, signatures of individuals as corporate officers on behalf of a corporation that never employed the individuals in any such capacity, and signatures of individuals as corporate officers on behalf of mortgage companies that had been dissolved by bankruptcy years prior to the transfers, among other things.

1000.    The fabrication of the mortgage transfers appears to have been intended to conceal the actual date that interests in the properties were acquired by the RMBS trusts.   The fraudulent transfers uncovered in foreclosure litigation often show that the transfers were prepared and filed in 2008 and 2009, when, in reality, the mortgages and notes were intended and should have been transferred prior to the closing date of the trusts, in 2005, 2006 and 2007, as stated in the Offering Documents relied on by plaintiffs.   Moreover, Szymoniak published an article on *Phil's Stock World* on July 20, 2011, setting forth the huge numbers of "trusts that closed in 2005, 2006 and 2007 [that have] repeatedly filed mortgage assignments signed and notarized in 2011," years after the closing dates. These late transfers of mortgages are an obvious improper attempt by defendants to untimely transfer the mortgage loans to the trusts after-the-fact.   As discussed above, even if such transfers are valid, plaintiffs have been severely damaged because of defendants' failure to timely transfer the loans, as the trusts have potentially lost their tax-free status and the payments to investors might now be subject to various forms of draconian taxation.

1001.    Other public reports corroborate the fact that the loans were not properly transferred. For example, Cheryl Samons, an office manager for the Law Office of David J. Stern – a "foreclosure mill" under investigation by the Florida Attorney General for mortgage foreclosure fraud that was forced to shut down in March 2011 – signed tens of thousands of documents purporting to establish mortgage transfers for trusts that closed in 2005 and 2006 in 2008, 2009 and

- 418 -

2010 from Mortgage Electronic Registration Services, an electronic registry that was intended to eliminate the need to file transfers in the county land records.  In depositions in foreclosure actions, Samons has admitted that she had no personal knowledge of the facts recited on the mortgage transfers that were used in foreclosure actions to recover the properties underlying the mortgages backing RMBS.  *See, e.g.*, Deposition of Cheryl Samons, *Deutsche Bank Nat'l Trust Co., as Trustee for Morgan Stanley ABS Capital 1 Inc. Trust 2006-HE4 v. Pierre*, No. 50-2008-CA-028558-XXX-MB (Fla. Cir. Ct., 15th Jud. Cir., Palm Beach City, May 20, 2009).

1002.   The need to fabricate or fraudulently alter mortgage assignment documentation provides compelling evidence that, in many cases, title to the mortgages backing the certificates plaintiffs purchased was never properly or timely transferred.  This fact is confirmed by an investigation conducted by plaintiffs concerning one of the specific offerings at issue herein, which revealed that the vast majority of loans underlying the offering were not properly or timely transferred to the trust.

1003.   Specifically, plaintiffs performed an investigation concerning the mortgage loans purportedly transferred to the trust for the JPMorgan Defendants' JPMAC 2006-WMC4 offering. The closing date for this offering was on or about December 20, 2006.  Plaintiffs reviewed the transfer history for 274 loans that were supposed to be timely transferred to this trust.  Sixty-six (66) of the loans were not and have never been transferred to the trust.  In addition, several other loans that were supposed to be transferred to the trust were transferred to entities other than the trust, but not to the trust.  The remainder of the loans (approximately 140) were eventually transferred to the trust, but all such transfers occurred between 2008 and the present, well beyond the three-month time period required by the trust documents and far after the three-month period for the trust to maintain its tax-free REMIC status.  *In other words, none of the reviewed mortgage loans were timely transferred to the trust, a 100% failure rate*.

- 419 -

1004.   The foregoing example, coupled with the public news, lawsuits and settlements discussed above, plainly establishes that defendants failed to properly and timely transfer title to the mortgage loans to the trusts.  Moreover, it shows that defendants' failure to do so was widespread and pervasive.  In fact, the specific example discussed above shows that defendants utterly and completely failed to properly and timely transfer title.  Defendants' failure has caused plaintiffs (and other RMBS investors) massive damages.  As noted by law professor Adam Levitin of Georgetown University Law Center on November 18, 2010, in testimony he provided to the a U.S. House Subcommittee investigating the mortgage crisis, "[i]f the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors[] purchased were in fact **non-mortgaged-backed securities**" (emphasis in original), and defendants' failure "ha[d] profound implications for [R]MBS investors" like plaintiffs.  Indeed, Professor Levitin noted in his testimony that widespread failures to properly transfer title would appear to provide investors with claims for rescission that could amount to trillions of dollars in claims.

## VII.   THE JPMORGAN DEFENDANTS KNEW THAT THE REPRESENTATIONS IN THE OFFERING DOCUMENTS WERE FALSE AND MISLEADING

1005.   Defendants' representations in the Offering Documents were not only false and misleading, but defendants also **knew**, or were at least reckless in disregarding, that the misrepresentations identified herein were false and misleading at the time defendants made them.

1006.   Indeed, as set forth above and further detailed immediately below, defendants were explicitly informed by their own independent due diligence firms, such as Clayton and Bohan, that substantial percentages of the loans underlying plaintiffs' certificates either did not comply with their stated guidelines, had been issued without regard for their borrowers' true repayment ability or were secured by inadequate collateral.

- 420 -

1007.   In addition, as further detailed below, defendants' undeniable awareness of the

Offering Documents' misrepresentations is further established by several other publicly-available

sources of information, including governmental investigations and documents disclosed in other civil

litigations.

### 1.     JPMorgan's Due Diligence Confirmed that the Certificates' Underlying Loans Were Not Adequately Underwritten and Were Defective

1008.   JPMorgan, through defendant J.P. Morgan Securities, served as an "underwriter" for

all of the JPMorgan Offerings at issue herein.  In this capacity, JPMorgan was required under U.S.

securities laws to "perform a review of the [loans] underlying the [certificates]," and had a legal duty

to ensure that the information it reported about the loans in the offering documents was "accurate in

all material respects." 17 C.F.R. §230.193.  As such, JPMorgan had a legal duty to carefully examine

the loans, and ensure statements made about them in the Offering Documents were not false.

1009.   Given JPMorgan's legal duties to conduct due diligence to ensure that the Offering

Documents were accurate, JPMorgan knew of the system-wide abandonment of loan underwriting

guidelines during 2004-2007, which resulted in the origination of numerous, risky loans to

borrowers who could not afford to repay them, and which were supported by falsely inflated

appraisals/valuations.  Moreover, the magnitude of the errors regarding the LTV ratios and the

Primary Residence Percentages, and the consistent repetitive nature of those errors – affecting nearly

every offering – were so large and so frequent that, at the least, JPMorgan had to have turned a blind

eye to repeatedly miss the errors.  Moreover, given how the errors were always deceptively slanted

to make the loans look safer than they actually were, thereby increasing JPMorgan's profits at the

time of securitization, it is virtually certain that the Offering Documents' misrepresentations were

***intentionally*** and ***deliberately*** made by the JPMorgan Defendants.

- 421 -

1010.   JPMorgan engaged third-party due diligence firms like Clayton and Bohan to test samples from loan pools that JPMorgan sought to purchase and securitize.  As noted above, the purpose of the due diligence firm's work was to review the loans and determine whether they met the stated underwriting guidelines or had valid compensating factors otherwise meriting approval.  As part of the foregoing review, the due diligence firms also checked the loans to determine whether the loans were supported by accurate appraisals that conformed to the underwriting guidelines and indicated that the loans were secured by adequate collateral.

1011.   Internal JPMorgan documents and testimony of JPMorgan employees recently made public in the litigation styled, *Dexia SA/NV, et al. v. Bear Stearns & Co, Inc., et al.,* No. 1:12-cv-04761 (S.D.N.Y) ("*Dexia* litigation") demonstrate precisely how the due diligence process worked at JPMorgan.  According the internal documents and sworn testimony of JPMorgan employees, JPMorgan determined the size of the sample that the due diligence firm would review, which was usually between 10% and 30% of the pool, as well as the type and scope of the due diligence.  No loans outside of the 10%-30% sample selected by JPMorgan were ever reviewed.  The due diligence firms re-underwrote the sampled loans and graded each reviewed loan, using a scale of "EV1" (loan properly underwritten), "EV2" (loan issued outside underwriting guidelines, but with "compensating factors" justifying the exception), or "EV3" (loan issued outside guidelines with a "material" or "critical" defect).  A loan would be graded EV3 if the loan had a fraudulent loan application, if the borrower did not have the capacity to repay the loan, or if the borrower did not meet minimum creditworthiness set by the underwriting guidelines.  Any loans rated "EV3" were reviewed by JPMorgan's internal due diligence managers, who had the ability to override the rating of "EV3" and upgrade the rating to "EV2," resulting in the loan remaining in the pool.  After that, JPMorgan's RMBS securitization bankers had the power to override the decisions of JPMorgan due diligence managers and the independent outside due diligence firms to rate a loan "EV3," and did in fact

- 422 -

override the decisions of both the outside due diligence firms and JPMorgan due diligence managers

by changing the ratings of loans from EV3 to EV2, and thereby including such loans in JPMorgan

RMBS.

1012.    Additional documents and testimony from the *Dexia* litigation dramatically

demonstrate that the JPMorgan Defendants *intentionally* included defective loans into the JPMorgan

Offerings at issue herein.  For example, in 2006, JPMorgan purchased a pool of loans originated by

Flagstar.   Loans from that pool were included in the JPALT 2006-A7 and JPALT 2007-A1

Offerings.  JPMorgan hired Clayton to perform a due diligence review of the loan pool, and Clayton

sampled 396 loans from the pool.  Of the 396 loans that Clayton reviewed, 214 – *or 54% of the*

*sample – had material defects and were rated "EV3."*    After receiving the Clayton report,

JPMorgan *overrode Clayton's rating of EV3 for almost all of the loans,* resulting in *only 5.8%* of

the loans being rated "EV3" and being excluded from the pool.

1013.    Another internal JPMorgan report made public in the *Dexia* litigation demonstrates

that, by May 2007, JPMorgan was tracking originator performance and quality, and assigned loan

originators a grade based on the quality of the loans they originated.  Wells Fargo, IndyMac, AHM,

and JPMorgan Chase (all of whom originated loans in the JPMorgan Offerings at issue herein) were

given the lowest rating, *i.e.* "poor," and "common issues" with the loans originated by these

originators included: "Appraisal/Value Not Supported," "Does Not Meet Guidelines," "Occupancy

status not supported by file documentation," and "Assets are not sufficient to close."   These facts

clearly demonstrate that the JPMorgan Defendants knew these originators were ignoring their

underwriting guidelines, were making loans they knew would not be repaid, and that JPMorgan

knew of the massive misstatements of the LTV ratios and Primary Residence Percentages in those

offerings, and that the appraisals for many of the properties were falsely inflated.

- 423 -

1014.  These specific examples were not isolated incidents.  As the FCIC described, in the internal Clayton "Trending Reports" made public by the government in September 2010, between January 2006 and June 2007, JPMorgan received reports indicating that 26.7% of *all* the loans Clayton reviewed for JPMorgan failed to meet the underwriting guidelines, did not have compensating factors meriting approval, and/or had defective appraisals.  In other words, at least one in every four loans was plainly defective.

1015.  Despite such a high level of nonconforming loans, JPMorgan nevertheless continued utilizing, and indeed purchasing from, the same originators who had supplied these defective loans for its securitizations.  Even worse, the JPMorgan Defendants also *deliberately and intentionally "waived" into the JPMorgan Offerings 51.2% of the toxic loans identified by Clayton as being in violation of the underwriting guidelines.  Then, the JPMorgan Defendants sold them to plaintiffs via the certificates*.  While the JPMorgan Defendants knowingly put defective loans into their offerings, they also affirmatively represented in their Offering Documents that all of the loans in fact met the stated underwriting guidelines, and never disclosed to plaintiffs anything to the contrary, especially the fact that JPMorgan had intentionally filled its offerings with defective loans.

1016.  However, recently uncovered evidence demonstrates that even *Clayton's reports, as damning as they are to defendants, actually understated the number of defective loans underlying the JPMorgan Defendants' offerings*.  Recently, in the case titled *Ambac Assurance Corp. v. EMC Mortgage LLC, et al.*, No. 650421/2011 (N.Y. Sup. Ct., N.Y. Cty.), excerpts from the deposition of a former Clayton employee were filed in that case.  The former Clayton employee's sworn testimony revealed that *Clayton was instructed by <u>all</u> of its Wall Street bank clients to "approve loans that often did not satisfy the underwriting guidelines," to ignore defects in loan applications, to code defective loans as non-defective and to change many of the grades on loans that were coded as defective to non-defective.  Defendants' instructions included ignoring appraisals which did not*

- 424 -

*support the stated value of the properties and applications for which borrowers' stated incomes*

*were "unreasonable" or not supported by documentation.  The former employee testified that*

*while he worked at Clayton, "[d]ue diligence underwriters like myself were forced to find*

*compensating factors for defective loans where none existed*."[25]   This sworn testimony

demonstrates two things: (1) that Clayton's trending reports showing the numbers of defective loans

it found while reviewing the JPMorgan Defendants' loans actually understated the number of

defective loans found and "waived" into the offerings; and (2) that the JPMorgan Defendants were

aware of the large number of defective loans and actively attempted to conceal them by instructing

Clayton to change defective loans to non-defective loans.  This unequivocally establishes the

JPMorgan Defendants' scienter.

1017.   Indeed, by 2006, it was well known within JPMorgan that RMBS were horrible

investments.  By then, unbeknownst to the public, JPMorgan had grown alarmed at the increasing

rate of late payments in its subprime portfolio.  Because JPMorgan was well aware of the poor

quality of these mortgage loans, it decided to exit its subprime positions. This decision came from

JPMorgan's CEO, Jamie Dimon, evidencing that the highest levels of JPMorgan management were

aware of and engaged in JPMorgan's wrongdoing.  An article in *Bloomberg* on February 17, 2010

revealed that Dimon was fully aware that JPMorgan's RMBS were of poor and deteriorating credit

quality and that he attempted to shed the associated risk from the company's balance sheet.  The

article reported that "[i]n October 2006, Dimon, JPMorgan's CEO, told William King, then its head

of securitized products, that [JPMorgan] needed to start selling its subprime-mortgage positions."

By the end of 2006, JPMorgan had unloaded $12 billion in subprime assets that JPMorgan itself had

---

[25]       This former Clayton employee's testimony is apparently so devastating to the defendants in
that case that the former Clayton employee's name has been redacted from the excerpts of his
deposition transcript filed with the court, thereby concealing his identity.

originated.  But JPMorgan continued to sell RMBS certificates to plaintiffs thereafter, while falsely representing that they were "AAA" rated securities.

