STATE OF INDIANA MARION COUNTY SUPERIOR COURT

COUNTY OF MARION CAUSE NO.: 49D06-0703-MF-013045
consolidated with: 49D10-0609-PL-40167

---

U.S. Bank, NA as Trustee,

Plaintiff(s),

vs.

Mamie Robinson, Individually and as Personal Representative of Jessie Robinson,

Defendant.

---

COPY

DEPOSITION TRANSCRIPT OF

JUDY FABER

August 14, 2009

10:10 A.M.

at

GMAC RFC, LLC
One Meridian Crossings
Minneapolis, Minnesota 55423

*REPORTED BY: Janet D. Winberg, RPR*

Page 1

STATE OF INDIANA MARION COUNTY SUPERIOR COURT

COUNTY OF MARION CAUSE NO.: 49D06-0703-MF-013045 consolidated with: 49D10-0609-PL-40167

---

U.S. Bank, NA as Trustee,

Plaintiff(s),

vs.

Mamie Robinson, Individually and as Personal Representative of Jessie Robinson,

Defendant.

---

DEPOSITION TRANSCRIPT OF

JUDY FABER

August 14, 2009

10:10 A.M.

at

GMAC RFC, LLC
One Meridian Crossings
Minneapolis, Minnesota 55423

REPORTED BY: Janet D. Winberg, RPR

CHASER COURT REPORTING
Phone (612) 986-5960 ** Fax (952) 226-1784 ** chaserreporting@aol.com

Page 2

APPEARANCES:

**On Behalf of the Plaintiff(s):**

Christine M. Jackson
Chris Jackson Law, LLC
8555 Cedar Place Drive
Suite 111-A
Indianapolis, IN 46240
***chris@chrisjacksonlaw.com***

**On Behalf of the Defendant:**

James M. Boyers
Wooden & McLaughlin, LLP
211 North Pennsylvania
One Indiana Square
Suite 1800
Indianapolis, IN 46204
***jboyers@woodmclaw.com***

**Also Present:**

Kathy Priore
Christine Buen

**NOTE:** *Pursuant to Minnesota Rule of Civil Procedure 30.06, the original transcript will be delivered to the noticing party.*

**NOTE:** *Exhibits 1 - 8 were marked.*

CHASER COURT REPORTING
Phone (612) 986-5960 ** Fax (952) 226-1784 ** chaserreporting@aol.com

Page 3

**EXAMINATION INDEX**

**By Mr. Boyers: 174 - 176, 181 - 181**

**By Ms. Jackson: 4 - 174, 77 - 181**

---

**OBJECTION INDEX**

**Mr. Boyers: 9, 16, 18, 58, 68, 77, 88, 99, 107, 115, 124, 128, 129, 135, 142, 150, 152, 154, 164, 166**

---

**EXHIBIT INDEX**

**Exhibit No. 1**
***(Purchase Advice)***
**Marked..............................................4**

**Exhibit No. 2**
***(Interim Certification/Exception Report)***
**Marked..............................................4**

**Exhibit No. 3**
***(Corporation Assignment of Mortgage)***
**Marked..............................................4**

**Exhibit No. 4**
***(Complaint on Note and to Foreclose Mortgage...)***
**Marked..............................................4**

**Exhibit No. 5**
***(Complaint on Note and to Foreclose Mortgage...)***
**Marked..............................................4**

**Exhibit No. 6**
***(Note)***
**Marked..............................................4**

**Exhibit No. 7**
***(Note)***
**Marked..............................................4**

**Exhibit No. 8**
***(Affidavit of Judy Faber)***
**Marked..............................................4**

Phone (612) 988-5960 ** Fax (952) 226-1784 ** chaserreporting@aol.com

Page 4

PROCEEDINGS

(Exhibits 1 - 8 marked.)

* * *

(Witness sworn.)

JUDY FABER,

called as a witness, being first duly sworn,

was examined and testified as follows:

* * *

EXAMINATION

BY MS. JACKSON:

Q. Can you please say and spell your name for the record?

**A. Judy Faber, F as in *Frank*. A. B as in *Boy*. E-R.**

Q. And what is your current job position?

**A. I am a Vice President and a Director of Residential Funding Corporation or Residential Funding Company, LLC and GMAC Mortgage Company, LLC.**

Q. Wow.

**A. Pretty impressive.**

Q. Does it all fit on your card?

**A. No. I don't have cards. Too expensive.**

Q. Really.

1 of 53 sheets Page 1 to 4 of 152 09/13/2009 07:57:23 PM

And how long have you worked for Residential Funding Corporation?
A. **A little over 13 years.**
Q. Okay. And when you first started with Residential Funding Corporation what was your first job?
A. **A Records Services Manager.**
Q. Okay. And then at what time period did you move to your new position?
A. **Well, it's the same position.**
Q. Okay.
A. **I received the title probably about a year after I started.**
Q. Okay. Did your job duties change?
A. **No.**
Q. Okay. That makes it much easier.
Okay. And then I just want to ask just a little bit...
First of all, have you ever been deposed before?
A. **Yes.**
Q. Okay. So just briefly, if I say anything and you don't understand it, --
A. **Uh-huh.**
Q. -- like I said, tell me and let me know.

I'm struggling, trying to understand some of your terminology and stuff. At times I'm just trying to figure out how the process works.
A. **Okay.**
Q. If you need a restroom break, water break, any kind of break, just let us know. If I've asked you a question I would just like you to finish answering the question before you go.
A. **Okay.**
Q. And yesterday I forgot to tell the witness, but make sure that you try to always answer either *Yes* or *No* because the court reporter can't do the *Uh-huhs* and, --
A. **Okay.**
Q. -- you know, head bobs.
So can you tell me just a little bit about your educational background?
A. **I have an undergraduate degree from the University of Minnesota --**
Q. Uh-huh.
A. **-- in business.**
Q. Okay.
A. **High school?**
Q. Well, yeah. And did you have any other education beyond your undergraduate?

A. **I do have a 2-year certificate, legal assistant certificate --**
Q. Good.
A. **-- from North Hennepin Community College.**
Q. Okay. And part of the reason that you have been offered to testify today is that you are supposed to have knowledge of how the documents are handled from the beginning of the loan process when the documents first come into RFC and then through the point they may be transferred over to another entity; --
A. **Right.**
Q. -- is that correct?
MR. BOYERS: I'd just note an objection --
MS. JACKSON: Uh-huh.
MR. BOYERS: -- because you talked about the beginning of the loan process.
MS. JACKSON: Uh-huh.
MR. BOYERS: The beginning of the loan process occurs before anything comes in to GMAC. Just for clarity.
So if you're asking about the process from the time it comes in to RFC, that's fine, but the way you asked it suggested that the

beginning of the loan process itself started with RFC and that's a fact not in evidence.
MS. JACKSON: Absolutely.
BY MS. JACKSON:
Q. You don't think I was asking you about what another company did that you have no knowledge of, did you?
A. **(Nodding.)**
Q. Okay.
So we are talking about just your duties at Residential Funding Corporation.
A. **Okay.**
Q. And if I get any acronyms mixed up, please stop and correct me; okay?
A. **(Nodding.)**
Q. So if you could tell me your job...
Have your job duties changed from 2005 from what you do now?
A. **Um...**
MR. BOYERS: Asked and answered.
MS. JACKSON: Well, she said she did the same thing for 13 years. I don't know...
MR. BOYERS: If you can answer, --
THE WITNESS: Um...
MR. BOYERS: -- you can answer.

THE WITNESS: They have changed. I guess I would say *Yes*.

MS. JACKSON: Okay.

BY MS. JACKSON:

Q. This is the other *Pre* thing we need to tell you about depositions.

At various points in time Jim Boyers, with an S, may go ahead and object and that has to do with literally if we can use the information later on, when everybody is basically noting it for the objection.

Most of the time he's going to allow you to answer the question. I mean he will tell you specifically, *"Do not answer that,"* if not. So a lot of times there will be objections, but we will just kind of continue on.

BY MS. JACKSON:

Q. So can you tell me what your job duties were in 2005?

A. **Well, in 2005 I directly managed people that did the work.**

In 2007 all those people were released and the functions went to a vendor who does the work for us now. So I now manage the vendor as opposed to directly managing people.

Q. And when you say you managed people who did the work, what type of work are we talking about?

A. **Work around managing both the origination files, as they were received by the organization and the collateral files as they were received by the organization. And then also fulfillment of requests, internal requests, external requests for those documents or files.**

Q. Okay. And you just made a distinction between original files and custodial files. Can you explain to me...

A. **I don't think I --**

MR. BOYERS: Could you read back her answer, please?

(Record read.)

MS. JACKSON: Thank you.

BY MS. JACKSON:

Q. The difference between the origination files and the collateral files.

A. **Uh-huh.**

Q. Can you explain to me -- I mean you made a distinction between the two, --

A. **Okay.**

Q. -- so can you tell me what the difference is?

A. **An origination file, which we also call a credit**

**file, would be the documents that are used by the underwriter, by the processor, to make the decision as to whether they want to fund the loan or not.**

Q. Okay.

A. **The collateral file/legal file we refer to as the folder that contains the original Note and copies of the mortgage and assignments, if any.**

The legal file/collateral file is what is held at the custodian.

The legal -- or the credit file is what's held at off-site storage.

Q. And was -- in 2005 was the legal file held off site or was it still here at this location?

MR. BOYERS: At what point in the --

MS. JACKSON: 2005.

MR. BOYERS: In the process, though. At what point in the process are you asking about?

MS. JACKSON: In 2005.

BY MS. JACKSON:

Q. In 2005 were the collateral files still maintained here at Residential Funding Corporation by the custodian, as opposed to off site?

MR. BOYERS: If you understand the

question, you can answer.

My objection is not to the year you're asking about, --

MS. JACKSON: Uh-huh.

MR. BOYERS: -- but to at what point in the process are you talking about.

MS. JACKSON: At what point in the process.

BY MS. JACKSON:

Q. Well, let's just start at the beginning.

So a file comes in from -- and how do you want me to refer to -- in this particular case the loan originator was Mercantile Mortgage. So I want to refer to that type of entity.

A. **Okay.**

Q. Do you call them loan originators? Or what do you --

A. **Or clients.**

Q. Clients. Okay.

Okay. So when a client file comes in...

A. **(Gesturing.)**

Q. No, that doesn't?

A. **No -- yeah, it's very difficult to answer to the extent that we had different processes for different clients and it's hard -- I didn't**

**manage that piece of it, --**
Q. Uh-huh.
A. **-- as to when the files were received within the door, --**
Q. Okay.
A. **-- so I couldn't answer how Mercantile delivered a file.**
Q. Okay.
A. **Honestly. I had -- I had defined procedures as to how -- how the file had to be delivered to me --**
Q. Okay.
A. **-- from that group that received the file from Mercantile. But how they received it, I would not have knowledge.**
Q. Okay. So are there different groups receiving different type of client files? Or is there -- are you talking about one group and then it would sort it out between the different...
MR. BOYERS: Object to the form of the question, --
MS. JACKSON: Yeah.
MR. BOYERS: -- it's vague and confusing.
MS. JACKSON: I know it's vague. That's

what I'm trying to understand again.
THE WITNESS: Um...
MS. JACKSON: And I've kind of confused myself.
So...
BY MS. JACKSON:
Q. Well, let's talk about the file. You said that you had separate procedures when the files came to you.
A. **Uh-huh.**
Q. What type of files did you -- are you referring to?
A. **We received the origination file and the legal file after the loans were purchased.**
Q. Okay. And the loans --
A. **Were purchased by Residential Funding Corporation.**
Q. Okay. Did... What is the -- you're saying loans, but if I understood you correctly before you said there was differences in how different loans were -- that were coming in were processed.
A. **Uh-huh.**
Q. Okay.
A. **Yes.**

Q. So when you're saying loans... If -- you said you weren't familiar -- are you or are you not familiar with the Mercantile loan process?
A. **No.**
Q. Okay. If a Mercantile loan would come into Residential Funding for processing, are you familiar with the procedures that would happen in its processing by Residential Funding?
MR. BOYERS: She's not offered here to testify about the process of evaluating the loan.
MS. JACKSON: I'm not asking about --
MR. BOYERS: She's here to testify about --
MS. JACKSON: I'm asking about where the documents come in.
So it comes in, what happens with that doc- -- where does it go?
MR. BOYERS: Well, you've received -- Peggi told you where the documents go. They go through the process that she testified about yesterday.
MS. JACKSON: But she didn't know where they came from.
MR. BOYERS: Well, she testified it came

from the client. Mercantile.
MS. JACKSON: Directly? I don't think so. But... Okay.
BY MS. JACKSON:
Q. Let's just go back to -- why -- before I ask you any specific questions, let me let you try to just tell me a general overview of when -- if a loan file is coming to you, what department it's come from and then what you do with it.
A. **Files would come to us. It would be -- again, it would be broken down between the origination file and the legal or the collateral file.**
The legal file would come -- and the origination file would come from the Acquisition area.
The legal file again would have the original Note, copy of the mortgage and any assignments, if it was -- if they were necessary.
A. **The Acquisition Team would have created that legal file from the documents that they received.**
And then the credit file or the origination file would have, again, the documents that were used to make that decision to purchase the loan.
Q. Okay. And when these documents -- these files

come to you are you saying there's two physical hard copies of the files? You said there was a legal file and then the origination file.
A. **There's two files.**
Q. And they're hard copy files?
A. **I'm not sure.**
Q. I mean they're actual papers?
A. **Right. Yes.**
Q. Okay.
A. **(Gesturing.)**
Q. No?
A. **Most of the time, yes. There were instances when we only received images from clients so we never received a hard paper file, we just received images.**
Q. Okay.
MR. BOYERS: With respect to the origination file.
THE WITNESS: With respect... We always received an original Note, but there were times that we did not require the client to deliver paper. And I don't believe Mercantile was a situation like that, but I just wanted to --
MS. JACKSON: Listen, I am just trying to understand the process. And coming from having

no experience in this business at all, if I'm confusing you --
MR. BOYERS: Move to strike any comments of what your understanding is. It's completely irrelevant and you're wasting time. Why don't you ask questions?
MS. JACKSON: Okay. We will try again.
BY MS. JACKSON:
Q. You just stated that sometimes you did not get a hard copy file for what you're referring to as the origination file.
A. **Correct.**
Q. Okay. Do you have a way of determining by client who provided hard copy files and who provided imaged files?
A. **No.**
Q. If you did receive a hard copy origination file from a client what happened with that file as far as storage of it?
A. **Which file?**
Q. The -- if you got a hard copy origination file?
A. **It would -- the origination file would be delivered to the Records area. We would track it in our tracking system that we had received it. And it would be sent off site to**

