**Hearing Date:  October 9, 2013 at 10:00 a.m. (ET)**
**Objection Deadline:  October 4, 2013 at 12:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Naomi Moss

*Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------- | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------- | ) | |

**NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND
363(b) OF THE BANKRUPTCY CODE FOR AN ORDER APPROVING
AMENDMENT TO ENGAGEMENT LETTER WITH DEBTORS'
<u>CHIEF RESTRUCTURING OFFICER, LEWIS KRUGER</u>**

**PLEASE TAKE NOTICE** that the undersigned have filed the attached *Debtors'*

*Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order*

*Approving Amendment to Engagement Letter with Debtors' Chief Restructuring Officer,*

*Lewis Kruger* (the "<u>Motion</u>").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will take

place on **October 9, 2013 at 10:00 a.m. (prevailing Eastern Time)** before the

Honorable Martin Glenn, at the United States Bankruptcy Court for the Southern District

of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New

York 10004-1408, Room 501.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion

must be made in writing, conform to the Federal Rules of Bankruptcy Procedure, the

Local Bankruptcy Rules for the Southern District of New York, and the Notice, Case

Management, and Administrative Procedures approved by the Bankruptcy Court [Docket

No. 141], be filed electronically by registered users of the Bankruptcy Court's electronic

case filing system, and be served, so as to be received no later than **October 4, 2013 at**

**12:00 p.m. (Prevailing Eastern Time)**, upon (a) counsel to the Debtors, Morrison &

Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Gary S.

Lee, Lorenzo Marinuzzi and Naomi Moss); (b) the Office of the United States Trustee for

the Southern District of New York, U.S. Federal Office Building, 201 Varick Street,

Suite 1006, New York, NY 10014 (Attention: Tracy Hope Davis, Linda A. Riffkin, and

Brian S. Masumoto); (c) the Office of the United States Attorney General, U.S.

Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001

(Attention: US Attorney General, Eric H. Holder, Jr.); (d)  Office of the New York State

Attorney General, The Capitol, Albany, NY 12224-0341 (Attention: Nancy Lord, Esq.

and Enid N. Stuart, Esq.); (e) Office of the U.S. Attorney for the Southern District of

New York, One St. Andrews Plaza, New York, NY 10007 (Attention: Joseph N. Cordaro,

Esq.); (f) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street,

New York, NY 10022 (Attention: Richard M. Cieri and Ray Schrock); (g) counsel for the

committee of unsecured creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue

of the Americas, New York, NY 10036 (Attention: Kenneth Eckstein and Douglas

Mannal); (h) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West

52nd Street, New York, NY 10019 (Attention: Jennifer C. DeMarco and Adam Lesman);

(i) counsel for Berkshire Hathaway Inc., Munger, Tolles & Olson LLP, 355 South Grand

Avenue, Los Angeles, CA 90071 (Attention:  Thomas Walper and Seth Goldman);

(j) Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by

overnight mail, to 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-

5016); and (k) Securities and Exchange Commission, New York Regional Office, 3

World Financial Center, Suite 400, New York, NY 10281-1022 (Attention: George S.

Canellos, Regional Director).

PLEASE TAKE FURTHER NOTICE that if you do not timely file and serve a

written objection to the relief requested in the Motion, the Bankruptcy Court may deem

any opposition waived, treat the Motion as conceded, and enter an order granting the

relief requested in the Motion without further notice or hearing.

Dated: September 27, 2013                    Respectfully submitted,
       New York, New York

                                             /s/ Gary S. Lee
                                           Gary S. Lee
                                         Lorenzo Marinuzzi
                                         Naomi Moss
                                         MORRISON & FOERSTER LLP
                                         1290 Avenue of the Americas
                                         New York, New York 10104
                                         Telephone: (212) 468-8000
                                         Facsimile: (212) 468-7900

                                         *Counsel to the Debtors and*
                                         *Debtors in Possession*

**Hearing Date: October 9, 2013 at 10:00 a.m. (ET)**
**Objection Deadline: October 4, 2013 at 12:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Naomi Moss

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ----------------------------------------------------------------- ) | | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ----------------------------------------------------------------- ) | | |

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)**
**OF THE BANKRUPTCY CODE FOR AN ORDER APPROVING**
**AMENDMENT TO ENGAGEMENT LETTER WITH DEBTORS'**
**CHIEF RESTRUCTURING OFFICER, LEWIS KRUGER**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

JURISDICTION ............................................................................................................... 5

BACKGROUND ............................................................................................................... 5

RELIEF REQUESTED...................................................................................................... 7

BASIS TO AWARD MR. KRUGER THE SUCCESS FEE......................................... 8

    A.      Mr. Kruger's Achievements Warrant the Success Fee ........................................ 8

        1.      Mr. Kruger's Appointment .................................................. 8

        2.      Plan Accomplishments........................................................ 10

        3.      Other Accomplishments...................................................... 10

    B.      Mr. Kruger's Unique Role .............................................................. 11

BASIS FOR RELIEF REQUESTED............................................................................... 13

NOTICE........................................................................................................................... 19

