**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

**DECLARATION OF JOHN DEMPSEY IN SUPPORT OF
DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)
OF THE BANKRUPTCY CODE FOR AN ORDER APPROVING
AMENDMENT TO ENGAGEMENT LETTER WITH DEBTORS'
<u>CHIEF RESTRUCTURING OFFICER, LEWIS KRUGER</u>**

I, John Dempsey, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am a Partner at Mercer (US) Inc. ("<u>Mercer</u>"). My business address is 155 North Wacker Drive, Suite 1500, Chicago, Illinois 60606. Mercer is a global professional compensation services firm that was engaged by the above-captioned debtors and debtors in possession (the "<u>Debtors</u>").

**A.    Background Information and Qualifications**

2. I joined Mercer following my graduation from Yale University, and have worked in the firm's Chicago, Cleveland and London offices. I received an MBA in 1992 from the Ohio State University. I have been a Principal or Partner at Mercer for approximately 12 years.

3. I have extensive experience advising organizations undergoing major financial transitions (including bankruptcies, IPOs, LBOs, and acquisitions) regarding compensation issues, and also have extensive experience with designing annual and multi-year incentive programs, change in control arrangements, and employment agreements. My recent bankruptcy-related engagements include Fastbucks, Overseas Shipholding Group, Exide Technologies,

ny-1110953

Borders Group, Nortel Networks, Tribune Company, Aleris, Charter Communications, Masonite, CIT Group, Capmark, Fairpoint, Caraustar, Adelphia Communications (Creditors' Committee), R.H. Donnelley, Freedom Communications, Stallion, Dana, Owens Corning, Kaiser Aluminum, Solutia, Oglebay Norton, Citation, Intermet, Venture Holdings, Alterra, EaglePicher, Allied Holdings, Mesaba Aviation, and FLAG Telecom. I have also worked on restructuring issues with Georgia Gulf, ABN AMRO, US Foodservice, Barrick Gold, Manulife, CareMark Rx, Archipelago, and Sky Financial.

4.      Additionally, I published an article entitled *Bankruptcy Blues: Retaining Key Employees During a Financial Crisis* with Michael Siebenhaar in the February 2002 issue of Workspan, and an update, *The New Challenge of Chapter 11*, with Elizabeth Stephens in August 2008. I have been frequently quoted on issues relating to effective transitional compensation practices in such publications as HR Magazine, Cox News, and the Atlanta Journal Constitution. In addition, I have been quoted in the Dallas Morning News, the Chicago Tribune, and the Milwaukee Journal Sentinel. I have also presented at the National Meeting of the Conference Board, the National Association of Stock Plan Professionals, and the National Center for Employee Ownership.

5.      I have performed an analysis to assess the reasonableness and appropriateness of success fees in the context of market practice. As a result of my analysis, described more fully below, I believe that the proposed success fee as described in the *Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Approving Amendment to Engagement Letter With Debtors' Chief Restructuring Officer, Lewis Kruger* (the "Motion"), filed contemporaneously herewith, is generally in line with market standards and is appropriate.

Additional formation is included in the presentation entitled "CRO Success Fees" attached hereto as Exhibit A.

### B. Chief Restructuring Officer Work Responsibilities and Compensation

#### 1. Mr. Kruger's Duties

6. On February 7, 2013, the Debtors appointed Lewis Kruger ("Mr. Kruger") to serve as Chief Restructuring Officer of the Debtors with responsibility for (1) leading the Debtors in plan mediation and assisting in the formulation of a Chapter 11 plan, (2) assisting in the resolution of inter-estate claims, (3) working with creditors to resolve inter debtor and inter creditor disputes including allocation of assets among Debtors, (4) working with the Debtors' major stakeholders and AFI[1] to create a global settlement of the Debtors' claims against AFI (the "AFI Settlement") and (5) assisting the remaining management team with the resolution, settlement, and, as necessary, litigation of large disputed claims against the Debtors.

7. Mercer has been informed by the Board that, in addition to the plan-related duties, Mr. Kruger has served in a general oversight capacity over the Debtors' employees and the activities of the senior leaders. Members of the Board have informed me that following the departure of the Debtors' Chief Executive Officer, Thomas Marano, they perceived Mr. Kruger as functioning as the Debtors' Chief Executive Officer, in addition to Chief Restructuring Officer.

