**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
                                              )
In re:                                        )    Case No. 12-12020 (MG)
                                              )
RESIDENTIAL CAPITAL, LLC, et al.,             )    Chapter 11
                                              )
                          Debtors.            )    Jointly Administered
                                              )
---------------------------------------------------------------

**DECLARATION OF WILLIAM J. NOLAN IN SUPPORT OF
DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)
OF THE BANKRUPTCY CODE FOR AN ORDER APPROVING
AMENDMENT TO ENGAGEMENT LETTER WITH DEBTORS'
CHIEF RESTRUCTURING OFFICER, LEWIS KRUGER**

I, William J. Nolan, being duly sworn, state the following under penalty of perjury:

1. I am a Senior Managing Director in the Corporate Finance practice group of FTI Consulting, Inc. ("FTI"). FTI's Corporate Finance practice is one of the largest restructuring and reorganization advisory practices in the country. FTI's Corporate Finance practice is successor to PricewaterhouseCoopers's ("PWC") Business Recovery Services practice. Prior to joining FTI, I was a Partner at PWC. I am a member of my firm's Real Estate and Structured Finance practice group and I have over 20 years of experience providing financial advisory services to debtors and creditors. FTI currently is serving as financial advisor to Residential Capital, LLC ("ResCap") and the other above-captioned debtors and debtors-in-possession (collectively the "Debtors").

2. I submit this declaration (the "Declaration") in support of the *Debtors' Motion Pursuant to Sections 105 (a) and 363(b) of the Bankruptcy Code for an Order Approving Amendment to Engagement Letter with Debtors' Chief Restructuring Officer, Lewis Kruger* (the

ny-1110968

"Motion"), filed contemporaneously herewith. This Declaration reflects work performed to date, and I reserve the right to augment and refine the analysis.

## QUALIFICATIONS

3. FTI was first engaged by ResCap in March 2007 to provide financial advisory services and has been periodically reengaged by the Debtors since that time. Since March 2007, FTI has developed a great deal of institutional knowledge regarding the Debtors' operations, finances, and issues related to the ongoing bankruptcy proceedings. Since August 2011, Gina Gutzeit, a FTI Senior Managing Director, and I have been the primary contacts at FTI responsible for providing ResCap with financial advisory services, including, but not limited to, the evaluation of strategic alternatives, bankruptcy planning, bankruptcy operational readiness, cash flow analysis, and planning and general restructuring advice. In addition, I, along with other FTI professionals, have been involved personally in the negotiation of the Plan Support Agreement.[1]

4. As a member of FTI's and PWC's practices over the course of the last 20 years, I have developed extensive experience in advising troubled and bankrupt companies and their creditors. My experience includes a wide range of assignments including out-of-court restructurings, turnarounds, workouts and corporate bankruptcies. In addition, I have considerable experience in restructurings and bankruptcies in the financial services industry, including, but are not limited to, the bankruptcies and restructurings of: MF Global Holdings Ltd, Advanta Corp, The Education Resources Institute, Inc., Refco, Inc., People's Choice Home Loan, Inc., Mortgage Lenders Network USA Inc., ResMae Mortgage Corporation, First NLC Financial Services LLC, Alliance Bancorp, Mortgage Corporation of America, American

---

[1] Capitalized terms otherwise not defined herein shall have the meanings ascribed to them in the Motion.

2

ny-1110968

Business Financial Services, Inc., ContiFinancial Corporation, The Thaxton Group Inc., Criimi Mae Inc., and Fidelity Bond and Mortgage.

5.  In addition, I have been engaged in other large workouts and bankruptcies on behalf of the Debtors or their creditors, including: Orleans Homebuilders, Inc., M. Fabrikant & Sons, Inc., Oakwood Homes, Inc., Cone Mills Corp., Delta Mills, Inc., US Aggregates, Inc., and Heilig-Meyers Company. I have also been engaged in many out-of-court restructurings, including Credit-Based Asset Servicing and Securitization LLC, LNR Corporation, and other, nonpublic matters.

6.  Furthermore, FTI and I have provided financial advisory services to parties involved in mortgage-related litigation, all of which are confidential in nature.

