BARRY B. ESKANOS AND
AMI B. ESKANOS
3122 PINE TREE DRIVE
MIAMI BEACH, FL 33140
Tel: (305) 613-6894
Fax: (305) 735-3437
bbeskanos@aol.com

CREDITORS PRO SE

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

_____
                                          )
In re:                                    )     CASE NO.  12-12020 (MG)
                                          )     CHAPTER 11
RESIDENTIAL CAPITAL, LLC, *et al*         )     JOINTLY ADMINISTERED
                                          )
              Debtors.                    )
_____)

**CREDITORS, BARRY B. ESKANOS AND AMI B. ESKANOS' OPPOSITION TO
THE DEBTORS OBJECTION TO THEIR CLAIM (19)
AND
CREDITOR BARRY AND AMI ESKANOS' MOTION FOR AN ORDER FOR
RELIEF FROM THE AUTOMATIC STAY TO ALLOW
<u>CREDITORS TO FILE AND SERVE A STATE COURT ACTION</u>**

**BARRY B. ESKANOS AND AMI B. ESKANOS** hereby respectfully move pursuant to

11 U.S.C.§ 362(d)(1) and (2), Bankruptcy Rule 4001, and consistent with the prior orders

modifying the stay for homeowners seeking to resolve disputes regarding their real

property, for an order terminating or, alternatively, modifying the automatic stay imposed

pursuant to 11 U.S.C. § 362, to permit the Eskanos' to pursue certain claims that it has

against debtors GMAC Mortgage, LLC, and non-debtors, Rust Consulting  Managers,

LLC, in the Civil Circuit Court of Miami Dade County. The Eskanos' are creditors of

Debtors' in the fact that Debtor admitted in open court before the Honorable AJ Crystol,

1

under the principal Case Numbers 11-40292-AJC ; that it ADMITTED that it willfully

and intentionally violated the Florida Fraudulent Transfer Act in order to avoid

enforcement by the Creditors, Ami Eskanos and Barry Eskanos of the pending default

judgment against Washington Mutual Bank, FA; and even sought and obtained an order

intervening in that adversary action and is a party to that action.  Further, that the Debtor

committed fraud by making a false representation of a material fact, which Rust relied

upon, to the detriment of both Rust and Creditors, which actually and proximately caused

monetary and irreparable harm to the Creditors when GMAC informed Rust Consulting

during the independent foreclosure review, that Creditors were not victims of the

foreclosure fraud and were not under a foreclosure action in order to avoid payment of

the money and other equitable relief which was actually due the Creditors under the

flawed Independent Foreclosure Review Process.

## **PROCEDURAL HISTORY**

1. GMAC MORTGAGE, LLC, filed a voluntary petition in the United States

   Bankruptcy Court for the Southern District of New York for relief under chapter

   11 of title 11 of the United States Code (the "Bankruptcy Code") in the case In re

   RESIDENTIAL CAPITAL, LLC. (ResCap), and its subsidiaries, including

   GMAC Mortgage, LLC, Case No. 12-12020.

2. On the Petition Date, each of the Debtors, including GMAC Mortgage, LLC, filed

   a voluntary United States Code (the "Bankruptcy Code"). The Debtors are

   managing and operating their businesses as debtors in possession pursuant to

   Bankruptcy Code sections 1107(a) and 1108. These cases are being jointly

   administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

Procedure ("Bankruptcy Rules"). No trustee has been appointed in these Chapter 11 cases.

3.    On May 16, 2012, the Office of the United States Trustee for the Southern District of New York (the "United States Trustee") appointed a nine member official committee of unsecured creditors. On July 3, 2012, the United States Trustee appointed the Honorable Arthur T. Gonzalez, former Chief Judge of the United States Bankruptcy Court for the Southern District of New York, as examiner.

4.    Debtors fraudulently objected to the claim presented by the Creditors when the Debtors themselves admitted to committing a fraudulent transfer of assets belonging to the Creditors when GMAC admitted to making the transfer in order to avoid enforcement of a default judgment against WAMU; in an action (11-03107-AJC ) where GMAC further intentionally sought to intervene, and did intervene as a co-defendant with Washington Mutual Bank, FA and further admitted in its pleadings that interfered with the action solely to protect the fraudulently transferred asset.  This rogue fraudulent conduct is one of many fraudulent acts which caused the downfall of GMAC and the entry of the Consent Judgment which GMAC is attempting to avoid by their bankruptcy action.

## JURISDICTION

5.    The court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334, 11 U.S.C. § 362(d)(1) and (2). and Rules 4001(a) and 9014 of the Rules of Bankruptcy Procedure. Venue of this case and this motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3

6.  On or about **February 10th, 2012**, the US District Court Clerk entered a Default

in a civil action for compensatory and punitive damages against Washington

Mutual Bank, FA ("WAMU") for their responsibility to Plaintiffs / Creditors,

Ami and Barry Eskanos for DAMAGES AGAINST DEFENDANT

WASHINGTON MUTUAL BANK, FA, TO SET ASIDE THE SUMMARY

JUDGMENT ON THE BASIS OF FRAUD; FOR VIOLATIONS OF THE

FLORIDA FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA"), 15

U.S.C. §  1692 ET. SEQ.; FLORIDA CIVIL CONSPIRACY; MAIL AND WIRE

FRAUD 18 U.S.C., SECTIONS 1341, 1343; BANK FRAUD 18 U.S.C. 1341,

1344; VIOLATION OF 18 U.S.C. § 1001; VIOLATION OF 18 U.S.C. § 1005;

VIOLATION OF 12 C.F.R. §202.16, EQUAL OPPORTUNITY ACT,

REGULATION B; DECLARATORY RELIEF; DECLARATORY RELIEF

ORDER FINDING THE LINE OF CREDIT OF $100,000 ISSUED BY WAMU

IS VOID AS PREDATORY LENDING; UNCOLLECTABLE AS BEYOND

THE STATUTE OF LIMITATIONS; AND VOID AS PLAINTIFFS WERE

VICTIMS OF IDENTITY THEFT AND THE LIENS THEREON SHOULD BE

ORDERED VACATED;  AND DAMAGES PURSUANT TO FLORIDA

STATUTE CHAPTER 701.04 (1), US District Court Case, 11-03107-AJC.

Default by the Clerk was entered in that action in favor of Plaintiffs for a total of

$264,500,000; and to date, $264,500,000 remains unsatisfied.

7.  On or about February 10th, 2012, the Debtor, GMAC Mortgage LLC filed a

motion with the Third District Court of Appeals asking the Court to substitute

themselves in the action in the stead of Washington Mutual Bank, FA on the

4

fraudulent basis that they contemporaneously purchased the mortgage from

Washington Mutual Bank in February of 2012 for value.

8. The true facts are, that they did not contemporaneously pay ANY value for the

fraudulently transferred purported obligation at that time, and further

ADMITTED to the Honorable AJ Crystol that they substituted the names of the

Plaintiffs solely to AVOID enforcement of the Clerks default judgment in his

court against Washington Mutual Bank, FA.

9. That as a result of that admission, Plaintiffs / Creditors Barry and Ami Eskanos

filed suit in the Circuit Court of Miami Dade County, Fraudulent Transfer

Complaint, Miami Dade Case Number:  2012-22689-CA-01, against Washington

Mutual Bank, FA for violation of the Florida Fraudulent Transfer Act and a

default is pending in that action in the following sums:

| | |
|---|---|
| The principal sum of | $ 264000000.00; |
| Exemplary Damages in the sum of | $ 792000000.00; |
| Court Costs of | $        411.00; |
| **Making a total of** | **$ 1056000411.00** |

10. Thereafter, Creditors / Plaintiffs filed a claim with the Independent Foreclosure

Review in care of Rust Consulting, a co-conspirator of GMAC Mortgage, LLC.

In response to the claim filed by the Creditors / Plaintiffs, the Debtor, GMAC

Mortgage, LLC, fraudulently stated to Rust Consulting that the claim made by the

Creditors Plaintiffs should be denied because the Plaintiffs / Creditors were not in

foreclosure proceedings during 2009 through 2010.  Said false statement was

made by GMAC Mortgage, LLC with the intention of making Rust Consulting to

reasonably and justifiable rely and they did rely, to the detriment of the Plaintiff /

Creditors; and further the statement was intended to cause, and did cause, the

5

Plaintiff / Creditors to suffer monetary damage and economic harm which entitles the Plaintiff / Creditors to unlimited punitive damages under Florida Law related to Punitive Damages.  Rust Consulting, after being provided the true facts and shown public records which clearly contradicted the fraudulent statements by GMAC, took no steps to remedy the fraud committed by GMAC and further ratified their wrongful conduct and disclaimed responsibility for their harm.

11. Because the Debtors falsely claim an interest in the Creditors home, where the Debtors paid NO VALUE contemporaneous with the fraudulent transfer that occurred on or about the same exact time as the default was entered by the Clerk; Creditor, as part of the remedies they are entitled to under the Florida Fraudulent Transfer Act is the disgorgement of the fraudulently transferred asset from GMAC Mortgage, LLC and the return of the fraudulently transferred asset to the Creditors, the Eskanos'.  Further, the Statute provides for damages in the amount of the fraudulently transferred asset, the sum of **$ 1,056,000,411.00 which is the amount claimed in the bankruptcy.**

12. A proof of claim has been filed by the Creditors in this action, and after receiving a letter from the Debtors seeking supporting information, Creditors provided the Debtors with approximately 5000 pages of supporting documentation.

13. That in order to avoid exposure to the court of the fraudulent transfer and fraudulent and blatantly illegal conduct of the Debtors, they fraudulently objected to the claim, seeking to strike the same on the basis of a lack of information, when, in fact, they are in possession of all the attached proof.

6

14. GMAC has consistently committed blatant acts of fraud, and concealed them from the Court to avoid enough victims from coming to court and seeking to dismiss the Chapter 11 Bankruptcy filing, or, in the alternative, to convert to Chapter 7, pursuant to 11 USC § 1112 (b)(1) "Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate"; and on the basis of fraud, including, but not limited to:

a.   Mail Fraud, 18 U.S.C. Section 1341; Preparing and filing of fraudulent documents by means of the US Mail System.

b.   Wire Fraud, 18 U.S.C. Section 1343; Representations of material facts that are false, misleading, with the intent of having the Creditors and others rely on those representations, and they reasonably, and detrimentally relied on those fraudulent, false, and misleading statements by means of the wire system.

c.   Bankruptcy Fraud, 18 U.S.C. Section 152: Concealed assets or false statements.

d.   Bankruptcy Fraud, 18 U.S.C. Section 157: The use of bankruptcy which is intended to, and actually does, aid the fraud scheme by means of delaying creditors, allowing the debtor to continue to operate in a fraudulent manner while covering up the scheme;

e.   Intentional and willful violations of the Fraudulent Transfers Act;

f.   And, for cause, pursuant to the grounds set forth in 11 USC § 1112 (b) (4)

7

(4) For purposes of this subsection, the term "cause" includes —

(A)    substantial or continuing loss to or diminution of the estate and the absence of a

reasonable likelihood of rehabilitation;

(B)    gross mismanagement of the estate;

(C)    failure to maintain appropriate insurance that poses a risk to the estate or to the

public;

(D)    unauthorized use of cash collateral substantially harmful to one or more creditors;

and

(E)    failure to comply with an order of the court;

13.    EXHIBIT A, attached hereto and incorporated herein is the complaint that

Plaintiffs / Creditors seek relief from the automatic stay so they can file the same.

14.    EXHIBIT B, attached hereto is the response the Debtors request for supplemental

information related to the claim.

## RELIEF SOUGHT

15.    Overrule the Debtors Objection to the Creditors Claim (Claim 19); and

16.    The Creditors respectfully request that the Court lift the automatic Stay and

permit the Plaintiff Creditors to proceed in Miami Dade Circuit Court against

BOTH Rust Consulting and GMAC Mortgage, LLC; that Creditors be permitted

to file the attached complaint and that the objection to the claim filed by the

Creditors (19) be denied and the claim be permitted to stand; and that upon the

entry of judgment in the fraudulent transfer action, the Creditors be permitted to

amend their claim to the amount awarded by the Miami Dade Circuit Court.

8

17.     Granting the Creditors, Ami and Barry Eskanos, relief from the automatic stay will promote judicial economy, since regardless of whether or not the Court terminates the automatic stay, the Creditors intend to proceed against Rust Consulting for their participation in the fraudulent handling of the independent foreclosure process; their possession of the actual facts in direct contravention to the fraudulent representations of GMAC, and then their refusal to reconsider their decision after being in possession of the facts which contradicted the fraudulent statements of GMAC; and their continued denial of the claims filed by the Creditors by continuing to rely on the fraudulent statements of GMAC, and continued denial of the independent foreclosure claim.

18.     The Debtors would suffer no prejudice or surprise by having the automatic stay terminated, since Rust Consulting has to answer for their fraudulent conduct and conspiracy to commit intentional harm against the Creditors / Plaintiffs and Debtors cannot claim that they will be prejudiced by having their fraudulent behavior tried by a Court of Law.

19.     Debtors cannot hide behind the bankruptcy Court to conceal their ongoing fraudulent behavior.

20.     Furthermore, the allegations against the Debtors in all of the coordinated actions are overlapping and often identical.

21.     If the Creditors' claims against all defendants are not heard in one forum, then there is a "risk of inconsistent rulings or judgments.

22.     In addition, one forum "will prevent duplication of document discovery and depositions.

9

23.     Litigating these matters in two forums is not in the interests of judicial economy,

but judicial economy would be diminished if the Court were to deny this motion,

because the Creditors still intends to pursue its claims against the non-debtor

defendants in the Florida State Circuit Court action.

24.     The Debtors should not be allowed to delay the Creditor's action for one year by

seeking to coordinate that action with five other lawsuits, and then use the shield

of the automatic stay to force the Creditors to litigate in two forums.

25.     The proper forum for the Creditors' claims against the Debtors is in the Florida

Miami Dade County Circuit Court, because the criminally fraudulent and

admittedly fraudulent conduct occurred in that County, the real property is located

in that county, the Florida Statutes apply, and the law at issue and because it is the

Creditors' chosen forum.

**PRAYER FOR RELIEF**

WHEREFORE, the Creditors, Barry and Ami Eskanos, respectfully requests that the

Court OVERRULE the debtors objection to Claim 19, and further terminate or modify

the automatic stay imposed by 11 U.S.C. § 362 in order to permit the Creditors to pursue

their claims against the Debtors AND THE NON- PARTY co-conspirators, Rust

Consulting, in the Circuit Court of Miami Dade County, Florida, to the extent of the

recovery of the fraudulently transferred asset, the interest in the subject property, the

Creditors homestead home, 3122 Pine Tree Drive, Miami Beach, Florida, if any there is,

and allow any recovery in excess of the fraudulently transferred asset to form the basis of

the Creditor's claim against Debtors' estates, together with such other and further relief

as this Court deems just and proper.  To the extent the Miami Dade Circuit Court finds

10

that the transfer of the interest in Plaintiffs property, if any there is to be fraudulent, then

the stay is lifted to the extent that it releases the interest in the Creditors home, 3122 Pine

Tree Drive, Miami Beach, Fl 33140. Further, that the objection to the claim as being

insufficiently supported be denied and the claim be sustained and permission to amend

once the final judgment is entered in the fraudulent transfer action.

RESPECTFULLY SUBMITTED:

DATED:  September 18th, 2013

_____
    Ami B. Eskanos, JD MPA
    3122 Pine Tree Drive
    Miami Beach, FL 33140
    (305) 613-6894
    bbeskanos@aol.com


_____
    Barry B. Eskanos, JD MPA
    3122 Pine Tree Drive
    Miami Beach, FL 33140
    (305) 613-6894
    bbeskanos@aol.com

11

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                            )
In re:                                      )        CASE NO.  12-12020 (MG)
                                            )        CHAPTER 11
RESIDENTIAL CAPITAL, LLC, *et al*           )        JOINTLY ADMINISTERED
                                            )
                          Debtors.          )
_____)

ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY

Upon the Motion of Barry Eskanos and Ami Eskanos for Relief from the Automatic

Stay and overrule the objection of the Debtor to the Creditors Claim (Claim 19), dated

September 18th, 2013 (the "Motion") for entry of an order granting relief from the

automatic stay and overruling of the Debtors Objection to the Creditors Claim; and the

Court having jurisdiction to consider the Motion and grant the requested relief in

accordance with 28 U.S.C. §§ 157 and 1334; and the Court having reviewed the Motion

and Debtors' Response to Motion of Creditors, Barry B. Eskanos and Ami Eskanos for

Relief from the Automatic Stay, dated April 23, 2013; and the Court having determined

that the relief granted herein is in the best interests of the Debtors, their estates, their

creditors, and all parties in interest; and it appearing that proper and adequate notice of

the Motion has been given and that no other or further notice is necessary; and upon the

record herein; and after due deliberation thereon; and good and sufficient cause appearing

therefor,

1.  The automatic stay shall be modified solely to the extent set forth herein.

2.      Movants may proceed with the action against the Debtors and Rust Consulting, a

non party debtor, against the Debtors in the Action, and the parties may pursue

any appeal therefrom, solely for the purpose of determining the extent, if any, of

the Debtors' liability to Movants in connection with the Action.

3.      To the extent the Miami Dade Circuit Court finds that the transfer of the interest

in Plaintiffs property, if any there is, is fraudulent, then the stay is lifted to the

extent that it releases the interest in the Creditors home, 3122 Pine Tree Drive,

Miami Beach, Fl 33140.

4       Notwithstanding anything in this Order or the Motion to the contrary, absent

further order of this Court, (i) Movants shall not enforce as against the Debtors,

their assets, or their estates, any judgment obtained in the Action or take any other

action against the Debtors with respect to the Action except recovery of their

home at 3122 Pine Tree Drive, Miami Beach, Florida, and (ii) the automatic stay

shall remain in full force and effect with respect to any equitable relief sought by

Movants in the Action.

5.      The Action shall be the sole proceeding in which to resolve any and all claims

Movants may have arising in connection with the Action, and the proofs of claim

(19) filed by Movants in the Debtors' Chapter 11 cases arising from the facts and

circumstances relating to the Action shall be amended to reflect the amount of the

final judgment, if any, obtained in the Action within ten (10) business days

following the entry thereof, and be deemed disallowed and expunged without

further order of the Court to the extent the Debtors are found to have no liability

to Movants by a final order or judgment entered in the Action.

13

6.        The Debtors are hereby authorized to execute and deliver all instruments  and

documents, and take all other actions, as may be necessary or appropriate to

implement and effectuate the relief granted in this Order.

7.        This Court shall retain jurisdiction with respect to all matters arising from  or

related to the implementation or interpretation of this Order.

Dated: _____, 2013                          New York, New York


_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

BARRY B. ESKANOS AND
AMI B. ESKANOS
3122 PINE TREE DRIVE
MIAMI BEACH, FL 33140
Tel: (305) 613-6894
Fax: (305) 735-3437
bbeskanos@aol.com

CREDITORS PRO SE


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                                    )
In re:                                              )        CASE NO.  12-12020 (MG)
                                                    )        CHAPTER 11
RESIDENTIAL CAPITAL, LLC, *et al*    )        JOINTLY ADMINISTERED
                                                    )
                            Debtors.          )
_____)


**AFFIDAVIT OF BARRY B. ESKANOS IN SUPPORT OF HIS MOTION FOR**
**RELIEF FROM THE AUTOMATIC STAY AND IN OPPOSITION TO THE**
**DEBTORS OBJECTION TO THE CREDITORS CLAIM 19.**

I, Barry B. Eskanos, JD MPA, if called to testify, could competently testify to the

following facts:

1.  I am one of the creditors in the claim we filed against GMAC Mortgage, LLC.

2.  That GMAC MORTGAGE, LLC filed a voluntary petition in the United States

    Bankruptcy Court for the Southern District of New York for relief under chapter

    11 of title 11 of the United States Code (the "Bankruptcy Code") in the case In re

    RESIDENTIAL CAPITAL, LLC. (ResCap), and its subsidiaries, including

    GMAC Mortgage, LLC., Case No. 12-12020.

15

3.  On the Petition Date, each of the Debtors, including GMAC Mortgage, LLC, filed

    a voluntary United States Code (the "Bankruptcy Code"). The Debtors are

    managing and operating their businesses as debtors in possession pursuant to

    Bankruptcy Code sections 1107(a) and 1108. These cases are being jointly

    administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

    Procedure ("Bankruptcy Rules"). No trustee has been appointed in these Chapter

    11 cases.

4.  On May 16, 2012, the Office of the United States Trustee for the Southern District

    of New York (the "United States Trustee") appointed a nine member official

    committee of unsecured creditors. On July 3, 2012, the United States Trustee

    appointed the Honorable Arthur T. Gonzalez, former Chief Judge of the United

    States Bankruptcy Court for the Southern District of New York, as examiner.

5.  The court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334, 11 U.S.C. §

    362(d)(1) and (2). and Rules 4001(a) and 9014 of the Rules of Bankruptcy

    Procedure. Venue of this case and this motion in this district is proper pursuant to

    28 U.S.C. §§ 1408 and 1409.

6.  On or about February 10th, 2012, the US District Court Clerk entered a Default in

    a civil action for compensatory and punitive damages against Washington Mutual

    Bank, FA ("WAMU") for their responsibility to Plaintiffs / Creditors, Ami and

    Barry Eskanos for DAMAGES AGAINST DEFENDANT WASHINGTON

    MUTUAL BANK, FA, TO SET ASIDE THE SUMMARY JUDGMENT ON

    THE BASIS OF FRAUD; FOR VIOLATIONS OF THE FLORIDA FAIR DEBT

    COLLECTION PRACTICES ACT ("FDCPA"), 15 U.S.C. § 1692 ET. SEQ.;

16

FLORIDA CIVIL CONSPIRACY; MAIL AND WIRE FRAUD 18 U.S.C.,

SECTIONS 1341, 1343; BANK FRAUD 18 U.S.C. 1341, 1344; VIOLATION

OF 18 U.S.C. § 1001; VIOLATION OF 18 U.S.C. § 1005; VIOLATION OF 12

C.F.R. §202.16, EQUAL OPPORTUNITY ACT, REGULATION B;

DECLARATORY RELIEF; DECLARATORY RELIEF ORDER FINDING THE

LINE OF CREDIT OF $100,000 ISSUED BY WAMU IS VOID AS

PREDATORY LENDING; UNCOLLECTABLE AS BEYOND THE STATUTE

OF LIMITATIONS; AND VOID AS PLAINTIFFS WERE VICTIMS OF

IDENTITY THEFT AND THE LIENS THEREON SHOULD BE ORDERED

VACATED;  AND DAMAGES PURSUANT TO FLORIDA STATUTE

CHAPTER 701.04 (1), US District Court Case, 11-03107-AJC. Default by the

Clerk was entered in that action in favor of Plaintiffs for a total of $264,500,000;

and to date, $264,500,000 remains unsatisfied.  GMAC MORTGAGE, LLC filed

a motion and received an order granting their intervention into that action and is

now a Defendant in that action.

7.  On or about February 10th, 2012, the same time the default was entered by the

Clerk in the adversary action, 11-03107-AJC, the Debtor, GMAC Mortgage LLC

filed a motion with the Third District Court of Appeals asking the Court to

substitute themselves in the action in the stead of Washington Mutual Bank, FA

on the fraudulent basis that they contemporaneously purchased the mortgage from

Washington Mutual Bank in February of 2012 for value. GMAC admitted to its

criminal behavior in its pleadings stating that it only intervened in order to protect

its claim on the fraudulently transferred assets.

17

8. The true facts are, that they did not contemporaneously pay ANY value for the fraudulently transferred purported obligation at that time, and further ADMITTED to the Honorable AJ Crystol that they substituted the names of the Plaintiffs solely to AVOID enforcement of the Clerks default judgment in his court against Washington Mutual Bank, FA and further admitted to intervening in order to protect its claim on the fraudulently transferred asset.

9. That as a result of that admission, Plaintiffs / Creditors Barry and Ami Eskanos filed suit in the Circuit Court of Miami Dade County, Fraudulent Transfer Complaint, Miami Dade Case Number:  2012-22689-CA-01, against Washington Mutual Bank, FA for violation of the Florida Fraudulent Transfer Act and a default is pending in that action in the following sums:

The principal sum of                     $ 264000000.00;

Exemplary Damages in the sum of    $ 792000000.00;

Court Costs of                              $        411.00;

Making a total of                          $ 1056000411.00

10. Thereafter, Creditors / Plaintiffs filed a claim with the Independent Foreclosure Review in care of Rust Consulting, a co-conspirator of GMAC Mortgage, LLC. In response to the claim filed by the Creditors / Plaintiffs, the Debtor, GMAC Mortgage, LLC, fraudulently stated to Rust Consulting that the claim made by the Creditors Plaintiffs should be denied because the Plaintiffs / Creditors were not in foreclosure proceedings during 2009 through 2010.  Said false statement was made by GMAC Mortgage, LLC with the intention of making Rust Consulting to reasonably and justifiable rely and they did rely, to the detriment of the Plaintiff /

18

Creditors; and further the statement was intended to cause, and did cause, the

Plaintiff / Creditors to suffer monetary damage and economic harm which entitles

the Plaintiff / Creditors to unlimited punitive damages under Florida Law related

to Punitive Damages.  Rust Consulting, after having actual possession of the true

facts, including public records which contradicted GMAC's criminal fraud,

ratified the fraudulent conduct of GMAC and denied the appeal of the claim by

the Creditors after providing RUST with dockets from the court records proving

that GMAC Lied and committed fraud.  Rust, with knowledge of the true facts,

again denied the claim filed by the Plaintiffs.

11. Because the Debtors falsely claim an interest in the Creditors home, where the

Debtors paid NO VALUE contemporaneous with the fraudulent transfer that

occurred on or about the same exact time as the default was entered by the Clerk;

Creditor, as part of the remedies they are entitled to under the Florida Fraudulent

Transfer Act is the disgorgement of the fraudulently transferred asset from

GMAC Mortgage, LLC and the return of the fraudulently transferred asset to the

Creditors, the Eskanos'.  Further, the Statute provides for damages in the amount

of the fraudulently transferred asset, the sum of $ 1,056,000,411.00 which is the

amount claimed in the bankruptcy.

12. A proof of claim has been filed by the Creditors in this action, and after receiving

a letter from the Debtors seeking supporting information, Creditors provided the

Debtors with approximately 5000 pages of supporting documentation.

13. That in order to avoid exposure to the court of the fraudulent transfer and

fraudulent and blatantly illegal conduct of the Debtors, they fraudulently objected

19

to the claim, seeking to strike the same on the basis of a lack of information,

when, in fact, they are in possession of all the attached proof.

14. GMAC has consistently committed blatant acts of fraud, and concealed them from

the Court to avoid enough victims from coming to court and seeking to dismiss

the Chapter 11 Bankruptcy filing, or, in the alternative, to convert to Chapter 7,

pursuant to 11 USC § 1112 (b)(1) "Except as provided in paragraph (2) and

subsection (c), on request of a party in interest, and after notice and a hearing, the

court shall convert a case under this chapter to a case under chapter 7 or dismiss a

case under this chapter, whichever is in the best interests of creditors and the

estate, for cause unless the court determines that the appointment under section

1104(a) of a trustee or an examiner is in the best interests of creditors and the

estate";  and on the basis of fraud, including, but not limited to:

15. Mail Fraud, 18 U.S.C. Section 1341; Preparing and filing of fraudulent documents

by means of the US Mail System.

16. Wire Fraud, 18 U.S.C. Section 1343; Representations of material facts that are

false, misleading, with the intent of having the Creditors and others rely on those

representations, and they reasonably, and detrimentally relied on those fraudulent,

false, and misleading statements by means of the wire system.

17. Bankruptcy Fraud, 18 U.S.C. Section 152: Concealed assets or false statements.

18. Bankruptcy Fraud, 18 U.S.C. Section 157: The use of bankruptcy which is

intended to, and actually does, aid the fraud scheme by means of delaying

creditors, allowing the debtor to continue to operate in a fraudulent manner while

covering up the scheme;

20

19. Intentional and willful violations of the Fraudulent Transfers Act;

20. And, for cause, pursuant to the grounds set forth in 11 USC § 1112 (b) (4)

(4) For purposes of this subsection, the term "cause" includes —

(A)      substantial or continuing loss to or diminution of the estate and the
absence of a reasonable likelihood of rehabilitation;

(B)      gross mismanagement of the estate;

(C)      failure to maintain appropriate insurance that poses a risk to the estate or
to the public;

(D)      unauthorized use of cash collateral substantially harmful to one or more
creditors; and

(E)      failure to comply with an order of the court;

21. The Creditors respectfully request that the Court lift the automatic Stay and
permit the Plaintiff Creditors to proceed in Miami Dade Circuit Court against
BOTH Rust Consulting and GMAC Mortgage, LLC; that Creditors be permitted
to file the attached complaint and that the objection to the claim filed by the
Creditors (19) be denied and the claim be permitted to stand; and that upon the
entry of judgment in the fraudulent transfer action, the Creditors be permitted to
amend their claim to the amount awarded by the Miami Dade Circuit Court.

22. Granting the Creditors, Ami and Barry Eskanos, relief from the automatic stay
will promote judicial economy, since regardless of whether or not the Court
terminates the automatic stay, the Creditors intend to proceed against Rust
Consulting for their participation in the fraudulent handling of the independent
foreclosure process; their possession of the actual facts in direct contravention to

the fraudulent representations of GMAC, and then their refusal to reconsider their decision after being in possession of the facts which contradicted the fraudulent statements of GMAC; and their continued denial of the claims filed by the Creditors by continuing to rely on the fraudulent statements of GMAC, and continued denial of the independent foreclosure claim.

23. The Debtors would suffer no prejudice or surprise by having the automatic stay terminated, since Rust Consulting has to answer for their fraudulent conduct and conspiracy to commit intentional harm against the Creditors / Plaintiffs and Debtors cannot claim that they will be prejudiced by having their fraudulent behavior tried by a Court of Law.

24. Debtors cannot hide behind the bankruptcy Court to conceal their ongoing fraudulent behavior.

25. Furthermore, the allegations against the Debtors in all of the coordinated actions are overlapping and often identical.

26. If the Creditors' claims against all defendants are not heard in one forum, then there is a "risk of inconsistent rulings or judgments.

27.  In addition, one forum "will prevent duplication of document discovery and depositions.

28. Litigating these matters in two forums is not in the interests of judicial economy, but judicial economy would be diminished if the Court were to deny this motion, because the Creditors still intends to pursue its claims against the non-debtor defendants in the Florida State Circuit Court action.

29. The Debtors should not be allowed to delay the Creditor's action for one year by seeking to coordinate that action with five other lawsuits, and then use the shield of the automatic stay to force the Creditors to litigate in two forums.

30. The proper forum for the Creditors' claims against the Debtors is in the Florida Miami Dade County Circuit Court, because the criminally fraudulent and admittedly fraudulent conduct occurred in that County, the real property is located in that county, the Florida Statutes apply, and the law at issue and because it is the Creditors' chosen forum.

31. WHEREFORE, the Creditors, Barry and Ami Eskanos, respectfully requests that the Court terminate or modify the automatic stay imposed by 11 U.S.C. § 362 in order to permit the Creditors to pursue their claims against the Debtors AND THE NON- PARTY co-conspirators, in the Circuit Court of Miami Dade County, Florida, to the extent of the recovery of the fraudulently transferred asset, the interest in the subject property, if any there is, and allow any recovery in excess of the fraudulently transferred asset to form the basis of the Creditor's claim against Debtors' estates, together with such other and further relief as this Court deems just and proper.  To the extent the Miami Dade Circuit Court finds that the transfer of the interest in Plaintiffs property, if any there is, is fraudulent, then the stay is lifted to the extent that it releases the interest in the Creditors home, 3122 Pine Tree Drive, Miami Beach, Fl 33140. Further, that the objection to the claim as being insufficiently supported be denied and the claim be sustained and permission to amend once the final judgment is entered in the fraudulent transfer action.

23

I declare under penalty of perjury that the foregoing is true and correct and I executed

this Declaration in Miami Beach Florida on September 18th, 2013.


_____
BARRY B. ESKANOS
3122 PINE TREE DRIVE
MIAMI BEACH, FL 33140
Tel: (305) 613-6894
Fax: (305) 735-3437
bbeskanos@aol.com

CREDITOR PRO SE

24

BARRY B. ESKANOS AND
AMI B. ESKANOS
3122 PINE TREE DRIVE
MIAMI BEACH, FL 33140
Tel: (305) 613-6894
Fax: (305) 735-3437
bbeskanos@aol.com

CREDITORS PRO SE


**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**


_____
                                    )
In re:                              )        CASE NO.  12-12020 (MG)
                                    )        CHAPTER 11
RESIDENTIAL CAPITAL, LLC, *et al*   )        JOINTLY ADMINISTERED
                                    )
            Debtors.                )
_____)

**CREDITORS, BARRY B. ESKANOS AND AMI B. ESKANOS' EXHIBITS**

**EXHIBIT 1**

**COMPLAINT FOR WHICH THE CREDITORS ARE SEEKING RELIEF FROM**

**THE AUTOMATIC STAY, SO THEY CAN FILE THE ATTACHED IN MIAMI**

**DADE COUNTY CIRCUIT COURT.**

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

AMI B. ESKANOS,
BARRY B. ESKANOS

     Plaintiff,

-vs.-

GMAC MORTGAGE, LLC.
RUST CONSULTING, INC.

    Defendant.

Case No.

Division:

## VERIFIED COMPLAINT FOR MONEY DAMAGES

**COMES NOW** Plaintiffs, AMI B. ESKANOS AND BARRY B. ESKANOS,

(hereinafter "ESKANOS") by and through their undersigned attorney, THE LAW

OFFICE OF DAVID HARRIS, file this action against Defendants RUST

CONSULTING, INC., (hereinafter "RUST") and GMAC MORTGAGE, LLC doing

business in the State of Florida (hereinafter "GMAC"), and allege as follows:

### PARTIES

1. Plaintiffs, Barry Eskanos and Ami Eskanos are residents of the State of Florida,

   Miami Dade County, and are the homestead owners of the property located at

   3122 Pine Tree Drive, Miami Beach, Florida, 33140.

2. Defendant "RUST" is a Minnesota corporation which is registered to do business

   and is doing business in Florida. They have designated as their registered agent

   for Service of Process the CORPORATION SERVICE COMPANY, 1201 HAYS

   STREET, TALLAHASSEE, FL 32301-2525

27

3. Defendant GMAC MORTGAGE, LLC is a Delaware Corporation Registered
which is registered to do business and is doing business in Florida. They have
designated as their registered agent for Service of Process the CORPORATION
SERVICE COMPANY, 1201 HAYS STREET, TALLAHASSEE, FL 32301-
2525.

## NATURE OF ACTION

4. As part of consent orders with federal bank regulators, the Office of the
Comptroller of the Currency (OCC), the Office of Thrift Supervision (OTS), and
the Board of Governors of the Federal Reserve System (FRB), the Independent
Foreclosure Review was established to determine whether eligible homeowners
suffered financial injury because of errors or other problems during their home
foreclosure process between January 1, 2009 and December 31, 2010. The
Federal Reserve's role is to ensure compliance with the enforcement actions
issued in April 2011. As required by those actions, independent consultants will
conduct the reviews of foreclosures and determine whether errors,
misrepresentations, or other deficiencies resulted in financial injury. The Federal
Reserve was to monitor the independent foreclosure review process.

5. Plaintiffs were victims of a fraudulent foreclosure action brought by Washington
Mutual, Defendant GMAC Mortgage, LLC and RFC Homecomings (hereinafter
RFC) and others.

3. During that process, Washington Mutual, GMAC and others filed fraudulent
foreclosure affidavits against the Plaintiffs; had no standing to sue for foreclosure
but perfected a fraudulent scheme to convince the court otherwise; filed a false

28

and forged promissory note; failed to provide the court with accurate information

and instead, falsely claimed there was an arrearage when the Plaintiff was current

in his mortgage payments; fraudulently retained insurance proceeds; lied to the

Court of Appeals and Florida Supreme Court; then lied to the Independent

Foreclosure Review and Defendant, stating that the Plaintiffs "mortgage loan was

not in the foreclosure process during the eligible review period of January 1, 2009

to December 31, 2010.  Exhibit A, referred to and incorporated herein.

4.      That information is in direct contradiction to the public records, and the 5000 plus

pages of documents in the possession of the Defendant RUST at the time they

wrote the letter, Exhibit A, as the Defendant RUST and the Defendant GMAC

were in possession of both public records, Case Numbers 11-40292-AJC Eskanos

bankruptcy proceedings in the US District Court; the Adversary complaint

pending in that court claiming damages for violation of HAMP, wrongful

foreclosure, bank fraud, mail fraud, wire fraud, and a plethora of other allegations

in the adversary complaint; the State Court foreclosure action, Miami Dade Case

No.: 05-06570 CA 15; the action that GMAC said was not pending at the time, in

fact, was pending; the Fraudulent Transfer Complaint, Miami Dade Case Number:

2012-22689-CA-01; and the appellate cases that were pending before the Florida

Third District Court of Appeals 09-3392, 11-108 and 11-2642 (and the Florida

Supreme Court, SC12-943).

5.      Defendant GMAC knew, and Defendant RUST was charged, with the

responsibility of providing an independent evaluation of the claims of the

homeowner, reviewing the foreclosure of the Plaintiffs for the conduct

complained of by the Plaintiffs homeowners. Rust Consulting was selected and

hired by the servicers to serve as the central administrator of the independent

foreclosure review.

6.     Rust Consulting was to notify borrowers, receive requests for a review, and

respond to questions about the independent foreclosure review process.

7.     Defendant had and violated its fiduciary, legal, ethical, and contractual

obligations to provide an independent review; failed in every respect; took over

1.5 billion dollars of the funds belonging to the victims, including the Plaintiffs,

and did not dispense the funds; did not independently review the documents;

committed fraud; took directions from the lenders finding in their favor in direct

contradiction to the public records and facts which were in their possession;

deprived the Plaintiffs of their recovery to which they were clearly entitled; and

denied the claim filed by the Plaintiffs on false grounds.

8.     Defendant Rust received all the supporting documents from the Plaintiffs, and

then purportedly requested the information from DEFENDANT GMAC, and thus

has misled Plaintiffs by claiming they were going to independently review the

information provided by BOTH the Plaintiff and Defendant GMAC, but instead,

they fraudulently, recklessly, negligently and/or knowingly ignoring information

in public records and provided by the Plaintiffs, and relied solely on the false

evidence provided by the Lender.

9.     This case is brought by Plaintiffs under the following causes of action: (a) Gross

Negligence; (b) Negligence; (c) Negligence Per Se; (d) Fraud; (e) Fraudulent

Inducement; (f) Promissory Estoppel; and (g) Unjust Enrichment.

30

## JURISDICTION AND VENUE

10. This is an action for damages which exceeds fifteen thousand dollars ($15,000.00).

11. Venue in this judicial district is proper under Florida Statute § 48.193 because the tortious acts and injuries alleged in this action were committed in Miami Dade County, Florida and Defendants operate, conduct, engage in, or carry on a business or business venture in Miami Dade County, Florida.

## BACKGROUND FACTS

12. The Office of the Comptroller of the Currency (OCC) and the Board of Governors of the Federal Reserve System (FRB) developed a Financial Remediation Framework that provides examples of situations where compensation or other remediation is justified because of errors or problems during a homeowner's foreclosure process.

13. The independent consultants were supposed to use the Financial Remediation Framework to recommend remediation for financial injury identified during the Independent Foreclosure Review.

14. The servicers were supposed to prepare remediation plans based on the independent consultants' recommendations.

15. The federal banking regulators must approve each servicer's remediation plan.

16. The Plaintiffs, when they were wrongfully sued by the Lender, RFC Homecomings, GMAC and others:

   a.    were current in their mortgage at the time suit was filed;

31

b.      were victims of a wrongful foreclosure by a lender who had no standing to

sue;

c.      whose lender placed forced place insurance on the Plaintiffs' property

when there was already insurance on the property;

d.      who sent Plaintiffs admissions that they had in escrow in excess of

$190,000 of payments made by Plaintiffs;

e.      whose lender filed a forged promissory note;

f.      whose lender filed a fraudulent affidavit;

g.      who was wrongfully denied a HAMP;

h.      whose lender had no standing to sue when suit was filed;

i.      who incurred over $300,000 in attorney's fees;

j.      who suffered irreparable harm to their credit; and

k.      who were victims of a litany of other acts which led to a wrongful

foreclosure judgment which is currently on appeal before the Florida

Supreme Court.

17.     Pursuant to the representations made by the Defendant Rust, Plaintiffs were told

remediation will be determined on a case by case basis as the State Law Dictates

– pursuant to their agreement, and the State Law Dictates a finding of liability in

the sum already ordered by the Court in multiple cases, Federal and State actions,

Adversary Number: 11-03107-AJC, Southern District of Florida  AND MIAMI

DADE CASE NUMBER Case No.:  2012-22689-CA-01, ESKANOS V.

WASHINGTON MUTUAL BANK, FA, with a claim amount of:

THERE, the WAMU AND GMAC are indebted to Plaintiffs jointly and severally

in the principal sums of :

a.    Economic damages         $ 19,550,000;

b.    Non-economic damages     $ 45,500,000;

c.    Punitive damages         $198,150,000;

d.    Attorney's fees          $ 300,000;

e.    Slander of Credit        $ 1,000,000

f.    Total:  $ 264,500,000 plus interest thereon at the legal rate of 12 percent

per annum; that defendant had been defaulted for failure to appear

pursuant to Rule 55(a) of the Federal Rules of Civil Procedure;.

g.    Treble damages for FRAUDULENT TRANSFER OF ASSETS as

admitted to Judge Crystol by GMAC - $793,500,000.

h.    GRAND TOTAL $1,058,000,000.

i.    Plaintiffs harm occurred on or about 8/24/12 and continuing until said

claim is paid in full by the Defendant, Rust Consulting.

18.    Plaintiffs sued the Washington Mutual Bank, FA, in Federal Court in an

Adversary Proceeding and on the date Plaintiffs obtained a clerk's entry of default

in the amount of $264,500,000; on the day the default was entered by the Clerk,

February 10th, 2012; GMAC concurrently admitted to committing a fraudulent

transferred of the subject property to avoid the Plaintiffs from enforcing a

judgment and protecting their property.

33

19.     Thereafter, Plaintiffs filed a complaint in Circuit Court for violation of the

Fraudulent Transfer Act, and are awaiting a judgment of $264,500,000 plus treble

damages.

20      As a result, the Plaintiffs have suffered and are entitled to damages in excess of

$1,058,000,000.

22.     Under the Financial Remediation Framework, the Plaintiffs would be entitled to

the amount of $1,058,000,000.

23.     Even though pending during the time frame for the review process were a

multiplicity of actions from the wrongful foreclosure, as well as the wrongful

foreclosure itself, Defendant GMAC fraudulently told the Defendant Rust that no

foreclosure was pending, and thus no recovery by the Plaintiffs was warranted.

The review denial letter made no mention of Washington Mutual.

24.     Defendants Rust and GMAC had, in their possession, over 5000 documents from

the Plaintiffs contradicting that, as well as they had actual and constructive

knowledge of the wrongful foreclosure action, the appeals case numbers, and the

other related actions filed by the Plaintiffs to recover their damages under Florida

Law.

25.     The Financial Remediation Framework specifically provides that Plaintiffs were

entitled to recovery "to be determined on a case-by-case basis as state law

dictates".

26.     Thus, state law dictated that as a result of the fraudulent transfer, the Plaintiffs

were entitled to recover $1,058,000,000; they were entitled to the foreclosure

action being stopped; and the judgment vacated.

34

27.     However, Defendant believed a clearly blatant lie by the lender and deprived the

        Plaintiffs of any recovery whatsoever.

28.     What is worse is the Plaintiffs were not the only victims of the Defendants fraud

        and intent to cause financial harm to the Plaintiffs; others similarly situated with

        the Plaintiffs also suffered similar fate due to the fraud and deception of the

        Defendant.

## COUNT I GROSS NEGLIGENCE

29.     Plaintiffs refer to and incorporate by reference as though fully set forth herein

        paragraph 1 through 28 of this Complaint.

30.     Defendant GMAC Mortgage LLC and Defendant Rust Consulting owed a duty to

        Plaintiffs to exercise reasonable care in regard to the providing of information to

        Rust Consulting and Rust Consulting had the duty to exercise reasonable care in

        regard to the operation of the claim intake, claim review, claim evaluation and

        claim settlement and payment services.

31.     Defendant GMAC and Defendant RUST had a heightened duty of care to

        Plaintiffs because of the consent judgment and the unprecedented economic harm

        resulting from the millions of wrongfully foreclosed homes; dire harm to the

        economy caused by the banks fraudulent conduct, and the trust placed on the

        Defendant to properly administer the claim filed by the Plaintiffs and others

        similarly situated.

32.     Defendants and each of them breached their legal duty to Plaintiffs, failed to

        exercise reasonable care, and acted with reckless, willful, and wanton disregard

        for the business and livelihood of Plaintiffs in their negligent operation of the

35

providing of truthful information to Rust Consulting by GMAC and Rust in the

claim intake, claim review, claim evaluation and claim settlement and payment

services in the following manner:

(1)    Inadequate Claim Processing - On or about December of 2012, Plaintiffs

received Exhibit A, the denial letter, which clearly and unequivocally

shows that Defendant failed to verify the facts the lender provided to

them, when they had in their possession over 5000 documents, and had

actual and constructive knowledge of pending litigation which directly

contradicted the false statement made by GMAC.

(2)    The Defendant took the word of GMAC over the public records and claim

which Plaintiffs had filed with Defendant on August 24th, 2012.

(3)    The Defendant failed to appraise the amount of loss claimed by Plaintiffs;

and failed to provide the Plaintiffs with any relief provided by Exhibit B.

(4)    Unreasonable Denial of Claim - In this case, payment is wrongfully and

unreasonably denied.

(5)    Rust Consulting, after being provided the true facts and shown public

records which clearly contradicted the fraudulent statements by GMAC,

took no steps to remedy the fraud committed by GMAC and further

ratified their wrongful conduct and disclaimed responsibility for their

harm.

33.    Defendants and each of them knew or should have known that their wanton or

reckless conduct would foreseeably result in the financial harm, pain and

36

suffering to the Plaintiffs, causing irreversible damage to the health and the economic interests of Plaintiffs.

34.     As a direct and proximate result of Defendants' and each of their wanton or reckless conduct, Plaintiffs have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of benefits under the independent foreclosure review settlement, continuing legal expenses defending a fraudulent foreclosure, risk to their home, emotional distress, upset, anger, pain, suffering, loss of sleep, loss of consortium, loss of profit, loss of reputation, loss of livelihood, loss of income, and other economic loss.

35.     The defendants and each of them had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.

36.     Because the Defendants' and each of their wanton or reckless conduct, as described herein, constitutes such a conscious disregard or indifference to the rights of Plaintiffs and the intent was to financially harm the Plaintiffs, and that it actually financially harmed the Plaintiffs, it therefore entitles Plaintiffs to unlimited punitive damages pursuant to Florida Statute 768.73(c)[1], et seq.

---

[1] 768.73  Punitive damages; limitation.—
    (1)(a)    Except as provided in paragraphs (b) and (c), an award of punitive damages may not exceed the greater of:
    1.    Three times the amount of compensatory damages awarded to each claimant entitled thereto, consistent with the remaining provisions of this section; or
    2.    The sum of $500,000.
    (b)    Where the fact finder determines that the wrongful conduct proven under this section was motivated solely by unreasonable financial gain and determines that the

37

## COUNT II NEGLIGENCE

37.    Plaintiffs refer to and incorporate by reference as though fully set forth herein

paragraph 1 through 28 of this Complaint.

---

unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant, it may award an amount of punitive damages not to exceed the greater of:

    1.    Four times the amount of compensatory damages awarded to each claimant entitled thereto, consistent with the remaining provisions of this section; or

    2.    The sum of $2 million.

    (c)    Where the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant's conduct did in fact harm the claimant, there shall be no cap on punitive damages.

    (d)    This subsection is not intended to prohibit an appropriate court from exercising its jurisdiction under s. 768.74 in determining the reasonableness of an award of punitive damages that is less than three times the amount of compensatory damages.

    (2)(a)    Except as provided in paragraph (b), punitive damages may not be awarded against a defendant in a civil action if that defendant establishes, before trial, that punitive damages have previously been awarded against that defendant in any state or federal court in any action alleging harm from the same act or single course of conduct for which the claimant seeks compensatory damages. For purposes of a civil action, the term "the same act or single course of conduct" includes acts resulting in the same manufacturing defects, acts resulting in the same defects in design, or failure to warn of the same hazards, with respect to similar units of a product.

    (b)    In subsequent civil actions involving the same act or single course of conduct for which punitive damages have already been awarded, if the court determines by clear and convincing evidence that the amount of prior punitive damages awarded was insufficient to punish that defendant's behavior, the court may permit a jury to consider an award of subsequent punitive damages. In permitting a jury to consider awarding subsequent punitive damages, the court shall make specific findings of fact in the record to support its conclusion. In addition, the court may consider whether the defendant's act or course of conduct has ceased. Any subsequent punitive damage awards must be reduced by the amount of any earlier punitive damage awards rendered in state or federal court.

    (3)    The claimant attorney's fees, if payable from the judgment, are, to the extent that the fees are based on the punitive damages, calculated based on the final judgment for punitive damages. This subsection does not limit the payment of attorney's fees based upon an award of damages other than punitive damages.

    (4)    The jury may neither be instructed nor informed as to the provisions of this section.

    (5)    The provisions of this section shall be applied to all causes of action arising after the effective date of this act.

38.    Defendants, and each of them, owed a duty to Plaintiffs to exercise reasonable

care in regard to the operation of Defendants claim intake, claim review, claim

evaluation and claim settlement and payment services.

39.    Defendants and each of them, knew or should have known that its conduct would

foreseeably result in the financial, emotional, physical, and other harm to

Plaintiffs.

40.    Defendants, and each of them, knew or should have known that its conduct would

foreseeably cause irreversible damage to the health and the economic interests of

Plaintiffs.

41.    Defendants, and each of them, breached its legal duty to Plaintiffs, failed to

exercise reasonable care, and acted with reckless, willful, and wanton disregard

for the business and livelihood of Plaintiffs in the Defendant GMAC negligent

providing of information to Rust Consulting and Rust Consulting's negligent

operation of the claim intake, claim review, claim evaluation and claim settlement

and payment services in the following manner:

(1)    Inadequate Claim Processing - On or about December of 2012, Plaintiffs

received Exhibit A, the denial letter, which clearly and unequivocally

shows that Defendant failed to verify the facts the lender provided to

them, when they had in their possession over 5000 documents, and had

actual and constructive knowledge of pending litigation which directly

contradicted the false statement made by GMAC.

(2)     The Defendant took the word of GMAC over the public records and claim

which Plaintiffs had filed with Defendant on August 24th, 2012 and

ignored Washington Mutuals' liability altogether.

(3)     The Defendant failed to appraise the amount of loss claimed by Plaintiffs;

and failed to provide the Plaintiffs with any relief provided by Exhibit B.

(4)     Unreasonable Denial of Claim - In this case, payment is wrongfully and

unreasonably denied.

42.     As a direct and proximate result of Defendants' wanton or reckless conduct,

Plaintiffs have suffered legal injury and damages, in an amount to be proven at

trial, including, but not limited to, loss of benefits under the independent

foreclosure review settlement, continuing legal expenses defending a fraudulent

foreclosure, risk to their home, emotional distress, upset, anger, pain, suffering,

loss of sleep, loss of consortium, loss of profit, loss of reputation, loss of

livelihood, loss of income, and other economic loss.

43.     Defendants and each of them are further liable under the doctrine of *res ipsa

loquitor* because the loss of benefits, rights to recovery as provided under Florida

Law, including, recompense for the pending judgments as specifically provided

under the Financial Remediation Framework, the Plaintiffs would be entitled to

the amount of $1,058,000,000, loss of profits, loss of reputation, loss of

consortium, loss of livelihood, loss of income, and other health and economic loss

by Plaintiffs could not have occurred in the absence of the negligence of

Defendants.

**COUNT III NEGLIGENCE PER SE**

40

44.     Plaintiffs refer to and incorporate by reference as though fully set forth herein paragraph 1 through 28 of this Complaint.

45.     Defendants' and each of their conduct with regard to the operation of Defendant GMAC's submission of information, and Rust's claim intake, claim review, claim evaluation and claim settlement and payment services is governed by the  Federal Reserve[2].

---

## [2] Background

The Federal Reserve Board issued enforcement actions against four large mortgage servicers --GMAC Mortgage, HSBC Finance Corporation, SunTrust Mortgage, and EMC Mortgage Corporation--in April 2011. Under those actions, the four servicers were required to retain independent consultants to review foreclosures that were initiated, pending, or completed during 2009 or 2010. The review is intended to determine if borrowers suffered financial harm directly resulting from errors, misrepresentations, or other deficiencies that may have occurred during the foreclosure process. The servicers are required to compensate borrowers for financial injury resulting from deficiencies in their foreclosure processes.

Borrowers who had a mortgage loan on their primary residence and believe they were financially harmed during the mortgage foreclosure process by any of the four servicers in 2009 or 2010, were able to request an independent review and potentially receive compensation. The four servicers are required to make the independent reviews available to borrowers as part of their compliance with the April 2011 enforcement actions.

A number of servicers supervised by the Office of the Comptroller of the Currency (OCC) were also required to conduct independent reviews. (See below for the full list of servicers.)

**The deadline to request a review was December 31, 2012.**

## Eligibility for Review

Borrowers were eligible for an independent foreclosure review if they met the following criteria:

- the property securing the loan was the borrower's primary residence;

- the mortgage was in the foreclosure process (initiated, pending, or completed) at any time between January 1, 2009, and December 31, 2010; and

- the mortgage was serviced by one of the following mortgage servicers:

America's Servicing Company    Countrywide                         National City Mortgage

| | | |
|---|---|---|
| Aurora Loan Services | EMC Mortgage Corporation | PNC Mortgage |
| BAC Home Loans Servicing | EverBank/EverHome Mortgage Company | Sovereign Bank |
| Bank of America | Financial Freedom | SunTrust Mortgage |
| Beneficial | GMAC Mortgage | U.S. Bank |
| Chase | HFC | Wachovia Mortgage |
| Citibank | HSBC | Washington Mutual (WaMu) |
| CitiFinancial | IndyMac Mortgage Services | Wells Fargo Bank, N.A. |
| CitiMortgage | MetLife Bank | Wilshire Credit Corporation |

Eligible borrowers were sent a Request for Review form by mail starting in November of 2011 when the program launched.

If a borrower previously filed a complaint with these servicers about foreclosures pending during the review period, they were still eligible to file an independent review of their foreclosure.

There were no costs associated with being included in the review; the review was a free program. Borrowers should beware of anyone requiring payments for assistance in connection with the independent foreclosure review or any other foreclosure assistance program.

## Review Process

Information about the review process, including how to request an independent review, was mailed to potentially eligible borrowers in November and December 2011. Throughout 2012, borrowers who had not yet requested a review were sent reminder letters. The last reminder letters were mailed in November of 2012. More information about the review can be found on the following website set up by the servicers, www.IndependentForeclosureReview.com. A list of *Frequently Asked Questions and Answers* are available on the website.

Individuals were sent an acknowledgement letter from the review administrator within one week after their request for an independent review is received. Individuals will be notified in writing of the results of the review. Because the review process will be a thorough and complete examination of many details and documents, it could take several months to complete the review.

Rust Consulting was selected and hired by the servicers to serve as the central administrator of the independent foreclosure review. Rust Consulting will notify borrowers, receive requests for a review, and respond to questions about the independent foreclosure review process.

## Federal Reserve's Role

The Federal Reserve's role is to ensure compliance with the enforcement actions issued in April 2011. As required by those actions, independent consultants will conduct the reviews of foreclosures and determine whether errors, misrepresentations, or other deficiencies resulted in financial injury. The The Federal Reserve will monitor the independent foreclosure review process.

46.    The Federal Reserve Board issued enforcement actions against four large

mortgage servicers  including --GMAC Mortgage, in April 2011.

47.    Under those actions, the four servicers were required to retain independent

consultants to review foreclosures that were initiated, pending, or completed

during 2009 or 2010 of which Plaintiff falls within the class of individuals that the

review was designed and intended to protect, see Miami Dade Case Number 05-

006570-CA 15.

48.    The review is intended to determine if borrowers suffered financial harm directly

resulting from errors, misrepresentations, or other deficiencies that may have

occurred during the foreclosure process, of which the Plaintiffs were clearly

victims.

49.    The servicers are required to compensate borrowers for financial injury resulting

from deficiencies in their foreclosure processes.

50.    In direct contradiction with PUBLIC INFORMATION, OFFICIAL COURT

RECORDS, AND the **INFORMATION IN THE POSSESSION  OF RUST**

**CONSULTING AND GMAC MORTGAGE LLLC**, including the case number

and over 5000 pages of proof from the Plaintiffs that Plaintiffs were in the

foreclosure process, the foreclosure was fraudulent, and the Plaintiffs clearly were

entitled to protection and relief; they accepted Defendant GMAC's false and

fraudulent representation that "GMAC's records indicate that" Plaintiffs were not

in the foreclosure process.

51.    The FDIC created standards that are intended to protect and benefit Plaintiffs.

43

52.     Defendants' violations of these statutory standards constitute negligence per se under Florida law.

53.     Defendants' violations of these statutory standards proximately caused Plaintiffs' injuries, warranting compensatory and punitive damages.

WHEREFORE PLAINTIFFS PRAYS FOR RELIEF AS SET FORTH BELOW.


**COUNT IV**

**FRAUD**

54.     Plaintiffs refer to and incorporate by reference as though fully set forth herein paragraph 1 through 28 of this Complaint.

55.     Defendant Rust Consulting, knowing the representations were false at the time the representations were made, made the following false representations of fact to Plaintiffs and to others:

1.     That GMAC would provide truthful and complete information to Rust Consulting;

2.     That Rust would independently review ALL relevant information to determine the money owed to each victim.

3.     That they would find that the Plaintiffs and others were eligible for Review for an independent foreclosure review if they met the following criteria:

•     the property securing the loan was the borrower's primary residence as was the Plaintiffs – 3122 Pine Tree Drive, Miami

44

Beach FL is the only residence of the Plaintiffs and has been since 1999;

- the mortgage was in the foreclosure process (initiated, pending, or completed) at any time between January 1, 2009, and December 31, 2010 – See Miami Dade Case Number Miami Dade Case Number 05-006570-CA 15; and

- the mortgage was serviced by one of the following mortgage servicers GMAC Mortgage – which includes RFC Homecomings, see the Affidavit of Debra Lyman which clearly shows the same; and Washington Mutual (WaMu) who was the named plaintiff before GMAC substituted in as Plaintiff AFTER the default against Washington Mutual Bank was entered in the Adversary Proceeding, and GMAC admitted to Federal Judge Crystol that they did so to avoid enforcement of the judgment against the subject property and to protect GMAC's interest in the subject property – the same interest it told the Defendant, Rust Consulting, that it did NOT HAVE.

- Eligible borrowers were SUPPOSED TO BE sent a Request for Review form by mail starting in November of 2011 when the program launched – BUT PLAINTIFFS RECEIVED NO CARD AND INSTIGATED ON THEIR OWN THE REVIEW PROCESS.

- If a borrower previously filed a complaint with these servicers about foreclosures pending during the review period, WHICH THE

45

PLAINTIFFS DID, they were still eligible to file an independent

review of their foreclosure.

- There were no costs associated with being included in the review; the

  review was a free program.

- That information about the review process, including how to request

  an independent review, was supposed to be mailed to potentially

  eligible borrowers in November and December 2011, but

  PLAINTIFFS RECEIVED NO NOTIFICATION, THEY

  INSTIGATED THE INVESTIGATION.

- Throughout 2012, borrowers who had not yet requested a review were

  sent reminder letters – BUT PLAINTIFFS RECEIVED NO

  REMINDER.

- AGAIN, even though the last reminder letters were mailed in

  November of 2012 PLAINTIFFS RECEIVED NO REMINDERS.

- Individuals were SUPPOSED TO BE sent an acknowledgement letter

  from the review administrator within one week after their request for

  an independent review is received, but no acknowledgment was timely

  received.

- Individuals will be notified in writing of the results of the review.

- Defendants promised, represented and were obligated by their

  agreement that "the review process will be a thorough and complete

  examination of many details and documents, it could take several

  months to complete the review."  In Plaintiffs case, the review was

NOT THOROUGH, NOT COMPLETE, AND CLEARLY THEY DID

NOT EXAMINE MANY OR ANY OF THE DETAILS OR

DOCUMENTS PROVIDED THEM BY THE PLAINTIFFS; NOR

DID THEY REVIEW THE PUBLIC RECORDS WHICH CLEARLY

CONTRADICTED GMACS AND WAMU'S FALSE

REPRESENTATIONS.

- Rust Consulting was selected and hired by the servicers to serve as the central administrator of the independent foreclosure review, BUT FAILED IN EVERY RESPECT.

- Rust Consulting will notify borrowers, receive requests for a review, and respond to questions about the independent foreclosure review process.

56. Defendants, and each of them, made these false representations for the purpose of inducing Plaintiffs AND OTHERS to act in reliance on the false representations.

57. Plaintiffs and others who hired Rust Consulting to perform their duties as set forth above, in reasonable and justifiable reliance on the Defendants' representations:

a. The Fraudulent Banks provided them with billions of dollars for distribution,

b. Plaintiffs provided Defendants with a plethora of proof of the claim;

c. Plaintiffs relied on the plethora of representations as set forth above, and expected that Plaintiffs would receive a portion of the funds that are in the possession of the Defendants earmarked for the Plaintiffs and others similarly situated.

47

58.    Plaintiff's reliance, which was reasonable and foreseeable, resulted in the

following damage to Plaintiffs:

a.    Plaintiffs have suffered legal injury and damages, in an amount to be

proven at trial, including, but not limited to, loss of profit, loss of business

reputation, loss of livelihood, loss of income, and other health and

economic loss;

b.    Under the Financial Remediation Framework, the Plaintiffs are entitled to

the amount of $1,058,000,000.

## COUNT V

## FRAUDULENT INDUCEMENT

59.    Plaintiffs refer to and incorporate by reference as though fully set forth herein

paragraphs 1 – 26, inclusive, of this Complaint.

60.    Defendants RUST and GMAC made the following false statements of material

fact to Plaintiffs:

That Rust would obtain truthful, and complete, and GMAC would provide

truthful and complete information, and after reviewing the same, Rust would find

that the Plaintiffs and others were eligible for Review for an independent

foreclosure review if they met the following criteria:

•    the property securing the loan was the borrower's primary

residence as was the Plaintiffs – 3122 Pine Tree Drive, Miami

Beach FL is the only residence of the Plaintiffs and has been since

1999;

48

- the mortgage was in the foreclosure process (initiated, pending, or completed) at any time between January 1, 2009, and December 31, 2010 – See Miami Dade Case Number Miami Dade Case Number 05-006570-CA 15; and

- the mortgage was serviced by one of the following mortgage servicers GMAC Mortgage – which includes RFC Homecomings, see the Affidavit of Debra Lyman which clearly shows the same; and Washington Mutual (WaMu) who was the named plaintiff before GMAC substituted in as Plaintiff AFTER the default against Washington Mutual Bank was entered in the Adversary Proceeding, and GMAC admitted to Federal Judge Crystol that they did so to avoid enforcement of the judgment against the subject property and to protect GMAC's interest in the subject property – the same interest it told the Defendant, Rust Consulting, that it did NOT HAVE.

- Eligible borrowers were SUPPOSED TO BE sent a Request for Review form by mail starting in November of 2011 when the program launched – BUT PLAINTIFFS RECEIVED NO CARD AND INSTIGATED ON THEIR OWN THE REVIEW PROCESS.

- If a borrower previously filed a complaint with these servicers about foreclosures pending during the review period, WHICH THE PLAINTIFFS DID, they were still eligible to file an independent review of their foreclosure.

49

- There were no costs associated with being included in the review; the review was a free program.

- That information about the review process, including how to request an independent review, was supposed to be mailed to potentially eligible borrowers in November and December 2011, but PLAINTIFFS RECEIVED NO NOTIFICATION, THEY INSTIGATED THE INVESTIGATION.

- Throughout 2012, borrowers who had not yet requested a review were sent reminder letters – BUT PLAINTIFFS RECEIVED NO REMINDER.

- AGAIN, even though the last reminder letters were mailed in November of 2012 PLAINTIFFS RECEIVED NO REMINDERS.

- Individuals were SUPPOSED TO BE sent an acknowledgement letter from the review administrator within one week after their request for an independent review is received, but no acknowledgment was timely received.

- Individuals will be notified in writing of the results of the review.

- Defendants promised, represented and were obligated by their agreement that "the review process will be a thorough and complete examination of many details and documents, it could take several months to complete the review."  In Plaintiffs case, the review was NOT THOROUGH, NOT COMPLETE, AND CLEARLY THEY DID NOT EXAMINE MANY OR ANY OF THE DETAILS OR

DOCUMENTS PROVIDED THEM BY THE PLAINTIFFS; NOR

DID THEY REVIEW THE PUBLIC RECORDS WHICH CLEARLY

CONTRADICTED GMACS AND WAMU'S FALSE

REPRESENTATIONS.

- Rust Consulting was selected and hired by the servicers to serve as the central administrator of the independent foreclosure review, BUT FAILED IN EVERY RESPECT.

- Rust Consulting will notify borrowers, receive requests for a review, and respond to questions about the independent foreclosure review process but failed to do so.

61.    Defendant Rust Consulting and GMAC knew or should have known these statements were false.

62.    Defendants and each of them made these false statements of material fact for the purpose of inducing Plaintiff to act as complained of herein; and accepted billions of dollars for distribution under an agreement to independently review records and failed to do so.

63.    Plaintiffs justifiably relied upon these false statements of material fact as alleged herein, including submission of their proper claim.

64.    Reliance on these false statements of material fact did, in fact, induce Plaintiffs to so act as alleged herein.

65.    That as an actual, legal and proximate cause of the Defendants conduct, the Plaintiff was deprived of their share of the billions of dollars in their possession that was earmarked for the Plaintiff.

51

66.    Plaintiffs have suffered legal injury and damages, in an amount to be proven at

trial, including, but not limited to, loss of profit, loss of business reputation, loss

of livelihood, loss of income, and other health and economic loss;

67.    Under the Financial Remediation Framework, the Plaintiffs are entitled to the

amount of $1,058,000,000.

WHEREFORE PLAINTIFF PRAYS FOR RELIEF AS SET FORTH BELOW


## COUNT VI

## PROMISSORY ESTOPPEL

68.    Plaintiffs refer to and incorporate by reference as though fully set forth herein

paragraphs 1 – 28, inclusive, of this Complaint.

69.    Defendants and each of them made the following representations as to material

facts that are contrary to Defendants' current representations:

70.    Defendants and each of them made the following false statements of material fact

to Plaintiffs:

A.    That GMAC would provide complete and truthful information to Rust;

B.    That Rust would find that the Plaintiffs and others were eligible for

Review for an independent foreclosure review if they met the following

criteria:

•    the property securing the loan was the borrower's primary

residence as was the Plaintiffs – 3122 Pine Tree Drive, Miami

Beach FL is the only residence of the Plaintiffs and has been since

1999;

52

- the mortgage was in the foreclosure process (initiated, pending, or completed) at any time between January 1, 2009, and December 31, 2010 – See Miami Dade Case Number Miami Dade Case Number 05-006570-CA 15; and

- the mortgage was serviced by one of the following mortgage servicers GMAC Mortgage – which includes RFC Homecomings, see the Affidavit of Debra Lyman which clearly shows the same; and Washington Mutual (WaMu) who was the named plaintiff before GMAC substituted in as Plaintiff AFTER the default against Washington Mutual Bank was entered in the Adversary Proceeding, and GMAC admitted to Federal Judge Crystol that they did so to avoid enforcement of the judgment against the subject property and to protect GMAC's interest in the subject property – the same interest it told the Defendant, Rust Consulting, that it did NOT HAVE.

- Eligible borrowers were SUPPOSED TO BE sent a Request for Review form by mail starting in November of 2011 when the program launched – BUT PLAINTIFFS RECEIVED NO CARD AND INSTIGATED ON THEIR OWN THE REVIEW PROCESS.

- If a borrower previously filed a complaint with these servicers about foreclosures pending during the review period, WHICH THE PLAINTIFFS DID, they were still eligible to file an independent review of their foreclosure.

53

- There were no costs associated with being included in the review; the review was a free program.

- That information about the review process, including how to request an independent review, was supposed to be mailed to potentially eligible borrowers in November and December 2011, but PLAINTIFFS RECEIVED NO NOTIFICATION, THEY INSTIGATED THE INVESTIGATION.

- Throughout 2012, borrowers who had not yet requested a review were sent reminder letters – BUT PLAINTIFFS RECEIVED NO REMINDER.

- AGAIN, even though the last reminder letters were mailed in November of 2012 PLAINTIFFS RECEIVED NO REMINDERS.

- Individuals were SUPPOSED TO BE sent an acknowledgement letter from the review administrator within one week after their request for an independent review is received, but no acknowledgment was timely received.

- Individuals will be notified in writing of the results of the review.

- Defendants promised, represented and were obligated by their agreement that "the review process will be a thorough and complete examination of many details and documents, it could take several months to complete the review."  In Plaintiffs case, the review was NOT THOROUGH, NOT COMPLETE, AND CLEARLY THEY DID NOT EXAMINE MANY OR ANY OF THE DETAILS OR

> DOCUMENTS PROVIDED THEM BY THE PLAINTIFFS; NOR
>
> DID THEY REVIEW THE PUBLIC RECORDS WHICH CLEARLY
>
> CONTRADICTED GMACS AND WAMU'S FALSE
>
> REPRESENTATIONS.

- Rust Consulting was selected and hired by the servicers to serve as the central administrator of the independent foreclosure review, BUT FAILED IN EVERY RESPECT.

- Rust Consulting will notify borrowers, receive requests for a review, and respond to questions about the independent foreclosure review process.

71.    Defendants and each of them knew or should have known these statements were false.

72.    Defendants and each of them made these false statements of material fact for the purpose of inducing Plaintiff to act as complained of herein; and accepted billions of dollars for distribution under an agreement to independently review records and failed to do so.

73.    Plaintiffs justifiably relied upon these false statements of material fact as alleged herein, including submission of their proper claim.

74.    Reliance on these false statements of material fact did, in fact, Defendants did induce Plaintiffs to so act as alleged herein.

75.    That as an actual, legal and proximate cause of the Defendants and each of their conduct, the Plaintiff was deprived of their share of the billions of dollars in their possession that was earmarked for the Plaintiff.

76.    Plaintiffs reasonably relied on Defendants' and each of their representation that its claim would be paid in a timely manner.

77.    This reasonable reliance of Plaintiff s on the Defendants' and each of their representation proximately caused the following injury to Plaintiffs in depriving them of their share of the billions of dollars that were deposited into the trust and care of the Defendants to be paid to the Plaintiffs and others similarly situated:

78.    Due to the fact that Defendant wrongfully relied on the fraudulent representation of GMAC when the Defendant knew it was fraudulent, had possession of public records and the records directly from the Plaintiff that the Plaintiffs were entitled to recovery, willfully and wrongfully denied the claim, pretending and falsely representing that said decision was their independent decision.

79.    Defendants and each of them still have not made any payment or offer to Plaintiffs

80.    Plaintiffs have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other health and economic loss.

81.    Under the Financial Remediation Framework, the Plaintiffs are entitled to the amount of $1,058,000,000.

WHEREFORE PLAINTIFF PRAYS FOR RELIEF AS SET FORTH BELOW.

## COUNT VII

## UNJUST ENRICHMENT

82.    Plaintiffs refer to and incorporate by reference as though fully set forth herein

paragraphs 1 – 28, and 66 – 81 inclusive, of this Complaint

83.    As of the date of the filing of this Complaint, due to Defendants' and each of their

intentional and systematic delay of payment of legitimate claims, including the

Plaintiffs, time has lapsed from the date the billions in funds were placed in their

care, custody and control and the date of entry of judgment.

84.    At all times material herein, Defendants Rust Consulting held the funds with their

legal and contractual duty to disburse the same and accepted fees and contractual

sums as payment therefore.

85.    Pursuant to the Defendant GMAC and Defendant Rust Consulting Agreement,

they are the responsible party or the responsible party's guarantor is liable to a

claimant for interest on the amount paid in satisfaction of a claim.

86.    More than enough time has lapsed and the period for which interest shall be paid

is the period beginning on the 30th day following the date on which the claim is

presented to the responsible party or guarantor and ending on the date on which

the claim is paid.

87.    Defendants and each of them have been enriched by delaying the payment of the

legitimate claim of Plaintiffs and by not paying the statutorily-mandated interest

thereon.

57

88.     Defendants' and each of their delay of payment and intentional and wrongful

         refusal to pay the claim and the interest thereon in satisfaction of the claim of

         Plaintiffs have allowed Defendants to save thousands of dollars in costs.

89.     As a result wrongful refusal to pay, failure to properly perform their duties, by

         delaying and refusing payment and by not paying interest on the amount paid in

         satisfaction of the claim of Plaintiffs , Defendants Rust were unjustly enriched by

         GMAC and (GMAC by fraud and delay) by receiving a monthly payment for

         services which did not rise to the standards expected of their profession.

90.     Plaintiffs have suffered legal injury and damages, in an amount to be proven at

         trial, including, but not limited to, loss of profit, loss of business reputation, loss

         of livelihood, loss of income, and other health and economic loss due to

         Defendants' delay of payment and intentional refusal to pay interest on the

         amount paid in satisfaction of the claim of Plaintiff

91.     Defendants and each of their lack any legal justification for violating the rights

         provided to Plaintiffs under the consent judgment and consulting agreement.

92.     Under the circumstances described herein it would be inequitable for Defendants

         and each of them to retain the benefits of their actions without paying the value

         thereof to Plaintiffs.

**COUNT VIII**

**FLORIDA FRAUDULENT TRANSFER ACT**

93.     Plaintiff incorporates paragraph 1 – 28 herein as though set forth in full.

94.     This complaint is ancillary to the underlying case, which was a civil action for

         compensatory and punitive damages against Washington Mutual Bank, FA

58

("Defendants") for their responsibility for DAMAGES AGAINST DEFENDANT WASHINGTON MUTUAL BANK, FA, TO SET ASIDE THE SUMMARY JUDGMENT ON THE BASIS OF FRAUD; FOR VIOLATIONS OF THE FLORIDA FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA"), 15 U.S.C. §  1692 ET. SEQ.; FLORIDA CIVIL CONSPIRACY; MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343; BANK FRAUD 18 U.S.C. 1341, 1344; VIOLATION OF 18 U.S.C. § 1001; VIOLATION OF 18 U.S.C. § 1005; VIOLATION OF 12 C.F.R. §202.16, EQUAL OPPORTUNITY ACT, REGULATION B; DECLARATORY RELIEF; DECLARATORY RELIEF ORDER FINDING THE LINE OF CREDIT OF $100,000 ISSUED BY WAMU IS VOID AS PREDATORY LENDING; UNCOLLECTABLE AS BEYOND THE STATUTE OF LIMITATIONS; AND VOID AS PLAINTIFFS WERE VICTIMS OF IDENTITY THEFT AND THE LIENS THEREON SHOULD BE ORDERED VACATED;  AND DAMAGES PURSUANT TO FLORIDA STATUTE CHAPTER 701.04 (1), US District Court Case, 11-03107-AJC.

95.    On February 10th, 2012, the US District Court Clerk entered a Default in that action in favor of Plaintiffs for a total of $264,500,000.

96.    To date, $264,500,000 remains unsatisfied.

97.    Plaintiffs bring this action pursuant to Fla Stat. § 56.29 and the Florida Uniform Fraudulent Transfer Act, Fla. Stat. § 726.101 et seq in order to collect monies that were fraudulently transferred to third parties, as well as to seek relief from further flouting of the Court's judgment in this matter.

59

98.     This Court has jurisdiction over the underlying claims in this action based the fact

        that the judgment was entered in this county; that the Defendant fraudulently

        transferred assets to avoid the judgment in this county; and recorded the

        fraudulent transfer of those real assets (notes and mortgages securing property in

        the name of the Defendant); in this County.

99.     This is an action for equitable and other relief pursuant to the Uniform Fraudulent

        Transfer Act, Fla. Stat § 726.101, et seq and pursuant to Fla. Stat. § 56.29.

100.    Defendant GMAC MORTGAGE, LLC, immediately upon learning of the Clerk's

        Entry of Default against Washington Mutual Bank, FA, in the sum of

        $264,500,000, admitted to the Federal Court Judge, in open court, AJ Crystol, that

        it substituted itself as a plaintiff; signed and recorded substitution of mortgages;

        assigned mortgages; assigned rights of recovery to mortgages; and took other acts

        to avoid WAMU from payment to Plaintiffs in the sum of **$264,500,000; and to**

        **avoid enforcement of that judgment against the plaintiffs homestead home,**

        **at 3122 Pine Tree Drive, Miami Beach, FL, 33140**.

101.    GMAC MORTGAGE, LLC, has engaged in fraudulent acts in furtherance of a

        fraudulent scheme to transfer its assets out of the reach of Plaintiffs.

102.    GMAC MORTGAGE, LLC has transferred assets outside of the County as well

        as inside the County, in an amount in excess of the default amount of

        $264,500,000 in an attempt to avoid payment of the judgment to the Plaintiffs.

103.    All of the above transfers were made without adequate compensation.

104.    Defendant GMAC MORTGAGE, LLC has acted with actual intent to hinder, delay and defraud his creditors by fraudulently transferring assets to insiders without adequate compensation.

105.    At all times relevant to this action, Defendant GMAC MORTGAGE, LLC is under the protection of the Bankruptcy Court, claiming it is currently insolvent because the claims and judgment against it for over $264 million and other pending actions, far exceed his ability to pay.

106.    Plaintiffs lack an adequate remedy at law because, unless the relief sought in this count is granted, Defendant GMAC MORTGAGE, LLC will have succeeded in fraudulently transferring its assets to insiders.

107.    Plaintiffs have a high probability of success on the merits in this action.

108.    The transfers of assets to insiders were made with actual intent to hinder, delay or defraud creditors and thus constitute fraudulent transfers in violation of Fla. Stat. § 726.105(1)(a).

109.    Further, the debtor Defendant GMAC Mortgage LLC did not receive reasonably equivalent value for any of the transfers and intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they become due, and thus the transfers at issue are fraudulent transfers in violation of Fla. Stat. § 726.105(1)(b).

110.    Plaintiffs are entitled to statutory relief under Fla. Stat. § 726.108.

111.    Plaintiffs are further entitled to exemplary damages pursuant to 768.73 Punitive damages; limitation.--

61

(1)(a)  Except as provided in paragraphs (b) and (c), an award of punitive

damages may not exceed the greater of:

1.  Three times the amount of compensatory damages awarded to each claimant

…

2. (c)  Where the fact finder determines that at the time of injury the defendant

had a specific intent to harm the claimant and determines that the defendant's

conduct did in fact harm the claimant, there shall be no cap on punitive damages.

112.  Because the Defendants intentionally harmed, and intended to harm, the Plaintiffs

financially by fraudulent concealment by means of substitution of Plaintiffs in

pending cases where they had the right to recover funds; and transfer of assets by

means of assignments of mortgages without sufficient consideration; transfer of

mortgages without consideration; and transfer of funds received on mortgage

payments to insiders without assignment of mortgages and without consideration;

the Plaintiffs are entitled to unlimited punitive damages. However, Plaintiffs are

only seeking liquidated treble damages pursuant to 768.73(1)(a) in the event of

default of Defendant; or the liquidated punitive damage sum of **$ 792,000,000..**

113.  Because of the special circumstances in this case, in which the Defendant GMAC

MORTGAGE, LLC is liable for a judgment for fraud, bank fraud, wire fraud,

mail fraud, and other willful violations of statute, and then has committed fraud to

avoid that judgment, is hiding assets, and is an ongoing risk of flouting the

Court's authority, Plaintiffs are entitled to:

a.       A judgment pursuant to Florida Statute § 726 et seq., in the liquidated sum

         of $264,000,000 as the equivalent amount of the judgment avoided by the

62

fraudulent transfer assets and interest that accrues thereon at the legal rate

of twelve percent per annum;

b.    Appointment of a special receiver to take charge of Defendant's assets;

c.    An injunction against further disposition or assignment of property;

d.    Discovery into all of Defendants' assets and their disposition;

e.    Disgorgement of any and all claims that the Defendant GMAC Mortgage

LLC has or claims to have on Plaintiffs homestead property, 3122 Pine

Tree Drive, Miami Beach, Fl 33140 and whose legal description is

e.    fees and costs for bringing this action; and

f.    Any other relief the circumstances may require.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.    A judgment pursuant to Florida Statute § 726 et seq., in the liquidated,

statutory sum of **$264,000,000** as the equivalent amount of the judgment

avoided by the fraudulent transfer assets (in addition to the original

judgment of $264,000,000);

b.    Appointment of a special receiver to take charge of Defendant's assets;

c.    An injunction against further disposition or assignment of property until

satisfaction of this and the underlying action;

d.    Discovery into all of Defendants' assets and their disposition;

e.    Interest that accrues thereon at the legal rate of **interest of twelve percent

per annum**;

63

f.      Exemplary Damages in three times the amount of the damages, pursuant
        to statute in the sum of **$ 792,000,000**.

g.      Fees and costs for bringing this action; and

h.      Any other relief the circumstances may require and the court deems just
        and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Ami B. Eskanos and Barry B. Eskanos, demand judgment

against Defendants, jointly and severally, as follows:

(a)     Economic and compensatory damages in amounts to be determined at trial;

(b)     Punitive damages;

(c)     Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(d)     Attorney's fees and costs of litigation;

(e)     Such other and further relief as the Court may deem just and appropriate; and

(f)     A trial by jury as to all Defendants on all issues so triable.

And as against GMAC Mortgage LLC on the claim of Fraudulent Transfer;

a.      A judgment pursuant to Florida Statute § 726 et seq., in the liquidated sum of
        $264,000,000 as the equivalent amount of the judgment avoided by the fraudulent
        transfer assets and interest that accrues thereon at the legal rate of twelve percent
        per annum;

b.      Appointment of a special receiver to take charge of Defendant's assets;

c.      An injunction against further disposition or assignment of property;

d.      Discovery into all of Defendants' assets and their disposition;

e.      fees and costs for bringing this action; and

64

f.      Any other relief the circumstances may require.

DATED: September  __, 2013

Respectfully submitted,

_____

DAVID HARRIS
Florida Bar #112739
6431 S.W. 39th St.
Miami, FL 33155
(786) 306-7278
Davidharris@att.net

**SPACE RESERVED FOR RECORDING INFORMATION**

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

| | |
|---|---|
| AMI B. ESKANOS,<br>BARRY B. ESKANOS | Case No. |
| Plaintiff,<br>-vs.- | Division: |
| GMAC MORTGAGE, LLC.<br>RUST CONSULTING, INC. | |
| Defendant. | |

**LIS PENDENS**

TO THE ABOVE NAMED DEFENDANT(S) AND ALLOTHERS WHOM IT MAY
CONCERN:

YOU ARE HEREBY NOTIFIED that suit was instituted by the above-named Plaintiff
against the above-named Defendant(s), in the above-styled cause, involving the following
described property, situated, lying and being 3122 Pine Tree Drive, Miami Beach, Fl
33140, and more fully described as follows:

> LOT 3, BLOCK 44, ORCHARD SUBDIVISION NO. 1, ACCORDING
> TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 6, PAGE
> 111, OF THE PUBLIC RECORDS OF DADE COUNTY, FLORIDA.

Relief sought as to such property is for return of the fraudulently transferred
mortgage encumbering the subject property.

1. CFN 99R557843, OR 18845, PAGE 1093 – 1107;

YOU will, therefore, please govern yourselves accordingly.

DATED: September  __, 2013

Respectfully submitted,

_____
DAVID HARRIS
Florida Bar #112739
6431 S.W. 39th St.
Miami, FL 33155
(786) 306-7278
Davidharris@att.net

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

AMI B. ESKANOS,
BARRY B. ESKANOS

Case No.

          Plaintiff,

Division:

-vs.-

RUST CONSULTING, INC.

          Defendant.

EXHIBITS

EXHIBIT A

## Independent Foreclosure Review



**Your mortgage loan is not eligible for the Independent Foreclosure Review.**

Reference Number: 1002338054

Property Address:

3122 Pine Tree Dr
Miami Beach FL 33140

***** SINGLE PIECE
78639-00-V002-0000022-M3105
Ami Eskanos
3122 Pine Tree Dr
Miami Beach FL 33140
|.|||""||.|||...|.|.|.|||.||.||.|.|....|.|.|"||.||||||.|||||.

*Si usted habla español, tenemos representantes que pueden asistirle en su idioma.*

Dear Ami Eskanos,

Federal banking regulators have directed certain residential mortgage servicers to make an Independent Foreclosure Review available to homeowners whose mortgage loans on their primary residence were subject to foreclosure proceedings during the period from January 1, 2009 through December 31, 2010. Regulators from the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System monitor the Independent Foreclosure Review to promote a fair and impartial process.

On 08/24/2012, we received your Request for Review Form with respect to the mortgage loan referenced above.

## In a process reviewed by an independent consultant and monitored by the federal banking agencies, it was determined that your mortgage loan is not eligible for the Independent Foreclosure Review.

**Your request for review will not be considered for the following reason(s):**

GMAC Mortgage, LLC's records indicate that your mortgage loan was not in the foreclosure process during the eligible review period of January 1, 2009 to December 31, 2010. It is not possible to include your request in the review as only homeowners whose mortgage loans were in the foreclosure process during this time period are eligible.

Even if your mortgage loan is not eligible for the Independent Foreclosure Review, this will not impact any other options you may pursue related to your foreclosure.

You can have your mortgage situation considered by contacting GMAC Mortgage, LLC directly at 1-800-766-4622 or in writing at P.O. Box 4622, Waterloo, IA 50704-4622.

Rust Consulting serves as the central administrator of the Independent Foreclosure Review. The firm has been hired to notify customers and receive Request for Review Forms. Rust will also respond to questions about the Independent Foreclosure Review.

This letter is being sent to you at the request of federal bank regulators. This letter is not an attempt to collect a debt or to impose personal liability for any obligation, including, without limitation, any obligation that was discharged, or is subject to an automatic stay in bankruptcy under Title 11 of the United States Code.

The information that you submit in connection with the Independent Foreclosure Review process will be available to the servicer(s) of your mortgage loan and will be shared with an independent consultant of that servicer(s). Where required to comply with the law, the servicer(s) may be compelled to provide this information in response to a legal process.

Under the April 13, 2011 Consent Orders governing the Independent Foreclosure Review, the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System have also directed servicers to use contact or personal information provided by the borrower in connection with the Independent Foreclosure Review only for purposes relating to the Independent Foreclosure Review process, including remediation efforts or other borrower communications.

If you would like the servicer's internal records to include updated contact or personal information that you provide in connection with the Independent Foreclosure Review process for the servicer's future correspondence or notices outside the Independent Foreclosure Review, then you must separately provide your new contact or personal information directly to the servicer.

The servicers may always use information obtained from publicly or commercially available sources to update borrower contact or personal information.

Llame al 1-888-764-8867 para hablar con un representante que le podrá brindar gratuitamente traducciones de la información que le envió la Revisión Independiente de la Ejecución Hipotecaria y responder a sus preguntas acerca de la Revisión Independiente de la Ejecución Hipotecaria o completar el Formulario de Solicitud de Revisión. Esta información es precisa a la fecha de impresión y está sujeta a cambios sin previo aviso.

Call 1-888-764-8867 to speak to a representative that will be able to provide free translations of information sent to you from the Independent Foreclosure Review and answer your questions about the Independent Foreclosure Review or completing the Request for Review Form. This information is accurate as of date of printing and is subject to change without notice.

Assistance is available in over 200 languages, including: Chinese, Korean, Vietnamese, Tagalog, Hmong and Russian.

提供中文幫助。

한국어 도움을 제공합니다.

Trợ giúp hiện có bằng tiếng Việt.

Available ang tulong sa wikang Tagalog.

Peb muaj cov neeg hais lus Hmoob pab nej.

Помощь на русском языке.

**Consent Order Details**

As part of consent orders issued on April 13, 2011 between certain residential mortgage servicers and their federal bank regulators, an Independent Foreclosure Review is being made available to individual borrowers who were part of a foreclosure action on their primary residence during the period of January 1, 2009 to December 31, 2010. Pursuant to the consent orders, each mortgage servicer has hired an approved independent consultant to review certain residential foreclosure actions to determine whether an individual borrower was financially injured as a result of any errors, misrepresentations or other deficiencies made during the foreclosure process.

The Independent Foreclosure Review is monitored by federal bank regulators from the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System.

EXHIBIT B

**Office of the Comptroller of the Currency**
**Board of Governors of the Federal Reserve System**

**JUNE 21, 2012**
**FINANCIAL REMEDIATION FRAMEWORK**
**FOR USE IN THE INDEPENDENT FORECLOSURE REVIEW**

In April 2011, federal banking regulators issued enforcement orders against 14 large mortgage servicers for deficient mortgage servicing and foreclosure practices. The orders required those servicers to retain independent consultants to conduct a comprehensive review of foreclosures that were in process or completed in 2009 or 2010 (the Independent Foreclosure Review) to identify financial injury to borrowers that resulted from errors, misrepresentations, and other deficiencies in the foreclosure process. The Independent Foreclosure Review also requires those servicers to provide compensation or other remediation for identified financial injury.

The OCC and FRB have developed a financial remediation framework (the Framework) that provides examples of situations where compensation or other remediation is required for financial injury due to servicer errors, misrepresentations, or other deficiencies. The independent consultants will use the Framework to recommend remediation for financial injury identified during the Independent Foreclosure Review. The servicers will prepare remediation plans based on the independent consultants' recommendations. The federal banking regulators must approve each servicer's remediation plan.

The categories included in the Framework are not intended to be exhaustive or to cover all possible situations or remediation options for borrowers who may require compensation or other remediation for financial injury. It is important to read the Frequently Asked Questions (FAQs) that accompany the Framework to understand how remediation will work.

**OCC FRB Financial Remediation Framework**
**Independent Foreclosure Review**

| No. | CATEGORY | ERROR | DESCRIPTION | FORECLOSURE IN PROCESS (AT TIME OF REMEDIATION) | | FORECLOSURE COMPLETE (AT TIME OF REMEDIATION) | |
|---|---|---|---|---|---|---|---|
| | | | | Remedy | Dollar Payment | Remedy | Dollar Payment |
| 1 | Servicemembers Civil Relief Act (SCRA) | SCRA violation | Servicer foreclosed on a borrower in violation of the SCRA. | Suspend foreclosure. | N/A | Rescind foreclosure when possible; pay $15,000, correct servicer record for any improper amounts, and correct credit reports. | $15,000 |
| | | | | | | If rescission of foreclosure is not possible; pay $125,000 plus equity, remedy deficiency, and correct credit reports. | $125,000 plus equity |
| 2 | Borrower Not in Default | Borrower not in default when foreclosure occurred or in default as direct result of servicer error | Servicer initiated foreclosure or foreclosed on borrower who was not in default on mortgage or in default only directly due to servicer error. | Cancel foreclosure; pay $5,000, correct servicer record for late fees, foreclosure fees, and/or any other improper amounts, and correct credit reports. | $5,000 | Rescind foreclosure when possible; pay $15,000, correct servicer record for any improper amounts, and correct credit reports. | $15,000 |
| | | | | | | If  rescission of foreclosure is not possible; pay $125,000 plus equity, remedy deficiency, and correct credit reports. | $125,000 plus equity |
| 3a | Error after Trial Loan Modification Completed | Failure to convert written trial-period plan to permanent modification | Servicer failed to convert borrower to permanent modification after successful completion of written trial-period plan. | Suspend foreclosure as required by program; pay $5,000, provide permanent loan modification, correct servicer record for any improper amounts, and correct credit reports. | $5,000 | Rescind foreclosure when possible and provide permanent loan modification; pay $15,000, correct servicer record for any improper amounts, and correct credit reports. | $15,000 |
| | | | | If servicer cannot provide permanent loan modification; pay $35,000, correct servicer record for any improper amounts, and correct credit reports. | $35,000 | If rescission of foreclosure is not possible; pay $125,000 plus equity, remedy deficiency for any improper amounts, and correct credit reports. Servicer may offset missed and unpaid principal & interest payments and property taxes paid on behalf of the borrower, subject to certain limitations. | $125,000 plus equity, less offset |

**OCC FRB Financial Remediation Framework**
*Independent Foreclosure Review*

| No. | CATEGORY | ERROR | DESCRIPTION | FORECLOSURE IN PROCESS *(AT TIME OF REMEDIATION)* | | FORECLOSURE COMPLETE *(AT TIME OF REMEDIATION)* | |
|---|---|---|---|---|---|---|---|
| | | | | Remedy | Dollar Payment | Remedy | Dollar Payment |
| 3b | Error after Trial Loan Modification Approved | Foreclosure completed during written trial-period plan for a permanent modification | Servicer foreclosed on borrower prior to expiration of written trial-period plan while borrower was performing all requirements of the written trial-period plan. | N/A | N/A | Rescind foreclosure when possible and provide trial-period plan; pay $15,000, correct servicer record for any improper amounts, and correct credit reports. | $15,000 |
| | | | | | | If rescission of foreclosure is not possible; pay $125,000 plus equity, remedy deficiency for any improper amounts, and correct credit reports. Servicer may offset missed and unpaid principal & interest payments and property taxes paid on behalf of the borrower, subject to certain limitations. | $125,000 plus equity, less offset |
| 4 | Forbearance Plan | Foreclosure completed when borrower performing under documented forbearance plan | Servicer completed foreclosure on borrower before documented forbearance period expired while borrower was meeting all requirements of documented forbearance plan. | N/A | N/A | Rescind foreclosure when possible; pay $15,000, correct servicer record for any improper amounts, and correct credit reports. | $15,000 |
| | | | | | | If rescission of foreclosure is not possible; pay $60,000 plus equity, remedy deficiency for any improper amounts, and correct credit reports. Servicer may offset missed and unpaid principal & interest payments and property taxes paid on behalf of the borrower, subject to certain limitations. | $60,000 plus equity, less offset |

2

**OCC FRB Financial Remediation Framework**
**Independent Foreclosure Review**

| No. | CATEGORY | ERROR | DESCRIPTION | FORECLOSURE IN PROCESS (AT TIME OF REMEDIATION) | | FORECLOSURE COMPLETE (AT TIME OF REMEDIATION) | |
|---|---|---|---|---|---|---|---|
| | | | | Remedy | Dollar Payment | Remedy | Dollar Payment |
| 5 | Loan Modification Application | Loan modification application denied in error, or complete loan modification application where borrower would have qualified was never decisioned | Servicer denied borrower application for loan modification that should have been approved, or servicer failed to decision complete loan modification application for which borrower would have qualified. | Suspend foreclosure as required by program and where loan modification permitted based on past documentation; pay $2,500, provide loan modification for which borrower should have been approved, correct servicer record for excess interest, late fees, foreclosure fees, and/or any other improper amounts, and correct credit reports. | $2,500 | Rescind foreclosure and provide loan modification for which borrower should have been approved based on past documentation when possible; pay $5,000, correct servicer record for excess interest, late fees, foreclosure fees, and/or any other improper amounts, and correct credit reports. | $5,000 |
| | | | | Suspend foreclosure as required by program and where loan modification not permitted based on past documentation; pay $10,000, offer existing loan modification or other loss mitigation programs, correct servicer record for excess interest, late fees, foreclosure fees, and/or any other improper amounts, and correct credit reports. | $10,000 | If either rescission of foreclosure is not possible or where loan modification not permitted based on past documentation; pay $15,000 plus equity, remedy deficiency for excess interest, late fees, foreclosure fees, and/or any other improper amounts, and correct credit reports. | $15,000 plus equity |
| 6 | Loan Modification Application | No follow up on loan modification application | Servicer never followed up to obtain complete loan modification documents as required under HAMP or other program designated by regulator. | Pay $2,000 and offer existing loan modification or other loss mitigation programs. | $2,000 | Pay $2,000. | $2,000 |
| 7 | Loan Modification Application | Never solicited loan modification | Servicer never solicited borrower loan modification option as required under HAMP or other program designated by regulator. | Pay $1,000 and offer existing loan modification or other loss mitigation programs. | $1,000 | Pay $1,000. | $1,000 |
| 8 | Loan Modification Application | Failed to approve modification in prescribed timeframe | Servicer approved borrower for loan modification under HAMP or other program designated by regulator, but did not make decision within required timeframe. | Correct servicer record for excess interest accrued by borrower. | N/A | Remedy deficiency for excess interest. | N/A |

3

**OCC FRB Financial Remediation Framework**
**Independent Foreclosure Review**

| No. | CATEGORY | ERROR | DESCRIPTION | FORECLOSURE IN PROCESS (AT TIME OF REMEDIATION) | | FORECLOSURE COMPLETE (AT TIME OF REMEDIATION) | |
|---|---|---|---|---|---|---|---|
| | | | | Remedy | Dollar Payment | Remedy | Dollar Payment |
| 9 | Loan Modification | Used wrong interest rate in an approved modification | Servicer error resulted in loan modification with higher interest rate than borrower should have been charged under HAMP or other loan modification program designated by regulator. | Correct servicer record for excess interest accrued by borrower. | N/A | Remedy deficiency for excess interest. | N/A |
| 10 | Bankruptcy | Bankruptcy | Servicer initiated foreclosure or foreclosed on borrower who was protected by federal bankruptcy law. | Remediation determined on a case-by-case basis as bankruptcy law dictates. | | | |
| 11 | No Standing | Servicer did not have standing to foreclose | Servicer initiated foreclosure or foreclosed on borrower, but lacked standing to foreclose. | Remediation determined on a case-by-case basis as state law dictates. | | | |
| 12 | Notice | Servicer failed to provide legally sufficient notice | Servicer initiated foreclosure or foreclosed on borrower and either failed to provide any notice or legally sufficient notice as required under state law. | Remediation determined on a case-by-case basis as state law dictates. | | | |
| 13 | General | Error caused financial injury | Servicer error occurred that did not directly cause foreclosure, but did directly result in financial injury to borrower. | Suspend foreclosure where appropriate, correct servicer record for amounts in error and/or reimburse borrower for amounts paid in error, plus interest; and where required, correct credit reports and pay $500 for credit reporting error. | Case-by-case basis | Remedy deficiency for amounts in error and/or reimburse borrower for amounts paid in error, plus interest; and where required, correct credit reports and pay $500 for credit reporting error. | Case-by-case basis |

EXHIBIT C

Civil / Probate Justice System - Docket Information

BACK TO SEARCH
RESULTS                        ALL PARTIES          START A NEW SEARCH

**WASHINGTON MUTUAL BANK (FA) vs ESKANOS, AMI B**
**\* Click on BOOK/PAGE of a particular docket to see the image if it is available \***

| | | | | |
|---|---|---|---|---|
| **Case Number (LOCAL):** | 2005-6570-CA-01 | **Dockets Retrieved:** | 236 | **Filing Date:** 03/30/2005 |
| **Case Number (STATE):** | 13-2005-CA-006570-0000-01 | **Judicial Section:** | 42 | |

EXHIBIT D



**Forensic Document Examiners Inc.**
**E. C. Bryan**
**Box 811958**
**Boca Raton, Fl. 33481**
**561.361.0007**
BocaForensic@aol.com
www.FloridaDocumentExaminer.com

DATE:                          October 27, 2009

INVESTIGATION:                 Questioned signature/document page: Washington Mutual
                               Adjustable Rate Note

Dear Mr. Eskanos:

Upon your request, I met with Mr. Barry Eskanos on October 26, 2009, at the main
courthouse located at 73 W. Flagler Drive, Miami Beach, Florida. You instructed me to
examine the documents on file in regard to case number 05-06570-CA15. Specifically,
you requested that I examine pages one through six captioned "Adjustable Rate Note."

I have examined the following documents:

*Questioned:* (referred to as Q1, Q2, Q3, Q4, Q5, Q6)

Q-1  Page 1 of 6 doubled sided includes Q 2, page 2 of 6
Q-3  Page 3 of 6  double sided includes  Q-4  page 4 of 6
Q-5  Page 5 of 6-double sided includes   Q-6  page 6 of 6

*Exemplars:* (known signatures referred to as K-1 through K-10 as displayed, in order as
they appear on pages 1-3 of photo copied checks) and K-11, additional exemplar.

K-1 photo copy of canceled check #224
K-2        "              "          #226
K-3        "              "          #227
K-4        "              "          #228
K-5        "              "          #230
K-6        "              "          #231
K-7        "              "          #232
K-8        "              "          #234
K-9        "              "          #235
K-10       "              "          #237

*Additional document of known handwriting:*

K-11.  "Parent signature" of Ami Eskanos on one document, "Measurable Annual Goals and Benchmarks (Insert B) on page 2 of 2.

*Comments:*

In order to establish a document was written by a particular person, an examination of known, verified, genuine writing must be provided. When examining a multi page document, the writing, margins, typewritten text and paper must show substantial agreement without unexplainable differences. Substantial agreement in sufficient handwriting characteristics is needed to identify the maker and eliminate the possibility of any other writer. The paper should be consistent with other documents of the same batch, and should be the same font size (letter size) and style.

*Examination:*

This examination covers the obvious characteristics in handwriting, such as letter formations, spacing, margins, hooks, ticks (slash marks instead of dots over the letter "i" or similarly dotted letters), slant, and line quality as well as the less conspicuous characteristics including pressure patterns, proportions, connectors and initial and terminal stroke formations. Staple holes and punched holes are also scrutinized for alignment. Also examined are the typewritten aspects of each page of the multipage document. The type of font (type style) size and type of paper used for each page was considered.  Misaligned margins are usually indicative of mechanically altered documents or added pages, so margins are carefully examined.

*Equipment Used:*

Hewlett Packard Pavillion DV9000 computer
Zarbeco MiScope IR digital microscope-(infrared) with MiScope zoom from 15x to 140x
Zarbeco LP-100 florescent light (box) panel

MiScope Filter Kit:
Roscolux #27 (Medium Red)
Roscolux #21 (Golden Amber)
Roscolux #74 (Night Blue)

2

A.L.S. (alternate light source) White side lighting and Ultraviolet light
Straedtler grid measurement guide
Straedtler Computer Picus Scale
Straedtler Point Scale

*Conclusion: (original reports have my raised seal)*

Upon examining the double sided pages of the Washington Mutual Adjustable Rate Note numbered page 1 of 6 through page 6 of 6, an abundance of abnormalities and anomalies were detected. Specifically, the double sided page 5 of 6 and the reverse side, page 6 of 6 have the following differences (but not limited to):

1. Under ultraviolet light examination, the paper of pages 1 of 6 through page 4 of 6 fluoresced the same, but differently when compared to page 5/ 6. The difference in color (light that is emitted at a different frequency and reflected or absorbed) is indicative of a page substitution.

2. The paper of page 5/6 is a different texture than that of pages 1 through 4.

3. The font (style of print) on page 5/6 is inconsistent with that of pages 1 through 4. Under 140x and 40x magnification, the differences are readily observable. For example, the questioned page 5/6 is printed with a font that has rounded "i" dots. The preceding pages 1 through 4 are printed with fonts that produce square "i" dots. In addition, the tops of the "t" letters in pages 1 through 4 have angled slanted tops whereas the page 5/6 letter "t" has rounded tops. See exhibit section of report.

4. The margins on page 5/6 differ slightly and do not line up with the previous pages 1 through 4.

5. On the bottom of each page, (1 through 4) the page numbers are in the same position on each page. When the page number is examined using the florescent light box, the number of the page on the reverse side shows through and is in relative alignment. On the questioned page 5 and on the reverse side, page 6, when viewed with the florescent light box the page numbers do not line up and are in obvious different locations, far apart.

6. The numerical fonts on page 5/6 are different than on pages 1 through 4. Specifically to illustrate that point the number "3" and the numbers "1" and "2" are a different size and style on page 5/6 than on pages 1 through 4.

7. The signature of Ami Eskanos is suspect since it appears to be written with a lighter pressure and lighter color blue ink than on other documents. The signature has areas of unexplained tremors not present in the exemplars.

3

83

Therefore, it is the opinion of this examiner that page 5/6 of the Washington Mutual Adjustable Rate Note was not originally part of the 6 page package.

If you have any questions, please don't hesitate to call.

Sincerely,

E. C. Bryan

Certified Forensic
Document Examiner

4

EXHIBIT E

Court of Appeals
Third District
2001 S.W. 117 Ave,
Miami, FL 33175-1716

Re:   Third DCA Case No.: 09-3392
      Lower Court Number 05-06570 CA 15

To Whom It May Concern,

I am an employee of the law firm of Ackerman and Senterfitt. I have
worked with the lawyers on the above-entitled case and am aware, and
participated in the filing of false documents with the courts. I am admitting
this because I believe the investigators will find that a bunch of the
documents and affidavits are forged and false, and I will be ultimately
blamed and made a scape goat. My attorney advised me not to give my
name, but notify the court that the documents filed were meant to mislead
the court into giving us a judgment against the Defendants. He said that if
we do not take the houses because of the fraudulent documents, then it will
go better for me, but that I should take measures to alert the court of the
misleading paperwork and fraud and minimize the damages we caused by
lying.

I helped prepare forged documents and affidavits that contained lies in a
number of cases, including this one. I was told to do this by the lawyers and
should have stood up to them. I did not. For that, I am truly sorry. Also, I
know I should have spoken up earlier, but I was worried for obvious reasons
that I would get into a lot of trouble for my part in all of this.

After we won the Motion for Summary Judgment, the lawyer came into the
office and she bragged how we won on a "forged note", and how we can "do
anything and the court will believe it." All the lawyers in the office regularly
make comments like, "we have these judges in our back pockets," but I think
they are really worried that they are going to get caught now that all this
stuff has been in the newspapers.

I do not want these people in this case to lose their home because of the
things I did, and when the truth comes out, I do not want to be responsible
for the loss of their home.  I am having trouble sleeping at night and feel

## DEFENDANTS' MOTION EXHIBIT 1

very bad for all those people we have hurt. I just found out that there is an investigator report proving that the note is forged. I do not want to be blamed for making up that note. I did not personally do that, but did go along with some of the other things that were done in this case.

When I learned there was a huge investigation by the FBI, the Attorney General and all the trouble that this has caused, I am sure that the truth will come out and don't want to be the only one blamed. I was doing what I was told. Everyone in the office knows what is going on, including the bosses.

Again, I am sorry.

Akerman and Senterfitt Employee

Cc:   Danny E. Eskanos, Esq
      783 Wildflower Dr
      Palm Harbor, Florida 346835889
      United States

      Clerk of the Courts
      Miami-Dade County Courthouse
      73 West Flagler Street, Suite # 242
      Miami, Florida 33130

EXHIBIT F

IN THE CIRCUIT COURT OF THE 11th
**JUDICIAL CIRCUIT OF FLORIDA, IN
AND FOR MIAMI-DADE COUNTY**

**WASHINGTON MUTUAL BANK, F.A.**

      Plaintiff,

**Case #:  05-06570 CA 15**

v.

**AMI B. ESKANOS and BARRY B.
ESKANOS**

      Defendant

_____ /

**Affidavit of Debra Lyman**

I, Debra Lyman, being duly sworn, depose and say:

1. I am the Vice President of Litton Loan Servicing LP,  which I shall refer to as "Litton."  I have held this position at all times material to this affidavit.

2. This affidavit is made from my personal knowledge, the source of which is my professional responsibilities and duties.

3. Litton is the servicing agent for RFC Homecomings Financial ("RFC"), the successor in interest to Washington Mutual Bank, F.A. ("Washington Mutual") and the current beneficial interest holder of Ms. Eskanos' loan.  As loan servicer, Litton is duly authorized to submit this affidavit on Plaintiff's behalf.

4. Ms. Eskanos executed a promissory note in favor of Washington Mutual in the amount of $364,000.00 on October 28, 1999.  The note was secured by a mortgage signed the same day.  The original note and mortgage have been filed with the Court and copies of the note and mortgage are attached as **EXHIBITS 1** and **2,** respectively.

{FT539678;1}

ACAP EXHIBIT 7



**PLAINTIFF'S
EXHIBIT**

A

5.   On March 25, 2005, subsequent to the filing of the foreclosure complaint, the loan was
     transferred from Washington Mutual to RFC. All rights under the note and mortgage
     were transferred at that time.

6.   At approximately the same time, servicing of the loan was transferred from Washington
     Mutual to Litton, which serviced the loan to présent. Prior to that time, Washington
     Mutual serviced the loan from origination until transfer of servicing to Litton.
     Washington Mutual's loan file and servicing history were added to Litton's records
     pursuant to the transfer and are maintained within Litton's records in the ordinary course
     of Litton's business.

   7. I have reviewed and am personally familiar with Ms. Eskanos' loan file, including all
      documents transferred from Washington Mutual, which is maintained by Litton and is
      within my custody and control. Entries in Ms. Eskanos' loan file are made by Litton
      employees with personal knowledge of the information being entered at or about the time
      the information is received or created. This is Litton's regular course of business.

   8. In addition to Litton's paper business records, I am familiar with its on-line servicing
      history. This is an operating system that stores data files (*i.e.*, digital business records).
      Litton employees routinely input data into this servicing history and the data is entered by
      Litton employees with personal knowledge of the data being entered at or about the time
      the data is received or created.

   9. The servicing history is used by Litton to record such events as the date of delinquency
      and default, as well as communications with borrowers. Printouts from the payment and
      servicing histories are attached as **EXHIBITS 3** and **4.**

Page 2 of 5

91

10. Ms. Eskanos failed to make the monthly installment payment due on October 1, 2004. A more detailed explanation of the default follows.

11. February 15, 2005, Ms. Eskanos had an escrow deficiency of negative $2,937.43, with $3,702.82 being held in suspense as insufficient to complete a full installment. That day, Ms. Eskanos made a $3,127.51 payment by Check No. 2815. Along with that payment, Washington Mutual took $1,923.29 out of suspense and from this total applied $680.01 to principal, $1,249.95 to interest, and $3,120.84 to escrow. This left a $183.41 positive escrow balance with $1,779.53 left in suspense because it was insufficient to complete the next installment.

12. The following day, on February 16, 2005, Washington Mutual took $1,204.22 out of the $1,779.53 in suspense and applied it to escrow. This left a $1,387.63 positive escrow balance, with $575.31 remaining in suspense because it was insufficient to complete the next installment.

13. On March 14, 2005, the Eskanoses made another payment of $3,127.51 by Check No. 2632. The entire amount was placed in suspense with the $575.31 already there.

14. On March 18, 2005, Washington Mutual paid $13,731.66 in county taxes from the escrow account, leaving an escrow deficiency of negative $12,344.03.

15. On March 25, 2005, Washington Mutual took $3,127.50 from suspense and applied it to the negative $12,344.03 escrow deficiency. This reduced the escrow deficiency to negative $9,216.53 with $575.31 held in suspense because it was insufficient to complete an installment.

16. At this point, Ms. Eskanos was six months behind, still owing her October, November and December 2004 and January, February, and March 2005 installments, and had an

Page 3 of 5

92

escrow deficiency of negative $9,216.53. On March 29, 2005, the foreclosure complaint was filed based on the October 1, 2004 installment still being due.

17. After the foreclosure complaint was filed, the Eskanoses sent in a check for $3,127.51 dated April 28, 2005, via Check No. 2656. On July 19, 2005, Litton returned the check un-cashed, explaining that the funds were not sufficient to pay the full amount due on the loan. A copy of the letter to the Eskanoses returning the check is attached as EXHIBIT 5.

18. The Eskanoses sent in a check for $3,127.51 dated July 28, 2005, Check No. 2664. On August 15, 2006, Litton returned the check un-cashed to Ami Eskanos, explaining the funds were not sufficient to pay the full amount due on the loan. A copy of the letter returning the check is attached as EXHIBIT 6.

19. On October 5, 2005, the Eskanoses sent in a payment to prior servicer, Washington Mutual in the amount of $3,127.51. $836.75 was applied to court fees, $325.00 was applied to title fees, $900.00 was applied to attorneys' fees, and the remaining $1,065.76 was held in suspense as it was insufficient to cure the Eskanoses' default or complete the next monthly installment.

20. Washington Mutual issued a check to Litton for the remaining $1,065.76 in suspense to be refunded to Ms. Eskanos because it was insufficient to cure her default. Litton forwarded this check directly to the Eskanoses in error, rather than issuing a check payable to the Eskansoses. *See* EXHIBIT 7. Litton was never notified about this error by the Eskanoses. Accordingly, the amount remains held as a credit on the account.

21. Ms. Eskanos made no further payments and has failed to cure her default.

22. Ms. Eskanos owes the following amounts on the loan:

Page 4 of 5

| | |
|---|---|
| $366,862.06 | Principal |
| $100,462.46 | Interest |
| $ 59,325.34 | Escrows |
| $  1,578.25 | Late Fees |
| $     44.50 | Property Inspection |
| $    725.00 | Broker Price Opinions |

$528,997.61 Total Amount Due through December 31, 2008

23.    Additionally, Litton, in its role as loan servicer, has retained Akerman Senterfitt to represent plaintiff in this action. Litton is obligated to pay the firm a reasonable fee for its services.

Further affiant sayeth not.

Debra Lyman
**VICE PRESIDENT**

STATE OF TEXAS:
COUNTY OF :

The foregoing instrument was acknowledged before me this 25th day of February 2008, by Debra Lyman, who is personally known to me.

JUDY A. TIDWELL
Notary Public State of Texas
My Commission Expires
06-23-2009

Notary Public
Commission No.: _____

My Commission Expires:_____

Page 5 of 5

EXHIBIT G

**Adversary Number: 11-03107-AJC, Southern District of Florida AND MIAMI DADE CASE NUMBER Case No.: 2012-22689-CA-01, ESKANOS V. WASHINGTON MUTUAL BANK, FA, with a claim amount of:**

**THERE, the WAMU AND GMAC are indebted to Plaintiffs jointly and severally in the principal sums of :**

- **a. Economic damages**      **$ 19,550,000;**
- **b. Non-economic damages**      **$ 45,500,000;**
- **c. Punitive damages**      **$198,150,000;**
- **d. Attorney's fees**      **$ 300,000;**
- **e. Slander of Credit**      **$ 1,000,000**
- f. **Total:**      **$ 264,500,000 plus interest thereon at the legal rate of 12 percent per annum; that defendant had been defaulted for failure to appear pursuant to Rule 55(a) of the Federal Rules of Civil Procedure;.**
- g. **Treble damages for FRAUDULENT TRANSFER OF ASSETS as admitted to Judge Crystol - $793,500,000.**
- h. <mark>**GRAND TOTAL $1,058,000,000.**</mark>

96

Form CGFD61 (9/19/08)

**United States Bankruptcy Court**
**Southern District of Florida**
**www.flsb.uscourts.gov**

**Case Number:** 11−40292−AJC                              **Adversary Number:** 11−03107−AJC

In re:

**Name of Debtor(s):** Barry B Eskanos and Ami B Eskanos

—————————————————————————————/

**Barry B Eskanos**

Plaintiff(s)

**VS.**

**Washington Mutual Bank FA**

Defendant(s)

—————————————————————————————/

## ENTRY OF DEFAULT

A motion for entry of default has been filed pursuant to Local Rule 7055−1. It appears from the record that the following defendant failed to plead or otherwise defend in this case as required by law:

Name: **WASHINGTON MUTUAL BANK FA**

Therefore, default is entered against the defendant as authorized by Bankruptcy Rule 7055.

Dated: 2/9/12                                    **CLERK OF COURT**
                                                By: Alexandra Oriol−Bennett
                                                Deputy Clerk (305) 714−1800

The clerk shall serve a copy of the Entry of Default on all parties to the adversary proceeding

EXHIBIT 2

RESPONSE TO THE DEBTORS REQUEST FOR SUPPLEMENTAL INFORMATION
PROVIDED BY THE CREDITORS, BARRY ESKANOS AND AMI ESKANOS

          MORRISON | FOERSTER

## Claim Information

| Claim Number | 19 | |
|---|---|---|
| **Basis of Claim**<br><br>Explanation that states the legal and factual reasons why you believe you are owed money or are entitled to other relief from one of the Debtors as of May 14, 2012 (the date the Debtors filed their bankruptcy cases) and, you **must** provide copies of any and all documentation that you believe supports the basis for your claim. | **SEE ATTACHED** | |

If your claim relates to a mortgage loan that you believe was originated or serviced by one of the Debtors, please be sure to include the following loan information, so that we can effectively search our records for information on your property and loan, and evaluate your claim.

| Loan Number: 13859830 | | |
|---|---|---|
| Address of property related to the above loan number: 3122 PINE TREE DRIVE | | |
| City: MIAMI BEACH | State: FL | ZIP Code: 33140 |

Additional resources may be found at  -  http://www.kccllc.net/rescap

Residential Capital, LLC      P.O. Box 385220   Bloomington, MN  55438

**Basis of Claim (Continued) GMAC IS LIABLE FOR A MULTIPLICITY OF REASONS. WHILE THE COMPLAINT THEY REFER TO WAS DISMISSED, IT WAS DISMISSED WITHOUT PREJUDICE AND CAN BE RE-FILED ANY TIME IN THE FORM OF AN ADVERSARY PROCEEDING OR A NEW COMPLAINT. THE DAMAGE IS CONTINUING AND RENEWED BY THEIR MOST RECENT FRAUD COMMITTED BY GMAC AND THE INDEPENDENT FORECLOSURE REVIEW.  THE BASIS ARE MULTIPLE AND AS FOLLOWS:**

1. **GMAC successfully sought to intervene and DID INTERVENE as a CO-DEFENDANT in the Federal Bankruptcy Adversary Proceeding, Adversary Number: 11-03107-AJC, Southern District of Florida with a claim amount of:**

   **THERE, the Debtors are indebted to Plaintiffs jointly and severally in the principal sums of :**

   | | | |
   |---|---|---|
   | i. | **Economic damages** | **$ 19,550,000;** |
   | j. | **Non-economic damages** | **$ 45,500,000;** |
   | k. | **Punitive damages** | **$198,150,000;** |
   | l. | **Attorney's fees** | **$ 300,000;** |
   | m. | **Slander of Credit** | **$ 1,000,000** |
   | n. | **Grand Total:** | **$ 264,500,000 plus interest thereon** |

   **at the legal rate of 12 percent per annum; that defendant had been defaulted for failure to appear pursuant to Rule 55(a) of the Federal Rules of Civil Procedure;.**

   **GMAC ASKED and RECEIVED AN ORDER granting it permission to be A DEFENDANT IN THIS ACTION.  GMAC CANNOT NOW CLAIM THAT THEY ARE NOT RESPONSIBLE, AFTER ASKING FOR A COURT ORDER, AND RECEIVING A COURT ORDER, MAKING THEM A RESPONSIBLE PARTY TO THE ACTION.  THE SUIT WAS FOR $264,500,000 AND BECAUSE OF THE FRAUD PERPETRATED BY GMAC, TREBLE DAMAGES WERE PROPERLY AWARDED IN THE DEFAULT ENTERED BY THE CLERK**

100

**ON 2/9/2012. Because d**efault in the above entitled action was entered by the clerk on 2/9/2012.  The next day, the Debtor filed a motion to substitute Plaintiffs in a pending action and testified before Judge Crystol in the above-entitled action that they did so, to avoid enforcement of the Default judgment by the Plaintiff against the Debtors and lose the purported security interest in the Plaintiffs home.  Said admission constitutes an admitted fraudulent transfer of assets in violation of Florida law and Federal Bankruptcy Concealment statutes.

  **2.**    GMAC fraudulently informed the Independent Foreclosure Review that our mortgage loan was not in the foreclosure process during the eligible review period of January 1, 2009 to December 31, 2010.  As a result of that fraudulent representation, the Creditors were deprived of their settlement due them under the independent foreclosure review in the sum of $1,058,000,000.

      The Office of the Comptroller of the Currency (OCC) and the Board of Governors of the Federal Reserve System (FRB) developed a Financial Remediation Framework that provides examples of situations where compensation or other remediation is justified because of errors or problems during a homeowner's foreclosure process. The independent consultants were supposed to use the Financial Remediation Framework to recommend remediation for financial injury identified during the Independent Foreclosure Review. The servicers were supposed to prepare remediation plans based on the independent consultants' recommendations.  The federal banking regulators must approve each servicer's remediation plan. The Plaintiffs, when they were wrongfully sued by the Lender, RFC Homecomings, GMAC and others:

        a.     were current in their mortgage at the time suit was filed;
        b.     were victims of a wrongful foreclosure by a lender who had no standing to sue;
        c.     whose lender placed forced place insurance on the Plaintiffs' property when there was already insurance on the property;
        d.     who sent Plaintiffs admissions that they had in escrow in excess of $190,000 of payments made by Plaintiffs;
        e.     whose lender filed a forged promissory note;
        f.     whose lender filed a fraudulent affidavit;
        g.     who was wrongfully denied a HAMP;
        h.     whose lender had no standing to sue when suit was filed;
        i.     who incurred over $300,000 in attorney's fees;

101

j.      who suffered irreparable harm to their credit; and

k.      who were victims of a litany of other acts which led to a wrongful foreclosure judgment which is currently on appeal before the Florida Supreme Court.

l.      Remediation will be determined on a case by case basis as the State Law Dictates – pursuant to their agreement, and the State Law Dictates a finding of liability in the sum already ordered by the Court in multiple cases, Federal and State actions, Adversary Number: 11-03107-AJC, Southern District of Florida  AND MIAMI DADE CASE NUMBER Case No.: 2012-22689-CA-01, ESKANOS V. WASHINGTON MUTUAL BANK, FA, with a claim amount of:

THERE, the WAMU AND GMAC are indebted to Plaintiffs jointly and severally in the principal sums of :

a.      Economic damages              $ 19,550,000;

b.      Non-economic damages  $ 45,500,000;

c.      Punitive damages              $198,150,000;

d.      Attorney's fees              $ 300,000;

e.      Slander of Credit              $ 1,000,000

f.      Total: $ 264,500,000 plus interest thereon at the legal rate of 12 percent per annum; that defendant had been defaulted for failure to appear pursuant to Rule 55(a) of the Federal Rules of Civil Procedure;.

g.      Treble damages for FRAUDULENT TRANSFER OF ASSETS as admitted to Judge Crystol by GMAC - $793,500,000.

h.      GRAND TOTAL $1,058,000,000.

i.      Plaintiffs harm occurred on or about 8/24/12 and continuing until said claim is paid in full by the Defendant, Rust Consulting.

BECAUSE GMAC FALSELY AND FRAUDULENTLY TOLD RUST CONSULTING that CREDITORS were NOT involved in the foreclosure process during the period, Rust Consulting refused to pay the Creditors any sum under the independent foreclosure review process, and Creditors were entitled to the sum of $1,058,000,000 thereunder. Rust Consulting reasonably, justifiably and detrimentally relied on the false representations of GMAC.  As an actual and proximate Cause and result of the fraudulent representations by GMAC to Rust Consulting, Inc. the Creditors were harmed in the amount of $1,058,000,000.

**3.** GMAC committed a FRAUDULENT TRANSFER OF ASSETS in

violation of the Florida Statute. Specifically, GMAC told Judge Crystol of the Federal Court that they specifically transferred the assets belonging to Washington Mutual Bank, FA to avoid enforcement of a default judgment entered by the Clerk of the Court the day before the transfer.

Specifically, it is alleged in the suit which is pending an entry of default and default judgment against Washington Mutual Bank, FA:

Plaintiffs Barry B. Eskanos, JD MPA, and Ami B. Eskanos (collectively "Plaintiffs") allege as follows:

**PRELIMINARY STATEMENT**

1.     This complaint is ancillary to the underlying case, which was a civil action for compensatory and punitive damages against Washington Mutual Bank, FA ("Defendants") for their responsibility for DAMAGES AGAINST DEFENDANT WASHINGTON MUTUAL BANK, FA, TO SET ASIDE THE SUMMARY JUDGMENT ON THE BASIS OF FRAUD; FOR VIOLATIONS OF THE FLORIDA FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA"), 15 U.S.C. § 1692 ET. SEQ.; FLORIDA CIVIL CONSPIRACY; MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343; BANK FRAUD 18 U.S.C. 1341, 1344; VIOLATION OF 18 U.S.C. § 1001; VIOLATION OF 18 U.S.C. § 1005; VIOLATION OF 12 C.F.R. §202.16, EQUAL OPPORTUNITY ACT, REGULATION B; DECLARATORY RELIEF; DECLARATORY RELIEF ORDER FINDING THE LINE OF CREDIT OF $100,000 ISSUED BY WAMU IS VOID AS PREDATORY LENDING; UNCOLLECTABLE AS BEYOND THE STATUTE OF LIMITATIONS; AND VOID AS PLAINTIFFS WERE VICTIMS OF IDENTITY THEFT AND THE LIENS THEREON SHOULD BE ORDERED VACATED; AND DAMAGES PURSUANT TO FLORIDA STATUTE CHAPTER 701.04 (1), US District Court Case, 11-03107-AJC.

2.     On February 10th, 2012, the US District Court Clerk entered a Default in that action in favor of Plaintiffs for a total of $264,500,000.

3.     To date, $264,500,000 remains unsatisfied.

4.     Plaintiffs bring this action pursuant to Fla Stat. § 56.29 and the Florida Uniform Fraudulent Transfer Act, Fla. Stat. § 726.101 et seq in order to collect monies that were fraudulently transferred to third parties, as well as to seek relief from further flouting of the Court's judgment in this matter.

**JURISDICTION AND VENUE**

5.     This Court has jurisdiction over the underlying claims in this action based the fact that the judgment was entered in this county; that the

Defendant fraudulently transferred assets to avoid the judgment in this
county; and recorded the fraudulent transfer of those real assets (notes
and mortgages securing property in the name of the Defendant); in
this County.

**PARTIES**

Plaintiffs

6.      Plaintiffs Barry B. Eskanos, JD MPA and Ami B. Eskanos, are
        residents of the State of Florida, and Miami Dade County.

7.      Defendant Washington Mutual Bank, FA is a dissolved entity, which
        was doing business in Miami Dade County, and still retains property
        and still collects money on mortgages it owns in this County in
        violation of the Florida and Federal Laws prohibiting them from
        continuing to do business as a defunct entity.

CLAIM FOR RELIEF

(Fraudulent Transfer)

8.      Plaintiffs re-allege and incorporate by reference the allegations set
        forth in paragraphs 1 through 7 of this Complaint as if fully set forth
        herein.

9.      This is an action for equitable and other relief pursuant to the Uniform
Fraudulent Transfer Act, Fla. Stat § 726.101, et seq and pursuant to Fla. Stat.
§ 56.29.

10.     Defendant Washington Mutual Bank, FA, immediately upon learning
        of the Clerk's Entry of Default against it in the sum of $264,500,000,
        substituted itself as a plaintiff out of actions; signed and recorded
        substitution of mortgages; assigned mortgages; assigned rights of
        recovery to mortgages; and took other acts to avoid payment to
        Plaintiffs in the sum of **$264,500,000 in favor of GMAC**.

11.     Washington Mutual Bank, FA, has engaged in fraudulent acts in
        furtherance of a fraudulent scheme to transfer its assets out of the
        reach of Plaintiffs **AND TO GMAC**.

12.     Washington Mutual Bank, FA has transferred assets outside of the
        County as well as inside the County, in an amount in excess of the
        default amount of **$264,500,000** in an attempt to avoid payment of the
        judgment to the Plaintiffs.

13.     All of the above transfers were made without adequate compensation.

14.     Defendant Washington Mutual Bank, FA has acted with actual intent
        to hinder, delay and defraud his creditors by fraudulently transferring
        assets to insiders without adequate compensation.

15.     At all times relevant to this action, Defendant Washington Mutual
        Bank, FA has been insolvent because the claims and judgment against

104

it for over $264 million and other pending actions, far exceed his ability to pay.

16.  Plaintiffs lack an adequate remedy at law because, unless the relief sought in this count is granted, Defendant Washington Mutual Bank, FA will have succeeded in fraudulently transferring its assets to insiders.

17.  Plaintiffs have a high probability of success on the merits in this action.

18.  The transfers of assets to insiders were made with actual intent to hinder, delay or defraud creditors and thus constitute fraudulent transfers in violation of Fla. Stat. § 726.105(1)(a).

19.  Further, the debtor did not receive reasonably equivalent value for any of the transfers and intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they become due, and thus the transfers at issue are fraudulent transfers in violation of Fla. Stat. § 726.105(1)(b).

20.  Plaintiffs are entitled to statutory relief under Fla. Stat. § 726.108.

21.  Plaintiffs are further entitled to exemplary damages pursuant to 768.73 Punitive damages; limitation.--

(1)(a)  Except as provided in paragraphs (b) and (c), an award of punitive damages may not exceed the greater of:

1.  Three times the amount of compensatory damages awarded to each claimant

…

2. (c)  Where the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant's conduct did in fact harm the claimant, there shall be no cap on punitive damages.

22.  Because the Defendants intentionally harmed, and intended to harm, the Plaintiffs financially by fraudulent concealment by means of substitution of Plaintiffs in pending cases where they had the right to recover funds; and transfer of assets by means of assignments of mortgages without sufficient consideration; transfer of mortgages without consideration; and transfer of funds received on mortgage payments to insiders without assignment of mortgages and without consideration; the Plaintiffs are entitled to unlimited punitive damages. However, Plaintiffs are only seeking liquidated treble damages pursuant to 768.73(1)(a) in the event of default of Defendant; or the liquidated punitive damage sum of **$ 792,000,000..**

23.     Because of the special circumstances in this case, in which the Defendant Washington Mutual Bank, FA *and GMAC ARE* liable for a judgment for fraud, bank fraud, wire fraud, mail fraud, and other willful violations of statute, and then has committed fraud to avoid that judgment, is hiding assets, and is an ongoing risk of flouting the Court's authority, Plaintiffs are entitled to:

    a.     A judgment pursuant to Florida Statute § 726 et seq., in the liquidated sum of $264,000,000 as the equivalent amount of the judgment avoided by the fraudulent transfer assets and interest that accrues thereon at the legal rate of twelve percent per annum;

    b.     Appointment of a special receiver to take charge of Defendant's assets;

    c.     An injunction against further disposition or assignment of property;

    d.     Discovery into all of Defendants' assets and their disposition;

    e.     fees and costs for bringing this action; and

    f.     Any other relief the circumstances may require.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

    a.     A judgment pursuant to Florida Statute § 726 et seq., in the liquidated, statutory sum of **$264,000,000** as the equivalent amount of the judgment avoided by the fraudulent transfer assets (in addition to the original judgment of $264,000,000);

    b.     Appointment of a special receiver to take charge of Defendant's assets;

    c.     An injunction against further disposition or assignment of property until satisfaction of this and the underlying action;

    d.     Discovery into all of Defendants' assets and their disposition;

    e.     Interest that accrues thereon at the legal rate of **interest of twelve percent per annum**;

    f.     Exemplary Damages in three times the amount of the damages, pursuant to statute in the sum of **$ 792,000,000**.

    g.     Fees and costs for bringing this action; and

    h.     Any other relief the circumstances may require and the court deems just and proper.

**4.     Creditors further set forth the following VERY DETAILED SET OF facts which support its claim against DEBTORS, GMAC, ET AL**

INTRODUCTION AND NATURE OF ACTION

1.      This action arises as a result of the Defendant ALLY FINANICAL INC., which wholly owns GMAC MORTGAGE, LLC, Individually and Doing Business as RFC Homecomings and co-conspiring with GOLDMAN SACHS GROUP, INC., (GOLDMAN SACHS), A registered bank holding company, owns and controls GOLDMAN SACHS BANK USA, NEW YORK, NEW YORK (SACHS BANK), A STATE CHARTERED BANK THAT IS A MEMBER OF THE FEDERAL RESERVE SYSTEM, AND THE SACHS BANK, UNTIL SEPTEMBER 1, 2011, INDIRECT OWNER OF LITTON LOAN SERVICING LP, HOUSTON, TEXAS (LITTON) at which time, it was sold to DEFENDANT OCWEN LOAN SERVICES LLC (HEREINAFTER REFERRED TO AS "OCWEN"), during the relevant times herein, and the individual entity, Litton Loan Servicing, LP, and each of their: (1) refusal to acknowledge receipt of Plaintiffs application which met all the terms and conditions and were in compliance with the requirements of HOME AFFORDABLE MODIFICATION PROGRAM (HAMP), refusal to comply with the obligations of the HAMP program, refusal to even consider the Plaintiffs application under the HAMP, refusal to appoint a single point of contact under HAMP, refusal to provide Plaintiffs a TPP, refusal to stay a pending proceeding pursuant to HAMP, and failure and refusal to perform any and all of the obligations owed Plaintiff under HAMP; (2) refusal to notify the Plaintiffs of their rights to apply for, nor did Defendants comply with the requirements of HELP FOR HOMEOWNERS (H4H); (3) commission of violations of Regulation D; (4) commission of mail fraud (18 U.S.C., SECTIONS 1341, 1343); (5) commission of bank fraud (18 U.S.C. 1341, 1344); (7) violating the RICO act; (8) violating the Fair Debt Collection Practices Act[3]; (9) lying to and providing false information to agents of the Federal Government (OCC) conducting an official investigation in criminal violation of 18 U.S.C. § 1001 and 18 U.S.C. § 1005; (10) commission of civil conspiracy; and (11) filing false documents with the court in a foreclosure action (a false affidavit and a forged promissory note); (12) willful, intentional, and stated refusal to comply with Florida Statute 701.04 (1) after proper demand; (13) willful, intentional, and ongoing violation of the terms and conditions of the cease and desist order stipulated, signed, and entered into, between the OCC and JPMorgan Chase on April 13, 2011; (14) perjury and the other wrongful acts complained of herein, and proven at the time of trial.

2.      Defendant Washington Mutual Bank, FA, (1) refusal to acknowledge receipt of Plaintiffs application which met all the terms and conditions and were in compliance with the requirements of HOME AFFORDABLE MODIFICATION PROGRAM (HAMP), refusal to comply with the obligations of the HAMP program, refusal to even consider the Plaintiffs application under the HAMP, refusal to appoint a single point of contact under HAMP, refusal to provide Plaintiffs a TPP, refusal to stay a pending proceeding pursuant to HAMP, and failure and refusal to perform any and all of the obligations owed Plaintiff under HAMP; (2) refusal to notify the Plaintiffs of their rights to apply for, nor did Defendants comply with the requirements of HELP FOR HOMEOWNERS (H4H); (3) commission of violations of Regulation D; (4) commission of mail fraud (18 U.S.C., SECTIONS 1341, 1343); (5) commission of bank fraud (18 U.S.C. 1341, 1344); (6) lying to and providing false information to agents of the Federal Government (OCC) conducting an official investigation (18 U.S.C. § 1001 and 18 U.S.C. § 1005); (7) continuing to do business in violation of the cease and desist orders of the OTS and Federal Court Receivership (now OCC); (8) Failing to comply with the "consent order" for JP Morgan Chase which required the Defendant to engage an independent firm to conduct a multi-faceted review of foreclosure actions. The third-party consultant will assess whether foreclosures complied with federal and state laws, whether foreclosures occurred when grounds for foreclosure were not present, such as when loans were performing, and whether any errors, misrepresentations or other deficiencies resulted in financial injury to borrowers. As part of that review, the enforcement actions require each servicer to establish a process for borrowers who to request their case be reviewed and considered for remediation if they believe they have suffered financial harm as a result of improper foreclosure actions.

---

[3] Defendant Washington Mutual Bank, FA successfully argued to the court that they were the ONLY entity entitled to recover under the note.  However, Litton Loan Servicing, on the behalf of RFC Homecomings and GMAC MORTGAGE LLC unlawfully sent more than 30 letters demanding payment for the same purported debt, the exact number will be proven at trial. Each separate letter, then, is a separate violation of the Federal Fair Debt Collection Practices Act.

Each servicer must submit a plan to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the independent consultant's findings as required by the OCC; (9) lying to and providing false information to agents of the Federal Government (OCC) conducting an official investigation in criminal violation of 18 U.S.C. § 1001 and 18 U.S.C. § 1005; (10) violating the RICO act; (11) commission of civil conspiracy; and (12) filing false documents with the court in a foreclosure action (a false affidavit and a forged promissory note); (13) willful, intentional, and stated refusal to comply with Florida Statute 701.04 (1) after proper demand; (14) perjury and the other wrongful acts complained of herein, and proven at the time of trial. Plaintiffs are entitled, and are seeking a Declaratory relief order from this Court, finding that the judgment of foreclosure was obtained in violation of the Constitutional rights of the Plaintiffs; was obtained by means of fraud; and an order setting aside the judgment of foreclosure that was fraudulently obtained, and obtained in violation of the US and State Constitutional Rights of the Plaintiffs, including, but not limited to 5th and 14th Amendment Due Process and Constitutional Violations; and to set aside the judgment as an independent action as further authorized by Florida Statutes Florida Rule of Civil Procedure 1.540, et seq.

3.    On Thursday, September 25, 2008, the United States Office of Thrift Supervision (OTS) seized Washington Mutual Bank from Washington Mutual, Inc. (including all original residential loan documents such as notes and mortgages as well as the buildings that housed those files) and placed it into the receivership of the Federal Deposit Insurance Corporation (FDIC). The FDIC Receiver subsequently sold the banking subsidiaries (minus unsecured debt or equity claims) to JPMorgan Chase for $1.9 billion which JPMorgan Chase who has always disavowed any right, title, or interest under the note and claims Plaintiffs do not owe Washington Mutual Bank, FA or JPMorgan Chase any money.  However, JPMorgan Chase Bank (and Washington Mutual Bank, FA) instead of dismissing the action, allowed the foreclosure litigation to proceed in the name of Washington Mutual Bank, FA falsely claiming that although the subject note was sold to Defendant ALLY FINANICAL INC., which wholly owns GMAC MORTGAGE, instructed their employee, CYNTHIA A. RILEY, to endorse en blanc, on behalf of WAMU, (a bank that was ordered to cease and desist operations), a forged promissory note and deliver it via the US Mail and by means of interstate commerce, or other mail service, for the purpose of furthering the conspiracy as complained of herein, to Litton Loan Servicing, Individually and Doing Business as RFC Homecomings and their co-conspirator, their servicing agent, Litton Loan Servicing, LP; the asset (note) was lost, and thus had never been transferred to the GMAC, RFC or Litton, and thus, according to the position they took with the state court was, that Washington Mutual Bank, FA, that because of CYNTHIA A. RILEY's blanc endorsement, claimed that WAMU, was the only entity entitled to recover under the note.  Because of the seizure of all assets by the Office of Thrift Supervision, and because of the sale and transfer of all assets to JPMorgan Chase, and because Washington Mutual Bank, FA was ordered to cease and desist from doing any further business by the OTS; the subject note became the property of JPMorgan Chase, who, throughout the entire case, and presently, disclaim any right, title or interest in recovering any sum under that note, show that the note is paid in full, and further acknowledging that it was sold in March 25, 2005, five days prior to the filing of the foreclosure action (filed March 30, 2005) (See the false affidavit of Defendant, Debra Lyman, the only evidence submitted by the Plaintiff in support of their Motion for Summary Judgment and the forged promissory note). When a complaint was filed with the OCC against JP Morgan Chase for their complicity, conspiracy, and participation in the fraud upon the court and upon the Eskanos', Defendant JPMorgan Chase, and Defendant Stephanie Jackson, an employee in the Chase Home Lending Executive Offices then provided false information and made false statements to the OCC in the hopes that the OCC would discontinue their investigation against CHASE. Defendant JPMorgan Chase, in other communications with the OCC as well, provided them with false and misleading information in order to further their conspiracy with the defendants and in order to ratify the wrongful conduct of CYNTHIA A. RILEY.  Defendant JPMorgan Chase, when presented with a plethora of information about the misdeeds and misconduct of the co-defendants as complained of herein ratified the wrongful conduct of the co-defendants[4].

---

[4] From: Kaplan, Nicole [mailto:nicole.kaplan@jpmchase.com]
Sent: Tuesday, January 18, 2011 4:40 PM
To: Danny E. Eskanos
Subject: RE: Washington Mutual v. Ami Eskanos, FW: Further research

4.       Defendant Litton Loan Servicing, LP., and OCWEN as the purchaser of LITTON, individually, and doing business as the designated servicing agent, while acting on the behalf, and with the consent, and subsequent to Litton Loan Servicing, LP[5] illegal acts,  for Defendant GMAC, individually and

---

I have reviewed all of the documents you sent as well as documents sent by Akermann Senterfitt.  I have also conducted independent research regarding this case.  After a thorough review of everything, it appears the foreclosure was conducted appropriately.  We will not be able to assist you any further in this matter.



# Nicole Kaplan

VP and Assistant General Counsel at JP Morgan Chase
Greater New York City Area
Law Practice

Current

- **VP and Assistant General Counsel at JP Morgan Chase**

Past

- Consultant at Chase Home Finance
- Consultant at Chase Home Finance
- Associate at Dickstein Shapiro LLP
see all

Education

- Brooklyn Law School
- University of Pennsylvania

Connections

**83** connections

Public Profile

http://www.linkedin.com/pub/nicole-kaplan/13/a29/913

---

[5] Defendant Litton Loan Servicing, on Thursday, August 6th, 2009, signed an agreement with the US Treasury Department to become the 40th participant in the Home Affordable Modification Program (HAMP). Litton further agreed, on or about September 1, 2011, and is currently violating that agreement in this case, to stop their practice of fraudulently signing and halt foreclosures of homes if mortgage paperwork was fraudulently signed as

DBA RFC Homecomings (1) refused to comply with Florida Statute 701.04 (1); (2) refused to comply with the requirements of HOME AFFORDABLE MODIFICATION PROGRAM (HAMP); (3) refused to comply with the requirements of HELP FOR HOMEOWNERS (H4H); (4) committed mail fraud (18 U.S.C., SECTIONS 1341, 1343); (5) committed bank fraud; (6) committed civil conspiracy; (7) violated the RICO act; (8) conspired with Litton Loan Servicing to violate the Fair Debt Collection Practices Act; (9) lied to and provided false information to agents of the Federal Government (OCC) conducting an official investigation; (10) committed perjury; and (11) obtained a judgment of foreclosure against the Plaintiff using a forged promissory note and forged affidavit prepared and filed by Defendant ALLY FININACAL INC., which wholly owns GMAC MORTGAGE LLC, Individually and Doing Business as RFC Homecomings and co-conspiring with their servicing agent, Litton Loan Servicing, LP individually, and on behalf of Defendant THE GOLDMAN SACHS GROUP, INC., a registered bank holding company, that owns and controls Goldman Sachs Bank USA, New York, New York, a state-chartered bank that is a member of the Federal Reserve System, and the Goldman Sachs Bank USA until September 1, 2011, indirectly owned (subsidiary) Litton Loan Servicing LP, Houston, Texas, and the other wrongful acts complained of herein, and proven at the time of trial. Litton was sold to Defendant OCWEN on September 1, 2011.  Litton further agreed, and as a condition to the State of New York permitting the sale to be completed, on or about September 1, 2011, and is currently in breach of that newly formed agreement in this case which requires Litton to withdraw any pending foreclosure actions in which filed affidavits were Robo-signed or otherwise not accurate, as well as the other provisions of which are incorporated herein, and attached hereto, in full. Litton, individually, and on behalf of the remaining Defendants, is in direct and continuing breach of their Agreement on Mortgage Servicing Practices, which was intended to protect the Plaintiffs, and others similarly situated, as third party beneficiaries of that agreement with New York's Department of Financial Services and Banking Department of September 1, 2011[6] on the following grounds:

1.        As is pled herein, the Affidavit of Debra Lyman is fraudulent.  JP Morgan Chase has already notified the OCC that the Affidavit of Debra Lyman is false.  The affidavit states that the loan was sold on March 25, 2005, "subsequent" to the suit being filed, but March 25, 2005, is five days prior to the suit being filed.  The date it was signed is PRIOR to some of the events which the affidavit says already occurred, including the filing of the "original note". The affidavit states that the original note was filed, but the note your office filed is a forgery.

2.        Plaintiffs provided Litton with a HAMP application, and were qualified for the same, and it was ignored. No timely response was given, and thus, Litton individually, and on behalf of the remaining Defendants, are in violation of that portion of the agreement they signed on September 1, 2011, as well.

3.        Litton is currently placing forced placed insurance on our property without using the carrier Plaintiff selected.

4.        Only parties and entities possessing the legal right to foreclose can sue borrowers, yet Litton intentionally and willfully is in violation of this provision.

5.        Litton is currently and already in violation with the remainder of the provisions of their agreement by failing to withdraw their suit as required by that agreement.

6.        Litton has failed to appoint a single point of contact.

7.        After receiving a cease and desist demand from the Plaintiffs, Litton, by and through their attorneys, Akerman Senterfitt cancelled a scheduled a motion to set the home of the Plaintiffs for sale and reset it for one week later.

8.        After the sale to Ocwen, and after first cancelling a motion to set the Plaintiffs home for sale, On September 2, 2011, Litton's counsel filed a notice of cancellation of the old date, and reset the hearing for a week later, AFTER LITTON and OCWEN received a CEASE and DESIST demand

---

part of a settlement with New York's Department of Financial Services and Banking Department.

[6] STATE OF NEW YORK DEPARTMENT OF FINANCIAL SERVICES BANKING DEPARTMENT AGREEMENT ON MORTGAGE SERVICING PRACTICES, SEPTEMBER 1, 2011, ATTACHED HERETO AS EXHIBIT AND INCORPORATED HEREIN IN FULL.

from the Plaintiff, and after Litton executed the September 1, 2011 agreement (it was mailed out on September 2, 2011) after the Plaintiff tendered a CEASE AND DESIST demand on Litton, and copied the State of New York and Ocwen on the 1st of September, 2011. By the date of the filing of this complaint, that Motion has not been withdrawn, and the suit also has not been withdrawn. As a result of the conduct of resetting the motion, OCWEN has ratified the wrongful conduct of Litton and is liable for all conduct from the outset and become a co-conspirator with the defendants, jointly and severally.

5.       According to the Sworn Affidavit of Debra Lyman, VP of Litton Loan Servicing, LP., on March 25, 2005, Washington Mutual Bank, FA sold the subject note to Defendant RFC Homecomings, now GMAC and all the files and documents were transferred to GMAC individually and DBA Defendant RFC Homecomings, and Litton Loan Servicing at that time.

6.       According to the information provided to the investigators at the OCC, the note was sold on April 19, 2005.

7.       Suit was actually filed on March 30, 2005.

8.       If the sworn testimony of Debra Lyman is true, then Stephanie Jackson gave false information to the OCC, and there was never standing to file suit.

9.       If the subsequently provided (and changed story) by Defendant Stephanie Jackson is true, then the subsequently provided statement to a Federal Employee conducting an official investigation to the contrary of Debra Lyman's sworn testimony means that Debra Lyman committed perjury.

10.      Other parts of Debra Lyman's testimony in her affidavit are also factually impossible, including, but not limited to:

a) The complaint alleges that the promissory note was lost, and provides a certified copy of the promissory note of the original, which then differed substantially from the note that Debra Lyman swore was an original that was fraudulently found and filed years later;

b) The complaint alleges that Washington Mutual Bank had all right title and interest in the loan, but the affidavit of Debra Lyman states it was sold five days prior to the suit being filed and all right, title and interest was transferred to RFC Homecomings at that time;

c) The affidavit of Debra Lyman states the loan was sold on March 25, 2005 and the Defendant, said it was April 19, 2005;

d) Debra Lyman discussed events that occurred on and after the date she signed the affidavit;[7]

e) Debra Lyman testified that "

I have reviewed and am personally familiar with Ms. Eskanos' loan file, including all

documents transferred from Washington Mutual, which is maintained by Litton and is

within my custody and control.   Entries in Ms. Eskanos' loan file are made by Litton

employees with personal knowledge of the information being entered at or about the time

the information is received or created.  This is Litton's regular course of business.

"That testimony, in conjunction with the testimony that "the original promissory note" was filed, means that Debra Lyman was responsible for filing the forged promissory note; and Washington Mutual Bank, FA lied to the court when it said that the note was "found" in the possession of Washington Mutual Bank, FA and had not been transferred.

11.      The amount of attorney's fees sought are excessive and neither authorized by the order of the court, nor permitted by the Agreement.

---

[7] The Defendant Debra Lyman's Affidavit stated a Total amount due up to December 31st, 2008, but signed the affidavit on February 25th, 2008; and claims the original note was already filed, but the forged note was not filed until May 1, 2009.  The Lyman Affidavit swore to facts that had not yet even occurred. It was not filed with the court until just before the Summary Judgment Motion was heard by the court.

12.    Two contradictory statements that were given to the court by Litton's Debra Lyman in contrast to the statements made to the OCC during an official investigation, can only mean one of the two statements were false and irrefutable evidence of lying to a federal official during the course of litigation or perjury during the course of an official investigation.

13.    Debra Lyman, in her affidavit, also concealed and failed to inform the court of the fact that Washington Mutual Bank, FA was paid in full, concealing from the court the $373,907.18 in principal actually received but never credited.

14.    Defendant, Debra Lyman, as a robo-signer, in her position of VP of Litton Loan Servicing, as servicing agent for GMAC and RFC Homecomings, owed the Defendants, and others, a higher duty of care than that of a reasonable person, but instead, a fiduciary duty owed by all members of the financial community in dealing with the financial affairs of the banks and financial institutions.

15.    Defendant Litton Loan Servicing, LP, falsely held themselves out to the court as Servicing Agent for Washington Mutual Bank, FA in an attempt to seize insurance proceeds from hurricane damage suffered by the Plaintiffs, to their home.

16.    Defendant Debra Lyman, VP of Litton Loan Servicing, LP, who falsely held herself out as authorized agent for Washington Mutual Bank, FA, voluntarily placed herself in the position of being held responsible as an agent and employee of FDIC guaranteed institutions, Washington Mutual Bank, FA and JP Morgan Chase Bank.

17.    Defendant, Debra Lyman, then, by her false representations to the court and concealment of material facts, and other acts complained of here, individually, and doing business as the designated servicing agent, while acting on the behalf, and with the consent, and subsequent to Litton Loan Servicing, LP illegal acts,  for Defendant GMAC, individually and DBA RFC Homecomings (1) refusal to comply with Florida Statute 701.04 (1); (2) refusal to comply with the requirements of HOME AFFORDABLE MODIFICATION PROGRAM (HAMP); (3) refusal to comply with the requirements of HELP FOR HOMEOWNERS (H4H); (4) committed mail fraud (18 U.S.C., SECTIONS 1341, 1343); (5) committed bank fraud, 18 U.S.C. 1341, 1344; (6) violated 18 U.S.C. § 1001; (7) violated 18 U.S.C. § 1005; (8) committed civil conspiracy; (9) violated the RICO act; (10) conspired with Litton Loan Servicing and each and every one of the other Defendants, to violate the Fair Debt Collection Practices Act; (11) lied to and provided false information to agents of the Federal Government (OCC) conducting an official investigation; (12) committed perjury; and (13) obtained a judgment of foreclosure against the Plaintiff using a forged promissory note and forged affidavit prepared and filed by Defendant ALLY FINANICAL INC., which wholly owns GMAC MORTGAGE LLC, Individually and Doing Business as RFC Homecomings and co-conspiring with their servicing agent, Litton Loan Servicing, LP and the other wrongful acts complained of herein, and proven at the time of trial. Further, Litton, individually, and on behalf of the remaining defendants, willfully and intentionally violated the agreement they entered into on September 1, 2011 with the New York Department of Financial Services.

18.    Defendant Stephanie Jackson, Chase Home Lending Executive Office employee, was responsible for responding to the complaint Plaintiffs filed with the OCC regarding the conduct of JPMorgan Chase.

19.    As an officer and employee of the bank, JPMorgan Chase, Defendant Stephanie Jackson is responsible for being truthful when responding to the Federal Governmental Officials conducting an official investigation, or be subject to liability under 18 U.S.C. § 1005.

20.    When requested, Stephanie Jackson told the OCC that Chase confirmed with their lawyers, Shapiro and Fishman that their name had been removed from the lawsuit, she lied.

21.    Stephanie Jackson also lied directly to the OCC with the intention of deflecting the investigation from JPMorgan Chase, and in addition to being charged with violation of 18 U.S.C. § 1005, Defendant Stephanie Jackson's conduct clearly showed a conspiracy between JPMorgan Chase, their disrepute attorneys, Shapiro and Fishman, Litton Loan Servicing, ALLY FINANICAL INC., which wholly owns GMAC MORTGAGE LLC, and Defendant Stephanie Jackson to harm the Plaintiffs and avoid prosecution by authorities.

22.    Stephanie Jackson's lie was further compounded by the fact that the judgment was in the name of Washington Mutual Bank, FA, listing Litton Loan Servicing's address as the place of business for Washington Mutual Bank, FA.

23.    Further facts in support of Plaintiff's RICO claim, include the post seizure, and under order of the Federal Government, Washington Mutual Bank, FA was and is not permitted to conduct any

112

business, as all of its assets were seized by the Office of Thrift Supervision's Receiver, (the OTS is now combined with the OCC).

        a.      Washington Mutual Bank, FA., was ordered to cease and desist operations, cannot have any assets, had no real property in their name, had no physical location to store the note in their name, nor any documents, and, in point of fact, could not and did not have possession of the note that was subsequently and falsely alleged to have been found.  It was not found, it was forged.

        b.      Any documents it may have had, were transferred either to Litton when the loan was sold, or, transferred in the sale to JPMorgan Chase.

        c.      A third alternative could be that it remains the estate of Washington Mutual, Inc., but they filed bankruptcy, and did not list this loan as an asset in their bankruptcy pleadings.

    24.     Defendant Stephanie Jackson's conduct in lying to the OCC, also included her stating that the sale occurred on April 19, 2005 in contradiction to the sworn testimony of Debra Lyman, stating that the sale occurred on March 25, 2005, five days prior to the suit being filed.

    25.     Stephanie Jackson's lie to the OCC was made with the intention to overcome the presumption that Washington Mutual Bank, FA had no standing to sue because of the April 19th, 2005 date rather than the March 25th, 2005 date.

    26.     In September 2008 Washington Mutual Bank was seized by regulators with the Office of Thrift Supervision and all of the residential mortgage assets (including all original residential loan documents such as notes and mortgages as well as the buildings that housed those files) were sold and transferred to JPMorgan Chase Bank, who also disavowed any right, title, or interest under the note.

    27.     Washington Mutual Bank filed Bankruptcy in September 26, 2008 and did not list the note securing the Plaintiff's home as an asset of that bankruptcy; did not transfer the action to the bankruptcy court, and failed to inform the creditors of the purported asset belonging to Washington Mutual Bank, FA, thereby violating the cease and desist order of the Office of Thrift Supervision and the rules of the Bankruptcy Court and statutes governing bankruptcy of companies.

    28.     Plaintiffs in this action have never made any payments to ALLY FINANICAL INC., which wholly owns GMAC MORTGAGE LLC or its entity, RFC Homecomings, and more than five years have passed since the Plaintiffs acquired their home.

    29.     Plaintiffs have no contractual relationship nor did they have any contact with RFC Homecomings or ALLY FINANICAL INC., which wholly owns ALLY FINANICAL INC., which wholly owns GMAC MORTGAGE LLC (hereinafter referred to as GMAC) since the purchase of their home, other than making formal demands to dismiss the action in 2005; demands to Litton Loan Servicing LP, to release the insurance proceeds stolen from the Plaintiffs during the pendency of the foreclosure litigation; and demands for estoppel certificates pursuant to Florida Statute 701.04 (1).

    30.     In response to the Plaintiffs demands, contrary to the sworn testimony of Litton Loan Servicing, GMAC's Agent, GMAC informed the Plaintiff that GMAC had no interest in the Plaintiffs home; did not have a loan in their name, and further stated that Litton Loan Servicing was not servicing any of GMAC's loans.

    31.     Without any right, title or interest, Litton Loan Servicing illegally and unlawfully, all on behalf of GMAC individually and DBA Defendant RFC Homecomings, has sent an excess of 40 collection letters, seeking money that GMAC, RFC and by their own admission, do not belong to GMAC.

    32.     Defendant GMAC allowed Defendant Litton Loan Servicing to continue to pursue the Plaintiffs, knowing it had no right, title or interest in the Plaintiff's home; was a disreputable firm who committed numerous acts of fraud and committed actual knowing fraud against the Plaintiffs; and therefore Defendant GMAC ratified all the wrongful acts committed by Litton Loan Servicing and its disreputable lawyers.

    33.     In May of 2011, Plaintiffs informed Brett Mohler of GMAC of the complaints, history of the case, proof of the forgery, and proof of the fraudulent affidavit and claims against GMAC and RFC Homecomings.

    34.     In or about June of 2011, after reviewing all of the facts and evidence, Brett Mohler of GMAC ratified the wrongful conduct of Litton Loan Servicing, LP in its entirety, said there was nothing he could do, and referred the Plaintiffs to contact Litton Loan Servicing, LP as their loan servicer, for resolution of the Plaintiffs complaint.

    35.     The Defendants, and each of them, co-conspired to commit fraud upon the Plaintiffs and other homeowners similarly situated.

113

a.      The Florida State Bar, the 50 State Attorney Generals, and the FBI are all investigating the mortgage fraud and other wrongful acts of Litton Loan Servicing as well as a pattern of mortgage fraud and other related acts wrongfully committed by GMAC, establishing a pattern of wrongful behavior, a criminal conspiracy and joint venture between Litton Loan Servicing, GMAC, and its lawyers, to harm the Plaintiff and others similarly situated.

b.      The investigation by the OCC of the Defendants as part of an interagency horizontal review of major residential mortgage servicers, has conducted an examination of the residential real estate mortgage foreclosure processes of JPMorgan Chase Bank, N.A., New York, New York ("Bank").  The OCC has identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings. Said deficiencies showed a pattern and practice sufficient to warrant Plaintiff's claims for RICO violations as pled herein.

c.      The investigation by the OCC of the Defendants as part of an interagency horizontal review of major residential mortgage servicers, has conducted an examination of the residential real estate mortgage foreclosure processes of GMAC and CHASE.  The OCC has identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings. Said deficiencies showed a pattern and practice sufficient to warrant Plaintiff's claims for RICO violations as pled herein.

36.      On or about November 4, 2010, Plaintiff filed complaints with, among others, the Office of the Comptroller of the Currency (OCC) regarding the forged document and false affidavit.  In response to that complaint, the OCC began an investigation.

37.      Plaintiffs are informed, believe and thereon allege that Cynthia A. Riley was a Vice President of Washington Mutual Bank, FA, prior to the seizure by the Office of Thrift Supervision September, 2008, and during all relevant times herein.

38.      That at some time after the seizure by the Office of Thrift Supervision, Cynthia A. Riley became an employee of Defendant JPMorgan Chase.

39.      That, according to the Defendant Washington Mutual Bank, FA and their legal counsel, the forged promissory note that was lost, was discovered after September 2008.

40.      That after the discovery of the purported note after September of 2008, Cynthia A. Riley on behalf of herself, on behalf of JPMorgan Chase, as her employer, and on behalf of Washington Mutual Bank, FA, and in furtherance of the conspiracy complained of herein, placed, or caused to be placed, the en blanc endorsement on the forged promissory note.



41.      That, at the time she placed her stamp, or caused her stamp to be placed on the forged note, she knew, or reasonably should have known, that the note was a forgery.

42.      That, while all other pages to the document which she placed her stamp, or caused her stamp to be placed on said note, was of an onion skin type paper, the signature page which contained the forged signature, was of a copy type paper, wholly and distinctly different from the remaining pages.

43.      That, the differences in the types of paper, the font, and other apparent differences visible to the naked eye, and apparent to any reasonable person, and clear fact that the last signature page was a

114

copy Cynthia A. Riley knew, or reasonably should have known that she was stamping, or causing her stamp to be placed on a forgery.

44.     Further, since the documents on file create a reasonable inference that the signed endorsement in blank or "bearer" endorsement allegedly made by "WASHINGTON MUTUAL BANK, FA By CYNTHIA RILEY VICE PRESIDENT" was placed upon the original note at some point in time after September 8, 2008, and according to the sworn affidavit of Debra Lyman, that all right title and interest in the note transferred to RFC Homecomings, GMAC on March 25, 2005; and Washington Mutual Bank, FA relinquished all of its rights to the Note and Mortgage prior to filing suit; and the seizure of Washington Mutual Bank, FA and the imposition by the Office of Thrift Supervision (now the OCC) of a cease and desist order; her stamp, or her causing of the placing of a Washington Mutual Bank, FA endorsement after the assignment, and cease and desist order, prohibiting any further acts by Washington Mutual Bank, FA whatsoever;  is irrefutable proof and clear and convincing evidence that Washington Mutual Bank, FA's endorsement is unauthorized and Vice President, Cynthia Riley's, signature on the original Note is unauthorized as a matter of law, and clear evidence that the note that was filed by Washington Mutual Bank, FA, Cynthia A. Riley, Debra Lyman, Litton Loan Servicing, GMAC, and RFC Homecomings, was a forgery; and further within the last six months, Plaintiff spoke to CYNTHIA A. RILEY on the telephone, wherein she ratified her wrongful conduct and ratified her furtherance in the conspiracy, claiming that she had and has the authority to perform acts on behalf of Washington Mutual Bank, FA after it was closed; admitted her employment with JP Morgan Chase, and as such, ratified her conduct as an employee of JP Morgan Chase; attempted to conceal further liability by refusing to disclose facts regarding her role in the endorsement of the note, and implied that she regularly performed similar acts of endorsing notes in blanc after the seizure and while employed by JP Morgan Chase; and to say that all in conspiracy with her co-defendants, and each of them, and their lawyers, Shapiro and Fishman and Akerman Senterfitt..

45.     That, at all relevant times herein, Cynthia A. Riley was an employee of Washington Mutual Bank, FA or September of 2008, or, thereafter, an employee of JPMorgan Chase Bank, both FDIC Guaranteed institutions. According to their Annual Report, JPMorgan Chase & Co. (NYSE: JPM) is a leading global financial services firm with assets of $2.1 trillion and operations in more than 60 countries.

46.     That as a result of being an employee of those banks, owed fiduciary and other higher duties to the Plaintiffs, and owed Plaintiffs a higher standard of care than a reasonable person standard, but one of a fiduciary standard.

47.     That, as a result of that higher fiduciary duty standard, special skill and training, when Defendant Cynthia A. Riley was presented with a note, where the first pages were of a wholly and distinctly different kind of onion skin paper than the signature page, and the signature page was of commonly found copy paper, and bore copy marks and lacked other significant and commonly found marks, like the scanner bar mark; she, as a fiduciary, had the special skill, or should have had the special skill and knowledge, to know that the document presented to her for her endorsement was, in fact, a forgery.

48.     That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she furthered the scheme and artifice to defraud the Plaintiffs, and ratified her conduct within the past six months.

49.     That, after endorsing, or causing to be endorsed with her stamp and signature, the forged note, she used the US Mail or other mail services, to deliver the forged document to the lawyers for Defendant Litton Loan Servicing, Washington Mutual Bank, FA, and JPMorgan Chase.

50.     That the forged document was mailed across state lines, using means of interstate commerce, in furtherance of conspiracy of the Defendants, and each of them.

51.     That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §  1692 et. seq.;

52.     That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations

115

of the Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) <u>18 U.S.C. 1961</u> et seq.;

53. That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the <u>18 U.S.C. 1964</u>, (Civil Rico Remedies).

54. That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Mail and Wire Fraud 18 U.S.C., sections 1341, 1343.

55. That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the bank fraud statutes, 18 U.S.C. 1341, 1344.

56. That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Statute 18 U.S.C. § 1001;

57. That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Statute 18 U.S.C. § 1005.

58. That Debra Lyman, in her affidavit, swore to the court that the original note was filed with the court.

59. That Debra Lyman, on her behalf, and on behalf of Litton Loan Servicing, RFC Homecomings, GMAC, Washington Mutual Bank, FA, and JP Morgan Chase, caused, or filed with the court a false affidavit.

60. That because Defendant Litton Loan Servicing, LP, during the course of the litigation fraudulently and falsely held themselves out as servicing agent for Washington Mutual Bank, FA, in an attempt to keep and did obtain a portion of the Plaintiffs insurance proceeds, rendered themselves and their employees agents of an FDIC guaranteed institution and thus liable under the Federal Statutes governing their, and each of their, conduct.

61. That after the discovery of the purported note after September of 2008, Debra Lyman, on behalf of herself, on behalf of Washington Mutual Bank, FA and their co-conspirators, JPMorgan Chase, GMAC and Litton Loan Servicing, LP, and in furtherance of the conspiracy complained of herein, placed, or caused Cynthia Riley to place, the en blanc endorsement on the forged promissory note.

116



62.    That, at the time Debra Lyman placed, or caused Cynthia A. Riley, Vice President, to place the stamp, on the forged note, she knew, or reasonably should have known, that the note was a forgery.

63.    That, while all other pages to the document which Cynthia A. Riley placed her stamp, or caused her stamp to be placed on said note, was of an onion skin type paper, the signature page which contained the forged signature, was of a copy type paper, wholly and distinctly different from the remaining pages.

64.    That, the differences in the types of paper, the font, and other apparent differences visible to the naked eye, and apparent to any reasonable person, and clear fact that the last signature page was a copy Debra Lyman clearly knew, or reasonably should have known was a forgery.

65.    Further, since the documents on file create a reasonable inference that the signed endorsement in blank or "bearer" endorsement allegedly made by "WASHINGTON MUTUAL BANK, FA By CYNTHIA RILEY VICE PRESIDENT" was placed upon the original note at some point in time after September 8, 2008, and according to the sworn affidavit of Debra Lyman, that all right title and interest in the note transferred to RFC Homecomings, GMAC on March 25, 2005; and Washington Mutual Bank, FA relinquished all of its rights to the Note and Mortgage prior to filing suit; and the seizure of Washington Mutual Bank, FA and the imposition by the Office of Thrift Supervision (now the OCC) of a cease and desist order; her stamp, or her causing of the placing of a Washington Mutual Bank, FA endorsement after the assignment, and cease and desist order, prohibiting any further acts by Washington Mutual Bank, FA whatsoever;  is irrefutable proof and clear and convincing evidence that Washington Mutual Bank, FA's endorsement is unauthorized and Vice President, Cynthia Riley's, signature on the original Note is unauthorized as a matter of law, and clear evidence that the note that was filed by Washington Mutual Bank, FA, Cynthia A. Riley, Debra Lyman, Litton Loan Servicing, GMAC, and RFC Homecomings, was a forgery.

66.    That, at all relevant times herein, Debra Lyman, VP of Litton Loan Servicing, LP, by her representations in her sworn affidavit, falsely authenticated the note by swearing to the court that the note filed with the court was the original note.

67.    That Debra Lyman, VP of Litton Loan Servicing further knew, or reasonably should have known, at the time she signed her affidavit, that Cynthia A. Riley was not authorized to execute any documents, or sign any documents on behalf of Washington Mutual Bank, FA as it was no longer permitted to conduct any business and all assets were transferred to JP Morgan Chase, and thus, any documents executed, if any, should have been executed by JP Morgan Chase.

68.    That because Debra Lyman filed the forged document with the court; or, caused the forged document to be filed with the court, did so as a purported agent or co-conspirator of Washington Mutual Bank, FA or September of 2008, or, thereafter, as a purported agent or co-conspirator of JPMorgan Chase Bank, both FDIC Guaranteed institutions, in furtherance of the conspiracy.

69.    That as a result of being an employee Litton Loan Servicing, as servicing agent of one or more of the banks, GMAC's owner, ALLY Bank, JP Morgan Chase and Washington Mutual Bank, FA, and as a loan servicer, owed fiduciary and other higher duties to the Plaintiffs, and others, and further owed

117

Plaintiffs and others a higher standard of care than a reasonable person standard, a fiduciary standard of care.

70.     That, as a result of that higher fiduciary duty standard, special skill and training, when Defendant Debra Lyman, individually and on behalf of Litton Loan Servicing, LP., presented Cynthia A. Riley with a note, where the first pages were of a wholly and distinctly different kind of onion skin paper than the signature page, and the signature page was of commonly found copy paper, and bore copy marks and lacked other significant and commonly found marks, like the scanner bar mark; she, as a fiduciary, had the special skill, or should have had the special skill and knowledge, to know that the document presented to her for her endorsement was, in fact, a forgery.

71.     That, when Defendant Debra Lyman, individually and on behalf of Litton Loan Servicing, caused Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, to willfully and volitionally place her endorsement on that forged document, Debra Lyman individually and on behalf of her co-conspirators, furthered the scheme and artifice to defraud the Plaintiffs.

72.     That, after endorsing, or causing to be endorsed with her stamp and signature, the forged note, Debra Lyman used the US Mail or other mail services, to deliver the forged document to the lawyers for Defendant Litton Loan Servicing, Washington Mutual Bank, FA, and JPMorgan Chase.

73.     That the forged note and false affidavits and other bills and demands were all mailed across state lines, and Defendant Debra Lyman, on her own behalf, and on behalf of her co-conspirators, used means of interstate commerce, in furtherance of conspiracy of the Defendants, and each of them.

74.     That, when Defendant Debra Lyman, knowing that the purported promissory note, or reasonably should have known the purported note was a forgery, and knew the allegations contained in her affidavit were false, knew she concealed material facts from the court, she willfully and volitionally placed her signature on that false affidavit.

75.     Debra Lyman committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et. seq.;

76.     That, when Debra Lyman, knowing that the document, or reasonably should have known the affidavit was false and concealed material facts from the court, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.;

77.     That, when Debra Lyman, knowing that the document, or reasonably should have known the affidavit was false and concealed material facts from the court, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the 18 U.S.C. 1964, (Civil Rico Remedies).

78.     That, when Debra Lyman, knowing that the document, or reasonably should have known the affidavit was false and concealed material facts from the court, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Mail and Wire Fraud 18 U.S.C., sections 1341, 1343.

79.     That, when Debra Lyman, knowing that the document, or reasonably should have known the affidavit was false and concealed material facts from the court, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the bank fraud statutes, 18 U.S.C. 1341, 1344.

80.     That, when Debra Lyman, knowing that the document, or reasonably should have known the affidavit was false and concealed material facts from the court, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Statute 18 U.S.C. § 1001;

81.     That, when Debra Lyman, knowing that the document, or reasonably should have known the affidavit was false and concealed material facts from the court, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Statute 18 U.S.C. § 1005.

82.     On January 18, 2011, VP and Assistant General Counsel at JP Morgan Chase after being apprised of all the facts, and conducting her own thorough investigation on behalf of JP Morgan Chase, ratified in writing, all the wrongful conduct of the defendants, and each of them, thereby accepting full

118

responsibility for all the negligent, malicious, illegal, intentional, wanton and willful conduct, all on behalf of Defendant JP Morgan Chase.

83.      On or about July 28, 2011, Defendant Stephanie Jackson, an employee in the Chase Home Lending Executive Offices, during the course of an official investigation by the OCC, then provided false information and made false statements to the OCC in the hopes that the OCC would discontinue their investigation against CHASE.

84.      Defendant ALLY FINANCIAL INC., which wholly owns GMAC Mortgage's, individually and dba (DEFENDANT) RFC HOMECOMINGS, LITTON LOAN SERVICING, LP, Defendant WASHINGTON MUTUAL BANK, FA, Defendant JP MORGAN CHASE, officious intermeddling, intentional interference, filing of false affidavits, and forged promissory note and obtaining a fraudulent judgment of foreclosure on the property owned by the Plaintiffs at 3122 Pine Tree Drive, in Miami Beach, Florida, 33140; then, the subsequent concealment of their wrongful conduct by lying to government officials, and providing them with knowingly false information; including, but not limited to, providing false information to the Office of the Comptroller of the Currency (OCC) during their official investigation.

85.      At various times and places partially enumerated in Plaintiff's documentary material, all Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO enterprise of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

86.      The illegal acts complained of by the Plaintiff, and committed by the Defendants, and their co-conspirators, include, but are not limited to the following violations of State and Federal Law:

a.      Acquisition and Maintenance of an Interest in and Control of an illegal Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities)

b.      Conduct and Participation in a RICO Enterprise through a Pattern of Racketeering Activity: 18 U.S.C. §§ 1961(5), 1962(c)

c.      Conspiracy to Engage in a Pattern of Racketeering Activity: 18 U.S.C. §§ 1961(5), 1962(d)

d.      Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343;

e.      Bank Fraud 18 U.S.C. 1341, 1344;

f.      Violations of 18 U.S.C. § 1001;

g.      Violations of 18 U.S.C. § 1005;

h.      Violations of HAMP;

i.      Violations of 12 C.F.R. §202.16 ; Violations of REGULATION B

j.      Willful violation of Florida Statute 701.04(1), demand for estoppel.

k.      Willful violation of the September 1, 2011 agreement with New York's Department of Financial Services and Banking Department.

I.      **JURISDICTION AND VENUE**

87.      This is a complaint is for damages and other relief, under the Federal Fair Debt Collection Practices Act, ("FDCPA"), 15 U.S.C. §  1692 ET. SEQ.; Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.; 18 U.S.C. 1964, (Civil RICO Remedies); Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343; Bank Fraud 18 U.S.C. 1341, 1344; Violation of 18 U.S.C. § 1001; Violation of 18 U.S.C. § 1005; Violation of HOME AFFORDABILITY MODIFICATION PROGRAM (HAMP); Violation of 12 C.F.R. §202.16, Regulation B; Declaratory Relief and Damages Pursuant to Florida Statute Chapter 701.04 (1).

88.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Pursuant to 28 U.S.C. § 1367, this court has supplemental jurisdiction over the state law claims because Plaintiff's state law claims are so related to Plaintiff's federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

89.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 as Plaintiffs reside and the violations discussed herein occurred in Miami Dade County, Florida.

90.      This Court further has Diversity Jurisdiction pursuant to 28 U.S.C. § 1332 (a) (1).

a.      Plaintiffs reside in the County of Miami Dade, in the State of Florida;

b.      Defendant ALLY FINANICAL INC., a Delaware corporation, with a principal place of business at 200 Renaissance Center, P.O. Box 200 Detroit, Michigan 48265-2000 which wholly

119

owns GMAC Mortgage, formerly known as GMAC Mortgage Corporation, is a Delaware limited liability company with a principal place of business in Fort Washington, Pennsylvania;

        c.      Defendant RFC Homecomings is a wholly owned subsidiary of Defendant GMAC Mortgage Corporation, a Delaware Limited Liability Company;

        d.      Defendant JPMorgan Chase is a Delaware Corporation with its principal place of business in New York.

        e.      Defendant Litton Loan Servicing, LP is formed and its principal place of business is in Texas;

        f.      Plaintiffs are informed, believe, and thereon allege that Defendant Debra Lyman is a resident of the State of Texas;

        g.      Plaintiffs are informed, believe, and thereon allege that Defendant Washington Mutual Bank, FA was a Washington Corporation whose assets were seized by the OTS, and the Receiver sold the assets to Defendant JPMorgan Chase.  Defendant, Washington Mutual Bank, FA has produced discovery showing Plaintiff does not owe Washington Mutual Bank, FA any sum, but as a result of fraud perpetrated on the court, Washington Mutual Bank obtained a fraudulent judgment of foreclosure against the Plaintiffs;

        h.      Plaintiffs are informed, believe, and thereon allege that Defendant Stephanie Jackson is a resident of South Carolina; and

        i.      The amount in controversy exceeds the sum of $75,000.

        j.      Defendant Ocwen Loan Services, LLC.,

**II.**      **COUNTS (BY DEFENDANTS)**

<u>**COUNT ONE**</u>:

**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Damages And Declaratory Relief Action For Failure Of Litton Loan Service To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

        91.      Plaintiffs incorporate paragraphs 1 to 90, inclusive, herein, as though set forth herein in full.

        92.      The Making Home Affordable Program was introduced in February 2009 by the Obama Administration which was intended to stabilize the housing market and help struggling homeowners get relief and avoid foreclosure.

        93.      Because the stated purpose of the program was partly designed to help homeowners, homeowners, including the Plaintiffs, were the intended third party beneficiaries of the Program.

        94.      In March of 2009, the Treasury Department (Treasury) issued uniform guidance for loan modifications across the mortgage industry, and updated those guidelines with policy announcements.

        95.      The MHA Handbook for Servicers of Non-GSE Mortgages (Handbook) was issued to provide guidance for servicers of mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac.

        96.      On Thursday, August 6, 2009, Litton Loan Servicing, LLC (Litton) became the 40TH participant in the Home Affordable Modification Program (HAMP), by signing the Servicer Participation Agreement (SPA).

        97.      Litton registered and executed a Servicer Participation Agreement, related documents, and one or more Service Schedules (SPA) with the Program Administrator on or before October 3, 2010.

        98.      The SPA governs servicer participation in MHA for all Non-GSE Mortgages.

        99.      Litton Loan Servicing, LP agreed to abide by the terms of the handbook as part of the Servicer Participation Agreement (SPA).

        100.      All participating servicers, including Litton, are required, among other things, to consider all eligible mortgage loans for Services (as defined in the SPA) unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. MHA 1.1

        a.      Pursuant to the Handbook, Litton cannot escape liability by simply referring the matter to their lawyers.

120

b.       The Handbook, in pertinent part says that if the entity that signed the SPA sub-contracts out any portion of its responsibilities as a servicer to another party, the entity that signed the SPA will be liable for the acts and omissions of the sub-contracted party under the SPA.

c.       Litton has instructed Akerman Senterfitt, its lawyers to act on their behalf, and thus Litton is responsible for all the willful violations, intentional and negligent misconduct of its lawyers and co-conspirators as pled herein, in failing in every respect to meet the requirements of HAMP.

d.       All of the wrongdoings complained of herein, include the conduct of Akerman Senterfitt as the agent and subcontractor of Litton.

101.     As further described in Section 1.3, participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out the requirements of the SPA. MHA 1.1

102.     In 2009, Congress passed the Helping Families Save Their Homes Act of 2009, which includes legal protection for servicers that modify residential mortgages.

103.     It was intended to encourage more servicers to modify more mortgages for the benefit of the homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

104.      The bill essentially provides authority for, and legal protection for servicers to alter mortgage contracts and, as the argument goes, investor contracts where mortgages have been securitized.

105.     Thus, not only does no legal impediment existed for Litton Loan Servicing LLC to grant a loan modification to any and all individuals who qualify, but also every action taken by the Government was intended to benefit the Homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

106.     In addition to the normal obligation to obey all laws, and the implied covenants of good faith and fair dealing that are found in every contractual agreement, the SPA requires that Litton Loan Servicing fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP.

a.       Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

b.       The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

c.       The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

d.       The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

e.       The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

f.       The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

g.       The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act.

h.       Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.; 18 U.S.C. 1964, (Civil RICO Remedies);

i.       Conspiracy to commit and commission of Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343;

j.       Conspiracy to commit and commission of Bank Fraud 18 U.S.C. 1341, 1344;

k.       Conspiracy to commit and commission of 18 U.S.C. § 1001;

l.       Conspiracy to commit and commission of 18 U.S.C. § 1005;

107.     The Plaintiff's property would have been qualified under the conditions required of HAMP, and the Plaintiff would have been eligible for HAMP, including, but not limited to, the following conditions:

a.       Mortgage loan was originated on or before January 1, 2009;

b.       Mortgage loan was not previously modified under HAMP.

121

c.      The Mortgage loan is delinquent or default is reasonably foreseeable.

d.      The Mortgage loan is secured by a one unit property, which is the principal residence of the Plaintiff.

e.      The subject property is not vacant or condemned.

f.      The borrower has documented financial hardship and represented she does not have sufficient liquid assets to make the monthly mortgage payments because of a reduction in her salary and a reduction in her spouses work to part time status.

g.      The Plaintiff's monthly mortgage payment (including principal, interest, taxes, and insurance) is greater than 31 percent of the Plaintiff's verified monthly gross income.

h.      The Plaintiff is willing to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.

i.      The Current unpaid principal balance (UPB) of the mortgage loan prior to capitalization is not greater than $729,750.

j.      The Plaintiff offered to make a timely first trial period payment on or before December 31, 2012, but no TPP was ever offered to the Plaintiff.

k.      The Plaintiff is in active litigation, and is eligible for HAMP.

108.    Litton was required to communicate with clear written information designed to help the borrower understand the modification process in accordance with the HAMP guidelines and Handbook.

109.    Litton has failed and refused to communicate with the Plaintiff, and referred the Plaintiff to their attorney, who has also refused to provide any information regarding HAMP; expressly, blatantly and openly refused to comply with the statutory requirements of providing an estoppel letter; and has willfully violated every provision of the HAMP and the handbook.

110.    Although Litton has a toll free number, the Plaintiff was told he was not allowed to call Litton; not allowed to discuss HAMP with Litton; nor was he allowed to discuss the HAMP modification process or other alternative modification programs with Litton.

111.    Litton is required to maintain adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents.

112.    Litton has refused to acknowledge receipt of Plaintiffs HAMP application; refused to respond to the application; refused to discuss the application with Plaintiff; and willfully violated the following regulations:

113.    Although Section 5 of the Federal Trade Commission Act prohibits unfair or deceptive acts or practices, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, used false affidavits; filed a forged promissory note; committed perjury and numerous acts of fraud upon the court and the Plaintiff in order to obtain a judgment of foreclosure.

114.    Although the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibits discrimination on a prohibited basis in connection with mortgage transactions, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants discriminated against the Plaintiff because of her gender and her religion.

115.    Although the Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants failed to provide proper documentation in violation of RESPA.

116.    Although the Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants tendered multiple demands seeking payment on behalf of RFC Homecomings, but obtained a judgment in the name of Washington Mutual Bank, FA, informing the court that the only entity entitled to recover was Washington Mutual Bank, FA. Each letter and piece of correspondence sent on behalf of RFC Homecomings was a separate violation of the Fair Debt Collection Practices Act.

117.    Although the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification, (these laws also prohibit red-lining), Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants has discriminated against the Plaintiffs on the basis of her gender and her religion.

122

118.     Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants negotiated modifications of loans with others, but refused to even consider the Plaintiffs, failing to acknowledge or respond to the Plaintiffs application.

119.     Although he Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants used false information in reporting consumer credit information to credit reporting agencies about the Plaintiff.

120.     Although the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally and willfully failed and refused to comply with Regulation B by failing to timely respond to the HAMP application, thus violating Regulation B.

121.     Under Florida Law, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, was required to provide an estoppel letter pursuant to Florida Statutes Chapter 701.04 (1), which says, in pertinent part:

> "Within 14 days after receipt of the written request of a mortgagor, the holder of a mortgage shall deliver to the mortgagor at a place designated in the written request an estoppel letter setting forth the unpaid balance of the loan secured by the mortgage, including principal, interest, and any other charges properly due under or secured by the mortgage and interest on a per-day basis for the unpaid balance. Whenever the amount of money due on any mortgage, lien, or judgment shall be fully paid to the person or party entitled to the payment thereof, the mortgagee, creditor, or assignee, or the attorney of record in the case of a judgment, to whom such payment shall have been made, shall execute in writing an instrument acknowledging satisfaction of said mortgage, lien, or judgment and have the same acknowledged, or proven, and duly entered of record in the book provided by law for such purposes in the proper county. Within 60 days of the date of receipt of the full payment of the mortgage, lien, or judgment, the person required to acknowledge satisfaction of the mortgage, lien, or judgment shall send or cause to be sent the recorded satisfaction to the person who has made the full payment. In the case of a civil action arising out of the provisions of this section, the prevailing party shall be entitled to attorney's fees and costs."

122.     Proper demand was made upon Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, Washington Mutual Bank, FA, on 10/28/2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

123.     On February 18, 2011, well past the deadline of the statute, Litton's lawyers sent a letter stating unequivocally that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

124.     That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law, as well as a direct violation of the requirement of the HAMP guidelines wherein "the SPA requires that Litton Loan Servicing fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

125.     Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, pursuant to the HAMP guidelines, is required to make a reasonable effort to solicit borrower by performing at a minimum, the following acts:

a.     The servicer is to make a minimum of four telephone calls to the last known phone numbers of record, at different times of the day; -  (Litton made none) and

b.     The servicer is to send two written notices to the last address of record by sending one letter via certified/express mail or via overnight delivery service (such as Federal Express or

123

UPS) with return receipt/delivery confirmation and one letter via regular mail.   (Litton's only correspondence was the bad faith demand letters, never any response or mention of the HAMP or other rights of the Borrower).

        c.        Any contact with eligible borrowers, whether by telephone, mail or otherwise, must:

        1.        Advise borrowers that they may be eligible for HAMP; MHA Handbook v 2.0.  (Litton made no such effort nor provide no such advice).

        2.        Clearly describe the Initial Package that the borrower is required to submit pursuant to the requirements outlined in Section 4, and state what other information the servicer needs to complete the HAMP analysis;  (Litton never discussed HAMP, refused to discuss HAMP with the Plaintiffs, and never reviewed the Plaintiffs application.)

        3.        Provide a toll-free telephone number through which the borrower can reach a loan servicer representative; (Litton stated that Plaintiff is not permitted to call them at all) and

        4.        Identify any unique requirements the servicer may have established for submission of an Initial Package received later than 30 business days prior to a scheduled foreclosure sale date.  (Litton refused to provide any information regarding HAMP or mention the application whatsoever).

        5.        All contact attempts must be documented in the servicing file.  If the servicer has documentation evidencing that it satisfied the Reasonable Effort standard for HAMP prior to June 1, 2010, resolicitation of the borrower is not required. (If Litton documented any efforts, then they would be fraudulent and further violations of the Agreement.)

        126.     Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants failed to make ANY contact with the Plaintiff; refused to discuss the matter with the Plaintiff; refused to provide a number for the Plaintiff to discuss the matter with the Servicer; and refused to comply with all the requirements set forth in 20.

        127.     Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants was further required to, and willfully failed and refused to comply with each and every one of the following conditions:

        a.        The servicer must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Package, which is required to be submitted by the borrower to request a HAMP modification.

        b.        The communication should:

        1.        Describe the income evidence required to be evaluated for HAMP;

        c.        Provide the RMA (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit); and

        d.        Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

        e.        The communication should also include clear language stating that during the HAMP evaluation the home will not:  (i) be referred to foreclosure; or (ii) be sold at a foreclosure sale if the foreclosure process has already been initiated.  In the communication, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the communication.

        f.        If Right Party Contact is established prior to satisfaction of the Reasonable Effort standard, the servicer must continue to take steps to satisfy the Reasonable Effort standard until the Initial Package is submitted by the borrower.

        g.        If Right Party Contact is established, but the borrower does not submit an Initial Package, the servicer must resend the Initial Package communication.  Again, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the second communication.  If the borrower does not respond by providing an Initial Package within the required time period set forth in the second communication, the servicer may determine the borrower to be ineligible for HAMP.

        h.        If Right Party Contact is established, but the borrower submits an incomplete Initial Package within the required time period, the servicer must comply with the "Incomplete Information Notice" requirements set forth below in Section 2.3.3.  If the borrower does not respond to either the 30-day Incomplete Information Notice or the 15-day Incomplete Information Notice by providing an Initial Package within the required time period, the servicer may determine the borrower to be ineligible for HAMP.

124

Servicers must acknowledge receipt of the Initial Package within 10 business days per the requirements in Section 4.5 and respond within 30 calendar days with either an Incomplete Information Notice (as outlined in Section 2.3.3), a TPP Notice (as outlined in Section 8.1) or a Non-Approval Notice (as outlined in Section 2.3.2).

128.    Pursuant to the provisions of the agreement, Plaintiffs are entitled to a stay as Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants failed in every respect to meet the provisions of the SPA.

129.    Pursuant to the provisions of the SPA, Litton intentionally and willfully failed to comply with each and every provision as set forth below:

3    Protections Against Unnecessary Foreclosure

3.1    Suspension of a Referral to Foreclosure
A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of the following circumstances exists:
-    The borrower is evaluated for HAMP and is determined to be ineligible for the program; or
-    The borrower is offered a TPP, but fails to make current trial period payments as set forth in Section 8.3; or
-    The servicer has established Right Party Contact, has sent at least two written requests asking the borrower to supply required information in accordance with Section 2.2.2, and has otherwise satisfied the Reasonable Effort solicitation standard, and the borrower failed to respond by the dates indicated in those requests; or
-    The servicer has satisfied the Reasonable Effort solicitation standard without establishing Right Party Contact; or The borrower or co-borrower states he or she is not interested in pursuing a HAMP modification and such statement is reflected by the servicer in its servicing system and/or mortgage file.

3.2    Suspension of Foreclosure Proceedings in Process
With respect to a borrower who submits a request for HAMP consideration after a loan has been referred to foreclosure, the servicer must, immediately upon the borrower's acceptance of a TPP based on verified income, and for the duration of the trial period, take those actions within its authority that are necessary to halt further activity and events in the foreclosure process, whether judicial or non-judicial, including but not limited to refraining from scheduling a sale or causing a judgment to be entered.

3.3    Suspension of Scheduled Foreclosure Sale
When a borrower submits a request for HAMP consideration after a foreclosure date has been scheduled and the request is received no later than midnight of the seventh business day prior to the foreclosure sale date (Deadline), the servicer must suspend the sale as necessary to evaluate the borrower for HAMP…

3.4    Mitigating Foreclosure Impact
The servicer must take the following actions to mitigate foreclosure impact:

3.4.1    Simultaneous Trial Period Plan and Foreclosure Explanation
When a borrower is simultaneously in foreclosure and is either being evaluated for HAMP or is in a TPP, the servicer must provide the borrower with a written notification that explains, in clear language, the concurrent modification and foreclosure processes and states that even though certain foreclosure activities may continue, the home will not be sold at a foreclosure sale while the borrower is being considered for HAMP or while the borrower is making payments under a TPP…

3.4.2    Foreclosure Attorney/Trustee Communication
Servicers must develop and implement written policies and procedures to provide notification to their foreclosure attorney/trustee regarding a borrower's HAMP status, including whether the borrower is potentially eligible for HAMP (and is subject to Section 2.2), and whether the borrower is being evaluated for, or is currently in, a TPP. Servicers must ensure that their foreclosure attorney/trustee adheres to all of the

125

requirements of    Section 3.1, Section 3.2 and Section 3.3 with respect to referral to
foreclosure, stay of    foreclosure actions and suspension of foreclosure sales.

    3.4.3  Certification Prior to Foreclosure Sale

      Servicers must develop and implement written procedures applicable to all loans
that    are potentially eligible for HAMP (and are subject to Section 2.2) that require the servicer
to    provide to the foreclosure attorney/trustee a written certification that (i) one of the five
    circumstances under Section 3.1 exists, and (ii) all other available loss mitigation
alternatives    have been exhausted and a non-foreclosure outcome could not be reached.  This
certification    must be provided no sooner than seven business days prior to the scheduled
foreclosure sale    date (the Deadline) or any extension thereof.

   130.   Plaintiffs were further entitled, and never received the required acknowledgement of the
Initial Package.

    4.5 Acknowledgment of Initial Package

    Within 10 business days following receipt of an Initial Package, the
    servicer **must** acknowledge in writing the borrower's request for
    HAMP participation by sending the borrower confirmation that the
    Initial Package was received and a description of the servicer's
    evaluation process and timeline. If the Initial Package is received from
    the borrower via email, the servicer may email the acknowledgment.
    Servicers must maintain evidence of the date of receipt of the
    borrower's Initial Package in its records.

    A single written communication sent within 10 business days of receipt
    of a borrower's request for HAMP participation may also include, at
    the servicer's discretion, the results of its review of the Initial Package.

   131.   Although Litton Loan Services, LP, on their own behalf, and on behalf of the co-
defendants **MUST** comply, Litton Loan Services, LP, on their own behalf, and on behalf of the co-
defendants not only failed to acknowledge their receipt of the Initial Package that was sent to them and
received on May 4, 2011, but wantonly, willfully and intentionally failed and refused in every respect to
comply with any of the provisions of HAMP contained herein for the benefit of the Plaintiff.

   132.   Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-
defendants was obligated to review the documentation submitted by Plaintiff on May 4, 2011, within 30
days, and failed and refused to do so.

   133.   Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf
of the co-defendants had 30 days wherein they were contractually obligated to review the initial package,
and they willfully, wantonly and intentionally failed and refused in every respect to do so.

    4.6 Review of Initial Package

    Within 30 calendar days from the date an Initial Package is received,
    the servicer **must** review the documentation provided by the borrower
    for completeness.  If the documentation is incomplete or insufficient for
    use in underwriting, the servicer must send the borrower an Incomplete
    Information

    Notice in accordance with the guidance set forth in Section 2.3.3.

    If the borrower's documentation is complete, the servicer must evaluate
    the borrower's eligibility for HAMP and either:

    -  Send the borrower a TPP Notice (see Section 8.1); or
    -  Make a determination that the borrower is not eligible for
    HAMP and communicate this determination to the borrower in
    accordance with the guidance in Section 2.3.2.

   134.   Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants had
only 30 days from May 11, 2011 to wherein they were contractually obligated to complete their assessment
of borrower eligibility and notify the borrower of the eligibility determination, and utterly, willfully,
wantonly, and intentionally failed and refused to do so.

126

135.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants had 30 days from May 11, 2011 wherein they were contractually obligated to provide the Plaintiff with a determination, and willfully, wantonly, and intentionally failed and refused to do so in breach of that agreement.

> 6 Underwriting
> Servicers must determine the borrower's eligibility for a modification using information obtained in the Initial Package and subsequently verified.  **Servicers are required** to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination within 30 calendar days of receiving all required borrower documentation.

136.    Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants was contractually obligated to consider the Plaintiff for Hope for Homeowners, and utterly failed and refused to do so.

137.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants was contractually obligated to consider the Plaintiff for Hope for Homeowners, as set forth herein.

> 6.2 Coordination with Hope for Homeowners
> Servicers are **required** to consider a borrower for a refinance through the Federal Housing Administration's HOPE for Homeowners (H4H) program when feasible.  Consideration for an H4H refinance should not delay eligible borrowers from receiving a TPP Notice.  The servicer's obligation as it relates to the H4H requirement is that while the servicer is gathering information to determine if a borrower meets the minimum eligibility criteria for HAMP, it should also be assessing whether the borrower may be eligible to refinance through H4H. This assessment would involve asking the following set of questions:
> -        Will the loan amount exceed $550,440?  No.
> -        Has the borrower made less than six (6) full payments during the life of the first lien loan?  No.
> -        Does the borrower have an ownership interest in other residential real estate, including any second homes or rental properties? No.
> -        Was the mortgage to be refinanced originated after January 1, 2008?  No.
> -        Does the property contain more than one (1) unit?  No.
> If the answer to all of these questions is "NO", the borrower may be eligible for H4H. (As is the precise case for the Plaintiff, herein). In this case, the servicer should counsel the borrower to seek a refinance with an H4H lender.

138.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants failed and refused to notify the Plaintiff of their consideration, as well as Litton failed and refused to consider the Plaintiff, entitlement to relief under Hope for Homeowners.

139.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants was obligated to apply the modification steps until the monthly mortgage payment ratio is reduced to 31 percent, but utterly failed and refused to do so.

140.    Pursuant to the Handbook, section 6.3 Standard Modification Waterfall
Servicers **must** apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent (target monthly mortgage payment ratio).

141.    A borrower will qualify for HAMP only if the interest rate on the mortgage loan can be reduced by at least 0.125 percent without the modified monthly mortgage payment ratio going below 31 percent. If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31

127

percent, the modification will not satisfy HAMP requirements and no incentives will be payable in connection with the modification.

142.    Even though clearly, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, **MUST** have taken action, they failed and intentionally refused to comply with every requirement of HAMP; failed and refused to comply with State and Federal Law; committed fraud; willfully and maliciously acted with the sole intent to deprive Plaintiffs of their property.

143.    Because there existed a contract between Litton Loan Servicing, LP and the US Treasury Department which was intended to benefit the Plaintiffs, and others similarly situated; and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants accepted consideration for each loan modification application from the US Treasury Department; because there was a mutual intent to benefit the Plaintiffs, and others similarly situated; and the Plaintiffs were deprived of their opportunity to have their HAMP application, their H4H application properly and timely reviewed, the Plaintiffs suffered irreparable harm.

144.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants further owed the Plaintiffs and others similarly situated the implied obligations of good faith and fair dealing, which covenants are implied in every contract.

145.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants committed intentional, wanton and willful breaches of the covenants of good faith and fair dealing; intentional, wanton and willful breaches of the agreement with the US Treasury Department; and the Plaintiffs, and others similarly situated were the intended third party beneficiaries of that agreement between Litton Loan Servicing, LP and were harmed as a result of those breaches.

146.    Plaintiffs are entitled to receive compensatory damages according to proof;

147.    Plaintiffs are entitled to receive exemplary damages based on the net worth of Litton Loan Servicing, LP for their malicious, wanton and willful breaches of the agreement.

148.    Wherefore Plaintiffs respectfully request that the court:

A.    Issue an order requiring Litton Loan Services, LP, on their own behalf, on behalf of each of the co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiffs and dismiss them with prejudice;

B.    Find that Litton Loan Services, LP, on their own behalf, and on behalf of each of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

C.    Find that Litton Loan Services, LP, on their own behalf, and on behalf of each of the co-defendants, were in breach of the SPA agreement with the US Treasury Department, intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

1.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

2.    The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

3.    The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

4.    The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

5.    The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

6.    The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

7.    The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

128

8.        Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

D.        Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

E.        Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.        Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.        Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.        Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.        Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

J.        Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

K.        Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.        That the court further grant compensatory damages to Plaintiffs for Litton Loan Servicing LPs' intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.        That the court further grant punitive damages to Plaintiff against Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants for Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant Litton Loan Services, LP, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.        That the court further grant statutory damages of $10,000 per violation, to Plaintiff against Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.        That the court order Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

P.        That the court grants to Plaintiff against the Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

## COUNT TWO:

129

**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the FEDERAL FAIR
DEBT COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. §  1692 ET. SEQ

149.    Plaintiffs incorporate paragraphs 1 to 148, inclusive, herein, as though set forth herein in full.

150.    Plaintiffs fall within the class of individuals who are defined by the Statute as consumer—"any natural person obligated or allegedly obligated to pay any debt".

151.    Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, claims that Plaintiffs owed a consumer debt—"any obligation... [I incurred] primarily for personal, family or household purposes", a mortgage secured by a forged note and deed of trust.

152.    Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants is a debt collector—any person using interstate commerce who regularly collects debts as defined by the statute and as proven by their acts alleged herein.

153.    Each separate letter demanding payment, including billing the Plaintiffs for attorneys' fees and court costs, inspection fees, and all demands for money of any and all kinds, sent by, or demanded on the behalf of Litton Loan Servicing, LP individually, and on behalf of Defendant RFC Homecomings and GMAC is a separate violation of the FDCPA.

154.    Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

<u>COUNT THREE</u>:
**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Damages And Declaratory Relief Action For Litton Loan Service's Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and 18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

155.    Plaintiffs incorporate paragraphs 1 to 154, inclusive, herein, as though set forth herein in full. Substance prevails over form.

156.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

157.    On March 25, 2005, and continuing, through the present, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

158.    Plaintiffs further allege that Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, in conjunction with and in furtherance of the conspiracy with all the remaining Defendants, did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(b) supra.

159.    Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.

160.    Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise). Litton Loan Services, LP, on their own behalf, and on

130

behalf of the co-defendants, are liable for all wrongful conduct of its co-defendants, and each of them, its lawyers, Shapiro and Fishman and Akerman Senterfitt.

161.    At all times herein, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, and each of them, conspired with remaining defendants, to interfere with the quiet enjoyment of Plaintiffs home; steal the equity in the Plaintiff's home; and used a forged promissory note and fraudulent affidavit in a civil court action in order to fraudulently obtain a judgment of foreclosure. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants;

c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

## COUNT FOUR:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Conduct and Participation in a RICO Enterprise
through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

162.    Plaintiffs incorporate paragraphs 1 to 161, inclusive, herein, as though set forth herein in full. Substance prevails over form.

163.    Plaintiffs further incorporate the allegations of the remaining Counts of the rest of this complaint, contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

164.    At various times and places partially enumerated Plaintiff's documentary material, all Defendants, and each of them, did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

165.    Likewise, all Defendants, and each of them, did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

166.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

167.    Plaintiffs further allege that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

168.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

## COUNT FIVE:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

169.    Plaintiffs incorporate paragraphs 1 to 168, inclusive, herein, as though set forth herein in full. Substance prevails over form.

170.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

171.    At various times and places as enumerated in Plaintiff's exhibits which are attached hereto, and incorporated herein, all Defendants, and each of them, did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

172.    At various times and places partially enumerated in Plaintiff's documentary material, all Defendants, individually and on behalf of each other, committed acts in furtherance of the conspiracy, did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

173.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

174.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d) (Prohibited activities supra).

175.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

**COUNT SIX:**
**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

176.    Plaintiffs incorporate paragraphs 1 to 175, inclusive, herein, as though set forth herein in full. Substance prevails over form.

177.    As alleged herein, Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, committed numerous of acts of mail fraud, which is a violation of federal law.

178.    That Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, knowingly devised a scheme to defraud or to obtain money or property (or the intangible right of honest services) by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

179.    That Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, acted with the intent to defraud the Plaintiffs and others (including the US Treasury) to the detriment of the Plaintiffs, and each of them.

180.    That in advancing, furthering, or carrying out the scheme, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, used the mails (a private or commercial interstate carrier), or caused the mails (a private or commercial interstate carrier) to be used. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

132

c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

d.      Reasonable attorney's fees and court costs according to proof;

e.      Such other and further relief as the court deems just and proper.

**COUNT SEVEN**:

**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the
VIOLATION OF 18 U.S.C. § 1001

181.    Plaintiffs incorporate paragraphs 1 to 180, inclusive, herein, as though set forth herein in full. Substance prevails over form.

182.    Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, violated 18 U.S.C. § 1001 by the conduct complained of herein, and as proven at the time of trial.

183.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants falsified, concealed or covered up by any trick, scheme or device, material facts, including, but not necessarily limited to:

a.      The date of the transfer of the loan from Washington Mutual Bank, FA;

b.      The use of false and misleading language in the affidavit of Debra Lyman.

5.      On March 25, 2005, subsequent to the filing of the foreclosure complaint, the loan was

transferred from Washington Mutual to RFC.  All rights under the note and mortgage

were transferred at that time.

c.      The true facts were, that March 25, 2005 is five days prior to the filing of the lawsuit. The court was misled by Defendant Washington Mutual Bank, FA, Defendant Debra Lyman, Defendant Litton Loan Servicing LP's use of the misleading words "subsequent to the filing of the foreclosure complaint".  Had each of the Defendants informed the court of the true facts, that March 25, 2005, was five days prior to suit being filed, then Washington Mutual Bank, FA would have had no standing to bring the action, and thus the action would have been dismissed.

d.      The Defendant's affidavit was further false in that it claimed Washington Mutual Bank, FA, was entitled to sums that Washington Mutual Bank, FA later admitted were neither due nor owing to them.

e.      In fact, Defendants concealed from the court and failed to inform the court of a credit of $373,907.18 in principal, proving that Washington Mutual Bank, FA, was paid in full and not owed any money from the Plaintiffs.

f.      The Defendants, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, filed false affidavits with the court in order to obtain a judgment of foreclosure.

g.      The Defendants, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants also filed a fraudulent affidavit.

h.      The Defendants, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants violated the State and Federal Statutes listed herein and committed other wrongful and intentional misconduct, all according to proof as pled herein.

184.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001 by their made, and / or caused to be made fictitious or fraudulent statements or representations to the Plaintiffs, to the court, and to the US Department of the Treasury; to the OCC; to the FTC; to the State and local authorities, and to the court of appeals.

185.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001by making or using any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, all as alleged herein.

186.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001, as alleged herein, because the statements made by the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants were all material, and adversely affected the Plaintiffs, the court, the US Government, and others.

133

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.       Statutory Compensatory damages for each separate violation according to proof;

b.       Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

c.       Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d.       Reasonable attorney's fees and court costs according to proof;

e.       Such other and further relief as the court deems just and proper.

## COUNT EIGHT:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Damages And Declaratory Relief Action for Litton Loan Service's Violation of
18 U.S.C. § 1005

187.    Plaintiffs incorporate paragraphs 1 to 186, inclusive, herein, as though set forth herein in full. Substance prevails over form.

188.    Defendant Stephanie Jackson, in furtherance of the co-conspiracies complained of herein, and in order to conceal and misdirect the officials conducting an official investigation, provided false information to the OCC, delivered by means of the US Mail, and across State lines.

189.    The defendant Stephanie Jackson knew that the OCC was conducting a full investigation of the conduct of JPMorgan Chase, the fraudulent affidavit of Debra Lyman and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants and the use of a forged promissory note in obtaining a fraudulent judgment of foreclosure.

190.    During that investigation stemming from a complaint filed on November 4, 2010, the OCC sent a request for a response from Chase on November 22, 2010, and replied to by Stephanie Jackson on July 28, 2011.

191.    That letter, dated July 28, 2011 delivered by means of the US Mail, and across State lines, contained numerous lies to the Federal Government with the intention of having the Federal Government cease any further investigation, including the false statement that their name was removed from the lawsuit as a result of the sale of the loan on April 19, 2005 (contrary to the date of March 25, 2005) that Debra Lyman, VP of Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants swore to in her affidavit to the court.

192.    The facts are that the name on the action never changed, and the date sold contradicts the sworn testimony of Debra Lyman of Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants.

193.    The Defendant, Stephanie Jackson, therefore conspired with Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, with the remaining Defendants conspired to, and did falsify information and create false entries in the books and records of JPMorgan Chase Bank with the intent to injure, and defraud the bank, and defraud the Plaintiffs, the courts and the OCC.

194.    In the letter of July 28, 2011, delivered by means of the US Mail, and across State lines, the attorneys for JPMorgan Chase, Shapiro and Fishman, also lied to JPMorgan Chase and entered, or caused to be entered, false information into the records of the Bank, with the intention of defrauding the Plaintiffs, the OCC and JPMorgan Chase.

195.    Plaintiffs are informed, believe, and thereon allege, and have incorporated herein, that other false and misleading statements were entered into the books and records of the bank, JP Morgan Chase, Washington Mutual Bank, FA's, and GMAC's Ally Bank, with the intent to defraud the Banks, the Plaintiff, and different branches of the Federal Government, all in violation of the above-stated statute.

196.    Said false and malicious statements and false entries were designed to, and intended to injure or defraud such banks, and other company, body politic or corporate, and individual person, including the Plaintiffs, and to deceive the officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System.

197.    Further, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, in concert with, and with the intent to defraud the United States or any agency thereof, or any financial institution referred to in this complaint, participated and shared in and or received (directly or

134

indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution, and should be fined not more than $1,000,000 or imprisoned not more than 30 years, or both pursuant to code.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

  a.  Statutory Compensatory damages for each separate violation according to proof;

  b.  Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

  c.  Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

  d.  Reasonable attorney's fees and court costs according to proof;

  e.  Such other and further relief as the court deems just and proper.

<u>**COUNT NINE**</u>:
**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

198.  Plaintiffs incorporate paragraphs 1 to 197, inclusive, herein, as though set forth herein in full. Substance prevails over form.

199.  Regulation B notice is required when the Defendant, Litton Loan Servicing, LP, failed to acknowledge receipt of the HAMP application, thus constituting a denial of the application and denial of credit there under.

200.  Pursuant to Regulation B, any denial of credit required Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, to tender a proper notice pursuant to that Regulation B.

201.  Each separate act by Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, constituted separate violations of the statutes as alleged in this entire Complaint constitutes grounds for statutory damages payable to the Plaintiffs in the sum of $10,000 per violation, according to proof.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

  a.  Statutory Compensatory damages for each separate violation according to proof;

  b.  Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

  c.  Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

  d.  Reasonable attorney's fees and court costs according to proof;

  e.  Such other and further relief as the court deems just and proper.

<u>**COUNT TEN**</u>:
**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

PENDANT STATE CLAIM
Damages And Declaratory Relief Action For Litton Loan Service's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)

202.  Plaintiffs incorporate paragraphs 1 to 201, inclusive, herein, as though set forth herein in full. Substance prevails over form.

203.  Proper demand was made upon Litton on 10/28/2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

204.  On February 18, 2011, well past the deadline of the statute, Litton's lawyers sent a letter stating unequivocally that Litton received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

205.  That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law.

206.  That, had Litton Loan Servicing, LP answered, then they would be forced to admit, under oath, that they had no interest in the loan which was the subject of the litigation; would have to admit that

135

Washington Mutual Bank, FA was paid in full; and that there never existed a servicing agreement between Litton Loan Servicing, LP and Washington Mutual Bank, FA.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.     Statutory Compensatory damages for each separate violation according to proof;

      b.     Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP to the extent permitted by law;

      c.     Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

      d.     Reasonable attorney's fees and court costs according to proof;

      e.     Such other and further relief as the court deems just and proper.

## COUNT ELEVEN:
## PLAINTIFFS v. GMAC MORTGAGE, LLC

Damages And Declaratory Relief Action For Failure GMAC Mortgage LLC's Failure To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

      207.    Plaintiffs incorporate paragraphs 1 to 195, inclusive, herein, as though set forth herein in full.

      208.    The Making Home Affordable Program was introduced in February 2009 by the Obama Administration which was intended to stabilize the housing market and help struggling homeowners get relief and avoid foreclosure.

      209.    Because the stated purpose of the program was partly designed to help homeowners, homeowners, including the Plaintiffs, were the intended third party beneficiaries of the Program.

      210.    In March of 2009, the Treasury Department (Treasury) issued uniform guidance for loan modifications across the mortgage industry, and updated those guidelines with policy announcements.

      211.    The MHA Handbook for Servicers of Non-GSE Mortgages (Handbook) was issued to provide guidance for servicers of mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac.

      212.    GMAC Mortgage LLC (hereinafter GMAC) signed the HAMP servicer participation agreement on April 13, 2009, becoming a participant in the Home Affordable Modification Program (HAMP), by signing the Servicer Participation Agreement (SPA).

      213.    Defendant GMAC registered and executed a Servicer Participation Agreement, related documents, and one or more Service Schedules (SPA) with the Program Administrator on or before April 13, 2009.

      214.    Plaintiffs were informed, believe, and thereon allege, that, contrary to the statements of GMAC, Litton Loan Servicing, LP, at all relevant times, had a servicing agreement with RFC Homecomings and GMAC.

      215.    That Plaintiffs filed a formal complaint with RFC Homecomings (hereinafter referred to as RFC) and GMAC, regarding the fraudulent conduct of the Defendant, Litton Loan Servicing, LP.

      216.    That, in order to conceal their conspiracy, complicity, cooperation and agency relationship with Litton Loan Servicing, LP, GMAC individually and on behalf of RFC told the Plaintiffs that no one services the loans for GMAC and they service their own loans.

From:    GMAC 1st Mortgage Servicing [customer_service@gmacm.com]

Sent:    Wednesday, December 29, 2010 8:15 AM

To:    Barry B. Eskanos

Subject: Re: * AND * / * * USE OF FORGED PROMISSORY NOTE

Dear Customer,

In response to your inquiry, please be advised, GMAC Mortgage does not have other mortgage companies service loans on our behalf.

136

217.    The statements made using means of interstate commerce were false.

218.    The SPA governs servicer participation in MHA for all Non-GSE Mortgages.

219.    GMAC and Litton Loan Servicing, LP on behalf of themselves and the lenders whose loans they service, agreed to abide by the terms of the handbook as part of the Servicer Participation Agreement (SPA).

220.    All participating servicers, including GMAC and Litton Loan Servicing, LP (hereinafter referred to as Litton) acting on behalf of GMAC, and RFC, are required, among other things, to consider all eligible mortgage loans for Services (as defined in the SPA) unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. MHA 1.1

a.    Pursuant to the Handbook, GMAC, RFC, and Litton cannot escape liability by simply referring the matter to their lawyers.

b.    The Handbook, in pertinent part says that if the entity that signed the SPA sub-contracts out any portion of its responsibilities as a servicer to another party, the entity that signed the SPA will be liable for the acts and omissions of the sub-contracted party under the SPA, thereby making GMAC responsible for the conduct of Litton.

c.    GMAC, by and through their agent, Litton, individually and on behalf of GMAC and RFC, instructed Akerman Senterfitt, its lawyers to act on their behalf, and thus GMAC is responsible for all the willful violations, intentional and negligent misconduct of its lawyers and co-conspirators as pled herein, in failing in every respect to meet the requirements of HAMP.

d.    All of the wrongdoings complained of herein, include the conduct of Akerman Senterfitt as the agent and subcontractor of GMAC.

221.    As further described in Section 1.3, participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out the requirements of the SPA. MHA 1.1, but Plaintiffs are informed, believe and thereon allege, that Litton failed to use reasonable efforts to contact GMAC regarding the Plaintiffs; and, once GMAC was contacted by the Plaintiffs, failed to request Litton to resolve the complaints of the Plaintiffs.

222.    In 2009, Congress passed the Helping Families Save Their Homes Act of 2009, which includes legal protection for servicers that modify residential mortgages.

223.    It was intended to encourage more servicers to modify more mortgages for the benefit of the homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

224.    The bill essentially provides authority for, and legal protection for servicers to alter mortgage contracts and, as the argument goes, investor contracts where mortgages have been securitized.

225.    Thus, not only does no legal impediment existed for GMAC through Litton Loan Servicing LLC to grant a loan modification on behalf of GMAC, RFC or even Washington Mutual Bank, FA (if it existed or were so entitled) to any and all individuals who qualify, but also every action taken by the Government was intended to benefit the Homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

226.    In addition to the normal obligation to obey all laws, and the implied covenants of good faith and fair dealing that are found in every contractual agreement, the SPA requires that GMAC, RFC and Litton Loan Servicing, individually and acting on behalf of GMAC and RFC, fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP.

a.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

b.    The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

c.    The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

d.    The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

e.    The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial

137

status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

       f.      The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

       g.      The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act.

       h.      Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.; 18 U.S.C. 1964, (Civil RICO Remedies);

       i.      Conspiracy to commit and commission of Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343;

       j.      Conspiracy to commit and commission of Bank Fraud 18 U.S.C. 1341, 1344;

       k.      Conspiracy to commit and commission of 18 U.S.C. § 1001;

       l.      Conspiracy to commit and commission of 18 U.S.C. § 1005;

       227.      If Litton Loan Servicing, LP, individually and on behalf of GMAC Mortgage, LLC., actually legally serviced any loan for GMAC, RFC Homecomings, or Washington Mutual Bank, FA then Plaintiffs would have received from Litton Loan Servicing, LP, on behalf of at least one of the defendant entities, at a minimum, a response to their HAMP loan modification request, or been provided the H4H application or responded to the Florida Statute Estoppel Demand Pursuant to Florida Statute 701.04 (1).

       228.      Defendant GMAC and RFC by and through its servicing agent, Litton Loan Servicing, LP, did not respond, because they had no legal right or basis upon which to provide a response.

       229.      The Plaintiff's property qualifies under the conditions required of HAMP, and the Plaintiff would have been eligible for HAMP, including, but not limited to, the following conditions:

       a.      Mortgage loan was originated on or before January 1, 2009;

       b.      Mortgage loan was not previously modified under HAMP.

       c.      The Mortgage loan is delinquent or default is reasonably foreseeable.

       d.      The Mortgage loan is secured by a one unit property, which is the principal residence of the Plaintiff.

       e.      The subject property is not vacant or condemned.

       f.      The borrower has documented financial hardship and represented she does not have sufficient liquid assets to make the monthly mortgage payments because of a reduction in her salary and a reduction in her spouses work to part time status.

       g.      The Plaintiff's monthly mortgage payment (including principal, interest, taxes, and insurance) is greater than 31 percent of the Plaintiff's verified monthly gross income.

       h.      The Plaintiff is willing to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.

       i.      The Current unpaid principal balance (UPB) of the mortgage loan prior to capitalization is not greater than $729,750.

       j.      The Plaintiff offered to make a timely first trial period payment on or before December 31, 2012, but no TPP was ever offered to the Plaintiff.

       k.      The Plaintiff is in active litigation, and is eligible for HAMP.

       230.      Litton Loan Servicing, LP, individually and on behalf of GMAC Mortgage, LLC. was required to communicate with clear written information designed to help the borrower understand the modification process in accordance with the HAMP guidelines and Handbook.

       231.      Litton Loan Servicing, LP, individually and on behalf of GMAC has failed and refused to communicate with the Plaintiff, and referred the Plaintiff to their attorney, who has also refused to provide any information regarding HAMP; who then expressly, blatantly and openly refused to comply with the statutory requirements of providing an estoppel letter; and has willfully violated every provision of the HAMP and the handbook.

       232.      Plaintiffs put GMAC on formal notice of the conduct complained of herein, as early as when the complaint was filed in March of 2005 and as the case progressed, and filed further complaints with GMAC in December of 2010 and June of 2011.

       233.      As late as June of 2011, although GMAC and were fully apprised that Litton failed in every respect to obey the statutes complained of herein, and has a toll free number for HAMP applications, the Defendant, GMAC, told Plaintiffs they were not allowed to call GMAC or RFC; not allowed to discuss HAMP with GMAC; nor was he allowed to discuss the HAMP modification process or other alternative

modification programs with GMAC, but instead, Plaintiffs were told by GMAC they would have to contact Litton.

234.    Although GMAC has a toll free number, the Plaintiff was told he was not allowed to call GMAC; not allowed to discuss HAMP with GMAC; nor was he allowed to discuss the HAMP modification process or other alternative modification programs with GMAC.

235.    GMAC and their designated agents, (in this case, Litton) are required to maintain adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents.

236.    Litton Loan Servicing, LP, individually and on behalf of GMAC Mortgage, LLC., and GMAC has ratified the wrongful conduct of Litton in every respect and after having been fully apprised of their conduct, has refused to acknowledge receipt of Plaintiffs HAMP application; refused to respond to the application; refused to discuss the application with Plaintiff; and willfully violated the following regulations:

237.    Although Section 5 of the Federal Trade Commission Act prohibits unfair or deceptive acts or practices, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC, used false affidavits; filed a forged promissory note; committed perjury and numerous acts of fraud upon the court and the Plaintiff in order to obtain a judgment of foreclosure.

238.    Although the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibits discrimination on a prohibited basis in connection with mortgage transactions, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC discriminated against the Plaintiff because of her gender and her religion.

239.    Although the Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC failed to provide proper documentation in violation of RESPA.

240.    Although the Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC tendered multiple demands seeking payment on behalf of RFC, but obtained a judgment in the name of Washington Mutual Bank, FA, informing the court that the only entity entitled to recover was Washington Mutual Bank, FA.

241.    Each letter and piece of correspondence sent by Litton, including billings for attorneys fees, on behalf of GMAC with GMAC's consent, and full ratification after being fully apprised of their conduct, individually and doing business as RFC was a separate violation of the Fair Debt Collection Practices Act,.

242.    Although the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification, (these laws also prohibit red-lining), Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC has discriminated against the Plaintiffs on the basis of her gender and her religion.

243.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC negotiated modifications of loans with others, but refused to even consider the Plaintiffs, failing to acknowledge or respond to the Plaintiffs application.

244.    Although the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC used false information in reporting consumer credit information to credit reporting agencies about the Plaintiff.

245.    Although the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC, and GMAC ratified the conduct of Litton, who intentionally and willfully failed and refused to comply with Regulation B by failing to timely respond to the HAMP application, thus violating Regulation B.

246.    Under Florida Law, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC, was required to provide an estoppel letter pursuant to Florida Statutes Chapter 701.04 (1), which says, in pertinent part:

139

"Within 14 days after receipt of the written request of a mortgagor, the holder of a mortgage shall deliver to the mortgagor at a place designated in the written request an estoppel letter setting forth the unpaid balance of the loan secured by the mortgage, including principal, interest, and any other charges properly due under or secured by the mortgage and interest on a per-day basis for the unpaid balance. Whenever the amount of money due on any mortgage, lien, or judgment shall be fully paid to the person or party entitled to the payment thereof, the mortgagee, creditor, or assignee, or the attorney of record in the case of a judgment, to whom such payment shall have been made, shall execute in writing an instrument acknowledging satisfaction of said mortgage, lien, or judgment and have the same acknowledged, or proven, and duly entered of record in the book provided by law for such purposes in the proper county. Within 60 days of the date of receipt of the full payment of the mortgage, lien, or judgment, the person required to acknowledge satisfaction of the mortgage, lien, or judgment shall send or cause to be sent the recorded satisfaction to the person who has made the full payment. In the case of a civil action arising out of the provisions of this section, the prevailing party shall be entitled to attorney's fees and costs."

247.    Proper demand was made upon Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, GMAC and RFC, on 10/29/2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

248.    On February 18, 2011, well past the deadline of the statute, Litton's lawyers sent a letter stating unequivocally that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC and RFC, and each of them, received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

249.    That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law, as well as a direct violation of the requirement of the HAMP guidelines wherein "the SPA requires that [GMAC and Litton Loan Servicing] fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

250.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC, pursuant to the HAMP guidelines, is required to make a reasonable effort to solicit borrower by performing at a minimum, the following acts:

a.    The servicer (including Litton and GMAC) is to make a minimum of four telephone calls to the last known phone numbers of record, at different times of the day; -  (Litton made none) and

b.    The servicer (including Litton and GMAC) is to send two written notices to the last address of record by sending one letter via certified/express mail or via overnight delivery service (such as Federal Express or UPS) with return receipt/delivery confirmation and one letter via regular mail. (Litton, individually, and on behalf of GMAC and RFC's only correspondence was the bad faith demand letters, never any response or mention of the HAMP or other rights of the Borrower).

c.    Any contact with eligible borrowers, whether by telephone, mail or otherwise, must:

1.    Advise borrowers that they may be eligible for HAMP; MHA Handbook v 2.0.  (Litton and GMAC made no such effort nor provide no such advice).

2.    Clearly describe the Initial Package that the borrower is required to submit pursuant to the requirements outlined in Section 4, and state what other information the servicer needs to complete the HAMP analysis;  (Litton, individually and on behalf of GMAC, never discussed HAMP, refused to discuss HAMP with the Plaintiffs, and never reviewed the Plaintiffs application.)

3.    Provide a toll-free telephone number through which the borrower can reach a loan servicer representative; (Litton, individually and on behalf of GMAC stated that Plaintiff is not permitted to call them at all, and GMAC required Plaintiffs to call Litton) and

140

4.      Identify any unique requirements the servicer may have established for submission of an Initial Package received later than 30 business days prior to a scheduled foreclosure sale date.  (Litton, individually and on behalf of GMAC, refused to provide any information regarding HAMP or mention the application whatsoever).

5.      All contact attempts must be documented in the servicing file.  If the servicer has documentation evidencing that it satisfied the Reasonable Effort standard for HAMP prior to June 1, 2010, resolicitation of the borrower is not required. (If Litton, individually and on behalf of GMAC, documented any efforts, then they would be fraudulent and further violations of the agreement.)

251.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC failed to make ANY contact with the Plaintiff; refused to discuss the matter with the Plaintiff; refused to provide a number for the Plaintiff to discuss the matter with the Servicer; and refused to comply with all the requirements set forth in this complaint.

252.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC; and GMAC separately agreed, that they were further required to, and willfully failed and refused to comply with each and every one of the following conditions:

a.      The servicer (including Litton and GMAC) must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Package, which is required to be submitted by the borrower to request a HAMP modification.

b.      The communication should:

1.      Describe the income evidence required to be evaluated for HAMP;

c.      Provide the RMA (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit); and

d.      Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

e.      The communication should also include clear language stating that during the HAMP evaluation the home will not:  (i) be referred to foreclosure; or (ii) be sold at a foreclosure sale if the foreclosure process has already been initiated.  In the communication, the servicer **must** include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the communication.

f.      If Right Party Contact is established prior to satisfaction of the Reasonable Effort standard, the **servicer must continue** to take steps to satisfy the Reasonable Effort standard until the Initial Package is submitted by the borrower.

g.      If Right Party Contact is established, but the borrower does not submit an Initial Package, the **servicer must resend** the Initial Package communication.  Again, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the second communication.  If the borrower does not respond by providing an Initial Package within the required time period set forth in the second communication, the servicer may determine the borrower to be ineligible for HAMP.

h.      If Right Party Contact is established, but the borrower submits an incomplete Initial Package within the required time period, the servicer (including Litton and GMAC) **must comply** with the "Incomplete Information Notice" requirements set forth below in Section 2.3.3.  If the borrower does not respond to either the 30-day Incomplete Information Notice or the 15-day Incomplete Information Notice by providing an Initial Package within the required time period, the servicer may determine the borrower to be ineligible for HAMP.

Servicers **must acknowledge receipt** of the Initial Package within 10 business days per the requirements in Section 4.5 and respond within 30 calendar days with either an Incomplete Information Notice (as outlined in Section 2.3.3), a TPP Notice (as outlined in Section 8.1) or a Non-Approval Notice (as outlined in Section 2.3.2).

253.    Pursuant to the provisions of the agreement, Plaintiffs are entitled to a stay as Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC failed in every respect to meet the provisions of the SPA.

254.    Pursuant to the provisions of the SPA, Litton, GMAC and RFC, intentionally and willfully failed to comply with each and every provision as set forth below:

3       Protections Against Unnecessary Foreclosure
3.1     Suspension of a Referral to Foreclosure

A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of the following circumstances exists:

-       The borrower is evaluated for HAMP and is determined to be ineligible for the program; or

-       The borrower is offered a TPP, but fails to make current trial period payments as set forth in Section 8.3; or

-       The servicer has established Right Party Contact, has sent at least two written requests asking the borrower to supply required information in accordance with Section 2.2.2, and has otherwise satisfied the Reasonable Effort solicitation standard, and the borrower failed to respond by the dates indicated in those requests;                or

-       The servicer has satisfied the Reasonable Effort solicitation standard without establishing Right Party Contact; or The borrower or co-borrower states he or she is not interested in pursuing a                          HAMP modification and such statement is reflected by the servicer                          in its servicing system and/or mortgage file.

3.2      Suspension of Foreclosure Proceedings in Process

With respect to a borrower who submits a request for HAMP consideration after a loan has been referred to foreclosure, the                          servicer must, immediately upon the borrower's acceptance of a                          TPP based on verified income, and for the duration of the  trial                          period, take those actions within its authority that are necessary to                          halt further activity and events in the foreclosure process, whether                          judicial or non-judicial, including but not limited to refraining from                          scheduling a sale or causing a judgment to be entered.

3.3      Suspension of Scheduled Foreclosure Sale

When a borrower submits a request for HAMP consideration after a foreclosure sale date has been scheduled and the request is received no later than midnight of the seventh business day prior to                          the foreclosure sale date (Deadline), the servicer must suspend the                          sale as necessary to evaluate the borrower for HAMP…

3.4      Mitigating Foreclosure Impact

The servicer must take the following actions to mitigate foreclosure impact:

3.4.1      Simultaneous Trial Period Plan and Foreclosure Explanation

When a borrower is simultaneously in foreclosure and is either being evaluated for HAMP or is in a TPP, the servicer must provide the borrower with a written notification that explains, in clear language, the concurrent modification and foreclosure processes and that states that even though certain foreclosure activities may continue, the home will not be sold at a foreclosure sale while the borrower is being considered for HAMP or while the borrower is making payments under a TPP…

3.4.2      Foreclosure Attorney/Trustee Communication

Servicers must develop and implement written policies and procedures to provide notification to their foreclosure attorney/trustee regarding a borrower's HAMP status, including whether the borrower is potentially eligible for HAMP (and is                          subject to Section 2.2), and whether the borrower is being                          evaluated for, or is currently in, a TPP.  Servicers must ensure that                          their foreclosure attorney/trustee adheres to all of the requirements                          of Section 3.1, Section 3.2 and Section 3.3 with respect to referral                          to foreclosure, stay of foreclosure actions and suspension of                          foreclosure sales.

3.4.3      Certification Prior to Foreclosure Sale

Servicers must develop and implement written procedures
applicable to all loans that are potentially eligible for HAMP (and
are subject to Section 2.2) that require the servicer to provide to the
foreclosure attorney/trustee a written certification that (i) one of
the five circumstances under Section 3.1 exists, and (ii) all other
available loss mitigation alternatives have been exhausted and a
non-foreclosure outcome could not be reached.  This certification
must be provided no sooner than seven business days prior to the
scheduled foreclosure sale date (the Deadline) or any extension
thereof.

255.    Plaintiffs were further entitled, and never received the required acknowledgement of the
Initial Package.

4.5 Acknowledgment of Initial Package
Within 10 business days following receipt of an Initial Package, the
servicer **must** acknowledge in writing the borrower's request for
HAMP participation by sending the borrower confirmation that the
Initial Package was received and a description of the servicer's
evaluation process and timeline. If the Initial Package is received from
the borrower via email, the servicer may email the acknowledgment.
Servicers must maintain evidence of the date of receipt of the
borrower's Initial Package in its records.
A single written communication sent within 10 business days of receipt
of a borrower's request for HAMP participation may also include, at
the servicer's discretion, the results of its review of the Initial Package.

256.    Although Litton Loan Services, LP, on their own behalf, and on behalf of the co-
defendant, GMAC and RFC, and GMAC separately, **MUST** comply, Litton Loan Services, LP, on their
own behalf, and on behalf of the co-defendant GMAC not only failed to acknowledge their receipt of the
Initial Package that was sent to them and received on May 4, 2011, but wantonly, willfully and
intentionally failed and refused in every respect to comply with any of the provisions of HAMP contained
herein for the benefit of the Plaintiff.

257.    Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-
defendant GMAC was **obligated** to review the documentation submitted by Plaintiff on May 4, 2011,
within 30 days, and failed and refused to do so.

258.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf
of the co-defendant GMAC had 30 days wherein they were contractually obligated to review the initial
package, and they willfully, wantonly and intentionally failed and refused in every respect to do so.

4.6 Review of Initial Package
Within 30 calendar days from the date an Initial Package is received,
the servicer **must** review the documentation provided by the borrower
for completeness.  If the documentation is incomplete or insufficient for
use in underwriting, the servicer must send the borrower an Incomplete
Information
Notice in accordance with the guidance set forth in Section 2.3.3.
If the borrower's documentation is complete, the servicer must evaluate
the borrower's eligibility for HAMP and either:
-        Send the borrower a TPP Notice (see Section 8.1); or
-        Make a determination that the borrower is not eligible for
HAMP and communicate this determination to the borrower in
accordance with the guidance in Section 2.3.2.

259.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC
had only 30 days from May 11, 2011 to wherein they were contractually obligated to complete their
assessment of borrower eligibility and notify the borrower of the eligibility determination, and utterly,
willfully, wantonly, and intentionally failed and refused to do so.

143

260.     Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC had 30 days from May 11, 2011 wherein they were contractually obligated to provide the Plaintiff with a determination, and willfully, wantonly, and intentionally failed and refused to do so in breach of that agreement.

> 6 Underwriting
> Servicers must determine the borrower's eligibility for a modification using information obtained in the Initial Package and subsequently verified. **Servicers are required** to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination within 30 calendar days of receiving all required borrower documentation.

261.     Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC, and GMAC separately was contractually obligated to consider the Plaintiff for Hope for Homeowners, and utterly failed and refused to do so.

262.     Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC was jointly and separately contractually obligated to consider the Plaintiff for Hope for Homeowners, as set forth herein.

> 6.2 Coordination with Hope for Homeowners
> Servicers are **required** to consider a borrower for a refinance through the Federal Housing Administration's HOPE for Homeowners (H4H) program when feasible.  Consideration for an H4H refinance should not delay eligible borrowers from receiving a TPP Notice.  The servicer's obligation as it relates to the H4H requirement is that while the servicer is gathering information to determine if a borrower meets the minimum eligibility criteria for HAMP, it should also be assessing whether the borrower may be eligible to refinance through H4H. This assessment would involve asking the following set of questions:
> -       Will the loan amount exceed $550,440?  No.
> -       Has the borrower made less than six (6) full payments during the life of the first lien loan?  No.
> -       Does the borrower have an ownership interest in other residential real estate, including any second homes or rental properties? No.
> -       Was the mortgage to be refinanced originated after January 1, 2008?  No.
> -       Does the property contain more than one (1) unit?  No.
> If the answer to all of these questions is "NO", the borrower may be eligible for H4H. (As is the precise case for the Plaintiff, herein). In this case, the servicer should counsel the borrower to seek a refinance with an H4H lender.

263.     Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC failed and refused to notify the Plaintiff of their consideration, as well as Litton individually and on behalf of GMAC, failed and refused to consider the Plaintiff, entitlement to relief under Hope for Homeowners.

264.     Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC was obligated to apply the modification steps until the monthly mortgage payment ratio is reduced to 31 percent, but utterly failed and refused to do so.

265.     Pursuant to the Handbook, section 6.3 Standard Modification Waterfall
Servicers (including GMAC and LITTON) **must** apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent (target monthly mortgage payment ratio).

266.     A borrower will qualify for HAMP only if the interest rate on the mortgage loan can be reduced by at least 0.125 percent without the modified monthly mortgage payment ratio going below 31 percent. If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31

144

percent, the modification will not satisfy HAMP requirements and no incentives will be payable in connection with the modification.

267.    Even though clearly, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC and LITTON, **MUST** have taken action, they failed and intentionally refused to comply with every requirement of HAMP; failed and refused to comply with State and Federal Law; committed fraud; willfully and maliciously acted with the sole intent to deprive Plaintiffs of their property.

268.    Because there existed a contract between GMAC, Litton Loan Servicing, LP and the US Treasury Department which was intended to benefit the Plaintiffs, and others similarly situated; and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC, accepted consideration for each loan modification application from the US Treasury Department; because there was a mutual intent to benefit the Plaintiffs, and others similarly situated; and the Plaintiffs were deprived of their opportunity to have their HAMP application, their H4H application properly and timely reviewed, the Plaintiffs suffered irreparable harm.

269.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC further owed the Plaintiffs and others similarly situated the implied obligation of good faith and fair dealing, which is implied in every contract.

270.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC committed intentional, wanton and willful breaches of the covenants of good faith and fair dealing; intentional, wanton and willful breaches of the agreement with the US Treasury Department; and the Plaintiffs, and others similarly situated were the intended third party beneficiaries of that agreement between the US Treasury Department, GMAC and Litton Loan Servicing, LP and Plaintiffs as the intended beneficiary, and Plaintiffs, and others, were harmed as a result of those breaches.

271.    Plaintiffs are entitled to receive compensatory damages according to proof;

272.    Plaintiffs are entitled to receive exemplary damages based on the net worth of GMAC for their malicious, wanton and willful breaches of the agreement and their ratification of the wrongful conduct of their co-conspirators to the extent permitted by law.

273.    Wherefore Plaintiffs respectfully request that the court:

A.    Issue an order requiring GMAC, jointly and severally, with the remaining co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiff and dismiss them with prejudice;

B.    Find that GMAC, on their own behalf, and on behalf of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that [GMAC and Litton Loan Services, LP], on their own behalf, and on behalf of the remaining co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

C.    Find that GMAC, on their own behalf, and on behalf of the remaining co-defendants, were in breach of the SPA agreement with the US Treasury Department, intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

1.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

2.    The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

3.    The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

4.    The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

5.    The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

6.    The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

145

7.	The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

8.	Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

D.	Find that GMAC, on their own behalf, and on behalf of the remaining co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

E.	Find that GMAC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.	Find that GMAC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.	Find that GMAC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.	Find that GMAC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.	Find that GMAC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

J.	Find that GMAC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

K.	Find that GMAC, individually, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.	That the court further grant compensatory damages to Plaintiffs for GMACs' intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.	That the court further grant punitive damages to Plaintiffs against GMAC, on their own behalf, and on behalf of the co-defendants for GMAC, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant GMAC, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.	That the court further grant statutory damages of $10,000 per violation, to Plaintiff against GMAC, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant GMAC, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.	That the court order Defendant GMAC, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of GMAC and its agents, in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

P.	That the court grants to Plaintiff against the Defendant GMAC, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

146

## COUNT TWELVE:
## PLAINTIFFS v. GMAC

Damages And Declaratory Relief Action For GMAC's Violation of the FEDERAL FAIR DEBT
COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. § 1692 ET. SEQ

274.   Plaintiffs incorporate paragraphs 1 to 273, inclusive, herein, as though set forth herein in full.

275.   Plaintiffs fall within the class of individuals who are defined by the Statute as consumer—"any natural person obligated or allegedly obligated to pay any debt".

276.   Defendant, Litton on the behalf of GMAC, and on behalf of the other co-defendants, claims that Plaintiffs owed a consumer debt—"any obligation... [incurred] primarily for personal, family or household purposes", a mortgage secured by a forged note and deed of trust.

277.   Defendant, GMAC, on their own behalf, retained the services of Litton, and on behalf of the co-defendants, Litton is a debt collector defined as any person using interstate commerce who regularly collects debts as defined by the statute and as proven by their acts alleged herein.

278.   Each separate letter demanding payment, including billing the Plaintiffs for attorneys' fees and court costs, inspection fees, and all demands for money of any and all kinds, sent by, or demanded on the behalf of Litton Loan Servicing, LP individually, and on behalf of Defendant RFC Homecomings and GMAC is a separate violation of the FDCPA.

279.   Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
   a.   Statutory Compensatory damages for each separate violation according to proof;
   b.   Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC to the extent permitted by law;
   c.   Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC, or any of their successors, agents or assigns, from any further breaches of the statute;
   d.   Reasonable attorney's fees and court costs according to proof;
   e.   Such other and further relief as the court deems just and proper.

## COUNT THIRTEEN:
## PLAINTIFFS v. GMAC

Damages And Declaratory Relief Action For GMAC's Acquisition and Maintenance of an Interest in and
Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18
U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and
18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

280.   Plaintiffs incorporate paragraphs 1 to 279, inclusive, herein, as though set forth herein in full. Substance prevails over form.

281.   Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

282.   On March 25, 2005, and continuing, through the present, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

283.   Plaintiffs further allege that Defendant GMAC, on their own behalf, and on behalf of the co-defendants, in conjunction with and in furtherance of the conspiracy with all the remaining Defendants, did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(b) supra.

284.   Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.

147

285.    Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise). GMAC, on their own behalf, and on behalf of the co-defendants, are liable for all wrongful conduct of its co-defendants, and each of them, its lawyers, Shapiro and Fishman and Akerman Senterfitt.

286.    At all times herein, GMAC, on their own behalf, and on behalf of the co-defendants, and each of them, conspired with remaining defendants, ratified the conduct, and conspired with the remaining Defendants, to interfere with the quiet enjoyment of Plaintiffs home; steal the equity in the Plaintiff's home; and used a forged promissory note and fraudulent affidavit in a civil court action in order to fraudulently obtain a judgment of foreclosure.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC, on their own behalf, and on behalf of the co-defendants to the extent permitted by law;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

**COUNT FOURTEEN**:
**PLAINTIFFS v. GMAC**

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

287.    Plaintiffs incorporate paragraphs 1 to 286, inclusive, herein, as though set forth herein in full. Substance prevails over form.

288.    Plaintiffs further incorporate the allegations of the remaining Counts of the rest of this complaint, contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

289.    At various times and places partially enumerated Plaintiff's documentary material, all Defendants, and each of them, did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

290.    Likewise, all Defendants, and each of them, did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

291.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

292.    Plaintiffs further allege that all Defendants jointly or severally did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

293.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC to the extent permitted by law;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

**COUNT FIFTEEN**:
**PLAINTIFFS v. GMAC**

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

294.    Plaintiffs incorporate paragraphs 1 to 292, inclusive, herein, as though set forth herein in full. Substance prevails over form.

295.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

296.    At various times and places as enumerated in Plaintiff's exhibits which are attached hereto, and incorporated herein, all Defendants, and each of them, did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

297.    At various times and places partially enumerated in Plaintiffs documentary material, all Defendants, individually and on behalf of each other, committed acts in furtherance of the conspiracy, did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

298.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

299.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d) (Prohibited activities supra).

300.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
    a.    Statutory Compensatory damages for each separate violation according to proof;
    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC, to the extent permitted by law;
    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;
    d.    Reasonable attorney's fees and court costs according to proof;
    e.    Such other and further relief as the court deems just and proper.

**COUNT SIXTEEN**:
**PLAINTIFFS v. GMAC**

Damages And Declaratory Relief Action for GMAC's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

301.    Plaintiffs incorporate paragraphs 1 to 300, inclusive, herein, as though set forth herein in full. Substance prevails over form.

302.    As alleged herein, Defendant GMAC, on their own behalf, and on behalf of the co-defendants, committed numerous of acts of mail fraud, which is a violation of federal law.

303.    That Defendant GMAC, on their own behalf, and on behalf of the co-defendants, knowingly devised a scheme to defraud or to obtain money or property (or the intangible right of honest services) by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

304.    That GMAC, on their own behalf, and on behalf of the co-defendants, acted with the intent to defraud the Plaintiffs and others (including the US Treasury) to the detriment of the Plaintiffs, and each of them.

305.    That in advancing, furthering, or carrying out the scheme, GMAC, on their own behalf, and on behalf of the co-defendants, used the mails (a private or commercial interstate carrier), or caused the mails (a private or commercial interstate carrier) to be used.
Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
    a.    Statutory Compensatory damages for each separate violation according to proof;

149

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC to the extent permitted by law;

c.    Declaratory relief, including permanent injunctive relief, prohibiting GMAC, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

## COUNT SEVENTEEN:
## PLAINTIFFS v. GMAC

Damages And Declaratory Relief Action For GMAC's Violation of the
VIOLATION OF 18 U.S.C. § 1001

306.    Plaintiffs incorporate paragraphs 1 to 305, inclusive, herein, as though set forth herein in full. Substance prevails over form.

307.    Defendant, GMAC, on their own behalf, and on behalf of the co-defendants, violated 18 U.S.C. § 1001 by the conduct complained of herein, and as proven at the time of trial.

308.    Defendant GMAC, on their own behalf, and on behalf of the co-defendants falsified, concealed or covered up by any trick, scheme or device, material facts, including, but not necessarily limited to:

a.    The date of the transfer of the loan from Washington Mutual Bank, FA;

b.    The use of false and misleading language in the affidavit of Debra Lyman.

5.    On March 25, 2005, subsequent to the filing of the foreclosure complaint, the loan was

transferred from Washington Mutual to RFC.  All rights under the note and mortgage

were transferred at that time.

c.    The true facts were, that March 25, 2005 is five days prior to the filing of the lawsuit. The court was misled by Defendant Washington Mutual Bank, FA, Defendant Debra Lyman, Defendant Litton Loan Servicing LP's use of the misleading words "subsequent to the filing of the foreclosure complaint".  Had each of the Defendants informed the court of the true facts, that March 25, 2005, was five days prior to suit being filed, then Washington Mutual Bank, FA would have had no standing to bring the action, and thus the action would have been dismissed.

d.    The Defendant's affidavit was further false in that it claimed Washington Mutual Bank, FA, was entitled to sums that Washington Mutual Bank, FA later admitted were neither due nor owing to them.

e.    In fact, Defendants concealed from the court and failed to inform the court of a credit of $373,907.18 in principal, proving that Washington Mutual Bank, FA, was paid in full and not owed any money from the Plaintiffs.

f.    The Defendants, GMAC, by and through its agent, Litton, and on behalf of the co-defendants, filed false affidavits and a forged promissory note, with the court in order to obtain a judgment of foreclosure.

g.    The Defendant, GMAC, by and through its agent, Litton, and on behalf of the co-defendants also filed a fraudulent affidavit and a forged promissory note.

h.    The Defendant GMAC, individually, and by and through its agent, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants violated the State and Federal Statutes listed herein and committed other wrongful and intentional misconduct, all according to proof as pled herein.

309.    Defendant GMAC, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001 by making, and / or causing to be made, or ratifying, fictitious or fraudulent statements or representations to the Plaintiffs, to the court, and to the US Department of the Treasury; to the OCC; to the FTC; to the State and local authorities, and to the court of appeals.

310.    Defendant GMAC, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001by ratifying, making or using any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, all as alleged herein.

150

311.    Defendant GMAC, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001, as alleged herein, because the statements made by the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants were all material, and adversely affected the Plaintiffs, the court, the US Government, and others and were ratified by the Defendant, GMAC.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting GMAC, or any of their loan servicers, agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

## COUNT EIGHTEEN:
## PLAINTIFFS v. GMAC

Damages And Declaratory Relief Action for GMAC's Violation of
18 U.S.C. § 1005

312.    Plaintiffs incorporate paragraphs 1 to 311, inclusive, herein, as though set forth herein in full. Substance prevails over form.

313.    Defendant GMAC, in furtherance of the co-conspiracies complained of herein, and in order to conceal and misdirect the officials conducting an official investigation, provided false information to the Florida Office of Financial Regulation, delivered by means of the US Mail, and used means of Interstate Commerce, and transmitted mail across State lines.

314.    The Defendant GMAC knew that the Florida Office of Financial Regulation (OFR) was conducting a full investigation of the conduct of the Defendants, and each of them, including the fraudulent affidavit of Debra Lyman and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants and the use of a forged promissory note in obtaining a fraudulent judgment of foreclosure.

315.    During that investigation stemming from a complaint filed with that office in 2010, the OFR sent a request for a response from GMAC, and upon receipt of false and misleading information from GMAC, closed their investigation.

316.    That letter, dated June 22, 2001, delivered by means of the US Mail, and across State lines, contained numerous lies to the Government with the intention of having the Government cease any further investigation.

317.    Additionally, the Defendant, GMAC ratified the conduct of the co-conspirators, and each of them, who furthered the co-conspiracy against the interests of the Plaintiffs.

318.    Plaintiffs are informed, believe, and thereon allege, and have incorporated herein, that other false and misleading statements were entered into the books and records of the bank, JP Morgan Chase, Washington Mutual Bank, FA's, and GMAC's Ally Bank, with the intent to defraud the Banks, the Plaintiff, and different branches of the State and Federal Government, all in violation of the above-stated statute.

319.    Said false and malicious statements and false entries were designed to, and intended to injure or defraud such banks, and other company, body politic or corporate, and individual person, including the Plaintiffs, and to deceive the officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System.

320.    Further, GMAC, on their own accord, individually, and by and through Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, in concert with, and with the intent to defraud the State of Florida, and the United States or any agency thereof, or any financial institution referred to in this complaint, participated and shared in and or received (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution, and should be fined not more than $1,000,000 or imprisoned not more than 30 years, or both pursuant to code.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.        Statutory Compensatory damages for each separate violation according to proof;

b.        Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC to the extent permitted by law;

c.        Declaratory relief, including permanent injunctive relief, prohibiting GMAC, their servicing agent, Litton Loan Servicing, or any of their successor agents or assigns, from any further breaches of the statute;

d.        Reasonable attorney's fees and court costs according to proof;

e.        Such other and further relief as the court deems just and proper.

**<u>COUNT NINETEEN</u>**:

**PLAINTIFFS v. GMAC**

Damages And Declaratory Relief Action For GMACs Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

321.        Plaintiffs incorporate paragraphs 1 to 320, inclusive, herein, as though set forth herein in full. Substance prevails over form.

322.        Regulation B notice is required when the Defendant, GMAC, individually, and by and through their servicing agent, Litton Loan Servicing, LP, failed to acknowledge receipt of the HAMP application, thus constituting a denial of the application and denial of credit there under.

323.        Pursuant to Regulation B, any denial of credit required GMAC, individually and on behalf of the co-defendants, to tender a proper notice pursuant to that Regulation B.

324.        Each separate act by GMAC, on their own behalf, and on behalf of the co-defendants, constituted separate violations of the statutes as alleged in this entire Complaint constitutes grounds for statutory damages payable to the Plaintiffs in the sum of $10,000 per violation, according to proof. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.        Statutory Compensatory damages for each separate violation according to proof;

b.        Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC to the extent permitted by law;

c.        Declaratory relief, including permanent injunctive relief, prohibiting GMAC or their servicing agent, Litton Loan Servicing, or any of their successors, agents or assigns, from any further breaches of the statute;

d.        Reasonable attorney's fees and court costs according to proof;

e.        Such other and further relief as the court deems just and proper.

**<u>COUNT TWENTY</u>**:

**PLAINTIFFS v. GMAC**

PENDANT STATE CLAIM
Damages And Declaratory Relief Action for GMAC's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)

325.        Plaintiffs incorporate paragraphs 1 to 324, inclusive, herein, as though set forth herein in full. Substance prevails over form.

326.        Proper demand was made upon GMAC in October of 2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

327.        GMAC never responded to the request, except for their attorney, on February 18, 2011, well past the deadline of the statute, GMAC's lawyers sent a letter stating unequivocally that Litton received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

328.        That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law.

329.        That, had GMAC answered, then they would be forced to admit, under oath, that they had no interest in the loan which was the subject of the litigation; would have to admit that Washington Mutual Bank, FA was paid in full; and that there never existed a servicing agreement between Litton Loan Servicing, LP and Washington Mutual Bank, FA.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

152

a.      Statutory Compensatory damages for each separate violation according to proof;

b.      Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC to the extent permitted by law;

c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d.      Reasonable attorney's fees and court costs according to proof;

e.      Such other and further relief as the court deems just and proper.

## COUNT TWENTY ONE:
## PLAINTIFFS v. RFC

Damages And Declaratory Relief Action For Failure RFC HOMECOMINGS, LLC Failure To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

330.     Plaintiffs incorporate paragraphs 1 to 329, inclusive, herein, as though set forth herein in full.

331.     The Making Home Affordable Program was introduced in February 2009 by the Obama Administration which was intended to stabilize the housing market and help struggling homeowners get relief and avoid foreclosure.

332.     Because the stated purpose of the program was partly designed to help homeowners, homeowners, including the Plaintiffs, were the intended third party beneficiaries of the Program.

333.     In March of 2009, the Treasury Department (Treasury) issued uniform guidance for loan modifications across the mortgage industry, and updated those guidelines with policy announcements.

334.     The MHA Handbook for Servicers of Non-GSE Mortgages (Handbook) was issued to provide guidance for servicers of mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac.

335.     GMAC Mortgage LLC, individually and on behalf of RFC HOMECOMINGS, LLC, and Ally Financial, Inc. signed the HAMP servicer participation agreement on April 13, 2009, becoming a participant in the Home Affordable Modification Program (HAMP), by signing the Servicer Participation Agreement (SPA).

336.     Defendant GMAC Mortgage LLC individually and on behalf of RFC HOMECOMINGS, LLC, and Ally Financial, Inc. registered and executed a Servicer Participation Agreement, related documents, and one or more Service Schedules (SPA) with the Program Administrator on or before April 13, 2009.

337.     Plaintiffs were informed, believe, and thereon allege, that, contrary to the statements of GMAC Mortgage LLC, individually and on behalf of RFC HOMECOMINGS, LLC, and Ally Financial, Inc. Litton Loan Servicing, LP, at all relevant times, had a servicing agreement with RFC Homecomings and GMAC MORTGAGE, LLC.

338.     That Plaintiffs filed a formal complaint with RFC Homecomings (hereinafter referred to as RFC) and GMAC MORTGAGE, LLC, (hereinafter referred to as GMAC) regarding the fraudulent conduct of the Defendant, Litton Loan Servicing, LP.

339.     That, in order to conceal their conspiracy, complicity, cooperation and agency relationship with Litton Loan Servicing, LP, GMAC individually and on behalf of RFC told the Plaintiffs that no one services the loans for GMAC and they service their own loans.

From:    GMAC 1st Mortgage Servicing [customer_service@gmacm.com]
Sent:    Wednesday, December 29, 2010 8:15 AM
To:    Barry B. Eskanos
Subject: Re: * AND * / * * USE OF FORGED PROMISSORY NOTE

Dear Customer,

In response to your inquiry, please be advised, GMAC Mortgage does not have other mortgage companies service loans on our behalf.

153

340.    The statements made using means of interstate commerce were false.

341.    The SPA governs servicer participation in MHA for all Non-GSE Mortgages.

342.    GMAC individually and on behalf of RFC HOMECOMINGS, LLC, and Ally Financial, Inc. and Litton Loan Servicing, LP on behalf of themselves and the lenders whose loans they service, agreed to abide by the terms of the handbook as part of the Servicer Participation Agreement (SPA).

343.    All participating servicers, including GMAC individually and on behalf of RFC HOMECOMINGS, LLC, and Ally Financial, Inc. and Litton Loan Servicing, LP (hereinafter referred to as Litton) acting on behalf of GMAC, and RFC, are required, among other things, to consider all eligible mortgage loans for Services (as defined in the SPA) unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. MHA 1.1

a.    Pursuant to the Handbook, GMAC, RFC, and Litton cannot escape liability by simply referring the matter to their lawyers.

b.    The Handbook, in pertinent part says that if the entity that signed the SPA sub-contracts out any portion of its responsibilities as a servicer to another party, the entity that signed the SPA will be liable for the acts and omissions of the sub-contracted party under the SPA, thereby making GMAC responsible for the conduct of Litton.

c.    GMAC, by and through their agent, Litton, individually and on behalf of GMAC and RFC, instructed Akerman Senterfitt, its lawyers to act on their behalf, and thus GMAC is responsible for all the willful violations, intentional and negligent misconduct of its lawyers and co-conspirators as pled herein, in failing in every respect to meet the requirements of HAMP.

d.    All of the wrongdoings complained of herein, include the conduct of Akerman Senterfitt as the agent and subcontractor of GMAC.

344.    As further described in Section 1.3, participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out the requirements of the SPA. MHA 1.1, but Plaintiffs are informed, believe and thereon allege, that Litton failed to use reasonable efforts to contact GMAC, Ally or RFC regarding the Plaintiffs; and, once GMAC, RFC and Ally were contacted by the Plaintiffs, they each, jointly and severally, failed to request Litton to resolve the complaints of the Plaintiffs.

345.    In 2009, Congress passed the Helping Families Save Their Homes Act of 2009, which includes legal protection for servicers that modify residential mortgages.

346.    It was intended to encourage more servicers to modify more mortgages for the benefit of the homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

347.    The bill essentially provides authority for, and legal protection for servicers to alter mortgage contracts and, as the argument goes, investor contracts where mortgages have been securitized.

348.    Thus, not only does no legal impediment existed for RFC through Litton Loan Servicing LLC to grant a loan modification on behalf of Ally, GMAC, RFC or even Washington Mutual Bank, FA (if it existed or were so entitled) to any and all individuals who qualify, but also every action taken by the Government was intended to benefit the Homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

349.    In addition to the normal obligation to obey all laws, and the implied covenants of good faith and fair dealing that are found in every contractual agreement, the SPA requires that GMAC, RFC and Litton Loan Servicing, individually and acting on behalf of Ally, GMAC and RFC, fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP.

a.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

b.    The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

c.    The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

d.    The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

154

e.      The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

f.      The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

g.      The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act.

h.      Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.; 18 U.S.C. 1964, (Civil RICO Remedies);

i.      Conspiracy to commit and commission of Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343;

j.      Conspiracy to commit and commission of Bank Fraud 18 U.S.C. 1341, 1344;

k.      Conspiracy to commit and commission of 18 U.S.C. § 1001;

l.      Conspiracy to commit and commission of 18 U.S.C. § 1005;

350.      If Litton Loan Servicing, LP, individually and on behalf of Ally, GMAC, RFC, actually legally serviced any loan for GMAC, RFC Homecomings, or Washington Mutual Bank, FA then Plaintiffs would have received from Litton Loan Servicing, LP, on behalf of at least one of the defendant entities, at a minimum, a response to their HAMP loan modification request, or been provided the H4H application or responded to the Florida Statute Estoppel Demand Pursuant to Florida Statute 701.04 (1).

351.      Defendant GMAC and RFC by and through its servicing agent, Litton Loan Servicing, LP, did not respond, because they had no legal right or basis upon which to provide a response.

352.      The Plaintiff's property qualifies under the conditions required of HAMP, and the Plaintiff would have been eligible for HAMP, including, but not limited to, the following conditions:

a.      Mortgage loan was originated on or before January 1, 2009;

b.      Mortgage loan was not previously modified under HAMP.

c.      The Mortgage loan is delinquent or default is reasonably foreseeable.

d.      The Mortgage loan is secured by a one unit property, which is the principal residence of the Plaintiff.

e.      The subject property is not vacant or condemned.

f.      The borrower has documented financial hardship and represented she does not have sufficient liquid assets to make the monthly mortgage payments because of a reduction in her salary and a reduction in her spouses work to part time status.

g.      The Plaintiff's monthly mortgage payment (including principal, interest, taxes, and insurance) is greater than 31 percent of the Plaintiff's verified monthly gross income.

h.      The Plaintiff is willing to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.

i.      The Current unpaid principal balance (UPB) of the mortgage loan prior to capitalization is not greater than $729,750.

j.      The Plaintiff offered to make a timely first trial period payment on or before December 31, 2012, but no TPP was ever offered to the Plaintiff.

k.      The Plaintiff is in active litigation, and is eligible for HAMP.

353.      Litton Loan Servicing, LP, individually and on behalf of GMAC, RFC, Ally, and the remaining co-defendants, was required to communicate with clear written information designed to help the borrower understand the modification process in accordance with the HAMP guidelines and Handbook.

354.      Litton Loan Servicing, LP, individually and on behalf of GMAC, Ally, and RFC has failed and refused to communicate with the Plaintiff, and referred the Plaintiff to their attorney, who has also refused to provide any information regarding HAMP; who then expressly, blatantly and openly refused to comply with the statutory requirements of providing an estoppel letter; and has willfully violated every provision of the HAMP and the handbook.

355.      Plaintiffs put GMAC, (which therefore includes RFC, and Ally), on formal notice of the conduct complained of herein, as early as when the complaint was filed in March of 2005 and as the case progressed, and filed further complaints with RFC, GMAC and Ally, in December of 2010 and June of 2011.

155

356.    As late as June of 2011, although RFC, GMAC and were fully apprised that Litton failed in every respect to obey the statutes complained of herein, and has a toll free number for HAMP applications, the Defendant, GMAC, told Plaintiffs they were not allowed to call GMAC or RFC; not allowed to discuss HAMP with GMAC; nor was he allowed to discuss the HAMP modification process or other alternative modification programs with GMAC, but instead, Plaintiffs were told by GMAC they would have to contact Litton.

357.    Although GMAC (and therefore RFC and Ally) has a toll free number, the Plaintiff was told he was not allowed to call GMAC; not allowed to discuss HAMP with GMAC; nor was he allowed to discuss the HAMP modification process or other alternative modification programs with GMAC.

358.    GMAC, individually, and on behalf of RFC, and Ally, is required to maintain adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents.

359.    Litton Loan Servicing, LP, individually and on behalf of GMAC, RFC and Ally, and GMAC, Ally and RFC, have ratified the wrongful conduct of Litton in every respect and after having been fully apprised of their conduct, has refused to acknowledge receipt of Plaintiffs HAMP application; refused to respond to the application; refused to discuss the application with Plaintiff; and willfully violated the following regulations:

360.    Although Section 5 of the Federal Trade Commission Act prohibits unfair or deceptive acts or practices, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC, used false affidavits; filed a forged promissory note; committed perjury and numerous acts of fraud upon the court and the Plaintiff in order to obtain a judgment of foreclosure.

361.    Although the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibits discrimination on a prohibited basis in connection with mortgage transactions, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, RFC discriminated against the Plaintiff because of her gender and her religion.

362.    Although the Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, RFC failed to provide proper documentation in violation of RESPA.

363.    Although the Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, Ally and GMAC tendered multiple demands seeking payment on behalf of RFC, but obtained a judgment in the name of Washington Mutual Bank, FA, informing the court that the only entity entitled to recover was Washington Mutual Bank, FA.

364.    Each letter and piece of correspondence sent by Litton, on behalf of RFC with Ally's and GMAC's consent, and full ratification after being fully apprised of their conduct, individually and doing business as RFC was a separate violation of the Fair Debt Collection Practices Act,.

365.    Although the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification, (these laws also prohibit red-lining), Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC, Ally, and GMAC has discriminated against the Plaintiffs on the basis of her gender and her religion.

366.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC negotiated modifications of loans with others, but refused to even consider the Plaintiffs, failing to acknowledge or respond to the Plaintiffs application.

367.    Although the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC used false information in reporting consumer credit information to credit reporting agencies about the Plaintiff.

368.    Although the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC, and RFC ratified the conduct of Litton, who intentionally and willfully failed and refused to comply with Regulation B by failing to timely respond to the HAMP application, thus violating Regulation B.

156

369.    Under Florida Law, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC, was required to provide an estoppel letter pursuant to Florida Statutes Chapter 701.04 (1), which says, in pertinent part:

> "Within 14 days after receipt of the written request of a mortgagor, the holder of a mortgage shall deliver to the mortgagor at a place designated in the written request an estoppel letter setting forth the unpaid balance of the loan secured by the mortgage, including principal, interest, and any other charges properly due under or secured by the mortgage and interest on a per-day basis for the unpaid balance. Whenever the amount of money due on any mortgage, lien, or judgment shall be fully paid to the person or party entitled to the payment thereof, the mortgagee, creditor, or assignee, or the attorney of record in the case of a judgment, to whom such payment shall have been made, shall execute in writing an instrument acknowledging satisfaction of said mortgage, lien, or judgment and have the same acknowledged, or proven, and duly entered of record in the book provided by law for such purposes in the proper county. Within 60 days of the date of receipt of the full payment of the mortgage, lien, or judgment, the person required to acknowledge satisfaction of the mortgage, lien, or judgment shall send or cause to be sent the recorded satisfaction to the person who has made the full payment. In the case of a civil action arising out of the provisions of this section, the prevailing party shall be entitled to attorney's fees and costs."

370.    Proper demand was made upon Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, GMAC and RFC, on 10/29/2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

371.    On February 18, 2011, well past the deadline of the statute, Litton's lawyers sent a letter stating unequivocally that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC and RFC, and each of them, received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

372.    That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law, as well as a direct violation of the requirement of the HAMP guidelines wherein "the SPA requires that [RFC and Litton Loan Servicing] fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

373.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC, pursuant to the HAMP guidelines, is required to make a reasonable effort to solicit borrower by performing at a minimum, the following acts:

a.    The servicer (including Litton and GMAC) is to make a minimum of four telephone calls to the last known phone numbers of record, at different times of the day; - (Litton made none) and

b.    The servicer (including Litton and RFC) is to send two written notices to the last address of record by sending one letter via certified/express mail or via overnight delivery service (such as Federal Express or UPS) with return receipt/delivery confirmation and one letter via regular mail.  (Litton, individually, and on behalf of GMAC and RFC's only correspondence was the bad faith demand letters, never any response or mention of the HAMP or other rights of the Borrower).

c.    Any contact with eligible borrowers, whether by telephone, mail or otherwise, must:

1.    Advise borrowers that they may be eligible for HAMP; MHA Handbook v 2.0.  (Litton and RFC made no such effort nor provide no such advice).

2.    Clearly describe the Initial Package that the borrower is required to submit pursuant to the requirements outlined in Section 4, and state what other information the servicer needs to complete the HAMP analysis;  (Litton, individually and on behalf of Ally, RFC and GMAC, never

157

discussed HAMP, refused to discuss HAMP with the Plaintiffs, and never reviewed the Plaintiffs application.)

        3.        Provide a toll-free telephone number through which the borrower can reach a loan servicer representative; (Litton, individually and on behalf of RFC stated that Plaintiff is not permitted to call them at all, and RFC required Plaintiffs to call Litton) and

        4.        Identify any unique requirements the servicer may have established for submission of an Initial Package received later than 30 business days prior to a scheduled foreclosure sale date.  (Litton, individually and on behalf of RFC, refused to provide any information regarding HAMP or mention the application whatsoever).

        5.        All contact attempts must be documented in the servicing file.  If the servicer has documentation evidencing that it satisfied the Reasonable Effort standard for HAMP prior to June 1, 2010, resolicitation of the borrower is not required. (If Litton, individually and on behalf of RFC, documented any efforts, then they would be fraudulent and further violations of the agreement.)

    374.      Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC failed to make ANY contact with the Plaintiff; refused to discuss the matter with the Plaintiff; refused to provide a number for the Plaintiff to discuss the matter with the Servicer; and refused to comply with all the requirements set forth in this complaint.

    375.      Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC; and GMAC (individually and on behalf of RFC and Ally) separately agreed, that they were further required to, and willfully failed and refused to comply with each and every one of the following conditions:

        a.        The servicer (including Litton and RFC) must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Package, which is required to be submitted by the borrower to request a HAMP modification.

        b.        The communication should:

        1.        Describe the income evidence required to be evaluated for HAMP;

        c.        Provide the RMA (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit); and

        d.        Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

        e.        The communication should also include clear language stating that during the HAMP evaluation the home will not:  (i) be referred to foreclosure; or (ii) be sold at a foreclosure sale if the foreclosure process has already been initiated.  In the communication, the servicer **must** include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the communication.

        f.        If Right Party Contact is established prior to satisfaction of the Reasonable Effort standard, the **servicer must continue** to take steps to satisfy the Reasonable Effort standard until the Initial Package is submitted by the borrower.

        g.        If Right Party Contact is established, but the borrower does not submit an Initial Package, the **servicer must resend** the Initial Package communication.  Again, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the second communication.  If the borrower does not respond by providing an Initial Package within the required time period set forth in the second communication, the servicer may determine the borrower to be ineligible for HAMP.

        h.        If Right Party Contact is established, but the borrower submits an incomplete Initial Package within the required time period, the servicer (including Litton and RFC) **must comply** with the "Incomplete Information Notice" requirements set forth below in Section 2.3.3.  If the borrower does not respond to either the 30-day Incomplete Information Notice or the 15-day Incomplete Information Notice by providing an Initial Package within the required time period, the servicer may determine the borrower to be ineligible for HAMP.

Servicers **must acknowledge receipt** of the Initial Package within 10 business days per the requirements in Section 4.5 and respond within 30 calendar days with either an Incomplete Information Notice (as outlined in Section 2.3.3), a TPP Notice (as outlined in Section 8.1) or a Non-Approval Notice (as outlined in Section 2.3.2).

    376.      Pursuant to the provisions of the agreement, Plaintiffs are entitled to a stay as Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC failed in every respect to meet the provisions of the SPA.

158

377. Pursuant to the provisions of the SPA, Litton, GMAC and RFC, intentionally and willfully failed to comply with each and every provision as set forth below:

3 Protections Against Unnecessary Foreclosure

3.1 Suspension of a Referral to Foreclosure

A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of the following circumstances exists:

- The borrower is evaluated for HAMP and is determined to be ineligible for the program; or

- The borrower is offered a TPP, but fails to make current trial period payments as set forth in Section 8.3; or

- The servicer has established Right Party Contact, has sent at least two written requests asking the borrower to supply required information in accordance with Section 2.2.2, and has otherwise satisfied the Reasonable Effort solicitation standard, and the borrower failed to respond by the dates indicated in those requests; or

- The servicer has satisfied the Reasonable Effort solicitation standard without establishing Right Party Contact; or The borrower or co-borrower states he or she is not interested in pursuing a HAMP modification and such statement is reflected by the servicer in its servicing system and/or mortgage file.

3.2 Suspension of Foreclosure Proceedings in Process

With respect to a borrower who submits a request for HAMP consideration after a loan has been referred to foreclosure, the servicer must, immediately upon the borrower's acceptance of a TPP based on verified income, and for the duration of the trial period, take those actions within its authority that are necessary to halt further activity and events in the foreclosure process, whether judicial or non-judicial, including but not limited to refraining from scheduling a sale or causing a judgment to be entered.

3.3 Suspension of Scheduled Foreclosure Sale

When a borrower submits a request for HAMP consideration after a foreclosure sale date has been scheduled and the request is received no later than midnight of the seventh business day prior to the foreclosure sale date (Deadline), the servicer must suspend the sale as necessary to evaluate the borrower for HAMP…

3.4 Mitigating Foreclosure Impact

The servicer must take the following actions to mitigate foreclosure impact:

3.4.1 Simultaneous Trial Period Plan and Foreclosure Explanation

When a borrower is simultaneously in foreclosure and is either being evaluated for HAMP or is in a TPP, the servicer must provide the borrower with a written notification that explains, in clear language, the concurrent modification and foreclosure processes and that states that even though certain foreclosure activities may continue, the home will not be sold at a foreclosure sale while the borrower is being considered for HAMP or while the borrower is making payments under a TPP…

3.4.2 Foreclosure Attorney/Trustee Communication

Servicers must develop and implement written policies and procedures to provide notification to their foreclosure attorney/trustee regarding a borrower's HAMP status, including whether the borrower is potentially eligible for HAMP (and is subject to Section 2.2), and whether the borrower is being evaluated for, or is currently in, a TPP. Servicers must ensure that their foreclosure attorney/trustee adheres to all of the requirements of Section 3.1, Section 3.2

159

and Section 3.3 with respect to referral                                    to foreclosure, stay of foreclosure
actions and suspension of                               foreclosure sales.

    3.4.3    Certification Prior to Foreclosure Sale
        Servicers must develop and implement written procedures
applicable to all loans that are potentially eligible for HAMP (and
are subject to Section 2.2) that require the servicer to provide to the
foreclosure attorney/trustee a written certification that (i) one of
the five circumstances under Section 3.1 exists, and (ii) all other
available loss mitigation alternatives have been exhausted and a
non-foreclosure outcome could not be reached.  This certification
must be provided no sooner than seven business days prior to the
scheduled foreclosure sale date (the Deadline) or any extension
thereof.

    378.    Plaintiffs were further entitled, and never received the required acknowledgement of the
Initial Package.

    4.5 Acknowledgment of Initial Package
Within 10 business days following receipt of an Initial Package, the
servicer **must** acknowledge in writing the borrower's request for
HAMP participation by sending the borrower confirmation that the
Initial Package was received and a description of the servicer's
evaluation process and timeline. If the Initial Package is received from
the borrower via email, the servicer may email the acknowledgement.
Servicers must maintain evidence of the date of receipt of the
borrower's Initial Package in its records.
A single written communication sent within 10 business days of receipt
of a borrower's request for HAMP participation may also include, at
the servicer's discretion, the results of its review of the Initial Package.

    379.    Although Litton Loan Services, LP, on their own behalf, and on behalf of the co-
defendant, GMAC and RFC, and GMAC separately, **MUST** comply, Litton Loan Services, LP, on their
own behalf, and on behalf of the co-defendant RFC not only failed to acknowledge their receipt of the
Initial Package that was sent to them and received on May 4, 2011, but wantonly, willfully and
intentionally failed and refused in every respect to comply with any of the provisions of HAMP contained
herein for the benefit of the Plaintiff.

    380.    Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-
defendant RFC was **obligated** to review the documentation submitted by Plaintiff on May 4, 2011, within
30 days, and failed and refused to do so.

    381.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf
of the co-defendant RFC had 30 days wherein they were contractually obligated to review the initial
package, and they willfully, wantonly and intentionally failed and refused in every respect to do so.

    4.6 Review of Initial Package
Within 30 calendar days from the date an Initial Package is received,
the servicer **must** review the documentation provided by the borrower
for completeness.  If the documentation is incomplete or insufficient for
use in underwriting, the servicer must send the borrower an Incomplete
Information
Notice in accordance with the guidance set forth in Section 2.3.3.
If the borrower's documentation is complete, the servicer must evaluate
the borrower's eligibility for HAMP and either:
-       Send the borrower a TPP Notice (see Section 8.1); or
-       Make a determination that the borrower is not eligible for
HAMP and communicate this determination to the borrower in
accordance with the guidance in Section 2.3.2.

160

382.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC had only 30 days from May 11, 2011 to wherein they were contractually obligated to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination, and utterly, willfully, wantonly, and intentionally failed and refused to do so.

383.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC had 30 days from May 11, 2011 wherein they were contractually obligated to provide the Plaintiff with a determination, and willfully, wantonly, and intentionally failed and refused to do so in breach of that agreement.

> 6 Underwriting
> Servicers must determine the borrower's eligibility for a modification using information obtained in the Initial Package and subsequently verified. **Servicers are required** to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination within 30 calendar days of receiving all required borrower documentation.

384.    Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC, and GMAC separately was contractually obligated to consider the Plaintiff for Hope for Homeowners, and utterly failed and refused to do so.

385.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC was jointly and separately contractually obligated to consider the Plaintiff for Hope for Homeowners, as set forth herein.

> 6.2 Coordination with Hope for Homeowners
> Servicers are **required** to consider a borrower for a refinance through the Federal Housing Administration's HOPE for Homeowners (H4H) program when feasible. Consideration for an H4H refinance should not delay eligible borrowers from receiving a TPP Notice. The servicer's obligation as it relates to the H4H requirement is that while the servicer is gathering information to determine if a borrower meets the minimum eligibility criteria for HAMP, it should also be assessing whether the borrower may be eligible to refinance through H4H. This assessment would involve asking the following set of questions:
> -    Will the loan amount exceed $550,440? No.
> -    Has the borrower made less than six (6) full payments during the life of the first lien loan? No.
> -    Does the borrower have an ownership interest in other residential real estate, including any second homes or rental properties? No.
> -    Was the mortgage to be refinanced originated after January 1, 2008? No.
> -    Does the property contain more than one (1) unit? No.
> If the answer to all of these questions is "NO", the borrower may be eligible for H4H. (As is the precise case for the Plaintiff, herein). In this case, the servicer should counsel the borrower to seek a refinance with an H4H lender.

386.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC failed and refused to notify the Plaintiff of their consideration, as well as Litton individually and on behalf of RFC, failed and refused to consider the Plaintiff, entitlement to relief under Hope for Homeowners.

387.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC was obligated to apply the modification steps until the monthly mortgage payment ratio is reduced to 31 percent, but utterly failed and refused to do so.

388.    Pursuant to the Handbook, section 6.3 Standard Modification Waterfall Servicers (including RFC and LITTON) **must** apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent (target monthly mortgage payment ratio).

161

389.    A borrower will qualify for HAMP only if the interest rate on the mortgage loan can be reduced by at least 0.125 percent without the modified monthly mortgage payment ratio going below 31 percent. If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31 percent, the modification will not satisfy HAMP requirements and no incentives will be payable in connection with the modification.

390.    Even though clearly, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC and LITTON, **MUST** have taken action, they failed and intentionally refused to comply with every requirement of HAMP; failed and refused to comply with State and Federal Law; committed fraud; willfully and maliciously acted with the sole intent to deprive Plaintiffs of their property.

391.    Because there existed a contract between RFC, Litton Loan Servicing, LP and the US Treasury Department which was intended to benefit the Plaintiffs, and others similarly situated; and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC, accepted consideration for each loan modification application from the US Treasury Department; because there was a mutual intent to benefit the Plaintiffs, and others similarly situated; and the Plaintiffs were deprived of their opportunity to have their HAMP application, their H4H application properly and timely reviewed, the Plaintiffs suffered irreparable harm.

392.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC further owed the Plaintiffs and others similarly situated the implied obligation of good faith and fair dealing, which is implied in every contract.

393.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant RFC committed intentional, wanton and willful breaches of the covenants of good faith and fair dealing; intentional, wanton and willful breaches of the agreement with the US Treasury Department; and the Plaintiffs, and others similarly situated were the intended third party beneficiaries of that agreement between the US Treasury Department, RFC and Litton Loan Servicing, LP and Plaintiffs as the intended beneficiary, and Plaintiffs, and others, were harmed as a result of those breaches.

394.    Plaintiffs are entitled to receive compensatory damages according to proof;

395.    Plaintiffs are entitled to receive exemplary damages based on the net worth of RFC for their malicious, wanton and willful breaches of the agreement and their ratification of the wrongful conduct of their co-conspirators.

396.    Wherefore Plaintiffs respectfully request that the court:

A.    Issue an order requiring RFC, jointly and severally, with the remaining co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiff and dismiss them with prejudice;

B.    Find that RFC, on their own behalf, and on behalf of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that [RFC and Litton Loan Services, LP], on their own behalf, and on behalf of the remaining co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

C.    Find that RFC, on their own behalf, and on behalf of the remaining co-defendants, were in breach of the SPA agreement with the US Treasury Department, intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

1.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

2.    The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

3.    The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

4.    The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

5.    The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

162

6.      The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

7.      The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

8.      Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

D.      Find that RFC, on their own behalf, and on behalf of the remaining co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

E.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

J.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

K.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.      That the court further grant compensatory damages to Plaintiffs for RFCs' intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.      That the court further grant punitive damages to Plaintiffs against RFC, on their own behalf, and on behalf of the co-defendants for RFC, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant RFC, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.      That the court further grant statutory damages of $10,000 per violation, to Plaintiff against RFC, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant RFC, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.      That the court order Defendant RFC, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of RFC and its agents, in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

163

P.    That the court grants to Plaintiff against the Defendant RFC, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

## COUNT TWENTY TWO:
## PLAINTIFFS v. RFC

Damages And Declaratory Relief Action For RFC's Violation of the FEDERAL FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. § 1692 ET. SEQ

397.    Plaintiffs incorporate paragraphs 1 to 396, inclusive, herein, as though set forth herein in full.

398.    Plaintiffs fall within the class of individuals who are defined by the Statute as consumer—"any natural person obligated or allegedly obligated to pay any debt".

399.    Defendant, Litton on the behalf of RFC, and on behalf of the other co-defendants, claims that Plaintiffs owed a consumer debt—"any obligation... [incurred] primarily for personal, family or household purposes", a mortgage secured by a forged note and deed of trust.

400.    Defendant, RFC, on their own behalf, retained the services of Litton, and on behalf of the co-defendants, Litton is a debt collector defined as any person using interstate commerce who regularly collects debts as defined by the statute and as proven by their acts alleged herein.

401.    Each separate letter demanding payment, including billing the Plaintiffs for attorneys' fees and court costs, inspection fees, and all demands for money of any and all kinds, sent by, or demanded on the behalf of Litton Loan Servicing, LP individually, and on behalf of Defendant RFC Homecomings and GMAC is a separate violation of the FDCPA.

402.    Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
        a.    Statutory Compensatory damages for each separate violation according to proof;
        b.    Exemplary damages for each separate violation based on the net worth of the Defendant, RFC to the extent permissible by law;
        c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC, or any of their successors, agents or assigns, from any further breaches of the statute;
        d.    Reasonable attorney's fees and court costs according to proof;
        e.    Such other and further relief as the court deems just and proper.

## COUNT TWENTY THREE
## PLAINTIFFS v. RFC

Damages And Declaratory Relief Action For RFC's Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and 18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

403.    Plaintiffs incorporate paragraphs 1 to 402, inclusive, herein, as though set forth herein in full. Substance prevails over form.

404.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

405.    On March 25, 2005, and continuing, through the present, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

406.    Plaintiffs further allege that Defendant RFC, on their own behalf, and on behalf of the co-defendants, in conjunction with and in furtherance of the conspiracy with all the remaining Defendants, did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(b) supra.

164

407.    Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.

408.    Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise). RFC, on their own behalf, and on behalf of the co-defendants, are liable for all wrongful conduct of its co-defendants, and each of them, its lawyers, Shapiro and Fishman and Akerman Senterfitt.

409.    At all times herein, RFC, on their own behalf, and on behalf of the co-defendants, and each of them, conspired with remaining defendants, ratified the conduct, and conspired with the remaining Defendants, to interfere with the quiet enjoyment of Plaintiffs home; steal the equity in the Plaintiff's home; and used a forged promissory note and fraudulent affidavit in a civil court action in order to fraudulently obtain a judgment of foreclosure.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

## COUNT TWENTY FOUR
### PLAINTIFFS v. RFC

Conduct and Participation in a RICO Enterprise
through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

410.    Plaintiffs incorporate paragraphs 1 to 409, inclusive, herein, as though set forth herein in full. Substance prevails over form.

411.    Plaintiffs further incorporate the allegations of the remaining Counts of the rest of this complaint, contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

412.    At various times and places partially enumerated Plaintiff's documentary material, all Defendants, and each of them, did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

413.    Likewise, all Defendants, and each of them, did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

414.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

415.    Plaintiffs further allege that all Defendants jointly or severally did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

416.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

## COUNT TWENTY FIVE

165

**PLAINTIFFS v. RFC**

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

417.    Plaintiffs incorporate paragraphs 1 to 416, inclusive, herein, as though set forth herein in full. Substance prevails over form.

418.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

419.    At various times and places as enumerated in Plaintiff's exhibits which are attached hereto, and incorporated herein, all Defendants, and each of them, did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

420.    At various times and places partially enumerated in Plaintiffs documentary material, all Defendants, individually and on behalf of each other, committed acts in furtherance of the conspiracy, did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

421.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

422.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d) (Prohibited activities supra).

423.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.    Statutory Compensatory damages for each separate violation according to proof;

      b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

      c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

      d.    Reasonable attorney's fees and court costs according to proof;

      e.    Such other and further relief as the court deems just and proper.

**COUNT TWENTY SIX**
**PLAINTIFFS v. RFC**

Damages And Declaratory Relief Action for GMAC's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

424.    Plaintiffs incorporate paragraphs 1 to 423, inclusive, herein, as though set forth herein in full. Substance prevails over form.

425.    As alleged herein, Defendant RFC, on their own behalf, and on behalf of the co-defendants, committed numerous acts of mail fraud, which is a violation of federal law.

426.    That Defendant RFC, on their own behalf, and on behalf of the co-defendants, knowingly devised a scheme to defraud or to obtain money or property (or the intangible right of honest services) by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

427.    That RFC, on their own behalf, and on behalf of the co-defendants, acted with the intent to defraud the Plaintiffs and others (including the US Treasury) to the detriment of the Plaintiffs, and each of them.

428.    That in advancing, furthering, or carrying out the scheme, RFC, on their own behalf, and on behalf of the co-defendants, used the mails (a private or commercial interstate carrier), or caused the mails (a private or commercial interstate carrier) to be used.

166

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

     a.     Statutory Compensatory damages for each separate violation according to proof;

     b.     Exemplary damages for each separate violation based on the net worth of the Defendant, RFC, to the extent permitted by law;

     c.     Declaratory relief, including permanent injunctive relief, prohibiting RFC, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

     d.     Reasonable attorney's fees and court costs according to proof;

     e.     Such other and further relief as the court deems just and proper.

<u>COUNT TWENTY SEVEN</u>:

**Plaintiffs v. RFC**

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the
VIOLATION OF 18 U.S.C. § 1001

429.     Plaintiffs incorporate paragraphs 1 to 428, inclusive, herein, as though set forth herein in full. Substance prevails over form.

430.     Defendant, RFC, on their own behalf, and on behalf of the co-defendants, violated 18 U.S.C. § 1001 by the conduct complained of herein, and as proven at the time of trial.

431.     Defendant RFC, on their own behalf, and on behalf of the co-defendants falsified, concealed or covered up by any trick, scheme or device, material facts, including, but not necessarily limited to:

     a.     The date of the transfer of the loan from Washington Mutual Bank, FA;

     b.     The use of false and misleading language in the affidavit of Debra Lyman.

5.     On March 25, 2005, subsequent to the filing of the foreclosure complaint, the loan was

transferred from Washington Mutual to RFC.  All rights under the note and mortgage

were transferred at that time.

     c.     The true facts were, that March 25, 2005 is five days prior to the filing of the lawsuit. The court was misled by Defendant Washington Mutual Bank, FA, Defendant Debra Lyman, Defendant Litton Loan Servicing LP's use of the misleading words "subsequent to the filing of the foreclosure complaint".  Had each of the Defendants informed the court of the true facts, that March 25, 2005, was five days prior to suit being filed, then Washington Mutual Bank, FA would have had no standing to bring the action, and thus the action would have been dismissed.

     d.     The Defendant's affidavit was further false in that it claimed Washington Mutual Bank, FA, was entitled to sums that Washington Mutual Bank, FA later admitted were neither due nor owing to them.

     e.     In fact, Defendants concealed from the court and failed to inform the court of a credit of $373,907.18 in principal, proving that Washington Mutual Bank, FA, was paid in full and not owed any money from the Plaintiffs.

     f.     The Defendants, RFC, by and through its agent, Litton, and on behalf of the co-defendants, filed false affidavits and a forged promissory note, with the court in order to obtain a judgment of foreclosure.

     g.     The Defendant, RFC, by and through its agent, Litton, and on behalf of the co-defendants also filed a fraudulent affidavit and a forged promissory note.

     h.     The Defendant RFC, individually, and by and through its agent, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants violated the State and Federal Statutes listed herein and committed other wrongful and intentional misconduct, all according to proof as pled herein.

432.     Defendant RFC, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001 by making, and / or causing to be made, or ratifying, fictitious or fraudulent statements or representations to the Plaintiffs, to the court, and to the US Department of the Treasury; to the OCC; to the FTC; to the State and local authorities, and to the court of appeals.

167

433.    Defendant RFC, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001by ratifying, making or using any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, all as alleged herein.

434.    Defendant RFC, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001, as alleged herein, because the statements made by the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants were all material, and adversely affected the Plaintiffs, the court, the US Government, and others and were ratified by the Defendant, RFC. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, RFC;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting RFC, or any of their loan servicers, agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

## COUNT TWENTY EIGHT
### Plaintiffs v. RFC

Damages And Declaratory Relief Action for RFC's Violation of
18 U.S.C. § 1005

435.    Plaintiffs incorporate paragraphs 1 to 434, inclusive, herein, as though set forth herein in full. Substance prevails over form.

436.    Defendant RFC, in furtherance of the co-conspiracies complained of herein, and in order to conceal and misdirect the officials conducting an official investigation, provided false information to the Florida Office of Financial Regulation, delivered by means of the US Mail, and used means of Interstate Commerce, and transmitted mail across State lines.

437.    The Defendant RFC knew that the Florida Office of Financial Regulation (OFR) was conducting a full investigation of the conduct of the Defendants, and each of them, including the fraudulent affidavit of Debra Lyman and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants and the use of a forged promissory note in obtaining a fraudulent judgment of foreclosure.

438.    During that investigation stemming from a complaint filed with that office in 2010, the OFR sent a request for a response from RFC, and upon receipt of false and misleading information from RFC, closed their investigation.

439.    That letter, dated June 22, 2001, delivered by means of the US Mail, and across State lines, contained numerous lies to the Government with the intention of having the Government cease any further investigation.

440.    Additionally, the Defendant, RFC ratified the conduct of the co-conspirators, and each of them, who furthered the co-conspiracy against the interests of the Plaintiffs.

441.    Plaintiffs are informed, believe, and thereon allege, and have incorporated herein, that other false and misleading statements were entered into the books and records of the bank, JP Morgan Chase, Washington Mutual Bank, FA's, and GMAC's Ally Bank, with the intent to defraud the Banks, the Plaintiff, and different branches of the State and Federal Government, all in violation of the above-stated statute.

442.    Said false and malicious statements and false entries were designed to, and intended to injure or defraud such banks, and other company, body politic or corporate, and individual person, including the Plaintiffs, and to deceive the officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System.

443.    Further, RFC, on their own accord, individually, and by and through Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, in concert with, and with the intent to defraud the State of Florida, and the United States or any agency thereof, or any financial institution referred to in this complaint, participated and shared in and or received (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any

168

such financial institution, and should be fined not more than $1,000,000 or imprisoned not more than 30 years, or both pursuant to code.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.      Statutory Compensatory damages for each separate violation according to proof;

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, RFC, to the extent permitted by law;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting RFC, their servicing agent, Litton Loan Servicing, or any of their successor agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

## COUNT TWENTY NINE:
## PLAINTIFFS v. RFC

Damages And Declaratory Relief Action For RFC's Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

      444.      Plaintiffs incorporate paragraphs 1 to 443, inclusive, herein, as though set forth herein in full. Substance prevails over form.

      445.      Regulation B notice is required when the Defendant, RFC, individually, and by and through their servicing agent, Litton Loan Servicing, LP, failed to acknowledge receipt of the HAMP application, thus constituting a denial of the application and denial of credit there under.

      446.      Pursuant to Regulation B, any denial of credit required RFC, individually and on behalf of the co-defendants, to tender a proper notice pursuant to that Regulation B.

      447.      Each separate act by RFC, on their own behalf, and on behalf of the co-defendants, constituted separate violations of the statutes as alleged in this entire Complaint constitutes grounds for statutory damages payable to the Plaintiffs in the sum of $10,000 per violation, according to proof.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.      Statutory Compensatory damages for each separate violation according to proof;

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, RFC, to the extent permitted by law;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting RFC or their servicing agent, Litton Loan Servicing, or any of their successors, agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

## COUNT THIRTY

PLAINTIFFS v. RFC

PENDANT STATE CLAIM
Damages And Declaratory Relief Action for GMAC's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)

      448.      Plaintiffs incorporate paragraphs 1 to 447, inclusive, herein, as though set forth herein in full. Substance prevails over form.

      449.      Proper demand was made upon RFC in October of 2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

      450.      RFC never responded to the request, except for Litton's attorney, on February 18, 2011, well past the deadline of the statute, Litton's lawyers, individually sent a letter stating unequivocally that Litton received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".  RFC made no reply.

      451.      That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law.

169

452.     That, had RFC answered, then they would be forced to admit, under oath, that they had no interest in the loan which was the subject of the litigation; would have to admit that Washington Mutual Bank, FA was paid in full; and that there never existed a servicing agreement between Litton Loan Servicing, LP and Washington Mutual Bank, FA.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.     Statutory Compensatory damages for each separate violation according to proof;

      b.     Exemplary damages for each separate violation based on the net worth of the Defendant, RFC, to the extent permitted by law;

      c.     Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

      d.     Reasonable attorney's fees and court costs according to proof;

      e.     Such other and further relief as the court deems just and proper.

## COUNT THIRTY ONE
## PLAINTIFFS v. ALLY FINANCIAL INC

Damages And Declaratory Relief Action For Failure ALLY FININAICAL INC.'s Failure To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

453.     Plaintiffs incorporate paragraphs 1 to 452, inclusive, herein, as though set forth herein in full.

454.     The Making Home Affordable Program was introduced in February 2009 by the Obama Administration which was intended to stabilize the housing market and help struggling homeowners get relief and avoid foreclosure.

455.     Because the stated purpose of the program was partly designed to help homeowners, homeowners, including the Plaintiffs, were the intended third party beneficiaries of the Program.

456.     In March of 2009, the Treasury Department (Treasury) issued uniform guidance for loan modifications across the mortgage industry, and updated those guidelines with policy announcements.

457.     The MHA Handbook for Servicers of Non-GSE Mortgages (Handbook) was issued to provide guidance for servicers of mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac.

458.     ALLY FINANCIAL, INC., (hereinafter ALLY) signed the HAMP servicer participation agreement on April 13, 2009, becoming a participant in the Home Affordable Modification Program (HAMP), by signing the Servicer Participation Agreement (SPA).

459.     Defendant ALLY registered and executed a Servicer Participation Agreement, related documents, and one or more Service Schedules (SPA) with the Program Administrator on or before April 13, 2009.

460.     Plaintiffs were informed, believe, and thereon allege, that, contrary to the statements of GMAC on behalf of ALLY, Litton Loan Servicing, LP, at all relevant times, had a servicing agreement with RFC Homecomings and GMAC on behalf of ALLY.

461.     That Plaintiffs filed a formal complaint with RFC Homecomings (hereinafter referred to as RFC) and GMAC on behalf of ALLY, regarding the fraudulent conduct of the Defendant, Litton Loan Servicing, LP.

462.     That, in order to conceal their conspiracy, complicity, cooperation and agency relationship with Litton Loan Servicing, LP, GMAC individually and on behalf of ALLY told the Plaintiffs that no one services the loans for GMAC and they service their own loans.

From:   GMAC 1st Mortgage Servicing [customer_service@gmacm.com]
Sent:   Wednesday, December 29, 2010 8:15 AM
To:   Barry B. Eskanos
Subject: Re: * AND * / * * USE OF FORGED PROMISSORY NOTE

Dear Customer,

In response to your inquiry, please be advised, GMAC Mortgage does not have other mortgage companies service loans on our behalf.

463.    The statements made using means of interstate commerce were false.

464.    The SPA governs servicer participation in MHA for all Non-GSE Mortgages.

465.    GMAC on behalf of ALLY and Litton Loan Servicing, LP on behalf of themselves and the lenders whose loans they service, agreed to abide by the terms of the handbook as part of the Servicer Participation Agreement (SPA).

466.    All participating servicers, including GMAC on behalf of ALLY and Litton Loan Servicing, LP (hereinafter referred to as Litton) acting on behalf of GMAC, ALLY, and RFC, are required, among other things, to consider all eligible mortgage loans for Services (as defined in the SPA) unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. MHA 1.1

a.    Pursuant to the Handbook, GMAC, RFC, and Litton cannot escape liability by simply referring the matter to their lawyers.

b.    The Handbook, in pertinent part says that if the entity that signed the SPA sub-contracts out any portion of its responsibilities as a servicer to another party, the entity that signed the SPA will be liable for the acts and omissions of the sub-contracted party under the SPA, thereby making ALLY responsible for the conduct of Litton.

c.    ALLY, by and through their agent, Litton, individually and on behalf of ALLY, GMAC and RFC, instructed Akerman Senterfitt, its lawyers to act on their behalf, and thus ALLY is responsible for all the willful violations, intentional and negligent misconduct of its lawyers and co-conspirators as pled herein, in failing in every respect to meet the requirements of HAMP.

d.    All of the wrongdoings complained of herein, include the conduct of Akerman Senterfitt as the agent and subcontractor of ALLY.

467.    As further described in Section 1.3, participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out the requirements of the SPA. MHA 1.1, but Plaintiffs are informed, believe and thereon allege, that Litton failed to use reasonable efforts to contact ALLY regarding the Plaintiffs; and, once ALLY was contacted by the Plaintiffs, failed to request Litton to resolve the complaints of the Plaintiffs.

468.    In 2009, Congress passed the Helping Families Save Their Homes Act of 2009, which includes legal protection for servicers that modify residential mortgages.

469.    It was intended to encourage more servicers to modify more mortgages for the benefit of the homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

470.    The bill essentially provides authority for, and legal protection for servicers to alter mortgage contracts and, as the argument goes, investor contracts where mortgages have been securitized.

471.    Thus, not only does no legal impediment existed for ALLY through Litton Loan Servicing LLC to grant a loan modification on behalf of ALLY, GMAC, RFC or even Washington Mutual Bank, FA (if it existed or were so entitled) to any and all individuals who qualify, but also every action taken by the Government was intended to benefit the Homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

472.    In addition to the normal obligation to obey all laws, and the implied covenants of good faith and fair dealing that are found in every contractual agreement, the SPA requires that ALLY, GMAC, RFC and Litton Loan Servicing, individually and acting on behalf of ALLY, GMAC and RFC, fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP.

a.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

b.    The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

c.    The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

d.    The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

171

e.      The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

f.      The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

g.      The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act.

h.      Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.; 18 U.S.C. 1964, (Civil RICO Remedies);

i.      Conspiracy to commit and commission of Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343;

j.      Conspiracy to commit and commission of Bank Fraud 18 U.S.C. 1341, 1344;

k.      Conspiracy to commit and commission of 18 U.S.C. § 1001;

l.      Conspiracy to commit and commission of 18 U.S.C. § 1005;

473.    If Litton Loan Servicing, LP, individually and on behalf of ALLY, actually legally serviced any loan for GMAC, RFC Homecomings, or Washington Mutual Bank, FA then Plaintiffs would have received from Litton Loan Servicing, LP, on behalf of at least one of the defendant entities, at a minimum, a response to their HAMP loan modification request, or been provided the H4H application or responded to the Florida Statute Estoppel Demand Pursuant to Florida Statute 701.04 (1).

474.    Defendant ALLY and RFC by and through its servicing agent, Litton Loan Servicing, LP, did not respond, because they had no legal right or basis upon which to provide a response.

475.    The Plaintiff's property qualifies under the conditions required of HAMP, and the Plaintiff would have been eligible for HAMP, including, but not limited to, the following conditions:

a.      Mortgage loan was originated on or before January 1, 2009;

b.      Mortgage loan was not previously modified under HAMP.

c.      The Mortgage loan is delinquent or default is reasonably foreseeable.

d.      The Mortgage loan is secured by a one unit property, which is the principal residence of the Plaintiff.

e.      The subject property is not vacant or condemned.

f.      The borrower has documented financial hardship and represented she does not have sufficient liquid assets to make the monthly mortgage payments because of a reduction in her salary and a reduction in her spouses work to part time status.

g.      The Plaintiff's monthly mortgage payment (including principal, interest, taxes, and insurance) is greater than 31 percent of the Plaintiff's verified monthly gross income.

h.      The Plaintiff is willing to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.

i.      The Current unpaid principal balance (UPB) of the mortgage loan prior to capitalization is not greater than $729,750.

j.      The Plaintiff offered to make a timely first trial period payment on or before December 31, 2012, but no TPP was ever offered to the Plaintiff.

k.      The Plaintiff is in active litigation, and is eligible for HAMP.

476.    Litton Loan Servicing, LP, individually and on behalf of ALLY was required to communicate with clear written information designed to help the borrower understand the modification process in accordance with the HAMP guidelines and Handbook.

477.    Litton Loan Servicing, LP, individually and on behalf of ALLY has failed and refused to communicate with the Plaintiff, and referred the Plaintiff to their attorney, who has also refused to provide any information regarding HAMP; who then expressly, blatantly and openly refused to comply with the statutory requirements of providing an estoppel letter; and has willfully violated every provision of the HAMP and the handbook.

478.    Plaintiffs put ALLY on formal notice of the conduct complained of herein, as early as when the complaint was filed in March of 2005 and as the case progressed, and filed further complaints with GMAC on behalf of ALLY in December of 2010 and June of 2011.

479.    As late as June of 2011, although GMAC on behalf of ALLY were fully apprised that Litton failed in every respect to obey the statutes complained of herein, and has a toll free number for

172

HAMP applications, the Defendant, GMAC on behalf of ALLY, told Plaintiffs they were not allowed to call GMAC or RFC; not allowed to discuss HAMP with GMAC; nor was he allowed to discuss the HAMP modification process or other alternative modification programs with GMAC, but instead, Plaintiffs were told by GMAC on behalf of ALLY, they would have to contact Litton.

480.    Although GMAC on behalf of ALLY has a toll free number, the Plaintiff was told he was not allowed to call GMAC; not allowed to discuss HAMP with GMAC; nor was he allowed to discuss the HAMP modification process or other alternative modification programs with GMAC.

481.    ALLY and their designated agents, (in this case, Litton) are required to maintain adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents.

482.    Litton Loan Servicing, LP, individually and on behalf of ALLY, and ALLY has ratified the wrongful conduct of Litton in every respect and after having been fully apprised of their conduct, has refused to acknowledge receipt of Plaintiffs HAMP application; refused to respond to the application; refused to discuss the application with Plaintiff; and willfully violated the following regulations:

483.    Although Section 5 of the Federal Trade Commission Act prohibits unfair or deceptive acts or practices, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, ALLY, used false affidavits; filed a forged promissory note; committed perjury and numerous acts of fraud upon the court and the Plaintiff in order to obtain a judgment of foreclosure.

484.    Although the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibits discrimination on a prohibited basis in connection with mortgage transactions, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, ALLY discriminated against the Plaintiff because of her gender and her religion.

485.    Although the Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, ALLY failed to provide proper documentation in violation of RESPA.

486.    Although the Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, ALLY tendered multiple demands seeking payment on behalf of RFC, but obtained a judgment in the name of Washington Mutual Bank, FA, informing the court that the only entity entitled to recover was Washington Mutual Bank, FA.

487.    Each letter and piece of correspondence sent by Litton, including billings for attorneys fees, on behalf of ALLY with ALLY's consent, and full ratification after being fully apprised of their conduct, individually and doing business as RFC was a separate violation of the Fair Debt Collection Practices Act,.

488.    Although the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification, (these laws also prohibit red-lining), Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY has discriminated against the Plaintiffs on the basis of her gender and her religion.

489.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY negotiated modifications of loans with others, but refused to even consider the Plaintiffs, failing to acknowledge or respond to the Plaintiffs application.

490.    Although the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY used false information in reporting consumer credit information to credit reporting agencies about the Plaintiff.

491.    Although the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY, and ALLY ratified the conduct of Litton, who intentionally and willfully failed and refused to comply with Regulation B by failing to timely respond to the HAMP application, thus violating Regulation B.

492.    Under Florida Law, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC on behalf of ALLY, was required to provide an estoppel letter pursuant to Florida Statutes Chapter 701.04 (1), which says, in pertinent part:

173

"Within 14 days after receipt of the written request of a mortgagor, the holder of a mortgage shall deliver to the mortgagor at a place designated in the written request an estoppel letter setting forth the unpaid balance of the loan secured by the mortgage, including principal, interest, and any other charges properly due under or secured by the mortgage and interest on a per-day basis for the unpaid balance. Whenever the amount of money due on any mortgage, lien, or judgment shall be fully paid to the person or party entitled to the payment thereof, the mortgagee, creditor, or assignee, or the attorney of record in the case of a judgment, to whom such payment shall have been made, shall execute in writing an instrument acknowledging satisfaction of said mortgage, lien, or judgment and have the same acknowledged, or proven, and duly entered of record in the book provided by law for such purposes in the proper county. Within 60 days of the date of receipt of the full payment of the mortgage, lien, or judgment, the person required to acknowledge satisfaction of the mortgage, lien, or judgment shall send or cause to be sent the recorded satisfaction to the person who has made the full payment. In the case of a civil action arising out of the provisions of this section, the prevailing party shall be entitled to attorney's fees and costs."

493.     Proper demand was made upon Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, ALLY and RFC, on 10/29/2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

494.     On February 18, 2011, well past the deadline of the statute, Litton's lawyers sent a letter stating unequivocally that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, ALLY and RFC, and each of them, received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

495.     That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law, as well as a direct violation of the requirement of the HAMP guidelines wherein "the SPA requires that [ALLY and Litton Loan Servicing] fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

496.     Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY, pursuant to the HAMP guidelines, is required to make a reasonable effort to solicit borrower by performing at a minimum, the following acts:

a.     The servicer (including Litton and GMAC on behalf of ALLY) is to make a minimum of four telephone calls to the last known phone numbers of record, at different times of the day; - (Litton made none) and

b.     The servicer (including Litton and GMAC on behalf of ALLY) is to send two written notices to the last address of record by sending one letter via certified/express mail or via overnight delivery service (such as Federal Express or UPS) with return receipt/delivery confirmation and one letter via regular mail.  (Litton, individually, and on behalf of ALLY and RFC's only correspondence was the bad faith demand letters, never any response or mention of the HAMP or other rights of the Borrower).

c.     Any contact with eligible borrowers, whether by telephone, mail or otherwise, must:

1.     Advise borrowers that they may be eligible for HAMP; MHA Handbook v 2.0.  (Litton and ALLY made no such effort nor provide no such advice).

2.     Clearly describe the Initial Package that the borrower is required to submit pursuant to the requirements outlined in Section 4, and state what other information the servicer needs to complete the HAMP analysis;  (Litton, individually and on behalf of ALLY, never discussed HAMP, refused to discuss HAMP with the Plaintiffs, and never reviewed the Plaintiffs application.)

3.     Provide a toll-free telephone number through which the borrower can reach a loan servicer representative; (Litton, individually and on behalf of GMAC on behalf of ALLY

stated that Plaintiff is not permitted to call them at all, and GMAC on behalf of ALLY required Plaintiffs to call Litton) and

4.    Identify any unique requirements the servicer may have established for submission of an Initial Package received later than 30 business days prior to a scheduled foreclosure sale date. (Litton, individually and on behalf of ALLY, refused to provide any information regarding HAMP or mention the application whatsoever.)

5.    All contact attempts must be documented in the servicing file.  If the servicer has documentation evidencing that it satisfied the Reasonable Effort standard for HAMP prior to June 1, 2010, resolicitation of the borrower is not required. (If Litton, individually and on behalf of ALLY, documented any efforts, then they would be fraudulent and further violations of the agreement.)

497.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY failed to make ANY contact with the Plaintiff; refused to discuss the matter with the Plaintiff; refused to provide a number for the Plaintiff to discuss the matter with the Servicer; and refused to comply with all the requirements set forth in this complaint.

498.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY; and GMAC on behalf of ALLY separately agreed, that they were further required to, and willfully failed and refused to comply with each and every one of the following conditions:

a.    The servicer (including Litton and GMAC on behalf of ALLY) must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Package, which is required to be submitted by the borrower to request a HAMP modification.

b.    The communication should:

1.    Describe the income evidence required to be evaluated for HAMP;

c.    Provide the RMA (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit); and

d.    Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

e.    The communication should also include clear language stating that during the HAMP evaluation the home will not:  (i) be referred to foreclosure; or (ii) be sold at a foreclosure sale if the foreclosure process has already been initiated.  In the communication, the servicer **must** include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the communication.

f.    If Right Party Contact is established prior to satisfaction of the Reasonable Effort standard, the **servicer must continue** to take steps to satisfy the Reasonable Effort standard until the Initial Package is submitted by the borrower.

g.    If Right Party Contact is established, but the borrower does not submit an Initial Package, the **servicer must resend** the Initial Package communication.  Again, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the second communication.  If the borrower does not respond by providing an Initial Package within the required time period set forth in the second communication, the servicer may determine the borrower to be ineligible for HAMP.

h.    If Right Party Contact is established, but the borrower submits an incomplete Initial Package within the required time period, the servicer (including Litton and GMAC on behalf of ALLY) **must comply** with the "Incomplete Information Notice" requirements set forth below in Section 2.3.3.  If the borrower does not respond to either the 30-day Incomplete Information Notice or the 15-day Incomplete Information Notice by providing an Initial Package within the required time period, the servicer may determine the borrower to be ineligible for HAMP.

Servicers **must acknowledge receipt** of the Initial Package within 10 business days per the requirements in Section 4.5 and respond within 30 calendar days with either an Incomplete Information Notice (as outlined in Section 2.3.3), a TPP Notice (as outlined in Section 8.1) or a Non-Approval Notice (as outlined in Section 2.3.2).

499.    Pursuant to the provisions of the agreement, Plaintiffs are entitled to a stay as Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC on behalf of ALLY failed in every respect to meet the provisions of the SPA.

500.    Pursuant to the provisions of the SPA, Litton, ALLY, GMAC and RFC, intentionally and willfully failed to comply with each and every provision as set forth below:

3    Protections Against Unnecessary Foreclosure

175

3.1    Suspension of a Referral to Foreclosure

A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of the following circumstances exists:

-    The borrower is evaluated for HAMP and is determined to be ineligible for the program; or

-    The borrower is offered a TPP, but fails to make current trial period payments as set forth in Section 8.3; or

-    The servicer has established Right Party Contact, has sent at least two written requests asking the borrower to supply required information in accordance with Section 2.2.2, and has otherwise satisfied the Reasonable Effort solicitation standard, and the borrower failed to respond by the dates indicated in those requests;    or

-    The servicer has satisfied the Reasonable Effort solicitation standard without establishing Right Party Contact; or The borrower    or co-borrower states he or she is not interested in pursuing a    HAMP modification and such statement is reflected by the servicer    in its servicing system and/or mortgage file.

3.2    Suspension of Foreclosure Proceedings in Process

With respect to a borrower who submits a request for HAMP consideration after a loan has been referred to foreclosure, the    servicer must, immediately upon the borrower's acceptance of a    TPP based on verified income, and for the duration of the  trial    period, take those actions within its authority that are necessary to    halt further activity and events in the foreclosure process, whether    judicial or non-judicial, including but not limited to refraining from    scheduling a sale or causing a judgment to be entered.

3.3    Suspension of Scheduled Foreclosure Sale

When a borrower submits a request for HAMP consideration after a foreclosure sale date has been scheduled and the request is received no later than midnight of the seventh business day prior to    the foreclosure sale date (Deadline), the servicer must suspend the    sale as necessary to evaluate the borrower for HAMP…

3.4    Mitigating Foreclosure Impact

The servicer must take the following actions to mitigate foreclosure impact:

3.4.1    Simultaneous Trial Period Plan and Foreclosure Explanation

When a borrower is simultaneously in foreclosure and is either being evaluated for HAMP or is in a TPP, the servicer must provide the borrower with a written notification that explains, in clear language, the concurrent modification and foreclosure processes and that states that even though certain foreclosure activities may continue, the home will not be sold at a foreclosure sale while the borrower is being considered for HAMP or while the borrower is making payments under a TPP…

3.4.2    Foreclosure Attorney/Trustee Communication

Servicers must develop and implement written policies and procedures to provide notification to their foreclosure attorney/trustee regarding a borrower's HAMP status, including whether the borrower is potentially eligible for HAMP (and is    subject to Section 2.2), and whether the borrower is being    evaluated for, or is currently in, a TPP.  Servicers must ensure that    their foreclosure attorney/trustee adheres to all of the requirements    of Section 3.1, Section 3.2 and Section 3.3 with respect to referral    to foreclosure, stay of foreclosure actions and suspension of    foreclosure sales.

3.4.3    Certification Prior to Foreclosure Sale

Servicers must develop and implement written procedures applicable to all loans that are potentially eligible for HAMP (and are subject to Section 2.2) that require the servicer to provide to the foreclosure attorney/trustee a written certification that (i) one of the five circumstances under Section 3.1 exists, and (ii) all other available loss mitigation alternatives have been exhausted and a non-foreclosure outcome could not be reached. This certification must be provided no sooner than seven business days prior to the scheduled foreclosure sale date (the Deadline) or any extension thereof.

501.    Plaintiffs were further entitled, and never received the required acknowledgement of the Initial Package.

4.5 Acknowledgment of Initial Package
Within 10 business days following receipt of an Initial Package, the servicer **must** acknowledge in writing the borrower's request for HAMP participation by sending the borrower confirmation that the Initial Package was received and a description of the servicer's evaluation process and timeline. If the Initial Package is received from the borrower via email, the servicer may email the acknowledgment. Servicers must maintain evidence of the date of receipt of the borrower's Initial Package in its records.
A single written communication sent within 10 business days of receipt of a borrower's request for HAMP participation may also include, at the servicer's discretion, the results of its review of the Initial Package.

502.    Although Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, ALLY and RFC, and ALLY separately, **MUST** comply, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY not only failed to acknowledge their receipt of the Initial Package that was sent to them and received on May 4, 2011, but wantonly, willfully and intentionally failed and refused in every respect to comply with any of the provisions of HAMP contained herein for the benefit of the Plaintiff.

503.    Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY was **obligated** to review the documentation submitted by Plaintiff on May 4, 2011, within 30 days, and failed and refused to do so.

504.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY had 30 days wherein they were contractually obligated to review the initial package, and they willfully, wantonly and intentionally failed and refused in every respect to do so.

4.6 Review of Initial Package
Within 30 calendar days from the date an Initial Package is received, the servicer **must** review the documentation provided by the borrower for completeness. If the documentation is incomplete or insufficient for use in underwriting, the servicer must send the borrower an Incomplete Information
Notice in accordance with the guidance set forth in Section 2.3.3.
If the borrower's documentation is complete, the servicer must evaluate the borrower's eligibility for HAMP and either:
-    Send the borrower a TPP Notice (see Section 8.1); or
-    Make a determination that the borrower is not eligible for HAMP and communicate this determination to the borrower in accordance with the guidance in Section 2.3.2.

505.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY had only 30 days from May 11, 2011 to wherein they were contractually obligated to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination, and utterly, willfully, wantonly, and intentionally failed and refused to do so.

177

506.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY had 30 days from May 11, 2011 wherein they were contractually obligated to provide the Plaintiff with a determination, and willfully, wantonly, and intentionally failed and refused to do so in breach of that agreement.

6 Underwriting

Servicers must determine the borrower's eligibility for a modification using information obtained in the Initial Package and subsequently verified. **Servicers are required** to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination within 30 calendar days of receiving all required borrower documentation.

507.    Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY, and ALLY separately was contractually obligated to consider the Plaintiff for Hope for Homeowners, and utterly failed and refused to do so.

508.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY was jointly and separately contractually obligated to consider the Plaintiff for Hope for Homeowners, as set forth herein.

6.2 Coordination with Hope for Homeowners

Servicers are **required** to consider a borrower for a refinance through the Federal Housing Administration's HOPE for Homeowners (H4H) program when feasible. Consideration for an H4H refinance should not delay eligible borrowers from receiving a TPP Notice. The servicer's obligation as it relates to the H4H requirement is that while the servicer is gathering information to determine if a borrower meets the minimum eligibility criteria for HAMP, it should also be assessing whether the borrower may be eligible to refinance through H4H. This assessment would involve asking the following set of questions:
-    Will the loan amount exceed $550,440? No.
-    Has the borrower made less than six (6) full payments during the life of the first lien loan? No.
-    Does the borrower have an ownership interest in other residential real estate, including any second homes or rental properties? No.
-    Was the mortgage to be refinanced originated after January 1, 2008? No.
-    Does the property contain more than one (1) unit? No.
If the answer to all of these questions is "NO", the borrower may be eligible for H4H. (As is the precise case for the Plaintiff, herein). In this case, the servicer should counsel the borrower to seek a refinance with an H4H lender.

509.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY failed and refused to notify the Plaintiff of their consideration, as well as Litton individually and on behalf of ALLY, failed and refused to consider the Plaintiff, entitlement to relief under Hope for Homeowners.

510.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY was obligated to apply the modification steps until the monthly mortgage payment ratio is reduced to 31 percent, but utterly failed and refused to do so.

511.    Pursuant to the Handbook, section 6.3 Standard Modification Waterfall Servicers (including GMAC on behalf of ALLY and LITTON) **must** apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent (target monthly mortgage payment ratio).

512.    A borrower will qualify for HAMP only if the interest rate on the mortgage loan can be reduced by at least 0.125 percent without the modified monthly mortgage payment ratio going below 31 percent. If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31

178

percent, the modification will not satisfy HAMP requirements and no incentives will be payable in connection with the modification.

513.    Even though clearly, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY and LITTON, **MUST** have taken action, they failed and intentionally refused to comply with every requirement of HAMP; failed and refused to comply with State and Federal Law; committed fraud; willfully and maliciously acted with the sole intent to deprive Plaintiffs of their property.

514.    Because there existed a contract between GMAC on behalf of ALLY, Litton Loan Servicing, LP and the US Treasury Department which was intended to benefit the Plaintiffs, and others similarly situated; and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, ALLY, accepted consideration for each loan modification application from the US Treasury Department; because there was a mutual intent to benefit the Plaintiffs, and others similarly situated; and the Plaintiffs were deprived of their opportunity to have their HAMP application, their H4H application properly and timely reviewed, the Plaintiffs suffered irreparable harm.

515.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY further owed the Plaintiffs and others similarly situated the implied obligation of good faith and fair dealing, which is implied in every contract.

516.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY committed intentional, wanton and willful breaches of the covenants of good faith and fair dealing; intentional, wanton and willful breaches of the agreement with the US Treasury Department; and the Plaintiffs, and others similarly situated were the intended third party beneficiaries of that agreement between the US Treasury Department, GMAC on behalf of ALLY and Litton Loan Servicing, LP and Plaintiffs as the intended beneficiary, and Plaintiffs, and others, were harmed as a result of those breaches.

517.    Plaintiffs are entitled to receive compensatory damages according to proof;

518.    Plaintiffs are entitled to receive exemplary damages based on the net worth of ALLY for their malicious, wanton and willful breaches of the agreement and their ratification of the wrongful conduct of their co-conspirators to the extent permitted by law.

519.    Wherefore Plaintiffs respectfully request that the court:

A.    Issue an order requiring ALLY, jointly and severally, with the remaining co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiff and dismiss them with prejudice;

B.    Find that ALLY, on their own behalf, and on behalf of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that [GMAC on behalf of ALLY and Litton Loan Services, LP], on their own behalf, and on behalf of the remaining co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

C.    Find that ALLY, on their own behalf, and on behalf of the remaining co-defendants, were in breach of the SPA agreement with the US Treasury Department, intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

1.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

2.    The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

3.    The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

4.    The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

5.    The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

6.    The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

179

7.      The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

8.      Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

D.      Find that ALLY, on their own behalf, and on behalf of the remaining co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

E.      Find that ALLY, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.      Find that ALLY, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.      Find that ALLY, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.      Find that ALLY, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.      Find that ALLY, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

J.      Find that ALLY, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

K.      Find that ALLY, individually, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.      That the court further grant compensatory damages to Plaintiffs for ALLYs' intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.      That the court further grant punitive damages to Plaintiffs against ALLY, on their own behalf, and on behalf of the co-defendants for ALLY, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant ALLY, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.      That the court further grant statutory damages of $10,000 per violation, to Plaintiff against ALLY, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant ALLY, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.      That the court order Defendant ALLY, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of ALLY and its agents, in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

P.      That the court grants to Plaintiff against the Defendant ALLY, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

180

## COUNT THIRTY TWO
### PLAINTIFFS v. ALLY

Damages And Declaratory Relief Action For ALLY's Violation of the FEDERAL  FAIR DEBT
COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. §  1692 ET. SEQ

520.     Plaintiffs incorporate paragraphs 1 to 519, inclusive, herein, as though set forth herein in full.

521.     Plaintiffs fall within the class of individuals who are defined by the Statute as consumer—"any natural person obligated or allegedly obligated to pay any debt".

522.     Defendant, Litton on the behalf of ALLY, and on behalf of the other co-defendants, claims that Plaintiffs owed a consumer debt—"any obligation... [incurred] primarily for personal, family or household purposes", a mortgage secured by a forged note and deed of trust.

523.     Defendant, ALLY, on their own behalf, retained the services of Litton, and on behalf of the co-defendants, Litton is a debt collector defined as any person using interstate commerce who regularly collects debts as defined by the statute and as proven by their acts alleged herein.

524.     Each separate letter demanding payment, including billing the Plaintiffs for attorneys' fees and court costs, inspection fees, and all demands for money of any and all kinds, sent by, or demanded on the behalf of Litton Loan Servicing, LP individually, and on behalf of Defendant RFC Homecomings and ALLY is a separate violation of the FDCPA.

525.     Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
   a.     Statutory Compensatory damages for each separate violation according to proof;
   b.     Exemplary damages for each separate violation based on the net worth of the Defendant, ALLY to the extent permitted by law;
   c.     Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY, or any of their successors, agents or assigns, from any further breaches of the statute;
   d.     Reasonable attorney's fees and court costs according to proof;
   e.     Such other and further relief as the court deems just and proper.

## COUNT THIRTY THREE
### PLAINTIFFS v. ALLY

Damages And Declaratory Relief Action For ALLY's Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18
U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and
18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

526.     Plaintiffs incorporate paragraphs 1 to 525, inclusive, herein, as though set forth herein in full. Substance prevails over form.

527.     Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

528.     On March 25, 2005, and continuing, through the present, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

529.     Plaintiffs further allege that Defendant ALLY, on their own behalf, and on behalf of the co-defendants, in conjunction with and in furtherance of the conspiracy with all the remaining Defendants, did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(b) supra.

530.     Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.

181

531.     Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise). ALLY, on their own behalf, and on behalf of the co-defendants, are liable for all wrongful conduct of its co-defendants, and each of them, its lawyers, Shapiro and Fishman and Akerman Senterfitt.

532.     At all times herein, ALLY, on their own behalf, and on behalf of the co-defendants, and each of them, conspired with remaining defendants, ratified the conduct, and conspired with the remaining Defendants, to interfere with the quiet enjoyment of Plaintiffs home; steal the equity in the Plaintiff's home; and used a forged promissory note and fraudulent affidavit in a civil court action in order to fraudulently obtain a judgment of foreclosure.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.     Statutory Compensatory damages for each separate violation according to proof;

b.     Exemplary damages for each separate violation based on the net worth of the Defendant, ALLY, on their own behalf, and on behalf of the co-defendants to the extent permitted by law;

c.     Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d.     Reasonable attorney's fees and court costs according to proof;

e.     Such other and further relief as the court deems just and proper.

**COUNT THIRTY FOUR**
**PLAINTIFFS v. ALLY**

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

533.     Plaintiffs incorporate paragraphs 1 to 532, inclusive, herein, as though set forth herein in full. Substance prevails over form.

534.     Plaintiffs further incorporate the allegations of the remaining Counts of the rest of this complaint, contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

535.     At various times and places partially enumerated Plaintiff's documentary material, all Defendants, and each of them, did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

536.     Likewise, all Defendants, and each of them, did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

537.     During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

538.     Plaintiffs further allege that all Defendants jointly or severally did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

539.     Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.     Statutory Compensatory damages for each separate violation according to proof;

b.     Exemplary damages for each separate violation based on the net worth of the Defendant, ALLY to the extent permitted by law;

c.     Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d.     Reasonable attorney's fees and court costs according to proof;

e.     Such other and further relief as the court deems just and proper.

**COUNT THIRTY FIVE**
**PLAINTIFFS v. ALLY**

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

540.    Plaintiffs incorporate paragraphs 1 to 539, inclusive, herein, as though set forth herein in full. Substance prevails over form.

541.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

542.    At various times and places as enumerated in Plaintiff's exhibits which are attached hereto, and incorporated herein, all Defendants, and each of them, did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

543.    At various times and places partially enumerated in Plaintiffs documentary material, all Defendants, individually and on behalf of each other, committed acts in furtherance of the conspiracy, did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

544.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

545.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d) (Prohibited activities supra).

546.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

   a.    Statutory Compensatory damages for each separate violation according to proof;
   b.    Exemplary damages for each separate violation based on the net worth of the Defendant, ALLY, to the extent permitted by law;
   c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;
   d.    Reasonable attorney's fees and court costs according to proof;
   e.    Such other and further relief as the court deems just and proper.

## COUNT THIRTY SIX
## PLAINTIFFS v. ALLY

Damages And Declaratory Relief Action for ALLY's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

547.    Plaintiffs incorporate paragraphs 1 to 546, inclusive, herein, as though set forth herein in full. Substance prevails over form.

548.    As alleged herein, Defendant ALLY, on their own behalf, and on behalf of the co-defendants, committed numerous of acts of mail fraud, which is a violation of federal law.

549.    That Defendant ALLY, on their own behalf, and on behalf of the co-defendants, knowingly devised a scheme to defraud or to obtain money or property (or the intangible right of honest services) by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

550.    That ALLY, on their own behalf, and on behalf of the co-defendants, acted with the intent to defraud the Plaintiffs and others (including the US Treasury) to the detriment of the Plaintiffs, and each of them.

551.    That in advancing, furthering, or carrying out the scheme, ALLY, on their own behalf, and on behalf of the co-defendants, used the mails (a private or commercial interstate carrier), or caused the mails (a private or commercial interstate carrier) to be used.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

   a.    Statutory Compensatory damages for each separate violation according to proof;

b.        Exemplary damages for each separate violation based on the net worth of the Defendant, ALLY to the extent permitted by law;

c.        Declaratory relief, including permanent injunctive relief, prohibiting ALLY, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

d.        Reasonable attorney's fees and court costs according to proof;

e.        Such other and further relief as the court deems just and proper.

## COUNT THIRTY SEVEN
## PLAINTIFFS v. ALLY

Damages And Declaratory Relief Action For ALLY's Violation of the
VIOLATION OF 18 U.S.C. § 1001

552.        Plaintiffs incorporate paragraphs 1 to 551, inclusive, herein, as though set forth herein in full. Substance prevails over form.

553.        Defendant, ALLY, on their own behalf, and on behalf of the co-defendants, violated 18 U.S.C. § 1001 by the conduct complained of herein, and as proven at the time of trial.

554.        Defendant ALLY, on their own behalf, and on behalf of the co-defendants falsified, concealed or covered up by any trick, scheme or device, material facts, including, but not necessarily limited to:

a.        The date of the transfer of the loan from Washington Mutual Bank, FA;

b.        The use of false and misleading language in the affidavit of Debra Lyman.

5.        On March 25, 2005, subsequent to the filing of the foreclosure complaint, the loan was

transferred from Washington Mutual to RFC.  All rights under the note and mortgage

were transferred at that time.

c.        The true facts were, that March 25, 2005 is five days prior to the filing of the lawsuit. The court was misled by Defendant Washington Mutual Bank, FA, Defendant Debra Lyman, Defendant Litton Loan Servicing LP's use of the misleading words "subsequent to the filing of the foreclosure complaint".  Had each of the Defendants informed the court of the true facts, that March 25, 2005, was five days prior to suit being filed, then Washington Mutual Bank, FA would have had no standing to bring the action, and thus the action would have been dismissed.

d.        The Defendant's affidavit was further false in that it claimed Washington Mutual Bank, FA, was entitled to sums that Washington Mutual Bank, FA later admitted were neither due nor owing to them.

e.        In fact, Defendants concealed from the court and failed to inform the court of a credit of $373,907.18 in principal, proving that Washington Mutual Bank, FA, was paid in full and not owed any money from the Plaintiffs.

f.        The Defendants, ALLY, by and through its agent, Litton, and on behalf of the co-defendants, filed false affidavits and a forged promissory note, with the court in order to obtain a judgment of foreclosure.

g.        The Defendant, ALLY, by and through its agent, Litton, and on behalf of the co-defendants also filed a fraudulent affidavit and a forged promissory note.

h.        The Defendant ALLY, individually, and by and through its agent, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants violated the State and Federal Statutes listed herein and committed other wrongful and intentional misconduct, all according to proof as pled herein.

555.        Defendant ALLY, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001 by making, and / or causing to be made, or ratifying, fictitious or fraudulent statements or representations to the Plaintiffs, to the court, and to the US Department of the Treasury; to the OCC; to the FTC; to the State and local authorities, and to the court of appeals.

556.        Defendant ALLY, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001by ratifying, making or using any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, all as alleged herein.

184

557.     Defendant ALLY, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001, as alleged herein, because the statements made by the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants were all material, and adversely affected the Plaintiffs, the court, the US Government, and others and were ratified by the Defendant, ALLY.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

       a.     Statutory Compensatory damages for each separate violation according to proof;
       b.     Exemplary damages for each separate violation based on the net worth of the Defendant, ALLY, to the extent permitted by law;
       c.     Declaratory relief, including permanent injunctive relief, prohibiting ALLY, or any of their loan servicers, agents or assigns, from any further breaches of the statute;
       d.     Reasonable attorney's fees and court costs according to proof;
       e.     Such other and further relief as the court deems just and proper.

## <u>COUNT THIRTY EIGHT</u>
### **PLAINTIFFS v. ALLY**

Damages And Declaratory Relief Action for ALLY's Violation of
18 U.S.C. § 1005

558.     Plaintiffs incorporate paragraphs 1 to 557, inclusive, herein, as though set forth herein in full. Substance prevails over form.

559.     Defendant ALLY, in furtherance of the co-conspiracies complained of herein, and in order to conceal and misdirect the officials conducting an official investigation, provided false information to the Florida Office of Financial Regulation, delivered by means of the US Mail, and used means of Interstate Commerce, and transmitted mail across State lines.

560.     The Defendant ALLY knew that the Florida Office of Financial Regulation (OFR) was conducting a full investigation of the conduct of the Defendants, and each of them, including the fraudulent affidavit of Debra Lyman and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants and the use of a forged promissory note in obtaining a fraudulent judgment of foreclosure.

561.     During that investigation stemming from a complaint filed with that office in 2010, the OFR sent a request for a response from ALLY, and upon receipt of false and misleading information from ALLY, closed their investigation.

562.     That letter, dated June 22, 2001, delivered by means of the US Mail, and across State lines, contained numerous lies to the Government with the intention of having the Government cease any further investigation.

563.     Additionally, the Defendant, ALLY ratified the conduct of the co-conspirators, and each of them, who furthered the co-conspiracy against the interests of the Plaintiffs.

564.     Plaintiffs are informed, believe, and thereon allege, and have incorporated herein, that other false and misleading statements were entered into the books and records of the bank, JP Morgan Chase, Washington Mutual Bank, FA's, and Ally, with the intent to defraud the Banks, the Plaintiff, and different branches of the State and Federal Government, all in violation of the above-stated statute.

565.     Said false and malicious statements and false entries were designed to, and intended to injure or defraud such banks, and other company, body politic or corporate, and individual person, including the Plaintiffs, and to deceive the officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System.

566.     Further, ALLY, on their own accord, individually, and by and through Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, in concert with, and with the intent to defraud the State of Florida, and the United States or any agency thereof, or any financial institution referred to in this complaint, participated and shared in and or received (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution, and should be fined not more than $1,000,000 or imprisoned not more than 30 years, or both pursuant to code.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

       a.     Statutory Compensatory damages for each separate violation according to proof;

    b.     Exemplary damages for each separate violation based on the net worth of the Defendant, ALLY to the extent permitted by law;

    c.     Declaratory relief, including permanent injunctive relief, prohibiting ALLY, their servicing agent, Litton Loan Servicing, or any of their successor agents or assigns, from any further breaches of the statute;

    d.     Reasonable attorney's fees and court costs according to proof;

    e.     Such other and further relief as the court deems just and proper.

### COUNT THIRTY NINE
### PLAINTIFFS v. ALLY

Damages And Declaratory Relief Action For ALLYs Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

567.    Plaintiffs incorporate paragraphs 1 to 566, inclusive, herein, as though set forth herein in full. Substance prevails over form.

568.    Regulation B notice is required when the Defendant, ALLY, individually, and by and through their servicing agent, Litton Loan Servicing, LP, failed to acknowledge receipt of the HAMP application, thus constituting a denial of the application and denial of credit there under.

569.    Pursuant to Regulation B, any denial of credit required ALLY, individually and on behalf of the co-defendants, to tender a proper notice pursuant to that Regulation B.

570.    Each separate act by ALLY, on their own behalf, and on behalf of the co-defendants, constituted separate violations of the statutes as alleged in this entire Complaint constitutes grounds for statutory damages payable to the Plaintiffs in the sum of $10,000 per violation, according to proof. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.     Statutory Compensatory damages for each separate violation according to proof;

    b.     Exemplary damages for each separate violation based on the net worth of the Defendant, ALLY to the extent permitted by law;

    c.     Declaratory relief, including permanent injunctive relief, prohibiting ALLY or their servicing agent, Litton Loan Servicing, or any of their successors, agents or assigns, from any further breaches of the statute;

    d.     Reasonable attorney's fees and court costs according to proof;

    e.     Such other and further relief as the court deems just and proper.

### COUNT FORTY
### PLAINTIFFS v. ALLY

PENDANT STATE CLAIM
Damages And Declaratory Relief Action for ALLY's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)

571.    Plaintiffs incorporate paragraphs 1 to 570, inclusive, herein, as though set forth herein in full. Substance prevails over form.

572.    Proper demand was made upon ALLY in October of 2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

573.    ALLY never responded to the request, except for Litton's attorney, on February 18, 2011, well past the deadline of the statute, ALLY's lawyers sent a letter stating unequivocally that Litton received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

574.    That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law.

575.    That, had ALLY answered, then they would be forced to admit, under oath, that they had no interest in the loan which was the subject of the litigation; would have to admit that Washington Mutual Bank, FA was paid in full; and that there never existed a servicing agreement between Litton Loan Servicing, LP and Washington Mutual Bank, FA.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.     Statutory Compensatory damages for each separate violation according to proof;

186

b.        Exemplary damages for each separate violation based on the net worth of the Defendant, ALLY to the extent permitted by law;

c.        Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d.        Reasonable attorney's fees and court costs according to proof;

e.        Such other and further relief as the court deems just and proper.

## COUNT FORTY ONE
## PLAINTIFFS v. JP MORGAN CHASE & CO

Damages And Declaratory Relief Action For Failure CHASE's Failure To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

576.    Plaintiffs incorporate paragraphs 1 to 575, inclusive, herein, as though set forth herein in full.

577.    The Making Home Affordable Program was introduced in February 2009 by the Obama Administration which was intended to stabilize the housing market and help struggling homeowners get relief and avoid foreclosure.

578.    Because the stated purpose of the program was partly designed to help homeowners, homeowners, including the Plaintiffs, were the intended third party beneficiaries of the Program.

579.    In March of 2009, the Treasury Department (Treasury) issued uniform guidance for loan modifications across the mortgage industry, and updated those guidelines with policy announcements.

580.    The MHA Handbook for Servicers of Non-GSE Mortgages (Handbook) was issued to provide guidance for servicers of mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac.

581.    JP MORGAN CHASE & CO, (hereinafter CHASE) signed the HAMP servicer participation agreement on MARCH 22, 2010, becoming a participant in the Home Affordable Modification Program (HAMP), by signing the Servicer Participation Agreement (SPA).

582.    Defendant CHASE registered and executed a Servicer Participation Agreement, related documents, and one or more Service Schedules (SPA) with the Program Administrator on or before MARCH 22, 2010.

583.    Plaintiffs were informed, believe, and thereon allege, that, contrary to the statements of Washington Mutual Bank, FA by and through Litton's attorneys, and ratified by CHASE, Litton Loan Servicing, LP, at all relevant times, had a servicing agreement with RFC Homecomings and GMAC on behalf of Ally, RFC and GMAC. CHASE, with full knowledge of the facts, ratified this conduct.

584.    That Plaintiffs filed a formal complaint with CHASE, regarding the fraudulent conduct of the Defendant, Litton Loan Servicing, LP.

585.    That, in order to conceal their conspiracy, complicity, cooperation and agency relationship with Litton Loan Servicing, LP, falsely represented they were servicing the loan for Washington Mutual Bank, FA, and their conduct was wholly ratified by CHASE.

586.    The statements made using means of interstate commerce were false.

587.    The SPA governs servicer participation in MHA for all Non-GSE Mortgages.

588.    CHASE and Litton Loan Servicing, LP on behalf of themselves and the lenders whose loans they service, agreed to abide by the terms of the handbook as part of the Servicer Participation Agreement (SPA).

589.    All participating servicers, including CHASE and Litton Loan Servicing, LP (hereinafter referred to as Litton) acting on behalf of CHASE, GMAC, ALLY, and RFC, are required, among other things, to consider all eligible mortgage loans for Services (as defined in the SPA) unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. MHA 1.1

a.        Pursuant to the Handbook, CHASE, GMAC, RFC, and Litton cannot escape liability by simply referring the matter to their lawyers.

b.        The Handbook, in pertinent part says that if the entity that signed the SPA sub-contracts out any portion of its responsibilities as a servicer to another party, the entity that signed the SPA

will be liable for the acts and omissions of the sub-contracted party under the SPA, thereby making CHASE responsible for the conduct of Litton.

        c.      CHASE, by and through their agent, Litton, individually and on behalf of CHASE, GMAC and RFC, instructed Akerman Senterfitt, its lawyers to act on their behalf, and thus CHASE is responsible for all the willful violations, intentional and negligent misconduct of its lawyers and co-conspirators as pled herein, in failing in every respect to meet the requirements of HAMP.

        d.      All of the wrongdoings complained of herein, include the conduct of Akerman Senterfitt as the agent and subcontractor of CHASE.

590.     As further described in Section 1.3, participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out the requirements of the SPA. MHA 1.1, but Plaintiffs are informed, believe and thereon allege, that Litton failed to use reasonable efforts to contact CHASE regarding the Plaintiffs; and, once CHASE was contacted by the Plaintiffs, failed to request Litton to resolve the complaints of the Plaintiffs.

591.     In 2009, Congress passed the Helping Families Save Their Homes Act of 2009, which includes legal protection for servicers that modify residential mortgages.

592.     It was intended to encourage more servicers to modify more mortgages for the benefit of the homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

593.     The bill essentially provides authority for, and legal protection for servicers to alter mortgage contracts and, as the argument goes, investor contracts where mortgages have been securitized.

594.     Thus, not only does no legal impediment existed for CHASE through Litton Loan Servicing LLC to grant a loan modification on behalf of CHASE, GMAC, RFC or even CHASE as owner of all assets of Washington Mutual Bank, FA (if it existed or were so entitled) to any and all individuals who qualify, but also every action taken by the Government was intended to benefit the Homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

595.     In addition to the normal obligation to obey all laws, and the implied covenants of good faith and fair dealing that are found in every contractual agreement, the SPA requires that CHASE, GMAC, RFC and Litton Loan Servicing, individually and acting on behalf of CHASE, GMAC and RFC, fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP.

        a.      Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

        b.      The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

        c.      The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

        d.      The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

        e.      The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

        f.      The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

        g.      The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act.

        h.      Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.; 18 U.S.C. 1964, (Civil RICO Remedies);

        i.      Conspiracy to commit and commission of Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343;

        j.      Conspiracy to commit and commission of Bank Fraud 18 U.S.C. 1341, 1344;

        k.      Conspiracy to commit and commission of 18 U.S.C. § 1001;

        l.      Conspiracy to commit and commission of 18 U.S.C. § 1005;

188

596.    If Litton Loan Servicing, LP, individually and on behalf of CHASE, actually legally serviced any loan for GMAC, RFC Homecomings, or Washington Mutual Bank, FA then Plaintiffs would have received from Litton Loan Servicing, LP, on behalf of at least one of the defendant entities, at a minimum, a response to their HAMP loan modification request, or been provided the H4H application or responded to the Florida Statute Estoppel Demand Pursuant to Florida Statute 701.04 (1). CHASE allowed Litton Loan Servicing to continue to bill for legal services; allowed Litton to demand payment for a mortgage that CHASE knew was no longer owing, and further expressly claimed no interest in recovering.

597.    Defendant CHASE and RFC by and through its servicing agent, Litton Loan Servicing, LP, did not respond, because they had no legal right or basis upon which to provide a response.

598.    The Plaintiff's property qualifies under the conditions required of HAMP, and the Plaintiff would have been eligible for HAMP, including, but not limited to, the following conditions:

a.    Mortgage loan was originated on or before January 1, 2009;

b.    Mortgage loan was not previously modified under HAMP.

c.    The Mortgage loan is delinquent or default is reasonably foreseeable.

d.    The Mortgage loan is secured by a one unit property, which is the principal residence of the Plaintiff.

e.    The subject property is not vacant or condemned.

f.    The borrower has documented financial hardship and represented she does not have sufficient liquid assets to make the monthly mortgage payments because of a reduction in her salary and a reduction in her spouses work to part time status.

g.    The Plaintiff's monthly mortgage payment (including principal, interest, taxes, and insurance) is greater than 31 percent of the Plaintiff's verified monthly gross income.

h.    The Plaintiff is willing to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.

i.    The Current unpaid principal balance (UPB) of the mortgage loan prior to capitalization is not greater than $729,750.

j.    The Plaintiff offered to make a timely first trial period payment on or before December 31, 2012, but no TPP was ever offered to the Plaintiff.

k.    The Plaintiff is in active litigation, and is eligible for HAMP.

599.    Litton Loan Servicing, LP, individually and on behalf of CHASE was required to communicate with clear written information designed to help the borrower understand the modification process in accordance with the HAMP guidelines and Handbook.

600.    Litton Loan Servicing, LP, individually and on behalf of CHASE has failed and refused to communicate with the Plaintiff, and referred the Plaintiff to their attorney, who has also refused to provide any information regarding HAMP; who then expressly, blatantly and openly refused to comply with the statutory requirements of providing an estoppel letter; and has willfully violated every provision of the HAMP and the handbook.

601.    Plaintiffs put CHASE on formal notice of the conduct complained of herein, and as the case progressed, and filed further complaints and CHASE ratified the conduct in full after claiming to complete a thorough investigation.

602.    As late as June of 2011, although CHASE was fully apprised that Litton failed in every respect to obey the statutes complained of herein, and has a toll free number for HAMP applications, the Defendant, CHASE took no steps to help the Plaintiffs, and referred the Plaintiffs to contact LITTON.

603.    Although CHASE has a toll free number, the Plaintiff was told he was not allowed to call CHASE; was not allowed to discuss HAMP with CHASE; nor was he allowed to discuss the HAMP modification process or other alternative modification programs with CHASE.

604.    CHASE and their designated agents, (in this case, Litton) are required to maintain adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents.

605.    Litton Loan Servicing, LP, individually and on behalf of CHASE, and CHASE has ratified the wrongful conduct of Litton in every respect and after having been fully apprised of their conduct, has refused to acknowledge receipt of Plaintiffs HAMP application; refused to respond to the application; refused to discuss the application with Plaintiff; and willfully violated the following regulations:

189

606.     Although Section 5 of the Federal Trade Commission Act prohibits unfair or deceptive acts or practices, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, CHASE, used false affidavits; filed a forged promissory note; committed perjury and numerous acts of fraud upon the court and the Plaintiff in order to obtain a judgment of foreclosure.

607.     Although the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibits discrimination on a prohibited basis in connection with mortgage transactions, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, CHASE discriminated against the Plaintiff because of her gender and her religion.

608.     Although the Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, CHASE failed to provide proper documentation in violation of RESPA.

609.     Although the Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, CHASE tendered multiple demands seeking payment on behalf of RFC, but obtained a judgment in the name of Washington Mutual Bank, FA, informing the court that the only entity entitled to recover was Washington Mutual Bank, FA while at the same time,  CHASE continued to assert that Plaintiffs were paid in full, an owed CHASE nothing.
.

610.     Each letter and piece of correspondence sent by Litton, including billings for attorney's fees, on behalf of CHASE with CHASE's consent, and full ratification after being fully apprised of their conduct was a separate violation of the Fair Debt Collection Practices Act.

611.     Although the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification, (these laws also prohibit red-lining), Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE has discriminated against the Plaintiffs on the basis of her gender and her religion.

612.     Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE negotiated modifications of loans with others, but refused to even consider the Plaintiffs, failing to acknowledge or respond to the Plaintiffs application.

613.     Although the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE used false information in reporting consumer credit information to credit reporting agencies about the Plaintiff.

614.     Although the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE, and CHASE ratified the conduct of Litton, who intentionally and willfully failed and refused to comply with Regulation B by failing to timely respond to the HAMP application, thus violating Regulation B.

615.     Under Florida Law, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE, was required to provide an estoppel letter pursuant to Florida Statutes Chapter 701.04 (1), which says, in pertinent part:

> "Within 14 days after receipt of the written request of a mortgagor, the holder of a mortgage shall deliver to the mortgagor at a place designated in the written request an estoppel letter setting forth the unpaid balance of the loan secured by the mortgage, including principal, interest, and any other charges properly due under or secured by the mortgage and interest on a per-day basis for the unpaid balance. Whenever the amount of money due on any mortgage, lien, or judgment shall be fully paid to the person or party entitled to the payment thereof, the mortgagee, creditor, or assignee, or the attorney of record in the case of a judgment, to whom such payment shall have been made, shall execute in writing an instrument acknowledging satisfaction of said mortgage, lien, or judgment and have the same acknowledged, or proven, and duly entered of record in the book provided by law for such purposes in the proper county. Within 60 days

of the date of receipt of the full payment of the mortgage, lien, or judgment, the person required to acknowledge satisfaction of the mortgage, lien, or judgment shall send or cause to be sent the recorded satisfaction to the person who has made the full payment. In the case of a civil action arising out of the provisions of this section, the prevailing party shall be entitled to attorney's fees and costs."

616.    Proper demand was made upon Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, CHASE and RFC, on 11/15/2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

617.    On February 18, 2011, well past the deadline of the statute, Litton's lawyers sent a letter stating unequivocally that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, ALLY and RFC, and each of them, received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".  CHASE never responded.

618.    That said refusal to respond was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law, as well as a direct violation of the requirement of the HAMP guidelines wherein "the SPA requires that [CHASE and Litton Loan Servicing] fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

619.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE, pursuant to the HAMP guidelines, is required to make a reasonable effort to solicit borrower by performing at a minimum, the following acts:

a.    The servicer (including Litton and GMAC on behalf of CHASE) is to make a minimum of four telephone calls to the last known phone numbers of record, at different times of the day; - (Litton made none) and

b.    The servicer (including Litton and GMAC on behalf of CHASE) is to send two written notices to the last address of record by sending one letter via certified/express mail or via overnight delivery service (such as Federal Express or UPS) with return receipt/delivery confirmation and one letter via regular mail.  (Litton, individually, and on behalf of CHASE and RFC's only correspondence was the bad faith demand letters, never any response or mention of the HAMP or other rights of the Borrower).

c.    Any contact with eligible borrowers, whether by telephone, mail or otherwise, must:

1.    Advise borrowers that they may be eligible for HAMP; MHA Handbook v 2.0.  (Litton and CHASE made no such effort nor provided any such advice).

2.    Clearly describe the Initial Package that the borrower is required to submit pursuant to the requirements outlined in Section 4, and state what other information the servicer needs to complete the HAMP analysis;  (Litton, individually and on behalf of CHASE, never discussed HAMP, refused to discuss HAMP with the Plaintiffs, and never reviewed the Plaintiffs application.)

3.    Provide a toll-free telephone number through which the borrower can reach a loan servicer representative; (Litton, individually and on behalf of CHASE stated that Plaintiff is not permitted to call them at all, and CHASE required Plaintiffs to call Litton) and

4.    Identify any unique requirements the servicer may have established for submission of an Initial Package received later than 30 business days prior to a scheduled foreclosure sale date.  (Litton, individually and on behalf of CHASE, refused to provide any information regarding HAMP or mention the application whatsoever).

5.    All contact attempts must be documented in the servicing file.  If the servicer has documentation evidencing that it satisfied the Reasonable Effort standard for HAMP prior to June 1, 2010, resolicitation of the borrower is not required. (If Litton, individually and on behalf of CHASE, documented any efforts, then they would be fraudulent and further violations of the agreement.)

620.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE failed to make ANY contact with the Plaintiff; refused to discuss the matter with the Plaintiff; refused to provide a number for the Plaintiff to discuss the matter with the Servicer; and refused to comply with all the requirements set forth in this complaint.

191

621.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE; and GMAC on behalf of CHASE separately agreed, that they were further required to, and willfully failed and refused to comply with each and every one of the following conditions:

a.    The servicer (including Litton and GMAC on behalf of CHASE) must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Package, which is required to be submitted by the borrower to request a HAMP modification.

b.    The communication should:

1.    Describe the income evidence required to be evaluated for HAMP;

c.    Provide the RMA (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit); and

d.    Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

e.    The communication should also include clear language stating that during the HAMP evaluation the home will not:  (i) be referred to foreclosure; or (ii) be sold at a foreclosure sale if the foreclosure process has already been initiated.  In the communication, the servicer **must** include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the communication.

f.    If Right Party Contact is established prior to satisfaction of the Reasonable Effort standard, the **servicer must continue** to take steps to satisfy the Reasonable Effort standard until the Initial Package is submitted by the borrower.

g.    If Right Party Contact is established, but the borrower does not submit an Initial Package, the **servicer must resend** the Initial Package communication.  Again, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the second communication.  If the borrower does not respond by providing an Initial Package within the required time period set forth in the second communication, the servicer may determine the borrower to be ineligible for HAMP.

h.    If Right Party Contact is established, but the borrower submits an incomplete Initial Package within the required time period, the servicer (including Litton and GMAC on behalf of CHASE) **must comply** with the "Incomplete Information Notice" requirements set forth below in Section 2.3.3.  If the borrower does not respond to either the 30-day Incomplete Information Notice or the 15-day Incomplete Information Notice by providing an Initial Package within the required time period, the servicer may determine the borrower to be ineligible for HAMP.

Servicers **must acknowledge receipt** of the Initial Package within 10 business days per the requirements in Section 4.5 and respond within 30 calendar days with either an Incomplete Information Notice (as outlined in Section 2.3.3), a TPP Notice (as outlined in Section 8.1) or a Non-Approval Notice (as outlined in Section 2.3.2).

622.    Pursuant to the provisions of the agreement, Plaintiffs are entitled to a stay as Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE failed in every respect to meet the provisions of the SPA.

623.    Pursuant to the provisions of the SPA, Litton, CHASE, ALLY, GMAC and RFC, intentionally and willfully failed to comply with each and every provision as set forth below:

3    Protections Against Unnecessary Foreclosure

3.1    Suspension of a Referral to Foreclosure

A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of the following circumstances exists:

-    The borrower is evaluated for HAMP and is determined to be ineligible for the program; or

-    The borrower is offered a TPP, but fails to make current trial period payments as set forth in Section 8.3; or

-    The servicer has established Right Party Contact, has sent at least two written requests asking the borrower to supply required information in accordance with Section 2.2.2, and has otherwise satisfied the Reasonable Effort solicitation standard, and the borrower failed to respond by the dates indicated in those requests;                    or

-        The servicer has satisfied the Reasonable Effort solicitation standard without establishing Right Party Contact; or The borrower or co-borrower states he or she is not interested in pursuing a HAMP modification and such statement is reflected by the servicer in its servicing system and/or mortgage file.

3.2        Suspension of Foreclosure Proceedings in Process
With respect to a borrower who submits a request for HAMP consideration after a loan has been referred to foreclosure, the servicer must, immediately upon the borrower's acceptance of a TPP based on verified income, and for the duration of the  trial period, take those actions within its authority that are necessary to halt further activity and events in the foreclosure process, whether judicial or non-judicial, including but not limited to refraining from scheduling a sale or causing a judgment to be entered.

3.3        Suspension of Scheduled Foreclosure Sale
When a borrower submits a request for HAMP consideration after a foreclosure sale date has been scheduled and the request is received no later than midnight of the seventh business day prior to the foreclosure sale date (Deadline), the servicer must suspend the sale as necessary to evaluate the borrower for HAMP…

3.4        Mitigating Foreclosure Impact
The servicer must take the following actions to mitigate foreclosure impact:

3.4.1        Simultaneous Trial Period Plan and Foreclosure Explanation
When a borrower is simultaneously in foreclosure and is either being evaluated for HAMP or is in a TPP, the servicer must provide the borrower with a written notification that explains, in clear language, the concurrent modification and foreclosure processes and that states that even though certain foreclosure activities may continue, the home will not be sold at a foreclosure sale while the borrower is being considered for HAMP or while the borrower is making payments under a TPP…

3.4.2        Foreclosure Attorney/Trustee Communication
Servicers must develop and implement written policies and procedures to provide notification to their foreclosure attorney/trustee regarding a borrower's HAMP status, including whether the borrower is potentially eligible for HAMP (and is subject to Section 2.2), and whether the borrower is being evaluated for, or is currently in, a TPP.  Servicers must ensure that their foreclosure attorney/trustee adheres to all of the requirements of Section 3.1, Section 3.2 and Section 3.3 with respect to referral to foreclosure, stay of foreclosure actions and suspension of foreclosure sales.

3.4.3        Certification Prior to Foreclosure Sale
Servicers must develop and implement written procedures applicable to all loans that are potentially eligible for HAMP (and are subject to Section 2.2) that require the servicer to provide to the foreclosure attorney/trustee a written certification that (i) one of the five circumstances under Section 3.1 exists, and (ii) all other available loss mitigation alternatives have been exhausted and a non-foreclosure outcome could not be reached.  This certification must be provided no sooner than seven business days prior to the scheduled foreclosure sale date (the Deadline) or any extension thereof.

624.        Plaintiffs were further entitled, and never received the required acknowledgement of the Initial Package.

4.5 Acknowledgment of Initial Package

193

Within 10 business days following receipt of an Initial Package, the
servicer **must** acknowledge in writing the borrower's request for
HAMP participation by sending the borrower confirmation that the
Initial Package was received and a description of the servicer's
evaluation process and timeline. If the Initial Package is received from
the borrower via email, the servicer may email the acknowledgment.
Servicers must maintain evidence of the date of receipt of the
borrower's Initial Package in its records.
A single written communication sent within 10 business days of receipt
of a borrower's request for HAMP participation may also include, at
the servicer's discretion, the results of its review of the Initial Package.

625.    Although Litton Loan Services, LP, on their own behalf, and on behalf of the co-
defendant, CHASE and RFC, and ALLY separately, **MUST** comply, Litton Loan Services, LP, on their
own behalf, and on behalf of the co-defendant CHASE not only failed to acknowledge their receipt of the
Initial Package that was sent to them and received on May 4, 2011, but wantonly, willfully and
intentionally failed and refused in every respect to comply with any of the provisions of HAMP contained
herein for the benefit of the Plaintiff.

626.    Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-
defendant CHASE was **obligated** to review the documentation submitted by Plaintiff on May 4, 2011,
within 30 days, and failed and refused to do so.

627.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf
of the co-defendant CHASE had 30 days wherein they were contractually obligated to review the initial
package, and they willfully, wantonly and intentionally failed and refused in every respect to do so.

4.6 Review of Initial Package
Within 30 calendar days from the date an Initial Package is received,
the servicer **must** review the documentation provided by the borrower
for completeness.  If the documentation is incomplete or insufficient for
use in underwriting, the servicer must send the borrower an Incomplete
Information
Notice in accordance with the guidance set forth in Section 2.3.3.
If the borrower's documentation is complete, the servicer must evaluate
the borrower's eligibility for HAMP and either:
-        Send the borrower a TPP Notice (see Section 8.1); or
-        Make a determination that the borrower is not eligible for
HAMP and communicate this determination to the borrower in
accordance with the guidance in Section 2.3.2.

628.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE
had only 30 days from May 11, 2011 to wherein they were contractually obligated to complete their
assessment of borrower eligibility and notify the borrower of the eligibility determination, and utterly,
willfully, wantonly, and intentionally failed and refused to do so.

629.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf
of the co-defendant CHASE had 30 days from May 11, 2011 wherein they were contractually obligated to
provide the Plaintiff with a determination, and willfully, wantonly, and intentionally failed and refused to
do so in breach of that agreement.

6 Underwriting
Servicers must determine the borrower's eligibility for a modification
using information obtained in the Initial Package and subsequently
verified. **Servicers are required** to complete their assessment of
borrower eligibility and notify the borrower of the eligibility
determination within 30 calendar days of receiving all required
borrower documentation.

194

630.    Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE, and CHASE separately was contractually obligated to consider the Plaintiff for Hope for Homeowners, and utterly failed and refused to do so.

631.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE was jointly and separately contractually obligated to consider the Plaintiff for Hope for Homeowners, as set forth herein.

6.2 Coordination with Hope for Homeowners

Servicers are **required** to consider a borrower for a refinance through the Federal Housing Administration's HOPE for Homeowners (H4H) program when feasible.  Consideration for an H4H refinance should not delay eligible borrowers from receiving a TPP Notice.  The servicer's obligation as it relates to the H4H requirement is that while the servicer is gathering information to determine if a borrower meets the minimum eligibility criteria for HAMP, it should also be assessing whether the borrower may be eligible to refinance through H4H. This assessment would involve asking the following set of questions:

-    Will the loan amount exceed $550,440?  No.
-    Has the borrower made less than six (6) full payments during the life of the first lien loan?  No.
-    Does the borrower have an ownership interest in other residential real estate, including any second homes or rental properties? No.
-    Was the mortgage to be refinanced originated after January 1, 2008?  No.
-    Does the property contain more than one (1) unit?  No.

If the answer to all of these questions is "NO", the borrower may be eligible for H4H. (As is the precise case for the Plaintiff, herein). In this case, the servicer should counsel the borrower to seek a refinance with an H4H lender.

632.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE failed and refused to notify the Plaintiff of their consideration, as well as Litton individually and on behalf of CHASE, failed and refused to consider the Plaintiff, entitlement to relief under Hope for Homeowners.

633.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE was obligated to apply the modification steps until the monthly mortgage payment ratio is reduced to 31 percent, but utterly failed and refused to do so.

634.    Pursuant to the Handbook, section 6.3 Standard Modification Waterfall
Servicers (including CHASE, ALLY and LITTON) **must** apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent (target monthly mortgage payment ratio).

635.    A borrower will qualify for HAMP only if the interest rate on the mortgage loan can be reduced by at least 0.125 percent without the modified monthly mortgage payment ratio going below 31 percent. If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31 percent, the modification will not satisfy HAMP requirements and no incentives will be payable in connection with the modification.

636.    Even though clearly, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE, ALLY and LITTON, **MUST** have taken action, they failed and intentionally refused to comply with every requirement of HAMP; failed and refused to comply with State and Federal Law; committed fraud; willfully and maliciously acted with the sole intent to deprive Plaintiffs of their property.

637.    Because there existed a contract between CHASE, Litton Loan Servicing, LP and the US Treasury Department which was intended to benefit the Plaintiffs, and others similarly situated; and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, CHASE, accepted consideration for each loan modification application from the US Treasury Department; because there was a mutual intent to benefit the Plaintiffs, and others similarly situated; and the Plaintiffs were deprived of their opportunity to have their HAMP application, their H4H application properly and timely reviewed, the Plaintiffs suffered irreparable harm.

195

638.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE further owed the Plaintiffs and others similarly situated the implied obligation of good faith and fair dealing, which is implied in every contract.

639.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE committed intentional, wanton and willful breaches of the covenants of good faith and fair dealing; intentional, wanton and willful breaches of the agreement with the US Treasury Department; and the Plaintiffs, and others similarly situated were the intended third party beneficiaries of that agreement between the US Treasury Department, GMAC, CHASE, ALLY and Litton Loan Servicing, LP and Plaintiffs as the intended beneficiary, and Plaintiffs, and others, were harmed as a result of those breaches.

640.    Plaintiffs are entitled to receive compensatory damages according to proof;

641.    Plaintiffs are entitled to receive exemplary damages based on the net worth of CHASE for their malicious, wanton and willful breaches of the agreement and their ratification of the wrongful conduct of their co-conspirators to the extent permitted by law.

642.    Wherefore Plaintiffs respectfully request that the court:

A.    Issue an order requiring CHASE, jointly and severally, with the remaining co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiff and dismiss them with prejudice;

B.    Find that CHASE, on their own behalf, and on behalf of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that [GMAC on behalf of CHASE and Litton Loan Services, LP], on their own behalf, and on behalf of the remaining co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

C.    Find that CHASE, on their own behalf, and on behalf of the remaining co-defendants, were in breach of the SPA agreement with the US Treasury Department intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

1.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

2.    The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

3.    The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

4.    The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

5.    The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

6.    The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

7.    The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

8.    Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

D.    Find that CHASE, on their own behalf, and on behalf of the remaining co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

E.    Find that CHASE, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.    Find that CHASE, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act

(RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.     Find that CHASE, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.     Find that CHASE, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.     Find that CHASE, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

J.     Find that CHASE, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

K.     Find that CHASE, individually, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.     That the court further grant compensatory damages to Plaintiffs for CHASE'S intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.     That the court further grant punitive damages to Plaintiffs against CHASE, on their own behalf, and on behalf of the co-defendants for CHASE, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant CHASE, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.     That the court further grant statutory damages of $10,000 per violation, to Plaintiff against CHASE, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant CHASE, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.     That the court order Defendant CHASE, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of CHASE and its agents, in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

P.     That the court grants to Plaintiff against the Defendant CHASE, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

## COUNT FORTY TWO
## PLAINTIFFS v. CHASE

Damages And Declaratory Relief Action For CHASE's Violation of the FEDERAL  FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. §  1692 ET. SEQ

643.     Plaintiffs incorporate paragraphs 1 to 642, inclusive, herein, as though set forth herein in full.

644.     Plaintiffs fall within the class of individuals who are defined by the Statute as consumer—"any natural person obligated or allegedly obligated to pay any debt".

645.     Defendant, Litton on the behalf of CHASE, and on behalf of the other co-defendants, claims that Plaintiffs owed a consumer debt—"any obligation... [incurred] primarily for personal, family or household purposes", a mortgage secured by a forged note and deed of trust.

646.    Defendant, CHASE, on their own behalf, retained the services of Litton, and on behalf of the co-defendants, Litton is a debt collector defined as any person using interstate commerce who regularly collects debts as defined by the statute and as proven by their acts alleged herein.

647.    Each separate letter demanding payment, including billing the Plaintiffs for attorneys' fees and court costs, inspection fees, and all demands for money of any and all kinds, sent by, or demanded on the behalf of Litton Loan Servicing, LP individually, and on behalf of Defendant RFC Homecomings and CHASE is a separate violation of the FDCPA.

648.    Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE to the extent permitted by law;

c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE, or any of their successors, agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

## COUNT FORTY THREE
## PLAINTIFFS v. CHASE

Damages And Declaratory Relief Action For CHASE's Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and 18 U.S.C. §§ 1964, (Prohibited activities) (Civil RICO Remedies)

649.    Plaintiffs incorporate paragraphs 1 to 648, inclusive, herein, as though set forth herein in full. Substance prevails over form.

650.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

651.    On March 25, 2005, and continuing, through the present, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

652.    Plaintiffs further allege that Defendant CHASE, on their own behalf, and on behalf of the co-defendants, in conjunction with and in furtherance of the conspiracy with all the remaining Defendants, did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(b) supra.

653.    Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.

654.    Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise). CHASE, on their own behalf, and on behalf of the co-defendants, are liable for all wrongful conduct of its co-defendants, and each of them, its lawyers, Shapiro and Fishman and Akerman Senterfitt.

655.    At all times herein, CHASE, on their own behalf, and on behalf of the co-defendants, and each of them, conspired with remaining defendants, ratified the conduct, and conspired with the remaining Defendants, to interfere with the quiet enjoyment of Plaintiffs home; steal the equity in the Plaintiff's home; and used a forged promissory note and fraudulent affidavit in a civil court action in order to fraudulently obtain a judgment of foreclosure.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE, on their own behalf, and on behalf of the co-defendants to the extent permitted by law;

c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

198

    d.        Reasonable attorney's fees and court costs according to proof;

    e.        Such other and further relief as the court deems just and proper.

**COUNT FORTY FOUR**
**PLAINTIFFS v. CHASE**

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

656.    Plaintiffs incorporate paragraphs 1 to 655, inclusive, herein, as though set forth herein in full. Substance prevails over form.

657.    Plaintiffs further incorporate the allegations of the remaining Counts of the rest of this complaint, contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

658.    At various times and places partially enumerated Plaintiff's documentary material, all Defendants, and each of them, did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

659.    Likewise, all Defendants, and each of them, did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

660.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

661.    Plaintiffs further allege that all Defendants jointly or severally did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

662.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.        Statutory Compensatory damages for each separate violation according to proof;

    b.        Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE to the extent permitted by law;

    c.        Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.        Reasonable attorney's fees and court costs according to proof;

    e.        Such other and further relief as the court deems just and proper.

**COUNT FORTY FIVE**
**PLAINTIFFS v. CHASE**

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

663.    Plaintiffs incorporate paragraphs 1 to 662, inclusive, herein, as though set forth herein in full. Substance prevails over form.

664.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

665.    At various times and places as enumerated in Plaintiff's exhibits which are attached hereto, and incorporated herein, all Defendants, and each of them, did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

666.    At various times and places partially enumerated in Plaintiffs documentary material, all Defendants, individually and on behalf of each other, committed acts in furtherance of the conspiracy, did

also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

667.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

668.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d) (Prohibited activities supra).

669.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

          a.    Statutory Compensatory damages for each separate violation according to proof;

          b.    Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE, to the extent permitted by law;

          c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

          d.    Reasonable attorney's fees and court costs according to proof;

          e.    Such other and further relief as the court deems just and proper.

## COUNT FORTY SIX
### PLAINTIFFS v. CHASE

Damages And Declaratory Relief Action for CHASE's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

670.    Plaintiffs incorporate paragraphs 1 to 669, inclusive, herein, as though set forth herein in full. Substance prevails over form.

671.    As alleged herein, Defendant CHASE, on their own behalf, and on behalf of the co-defendants, committed numerous of acts of mail fraud, which is a violation of federal law.

672.    That Defendant CHASE, on their own behalf, and on behalf of the co-defendants, knowingly devised a scheme to defraud or to obtain money or property (or the intangible right of honest services) by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

673.    That CHASE, on their own behalf, and on behalf of the co-defendants, acted with the intent to defraud the Plaintiffs and others (including the US Treasury) to the detriment of the Plaintiffs, and each of them.

674.    That in advancing, furthering, or carrying out the scheme, CHASE, on their own behalf, and on behalf of the co-defendants, used the mails (a private or commercial interstate carrier), or caused the mails (a private or commercial interstate carrier) to be used.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

          a.    Statutory Compensatory damages for each separate violation according to proof;

          b.    Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE to the extent permitted by law;

          c.    Declaratory relief, including permanent injunctive relief, prohibiting CHASE, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

          d.    Reasonable attorney's fees and court costs according to proof;

          e.    Such other and further relief as the court deems just and proper.

## COUNT FORTY SEVEN
### PLAINTIFFS v. CHASE

Damages And Declaratory Relief Action For CHASE's Violation of the VIOLATION OF 18 U.S.C. § 1001

675.    Plaintiffs incorporate paragraphs 1 to 674, inclusive, herein, as though set forth herein in full. Substance prevails over form.

676.    Defendant, CHASE, on their own behalf, and on behalf of the co-defendants, violated 18 U.S.C. § 1001 by the conduct complained of herein, and as proven at the time of trial.

677.    Defendant CHASE, on their own behalf, and on behalf of the co-defendants falsified, concealed or covered up by any trick, scheme or device, material facts, including, but not necessarily limited to:

      a.    The date of the transfer of the loan from Washington Mutual Bank, FA;

      b.    The use of false and misleading language in the affidavit of Debra Lyman.

5.    On March 25, 2005, subsequent to the filing of the foreclosure complaint, the loan was

      transferred from Washington Mutual to RFC.  All rights under the note and mortgage

      were transferred at that time.

      c.    The true facts were, that March 25, 2005 is five days prior to the filing of the lawsuit. The court was misled by Defendant Washington Mutual Bank, FA, Defendant Debra Lyman, Defendant Litton Loan Servicing LP's use of the misleading words "subsequent to the filing of the foreclosure complaint".  Had each of the Defendants informed the court of the true facts, that March 25, 2005, was five days prior to suit being filed, then Washington Mutual Bank, FA would have had no standing to bring the action, and thus the action would have been dismissed.

      d.    The Defendant's affidavit was further false in that it claimed Washington Mutual Bank, FA, was entitled to sums that Washington Mutual Bank, FA later admitted were neither due nor owing to them.

      e.    In fact, Defendants concealed from the court and failed to inform the court of a credit of $373,907.18 in principal, proving that Washington Mutual Bank, FA, was paid in full and not owed any money from the Plaintiffs.

      f.    The Defendants, CHASE, by and through its agent, Litton, and on behalf of the co-defendants, filed false affidavits and a forged promissory note, with the court in order to obtain a judgment of foreclosure.

      g.    The Defendant, CHASE, by and through its agent, Litton, and on behalf of the co-defendants also filed a fraudulent affidavit and a forged promissory note.

      h.    The Defendant CHASE, individually, and by and through its agent, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants violated the State and Federal Statutes listed herein and committed other wrongful and intentional misconduct, all according to proof as pled herein.

678.    Defendant CHASE, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001 by making, and / or causing to be made, or ratifying, fictitious or fraudulent statements or representations to the Plaintiffs, to the court, and to the US Department of the Treasury; to the OCC; to the FTC; to the State and local authorities, and to the court of appeals.

679.    Defendant CHASE, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001by ratifying, making or using any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, all as alleged herein.

680.    Defendant CHASE, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001, as alleged herein, because the statements made by the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants were all material, and adversely affected the Plaintiffs, the court, the US Government, and others and were ratified by the Defendant, CHASE.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.    Statutory Compensatory damages for each separate violation according to proof;

      b.    Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE, to the extent permitted by law;

      c.    Declaratory relief, including permanent injunctive relief, prohibiting CHASE, or any of their loan servicers, agents or assigns, from any further breaches of the statute;

      d.    Reasonable attorney's fees and court costs according to proof;

      e.    Such other and further relief as the court deems just and proper.

## COUNT FORTY EIGHT
## PLAINTIFFS v. CHASE

201

Damages And Declaratory Relief Action for CHASE's Violation of
18 U.S.C. § 1005

681.     Plaintiffs incorporate paragraphs 1 to 680, inclusive, herein, as though set forth herein in full. Substance prevails over form.

682.     Defendant CHASE, in furtherance of the co-conspiracies complained of herein, and in order to conceal and misdirect the officials conducting an official investigation, provided false information to the Florida Office of Financial Regulation, delivered by means of the US Mail, and used means of Interstate Commerce, and transmitted mail across State lines.

683.     The Defendant CHASE knew that the Florida Office of Financial Regulation (OFR) was conducting a full investigation of the conduct of the Defendants, and each of them, including the fraudulent affidavit of Debra Lyman and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants and the use of a forged promissory note in obtaining a fraudulent judgment of foreclosure.

684.     During that investigation stemming from a complaint filed with that office in 2010, the OFR sent a request for a response from CHASE, and upon receipt of false and misleading information from CHASE, closed their investigation.

685.     That letter, dated June 22, 2001, delivered by means of the US Mail, and across State lines, contained numerous lies to the Government with the intention of having the Government cease any further investigation.

686.     Additionally, the Defendant, CHASE ratified the conduct of the co-conspirators, and each of them, who furthered the co-conspiracy against the interests of the Plaintiffs.

687.     Plaintiffs are informed, believe, and thereon allege, and have incorporated herein, that other false and misleading statements were entered into the books and records of the bank, JP Morgan Chase, Washington Mutual Bank, FA's, and Ally, with the intent to defraud the Banks, the Plaintiff, and different branches of the State and Federal Government, all in violation of the above-stated statute.

688.     Said false and malicious statements and false entries were designed to, and intended to injure or defraud such banks, and other company, body politic or corporate, and individual person, including the Plaintiffs, and to deceive the officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System.

689.     Further, CHASE, on their own accord, individually, and by and through Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, in concert with, and with the intent to defraud the State of Florida, and the United States or any agency thereof, or any financial institution referred to in this complaint, participated and shared in and or received (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution, and should be fined not more than $1,000,000 or imprisoned not more than 30 years, or both pursuant to code.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.     Statutory Compensatory damages for each separate violation according to proof;

b.     Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE to the extent permitted by law;

c.     Declaratory relief, including permanent injunctive relief, prohibiting CHASE, their servicing agent, Litton Loan Servicing, or any of their successor agents or assigns, from any further breaches of the statute;

d.     Reasonable attorney's fees and court costs according to proof;

e.     Such other and further relief as the court deems just and proper.

**COUNT FORTY NINE**
**PLAINTIFFS v. CHASE**

Damages And Declaratory Relief Action For CHASEs Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

690.     Plaintiffs incorporate paragraphs 1 to 689, inclusive, herein, as though set forth herein in full. Substance prevails over form.

691.     Regulation B notice is required when the Defendant, CHASE, individually, and by and through their servicing agent, Litton Loan Servicing, LP, failed to acknowledge receipt of the HAMP application, thus constituting a denial of the application and denial of credit there under.

692.     Pursuant to Regulation B, any denial of credit required CHASE, individually and on behalf of the co-defendants, to tender a proper notice pursuant to that Regulation B.

693.     Each separate act by CHASE, on their own behalf, and on behalf of the co-defendants, constituted separate violations of the statutes as alleged in this entire Complaint constitutes grounds for statutory damages payable to the Plaintiffs in the sum of $10,000 per violation, according to proof. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.     Statutory Compensatory damages for each separate violation according to proof;

b.     Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE to the extent permitted by law;

c.     Declaratory relief, including permanent injunctive relief, prohibiting CHASE or their servicing agent, Litton Loan Servicing, or any of their successors, agents or assigns, from any further breaches of the statute;

d.     Reasonable attorney's fees and court costs according to proof;

e.     Such other and further relief as the court deems just and proper.

## COUNT FIFTY
## PLAINTIFFS v. CHASE

PENDANT STATE CLAIM
Damages And Declaratory Relief Action for CHASE's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)

694.     Plaintiffs incorporate paragraphs 1 to 693, inclusive, herein, as though set forth herein in full. Substance prevails over form.

695.     Proper demand was made upon CHASE in October of 2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

696.     CHASE never responded to the request, except for Litton's attorney, on February 18, 2011, well past the deadline of the statute, CHASE's lawyers sent a letter stating unequivocally that Litton received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

697.     That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law.

698.     That, had CHASE answered, then they would be forced to admit, under oath, that they had no interest in the loan which was the subject of the litigation; would have to admit that Washington Mutual Bank, FA was paid in full; and that there never existed a servicing agreement between Litton Loan Servicing, LP and Washington Mutual Bank, FA.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.     Statutory Compensatory damages for each separate violation according to proof;

b.     Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE to the extent permitted by law;

c.     Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d.     Reasonable attorney's fees and court costs according to proof;

e.     Such other and further relief as the court deems just and proper.

Defendant Washington Mutual Bank, FA, (1) refusal to acknowledge receipt of Plaintiffs application which met all the terms and conditions and were in compliance with the requirements of HOME AFFORDABLE MODIFICATION PROGRAM (HAMP), refusal to comply with the obligations of the HAMP program, refusal to even consider the Plaintiffs application under the HAMP, refusal to appoint a single point of contact under HAMP, refusal to provide Plaintiffs a TPP, refusal to stay a pending proceeding pursuant to HAMP, and failure and refusal to perform any and all of the obligations owed Plaintiff under HAMP; (2) refusal to notify the Plaintiffs of their rights to apply for, nor did Defendants comply with the requirements of HELP FOR HOMEOWNERS (H4H); (3) commission of violations of Regulation D; (4) commission of mail fraud (18 U.S.C., SECTIONS 1341, 1343); (5) commission of bank fraud (18 U.S.C. 1341, 1344); (6)

lying to and providing false information to agents of the Federal Government (OCC) conducting an official investigation (18 U.S.C. § 1001 and 18 U.S.C. § 1005); (7) continuing to do business in violation of the cease and desist orders of the OTS and Federal Court Receivership (now OCC); (8) Failing to comply with the "consent order" for JP Morgan Chase which required the Defendant to engage an independent firm to conduct a multi-faceted review of foreclosure actions. The third-party consultant will assess whether foreclosures complied with federal and state laws, whether foreclosures occurred when grounds for foreclosure were not present, such as when loans were performing, and whether any errors, misrepresentations or other deficiencies resulted in financial injury to borrowers. As part of that review, the enforcement actions require each servicer to establish a process for borrowers who request their case be reviewed and considered for remediation if they believe they have suffered financial harm as a result of improper foreclosure actions.

Each servicer must submit a plan to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the independent consultant's findings as required by the OCC; (9) lying to and providing false information to agents of the Federal Government (OCC) conducting an official investigation in criminal violation of 18 U.S.C. § 1001 and 18 U.S.C. § 1005; (10) violating the RICO act; (11) commission of civil conspiracy; and (12) filing false documents with the court in a foreclosure action (a false affidavit and a forged promissory note); (13) willful, intentional, and stated refusal to comply with Florida Statute 701.04 (1) after proper demand; (14) perjury and the other wrongful acts complained of herein, and proven at the time of trial. Plaintiffs are entitled, and are seeking a Declaratory relief order from this Court, finding that the judgment of foreclosure was obtained in violation of the Constitutional rights of the Plaintiffs; was obtained by means of fraud; and an order setting aside the judgment of foreclosure that was fraudulently obtained, and obtained in violation of the US and State Constitutional Rights of the Plaintiffs, including, but not limited to 5th Amendment Due Process Violations; and as authorized by Florida Statutes Florida Rule of Civil Procedure 1.540, et seq.

## COUNT FIFTY ONE
### PLAINTIFFS v. WASHINGTON MUTUAL BANK, FA

Damages And Declaratory Relief Action For Failure WASHINGTON MUTUAL BANK FA's Failure To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

576.    Plaintiffs incorporate paragraphs 1 to 575, inclusive, herein, as though set forth herein in full.

577.    The Making Home Affordable Program was introduced in February 2009 by the Obama Administration which was intended to stabilize the housing market and help struggling homeowners get relief and avoid foreclosure.

578.    Because the stated purpose of the program was partly designed to help homeowners, homeowners, including the Plaintiffs, were the intended third party beneficiaries of the Program.

579.    In March of 2009, the Treasury Department (Treasury) issued uniform guidance for loan modifications across the mortgage industry, and updated those guidelines with policy announcements.

580.    The MHA Handbook for Servicers of Non-GSE Mortgages (Handbook) was issued to provide guidance for servicers of mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac.

581.    JP MORGAN CHASE & CO (PURCHASER OF ALL RELEVEANT WASHINGTON MUTUAL BANK, FA'S ASSETS, (hereinafter WAMU) signed the HAMP servicer participation agreement on MARCH 22, 2010, becoming a participant in the Home Affordable Modification Program (HAMP), by signing the Servicer Participation Agreement (SPA).

582.    Defendant CHASE registered and executed a Servicer Participation Agreement, related documents, and one or more Service Schedules (SPA) with the Program Administrator on or before MARCH 22, 2010. As alleged herein, Litton also was a signer of the same agreement.

583.    Plaintiffs were informed, believe, and thereon allege, that, contrary to the statements of Washington Mutual Bank, FA by and through Litton's attorneys, and ratified by CHASE, Litton Loan Servicing, LP, at all relevant times, had a servicing agreement with RFC Homecomings and GMAC on

204

behalf of Ally, RFC and GMAC. CHASE, with full knowledge of the facts, ratified this conduct on their behalf and on behalf of WAMU.

584.    That Plaintiffs filed a formal complaint with CHASE, regarding the fraudulent conduct of the Defendant, Litton Loan Servicing, LP.

585.    That, in order to conceal their conspiracy, complicity, cooperation and agency relationship with Litton Loan Servicing, LP, falsely represented they were servicing the loan for Washington Mutual Bank, FA, and their conduct was wholly ratified by CHASE.

586.    The statements made using means of interstate commerce were false.

587.    The SPA governs servicer participation in MHA for all Non-GSE Mortgages.

588.    CHASE and Litton Loan Servicing, LP on behalf of themselves and the lenders whose loans they service, agreed to abide by the terms of the handbook as part of the Servicer Participation Agreement (SPA).

589.    All participating servicers, including CHASE and Litton Loan Servicing, LP (hereinafter referred to as Litton) acting on behalf of CHASE, GMAC, ALLY, and RFC, are required, among other things, to consider all eligible mortgage loans for Services (as defined in the SPA) unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. MHA 1.1

a.    Pursuant to the Handbook, CHASE, GMAC, RFC, and Litton cannot escape liability by simply referring the matter to their lawyers.

b.    The Handbook, in pertinent part says that if the entity that signed the SPA sub-contracts out any portion of its responsibilities as a servicer to another party, the entity that signed the SPA will be liable for the acts and omissions of the sub-contracted party under the SPA, thereby making CHASE responsible for the conduct of Litton.

c.    WAMU, by and through their agent, Litton, individually and on behalf of WAMU, GMAC and RFC, instructed Akerman Senterfitt, its lawyers to act on their behalf, and thus WAMU is responsible for all the willful violations, intentional and negligent misconduct of its lawyers and co-conspirators as pled herein, in failing in every respect to meet the requirements of HAMP.

d.    All of the wrongdoings complained of herein, include the conduct of Akerman Senterfitt as the agent and subcontractor of WAMU.

590.    As further described in Section 1.3, participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out the requirements of the SPA. MHA 1.1, but Plaintiffs are informed, believe and thereon allege, that Litton failed to use reasonable efforts to contact WAMU regarding the Plaintiffs; and, once CHASE as purchaser of the assets of WAMU, was contacted by the Plaintiffs, failed to request Litton to resolve the complaints of the Plaintiffs. WAMU's attorneys, Akerman Senterfitt argued to the Court of Appeals that the only entity entitled to recover under the note was WAMU.  However, as proven herein, WAMU was paid in full, refused to respond to the Demand for an estoppel letter, and JPMorgan Chase, as custodian of the records for WAMU, claimed that WAMU was paid in full, and could not accept any payment on its behalf. Furthermore, it was ordered to Cease and Desist from doing any further business, and thus could not legally hold a note, nor could it collect on the note, nor could it continue to maintain a cause of action, or it would be in violation of that order. Litton knew the real owner of the note, if there was one, and could have entered into a HAMP agreement on their behalf, or should have entered into a HAMP agreement on their behalf, or, at a minimum, responded to the HAMP, instead of simply ignoring it altogether, while at the same time, encouraging their lawyers to continue with the fraudulent action against the Plaintiffs.

591.    In 2009, Congress passed the Helping Families Save Their Homes Act of 2009, which includes legal protection for servicers that modify residential mortgages.

592.    It was intended to encourage more servicers to modify more mortgages for the benefit of the homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

593.     The bill essentially provides authority for, and legal protection for servicers to alter mortgage contracts and, as the argument goes, investor contracts where mortgages have been securitized.

594.    Thus, not only does no legal impediment existed for WAMU through Litton Loan Servicing LLC to grant a loan modification on behalf of WAMU, GMAC, RFC or even CHASE as owner of all assets of Washington Mutual Bank, FA (if it existed or were so entitled) to any and all individuals who qualify, but also every action taken by the Government was intended to benefit the Homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

595.    In addition to the normal obligation to obey all laws, and the implied covenants of good faith and fair dealing that are found in every contractual agreement, the SPA requires that CHASE, GMAC,

RFC and Litton Loan Servicing, individually and acting on behalf of WAMU, GMAC and RFC, fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP.

      a.      Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

      b.      The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

      c.      The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

      d.      The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

      e.      The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

      f.      The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

      g.      The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act.

      h.      Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.; 18 U.S.C. 1964, (Civil RICO Remedies);

      i.      Conspiracy to commit and commission of Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343;

      j.      Conspiracy to commit and commission of Bank Fraud 18 U.S.C. 1341, 1344;

      k.      Conspiracy to commit and commission of 18 U.S.C. § 1001;

      l.      Conspiracy to commit and commission of 18 U.S.C. § 1005;

596.      If Litton Loan Servicing, LP, individually and on behalf of WAMU, actually legally serviced any loan for GMAC, RFC Homecomings, or Washington Mutual Bank, FA then Plaintiffs would have received from Litton Loan Servicing, LP, on behalf of at least one of the defendant entities, at a minimum, a response to their HAMP loan modification request, or been provided the H4H application or responded to the Florida Statute Estoppel Demand Pursuant to Florida Statute 701.04 (1). WAMU allowed Litton Loan Servicing to continue to bill for legal services; allowed Litton to demand payment for a mortgage that WAMU knew was no longer owing, and further expressly claimed no interest in recovering.

597.      Defendant WAMU and RFC by and through its servicing agent, Litton Loan Servicing, LP, did not respond, because they had no legal right or basis upon which to provide a response.

598.      The Plaintiff's property qualifies under the conditions required of HAMP, and the Plaintiff would have been eligible for HAMP, including, but not limited to, the following conditions:

      a.      Mortgage loan was originated on or before January 1, 2009;

      b.      Mortgage loan was not previously modified under HAMP.

      c.      The Mortgage loan is delinquent or default is reasonably foreseeable.

      d.      The Mortgage loan is secured by a one unit property, which is the principal residence of the Plaintiff.

      e.      The subject property is not vacant or condemned.

      f.      The borrower has documented financial hardship and represented she does not have sufficient liquid assets to make the monthly mortgage payments because of a reduction in her salary and a reduction in her spouses work to part time status.

      g.      The Plaintiff's monthly mortgage payment (including principal, interest, taxes, and insurance) is greater than 31 percent of the Plaintiff's verified monthly gross income.

      h.      The Plaintiff is willing to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.

      i.      The Current unpaid principal balance (UPB) of the mortgage loan prior to capitalization is not greater than $729,750.

206

j.        The Plaintiff offered to make a timely first trial period payment on or before December 31, 2012, but no TPP was ever offered to the Plaintiff.

k.        The Plaintiff is in active litigation, and is eligible for HAMP.

599.        Litton Loan Servicing, LP, individually and on behalf of WAMU was required to communicate with clear written information designed to help the borrower understand the modification process in accordance with the HAMP guidelines and Handbook.

600.        Litton Loan Servicing, LP, individually and on behalf of WAMU has failed and refused to communicate with the Plaintiff, and referred the Plaintiff to their attorney, who has also refused to provide any information regarding HAMP; who then expressly, blatantly and openly refused to comply with the statutory requirements of providing an estoppel letter; and has willfully violated every provision of the HAMP and the handbook.

601.        Plaintiffs put WAMU on formal notice of the conduct complained of herein, and as the case progressed, and filed further complaints and WAMU ratified the conduct in full after claiming to complete a thorough investigation.

602.        As late as June of 2011, although WAMU was fully apprised that Litton failed in every respect to obey the statutes complained of herein, and has a toll free number for HAMP applications, the Defendant, WAMU took no steps to help the Plaintiffs, and referred the Plaintiffs to contact LITTON.

603.        Although WAMU has a toll free number, the Plaintiff was told he was not allowed to call WAMU; was not allowed to discuss HAMP with WAMU; nor was he allowed to discuss the HAMP modification process or other alternative modification programs with WAMU.

604.        WAMU and their designated agents, (in this case, Litton) are required to maintain adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents.

605.        Litton Loan Servicing, LP, individually and on behalf of WAMU, and WAMU has ratified the wrongful conduct of Litton in every respect and after having been fully apprised of their conduct, has refused to acknowledge receipt of Plaintiffs HAMP application; refused to respond to the application; refused to discuss the application with Plaintiff; and willfully violated the following regulations:

606.        Although Section 5 of the Federal Trade Commission Act prohibits unfair or deceptive acts or practices, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, WAMU, used false affidavits; filed a forged promissory note; committed perjury and numerous acts of fraud upon the court and the Plaintiff in order to obtain a judgment of foreclosure.

607.        Although the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibits discrimination on a prohibited basis in connection with mortgage transactions, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, WAMU discriminated against the Plaintiff because of her gender and her religion.

608.        Although the Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, WAMU failed to provide proper documentation in violation of RESPA.

609.        Although the Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, WAMU tendered multiple demands seeking payment on behalf of RFC, but obtained a judgment in the name of Washington Mutual Bank, FA, informing the court that the only entity entitled to recover was Washington Mutual Bank, FA while at the same time,  WAMU continued to assert that Plaintiffs were paid in full, an owed WAMU nothing.

610.        Each letter and piece of correspondence sent by Litton, including billings for attorney's fees, on behalf of WAMU with WAMU's consent, and full ratification after being fully apprised of their conduct was a separate violation of the Fair Debt Collection Practices Act.

611.        Although the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification, (these laws also prohibit red-lining), Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU has discriminated against the Plaintiffs on the basis of her gender and her religion.

612.      Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU negotiated modifications of loans with others, but refused to even consider the Plaintiffs, failing to acknowledge or respond to the Plaintiffs application.

613.      Although the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU used false information in reporting consumer credit information to credit reporting agencies about the Plaintiff.

614.      Although the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU, and WAMU ratified the conduct of Litton, who intentionally and willfully failed and refused to comply with Regulation B by failing to timely respond to the HAMP application, thus violating Regulation B.

615.      Under Florida Law, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU, was required to provide an estoppel letter pursuant to Florida Statutes Chapter 701.04 (1), which says, in pertinent part:

> "Within 14 days after receipt of the written request of a mortgagor, the holder of a mortgage shall deliver to the mortgagor at a place designated in the written request an estoppel letter setting forth the unpaid balance of the loan secured by the mortgage, including principal, interest, and any other charges properly due under or secured by the mortgage and interest on a per-day basis for the unpaid balance. Whenever the amount of money due on any mortgage, lien, or judgment shall be fully paid to the person or party entitled to the payment thereof, the mortgagee, creditor, or assignee, or the attorney of record in the case of a judgment, to whom such payment shall have been made, shall execute in writing an instrument acknowledging satisfaction of said mortgage, lien, or judgment and have the same acknowledged, or proven, and duly entered of record in the book provided by law for such purposes in the proper county. Within 60 days of the date of receipt of the full payment of the mortgage, lien, or judgment, the person required to acknowledge satisfaction of the mortgage, lien, or judgment shall send or cause to be sent the recorded satisfaction to the person who has made the full payment. In the case of a civil action arising out of the provisions of this section, the prevailing party shall be entitled to attorney's fees and costs."

616.      Proper demand was made upon Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, WAMU and RFC, on 11/15/2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

617.      On February 18, 2011, well past the deadline of the statute, Litton's lawyers sent a letter stating unequivocally that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, ALLY and RFC, and each of them, received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter". WAMU never responded.

618.      That said refusal to respond was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law, as well as a direct violation of the requirement of the HAMP guidelines wherein "the SPA requires that [WAMU and Litton Loan Servicing] fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

619.      Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU, pursuant to the HAMP guidelines, is required to make a reasonable effort to solicit borrower by performing at a minimum, the following acts:

a.      The servicer (including Litton and GMAC on behalf of WAMU) is to make a minimum of four telephone calls to the last known phone numbers of record, at different times of the day; - (Litton made none) and

208

b.      The servicer (including Litton and GMAC on behalf of WAMU) is to send two written notices to the last address of record by sending one letter via certified/express mail or via overnight delivery service (such as Federal Express or UPS) with return receipt/delivery confirmation and one letter via regular mail.  (Litton, individually, and on behalf of WAMU and RFC's only correspondence was the bad faith demand letters, never any response or mention of the HAMP or other rights of the Borrower).

c.      Any contact with eligible borrowers, whether by telephone, mail or otherwise, must:

1.      Advise borrowers that they may be eligible for HAMP; MHA Handbook v 2.0.  (Litton and WAMU made no such effort nor provided any such advice).

2.      Clearly describe the Initial Package that the borrower is required to submit pursuant to the requirements outlined in Section 4, and state what other information the servicer needs to complete the HAMP analysis;  (Litton, individually and on behalf of WAMU, never discussed HAMP, refused to discuss HAMP with the Plaintiffs, and never reviewed the Plaintiffs application.)

3.      Provide a toll-free telephone number through which the borrower can reach a loan servicer representative; (Litton, individually and on behalf of WAMU stated that Plaintiff is not permitted to call them at all, and WAMU required Plaintiffs to call Litton) and

4.      Identify any unique requirements the servicer may have established for submission of an Initial Package received later than 30 business days prior to a scheduled foreclosure sale date.  (Litton, individually and on behalf of WAMU, refused to provide any information regarding HAMP or mention the application whatsoever).

5.      All contact attempts must be documented in the servicing file.  If the servicer has documentation evidencing that it satisfied the Reasonable Effort standard for HAMP prior to June 1, 2010, resolicitation of the borrower is not required. (If Litton, individually and on behalf of WAMU, documented any efforts, then they would be fraudulent and further violations of the agreement.)

620.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU failed to make ANY contact with the Plaintiff; refused to discuss the matter with the Plaintiff; refused to provide a number for the Plaintiff to discuss the matter with the Servicer; and refused to comply with all the requirements set forth in this complaint.

621.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU; and GMAC on behalf of the defendants, and each of them, who separately agreed, that they were further required to, and willfully failed and refused to comply with each and every one of the following conditions:

a.      The servicer (including Litton and GMAC on behalf of WAMU) must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Package, which is required to be submitted by the borrower to request a HAMP modification.

b.      The communication should:

1.      Describe the income evidence required to be evaluated for HAMP;

c.      Provide the RMA (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit); and

d.      Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

e.      The communication should also include clear language stating that during the HAMP evaluation the home will not:  (i) be referred to foreclosure; or (ii) be sold at a foreclosure sale if the foreclosure process has already been initiated.  In the communication, the servicer **must** include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the communication.

f.      If Right Party Contact is established prior to satisfaction of the Reasonable Effort standard, the **servicer must continue** to take steps to satisfy the Reasonable Effort standard until the Initial Package is submitted by the borrower.

g.      If Right Party Contact is established, but the borrower does not submit an Initial Package, the **servicer must resend** the Initial Package communication.  Again, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the second communication.  If the borrower does not respond by providing an Initial Package within the required time period set forth in the second communication, the servicer may determine the borrower to be ineligible for HAMP.

209

h.      If Right Party Contact is established, but the borrower submits an incomplete
Initial Package within the required time period, the servicer (including Litton and GMAC on behalf of
WAMU) **must comply** with the "Incomplete Information Notice" requirements set forth below in Section
2.3.3.  If the borrower does not respond to either the 30-day Incomplete Information Notice or the 15-day
Incomplete Information Notice by providing an Initial Package within the required time period, the servicer
may determine the borrower to be ineligible for HAMP.
Servicers **must acknowledge receipt** of the Initial Package within 10 business days per the requirements in
Section 4.5 and respond within 30 calendar days with either an Incomplete Information Notice (as outlined
in Section 2.3.3), a TPP Notice (as outlined in Section 8.1) or a Non-Approval Notice (as outlined in
Section 2.3.2).

622.    Pursuant to the provisions of the agreement, Plaintiffs are entitled to a stay as Defendant
Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU failed in every
respect to meet the provisions of the SPA.

623.    Pursuant to the provisions of the SPA, Litton, WAMU, ALLY, GMAC and RFC,
intentionally and willfully failed to comply with each and every provision as set forth below:

3        Protections Against Unnecessary Foreclosure
3.1      Suspension of a Referral to Foreclosure
A servicer may not refer any loan to foreclosure or conduct
a scheduled foreclosure sale unless and until at least one of
the following circumstances exists:
-        The borrower is evaluated for HAMP and is determined to
be ineligible for the program;
or
-        The borrower is offered a TPP, but fails to make current
trial period payments as set forth in Section 8.3; or
-        The servicer has established Right Party Contact, has sent
at least two written requests asking the borrower to supply required
information in accordance with Section 2.2.2, and has otherwise
satisfied the Reasonable Effort solicitation standard, and the
borrower failed to respond by the dates indicated in those requests;            or
-        The servicer has satisfied the Reasonable Effort solicitation
standard without establishing Right Party Contact; or The borrower            or co-
borrower states he or she is not interested in pursuing a                      HAMP
modification and such statement is reflected by the servicer              in its servicing system
and/or mortgage file.
3.2      Suspension of Foreclosure Proceedings in Process
With respect to a borrower who submits a request for HAMP
consideration after a loan has been referred to foreclosure, the                  servicer
must, immediately upon the borrower's acceptance of a                      TPP based on
verified income, and for the duration of the trial                       period, take those actions
within its authority that are necessary to                    halt further activity and events in
the foreclosure process, whether                    judicial or non-judicial, including but not
limited to refraining from                    scheduling a sale or causing a judgment to be entered.
3.3      Suspension of Scheduled Foreclosure Sale
When a borrower submits a request for HAMP consideration after
a foreclosure sale date has been scheduled and the request is
received no later than midnight of the seventh business day prior to            the
foreclosure sale date (Deadline), the servicer must suspend the                  sale as
necessary to evaluate the borrower for HAMP…
3.4      Mitigating Foreclosure Impact
The servicer must take the following actions to mitigate
foreclosure impact:
3.4.1    Simultaneous Trial Period Plan and Foreclosure Explanation
When a borrower is simultaneously in foreclosure and is either
being evaluated for HAMP or is in a TPP, the servicer must    provide the borrower with
a written        notification that explains, in clear language, the concurrent modification and foreclosure

210

home will while the provide including whether Section that provide under a

processes and that states that even though certain foreclosure activities may continue, the not be sold at a foreclosure sale while the borrower is being considered for HAMP or borrower is making payments under a TPP…

3.4.2    Foreclosure Attorney/Trustee Communication

Servicers must develop and implement written policies and       procedures to notification to their foreclosure attorney/trustee regarding a borrower's HAMP status, whether the borrower is potentially eligible for HAMP (and is subject to Section 2.2), and the borrower is being evaluated for, or is currently in, a TPP.  Servicers must ensure that their foreclosure attorney/trustee adheres to all of the requirements of Section 3.1, Section 3.2 and 3.3 with respect to referral to foreclosure, stay of foreclosure actions and suspension of foreclosure sales.

3.4.3    Certification Prior to Foreclosure Sale

Servicers must develop and implement written procedures applicable to all loans are potentially eligible for HAMP (and are subject to Section 2.2) that require the servicer to to the foreclosure attorney/trustee a written certification that (i) one of the five circumstances Section 3.1 exists, and (ii) all other available loss mitigation alternatives have been exhausted and non-foreclosure outcome could not be reached.  This certification must be provided no sooner than seven business days prior to the scheduled foreclosure sale date (the Deadline) or any extension thereof.

624.    Plaintiffs were further entitled, and never received the required acknowledgement of the Initial Package.

4.5 Acknowledgment of Initial Package
Within 10 business days following receipt of an Initial Package, the servicer **must** acknowledge in writing the borrower's request for HAMP participation by sending the borrower confirmation that the Initial Package was received and a description of the servicer's evaluation process and timeline. If the Initial Package is received from the borrower via email, the servicer may email the acknowledgment. Servicers must maintain evidence of the date of receipt of the borrower's Initial Package in its records.
A single written communication sent within 10 business days of receipt of a borrower's request for HAMP participation may also include, at the servicer's discretion, the results of its review of the Initial Package.

625.    Although Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, WAMU and RFC, and ALLY separately, **MUST** comply, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU not only failed to acknowledge their receipt of the Initial Package that was sent to them and received on May 4, 2011, but wantonly, willfully and intentionally failed and refused in every respect to comply with any of the provisions of HAMP contained herein for the benefit of the Plaintiff.

626.    Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU was **obligated** to review the documentation submitted by Plaintiff on May 4, 2011, within 30 days, and failed and refused to do so.

627.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU had 30 days wherein they were contractually obligated to review the initial package, and they willfully, wantonly and intentionally failed and refused in every respect to do so.

4.6 Review of Initial Package
Within 30 calendar days from the date an Initial Package is received, the servicer **must** review the documentation provided by the borrower for completeness.  If the documentation is incomplete or insufficient for use in underwriting, the servicer must send the borrower an Incomplete Information
Notice in accordance with the guidance set forth in Section 2.3.3.
If the borrower's documentation is complete, the servicer must evaluate the borrower's eligibility for HAMP and either:

211

-    Send the borrower a TPP Notice (see Section 8.1); or
-    Make a determination that the borrower is not eligible for
HAMP and communicate this determination to the borrower in
accordance with the guidance in Section 2.3.2.

628.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU had only 30 days from May 11, 2011 to wherein they were contractually obligated to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination, and utterly, willfully, wantonly, and intentionally failed and refused to do so.

629.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU had 30 days from May 11, 2011 wherein they were contractually obligated to provide the Plaintiff with a determination, and willfully, wantonly, and intentionally failed and refused to do so in breach of that agreement.

6 Underwriting
Servicers must determine the borrower's eligibility for a modification
using information obtained in the Initial Package and subsequently
verified. **Servicers are required** to complete their assessment of
borrower eligibility and notify the borrower of the eligibility
determination within 30 calendar days of receiving all required
borrower documentation.

630.    Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU, and the remaining co-defendant banks and servicers, separately was contractually obligated to consider the Plaintiff for Hope for Homeowners, and utterly failed and refused to do so.

631.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU was jointly and separately contractually obligated to consider the Plaintiff for Hope for Homeowners, as set forth herein.

6.2 Coordination with Hope for Homeowners
Servicers are **required** to consider a borrower for a refinance through
the Federal Housing Administration's HOPE for Homeowners (H4H)
program when feasible. Consideration for an H4H refinance should not
delay eligible borrowers from receiving a TPP Notice. The servicer's
obligation as it relates to the H4H requirement is that while the servicer
is gathering information to determine if a borrower meets the minimum
eligibility criteria for HAMP, it should also be assessing whether the
borrower may be eligible to refinance through H4H. This assessment
would involve asking the following set of questions:
-    Will the loan amount exceed $550,440? No.
-    Has the borrower made less than six (6) full payments during
the life of the first lien loan? No.
-    Does the borrower have an ownership interest in other
residential real estate, including any second homes or rental properties?
No.
-    Was the mortgage to be refinanced originated after January 1,
2008? No.
-    Does the property contain more than one (1) unit? No.
If the answer to all of these questions is "NO", the borrower may be
eligible for H4H. (As is the precise case for the Plaintiff, herein). In this
case, the servicer should counsel the borrower to seek a refinance with
an H4H lender.

632.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU failed and refused to notify the Plaintiff of their consideration, as well as Litton individually and on behalf of WAMU, failed and refused to consider the Plaintiff, entitlement to relief under Hope for Homeowners.

212

633.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU was obligated to apply the modification steps until the monthly mortgage payment ratio is reduced to 31 percent, but utterly failed and refused to do so.

634.    Pursuant to the Handbook, section 6.3 Standard Modification Waterfall Servicers (including CHASE, ALLY and LITTON) **must** apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent (target monthly mortgage payment ratio).

635.    A borrower will qualify for HAMP only if the interest rate on the mortgage loan can be reduced by at least 0.125 percent without the modified monthly mortgage payment ratio going below 31 percent. If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31 percent, the modification will not satisfy HAMP requirements and no incentives will be payable in connection with the modification.

636.    Even though clearly, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU, ALLY and LITTON, **MUST** have taken action, they failed and intentionally refused to comply with every requirement of HAMP; failed and refused to comply with State and Federal Law; committed fraud; willfully and maliciously acted with the sole intent to deprive Plaintiffs of their property.

637.    Because there existed a contract between CHASE, Litton Loan Servicing, LP and the US Treasury Department which was intended to benefit the Plaintiffs, and others similarly situated; and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, CHASE, accepted consideration for each loan modification application from the US Treasury Department; because there was a mutual intent to benefit the Plaintiffs, and others similarly situated; and the Plaintiffs were deprived of their opportunity to have their HAMP application, their H4H application properly and timely reviewed, the Plaintiffs suffered irreparable harm.

638.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU further owed the Plaintiffs and others similarly situated the implied obligation of good faith and fair dealing, which is implied in every contract.

639.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU committed intentional, wanton and willful breaches of the covenants of good faith and fair dealing; intentional, wanton and willful breaches of the agreement with the US Treasury Department; and the Plaintiffs, and others similarly situated were the intended third party beneficiaries of that agreement between the US Treasury Department, GMAC, CHASE, ALLY and Litton Loan Servicing, LP and Plaintiffs as the intended beneficiary, and Plaintiffs, and others, were harmed as a result of those breaches.

640.    Plaintiffs are entitled to receive compensatory damages according to proof;

641.    Plaintiffs are entitled to receive exemplary damages based on the net worth of WAMU for their malicious, wanton and willful breaches of the agreement and their ratification of the wrongful conduct of their co-conspirators to the extent permitted by law.

642.    Wherefore Plaintiffs respectfully request that the court:

A.    Issue an order requiring WAMU, jointly and severally, with the remaining co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiff and dismiss them with prejudice;

B.    Find that WAMU, on their own behalf, and on behalf of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that [CHASE on behalf of WAMU and Litton Loan Services, LP], on their own behalf, and on behalf of the remaining co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

C.    Find that WAMU, on their own behalf, and on behalf of the remaining co-defendants, were in breach of the SPA agreement with the US Treasury Department intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

1.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

2.    The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

213

3.       The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

4.       The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

5.       The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

6.       The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

7.       The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

8.       Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

D.       Find that WAMU, on their own behalf, and on behalf of the remaining co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

E.       Find that WAMU, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.       Find that WAMU, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.       Find that WAMU, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.       Find that WAMU, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.       Find that WAMU, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

J.       Find that WAMU, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

K.       Find that WAMU, individually, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.       That the court further grant compensatory damages to Plaintiffs for WAMU'S intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.       That the court further grant punitive damages to Plaintiffs against WAMU, on their own behalf, and on behalf of the co-defendants for WAMU, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant WAMU, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.       That the court further grant statutory damages of $10,000 per violation, to Plaintiff against WAMU, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the

214

Defendant such that Defendant WAMU, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

      O.     That the court order Defendant WAMU, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of WAMU and its agents, in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

      P.     That the court grants to Plaintiff against the Defendant WAMU, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

### COUNT FIFTY TWO
### PLAINTIFFS v. WAMU

Damages And Declaratory Relief Action For WAMU's Violation of the FEDERAL  FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C.  §  1692 ET. SEQ

643.    Plaintiffs incorporate paragraphs 1 to 642, inclusive, herein, as though set forth herein in full.

644.    Plaintiffs fall within the class of individuals who are defined by the Statute as consumer—"any natural person obligated or allegedly obligated to pay any debt".

645.    Defendant, Litton on the behalf of WAMU, and on behalf of the other co-defendants, claims that Plaintiffs owed a consumer debt—"any obligation... [incurred] primarily for personal, family or household purposes", a mortgage secured by a forged note and deed of trust.

646.    Defendant, WAMU, on their own behalf, retained the services of Litton, and on behalf of the co-defendants, Litton is a debt collector defined as any person using interstate commerce who regularly collects debts as defined by the statute and as proven by their acts alleged herein.

647.    Each separate letter demanding payment, including billing the Plaintiffs for attorneys' fees and court costs, inspection fees, and all demands for money of any and all kinds, sent by, or demanded on the behalf of Litton Loan Servicing, LP individually, and on behalf of Defendant RFC Homecomings and WAMU is a separate violation of the FDCPA.

648.    Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU to the extent permitted by law;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant WAMU, or any of their successors, agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

### COUNT FIFTY THREE
### PLAINTIFFS v. WAMU

Damages And Declaratory Relief Action For WAMU's Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and 18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

649.    Plaintiffs incorporate paragraphs 1 to 648, inclusive, herein, as though set forth herein in full. Substance prevails over form.

650.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

215

651.    On March 25, 2005, and continuing, through the present, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

652.    Plaintiffs further allege that Defendant WAMU, on their own behalf, and on behalf of the co-defendants, in conjunction with and in furtherance of the conspiracy with all the remaining Defendants, did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(b) supra.

653.    Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.

654.    Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise). WAMU, on their own behalf, and on behalf of the co-defendants, are liable for all wrongful conduct of its co-defendants, and each of them, its lawyers, Shapiro and Fishman and Akerman Senterfitt.

655.    At all times herein, WAMU, on their own behalf, and on behalf of the co-defendants, and each of them, conspired with remaining defendants, ratified the conduct, and conspired with the remaining Defendants, to interfere with the quiet enjoyment of Plaintiffs home; steal the equity in the Plaintiff's home; and used a forged promissory note and fraudulent affidavit in a civil court action in order to fraudulently obtain a judgment of foreclosure.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.    Statutory Compensatory damages for each separate violation according to proof;

      b.    Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU, on their own behalf, and on behalf of the co-defendants to the extent permitted by law;

      c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

      d.    Reasonable attorney's fees and court costs according to proof;

      e.    Such other and further relief as the court deems just and proper.

**COUNT FIFTY FOUR**
**PLAINTIFFS v. WAMU**

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

656.    Plaintiffs incorporate paragraphs 1 to 655, inclusive, herein, as though set forth herein in full. Substance prevails over form.

657.    Plaintiffs further incorporate the allegations of the remaining Counts of the rest of this complaint, contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

658.    At various times and places partially enumerated Plaintiff's documentary material, all Defendants, and each of them, did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

659.    Likewise, all Defendants, and each of them, did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

660.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

661.    Plaintiffs further allege that all Defendants jointly or severally did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

662.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior.

216

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.      Statutory Compensatory damages for each separate violation according to proof;

    b.      Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU to the extent permitted by law;

    c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.      Reasonable attorney's fees and court costs according to proof;

    e.      Such other and further relief as the court deems just and proper.

## COUNT FIFTY FIVE
### PLAINTIFFS v. WAMU

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

663.    Plaintiffs incorporate paragraphs 1 to 662, inclusive, herein, as though set forth herein in full. Substance prevails over form.

664.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

665.    At various times and places as enumerated in Plaintiff's exhibits which are attached hereto, and incorporated herein, all Defendants, and each of them, did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

666.    At various times and places partially enumerated in Plaintiffs documentary material, all Defendants, individually and on behalf of each other, committed acts in furtherance of the conspiracy, did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

667.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

668.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d) (Prohibited activities supra).

669.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.      Statutory Compensatory damages for each separate violation according to proof;

    b.      Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU, to the extent permitted by law;

    c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.      Reasonable attorney's fees and court costs according to proof;

    e.      Such other and further relief as the court deems just and proper.

## COUNT FIFTY SIX
### PLAINTIFFS v. WAMU

Damages And Declaratory Relief Action for WAMU's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

670.    Plaintiffs incorporate paragraphs 1 to 669, inclusive, herein, as though set forth herein in full. Substance prevails over form.

671.    As alleged herein, Defendant WAMU, on their own behalf, and on behalf of the co-defendants, committed numerous acts of mail fraud, which is a violation of federal law.

672.    That Defendant WAMU, on their own behalf, and on behalf of the co-defendants, knowingly devised a scheme to defraud or to obtain money or property (or the intangible right of honest services) by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

673.    That WAMU, on their own behalf, and on behalf of the co-defendants, acted with the intent to defraud the Plaintiffs and others (including the US Treasury) to the detriment of the Plaintiffs, and each of them.

674.    That in advancing, furthering, or carrying out the scheme, WAMU, on their own behalf, and on behalf of the co-defendants, used the mails (a private or commercial interstate carrier), or caused the mails (a private or commercial interstate carrier) to be used.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU to the extent permitted by law;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting WAMU, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

## COUNT FIFTY SEVEN
## PLAINTIFFS v. WAMU

Damages And Declaratory Relief Action For WAMU's Violation of the
VIOLATION OF 18 U.S.C. § 1001

675.    Plaintiffs incorporate paragraphs 1 to 674, inclusive, herein, as though set forth herein in full. Substance prevails over form.

676.    Defendant, WAMU, on their own behalf, and on behalf of the co-defendants, violated 18 U.S.C. § 1001 by the conduct complained of herein, and as proven at the time of trial.

677.    Defendant WAMU, on their own behalf, and on behalf of the co-defendants falsified, concealed or covered up by any trick, scheme or device, material facts, including, but not necessarily limited to:

    a.    The date of the transfer of the loan from Washington Mutual Bank, FA;

    b.    The use of false and misleading language in the affidavit of Debra Lyman.

5.    On March 25, 2005, subsequent to the filing of the foreclosure complaint, the loan was

transferred from Washington Mutual to RFC.  All rights under the note and mortgage

were transferred at that time.

    c.    The true facts were, that March 25, 2005 is five days prior to the filing of the lawsuit. The court was misled by Defendant Washington Mutual Bank, FA, Defendant Debra Lyman, Defendant Litton Loan Servicing LP's use of the misleading words "subsequent to the filing of the foreclosure complaint".  Had each of the Defendants informed the court of the true facts, that March 25, 2005, was five days prior to suit being filed, then Washington Mutual Bank, FA would have had no standing to bring the action, and thus the action would have been dismissed.

    d.    The Defendant's affidavit was further false in that it claimed Washington Mutual Bank, FA, was entitled to sums that Washington Mutual Bank, FA later admitted were neither due nor owing to them.

    e.    In fact, Defendants concealed from the court and failed to inform the court of a credit of $373,907.18 in principal, proving that Washington Mutual Bank, FA, was paid in full and not owed any money from the Plaintiffs.

    f.    The Defendants, WAMU, by and through its agent, Litton, and on behalf of the co-defendants, filed false affidavits and a forged promissory note, with the court in order to obtain a judgment of foreclosure.

    g.    The Defendant, WAMU, by and through its agent, Litton, and on behalf of the co-defendants also filed a fraudulent affidavit and a forged promissory note.

218

h.    The Defendant WAMU, individually, and by and through its agent, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants violated the State and Federal Statutes listed herein and committed other wrongful and intentional misconduct, all according to proof as pled herein.

678.    Defendant WAMU, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001 by making, and / or causing to be made, or ratifying, fictitious or fraudulent statements or representations to the Plaintiffs, to the court, and to the US Department of the Treasury; to the OCC; to the FTC; to the State and local authorities, and to the court of appeals.

679.    Defendant WAMU, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001by ratifying, making or using any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, all as alleged herein.

680.    Defendant WAMU, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001, as alleged herein, because the statements made by the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants were all material, and adversely affected the Plaintiffs, the court, the US Government, and others and were ratified by the Defendant, WAMU.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU, to the extent permitted by law;

c.    Declaratory relief, including permanent injunctive relief, prohibiting WAMU, or any of their loan servicers, agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

**COUNT FIFTY EIGHT**
**PLAINTIFFS v. WAMU**

Damages And Declaratory Relief Action for WAMU's Violation of
18 U.S.C. § 1005

681.    Plaintiffs incorporate paragraphs 1 to 680, inclusive, herein, as though set forth herein in full. Substance prevails over form.

682.    Defendant WAMU, in furtherance of the co-conspiracies complained of herein, and in order to conceal and misdirect the officials conducting an official investigation, provided false information to the Florida Office of Financial Regulation, delivered by means of the US Mail, and used means of Interstate Commerce, and transmitted mail across State lines.

683.    The Defendant WAMU knew that the Florida Office of Financial Regulation (OFR) was conducting a full investigation of the conduct of the Defendants, and each of them, including the fraudulent affidavit of Debra Lyman and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants and the use of a forged promissory note in obtaining a fraudulent judgment of foreclosure.

684.    During that investigation stemming from a complaint filed with that office in 2010, the OFR sent a request for a response from WAMU, and upon receipt of false and misleading information from WAMU, closed their investigation.

685.    That letter, dated June 22, 2001, delivered by means of the US Mail, and across State lines, contained numerous lies to the Government with the intention of having the Government cease any further investigation.

686.    Additionally, the Defendant, WAMU ratified the conduct of the co-conspirators, and each of them, who furthered the co-conspiracy against the interests of the Plaintiffs.

687.    Plaintiffs are informed, believe, and thereon allege, and have incorporated herein, that other false and misleading statements were entered into the books and records of the bank, JP Morgan Chase, Washington Mutual Bank, FA's, and Ally, with the intent to defraud the Banks, the Plaintiff, and different branches of the State and Federal Government, all in violation of the above-stated statute.

688.    Said false and malicious statements and false entries were designed to, and intended to injure or defraud such banks, and other company, body politic or corporate, and individual person, including the Plaintiffs, and to deceive the officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner

219

appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System.

689.    Further, WAMU, on their own accord, individually, and by and through Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, in concert with, and with the intent to defraud the State of Florida, and the United States or any agency thereof, or any financial institution referred to in this complaint, participated and shared in and or received (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution, and should be fined not more than $1,000,000 or imprisoned not more than 30 years, or both pursuant to code.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU to the extent permitted by law;

c.    Declaratory relief, including permanent injunctive relief, prohibiting WAMU, their servicing agent, Litton Loan Servicing, or any of their successor agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

## COUNT FIFTY NINE
## PLAINTIFFS v. WAMU

Damages And Declaratory Relief Action For WAMUs Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

690.    Plaintiffs incorporate paragraphs 1 to 689, inclusive, herein, as though set forth herein in full. Substance prevails over form.

691.    Regulation B notice is required when the Defendant, WAMU, individually, and by and through their servicing agent, Litton Loan Servicing, LP, failed to acknowledge receipt of the HAMP application, thus constituting a denial of the application and denial of credit there under.

692.    Pursuant to Regulation B, any denial of credit required WAMU, individually and on behalf of the co-defendants, to tender a proper notice pursuant to that Regulation B.

693.    Each separate act by WAMU, on their own behalf, and on behalf of the co-defendants, constituted separate violations of the statutes as alleged in this entire Complaint constitutes grounds for statutory damages payable to the Plaintiffs in the sum of $10,000 per violation, according to proof.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU to the extent permitted by law;

c.    Declaratory relief, including permanent injunctive relief, prohibiting WAMU or their servicing agent, Litton Loan Servicing, or any of their successors, agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

## COUNT SIXTY
## PLAINTIFFS v. WAMU

PENDANT STATE CLAIM
Damages And Declaratory Relief Action for WAMU's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)

694.    Plaintiffs incorporate paragraphs 1 to 693, inclusive, herein, as though set forth herein in full. Substance prevails over form.

695.    Proper demand was made upon WAMU in October of 2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

220

696.    WAMU never responded to the request, except for Litton's attorney, on February 18, 2011, well past the deadline of the statute, WAMU's lawyers sent a letter stating unequivocally that Litton received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

697.    That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law.

698.    That, had WAMU answered, then they would be forced to admit, under oath, that they had no interest in the loan which was the subject of the litigation; would have to admit that Washington Mutual Bank, FA was paid in full; and that there never existed a servicing agreement between Litton Loan Servicing, LP and Washington Mutual Bank, FA.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU to the extent permitted by law;

c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

## COUNT SIXTY ONE
## PLAINTIFFS v. LITTON, GMAC,

COMPLAINT TO SET ASIDE JUDGMENT FOR FRAUD

Damages And Declaratory Relief Action to Set Aside the Judgment obtained in the lower court for fraud and in violation of the US Constitution's 5th Amendment, 14th Amendment of the US Constitution, Pursuant to the Fraud Statutes 18 U.S.C. §§ 1001, 1005, filing false documents with the court, including a false affidavit and forged promissory note; and this independent action as authorized by Florida Rules of Civil Procedure 1.540(b)

699.    Plaintiffs incorporate paragraphs 1 to 698, inclusive, herein, as though set forth herein in full. Substance prevails over form.

700.    WAMU, and the defendants, and each of them, conspired to commit fraud upon the lower court in case *Washington Mutual Bank, FA v Eskanos, et al*, Miami Dade Circuit Court Case Number 05-006570-CA 15.

701.    WAMU, and the defendants, and each of them, in furtherance of that conspiracy, filed false documents with that court, including a false affidavit of Debra Lyman and a forged promissory note filed by the attorneys for Litton Loan Servicing, LP.

702.    That said fraud was perpetrated by means of interstate commerce, including the US Mail or Interstate Mail System.

703.    That, in furtherance of the fraud, the Defendants, and each of them, jointly and severally, convinced the court to rely on the fraudulent affidavit and the forged note in granting a summary judgment of foreclosure.

704.    That the Plaintiffs had asked the judge in the lower court to consider, but the court refused to consider, the expert witness report that the note was not authentic in violation of the Plaintiffs 5th and 14th Amendment Due Process Rights.

705.    That the conduct as alleged, and incorporated herein, was intended by the Defendants, and each of them, to cause the Plaintiffs to lose their home to the Defendants, Litton Loan Servicing, RFC Homecomings, GMAC, and ALLY by perpetrating the fraud in the name of Washington Mutual Bank, FA, a defunct entity, and therefore an entity that could be held blameless for the illegal conduct complained of herein.

706.    WAMU has obtained a judgment in its name, as a result of the fraud, where WAMU has no interest in recovering under the loan which was the subject of the litigation; that Washington Mutual Bank, FA was paid in full; Litton, in perpetrating their fraud, failed to inform the court that WAMU was paid in full, concealing from the court the $373,907.18 in principal actually received but never credited and that there never existed a servicing agreement between Litton Loan Servicing, LP and Washington Mutual Bank, FA.

221

707.     As further evidence of the attempted fraud that was perpetrated on the State Court, the law offices of Akerman Senterfitt attempted to bill for legal services billed to Litton Loan Servicing LP for "APPEAL CASE 3D09-3392".

708.     The Court of Appeals, however, awarded a reasonable attorney's fee to the Appellee, Washington Mutual Bank, FA in Case Number 3D11-108, not to the company named Litton Loan Servicing LP, and not in the Appeal with Case number 3D09-3392.

709.     Litton Loan Servicing LP is not the Plaintiff in this State case, never *was* a party to the case, nor was it the Appellee in the Appeal of Ami B. Eskanos, et al vs. Washington Mutual Bank, FA, Number 3D11-108.

710.     Furthermore, there have been **no** lawful assignments or transfer of the purported promissory note or mortgage entered for the record in this matter to reflect that the Plaintiff in this case (or the Appellee in the Third District Court of Appeal) is now Litton Loan Servicing LP and not Washington Mutual Bank, FA.

711.     Litton, individually, and on behalf of the remaining Defendants, is in fraudulently represented to the New York Department of Financial Services that they would correct the conduct complained of by Plaintiff herein.

712.     Litton Loan Servicing, LP, is in direct violation of their settlement with New York's Department of Financial Services and Banking Department of September 1, 2011 on the following grounds

1.     As is pled herein, the Affidavit of Debra Lyman is fraudulent.  JP Morgan Chase has already notified the OCC that the Affidavit of Debra Lyman is false.  The affidavit states that the loan was sold on March 25, 2005, "subsequent" to the suit being filed, but March 25, 2005, is five days prior to the suit being filed.  The date it was signed is before some of the events which the affidavit says already occurred.  The affidavit states that the original note was filed, but the note your office filed is a forgery.

2.     Plaintiffs provided Litton with a HAMP application, and were qualified for the same, and it was ignored. No timely response was given, and thus, Litton individually, and on behalf of the remaining Defendants, are in violation of that portion of the agreement they signed on September 1, 2011, as well.

3.     Litton is currently placing forced placed insurance on our property without using the carrier Plaintiff selected.

4.     Only parties and entities possessing the legal right to foreclose can sue borrowers, yet Litton intentionally and willfully is in violation of this provision.

5.     Litton is currently and already in violation with the remainder of the provisions of their agreement by failing to withdraw their suit as required by that agreement.

713.     According to the Sworn Affidavit of Debra Lyman, VP of Litton Loan Servicing, LP., on March 25, 2005, Washington Mutual Bank, FA sold the subject note to Defendant RFC Homecomings, now GMAC and all the files and documents were transferred to GMAC individually and DBA Defendant RFC Homecomings, and Litton Loan Servicing at that time.

714.     According to the information provided to the investigators at the OCC, the note was sold on April 19, 2005.

715.     Suit was actually filed on March 30, 2005.

716.     If the sworn testimony of Debra Lyman is true, then Stephanie Jackson gave false information to the OCC, and there was never standing to file suit.

717.     If the subsequently provided (and changed story) by Defendant Stephanie Jackson is true, then the subsequently provided statement to a Federal Employee conducting an official investigation to the contrary of Debra Lyman's sworn testimony means that Debra Lyman committed perjury.

718.     Other parts of Debra Lyman's testimony in her affidavit are also factually impossible, including, but not limited to:

a) The complaint alleges that the promissory note was lost, and provides a certified copy of the promissory note of the original, which then differed substantially from the note that Debra Lyman swore was an original that was fraudulently found and filed years later;

b) The complaint alleges that Washington Mutual Bank had all right title and interest in the loan, but the affidavit of Debra Lyman states it was sold five days prior to the suit being filed and all right, title and interest was transferred to RFC Homecomings at that time;

c) The affidavit of Debra Lyman states the loan was sold on March 25, 2005 and the Defendant, said it was April 19, 2005;

d) Debra Lyman discussed events that occurred on and after the date she signed the affidavit;[8]

e) Debra Lyman testified that "

I have reviewed and am personally familiar with Ms. Eskanos' loan file, including all

documents transferred from Washington Mutual, which is maintained by Litton and is

within my custody and control.  Entries in Ms. Eskanos' loan file are made by Litton

employees with personal knowledge of the information being entered at or about the time

the information is received or created.  This is Litton's regular course of business.

"That testimony, in conjunction with the testimony that "the original promissory note" was filed, means that Debra Lyman was responsible for filing the forged promissory note; and Washington Mutual Bank, FA lied to the court when it said that the note was "found" in the possession of Washington Mutual Bank, FA and had not been transferred.

719.    If it was not transferred, then Litton Loan Serving's Debra Lyman committed Perjury; if it was transferred, then Washington Mutual Bank, FA committed perjury.

720.    Two contradictory statements that were given to the court can only mean one of the two statements were false and irrefutable evidence of perjury during the course of litigation.

721.    Debra Lyman, in her affidavit, also concealed and failed to inform the court of the fact that Washington Mutual Bank, FA was paid in full, concealing from the court the $373,907.18 in principal actually received but never credited.

722.    Defendant, Debra Lyman, in her position of VP of Litton Loan Servicing, as servicing agent for GMAC and RFC Homecomings, owed the Defendants, and others, a higher duty of care than that of a reasonable person, but instead, a fiduciary duty owed by all members of the financial community in dealing with the financial affairs of the banks and financial institutions.

723.    Defendant Litton Loan Servicing, LP, falsely held themselves out to the court as Servicing Agent for Washington Mutual Bank, FA in an attempt to seize insurance proceeds from hurricane damage suffered by the Plaintiffs, to their home.

724.    Defendant Debra Lyman, VP of Litton Loan Servicing, LP, who falsely held herself out as authorized agent for Washington Mutual Bank, FA, voluntarily placed herself in the position of being held responsible as an agent and employee of FDIC guaranteed institutions, Washington Mutual Bank, FA and JP Morgan Chase Bank.

725.    That, as a result of the false affidavit and the forged promissory note, and the agreement entered into by Litton on September 1, 2011[9]; wherein when Litton promised to dismiss actions based on the conduct alleged herein they became obligated to do so, and have intentionally and willfully failed to comply with the terms of their agreement.

726.    That when Litton signed that agreement, Litton had no intention of ceasing the litigation against the Plaintiff.

727.    That after demand to dismiss the litigation against the Plaintiff, Litton failed and refused to do so.

728.    That at all times, each of the defendants, jointly and severally, acted with malice and the intent to harm the Plaintiffs.

---

[8] The Defendant Debra Lyman's Affidavit stated a Total amount due up to December 31st, 2008, but signed the affidavit on February 25th, 2008; and claims the original note was already filed, but the forged note was not filed until 5/1/2009.

[9] State of New York Department of Financial Services Banking Department Agreement on Mortgage Services Practices, signed September 1, 2011, attached hereto, and incorporated herein, in full, as Exhibit __.

729.    The courts relied on the false representations of Litton and the defendants, and each of them, reasonably believing that ethical people would not file false affidavits and forged promissory notes.

730.    The true facts are that the documents, pleadings and information provided to the court by the Defendants, and each of them, was false and misleading and it was done in furtherance of the conspiracy of the Defendants to deprive the Plaintiffs and others of their property.

731.    That the net worth of Litton Loan Servicing, LP is a loan servicing arm of Goldman Sachs, the company has a loan portfolio that includes approximately 300,000 mortgages worth around $50 billion. Litton Loan Servicing was founded in 1988 as a sub servicer of problem loans in the wake of the Texas real estate bust by Larry Litton Sr. His son, Larry Jr., has since taken over the reins as president and CEO. Ocwen Financial is acquiring Litton Loan Servicing for around $264 million.

732.    Ally earned core pre-tax income of $533 million and net income of $79 million in just the 4th quarter of 2010, with $2.5 billion of core pre-tax income and $1.1 billion of net income in 2010 and has assets in excess of 172,000,000,000.

733.    As alleged herein, the affidavit of robo-signer, Debra Lyman was used to obtain a Summary Judgment against the Eskanos' in that lower court action, including the Plaintiffs, the final writ of mandate was not issued until 8/30/ 2011, and no final judgment has been signed with a sale date, so Plaintiffs are filing this separate action to obtain relief pursuant to the US Constitution's 5th Amendment, 14th Amendment of the US Constitution, to the Fraud Statutes 18 U.S.C. §§ 1001, 1005, filing false documents with the court, including a false affidavit and forged promissory note; and this independent action as authorized by Florida Rules of Civil Procedure 1.540(b).

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate fraudulent act as alleged herein;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendants, and each of them, to the extent permitted by law;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further conduct collecting on the judgment fraudulently obtained in the name of WAMU;

    d.    A declaratory order finding the judgment was based on fraud, is unenforceable, and unconstitutional.

    e.    Reasonable attorney's fees and court costs according to proof;

    f.    The court further order Litton Loan Servicing, LP instruct their attorney's to dismiss the action,

    f.    Such other and further relief as the court deems just and proper.

## COUNT SIXTY TWO

## PLAINTIFFS v. WAMU and LITTON LOAN SERVICING, LP

COMPLAINT TO SET ASIDE JUDGMENT PURSUANT TO AGREEMENT ON MORTGAGE SERVICING PRACTICES OF SEPTEMBER 1, 2011 SIGNED BY LITTON LOAN SERVICING, LP, OCWEN FINANCIAL CORPORATION, AND THE STATE OF NEW YORK DEPARTMENT OF FINANCIAL SERVICES BANKING DEPARTMENT, FOR THE BENEFIT OF PLAINTIFFS AS THE INTENDED THIRD PARTY BENEFICIARY OF THAT AGREEMENT

734.    Plaintiffs incorporate paragraphs 1 to 733, inclusive, herein, as though set forth herein in full. Substance prevails over form.

735.    On or about September 1, 2011, Defendants Litton Loan Servicing, LP ("Litton") a subsidiary of Goldman Sachs Bank USA ("GSB") entered into an Agreement, a copy of which is attached hereto as an exhibit, and incorporated herein as though set forth in full.

736.    In addition to other complaints of Plaintiff, Washington Mutual Bank, FA placed forced place insurance on the Plaintiffs already insured property, creating a deficiency, and ultimately default. Plaintiffs were otherwise not in arrears on their mortgage payments.

737.    According to robo-signer, Defendant Debra Lyman's sworn testimony as VP of Litton Loan Servicing, the loan was sold on March 25, 2005, and all rights, title and interest was transferred to RFC Homecomings, (and thus Ally Bank, and GMAC), and the loan was being serviced by Litton Loan Servicing, LP, individually and on behalf of RFC, GMAC, ALLY Bank, and Goldman Sachs Bank as the

indirect owner of Litton Loan Services, LP at that time, but suit was not filed until March 30, 2005 by Washington Mutual Bank, FA, so Washington Mutual Bank, FA had no standing to institute the action.

738.    The misleading affidavit of Debra Lyman falsely stated that the loan was transferred on March 25, 2005, "SUBSEQUENT to the filing of this suit".  That language was false and misled the court into believing that the transfer occurred after the suit was filed, and thus WAMU had standing to sue.

739.    The case was filed IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT, MIAMI-DADE COUNTY, FLORIDA *WASHINGTON MUTUAL BANK, FA v. ESKANOS, ET AL.* Case No.: 05-06570 CA 15.

740.    As incorporated herein, the affidavit of robo-signer, Debra Lyman was used to obtain a Summary Judgment against the Eskanos' in that lower court action, including the Plaintiffs, the final writ of mandate was not issued until 8/30/ 2011, and no final judgment has been signed with a sale date, so Plaintiffs are filing this separate action to obtain relief pursuant to the US Constitution's 5th Amendment, 14th Amendment of the US Constitution, to the Fraud Statutes 18 U.S.C. §§ 1001, 1005, filing false documents with the court, including a false affidavit and forged promissory note; and this independent action as authorized by Florida Rules of Civil Procedure 1.540(b).

741.    Attached hereto and incorporated herein, is a copy of the State of New York Department of Financial Services Agreement on Mortgage Servicing Practices signed by Defendants New York State Banking Department, Ocwen Financial Corporation, Goldman Sachs Bank USA, and Litton Loan Servicing, LP.

742.    As a condition to your New York State Banking Department's approval of the sale of Litton to Ocwen Litton was obligated to withdraw any action where there were, among other things, robo-signed and/or false affidavits; and further required Litton to adopt various practices.

743.    Plaintiff tendered demands on September 1st, 2nd and 4th, and for Litton to withdraw their complaint was served on Litton, and copied to New York State Banking Department, Ocwen, and Goldman Sachs Bank USA.

744.    Subsequent to the Litton and Goldman Sachs Bank, USA signing that agreement, after proper demand was made upon them, Litton has failed to withdraw the foreclosure action pending against the Plaintiffs.

745.    Washington Mutual Bank, FA, Litton and their lawyers, Akerman Senterfitt, filed a motion with the lower court seeking the court to set a sale date to sell the Plaintiff's home on or about August 31, 2011 (hearing date of September 7, 2011).

746.    Washington Mutual Bank, FA, Litton and their lawyers, after receiving Plaintiffs Cease and Desist Demand, on September 2, 2011, Defendants filed a notice to cancel the hearing on September 7, 2011, and reset their motion to sell the Plaintiff's home for September 13, 2011.

747.    Cancelling and resetting the motion was a bad faith breach of that agreement, wanton, willful, blatant and out rightly intentional breach of the Agreement on Mortgage Servicing Practices.

748.    The basis of the Cease and Desist Demand was the fact that, among other things, the affidavit signed by Debra Lyman (a robo-signer) is facially and factually false;  Litton filed a forged promissory note to obtain a summary judgment of foreclosure; settlement attempts on the part of the Plaintiffs to resolve the dispute by filing with Litton a proper HAMP application (which was not ever responded to, even with the help of the Homeowner's HOPE™ Hotline, and a conference call between the borrower, Litton and Homeowner's HOPE™ Hotline; and other acts complained of herein.  During that conference call, where Litton could have undertaken to start the HAMP PROCESS, instead out rightly refused to comply with any of the provisions of HAMP.

749.    Attached hereto, and incorporated herein, are the affidavits of Debra Lyman, a copy of the forged note, and a copy of the report from the police's forensic Expert proving the note is a forgery.

750.    The Agreement on Mortgage Servicing Practices, Litton, by and through their attorneys, Akerman Senterfitt, have not only blatantly violated that agreement within days of its execution, but their conduct of attempting to set a sale date immediately prior to the Agreement being signed, and then attempting to RESET the hearing date immediately after the Agreement was signed, clearly shows that Litton had no intention whatsoever of living up to the terms of that Agreement, and executed it under false pretenses and solely in order to obtain the consent of the Superintendent of Financial Services and of Banks.

751.    That, as a result of fraudulently obtaining the consent of the Department of Financial Services Banking Department, Litton was able to effectuate the sale of their company.

752. Among other complaints, pursuant to the Mortgage Servicing Practices List of the Agreement, Litton has committed the following violations:

753. According to the Agreement, MORTGAGE SERVICING PRACTICES, Document Execution and Accuracy of Documentation:

1. Servicer shall ensure that affidavits and sworn statements submitted in foreclosure proceedings are executed by individuals with actual personal knowledge of the matters set forth therein based upon the individuals' personal review of borrowers' loan files and other information relating to borrowers' loans.

The Debra Lyman Affidavit was signed without actual personal knowledge of the matters set forth.

a. Debra Lyman is a robo-signer.

b. The Defendant Debra Lyman's Affidavit stated a Total amount due up to December 31st, 2008, but signed the affidavit on February 25th, 2008; and claims the original note was already filed, but the forged note was not filed until May 1, 2009. The Lyman Affidavit swore to facts that had not yet even occurred. It was not filed with the court until just before the Summary Judgment Motion was heard by the court.

c. Debra Lyman swore that her affidavit was based on her personal information and her review of the file. However, she is a robo-signer and did not personally review the file.

d. According to the Consent Order, Docket Number 11-112-B-HC and 11-112-B-SM against Goldman Sachs Group, Inc and Goldman Sachs Bank, USA. Goldman, during their ownership of Litton as a subsidiary, violated their obligations to the Plaintiffs for the conduct complained of herein.

f. Clearly, the affiant, Debra Lyman, could not have had personal knowledge of the file.

g. Plaintiffs further contend that the incorporated allegations regarding the purportedly lost note, then the sudden location of the note, and the filing of a forged note also constitute grounds for Litton to be required to withdraw their complaint.

h. The note that was filed with the court as the original did not match the copy that was attached to the complaint and purported to be the certified copy.

i. Evidence that would otherwise indicate to anyone in the profession the authenticity of the note, including bar codes and other marks were missing. Litton and Debra Lyman, Debra Lyman had inspected the documents as required and as she swore she did, she would have noticed the absence of the authenticating marks and noticed that the promissory note she submitted had a signature page made of copy paper, with the rest of the note composed of a totally different type of paper.

j. Debra Lyman falsely testified from her personal knowledge to facts that had not even yet occurred.

k. Debra Lyman testified from her personal knowledge that the "original note" was filed with the court on May of 2009, but her affidavit was signed in February of 2008.

l. Testimony of events that had not occurred is clear and convincing evidence that the Debra Lyman Affidavit was robo-signed and clearly false and fabricated.

2. Servicer shall ensure that any information set forth in an affidavit or sworn statement detailing a borrower's default and the right to foreclose is accurate, complete and reliable.

a. As mentioned above, and as provided in the portion of the complaint you are already in receipt of, the Litton employee, Debra Lyman, provided a false promissory note and the sworn affidavit was replete with fraud. Also of great significance, the affidavit omitted that Washington Mutual Bank, FA, was PAID IN FULL, and had received over $373,907.18 , and thus was NOT entitled to recover any money under the note.

3. Servicer shall ensure that notarized documents are signed by the affiant in the actual presence of a notary.

a. Debra Lyman                               Robosigner

226

http://www.deanmostofi.com/?p=924 http://thehill.com/blogs/on-the-money/banking-financial-institutions/122195-bank-of-america-suspends-foreclosure-proceedings-in-23-states.

      b.     Debra Lyman is a robo-signer and did not sign the affidavits in the presence of
her     notary.

      c.     Plaintiffs tendered demands under the Freedom of Information Act for the
Notary     Books for the Notary Judy A. Tidwell, the notary of the Affiant Debra
Lyman.

      d.     Suspiciously, the notary, Judy A. Tidwell, has refused to provide the page from
her     book for the date the affidavit was purportedly signed.

      e.     Judy A. Tidwell also refused to provide copies under the Freedom of
Information     Request for her billing book.

    4.    **Servicer shall withdraw any pending foreclosure action in which filed affidavits**
**are not**     **accurate, complete, and reliable, and/or were not notarized in accordance**
    **with applicable law.**    In any subsequent foreclosure action concerning the same
    mortgage, Servicer shall ensure that all affidavits are accurate, complete,
reliable, and     notarized in accordance with applicable law.

      a.     Plaintiff has consistently placed Litton on notice from the preparation and filing
of     the false affidavit that the Lyman Affidavit was false, and the promissory note
was a     forgery.

      b.     Any reasonable person carefully reading the affidavit of Debra Lyman would
have     realized it contained fabrications.

      c.     Even the statement as to the filing date of the lawsuit was false.

      d.     The affidavit says that the loan was sold on March 25, 2005, SUBSEQUENT to
the     filing of the suit, but the suit was not filed until March 30, 2005.

      e.     Had Debra Lyman actually reviewed the file, she would have known it
contained     false and misleading statements of fact.

      f.     Demand has been made on Litton to withdraw their complaint, and they have
failed     and refused to do so.

      g.     Further, in absolute contravention and in bad faith breach of their Agreement on
    Mortgage Servicing Practices, they have sought an urgent order to sell our home
in     blatant violation of the Agreement they just made.

    5.    Servicer shall implement policies and procedures to ensure that borrowers'
    account information is accurate and complete, and shall promptly remediate any
inaccuracies     in borrowers' account information. Servicer shall annually cause to be
conducted     an independent review of its systems, policies and procedures
to ensure that they     are sufficient to ensure that borrower's account
information is accurate and complete.

      a.     Litton has lied to the courts, lied to the Plaintiffs, and provide false information
to the     Courts and officials who are investigating them.

      b.     The information in the Litton file is neither accurate nor true.

    6.    Ownership of Note; Foreclosures - Servicer shall implement processes to ensure that, in
any     foreclosure action Servicer services, the foreclosing entity has a documented enforceable
    interest in the commencing, or in any foreclosure action commenced by another entity on a
    mortgage promissory note and mortgage under applicable law, or otherwise possesses the
    legal right to foreclose.

      a.     Litton put in the affidavit that the loan was sold on March 25, 2005.  That date
was     five days prior to the suit being filed. However, the suit was filed not in the
name of     the buyer, RFC Homecomings, but in the name of Washington Mutual Bank,
FA, an     entity that was seized by the Office of Thrift Supervision and the assets were
sold to     Chase.  Even where Litton knew that WAMU had no right, title or interest (as
sworn     to in the affidavit of Lyman), they continued to sue in the name of WAMU when
the     loan was sold PRIOR to suit being filed in the name of WAMU.

      b.     That means WAMU had no standing to sue, and, in order to cover up that fraud
upon     the court, filed a false affidavit and a forged promissory note in order to
fraudulently     obtain a judgment.

227

7.    Upon a borrower's request, Servicer shall provide to the borrower the name of the entity

that    holds the borrower's note and contact information for such entity.

a.    Statutory Demand was made pursuant to Florida Statutes 701.04, requiring

Litton to    respond within 15 days. Their response was an outright refusal to

provide the    information in direct violation of that statute as complained of

herein.

8.    If the original note or any interim assignment or allonge is lost or otherwise unavailable,
Servicer shall comply with applicable law in any attempt to establish ownership of the

note    and the right to enforcement. Servicer shall ensure good faith efforts to obtain or locate a
note lost while in the possession of Servicer or Servicer's agent.

a.    The note that was filed by Litton was simply a forgery.  The Servicer knew it

was    forged. Any person looking at the note can tell that the last page is a

clearly of a    different type paper and a forgery.  See the attached experts

report.

9.    In the event that any borrower is found to have been wrongfully foreclosed, Servicer shall
ensure that the borrower's equity in the property is returned if the property has not been

sold    to a third party, or if sold to a third party, adequately compensate the borrower for the
wrongful foreclosure.

a.    Servicer has intentionally sought to Plaintiffs home after signing the Agreement;
after receiving Plaintiffs complaint; and after cancelling the sale for the purpose

of    resetting it as an affront to the Department of Financial Services and to the

Plaintiffs.

10.    Servicer shall adopt policies and procedures to oversee and manage foreclosure firms,

law    firms, foreclosure trustees, and other agents, independent contractors, entities and third
parties (including subsidiaries and affiliates) that provide foreclosure or bankruptcy
processing services ("Third-Party Providers")

a.    So far, the firm of Akerman Senterfitt, under the guidance and control of Litton

Loan    Servicing, has intentionally violated numerous provisions of this agreement;

ignored    the provisions of HAMP; lied to the court on multiple occasions; filed the forged

note    and false affidavit, and, from all apparent evidence was responsible for

preparing the    false affidavit, and filed a forged the note.

b.    Litton's attorneys also began the process of seeking attorneys fees and are

grossly    and wrongly overcharging the Plaintiffs.

1.    The Plaintiff, Washington Mutual Bank, FA, has asked this Court to

award to    it the essential equivalent of $2,000.00 per page ($16,095.15)

for an eight    page Motion to Dismiss that the Plaintiff filed in the

Third District Court of    Appeal (case number 3D11-108), and has somehow

claimed that it is "a    reasonable attorney fee" pursuant to Florida

Rule of Appellate procedure    9.410 and Florida Statute § 57.105.

2.    Not only is the claimed fee completely and outrageously beyond the
"reasonable attorney's fee" ordered by the Third District Court of

Appeal, but    it is also unsupported by affidavit or any other credible

evidence.

3.    The purported 'billing statements' from the law offices of Akerman Senterfitt
that the Plaintiff has attached to its Motion must be stricken as they show that
they are for services billed to Litton Loan Servicing LP for "APPEAL CASE
3D09-3392".

4.    The Court of Appeals, however, awarded a reasonable attorney's fee to

the    Appellee, Washington Mutual Bank, FA in Case Number 3D11-108,

not to    the company named Litton Loan Servicing LP, and not in the Appeal

with    Case number 3D09-3392.

5.    Litton Loan Servicing LP is not the Plaintiff in this present case,

never was a    party to that case, nor was it the Appellee in the Appeal of *Ami*

*B. Eskanos, et*    *al vs. Washington Mutual Bank, FA*, Number 3D11-108.

6.    Furthermore, there have been no lawful assignments or transfer of the
purported promissory note or mortgage entered for the record in this

matter to reflect that the Plaintiff in this case (or the Appellee in the Third District Court of Appeal) is now Litton Loan Servicing LP and not Washington Mutual Bank, FA.

7. The final Judgment of Foreclosure in this matter was entered in favor of Washington Mutual Bank, FA after the Plaintiff successfully argued that Washington Mutual Bank, FA was the owner and holder of the mortgage and mortgage promissory note.

8. Further, there has never been introduced in this matter, nor was any record produced during discovery in this matter of any contract for the sale of the mortgage or note, any loan servicing agreement, or other agency authority that indicates or provides any reasonable proof that Litton Loan Servicing LP was authorized by or contracted with Washington Mutual Bank, FA to service the purported mortgage, to manage the litigation of the foreclosure of the mortgage on behalf of Washington Mutual Bank, FA, or to expend any funds for attorney's fees in this matter on behalf of Washington Mutual Bank, FA.

11. Acquisition of Delinquent Loans. Within 30 days of the acquisition of delinquent loans, i.e., loans that are delinquent 60 days or more, and loans where default may be imminent, a notice must be provided to borrowers appointing a single point of contact or providing for the appointment of a single point of contact based upon the borrower's convenience. The notice must also include information regarding the policies and procedures employed by the acquiring Servicer in handling any pending loss mitigation request, trial modification, permanent modification or non-foreclosure option transferred from the previous servicer. The provisions of paragraphs 26 and 27 shall apply to the designated single point of contact.

a. Although Litton has been contacted on numerous recent occasions, even with the assistance of the Homeowner's HOPE™ Hotline, and a conference call between the borrower, Litton and Homeowner's HOPE™ Hotline.

b. Litton refused to comply with any of the provisions of HAMP, including designating a single point of contact. In fact, they refused to respond to the Plaintiffs at all.

21. Pending Modification. Borrowers with pending modification requests must be provided with a notice within 5 days of the initial communication identifying the single point of contact. The notice shall provide: (1) a list of all documents and information required from the borrower to evaluate the borrower for a loan modification; (2) an explanation of any change in the type of loss mitigation alternative for which the borrower is being considered; (3) the reason for the change in the type of loss mitigation offered (e.g., borrower does not qualify, program not offered); (4) the time frame in which the borrower must supply the requested information; (5) a toll-free number that provides a list of government approved not-for-profit housing counselors in the homeowner's geographic area as listed on the Department's Website, the Department of Housing and Urban Development's website or the Division of Housing and Community Renewal's website; (6) a statement clearly outlining the effect of the borrower's failure to submit all required documentation, including potential denial of loan modification or other loss mitigation alternatives, continuation of pending foreclosure action or referral to foreclosure; and (7) a statement outlining the action that will be taken if documentation is not received within the time period specified in the notice.

a. Plaintiffs submitted a timely and proper HAMP application in hopes of simply settling the dispute and saving their home from a wrongful foreclosure by the Defendants fraudulent use of documents.

b. However, instead of complying with HAMP, or the Agreement on Mortgage Servicing Practices, Litton filed a motion to set the Plaintiffs home for sale after signing the Agreement and obtaining, under false pretenses, the consent of the Department to create an even larger monster. That consent was obtained, in the words of the Agreement, with Litton's commitment to adhere to the Servicing Practices.

c. That is simply a lie and a fraud perpetrated on the homeowners, including the Plaintiff.

       d.       Litton's conduct the day after they signed that agreement is more telling than the promises they made in order to get the consent of Department.

       e.       Their actions in ignoring the terms, and seeking to sell the Plaintiffs home the

day

after they entered this Agreement, is a revelation of their fraud upon the

Department.

22.     Borrower Communication - Servicer shall assign a single point of contact or provide for

the

appointment of a single point of contact based upon the borrower's convenience, to each borrower who has submitted a request or an application for a loss mitigation alternative,

and

to borrowers in the process of foreclosure, within the following timetable:

       a.       Litton failed to designate a single point of contact.

   (a)     Within 30 days of the date of Servicer's agreement to adhere to these Servicing Practices as to Servicer's existing delinquent borrowers

       a.       More than 30 days have passed since the Plaintiffs attempted to settle

the

matter by submitting a HAMP application. It has been utterly

and completely

disregarded by LITTON.

   (b)     Within 7 days of the date of Servicer's agreement to adhere to these Servicing Practices as to all of Servicer's existing borrowers in foreclosure;

   (c)     Thereafter, within 15 days of Servicer's identification consistent with GSE requirements of a borrower for whom default may be imminent (current or less

than

60 days delinquent), and 15 days after a borrower has missed a contractual

payment.

Servicer shall provide within 5 business days of the designation of a single point

of

contact a written communication detailing the designated representative's

telephone

number, email address and hours of availability, or providing for the

appointment of a

single point of contact based upon the borrower's convenience.

       a.       More than 7, 15, and 30 days have passed and all of the Servicing

Practices

have been ignored and completely disregarded by Litton.  No

contact has been

made.  Even after the 1st of September, when Litton could

have acted, they

chose not to, and instead, are seeking the sale on an expedited

basis, of the

Plaintiffs home.

23.     Timelines for loan modifications referenced above shall conform to the time periods

required

by HAMP or by the GSEs, whichever are shorter

       a.       It is redundant to point out that more than 7, 15, and 30 days have passed and all

of

the Servicing Practices have been ignored and completely disregarded by

Litton. No

contact has been made by Litton, other than sending demands for

payment in

violation of the Fair Debt Collection Practices Act as alleged

herein, submitting false

attorney's fees invoices seeking money for RFC

Homecomings when the judgment

was in the name of Washington Mutual Bank, FA.

       b.       Even after the 1st of September, when Litton could have acted, they chose not

to, and

instead, are seeking the sale on an expedited basis, of the Plaintiffs home.

       c.       Litton violated the time frames for all of HAMP and the GSE.

24.     Complaint Resolution. Within 30 days of the receipt of a complaint, if all information required to make a final determination with respect to the complaint is provided to the Servicer, the Servicer shall notify the borrower of the final determination with respect to

the

complaint.

       a.       Again, Litton has failed to conduct itself accordingly, disregarding complaints of

the

Plaintiffs since their initial involvement.

25.     Attorney's Fees. In addition to the limitations in Paragraph 50, attorney's fees charged in connection with a foreclosure action shall not exceed reasonable and customary fees for

such

work. The maximum foreclosure attorney's fees imposed should be consistent with guidelines published in Fannie Mae Allowable Attorney and Trust Fee Schedule, as

updated

from time to time. In the event the foreclosure action is terminated prior to final judgment and sale for a loss mitigation option, a reinstatement or payment in full, the borrower

shall

only be liable for reasonable and customary fees for work actually performed as required

by

Part 419.10(c) of the Superintendent's Regulations.

a. Fraudulently holding themselves out as attorney's for Washington Mutual Bank,
FA, sans retainer agreement, has asked this Court to award to it the essential
equivalent of $2,000.00 per page ($16,095.15) for an eight page Motion to Dismiss
that the Plaintiff filed in the Third District Court of Appeal (case number 3D11-
108), and has somehow claimed that it is "a reasonable attorney fee" pursuant to
Florida Rule of Appellate procedure 9.410 and Florida Statute § 57.105.

b. Not only is the claimed fee completely and outrageously beyond the "reasonable
attorney's fee" ordered by the Third District Court of Appeal, but it is
also unsupported by affidavit or any other credible evidence and is far and
in excess of Part 419.10(c) of the Superintendent's Regulations ($1,300).

c. The purported 'billing statements' from the law offices of Akerman Senterfitt
that the Plaintiff has attached to its Motion to Strike showed that they are for services
billed to a company named Litton Loan Servicing LP for "APPEAL CASE 3D09-3392".

d. The Court of Appeals, however, awarded a reasonable attorney's fee to the
Appellee, Washington Mutual Bank, FA in Case Number 3D11-108, not to Litton
Loan Servicing LP, and not in the Appeal with Case number 3D09-3392.

e. Litton Loan Servicing LP was not the Plaintiff in that case, never was a party to
the case, was nothing more than an officious intermeddler, nor was it the Appellee
in the Appeal of *Ami B. Eskanos, et al vs. Washington Mutual Bank, FA*, Number
3D11- 108.

f. Furthermore, there have been no lawful assignments or transfer of the purported
the promissory note or mortgage entered for the record in this matter to reflect that
now Plaintiff in this case (or the Appellee in the Third District Court of Appeal) is
Litton Loan Servicing LP and not Washington Mutual Bank, FA.

g. The attached listing reflects the unrelated and outrageous fee detail allegedly
billed to Litton Loan Servicing LP by the law firm of Akerman Senterfitt purportedly
incurred by the Plaintiff in the defense of the appeal.

1. Not only was the Plaintiff, Washington Mutual Bank, FA not ever
billed these amounts, but the amounts and kinds of fees represent a clear
example of the worst in "billable hours syndrome", are absolutely
unreasonable, and essentially equate to a billing of over
$16,000.00 to produce a single eight page motion to dismiss.

2. The outrageous amounts include:
a. $1360.50 for checking the Court Docket and calendar eleven
times, included approximately 3 times where pleading due dates
were calculated. This amount is absolutely ludicrous as
checking the Court docket can be accomplished online in less
than two minutes (much less if the search page is saved) and
counting the number of days for pleading deadlines takes
barely more time than it takes to look up the docket…less if the firm
employs a case management program.

b. $460.00 for 3 emails to opposing counsel:
one, dated 02/3/11 for billed at $88.00, consisted of 8 words;
the second, on 03/03/11, billed at $88.00, consisted of 23
words; and the last, on July 11, 2011, is in the amount of $264.00
and is not even arguably related to the appeal but charging
the Plaintiffs for refusing to respond to the Plaintiffs payoff demand.

c. $748.00 for six "communications with 'the client'", 2 of
which were redacted so the purpose of the communication is
unknown, one is related to the payoff request and not even
arguably related to the appeal, and the others are likely
very short entries into the client's online computer case
management system.

d. $ 3003.00 for research limited to the subject of obtaining
attorney's fees pursuant to Fla. Stat. 57.105 and Fla. R. App. P.
9.410, was absolutely unrelated to the defense of the

231

appeal, and was purportedly Plaintiff's footnote allegation in its that it had not sought attorney's fees in the the Plaintiff, Washington Mutual Bank, FA fees in this regard, which it clearly did not, exists) those fees could not be reasonably defense of the      appeal.

charged to Litton despite the Motion for Appellate Fees Court of Appeal.  Even if had actually incurred any and could not (it no longer attributed to the actual

for therefore, be appeal.

e.    Additionally, of the foregoing amounts, the explanation detail $285.50 of the fees have been redacted and cannot, properly attributed to the defense of the

for sanctions under actually advanced any simply not chargeable under in that matter.

f.    Therefore, any alleged "billable" hours designated by counsel investigation of collection of attorney fees or other Section 57.105, especially when counsel never legal argument to obtain those fees; are the Court of Appeal's      Mandate

consisted of on the Order to the defense of the amount to attempt to charge reading a two paragraph opinion.

g.    $206.00 to "review court order" on June 15, 2011 which reading the Court of Appeal's two paragraph opinion Show Cause. This is not only absolutely unrelated to appeal, but at its foundation is a ludicrous a client (and the Plaintiffs) for

Ami B. regarding In addition to the fact that the defense of the appeal, any further action on the Court of Appeals after its these fees were not incurred FA, are unrelated to the Defense of chargeable to the Plaintiffs in this action. to "strategize regarding effect of Notice of court] motions". This is clearly unrelated to

h.    $1,965.50 purportedly spent analyzing the pro se Motions for Rehearing and for Clarification filed by Barry B. Eskanos and Eskanos after appeal dismissed and the Court's Order Appellate attorney's fees had already issued. none of these alleged fees were applicable to nor used by the Akerman Senterfitt to take case (the Appellant filed nothing with the initial Motion to Dismiss). Even though by the Washington Mutual Bank, the Appeal, and therefore not

i.    $132.00  on 01/14/2011 Appeal on pending [trial the defense of the appeal.

It is $103.00 to read a that likely took type of outrageous to charge in this matter.

j.    $ 103.00 on 01/20/11 to "Analyze Notice of Appellate Case". absolutely unreasonable to attempt to charge a fee of Notice of Appeal consisting of one short paragraph less than one minute to read. This is typical for the fee Litton's purported counsel is attempting

Appearance

k.    $ 88.00 on 01/20/2011 to Strategize regarding Notice of and Status of Appeal:

appeal. "billable hours" actual defense of where the Court

l.    $88.00 to decide that Nancy M. Wallace would handle the There are entries after entries of the same padding at outrageous costs; little of it actually geared toward the appeal and none with the correct case number allowed reasonable fees to be charged.

Dismiss. worth consisted consisted of case verbatim from the Motion for Relief from this Appellant (Defendants') Appellant Brief

m.    $7,300.50 for actual preparation of the Appellee's Motion to The Motion consisted of eight pages. One entire page of heading information and signatures. Five pages background information copied and pasted almost WAMU'S Motion to Strike the Eskanos' Court with references to the Index. That left

only two pages of actual legal argument, which again                                    was
almost entirely cut and pasted from the Plaintiff's earlier Motion
        to Strike filed previously in this Court.

Over seven thousand dollars to cut and paste two pages of
legal                                    argument. 16.8 hours billed at $434.55 per hour to
cut and paste                          someone else's work is not reasonable.

n.        $940.00 to read the Appellants' Response to the Appellee's
Motion to                          Dismiss and the Court's one page Order.

There is simply no justification for attempting to pad a legal
bill in this                          manner.

h.    § 419.10 Fees

c.    Attorneys Fees.  In addition to the limitations in paragraph (b), attorneys
fees                    charged in connection with a foreclosure action shall not exceed reasonable and
                        customary fees for such work.  In the event a foreclosure action is terminated
prior to                the final judgment and sale for a loss mitigation option, a reinstatement or
payment in              full, the borrower shall only be liable for reasonable and customary fees
for work                actually performed.

Fannie Mae Allowable Attorney and Trust Fee
Schedule
Only items billed as Attorney Fees should be requested under this line. Fees are
limited to a state maximum per fee schedule outlined in Announcement 08-19.*
Additional foreclosure fees will not be reimbursed without pre-approval from
Fannie                  Mae.

*Servicing Guide, Part VIII, Chapter 1, Exhibit 3: Attorney's and Trustee's
Fees

(Effective May 1, 2010)
State Nonjudicial
Florida   $1,300
1
This fee covers the combined attorney's and notary's fees
7
This fee includes reimbursement for any fee for the attorney's certificate of title

i.    Force-Placed Insurance

26.    Servicer shall take all commercially reasonable steps to continue or reestablish
       the existing homeowner's property hazard policy if there is a lapse in payment.
       Servicer shall ensure that force-placed insurance is not obtained for a borrower unless
       the borrower fails to provide evidence that property hazard insurance has been
       maintained as required by the mortgage loan contract following notices provided, at a
       minimum over two months, sent by Servicer, by first class mail, reminding the
       borrower that property hazard insurance must be maintained, stating that evidence
       that the borrower maintains such insurance is lacking, describing how the borrower
       may provide evidence of such coverage, and explaining that if such coverage is not
       obtained, force-placed insurance may be obtained that will be significantly more
       costly and may provide less protection for the borrower.

27.    Any force-placed insurance obtained for a borrower by Servicer shall be the
       lower of the last known amount of the borrower's coverage that was compliant with
       the requirements of the mortgage loan or the outstanding balance of the borrower's
       loan, provided further, that in no circumstances shall the amount of force-placed
       insurance exceed the replacement cost of the improvements on the mortgaged
       property.

28.    Upon receipt of evidence of a borrower's existing property hazard insurance coverage,
       Servicer shall ensure that any force-placed insurance is terminated and that any unearned
       premiums are returned to the borrower.

29.    To the extent Servicer purchases a master hazard insurance policy for force-placed
insurance,              it shall only purchase a policy that is reasonably priced in relation to the claims

233

that may be            incurred. In no event shall Servicer purchase a master hazard insurance policy
from an            affiliated entity.

the       Litton's attorneys, acting on behalf of the defendants, and each of them, in furtherance of
conspiracy, provided, during discovery, a document from closing, which designated the
Plaintiffs insurance carrier, State Farm. Instead, Washington Mutual Bank, then Litton,
put       forced placed insurance on the Plaintiffs property, and did not reimburse the Plaintiff.
The       cause of the foreclosure, in fact, was the fraudulently placed forced placed insurance and
the       false deficiency caused thereby. Currently, Litton has put forced placed insurance at
many       times the normal cost of insurance, and failed to use the designated carrier in violation of
Federal Law. Had WAMU and Litton used the carrier, State Farm, to provide insurance,
the       cost would have been the same as Plaintiffs were paying.

        j.       Furthermore, and even more reprehensible, Litton Loan Servicing, by and through their
attorney's, are attempting unlawfully to collect the legal fees they promised to pay to
their       attorneys. Washington Mutual Bank, FA has never signed a retainer agreement with
Litton       Loan Servicing's lawyers, Akerman Senterfitt. Plaintiffs paid, during the course of the
litigation, a mortgage payment, that was applied by Washington Mutual Bank, FA to the
balance of their attorney's fees and court costs, and attempted to return the balance to the
Plaintiffs. Litton Loan Servicing has never returned the balance.

Wherefore Plaintiffs seek relief, including, but not limited to:

        a.       That the court find that WAMU and Litton committed fraud upon the Plaintiffs and the
court       in the underlying action;

        b.       That the court finds that the judgment is void ab initio based on the fraud perpetrated by
the       Defendants, and each of them.

        c.       Or, in the alternative, that the court further order Litton Loan Servicing to withdraw the
suit as a result of the Agreement they signed on behalf of themselves and Goldman
Sachs.    d.       Compensatory damages for each separate fraudulent act as alleged herein;

        e.       Exemplary damages for each separate violation based on the net worth of the Defendants,
and each of them, to the extent permitted by law;

        f.       Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan
Servicing,       or any of their agents or assigns, from any further conduct collecting on the
judgment       fraudulently obtained in the name of WAMU and ordering them to
comply with each and       every term and condition of the Agreement they signed, and withdraw
the action pursuant       thereto;

        g.       A declaratory order finding the judgment was based on fraud, is unenforceable, and
unconstitutional.

        h.       Reasonable attorney's fees and court costs according to proof;

        i.       The court further order Litton Loan Servicing, LP instruct their attorney's to dismiss the
action,

        j.       Such other and further relief as the court deems just and proper.

        k.       Issue a restraining order against Litton and Ocwen from taking any further steps to
accomplish the sale until such time as they withdraw the complaint against the Plaintiffs
and       comply with the rest of the terms of their Agreement.

        l.       Such other and further relief as the court deems just and adequate.

### COUNT SIXTY THREE
### PLAINTIFFS v. DEBRA LYMAN

Damages And Declaratory Relief Action For Debra Lyman's Acquisition and Maintenance of an Interest in
and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18
U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and
18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

        754.       Plaintiffs incorporate paragraphs 1 to 753, inclusive, herein, as though set forth herein in
full. Substance prevails over form.

234

755.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

756.    On March 25, 2005, and continuing, through the present, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

757.    Plaintiffs further allege that Defendant Debra Lyman, on their own behalf, and on behalf of the co-defendants, in conjunction with and in furtherance of the conspiracy with all the remaining Defendants, did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(b) supra.

758.    Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.

759.    Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise). Debra Lyman, holding herself out as a Vice President of Litton Loan Servicing, an officer of that company, on their own behalf, and on behalf of the co-defendants, are liable for all wrongful conduct, including, but not limited to, providing false testimony in an affidavit; swore to facts not yet in existence; filing, or causing to be filed, a forged promissory note with a court by mailing a forged note and/or false affidavit across state lines by means of interstate mail service, and / or falsely swearing to the authenticity of a forged note; all in conspiracy with her co-defendants, and each of them, and their lawyers, Shapiro and Fishman and Akerman Senterfitt.

760.    At all times herein, Debra Lyman, on her own behalf, and on behalf of the co-defendants, and each of them, conspired with remaining defendants, ratified the conduct, and conspired with the remaining Defendants, to interfere with the quiet enjoyment of Plaintiffs home; steal the equity in the Plaintiff's home; and used a forged promissory note and fraudulent affidavit in a civil court action in order to fraudulently obtain a judgment of foreclosure.
Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

        a.    Statutory Compensatory damages for each separate violation according to proof;

        b.    Exemplary damages for each separate violation based on the net worth of the Defendant, DEBRA LYMAN, on her own behalf, and on behalf of the co-defendants to the extent permitted by law;

        c.    Declaratory relief, including permanent injunctive relief, prohibiting DEBRA LYMAN and her employer, Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

        d.    Reasonable attorney's fees and court costs according to proof;

        e.    Such other and further relief as the court deems just and proper.

## COUNT SIXTYFOUR
## PLAINTIFFS v. DEBRA LYMAN

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

761.    Plaintiffs incorporate paragraphs 1 to 760, inclusive, herein, as though set forth herein in full. Substance prevails over form.

762.    Plaintiffs further incorporate the allegations of the remaining Counts of the rest of this complaint, contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

763.    At various times and places partially enumerated Plaintiff's documentary material, all Defendants, and each of them, did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

764.    Likewise, all Defendants, and each of them, did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

235

765.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

766.    Plaintiffs further allege that all Defendants jointly or severally did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

767.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU to the extent permitted by law;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

## COUNT SIXTY FIVE
## PLAINTIFFS v. DEBRA LYMAN

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

768.    Plaintiffs incorporate paragraphs 1 to 767, inclusive, herein, as though set forth herein in full. Substance prevails over form.

769.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

770.    At various times and places as enumerated in Plaintiff's exhibits which are attached hereto, and incorporated herein, all Defendants, and each of them, did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

771.    At various times and places partially enumerated in Plaintiffs documentary material, all Defendants, individually and on behalf of each other, committed acts in furtherance of the conspiracy, did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

772.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

773.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d) (Prohibited activities supra).

774.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU, to the extent permitted by law;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

## COUNT SIXTY SIX

**PLAINTIFFS v. DEBRA LYMAN**

Damages And Declaratory Relief Action for DEBRA LYMAN's Violation of the MAIL AND WIRE
FRAUD 18 U.S.C., SECTIONS 1341, 1343

775.     Plaintiffs incorporate paragraphs 1 to 774, inclusive, herein, as though set forth herein in full. Substance prevails over form.

776.     As alleged herein, Defendant Debra Lyman, on her own behalf, and on behalf of the co-defendants, committed numerous of acts of mail fraud, which is a violation of federal law.

777.     That Defendant Debra Lyman, on her own behalf, and on behalf of the co-defendants, knowingly devised a scheme to defraud or to obtain money or property (or the intangible right of honest services) by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

778.     That Debra Lyman, on her own behalf, and on behalf of the co-defendants, acted with the intent to defraud the Plaintiffs and others (including the US Treasury) to the detriment of the Plaintiffs, and each of them.

779.     That in advancing, furthering, or carrying out the scheme, Debra Lyman, on her own behalf, and on behalf of the co-defendants, used the mails (a private or commercial interstate carrier), or caused the mails (a private or commercial interstate carrier) to be used.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.     Statutory Compensatory damages for each separate violation according to proof;

b.     Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU to the extent permitted by law;

c.     Declaratory relief, including permanent injunctive relief, prohibiting WAMU, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

d.     Reasonable attorney's fees and court costs according to proof;

e.     Such other and further relief as the court deems just and proper.

**COUNT SIXTY SEVEN**
**PLAINTIFFS v. DEBRA LYMAN**

Damages And Declaratory Relief Action For DEBRA LYMAN's Violation of the
VIOLATION OF 18 U.S.C. § 1001

780.     Plaintiffs incorporate paragraphs 1 to 779, inclusive, herein, as though set forth herein in full. Substance prevails over form.

781.     Defendant, Debra Lyman, on her own behalf, and on behalf of the co-defendants, violated 18 U.S.C. § 1001 by the conduct complained of herein, and as proven at the time of trial.

782.     Defendant Debra Lyman, on her own behalf, and on behalf of the co-defendants falsified, concealed or covered up by any trick, scheme or device, material facts, including, but not necessarily limited to:

a.     The date of the transfer of the loan from Washington Mutual Bank, FA;

b.     The use of false and misleading language in the affidavit of Debra Lyman.

5.     On March 25, 2005, subsequent to the filing of the foreclosure complaint, the loan was

transferred from Washington Mutual to RFC.  All rights under the note and mortgage

were transferred at that time.

c.     The true facts were, that March 25, 2005 is five days prior to the filing of the lawsuit. The court was misled by Defendant Washington Mutual Bank, FA, Defendant Debra Lyman, Defendant Litton Loan Servicing LP's use of the misleading words "subsequent to the filing of the foreclosure complaint". Had each of the Defendants informed the court of the true facts, that March 25, 2005, was five days prior to suit being filed, then Washington Mutual Bank, FA would have had no standing to bring the action, and thus the action would have been dismissed.

d.     The Defendant DEBRA LYMAN's affidavit, individually, and on behalf of Litton Loan Services, LP, as Vice President, and on behalf of the defendants, and each of them, jointly and

237

severally, was further false in that it claimed Washington Mutual Bank, FA, was entitled to sums that Washington Mutual Bank, FA later admitted were neither due nor owing to them.

        e.       In fact, Defendants concealed from the court and failed to inform the court of a credit of $373,907.18 in principal, proving that Washington Mutual Bank, FA, was paid in full and not owed any money from the Plaintiffs.

        f.       The Defendants, WAMU, by and through its agent, Litton, by and through their Vice President, Debra Lyman, and on behalf of the co-defendants, and each of them, filed false affidavit and a forged promissory note, with the court in order to obtain a judgment of foreclosure.

        g.       The Defendant, WAMU, by and through its agent, Litton, by and through their Vice President, Debra Lyman, on behalf of the co-defendants and each of them, also filed a fraudulent affidavit and a forged promissory note.

        h.       The Defendant WAMU, individually, and by and through its agent, DEBRA LYMAN individually, and as Vice President of Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, and each of them, jointly and severally, violated the State and Federal Statutes listed herein and committed other wrongful and intentional misconduct, all according to proof as pled herein.

        i.       Defendant, Debra Lyman, is a robo-signer, signing this affidavit, and others, without actual knowledge of the facts, and without actually review of the files as sworn to in her affidavit.

783.     Defendant Debra Lyman, on her own behalf , and on behalf of her employer, Litton Loan Servicing, LP, and on behalf of WAMU, on their own behalf, and on behalf of the co-defendants and each of them, further violated 18 U.S.C § 1001 by making, and / or causing to be made, or ratifying, fictitious or fraudulent statements or representations to the Plaintiffs, to the court, and to the US Department of the Treasury; to the OCC; to the FTC; to the State and local authorities, and to the court of appeals.

784.     Defendant Debra Lyman, on her own behalf , on behalf of Litton Loan Servicing, LP, her employer, and on behalf of WAMU, and on behalf of the co-defendants further violated 18 U.S.C § 1001by ratifying, making or using any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, all as alleged herein.

785.     Defendant Debra Lyman, on her own behalf, on behalf of Litton Loan Servicing, LP as Vice President of Litton Loan Servicing, LP, on their own behalf, and on behalf of the co-defendants, and each of them, further violated 18 U.S.C § 1001, as alleged herein, because the statements made by the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants were all material, and adversely affected the Plaintiffs, the court, the US Government, and others and were ratified by the Defendant, WAMU.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

        a.       Statutory Compensatory damages for each separate violation according to proof;

        b.       Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU, to the extent permitted by law;

        c.       Declaratory relief, including permanent injunctive relief, prohibiting WAMU, or any of their loan servicers, agents or assigns, from any further breaches of the statute;

        d.       Reasonable attorney's fees and court costs according to proof;

        e.       Such other and further relief as the court deems just and proper.

## COUNT SIXTY EIGHT
## PLAINTIFFS v. DEBRA LYMAN

Damages And Declaratory Relief Action for WAMU's Violation of
18 U.S.C. § 1005

786.     Plaintiffs incorporate paragraphs 1 to 785, inclusive, herein, as though set forth herein in full. Substance prevails over form.

787.     Defendant DEBRA LYMAN, in furtherance of the co-conspiracies complained of herein, and in order to conceal and misdirect the officials conducting an official investigation, provided, or caused to be provided, false information to the Florida Office of Financial Regulation, delivered by means of the US Mail, and used means of Interstate Commerce, and transmitted mail across State lines.

788.     The Defendant WAMU knew that the Florida Office of Financial Regulation (OFR) was conducting a full investigation of the conduct of the Defendants, and each of them, including the fraudulent

238

affidavit of Debra Lyman and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants and the use of a forged promissory note in obtaining a fraudulent judgment of foreclosure.

789.    Defendant Debra Lyman, when she signed a false affidavit, knew that the information contained therein would result in a summary judgment, that would then be entered into official records, and then entered into bank records.

790.    Debra Lyman knew the information she provided that was false was entered, or would be entered, into official banking records.

791.    During that investigation stemming from a complaint filed with that office in 2010, the OFR sent a request for a response from WAMU, and upon receipt of false and misleading information from WAMU, closed their investigation.

792.    That letter, dated June 22, 2001, delivered by means of the US Mail, and across State lines, contained numerous lies to the Government with the intention of having the Government cease any further investigation.

793.    Additionally, the Defendant, WAMU ratified the conduct of the co-conspirators, and each of them, who furthered the co-conspiracy against the interests of the Plaintiffs, including ratifying the fraudulent representations of DEBRA LYMAN, individually and as Vice President of Litton Loan Servicing.

794.    Plaintiffs are informed, believe, and thereon allege, and have incorporated herein, that other false and misleading statements were entered into the books and records of the bank, JP Morgan Chase, Washington Mutual Bank, FA's, and Ally, with the intent to defraud the Banks, the Plaintiff, and different branches of the State and Federal Government, all in violation of the above-stated statute.

795.    Said false and malicious statements and false entries were designed to, and intended to injure or defraud such banks, and other company, body politic or corporate, and individual person, including the Plaintiffs, and to deceive the officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System.

796.    Further, WAMU, on their own accord, individually, and by and through Debra Lyman, individually, and as Vice President of Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, in concert with each of them, jointly and severally, and with the intent to defraud the State of Florida, and the United States or any agency thereof, or any financial institution referred to in this complaint, participated and shared in and or received (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution, and should be fined not more than $1,000,000 or imprisoned not more than 30 years, or both pursuant to code.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, DEBRA LYMAN to the extent permitted by law;

c.    Declaratory relief, including permanent injunctive relief, prohibiting DEBRA LYMAN, Litton Loan Servicing, LP, WAMU, or any of their successor agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

**COUNT SIXTY NINE**
**PLAINTIFFS v. CYNTHIA A. RILEY**

Damages And Declaratory Relief Action For CYNTHIA A. RILEY's Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and 18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

797.    Plaintiffs incorporate paragraphs 1 to 796, inclusive, herein, as though set forth herein in full. Substance prevails over form.

798.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

799.    On March 25, 2005, and continuing, through the present, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

800.    Plaintiffs further allege that Defendant CYNTHIA A. RILEY, on her own behalf, and on behalf of the co-defendant, WASHINGTON MUTUAL BANK, FA, in conjunction with and in furtherance of the conspiracy with all the remaining Defendants, did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(b) supra.

801.    Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.

802.    Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise). CYNTHIA A. RILEY, holding herself out as a Vice President of WAMU, an officer of that company, on their own behalf, and on behalf of the co-defendants, are liable for all wrongful conduct, including, but not limited to, endorsing a forged promissory note with a blanc endorsement; endorsing a forged note after the Department of Financial Services had served a cease and desist order on Washington Mutual Bank, FA, closing the bank, and after their assets were seized and sold; by means of interstate commerce and interstate mail, and filed, or causing to be filed, a forged promissory note she knew, or reasonably should have known as a result of her knowledge, experience, expertise, and fiduciary duties owed to the Plaintiffs and others, was a forged document. CYNTHIA A. RILEY by means of Interstate Commerce, mailed a forged note, and filed, or caused to be filed, in a court a forged note; within the last six months, Plaintiff spoke to CYNTHIA A. RILEY on the telephone, wherein she ratified her wrongful conduct and ratified her furtherance in the conspiracy, claiming that she had and has the authority to perform acts on behalf of Washington Mutual Bank, FA after it was closed; admitted her employment with JP Morgan Chase, and as such, ratified her conduct as an employee of JP Morgan Chase; all in conspiracy with her co-defendants, and each of them, and their lawyers, Shapiro and Fishman and Akerman Senterfitt.

803.    At all times herein, CYNTHIA A. RILEY, on her own behalf, and on behalf of the co-defendants, and each of them, conspired with remaining defendants, ratified the conduct, and conspired with the remaining Defendants, to interfere with the quiet enjoyment of Plaintiffs home; steal the equity in the Plaintiff's home; and used a forged promissory note and fraudulent affidavit in a civil court action in order to fraudulently obtain a judgment of foreclosure.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;
    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, CYNTHIA A. RILEY, on her own behalf, and on behalf of the co-defendants to the extent permitted by law;
    c.    Declaratory relief, including permanent injunctive relief, prohibiting CYNTHIA A. RILEY and her employer, WAMU, or any of their agents or assigns, from any further breaches of the statute;
    d.    Reasonable attorney's fees and court costs according to proof;
    e.    Such other and further relief as the court deems just and proper.

### COUNT SEVENTY
### PLAINTIFFS v. CYNTHIA A. RILEY

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

804.    Plaintiffs incorporate paragraphs 1 to 803, inclusive, herein, as though set forth herein in full. Substance prevails over form.

240

805.     Plaintiffs further incorporate the allegations of the remaining Counts of the rest of this complaint, contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

806.     At various times and places partially enumerated Plaintiff's documentary material, all Defendants, and each of them, did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

807.     Likewise, all Defendants, and each of them, did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

808.     During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

809.     Plaintiffs further allege that all Defendants jointly or severally did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

810.     Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.     Statutory Compensatory damages for each separate violation according to proof;

    b.     Exemplary damages for each separate violation based on the net worth of the Defendant, CYNTHIA A. RILEY to the extent permitted by law;

    c.     Declaratory relief, including permanent injunctive relief, prohibiting CYNTHIA A. RILEY, individually and on behalf of the remaining defendants, and each of them, or any of their agents or assigns, from any further breaches of the statute;

    d.     Reasonable attorney's fees and court costs according to proof;

    e.     Such other and further relief as the court deems just and proper.

## COUNT SEVENTY ONE
## PLAINTIFFS v. CYNTHIA A. RILEY

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

811.     Plaintiffs incorporate paragraphs 1 to 810, inclusive, herein, as though set forth herein in full. Substance prevails over form.

812.     Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the Defendant, CYNTHIA A. RILEY's participation and her aiding and abetting conduct furthered the  conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

813.     At various times and places as enumerated in Plaintiff's exhibits which are attached hereto, and incorporated herein, all Defendants, and each of them, did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

814.     At various times and places partially enumerated in Plaintiffs documentary material, all Defendants, individually and on behalf of each other, committed acts in furtherance of the conspiracy, did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

815.     During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

816.     Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d) (Prohibited activities supra).

241

817.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to
be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior.
Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the
Defendant, CYNTHIA A. RILEY, to the extent permitted by law;

c.    Declaratory relief, including permanent injunctive relief, prohibiting CYNTHIA
A. RILEY, or any of their agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

## COUNT SEVENTY TWO
## PLAINTIFFS v. CYNTHIA A. RILEY

Damages And Declaratory Relief Action for CYNTHIA A. RILEY's Violation of the MAIL AND WIRE
FRAUD 18 U.S.C., SECTIONS 1341, 1343

818.    Plaintiffs incorporate paragraphs 1 to 774, inclusive, herein, as though set forth herein in
full. Substance prevails over form.

819.    As alleged herein, Defendant CYNTHIA A. RILEY, on her own behalf, and on behalf of
the co-defendants, committed numerous of acts of mail fraud, which is a violation of federal law.

820.    That Defendant CYNTHIA A. RILEY, on her own behalf, and on behalf of the co-
defendants, knowingly devised a scheme to defraud or to obtain money or property (or the intangible right
of honest services) by materially false or fraudulent pretenses, representations or promises (or willfully
participated in such a scheme with knowledge of its fraudulent nature);

821.    That CYNTHIA A. RILEY, on her own behalf, and on behalf of the co-defendants, acted
with the intent to defraud the Plaintiffs and others (including the US Treasury) to the detriment of the
Plaintiffs, and each of them.

822.    That in advancing, furthering, or carrying out the scheme, CYNTHIA A. RILEY, on her
own behalf, and on behalf of the co-defendants, used the mails (a private or commercial interstate carrier),
or caused the mails (a private or commercial interstate carrier) to be used.
Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant,
WAMU to the extent permitted by law;

c.    Declaratory relief, including permanent injunctive relief, prohibiting WAMU, on their
own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches
of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

## COUNT SEVENTY THREE
## PLAINTIFFS v. CYNTHIA A. RILEY

Damages And Declaratory Relief Action For CYNTHIA A. RILEY's Violation of the
VIOLATION OF 18 U.S.C. § 1001

823.    Plaintiffs incorporate paragraphs 1 to 822, inclusive, herein, as though set forth herein in
full. Substance prevails over form.

824.    Defendant, CYNTHIA A. RILEY, on her own behalf, and on behalf of the co-defendants,
violated 18 U.S.C. § 1001 by the conduct complained of herein, and as proven at the time of trial.

825.    Defendant CYNTHIA A. RILEY, on her own behalf, and on behalf of the co-defendants
falsified, concealed or covered up by any trick, scheme or device, material facts, including, but not
necessarily limited to:

a.    CYNTHIA A. RILEY's conduct in endorsing a forged note was a central act in
leading to the fraudulent judgment being obtained by Washington Mutual Bank, FA.

b.    CYNTHIA A. RILEY was employed as a member of an FDIC Bank,
Washington Mutual Bank, FA and is currently employed by Defendant JP Morgan Chase.

c.        At the time CYNTHIA A. RILEY endorsed the forged note on behalf of
Washington Mutual Bank, FA in blanc, she was no longer an officer of that bank, and no longer authorized
to conduct any business for that bank.

d.        At the time CYNTHIA A. RILEY endorsed the forged note, she knew that said
information would be entered into official banking records, and she knew that information was false, or,
she reasonably should have known she was making false entries into official records.

e.        At the time CYNTHIA A. RILEY endorsed the forged note, she knew, or
reasonably should have known, that her conduct would lead to the Defendants use of that forged note in an
action to take the Plaintiffs home by means of a fraudulent foreclosure action, knowing that the note was
sold, she endorsed it in blanc, understanding that WAMU may still attempt to collect on a note they already
had been paid in full for; all in violation of 18 U.S.C. § 1001.

f.        The Defendant CYNTHIA A. RILEY's forged note, in conjunction with
DEBRA LYMAN's affidavit, individually, and on behalf of Litton Loan Services, LP, as Vice President,
and on behalf of the defendants, and each of them, jointly and severally, was furthered the false in that it
claims that Washington Mutual Bank, FA, was entitled to sums that Washington Mutual Bank, FA later
admitted were neither due nor owing to them.

e.        In fact, Defendants, and each of them, jointly and severally, concealed from the
court and failed to inform the court of a credit of $373,907.18 in principal, proving that Washington Mutual
Bank, FA, was paid in full and not owed any money from the Plaintiffs and CYNTHIA A. RILEY'S blanc
endorsement, permitting WAMU to double collect after they were paid in full, was done in furtherance of
that conspiracy.

f.        The Defendants, WAMU, by and through its agent, Litton, by and through their
Vice President, Debra Lyman, and on behalf of the co-defendants, and each of them, filed false affidavit
and Defendant CYNTHIA A. RILEY, filed, or caused to be filed, a forged promissory note, with the court
in order to obtain a judgment of foreclosure.

g.        The Defendant, WAMU, by and through its agent, Litton, by and through their
Vice President, Debra Lyman, and CYNTHIA A. RILEY, no longer employed by Washington Mutual
Bank, FA, as Vice President, held herself out as Vice President and endorsed the note en blanc, on behalf of
the co-defendants and each of them, also filed, by means of interstate mail and interstate commerce, a
fraudulent affidavit and a forged promissory note.

h.        The Defendant WAMU, individually, and by and through its agent, CYNTHIA
A. RILEY individually, and as Vice President of WAMU, after the bank was closed, on their own behalf,
and on behalf of the co-defendants, and each of them, jointly and severally, violated the State and Federal
Statutes listed herein and committed other wrongful and intentional misconduct, all according to proof as
pled herein.

i.        Defendant, Debra Lyman, is a robo-signer, signing this affidavit, and others,
without actual knowledge of the facts, and without actually review of the files as sworn to in her affidavit;
and her sworn testimony regarding the en blanc forged note by Defendant CYNTHIA A. RILEY, all were
in furtherance of the conspiracy.

826.        Defendant CYNTHIA A. RILEY, on her own behalf , and on behalf of her employer, JP
Morgan Chase, and on behalf of WAMU, on their own behalf, and on behalf of the co-defendants and each
of them, further violated 18 U.S.C § 1001 by making, and / or causing to be made, or ratifying, fictitious or
fraudulent statements or representations to the Plaintiffs, to the court, and to the US Department of the
Treasury; to the OCC; to the FTC; to the State and local authorities, and to the court of appeals.

827.        Defendant CYNTHIA A. RILEY, on her own behalf , on behalf of jp morgan chase, her
employer, and on behalf of WAMU, and on behalf of the co-defendants further violated 18 U.S.C § 1001by
ratifying, making or using any false writing or document knowing the same to contain any false, fictitious
or fraudulent statement or entry, all as alleged herein.

828.        Defendant CYNTHIA A. RILEY, on her own behalf, on behalf of JP MORGAN CHASE
as, on their own behalf, and on behalf of the co-defendants, and each of them, further violated 18 U.S.C
§ 1001, as alleged herein, because the statements made by the Defendant, Litton Loan Services, LP, on
their own behalf, and on behalf of the co-defendants were all material, and adversely affected the Plaintiffs,
the court, the US Government, and others and were ratified by the Defendant, WAMU.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.        Statutory Compensatory damages for each separate violation according to proof;

243

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU, to the extent permitted by law;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting WAMU, or any of their loan servicers, agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

## COUNT SEVENTY FOUR
## PLAINTIFFS v. CYNTHIA A. RILEY

Damages And Declaratory Relief Action for CYNTHIA A. RILEY's Violation of
18 U.S.C. § 1005

829.     Plaintiffs incorporate paragraphs 1 to 828, inclusive, herein, as though set forth herein in full. Substance prevails over form.

830.     Defendant CYNTHIA A. RILEY, in furtherance of the co-conspiracies complained of herein, and in order to conceal and misdirect the officials conducting an official investigation, provided, or caused to be provided, false information to the Florida Office of Financial Regulation, and others, delivered by means of the US Mail, and used means of Interstate Commerce, and transmitted mail across State lines.

831.     The Defendant WAMU, CYNTHIA A. RILEY, individually and on behalf of WAMU and JP Morgan Chase, knew that the Florida Office of Financial Regulation (OFR) was conducting a full investigation of the conduct of the Defendants, and each of them, including the fraudulent note which was endorsed, en blanc, by CYNTHIA A. RILEY, on her own behalf, and on behalf of the co-defendants and each of them, and the use of a forged promissory note in obtaining a fraudulent judgment of foreclosure.

832.     Defendant CYNTHIA A. RILEY, when she endorsed the forged note, knew that the information contained therein would result in a summary judgment, that would then be entered into official records, and then entered into bank records and the information was entered into official records and bank records.

833.     CYNTHIA A. RILEY knew the information she provided that was false was entered, or would be entered, into official banking records including the records of JP Morgan Chase Bank, an FDIC Bank, and Washington Mutual Bank, FA's Records, a closed FDIC bank, and ALLY Bank, an FDIC Banking institution.

834.     During that investigation stemming from a complaint filed with that office in 2010, the OFR sent a request for a response from WAMU, and upon receipt of false and misleading information from WAMU, closed their investigation, all actually and proximately caused by CYNTHIA A. RILEYS' direct participation in the fraud.

835.     That letter, dated June 22, 2001, delivered by means of the US Mail, and across State lines, contained numerous lies to the Government with the intention of having the Government cease any further investigation.

836.     Additionally, the Defendant, WAMU and JP MORGAN CHASE ratified the conduct of the Defendant, CYNTHIA A. RILEY, and the co-conspirators, and each of them, who furthered the co-conspiracy against the interests of the Plaintiffs, including ratifying the fraudulent representations of CYNTHIA A. RILEY, individually and as Vice President of WAMU while actually working as an employee of JP MORGAN CHASE.

837.     Plaintiffs are informed, believe, and thereon allege, and have incorporated herein, that other false and misleading statements were entered into the books and records of the bank, JP Morgan Chase, Washington Mutual Bank, FA's, and Ally, with the intent to defraud the Banks, the Plaintiff, and different branches of the State and Federal Government, all in violation of the above-stated statute.

838.     Said false and malicious statements and false entries were designed to, and intended to injure or defraud such banks, and other company, body politic or corporate, and individual person, including the Plaintiffs, and to deceive the officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System.

839.     Further, WAMU, on their own accord, individually, and by and through CYNTHIA A. RILEY, individually, and holding herself out as Vice President of WAMU, while actually being employed by JP Morgan Chase, on their own behalf, and on behalf of the co-defendants, in concert with each of them,

244

jointly and severally, and with the intent to defraud the State of Florida, and the United States or any agency thereof, or any financial institution referred to in this complaint, participated and shared in and or received (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution, and should be fined not more than $1,000,000 or imprisoned not more than 30 years, or both pursuant to code.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.     Statutory Compensatory damages for each separate violation according to proof;

      b.     Exemplary damages for each separate violation based on the net worth of the Defendant, CYNTHIA A. RILEY to the extent permitted by law;

      c.     Declaratory relief, including permanent injunctive relief, prohibiting CYNTHIA A. RILEY,  from endorsing any further notes on behalf of WAMU, or permitting JP MORGAN CHASE, to allow her to continue to deceive the Plaintiff and other members of the public as to her authority to execute or endorse notes en blanc on behalf of  WAMU, or any of their successor agents or assigns, from any further breaches of the statute;

      d.     Reasonable attorney's fees and court costs according to proof;

      e.     Such other and further relief as the court deems just and proper.

**COUNT SEVENTY FIVE**
**PLAINTIFFS v. STEPHANIE JACKSON**

Damages And Declaratory Relief Action For STEPHANIE JACKSON's Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and 18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

840.     Plaintiffs incorporate paragraphs 1 to 839, inclusive, herein, as though set forth herein in full. Substance prevails over form.

841.     Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

842.     On March 25, 2005, and continuing, through the present, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

843.     Plaintiffs further allege that Defendant STEPHANIE JACKSON, on her own behalf, and on behalf of the co-defendant, WASHINGTON MUTUAL BANK, FA, and on behalf of her employer, JP MORGAN CHASE, in conjunction with and in furtherance of the conspiracy with all the remaining Defendants, did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(b) supra.

844.     Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.

845.     Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise.

846.     STEPHANIE JACKSON, holding herself out as an employee of JP Morgan Chase, purchaser of assets of WAMU, an officer of that company, on their own behalf, and on behalf of the co-defendants, are liable for all wrongful conduct, including, but not limited to: ratifying the wrongful conduct of JP Morgan Chases employee, CYNTHIA A. RILEY; lying to, and providing false information to the OCC during the course of their official investigation with the intention of convincing them to reasonably rely on the false information; and the OCC's actually relying on the false information, closing their investigation based on the false information.

847.     The reliance by the OCC was to the detriment of the Plaintiffs in convincing the OCC to discontinue their investigation into the fraudulent use of a forged promissory note and a false affidavit.

848.     CYNTHIA A. RILEY told the OCC that the loan was sold on April 19, 2005, and the name on the suit was changed to RFC Homecomings.

245

849.    The true facts were, and known by STEPHANIE JACKSON, that the name on the suit was not changed, and the sworn affidavit of Debra Lyman stated that the loan was sold and all rights were transferred on March 25, 2005, five days prior to the suit being filed.

850.    Faced with the information in her possession, since it differed from the Affidavit of Debra Lyman, STEPHANIE JACKSON should have been truthful with the OCC and informed them that the Affidavit of Debra Lyman was false and provided information to them that contradicted the facts in her possession.

851.    STEPHANIE JACKSON knew, or reasonably should have known, that CYNTHIA A. RILEY had no authority to endorse the forged note, en blanc, after the seizure and closure of WAMU.

852.    STEPHANIE JACKSON knew, or reasonably should have known, that CYNTHIA A. RILEY was employed by JP Morgan Chase at the time CYNTHIA A. RILEY endorsed the forged note, en blanc.

853.    STEPHANIE JACKSON knew, or reasonably should have known, that she had a duty to be truthful when providing information to an official of the OCC during their investigation.

854.    STEPHANIE JACKSON knew, or reasonably should have known, that, by lying and / or concealing and or telling the OCC false information, was done so in furtherance of the conspiracy, and to ratify the wrongful conduct of CYNTHIA A. RILEY and JP MORGAN CHASE.

855.    STEPHANIE JACKSON knew, or reasonably should have known, that when she lied to the OCC conducting an official investigation, they would be misled into closing their investigation.

856.    STEPHANIE JACKSON knew, or reasonably should have known, that once she was provided with a demand by the Plaintiffs, she further owed an obligation to rectify the false statements she previously made to the OCC.

857.    STEPHANIE JACKSON, after being given an opportunity to correct the mis-information, failed and refused to correct the misinformation she gave to the OCC.

858.    STEPHANIE JACKSON knew, or reasonably should have known, that the co-defendants endorsed a forged promissory note with a blanc endorsement; endorsing a forged note after the Department of Financial Services had served a cease and desist order on Washington Mutual Bank, FA, closing the bank, and after their assets were seized  and sold; by means of interstate commerce and interstate mail, and filed, or causing to be filed, a forged promissory note she knew, or reasonably should have known as a result of her knowledge, experience, expertise, and fiduciary duties owed to the Plaintiffs and others, was a forged document.

859.    STEPHANIE JACKSON by means of Interstate Commerce, and across state lines, mailed false information regarding the conduct of her co-defendants, to the OCC.

860.    Within the last six months, Plaintiff spoke to STEPHANIE JACKSON on the telephone, wherein she ratified her wrongful conduct and ratified her furtherance in the conspiracy, and asked for supporting documents which contradicted the statements she made to the OCC; and, after her receipt of the information she requested, STEPHANIE JACKSON failed to correct the information she provided to the OCC.

861.    STEPHANIE JACKSON knew, or reasonably should have known, that her conduct was in furtherance and done in an effort to further the conspiracy with her co-defendants, and each of them, and their lawyers, Shapiro and Fishman and Akerman Senterfitt.

862.    At all times herein, STEPHANIE JACKSON, on her own behalf, and on behalf of the co-defendants, and each of them, conspired with remaining defendants, ratified the conduct, and conspired with the remaining Defendants, to interfere with the quiet enjoyment of Plaintiffs home; steal the equity in the Plaintiff's home; and used a forged promissory note and fraudulent affidavit in a civil court action in order to fraudulently obtain a judgment of foreclosure.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

        a.    Statutory Compensatory damages for each separate violation according to proof;

        b.    Exemplary damages for each separate violation based on the net worth of the Defendant, STEPHANIE JACKSON, on her own behalf, and on behalf of the co-defendants to the extent permitted by law;

        c.    Declaratory relief, including permanent injunctive relief, prohibiting STEPHANIE JACKSON and her employer, JP Morgan Chase individually and on behalf of WAMU, or any of their agents or assigns, from any further breaches of the statute;

        d.    Reasonable attorney's fees and court costs according to proof;

        e.    Such other and further relief as the court deems just and proper.

246

## COUNT SEVENTY SIX
## PLAINTIFFS v. STEPHANIE JACKSON

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

863.    Plaintiffs incorporate paragraphs 1 to 862, inclusive, herein, as though set forth herein in full. Substance prevails over form.

864.    Plaintiffs further incorporate the allegations of the remaining Counts of the rest of this complaint, contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

865.    At various times and places partially enumerated Plaintiff's documentary material, all Defendants, and each of them, did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

866.    Likewise, all Defendants, and each of them, did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

867.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

868.    Plaintiffs further allege that all Defendants jointly or severally did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

869.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;
    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, STEPHANIE JACKSON to the extent permitted by law;
    c.    Declaratory relief, including permanent injunctive relief, prohibiting STEPHANIE JACKSON, individually and on behalf of the remaining defendants, and each of them, or any of their agents or assigns, from any further breaches of the statute;
    d.    Reasonable attorney's fees and court costs according to proof;
    e.    Such other and further relief as the court deems just and proper.

## COUNT SEVENTY SEVEN
## PLAINTIFFS v. STEPHANIE JCKSON

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

870.    Plaintiffs incorporate paragraphs 1 to 869, inclusive, herein, as though set forth herein in full. Substance prevails over form.

871.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the Defendant, STEPHANIE JACKSON's participation and her aiding and abetting conduct furthered the  conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

872.    At various times and places as enumerated in Plaintiff's exhibits which are attached hereto, and incorporated herein, all Defendants, and each of them, did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

873.    At various times and places partially enumerated in Plaintiffs documentary material, all Defendants, individually and on behalf of each other, committed acts in furtherance of the conspiracy, did

also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

874.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

875.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d) (Prohibited activities supra).

876.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.    Statutory Compensatory damages for each separate violation according to proof;
      b.    Exemplary damages for each separate violation based on the net worth of the Defendant, STEPHANIE JACKSON, to the extent permitted by law;
      c.    Declaratory relief, including permanent injunctive relief, prohibiting STEPHANIE JACKSON, or any of their agents or assigns, from any further breaches of the statute;
      d.    Reasonable attorney's fees and court costs according to proof;
      e.    Such other and further relief as the court deems just and proper.

### COUNT SEVENTY EIGHT
### PLAINTIFFS v. STEPHANIE JACKSON

Damages And Declaratory Relief Action for STEPHANIE JACKSON's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

877.    Plaintiffs incorporate paragraphs 1 to 876, inclusive, herein, as though set forth herein in full. Substance prevails over form.

878.    As alleged herein, Defendant STEPHANIE JACKSON, on her own behalf, and on behalf of the co-defendants, committed numerous of acts of mail fraud and wire fraud, which is a violation of federal law.

879.    That Defendant STEPHANIE JACKSON, on her own behalf, and on behalf of the co-defendants, knowingly devised a scheme to defraud or to obtain money or property (or the intangible right of honest services) by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

880.    That STEPHANIE JACKSON, on her own behalf, and on behalf of the co-defendants, acted with the intent to defraud the Plaintiffs and others (including the US Treasury) to the detriment of the Plaintiffs, and each of them.

881.    That in advancing, furthering, or carrying out the scheme, STEPHANIE JACKSON, on her own behalf, and on behalf of the co-defendants, used the mails (a private or commercial interstate carrier), or caused the mails (a private or commercial interstate carrier) to be used.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.    Statutory Compensatory damages for each separate violation according to proof;
      b.    Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU to the extent permitted by law;
      c.    Declaratory relief, including permanent injunctive relief, prohibiting WAMU, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;
      d.    Reasonable attorney's fees and court costs according to proof;
      e.    Such other and further relief as the court deems just and proper.

### COUNT SEVENTY NINE
### PLAINTIFFS v. STEPHANIE JACKSON

Damages And Declaratory Relief Action For STEPHANIE JACKSON's Violation of the VIOLATION OF 18 U.S.C. § 1001

882.    Plaintiffs incorporate paragraphs 1 to 881, inclusive, herein, as though set forth herein in full. Substance prevails over form.

883.    Defendant, STEPHANIE JACKSON, on her own behalf, and on behalf of the co-defendants, violated 18 U.S.C. § 1001 by the conduct complained of herein, and as proven at the time of trial.

884.    Defendant STEPHANIE JACKSON, on her own behalf, and on behalf of the co-defendants falsified, concealed or covered up by any trick, scheme or device, material facts, including, but not necessarily limited to:

a.    STEPHANIE JACKSON's conduct in failing to report CYNTHIA A. RILEY's endorsing a forged note was a central act in leading to the fraudulent judgment being obtained by Washington Mutual Bank, FA.

b.    STEPHANIE JACKSON was employed as a member of an FDIC Bank, and is currently employed by Defendant JP Morgan Chase.

c.    At the time STEPHANIE JACKSON misled the OCC, she knew that CYNTHIA A. RILEY endorsed the forged note on behalf of Washington Mutual Bank, FA in blanc, she was no longer an officer of that bank, and no longer authorized to conduct any business for that bank.

d.    At the time STEPHANIE JACKSON lied and misled the OCC, she knew that CYNTHIA A. RILEY, endorsed the forged note, she knew that her misleading information would be entered into official banking records, and she knew that information was false, or, she reasonably should have known she was making false entries into official records.

e.    At the time STEPHANIE JACKSON knew CYNTHIA A. RILEY endorsed the forged note, she knew, or reasonably should have known, that her conduct led to the Defendants use of that forged note in an action to take the Plaintiffs home by means of a fraudulent foreclosure action, knowing that the note was sold, she endorsed it in blanc, understanding that WAMU may still attempt to collect on a note they already had been paid in full for; all in violation of 18 U.S.C. § 1001.

f.    The Defendant STEPHANIE JACKSON's knew that the forged note, in conjunction with DEBRA LYMAN's false affidavit, individually, and on behalf of Litton Loan Services, LP, as Vice President, and on behalf of the defendants, and each of them, jointly and severally, was false and furthered the conspiracy, in that it claims that Washington Mutual Bank, FA, was entitled to sums that Washington Mutual Bank, FA later admitted, and STEPHANIE JACKSON knows are neither due nor owing to WAMU.

e.    In fact, Defendants, and each of them, jointly and severally, concealed from the court and failed to inform the court of a credit of $373,907.18 in principal, proving that Washington Mutual Bank, FA, was paid in full and not owed any money from the Plaintiffs and STEPHANIE JACKSON'S ratification and concealment of Riley's blanc endorsement, permitting WAMU to double collect after they were paid in full, was done in furtherance of that conspiracy.

f.    The Defendants, WAMU, by and through its agent, Litton, by and through their Vice President, Debra Lyman, and on behalf of the co-defendants, and each of them, filed false affidavit and Defendant STEPHANIE JACKSON ratified, and concealed Riley's active participation in filing, or causing to be filed, a forged promissory note, with the court in order to obtain a judgment of foreclosure.

g.    The Defendant, STEPHANIE JACKSON, individually and on behalf of WAMU and JP MORGAN CHASE, by and through its agent, Litton, by and through their Vice President, Debra Lyman, and CYNTHIA A. RILEY, no longer employed by Washington Mutual Bank, FA, as Vice President, held herself out as Vice President and endorsed the note en blanc, on behalf of the co-defendants and each of them, also filed, by means of interstate mail and interstate commerce, a fraudulent affidavit and a forged promissory note.

h.    STEPHANIE JACKSON, individually and on behalf of WAMU and JP MORGAN CHASE, CYNTHIA A. RILEY, individually, and as Vice President of WAMU, and while employed by JP Morgan Chase, after the bank was closed, on their own behalf, and on behalf of the co-defendants, and each of them, jointly and severally, violated the State and Federal Statutes listed herein and committed other wrongful and intentional misconduct, all according to proof as pled herein.

i.    Defendant, STEPHANIE JACKSON, individually and on behalf of WAMU AND JP MORGAN CHASE, ratified that Debra Lyman, as a robo-signer, signing this affidavit, and others, without actual knowledge of the facts, and without actually review of the files as sworn to in her affidavit; and her sworn testimony regarding the en blanc forged note by Defendant CYNTHIA A. RILEY, all were in furtherance of the conspiracy.

885.    Defendant STEPHANIE JACKSON, on her own behalf , and on behalf of her employer, JP Morgan Chase, and on behalf of WAMU, on their own behalf, and on behalf of the co-defendants and

249

each of them, further violated 18 U.S.C § 1001 by making, and / or causing to be made, or ratifying, fictitious or fraudulent statements or representations to the Plaintiffs, to the court, and to the US Department of the Treasury; to the OCC; to the FTC; to the State and local authorities.

886.    Defendant STEPHANIE JACKSON, on her own behalf , on behalf of JP MORGAN CHASE, her employer, and on behalf of WAMU, and on behalf of the co-defendants further violated 18 U.S.C § 1001by ratifying, making or using any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, all as alleged herein.

887.    Defendant STEPHANIE JACKSON, on her own behalf, on behalf of JP MORGAN CHASE as, on their own behalf, and on behalf of the co-defendants, and each of them, further violated 18 U.S.C § 1001, as alleged herein, because the statements made by the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants were all material, and adversely affected the Plaintiffs, the court, the US Government, and others and were ratified by the Defendant, STEPHANIE JACKSON as an employee of CHASE and WAMU.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.    Statutory Compensatory damages for each separate violation according to proof;

      b.    Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU, to the extent permitted by law;

      c.    Declaratory relief, including permanent injunctive relief, prohibiting WAMU, or any of their loan servicers, agents or assigns, from any further breaches of the statute;

      d.    Reasonable attorney's fees and court costs according to proof;

      e.    Such other and further relief as the court deems just and proper.

## COUNT EIGHTY
### PLAINTIFFS v. STEPHANIE JACKSON

Damages And Declaratory Relief Action for STEPHANIE JACKSON's Violation of
18 U.S.C. § 1005

888.    Plaintiffs incorporate paragraphs 1 to 887, inclusive, herein, as though set forth herein in full. Substance prevails over form.

889.    Defendant STEPHANIE JACKSON, in furtherance of the co-conspiracies complained of herein, and in order to conceal and misdirect the officials conducting an official investigation, provided, or caused to be provided, false information to the Florida Office of Financial Regulation, and others, delivered by means of the US Mail, and used means of Interstate Commerce, and transmitted mail across State lines.

890.    The Defendant WAMU, STEPHANIE JACKSON, individually and on behalf of WAMU and JP Morgan Chase, knew that the Office of the Comptroller of the Currency (OCC) was conducting a full investigation of the conduct of the Defendants, and each of them, including the fraudulent note which was endorsed, en blanc, by RILEY, on her own behalf, and on behalf of the co-defendants and each of them, and the use of a forged promissory note in obtaining a fraudulent judgment of foreclosure.

891.    Defendant STEPHANIE JACKSON, when she found that the forged note was fraudulent, and knew that the information contained resulted in a summary judgment, the fraudulent judgment was entered into official records, and then entered into bank records and the information was entered into official records and bank records, had a duty to reveal the facts to the OCC, regardless of the outcome.

892    STEPHANIE JACKSON knew the information she provided that was false was entered, or would be entered, into official banking records including the records of JP Morgan Chase Bank, an FDIC Bank, and Washington Mutual Bank, FA's Records, a closed FDIC bank, and ALLY Bank, an FDIC Banking institution and the OCC.

893.    During that investigation stemming from a complaint filed with that office, the OCC sent a request for a response from WAMU and JP MORGAN CHASE, and upon receipt of false and misleading information from WAMU and JP MORGAN CHASE, closed their investigation, all actually and proximately caused by STEPHANIE JACKSONS' direct participation in the fraud.

894.    That letter, delivered by means of the US Mail, and across State lines, contained numerous lies to the Government with the intention of having the Government cease any further investigation.

895.    Additionally, the Defendant, WAMU and JP MORGAN CHASE ratified the conduct of the Defendant, STEPHANIE JACKSON, and the co-conspirators, and each of them, who furthered the co-conspiracy against the interests of the Plaintiffs, including ratifying the fraudulent representations of

RILEY, individually and as Vice President of WAMU while actually working as an employee of JP MORGAN CHASE.

896.    Plaintiffs are informed, believe, and thereon allege, and have incorporated herein, that other false and misleading statements were entered into the books and records of the bank, JP Morgan Chase, Washington Mutual Bank, FA's, and Ally, with the intent to defraud the Banks, the Plaintiff, and different branches of the State and Federal Government, all in violation of the above-stated statute.

897.    Said false and malicious statements and false entries were designed to, and intended to injure or defraud such banks, and other company, body politic or corporate, and individual person, including the Plaintiffs, and to deceive the officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System.

898.    Further, WAMU, on their own accord, individually, and by and through STEPHANIE JACKSON, ratified RILEY'S conduct, individually, and holding herself out as Vice President of WAMU, while actually being employed by JP Morgan Chase, on their own behalf, and on behalf of the co-defendants, in concert with each of them, jointly and severally, and with the intent to defraud the State of Florida, and the United States or any agency thereof, or any financial institution referred to in this complaint, participated and shared in and or received (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution, and should be fined not more than $1,000,000 or imprisoned not more than 30 years, or both pursuant to code.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, STEPHANIE JACKSON to the extent permitted by law;

c.    Declaratory relief, including permanent injunctive relief, prohibiting STEPHANIE JACKSON, on behalf of WAMU, or permitting JP MORGAN CHASE, to allow her to continue to deceive the Plaintiff and other members of the public as to her authority to execute or endorse notes en blanc on behalf of JP MORGAN CHASE and WAMU, or any of their successor agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

## COUNT EIGHTY ONE:
## PLAINTIFFS v. OCWEN

Damages And Declaratory Relief Action For Failure Of OCWEN To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

899.    Plaintiffs incorporate paragraphs 1 to 898, inclusive, herein, as though set forth herein in full.

900.    The Making Home Affordable Program was introduced in February 2009 by the Obama Administration which was intended to stabilize the housing market and help struggling homeowners get relief and avoid foreclosure.

901.    Because the stated purpose of the program was partly designed to help homeowners, homeowners, including the Plaintiffs, were the intended third party beneficiaries of the Program.

902.    Because OCWEN and LITTON signed the STATE OF NEW YORK DEPARTMENT OF FINANCIAL SERVICES BANKING DEPARTMENT AGREEMENT, among other things, comply with HAMP requirements, and the States consent was contingent on each of the parties commitment to adhere to the Servicing Practices Agreement, which included the requirement they comply with HAMP and withdraw any case that is based on robo signed affidavits or false affidavits.

903.    In March of 2009, the Treasury Department (Treasury) issued uniform guidance for loan modifications across the mortgage industry, and updated those guidelines with policy announcements.

251

904.    The MHA Handbook for Servicers of Non-GSE Mortgages (Handbook) was issued to provide guidance for servicers of mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac.

905.    On or about April 14, 2009, OCWEN became a participant in the Home Affordable Modification Program (HAMP), by signing the Servicer Participation Agreement (SPA).

906.    OCWEN registered and executed a Servicer Participation Agreement, related documents, and one or more Service Schedules (SPA) with the Program Administrator on or before October 3, 2010.

907.    The SPA governs servicer participation in MHA for all Non-GSE Mortgages.

908.    OCWEN agreed to abide by the terms of the handbook as part of the Servicer Participation Agreement (SPA).

909.    All participating servicers, including Litton and OCWEN, are required, among other things, to consider all eligible mortgage loans for Services (as defined in the SPA) unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. MHA 1.1

a.    Pursuant to the Handbook, OCWEN cannot escape liability by OCWEN or the company they purchased, LITTON, simply referring the matter to their lawyers.

b.    The Handbook, in pertinent part says that if the entity that signed the SPA sub-contracts out any portion of its responsibilities as a servicer to another party, the entity that signed the SPA will be liable for the acts and omissions of the sub-contracted party under the SPA.

c.    Litton, individually, and on behalf of its new owner, OCWEN, prior to the sale, instructed Akerman Senterfitt, its lawyers to act on their behalf, and thus Litton is responsible for all the willful violations, intentional and negligent misconduct of its lawyers and co-conspirators as pled herein, in failing in every respect to meet the requirements of HAMP, and by OCWEN's purchase with knowledge, either actual or constructive, of the conduct of Litton, and by OCWENS PURCHASE AND ASSUMPTION OF LITTON, and OCWEN ratified the wrongful conduct by allowing their attorneys to file a notice to set a sale date AFTER the date of the acquisition of LITTON by OCWEN.

d.    All of the wrongdoings complained of herein, include the conduct of Akerman Senterfitt as the agent and subcontractor of Litton and OCWEN as intended recipients of the proceeds of the fraudulent sale of the PLAINTIFFS' HOME.

910.    As further described in Section 1.3, participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out the requirements of the SPA. MHA 1.1

911.    In 2009, Congress passed the Helping Families Save Their Homes Act of 2009, which includes legal protection for servicers that modify residential mortgages.

912.    It was intended to encourage more servicers to modify more mortgages for the benefit of the homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

913.    The bill essentially provides authority for, and legal protection for servicers to alter mortgage contracts and, as the argument goes, investor contracts where mortgages have been securitized.

914.    Thus, not only does no legal impediment existed for Litton Loan Servicing LLC and OCWEN to grant a loan modification to any and all individuals who qualify, but also every action taken by the Government was intended to benefit the Homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

915.    In addition to the normal obligation to obey all laws, and the implied covenants of good faith and fair dealing that are found in every contractual agreement, the SPA requires that Litton Loan Servicing LLC and OCWEN fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP.

a.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

b.    The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

c.    The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

d.    The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

252

e.    The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

f.    The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

g.    The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act.

h.    Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.; 18 U.S.C. 1964, (Civil RICO Remedies);

i.    Conspiracy to commit and commission of Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343;

j.    Conspiracy to commit and commission of Bank Fraud 18 U.S.C. 1341, 1344;

k.    Conspiracy to commit and commission of 18 U.S.C. § 1001;

l.    Conspiracy to commit and commission of 18 U.S.C. § 1005;

916.    The Plaintiff's property would have been qualified under the conditions required of HAMP, and the Plaintiff would have been eligible for HAMP, including, but not limited to, the following conditions:

a.    Mortgage loan was originated on or before January 1, 2009;

b.    Mortgage loan was not previously modified under HAMP.

c.    The Mortgage loan is delinquent or default is reasonably foreseeable.

d.    The Mortgage loan is secured by a one unit property, which is the principal residence of the Plaintiff.

e.    The subject property is not vacant or condemned.

f.    The borrower has documented financial hardship and represented she does not have sufficient liquid assets to make the monthly mortgage payments because of a reduction in her salary and a reduction in her spouses work to part time status.

g.    The Plaintiff's monthly mortgage payment (including principal, interest, taxes, and insurance) is greater than 31 percent of the Plaintiff's verified monthly gross income.

h.    The Plaintiff is willing to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.

i.    The Current unpaid principal balance (UPB) of the mortgage loan prior to capitalization is not greater than $729,750.

j.    The Plaintiff offered to make a timely first trial period payment on or before December 31, 2012, but no TPP was ever offered to the Plaintiff.

k.    The Plaintiff is in active litigation, and is eligible for HAMP.

917.    OCWEN and LITTON was required to communicate with clear written information designed to help the borrower understand the modification process in accordance with the HAMP guidelines and Handbook.

918.    OCWEN and LITTON has failed and refused to communicate with the Plaintiff, and referred the Plaintiff to their attorney, who has also refused to provide any information regarding HAMP; expressly, blatantly and openly refused to comply with the statutory requirements of providing an estoppel letter; and has willfully violated every provision of the HAMP and the handbook.

919.    Although LITTON has a toll free number, the Plaintiff was told he was not allowed to call Litton; not allowed to discuss HAMP with Litton; nor was he allowed to discuss the HAMP modification process or other alternative modification programs with Litton.

920.    Litton Loan Servicing LLC and OCWEN is required to maintain adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents.

921.    Litton Loan Servicing LLC and OCWEN has refused to acknowledge receipt of Plaintiffs HAMP application; refused to respond to the application; refused to discuss the application with Plaintiff; and willfully violated the following regulations:

923.    Although Section 5 of the Federal Trade Commission Act prohibits unfair or deceptive acts or practices, Litton Loan Services, LP and OCWEN, on their own behalf, and on behalf of the co-

253

defendants, used false affidavits; filed a forged promissory note; committed perjury and numerous acts of fraud upon the court and the Plaintiff in order to obtain a judgment of foreclosure.

924.    Although the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibits discrimination on a prohibited basis in connection with mortgage transactions, Litton Loan Servicing LLC and OCWEN, on their own behalf, and on behalf of the co-defendants discriminated against the Plaintiff because of her gender and her religion.

925.    Although the Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts, Litton Loan Servicing LLC and OCWEN, on their own behalf, and on behalf of the co-defendants failed to provide proper documentation in violation of RESPA.

926.    Although the Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another, OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants tendered multiple demands seeking payment on behalf of RFC Homecomings, but obtained a judgment in the name of Washington Mutual Bank, FA, informing the court that the only entity entitled to recover was Washington Mutual Bank, FA. Each letter and piece of correspondence sent on behalf of RFC Homecomings was a separate violation of the Fair Debt Collection Practices Act[10].

927.    Although the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification, (these laws also prohibit red-lining), OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants has discriminated against the Plaintiffs on the basis of her gender and her religion.

928.    OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants negotiated modifications of loans with others, but refused to even consider the Plaintiffs, failing to acknowledge or respond to the Plaintiffs application.

929.    Although he Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information, OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants used false information in reporting consumer credit information to credit reporting agencies about the Plaintiff.

---

[10] Nancy M. Wallace's Answer Brief, filed on behalf of Washington Mutual Bank in the Eskanoses' Appeal of the Summary Judgment in this matter. Ms. Wallace stated:

> "Because the original note was lost on the date the complaint was filed, Washington Mutual could not deliver it to RFC and, thus, could not legally transfer it to RFC. Washington Mutual held the original note, even though it could not be located. RFC could not have filed the foreclosure action because the delivery of the original note had not occurred.
>
> The note never was delivered to RFC. *When Washington Mutual located the original note in storage, it filed it with the circuit court so an effective transfer of the note to RFC did not occur.* No entity other than Washington Mutual ever held the note. As the only entity entitled to enforce it, Washington Mutual had standing to bring this action." (*See*: *Answer Brief of Washington Mutual Bank, Inc.*, *Ami Eskanos, et al, Appellants, vs. Washington Mutual Bank, FA, Appellee*, 3rd DCA Case No. 3D09-3392, Pg. 14)

930.    Although the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants intentionally and willfully failed and refused to comply with Regulation B by failing to timely respond to the HAMP application, thus violating Regulation B.

931.    Under Florida Law, OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants, was required to provide an estoppel letter pursuant to Florida Statutes Chapter 701.04 (1), which says, in pertinent part:

> "Within 14 days after receipt of the written request of a mortgagor, the holder of a mortgage shall deliver to the mortgagor at a place designated in the written request an estoppel letter setting forth the unpaid balance of the loan secured by the mortgage, including principal, interest, and any other charges properly due under or secured by the mortgage and interest on a per-day basis for the unpaid balance. Whenever the amount of money due on any mortgage, lien, or judgment shall be fully paid to the person or party entitled to the payment thereof, the mortgagee, creditor, or assignee, or the attorney of record in the case of a judgment, to whom such payment shall have been made, shall execute in writing an instrument acknowledging satisfaction of said mortgage, lien, or judgment and have the same acknowledged, or proven, and duly entered of record in the book provided by law for such purposes in the proper county. Within 60 days of the date of receipt of the full payment of the mortgage, lien, or judgment, the person required to acknowledge satisfaction of the mortgage, lien, or judgment shall send or cause to be sent the recorded satisfaction to the person who has made the full payment. In the case of a civil action arising out of the provisions of this section, the prevailing party shall be entitled to attorney's fees and costs."

932.    Proper demand was made upon Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, Washington Mutual Bank, FA, on 10/28/2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

933.    On February 18, 2011, well past the deadline of the statute, Litton's lawyers sent a letter stating unequivocally that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

934.    That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law, as well as a direct violation of the requirement of the HAMP guidelines wherein "the SPA requires that Litton Loan Servicing fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP." OCWEN'S purchase of LITTON and rescheduling the motion to set a sale date after being placed on notice, is a ratification of all the wrongful conduct of Litton and the remaining co-defendants.

935.    OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants, pursuant to the HAMP guidelines, is required to make a reasonable effort to solicit borrower by performing at a minimum, the following acts:

a.    The servicer is to make a minimum of four telephone calls to the last known phone numbers of record, at different times of the day; -  (Litton made none) and

b.    The servicer is to send two written notices to the last address of record by sending one letter via certified/express mail or via overnight delivery service (such as Federal Express or UPS) with return receipt/delivery confirmation and one letter via regular mail.   (Litton's only correspondence was the bad faith demand letters, never any response or mention of the HAMP or other rights of the Borrower).

c.    Any contact with eligible borrowers, whether by telephone, mail or otherwise, must:

255

1.        Advise borrowers that they may be eligible for HAMP; MHA Handbook v 2.0.  (Litton made no such effort nor provide no such advice).

2.        Clearly describe the Initial Package that the borrower is required to submit pursuant to the requirements outlined in Section 4, and state what other information the servicer needs to complete the HAMP analysis;  (Litton never discussed HAMP, refused to discuss HAMP with the Plaintiffs, and never reviewed the Plaintiffs application.)

3.        Provide a toll-free telephone number through which the borrower can reach a loan servicer representative; (Litton stated that Plaintiff is not permitted to call them at all) and

4.        Identify any unique requirements the servicer may have established for submission of an Initial Package received later than 30 business days prior to a scheduled foreclosure sale date.  (Litton refused to provide any information regarding HAMP or mention the application whatsoever).

5.        All contact attempts must be documented in the servicing file.  If the servicer has documentation evidencing that it satisfied the Reasonable Effort standard for HAMP prior to June 1, 2010, resolicitation of the borrower is not required. (If Litton documented any efforts, then they would be fraudulent and further violations of the Agreement.)

936.        OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants failed to make ANY correct contact with the Plaintiff; refused to discuss the matter with the Plaintiff; refused to provide a number for the Plaintiff to discuss the matter with the Servicer; and refused to comply with all the requirements set forth in 20.

937.        OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants was further required to, and willfully failed and refused to comply with each and every one of the following conditions:

a.        The servicer must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Package, which is required to be submitted by the borrower to request a HAMP modification.

b.        The communication should:

1.        Describe the income evidence required to be evaluated for HAMP;

c.        Provide the RMA (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit); and

d.        Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

e.        The communication should also include clear language stating that during the HAMP evaluation the home will not:  (i) be referred to foreclosure; or (ii) be sold at a foreclosure sale if the foreclosure process has already been initiated.  In the communication, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the communication.

f.        If Right Party Contact is established prior to satisfaction of the Reasonable Effort standard, the servicer must continue to take steps to satisfy the Reasonable Effort standard until the Initial Package is submitted by the borrower.

g.        If Right Party Contact is established, but the borrower does not submit an Initial Package, the servicer must resend the Initial Package communication.  Again, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the second communication.  If the borrower does not respond by providing an Initial Package within the required time period set forth in the second communication, the servicer may determine the borrower to be ineligible for HAMP.

h.        If Right Party Contact is established, but the borrower submits an incomplete Initial Package within the required time period, the servicer must comply with the "Incomplete Information Notice" requirements set forth below in Section 2.3.3.  If the borrower does not respond to either the 30-day Incomplete Information Notice or the 15-day Incomplete Information Notice by providing an Initial Package within the required time period, the servicer may determine the borrower to be ineligible for HAMP.

Servicers must acknowledge receipt of the Initial Package within 10 business days per the requirements in Section 4.5 and respond within 30 calendar days with either an Incomplete Information Notice (as outlined in Section 2.3.3), a TPP Notice (as outlined in Section 8.1) or a Non-Approval Notice (as outlined in Section 2.3.2).

938.    Pursuant to the provisions of the agreement, Plaintiffs are entitled to a stay as Defendant OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants failed in every respect to meet the provisions of the SPA.

939.    Pursuant to the provisions of the SPA, OCWEN and LITTON intentionally and willfully failed to comply with each and every provision as set forth below:

3        Protections Against Unnecessary Foreclosure

3.1      Suspension of a Referral to Foreclosure

A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of    the following circumstances    exists:

-        The borrower is evaluated for HAMP and is determined to be ineligible for the program; or

-        The borrower is offered a TPP, but fails to make current trial period payments as set forth in Section 8.3; or

-        The servicer has established Right Party Contact, has sent at least two written    requests asking the borrower to supply required information in accordance with Section 2.2.2, and has otherwise satisfied the Reasonable Effort solicitation standard, and the borrower failed to respond by the dates indicated in those requests;    or

-        The servicer has satisfied the Reasonable Effort solicitation standard without    establishing Right Party Contact; or The borrower or co-borrower states he or she is not interested in pursuing a HAMP modification and such statement is reflected by the servicer    in its servicing system and/or mortgage file.

3.2      Suspension of Foreclosure Proceedings in Process

With respect to a borrower who submits a request for HAMP consideration after a    loan has been referred to foreclosure, the servicer must, immediately upon the borrower's acceptance of a TPP based on verified income, and for the duration of the  trial period, take    those actions within its authority that are necessary to halt further activity and events in the    foreclosure process, whether judicial or non-judicial, including but not limited to refraining    from scheduling a sale or causing a judgment to be entered.

3.3       Suspension of Scheduled Foreclosure Sale

When a borrower submits a request for HAMP consideration after a foreclosure sale    date has been scheduled and the request is received no later than midnight of the seventh business day prior to the foreclosure sale date (Deadline), the servicer must suspend the sale as    necessary to evaluate the borrower for HAMP…

3.4      Mitigating Foreclosure Impact

The servicer must take the following actions to mitigate foreclosure impact:

3.4.1    Simultaneous Trial Period Plan and Foreclosure Explanation

When a borrower is simultaneously in foreclosure and is either being evaluated for    HAMP or is in a TPP, the servicer must provide the borrower with a written notification that    explains, in clear language, the concurrent modification and foreclosure processes and that    states that even though certain foreclosure activities may continue, the home will not be sold    at a foreclosure sale while the borrower is being considered for HAMP or while the borrower    is making payments under a TPP…

3.4.2    Foreclosure Attorney/Trustee Communication

Servicers must develop and implement written policies and    procedures to provide    notification to their foreclosure attorney/trustee regarding a borrower's HAMP status,    including whether the borrower is potentially eligible for HAMP (and is subject to Section    2.2), and whether the borrower is being evaluated for, or is currently in, a TPP. Servicers    must ensure that their foreclosure attorney/trustee adheres to all of the requirements of    Section 3.1, Section 3.2 and Section 3.3 with respect to referral to foreclosure, stay of    foreclosure actions and suspension of foreclosure sales.

3.4.3    Certification Prior to Foreclosure Sale

Servicers must develop and implement written procedures applicable to all loans that    are potentially eligible for HAMP (and are subject to Section 2.2) that require the servicer

to | provide to the foreclosure attorney/trustee a written certification that (i) one of the five circumstances under Section 3.1 exists, and (ii) all other available loss mitigation

alternatives

certification

foreclosure sale | have been exhausted and a non-foreclosure outcome could not be reached.  This must be provided no sooner than seven business days prior to the scheduled date (the Deadline) or any extension thereof.

940.    Plaintiffs were further entitled, and never received the required acknowledgement of the Initial Package.

4.5 Acknowledgment of Initial Package
Within 10 business days following receipt of an Initial Package, the servicer **must** acknowledge in writing the borrower's request for HAMP participation by sending the borrower confirmation that the Initial Package was received and a description of the servicer's evaluation process and timeline. If the Initial Package is received from the borrower via email, the servicer may email the acknowledgment. Servicers must maintain evidence of the date of receipt of the borrower's Initial Package in its records.
A single written communication sent within 10 business days of receipt of a borrower's request for HAMP participation may also include, at the servicer's discretion, the results of its review of the Initial Package.

941.    Although Litton Loan Services, LP and OCWEN, on their own behalf, and on behalf of the co-defendants **MUST** comply, Litton Loan Services, LP and OCWEN, on their own behalf, and on behalf of the co-defendants not only failed to acknowledge their receipt of the Initial Package that was sent to them and received on May 4, 2011, but wantonly, willfully and intentionally failed and refused in every respect to comply with any of the provisions of HAMP contained herein for the benefit of the Plaintiff.

942.    Furthermore, OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants was obligated to review the documentation submitted by Plaintiff on May 4, 2011, within 30 days, and failed and refused to do so.

943.    Pursuant to the Handbook, Litton Loan Services, LP and OCWEN, on their own behalf, and on behalf of the co-defendants had 30 days wherein they were contractually obligated to review the initial package, and they willfully, wantonly and intentionally failed and refused in every respect to do so.

4.6 Review of Initial Package
Within 30 calendar days from the date an Initial Package is received, the servicer **must** review the documentation provided by the borrower for completeness.  If the documentation is incomplete or insufficient for use in underwriting, the servicer must send the borrower an Incomplete Information
Notice in accordance with the guidance set forth in Section 2.3.3.
If the borrower's documentation is complete, the servicer must evaluate the borrower's eligibility for HAMP and either:
-        Send the borrower a TPP Notice (see Section 8.1); or
-        Make a determination that the borrower is not eligible for HAMP and communicate this determination to the borrower in accordance with the guidance in Section 2.3.2.

944.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants had only 30 days from May 11, 2011 to wherein they were contractually obligated to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination, and utterly, willfully, wantonly, and intentionally failed and refused to do so.

945.    Pursuant to the Handbook, OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants had 30 days from May 11, 2011 wherein they were contractually obligated to provide the Plaintiff with a determination, and willfully, wantonly, and intentionally failed and refused to do so in breach of that agreement.

6 Underwriting

258

Servicers must determine the borrower's eligibility for a modification using information obtained in the Initial Package and subsequently verified. **Servicers are required** to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination within 30 calendar days of receiving all required borrower documentation.

946.    Furthermore, OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants was contractually obligated to consider the Plaintiff for Hope for Homeowners, and utterly failed and refused to do so.

947.    Pursuant to the Handbook, OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants was contractually obligated to consider the Plaintiff for Hope for Homeowners, as set forth herein.

6.2 Coordination with Hope for Homeowners
Servicers are **required** to consider a borrower for a refinance through the Federal Housing Administration's HOPE for Homeowners (H4H) program when feasible. Consideration for an H4H refinance should not delay eligible borrowers from receiving a TPP Notice. The servicer's obligation as it relates to the H4H requirement is that while the servicer is gathering information to determine if a borrower meets the minimum eligibility criteria for HAMP, it should also be assessing whether the borrower may be eligible to refinance through H4H. This assessment would involve asking the following set of questions:
-        Will the loan amount exceed $550,440? No.
-        Has the borrower made less than six (6) full payments during the life of the first lien loan? No.
-        Does the borrower have an ownership interest in other residential real estate, including any second homes or rental properties? No.
-        Was the mortgage to be refinanced originated after January 1, 2008? No.
-        Does the property contain more than one (1) unit? No.
If the answer to all of these questions is "NO", the borrower may be eligible for H4H. (As is the precise case for the Plaintiff, herein). In this case, the servicer should counsel the borrower to seek a refinance with an H4H lender.

948.    OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants failed and refused to notify the Plaintiff of their consideration, as well as Litton failed and refused to consider the Plaintiff, entitlement to relief under Hope for Homeowners.

949.    OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants was obligated to apply the modification steps until the monthly mortgage payment ratio is reduced to 31 percent, but utterly failed and refused to do so.

950.    Pursuant to the Handbook, section 6.3 Standard Modification Waterfall Servicers **must** apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent (target monthly mortgage payment ratio).

951.    A borrower will qualify for HAMP only if the interest rate on the mortgage loan can be reduced by at least 0.125 percent without the modified monthly mortgage payment ratio going below 31 percent. If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31 percent, the modification will not satisfy HAMP requirements and no incentives will be payable in connection with the modification.

952.    Even though clearly, OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants, **MUST** have taken action, they failed and intentionally refused to comply with every requirement of HAMP; failed and refused to comply with State and Federal Law; committed fraud; willfully and maliciously acted with the sole intent to deprive Plaintiffs of their property.

259

953.    Because there existed a contract between OCWEN and LITTON and the US Treasury Department which was intended to benefit the Plaintiffs, and others similarly situated; and OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants accepted consideration for each loan modification application from the US Treasury Department; because there was a mutual intent to benefit the Plaintiffs, and others similarly situated; and the Plaintiffs were deprived of their opportunity to have their HAMP application, their H4H application properly and timely reviewed, the Plaintiffs suffered irreparable harm.

954.    Defendant OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants further owed the Plaintiffs and others similarly situated the implied obligations of good faith and fair dealing, which covenants are implied in every contract.

955.    Defendant OCWEN, on their own behalf, and on behalf of the co-defendants committed intentional, wanton and willful breaches of the covenants of good faith and fair dealing; intentional, wanton and willful breaches of the agreement with the US Treasury Department; and the Plaintiffs, and others similarly situated were the intended third party beneficiaries of that agreement between Litton Loan Servicing, LP and OCWEN and were harmed as a result of those breaches.

956.    Plaintiffs are entitled to receive compensatory damages according to proof;

957.    Plaintiffs are entitled to receive exemplary damages based on the net worth of OCWEN for their malicious, wanton and willful breaches of the agreement.

958.    Wherefore Plaintiffs respectfully request that the court:

A.    Issue an order requiring OCWEN, Litton Loan Services, LP, on their own behalf, on behalf of each of the co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiffs and dismiss them with prejudice;

B.    Find that Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of each of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

C.    Find that Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of each of the co-defendants, were in breach of the SPA agreement with the US Treasury Department, intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

1.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

2.    The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

3.    The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

4.    The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

5.    The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

6.    The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

7.    The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

8.    Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

D.    Find that Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

260

E.      Find that Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.      Find that Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.      Find that Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.      Find that Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.      Find that Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

J.      Find that Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

K.      Find that Litton Loan Servicing, LP and OCWEN, individually and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.      That the court further grant compensatory damages to Plaintiffs for Litton Loan Servicing, LP and OCWENs' intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.      That the court further grant punitive damages to Plaintiff against OCWEN, on their own behalf, and on behalf of the co-defendants for Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant Litton Loan Servicing, LP and OCWEN, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.      That the court further grant statutory damages of $10,000 per violation, to Plaintiff against OCWEN, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.      That the court order Defendant OCWEN, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of the co-defendants in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

P.      That the court grants to Plaintiff against the Defendant Litton Loan Servicing, LP and OCWEN, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

**COUNT EIGHT TWO**:
**PLAINTIFFS v. OCWEN**

Damages And Declaratory Relief Action For OCWEN's Violation of the FEDERAL FAIR DEBT
COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. § 1692 ET. SEQ

959.    Plaintiffs incorporate paragraphs 1 to 958, inclusive, herein, as though set forth herein in full.

960.    Plaintiffs fall within the class of individuals who are defined by the Statute as consumer—"any natural person obligated or allegedly obligated to pay any debt".

961.    Defendant, OCWEN, on their own behalf, and on behalf of the co-defendants, claims that Plaintiffs owed a consumer debt—"any obligation... [I incurred] primarily for personal, family or household purposes", a mortgage secured by a forged note and deed of trust.

962.    Defendant, OCWEN, on their own behalf, and on behalf of the co-defendants is a debt collector—any person using interstate commerce who regularly collects debts as defined by the statute and as proven by their acts alleged herein.

963.    Each separate letter demanding payment, including billing the Plaintiffs for attorneys' fees and court costs, inspection fees, and all demands for money of any and all kinds, sent by, or demanded on the behalf of OCWEN individually, and on behalf of Defendant RFC Homecomings and GMAC is a separate violation of the FDCPA.

964.    Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
        a.      Statutory Compensatory damages for each separate violation according to proof;
        b.      Exemplary damages for each separate violation based on the net worth of the Defendant, OCWEN;
        c.      Declaratory relief, including permanent injunctive relief, prohibiting OCWEN, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;
        d.      Reasonable attorney's fees and court costs according to proof;
        e.      Such other and further relief as the court deems just and proper.

## COUNT EIGHTY THREE:
## PLAINTIFFS v. OCWEN

Damages And Declaratory Relief Action For OCWEN's Acquisition and Maintenance of an Interest in and
Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18
U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and
18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

965.    Plaintiffs incorporate paragraphs 1 to 964, inclusive, herein, as though set forth herein in full. Substance prevails over form.

966.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

967.    On March 25, 2005, and continuing, through the present, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

968.    Plaintiffs further allege that Defendant OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants, in conjunction with and in furtherance of the conspiracy with all the remaining Defendants, did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(b) supra.

969.    Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.

970.    Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise). OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants, are liable for all wrongful conduct of its co-defendants, and each of them, its lawyers, Shapiro and Fishman and Akerman Senterfitt.

971.    At all times herein, OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants, and each of them, conspired with remaining defendants, to interfere with the quiet enjoyment of Plaintiffs home; steal the equity in the Plaintiff's home; and used a forged promissory note and fraudulent affidavit in a civil court action in order to fraudulently obtain a judgment of foreclosure. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

**COUNT EIGHTY FOUR:**
**PLAINTIFFS v. OCWEN**

Conduct and Participation in a RICO Enterprise
through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

972.    Plaintiffs incorporate paragraphs 1 to 971, inclusive, herein, as though set forth herein in full. Substance prevails over form.

973.    Plaintiffs further incorporate the allegations of the remaining Counts of the rest of this complaint, contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

974.    At various times and places partially enumerated Plaintiff's documentary material, all Defendants, and each of them, did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

975.    Likewise, all Defendants, and each of them, did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

976.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

977.    Plaintiffs further allege that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

978.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

**COUNT EIGHTY FIVE:**
**PLAINTIFFS v. OCWEN**

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

979.     Plaintiffs incorporate paragraphs 1 to 978, inclusive, herein, as though set forth herein in full. Substance prevails over form.

980.     Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

981.     At various times and places as enumerated in Plaintiff's exhibits which are attached hereto, and incorporated herein, all Defendants, and each of them, did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

982.     At various times and places partially enumerated in Plaintiff's documentary material, all Defendants, individually and on behalf of each other, committed acts in furtherance of the conspiracy, did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

983.     During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

984.     Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d) (Prohibited activities supra).

985.     Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.     Statutory Compensatory damages for each separate violation according to proof;

    b.     Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

    c.     Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.     Reasonable attorney's fees and court costs according to proof;

    e.     Such other and further relief as the court deems just and proper.

### COUNT EIGHTY SIX:
### PLAINTIFFS v. OCWEN

Damages And Declaratory Relief Action For OCWEN's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

986.     Plaintiffs incorporate paragraphs 1 to 985, inclusive, herein, as though set forth herein in full. Substance prevails over form.

987.     As alleged herein, Defendant OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants, committed numerous of acts of mail fraud, which is a violation of federal law.

988.     That Defendant OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants, knowingly devised a scheme to defraud or to obtain money or property (or the intangible right of honest services) by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

989.     That OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants, acted with the intent to defraud the Plaintiffs and others (including the US Treasury) to the detriment of the Plaintiffs, and each of them.

990.     That in advancing, furthering, or carrying out the scheme, OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants, used the mails (a private or commercial interstate carrier), or caused the mails (a private or commercial interstate carrier) to be used.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.     Statutory Compensatory damages for each separate violation according to proof;

    b.     Exemplary damages for each separate violation based on the net worth of the Defendant, OCWEN;

c.      Declaratory relief, including permanent injunctive relief, prohibiting OCWEN, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

d.      Reasonable attorney's fees and court costs according to proof;

e.      Such other and further relief as the court deems just and proper.

## COUNT EIGHTY SEVEN:
## PLAINTIFFS v. OCWEN

Damages And Declaratory Relief Action For OCWEN's Violation of the
VIOLATION OF 18 U.S.C. § 1001

991.      Plaintiffs incorporate paragraphs 1 to 990, inclusive, herein, as though set forth herein in full. Substance prevails over form.

992.      Defendant, OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants, violated 18 U.S.C. § 1001 by the conduct complained of herein, and as proven at the time of trial.

993.      Defendant OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants falsified, concealed or covered up by any trick, scheme or device, material facts, including, but not necessarily limited to:

a.      The date of the transfer of the loan from Washington Mutual Bank, FA;

b.      The use of false and misleading language in the affidavit of Debra Lyman.

5.      On March 25, 2005, subsequent to the filing of the foreclosure complaint, the loan was

transferred from Washington Mutual to RFC.  All rights under the note and mortgage

were transferred at that time.

c.      The true facts were, that March 25, 2005 is five days prior to the filing of the lawsuit. The court was misled by Defendant Washington Mutual Bank, FA, Defendant Debra Lyman, Defendant Litton Loan Servicing LP's use of the misleading words "subsequent to the filing of the foreclosure complaint".  Had each of the Defendants informed the court of the true facts, that March 25, 2005, was five days prior to suit being filed, then Washington Mutual Bank, FA would have had no standing to bring the action, and thus the action would have been dismissed.

d.      The Defendant's affidavit was further false in that it claimed Washington Mutual Bank, FA, was entitled to sums that Washington Mutual Bank, FA later admitted were neither due nor owing to them.

e.      In fact, Defendants concealed from the court and failed to inform the court of a credit of $373,907.18 in principal, proving that Washington Mutual Bank, FA, was paid in full and not owed any money from the Plaintiffs.

f.      The Defendants, OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants, filed false affidavits with the court in order to obtain a judgment of foreclosure.

g.      The Defendants, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants also filed a fraudulent affidavit.

h.      The Defendants, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants violated the State and Federal Statutes listed herein and committed other wrongful and intentional misconduct, all according to proof as pled herein.

994.      Defendant OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001 by their made, and / or caused to be made fictitious or fraudulent statements or representations to the Plaintiffs, to the court, and to the US Department of the Treasury; to the OCC; to the FTC; to the State and local authorities, and to the court of appeals.

995.      Defendant OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001by making or using any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, all as alleged herein.

996.      Defendant OCWEN and LITTON, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001, as alleged herein, because the statements made by the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants were all material, and adversely affected the Plaintiffs, the court, the US Government, and others.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.      Statutory Compensatory damages for each separate violation according to proof;

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

## COUNT EIGHTY EIGHT:
### PLAINTIFFS v. OCWEN

Damages And Declaratory Relief Action for OCWEN's Violation of
18 U.S.C. § 1005

997.    Plaintiffs incorporate paragraphs 1 to 996, inclusive, herein, as though set forth herein in full. Substance prevails over form.

998.    Defendant Stephanie Jackson, in furtherance of the co-conspiracies complained of herein, and in order to conceal and misdirect the officials conducting an official investigation, provided false information to the OCC, delivered by means of the US Mail, and across State lines.

999.    The defendant Stephanie Jackson knew that the OCC was conducting a full investigation of the conduct of JPMorgan Chase, the fraudulent affidavit of Debra Lyman and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants and the use of a forged promissory note in obtaining a fraudulent judgment of foreclosure.

1000.    During that investigation stemming from a complaint filed on November 4, 2010, the OCC sent a request for a response from Chase on November 22, 2010, and replied to by Stephanie Jackson on July 28, 2011.

1001.    That letter, dated July 28, 2011 delivered by means of the US Mail, and across State lines, contained numerous lies to the Federal Government with the intention of having the Federal Government cease any further investigation, including the false statement that their name was removed from the lawsuit as a result of the sale of the loan on April 19, 2005 (contrary to the date of March 25, 2005) that Debra Lyman, VP of Litton Loan Services, LP, on their own behalf, on behalf of OCWEN, and the remaining co-defendants swore to in her affidavit to the court.

1002.    The facts are that the name on the action never changed, and the date sold contradicts the sworn testimony of Debra Lyman of Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants.

1003.    The Defendant, Stephanie Jackson, therefore conspired with Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, with the remaining Defendants conspired to, and did falsify information and create false entries in the books and records of JPMorgan Chase Bank with the intent to injure, and defraud the bank, and defraud the Plaintiffs, the courts and the OCC.

1004.    In the letter of July 28, 2011, delivered by means of the US Mail, and across State lines, the attorneys for JPMorgan Chase, Shapiro and Fishman, also lied to JPMorgan Chase and entered, or caused to be entered, false information into the records of the Bank, with the intention of defrauding the Plaintiffs, the OCC and JPMorgan Chase.

1005.    Plaintiffs are informed, believe, and thereon allege, and have incorporated herein, that other false and misleading statements were entered into the books and records of the bank, JP Morgan Chase, Washington Mutual Bank, FA's, and GMAC's Ally Bank, with the intent to defraud the Banks, the Plaintiff, and different branches of the Federal Government, all in violation of the above-stated statute.

1006.    Said false and malicious statements and false entries were designed to, and intended to injure or defraud such banks, and other company, body politic or corporate, and individual person, including the Plaintiffs, and to deceive the officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System.

1007.    Further, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, in concert with, and with the intent to defraud the United States or any agency thereof, or any financial institution referred to in this complaint, participated and shared in and or received (directly or

266

indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution, and should be fined not more than $1,000,000 or imprisoned not more than 30 years, or both pursuant to code.  OCWEN ratified the wrongful conduct by resetting the sale date motion after the sale.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.        Statutory Compensatory damages for each separate violation according to proof;
    b.        Exemplary damages for each separate violation based on the net worth of the Defendant, OCWEN;
    c.        Declaratory relief, including permanent injunctive relief, prohibiting OCWEN, or any of their agents or assigns, from any further breaches of the statute;
    d.        Reasonable attorney's fees and court costs according to proof;
    e.        Such other and further relief as the court deems just and proper.

## COUNT EIGHTY NINE:
## PLAINTIFFS v. OCWEN

Damages And Declaratory Relief Action For OCWEN's Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

    1008.    Plaintiffs incorporate paragraphs 1 to 1007, inclusive, herein, as though set forth herein in full. Substance prevails over form.
    1009.    Regulation B notice is required when the Defendant, Litton Loan Servicing, LP, failed to acknowledge receipt of the HAMP application, thus constituting a denial of the application and denial of credit there under.
    1010.    Pursuant to Regulation B, any denial of credit required Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, to tender a proper notice pursuant to that Regulation B.
    1011.    Each separate act by Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, and RATIFIED BY OCWEN, by its bad faith breach of the Agreement, constituted separate violations of the statutes as alleged in this entire Complaint constitutes grounds for statutory damages payable to the Plaintiffs in the sum of $10,000 per violation, according to proof.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.        Statutory Compensatory damages for each separate violation according to proof;
    b.        Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;
    c.        Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;
    d.        Reasonable attorney's fees and court costs according to proof;
    e.        Such other and further relief as the court deems just and proper.

## COUNT NINETY:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

PENDANT STATE CLAIM
Damages And Declaratory Relief Action For OCWEN's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)

    1012.    Plaintiffs incorporate paragraphs 1 to 1011, inclusive, herein, as though set forth herein in full. Substance prevails over form.
    1013.    Proper demand was made upon Litton on 10/28/2010 pursuant to said statute to provide Plaintiff with an estoppel letter.
    1014.    On February 18, 2011, well past the deadline of the statute, Litton's lawyers sent a letter stating unequivocally that Litton received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".
    1015.    That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law.

267

1016.    That, had Litton Loan Servicing, LP answered, then they would be forced to admit, under oath, that they had no interest in the loan which was the subject of the litigation; would have to admit that Washington Mutual Bank, FA was paid in full; and that there never existed a servicing agreement between Litton Loan Servicing, LP and Washington Mutual Bank, FA. OCWEN, by their purchase of Litton and their bad faith conduct, ratified the conduct of Litton.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP to the extent permitted by law;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

## <u>COUNT ONE</u>:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Damages And Declaratory Relief Action For Failure Of Litton Loan Service To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

Wherefore Plaintiffs respectfully request that the court:

    A.    Issue an order requiring Litton Loan Services, LP, on their own behalf, on behalf of each of the co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiffs and dismiss them with prejudice;

    B.    Find that Litton Loan Services, LP, on their own behalf, and on behalf of each of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

    C.    Find that Litton Loan Services, LP, on their own behalf, and on behalf of each of the co-defendants, were in breach of the SPA agreement with the US Treasury Department, intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

    1.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

    2.    The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

    3.    The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

    4.    The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

    5.    The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

    6.    The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

    7.    The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

268

8.      Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

D.      Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

E.      Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.      Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.      Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.      Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.      Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

J.      Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

K.      Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.      That the court further grant compensatory damages to Plaintiffs for Litton Loan Servicing LPs' intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.      That the court further grant punitive damages to Plaintiff against Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants for Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant Litton Loan Services, LP, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.      That the court further grant statutory damages of $10,000 per violation, to Plaintiff against Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.      That the court order Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

P.      That the court grants to Plaintiff against the Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

**COUNT TWO**:

269

**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the FEDERAL FAIR
DEBT COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. §  1692 ET. SEQ

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
        a.       Statutory Compensatory damages for each separate violation according to proof;
        b.       Exemplary damages for each separate violation based on the net worth of the
Defendant, Litton Loan Servicing, LP;
        c.       Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan
Services, LP, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns,
from any further breaches of the statute;
        d.       Reasonable attorney's fees and court costs according to proof;
        e.       Such other and further relief as the court deems just and proper.
<u>**COUNT THREE**</u>:
**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Damages And Declaratory Relief Action For Litton Loan Service's Acquisition and Maintenance of an
Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18
U.S.C. §§ <u>1961</u>(1)(A) and (B), and did so in violation of the RICO law at <u>18 U.S.C. 1962</u>(b) and
18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
1.        That this Court liberally construe the RICO laws and thereby find that all Defendants, both
jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or
control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom
engaged in, and whose activities did affect, interstate and foreign commerce in violation of <u>18 U.S.C.
1962</u>(b) (Prohibited activities).
2.       That all Defendants and all their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any
interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are
engaged in, or whose activities do affect, interstate or foreign commerce.
3.       That all Defendants and all of their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from committing any more predicate acts in furtherance of the
RICO enterprise alleged in <u>COUNT ONE</u> supra.
4.       That all Defendants be required to account for all of their gains, profits, and advantages derived
from their several acts of racketeering activity in violation of <u>18 U.S.C. 1962</u>(b) and from all other
violation(s) of applicable State and federal law(s).
5.       That judgment be entered for Plaintiff and against all Defendants, jointly and severally, for
Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of <u>18
U.S.C. 1962</u>(b), according to the best available proof.
6.       That all Defendants pay to Plaintiff treble (triple) damages, under authority of <u>18 U.S.C. 1964</u>(c),
for any gains, profits, or advantages attributable to all violations of <u>18 U.S.C. 1962</u>(b), according to the best
available proof, or, an amount permitted by law.
7.       That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of
Defendants' several violations of <u>18 U.S.C. 1962</u>(b), according to the best available proof.
8.       That all Defendants pay to Plaintiff their costs of the lawsuit incurred herein including, but not
limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at an
amount according to proof.
9.       That all damages caused by all Defendants, and all gains, profits, and advantages derived by all
Defendants, from their several acts of racketeering in violation of <u>18 U.S.C. 1962</u>(b) and from all other

violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

10.      That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

11.      Such other and further relief as the court deems just and proper.

**COUNT FOUR**:
**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Conduct and Participation in a RICO Enterprise
through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.      That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with, conducted and participated in a RICO Enterprise through a Pattern of Racketeering Activity RICO enterprise of persons and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at 18 U.S.C. §§ 1961(5), 1962(c)  (Prohibited activities).

2.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) supra.

3.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

4.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

5.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT TWO supra.

6.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s).

7.      That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof.

8.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof, or the maximum permitted by law.

9.      That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c)supra, according to the best available proof.

10.      That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, in an amount according to proof.

11.      That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

12.      That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

271

**COUNT FIVE**:
**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§1961(5), 1962(b) and (d) supra.

2.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) supra.

3.      That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO enterprise that engages in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d)supra.

4.      That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d)supra.

5.      That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged herein throughout the complaint.

6.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s).

7.      That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof.

8.      That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof or the maximum permitted by law.

9.      That all Defendants pay to Plaintiff all damages sustained by Plaintiff as a consequence of Defendants' several violations of 18 U.S.C. 1962(d)supra, according to the best available proof.

10.     That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, according to proof.

11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign for the benefit of Plaintiffs, their heirs and assigns.

12. That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

**COUNT SIX**:
**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.      Statutory Compensatory damages for each separate violation according to proof;

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

## COUNT SEVEN:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the
VIOLATION OF 18 U.S.C. § 1001

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.      Statutory Compensatory damages for each separate violation according to proof;

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

## COUNT EIGHT:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Damages And Declaratory Relief Action for Litton Loan Service's Violation of
18 U.S.C. § 1005

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.      Statutory Compensatory damages for each separate violation according to proof;

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

## COUNT NINE:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.      Statutory Compensatory damages for each separate violation according to proof;

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

## COUNT TEN:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

PENDANT STATE CLAIM

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the

FLORIDA STATUTE CHAPTER 701.04 (1)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.         Statutory Compensatory damages for each separate violation according to proof;

b.         Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP to the extent permitted by law;

c.         Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d.         Reasonable attorney's fees and court costs according to proof;

e.         Such other and further relief as the court deems just and proper.

## <u>COUNT ELEVEN</u>:
## PLAINTIFFS v. GMAC MORTGAGE, LLC

Damages And Declaratory Relief Action For Failure GMAC Mortgage LLC's Failure To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

Wherefore Plaintiffs respectfully request that the court:

A.         Issue an order requiring GMAC, jointly and severally, with the remaining co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiff and dismiss them with prejudice;

B.         Find that GMAC, on their own behalf, and on behalf of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that [GMAC and Litton Loan Services, LP], on their own behalf, and on behalf of the remaining co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

C.         Find that GMAC, on their own behalf, and on behalf of the remaining co-defendants, were in breach of the SPA agreement with the US Treasury Department, intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

1.         Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

2.         The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

3.         The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

4.         The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

5.         The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

6.         The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

7.         The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

8.         Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

274

D.      Find that GMAC, on their own behalf, and on behalf of the remaining co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

E.      Find that GMAC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.      Find that GMAC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.      Find that GMAC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.      Find that GMAC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.      Find that GMAC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

J.      Find that GMAC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

K.      Find that GMAC, individually, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.      That the court further grant compensatory damages to Plaintiffs for GMACs' intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.      That the court further grant punitive damages to Plaintiffs against GMAC, on their own behalf, and on behalf of the co-defendants for GMAC, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant GMAC, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.      That the court further grant statutory damages of $10,000 per violation, to Plaintiff against GMAC, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that GMAC, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.      That the court order Defendant GMAC, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of GMAC and its agents, in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

P.      That the court grants to Plaintiff against the Defendant GMAC, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

## <u>COUNT TWELVE</u>:
## PLAINTIFFS v. GMAC

Damages And Declaratory Relief Action For GMAC's Violation of the FEDERAL  FAIR DEBT
COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. §  1692 ET. SEQ

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
        a.      Statutory Compensatory damages for each separate violation according to proof;
        b.      Exemplary damages for each separate violation based on the net worth of the
Defendant, GMAC to the extent permitted by law;
        c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan
Services, LP, on their own behalf, and on behalf of the co-defendant GMAC, or any of their successors,
agents or assigns, from any further breaches of the statute;
        d.      Reasonable attorney's fees and court costs according to proof;
        e.      Such other and further relief as the court deems just and proper.

**COUNT THIRTEEN**:

**PLAINTIFFS v. GMAC**

Damages And Declaratory Relief Action For GMAC's Acquisition and Maintenance of an Interest in and
Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18
U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and
18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
1.      That this Court liberally construe the RICO laws and thereby find that all Defendants, both
jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or
control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom
engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C.
1962(b) (Prohibited activities).
2.      That all Defendants and all their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any
interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are
engaged in, or whose activities do affect, interstate or foreign commerce.
3.      That all Defendants and all of their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from committing any more predicate acts in furtherance of the
RICO enterprise alleged in COUNT ONE supra.
4.      That all Defendants be required to account for all of their gains, profits, and advantages derived
from their several acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other
violation(s) of applicable State and federal law(s).
5.      That judgment be entered for Plaintiff and against all Defendants, jointly and severally, for
Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18
U.S.C. 1962(b), according to the best available proof.
6.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c),
for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best
available proof, or, an amount permitted by law.
7.      That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of
Defendants' several acts of racketeering in violation of 18 U.S.C. 1962(b), according to the best available proof.
8.      That all Defendants pay to Plaintiff their costs of the lawsuit incurred herein including, but not
limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at an
amount according to proof.
9.      That all damages caused by all Defendants, and all gains, profits, and advantages derived by all
Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other
violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally
foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

276

10.      That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

11.      Such other and further relief as the court deems just and proper.

**COUNT FOURTEEN**:
**PLAINTIFFS v. GMAC**

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.      That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with, conducted and participated in a RICO Enterprise through a Pattern of Racketeering Activity RICO enterprise of persons and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at 18 U.S.C. §§ 1961(5), 1962(c)  (Prohibited activities).

2.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) supra.

3.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

4.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

5.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT TWO supra.

6.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s).

7.      That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof.

8.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof, or the maximum permitted by law.

9.      That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c)supra, according to the best available proof.

10.      That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, in an amount according to proof.

11.      That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

12.      That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

**COUNT FIFTEEN**:
**PLAINTIFFS v. GMAC**

277

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
1.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§1961(5), 1962(b) and (d) supra.
2.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) supra.
3.      That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO enterprise that engages in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d)supra.
4.      That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d)supra.
5.      That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged herein throughout the complaint.
6.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s).
7.      That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof.
8.      That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof or the maximum permitted by law.
9.      That all Defendants pay to Plaintiff all damages sustained by Plaintiff as a consequence of Defendants' several violations of 18 U.S.C. 1962(d)supra, according to the best available proof.
10.     That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, according to proof.
11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign for the benefit of Plaintiffs, their heirs and assigns.
12.     That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## COUNT SIXTEEN:
## PLAINTIFFS v. GMAC

Damages And Declaratory Relief Action for GMAC's Violation of the MAIL AND WIRE FRAUD 18
U.S.C., SECTIONS 1341, 1343

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
        a.      Statutory Compensatory damages for each separate violation according to proof;

b.       Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC to the extent permitted by law;

c.       Declaratory relief, including permanent injunctive relief, prohibiting GMAC, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

d.       Reasonable attorney's fees and court costs according to proof;

e.       Such other and further relief as the court deems just and proper.

**COUNT SEVENTEEN**:
**PLAINTIFFS v. GMAC**

Damages And Declaratory Relief Action For GMAC's Violation of the
VIOLATION OF 18 U.S.C. § 1001

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.       Statutory Compensatory damages for each separate violation according to proof;

b.       Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC;

c.       Declaratory relief, including permanent injunctive relief, prohibiting GMAC, or any of their loan servicers, agents or assigns, from any further breaches of the statute;

d.       Reasonable attorney's fees and court costs according to proof;

e.       Such other and further relief as the court deems just and proper.

**COUNT EIGHTEEN**:
**PLAINTIFFS v. GMAC**

Damages And Declaratory Relief Action for GMAC's Violation of
18 U.S.C. § 1005

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.       Statutory Compensatory damages for each separate violation according to proof;

b.       Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC to the extent permitted by law;

c.       Declaratory relief, including permanent injunctive relief, prohibiting GMAC, their servicing agent, Litton Loan Servicing, or any of their successor agents or assigns, from any further breaches of the statute;

d.       Reasonable attorney's fees and court costs according to proof;

e.       Such other and further relief as the court deems just and proper.

**COUNT NINETEEN**:
**PLAINTIFFS v. GMAC**

Damages And Declaratory Relief Action For GMACs Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.       Statutory Compensatory damages for each separate violation according to proof;

b.       Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC to the extent permitted by law;

c.       Declaratory relief, including permanent injunctive relief, prohibiting GMAC or their servicing agent, Litton Loan Servicing, or any of their successors, agents or assigns, from any further breaches of the statute;

d.       Reasonable attorney's fees and court costs according to proof;

e.       Such other and further relief as the court deems just and proper.

**COUNT TWENTY**:
**PLAINTIFFS v. GMAC**

PENDANT STATE CLAIM

279

Damages And Declaratory Relief Action for GMAC's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)
Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.      Statutory Compensatory damages for each separate violation according to proof;

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, GMAC to the extent permitted by law;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

### COUNT TWENTY ONE:
### PLAINTIFFS v. RFC

Damages And Declaratory Relief Action For Failure RFC HOMECOMINGS, LLC Failure To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

Wherefore Plaintiffs respectfully request that the court:

      A.      Issue an order requiring RFC, jointly and severally, with the remaining co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiff and dismiss them with prejudice;

      B.      Find that RFC, on their own behalf, and on behalf of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that [RFC and Litton Loan Services, LP], on their own behalf, and on behalf of the remaining co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

      C.      Find that RFC, on their own behalf, and on behalf of the remaining co-defendants, were in breach of the SPA agreement with the US Treasury Department, intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

      1.      Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

      2.      The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

      3.      The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

      4.      The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

      5.      The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

      6.      The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

      7.      The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

      8.      Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

      D.      Find that RFC, on their own behalf, and on behalf of the remaining co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

280

E.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

J.      Find that RFC, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

K.      Find that RFC on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.      That the court further grant compensatory damages to Plaintiffs for RFCs' intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred dollars;

M.      That the court further grant punitive damages to Plaintiffs against RFC, on their own behalf, and on behalf of the co-defendants for RFC, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant RFC, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.      That the court further grant statutory damages of $10,000 per violation, to Plaintiff against RFC, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant RFC, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.      That the court order Defendant RFC, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of RFC and its agents, in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

P.      That the court grants to Plaintiff against the Defendant RFC, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

## COUNT TWENTY TWO:
## PLAINTIFFS v. RFC

Damages And Declaratory Relief Action For RFC's Violation of the FEDERAL  FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. §  1692 ET. SEQ

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

281

a.      Statutory Compensatory damages for each separate violation according to proof;

b.      Exemplary damages for each separate violation based on the net worth of the Defendant, RFC to the extent permissible by law;

c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC, or any of their successors, agents or assigns, from any further breaches of the statute;

d.      Reasonable attorney's fees and court costs according to proof;

e.      Such other and further relief as the court deems just and proper.

## COUNT TWENTY THREE
## PLAINTIFFS v. RFC

Damages And Declaratory Relief Action For RFC's Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and 18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.      That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

2.      That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

3.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT ONE supra.

4.      That all Defendants be required to account for all of their gains, profits, and advantages derived from their several acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

5.      That judgment be entered for Plaintiff and against all Defendants, jointly and severally, for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

6.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof, or, an amount permitted by law.

7.      That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

8.      That all Defendants pay to Plaintiff their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at an amount according to proof.

9.      That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

10.     That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

11.     Such other and further relief as the court deems just and proper.

## COUNT TWENTY FOUR
## PLAINTIFFS v. RFC

Conduct and Participation in a RICO Enterprise
through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

1.      That this Court liberally construe the RICO laws and thereby find that all Defendants have
associated with, conducted and participated in a RICO Enterprise through a Pattern of Racketeering
Activity RICO enterprise of persons and of other individuals who were associated in fact, all of whom did
engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law
at 18 U.S.C. §§ 1961(5), 1962(c)  (Prohibited activities).

2.      That this Court liberally construe the RICO laws and thereby find that all Defendants have
conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern
of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined)
and 1962(c) supra.

3.      That all Defendants and all of their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other
individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign
commerce.

4.      That all Defendants and all of their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the
conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the
RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

5.      That all Defendants and all of their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from committing any more predicate acts in furtherance of the
RICO enterprise alleged in COUNT TWO supra.

6.      That all Defendants be required to account for all gains, profits, and advantages derived from their
several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of
applicable State and federal law(s).

7.      That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages,
and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according
to the best available proof.

8.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c),
for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to
the best available proof, or the maximum permitted by law.

9.      That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of
Defendants' several violations of 18 U.S.C. 1962(c)supra, according to the best available proof.

10.     That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not
limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, in an
amount according to proof.

11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all
Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all
other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally
foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

12.     That Plaintiffs have such other and further relief as this Court deems just and proper, under the full
range of relevant circumstances which have occasioned the instant action.

**COUNT TWENTY FIVE**
**PLAINTIFFS v. RFC**

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.       That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§1961(5), 1962(b) and (d) supra.

2.       That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) supra.

3.       That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO enterprise that engages in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d)supra.

4.       That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d)supra.

5.       That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged herein throughout the complaint.

6.       That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s).

7.       That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof.

8.       That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof or the maximum permitted by law.

9.       That all Defendants pay to Plaintiff all damages sustained by Plaintiff as a consequence of Defendants' several violations of 18 U.S.C. 1962(d)supra, according to the best available proof.

10.      That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, according to proof.

11.      That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign for the benefit of Plaintiffs, their heirs and assigns.

12.  That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## COUNT TWENTY SIX
## PLAINTIFFS v. RFC

Damages And Declaratory Relief Action for GMAC's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

        a.       Statutory Compensatory damages for each separate violation according to proof;
        b.       Exemplary damages for each separate violation based on the net worth of the Defendant, RFC, to the extent permitted by law;
        c.       Declaratory relief, including permanent injunctive relief, prohibiting RFC, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;
        d.       Reasonable attorney's fees and court costs according to proof;

e.        Such other and further relief as the court deems just and proper.
## COUNT TWENTY SEVEN:
### Plaintiffs v. RFC


Damages And Declaratory Relief Action For Litton Loan Service's Violation of the
VIOLATION OF 18 U.S.C. § 1001
Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.        Statutory Compensatory damages for each separate violation according to proof;

b.        Exemplary damages for each separate violation based on the net worth of the Defendant, RFC;

c.        Declaratory relief, including permanent injunctive relief, prohibiting RFC, or any of their loan servicers, agents or assigns, from any further breaches of the statute;

d.        Reasonable attorney's fees and court costs according to proof;

e.        Such other and further relief as the court deems just and proper.

## COUNT TWENTY EIGHT
### Plaintiffs v. RFC


Damages And Declaratory Relief Action for RFC's Violation of
18 U.S.C. § 1005


Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.        Statutory Compensatory damages for each separate violation according to proof;

b.        Exemplary damages for each separate violation based on the net worth of the Defendant, RFC, to the extent permitted by law;

c.        Declaratory relief, including permanent injunctive relief, prohibiting RFC, their servicing agent, Litton Loan Servicing, or any of their successor agents or assigns, from any further breaches of the statute;

d.        Reasonable attorney's fees and court costs according to proof;

e.        Such other and further relief as the court deems just and proper.


## COUNT TWENTY NINE:
### PLAINTIFFS v. RFC


Damages And Declaratory Relief Action For RFC's Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B


Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.        Statutory Compensatory damages for each separate violation according to proof;

b.        Exemplary damages for each separate violation based on the net worth of the Defendant, RFC, to the extent permitted by law;

c.        Declaratory relief, including permanent injunctive relief, prohibiting RFC or their servicing agent, Litton Loan Servicing, or any of their successors, agents or assigns, from any further breaches of the statute;

d.        Reasonable attorney's fees and court costs according to proof;

e.        Such other and further relief as the court deems just and proper.

## COUNT THIRTY


PLAINTIFFS v. RFC


PENDANT STATE CLAIM
Damages And Declaratory Relief Action for GMAC's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

     a.      Statutory Compensatory damages for each separate violation according to proof;

     b.      Exemplary damages for each separate violation based on the net worth of the Defendant, RFC, to the extent permitted by law;

     c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

     d.      Reasonable attorney's fees and court costs according to proof;

     e.      Such other and further relief as the court deems just and proper.

<u>**COUNT THIRTY ONE**</u>
**PLAINTIFFS v. ALLY FINANCIAL INC**

Damages And Declaratory Relief Action For Failure ALLY FINANICAL INC.'s Failure To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

Wherefore Plaintiffs respectfully request that the court:

     A.      Issue an order requiring ALLY, jointly and severally, with the remaining co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiff and dismiss them with prejudice;

     B.      Find that ALLY, on their own behalf, and on behalf of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that [GMAC on behalf of ALLY and Litton Loan Services, LP], on their own behalf, and on behalf of the remaining co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

     C.      Find that ALLY, on their own behalf, and on behalf of the remaining co-defendants, were in breach of the SPA agreement with the US Treasury Department, intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

     1.      Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

     2.      The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

     3.      The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

     4.      The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

     5.      The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

     6.      The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

     7.      The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

     8.      Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

     D.      Find that ALLY, on their own behalf, and on behalf of the remaining co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

286

E.      Find that ALLY, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.      Find that ALLY, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.      Find that ALLY, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.      Find that ALLY, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.      Find that ALLY, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

J.      Find that ALLY, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

K.      Find that ALLY, individually, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.      That the court further grant compensatory damages to Plaintiffs for ALLYs' intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.      That the court further grant punitive damages to Plaintiffs against ALLY, on their own behalf, and on behalf of the co-defendants for ALLY, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant ALLY, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.      That the court further grant statutory damages of $10,000 per violation, to Plaintiff against ALLY, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant ALLY, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.      That the court order Defendant ALLY, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of ALLY and its agents, in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

P.      That the court grants to Plaintiff against the Defendant ALLY, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

## COUNT THIRTY TWO
## PLAINTIFFS v. ALLY

Damages And Declaratory Relief Action For ALLY's Violation of the FEDERAL  FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C.  §  1692 ET. SEQ

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

        a.        Statutory Compensatory damages for each separate violation according to proof;

        b.        Exemplary damages for each separate violation based on the net worth of the Defendant, ALLY to the extent permitted by law;

        c.        Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant ALLY, or any of their successors, agents or assigns, from any further breaches of the statute;

        d.        Reasonable attorney's fees and court costs according to proof;

        e.        Such other and further relief as the court deems just and proper.

### COUNT THIRTY THREE
### PLAINTIFFS v. ALLY

Damages And Declaratory Relief Action For ALLY's Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and 18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.        That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

2.        That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

3.        That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT ONE supra.

4.        That all Defendants be required to account for all of their gains, profits, and advantages derived from their several acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

5.        That judgment be entered for Plaintiff and against all Defendants, jointly and severally, for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

6.        That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof, or, an amount permitted by law.

7.        That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

8.        That all Defendants pay to Plaintiff their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at an amount according to proof.

9.        That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

10.      That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

11.      Such other and further relief as the court deems just and proper.

### COUNT THIRTY FOUR

**PLAINTIFFS v. ALLY**

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

1.      That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with, conducted and participated in a RICO Enterprise through a Pattern of Racketeering Activity RICO enterprise of persons and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at 18 U.S.C. §§ 1961(5), 1962(c)  (Prohibited activities).

2.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) supra.

3.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

4.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

5.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT TWO supra.

6.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s).

7.      That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof.

8.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof, or the maximum permitted by law.

9.      That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c)supra, according to the best available proof.

10.      That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, in an amount according to proof.

11.      That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

12.      That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

**COUNT THIRTY FIVE**
**PLAINTIFFS v. ALLY**

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

1.      That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with, conducted and participated in a RICO Enterprise through a Pattern of Racketeering Activity RICO enterprise of persons and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at 18 U.S.C. §§ 1961(5), 1962(c)  (Prohibited activities).

2.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) supra.

3.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

4.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

5.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT TWO supra.

6.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s).

7.      That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof.

8.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof, or the maximum permitted by law.

9.      That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c)supra, according to the best available proof.

10.     That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, in an amount according to proof.

11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

12.     That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## COUNT THIRTY SIX
## PLAINTIFFS v. ALLY

Damages And Declaratory Relief Action for ALLY's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

1.      That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with, conducted and participated in a RICO Enterprise through a Pattern of Racketeering Activity RICO enterprise of persons and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at 18 U.S.C. §§ 1961(5), 1962(c)  (Prohibited activities).

2.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern

of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined)
and 1962(c) supra.

3.      That all Defendants and all of their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other
individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign
commerce.

4.      That all Defendants and all of their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the
conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the
RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

5.      That all Defendants and all of their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from committing any more predicate acts in furtherance of the
RICO enterprise alleged in COUNT TWO supra.

6.      That all Defendants be required to account for all gains, profits, and advantages derived from their
several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of
applicable State and federal law(s).

7.      That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages,
and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according
to the best available proof.

8.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c),
for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to
the best available proof, or the maximum permitted by law.

9.      That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of
Defendants' several violations of 18 U.S.C. 1962(c)supra, according to the best available proof.

10.     That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not
limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, in an
amount according to proof.

11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all
Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all
other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally
foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

12.     That Plaintiffs have such other and further relief as this Court deems just and proper, under the full
range of relevant circumstances which have occasioned the instant action.

## COUNT THIRTY SEVEN
### PLAINTIFFS v. ALLY

Damages And Declaratory Relief Action For ALLY's Violation of the
VIOLATION OF 18 U.S.C. § 1001

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.      Statutory Compensatory damages for each separate violation according to proof;

b.      Exemplary damages for each separate violation based on the net worth of the Defendant,
ALLY, to the extent permitted by law;

c.      Declaratory relief, including permanent injunctive relief, prohibiting ALLY, or any of
their loan servicers, agents or assigns, from any further breaches of the statute;

d.      Reasonable attorney's fees and court costs according to proof;

e.      Such other and further relief as the court deems just and proper.

## COUNT THIRTY EIGHT
### PLAINTIFFS v. ALLY

Damages And Declaratory Relief Action for ALLY's Violation of
18 U.S.C. § 1005

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
      a.      Statutory Compensatory damages for each separate violation according to proof;
      b.      Exemplary damages for each separate violation based on the net worth of the Defendant,
ALLY to the extent permitted by law;
      c.      Declaratory relief, including permanent injunctive relief, prohibiting ALLY, their
servicing agent, Litton Loan Servicing, or any of their successor agents or assigns, from any further
breaches of the statute;
      d.      Reasonable attorney's fees and court costs according to proof;
      e.      Such other and further relief as the court deems just and proper.

## COUNT THIRTY NINE
### PLAINTIFFS v. ALLY

Damages And Declaratory Relief Action For ALLYs Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
      a.      Statutory Compensatory damages for each separate violation according to proof;
      b.      Exemplary damages for each separate violation based on the net worth of the Defendant,
ALLY to the extent permitted by law;
      c.      Declaratory relief, including permanent injunctive relief, prohibiting ALLY or their
servicing agent, Litton Loan Servicing, or any of their successors, agents or assigns, from any further
breaches of the statute;
      d.      Reasonable attorney's fees and court costs according to proof;
      e.      Such other and further relief as the court deems just and proper.

## COUNT FORTY
### PLAINTIFFS v. ALLY

PENDANT STATE CLAIM
Damages And Declaratory Relief Action for ALLY's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)
Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
      a.      Statutory Compensatory damages for each separate violation according to proof;
      b.      Exemplary damages for each separate violation based on the net worth of the Defendant,
ALLY to the extent permitted by law;
      c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan
Servicing, or any of their agents or assigns, from any further breaches of the statute;
      d.      Reasonable attorney's fees and court costs according to proof;
      e.      Such other and further relief as the court deems just and proper.

## COUNT FORTY ONE
### PLAINTIFFS v. JP MORGAN CHASE & CO

Damages And Declaratory Relief Action For Failure CHASE's Failure To Acknowledge Receipt Of
HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations
Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home
Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF
CONTRACT THIRD PARTY BENEFICIARY

Wherefore Plaintiffs respectfully request that the court:
      A.      Issue an order requiring CHASE, jointly and severally, with the remaining co-
defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiff and
dismiss them with prejudice;
      B.      Find that CHASE, on their own behalf, and on behalf of the co-defendants
committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that
[GMAC on behalf of CHASE and Litton Loan Services, LP], on their own behalf, and on behalf of the

292

remaining co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

      C.     Find that CHASE, on their own behalf, and on behalf of the remaining co-defendants, were in breach of the SPA agreement with the US Treasury Department intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

          1.     Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

          2.     The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

          3.     The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

          4.     The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

          5.     The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

          6.     The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

          7.     The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

          8.     Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

      D.     Find that CHASE, on their own behalf, and on behalf of the remaining co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

      E.     Find that CHASE, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

      F.     Find that CHASE, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

      G.     Find that CHASE, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

      H.     Find that CHASE, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

      I.     Find that CHASE, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

      J.     Find that CHASE, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

      K.     Find that CHASE, individually, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

293

L.      That the court further grant compensatory damages to Plaintiffs for CHASE'S intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.      That the court further grant punitive damages to Plaintiffs against CHASE, on their own behalf, and on behalf of the co-defendants for CHASE, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant CHASE, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.      That the court further grant statutory damages of $10,000 per violation, to Plaintiff against CHASE, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant CHASE, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.      That the court order Defendant CHASE, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of CHASE and its agents, in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

P.      That the court grants to Plaintiff against the Defendant CHASE, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

## COUNT FORTY TWO
## PLAINTIFFS v. CHASE

Damages And Declaratory Relief Action For CHASE's Violation of the FEDERAL  FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. §  1692 ET. SEQ

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
   a.      Statutory Compensatory damages for each separate violation according to proof;
   b.      Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE to the extent permitted by law;
   c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant CHASE, or any of their successors, agents or assigns, from any further breaches of the statute;
   d.      Reasonable attorney's fees and court costs according to proof;
   e.      Such other and further relief as the court deems just and proper.

## COUNT FORTY THREE
## PLAINTIFFS v. CHASE

Damages And Declaratory Relief Action For CHASE's Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and 18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
      Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
1.      That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

294

2.        That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

3.        That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT ONE supra.

4.        That all Defendants be required to account for all of their gains, profits, and advantages derived from their several acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

5.        That judgment be entered for Plaintiff and against all Defendants, jointly and severally, for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

6.        That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof, or, an amount permitted by law.

7.        That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

8.         That all Defendants pay to Plaintiff their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at an amount according to proof.

9.        That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

10.        That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

11.        Such other and further relief as the court deems just and proper.

### COUNT FORTY FOUR
### PLAINTIFFS v. CHASE

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

1.        That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with, conducted and participated in a RICO Enterprise through a Pattern of Racketeering Activity RICO enterprise of persons and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at 18 U.S.C. §§ 1961(5), 1962(c)  (Prohibited activities).

2.        That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) supra.

3.        That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

4.        That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

5.        That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT TWO supra.

6.        That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s).

7.        That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof.

8.        That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof, or the maximum permitted by law.

9.        That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c)supra, according to the best available proof.

10.        That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, in an amount according to proof.

11.        That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

12.        That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## COUNT FORTY FIVE
## PLAINTIFFS v. CHASE

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)


Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.        That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§1961(5), 1962(b) and (d) supra.

2.        That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) supra.

3.        That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO enterprise that engages in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d)supra.

4.        That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d)supra.

5.        That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged herein throughout the complaint.

6.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s).

7.      That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof.

8.      That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof or the maximum permitted by law.

9.      That all Defendants pay to Plaintiff all damages sustained by Plaintiff as a consequence of Defendants' several violations of 18 U.S.C. 1962(d)supra, according to the best available proof.

10.     That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, according to proof.

11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign for the benefit of Plaintiffs, their heirs and assigns.

12.  That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## COUNT FORTY SIX
## PLAINTIFFS v. CHASE

Damages And Declaratory Relief Action for CHASE's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

     a.      Statutory Compensatory damages for each separate violation according to proof;

     b.      Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE to the extent permitted by law;

     c.      Declaratory relief, including permanent injunctive relief, prohibiting CHASE, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

     d.      Reasonable attorney's fees and court costs according to proof;

     e.      Such other and further relief as the court deems just and proper.

## COUNT FORTY SEVEN
## PLAINTIFFS v. CHASE

Damages And Declaratory Relief Action For CHASE's Violation of the VIOLATION OF 18 U.S.C. § 1001

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

     a.      Statutory Compensatory damages for each separate violation according to proof;

     b.      Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE, to the extent permitted by law;

     c.      Declaratory relief, including permanent injunctive relief, prohibiting CHASE, or any of their loan servicers, agents or assigns, from any further breaches of the statute;

     d.      Reasonable attorney's fees and court costs according to proof;

     e.      Such other and further relief as the court deems just and proper.

## COUNT FORTY EIGHT
## PLAINTIFFS v. CHASE

Damages And Declaratory Relief Action for CHASE's Violation of 18 U.S.C. § 1005

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

     a.      Statutory Compensatory damages for each separate violation according to proof;

   b.  Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE to the extent permitted by law;

   c.  Declaratory relief, including permanent injunctive relief, prohibiting CHASE, their servicing agent, Litton Loan Servicing, or any of their successor agents or assigns, from any further breaches of the statute;

   d.  Reasonable attorney's fees and court costs according to proof;

   e.  Such other and further relief as the court deems just and proper.

## COUNT FORTY NINE
## PLAINTIFFS v. CHASE

Damages And Declaratory Relief Action For CHASEs Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

   a.  Statutory Compensatory damages for each separate violation according to proof;

   b.  Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE to the extent permitted by law;

   c.  Declaratory relief, including permanent injunctive relief, prohibiting CHASE or their servicing agent, Litton Loan Servicing, or any of their successors, agents or assigns, from any further breaches of the statute;

   d.  Reasonable attorney's fees and court costs according to proof;

   e.  Such other and further relief as the court deems just and proper.

## COUNT FIFTY
## PLAINTIFFS v. CHASE

PENDANT STATE CLAIM
Damages And Declaratory Relief Action for CHASE's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

   a.  Statutory Compensatory damages for each separate violation according to proof;

   b.  Exemplary damages for each separate violation based on the net worth of the Defendant, CHASE to the extent permitted by law;

   c.  Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

   d.  Reasonable attorney's fees and court costs according to proof;

   e.  Such other and further relief as the court deems just and proper.

Defendant Washington Mutual Bank, FA, (1) refusal to acknowledge receipt of Plaintiffs application which met all the terms and conditions and were in compliance with the requirements of HOME AFFORDABLE MODIFICATION PROGRAM (HAMP), refusal to comply with the obligations of the HAMP program, refusal to even consider the Plaintiffs application under the HAMP, refusal to appoint a single point of contact under HAMP, refusal to provide Plaintiffs a TPP, refusal to stay a pending proceeding pursuant to HAMP, and failure and refusal to perform any and all of the obligations owed Plaintiff under HAMP; (2) refusal to notify the Plaintiffs of their rights to apply for, nor did Defendants comply with the requirements of HELP FOR HOMEOWNERS (H4H); (3) commission of violations of Regulation D; (4) commission of mail fraud (18 U.S.C., SECTIONS 1341, 1343); (5) commission of bank fraud (18 U.S.C. 1341, 1344); (6) lying to and providing false information to agents of the Federal Government (OCC) conducting an official investigation (18 U.S.C. § 1001 and 18 U.S.C. § 1005); (7) continuing to do business in violation of the cease and desist orders of the OTS and Federal Court Receivership (now OCC); (8) Failing to comply with the "consent order" for JP Morgan Chase which required the Defendant to engage an independent firm to conduct a multi-faceted review of foreclosure actions. The third-party consultant will assess whether foreclosures complied with federal and state laws, whether foreclosures occurred when grounds for foreclosure were not present, such as when loans were performing, and whether any errors, misrepresentations or other deficiencies resulted in financial injury to borrowers. As part of that review, the

enforcement actions require each servicer to establish a process for borrowers who to request their case be reviewed and considered for remediation if they believe they have suffered financial harm as a result of improper foreclosure actions.

Each servicer must submit a plan to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the independent consultant's findings as required by the OCC; (9) lying to and providing false information to agents of the Federal Government (OCC) conducting an official investigation in criminal violation of 18 U.S.C. § 1001 and 18 U.S.C. § 1005; (10) violating the RICO act; (11) commission of civil conspiracy; and (12) filing false documents with the court in a foreclosure action (a false affidavit and a forged promissory note); (13) willful, intentional, and stated refusal to comply with Florida Statute 701.04 (1) after proper demand; (14) perjury and the other wrongful acts complained of herein, and proven at the time of trial. Plaintiffs are entitled, and are seeking a Declaratory relief order from this Court, finding that the judgment of foreclosure was obtained in violation of the Constitutional rights of the Plaintiffs; was obtained by means of fraud; and an order setting aside the judgment of foreclosure that was fraudulently obtained, and obtained in violation of the US and State Constitutional Rights of the Plaintiffs, including, but not limited to 5th Amendment Due Process Violations; and as authorized by Florida Statutes Florida Rule of Civil Procedure 1.540, et seq.

## COUNT FIFTY ONE
### PLAINTIFFS v. WASHINGTON MUTUAL BANK, FA

Damages And Declaratory Relief Action For Failure WASHINGTON MUTUAL BANK FA's Failure To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

Wherefore Plaintiffs respectfully request that the court:

      A.      Issue an order requiring WAMU, jointly and severally, with the remaining co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiff and dismiss them with prejudice;

      B.      Find that WAMU, on their own behalf, and on behalf of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that [CHASE on behalf of WAMU and Litton Loan Services, LP], on their own behalf, and on behalf of the remaining co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

      C.      Find that WAMU, on their own behalf, and on behalf of the remaining co-defendants, were in breach of the SPA agreement with the US Treasury Department intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

      1.      Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

      2.      The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

      3.      The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

      4.      The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

      5.      The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

      6.      The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

7.        The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

8.        Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

D.        Find that WAMU, on their own behalf, and on behalf of the remaining co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

E.        Find that WAMU, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.        Find that WAMU, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.        Find that WAMU, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.        Find that WAMU, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.        Find that WAMU, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

J.        Find that WAMU, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

K.        Find that WAMU, individually, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.        That the court further grant compensatory damages to Plaintiffs for WAMU'S intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.        That the court further grant punitive damages to Plaintiffs against WAMU, on their own behalf, and on behalf of the co-defendants for WAMU, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant WAMU, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.        That the court further grant statutory damages of $10,000 per violation, to Plaintiff against WAMU, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant WAMU, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.        That the court order Defendant WAMU, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of WAMU and its agents, in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

P.        That the court grants to Plaintiff against the Defendant WAMU, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

300

**COUNT FIFTY TWO**
**PLAINTIFFS v. WAMU**

Damages And Declaratory Relief Action For WAMU's Violation of the FEDERAL  FAIR DEBT
COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. §  1692 ET. SEQ

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.    Statutory Compensatory damages for each separate violation according to proof;

    b.    Exemplary damages for each separate violation based on the net worth of the
Defendant, WAMU to the extent permitted by law;

    c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan
Services, LP, on their own behalf, and on behalf of the co-defendant WAMU, or any of their successors,
agents or assigns, from any further breaches of the statute;

    d.    Reasonable attorney's fees and court costs according to proof;

    e.    Such other and further relief as the court deems just and proper.

**COUNT FIFTY THREE**
**PLAINTIFFS v. WAMU**

Damages And Declaratory Relief Action For WAMU's Acquisition and Maintenance of an Interest in and
Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18
U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and
18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.    That this Court liberally construe the RICO laws and thereby find that all Defendants, both
jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or
control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom
engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C.
1962(b) (Prohibited activities).

2.    That all Defendants and all their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any
interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are
engaged in, or whose activities do affect, interstate or foreign commerce.

3.    That all Defendants and all of their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from committing any more predicate acts in furtherance of the
RICO enterprise alleged in COUNT ONE supra.

4.    That all Defendants be required to account for all of their gains, profits, and advantages derived
from their several acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other
violation(s) of applicable State and federal law(s).

5.    That judgment be entered for Plaintiff and against all Defendants, jointly and severally, for
Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18
U.S.C. 1962(b), according to the best available proof.

6.    That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c),
for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best
available proof, or, an amount permitted by law.

7.    That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of
Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

8.	That all Defendants pay to Plaintiff their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at an amount according to proof.

9.	That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

10.	That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

11.	Such other and further relief as the court deems just and proper.

## COUNT FIFTY FOUR
## PLAINTIFFS v. WAMU

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)


1.	That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with, conducted and participated in a RICO Enterprise through a Pattern of Racketeering Activity RICO enterprise of persons and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at 18 U.S.C. §§ 1961(5), 1962(c)  (Prohibited activities).

2.	That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) supra.

3.	That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

4.	That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

5.	That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT TWO supra.

6.	That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s).

7.	That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof.

8.	That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof, or the maximum permitted by law.

9.	That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c)supra, according to the best available proof.

10.	That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, in an amount according to proof.

11.    That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

12.    That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## COUNT FIFTY FIVE
## PLAINTIFFS v. WAMU

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.    That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§1961(5), 1962(b) and (d) supra.

2.    That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) supra.

3.    That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO enterprise that engages in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d)supra.

4.    That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d)supra.

5.    That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged herein throughout the complaint.

6.    That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s).

7.    That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof.

8.    That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof or the maximum permitted by law.

9.    That all Defendants pay to Plaintiff all damages sustained by Plaintiff as a consequence of Defendants' several violations of 18 U.S.C. 1962(d)supra, according to the best available proof.

10.    That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, according to proof.

11.    That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign for the benefit of Plaintiffs, their heirs and assigns.

12.  That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## COUNT FIFTY SIX
## PLAINTIFFS v. WAMU

Damages And Declaratory Relief Action for WAMU's Violation of the MAIL AND WIRE FRAUD 18
U.S.C., SECTIONS 1341, 1343

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
      a.     Statutory Compensatory damages for each separate violation according to proof;
      b.     Exemplary damages for each separate violation based on the net worth of the Defendant,
WAMU to the extent permitted by law;
      c.     Declaratory relief, including permanent injunctive relief, prohibiting WAMU, on their
own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches
of the statute;
      d.     Reasonable attorney's fees and court costs according to proof;
      e.     Such other and further relief as the court deems just and proper.

## COUNT FIFTY SEVEN
## PLAINTIFFS v. WAMU

Damages And Declaratory Relief Action For WAMU's Violation of the
VIOLATION OF 18 U.S.C. § 1001

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
      a.     Statutory Compensatory damages for each separate violation according to proof;
      b.     Exemplary damages for each separate violation based on the net worth of the Defendant,
WAMU, to the extent permitted by law;
      c.     Declaratory relief, including permanent injunctive relief, prohibiting WAMU, or any of
their loan servicers, agents or assigns, from any further breaches of the statute;
      d.     Reasonable attorney's fees and court costs according to proof;
      e.     Such other and further relief as the court deems just and proper.

## COUNT FIFTY EIGHT
## PLAINTIFFS v. WAMU

Damages And Declaratory Relief Action for WAMU's Violation of
18 U.S.C. § 1005

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
      a.     Statutory Compensatory damages for each separate violation according to proof;
      b.     Exemplary damages for each separate violation based on the net worth of the Defendant,
WAMU to the extent permitted by law;
      c.     Declaratory relief, including permanent injunctive relief, prohibiting WAMU, their
servicing agent, Litton Loan Servicing, or any of their successor agents or assigns, from any further
breaches of the statute;
      d.     Reasonable attorney's fees and court costs according to proof;
      e.     Such other and further relief as the court deems just and proper.

## COUNT FIFTY NINE
## PLAINTIFFS v. WAMU

Damages And Declaratory Relief Action For WAMUs Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
      a.     Statutory Compensatory damages for each separate violation according to proof;
      b.     Exemplary damages for each separate violation based on the net worth of the Defendant,
WAMU to the extent permitted by law;

304

    c.      Declaratory relief, including permanent injunctive relief, prohibiting WAMU or their servicing agent, Litton Loan Servicing, or any of their successors, agents or assigns, from any further breaches of the statute;

    d.      Reasonable attorney's fees and court costs according to proof;

    e.      Such other and further relief as the court deems just and proper.

**COUNT SIXTY**

**PLAINTIFFS v. WAMU**

PENDANT STATE CLAIM

Damages And Declaratory Relief Action for WAMU's Violation of the

FLORIDA STATUTE CHAPTER 701.04 (1)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.      Statutory Compensatory damages for each separate violation according to proof;

    b.      Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU to the extent permitted by law;

    c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.      Reasonable attorney's fees and court costs according to proof;

    e.      Such other and further relief as the court deems just and proper.

**COUNT SIXTY ONE**

**PLAINTIFFS v. LITTON, GMAC,**

COMPLAINT TO SET ASIDE JUDGMENT FOR FRAUD

Damages And Declaratory Relief Action to Set Aside the Judgment obtained in the lower court for fraud and in violation of the US Constitution's 5th Amendment, 14th Amendment of the US Constitution, Pursuant to the Fraud Statutes 18 U.S.C. §§ 1001, 1005, filing false documents with the court, including a false affidavit and forged promissory note; and this independent action as authorized by Florida Rules of Civil Procedure 1.540(b)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.      Statutory Compensatory damages for each separate fraudulent act as alleged herein;

    b.      Exemplary damages for each separate violation based on the net worth of the Defendants, and each of them, to the extent permitted by law;

    c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further conduct collecting on the judgment fraudulently obtained in the name of WAMU;

    d.      A declaratory order finding the judgment was based on fraud, is unenforceable, and unconstitutional.

    e.      Reasonable attorney's fees and court costs according to proof;

    f.      The court further order Litton Loan Servicing, LP instruct their attorney's to dismiss the action,

    f.      Such other and further relief as the court deems just and proper.

**COUNT SIXTY TWO**

**PLAINTIFFS v. WAMU and LITTON LOAN SERVICING, LP**

COMPLAINT TO SET ASIDE JUDGMENT PURSUANT TO AGREEMENT ON MORTGAGE SERVICING PRACTICES OF SEPTEMBER 1, 2011 SIGNED BY LITTON LOAN SERVICING, LP, OCWEN FINANCIAL CORPORATION, AND THE STATE OF NEW YORK DEPARTMENT OF FINANCIAL SERVICES BANKING DEPARTMENT, FOR THE BENEFIT OF PLAINTIFFS AS THE INTENDED THIRD PARTY BENEFICIARY OF THAT AGREEMENT

Wherefore Plaintiffs seek relief, including, but not limited to:

    a.      That the court find that WAMU and Litton committed fraud upon the Plaintiffs and the court         in the underlying action;

305

        b.        That the court finds that the judgment is void ab initio based on the fraud perpetrated by the Defendants, and each of them.

        c.        Or, in the alternative, that the court further order Litton Loan Servicing to withdraw the suit as a result of the Agreement they signed on behalf of themselves and Goldman Sachs.

        d.        Compensatory damages for each separate fraudulent act as alleged herein;

        e.        Exemplary damages for each separate violation based on the net worth of the Defendants, and each of them, to the extent permitted by law;

        f.        Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further conduct collecting on the judgment fraudulently obtained in the name of WAMU and ordering them to comply with each and every term and condition of the Agreement they signed, and withdraw the action pursuant thereto;

        g.        A declaratory order finding the judgment was based on fraud, is unenforceable, and unconstitutional.

        h.        Reasonable attorney's fees and court costs according to proof;

        i.        The court further order Litton Loan Servicing, LP instruct their attorney's to dismiss the action,

        j.        Such other and further relief as the court deems just and proper.

        k.        Issue a restraining order against Litton and Ocwen from taking any further steps to accomplish the sale until such time as they withdraw the complaint against the Plaintiffs and comply with the rest of the terms of their Agreement.

        l.        Such other and further relief as the court deems just and adequate.

### COUNT SIXTY THREE
### PLAINTIFFS v. DEBRA LYMAN

Damages And Declaratory Relief Action For Debra Lyman's Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and 18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.        That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

2.        That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

3.        That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT ONE supra.

4.        That all Defendants be required to account for all of their gains, profits, and advantages derived from their several acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

5.        That judgment be entered for Plaintiff and against all Defendants, jointly and severally, for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

6.        That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof, or, an amount permitted by law.

7.      That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

8.       That all Defendants pay to Plaintiff their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at an amount according to proof.

9.      That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

10.      That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

11.      Such other and further relief as the court deems just and proper.

## COUNT SIXTY FOUR
## PLAINTIFFS v. DEBRA LYMAN

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

1.      That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with, conducted and participated in a RICO Enterprise through a Pattern of Racketeering Activity RICO enterprise of persons and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at 18 U.S.C. §§ 1961(5), 1962(c)  (Prohibited activities).

2.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) supra.

3.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

4.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

5.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT TWO supra.

6.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s).

7.      That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof.

8.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof, or the maximum permitted by law.

9.      That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c)supra, according to the best available proof.

10.      That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, in an amount according to proof.

11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

12.     That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## COUNT SIXTY FIVE
## PLAINTIFFS v. DEBRA LYMAN

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.     That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§1961(5), 1962(b) and (d) supra.

2.     That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) supra.

3.     That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO enterprise that engages in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d)supra.

4.     That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d)supra.

5.     That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged herein throughout the complaint.

6.     That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s).

7.     That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof.

8.     That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof or the maximum permitted by law.

9.     That all Defendants pay to Plaintiff all damages sustained by Plaintiff as a consequence of Defendants' several violations of 18 U.S.C. 1962(d)supra, according to the best available proof.

10.     That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, according to proof.

11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign for the benefit of Plaintiffs, their heirs and assigns.

12. That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## COUNT SIXTY SIX

## PLAINTIFFS v. DEBRA LYMAN

Damages And Declaratory Relief Action for DEBRA LYMAN's Violation of the MAIL AND WIRE
FRAUD 18 U.S.C., SECTIONS 1341, 1343

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
    a.    Statutory Compensatory damages for each separate violation according to proof;
    b.    Exemplary damages for each separate violation based on the net worth of the Defendant,
WAMU to the extent permitted by law;
    c.    Declaratory relief, including permanent injunctive relief, prohibiting WAMU, on their
own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches
of the statute;
    d.    Reasonable attorney's fees and court costs according to proof;
    e.    Such other and further relief as the court deems just and proper.

### COUNT SIXTY SEVEN
### PLAINTIFFS v. DEBRA LYMAN

Damages And Declaratory Relief Action For DEBRA LYMAN's Violation of the
VIOLATION OF 18 U.S.C. § 1001

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
    a.    Statutory Compensatory damages for each separate violation according to proof;
    b.    Exemplary damages for each separate violation based on the net worth of the Defendant,
WAMU, to the extent permitted by law;
    c.    Declaratory relief, including permanent injunctive relief, prohibiting WAMU, or any of
their loan servicers, agents or assigns, from any further breaches of the statute;
    d.    Reasonable attorney's fees and court costs according to proof;
    e.    Such other and further relief as the court deems just and proper.

### COUNT SIXTY EIGHT
### PLAINTIFFS v. DEBRA LYMAN

Damages And Declaratory Relief Action for WAMU's Violation of
18 U.S.C. § 1005

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
    a.    Statutory Compensatory damages for each separate violation according to proof;
    b.    Exemplary damages for each separate violation based on the net worth of the Defendant,
DEBRA LYMAN to the extent permitted by law;
    c.    Declaratory relief, including permanent injunctive relief, prohibiting DEBRA LYMAN,
Litton Loan Servicing, LP, WAMU, or any of their successor agents or assigns, from any further breaches
of the statute;
    d.    Reasonable attorney's fees and court costs according to proof;
    e.    Such other and further relief as the court deems just and proper.

### COUNT SIXTY NINE
### PLAINTIFFS v. CYNTHIA A. RILEY

Damages And Declaratory Relief Action For CYNTHIA A. RILEY's Acquisition and Maintenance of an
Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18
U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and
18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

309

1.        That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

2.        That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

3.        That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT ONE supra.

4.        That all Defendants be required to account for all of their gains, profits, and advantages derived from their several acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

5.        That judgment be entered for Plaintiff and against all Defendants, jointly and severally, for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

6.        That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof, or, an amount permitted by law.

7.        That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

8.         That all Defendants pay to Plaintiff their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at an amount according to proof.

9.        That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

10.       That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

11.       Such other and further relief as the court deems just and proper.

## COUNT SEVENTY
### PLAINTIFFS v. CYNTHIA A. RILEY

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

1.        That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with, conducted and participated in a RICO Enterprise through a Pattern of Racketeering Activity RICO enterprise of persons and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at 18 U.S.C. §§ 1961(5), 1962(c)  (Prohibited activities).

2.        That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) supra.

3.        That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other

individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

4.        That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

5.        That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT TWO supra.

6.        That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s).

7.        That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof.

8.        That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof, or the maximum permitted by law.

9.        That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c)supra, according to the best available proof.

10.        That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, in an amount according to proof.

11.        That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

12.        That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

**COUNT SEVENTY ONE**
**PLAINTIFFS v. CYNTHIA A. RILEY**

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.        That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§1961(5), 1962(b) and (d) supra.

2.        That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) supra.

3.        That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO enterprise that engages in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d)supra.

4.        That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d)supra.

311

5.      That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged herein throughout the complaint.

6.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s).

7.      That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof.

8.      That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof or the maximum permitted by law.

9.      That all Defendants pay to Plaintiff all damages sustained by Plaintiff as a consequence of Defendants' several violations of 18 U.S.C. 1962(d)supra, according to the best available proof.

10.     That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, according to proof.

11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign for the benefit of Plaintiffs, their heirs and assigns.

12.  That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## COUNT SEVENTY TWO
### PLAINTIFFS v. CYNTHIA A. RILEY

Damages And Declaratory Relief Action for CYNTHIA A. RILEY's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.      Statutory Compensatory damages for each separate violation according to proof;

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU to the extent permitted by law;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting WAMU, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

## COUNT SEVENTY THREE
### PLAINTIFFS v. CYNTHIA A. RILEY

Damages And Declaratory Relief Action For CYNTHIA A. RILEY's Violation of the VIOLATION OF 18 U.S.C. § 1001

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.      Statutory Compensatory damages for each separate violation according to proof;

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, WAMU, to the extent permitted by law;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting WAMU, or any of their loan servicers, agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

## COUNT SEVENTY FOUR
### PLAINTIFFS v. CYNTHIA A. RILEY

Damages And Declaratory Relief Action for CYNTHIA A. RILEY's Violation of
18 U.S.C. § 1005

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
      a.      Statutory Compensatory damages for each separate violation according to proof;
      b.      Exemplary damages for each separate violation based on the net worth of the Defendant,
CYNTHIA A. RILEY to the extent permitted by law;
      c.      Declaratory relief, including permanent injunctive relief, prohibiting CYNTHIA A.
RILEY,  from endorsing any further notes on behalf of WAMU, or permitting JP MORGAN CHASE, to
allow her to continue to deceive the Plaintiff and other members of the public as to her authority to execute
or endorse notes en blanc on behalf of  WAMU, or any of their successor agents or assigns, from any
further breaches of the statute;
      d.      Reasonable attorney's fees and court costs according to proof;
      e.      Such other and further relief as the court deems just and proper.

## COUNT SEVENTY FIVE
### PLAINTIFFS v. STEPHANIE JACKSON

Damages And Declaratory Relief Action For STEPHANIE JACKSON's Acquisition and Maintenance of
an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18
U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and
18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
1.      That this Court liberally construe the RICO laws and thereby find that all Defendants, both
jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or
control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom
engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C.
1962(b) (Prohibited activities).
2.      That all Defendants and all their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any
interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are
engaged in, or whose activities do affect, interstate or foreign commerce.
3.      That all Defendants and all of their directors, officers, employees, agents, servants and all
other persons in active concert or in participation with them, be enjoined temporarily during pendency of
this action, and permanently thereafter, from committing any more predicate acts in furtherance of the
RICO enterprise alleged in COUNT ONE supra.
4.      That all Defendants be required to account for all of their gains, profits, and advantages derived
from their several acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other
violation(s) of applicable State and federal law(s).
5.      That judgment be entered for Plaintiff and against all Defendants, jointly and severally, for
Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18
U.S.C. 1962(b), according to the best available proof.
6.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c),
for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best
available proof, or, an amount permitted by law.
7.      That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of
Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

313

8.	That all Defendants pay to Plaintiff their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at an amount according to proof.

9.	That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

10.	That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

11.	Such other and further relief as the court deems just and proper.

## COUNT SEVENTY SIX
### PLAINTIFFS v. STEPHANIE JACKSON

Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

1.	That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with, conducted and participated in a RICO Enterprise through a Pattern of Racketeering Activity RICO enterprise of persons and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at 18 U.S.C. §§ 1961(5), 1962(c)  (Prohibited activities).

2.	That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) supra.

3.	That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

4.	That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

5.	That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT TWO supra.

6.	That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s).

7.	That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof.

8.	That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof, or the maximum permitted by law.

9.	That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c)supra, according to the best available proof.

10.	That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, in an amount according to proof.

11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

12.     That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## COUNT SEVENTY SEVEN
## PLAINTIFFS v. STEPHANIE JCKSON

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.     That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§1961(5), 1962(b) and (d) supra.

2.     That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) supra.

3.     That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO enterprise that engages in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d)supra.

4.     That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d)supra.

5.     That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged herein throughout the complaint.

6.     That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s).

7.     That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof.

8.     That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof or the maximum permitted by law.

9.     That all Defendants pay to Plaintiff all damages sustained by Plaintiff as a consequence of Defendants' several violations of 18 U.S.C. 1962(d)supra, according to the best available proof.

10.     That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, according to proof.

11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign for the benefit of Plaintiffs, their heirs and assigns.

12. That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## COUNT SEVENTY EIGHT

315

**PLAINTIFFS v. STEPHANIE JACKSON**

Damages And Declaratory Relief Action for STEPHANIE JACKSON's Violation of the MAIL AND
WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
  a.    Statutory Compensatory damages for each separate violation according to proof;
  b.    Exemplary damages for each separate violation based on the net worth of the Defendant,
WAMU to the extent permitted by law;
  c.    Declaratory relief, including permanent injunctive relief, prohibiting WAMU, on their
own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches
of the statute;
  d.    Reasonable attorney's fees and court costs according to proof;
  e.    Such other and further relief as the court deems just and proper.
**COUNT SEVENTY NINE**
**PLAINTIFFS v. STEPHANIE JACKSON**

Damages And Declaratory Relief Action For STEPHANIE JACKSON's Violation of the
VIOLATION OF 18 U.S.C. § 1001

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
  a.    Statutory Compensatory damages for each separate violation according to proof;
  b.    Exemplary damages for each separate violation based on the net worth of the Defendant,
WAMU, to the extent permitted by law;
  c.    Declaratory relief, including permanent injunctive relief, prohibiting WAMU, or any of
their loan servicers, agents or assigns, from any further breaches of the statute;
  d.    Reasonable attorney's fees and court costs according to proof;
  e.    Such other and further relief as the court deems just and proper.
**COUNT EIGHTY**
**PLAINTIFFS v. STEPHANIE JACKSON**

Damages And Declaratory Relief Action for STEPHANIE JACKSON's Violation of
18 U.S.C. § 1005

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
  a.    Statutory Compensatory damages for each separate violation according to proof;
  b.    Exemplary damages for each separate violation based on the net worth of the Defendant,
STEPHANIE JACKSON to the extent permitted by law;
  c.    Declaratory relief, including permanent injunctive relief, prohibiting STEPHANIE
JACKSON, on behalf of WAMU, or permitting JP MORGAN CHASE, to allow her to continue to deceive
the Plaintiff and other members of the public as to her authority to execute or endorse notes en blanc on
behalf of JP MORGAN CHASE and WAMU, or any of their successor agents or assigns, from any further
breaches of the statute;
  d.    Reasonable attorney's fees and court costs according to proof;
  e.    Such other and further relief as the court deems just and proper.
**COUNT EIGHTY ONE**:
**PLAINTIFFS v. OCWEN**

Damages And Declaratory Relief Action For Failure Of OCWEN To Acknowledge Receipt Of HAMP
Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The
Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability
Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD
PARTY BENEFICIARY

Wherefore Plaintiffs respectfully request that the court:

A.       Issue an order requiring OCWEN, on their own behalf, on behalf of each of the co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiffs and dismiss them with prejudice;

B.       Find that OCWEN, on their own behalf, and on behalf of each of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

C.       Find that OCWEN, on their own behalf, and on behalf of each of the co-defendants, were in breach of the SPA agreement with the US Treasury Department, intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

1.       Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

2.       The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

3.       The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

4.       The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

5.       The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining.

6.       The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

7.       The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

8.       Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

D.       Find that OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

E.       Find that OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

F.       Find that OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

G.       Find that OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

H.       Find that OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

I.       Find that OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

317

      J.      Find that OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

      K.      Find that OCWEN, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

      L.      That the court further grant compensatory damages to Plaintiffs for OCWENS' intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

      M.      That the court further grant punitive damages to Plaintiff against OCWEN, on their own behalf, and on behalf of the co-defendants for Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant OCWEN, will be punished, will not commit further acts against other similarly situated Plaintiffs;

      N.      That the court further grant statutory damages of $10,000 per violation, to Plaintiff against OCWEN, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant OCWEN, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

      O.      That the court order Defendant OCWEN, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of OCWEN, on their own behalf, and on behalf of the co-defendants in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

      P.      That the court grants to Plaintiff against the Defendant OCWEN, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

## COUNT EIGHTY TWO:
## PLAINTIFFS v. OCWEN

Damages And Declaratory Relief Action For OCWEN'S Violation of the FEDERAL FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. §  1692 ET. SEQ

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.      Statutory Compensatory damages for each separate violation according to proof;

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, OCWEN;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting OCWEN, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

## COUNT EIGHTY THREE:
## PLAINTIFFS v. OCWEN

Damages And Declaratory Relief Action For OCWEN'S Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) and 18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.       That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

2.       That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

3.       That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT ONE supra.

4.       That all Defendants be required to account for all of their gains, profits, and advantages derived from their several acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

5.       That judgment be entered for Plaintiff and against all Defendants, jointly and severally, for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

6.       That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof, or, an amount permitted by law.

7.       That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

8.        That all Defendants pay to Plaintiff their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at an amount according to proof.

9.       That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

10.      That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

11.       Such other and further relief as the court deems just and proper.

## **COUNT EIGHTY FOUR**:
## **PLAINTIFFS v. OCWEN**

Conduct and Participation in a RICO Enterprise
through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.       That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with, conducted and participated in a RICO Enterprise through a Pattern of Racketeering Activity RICO enterprise of persons and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at 18 U.S.C. §§ 1961(5), 1962(c)  (Prohibited activities).

2.       That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) supra.

3.       That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other

individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

4.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

5.      That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT TWO supra.

6.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s).

7.      That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof.

8.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) supra, according to the best available proof, or the maximum permitted by law.

9.      That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c)supra, according to the best available proof.

10.     That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, in an amount according to proof.

11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

12.     That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

### COUNT EIGHTY FIVE:
### PLAINTIFFS v. LITTON LOAN SERVICING, LP

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

1.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§1961(5), 1962(b) and (d) supra.

2.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) supra.

3.      That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO enterprise that engages in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d)supra.

4.      That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d)supra.

320

5.        That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged herein throughout the complaint.

6.        That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s).

7.        That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof.

8.        That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) supra, according to the best available proof or the maximum permitted by law.

9.        That all Defendants pay to Plaintiff all damages sustained by Plaintiff as a consequence of Defendants' several violations of 18 U.S.C. 1962(d)supra, according to the best available proof.

10.        That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, according to proof.

11.        That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) supra and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign for the benefit of Plaintiffs, their heirs and assigns.

12. That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

**COUNT EIGHTY SIX:**
**PLAINTIFFS v. OCWEN**

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
   a.        Statutory Compensatory damages for each separate violation according to proof;
   b.        Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;
   c.        Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;
   d.        Reasonable attorney's fees and court costs according to proof;
   e.        Such other and further relief as the court deems just and proper.

**COUNT EIGHTY SEVEN:**
**PLAINTIFFS v. OCWEN**

Damages And Declaratory Relief Action For OCWEN'S Violation of the VIOLATION OF 18 U.S.C. § 1001

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
   a.        Statutory Compensatory damages for each separate violation according to proof;
   b.        Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;
   c.        Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;
   d.        Reasonable attorney's fees and court costs according to proof;
   e.        Such other and further relief as the court deems just and proper.

**COUNT EIGHTY EIGHT:**
**PLAINTIFFS v. OCWEN**

12-12020-mg    Doc 5250    Filed 09/27/13    Entered 10/01/13 10:37:52    Main Document
Pg 322 of 359

Damages And Declaratory Relief Action for OCWEN'S Violation of
18 U.S.C. § 1005

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
      a.      Statutory Compensatory damages for each separate violation according to proof;
      b.      Exemplary damages for each separate violation based on the net worth of the Defendant,
Litton Loan Servicing, LP;
      c.      Declaratory relief, including permanent injunctive relief, prohibiting OCWEN, or any of
their agents or assigns, from any further breaches of the statute;
      d.      Reasonable attorney's fees and court costs according to proof;
      e.      Such other and further relief as the court deems just and proper.

## COUNT EIGHTY NINE:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
      a.      Statutory Compensatory damages for each separate violation according to proof;
      b.      Exemplary damages for each separate violation based on the net worth of the Defendant,
Litton Loan Servicing, LP;
      c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan
Servicing, or any of their agents or assigns, from any further breaches of the statute;
      d.      Reasonable attorney's fees and court costs according to proof;
      e.      Such other and further relief as the court deems just and proper.

## COUNT NINETY:
## PLAINTIFFS v. OCWEN

PENDANT STATE CLAIM
Damages And Declaratory Relief Action For OCWEN's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)
Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:
      a.      Statutory Compensatory damages for each separate violation according to proof;
      b.      Exemplary damages for each separate violation based on the net worth of the Defendant,
OCWEN to the extent permitted by law;
      c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan
Servicing, or any of their agents or assigns, from any further breaches of the statute;
      d.      Reasonable attorney's fees and court costs according to proof;
      e.      Such other and further relief as the court deems just and proper.

Exhibit A

Form CGFD61 (9/19/08)

**United States Bankruptcy Court**
**Southern District of Florida**
**www.flsb.uscourts.gov**

**Case Number:** 11−40292−AJC                                                    **Adversary Number:** 11−03107−AJC

In re:

**Name of Debtor(s):** Barry B Eskanos and Ami B Eskanos

−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−/

**Barry B Eskanos**

Plaintiff(s)

**VS.**

**Washington Mutual Bank FA**

Defendant(s)
−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−−/

## ENTRY OF DEFAULT

A motion for entry of default has been filed pursuant to Local Rule 7055−1. It appears from the record that the following defendant failed to plead or otherwise defend in this case as required by law:

Name: **WASHINGTON MUTUAL BANK FA**

Therefore, default is entered against the defendant as authorized by Bankruptcy Rule 7055.

Dated: <u>2/9/12</u>                                    **CLERK OF COURT**
                                                       By: <u>Alexandra Oriol−Bennett</u>
                                                       Deputy Clerk (305) 714−1800

The clerk shall serve a copy of the Entry of Default on all parties to the adversary proceeding

EXHIBIT B

## Independent Foreclosure Review



**Your mortgage loan is not eligible for the Independent Foreclosure Review.**

Reference Number: 1002338054

Property Address:

3122 Pine Tree Dr
Miami Beach FL 33140

\*\*\*\*\* SINGLE PIECE
78639-00-V002-0000022-M3105
Ami Eskanos
3122 Pine Tree Dr
Miami Beach FL 33140

*Si usted habla español, tenemos representantes que pueden asistirle en su idioma.*

Dear Ami Eskanos,

Federal banking regulators have directed certain residential mortgage servicers to make an Independent Foreclosure Review available to homeowners whose mortgage loans on their primary residence were subject to foreclosure proceedings during the period from January 1, 2009 through December 31, 2010. Regulators from the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System monitor the Independent Foreclosure Review to promote a fair and impartial process.

On 08/24/2012, we received your Request for Review Form with respect to the mortgage loan referenced above.

### In a process reviewed by an independent consultant and monitored by the federal banking agencies, it was determined that your mortgage loan is not eligible for the Independent Foreclosure Review.

**Your request for review will not be considered for the following reason(s):**

GMAC Mortgage, LLC's records indicate that your mortgage loan was not in the foreclosure process during the eligible review period of January 1, 2009 to December 31, 2010. It is not possible to include your request in the review as only homeowners whose mortgage loans were in the foreclosure process during this time period are eligible.

Even if your mortgage loan is not eligible for the Independent Foreclosure Review, this will not impact any other options you may pursue related to your foreclosure.

You can have your mortgage situation considered by contacting GMAC Mortgage, LLC directly at 1-800-766-4622 or in writing at P.O. Box 4622, Waterloo, IA 50704-4622.

Rust Consulting serves as the central administrator of the Independent Foreclosure Review. The firm has been hired to notify customers and receive Request for Review Forms. Rust will also respond to questions about the Independent Foreclosure Review.

This letter is being sent to you at the request of federal bank regulators. This letter is not an attempt to collect a debt or to impose personal liability for any obligation, including, without limitation, any obligation that was discharged, or is subject to an automatic stay in bankruptcy under Title 11 of the United States Code.

The information that you submit in connection with the Independent Foreclosure Review process will be available to the servicer(s) of your mortgage loan and will be shared with an independent consultant of that servicer(s). Where required to comply with the law, the servicer(s) may be compelled to provide this information in response to a legal process.

Under the April 13, 2011 Consent Orders governing the Independent Foreclosure Review, the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System have also directed servicers to use contact or personal information provided by the borrower in connection with the Independent Foreclosure Review only for purposes relating to the Independent Foreclosure Review process, including remediation efforts or other borrower communications.

If you would like the servicer's internal records to include updated contact or personal information that you provide in connection with the Independent Foreclosure Review process for the servicer's future correspondence or notices outside the Independent Foreclosure Review, then you must separately provide your new contact or personal information directly to the servicer.

The servicers may always use information obtained from publicly or commercially available sources to update borrower contact or personal information.

Llame al 1-888-764-8867 para hablar con un representante que le podrá brindar gratuitamente traducciones de la información que le envió la Revisión Independiente de la Ejecución Hipotecaria y responder a sus preguntas acerca de la Revisión Independiente de la Ejecución Hipotecaria o completar el Formulario de Solicitud de Revisión. Esta información es precisa a la fecha de impresión y está sujeta a cambios sin previo aviso.

Call 1-888-764-8867 to speak to a representative that will be able to provide free translations of information sent to you from the Independent Foreclosure Review and answer your questions about the Independent Foreclosure Review or completing the Request for Review Form. This information is accurate as of date of printing and is subject to change without notice.

Assistance is available in over 200 languages, including: Chinese, Korean, Vietnamese, Tagalog, Hmong and Russian.

提供中文幫助。

한국어 도움을 제공합니다.

Trợ giúp hiện có bằng tiếng Việt.

Available ang tulong sa wikang Tagalog.

Peb muaj cov neeg hais lus Hmoob pab nej.

Помощь на русском языке.

**Consent Order Details**

As part of consent orders issued on April 13, 2011 between certain residential mortgage servicers and their federal bank regulators, an Independent Foreclosure Review is being made available to individual borrowers who were part of a foreclosure action on their primary residence during the period of January 1, 2009 to December 31, 2010. Pursuant to the consent orders, each mortgage servicer has hired an approved independent consultant to review certain residential foreclosure actions to determine whether an individual borrower was financially injured as a result of any errors, misrepresentations or other deficiencies made during the foreclosure process.

The Independent Foreclosure Review is monitored by federal bank regulators from the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System.

EXHIBIT A

## Independent Foreclosure Review



**Your mortgage loan is not eligible for the Independent Foreclosure Review.**

Reference Number: 1002338054

Property Address:

3122 Pine Tree Dr
Miami Beach FL 33140

***** SINGLE PIECE
78639-00-V002-0000022-M3105
Ami Eskanos
3122 Pine Tree Dr
Miami Beach FL 33140

*Si usted habla español, tenemos representantes que pueden asistirle en su idioma.*

Dear Ami Eskanos,

Federal banking regulators have directed certain residential mortgage servicers to make an Independent Foreclosure Review available to homeowners whose mortgage loans on their primary residence were subject to foreclosure proceedings during the period from January 1, 2009 through December 31, 2010. Regulators from the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System monitor the Independent Foreclosure Review to promote a fair and impartial process.

On 08/24/2012, we received your Request for Review Form with respect to the mortgage loan referenced above.

## In a process reviewed by an independent consultant and monitored by the federal banking agencies, it was determined that your mortgage loan is not eligible for the Independent Foreclosure Review.

**Your request for review will not be considered for the following reason(s):**

GMAC Mortgage, LLC's records indicate that your mortgage loan was not in the foreclosure process during the eligible review period of January 1, 2009 to December 31, 2010. It is not possible to include your request in the review as only homeowners whose mortgage loans were in the foreclosure process during this time period are eligible.

Even if your mortgage loan is not eligible for the Independent Foreclosure Review, this will not impact any other options you may pursue related to your foreclosure.

You can have your mortgage situation considered by contacting GMAC Mortgage, LLC directly at 1-800-766-4622 or in writing at P.O. Box 4622, Waterloo, IA 50704-4622.

Rust Consulting serves as the central administrator of the Independent Foreclosure Review. The firm has been hired to notify customers and receive Request for Review Forms. Rust will also respond to questions about the Independent Foreclosure Review.

This letter is being sent to you at the request of federal bank regulators. This letter is not an attempt to collect a debt or to impose personal liability for any obligation, including, without limitation, any obligation that was discharged, or is subject to an automatic stay in bankruptcy under Title 11 of the United States Code.

The information that you submit in connection with the Independent Foreclosure Review process will be available to the servicer(s) of your mortgage loan and will be shared with an independent consultant of that servicer(s). Where required to comply with the law, the servicer(s) may be compelled to provide this information in response to a legal process.

Under the April 13, 2011 Consent Orders governing the Independent Foreclosure Review, the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System have also directed servicers to use contact or personal information provided by the borrower in connection with the Independent Foreclosure Review only for purposes relating to the Independent Foreclosure Review process, including remediation efforts or other borrower communications.

If you would like the servicer's internal records to include updated contact or personal information that you provide in connection with the Independent Foreclosure Review process for the servicer's future correspondence or notices outside the Independent Foreclosure Review, then you must separately provide your new contact or personal information directly to the servicer.

The servicers may always use information obtained from publicly or commercially available sources to update borrower contact or personal information.

Llame al 1-888-764-8867 para hablar con un representante que le podrá brindar gratuitamente traducciones de la información que le envió la Revisión Independiente de la Ejecución Hipotecaria y responder a sus preguntas acerca de la Revisión Independiente de la Ejecución Hipotecaria o completar el Formulario de Solicitud de Revisión. Esta información es precisa a la fecha de impresión y está sujeta a cambios sin previo aviso.

Call 1-888-764-8867 to speak to a representative that will be able to provide free translations of information sent to you from the Independent Foreclosure Review and answer your questions about the Independent Foreclosure Review or completing the Request for Review Form. This information is accurate as of date of printing and is subject to change without notice.

Assistance is available in over 200 languages, including: Chinese, Korean, Vietnamese, Tagalog, Hmong and Russian.

提供中文幫助。

한국어 도움을 제공합니다.

Trợ giúp hiện có bằng tiếng Việt.

Available ang tulong sa wikang Tagalog.

Peb muaj cov neeg hais lus Hmoob pab nej.

Помощь на русском языке.

**Consent Order Details**

As part of consent orders issued on April 13, 2011 between certain residential mortgage servicers and their federal bank regulators, an Independent Foreclosure Review is being made available to individual borrowers who were part of a foreclosure action on their primary residence during the period of January 1, 2009 to December 31, 2010. Pursuant to the consent orders, each mortgage servicer has hired an approved independent consultant to review certain residential foreclosure actions to determine whether an individual borrower was financially injured as a result of any errors, misrepresentations or other deficiencies made during the foreclosure process.

The Independent Foreclosure Review is monitored by federal bank regulators from the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System.

EXHIBIT B

**Office of the Comptroller of the Currency**
**Board of Governors of the Federal Reserve System**

**JUNE 21, 2012**
**FINANCIAL REMEDIATION FRAMEWORK**
**FOR USE IN THE INDEPENDENT FORECLOSURE REVIEW**

In April 2011, federal banking regulators issued enforcement orders against 14 large mortgage servicers for deficient mortgage servicing and foreclosure practices. The orders required those servicers to retain independent consultants to conduct a comprehensive review of foreclosures that were in process or completed in 2009 or 2010 (the Independent Foreclosure Review) to identify financial injury to borrowers that resulted from errors, misrepresentations, and other deficiencies in the foreclosure process. The Independent Foreclosure Review also requires those servicers to provide compensation or other remediation for identified financial injury.

The OCC and FRB have developed a financial remediation framework (the Framework) that provides examples of situations where compensation or other remediation is required for financial injury due to servicer errors, misrepresentations, or other deficiencies. The independent consultants will use the Framework to recommend remediation for financial injury identified during the Independent Foreclosure Review. The servicers will prepare remediation plans based on the independent consultants' recommendations. The federal banking regulators must approve each servicer's remediation plan.

The categories included in the Framework are not intended to be exhaustive or to cover all possible situations or remediation options for borrowers who may require compensation or other remediation for financial injury. It is important to read the Frequently Asked Questions (FAQs) that accompany the Framework to understand how remediation will work.

**OCC FRB Financial Remediation Framework**
**Independent Foreclosure Review**

| No. | CATEGORY | ERROR | DESCRIPTION | FORECLOSURE IN PROCESS (AT TIME OF REMEDIATION) | | FORECLOSURE COMPLETE (AT TIME OF REMEDIATION) | |
|---|---|---|---|---|---|---|---|
| | | | | Remedy | Dollar Payment | Remedy | Dollar Payment |
| 1 | Servicemembers Civil Relief Act (SCRA) | SCRA violation | Servicer foreclosed on a borrower in violation of the SCRA. | Suspend foreclosure. | N/A | Rescind foreclosure when possible; pay $15,000, correct servicer record for any improper amounts, and correct credit reports. | $15,000 |
| | | | | | | If rescission of foreclosure is not possible; pay $125,000 plus equity, remedy deficiency, and correct credit reports. | $125,000 plus equity |
| 2 | Borrower Not in Default | Borrower not in default when foreclosure occurred or in default as direct result of servicer error | Servicer initiated foreclosure or foreclosed on borrower who was not in default on mortgage or in default only directly due to servicer error. | Cancel foreclosure; pay $5,000, correct servicer record for late fees, foreclosure fees, and/or any other improper amounts, and correct credit reports. | $5,000 | Rescind foreclosure when possible; pay $15,000, correct servicer record for any improper amounts, and correct credit reports. | $15,000 |
| | | | | | | If rescission of foreclosure is not possible; pay $125,000 plus equity, remedy deficiency, and correct credit reports. | $125,000 plus equity |
| 3a | Error after Trial Loan Modification Completed | Failure to convert written trial-period plan to permanent modification | Servicer failed to convert borrower to permanent modification after successful completion of written trial-period plan. | Suspend foreclosure as required by program; pay $5,000, provide permanent loan modification, correct servicer record for any improper amounts, and correct credit reports. | $5,000 | Rescind foreclosure when possible and provide permanent loan modification; pay $15,000, correct servicer record for any improper amounts, and correct credit reports. | $15,000 |
| | | | | If servicer cannot provide permanent loan modification; pay $35,000, correct servicer record for any improper amounts, and correct credit reports. | $35,000 | If rescission of foreclosure is not possible; pay $125,000 plus equity, remedy deficiency for any improper amounts, and correct credit reports. Servicer may offset missed and unpaid principal & interest payments and property taxes paid on behalf of the borrower, subject to certain limitations. | $125,000 plus equity, less offset |

**OCC FRB Financial Remediation Framework**
**Independent Foreclosure Review**

| No. | CATEGORY | ERROR | DESCRIPTION | FORECLOSURE IN PROCESS (AT TIME OF REMEDIATION) | | FORECLOSURE COMPLETE (AT TIME OF REMEDIATION) | |
|---|---|---|---|---|---|---|---|
| | | | | Remedy | Dollar Payment | Remedy | Dollar Payment |
| 3b | Error after Trial Loan Modification Approved | Foreclosure completed during written trial-period plan for a permanent modification | Servicer foreclosed on borrower prior to expiration of written trial-period plan while borrower was performing all requirements of the written trial-period plan. | N/A | N/A | Rescind foreclosure when possible and provide trial-period plan; pay $15,000, correct servicer record for any improper amounts, and correct credit reports. | $15,000 |
| | | | | | | If rescission of foreclosure is not possible; pay $125,000 plus equity, remedy deficiency for any improper amounts, and correct credit reports. Servicer may offset missed and unpaid principal & interest payments and property taxes paid on behalf of the borrower, subject to certain limitations. | $125,000 plus equity, less offset |
| 4 | Forbearance Plan | Foreclosure completed when borrower performing under documented forbearance plan | Servicer completed foreclosure on borrower before documented forbearance period expired while borrower was meeting all requirements of documented forbearance plan. | N/A | N/A | Rescind foreclosure when possible; pay $15,000, correct servicer record for any improper amounts, and correct credit reports. | $15,000 |
| | | | | | | If rescission of foreclosure is not possible; pay $60,000 plus equity, remedy deficiency for any improper amounts, and correct credit reports. Servicer may offset missed and unpaid principal & interest payments and property taxes paid on behalf of the borrower, subject to certain limitations. | $60,000 plus equity, less offset |

2

**OCC FRB Financial Remediation Framework**
**Independent Foreclosure Review**

| No. | CATEGORY | ERROR | DESCRIPTION | FORECLOSURE IN PROCESS (AT TIME OF REMEDIATION) | | FORECLOSURE COMPLETE (AT TIME OF REMEDIATION) | |
|---|---|---|---|---|---|---|---|
| | | | | Remedy | Dollar Payment | Remedy | Dollar Payment |
| 5 | Loan Modification Application | Loan modification application denied in error, or complete loan modification application where borrower would have qualified was never decisioned | Servicer denied borrower application for loan modification that should have been approved, or servicer failed to decision complete loan modification application for which borrower would have qualified. | Suspend foreclosure as required by program and where loan modification permitted based on past documentation; pay $2,500, provide loan modification for which borrower should have been approved, correct servicer record for excess interest, late fees, foreclosure fees, and/or any other improper amounts, and correct credit reports. | $2,500 | Rescind foreclosure and provide loan modification for which borrower should have been approved based on past documentation when possible; pay $5,000, correct servicer record for excess interest, late fees, foreclosure fees, and/or any other improper amounts, and correct credit reports. | $5,000 |
| | | | | Suspend foreclosure as required by program and where loan modification not permitted based on past documentation; pay $10,000, offer existing loan modification or other loss mitigation programs, correct servicer record for excess interest, late fees, foreclosure fees, and/or any other improper amounts, and correct credit reports. | $10,000 | If either rescission of foreclosure is not possible or where loan modification not permitted based on past documentation; pay $15,000 plus equity, remedy deficiency for excess interest, late fees, foreclosure fees, and/or any other improper amounts, and correct credit reports. | $15,000 plus equity |
| 6 | Loan Modification Application | No follow up on loan modification application | Servicer never followed up to obtain complete loan modification documents as required under HAMP or other program designated by regulator. | Pay $2,000 and offer existing loan modification or other loss mitigation programs. | $2,000 | Pay $2,000. | $2,000 |
| 7 | Loan Modification Application | Never solicited loan modification | Servicer never solicited borrower loan modification option as required under HAMP or other program designated by regulator. | Pay $1,000 and offer existing loan modification or other loss mitigation programs. | $1,000 | Pay $1,000. | $1,000 |
| 8 | Loan Modification Application | Failed to approve modification in prescribed timeframe | Servicer approved borrower for loan modification under HAMP or other program designated by regulator, but did not make decision within required timeframe. | Correct servicer record for excess interest accrued by borrower. | N/A | Remedy deficiency for excess interest. | N/A |

**OCC FRB Financial Remediation Framework**
**Independent Foreclosure Review**

| No. | CATEGORY | ERROR | DESCRIPTION | FORECLOSURE IN PROCESS (AT TIME OF REMEDIATION) | | FORECLOSURE COMPLETE (AT TIME OF REMEDIATION) | |
|---|---|---|---|---|---|---|---|
| | | | | Remedy | Dollar Payment | Remedy | Dollar Payment |
| 9 | Loan Modification | Used wrong interest rate in an approved modification | Servicer error resulted in loan modification with higher interest rate than borrower should have been charged under HAMP or other loan modification program designated by regulator. | Correct servicer record for excess interest accrued by borrower. | N/A | Remedy deficiency for excess interest. | N/A |
| 10 | Bankruptcy | Bankruptcy | Servicer initiated foreclosure or foreclosed on borrower who was protected by federal bankruptcy law. | Remediation determined on a case-by-case basis as bankruptcy law dictates. | | | |
| 11 | No Standing | Servicer did not have standing to foreclose | Servicer initiated foreclosure or foreclosed on borrower, but lacked standing to foreclose. | Remediation determined on a case-by-case basis as state law dictates. | | | |
| 12 | Notice | Servicer failed to provide legally sufficient notice | Servicer initiated foreclosure or foreclosed on borrower and either failed to provide any notice or legally sufficient notice as required under state law. | Remediation determined on a case-by-case basis as state law dictates. | | | |
| 13 | General | Error caused financial injury | Servicer error occurred that did not directly cause foreclosure, but did directly result in financial injury to borrower. | Suspend foreclosure where appropriate, correct servicer record for amounts in error and/or reimburse borrower for amounts paid in error, plus interest; and where required, correct credit reports and pay $500 for credit reporting error. | Case-by-case basis | Remedy deficiency for amounts in error and/or reimburse borrower for amounts paid in error, plus interest; and where required, correct credit reports and pay $500 for credit reporting error. | Case-by-case basis |

EXHIBIT C

## Civil / Probate Justice System - Docket Information

BACK TO SEARCH RESULTS          ALL PARTIES          START A NEW SEARCH

### WASHINGTON MUTUAL BANK (FA) vs ESKANOS, AMI B

**\* Click on BOOK/PAGE of a particular docket to see the image if it is available \***

| | | | |
|---|---|---|---|
| **Case Number (LOCAL):** | 2005-6570-CA-01 | **Dockets Retrieved:** | 236 | **Filing Date:** 03/30/2005 |
| **Case Number (STATE):** | 13-2005-CA-006570-0000-01 | **Judicial Section:** | 42 |

EXHIBIT D



**Forensic Document Examiners Inc.**
**E. C. Bryan**
Box 811958
Boca Raton, Fl. 33481
561.361.0007
BocaForensic@aol.com
www.FloridaDocumentExaminer.com

DATE:                           October 27, 2009

INVESTIGATION:           Questioned signature/document page: Washington Mutual
                                       Adjustable Rate Note

Dear Mr. Eskanos:

Upon your request, I met with Mr. Barry Eskanos on October 26, 2009, at the main
courthouse located at 73 W. Flagler Drive, Miami Beach, Florida. You instructed me to
examine the documents on file in regard to case number 05-06570-CA15. Specifically,
you requested that I examine pages one through six captioned "Adjustable Rate Note."

I have examined the following documents:

*Questioned:* (referred to as Q1, Q2, Q3, Q4, Q5, Q6)

   Q-1  Page 1 of 6 doubled sided includes Q 2, page 2 of 6
   Q-3  Page 3 of 6  double sided includes  Q-4  page 4 of 6
   Q-5  Page 5 of 6-double sided includes   Q-6  page 6 of 6

*Exemplars:* (known signatures referred to as K-1 through K-10 as displayed, in order as
they appear on pages 1-3 of photo copied checks) and K-11, additional exemplar.

   K-1 photo copy of canceled check #224
   K-2        "                    "            #226
   K-3        "                    "            #227
   K-4        "                    "            #228
   K-5        "                    "            #230
   K-6        "                    "            #231
   K-7        "                    "            #232
   K-8        "                    "            #234
   K-9        "                    "            #235
   K-10       "                    "            #237

*Additional document of known handwriting:*

K-11.  "Parent signature" of Ami Eskanos on one document, "Measurable Annual Goals and Benchmarks (Insert B) on page 2 of 2.

*Comments:*

In order to establish a document was written by a particular person, an examination of known, verified, genuine writing must be provided. When examining a multi page document, the writing, margins, typewritten text and paper must show substantial agreement without unexplainable differences. Substantial agreement in sufficient handwriting characteristics is needed to identify the maker and eliminate the possibility of any other writer. The paper should be consistent with other documents of the same batch, and should be the same font size (letter size) and style.

*Examination:*

This examination covers the obvious characteristics in handwriting, such as letter formations, spacing, margins, hooks, ticks (slash marks instead of dots over the letter "i" or similarly dotted letters), slant, and line quality as well as the less conspicuous characteristics including pressure patterns, proportions, connectors and initial and terminal stroke formations. Staple holes and punched holes are also scrutinized for alignment. Also examined are the typewritten aspects of each page of the multipage document. The type of font (type style) size and type of paper used for each page was considered.  Misaligned margins are usually indicative of mechanically altered documents or added pages, so margins are carefully examined.

*Equipment Used:*

Hewlett Packard Pavillion DV9000 computer
Zarbeco MiScope IR digital microscope-(infrared) with MiScope zoom from 15x to 140x
Zarbeco LP-100 florescent light (box) panel

MiScope Filter Kit:
Roscolux #27 (Medium Red)
Roscolux #21 (Golden Amber)
Roscolux #74 (Night Blue)

2

A.L.S. (alternate light source) White side lighting and Ultraviolet light
Straedtler grid measurement guide
Straedtler Computer Picus Scale
Straedtler Point Scale

*Conclusion: (original reports have my raised seal)*

Upon examining the double sided pages of the Washington Mutual Adjustable Rate Note numbered page 1 of 6 through page 6 of 6, an abundance of abnormalities and anomalies were detected. Specifically, the double sided page 5 of 6 and the reverse side, page 6 of 6 have the following differences (but not limited to):

1. Under ultraviolet light examination, the paper of pages 1 of 6 through page 4 of 6 fluoresced the same, but differently when compared to page 5/ 6. The difference in color (light that is emitted at a different frequency and reflected or absorbed) is indicative of a page substitution.

2. The paper of page 5/6 is a different texture than that of pages 1 through 4.

3. The font (style of print) on page 5/6 is inconsistent with that of pages 1 through 4. Under 140x and 40x magnification, the differences are readily observable. For example, the questioned page 5/6 is printed with a font that has rounded "i" dots. The preceding pages 1 through 4 are printed with fonts that produce square "i" dots. In addition, the tops of the "t" letters in pages 1 through 4 have angled slanted tops whereas the page 5/6 letter "t" has rounded tops. See exhibit section of report.

4. The margins on page 5/6 differ slightly and do not line up with the previous pages 1 through 4.

5. On the bottom of each page, (1 through 4) the page numbers are in the same position on each page. When the page number is examined using the florescent light box, the number of the page on the reverse side shows through and is in relative alignment. On the questioned page 5 and on the reverse side, page 6, when viewed with the florescent light box the page numbers do not line up and are in obvious different locations, far apart.

6. The numerical fonts on page 5/6 are different than on pages 1 through 4. Specifically to illustrate that point the number "3" and the numbers "1" and "2" are a different size and style on page 5/6 than on pages 1 through 4.

7. The signature of Ami Eskanos is suspect since it appears to be written with a lighter pressure and lighter color blue ink than on other documents. The signature has areas of unexplained tremors not present in the exemplars.

3

Therefore, it is the opinion of this examiner that page 5/6 of the Washington Mutual Adjustable Rate Note was not originally part of the 6 page package.

If you have any questions, please don't hesitate to call.

Sincerely,

E. C. Bryan

Certified Forensic
Document Examiner

4

EXHIBIT E

Court of Appeals
Third District
2001 S.W. 117 Ave,
Miami, FL 33175-1716

Re:    Third DCA Case No.: 09-3392
       Lower Court Number 05-06570 CA 15

To Whom It May Concern,

I am an employee of the law firm of Ackerman and Senterfitt. I have
worked with the lawyers on the above-entitled case and am aware, and
participated in the filing of false documents with the courts. I am admitting
this because I believe the investigators will find that a bunch of the
documents and affidavits are forged and false, and I will be ultimately
blamed and made a scape goat. My attorney advised me not to give my
name, but notify the court that the documents filed were meant to mislead
the court into giving us a judgment against the Defendants. He said that if
we do not take the houses because of the fraudulent documents, then it will
go better for me, but that I should take measures to alert the court of the
misleading paperwork and fraud and minimize the damages we caused by
lying.

I helped prepare forged documents and affidavits that contained lies in a
number of cases, including this one. I was told to do this by the lawyers and
should have stood up to them. I did not. For that, I am truly sorry. Also, I
know I should have spoken up earlier, but I was worried for obvious reasons
that I would get into a lot of trouble for my part in all of this.

After we won the Motion for Summary Judgment, the lawyer came into the
office and she bragged how we won on a "forged note", and how we can "do
anything and the court will believe it." All the lawyers in the office regularly
make comments like, "we have these judges in our back pockets," but I think
they are really worried that they are going to get caught now that all this
stuff has been in the newspapers.

I do not want these people in this case to lose their home because of the
things I did, and when the truth comes out, I do not want to be responsible
for the loss of their home. I am having trouble sleeping at night and feel

## DEFENDANTS' MOTION EXHIBIT 1

very bad for all those people we have hurt. I just found out that there is an investigator report proving that the note is forged. I do not want to be blamed for making up that note. I did not personally do that, but did go along with some of the other things that were done in this case.

When I learned there was a huge investigation by the FBI, the Attorney General and all the trouble that this has caused, I am sure that the truth will come out and don't want to be the only one blamed. I was doing what I was told. Everyone in the office knows what is going on, including the bosses.

Again, I am sorry.

Akerman and Senterfitt Employee

Cc:   Danny E. Eskanos, Esq
      783 Wildflower Dr
      Palm Harbor, Florida 346835889
      United States

      Clerk of the Courts
      Miami-Dade County Courthouse
      73 West Flagler Street, Suite # 242
      Miami, Florida 33130

EXHIBIT F

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT OF FLORIDA, IN
AND FOR MIAMI-DADE COUNTY

**WASHINGTON MUTUAL BANK, F.A.**

Case #:  05-06570 CA 15

Plaintiff,

v.

**AMI B. ESKANOS and BARRY B.
ESKANOS**

Defendant

_____/

**Affidavit of Debra Lyman**

I, Debra Lyman, being duly sworn, depose and say:

1.    I am the Vice President of Litton Loan Servicing LP,  which I shall refer to as "Litton."  I
have held this position at all times material to this affidavit.

2.    This affidavit is made from my personal knowledge, the source of which is my
professional responsibilities and duties.

3.    Litton is the servicing agent for RFC Homecomings Financial ("RFC"), the successor in
interest to Washington Mutual Bank, F.A. ("Washington Mutual") and the current
beneficial interest holder of Ms. Eskanos' loan.   As loan servicer, Litton is duly
authorized to submit this affidavit on Plaintiff's behalf.

4.    Ms. Eskanos executed a promissory note in favor of Washington Mutual in the amount of
$364,000.00 on October 28, 1999.  The note was secured by a mortgage signed the same
day.  The original note and mortgage have been filed with the Court and copies of the
note and mortgage are attached as **EXHIBITS 1** and **2,** respectively.

{FT539678;1}                    ACAP EXHIBIT 7



PLAINTIFF'S
EXHIBIT

A

5.    On March 25, 2005, subsequent to the filing of the foreclosure complaint, the loan was transferred from Washington Mutual to RFC. All rights under the note and mortgage were transferred at that time.

6.    At approximately the same time, servicing of the loan was transferred from Washington Mutual to Litton, which serviced the loan to present. Prior to that time, Washington Mutual serviced the loan from origination until transfer of servicing to Litton. Washington Mutual's loan file and servicing history were added to Litton's records pursuant to the transfer and are maintained within Litton's records in the ordinary course of Litton's business.

7. I have reviewed and am personally familiar with Ms. Eskanos' loan file, including all documents transferred from Washington Mutual, which is maintained by Litton and is within my custody and control. Entries in Ms. Eskanos' loan file are made by Litton employees with personal knowledge of the information being entered at or about the time the information is received or created. This is Litton's regular course of business.

8. In addition to Litton's paper business records, I am familiar with its on-line servicing history. This is an operating system that stores data files (*i.e.*, digital business records). Litton employees routinely input data into this servicing history and the data is entered by Litton employees with personal knowledge of the data being entered at or about the time the data is received or created.

9. The servicing history is used by Litton to record such events as the date of delinquency and default, as well as communications with borrowers. Printouts from the payment and servicing histories are attached as **EXHIBITS 3** and **4**.

Page 2 of 5

10. Ms. Eskanos failed to make the monthly installment payment due on October 1, 2004. A more detailed explanation of the default follows.

11. February 15, 2005, Ms. Eskanos had an escrow deficiency of negative $2,937.43, with $3,702.82 being held in suspense as insufficient to complete a full installment. That day, Ms. Eskanos made a $3,127.51 payment by Check No. 2815. Along with that payment, Washington Mutual took $1,923.29 out of suspense and from this total applied $680.01 to principal, $1,249.95 to interest, and $3,120.84 to escrow. This left a $183.41 positive escrow balance with $1,779.53 left in suspense because it was insufficient to complete the next installment.

12. The following day, on February 16, 2005, Washington Mutual took $1,204.22 out of the $1,779.53 in suspense and applied it to escrow. This left a $1,387.63 positive escrow balance, with $575.31 remaining in suspense because it was insufficient to complete the next installment.

13. On March 14, 2005, the Eskanoses made another payment of $3,127.51 by Check No. 2632. The entire amount was placed in suspense with the $575.31 already there.

14. On March 18, 2005, Washington Mutual paid $13,731.66 in county taxes from the escrow account, leaving an escrow deficiency of negative $12,344.03.

15. On March 25, 2005, Washington Mutual took $3,127.50 from suspense and applied it to the negative $12,344.03 escrow deficiency. This reduced the escrow deficiency to negative $9,216.53 with $575.31 held in suspense because it was insufficient to complete an installment.

16. At this point, Ms. Eskanos was six months behind, still owing her October, November and December 2004 and January, February, and March 2005 installments, and had an

Page 3 of 5

352

escrow deficiency of negative $9,216.53.  On March 29, 2005, the foreclosure complaint
was filed based on the October 1, 2004 installment still being due.

17. After the foreclosure complaint was filed, the Eskanoses sent in a check for $3,127.51
dated April 28, 2005, via Check No. 2656.  On July 19, 2005, Litton returned the check
un-cashed, explaining that the funds were not sufficient to pay the full amount due on the
loan.  A copy of the letter to the Eskanoses returning the check is attached as **EXHIBIT 5.**

18. The Eskanoses sent in a check for $3,127.51 dated July 28, 2005, Check No. 2664.  On
August 15, 2006, Litton returned the check un-cashed to Ami Eskanos, explaining the
funds were not sufficient to pay the full amount due on the loan.  A copy of the letter
returning the check is attached as **EXHIBIT 6.**

19. On October 5, 2005, the Eskanoses sent in a payment to prior servicer, Washington
Mutual in the amount of $3,127.51.  $836.75 was applied to court fees, $325.00 was
applied to title fees, $900.00 was applied to attorneys' fees, and the remaining $1,065.76
was held in suspense as it was insufficient to cure the Eskanoses' default or complete the
next monthly installment.

20. Washington Mutual issued a check to Litton for the remaining $1,065.76 in suspense to
be refunded to Ms. Eskanos because it was insufficient to cure her default.  Litton
forwarded this check directly to the Eskanoses in error, rather than issuing a check
payable to the Eskansoses.  *See* **EXHIBIT 7.** Litton was never notified about this error by
the Eskanoses.  Accordingly, the amount remains held as a credit on the account.

21. Ms. Eskanos made no further payments and has failed to cure her default.

22. Ms. Eskanos owes the following amounts on the loan:

Page 4 of 5

| $366,862.06 | Principal |
| $100,462.46 | Interest |
| $ 59,325.34 | Escrows |
| $ 1,578.25 | Late Fees |
| $ 44.50 | Property Inspection |
| $ 725.00 | Broker Price Opinions |
| $528,997.61 | Total Amount Due through December 31, 2008 |

23. Additionally, Litton, in its role as loan servicer, has retained Akerman Senterfitt to
represent plaintiff in this action. Litton is obligated to pay the firm a reasonable fee for
its services.

Further affiant sayeth not.



Debra Lyman
VICE PRESIDENT

STATE OF TEXAS:
COUNTY OF :

The foregoing instrument was acknowledged before me this 25th day of February 2008, by

Debra Lyman, who is personally known to me.

JUDY A. TIDWELL
Notary Public State of Texas
My Commission Expires
06-23-2009

Notary Public
Commission No.: _____

My Commission Expires:_____

Page 5 of 5

EXHIBIT G

**Adversary Number: 11-03107-AJC, Southern District of Florida  AND MIAMI DADE CASE NUMBER Case No.:  2012-22689-CA-01, ESKANOS V. WASHINGTON MUTUAL BANK, FA, with a claim amount of:**

**THERE, the WAMU AND GMAC are indebted to Plaintiffs jointly and severally in the principal sums of :**

- o. **Economic damages           $ 19,550,000;**
- p. **Non-economic damages      $ 45,500,000;**
- q. **Punitive damages              $198,150,000;**
- r. **Attorney's fees        $ 300,000;**
- s. **Slander of Credit        $ 1,000,000**
- t. **Total:                $ 264,500,000 plus interest thereon at the legal rate of 12 percent per annum; that defendant had been defaulted for failure to appear pursuant to Rule 55(a) of the Federal Rules of Civil Procedure;.**
- u. **Treble damages for FRAUDULENT TRANSFER OF ASSETS as admitted to Judge Crystol - $793,500,000.**
- v. **GRAND TOTAL $1,058,000,000.**

BARRY B. ESKANOS AND
AMI B. ESKANOS
3122 PINE TREE DRIVE
MIAMI BEACH, FL 33140
Tel: (305) 613-6894
Fax: (305) 735-3437
bbeskanos@aol.com

CREDITORS PRO SE


**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | CASE NO.  12-12020 (MG) |
| | ) | CHAPTER 11 |
| RESIDENTIAL CAPITAL, LLC, *et al* | ) | JOINTLY ADMINISTERED |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I declare that a true and correct copy of the foregoing was served on the following:

THE CHAMBERS OF THE HONORABLE MARTIN GLENN,
ONE BOWLING GREEN
NEW YORK, NEW YORK 10004

MORRISON & FOERSTER LLP
1290 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10104
ATTN. GARY S. LEE, ESQ., NORMAN S. ROSENBAUM, ESQ. AND
JORDAN A. WISHNEW, ESQ. ATTORNEYS FOR THE DEBTORS;

KRAMER LEVIN NAFTALIS & FRANKEL LLP,
1117 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036, ATTN KENNETH H. ECKSTEIN, ESQ.
AND DOUGLAS H. MANNAL, ESQ. ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

357

RESPECTFULLY SUBMITTED:

DATED:  September 18th, 2013


_____
Barry B. Eskanos, JD MPA
3122 Pine Tree Drive
Miami Beach, FL 33140
(305) 613-6894
bbeskanos@aol.com

359