# EXHIBIT A

NEWYORK 8992274 (2K)

**UNITED STATE BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------)
In re:                                                    )        **Chapter 11**
                                                          )
**RESIDENTIAL CAPITAL, LLC,** *et al.*,   )        **Case No.  12-12020 (MG)**
                                                          )
                              Debtors.    )        **Jointly Administered**
----------------------------------------------------------)

### ORDER GRANTING DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG FGIC, THE DEBTORS, THE TRUSTEES AND THE INSTITUTIONAL INVESTORS

Upon the motion, dated June 7, 2013 (the "**Motion**"), of Residential Capital, LLC

and its affiliated debtors in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**"), as

debtors in possession (collectively, the "**Debtors**"), pursuant to Fed. R. Bankr. P. 9019 for

approval of that certain Settlement Agreement entered into among the Debtors, Financial

Guaranty Insurance Company ("**FGIC**"), The Bank of New York Mellon, The Bank of New

York Mellon Trust Company, N.A., Law Debenture Trust Company of New York, U.S. Bank

National Association and Wells Fargo Bank, N.A., each solely in their respective capacities as

trustees, indenture trustees or separate trustees (collectively, the "**Trustees**") under the Trusts[1]

and the Institutional Investors, dated May 23, 2013 (the "**Settlement Agreement**"); and the

Court having jurisdiction to consider the Motion and the relief requested therein in accordance

with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein

being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409; and upon the affidavits of the Trustees of mailing

notice of the Settlement Agreement to all Investors in the Trusts; and due and proper notice of

the Settlement Agreement, the Motion and the relief requested therein having been provided to

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Settlement Agreement.

1212020130920000000000002

all parties in interest in the Chapter 11 Cases, including the Investors, in satisfaction of federal

and state due process requirements and other applicable law, and no other or further notice being

necessary; and the Court having reviewed the Settlement Agreement; and after due deliberation

and for good cause shown, it is

ADJUDGED, FOUND AND DETERMINED:

A.     The legal and factual bases set forth in the Motion establish just and

sufficient cause to grant the relief requested therein.

B.     The Settlement Agreement and the transactions contemplated thereby,

including the releases given therein, meet the standards established by the Second Circuit for the

approval of a compromise and settlement in bankruptcy, and are reasonable, fair and equitable

and supported by adequate consideration.

C.     The Settlement Agreement and the transactions contemplated thereby,

including the releases given therein, are in the best interests of the Debtors, their estates, their

creditors, the Investors in each Trust, each such Trust, the Trustees and all other parties in

interest.

D.     The Trustees acted reasonably, in good faith and in the best interests of the

Investors in each Trust and each such Trust in agreeing to the Settlement Agreement.

E.     Notice of the Settlement Agreement, including the Trustees' notice of the

same, is sufficient and effective in satisfaction of federal and state due process requirements and

other applicable law to put the parties in interest in these Chapter 11 Cases and others, including

the Investors in each Trust, on notice of the Settlement Agreement.

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.     The Motion is granted.

2.    Any and all objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled on the merits.

3.    The Settlement Agreement is hereby approved pursuant to Fed. R. Bankr. P. 9019(a) and the applicable decisional case law, and, pursuant to the terms and conditions of the Settlement Agreement, and subject to the occurrence of the Effective Date, the Debtors are hereby authorized and directed to take any and all actions as may be necessary to effectuate and implement the Settlement Agreement.

4.    Pursuant to the Settlement Agreement, and subject to the occurrence of the Effective Date, (a) the FGIC Claims shall be allowed as general unsecured claims against each of Residential Capital, LLC, GMAC Mortgage, LLC and Residential Funding Company, LLC (A) in the aggregate amount of $596.5 million, which amount (i) is equal to the sum of (x) $343.2 million, the amount of claims FGIC has paid under the Policies that remain unreimbursed and (y) $253.3 million, the sum of all of the Payment Amounts and (ii) will be allocated among Residential Capital, LLC, GMAC Mortgage, LLC and Residential Funding Company, LLC pro rata based on which of the Debtors would be obligated to reimburse FGIC for such payments under the Governing Agreements; or (B) if a chapter 11 plan contemplated by that certain Plan Support Agreement, dated as of May 13, 2013, by and among the Parties to the Settlement Agreement and certain other parties (the "**Plan Support Agreement**") is confirmed and goes effective, in the aggregate and allocated amounts, as applicable, set forth in Annex I (as such annex may be adjusted, amended or revised) of the Supplemental Term Sheet (as defined in the Plan Support Agreement) as provided for in the Supplemental Term Sheet Paragraph 2 at pages 6 and 7 (in the case of either (A) or (B), the "**FGIC Allowed Claims**"); provided, further

that if the Plan Support Agreement is terminated in accordance with its terms or the chapter 11

plan contemplated thereunder does not go effective, in addition to the FGIC Allowed Claims,

FGIC reserves all rights to assert general unsecured claims against each of Residential Capital,

LLC, GMAC Mortgage, LLC and Residential Funding Company, LLC, as reflected in the proofs

of claim filed by FGIC in the Chapter 11 Cases, with all claims by FGIC (including any FGIC

Allowed Claims or otherwise) against each such entity capped in each case at the amount of

$596.5 million and (b) the FGIC Allowed Claims shall be treated in accordance with the Plan

Support Agreement and the chapter 11 plan contemplated thereby, or, if such agreement is

terminated in accordance with its terms or the chapter 11 plan contemplated thereby does not go

effective, the FGIC Allowed Claims shall be treated *pari passu* with other unsecured claims

allowed against Residential Capital, LLC, GMAC Mortgage, LLC and Residential Funding

Company, LLC in the Chapter 11 Cases.

5.      The Settlement Agreement is not, and shall not be construed as, a

settlement, termination, release, discharge or waiver of any claims (including with respect to the

Prepetition Litigation) FGIC may have against non-Debtor affiliates of Residential Capital, LLC

(including Ally Financial, Inc.) or the Representatives of such non-Debtor affiliates.  For the

avoidance of doubt, this paragraph does not apply to the Representatives of the Debtors.

6.      Subject to the occurrence of the Effective Date, the Settlement Agreement

and the settlements, releases and discharges contemplated thereby shall be binding on all parties

in interest in the Chapter 11 Cases, including the Investors.

7.      Except as otherwise provided in the Settlement Agreement, this Court

shall retain jurisdiction with respect to all matters arising out of or relating to the

implementation, interpretation and/or enforcement of this Order.


**SO ORDERED.**

Dated:   September 20, 2013
            New York, New York


                              _____**/s/Martin Glenn**_____
                                   MARTIN GLENN
                              United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | **FOR PUBLICATION** |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Case No. 12-12020 (MG) |
|  | Chapter 11 |
| Debtors. | Jointly Administered |

### MEMORANDUM OPINION AND ORDER, AND FINDINGS OF FACT AND CONCLUSIONS OF LAW, APPROVING THE FGIC SETTLEMENT MOTION

*A P P E A R A N C E S :*

ALSTON & BIRD LLP
*Counsel to Wells Fargo Bank, N.A., as Trustee*
*of Certain Mortgage Backed Securities Trusts*
90 Park Avenue
New York, NY 10016
By:     John C. Weitnauer, Esq. (*pro hac vice*)
          Michael E. Johnson, Esq.

DECHERT LLP
*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company,*
*N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*
1095 Avenue of the Americas
New York, New York 10036-6797
By:     Glenn E. Siegel, Esq.

GIBBS & BRUNS LLP
*Attorneys for Steering Committee of RMBS Investors*
1100 Louisiana, Suite 5300
Houston, Texas 77002
By:     Kathy Patrick, Esq.

JONES DAY
*Attorneys for Creditor Financial Guaranty*
*Insurance Company*
222 East 41st Street
New York, New York 10017.6702
By:     Richard L. Wynne, Esq.
          Howard F. Sidman, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel to the Official Committee of Unsecured Creditors*
1177 Avenue of Americas
New York, New York 10036
By:    Philip S. Kaufman, Esq.

MCKOOL SMITH, P.C.
*Counsel for Federal Home Loan Mortgage Corporation*
One Bryant Park, 47th Floor
New York, New York 10036
By:    Peter S. Goodman, Esq.
       Michael R. Carney, Esq.

MORRISON & FOERSTER LLP
*Counsel for the Debtors and Debtors in Possession*
1290 Avenue of the Americas
New York, New York 10104
By:    Charles L. Kerr, Esq.
       Joseph Alexander Lawrence, Esq.

MOSS & KALISH, PLLC
*Counsel for Federal Home Loan Mortgage Corporation*
125 East 42nd Street
New York, New York 10128
By:    David B. Gelfarb, Esq.

ROPES & GRAY
*Attorneys for Steering Committee of RMBS Investors*
800 Boylston Street
Boston, Massachusetts 02199
By:    Andrew G. Devore, Esq.

SEWARD & KISSEL LLP
*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities
Trusts*
One Battery Park Plaza
New York, New York 10004
By:    Jeffrey Dine, Esq.
       Mark Kotwick, Esq.

WHITE & CASE LLP
*Attorneys for the Ad Hoc Group of Junior Secured Noteholders*
1155 Avenue of the Americas
New York, New York 10036
By:    J. Christopher Shore, Esq.

WILLKIE FARR & GALLAGHER LLP
*Attorneys for Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund limited and CQS Alpha Master Fund Limited*
787 Seventh Avenue
New York, New York 10019
By:     Joseph T. Baio, Esq.
        Mary Eaton, Esq.
        Emma J. James, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT**

      Before the Court is the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* (the "Motion," ECF Doc. # 3929).[1]  Through the Motion, the Debtors seek approval of a settlement agreement (the "Settlement" or "Settlement Agreement," Motion, Ex. 2) dated May 23, 2013, among the Debtors, Financial Guaranty Insurance Company ("FGIC"), the FGIC Trustees,[2] and the Institutional Investors[3] (collectively, the "Settlement Parties" or "Proponents").  The Proponents contend that the Settlement Agreement (i) is the product of months of good faith negotiations between numerous parties, (ii) resolves proofs of claim by FGIC totaling $5.55 billion in the aggregate, (iii) resolves the majority of the general unsecured claims asserted by the FGIC Trustees relating to the FGIC Insured Trusts, and (iv) is an essential cornerstone of the Global Settlement (defined below).  The Settlement Agreement additionally contemplates a $253.3 million payment from FGIC to the FGIC Trustees in exchange for the release of FGIC's obligations under its insurance policies, and the Motion asks the Court to make

---

[1]      In support of their Motion, the Debtors submitted the declarations of Lewis Kruger, Jeffrey Lipps and Ron D'Vari (Motion, Exs. 3-5).

[2]      The "FGIC Trustees" include The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., Law Debenture Trust Company of New York, U.S. Bank National Association and Wells Fargo Bank, N.A., each solely in their respective capacities as trustees, indenture trustees or separate trustees for certain FGIC Insured Trusts.

[3]      The "Institutional Investors" include certain members of the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants.

affirmative findings that the FGIC Trustees acted in good faith in entering the Settlement and

that the Settlement is in the best interests of the investors in each FGIC Insured Trust.

A group of investors (the "Investor Objecting Parties")[4] in the FGIC Insured Trusts as

well as the Ad Hoc Group of Junior Secured Noteholders ("Ad Hoc Group" or "JSNs") opposed

the Motion.  This opposition created a contested matter under FED. R. BANKR. P. 9014.  The

Court held a trial on the Motion on August 16 and 19, 2013, and as agreed at the conclusion of

the hearing on August 19, 2013, the Court received the parties' deposition designations, counter-

designations and objections on August 22, 2013.  With a few exceptions noted below, all

objections to the deposition designations and counter-designations are overruled, and the

deposition excerpts are admitted in evidence and considered as part of the trial record.[5]  The

direct trial testimony of lay and expert witnesses was presented at trial and admitted in evidence

in the form of written declarations, with the declarants present in Court and available for cross-

examination.  The parties offered numerous exhibits that the Court admitted into evidence during

the trial.[6]  Counsel conducted cross-examination and redirect examination of some of the

witnesses during the trial.

On September 11, 2013, the Investor Objecting Parties withdrew their objections to the

Settlement Agreement (ECF Doc. ## 5020, 5021).  The JSNs' objection remains pending.  All of

the evidence introduced in connection with this contested matter will be considered in resolving

---

[4]    Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited (the "Willkie Objecting Parties") (ECF Doc. # 4400); and Federal Home Loan Mortgage Corporation ("Freddie Mac," and, together with the Willkie Objecting Parties, the "Investor Objecting Parties").

[5]    The Court sustains two objections to deposition testimony: BNY's objection to Freddie Mac's designation (Sohlberg Dep. at 189:2-7); US Bank's objection to Freddie Mac's designation (Scott Dep. at 133:7-25).  All other objections are overruled.

[6]    The written direct testimony of lay and expert witnesses is cited in this opinion by witness name and paragraph number, e.g., Kruger Direct ¶ 1.  In-court testimony is cited by date and transcript page and line numbers, e.g., Trial Tr. 10:11-12.  Exhibits admitted in evidence are cited by exhibit number; the Settlement Proponents exhibits are identified with numbers, e.g., Ex. 5, and Objectors exhibits are identified with letters, e.g., Ex. D. Deposition testimony is referenced by witness name and page and line numbers, e.g., Kruger Dep. 10:11-12.

the issues raised by the Proponents and the JSNs even though the Investor Objecting Parties have
withdrawn their objections.

