MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------- | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------------------- | ) | |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF**
**DEBTORS' THIRTIETH OMNIBUS OBJECTION TO CLAIMS**
**(NO LIABILITY BORROWER CLAIMS – BOOKS AND RECORDS)**

## Table of Contents

Page

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................ 2

REPLY ............................................................................................................................... 3

    A.    Anthony E. Fisher (Claim No. 1972) ...................................................... 3

    B.    Barry B. Eskanos and Ami B. Eskanos (Claim No. 19) ........................ 5

    C.    Caren Wilson (Claim No. 4754) ........................................................... 14

    D.    Constantino and Sybil Acevedo (Claim No. 2552) ............................. 16

    E.    Jan B. Ibrahim (Claim No. 997) ............................................................ 17

    F.    Pamela Z. Hill (Claim No. 2429) .......................................................... 19

    G.    Paul and Marge Pfunder (Claim No. 1430) .......................................... 20

    H.    Ron R. Bejarano (Claim No. 604) ........................................................ 23

CONCLUSION ................................................................................................................ 26

## Exhibit List

Exhibit 1      Responses to Thirtieth Omnibus Objection to Claims

Exhibit 2      The Disputed Claims

Exhibit 3      Supplemental Declaration

Exhibit 4-1    Answer and Counterclaim

Exhibit 4-2    Order Dismissing Counterclaims with 20 Days to Amend

Exhibit 4-3    Counterclaim

Exhibit 4-4    WaMu Cross Motion

Exhibit 4-5    Summary Judgment Order

Exhibit 4-6    Final Judgment of Foreclosure

Exhibit 4-7    Notice of Appeal

Exhibit 4-8    Order Affirming Per Curiam

Exhibit 4-9    Order Denying Petition for Writ

Exhibit 4-10   Adversary Complaint

Exhibit 4-11   Motion to Intervene

Exhibit 4-12   Dismissing Adversary Proceeding

Exhibit 5-1    Dismissal Order

Exhibit 5-2    Nonsuit Order

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Allen v. McCurry,
   449 U.S. 90 (1980)...........................................................................................9, 11

Ashby v. Polinsky,
   No. 06-CV-6778 (DLI), 2007 U.S. Dist. LEXIS 12692 (E.D.N.Y. Feb. 22, 2007) ...............13

Burgos v. Hopkins,
   14 F.3d 787 (2d Cir. 1994).................................................................................9, 11

D.C. Court of Appeals v. Feldman,
   460 U.S. 462 (1983)...............................................................................................12

Department of Health & Rehabilitation Services v. B.J.M.,
   656 So. 2d 906 (Fla. 1995)......................................................................................11

Done v. Wells Fargo Bank, N.A.,
   No. 08-CV-3040 (JFB) (ETB), 2009 U.S. Dist. LEXIS 84114 (E.D.N.Y. Aug. 7,
   2009) ...............................................................................................................9, 13

Exxon Mobil Corp. v. Saudi Basic Industries Corp.,
   544 U.S. 280 (2005)...........................................................................................12, 13

Feinberg v. Bank of New York (In re Feinberg),
   442 B.R. 215 (Bankr. S.D.N.Y. 2010) ........................................................................3

Florida Department of Transportation v. Juliano,
   801 So. 2d 101 (Fla. 2001)......................................................................................10

Hoblock v. Albany County Board of Elections,
   422 F.3d 77 (2d Cir. 2005).................................................................................12, 13

In re Oneida Ltd.,
   400 B.R. 384 (Bankr. S.D.N.Y. 2009), aff'd sub nom., Peter J. Solomon Co., L.P. v.
   Oneida, Ltd., No. 09-cv-2229, 2010 U.S. Dist. LEXIS 6500 (S.D.N.Y. Jan. 22, 2010) ...........1

In re Rockefeller Center Properties,
   272 B.R. 524 (Bankr. S.D.N.Y. 2000), aff'd sub nom., NBC v. Rockefeller Center
   Properties (In re Rockefeller Center Properties), 266 B.R. 52 (S.D.N.Y. 2001), aff'd,
   46 Fed. Appx. 40 (2d Cir. 2002) ...............................................................................1

Kimbrell v. Paige,
   448 So. 2d 1009 (Fla. 1984).....................................................................................10

Marrese v. American Academy of Orthopaedic Surgeons,
   470 U.S. 373 (1985)...........................................................................................10, 11

ii

Niles v. Wilshire Inv. Group, LLC,
    859 F. Supp. 2d 308 (E.D.N.Y. 2011) ...................................................................9, 13

Reusser v. Wachovia Bank, N.A.,
    525 F.3d 855 (9th Cir. 2008) ................................................................................12

Rooker v. Fidelity Trust Co.,
    263 U.S. 413 (1923)................................................................................................12

Ward v. Bankers Trust Co. of California, N.A.,
    No. 09-CV-1943 (RRM)(LB), 2011 U.S. Dist. LEXIS 32796 (E.D.N.Y. Mar. 29,
    2011) .......................................................................................................................13

Washington v. Wilmore,
    407 F.3d 274 (4th Cir. 2005) ................................................................................12

Youngblood v. Taylor,
    89 So. 2d 503 (Fla. 1956)......................................................................................10

STATUTES

11 U.S.C. 502(b)(1) .......................................................................................................3, 8

11 U.S.C. § 101(5) .............................................................................................................8

11 U.S.C. § 502(a) .............................................................................................................3

OTHER AUTHORITIES

Federal Rule of Civil Procedure 41 ................................................................................15

Residential Capital, LLC (ResCap) and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this omnibus reply (the "Reply") to certain responses, objections, and oppositions (collectively, the "Responses") interposed by those claimants (collectively, the "Claimants"), listed on Exhibit 1 annexed hereto, to the *Debtors' Thirtieth Omnibus Objection to Claims (No Liability Borrower Claims – Books and Records)* [Docket No. 4887] (the "Objection").   In support of the Reply, the Debtors submit the Supplemental Declaration of Deanna Horst, ResCap's Senior Director of Claims Management, annexed hereto as Exhibit 3 (the "Supplemental Declaration").   In further support hereof, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors have examined each of the Responses and the statements and exhibits submitted in support thereof.   Exhibit 1 contains a summary of each Claimant's Response.  The Debtors examined their books and records and found no liability with respect to the asserted claims.  Copies of the claims that are at issue in the Responses are attached hereto as Exhibit 2.

