# Exhibit 3

**Supplemental Declaration**

ny-1111555

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**SUPPLEMENTAL DECLARATION OF DEANNA HORST WITH RESPECT TO
DEBTORS' THIRTIETH OMNIBUS OBJECTION TO CLAIMS
(NO LIABILITY BORROWER CLAIMS – BOOKS AND RECORDS)**

Deanna Horst, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury:

1.      I am the Senior Director of Claims Management for Residential Capital, LLC and its affiliates ("<u>ResCap</u>"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "<u>Debtors</u>").  I have been employed by affiliates of ResCap since August of 2001, and have held my current position since June of 2012.  I began my association with ResCap in 2001 as the Director, Responsible Lending Manager, charged with managing the Debtors' responsible lending on-site due diligence program.  In 2002, I became the Director of Quality Asset Management, managing Client Repurchase, Quality Assurance and Compliance—a position I held until 2006, at which time I became the Vice President of the Credit Risk Group, managing Correspondent and Broker approval and monitoring.  In 2011, I became the Vice President, Business Risk and Controls, and supported GMAC Mortgage, LLC ("<u>GMACM</u>") and Ally Bank in this role.  In my current position, I am responsible for Claims Management and Reconciliation and Client Recovery.  I am authorized to submit this supplemental declaration (the "<u>Supplemental Declaration</u>") with respect to the *Debtors' Omnibus*

ny-1111555

*Reply in Support of Debtors' Thirtieth Omnibus Objection to Claims (No Liability Borrower Claims - Books and Records)* (the "Reply").[1]

2. Except as otherwise indicated, all facts set forth in this Supplemental Declaration are based upon my familiarity with the Debtors' books and records, information learned from my review of relevant documents and information I have received through my discussions with other members of the Debtors' management or other employees of the Debtors, and/or the Debtors' professionals and consultants. If I were called upon to testify, I could and would testify competently to the facts set forth in the Reply on that basis.

3. The Debtors have examined each of the Responses and the statements and exhibits submitted in support thereof. Upon review of the Responses, the Debtors diligently examined their books and records in order to assess the validity of the allegations made in the No Liability Borrower Claims and the Responses. For the reasons set forth below, the Debtors determined that the Claimants' allegations of liability are unsubstantiated and have no validity.

**A.    Anthony E. Fisher (Claim No. 1972)**

4. Mr. Fisher filed proof of claim number 1972 (the "Fisher Claim") in relation to his mortgage note, which secured a loan (the "Fisher Loan") that originated with USAA Federal Savings Bank ("USAA") on May 15, 2006. Fannie Mae is the investor for the Fisher Loan. On June 5, 2006, GMACM began sub-servicing the Fisher Loan for USAA, and on February 1, 2013, servicing of the Fisher Loan was transferred to Green Tree Servicing LLC ("Green Tree"). All correspondence provided to Mr. Fisher was either on the letterhead of USAA or GMAC Mortgage-Proudly Serving USAA Members.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Reply.

5. On August 15, 2008, GMACM referred the Fisher Loan for foreclosure. At that time, the Fisher Loan had been delinquent since June 1, 2008. The Law Offices of David J. Stern was the foreclosing attorney for GMACM. On September 2, 2008, a complaint was filed in connection with the foreclosure, service was effectuated on September 18, 2008 and a judgment was entered in relation to the foreclosure. On April 9, 2010, Mr. Fisher entered into a loan modification (the "Fisher Loan Modification") offered by USAA, and the foreclosure was closed after May 25, 2012. At no time did Mr. Stern own the property.

6. The $38,835.20 in "illegal fees," to which Mr. Fisher alleges that he is entitled, represents the balance of the Fisher Loan that was deferred as part of the Fisher Loan Modification. This deferred balance is a non-interest bearing principal balance, which consists of past due payments, escrow and/or principal balance that was placed at the end of the Fisher Loan to assist with lowering Mr. Fisher's monthly payments. The concept of the deferred balance and the amount of the deferred balance is explained and identified in the Fisher Loan Modification, which was signed by Mr. Fisher.

7. In connection with the Fisher Claim, the Debtors reviewed Mr. Fisher's payment history, the Debtors' internal servicing notes, the Fisher Loan Modification documents and any applicable investor guidelines. The Debtors determined that they have no liability with respect to the Fisher Claim because the Debtors, at all times, complied with the appropriate guidelines and policies governing the loan modification process and acted properly with respect to Mr. Fisher's foreclosure and loan modification requests.

