IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

| | |
|---|---|
| WASHINGTON MUTUAL BANK, FA, | Case No.: 05-06570 CA 15 |
| Plaintiff, | |
| -vs.- | Division: |
| AMI B. ESKANOS; ET AL. | |
| Defendants. | |

## AMENDED COUNTERCLAIM

Comes Now Ami B. Eskanos and Barry B. Eskanos, Defendants ("Defendants"), by and through their attorney, Danny E. Eskanos, and hereby assert the following Counterclaims against Washington Mutual Bank, FA ("Plaintiff") in the above-entitled action as follows:

### RECITATION OF FACTUAL BASIS FOR COUNTERCLAIMS

1.      On or about October 28 1999 the Defendants entered into a residential mortgage transaction with the Plaintiff and borrowed the sum of Three Hundred Sixty Four Thousand and 00/100 U.S. Dollars from the Plaintiff in order to purchase their home located at 3122 Pinetree Drive, Miami Beach, Florida.

2.      Plaintiff required the Defendant, Ami Eskanos, to execute a promissory note payable by the Plaintiff in the principal sum of $364,000.00. (A copy of said note is attached hereto, is marked "Defendants Exhibit 9", and by this reference is made a part hereof.) The "Note" is an adjustable interest rate 30-year promissory note. The payments on the Note are due on the 1st day of each month, began on December 1 1999, and are to be paid in full on or before November 1 2029 (the "Maturity Date"). Pursuant to the terms of the Note the annual interest due and payable on the principal balance started at 3.45 percent for the time between October 28 1999 and ending on November 30 1999. Thereafter, (pursuant to paragraph 4 of the Note) on the

118

first day of each month (the "Interest Rate Change date"), starting December 1 1999, the interest

rate was to be adjusted up or down and was to be determined by adding together the interest rate

index most commonly known as the "12-MTA Index" (the 12-MTA Index is the twelve month

average on the annual yields on actively traded United States Treasury Securities adjusted to a

constant maturity of one year as published by the Federal Reserve Board.) and a fixed rate of

2.700%. Pursuant to the Note the index rate to be used each month was supposed to be the most

recent index figure available as of 15 days before each interest rate change date. Therefore, the

total interest rate due under the note on the first day of each month would be based on the 12-

MTA Index figures available for the end of the month two calendar months prior to the change

date. For example, the 12-MTA Index figure that was supposed to be used as the basis for the

December 1 1999 change date was the 12-MTA Index figure available on November 16 1999.

The 12-MTA figure available on November 16 1999 was the rate calculated and released by the

Federal Reserve Board as of the end of October 1999. From January 2000 to date the Plaintiff

has failed to properly calculate or assess the proper interest rate pursuant the terms of the Note.

    3.      Pursuant to paragraph "4(E)" of the Note the amount of the monthly principal and

interest payments was supposed to be changed on an annual basis. During the first year of the

term of the note the principal and interest payments were based on a 30 year full-amortization of

the principal and interest at an annual interest rate of 3.45%. Commencing on December 1 2000,

and on December 1 each year thereafter (the "Payment Change Date"), the amount of the

monthly principal and interest payments was supposed to be changed (with limitations) to an

amortized amount necessary to repay the principal balance expected to be owed as of the

Payment Change Date in full on the Maturity Date at the interest rate that was in effect 45 days

prior to the Payment Change Date in substantially equal payments. Therefore, pursuant to the

119

Note, the monthly principal and interest payments beginning on December 1 of each year were supposed to be based on the interest rate in effect on the 17th day of October of that current year. The interest rate in effect on the 17th of October of each year was 2.7% plus the 12-MTA Index figure for August of that current year. From December 2000 to date the Plaintiff has failed to properly calculate or assess the proper principal and interest payment as required by the terms of the Note.

4.    Pursuant to paragraph "4(J)" of the Note, the Plaintiff was supposed to provide notice to the Defendants prior to any change in the amount of the monthly payment including any information required by law to be given the Defendants and the title and telephone number of a person the Defendants could contact to answer any questions the Defendant had regarding the notice. From November 2000 to date the Plaintiff has failed to properly notify the Defendants of the correct change in required payment amounts.

5.    Pursuant to paragraph "7" of the Note the Defendant is supposed to pay a late fee of 5.000% of any principal and interest payment not paid to the Plaintiff by the end of fifteen calendar days after the payment is due. That late charge is only supposed to be assessed once for each late payment. From conception of the Note to date the Defendants have consistently mailed or delivered their required monthly principal and interest payments in a timely manner. From the conception of the note to date the Plaintiff has repeatedly charged the Defendant improper, excessive, and redundant amounts for late fees in direct contradiction to the terms of the Note.

