## **Exhibit 3**

(Engagement Letter)

CENTER VIEW PARTNERS

October 18, 2011

Residential Capital, LLC
1177 Avenue of the Americas
16th Floor
New York, NY 10036

Attention:    Thomas Marano
              Chief Executive Officer

Ladies and Gentlemen:

This letter agreement (the "Agreement") confirms the understanding and agreement between Centerview Partners LLC (the "Advisor" or "Centerview") and Residential Capital, LLC and its controlled subsidiaries (collectively with any entity formed or used for the purposes set forth herein, the "Company").

*Assignment Scope:*

1.      The Company hereby retains Advisor as its investment banker to provide the Company with general restructuring advice and to advise it in connection with any Restructuring, Sale Transaction and/or Financing (each as defined below) on the terms and conditions set forth herein.  By signing this Agreement, we hereby accept our appointment as your investment banker under the terms hereof.  The individuals listed on Exhibit A will constitute the core team (the "Core Team"), and we agree that the Core Team will, as appropriate, devote its full time and attention to this engagement.

As used in this Agreement:

(a)     "Restructuring" shall mean any restructuring, reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code) and/or recapitalization transaction or series of related transactions in respect of all or a significant portion of the Company's outstanding indebtedness (including any debt to an affiliate, bank debt, bond debt, and other on and off balance sheet indebtedness), and which may also include trade claims, leases (both on and off balance sheet), litigation-related claims and obligations, unfunded pension and retiree medical liabilities, and other liabilities (collectively, the "Existing Obligations"), and that is achieved, without limitation, through (i) a solicitation of waivers and consents from the holders of Existing Obligations (collectively, the "Stakeholders"); (ii) rescheduling of the maturities of Existing Obligations; (iii) a change in interest rates; (iv) repurchase, settlement or forgiveness of Existing Obligations; (v) conversion of Existing Obligations into equity; (vi) an exchange offer involving the issuance of new securities in exchange for Existing

31 WEST 52ND STREET, 22ND FLOOR, NEW YORK, NY 10019
PHONE: (212) 380-2650    FAX: (212) 380-2651    WWW.CENTERVIEWPARTNERS.COM

NEW YORK  •  LONDON  •  SAN FRANCISCO  •  LOS ANGELES.

Obligations; or (vii) the issuance of new securities, sale or disposition of assets, sale of debt or equity securities or other interests. Notwithstanding the foregoing, neither (1) settlements of the matters described on Exhibit C hereto nor (2) capital contributions by the member of the Company, affiliates of the member, or the U.S government in the ordinary course of business, including for the purpose of satisfying the Company's financial covenants under its debt facilities or agreements with Fannie Mae or other government sponsored or owned entity, and which do not otherwise involve a Restructuring, Sale Transaction or Financing shall be deemed a Restructuring.

(b)    "Financing" means any transaction or series of transactions involving the public or private issuance, sale, or placement of equity, equity-linked, or debt securities, instruments, or obligations of the Company entailing debtor-in-possession financing or exit financing in connection with a case under the Bankruptcy Code. Notwithstanding the foregoing, capital contributions by the member of the Company, affiliates of the member, or the U.S. government shall not be deemed a Financing, except if the member of the Company or affiliates of the member provide debtor-in-possession financing.

(c)    "Sale Transaction" means any transaction or series of transactions, whether consummated before or after a filing pursuant to Chapter 11 of the United States Bankruptcy Code, and involving (i) an acquisition, merger, consolidation, or other business combination pursuant to which all or substantially all of the business or assets of the Company are, directly or indirectly, combined with another company; (ii) the acquisition, directly or indirectly, by a buyer or buyers (which term shall include a "group" of persons as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended), of equity interests or options, or any combination thereof constituting a majority of the then outstanding stock of the Company or possessing a majority of the then outstanding voting power of the Company (except as may occur with current Stakeholders as a result of a Restructuring); (iii) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of all or substantially all of the assets, securities or other interests of the Company or (iv) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purpose of effecting a transfer of all or substantially all of the interests in the Company to a third party.

