**Hearing Date: November 7, 2013 at 2:00 p.m. (EST)**

Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300
Paul R. DeFilippo
Randall R. Rainer
Fletcher W. Strong

*Attorneys for Syncora Guarantee Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No: 12-12020-MG |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Chapter 11 |
| Debtors. | Jointly Administered |

**RESPONSE OF SYNCORA GUARANTEE INC. TO DEBTORS'
OBJECTION TO PROOF OF CLAIM # 7170 OF SYNCORA GUARANTEE INC.**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT .................................................................................................. 1

FACTUAL BACKGROUND ....................................................................................................... 5

    I.    GMACM and RFC had First-Party Obligations to Syncora to Perform Servicing and
          Related Duties for Each of the Syncora-Related Trusts ...................................................... 5

        A.    The Debtor's Contractual Obligations as Servicers, Including
              Notice Obligations Regarding Defective Loans in Its Care.................................... 5

             1.   RALI 2006-QO4 .......................................................................................... 5

             2.   BSSLT 2007-SV1 ........................................................................................ 7

             3.   STACS 2007-1 ............................................................................................. 8

        B.    The Debtors' Independent Duty of Care Owed to Syncora ................................. 10

        C.    The Debtors' Breaches of Their Obligations and
              Duties Caused Substantial Losses to Syncora ..................................................... 11

    II.    Motion to Assume and Assign Servicing Agreements .................................................. 13

    III.    Timely Proofs of Claim Were Filed Giving Notice of Syncora's Claims ..................... 14

    IV.    Syncora Provided Debtors Prompt Notice of Syncora's Claims for RALI 2006-QO4
          After Such Claims Were Proposed to Be Abandoned by RALI Trustee ....................... 17

    V.    The Debtors' Objection to Syncora's Proof of Claim ................................................... 18

ARGUMENT .............................................................................................................................. 18

    I.    The Amended Proof of Claim Satisfies The Legal Standard for Amendment .............. 18

        A.    The Amended Proof of Claim Describes the Bear Stearns and SunTrust Claims
              Referenced in the Original Proof of Claim with Greater Particularity ............... 20

        B.    The Amended Proof of Claim Relates Back to Deutsche Bank's
              Timely Filed Proof of Claim for Syncora's Claims against RFC ...................... 25

        C.    Syncora Is Not Barred From Asserting Cure Claims.......................................... 29

i

II.    The Debtors' Arguments Against the Merits of Syncora's Claims Are Erroneous........ 32

    A.  Causation Exists................................................................................................ 32

    B.  The Governing Agreements Expressly Provide for Syncora's Claims............... 33

    C.  The Economic Loss Rule Does Not Bar Syncora's Negligence Claims ............ 34

III.    Syncora Is Entitled to Obtain Discovery On Its Proof of Claim.................................... 35

CONCLUSION............................................................................................................ 36

# TABLE OF AUTHORITIES

## CASES

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
  96 N.Y.2d 280 (N.Y. 2001) ......................................................................... 34

*Abdallah v. Caribbean Sec. Agency*,
  557 F.2d 61 (3d Cir. 1977) .......................................................................... 32

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*,
  618 F.Supp.2d 280 (S.D.N.Y. 2009) ........................................................... 12

*Bell A. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................... 22

*Compania Sud Americana De Vapores, S.A. v. I.T.O. Corp. of Baltimore*,
  940 F. Supp. 855 (D. Md. 1996) .................................................................. 32

*Gens v. Resolution Trust Corp.*,
  112 F.3d 569 (1st Cir. 1997) ................................................................. 21, 27

*Gruby v. Brady*,
  838 F. Supp. 820 (S.D.N.Y. 1993) ............................................................... 35

*Ideal Mut. Ins. Co. v. Korean Reins. Corp.*,
  657 F. Supp. 1174 (S.D.N.Y. 1987) ............................................................. 13

*In re AMR Corp.*,
  2013 WL 1155434 (S.D.N.Y. March 21, 2013) ........................................... 35

*In re Bender Shipbuilding and Repair Co., Inc.*,
  2012 WL 4086445 (Bankr. S.D. Ala. Sept. 17, 2012) ................................. 27

*In re Calpine*,
  2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) .............................................. 22

*In re Coates*,
  292 B.R. 894 (Bankr. C.D. Ill. 2003) ........................................................... 35

*In re Delmonte*,
  237 B.R. 132 (Bankr. E.D. Tex. 1999) ......................................................... 29

*In re Edison Bros. Stroes, Inc.*,
  2012 WL 999260 (Bankr. D.Del. May 15, 2002) ......................................... 21

*In re Great A. & P. Tea Co., Inc.*,
    2011 WL 5546954 (S.D.N.Y. Nov. 14, 2011) ............................................................. 35

*In re Integrated Resources, Inc. v. Ameritrust Co. National Association*,
    157 B.R. 66 (S.D.N.Y. 1993) ................................................................. 19, 23, 28

*In re Macmillan, Inc.*,
    186 B.R. 35 (Bankr. S.D.N.Y. 1995) ....................................................... 19, 20, 25

*In re McLean Industries, Inc.*,
    121 B.R. 704 (Bankr. S.D.N.Y. 1990) ............................................................ 19, 20

*In re Meruelo Maddux Properties, Inc.*,
    2013 WL 1615784 (Bankr. App. 9th Cir. Apr. 15, 2013) ...................................... 21, 22

*In re Miss Glamour Coat Co., Inc.*,
    1980 WL 1668 (S.D.N.Y. Oct. 8, 1980) .................................................................. 31

*In re O'Malley*,
    252 B.R. 451 (Bankr. N.D. Ill. 1999) ..................................................................... 21

*In re Sacko*,
    394 B.R. 90 (Bankr. E.D. Pa. 2008) ...................................................................... 35

*In re Semcrude, L.P.*,
    442 B.R. 258 (Bankr. D. Del. 2010) ....................................................................... 22

*In re Telephone Co. of Cent. Florida*,
    308 B.R. 579 (M.D. Fla. 2004) ......................................................................... 20, 21

*In re Unioil, Inc.*,
    962 F.2d 988 (10th Cir. 1992) .................................................................................. 27

*In re Uvino*,
    2012 WL 892501 (Bankr. S.D.N.Y. Mar. 14, 2012) .............................................. 23

*Midland Cogeneration Venture v. Enron (In re Enron)*,
    419 F.3d 115 (2d Cir. 2005) .................................................... 20, 23, 27, 30, 31

*Ocean Ships, Inc. v. Stiles*,
    315 F.2d 111 (2d Cir. 2002) ................................................................................... 13

*Radian Ins., Inc. v. Deutsche Bank Nat. Trust Co.*,
    2009 WL 3163557 (E.D. Pa. Oct. 1, 2009) ........................................................... 22

*Travelers Cas. and Sur. Co.*,
    734 F. Supp. 2d 378 ................................................................................................ 34

*Tycon Tower I Inv. Ltd. Partn. v. John Burgee Architects*,
    1999 WL 676007 (S.D.N.Y. Aug. 31, 1999) .......................................................... 20, 26

*Ventura Assoc., Inc. v. Int'l Outsourcing Svcs., Inc.*,
    2005 WL 1634002 (S.D.N.Y. July 12, 2005) ............................................................ 13

## OTHER AUTHORITIES

Federal Rule of Bankruptcy Procedure 3001 ............................................................... 21

Federal Rule of Bankruptcy Procedure 7008 ............................................................... 22

Federal Rule of Bankruptcy Procedure 9014 ............................................................... 22, 35, 36

Federal Rule of Civil Procedure 8 ............................................................................... 22

Federal Rule of Civil Procedure 15 ............................................................................. 22

Syncora Guarantee Inc. ("Syncora") submits this response to the Debtors' Objection To Second Amended Proof of Claim # 7170 Amending Proof of Claim # 2781 of Syncora Guarantee, Inc. [Dkt. No. 5115], along with the supporting Declaration of Randall R. Rainer and the exhibits annexed thereto ("Rainer Dec.").[1]  Syncora respectfully states as follows:

## PRELIMINARY STATEMENT

1.        Syncora issued a financial guaranty insurance policy ("Policy") insuring each of three trust's payment of principal and interest to the holders of more than $800 million worth of mortgage-backed certificates issued by the trusts.  Debtors GMAC Mortgage, LLC ("GMACM") and Residential Funding Company, LLC ("RFC") acted as servicer to the trusts, and in related capacities.  Specifically, Syncora issued Policies to certificate holders for (i) SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1 ("STACS 2007-1" or the "SunTrust" transaction), for which GMACM acts as Servicer; (ii) Bear Stearns Second Lien Trust 2007-SV1 ("BSSLT 2007-SV1" or the "Bear Stearns" transaction), for which GMACM acts as Servicer; and (iii) Residential Accredit Loans, Inc., Series 2006-QO4 ("RALI 2006-QO4" or the "RALI" transaction), for which RFC acted as Master Servicer (retaining all direct servicing function), as well as transaction Sponsor and Seller to the trust.[2]

2.        As servicer to each of the trusts, GMACM and RFC (collectively the "Debtors") owed direct, first-party duties to Syncora under express obligations contained in the servicing and related agreements, including an obligation to alert the RMBS trustee to loans that the Debtors discovered breached the loan originator's or seller's representations and warranties in their applicable guidelines for the loans underlying the trusts.  In addition, RFC was obligated as Sponsor and Seller to cure, repurchase or substitute such defective loans for the benefit of the RALI certificateholders and Syncora. The Debtors also owed duties to the Trusts, and Syncora is subrogated to the rights of the insured

---

[1] Unless otherwise defined herein, references to an "Exhibit" or "Exh." shall refer to the applicable exhibit of the Rainer Dec.

[2] Each of the three trusts hold Recognized R+W Claims under the Plan [Dkt. No. 4153].  *See* Plan Sched. 2-R (listing RALI 2006-QO4); Schedule 3-G (listing BSSLT 2007-SV1 and STACS 2007-1).  However, because they are Insured RMBS Trusts, Article IV.C.3.(a)(iv) of the Plan would leave those Trusts *without* claims if the Plan is confirmed.

certificateholders, for whom the Trustee acts as agent in respect of the damages that the Debtors'

breaches caused the trusts.  Under the applicable agreements and related duties, the Debtors also have a

duty to pay Syncora damages and/or indemnification for any losses Syncora has incurred as a result of

the Debtors' breaches.

3.       Each of the subject trusts has suffered unusually high rates of default on the loans

underlying the trusts.  For example, approximately 63% of the loans underlying the STACS 2007-1 trust

have defaulted.  As a result, Syncora has already paid approximately $225 million of insurance claims to

certificate holders to date, and estimates that as a result of the Debtors' breaches, the three trusts will

have suffered substantially greater losses in the aggregate.

4.       Prior to the bar date for filing proofs of claim, Syncora filed a proof of claim against

GMACM asserting claims concerning GMACM's role as servicer to the BSSLT 2007-SV1 and STACS

2007-1 trusts.  Syncora's proof of claim asserted any and all claims against GMACM under the

applicable transaction documents, including the applicable servicing agreements, and reserved the right

to assert additional claims, as well as to assert claims against Debtors other than GMACM, such as RFC.

