EXHIBIT I

FORM OF TRANSFEROR REPRESENTATION LETTER

_____, 20_

Residential Accredit Loans, Inc.
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, MN 55437

_____
_____
_____

Attention: Residential Funding Corporation Series ____-___

Re:    Mortgage Asset-Backed Pass-Through Certificates,
Series ____-___, [Class B-] _____

Ladies and Gentlemen:

In connection with the sale by _____(the "Seller") to _____ (the "Purchaser") of $_____ Initial Certificate Principal Balance of Mortgage Asset-Backed Pass-Through Certificates, Series ____-___, Class _ (the "Certificates"), issued pursuant to the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of _____ 1, ____ among Residential Accredit Loans, Inc., as seller (the "Company"), Residential Funding Corporation, as master servicer, and _____, as trustee (the "Trustee"). The Seller hereby certifies, represents and warrants to, and covenants with, the Company and the Trustee that:

Neither the Seller nor anyone acting on its behalf has (a) offered, pledged, sold, disposed of or otherwise transferred any Certificate, any interest in any Certificate or any other similar security to any person in any manner, (b) has solicited any offer to buy or to accept a pledge, disposition or other transfer of any Certificate, any interest in any Certificate or any other similar security from any person in any manner, (c) has otherwise approached or negotiated with respect to any Certificate, any interest in any Certificate or any other similar security with any person in any manner, (d) has made any general solicitation by means of general advertising or in any other manner, or (e) has taken any other action, that (as to any of (a) through (e) above) would constitute a distribution of the Certificates under the Securities Act of 1933 (the "Act"), that would render the disposition of any Certificate a violation of Section 5 of the Act or any state securities law, or that would require registration or qualification pursuant thereto. The Seller will not act, in any manner set forth in the foregoing sentence with respect to any Certificate. The Seller has not and will not sell or otherwise transfer any of the Certificates, except in compliance with the provisions of the Pooling and Servicing Agreement.

Very truly yours,

_____

(Seller)


By:_____
Name:_____
Title:_____

EXHIBIT J

[FORM OF RULE 144A INVESTMENT REPRESENTATION]

Description of Rule 144A Securities, including numbers:

_____

_____

_____

_____

The undersigned seller, as registered holder (the "Seller"), intends to transfer the Rule 144A Securities described above to the undersigned buyer (the "Buyer").

1.      In connection with such transfer and in accordance with the agreements pursuant to which the Rule 144A Securities were issued, the Seller hereby certifies the following facts: Neither the Seller nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Rule 144A Securities under the Securities Act of 1933, as amended (the "1933 Act"), or that would render the disposition of the Rule 144A Securities a violation of Section 5 of the 1933 Act or require registration pursuant thereto, and that the Seller has not offered the Rule 144A Securities to any person other than the Buyer or another "qualified institutional buyer" as defined in Rule 144A under the 1933 Act.

2.      The Buyer warrants and represents to, and covenants with, the Seller, the Trustee and the Master Servicer (as defined in the Pooling and Servicing Agreement (the "Agreement"), dated as of _____ 1, ____ among Residential Funding Corporation as Master Servicer, Residential Accredit Loans, Inc. as depositor pursuant to Section 5.02 of the Agreement and _____, as trustee, as follows:

(a)      The Buyer understands that the Rule 144A Securities have not been registered under the 1933 Act or the securities laws of any state.

(b)      The Buyer considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Rule 144A Securities.

(c)    The Buyer has been furnished with all information regarding the Rule 144A Securities that it has requested from the Seller, the Trustee or the Servicer.

(d)    Neither the Buyer nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Rule 144A Securities under the 1933 Act or that would render the disposition of the Rule 144A Securities a violation of Section 5 of the 1933 Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Rule 144A Securities.

(e)    The Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the 1933 Act and has completed either of the forms of certification to that effect attached hereto as Annex 1 or Annex 2.  The Buyer is aware that the sale to it is being made in reliance on Rule 144A.  The Buyer is acquiring the Rule 144A Securities for its own account or the accounts of other qualified institutional buyers, understands that such Rule 144A Securities may be resold, pledged or transferred only (i) to a person reasonably believed to be a qualified institutional buyer that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A, or (ii) pursuant to another exemption from registration under the 1933 Act.

[3.    The Buyer

[(a)    is not an employee benefit or other plan subject to the prohibited transaction provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (a "Plan"), or any other person (including an investment manager, a named fiduciary or a trustee of any Plan) acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any Plan within the meaning of the Department of Labor ("DOL") regulation at 29 C.F.R. § 2510.3-101][1]; or

(b)    is an insurance company, the source of funds to be used by it to purchase the Certificates is an "insurance company general account" (within the meaning of DOL Prohibited Transaction Class Exemption ("PTCE") 95-60), and the purchase is being made in reliance upon the availability of the exemptive relief afforded under Sections I and III of PTCE 95-60.][2]

---

[1] Only paragraph (a) for Class P Certificates.
[2] Class B Certificateholders may represent to either (a) or (b).

4.     This document may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same document.

IN WITNESS WHEREOF, each of the parties has executed this document as of the date set forth below.

| | |
|---|---|
| _____ | _____ |
| Print Name of Seller | Print Name of Buyer |
| By:_____ | By:_____ |
|    Name: |    Name: |
|    Title: |    Title: |
| Taxpayer Identification | Taxpayer Identification: |
| No._____ | No:_____ |
| Date:_____ | Date:_____ |

### QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

[For Buyers Other Than Registered Investment Companies]

The undersigned hereby certifies as follows in connection with the Rule 144A Investment Representation to which this Certification is attached:

1.      As indicated below, the undersigned is the President, Chief Financial Officer, Senior Vice President or other executive officer of the Buyer.

2.      In connection with purchases by the Buyer, the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because (i) the Buyer owned and/or invested on a discretionary basis $_____ in securities (except for the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A) and (ii) the Buyer satisfies the criteria in the category marked below.

—    <u>Corporation, etc.</u> The Buyer is a corporation (other than a bank, savings and loan association or similar institution), Massachusetts or similar business trust, partnership, or charitable organization described in Section 501(c)(3) of the Internal Revenue Code.

—    <u>Bank.</u> The Buyer (a) is a national bank or banking institution organized under the laws of any State, territory or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official or is a foreign bank or equivalent institution, and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, <u>a copy of which is attached hereto.</u>

—    <u>Savings and Loan.</u> The Buyer (a) is a savings and loan association, building and loan association, cooperative bank, homestead association or similar institution, which is supervised and examined by a State or Federal authority having supervision over any such institutions or is a foreign savings and loan association or equivalent institution and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements.

—    <u>Broker-Dealer.</u> The Buyer is a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

—    <u>Insurance Company.</u> The Buyer is an insurance company whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies and which is subject to supervision by the insurance commissioner or a similar official or agency of a State or territory or the District of Columbia.

— <u>State or Local Plan</u>. The Buyer is a plan established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees.

— <u>ERISA Plan</u>. The Buyer is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974.

— <u>Investment Adviser</u>. The Buyer is an investment adviser registered under the Investment Advisers Act of 1940.

— <u>SBIC</u>. The Buyer is a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

— <u>Business Development Company</u>. The Buyer is a business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

— <u>Trust Fund</u>. The Buyer is a trust fund whose trustee is a bank or trust company and whose participants are exclusively (a) plans established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees, or (b) employee benefit plans within the meaning of Title I of the Employee Retirement Income Security Act of 1974, but is not a trust fund that includes as participants individual retirement accounts or H.R. 10 plans.

3.     The term "<u>securities</u>" as used herein <u>does not include</u> (i) securities of issuers that are affiliated with the Buyer, (ii) securities that are part of an unsold allotment to or subscription by the Buyer, if the Buyer is a dealer, (iii) bank deposit notes and certificates of deposit, (iv) loan participations, (v) repurchase agreements, (vi) securities owned but subject to a repurchase agreement and (vii) currency, interest rate and commodity swaps.

4.     For purposes of determining the aggregate amount of securities owned and/or invested on a discretionary basis by the Buyer, the Buyer used the cost of such securities to the Buyer and did not include any of the securities referred to in the preceding paragraph. Further, in determining such aggregate amount, the Buyer may have included securities owned by subsidiaries of the Buyer, but only if such subsidiaries are consolidated with the Buyer in its financial statements prepared in accordance with generally accepted accounting principles and if the investments of such subsidiaries are managed under the Buyer's direction. However, such securities were not included if the Buyer is a majority-owned, consolidated subsidiary of another enterprise and the Buyer is not itself a reporting company under the Securities Exchange Act of 1934.

5.     The Buyer acknowledges that it is familiar with Rule 144A and understands that the seller to it and other parties related to the Certificates are relying and will continue to rely on the statements made herein because one or more sales to the Buyer may be in reliance on Rule 144A.

_____   _____   Will the Buyer be purchasing the Rule 144A
Yes        No        Securities only for the Buyer's own account?

      6.    If the answer to the foregoing question is "no", the Buyer agrees that, in connection with any purchase of securities sold to the Buyer for the account of a third party (including any separate account) in reliance on Rule 144A, the Buyer will only purchase for the account of a third party that at the time is a "qualified institutional buyer" within the meaning of Rule 144A.  In addition, the Buyer agrees that the Buyer will not purchase securities for a third party unless the Buyer has obtained a current representation letter from such third party or taken other appropriate steps contemplated by Rule 144A to conclude that such third party independently meets the definition of "qualified institutional buyer" set forth in Rule 144A.

      7.    The Buyer will notify each of the parties to which this certification is made of any changes in the information and conclusions herein.  Until such notice is given, the Buyer's purchase of Rule 144A Securities will constitute a reaffirmation of this certification as of the date of such purchase.

 

_____
Print Name of Buyer

By:   _____
        Name:
        Title:

Date:_____

ANNEX 2 TO EXHIBIT J

## QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

[For Buyers That Are Registered Investment Companies]

The undersigned hereby certifies as follows in connection with the Rule 144A Investment Representation to which this Certification is attached:

8.     As indicated below, the undersigned is the President, Chief Financial Officer or Senior Vice President of the Buyer or, if the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because Buyer is part of a Family of Investment Companies (as defined below), is such an officer of the Adviser.

