Wendy Alison Nora                           Hearing Date: November 19, 2013
310 Fourth Avenue South, Suite 5010         Hearing Time: 10:00 a.m. EST
Minneapolis, Minnesota 55415                Response Deadline: October 21, 2013
Telephone (612) 333-4144                              4:00 p.m. EDT
Facsimile (608) 497-1026

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

In re:

Residential Capital, LLC *et al.,*              Chapter 11
                        Debtors              Case No. 12-12020 (MG)
                                             Administratively Consolidated

## OBJECTION TO CONFIRMATION OF DEBTORS' CHAPTER 11 PLAN
(NOTICE: THIS MOTION IS NOT TO BE DETERMINED BY
JUDGE MARTIN GLENN WHO HAS DISPLAYED EXTREME BIAS AND PREJUDICE
AGAINST THE MOVANT BY THREATENING HER WITH BODILY SEIZURE AND
REMOVAL FROM THE COURT PROCEEDINGS ON OCTOBER 9, 2013 WITHOUT
PROBABLE CAUSE, REVOKED HER PRO HAC VICE ADMISSION WITHOUT NOTICE
AND OPPORTUNITY TO BE HEARD, FILED A SUBSEQUENT SUA SPONTE ORDER TO
SHOW CAUSE *POST FACTO* PURPORTING TO ACCORD THE OPPORTUNITY FOR
HEARING ON THE PRO HAC VICE ADMISSION AFTER THE REVOCATION THEREOF
WITHOUT CAUSE OR HEARING, ON FALSE AND FICTITIOUS GROUNDS AND UPON
A PATTERN OF CONDUCT IN THESE PROCEEDINGS WHICH HAS ESCALATED TO
THE POINT OF COMPLETE EXPOSURE OF JUDGE GLENN'S ACTUAL BIAS AGAINST
THE RIGHTS OF HOMEOWNERS TO BE HEARD IN THESE PROCEEDINGS, WHICH
RIGHTS ARE DESCRIBED BY JUDGE GLENN AS "*RIGHTS, IF ANY*"[1]
**(ALL RIGHTS RESERVED)**

Wendy Alison Nora files this Objection to the Confirmation of Debtors' Chapter 11 Plan

to be heard by the Court, at such time as a qualified and unbiased judge is appointed to preside in

---

[1]  See Order to Show Cause Why Pro Hac Vice Admission of Wendy Alison Nora Should Not
Be Revoked (Doc. 5330) dated October 10, 2013 at page 5, ¶1 which provides that the "rights, if any," of
homeowner clients, who she represented prior to the October 9, 2013 sua sponte revocation of the pro
hac vice admission, should be addressed in her Response to the post facto rule nisi proceedings initiated
sua sponte by Judge Glenn after he displayed extreme prejudice against this Claimant and her clients.

this and shows the Court:

1.   The undersigned holds Proofs of Claims #1 (KCC, LLC Proof of Claim #2) and KCC, LLC Proof of  #440 (collectively, the Nora Proofs of Claims.)

2.   Debtors are seeking to disallow Nora's Proofs of Claims on grounds not recognized by Bankruptcy Rule 3007 and which grounds are not even suggested in the overly expansive, unconstitutional and void special Claims Procedures Order being applied to "Borrowers'" claims in these proceedings (Doc. 3294.)

3.   The undersigned is allowed to represent, on her Claim #1, the interests of all homeowners similarly situated to her Proof of Claim #1: the use of forged and perjured documents to confiscate their homes.  She has suffered an injury in fact from the Debtors' illegal conduct.   She  has a sufficiently close relationship to the parties injured by the illegal conduct because she is an officer of the  United States Supreme Court, the Supreme Court of Wisconsin, the Supreme Court of Minnesota, the Eighth Circuit Court of Appeals, the Seventh Circuit Court of Appeals, the Western District of Wisconsin, the Eastern District of Wisconsin, and the District of Minnesota and has consulted with homeowners throughout the nation concerning their rights in these proceedings until her pro hac vice admission was unconstitutionally revoked without notice and hearing by Judge Glenn on October 9, 2013.  She is far more qualified to assure that the rights of homeowners who have had and are having their homes confiscated through the use of forged and perjured documents through her individual action which seeks to obtain punitive damages to be placed in trust for the thousands of injured homeowners.   She has suffered the requisite "injury in fact," bears a sufficiently close relationship to the other affected homeowners as both legal counsel to some before the unconstitutional revocation of her pro hac vice

admission on October 9, 2013 (which is simply more evidence of the silencing of homeowner

interests in these proceedings) and the fact that punitive damages for the RICO and fraud

offenses committed by the Debtors, their parents, their agents, employees and attorneys, the

complicit trustees of the (empty) Real Estate Mortgage Investment (REMIC) trusts, the Debtors

and their affiliated entities and collaborators, all directed by AFI and Cerberus prior to the

rebranding of the Debtors' parent as a bank holding company,  are to be calculated in

determining the scope of the RICO enterprise, and because it is clearly impossible for individual

homeowners to protect their own interests in these proceedings.

4.  In these proceedings, the protection of homeowners' interests, other than by the Nora

Proofs of Claims and adversary proceedings and counsel for the occasional individual Claimant,

has been "handled" by "Special 'Borrowers' Counsel" to the Committee of Unsecured Creditors.

As stated so cogently by Attorney Robert E. Brown in the Motion for Appointment of a

"Borrowers'"Committee (Doc. 1264), the interests of "borrowers" (homeowners and former

homeowners) are in serious conflict with the stacking of financial institutions and insurance

industry representatives appointed to the Unsecured Creditors Committee by the Office of the

United States Trustee.   Properly viewed as to the reality of the injuries caused by the mortgage

fraud scheme which brought Ally Financial, Inc. (AFI), formerly GMAC Financial Services and

Cerberus Capital Management, Inc. (Cerberus) together as "partners" in 2006, which then

arranged to receive Troubled Asset Relief Program (TARP) funds under the false pretense of the

General Motors (GM) bailout in 2008, when the majority of the 17 billion dollars in TARP funds

went to the mortgage side of the conglomerate (12.5 billion (mortgage unit): 5.5 billion

(automotive sector), the economic loss to homeowners whose homes were confiscated by forged

and perjured documents, were still resisting foreclosure fraud after the 363 Sale to Ocwen

Financial, Inc. (servicing rights), Walters Investment, Inc. (servicing rights) and Berkshire