<div align="center">

**2.    Bear Stearns Knew Its Representations Were False and Was Willing to Capitalize on Its Unique Knowledge at the Expense of Investors**

</div>

1018.   As previously alleged, in 2008, JPMorgan Chase & Co. acquired Bear Stearns and took control of its operations and assumed its liabilities.  Based upon information detailed by the FCIC Report, transcripts of FCIC interviews, the U.S. Senate's Levin-Coburn Report, documents produced pursuant to governmental investigations, and  internal Bear Stearns documents revealed in various litigations against it, as well as the other sources detailed herein, it is clear that Bear Stearns knew, or was reckless in disregarding, that it was falsely representing the origination and riskiness of the mortgage loans that collateralized plaintiffs' certificates.

1019.   Bear Stearns' collapse and subsequent acquisition by JPMorgan has been the subject of intense public scrutiny and investigation, most notably by the FCIC.  In February 2011, the FCIC released interviews with Bear Stearns executives regarding its role in the origination, acquisition, and securitization of mortgage loans. The documentary evidence revealed widespread fraudulent conduct on the part of Bear Stearns.   Such fraudulent conduct has been the basis for both investigations and litigation by public officials.

1020.   Bear Stearns also had a legal obligation to perform due diligence on the loans it securitized.  The Offering Documents represented that Bear Stearns conducted a thorough review of the loan originators, the loans, and the loan origination processes used, to ensure that the loans in the offerings were originated pursuant to the stated underwriting guidelines.  For example, in the BSABS 2006-HE9 prospectus supplement, the Bear Stearns represented that "loans acquired by the sponsor are subject to . . . due diligence prior to purchase.  Portfolios may be reviewed for credit, data integrity, appraisal valuation, documentation, as well as compliance with certain laws. . . .

<div align="center">- 426 -</div>

[L]oans [that are] purchased will have been originated pursuant to the sponsor's underwriting guidelines or the originator's underwriting guidelines that are acceptable to the sponsor." BSABS 2006-HE9 Pros. Supp. at S-47.

1021.    Bear Stearns was aware that the RMBS it was selling were of low quality and not as it represented in the Offering Documents. This is illustrated by the e-mail of one Bear Stearns (now part of JPMorgan) employee Nicholas Smith, who worked on various Bear Stearns RMBS offerings. Smith e-mailed Bear Stearns colleagues on August 11, 2006, and discussed Bear Stearns' SACO 2006-8 offering, which contained loans originated by EMC Mortgage, an originator of many of the loans at issue herein.[26]  In discussing the SACO 2006-8 offering, Smith's e-mail called it a "**SACK OF SHIT 8**," an obvious reference to the offering's name and the awful loans in it. In the e-mail, he tells his colleagues: "I hope your [sic] making a lot of money off of this trade." Another former Bear Stearns employee, John Tokarczyk, e-mailed Bear Stearns colleagues on April 30, 2007, discussing another Bear Stearns' RMBS offering containing EMC Mortgage loans. He stated the following about the offering: "**LET'S CLOSE THIS DOG**."

1022.    ***These Bear Stearns insiders, who were aware that the loans did not comply with EMC Mortgage's underwriting guidelines, honestly and frankly described, albeit bluntly, the true nature of the loans – loans that were "DOG[S]" and "SACK[S] OF SHIT**."

1023.    In addition, the JPMorgan Defendants were making these statements regarding the quality of the RMBS investments while they were also selling such RMBS short. In fact, by 2007, Bear Stearns' RMBS short position exceeded *$1 billion*. The JPMorgan Defendants also profited on their inside knowledge that the RMBS they sold were "SACK[S] OF SHIT" by shorting the securities of their fellow Wall Street banks that held RMBS that were insured by insurance company

---

[26]    Plaintiffs bought certificates in several Bear Stearns' "SACO" offerings: SACO 2005-7; SACO 2005-8; and SACO 2006-5.

Ambac.  The JPMorgan Defendants knew that Ambac was on the verge of insolvency (because they had driven it there by refusing to repurchase defective loans they had sold to it and/or had it insure), and they knew that they could profit on their Wall Street brethrens' defective RMBS when it was discovered that Ambac was unable to insure them.  Indeed, by late 2007, Bear Stearns employees internally boasted about the huge profits they made on their shorts.  This clearly demonstrates that the certificates sold to plaintiffs were not the prudent investment grade securities that the defendants represented them to be in the Offering Documents, and that those defendants *knew* the certificates were not as represented to plaintiffs.

1024.   Through its various affiliates and subsidiaries, Bear Stearns participated in every step of the securitization process, from the origination and servicing of the mortgage loans to the sponsoring and structuring of the securitizations, to the underwriting and marketing of the certificates and the drafting of the Offering Documents at issue herein.  This vertical integration allowed Bear Stearns to control and manipulate the loan level documentation, to knowingly choose poor quality mortgage loans for securitization as a method of off-loading the bad loans to investors as soon as possible, and to selectively make repurchase claims of originators while simultaneously denying those of investors.  By virtue of their control over each step in the securitization process, Bear Stearns had knowledge of the true characteristics and credit quality of the mortgage loans.

1025.   Bear Stearns owned a number of lenders that originated or acquired the loans for numerous Bear Stearns' JPMorgan offerings.  As previously alleged, Bear Stearns owned originators EMC Mortgage, Bear Stearns Residential and Encore.  These three captive loan originators originated or acquired all or many of the mortgage loans underlying the following JPMorgan Offerings in which plaintiffs purchased certificates: BALTA 2005-7; BALTA 2005-8; BALTA 2006-2; BALTA 2006-3; BSABS 2006-HE10; BSABS 2006-HE9; BSABS 2007-HE1; BSMF 2006-

AR3; BSMF 2006-SL1; BSMF 2006-SL4; BSMF 2007-AR3; BSMF 2007-AR5; BSMF 2007-SL1;

LUM 2005-1; SACO 2005-8; and SACO 2006-5.

1026.    Bear Stearns directed and controlled the business operations of EMC Mortgage, Bear

Stearns Residential and Encore as part of its plan to originate and securitize an increasingly larger

volume of mortgage loans.  For example, during the relevant time period (2004-2007), EMC

Mortgage more than doubled the volume of subprime loans it acquired for securitization, from over

$27 billion in 2004 to over $80 billion in 2007.  In addition, in 2006, Bear Stearns Residential

originated over $4 billion in mortgages.  Bear Stearns securitized these loans through Bear Stearns &

Co., its underwriting affiliate, which is now part of defendant J.P. Morgan Securities LLC, as a result

of the JPMorgan/Bear Stearns merger.

1027.    Because it owned and controlled these lenders/originators, Bear Stearns set the

underwriting guidelines under which these entities would originate or acquire loans.  Thus, Bear

Stearns knew that it had set the guidelines that ignored the borrowers' repayment ability, and

resulted in inflated incomes, inflated appraisals, falsified Primary Residence Percentages,

understated LTV ratios, and other false loan data.

1028.    Moreover, Bear Stearns used third-party due diligence firms such as Clayton to

review whether the loans Bear Stearns intended to acquire for securitization were underwritten in

accordance with applicable underwriting standards.  If a loan did not comply with underwriting

guidelines, Bear Stearns could (i) demand that the originator cure the defect, (ii) reject the loan for

inclusion in the securitization, or (iii) accept the defective loan as part of the loan pool for purchase.

As its appetite for mortgage loans to securitize grew, Bear Stearns rejected fewer and fewer

defective loans, effectively abandoning the stated underwriting guidelines.  In fact, as revealed by

the FCIC evidence, Bear Stearns was specifically notified by Clayton that at least 16.3% of the loans

Clayton tested did not meet the stated underwriting guidelines, did not have compensating factors

meriting approval, and/or had inflated appraisals.  Nonetheless, Bear Stearns intentionally "waived" 41.8% of the defective loans into its RMBS offerings, while falsely representing to plaintiffs and other investors that all of the loans complied with the stated underwriting guidelines.  In fact, internal EMC Mortgage and Bear Stearns Residential documents made public in other litigations indicate that Bear Stearns' loans from EMC Mortgage and Bear Stearns Residential had even higher waiver rates for defective loans.  As previously alleged, in an internal Clayton report dated April 13, 2007, it was revealed that in the third quarter of 2006, EMC Mortgage waived 65% of the defective loans Clayton identified into the JPMorgan/Bear Stearns offerings, while in that same quarter Bear Stearns Residential waived 56% of the defective loans into the JPMorgan/Bear Stearns offerings.

1029.  However, as was recently discovered, Clayton's statistics about the number of defective loans included in the offerings were actually ***understated***, as the deposition of a former Clayton employee revealed that Bear Stearns actually instructed Clayton to designate defective loans as non-defective, concealing the true, much higher, number of loans that did not comply with the stated underwriting guidelines.  To explain, a former underwriter for both Clayton and Watterson (another due diligence firm utilized by Bear Stearns) has recently testified in a pending case titled *Ambac Assurance Corp. v. EMC Mortgage LLC, et al.*, No. 650421/2011 (N.Y. Sup. Ct., N.Y. Cty.). The former employee testified under oath that Bear Stearns instructed both Clayton and Watterson to "approve loans ***that often did not satisfy the underwriting guidelines***," to ignore defects in loan applications, to code defective loans as non-defective and to change many of the grades on loans that were coded as defective to reflect that they were non-defective.  For example, the former Clayton and Watterson employee testified that:

- During the due diligence process, Clayton and Watterson underwriters were directed to overlook defects and to grade defective loans as non-defective. These instructions came from Bear Stearns and were conveyed to underwriters by their supervisors.

- Clayton and Watterson underwriters were directed by Bear Stearns not to look for fraud in the loan files and to overlook any fraudulent documents.

- Clayton and Watterson underwriters were directed by Bear Stearns to grade loans as non-defective even where the underwriters determined that the borrowers' incomes listed on loan applications were unreasonable.

- Clayton and Watterson performed "1003/1008 underwriting," a practice whereby an underwriter does not verify the information on the borrower's loan application when reviewing loans for Bear Stearns.

- Clayton and Watterson were instructed by Bear Stearns to grade defective loans as non-defective by utilizing "compensating factors" that were not supported by the data in the loan files.

- Clayton underwriters used the phrase "Bear don't care" to describe Bear Stearns' attitude towards the due diligence underwriting review process.

1030.    This testimony was apparently so damning to the JPMorgan Defendants/Bear Stearns in that case that the former employee's name was redacted from the his deposition transcript filed in that action.  This is understandable, as the testimony unequivocally shows that Bear Stearns knew the loans did not comply with the stated underwriting guidelines, contrary to its representations in the Offering Documents, and that in fact JPMorgan/Bear Stearns actively attempted to conceal the defective loans.

1031.    In addition, in testimony to the FCIC in September 2010, former Clayton President D. Keith Johnson said that investment banks like Bear Stearns were aware that the loans were defective, and affirmatively used the defects as leverage to negotiate a lower purchase price for the loans. Internal communications from Bear Stearns, discussed below, confirm that Bear Stearns knew of the defective loans and nonetheless denied repurchase demands for defective loans from investors while simultaneously making repurchase demands on originators for the same loans.  As such, Bear Stearns knowingly securitized, marketed, and sold loans that did not meet the stated underwriting standards.

- 431 -

1032.   Bear Stearns' management was so eager to securitize as many mortgage loans as possible that it abandoned any adherence to underwriting or due diligence standards.  On February 11, 2005, Bear Stearns Senior Managing Director Mary Haggerty e-mailed Vice President of Due Diligence John Mongelluzzo with instructions to reduce the amount of due diligence conducted "in order to make us more competitive on bids with larger sub-prime sellers."  This was a transparent attempt to turn a blind eye to the masses of defective loans Bear Stearns knew were in the pools it purchased, to cultivate good relationships with lenders in order to ensure a steady supply of loans to securitize.

1033.   Third-party due diligence firms were also told to reduce due diligence.  In an e-mail dated April 5, 2007, an EMC Mortgage Assistant Manager for Quality Control Underwriting and Vendor Management ordered Adfitech, Inc. not to make efforts to verify information in a loan file, directing:

- "Effective immediately, in addition to not ordering occupancy inspections and review appraisals, DO NOT PERFORM REVERIFICATIONS OR RETRIEVE CREDIT REPORTS ON THE SECURITIZATION BREACH AUDITS";

- Do not "make phone calls on employment"; and

- "Occupancy misrep is not a securitization breach."

This e-mail confirms the falsity of some of the very same misrepresentations alleged herein, as well as defendants' awareness of the falsity of the statements.  The foregoing shows that defendants knew that their OOR representations were false, that appraisals were inflated, and that basic information, such as employment histories, was false.  These were clear signs that Bear Stearns knew of and intentionally turned a blind eye to defects that existed within the loans pools it was purchasing, simply because it knew it could and did pass the defective loans off onto investors like plaintiffs.

1034.   Bear Stearns Internal Audit Reports also described the various reductions in due diligence.  According to February 28, 2006 and June 22, 2006 reports, Bear Stearns reduced the

- 432 -

number of loans in the loan samples that were reviewed as part of the due diligence process, conducted due diligence only *after* the loans were purchased ("post-closing" due diligence), eliminated internal reports on defective loans, and conducted *no* due diligence if such due diligence would interfere with the mortgage loan pools being securitized.  *The Atlantic* confirmed this abandonment of due diligence procedures in a 2010 article describing:

- how Bear Stearns unreasonably pressured EMC Mortgage analysts to perform their due diligence of the underlying mortgages in only one to three days;

- how Bear Stearns improperly encouraged EMC Mortgage analysts to falsify loan data (including FICO scores) if the loan file was missing the requisite information; and

- how Bear Stearns pushed EMC Mortgage analysts to avoid investigating a potentially bad loan and instead focus on making it "fit."

1035.  Former EMC Mortgage analyst Matthew Van Leeuwen, an employee from 2004 to 2006, confirmed in a March 30, 2009 e-mail that "the pressure was pretty great for everybody to just churn the mortgages on through the system," so that if there were "outstanding data issues" analysts should just "'fill in the holes.'"  Van Leeuwen and another EMC Mortgage employee also were quoted in an *Atlantic* article, reporting that they were instructed by superiors to provide false credit data to the Credit Rating Agencies on loans to be securitized and that they just made data up.

1036.  The pressure was directed from the top of Bear Stearns' corporate structure.  For example, EMC Mortgage's Senior Vice President of Conduit Operations, Jo-Karen Whitlock, told her staff in an April 14, 2006 e-mail to do "whatever is necessary" to meet Bear Stearns' objectives for desired loan production.  Her e-mail stated:

I refuse to receive any more emails . . . questioning why we're not funding more loans each day.  I'm holding each of you responsible for making sure we fund at least 500 each and every day. . . .  [I]f we have 500+ loans in this office we MUST find a way to . . . buy them. . . . I expect to see 500+ each day. . . . I'll do whatever is necessary to make sure you're successful in meeting this objective.