**Iron Mountain.**
Q. Okay. For the origination files that you received that were hard copies, --
A. **Uh-huh.**
Q. -- did Residential Funding Corporation make an imaged copy of it?
A. **We imaged -- in 2005 we would have imaged key documents from that file, key documents that were needed to service the loan.**
Q. And do you know what those key documents were?
A. **Not off the top of my head, no.**
Q. Do you know which department or where that information would be as far as what the key documents were?
A. **It would have been with the Acquisition Team.**
Q. Acquisition Team?
A. **Or with the Servicing Group.**
Q. Okay. So -- and I'm still just talking about origination files that we have hard copy files for.
What -- you said you managed people who did the work. What type of work did your team do on -- with the hard copy origination file?
MR. BOYERS: During what time period are you --

MS. JACKSON: In 2005, when you managed people that did the work.
THE WITNESS: We would have scanned -- we would have imaged those key documents.
MS. JACKSON: Okay.
THE WITNESS: We would have updated our tracking system to indicate that we had received the file.
We would have created a transmittal to deliver the files to Iron Mountain.
We would have put them on a cart.
We would have wrapped the cart with paper, with cellophane basically, --
MS. JACKSON: Yeah.
THE WITNESS: -- to insure that they did not fall off the cart.
We would have called Iron Mountain to request that the files be picked up.
We would have walked with Iron Mountain to the truck, watched them put the files into the truck.
BY MS. JACKSON:
Q. Is that it?
A. **Yeah.**
Q. Do you know where Iron Mountain is? Just --

A. **Yes.**
Q. It's in Minnesota?
A. **Yes.**
Q. Okay. And do you know what city it's in?
A. **Some of our files are stored in St. Paul and some are filed in Eagan.**
Q. When you scanned -- we're still back in 2005. You said that key documents were scanned in. Where were the scanned documents maintained? In a specific computer program? Or I mean how would that work? You said your internal file, --
A. **Right.**
Q. -- but is there a specific name for that?
A. **In 2005 they were stored in a system called Fetch.**
Q. Okay. And then who would have access to the Fetch documents at Residential Funding?
A. **In 2005?**
Q. Uh-huh.
A. **If you wanted access to the document -- or if you wanted access to Fetch, --**
Q. Right.
A. **-- you would have to request access to it.** And then there was a group that would either

deny or provide you with access.
Q. Do you know the name of that group?
A. **No.**
Q. And -- and then when you're saying you scanned the key documents, and we're still in 2005, you said you updated them to your tracking system. Does the tracking system have a name or --
A. **RMS.**
Q. Okay. So then let's flip -- we're still staying in 2005, but we just talked about the hard-copy documents.
So let's go through the process of what would happen with an origination file that came in electronically or imaged.
A. **I -- I don't even know if I could speak to that.**
Q. Okay.
A. **It was pretty far outside of my knowledge at that point.**
Q. Right.
A. **And I...**
Q. Okay. Do you know -- I mean do you know what department or who would have?
A. **Again, it would have been Acquisitions --**
Q. Acquisitions?
A. **-- that managed them.**

Right.
Q. Okay. And so do you have any knowledge on where these documents were stored or what system they were kept on?
A. **They would have been stored on Fetch.**
Q. Fetch, too?
A. **Uh-huh.**
Q. Okay. And then you said that in 2007 that the work that was being done by your department...
Did your department have a name? When you were talking that you managed the people that did the work in that department. How should I refer to them --
A. **Just Record Services.**
Q. -- if I want to ask you a question?
Record Services. Okay.
So did Record Services have -- Record Services would have been the first department that received documents, hard copy documents coming in from clients?
MR. BOYERS: Object to the form of the question, that's leading. And I think that misstates her testimony.
You can answer.
BY MS. JACKSON:

Q. Well, try -- who was -- when a hard copy origination file came in from a client where did that document go first?
A. **It would have gone to Acquisitions.**
Q. Acquisitions?
A. **(Nodding.)**
Q. And then from Acquisitions it would have gone to?
A. **To Records.**
Q. To Records?
A. **(Nodding.)**
Q. And where did the review process fall in there, in between -- by the time you got the documents they were already reviewed through the Review Team?
A. **Correct. And Peggi would be better to explain that than I.**
MR. BOYERS: Peggi did explain that yesterday.
MS. JACKSON: Well, she explained what she did, but I didn't --
THE WITNESS: She's much more knowledgeable in the process.
MR. BOYERS: She's not here to talk about --

MS. JACKSON: And I'm not asking about the process. I'm just trying to talk about like the flow of documents through the organization.

THE WITNESS: Uh-huh.

MS. JACKSON: So I was just trying to see *Acquisitions*. Because we don't have anybody from the Acquisitions Department and it seems like a lot of stuff is falling back on Acquisitions.

Okay. So...

MR. BOYERS: Peggi testified about the process, which is what you asked for testimony on, the process for evaluating --

MS. JACKSON: For reviewing --

MR. BOYERS: -- documents, which she gave you the testimony on that.

MS. JACKSON: Right. And I'm just asking --

MR. BOYERS: To suggest we haven't provided in terms of testimony, people to cover the topics you asked to cover, I think is argumentative and has nothing to do with the deposition. Ask her questions about what she's responsible for.

MS. JACKSON: Can we go off the record a

second?

(Discussion had off the record.)

MS. JACKSON: We can go back on the record.

BY MS. JACKSON:

Q. So we were talking about 2005. You said some clients provide imaged documents and to the best of your knowledge they went onto a system called Fetch.

A. **Right.**

Q. Okay. Once documents were stored on Fetch, images made from the hard copies that came in, or were these electronic images that came in, did you have anything else to do with those documents?

A. **The -- okay. Origination documents?**

Q. Yeah. Origination documents.

A. **Okay.**

Q. Because it came in two ways, --

A. **Right.**

Q. -- so...

A. **If somebody needed a document from one of those files --**

Q. Okay.

A. **-- then we fulfilled the request for those**

**documents.**

Q. Okay. And what type of requests would you get?

A. **Christine.**

Q. And can you explain who *Christine* is?

A. ***Christine* from Legal.**

Anybody that would need a document internally, whatever document it would be, we would identify whether there was truly a need for that document, whether they were authorized to receive that document and then either fulfill their request or tell them no, they could not have that document.

Q. Okay. And what -- can you explain to me what type of document requests were fulfilled or were actually provided out to requesters?

A. **In what time frame?**

Q. 2005.

A. **The majority of the requests that were filled in 2005 were from the -- our *Servicing Area*, where they would need an additional document from a file.**

Q. Okay. And you say *Servicing Area,* so I need to know what the *Servicing Area* does.

A. **Receiving payments from the borrowers. Payment of taxes. Payment of insurance. Lien release.**

**Any -- anything having to do with processing or servicing the borrower's loan.**

MR. BOYERS: And for the record, that's based on your personal knowledge, not as corporate representative.

THE WITNESS: Thank you.

BY MS. JACKSON:

Q. And where's the Servicing Area located?

A. **In 2005?**

Q. 2005.

A. **In 2005 the majority of the Servicing was done in Dallas, --**

Q. Okay.

A. **-- but there were pieces that were also done in San Diego.**

Q. Was it any specific company that did the servicing or...

MR. BOYERS: Object to the form of the question.

To the extent you have personal knowledge, you can answer.

Again, she's not been offered as a --

THE WITNESS: Expert.

MR. BOYERS: -- corporate representative or an expert --

MS. JACKSON: I am --
MR. BOYERS: -- with respect to --
MS. JACKSON: -- just asking for general --
MR. BOYERS: Right.
MS. JACKSON: -- information.
MR. BOYERS: You can answer.
THE WITNESS: The majority that was done in Dallas and San Diego was done by Homecomings.
We also bought loans where we did not buy the servicing and those would have been serviced. We probably had four or five hundred different companies that serviced on our behalf.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. You said that -- was your Record Services Department -- you said that you might -- they might go back into the Fetch records stored, the images stored on there, if they needed a document from the Servicing Area.
Did the Record Services Department provide the...
At any point in time was...
Okay, let me rephrase that.
Do you know, did the Servicing Area...

And if you don't know this, please say so.
Did the Servicing Area also have a copy of loan document files?
A. **No.**
Q. No?
So I mean you said that if they needed a document that they would contact your Records Department.
A. **Yes.**
Q. Okay. Was there any specific form or, you know, type of document that they needed to fill out, you know, to -- to get the documents released? I mean I guess how did the requests come in for documents?
A. **It was on a system and I honestly can't even remember the name of the system at that point. But they would go into the system, make the request for the document.**
Q. So it would be like an electronic request?
A. **Yes.**
Q. Okay.
A. **Yes.**
Q. And then did you -- did these requests come in directly to you or...
A. **Oh gosh, no.**

Q. So they were --
A. **They went to a team.**
Q. -- approved --
A. **They went to a team that managed that.**
Q. Okay. And then how did you get the information to know whether or not a document needed to be researched and provided?
A. **I'm not sure I understand.**
Q. You said an electronic request was made to somebody who needed a document.
A. **Uh-huh.**
Q. Okay.
MR. BOYERS: Is that a *Yes*?
THE WITNESS: Yes.
MS. JACKSON: I'm sorry.
THE WITNESS: Yes.
BY MS. JACKSON:
Q. So for you to be able to tell your team to pull the specific document that's been asked for, what kind of documentation did you get to alert you that a document needed to be retrieved?
MR. BOYERS: And when you say *You*, you're talking about --
THE WITNESS: My team.
MR. BOYERS: -- her department?

MS. JACKSON: Her team that she was managing in 2005.
THE WITNESS: Again, it was all done systematically. So --
MS. JACKSON: Okay.
THE WITNESS: -- a request would be logged into the system and then we would pull the request from the system.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. And then after the request was pulled from the system was it provided in electronic format or was it printed --
A. **No, it was not printed. Everything was done electronically.**
Q. Okay. And then once the document was found...
And who was it sent to electronically?
A. **It was --**
Q. The --
A. **It was imaged into Fetch. It was put into Fetch so that it could be viewed.**
MR. BOYERS: Could you read back the question and answer? Or I'm going to step around and read it.
(Reviewing transcript.)

BY MS. JACKSON:
Q. So the Records Department would provide the requested records to someone else internally within Residential Funding Corporation who had requested it?
A. Correct.
Q. So you did not send -- the Records Department did not send the documents directly out to the requestor?
A. No.
Q. Okay. And then you said that -- and this is in one of your depositions, that Residential Funding Corporation --
MR. BOYERS: You mean *affidavit*; right?
MS. JACKSON: Affidavit, yeah, I'm sorry.
BY MS. JACKSON:
Q. That Residential Funding Corporation is Master Servicer. Can you just explain to me within your job duties what you do as Master Servicer?
MR. BOYERS: Object to the form of the question. There are several objections.
MS. JACKSON: Okay.
MR. BOYERS: One is she's not been offered as an expert with respect to the role of

Master Servicer.
Two, the role of Master Servicer is defined in the Pooling and Servicing Agreement.
So to the extent you're asking her to describe the role of Master Servicer, it's defined within a legal document and the document speaks for itself.
MS. JACKSON: I am trying to ask how documentation is kept and maintained for mortgage loans for which Residential Funding Corporation is the Master Servicer.
So her -- her --
MR. BOYERS: But I think you were asking her to define what a Master Servicer is.
If your question is when she's advised that RFC is in the role of Master Servicer, what does the Records Department do, that's one thing.
But if you're asking her to define what Master Servicer is, that's another... It sounded to me like you were asking her to define Master Servicer and that's why I'm objecting.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. Well, let me ask you this: Do you know what a Master Servicer is? Just your general personal

knowledge.
MR. BOYERS: Object to the --
MS. JACKSON: To the form.
MR. BOYERS: -- to the form.
She's not an expert --
MS. JACKSON: Right.
MR. BOYERS: -- and she's not speaking for the corporation.
You can answer as to your personal knowledge.
THE WITNESS: Yes.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. And from your own personal knowledge do you know -- what do you -- what is your understanding of what a Master Servicer does?
MR. BOYERS: Continuing objection.
MS. JACKSON: Uh-huh.
MR. BOYERS: You can answer.
MS. JACKSON: Yeah.
THE WITNESS: My personal knowledge...
MS. JACKSON: Uh-huh.
THE WITNESS: I guess the simplest way to explain it and the way I explain it is that there's an investor who receives monthly

payments.
The Master Servicer receives payment from miscellaneous servicers, aggregates those payments and makes the remittances to the end investor. That's the main role for a Master Servicer, is the aggregator so that the investor doesn't have to receive ten different payments from ten different servicers, so...
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. And we went through the document flow for records that came in in hard copy and then electronically.
MR. BOYERS: And I'd just object to your characterization because we've talked about the origination file.
MS. JACKSON: For the origination file.
BY MS. JACKSON:
Q. And now what I'd like to do is ask similar questions involving how you said you also had collateral files, how they're processed.
I what I mean by *processed*, just kind of moved through the organization.
So we have...
First of all, can you just give me -- when

you say an origination file, --
A. **(Nodding.)**
Q. -- can you describe to me what that...
MR. BOYERS: Asked and answered. You can answer.
THE WITNESS: Again, the origination file are the documents that are used to make that decision as to whether we want to purchase the loan or not.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. So the collateral files.
A. **Well, --**
Q. Okay. We went through the origination file process, --
A. **Okay.**
Q. -- so what I'd like to do is, with the collateral files, to do the document flow from, you know, how it kind of flows through your organization.
So first question I'd like to ask is for -- the words collateral file.
For the collateral file, does it come in in hard copy or electronic copy?
MR. BOYERS: Asked and answered.