NO PRIOR REQUEST ................................................................................................... 20

ny-1110889

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    60 B.R. 612 (Bankr. S.D.N.Y. 1986) ........................................................................14

*Committee of Equity Security Holders v. Lionel Corp. (In re The Lionel Corp.)*,
    722 F.2d 1063 (2d Cir. 1983) ..................................................................................14

*Fulton State Bank v. Schipper (In re Schipper)*,
    933 F.2d 513 (7th Cir. 1991) ...................................................................................14

*In re The 1031 Tax Group, LLC*,
    Case No. 07-11448 (MG) (Bankr. S.D.N.Y. 2007) .................................................14

*In re AGH Liquidating, LLC (f/k/a Alexander Gallo Holdings, LLC)*,
    Case No. 11-14220 (ALG) (Bankr. S.D.N.Y. Oct. 13, 2011) .................................14

*In re Delaware & Hudson Railway Co.*,
    124 B.R. 169 (D. Del. 1991) ...................................................................................14

*In re Eastman Kodak Co.*,
    Case No. 12-10202 (REG) (Bankr. S.D.N.Y. Feb. 28, 2012)..................................14

*In re Motors Liquidation Corp. (f/k/a In re General Motors Corp.)*,
    Case No. 09-50026 (REG) (Bankr. S.D.N.Y. June 25, 2009) .................................14

*In re Residential Capital, LLC*,
    Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Sept. 13, 2013) ..................................11

*In re Residential Capital, LLC*,
    Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Mar. 5, 2013) ....................................10

*In re Tokheim Corp.*,
    Case No. 02-13437 (RJN) (Bankr. D. Del. Feb 25, 2003).......................................14

*Myers v. Martin (In re Martin)*,
    91 F.3d 389 (3d Cir. 1996)......................................................................................14

*Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*,
    147 B.R. 650 (S.D.N.Y. 1992).............................................................................18, 19

## TABLE OF AUTHORITIES

**Page(s)**

STATUTES

11 U.S.C. § 105(a) ................................................................................................14

11 U.S.C. § 363(b) ................................................................................................13


OTHER AUTHORITIES

Jay Alix Protocol, Compensation § II.D,
    *http://www.justice.gov/ust/r02/manhattan/chapter11.htm*  (Nov. 3, 2004) .............................19

ny-1110889

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"),[1] hereby move (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit 1, approving an amendment (the "Amendment"), attached hereto as Exhibit 2, to the Engagement Letter (defined below) between the Debtors and Lewis Kruger ("Mr. Kruger"), Chief Restructuring Officer ("CRO") of the Debtors. In support of this Motion, the Debtors submit the Declaration of Pamela E. West (the "West Decl."), the Declaration of John Dempsey (the "Dempsey Decl."), and the Declaration of William J. Nolan (the "Nolan Decl."), each of which is filed contemporaneously herewith and incorporated by reference herein. In further support of this Motion, the Debtors respectfully state as follows:

**PRELIMINARY STATEMENT**

1. Since Mr. Kruger's appointment as CRO,[2] the Debtors have made tremendous strides towards achieving their goal of confirming a Chapter 11 plan with the support of the majority of the Debtors' creditors. At the time of Mr. Kruger's appointment, these cases were at a crossroads and mired in discord. The Debtors' creditors questioned whether the historical relationships between the Debtors' board of directors (the "Board") and management, on the one hand, and the Debtors' parent, Ally Financial Inc. ("AFI"), on the other, rendered it impossible for the Debtors to have meaningful plan discussions concerning the settlement of the claims of the Debtors' estates against AFI. The Debtors' Board and management understood

---

[1]   The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 6] (the "Whitlinger Affidavit").

[2]   On March 5, 2013, the Court approved the appointment of Mr. Kruger as CRO [Docket No. 3103] (the "CRO Order").

ny-1110889

and appreciated that concern. They determined that the appointment of a CRO with an unquestionable wealth of experience in bankruptcy was necessary to allow these cases to progress.

2.       At the time of this Court's approval of Mr. Kruger's appointment on March 5, 2013, the Debtors advised the Court that they would work with the Creditors' Committee[3] to arrive at what the Debtors hoped to be a mutually acceptable success fee. It was hoped and intended that the Success Fee would have been agreed upon, and presented for further Court approval, on an expedited bases. Unfortunately, while parties were heavily mired in negotiations concerning Plan terms and other settlement negotiations, discussions concerning the Success Fee were delayed. Now, with the Plan on file and major settlements finalized in these cases, the Debtors, given the significant continued efforts of the CRO since his appointment on February 7, 2013, determined that further delay was unwarranted, and thus seek approval of the Success Fee for Mr. Kruger in the amount of $2.0 million.