#### 2. Compensation

8. The engagement provides for an hourly rate of $895 per hour, reimbursement for reasonable and necessary expenses, and the right to earn a fee for the successful conclusion of his engagement (the "Success Fee"). The Motion seeks approval of the Success Fee that was determined by the Board.

---

[1] Capitalized terms otherwise not defined herein shall have the meanings ascribed to them in the Motion.

**C.      Description of the Proposed Success Fee Structure**

9.      In the Motion, the Debtors seek Court approval of an amendment to Mr. Kruger's Engagement Letter. The Amendment provides that upon the effective date of the proposed Plan, the Debtors, or any successors thereto, shall pay to Mr. Kruger the sum of $2.0 million as a Success Fee.

10.     As discussed below, based on my analysis, I believe the proposed Success Fee of $2.0 million is in line with market standards and appropriate.

**D.      Mercer's Analysis of Success Fees in the Market**

11.     Following Mr. Kruger's appointment, the Debtors engaged Mercer to advise on the compensation of a chief restructuring officer ("CRO"). Specifically, Mercer was asked to examine the design, prevalence, and appropriateness of success fees in bankruptcy cases.

12.     In assessing the reasonableness of success fees, Mercer conducted a market study that reviewed the retention of restructuring professionals in bankruptcies since 2005. From these companies, Mercer specifically looked at bankruptcies where a CRO was retained and the details of their compensation arrangements were disclosed.

13.     Mercer examined 32 bankruptcy cases where the debtor retained restructuring professionals to act as CROs and, in five cases, CEO and found that 21 (66%) of these companies disclosed both a time based compensation rate (determined in either an hourly or monthly rate) and a success fee. Furthermore, it is Mercer's experience that the inclusion of a success fee (sometimes called a "completion fee" or "success bonus") is common practice for restructuring professionals and a typical part of the compensation package for retained restructuring professionals. As the annexed analysis demonstrates, the median value of the success fee was $2 million, and the 75th percentile was $3 million. The $2.0 million Success Fee falls at the median of the sample.

14. As noted above, it is Mercer's understanding that Mr. Kruger performs the duties of a chief executive officer ("CEO") in addition to his duties as CRO for the Debtors. In the five of the 35 cases examined by Mercer, where the CRO also served as CEO and in addition to restructuring responsibilities, was tasked with the ongoing management of the company's operations, senior leadership team and other employees. In these cases, which reflect the CRO assuming additional responsibilities and internal and external visibility, the median value of the success fee awarded to the CEO was $3 million and the 75th percentile was $13 million. Compared to the CEO sample, the proposed Success Fee is below the median. If the cases where the CRO served as CEO are excluded from the analysis, the median is $1.75 million and the 75th percentile is $2.25 million. Compared to the CRO only sample, the Success Fee is between the median and the 75th percentile.

15. A statistical analysis of success fees found that a higher prepetition asset base roughly correlates to a higher success fee. Approximately 50% of the variation of success fees can be explained by the size of the debtors' estate as measured by asset size and as of the petition date. Using a regression analysis to predict the size of the award and the Debtors' approximately $15 billion in prepetition assets,[2] our analysis suggests a success fee of $4.1 million for Mr. Kruger. Our belief is that book value of assets is a proxy for the value of the underlying assets (admittedly imperfect since the assets of organizations filing from Chapter 11 are often impaired) and the scope of responsibility the CRO anticipates when the success fee is negotiated.

16. I believe that the $4.1 million predicted values based on asset size should be discounted because Mr. Kruger was engaged later in the bankruptcy process than the cases we reviewed (most often, the CRO is retained on the same day or very close to the bankruptcy

---

[2] As of March 31, 2012, the carrying value of the Debtors' assets totaled approximately $15.7 billion. *See* Whitlinger Affidavit ¶ 48.

5

ny-1110953

filing). Here, Mr. Kruger was engaged shortly before the close of the Asset Sales, as attention shifted to the preparation of a Chapter 11 plan of which the AFI Settlement and the inter-debtor and inter-creditor settlements were important components. The proposed $2.0 million Success Fee represents a 51% discount to the predicted value from our regression analysis.