7.  I hold a bachelor of science from the University of Delaware and a Masters Degree in Business Administration in Finance from The Wharton School of the University of Pennsylvania. I have been a speaker at various industry conferences, covering topics such as the recent financial crisis, tranche warfare in structured finance, and other real estate issues.

8.  In preparing this Declaration and in addition to the information referenced herein, I, and others from my firm under my direction, reviewed and considered other materials and documents, the internal nonpublic financial and operating data concerning the Debtors furnished to me by the management of the Debtors and information publicly available about the Debtors.

## BACKGROUND

9.  Mr. Kruger was appointed as the Debtors' Chief Restructuring Officer ("CRO") on February 7, 2013. At such point in time, Mr. Kruger was tasked with leading Plan mediation sessions; assisting in the resolution of inter-estate claims; working toward the resolution of interdebtor and intercreditor disputes; assisting with the pursuit of a global settlement with AFI;

and assisting the Debtors' management team with the resolution, settlement and potential litigation of large disputed claims against the Debtors.

10. In addition to his hourly compensation as approved by the Court on March 5, 2013, Mr. Kruger has the right to request a fee for the successful completion of his engagement (the "Success Fee"). Contemporaneously herewith, the Debtors filed the Motion, which seeks Court approval of an amendment to Mr. Kruger's Engagement Letter with the Debtors. The Amendment provides Mr. Kruger with a Success Fee of $2.0 million to be earned upon the effective date of the Plan.

11. It is my understanding that the Board believes that, while the role played by Mr. Kruger during the pendency of these bankruptcy cases is different from the roles established for CROs in other large bankruptcies, a Success Fee in the amount of $2.0 million is reasonable due to Mr. Kruger's contributions to the negotiations of the AFI Settlement (a significant source of recovery for the Debtors' unsecured creditors) and his credibility in those negotiations.

12. Under Mr. Kruger's leadership, the Debtors, have made significant progress toward the confirmation of a largely consensual Chapter 11 plan. Key achievements to date include the achievement of a Plan Support Agreement with the Consenting Claimants which contemplates an AFI contribution valued at $2.1 billion, the filing of the Plan with the Creditors' Committee, and the approval of the Disclosure Statement. Additionally, Mr. Kruger has significantly contributed to the FRB Settlement, and has performed certain duties previously performed by the Debtors' Chief Executive Officer ("CEO"), Thomas Marano.

## **ANALYSIS**

13. In order to identify an estimated range of values with respect to CRO compensation, I, and other professionals at my direction, prepared an analysis of CRO success

fees in bankruptcy engagements deemed to be comparable to these cases. While the role of Mr. Kruger balanced certain duties typical of a CRO and other duties typical of a CEO, we were able to identify ten large bankruptcy cases in the Southern District of New York in which a CRO was retained that I believe are a reasonable proxy for the facts and circumstances surrounding these cases.

14. In the cases examined for this Declaration, CROs were often tasked with leading the effort to liquidate the Debtors' remaining assets; Mr. Kruger, however, was retained by the Debtors when the sale of the majority of the Debtors' assets was substantively completed. Mr. Kruger's primary duties involved the negotiation of the settlement of the Debtors' significant liabilities with various stakeholders.

15. I reviewed the retention applications and orders for CROs in each of the large bankruptcy cases shown in detail on <u>Exhibit A</u> attached hereto. Using publicly available information, the completion fee or success fee included in the retention documents (or subsequent amendments) for each CRO was identified. Rather than simply taking the average success fee for each retention, I attempted to refine the analysis by taking a weighted average based on the size of each debtor in <u>Exhibit A</u>. While many CROs included in this analysis were tasked with the disposition of the assets of their respective debtors, Mr. Kruger was retained by the Debtors when the sale of the majority of the Debtors' assets had been substantively completed. As such, it would seem reasonable that one of the determinants of the size of a success fee is likely the size of the Debtors' liabilities at the time of filing. In this case, because the majority of the Debtors' assets were effectively sold at the time of the appointment of a CRO, the quantum and composition of the Debtors' assets would seem a less relevant factor.

16.     As the analysis in Exhibit A shows, the weighted average success fee paid to CROs in the sample of large cases in the Southern District of New York is 0.02% of total liabilities at filing. Using that metric and applying it to ResCap's $15.276 billion[2] of liabilities at filing, a success fee ranging from $2.5 million to $2.8 million is implied.