Following a thorough review of the record, the Court finds based on a preponderance of
the evidence that (i) the Settlement Agreement is fair, equitable and in the best interests of the
Debtors and their estates, and (ii) the FGIC Trustees acted in good faith in entering the
Settlement and the Settlement is in the best interests of the investors in each FGIC Insured Trust.
As explained below, the legal standards for approval of the Settlement are satisfied.  Therefore,
the Motion is **GRANTED**.

The findings set forth herein constitute the Court's findings of fact and conclusions of
law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by
Bankruptcy Rules 7052 and 9014.  In making the findings of fact, the Court considered the
credibility of the witnesses based on the Court's observation of their live testimony as well as
their written direct testimony and deposition testimony, when considered in relation to the rest of
the evidence submitted at trial.

## I.        BACKGROUND

On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition in
this Court for relief under Chapter 11 of Bankruptcy Code.  On July 3, 2012, the Court approved
Arthur J. Gonzalez as the examiner (the "Examiner") (ECF Doc. # 674).  On November 19,
2012, the Court approved the Debtors' sale of (i) their mortgage servicing businesses (the
"Platform Sale") and (ii) most of the estates' whole loan portfolio (the "Whole Loan Sale").
After the sales of the Debtors' assets, the Debtors focused their efforts on reaching a consensual
resolution of a chapter 11 plan.  After months of negotiations that failed to lead to a consensual
plan of reorganization, the Debtors sought the appointment of a plan mediator and, separately, of

a chief restructuring officer. The Court selected my colleague, the Honorable James M. Peck, as

Plan Mediator (the "Plan Mediator"). The Debtors, in consultation with the Creditors'

Committee, selected and the Court approved the appointment of Lewis Kruger as the Debtors'

Chief Restructuring Officer (the "CRO"). Mr. Kruger is a very experienced bankruptcy lawyer

who is independent, having had no prior relationship with the Debtors.

Following the Court's appointment of the Plan Mediator and months of arm's-length

mediation negotiations, the Debtors and most of their claimant constituencies reached a broad

settlement embodied in the Plan Support Agreement (the "Plan Support Agreement" or "PSA")

and Plan Term Sheet (the "Plan Term Sheet"), each dated May 13, 2013, and the Supplemental

Term Sheet (the "Supplemental Term Sheet"), dated May 23, 2013, for which the Debtors sought

Court approval (collectively, the "Global Settlement"). The PSA was approved by the Court on

June 26, 2013, and the Court entered a written opinion on June 27, 2013. (ECF Doc. ## 4098,

4102.) The Settlement Agreement that is the subject of this Motion, while a stand-alone

agreement, represents a critical component of the Global Settlement. Because the Settlement

Agreement involves an insurance company that is subject to a New York state court

rehabilitation proceeding, it required approval by the Supreme Court of the State of New York,

FGIC's rehabilitation court (the "Rehabilitation Court"); on August 19, 2013, Justice Doris Ling-

Cohan, in a written opinion, approved the Settlement.

### A.   FGIC's Claims Against the Debtors

As part of the Debtors' mortgage servicing and origination businesses, Debtors GMAC

Mortgage, LLC ("GMAC Mortgage") and Residential Funding Company, LLC ("RFC") acted as

Sponsor, Depositor, Master Servicer, Primary Servicer, or Subservicer in connection with

transactions involving the securitization of residential mortgages through securitization trusts (the "RMBS Transactions"). (Kruger Decl. ¶ 8.)

FGIC, a monoline financial guaranty insurance company, issued irrevocable insurance policies (the "Policies") for certain securities (the "Securities") issued by certain of the RMBS Trusts. By "wrapping" the Securities, FGIC guaranteed the payment of principal and interest due on the Securities. (*See* Kruger Decl. ¶ 9.) Additionally, FGIC entered into an Insurance and Indemnity Agreement with one or more of the Debtors in connection with each of the trusts "wrapped" by FGIC (the "Insurance Agreements"). (*Id.*) Pursuant to the Insurance Agreements, the Debtor-parties agreed, among other things, to reimburse FGIC for certain payments FGIC made under the Policies that resulted from the applicable Debtor's failure to repurchase or substitute mortgage loans that breached one or more representations or warranties contained in the applicable governing agreements.[7] (*See* Kruger Decl. ¶ 9.)

Beginning before 2008, certain of the Debtors originated or acquired residential mortgage loans that were contributed or sold to various trusts (the "RMBS Trusts"). The RMBS Trusts were formed and administered pursuant to the Governing Agreements. Forty-seven of the RMBS Trusts were "wrapped" by FGIC (the "FGIC Insured Trusts"). Wells Fargo Bank, N.A. ("Wells Fargo") serves as trustee of eight of the FGIC Insured Trusts (TX-103 ¶ 3). The Bank of New York Mellon Trust Company, N.A. ("BNY") serves as trustee of 31 of the FGIC Insured Trusts (TX-101 ¶ 5). U.S. Bank National Association ("U.S. Bank") serves as trustee of eight of the FGIC Insured Trusts (TX-102 ¶ 4) (Wells Fargo, BNY, and U.S. Bank, collectively, the "Trustees" or "FGIC Trustees"). Each of the FGIC Trustees also serves as trustee of several

---

[7]        In conjunction with their various roles in the RMBS Transactions, certain of the Debtors were parties to Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and other agreements (collectively, the "Governing Agreements") governing the creation and operation of the FGIC Insured Trusts (defined below). (Kruger Direct ¶ 16; *see e.g.,* Exs. 114 through 118.)

RMBS Trusts that are not wrapped by insurance policies issued by FGIC.  The Objecting

Investors either hold or are investment advisors to certain funds that hold Securities in the FGIC

Insured Trusts.  (TX-AB at 6-7.)

Before the Petition Date, FGIC filed twelve civil suits asserting a variety of claims

against ResCap, GMAC Mortgage, and RFC in connection with twenty of the FGIC Insured

Trusts.  (*See* Kruger Decl. ¶ 10.)  These actions are currently pending in the United States

District Court for the Southern District of New York, and each action has been stayed against the

Debtors as of the Petition Date.  (*Id*.)  Based on these prepetition lawsuits, FGIC filed three

general unsecured proofs of claim (the "FGIC Claims") against Debtors RFC, ResCap and

GMAC Mortgage totaling $5.55 billion in the aggregate—$1.85 billion against each Debtor.

(*See id.* ¶ 11.)

The FGIC Claims allege that: (1) RFC and GMAC Mortgage breached various

representations, warranties and/or covenants in the Governing Agreements or the offering

documents; (2) FGIC was fraudulently induced to issue the Policies in connection with most of

these FGIC Insured Trusts; and (3) ResCap is liable for the alleged breaches and fraud of GMAC

Mortgage and RFC under alter ego and aiding and abetting theories of liability.  FGIC also

asserted claims related to the Debtors' servicing of the mortgage loans in the FGIC Insured

Trusts, arguing that it was damaged by (1) the Debtors' failure to properly service the loans,

implement loss mitigation efforts, and enforce the FGIC Insured Trusts' sponsors' obligations to

repurchase or substitute mortgage loans that breached representations and warranties; and (2) the

Debtors' alleged refusal to provide FGIC access to certain financial information.  Last, the FGIC

Claims seek to recover certain amounts FGIC has been requested to pay under the Policies

pursuant to indemnification provisions contained in the Insurance Agreements.

The FGIC Trustees also filed claims against certain of the Debtors.  Their claims address

twenty-seven FGIC Insured Trusts that were *not* part of the pre-petition litigations.  The FGIC

Trustees assert that the FGIC Insured Trusts possess, among other things, breach of contract and

tort claims arising out of the representations and warranties contained in the Governing

Agreements, and that these claims could be equal to the aggregate estimated lifetime reductions

in the value of the collateral pools underlying the RMBS Trusts.  Dr. Ron D'Vari, one of the

Debtors' experts, estimates the aggregate of such claims to be approximately $5.41 billion.

(Direct Testimony of Ron D'Vari ¶ 4, July 31, 2013 ("D'Vari Direct," ECF Doc. # 4432).)

### B.    FGIC's Rehabilitation Proceeding

On November 24, 2009, the predecessor to the Department of Financial Services of the

State of New York (the "DFS") issued an order pursuant to the New York Insurance Law

requiring FGIC to suspend paying any and all claims and prohibiting FGIC from writing any

new policies.  (TX-AR at 12-13.)  As of that date, FGIC ceased making any payments relating to

the FGIC Policies.  (*Id*. at 13.)  On June 11, 2012, the Superintendent of the DFS (the

"Superintendent") filed a petition in the Supreme Court of the State of New York, New York

County, seeking an order appointing the Superintendent as the Rehabilitator of FGIC.  (*In re

Rehabilitation of Fin. Guar. Ins. Co.*, No. 401265/12, Verified Petition at 1, 18 (June 11, 2012).)

According to the Verified Petition, "[s]ince the fourth quarter of 2007, FGIC's business, results

of operations, and financial condition have been adversely affected" by significant losses on

RMBS policies due to a "dramatic, sustained increase in payment defaults on the U.S. residential

mortgage loans collateralizing these securities."  (Verified Petition ¶ 16.)  On June 28, 2012, the

Rehabilitation Court issued an order appointing the Superintendent to serve as the Rehabilitator

for FGIC (the "Rehabilitator"), and charged the Rehabilitator with taking possession of FGIC's

property and assets and with conducting FGIC's business.  (TX-212 at 4; TX-AR at 1.)

The Rehabilitator filed a proposed Plan of Rehabilitation (TX-AR at 1) on September 27,

2012, along with Amended Plans on December 12, 2012, April 12, 2013, and June 4, 2013 (the

"Rehabilitation Plan").  Justice Ling-Cohan approved the Rehabilitation Plan, without objection,

by order dated June 11, 2013.  *See In re FGIC*, No. 401265/2012, 2013 N.Y. Misc. LEXIS 3607,

at *2 (Sup. Ct. N.Y. County Aug. 16, 2013) (the "August 16th Mem. of Decision").  The

Rehabilitation Plan became effective on August 19, 2013.  (*In re Rehabilitation of Fin. Guar.

Ins. Co.*, No. 401265/12, Notice of Effective Date and Initial CPP (August 19, 2013.)

### C.      The Settlement Agreement

The FGIC Settlement Agreement consists of three main parts.  First, it provides for the

settlement, discharge and release of FGIC's obligations under the Policies in exchange for a bulk

cash payment of $253.3 million from FGIC to the FGIC Trustees (the "Commutation Payment").

The Commutation Payment will prevent any further claims against FGIC under the Policies,

ending any further accrual of claims that FGIC alleges it holds against the Debtors, particularly

the FGIC Claims seeking reimbursement or indemnification.

Second, the Settlement Agreement provides for the allowance of claims against certain of

the Debtors' estates.  If the Debtors' reorganization plan becomes effective, the amount of the

FGIC Allowed Claims will be the amounts set forth in the Supplemental Term Sheet of the PSA,

which currently provides that the FGIC Claims will be allowed against ResCap in the amount of

$337.5 million, GMAC Mortgage in the amount of $181.5 million, and RFC in the amount of

$415 million (for a total of $934 million).  This allowance is projected to yield a recovery of

approximately $206.5 million.  (*See* Kruger Decl. ¶ 19.)

If the PSA instead terminates in accordance with its terms, the FGIC Claims will be allowed in the amount of $596.5 million (the "Minimum Allowed Claim Amount"), allocated *pro rata* among ResCap, RFC, and GMAC Mortgage, based on which of the Debtors would be contractually obligated to reimburse FGIC for such payments under the Governing Agreements. FGIC will further retain its rights to assert a general unsecured claim against each of ResCap, GMAC Mortgage and RFC, though each claim against each Debtor will be capped at $596.5 million (which cap includes any portion of the Minimum Allowed Claim Amount allocated to such Debtor). The Settlement Agreement also does not preclude the Settlement Parties from objecting to or otherwise seeking subordination of any unsecured claims asserted by FGIC in excess of the Minimum Allowed Claim Amount. Thus, the Settlement Agreement provides a ceiling ($1.8 billion) and a floor ($934 million) for the amount of allowed claims that FGIC will receive, based on whether the reorganization plan is confirmed. Both of those figures are significantly lower than the $5.5 billion that FGIC has asserted against the Debtors.

Third, the Settlement Agreement provides that FGIC will release the remainder of the FGIC Claims against the Debtors' estates along with the bulk of the claims asserted by the FGIC Trustees on behalf of the FGIC Insured Trusts. According to Dr. D'Vari, the value of the claims that FGIC will release against the Debtors may be as high as $6.85 billion, less the maximum claim FGIC is permitted to assert against that Debtor. *See* D'Vari Decl. ¶ 2.