2.      If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  See In re Oneida Ltd., 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), aff'd sub nom., Peter J. Solomon Co., L.P. v. Oneida, Ltd., No. 09-cv-2229, 2010 U.S. Dist. LEXIS 6500 (S.D.N.Y. Jan. 22, 2010); In re Rockefeller Ctr. Props., 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000), aff'd sub nom., NBC v. Rockefeller Ctr. Props. (In re Rockefeller Ctr. Props), 266 B.R. 52 (S.D.N.Y. 2001), aff'd, 46 Fed. Appx. 40 (2d Cir. 2002).  Each Claimant has failed to provide a sufficient explanation as to

why its claim represents a valid claim that should be allowed against the Debtors.  Accordingly, the relief sought in the Objection should be granted with respect to the Claimants.

## **BACKGROUND**

3.      In connection with the claims reconciliation process, the Debtors identified certain claims filed by Borrowers[1] that either (i) contradict the information in the Debtors' books and records and/or (ii) fail to establish a liability reflected in the Debtors' books and records (together, the "No Liability Borrower Claims").

4.      After consulting with SilvermanAcampora LLP, special borrowers' counsel to the official committee of unsecured creditors ("Special Counsel"), the Debtors sent Request Letters to those Borrowers who filed the No Liability Borrower Claims with insufficient or no supporting documentation requesting additional documentation in support of such claims. The Request Letters required the Claimant to substantiate the legal and factual reasons as to why the Claimant believes it is owed money or is entitled to other relief from the Debtors, and the Claimant was required to provide copies of any and all documentation that the Claimant believes supports the basis for its claim.

5.      The Debtors either did not receive any response to the Request Letters or received insufficient information to establish a basis for liability with respect to the applicable No Liability Borrower Claims.

6.      Accordingly, on August 29, 2013, the Debtors filed the Objection to the No Liability Borrower Claims.  After the Debtors filed the Objection, each of the Claimants submitted a Response, as summarized on Exhibit 1 annexed hereto.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in each Objection.

**REPLY**

7.        A filed proof of claim is "deemed allowed, unless a party in interest . . .

objects." 11 U.S.C. § 502(a).  Moreover, section 502(b)(1) of the Bankruptcy Code provides, in

relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable

against the debtor and property of the debtor, under any agreement or applicable law…." 11

U.S.C. 502(b)(1).  Furthermore, the burden of persuasion is on the holder of a proof of claim to

establish a valid claim against a debtor.  Feinberg v. Bank of N.Y. (In re Feinberg), 442 B.R.

215, 220-22 (Bankr. S.D.N.Y. 2010).

8.        Upon review of the Responses and as explained in further detail below

and in the Supplemental Declaration, the Debtors conducted an exhaustive examination of their

books and records to assess the allegations made in the No Liability Borrower Claims and the

Responses.  The Debtors determined that the Claimants' allegations of liability have no validity

and are simply unsubstantiated allegations devoid of fact.  Accordingly, the No Liability

Borrower Claims should be disallowed and expunged from the Debtors' claims register.  Below

the Debtors address the Responses filed by each Claimant.

**A.        Anthony E. Fisher (Claim No. 1972)**

9.        Mr. Fisher filed proof of claim number 1972 in the amount of $286,223.93

(the "Fisher Claim") in relation to his mortgage note, which secured a loan (the "Fisher Loan")

that originated with USAA Federal Savings Bank ("USAA") on May 15, 2006.  See

Supplemental Declaration at ¶ 4.  Fannie Mae is the investor for the Fisher Loan.  See id.  On

June 5, 2006, GMAC Mortgage, LLC ("GMACM") began sub-servicing the Fisher Loan for

USAA, and on February 1, 2013, servicing of the Fisher Loan was transferred to Green Tree

Servicing LLC ("Green Tree").  See id.  All correspondence provided to Mr. Fisher was either on

the letterhead of USAA or GMAC Mortgage-Proudly Serving USAA Members.  See id.

3

10.     As explained herein, Mr. Fisher's allegation that the Fisher Loan was illegally purchased by David Stern is untrue.  On August 15, 2008, GMACM referred the Fisher Loan for foreclosure.  See id. at ¶ 5.  At that time, the Fisher Loan had been delinquent since June 1, 2008.  See id.  The Law Offices of David J. Stern was the foreclosing attorney for GMACM.  See id.  On September 2, 2008, a complaint was filed in connection with the foreclosure, service was effectuated on September 18, 2008 and a judgment was entered in relation to the foreclosure.  See id.  On April 9, 2010, Mr. Fisher entered into a loan modification (the "Fisher Loan Modification") offered by USAA, and the foreclosure was closed after May 25, 2012.  See id.  At no time did Mr. Stern own the property.  See id.

11.     Mr. Fisher alleges that he is entitled to $38,835.20 in "illegal fees." However, the amount of $38,835.20 is the balance of the Fisher Loan that was deferred as part of the Fisher Loan Modification.  See id. at ¶ 6.  This deferred balance is a non-interest bearing principal balance, that consists of past due payments, escrow and/or principal balance that was placed at the end of the Fisher Loan to assist with lowering Mr. Fisher's monthly payments.  See id.  The concept of the deferred balance and the amount of the deferred balance is explained and identified in the Fisher Loan Modification, which was signed by Mr. Fisher.  See id.

12.     In connection with the Fisher Claim, the Debtors reviewed Mr. Fisher's payment history, the Debtors' internal servicing notes, the Fisher Loan Modification documents and any applicable investor guidelines.  See id. at ¶ 7.  The Debtors determined that they have no liability with respect to the Fisher Claim because the Debtors, at all times, complied with the appropriate guidelines and policies governing the loan modification process and acted properly with respect to Mr. Fisher's foreclosure and loan modification requests.  See id.

4

B.    **Barry B. Eskanos and Ami B. Eskanos (Claim No. 19)**

13.    Mr. and Ms. Eskanos are borrowers under a loan (the "Eskanos Loan")

evidenced by a note in the principal amount of $364,000.00 executed on October 28, 1999, in

favor of Washington Mutual, F.A. ("WaMu"), which is secured by a mortgage on real property

located at 3122 Pine Tree Drive, Miami Beach, Florida (the "Eskanos Property").  See

Supplemental Declaration at ¶ 8.  In October 2004, Mr. and Ms. Eskanos defaulted under the

Eskanos Loan based upon their failure to timely make payments. See id.  On October 27, 2011,

GMACM acquired the servicing rights to the Eskanos Loan from Litton Loan Servicing LP and

began servicing the loan for Residential Funding Company, LLC ("Residential Funding"),

which, at that time, was the holder of the Eskanos Loan.  See id.