**B.    Barry B. Eskanos and Ami B. Eskanos (Claim No. 19)**

8. Mr. and Ms. Eskanos are borrowers under a loan (the "Eskanos Loan") evidenced by a note in the principal amount of $364,000.00 executed on October 28, 1999, in

3

ny-1111555

favor of Washington Mutual, F.A. ("WaMu"), which is secured by a mortgage on real property located at 3122 Pine Tree Drive, Miami Beach, Florida (the "Eskanos Property"). In October 2004, Mr. and Ms. Eskanos defaulted under the Eskanos Loan based upon their failure to timely make payments. On October 27, 2011, GMACM acquired the servicing rights to the Eskanos Loan from Litton Loan Servicing LP and began servicing the loan for Residential Funding Company, LLC, which, at that time, was the holder of the Eskanos Loan.

9. For the reasons set forth in the Reply, the Debtors have no liability due and owing to Mr. and Ms. Eskanos because (i) the Debtors' books and records reflect no liability to Mr. and Ms. Eskanos by ResCap and (ii) the Eskanos Claim is based on issues that have already been judicially determined and dismissed with prejudice by the Florida State Court and none of the Debtors had any role in the alleged circumstances giving rise to the Florida State Foreclosure Action as GMACM only commenced servicing of the Eskanos Loan in October 2011, over six (6) years after the commencement of the State Foreclosure Action, as defined and discussed in the Reply.

**C.    Constantino and Sybil Acevedo (Claim No. 2552)**

10. Mr. and Ms. Acevedo filed proof of claim number 2552 (the "Acevedo Claim") in the amount of $197,839.61 alleging that their mortgage note should be discharged as part of the Debtors' bankruptcy proceedings. Mr. and Ms. Acevedo's mortgage note secures a loan (the "Acevedo Loan") that was originated with Metropolitan Home Mortgage Inc. ("Metropolitan") on March 17, 2011. GMACM began servicing the Acevedo Loan as of May 1, 2011. On March 29, 2011, GMACM mailed to Mr. and Ms. Acevedo a welcome letter detailing the new servicing information. Metropolitan completed an Allonge endorsing the mortgage note to Ally Bank.

4

11. Mr. and Ms. Acevedo provided payoff funds to GMACM in the amount of $195,971.85 and such funds were applied on August 9, 2013. A refund of escrow in the amount of $1,452.98 was disbursed to Mr. and Ms. Acevedo on August 27, 2013. The Acevedo Loan is paid in full.

12. In connection with the Acevedo Claim, the Debtors reviewed Mr. and Ms. Acevedo's payment history as well as the Debtors' internal servicing notes, and determined that the Mr. and Ms. Acevedo were not in default, involved in a bankruptcy proceeding or the subject of a foreclosure. In addition, the Debtors found that no fees or costs were applied to the Acevedo Loan, with the exception of one Speedpay Fee in the amount of $12.50.

13. Based on the Debtors' review of their books and records, the Debtors do not have any liability due and owing to Mr. and Ms. Acevedo.

**D.    Jan B. Ibrahim (Claim No. 997)**

14. Mr. Ibrahim filed proof of claim number 997 (the "<u>Ibrahim Claim</u>") in the amount of $206,922.56 relating to an alleged wrongful foreclosure and the alleged wrongful reporting of Mr. Ibrahim to a credit agency. Mr. Ibrahim's mortgage note secures a loan (the "<u>Ibrahim Loan</u>") that was originated by Decision One Mortgage Company LLC on November 3, 2006. Homecomings began servicing the Ibrahim Loan on April 1, 2009, and on or about July 1, 2009, GMACM assumed servicing of the Ibrahim Loan. On August 1, 2013, servicing of the Ibrahim Loan was transferred to Ocwen. The investor on the Ibrahim Loan is E*Trade.

15. In connection with the Ibrahim Loan, the Debtors reviewed Mr. Ibrahim's payment history, the Debtors' internal servicing notes, as well as Mr. Ibrahim's loan modification applications, loan modification denial letters, loan modification document request letters and any applicable investor guidelines. The Debtors' review reflects that, as of November

5

ny-1111555

2008, Mr. Ibrahim had ceased making payments on the Ibrahim Loan. The Debtors' internal servicing notes reflect that Mr. Ibrahim contacted GMACM on several occasions (i) alleging financial hardship in connection with the late payments and (ii) attempting to obtain a loan modification.

16. On January 21, 2009, the Debtors mailed a breach of contract letter to Mr. Ibrahim indicating that payments on the Ibrahim Loan were due for the months of November 2008 through January 2009. A second breach of contract letter was mailed to Mr. Ibrahim on February 10, 2009 indicating that payments on the Ibrahim Loan were due for November 2008 through February 2009. On June 29, 2009, Mr. Ibrahim submitted payments for the months of November and December 2008. However, Mr. Ibrahim did not submit any further payments on the Ibrahim Loan and, on July 16, 2009, the Debtors mailed a third breach of contract letter indicating that Mr. Ibrahim's account was due and owing for payments on the Ibrahim loan for the months of January 2009 through July 2009.