6.    The residential mortgage transaction between the Plaintiff and the Defendants was and is subject to the Federal Truth in Lending Laws as specified in *15 USC § 1601* et seq. and all relevant Federal Regulations and the Real Estate Settlement Procedures Act (*12 U.S.C. 2601* et seq.) and all of its relevant Federal Regulations. Pursuant to Federal Law as reflected in *Truth in*

120

*Lending Reg. Z, 12 CFR § 226.19 & § 226.20* the Plaintiff was and is required to make significant disclosures both before the initial consummation of the residential mortgage transaction and annually thereafter prior to any change in the required principal and interest payment. The Plaintiff has repeatedly failed to make those required disclosures. *15 U.S.C.A. § 1640* and extensive case law provides civil remedies for violations of the Federal Truth in Lending Laws including use of damages for set-off and recoupment as counterclaims to a foreclosure action. The Plaintiff's repeated violations entitle the Defendants to recover their damages from the Plaintiff in their counterclaim and use those damages as set-off against any money allegedly owed to the Plaintiffs.

7.     On or about October 28 1999 the Plaintiff also required the Defendants to execute a Security Agreement in the form of a Mortgage (A copy of said "Mortgage" is attached hereto, is marked "Defendants Exhibit 10", and by this reference is made a part hereof.) in addition to the Note that Plaintiff required from the Defendants. The Mortgage was and is intended to secure the performance of the Defendants under the Promissory Note and also created additional duties of both the Plaintiff and the Defendants under that separate agreement. That agreement is also controlled by Federal and Florida Laws and those laws create additional duties and obligations between the parties.

8.     Pursuant to Paragraph 2 of the Mortgage the Plaintiff may collect from the Defendants on a monthly basis any sums necessary to pay any required taxes and assessments, property insurance premiums, and mortgage insurance premiums. If it collects funds pursuant to paragraph 2 then it must comply with the Mortgage Agreement and Note and also with extensive federal, state and common law contractual requirements for the collection, maintenance, and disbursement of those funds. In addition to the contractual requirements for collection and

121

maintenance of the "Escrowed" funds and disbursements from that escrow, Florida and Federal

Laws (see *FRSA 501.137*, and *Real Estate Settlement Procedures Act of 1974, §§ 10, 12*

*U.S.C.A. §§ 2609* set limits on the amounts allowed to be retained in the escrow at any one time

and also require that payments from the escrow account be made in a timely manner, that any

discount available for timely payment be taken advantage of, and that annually the Plaintiff make

a full accounting of the escrow account and provide to the Defendants full disclosure of the

deposits to, and payments out of the escrow account. From the inception of the Mortgage, the

Plaintiff failed to perform as required by the Mortgage agreement by repeatedly collecting and

disbursing incorrect and excessive escrow funds and repeatedly failing to comply with Florida or

Federal Law regarding the maintenance of the escrow account.

9.    Pursuant to Paragraph 3 of the Mortgage agreement, payments made by the

Defendants must be applied by the Plaintiff as follows: First to the payment of any charges for

pre-payment of note; second to the payment of amounts payable under paragraph 2 of the

Mortgage agreement (funds for taxes, insurance and other liens); third to the payment of interest

due on the Note; fourth to principal due on the Note; and finally fifth to any late charges due

under the note. From the inception of the Note and Mortgage the Plaintiff repeatedly misapplied

the payments made by the Defendants by applying funds to late charges first, by applying funds

to the payment of escrow items when no funds were due or payable to the escrow items, by

holding funds "in reserve" without immediately applying those funds to any of the amounts

actually due at that time, by failing to apply funds to interest and principal as required, and by

paying other items that were not required by either the Note or the Mortgage, including but not

limited to excess and/or duplicate property insurance, improper late fees, and other charges.

*122*

10.    Paragraph 5 of the Mortgage required the Defendants to obtain and directly pay for property insurance for the mortgaged property and provide copies of said insurance policies to the Plaintiff. The Plaintiff was only allowed to procure the same type property insurance if the Defendants failed to do so first.  From the inception of the Note and Mortgage, the Defendants consistently obtained the necessary insurance and the Plaintiff received complete notice (any copies and/or originals of any insurance policies as required) of the placement of the insurance. In direct contradiction of the terms of the Mortgage, the Plaintiff, without prior notice to the Defendants and without authority or right knowingly, intentionally, and with fraudulent intent, purchased additional property insurance coverage at exorbitant rates from companies affiliated with the Plaintiff and improperly paid for those policies both from funds then held in the escrow account and also by misapplying other funds toward the excess insurance when those funds should have been used to pay taxes, interest or principal. On numerous occasions the policies purchased by the Plaintiff were later cancelled and a refund obtained, but not until after principal, interest and proper escrow amounts were misapplied and charges were levied against the Defendants by the Plaintiff for commissions, late fees, additional interest, and other amounts. The Defendants are also informed and believe that the Plaintiff also received kickbacks and tracking services from the insurance companies from whom they purchased the excess insurance. The Plaintiff consistently, since the inception of the Mortgage and Note, knowingly and fraudulently retained these excess and improper fees, charges and interest for its own benefit.

11.    Further, *F.S.A. § 501.13(2)* requires that the Plaintiff notify the Defendant within 15 days after the Plaintiff receives notification of taxes due from the county tax collector or receives notification from the insurer that a premium is due if the amounts held in the escrow account for the taxes or insurance premiums is not sufficient to pay the amounts required.