*Description of Services*:

2.    Advisor agrees, in consideration of the compensation provided in Section 3 below, to perform such of the following investment banking services as the Company may reasonably request:

(a)    Reviewing and analyzing the Company's business, operations and financial projections;

(b)     Evaluating the Company's potential debt capacity in light of its projected cash flows;

(c)     Assisting in the determination of a capital structure for the Company;

(d)     Assisting in the determination of a range of values for the Company on a going concern basis;

(e)     Advising the Company on tactics and strategies for negotiating with the Stakeholders;

(f)     Rendering financial advice to the Company and participating in meetings or negotiations with the Stakeholders and/or rating agencies or other appropriate parties in connection with any Restructuring;

(g)     Advising the Company on the timing, nature, and terms of new securities, other consideration or other inducements to be offered pursuant to the Restructuring;

(h)     Advising and assisting the Company in evaluating potential Financing transactions by the Company, and, subject to our agreement to so act and the execution of appropriate agreements in the case of any public issuance of securities or other circumstances where additional agreements may be customary between the Company and Advisor or an entity described in Section 13 below that is acting as underwriter or placement agent therefor, contacting potential sources of capital as the Company may designate and assisting the Company in implementing such a Financing;

(i)     Assisting the Company in preparing documentation within our area of expertise that is required in connection with the Restructuring;

(j)     Assisting the Company in identifying and evaluating candidates for a potential Sale Transaction, advising the Company in connection with negotiations and aiding in the consummation of one or more Sale Transactions;

(k)     Attending meetings of the Company's Board of Directors and its committees with respect to matters on which we have been engaged to advise you;

(l)     Providing testimony, as necessary, with respect to matters on which we have been engaged to advise you in any proceeding before the Bankruptcy Court; and

(m)     Providing the Company with other financial restructuring advice as may be specifically agreed upon in writing by the Company and the Advisor.

_Fees and Expense Reimbursement; Indemnification_:

3. As consideration for the services to be provided, the Company shall pay Advisor the following fees:

(a) A monthly financial advisory fee of $300,000 (the "Monthly Advisory Fee"), the first payment of which shall be due and paid by the Company upon execution of this Agreement and thereafter on each monthly anniversary thereof during the term of this engagement. Advisor will issue a written invoice to the Company for the initial and each subsequent Monthly Advisory Fee. 50% of Monthly Advisory Fees paid in excess of $1,800,000 shall be credited (but only once) against an Out-of-Court Transaction Fee, an In-Court Transaction Fee or a Limited Transaction Fee (each as defined below) payable; provided, that in the event of a Chapter 11 filing such credit will only apply proportionately to the extent that such fees are approved by the Bankruptcy Court, if applicable.

(b) If at any time during the term of this engagement or within the nine full months following the termination of this engagement (including the term of this engagement, the "Fee Period"), (x) any Restructuring or Sale Transaction is consummated outside of Bankruptcy Court or (y)(1) an agreement in principle, definitive agreement or plan to effect a Restructuring or Sale Transaction is entered into and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), any Restructuring or Sale Transaction is consummated outside of Bankruptcy Court, Centerview shall be entitled to receive a transaction fee (an "Out-Of-Court Transaction Fee"), contingent upon the consummation of a Restructuring or Sale Transaction and payable at the closing thereof equal to $15,000,000; provided, however, that if (x) any Restructuring or Sale Transaction is consummated in Bankruptcy Court or (y)(1) an agreement in principle, definitive agreement or plan to effect a Restructuring or Sale Transaction is entered into and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), any Restructuring or Sale Transaction is consummated in Bankruptcy Court, Centerview shall be entitled to receive a transaction fee (an "In-Court Transaction Fee"), contingent upon the consummation of a Restructuring or Sale Transaction and payable at the closing thereof equal to $12,500,000; provided, further, that if an agreement in principle or definitive agreement to effect a Sale Transaction is entered into prior to the six month anniversary of this Agreement and concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), any Sale Transaction is consummated (i) outside of Bankruptcy Court; and (ii) with the party disclosed separately to Centerview on the date hereof with whom the Company is currently engaged in pending negotiations (the "Disclosed Party"), Centerview shall be entitled to receive a transaction fee (a "Limited Transaction Fee") equal to $7,500,000. Notwithstanding anything to the contrary in this subparagraph 3(b), in connection with any Restructuring or Sale Transaction that is intended to be effected, in

whole or in part, as a prepackaged, partial prepackaged or prearranged plan of reorganization anticipated to involve the solicitation of acceptances of such plan in compliance with the Bankruptcy Code, by or on behalf of the Company, from holders of any class of the Company's securities, indebtedness or obligations (a "Prepackaged Plan") the Transaction Fee shall be earned and payable (x) 50% upon the earlier of (i) execution of definitive agreements with respect to such plan and (ii) delivery of binding consents to such plan by a sufficient number of creditors and/or bondholders, as the case may be, to the plan and (y) 50% upon consummation of such Restructuring or Sale Transaction; provided, however, that if the Advisor is paid 50% of the Transaction fee in connection with a Prepackaged Plan and a plan of reorganization is not consummated, the Advisor will return such fee to the Company.