After the bar date expired, Syncora amended its proof of claim to describe in greater detail Syncora's

claims against GMACM for BSSLT 2007-SV1 and STACS 2007-1 for breaches of GMACM's

contractual and common law duties as servicer to the trusts.  In its amendment, Syncora also included

claims against RFC for breaches of RFC's contractual and common law duties as servicer, sponsor, and

seller of the RALI trust.

5.       The Debtors' claim objection seeking to disallow Syncora's amended proof of claim

should be overruled because the amended proof of claim properly relates back to Syncora's original

proof of claim, as well as to other timely filings by the Trustee, Master Servicer, and Securities

Administrator, who for these purposes filed claims as Syncora's agents.  First, the amended claims

against GMACM arising from BSSLT 2007-SV1 and STACS 2007-1 are valid because they describe

Syncora's original claims with greater particularity.  The amended claims also are proper because they

arise from the same transactions identified in Syncora's original proof of claim (*i.e.*, GMACM's breach of its servicing and related duties), and thus there can be no prejudice to the Debtors to uphold Syncora's amended claims for the two trusts.

6.      Second, Syncora's amended proof of claim asserting claims against RFC in its role as servicer, sponsor, and seller of RALI 2006-QO4 properly relates back to the timely proof of claim filed by Deutsche Bank Trust Company Americas ("Deutsche Bank" or "DB"), the RALI trustee.  In fact, prior to the applicable bar date, Syncora contacted Deutsche Bank and requested that it file a proof of claim against RFC to assert claims with respect to RALI 2006-QO4, which Deutsche Bank did.  The timely DB proof of claim stated that it included claims held by "certificate insurers" and "monoline insurers" for RALI 2006-QO4.  The DB proof of claim also asserted virtually identical servicing, repurchase, and common law claims against RFC for RALI as those servicing, repurchase, and common law claims asserted in Syncora's amended proof of claim against RFC for RALI.  Accordingly, Syncora's amended proof of claim should be held to relate back to the DB proof of claim because the amended proof of claim is based on the exact same transactions and claims asserted in Deutsche Bank's proof of claim, and the Plan proposes to deny any claims to Insured Trusts like RALI 2006-QO4.[3]

7.      Moreover, Syncora was justified in asserting its RALI claims after the Bar Date because Deutsche Bank, as agent for the trusts and those holding claims that arise through the trust (like Syncora as monoline insurer) timely filed a proof of claim expressly asserting claims on Syncora's behalf.  Such claims included the same claims asserted in Syncora's amended proof of claim.  Under the RALI Pooling and Servicing Agreement, the Trustee is authorized to enforce RFC's repurchase obligations on behalf of the certificateholders.  To the extent of claims it pays under the Policy, Syncora is subrogated to those certifcateholders's rights in respect of RALI being advanced by the Trustee.  As such, the

---

[3] In defending the reasonableness of their actions, the RMBS Trustees argued in support of the Plan Support Agreement that the Trustees discharged their duties "by allowing the Monolines, including Syncora, to assert non-competing claims directly against the Debtors."  [Dkt. No. 4061] ¶ 21.

Trustee enforces repurchase obligations as the agent of both the certificateholders and Syncora. Amendments to timely filed proofs of claim filed by agents (*i.e.*, Deutsche Bank) are permitted to identify the proper claimant (*i.e.*, Syncora) after the bar date expires. In addition, the equities favor Syncora because promptly after Syncora received notice that the Debtors' proposed Plan, as embodied in the Plan Support Agreement, determined to deny "Insured Trusts" and their RMBS Trustees any of their noticed claims, and instead vest such claims in the applicable monoline insurer, Syncora promptly gave the Debtors notice in its objection to the Plan Support Agreement (three weeks later) that it was asserting claims against RFC for RALI.[4]

8.    Third, Syncora's amended proof of claim, which effectively asserts Cure Claims against GMACM for GMACM's breaches of its contractual servicer duties and related obligations for BSSLT 2007-SV1 and STACS 2007-1, should not be disallowed because it properly relates back to the timely Notice of Cure Claims filed by Wells Fargo in its capacity as Trustee and Master Servicer for those same transactions, which notice asserted virtually identical cure claims against GMACM for servicing breaches. In addition, Wells Fargo's Notice of Cure Claims against GMACM for BSSLT 2007-SV1 and STACS 2007-1 also prominently references claims held by "certificate insurers" and "monoline insurers." Under the respective Pooling and Servicing Agreements for BSSLT-SV1 and STACS 2007-1, Wells Fargo, as Master Servicer, shall enforce the obligations of the Servicer (GMACM) for the benefit of the certificateholders. To the extent of claims it pays under the Policy, Syncora is subrogated to those certifcateholders's rights in respect of BSSLT 2007-SV1 and STACS 2007-1. As such, Wells Fargo asserted cure claims against GMACM as the agent of both the certificateholders and Syncora. Accordingly, Syncora's amended proof of claim, which is based on the very same transactions asserted in the Wells Fargo notice (cure claims arising from servicing breaches for BSSLT 2007-SV1 and STACS 2007-1), and identifies Syncora as the "certificate insurer" or "monoline insurer" holding claims

---

[4] Had Insured Trusts been allowed to assert claims, then Syncora would have participated in the recovery by the RALI trust by virtue of its being subrogated to the rights of certificate holders it paid with Policy proceeds. *See* Exh. I, RALI 2006-QO4 Insurance Policy Endorsement at A-5.

against GMACM for the two trusts referenced in the Wells Fargo notice, properly relates back to Wells Fargo's timely Notice of Cure Claims. The equities also favor amendment because all parties were aware of Wells Fargo's timely Notice of Cure Claims, and Syncora's amendment merely provides greater detail as to the nature and amount of the Cure Claims against GMACM.

9.        Given the timeliness of Syncora's amended proof of claim, the claims themselves are, despite the Debtors' arguments to the contrary, valid and well-recognized. The relevant agreements impose the servicing and repurchase obligations upon the Debtors that appear to have been breached, those breaches have caused Syncora's losses notwithstanding the Debtors' attempt to point the finger at others, and the Debtors are liable in damages for such first-party claims. At a minimum, Syncora is entitled to discovery from the Debtors and third parties before the Court makes any final determination on the validity or amount of Syncora's claims.[5]

## FACTUAL BACKBROUND

**I.      GMACM and RFC had First-Party Obligations to Syncora to Perform
Servicing and Related Duties for Each of the Syncora-Related Trusts**

10.      GMACM and RFC have first-party obligations to the trusts and Syncora under the relevant agreements. The Debtors' failure to abide by such obligations has resulted in the significant losses incurred by the trusts, their certificate holders and Syncora.

**A.      The Debtors' Contractual Obligations as Servicers, Including
Notice Obligations Regarding Defective Loans in Its Care**

**1.      RALI 2006-QO4**

11.      Debtor RFC was the Master Servicer of the mortgage loans in the RALI 2006-QO4 trust pursuant to the (i) Standard Terms of Pooling and Servicing Agreement, dated March 1, 2006, for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates ("Standard PSA Terms"), and (ii) the Series Supplement, dated April 1, 2006, between Residential Accredit Loans, Inc.,

---

[5] The Debtors' reliance on Duff & Phelps' analysis of servicing claims (Obj. 2 ¶ 47) is at best premature, since the Duff report is not in evidence and Syncora has been denied access to the Duff report and analysis. *See* Rainer Dec. ¶¶ 16-19.

RFC as Master Servicer, and Deutsche Bank Trust Company Americas Trustee ("PSA Supp," and

together with the Standard PSA Terms, the "RALI Servicing Agreement").  Exh. H.  As Master

Servicer, RFC serviced the loans in the RALI 2006-QO4 trust itself, and did not delegate that function

to a sub-servicer.

> 12.     Under Section 3.01 of the RALI Servicing Agreement, "The Master Servicer shall

service and administer the Mortgage Loans in accordance with the terms of this Agreement."  Section

2.04 of the RALI Servicing Agreement provides:

> Upon the discovery by the Company, the Trustee, the Master Servicer or any Custodian
> of a breach of any of the representations and warranties made . . . in respect of any
> Mortgage Loan that materially and adversely affects the interests of the
> Certificateholders in such Mortgage Loan, the party discovering such breach shall give
> prompt written notice to the other parties. . . .   The Master Servicer shall promptly notify
> Residential Funding [i.e., RFC as Sponsor] of such breach and request that Residential
> Funding either (i) cure such breach . . . or (ii) purchase such Mortgage Loan from the
> Trust [or substitute a qualified mortgage]. . . . If the Master Servicer is Residential
> Funding, then the Trustee shall also have the right to give the notice and require the
> repurchase or substitution . . . in the event of such a breach of representation or warranty
> of Residential Funding . . . .

RALI Servicing Agreement § 2.04 (emphasis added).

> 13.     Thus, upon discovering a material breach of any representation or warranty for a loan,

RFC, as Master Servicer, is required to give prompt written notice of such breach to the RALI 2006-

QO4 Trustee and others.  Such notice also triggers the Master Servicer's and Trustee's independent

obligations to request that the Sponsor (i.e., RFC itself) repurchase the defective loan or substitute a

conforming loan.  Moreover, as part of its servicing duties "for the benefit of the . . . Certificateholders,"

the RALI Servicing Agreement states that the Master Servicer "shall use its best reasonable efforts to

enforce the obligations of . . . each Seller [i.e., RFC] to purchase a Mortgage Loan on account of

defective documentation . . . or on account of a breach of a representation and warranty."  Id. § 3.02(b).

> 14.     Accordingly, the RALI Servicing Agreement expressly deems cure, repurchase or

substitution as the most effective way for the Master Servicer to maximize recoveries for the trust on

mortgage loans infected with breaches of representation and warranties by the seller, or mortgage loans

6

in default that will be difficult, time-consuming and expensive to foreclose upon, for a recovery of less than full loan value, due to missing required documentation.

15.     The PSA Supp for RALI 2006-QO4 states throughout that the Master Servicer is to perform its servicing duties and obligations "for the benefit of the Certificateholders" (*e.g.*, § 2.04), and each of the Standard PSA Terms and PSA Supp state the same with respect to the Sponsor's repurchase obligations (*id.*).  The PSA Supp further provides that Syncora is fully subrogated to the rights of Insured Certificateholders to the extent Syncora pays claims under its Policy for their benefit.  PSA Supp § 13.03; *see also* Syncora Financial Guaranty Insurance Policy in respect of certain RALI 2006-QO4 certificates, Endorsement at A-5 and Payment Notice at ¶ 7 (same).  In addition to its subrogation rights, Syncora is itself a third party beneficiary of the Master Servicer's obligations under the PSA Supp.  PSA Supp § 13.09.  Accordingly, Syncora may assert its breach of contract claims against RFC for losses that RFC caused, as both Master Servicer and Sponsor.

16.     Also, as Sponsor, RFC is obligated to repurchase or substitute mortgage loans in the RALI 2006-QO4 mortgage pool for which there is a breach of an origination-related representation and warranty that materially adversely affects the value of the loan or for which material loan documentation is missing from the loan file.  *See* RALI Servicing Agreement §§ 2.02, 2.04.[6]  Syncora understands that RFC failed as Sponsor to repurchase loans that it knew were defective and materially breached representations and warranties, amply demonstrating RFC's negligence (or gross negligence or willful misconduct) that would eviscerate RFC's contractual exculpation from liability for what occurred.