9.     In connection with purchases by Buyer, the Buyer is a "qualified institutional buyer" as defined in SEC Rule 144A because (i) the Buyer is an investment company registered under the Investment Company Act of 1940, and (ii) as marked below, the Buyer alone, or the Buyer's Family of Investment Companies, owned at least $100,000,000 in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year. For purposes of determining the amount of securities owned by the Buyer or the Buyer's Family of Investment Companies, the cost of such securities was used.

—     The Buyer owned $_____ in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

—     The Buyer is part of a Family of Investment Companies which owned in the aggregate $_____ in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

10.     The term "Family of Investment Companies" as used herein means two or more registered investment companies (or series thereof) that have the same investment adviser or investment advisers that are affiliated (by virtue of being majority owned subsidiaries of the same parent or because one investment adviser is a majority owned subsidiary of the other).

11.     The term "securities" as used herein does not include (i) securities of issuers that are affiliated with the Buyer or are part of the Buyer's Family of Investment Companies, (ii) bank deposit notes and certificates of deposit, (iii) loan participations, (iv) repurchase agreements, (v) securities owned but subject to a repurchase agreement and (vi) currency, interest rate and commodity swaps.

12.     The Buyer is familiar with Rule 144A and understands that each of the parties to which this certification is made are relying and will continue to rely on the statements made herein because one or more sales to the Buyer will be in reliance on Rule 144A. In addition, the Buyer will only purchase for the Buyer's own account.

13.     The undersigned will notify each of the parties to which this certification is made of any changes in the information and conclusions herein.  Until such notice, the Buyer's purchase of Rule 144A Securities will constitute a reaffirmation of this certification by the undersigned as of the date of such purchase.

_____

Print Name of Buyer


By:    _____

      Name:_____

      Title:_____


IF AN ADVISER:


_____

Print Name of Buyer


Date:_____

EXHIBIT K

[TEXT OF AMENDMENT TO POOLING AND SERVICING
AGREEMENT PURSUANT TO SECTION 11.01(E) FOR A
LIMITED GUARANTY]

ARTICLE XIII

Subordinate Certificate Loss Coverage; Limited Guaranty

Section 13.01.  Subordinate Certificate Loss Coverage; Limited Guaranty.  (a)
Subject to subsection (c) below, prior to the later of the third Business Day prior to each
Distribution Date or the related Determination Date, the Master Servicer shall determine whether
it or any Sub-Servicer will be entitled to any reimbursement pursuant to Section 4.02(a) on such
Distribution Date for Advances or Sub-Servicer Advances previously made, (which will not be
Advances or Sub-Servicer Advances that were made with respect to delinquencies which were
subsequently determined to be Excess Special Hazard Losses, Excess Fraud Losses, Excess
Bankruptcy Losses or Extraordinary Losses) and, if so, the Master Servicer shall demand
payment from Residential Funding of an amount equal to the amount of any Advances or Sub-
Servicer Advances reimbursed pursuant to Section 4.02(a), to the extent such Advances or Sub-
Servicer Advances have not been included in the amount of the Realized Loss in the related
Mortgage Loan,  and shall distribute the same to the Class B Certificateholders in the same
manner as if such amount were to be distributed pursuant to Section 4.02(a).

(b)    Subject to subsection (c) below, prior to the later of the third Business Day
prior to each Distribution Date or the related Determination Date, the Master Servicer shall
determine whether any Realized Losses (other than Excess Special Hazard Losses, Excess
Bankruptcy Losses, Excess Fraud Losses and Extraordinary Losses) will be allocated to the
Class B Certificates on such Distribution Date pursuant to Section 4.05, and, if so, the Master
Servicer shall demand payment from Residential Funding of the amount of such Realized Loss
and shall distribute the same to the Class B Certificateholders in the same manner as if such
amount were to be distributed pursuant to Section 4.02(a); provided, however, that the amount of
such demand in respect of any Distribution Date shall in no event be greater than the sum of (i)
the additional amount of Accrued Certificate Interest that would have been paid for the Class B
Certificateholders on such Distribution Date had such Realized Loss or Losses not occurred plus
(ii) the amount of the reduction in the Certificate Principal Balances of the Class B Certificates
on such Distribution Date due to such Realized Loss or Losses.  Notwithstanding such payment,
such Realized Losses shall be deemed to have been borne by the Certificateholders for purposes
of Section 4.05.  Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses
and Extraordinary Losses allocated to the Class B Certificates will not be covered by the
Subordinate Certificate Loss Obligation.

(c)    Demands for payments pursuant to this Section shall be made prior to the
later of the third Business Day prior to each Distribution Date or the related Determination Date
by the Master Servicer with written notice thereof to the Trustee.  The maximum amount that
Residential Funding shall be required to pay pursuant to this Section on any Distribution Date

(the "Amount Available") shall be equal to the lesser of (X) _____ minus the sum of (i) all previous payments made under subsections (a) and (b) hereof and (ii) all draws under the Limited Guaranty made in lieu of such payments as described below in subsection (d) and (Y) the then outstanding Certificate Principal Balances of the Class B Certificates, or such lower amount as may be established pursuant to Section 13.02. Residential Funding's obligations as described in this Section are referred to herein as the "Subordinate Certificate Loss Obligation."

(d)     The Trustee will promptly notify General Motors Acceptance Corporation of any failure of Residential Funding to make any payments hereunder and shall demand payment pursuant to the limited guaranty (the "Limited Guaranty"), executed by General Motors Acceptance Corporation, of Residential Funding's obligation to make payments pursuant to this Section, in an amount equal to the lesser of (i) the Amount Available and (ii) such required payments, by delivering to General Motors Acceptance Corporation a written demand for payment by wire transfer, not later than the second Business Day prior to the Distribution Date for such month, with a copy to the Master Servicer.

(e)     All payments made by Residential Funding pursuant to this Section or amounts paid under the Limited Guaranty shall be deposited directly in the Certificate Account, for distribution on the Distribution Date for such month to the Class B Certificateholders.

(f)     The Company shall have the option, in its sole discretion, to substitute for either or both of the Limited Guaranty or the Subordinate Certificate Loss Obligation another instrument in the form of a corporate guaranty, an irrevocable letter of credit, a surety bond, insurance policy or similar instrument or a reserve fund; provided that (i) the Company obtains (subject to the provisions of Section 10.01(f) as if the Company was substituted for the Master Servicer solely for the purposes of such provision) an Opinion of Counsel (which need not be an opinion of Independent counsel) to the effect that obtaining such substitute corporate guaranty, irrevocable letter of credit, surety bond, insurance policy or similar instrument or reserve fund will not cause either (a) any federal tax to be imposed on the Trust Fund, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860(F)(a)(1) of the Code or on "contributions after the startup date" under Section 860(G)(d)(1) of the Code or (b) the Trust Fund to fail to qualify as a REMIC at any time that any Certificate is outstanding, and (ii) no such substitution shall be made unless (A) the substitute Limited Guaranty or Subordinate Certificate Loss Obligation is for an initial amount not less than the then current Amount Available and contains provisions that are in all material respects equivalent to the original Limited Guaranty or Subordinate Certificate Loss Obligation (including that no portion of the fees, reimbursements or other obligations under any such instrument will be borne by the Trust Fund), (B) the long term debt obligations of any obligor of any substitute Limited Guaranty or Subordinate Certificate Loss Obligation (if not supported by the Limited Guaranty) shall be rated at least the lesser of (a) the rating of the long term debt obligations of General Motors Acceptance Corporation as of the date of issuance of the Limited Guaranty and (b) the rating of the long term debt obligations of General Motors Acceptance Corporation at the date of such substitution and (C) the Company obtains written confirmation from each nationally recognized credit rating agency that rated the Class B Certificates at the request of the Company that such substitution shall not lower the rating on the Class B Certificates below the lesser of (a) the then-current rating assigned to the Class B Certificates by such rating agency and (b) the original rating assigned to the Class B Certificates by such rating agency. Any replacement of the

K-2

Limited Guaranty or Subordinate Certificate Loss Obligation pursuant to this Section shall be accompanied by a written Opinion of Counsel to the substitute guarantor or obligor, addressed to the Master Servicer and the Trustee, that such substitute instrument constitutes a legal, valid and binding obligation of the substitute guarantor or obligor, enforceable in accordance with its terms, and concerning such other matters as the Master Servicer and the Trustee shall reasonably request. Neither the Company, the Master Servicer nor the Trustee shall be obligated to substitute for or replace the Limited Guaranty or Subordinate Certificate Loss Obligation under any circumstance.

Section 13.02. Amendments Relating to the Limited Guaranty. Notwithstanding Sections 11.01 or 13.01: (i) the provisions of this Article XIII may be amended, superseded or deleted, (ii) the Limited Guaranty or Subordinate Certificate Loss Obligation may be amended, reduced or canceled, and (iii) any other provision of this Agreement which is related or incidental to the matters described in this Article XIII may be amended in any manner; in each case by written instrument executed or consented to by the Company and Residential Funding but without the consent of any Certificateholder and without the consent of the Master Servicer or the Trustee being required unless any such amendment would impose any additional obligation on, or otherwise adversely affect the interests of, the Master Servicer or the Trustee, as applicable; provided that the Company shall also obtain a letter from each nationally recognized credit rating agency that rated the Class B Certificates at the request of the Company to the effect that such amendment, reduction, deletion or cancellation will not lower the rating on the Class B Certificates below the lesser of (a) the then-current rating assigned to the Class B Certificates by such rating agency and (b) the original rating assigned to the Class B Certificates by such rating agency, unless (A) the Holder of 100% of the Class B Certificates is Residential Funding or an Affiliate of Residential Funding, or (B) such amendment, reduction, deletion or cancellation is made in accordance with Section 11.01(e) and, provided further that the Company obtains (subject to the provisions of Section 10.01(f) as if the Company was substituted for the Master Servicer solely for the purposes of such provision), in the case of a material amendment or supercession (but not a reduction, cancellation or deletion of the Limited Guaranty or the Subordinate Certificate Loss Obligation), an Opinion of Counsel (which need not be an opinion of Independent counsel) to the effect that any such amendment or supercession will not cause either (a) any federal tax to be imposed on the Trust Fund, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code or (b) the Trust Fund to fail to qualify as a REMIC at any time that any Certificate is outstanding. A copy of any such instrument shall be provided to the Trustee and the Master Servicer together with an Opinion of Counsel that such amendment complies with this Section 13.02.