Hathaway (whole loans, discounted to an average of $30,000.00 each) are equal to the investors'

losses from the securities fraud side of the equation.   Yet AFI (and its partner Cerberus) have

deliberately bankrupted their subsidiaries, which were created under a variety of names to

conceal their relationship to GMAC and their roles in the mortgage securitization fraud scheme,[2]

which Judge Glenn found to be a strategy by AFI to "file these Chapter 11 cases. . .[with the

goal] to isolate its money-losing businesses and shed as much of the present and future liabilities

associated with those businesses as possible." (Doc. 1921, page 5-6)   The "Special Borrowers'

Counsel" was appointed without notice and hearing to make it appear that the Committee of

Unsecured Creditors was addressing homeowner concerns.   It is crystal clear on the record of

these proceedings that "Special Borrowers' Counsel" is not counsel for the interests of the

homeowners at all, but exists simply to authorize the unconstitutional failures of notice to the

homeowner class of injured parties.   It is the "Special Borrowers' Counsel" which has

"consulted" with the Debtors to approve their mass claims disallowance motions and to concur in

the actions taken to disallow certain individual homeowner claims.   "Special Borrowers'

---

[2]   See for example, the names Homecomings Financial, Inc., the GMAC subsidiary which acted
in some mortgage schemes as originator of the "loan" and in others as the subservicer of the "loan;" Di-
tech, another loan originator/seller of collateral; Residential Funding Company, LLC (formerly
Residential Funding Corporation); Residential Capital, LLC itself, apparently a holding company
subsidiary of a holding company subsidiary of what it now AFI, Executive TS Trustee Services (which
acts as the substitute Trustee of Deeds of Trust in order to foreclose on collateral for unnamed interests;
and Residential Asset Securities Corporation (one of the depositors to REMIC Trusts) all of which are
what any first year criminal prosecutor could see are aliases created to sound as generic and, at the same
time, distinctly different from the brand name "GMAC" which occasionally appears in the scheme as a
master servicer known as GMAC Mortgage, LLC or in a chain of holding companies, like GMAC-RFC
Holding Company, Inc., all of which are wholly owned subsidiaries of what is now AFI and which the
Debtors and AFI disingenuously claim are "indirect" subsidiaries.

Counsel" knows that forged and perjured documents have been and are being used to confiscate

real estate which Debtors' have claimed to own and re-sell, but has taken no steps to prevent the

continuing, ongoing offenses being committed in these proceedings or to prevent the wholesale

disallowance of homeowner claims.

5.  At a price tag of approximately 83 million dollars charged to the Debtors' estate which

is almost entirely funded by the collateral belonging to homeowners, the Examiner appointed on

the Motion of Berkshire Hathaway (which has long since departed the scene with a deeply

discounted "whole loan" portfolio) makes no mention in his thousands-of- pages long report

of the ubiquitous facts that the homes which have been and are being confiscated by the Debtors'

use of forged and perjured documents are a potential liability to their nondebtor parent, AFI.

The report suggests alter ego status of the Debtors as subsidiaries of AFI and then over-

intellectualizes the application of the laws of various states where the various species of liability

claims might be litigated (the undersigned does appreciate the analysis of complex conflicts of

law issues and read the entire report) but does not once mention the liability of AFI/Cerberus to

homeowners for the forgery/perjury scheme operated in the several states, including, but not

limited to Florida, Georgia, Minnesota, Pennsylvania and Iowa, which will be shown to have

been directed and controlled by AFI/Cerberus and from which they seek to escape with the real

prize in the entire mortgage securitization fraud scheme: 12.5 billion dollars in TARP funds.

Cerberus has already shown itself adept at concealing its ownership of its bankrupt subsidiaries

via the Delaware bankruptcy, In re: Aegis Mortgage Corporation, et al. Case No. 07-11119-BLS

in the United States Bankruptcy Court for the District of Delaware, in which it walked away from

its subsidiaries' bankruptcy with a large payment to another of its subsidiaries, Madeleine, LLC,

in a largely unpublicized coup.[3]   "Special Borrowers' Counsel" functions as an extension of the

Debtors and stands in to make it appear that the homeowners are receiving due process before

their rights are predictably ignored and then stripped away by a judge who entered an Order to

Show Cause against the undersigned referring to her clients' "rights, if any."   The homeowners

have been completely unrepresented as a class of claimants in these bankruptcy proceedings.

That it is impossible for members of the class of homeowner claimants to represent their own

interests in these proceedings was acknowledged by Judge Glenn which he approved the

appointment of "Special 'Borrowers' Counsel" to pretend to protect the rights of homeowners

and former homeowners and which they have wholly failed to do.

6.  In  Powers v. Ohio, 499 U.S. 400, 410, the United States Supreme Court stated:
. . .
We must consider whether a criminal defendant has standing to raise the equal protection
rights of a juror excluded from service in violation of these principles. In the ordinary
course, a litigant must assert his or her own legal rights and interests, and cannot rest a
claim to relief on the legal rights or interests of third parties. Department of Labor v.
Triplett, 494 U.S. 715, 720, 110 S.Ct. 1428, ----, 108 L.Ed.2d 701 (1990); Singleton v.
Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). This fundamental restriction
on our authority admits of certain, limited exceptions. We have recognized the right of
litigants to bring actions on behalf of [411] third parties, provided three important
criteria are satisfied: The litigant must have suffered an "injury in fact," thus giving him
or her a "sufficiently concrete interest" in the outcome of the issue in dispute, id., at 112,
96 S.Ct., at 2873; the litigant must have a close relation to the third party, id., at 113-114,
96 S.Ct., at 2873-2874; and there must exist some hindrance to the third party's ability to
protect his or her own interests. Id., at 115-116, 96 S.Ct., at 2874-2875. See also Craig v.
Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). These criteria have been
satisfied in cases where we have permitted criminal defendants to challenge their
convictions by raising the rights of third parties. See, e.g., Eisenstadt v. Baird, 405 U.S.
438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Griswold v. Connecticut, 381 U.S. 479, 85
S.Ct. 1678, 14 L.Ed.2d 510 (1965); see also McGowan v. Maryland, 366 U.S. 420, 81
S.Ct. 1101, 6 L.Ed.2d 393 (1961). By similar reasoning, we have permitted litigants to
raise third-party rights in order to prevent possible future prosecution. See, e.g., Doe v.