- 433 -

1037.  Not surprisingly, given the abandonment of due diligence and underwriting standards by Bear Stearns, loans acquired by Bear Stearns began to default at a staggering rate.  This triggered concern in Bear Stearns as early as 2005.  But rather than improving the quality of loans acquired for securitization, internally Bear Stearns reacted by changing the time period in which Bear Stearns held loans it acquired.  Previously, Bear Stearns held third-party loans in inventory for between 30 and 90 days before the loans were securitized.  This allowed Bear Stearns to determine whether any of the loans would suffer from an "early payment default" ("EPD").  In 2006, Bear Stearns stopped screening out these defective loans and instead required that all mortgage loans be securitized before the EPD period expired.  Bear Stearns Senior Managing Director Jeffrey Verschleiser confirmed the revised internal protocol in a June 13, 2006 e-mail to Haggerty stating that they need "to be certain we can securitize the loans with 1 month epd before the epd period expires."  This desire to quickly unload bad mortgage loans by selling them to investors through the securitization process was further evidenced by a May 5, 2007 e-mail from Bear Stearns Managing Director Keith Lind, who demanded "to know why we are taking losses on 2nd lien loans from 2005 when they could have been securitized?????"

1038.  In addition to purposely acquiring and securitizing defective loans that did not meet the represented underwriting guidelines and selling them to investors, Bear Stearns' subsidiary, defendant EMC Mortgage, further profited from these bad loans by making repurchase claims against the originators of the loans.  Repurchase claims are derived from rights found in mortgage loan purchase agreements, whereby the originator makes representations to the sponsor (EMC Mortgage) that the loans were underwritten in accordance with certain underwriting standards.  If the sponsor (EMC Mortgage) discovers this not to be the case, it can request that the originator repurchase any affected loans.  Similarly, the agreements between EMC Mortgage and the RMBS trusts require that EMC Mortgage repurchase any loans from the trusts that it knows are defective.

- 434 -

EMC Mortgage **knew** that numerous loans that it had securitized were defective, and thus made repurchase demands from the loan originators.  However, EMC Mortgage never told the trusts (and thus the investors such as plaintiffs) about the defective loans.  Accordingly, EMC Mortgage received millions of dollars from loan originators that bought back their defective loans that were in the trusts.  Yet, EMC Mortgage never bought back the defective loans from the trusts, thus pocketing millions that should have gone to the trusts and their investors (*i.e.*, plaintiffs).  By this method, EMC Mortgage improperly pocketed monies that were rightfully due the trusts/investors, thereby further improperly and fraudulently enriching itself, but also establishing that Bear Stearns **knew** there were numerous defective loans within its offerings.

1039.    EMC Mortgage came to several such settlement agreements and other arrangements with originators as part of its repurchase scheme.  On January 30, 2007, an originator agreed to pay over $2.5 million to EMC Mortgage "in lieu of repurchasing the Defective Loans."  On December 18, 2007, an originator agreed to pay almost $12 million "for full payment and satisfaction of the Monetary Claims, and the balance of the Settlement Amount (if any) for settlement of the Defective Loans."  On October 1, 2007, an originator agreed to pay $1 million "in lieu of repurchasing the Defective Loans."  According to an internal presentation requested by Bear Stearns' Managing Director and Head of Mortgage-Backed Securities, Thomas Marano, EMC Mortgage received $1.9 billion from April 2006 to April 2007 in payments, with most resolutions being settlements.  Bear Stearns would also accept discounts on future loan purchases instead of immediate cash settlements, valuing these arrangements at $367 million for the period beginning in 2007 through the first quarter of 2008.  *See also* Teri Buhl, *E-mails Suggest Bear Stearns Cheated Clients Out of Billions*, The Atlantic, Jan. 25, 2011.

1040.    These funds should have been passed on to the RMBS trusts Bear Stearns created and the investors such as plaintiffs that paid money for certificates from these trusts, but Bear Stearns did

- 435 -

not do so.  Nor did it disclose its repurchase settlements with certificate holders in the trusts.  In a December 11, 2009 deposition, Bear Stearns' Deal Manager Robert Durden could not identify a single "instance in which EMC or Bear Stearns disclosed to Ambac or other investors that it was recovering on EPDs from originators with respect to securitized mortgage loans, pocketing the money and not putting it into the trust."  Bear Stearns knew this practice was wrong and fraudulent. Indeed, PricewaterhouseCoopers LLP advised Bear Stearns that the program was contrary to "common industry practices, the expectation of investors and . . . the provisions in the [deal documents]" in an August 31, 2006 audit, and, according to EMC Mortgage President Stephen Golden, EMC Mortgage concluded that it could not retain the funds in connection with the repurchase claims in mid-2007.  Despite this advice, EMC Mortgage reached two such agreements in the latter half of 2007 and continued to fail to inform or remit the proceeds to the trusts.  *See* PricewaterhouseCoopers LLP, Bear Stearns/EMC Audit Report: "UPB Break Repurchase Project – August 31, 2006."

1041.   Relying upon much of the evidence cited above, and upon additional documents and testimony gathered in its own investigation, on October 1, 2012, the co-chair of the United States Department of Justice Task Force on mortgage-backed securities fraud, New York State Attorney General Eric T. Schneiderman ("N.Y. AG"), filed a complaint against JPMorgan and EMC Mortgage for fraud arising out of Bear Stearns' creation and sale of RMBS.  Similar to plaintiffs' allegations herein, the N.Y. AG alleges that:

> Defendants led investors to believe that Defendants had carefully evaluated – and would continue to monitor – the quality of the loans in their RMBS. In fact, ***Defendants systematically failed to fully evaluate the loans, largely ignored the defects that their limited review did uncover, and kept investors in the dark about both the inadequacy of their review procedures and the defects in the underlying loans.*** Furthermore, even when Defendants were made aware of these problems, they failed to reform their practices or to disclose material information to investors. As a result, the loans in Defendants' RMBS included many that had been made to

- 436 -

borrowers who were unable to repay, were highly likely to default, and did in fact
default in large numbers.

Complaint, ¶2, *People of the State of New York v. J.P. Morgan Securities LLC, et. al.*, No.

451556/2012 (N.Y. Sup. Ct., N.Y. Cty. Oct. 1, 2012) ("N.Y. AG Complaint").  The N.Y. AG

Complaint states that Bear Stearns' made "materially false and fraudulent" misrepresentations to

investors regarding the quality of its due diligence for its RMBS, and that the "due diligence process,

as Defendants were well aware, was fundamentally compromised by the massive number of loans

that Defendants sought to have reviewed in a short period of time." *Id.*, ¶¶48-49.  Citing to internal

documents, the N.Y. AG Complaint alleges that, far from identifying potential bad loans, "Clayton's

paramount objective was to get the review job done as quickly as possible . . . .  Clayton executives

established aggressive daily 'productivity' goals. Underwriters who did not maintain the requisite

pace of review received warnings from their supervisors and faced the very real prospect of

dismissal." *Id.*, ¶52.  In order to process more and more loans, Bear Stearns' "due diligence process

abandoned certain basic inquiries," such as the reasonableness of stated income loans, which one

Bear Stearns executive acknowledged – that prior to 2007 – were not "'looked at . . . as hard,'" and

that, "even in 2007, he was not aware of any process in place to verify employment for stated

income loans either at Bear Stearns or its due diligence providers." *Id.*, ¶¶53-54.

1042.   The N.Y. AG Complaint states that Bear Stearns was in fact waiving in even more

defective loans than was reported by the Levin-Coburn Report and the FCIC.  For 32 loan pools that

were reviewed by Clayton for defendants during the first quarter of 2007, for example, "the average

waiver rate was ***35.7% . . . including one stated income loan for a borrower who, as a manager of***

***the fast food restaurant Baja Fresh, claimed to make $7,000 a month***." *Id.*, ¶61 n.5.

1043.   The N.Y. AG Complaint concluded that despite the fact that a lack of quality control

over the due diligence of loans the company was securitizing had been a "long-standing" concern

within Bear Stearns, "Defendants [did not] take any significant steps prior to 2007 to adopt internally-recommended proposals to correct perceived deficiencies in the system. ***Instead, Defendants permitted the critical problems that their own employees had identified in 2005 to continue throughout 2006 and into 2007***." *Id*, ¶65.

1044.    Bear Stearns also abused its reduced documentation programs, including its stated income, low documentation, and no documentation loan programs in its pursuit to originate as many loans as possible. Low documentation loan programs were originally designed for self-employed business owners and professionals with high credit scores and loans with low LTV ratios. Despite representations in the Offering Documents that low documentation loans adhered to traditional underwriting standards, low documentation loan programs were instead abused and used as a tactic to circumvent Bear Stearns' underwriting standards altogether.

1045.    A Bear Stearns internal audit report dated February 28, 2006 revealed that Bear Stearns systematically issued reduced documentation loans to borrowers who misrepresented their income, assets, employment, and intentions to occupy purchased properties. Bear Stearns loan officers were instructed to ignore red flags and close the loans regardless. Former EMC Mortgage Analyst Matthew Van Leeuwen explained in a March 30, 2009 e-mail that a "missing credit score would magically become a 680 in Bear's system, things like that." Stated Income loans were typically approved even if the stated income could not be verified as reasonable by sources like Salary.com or the loan application.

1046.    The evidence discussed above reveals that Bear Stearns had knowledge that it and other lenders had, in fact, completely abandoned the stated underwriting standards. Bear Stearns knowingly waived a significant number of loans rejected by its third-party due diligence firms into loan pools for securitization. Bear Stearns also packaged loans for securitizations at an earlier and earlier date, effectively eliminating any sort of due diligence that could be done, and thereby passed

- 438 -

numerous defective loans onto plaintiffs.  The senior management of Bear Stearns also directed its

employees to abandon the stated underwriting standards by not verifying employment information or

checking credit reports – all in the pursuit of increased volume and market share.  Further, Bear

Stearns demanded that originators repurchase defective loans and then retained the payments

received, as opposed to remitting such funds to the trusts. These facts demonstrate that Bear Stearns

knew its representations were false, but nonetheless was willing to, and in fact did, act fraudulently

and profit from such knowledge to the detriment of the plaintiffs.

### 3.    JPMorgan Defendants' Scienter with Respect to the Certificates' Credit Ratings

1047.    Others have described the manner in which defendants used the false information in

the Offering Documents to obtain investment grade and even "AAA" credit ratings, which were

essential for marketing the certificates to plaintiffs.  As Susan Barnes, the North American Practice

Leader for RMBS at S&P from 2005 to 2008, explained:

> The securitization process relies on the quality of the data generated about the loans going into [the offerings].  ***S&P relies on the data produced by others and reported to both S&P and investors about those loans***.  At the time that it begins its analysis of a[n offering], S&P receives detailed data concerning the loan characteristics of each of the loans in the pool – up to 70 separate characteristics for each loan in a pool of, potentially, thousands of loans.  ***S&P does not receive the original loan files for the loans in the pool.  Those files are reviewed by the arranger or sponsor of the transaction, who is also responsible for reporting accurate information about the loans in the deal documents and offering documents to potential investors***.

Testimony of Susan Barnes Before the Senate Permanent Subcommittee on Investigations, Apr. 23,

2010.

1048.    Defendants met with the Credit Rating Agencies prior to having the certificates rated,

to discuss the proposed guidelines the Credit Rating Agencies would use to determine the ratings and

how the Credit Rating Agencies would treat the loans in question.  Defendants did this to ensure that

they understood how the Credit Rating Agencies would determine the ratings.  Defendants learned

- 439 -

from these meetings – as well as from their prior knowledge of Fitch's, Moody's and S&P's ratings

software from earlier RMBS securitizations – that using accurate information would not yield the

required ratings.   Accordingly, defendants fed the Credit Rating Agencies the same false loan-level

data regarding LTV ratios, Primary Residence Percentages, home values, DTI ratios, FICO scores,

underwriting guidelines and repayment ability that they provided to plaintiffs in aggregate form in

the Offering Documents.   In fact, in an article published in July 2010 in *The Atlantic*, **former**

**employees of the JPMorgan Defendants, i.e., employees of Bear Stearns/EMC Mortgage, admitted**

**that they routinely provided the Credit Ratings Agencies with falsified loan data**.   The Credit

Rating Agencies then put this false data into their quantitative models to assess the supposed credit

risk associated with the certificates, project likely future defaults, and ultimately, determine the

credit ratings to be assigned to the certificates.   Defendants essentially pre-determined the ratings by

putting false data into the ratings system.   In essence, defendants engaged in the maxim "garbage in,

garbage out" – they fed the Credit Rating Agencies "garbage," in the form of falsified property

valuations, borrower credit information, LTV ratios, OOR percentages, and the like, and the Credit

Rating Agencies put "garbage out," in the form of inaccurate credit ratings that were based on

defendants' falsified data.   Unfortunately, as a former Wall Street insider revealed to the U.S. Senate

in testimony concerning the mortgage crisis, "***most people believed in the ratings***."   Levin-Coburn

Report at 340.

1049.   Because data supplied by defendants to the Credit Rating Agencies was already false

and made the loans appear to be of higher credit quality, and safer and less risky than they actually

were, the credit ratings were similarly affected – the Credit Rating Agencies' credit ratings always

made the certificates appear safer and of higher credit quality than they actually were.   But far from

being the safe, high quality, investment grade securities their credit ratings depicted, the undisclosed

truth was that the certificates were junk bonds, or worse.   Because of defendants' knowing use of

- 440 -

false data, the credit ratings contained in the Offering Documents had no reasonable basis in fact. As

a result, the RMBS securities at issue in this case should never have been registered, marketed or

sold by way of the SEC and other Offering Documents alleged herein.

> **4.    The JPMorgan Defendants Knowingly Misrepresented that
> Title to the Certificates' Underlying Loans Was Properly and
> Timely Transferred**

1050.    As previously alleged, defendants represented in the Offering Documents that they

would properly and timely transfer title to the mortgage loans to the trusts that issued plaintiffs'

certificates. The Offering Documents represented that the depositor defendants would ensure that all

right, title and interest in the mortgage loans would be transferred to the trusts at or about the

"closing" or "cut-off" dates of the offerings, to ensure that plaintiffs' certificates would be

"mortgage-backed," as opposed to "*non*-mortgaged-backed" securities, as well as to ensure the trust

maintained its tax-free status as a REMIC mortgage pass-through conduit.

1051.    However, as is now evident, defendants, notwithstanding their promises, did not

timely and/or effectively transfer title to the mortgage loans. This is evidenced by the news reports

and lawsuits concerning the problems trustees are having with foreclosing on defaulting loans, the

news reports of large scale forgeries and bogus assignments of loans after-the-fact, the mega-

settlement with the Attorneys General of 49 states for $25 billion over such practices, and plaintiffs'

representative investigation concerning the loans in at least one of the trusts at issue herein, which

revealed that nearly all of the loans were never properly or timely transferred to the trusts. *See*

§VI.E, *supra*.