You can tell her again.
MS. JACKSON: I think she did it for origination file.
MR. BOYERS: She already...
Go ahead.
THE WITNESS: And, again, it comes in... Depending on the client, it would come in differently.
It never -- it would never come as images, though. We also receive the original Note.
BY MS. JACKSON:
Q. For the collateral -- what type of documents are in the collateral file?
A. **The original Note, a copy of the mortgage and any assignments, if necessary. If required.**
Q. Is there anything else maintained in that collateral file?
A. **Nothing that's...**
Yes.
Q. Okay. What type of other documents?
A. **It would be miscellaneous documents, depending on the type of loan.**
Q. And when you say *miscellaneous documents* what -- can you give me some examples?
A. **It could be a CEMA, it could be a modification,**

**it could be affidavits.**
Q. Okay. I'm going to hand you what's labeled Exhibit Number 1 and if you could please go through, look at the documents and tell me if this is the type of documentation that would be maintained in the origination file, or the collateral file, or if it would be maintained in both?
MR. BOYERS: Could you restate that question? Because you added like three or four questions into it.
MS. JACKSON: Right.
I asked her -- the documents that I just handed her, what file would those be maintained in.
MR. BOYERS: Well, just for the record, you've given her a stack, --
MS. JACKSON: Uh-huh.
MR. BOYERS: -- which is approximately a quarter inch thick, so... And they're not necessarily in any specific order. So...
And, you know, we're talking about many pages of documents. So take your time, review through those and once you've done -- once you've completed reviewing them, what is your

question again?
BY MS. JACKSON:
Q. Would the documents that are in Exhibit 1, would those be the type of documents that would be found in the collateral file?
A. **From my knowledge the majority of these would be found in the origination file, not in the collateral file.**
Q. And if you look on the third page in, on the bottom it will be stamped *US Bank 78*.
A. **Uh-huh.**
Q. And in the middle of the document it says *Shannon Alberts/Operations Associate*.
Do you know Miss -- or did you know Ms. Alberts?
A. **No.**
Q. No? Okay.
So this Operations Associate, that would not work in your Records Department?
A. **No.**
Q. Okay. And do you know...
If you turn into -- two, three, four, five -- the sixth document in on the very bottom right-hand corner says *US Bank 120* on the bottom there. It says it was *Reviewed by J Larson*. Do

you know who *J Larson* is?
A. **No.**
Q. Okay. And the package of documents that I just gave to you starting the third page in, there's like a cover sheet and at the bottom it's *US Bank 113*.
A. **Uh-huh.**
Q. Did the Records Department have any responsibility in preparing this type of cover sheet?
A. **Yeah. This was the document that we created for scanning the documents.**
Q. Okay. And do you know what this coding is on the top here, the *BPC: PFN...*
A. ***BPC* means *Business Process Code*.**
*Post Funding New Loan Setup*.
Q. Okay. And then there's like one, two, three, four, five, six -- seven different bar codes on it.
A. **Uh-huh.**
Q. Do you know -- can you tell us -- I don't know if you can read the bar code, but can you tell us what they would be for, what they would represent?
A. **The top one, to my knowledge, --**

Q. Yeah.
A. **-- what I remember, is just -- this was just telling the scanner --**
Q. Uh-huh.
A. **-- that this was the start of the next set of documents, --**
Q. Okay.
A. **-- to separate it from one set of documents to the next.**
Q. Okay.
A. **The next one is -- it simply corresponds to what's on the left-hand side. So the bar code there is the *Loan Number*. The bar code next to the *Client ID* is the *Client ID*. The *AssetWise Submission ID*. The *Servicer ID*.**
Q. Okay. And were these cover sheets prepared when the client file arrived in your department?
A. **Yes.**
Q. Were these cover sheets prepared before it went to the Review Team?
A. **No.**
Q. Okay. When the file arrived in the Records Department was it physically maintained somewhere before it went to the Review Team?
A. **I have no knowledge of that.**

Q. When you said requests were made for records, was -- a typical request be one where the Review Team is asking for the file --
A. **No.**
Q. -- to do their review?
A. **No.**
Q. Okay. Do you know how the Review Team got the records?
A. **(Shaking head.)**
Q. Might not have been your function, so...
A. **That was not part of our function.**
Q. Okay. And then if you look on the very last two pages it will say on the bottom of the document *131* and *132*. If you could look at that also and just tell me--is that another document or -- it says at the top *EvaluWise Decision Summary*.
A. **I'm not familiar with this document.**
Q. So this isn't something the Records Department would prepare?
A. **No.**
Q. Okay. We are done with Number 1.
Okay. So let's go back to the collateral file. And you said in the collateral file would be documents such as the Note, mortgage and assignments. When you are talking about the

collateral file, are these the documents in the form that they would have come in from the client?
A. **Again, I would have no knowledge of that.**
Q. Okay. Who...
Was the Records Department responsible for preparing or for segregating out the documents which were required to be put in the collateral file?
A. **No.**
Q. Do you know where that -- where the collateral file was prepared?
A. **By the Acquisition Group.**
Q. Okay. And those are the people that had it prior to --
A. **Correct.**
Q. -- it coming to the Records Division?
A. **Correct.**
Q. Okay. Okay. So did these collateral files, after the Acquisition Group prepared them, did they ever come through your department at all?
A. **They all did.**
Q. Okay. And then what did you do with them once you got them?
A. **We scanned the contents.**

Q. Right. Into that Fetch?
A. **Yes.**
Q. Okay.
A. **Manifested them. Tracked them in RMS that we had received them. Tracked them in RMS that we had delivered them to the custodian. And, again, they were put on carts.**
Q. What kind of volume are we talking about?
A. **Daily? Monthly?**
MR. BOYERS: Yeah, what time frame?
MS. JACKSON: Yeah. Yeah.
BY MS. JACKSON:
Q. I guess because you were talking about the carts and you had to put the paper stuff around so it didn't fall off, so to me it seems like a huge volume.
Would they be packaged, like you said, on a daily basis? Or monthly basis? Or were they --
A. **Yes. Daily.**
Q. Daily.
A. **(Nodding.)**
Q. And at the point in time they were packaged did you have to code them in any way to -- I guess at the time the collateral file came in had Residential Funding Corporation determined

whether or not they were going to purchase that loan?
A. **Yes.**
Q. Okay. So were they packaged by specific categories of, you know, who purchased it? Or were they categories -- categorized by who the loan servicer was going to be?
A. **No.**
Q. Okay. So when they came in -- were they batched in any sort of --
A. **No.**
Q. Okay. So they just got filed up and --
A. **Uh-huh.**
MR. BOYERS: Object to your characterization. That is argumentative.
Do you want to rephrase?
MS. JACKSON: Yes.
THE WITNESS: Yeah.
MS. JACKSON: I did not mean to be argumentative.
BY MS. JACKSON:
Q. So there was no order --
MR. BOYERS: Object to your characterization. You're misstating her testimony and you're saying *no order*. That's

argumentative. Just ask her the question.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. You said that the collateral files came to you through Acquisitions and they had already had the documents in them that were needed.
Was there a cover sheet on the origination file? Can you explain to me how -- when you got them, how did you differentiate between one loan and another loan?
A. **Every file has a bar code --**
Q. Okay.
A. **-- label on it with the borrower name. And the bar code with a loan number.**
Q. Okay. And this would be like a sheet of paper on the top?
A. **No. It was a bar code label.**
Q. The label went on what document?
A. **On the folder.**
Q. It has a folder?
A. **Yes.**
Q. Okay.
A. **Yes.**
Q. Okay. Were they -- the folders that the documents were placed in, were they in there

loose or were they bound in any way?
A. **Which folder?**
Q. The origination -- collateral file folder, the one that's --
A. **Collateral file folder is -- it's only open on the top, it's closed on three sides and the documents are in there loose.**
Q. Okay. So these would come to you, I'm going to call it an envelope, like a folder that's closed in on three sides. The documents are in there loose and there's a bar coding on it?
A. **Right.**
Q. Okay. And that comes into your office and how does it get to the cart? Is there any sorting done?
MR. BOYERS: I think you're mixing... You're talking about the cart.
She testified about the cart with respect to the origination files. You haven't asked her about how the legal files were handled, the legal collateral files.
She's been using the term *Collateral* and *Legal file* interchangeably.
MS. JACKSON: Um...
MR. BOYERS: You asked about the

origination files before. That's when she offered the testimony about the carts. So you haven't gotten there yet.

BY MS. JACKSON:
Q. Collateral files.
A. **Uh-huh.**
Q. Bar code. 3-sided closed envelope. What happened to them as far as -- they didn't stay in your office, in your department; right? When they came in...
MR. BOYERS: What's your question?
THE WITNESS: I don't know what the question is.
BY MS. JACKSON:
Q. What the question is, is... The Acquisitions Department sent you collateral files, 3-sided envelope with a bar code on it. What did you guys do with it after that, after they came into your department?
A. **Again, as I stated --**
Q. Uh-huh.
A. **-- we scanned them.**
Q. Uh-huh.
A. **Scanned the contents.**
Q. Uh-huh.

A. **We tracked the fact that we had received them.**
Q. Uh-huh.
A. **We tracked the fact that we were delivering them to the custodian. And then we delivered them to the custodian.**
Q. How did you deliver them to the custodian?
A. **They were put on carts and rolled downstairs. The custodian was on site at that point, so they were brought downstairs.**
Q. Okay. And when they were put on the carts were they put on the carts in any specific order?
A. **In 19- --**
Q. 19- -- 2005.
A. **I believe we were putting them in loan number order at that point, but I can't be sure. At some point in time we changed that.**
Q. And when did that process change?
A. **I honestly don't remember. It was...**
Q. Okay. So once...
Did you have any other responsibilities for the collateral files rather than... It sounds like you tracked them and then just delivered them to the custodian. Is -- I mean did you have to do any work to the custodial file?
MR. BOYERS: What? Custodial file? We

haven't even talked about a custodial file.
MS. JACKSON: Collateral file. I don't know. They're different. Well, the deposition says custodial file.
BY MS. JACKSON:
Q. Okay. The collateral file.
A. **Um... Again, I'm not sure...**
MR. BOYERS: Can you restate the question?
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. Outside of handling the physical transfer from receiving the collateral file from the Origination Department, logging it in for receipt and then placing it on a cart to transfer to --
MR. BOYERS: You used the term *collateral file* again. Could you -- I don't think you meant to, but you asked her about *collateral file* again.
MS. JACKSON: With the collateral file --
MR. BOYERS: I'm sorry. I... Could you start over?
MS. JACKSON: Yes.

BY MS. JACKSON:
Q. Let's make sure we're talking about the right thing.
The collateral file is the file that ends up going to the custodian?
A. **Correct.**
Q. Okay. So the collateral file, once it comes into the Records Department, did you have any other responsibilities or any other actions you needed to take with the collateral file besides what you told us, which was to log it in and then deliver it to the custodian?
A. **I'm not sure how to answer that because I'm not sure -- are you talking about that -- at that specific point in time?**
Q. Yeah. And we're referring mainly to 2005 because the loan we're talking about was processed in 2005.
A. **Okay.**
Q. So that's why in 2005.
A. **So -- again, so at the point it was received from Acquisitions, --**
Q. Uh-huh.
A. **-- scanned it, tracked it and delivered it to the custodian.**

Q. Correct. We got that.
A. **Okay. At that point in time, --**
Q. Okay. Right.
A. **-- yes.**
Q. Okay.
A. **But -- and I guess I need to clarify. *That point in time* not being 2005, --**
Q. Okay.
A. **-- just that point in time in the life of the loan. That's all we did with the collateral. Does that make sense?**
Q. Um...

MR. BOYERS: Can we go off the record for a second?

MS. JACKSON: Yeah.

(Discussion had off the record.)

MS. JACKSON: All right. Let's go back on the record.

BY MS. JACKSON:

Q. You said part of the Records Department's responsibility with the collateral file would be to image the documents that were in it. And those images were kept on the software program called Fetch.
A. **Correct.**

Q. Okay. Is -- this would be your personal understanding again of the Fetch program. Is that a Residential Funding Corporation program? I mean it's used by Residential Funding Corporation?

MR. BOYERS: Yeah. I think that in some ways you're asking her to provide a legal conclusion about the system. I think the last question that you asked --

MS. JACKSON: Uh-huh.

MR. BOYERS: -- as part of that two-part question --

MS. JACKSON: Uh-huh.

MR. BOYERS: -- was whether that was a system that RFC used.

MS. JACKSON: Right.

MR. BOYERS: That's a fair question. Asking her if it was created -- I think your first part of the question sort of suggested --

MS. JACKSON: That's not what I meant.

MR. BOYERS: Okay.

MS. JACKSON: That's not what I meant. That's not what I meant.

MR. BOYERS: Okay.

BY MS. JACKSON:

Q. Your Fetch software system, did anyone other than Residential Funding Corporation employees have access to use that system?
A. **Not to my knowledge.**
Q. Okay. So I'm going to move to Exhibit 3. I'm setting Exhibit 2 aside for the moment.

But if we could go ahead and let you look at this document marked Exhibit 3.

Do you recognize this type of document?
A. **Yes.**
Q. In the Records Department, where you work, and this is a general question so there's no time period attached to it, what -- when would you see this type of document and was there anything you were requested to do with this type of document?

MR. BOYERS: Can you break that up?

THE WITNESS: Yeah.

MS. JACKSON: Yeah.

BY MS. JACKSON:

Q. When would this type of document come to the document Records Department?

MR. BOYERS: Object to the form of the question, --

MS. JACKSON: Yeah.

MR. BOYERS: -- it's vague and it calls for speculation.

MS. JACKSON: Yeah, yeah.

BY MS. JACKSON:

Q. You stated at one point in time that you would get requests for documents, the Records Department would get requests for different documents that were in the files.
A. **Correct.**
Q. Did you -- were requests made for copies of Corporate Assignments?
A. **Yes.**
Q. Okay. Were you -- was the Records Department responsible for processing anything with a Corporate Assignment or was it just responsible for copying what was already in the file?

MR. BOYERS: Object to the form of the question. I think she's already...

One, I think it misstates her past testimony because she's testified to sometimes assignments being within --

MS. JACKSON: Right.

MR. BOYERS: -- the collateral/legal file.

MS. JACKSON: Right.