3.       Mr. Kruger's significant accomplishments to date warrant approval of the Success Fee. Under Mr. Kruger's leadership, the Debtors engaged in extensive settlement negotiations with the Creditors' Committee and other major stakeholders. Following months of intense discussions, which occurred during Court-ordered mediation under the Honorable James M. Peck, the Debtors and the Creditors' Committee reached consensus on the terms of a Chapter 11 plan (the "Plan Support Agreement") that contemplates a substantial contribution from AFI (the

---

[3]      Capitalized terms otherwise not defined in the Preliminary Statement shall have the meanings ascribed to them in the body of the Motion.

ny-1110889

"AFI Settlement") and is endorsed by individual Creditors' Committee members, and certain additional Consenting Claimants.[4]

4.      Following the Court's approval of the Debtors' entry into the Plan Support Agreement,[5] the Debtors and the Creditors' Committee filed their *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4153] (the "Plan") and the *Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4157] (the "Disclosure Statement").  On August 23, 2013, the Court approved the Disclosure Statement [Docket No. 4809].

5.      In the context of these Chapter 11 cases, and given the divergent interests of creditors, that the Debtors are proceeding on a clear path towards a hearing on confirmation of the Plan is unquestionably remarkable.  The Debtors believe that Mr. Kruger's reputation in the restructuring field and his objective lack of bias concerning the Debtors' pre-petition relationship with AFI made him uniquely qualified to lead the plan process.  The Debtors believe that the tremendous progress made in resolving outstanding disputes, including the AFI Settlement, is due directly to Mr. Kruger's leadership.

6.      While his Plan contributions are clearly important, Mr. Kruger also provided invaluable assistance in other aspects of the Debtors' bankruptcy cases.  As an example, Mr. Kruger played an important role on behalf of the estates in obtaining Court approval of the

---

[4]      As defined in the PSA Approval Motion (defined herein).

[5]      On June 27, 2013, the Court entered the *Memorandum Opinion Approving the Plan Support Agreement* [Docket No. 4102].

ny-1110889

FGIC Settlement.[6]  Mr. Kruger also participated meaningfully in the Debtors' assessment of

settlement proposals and discussions with the Federal Reserve Board regarding the Debtors'

obligations under the Consent Order.[7]  Furthermore, as described below, because of the nature

of these cases and the timing of Mr. Kruger's appointment, Mr. Kruger has performed duties

typically performed by a chief executive officer ("CEO"), including advising on the day-to-day

management of the Debtors' businesses and the wind-down.

7.      Following the Court's approval of the Disclosure Statement, the Debtors took the

opportunity to finalize the terms of Mr. Kruger's success fee (the "Success Fee").  The facts of

this case are unique in that the Debtors had the opportunity to evaluate Mr. Kruger's

performance prior to finalizing the terms of his Success Fee.  With assistance from the Debtors'

professionals and counsel for the Board's independent directors (the "Independent Directors'

Counsel"), the Board performed a thorough analysis and determined that a Success Fee in the

amount of $2.0 million, payable on the effective date of the Plan, is reasonable and appropriate.

In doing so, among other things, they considered that Mr. Kruger's past and expected future

services are and will be beneficial to the Debtors' estates, that Mr. Kruger functioned in a

capacity that was akin to a CEO in addition to exceptionally performing as CRO and his

compensation should be set accordingly, and that the Success Fee was reasonable considering

the available market comparisons.  In considering the course of events following Mr. Kruger's

---

[6]     On June 7, 2013, the Debtors filed the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, The FGIC Trustees and Certain Institutional Lenders* (the "FGIC Settlement") [Docket No. 3929].  On September 13, 2013, the Court approved the FGIC Settlement [Docket No. 5042].

[7]     Prior to the Petition Date, certain of the Debtors entered into a consent order (the "Consent Order") with the Federal Reserve Board and the Federal Deposit Insurance Corporation, which sought to resolve the issues raised by federal regulators in their examination of certain of the Debtors' alleged abuses of foreclosure processes in their mortgage servicing operations.  Pursuant to the Consent Order, GMAC Mortgage, LLC agreed to pay for an independent file review regarding certain residential foreclosure actions and foreclosures sales prosecuted by GMAC Mortgage, LLC and its subsidiaries (the "Foreclosure Review").

-4-

appointment, the Debtors believe that it was his appointment as CRO that precipitated a renewed focus on resolving major issues. The Board also believes that absent his appointment, these estates would almost certainly have incurred additional professional fees in litigating many claims.

8.      Accordingly, the Debtors, in the exercise of their business judgment, have determined that an amendment to the Engagement Letter that provides for payment of the Success Fee is warranted at this time.