17. In three of the cases reviewed by Mercer, a fixed sharing rate was used to calculate the success fee payable to the CRO, the formula for which was specified in the respective engagement letter. In these cases, the success fee was calculated using either (i) asset sale proceeds, (ii) creditor recoveries or (iii) some other measure of value creation. These rates were observed to be 2.5% of net sale proceeds above $70 million, 1% of cash generated from certain asset sales, and, in the case of Lehman Brothers, 0.175% of all unsecured distributions greater than $15 billion.

18. Following Mr. Kruger's appointment, the Debtors have made substantial progress towards confirmation of a Chapter 11 plan, including the negotiation of the AFI Settlement. I understand from the Board that Mr. Kruger represented the Debtor in the negotiation of the AFI Settlement and in improving the credibility of and perceived independence of the Debtors. By itself, the AFI Settlement enhanced the creditors' estate by $1.35 billion. The proposed success fee of $2.0 million reflects 0.148% of the incremental $1.35 billion contributed by AFI in the AFI Settlement. This sharing rate is below the lowest sharing rate observed in our analysis.

19. In addition, Mr. Kruger's perceived independence from the Debtors and AFI has accelerated the progress of the cases. I believe that even a three month acceleration of the resolution of plan issues has saved substantial costs in professional fees alone – the total professional fees for a recent quarter was just short of $100 million.

20. Furthermore, Mercer also considered whether the size of the engagement team and the duration of the engagement should impact the size of the success fee (the theory being that higher success fees were commanded by CROs that brought a large team of professionals and/or worked longer). In our deliberations, we considered that most services (reflected by a larger engagement team or longer engagement duration) might warrant a higher success fee. We also considered that charges tied to hourly or monthly rates directly compensate the retained firms for the amount of professional resources assigned to the engagement teams. On balance, our opinion is that Mr. Kruger's success fee ought to reflect the value of the contribution rather than the amount of human resources assigned to the engagement. In any event, we found an empirical correlation between team size and success fee that was weaker than the link between asset size and success fee.

21. Mercer also considered whether the duration of the CRO's engagement impacted the success fee. In 59% of cases, the amount of the success fee is defined at the engagement so there will not be any link between duration of the case and success fee. In our experience, these fixed success fees are in part an incentive to complete the case quickly (so that the CRO can earn the fee and move onto the next case, with another potential success fee). Fees are typically subject to court review at the end of the case to assess whether the maximum fee is warranted based on the actual contribution of the CRO. There is a 31% correlation between the size of the success fee and case duration which is not as strong as the correlation with assets. However, Lehman is both the highest success fee and the longest case (at 38 months) and we know that the success fee was a formula based on distributions to creditors. In the absence of Lehman, case duration explains 10% of the variation of the success fee. As stated above, the best way to assess the success fee is based on the contribution of CRO rather than the time or other resources

7

associated with the engagement. Mercer undertook multiple regression statistical analysis of success fees among sixteen companies in our sample where we had a success fee, the size of the engagement team, the duration of the engagement, and the total assets. The total assets were a stronger predictor of the success fee than either engagement team or case duration.

22. In conclusion, Mercer believes that a success fee of $2.0 million is consistent with market practice and reasonable in light of Mr. Kruger's contribution as we understand it based on the assessment of the Board.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on the 27th day of September, 2013.

/s/ John Dempsey
John Dempsey

# **EXHIBIT A**

ny-1110953



TALENT • HEALTH • RETIREMENT • INVESTMENTS

# Residential Capital
## CRO Success Fees
September 27, 2013

**John Dempsey**

john.dempsey@mercer.com

This report is confidential to ResCap and its advisors. It may not be used for any other purpose. Receipt of and use of this document in connection with the ResCap bankruptcy shall serve as acceptance of the confidentiality of the material herein.