17.     Additionally, in *In re Velo Holdings, Inc.*, Case No. 12-11384 (MG) (Bankr. S.D.N.Y. 2012), the debtor retained a professional from AMJ Advisors as CRO. In that case, the CRO's compensation structure was largely based upon the Estate's Key Employee Incentive Program. The inclusion of a success fee "metric" based on incremental recovery value to creditors is a common component of CRO compensation (*see also In re Motors Liquidation Corp. (f/k/a In re General Motors Corp.*), Case No. 09-50026 (Bankr. S.D.N.Y. 2009), *In re Eastman Kodak Co.*, Case No. 12-10202 (REG) (Bankr. S.D.N.Y. 2012). As such, FTI staff, at my direction, performed an additional analysis, shown in Exhibits B and C, which aligns the critical accomplishment of Mr. Kruger's tenure with the Estate KEIP asset recovery metrics.

18.     The ResCap Estate KEIP (the "Estate KEIP") was established to incentivize Estate management by matching compensation to increased recoveries to creditors. By making compensation targets flexible based on a "stepped up" scale for performance (asset recoveries and cost minimization), the KEIP plan directly aligned the interests of the KEIP plan participants with the interests of ResCap's creditors. Given Mr. Kruger's similar involvement and role as an intermediary negotiating between multiple parties-in-interest and having the Estate's (and ultimately, the creditors') interests in mind, I believe it reasonable to use the Estate KEIP as a baseline for analysis of a success fee for Mr. Kruger.

---

[2] Amount taken from Voluntary Petition (as of 3/31/13) and excludes contingent and unliquidated liabilities, many of which were only identified after the bankruptcy filing.

19.     In <u>Exhibit B</u>, we used the Estate KEIP "Scenario 1",[3] as approved by the Court [Docket No. 3280], to estimate the percentage of potential improved recoveries which accrues to the KEIP participants. The Estate KEIP compensates six critical executives based upon, among other metrics, the realization of certain recovery values on different classes of assets. For purposes of this analysis, I calculated the difference between the Target and Max KEIP payment allocable to the sale of FHA/VA loans and non-FHA/VA loans, as well as the corresponding increase in gross sale recoveries on those assets to justify the incremental payment. My calculations indicate that the KEIP participants would share in an additional $539,500 in cash for obtaining an additional $52.5 million in sale proceeds over the proceeds required to meet the Target levels. As the FHA/VA and non-FHA/VA gross recovery amounts accounted for 32.5%[4] of the total KEIP payout metric (calculation follows), the Incremental Bonus was then multiplied by 32.5% to calculate the total KEIP payout attributable to FHA/VA and non-FHA/VA recoveries.

[*Remainder of Page Intentionally Left Blank.*]

---

[3]   The Estate KEIP contemplates two potential scenarios: Scenario 1, which contemplates a bulk sale of FHA/VA assets, and Scenario 2, which contemplates smaller asset sales over time.

[4]   For purposes of the sale component of KEIP metrics, only FHA/VA and non-FHA/VA loan recoveries were ultimately considered in the Estate KEIP.

*($ thousands)*

| | | Bonus Amount[1] | |
|---|---|---|---|
| **Estate KEIP Bonus Allocation** | | | |
| Target KEIP Bonus Pool (Base)[2] | | $ 2,158.0 | (A) |
| KEIP Allocation - Asset Recovery | | 50% | (B) |
| KEIP Allocation - Expense Management | | 50% | |
| **Total KEIP Bonus Allocation** | | **100%** | |
| KEIP Bonus Amount Allocable to Asset Recovery | =(A) * (B) | $ 1,079.0 | (C) |
| **Breakdown of KEIP Bonus Asset Recovery Component** | | | |
| Portion of KEIP Target Asset Recovery Bonus Atrributable to FHA/VA Gross Proceeds | | 55% | (D) |
| Portion of KEIP Target Asset Recovery Bonus Atrributable to Non-FHA/VA Gross Proceeds | | 10% | (E) |
| Portion of KEIP Target Asset Recovery Bonus Atrributable to FHA/VA Recovery Rate | | 30% | |
| Portion of KEIP Target Asset Recovery Bonus Atrributable to Non-FHA/VA Recovery Rate | | 5% | |
| **Total KEIP Asset Recovery Component** | | **100%** | |
| KEIP Bonus Pool Represented by Gross Sale Proceeds of FHA/VA and Non-FHA/VA Gross Sale Proceeds[3] | =(C) * [(D)+(E)] | $ 701.4 | (F) |
| **Total FHA/VA and Non FHA/VA Gross Recovery Allocation as a Percentage of Total Target KEIP Award** | =(F) / (A) | **32.5%** | |