In addition, the Settlement Agreement contemplates that the order approving the Agreement (the "Proposed Order") will contain affirmative findings (the "Findings") in connection with the FGIC Trustees' entry into the Settlement Agreement. Settlement Agreement § 1.03. The Motion seeks a finding from the Court that the Settlement is (1) in best interests of (a) the investors in each FGIC Insured Trust, (b) each such FGIC Insured Trust, (c) the FGIC

Trustees and (d) all other parties, as well as (2) a finding that the FGIC Trustees have acted reasonably, in good faith and in the best interests of (a) the investors in each FGIC Insured Trust and (b) each such FGIC Insured Trust in agreeing to the Agreement.  The Motion also requests a finding that notice of the Settlement Agreement was adequate and satisfies due process.

### D.    Motion to Approve the Settlement Agreement

On June 7, 2013, the Debtors filed the Motion to approve the Settlement Agreement.  The FGIC Trustees filed a joinder in the Motion (ECF Doc. # 3982); they also filed declarations of the following individuals in support of the Settlement Agreement: Robert H. Major of BNY Mellon; Brendan Meyer of Deutsche Bank; Fernando Acebedo of HSBC; Thomas Musarra of Law Debenture; Mamta K. Scott of U.S. Bank; and Mary L. Sohlberg of Wells Fargo.  (ECF Doc. # 3940.)

The JSNs (ECF Doc. # 4027) and the Investor Objecting Parties (*see supra* n.4) (ECF Doc. ## 4400, 4453) opposed the Motion, although the Investor Objecting Parties later withdrew their objection.  The Investor Objecting Parties filed the declarations of the following individuals in support of their opposition: Paul V. Shalhoub of Willkie Farr (ECF Doc. # 4402); David Williams of CQS (ECF Doc. # 4430); Adam Sklar of Monarch (ECF Doc. # 4427); and K. Austin McQuillen of Bayview (ECF Doc. # 4425).  The Investor Objecting Parties also filed the declaration of their expert, Charles R. Goldstein of Protiviti Inc. ("Goldstein Direct," ECF Doc. # 4675).  Freddie Mac filed the declarations of Gina Healy of Freddie Mac (ECF Doc. # 4446), and their expert, Scott R. Gibson of MountainView IPS, LLC ("Gibson Direct," ECF Doc. # 4447).

Several parties filed replies, including the Debtors (ECF Doc. # 4474); the Committee (ECF Doc. # 4473); the Steering Committee Group of RMBS Holders ("RMBS Trustees") (ECF

Doc. # 4472); the FGIC Trustees (ECF Doc. # 4476); and FGIC (ECF Doc. # 4476).  The

Debtors filed the direct testimony of Lewis Kruger ("Kruger Direct," ECF Doc. # 4431), Jeffrey

A. Lipps ("Lipps Direct," ECF Doc. # 4689), and Ron D'Vari.  In addition, the FGIC Trustees

filed the direct testimony of their two experts: S.P. Kothari, Gordon Y. Billard Professor in

Management at the Sloan School of Management at the Massachusetts Institute of Technology

("Kothari Direct," ECF Doc. # 4443) and Allen M. Pfeiffer of Duff & Phelps, LLC ("Pfeiffer

Direct," ECF Doc. # 4454).  The FGIC Trustees also filed declarations of the following

individuals: Robert H. Major of New York Mellon ("Major Direct," ECF Doc. # 4692); Mamta

K. Scott, of U.S. Bank ("Scott Direct," ECF Doc. # 4697); and Mary L. Sohlberg of Wells Fargo

("Sohlberg Direct," ECF Doc. # 4695).  FGIC submitted the witness statement of John S. Dubel,

CEO of FGIC ("Dubel Direct," ECF Doc. # 4436).

In their Motion, the Debtors argue that each of the *Iridium* factors (defined below)

weighs in favor of approving the Settlement.  In particular, the Debtors determined that (i) absent

a settlement, they would be forced to engage in complex and protracted litigation with FGIC,

which would cause the estates to incur significant expenses with the likelihood of no better (and

perhaps a far worse) outcome; (ii) the Minimum Allowed Claim Amount is reasonable in light of

the releases of claims up to approximately $6.85 billion (less the maximum claim FGIC is

permitted to assert against that Debtor); (iii) the Settlement is in the best interest of creditors

because it will resolve significant claims against the estates for far less than the amounts

asserted; and (iv) the Settlement is supported by the Creditors' Committee and each of the other

parties to the Global Settlement after months of arm's-length negotiations by sophisticated

parties under the guidance of Judge Peck.

1.  *Investor Objecting Parties*

The Willkie Objecting Parties either hold or are investment advisors to certain funds

holding collectively over $714 million in current principal balance of "wrapped" securities

issued by certain of the RMBS Trusts.  Freddie Mac is a corporate instrumentality of the United

States of America, chartered by Congress under the Federal Home Loan Mortgage Corporation

Act, Title III of the Emergency Home Finance Act of 1970, 12 U.S.C. §§ 1451-59.  Freddie Mac

is the single largest FGIC-wrapped security holder.  Freddie Mac is also one of the largest

investors in FGIC-wrapped ResCap RMBS.  The Investor Objecting Parties made two primary

arguments: (1) the Court lacks jurisdiction to make the Findings, and (2) the Settling Parties have

not met their burden to establish the Findings.  Because the Investor Objecting Parties withdrew

their objections, the Court will only briefly discuss their arguments.

First, citing the McCarran-Ferguson Act ("MFA"), 15 U.S.C. § 1101 *et seq*, the Investor

Objecting Parties argued that the Rehabilitation Court, not this Court, has the exclusive

jurisdiction to determine whether the Settlement Agreement is fair and equitable to FGIC

policyholders under the reverse preemption doctrine.  Second, they argued that this Court lacks

jurisdiction to make Findings regarding the Trustees' behavior towards the Investor Objecting

Parties because the Trustees have no indemnification rights vis-à-vis the Debtors.  Third, they

claimed that the Trustees "manufactured" subject matter jurisdiction by demanding the Court

make the Findings.[8]  Fourth, the Investor Objecting Parties argued that the Findings are outside

---

[8]        The Court rejects the argument that the FGIC Trustees have "manufactured" jurisdiction.  The FGIC
Trustees timely asserted claims for indemnification against the Debtors for claims raised by investors in RMBS
trusts; as explained below, assertion of the claims for indemnification gives rise to "related to" jurisdiction that
permits the Court upon a proper showing to make the requested findings.
        It is hardly surprising that the FGIC Trustees refused to bear the risk of claims by investors that the FGIC
Trustees failed to act reasonably and in good faith in entering into the Settlement Agreement, or that the notice of
the Settlement Agreement provided by the FGIC Trustees was insufficient.  The FGIC Trustees, of course, have the

the scope of a Rule 9019 motion.  *See Krys v. Official Comm. of Unsecured Creditors (In re Refco, Inc.),* 505 F.3d 109, 119 (2d Cir. 2007).  Fifth, they argued that federal and state due process requirements had not been satisfied because the Debtors and the Trustees purportedly refused to disclose information about the Settlement negotiations and because of the compressed time frame of this proceeding.[9]

Substantively, the Investor Objecting Parties argued (1) that the Governing Agreements and the Trust Indenture Act ("TIA") prohibit the FGIC Trustees from commuting the policies without investor consent, which was never given; (2) the FGIC Trustees cannot amend the terms of the Governing Agreements to provide for a commutation because the Governing Agreements strictly proscribe alterations by means of amendment or entry into a supplemental indenture; (3) the proposed commutation amount is grossly inadequate and the Trustees breached their fiduciary duties to investors by agreeing to cut off the FGIC Insured Trusts' two independent sources of recoveries (outside of the mortgage assets of the trusts) for purportedly inadequate consideration; (4) the FGIC Trustees did not act in good faith because they negotiated the commutation in secret; (5) the FGIC Trustees violated their duty of loyalty to the beneficiaries because they represent various constituencies in these cases and in the Rehabilitation Proceeding, each with differing interests; and (6) the Findings are factually inaccurate because the Commutation Payment is not in the best interests of the investors or the FGIC Insured Trusts. Ultimately, the Investor Objecting Parties argued that the FGIC policyholders will obtain far less under the FGIC commutation than they would have under the Rehabilitation Plan.  Much of the evidence presented at trial focused on these issues and the Court's findings of fact are discussed

---

burden of establishing by a preponderance of the evidence that the Findings are supported by the record.  As explained below, the FGIC Trustees have carried their burden.

[9]        The Court rejects the argument that any of the Objectors were provided insufficient time or impermissibly limited discovery to oppose approval of the Settlement.

below.  Because the Settlement Agreement requires the Court to make the Findings regarding the

actions of the FGIC Trustees in entering into the Settlement, the Court will address these issues

even though the Investor Objecting Parties have withdrawn their objections.

> 2. *JSNs*

The JSNs argue that the Settlement Agreement is not in the best interests of the Debtors'

estates.  First, they argue that the maximum amount FGIC could actually recover against all

Debtors is $1.85 billion in the aggregate because their proofs of claim are duplicative, and

FGIC's allowed claim in the event that the plan is not confirmed is only approximately $60.5

million less than FGIC's total asserted claims.

Second, the JSNs argue that the Court should preserve the ability of parties in interest to

seek to subordinate FGIC's claims in an adversary proceeding brought pursuant to section 510(b)

of the Bankruptcy Code.  According to the JSNs, the FGIC Claims fall within the ambit of

section 510(b) because they are the direct result of, and intended to compensate for, damages

sustained on account of the purchase of the Securities, which are securities of one or more

Debtors.  The JSNs also believe subordination is appropriate because the FGIC Claims arise

from Governing Agreements which were an inextricable part of the purchase or sale of the

Securities and an instrument by which FGIC assumed the same risk of loss as purchasers of the

Securities.

Last, the JSNs argue that the process by which the Debtors entered into the Settlement

was improper.  The Debtors allegedly have refused to produce any information concerning the

nature of the negotiations between the Debtors and FGIC or provide any evidence to support the

process by which they determined to enter into the Settlement Agreement.  The JSNs criticize the

evidence that does exist, arguing that it does not support the allowance of the aggregate FGIC

Claims against GMACM and RFC.  They believe that the opinions formed by the Debtors'

experts should carry no weight because both experts were retained and/or did not form or convey

their opinions until after the Debtors entered into the Settlement Agreement.  The JSNs assert

that the Debtors offer no evidence as to why (1) FGIC is entitled to lock-in its recoveries on the

Global Settlement before that settlement is approved and before any other settling party is

allocated a portion of the Ally Contribution (discussed below), or (2) the FGIC Claims and FGIC

Trustee Claims should receive different treatment under the Settlement Agreement than other

claims asserted by monoline insurers and other wrapped RMBS parties in these cases.

Moreover, the Debtors allegedly have not produced any budget or analysis of the hypothetical

costs of defending against the FGIC Claims and FGIC Trustee Claims.

       The JSNs also argue that discovery provided by the Debtors as to the allowance of claims

against GMAC Mortgage and RFC shows that the allowance should not occur outside of a plan

resolving all Ally Financial Inc. ("AFI") issues.  Specifically, the JSNs argue that the Debtors

gave almost no consideration to the reasonableness of a failed plan scenario to the FGIC Claims.

In the failed plan scenario, the Settlement Agreement allows FGIC to assert any and all of its

claims directly against AFI, and AFI could then make a claim for indemnity or contribution

against one or more of the Debtors for any amounts FGIC recovered.

       In response, the Debtors and the Committee argue that the Settlement is in the estates'

best interest because the Debtors managed to reduce the asserted amount of the FGIC Claims by

nearly two-thirds (from $1.85 billion to $596.5 million against each of the Settling Debtors) with

two-thirds of the remaining asserted FGIC Claims still subject to objection and challenge by the

Debtors.  In addition, the Debtors dispute the JSNs' arguments that the FGIC Claims would be

subject to subordination under section 510(b) of the Bankruptcy Code, and they argue that the

JSNs are incorrect in claiming that the releases in the Settlement Agreement are illusory—the

Examiner concluded that third party claims against AFI for alter-ego, aiding and abetting, and

veil piercing are unlikely to prevail, and thus AFI likely would not have claims against the

Debtors for indemnification.

## II.      FINDINGS OF FACT[10]

### A.      Facts Supporting Debtors' Entry into the Settlement Agreement

At trial, none of the Investor Objecting Parties argued that the Settlement was not in the

best interests of the Debtors' estates, and the JSNs' only evidence concerning the best interests of

the Debtors' estates was their counsel's cross-examination of the Debtors' CRO, Lewis Kruger,

and certain deposition designations and counter-designations.  The JSNs did not sponsor the

testimony of any witnesses at trial.  As discussed below, the evidence overwhelmingly supports

the Debtors' entry into the Settlement Agreement.

#### 1.  Mr. Kruger Exercised Appropriate Business Judgment in Entering the Settlement

The Court finds that Mr. Kruger was authorized to enter into the Settlement Agreement

pursuant to his Engagement Letter (Ex. 30) and that he exercised his own independent business

judgment in determining that entry into the Settlement Agreement was in the best interests of the

Debtors and their creditors.  Prior to approving the Settlement Agreement, Mr. Kruger reviewed

a significant amount of materials including, but not limited to, one of the FGIC Complaints filed

pre-petition, one of FGIC's proofs of claim, a memorandum prepared by Morrison & Foerster

regarding the merits of the FGIC Claims, presentations by Morrison & Foerster on monoline

claims, a Carpenter Lipps & Leland presentation on monoline claims, and the substantive

materials prepared in connection with the RMBS 9019 Motion.  (Kruger Direct ¶¶ 10, 37; *see*

---

[10]      Section I of this Opinion—Backround—*supra*, contains the Court's findings of fact regarding the general
background of this dispute.  This Section of the Opinion contains Findings of Fact specific to approval of the
Settlement.