14.    As a result of the default, on or about March 29, 2005, WaMu, filed a

complaint for foreclosure against Mr. and Ms. Eskanos in the Circuit Court of the 11th Judicial

Circuit of Florida, in and for Miami-Dade County (the "Florida State Court"), case number 05-

6570 (the "State Foreclosure Action"), seeking to foreclose its interest in the Eskanos Property.

On or about May 5, 2005, Mr. and Ms. Eskanos filed an answer and counterclaim (the "Answer

and Counterclaim"), a copy of which is attached hereto as Exhibit 4-1, to WaMu's complaint,

asserting various defenses and claims against WaMu for breach of contract, breach of duty of

good faith and fair dealing, violations of the Consumer Protection Act, and unjust enrichment.[2]

See Answer and Counterclaim.  On September 7, 2005 the Florida State Court entered an order

(the "Order Dismissing Counterclaims with 20 Days to Amend"), a copy of which is attached

hereto as Exhibit 4-2, dismissing those counterclaims and providing Mr. and Ms. Eskanos with

---

[2] GMACM was not a named party in the State Foreclosure Action as GMACM did not acquire servicing of the
Eskanos Loan until October 27, 2011, almost two years after the Final Judgment of Foreclosure (defined below) was
entered in this matter.

twenty (20) days to amend the pleading.  See Order Dismissing Counterclaims with 20 Days to Amend.

15.    On or about September 21, 2005, Mr. and Ms. Eskanos filed an amended counterclaim (the "Amended Counterclaim"), a copy of which is attached hereto as Exhibit 4-3, adding claims against WaMu for violations of the federal Truth in Lending Act, the Florida RICO Statute, breach of fiduciary duty, and violation of the federal and state Fair Debt Collection Practices Acts.  See Amended Counterclaim.

16.    In addition, Mr. and Ms. Eskanos filed a motion for summary judgment, in response to which WaMu, in or around May 2009, filed a cross motion for summary judgment (the "WaMu Cross Motion"), a copy of which is attached hereto as Exhibit 4-4, that addressed Mr. and Ms. Eskanos' counterclaims.  See WaMu Cross Motion.  On October 29, 2009, the Florida State Court entered an order granting summary judgment in favor of WaMu (the "Summary Judgment Order"), a copy of which is attached hereto as Exhibit 4-5.  See Summary Judgment Order.  Moreover, on December 9, 2009, the Florida State Court entered a final judgment of foreclosure (the "Final Judgment of Foreclosure") in the State Foreclosure Action, a copy of which is attached hereto as Exhibit 4-6, pursuant to which WaMu was entitled to foreclose on the Eskanos Property (the "State Court Foreclosure Judgment").

17.    Subsequent to entry of the Final Judgment of Foreclosure, Mr. and Ms. Eskanos appealed that judgment to the Florida Third District Court of Appeals.  See Notice of Appeal, a copy of which is attached hereto as Exhibit 4-7.  The appellate court affirmed the Final Judgment of Foreclosure without opinion on June 20, 2012.[3]  See Order Affirming Per Curiam, a copy of which is attached hereto as Exhibit 4-8.  Mr. and Ms. Eskanos petitioned for a writ of

---

[3] GMACM was a named party on the Order Affirming Per Curiam and the Order Denying Petition for Writ (defined below).  See Order Affirming Per Curiam; Order Denying Petition for Writ.

ny-1111555

mandamus from the Florida Supreme Court, but the Supreme Court denied that petition on

February 4, 2013.  See Order Denying Petition for Writ, a copy of which is attached hereto as

Exhibit 4-9.

18.     On October 31, 2011, Mr. and Ms. Eskanos, *pro se*, filed a voluntary

petition with the Bankruptcy Court for the Southern District of Florida (the "Florida Bankruptcy

Court") under chapter 13 of the Bankruptcy Code (the "Eskanos Bankruptcy Case"), which was

docketed as Case No. 11-40292 (Bankr. S.D. Fl.).

19.     On December 20, 2011, Mr. and Ms. Eskanos, *pro se*, commenced an

adversary proceeding (the "Eskanos Adversary Proceeding") against WaMu by filing a

complaint in the bankruptcy court (the "Adversary Complaint"), which was docketed as Case

No. 11-03107 (Bankr. S.D. Fl.).[4]  See Adversary Complaint, a copy of which is attached hereto

as Exhibit 4-10.   In the Adversary Complaint, Mr. and Ms. Eskanos sought to set aside the grant

of summary judgment by the Florida State Court and re-asserted various claims against WaMu

including, among other things: (i) fraud, (ii) violations of the Fair Debt Collection Practices Act,

15 U.S.C. § 1601 et seq., (iii) Florida civil conspiracy, (iv) mail and wire fraud, and (v) bank

fraud.  See id.  Mr. and Mrs. Eskanos sought actual damages, compensatory and punitive

damages, and attorneys' fees.  See id.

20.     On March 5, 2012, GMACM, as servicer of the Eskanos Loan, filed the

Motion to Intervene and Objection to Motion for Default and Motion for Default Judgment (the

"Motion to Intervene") in the Eskanos Adversary Proceeding in order to fulfill its obligation to

protect Residential Funding's interest in the Eskanos Property.  See Motion to Intervene, a copy

of which is attached hereto as Exhibit 4-11.  On May 22, 2012, GMACM filed a Notice of

---

[4] At the time the Adversary Complaint was filed, GMACM was not a named party in the litigation.  See Adversary
Complaint.

Suggestion of Bankruptcy based upon the bankruptcy filing by GMACM and the other Debtors.

On October 18, 2012, the Eskanos Bankruptcy Case was dismissed and was closed on December

28, 2012.  As a result of the dismissal of the Eskanos Bankruptcy Case, the Eskanos Adversary

Proceeding was dismissed on April 23, 2013.  See Order Dismissing Adversary Proceeding, a

copy of which is attached hereto as Exhibit 4-12.

21.     On May 24, 2012, Mr. and Ms. Eskanos filed proof of claim number 19

(the "Eskanos Claim") asserting a claim against ResCap in the amount of $264.5 million.  The

Eskanos Claim describes the basis for claim as "Bank Fraud, Mail Fraud, Wire Fraud, FDCPA,

Civil Conspiracy" and references Mr. and Ms. Eskanos' bankruptcy case.[5]

22.     Pursuant to section 101 of the Bankruptcy Code, a creditor holds a claim

against a bankruptcy estate only to the extent that it has a "right to payment" for the asserted

liability.  See 11 U.S.C. § 101(5).  Likewise, section 502(b)(1) of the Bankruptcy Code provides,

in relevant part, that the Court shall allow a claim except to the extent that "such claim is

unenforceable against the debtor and property of the debtor, under any agreement or applicable

law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. §

502(b)(1).