17. On April 1, 2009, a permanent loan modification was offered to Mr. Ibrahim, and such modification was scheduled to begin on May 3, 2009. However, the loan modification was ultimately denied on June 30, 2009 because Mr. Ibrahim failed to make the first payment due under the modification. On July 29, 2009, Mr. Ibrahim's loan account was approved to be charged-off[2] because it is a second lien with no equity in the property and, at the time the charge off was approved, payments on the Ibrahim Loan were due and owing for the months January 2009 through July 2009. The Debtors' internal servicing notes reflect that the

---

[2] A "charge off" is typically approved when a borrower fails to make loan payments and the investor determines that it is not cost effective to foreclose on the property. The purpose of a charge off is to prevent a property with little or no net value from entering into a costly and time-consuming foreclosure process. It is common for an investor to delegate to a servicer the decision of whether to charge-off an account. A charge off does not mean that the investor or the servicer has canceled the note or released the lien on the property.

6

ny-1111555

Debtors attempted to facilitate a settlement of the Ibrahim Loan, but the investor and Mr. Ibrahim were unable to reach an agreement. As a result, the Ibrahim Loan is currently charged-off and the total principal amount remains due and owing along with accrued interest and other charges.

18. In 2009, the Debtors reported Mr. Ibrahim's account to the credit bureau on several occasions, including, without limitation, on the following dates for the following reasons: (i) on January 16, 2009 because Mr. Ibrahim's account was thirty (30) days past due; (ii) on February 13, 2009 because Mr. Ibrahim's account was sixty (60) days past due; (iii) on March 13, 2009 because Mr. Ibrahim's account was ninety (90) days past due; (iv) on April 10, 2009 because Mr. Ibrahim's account was 120 days past due; (v) on May 8, 2009 because Mr. Ibrahim's account was 150 days past due; (vi) on June 12, 2009 because Mr. Ibrahim's account was in excess of 180 days past due; (vii) on July 10, 2009 because Mr. Ibrahim's account was 150 days past due; (viii) on August 14, 2009 due to Mr. Ibrahim's account being charged-off. On March 18, 2013, Mr. Ibrahim's account was again reported to the credit bureau to reflect an active charge off under Ocwen. The Debtors' internal servicing notes do not reflect that Mr. Ibrahim ever provided sufficient evidence, such as cancelled checks and/or bank statements, to establish that (i) he had made certain payments to GMACM and (ii) that GMACM failed to apply such payments to Mr. Ibrahim's account.

19. Based on the above information, the Debtors have no liability with respect to the Ibrahim Claim because the Debtors, at all times, complied with the appropriate guidelines and policies governing the loan modification process and acted properly with respect to Mr. Ibrahim's late payments, loan modification requests and credit reporting.

7

### E. Pamela Z. Hill (Claim No. 2429)

20. Ms. Hill filed proof of claim number 2429 (the "Hill Claim") in the amount of $389,331.00 alleging an obligation on the part of the Debtors due to a mortgage note and loan that was serviced by GMACM. Ms. Hill's mortgage note secures a loan (the "Hill Loan") that was originated with People's Bank on February 20, 2009 and was being serviced by GMACM as of April 1, 2009. The investor on the Hill Loan is Fannie Mae. On August 1, 2013, the servicing of the Hill Loan was transferred to Ocwen.

21. In an effort to reconcile the Hill Claim with the Debtors' books and records, the Debtors reviewed Ms. Hill's payment history and the Debtors' internal servicing notes. The Debtors determined that the Hill Loan has not been in default or breach, nor had any foreclosure or bankruptcy proceedings been filed with respect to Ms. Hill. Moreover, the Debtors' books and records reflected that no fees or costs had been applied to the Hill Loan. Furthermore, the Debtors' internal servicing notes show no evidence of Ms. Hill ever (i) challenging GMACM's right to service the Hill Loan or (ii) asserting that there is a cloud on Ms. Hill's title.

22. The Debtors' records indicate that they never received any correspondence from Ms. Hill until after the Chapter 11 Cases were initiated. Since that time, Ms. Hill has mailed letters along with her monthly payments advising GMACM that she is a claimant and that her loan payments are being made without prejudice. The Debtors replied to Ms. Hill's letters indicating, among other things, that her payment was received.