123

Although the funds necessary to maintain a sufficient escrow account were consistently deposited with the Plaintiff by the Defendants, Plaintiff's improper distributions from the escrow account caused deficiencies in the escrow account at times when taxes became due and payable. The Plaintiff repeatedly failed to properly notify the Defendants within the time required by statute. This statutory requirement is a part of the Mortgage Agreement and Plaintiff repeatedly failed to perform as required.

12.    The Defendants have consistently and timely made each and every principal, interest and escrow payment as required by the Mortgage and Note; have consistently and timely maintained any and all insurance as required by the Mortgage and Note, and have in every other way consistently and timely complied with each and every duty imposed on them by the Mortgage and Note. The Plaintiff has, however, consistently failed to adhere to its duties under the Mortgage, the Note, and Federal and Florida Law. It has repeatedly failed to accept and properly apply Mortgage and Note payments; has repeatedly failed to properly account for the funds in its possession; has repeatedly failed to communicate effectively with the Defendants about the Mortgage and Note; has consistently breached its fiduciary duties with regard to the funds it holds on Defendants' behalf; and has knowingly and intentionally breached the terms and conditions of the Mortgage agreement and federal and state laws regarding the servicing of the Mortgage loans.

13.    The Plaintiff repeatedly failed to adhere to *12 USC § 1831n(2)(A)* which requires banks to follow "Uniform accounting principles consistent with GAAP" when it misapplied payments and retroactively edited interest rates, payments and deposits relevant to the Note and Mortgage.

*124*

14.     The Plaintiff further violated *12 USC § 2605 (RESPA)* that requires banks acknowledge & respond to a "qualified written request" by repeatedly failing to properly respond to Defendants' written requests for information and account corrections.

15.     Ami B. Eskanos and Barry B. Eskanos are residents of the State of Florida.

16.     The Defendants are informed, believe, and thereon allege, that the Plaintiff, Washington Mutual Bank, FA is no longer chartered under the Laws of the United States and has not been so since April 2 2005; that Plaintiff knew this fact, but has continued to prosecute this case as if it were still a viable entity; that Plaintiff knew that it had no right or authority under Florida law to continue this case, and has thereby intentionally damaged the Defendants by continuing to prosecute this matter.

17.     Venue is proper for this counter-claim in The Circuit Court Of the 11th Judicial Circuit, in and for Miami-Dade County, Florida because the subject property is located in this jurisdiction.

18.     The Plaintiff subjected the Defendants, whose mortgage loans they serviced, to unlawful property inspection fees, insurance commissions, late fees, and other charges in violation of federal regulations and the terms of the Mortgage agreement.

19.     Plaintiff made it a pattern of their regular course of dealing with the Defendants to fail to timely communicate with the Defendants; failed to timely respond to correspondence with the Defendants; failed to timely attempt to resolve any dispute with the Defendants; and hired and retained third party calling companies that were known by the Plaintiff to be inadequate and inoperative.

125

20.    That contrary to the advertisements made by Visa and the Plaintiff, the Plaintiff failed and refused to timely remove admitted fraudulent charges from Defendants' visa card that was tied a home equity loan from the Plaintiff.

21.    That Plaintiff further failed to communicate with the Defendants about the status of the credits for the fraudulent charges by maintaining a third party calling system that was inoperative and ineffective.

22.    That Plaintiff was, in fact, responsible for the loss of the credit card information by revealing or allowing the credit card numbers to be revealed to the unknown third party.

23.    The Plaintiff admitted to Defendants that Plaintiff released a whole list of credit card numbers that were fraudulently copied and used by unknown third parties in France.

24.    . Plaintiff violated the rights of financial privacy of the Defendants and violated the standards of a fiduciary by failing to protect the credit and personal information of the Defendants.

25.    Furthermore, Plaintiff repeatedly failed to adhere to the Fair Debt Collection Practices Act by repeatedly contacting the Defendants directly even after they were notified that the Defendants disputed the debt and that they were represented by legal counsel; by continuing their collection activities prior to the expiration of 30 days after the Defendants requested documentation substantiating the debt; and by continuing their collection activities when the Plaintiff was no longer the rightful holder of the Note and no longer had authority to collect any sums due under the Note and Mortgage.

26.    Furthermore, Defendant is informed and believes that the Plaintiff's pattern of conduct as alleged hereinbefore has violated the Federal Racketeer Influenced & Corrupt Organizations Act (RICO) laws, *18 U.S.C. s. 1961*, et seq, and also thereby Florida Law, *FL ST*

126

§ 772.103 et seq., because the same pattern of criminally fraudulent activity has been visited on a

large number of individuals in addition to the Defendants.

27.    There is a duty of good faith and fair dealing inherent in every contract entered

into in Florida. The plaintiff has consistently knowingly and intentionally breached that duty

from the inception of the Mortgage and Note.

28.    Plaintiff, by accepting the duty of holding and disbursing funds for the

Defendants for payment of taxes and other amounts, stands in a fiduciary position for the

Defendants. Plaintiff has repeatedly breached that fiduciary duty.