(c)     If at any time during the Fee Period, the Company consummates any Financing, the Company will pay Advisor the following:

  i.      1.0% of the aggregate amount of any indebtedness issued that is secured by a first lien;

  ii.     3.0% of the aggregate amount of any indebtedness issued that (x) is secured by a second or junior lien, (y) is unsecured and/or (z) is subordinated;

  iii.    5.0% of the aggregate amount of any equity or equity-linked securities or obligations issued; and

  iv.     0.5% of the aggregate amount of any debtor-in-possession financing issued, plus 1.0% of the aggregate amount of any debtor-in-possession financing issued to new lenders, not to exceed $5,000,000 in the aggregate (or, if such financing is provided by a member of the Company, affiliates of the member, the U.S. government or by the Disclosed Party, not to exceed $500,000).

Any fee(s) paid under subparagraphs 3(c)(i), 3(c)(ii) and 3(c)(iii) shall be 50% credited (but only once) against an Out-of-Court Transaction Fee, an In-Court Transaction Fee or a Limited Transaction Fee subsequently paid under subparagraph 3(b).

Any fee in excess of $500,000, paid under subparagraph 3(c)(iv) shall be 50% credited (but only once) against an Out-of-Court Transaction Fee, an In-Court Transaction Fee or a Limited Transaction Fee subsequently paid under subparagraph 3(b).

(d)     In addition to any fees that may be payable to Advisor and, regardless of whether any transaction occurs, the Company shall promptly reimburse Advisor for all:

(A) reasonable documented production charges and out-of-pocket expenses (including travel and lodging, data processing and communications charges, courier services and other appropriate expenditures) and (B) other reasonably incurred fees and expenses, including reasonable expenses of counsel if engaged with the prior approval of the Company, which approval shall not be unreasonably withheld.

(e) As part of the compensation payable to Advisor hereunder, the Company agrees to the indemnification, contribution and related provisions (the "Indemnification Provisions") attached to this Agreement as Exhibit B and incorporated herein in their entirety. Nothing contained in this Paragraph 3 shall be deemed to limit in any manner the Company's obligations under the Indemnification Provisions.

(f) All amounts referenced hereunder reflect United States currency and shall be paid promptly in cash after such amounts accrue hereunder.

For the avoidance of doubt, if both a Restructuring and a Sale Transaction occur (in separate transactions or through a single transaction that meets both definitions) the Company will be obligated to pay the Advisor either an Out-of-Court Transaction Fee or an In-Court Transaction Fee but not both. One or more fees pursuant to subparagraph 3(c) may be payable in addition to an In-Court Transaction Fee (subject to the crediting set forth above).

*Retention in Chapter 11 Proceedings*:

4.      In the event of the commencement of proceedings pursuant to Chapter 11 of the United States Bankruptcy Code during the term of this Agreement or during the period until nine months following any termination of this Agreement by the Company, the Company agrees that it will use commercially reasonable efforts to obtain prompt authorization from the Bankruptcy Court to retain Advisor on the terms and conditions set forth in this Agreement under the provisions of Section 328(a) of the Bankruptcy Code. Subject to being so retained, Advisor agrees that during the pendency of any such proceedings, it shall continue to perform its obligations under this Agreement and that it shall file interim and final applications for allowance of the fees and expenses payable to it under the terms of this Agreement pursuant to the applicable Federal Rules of Bankruptcy Procedure, and the local rules and order of the Bankruptcy Court. The Company shall supply Advisor with a draft of the application and proposed retention order authorizing Advisor's retention sufficiently in advance of the filing of such application and proposed order to enable Advisor and its counsel to review and comment thereon. Advisor shall be under no obligation to provide any services under this agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Advisor's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court, which order is acceptable to Advisor. In so agreeing to seek Advisor's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Advisor's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the

benefit of the Company in pursuing any Restructuring, Sale Transaction or Financing, that the value to the Company of Advisor's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the various contingent fees set forth herein are reasonable regardless of the number of hours to be expended by Advisor's professionals in the performance of the services to be provided hereunder.

*Other*:

     5.     No fee payable to any other person, by the Company or by any other party, shall reduce or otherwise affect any fee payable or expense reimbursement hereunder to the Advisor.

     6.     The Company will furnish or cause to be furnished to Advisor such current and historical financial information and other information regarding the business of the Company as Advisor may request in connection with this engagement. The Company will keep Advisor advised of all developments materially affecting the Company or its financial position. In performing its services pursuant to this Agreement, including in connection with any valuation of the Company, Advisor shall be entitled to rely upon information furnished to it by the Company or that is publicly available, may assume the accuracy and completeness of such information and shall not assume any responsibility for independent verification of any such information. Advisor will not, as part of its engagement, undertake any independent valuation or appraisal of any of the assets or liabilities of the Company or of any third party, or opine or give advice to the Board of Directors, the Company or management or shareholders with respect thereto. With respect to any forecasts or projections that may be furnished to Centerview by the Company Centerview will assume that they have been reasonably prepared on bases reflecting the best then currently available estimates and judgments of the management of the Company as to the matters covered thereby. In connection with the services described above, the Company authorizes us to transmit any memorandum prepared by the Company describing the Company and its assets, properties, or businesses in connection with a Sale Transaction or Financing to potential parties to a Sale Transaction or Financing. The Company will be solely responsible for the contents of any such memorandum.