**2.     BSSLT 2007-SV1**

17.     Debtor GMACM has acted as the Servicer for the BSSLT 2007-SV1 trust.  In such capacity, GMACM's obligations for BSSLT 2007-SV1 are similar to RFC's servicing obligations for

---

[6] When the Trustee for RALI enforces the Sponsor's repurchase obligations, it does so "on behalf of the Certificateholders."  RALI Servicing Agreement § 2.03(a).  Thus, given Syncora's subrogation to the Certificateholders' rights, the Trustee does so on behalf of Syncora as well, and when it timely filed a proof of claim asserting such claims, it did so as Syncora's agent.

RALI 2006-QO4 described above.  Under the Servicing Agreement, dated as of May 1, 2001, by and

between EMC Mortgage Corporation ("EMC") and GMACM, as amended (the "Bear Stearns Servicing

Agreement"), annexed to the Debtors' Objection as Exhibit 23, GMACM was required to:

> a.  "ensure that the Mortgage Loans are serviced in accordance with prudent mortgage
>     banking practices" (*Id*. § 2.06);
>
> b.  "exercise the same care that it customarily employs for its own account" (*Id*. § 4.01),
>
> c.  administer the loans "in accordance with all applicable requirements of [Item
>     1122(d) of SEC Regulation AB, 17 C.F.R. 229.1122]" (*Id*. § 6.09); and
>
> d.  realize upon defaulted mortgage loans "in such manner as will maximize the receipt
>     of principal and interest."  *Id.* § 4.03.

18.     Under the Insurance and Indemnity Agreement, dated as of March 30, 2007, between

and among Syncora, EMC, SACO I, GMACM and the Trustee ("Bear Stearns I&I"), GMACM

expressly represented, warranted and covenanted to Syncora that GMACM "will" service the subject

mortgage loans "in compliance with" the terms of the Bear Stearns Servicing Agreement.  Obj. 2 Exh.

21.  Bear Stearns I&I § 2.04(f).  Syncora's issuance of the relevant Policy was "subject to" the condition

precedent that GMACM's promise to perform was "true and correct."  *Id.* § 3.01(c).  Accordingly, from

the outset of the BSSLT 2007-SV1 transaction, GMACM was fully aware that Syncora relied upon,

would benefit from, and expected to benefit from GMACM's performance of its servicing obligations.

Otherwise, Syncora would not have issued the policy.  Separately, under the Bear Stearns I&I, GMACM

agreed to indemnify Syncora for any losses arising from any breaches by GMACM of its representations

and warranties, or arising from GMACM's negligence or misfeasance.  *Id.* § 3.04(b).

### 3.    **STACS 2007-1**

19.     GMACM also was the Servicer for the STACS 2007-1 trust.  In such capacity,

GMACM's mortgage loan servicing obligations are set forth in the Pooling and Servicing Agreement,

dated as of April 1, 2007, among ACE Securities Corp., as Depositor, GMAC as Servicer, Wells Fargo

Bank, National Association, as Master Servicer and Securities Administrator and HSBC Bank USA,

National Association, as Trustee ("SunTrust Servicing Agreement"), annexed to the Debtors' Objection

as Exhibit 25, which provides:

> [T]he Servicer [GMACM] shall service and administer the Mortgage Loans on behalf of the
> Trust Fund and in the best interests of and for the benefit of the Certificateholders (as
> determined by the Servicer in its reasonable judgment) in accordance with the terms of this
> Agreement and the Mortgage Loans and all applicable law and regulations and, to the extent
> consistent with such terms, in the same manner in which it services and administers similar
> mortgage loans for its own portfolio, giving due consideration to customary and usual standards
> of practice of prudent mortgage lenders and loan servicers . . . .To the extent consistent with the
> foregoing, the Servicer shall also seek to maximize the timely and complete recovery of
> principal and interest on the related Mortgage Notes . . . .

*Id*. § 3.01 (emphasis added).

20.     Thus, in addition to its specified servicing provisions under the STACS Servicing

Agreement, GMACM is required to do more – *i.e*., to service the underlying mortgage loans prudently,

as if the loans were its own and in a manner that maximizes full and complete recovery of principal on

each loan.  *Id.* § 3.01.  Therefore, when GMACM was aware of an opportunity for a *full and complete*

recovery of principal on a delinquent or defaulting loan, it was required to avail itself of such

opportunity, instead of merely engaging in foreclosures to obtain partial recoveries or loan charge-offs

that yield no recovery.

21.     As was standard and well-known to GMACM, under Section 2.03(a) of the STACS

Servicing Agreement, upon discovery or receipt of notice of a breach by the Sponsor of mortgage loan

origination representations or warranties that materially adversely affect the value of a mortgage loan,

the Trustee shall promptly notify the Sponsor and enforce the Sponsor's obligation to cure, repurchase

or substitute the defective loan.  STACS Servicing Agreement § 2.03(a).[7]  Such actions are not only the

superior means of maximizing recovery on a loan in GMACM's care for servicing, but it also is a

---

[7] The Debtors contend that § 2.03(a) is inconsistent with Syncora's claim because it requires the Trustee to notify other
transaction parties, including the Servicer, of breaches of representations and warranties of which the Trustee becomes
aware, rather than the other way around.  Obj. 2 at 27.  The Debtors fail to recognize the provision merely recognizes
the Trustee's general obligation to notify interested transaction parties of material events, including when the Trustee
has learned of a breach from a source other than the Servicer (*e.g*., a certificateholder or the monoline insurer), which
often occurs.  Such fact does not affect, however, the Servicer's obligation above to maximize recoveries by alerting the
Trustee to breaches it independently discovers from borrower and servicing files.

customary measure in the industry.  In fact, such a remedial measure often is expressly required in servicing agreements.  *See*, *e.g.*, RALI Servicing Agreement § 2.04; *see also* Rainer Dec. Exh. D ¶ 31 (same notice obligation referenced in proofs of claim filed against GMACM by Trustees).  In doing so, the Trustee, HSBC Bank, would have been obligated to enforce the Sponsor's repurchase obligation.

22.     As in the Bear Stearns transaction, Syncora entered into an Insurance and Indemnity Agreement, dated as of May 15, 2007, with GMACM and certain other transaction participants, SunTrust Asset Funding, LLC, SunTrust Bank, ACE Securities Corp. and Wells Fargo Bank, National Association (the "SunTrust I&I").  Obj. 2 Exh. 24.  Once again, GMACM represented, warranted and covenanted to Syncora that it "shall . . . perform its obligations" under the SunTrust Servicing Agreement.  SunTrust I&I § 2.02(a) & (m).  And once again, as a condition precedent, Syncora's issuance of the Policy for SunTrust was "subject to" GMACM's promise to perform being "true and correct."  *Id.* § 3.01(c).  Separately, GMACM also agreed to indemnify Syncora for any and all losses arising out of or relating to the breaches of such representation and warranty, or arising from GMACM's negligence or misfeasance in connection with servicing.  *Id*. § 3.04(a).

## B.     The Debtors' Independent Duty of Care Owed to Syncora

23.     Separate from their contractual obligations under the above-described servicing agreements, RFC and GMACM each owed Syncora a duty of care.  Each of RFC and GMACM was fully aware that Syncora had issued an insurance policy guaranteeing the payment of principal and interest in respect of certain tranches of certificates issued by their respective trusts.  RFC and GMACM also were fully aware that Syncora's risk of paying claims under its respective Policies would increase if cash flows from the underlying mortgage loans being serviced by them substantially decreased.  Furthermore, RFC and GMACM were aware that Syncora would not have issued the Policy for their respective transactions without the reasonable expectation that the Servicers would properly perform their servicing obligations, which would reduce the risk of Syncora paying claims.  Thus, it was foreseeable to RFC and GMACM  that their failure to exercise due care with respect to servicing the

10

mortgage loans in their transactions would cause Syncora to pay claims and/or face a greatly enhanced

risk of paying claims under the respective Policy.

> ### C.    The Debtors' Breaches of Their Obligations and Duties Caused Substantial Losses to Syncora

24.    Astronomical numbers of mortgage loans in the three Syncora-insured transactions

defaulted – far in excess of what normally would be expected.  Specifically, more than 52% of the loans

in the RALI 2006-QO4 transaction (1,291 of 2,470) defaulted; nearly 25% of the loans in the BSSLT

2007-SV1 transaction (8,821 of 37,535) defaulted; and approximately 63% of the loans in the STACS

2007-1 transaction (3,617 of 5,767) defaulted.

25.    As Syncora believes the evidence will show, in the ordinary course of RFC's and

GMACM's performance as Servicers, RFC and GMACM knew, discovered or should have known or

discovered the defective mortgage loans giving rise to such high rates of default among the loans it was

servicing.[8]  Also, while RFC and GMACM were aware that such an inordinately high number of

borrowers were defaulting, they also would have been on notice to be alert to, and would be

encountering, loan files and other information for hundreds of delinquent or defaulting borrowers

indicating that the borrowers' loans had not been originated in conformity with prudent loan

underwriting practices and/or lacked required mortgage documentation in the file.  In either instance,

mortgage loans regularly breached origination-related representations and warranties, a fact which RFC

knew or should have known.

26.    Syncora believes that the evidence also will show that, inexplicably, the Debtor

Servicers did not notify the Trustee, Master Servicer or Sponsor (as applicable) of a *single* mortgage

loan in the Syncora-insured trusts that breached Sponsor representations and warranties.  For example,

in the case of RALI 2006-QO4, although RFC was required, as Master Servicer, to exercise its "good

---

[8] GMACM's monthly reporting obligations under Section 5.02 of the Bear Stearns Servicing Agreement and required Sections 5.02 and 5.03 of the SunTrust Servicing Agreement required GMACM to actually itemize such defaults.

faith best judgment" in making a "best reasonable effort" to cause such defective loans to be repurchased or replaced, Syncora understands that RFC consciously did nothing.

27.     By the same course of conduct, RFC and GMACM also were negligent and, Syncora believes, even grossly negligent in engaging in such willful blindness that it knew and/or foresaw would cause losses to the transaction's insurer, Syncora.  Had RFC and GMACM fulfilled their respective duties in good faith, hundreds of millions of dollars in principal and interest losses in the RALI 2006-QO4, BSSLT 2007-SV1 and STACS 2007-1 transactions could have been avoided.  *See* Amended POC Exhs. B-D.  Instead, the transactions experienced substantial principal and interest shortfalls in the mortgage loan pool, which in turn caused principal write-downs and shortfalls in interest payments in respect of "first-loss position" junior notes.  Such losses have spread up the waterfall priority to the more senior notes insured by Syncora.

28.     As a result, Syncora has paid $74,816,151 in insurance claims on RALI 2006-QO4; forecasts future claims payments to certificateholders in BSSLT 2007-SV1 of $1,737,173[9]; and for STACS 2007-1 has paid $148,914,678 in insurance claims and forecasts paying an additional $30,350,200 in future claims payments.

29.     Given such distress in the transaction and Syncora's losses, and directly as a consequence of the harm inflicted by RFC's and GMACM's faulty servicing, in 2009 Syncora sought to hedge against its exposure by investing in a tender offer for such certificates, paying consent fees and other fees totaling $44,267,847 to consummate the remediation for these transactions.[10]  Had RFC and GMACM acted as they should have as Servicers and had the principal and interest losses been avoided,

---

[9] Syncora's financial advisors project principal losses on the two tranches of BSSLT 2007-SV1 certificates insured by Syncora to total up to approximately $232 million, although Syncora has not yet paid claims on the more senior notes Syncora insures.