EXHIBIT L

[FORM OF LIMITED GUARANTY]

LIMITED GUARANTY

RESIDENTIAL ACCREDIT LOANS, INC.

Mortgage Asset-Backed Pass-Through Certificates
Series _____-____

_____, 200__

_____
_____
_____

Attention:  Residential Funding Corporation Series _____-____

Ladies and Gentlemen:

WHEREAS, Residential Funding Corporation, a Delaware corporation ("Residential Funding"), an indirect wholly-owned subsidiary of General Motors Acceptance Corporation, a New York corporation ("GMAC"), plans to incur certain obligations as described under Section 13.01 of the Pooling and Servicing Agreement dated as of _____ 1, ____ (the "Servicing Agreement"), among Residential Accredit Loans, Inc. (the "Company"), Residential Funding and _____ (the "Trustee") as amended by Amendment No. ___ thereto, dated as of _____, with respect to the Mortgage Asset-Backed Pass-Through Certificates, Series _____-___ (the "Certificates"); and

WHEREAS, pursuant to Section 13.01 of the Servicing Agreement, Residential Funding agrees to make payments to the Holders of the Class B Certificates with respect to certain losses on the Mortgage Loans as described in the Servicing Agreement; and

WHEREAS, GMAC desires to provide certain assurances with respect to the ability of Residential Funding to secure sufficient funds and faithfully to perform its Subordinate Certificate Loss Obligation;

NOW THEREFORE, in consideration of the premises herein contained and certain other good and valuable consideration, the receipt of which is hereby acknowledged, GMAC agrees as follows:

1.   Provision of Funds. (a) GMAC agrees to contribute and deposit in the Certificate Account on behalf of Residential Funding (or otherwise provide to Residential Funding, or to cause to be made available to Residential Funding), either directly or through a subsidiary, in any case prior to the related Distribution Date, such moneys as may be required by

Residential Funding to perform its Subordinate Certificate Loss Obligation when and as the same arises from time to time upon the demand of the Trustee in accordance with Section 13.01 of the Servicing Agreement.

(b)     The agreement set forth in the preceding clause (a) shall be absolute, irrevocable and unconditional and shall not be affected by the transfer by GMAC or any other person of all or any part of its or their interest in Residential Funding, by any insolvency, bankruptcy, dissolution or other proceeding affecting Residential Funding or any other person, by any defense or right of counterclaim, set-off or recoupment that GMAC may have against Residential Funding or any other person or by any other fact or circumstance. Notwithstanding the foregoing, GMAC's obligations under clause (a) shall terminate upon the earlier of (x) substitution for this Limited Guaranty pursuant to Section 13.01(f) of the Servicing Agreement, or (y) the termination of the Trust Fund pursuant to the Servicing Agreement.

2.     Waiver. GMAC hereby waives any failure or delay on the part of Residential Funding, the Trustee or any other person in asserting or enforcing any rights or in making any claims or demands hereunder. Any defective or partial exercise of any such rights shall not preclude any other or further exercise of that or any other such right. GMAC further waives demand, presentment, notice of default, protest, notice of acceptance and any other notices with respect to this Limited Guaranty, including, without limitation, those of action or nonaction on the part of Residential Funding or the Trustee.

3.     Modification, Amendment and Termination. This Limited Guaranty may be modified, amended or terminated only by the written agreement of GMAC and the Trustee and only if such modification, amendment or termination is permitted under Section 13.02 of the Servicing Agreement. The obligations of GMAC under this Limited Guaranty shall continue and remain in effect so long as the Servicing Agreement is not modified or amended in any way that might affect the obligations of GMAC under this Limited Guaranty without the prior written consent of GMAC.

4.     Successor. Except as otherwise expressly provided herein, the guarantee herein set forth shall be binding upon GMAC and its respective successors.

5.     Governing Law. This Limited Guaranty shall be governed by the laws of the State of New York.

6.     Authorization and Reliance. GMAC understands that a copy of this Limited Guaranty shall be delivered to the Trustee in connection with the execution of Amendment No. 1 to the Servicing Agreement and GMAC hereby authorizes the Company and the Trustee to rely on the covenants and agreements set forth herein.

7.     Definitions. Capitalized terms used but not otherwise defined herein shall have the meaning given them in the Servicing Agreement.

8.     Counterparts. This Limited Guaranty may be executed in any number of counterparts, each of which shall be deemed to be an original and such counterparts shall constitute but one and the same instrument.

IN WITNESS WHEREOF, GMAC has caused this Limited Guaranty to be executed and delivered by its respective officers thereunto duly authorized as of the day and year first above written.

GENERAL MOTORS ACCEPTANCE
CORPORATION

By:_____
Name:_____
Title:_____

Acknowledged by:

_____,
    as Trustee

By:_____
Name:_____
Title:_____

RESIDENTIAL ACCREDIT LOANS, INC.

By:_____
Name:_____
Title:_____

L-3

EXHIBIT M

FORM OF LENDER CERTIFICATION FOR ASSIGNMENT OF MORTGAGE LOAN

_____, 20_____

Residential Accredit Loans, Inc.
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota  55437

_____
_____
_____

Attention:  Residential Funding Corporation Series _____-____

Re:   Mortgage Asset-Backed Pass-Through Certificates,
Series _____-____   Assignment of Mortgage Loan   

Ladies and Gentlemen:

This letter is delivered to you in connection with the assignment by _____ (the "Trustee") to _____ (the "Lender") of _____ (the "Mortgage Loan") pursuant to Section 3.13(d) of the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of _____ 1, ____ among Residential Accredit Loans, Inc., as seller (the "Company"), Residential Funding Corporation, as Master Servicer, and the Trustee.  All terms used herein and not otherwise defined shall have the meanings set forth in the Pooling and Servicing Agreement.  The Lender hereby certifies, represents and warrants to, and covenants with, the Master Servicer and the Trustee that:

(i)      the Mortgage Loan is secured by Mortgaged Property located in a jurisdiction in which an assignment in lieu of satisfaction is required to preserve lien priority, minimize or avoid mortgage recording taxes or otherwise comply with, or facilitate a refinancing under, the laws of such jurisdiction;

(ii)      the substance of the assignment is, and is intended to be, a refinancing of such Mortgage Loan and the form of the transaction is solely to comply with, or facilitate the transaction under, such local laws;

(iii)      the Mortgage Loan following the proposed assignment will be modified to have a rate of interest at least 0.25 percent below or above the rate of interest on such Mortgage Loan prior to such proposed assignment; and

(iv)      such assignment is at the request of the borrower under the related Mortgage Loan.

Very truly yours,

_____

(Lender)

By:_____
Name:_____
Title:_____

EXHIBIT N

FORM OF REQUEST FOR EXCHANGE

[DATE]

_____
_____
_____

Re:    Residential Accredit Loans, Inc.,
        Mortgage Asset-Backed Pass-Through Certificates,
        Series ____-_____

Residential Funding Corporation, as the Holder of a ___% Percentage Interest of the [Interest Only/Class A-V][-1] Certificates, hereby requests the Trustee to exchange the above-referenced Certificates for the Subclasses referred to below:

1.    [Interest Only/Class A-V]-_ Certificates, corresponding to the following Uncertificated REMIC Regular Interests: [List numbers corresponding to the related loans and Pool Strip Rates from the Mortgage Loan Schedule]. The initial Subclass Notional Amount and the Initial Pass-Through Rate on the [Interest Only/Class A-V]-_ Certificates will be $_____ and ____%, respectively.

2.    [Repeat as appropriate.]

The Subclasses requested above will represent in the aggregate all of the Uncertificated REMIC Regular Interests represented by the [Interest Only/Class A-V][-1] Certificates surrendered for exchange.

All capitalized terms used but not defined herein shall have the meanings set forth in the Pooling and Servicing Agreement, dated as of _____ 1, ____, among Residential Accredit Loans, Inc., Residential Funding Corporation and _____, as trustee.

RESIDENTIAL FUNDING CORPORATION

By:_____
Name:
Title:

EXHIBIT O

Form of Form 10-K Certification

I, [identify the certifying individual], certify that:

1.    I have reviewed this report on Form 10-K and all reports on Form 10-D required to be filed in respect of the period covered by this report on Form 10-K of the trust (the "Exchange Act periodic reports") created pursuant to the Series Supplement dated _____ to the Standard Terms of Pooling and Servicing Agreement dated _____ (together, the "P&S Agreement") among Residential Accredit Loans, Inc., Residential Funding Corporation (the "Master Servicer") and [Name of Trustee] (the "Trustee");

2.    Based on my knowledge, the Exchange Act periodic reports, taken as a whole, do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, all of the distribution, servicing and other information required to be provided under Form 10-D for the period covered by this report is included in the Exchange Act periodic reports;

4.    I am responsible for reviewing the activities performed by the Master Servicer and based on my knowledge and the compliance review conducted in preparing the servicer compliance statement required in this report under Item 1123 of Regulation AB, and except a disclosed in the Exchange Act periodic reports, the Master Servicer has fulfilled its obligations under the P&S Agreement; and

5.    All of the reports on assessment of compliance with servicing criteria for asset-backed securities and their related attestation reports on assessment of compliance with servicing criteria for asset-backed securities required to be included in this report in accordance with Item 1122 of Regulation AB and Exchange Act Rules 13a-18 and 15d-18 have been included as an exhibit to this report, except as otherwise disclosed in this report. Any material instances of noncompliance described in such reports have been disclosed in this report on Form 10-K.

In giving the certifications above, I have reasonably relied on the information provided to me by the following unaffiliated parties: [the Trustee].

Date:_____

_____*
[Signature]
[Title:]

* to be signed by the senior officer in charge of the servicing functions of the Master Servicer

EXHIBIT P

## [FORM OF BACK-UP CERTIFICATION TO FORM 10-K CERTIFICATE]

The undersigned, a Responsible Officer of [_____] (the "Trustee") certifies that:

(a)    The Trustee has performed all of the duties specifically required to be performed by it pursuant to the provisions of the Pooling and Servicing Agreement dated as of [_____], 20[__] (the "Agreement") by and among [_____], as depositor, Residential Funding Corporation, as Master Servicer, and the Trustee in accordance with the standards set forth therein.