---

[3]

http://www.housingwire.com/articles/private-equity-public-exit-aegis-mortgage-files-bankruptcy

Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

7.    In Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the

Supreme Court allowed doctors to represent their patients in litigation where there was an

obstacle preventing the patients from asserting their own rights, in that case, embarrassment.

The dissent in *Singleton* would not go as far as the majority and required a higher standard for the

proof that there is an obstacle to the homeowners' representation of their own rights bordering on

impossibility.    This case clearly demonstrates the impossibility of the homeowners defending

their own rights.    The undersigned incorporates by reference the Motion for Appointment of a

"Borrowers'" Committee dated August 24, 2012, (Doc. 1264) in its entirety as if fully set forth

herein.  She incorporates her joinder in the Motion for Appointment of a Borrowers' Committee

as if fully set forth herein.  She incorporates by reference Judge Glenn's Orders allowing the

continuing foreclosure of homes under the Special Servicing Order (Doc. 774) in which the

Debtors have been permitted to use the automatic stay as a sword and a shield against

homeowners, Judge Glenn's denial of the Motion for Appointment of a "Borrowers'" Committee

(Doc. 1921), Judge Glenn's Order creating special Claims Procedures (Doc. 3294) as evidence of

impossibility of the homeowners representing their own interests in these proceedings.

8.    As detailed evidence of impossibility of the homeowners representing themselves

individually in these proceedings, the undersigned refers to Judge Glenn's numerous Orders

denying relief from the automatic stay to allow homeowners to seek damages outside of this

Court by bringing a claim which has far less potential value to the homeowners than their right to

offset their damages against the debt claim on which the foreclosures are proceeding.    Judge

Glenn committed a massive error when he declared that foreclosures were in rem proceedings in

addressing the Motion to Lift the Automatic Stay of Kenneth Taggart in August, 2012.  He then

threatened Kenneth Taggart with frivolous claims sanctions for Mr. Taggart's repeated efforts to

obtain relief from automatic stay and call the injustice of the Debtors' court sanctioned use of the

automatic stay as a sword and a shield.  He denied Corla Jackson an adjournment on her Motion

to the Lift the Automatic Stay pretending to require arcane language which Ms. Jackson

purportedly did not use when anyone hearing Ms. Jackson's choice of words would know what

she was trying to say.   He denied the Motions of Nora, Paul N. Papas II and Ray Elliott when

they sought to call the sword and shield issue to his attention at the hearing on the Final

Supplemental Servicing Order, calling their concerns frivolous when they sought reconsideration

for being  denied hearing on their objection.   But,  when the Debtors' obtained the special

Claims Procedure prior to preparing their Disclosure Statement and Chapter 11 Plan, the

homeowners were set up to be completely excluded from individually representing their own

interests.

9.   Simultaneously with the filing of their Disclosure Statement and Chapter 11 Plan,

Debtors went on what is best described as a rampage to disallow claims.   The Disclosure

Statement and Plan created a minuscule "Borrowers'" Claims Trust and the Disclosure Statement

crowed about having disposed of billions of dollars of "Borrower" Claims.   How they

accomplished that feat is anyone's guess, since the Debtors do not explain how they did it (if they

even did because almost nothing the Debtors put in public records can be believed) but starting

with the Eleventh Omnibus Objection to Claims and accelerating, Debtors have and are pursuing

mass disallowance of what it designates as "Borrowers'" claims.   They waited to commence

8

their assault on "Borrower" Claims until the date they filed their Chapter 11 Plan, July 3, 2013.[4]

That day they filed the Eleventh,[5] Twelfth,[6] Thirteenth,[7] Fourteenth,[8] Fifteenth,[9] Sixteenth,[10] and

Seventeenth Omnibus Objections to Claims.  The Seventeenth Omnibus Objection to Claims

[Doc. 4151] sought relief from "misclassified" claims of "Borrowers" and was filed on the date

the Chapter 11 Plan was filed.

     10.   On July 4, 2013, Debtors continued their assault on Borrower Claims with their

Eighteenth (Doc. 4154), Nineteenth (Doc. 4155), Twentieth (Doc. 4156) and Twenty-First (Doc.

4148) Omnibus Objections to "Borrower" Claims, listing hundreds of claims as purportedly

flawed for "insufficient documentation.[11]"   Again, on July 10, 2013, in their Twenty-Second

---

[4]  Debtors' previous omnibus objections were facially routine, generally seeking relief from late-filed claims [First Objection (Doc. 3573)  and  Fourth Objection (Doc. 3923) dated May 1, 2013, and Fifth Objection (Doc. 3924)]; duplicate claims [Second Objection (Doc. 3574 and Sixth Objection (Doc. 3925) and Ninth Objection (Doc. 3926?)] dated June 7, 2013; amended and superceded claims [Third Objection (Doc. 3575) dated May 1, 2013 and Seventh Objection dated June 7, 2013; redundant claims (Doc. 3927)] and, then, "insufficiently documented" claims as to tax claims (Doc. Unknown)].

[5]  Doc. 4145: "Misclassified" Claims

[6]  Doc. 4146: "No liability-Paid and Satisfied" Tax Claims

[7]  Doc. 4147: "No liability (on their) Books and Records"

[8] Doc. 4148: "No liability (on their) Books and Records" Tax Claims

[9]  Doc. 4149: "Insufficient Documentation" Tax Claims

[10]  Doc. 4150: "Redundant" Claims

[11]  Bankruptcy Rule 3007(e) does not provide for an Omnibus Objection on the grounds that the documentation is insufficient.  The closest authority stated in Rule 3007(e) to that asserted by the Debtors is BR 3007(e)(6), which provides: (6) they [the claims] were presented in a form that does not comply with applicable rules, and the objection states that the objector is unable to determine the validity of the claim because of the noncompliance."  Debtors' Omnibus Objections fail to support their contention as required by BR 3007(f) (3) which requires the Debtors state the grounds of the objection to *each claim and provide a cross-reference to the pages in the omnibus objection pertinent to the stated grounds*.  Ms. Wilson was not provided with the objection so the objection was not cross-referenced.