1052.    The foregoing shows that defendants did not timely or effectively transfer title to the

mortgage loans to plaintiffs' trusts. Of course, defendants were aware of this failure, as it was they,

themselves, who were responsible for carrying out such conduct. Defendants obviously know what

they did or did not do – here, it is obvious they did nothing, and equally obvious that they are aware

of that fact.  This is evidenced by the fact that years after the offerings closed, defendants attempted

to scramble and create assignments after-the-fact, once they realized the implications of their earlier

failures to act.  The mass of late assignments, forged assignments, and bogus assignment documents,

is just further evidence of defendants' attempts to cover up their fraudulent scheme.

## VIII.  DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS WERE MADE FOR THE PURPOSE OF INDUCING PLAINTIFFS TO RELY ON THEM AND PLAINTIFFS ACTUALLY AND JUSTIFIABLY RELIED ON DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS

1053.   Plaintiffs and their assigning entities actually and justifiably relied upon the false

information that defendants knowingly wrote into the Offering Documents and that were used to

market the certificates.

1054.   The Offering Documents contained detailed descriptions of the mortgage pools

underlying the certificates.  The Offering Documents provided the specific terms of the particular

offering.  They included data concerning the loans underlying the offering, including, without

limitation: the type of loans; the number of loans; the mortgage rate; the aggregate scheduled

principal balance of the loans; the LTV ratios; OOR percentages, including the Primary Residence

Percentages; credit enhancement; and the geographic concentration of the mortgaged properties.

The Offering Documents also contained a description of the loan originators' underwriting and

appraisal/valuation standards, guidelines and practices.  The Offering Documents further contained

the investment grade credit ratings assigned to the certificates by the Credit Rating Agencies, and a

promise that the relevant mortgage loans would be properly and timely transferred to the trusts.

1055.   In deciding to purchase the certificates, plaintiffs and the assigning entities actually

relied on defendants' false representations and omissions of material fact in the prospectuses, pitch

books, term sheets, loan tapes, "free writing" prospectuses, "red" and "pink" prospectuses,

prospectus supplements and other Offering Documents alleged herein that defendants provided to

plaintiffs, including the representations regarding the loan underwriting guidelines, the characteristics of the underlying mortgage loans (such as the LTV ratios and OOR percentages, including the Primary Residence Percentages), the credit ratings assigned by the Credit Rating Agencies, and the transfer of title to the mortgage loans. But for defendants' misrepresentations and omissions in the Offering Documents, plaintiffs and the assigning entities would not have purchased the certificates.

1056.   Plaintiffs and the assigning entities reasonably and justifiably relied upon the information that defendants wrote into the Offering Documents and could not have discovered that defendants – the most sophisticated and then-respected commercial actors in the world – were omitting and misrepresenting material information exclusively within their possession, custody and control. Plaintiffs and the assigning entities performed a diligent investigation concerning the offerings, certificates and the underlying loans before they purchased the certificates and could not have learned that defendants were making material misrepresentations and omissions about the offerings, certificates and loans.

1057.   Each of the plaintiffs or their assignors hired skilled, experienced, professional asset managers who diligently conducted their investment activities. They could not and did not detect defendants' misrepresentations and omissions.

A.    **The Brightwater-Managed Entities Actually and Justifiably Relied on the False Information that Defendants Used to Sell the Subject Certificates**

1058.   Assignors Harrier, Kestrel and Greyhawk, and plaintiffs Blue Heron II, Blue Heron V, Blue Heron VI, Blue Heron VII, and Blue Heron IX each hired a professional asset investment manager, Brightwater, to conduct their investment activities. Brightwater, in turn, employed highly qualified, conscientious, and experienced investment professionals to make investments on behalf of its clients. The process involved screening and testing the quality of potential investments, which

- 443 -

included portfolio and RMBS-level analyses. This process was diligently followed by Brightwater and eminently reasonable.

### 1.    Portfolio-Level Screening

1059.    Before any Brightwater-managed entity was even permitted to purchase a particular security, that security had to conform to numerous investment parameters. For example, the security had to be a debt security, which, unlike equity, requires the obligor to return 100% of the invested principal amount by a date certain. Further, each debt security must have passed the major Credit Rating Agencies' own tests, qualifying as an "investment grade" security under those tests and analyses. In addition, each debt security had to be rated "investment grade" by at least two of the Credit Rating Agencies. Only if the particular security satisfied such portfolio-level criteria could it be considered for further review. Any security affected by defendants' misrepresentations and omissions would have been rejected at this first screening *if* defendants' misrepresentations and omissions *could have* been detected.

### 2.    RMBS-Level Screening

1060.    Even after putting in place reasonable screens to weed out bad investments, Brightwater conducted further analyses. Specifically, Brightwater reviewed term sheets or similar summary materials (sometimes called "pitch books") provided regarding a particular RMBS, analyzed the RMBS's yield and price relative to similar securities in the market, and made an initial recommendation about whether to purchase the RMBS. After this step, Brightwater conducted even deeper analyses into the proposed RMBS.

1061.    The next step in Brightwater's investment process involved conducting further credit analyses on the proposed RMBS. In that process, a credit analyst read marketing materials, including prospectus supplements and other offering documents. The process also involved using an expensive database and software system to detect any anomalies in a particular offering and to model

the particular offering under various economic assumptions.  This credit analysis further considered the level of structural subordination (or credit enhancement) supporting the proposed RMBS, and how sensitive the particular RMBS security was to various cashflow assumptions.  The credit analysis focused on underwriting criteria, LTV ratios, FICO scores, OOR percentages, geographic dispersion, and the quality of the loan servicer supporting the transaction, among other pertinent credit characteristics.

1062.   Following its credit analysis, Brightwater subjected a proposed RMBS purchase to even more screening.  Brightwater gathered the foregoing portfolio-level data, pricing information and credit analysis data, and subjected all of that information to review by a seasoned investment committee.  If the investment committee did not unanimously approve the particular RMBS for one of its client's portfolios, then the RMBS was rejected.

1063.   In fact, there were at least four different screens that Brightwater employed that would have rejected defendants' "junk" securities that were falsely masquerading as investment grade bonds.  *First*, the certificates at issue in this case never should have been rated "investment grade," because, as defendants knew, those ratings were based on "garbage in" the Credit Rating Agencies' rating models, resulting naturally in "garbage out" of those models.  Thus, the certificates would have failed Brightwater's portfolio-level screening had the truth about defendants' misrepresentations been known.  *Second*, the subject certificates would have failed the initial RMBS-level screening, because the true qualitative and quantitative data would have exposed the certificates as being massively mispriced had it been accurately set forth in the certificates' Offering Documents.  *Third*, the subject certificates would have been thoroughly rejected by Brightwater's robust credit analysis, which, as noted, served to double check prior analyses and dive even deeper into the credit characteristics of the particular bond.  *Fourth*, if Brightwater's personnel had detected defendants' use of phony data, they would have rejected the certificates at every stage noted above

- 445 -

and would have rejected the certificates at the investment committee phase of the investment process.

1064.  In the end, none of Brightwater's expertise, databases, software, investment personnel, quality control checks or substantial investment in all of these processes really mattered. Indeed, where highly sophisticated commercial actors like defendants have material non-public information about a security and a premeditated plan to commit fraud, such as was the case here, even the most sophisticated systems in the world are insufficient to detect those misrepresentations and omissions.  That is one of the many reasons why it has taken the full force of the U.S. Government and its agencies, exercising their subpoena power, through the U.S. Senate and the FCIC, to alert investors to the fact that defendants received reports from Clayton showing that the loans they were selling to investors – including plaintiffs – via the certificates were *defective on the day they were made*.

### B.    Plaintiff Kleros V Actually and Justifiably Relied on the False Information that Defendants Used to Sell the Subject Certificates

1065.  Similar to the Brightwater-managed entities, plaintiff Kleros V actually and reasonably relied on the false data that defendants used to sell the subject certificates.  Kleros V invested most of its capital in RMBS and other securities tied to RMBS.  Kleros V had sound investment processes in place that would have avoided fraudulent junk bonds like the ones defendants sold in this case, *if* defendants' fraud could have been detected.  Kleros V's sound investment processes focused on its portfolio and RMBS-level screening processes.

### 1.    Portfolio-Level Screening

1066.  To avoid junk bonds like the ones defendants sold to Kleros V in this case, Kleros V had 37 different tests that every potential security had to pass before it could even be eligible for Kleros V to buy.  For example, every potential security had to be a debt or fixed-income bond,

- 446 -

which, unlike equity investments, require the obligor to repay an investor's entire principal plus stated interest during the period in which the borrower holds the investor's funds. Kleros V could not even consider buying a bond that was not rated by the two major Credit Rating Agencies, Moody's and S&P. Nor could it buy a bond that was not rated at least "Baa1" by Moody's or "BBB+" by S&P (both "investment grade" ratings). Moody's quantifies the probability of default associated with a bond that it rates as Baa1 as having a 2.6% chance of defaulting over a ten-year period. As such, even the "riskiest" bonds that Kleros V was permitted to purchase were supposed to have at least a 97.4% likelihood of repaying Kleros V its principal investment.

1067.   All of Kleros V's proposed investments had to satisfy even more quality control tests. Kleros V used computer software called the Standard & Poor's CDO Monitor to make certain that the proposed RMBS would not inhibit Kleros V from repaying its own investors. This computer software provided another layer of investment screening.

## 2.    RMBS-Level Screening

1068.   To further strengthen Kleros V's investment processes, it hired an experienced external asset manager to help select RMBS that satisfied the portfolio-level screening described above, and to subject the proposed RMBS to additional investment screens. The manager was Strategos.

1069.   Strategos followed a systematic approach to purchasing RMBS for Kleros V. Among other things, Strategos analyzed three major components of each RMBS and considered distinct pieces of information within each of those components. First, it analyzed the originator and servicers supporting each RMBS. The types of information that Strategos considered in this review category included originators' financial strength, management experience, business strategy, underwriting experience and historical loan performance.

- 447 -

1070.    Second, with respect to each RMBS, Strategos analyzed the characteristics of the collateral underlying the RMBS.  Specifically, it relied upon the LTV ratios, the occupancy status of the loan (*i.e.*, whether the borrower owned the property or was an investor in it) and the underwriting criteria that the originator followed to make the loan (*i.e.*, the type of documentation program, such as full, stated or no-doc criteria).  In addition to these data points, Strategos relied upon many others, such as the purpose of the loan, the borrower's FICO score, and the DTI ratio associated with the loan.

1071.    Third, with respect to each RMBS, Strategos analyzed the structural features of the bond.  For example, among other things, it analyzed the principal and interest "waterfall" supporting the bond, the level of credit enhancement or subordination beneath the particular certificate issued by the subject RMBS issuing trust, and how the particular certificate would perform under a break-even cash flow analysis.   All of these factors were part of Strategos's investment process and complemented the portfolio-level analysis that Strategos conducted, which depended upon the ratings assigned to the various RMBS in the Kleros V portfolio, as well as their correlation and concentration levels.  Strategos, like other investors, reviewed the data that defendants wrote in the relevant RMBS Offering Documents, such as term sheets, pitch books, loan tapes, various prospectuses and prospectus supplements, and electronic summaries of information in those documents, and other Offering Documents, that defendants provided to industry investment platforms, including Intex.

1072.    To execute the tasks described above, Strategos made substantial investments in information technology and personnel.  Some of the software programs that Strategos used to make and manage Kleros V's investments included CDOnet (to perform portfolio analysis) and a program called "Synergy" that provided collateral-level information on RMBS.  Strategos conducted surveillance of the RMBS it purchased on behalf of Kleros V by subscribing to expensive data

- 448 -

services such as Intex, Bloomberg, Realpoint and Lewtan Technologies, and by monitoring ratings assigned to the RMBS by the Credit Rating Agencies.  Strategos likewise invested in skilled professionals, experienced in credit analysis, finance and economics.

1073.    Due to the fact that WestLB's New York branch sponsored and provided funding to Kleros V, Kleros V had yet another quality control screen in place.  WestLB employed a skilled professional who – in advance of Kleros V's committing to purchase an RMBS – reviewed documents that defendants wrote and filed with the SEC for the purpose of describing the relevant RMBS.  WestLB reviewed such materials, including the various prospectuses and prospectus supplements, as an additional credit check on each bond that Kleros V wished to purchase.  This analysis focused on RMBS collateral data such as the LTV ratios, OOR percentages (such as the Primary Residence Percentages) and FICO scores of the borrowers supporting the RMBS.  Through this process, Kleros V again relied upon the credit ratings assigned to the RMBS, as reflected in the Offering Documents that defendants wrote.  This final screen did not detect and could not have detected defendants' misrepresentations and omissions.

1074.    If a proposed RMBS failed to pass any one of the diligent investment screening processes described above, then that RMBS would have been rejected and Kleros V would not have bought it.  Short of conducting a government-sponsored investigation backed by the full subpoena power of the U.S. Government, Kleros V could not have discovered – and did not discover – the fraud alleged herein at any time before late September 2010, when the government released the Clayton documents to the public.  Kleros V justifiably relied upon the false data that defendants used to market the certificates.  Defendants cannot blame Kleros V for their own misconduct in corrupting the data and ratings that defendants used to market and sell the RMBS that Kleros V purchased.

- 449 -

### C.    Plaintiff Silver Elms Actually and Justifiably Relied on the False Information that Defendants Used to Sell the Subject Certificates

1075.    Plaintiff Silver Elms – through its assignor and warehousing entity, Paradigm, who essentially acquired securities on Silver Elms' behalf, generally in accordance with the procedures set forth below – actually and reasonably relied on the false data that defendants used to sell the subject RMBS certificates.  Silver Elms invested a material amount of capital in RMBS and other securities tied to RMBS.  Silver Elms acted prudently to attempt to avoid junk bonds filled with defective, misrepresented loans, such as those at issue here.  Similar to other plaintiffs in this case, Silver Elms built safeguards into its investment program to avoid such junk bonds.

### 1.    Portfolio-Level Screening

1076.    Silver Elms had approximately 37 portfolio-level tests that it applied to any bond that it even considered purchasing.  To provide one example, Silver Elms would not even consider purchasing a bond unless it was of "investment grade" caliber in general, and in particular, had a Credit Rating Agency rating of at least "A-" (in the case of S&P and Fitch) or "A3" (in the case of Moody's).  Over a ten-year period, the odds of an A3 bond defaulting are 1.8%, according to Moody's data.  Thus, the "riskiest" bonds that Silver Elms was permitted to carry were supposed to have at least a 98.2% likelihood of repaying Silver Elms its principal investment.

1077.    Quantifying default probabilities using standard industry metrics, Silver Elms would only purchase bonds that, on an aggregated weighted average basis, had even higher ratings and lower probabilities of default than any particular bond was permitted to have – at most a 0.55% probability of default over a ten-year period.  These ratings-based metrics are standard industry measures that were used during the relevant time period by the most sophisticated investors in the world to communicate quality and pricing information to one another.  Defendants at all times had actual knowledge of these facts and actual knowledge of the fact that investors like Silver Elms

- 450 -

hardwired such standard industry metrics into their portfolio modeling and bond management programs.  Defendants had actual knowledge of these facts because they created investment programs that were very similar to Silver Elms' program.  There was no way Silver Elms could have known that defendants corrupted the ratings processes, and results, with phony LTV, OOR and other data.