MR. BOYERS: So -- and I also don't understand what you mean by *processing*.
MS. JACKSON: Making copy.
MR. BOYERS: At what point?
MS. JACKSON: Generally, when they would get a request. I mean...
BY MS. JACKSON:
Q. Did the Records Department ever have to complete a document such as this?
MR. BOYERS: What do you mean by *complete*?
MS. JACKSON: To complete, to fill it in, to provide, you know.
BY MS. JACKSON:
Q. Do you know...
Outside of making a copy of a document that was already in the file, did the Records Department have any responsibility for producing or drafting any documents?
A. **Yes.**
Q. Okay. And what type of documents did you draft?
A. **We would draft the assignments.**
Q. Okay. And at what point in time -- how would you know to do that? Did you get... How did you know whether or not you needed to draft a

Corporate Assignment?
A. **Many different... Again, I'm not even sure where to start. You know, we could talk for the rest of the day as to when we knew when a Corporate Assignment had to be drafted. Probably the main reasons would be because the loan was sold.**
Q. Uh-huh.
MR. BOYERS: Before you ask the question, I want to take a break.
THE WITNESS: Okay.
(Recess taken.)
BY MS. JACKSON:
Q. Right before we took the break you had stated that your department sometimes drafted these *Corporate Assignments of Mortgage*. And I've given you as Exhibit 3 an example of a *Corporate Mortgage Assignment* that pertains to Mr. and Mrs. Robinson, which is who I represent.
Where -- if your department had to -- was asked to draft a *Corporate Assignment Mortgage*, from whom did that request come?
A. **Are you specifying for this specific one?**
Q. If you can testify to the specific one...
A. **I can't say for sure, but I would say again -- I would say because it's coming from MERS and**

**going to the trustee and based on the date of it, the request probably came from the foreclosure attorney --**
Q. Okay.
A. **-- to record it out of MERS to the trustee.**
Q. So do the foreclosure attorneys in an instance where they need a Corporate Assignment, do they communicate directly with Residential Funding?
A. **They communicate through a system called New Track.**
Q. And do the requests that are in New Track come directly to you in Records?
A. **Again, yes, to Records.**
Q. Okay. Is there a -- before you said when certain requests came in there was like a review process--that someone looked at the request to see whether or not you should provide the documents.
A. **Right.**
Q. When a foreclosure attorney makes a request for we'll say a Corporate Assignment, did that go through a review process?
A. **Yes.**
Q. Okay. And when the request comes off of New Track can you tell me how descriptive it is

or what type of information is provided to you to draft a Corporate Assignment?
A. **I could not provide specifics, no.**
Q. Did you personally ever have to draft a *Corporate Assignment of Mortgage*?
A. **No.**
Q. Did your employees --
A. **Yes.**
Q. -- have to?
Okay. Did you ever review Corporate Assignments that were drafted by your employees?
A. **Yes.**
MR. BOYERS: Object to the extent it's vague.
You answered, so...
THE WITNESS: Yes.
BY MS. JACKSON:
Q. And what did your review consist of? What type of things did you look at or...
A. **I would look at the loan number and look at the situation. You know, look at RMS, look at the servicing system to validate that the assignment should have been drafted. That it was -- correctly.**
Q. Okay. You said look at the situation. Can you

explain that a little bit more? What...
A. **I...**
Q. Okay. I...
A. **You know, when the loan was purchased, who it was purchased from, who it was sold to. If it was in a disposition status. A lot of factors that would play into researching whether the assignment was done correctly or not.**
Q. And when you're reviewing the document that your employees prepared, when you're saying that -- you're saying you're comparing it to various things. Is that -- is that the tracking data? Or what -- when you say you're comparing it to like the loan number, or this, what are you using to determine what the loan number is?
A. **System data.**
Q. So the electronic data. Is this in the Fetch system or this is in the New Track system?
A. **It would -- first of all, Fetch doesn't have any data, it's an imaging system.**
Q. Okay.
A. **New Track would have data. I wouldn't look in there.**
Q. Okay.
A. **I would look in -- more than likely in the...**

**Yeah, probably mostly in RMS, which would have asset data. So information regarding the loan.**
Q. Okay. And what does RMS mean?
A. **Records Management System.**
Q. Okay. And you said *asset data*. Can you just give me examples of the type of --
A. **Loan amount. Loan interest. Who we acquired the loan from. Who we sold the loan to.**
Q. And just to be clear again. When you're talking about the asset data on the RMS system, that's electronic data?
A. **Yes.**
Q. When a request came in to -- for the Records Department to draft a Corporate Assignment from New Track, did that request coming off of New Track inform your employees to whom the assignment needed the parties involved...
The information on New Track, did it tell your employees to transfer it to -- or assign -- prepare an assignment to a specific entity?
A. **Different attorneys would provide different information, so --**
Q. Okay.
A. **And I couldn't speak to this one.**
Q. Can you tell from the New Track system who the

attorney was that requested the document?
A. **Yes.**
Q. Do you -- did the Records Department have a Corporate Assignment template that it used to prepare requests for Corporate Assignments?
A. **Yes, we had an application.**
Q. So going back to Exhibit 3, and looking at this Corporate Assignment, at the very top under the title *Corporation Assignment of Mortgage*, it says *FOR VALUE RECEIVED* and then there's a name of a company there. Would you -- your employees have to fill in that information?
A. **Yes.**
Q. Okay. And from where would they obtain that information?
A. **(No response.)**
Q. Would they have to pull a hard copy file or would this be information maintained in your Record Management System?
A. **It would depend on the circumstances. Each case would be done -- would be handled differently based on the type of loan, --**
Q. Okay.
A. **-- the state that it was located in, who we bought the loan from.**

Q. Uh-huh.
I guess the basic question is did the foreclosure attorney, when the information came -- when the request came in to prepare a Corporate Assignment, included in that information was the parties that the Corporate Assignment -- this particular Corporate Assignment says, you know, *FOR VALUE RECEIVED* from a company and then that company undersigns and transfers into another company or entity. Was that part of the New Track information from the foreclosure attorney?
A. **Sometimes.**
Q. Okay. And if it didn't come from the foreclosure attorney where would you --
A. **We would have to determine what that -- what it should be.**
Q. And then what type of documents would you review to determine what it should be?
A. **Again, you'd look at system data. You'd look at the mortgage. You'd look at any assignments that were in the file. You'd look at the servicing system, data in the servicing system. You'd look at the MERS system. You'd do the research to determine what was the right way to**

A. **complete the assignment.**
Q. Okay. And this -- as we said before, this Document 3 is a document that's related to the loan of Mr. and Mrs. Robinson and that loan was originated in September of 2005.
And can you look at this *Corporate Assignment of Mortgage* and tell me when this was prepared, the date this was prepared?
A. **December 14, 2006.**
Q. Okay. And then it looks like once it's prepared -- I guess once the Records Department prepared this, was it -- did it remain in an electronic file or did you guys put it in hard copy once it was done or drafted?
A. **Well, it would be drafted without the signatures.**
Q. Right.
A. **And then it would be signed. And then the original would be given to the foreclosure attorney.**
Q. Okay. I guess what I'm asking is did -- did you transfer an electronic copy to whatever department, whoever needed to sign it? Or did you guys print a hard copy?
A. **You have to print a hard copy to sign it.**

Q. Okay. Well... Right. So a hard copy would be printed. And then was the Record Department/Division responsible for also signing and notarizing --
A. **Yes.**
Q. -- these documents?
Okay. And do you know what Mortgage Electronic Registration System is just personally? Any personal knowledge of what that --
A. **Yes.**
Q. -- company is?
A. **Yes.**
Q. And what do they do?
A. **It's a corporation that was developed by the industry to eliminate the backlog and expenses involved in recording assignments.**
Q. Okay. And did employees of this company work or have offices here at Residential Funding Corporation?
A. **I'm not sure I understand your question.**
Q. You said part of your -- part of the responsibility of the Records Department was to have the prepared Corporate Assignments signed and notarized.

A. **Uh-huh.**
Q. Okay.
MR. BOYERS: Is that a *Yes*?
THE WITNESS: Oh, I'm sorry.
Yes.
MS. JACKSON: Signed and notarized.
BY MS. JACKSON:
Q. And this appears to be signed by Matt Favorite, who is Vice President of the Mortgage Electronic Registration Systems. So I'm just trying to figure out where Matt Favorite was located. I mean do you know -- I mean...
A. **I'm not sure what your question is.**
Q. Okay. Part of your responsibility is to get the assignment signed and notarized.
A. **(Nodding.)**
Q. Correct?
A. **Yes.**
Q. Okay. Who signed for Mortgage Electronic Systems, Inc.?
MR. BOYERS: Well, the document speaks for itself.
THE WITNESS: Matt signed for it.
MS. JACKSON: Right.
BY MS. JACKSON:

Q. Did Matt work here in the Residential Funding Corporation building?
A. **Yes.**
Q. Okay. Did any other MERS employees work here in the Residential Funding Corporation building?
A. **(No response.)**
MR. BOYERS: I'd just object to the form of the question. *Employee* has a legal meaning and to the extent you're calling on her to give a legal conclusion about what an employee is, I'd object to that. She can answer to the extent she can.
THE WITNESS: Yeah, I'm not sure I could answer that question.
BY MS. JACKSON:
Q. Does Matt -- do you -- do you know Matt Favorite?
A. **I did know Matt Favorite, yes.**
Q. Okay. And at what point in time did he -- okay.
Did Matt Favorite have offices within Residential Funding Corporation?
A. **Yes.**
Q. Okay. Where did Matt Favorite -- where was his office or where did he sit? Or did he have a cubicle?

A. **I honestly don't...**
Q. You don't know?
Okay. So when someone in your department needed to get the Corporate Assignment executed, what did they -- how did the physical piece of paper get to Matt Favorite?
A. **You know, I'm not even sure I could answer that.**
Q. Okay. Did Matt Favorite have a desk or something that was located within the Records Department?
A. **Yes.**
Q. Okay. Does Matt Favorite still have -- still have -- is his desk still located in the Records Department?
A. **No.**
Q. Do you know at what point in time he left?
A. **No.**
Q. Okay. Do you know -- was he one of the persons that you were in charge of supervising as being manager of the Records Department?
A. **Yes.**
Q. Were you responsible for doing any type of evaluation, job evaluation for him?
A. **No.**
Q. Okay. So did you like have to monitor his time

reports or anything like that?
A. **No.**
Q. Okay. So in addition to signing Corporate Assignment of Mortgages, were there any other job duties that Matt was responsible for within your Records Department?
A. **Yes.**
Q. And can you describe to me what those duties are?
A. **I don't know exactly, no. I know he did other functions, I don't know what they were.**
Q. I'm just talking about the ones that you would be responsible for supervising him for because otherwise --
A. **I honestly even couldn't tell you that.**
Q. Okay.
A. **Again, I managed the department. He...**
Q. Uh-huh.
A. **I couldn't tell you specifically, I'm sorry.**
Q. And at the time -- you said that, you know, when the Corporate Assignments of Mortgage were prepared, at the time of your review to make sure they were complete, would the signatures and notary already have been affixed to the document?

A. **Normally, yes.**
Q. Okay. And was that one of the things you were reviewing the document for?
A. **Correct. Yes.**
Q. Okay. And then... So we have Matt up there. And then when you go right down below it, it looks like Karen E. Steffensen?
A. **Uh-huh.**
Q. Did she work for your department?
A. **Yes.**
Q. Okay. And what was her job title?
A. **Operations Associate.**
Q. Okay. And then is she still working here?
A. **No.**
Q. Okay. During the time that she worked for you at the Records Department can you just tell us what her general duties would have included?
A. **She worked in the Disposition Team, so she would pick the requests off of New Track and would research and resolve those requests for the foreclosure attorneys.**
Q. Okay. And was there more than one operation associate, did you call her title?
A. **Yes.**
Q. Was there more than one operation associate that

did work for foreclosing attorneys?
A. **Yes.**
Q. And under the notary, under her name it says, *"This instrument was drafted by Matt Favorite, Residential Funding Corporation."*
Was it Matt Favorite's job duty to draft these, to draft Corporate Assignments of Mortgages?
A. **Probably, since it says it was drafted by him.**
Q. Okay. And was there anybody -- were there any other people at -- in your department that also drafted Corporate Assignments of Mortgages?
A. **Yes.**
Q. So he wasn't the only one?
A. **Correct.**
Q. Was there anyone in your department that was also able to sign Corporate Assignments of Mortgages on behalf of electronic -- Mortgage Electronic Registration Systems?
A. **Yes.**
Q. And do you remember approximately -- and now we're going back to 2005, approximately how many people?
A. **Probably 10 to 12.**
Q. And then were you responsible for supervising

those 10 to 12 people?
A. **Yes.**
Q. But... I'll ask it differently.
Did you have to prepare their job evaluations?
A. **No.**
Q. Okay. And did you have to keep their time reports or were you in charge of their time reports?
A. **No.**
Q. Did they turn in a time card to you?
A. **To me?**
Q. Yes.
A. **No.**
Q. Did you ever have to sign off on how many hours they worked?
A. **Myself, no.**
Q. Okay. And then at the very top of this document it says *WHEN RECORDED MAIL TO Residential Funding LLC*. So --
MR. BOYERS: *Residential Funding Company, LLC*; right?
MS. JACKSON: Yes.
BY MS. JACKSON:
Q. Can you kind of give me the flow of the

document? It would get signed and then it would get notarized. And then what did your department do with the document? And then would you get the document back?
A. **Like I said, we would draft the document.**
Q. Uh-huh.
A. **We would provide it to the foreclosure attorney because they were the ones that requested it at New Track.**
Q. Right.
A. **And then when it got recorded, as part of the foreclosure process, --**
Q. Right.
A. **-- it would get recorded and it would be returned to us.**
Q. Okay. And then when it got returned to you did it get returned in hard copy?
A. **Yes.**
Q. Okay. And then what did you do with it once it got returned?
A. **It was imaged and submitted to the custodian.**
Q. So the hard copy went to the custodian?
A. **Yes.**
Q. Okay. And when you imaged it was there also some tracking information entered into your

system?
A. **In 2005?**
Q. 2005.
MR. BOYERS: You're talking generally?
MS. JACKSON: Yeah. Generally.
MR. BOYERS: Okay.
BY MS. JACKSON:
Q. Like would you guys know it came back and you gave it to the custodian?
A. **Yes.**
Q. Okay. And were you responsible for -- you know they got sent out to the foreclosure attorney. Was there something in your system that tracked whether or not you ever got it back? Was that part of your...
A. **No.**
Q. No?
A. **(Shaking head.)**
Q. Okay.
So the foreclosure attorney or someone on their behalf would have had to return the document to you before you would take any other action on it?
A. **Correct.**
Q. And then still on this document, Exhibit 3, if

we look to the entry that says, "*The undersigned hereby grants, assigns and transfers to U.S. Bank National Association as trustee.*"
Who would provide the specific name of whom the Corporate Assignment should be transferred to?
MR. BOYERS: I'd just note an objection for the record. I believe she's already offered testimony about everything that had to be reviewed --
MS. JACKSON: Okay.
MR. BOYERS: -- to make that determination.
MS. JACKSON: Well, let me say it, but hopefully I'll say it and I won't mischaracterize.
BY MS. JACKSON:
Q. I believe you said that it's the foreclosure attorney --
A. **Uh-huh.**
Q. -- that tells how --
A. **Sometimes.**
Q. Okay. And then if it isn't the foreclosure attorney where else would you get that information?

A. **We would determine -- we would look to see how the loan had been sold and that would determine how that was completed.**

Q. Okay. And when you said *determine how the loan had been sold*, can you just give me some examples of that or kind of explain what you mean by that?