## JURISDICTION

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

10.      As of the Petition Date, the Debtors were a leading residential real estate finance company indirectly owned by AFI, which is not a Debtor. The Debtors were the fifth largest servicer of residential mortgage loans in the United States, servicing over 2.4 million domestic mortgage loans with an aggregate unpaid principal balance of approximately $374.2 billion. In addition, prior to the Petition Date, the Debtors and their non-debtor affiliates, including Ally Bank, were collectively the tenth largest originator of residential mortgage loans in the United States. A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the Whitlinger Affidavit.

-5-

11.    On the Petition Date, each of the Debtors filed a voluntary petition with the Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No trustee has been appointed in these Chapter 11 cases.

12.    On May 16, 2012, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed a nine-member official committee of unsecured creditors (the "Creditors' Committee").

13.    On February 11, 2013, the Debtors appointed Mr. Kruger as CRO.  Also on February 11, 2013, the Debtors filed the *Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer* [Docket No. 2887] (the "CRO Retention Motion").  On March 5, 2013, the Court entered the CRO Order.

14.    On May 23, 2013, the Debtors filed the *Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants* [Docket No. 3814] (the "PSA Approval Motion").  On June 27, 2013, the Court approved the Debtors' entry into the Plan Support Agreement [Docket No. 4102].

15.    On July 3, 2013, the Debtors and the Creditors' Committee filed the Plan and the Disclosure Statement.  The Court approved the Disclosure Statement on August 23, 2013 [Docket No. 4809].  The hearing on confirmation of the Plan is scheduled to commence on November 19, 2013.

ny-1110889

## RELIEF REQUESTED

16.    By this Motion, the Debtors seek an order pursuant to sections 105(a) and 363(b) of the Bankruptcy Code approving the Amendment to the engagement letter dated as of February 11, 2013 (the "Engagement Letter"), as amended, a copy of which is attached hereto as Exhibit 3.

17.    The Amendment provides that upon the effective date of the proposed Plan, as the same may be modified, the Debtors, or any successors thereto, shall pay to Mr. Kruger the sum of $2.0 million as a Success Fee.  Specifically, the Amendment will revise Section 2(d) of the Engagement Letter to state:

> d.    Success Fee:  In addition to the CRO's hourly compensation, the Company agrees that Mr. Kruger will be entitled to a success fee in the amount of $2,000,000 (the "Success Fee") as compensation for (x) leading key parties to achieve significant milestones in the Chapter 11 Cases in an expeditious manner, and (y) assuming the additional responsibilities of the Company's Chief Executive Officer following the resignation of Thomas Marano, effective May 3, 2013.
>
> > i.    The Success Fee shall be payable upon the effective date of the Chapter 11 plan filed with the Bankruptcy Court [Docket No. 4153] (the "Plan"), as such Plan may be amended by the Plan Proponents, namely, the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee"), in these Chapter 11 Cases.
> >
> > ii.    The Company's Board of Directors, which consulted with the Creditors' Committee in determining the Success Fee, has the sole discretion to approve the amount and the appropriateness of the Success Fee.  The parties acknowledge that any Success Fee would require appropriate notice and ultimately Bankruptcy Court approval.

18.    Payment of the Success Fee will remain consistent with the CRO Retention Motion.  The Debtors do not intend for the Amendment to modify the requirements under the Jay Alix Protocol.

ny-1110889

## BASIS TO AWARD MR. KRUGER THE SUCCESS FEE

A.    **Mr. Kruger's Achievements Warrant the Success Fee**

1.    **Mr. Kruger's Appointment**

19.    In early 2013, the Board resolved to retain a chief restructuring officer to assist the Board and the company in its attempts to achieve a consensual plan of reorganization, as well as to negotiate settlements with major consistencies.  The Debtors' independent directors, through the Independent Directors' Counsel, conducted an in-depth interview process.  Mr. Kruger was selected as CRO following this process.  On February 7, 2013, the ResCap Board, by unanimous vote, appointed Mr. Kruger as Chief Restructuring Officer of the Debtors.  On February 11, 2013, ResCap and Mr. Kruger executed the Engagement Letter that set forth the terms and conditions of his employment.

20.    The Engagement Letter provides: "In addition to regular fees, the Company and Mr. Kruger agree that Mr. Kruger may, in the future, request a Success Fee upon the confirmation of a plan of reorganization or upon the occurrence of a significant milestone to be later defined and determined in these Chapter 11 cases.  The approval of the amount and the appropriateness of the Success Fee, if any, will be at the sole discretion of the Company's Board of Directors after consultation with the Official Committee of Unsecured Creditors of the Chapter 11 Cases.  The parties acknowledge that any Success Fee would require appropriate notice and ultimately Bankruptcy Court approval."  Engagement Letter at 3.