# Background & Context

- Mercer was engaged to advise on the compensation of a Chief Restructuring Officer ("CRO"), specifically the design, prevalence, and appropriateness of success fees
- CROs are typically retained in large bankruptcy or distressed restructuring scenarios and responsible for such bankruptcy-specific duties as: negotiating settlements and sale transactions, restructuring operations to optimize efficiency and value, navigating the court process and negotiating with creditors and other stakeholders with the aim of consummating a timely and effective Plan of Reorganization ("POR")
  - In the ResCap bankruptcy, the CRO's principle duty is to negotiate a POR which is challenging given the disparate creditor constituencies and the numerous separate subsidiaries
  - Another notable challenge was the negotiation of the Ally settlement
- CROs are often hired through the retention of a restructuring firm and bring with them a staff of professionals that aid them through the restructuring
- To opine on the CRO compensation package, Mercer looked at bankruptcies since 2005 that retained restructuring professionals
  - From these companies, Mercer specifically looked at bankruptcies where a CRO was retained and details of the CRO's compensation were disclosed
  - Mercer also included companies filing in SDNY for direct comparison purposes
- The results of this analysis can be found in the following pages

# Chief Restructuring Officer Compensation Structure
## Prevalence of Hourly/Monthly Rates and Success Fees

- Mercer looked at 32 cases where the debtors retained restructuring professionals in the capacity of a CRO

- Upon retention of a CRO, compensation is typically determined using either a monthly or hourly rate
  - Market practice is almost equally split but a slight majority of companies (56%) paid using an hourly rate

- In addition to this monthly or hourly fee, there are often success fees paid out at the end of the case based on the achievement of certain metrics or milestones by the CRO
  - Can also be called a "success bonus," "completion fee," "incentive fee," etc.
  - 66% of these companies paid a success fee

| Company | Fee Determination | | Success Fee |
|---|---|---|---|
| | Hourly Fee | Monthly Fee | |
| AbitibiBowater Inc. | | ✓ | ✓ |
| AmTrust Financial Corporation | ✓ | | |
| ATP Oil & Gas Corporation | ✓ | | ✓ |
| BankUnited Financial Corporation | | ✓ | |
| Blockbuster Inc. | | ✓ | ✓ |
| Borders Group, Inc. | ✓ | | ✓ |
| Capmark Financial Group Inc. | | ✓ | ✓ |
| Central European Distribution Corporation | | ✓ | |
| Chemtura Corporation | | ✓ | ✓ |
| Circuit City Stores, Inc. | ✓ | | |
| Delta Petroleum Corporation | ✓ | | |
| Exide Technologies | | ✓ | ✓ |
| FirstFed Financial Corp. | | ✓ | |
| General Motors Corporation | ✓ | | ✓ |
| Guaranty Financial Group Inc. | ✓ | | |
| Hayes Lemmerz International, Inc. (2009) | ✓ | | ✓ |
| LandAmerica Financial Group, Inc. | ✓ | | ✓ |
| Lehman Brothers Holdings Inc. | ✓ | | ✓ |
| Linens 'n Things, Inc. | | ✓ | ✓ |
| Lyondell Chemical Company | ✓ | | ✓ |
| Magna Entertainment Corp. | | ✓ | ✓ |
| Overseas Shipholding Group, Inc. | ✓ | | |
| Patriot Coal Corporation | ✓ | | ✓ |
| Pilgrim's Pride Corporation | ✓ | | ✓ |
| Revel AC | ✓ | | |
| Saint Vincents Catholic Medical Centers of NY | ✓ | | ✓ |
| Sea Containers Ltd. | | ✓ | ✓ |
| SemGroup, L.P. | | ✓ | ✓ |
| Spansion Inc. | | ✓ | |
| Velo Holdings | | ✓ | ✓ |
| VeraSun Energy Corporation | ✓ | | ✓ |
| Washington Mutual, Inc. | ✓ | | |
| **Prevalence** | **56%** | **44%** | **66%** |
| **ResCap** | ✓ | | ✓ |

MERCER

2

# Data Detail: Market Compensation Data
## Success Fee Amounts and Metrics

- The table to the right outlines cases where the CRO was paid a success fee
  - The median value of these fees fell at $2 million and the 75th percentile at $3 million