[1] Amounts taken from Estate KEIP presentation and Court filings
[2] Estate KEIP Bonus was designed for six participants, however not all participants were directly involved with asset dispositions
[3] For purposes of this analysis, only the gross sale proceeds component of the KEIP was considered as only that component could be reasonably aligned with Mr. Kruger's contribution with respect to enhanced creditor recoveries. The remaining 35% is attributable to the rate recovery metric vs. book value of assets sold

Using the Incremental Recovery ($52.5 million), the Incremental Bonus ($539,500) weighted by the 32.5% attribution calculated above, the percentage of the Incremental Recovery that was effectively earned by the Estate KEIP participants in the form of the Incremental Bonus was 0.33% ([$539,500 * 32.5%] / $52.5 million) (the "Effective Bonus Rate").

20.   In order to estimate Mr. Kruger's contribution to the Debtors' creditors, we then calculated the incremental value achieved by the $2.1 billion global settlement with AFI by subtracting the original settlement of $750 million from that amount. This calculation implies that Mr. Kruger could have participated in adding up to $1.35 billion in value to the benefit of the Debtors' creditors (the "Incremental Settlement"). As Mr. Kruger was the Debtors' critical representative in achieving an enhanced settlement with AFI, it would seem reasonable to compare that enhanced recovery to the sharing percentage of other Estate KEIP participants in this case. However, it would be unrealistic to assume that Mr. Kruger was solely responsible for

8

ny-1110968

the $1.35 billion enhanced recovery.  As shown in <u>Exhibit C</u>, the Effective Bonus Rate was applied to the Incremental Settlement and then weighted across a range of percentages representing Mr. Kruger's assumed contribution to the enhanced settlement, resulting in a range of potential Success Fees that could be considered reasonable.  If the mid-point of the analysis is used, the CRO success fee would be approximately $2.228 million.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  September 27, 2013                        /s/ William J. Nolan
        New York, New York                          William J. Nolan