Exs. 54, 55, 56.)  Mr. Kruger's views of the Settlement Agreement were also informed by

additional discussions with his counsel, financial advisors, and with the other parties and

constituencies involved in the effort to reach a global settlement.

Mr. Kruger was aware that potential lifetime losses for the FGIC Insured Trusts could be

$3 to $4 billion.  (Kruger Direct ¶ 23.)  He understood that if the parties were unable to reach an

agreement to resolve the claims involving the FGIC Insured Trusts, the FGIC Trustees' claims

against the Debtors could be substantial and in the billions of dollars.  Mr. Kruger also

considered potential drawbacks to entering into the Settlement Agreement, such as the waiver of

the possibility to subordinate the FGIC Claims under Section 510(b) of the Bankruptcy Code and

possible future AFI indemnification claims; he believed that the benefits of the Settlement far

outweighed these risks, both of which he believed to be remote.  (*See* Trial Tr. 118:17-25;

125:10-22.)

> 2. *The Settlement Agreement Provides Many Benefits to the Debtors' Estates and the FGIC Insured Trusts*

Absent the Settlement Agreement, the Debtors would face complex and lengthy litigation

with FGIC and the FGIC Trustees over the validity, amount and possible subordination of their

asserted claims. (Kruger Direct ¶ 48; Kruger Dep. 125:10-21.)  This litigation would be fact-

intensive and would include relatively novel legal issues, making the potential outcome

uncertain.  (Kruger Direct ¶ 45.)  In addition, the Debtors have experienced tremendous attrition

among their employees who worked on the securitizations at issue and this would hinder the

Debtors' efforts to offer meaningful live testimony in support of the Debtors' defenses.  (*See*

Lipps Direct ¶¶ 129-130.)

The anticipated scope of discovery alone would likely involve tens of millions of pages

of documents and hundreds of days of deposition testimony from current and former employees

of the Debtor entities.  (*Id.* ¶ 141.)  The MBIA Insurance Corp. ("MBIA") litigation against RFC and GMAC Mortgage demonstrated the enormous discovery burden required: although the case involved only five securitizations, RFC has produced over one million pages of documents; MBIA has taken over eighty days of depositions and RFC has taken fifty days of depositions; and ten expert reports have been exchanged to date.  (*Id.* ¶¶ 142-44.)  Litigating the FGIC claims could pose an even greater burden than the MBIA cases, as the FGIC Insured Trusts consist of a larger number and a more diverse array of securitizations and loan types that were issued over many more years.  (*Id.* ¶ 146.)

The Settlement Agreement provides a number of significant benefits to the Debtors' estates and their creditors.  First, the amount of claims asserted against the estates is substantially reduced.  The remaining FGIC Claims will be limited to an amount between (i) the Minimum Allowed Claim Amount and the claims that FGIC is allowed to assert in the event that the plan contemplated under the PSA does not become effective, (ii) certain servicing claims held by the FGIC Trustees, and (iii) claims attributable to losses by holders of Securities not insured by the Policies.  (Kruger Direct ¶¶ 30-32; Ex.1 at § 2.01.)  Additionally, the Settlement provides increased certainty regarding the validity, priority and amount of the FGIC Claims and the FGIC Trustees' Claims, along with substantial cost savings when compared with the probable costs of professional fees and experts that would be needed if litigation over the FGIC Claims and the FGIC Trustees' Claims proceeded.  (*Id.*)  Equally important, the Settlement Agreement is part of the Global Settlement that, if ultimately approved, will provide a $2.1 billion contribution to the Debtors' estates from AFI and secure global resolution.  (Kruger Direct ¶ 40.)

The FGIC Insured Trusts and their investors benefit as well from the Settlement.  The FGIC Trustees will receive $253.3 million in cash compensation from FGIC which will be

distributed to the Trusts in accordance with the Governing Agreements.  (Kruger Direct ¶ 33;

Ex.1 at § 2.02.)  The Trusts will not have to wait for plan confirmation to receive payment, but

can and will be paid upon this Court's order approving this Settlement and the Rehabilitation

Court's order each becoming final.  (*Id*.)  The FGIC Trustees will also be relieved of the

responsibility of continuing to pay premiums of approximately $40 million on the Policies.

(Ex.1 at § 2.01(a)(i).)  Discounted at a 15% rate, these omitted payments represent approximately

$18.3 million in present value savings to the FGIC Insured Trusts.  (Dubel Direct ¶ 23.)

Moreover, FGIC will also forgo its right to receive reimbursements from the FGIC Insured

Trusts pursuant to the waterfall provisions under the Governing Agreements and these amounts

will be retained by the Trusts.  (Dubel Direct ¶ 25; Ex. 1 at § 2.01(b).)

> 3. *The Settlement Is the Result of Arm's-Length Negotiations Between Sophisticated Parties and Is Supported by Nearly Every Major Creditor Constituency in These Cases*

The parties who negotiated the Settlement were all represented by competent and

experienced counsel.  (Kruger Direct ¶ 56.)  The Mediation, overseen by Judge Peck, proceeded

over approximately five months of intense negotiations among the Settlement Parties and

involved dozens of small group mediation meetings and conference calls, which culminated in a

series of five all-hands mediation sessions, and ultimately produced the Settlement Agreement.

The Settlement Agreement has support from entities that hold or represent the holders of the

overwhelming majority of claims asserted in the Debtors' chapter 11 cases.  (Kruger Direct ¶

54.)  Each of the Debtors' claimant constituencies that have signed on to the PSA also support

the Settlement Agreement.

### B.    Facts Supporting the Findings

The Settlement Agreement contemplates that the order approving it will contain Findings that (1) the relief requested in the Motion is in best interests of the investors in each FGIC Insured Trust, each such FGIC Insured Trust, the FGIC Trustees and all other parties; and (2) the FGIC Trustees have acted reasonably, in good faith and in the best interests of the investors in each FGIC Insured Trust.  Much of the hearing revolved around these factual issues.  Based on the evidence submitted at trial, the Settling Parties have demonstrated that these Findings are supported by a preponderance of the evidence and are necessary and appropriate in the circumstances.

### 1.    The FGIC Trustees Retained and Relied on Experienced Financial Professionals and Sophisticated Counsel in Entering the Settlement

At the outset of these chapter 11 cases, the FGIC Trustees retained Duff & Phelps as their financial advisor in the bankruptcy.   Duff & Phelps was chosen by the FGIC Trustees over other qualified candidates after a rigorous interview process, because, among other things, it had extensive experience in mortgage loan servicing agreements and loan origination agreements, asset valuation, complex securitizations and RMBS loan repurchase actions.  (Major Direct ¶¶ 18-19; Scott Direct ¶¶ 15-16; Sohlberg Direct ¶¶ 11-12.)  The FGIC Trustees also retained experienced and knowledgeable counsel and have been advised by counsel throughout these chapter 11 cases, including in connection with their consideration of the Settlement Agreement.  (Major Direct ¶ 16; Scott Direct ¶ 13; Sohlberg Direct ¶ 10; Dubel Direct ¶ 11; Kruger Direct ¶¶ 5, 14, 42, 56 and 57.)

The FGIC Trustees, their counsel, and Duff & Phelps all participated in the Mediation and negotiation of the Settlement Agreement.  During the Mediation, the FGIC Trustees were asked to consider a settlement proposal between FGIC, MBIA and the Steering Committee

Consenting Claimants (the "Settlement Proposal"). (Major Direct ¶ 8; Scott Direct ¶ 7; Sohlberg Direct ¶ 6.) Certain terms of that Settlement Proposal ultimately became the basis of the Settlement Agreement.

The Settlement Proposal included, among other things, the payment of the lump sum Commutation Payment by FGIC to the FGIC Insured Trusts in satisfaction of any obligations of FGIC to make projected payments in the future (the "Projected Payments") to the FGIC Insured Trusts under the Rehabilitation Plan. Extensive negotiations regarding the amount of the Commutation Payment, and other terms of the Settlement Agreement, began on or about January 14, 2013, and continued through late March or early April 2013. (*See* Trial Tr. 52:13-17; 467:8-19; Ex. 311 (Dubel timeline).) The Commutation Payment amount was reached through negotiations among FGIC, the Steering Committee Consenting Claimants, MBIA, the Debtors, and a representative of the FGIC Trustees. (Ex. 311; Dubel Direct ¶¶ 6-7, 10-11, and 16; Dubel Dep. 145:25-146:21, 146:24-147:10; *see also* Major Dep. 154:22-155:9; Major Direct ¶¶ 8-9, 16.)[11]

Before entering the Settlement, the FGIC Trustees requested that Duff & Phelps analyze the economic terms of the Settlement Proposal and, in particular, compare the value of the Projected Payments under the Rehabilitation Plan with the Commutation Payment and other value to the FGIC Insured Trusts under the Settlement Proposal, and provide a recommendation to the FGIC Trustees. (Major Direct ¶ 9; Scott Direct ¶ 8; Sohlberg Direct ¶ 7; Trial Tr. 259:14-24; Sohlberg Dep. 56:3-5, 56:8-18, 138:15-19, 138:20-139:6.) After receiving the initial

---

[11]    The timeline included with Mr. Dubel's direct testimony indicates that there were at least ten meetings and calls between FGIC, the Steering Committee Consenting Claimants, and others between the beginning of Mediation and the time that the parties arrived at the $253 million Commutation Payment. (Ex. 311.) BNY Mellon participated in at least one of these meetings in mid-March. (Ex. 311 at 3; Dubel Dep. 145:25-146:21, 146:24-147:10.) Ms. Scott testified that U.S. Bank's counsel did most of the negotiating. (Trial Tr. 189:23-190:4.) Ms. Sohlberg similarly testified at trial that although she did not make any comments to drafts of the Settlement Agreement, Wells Fargo's legal counsel "participated in the drafting of the agreement." (Trial Tr. 142:20-143:2; *see also* Major Dep. 154:22-155:9.)

Settlement Proposal in April 2013, the FGIC Trustees did not ask Duff & Phelps to analyze how the Commutation Payment was determined, but rather how the financial terms of the Settlement Proposal, and in particular the Commutation Payment, compared to the Projected Payments. (Major Direct ¶ 28; Scott Direct ¶ 25; Sohlberg Direct ¶ 21.)

In conducting its analysis, Duff & Phelps reviewed and analyzed publicly available information and also signed a confidentiality agreement with FGIC, pursuant to which Duff & Phelps had access to FGIC's Chief Restructuring Officer and Lazard Freres & Co. LLC ("Lazard"), the financial advisors to the FGIC Rehabilitator, providing additional information concerning the Rehabilitation Plan.  (Major Direct ¶ 29; Scott Direct ¶ 26; Sohlberg Direct ¶ 22; Pfeiffer Direct ¶ 14.)

Duff & Phelps analyzed the recoveries to *each* of the forty-seven FGIC Insured Trusts under the Settlement Proposal and Rehabilitation Plan.  It analyzed and calculated the actual and projected losses of the FGIC Insured Trusts on a trust-by-trust basis in order to estimate Projected Payments to the trusts under the Rehabilitation Plan.  (Pfeiffer Direct ¶¶ 35-39, 42.)  In order to determine the present value of the Projected Payments, Duff & Phelps used what it believed was a reasonable discount rate to determine the present value of those projected future cash flows.  (Pfeiffer Direct ¶¶ 53, 81; Kothari Direct ¶¶ 8-15.)  Duff & Phelps concluded that a range of discount rates of 10-20% was reasonable to discount future cash flows under the Rehabilitation Plan.[12]  (Pfeiffer Direct ¶ 54.)

All FGIC policyholder claims, including those of the FGIC Insured Trusts, are intended to receive the same nominal payout under the Rehabilitation Plan, regardless of when the claims are incurred.  Approximately 80% of the FGIC Insured Trusts' claims under the Policies,

---

[12]      Freddie Mac's expert witness, Scott Gibson, testified that Duff & Phelps' use of the 10-20% discount rate range was reasonable.  (Trial Tr. 369:7-15.)

however, have either already been incurred or are estimated to be incurred in the next five years.

(Pfeiffer Direct ¶ 75.)  Under the Rehabilitation Plan, those claims will be paid out over the next

forty years.  As a result, the Projected Payments to the FGIC Insured Trusts have a lower present

value relative to the claims of policyholders that are projected to arise later in time.  (*Id.* ¶¶ 70-

76.)  Because the claims of the FGIC Insured Trusts are front-loaded, Duff & Phelps estimated

that the FGIC Insured Trusts would *not* receive 27-30% net present value recovery as estimated

for all FGIC policyholders under the Rehabilitation Plan; Duff & Phelps estimated that the actual

recoveries would be closer to 24-28% on a discounted basis.  (Pfeiffer Direct ¶¶ 52-60.)

In early May 2013, Duff & Phelps provided to the FGIC Trustees draft discussion

materials setting forth its analysis of the Settlement Proposal.  (Scott Dep. 45:5-10; Exs. 119-

122.)  On May 13, 2013, Duff & Phelps made a presentation in New York to the FGIC Trustees

and their counsel concerning the Settlement Proposal (the "May 13 Presentation").  The

presentation was also available via a "webex" that allowed people to participate remotely.