23.     Mr. and Ms. Eskanos filed the Eskanos Claim solely against ResCap.

However, the supporting documentation provided with respect to the Eskanos Claim relates to

the State Court Proceeding and the Eskanos Adversary Proceeding.  ResCap was not a party to

either of those actions.  There is no explanation whatsoever as to why the Eskanos Claim is

properly asserted against ResCap.  The Debtors believe the Eskanos Claim is not enforceable

---

[5] The Eskanos Claim also includes a request for relief from the automatic stay.  The issue of relief from the
automatic stay is not presently before this Court, and such request would be mooted by the expungement of the
Eskanos Claim.

ny-1111555

against ResCap under any applicable law or agreement. Additionally, the Debtors' books and records reflect no liability due and owing to Mr. and Ms. Eskanos by ResCap.

24.    Moreover, even if the Eskanos Claim had been filed against GMACM, the Eskanos Claim is an improper attempt to re-litigate issues that have already been judicially determined by the Florida State Court and consequently should be disallowed and expunged under the doctrines of res judicata and collateral estoppel, as well as under the Rooker-Feldman doctrine.

25.    Finally, Mr. and Ms. Eskanos have proffered no basis as to why GMACM, or any other Debtors, can conceivably be found liable for the alleged conduct of a non-Debtor party asserted in litigation commenced six (6) years prior to the time GMACM acquired its interest. Any such claim, if any, would be time-barred.

### i.    *Res Judicata*

26.    Res judicata provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Burgos v. Hopkins, 14 F.3d 787, 789 (2d Cir. 1994) (quoting Allen v. McCurry, 449 U.S. 90, 94 (1980)); Niles v. Wilshire Inv. Grp., LLC, 859 F. Supp. 2d 308, 338 (E.D.N.Y. 2011) ("In applying the doctrine of res judicata, [a court] must keep in mind that a state court judgment has the same preclusive effect in federal court as the judgment would have had in state court.") (internal quotation marks and citations omitted). "All litigants, including pro se plaintiffs, are bound by the principles of res judicata." Done v. Wells Fargo Bank, N.A., No. 08-CV-3040 (JFB) (ETB), 2009 U.S. Dist. LEXIS 84114, at *9 (E.D.N.Y. Aug. 7, 2009).

27.    Because a state court judgment must be accorded the same deference in a federal court as it would be given by courts in the state where the judgment was rendered

9

pursuant to 28. U.S.C. § 1738, this Court must look to Florida state law to determine whether the claims set forth in the Eskanos Claim are barred under res judicata. See, e.g., Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985). Under Florida law, res judicata applies where (1) there is a previous adjudication on the merits; (2) the previous action involved the party against whom res judicata is invoked or its privy; and (3) the claims involved were or could have been raised in the previous action. Fla. Dep't of Transp. v. Juliano, 801 So. 2d 101, 105 (Fla. 2001) (quoting Youngblood v. Taylor, 89 So. 2d 503, 505 (Fla. 1956)) (establishing that under principles of res judicata, a judgment on the merits bars "a subsequent action between the same parties on the same cause of action."). The Florida Supreme Court has clearly explained this principle:

> A judgment on the merits rendered in a former suit between the same parties or their privies, upon the same cause of action, by a court of competent jurisdiction, is conclusive not only as to every matter which was offered and received to sustain or defeat the claim, but as to every other matter which might with propriety have been litigated and determined in that action.

Kimbrell v. Paige, 448 So. 2d 1009, 1012 (Fla. 1984) (citation omitted). Thus, the doctrine of res judicata not only bars issues that were in fact raised in the first case, but it also precludes, in subsequent litigation, consideration of issues that could have been raised in the first case. Fla. Dep't of Transp., 801 So. 2d at 105. This important doctrine "provides finality to judgments, predictability to litigants, and stability to judicial decisions." Id.

28.    Each of the elements for res judicata is met here. First, the Summary Judgment Order in the State Foreclosure Action operates as a final judgment. Second, Mr. and Ms. Eskanos were named parties in both the State Foreclosure Action and the Eskanos Claim. And third, the claims involved in the Eskanos Claim are the same as those in the State

Foreclosure Action. Accordingly, the claims set forth in the Eskanos Claim are barred on the basis of res judicata.

### ii.   *Collateral Estoppel*

29.     "[U]nder collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Burgos v. Hopkins, 14 F.3d at 789 (quoting Allen v. McCurry, 449 U.S. at 94). As with res judicata, the law of the state where the original litigation occurred controls the preclusive effect of its judgment in federal court. See, e.g., Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. at 380. Under Florida law, collateral estoppel bars relitigation of an issue when (i) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (ii) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action. Dep't of Health & Rehab. Servs. v. B.J.M., 656 So. 2d 906, 910 (Fla. 1995).

30.     As noted above, the Eskanos Claim necessarily is based on the same issues of fact and law that were at issue in the State Court because the all of the supporting documentation provided for the Eskanos Claim relates to the Eskanos Adversary Proceeding, which in turn sought to relitigate the very same issues already decided against Mr. and Ms. Eskanos by the Florida State Court. Mr. and Ms. Eskanos were parties in the State Foreclosure Action and are the parties asserting the Eskanos Claim. Thus, Mr. and Ms. Eskanos had a full and fair opportunity to litigate the issues in the prior action. Accordingly, the claims set forth in the Eskanos Claim are barred on the basis of collateral estoppel.

11

### iii.    *Rooker-Feldman*

31.    The Rooker-Feldman doctrine is premised upon two United States Supreme Court decisions:  Rooker v. Fid. Trust Co., 263 U.S. 413 (1923) and D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983).  The doctrine bars the exercise of federal court jurisdiction where the claims are "inextricably intertwined" with the claims adjudicated in a state court.  Feldman, 460 U.S. at 483, n.16.  According to Rooker, Feldman, and their progeny, this Court cannot sit in the place of a court of appeal reviewing facts or determinations made by Florida state courts, particularly where there is a means of appeal expressly provided under state law.  See Washington v. Wilmore, 407 F.3d 274, 279-80 (4th Cir. 2005); see also Hoblock v. Albany Cnty. Bd. of Elections, 422 F.3d 77 (2d Cir. 2005); Reusser v. Wachovia Bank, N.A., 525 F.3d 855, 858 (9th Cir. 2008).  Rooker-Feldman also may apply "over a suit that is a de facto appeal from a state court judgment" because in such circumstances, "the district court is in essence being called upon to review the state court decision."  Reusser v. Wachovia Bank, N.A., 525 F.3d at 859 (internal quotations omitted).