23. Based on the Debtors' review of their books and records, the Debtors do not have any liability due and owing to Ms. Hill.

8

ny-1111555

### F.     Paul and Marge Pfunder (Claim No. 1430)

24.     Mr. and Ms. Pfunder filed proof of claim number 1430 (the "<u>Pfunder Claim</u>") in the amount of $435,000.00 alleging that the Debtors refused to provide a loan modification in relation to Mr. and Ms. Pfunder's loan (the "<u>Pfunder Loan</u>"), which was originated with Quicken Loans Inc. on December 18, 2004 and was being serviced by GMACM as of January 18, 2005.  Mr. and Ms. Pfunder further allege that they were forced to sell their home through a short sale as a result of the Debtors' refusal to provide a loan modification.  In connection with the Pfunder Claim, the Debtors reviewed Mr. and Ms. Pfunder's payment history, the Debtors' internal servicing notes as well as Mr. and Ms. Pfunder's loan modification applications, loan modification denial letters, loan modification document request letters, compliance with modifications (trial and/or permanent) and any applicable investor guidelines.

25.     The Debtors' books and records reflect that Mr. and Ms. Pfunder first contacted GMACM regarding a loan modification on August 5, 2008.  At that time, the only payment due and owing on the Pfunder Loan was for August 1, 2008.  Mr. and Ms. Pfunder indicated that due to the loss of full time employment, they were unable to continue to make payments on the Pfunder Loan. On September 25, 2008, Mr. and Ms. Pfunder's loan modification request was denied because the payment options at the time of the request were not affordable to Mr. and Ms. Pfunder.

26.     On May 9, 2009, the Debtors received a workout package from Mr. and Ms. Pfunder, and on May 11, 2009, the Debtors informed Monica Ortiz, Mr. and Ms. Pfunder's authorized third party agent, that the package was missing certain documents that were required for consideration of the requested loan modification.  On May 26, 2009, Mr. and Ms. Pfunder's loan account was approved for a trial modification, with trial payments due from June 1, 2009

through December 1, 2009. The Debtors advised Ms. Ortiz of the approval of the trial loan modification, and Ms. Ortiz advised the Debtors that Mr. and Ms. Pfunder could not afford the trial payments as they were the same amount as the prior mortgage payment. On June 19, 2009, GMACM employees spoke to Ms. Ortiz and explained (i) the trial modification plan, (ii) the reason for the payment amount and (iii) that if Mr. and Ms. Pfunder could not afford the payment, then they should consider selling the property. On July 23, 2009, Ms. Ortiz was advised that GMACM still required a Profit and Loss Statement for Mr. and Ms. Pfunder. The Profit and Loss Statement was received on July 24, 2009; however, the Statement was not properly completed and was not useable for review.

27. On October 27, 2009, Mr. and Ms. Pfunder were approved for a traditional loan modification. GMACM mailed the documents to Mr. and Ms. Pfunder on November 9, 2009, and the documents, along with a Contribution,[3] were to be returned by Mr. and Ms. Pfunder by November 17, 2009. As of January 14, 2010, the documents had not been returned to GMACM and, as a result, the permanent loan modification was denied.

28. Mr. and Ms. Pfunder's account was again reviewed for a loan modification and another loan modification was offered; however, the loan modification was ultimately denied on April 12, 2010 because Mr. and Ms. Pfunder did not return the executed loan modification documents to the Debtors. The Debtors subsequently re-reviewed Mr. and Ms. Pfunder's account and, on August 19, 2010, denied the requested loan modification because Mr.

---

[3] As used herein, the term "Contribution" refers to money that must be paid by a borrower to finalize a loan modification. The Debtors typically require payment of a Contribution at the time the executed loan modification documents are delivered to the mortgage company. The Debtors may apply a Contribution, for example, toward either the first payment due on the loan after the modification takes effect, the principal balance of the loan or fees that could not be capped under the loan modification.

10

ny-1111555

and Ms. Pfunder's income was insufficient to support the mortgage based on the modification programs available at time of review.

29. The Debtors attempted to assist Mr. and Ms. Pfunder with their loan modification requests, however, the parties were unable to reach a resolution due to Mr. and Ms. Pfunder either not accepting, not being able to afford or not qualifying for the terms of the loan modification. Based on the Debtors' review of their books and records, the Debtors do not have any liability with respect to the Pfunder Claim because the Debtors, at all times, complied with the appropriate guidelines and policies governing the loan modification process and acted properly with respect to Mr. and Ms. Pfunder's loan modification requests.