## FIRST CLAIM FOR RELIEF – Breach of Contract

29.    Defendants reallege as if fully set forth here, each and every allegation above.

30.    The Defendants have tendered performance and/or have substantially performed

all their obligations under the Mortgage and Note agreements.

31.    As detailed above, the Plaintiff has failed to perform in accordance with the terms

of the Mortgage and Note, thereby breaching the terms of the Mortgage and Note agreements.

32.    Due to the Plaintiff's breach of the Mortgage and Note agreements the Defendants

have suffered extensive damages, in an amount to be proven at trial, and their real property has

been endangered as a result of Plaintiff's breaches.

33.    Plaintiff's breaches are the actual and proximate cause of Defendants' damages.

34.    The defendants are therefore entitled to recover their damages from the Plaintiff

in an amount to be determined at trial; to a declaration establishing that the Defendants are not in

default of their obligations under the Mortgage and Note; to an order requiring Plaintiff to

properly credit all past and future payments proffered by the Defendants; to remove all late

charges improperly applied to the Mortgage and Note; to credit the Defendants' for all charges

127

relating to the improper procurement of excess insurance; to retroactively correct all interest charged and properly credit the account for the proper amount of interest, principal, escrow, and other charges and credits; and to such other relief as the Court may deem proper.

## SECOND CLAIM FOR RELIEF - Breach of the Duty of Good Faith and Fair Dealing

35.    Defendants re-allege as if fully set forth here, each and every allegation above.

36.    Defendants have tendered good faith performance and/or have substantially performed all their obligations under their Mortgage loan contracts.

37.    The Plaintiff's duty of good faith and fair dealing is implied in the subject Mortgage loan contracts.

38.    Under this implied term of the agreements, necessary to carry out the intent of the parties, Defendants are entitled to have Plaintiff adhere to the Mortgage and Note agreements and also to apply mortgage servicing procedures in a way that do not result in any fraudulent charges assessed in breach of their contracts or in violation of state or federal banking or collection laws.

39.    By virtue of the Plaintiff's intentional conduct set forth above, Plaintiff deprived the Defendants of the benefit of their bargains, and breached the implied covenant of good faith and fair dealing inherent in their contracts.

40.    The Defendants have suffered damages, in an amount to be proven at trial, and their real property has been endangered as a result of the Plaintiff's breaches.

41.    Plaintiff's breach of its duty of good faith and fair dealing is the actual and proximate cause of Defendants' damages.

42.    The defendants are therefore entitled to recover their damages from the Plaintiff in an amount to be determined at trial; to a declaration establishing that the Defendants are not in

128

default of their obligations under the Mortgage and Note; to an order requiring Plaintiff to properly credit all past and future payments proffered by the Defendants; to remove all late charges improperly applied to the Mortgage and Note; to credit the Defendants' for all charges relating to the improper procurement of excess insurance; to retroactively correct all interest charged and properly credit the account for the proper amount of interest, principal, escrow, and other charges and credits; and to such other relief as the Court may deem proper

### THIRD CLAIM FOR RELIEF - Violations of Federal Truth in Lending Laws

43.    The Defendants reallege as if fully set forth here, each and every allegation above.

44.    The Plaintiff's repeated violations of the Federal Truth in Lending laws as hereinabove alleged has directly and significantly damaged the Defendants in an amount to be proven at trial.

45.    Pursuant to *15 U.S.C.A. § 1640* the Defendant's are entitled to recover their actual damages from the Plaintiff plus attorney's fees and costs of this action.

### FOURTH CLAIM FOR RELIEF - Unjust Enrichment

46.    The Defendants reallege as if fully set forth here, each and every allegation above.

47.    By paying the Plaintiff's improperly assessed fees, charges and interest and/or by incurring the obligation to pay the Plaintiff's improperly assessed fees, charges and interest, the Defendants involuntarily conferred a benefit to the Plaintiff.

48    The Plaintiff knew or should have known that it was not entitled to retain the benefits conferred on it by the Defendants, has been unjustly enriched by the benefit they received, but continues to retain those benefits.

49.    The Defendants are entitled to restitution and/or disgorgement of the profit or the benefits Plaintiff derived from the unlawful conduct described herein.

129

**FIFTH CLAIM FOR RELIEF – Violation of Florida RICO Statute: FL ST § 772.103 et seq**

50.    The Defendants reallege as if fully set forth here, each and every allegation above.

51.    The Plaintiff's pattern of conduct as alleged hereinbefore, including but not limited to mail fraud, wire fraud, and usury/fraudulent debt laws has violated the Federal Racketeer Influenced & Corrupt Organizations Act (RICO) laws, *18 U.S.C. s. 1961*, et seq, and also thereby Florida Law, *FL ST § 772.103* et seq., because the same pattern of criminally fraudulent activity has been visited on the Defendants and a large number of other individuals other than the Defendants.

52.    Pursuant to FL ST § 772.103 et seq. the Defendants are entitled to recover treble their actual damages and their costs of this action including attorney's fees.