     7.     In performing its services pursuant to this Agreement, Advisor is not assuming any responsibility for the decision of the Company or any other party to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Restructuring, Sale Transaction, Financing, or other transaction. Advisor shall not have any obligation or responsibility to provide "crisis management" for or business consultant services to the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements; nor shall Advisor be responsible for providing any tax, legal or other specialist advice.

     8.     It is understood and agreed that nothing contained in this Agreement shall constitute an express or implied commitment by Advisor or any of its affiliates to underwrite, place or purchase any securities in a financing or otherwise, which commitment shall only be set forth in a separate underwriting, placement agency or purchase agreement, as applicable, relating to the financing.

9.      In order to coordinate our efforts on behalf of the Company during the period of our engagement hereunder, the Company will promptly inform Advisor of any discussions, negotiations, or inquiries regarding a potential Restructuring, Sale Transaction or Financing, including any such material discussions or inquiries that have occurred during the six-month period prior to the date of this Agreement to the extent relevant to this engagement.  In the event that Advisor receives an inquiry concerning any transaction, we will promptly inform the Company of such inquiry.

10.     The Company agrees that neither Centerview nor any of its affiliates, their respective members, directors, officers, employees and  controlling persons, and each of their respective successors and assigns (collectively, the "Centerview Persons" and each individually, a "Centerview Person") shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any person asserting claims on behalf of or in right of the Company for or in connection with this engagement or any transactions or conduct in connection herewith, except to the extent that any losses, claims, damages or liabilities incurred by the Company are finally judicially determined to have resulted directly from the willful misconduct or gross negligence of such Centerview Person.

11.     Advisor's engagement hereunder will automatically terminate upon termination of any Chapter 11 proceedings involving the Company and may be terminated by you or us at any time without liability or continuing obligation to you or us, except that following any such termination (a) Advisor shall remain entitled to any fees accrued pursuant to Section 3 but not yet paid prior to such termination, and to reimbursement of reasonable documented production charges and out-of- pocket expenses incurred prior to such termination as provided in subparagraph 3(d) hereof, (b) the Indemnification Provisions shall survive termination indefinitely and (c) in the case of automatic termination or termination by the Company, Advisor shall remain entitled to full payment of all fees contemplated by Section 3 hereof in respect to any Restructuring, any Sale Transaction and any Financing.

12.     The Company recognizes that Advisor has been engaged only by the Company with duties solely to the Company, and that the Company's engagement of Advisor is not deemed to be on behalf of and is not intended to confer rights upon any member, shareholder, partner or other owner of the Company, any creditor, lender or any other person not a party hereto as against Advisor or any of its affiliates or any of their respective directors, officers, members, agents, employees or representatives.  No one, other than senior management or the Board of Directors of the Company is authorized to rely upon the Company's engagement of Advisor or use or rely upon (in their capacities as such and not in any individual capacities) any statements, advice, opinions or conduct by Advisor.  Without limiting the foregoing, any advice, written or oral, rendered to the Company's Board of Directors or management in the course of the Company's engagement of Advisor are solely for the purpose of assisting senior management or the Board of Directors of the Company, as the case may be, in evaluating any Restructuring, Sale Transaction or Financing, as the case may be, and does not constitute a recommendation to any stakeholder of the Company that such stakeholder might or should take in connection with the Restructuring, Sale Transaction or Financing.  Any advice, written or oral, rendered by Advisor may not be reproduced, disseminated, disclosed publicly or made available to third

parties at any time, in any manner or for any purpose, without the prior written consent of Advisor. Notwithstanding the foregoing, nothing herein shall prohibit you from disclosing to any and all persons the tax treatment and tax structure of any transaction and the portions of any materials that relate to such tax treatment or tax structure. Advisor's role herein is that of an independent contractor; nothing herein is intended to create or shall be construed as creating a fiduciary or agency relationship between Advisor and the Company or its Board of Directors or any other party. Centerview is not assuming any duties or obligations other than those expressly set forth in this Agreement

13.    In connection with the services to be provided hereunder, Advisor may employ the services of its affiliates and may share with any such entity any information concerning the Company, *provided* that Advisor and such entities shall hold any non- public information confidential in accordance with the Confidentiality Agreement, dated October 12, 2011 (the "Confidentiality Agreement") and their respective customary policies relating to nonpublic information. Any such entity so employed shall be entitled to all of the benefits afforded to Advisor hereunder, including the Indemnification Provisions and shall be entitled to be reimbursed for its costs and expenses on the same basis as Advisor.