[10] Remediation expenses are a proper measure of consequential damages that an aggrieved party is entitled to recover in suits sounding in breach of contract and common law tort.  *See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 618 F.Supp.2d 280, 303 (S.D.N.Y. 2009) (bondholders were entitled to damages in the amount of the price paid to purchase shares on the open market to close their short positions because it was foreseeable to the trustee that some bondholders would maintain this investment strategy when Trustee failed to convert bonds).

the Syncora-insured transactions would not have experienced nearly the same distress that they have, and Syncora would not have incurred such remediation expense.[11]

30.     For the reasons described above, RFC and GMAMC breached their obligations as Servicers under the servicing agreements, and thus RFC is liable to Syncora for damages totaling at least $83,439,280, plus pre-petition interest,[12] and GMACM is liable to Syncora for damages totaling at least $216,652,769, plus pre-petition interest.  In addition, GMACM breached its covenant to fully perform its obligations as Servicer under the Bear Stearns and SunTrust Servicing Agreements and thus is required to indemnify Syncora for the same amount of losses in respect of BSSLT 2007-SV1 and SunTrust 2007-1 under the Bear Stearns I&I and SunTrust I&I, respectively.  Separately, RFC and GMACM also are liable to Syncora for their negligence and gross negligence and owe Syncora damages in at least the same amount.

## II.    Motion to Assume and Assign Servicing Agreements

31.     On July 26, 2012, the Debtors filed a Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property and (II) Cure Amounts Related Thereto (the "Assumption Notice") [Dkt. No. 924], which was amended and restated on September 18, 2012 (the "Amended Assumption Notice") [Dkt. No. 1484], and which, in accordance with the Sale Procedures Order [Dkt. No. 538] (collectively the "Sale Motion"), established September 28, 2012 as the deadline for filing cure claims for assignment

---

[11] Although the Debtors have suggested that any return that Syncora received on its investment should be offset against its claims paid and other losses, such amounts are legally irrelevant under the collateral source rule.  In *Ventura Assoc., Inc. v. Int'l Outsourcing Svcs., Inc.*, 2005 WL 1634002 (S.D.N.Y. July 12, 2005), the Court rejected the defendant's argument that plaintiff's claimed contract damages must be reduced by payments the plaintiff received from its insurer, stating that under New York's collateral source rule, "damages recoverable for a wrong are not diminished by the fact that the party injured has been wholly or partially indemnified for his loss by insurance effected by him and to the procurement of which the wrongdoer did not contribute."  *Id.* at *6 (citing *Ocean Ships, Inc. v. Stiles*, 315 F.2d 111, 116 (2d Cir. 2002)).  In *Ideal Mut. Ins. Co. v. Korean Reins. Corp.*, 657 F. Supp. 1174, 1175-77 (S.D.N.Y. 1987), the court applied the collateral source rule to reject the defendant-reinsurer's argument that the plaintiff-insurer's breach of contract damages being claimed should be reduced based upon funds plaintiff separately received from its broker.

[12] The Debtors have asserted that in 2008 RFC assigned its servicing obligations on RALI 2006-QO4 to another servicer and that such transfer affects Syncora's claim on RALI.  The degree to which any such assignment impacts Syncora's damages from RFC's servicing failures remains an issue for discovery.  And in any event, any such assignment has no bearing on Syncora's claims against RFC based upon its repurchase obligations as Sponsor.

13

of an "Assumed Contract" (the "Cure Claims Bar Date").  *See* Sale Procedures Order ¶ 25.   The

Assumption Notice listed the Bear Stearns and SunTrust transactions for assumption and assignment of

the servicing agreements held by GMACM.[13]  Syncora filed objections to the sale of the Syncora

servicing agreements on September 28, 2012 and October 29, 2012 [Dkt. No. 1657 and 1996].  The two

Syncora trusts were later removed from the Sale Motion and the Sale Order further clarified that it

would not have any binding effect on Syncora.  Sale Order [Dkt. No. 2246] ¶ 61.

        32.      On August 15, 2013, the Debtors filed a Motion to Assume and Assign Servicing-

Related Agreements for Syncora Trusts to Ocwen Loan Servicing, LLC (the "Motion to Assign Syncora

Trusts") [Dkt. No. 4718].  Included in this motion were (i) the Bear Stearns transaction, (ii) the SunTrust

transaction, and (iii) the Greenpoint Mortgage Funding Trust 2006-HE1 transaction.  On August 28,

2013, Syncora filed its Objection to the Motion to Assign Syncora Trusts [Dkt. No. 4870].

**III.**     **Timely Proofs of Claim Were Filed Giving Notice of Syncora's Claims**

        33.      On November 7, 2012, Syncora timely filed proof of claim number 2781 (the "Original

Proof of Claim").  The Original Proof of Claim stated that Syncora "insured payment of principal and

interest for the benefit of the holders of certain securities issued by [certain] trusts (the 'Syncora-Related

Trusts') that own loans serviced by GMAC."  Exh. A, Original Proof of Claim ¶ 2.  The "Syncora-

Related Trusts" include the BSSLT 2007-SV1 and STACS 2007-1 transactions.  *Id.* n.1.[14]  According to

the Original Proof of Claim, Syncora's claim against GMACM arose from the rights Syncora held under

certain "Trust Documents" that were listed on Exhibit A to the Proof of Claim.  Exhibit A to the Proof

of Claim listed, among other things, (a) six Trust Documents for BSSLT 2007-SV1, including the Bear

Stearns Servicing Agreement, Bear Stearns I&I, and Bear Stearns PSA; and (b) nine Trust Documents

for STACS 2007-1, including the SunTrust Servicing Agreement and SunTrust I&I.

---

[13] The RALI transaction was not subject to the Debtors' Assumption Notice, Amended Assumption, or any subsequent
Motion filed by the Debtors to assume and assign.

[14] Although the Greenpoint Mortgage Funding Trust 2006-HE1 ("GP 2006-HE1") transaction also was part of
Syncora's Original Proof of Claim, Syncora is not asserting a claim with respect to GP 2006-HE1.

34.    Based upon the foregoing and other Trust Documents identified in its Proof of Claim,

Syncora's Proof of Claim stated that its claims are based upon, *inter alia*,

> Syncora's rights arising out of, arising under, related to, or associated with the Syncora-Related Trusts, including, without limitation, all rights arising out of or related to the Trust Documents, *which includes, without limitation, rights of indemnification, reimbursement and subrogation and all other rights (including those arising out of common law)* that Syncora has *as a result of a breach of or in connection with* any provision in the Trust Documents for which Syncora is a beneficiary, whether through the explicit terms of such provision, through Syncora's third-party beneficiary or subrogation rights or otherwise.  For the avoidance of doubt, Syncora asserts a claim based on all of its rights associated with the Syncora-Related Trusts and the Trust Documents . . . *including, without limitation . . . any and all rights against GMAC for liabilities incurred in connection with the origination, sale, or transfer of the loans ultimately sold or transferred into the Syncora-Related Trusts (including any repurchase obligations incurred in connection with such origination, sale or transfer)* or in connection with the creation of the Syncora-Related Trusts and the issuance of the securities backed by such loans.

*Id.* ¶ 3 (emphasis added).  Syncora also reserved the right to amend, supplement and revise its Original

Proof of Claim, including after further investigation and discovery.  *Id.* ¶¶ 10-13.  Syncora also reserved

the right to assert claims against Debtors other than GMACM.  *Id.* ¶ 10.

35.    On November 8, 2012, prior to the Bar Date for filing proofs of claim, Syncora

contacted Deutsche Bank, Trustee for RALI 2006-QO4, and requested that Deutsche Bank file a proof

of claim for the RALI transaction.  Exh. D.

36.    On March 1, 2013, Deutsche Bank filed proof of claim number 6706 (the "DB Proof of

Claim" or "DB POC"), an amendment to proof of claim number 6451 filed the day before on February

28, 2013.  Exh. F.  Pursuant to a stipulation with the Debtors, the DB Proof of Claim was timely filed.

*See* Stipulation and Order Permitting Certain Parties to File Proofs of Claim After the Bar Date [Dkt.

No. 2095].  The DB Proof of Claim expressly asserts claims against RFC for, among other things,

"Representations and Warranties Claims" and "Transferred Servicing Claims" in respect of the

transactions for which Deutsche Bank is Trustee.  *See* DB POC ¶¶ 18-44 & Sched. A.  Such transactions

expressly include RALI.  *Id.*, Sched. A at 35.

37.     Among the "Servicing Obligations" that are the subject of Deutsche Bank's Transferred Servicing Claims is the Servicers' obligation "*to give notice of and enforce Buyback Claims* and other Representations and Warranties Claims," *id*. ¶ 13 (emphasis added), *i.e.*, the very same claim Syncora has asserted against RFC in the Amended Proof of Claim.  Deutsche Bank described the amount of such claims as contingent and unliquidated.  *Id.*  The DB Proof of Claim further states that it is "based on *all* the Debtors' obligations under *all* of the Claimant Transaction Documents[15] with respect to the RMBS Trusts for which [Deutsche Bank] acts and encompasses and includes all obligations and indemnities under the Claimant Transaction Documents and such RMBS Trusts."  *Id.* ¶ 56 (emphasis added).

38.     Not only does the DB Proof of Claim include a claim by the Trustee (on behalf of the RALI 2006-QO4 trust) against RFC for failing to give notice of defective mortgage loans and enforce repurchase remedies for such loans against the Sponsor, but the proof of claim *also expressly includes the same servicing claim held by the monoline insurer for RALI – i.e., Syncora*.  Deutsche Bank's proof of claim states:

> Other non-Debtor parties to the RMBS Trusts for which the Trustee acts, including, without limitation, securities underwriters, depositors, loan servicers, *certificate insurers, including but not limited to, the monoline insurers*, and investors, *may* file proofs of claim in these cases relating to the Claimant Transactions Documents, that may be *duplicative of*, or supplemental to, the claims stated herein (the "Third Party Trust Related Claims").  To the extent that such Third Party Trust Related Claims are property of such RMBS Trusts, *Claimant incorporates such Third Party Trust Related Claims herein by reference*.

DB Proof of Claim ¶ 65 (emphasis added); *see also id.* ¶ 15 n.11.  Accordingly, based upon the DB Proof of Claim, the Debtors and others were fully aware that DB and/or Syncora, as monoline insurer, intended to hold RFC liable on representation and warranty claims and servicing claims for RALI.

---

[15] "Claimant Transaction Documents" are defined a "one or more *pooling and servicing agreements*, highly integrated sets of "*servicing agreements*," mortgage loan repurchase agreements, deposit trust agreements, trust agreements, indentures, asset sale agreements, depositor sale agreements, administration agreements, yield maintenance agreements, prospectuses *and other ancillary transaction documents*."  *Id.* ¶ 2 (emphasis added).