(b)    Based on my knowledge, the list of Certificateholders as shown on the Certificate Register as of the end of each calendar year that is provided by the Trustee pursuant to the Agreement is accurate as of the last day of the 20[__] calendar year.

Capitalized terms used and not defined herein shall have the meanings given such terms in the Agreement.

IN WITNESS WHEREOF, I have duly executed this certificate as of _____, 20__.]

Name:
Title:

**EXHIBIT Q**

## INFORMATION TO BE PROVIDED BY THE MASTER SERVICER TO THE RATING AGENCIES RELATING TO REPORTABLE MODIFIED MORTGAGE LOANS

Account number

Transaction Identifier
Unpaid Principal Balance prior to Modification
Next Due Date
Monthly Principal and Interest Payment
Total Servicing Advances
Current Interest Rate
Original Maturity Date
Original Term to Maturity (Months)
Remaining Term to Maturity (Months)
Trial Modification Indicator
Mortgagor Equity Contribution
Total Servicer Advances
Trial Modification Term (Months)
Trial Modification Start Date
Trial Modification End Date
Trial Modification Period Principal and Interest Payment
Trial Modification Interest Rate
Trial Modification Term
Rate Reduction Indicator
Interest Rate Post Modification
Rate Reduction Start Date
Rate Reduction End Date
Rate Reduction Term

Term Modified Indicator
Modified Amortization Period
Modified Final Maturity Date
Total Advances Written Off
Unpaid Principal Balance Written Off
Other Past Due Amounts Written Off
Write Off Date
Unpaid Principal Balance Post Write Off
Capitalization Indicator
Mortgagor Contribution
Total Capitalized Amount
Modification Close Date
Unpaid Principal Balance  Post Capitalization Modification
Next Payment Due Date per Modification Plan
Principal and Interest Payment Post Modification

Interest Rate Post Modification
Payment Made Post Capitalization
Delinquency Status to Modification Plan

## EXHIBIT R

### SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

The assessment of compliance to be delivered by the Trustee shall address, at a minimum, the criteria identified as below as "Applicable Servicing Criteria":

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| **Reference** | **Criteria** | |
| | **General Servicing Considerations** | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the pool assets are maintained. | |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | |
| | **Cash Collection and Administration** | |
| 1122(d)(2)(i) | Payments on pool assets are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | ✓ (as to accounts held by Trustee) |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | ✓ (as to investors only) |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of overcollateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | ✓ (as to accounts held by Trustee) |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. | |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | |

| Reference | Criteria | Applicable Servicing Criteria |
|---|---|---|
| | ***Servicing Criteria*** | |
| **Reference** | **Criteria** | |
| | **Investor Remittances and Reporting** | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of pool assets serviced by the servicer. | |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | ✓ |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the servicer's investor records, or such other number of days specified in the transaction agreements. | ✓ |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | ✓ |
| | **Pool Asset Administration** | |
| 1122(d)(4)(i) | Collateral or security on pool assets is maintained as required by the transaction agreements or related asset pool documents. | |
| 1122(d)(4)(ii) | Pool assets and related documents are safeguarded as required by the transaction agreements | |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | |
| 1122(d)(4)(iv) | Payments on pool assets, including any payoffs, made in accordance with the related pool asset documents are posted to the servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related pool asset documents. | |
| 1122(d)(4)(v) | The servicer's records regarding the pool assets agree with the servicer's records with respect to an obligor's unpaid principal balance. | |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's pool asset (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. | |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a pool asset is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent pool assets including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for pool assets with variable rates are computed based on the related pool asset documents. | |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's pool asset documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable pool asset documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related pool asset, or such other number of days specified in the transaction agreements. | |

| | Servicing Criteria | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. | |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | ✓ |
| | | |

R-3

# EXHIBIT FOUR

## CERTIFICATE POLICY OF XL CAPITAL ASSURANCE INC.

(See Tab 38)

**RESIDENTIAL ACCREDIT LOANS, INC.,**

Company,

**RESIDENTIAL FUNDING CORPORATION,**

Master Servicer,

and

**DEUTSCHE BANK TRUST COMPANY AMERICAS,**

Trustee

**SERIES SUPPLEMENT,**

Dated as of April 1, 2006,

**TO**

**STANDARD TERMS OF
POOLING AND SERVICING AGREEMENT**
dated as of March 1, 2006

Mortgage Asset-Backed Pass-Through Certificates

**Series 2006-QO4**

# TABLE OF CONTENTS

**Page**

ARTICLE I          DEFINITIONS......................................................................................... 3

    Section 1.01.          Definitions..................................................................... 3

    Section 1.02.          Determination of LIBOR ................................................ 49

    Section 1.03.          Determination of MTA ................................................... 50

    Section 1.04.          Use of Words and Phrases .............................................. 50

ARTICLE II          CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE
OF CERTIFICATES......................................................................... 51

    Section 2.01.          Conveyance of Mortgage Loans ...................................... 51

    Section 2.02.          Acceptance by Trustee ................................................... 51

    Section 2.03.          Representations, Warranties and Covenants of the Master
Servicer and the Company .............................................. 51

    Section 2.04.          Representations and Warranties of Sellers ....................... 54

    Section 2.05.          Execution and Authentication of Certificates/Issuance of
Certificates Evidencing Interests in REMIC I and REMIC II
Certificates .................................................................... 54

    Section 2.06.          Conveyance of Uncertificated Regular Interests; Acceptance by
the Trustee...................................................................... 54

    Section 2.07.          Issuance of Certificates Evidencing Interest in REMIC III .............. 55

    Section 2.08.          Purposes and Powers of the Trust.................................... 55

    Section 2.09.          Agreement Regarding Ability to Disclose ........................ 55

ARTICLE III          ADMINISTRATION AND SERVICING OF MORTGAGE LOANS......... 56

    Section 3.01          Master Servicer to Act as Servicer................................... 56

    Section 3.02          Subservicing Agreements Between Master Servicer and
Subservicers; Enforcement of Subservicers' and Sellers'
Obligations..................................................................... 56

    Section 3.03          Successor Subservicers ................................................... 56

    Section 3.04          Liability of the Master Servicer ....................................... 56

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| Section 3.05 | No Contractual Relationship Between Subservicer and Trustee or Certificateholders | 56 |
| Section 3.06 | Assumption or Termination of Subservicing Agreements by Trustee | 56 |
| Section 3.07 | Collection of Certain Mortgage Loan Payments; Deposit to Custodial Account | 56 |
| Section 3.08. | Subservicing Accounts; Servicing Accounts | 59 |
| Section 3.09. | Access to Certain Documentation and Information Regarding the Mortgage Loans | 59 |
| Section 3.10. | Permitted Withdrawals from the Custodial Account | 59 |
| Section 3.11. | Maintenance of the Primary Insurance Policies; Collections Thereunder | 59 |
| Section 3.12. | Maintenance of Fire Insurance and Omissions and Fidelity Coverage | 59 |
| Section 3.13. | Enforcement of Due-on-Sale Clauses; Assumption and Modification Agreements; Certain Assignments | 59 |
| Section 3.14. | Realization Upon Defaulted Mortgage Loans | 59 |
| Section 3.15. | Trustee to Cooperate; Release of Mortgage Files | 60 |
| Section 3.16. | Servicing and Other Compensation; Compensating Interest | 60 |
| Section 3.17. | Reports to the Trustee and the Company | 61 |
| Section 3.18. | Annual Statement as to Compliance | 61 |
| Section 3.19. | Annual Independent Public Accountants' Servicing Report | 61 |
| Section 3.20. | Rights of the Company in Respect of the Master Servicer | 61 |
| Section 3.21. | Administration of Buydown Funds | 61 |
| Section 3.22 | Advance Facility | 61 |
| ARTICLE IV | PAYMENTS TO CERTIFICATEHOLDERS | 62 |
| Section 4.01. | Certificate Account | 62 |

## TABLE OF CONTENTS
(continued)

Page

Section 4.02.    Distributions ................................................................ 62

Section 4.03.    Statements to Certificateholders; Statements to the Rating
Agencies; Exchange Act Reporting .................................................. 68

Section 4.04.    Distribution of Reports to the Trustee and the Company;
Advances by the Master Servicer ...................................................... 68

Section 4.05.    Allocation of Realized Losses .......................................... 69

Section 4.06.    Reports of Foreclosures and Abandonment of Mortgaged
Property ................................................................................................ 71

Section 4.07.    Optional Purchase of Defaulted Mortgage Loans ............................. 71

Section 4.08.    Surety Bond ....................................................................... 71

Section 4.09.    Basis Risk Shortfall Reserve Fund .................................... 71

ARTICLE V    THE CERTIFICATES ................................................. 73

ARTICLE VI    THE COMPANY AND THE MASTER SERVICER ................................... 74

ARTICLE VII    DEFAULT ............................................................. 75

ARTICLE VIII    CONCERNING THE TRUSTEE ............................................. 76

ARTICLE IX    TERMINATION .......................................................... 77

Section 9.01    Optional Purchase by the Master Servicer of All Certificates;
Termination Upon Purchase by the Master Servicer or
Liquidation of All Mortgage Loans .................................................. 77

Section 9.02    Additional Termination Requirements ............................... 81

Section 9.03    (See Section 9.03 of the Standard Terms) ......................... 82

ARTICLE X    REMIC PROVISIONS ................................................... 83

Section 10.01.    REMIC Administration .................................................. 83

Section 10.02.    Master Servicer; REMIC Administrator and Trustee
Indemnification .................................................................................. 83

Section 10.03.    Designation of REMICs ................................................. 83

Section 10.04.    Distributions on the REMIC I Regular Interests .................. 83

# TABLE OF CONTENTS
(continued)

**Page**

Section 10.05.    Compliance with Withholding Requirements .................................... 83

ARTICLE XI    MISCELLANEOUS PROVISIONS ............................................................ 85

Section 11.01.    Amendment ............................................................................................. 85

Section 11.02.    Recordation of Agreement; Counterparts .......................................... 85

Section 11.03.    Limitation on Rights of Certificateholders ........................................ 85

Section 11.04.    Governing Law ...................................................................................... 85