Omnibus Objection (Doc. 4199), they sought to disallow "Borrower" Claims for "insufficient

documentation.  On July 25, 2013, Debtors filed their Twenty-Third Objection to "Borrower"

Claims asserting no liability for the claims, based on their "books and records.[12]"  On August 15,

2013, Debtors filed their Twenty-Fourth (Doc. 4714), Twenty-Fifth (Doc. 4715) Objections

to"Borrower" Claims which have been "Amended and Superceded."  On August 16, 2013,

Debtors filed their Twenty-Sixth (Doc. 4734) and Twenty-Seventh (Doc. 4735) Omnibus

Objections to "Borrower" Claims for "insufficient documentation"[13] and on August 19, 2013,

Debtors again seek to violate the Bankruptcy Code and abuse the processes of this Court by

asserting grounds to disallow "Borrower" Claims on the grounds that there is no such liability

reflected on their books and records[14] in their Twenty-Eighth Omnibus Objection.   On August

23, 2013, Debtors filed their Twenty-Ninth Objection to Late-Filed Claims (Doc. 4891) and then,

once again, on August 29, 2013, Debtors violated Bankruptcy Rule 3007(e) and seek to abuse the

processes of this court, by filing another Omnibus Objection to "Borrower" Claims on grounds

that they show no liability for the claims on their books and records, without any lawful authority

for such an objection,[15] by filing Debtors' Thirtieth Omnibus Objection to Claims (No Liability

Borrower Claims – Books and Records.)   With dizzying speed the Debtors have redoubled their

Objections to "Borrowers'" Claims filing 19 more omnibus motions to disallow claims, mostly

---

[12]  Bankruptcy Rule 3007(e) does not provide for an Omnibus Objection on the grounds that the "Liability is Not Reflected in Debtors' Books and Records" and the Motion to Disallow Claims on that basis is without lawful authority.

[13]  See footnote 8, above.

[14]  See footnote 9, above.

[15]  See footnote 9, above.

as to "Borrowers'" Claims (up to 150 claims per motion) through September 20, 2013, all

amounting to approximately 5,250 claims of "Borrowers" to the best, quick estimate of the

undersigned. (Approximately 35 omnibus motions of 150 claims each equals 5,250 claims.) The

face value of the claims designated as "Borrowers'" Claims sought to be disallowed since the

date of filing of the Chapter 11 Plan has not yet been calculated. The success rate of the

omnibus motions to disallow claims appears to be around 99%, although it is doubtful that most

homeowners even received notice of the special procedure by which they were purportedly

required to justify their claims to the Debtors and not to the Court in due process proceedings and

then were stripped of their claims because notice was not first not given in the required manner

and then, if notice somehow was given, the opportunity to be heard was suppressed for those

who sought actual representation by this counsel and, for those appearing pro se on October 9,

2013, begging the Court for consideration of loan modification requests seemed to be the only

way to escape the immediate disallowance. Those who have already lost their homes clearly

cannot beg for a loan modification. Of those in the Thirtieth Omnibus Motion to Disallow

Borrower Claims (150 claims) only three (3) were adjourned to a future omnibus proceeding date

set for November 7, 2013--Gwendell L. Philpot (Claim No. 5067); Judith A. Winkler and James

C. Winkler (Claim No. 3582); and M. Francine Modderno (Claim No. 4866); and three (3) were

adjourned to an undetermined date: Paul and Marge Pfunder (Claim No. 1430); Ron R. Bejarano

(Claim No. 604); and Caren Wilson (Claim No. 4754).

   11.   The initial hearing on Caren Wilson's Proof of Claim (KCC, LLC #4754) was

adjourned on October 9, 2013 at the request of the Debtors' without a showing of good cause.

Ms. Wilson's counsel was threatened with bodily seizure and forced removal from the courtroom

for objecting.  For good measure, Ms. Wilson was instructed (advised) by Judge Glenn to obtain

new counsel because her attorney, the undersigned "was going to have" her pro hac vice status

revoked, which happened a few minutes later when she rose to address the rights of Jan Ibrahim.

   12.   Paul N. Papas II, whose Response to the Disallowance of his Claim (KCC, LLC

Claim #242) was putatively considered on October 9, 2013, had the undersigned present as

counsel and had his response attacked as being "scurrilous" by Judge Glenn sua sponte and not

by the Debtors.  His amended Proof of Claim 17 (KCC, LLC Claim #7171) was treated as

subterfuge by Judge Glenn, despite the fact that there is nothing in Title 11, Bankruptcy Rule

3007 or interpretive case law which suggests that a Proof of Claim may not be amended prior to

confirmation of the Plan.

   13.   Judge Glenn leaped to the unsupported conclusion that the undersigned engages in

some improper motive to amend claims prior to confirmation of the Plan because the

undersigned represented Papas on his Response to Debtors' Objection to KCC, LLC Proof of

Claim #242 and Papas had filed an Amended Proof of Claim, and because she also represented

Caren Wilson on her Claim #4754 which had also been amended in connection to her

representation of Ms. Wilson.  The undersigned, silenced under threat of bodily seizure and

forced removal from the courtroom was not permitted to explain that the Papas claim had been

amended according to its value which could be submitted on an offer of proof (from 10 billion to

approximately 664 million) because punitive damages were not believed to be sustainable on the

interests he claimed as the basis of his Proofs of Claim.   As to Ms. Wilson, the amendment was

plain vanilla: Ms. Wilson had asserted a secured claim of 5 million dollars, whereas only the

market value of the real estate she owned could have been theoretically claimed as secured.  The

unsecured portion of the claim was properly recalculated after consultation with Ms. Wilson's

expert witness, who is prepared to testify that the 15 times face value of the note collateral

calculation is the lowest multiplication of the profits to be disgorged by the Debtors and their

associates for the illegal sale of Ms. Wilson's note and Deed of Trust as collateral.  The injustice

of attempting to impute an improper motive to the amendment of Proofs of Claim in proceedings

in which the claim is sought to be disallowed without permitting evidence or argument is

particularly demonstrable by these facts: the undersigned also appeared for Jan Ibrahim (KCC,

LLC Claim #997) and responded as co-counsel for Shane M. Haffey (Claims 2582 and 4402) and

did not seek to amend the face value or the underlying classification of either claim.   Judge

Glenn, in his extreme personal bias and prejudice against homeowner claims, directed against

homeowner claimants by threats against their counsel and imposing a penalty of revoking her

privilege to continue to represent them without due process, attributed a motive for the

amendments which simply did not exist.   The amendments of the Papas and Wilson Proofs of

Claim were to conform to the provable facts under the legal theories asserted and to properly

classify the Wilson claim under 11 USC sec. 502 because the undersigned recognized a

misclassified claim.   Haffey and Ibrahim were properly classified and factually supportable on

the face of the documents reviewed by the undersigned and were not amended.   Holding

amended claims prior to confirmation to be suspect  is simply evidence of Judge Glenn's

personal bias and prejudice which has simmered just under the surface against homeowners,

who,  in his own words, have "rights, if any," which boiled over on October 9, 2013 resulting in

the "default" disallowance of Jan Ibrahim's Proof of Claim for nonappearance when his

counsel's pro hac vice admission was "revoked" at the very moment she sought to appear on his

behalf, having already been displayed in the Papas and Wilson matters on that same day.