1078.   All of Silver Elms' proposed investments had to satisfy even more quality control tests.  It used computer software called the Standard & Poor's CDO Monitor to make certain that the proposed RMBS would not inhibit it from repaying its own investors.  This computer software provided another layer of investment screening.

### 2.    RMBS-Level Screening

1079.   Although none of the junk bonds at issue in this case would have survived Silver Elms' initial screening *if* the truth about them had been detectable, Silver Elms had in place additional screens that were designed to keep such bonds out of its portfolio.  Silver Elms and its agents hired an experienced asset manager, SFA, to further assist Silver Elms in buying and managing its RMBS.

1080.   SFA was an experienced structured asset manager with significant analytical expertise in RMBS.  SFA employed a robust and thorough investment process to ensure that the RMBS Silver Elms purchased were free of fraud and were prudent investments.  SFA reviewed the LTV ratios, OORs, FICO scores and underwriting guidelines used by the loan originators for the offerings at issue herein before the certificates were purchased.  SFA further employed a proprietary and unique database system to screen the RMBS before purchase.  SFA also reviewed and analyzed the term sheets defendants' provided containing the loan data – loan data such as the underwriting guidelines, LTV ratios, OORs and credit ratings – before proceeding with purchases for Silver Elms.  In addition, SFA had discussions with the defendant underwriters and issuers prior to making a

864087_1

decision on whether Silver Elms should purchase the certificates.  Only after SFA's Credit Committee reviewed all of the above data and found that the RMBS was a prudent investment did the purchase then occur.

1081.    Similar to other plaintiffs, due to the fact that WestLB's New York branch sponsored and provided funding to Silver Elms, Silver Elms had yet another quality control screen in place. WestLB employed a skilled professional who – in advance of Silver Elms' committing to purchase an RMBS – reviewed documents that defendants wrote and filed with the SEC for the purpose of describing the relevant RMBS.  WestLB reviewed such materials, including the various prospectuses and the prospectus supplements described herein, as an additional credit check on each bond that Silver Elms wished to purchase.  This analysis focused on RMBS collateral data, such as the LTV ratios, OORs, and FICO scores associated with the loans supporting the RMBS.  Through this process, Silver Elms again relied upon the credit ratings assigned to the proposed RMBS, as reflected in the prospectuses, prospectus supplements and other Offering Documents that defendants wrote.  This final screen did not detect and could not have detected defendants' fraud because defendants actively concealed their misconduct.

1082.    The revelation that defendants actively and intentionally "waived" known defective loans into their RMBS and knowingly misrepresented some of the key characteristics supporting the RMBS at issue in this case was not known until late September 2010, at the earliest.  That is when Clayton's former President, D. Keith Johnson, testified that Clayton's loan reports showed "huge" numbers of defects and that many of the defective loans were included in the offerings, but that this was concealed from investors and the Credit Rating Agencies.  In September 2010, the FCIC asked Johnson to clarify whether any of Clayton's data was disclosed publicly, noting "from what I can tell, it doesn't look like your [Clayton's] information ever migrated to disclosure."  Johnson agreed,

testifying: "We are not aware of – and we looked at a lo[t] [of] prospectuses – of any of our information . . . going through the prospectus."

1083.   In the end, it never really mattered how much intellectual capital, time, or money Silver Elms or any of the other plaintiffs spent on data, professionals and systems to analyze defendants' RMBS, because only defendants could access the data that revealed the truth about the certificates.   Only defendants had access to the loan files for the RMBS they sold, and only defendants received Clayton's summaries detailing how defective the loans truly were.

**D.    Plaintiff Silver Elms II Actually and Justifiably Relied on the False Information that Defendants Used to Sell the Subject Certificates**

1084.   Plaintiff Silver Elms II – through its assignor and warehousing entity, Paradigm, who essentially acquired securities on Silver Elms II's behalf, generally in accordance with the procedures set forth below – actually and reasonably relied on the false data that defendants used to sell the subject RMBS certificates.   Silver Elms II invested a material amount of capital in RMBS and other securities tied to RMBS.

**1.    Portfolio-Level Screening**

1085.   Silver Elms II had over 60 portfolio-level tests that it applied to any bond that it even considered purchasing and holding. Approximately 25 of these tests focused on the types and percentages of securities that Silver Elms II would consider purchasing.

1086.   For example, none of defendants' certificates in this case would have passed Silver Elms II's rating screens *if* it was possible to determine that defendants had corrupted the Credit Rating Agencies' computer models with "garbage" data.  Moody's models never accounted for this "garbage" data, according to Moody's former President, Brian Clarkson, at the time it rated the RMBS certificates at issue in this case.

1087.   This is significant because Silver Elms II required every bond in its portfolio to possess an "investment grade" rating of at least "A-" (in the case of S&P) or "A3" (in the case of Moody's).  Over a ten-year period, the odds of an A3-rated bond defaulting are 1.8%, according to Moody's data.  Thus, the "riskiest" bonds that Silver Elms II would even consider purchasing were supposed to have at least a 98.2% likelihood of repaying Silver Elms II its principal investment.  For the reasons already stated, defendants at all times knew exactly how ratings metrics impacted pricing and modeling techniques that were used by investors like Silver Elms II during the relevant time period.

1088.   All of Silver Elms II's proposed investments had to satisfy even more quality control tests.  It used computer software called the Standard & Poor's CDO Monitor to make certain that the proposed RMBS would not inhibit it from repaying its own investors.  This computer software provided another layer of investment screening.

## 2.   RMBS-Level Screening

1089.   Silver Elms II hired seasoned asset manager, Princeton, to ensure that all of the RMBS that Silver Elms II purchased satisfied all of the credit and quality control steps outlined above.  Princeton, like other asset managers, invested in technology and personnel to make prudent investment decisions and to make every effort to avoid bonds that were tainted by fraud.  To start, Princeton never would have permitted Silver Elms II to buy any bonds that did not satisfy the portfolio-level screens summarized above.  Princeton's investment processes were regimented, and involved selectively choosing assets for inclusion in the portfolio based on disciplined asset selection.

1090.   Among other things, Princeton's investment process involved credit due diligence focusing on originators, RMBS collateral, the structure of each RMBS and cash flow analyses of RMBS.  Princeton would not have allowed a bond into Silver Elms II's portfolio if it had known that

- 454 -

defendants knowingly used inaccurate LTV, OOR, or underwriting information to describe the bond's credit characteristics and credit ratings. Princeton analyzed RMBS and relied upon these and other data that defendants wrote and disseminated, including pitch books, the various prospectuses and prospectus supplements.

1091.    The personnel whom Princeton employed to conduct these tasks were experienced and had skills in analyzing the credit quality of RMBS. Most of Princeton's employees held graduate or postgraduate certifications, such as being Chartered Financial Analysts ("CFA"), a prestigious and difficult certification to obtain. Princeton required all individuals involved in giving any investment advice to have the highest ethical standards and technical abilities necessary to meet its clients' – including Silver Elms II's – needs. In addition to hiring skilled personnel, Princeton also invested in computer software and technology to help manage Silver Elms II's portfolio.

1092.    Moreover, Silver Elms II's RMBS were also screened by another seasoned investor, Eiger. Eiger was an investment management company specializing in RMBS, whose members came from top investment banks, institutional investors, and accounting or consulting firms. Eiger employed a "bottoms-up" investment approach through its Investment Group, consisting of 17 persons with Masters or Post Graduate degrees and who were CFAs or CFA candidates. Eiger's review of the RMBS before being purchased by Silver Elms II consisted of a rigorous credit review of the RMBS, *i.e.*, a review of the credit characteristics of the loans, such as LTV ratios, OORs and credit ratings, as well as a review of the structure of the RMBS and a relative value assessment. A complete analysis of the underlying collateral pool of an RMBS was conducted by Eiger before purchase by Silver Elms II. Further, purchases were made only after Eiger's Investment Policy Committee thoroughly reviewed and approved the RMBS for purchase. Notwithstanding Eiger's exhaustive review, defendants' well-concealed fraud could not be detected.

- 455 -

1093.    Similar to other plaintiffs, due to the fact that WestLB's New York branch sponsored and provided funding to Silver Elms II, Silver Elms II had yet another quality control screen in place.  WestLB employed a skilled professional who – in advance of Silver Elms II's committing to purchase an RMBS – reviewed documents that defendants wrote and filed with the SEC for the purpose of describing the relevant RMBS.  WestLB reviewed such materials, including the various prospectuses and the prospectus supplements described herein, as an additional credit check on each bond that Silver Elms II wished to purchase.  This analysis focused on RMBS collateral data, such as the LTV ratios, OORs, and FICO scores associated with the loans supporting the RMBS.  Through this process, Silver Elms II again relied upon the credit ratings assigned to the proposed RMBS, as reflected in the prospectuses, prospectus supplements and other Offering Documents that defendants wrote.  This final screen did not detect and could not have detected defendants' fraud because defendants actively concealed their misconduct.

1094.    In the end, it never really mattered how much intellectual capital, time, or money Silver Elms II or any of the other plaintiffs spent on data, professionals and systems to analyze defendants' RMBS, because only defendants could access the data that revealed the truth about the certificates.  Only defendants had access to the loan files for the RMBS they sold, and only defendants received Clayton's summaries detailing how defective the loans truly were.  None of these persons and entities hired by the plaintiffs and/or the entities that originally purchased the certificates that were assigned to plaintiffs received the loan files or the due diligence summaries that defendants received.

### E.    WestLB Actually and Justifiably Relied on the False Information that Defendants Used to Sell the Subject Certificates

1095.    Assignor WestLB actually and reasonably relied on the false data that defendants used to sell the subject certificates.  WestLB invested in RMBS and other securities tied to RMBS

via sound investment processes that would have avoided fraudulent junk bonds like the ones defendants sold in this case, *if* defendants' fraud could have been detected. WestLB's sound investment processes focused on its portfolio and RMBS-level screening processes.

### 1.    Portfolio-Level Screening

1096.    To avoid junk bonds like the ones defendants sold to WestLB in this case, WestLB had numerous different tests that every potential security had to pass before it could even be eligible to buy. For example, every potential security had to be a debt or fixed-income bond, which, unlike equity investments, require the obligor to repay an investor's entire principal plus stated interest during the period in which the borrower holds the investor's funds. WestLB could not even consider buying a bond that was not rated by the two major Credit Rating Agencies, Moody's and S&P. Nor could it buy a bond that was not rated at least "Aa2" by Moody's or "AA" by S&P (both "investment grade" ratings).

### 2.    RMBS-Level Screening

1097.    To further strengthen WestLB's investment processes, it hired experienced external asset managers to help select RMBS that satisfied the portfolio-level screening described above, and to subject the proposed RMBS to additional investment screens. The managers that assisted in the purchase of the securities at issue here were DCP and Strategos. Strategos's diligent investment procedures are described above. *See* §VIII.B, *supra*. DCP's procedures are described below.

1098.    DCP followed a systematic approach to recommending RMBS for WestLB. Among other things, DCP's review of the RMBS before being purchased by WestLB consisted of a rigorous credit review of the RMBS, *i.e.*, a review of the credit characteristics of the loans, such as LTV ratios, OORs and credit ratings, as well as a review of the structure of the RMBS, the performance of the issuer and the servicer, and a relative value assessment. A complete analysis of the underlying collateral pool of an RMBS was conducted by DCP before purchase by WestLB, including review of

- 457 -

all offering documents, risk statistics, and structural protections.  Moreover, purchases were further made only after DCP's investment committee (made up of DCP principals) thoroughly reviewed and unanimously approved the RMBS for purchase.  Notwithstanding DCP's exhaustive review, defendants' well-concealed fraud could not be detected.

1099.  WestLB also employed skilled professionals who – in advance of WestLB committing to purchase an RMBS – reviewed offering documents for the relevant RMBS.  WestLB reviewed such materials, including the various prospectuses and prospectus supplements, as an additional credit check on each bond that WestLB wished to purchase.  This analysis focused on RMBS collateral data such as the LTV ratios, OOR percentages (such as the Primary Residence Percentages) and FICO scores of the borrowers supporting the RMBS.  Through this process, WestLB again relied upon the credit ratings assigned to the proposed RMBS, as reflected in the Offering Documents that defendants wrote.  This final screen did not detect and could not have detected defendants' misrepresentations and omissions.

1100.  If a proposed RMBS failed to pass any one of the diligent investment screening processes described above, then that RMBS would have been rejected and WestLB would not have bought it.  Short of conducting a government-sponsored investigation backed by the full subpoena power of the U.S. Government, WestLB could not have discovered – and did not discover – the fraud alleged herein at any time before late September 2010, when the government released the Clayton documents to the public.  WestLB justifiably relied upon the false data that defendants used to market the certificates.  Defendants cannot blame WestLB for defendants' own misconduct in corrupting the data and ratings that defendants used to market and sell the RMBS on which WestLB relied.

- 458 -

**F.      All of the Assignors and Plaintiffs Were Reasonable and Could Not
Have Discovered the Fraud Alleged Herein**

1101.    Plaintiffs and the assigning entities did not learn that the defendants were making the

misrepresentations and omissions alleged herein prior to purchasing the certificates because such

information about the certificates and loans was peculiarly within defendants' knowledge and

control, and defendants did not allow plaintiffs and the assigning entities access to such information.

The only way for plaintiffs or the assigning entities to learn that defendants were making

misrepresentations and omissions about the certificates and the underlying loans was to have access

to the actual loan files or Clayton's due diligence reports analyzing those loan files.  Defendants had

such access, but did not share it with plaintiffs, the assigning entities, or other investors.

1102.    At the time they purchased the certificates, plaintiffs and the assigning entities could

not determine from available information that defendants had made misrepresentations and

omissions in the Offering Documents.  The information that would have revealed defendants'

misrepresentations and omissions – the loan files – was private information in the complete control

and possession of defendants.  Moreover, information such as "loan tapes," and the like, and other

information defendants supplied to plaintiffs before they purchased the certificates, would not have

revealed borrowers' names or property addresses so that plaintiffs could conduct an investigation.

Such information also would not have revealed defendants' misrepresentations and omissions

because the "loan tapes" and the other information defendants provided to plaintiffs ***contained*** the

falsified appraisal values, LTV ratios, OOR percentages, FICO scores and DTI ratios upon which

defendants' scheme was premised, and thus, revealed nothing concerning the loans' true nature,

characteristics and risks.

1103.    In addition, at the time plaintiffs bought the certificates – 2005 through 2007 – there

were no loan databases available that contained sufficient data to conduct analyses concerning the

LTV ratios and OOR percentages like the ones plaintiffs were able to conduct before filing this complaint. In short, there was no information available to plaintiffs at the time they bought the certificates – other than the loan files, which defendants did not share – that would have allowed plaintiffs or the assigning entities to conduct an investigation that would have revealed that defendants were making misrepresentations and omitting material information in the Offering Documents.