A. **Basically whether it was -- if the loan had been sold, we would look to see whether it was in a whole loan transaction or in a security. And that would determine -- if the loan was in a security it's foreclosed in the name of the trustee. If the loan is in a whole loan, it's normally foreclosed in the name of RFC. If the loan wasn't sold, it would normally be foreclosed in the name of RFC.**

Again, there's exceptions to everything.

Q. Oh absolutely. I understand.

So if you had a loan that was -- that indicated it was being -- it was a loan that was -- did you say securitized or security?

A. **In a public security.**

Q. In a public security.

A. **Uh-huh.**

Q. And when you say *public security* you're talking

about one of these things that are called trusts? Or I mean -- when you say *public security* -- how would -- I guess looking at *U.S. National Bank as Trustee*, --

A. **Uh-huh.**

Q. -- from what you just said, that that would indicate to you that that would be in a public security.

A. **Correct.**

Q. Okay. Okay. How do you know which security it's in?

MR. BOYERS: I...

MS. JACKSON: Can you tell -- okay. Can you tell what security this is in by...

THE WITNESS: I mean I can tell...

MR. BOYERS: I mean you can answer.

My objection would be you're using the term *security*, which is a legal term.

MS. JACKSON: Uh-huh.

MR. BOYERS: To the extent you can answer based on your personal knowledge, how you're using that term, please go ahead.

THE WITNESS: Okay.

Again, the system -- our system tells us how the loan was sold, what security it's in.

I mean it's as simple as if it's in the public security the pool number starts with a 4. If it's a private whole loan deal the pool number starts with a 3. That's how I would know if it's going to be foreclosed in the name of RFC or foreclosed in the name of the trust.

MS. JACKSON: Okay.

BY MS. JACKSON:

Q. And when you say *the pool number starts with* -- excuse me. I'm sorry. You said...

A. **Every loan is assigned a pool number.**

Q. Uh-huh. And you said if it was a trust it started with?

A. **A 4.**

Q. A 4. Okay.

And each pool has a specific number assigned to it?

A. **In our system, yes.**

Q. In your system.

And so you could look at your system record and determine for any given loan what specific pool?

A. **Yes.**

Q. When the Corporate Assignment request would come in, did -- was a review done to determine the

specific pool that particular loan was in?

A. **Are you asking me specific to this loan?**

Q. Just -- let's just keep it general. If -- you said that if, you know, a loan came -- a request came in by a foreclosing attorney that, you know, it would get reviewed for you to determine, you know, what type of sale occurred and that one of those was if it got sold to a public security and you knew that because the code started with a 4. And that each pool has a specific code number starting with a 4.

Do your records -- when it came time to do a Corporate Assignment would you have identified the specific pool that a particular loan belonged to?

A. **Yes.**

Q. Okay. Going back to this document and this specific instance, was the specific public security pool identified on this Corporate Assignment?

MR. BOYERS: Well, I'd just object because she talked about pool --

MS. JACKSON: Uh-huh.

MR. BOYERS: -- in terms of their internal tracking number.

MS. JACKSON: Uh-huh.
MR. BOYERS: And it seems to me your question was whether they identified the number of the pool within their system and I mean this document that's publicly recorded, I'm not sure why their internal information -- their internal pool number would not --
THE WITNESS: It's not relevant. It doesn't need to go on there.
MR. BOYERS: So I don't see that it's relevant.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. In your personal knowledge, *U.S. Bank National Association as Trustee*, is it -- are there a lot of pools associated with U.S. Bank, *U.S. Bank National Association as Trustee*?
A. **U.S. Bank --**
Q. Uh-huh.
A. **-- is the trustee on many of our public securities, yes.**
Q. Okay. Many different ones?
A. **Yes.**
Q. Okay. And you could, if you had to look at your internal records, and determine what specific

pool a particular loan was in?
A. **Yes.**
Q. When you prepared -- your department prepared Corporate Assignments did they indicate on the Corporate Assignment the specific pool for which the loan was in?
MR. BOYERS: Again, you're asking about pool and she's used the term -- she's described pools as being tracked by an internal number within the company based on their recordkeeping practices.
So, again, I don't understand how it's relative or relevant to put in their pool ID number within their internal system onto a mortgage. So --
MS. JACKSON: That's not what I'm asking.
MR. BOYERS: I don't see the relevance.
MS. JACKSON: I'll redo it.
BY MS. JACKSON:
Q. For the pool ID number that's in your internal tracking system, does that allow you to identify the specific public security pool?
A. **I'm sorry, but that question doesn't make any sense.**

Q. When -- your internal tracking records have a pool number; correct?
A. **Each loan number --**
Q. Right.
A. **-- is associated -- when it's sold, it's associated to a pool, --**
Q. Okay.
A. **-- which has a pool number.**
Q. Does that pool number relate to any pool name that you know of? I mean...
MR. BOYERS: Are you -- are you asking her --
MS. JACKSON: I'm asking --
MR. BOYERS: -- what the name of the public security is?
MS. JACKSON: I'm asking her for pool number, whatever the pool number is in their system. Do they have an actual name that correlates with that pool number or does it exist --
MR. BOYERS: Name of what? Of the public security, is that what you're asking?
THE WITNESS: That would be in the Pooling & Servicing Agreement, would have the information as to what the name of the pool is.

Or what the name of --
MR. BOYERS: Public security.
THE WITNESS: -- the public security, I'm sorry.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. So in your records you have this pool number?
A. **Uh-huh.**
Q. Okay. To determine what public security that pool ID was associated with did you have any way within your records to locate that information?
A. **Well, our records would have the pool number, would have the trustee name and would have the deal name, yes.**
Q. What's a deal name?
A. **That's what you were calling the security name.**
Q. Okay. So the security name is the deal name? Right? No?
A. **And I could be calling it something that I call it, but I'm not sure...**
MR. BOYERS: Yeah. To the extent you're asking her --
MS. JACKSON: Uh-huh.
MR. BOYERS: -- to give a legal conclusion about what the...

I think there could be some confusion in terms of what deal name means in terms of matching up exactly with what the Pooling & Servicing Agreement says.

MS. JACKSON: Uh-huh.

MR. BOYERS: I don't think she was put out here to provide the exact name of --

MS. JACKSON: I didn't ask her. I just said is there a way for them to find out.

MR. BOYERS: And I think she answered.

MS. JACKSON: She just said *Yes*, yeah.

THE WITNESS: Yes.

BY MS. JACKSON:

Q. During the time that you supervised employees in the Records Department, in the course of them preparing *Corporate Assignments For Mortgages* was there ever an instance where the foreclosing attorney asked that the deal name or something other than just *U.S. Bank as Trustee?* Was there any other clarifying identification besides just the trustee's name ever requested to be put on the Corporate Assignments?

MR. BOYERS: I'm going to object because that's overbroad. You're asking her --

MS. JACKSON: Uh-huh.

MR. BOYERS: -- if that type of request was ever made --

MS. JACKSON: Uh-huh.

MR. BOYERS: -- by any foreclosure attorney --

MS. JACKSON: Uh-huh.

MR. BOYERS: -- to anyone in her department.

MS. JACKSON: Well, that she supervised.

MR. BOYERS: That's overly broad and she wouldn't necessarily be aware of all of those.

If you're asking about her personal -- is she aware of any instances, if they did something. But you're saying were there ever any. There's a difference. And so your question is really overbroad and burdensome and asks her to go beyond her personal knowledge.

So why don't you ask her what she's aware of?

BY MS. JACKSON:

Q. Are you aware of any instances where any of your employees were requested by the foreclosing attorneys to include more specific information identifying the pool or the deal name of --

MR. BOYERS: Can we go off the record

for a second?

MS. JACKSON: Yes.

(Discussion had off the record.)

MR. BOYERS: Let's go back on the record.

BY MS. JACKSON:

Q. Are you aware of any instances where a request would have been made to the Documents Record Department where the foreclosing attorney would have requested more specific information be recorded or be included on the Corporate Assignment, which -- besides just the name of the trustee?

A. **In 2006, no.**

Q. Okay. Did that process change at any point in time?

A. **It has changed with some states recently.**

Q. And your procedures, as far as what information is included on these assignments, is governed by your request from the specific --

MR. BOYERS: I'm just going --

MS. JACKSON: Okay.

MR. BOYERS: -- to object because I think you're getting into attorney/client privileged-type communications, --

MS. JACKSON: Yeah, I just want to make --

MR. BOYERS: -- so I'm going to instruct her not to answer further.

MS. JACKSON: Okay.

Let me phrase this differently.

BY MS. JACKSON:

Q. Do you -- when your employees are drafting Corporate Assignments do you have any freedom or latitude as far as how an entity is described on here? Or are you strictly following the instructions that come under New Track?

MR. BOYERS: I'm going to object because I think you're getting into...

If you had left...

I would have to object to the question --

MS. JACKSON: Okay.

MR. BOYERS: -- from the beginning because you're saying *any freedom or latitude.*

MS. JACKSON: Yeah.

MR. BOYERS: I have no idea what that means, so that's vague.

And then you're getting into the attorney/client privilege.

MS. JACKSON: Right.

BY MS. JACKSON:

Q. Are you aware of any instances where the Records Department employees would have, as a routine practice, without request from an attorney, gone out and researched and determined the pool ID and the deal name and placed the name of the security on the Corporate Assignment?

MR. BOYERS: What time period?

MS. JACKSON: If there's a difference in time periods, if we can...

THE WITNESS: And I apologize. I don't understand the question.

MS. JACKSON: Yeah, I know because I am...

Let me just try one more time and then we'll leave it.

BY MS. JACKSON:

Q. Are you -- you said that sometimes the name on the security would also be included along with the trustee as a descriptor of who is taking assignment. And you said that in 2006 that began to happen because of some -- you said some states. And can you just kind of describe to me what you meant by that?

MR. BOYERS: Well, I'm going to object

to the question to the extent you're seeking information that may be attorney/client privileged.

You're not to offer any --

MS. JACKSON: Yeah.

MR. BOYERS: -- testimony about communications from attorneys internally or externally to you. You can offer your personal knowledge to the extent it doesn't get into those types of communications.

THE WITNESS: Okay.

MS. JACKSON: I'm not trying to ask you that information. I'm just trying to figure out the...

BY MS. JACKSON:

Q. Let me just ask it this way: When you got information off of New Track to prepare a Corporate Assignment, your department did, sometimes you said that you would do some research to find out what type of loan it was, whether it was like wholesale or whether it was a public security. If it was a public security for your routine practice how would the name or the entity be reported?

A. **It would be --**

MR. BOYERS: Reported where and in what time period?

MS. JACKSON: Reported on the Corporate Assignment. And this would be prior to 2006, when it changed.

THE WITNESS: It would be the trustee -- the name of the trustee.

MS. JACKSON: Okay.

BY MS. JACKSON:

Q. And that was the general practice, --

A. **Yes.**

Q. -- just to have the trustee's name on there?

A. **Correct.**

Q. Okay.

Okay. And now let's switch over.

You said another part of the job duties of the Records Department is to respond to requests for information that might come in on a particular loan.

A. **Request for documents.**

Q. Uh-huh.

A. **Okay.**

Q. What type?

A. **Excuse me. Because I think she said this somewhere. I asked I believe previously what**

**type of requests you would get. And if you would indulge me. If you could just tell me again so I don't have to look through my notes.**

MR. BOYERS: Well...

MS. JACKSON: No, can't indulge me? I'll ask it again.

MR. BOYERS: Well, it's asked and answered and you're... You're not entitled to ask the same questions over and over again. Okay?

MS. JACKSON: Right.

MR. BOYERS: So I would object to your asking the same questions.

And for you to say that you want to ask them again because you don't want to go through your notes and determine...

If you need a break, go through your notes and then figure out what you need to ask and make sure it's not the same thing again. But --

MS. JACKSON: Do you --

MR. BOYERS: -- the way you just phrased that --

MS. JACKSON: -- want to break for lunch?

MR. BOYERS: Well, how much more time do

you think you're going to take?
MS. JACKSON: It's hard to tell, Jim.
MR. BOYERS: Well, what's your best estimate?
MS. JACKSON: Two hours maybe.
MR. BOYERS: Are you hungry?
THE WITNESS: Yes.
MR. BOYERS: Let's take our time. 1:00 o'clock.
(Lunch recess: 12:19 - 12:55 PM.)
BY MS. JACKSON:
Q. You said that one of the responsibilities of your Document Record Department was to respond to requests for various documents.
A. **Correct.**
Q. Would -- who would be making those document requests?
A. **Um...**
Q. And the types of people, like --
MR. BOYERS: That's asked and answered. She already answered that.
MS. JACKSON: Do you want me to ask the court reporter to read the question back? Or...
MR. BOYERS: I mean it's been asked and answered. She told you.

If you want to testify again, you can say it again.
THE WITNESS: Various individuals within the organization--Legal, Servicing, Acquisition areas. Other people within Records.
BY MS. JACKSON:
Q. Did you get request from the Service areas, or Servicer areas, I believe you --
A. **Yes.**
Q. And what type of requests would you get from the Servicer areas?
A. **For documents.**
Q. And what type of documents would they be asking for?
A. **It could be any document from the origination file or the legal file.**
Q. Did the servicer areas -- did the -- did your Records Department provide copies or the images of files to your service -- the service area?
A. **I'm not under- --**
Q. I believe you said, when you were talking about servicer areas, you were talking about -- you said maybe Homecomings was a servicer.
A. **Correct.**
Q. Okay. And I'm just going to use Homecomings

as -- or can I call them a loan servicer, if I refer to loan servicers?
A. **Definitely, yes.**
MR. BOYERS: If you're asking about them generally --
MS. JACKSON: Well, yeah, I want to refer to generally the servicer area and I'm going to botch that.
BY MS. JACKSON:
Q. So servicer area -- if I call those loan servicers, --
A. **Uh-huh.**
Q. -- you understand that I'm referring to what you're calling as a servicer area?
A. **Okay.**
Q. Okay. Did the loan servicers have -- did you ever provide the loan servicers with the entire file, the entire loan file?
A. **On occasion we would.**
Q. And when a loan servicer would request documents, did they request documents from the origination file or the collateral --
MR. BOYERS: That's asked and answered. She's already testified that they would ask for all different types of documents --

MS. JACKSON: Oh, --
MR. BOYERS: (Inaudible.)
THE WITNESS: Yes.
I mean, as I said before, --
MS. JACKSON: Uh-huh.
THE WITNESS: -- from either file.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. Did the loan servicers have their own copies of your origination file?
A. **No.**
Q. So if the loan servicer needed any documents relating to a loan file they requested that through your Records Services Department?
A. **Yes.**
Q. And was there a specific records request form or...
A. **As I said before, there was a system that they used to make the request.**
Q. Was that the New Track system?
A. **No.**
Q. No. What system did they use?
A. **I don't remember the name of the system.**
Q. Okay. But it was an electronic request?
A. **Yes.**

Q. Okay. And then once you received the electronic request were the documents requested provided in hard copy or were they provided in imaging, --
A. **As I said before, --**
Q. -- or didn't it matter?
A. **As I said before, we scanned the documents and provided it in Fetch.**
Q. Okay.
MR. BOYERS: And just --
MS. JACKSON: But the --
MR. BOYERS: Chris, we took time for lunch so you could review your notes.
MS. JACKSON: Uh-huh.
MR. BOYERS: You are going over --
THE WITNESS: What we've already talked --
MR. BOYERS: -- the same items.
MS. JACKSON: We were talking foreclosure attorneys. I'm just seeing if there's any difference between them --
MR. BOYERS: But --
MS. JACKSON: -- and loan servicers.
MR. BOYERS: -- before you talked about --
THE WITNESS: We discussed this already.