21.    On February 11, 2013, the Debtors filed the CRO Retention Motion.  In connection with Mr. Kruger's proposed compensation, the CRO Retention Motion states:

In addition to the Hourly Rate and expense reimbursement, the Engagement Letter provides that Mr. Kruger will have the right to earn a fee for the successful completion of his engagement.  Mr. Kruger and the Board are in the process of negotiating the

-8-

amount of the Success Fee and the targets required to be achieved in order to earn such Success Fee.  Once the parameters of the Success Fee are determined, the Debtors will separately seek Court approval for the Success Fee.

CRO Retention Motion at ¶ 29.  The CRO Retention Motion further states: "Consistent with the Jay Alix Protocol, the Debtors propose that approval of any Success Fee will be considered at the close of Mr. Kruger's engagement, subject to a reasonableness standard." *Id.* at n.3.

22.    On March 5, 2013, the Court entered the CRO Order.  The CRO Order provides "[t]he Debtors are authorized to pay Mr. Kruger in such amounts and at such times as is provided in the Engagement Letter. Notwithstanding the previous provision, any Success Fee shall not be pre-approved under section 328(a) of the Bankruptcy Code, and the Debtors shall separately seek Court approval of the Success Fee."  CRO Order at ¶¶ 4-5.

23.    Prior to his appointment as CRO, Mr. Kruger was a partner and Co-Chair of the Financial Restructuring Group at Stroock & Stroock & Lavan LLP ("Stroock"), a law firm that has extensive experience in all aspects of restructuring and insolvency matters.  Mr. Kruger played a major role in many of the significant reorganization proceedings in the United States, representing debtors, official and ad hoc creditors' committees, financial institutions and acquirers of assets.  The Debtors believe that Mr. Kruger's vast restructuring experience was invaluable in leading Plan negotiations and in the mediation.

24.    Upon his appointment, this Court recognized Mr. Kruger's far-reaching experience and expertise in restructurings, noting that "[o]bviously, Mr. Kruger has very extensive experience as an insolvency professional, and it's clear that he's very highly respected. He has an important role.  I think the changes that were made to the scope of the CRO's engagement here emphasize the importance of his independence in developing and trying to get the parties to develop a consensual plan.  And it's certainly the Court's hope that Mr. Kruger's

-9-

efforts will come to fruition with a consensual plan . . ." Transcript of Hearing at 14:25 – 15:8, *In re Residential Capital, LLC*, Case. No. 12-12020 (MG) (Bankr. S.D.N.Y. Mar. 5, 2013).

### 2.    Plan Accomplishments

25.    The achievement of consensus on the terms of a Chapter 11 Plan that has the support of a majority of the Debtors' key stakeholders is a tremendous accomplishment. Because the Debtors' creditors hold extremely divergent interests, settling Plan issues was not an easy task.    The Plan Support Agreement is a reflection of Mr. Kruger's invaluable restructuring expertise and his tireless efforts in assisting all parties through these cases.    The Debtors believe that the Plan-related settlements contained in the Plan Support Agreement would have been immeasurably more difficult without the appointment of Mr. Kruger.

### 3.    Other Accomplishments

26.    Additionally, Mr. Kruger was instrumental in negotiating and attaining Court approval of the FGIC Settlement.    As the Court is aware, the FGIC Settlement is critical to the success of these cases because absent agreement on these issues, the Debtors would be faced with significant and uncertain litigation regarding the validity, amount and priority of the claims of FGIC and the trustees for securitization trusts guaranteed by FGIC (the "FGIC Trustees") in connection with the affected trusts, particularly in light of the novel and fact-intensive issues raised in connection with the prepetition FGIC litigation.    In leading the negotiations with FGIC and the FGIC Trustees on behalf of the Debtors, Mr. Kruger's efforts unquestionably benefited the Debtors' estates.    Moreover, the Debtors believe that approval of the FGIC Settlement was due in part to Mr. Kruger's reputation and independence, as stated by the Court in the decision approving the FGIC Settlement: "Mr. Kruger is a very experienced bankruptcy lawyer who is independent, having had no prior relationship with the Debtors."    Memorandum Opinion and

-10-

Order, and Findings of Fact and Conclusions of Law, Approving the FGIC Settlement Motion, at 6, *In re Residential Capital, LLC*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Sept. 13, 2013) [Docket No. 5042].  Mr. Kruger's efforts negotiating and attaining Court approval of the FGIC Settlement further warrants the Success Fee.

27.    Furthermore, Mr. Kruger's guidance was helpful in resolving the Debtors' Foreclosure Review obligations under the Consent Order.  As described extensively in the *Debtors' Motion for an Order Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363(b)(1) Authorizing the Debtors to Enter Into and Perform Under Amendment to Consent Order* [Docket No. 4228], during the course of these cases, it became clear that although well-intentioned, the Foreclosure Review proved to make little sense.  Therefore, the Debtors engaged in negotiations with the government regarding those obligations.