- Payout determination metrics were either:
  - <u>POR Confirmation (71%):</u> fee (usually fixed) paid upon confirmation of a POR or the closing of a significant asset sale
  - <u>Time to Confirmation (19%):</u> fee is contingent upon confirmation by a set timetable, or fee is adjusted based on time to confirmation/ emergence
  - <u>Proceeds/Recoveries (19%):</u> fee is based on the level of asset sale proceeds or creditor recoveries and is determined using either a sliding scale or tiers

- In addition, in some cases (29%) there were discretionary adjustments allowed for factors such as case success, notable challenges and value added

| Company Name | Success Fee Amount | Fee Determination | | | |
|---|---|---|---|---|---|
| | | POR Confirmation | Time to Confirmation | Proceeds/ Recoveries | Discretionary Adjustments |
| AbitibiBowater Inc. | $1,500,000 | ✓ | ✓ | | |
| ATP Oil & Gas Corporation | $250,000 | ✓ | | | |
| Blockbuster Inc. | $2,000,000 | ✓ | | | ✓ |
| Borders Group, Inc. | $2,000,000 | ✓ | ✓ | | |
| Capmark Financial Group Inc. | $1,000,000 | ✓ | | | ✓ |
| Chemtura Corporation | $3,000,000 | ✓ | | | |
| Exide Technologies | $1,750,000 | ✓ | | | |
| General Motors Corporation | $13,000,000 | ✓ | | | ✓ |
| Hayes Lemmerz International, Inc. (2009) | $500,000 | ✓ | | | |
| LandAmerica Financial Group, Inc. | $1,136,126 | | | ✓ | |
| Lehman Brothers Holdings Inc. | $90,760,000 | | | ✓ | ✓ |
| Linens 'n Things, Inc. | $3,000,000 | ✓ | | | |
| Lyondell Chemical Company | $7,000,000 | ✓ | | | |
| Magna Entertainment Corp. | $1,000,000 | ✓ | ✓ | | |
| Patriot Coal Corporation | $2,000,000 | ✓ | | | |
| Pilgrim's Pride Corporation | $1,000,000 | | | | ✓ |
| Saint Vincents Catholic Medical Centers of NY | $2,000,000 | | ✓ | | |
| Sea Containers Ltd. | $709,450 | | | ✓ | |
| SemGroup, L.P. | $6,825,000 | ✓ | | | ✓ |
| Velo Holdings | $500,000 | | | ✓ | |
| VeraSun Energy Corporation | $3,500,000 | ✓ | | | |
| n = 21 | | | | | |
| 75th %ile | $3,000,000 | *Prevalence:* | | | |
| 50th %ile | $2,000,000 | 71% | 19% | 19% | 29% |
| 25th %ile | $1,000,000 | | | | |
| **ResCap Proposed** | **$2,000,000** | ✓ | | | ✓ |

MERCER                                   September 27, 2013                                   3

# Data Detail: Market Compensation Data
## Success Fee Relative to Assets

- The chart to the right displays the relationship between CRO success fees and companies' pre-petition asset size

- There is a slight relationship that suggests larger fees are paid for companies with larger asset bases
  - Based on this relationship, ResCap would have a predicted success fee of ~$4.1M
  - The median and 75th percentile of the market data are also plotted, as well as the proposed fee for ResCap's CRO



MERCER

September 27, 2013

4

# Data Detail: Market Compensation Data
## Compensation Levels

- The table below outlines the market compensation levels for CROs that receive a success fee
  - Base compensation is expressed as an hourly rate (monthly fees are converted into hourly rates)
- In addition, Mercer researched the cases where the CRO was either retained to cover CEO responsibilities or, during the course of the case, attained CEO responsibilities (typically when the incumbent CEO leaves the company)
  - Usually these executives are paid higher than executives who have CRO responsibilities only

|  | Hourly Rate | | | Success Fee | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | CRO | CEO | All | CRO | CEO | All |
| *75th %ile* | $831 | $952 | $850 | $2,250,000 | $13,000,000 | $3,000,000 |
| *50th %ile* | $725 | $850 | $750 | $1,750,000 | $3,000,000 | $2,000,000 |
| *25th %ile* | $572 | $835 | $695 | $927,363 | $1,750,000 | $1,000,000 |
|  | n=16 | n=5 | n=21 | n=16 | n=5 | n=21 |
| *ResCap* |  | $895 |  |  | $2,000,000 |  |