# EXHIBIT A

**CRO Success Fees in Large Bankruptcies in the SDNY**

*($ in millions)*

| Case Name | Name of Filing | Filing Date | Total Liabilities [1] | Success Fee (Low) | Success Fee (High) | Low as % of Liabilities | High as % of Liabilities |
|---|---|---|---|---|---|---|---|
| Lyondell Chemical Company[3] | Application Of The Debtors Pursuant To 11 U.S.C. § 363, Nunc Pro Tunc To The Petition Date To Employ And Retain AP Services, Llc And Designate Kevin Mcshea As Chief Restructuring Officer To The Debtors | 1/6/09 | $ 30,307 | $ 7.0 | $ 7.0 | 0.02% | 0.02% |
| Chemtura | Application Authorizing Employment and Retention of A&M as Crisis Manager for Debtors and Appointment of Ray Dombrowski as CRO | 3/18/09 | 2,600 | 3.0 | 3.0 | 0.12% | 0.12% |
| General Motors Corporation[4] | Debtors' Motion for an Order Authorizing the Debtors to Employ and Retain AP Services, LLC as Crises Managers and to Designate Albert A. Koch as CRO, Nunc Pro Tunc To The Petition Date | 6/1/09 | 172,810 | 13.0 | 13.0 | 0.01% | 0.01% |
| Saint Vincents Catholic Medical Centers of NY | Application for Authority to Retain Grant Thornton LLP to Provide Crisis Management Services and Employ Mark E. Toney as CRO and Steven R. Korf as CFO | 4/14/10 | 1,100 | 1.5 | 2.0 | 0.14% | 0.18% |
| Blockbuster Inc. | Application to Retain A&M to Provide the Debtors a CRO and Certain Additional Personnel and Designate Jeffery J. Stegenga as CRO | 9/23/10 | 1,467 | 2.0 | 2.0 | 0.14% | 0.14% |
| Borders Group Inc. | Application to Employ AP Services as Crisis Managers and Ken Hiltz as Senior Vice President of Restructuring | 2/16/11 | 1,293 | 1.0 | 2.0 | 0.08% | 0.15% |
| Eastman Kodak Co.[5] | Debtors' Motion to Employ and Retain AP Services, LLC and Designate James A. Mesterharm as Chief Restructuring Officer to the Debtors Nunc Pro Tunc to the Petition Date | 1/19/12 | 6,751 | 3.0 | 3.0 | 0.04% | 0.04% |
| Velo Holdings Inc. | Debtors' Motion Pursuant To Section 363 Of The Bankruptcy Code For Entry Of An Order Authorizing The Debtors To (A) Employ AMJ Advisors LLC And (B) Designate Alan M. Jacobs As Chief Restructuring Officer For Credit & Identity Theft Protection Business And Lifestyle & Shopping Business, Nunc Pro Tunc To The Petition Date | 4/2/12 | 713 | 0.5 | 2.9 | 0.07% | 0.40% |
| Metro-Goldwyn-Mayer Studios Inc. | Debtors' Motion For Order Approving The Services Agreement With Cair Management, Llc, Stephen F. Cooper, And Zolfo Cooper Management, Llc, And Authorizing The Debtors To Perform Thereunder Nunc Pro Tunc To The Petition Date | 11/3/10 | 3,451 | 4.0 | 4.0 | 0.12% | 0.12% |
| Patriot Coal Corp. | Debtors' Application For Entry Of An Order Authorizing the Retention and Employment of AP Services and Designating Kenneth Hiltz as CRO | 7/9/12 | 3,072 | 2.0 | 2.0 | 0.07% | 0.07% |
| **Weighted Average - All Cases** | | | **$ 22,356** | **$ 3.7** | **$ 4.1** | **0.02%** | **0.02%** |
| Residential Capital, LLC (Implied) - Weighted Average | | 5/14/12 | $ 15,276 | $ 2.5 | $ 2.8 | 0.02% | 0.02% |
| Residential Capital, LLC (Implied) - Minimum | | 5/14/12 | 15,276 | 1.1 | 1.1 | 0.01% | 0.01% |
| Residential Capital, LLC (Implied) - Maximum | | 5/14/12 | 15,276 | 20.8 | 61.0 | 0.14% | 0.40% |

(1) Taken from estimated amounts in Voluntary Petitions or other First Day Filings unless otherwise noted

(2) Total Assets are calculated as of 11/30/08 date and based on the amount as filed in the First Day Affidavit of 1/6/09

(3) Success Fee (High) excludes provision for incremental bonus amount for the addition of "significant value"

(4) Success Fee (High) excludes adjustment for incremental recoveries to creditors based on asset sale proceeds (only includes completion fee portion)

**EXHIBIT B**

| Calculation of Effective Bonus Rate | | | |
|---|---|---|---|
| *($ thousands)* | Recovery | Bonus | Implied % |
| Estate KEIP | | | |
|   Target Metric | | $ 2,158.0 | |
|   Maximum Metric | | 2,697.5 | |
| Incremental | $ 52,500.0 | $ 539.5 | |
| Recovery Component of Bonus | | 32.5% | |
| Effective Bonus Rate[1] | | $ 175.3 | 0.33% |

[1] By comparing the Incremental Bonus due to Gross Asset Recovery Metrics ($175.3M) to the incremental gross recovery required to achieve the maximum bonus payout, we were able to calculate an implied sharing percentage of the benefit equal to 0.33%  [= ($539.5*32.5%)/$52,500]

# EXHIBIT C

| *($ thousands)* | **Stratification of Potential CRO Payout Amounts** | | |
|---|---:|---:|---:|
| CRO Recovery Attribution %[1] | 25% | 50% | 75% |
| Incremental Settlement | $ 1,350,000 | $ 1,350,000 | $ 1,350,000 |
| Effective Bonus Rate | 0.33% | 0.33% | 0.33% |
| Implied Success Fee | $ 1,114 | $ 2,228 | $ 3,341 |

[1] Denotes percentage of Incremental AFI settlement credited to CRO for Success Fee calculation purposes

ny-1110968