During the May 13 Presentation, the FGIC Trustees focused on how the Commutation

Payment, together with the other benefits to each of the forty-seven FGIC Insured Trusts under

the Settlement Proposal, compared to the Projected Payments under the Rehabilitation Plan.

(Major Direct ¶ 33; Scott Direct ¶ 30; Sohlberg Direct ¶ 28.)  The FGIC Trustees testified that

they understood Duff & Phelps' analysis and its advice that the financial benefits of the

Settlement Proposal, including in particular the amount of the Commutation Payment, was

within the reasonable range of Projected Payments under the Rehabilitation Plan.  (Major Direct

¶¶ 33, 35 Scott Direct ¶¶ 30, 33; Sohlberg Direct ¶¶ 25, 27; Major Dep. 125:10-127:25.)

On or about May 15, 2013, Duff & Phelps provided a final written version of its analysis

to the FGIC Trustees (the "Duff Report," Ex. 123).  The Duff Report concluded that (i) the

$253.3 million Commutation Payment is within the reasonable range of the present value of the

Projected Payments *to each of the forty-seven FGIC Insured Trusts*; (ii) that there is value

associated with not having to pay premiums on the Policies going forward; and (iii) that the

Settlement Agreement, as part of the Global Settlement, adds value to the Trusts by resolving

various outstanding disputes in the chapter 11 cases, including various potential litigations and

inter-creditor disputes in the chapter 11 cases.  Duff & Phelps recommended that the FGIC

Trustees accept the Settlement Proposal and forego the Projected Payments.

Based on the FGIC Trustees' prior work with Duff & Phelps in the chapter 11 cases, Duff

& Phelps' access to FGIC and Lazard in connection with analyzing the Settlement Proposal, the

Duff Report and the May 13 Presentation, the FGIC Trustees relied on Duff & Phelps'

recommendation in entering the Settlement.  (Major Direct ¶ 39; Scott Direct ¶ 36; Sohlberg

Direct ¶ 30.)[13]

2. *The Settlement is in the Best Interests of the Investors in the FGIC Insured*
   *Trusts*

The Settling Parties have established by a preponderance of the evidence that the

Settlement Agreement, as a whole, is in the best interests of the Investors in each of the FGIC

Insured Trusts.  The primary evidence supporting this Finding is the written direct testimony and

live testimony of Pfeiffer and Kothari.  The primary evidence in opposition to the Finding was

set forth in the direct testimony and live testimony of Goldstein and Gibson, both of whom were

retained by the Investor Objecting Parties.  As previously noted, the Investor Objecting Parties

ultimately withdrew their objections to the Settlement.

---

[13]      Ms. Sohlberg also testified that she understood the Settlement Agreement as "an integral part of a Plan
Support Agreement" that provided additional value for Investors in the FGIC Insured Trusts, and the FGIC Trustees
considered that value in deciding to enter into the Settlement Agreement.  (Sohlberg Direct ¶ 8.)  Ms. Sohlberg was
aware that the supplemental term sheet for the Plan was not executed until May 22nd or 23rd.  (Trial Tr. 160:13-18.)

In March 2013, FGIC estimated projected losses related to the FGIC Insured Trusts to be
approximately $481 million. (Pfeiffer Direct ¶¶ 28-30.)  FGIC's calculations show an overall
estimated recovery of 28.5% (the "Base Case Payout"); the amount of the Commutation Payment
($253.3 million) equals the aggregate claims multiplied by the Base Case Payout multiplied by
an assumed discount of 40%.[14]  (*Id.*)

Pfeiffer, the Debtors' expert, calculated the range of recoveries under a base scenario of
the Rehabilitation Plan to be $217 to $340 million, and thus a Commutation Payment of $253.3
million with a value of $272 million (and a possible additional $92 million distribution if the
Plan is approved) is reasonable.  (*Id.* ¶ 60.)  Dr. Kothari affirmed Pfeiffer's conclusions.  The
Investor Objecting Parties' expert, Mr. Goldstein, testified that FGIC Insured Trusts should
expect to receive the present value of total payments equaling approximately $386 million under
the terms of the Rehabilitation Plan using a 28.5% discount rate.  (Goldstein Report (Goldstein
Direct, Ex. A) ¶ 26.)  For the reasons stated below, the Court found the evidence presented by the
Settling Parties' experts to be credible and persuasive, and the Court concludes that the
Commutation Payment is reasonable and in the best interest of the investors in the FGIC Insured
Trusts.

Under the Rehabilitation Plan, FGIC could pay a certain cash payment percentage
("CPP") (subject to annual adjustment) of each permitted policy claim, in cash, with the
remainder of the claim to be treated as a deferred payment obligation ("DPO") to be paid over a
forty year period.  The DPO accrues interest at a rate of three percent per annum on a non-
compounding basis.  (Pfeiffer Direct ¶ 19.)  Pfeiffer testified that under a base scenario, each
policyholder is projected to receive a nominal recovery of 38.6% of their permitted policy claims

---

[14]     Although the Investor Objecting Parties argued that this 40% discount is arbitrary and unsupported, it was
not relevant to Duff's analysis—it pertained solely to FGIC's, not Duff's, calculations.

by 2052, and the net present value of aggregate recoveries divided by the net present value of all

permitted policy claims is estimated to be 27-30%.  (*Id*. ¶ 26.)

However, the evidence shows that actual recoveries under the Rehabilitation Plan may

differ materially from the estimated recoveries.  As previously discussed, the claims of the FGIC

Insured Trusts are front-loaded, meaning investors in the FGIC Insured Trusts would not receive

the same present value recovery as FGIC policyholders whose claims have not yet accrued.  (*See*

Pfeiffer Direct ¶¶ 70-76.)   In addition, there are multiple factors at play that could "significantly

increase the pool of projected losses."  (*Id*. ¶ 51.)  First, the Commutation Payment is a fixed

amount, while the estimated $150 million initial Projected Payments to the FGIC Insured Trusts

under the Rehabilitation Plan is uncertain and subject to change at the discretion of the FGIC

Rehabilitator.  (*See* Ex. AS (Plan Approval Order, *In the Matter of the Rehabilitation of FGIC*,

June 13, 2013).)  Second, the amount and timing of any future Projected Payments is uncertain,

and there is a risk that future Projected Payments will fall short of the amount of the

Commutation Payment.  (Ex. 123 at 3; Major Direct ¶ 37; Scott Direct ¶ 34; Sohlberg Direct ¶

28.)  And, any Projected Payments would be paid over forty years.

Other factors further contributing to the uncertainty surrounding the Projected Payments

under the Rehabilitation Plan include outdated projections, uncertainty of FGIC's actual

investment income, uncertainty regarding tax-related payments, uncertainty of the expected

timing and magnitude of claims, and the unpredictable litigation recoveries that contribute to the

uncertainty surrounding the Projected Payments.  (Pfeiffer Direct ¶¶ 44-56.)  The extended time

frame for payment of claims under the Rehabilitation Plan also subjects the investors in the

FGIC Insured Trusts to myriad risks relating to the economy.  For example, FGIC has potentially

over two billion dollars in exposure to bonds issued by Detroit.  (Trial Tr. 73:4-11.)  As a result

of the recent Detroit bankruptcy and other declines in the public finance sector, FGIC had

increased its reserves for the second quarter of 2013 "by approximately a little over 800 million

dollars." (Trial Tr. 74:11-22.)

The Settlement Proposal and the fixed amount of the Commutation Payment eliminates

the risk and uncertainty associated with the financial condition of FGIC. (Major Direct ¶¶ 37,

54; Dubel Direct ¶ 26.) The Settlement Agreement "mitigates downside risk to Investors by

securing a known payment to Investors following approval of the Settlement Agreement by the

Bankruptcy Court and the Rehabilitation Court." (Pfeiffer Direct ¶ 12.)

When weighing the uncertainty of payments from FGIC, the FGIC Trustees considered

that although the FGIC Insured Trusts continued to pay premiums under the FGIC Policies, they

had not received payments on any claims made under the Policies since late 2009. (Major Direct

¶ 37; Scott Direct ¶ 34; Sohlberg Direct ¶ 28.) The FGIC Trustees therefore concluded that

securing a certain and immediate payment and eliminating future payment risk represents a

significant benefit and is in the best interests of each of the forty-seven FGIC Insured Trusts and

their respective holders. (Major Direct ¶ 37; Scott Direct ¶ 34; Sohlberg Direct ¶ 28.) As further

discussed below, the Court finds that the evidence establishes that the FGIC Trustees reached

this conclusion in good faith and in the best interests of the investors and each of the FGIC

Insured Trusts.

In addition to the Commutation Payment, the Settlement Agreement provides that FGIC

will no longer have any rights "to receive any premiums, reimbursements or any other amounts

otherwise payable to FGIC" from each of the FGIC Insured Trusts pursuant to the waterfall

provisions of the Governing Agreements. (Ex 1 at § 2.01(b).) Thus, under the Settlement

Agreement, each of the FGIC Insured Trusts will avoid paying their respective portion of some

$40 million in aggregate future insurance premiums under the Policies, resulting in an aggregate

net present value of approximately $18.3 million.  (Major Direct ¶ 38; Pfeiffer Direct ¶ 57.)

Additionally, pursuant to the Governing Agreements, FGIC had the right to receive all

amounts owing to it under the Policies for each of the FGIC Insured Trusts. (*See, e.g.,* Ex. 116 §

5.04(b); Ex. 118 §§ 4.02(c), (d) & 4.12.)  Under the Settlement Agreement, FGIC agrees to

forego its right to receive reimbursement amounts from each of the forty-seven FGIC Insured

Trusts pursuant to the waterfall provisions under the relevant Governing Agreements.  (Ex. 1

§2.01(b).)  "Reimbursements" refer to recoveries on individual mortgage loans (such as

foreclosure or REO sale proceeds) that are received by a FGIC Insured Trust after FGIC has paid

a loss with respect to the loans; the FGIC Insured Trusts are obligated to pay to FGIC certain of

these reimbursements.  (*See, e.g.,* Ex. 116 § 5.04(b); Ex. 118 §§ 4.02(c), (d) & § 4.12; Ex. AS.)

Although the FGIC Trustees recognized this as additional value to the FGIC Insured

Trusts at the time they were considering the Settlement Proposal (Major Direct ¶ 38; Scott Direct

¶ 35; Sohlberg Direct ¶ 29), it was, and continues to be, a largely unquantified value.  FGIC

itself, however, has estimated that the value of the reimbursements it is foregoing from the FGIC

Insured Trusts, based on projections in its publicly filed financial statements, could exceed $140

million over the lifetime of the FGIC Insured Trusts.  (Dubel Direct ¶ 29.)  While Mr. Dubel

testified that the value of the reimbursements in uncertain (Trial Tr. 66:3-5), any value that exists

will go to the Trusts and not FGIC under the Settlement Agreement (Dubel Direct ¶ 25).

The combined notional value of the Settlement Agreement to the FGIC Insured Trusts

and their investors is therefore significantly higher than the $253.3 million Commutation

Payment.  The total value also includes the forgone premiums of approximately $18.3 million in

aggregate present value and the potential additional distributions of approximately $92 million in

recoveries under the proposed Chapter 11 Plan for alleged breaches of representations and warranties. Even before adding the value of the waived reimbursements, the total value of the Settlement Agreement exceeds $363.6 million, assuming the Plan is confirmed. (Pfeiffer Direct ¶ 59.) Even if the Plan is not confirmed, the present value of the Settlement Agreement is $271.6 (present value) plus the present value (currently undetermined) of the estimated notational value of the reimbursements of approximately $140 million.

In the absence of the Settlement Agreement and the Global Settlement, the amount of future recovery, if any, by each of the forty-seven FGIC Insured Trusts and their holders in the chapter 11 cases is highly uncertain. First, under the terms of the PSA and Plan, AFI will make a $2.1 billion contribution to the Debtors' estates, which is a substantial portion of the assets that will be distributed to the creditors of the Debtors' estates (including the FGIC Insured Trusts). Second, the PSA and Plan allow the repurchase claims and servicing claims of the FGIC Insured Trusts that otherwise would be the subject of time-consuming and uncertain proceedings. Third, many of the contentious and complicated inter-creditor issues in the chapter 11 cases are resolved by the PSA and Plan, including disputes over the priority of claims asserted by FGIC and the other monoline insurers and by certain other securities claimants. "Absent the Settlement Agreement and the overall global settlement, the Debtors' estates would be diminished significantly and there is very little likelihood that the creditors will see a distribution, if any, for years to come." (Kruger Direct ¶ 4.) Finally, the Plan effectively abates the continued accrual of the administrative costs of the chapter 11 cases, thus increasing the amount of ultimate recoveries to all creditors, including the FGIC Insured Trusts.