32.    In 2005, the United States Supreme Court squarely addressed the principles of the Rooker-Feldman doctrine for the first time since the Feldman decision.  Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 287 (2005).  In Exxon Mobil, the Court set forth the following rule of application for the doctrine: "The Rooker-Feldman doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name:  cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  Id. at 284.  The Exxon Mobil test for the application of the Rooker-Feldman doctrine can be divided into the following four elements: "[1] cases brought by state-

court losers [2] complaining of injuries caused by state-court judgments [3] rendered before the district court proceedings commenced and [4] inviting district court review and rejection of those judgments." Id.; Hoblock v. Albany Cnty. Bd. of Elections, 422 F.3d at 85.

33.    The Eskanos Claim at issue here satisfies all four elements in that Mr. and Ms. Eskanos filed the Eskanos Claim notwithstanding the resolution of the State Foreclosure Action, Mr. and Ms. Eskanos' counterclaims in the State Foreclosure Action were dismissed prior to the Petition Date and the Bar Date, and Mr. and Ms. Eskanos are seeking now the Eskanos Claim in the amount of $264.5 million on account of the very same claims that were asserted and dismissed in the State Foreclosure Action.  By the Eskanos Claim, Mr. and Ms. Eskanos are simply attempting to have this Court review, reject, and overturn the results of the State Foreclosure Action.  However, the Florida State Court has already ruled that Mr. and Ms. Eskanos' claims lack merit.

34.    Moreover, "courts in this Circuit have consistently held that any attack on a judgment of foreclosure is clearly barred by the Rooker-Feldman doctrine." Niles v. Wilshire Inv. Group, LLC, 859 F. Supp. 2d at 334 (citing Ashby v. Polinsky, No. 06-CV-6778 (DLI), 2007 U.S. Dist. LEXIS 12692, at *1 (E.D.N.Y. Feb. 22, 2007) (internal quotation marks and citation omitted), aff'd, 328 Fed. Appx. 20 (2d Cir. 2009); Done, 2009 U.S. Dist. LEXIS 84114 (Sept. 14, 2009); and Ward v. Bankers Trust Co. of Cal., N.A., No. 09-CV-1943 (RRM)(LB), 2011 U.S. Dist. LEXIS 32796, at *13-14 (E.D.N.Y. Mar. 29, 2011)).

35.    The rights of the parties to the State Foreclosure Action, including those of GMACM as successor-in-interest to WaMu, have become fixed—this is precisely the kind of litigation that is intended to be barred under Rooker-Feldman.  Accordingly, the Eskanos Claim, which is based on the same counterclaims made in the State Foreclosure Action for which

13

summary judgment has been granted in favor of WaMu and ultimately upheld on appeal, should

be disallowed and expunged in its entirety.

**C.      Caren Wilson (Claim No. 4754)**

36.      On November 14, 2012, Ms. Wilson filed, *pro se,* proof of claim number

4754 against ResCap[6] (the "Wilson Claim").[7]  Ms. Wilson is a borrower under a loan evidenced

by a note dated December 13, 2006 (the "Note"), in favor of Debtor Homecomings Financial

("Homecomings"), which is secured by a mortgage on property located at 211 W. Chandler

Street, Culpepper, Virginia 22701.

37.      On September 23, 2013, claim number 7181 was filed on behalf of Ms.

Wilson, by her counsel Wendy Alison Nora against ResCap, Homecomings and RFC (the

"Purported Amended Wilson Claim").  On September 27, 2013, Ms. Wilson filed her *Response

to Objection to Claim #4754 in the Record of Kurtzman Carson Consultants, LLC (KCC LLC) of

Caren Wilson Amended as Claim 18 in These Proceedings* [Docket No. 5222] (the "Wilson

Response").

38.      The Wilson Response and the Purported Amended Wilson Claim fail to

address the arguments made in the Objection.

---

[6]  The face of the Wilson Claim states that it is asserted against ResCap.  The Wilson Claim also includes a notation to "See Exhibit A."  Exhibit A is a list of all of the Debtors.  There are handwritten numbers next to various Debtor entities.  The Debtors reserve that right to object to the Wilson Claim on the basis that it was filed against the wrong Debtor entity.

[7]  On September 23, 2013, claim number 7181 was filed on behalf of Ms. Wilson, by her counsel Wendy Alison Nora (the "Second Wilson Claim").  On September 27, 2013, Ms. Wilson filed her *Response to Objection to Claim #4754 in the Record of Kurtzman Carson Consultants, LLC (KCC LLC) of Caren Wilson Amended as Claim 18 in These Proceedings* [Docket No. 5222] (the "Wilson Response").

14

39.     Prior to the Petition Date, Ms. Wilson commenced two separate actions[8] (together, the "Wilson Actions") against certain of the Debtors related to the Note.  Both of the Wilson Actions have been addressed by the trial courts.

40.     On October 26, 2011, the United States District Court for the Western District of Virginia entered a Final Order dismissing (the "Dismissal Order") the Wilson Action pending in that court pursuant to Federal Rule of Civil Procedure 41(b), which is a "dismissal on the merits."  Fed. R. Civ. P. 41.[9]  On February 28, 2012, the other Wilson Action, which was pending in the Culpepper County Circuit Court, Virginia, was nonsuited (the "Nonsuit Order"). The Dismissal Order and the Nonsuit Order are attached hereto as Exhibit 5-1 and Exhibit 5-2, respectively.  Accordingly, Ms. Wilson has no valid claims against the Debtors, and any such claims are barred by the principles of res judicata, collateral estoppel and the Rooker Feldman doctrine.

41.     Ms. Wilson, through the Wilson Response, contends that the Purported Amended Wilson Claim moots the Objection without providing any basis for this assertion. Nevertheless, in light of the filing of the Purported Amended Wilson Claim, the Debtors intend to file an amended Objection to further address the Wilson Claim and the Purported Amended Wilson Claim and reserve the right to contest the merits of both claims and the timeliness and validity of the Purported Amended Wilson Claim.

---

[8]  Case number CL11-304 in the Circuit Court for Culpepper County, Virginia and Case number CL11-057 in the United States District Court for the Western District of Virginia, Charlottesville Division.