**G.    Ron R. Bejarano (Claim No. 604)**

30. Mr. Bejarano has a mortgage loan that was serviced by GMACM. In August 2009, Mr. Bejarano initiated litigation against Homecomings and GMACM (the "Bejarano Litigation") to recover insurance proceeds owed for repair work required on Mr. Bejarano's property. In October 2009, the parties executed a settlement agreement with respect to the Bejarano Litigation and the Debtors have fulfilled their obligations under the settlement agreement. Also in 2009, Mr. Bejarano began working with MDF Financial Services to negotiate a loan modification on his behalf with Homecomings.

31. On September 17, 2012, Mr. Bejarano filed proof of claim number 607 (the "Bejarano Claim") against ResCap on the asserted basis of breach of contract. The Bejarano Claim did not include supporting documentation. The Debtors, after reviewing the Bejarano Claim, believed that the Bejarano Claim related to the settlement of the Bejarano Litigation;[4]

---

[4] To the extent that the Bejarano Claim does relate to the settlement of the Bejarano Litigation, the Debtors, based on a review of their books and records, maintain that they fulfilled their obligations under the settlement and, as a result, have no liabilities due and owing to Mr. Bejarano in relation to the settlement of the Bejarano Litigation.

11

however, upon review of Mr. Bejarano's response to the Objection, the Bejarano Claim appears to relate to allegations concerning his requests for loan modifications.

33. After reviewing Mr. Bejarano's response to the Objection, the Debtors attempted to reconcile the Bejarano Claim with the information in its books and records. Specifically, the Debtors reviewed Mr. Bejarano's payment history, the Debtors' internal servicing notes and Mr. Bejarano's loan modification applications, loan modification denial letters, loan modification document request letters, compliance with modifications (trial and/or permanent) and any applicable investor guidelines.

33. The Debtors' review of their books and records established that Mr. Bejarano applied for loan modifications several times between 2009 and 2013. Initially, Mr. Bejarano was provided a trial loan modification in March 25, 2009 and made payments under such trial modification in the months of March 2009 through June 2009, as well as in August and November of 2009 and January 2010. However, on February 17, 2010, Mr. Bejarano was denied a permanent loan modification due to Mr. Bejarano's failure to provide certain documentation and a Contribution.

34. On December 8, 2010, Mr. Bejarano was offered a traditional permanent loan modification; however, Mr. Bejarano's account was denied the loan modification on January 4, 2011 due to Mr. Bejarano not returning the signed and executed loan modification agreement. Mr. Bejarano subsequently requested another loan modification, and, on May 4, 2011, a missing item letter was mailed to Mr. Bejarano, and Mr. Bejarano provided the requested information. After receiving the requisite information, Mr. Bejarano's loan account was reviewed for loan modification options. On May 26, 2011, Mr. Bejarano's account was denied a Home Affordable Modification Program ("HAMP") loan modification due to Mr. Bejarano's

income being insufficient to support the loan. On June 2, 2011, Mr. Bejarano's account was denied a traditional modification on the same basis. At that time, the Debtors recommended that Mr. Bejarano consider selling the property.

35. Mr. Bejarano continued to request loan modifications and was denied such modifications on the following dates and for the following reasons: (i) on August, 12, 2011, December 2, 2011, October 18, 2012, November 18, 2012, August 16, 2012, January 14, 2013, February 4, 2013, March 8, 2013, March 28, 2013 and May 10, 2013, Mr. Bejarano was denied a loan modification for failing to provided additional information; (ii) on January 26, 2012, September 5, 2012 and June 27, 2013, Mr. Bejarano was denied a HAMP loan modification for failing to meet the HAMP criteria; and (iii) on February 3, 2012 and September 10, 2012, Mr. Bejarano was denied a loan modification for failing to meet the program guidelines for a traditional modification.

36. Since 2007, Mr. Bejarano's loan has been foreclosed upon three times. The first foreclosure was initiated with respect to Mr. Bejarano's loan on March 2, 2007, but the loan was reinstated on July 20, 2007. On February 2, 2009, a second foreclosure was initiated, but the loan was again reinstated on April 15, 2011. On August, 16, 2011, a third foreclosure was initiated with regard to Mr. Bejarano's loan. Mr. Bejarano's loan account was service released to Ocwen on September 1, 2013. Mr. Bejarano's loan was still in active foreclosure at the time of the transfer.

37. The Debtors have no liability with respect to the Bejarano Claim because the Debtors, at all times, complied with the appropriate guidelines and policies governing the loan modification process and acted properly with respect to Mr. Bejarano's loan modification requests.

Dated: October 7, 2013

                                            /s/ Deanna Horst
                                            Deanna Horst
                                            Senior Director of Claims Management for
                                            Residential Capital, LLC