**SIXTH CLAIM FOR RELIEF – Breach of Fiduciary Duty**

53.    The Defendants reallege as if fully set forth here, each and every allegation above.

54.    The Plaintiff owed the Defendants fiduciary duties of performance for the proper maintenance of the Defendants' Mortgage Escrow Account.

55.    The Plaintiff repeatedly violated those duties by improperly disbursing funds out of the escrow account and by failing to properly account for the funds in the escrow account.

56.    The Defendants were damaged, in an amount to be proven at trial, as a direct result of the Plaintiff's violation of the fiduciary duties.

57.    The Defendants are entitled to recover their damages from the Plaintiff.

**SEVENTH CLAIM FOR RELIEF – Breach of Federal and State Fair Debt Collection Practices Acts**

58.    The Defendants reallege as if fully set forth here, each and every allegation above.

130

59.    The Plaintiff's repeated violations of Federal and State Fair Debt Collection Practices Acts and Banking Laws and Regulations have directly caused the Defendants extensive financial damages as well as extensive pain and suffering.

60.    The Defendants' damages, in an amount to be proven at trial, are a direct result of the Plaintiff's violation of the Federal and State Fair Debt Collection Practices Acts.

61.    The Defendants are entitled to recover those damages from the Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Defendants respectfully requests of this Court the following relief:

A.    An order denying any and all of Plaintiff's claims for relief; and

B.    An order awarding Defendants actual, treble, and other exemplary damages in accord with Federal and Florida Statutes and according to proof; and

C.    An order enjoining the Plaintiff from any future improper activities and practices as described herein; and

D.    An order awarding declaratory relief as requested, including but not limited to a full accounting,  reinstating the Defendants' Mortgage Loan, and other declaratory relief as the Court deems appropriate; and

E.    An order awarding restitution and/or disgorgement of profits; and

F.    An order mandating that Plaintiff take any and all measures to correct any negative reports about Defendants that the Plaintiff has provided to credit reporting bureaus relating to the allegations herein; and

G.    An order requiring the Plaintiff to engage an independent accounting firm to audit the Mortgage Agreement that is the subject of this action, and also each and every adjustable rate

131

mortgage loan for which the Plaintiff is the "loan servicer" and/or note holder, and provide the results of that audit to the Court and to each Mortgagor whose loan has been audited; and

H.    An award to Defendants of their prejudgment interest, attorney's fees, and costs of suit, including expert witness fees; and

I.    An order staying or otherwise enjoining any foreclosure proceedings against the Defendants by any party pending final resolution of the Counterclaims made herein.

J.    Such other and further legal and equitable relief, including exemplary relief, as is merited by the facts proven at trial and as this Court may otherwise deem proper.

The foregoing AMENDED COUNTERCLAIM is respectfully submitted this 21st day of September 2005 by:

Danny E. Eskanos, Attorney at law
Attorney for Above named Defendants

Attorney's Address:
16870 Lovaca Drive
Peyton, Colorado 80831
(719)749-2790, Fax (720) 528-8154
Florida Attorney Registration # 0239940

132

## CERTIFICATE OF MAILING

I hereby certify that on this 20H day of SEPTEMBER, 2005, a true and correct copy of the attached Amended Counterclaim was mailed by United States Mail, postage prepaid and addressed to:


Attorneys for Plaintiffs:

Evonne Andris
Shapiro & Fishman, LLP
777 Yamato Rd.
Suite 200
Boca Raton, Florida 33431

Kimberly A. Leary
Akerman Senterfitt
350 East Las Olas Blvd., Suite 1600
Ft. Lauderdale, FL 33301


And by Federal Express delivery to:

Clerk of the Court
11th Judicial Circuit of Florida in and For Miami-Dade County
73 West Flagler Street, Room 133
Miami, Florida 33130

_____
Danny Eskanos

133

**Washington Mutual** ●

I HEREBY CERTIFY
THAT THIS IS A TRUE
AND CORRECT COPY

x ~~(signature)~~

ADJUSTABLE RATE NOTE
(12-MTA Index - Payment and Rate Caps)

03-2324-003314414-8

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ __455,000.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

PNOTE

Ft. Lauderdale          Florida
(City)                 (State)

October 28, 1999

3122 PINETREE DRIVE, MIAMI BEACH, FL 33140
(Property Address)

1.   **BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. $ __364,000.00__ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is Washington Mutual Bank, FA . I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

2.   **INTEREST**
    Interest will be charged on unpaid principal until the full amount has been paid. I will pay interest at a yearly rate of __3.450__ %. The interest rate I will pay will change in accordance with Section 4 of this Note.
    The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

3.   **PAYMENTS**
    (A)  Time and Place of Payments
    I will pay principal and interest by making payments every month. In this Note, "payments" refer to principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.
    I will make my monthly payments on __1st__ day of each month beginning on __December, 1999__ , I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on __November 1, 2029__ , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date".
    I will make my monthly payments at 9451 CORBIN AVE, NORTHRIDGE, CA 91324 _____ , or at a different place if required by the Note Holder.

    (B)  Amount of My Initial Monthly Payments
    Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ __1,624.38__ , unless adjusted at an earlier time under Section 4(H) of this Note.