14.    The provisions hereof and the Indemnification Provisions shall inure to the benefits of and be binding upon the successors and assigns of the Company, Advisor and any other person entitled to indemnity under the Indemnification Provisions. The Company's obligations pursuant to this Agreement are joint and several. This Agreement, including the Indemnification Provisions, and the Confidentiality Agreement embody the entire agreement and understanding among the parties hereto and supersedes any and all prior agreements, arrangements, and understandings, related to the matters provided for herein. No waiver, amendment or other modification of this Agreement, including the Indemnification Provisions, shall be effective unless in writing and signed by each party to be bound thereby.

15.    This Agreement and any claim related directly or indirectly to this Agreement (including any claim concerning advice provided pursuant to this Agreement) and the Indemnification Provisions shall be governed by and construed in accordance with the laws of the State of New York without regard to the principle of conflicts of law. No such claim shall be commenced, prosecuted or continued in any forum other than the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York, and each of the parties hereby submits to the jurisdiction of such courts. The Company hereby waives on behalf of itself and its successors and assigns any and all right to argue that the choice of forum provision is or has become unreasonable in any legal proceeding. The Company waives all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the engagement of Advisor pursuant to, or the performance by Advisor of the services contemplated by, this Agreement.

If the foregoing Agreement is in accordance with your understanding of the terms of our engagement, please sign and return to us the enclosed duplicate hereof.

Very truly yours,

CENTERVIEW PARTNERS LLC

By: _____

Marc Puntus
Partner

Accepted and Agreed to as of the date first written above.

RESIDENTIAL CAPITAL, LLC, on behalf of itself
and its controlled subsidiaries

By: _____

Thomas Marano
Chief Executive Officer

**Exhibit A**
**Core Team**

Stephen Crawford – Partner
Samuel Greene - Partner
Marc Puntus – Partner
1 Managing Director
1-2 Principals
2 Associates
2-3 Analysts

**Exhibit B**
**Indemnification Provisions**

**Attached Hereto**

**Exhibit C**
**Litigation and Claims**

The settlement or compromise of any of the following matters will not be deemed to constitute a "Restructuring" for purposes of this Engagement:

1. Pending investigations, lawsuits or claims by any state attorney general, state banking department, US Department of Justice, US Department for Housing and Urban Development, or similar bodies or agencies relating to mortgage servicing and related issues

2. Pending lawsuits or claims by the Federal Housing Finance Authority in respect of mortgage loan repurchase or mortgage-backed securities claims

CENTER|VIEW PARTNERS

## Exhibit B

October 18, 2011

Centerview Partners LLC
31 West 52nd Street, 22nd Floor
New York, NY 10019

Gentlemen:

In connection with the engagement (the "Engagement") of Centerview Partners LLC ("Centerview") by the undersigned (the "Company") to render financial advisory services to the Company pursuant to a letter agreement dated the date hereof (the "Engagement Agreement"), the Company hereby agrees as follows:

1. Except as provided in paragraph 3. below, the Company agrees to indemnify and hold harmless Centerview and each of its affiliates, their respective members, directors, officers, employees and controlling persons, and each of their respective successors and assigns (collectively, the "Indemnified Persons" and each individually, an "Indemnified Person") from and against any and all losses, claims, damages, demands and liabilities, joint or several, or actions or proceedings in respect thereof, brought by or against any person (collectively, "Losses"), which are related to or arise out of the Engagement or any matter or transaction contemplated thereby.

2. The Company agrees to reimburse each Indemnified Person promptly upon request for all costs and expenses (including fees, disbursements and other charges of legal counsel) as they are incurred in connection with investigating, preparing for, pursuing, defending against or providing evidence in, any pending or threatened action, claim, suit, investigation or other proceeding brought by or against any person in any jurisdiction related to or arising out of the Engagement or any matter or transaction contemplated thereby (whether or not Centerview or any other Indemnified Person is a named party or witness, and whether or not any liability to any person results therefrom), including in connection with enforcing the terms hereof.

3. Notwithstanding the foregoing, the Company shall have no obligation to indemnify and hold harmless any Indemnified Person under this letter agreement in respect of any Losses to the extent that such Losses are finally judicially determined to have resulted from the willful misconduct or gross negligence of such Indemnified Person.