39.    On April 16, 2013, Wells Fargo timely filed its Notice of Cure Claims [Dkt. No. 3454] ("Wells Fargo Notice").[16]  The Wells Fargo Notice was filed by Wells Fargo asserting Cure Claims as Trustee, Master Servicer, and Securities Administrator of all the RMBS Trusts listed in Schedule A thereto.  Schedule A listed both BSSLT 2007-SV1 and STACS 2007-1.  *See* Wells Fargo Notice, Sched. A at 2, 9.  Among the claims asserted was:

> *a claim for damages arising from the Servicer's failure to give timely notice and failure to enforce breaches of the representations and warranties* given by the sellers or depositors under the governing agreements related to, among other things, the Mortgage Loans or RMBS certificates . . . .

Wells Fargo Notice, ¶ 21 (emphasis added).  The Wells Fargo Notice further states that it includes cure claims held by "monoline insurers" and "certificate insurers" of the RMBS Trusts.  *See* Wells Fargo Notice ¶¶ 19 n.17, 43.  Thus, the Wells Fargo Notice of cure claims gave the Debtors notice that Wells Fargo and/or Syncora, as monoline insurer, intended to hold GMACM liable for Cure Claims in respect of BSSLT 2007-SV1 and STACS 2007-1 – specifically for the *same* claims at issue here.

**IV.    Syncora Provided Debtors Prompt Notice of Syncora's Claims for RALI 2006-QO4 After Such Claims Were Proposed to Be Abandoned by RALI Trustee**

40.    On May 23, 2013, the Debtors filed their Motion to authorize the Plan Support Agreement ("PSA") [Dkt. No. 3814], attaching the PSA as an exhibit.  The PSA provided that claims held by Insured Trusts would no longer be entitled to an Allowed Claim under the Plan.  *See* PSA Supplemental Term Sheet at 5, 7; *id* Annex III ("RMBS Trust Allocation Protocol") at 1.  Instead, such claims would be vested in the monoline insurer of the certificateholders of the Insured Trust.  *See* PSA Supplemental Term Sheet at 3-4, 7; Annex III at 1.  It was not until the filing of the proposed PSA that Syncora first became aware that Deutsche Bank, as trustee for RALI, planned to release the claims asserted in the DB Proof of Claim against RFC.

---

[16] The Scheduling Order dated December 27, 2012 [Dkt. No. 2528] provided that RMBS Trusts "shall file a notice of any alleged cure claim no later than sixty (60) calendar days after the closing of the sale of the servicing platform[.]" Order ¶ 15.  The closing occurred on February 15, 2013. *See NOTICE REGARDING CLOSING OF SALE* (April 8, 2013) § II, available at http://www.rescaprmbssettlement.com/docs/Ocwen_Sale_Notice%20(April%202013).pdf. Accordingly, the deadline to file cure claims for RMBS Trusts was April 16, 2013.

41.     On June 19, 2013, less than one month after receiving notice that Deutsche Bank was planning to abandon its claims for RALI, Syncora filed its objection to the PSA [Dkt. No. 4028].  In its objection, Syncora asserted claims against RFC with respect to RALI 2006-QO4.  PSA Objection at 4, 6, 10 n.3; Rainer Decl. in Support of PSA Objection [Dkt. No. 4030] ¶¶ 6, 7.

## V.     The Debtors' Objection to Syncora's Proof of Claim

42.     On August 13, 2013, the Debtors filed an objection to Syncora's proof of claim ("First Objection" or "Obj. 1") [Dkt. No. 4632].  The Debtors argued, in substance, that Syncora's Original Proof of Claim constituted a "mere placeholder" that cannot form the basis of an allowed claim.

43.     On September 9, 2013, Syncora filed its response to the First Objection [Dkt. No. 4925], and also filed first amended proof of claim number 7164.  On September 16, 2013, Syncora filed second amended proof of claim number 7170, which contained certain corrections (hereinafter the "Amended Proof of Claim" or "Amended POC").

44.     On September 19, 2013, the Debtors filed their objection to the Amended Proof of Claim ("Second Objection" or "Obj. 2").

\*       \*       \*

45.     For the reasons set forth below, the Debtors' First and Second Objections should be overruled because Syncora's Amended Proof of Claim constitutes a proper amendment that relates back to timely claim filings, and the Debtors will not be prejudiced as the Amended Proof of Claim merely describes Syncora's claims asserted in the Original Proof of Claim, Deutsche Bank Proof of Claim, and Wells Fargo Notice of Cure Claims with greater particularity.

## ARGUMENT

## I.     The Amended Proof of Claim Satisfies
## The Legal Standard for Amendment

46.     In determining whether to allow an amended proof of claim filed after the bar date, courts apply a two-prong test: (i) whether the amended proof of claim "relates back" to a timely filed

proof of claim, and (ii) if so, whether allowing the amendment is equitable. *Integrated Resources, Inc.*

*v. Ameritrust Co. Nat'l Assoc. (In re Integrated Resources, Inc.)*, 157 B.R. 66, 70 (S.D.N.Y. 1993).

47.    In determining whether a proof of claim relates back to a timely filed proof of claim,

courts look to "whether there was timely assertion of a similar claim evidencing an intention to hold the

estate liable." *In re Macmillan, Inc.*, 186 B.R. 35, 49 (Bankr. S.D.N.Y. 1995) (citing *Integrated*

*Resources,* 157 B.R. at 70).  Syncora's Original Proof of Claim clearly and unequivocally evidenced an

intent to hold the Debtor liable as it states that Syncora holds an unliquidated claim against the Debtor

arising from breaches of the agreements entered into when  Syncora insured payment of principal and

interest on certificates issued by identified trusts "that own loans serviced by GMACM."  Exh. A ¶ 2.

Thus, the fact that the claim arose out of the Debtor's status as servicer for those trusts was made

apparent.  Moreover, Syncora based its claim on the "agreements and documents associated with each

such trust . . . and rights (including those arising out of common law) that Syncora has *as a result of a*

*breach of or in connection with any provision in the Trust documents*."  *Id.* ¶ 3 (emphasis added).  In

fact, Syncora's Original Proof of Claim was as specific as many other proofs of claim filed in respect of

claims against GMACM and RFC for breaches of servicing obligations; sufficiently alerted the Debtors

to the fact that the claims arose from the Debtor's role as servicer of the loans in the trusts identified in

the proof of claim; sufficiently identified the basis for the claims (breaches of the agreements or

violations of Syncora's common law rights); and informed the Debtors that the claims were unliquidated

in amount.[17]  Accordingly, any argument that the Original Proof of Claim was legally insufficient is

without merit.

48.    A subsequent claim relates back to the original claim it "(1) corrects a defect of form in

the original claim; (2) describes the original claim with greater particularity; or (3) pleads a new theory

of recovery on the facts set forth in the original claim."  *In re McLean Industries, Inc.*, 121 B.R. 704,

---

[17] *See, e.g.*, Exh. E, HSBC Proof of Claim No. 5254 for BSSLT 2007-SV1 (generally asserting claims "arising from the
relevant Debtor's failure to perform its servicing obligations under the Transaction documents" or "claims arising from
the relevant Debtor's failure to repurchase" loans from the trust).

708 (Bankr. S.D.N.Y. 1990). Here, the Amended Claim merely describes the original claim for

damages arising from servicing and related defaults with greater particularity.

49.     In determining whether to allow a claim amendment to relate back to the original claim

filing, courts "look[] to such factors as (1) undue prejudice to the opposing party; (2) bad faith or

dilatory behavior on the part of the claimant; (3) whether other creditors would receive a windfall were

the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and (5) the

justification for the inability to file the amended claim at the time the original claim was filed."

*Macmillan, Inc.*, 186 B.R. at 49. Generally speaking, "belated amendments will ordinarily be 'freely

allowed' where other parties are not prejudiced." *See Midland Cogeneration Venture v. Enron* (*In re

Enron*), 419 F.3d 115, 133 (2d Cir. 2005). The Court should reject the Debtors' claims of prejudice out

of hand since the Original Proof of Claim and other proofs of claim (described below) gave the Debtors

and other parties adequate notice of the nature and basis of Syncora's servicing related claims and the

trusts to which they relate. In any case, discovery and an evidentiary hearing is required before the

Court determines whether any of the factors set forth above justify rejecting the amendment, and

Syncora reserves its rights to supplement this response after completion of discovery.

### A.     The Amended Proof of Claim Describes the Bear Stearns and SunTrust Claims Referenced in the Original Proof of Claim with Greater Particularity

50.     In determining whether an amended proof of claim relates back, bankruptcy courts

merely look to whether "the proposed amended claim is *reasonably related* to a timely filed claim."

*Tycon Tower I Inv. Ltd. Partn. v. John Burgee Architects*, 1999 WL 676007, at *9 (S.D.N.Y. Aug. 31,

1999) (emphasis added). On this point, *In re Telephone Co. of Cent. Florida*, 308 B.R. 579 (M.D. Fla.

2004) is instructive. In that case, the IRS filed a timely proof of claim for $580,000 for certain taxes,

stating in the proof of claim that the IRS was conducting a "pending examination." One and a half years

later, after a plan of reorganization was confirmed, the IRS filed an amended proof of claim for $2.85

million. The Court upheld the amended IRS proof of claim notwithstanding the long delay to file the

amended claim and significant increase in amount. *In re Telephone Co. of Cent. Florida*, 308 B.R. at

582; *see also In re Meruelo Maddux Properties, Inc.*, 2013 WL 1615784, at *8 (Bankr. App. 9th Cir.

Apr. 15, 2013) (upholding late claim based on reservation of rights in timely proof of claim).

51.    Here, the Original Proof of Claim gave adequate notice of its claims against GMACM *as*

*servicer* under the related agreements supporting such claims with respect to the Bear Stearns and

SunTrust deals, as well as under common law.  The Amended Proof of Claim is based on the same

transactions as the Original Proof of Claim and merely describes the claims arising from GMACM's

servicing for the Bear Stearns and SunTrust securitizations with greater particularity.  Accordingly, the

first requirement for relation back is satisfied as to the Bear Stearns and SunTrust deals.  *See In re*

*Edison Bros. Stroes, Inc.*, 2012 WL 999260, at *4 (Bankr. D.Del. May 15, 2002) (upholding amended

claim because "both the claim and the amendment are based on the same transaction").[18]

52.    The Debtors' argument that Syncora's claims cannot relate back to the Original Proof of

Claim because the Original Proof of Claim is a "mere placeholder" is unfounded.  Obj. 2 ¶ 4-5, 43-46.

Federal Rule of Bankruptcy Procedure 3001(a) states what is required in a proof of claim: "a written

statement setting forth [the] creditor's claim" that conforms to the Official Form.  Fed. R. Bankr. P.

3001(a).  Proofs of claim "need only 'provide adequate notice of the existence, nature and amount of the

claim as well as the creditor's intent to hold the estate liable."  *In re O'Malley*, 252 B.R. 451, 456

(Bankr. N.D. Ill. 1999) (quoting *Gens v. Resolution Trust Corp.*, 112 F.3d 569, 575 (1st Cir. 1997)).