Section 11.05.    Notices ................................................................................................... 85

Section 11.06.    Required Notices to Rating Agency and Subservicer ........................ 86

Section 11.07.    Severability of Provisions ................................................................... 86

Section 11.08.    Supplemental Provisions for Resecuritization ................................... 86

Section 11.09.    Allocation of Voting Rights ................................................................. 86

Section 11.10.    No Petition ............................................................................................ 86

ARTICLE XII    COMPLIANCE WITH REGULATION AB ............................................. 87

ARTICLE XIII    CERTAIN MATTERS REGARDING THE CERTIFICATE
INSURER ............................................................................................... 88

Section 13.01. Rights of the Certificate Insurer to Exercise Rights of Insured
Certificateholders ............................................................................... 88

Section 13.02. Claims Upon the Certificate Policy; Certificate Insurance Account ....... 88

Section 13.03. Effect of Payments by the Certificate Insurer; Subrogation .................... 89

Section 13.04. Notices and Information to the Certificate Insurer .................................. 90

Section 13.05. Trustee to Hold Certificate Policy .......................................................... 90

Section 13.06. Insurance Premium Payments .................................................................. 91

Section 13.07. Ratings ..................................................................................................... 91

Section 13.08. Voting Rights; Amendments .................................................................... 91

Section 13.09    Termination ............................................................................................ 92

## TABLE OF CONTENTS
(continued)

**Page**

Section 13.10. Third Party Beneficiaries ......................................................................... 92

**TABLE OF CONTENTS**

**Page**

EXHIBITS

Exhibit One:   Mortgage Loan Schedule

Exhibit Two:   Information to be Included in Monthly Distribution Date Statement

Exhibit Three: Standard Terms of Pooling and Servicing Agreement, dated as of March 1, 2006

Exhibit Four:  Certificate Policy of XL Capital Assurance Inc.

This is a Series Supplement, dated as of April 1, 2006 (the "Series Supplement"), to the Standard Terms of Pooling and Servicing Agreement, dated as of March 1, 2006 and attached as Exhibit Four hereto (the "Standard Terms" and, together with this Series Supplement, the "Pooling and Servicing Agreement" or "Agreement"), among RESIDENTIAL ACCREDIT LOANS, INC., as the company (together with its permitted successors and assigns, the "Company"), RESIDENTIAL FUNDING CORPORATION, as master servicer (together with its permitted successors and assigns, the "Master Servicer"), and DEUTSCHE BANK TRUST COMPANY AMERICAS, as Trustee (together with its permitted successors and assigns, the "Trustee").

## PRELIMINARY STATEMENT:

The Company intends to sell mortgage asset-backed pass-through certificates (collectively, the "Certificates"), to be issued hereunder in multiple classes, which in the aggregate will evidence the entire beneficial ownership interest in the Mortgage Loans.

The terms and provisions of the Standard Terms are hereby incorporated by reference herein as though set forth in full herein. If any term or provision contained herein shall conflict with or be inconsistent with any provision contained in the Standard Terms, the terms and provisions of this Series Supplement shall govern. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Standard Terms. The Pooling and Servicing Agreement shall be dated as of the date of this Series Supplement.

## REMIC I

As provided herein, the REMIC Administrator will make an election to treat the segregated pool of assets consisting of the Mortgage Loans and certain other related assets subject to this Agreement (but excluding the Basis Risk Shortfall Reserve Fund) as a real estate mortgage investment conduit (a "REMIC") for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC I." The Class R-I Certificates will represent the sole Class of "residual interests" in REMIC I for purposes of the REMIC Provisions (as defined herein) under federal income tax law. The following table irrevocably sets forth the designation, remittance rate (the "Uncertificated REMIC I Pass-Through Rate") and initial Uncertificated Principal Balance for each of the "regular interests" in REMIC I (the "REMIC I Regular Interests"). The "latest possible maturity date" (determined solely for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii)) for each REMIC I Regular Interest shall be the Maturity Date. None of the REMIC I Regular Interests will be certificated.

| Designation | Uncertificated REMIC I Pass-Through Rate | Initial Uncertificated Principal Balance | Latest Possible Maturity Date |
|---|---|---|---|
| Y-1 | Variable[1] | $222,388.34 | April 25, 2046 |
| Y-2 | Variable[1] | $202,619.47 | April 25, 2046 |
| Z-1 | Variable[1] | $444,554,285.66 | April 25, 2046 |
| Z-2 | Variable[1] | $405,047,988.53 | April 25, 2046 |

---

[1] Calculated in accordance with the definition of "Uncertificated REMIC I Pass Through Rate" herein.

1

## REMIC II

As provided herein, the REMIC Administrator will make an election to treat the segregated pool of assets consisting of the REMIC I Regular Interests and certain other related assets subject to this Agreement as a real estate mortgage investment conduit (a "REMIC") for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC II." The Class R-II Certificates will represent the sole Class of "residual interests" in REMIC II for purposes of the REMIC Provisions (as defined herein) under federal income tax law. The following table irrevocably sets forth the designation, remittance rate (the "Uncertificated REMIC II Pass-Through Rate") and initial Uncertificated Principal Balance for each of the "regular interests" in REMIC II (the "REMIC II Regular Interests"). The "latest possible maturity date" (determined solely for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii)) for each REMIC II Regular Interest shall be the Maturity Date. None of the REMIC II Regular Interests will be certificated.

| Designation | Uncertificated REMIC I Pass-Through Rate | Initial Uncertificated REMIC I Principal Balance | Latest Possible Maturity Date[3] |
|---|---|---|---|
| LT1 | Variable[1] | $489,983,363.36 | April 25, 2046 |
| LT2 | Variable[1] | $23,519.75 | April 25, 2046 |
| LT3 | 0.00% | $25,508.28 | April 25, 2046 |
| LT4 | Variable[1] | $25,508.28 | April 25, 2046 |
| LT5 | Variable[1] | $411,223,498.79 | April 25, 2046 |
| LT6 | Variable[1] | $20,100.41 | April 25, 2046 |
| LT7 | 0.00% | $21,048.42 | April 25, 2046 |
| LT8 | Variable[1] | $21,048.42 | April 25, 2046 |
| LT-Y1[2] | Variable[1] | $222,388.34 | April 25, 2046 |
| LT-Y2[2] | Variable[1] | $202,619.47 | April 25, 2046 |

(1)     Calculated as provided in the definition of Uncertificated REMIC II Pass-Through Rate.

(2)     LT-Y1 will have the same interest rate, principal balance, Principal Reduction Amount and allocation of Realized Losses as the REMIC I Regular Interest Y-1. LT-Y2 will have the same interest rate, principal balance, Principal Reduction Amount and allocation of Realized Losses as the REMIC I Regular Interest Y-2.

## REMIC III

As provided herein, the REMIC Administrator will elect to treat the segregated pool of assets consisting of the REMIC II Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as REMIC III. The Class R-III Certificates will represent the sole Class of "residual interests" in REMIC III for purposes of the REMIC Provisions under federal income tax law. The following table sets forth the designation, type, Pass-Through Rate, aggregate Initial Certificate Principal Balance, Maturity Date, initial ratings and certain features for each Class of Certificates comprising the interests in the Trust Fund created hereunder. The "latest possible maturity date" (determined solely for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii)) for each Class of REMIC III Regular Interests and the Certificates shall be the Maturity Date.

| Designation | Pass-Through Rate | Aggregate Initial Certificate Principal Balance | Features | Maturity Date | S&P/ Moody's | Minimum Denominations |
|---|---|---|---|---|---|---|
| Class I-A-1 | Adjustable Rate(1)(2) | $327,356,000.00 | Super Senior/ Adjustable Rate | April 25, 2046 | AAA/Aaa | $100,000.00 |
| Class I-A-2 | Adjustable Rate(1)(2) | $81,838,000.00 | Senior Mezzanine/ Adjustable Rate | April 25, 2046 | AAA/Aaa | $100,000.00 |
| Class II-A-1 | Adjustable Rate(1)(2) | $223,699,000.00 | Super Senior/ Adjustable Rate | April 25, 2046 | AAA/Aaa | $100,000.00 |
| Class II-A-2 | Adjustable Rate(1)(2) | $93,208,000.00 | Senior Mezzanine/ Adjustable Rate | April 25, 2046 | AAA/Aaa | $100,000.00 |
| Class II-A-3 | Adjustable Rate(1)(2) | $55,924,000.00 | Senior Mezzanine/ Adjustable Rate | April 25, 2046 | AAA/Aaa | $100,000.00 |
| Class M-1 | Adjustable Rate(1)(2) | $19,126,000.00 | Mezzanine/Adjustable Rate | April 25, 2046 | AA+/Aa1 | $100,000.00 |
| Class M-2 | Adjustable Rate(1)(2) | $8,075,000.00 | Mezzanine/Adjustable Rate | April 25, 2046 | AA/Aa2 | $100,000.00 |
| Class M-3 | Adjustable Rate(1)(2) | $4,250,000.00 | Mezzanine/Adjustable Rate | April 25, 2046 | AA/Aa2 | $100,000.00 |
| Class M-4 | Adjustable Rate(1)(2) | $4,250,000.00 | Mezzanine/Adjustable Rate | April 25, 2046 | AA-/Aa3 | $100,000.00 |
| Class M-5 | Adjustable Rate(1)(2) | $4,250,000.00 | Mezzanine/Adjustable Rate | April 25, 2046 | A+/A1 | $250,000.00 |
| Class M-6 | Adjustable Rate(1)(2) | $4,250,000.00 | Mezzanine/Adjustable Rate | April 25, 2046 | A+/A2 | $250,000.00 |
| Class M-7 | Adjustable Rate(1)(2) | $4,250,000.00 | Mezzanine/Adjustable Rate | April 25, 2046 | A/A3 | $250,000.00 |
| Class M-8 | Adjustable Rate(1)(2) | $4,250,000.00 | Mezzanine/Adjustable Rate | April 25, 2046 | BBB+/Baa1 | $250,000.00 |
| Class M-9 | Adjustable Rate(1)(2) | $4,250,000.00 | Mezzanine/Adjustable Rate | April 25, 2046 | BBB/Baa2 | $250,000.00 |
| Class M-10 | Adjustable Rate(1)(2) | $4,250,000.00 | Mezzanine/Adjustable Rate | April 25, 2046 | BBB-/Ba1 | $250,000.00 |
| Class SB [3] | (3) | $6,801,282.71 | Subordinate | April 25, 2046 | N/R | N/A |

(1)    The REMIC III Regular Interests, ownership of which is represented by the Class I-A, Class II-A and Class M Certificates, will accrue interest at a per annum rate equal to MTA plus the related Margin or LIBOR plus the related Margin, as the case may be, and each subject to a payment cap, as described in the definition of "Pass-Through Rate," and the provisions for the payment of Basis Risk Shortfalls herein, which payments will not be part of the entitlement of the REMIC III Regular Interests related to such Certificates.