14.    Papas and Nora both objected to the entry of an order approving Debtors' Disclosure

Statement (Doc. 4157) filed on July 4, 2013.    Both were denied contested proceedings on their

timely objections to the entry of the order approving the Disclosure Statement as required by

Bankruptcy Rule 9014.    Nora was placed on mute, apparently by someone in the courtroom on

August 21, 2013 before the disclosure statement approval hearing commenced.    When her name

was called, she heard it repeated several times, but the Court could not hear her.    Several other

names were called, just once each, including Paul N. Papas II, and immediately passed over.

While Nora was on mute, she heard lengthy discussions in which anyone in the courtroom was

able to discuss everything from the sublime to the ridiculous on the record in what sounded

extremely informal for what ought to have been a contested matter.    Nora was then cut off from

the connection somehow, called back in through Court Call several times, once was

acknowledged by Judge Glenn, told not to interrupt the proceedings (which were a lot of what

sounded like sociable discussions about how everyone was so proud of themselves and each

other for having worked so hard) and then cut off again.    She called in again and was told by

Judge Glenn that her Objection had already been overruled on the basis of her papers.    After she

filed her First Objection to the Disclosure Statement on July 28, 2013 (Doc. 4388), the Debtors'

had filed an Amended Disclosure Statement (Doc. 4733) on August 16, 2013, five (5) days

before the hearing on the approval of the Disclosure Statement.    Neither she nor any other

objecting party was ever heard on the approval of the Amended Disclosure Statement, which still

failed to disclose the nature of the Debtors' business operations, what led them to seek the

protection of the Court, how they are funding the proposed Chapter 11 Plan, the legal authority

14

for creating separate classes of general, unsecured claims in which homeowner claims were to be

paid a far smaller share than other general, unsecured claimants and what, if anything, the

business of the reorganized entity would be.  Most importantly, neither the Disclosure Statement

nor the Amended Disclosure Statement justifies the key provision contained therein: a Third

Party Release in favor of AFI/Cerberus in exchange for a cash contribution 2.1 billion, no more

than 1/6 of the TARP funds taken for the mortgage business operations and, considering the

priority claim repaid to AFI for maintaining the Debtors' business operations to obtain the Third

Party Release in excess of 1 billion dollars, amounts to approximately 1.1 billion dollars in

contribution from AFI, which seeks a release for liabilities in excess of 20 billion dollars to

investors and homeowners, the Janus-face of the securitization fraud operation.  The Chapter 11

Plan, which included the unjustified Third Party Release must NOT be confirmed.

    15.  The Chapter 11 Plan is **<u>NOT</u>** confirmable because it does not comply with the

requirements of 11 USC sec. 1125, is **<u>NOT</u>** proposed in good faith, is founded on the disparate

treatment of the homeowners' claims as a separate class of general, unsecured claims is **<u>NOT</u>**

permitted by law,  and it suffers from the same flaws as those exposed by Nora's Objection to in

the inadequate Disclosure Statement which were not cured by the amendment filed five (5) days

before the hearing on approval of the Disclosure Statement, including but not limited to the

following legal deficiencies:

        a.   Debtors' Chapter 11 Plan is based upon a fraudulently administered estate in

        which homeowners whose real estate assets are listed on the Debtors' Schedules

        A have been illegally taken.  The Schedules A assets consist largely of homes and

        other real property which Debtors have obtained by a claim of a right to the

remedy of foreclosure founded upon forged and/or perjured documents created by

DOCX, a division of Lender Processing Services, Inc. (LPS) or manufactured at

the offices of GMAC Mortgage, LLC (GMACM) in Pennsylvania and Iowa and

Residential Funding Company, LLC (RFC) in Minnesota, but forged documents

have also been manufactured by LPS in Florida, Georgia and Minnesota

and used by the Debtors whose officers and the officers of its parent company,

AFI, knows are forgeries.

b.  Debtors' Chapter 11 Plan is based upon the retention of assets belonging to

homeowners in thousands of pending judicial and nonjudicial foreclosure

proceedings throughout the nation have been undertaken and continue to be

pursued upon forged and/or perjured documents created by DOCX, a division of

Lender Processing Services, Inc. (LPS) or manufactured at the offices of GMAC

Mortgage, LLC (GMACM) in Pennsylvania and Residential Funding Company,

LLC (RFC) in Minnesota, now being pursued by Ocwen, from which the Debtors

have illegally profited under the 363 sale.

c.  Debtors' Chapter 11 Plan wholly fails to account for the funds which Debtors

have obtained through the liquidation of the illegally confiscated real estate assets

during the pendency of these proceedings.

d.  Debtors failed to provide this Claimant,  and every other homeowner, with

sufficient information about the true ownership of the real estate assets

after foreclosure with adequate advance notice that their homes were being sold as

assets of the Debtors estate, when they were not lawfully taken by the Debtors

order to prevent them from paying an amount greater than the third party offered in an effort to launder their title by its transfer to a "bona fide purchaser" in good faith and without notice of their rights to recover possession and control of their homes.

e.  Debtors' Chapter 11 Plan proposes to pay other creditors in these proceedings with the proceeds of sale of illegally confiscated real estate assets belonging to the class of homeowner claimants, many of whom received no notice of these proceedings.

f.  Debtors used their servicing platform to obtain access to images of notes and mortgages scanned into a computer database after the documents were signed by persons who were defrauded into believing they were borrowing mortgage funds from "originating lenders," when the "originating lenders" appeared at the real estate closings to obtain the notes and mortgage securities for immediate resale by undisclosed entities providing warehouse lines of credit to facilitate the sale of the notes and mortgages to government sponsored entities (GSEs) and sponsors of private label securities offerings to pension funds.

g.  Debtors operated largely as loan servicers for the concealed real parties in interest and had no ownership interest in the notes and mortgages taken from parties who have been fraudulently identified as "borrowers"[16] of the Debtors in