1104. Indeed, plaintiffs could not have learned, and did not learn, that defendants were defrauding them until late September 2010, when the FCIC investigation revealed for the first time that defendants: (1) were told by Clayton in 2006 and 2007 that significant portions of the loans within the offerings did not comply with the underwriting guidelines stated in Offering Documents; and (2) *defendants then knowingly included large numbers of those defective loans into the offerings*. It was only at that time that plaintiffs and the public first learned that defendants were intentionally defrauding investors in connection with RMBS offerings. Specifically, the information disclosed by the FCIC in September 2010 revealed, for the first time, that defendants were expressly aware that their RMBS offerings were filled with defective loans, and that defendants knew so:

(a)      *before* marketing the RMBS;

(b)      *before* describing the collateral underlying the RMBS;

(c)      *before* writing the prospectuses, prospectus supplements and other Offering Documents they used to market the certificates;

(d)      *before* "structuring" the RMBS with the Credit Rating Agencies' data-sensitive models;

(e)      *before* "pricing" the subject RMBS; and

(f)      *before* conveying the false information to plaintiffs or their agents.

1105.   Moreover, it was not until late 2010, when the FCIC and U.S. Senate revealed that defendants were shorting investments like the certificates at the same time that defendants were selling the certificates to plaintiffs and others, that the investing public first learned that defendants were profiting from their inside knowledge about the defective nature of their own RMBS offerings, at plaintiffs' and other investors' expense.

1106.   This information only came to light in late September 2010, and only after the U.S. Government compelled defendants, Clayton, and others to produce documents and testimony that finally revealed defendants' fraud.   Only the unique power of the government to compel people, documents and testimony without bringing a legal action revealed defendants' fraud.   Obviously, plaintiffs do not and did not have such power or unique abilities.   This further serves to demonstrate that plaintiffs and the assigning entities could not have uncovered defendants' misconduct by any means available to them.

## IX.    DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS CAUSED INJURY TO PLAINTIFFS

1107.   Defendants' material misrepresentations and omissions relate directly to plaintiffs' economic losses.   Sophisticated securities dealers like defendants have long known about the relationship between LTV ratios, OORs, credit ratings, title and ownership, and underwriting criteria on the one hand, and the price and performance of an RMBS certificate on the other hand. Defendants' misrepresentations were the actual and proximate causes of plaintiffs' injuries.

### A.    The Relationship Between Original LTV Ratios, Owner Occupancy Data and RMBS Performance

1108.   Original LTV or "OLTV" metrics are among the most important variables indicating whether a loan will default.   Studies conducted by one industry participant, Smith Barney, demonstrate that there is a strong correlation between the likelihood of default of a mortgage loan and the loan's OLTV ratio.   When home prices decrease, borrowers with lower OLTV ratios are

- 461 -

more likely to retain more equity in their homes *even if* housing prices generally decline.  Retaining such equity provides borrowers a powerful incentive to make loan payments, which reduces the propensity of a loan to default.  Retaining such equity also enables the borrower to sell the property, repay the loan and recover value in the event of default.

1109.    Conversely, if a borrower has a higher OLTV ratio, like those that were concealed in this case, there is much less incentive for the borrower to repay the loan if home prices decline or a borrower's financial condition changes, because such borrower would have little equity at risk of loss and therefore far less economic incentive to pay the loan.  As a consequence, from an investor's perspective, a loan with a higher OLTV ratio is a much riskier investment, as there is a much higher chance of default and a much higher risk of incurring a loss because of insufficient collateral for the loan.

1110.    When defendants misrepresented the OLTV ratios associated with the RMBS at issue in this case, they knew that they were also misrepresenting both the propensity of the loans to default *and* their propensity to recover any value and avoid a loss in the event of default.

1111.    Defendants had actual knowledge of the relationship between the OLTV ratios and the value of the RMBS certificates at issue in this case.  *See*, *e.g.*, ARSI 2006-M2 Pros. Supp. at S-12.  Thus, the very documents that defendants wrote to market the RMBS at issue in this case demonstrate that defendants understood the relationship between the misrepresentations that defendants made concerning LTV ratios and plaintiffs' economic harm: an increase in LTV ratios creates a greater risk of loss on the RMBS certificates.

1112.    The foregoing demonstrates that defendants clearly knew that the false OLTV ratios, and the related inflated appraisals they used to sell the certificates, would cause plaintiffs' damages.  The relationship between those inaccurate numbers and plaintiffs' harm is immediate and clear.  Just as industry literature shows a direct relationship between OLTV ratios, defaults and loss severity,

that literature shows the same relationship between OOR percentages and default probabilities. Under every market condition, the OLTV ratios and OOR percentages drive the probability of a loan defaulting. Under every market condition, OLTV ratios and OOR percentages also drive the degree of loss that will be suffered in the event of a loan default. As illustrated above, defendants say as much in their own Offering Documents.

1113. But that is not the full extent of defendants' fraud as it relates to OLTV ratios and OOR percentages in this case. Defendants further inflated the prices of the RMBS in this case by entering inaccurate OLTV and OOR numbers into the Credit Rating Agencies' computerized ratings models to secure artificially inflated ratings. This misconduct also relates to plaintiffs' losses.

### B.    The Relationship Between Credit Ratings and RMBS Performance

1114. It is already clear that defendants used "garbage" data to get overrated, inflated credit ratings assigned to the certificates at issue in this case. These false credit ratings, based on false facts, also contributed directly to plaintiffs' damages.

1115. When the Credit Rating Agencies began downgrading the certificates at issue in this case to speculative or "junk" grade levels and below because of escalating default rates, it became apparent that the certificates did not have the creditworthiness defendants had portrayed. As a result, the market value of the certificates plummeted. Because of defendants' misrepresentations and omissions, plaintiffs and the assigning entities suffered damages in the form of overpaying for the certificates in the first instance. Plaintiffs and the assigning entities also suffered damages as a result of defendants' misrepresentations and omissions when the risky loans defaulted, causing plaintiffs to lose principal and interest payments and incur writedowns to the loan pools underlying the certificates. Thirty-nine of the 74 certificates are now in default.

1116. Industry executives have explained how false credit ratings relate to losses on RMBS products like those defendants sold in this case. According to Charles Prince, the former CEO of

Citigroup, the largest bank in the world, the Credit Rating Agencies' downgrades were "the precipitating event in the financial crisis."

1117.   Downgrades to junk revealed the truth that the original ratings – like the OLTV and OOR data – were based on false and inaccurate information on the day they were issued.  It is not possible to ascribe this inaccurate information to mistakes in the origination or structuring processes outside of defendants' control.  Rather, as revealed by the government's disclosure of the Clayton data in September 2010, defendants were well aware of reports detailing the inaccurate OLTV, OOR and ratings data used to structure the RMBS at issue in this case *before* making, structuring and selling their RMBS to plaintiffs, and defendants nonetheless deliberately decided to misrepresent that data to plaintiffs, the Credit Rating Agencies, and other investors, so that they could profit.

### C.    The Relationship Between Underwriting and RMBS Performance

1118.   Defendants also concealed rampant, systematic violations of stated loan underwriting standards to maximize their profits at plaintiffs' expense.  Underwriting, by definition, refers to the process of determining a borrower's ability and willingness to repay a loan.  As with LTV ratios, OORs and credit ratings, defendants' decision to misrepresent underwriting standards relates directly to plaintiffs' economic damages.

1119.   Government investigations demonstrate the direct link between defendants' misrepresentations about underwriting standards and plaintiffs' economic harm.  On or about March 13, 2008, for example, after a seven-month investigation requested by the President of the United States, a working group led by the Secretary of Treasury and including the chairmen of the Federal Reserve, the SEC, and the Commodities Futures Trading Commission, issued a report finding that: (i) "a significant erosion of market discipline by those involved in the securitization process, including originators, underwriters, credit rating agencies and global investors, related in part to

- 464 -

failures to provide adequate risk disclosures"; and (ii) "[t]he turmoil in financial markets clearly was triggered by a dramatic weakening of underwriting standards for U.S. subprime mortgages."

1120.   Indeed, contrary to defendants' expected efforts to claim that plaintiffs' certificates declined in value because of this Nation's economic collapse, in fact the opposite is true – defendants' systemic misrepresentations in the Offering Documents caused plaintiffs' and many other investors' certificates to plummet in value, which in turn caused this Nation's financial collapse.  Defendants' systemic misrepresentations and omissions concerning the loans at issue caused plaintiffs' damages, and thereafter "*the high risk loans [defendants] issued became the fuel that ignited the financial crisis*."  Levin-Coburn Report at 50; *see also id*. at 475 ("*The widespread losses caused by . . . RMBS securities originated by investment banks [which contained "poor quality assets"] are a key cause of the financial crisis that affected the global financial system in 2007 and 2008*.").

1121.   When it became known that the loans in the offerings were much riskier than represented, through skyrocketing default rates that led to major credit downgrades to the certificates, it also became apparent that the loans had not been originated pursuant to the underwriting standards represented in the Offering Documents.  It became apparent then that the loans had been originated in a slipshod fashion, with little regard to the most basic underwriting guideline of all – determining whether the borrower could repay the loan.  This fact too was a cause of the plummeting value of plaintiffs' certificates, and a contributing cause of plaintiffs' damages.  Therefore, defendants' misrepresentations about underwriting standards directly and proximately caused plaintiffs' injuries.

- 465 -

### D.    The Relationship Between Proper and Timely Transfer of Title and Plaintiffs' Damages

1122.    Defendants' misrepresentations that the loans would be properly and timely transferred to the trusts were also a proximate cause of plaintiffs' economic damages.  Plaintiffs believed they were purchasing mortgage-***backed*** securities.  Given that the certificates are lacking much of the backing or collateral that was supposed to be providing security, and guaranteeing a source of funds if the loans defaulted, the certificates have lost value as it has become known that the RMBS might actually be ***non***-mortgage-backed securities.  In other words, the lack of collateral underlying the certificates has caused an understandable and logical diminution in the value of the certificates.  As Professor Levitin noted in his testimony to Congress in November 2010, the failure to properly or timely transfer title would have "profound implications for [R]MBS investors," and would cause trillions of dollars in damages.  Defendants' misrepresentations concerning the transfer of title proximately caused plaintiffs' damages.

## FIRST CAUSE OF ACTION

## (Common Law Fraud Against All Defendants)

1123.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

1124.    As alleged above, in the Offering Documents, defendants made false and misleading statements of material fact, and omitted material facts necessary in order to make their statements, in light of the circumstances under which the statements were made, not misleading.

1125.    As corporate parent of its wholly-owned subsidiaries, JPMorgan Chase & Co. directed and controlled the activities of its co-defendants, and used them as conduits to conduct the RMBS offerings alleged herein.

- 466 -

1126.    Defendants knew at the time they sold and marketed each of the certificates that the foregoing statements were false and misleading or, at the very least, were made recklessly.

1127.    Defendants made these materially false and misleading statements and omissions for the purpose of inducing plaintiffs (and the assigning entities) to purchase the certificates. Furthermore, these statements related to these defendants' own acts and omissions.

1128.    Defendants knew or recklessly disregarded that investors like plaintiffs (and the assigning entities) were relying on defendants' expertise, and defendants encouraged such reliance through the Offering Documents, as described herein.  Defendants knew or recklessly disregarded that investors like plaintiffs (and the assigning entities) would rely upon defendants' representations in connection with their decisions to purchase the certificates.  As alleged herein, defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

1129.    It was only by making such misrepresentations and omissions that defendants were able to induce plaintiffs (and the assigning entities) to buy the certificates.  Plaintiffs (and the assigning entities) would not have purchased or otherwise acquired the certificates but for defendants' fraudulent representations and omissions about the quality of the certificates and the underlying loans.

1130.    Plaintiffs (and the assigning entities) actually, justifiably, reasonably, and foreseeably relied upon defendants' false and misleading representations and omissions regarding the certificates and the underlying loans.

1131.    As a result of defendants' false and misleading statements and omissions, as alleged herein, plaintiffs (and the assigning entities) have suffered substantial damages.

1132.    The JPMorgan Defendants also defrauded plaintiffs (and the assigning entities) by concealing from plaintiffs (and the assigning entities) that such defendants were "shorting" RMBS

- 467 -

like the certificates sold to plaintiffs (and the assigning entities) at the same time those defendants

sold the certificates at issue to plaintiffs (and the assigning entities).  The JPMorgan Defendants

further defrauded plaintiffs (and the assigning entities) by concealing that they called the certificates

and other like RMBS "SACK[S] OF SHIT" and "DOG[S]," at the same time they sold the

certificates to plaintiffs (and the assigning entities) while also shorting them.

1133.   Because defendants committed these acts and omissions maliciously, wantonly and

oppressively, and because the consequences of these acts knowingly affected the general public,

including, but not limited to, all persons with interests in the RMBS, plaintiffs (through themselves

and the assigning entities) are entitled to recover punitive damages.

## SECOND CAUSE OF ACTION

### (Fraudulent Inducement Against All Defendants)

1134.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as

if fully set forth herein.

1135.   As alleged above, in the Offering Documents defendants made fraudulent, false and

misleading statements of material fact, and omitted material facts necessary in order to make their

statements, in light of the circumstances under which the statements were made, not misleading.

The JPMorgan Defendants also omitted that they were "shorting" plaintiffs' certificates, and other

similar RMBS, at the same time those defendants sold the certificates at issue herein to plaintiffs

(and the assigning entities).  The JPMorgan Defendants also omitted that they called RMBS like the

certificates sold to plaintiffs (and the assigning entities) "SACK[S] OF SHIT" and "DOG[S]" while

selling them to plaintiffs.

1136.   This is a claim for fraudulent inducement against all of the defendants.  As a

corporate parent, defendant JPMorgan Chase & Co. directed the activities of its co-defendant

subsidiaries and used them as conduits to conduct the RMBS offerings alleged herein.

1137.   Defendants knew at the time they sold and marketed each of the certificates that the foregoing statements were false and misleading or, at the very least, made recklessly.

1138.   Defendants made these materially false and misleading statements and omissions for the purpose of inducing plaintiffs (and the assigning entities) to purchase the certificates. Furthermore, these statements related to defendants' own acts and omissions.

1139.   Defendants knew or recklessly disregarded that investors like plaintiffs (and the assigning entities) were relying on defendants' expertise, and defendants encouraged such reliance through the Offering Documents, as described herein.  Defendants knew or recklessly disregarded that investors like plaintiffs (and the assigning entities) would rely upon defendants' representations in connection with their decisions to purchase the certificates.  As alleged herein, defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

1140.   It was only by making such misrepresentations and omissions that defendants were able to induce plaintiffs (and the assigning entities) to buy the certificates.  Plaintiffs (and the assigning entities) would not have purchased or otherwise acquired the certificates but for defendants' fraudulent representations and omissions about the certificates and the underlying loans.