MR. BOYERS: -- foreclosure attorneys. You asked her questions about who they fulfilled requests for and how they did it and you asked generally.
MS. JACKSON: Okay.
MR. BOYERS: So...
MS. JACKSON: So the -- let me just do this.
BY MS. JACKSON:
Q. The loan servicers, when they requested documents, followed the same general policies which you discussed previously?
MR. BOYERS: Well, just for the record, --
MS. JACKSON: Uh-huh.
MR. BOYERS: -- she's offered you testimony about how foreclosure counsel had a separate system --
MS. JACKSON: Right.
MR. BOYERS: -- that was used.
Before you asked about that testimony you asked about --
MS. JACKSON: Uh-huh.
MR. BOYERS: -- general fulfillment of record requests.

MS. JACKSON: Right.
MR. BOYERS: So just so the record is clear, you're not talking about New Track here.
MS. JACKSON: No.
MR. BOYERS: You're talking about requests generally, not touching on the New Track system; correct? Am I right?
MS. JACKSON: Correct.
MR. BOYERS: Okay.
And you've already -- you've asked about that general stuff before.
MS. JACKSON: Okay.
MR. BOYERS: So I don't see the point in going over the same things.
MS. JACKSON: I don't want to go over the same thing either. I'm not intending to go over the same thing.
MR. BOYERS: All right.
BY MS. JACKSON:
Q. Let me -- we'll work from Exhibit 4.
Exhibit 4 is a copy of a complaint that was filed in the Robinson case. And --
MR. BOYERS: And just for the --
MS. JACKSON: Uh-huh.
MR. BOYERS: Before you go any further.

Exhibit 4 you acknowledged earlier, off the record, is not a true and accurate copy of the *Complaint* because it's missing 12 pages of the mortgage that is an exhibit on the back of the *Complaint*; correct?
MS. JACKSON: Correct.
MR. BOYERS: Okay.
MS. JACKSON: Because we're only asking questions about the *Note*.
BY MS. JACKSON:
Q. If you flip through the first few pages you'll come to Exhibit A.
A. **(Complying.)**
Q. And can you tell me what -- it says Exhibit A on this side. And can you look at that and just tell me what that document is?
A. **It's called a *Note*.**
Q. Okay. And from the first page, if we go back one, two, three, four -- to the fifth page...
A. **(Complying.)**
Q. And do you recognize this type of document?
A. **Yes. It's an Allonge Note.**
Q. And was your Records Department responsible for preparing the Allonges?
A. **At what point?**

Q. In 2005.
A. **Um --**
MR. BOYERS: When you say *Preparing the Allonges* --
MS. JACKSON: Uh-huh.
MR. BOYERS: -- are you saying drafting this form or doing anything in connection with the Allonge?
MS. JACKSON: Or doing anything in connection with the Allonge.
THE WITNESS: With this Allonge?
MS. JACKSON: Why don't we -- let's just strike that.
BY MS. JACKSON:
Q. And when -- we'll go back to when the records first come in to you. And you said there was an origination file and a collateral file. What file would this Allonge be placed in?
A. **It would be in the legal file, collateral file.**
MR. BOYERS: For the record, she's been using *legal* and *collateral* file --
THE WITNESS: Interchangeably.
MR. BOYERS: -- interchangeably.
MS. JACKSON: I know. That's why I keep messing up, too.

BY MS. JACKSON:
Q. So -- and I think you said before the items that were in the legal file, did you have -- when they first came in was there -- did you have to make... Do any... Would a copy of this Allonge also be in the origination file?
A. **Yes.**
Q. Okay. And when these documents came to you they were already separated into origination file documents and the collateral/legal file documents; --
A. **Correct.**
Q. -- correct?
Okay. So the... Okay.
So when a request was made to foreclose on a loan, you said you would get requests for documents from foreclosing attorneys.
A. **Correct.**
Q. Okay. Did foreclosing attorneys request *Notes*?
A. **Yes.**
Q. Okay. And if your department got a request for a *Note* can you describe to me what actions you would take once you received that request?
A. **Well, the first thing we would do is check to see if the image of the *Note* was in Fetch. If**

**the image of the *Note* was in Fetch, then we would upload that document into New Track for the attorney. If the document was not in Fetch, we would either pull the origination file to obtain a copy of it or go to the custodian to obtain a copy of the Note. And there were different rules as to which file you pulled based on, again, different factors.**
Q. Uh-huh. Were the factors determined by what type of owner -- you said there were like the public owners --
A. **And honestly, I don't know to that detail. I just know there were different factors.**
Q. So when the request came into your department how did you know whether to get the Note from Fetch or from the --
A. **We always provided it from Fetch if it was there.**
Q. And why was that?
A. **Because it's the least expensive way to fulfill the request and fastest.**
Q. And fastest. And then what would happen if you needed a Note that was in the collateral or legal file? What kind of process would you have to go through to get that?

A. **One of two different processes. Either we would request a copy. We would request that the custodian make a copy for us. Or we would request the file back and make the copy ourselves. And that would depend on who the custodian was.**
Q. What was the procedure for -- where Wells Fargo was the custodian?
A. **Again, if the image was not available in Fetch, we would ask Wells to make a copy of the Note for us.**
Q. And when you're talking about the image that is made into Fetch, is -- are you talking about the documents as received from the client?
A. **Correct.**
Q. Okay. And then if you had to request an Allonge from Wells Fargo as custodian how was that word process set up? Was it electronic again?
A. **You said if I had to request an Allonge from the custodian?**
Q. Or a Note from the custodian.
A. **That was --**
Q. From the custodial file. That collateral file or legal file. Sorry.
A. **It was done via e-mail and a spreadsheet.**

Q. And how long did it take to -- from the time -- and this is just an average, from the time you would like request a Note out of the collateral file, how long would it take for you to get?
A. **Different time frames based on price. So depending on how quickly we needed it, there would be a different price involved. So if we needed it 24 hours it was one price. 48 hours one price. 72 hours one price.**
Q. Okay. Do you remember what those prices were back in 2005?
A. **No.**
Q. Do you know what the price would be now for like 24 hours if you wanted something from them?
MR. BOYERS: From whom?
MS. JACKSON: Wells Fargo presumably.
THE WITNESS: $5 for 24 hours.
BY MS. JACKSON:
Q. And then 72 or 48?
A. **48 is 2.50. 72, I'm not sure.**
Q. Okay. And then if it's longer than 72 do they give it to you for free --
A. **No.**
Q. -- or is there a flat fee?
A. **(No response.)**

Q. Were -- on average, in your personal knowledge, we'll say during a given year, how many requests were made to obtain the Note from the Wells Fargo custodian?
MR. BOYERS: Object to the form of the question because you're calling for her to speculate.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. During -- we'll do this.
During the year 2005 do you know how many requests the Records Department made to Wells Fargo custodian to obtain a copy of the Note in their collateral file?
A. **I couldn't tell you specifically off the top of my head, no.**
Q. Did you track those requests?
A. **Yes. They would have been tracked.**
Q. And was there a system name where they were tracked, or...
A. **Yes, they would have been tracked on RMS.**
Q. So would there be a way that you're aware of today to be able to go back and look in 2005 and find out how many requests for a Note was made from Wells Fargo custodian?

A. **I have no way of knowing.**
Q. Okay. And can you just... I'm back on Exhibit 4. And the page that you have open that you stated wasn't Allonge.
A. **Uh-huh.**
Q. Is there any indication of -- this is *Pay to the Order of*... Is there any indication there that -- is that field blank?
MR. BOYERS: Objection, the document speaks for itself.
MS. JACKSON: The document speaks for itself. Okay.
MR. BOYERS: You can answer it.
THE WITNESS: It is blank. That is the way that we require the clients to deliver the Notes to us, with the endorsement blank.
BY MS. JACKSON:
Q. And are you aware of why it's required to be...
A. **Again, it was for our ease and to reduce expense and improve -- or minimize the time and number of touches that we made to the Note. Minimize the time that it took us to get them to the custodian.**
Q. And when you say *touches, minimize touches to the Note...*

A. **So that no one had to touch it and endorse it.**
Q. Physically handle it?
A. **Right.**
Q. Okay.
A. **Exactly. Yeah.**
Q. All right.
All right. So let's put that one aside. That was Exhibit 4.
A. **(Complying.)**
Q. And then we're going to look at Exhibit 5, which is also a *Complaint* that was filed in this case. And just like the prior *Complaint* it is a copy of the *Note* and its attachments with the exception of the mortgage. We only have the first page of the mortgage.
MR. BOYERS: I would just say -- the mortgage is not an attachment to the *Note* and the way you asked the question said that it was, so I'm just clarifying that.
MS. JACKSON: Attachment to the *Complaint*.
MR. BOYERS: I think you said it, yeah. Good.
MS. JACKSON: Thank you, sir.
BY MS. JACKSON:

Q. So...
And this *Complaint*, likewise, I'd like to go back and -- if we go back four pages. And we have another document. If you recognize what type of document that is, if you could just...
A. **Again, it's a *Note*.**
Q. It's a *Note*. And let's go back one, two, three, four. And then the fifth page, could you tell me what that document is?
A. **Again, it's an Allonge.**
Q. An Allonge. And, again, is there an entry made for *Pay to the Order Of*?
MR. BOYERS: Same objection, --
MS. JACKSON: Same objection.
MR. BOYERS: -- the document speaks for itself.
You can answer.
THE WITNESS: No, there is not.
MS. JACKSON: Okay.
We're done with that.
THE WITNESS: Okay.
BY MS. JACKSON:
Q. And then this is Exhibit 6. Can you identify that document again?
A. **Again, it's a *Note*.**

Q. Okay. And this one has a Bate stamp down at the bottom that starts with *US Bank Number 208*. And if you could look through that document.
A. **(Complying.)**
Q. Is there an Allonge attached to that document?
A. **No.**
Q. Okay. We're done.
A. **Okay.**
Q. This is Number 7. And could you just look at that document and identify that document?
A. **A *Note*.**
Q. And if you turn to the last page.
A. **Uh-huh.**
Q. Can you tell me what that document is?
A. **Allonge.**
Q. All right. And do you -- let me just... Were you in the -- you still worked in the Records Department in December of 2007; --
A. **Yes.**
Q. -- correct?
Do you remember getting a request for this specific *Note*? To -- this is the Robinsons' *Note*?
A. **No.**
Q. Okay. Flipping to the last page, on this

particular Note the Allonge appears to have entries on it that weren't on the other two Allonges that we looked at.
MR. BOYERS: Again, the document speaks for itself.
MS. JACKSON: Uh-huh.
MR. BOYERS: Do you have questions about it?
MS. JACKSON: Uh-huh.
Do you know...
Let's do this in connection with your deposition.
MR. BOYERS: Her affidavit?
MS. JACKSON: Her affidavit.
MR. BOYERS: Which one?
MS. JACKSON: The first one.
MR. BOYERS: Exhibit No. 8?
MS. JACKSON: Exhibit No. 8.
BY MS. JACKSON:
Q. It will be easier to do it this way. Just keep that page open.
A. **Okay.**
Q. Could you just quickly review this document to make sure you recognize it?
A. **Yes.**

Q. All right. And do you recall why you prepared this?
MR. BOYERS: To the extent your question might require attorney/client communications, any attorney/client communications you had with the Legal Department or --
MS. JACKSON: Right.
MR. BOYERS: -- any other attorney are not things to offer as testimony because they're privileged.
THE WITNESS: Okay.
BY MS. JACKSON:
Q. So let me ask it this way: The purpose of this -- you included some explanation of it looks like your job duties and other things. Can you explain to me, nothing that you talked about with your attorney, but what the purpose was for providing this document? What were you trying to explain in this document?
MR. BOYERS: I think -- if that's your question...
You can go ahead and answer it, what you were explaining in the affidavit.
MS. JACKSON: In the affidavit, yeah.
MR. BOYERS: To the extent the document

doesn't speak for itself.

THE WITNESS: To explain what my job responsibilities were around managing the records involved with the case that was -- that's being litigated.

BY MS. JACKSON:

Q. Did you compose this affidavit?

MR. BOYERS: Object to the form of the question. That's vague.

BY MS. JACKSON:

Q. Did you write the sentences on this affidavit?

A. **I worked with Christine to put them together, yes.**

Q. Okay. And is there a date on this affidavit?

A. **No.**

Q. Okay. If you look at Paragraph 4, it says that you're familiar with the processes followed by RFC's custodians. When you say *RFC's custodians* to whom are you referring?

A. **Custodians that are holding collateral for loans that we have purchased -- or that RFC purchased.**

Q. Okay. And can you tell by your exhibits attached to this whom the RFC custodian would be in this particular -- for this particular Note attached?

A. **I could tell using the system. But no, not by looking at the Note I could not tell.**

Q. Okay. Attached to your affidavit is a Note that has Exhibit A on it. Do you recall where in your system this Note came from?

A. **I didn't... I mean looking at the document I can tell you that it came from the custodian.**

Q. Okay. Do you recall making a request to the custodian --

A. **I don't.**

Q. -- for this document?

A. **(Shaking head.)**

Q. And how can you tell that it came from the custodian?

A. **Because the endorsement is completed or the Allonge is completed.**

Q. So your Records Department was not responsible for completing Allonges?

MR. BOYERS: Object to the form of the question. To the extent you're saying *not responsible,* I think that's vague.

MS. JACKSON: Okay.

BY MS. JACKSON:

Q. You said the way that you could tell that this came from the custodian and not from your

records was because the endorsement was filled in.

Was your department ever responsible for filling in endorsements on Allonges?