28.    Settlement of the Debtors' Foreclosure Review obligations was a tremendous accomplishment.  The Debtors were able to obviate the enormous payment to consultants and provide larger restitution payments to borrowers.  Mr. Kruger's participation in those negotiations, his insight and feedback regarding the resulting settlement, as well as his involvement in seeking this Court's approval of the settlement, should not be downplayed.  The Debtors believe that Mr. Kruger's efforts to resolve the Foreclosure Review obligations further warrant the Success Fee.

## B.    Mr. Kruger's Unique Role

29.    Mr. Kruger's role was unique in these cases in that he also performed tasks that traditionally belong to a CEO.  Therefore, the Debtors believe that the calculation of the Success

ny-1110889

Fee should consider market compensation for a CEO.[8]  Typically, a chief restructuring officer does not manage a debtor's day-to-day business.  While Mr. Kruger was retained to spearhead the Plan process, over the course of his term as CRO, he also performed duties relating to the management of the Debtors' remaining businesses.  Specifically, following the Debtors' CEO, Thomas Marano's departure on May 3, 2013, Mr. Kruger expanded his duties to include certain functions previously provided by Mr. Marano.

30.    Prior to Mr. Kruger's appointment, the Debtors' existing Board and management was hamstrung in moving forward in discussions with their stakeholders.  This was due to the perception shared by key stakeholders that the Debtors' existing Board and management could not be parties to discussions with AFI to settle claims that the Debtors' Board and management, prior to the Petition Date, had settled with AFI for $750 million.  The Debtors' Board heeded these concerns.  To address them, the Board sought out a candidate to act as a CRO who would both understand well the nature of the claims being settled and be able to look at the facts and the law in an objective fashion and determine what was in the best interests of the entirety of the Debtors' estates.  Importantly, because the Debtors' estates and, in particular, the Debtors' CRO, is a fiduciary for all of the Debtors' creditors – secured and unsecured alike – Mr. Kruger played a critical role in balancing the process to be fair to all parties.

31.    Almost from the moment of his appointment, Mr. Kruger began his process of reaching out to the many stakeholders in these cases to schedule discussions, meetings, negotiations and mediation sessions, all in order to move these cases forward.  He recognized that insofar as progress in these cases was stagnated because of the perception of the

---

[8]    As discussed in the Dempsey Declaration, the median value of success fees awarded to CROs that also functioned as CEO, was greater than the success fees paid to CROs that acted only in a CRO capacity.  *See* Dempsey Decl. ¶ 14.

relationship between the Debtors' management and AFI, it was incumbent on him to convince parties to treat the Debtors' estates – under his leadership – as AFI-neutral in settlement discussions.  It was also critical that with respect to any underlying AFI-related transaction that a particular creditor believed gave rise to a valuable estate claim, Mr. Kruger could provide his own independent assessment.   As he was not party to the discussions, deliberations and approvals that gave rise to the Debtors' transactions in the first place, his insights could be given greater weight because he could not be viewed as trying to protect any of his prior determinations from outside scrutiny.

32.     The Debtors believe that Mr. Kruger's ability to provide creditors with comfort that the Debtors were led by an independent fiduciary with no ties to AFI was the reason for many of the aforementioned accomplishments.  The successful path, as well as the accelerated process, of these cases and the momentum towards global settlement can be traced directly to Mr. Kruger's appointment.

33.     Given the complex issues that Mr. Kruger was required to address in the performance of his services, Mr. Kruger's commitment to the time and effort necessary to address all such issues as they arise, and the market for success fees for engagements of this nature, the Debtors submit that the Success Fee provided for in the Amendment is reasonable.

## BASIS FOR RELIEF REQUESTED

34.     The Debtors seek approval of the Amendment pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  Section 363(b)(1) provides, in relevant part, that the trustee or debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ." 11 U.S.C. § 363(b)(1).  Further, pursuant

-13-

to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

35.    Under applicable case law, in this and other jurisdictions, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use may be approved.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re The Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring an "articulated business justification"); *see also In re The 1031 Tax Grp., LLC,* Case No. 07-11448 (MG) (Bankr. S.D.N.Y. 2007); *Myers v. Martin (In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996) (*citing Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").  Courts have applied the section 363(b) standard when a debtor employs one or more individuals to serve as restructuring officers.  *See, e.g.*, *In re AGH Liquidating, LLC (f/k/a Alexander Gallo Holdings, LLC)*, Case No. 11-14220 (ALG) (Bankr. S.D.N.Y. Oct. 13, 2011) [Docket No. 187]; *In re Eastman Kodak Co.*, Case No. 12-10202 (REG) (Bankr. S.D.N.Y. Feb. 28, 2012) [Docket No. 448]; *In re Motors Liquidation Corp. (f/k/a In re General Motors Corp.)*, Case No. 09-50026 (REG) (Bankr. S.D.N.Y. June 25, 2009) [Docket No. 2534]; *In re Tokheim Corp.*, Case No. 02-13437 (RJN) (Bankr. D. Del. Feb 25, 2003) [Docket No. 327].