Dr. Kothari, who was retained by the FGIC Trustees to determine whether Duff's analysis was reasonable, concluded that (i) the discount rates of ten to twenty percent per annum

used by Duff in its analysis of the expected payouts to FGIC Insured Trusts under the
Rehabilitation Plan were reasonable; (ii) the Commutation Payment is within the range of
present values of the expected payouts to the Trusts under the Rehabilitation Plan; (iii) it was
reasonable for Duff to not include potential recoveries associated with pending litigation in its
model; and (iv) to the extent the prices of certain FGIC-wrapped securities declined around the
time of the Settlement Agreement, that does not mean the Settlement Agreement is unfavorable
to the holders of the securities.  (Kothari Direct ¶ 6.)  In fact, Kothari found that Duff made
certain choices in its model that would tend to result in a less favorable view of the Settlement
Agreement from the perspective of Investors—Duff did not conduct an analysis under the
updated stress scenario from the Miller Affidavit, where it assumed that macroeconomic
conditions deteriorate, housing prices decline and unemployment increases significantly; and
Duff did not include in its quantitative analysis the benefit of the releases of the FGIC Insured
Trusts from all obligations, claims or liabilities (such as FGIC premiums, expenses and
recoveries).  (*Id*. ¶ 19.)

Overall, the Settling Parties established by a preponderance of the evidence that the
Settlement Agreement, as a whole, is reasonable with respect to the Investors in each of the
FGIC Insured Trusts.  In particular, (i) the Settlement Payment is within the range of
reasonableness when compared to the Projected Payments under the Plan of Rehabilitation (the
$253.3 million Settlement Payment is a fixed amount, whereas the amount that each non-settling
trust would otherwise receive under FGIC's Plan of Rehabilitation remains uncertain, and it
eliminates the risk of dilution by an increase in policy claims against FGIC); (ii) FGIC is
agreeing to forego insurance premiums from the FGIC Insured Trusts of approximately $18.3
million (increasing the value of the Settlement Payment to $272 million); (iii) FGIC is agreeing

to forego reimbursements from the FGIC Insured Trusts that FGIC stated could be in excess of

$140 million dollars; and (iv) the Settlement Agreement potentially confers significant benefits

upon the FGIC Insured Trusts as part of a Global Settlement embodied in the PSA, including an

additional estimated $92 million to be distributed to the FGIC Insured Trusts.  The Court finds

the testimony provided by the Settling Parties' expert witnesses to be in-depth, convincing and

credible.  In light of the fact that the Investor Objecting Parties withdrew their objections, the

Court will not fully address the evidence set forth by their experts at the hearing; that being said,

however, the Court finds that the evidence introduced by the Investor Objecting Parties fails to

overcome the strong and persuasive evidence introduced by the Proponents.

3. *The Evidence Supports the Finding that the FGIC Trustees Acted in Good Faith and in the Best Interests of the Investors in Each FGIC Insured Trust*

The Proponents have established by a preponderance of the evidence that the FGIC

Trustees acted reasonably, in good faith and in the best interests of Investors in each of the FGIC

Insured Trusts in negotiating and entering the Settlement.  First, the Settlement Agreement,

which (as discussed above) represents a reasonable settlement of the FGIC Insured Trusts'

claims against FGIC, is the result of months-long, arm's-length negotiations among many

sophisticated parties.  Although the Mediation Order prohibits the FGIC Trustees from

disclosing the substance of mediation discussions, representatives from each of the FGIC

Trustees have testified generally regarding the process surrounding the negotiations (including

that the amount of the Settlement Payment was extensively negotiated) and have testified at

length regarding the analysis provided to them by Duff & Phelps, including the benefits that the

Settlement Agreement provides to each of the FGIC Insured Trusts and the investors therein.

In particular, the FGIC Trustees testified that they took the following steps when

negotiating and considering the Settlement Agreement:

- The FGIC Trustees hired, after a rigorous selection process, Duff, and asked them to analyze and compare the economic terms of the Settlement Payment against the Projected Payments under the Rehabilitation Plan and provide a recommendation to the FGIC Trustees.  (*See* Major Direct ¶ 18; Sohlberg Direct ¶ 11; Scott Direct ¶ 15.)

- The FGIC Trustees participated in five months of global negotiations that were overseen by Judge Peck.  (*See* Major Direct ¶ 20; Scott Direct ¶ 18; Sohlberg Direct ¶ 14.)  The CEO of FGIC, John Dubel—a very experienced restructuring professional—testified that the mediation was "the most complex and lengthy such process with which I have ever been personally involved" and that the FGIC Trustees actively participated in the process.  (Dubel Direct ¶¶ 10-11.)

- Duff made a presentation to the FGIC Trustees on or about May 13, 2013 regarding the requested analysis and recommended that the Settlement Agreement was reasonable.  (*See* Major Direct ¶ 31; Scott Direct ¶ 28; Sohlberg Direct ¶ 24.)

- The FGIC Trustees carefully considered the Settlement Agreement both on its own and in the context of the PSA.  (*See* Major Direct ¶28; Sohlberg Direct ¶ 21; Scott Direct ¶ 25. Major Dep. at Tr. 142:9-22, 190:19-191:2; Sohlberg Dep. at Tr. 73:25-74:4, 126:2-15; Scott Dep. at Tr. 42:17-22, 43:3-15.)

- In evaluating and ultimately accepting the Settlement Agreement, the FGIC Trustees sought and received the advice of competent counsel they had retained to advise them in the Chapter 11 Cases.  (*See* Major Direct ¶ 16; Scott Direct ¶ 13; Sohlberg Direct ¶ 10; Dubel Direct ¶ 11; see Kruger Direct ¶¶ 5, 14, 42, 56 and 57.)

- The FGIC Trustees found it significant that the $253.3 million Commutation Payment was a fixed amount and that future Projected Payments under the Rehabilitation Plan were uncertain.  (*See* Major Direct ¶ 37; Scott Direct ¶ 34; Sohlberg Direct ¶ 28.)  And if the Global Settlement is approved, the FGIC Trustees believe that there are many additional benefits to be conferred on all of the Debtors' creditors, including the FGIC Insured Trusts.  (*See* Major Direct ¶ 40; Scott Direct ¶ 37; Sohlberg Direct ¶ 31.)

Moreover, after the Settlement Agreement was signed, the FGIC Trustees continued to

assess the reasonableness of the FGIC Settlement Agreement.  Duff & Phelps evaluated and

considered the assertions of the Investor Objecting Parties and its conclusions are presented in

the Expert Report of Allen M. Pfeiffer dated July 19, 2013 (the "Pfeiffer Expert Report"). In

addition, Dr. Kothari assessed the reasonableness of Duff & Phelps' conclusion that the

Commutation Payment under the Settlement Agreement is within the range of present values of

the expected payouts to the FGIC Insured Trusts under FGIC's Rehabilitation Plan. (Kothari

Direct ¶ 5.) Dr. Kothari considered the assumptions utilized by Duff & Phelps and the process

employed by Duff & Phelps to analyze the Settlement Agreement and determined that it was

reasonable for Duff & Phelps to conclude that the lump sum payment under the Settlement

Agreement is within the range of present values of the expected payouts to each of the forty-

seven FGIC Insured Trusts under FGIC's Rehabilitation Plan. (Kothari Direct ¶¶ 6, 16-20.) The

Court finds the testimony of Pfeiffer, Kothari and Dubel to be credible and persuasive. The

report prepared by Duff & Phelps is also persuasive and appropriate to the issues addressed and

the conclusions reached.

The Court previously held that the FGIC Trustees acted in good faith and in the best

interest of their respective constituencies with respect to the PSA, of which the Settlement

Agreement is a part. *Memorandum Opinion Approving the Plan Support Agreement*, No. 12-

12020 (MG) (Bankr. S.D.N.Y. June 27, 2013) (the "PSA Opinion," ECF Doc. # 4102) at 44-45.

The Settlement Agreement is an essential, inextricable and critical cornerstone of the Global

Settlement embodied in the PSA, now part of the Plan, and must be understood as the product of

heavily negotiated, arm's-length, good faith discussions conducted among sophisticated parties

with differing and conflicting interests, under the close supervision and guidance of the Plan

Mediator. (*See* Major Direct ¶ 21; Scott Direct ¶ 18; Sohlberg Direct ¶ 15.) *See also* PSA

Opinion at 12, 43-44 (stating that "[a]ll of the parties that signed the [the Settlement Agreement

and the Plan Support Agreement] are sophisticated" and that the Settlement Agreement and the

Plan Support Agreement were "the result of many months of the mediation led by Judge Peck"

and reflect "a heavily negotiated resolution supported by a substantial majority of the Debtors'

major claimant constituencies").

The evidence also demonstrates that the FGIC Trustees provided due process to the

Investors in negotiating and entering the Settlement.  The FGIC Trustees insisted that this

Settlement Agreement be approved at a hearing before this Court to afford Investors the

opportunity to object and be heard.  (See Major Decl. ¶ 23; Sohlberg Decl. ¶ 18; Scott Decl. ¶

20.)  The Motion to approve the Settlement was filed June 7, 2013.  A notice dated May 24, 2013

(the "May 24 Notice") was distributed to various investors and published on a website

maintained by the FGIC Trustees in connection with the Chapter 11 Cases (the "Trustee

Website").  (Ex. 128.)  The May 24 Notice, among other things, described the key financial

terms of the Settlement Agreement and the process by which the investors in the FGIC Insured

Trusts could direct the FGIC Trustees.  (*Id.* at 5-6.)  A further notice, dated June 4, 2013 (the

"June 4 Notice"), was distributed by the FGIC Trustees to holders in the FGIC Insured Trusts

and published on the Trustee Website.  (Ex. 129.)  The June 4 Notice described in greater detail

the terms of the Settlement Agreement, including the amount of the Commutation Payment and

the process by which holders could object to the Settlement Agreement in the FGIC

Rehabilitation Proceeding.

The FGIC Trustees utilized a robust notice program during these Chapter 11 Cases that

combines delivery of notices and notice through the Trustee Website.  (Major Direct ¶¶ 45-46;

Scott Direct ¶¶ 42-43; Sohlberg Direct ¶¶ 38-39.)  And the notice program, which was designed

by the Garden City Group, ensured that all investors were provided with notices by distributing

notices to all registered holders of RMBS by mail and posting the notices and other information

on the Trustee Website.  (*See, e.g.,* Major Direct ¶¶ 45-49; Scott Direct ¶¶ 42-46; Sohlberg

Direct ¶¶ 38-42.)  Because the form and method of notice that the FGIC Trustees provided was

reasonably calculated to provide notice to all investors, the notice program fully satisfies New

York and federal due process requirements.  *See Mullane*, 339 U.S. at 314 (finding that notice by

publication satisfied due process requirements); *Congregation Yetev Lev D'Satmar, Inc. v. Cnty.

of Sullivan*, 59 N.Y.2d 418, 423 (1983) ("Those whose names or whereabouts are unknown and

cannot be learned with due diligence or those whose interests are uncertain may be notified by

publication even though it is reasonably certain that such notice will prove futile . . . .") (*citing

Mullane*, 339 U.S. at 316).

The terms of the Mediation Order prevented the FGIC Trustees from discussing the

Settlement Proposal with investors in the FGIC Insured Trusts who were not participants in the

Mediation.  (Ex. 208.)  However, the Settlement was not negotiated in secret: approximately 140

parties participated in the global mediation sessions; there were dozens of pleadings filed in

Court and served on the Investor Objecting Parties' counsel that mentioned the mediation;

attorneys for Freddie Mac's conservator, the FHFA, attended the mediation; and attorneys for the

Talcott Franklin Group, of which CQS (an Objecting Investor) is a member, attended the

mediation.  (*See* Dubel Direct ¶ 18.)  As evidenced by the trial, the Investor Objecting Parties

were provided a full and fair opportunity to voice their objections to the Settlement Agreement

and the Court finds that these Parties were adequately notified of the Settlement.

For all of these reasons, the FGIC Trustees acted reasonably and in good faith, and in the

best interests of the Investors in each of the FGIC Insured Trusts and of each of the FGIC

Insured Trusts, in negotiating and agreeing to the Settlement.  Moreover, the Investors were

given an opportunity to object to the Settlement and be heard, and their right to due process was

not violated.

## III.   CONCLUSIONS OF LAW

### A.   This Court Has Jurisdiction to Approve the Settlement

#### 1.   *Approval of the Settlement Agreement Is a Core Proceeding*

Approval of the Settlement Agreement is undoubtedly a core proceeding under 28 U.S.C.

§ 157(b)(2).  "Core proceedings are matters arising under the Bankruptcy Code or arising in

bankruptcy cases."  *Cibro Petroleum Prods. v. City of Albany (In re Winimo Realty Corp.),* 270

B.R. 108, 119 (S.D.N.Y. 2001) (citations omitted).  The Motion is a proceeding under

Bankruptcy Rule 9019 and therefore constitutes a "proceeding arising under title 11" for

purposes of 28 U.S.C. § 1334(b).  *See In re Dewey & LeBoeuf LLP,* 478 B.R. 627, 640 (Bankr.

S.D.N.Y. 2012) (exercising jurisdiction over approval of settlement agreement pursuant to Rule

9019).  Moreover, section 157 sets out a non-exhaustive list of core bankruptcy proceedings,

including (i) matters concerning the administration of the estate; (ii) allowance or disallowance

of claims against the estate and (iii) other proceedings affecting the liquidation of assets of the

estate.  28 U.S.C. § 157(b)(2)(A),(B), and (O).  Resolution of the FGIC Claims and the FGIC

Trustee Claims against the Debtors clearly facilitates the administration of the estates and affects

the liquidation of the assets of the estate.