[9]  Federal Rule of Civil Procedure 41(b) states "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule--except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19--operates as an adjudication on the merits."

ny-1111555

D.      **Constantino and Sybil Acevedo (Claim No. 2552)**

42.      Mr. and Ms. Acevedo filed proof of claim number 2552 (the "Acevedo Claim") in the amount of $197,839.61 alleging that their mortgage note should be discharged as part of the Debtors' bankruptcy proceedings.  Mr. and Ms. Acevedo's mortgage note secures a loan (the "Acevedo Loan") that was originated with Metropolitan Home Mortgage Inc. ("Metropolitan") on March 17, 2011.  See Supplemental Declaration at ¶ 10.  GMACM began servicing the Acevedo Loan as of May 1, 2011.  See id.  On March 29, 2011, GMACM mailed to Mr. and Ms. Acevedo a welcome letter detailing the new servicing information. Metropolitan completed an Allonge endorsing the mortgage note to Ally Bank.  See id.

43.      Mr. and Ms. Acevedo provided payoff funds to GMACM in the amount of $195,971.85 and such funds were applied on August 9, 2013.  See id. at ¶ 11.  A refund of escrow in the amount of $1,452.98 was disbursed to Mr. and Ms. Acevedo on August 27, 2013. See id.  The Acevedo Loan is paid in full.  See id.

44.      In connection with the Acevedo Claim, the Debtors reviewed Mr. and Ms. Acevedo's payment history as well as the Debtors' internal servicing notes, and determined that the Mr. and Ms. Acevedo were neither in default, involved in a bankruptcy proceeding nor the subject of a foreclosure.  See id. at ¶ 12.  In addition, the Debtors found that no fees or costs were applied to the Acevedo Loan, with the exception of one Speedpay Fee in the amount of $12.50. See id.

45.      Mr. and Ms. Acevedo have failed to state a viable claim against the Debtors.  Moreover, the Debtors' review of their books and records show that the Acevedo Loan is paid in full and that the Acevedo Loan was properly serviced.  Accordingly, the Acevedo Claim should be disallowed and expunged from the Debtors' claim register.

16

E.    Jan B. Ibrahim (Claim No. 997)

46.    Mr. Ibrahim filed proof of claim number 997 (the "Ibrahim Claim") in the

amount of $206,922.56 relating to an alleged wrongful foreclosure and the alleged wrongful

reporting of Mr. Ibrahim to a credit agency.  Mr. Ibrahim's mortgage note secures a loan (the

"Ibrahim Loan") that was originated by Decision One Mortgage Company LLC on November 3,

2006.  See Supplemental Declaration at ¶ 14.  Homecomings began servicing the Ibrahim Loan

on April 1, 2009, and on or about July 1, 2009, GMACM assumed servicing of the Ibrahim

Loan.  See id.  On August 1, 2013, servicing of the Ibrahim Loan was transferred to Ocwen.  See

id.  The investor on the Ibrahim Loan is E*Trade.  See id.

47.    In connection with the Ibrahim Loan, the Debtors reviewed Mr. Ibrahim's

payment history, the Debtors' internal servicing notes, as well as Mr. Ibrahim's loan

modification applications, loan modification denial letters, loan modification document request

letters and any applicable investor guidelines.  See id. at ¶ 15.  The Debtors' analysis indicates

that, as of November 2008, Mr. Ibrahim had ceased making payments on the Ibrahim Loan.

Moreover, the Debtors' internal servicing notes also reflect that Mr. Ibrahim contacted GMACM

on several occasions (i) alleging financial hardship in connection with the late payments and (ii)

attempting to obtain a loan modification.  See id.

48.    On January 21, 2009, the Debtors mailed a breach of contract letter to Mr.

Ibrahim indicating that payments on the Ibrahim Loan were due for the months of November

2008 through January 2009.  See id. at ¶ 16.  A second breach of contract letter was mailed to

Mr. Ibrahim on February 10, 2009 indicating that payments on the Ibrahim Loan were due for

November 2008 through February 2009.  See id.  On June 29, 2009, Mr. Ibrahim submitted

payments for the months of November and December 2008.  See id.  However, Mr. Ibrahim did

not submit any further payments on the Ibrahim Loan and, on July 16, 2009, the Debtors mailed

17

a third breach of contract letter indicating that Mr. Ibrahim's account was due and owing for payments on the Ibrahim loan for the months of January 2009 through July 2009. See id.

49.    On April 1, 2009, a permanent loan modification was offered to Mr. Ibrahim, and such modification was scheduled to begin on May 3, 2009. See id. at ¶ 17. However, the loan modification was ultimately denied on June 30, 2009 because Mr. Ibrahim failed to make the first payment due under the modification. See id. at ¶ 17. On July 29, 2009, Mr. Ibrahim's loan account was approved to be charged-off[10] because it is a second lien against property with insufficient equity in the property and, at the time the charge off was approved, payments on the Ibrahim Loan were due and owing for the months January 2009 through July 2009. See id. The Debtors' internal servicing notes reflect that the Debtors attempted to facilitate a settlement of the Ibrahim Loan, but the investor and Mr. Ibrahim were unable to reach an agreement. See id. As a result, the Ibrahim Loan is currently charged-off and the total principal amount remains due and owing along with accrued interest and other charges. See id.

50.    In 2009, the Debtors reported Mr. Ibrahim's account to the credit bureau on several occasions, including, without limitation, on the following dates for the following reasons: (i) on January 16, 2009 because Mr. Ibrahim's account was thirty (30) days past due; (ii) on February 13, 2009 because Mr. Ibrahim's account was sixty (60) days past due; (iii) on March 13, 2009 because Mr. Ibrahim's account was ninety (90) days past due; (iv) on April 10, 2009 because Mr. Ibrahim's account was 120 days past due; (v) on May 8, 2009 because Mr. Ibrahim's account was 150 days past due; (vi) on June 12, 2009 because Mr. Ibrahim's account

---

[10] A "charge off" is typically approved when a borrower fails to make loan payments and the investor determines that it is not cost effective to foreclose on the property. See Supplemental Declaration at ¶ 17, n.2. The purpose of a charge off is to prevent a property with little or no net value from entering into a costly and time-consuming foreclosure process. See id. It is common for an investor to delegate to a servicer the decision of whether to charge-off an account. See id. A charge off does not mean that the investor or the servicer has canceled the note or released the lien on the property. See id.

was in excess of 180 days past due; (vii) on July 10, 2009 because Mr. Ibrahim's account was 150 days past due; and (viii) on August 14, 2009 due to Mr. Ibrahim's account being charged-off. See id. at ¶ 18. On March 18, 2013, Mr. Ibrahim's account was again reported to the credit bureau to reflect an active charge off under Ocwen. See id. The Debtors' internal servicing notes do not reflect that Mr. Ibrahim ever provided sufficient evidence, such as cancelled checks and/or bank statements, to establish that (i) he had made certain payments to GMACM and (ii) that GMACM failed to apply such payments to Mr. Ibrahim's account. See id.