32859 (02-99)

Page 1 of 6

**DEDENTANTS' EXHIBIT 9**

134

03-2324-003314414-8

**(C) Payment Changes**
My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
   The interest rate I will pay may further change on the ___1st___ day of ___December, 1999___ , and on that day every month thereafter. Each date on which my interest rate could change is called a "Change Date".
   **(B) The Index**
   Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (G. 13)" ("the Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.
   The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.
   **(C) Calculation of Changes**
   Before each Change Date, the Note Holder will calculate my new interest rate by adding ___Two & Seven-Tenths___ percentage points ___2.700___ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.
   **(D) Interest Rate Limit**
   My interest rate will never be greater than ___Ten & Ninety-Five-Hundredths___ percentage points ___10.950___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.
   **(E) Payment Change Dates**
   Effective every year commencing ___December 1, 2000___ , and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.
   **(F)  Monthly Payment Limitations**
   Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying.
   **(G)  Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**
   Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly

135

03-2324-003314414-8

payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

(H)  Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to ___125%___ of the principal amount original borrowed. In the event my unpaid principal would otherwise exceed that ___125%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

(I)  Required Full Monthly Payment

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

(J)  Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(K)  Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

5.    BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

6.    LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $___15.00___. Lender reserves the right to change the fee from time to time without notice except as may be required by law.

136

03-2324-003314414-8

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**
    **(A) Late Charges for Overdue Payments**
    If the Note Holder has not received the full amount of any monthly payment by the end of
Fifteen    calendar days after the date it is due, I will pay a late charge to the Note Holder. The
amount of the charge will be   5.000  % of my overdue payment of principal and interest. I will
pay this late charge promptly but only once of each late payment.
    **(B) Default**
    If I do not pay the full amount of each monthly payment on the date it is due, I will be in
default.
    **(C) Notice of Default**
    If I am in default, the Note Holder may send me a written notice telling me that if I do not
pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the
full amount of principal which has not been paid and all the interest that I owe on that amount.
That date must be at least 10 days after the date on which the notice is delivered or mailed to me
(or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation
buys all or part of Lender's rights under the Security Instrument, in which case the notice will
specify a date, not less than 30 days from the date the notice is given the Borrower).
    **(D) No Waiver By Note Holder**
    Even if, at a time when I am in default, the Note Holder does not require me to pay
immediately in full as described above, the Note Holder will still have the right to do so if I am in
default at a later time.
    **(E) Payment of Note Holder's Costs and Expenses**
    If the Note Holder has required me to pay immediately in full as described above, the Note
Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this
Note, whether or not a lawsuit is brought, to the extent not prohibited by applicable law. Those
expenses include, for example, reasonable attorneys' fees.
**8.    GIVING OF NOTICES**
    Unless applicable law requires a different method, any notice that must be given to me
under this Note will be given by delivering it or by mailing it by first class mail to me at the Property
Address above or at a different address if I give the Note Holder a notice of my different address.
    Any notice that must be given to the Note Holder under this Note will be given by mailing it
by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different
address if I am given a notice of that different address.
**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**
    If more than one person signs this Note, each person is fully and personally obligated to
keep all of the promises made in this Note, including the promise to pay the full amount owed. Any
person who is a guarantor, surety, or endorser of this Note is also obligated to do these things.
Any person who takes over these obligations, including the obligations of a guarantor, surety, or
endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note
Holder may enforce its rights under this Note against each person individually or against all of us
together. This means that any one of us may be required to pay all of the amounts owed under this
Note.
**10. WAIVERS**
    I and any other person who has obligations under this Note waive the rights of presentment and
notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of
amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to
other persons that amounts due have not been paid.

32859 (02-99)                    Page 4 of 5

137

03-2324-003314414-8

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed ( the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. MISCELLANEOUS PROVISIONS**

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

32859 (02-99)

138

03-2324-003314414-B

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

x _____
AMI ESKANOS

139

**Washington Mutual**

NOTE ADDENDUM
Borrower's Payments Before They are Due
(Prepayment Fee Clause)

03-2324-003314414-8

This Note Addendum is made this __28th__ day of __October, 1999__ and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") in favor of _____ Washington Mutual Bank, FA _____ (the "Lender") and dated as of even date herewith (the "Note").

This Note Addendum amends the provision in the Note regarding the Borrower's right to prepay as follows:

BORROWER'S RIGHT TO PREPAY
    I have the right to make payments of principal before they are due. Any payment of principal only is known as a "prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."
    If I make a full prepayment at any time during the first __Three__ years of the loan, I may be charged a fee as follows:
    If Noteholder receives a prepayment on or before the first anniversary of the date of the first payment due date of the Note, the Prepayment Fee shall be equal to __Three__ percent ( __3.000__ %) of the original loan amount. If Noteholder receives prepayment after the first anniversary but on or before the __Second__ anniversary of the first payment due date of the Note, the prepayment fee shall be __Two__ percent ( __2.000__ %) of the original loan amount. If Noteholder receives prepayment after the second anniversary but on or before the __Third__ anniversary of the first payment due date of the Note, the prepayment fee shall be __One__ percent ( __1.000__ %) of the original loan amount. Thereafter, prepayment of the Note shall be permitted without any Prepayment Fee.
    The Prepayment Fee shall be payable upon a full prepayment, voluntary or involuntary, including but not limited to a prepayment resulting from Noteholder's permitted acceleration of the balance due on the Note. Notwithstanding the foregoing, nothing herein shall restrict my right to prepay at anytime without penalty accrued but unpaid interest that has been added to Principal.
    When I make a full or partial prepayment I will notify the Noteholder in writing that I am doing so. Any partial prepayment of principal shall be applied to interest accrued on the amount prepaid and then to the principal balance of the Note which shall not reduce the amount of monthly installments of principal and interest (until reamortized as set forth in the Note at the next Payment Change Date) nor relieve me of the obligation to make the installments each and every month until the Note is paid in full. Partial prepayments shall have no effect upon the due dates or the amounts of my monthly payments unless the Noteholder agrees in writing to such changes.
    By signing below, borrower accepts and agrees to the terms and covenants contained in this Note Addendum.

X _____
    AMI ESKANOS

(ASB/A410)
32890 (09-97)

140

*Return to* 
**Prestige Title & Research Co.**
6291 N.W. 6th Way #202
Fort Lauderdale, FL 33309

OFF. REC. 18845PG1093

99R557843 1999 NOV 01 13:15

THIS MORTGAGE PREPARED BY
MELISSA SILVA

FOR:
Washington Mutual Bank, FA
C/O DATA PLEX
12691 PALA DRIVE - MS156DPCA
GARDEN GROVE, CA 92641

DOCSTPMTG 1,274.00 INTNG   728.00
HARVEY RUVIN, CLERK DADE COUNTY, FL

———— SPACE ABOVE THIS LINE FOR RECORDING DATA ————
Prestige Title & Research Company, Inc. 9912-1838488

## Washington Mutual

# MORTGAGE

LOAN NO. 03-2324-003314414-8

THIS MORTGAGE ("Security Instrument") is given on __October 28, 1999__
The mortgagor is __Ami Eskanos, a married woman, joined by her husband Barry__
__Eskanos__

("Borrower"), whose address is __3122 PINETREE DRIVE__
__MIAMI BEACH, FL 33140__ This Security Instrument is given to
__Washington Mutual Bank, FA__ which
is organized and existing under the laws of __USA__, and whose address is
__400 East Main Street Stockton, CA 95290__ ("Lender"). Borrower
owes Lender the principal sum of __Three Hundred Sixty-Four Thousand & 00/100__

Dollars (U.S. __364,000.00__ ). This debt is evidenced by Borrower's note dated the same
date as this Security Instrument ("Note"), which provides for monthly payments, with the full
debt, if not paid earlier, due and payable on __November 1, 2029__. This Security
Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with
interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other
sums, with interest, advanced under Paragraph 7 to protect the security of this Security
Instrument; and (c) the performance of Borrower's covenants and agreements under this
Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and
convey to Lender the following described property located in __Dade__
County, Florida:

Lot 3, Block 44, Orchard Subdivision No. 1, according to the Plat thereof,
as recorded in Plat Book 6, Page 111, of the Public Records of Dade County,
Florida.

which has the address of __3122 PINETREE DRIVE__
__MIAMI BEACH__ Florida __33140__ ("Property Address");

Borrower Initials

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3010  9/90
73213 (02-99)                              Page 1 of 9

# DEFENDANTS' EXHIBIT 10

141



OFF.
REC. 1884 PG 094

LOAN NO. 03-2324-003314414-8

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of Paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay

Borrower Initials

73213 (02-99)                                   Page 2 of 9

142

OFF.
REC. 1884  1095

LOAN NO. 03-2324-003314414-8

Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under Paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3.    **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under Paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under Paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4.    **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in Paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5.    **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with Paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Borrower Initials

73213 (02-99)                                Page 3 of 9

143

OFF.
REC. 18845PG1096

LOAN NO. 03-2324-003314414-8

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in Paragraphs 1 and 2 or change the amount of the payments. If under Paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6.    Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in Paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7.    Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this Paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this Paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate

Borrower Initials

73213 (02-99)                                            Page 4 of 9

144

OFF.
REC: 18845PG1097

LOAN NO. 03-2324-003314414-8

and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8.   **Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9.   **Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10.   **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in Paragraphs 1 and 2 or change the amount of such payments.

11.   **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the

Borrower Initials

73213 (02-99)                                    Page 5 of 9

145

OFF.
REC. 18845PG 1098

LOAN NO. 03-2324-003314414-8

liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12.   Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of Paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13.   Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14.   Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15.Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16.   Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17.   Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If

Borrower Initials

146

OFF.
REC. 18845 PG 1099

LOAN NO. 03-2324-003314414-8

Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18.   **Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Paragraph 17.

19.   **Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with Paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20.   **Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this Paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this Paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21.   **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not

Borrower Initials

73213 (02-99)                    Page 7 of 9

147

OFF. 18845PM 100
REC.