4. The Company agrees that it will not, without Centerview's prior written consent (which consent shall not be unreasonably withheld or delayed), settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, claim, suit, investigation or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not Centerview or any other Indemnified Person is an actual or potential party thereto) unless such settlement, compromise, consent or termination includes an unconditional release of each Indemnified Person from all liability arising out of such action, claim, suit, investigation or proceeding and does not impose any monetary or financial obligation on any Indemnified Person or contain any admission of culpability or liability on the part of any Indemnified Person. No Indemnified Person seeking indemnification, reimbursement or contribution under this letter agreement will, without the Company's prior written consent (which consent shall not be unreasonably withheld or delayed), settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding referred to herein.

31 WEST 52ND STREET, 22ND FLOOR, NEW YORK, NY 10019
PHONE: (212) 380-2650    FAX: (212) 380-2651    WWW.CENTERVIEWPARTNERS.COM

NEW YORK  •  LONDON  •  SAN FRANCISCO  •  LOS ANGELES

5.  If the foregoing indemnification provided for herein is determined to be unavailable to an Indemnified Person for any reason (other than as specified in paragraph 3. hereof) or is insufficient to hold it harmless in respect of any Losses referred to herein, then, in lieu of indemnifying such Indemnified Person hereunder, the Company shall contribute to the amount paid or payable by such Indemnified Person as a result of such Losses (and expenses related thereto) (i) in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and to Centerview, on the other hand, with respect to the Engagement or (ii) if the allocation provided by clause (i) of this paragraph is not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the fault of the Company and Centerview and any other relevant and equitable considerations; provided, however, that in no event shall the aggregate contribution of the Indemnified Persons to the amounts so paid or payable exceed the aggregate amount of all fees actually received by Centerview from the Company in connection with the Engagement (excluding any amounts received by Centerview as reimbursement of expenses pursuant to the Engagement Agreement). For purposes of this letter agreement, the relative benefit to the Company and Centerview of the Engagement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by the Company in the transaction or transactions that are the subject of the Engagement, whether or not such transaction is proposed or completed, bears to (b) the fees paid or to be paid to Centerview under the Engagement Agreement.

6.  The Company agrees that neither Centerview nor any other Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any person asserting claims on behalf of or in right of the Company for or in connection with the Engagement or any transactions or conduct in connection therewith, except to the extent that any losses, claims, damages or liabilities incurred by the Company are finally judicially determined to have resulted from the willful misconduct or gross negligence of such Indemnified Person.

7.  This letter agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws. Solely for purposes of enforcing this letter agreement, the Company hereby consents to personal jurisdiction of, service in and waives any objection to venue in any court in which any claim or proceeding which is subject to, or which may give rise to a claim for indemnification or contribution under, this letter agreement is brought against Centerview or any other Indemnified Person. ANY RIGHTS OF TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM OR ACTION ARISING OUT OF THIS LETTER AGREEMENT OR THE ENGAGEMENT IS HEREBY WAIVED.

8.  The indemnity, contribution, reimbursement and other obligations of the Company hereunder shall be in addition to any liability that the Company may have, at common law or otherwise, and shall be binding on its successors and permitted assigns. The obligations of the Company hereunder cannot be assigned without the prior written consent of Centerview.

9.  Prior to or at the time a public announcement is made concerning the Company entering into any agreement or arrangement with respect to, or effecting, any merger, statutory exchange or other business combination or proposed sale or exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth herein, the Company will notify Centerview in writing thereof and, if requested by Centerview, shall use commercially reasonable efforts to arrange in connection therewith alternative means of providing for the obligations of the Company set forth herein.

10. The terms of this letter agreement shall apply to all services provided by Centerview to the Company in connection with the matters contemplated by the Engagement, including those provided prior to the date of this letter agreement. The provisions of this letter agreement shall apply to any subsequent amendment to or modification of the Engagement Agreement, and shall survive the termination or completion of the Engagement.

Very truly yours

Residential Capital, LLC

By: _____

Thomas Marano
Chief Executive Officer

Accepted:

CENTERVIEW PARTNERS LLC

By: _____

Marc Puntus
Partner

March 13, 2012

Residential Capital, LLC
1177 Avenue of the Americas
16th Floor
New York, NY 10036

Attention: Thomas Marano
Chief Executive Officer

Ladies and Gentlemen:

Reference is made to that certain engagement letter dated October 18, 2011 (the "Engagement Letter"), between Centerview Partners LLC ("Centerview") and the Company (as such term is defined in the Engagement Letter). This agreement (the "Amendment") amends the Engagement Letter as follows:

Centerview and the Company mutually agree that Paragraph 3(a) and 3(b) of the Engagement Letter are hereby replaced with the following:

(a)      A monthly financial advisory fee (the "Monthly Advisory Fee") of $300,000, the first payment of which shall be due and paid by the Company upon execution of the Engagement Letter and thereafter on each monthly anniversary thereof through January 1, 2012. Thereafter, a Monthly Advisory Fee of $400,000, the first payment of which shall be due and paid by the Company on January 1, 2012 ("Revised Monthly Invoice Date") and thereafter on each monthly anniversary thereof through the earlier of the date the Company files chapter 11 (the "Petition Date") and the conclusion of this engagement. Subsequent to the Petition Date, a Monthly Advisory Fee of $300,000, the first payment of which shall be due and paid by the Company on the first monthly anniversary of the Revised Monthly Invoice Date occurring after the Petition Date, and thereafter on each monthly anniversary thereof during the term of this engagement. Advisor will issue a written invoice to the Company for the initial and each subsequent Monthly Advisory Fee. 50% of Monthly Advisory Fees paid subsequent to the Petition Date shall be credited (but only once) against an Out-of-Court Transaction Fee, an In-Court Transaction Fee or a Limited Transaction Fee (each as defined below) payable; provided, that in the event of a Chapter 11 filing such credit will only apply proportionately to the extent that such fees are approved by the Bankruptcy Court, if applicable.

(b)      If at any time during the term of this engagement or within the nine full months following the termination of this engagement (including the term of this engagement, the "Fee Period"), (x) any Restructuring or Sale Transaction is consummated outside of Bankruptcy Court or (y)(1) an agreement in principle, definitive agreement or plan to effect a

Restructuring or Sale Transaction is entered into and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), any Restructuring or Sale Transaction is consummated outside of Bankruptcy Court, Centerview shall be entitled to receive a transaction fee (an "Out-Of-Court Transaction Fee"), contingent upon the consummation of a Restructuring or Sale Transaction and payable at the closing thereof equal to $15,000,000; provided, however, that if (x) any Restructuring or Sale Transaction is consummated in Bankruptcy Court or (y)(1) an agreement in principle, definitive agreement or plan to effect a Restructuring or Sale Transaction is entered into and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), any Restructuring or Sale Transaction is consummated in Bankruptcy Court, Centerview shall be entitled to receive a transaction fee (an "In-Court Transaction Fee"), contingent upon the consummation of a Restructuring or Sale Transaction and payable at the closing thereof equal to $12,500,000; provided, further, that if an agreement in principle or definitive agreement to effect a Sale Transaction is entered into prior to the six month anniversary of this Agreement and concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), any Sale Transaction is consummated (i) outside of Bankruptcy Court; and (ii) with the party disclosed separately to Centerview on the date hereof with whom the Company is currently engaged in pending negotiations (the "Disclosed Party"), Centerview shall be entitled to receive a transaction fee (a "Limited Transaction Fee") equal to $7,500,000. Notwithstanding anything to the contrary in this subparagraph 3(b), in connection with any Restructuring or Sale Transaction that is intended to be effected, in whole or in part, as a §363 sale with a stalking horse bidder, or as a prepackaged, partial prepackaged or prearranged plan of reorganization, which plan may include a sale transaction (a "Prearranged Plan"), the Transaction Fee shall be earned and payable (x) 50% upon, in the case of a §363 sale, execution of a stalking horse asset purchase agreement, or, in the case of a Prearranged Plan, upon obtaining indications of support from certain of the Company's key creditors that in the good faith judgment of the Board of Directors of the Company are sufficient to justify filing such Prearranged Plan, and (y) 50% upon consummation of such Restructuring or Sale Transaction.

Centerview and the Company mutually agree that the following paragraph shall be added to section 3:

(g)     If at any time during the Fee Period the Company (x) receives a letter of intent to purchase all or substantially all of the Company's assets or (y) receives a debtor-in-possession financing proposal, in either case, satisfactory to the Company, Centerview shall be due and paid a transaction fee ("Interim Transaction Fee") equal to $1,200,000.

The Company and Centerview hereby agree that except as specifically set forth above, nothing contained in this Amendment shall affect any of the terms of the Engagement Letter, or any of the terms of the separate indemnification agreement, dated October 18, 2011 and referenced in paragraph 3(e) of the Engagement Letter (the "Indemnification Agreement").

This Amendment may be executed in counterparts, each of which together shall be considered a single document. This Amendment shall be binding on Centerview and the Company and their respective successors and assigns. This Amendment is not intended to confer any rights upon any shareholder, creditor, owner or partner of the Company, or on any other person not a party hereto other than the indemnified persons referenced in the Indemnification Agreement referenced in paragraph 3(e) of the Engagement Letter. This Amendment shall be governed by and construed in accordance with the laws of the State of New York.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate of this Amendment, which shall thereupon constitute a binding agreement between the Company and Centerview.