The Original Proof of Claim was presented on the Official Form 3001(a), together with an Addendum

that provided greater specificity as to the bases of the claims.  The Original Proof of Claim states that it

arises from rights Syncora has under various agreements whereby the Debtor serviced the loans in the

---

[18] The Original Proof of Claim also is, by its express terms, inclusive of non-contractual claims arising from GMACM's
servicing failures.  *See* Original Proof of Claim ¶ 3 (asserting claims "based on all of its rights associated with the
Syncora-Related Trusts and the Trust Documents, *regardless of whether such right arises from a Trust Document*")
(emphasis added); ¶ 10 (reserving right "to file proofs of claim for additional claims, whether arising from or relating to
any of the Trust Documents, *or with respect to any other liability or indebtedness of GMAC*") (emphasis added).

trusts identified in the Original Proof of Claim, together with rights under the common law, and states

that the Debtor breached those agreements and common law duties.  The rights referred to in the

Original Proof of Claim would necessarily include the right to breach of contract or tort damages if

Syncora proves a causal connection between the breaches and its losses.[19]

53.     Moreover, in related contexts, a "mere placeholder" can satisfy the legal requirements of

notice prior to the expiration of statutes of limitation.  For example, the use of "John Doe" as a

placeholder to assert claims against certain parties after the statute of limitations has expired is allowed

for purposes of relation back under Federal Rule 15 if the newly added defendants had adequate notice

of the claims.  *See In re Semcrude, L.P.*, 442 B.R. 258, 268-70 (Bankr. D. Del. 2010); *see also Radian*

*Ins., Inc. v. Deutsche Bank Nat. Trust Co.*, 2009 WL 3163557, at *18 (E.D. Pa. Oct. 1, 2009) (finding

that "vague" and "boilerplate" proofs of claim filed in receivership proceeding satisfied notice

requirements).[20]  It was not necessary that the Original Proof of Claim describe with specificity all of the

breaches under the transaction documents that are described in the Amended Proof of Claim.  *Meruelo*

*Maddux Properties*, 2013 WL 1615784, at *8 (upholding late filed claim because claimant "was not

required to identify the advancement provision specifically, or to mention the word advancement in

particular, in order to preserve his claim for all contractual rights under the Indemnity Agreement").[21]

---

[19] Although the civil pleading standard in Fed. R. Civ. P. 8 has no application here (FRBP 9014(c) omits application of FRBP 7008 in contested matters), Syncora's Original Proof of Claim more than satisfies this liberal "notice pleading" standard since it contains a short and plain statement of the claim with sufficient factual allegations, accepted as true, showing that the pleader (*i.e.*, Syncora) plausibly is entitled to relief. *See Bell A. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).  The claim is plausible on its face as it alleges breaches of contract and other common law rights that harmed Syncora in an unliquidated amount.

[20] Contrary to the Debtors' assertion, Syncora does not agree that its Original Proof of Claim is a "placeholder" or "boilerplate" proof of claim.

[21] The Debtors' reliance upon *In re Calpine*, 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) is inapposite.  Obj. 2 ¶ 43. *Calpine* involved a post-bar date amendment filed by an indenture trustee of convertible bonds based on "loss of conversion rights" arising from the bankruptcy petition filing, whereas the prior timely claim was for "principal and interest" under an indenture.  *Id.* at *2.  The *Calpine* court disallowed the late "novel" claim because it could not form the legal basis of an allowed claim in bankruptcy that arose by virtue of the petition filing itself (among other defects). *Id.* at *3, *8.  Here, however, there is no legitimate dispute that servicer claims against the Debtors, such as those held by Syncora for BSSLT 2007-SV1 and STACS 2007-1, constitute legally cognizable claims that existed pre-petition. *In re Uvino*, 2012 WL 892501 (Bankr. S.D.N.Y. Mar. 14, 2012) is also easily distinguishable.  Obj. 2 ¶ 44.  *Uvino* involved the timely assertion of a *secured* claim based on a mechanics lien without any reservation of rights, and a later

54.     In addition, the equities favor permitting the Amended Proof of Claim with respect to the Bear Stearns and SunTrust deals.  First, the Debtors will not be unduly prejudiced because the Debtors had notice of Syncora's Bear Stearns and SunTrust claims by virtue of the Original Proof of Claim.  *In re Integrated Resources, Inc.*, 157 B.R. at 70 (no undue prejudice where original claim gave notice of claims).  Further, the Debtors failed to set forth any facts or evidence to support a finding that they would be prejudiced by the Amended Proof of Claim, except to argue that the Original Proof of Claim was a "mere placeholder," and that its filing creates the "potential" for inflating claim reserves under the Plan.  Obj. 2 ¶¶ 41-46, 50.  However, such conclusory arguments cannot form the basis for undue prejudice.  *See In re Enron*, 419 F.3d at 131 ("prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence").  In fact, the Original Proof of Claim specifically referenced claims arising from GMACM's role as servicer of the Bear Stearns and SunTrust deals – the *only* role GMACM had.  The Debtors will not suffer any prejudice because they have been on notice since no later than the bar date of the nature and amount of Syncora's servicing related claims.  As noted above, the Original Proof of Claim gave ample notice of the nature of Syncora's claims against GMACM.

55.     Furthermore, during the course of these cases after the bar date, it has been evident that the Debtors have been well aware of Syncora and its claims.  In February 2013, the disposition of Syncora's claims was a subject of negotiation with the Debtors in connection with potential resolution of Syncora's objections to the Debtors' Sale Motion.  Rainer Dec. ¶ 7.   In addition, although Syncora was not invited to the mediation with Judge Peck, Syncora's name appears as a defined term in the PSA that was prepared in connection with the mediation (*see* PSA at 7), again indicating that the Debtors and Creditors' Committee continued to be aware that Syncora was a creditor.

---

claim filed 1.5 years after the bar date for an *unsecured* claim which would increase the overall claim amount by 350%. *Uvino*, 2012 WL 892501, at *3.  Here, unlike in *Uvino*, (i) the amendment does not assert unsecured claims based on the timely assertion of a secured claim; (ii) the Original Proof of Claim asserted a broad reservation of rights; (iii) the Debtors had notice of Syncora's claims by virtue of the timely Original Proof of Claim and related filings; and (iv) the Amended Proof of Claim was not filed 1.5 years after the bar date.

56.    In addition, the Debtors' proposed Plan contains a mechanism for the post-confirmation resolution of Disputed Claims, such as Syncora's, and for the establishment of a Disputed Claims Reserve.  Therefore, the Plan process will not be impeded by virtue of the need to adjudicate Syncora's claim.  In fact, the Disclosure Statement [Dkt. No. 4157] informs creditors that the amounts set forth in the Disclosure Statement with respect to projected claims amounts are estimates only and "there can be no assurance that the estimated amounts of Claim . . . are correct."  Disclosure Statement at 148.  In light of these provisions, neither the Debtors nor any creditor has any legitimate basis to assert they would be prejudiced, much less surprised, from the allowance of a claim in favor of Syncora.

57.    As to the second (bad faith) and fifth (justification) factors, there is no evidence that Syncora acted in bad faith and the record amply supports Syncora's argument that Syncora's behavior was justified.  Syncora timely filed the Original Proof of Claim which gave notice to the Debtors of Syncora's claims with respect to the Bear Stearns and SunTrust deals.  Syncora is unable to liquidate the amount of these claims without discovery, especially with respect to the servicing files, and to date the Debtors have strongly resisted providing such discovery.  *See* Obj. 1 ¶ 39.  Syncora properly identified the fact that its claims arose out of the insurance provided to the trusts, its rights arising from the trust documents (including the relevant servicing agreements) and common law, and the Debtors' breaches as servicer of its obligations and duties as servicer.  Nothing more was required in order to put the Debtors on notice of the nature of Syncora's claims.

58.    As to the third (windfall to creditors) and fourth (harm to creditors) factors, they clearly favor Syncora.  Creditors were on notice of Syncora's claims by operation of the Original Proof of Claim.  If Syncora proves after a hearing on the merits that the Debtors' servicing related breaches caused it harm, then it should be entitled to receive a distribution as a creditor in these cases, just like any other party harmed by breaches of contract or torts committed by the Debtors.  There is nothing inequitable about giving Syncora the opportunity to establish its entitlement to an allowed claim.

**B.**     **The Amended Proof of Claim Relates Back to Deutsche Bank's
Timely Filed Proof Of Claim for Syncora's Claims against RFC**

59.     The Amended Proof of Claim includes a claim against RFC arising from breaches of the

Debtor's obligations as Sponsor, Seller and Master Servicer of the loans in the RALI 2006-QO4 trust

insured by Syncora, which also satisfies the two-prong test for amendment. *Macmillan, Inc.*, 186 B.R. at

49. The claim to which the Amended Proof of Claim relates back with respect to RALI is the proof of

claim timely filed by Deutsche Bank, as Trustee for the RALI trust.  Since the Bar Date passed,

however, the Plan proponents, with the apparent acquiescence of the trustees, determined to deprive

insured trusts of the right to assert claims, and instead have vested such claims in the monolines that

insure certificates issued by such trusts.[22]  Accordingly, it is both equitable, and consistent with the

construct embodied in the Plan of vesting insured trusts' claims in the monolines that insured them, to

allow Syncora, whose insured RALI trust is the subject of the trustee's timely filed proof of claim as

against RFC, to amend to assert the claim as its own.

60.     Both the Amended Proof of Claim and DB Proof of Claim assert claims against RFC as

originator and depositor, as well as servicer, of the loans in the trust known as RALI 2006-QO4.  Exh. F

Schedule A at 35.  The breaches of contract and other wrongful conduct which form the basis of

Deutsche Bank's claim on behalf of the trust include the very transactions, occurrences and grounds that

the Amended Proof of Claim now asserts in the name of Syncora as insurer of that same trust.

Specifically, the Amended Proof of Claim asserts the following:

      a.   servicing claims against RFC based on RFC's role as servicer of the RALI 2006-
QO4 transaction (¶¶ 25-32);

      b.   common law claims including negligence and gross negligence against RFC based
on RFC's failure to fulfill its obligations as servicer of the RALI 2006-QO4
transaction (¶¶ 28, 31); and

---

[22] *See* Disclosure Statement at 28 ("The Plan provides that certain monoline insurers will have allowed claims against
the Debtors' Estates independent of the claims of the RMBS Trusts, and the Insured RMBS Trusts will have no allowed
RMBS Trust Claims . . . ."); Plan at 61 ("If an RMBS Trust (i) is an *Insured RMBS Trust* and (ii) *has made policy
claims against its Monoline* and, as of the Effective Date has received full payment of such claims, *such RMBS Trust
will not have any Recognized Claim*, unless the Insured Exception applies") (emphasis added).

c.  repurchase claims against RFC based on RFC's role as sponsor of the RALI deal (¶¶ 33-34).

61.     Similarly, the Deutsche Bank Proof of Claim asserts servicing claims (¶¶ 38-40), negligence and related common law claims (¶ 50), and repurchase claims (¶¶ 41-44) against RFC with respect to RALI 2006-QO4.  In addition, like the Amended Proof of Claim, the DB Proof of Claim states that it is "based on *all* the Debtors' obligations under *all* of the Claimant Transaction Documents[23] with respect to the RMBS Trusts for which [Deutsche Bank] acts and encompasses and includes all obligations and indemnities under the Claimant Transaction Documents and such RMBS Trusts." *Id.* ¶ 56 (emphasis added).  Accordingly, Syncora's Amended Proof of Claim is identical to the claims asserted in the DB Proof of Claim with respect to RFC's duties and obligations for the RALI deal.  *See Tycon Tower I Inv. Ltd. Partn.*, 1999 WL 676007, at *9 (permitting amendment if new claims are "reasonably related" to original claims).  That Deutsche Bank was acting as Syncora's agent in filing the RALI proof of claim  is evident from (a) § 2.03 of the RALI Servicing Agreement, which makes the trustee agent for the certificate holders in advancing claims, and (b) Syncora's rights of subrogation to the rights of insured certificate holders it has paid.  Exh. H, Endorsement at A-5.