(2)    The Class A Certificates and Class M Certificates will also entitle their holders to receive certain payments from the Holder of the Class SB Certificates from amounts to which the Holder of the Class SB Certificates is entitled, which will not be a part of their ownership of the related REMIC III Regular Interests.

(3)    The Class SB Certificates will accrue interest as described in the definition of Accrued Certificate Interest. The Class SB Certificates will not accrue interest on their Certificate Principal Balance. The Class SB Certificates will represent ownership of two REMIC III Regular Interests, a principal only regular interest designated REMIC III Regular Interest SB-PO and an interest only regular interest designated REMIC III Regular Interest SB-IO, which will be entitled to distributions as set forth herein.

The Group I Loans have an aggregate Cut-off Date Principal Balance equal to $444,776,674.36. The Group I Loans are payment-option adjustable-rate first lien mortgage loans with a negative amortization feature having terms to maturity at origination or modification of generally not more than 40 years. The Group II Loans have an aggregate Cut-off Date Principal Balance equal to $405,250,608.35. The Group II Loans are payment option adjustable rate first lien mortgage loans with a negative amortization feature having terms to maturity at origination or modification of generally not more than 40 years.

In consideration of the mutual agreements herein contained, the Company, the Master Servicer and the Trustee agree as follows:

# ARTICLE I

## DEFINITIONS

**Section 1.01.** <u>Definitions</u>.

Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article.

<u>Accrued Certificate Interest</u>:  With respect to each Distribution Date and each Class of Class A Certificates and Class M Certificates, interest accrued during the related Interest Accrual Period on the Certificate Principal Balance thereof immediately prior to such Distribution Date at the Pass-Through Rate for that Distribution Date.

The amount of Accrued Certificate Interest on each Class of Certificates shall be reduced by the amount of Prepayment Interest Shortfalls on the related Mortgage Loans during the prior calendar month to the extent not covered by Compensating Interest pursuant to Section 3.16, by Relief Act Shortfalls on the related Mortgage Loans during the related Due Period, and by any Net Deferred Interest on the related Mortgage Loans allocable to such Class of Certificates for that Distribution Date.  The portion of any Prepayment Interest Shortfalls or Relief Act Shortfalls allocated to the Class A Certificates will be based upon the related Senior Percentage of all such reductions with respect to the related Mortgage Loans, such reductions to be allocated among the related Class A Certificates, pro rata, on the basis of Accrued Certificate Interest payable on such Distribution Date absent such reductions, with the remainder of such reductions allocated among the Holders of all Classes of Class M Certificates, pro rata, on the basis of Accrued Certificate Interest payable on such Distribution Date absent such reductions.  Net Deferred Interest will be allocated to each Class of Certificates as described in Section 4.02(i).

Accrued Certificate Interest with respect for any Distribution Date shall further be reduced by the interest portion of Realized Losses allocated to any Class of Certificates pursuant to Section 4.05.

Accrued Certificate Interest with respect to the Class I-A Certificates shall accrue on the basis of a 360-day year divided into twelve 30-day months. Accrued Certificate Interest with respect to the Class II-A Certificates and Class M Certificates shall accrue on the basis of a 360-day year and the actual number of days in the related Interest Accrual Period.

With respect to each Distribution Date and the Class SB Certificates, interest accrued during the preceding Interest Accrual Period at the related Pass-Through Rate on the Notional Amount as specified in the definition of Pass-Through Rate, immediately prior to such Distribution Date, reduced by any interest shortfalls with respect to the Mortgage Loans, including Prepayment Interest Shortfalls to the extent not covered by Compensating Interest pursuant to Section 3.16 or by Excess Cash Flow pursuant to Section 4.02(c)(iii) and (iv). Accrued Certificate Interest on the Class SB Certificates shall accrue on the basis of a 360-day year and the actual number of days in the related Interest Accrual Period.

<u>Adjusted Rate Cap</u>:  For the Class I-A-1 Certificates and Class I-A-2 Certificates, the Adjusted Rate Cap shall equal the related Net WAC Cap Rate for that Distribution Date,

US_EAST:6223837.10

computed for this purpose by first reducing the Group I Net WAC Rate by a per annum rate equal to (i) the product of (a) the Net Deferred Interest, if any, on the Group I Loans for that Distribution Date and (b) 12, divided by (ii) the aggregate Stated Principal Balance of the Group I Loans immediately prior to such Distribution Date.

For the Class II-A-1, Class II-A-2 and Class II-A-3 Certificates, the Adjusted Rate Cap shall equal the related Net WAC Cap Rate for that Distribution Date, computed for this purpose by first reducing the Group II Net WAC Rate by a per annum rate equal to (i) the product of (a) the Net Deferred Interest, if any, on the Group II Loans for that Distribution Date and (b) 12, divided by (ii) the aggregate Stated Principal Balance of the Group II Loans immediately prior to such Distribution Date.

For the Class M Certificates, the Adjusted Rate Cap shall equal the related Net WAC Cap Rate for that Distribution Date, computed for this purpose by first reducing each of the Group I Net WAC Rate and Group II Net WAC Rate by a per annum rate equal to (i) the product of (a) the Net Deferred Interest, if any, on the related Mortgage Loans for that Distribution Date and (b) 12, divided by (ii) the aggregate Stated Principal Balance of the related Mortgage Loans immediately prior to such Distribution Date.

Adjustment Date:  With respect to each Mortgage Loan, each date set forth in the related Mortgage Note on which an adjustment to the interest rate on such Mortgage Loan becomes effective.

Available Distribution Amount:  As to any Distribution Date, and as calculated in the aggregate for both Loan Groups, an amount equal to (a) the sum of (i) the amount relating to the Mortgage Loans on deposit in the Custodial Account as of the close of business on the immediately preceding Determination Date, including any Subsequent Recoveries, and amounts deposited in the Custodial Account in connection with the substitution of Qualified Substitute Mortgage Loans, (ii) the amount of any Advance made on the immediately preceding Certificate Account Deposit Date, (iii) any amount deposited in the Certificate Account on the related Certificate Account Deposit Date pursuant to the second paragraph of Section 3.12(a), (iv) any amount deposited in the Certificate Account pursuant to Section 4.07 or Section 9.01, (v) any amount that the Master Servicer is not permitted to withdraw from the Custodial Account or the Certificate Account pursuant to Section 3.16(e), (vi) the proceeds of any Pledged Assets received by the Master Servicer, reduced by (b) the sum as of the close of business on the immediately preceding Determination Date of (v) any payments or collections consisting of Prepayment Charges on the Mortgage Loans that were received during the related Prepayment Period; (w) aggregate Foreclosure Profits, (x) the Amount Held for Future Distribution, (y) amounts permitted to be withdrawn by the Master Servicer from the Custodial Account in respect of the Mortgage Loans pursuant to clauses (ii)-(x), inclusive, of Section 3.10(a) and (z) Insurer Premium payable.

Avoided Payment:  Any amount previously distributed to a Certificateholder on an Insured Certificate that is voided as a result of an Insolvency Proceeding and which is returned by a Holder of an Insured Certificate as required by a final, nonappealable order of a court of competent jurisdiction.

Basis Risk Shortfall:

- With respect to the Class I-A-1 Certificates and Class I-A-2 Certificates and any Distribution Date on which the Pass-Through Rate is based on the Net WAC Cap Rate, an amount equal to the excess of (i) Accrued Certificate Interest for that Class calculated at a rate equal to MTA plus the related Margin (but not more than the Net Maximum Cap Rate), over (ii) Accrued Certificate Interest for that Class calculated using the related Net WAC Cap Rate; plus any unpaid Basis Risk Shortfall from prior Distribution Dates, plus interest thereon to the extent not previously paid from Excess Cash Flow calculated at a rate equal to MTA plus the related Margin (but not more than the Net Maximum Cap Rate).

- With respect to the Class II-A-1, Class II-A-2 or Class II-A-3 Certificates and any Distribution Date on which the Pass-Through Rate is based on the Net WAC Cap Rate, an amount equal to the excess of (i) Accrued Certificate Interest for that Class calculated at a rate equal to LIBOR plus the related Margin (but not more than 11.00%), over (ii) Accrued Certificate Interest for that Class calculated using the related Net WAC Cap Rate; plus any unpaid related Basis Risk Shortfall from prior Distribution Dates, plus interest thereon to the extent not previously paid from Excess Cash Flow calculated at a rate equal to LIBOR plus the related Margin (but not more than 11.00%).

- With respect to any Class of Class M Certificates and any Distribution Date on which the Pass-Through Rate is based on the Net WAC Cap Rate, an amount equal to the excess of (i) Accrued Certificate Interest for that Class calculated at a rate equal to LIBOR plus the related Margin (but not more than 11.00%), over (ii) Accrued Certificate Interest calculated using the Net WAC Cap Rate for the Class M Certificates; plus any unpaid Basis Risk Shortfall for the Class M Certificates from prior Distribution Dates, plus interest thereon, to the extent not previously paid from Excess Cash Flow, at a rate equal to LIBOR plus the related Margin (but not more than 11.00%).

Basis Risk Shortfall Reserve Fund:  The reserve fund created pursuant to Section 4.09.

Basis Risk Shortfall Reserve Fund Amount:  $860,000.00.

Book-Entry Certificate:  The Class A Certificates and Class M Certificates.

Capitalization Reimbursement Amount:  As to any Distribution Date and Loan Group, the amount of Advances or Servicing Advances that were added to the Stated Principal Balance of the Mortgage Loans in such Loan Group during the prior calendar month and reimbursed to the Master Servicer or Subservicer on or prior to such Distribution Date pursuant to Section 3.10(a)(vii), plus the Capitalization Reimbursement Shortfall Amount remaining unreimbursed from any prior Distribution Date and reimbursed to the Master Servicer or Subservicer on or prior to such Distribution Date.