---

[16]  The Debtors use the term "borrowers" to imply that members of the class obtained funds from the Debtors for the financing of real estate assets.  As used in this objection the term "borrowers" is defined as the owners of interests in real estate who were entitled, by law, to the use, occupancy and possession of the real estate, subject to claims for repayment of funds to the real party in interest which advanced the funds.  The class of "borrowers" identified as homeowners in this objection is further

17

these proceedings. Debtors were merely the loan servicers for the real parties in

interest, GSEs and holders of certificates on beneficial interest consisting of

"private label" securities. The private label securities were issued by Real Estate

Mortgage Investment Conduit (REMIC) Trusts.

h. The mortgage notes were not transferred by delivery to the GSEs or the

REMIC Trusts as required by the Uniform Commercial Code in the various states

of the United States of America. Rather, the mortgage notes were scanned into a

central computer data base and available to be viewed on computer screens

accessed by employees of the Debtors as servicers for the GSEs and REMIC

Trusts and the notes were either destroyed after they were scanned or the notes

were placed in a vault without being endorsed in blank or by special endorsement

to the GSEs or the REMIC Trusts.

i. The mortgages or deeds of trust either named another computer data base,

Mortgage Electronic Registration Systems, Inc. (MERS) as mortgagee or

beneficiary or maintained the name of the "originating lender" as the mortgagee or

beneficiary in order to fraudulently conceal the true nature of the loan transaction

which they almost uniformly believed were conventional mortgages to be paid

according to the terms appearing on the notes and mortgages or in accordance

---

defined as the class of individuals and entities whose are victims of the forgery/perjury operation by
which their real estate assets were and are being confiscated by the Debtors and their successors in
interest on false claims brought by servicers to foreclose on the "borrowers" real estate interests. The
relationship of the Debtors to the class of "borrowers" in these proceedings is generally that of a loan
servicing fiscal intermediary between the owners and occupants of real estate and the entities were led to
believe that they are entitled to receive a stream of income from the owners' and occupants' loan
payments.

with the terms of notes and deeds of trust.  The mortgagors and holders of the

possessory interest in the subject real estate under the deeds of trust were actually

deceived by their reliance on the terms of the loan documents because the

essential terms of the transactions: that the loan documents were being used to

create securities and that the securities were being sold to obtain the loan funds

from undisclosed third parties and that the Debtors did not have a financial

interest in the loan transactions, except for the right to receive servicing fees.

j.  When the United States Congress authorized funds for the Troubled Asset

Relief Program (TARP) in October, 2008, the Debtors, as servicers, sought to

foreclose on real estate assets throughout the nation in order to obtain payment in

full for long-term mortgages under 12 USC sec. 5212 and, commencing in

January, 2009, a massive enterprise popularly known as "robo-signing" began.

k.  "Robo-signing" is the popular name for forgery and perjury on a massive scale

by which the Debtors and other servicers of mortgage loans uttered forged and

perjured documents in order to make it appear that the servicers were lawfully

entitled to foreclose on real estate throughout the nation.   The foreclosure "crisis"

is nothing more than an effort to obtain double payments on loan instruments not

owned by the Debtors, first, by the claim for TARP payments and, second, by the

liquidation of the real estate by the servicers.[17]

---

[17]   There were often multiple payments in full of the mortgage loans procured from unsuspecting
real estate owners whose loan documents were fraudulently procured without disclosure of the true
nature of the transaction.  The first payment in full was upon the sale of the loan to the REMIC Trust.
Often mortgage insurance was also claimed and received as well as credit default swaps, culminating
with the TARP payment.

19

l.  Debtors, the Committee of Unsecured Creditors, the unsecured creditor class
represented by Trustees of REMIC Trusts, the classes of super-priority and
priority claimants all seek to benefit from the liquidation of the real estate assets
confiscated by forged and perjured documents.  Even the detailed investigation by
the Examiner in these proceedings entirely disregards the claims of the defrauded
owners of real estate assets taken by the Debtors on forged and perjured
documents.  There is no mention[18] in the Examiner's report of the 17 Billion
Dollars in TARP funds paid to the Debtors' parent, Ally Financial, Inc. (AFI) by
the United States Treasury, which is the core reason why the Debtors, as wholly
owned subsidiaries of AFI, were forced by its parent into Chapter 11–that AFI
seeks to "ring-fence" its legacy liabilities for the forgery/perjury operation by
which thousands of homes have been confiscated and are still being confiscated.

m.  The Debtors' Chapter 11 Plan is fatally deficient because its claims to real
estate titles listed on their various Schedules A (most particularly those of
GMACM and RFC) were obtained by forged and perjured documents, and which
it has been liquidating in these proceedings.  This scheme was engineered by
AFI/Cerberus and associated enterprises and the Chapter 11 Plan proposes to
hold the AFI/Cerberus securitization fraud scheme harmless without disclosing
the foreclosure fraud which is at the core of these proceedings.

n.  The Debtors' Chapter 11 Plan  is not permitted by law because it provides

---

[18]  If the Examiner did mention the TARP funds paid to Ally Financial, Inc. (AFI) this Claimant
was unable to find any mention of the TARP payments in the Examiner's Report.

unjustified treatment of the claims of the class which it designates as "borrowers"

who have claims for "robo-signing" against AFI, which seeks to be released from

liability for the forgery/perjury operations of its Debtor subsidiaries, of which its

CEO, Michael Carpenter, was specifically and personally placed on notice by the

United States Department of Justice, 49 State Attorneys General and financial

regulators in the investigations which culminated in the National Mortgage

Settlement and the Independent Foreclosure Review.

16.    Debtors have now, at the eleventh hour, sought to supplement their deficient

Chapter 11 Plan with exhibits sent to homeowners and received, for example, by objecting

claimant, Richard Rode of Texas, on October 18, 2013, the last business day before objections to

this Chapter 11 Plan are due.   This is typical of the "lack of notice, shortened notice, denial of

opportunity to be heard regime" which characterizes these proceedings.

17.    In Windsor v. McVeigh, 93 U.S. 274, 277-278 (1876), the United States Supreme

Court recognized the defect in proceedings had upon notice and in which the party notified is not

permitted to be heard:

> But notice is only for the purpose of affording the party an opportunity of being heard
> upon the claim or the charges made; it is a summons to him to appear and speak, if he has
> any thing to say, why the judgment sought should not be rendered. A denial to a party of
> the benefit of a notice would be in effect to deny that he is entitled to notice at all, and *the
> sham and deceptive proceeding had better be omitted altogether. It would be like saying
> to a party appear and you shall be heard, and, when he has appeared, saying your
> appearance shall not be recognized and you shall not be heard.* (Emphasis added.)