1141.   Plaintiffs (and the assigning entities) actually, justifiably, reasonably, and foreseeably relied upon defendants' false and misleading representations and omissions regarding the certificates and underlying loans.

1142.   By virtue of defendants' false and misleading statements and omissions, as alleged herein, plaintiffs (and the assigning entities) have suffered substantial damages and are also entitled to rescission or rescissory damages.

1143.   In addition, because defendants acted maliciously, wantonly and oppressively, and defendants' acts affected the general public, plaintiffs are entitled to recover punitive damages.

864087_1

### THIRD CAUSE OF ACTION

### (Aiding and Abetting Fraud Against All Defendants)

1144.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

1145.   This is a claim against each of the defendants for aiding and abetting the fraud by their co-defendants.  Specifically, each of the JPMorgan Defendants aided and abetted each of the other JPMorgan Defendants.

1146.   Each of the defendants knew of the fraud perpetrated by the each of their co-defendants on plaintiffs (and the assigning entities).  As alleged in detail above, each of the defendants knew that the certificates were not backed by loans of the quality represented by defendants, and were not underwritten according to the originators' stated underwriting standards. In fact, defendants owned originators and/or conducted due diligence on the loan pools securitized into the offerings purchased by plaintiffs (and the assigning entities) and identified the originators' deviations from the loan underwriting and appraisal standards set forth in the Offering Documents and knew that the LTV ratios, OOR percentages (including the Primary Residence Percentages) and credit ratings in the Offering Documents were false.  Each of the defendants also knew that their representations that they had timely and properly transferred title to the mortgage loans were false. Each of the defendants concealed from plaintiffs (and the assigning entities) that some of their co-defendants thought that RMBS, like the certificates, were "SACK[S] OF SHIT" and "DOG[S]," and were simultaneously "shorting" the same types of investments that they were selling to plaintiffs (and the assigning entities).  Each of the defendants participated in those violations of their co-defendants, and had actual knowledge of their own acts and participated in and had actual knowledge of their co-defendants' fraudulent acts alleged herein.

- 470 -

1147.   Furthermore, each of the defendants provided their co-defendants with substantial assistance in advancing the commission of their fraud.  As alleged in detail above, each of the defendants participated in the following acts constituting the fraud with their co-defendants: making false and misleading statements and omissions in the Offering Documents about the originators' loan underwriting and appraisal standards, the loans' LTV ratios, the loans' OOR percentages (including the Primary Residence Percentages), the certificates' credit ratings, and the transfer of title of the mortgage loans; providing false information about the loans underlying the certificates to the Credit Rating Agencies; providing false information for use in the Offering Documents; concealing from plaintiffs (and the assigning entities) the originators' deviations from their stated mortgage loan underwriting and appraisal standards; concealing from plaintiffs (and the assigning entities) that some of their co-defendants called RMBS like the certificates sold to plaintiffs (and the assigning parties) "SACK[S] OF SHIT" "DOG[S];" and concealing from plaintiffs (and the assigning entities) that they were shorting the certificates and other similar RMBS.

1148.   It was foreseeable to each of the defendants at the time they actively assisted in the commission of their co-defendants' frauds that plaintiffs (and the assigning entities) would be harmed as a result of each of the defendants' assistance of their co-defendants.

1149.   As a direct and natural result of the frauds committed by each defendant, and each defendant's knowing and active participation in each fraud committed by such defendant's co-defendants, plaintiffs (and the assigning entities) have suffered substantial damages.

1150.   In addition, because defendants acted maliciously, wantonly and oppressively, and defendants' acts affected the general public, plaintiffs are entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION

### (Negligent Misrepresentation Against All Defendants)

1151.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as if fully set forth herein, except any allegations that defendants made any untrue statements and omissions intentionally or recklessly.  For the purposes of this cause of action, plaintiffs expressly disclaim any claim of fraud or intentional or reckless misconduct.

1152.   This is a claim for negligent misrepresentation against all defendants.

1153.   Plaintiffs (and the assigning entities) made 74 separate investments in 47 offerings of RMBS that the defendants securitized and sold.

1154.   It is a required industry practice for underwriters of RMBS offerings to perform an investigation of the loans backing the certificates to ensure that the quality of the loans is as represented in the offering documents provided to investors.  In fact, U.S. securities laws require defendants to "*perform a review of the pool assets underlying the asset-backed security*" and ensure that such information shall be disclosed in the offering documents and "*is accurate in all material respects*."   17 C.F.R. §230.193.   In addition, "[p]rospective investors look to the underwriter – a fact well known to all concerned and *especially to the underwriter* – to pass on the soundness of the security and the correctness of the [offering documents]."  *Chris-Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973).

1155.   Because of the foregoing, defendants conducted due diligence and investigated the loans that backed their RMBS offerings.  The purpose and effect of defendants' legal obligations as underwriters to conduct due diligence and ensure the correctness of the statements in the Offering Documents, as well as the investing public's understanding that the RMBS underwriters perform such due diligence to ensure the accuracy of statements made in the Offering Documents, was to assure plaintiffs (and the assigning entities) that they could reasonably rely upon the Offering

- 472 -

Documents.  Moreover, by virtue of the due diligence defendants performed, and their extensive role in originating, purchasing, securitizing and selling the certificates that plaintiffs (and the assigning entities) purchased, defendants had extremely unique and special knowledge and expertise regarding the loans backing those certificates, including the loans' quality, the nature of their underwriting, their value and adequacy as collateral, their LTV ratios, their OOR percentages, and the title to such loans.

1156.   In particular, because plaintiffs (and the assigning entities) did not have access to the loan files for the mortgage loans, or defendants' due diligence and valuation reports, while only defendants did, and because plaintiffs (and the assigning entities) could not examine the underwriting quality of the mortgage loans underlying the offerings on a loan-by-loan basis, plaintiffs (and the assigning entities) were heavily dependent on defendants' unique and special knowledge and expertise regarding the loans that backed the certificates at issue herein when determining whether to invest in each certificate.  Plaintiffs (and the assigning entities) were entirely dependent on defendants to provide accurate and truthful information regarding the loans because plaintiffs (and the assigning entities) had no access to the loan files, which were completely within defendants' control.  Moreover, as alleged above, at the time plaintiffs (and the assigning entities) purchased the certificates, plaintiffs (and the assigning entities) had no ability to test the veracity of defendants' representations in the Offering Documents concerning the loans because there were no loan databases available in the 2005 to 2007 time period which would allow plaintiffs (or the assigning entities) to conduct sufficient analyses, like the analyses plaintiffs performed prior to filing this complaint.  Accordingly, defendants were uniquely situated to evaluate the safety and economics of each certificate sold to plaintiffs (and the assigning entities) and the loans underlying them.

1157.  Because plaintiffs (and the assigning entities) were without access to critical information regarding the loans backing the certificates, and defendants had a legal obligation to

perform due diligence on the loans and ensure any statements made about the loans in the Offering Documents were truthful and accurate, and plaintiffs (and the assigning entities) had the understanding that RMBS underwriters performed due diligence to ensure the accuracy of the Offering Documents, defendants had a duty to plaintiffs (and the assigning entities) to verify the "accuracy" and truthfulness of the Offering Documents.

1158.    Over the course of over three years, for 74 separate investments, plaintiffs (and the assigning entities) relied on defendants' unique and special knowledge regarding the quality of the underlying mortgage loans, and defendants' underwriting when determining whether to invest in the certificates.  This longstanding relationship, coupled with defendants' unique and special position of knowledge about the underlying loans, created a special relationship of trust, confidence, and dependence between defendants and plaintiffs (and the assigning entities).

1159.    Defendants were aware that plaintiffs (and the assigning entities) relied on defendants' unique and special position, expertise and experience, and depended upon defendants for accurate and truthful information.  Defendants also knew that the actual true statistics regarding the loans and the loans' compliance with the stated underwriting standards were exclusively within defendants' knowledge.

1160.    Based on defendants' expertise, superior knowledge, legal duties, and relationship with plaintiffs (and the assigning entities), defendants owed a duty to plaintiffs (and the assigning entities) to provide complete, accurate, truthful and timely information regarding the mortgage loans and the certificates.  Defendants breached their duty to provide such information to plaintiffs (and the assigning entities).

1161.    Defendants likewise made misrepresentations which they knew, or were negligent in not knowing at the time, to be false and misleading in order to induce plaintiffs' (and the assigning entities') investment in the certificates.  Defendants provided the Offering Documents to plaintiffs

(and the assigning entities) in connection with the sale of the certificates, for the purpose of informing plaintiffs (and the assigning entities) of material facts necessary to make an informed judgment about whether to purchase the certificates in the offerings. In providing these documents, defendants knew that the information contained and incorporated therein would be used for a serious purpose, and that plaintiffs (and the assigning entities), like other reasonably prudent investors, intended to rely on the information contained in the Offering Documents.

1162.    As alleged above, the Offering Documents contained materially false and misleading information and omissions, including, without limitation, misrepresentations concerning the underwriting guidelines, appraisals, LTV ratios, Primary Residence Percentages, credit ratings, and the transfer of title to the loans, and the omissions that the JPMorgan Defendants were shorting the certificates and other similar RMBS at the same time those defendants sold the certificates to plaintiffs (and the assigning entities), and while some of those defendants called them "SACK[S] OF SHIT" and "DOG[S]."

1163.    Defendants acted negligently in making the materially false and misleading statements and omissions to plaintiffs (and the assigning entities).

1164.    Unaware that the Offering Documents contained materially false and misleading statements and omissions, plaintiffs (and the assigning entities) reasonably relied on those false and misleading statements and omissions when deciding to purchase the certificates.

1165.    Plaintiffs (and the assigning entities) purchased certificates from defendant JPMorgan Securities LLC (and its predecessor Bear Stearns Co.) in the offerings, and are therefore in privity with them.

1166.    Based on defendants' expertise and specialized knowledge, and in light of the false and misleading representations and omissions in the Offering Documents, defendants owed plaintiffs (and the assigning entities) a duty to provide them with complete, accurate, truthful and timely

- 475 -

information regarding the quality of the certificates and underlying loans, and their title, and

defendants breached their duty to provide such information to plaintiffs (and the assigning entities).

1167.    Plaintiffs (and the assigning entities) reasonably relied on the information provided by

defendants and have suffered substantial damages as a result of defendants' misrepresentations.

### FIFTH CAUSE OF ACTION

**(Rescission Based upon Mutual Mistake
Against J.P. Morgan Securities LLC (including Bear Stearns Co.))**

1168.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as

if fully set forth herein.

1169.    Based on the representations in the Offering Documents, both the underwriter

defendant J.P. Morgan Securities LLC (which includes Bear Stearns Co.), which sold the

certificates, and the plaintiffs (and the assigning entities), which purchased them, believed that the

mortgages and notes described in the Offering Documents had been validly assigned to the trusts

and/or trustees at the time the certificates were purchased.

1170.    As alleged above, however, the vast majority of the mortgages and notes were, in

fact, not timely or properly assigned to the trusts and/or trustees at the time the certificates were

purchased by plaintiffs (and the assigning entities).

1171.    Therefore, a mutual mistake existed at the time that plaintiffs (and the assigning

entities) contracted for the sale of the certificates.

1172.    The assignment of the mortgages and notes to the trusts and/or trustees was a crucial

fact that went to the heart of each of the offerings at issue here.  Without proper assignments, the

trustees for the trusts have no legal right to foreclose on the collateral in the event a borrower

defaults, the trusts do not own the mortgages and the notes, and the trusts do not qualify for REMIC

tax classification.  Without proper and timely assignments, the trusts bear a substantial risk of being

subjected to heavy tax assessments and penalties which are ultimately borne by investors such as plaintiffs.

1173.   These were significant risks that were undisclosed due to the misrepresentations in the Offering Documents, and were neither part of plaintiffs' (or the assigning entities') investment objectives, nor defendants' purported investment offer.  Had plaintiffs (and the assigning entities) known that the mortgages and notes had not been properly and timely assigned to the trusts, they would not have purchased the certificates.

1174.   Because a mutual mistake of a material fact existed at the time plaintiffs (and the assigning entities) contracted for the sale of the certificates, the transactions are void and plaintiffs are therefore entitled to rescission.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

(a)    Awarding compensatory damages in favor of plaintiffs against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon.

(b)    Awarding punitive damages for plaintiffs' common-law fraud claims.

(c)    Alternatively, awarding plaintiffs the right to rescission and/or rescissory damages, as to all defendants, sustained as a result of defendants' wrongdoing and/or mutual mistake.

(d)    Awarding plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)    Such other relief, including equitable relief, as the Court may deem just and proper.

864087_1

**JURY DEMAND**

1175.  Plaintiffs demand a trial by jury on all claims so triable.

DATED:  August 20, 2013                    ROBBINS GELLER RUDMAN
                                                              & DOWD LLP
                                                           SAMUEL H. RUDMAN
                                                           WILLIAM J. GEDDISH


                                                              s/ SAMUEL H. RUDMAN
                                                           SAMUEL H. RUDMAN

                                                           58 South Service Road, Suite 200
                                                           Melville, NY  11747
                                                           Telephone:  631/367-7100
                                                           631/367-1173 (fax)

                                                           ROBBINS GELLER RUDMAN
                                                              & DOWD LLP
                                                           ARTHUR C. LEAHY
                                                           SCOTT H. SAHAM
                                                           LUCAS F. OLTS
                                                           NATHAN R. LINDELL
                                                           CAROLINE M. ROBERT
                                                           655 West Broadway, Suite 1900
                                                           San Diego, CA  92101-3301
                                                           Telephone:  619/231-1058
                                                           619/231-7423 (fax)