A. **Ever?**

Q. Sure.

A. **Yes.**

Q. During what time frame?

MR. BOYERS: Well, I -- I object to that question because it assumes a fact not in evidence--that that would apply to all loans within a specific time frame. And I don't think that's consistent with her testimony.

BY MS. JACKSON:

Q. Well, let's try 2005, when this -- this loan, it closed -- it looks like it closed on September 30th of 2005.

So during 2005 was the Records Department responsible for completing Allonges?

A. **Again, that's a very, very difficult question to answer. I don't know how to answer it. Were we responsible? We were responsible to make sure that it happened. Did we physically complete the Allonges? No.**

Q. Okay. And then how -- you said that you were

responsible to make sure that the Allonge was completed. What did you do to insure that?

A. **Well, again, as it says in the Custodial Agreement, the custodian was responsible for completing that on our behalf.**

Q. Okay. Well, then I guess what was your responsibility?

A. **Oversaw the custodian to make sure that that happened.**

Q. Okay. And when you say you oversaw the custodian to make sure that that happened, I mean what did you...

MR. BOYERS: Well, I'd just note an objection for the record --

MS. JACKSON: Sure.

MR. BOYERS: -- because you're using the term *Responsibility.*

MS. JACKSON: Okay.

MR. BOYERS: And based on the Custodial Agreement the physical act was delegated to the custodian, --

MS. JACKSON: Uh-huh.

MR. BOYERS: -- but responsibility is defined within the Pooling & Servicing Agreement, --

MS. JACKSON: Can we go off the record a second?
MR. BOYERS: -- which...
(Discussion had off the record.)
BY MS. JACKSON:
Q. You said that part of the -- part of your duties --
MR. BOYERS: That's...
MS. JACKSON: Can't do that? Can I use *Duties*?
MR. BOYERS: You can say *What you did*.
MS. JACKSON: *Did*. Okay.
BY MS. JACKSON:
Q. Part of what you did as a supervisor and manager of the Records Department included insuring that the custodian endorsed Allonges?
A. **Correct.**
Q. Okay. In order to perform that duty can you describe to me what you did to insure that the custodian had endorsed the Allonge?
A. **We had periodic meetings with the custodian, where they provided feedback as to where they were at in the endorsement process.**
Q. Okay.
A. **So what pools were outstanding, what pools they**

**had completed.**
Q. Did -- in order for you to determine whether a specific Allonge had been endorsed or not, did you maintain a spreadsheet or --
A. **No.**
Q. Okay. So when you said you had these meetings to see what their progress was, can you describe to me how you would review progress against -- what type of criteria?
A. **Oh. Well, again, according to the terms of the agreements, they have 90 days to complete the endorsements. The report would show each pool, when it was issued, when they had to have the endorsements complete and then they would show a percentage of what had beep completed. Once it reached a hundred percent it would fall off the report. We didn't look at it anymore.**
Q. Okay. So you had some kind of report which told you how many loans were in a particular pool?
A. **I'm not sure if that report had number of loans in the pool or not. I'm not sure. I don't remember.**
Q. So were you relying then on -- because you said these meetings, you know, they had the 90 days. You would have meetings and they would tell you

the percentage that had been endorsed.
Did you -- was there any oversight or review of their records, what they had done? Or were you relying on their verbal reporting that they had accomplished 20%?
A. **It was --**
MR. BOYERS: Object to the form, that it's vague.
You can answer.
MS. JACKSON: Right. Yeah.
THE WITNESS: It wasn't verbal. It was a written report. And no, we did not -- if what you're asking is did I validate that they had done that?
BY MS. JACKSON:
Q. Right.
A. **No.**
Q. Okay. So --
A. **They were required by the terms of the contract to do it. They did it.**
Q. Okay.
A. **I never had any issues with them not doing it. Never.**
Q. Okay. And then once they completed the endorsement and the loan or whatever would fall

off the report, that was the end of your involvement on whether or not the Note got endorsed -- or the Allonge was endorsed?
MR. BOYERS: Object --
MS. JACKSON: Okay.
MR. BOYERS: -- to the form of that --
MS. JACKSON: Yeah.
MR. BOYERS: -- because it's vague.
You can answer, if you can.
THE WITNESS: Again, I don't know if I can answer it.
MS. JACKSON: Yeah.
THE WITNESS: I'm not sure what you're getting at.
MR. BOYERS: I think it may call for a legal conclusion, as well.
MS. JACKSON: Yeah. Okay.
BY MS. JACKSON:
Q. In your affidavit, this is the first one...
MR. BOYERS: Exhibit 8?
MS. JACKSON: Exhibit 8.
BY MS. JACKSON:
Q. Okay. I believe you said in Paragraph 5 you instructed the custodian of the Robinson Note to endorse the Note.

A. **Uh-huh.**
Q. But I think you just said that...
I guess how were those instructions given to them?
A. **It was standard operating procedures. I worked out -- shortly after I came to RFC I worked out a process with the custodians so they would endorse the Notes for us.**
Q. And was there any reason why Residential Funding Corporation didn't endorse the Notes?
A. **Again, it would have been another touch. Again, it's the expense and the time. It's just easier for Wells to do it.**
Q. Did Wells Fargo charge Residential Funding for --
A. **Yes.**
Q. -- doing that?
MR. BOYERS: You've got to remember to wait --
THE WITNESS: I'm sorry.
MR. BOYERS: -- until she's finished asking her question.
That's okay. It's just easier for the court reporter.
(Discussion had off the record.)

BY MS. JACKSON:
Q. And looking back, and this is still on Exhibit 8, your Exhibit A to your affidavit.
And then going back to the last page, which has the Allonge on the Note...
So if you look at the bottom there's a stamp on there and it says *Pay to the Order of US Bank National Association.* And --
MR. BOYERS: *As Trustee.*
MS. JACKSON: *As Trustee.*
BY MS. JACKSON:
Q. It has your signature on there.
A. **Correct.**
Q. Is that signature part of the stamp?
A. **Yes, it's a facsimile signature.**
Q. Okay. So it didn't come back to you to sign?
A. **No.**
Q. And if I were just looking at this stamp, is there any way to tell...
MR. BOYERS: I'm going to object because you're asking her for an opinion.
MS. JACKSON: Okay.
MR. BOYERS: She's a lay witness.
MS. JACKSON: Okay. But it's her stamp.
MR. BOYERS: Right. But you're getting

ready to ask her an opinion. If you have a question about what it shows, then ask the question, but --
MS. JACKSON: Okay.
MR. BOYERS: -- to say *Is there any way to tell* you're asking --
MS. JACKSON: Okay.
MR. BOYERS: -- her for an opinion.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. The stamp -- how long has the stamp been in use?
A. **19 -- 1998. 1999 probably.**
Q. And then when was the last time the stamp was used?
MR. BOYERS: This specific stamp?
MS. JACKSON: The stamp in this format, yeah.
MR. BOYERS: If you know, you can answer.
BY MS. JACKSON:
Q. If not...
A. **Sometime last year. Late last year probably.**
Q. Okay. And why was it -- why did it quit being used?
A. **We don't sell loans in the name of Residential**

**Funding Corporation anymore.**
Q. And did you write or draft the terminology of the stamp?
A. **It's industry standard.**
Q. Do you know when it says *Without recourse...*
A. **Industry standard.**
Q. Okay. And did you order the stamp?
A. **Personally?**
Q. Yeah. From the company.
A. **I did not personally do that.**
Q. Okay. So when you received the stamp was it already imprinted? So you didn't draft it. You said it's industry standard.
MR. BOYERS: I'm just going to --
MS. JACKSON: Uh-huh.
MR. BOYERS: -- object to the form of the question because I think you're assuming some things that aren't in evidence.
Is your question did she participate in the creation of the stamp? Is that what you're trying to get at? Because her signature is on it. I mean...
MS. JACKSON: Right. Yeah, I'm trying to figure out who drafted the language on the stamp.

MR. BOYERS: So you're asking about the language, not the signature?

MS. JACKSON: Right. Because I already asked her about the signature.

BY MS. JACKSON:

Q. So did -- when I asked you about the language of the stamp you said it was industry standard. So where did that come from?

MR. BOYERS: And that's asked and answered. She said it's industry --

MS. JACKSON: Industry standard.

BY MS. JACKSON:

Q. How did you know it was industry standard?

A. **I don't know how to answer that. I don't know. I mean you can look in the Fannie and Freddie guidelines.**

Q. Okay.

A. **Fannie and Freddie guidelines and they'll tell you that's the format for an endorsement.**

Q. For an endorsement?

A. **Yes.**

Q. Okay.

And then moving up to the -- *Pay to the Order of*, there is -- *Residential Funding Corporation* is stamped there.

A. **Correct.**

Q. Is that -- was that stamped at your instruction by someone else?

A. **It was stamped by Wells Fargo as part of the endorsement process, yes.**

Q. Okay. And Residential Funding Corporation is who you worked for; right?

MR. BOYERS: Object to the form. I think that misstates her prior testimony.

You can answer.

THE WITNESS: I -- in 2006 I worked for Residential Funding Corporation, yes.

BY MS. JACKSON:

Q. Okay. Did you work for Residential Funding Corporation in 2005?

A. **Yes.**

Q. So did you provide this, the Residential Funding stamp to the Wells Fargo custodian?

A. **Yes.**

Q. Okay. During the time that -- 2005 to 2006, was there any discussion or did any of your -- it would be your clients, it would be the ultimate seller, so in this particular case it looked like Residential Funding Corporation was the Master Servicer for Residential Asset Securities

Corporation?

MR. BOYERS: You're --

MS. JACKSON: No?

MR. BOYERS: -- asking her to speak to the Pooling & Servicing Agreement.

MS. JACKSON: Right.

MR. BOYERS: This Pooling & Servicing Agreement speaks for itself.

MS. JACKSON: Okay.

MR. BOYERS: So if you're asking her to give you opinion testimony about that agreement, or to offer legal conclusions about that agreement, those -- that's not admissible testimony.

MS. JACKSON: I'm not asking her for an opinion. I'm just...

BY MS. JACKSON:

Q. In the internal documents that you have for this particular loan are you able to determine who ultimately purchased the loan from Residential Funding Corporation?

MR. BOYERS: Object to the form of the question.

MS. JACKSON: Okay.

MR. BOYERS: You're asking her to draw a

legal conclusion about a transaction. She's not here to testify about that. She's not an attorney. She can't --

MS. JACKSON: No.

MR. BOYERS: -- speak to what would show a transaction or not.

MS. JACKSON: Okay.

MR. BOYERS: She can't answer that question.

MS. JACKSON: Okay.

BY MS. JACKSON:

Q. So to...

Do you know...

In your own personal knowledge do you know what an Allonge is and the purpose of an Allonge?

A. **Yes.**

MR. BOYERS: Just noting the objection, --

MS. JACKSON: Personal knowledge.

MR. BOYERS: -- it's calling for a legal conclusion.

She can speak to her understanding of it.

MS. JACKSON: Right.

MR. BOYERS: And she said *Yes*.

BY MS. JACKSON:
Q. Okay. And then I said what is the purpose of an Allonge?
**A. It's to show transfer of ownership in a loan.**
Q. Okay. And based on your personal knowledge, when it says *Pay to the Order of Residential Funding Corporation,* does that show transfer of ownership to Residential Funding Corporation?
MR. BOYERS: I'm going to object again to the form. It's calling for a legal conclusion.
You can testify as to your understanding.
MS. JACKSON: Understanding, yes.
THE WITNESS: Yes, that would be my understanding.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. And then what is your understanding of why the stamp at the bottom of the Allonge that begins with *Pay to the Order Of: US Bank*, what is the purpose of putting that stamp on this Allonge --
MR. BOYERS: Same --
BY MS. JACKSON:
Q. -- based on your own personal knowledge?
MR. BOYERS: Same objection. Calls for

a legal conclusion. She can only speak as to her understanding, which is not admissible.
THE WITNESS: Again, transfer ownership to *U.S. Bank National Association as Trustee.*
BY MS. JACKSON:
Q. And as -- based on --
**A. I do have to break.**
MS. JACKSON: Go ahead.
(Recess taken.)
BY MS. JACKSON:
Q. We were talking about Exhibit 8, which was an affidavit which you submitted. And we were referring back to Paragraph 4 on there. And the last sentence of Paragraph 4 says that, *"I have attached a true and accurate copy of the original Note signed by Mr. and Mrs. Robinson hereto as Exhibit A."*
And then I'm going to go to Exhibit A and turn to the last page of it and that's the Allonge.
When you said that you attached a true and accurate copy of the original Note, how did you know that to be true?
**A. It would have been requested. A copy of the original would have been requested from the**

**system and it would have been attached. Again, I'm not real sure how to answer that question, so...**
MS. JACKSON: That's --
MR. BOYERS: When you say *System,* you mean *Wells Fargo*; correct?
THE WITNESS: Right.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. And when -- did you speak to anyone from Wells Fargo that told you this was the copy from their files or...
You said, *"It came to me."* The document came to you, so I'm just trying to figure out how you got -- you physically got it to look at.
MR. BOYERS: Well, I'd just note an objection --
MS. JACKSON: Uh-huh.
MR. BOYERS: -- because I believe she testified that she made the request from Wells Fargo to deliver a copy of the original to her, so doesn't that tell you how she got it?
MS. JACKSON: Right. But to me that's assuming that Wells Fargo provided her the correct copy. I mean...

BY MS. JACKSON:
Q. You did not go to the custodian and physically get the loan out of the file?
MR. BOYERS: I'm going to object to the form of the question because I believe that the testimony that's been provided here --
MS. JACKSON: Uh-huh.
MR. BOYERS: -- and by Steve Naasz was that -- and according to Steve Naasz's report --
MS. JACKSON: I thought we couldn't refer to anybody else's testimony?
MR. BOYERS: Well, I'm just saying...
Let's go off the record then.
MS. JACKSON: Okay.
(Discussion had off the record.)
MS. JACKSON: Okay.
MR. BOYERS: Let's go back on the record.
Reask your question.
MS. JACKSON: Well, let me reask it.
BY MS. JACKSON:
Q. So I'm asking how do you know that the Note that's attached as Exhibit A is a true and accurate copy of the original Note signed by Mr. and Mrs. Robinson?

MR. BOYERS: And I'll just note an objection because you're asking, *"How do you know?"* I think at the time her affidavit was made --

MS. JACKSON: Uh-huh.

MR. BOYERS: -- it's *How did you know*? Isn't that -- if you're asking her about her representations?

MS. JACKSON: Do you know -- how do you know --

MR. BOYERS: Are you asking about at the time the --

MS. JACKSON: Okay. Here we go. Here we go.