36.     Following Mr. Kruger's appointment, the Board requested that Mercer and FTI each perform an analysis of success fees awarded to chief restructuring officers in comparable bankruptcy cases.  The results of those analyses (the "Fee Analyses") are described in the Dempsey Declaration and the Nolan Declaration.  Both Mr. Dempsey and Mr. Nolan presented their respective analyses to the Board.  Based on those presentations, and in considering Mr. Kruger's achievements in these cases, the Board determined, in its reasonable business judgment, that a $2.0 million Success Fee was both reasonable and appropriate.  *See* West Decl. ¶ 7.

37.     While no individual case study presented to the Board was factually identical to the facts of these cases, the Board believes that the Fee Analyses provided helpful guidance in, and a framework for, determining the amount of the Success Fee.  Certain of the Board's considerations of the Fee Analyses are described below.

38.     The Fee Analyses set forth certain bankruptcy case factors to which success fees generally relate.  As described in both the Dempsey Declaration and the Nolan Declaration, one such criterion with which success fees are often correlated is a debtor's asset size.  In formulating the amount of a success fee that is comparable to market practice, the Board considered this factor.  Here, if Mr. Kruger's success fee were based on the Debtors' assets as of the Petition Date, according to Mercer, the resulting amount of the fee would be $4.1 million. *See* Dempsey Decl. ¶ 15.  Considering that Mr. Kruger was retained approximately nine (9) months into these cases, the Board determined that the amount of the Success Fee should be reduced to account for the timing of Mr. Kruger's retention.  The $2.0 million figure for the Success Fee represents a 51% discount to the predicted value from Mercer's regression analysis based on the Debtors' asset size.  *See* Dempsey Decl. ¶ 16.

-15-

39.     In these cases, Mr. Kruger's retention as CRO occurred shortly before the close of the Asset Sales, and Mr. Kruger was tasked with, among other things, leading the estates' efforts to reconcile and resolve the Debtors' liabilities, including to negotiate the settlement of the Debtors' significant liabilities with various stakeholders.  Accordingly, it is reasonable that one of the determinants of the size of a success fee, and one that is likely more relevant in these cases, is the size of the Debtors' liabilities as of the Petition Date.  *See* Nolan Decl. ¶¶ 14-15. As illustrated in <u>Exhibit A</u> to the Nolan Declaration, FTI analyzed large cases filed in the Southern District of New York and determined that the weighted average success fees paid to CROs is 0.02% of the debtor's total liabilities at filing.  *Id.* ¶ 16.  Applying such calculations to these cases, based on the Debtors' $15.276 billion[9] of liabilities as of the Petition Date, a success fee within the range of $2.5 million to $2.8 million is appropriate.  *Id.*

40.     In reviewing the Fee Analyses, other factors weighed by the Board in determining an appropriate Success Fee included, among others, (i) the amount of asset sale proceeds, (ii) creditor recoveries, (iii) duration of the CRO's engagement in the cases, and (iv) other measures of value creation for the estate.

41.     Mr. Nolan performed an analysis that sought to align and measure the critical accomplishment of Mr. Kruger's tenure as CRO with the ResCap estate KEIP asset recovery and cost savings metrics (*See* Nolan Decl. ¶¶ 17-20, Exs. B and C), including avoided litigation costs.  Mr. Dempsey also factored into his analysis the cost savings to the estates, supporting the payment of the Success Fee (Dempsey Decl. ¶ 19).

42.     Mercer analyzed certain cases where the success fee was calculated by using a fixed sharing rate based on a formula involving either (i) asset sale proceeds, (ii) creditor

---

[9]     This number excludes contingent and unliquidated liabilities, many of which arose after the bankruptcy filing.

ny-1110889

recoveries or (iii) some other measure of value creation. *See* Dempsey Decl. ¶ 17. In these cases, where net sale proceeds exceeded $70 million, the success fee amounted to 2.5% of such proceeds, and 1% of cash generated from certain asset sales. *See id.* In the case of Lehman Brothers, the fixed sharing rate for the success fee equaled 0.175% of all unsecured creditor distributions greater than $15 billion. *Id.*

43.    As discussed in the Dempsey Declaration, the AFI Settlement enhanced the creditors' estate by $1.35 billion. *See id.* ¶ 18. The proposed success fee of $2.0 million reflects 0.148% of the incremental $1.35 billion contributed by AFI in the AFI Settlement. *See id.* This percentage is below the rates used in the examples provided to the Board. Therefore, the Board, in considering this factor along with others, determined that a Success Fee in the amount of $2.0 million is reasonable. *See* West Decl. ¶ 7.