#### 2.   *The Findings are Appropriate Under this Court's "Related To" Jurisdiction.*

Section 1334(b) of Title 28 of the U.S. Code provides that a bankruptcy court has

jurisdiction over cases under title 11, proceedings arising under title 11, proceedings arising in a

case under title 11, and proceedings related to a case under title 11.  Such "related to"

jurisdiction is a broad grant of federal jurisdiction.  *See City of Ann Arbor Emps. Ret. Sys. v.*

*Citigroup Mortg. Loan Trust Inc.*, 572 F. Supp. 2d 314, 317 (E.D.N.Y. 2008) ("The scope of 'related to' bankruptcy jurisdiction has been broadly interpreted by the Second Circuit."); *Bond St. Assocs., Ltd. v. Ames Dep't Stores, Inc.,* 174 B.R. 28, 32-33 (S.D.N.Y. 1994) ("The legislative history makes it clear that section 1334(b), taken as a whole, constitutes an extraordinarily broad grant of jurisdiction to the Article III District Court.").

In the Second Circuit, "related to" bankruptcy jurisdiction exists in any civil action where the outcome "might have any 'conceivable effect' on [a bankruptcy] estate." *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 114 (2d Cir. 1992). To have a "conceivable effect" on a bankruptcy estate, "certainty, or even likelihood, is not required." *Winstar Holdings, LLC v. Blackstone Grp. L.P.,* No. 07 Civ. 4634, 2007 WL 4323003, at *1 n.1 (S.D.N.Y. Dec. 10, 2007); *In re WorldCom, Inc. Sec. Litig.,* 293 B.R. 308, 322 (S.D.N.Y. 2003). Rather, an action has a "conceivable effect" if "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *WorldCom,* 293 B.R. at 317 (quoting *Celotex Corp. v. Edwards,* 514 U.S. 300, 308 n.6 (1995)); *see also In re Quigley Co., Inc.,* 676 F.3d 45, 53 (2d Cir. 2012) (holding that bankruptcy court jurisdiction is appropriate over third party non-debtor claims that directly affect the *res* of the bankruptcy estate, including the obligation to pay costs and liabilities incurred in defending suits).

Jurisdiction exists where it is premised on a contractual indemnification obligation by a bankrupt entity. *See, e.g., WorldCom*, 293 B.R. at 318-19 (collecting cases); *In re River Center Holdings, LLC,* 288 B.R. 59, 63–65 (Bankr. S.D.N.Y. 2003) (finding jurisdiction where the debtor was contractually obligated to indemnify guarantor who was third party defendant); *see also In re Wolverine Radio Co.,* 930 F.2d 1132, 1143 (6th Cir. 1991) (holding that an

indemnification provision supported jurisdiction even though the debtor "would not be affected until and unless [the third party] invoked the indemnification" provision).

Nonetheless, "the potential applicability of indemnification provisions is not by itself the equivalent of an effect on an indemnifier's bankruptcy proceedings." *Allstate Ins. Co. v. Credit Suisse Secs. (USA)*, No. 11 Civ. 2232 (NRB), 2011 WL 4965150, *4 (S.D.N.Y. Oct. 19, 2011). Rather, "[t]he only way defendants' indemnification claims against the Bankrupt Originators can actually affect the allocation of property among the estates' creditors is if defendants have asserted their claims against the bankrupt estates." *Id.* (holding the plaintiffs failed to established "related to" jurisdiction in the RMBS action because they did not file proofs of claim by the bar date in the bankruptcy proceedings of the indemnifying originators); *see also Gen. Electric Cap. Corp. v. Pro-Fac Coop., Inc.,* No. 01 Civ. 10215 (LTS), 2002 WL 1300054, at *2 (S.D.N.Y. June 11, 2002) (stating that "potential ramifications are insufficient to render the claims that have been asserted against the non-debtor Defendants 'related to' Debtor's bankruptcy proceeding").

Moreover, "[a]n indemnification right arises at the time the indemnification agreement is executed, and it constitutes a claim under the Bankruptcy Code even if the act giving rise to the indemnification has not yet occurred." *Credit Suisse*, 2011 WL 4965150, at *5 (citations omitted); *see also In re Manville Forest Prods. Corp.*, 209 F.3d 125, 128-29 (2d Cir. 2000) (stating that "a right to payment based on a written indemnification contract arises at the time the indemnification agreement is executed," and constitutes "a valid contingent claim" in bankruptcy, even if the act giving rise to indemnification has not yet occurred).

The Court has "related to" jurisdiction to enter the Findings because the Governing Agreements provide the FGIC Trustees with broad indemnification rights against the Debtors for any action the FGIC Trustees take that affects the administration of the property in the FGIC

Insured Trusts.  (*See, e.g.*, Ex. 114 § 8.05(b)) (requiring Debtor to "indemnify the Trustee for, and to hold the Trustee harmless against, any loss, liability or expense incurred without negligence or willful misconduct on its part, arising out of, or in connection with, the acceptance and administration of the Trust Fund . . .").

Here, the Debtors have ongoing indemnification obligations to the FGIC Trustees by virtue of the Governing Agreements and the Sale Order (ECF Doc. # 2246).  Specifically, Paragraph 35 and subparagraph B of the Sale Order provide that to the extent Ocwen is not reimbursed by the applicable RMBS Trust for payments relating to an indemnified obligation under the Governing Agreements, the Debtors are obligated to reimburse Ocwen through payment of an administrative expense claim.  This is true notwithstanding the fact that under the TIA, a qualified indenture must not contain any provisions relieving the indenture trustee from liability for its own negligence, failure to act, or willful misconduct.  15 U.S.C. § 777ooo(c)(1). The Debtors could potentially be obligated to indemnify the FGIC Trustees for expenses associated with litigating the FGIC Insured Trusts' claims against the Debtors and FGIC in the event the Settlement Agreement is not approved, or in defending against Investors' claims against the FGIC Trustees if the Trustees acted improperly in entering into the Settlement Agreement, which creates "related to" jurisdiction.

3.    *The McCarran-Ferguson Act Does Not Preempt the Court's Jurisdiction*

The McCarran-Ferguson Act ("MFA") does not preempt this Court's authority to make findings regarding the commutation.  15 U.S.C. § 1101, *et seq*.  The MFA provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  Through the MFA, "Congress

mandated that the regulation of the insurance industry be left to the individual states." *Levy v. Lewis*, 635 F.2d 960, 963 (2d Cir. 1980). A federal statute, including the Bankruptcy Code and related jurisdictional statutes, would be preempted by New York Insurance Law ("NYIL") only if "(i) the federal statute does not specifically relate to insurance; (ii) the state law at issue was enacted to regulate the business of insurance; and (iii) the federal statute at issue would invalidate, impair, or supersede the state law." *In re MF Global Holdings Ltd.*, 469 B.R. 177, 195, n.17 (Bankr. S.D.N.Y. 2012).

The Court finds the MFA inapplicable here. The Settlement Agreement plainly states that it will not be effective unless it is approved by this Court *and* the Rehabilitation Court. *See* Settlement Agreement § 6.01. Moreover, the Rehabilitation Court, not this Court, made the determination that commutation of the FGIC Policies is appropriate. *In re FGIC*, No. 401265/2012, 2013 Misc. LEXIS 3607, at *1 (N.Y. Sup. Ct. Aug. 16, 2013). Approval of the Settlement Agreement and entry of the Findings will not "invalidate, impair, or supersede" New York insurance law since the Findings involve only the relationship between the FGIC Trustees (the policyholders) and individual investors in the FGIC Insured Trusts (who are not policyholders)—not the relationship between FGIC and its policyholders. Because the Debtors do not seek this Court's ruling on the Commutation Payment itself, and the Findings do not invalidate or supersede New York insurance law, the MFA does not apply.

### 4.     *Due Process Has Been Satisfied*

Due process requires only "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950). The Debtors and the FGIC Trustees have ensured that all investors in the FGIC Insured Trusts

would have a full and fair opportunity in *both* the Rehabilitation Court and the Bankruptcy Court

to voice any objections they may have to the Settlement Agreement.  The Court has provided the

objectors with the opportunity to be heard and in fact adjourned the hearing on the Motion to

allow them to seek discovery.  Although the FGIC Trustees were precluded by the Mediation

Order from disclosing the negotiations of the Settlement Agreement during the mediation

sessions, the FGIC Trustees, in negotiating the Settlement Agreement, insisted that the

Settlement Agreement not have any effect unless all the investors in the FGIC Insured Trusts

have received prompt notice of the proposed agreement and both this Court and the

Rehabilitation Court have approved the Settlement Agreement.  *See* Major Direct ¶ 23; Sohlberg

Direct ¶ 18; Scott Direct ¶ 20.  Accordingly, due process has been satisfied.

### B.    The FGIC Trustees Were Authorized to Enter into the Settlement

#### 1.    The Governing Agreements Authorized the FGIC Trustees to Enter into the Settlement

Under New York law, "only the policy owner has standing to sue based on an insurance

policy."  *Pike v. New York Life Ins. Co.,* 72 A.D.3d 1043, 1049 (N.Y. 2d Dep't 2010).  *See also*

*Orentreich v. Prudential Ins. Co. of Am.*, 275 A.D.2d 685 (N.Y. 1st Dep't 2000) ("The action

was properly dismissed on the ground that since the policies in question are owned by a trust,

only the trustee, who was not named as a plaintiff in that capacity, may seek their rescission or

damages attributable to their issuance") (citing RESTATEMENT (SECOND) OF TRUSTS §§ 280-82

(1959)).  "An incident to the right to sue or be sued is the power to compromise or settle suits."

*Levine v. Behn,* 169 Misc. 601, 606 (Sup. Ct. N.Y. Cnty. 1938), *aff'd,* 257 A.D. 156 (N.Y. 1st

Dep't 1939), *rev'd on other grounds*, 282 N.Y. 129 (1940); *see also Brown v. John Hancock*

*Mut. Life Ins. Co. of Boston*, 145 Misc. 642, 646 (N.Y. Mun. Ct. 1932) ("The power to sue

ordinarily carries with it the power to settle.")

The FGIC Trustees are the only parties who have the right and authority to enforce the Policies because they, on behalf of the FGIC Insured Trusts, are the policyholders.  (*See, e.g.*, Trial Tr. 473:8-15; August 16th Mem. of Decision at *8-9) ("The Rehabilitator negotiated the Settlement Agreement with its policyholders, the Trustees, who represent the trusts."). Pursuant to the Governing Agreements, the FGIC Trustees are the only parties authorized to enforce the claims of the FGIC Insured Trusts, including those against FGIC.  (*See, e.g.*, Ex. 116 § 5.03(a)-(b).)

The FGIC Trustees, as the party authorized to represent and assert claims on behalf of the FGIC Insured Trusts, have the authority to enter into settlement agreements with respect to the FGIC Insured Trusts' claims against FGIC under the FGIC Policies.  *See In re Delta Air Lines, Inc.,* 370 B.R. 537, 548 (Bankr. S.D.N.Y. 2007) (overruling dissenting bondholders' objections to approval of settlement entered into by trustee and finding that "implicit in the authority to commence proceedings to remedy defaults is the power to negotiate and agree upon settlements . . .").  Moreover, the Settlement Agreement is not an amendment to the Governing Agreements; it is a resolution of a claim against an insurer in an insolvency proceeding.  *See Delta*, 370 B.R. at 546-47 ("The impairment which the Objectors complain of results not from any agreement of the Bond Trustee, but from operation of the Bankruptcy Code and the simple economic fact that this insolvent debtor cannot pay its creditors unimpaired.").  By entering into the Settlement Agreement, the FGIC Trustees have simply agreed to the form of impaired payment which the FGIC Insured Trusts will receive from the Debtors and from FGIC.

2.      *The TIA Does Not Prevent the FGIC Trustees from Entering into the*
        *Settlement*

The TIA provides that

> the right of any holder of any indenture security to receive
> payment of the principal of and interest on such indenture security,
> on or after the respective due dates expressed in such indenture
> security, or to institute suit for the enforcement of any such
> payment on or after such respective dates, *shall not be impaired or*
> *affected without the consent of such holder . . .*

15 U.S.C. § 77ppp(b) (TIA section 316(b)) (emphasis added).

Section 316(b)'s restrictions on majority action are inapplicable in insolvency

proceedings.  Section 316(b) "was passed out of a concern about the motivation of insiders and

quasi-insiders to destroy a bond issue through insider control," *Delta,* 370 B.R. at 550, and as the

court made clear in *Delta*, it does not apply in bankruptcy proceedings:

> [I]n enacting Section 316(b), the SEC was "undoubtedly aware that
> requiring unanimity in bondholder voting – rather than mere
> majority action – would frustrate consensual workouts and help
> induce bankruptcy . . . [and] welcomed the prospect."  It is self-
> evident that Section 316(b) could not have been intended to impair
> the capacity of a debtor and its creditors to restructure debt in the
> context of bankruptcy.  *The cases have uniformly recognized that*
> *reorganization proceedings in Chapter 11 are not within the*
> *purview of TIA Section 316(b).*

*Id.* at 550 (*quoting UPIC & Co. v. Kinder-Care Learning Ctrs.,* 793 F. Supp. 448, 453 (S.D.N.Y.