51.    Based on the above information, the Debtors determined that they have no liability with respect to the Ibrahim Claim because the Debtors, at all times, complied with the appropriate guidelines and policies governing the loan modification process and acted properly with respect to Mr. Ibrahim's late payments, loan modification requests and credit reporting.

**F.    Pamela Z. Hill (Claim No. 2429)**

52.    Ms. Hill filed proof of claim number 2429 (the "Hill Claim") in the amount of $389,331.00 alleging an obligation on the part of the Debtors due to a mortgage note and loan that was serviced by GMACM. Ms. Hill's mortgage note secures a loan (the "Hill Loan") that was originated with People's Bank on February 20, 2009 and was being serviced by GMACM as of April 1, 2009. See Supplemental Declaration at ¶ 20. The investor on the Hill Loan is Fannie Mae. See id. On August 1, 2013, the servicing of the Hill Loan was transferred to Ocwen. See id.

53.    In an effort to reconcile the Hill Claim with the Debtors' books and records, the Debtors reviewed Ms. Hill's payment history and the Debtors' internal servicing notes, and determined that the Hill Loan has not been in default or breach, nor had any foreclosure or bankruptcy proceedings been filed with respect to Ms. Hill. See id. at ¶ 21. Moreover, the Debtors' books and records reflected that no fees or costs had been applied to the

19

Hill Loan.  See id.  Furthermore, the Debtors' internal servicing notes show no evidence of Ms. Hill ever (i) challenging GMACM's right to service the Hill Loan or (ii) asserting that there is a cloud on Ms. Hill's title.  See id.

54.    In fact, the Debtors' records indicate that they never received any correspondence from Ms. Hill until after the Chapter 11 Cases were initiated.  See id. at ¶ 22. Since that time, Ms. Hill has mailed letters along with her monthly payments advising GMACM that she is a claimant and that her loan payments are being made without prejudice.  See id.  The Debtors replied to Ms. Hill's letters indicating, among other things, that her payment was received.  See id.

55.    Ms. Hill has failed to state a viable claim against the Debtors.  Moreover, the Debtors' review of their books and records reflect that the Hill Loan was properly serviced by GMACM.    Accordingly, the Hill Claim should be disallowed and expunged from the Debtors' claim register.

**G.    Paul and Marge Pfunder (Claim No. 1430)**

56.    Mr. and Ms. Pfunder filed proof of claim number 1430 (the "Pfunder Claim") in the amount of $435,000.00 alleging that the Debtors refused to provide a loan modification in relation to Mr. and Ms. Pfunder's loan (the "Pfunder Loan"), which was originated with Quicken Loans Inc. on December 18, 2004 and was being serviced by GMACM as of January 18, 2005.  See Supplemental Declaration at ¶ 24.  Mr. and Ms. Pfunder further allege that they were forced to sell their home through a short sale as a result of the Debtors' refusal to provide a loan modification.  In connection with the Pfunder Claim, the Debtors reviewed Mr. and Ms. Pfunder's payment history, the Debtors' internal servicing notes as well as Mr. and Ms. Pfunder's loan modification applications, loan modification denial letters, loan

modification document request letters, compliance with modifications (trial and/or permanent) and any applicable investor guidelines.  See id.

57.    The Debtors' books and records reflect that Mr. and Ms. Pfunder first contacted GMACM regarding a loan modification on August 5, 2008.  See id. at ¶ 25.  At that time, the only payment due and owing on the Pfunder Loan was for August 1, 2008.  See id.  Mr. and Ms. Pfunder indicated that due to the loss of full time employment, they were unable to continue to make payments on the Pfunder Loan.  See id.  On September 25, 2008, Mr. and Ms. Pfunder's loan modification request was denied because the payment options at the time of the request were not affordable to Mr. and Ms. Pfunder.  See id.

58.    On May 9, 2009, the Debtors received a workout package from Mr. and Ms. Pfunder, and on May 11, 2009, the Debtors informed Monica Ortiz, Mr. and Ms. Pfunder's authorized third party agent, that the package was missing certain documents that were required for consideration of the requested loan modification.  See id. at ¶ 26.  On May 26, 2009, Mr. and Ms. Pfunder's loan account was approved for a trial modification, with trial payments due from June 1, 2009 through December 1, 2009.  See id.  The Debtors advised Ms. Ortiz of the approval of the trial loan modification, and Ms. Ortiz advised the Debtors that Mr. and Ms. Pfunder could not afford the trial payments as they were the same amount as the prior mortgage payment.  See id.  On June 19, 2009, GMACM employees spoke to Ms. Ortiz and explained (i) the trial modification plan, (ii) the reason for the payment amount and (iii) that if Mr. and Ms. Pfunder could not afford the payment, then they should consider selling the property.  See id.  On July 23, 2009, Ms. Ortiz was advised that GMACM still required a Profit and Loss Statement for Mr. and Ms. Pfunder.  The Profit and Loss Statement was received on July 24, 2009; however, the Statement was not properly completed and was not useable for review.  See id.

59.    On October 27, 2009, Mr. and Ms. Pfunder were approved for a traditional loan modification.  See id. at ¶ 27.  GMACM mailed the documents to Mr. and Ms. Pfunder on November 9, 2009, and the documents, along with a Contribution,[11] were to be returned by Mr. and Ms. Pfunder by November 17, 2009.  See id.  As of January 14, 2010, the documents had not been returned to GMACM and, as a result, the permanent loan modification was denied.  See id.

60.    Mr. and Ms. Pfunder's account was again reviewed for a loan modification and another loan modification was offered; however, the loan modification was ultimately denied on April 12, 2010 because Mr. and Ms. Pfunder did not return the executed loan modification documents to the Debtors.  See id. at ¶ 28.  The Debtors subsequently re-reviewed Mr. and Ms. Pfunder's account and, on August 19, 2010, denied the requested loan modification because Mr. and Ms. Pfunder's income was insufficient to support the mortgage based on the modification programs available at time of review.  See id.