LOAN NO. 03-2324-003314414-8

prior to acceleration under Paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

22.  Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument to Borrower. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

23.  Attorneys' Fees. As used in this Security Instrument and the Note, "attorneys' fees" shall include any attorneys' fees awarded by an appellate court.

24.  Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable line(s)].

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] 1-4 Family Rider |
| [ ] Graduated Payment Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [ ] Second Home Rider |
| [ ] Other(s) [specify] | | |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Borrower Initials _____

148

OFF.
REC. 18845 1101

LOAN NO. 03-2324-003314414-8

X _Ami Eskanos_
AMI ESKANOS

X _BBE_
BARRY ESKANOS

_____ [Space Below This Line for Acknowledgment] _____

STATE OF FLORIDA
COUNTY OF _Dade_

The foregoing instrument was acknowledged before me this 28th day of October 1999

by _Amy Eskanos and Barry Eskanos, her husband_

who is personally known to me or has produced _FL drivers license_
as identification.

My Commission expires:

_____
(Signature of person taking acknowledgment)

_Brad Ballard_
(Name of acknowledger typed, printed or stamped)

BRADFORD BALLARD
My Comm Exp. 6/20/2002
No. CC 750999
[ ] Personally Known [ ] Other I.D.

(Notary Rubber/Raised Stamp Seal)

73213 (02-99)                    Page 9 of 9

149

OFF. REC. 18845PG1102

**Washington Mutual**

**ADJUSTABLE RATE RIDER**
(12-MTA Index - Payment and Rate Caps)

03-2324-003314414-8

THIS ADJUSTABLE RATE RIDER is made this __28th__ day of __October, 1999__, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to __Washington Mutual Bank, FA__ (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

__3122 PINETREE DRIVE, MIAMI BEACH, FL 33140__
(Property Address)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ __455,000.00__). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of __3.450__ %. The interest rate I will pay will change in accordance with Section 4 of the Note.
Section 4 of the Note provides for changes in the interest rate and the monthly payments as follows:

Page 1 of 6

32843 (02-99)

OFF.
REC. 18845 PM 103

03-2324-003314414-8

"4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
     (A)   Change Dates
           The interest rate I will pay may further change on the ___1st___ day of
December, 1999 _____, and on that day every month thereafter. Each
date on which my interest rate could change is called a "Change Date".
     (B)   The Index
           Beginning with the first Change Date, my interest rate will be based on an
index. The "Index" is the Twelve-Month Average, determined as set forth below, of the
annual yields on actively traded United States Treasury Securities adjusted to a constant
maturity of one year as published by the Federal Reserve Board in the Federal Reserve
Statistical Release entitled "Selected Interest Rates (G.13)" (the "Monthly Yields"). The
Twelve-Month Average is determined by adding together the Monthly Yields for the most
recently available twelve months and dividing by 12.
           The most recent Index figure available as of the date 15 days before each
Change Date is called the "Current Index".
           If the Index is no longer available, the Note Holder will choose a new index
which is based upon comparable information. The Note Holder will give me notice of this
choice.
     (C)   Interest Rate Change
           Before each Change Date, the Note Holder will calculate my new interest rate by
adding    Two & Seven-Tenths _____ percentage
points    2.700   % ("Margin") to the Current Index. The Note Holder will then round
the result of this addition to the nearest one thousandth of one percentage point (0.001%).
Subject to the limits stated in Section 4(D) below, this rounded amount will be my new
interest rate until the next Change Date. In the event a new Index is selected, pursuant to
paragraph 4(B), a new Margin will be determined. The new Margin will be the difference
between the average of the old Index for the most recent three year period which ends on
the last date the Index was available plus the Margin on the last date the old Index was
available and the average of the new Index for the most recent three year period which
ends on that date (or if not available for such three year period, for such time as it is
available). The difference will be rounded to the next higher 1/8 of 1%.

32843 (02-99)

157

OFF.
REC. 18845 PG 1104

03-2324-003314414-8

**(D)   Interest Rate Limit**

My interest rate will never be greater than ___10.950___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E)   Payment Change Dates**

Effective every year commencing ___December 1, 2000___, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

**(F)   Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying.

**(G)   Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H)   Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to ___125%___ of the principal amount original borrowed. In the event my unpaid principal would otherwise

Page 3 of 6

32843 (02-99)

152

OFF.
REC. 18845 ₧ 1105

03-2324-003314414-8

exceed that ___125%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

    (I)   **Required Full Monthly Payment**

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

    (J)   **Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

    (K)   **Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid "Principal."

**B.**    **TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Covenant 17 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not

32843 (02-99)              Page 4 of 6

153

OFF. REC. 1884501106

03-2324-003314414-8

exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**Page 5 of 6**

32843 (02-99)

154

OFF. 18845 PG 1107
REC.

03-2324-003314414-8

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

X _____
AMI ESKANOS

X _____
BARRY ESKANOS

RECORDED IN OFFICIAL RECORDS BOOK
OF DADE COUNTY, FLORIDA
RECORD VERIFIED
HARVEY RUVIN
CLERK CIRCUIT COURT

32843 (02-99)                    Page 6 of 6

155