Very truly yours,

CENTERVIEW PARTNERS LLC


By: _____
Name: Marc Puntus
Title: Partner



ACCEPTED AND AGREED TO:

Residential Capital LLC


By: _____
Name: Thomas Marano
Title: CEO

January 17, 2013

Residential Capital, LLC
1177 Avenue of the Americas
16th Floor
New York, NY 10036

Attention: Thomas Marano
Chief Executive Officer

Ladies and Gentlemen:

Reference is made to that certain engagement letter dated October 18, 2011 as amended on March 14, 2012 (the "Engagement Letter"), between Centerview Partners LLC ("Centerview") and the Company (as such term is defined in the Engagement Letter), and that certain order of the Bankruptcy Court dated July 26, 2012 (the "Retention Order"), authorizing and approving Centerview's retention on the terms set forth in the Engagement Letter, as amended and supplemented by the Retention Order. This agreement (the "Amendment") amends the Engagement Letter as follows:

Centerview and the Company mutually agree that Paragraph 3(a) of the Engagement Letter is hereby replaced with the following:

(c)    A monthly financial advisory fee (the "Monthly Advisory Fee") of $300,000, the first payment of which shall be due and paid by the Company upon execution of the Engagement Letter and thereafter on each monthly anniversary thereof through January 1, 2012.    Thereafter, a Monthly Advisory Fee of $400,000, the first payment of which shall be due and paid by the Company on January 1, 2012 ("Revised Monthly Invoice Date") and thereafter on each monthly anniversary thereof through the earlier of the date the Company files chapter 11 (the "Petition Date") and the conclusion of this engagement.    Subsequent to the Petition Date, a Monthly Advisory Fee of $300,000, the first payment of which shall be due and paid by the Company on the first monthly anniversary of the Revised Monthly Invoice Date occurring after the Petition Date, and thereafter on each monthly anniversary thereof during the term of this engagement. Advisor will issue a written invoice to the Company for the initial and each subsequent Monthly Advisory Fee.  50% of Monthly Advisory Fees paid for the periods subsequent to the Petition Date through the date on which the sale of ResCap's servicing and origination platform closes (the "Platform Sale Closing Date") and after July 1, 2013 shall be credited (but only once) against an Out-of-Court Transaction Fee, an In-Court Transaction Fee or a Limited Transaction Fee (each as defined below) payable; provided, that in the event of a Chapter 11 filing such credit will only apply proportionately to the extent that such fees are approved by the Bankruptcy Court, if applicable. For the avoidance of doubt, Monthly Advisory Fees paid for the period from the Platform Sale Closing Date through June 30, 2013 shall not be credited. Centerview reserves the right to renegotiate with the Company,

subject to the reasonable consent of the official committee of unsecured creditors (the "UCC"), the appropriate amount of crediting of Monthly Advisory Fees paid for the period from and after July 1, 2013 based on the facts and circumstances extant at that point in time.

Centerview and the Company mutually agree that the following paragraph shall be added to section 1:

(d)    "FHA Sale Transaction" means any transaction or series of transactions involving a sale to a buyer or buyers of whole loans or receivables insured by the Federal Housing Administration ("FHA") as described in the Company's Motion to Approve Sale Procedures to sell Certain FHA Loans (Docket #2544), which may be executed as a whole or in parts. For the purposes of this definition, the term buyer shall exclude Ginnie Mae and its affiliates.

Centerview and the Company mutually agree that the following paragraph shall be added to section 3:

(h)    If at any time during the Fee Period, the Company consummates the FHA Sale Transaction, the Company will pay Centerview 1.0% of the aggregate sale price of the FHA Sale Transaction, which amount shall be due and paid upon closing. Centerview reserves the right to negotiate with the Company, subject to the reasonable consent of the UCC, additional fees for subsequent FHA Loan and other asset sales.

The Company and Centerview hereby agree that except as specifically set forth above, nothing contained in this Amendment shall affect any of the terms of the Engagement Letter, or any of the terms of the separate indemnification agreement, dated October 18, 2011 and referenced in paragraph 3(e) of the Engagement Letter (the "Indemnification Agreement"), as such terms were amended and supplemented pursuant to the Retention Order.

This Amendment may be executed in counterparts, each of which together shall be considered a single document. This Amendment shall be binding on Centerview and the Company and their respective successors and assigns. This Amendment is not intended to confer any rights upon any shareholder, creditor, owner or partner of the Company, or on any other person not a party hereto other than the indemnified persons referenced in the Indemnification Agreement referenced in paragraph 3(e) of the Engagement Letter. This

Amendment shall be governed by and construed in accordance with the laws of the State of New York.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate of this Amendment, which shall thereupon constitute a binding agreement between the Company and Centerview.

Very truly yours,

CENTERVIEW PARTNERS LLC

By: _____

Name:  Marc Puntus
Title:   Partner

ACCEPTED AND AGREED TO:

Residential Capital LLC

By: _____

Name:  Thomas Marano
Title:   Chief Executive Officer