62.     Moreover, the DB proof of claim contains an express statement that it *includes* the same servicing claims held by the monoline insurer for RALI 2006-QO4 – i.e., Syncora (¶¶ 37 n.11, 65) – effectively negating the Debtors' argument that the Debtors were not on notice of any claims held by Syncora for RALI against RFC.  Obj. 2 ¶¶ 5, 7, 22, 37.

63.     Under the unique circumstances present here, where the Plan proposes to deny otherwise valid claims held by the Insured Trusts, but recognizes the right of the monoline insurers of those trusts to assert such claims, it is equitable to allow the timely proof of claim filed by the RALI trustee to

---

[23] "Claimant Transaction Documents" are defined a "one or more *pooling and servicing agreements*, highly integrated sets of "*servicing agreements*," mortgage loan repurchase agreements, deposit trust agreements, trust agreements, indentures, asset sale agreements, depositor sale agreements, administration agreements, yield maintenance agreements, prospectuses *and other ancillary transaction documents*." *Id.* ¶ 2 (emphasis added).

constitute the timely claim to which Syncora's amendment relates back.  Deutsche Bank filed its timely

proof of claim as agent for the persons entitled to assert claims arising from injury to the RALI 2006-

QO4 trust or its assets.  As trustee, Deutsche Bank acted as agent for the certificate holders in the RALI

2006-QO4 trust, and by virtue of paying claims under its financial guarantee insurance policy for RALI

2006-QO4, Syncora has become entitled to stand in the shoes of those certificate holders.[24]

64.    It is permissible for an agent of a claimant to file a proof of claim on behalf of the claim

holder, and a later amendment to identify the principal as the true holder of the claim in the place of the

agent, will be deemed timely because the amendment relates back to the claim timely filed by the agent.

*See Gens,* 112 F.3d at 575 ("[A] simple substitution of the real part[y] in interest for a related party ...

listed in the original [proof of claim] represents a proper ground for amendment."); *In re Bender*

*Shipbuilding and Repair Co., Inc.*, 2012 WL 4086445, at *8 (Bankr. S.D. Ala. Sept. 17, 2012)

(upholding late-filed amendment because "amending HM's proof of claim by adding HP as the property

owner does not substantively change the claims made against Bender").  Deutsche Bank filed its proof

of claim in respect of itself and other parties, including "certificate insurers" and "monoline insurers" of

RALI 2006-QO4.  Exh. F ¶¶ 37 n.11, 65.  Accordingly, Syncora's Amended Proof of Claim, which is

based on the same transaction identified in the timely DB Proof of Claim, and which identifies Syncora

as the "certificate insurer" or "monoline insurer" holding such claims with respect to RALI 2006-QO4,

should be allowed.  *See In re Enron*, 419 F.3d at 133 (late-filed amendments "will ordinarily be freely

allowed"); *In re Unioil, Inc.*, 962 F.2d 988 (10th Cir. 1992) (permitting amendment to proof of claim

filed by trustee to identify trust as claim holder for claims referenced in original proof of claim).

---

[24] *See* RALI Pooling and Servicing Agreement Series Supplement, Exh. H § 13.03 ("*to the extent the Certificate Insurer or any fiscal agent on behalf of the Certificate Insurer makes payments*, directly or indirectly, on account of principal of or interest on the Insured Certificates to the Holders of such Certificates *the Certificate Insurer will be fully subrogated to*, and each Insured Certificateholder, the Master Servicer, the Company and the Trustee hereby delegate and assign to the Certificate Insurer, to the fullest extent permitted by law, *the rights of such Holders to receive such principal and interest from the Trust Fund*[.]") (emphasis added); RALI Financial Guaranty Insurance Policy, Exh. I at Exhibit A ¶ 7 ("The Trustee, on behalf of the Owners, *hereby assigns to [Syncora] all rights and claims . . . with respect to the Insured Obligations to the extent of any payments under the Policy.*  The foregoing assignment is in addition to . . . *rights of subrogation otherwise available to [Syncora] in respect of such payments.*") (emphasis added).

65.     Second, the equities favor Syncora with respect to Syncora's claims against RFC.  The

Debtors were on notice of claims on behalf of "certificate insurers" or "monoline insurers" (Exh. F ¶ 37

n.11, 65) with respect to RALI 2006-QO4 (*Id.* Sched. A at 35) through the DB Proof of Claim.  Because

the Debtors were on notice of Syncora's RALI 2006-QO4 claims by virtue of the Trustee's proof of

claim, and the Amended Proof of Claim merely describes the "monoline insurer" claims held by

Syncora for RALI 2006-QO4 with greater particularity, there is no prejudice to the Debtors.  *In re*

*Integrated Resources, Inc.*, 157 B.R. at 70 (no undue prejudice where original claim gave notice).

66.     Further, as noted above, the Debtors' proposed Plan contains a mechanism for the post-

confirmation resolution of Disputed Claims, such as Syncora's, and for the establishment of a Disputed

Claims Reserve, so the Plan process will not be impeded by virtue of the need to adjudicate Syncora's

claim.  The Disclosure Statement [Dkt. No. 4157] informs creditors that the amounts set forth in the

Disclosure Statement with respect to projected claims amounts are estimates only and "there can be no

assurance that the estimated amounts of Claim . . . are correct."  Disclosure Statement at 148.

67.     As to the second and fifth factors, Syncora did not act in bad faith and, in fact, Syncora's

actions were justified.  Prior to the Bar Date, Syncora contacted Deutsche Bank to ensure that Deutsche

Bank would file a proof of claim with respect to RALI 2006-QO4 prior to the Bar Date.  Exh. D.

Thereafter, Deutsche Bank filed a proof of claim for the RMBS trusts for which it serves as trustee,

including RALI 2006-QO4, on behalf of "certificate insurers" and "monoline insurers" such as Syncora.

Allowing the amendment to relate back to the timely claim by the RALI 2006-QO4 trustee is consistent

with the Plan; any other result would unfairly prejudice Syncora.

68.     Promptly after being notified that the PSA filed on May 23, 2013 contemplated that

Insured Trusts would not be permitted to assert claims directly, but that the Monoline Insurers of such

Trusts would be permitted to assert claims in their own names, Syncora notified the Debtors in its June

19, 2013 Objection to the PSA, wherein Syncora stated that it had a claim in respect of RALI 2006-QO4

and described the nature of its failure-to-notice claim.  Promptly after the Debtors filed their initial claim

objection on August 13, 2013, Syncora amended its proof of claim, expressly asserting Syncora's claims with respect to RALI.

69.    Therefore, Syncora was justified in promptly taking any and all actions necessary to protect its rights with respect to RALI 2006-QO4, notwithstanding the fact that the Amended Proof of Claim was filed after the Bar Date. *See In re Delmonte*, 237 B.R. 132, 135 (Bankr. E.D. Tex. 1999) (permitting late-filed proof of claim post-confirmation where claimant "promptly" filed amendment to protect its rights after sale of secured collateral for unsecured deficiency).  As such, the second and fifth factors weigh in Syncora's favor.

70.    The third (windfall to creditors) and fourth (harm to creditors) factors also weigh in Syncora's favor.  If Syncora proves after a hearing on the merits that the Debtors' servicing related breaches caused it harm, then it should be entitled to receive a distribution as a creditor in these cases, just like any other party who has been harmed by breaches of contract or torts committed by the Debtors.  There is nothing inequitable about giving Syncora the opportunity to establish its entitlement to an allowed claim, especially since all parties in interest were on notice of the existence of all of the claims Syncora asserts since not later than the applicable bar date.

71.    The fact that Syncora was not invited to participate in the mediation that led to the PSA should not deprive it of the right to establish the validity and extent of its claims.  Neither the Debtors nor any creditor has any legitimate basis to assert they would be prejudiced from the allowance of a claim in favor of Syncora.

72.    Accordingly, the equities favor permitting Syncora's amendment to assert claims against RFC with respect to RALI 2006-QO4.

## C.    Syncora Is Not Barred From Asserting Cure Claims

73.     Syncora is entitled to assert cure claims against GMACM for BSSLT 2007-SV1 and

STACS 2007-1.  The amount of Syncora's cure claim is to be determined after an evidentiary hearing.[25]

74.     The Debtors argue that the September 28, 2012 Cure Claims Bar Date applies by virtue

of the Sale Motion.  Obj. 2 ¶ 12.  In addition to the arguments advanced in Syncora's objection to

Assume and Assign Servicing-Related Agreements for Trusts Insured by Syncora to Ocwen Loan

Servicing, LLC [Dkt. No. 4870], the Cure Claims Bar Date does not preclude Syncora's Cure Claims for

BSSLT 2007-SV1 and STACS 2007-1.

75.     Syncora's Cure Claims were timely asserted by virtue of the timely filed Notice of Cure

Claims filed by Wells Fargo for BSSLT 2007-SV1 and STACS 2007-1 (the "Wells Fargo Notice") [Dkt.

No. 3454].  The Wells Fargo Notice was filed by Wells Fargo as Trustee and Master Servicer of all the

RMBS Trusts listed in Schedule A thereto.  Schedule A lists both BSSLT 2007-SV1 and STACS 2007-1

as trusts for which Wells Fargo gave notice of Cure Claims.  *See* Wells Fargo Notice Schedule A at 2, 9.

The Wells Fargo Notice also gives notice of Cure Claims held by "monoline insurers" and "certificate

insurers" of the RMBS Trusts.  *Id.* ¶¶ 19 n.17, 43.

76.     Thus, the Wells Fargo Notice properly gave timely notice that there were Cure Claims

held by both the trusts and by "monoline insurers" such as Syncora for the two Syncora trusts,

notwithstanding the Debtors' arguments to the contrary (see Obj. 2 ¶¶ 3, 9 n.5, 12).  The cure claims

asserted in the Amended Proof of Claim against GMACM, citing to the specific provisions of the Bear

Stearns and SunTrust servicing agreements (among other bases), describe Syncora's "monoline insurer"

claims under the "Servicing Agreements" and "applicable transaction documents" that are referenced in

the Wells Fargo Notice with greater particularity and should be allowed to relate back to the timely filed

Wells Fargo Notice of Cure Claims.  *See In re Enron*, 419 F.3d at 133 (stating rule that late-filed

---

[25] The Debtors' arguments based upon the Cure Claims Bar Date have no bearing upon Syncora's claims against RFC in respect of RALI because the Debtors' Assumption Notice never proposed assumption of any agreements concerning RALI.  Nevertheless, Syncora previously stated in the fall of 2012 in its Supplemental Objection to the Debtors' Sale Motion [Dct. No. 1996] that it may have cure claims as high as $457 million.  *See* Supplemental Objection at 6 n.6.

amendment must be allowed if it "describes the original claim with greater particularity"); *In re Miss Glamour Coat Co., Inc.*, 1980 WL 1668, at *5 (S.D.N.Y. Oct. 8, 1980) (allowing late-filed claim that provided "amplification" to timely claim).