Capitalization Reimbursement Shortfall Amount:  As to any Distribution Date and Loan Group, the amount, if any, by which the amount of Advances or Servicing Advances that were added to the Stated Principal Balance of the Mortgage Loans in such Loan Group during the preceding calendar month exceeds the amount of principal payments on the Mortgage Loans included in the portion of the Available Distribution Amount related to that Loan Group and Distribution Date.

Certificate:  Any Class A, Class M, Class SB or Class R Certificate.

Certificate Account:  The separate account or accounts created and maintained pursuant to Section 4.01 of the Standard Terms, which shall be entitled "DEUTSCHE BANK TRUST COMPANY AMERICAS, as trustee, in trust for the registered holders of Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO4" and which must be an Eligible Account.

Certificate Insurance Account: The account established pursuant to Section 13.02(b) of this Series Supplement.

Certificate Insurance Payment: Any payment made by the Certificate Insurer with respect to the Insured Certificates under the Certificate Policy.

Certificate Insurer: XL Capital Assurance Inc., a stock insurance company organized and created under the laws of the State of New York, and any successors thereto, as issuer of the Certificate Policy.

Certificate Insurer Default: The existence of a failure by the Certificate Insurer to make a payment required under the Certificate Policy in accordance with its terms and the continuance of such failure for two Business Days.

Certificate Policy: The financial guaranty insurance policy No. CA02956A issued by the Certificate Insurer for the benefit of the Holders of the Insured Certificates, including any endorsements thereto, attached hereto as Exhibit Four.

Certificate Principal Balance:  With respect to any Class A Certificate or Class M Certificate, on any date of determination, an amount equal to (i) the Initial Certificate Principal Balance of such Certificate as specified on the face thereof plus (ii) an amount equal to the aggregate Net Deferred Interest added to the Certificate Principal Balance thereof prior to such date of determination, minus (iii) the sum of (x) the aggregate of all amounts previously distributed with respect to such Certificate (or any predecessor Certificate) and applied to reduce the Certificate Principal Balance thereof pursuant to Section 4.02(c) and (y), the aggregate of all reductions in Certificate Principal Balance deemed to have occurred in connection with Realized Losses which were previously allocated to such Certificate (or any predecessor Certificate) pursuant to Section 4.05; provided, that with respect to any Distribution Date, the Certificate Principal Balances of (i) the Class I-A or Class M Certificates will be increased, in each case to the extent of Realized Losses previously allocated thereto and remaining unreimbursed, by the Subsequent Recovery Allocation Amount for Loan Group I in the following order of priority: first to the Class I-A Certificates, pro rata, and then to the Class M-1, Class M-2, Class M-3,

Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class M-10 Certificates, in that order and (ii) the Class II-A or Class M Certificates will be increased, in each case to the extent of Realized Losses previously allocated thereto and remaining unreimbursed, by the Subsequent Recovery Allocation Amount for Loan Group II in the following order of priority: to the Class II-A, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class M-10 Certificates, in that order. With respect to any Class SB Certificate, on any date of determination, an amount equal to the Percentage Interest evidenced by such Certificate, multiplied by an amount equal to (i) the excess, if any, of (A) the then aggregate Stated Principal Balance of the Mortgage Loans over (B) the then aggregate Certificate Principal Balance of the Class A Certificates and Class M Certificates then outstanding, which represents the sum of (i) the Initial Principal Balance of the REMIC III Regular Interest SB-PO, as reduced by Realized Losses allocated thereto and payments deemed made thereon, and (ii) accrued and unpaid interest on the REMIC III Regular Interest SB-IO, as reduced by Realized Losses allocated thereto. The Class R Certificates will not have a Certificate Principal Balance.

Class I-A-1 Certificate: The Class I-A-1 Certificates, executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class I-A-2 Certificates, Class M Certificates, Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group I Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class I-A-1 Margin: With respect to any Distribution Date, 0.920% per annum.

Class I-A-2 Certificate: The Class I-A-2 Certificates, executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class M Certificates, Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group I Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class I-A-2 Margin: With respect to any Distribution Date, 0.930% per annum.

Class I-A Certificates: Collectively, the Class I-A-1 Certificates and Class I-A-2 Certificates.

Class I-A Interest Remittance Amount: With respect to any Distribution Date, the portion of the Available Distribution Amount for that Distribution Date attributable to interest received or advanced with respect to the Group I Loans.

Class II-A-1 Certificate: The Class II-A-1 Certificates, executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class II-A-2 Certificates, Class II-A-3 Certificates, Class M Certificates, Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group II Loans as set forth in Section 4.05, and evidencing (i) an interest

designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class II-A-1 Margin:    With respect to any Distribution Date prior to the second Distribution Date after the first possible Optional Termination Date, 0.190% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Optional Termination Date, 0.380% per annum.

Class II-A-2 Certificate:    The Class II-A-2 Certificates, executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class II-A-3 Certificates, Class M Certificates, Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group II Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class II-A-2 Margin:    With respect to any Distribution Date prior to the second Distribution Date after the first possible Optional Termination Date, 0.240% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Optional Termination Date, 0.480% per annum.

Class II-A-3 Certificate:    The Class II-A-3 Certificates, executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class M Certificates, Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group II Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class II-A-3 Margin:    With respect to any Distribution Date prior to the second Distribution Date after the first possible Optional Termination Date, 0.210% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Optional Termination Date, 0.420% per annum.

Class II-A Certificates:    Collectively, the Class II-A-1 Certificates, Class II-A-2 Certificates and Class II-A-3 Certificates.

Class II-A Interest Remittance Amount:    With respect to any Distribution Date, the portion of the Available Distribution Amount for that Distribution Date attributable to interest received or advanced with respect to the Group II Loans.

Class A Certificates:  Collectively, the Class I-A Certificates and Class II-A Certificates.

Class A Interest Distribution Priority:  With respect to each Class of Class A Certificates and any Distribution Date, the amount available for payment of Accrued Certificate Interest thereon for that Distribution Date plus Accrued Certificate Interest thereon remaining unpaid from any prior Distribution Date, in the amounts and priority as follows:

- *first*, concurrently, (i) to the Class I-A Certificates, pro rata, from the Class I-A Interest Remittance Amount and (ii) to the Class II-A Certificates, pro rata, from the Class II-A Interest Remittance Amount;

- *second*, concurrently, (i) to the Class I-A Certificates, pro rata, from the remaining Class II-A Interest Remittance Amount and (ii) to the Class II-A Certificates, pro rata, from the remaining Class I-A Interest Remittance Amount, as needed after taking into account any distributions in respect of interest on the Class A Certificates made in *first* above;

- *third*, concurrently, (i) from the Principal Remittance Amount related to Loan Group I to the Class I-A Certificates, pro rata, and (ii) from the Principal Remittance Amount related to Loan Group II to the Class II-A Certificates, pro rata, after taking into account any distributions in respect of interest on the Class A Certificates made in *first* and *second* above; and

- *fourth*, concurrently, (i) from the remaining Principal Remittance Amount related to Loan Group II to the Class I-A Certificates, pro rata, and (ii) from the remaining Principal Remittance Amount related to Loan Group I to the Class II-A Certificates, pro rata, as needed after taking into account any distributions in respect of interest on the Class A Certificates made in *first*, *second* and *third* above.

Class A Principal Distribution Amount:  With respect to any Distribution Date (i) prior to the Stepdown Date or on or after the Stepdown Date if a Trigger Event is in effect for that Distribution Date, the Principal Distribution Amount for that Distribution Date or (ii) on or after the Stepdown Date if a Trigger Event is not in effect for that Distribution Date, the lesser of:

(i) the Principal Distribution Amount for that Distribution Date; and

(ii) the excess, if any, of (A) the aggregate Certificate Principal Balance of the Class A Certificates immediately prior to that Distribution Date over (B) the lesser of (x) the product of (1) the applicable Subordination Percentage and (2) the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date and (y) the excess, if any, of the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date, over the Overcollateralization Floor.

Class M-1 Certificate:  Any one of the Class M-1 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed to the Standard Terms as Exhibit B, senior to the Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10, Class SB and Class R Certificates with respect to distributions and the allocation of Realized Losses as set forth in Section 4.05, and evidencing (i)

an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class M-1 Margin:  With respect to any Distribution Date prior to the second Distribution Date after the first possible Optional Termination Date, 0.380% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Optional Termination Date, 0.570% per annum.

Class M-1 Principal Distribution Amount:  With respect to any Distribution Date (i) prior to the Stepdown Date or on or after the Stepdown Date if a Trigger Event is in effect for that Distribution Date, the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount or (ii) on or after the Stepdown Date if a Trigger Event is not in effect for that Distribution Date, the lesser of:

(i)    the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount; and

(ii)    the excess, if any, of (A) the sum of (1) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount for that Distribution Date) and (2) the Certificate Principal Balance of the Class M-1 Certificates immediately prior to that Distribution Date over (B) the lesser of (x) the product of (1) the applicable Subordination Percentage and (2) the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date and (y) the excess, if any, of the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date, over the Overcollateralization Floor.

Class M-2 Certificate:  Any one of the Class M-2 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed to the Standard Terms as Exhibit B, senior to the Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10, Class SB and Class R Certificates with respect to distributions and the allocation of Realized Losses as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class M-2 Margin:  With respect to any Distribution Date prior to the second Distribution Date after the first possible Optional Termination Date, 0.400% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Optional Termination Date, 0.600% per annum.

Class M-2 Principal Distribution Amount:  With respect to any Distribution Date (i) prior to the Stepdown Date or on or after the Stepdown Date if a Trigger Event is in effect for that Distribution Date, the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount and Class M-1 Principal Distribution Amount or (ii) on or after the Stepdown Date if a Trigger Event is not in effect for that Distribution Date, the lesser of:

(i)    the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount and the Class M-1 Principal Distribution Amount; and

(ii)    the excess, if any, of (A) the sum of (1) the aggregate Certificate Principal Balance of the Class A Certificates and Class M-1 Certificates (after taking into account the payment of the Class A Principal Distribution Amount and the Class M-1 Principal Distribution Amount for that Distribution Date) and (2) the Certificate Principal Balance of the Class M-2 Certificates immediately prior to that Distribution Date over (B) the lesser of (x) the product of (1) the applicable Subordination Percentage and (2) the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date and (y) the excess, if any, of the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date, over the Overcollateralization Floor.