The United States Supreme Court went on to say in *Windsor v. McVeigh*, supra, at page 283,

after reciting the holdings in several cases:

> The judgments mentioned, given in the cases supposed, would not be merely erroneous;

21

they would be absolutely void, because the court in rendering them would transcend the limits of its authority in those cases.

18.    Specific instances of the Debtors' failure to provide constitutionally sufficient

notices to homeowners entitled to bring claims in these proceedings abound.    Furthermore, the

purported notices sent for the purpose of disallowing homeowner claims, if the notices were even

received at all are uniformly deficient for failure to comply with Bankruptcy Rule 3007(a), which

provides:

> Rule 3007. Objections to Claims
> (a) Objections to Claims. An objection to the allowance of a claim shall be in writing and filed. <u>A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant</u>, the debtor or debtor in possession, and the trustee <u>at least 30 days prior to the hearing</u>.

19.    Thousands of homeowners never received copies of Objections to their Proofs of

Claims as required by Rule 3007(a), those who received the "Notice of Hearing" never received a

copy of the Objection to their claims and, based on confusing contents of the Notice of Hearing,

could have reasonably believed that their claims had already been disallowed for failure to

respond to an earlier mailing from the Debtors requesting additional documentation and

information.[19]    See Caren Wilson's Response (Doc. 5222) and Exhibit A attached thereto as an

example.    These mailings are standard and Ms. Wilson's Exhibit A is simply a common form

letter.    The record is replete with similar notices attached to up to 35 omnibus motions to

disallow the claims of so-called borrowers, who are, in fact, homeowners and former

---

[19]    The failure of notice, failure of service of the objections with the notices of hearing and the confusing language in the notices plainly demonstrates the utter uselessness of "Special Borrowers' Counsel" which did nothing to assure that the minimum requirements of procedural and substantive due process were afforded to the homeowner claimants and provided mere window dressing to the entire fraudulent, unconstitutional and void process by which homeowner claims are purportedly being disallowed *en masse*.

homeowners who provided the collateral for a securitization scheme never disclosed to them.

20.    The Debtors in these proceedings are absolutely addicted to creating a false reality,

whether it be by creating and uttering forged and perjured  documents and passing them off as if

they were authentic or abusing legal processes by creating and uttering forged and perjured

documents into court proceedings through their employees, agents and attorneys, they are

continuing the same course of conduct by instructing their administrative agent to record and

publish false data which purports to disallow claims before the claims have even been heard and

determined.   On October 7, 2013, in the course of preparing for the appearances in the Papas

matter and at her own proceedings, Claimant/Plaintiff reviewed the KCC, LLC's Claims

Registry, copied and pasted the data displayed there into a WordPerfect document because it

could not be downloaded and saved in PDF format.   The attached Exhibit A from the KCC, LLC

data base published the following false statements regarding the Papas Claim #242 and Nora

Claims #1 (KCC, LLC Claim #2) and #440:

7/2/2012   242      Paul N. Papas II          $10,000,000,000.00
Secured              Residential Capital, LLC    12-12020    The Claim is Not Properly Asserted
Against Rescap, and the Claim is Not Supported by Sufficient Documentation

5/18/2012   2      Wendy Alison Nora        $10,000,000,000.00
General Unsecured   Residential Capital, LLC  12-12020 The Claims Barred by the Judgments
Against Nora in the Wisconsin Litigatio, the Rooker-Feldman Doctrine Applies and the Claims
are Defective as Pleadings

8/29/2012    440      Wendy Alison Nora        $119,000.00
                        Residential Funding Company, LLC  12-12019 The Claims Barred by the
Judgments Against Nora in the Wisconsin Litigatio, the Rooker-Feldman Doctrine Applies and
the Claims are Defective as Pleadings

This data was published before Papas' hearing on his Response the Debtors' Objection to his

Claim on October 9, 2013, which has not yet been disallowed and before the Nora Response is

23

even due to be filed on October 21, 2013 and for which hearing was scheduled on November 7,

2013, conclusively demonstrating what many homeowners have discovered to their dismay: these

proceedings are being entirely controlled and directed by the Debtors in order to deprive

homeowners of their rights to be heard.    Debtors are so confident that whatever position they

take will be approved by the Court, they had already posted the outcome of hearings yet to be

held as to Nora and Papas and, in Nora's case, prior to her response even being due to be filed.

    21.    This Claimant has consulted with homeowners from around the country concerning

their rights in these proceedings, prior to the sua sponte revocation of her pro hac vice admission

on October 9, 2013, without cause and for the purposes of silencing the homeowners' voices in

these proceedings.    She has heard concerns and personally observed many due process

violations, including,  but not limited to, failures of notice, fictitious notices, false notices, refusal

of the Court to hear homeowners when they are present for telephonic hearings and oppressive

conduct by Judge Glenn, sporadic service of documents by KCC, LLC of what it considers

important (undoubtedly directed by the Debtors) even when the Request for Notices and

Documents is properly filed.    The data displayed by KCC, LLC regarding the Papas and Nora

claims demonstrates that these proceedings are nothing more than a sham and a mockery as

described by the United States Supreme Court in *Windsor v. McVeigh*, supra, in which even if

notice is given, the opportunity to be heard is denied.    As to the sua sponte revocation of the

Nora pro hac vice admission on October 9, 2013,  Judge Glenn's post facto Order to Show Cause

against her entered on October 10, 2013 (Doc. 5330)  was served electronically by KCC, LLC,

but KCC, LLC did not serve Nora's Motion to Disqualify Judge Glenn electronically (Doc. 5347)

and it would be extremely surprising if her Response to the Order to Show Cause will be served

24

by KCC, LLC.   KCC, LLC is the Debtors' agent and has taken over the public function of the

Court in maintaining a private claims registry in which the Debtors now publish their

unadjudicated positions on claims as if their positions have been adjudicated and have the force

and effect of law.