                                                           Attorneys for Plaintiffs

864087_1

**Appendix A**

| Offering | Issue Date | Depositor | Sponsor | Defendant Underwriter | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Plaintiff | Seller |
|---|---|---|---|---|---|---|---|---|---|---|
| ARSI 2006-M2 | 8/29/2006 | Argent Securities Inc. | Ameriquest | J.P. Morgan Securities | A2D | 04013BAD4 | 8/29/2006 | $22,080,000.00 | Phoenix | J.P. Morgan Securities |
| | | | | | M2 | 04013BAF9 | 8/18/2006 | $7,000,000.00 | Silver Elms II | J.P. Morgan Securities |
| | | | | | M3 | 04013BAG7 | 8/18/2006 | $5,000,000.00 | Silver Elms II | J.P. Morgan Securities |
| BALTA 2005-7 | 7/29/2005 | Structured Asset Mortgage | EMC Mortgage | Bear Stearns Co. | 11A2 | 07386HVH1 | 8/12/2005 | $9,055,000.00 | Phoenix | Bear Stearns Co. |
| | | | | | 12A2 | 07386HVK4 | 8/12/2005 | $30,570,000.00 | Phoenix | Bear Stearns Co. |
| | | | | | 12A3 | 07386HVL2 | 8/12/2005 | $24,569,000.00 | Phoenix | Bear Stearns Co. |
| | | | | | 1M1 | 07386HVM0 | 8/5/2005 | $25,619,000.00 | Phoenix | Bear Stearns Co. |
| BALTA 2005-8 | 8/31/2005 | Structured Asset Mortgage | EMC Mortgage | Bear Stearns Co. | 11A1 | 07386HWR8 | 8/10/2005 | $98,823,000.00 | Phoenix | Bear Stearns Co. |
| | | | | | 11A2 | 07386HWS6 | 8/10/2005 | $69,743,000.00 | Phoenix | Bear Stearns Co. |
| | | | | | 1M1 | 07386HWV9 | 9/1/2005 | $21,193,000.00 | Phoenix | Bear Stearns Co. |
| BALTA 2006-2 | 3/31/2006 | Structured Asset Mortgage | EMC Mortgage | Bear Stearns Co. | 2B2 | 07386HG70 | 3/8/2006 | $3,835,000.00 | Silver Elms | Bear Stearns Co. |
| BALTA 2006-3 | 4/28/2006 | Structured Asset Mortgage | EMC Mortgage | Bear Stearns Co. | 1M1 | 07386HK42 | 4/27/2006 | $15,000,000.00 | Phoenix | Bear Stearns Co. |
| | | | | | 2B1 | 07386HM32 | 4/18/2006 | $5,750,000.00 | Silver Elms | Bear Stearns Co. |
| BSABS 2005-AC4 | 6/20/2005 | BSABS | EMC Mortgage | Bear Stearns Co. | M3 | 073879YK8 | 4/4/2006 | $4,842,000.00 | Silver Elms II | Citigroup |
| BSABS 2006-HE10 | 12/29/2006 | BSABS | EMC Mortgage | Bear Stearns Co. | 2M6 | 07389RAY2 | 12/19/2006 | $11,845,000.00 | Kleros V | Bear Stearns Co. |
| BSABS 2006-HE9 | 11/30/2006 | BSABS | EMC Mortgage | Bear Stearns Co. | M5 | 07389MAK3 | 11/3/2006 | $5,000,000.00 | Kleros V | J.P. Morgan Securities |
| BSABS 2006-IM1 | 4/25/2006 | BSABS | EMC Mortgage | Bear Stearns Co. | M6 | 07387UFL0 | 2/14/2006 | $2,267,000.00 | Silver Elms | Bear Stearns Co. |
| BSABS 2007-HE1 | 1/30/2007 | BSABS | EMC Mortgage | Bear Stearns Co. | 21A2 | 07389UAP4 | 1/23/2007 | $20,000,000.00 | Phoenix | Bear Stearns Co. |
| BSMF 2006-AR3 | 10/31/2006 | Structured Asset Mortgage | EMC Mortgage | Bear Stearns Co. | 1B2 | 07400HAG8 | 12/15/2006 | $8,229,000.00 | Silver Elms II | Bear Stearns Co. |
| | | | | | 1B3 | 07400HAH6 | 12/15/2006 | $3,032,000.00 | Silver Elms II | Bear Stearns Co. |
| BSMF 2006-SL1 | 7/28/2006 | BSABS | EMC Mortgage | Bear Stearns Co. | M2 | 07400WAC4 | 7/20/2006 | $12,015,000.00 | Phoenix | Bear Stearns Co. |
| | | | | | M5 | 07400WAF7 | 7/20/2006 | $9,776,000.00 | Phoenix | Bear Stearns Co. |
| BSMF 2006-SL4 | 11/10/2006 | BSABS | EMC Mortgage | Bear Stearns Co. | M2 | 07401GAC8 | 11/3/2006 | $7,474,000.00 | Kleros V | J.P. Morgan Securities |
| BSMF 2007-AR3 | 3/30/2007 | Structured Asset Mortgage | EMC Mortgage | Bear Stearns Co. | 1A1 | 07401VAA9 | 2/23/2007 | $58,300,000.00 | Phoenix | Bear Stearns Co. |

| Offering | Issue Date | Depositor | Sponsor | Defendant Underwriter | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Plaintiff | Seller |
|---|---|---|---|---|---|---|---|---|---|---|
| BSMF 2007-AR5 | 6/29/2007 | Structured Asset Mortgage | EMC Mortgage | Bear Stearns Co. | 2A1 | 07400NAS9 | 9/13/2007 | $15,000,000.00 | Blue Heron IX | Bear Stearns Co. |
| | | | | | 2A1 | 07400NAS9 | 9/13/2007 | $15,000,000.00 | Blue Heron V | Bear Stearns Co. |
| | | | | | 2A1 | 07400NAS9 | 9/13/2007 | $5,000,000.00 | Blue Heron VI | Bear Stearns Co. |
| | | | | | 2A1 | 07400NAS9 | 9/13/2007 | $5,000,000.00 | Blue Heron VII | Bear Stearns Co. |
| BSMF 2007-SL1 | 1/30/2007 | BSABS | EMC Mortgage | Bear Stearns Co. | M2 | 07401PAD6 | 1/18/2007 | $6,000,000.00 | Kleros V | Bear Stearns Co. |
| CARR 2006-NC3 | 8/10/2006 | Stanwich Asset Accept. Co. | Carrington Securities | Bear Stearns Co. | M4 | 144528AH9 | 8/2/2006 | $12,000,000.00 | Kleros V | Bear Stearns Co. |
| CARR 2006-NC5 | 12/19/2006 | Stanwich Asset Accept. Co. | Carrington Securities | J.P. Morgan Securities | M1 | 144539AF0 | 5/9/2007 | $309,000.00 | Kleros V | Lehman Bros. |
| CARR 2007-FRE1 | 4/5/2007 | Stanwich Asset Accept. Co. | Carrington Securities | J.P. Morgan Securities | M2 | 144527AF5 | 4/5/2007 | $5,178,000.00 | Silver Elms | J.P. Morgan Securities |
| | | | | | M3 | 144527AG3 | 5/22/2007 | $200,000.00 | Kleros V | J.P. Morgan Securities |
| CBASS 2006-CB7 | 10/5/2006 | Bond Securitization, LLC | CBASS | J.P. Morgan Securities | M6 | 12479DAL2 | 10/2/2006 | $2,500,000.00 | Kleros V | J.P. Morgan Securities |
| CHASE 2006-S3 | 10/1/2006 | CMFC | Chase Home | J.P. Morgan Securities | 1A2 | 16162XAB3 | 10/6/2006 | $12,000,000.00 | Kleros V | J.P. Morgan Securities |
| IMM 2005-6 | 9/9/2005 | IMH Assets Corp. | Impac | Bear Stearns Co. | 1A1 | 45254NQG5 | 9/2/2005 | $11,000,000.00 | Blue Heron II | Merrill Lynch |
| | | | | | 1A1 | 45254NQG5 | 9/2/2005 | $24,000,000.00 | Blue Heron IX | Merrill Lynch |
| | | | | | 1A1 | 45254NQG5 | 9/2/2005 | $20,000,000.00 | Blue Heron V | Merrill Lynch |
| IMSA 2006-1 | 3/30/2006 | Impac Secured Assets Corp. | Impac | Bear Stearns Co. | 1A2B | 45254TTL8 | 3/29/2006 | $75,706,000.00 | Phoenix | Bear Stearns Co. |
| | | | | | 1A2C | 45254TTM6 | 3/29/2006 | $4,999,999.99 | Silver Elms | Bear Stearns Co. |
| IMSA 2006-4 | 11/16/2006 | Impac Secured Assets Corp. | Impac | Bear Stearns Co. | A2C | 45257BAD2 | 11/16/2006 | $30,000,000.00 | Phoenix | Bear Stearns Co. |
| | | | | | M5 | 45257BAK6 | 11/3/2006 | $1,925,000.00 | Silver Elms II | Bear Stearns Co. |
| | | | | | M6 | 45257BAL4 | 11/3/2006 | $1,750,000.00 | Silver Elms II | Bear Stearns Co. |
| IMSA 2006-5 | 12/21/2006 | Impac Secured Assets Corp. | Impac | Bear Stearns Co. | 1M2 | 45257EAG9 | 12/20/2006 | $4,570,000.00 | Phoenix | Bear Stearns Co. |
| | | | | | 1M3 | 45257EAH7 | 12/20/2006 | $1,400,000.00 | Phoenix | Bear Stearns Co. |
| IMSA 2007-2 | 3/29/2007 | Impac Secured Assets Corp. | Impac | Bear Stearns Co. | 1A1B | 452570AB0 | 3/27/2007 | $40,000,000.00 | Phoenix | Bear Stearns Co. |
| IMSA 2007-3 | 4/30/2007 | Impac Secured Assets Corp. | Impac | Bear Stearns Co. | A1B | 45257VAB2 | 4/20/2007 | $25,000,000.00 | Phoenix | Bear Stearns Co. |
| INDX 2006-AR29 | 9/29/2006 | IndyMac MBS | IndyMac | J.P. Morgan Securities | A4 | 45662DAD7 | 9/26/2006 | $19,396,000.00 | Phoenix | J.P. Morgan Securities |
| | | | | | M6 | 45662DAM7 | 9/26/2006 | $4,178,000.00 | Silver Elms II | J.P. Morgan Securities |
| JPALT 2006-A7 | 11/30/2006 | JPMAC | JPMMAC | J.P. Morgan Securities | 1A4 | 466286AD3 | 11/30/2006 | $9,239,000.00 | Phoenix | J.P. Morgan Securities |
| JPALT 2007-A1 | 2/28/2007 | JPMAC | JPMMAC | J.P. Morgan Securities | 1A1A | 466287AA7 | 2/15/2007 | $25,000,000.00 | Phoenix | J.P. Morgan Securities |
| JPMAC 2006-HE3 | 11/10/2006 | JPMAC | JPMMAC | J.P. Morgan Securities | M5 | 46629VAK1 | 10/27/2006 | $3,500,000.00 | Kleros V | J.P. Morgan Securities |

| Offering | Issue Date | Depositor | Sponsor | Defendant Underwriter | Tranche Purchased | CUSIP | Purchase Date | Original Face Amount | Plaintiff | Seller |
|---|---|---|---|---|---|---|---|---|---|---|
| JPMAC 2006-NC1 | 4/27/2006 | JPMAC | JPMMAC | J.P. Morgan Securities | M6 | 46626LJW1 | 4/11/2006 | $2,492,000.00 | Silver Elms II | J.P. Morgan Securities |
| JPMAC 2006-NC2 | 8/23/2006 | JPMAC | JPMMAC | J.P. Morgan Securities | M2 | 46629FAF7 | 8/14/2006 | $5,500,000.00 | Silver Elms II | J.P. Morgan Securities |
| JPMAC 2006-RM1 | 9/27/2006 | JPMAC | JPMMAC | J.P. Morgan Securities | M4 | 46629NAK9 | 9/21/2006 | $8,549,000.00 | Kleros V | J.P. Morgan Securities |
| JPMAC 2006-WMC3 | 9/14/2006 | JPMAC | JPMMAC | J.P. Morgan Securities | M4 | 46629KAK5 | 8/22/2006 | $2,000,000.00 | Silver Elms II | J.P. Morgan Securities |
| | | | | | M6 | 46629KAM1 | 8/22/2006 | $2,500,000.00 | Silver Elms II | J.P. Morgan Securities |
| JPMAC 2006-WMC4 | 12/20/2006 | JPMAC | JPMMAC | J.P. Morgan Securities | M6 | 46630BAM8 | 12/15/2006 | $10,224,000.00 | Kleros V | J.P. Morgan Securities |
| JPMMT 2006-S4 | 12/1/2006 | JPMAC | JPMMAC | J.P. Morgan Securities | A4 | 46629SAD4 | 1/19/2007 | $8,417,000.00 | Kleros V | J.P. Morgan Securities |
| LUM 2005-1 | 11/2/2005 | Structured Asset Mortgage | Mercury Mortgage | Bear Stearns Co. | A2 | 550279AB9 | 11/2/2005 | $37,057,000.00 | Phoenix | Bear Stearns Co. |
| NAA 2007-3 | 7/10/2007 | Nomura Asset | Nomura Credit | Bear Stearns Co. | A2 | 65537UAB4 | 6/29/2007 | $24,035,000.00 | Phoenix | Bear Stearns Co. |
| | | | | | A4 | 65537UAD0 | 6/29/2007 | $20,903,000.00 | Phoenix | Bear Stearns Co. |
| OPMAC 2006-1 | 3/27/2006 | Opteum Mortg. Accept. | Opteum | Bear Stearns Co. | 1A1B | 68383NDV2 | 3/20/2006 | $55,000,000.00 | Phoenix | Bear Stearns Co. |
| | | | | | 1AC1 | 68383NDW0 | 3/20/2006 | $5,000,000.00 | Silver Elms | Bear Stearns Co. |
| | | | | | M5 | 68383NEF6 | 3/20/2006 | $2,179,000.00 | Silver Elms | Bear Stearns Co. |
| | | | | | M6 | 68383NEG4 | 3/20/2006 | $1,803,000.00 | Silver Elms | Bear Stearns Co. |
| PCHLT 2005-4 | 10/26/2005 | People's Choice Home Loan Secs. Corp. | People's Choice | Bear Stearns Co. | M4 | 71085PDK6 | 12/12/2006 | $8,000,000.00 | Kleros V | Lehman Bros. |
| SACO 2005-7 | 9/30/2005 | BSABS | EMC Mortgage | Bear Stearns Co. | M3 | 785778KP5 | 10/2/2006 | $3,000,000.00 | Kleros V | J.P. Morgan Securities |
| SACO 2005-8 | 10/28/2005 | BSABS | EMC Mortgage | Bear Stearns Co. | M3 | 785778LF6 | 10/2/2006 | $2,000,000.00 | Kleros V | J.P. Morgan Securities |
| SACO 2006-5 | 4/28/2006 | BSABS | EMC Mortgage | Bear Stearns Co. | 2M4 | 785811AP5 | 10/2/2006 | $2,361,000.00 | Kleros V | J.P. Morgan Securities |
| SGMS 2006-FRE2 | 7/13/2006 | SG Mortgage Securities | SG Mortg. Finance Corp. | Bear Stearns Co. | M6 | 784208AL4 | 7/7/2006 | $2,500,000.00 | Blue Heron VI | Soc. Gen. |
| | | | | | M6 | 784208AL4 | 7/7/2006 | $2,500,000.00 | Blue Heron VII | Soc. Gen. |
| WFMBS 2006-12 | 9/1/2006 | Wells Fargo Asset Secs. Corp. | Wells Fargo | Bear Stearns Co. | A3 | 94984HAC9 | 10/5/2006 | $12,000,000.00 | Kleros V | Bear Stearns Co. |
| WFMBS 2007-2 | 2/1/2007 | Wells Fargo Asset Secs. Corp. | Wells Fargo | Bear Stearns Co. | 3A2 | 94984XBC3 | 4/12/2007 | $10,000,000.00 | Kleros V | Bear Stearns Co. |