BY MS. JACKSON:

Q. This affidavit, does it have a date on it?

A. **No.**

Q. Do you remember signing this affidavit?

A. **No, I don't, --**

Q. All right.

A. **-- to be perfectly honest.**

I signed a few.

Q. Okay. So on whatever date you signed this affidavit, explain to me how you knew that you did attach a true and accurate copy of the

original Note signed by Mr. and Mrs. Robinson?

A. **I couldn't remember -- I can't remember.**

Q. In looking at Paragraph 5 you say you instructed the custodian of the Note to endorse the Note. That -- you kind of indicated that was part of your standard operating procedures, to have Wells Fargo perform the Note endorsement duties for blank Notes that came in.

Okay. Um...

MR. BOYERS: Was --

MS. JACKSON: Well, I think --

MR. BOYERS: -- there a question there?

MS. JACKSON: Yeah. She said that it was standard operating procedure for Residential Funding Corporation to assign -- I can't use *responsibility* -- to assign the job of endorsing the Note to Wells Fargo.

BY MS. JACKSON:

Q. And then you also said that you would have status meetings with Wells Fargo to follow up with their progress on endorsing the Notes which were sent to them. Can you say for certain that you know when any particular Note would be signed on any particular day due to your general procedures? Your general procedures just...

MR. BOYERS: Object --

MS. JACKSON: Uh-huh.

MR. BOYERS: -- to the form of the question because it's a hypothetical.

MS. JACKSON: Uh-huh.

I can make it an unhypothetical.

MR. BOYERS: You can -- you can answer to the extent that you can.

THE WITNESS: Well, at this point in time, 2005 - 2006, we were probably selling 50 to 60 thousand loans a month. So no, I would not have any personal knowledge of when any one document was stamped. I couldn't.

BY MS. JACKSON:

Q. Right.

A. **When you're dealing with that kind of volume, there is no way.**

Q. Okay. Okay. And once again, just on this first affidavit, did you compose the language in this affidavit --

MR. BOYERS: I'm going to --

BY MS. JACKSON:

Q. -- or did someone compose it for you?

MR. BOYERS: I'm going to object to the form of the question.

To the extent who composed it, I don't think is relevant. The fact that she verified it is what's relevant, which she did.

You can...

And she's already testified about her participation in preparing the document, so you're asking something she's already answered.

MS. JACKSON: Well, she hasn't answered did she write this language on the affidavit.

MR. BOYERS: She testified that she participated in creating that document.

THE WITNESS: Yes.

MR. BOYERS: She did. She already testified to that.

MS. JACKSON: *Participation* is vague.

BY MS. JACKSON:

Q. Did you write the language?

MR. BOYERS: Objection. She's already testified that she was involved in the creation. That's her signature on the document.

THE WITNESS: As I said before...

MS. JACKSON: Okay. All right. Cool.

BY MS. JACKSON:

Q. What was your participation in the creation of this document? Can you explain that to me?

A. **Again, as --**
MR. BOYERS: To the extent it doesn't involve --
MS. JACKSON: Attorney/client privilege.
MR. BOYERS: -- attorney/client privileged communication.
THE WITNESS: And as I stated before, Christine and I worked on the document together.
BY MS. JACKSON:
Q. When you say *Worked on the document together,* --
A. **Put the verbiage together.**
Q. Put the verbiage together.
A. **And I can't remember who did what at this point.**
Q. Okay. So in Paragraph 5, where you're affirming that you instructed the custodian of the Robinson Note to do the endorsement, was your input on that based on the standard operating procedures or was that based on you had any personal knowledge that this particular Note was endorsed?
MR. BOYERS: Object to the form of the question.
MS. JACKSON: Uh-huh.
MR. BOYERS: That's vague.
You can answer.

I think she's already testified that that was based on standard operating procedure with Wells Fargo.
MS. JACKSON: Right. But we were talking generally, not this Note. So I'm just saying for this particular Note --
MR. BOYERS: You --
MS. JACKSON: -- do you remember.
MR. BOYERS: -- asked about that and she answered it.
THE WITNESS: Right. I was -- I was stating standard operating procedures, --
MS. JACKSON: Okay.
THE WITNESS: -- not this specific Note.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. And then we have one more and it's Number 9. And this is the second Affidavit. Can you just look at this -- it's Exhibit 9.
Can you just look at this Affidavit and review it and then I'm going to ask you just a few questions about it.
A. **(Reviewing exhibit.)**
Q. Are you ready?
A. **Uh-huh.**

Q. Can you tell when this affidavit was signed by you?
A. **May 6, 2008.**
Q. Okay. Do you recall preparing this affidavit?
A. **No, I don't.**
Q. Did you participate or have input in the preparation of this affidavit?
A. **Probably.**
Q. And just for clarification, when you're saying *legal file* in this Affidavit and the other, we're also referring to what we previously called the collateral file --
A. **Correct.**
Q. -- in discussion?
Okay. When is this one? 2008.
So you don't have any recollection of signing this or preparing this at all?
A. **No.**
MR. BOYERS: Object to the form of the question. That's compound. You're asking her both -- she said she didn't recall participation.
MS. JACKSON: Do you recall signing --
MR. BOYERS: Then you asked participation and signature.

THE WITNESS: No. As I said before, no, I don't.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. In your Document Department do you ever process records, requests that come directly from borrowers?
A. **No.**
Q. And when you provide documentation at the request of the service area or the loan servicers are you providing documents because they do not have a loan file with the documents?
MR. BOYERS: Objection. Asked and answered.
THE WITNESS: Right. We responded to that before. They do not have a file.
MS. JACKSON: Okay.
BY MS. JACKSON:
Q. And then the request that you would get from the service areas or the loan servicers, are they very specific in what they want? Or is this just general? I mean --
MR. BOYERS: That's sort of an odd question.
MS. JACKSON: I know.

MR. BOYERS: Just so you ask a lot of different -- she's already testified that they request lots of different things, under lots of different circumstances.

MS. JACKSON: Let me try it this way.

BY MS. JACKSON:

Q. If you get a request from the loan servicer is it your general practice just to give a copy of the entire origination file or are you required to go through and pull out specific documents -- at the request of the loan?

A. **Again, it depends on the request.**

Q. The request?

A. **Definitely.**

Q. Okay.

MS. JACKSON: I'm done.

MR. BOYERS: You're done?

MS. JACKSON: I'm done.

MR. BOYERS: All right.

Let's take five minutes and then see if we have anything.

(Recess taken.)

MR. BOYERS: Okay. We're ready to go back on.

EXAMINATION

BY MR. BOYERS:

Q. Do you know Peggi Fossell?

A. **Yes.**

Q. Is it your understanding that Peggi's responsibility back in 2005 was to work on the processes associated with the acquisition of new loans?

A. **Yes.**

Q. And so when you were referring to the Acquisition Department those would be the people who would, to your knowledge, be doing the review of the loan documents as they came in prior to purchase?

A. **Correct.**

Q. Okay. And the documents that they would receive, do you know who they came from?

A. **From the clients.**

Q. Okay. All right.

You were asked some questions about your affidavits, which are Exhibit 8 and Exhibit 9. On Exhibit 8, and this is a copy that counsel gave to me. On Page 2, are those your signature?

A. **Yes.**

Q. Okay. You testified earlier today that you

don't recall when you signed them or the act of signing them; correct?

A. **Correct.**

Q. But that is -- those are your signatures?

A. **Definitely.**

Q. And part of your job as a records custodian is from time to time to -- or within the Records Management Department is to execute affidavits?

A. **Correct.**

Q. Okay. And you also were asked questions about the Exhibit A and you said sitting here today you don't recall how that ended up in your hands; correct?

A. **Specifically, right.**

Q. At the time you executed this affidavit did you have that -- the knowledge of how that Note, which you authenticated, was delivered?

A. **At that point in time we were requesting the original documents back from the custodian, so we would have requested the file from Wells Fargo. We would have made a copy of the Note and then returned the file to Wells Fargo.**

Q. Okay. All right. And that was standard procedure --

A. **That --**

Q. -- with Wells Fargo --

A. **-- was standard procedure at that point, yes.**

Q. Okay. And then you were asked questions about Paragraph No. 5 of Exhibit 8, about the standard procedures. And you talked about the standard procedures of performing the endorsements that Wells Fargo would do.

In order to -- it would be -- it was communicated to Wells Fargo that the security deal to which this Note went into was closed on November 29, 2005?

A. **Correct.**

Q. And you testified about meeting with Wells Fargo personnel from time to time about the status of endorsements with various trusts for which Wells Fargo was records custodian.

As part of the process of those meetings were you ever provided Interim Certifications from Wells Fargo?

A. **Yes.**

Q. And what type of information would be provided in those Interim Certifications?

A. **Normally it would indicate the pool number, the deal name, the settlement date and the date that they were to complete the Interim Certification**

**or the signing of the endorsements and then the date that they actually completed it.**
Q. Okay. All right. The Interim Certification would also provide information about exceptions to Notes?
A. **Um...**
Q. And just --
A. **Correct. Right.**
Q. And just for your ease, I'm going to --
A. **I think that was Exhibit 2.**
MS. JACKSON: Exhibit 2.
MR. BOYERS: Yes.
BY MR. BOYERS:
Q. Exhibit 2 is a copy of the Interim Certification, which...
When you were talking about the Interim Certification, is this an example of that?
A. **This is the detail behind it. There was another piece of the Interim Certification that talked about the stamping and endorsing piece that's not included here.**
Q. Okay. Okay.
A. **But again, that was a summary, it wasn't a detail.**
Q. Okay. Now this Exception Report, though, only

identified those -- it identified those loans for which something had not been completed?
A. **Correct.**
MS. JACKSON: Objection. She didn't prepare that document, so...
BY MR. BOYERS:
Q. Your understanding of what this report provides from Wells Fargo, as part of the standard procedure, was the loans in which exceptions remained to be resolved?
A. **Correct.**
Q. Okay. And then with respect to Exhibit 9, you again testified that you didn't recall the specific act of signing this affidavit; is that your signature?
A. **Correct, it is.**
Q. And is that your handwriting --
A. **Yes.**
Q. -- with the date there?
A. **Yes.**
Q. And would you have signed this if the information was not true and correct?
A. **No, I would not.**
Q. Okay. Ms. Jackson asked you some questions about the use of the name of the actual trust on

some mortgage assignments and the use of the trustee's name on mortgage assignments; do you recall that?
A. **Yes.**
Q. Okay. To this day does Residential Funding Company continue to endorse -- or I'm sorry -- prepare assignments which show the name of the trustee?
A. **Yes.**
Q. Okay. And you testified earlier only in a few limited jurisdictions is the actual security identified by name?
A. **Correct.**
Q. Okay.
A. **And that's a very recent development.**
Q. Okay. Now she also asked you some questions about assignments, preparing the assignments and asked about the information that was put in the mortgage assignment.
Whoever requested that an assignment be prepared, was your department responsible for independently verifying that the information provided in that assignment was correct?
A. **Yes.**
Q. And that verification was based on the data

maintained on the specific loan?
A. **Yes.**
MR. BOYERS: I don't have any further questions.
MS. JACKSON: I just have a real quick follow-up, since you introduced Exhibit 2. I think we referred to that as an *Exception Sheet*, *Exception Log*.
MR. BOYERS: I think it was called an *Interim* --
MS. JACKSON: No, that was --
MR. BOYERS: -- *Certification Report*.
MS. JACKSON: But that's not -- you said that was the backup -- backup information and there was another document that went to it that was the Interim Certification.
I think she said -- she said this was a detail...
THE WITNESS: The --
FURTHER EXAMINATION
BY MS. JACKSON:
Q. I guess what is this report?
A. **This is a -- I would call this the *Exception*, the *Interim Exception Report*.**
Q. Okay.

A. **What Wells calls it, I'm not sure. That's what I would call it.**
Q. Okay. That's how we'll call it, too.
This *Interim Exception Report*, when your department received it, did it require that you do anything with that information?
A. **This was not in my department.**
Q. Okay. Do you know what department it went to?
A. **It was another area within Records.**
Q. Do you know what they called it?
A. **Deal Support.**
Q. Deal Support?
A. **Well, no. Panel Certification.**
Q. Okay. Okay. And when you said that Wells Fargo provided you Interim Certifications, were you required to do anything with that information?
A. **Again, what they provided to me --**
Q. Uh-huh.
A. **-- was the report that showed them where they were at as far as the endorsement stamping. It was tied to the *Interim*. They did the stamping and endorsing when they reviewed the file for the Interim Certification.**
Q. Okay. And is that the report that you were talking about where they told you if there was a

percentage done for it?
A. **Correct.**
Q. Okay. And was there any way to determine from the report whether a specific loan was stamped or not?
MR. BOYERS: Object to the form of the question. You're asking her if there's any way.
MS. JACKSON: Right.
MR. BOYERS: I think you're asking her about her personal knowledge; right? And you're -- therefore, if you're saying is there any way, you're asking for opinion.
MS. JACKSON: Okay.
MR. BOYERS: She can answer, but I'm just going to object.
Go ahead.
MS. JACKSON: On this particular report --
MR. BOYERS: Pointing to Exhibit 2.
BY MS. JACKSON:
Q. Exhibit 2. Is there any way to tell which one has the Notes endorsed and which one does not?
A. **If they were not endorsed, --**
Q. Uh-huh.
A. **-- they would have shown up as an exception on here.**

Q. Okay.
A. **So, yes, there is a way.**
Q. Okay. And outside of receiving the Interim Certificate and noting the progress, was there anything else you had to do with that information, your department, your Records Department?
A. **No.**
Q. Okay.
MS. JACKSON: (Nodding.)
THE WITNESS: That's it?
MS. JACKSON: That's it.
(Discussion had off the record.)
MR. BOYERS: The witness will read and sign her transcript.
(Concluded at 2:48 P.M.)

* * *

STATE OF MINNESOTA )
: ss CERTIFICATE
COUNTY OF WASHINGTON )

I, Janet D. Winberg, hereby certify that I reported the deposition of **JUDY FABER,** on the 14th day of August, 2009, in Minneapolis, Minnesota, and that the witness was, by me, first duly sworn to tell the truth;

That the testimony was transcribed by me and is a true record of the testimony of the witness;

That I am not a relative, or employee, or attorney, or counsel of any of the parties; or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the right to read and sign the transcript by the witness was reserved.

WITNESS MY HAND AND SEAL THIS 31st day of August, 2009.

JANET D. WINBERG
Registered Professional Reporter
Notary Public
Washington County, Minnesota.