44.    In terms of using value creation to the estates as a means to measure an appropriate success fee, FTI considered the rate of the Debtors' KEIP asset recovery as a means to calculate the Success Fee. *See* Nolan Decl. ¶¶ 17-20. FTI estimated the percentage of potential improved recoveries which accrues to KEIP participants, *i.e.*, six of the Debtors' critical employees who receive compensation based on the realization of certain recovery values on different classes of assets. *Id.* ¶ 19. FTI calculated the difference between target and maximum recovery amounts for both asset dispositions and KEIP payout so as to arrive at "incremental" recovery amounts from which a bonus could be calculated. In order to estimate Mr. Kruger's contribution to the Debtors' creditors, FTI calculated the incremental value achieved by the $2.1 billion AFI Settlement by subtracting the original settlement of $750 million from that amount. *Id.* ¶ 20. This calculation implies that Mr. Kruger could have added up to $1.35 billion in value to the benefit of the Debtors' creditors. *See id.* However, to account

for the fact that Mr. Kruger was not solely responsible for this enhanced recovery, as provided in the Nolan Declaration and further illustrated in <u>Exhibit B</u> and <u>Exhibit C</u> annexed thereto, FTI calculated that the mid-point of its analysis would bring the CRO Success Fee to approximately $2.228 million.  *Id.*

45.    In addition, Mercer looked at value creation in terms of costs saved to the Debtors' estates.  *See* Dempsey Decl. ¶ 19.  Mr. Dempsey states that, given that the total professional fees for a recent quarter was just short of $100 million, even a three month acceleration of the resolution of Plan issues has saved the estates from substantial costs in professional fees alone.  *See id.*  Further, the successful execution of the Plan Support Agreement and resolution of other major issues facing all parties in interest resulted in the estates saving substantial costs that would have been incurred through protracted and complex litigation between the stakeholders had issues not been settled consensually.  *See* West Decl. ¶ 5.

46.    Mercer also considered whether the duration of the CRO's engagement impacted the success fee earned at the culmination of a case.  *Id.* ¶ 21.  Based on an assessment of comparable cases reviewed, Mercer concluded that the best way to assess the success fee is based on the contribution of the CRO rather than the time spent involved in, or other resources associated with, the engagement.  *Id.*

47.    The Debtors have articulated a valid business justification for awarding Mr. Kruger the Success Fee.  The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Official Comm.*

*of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650,

656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)).

48.    The Debtors believe that entry into the Amendment and payment of the Success

Fee as set forth herein is a sound exercise of the Debtors' business judgment.  *See* West Decl.

¶ 8.  As described above, the Debtors believe that the CRO has provided and continues to

provide services that benefit the Debtors' estates and creditors.  *See id.* ¶¶ 5-7.  In light of the

foregoing, the Debtors believe that entry into the Amendment and payment of the Success Fee is

appropriate and in the best interests of the Debtors and their estates and creditors.  *See id.*

Accordingly, the Debtors respectfully submit that the Amendment should be approved pursuant

to section 363(b) of the Bankruptcy Code as an exercise of the Debtors' business judgment.

49.    As noted above and in the CRO Retention Motion, payment of the Success Fee to

Mr. Kruger is subject to this Court's review under a reasonableness standard.  While the Debtors

believe that Mr. Kruger's achievements to date warrant the Success Fee, the Court will have the

opportunity to further determine whether the Success Fee is reasonable under the appropriate

standard at the conclusion of these cases.[10]

## **NOTICE**

50.    The Debtors have provided notice of this Motion in accordance with the Case

Management Procedures Order, approved by this Court on May 23, 2012 [Docket No. 141].

---

[10]    Jay    Alix    Protocol,    *Compensation*    §    II.D    (Nov.    3,    2004),    *available    at
http://www.justice.gov/ust/r02/manhattan/chapter11.htm* ("Success fees or other back end fees shall be
approved by the Court at the conclusion of the case on a reasonableness standard and shall not be pre-approved
under section 328(a).").

## <u>NO PRIOR REQUEST</u>

    51.    No prior motion for the relief requested herein has been made to this or any other court.

    WHEREFORE, the Debtors respectfully request the entry of an order, substantially in the form attached hereto as <u>Exhibit 1</u>, (i) granting the relief requested herein approving the Amendment; and (ii) granting such other and further relief as the Court deems appropriate.


Dated:  September 27, 2013
         New York, New York

                        /s/ Gary S. Lee
                        Gary S. Lee
                        Lorenzo Marinuzzi
                        Naomi Moss
                        MORRISON & FOERSTER LLP
                        1290 Avenue of the Americas
                        New York, New York 10104
                        Telephone: (212) 468-8000
                        Facsimile: (212) 468-7900

                        *Counsel for the Debtors*
                        *and Debtors in Possession*

ny-1110889