1992)) (emphasis added).

**C.      The Settlement Agreement Satisfies the Rule 9019 Standard**

1.      *Legal Standard*

Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and

after notice and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR.

P. 9019(a).  As a general matter, "[s]ettlements and compromises are favored in bankruptcy as

they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641-642 (Bankr. S.D.N.Y. 2012) (quoting *In re MF Global Inc.*, No. 11-2790, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y Aug. 10, 2012); *see Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (stating that settlements are important in bankruptcy because they "help clear a path for the efficient administration of the bankrupt estate"); 10 COLLIER ON BANKRUPTCY ¶ 9019.01 (16th ed. rev. 2013) at 9019-2 (highlighting that "compromises are favored in bankruptcy").

A court must determine that a settlement under Bankruptcy Rule 9019 is fair, equitable, and in the best interests of the estate before approving it. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-25 (1968); *Air Line Pilots Assoc. v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994); *MF Global Inc.*, 2012 WL 3242533, at *5; *In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358, 361 (Bankr. S.D.N.Y. 2002). In so doing, the Court need not decide the numerous issues of law and fact raised by a compromise or settlement, "but must only 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Adelphia Commc'ns Corp.,* 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (quoting *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir. 1983)). Rather than "conduct[ing] a 'mini-trial,'" the Court only needs to "be apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment." *Adelphia*, 327 B.R. at 159.

The decision to approve or deny a particular settlement involving a bankruptcy estate lies within the discretion of the bankruptcy court. *See Vaughn v. Drexel Burnham Lambert Grp., Inc.*

*(In re Drexel Burnham Lambert Grp., Inc.),* 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also*

*Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994).  A court may exercise its discretion

"in light of the general public policy favoring settlements."  *In re Hibbard Brown & Co., Inc.*,

217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (citing cases).  In evaluating the necessary facts, a court

may rely on the opinion of the debtor, parties to the settlement, and the professionals.  *See In re*

*Chemtura Corp.,* 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010); *In re Purified Down Prods. Corp.,*

150 B.R. 519, 522-23 (Bankr. S.D.N.Y. 1993); *see also MF Global Inc.,* 2012 WL 3242533, at

\*5 (recognizing that although courts have the discretion to approve settlements, the business

judgment of the debtor in recommending a settlement should be considered).  "While the

bankruptcy court may consider the objections lodged by parties in interest, such objections are

not controlling. . . . [T]he bankruptcy court must still make informed and independent

judgment." *In re WorldCom, Inc.,* 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).  And, "[a]lthough

courts have discretion to approve settlements, the business judgment of the debtor in

recommending the settlement should be factored into the court's analysis." *MF Global Inc*.,

2012 WL 3242533, at \*5 (citing *JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating*

*LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009)).

In the Second Circuit, *Iridium* directs courts to balance seven interrelated factors in

determining whether a settlement is fair and equitable.  Those factors are:

> (1) the balance between the litigation's possibility of success and
> the settlement's future benefits;
>
> (2) the likelihood of complex and protracted litigation, "with its
> attendant expense, inconvenience, and delay," including the
> difficulty in collecting on the judgment;
>
> (3) "the paramount interests of the creditors," including each
> affected class's relative benefits "and the degree to which creditors

either do not object to or affirmatively support the proposed
settlement";

(4) whether other parties in interest support the settlement;

(5) the "competency and experience of counsel" supporting, and
"[t]he experience and knowledge of the bankruptcy court judge"
reviewing, the settlement;

(6) "the nature and breadth of releases to be obtained by officers
and directors"; and

(7) "the extent to which the settlement is the product of arm's
length bargaining."

*Iridium,* 478 F.3d at 462.

### 2.    The Iridium *Factors Weigh in Favor of Approving the Settlement*

The Debtors have met their burden of showing that the Settlement is fair, equitable, and

in the best interests of the estate, and each of the *Iridium* factors weigh in favor of approving the

Settlement.[15]  If the parties were forced to litigate the FGIC Claims, the outcome would be

uncertain because there are complex and novel legal issues involved, and the litigation would be

costly and protracted (*Iridium* factors 1 and 2).  (*See* Lipps Direct ¶¶ 27-139; Kruger Direct ¶¶

44-45.)

By entering the Settlement, FGIC is releasing claims against the Debtors of up to

approximately $6.85 billion in exchange for either (i) three allowed claims totaling $934 million

total if the Plan is confirmed, or (ii) the Minimum Allowed Claim Amount (totaling $1.8 billion)

with the right to assert further claims, subject to the cap and which may be disputed by the

Debtors, if the Plan is not confirmed.  Moreover, under either scenario, the Settlement provides

that FGIC will release the remainder of the FGIC Claims against the Debtors, and it will make

---

[15]    No objector has challenged the fact that the releases of the Debtors' officers and directors in the Settlement
Agreement are reasonable (*Iridium* factor 6).  These releases are consistent with those approved in other cases in this
District, providing only for voluntary releases by the non-debtor Settlement Parties.  (Kruger Direct ¶ 55.)

the Settlement Payment to the FGIC Trustees, thus preventing any further accrual of claims against the Debtors.  This Settlement is therefore clearly in the best interest of the creditors of the estates—it will resolve significant claims against the estates for far less than the amounts asserted and it imposes a cap on FGIC's claims in case the contemplated plan is not confirmed (*Iridium* factor 3).  (*See* Kruger Direct ¶¶ 4, 34, 37-38, 40,51-52.)  This Settlement was achieved after months of global mediation and is supported by every major constituency in these cases other than the JSNs (*Iridium* factors 4 and 7).  The parties that negotiated this Settlement were represented by sophisticated counsel and they did so under the supervision of Judge Peck and Mr. Kruger (*Iridium* factor 5).

The JSNs, who declined to participate in the global mediation, are the only party to object to the Settlement on the basis that it fails to satisfy the Rule 9019 standard.  Their objections are overruled.  First, the JSNs assert that the Settlement is unreasonable because it settles claims that could otherwise be subordinated under section 510(b) of the Bankruptcy Code.  Section 510(b) provides that a claim "for damages arising from the purchase or sale of" a "security of the debtor or of an affiliate of the debtor" "shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security." 11 U.S.C. § 510(b).  But the Settling Parties note that the FGIC Claims arise from Insurance and Indemnity Agreements—it is far from clear that these Claims would be subordinated.  *See CIT Grp., Inc. v. Tyco Int'l, Inc.,* Case No. 12-1692, 2012 U.S. App. LEXIS 18696, *4-5 (2d Cir. Sept. 6, 2012) (holding that the connection of a contract-based claim to the purchase or sale of a security is insufficient to support a finding that the claim "arises from" the purchase or sale of a security for purposes of section 510(b)).  At the very least, whether these claims should be subordinated would be hotly contested.

In fact, the Debtors previously submitted a brief in this case addressing why similar

section 510(b) arguments lack merit. *See Debtors' Reply Brief re Objection of Junior Secured*

*Noteholders to Motion for Approval of RMBS Settlement Agreements*, dated March 15, 2013

(ECF Doc. # 3221).  There, the Debtors explained that

> claims asserted by the investors [of RMBS trusts] do not arise out
> of the purchase or sale of securities because they arise out of a sale
> of mortgage loans, not securities. The investors' claims do not arise
> from the issuance of trust certificates, but rather from contractual
> representations and warranties made in connection with the deposit
> of mortgage loans into the trusts. . . . no "RMBS certificates or
> bonds" were ever deposited into the trusts. The financial assets
> deposited into the trusts were mortgage loans, in transactions
> unrelated to the issuance of certificates, or "securities," that were
> later sold to investors. . . . Section 510(b) does not reach—and was
> never intended to cover—claims resulting from the ownership of
> securities.  It only covers claims "arising from the purchase or sale"
> of securities.

*Id.* at 13-14.

In any event, courts in this District have approved settlements where the claims could be

subject to subordination.  *See In re WorldCom, Inc.,* No. 02-13533 (Bankr. S.D.N.Y. Aug. 6,

2003) (ECF Doc. # 8125) (approving a settlement that involved claims that may be subject to

subordination); *In re Adelphia Communications Corp*., 327 B.R. 143,168-70 (Bankr. S.D.N.Y.

2005), *aff'd sub. nom. Ad Hoc Adelphia Trade Claims Committee v. Adelphia Communications*

*Corp.,* 337 B.R. 475, 478 (S.D.N.Y. 2006) (same); *In re Drexel Lambert Grp., Inc*., 138 B.R.

717, 719 (Bankr. S.D.N.Y. 1992) (approving settlement resolving various employee ERISA and

compensation claims "related principally to the purchase or acquisition of stock by employees or

the divesture of stock by employees" over objections that those claims should be subordinated

under section 510(b) where it was unclear whether ERISA overrode the mandates of section

510(b)), *aff'd sub. nom. Lambert Brussels Assocs. L.P. v. Drexel Burnham Lambert Group, Inc.*

*(In re Drexel Burnham Lambert Group, Inc.),* 140 B.R. 347 (S.D.N.Y. 1992).

The court in *Adelphia* explained:

> The real issue before me . . . is whether the Government and the
> Debtors could settle a controversy as to which that close and
> difficult issue [of subordination under Section 510(b)] is an
> element, and the answer to that plainly is 'yes.' It is no different
> than the multitude of other difficult issues that are settled in
> litigation all the time.

327 B.R. at 168-70. The JSNs have failed to provide any authority holding that a court cannot

approve a settlement where the claims could potentially be subordinated. Rather, in all of the

cases cited by the JSNs, the claims at issue were clearly subject to subordination, and only one

case involved a Rule 9019 motion. *See In re Cincinnati Microwave, Inc.*, 210 B.R. at 133-34.

There, the court denied the motion because the settlement was not in the best interest of

creditors; it did not determine that claims subject to subordination cannot be settled.

The JSNs also argue that the Minimum Allowed Claim Amount is too high. For the

reasons discussed above, this argument fails as well. In particular, in exchange for agreeing to

this allowed claim, the Debtors receive substantial value including (i) the release of the

remainder of FGIC's $1.85 billion claims asserted against each of the Settling Debtors and (ii)

the release of all separate origination-related claims (potentially in the billions of dollars) that

may otherwise be asserted by the FGIC Trustees on account of the wrapped tranches of the FGIC

Insured Trusts. Dr. D'Vari was retained by the Debtors to quantify the claims asserted by the

FGIC Trustees. He first estimated the lifetime expected collateral losses of the FGIC Insured

Trusts because the FGIC Trustees asserted the total collateral loss as the basis for the amount of

their claims against their Debtors. He estimates that the lifetime collateral losses of the FGIC

Insured Trusts are approximately $5.4 billion. (D'Vari Direct ¶ 4.) He then estimated any past

or future losses to holders of Securities issued by FGIC Insured Trusts that were not insured by

FGIC, as those are outside the scope of the release provided by the Settlement.  He estimates that

number to be approximately $412 million. (*Id.*)  Based on his analysis, he estimates that the

Settlement is releasing claims against the Debtors of approximately $5 billion as a base case.

(*Id.*)  D'Vari's direct testimony states that the methodology his team used, which it has

previously used to analyze other RMBS-related pools, created independent projections for each

FGIC Insured Trust and group of loans based on their own characteristics and historical

performance.  (*Id.* ¶ 26.)

The JSNs argue that this testimony is futile because D'Vari was not retained until after

the parties entered the Settlement and because he did not determine whether the FGIC Trustees

would have a valid claim for $5 billion.  But the testimony is directly relevant to determining

whether the Settlement is reasonable—simply because the Settling Parties' may not have had this

information during negotiations does not undermine its utility in determining the appropriateness

of the Settlement.

Although the JSNs claim that the Settlement improperly grants FGIC a claim against

ResCap, the Debtors acknowledge that there would be no recovery of the Minimum Allowed

Claim Amount from ResCap because ResCap is not obligated to reimburse FGIC for any such

payments under the Governing Agreements.  *See* Settlement Agreement § 3.01(A) (providing

that the Minimum Allowed Claim Amount shall be "allocated among ResCap, LLC, GMAC[

Mortgage] and RFC pro rata *based on which of the Debtors would be obligated to reimburse

FGIC for such payments under the Governing Agreements*") (emphasis added).  At the hearing,

the JSNs withdrew this objection.

Overall, the *Iridium* factors weigh heavily in favor of approving the Settlement

Agreement.  In addition, the Court finds that it was Mr. Kruger's reasonable business judgment,

based on his years of experience as a restructuring lawyer, his personal involvement in months of

negotiations overseen by Judge Peck, input from the Debtors' professionals, his review of

relevant materials, and his knowledge of these cases as CRO, that the Settlement Agreement was

in the best interests of the Debtors and their estates.

### IV.    CONCLUSION

In accordance with the findings of fact and conclusions of law found above, the Court

hereby overrules the JSNs' Objections and will enter an order, in the form of the Proposed Order

attached to the Settlement Agreement as Exhibit D, granting the relief requested and granting

such other relief as is just and proper.

**IT IS SO ORDERED.**

Dated: September 13, 2013
New York, New York

*Martin Glenn*
_____
MARTIN GLENN
United States Bankruptcy Judge