61.    The Debtors attempted to assist Mr. and Ms. Pfunder with their loan modification requests, however, the parties were unable to reach a resolution due to Mr. and Ms. Pfunder either not accepting, not being able to afford or not qualifying for the terms of the loan modification.  See id. at ¶ 29.  Based on the Debtors' review of their books and records, as set forth above, the Debtors determined that they have no liability with respect to the Pfunder Claim because the Debtors, at all times, complied with the appropriate guidelines and policies governing the loan modification process and acted properly with respect to Mr. and Ms. Pfunder's loan modification requests.

---

[11] As used herein, the term "Contribution" refers to money that must be paid by a borrower to finalize a loan modification.  The Debtors typically require payment of a Contribution at the time the executed loan modification documents are delivered to the mortgage company.  The Debtors may apply a Contribution, for example, toward either the first payment due on the loan after the modification takes effect, the principal balance of the loan or fees that could not be capped under the loan modification.  See Supplemental Declaration at ¶ 27, n.3.

### H.    Ron R. Bejarano (Claim No. 604)

62.    Mr. Bejarano has a mortgage loan that was serviced by GMACM.  See Supplemental Declaration at ¶ 30.  In August 2009, Mr. Bejarano initiated litigation against Homecomings and GMACM (the "Bejarano Litigation") to recover insurance proceeds owed for repair work required on Mr. Bejarano's property.  See id.  In October 2009, the parties executed a settlement agreement with respect to the Bejarano Litigation and the Debtors have fulfilled their obligations under the settlement agreement.  See id.  Also in 2009, Mr. Bejarano began working with MDF Financial Services to negotiate a loan modification on his behalf with Homecomings.  See id.

63.    On September 17, 2012, Mr. Bejarano filed proof of claim number 607 (the "Bejarano Claim") against ResCap on the asserted basis of breach of contract.  The Bejarano Claim did not include supporting documentation.  Based on their review of the Bejarano Claim, the Debtors believed that the Bejarano Claim related to the settlement of the Bejarano Litigation;[12] however, upon review of Mr. Bejarano's response to the Objection, the Debtors now understand the Bejarano Claim to relate to requests for loan modifications.  See id. at ¶ 31.

64.    After reviewing Mr. Bejarano's response to the Objection, the Debtors attempted to reconcile the Bejarano Claim with the information in its books and records.  See id. at ¶ 32.  Specifically, the Debtors reviewed Mr. Bejarano's payment history, the Debtors' internal servicing notes and Mr. Bejarano's loan modification applications, loan modification denial letters, loan modification document request letters, compliance with modifications (trial and/or permanent) and any applicable investor guidelines.  See id.

---

[12] To the extent that the Bejarano Claim does relate to the settlement of the Bejarano Litigation, the Debtors, based on a review of their books and records, maintain that they fulfilled their obligations under the settlement and, as a result, have no liabilities due and owing to Mr. Bejarano in relation to the settlement of the Bejarano Litigation.  See Supplemental Declaration at ¶ 31, n.4.

65.     The Debtors' review of their books and records established that Mr. Bejarano applied for loan modifications several times between 2009 and 2013.  Initially, Mr. Bejarano was provided a trial loan modification in March 25, 2009 and made payments under such trial modification in the months of March 2009 through June 2009, as well as in August and November of 2009 and January 2010.  See id. at ¶ 33.  However, on February 17, 2010, Mr. Bejarano was denied a permanent loan modification due to Mr. Bejarano's failure to provide certain documentation and a Contribution.  See id.

66.     On December 8, 2010, Mr. Bejarano was offered a traditional permanent loan modification; however, Mr. Bejarano's account was denied the loan modification on January 4, 2011 due to Mr. Bejarano not returning the signed and executed loan modification agreement.  See id. at ¶ 34.  Mr. Bejarano subsequently requested another loan modification, and, on May 4, 2011, a missing item letter was mailed to Mr. Bejarano, and Mr. Bejarano provided the requested information.  See id.  After receiving the requisite information, Mr. Bejarano's loan account was reviewed for loan modification options.  See id.  On May 26, 2011, Mr. Bejarano's account was denied a Home Affordable Modification Program ("HAMP") loan modification due to Mr. Bejarano's income being insufficient to support the loan.  See id.  On June 2, 2011, Mr. Bejarano's account was denied a traditional modification on the same basis.  See id.  At that time, the Debtors recommended that Mr. Bejarano consider selling the property.  See id.

67.     Mr. Bejarano continued to request loan modifications and was denied such modifications on the following dates and for the following reasons: (i) on August, 12, 2011, December 2, 2011, October 18, 2012, November 18, 2012, August 16, 2012, January 14, 2013, February 4, 2013, March 8, 2013, March 28, 2013 and May 10, 2013, Mr. Bejarano was denied a loan modification for failing to provided additional information; (ii) on January 26, 2012,

September 5, 2012 and June 27, 2013, Mr. Bejarano was denied a HAMP loan modification for failing to meet the HAMP criteria; and (iii) on February 3, 2012 and September 10, 2012, Mr. Bejarano was denied a loan modification for failing to meet the program guidelines for a traditional modification. See id. at ¶ 35.

68.     Since 2007, Mr. Bejarano's loan has been foreclosed upon three times. See id. at ¶ 36.  The first foreclosure was initiated with respect to Mr. Bejarano's loan on March 2, 2007, but the loan was reinstated on July 20, 2007.  See id.  On February 2, 2009, a second foreclosure was initiated, but the loan was again reinstated on April 15, 2011.  See id.  On August, 16, 2011, a third foreclosure was initiated with regard to Mr. Bejarano's loan.  See id. Mr. Bejarano's loan account was service released to Ocwen on September 1, 2013.  See id.  Mr. Bejarano's loan was still in active foreclosure at the time of the transfer.  See id.

69.     The Debtors determined that they have no liability with respect to the Bejarano Claim because the Debtors, at all times, complied with the appropriate guidelines and policies governing the loan modification process and acted properly with respect to Mr. Bejarano's loan modification requests.

70.     Therefore, based on the information set forth above and as further supported by the Supplemental Declaration, the No Liability Borrower Claims to which the Responses apply should be disallowed and expunged.

## **CONCLUSION**

71.    WHEREFORE, the Debtors respectfully submit that the relief sought in

the Objection should be granted with respect to the Claimants.

Dated:  October 7, 2013
      New York, New York

/s/  Norman S. Rosenbaum
Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and*
*Debtors in Possession*

26