77.    Moreover, it is irrelevant that the timely Wells Fargo Notice was filed by Wells Fargo, and not Syncora.  Acting in its capacity as Master Servicer of the Bear Stearns and SunTrust transactions (Wells Fargo Notice ¶ 1), Wells Fargo was the party charged to enforce the Servicers' obligations on behalf of Syncora and its subrogors, the certificateholders.  Bear Stearns Servicing Agreement § 4.02(b); SunTrust Servicing Agreement § 4.03(b).  As such, Wells Fargo acted as agent for Syncora and the certificateholders in BSSLT 2007-SV1 and the certificateholders in STACS 2007-1, in whose shoes Syncora became entitled to stand when it paid claims.[26]

78.    As noted above, it is permissible for an agent of a claimant to file a proof of claim on behalf of the claim holder, and then later have an amendment filed to identify the principal as the true holder of the claim in the place of the agent.  Such filings will be deemed timely because they "relate back" to the claim timely filed by the agent.  Wells Fargo filed its Wells Fargo Notice of cure claims on behalf of "certificate insurers" and "monoline insurers" (Wells Fargo Notice ¶¶ 19 n.17, 43) for STACS 2007-1 (*id.* Schedule A at 9) and BSSLT 2007-SV1 (*id.* at 2).  Accordingly, Syncora's Amended Proof of Claim which identifies Syncora as the "certificate insurer" or "monoline insurer" holding such Cure Claims with respect to STACS 2007-1 and BSSLT 2007-SV1 should not be expunged as untimely.

79.    The equities also favor permitting Syncora to assert cure claims against GMACM with respect to the two Syncora trusts.  There will not be any undue prejudice to GMACM or other creditors because all parties were timely notified of "monoline insurer" and "certificate insurer" claims for BSSLT 2007-SV1 and STACS 2007-1 in the Wells Fargo Notice of Cure Claims.  The Amended Proof of Claim merely provides further particularity as to the nature and amount of Syncora's cure claims.  Permitting the cure claims would also not affect the Debtors' reorganization efforts because there has

---

[26] *See, e.g.,* SunTrust I&I § 3.07; Bear Stearns I&I § 3.07.

been no suggestion that the proceeds of the proposed sale of the servicing rights with respect to the trusts in question is so material that the Debtors will be unable to reorganize without those proceeds.

80.        Further, the equities favor Syncora as the policy of the Bankruptcy Code is that certain defaults under executory contracts, including pecuniary losses, must be satisfied as a condition of assumption of such contracts.  11 U.S.C. § 365(b).  It is not inequitable to require the Debtors to comply with their statutory obligations.

## II.        The Debtors' Arguments Against the Merits of Syncora's Claims Are Erroneous

### A.        Causation Exists

81.        In a series of misguided arguments, the Debtors contend that Syncora's servicing claims suffer from a lack of causation.  Obj. 2 ¶¶ 54-61.  As in their First Objection, the Debtors are wrong.

82.        First, in an attempt to pass the blame, the Debtors contend that Syncora's failure-to-notice claims fail because the Trustee and Servicers could not have ensured that the Sponsors would have responded affirmatively to the Trustee's repurchase demands, and thus the principal losses would have occurred despite the Servicer's notice.  Obj. 2 at 24.  In the case of RALI, the Debtors' assertion makes no sense because the Master Servicer and Sponsor are one in the same – RFC itself.  Moreover, the Debtors conspicuously fail to cite any legal authority for the proposition.  Although a plaintiff's claims may fail where the plaintiff itself was the sole proximate cause of its loss, *see*, *e.g.*, *Compania Sud Americana De Vapores, S.A. v. I.T.O. Corp. of Baltimore*, 940 F. Supp. 855, 871 (D. Md. 1996), that is not the assertion here.  In addition, intervening cause defenses have no application to breach of contract claims.  *See Abdallah v. Caribbean Sec. Agency*, 557 F.2d 61, 64 (3d Cir. 1977).

83.        Second, the Debtors' argue that Syncora's and the Trustees' general knowledge of distress in the RMBS securitizations at issue already put them on notice of that which the Servicers were supposed to inform the Trustee.  The Debtors have completely missed the point.  It is not the general knowledge of loan delinquency or default rates that would put the Trustees in a position to enforce a Sponsor's repurchase obligations.  Rather, the Trustees can only enforce repurchase remedies for

*specific defective loans* that the Servicers bring to their attention.  Generalized knowledge of transaction

distress does not in itself yield specific loan numbers or representation and warranty breaches upon

which to base a repurchase demand.

84.      Third, the Debtors place great emphasis on the fact that the Trustee for STACS 2007-1

already has "put back" loans to the Sponsor for repurchase, suggesting that the remedial steps that

Syncora has accused the Servicer of failing to take have been mooted.  They have not.  In the STACS

2007-1 transaction, only 1,445 out of 3,617 mortgage loans were the subject of the Trustee's repurchase

demands, *see* Obj. 2 Exh. 11 ¶¶ 35, 38, 40, just 39.9% of the loans in a pool in which *63%* of the loans

have defaulted.  As such, notwithstanding the portion of defective loans detected by the certificate

holders and Syncora and put back to the Sponsor, there remained twice as many defaulted loans, the vast

majority of which likely were also infected with breached representations and warranties and could have

provided a sufficient basis for avoiding the principal losses that caused Syncora to pay claims.

      **B.**      **The Governing Agreements Expressly Provide for Syncora's Claims**

85.      Contrary to the Debtors' recitation of isolated snippets of language from the servicing

agreements, as discussed in detail *supra* at 5-10, the agreements plainly impose an obligation on the

Servicers, RFC and GMACM, to alert the Trustee to mortgage loans breaching representations and

warranties.  In RALI, the obligation is express and unequivocal: upon discovery of the breach, RFC

"shall give prompt written notice to" the Trustee.  In BSSLT 2007-SV1 and STACS 2007-1, the

obligation is embodied in the obligations to (i) maximize the receipt of principal and interest, (ii)

exercise the same care and diligence as if the loans were its own, and (iii) adhere to prudent industry

practices, as typified by the foregoing express notice obligation in RALI and as cited by the RMBS

Trustees, who have a broad view of the servicing industry, in their own proofs of claim.  Discovery and

expert testimony will further demonstrate that, with borrower loan, income, debt and primary residence

information in its hands as servicers, the Servicers were well positioned to maximize recoveries through

repurchase rather than partial-recovery foreclosure.

86.     The Debtors' assertion that remedies against the mortgage loan sponsors under the Bear Stearns and SunTrust I&Is indicates the claim is against the sponsors not the servicers (Obj. 2 at 27-28) again misses the point.  Notwithstanding a remedy against a sponsor, the servicer expressly promised it would perform the above servicing obligations, as an inducement to Syncora to issue the Policy.  Bear Stearns I&I § 2.04(f); SunTrust I&I § 2.02(a) & (m).  Syncora has a direct claim for damages against GMACM for having breached its promises, notwithstanding separate remedies against the sponsors.[27]

### C.     The Economic Loss Rule Does Not Bar Syncora's Negligence Claims

87.     The Debtors misread New York law in arguing that Syncora's claims against RFC and GMACM for negligence is barred by the economic loss rule.  The New York Court of Appeals has made clear that the economic loss rule only applies in the products liability context.  *See 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc*., 96 N.Y.2d 280, 288 n.1 (N.Y. 2001) (stating that economic loss rule "has no application" outside products liability context); *Travelers Cas. and Sur. Co*., 734 F. Supp. 2d at 378 n.15 ("The New York Court of Appeals has admonished, however, that the 'economic loss rule' should not be used outside of the product-liability context[.]").  Moreover, Syncora has not been able to find any case authority rejecting a negligence claim on the facts present here, where the Debtors reasonably foresaw that their failure to maximize recoveries on defective mortgage loans by alerting the Trustee to repurchase opportunities would cause damage to Syncora in claims payments and remediation.  Accordingly, Syncora's negligence claims remain independently viable.

---

[27] Although the plain language of the I&Is' separate indemnification provisions (indemnifying Syncora against "any and all losses" caused by GMACM) also provides Syncora with a remedy, whether or not the Debtors' lengthy argument why it contends the indemnification clause does not apply (Obj. 2 at 29-31) is largely irrelevant given Syncora's direct claim for breach of the I&I.

88.     Insofar as the Debtors also have argued that Syncora's negligence claims duplicate its contract claims, if the Debtors are correct that Syncora's contract claims are not viable, then the Debtors' duplication and economic loss rule arguments have no application.[28]

### III.  Syncora Is Entitled to Obtain Discovery On Its Proof Of Claim

89.     Objections to proofs of claim constitute "contested matters" subject to Bankruptcy Rule 9014, *In re AMR Corp.*, 2013 WL 1155434, at *3 (S.D.N.Y. March 21, 2013), which entitles the parties to conduct discovery on their claims prior to final adjudication by the Court:

> An objection to a proof of claim merely commences the litigation. It joins the issue and nothing more. The claims litigation then proceeds as a contested matter pursuant to F.R.B.P. 9014 which permits the entire range of discovery mechanisms under the Federal Rules of Civil Procedure . . . .

*See In re Coates*, 292 B.R. 894, 902 (Bankr. C.D. Ill. 2003).  Syncora has a statutory right to discovery under Bankruptcy Rule 9014 before any ruling on the Debtors' claim objection.

90.     Moreover, notions of due process arise in contested matters.  *In re Great A. & P. Tea Co., Inc.*, 2011 WL 5546954, at *9 (S.D.N.Y. Nov. 14, 2011) ("due process requirements apply in motion proceedings (*i.e.*, contested proceedings) under Bankruptcy Rule 9014(b)").  Therefore, the Court should reject the Debtors' attempt to disallow Syncora's Proof of Claim on hyper-technical grounds that fail to address the substance of Syncora's claims.  *In re Sacko*, 394 B.R. 90, 99 (Bankr. E.D. Pa. 2008) ("The fundamental purpose of the claims allowance process and the various rules for filing of proofs of claim and allocating burdens of proof is to provide a fair and inexpensive procedure for the proper determination of claims on the merits [which] do not envision the determination of claims based on procedural technicalities").  Notions of due process and equity prohibit the Court from dismissing Syncora's claims without giving Syncora an opportunity to obtain discovery on its claims.

---

[28] For reasons not clear, the Debtors argue at length that the Trustees of the Syncora transactions did or could have asserted repurchase claims prior to expiration of the statute of limitations six years following the date each deal closed. That is not the applicable statute for Syncora's claims in any event, which accrued each time the Servicers failed to alert the Trustee to a loan it had discovered breached representations and warranties, a claim that is subject to a continuing breach such that none of the claims have expired. *Gruby v. Brady*, 838 F. Supp. 820, 831 (S.D.N.Y. 1993) (extending statute of limitations based on defendant-trustees' "continuing obligation to monitor the Fund's financial condition").

## <u>CONCLUSION</u>

WHEREFORE, Syncora respectfully requests that the Court deny the Objection, Order the

Debtors to submit to discovery pursuant to Bankruptcy Rule 9014, and enter such other and further

relief as is just and proper.

Date:    New York, New York
         October 15, 2013

WOLLMUTH MAHER & DEUTSCH LLP


By:  _____/s/ Paul R. DeFilippo_____
         Paul R. DeFilippo
         Randall R. Rainer
         Fletcher W. Strong

500 Fifth Avenue
New York, New York 10110
(212) 382-3300

*Attorneys for Syncora Guarantee Inc.*