Class M-3 Certificate:  Any one of the Class M-3 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit B, senior to the Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10, Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class M-3 Margin:  With respect to any Distribution Date prior to the second Distribution Date after the first possible Optional Termination Date, 0.420% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Optional Termination Date, 0.630% per annum.

Class M-3 Principal Distribution Amount:  With respect to any Distribution Date (i) prior to the Stepdown Date or on or after the Stepdown Date if a Trigger Event is in effect for that Distribution Date, the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount, Class M-1 Principal Distribution Amount and Class M-2 Principal Distribution Amount or (ii) on or after the Stepdown Date if a Trigger Event is not in effect for that Distribution Date, the lesser of:

(i)    the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount, Class M-1 Principal Distribution Amount and Class M-2 Principal Distribution Amount; and

(ii)    the excess, if any, of (A) the sum of (1) the aggregate Certificate Principal Balance of the Class A, Class M-1 and Class M-2 Certificates (after taking into account the payment of the Class A Principal Distribution Amount, the Class M-1 Principal Distribution Amount and the Class M-2 Principal Distribution Amount for that Distribution Date) and (2) the Certificate Principal Balance of the Class M-3 Certificates immediately prior to that Distribution Date over (B) the lesser of (x) the product of (1) the applicable Subordination Percentage and (2) the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date and (y) the excess, if any, of the aggregate

13

Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date, over the Overcollateralization Floor.

Class M-4 Certificate: Any one of the Class M-4 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit B, senior to the Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10, Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class M-4 Margin: With respect to any Distribution Date prior to the second Distribution Date after the first possible Optional Termination Date, 0.580% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Optional Termination Date, 0.870% per annum.

Class M-4 Principal Distribution Amount: With respect to any Distribution Date (i) prior to the Stepdown Date or on or after the Stepdown Date if a Trigger Event is in effect for that Distribution Date, the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount, Class M-1 Principal Distribution Amount, Class M-2 Principal Distribution Amount and Class M-3 Principal Distribution Amount or (ii) on or after the Stepdown Date if a Trigger Event is not in effect for that Distribution Date, the lesser of:

(i)    the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount, Class M-1 Principal Distribution Amount, Class M-2 Principal Distribution Amount and Class M-3 Principal Distribution Amount; and

(ii)    the excess, if any, of (A) the sum of (1) the aggregate Certificate Principal Balance of the Class A, Class M-1, Class M-2 and Class M-3 Certificates (after taking into account the payment of the Class A Principal Distribution Amount, the Class M-1 Principal Distribution Amount, the Class M-2 Principal Distribution Amount and the Class M-3 Principal Distribution Amount for that Distribution Date) and (2) the Certificate Principal Balance of the Class M-4 Certificates immediately prior to that Distribution Date over (B) the lesser of (x) the product of (1) the applicable Subordination Percentage and (2) the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date and (y) the excess, if any, of the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date, over the Overcollateralization Floor.

Class M-5 Certificate: Any one of the Class M-5 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit B, senior to the Class M-6, Class M-7, Class M-8, Class M-9, Class M-10, Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class M-5 Margin:  With respect to any Distribution Date prior to the second Distribution Date after the first possible Optional Termination Date, 0.600% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Optional Termination Date, 0.900% per annum.

Class M-5 Principal Distribution Amount:  With respect to any Distribution Date (i) prior to the Stepdown Date or on or after the Stepdown Date if a Trigger Event is in effect for that Distribution Date, the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount, Class M-1 Principal Distribution Amount, Class M-2 Principal Distribution Amount, Class M-3 Principal Distribution Amount and Class M-4 Principal Distribution Amount or (ii) on or after the Stepdown Date if a Trigger Event is not in effect for that Distribution Date, the lesser of:

(i)    the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount, Class M-1 Principal Distribution Amount, the Class M-2 Principal Distribution Amount, Class M-3 Principal Distribution Amount and Class M-4 Principal Distribution Amount; and

(ii)    the excess, if any, of (A) the sum of (1) the aggregate Certificate Principal Balance of the Class A, Class M-1, Class M-2, Class M-3 and Class M-4 Certificates (after taking into account the payment of the Class A Principal Distribution Amount, the Class M-1 Principal Distribution Amount, the Class M-2 Principal Distribution Amount, the Class M-3 Principal Distribution Amount and the Class M-4 Principal Distribution Amount for that Distribution Date) and (2) the Certificate Principal Balance of the Class M-5 Certificates immediately prior to that Distribution Date over (B) the lesser of (x) the product of (1) the applicable Subordination Percentage and (2) the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date and (y) the excess, if any, of the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date, over the Overcollateralization Floor.

Class M-6 Certificate:  Any one of the Class M-6 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit B, senior to the Class M-7, Class M-8, Class M-9, Class M-10, Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class M-6 Margin:  With respect to any Distribution Date prior to the second Distribution Date after the first possible Optional Termination Date, 0.640% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Optional Termination Date, 0.960% per annum.

Class M-6 Principal Distribution Amount:  With respect to any Distribution Date (i) prior to the Stepdown Date or on or after the Stepdown Date if a Trigger Event is in effect for that Distribution Date, the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount, Class M-1 Principal Distribution

Amount, Class M-2 Principal Distribution Amount, Class M-3 Principal Distribution Amount, Class M-4 Principal Distribution Amount and Class M-5 Principal Distribution Amount or (ii) on or after the Stepdown Date if a Trigger Event is not in effect for that Distribution Date, the lesser of:

(i)    the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount, Class M-1 Principal Distribution Amount, the Class M-2 Principal Distribution Amount, Class M-3 Principal Distribution Amount, Class M-4 Principal Distribution Amount and Class M-5 Principal Distribution Amount; and

(ii)    the excess, if any, of (A) the sum of (1) the aggregate Certificate Principal Balance of the Class A, Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Certificates (after taking into account the payment of the Class A Principal Distribution Amount, the Class M-1 Principal Distribution Amount, the Class M-2 Principal Distribution Amount, the Class M-3 Principal Distribution Amount, the Class M-4 Principal Distribution Amount and the Class M-5 Principal Distribution Amount for that Distribution Date) and (2) the Certificate Principal Balance of the Class M-6 Certificates immediately prior to that Distribution Date over (B) the lesser of (x) the product of (1) the applicable Subordination Percentage and (2) the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date and (y) the excess, if any, of the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date, over the Overcollateralization Floor.

Class M-7 Certificate:  Any one of the Class M-7 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit B, senior to the Class M-8, Class M-9, Class M-10, Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class M-7 Margin:  With respect to any Distribution Date prior to the second Distribution Date after the first possible Optional Termination Date, 1.490% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Optional Termination Date, 2.235% per annum.

Class M-7 Principal Distribution Amount:  With respect to any Distribution Date (i) prior to the Stepdown Date or on or after the Stepdown Date if a Trigger Event is in effect for that Distribution Date, the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount, Class M-1 Principal Distribution Amount, Class M-2 Principal Distribution Amount, Class M-3 Principal Distribution Amount, Class M-4 Principal Distribution Amount, Class M-5 Principal Distribution Amount and Class M-6 Principal Distribution Amount or (ii) on or after the Stepdown Date if a Trigger Event is not in effect for that Distribution Date, the lesser of:

(i)    the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount, Class M-1 Principal Distribution

Amount, Class M-2 Principal Distribution Amount, Class M-3 Principal Distribution Amount, Class M-4 Principal Distribution Amount, Class M-5 Principal Distribution Amount and Class M-6 Principal Distribution Amount; and

(ii)    the excess, if any, of (A) the sum of (1) the aggregate Certificate Principal Balance of the Class A, Class M-1, Class M-2, Class M-3, Class M-4, Class M 5 and Class M-6 Certificates (after taking into account the payment of the Class A Principal Distribution Amount, Class M-1 Principal Distribution Amount, Class M-2 Principal Distribution Amount, Class M-3 Principal Distribution Amount, Class M-4 Principal Distribution Amount, Class M-5 Principal Distribution Amount and Class M-6 Principal Distribution Amount for that Distribution Date) and (2) the Certificate Principal Balance of the Class M-7 Certificates immediately prior to that Distribution Date over (B) the lesser of (x) the product of (1) the applicable Subordination Percentage and (2) the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date and (y) the excess, if any, of the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date, over the Overcollateralization Floor.

Class M-8 Certificate:  Any one of the Class M-8 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit B, senior to the Class M-9, Class M-10, Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive Basis Risk Shortfalls.

Class M-8 Margin:  With respect to any Distribution Date prior to the second Distribution Date after the first possible Optional Termination Date, 1.690% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Optional Termination Date, 2.535% per annum.

Class M-8 Principal Distribution Amount:  With respect to any Distribution Date (i) prior to the Stepdown Date or on or after the Stepdown Date if a Trigger Event is in effect for that Distribution Date, the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount, Class M-1 Principal Distribution Amount, Class M-2 Principal Distribution Amount, Class M-3 Principal Distribution Amount, Class M-4 Principal Distribution Amount, Class M-5 Principal Distribution Amount, Class M-6 Principal Distribution Amount and Class M-7 Principal Distribution Amount or (ii) on or after the Stepdown Date if a Trigger Event is not in effect for that Distribution Date, the lesser of:

(i)    the remaining Principal Distribution Amount for that Distribution Date after distribution of the Class A Principal Distribution Amount, Class M-1 Principal Distribution Amount, Class M-2 Principal Distribution Amount, Class M-3 Principal Distribution Amount, Class M-4 Principal Distribution Amount, Class M-5 Principal Distribution Amount, Class M-6 Principal Distribution Amount and Class M-7 Principal Distribution Amount; and

(ii)    the excess, if any, of (A) the sum of (1) the aggregate Certificate Principal Balance of the Class A, Class M-1, Class M-2, Class M-3, Class M-4, Class M 5, Class M-6 and Class M-7 Certificates (after taking into account the payment of the Class A Principal