22.   This entire bankruptcy proceeding has been designed and implemented by Ally

Financial, Inc. (AFI), enabled by the Committee of Unsecured Creditors which is

disproportionately populated with parties in direct conflict with homeowners, who have been

denied notice and opportunity to be heard throughout these proceedings, and ratified by Judge

Glenn who has legislated new procedures beyond the scope of his authority by numerous orders,

including, but not limited to, the Final Supplemental Servicing Order (Doc. 774), the Special

Adversary Proceedings Case Management Order (Doc.  3293), the special Claims Procedures

Order (Doc. 3294) and followed by Omnibus Order disposing of billions of dollars of

homeowners' claims based on the Claims Procedures Order (Doc. 3294), all of which purport to

be entered under the Court's authority under 11 USC sec. 105.  Judge Glenn and the Debtors

know or should know that 11 USC sec. 105 cannot be used to expand the powers of the Court

beyond the provisions of Title 11 of the United States Code, the Federal Rules of Civil Procedure

and the Federal Rules of Bankruptcy Procedure and all the orders are void.

23.   It is little wonder that, when an attorney with some familiarity with bankruptcy

practice appears before Judge Glenn (and while the Debtors have stated that Nora has handled

many "consumer" bankruptcies and attached five pages of cases from the Pacer database, they

fail to note that she has also filed a number of business bankruptcy cases, many of which were

filed before electronic filing was available) and knows that the Orders being entered are

unconstitutional and void as in excess of his jurisdiction, she is threatened with bodily seizure

without probable cause in an effort to intimidate her into silence and prevent her from defending

her clients by the revocation of her pro hac vice admission without hearing less than 2 weeks

before her clients and prospective clients were depending upon her ability to represent them as

their pro hac vice counsel for instructions as to how to mark their ballots, how to vote on the

Chapter 11 Plan if they did not receive ballots and how to respond to the deadline for objections

to the confirmation of the Chapter 11 Plan, rendering the protection of their rights impossible.

24.   It is plain that the procedures in this case are being made up as the proceedings go

along in order to give the Debtors unprecedented powers never before granted to bankrupt

entities by which the Debtors are proceeding to extinguish the claims of individuals they have

severely damaged–the homeowners–as well as the investors they defrauded in the ultimate quest

for a Third Party Release in favor of their parent, who believes that it can use a portion of the

12.5 billion dollars in TARP funds it is holding to fund its alter ego subsidiaries in these

proceedings, liquidate their fraudulent lending and servicing portfolio, pay pennies on the dollar

to the insurance companies and investors they defrauded and do all this under Orders of a federal

bankruptcy judge.  Fortunately, the key orders providing the Debtors with the unprecedented

powers to continue to foreclose on homes with forged and perjured documents, to disallow

homeowners' claims on grounds not permitted under Title 11 or Bankruptcy Rule 3007 and to

create a separate class of unsecured claims just for homeowners are all unconstitutional and void.

25.   This objection to the confirmation of the Chapter 11 Plan is properly filed by Nora

in the restricted circumstances whereby her pro hac vice admission is, at this time, revoked,

without due process given to her, her clients or her prospective clients (those with whom she has

consulted during the course of these proceedings.)  Under the holdings of *Powers v. Ohio*, supra,

and *Singleton v. Wulff*, supra, this objection stands for the entire suppressed and silenced,

improperly subclassified homeowner category of general, unsecured claims in these proceedings.

But for the unconstitutional and void revocation of her pro hac vice admission, which she, as an

officer of the United States Supreme Court, the Supreme Courts of Wisconsin and Minnesota,

the Seventh and Eighth Circuit Courts of Appeal, and the Eastern and Western District Courts of

Wisconsin and the District of Minnesota must obey until the order is vacated, she would have

been able to file her clients' individual objections to confirmation of the Debtors' Chapter 11

Plan.  The Chapter 11 Plan should actually not be called the RESCAP Chapter 11 Plan.  It should

be called what it really is–the AFI/Cerberus Chapter 11 Plan–in which AFI and Cerberus are

attempting to discard their massive mortgage securitization and foreclosure fraud liabilities

without being exposed to the requirements of the United States Bankruptcy Code.

26.  These proceedings are a sham and a mockery because the homeowners have been

completely shut out of their rights to be heard even when they tried to be heard.  Then, when this

counsel appeared on behalf of a few homeowners, she was threatened with bodily seizure and

removal by force from the courtroom in an effort to silence her and had her pro hac vice

admission revoked without notice or opportunity to be heard.  Her Proof of Claim #1 in these

proceedings is the representative case for thousands of homeowners whose homes have been

confiscated on forged and perjured documents and who have not been able to defend their

interests in these proceedings and whose interests must be protected.

27.  Claimant/Plaintiff and her now orphaned clients, whether they have been able to join

in this objection or not,  reserve their rights to be fully heard on their objections to the

27

confirmation of the AFI/Cerberus Chapter 11 Plan masquerading as the RESCAP Debtors'

Chapter 11 Plan on November 19, 2013 or on such other date to which the hearing may be

adjourned before a qualified judge and not before Judge Glenn who is disqualified from hearing

and deciding any further matters in these proceedings for extreme bias and prejudice against

homeowners' rights in these proceedings,  plainly exposed on October 9, 2013.

WHEREFORE, the undersigned objects to the confirmation of the Debtors' Chapter 11

Plan, which is actually the AFI/Cerberus Chapter 11 Plan, designed to obtain a Third Party

Release of their liabilities for  Mortgage Securitization/Foreclosure Fraud scheme, in exchange

for the payment of a sum of money into the estate and not otherwise justified, which has been

filed in these proceedings.

Dated at Madison, Wisconsin this 21st day of October, 2013.

*/s/ Wendy Alison Nora*
Wendy Alison Nora
310 Fourth Avenue South, Suite 5010
Minneapolis, Minnesota 55415
Telephone (612) 333-4144
Facsimile (608) 497-1026
accesslegalservices@gmail.com

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY OF
WENDY ALISON NORA, IN HER OWN NAME AND RIGHT**

Wendy Alison Nora declares under penalty of perjury, pursuant to 28 USC sec. 1746, that the facts set forth in the foregoing motion are true and correct, to the best of her knowledge, information and belief.

*/s/ Wendy Alison Nora*
Wendy Alison Nora

**UNSWORN DECLARATION OF SERVICE**

Wendy Alison Nora declares, under penalty of perjury, that she filed the above-captioned

document with the United States Bankruptcy Court for the Southern District of New York on October 21,  2013 by CM/ECF and thereby served the same on all parties capable of service thereby.

*/s/ Wendy Alison Nora*
Wendy Alison Nora