1

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 Case No. 12-12020-mg

5 - - - - - - - - - - - - - - - - - - - - -x

6 In the Matter of:

7

8 RESIDENTIAL CAPITAL, LLC, et al.,

9

10            Debtors.

11

12 - - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            October 9, 2013

19            10:06 AM

20

21 B E F O R E:

22 HON. MARTIN GLENN

23 U.S. BANKRUPTCY JUDGE

24

25

1

2   Doc# 5227 Motion to Approve / Notice of Debtors' Motion

3   Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code

4   for an Order Approving Amendment to Engagement Letter with

5   Debtors' Chief Restructuring Officer, Lewis Kruger

6

7   Doc# 4768, (CC: Doc no. 4649) Hearing RE: Phillip Scotts'

8   Motion to (1) Determine that Bankruptcy Estate Owns Title to

9   Note, (2) Void State Court Title Transfer, and (3) Enjoin Post

10  Petition State Court Prosecution (related document(s)4649)

11

12  (CC: Doc# 4635)  Adj. Hearing RE: Motion for Objection to

13  Claim(s)/ Debtors' Objection to Proofs of Claim.

14

15  (CC: Doc# 4947)  Motion for Objection to Claim(s) Number:

16  242/Claim Filed by Paul N. Papas II.

17

18  (CC: Doc# 4156)  Adj. Hearing RE: Motion for Omnibus Objection

19  to Claim(s) /Debtors' Twentieth Omnibus Objection to Claims

20  (Borrower Claims with Insufficient Documentation).  Hearing on

21  this matter as it relates to Mark Ragonese is going forward.

22

23

24

25

1

2  (CC: Doc# 4199, 4831)  Adj. Hearing RE: Motion for Omnibus

3  Objection to Claim(s) /Debtors' Twenty-Second Omnibus Objection

4  to Claims (Borrower Claims with Insufficient Documentation).

5  Going forward as to the proof of claim filed by William C.

6  Walker and Keiran Walker (Claim No. 5529) and George Davis

7  (Claim No. 3443).

8

9  (CC: Doc# 4734)  Adj. Hearing RE: Motion for Omnibus Objection

10  to Claim(s) / Twenty-Sixth Omnibus Objection to Claims

11  (Borrower Claims with Insufficient Documentation) Hearing Going

12  Forward as to claims of Phenon Walker (Claim No. 5429), Fannie

13  Kendrick Dietrich (Claim No. 1385), and Juana Cerna (Claim No.

14  3816).  Hearing as it relates to the claim filed by Mary Lynn

15  Weber (Claim No. 3474) adj. to 11/7/2013.

16

17  (CC: Doc# 4735)  Adj. Hrg. RE: Motion for Omnibus Objection to

18  Claim(s) / Debtors' Twenty-Seventh Omnibus Objection to Claims

19  (Borrower Claims with Insufficient Documentation) Going Forward

20  as to Claims of Phenon Walker (Claim No. 4942), Freddie M.

21  Scott (Claim No. 3751), and Bette Jean Yelder (Claim No. 2002).

22

23  (CC: Doc# 4902)  Omnibus Motion for Omnibus Objection to

24  Claim(s) / Debtors' Thirty-First Omnibus Objection to Claims

25  (Late-Filed Borrower Claims)

1

2    (CC: Doc# 4887)  Motion for Omnibus Objection to Claim(s) /

3    Debtors' Thirtieth Omnibus Objection to Claims (No Liability

4    Borrower Claims - Books and Records).

5    Reset for 11/07/2013 at 2:00 pm as to claim of Gwendell L.

6    Philpot (Claim No. 5067) and; James C. and Judith A. Winkler

7    (Claim No. 3582).  Hearing as it relates to all other claimants

8    will be going forward.

9

10   (CC: Doc# 4996, 4998)  Motion for Omnibus Objection to

11   Claim(s)/ Debtors' Thirty-Third Omnibus Claims Objection

12   (Facially Defective and Time-Barred Securities Claims) with

13   hearing to be held on 10/9/2013 at 10:00 AM at Courtroom 501

14   (MG) Responses due by 9/30/2013.

15

16

17

18

19

20   Transcribed by:  Sharona Shapiro

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

**5**

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8  BY:   ADAM A. LEWIS, ESQ.

9        MELISSA A. HAGER, ESQ.

10        JORDAN A. WISHNEW, ESQ.

11        LORENZO MARINUZZI, ESQ.

12        NORMAN S. ROSENBAUM, ESQ.

13        PAUL A. GALANTE, ESQ.

14        JONATHAN M. PETTS, ESQ.

15        MERYL L. ROTHCHILD, ESQ.

16

17

18  KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP

19        Attorneys for Official Creditors' Committee

20        1177 Avenue of the Americas

21        New York, NY 10036

22

23  BY:   ELISE S. FREJKA, ESQ.

24        STEPHEN D. ZIDE, ESQ.

25

1

2  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

3          Conflicts Counsel to Debtors

4          101 Park Avenue

5          New York, NY 10178

6

7  BY:   MARYANN GALLAGHER, ESQ.

8

9

10  LAW OFFICES OF KIM DSOUZA

11          Attorney for Phillip Scott

12          2 Bordi Lane

13          Highland, NY 12528

14

15  BY:   KIM DSOUZA, ESQ.

16

17

18  ACCESS LEGAL SERVICE

19          Attorneys for Wendy Alison Nora

20          and similarly situated individuals

21          310 Fourth Avenue South

22          Suite 5010

23          Minneapolis, MN 55415

24

25  BY:   WENDY ALISON NORA, ESQ.

```
 1
 2  LAW OFFICES OF LAIRD J. HEAL
 3        Attorney for Thomas James La Casse
 4        3 Clinton Road
 5        Sterling  MA  01564
 6
 7  BY:   LAIRD J. HEAL, ESQ.
 8
 9
10  BRACEWELL & GIULIANI LLP
11        Attorneys for Lender Processing Services, Inc.
12        1251 Avenue of the Americas
13        49th Floor
14        New York, NY 10020
15
16  BY:   STAN CHELNEY, ESQ.
17
18
19  PRINCE LOBEL TYE LLP
20        Attorneys for Residential Funding Company
21        100 Cambridge Street
22        Suite 2200
23        Boston, MA 02114
24
25  BY:   ANDREW L. BALDWIN, ESQ.
```

```
 1
 2    SILVERMANACAMPORA LLP
 3          Special Counsel to the Creditors' Committee
 4          100 Jericho Quadrangle
 5          Suite 300
 6          Jericho, NY 11753
 7
 8    BY:   ROBERT D. NOSEK, ESQ.
 9          JUSTIN S. KRELL, ESQ.
10
11
12    LOCKE LORD LLP
13          Attorneys for RFC Trust; GMAC Mortgage Group, LLC;
14          GMAC Financial Services; Cerberus Capital Management;
15          MERS; MERSCORP Holdings; Stephen Feinberg; Kenneth
16          Urgwuadu; Manish Verma; Judy Faber; Amy Nelson
17          111 South Wacker Drive
18          Chicago, Illinois 60606
19
20    BY:   JULIE C. WEBB, ESQ.
21
22
23
24
25
```

 1

 2  HINSHAW & CULBERTSON LLP

 3          Attorneys for Gray & Associates, Duncan Delhey, Jay

 4          Pitner, Michael Riley, and William Foshag

 5          800 Third Avenue

 6          13th Floor

 7          New York, NY 10022

 8

 9  BY:   BENJAMIN NOREN, ESQ.

10

11

12  UNITED STATES DEPARTMENT OF JUSTICE

13          Office of the United States Trustee

14          201 Varick Street

15          Suite 1006

16          New York, NY 10014

17

18  BY:   BRIAN S. MASUMOTO, ESQ.

19

20

21

22

23

24

25

1

2   MENTER, RUDIN & TRIVELPIECE, P.C.

3          Attorneys for Bass & Moglowsky, Arthur Moglowsky,

4          David Potteiger, and Penny Gentges.

5          Suite 200

6          308 Maltbie Street

7          Syracuse, NY 13204

8

9   BY:   KEVIN M. NEWMAN, ESQ. (TELEPHONICALLY)

10

11

12   SAUL EWING LLP

13          Attorneys for Jeffrey Stephan

14          Centre Square West

15          1500 Market Street

16          38th Floor

17          Philadelphia, PA 19102

18

19   BY:   ADAM H. ISENBERG, ESQ.

20

21

22

23

24

25

1

2  GOLDMAN BEHR LLC

3          Attorneys for Bette and Willie Yelder

4          1132 South McDonough Street

5          Montgomery, AL 36104

6

7  BY:   HENRY JENKINS, ESQ. (TELEPHONICALLY)

8

9  ALSO PRESENT: (TELEPHONICALLY)

10         KAREN BEJARANO, Pro Se

11         JOHN DEMPSEY, Mercer USA

12         COLT B. DODRILL, Wolfe & Wyman LLP

13         BARRY ESKANOS, Pro Se

14         BETTE JEAN YELDER, Creditor

15         WILLIAM C. WALKER, Pro Se

16         TIMOTHY W. SCOTT, Pro Se

17         KENNETH RUSSO, Pro Se

18         MARGE PFUNDER, Pro Se

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  All right.  Please be seated.

3            All right.  We're here in Residential Capital, LLC,

4    number 12-12020.

5            Mr. Marinuzzi?

6            MR. MARINUZZI:  Good morning, Your Honor.  For the

7    record, Lorenzo Marinuzzi, Morrison & Foerster, on behalf of

8    the debtors.

9            Your Honor, the first matter for hearing this morning

10   is found at the bottom of page 5 of the amended agenda, and

11   that's the debtors' motion for an order approving the amendment

12   to the engagement letter with Lewis Kruger, the debtors' CRO.

13           The committee filed a statement of no objection

14   regarding the success fee.  The success fee was arrived at

15   after consultation with the committee.  We appreciate their

16   filing.

17           We've also submitted in support of the motion three

18   declarations, one by Pam West, a director; one by Bill Nolan of

19   FTI; and one by John Dempsey of Mercer.  They are all on the

20   phone, to the extent the Court or anybody has questions of

21   them.  And we appreciate Your Honor's accommodation to allow

22   them to participate telephonically and not have to fly into New

23   York.

24           Your Honor, in early February, the debtors appointed

25   Mr. Kruger as their CRO and filed a motion seeking approval of

1  that appointment.  We worked with the committee to modify the

2  scope of Mr. Kruger's duties, and ultimately, on March 5th, the

3  Court approved the debtors' appointment of Mr. Kruger as CRO.

4  We indicated in the initial application and at the hearing that

5  we hope to come back to the Court shortly with a success fee.

6  The success fees typically for CROs, as Your Honor understands

7  and knows, are usually set forth in the engagement letter, pre-

8  negotiated before day one of the appointment.  Here, it was

9  different.  We wanted to work with the committee and we wanted

10 to have consensus on it.

11        We got sidetracked and Mr. Kruger, obviously, was

12 focused on getting a plan put together, and a mediation, and

13 things that we all view as very important.  And to his credit,

14 he continued to work hard to try to achieve consensus on the

15 success fee.  And ultimately, several weeks ago, we picked the

16 discussions back up again.  And the board consulted with its

17 advisors, including FTI and including Mercer, consulted with

18 the committee, and arrived at a success fee of two million

19 dollars.

20        This was a little different from the typical CRO

21 engagement; as I noted, we had the benefit of eight months' of

22 performance, effectively, to review the accomplishments of Mr.

23 Kruger thus far, and certainly that was a benefit to all of us

24 in assessing the reasonableness of the fee.  But like typical

25 CRO retentions in the Southern District, it will be subject to

1    the Jay Alix protocol which we know is important to the Court

2    and to the U.S. Trustee.  And so it's clear, to the extent the

3    Court approves entry into the amendment by the debtors, it

4    still leaves the success fee, at the conclusion of the case,

5    subject to the reasonableness standard.  Now, my particular

6    views are it's already justified based on the accomplishments

7    to date, but it's reserved for another day.

8            Your Honor, if the Court has any questions of the

9    declarants -- the declarations, I think, speak for themselves

10   and demonstrate that the board properly deliberated, considered

11   this advice, and considered the views of the committee and

12   arrived at an amount that is certainly market.

13           THE COURT:  I think what we should do first, Mr.

14   Marinuzzi, is offer the declarations in evidence in support of

15   the motion.

16           MR. MARINUZZI:  Your Honor, thank you.  I guess I

17   would offer as Debtors' Exhibit 1, and I apologize for not --

18           THE COURT:  Well, you can just identify them by the

19   ECF docket number.

20           MR. MARINUZZI:  Sure.

21           THE COURT:  Each of them has it as part of the

22   heading, as the header in each document.

23           MR. MARINUZZI:  Your Honor, the first declaration is

24   docket number 5228, which is the declaration of Pamela West in

25   support of the debtors' motion.

1        THE COURT:  That was filed on September 27, 2013.  Are

2    there any objections to the West declaration?

3        All right, the West declaration is admitted into

4    evidence.

5    (West declaration was hereby received into evidence as Debtors'

6    Exhibit 1 [Docket Number 5228], as of this date.)

7        MR. MARINUZZI:  Your Honor, Debtors' Exhibit 2 would

8    be the declaration of John Dempsey in support of the motion,

9    docket number 5229.

10        THE COURT:  And that also was filed on September 27,

11    2013.  Are there any objections -- and I assume in addition to

12    the Dempsey declaration, you're offering the exhibits to it?

13        MR. MARINUZZI:  That's correct, Your Honor.

14        THE COURT:  All right.  Are there any objections to

15    the Court admitting into evidence the Dempsey declaration?

16        All right, it's admitted into evidence.

17    (Dempsey declaration and exhibits was hereby received into

18    evidence as Debtors' 2 [Docket Number 5229], as of this date.)

19        MR. MARINUZZI:  Your Honor, and the third declaration,

20    Debtors' Exhibit 3  is docket number 5230, which is the

21    declaration of William Nolan in support of the motion.

22        THE COURT:  And that, likewise, was filed on September

23    27, 2013.

24        Are there any objections to the Nolan declaration?

25        All right.  It, too, will be admitted into evidence.

RESIDENTIAL CAPITAL, LLC, et al.                    16

1   (Nolan declaration was hereby received into evidence as

2   Debtors' Exhibit 3 [Docket Number 5230], as of this date.)

3          MR. MARINUZZI:  Thank you, Your Honor.

4          THE COURT:  Does anybody else wish to be heard with

5   respect to the debtors' motion for approval of the amendment to

6   Mr. Kruger's engagement letter?

7          MR. ZIDE:  Good morning, Your Honor; Stephen Zide from

8   Kramer, Levin on behalf of the committee.

9          I will be brief; we did put a statement in.  Mr.

10  Marinuzzi's characterizations were correct.  The committee

11  believes Mr. Kruger played an active and fruitful role in these

12  cases and the success fee was the subject of negotiations with

13  the committee and we believe the success fee is appropriate

14  under the circumstances.

15         THE COURT:  Thank you.

16         Anybody else wish to be heard?

17         Mr. Masumoto, does the U.S. Trustee wish to be heard

18  on this?

19         MR. MASUMOTO:  Good morning, Your Honor; Brian

20  Masumoto for the Office of the United States Trustee.

21         Your Honor, as Mr. Marinuzzi indicated in his

22  statement, the order does include a provision that the

23  reasonableness of the success fee will be subject to a 330

24  review at the time the application is filed.

25         Accordingly, we have no objection.

1      THE COURT:  All right.  Thank you very much, Mr.

2  Marinuzzi -- Mr. Masumoto; I'm sorry.

3      MR. MASUMOTO:  That's okay.

4      MR. MARINUZZI:  Your Honor, just one point.  We've

5  modified, at the request of the junior secured noteholders, the

6  proposed order to add the reservation of rights.  I'm sorry;

7  the caveat that it's not being paid out of their cash

8  collateral.

9      THE COURT:  I saw that this morning, I saw the amended

10  order.

11      All right.  Pending before the Court is the debtors'

12  motion pursuant to Sections 105(a) and 363(b) of the Bankruptcy

13  Code for an order approving amendment to an engagement letter

14  with debtors' chief restructuring officer Lewis Kruger.  That

15  motion is at ECF docket number 5227.  In addition, the three

16  declarations that have now been admitted into evidence were

17  provided with the motion itself.

18      In the motion, the debtor seeks approval of the

19  amendment to the Kruger engagement letter pursuant to Sections

20  105(a) and 363(b) of the Bankruptcy Code.  The memorandum in

21  support of the motion provides the applicable law in the

22  circumstances.  This essentially is, in the first instance, a

23  business judgment rule test.  The declarations submitted in

24  support of the motion provide uncontroverted evidence that the

25  decision by the board to approve the success fee, subject to

1    the Jay Alix protocol, reflects a reasonable business judgment.

2    Furthermore, the declaration, particularly of Mr. Dempsey,

3    shows that the amount that's been set for the proposed

4    compensation which has been negotiated with the committee is

5    reasonable and perhaps below market, if one can determine a

6    market for such services.

7            Likewise, the Court is also, obviously, very familiar

8    with the role that Mr. Kruger has played in this case to date.

9    Since he's become involved in this case, he's been very

10   substantially involved in the mediation which led to the plan

11   support agreement, the approval of the disclosure statement,

12   the negotiation of the FGIC settlement which has now been

13   approved but is subject to appeal by the junior secured

14   noteholders, and certainly with all other aspects.  So the

15   Court is very comfortable, in these circumstances, concluding

16   that the debtors' board has exercised appropriate business

17   judgment in recommending -- in negotiating the proposed

18   amendment to the Kruger engagement letter and agreeing upon the

19   amount.  And under all of these circumstances, the Court

20   approves -- grants the motion.

21           MR. MARINUZZI:  Thank you, Your Honor.

22           THE COURT:  And I did look at the amended order and

23   it's satisfactory in form.

24           MR. MARINUZZI:  Thank you, Your Honor.

25           Your Honor, that brings us to the trilogy of

1  foreclosure review professional motions which begins on page 6

2  of the agenda and runs through page 13.  We had hoped to be in

3  a position to propose final orders, and there are lots of

4  things going on and we haven't been able to focus on them as

5  much as we'd like to.  So what we'd propose to do is continue

6  them for, I think, the thirteenth time, on an interim basis

7  through the November 7th omnibus hearing.

8            THE COURT:  Anybody else wish to be heard on that?

9            All right, they're approved (sic) on an interim basis.

10           MR. MARINUZZI:  Thank you, Your Honor.

11           Your Honor, I will cede the podium to my colleague

12  Jonathan Petts to take up matter 4 on page 14 of the agenda,

13  and I'd ask the Court if I can excuse myself to go back to the

14  office.  But before I do that, I just wanted to know if the

15  Court had any questions about anything the debtors are doing

16  while I'm here.

17           THE COURT:  The one question I have -- this is going

18  to come up when we talk about some of the claim objections --

19  and I will admit that I'm a little bit at a loss.  Some of

20  this, as I'm sure you're all aware, I've had the transition of

21  law clerks and I thought we were pretty diligent about making

22  sure everything was followed up.

23           At an earlier hearing, I had raised an issue about the

24  debtors and the committee, particularly with the assistance of

25  the special borrower's counsel, agreeing on a set of procedures

1   that would apply, particularly with respect to -- these are on

2   claim objections, specifically with respect to loan

3   modifications.  And I've lost track of what the status is.  I

4   know there was a draft that was submitted, and frankly, I

5   looked on the docket.  I wasn't sure whether it got entered; I

6   didn't see it on the docket.

7            MR. WISHNEW:  Your Honor, I don't --

8            THE COURT:  This may have gotten caught in this

9   transition.

10            MR. WISHNEW:  For the record, Your Honor, I'm Jordan

11   Wishnew, Morrison & Foerster.

12            With regards to your question, that order has gone

13   back and forth between debtors and borrower's counsel.  We, I

14   believe, vetted it with chambers.  It hasn't yet been docketed,

15   but we do have a -- I believe it's, at this point, in near

16   final form.  And not to speak for Mr. Nosek, but I believe that

17   we are intending to send the form of order to the borrowers in

18   advance of the December 10th hearing, letting them know that

19   they will have to make their submissions to the Court two weeks

20   before the December 10th hearing, as well as appear in person

21   for that hearing for that hearing, consistent with Your Honor's

22   instructions during a prior hearing.

23            THE COURT:  Okay.  So is the prop -- Mr. Nosek, do you

24   want to address this as well?  I mean, is the proposed form of

25   order set at this point, or is it still being tinkered with?

1   I'd like to -- I can't find it; let me put it -- I know I saw

2   an earlier version of it, okay?  And I don't know what -- I

3   was, frankly, unclear of what the status was.

4           MR. NOSEK:  Your Honor, we did -- it did go back and

5   forth several times between us and debtors' counsel, and we

6   actually are signing off on the form of the order.  We're good

7   with the final form.

8           THE COURT:  Okay.

9           MR. NOSEK:  There was a little bit of delay in trying

10  to get a hold of some of the borrowers to make sure the dates

11  were good.  And then I believe that we just decided to go

12  forward with the dates that we have.

13          THE COURT:  Because today we've got -- when we deal

14  with the claims objections, there are a number of claims

15  objections where the responses address issues relating to loan

16  modifications.  So let's see where we get to today.  I wanted

17  to be -- what I was unclear about whether this has already

18  been -- it hasn't been resolved.  Okay.  So we'll see where we

19  get to when we discuss some of the claims objections today.

20          MR. WISHNEW:  Thank you, Your Honor.

21          THE COURT:  I think if one of -- if you think that the

22  two of -- you know, that your respective constituencies have

23  agreed on the form, forward it to my chambers, okay, and I'd

24  like to look at it again.

25          MR. WISHNEW:  We have agreed on the format, and after

RESIDENTIAL CAPITAL, LLC, et al.                    22

1  the hearing we will submit it to chambers.

2          THE COURT:  Okay.  Mr. Marinuzzi, you're certainly

3  excused, if you want to go back.  I wanted to raise that now,

4  just --

5          MR. MARINUZZI:  Thank you very much.  We've got plan

6  supplement documents that have to be filed this week, so I'll

7  head back to the office.  Thank you.

8          THE COURT:  Thank you, Mr. Marinuzzi.

9          MR. ZIDE:  May I be excused as well, Your Honor?

10          THE COURT:  You certainly may, Mr. Zide.

11          MR. ZIDE:  Thank you.

12          THE COURT:  All right.  What's next?

13          Mr. Masumoto, I appreciate your being here today under

14  the circumstances in which you and your -- I guess it's very

15  few of you who are actually not furloughed.  So if at any time

16  you need to excuse yourself, you certainly feel free to do so,

17  okay?

18          MR. MASUMOTO:  Thank you, Your Honor.

19          MR. PETTS:  Thank you, Your Honor.  Jonathan Petts of

20  Morrison & Foerster for the debtors.

21          I'm here on the motion of Phillip Scott to impose the

22  automatic stay to determine that the bankruptcy estate owns

23  title to his note and to void -- oh, Mr. Scott's counsel is

24  here, so I will cede the podium to him.

25          THE COURT:  All right.  Thank you.  Yeah, if you'll

RESIDENTIAL CAPITAL, LLC, et al.                            23

1    please come on up.  Come on up to the podium; make your

2    appearance.

3         MR. DSOUZA:  Hi.  My name is Kim DSouza.  I'm the

4    counsel for Phillip Scott.

5         THE COURT:  All right, Mr. DSouza, go ahead.  Could

6    you spell your last name, sir?

7         MR. DSOUZA:  D-S-O-U-Z-A.

8         THE COURT:  Thank you.

9         MR. DSOUZA:  You just want me to proceed to state

10   the --

11        THE COURT:  Go ahead with your motion.

12        MR. DSOUZA:  Okay.  Your Honor, we've made a motion

13   for violation of automatic stay against the Bank of New York

14   and the state court.  We served Bank of New York and the state

15   court.  Neither responded.  The debtor and debtor-in-possession

16   responded and asked that the motion be dismissed.  And so we

17   are requesting the motion -- the automatic stay to preserve

18   assets of the estate based on derivative --

19        THE COURT:  Show me the derivative asset -- give me

20   any evidence at all that this is an asset of the estate.  I

21   mean, the debtors' response is, it's not -- the debtor doesn't

22   have an interest in this property.  So where is the asset of

23   the estate?

24        MR. DSOUZA:  Your Honor, the derivative would be on

25   behalf of a creditor, okay, a creditor seeking to get paid out

RESIDENTIAL CAPITAL, LLC, et al.                                    24

1    of the estate.  Okay?  The asset --

2            THE COURT:  Who's the creditor?

3            MR. DSOUZA:  The creditor would be the securitized

4    trust, RAMP.

5            THE COURT:  You're asserting the rights of a third

6    party?  Is that what you're telling me?

7            MR. DSOUZA:  Yes, that's what I'm telling you, yes.

8            THE COURT:  Do you have any authority for being able

9    to do that?

10           MR. DSOUZA:  Your Honor, my client is in a unique

11   position of knowledge to seek --

12           THE COURT:  Let me ask my question very

13   straightforward and simple.

14           MR. DSOUZA:  Yes.

15           THE COURT:  Do you have any authority supporting your

16   attempt to assert the rights of a third party to provide you

17   with standing to bring this motion?

18           MR. DSOUZA:  In terms of a consent --

19           THE COURT:  Authority -- no, authority means you have

20   a case -- do you have a case that supports an argument that

21   your client can assert the rights of a third party in bringing

22   this motion to this court.  Yes or no?

23           MR. DSOUZA:  I don't have a name of a case at the

24   moment, but I'd like --

25           THE COURT:  Well, come on.  You know, this is a fully-

RESIDENTIAL CAPITAL, LLC, et al.                    25

1    briefed motion.

2            MR. DSOUZA:  Right.

3            THE COURT:  And so the answer to my question is no you

4    don't have any authority to support your assertion of someone

5    else's rights in connection with this motion, is that right?

6            MR. DSOUZA:  Your Honor, could I have an adjournment

7    to provide you the --

8            THE COURT:  No.  No.  It's your motion.

9            MR. DSOUZA:  Right.

10           THE COURT:  Okay?  The debtors responded by arguing in

11   part that you lack standing.  Okay?  So now is the time and the

12   place for the hearing.  And I guess the answer is, you

13   certainly didn't identify any authority in your papers.

14           MR. DSOUZA:  There's no authority, Your Honor, that

15   says that an individual can't bring it.

16           THE COURT:  There most certainly is.  There's lots of

17   authority that you can't assert the rights of a third party.

18           MR. DSOUZA:  If you're --

19           THE COURT:  You've not filed -- your client has not

20   filed a claim in this bankruptcy.

21           MR. DSOUZA:  If you're int --

22           THE COURT:  Stop.  Your client --

23           MR. DSOUZA:  Yes.

24           THE COURT:  -- has not filed a claim in this

25   bankruptcy.  Is that correct?

RESIDENTIAL CAPITAL, LLC, et al.                    26

1          MR. DSOUZA:  Correct.

2          THE COURT:  Okay.  What is it that gives you party-in-

3  interest standing in this case, since your client has not filed

4  a proof of claim in the case?

5          MR. DSOUZA:  Knowledge of fraud, Your Honor.

6          THE COURT:  Well, you think that any stranger who

7  comes in and says I have knowledge of fraud, that that gives

8  them standing?

9          MR. DSOUZA:  Well, I think that --

10         THE COURT:  Could you answer my question?

11         MR. DSOUZA:  In the absence of indicating the nature

12  of the fraud, no.

13         THE COURT:  Do you have any case that supports your

14  position that a stranger to this case can come in and obtain

15  standing because it believes it has knowledge of fraud?

16         MR. DSOUZA:  Your Honor, any individual can come in if

17  they have knowledge that will protect the assets of the

18  bankruptcy estate if --

19         THE COURT:  Give me --

20         MR. DSOUZA:  -- they have knowledge.

21         THE COURT:  -- give me a case that says that.  You

22  think a stranger can walk in off the street and get standing

23  because it thinks it has knowledge of some fraud?

24         MR. DSOUZA:  If he has unique knowledge --

25         THE COURT:  Do you have a case --

RESIDENTIAL CAPITAL, LLC, et al.                        27

1          MR. DSOUZA:  -- that's going to protect --

2          THE COURT:  No, tell me do you have a case that

3    supports your argument?  Don't -- that's what I want to hear:

4    yes or no?  Do you have a case?

5          MR. DSOUZA:  There's a number of cases that have dicta

6    on this --

7          THE COURT:  Give me the names and citations of the

8    cases that support your argument.

9          MR. DSOUZA:  Okay.  One is Labuzan.

10          THE COURT:  What's the cite.

11          MR. DSOUZA:  Fifth Circuit.

12          THE COURT:  Give me the cite of the case.

13          MR. DSOUZA:  Can I just have a fifteen-minute

14    adjournment for that?

15          THE COURT:  No.

16          MR. DSOUZA:  Okay.

17          THE COURT:  I've got a full calendar.

18          MR. DSOUZA:  Okay.

19          THE COURT:  You know, you filed a motion the debtor

20    responded.  They say you don't have standing.  Okay?  If you

21    have case support -- case support -- I don't want to hear

22    argument right now, I want to hear do you have a case that

23    supports your argument that your client has standing?  If you

24    can't give me the case, fine.  Fine, meaning that you come here

25    without authority to support your position.

1          What's your next argument?

2          MR. DSOUZA:  Okay.

3          THE COURT:  I take your silence on that point as you

4    don't have a case.  You can't point to a single case?

5          MR. DSOUZA:  Well, I indicated a case.  I didn't

6    indicate the citation.

7          THE COURT:  Did you cite the case in your papers?

8          MR. DSOUZA:  Well, I was -- I received the papers from

9    the other side just yesterday, and I was going to put in a

10   response.  I just did not have the time to do so.  I was going

11   to include the name of that case and many others.

12         THE COURT:  But you can't give me the names of any

13   other cases?

14         MR. DSOUZA:  Well, I have all the names, they're just

15   in my car.  I didn't bring them in --

16         THE COURT:  I see.

17         MR. DSOUZA:  -- because I, quite frankly, didn't

18   anticipate this being quite as substantive today as it is.

19         THE COURT:  What did you think it was going to be?

20   You made the motion.

21         MR. DSOUZA:  Well, I thought -

22         THE COURT:  Did you think you were just -- what did

23   you think this was going to be?  You made a motion.  The debtor

24   filed a response.

25         MR. DSOUZA:  Yes.  I go to a lot of court proceedings,

1    Your Honor, and you've got a hot bench.  Okay?  So -- which is

2    good.

3            The argument here is that my client has a vested

4    interest as a guarantor --

5            THE COURT:  A vested interest?

6            MR. DSOUZA:  Absolutely.  Vested interest as a

7    guarantor -- effectively a guarantor --

8            THE COURT:  Who owns the note?

9            MR. DSOUZA:  The note is owned by the creditor, RAMP

10   2005 RZ3.

11           THE COURT:  And is RAMP a debtor in this case?

12           MR. DSOUZA:  Ramp is a creditor.

13           THE COURT:  Is RAMP a debtor in this case?

14           MR. DSOUZA:  RAMP is not a debtor; RAMP is a creditor.

15           THE COURT:  Okay.  And you're attempting to argue what

16   you believe is the interest of RAMP as a creditor?

17           MR. DSOUZA:  Correct.

18           THE COURT:  Okay.  All right, I have your argument,

19   thank you.

20           MR. DSOUZA:  Thank you.

21           MR. PETTS:  Jonathan Petts of Morrison & Foerster for

22   the debtors.  Your Honor, Your Honor has touched on a number of

23   points that we've raised in our briefing.  Unless you have any

24   further questions --

25           THE COURT:  Address the issue of subject-matter

RESIDENTIAL CAPITAL, LLC, et al.                              30

1  jurisdiction.

2          MR. PETTS:  Well, I think that if Mr. Scott wants to

3  prevent Bank of New York from foreclosing on his mortgage or

4  selling his mortgage, that is a dispute between two nondebtors,

5  and there's no conceivable impact that that dispute could have

6  on the debtors' estates, and therefore there's no subject-

7  matter jurisdiction under the Pacor case and its progeny, as

8  cited in our --

9          THE COURT:  Okay.

10         MR. PETTS:  -- briefs.

11         THE COURT:  Mr. DSouza do you want to respond with the

12 issue of subject-matter jurisdiction?  Come on up to the

13 microphone.  Just on the issue of subject-matter jurisdiction.

14 What's the basis for subject-matter jurisdiction in a dispute

15 between two nondebtors?

16         MR. DSOUZA:  The automatic stay provision provides

17 standing to, again, any individual --

18         THE COURT:  Mr. DSouza --

19         MR. DSOUZA:  -- provided that they can show --

20         THE COURT:  -- Mr. DSouza --

21         MR. DSOUZA:  -- damage.

22         THE COURT:  -- did you hear my question?  What's the

23 basis for subject-matter jurisdiction in this court of a

24 dispute between two nondebtors?

25         MR. DSOUZA:  The basis of jurisdiction is that it has

RESIDENTIAL CAPITAL, LLC, et al.                    31

1    to do with property of the estate.

2            THE COURT:  Well, what's the property of the estate?

3            MR. DSOUZA:  The property of the estate that property

4    that would be used to pay the creditor for which the creditor

5    otherwise will not receive payment.

6            THE COURT:  All right.  I have your argument.  I'm

7    going to take the matter under submission.  I'll enter an

8    order.

9            MR. DSOUZA:  Thank you.

10           MS. HAGER:  Good morning, Your Honor.  Melissa Hager

11   from Morrison & Foerster on behalf of the debtors.  Your Honor,

12   I believe that brings us up to page 14 of the amended agenda,

13   with the first contested item, or at least listed as contested,

14   which is the debtors' objections to proof of claims filed by

15   Thomas La Casse against Homecomings Financial and Residential

16   Capital.  And this involves claims number 3852, 3856 and 3860.

17   And the objection -- the debtors' objection can be found on the

18   docket number 4635.

19           Also appearing in this matter on behalf of the debtors

20   this morning is Andrew Baldwin of Prince Lobel Tye, who

21   represents Residential Funding Company in the litigation

22   brought by Mr. La Casse in Connecticut.  He is present in the

23   courtroom, as is Ms. Delehey, who signed the declaration in

24   support of the objection.  To the extent Mr. Baldwin speaks

25   today and answers any questions for the Court, a pro hac vice

1  order has been entered with regard to him.

2       Your Honor, Mr. La Casse filed three proofs of claims

3  against the debtors --

4       THE COURT:  Is anyone appearing for Mr. La Casse?

5       MR. HEAL:  Yes, Your Honor.

6       THE COURT:  Come on up and just make your appearance.

7  Okay?  And then I'll give you a chance to speak.

8       MR. HEAL:  Laird Heal of Worcester, Mass for --

9       THE COURT:  I'm sorry, can you spell your last name?

10      MR. HEAL:  H-E-A-L.  Thank you.

11      THE COURT:  All right.  Thank you.  And have you been

12  admitted pro hac, or are you a member of the bar of the court?

13      MR. HEAL:  I've been admitted pro hac vice.

14      THE COURT:  Thank you very much.

15      Go ahead, Ms. Hager.

16      MS. HAGER:  Thank you, Your Honor.  Mr. La Casse filed

17  three proofs of claims aggregating almost thirty-seven million

18  against the debtors.  Specifically, he filed virtually

19  identical claims against Homecomings Financial and Residential

20  Funding, LLC, in the amount of 5.289 million each, and one

21  claim against Residential Funding in the amount of 26.5

22  million.

23      I'd like to address first the two identical claims,

24  which is the Homecomings proof -- what we refer to in our

25  papers as the Homecomings proof of claim, which is claim number

1  3852 and the second RFC proof of claim, which is claim number

2  3856.

3         These claims in the amount of over five million

4  dollars on the face of the claim relate to fraudulent

5  foreclosure.  The claims assert direct punitive as well as

6  consequential damages allegedly arising from the foreclosure of

7  Mr. La Casse's property located in Longmeadow, Massachusetts,

8  in or about November of 2010.  The five-million-dollar claim

9  includes the following items, without limitation:  2 million

10  dollars for loss of reputation; 100,000 -- I'm sorry --

11  900,000, representing the value of the property; another

12  900,000 for punitive damages; and 500,000 dollars for emotional

13  distress.

14         By way of background, briefly, this foreclosure

15  proceeding arises from a note that was executed by Mr. La Casse

16  on or about November 15th, 2006 for the Longmeadow property

17  that was issued in favor of -- the note was issued in favor of

18  Homecomings and identified Mortgage Electronic Registration

19  Systems, as we all know as MERS, as the nominee for

20  Homecomings.  There was also a mortgage executed in favor of

21  homecomings with regard to the note.

22         Thereafter, Homecomings transferred the note to Aurora

23  Loan Servicing LLC, and in 2010, Aurora commenced a foreclosure

24  action and obtained a foreclosure judgment, and the property

25  was sold in late 2010.  None of the debtors, including

RESIDENTIAL CAPITAL, LLC, et al.                    34

1   Homecomings, who originally was on the note and mortgage, was

2   involved in the foreclosure action.

3          After the foreclosure action in December of 2010, Mr.

4   La Casse commenced an action in Connecticut Superior Court,

5   where Mr. La Casse lived at the time, even though the property

6   was in Massachusetts, against Aurora Loan Services LLC and

7   MERS.  No debtor was named as a defendant in that action at the

8   time it was commenced, nor has the debtor been named as a

9   defendant in that action today, nor has he sought relief to

10  name us, despite the passage of almost three years.

11         THE COURT:  Has the statute of limitations on any of

12  those claims run?

13         MS. HAGER:  I do not believe so.  I can defer to

14  counsel for --

15         THE COURT:  But --

16         MS. HAGER:  -- Massachusetts counsel.

17         THE COURT:  -- you haven't made that argument that

18  they --

19         MS. HAGER:  No, we haven't, Your Honor.

20         THE COURT:  So I mean, your papers, in part, focus on

21  the absence of a claim of this type having been asserted

22  against any of the debtors in -- I guess we'll also deal --

23  what there's both Massachusetts actions and Connecticut

24  actions.  And --

25         MS. HAGER:  Correct.

1         THE COURT:  -- was the debtor named in any -- any of

2    the debtors named in any of them?

3         MS. HAGER:  In the Residential Funding -- the second

4    claim, yes.  And I think that's a very different fact pattern.

5    Here, in response --

6         THE COURT:  Let me ask --

7         MS. HAGER:  Sure.

8         THE COURT:  -- this.  I mean, the -- was there a

9    requirement that the debtors be named as a -- the parties seem

10   to focus on they weren't named, we could amend now to add them

11   if the stay were lifted.  It seems kind of beside the point.

12   The issue -- if the claimant has asserted a proper claim in

13   this court on some theory against any of the debtors, whether

14   or not they named the debtors in the prior litigation, does it

15   matter?

16        MS. HAGER:  I think it does, Your Honor, here.

17   Because the proof of claim for the first two that we're talking

18   about, putting aside the Residential Funding first filed proof

19   of claim, the relief and the support, the evidence for the

20   prima facie case for his proof of claim cites to an action

21   that's pending in Connecticut State Court against other parties

22   that does not name the debtor.

23        THE COURT:  Okay.  Different issue.  Because it may be

24   that the support they've provided for the claim here against

25   the debtor is insufficient, because it relies on a pleading in

1   another court against other parties that don't deal with the

2   debtors' role.  But let me ask you a hypothetical.

3           MS. HAGER:  Sure.

4           THE COURT:  If the claim here had asserted all of the

5   elements of a claim against any one of the debtors, would it

6   make a difference whether that debtor had been named in the

7   prior state court litigation?

8           MS. HAGER:  Absent a statute of limitations issue,

9   probably not --

10          THE COURT:  Okay.

11          MS. HAGER:  -- although here I don't think -- if he

12  had even named Homecomings, who was the debtor party, and in

13  his complaint filed in Connecticut Superior Court, it does

14  state Homecomings -- it acknowledges that Homecomings was

15  listed in the original note and the mortgage.  He knew about

16  them.  He --

17          THE COURT:  Yes.  But there was no obligation for the

18  claimant here either to name Homecomings in the prior

19  litigation or assert allegations -- even if it didn't name

20  Homecomings, to assert allegations establishing wrongdoing on

21  the part of Homecomings.

22          The real issue -- isn't the real issue for me whether

23  this proof of claim includes appropriate support to

24  establish -- I mean, it's essential -- and I think in some of

25  the other claim objections, I think you quite properly deal

1    with the standard.  I essentially am applying a motion to

2    dismiss standard.  Do you agree with that?

3            MS. HAGER:  I agree with that.  And I think that

4    this -- these --

5            THE COURT:  And this one may fail on that count, but

6    it's not because Homecomings wasn't named in the other

7    litigation.  It's to the extent they want to rely on a pleading

8    that doesn't itself -- whether Homecomings was named or not, if

9    that pleading had asserted all of the elements of a cause of

10   action against Homecomings, short of naming them as a

11   defendant, and they wanted to incorporate that here, perhaps

12   that would be okay.

13           Now, your argument is, they haven't done that.

14   There's nothing in that state court complaint that states a

15   cause of action against Homecomings transported here by

16   incorporating it into a proof of claim.

17           MS. HAGER:  Agreed.  But I think there's other points

18   that we raise as well.

19           THE COURT:  Okay.  Well, go ahead.

20           MS. HAGER:  And I think the other points are, even if

21   they -- even if he had named us or if he purported to name us,

22   it wouldn't --

23           THE COURT:  He didn't --

24           MS. HAGER:  -- survive a motion to dismiss, because we

25   were not the servicer, and there's no proof that we were

1   involved in the foreclosure --

2        THE COURT:  So you're getting to the heart of it,

3   which is, I'm only -- I've got to deal with what I have, not

4   with what some other court has, okay?  And what I have is a

5   proof of claim.  They attempt to support it with a complaint in

6   another case that doesn't name any of the debtors.  And so when

7   I say I'm looking at the four corners of the proof of claim,

8   including anything attached to it.  Okay?

9        And the issue to me is, does anything that's before me

10  state a claim against any of the debtors, and what's the claim?

11  Do you agree with that?

12       MS. HAGER:  Yes, Your Honor.

13       THE COURT:  Okay.

14       MS. HAGER:  And I think under that standard, the

15  motion -- the objection to the claim should also be granted,

16  because he's absolutely established no proof as to any debtors'

17  involvement in any of the alleged fraudulent acts.

18       THE COURT:  So let's deal -- let's separate it out.

19  We're talking about two properties, right:  the Weston property

20  and the --

21       MS. HAGER:  Yeah, I was dealing --

22       THE COURT:  -- Aurora property.

23       MS. HAGER:  -- I was dealing just with the --

24       THE COURT:  The Aurora.

25       MS. HAGER:  -- the Aurora lawsuit --

1           THE COURT:  Okay.

2           MS. HAGER:  -- which is the Massachusetts property,

3    right now, which has the duplicate claims against Homecomings

4    as well as Residential -- RFC.

5           THE COURT:  Okay.  All right.  And with respect to the

6    Aurora property, that's what, in Longmeadow, Massachusetts?

7           MS. HAGER:  Correct, Your Honor.  And that property

8    has been foreclosed on and sold at sale.  And in connection

9    with the pending Connecticut Superior Court action, a motion

10   for summary judgment by the two defendants was made.  It was

11   not granted because the court found that there was one issue

12   there as to whether Aurora, who they did find had the actual

13   note to foreclose the property, whether they had the authority

14   as the agent to foreclose the property.  And that's the sole

15   issue that's left right now in that Connecticut State Court.

16          THE COURT:  And how is that being dealt with?

17          MS. HAGER:  It's -- we're not involved in that action.

18          THE COURT:  I know.

19          MS. HAGER:  But I assume it's going to be, they'll do

20   further discovery on that and proceed with either another

21   motion for summary judgment or something else procedurally

22   similar.

23          THE COURT:  Okay.  All right, go ahead.

24          MS. HAGER:  The --

25          THE COURT:  So with respect to -- with respect to --

1          MS. HAGER:  Sure.

2          THE COURT:  -- this Longmeadow or Aurora property, the

3    claimant asserts a RICO violation by the debtor?

4          MS. HAGER:  He says he does.

5          THE COURT:  Okay.

6          MS. HAGER:  He doesn't assert any facts or any support

7    as to what that is and why he's entitled to it.  I mean, the

8    problem here, Your Honor, is that -- and I appreciate that this

9    is a motion to dismiss standard, but the claimants for some of

10   the borrowers -- for the borrowers -- and these are a great

11   case in example is, they're asserting five million dollars for

12   claims.  They're asserting claims to get the value of the

13   property back, punitive damages, as --

14         THE COURT:  So the last one that was up here was a

15   thirty-million-dollar claim.  This one is a lot less, but I

16   mean --

17         MS. HAGER:  No, actually, collectively, they're over

18   thirty -- they're almost thirty-seven million.

19         THE COURT:  All right.

20         MS. HAGER:  So he just spread it out amongst the

21   debtors.

22         THE COURT:  Spread it out.

23         MS. HAGER:  So but, Your Honor, on their face, they

24   don't survive a motion to dismiss.

25         THE COURT:  That's what I want you to address.  Tell

1   me what are the shortcoming with respect to the assertion of a

2   RICO claim against the debtor?

3          MS. HAGER:  They've established no business activity

4   in naming any of the debtors that would rise to that level of

5   that type of claim.  They've also -- I mean, they've also --

6          THE COURT:  Look, you filed an objection to the proof

7   of claim.  I understand that.

8          MS. HAGER:  Correct.

9          THE COURT:  But you don't -- you spilled more ink over

10  the issue of what's happened in the other state court actions

11  than you have about what's before me.  Okay?  So if I --

12  because I think what I have to do is apply the motion to

13  dismiss standard and decide whether they've alleged all of the

14  elements of a RICO claim, but you never addressed what are the

15  elements of the RICO claim, did you?

16         MS. HAGER:  No, we did not.

17         THE COURT:  No, you're making me do all the work.

18         MS. HAGER:  That's certainly not our intention, Your

19  Honor.  We --

20         THE COURT:  Look, I want to make clear -- and this is

21  not intended as a criticism of you -- when I get claims

22  objections -- this one there's counsel on the other side --

23  many of them are pro se parties.  Okay.  Whether it's a pro se

24  party or a party represented by counsel, I evaluate the proof

25  of claim based on the applicable standards.  If the standard

RESIDENTIAL CAPITAL, LLC, et al.                    42

1   here is the motion to dismiss standard, and the claim purports
2   to assert a RICO claim, and you're seeking to have it expunged,
3   you need to establish that it doesn't -- frankly, I got to tell
4   you, here, it's pretty easy to do with respect to what they've
5   put before you -- before me with respect to a RICO claim.  But
6   you have to go through and be able to establish this proof of
7   claim fails to establish the elements of a claim for RICO, and
8   here's why.  Okay?

9          And you haven't done that.  Okay?  And I don't -- I
10  gets lots of -- I get these declarations from your firm that
11  say we've examined our books and records and there's no basis
12  for any liability.  Well, that's really nice.  I wouldn't
13  expect that your books and records show liability for RICO.

14         MS. HAGER:  Your Honor --

15         THE COURT:  So it does me absolutely no good.  And
16  that was the point I've made at prior hearings.  This message
17  needs to get across.  Okay?

18         MS. HAGER:  Understood.  One point of clarification,
19  Your Honor.  With regard to the RICO claim, that's actually on
20  the -- that's on the Weston, Connecticut property.  For the
21  first two proofs of claims that we were talking about
22  previously, all that is listed in connection with this proof of
23  claim is for a fraudulent foreclosure, and an itemized list of
24  damages, and is direct damages, punitive damages, attorneys'
25  fees, costs --

RESIDENTIAL CAPITAL, LLC, et al.                    43

1        THE COURT:  Let's put the damages aside, because I

2   don't even get to the issue of damages if the proof of claim

3   doesn't state a claim.  Okay?  Because you're not seeking to

4   expunge the claim because it asks for too much money, you're

5   asking to expunge the claim because it doesn't state a claim.

6        MS. HAGER:  Because there's no liability.

7        THE COURT:  Because there's no liability.

8        MS. HAGER:  Correct.

9        THE COURT:  And to do that --

10       MS. HAGER:  And I hear you -- I certainly hear you and

11  I understand Your Honor's position with regard to the second

12  proof of claim which is the 26.5 million.  And we're happy to

13  put this objection over, do further briefing on this issue, and

14  certainly speak with opposing counsel on that issue.  But I

15  think you have a very, very different issue with regard to the

16  5.2-million-dollar proofs of claims.

17       There, what he is alleging is fraudulent foreclosure,

18  but has not alleged that we were involved in the foreclosure at

19  all.  By his own admission he acknowledges that it was Aurora

20  that brought the foreclosure proceeding, that that's who they

21  sued.  They also sued MERS.  There's absolutely no ev --

22  putting aside the amount of the damages and whether you're

23  entitled to emotional distress and two million dollars for loss

24  of reputation, there is no valid claim as to those two debtors

25  on the 5.2 million dollars.  There's no -- even in his reply

1  papers it says something to the effect of, well, they're

2  obvious defendants.  If they are --

3          THE COURT:  That's very nice that he may think they're

4  obvious defendants, but that doesn't sustain a claim.

5          MS. HAGER:  Correct.  And that's why I think on those

6  two claims, separating those two, you do not survive a motion

7  to dismiss by saying I have a fraudulent foreclosure action.

8  I've got something pending there and I may have issues with it.

9  They have not stated anything as to one of these debtors for

10 which relief even in a dollar amount could be set.  So I think

11 the motion to dismiss standard as to those two claims is a very

12 different view.

13         THE COURT:  I'm going to hear opposing counsel, but I

14 must say, that's the argument I need to have, okay, from you,

15 that they haven't asserted the elements of the claim for

16 fraudulent foreclosure against any of the debtors.  Okay,

17 that's your argument, I understand the argument.  It's made in

18 the papers, and I'm going to allow counsel to respond.

19         MS. HAGER:  Certainly.

20         THE COURT:  Go ahead and deal with the Weston

21 property.

22         MS. HAGER:  Deal with the rest of it?  Okay.

23         THE COURT:  Yes.

24         MS. HAGER:  With regard to the other remaining claim,

25 which is the -- what we refer to as the first RFC proof of

1   claim, I hear Your Honor with regard to this, and I recognize
2   that there is a RICO claim that's alleged in there and we have
3   not gone through in our objection and recited line-by-line why
4   that's not applicable here.

5           Rather than make the Court do the work and -- you have
6   a full calendar today, I'd respectfully ask to adjourn the
7   objection --

8           THE COURT:  Well, I'm not adjourning it yet, because I
9   don't have to be a genius to know that they haven't asserted
10  the elements of a RICO claim, okay?

11          MS. HAGER:  Okay.  I can --

12          THE COURT:  But I'll decide what I'm going to do with
13  this.  But what I don't like, Ms. Hager, is your reply, at a
14  minimum, should have dealt with the elements of the claim,
15  okay, and not leave it to the Court to do all the work on it.
16  I just don't blow off --

17          MS. HAGER:  Understood.

18          THE COURT:  -- claims because it may seem preposterous
19  on its face or whatever.  I still give every one of them the
20  consideration it's entitled to.  That consideration may result
21  in sanctions against somebody for filing frivolous pleadings,
22  but I take every one of them seriously.

23          MS. HAGER:  Understood, Your Honor.  I mis -- I --

24          THE COURT:  Okay.  Let me hear from opposing counsel.

25          MS. HAGER:  Sure.

RESIDENTIAL CAPITAL, LLC, et al.                    46

1            THE COURT:  Mr. Heal.

2            MR. HEAL:  Good morning, Your Honor.  And thank you.

3    I have to say --

4            THE COURT:  I don't know if you should thank me yet,

5    because I read your papers, and I frankly think they're pretty

6    pathetic.

7            MR. HEAL:  Well, I was going to say, you're suggesting

8    a level of detail in proofs of claim that I haven't seen from

9    the other side before.  But --

10           THE COURT:  You haven't seen from the other side?

11           MR. HEAL:  Well, I haven't seen --

12           THE COURT:  You file a proof of claim.  Your client

13   files a proof of claim.  You assert a RICO claim with nothing

14   more than the bare allegation, essentially, that they committed

15   a RICO violation.  You think that's sus -- that withstands a

16   claim objection seeking to expunge it?

17           MR. HEAL:  Your Honor, I --

18           THE COURT:  To be entitled -- you haven't met the

19   threshold for your proof of claim to be entitled to -- that

20   it's prima facie evidence of validity and amount.

21           MR. HEAL:  Your Honor, the letter that -- the demand

22   letter of the Connecticut counsel that I attached to the proof

23   of claim, I thought, supported all of the elements that I've

24   put into it.  I did redo his arithmetic and came with a

25   slightly lower figure.  But aside from that --

1          THE COURT:  You think that letter supported a RICO

2     claim?

3          MR. HEAL:  That --

4          THE COURT:  Which is the enterprise -- do you know

5     what the elements of a RICO claim are?  Do you?

6          MR. HEAL:  Your Honor --

7          THE COURT:  Can you like tick off for me the elements

8     of a civil RICO claim.

9          MR. HEAL:  -- I'm sorry.  I've gone over them, but I

10    couldn't --

11         THE COURT:  Well, make your argument, you know.

12    You've asserted a RICO claim.  Tell me what the elements -- in

13    the Second Circuit, what are the elements of a civil RICO

14    claim, and point me to how you've satisfied each of those

15    elements in your pleading.

16         MR. HEAL:  Well, for the first, I don't think I could

17    recite the elements of a RICO claim, but certainly --

18         THE COURT:  It's very easy to say "RICO", but it's

19    another thing to be able to establish that you've actually set

20    forth support for each element of a RICO claim.  You're asking

21    for treble damages on an amount that seems preposterous on its

22    face to me to start.  And you have not set forth -- in response

23    to the objection, I would have thought you would have come

24    forward and say we have properly asserted the elements of a

25    civil RICO claim because; and you'd go through each of them,

RESIDENTIAL CAPITAL, LLC, et al.                    48

1  and you would show that you did.

2          You acknowledge you haven't done that, correct?

3          MR. HEAL:  I can't recite them off the top of my

4  head --

5          THE COURT:  No, have you done that in your papers?

6          MR. HEAL:  I don't believe I've done that.  I could

7  tell you what the facts are.

8          THE COURT:  No, I want you to tell me what each of the

9  elements of a civil RICO claim is and how you have supported

10 that claim.  Can you do that?

11         MR. HEAL:  Not without rebriefing the matter as best

12 as --

13         THE COURT:  Well, don't tell me about rebriefing the

14 matter.  The obligation was to do it in the proof of claim or

15 set forth -- the proof of claim needs to set forth a proper

16 legal basis for the assertion of liability.  And I may be

17 critical of the debtor because you throw out RICO and they

18 don't really respond to it, but that burden, in the first

19 instance, was yours.

20         MR. HEAL:  I speak to how they have brought this case

21 and didn't have the right, and then took over the debtors'

22 property and reduced it from a two-million-dollar showpiece to

23 nothing.

24         THE COURT:  What's the basis of your claim with

25 respect to the Longmeadow, Massachusetts property?

1    MR. HEAL:  Okay, now with respect to that, Your Honor,

2  there's a curious feature which is that in the bankruptcy

3  court, a proof of claim was -- or I believe a motion for leave

4  from stay -- it was filed.  And it -- the attached note showed

5  that it was endorsed over to Residential Funding.  But then in

6  the Connecticut case, when they filed a motion for summary

7  judgment, they filed a copy of the note which had that part

8  whited out.  And so as I said in the response, we don't know

9  what the correct note looks like.  All we know is that somebody

10  has marked it up and submitted these as accurate papers.  Each

11  counsel is on record, and you've got the transcripts, they say

12  ours is accurate.

13    So the basis of the claim is, have they really

14  negotiated this note?  Have they not?  If they haven't, well,

15  then obviously these two entities, Homecomings and Residential

16  Funding, are parties-in-interest.  That's --

17    THE COURT:  I don't understand your argument.

18    MR. HEAL:  Well, if they didn't transfer this note --

19  they say they have, but now they're giving us documents that

20  are inconsistent.  And the only reasonable way to resolve that

21  inconsistency is to say that somebody marked up a copy, didn't

22  mark up the original.  And since we don't have the original, we

23  don't yet know if it's Homecomings or if it's Residential

24  Funding or if it's Aurora or anybody who actually is the party-

25  in-interest for this loan.  All we know is that they have been

1  along the chain.

2       THE COURT:  You lost in the Massachusetts Land Court

3  with respect to the Longmeadow property, correct?

4       MR. HEAL:  The land --

5       THE COURT:  The court issued a judgment permitting

6  Aurora to foreclose.  And on November 22, 2010, Aurora bought

7  the property after an auction.  Is that correct?

8       MR. HEAL:  Now, the land court action -- I'm not sure

9  if this Court is familiar, but having gone there a couple of

10  times, they will not permit a homeowner to even appear in the

11  case unless that homeowner says I have the right to assert the

12  Servicemembers Civil Relief Act relief.  Other than that, it's

13  simply a judgment that a person is not entitled to the relief

14  from the Servicemembers Civil Relief Act, namely that the

15  foreclosure is not valid until they leave the service.  So

16  that's the only issue in that land court case.  The case of

17  substance is the one filed in the Stamford Superior Court.

18       THE COURT:  And tell me what the basis of your claim

19  here is with respect to this Longmeadow property.

20       MR. HEAL:  The Longmeadow property, they have alleged

21  that the loan was fraudulent and shouldn't have been given.

22  There is Massachusetts law that if a person -- if the lender

23  reasonably knows that a person can't repay a loan, it's not

24  actually enforceable.  The Sta -- that Stamford case is, if you

25  ask me, overdue for being amended and it hasn't been, just as

RESIDENTIAL CAPITAL, LLC, et al.                    51

1   the summary judgment has not been renewed.

2        But aside from that, they're just alleging that the

3   foreclosure should not have been done and there are defects

4   with it.

5        In the aftermath of the foreclosure, there were some

6   property management issues.  They damaged a roof.  They went in

7   and failed -- they changed the locks but then --

8        THE COURT:  Is it correct that the Connecticut court

9   entered a default judgment against your client on August 18th,

10  2009?

11       MR. HEAL:  That's in the Weston, Connecticut case.

12       THE COURT:  All right, okay.  All right, you're right.

13       MR. HEAL:  And as I cite in my brief, the Connecticut

14  courts treat the matter of whether a plaintiff in a foreclosure

15  action was entitled to the relief sought as a jurisdictional

16  matter, as a matter of standing in the first instance, so that

17  they will reopen such a judgment at any time if the homeowner

18  can show increasingly good means that the plaintiff was not

19  entitled to the relief.  There's sufficient cases at every

20  level of Connecticut appellate court to justify that assertion.

21       THE COURT:  With respect to the Longmeadow property,

22  you've attached a complaint, a state court complaint, but I

23  don't see any allegations of wrongful conduct by Homecomings in

24  that complaint.

25       MR. HEAL:  No, there weren't Your Honor.

1        THE COURT:  Okay.  So you agree with the statement I

2   made to Ms. Hager before, that that state court complaint

3   cannot provide the basis for a claim in this case?

4        MR. HEAL:  On the papers submitted to this Court, as I

5   said, the only thing that could be a hook for the judge would

6   be to notice, as we noticed a couple of years into litigation,

7   that we were given papers in one case that didn't agree with

8   papers in the other.

9        THE COURT:  Mr. Heal, you agree there is no fact

10  stated in the Connecticut complaint that support the assertion

11  of your claim in this court?

12       MR. HEAL:  Well, I wouldn't agree with that, Your

13  Honor.  It's just --

14       THE COURT:  So point me to specific facts in the

15  Connecticut complaint that support a claim against any of the

16  debtors in this case.

17       MR. HEAL:  Your Honor, the -- it would --

18       THE COURT:  Give me page, line number reference.  I

19  want to look specific -- I want you to tell me very

20  specifically what facts in the Connecticut complaint you

21  believe support the assertion of a claim against any of the

22  debtors in this case.

23       MR. HEAL:  Well, as a general matter, as I'm looking

24  for the papers, if you substitute Aurora Loan Service for --

25       THE COURT:  You can't substitute anybody, okay?  I

1    look at the four corners of that pleading and I don't find a

2    single allegation that supports a claim against any of the

3    debtors.  You can't just say well, if you substitute one of the

4    debtors for another party, well, then; okay?

5          Is there anything, as it exists today, in the four

6    corners of that complaint, that supports the assertion of a

7    claim against any of the debtors?  Yes or no?

8          MR. HEAL:  Not in the complaint, Your Honor.

9          THE COURT:  Okay.

10         MR. HEAL:  In the summary judgment motion.  And that's

11   where I pointed the Court, that when we examined the summary

12   judgment motion we noticed that the note had been doctored.

13   And from that, I based my assertion of possible liability.

14         THE COURT:  All right, Ms. Hager, respond to the issue

15   of whether there has been alteration to any of the documents,

16   the note, for example.

17         MS. HAGER:  Not that we're aware of.  The problem

18   here, Your Honor, is is that the "they" he keeps on using:

19   they submitted the motion for relief; they submitted the papers

20   in the Connecticut court; is Aurora.

21         We assigned it to them.  Aurora has the original note.

22   We don't have that note anymore.  We sold it to them.  So --

23   and all --

24         THE COURT:  What they did with it, that's their

25   problem.

1        MS. HAGER:  Unless we're named in a suit and have a

2   viable cause of action brought against us.  Correct, Your

3   Honor.

4        THE COURT:  Okay.

5        MS. HAGER:  Your Honor, if I might just briefly on --

6        THE COURT:  Yes.

7        MS. HAGER:  -- the second claim for the Connecticut

8   property?  Just a couple of things.  And I certainly understand

9   your instructions for going forward with claims objections.  I

10  think all of us here understand that and will make sure we

11  address those type of issues going forward.

12       But if you look at the face of the claim and the

13  documents and everything that were submitted in connection with

14  the -- and I'm talking about the Connecticut Weston property,

15  the Valley Forge property.  If you look at the claim itself, if

16  you look at the backup documentation to the claim and also if

17  you look at the reply that they filed, the claim states in one

18  place that it's twenty-five million for damages under civil

19  RICO "settlement demand".  So his reply further embellishes

20  upon that fact to say well, no, no, I'm not really looking for

21  my damages from the motion to vacate.  I've got an enforceable

22  agreement against you from the letter from Attorney Brown.

23       And we, looking back at it now, yeah, I probably

24  should have gone through all the elements of civil RICO, but

25  what we did address there in connection with his reply is, if

1   that's a binding settlement agreement attached to his proof of

2   claim, then I'm in trouble, Your Honor, because I've probably

3   got a lot of binding agreements out there that I better go fix

4   today.

5          But so I think we addressed the -- we addressed the

6   elements of his claim as we best could, given the information

7   there.  Hindsight's twenty-twenty.  I probably should have gone

8   through the Second Circuit RICO claims that there is no

9   enterprise.  I don't understand how you -- or RICO is like a

10  fraud claim, it has to be pled very specifically.  And I don't

11  think you even get to the prima facie burden of giving them the

12  benefit of the doubt on that.

13         THE COURT:  I don't think it would have taken you more

14  than a couple of paragraphs to do it.

15         MS. HAGER:  I agree with you, Your Honor.  But I still

16  think that when you go back to it -- and I'm not going to go

17  through the contorted history, I know you have a full calendar

18  and I know that you've -- as other people have noted, you're

19  very -- you read everything before you come on this bench.  But

20  I think the problem here with the proof of claim is also as

21  well is he doesn't get past the burden of proof on this based

22  upon what's submitted and where we are.

23         I mean, the second proof of claim, again, it's twenty-

24  five million for damages under civil RICO --

25         THE COURT:  Forget the amount.  Forget the amount.

1          MS. HAGER:  Okay.

2          THE COURT:  Okay.  It could have been a dollar.  It

3    would still raise the same issue as to whether it's asserted a

4    claim for the liability.

5          MS. HAGER:  And we respectfully submit, as is set

6    forth in our papers, that the proof of claim, as filed, even

7    adding in all the documents with the reply, fails to state a

8    sound legal basis for any claims against any of these debtors.

9          THE COURT:  All right.  I'm going to take it under

10   submission.

11         MS. HAGER:  Thank you.  Let's see.  That will bring us

12   to the second contested matter which is Paul Papas.  I think my

13   colleague Adam Lewis will be handling that.  Thank you, Your

14   Honor.  May I be excused?

15         THE COURT:  Yes, you can.

16         MS. HAGER:  Thank you.

17         THE COURT:  Who is here for Mr. Papas?

18         MR. LEWIS:  I think Ms. Nora is here today.

19         Your Honor, Adam Lewis.

20         THE COURT:  Hang on just a second.  Ms. Nora come up

21   here.  Ms. Nora, are you appearing for Mr. Papas?

22         MS. NORA:  I am, Your Honor.

23         THE COURT:  Have you been admitted pro hac vice to

24   represent Mr. Papas?

25         MS. NORA:  I have, Your Honor.  I have --

1          THE COURT:  No, you haven't.

2          MS. NORA:  I've been --

3          THE COURT:  No, you haven't.

4          MS. NORA:  -- admitted pro hac vice to represent

5    myself --

6          THE COURT:  Speak into the microphone.

7          MS. NORA:  -- myself and all others similarly

8    situated.

9          THE COURT:  Well, that's wrong.  That's wrong.  Okay.

10         MS. NORA:  Are you revoking that order today?

11         THE COURT:  Well, I'm entering an order -- I'm going

12   to enter an order to show cause --

13         MS. NORA:  Okay.

14         THE COURT:  -- why your -- why leave to appear in the

15   ResCap cases pro hac vice should not be revoked.

16         MS. NORA:  All right.

17         THE COURT:  Okay.

18         MS. NORA:  I need to be able to respond to that --

19         THE COURT:  I went back -- stop.  Just -- yes, you

20   will have a chance to respond to it.  Okay?  I'm going to enter

21   a written order to that effect.

22         I went back and looked at the order that got entered,

23   it was in the form you submitted it.  It doesn't say -- you

24   recite that you think you're representing thousands of people.

25   You have your own lawsuit.  And it's certainly proper for you,

1  pro se, to appear.

2          Have you appeared for any other creditors in this

3  case?

4          MS. NORA:  I have, Your Honor.

5          THE COURT:  How many?

6          MS. NORA:  I have appearances for Shane Haffey as co-

7  counsel with pro hac vice counsel, Heather McKeever that will

8  be heard on November --

9          THE COURT:  Okay.

10          MS. NORA:  -- 7th.

11          THE COURT:  All right.  I'm going to enter -- well, if

12  it's going to be heard on November 7th, I will enter an order

13  to show cause why your pro hac vice admission should not be

14  revoked for anyone other than appearing on your own behalf.

15  The pleadings you filed in this matter, this specific matter --

16          MS. NORA:  You're talking about Papas?

17          THE COURT:  -- yes, I'm talking about Papas.

18          MS. NORA:  Yes.

19          THE COURT:  Are scurrilous and frivolous and are

20  vexatious.  And I believe that they -- even assuming you were

21  admitted pro hac to represent anybody other than yourself, the

22  pleadings you have filed in this matter would support revoking

23  your pro hac vice application.  But I'm going to give you a

24  chance to respond to that in writing.

25          MS. NORA:  Absolutely, Your Honor.  Because this

RESIDENTIAL CAPITAL, LLC, et al.                          59

1   entire proceeding --

2           THE COURT:  Ms. --

3           MS. NORA:  -- is a fraud.

4           THE COURT:  I do not want to hear -- you have been

5   nothing but accusations about fraud in connection --

6           MS. NORA:  We can prove it, Your Honor.

7           THE COURT:  Stop.

8           MS. NORA:  We can --

9           THE COURT:  Don't interrupt, Ms. Nora.  Don't

10  interrupt.  Go sit down.  Go sit down.

11          MS. NORA:  I am --

12          THE COURT:  I will give you an opportunity to argue

13  with respect to Mr. Papas' claim.  If you deviate from

14  addressing solely the issues with respect to Mr. Papas' claim,

15  I will cut you off and I will have you escorted from the

16  courtroom.  So go sit down, and I will give you a chance to

17  respond only to the specific issues raised by the objection to

18  the Papas claim.

19          I don't want to hear about approval of the disclosure

20  statement.  I don't want to hear about anything else that

21  happened in the case.  I don't want to hear anything else from

22  you now.  If you say another word, I'm going to have you

23  escorted from the courtroom right now.  So go sit down, and I

24  will give you a chance to respond solely with respect to the

25  Papas claim.

RESIDENTIAL CAPITAL, LLC, et al.                    60

1          MS. NORA:  Your Honor, I know that you'll escort --

2          THE COURT:  Did you hear what I said.

3          MS. NORA:  Yes, but I --

4          THE COURT:  Do I have to call the Marshals --

5          MS. NORA:  -- I've got other --

6          THE COURT:  -- to have you escorted --

7          MS. NORA:  -- I've got other creditors for whom I'm

8    appearing today, so --

9          THE COURT:  Look, did I just --

10         MS. NORA:  -- I will sit down.

11         THE COURT:  -- tell you what to do?  Go sit down now I

12   will have you escorted from the courtroom.

13         MS. NORA:  Thank you, Your Honor.

14         THE COURT:  Go ahead, Mr. Lewis.

15         MR. LEWIS:  Thank you, Your Honor; Adam Lewis of

16   Morrison & Foerster for the debtors.  Obviously, Papas' claim

17   objection which is, I think, 4947, 1 through 3, on the docket

18   that was filed in -- on September 4th of this year.  So there's

19   the objection; there's the Delehey declaration.  Ms. Delehey is

20   here in the courtroom if the Court has any questions of her.

21         We have on the line Mr. Colt Dodrill, our local

22   counsel in Arizona.  He's admitted pro hac in case you have

23   questions that might relate to the Arizona litigation that he's

24   better situated to answer.

25         Your Honor, I think this claim objection is pretty

1    simple, kind of no matter how you cut it.  So Mr. Papas filed

2    his proof of claim, original proof of claim number 242 in July

3    of last year.  And in that proof of claim, the face of the

4    claim is for ten billion dollars and Mr. Papas says it's for,

5    in box 2, based on fraudulent transfers of title by debtor.  He

6    attaches a copy of the lis pendens that relates to the Arizona

7    litigation that describes in some respect what it's about, but

8    not very thoroughly.  It doesn't tell you much.  And then --

9    and so, our objection was filed and it essentially addresses

10   several points.

11          First of all, if you decide to look at the underlying

12   litigation in Arizona, you will see that the claims that are

13   made are made against GMACM, not against ResCap.  This proof of

14   claim was filed against ResCap, and the Court's bar date order

15   specifically told creditors to file claims under the case

16   number of the debtor they seek to hold liable.  That didn't

17   happen here.  So on that basis alone, the Court should sustain

18   the objection because it was not filed as to GMACM.

19          Now, if you choose to move on from that point, the

20   next important point, I think, is that if you look at the

21   Arizona litigation, it's basically litigation about title,

22   wrongful foreclosure, and if you look at the underlying

23   complaint, it says --

24          THE COURT:  Let me ask you this.

25          MR. LEWIS:  Yes, Your Honor.

1        THE COURT:  Tell me what the Arizona rule is with

2   respect to res judicata.  And by that I mean -- because it's

3   not a final judgment in Arizona.

4        MR. LEWIS:  In Arizona, for purposes -- and we cite

5   this in the brief -- in Arizona, for purposes of res judicata

6   and collateral estoppel, it doesn't have to be a final, final

7   order; it only has to be a final order at the trial.  And if

8   it's on appeal, it is still considered a final order for

9   preclusion purposes.

10        THE COURT:  All right.

11        MR. LEWIS:  And --

12        THE COURT:  And your argument is that the judgment in

13   Arizona, even though it's on appeal, is res judicata of the

14   claim that Mr. Papas has asserted here with respect to one of

15   what now is one of 114 properties, because he's tried to amend

16   the proof of claim to add another -- is it another 113 or

17   another 114?

18        MR. LEWIS:  Another 114 --

19        THE COURT:  Another 114.

20        MR. LEWIS:  -- to the one --

21        THE COURT:  Right.

22        MR. LEWIS:  -- in Arizona.  The other 114 are all over

23   the country.  There are three more in Arizona and then others

24   elsewhere.

25        And the federal jurisprudence says that for purposes

1  of preclusion --

2          THE COURT:  I apply to state --

3          MR. LEWIS:  -- you look to state court --

4          THE COURT:  I know.  I know I apply state law --

5          MR. LEWIS:  Okay.

6          THE COURT:  -- with respect to the elements of res

7  judicata.

8          MR. LEWIS:  So from our point of view, we have claim

9  preclusion, fact preclusion.  And we have Rooker-Feldman which

10  we also discuss which says that a federal court cannot serve to

11  review final state court judgments, which is exactly what's

12  going on here, in effect, by the filing of the proof of claim

13  to restate these claims.

14          THE COURT:  Well, I think res judicata, arguably,

15  disposes that -- Rooker-Feldman is not on the solidest ground

16  these days.  Let's put it that way.

17          MR. LEWIS:  Yeah.  But we just wanted to put in all

18  the grounds that we thought were appropriate.

19          THE COURT:  Yeah, okay, all right.

20          MR. LEWIS:  And we think the res judicata and

21  collateral estoppel and Rooker-Feldman all apply.

22          Mr. --

23          THE COURT:  So did the court in Arizona sanction Mr.

24  Papas?

25          MR. LEWIS:  I think he's been found to be a

RESIDENTIAL CAPITAL, LLC, et al.                    64

1  vexatious --

2          THE COURT:  A vexatious litigant.

3          MR. LEWIS:  -- litigant, yes.

4          So we filed that objection on the 4th.  Mr. Papas

5  filed an amended -- a purported amended proof of claim on the

6  10th of September.  That was filed with the clerk and it was

7  then recognized by KCC.  And in that, the box 2 says, "Basis

8  for Claim:  conversion of collateral, RICO fraud, interference

9  with contract", and has these additional 114 properties, but

10 does not otherwise describe the facts.  So on its face, that

11 proof of claim is totally inadequate from a 12(b)(6), 8(a),

12 9(b)(2) point of view.

13         But on top of that, I think the amended proof of claim

14 has to be disregarded for one of two reasons.  One, if you

15 apply -- if it is a permissible late amendment, then it has to

16 be about the same underlying facts as the original claim.

17         THE COURT:  Not the additional 114 properties.

18         MR. LEWIS:  Well, even putting that aside.  Let's say

19 it was.  The point here is that under those circumstances, the

20 same arguments of res judicata, collateral estoppel and Rooker-

21 Feldman would apply equally.

22         THE COURT:  Well, why would it apply as to properties

23 in other states that were not litigated in Arizona?

24         MR. LEWIS:  Your Honor, I'm not even conceding that.

25 I'm not conc -- all I'm saying is even if it did, res judicata

1    would apply.  Now, the 114 states (sic) --

2              THE COURT:  No, it would -- you would argue it would

3    apply as to the one that was the subject of the litigation in

4    Arizona?

5              MR. LEWIS:  Clearly applies to that, yes.

6              THE COURT:  And even if he attempted now to assert

7    additional causes of action that he didn't assert there, but

8    could have?

9              MR. LEWIS:  Right.  And as far as I'm concerned, if

10   you look at the test for whether you allow amendments, the test

11   is whether it relates to the underlying facts of the original

12   claim, and the answer is these don't.  These are separate

13   pieces of property in other states, mostly, and as a

14   consequence, it's a late-filed claim; it should be disallowed

15   on that grounds alone, even if you were to consider the

16   amendment to the proof of claim.

17             So I think we kind of have Mr. Papas in a box.  Either

18   way he turns, he's got himself a problem; either res judicata

19   and collateral estoppel, or a late-filed claim.  And I might

20   note, the amended proof of claim also was filed against ResCap

21   and not against GMACM.  That alone would be a reason to

22   disallow it, and it would be too late to file a claim now

23   against GMACM.

24             So I mean, we have some other arguments in the

25   objection.  I know the Court is always prepared.  I'm not going

RESIDENTIAL CAPITAL, LLC, et al.                    66

1   to go through that unless you have further questions.  These

2   are our main points; they're not our only points.  But I think

3   the res judicata -- the claim preclusion, Rooker-Feldman takes

4   out the original proof of claim and anything in the amendment

5   that has to do with the original proof of claim.  Anything in

6   the amendment which doesn't have to do with the original proof

7   of claim is late filed.

8           THE COURT:  Okay.  Let me hear from Ms. Nora.

9           MR. LEWIS:  Thank you, Your Honor.

10          THE COURT:  And I'll hear from Ms. Nora without -- I

11  want to make clear that she filed a notice of appearance with

12  respect to Mr. Papas reasonably recently.  She did not seek pro

13  hac admission to represent Mr. Papas.  I think the issue is

14  unclear whether she was admitted to represent anybody other

15  than herself.

16          I'll reserve that until the Court hears -- reads

17  papers and hears argument on the order to show cause.  But for

18  today, I'm going to permit Ms. Nora to address specifically the

19  issues raised by the objection to claim.

20          MS. NORA:  Thank you, Your Honor.

21          And in addition, I would like to call the Court's

22  attention to the fact that I have previously appeared for Mr.

23  Papas on a limited basis and also for another creditor in these

24  proceedings last year without objection from any party.  So --

25  just in terms of the history which will be addressed on the

1  order to show cause.

2            With respect to Mr. Papas' claim on the ten billion

3  dollars that --

4            THE COURT:  I'm not interested in the amount.  I'm

5  interested in whether there's any basis for legal liability

6  that Mr. Papas has asserted in his claim.

7            MS. NORA:  Yes, Your Honor.  For ResCap as a

8  consolidated case, we are aware of the Court's bar date order.

9  However, the issue with respect to whether the claim properly

10 lies against ResCap, and we can prove that ResCap is the parent

11 of all fifty other subsidiaries -- I believe it's fifty --

12 wholly owning each and every one.  Therefore, it is our

13 argument that a claim for the types of conduct that we are

14 asserting here properly lies against ResCap.  To file it

15 otherwise would be to lead to duplicative claims; that would be

16 GMACM, we'd go through all of our records, Mr. Papas' records

17 as to who originated this.  This claim from Massachusetts, for

18 example, could have been originated by Homecomings.  We could

19 have something originated by a third party that was purchased

20 by one of the multiple debtors.  But the point that we're

21 trying to raise here, Your Honor, is that we offer to prove to

22 this Court that all of the subsidiaries that have filed under

23 this consolidated case In re ResCap --

24            THE COURT:  It's consolidated for purposes of

25 administration only.

RESIDENTIAL CAPITAL, LLC, et al.                    68

1          MS. NORA:  And for purposes of reorganization --

2          THE COURT:  No.  It's -- the order consolidated the

3     case for administration only, Ms. Nora.  Go on with your

4     argument.

5          MS. NORA:  Thank you, Your Honor.

6          It is the theory of Mr. Papas that the filing In re

7     ResCap put the debtors on notice of a category of claims which

8     they should have addressed.  I will simply rely on our papers

9     with respect to disclosure, because the Court has --

10          THE COURT:  Let me ask you this.  Do you have any case

11     that supports your argument that filing a claim against the

12     parent company suffices to assert claims against all

13     subsidiaries or debtors' subsidiaries or affiliates?  Do you

14     have any case that supports that argument?

15          MS. NORA:  Not at this time, Your Honor.  I believe --

16          THE COURT:  Okay.

17          MS. NORA:  -- that this case would be --

18          THE COURT:  Again, you heard me before in another

19     argument --

20          MS. NORA:  Yes.

21          THE COURT:  -- now is the time and place for the

22     argument with respect to this.  The debtors specifically raised

23     the issue that the claim was filed against the wrong entity.

24     And so when I ask you do you have any authority, the answer as

25     you stand here now and in the reply that you filed, you

RESIDENTIAL CAPITAL, LLC, et al.                    69

1  identified no authority that would support your argument that a

2  claim against the parent is sufficient to assert a claim

3  against all subsidiaries and affiliates.

4          That's your argument.  Am I understanding that

5  correctly?

6          MS. NORA:  Your Honor, I believe that this is a unique

7  case.

8          THE COURT:  Could you just answer my question?

9          MS. NORA:  It is an experiment in the law --

10         THE COURT:  Do you have any case authority?

11         MS. NORA:  It should arise from the determination --

12         THE COURT:  Do you have any --

13         MS. NORA:  -- in this case.

14         THE COURT:  -- case authority --

15         MS. NORA:  Not historically.

16         THE COURT:  All right.  Go on with your -- I'd like

17  you to address the issue of why res judicata from the Arizona

18  action does not bar the claim -- let's deal with the original

19  claim.

20         MS. NORA:  Thank you, Your Honor.

21         We are taking the word of Arizona counsel and federal

22  interpretation of lower-level state court cases as establishing

23  this res judicata standard.

24         THE COURT:  Do you have any case authority that

25  Arizona does not apply res judicata to a nonfinal judgment of a

RESIDENTIAL CAPITAL, LLC, et al.                    70

1   lower court in Arizona?

2           MS. NORA:  No; it needs to be reversed, Your Honor.

3           THE COURT:  Oh, okay.

4           MS. NORA:  And it is pending on appeal.

5           THE COURT:  And -- all right.  So you acknowledge that

6   all existing cases in Arizona, all existing reported cases in

7   Arizona, apply res judicata to nonfinal decisions of the courts

8   in Arizona?  Correct?

9           MS. NORA:  Well, I think you're trying to say final

10  decisions of lower courts.

11          THE COURT:  Yes, I am.

12          MS. NORA:  Thank you.

13          THE COURT:  And do you agree with that?  That all

14  decisions, all appellate decisions in Arizona apply res

15  judicata to final decisions of lower courts in Arizona?  Do you

16  agree?

17          MS. NORA:  No.  I don't think that's correct.

18          THE COURT:  So give me a cite that shows that wrong.

19          MS. NORA:  Well, I -- what the Court offered as a

20  proposition was that all appellate courts in Arizona consider

21  the lower courts' ruling as res judicata, and since they're

22  appellate courts, they would be reviewing those lower court

23  decisions to see whether they would be reversed.

24          THE COURT:  Ms. Nora, do you have any cases that

25  support your argument?

RESIDENTIAL CAPITAL, LLC, et al.                    71

1          MS. NORA:  The standard for this is if the order --

2          THE COURT:  Ms. Nora --

3          MS. NORA:  -- entered at the trial could --

4          THE COURT:  Stop.  Stop, Ms. Nora.

5          I'm asking you a very specific question.  When I ask a

6   specific question, I wish to have an answer to my question.

7   Can you cite to me now as you stand there any case authority

8   from Arizona that applies a res judicata rule other than as

9   stated by Mr. Lewis?  Yes or no?

10         MS. NORA:  I don't believe that the debtors were

11  relying on the Arizona rule; I believe they were relying on the

12  federal --

13         THE COURT:  Okay.  I've heard all I want to hear from

14  you.  You do not answer the questions that the Court

15  specifically asks you.  When counsel appears before me and I

16  ask them direct questions, I expect a direct answer.

17         I'm going to give you one last chance.  If you don't

18  answer my question directly, your argument is concluded.  Do

19  you understand that?

20         MS. NORA:  Yes, Your Honor.

21         THE COURT:  Can you cite to me any Arizona case

22  authority that says that a final judgment of a lower court in

23  Arizona should not be treated as res judicata?  Yes or --

24         MS. NORA:  I don't believe such case law exists.

25         THE COURT:  All right.  Okay, go on with your

1    argument.

2            MS. NORA:  Now, Your Honor, the reason that the claim

3    was amended is using the standard that this Court is

4    applying -- that a motion-to-dismiss standard will apply -- is

5    we don't have any time frame for amendment of these claims.

6    The debtors are relying on the date of filing of the --

7            THE COURT:  There was a bar --

8            MS. NORA:  -- Chapter Thirt --

9            THE COURT:  There was a bar date --

10           MS. NORA:  -- Chapter 11 plan --

11           THE COURT:  -- in this case.  You acknowledge there

12   was a bar date?

13           MS. NORA:  Yes, Your Honor.

14           THE COURT:  And it's long since run.  What is your

15   understanding of the applicable authority in this circuit with

16   respect to whether an amended claim relates back to the

17   original filed claim?

18           MS. NORA:  I believe that it was well stated by the

19   debtors.  It has to do with the same factual nexus.  The

20   factual nexus in this case is MERS, Mortgage Electronic

21   Registration Systems, being the claimed beneficiary on deeds of

22   trust or being the nominee of the mortgages.  And this is Mr.

23   Papas' contention on behalf of all of the parties -- all of the

24   properties in which he has an interest, which he did note in

25   claim number 242.  He said here's an example, the Arizona case.

1    But he has always had this list of properties.  He tells me the

2    debtors have been aware of the list of properties from

3    combating him in various forums, and that this is no secret to

4    the debtors.

5         THE COURT:  Do you agree that Mr. Papas has been

6    determined to be a vexatious litigant in prior cases?

7         MS. NORA:  I do not agree with that.

8         THE COURT:  Okay.

9         MS. NORA:  I understand he was sanctioned for bringing

10   something to the attention of the Arizona court which is on

11   appeal.  But this idea of friv -- frivolous is one instance;

12   vexatious is repetitive.  And he has appealed from that

13   frivolous sanction, and I don't believe it's been enforced

14   against him.  And, in fact, I think it had something to do with

15   proceeding where the automatic stay in this court was in

16   effect.  But that's my understanding.  I think he's on the

17   phone in listen mode and would be prepared to make an offer of

18   proof with respect to his status on that one Arizona case.

19        THE COURT:  All right.  Anything else you're going to

20   argue?

21        MS. NORA:  I believe that the amendment is timely on

22   the basis that it pertains to the same factual nexus which is

23   the use of Mortgage Electronic Registration Systems, which we

24   would also offer to prove is an electronic database that does

25   not have any employees which has resulted in the creation of

1   forged mortgage assignments throughout the nation.  And that is

2   the basis for the RICO.  And I can address the standards of

3   RICO if Your Honor would like.

4           THE COURT:  No.  The issue is whether your claim --

5   whether the amended claim adding 114 properties relates back to

6   the original filing.  That's the issue for today.

7           MS. NORA:  I have stated that we believe that the

8   factual nexus --

9           THE COURT:  All right.

10          MS. NORA:  -- is the same.

11          THE COURT:  I have your argument.

12          MS. NORA:  Thank you, Your Honor.

13          THE COURT:  Mr. Lewis, do you wish to respond briefly?

14          MR. LEWIS:  Just a few points, Your Honor.  Thank you.

15          First of all, in terms of the violation of the stay

16  issue, the litigation continued in Arizona because of paragraph

17  14(a) of the procedures order which allowed litigation over

18  titles and foreclosures to proceed.  That's why it went

19  forward.

20          Mr. Dodrill can probably answer that even better than

21  I --

22          THE COURT:  No, I'm aware of that.

23          MR. LEWIS:  Okay.

24          The other thing -- one more thing I want to say here

25  is that the response does not address the objection at all.

RESIDENTIAL CAPITAL, LLC, et al.                    75

1          THE COURT:  It went off in every conceivable

2     direction --

3          MR. LEWIS:  Pretty --

4          THE COURT:  -- other than responding --

5          MR. LEWIS:  Yeah.

6          THE COURT:  -- to the objection.

7          MR. LEWIS:  Right.  So on that ground alone --

8          THE COURT:  It is that -- that is the reason, frankly,

9     that the Court is going to enter the order to show cause why

10    Ms. Nora's pro hac vice admission is unclear of -- certainly

11    for herself, and she'll be permitted to continue for herself,

12    but for anyone else, this is a frivolous pleading in my view,

13    the reply, the extent it goes off in every tangent possible

14    other than addressing the issues raised in the debtors' papers.

15         MR. LEWIS:  Your Honor, my final point is I thought I

16    heard Ms. Nora say -- suggest that the amendment somehow

17    relates to the original proof of claim because the original

18    proof of claim said the property concerned there was an example

19    of what -- that would be pretty cryptic to begin with.  But if

20    you look at the original proof of claim, there's no talking

21    about its being an example of anything.  There's only one

22    property mentioned.  There's no suggestion that there are any

23    other properties of concern.  And so it clearly does not

24    relate.

25         THE COURT:  Address her argument that the amendment is

RESIDENTIAL CAPITAL, LLC, et al.                    76

1   timely because it relates to the same conduct by MERS.

2        MR. LEWIS:  The conduct by MERS is not the subject

3   matter of the original proof of claim.  The original proof of

4   claim, if you look at the underlying complaint -- if you go

5   that far because it's not attached to the proof of claim

6   itself -- the allegations are against GMACM.  And in any event,

7   114 different properties are 114 claims or sets of claims.  And

8   while there may be a common pattern of conduct alleged as to

9   them, that doesn't make it relate to the original claim.

10        THE COURT:  Okay.  Have the debtors engaged in

11  litigation with Mr. Papas elsewhere in the country?

12        MR. LEWIS:  I don't -- other than the appeal, I don't

13  believe so.

14        THE COURT:  Has he filed lis pendens on other property

15  in other states, do you know?

16        MR. LEWIS:  I don't know the answer to that.  We did

17  make an attempt to find all these other properties and produced

18  this massive spreadsheet, some of which we were able to find

19  and some of which we weren't.  I can try to get the Court an

20  answer to that question --

21        THE COURT:  That's all right.

22        All right.  I'm going to take the matter under

23  submission.

24        MR. LEWIS:  Thank you, Your Honor.

25        May I ask a question --

RESIDENTIAL CAPITAL, LLC, et al.                    77

1          THE COURT:  Yeah, sure.

2          MR. LEWIS:  We attached a form of order, of course,

3    when we filed the objection.  The amended proof of claim is

4    something I think the Court will end up dealing with in some

5    fashion or another in ruling, or it may.  And if it does, then

6    perhaps we need to submit --

7          THE COURT:  I don't need anything else.

8          MR. LEWIS:  Okay.

9          THE COURT:  I -- it'll be addressed in an opinion.

10         MR. LEWIS:  Okay.  It would just -- something to

11   reflect --

12         THE COURT:  I don't need anything else.

13         MR. LEWIS:  Okay.  All right.

14         THE COURT:  The issue of the amended claim is dealt

15   with in Ms. Nora's reply and you've adequately dealt with it.

16         MR. LEWIS:  Okay.  Thank you, Your Honor.

17         THE COURT:  Okay.

18         What's next?

19         MR. WISHNEW:  Your Honor, Jordan Wishnew, Morrison &

20   Foerster for the debtors.

21         That brings us to the next contested claims matter

22   which is a matter of twenty-second omnibus objection.  There

23   are two claims being --

24         THE COURT:  What page of the agenda?

25         MR. WISHNEW:  I'm sorry, Your Honor; page 20.

1          THE COURT:  Go ahead.

2          MR. WISHNEW:  In the middle of the page, there are two

3    responses; Alicia and George Davis (ph.) and William C. and

4    Keiran Walker.  We intend to address the Davis claim and then

5    the Walker claim and then proceed onto the next docketed

6    matter.

7          THE COURT:  Go ahead.

8          Well, is anyone appearing for the claimants?

9          MR. WALKER:  Yes, William C. Walker representing

10   himself and his wife.  And it's pronounced Karen; it's spelled

11   funny.

12         THE COURT:  All right.  Anybody else on the phone?

13         MR. WALKER:  I can barely hear you.

14         THE COURT:  Is there anyone else on the phone

15   appearing for any of the claimants with respect to the -- I

16   guess this is what, the twentieth (sic) omnibus objection?

17         All right.  Mr. Walker, I'll hear from you after Mr.

18   Wishnew addresses the Court.

19         MR. WALKER:  All right, thank you.

20         MR. WISHNEW:  Thank you, Your Honor.

21         So, George Davis deals with claim number 3443.

22   Specifically, this is a claim in the amount of approximately

23   358,000 dollars.  All this is a secured claim against GMAC

24   Mortgage, the stated basis of which is a mortgage note.

25         The concern of the claimant is that he tried to pay a

1  portion of his mortgage arrears and did not succeed and has

2  purportedly been damaged.  Again, the claim amount appears to

3  be for the outstanding balance on the mortgage.  And in order

4  to address his concerns about his denial of a loan

5  modification, and considering the Court's earlier guidance, we

6  did put in a supplemental declaration of Deanna Horst from the

7  debtor.  And Ms. Horst is in the courtroom today should the

8  Court have any questions.

9          We basically say with regard to Mr. Davis' claim, we

10  believe that there has not been a valid claim stated against

11  the debtor here.  The debtor had made nine separate attempts

12  between 2009 and 2012 to work out a loan modification with Mr.

13  Davis.  The loan has been due since November 2010 and the

14  reasons for the failed workouts were either he could not

15  satisfy the guidelines under HAMP, but it is the debtors'

16  position that they acted properly during that time period to

17  try and accommodate Mr. Davis.  But unfortunately, we could not

18  reach an acceptable resolution that would allow for a loan

19  modification.

20          It's therefore our position that the claim should be

21  disallowed because there is not a colorable claim against the

22  debtor based on their dealings with this claimant.

23          THE COURT:  Is anybody appearing for Mr. Davis?

24          With respect to -- there was -- Mr. Davis submitted

25  seven loan modification applications.  Five were denied for

RESIDENTIAL CAPITAL, LLC, et al.                    80

1  incomplete documentation; one was denied because it didn't

2  comply with HAMP; and one was approved for trial modification.

3  Did Mr. Davis countersign a -- I guess, what's the term that

4  applies to it; it would be -- just bear with me.  He entered

5  into a trial plan, correct?

6          MR. WISHNEW:  Correct, Your Honor.

7          THE COURT:  And did he countersign the document that

8  set forth the terms of the trial plan?

9          MR. WISHNEW:  Yes, he did, Your Honor.  I would also

10  add with regards to the trial plan, that was approved and was

11  countersigned.  It's our -- our records reflect that it did not

12  go through because he did not make that first trial payment.

13          THE COURT:  Well, that's a different issue.

14          MR. WISHNEW:  Okay.

15          THE COURT:  Okay?  The -- in the evidence that the

16  debtor submitted, am I correct that you've indicated that Mr.

17  Davis did enter into a trial plan and your evidence would

18  establish that he failed to make payments that were required in

19  the trial plan?  Is that a fair statement?

20          MR. WISHNEW:  That is correct, Your Honor.

21          THE COURT:  And what happened after -- what, if

22  anything, happened after the trial plan, which is a contract,

23  was entered into and he failed to perform?

24          MR. WISHNEW:  Sure, Your Honor.  So if -- what we're

25  talking about -- I think it's between seven and nine packages.

1    The trial plan was approved in June 2011 but cancelled

2    September 2nd because, as we mentioned, the failure to make the

3    payment.  Subsequent to that, there was a sixth application

4    that was denied on December 28th, 2011, because GMAC Mortgage

5    could not reduce the mortgage payment to an acceptable level,

6    more specifically, that the HAMP's requirements of the modified

7    mortgage payment be no greater than thirty-one percent of the

8    borrower's total income, and in light of where his income was,

9    the numbers just were not working so that we could do a

10   modification.

11        So there were subsequent efforts to try again, but

12   frankly, the borrower's income was not enough to do another

13   modification.

14        THE COURT:  Did the debtors deny a subsequent HAMP

15   modification because of Davis' failure to meet -- is it because

16   the failure to meet the thirty-one percent income -- the ratio

17   of payments to his income?

18        MR. WISHNEW:  That's correct, Your Honor.

19        THE COURT:  All right.  I'm going to take the Davis

20   matter under submission.

21        MR. WISHNEW:  Thank you, Your Honor.

22        The next matter --

23        THE COURT:  Just bear with me for a second, Mr.

24   Wishnew.

25        MR. WISHNEW:  Sure.

1          THE COURT:  All right, go ahead.

2          MR. WISHNEW:  The next matter with regards to the

3  twenty-second omnibus deals with claim number 5529, filed by

4  William C. Walker and Keiran J. Walker.  This deals with a

5  402,000 dollar unsecured claim against Residential Capital, the

6  stated basis of which is a mortgage loan.

7          As best we could understand, the concern is that they

8  felt they were being -- they were getting a two-percent loan

9  modification but instead they received -- and I emphasize the

10 word, they did receive -- a four percent -- a modification that

11 adjusted their mortgage payment or mortgage interest rate from

12 six and one-eighth to four percent, with --

13         THE COURT:  Was there a trial plan that was signed by

14 both parties?

15         MR. WISHNEW:  Yes, Your Honor.  That was being done --

16 the claimants were approved for a permanent HAMP modification

17 on September 13th, 2010.

18         THE COURT:  Well, let me stop.  So they went through

19 the trial period and successfully completed the trial period?

20         MR. WISHNEW:  That's my understanding, Your Honor,

21 yes.

22         THE COURT:  And they were approved for a final

23 modification based on the successful completion of the trial

24 period?

25         MR. WISHNEW:  That was my understanding, Your Honor,

RESIDENTIAL CAPITAL, LLC, et al.                          83

1    yes.

2           THE COURT:  And the documents in connection with both

3    the trial plan -- let me ask you this.  Was there any -- was

4    the final modification that was approved also signed?

5           MR. WISHNEW:  Yes, Your Honor.

6           THE COURT:  By the Walkers?

7           MR. WISHNEW:  Yes, Your Honor.

8           THE COURT:  And did it set forth what the interest

9    rate would be?

10          MR. WISHNEW:  Yes, Your Honor.

11          THE COURT:  And what interest rate did it provide?

12          MR. WISHNEW:  Four percent.

13          THE COURT:  And what happened after that?

14          MR. WISHNEW:  After that, the debtors then -- I'm

15   sorry, the claimants sought subsequent HAMP modifications on

16   May 16th, 2011 and August 22nd, 2011.  They were denied those

17   modifications because they had already received the prior HAMP

18   modification in 2010.  In both instances, the company, GMAC

19   Mortgage, advised or spoke with the claimants about the

20   modification denials, so there was certainly full disclosure as

21   to why it was that subsequent modifications were denied.

22          THE COURT:  All right.  Anything else you wanted?

23          MR. WISHNEW:  Nothing more, Your Honor.

24          THE COURT:  All right.  Mr. Walker, do you want to

25   address the issues?

RESIDENTIAL CAPITAL, LLC, et al.                    84

1           MR. WALKER:  Yes, I'd like to, Your Honor.

2           THE COURT:  Go ahead, please.

3           MR. WALKER:  I don't know what else you need there.

4    I'm sixty-nine years old, started the process when I was sixty-

5    five.  We have lost a huge amount of money in equity in our

6    home; home's upside down.  In 2009, we were listening to the

7    radio, we heard all these things about special programs, so we

8    decided we'd call.  We ended up talking to GMAC, who sent us

9    all this stuff.  We qualified for -- they thought we would be

10   as low as a two percent or -- I mean, four percent -- they

11   promised us they'd give us a particular amount of loan.

12          THE COURT:  I'm sorry, you say they did or didn't

13   promise a specific modification?

14          MR. WALKER:  They did not promise us.

15          THE COURT:  Okay.

16          MR. WALKER:  They indicated in their paperwork they

17   did, but they did not promise us at that time --

18          THE COURT:  Okay.  Go ahead.

19          MR. WALKER:  -- we would set up a particular kind of a

20   loan, or we get any kind of a loan, to be honest with you.  We

21   ended up getting some notification; we talked to them several

22   times on the phone.  They told us that we'd be getting some

23   paperwork, that we were going to get a four-percent loan.

24          I told them that that would not be enough under our

25   circumstances.  My wife is turning sixty-two and planning to

1    retire and get on Social Security.  They wouldn't accept those

2    figures for our income, and I understand that.  They wouldn't

3    accept mine because I have a reduced income and had retired.

4    So we ended up complaining and telling them it just wasn't

5    going to be enough.  And they said don't worry about it -- this

6    is GMAC -- they told us many, many times there's going to be a

7    lot of other programs, Mr. Walker, just accept this thing,

8    don't worry about it, take this loan and you can go down in the

9    future.  Well, we -- if you look at the papers when we talked

10   to them originally, they told us that this four-percent loan

11   would include our taxes and insurance.  And when I called back

12   to question it, they told me, I'm sorry, Mr. Walker, you live

13   in California, we can't do it.  And I thought that's

14   ridiculous; we -- no one told us that we had to do something

15   special or anything else, they just told us it was going to be

16   included and it wasn't.

17          Can I go on?

18          THE COURT:  Yes, go ahead.

19          MR. WALKER:  What happened then was we struggled

20   along, we called and they still -- they kept telling us, as we

21   were having difficulty making our payments, we were selling our

22   personal property, cashed in our 401(k)s, cashed in our life

23   insurance, I sold a boat, a trailer, a whole bunch of different

24   things.  In any event -- personal property, gold our personal

25   jewelry except our wedding rings, and so on.

1        We -- the people were very nice when we talked to

2   them, but bottom line is they kept telling us there'd be other

3   programs.  So they would send us these -- the documentations to

4   fill out.  We filled them out and you can see we filled them

5   out on -- for the 5/17 denial, and what they told us was that

6   there was a new program, and to go ahead and submit the papers

7   again.  So we did.

8        So then on -- when we got the denial thing, I called

9   and they told me gee, I'm so sorry, there's not a program that

10  fits for you.  They didn't go into any more detail than that,

11  although I asked.  In any event, the next time they told us

12  that you had to wait a year to file the claim.  So we went

13  ahead and -- I think our thing was filed in September of 2009,

14  so in 2010 we filed the papers in August, which is what they

15  told us to do.  Again, they told us the same thing, there's no

16  new program and it's been about a year.  I said well, what are

17  we talking about?  And they said well, you had to wait a year

18  before you could resubmit for the loan, but --

19       THE COURT:  May I ask you this, Mr. Walker?  And I

20  asked Mr. Wishnew this.  Is it correct that you were provided

21  with a written document for a trial plan and you countersigned

22  that document and returned it to one of the debtors?  Is that

23  correct?

24       MR. WALKER:  Absolutely correct.

25       THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    87

1          MR. WISHNEW:  We took the four-percent loan --

2          THE COURT:  Right.

3          MR. WALKER:  -- with the understanding that the other

4    programs was what they told us.  And --

5          THE COURT:  All right.  Let me just ask another

6    question.  Is it also correct that you went through the ninety

7    days of the trial plan and were granted a final modification on

8    terms stated in a written agreement which you also

9    countersigned?

10         MR. WALKER:  Yes, absolutely.

11         THE COURT:  Okay.

12         MR. WALKER:  Again, with the understanding that there

13   were going to be other programs, and that's what they told us.

14         THE COURT:  All right.  Go ahead with your argument.

15         MR. WALKER:  So we ended up getting these denial

16   letters, and of course in the denial letters it wasn't -- you

17   know, it wasn't as clear as they'd like us to believe.  They

18   told us that we -- there was a -- we didn't meet any new

19   HAMP -- not new HAMP, but the HAMP requirements.  And again, we

20   went through the whole process several times, and they kept

21   telling us there'd be new programs.

22         Finally, a woman at GMAC said you know what, they've

23   been misleading you, Mr. Walker, they've been -- there is --

24   there's only one bite at the apple and that was done in, I

25   believe, September of that year, or the end of the year,

1   anyway, after we complained.  And they said whoever told you

2   there was going to be other programs and you'd be qualified,

3   they misled you or lied to you.  And that happened several

4   times.

5          We have been -- we have given -- we have been

6   presented with dozens of the loan modification applications

7   from GMAC; they knew from the start that we were not going to

8   ever qualify for it, but they never told us.  So when we were

9   being misled, of course, we kept selling our personal property

10  to stay in our home.  I even put taxes on our credit cards.

11  We'd have never done something like that.  My wife stayed

12  employed as a waitress at sixty-two so we could stay in our

13  home.

14          THE COURT:  May I ask you this, sir, are you still in

15  the house now?

16          MR. WALKER:  Yes, sir, we are.

17          THE COURT:  All right.

18          MR. WALKER:  We're behind certain days in our payment

19  to Ocwen.  And of course, GMAC before they filed bankruptcy,

20  they told us to file bankruptcy just to pay them.  And we -- I

21  couldn't believe it.  But in any event, they finally told us to

22  stop paying our house payment; then we could, in fact, qualify

23  for a new loan.  But the only way we could get out of the

24  situation we were in -- we were never going to get a new loan,

25  and, of course, you heard me tell you that was the first bite

1  at the apple thing, first time we'd ever heard it.

2          So when they told us that we were never going to get

3  another loan and all this stuff, I kind of thought, well, maybe

4  we better stop paying our payment.  I talked to several

5  attorneys, even to represent us in this case it's 10,000

6  dollars, a payment I couldn't afford, so that's why I'm talking

7  on the phone myself.

8          I don't know what else to do, just tell you what

9  happened.  But bottom line is they told us that -- basically,

10  they told us to stop paying our house payment.  We ended up

11  talking to several people, several of these lawyers, and all

12  these different companies that say they can save your house and

13  what mortgage thing and so on.  We ended up going to -- just

14  being honest and telling people what the circumstances were and

15  they ended up -- hang on just one second.  I'm going to have a

16  sip of water.

17          THE COURT:  Yep.  Go ahead, Mr. Walker.

18          MR. WALKER:  Thank you, I'm sorry.  When we got --

19  when we ended up with Ocwen finally telling us the same thing,

20  were the same company, the same people.

21          Laura King was our -- I don't know what she was, but

22  Mike Vias (ph.), I mean, there's several different names, I

23  have their first and last name.  Most of the time we'd call,

24  we'd always get a different person.  We'd always -- whenever

25  we'd call -- I tried to document the calls, they said they were

1  recording every call.  I asked for all of the phone calls to

2  be -- even if I have to pay to have them transcribe -- get them

3  transcribed, I said I need the calls.  You guys are telling me

4  one thing, you're doing something else.  You know, we're

5  spilling our life savings and everything else, things that I

6  paid for dearly over the years.  And, of course, everything's

7  gone.  We've got our wedding rings, and we've still got our

8  home, we've got furniture.  But everything else, the toys, are

9  gone.  And that's okay, we're -- my wife now is sixty-six.  And

10 like I said, she was going to retire in 2000- -- what was it

11 in, in 2010 when she turned sixty-two, but bottom line is we --

12 because of this situation we couldn't do that.  And more than

13 that, we have lost a huge amount of equity in our home.  So

14 what we were relying on to be our nest egg was gone.  So we

15 lost all kinds of things.

16        It doesn't matter.  The point is we were misled by the

17 company, they continually lied to us up until finally, I

18 believe it was Mrs. King, told us hey, they misled you, they

19 lied to you, there's not going to be in the program, you're out

20 of luck.  And that's when, of course, GMAC told me -- finally,

21 they told us they were going to go bankrupt.  We got a notice

22 from the company saying they were going bankrupt.  I wrote a

23 letter -- not a letter, I called; they said you're not

24 qualified, you're not going to be able to do anything with

25 this, you're wasting your time, don't bother submitting the

1    paperwork.

2          I waited till the very last and talking to my wife,

3    and she's crying her eyes out at night just because of this

4    situation.  And we end up filing the papers.

5          THE COURT:  All right.

6          MR. WALKER:  I ended up the total amount at that time

7    that I had was 400-and-some thousand dollars.  And we're trying

8    to put all that stuff together; we put all of our stuff in

9    storage.  I had my grandson help me; the stuff got shuffled

10   around a little bit.  Bottom line is I couldn't come up with

11   all the information for the stuff -- for the actual amount that

12   we think we're owed.

13         THE COURT:  Let me ask you this, Mr. Walker.  Are you

14   currently -- are you currently applying for a loan modification

15   with Ocwen, which is servicing your loan now?

16         MR. WALKER:  We've done that, but they told us the

17   same thing.

18         THE COURT:  Okay.

19         MR. WALKER:  They said the only way you're going to

20   get a loan modification is to stop paying your house payment.

21   And I stopped paying it for a few months, but I got these nasty

22   letters telling me that they were going to foreclose on our

23   home.  And I thought wait a minute, so I called and they said

24   well, there's no guarantee, you know, if you get out of the

25   HAMP loan, you're going to get another one.  And I said well,

1  the change -- my wife is now officially retired.  She was going

2  to retire, like I said, when she's sixty-two, but now she is at

3  sixty-five, July 1st it was her birthday, July 4 was our forty-

4  seventh wedding anniversary and our life has been a dream up

5  until the last two years, three years.  And then everything's

6  just falling apart.

7         And, I mean, we're not -- we're not desperate people,

8  but we're not doing all the things we had dreamed about.  So

9  those things are -- I can't help my grandkids, I can't even

10  travel to see them, to go to their sports and so on.  And a lot

11  of it is because of GMAC's lies to us, continually telling us,

12  there's going to be other programs, don't worry about it, and,

13  of course, when it finally came out that they lied, there we

14  sit.

15         And, of course, I feel like a fool, but the bottom

16  line is that they committed -- as far as I'm concerned, they

17  committed fraud.  I called our District Attorney's office, they

18  said I'm sorry, Mr. Walker, that's a civil matter, you're out

19  of luck.

20         So I thought, well, where am I going to go?  So I

21  called a couple of attorneys and those companies that say

22  they're going to save your home; all they want to do is they

23  want to take -- have you send the money to them that you're

24  going to pay your house payment with and then they try to

25  negotiate whatever they do it.  And I said well, wait a minute,

RESIDENTIAL CAPITAL, LLC, et al.                    93

1   I can do that myself.

2          Anyway, that's the --

3          THE COURT:  All right.

4          MR. WALKER:  -- facts of it.  I don't know what else

5   to tell you, Your Honor, except that this is wrong.  We -- I

6   mean, I can probably come out with a little tighter amount of

7   money that we've actually been, you know, tightened out of or

8   screwed out of, but I understand after listening to you and the

9   court process of those other folks, I'm humbled after listening

10  to it.  But I can't believe they did what they did to us.  And

11  I --

12         THE COURT:  All right.  Mr. Walker, the issue from the

13  Court's standpoint is whether the proof of claim that you

14  filed -- and I recognize you don't have a lawyer -- whether the

15  proof of claim you had filed asserts a legally supportable

16  claim against any of the debtors.  And I understand -- I've

17  listened to you, and I've read the papers, so I think I

18  understand the facts.  I'm going to ask Mr. Wishnew, who's

19  arguing on behalf of the debtors, a few questions now.  Okay?

20         MR. WALKER:  Sure, thank you.

21         THE COURT:  All right, thank you.

22         So Mr. Wishnew, one of the -- I guess the question I

23  have is whether a borrower may assert a claim, or if it was

24  outside of bankruptcy, assert a cause of action in a lawsuit

25  for wrongful denial of a loan modification, and if so, what are

1    the elements of such a claim or cause of action?

2          So in the cases I've read, there's a recent First

3    Circuit case, Young v. Wells Fargo, that really primarily deals

4    with -- this is breach of contract claim, where there was a

5    trial plan, and the argument -- and, actually, the First

6    Circuit affirmed in part and reversed in part the trial court's

7    dismissal of the complaint in that case.  They asserted a

8    variety of causes of action.  And it reversed, in part, as to a

9    breach of contract claim, but that hinges on an alleged breach

10   of contract; there it was a trial plan.

11         You know, it's an area where lawyers are increasingly

12   trying to sort of test the limits of what properly states a

13   cause of action.  And so one question I have is whether -- what

14   is -- I want you to address the issue of whether courts have

15   recognized a cause of action for wrongful denial of a loan

16   modification.

17         Here, Mr. Walker asserts that representatives of the

18   debtor verbally told him that there were going to be new

19   programs, that there could be a further modification, et

20   cetera, and that that didn't come to pass.  So what is the

21   debtors' view as to whether that states a cause of action for

22   breach of contract, negligent misrepresentation?  I'm not even

23   going to go to the issue of fraud.

24         For example, do those facts raise -- and for me the

25   issue is does it raise a contested matter as to whether the

1   Walkers have asserted facts that support a claim for negligent

2   misrepresentation against the debtors in connection with the

3   denial here of a further loan modification.  Mr. Walker

4   acknowledges that they did get a trial plan, and they got a

5   final modification based on that.  He indicates that they

6   subsequently -- the rates in that were too high for them to be

7   able to afford, although they're still in the house.  And so

8   the issue is whether statements by agents or representatives of

9   the debtor would give rise to a cause of action for negligent

10  misrepresentation or another theory.  What's the debtors' view

11  about that?

12          MR. WISHNEW:  Your Honor, it's the debtors' view that

13  the facts as they are before the Court would not give rise to

14  such a cause of action for negligent misrepresentation or

15  breach of contract.  I mean, these were conversations between,

16  you know, presumably an employee of GMAC Mortgage and the

17  borrower simply making an inquiry.  And there would not be --

18  the loan modification would have basically -- I'm not aware of

19  anything in the loan modification that would have promised some

20  sort of further relief that they asked for a loan mod, they got

21  the loan mod, it was approved at four percent, and whether or

22  not there was an opportunity for a further modification is not

23  something that the debtor would have promised to them, or there

24  would have been --

25          THE COURT:  That goes to an issue of disputed facts,

RESIDENTIAL CAPITAL, LLC, et al.                              96

1  or contested facts.  And the issue is what's the Court supposed

2  to do on your objection to the claim?  I'm dealing with pro se

3  parties; that's why I let Mr. Walker lay out --

4          MR. WISHNEW:  Of course, Your Honor.

5          THE COURT:  -- the facts.  I didn't see -- and maybe

6  you can point me to this, I didn't really see in your papers

7  where you addressed the issue of -- the elements of claims

8  for wrongful denial of a loan modification.  Clearly, they got

9  the first -- they got a trial plan, they got a final loan

10  modification, and the issue that Mr. Walker raises -- he

11  acknowledges he got it, four percent, didn't think he'd be able

12  to meet that, but he had -- I mean, in his -- I'm not saying --

13  I'm not finding any facts whatsoever at this point, but I think

14  a fair interpretation of what he says is he was promised,

15  assured -- maybe it didn't rise to that level; I don't know --

16  that there could be a further modification.  You acknowledge

17  that he applied for further modification and was turned down.

18          MR. WISHNEW:  That's correct, Your Honor, yes.

19          THE COURT:  I don't know whether GMAC -- you know, the

20  Walkers may not have qualified for a HAMP modification, but,

21  you know, the Court's experience, particularly when I had the

22  Chapter 13 calendar, is that a bunch of the financial

23  institutions in addition to evaluating a potential HAMP

24  modification, they typically had their own programs, as well.

25  And so even if someone didn't qualify for a HAMP modification

1    there'd be consideration whether some other basis would occur.

2    But I don't -- you agree you didn't address this issue of --

3    it's kind of in a bourgeoning area and --

4         MR. WISHNEW:  I would recognize that neither in the

5    objection or the reply did we specifically address whether

6    there is a cause of action for wrongful denial of a loan

7    modification.

8         THE COURT:  Let me ask Mr. Nosek, who's special

9    borrower's --

10        MR. WALKER:  Hello.

11        THE COURT:  -- counsel for the committee.  Does the

12   committee have a view --

13        MR. WALKER:  I can't hear you.

14        THE COURT:  I'm sorry, Mr. Walker.  I'm asking Mr.

15   Nosek or one of his colleagues, who are special borrower's

16   counsel.  They rep -- they're counsel to the creditors'

17   committee for borrowers.  They don't represent you

18   specifically, Mr. Walker, but the special borrower's counsel

19   really is there to try and address from the Court's standpoint

20   some of these issues of what would be a valid claim against the

21   debtor.

22        You know, I cited the one First Circuit case; there

23   are additional cases as well that explore the issue of

24   potential claims.  I'm describing it as wrongful denial of a

25   loan modification; they may apply different terms to it.  Mr.

1   Nosek, does the --

2           MR. WALKER:  Can I interject, this is Mr. Walker

3   again.

4           THE COURT:  Just hand on a second, Mr. Walker, let me

5   get an answer from Mr. Nosek or one of his colleagues.  If you

6   don't have an answer today, that's fine.

7           MR. NOSEK:  Your Honor, I do not have a specific

8   answer for you today, but we can obviously --

9           THE COURT:  You have to speak into the microphone,

10  because otherwise we're not going to get a complete record.

11  Karen keeps me honest here.  No, it's okay.  I'm sorry.

12          MR. NOSEK:  Sorry, Your Honor.  Robert Nosek, special

13  borrower's counsel.

14          THE COURT:  Okay.

15          MR. NOSEK:  We do not have a specific response to you

16  today; we can, certainly immediately begin looking at that

17  issue.  We do have a person on the phone in the office, and we

18  can begin to get an answer --

19          THE COURT:  Okay.

20          MR. NOSEK:  -- for you.

21          THE COURT:  Okay.  All right.

22          MR. NOSEK:  It didn't come up par -- we did speak with

23  Mr. Walker briefly yesterday --

24          THE COURT:  Yes.

25          MR. NOSEK:  -- I believe, but he chose to go -- you

 1  know, go forward and then --

 2          THE COURT:  Yes, I understand.  Okay.

 3          MR. NOSEK:  We're happy to look into it, Your Honor.

 4          THE COURT:  So the only issue for me today, frankly,

 5  is -- not the only issue, but the main issue for me today is

 6  whether this is sufficiently clear on its face that I would

 7  sustain the debtors' objection to the claim and expunge it, or

 8  whether, at least for today, I determine it to be a contested

 9  matter, set it down.  When I said earlier today that I wanted

10  to see the order that dealt with particularly the focus on loan

11  modifications, this was one of those that I specifically had in

12  mind.

13          But I want to give Mr. Walker a chance.  You wanted to

14  say something else go ahead.

15          MR. WALKER:  Yes, sir.  I appreciate it, thank you.

16          William C. Walker.  We didn't generate the information

17  that was sent to us from GMAC to reapply for these loans with

18  the understanding we already knew and they knew we already had

19  this HAMP loan, to be honest with you.  They know we did.  They

20  gave us the information with the understanding, and our

21  understanding with them, that they were sending this stuff to

22  us again to fill out, which is monumental, which I filled out

23  again myself, with the hardship letters and all the

24  documentation.  And of course, when you look at the income tax,

25  and I talked about that -- I was selling personal property and

1    declaring it as income, which was ridiculous.  I had the gold,

2    the trailer, all of those different things.  But in any event,

3    besides all the -- that part of it which is personal to me, I

4    didn't generate the information that they sent me to get the --

5    to get another loan; they did.  They were the ones that told me

6    there was a new program --

7              THE COURT:  Okay.

8              MR. WALKER:  -- submit the stuff, there's going to be

9    a new opportunity.

10             THE COURT:  Mr. Walker, I'm going to interrupt you now

11   only because what I'm going to do is adjourn this matter.

12             You may have heard -- I don't know when you got on the

13   phone today, but at a prior hearing I had raised the issue with

14   counsel for the creditors' committee and the debtors that I

15   wanted to establish procedures, particularly with respect to

16   issues that arose in connection with loan modifications,

17   because I was beginning to see the objections to claims that

18   related to it.  And in some instances, there may need to be a

19   hearing at which people will have to provide evidence to

20   support their claims.  I think in the first instance what I'm

21   going to ask both the debtors and the committee's borrower

22   counsel to address is the issue of what are the elements of

23   valid legal claims for wrongful denial of a loan modification.

24   And by framing it that way, I'm not limiting it to a single

25   cause of action.

1          As I say, I've read -- in the few cases I've read -- I

2     haven't had much chance to look at this yet.  But I mentioned

3     the First Circuit case, which primarily it evaluates some

4     others.  The only case -- the only theory that it reversed, I

5     think, was with respect to the breach of contract.  And I'm not

6     sure that would apply here, because there was a trial plan, he

7     successfully completed it, he got a final modification on

8     essentially the same terms.  That was where the problem came,

9     his performing consistent with that plan, and so he applied for

10    additional plans.

11         I will tell Mr. Walker I have some skepticism whether

12    there is a valid legal claim that can be asserted, but in

13    fairness, not only to the Walkers, but this issue is really --

14    I see it as a recurring issue with respect to some of the other

15    claims objections I have.  I need to get a better grasp of

16    that.

17         Mr. Walker, you'll get served with the pleading that

18    gets filed by the debtor and by the committee, and if you want,

19    you know, it's going to really address the legal arguments, so

20    I'm not necessarily expecting you to respond, but you'll have

21    an opportunity to do that.  But you'll get notice of a

22    subsequent hearing and maybe in connection with when I finally

23    approve a procedures order to deal with some of these claims.

24    So we'll make sure that you get notice of what's happening,

25    okay?

RESIDENTIAL CAPITAL, LLC, et al.                    102

1          MR. WALKER:  Your Honor, I really appreciate it.

2    Could I just add one short thing, and I'll be very brief?

3          THE COURT:  Yes, please, go ahead.

4          MR. WALKER:  In the responses to letters I got with

5    the objections, in both of those they circled, out of all the

6    things they could circle, "Account does not meet HAMP program

7    requirements."  And then they go on to say -- and they give a

8    phone number, which I always called each time, and they said

9    well, there's going to be other programs, it continually went

10   on.  In their answer -- I guess in their comments to the Court,

11   where they got this on page 6 of 12, it's Exhibit 1; I'm not

12   sure what their filing -- their filing docket number is

13   5294-1.  In their comments it says that the loan modification

14   was, of course, denied.  But they indicated that in both of the

15   occasions, the claimant received a letter regarding the

16   modification denial, and also spoke with GMAC employees

17   regarding the denial.  There's no question that is what

18   happened.

19         THE COURT:  Okay.

20         MR. WALKER:  I mean, it's just -- I was -- I

21   understand where you're coming from, and my wife even told me

22   that I was wasting my time, but whatever.  We were tagged by

23   the company and it's just -- well, I apologize for --

24         THE COURT:  Okay, that's all right.  So you'll be

25   notified when we're going to have another hearing and how we'll

1    proceed.  If you have any other -- one of the things in the

2    procedure order, if you have any other documents that support

3    your assertion of the claim, you'll have to submit those to the

4    Court, but we'll deal with that going forward.

5           Okay.  Thank you very much, Mr. Walker.

6           MR. WALKER:  Thank you.  Am I through with the phone

7    call, or --

8           THE COURT:  Yes, you are.  Okay.

9           MR. WALKER:  Thanks very much.

10          THE COURT:  All right.

11          MR. WALKER:  Thanks for listening to me, I appreciate

12   that.

13          THE COURT:  Mr. Wishnew, let's proceed.

14          MR. WALKER:  By the way --

15          THE COURT:  Yes.

16          MR. WALKER:  -- Mr. Jonathan Petts --

17          MR. WISHNEW:  He's my colleague, Your Honor.

18          THE COURT:  Yes.

19          MR. WALKER:  Jonathan Petts, I would like the Court to

20   know that he is a gentleman, he is just very, very -- I think

21   he's with the debtors and he knew -- and I had my stuff in

22   storage and I had some problems getting some of the

23   documentation, and still some is missing, but I couldn't get

24   it.  But he was a gentleman through the whole thing and treated

25   me very fairly; I really appreciate that.

RESIDENTIAL CAPITAL, LLC, et al.                    104

1       THE COURT:  I'm sure he'll appreciate it, because it's

2   not often that they hear compliments from people who are

3   asserting claims against the debtor, but I appreciate hearing

4   it as well.  Thank you very much, Mr. Walker.

5       MR. WALKER:  Thank you.  Bye.

6       THE COURT:  Go ahead.

7       MR. WISHNEW:  I'll make sure to frame the transcript

8   for Mr. Petts.

9       THE COURT:  Yeah.

10       MR. WISHNEW:  That moves us to, Your Honor, page 21,

11   into the twenty-sixth omnibus objections.  And there are

12   objections going to three claimants: Juana Cerna, Fannie

13   Kendrick Dietrich, and Phenon Walker.  So I'm going to first

14   address Juana Cerna, claim number 3816.  I don't know if Your

15   Honor wants to see if anyone is appearing.

16       THE COURT:  Is anyone at the hearing for Phenon Walker

17   or Juana Cerna?

18       Mr. Nosek?

19       MR. NOSEK:  Good afternoon, Your Honor.  With regard

20   to Ms. Cerna, we spoke with her on October 7th, explaining the

21   debtors' response and the basis for the objection.  And what

22   she apparently did not understand is that the money that she

23   had paid had actually dischar -- taken care of her second lien

24   on her house, and it was released.  And she indicated to us the

25   she would not be appearing today and that she understood the

RESIDENTIAL CAPITAL, LLC, et al.                    105

1   basis of the objection.  And she, I guess, isn't going to press

2   her response any further.

3           THE COURT:  All right.  Let me read my notes for a

4   second here.

5           All right.  And the issue here was she made a payment

6   of 12,803 dollars to GMAC, and she questioned how that money

7   was being applied.

8           MR. NOSEK:  Right.

9           THE COURT:  And the debtors' response, and I gather

10  your conversation with her, Mr. Nosek, explained what happened.

11          MR. NOSEK:  Yes, Your Honor.

12          THE COURT:  And on that basis -- and I've reviewed the

13  papers, and I understand it as well, so the debtors' objection

14  to the Phenon Walker (sic) claims -- it's claim 5429 and

15  4942 --

16          MR. WISHNEW:  Actually, Your Honor, I'm sorry, we were

17  dealing with Juana Cerna --

18          THE COURT:  I'm sorry.

19          MR. WISHNEW:  -- claim --

20          THE COURT:  -- Juana Cerna; it's 5076 (sic), claim

21  5076 (sic).

22          MR. WISHNEW:  Sorry, Your Honor, just claim 3816.

23          THE COURT:  I guess my notes have the wrong number;

24  3816?

25          MR. WISHNEW:  Yes, Your Honor.

1          THE COURT:  All right.  But I am right, it's the

2   12,803 --

3          MR. WISHNEW:  Yes.

4          THE COURT:  -- dollars?

5          MR. WISHNEW:  Everything else is correct, Your Honor.

6          THE COURT:  Okay.  Sustained.

7          MR. WISHNEW:  Thank you very much, Your Honor.  That

8   moves us to Fannie Kendrick Dietrich, claim 1385.  This is a

9   claim --

10         THE COURT:  Is anybody appearing for Ms. Dietrich?

11         Go ahead.

12         MR. WISHNEW:  This is a claim, Your Honor, an

13  unspecified amount, in which she alleges that she was expecting

14  a refinancing, that was purportedly completed online, to reduce

15  her monthly payment.  As set forth in the reply, as well as in

16  the supplemental declaration, what happened here was that she

17  did make an application for a modification.  The application

18  was denied.  And again, it goes to the ration of expenses to

19  income and the ability to have the mortgage payment fixed at an

20  acceptable level.  As we explain in our supplemental

21  declaration, there was a large one-time expense in her

22  application that severely increased her expenses relative to

23  her income, which likely contributed to the denial of her

24  application.

25         At this point in time, we're not quite sure how Ms.

1  Dietrich has been damaged, because our records show that her

2  loan is current at this point in time.  It is currently being

3  serviced by Ocwen, and --

4        THE COURT:  As I understand it, she applied for two --

5  applied for loan modifications twice, once in November of 2011,

6  and she was sent a denial on November 17th, 2011.  And she then

7  spoke with somebody, an employee of GMAC, on November 21, 2011,

8  and she reapplied for a loan modification in January 2012, and

9  she was provided with a letter of denial from that.  Am I

10 correct?

11       MR. WISHNEW:  The only fact that I would correct is

12 that she reapplied December of 2011 and was denied January of

13 2012.

14       THE COURT:  Okay.  All right.

15       MR. WISHNEW:  But other than that, Your Honor is

16 correct, and I would just add that we don't believe Ms.

17 Dietrich has been damaged.  Our consideration of her

18 applications was reasoned and appropriate, and at this point

19 she is current on her mortgage.  So --

20       THE COURT:  The Court has reviewed the papers, both in

21 support of and in opposition to the debtors' objection to the

22 claim of Fannie Kendrick Dietrich, and the Court is satisfied

23 that there is no legal basis for liability for the denial of

24 the loan modific -- any of the loan modifications to Ms.

25 Dietrich, and so the objection is sustained.

1          MR. WISHNEW:  Thank you very much, Your Honor.

2          That brings us to Phenon Walker, claim 5429 in the

3     twenty-sixth omni.  This is a proof of claim for 143,931

4     dollars and a penny.  It follows an unsecured claim, the stated

5     basis of which is a surplus check for a 2011 money loan.  Just

6     by way of loan history, for Mr. and Ms. Walker --

7          THE COURT:  I thought there was a second claim here.

8          MR. WISHNEW:  There is a second claim, and that was

9     addressed in our twenty-seventh omni.  I'm happy to address

10    both right now, Your Honor.

11         THE COURT:  All right, yeah, address both of them

12    together.

13         MR. WISHNEW:  Absolutely.  So both claims relate to

14    the same loan.

15         THE COURT:  The second claim is 4942.

16         MR. WISHNEW:  That's correct, Your Honor, and that's

17    in the amount -- in excess of one million doll --

18    $1,096,291.07.

19         THE COURT:  Is anybody on the phone for Phenon Walker?

20    Anybody in the courtroom?

21         All right.  Go ahead.

22         MR. WISHNEW:  Thank you, Your Honor.  This is a loan

23    that went back -- it originated in 2003.  It has been in

24    default and owing since July of 2004.  It was a fixed-rate loan

25    in the amount of 975,000 dollars.  Mr. and Ms. Walker are still

1   in the home.  And like I said, they've made few, if any,

2   payments since 2004 on this home.

3           The claim with regards to the surplus escrow, that is

4   simply a mischaracterization.  What had happened is because

5   they fell so far behind on taxes and insurance, the servicer

6   made the payments, and the records reflected an escrow balance

7   as if everything was current -- or as if the debtor had -- or

8   I'm sorry, as if the borrower had performed.  In no way is what

9   was submitted by the claimant indicative of monies owing to

10  them.  Because they were so severely in default, there would be

11  no outstanding surplus owing back to them.

12          Again, with regards to the second claim, the

13  million-plus claim, again, this is something where it's

14  completely unsubstantiated.  And given the claimants' payment

15  history and performance here, as well as the fact that they've

16  been in this home, I believe in large part, since they've been

17  in and out of the bankruptcy courts approximately seven times

18  in the past nine years, there just is no valid basis, no legal

19  basis for a claim against the debtor on account of -- you know,

20  it's just doing its job in servicing a property and keeping

21  current on taxes and insurance so as to avoid any sort of

22  improper liens being placed against the property and hurting

23  the investor for whom the servicer's working.

24          THE COURT:  All right.  Let me -- this is the

25  debtors' -- it's in the twenty-sixth and twenty-seventh omnibus

1  objections with respect to claims 5429 and 4942.  No response

2  was filed, although Mr. Walker faxed a letter to the debtors'

3  counsel on September 13th, 2013, requesting a two-week

4  adjournment of the response deadline and a thirty-day

5  adjournment of the hearing.  And the debtors counsel agreed to

6  that on September 30th, and the hearing was moved to today.

7           MR. WISHNEW:  That's correct, Your Honor.

8           THE COURT:  So Mr. Walker's response deadline was

9  extended, but no response has been filed.  The Court has

10  reviewed the evidence in connection with this claim objection,

11  and is satisfied the objection is well taken, so the objection

12  is sustained.

13           MR. WISHNEW:  Thank you --

14           THE COURT:  The objection to both claims is sustained

15  and they're expunged.

16           MR. WISHNEW:  Thank you very much, Your Honor.

17           That brings us to, again, the twenty-seventh omnibus

18  objection, and we are on page 21, carrying over to page 22.

19  And there are two additional claims to be addressed, one filed

20  by a Bette Jean Yelder, claim number 2002, and Freddie Scott,

21  claim number 3751.

22           THE COURT:  We're going to take a ten-minute recess

23  before we get to those.  I'm going to come back in ten minutes.

24  We're going to go through the agenda and not break for lunch,

25  but I do need to take a ten-minute recess.

RESIDENTIAL CAPITAL, LLC, et al.                    111

1          MR. WISHNEW:  Thank you, Your Honor.

2       (Recess from 12:20 p.m. until 12:33 p.m.)

3          THE COURT:  All right.  Please be seated.  Mr.

4    Wishnew?

5          MR. WISHNEW:  Thank you, Your Honor.  Continuing on

6    page 22 of the agenda, in regards to the twenty-seventh omnibus

7    objection, the claims of Bette Jean Yelder, claim number 2002,

8    and Freddie Scott, claim number 3751.

9          THE COURT:  Is anybody appearing for Mr. Scott or Mr.

10   Yelder?

11         MR. JENKINS:  Yes.  Yes, Your Honor.

12         THE COURT:  You.  Who are you, please?

13         MR. JENKINS:  This is Henry Jenkins with Goldman Behr

14   LLC in Montgomery, Alabama.

15         THE COURT:  And who are you appearing for?

16         MR. JENKINS:  Ms. Bette Yelder and Mr. Willie Yelder,

17   her husband, which is in my office as we speak.

18         THE COURT:  Okay.  I apologize.  Just tell me your

19   name again.

20         MR. JENKINS:  Henry Jenkins.

21         THE COURT:  Okay.  Thank you, Mr. Jenkins.

22         MR. JENKINS:  Thank you, sir.

23         THE COURT:  I'll give you a chance to respond after

24   Mr. Wishnew speaks.

25         MR. WISHNEW:  Thank you, Your Honor.

1        MR. JENKINS:  Okay.

2        MR. WISHNEW:  This --

3        MR. SCOTT:  Judge?  This is Timothy Scott.  I am also

4    here.

5        THE COURT:  Okay.  Mr. S -- now this objection is to

6    the claim of Freddie Scott.  Who are -- who is Timothy Scott?

7        MR. SCOTT:  I am the husband of Freddie Scott.

8        THE COURT:  Okay.  All right.  Technically you can't

9    appear for another person.  Are you a lawyer, Mr. Scott?

10       MR. SCOTT:  No.

11       THE COURT:  All right.  I'm going to permit you to

12   argue after Mr. Wishnew speaks.  Go ahead, Mr. Wishnew.

13       MR. WISHNEW:  Thank you, Your Honor.

14       MR. SCOTT:  Okay.  Thank you.

15       MR. WISHNEW:  With regard to Ms. Yelder's claim, it is

16   a claim for 100,000 dollars filed as a secured claim against

17   Residential Capital.  The stated basis of the claim is a

18   mortgage note.  Based upon the debtors' -- I'm sorry -- the

19   claimant's response she asserts that "my claim should not be

20   disallowed because of the mental hardship and financial

21   hardship caused by the debtors."

22       It's unclear to us -- she does not really go on to

23   substantiate the specific hardship, or how she has been

24   damaged, nor quantify any damages other than the 100,000

25   dollars for which we don't believe there's a basis.  And in

RESIDENTIAL CAPITAL, LLC, et al.                              113

1  reviewing our files we see no active litigation with this

2  claimant, and the matter is not in foreclosure.  And at the

3  same time, the loan is current right now.

4          So it's our position, the debtors' position, that the

5  claim should be disallowed and expunged because there really is

6  no stated basis or substantiation of damages or any liability

7  for the debtors.

8          THE COURT:  All right.  Mr. Jenkins, could you --

9  well, let me go ahead and hear from you.  I guess the issue I'm

10 most interested in after reading these papers was what is the

11 basis for any legal liability against any of the debtors with

12 respect to the Yelders?

13         MR. JENKINS:  Okay.  Let me first state, Your Honor,

14 that I am a consultant.  I am not an attorney, in fact.

15         THE COURT:  Well, I shouldn't even be hearing from

16 you.

17         MR. JENKINS:  Ms. Yelder and Mr. Yelder came to my

18 office for a loan modification which went pretty good to the

19 end where they did receive a modification.  However, Ms. Yelder

20 was constantly harassed; she was constantly put in a

21 threatening situation of losing her home.  There was several

22 robo-calls coming to Ms. Yelder and Mr. Yelder that really

23 affected them to the degree that Ms. Yelder just recently, in

24 the last month or so suffered a stroke as a result of the

25 pressure and the stress from ResCap/GMAC.

 1          It is in our opinion, Your Honor, that intentional

 2    infliction of mental distress was applied to a very high

 3    standard to my client, Ms. Yelder.  And I do have her in my

 4    office.

 5          And I think you know we're southerners down here.  I

 6    want to say that we did enjoy y'alls' northern dialect up

 7    there, just listening in on a lot of the cases.  But we take

 8    our homes pretty serious down here.  This is all that most of

 9    the people have.  And the way that they approached

10    Ms. Yelder -- and we got a list of robo's names that was called

11    that constantly badgered Ms. Yelder, constantly made threats of

12    her sleeping on the street and not being in the house, and

13    things of that nature.

14          So Ms. Yelder is trying to take action to have her day

15    in court.  She have suffered a stroke, sir, so she won't be

16    able to talk elongated talk, but she do want to express to the

17    Court what exactly happened to her.

18          THE COURT:  Mr. Jenk --

19          MR. JENKINS:  And her husband is here as well.  He's a

20    sixty-seven year old gentleman that she was care provider.  He

21    has cancer, melanoma cancer, and he's in severe condition as

22    well.  So --

23          THE COURT:  Mr. Jenkins.  Did you say that you have

24    letters from somebody at GMAC making threats against --

25          MR. JENKINS:  No.

RESIDENTIAL CAPITAL, LLC, et al.                    115

1           THE COURT:  -- the Yelders?

2           MR. JENKINS:  We have the names of the people that

3    called Ms. Yelder in a very hostile way, making -- which we

4    know now was idle, but at the time Ms. Yelder did not know.

5    She's a sixty year old gal that's really takes phone calls to

6    heart.  And when they call her and say things of that nature,

7    she really panicked and it also sent her into a deep

8    depression.

9           But I want Ms. Yelder -- she's been -- all morning

10   being very patient to say what she needs to say to the Court,

11   and also, Your Honor, to ask for some type of relief from the

12   Court.  So if you would, Your Honor, I'd like to put her on.

13          THE COURT:  Go ahead, Ms. Yelder.

14          MS. YELDER:  Morning.  Yes, I was getting harassing

15   phone calls from GMAC.  Sometime I get as many as ten or twelve

16   a day and all from different people at different times

17   threatening that I wouldn't be in my home.  I had one to even

18   tell me a phone was electric, have my phone turn off so I could

19   help pay my mortgage bill.  And at this time I was helping with

20   my husband who was sick and they didn't really care who

21   answered the -- they just lit up on them and sometime my

22   grandchildren would be at the house and maybe they'd pick up

23   the phone and they'd just go on talking.

24          And it just continued and it was just -- and since

25   then I had a stroke and now I'm permanently disabled.  And I

RESIDENTIAL CAPITAL, LLC, et al.                    116

1   believe some of all this stress from that -- me to have this

2   stroke.  And I'm just -- I just -- it was just too much for me.

3   I just -- it was just more than I could take.  I don't think

4   it's right for them -- sure, I was behind, but I don't think it

5   was right for them to talk to me the way they was talking.  It

6   was just -- just couldn't believe it.

7           MR. JENKINS:  Calm down, Ms. Yelder, calm down.

8           Your Honor, my client is really distraught by the

9   actions of -- the wrongful actions of GMAC/ResCap.  So she has

10  been patient here this morning with her to get through this

11  ordeal, so --

12          THE COURT:  All right.  Anything else you want to add,

13  Ms. Yelder.

14          MS. YELDER:  Yeah, I just say GMAC, someone should --

15  it should be a law against the way they treat these people.

16  And I feel like I deserve some type of restitution for the way

17  they treated me and talked to me.

18          THE COURT:  All right.  Mr. Wishnew, you want to

19  respond?

20          MR. WISHNEW:  Your Honor, while I am sympathetic for

21  Ms. Yelder, and I certainly wouldn't wish any sort of stroke or

22  anything else on someone, I, frankly, can't say that the --

23          THE COURT:  Let me ask you this.  The assertions of

24  fact that have been made, would they be sufficient to state a

25  claim under state of federal law under fair debt collection

1    practices, things of that nature?  I mean I thought that the

2    law -- it's a far cry -- I mean, I have someone who's not

3    represented by counsel who's made factual assertions -- I'm not

4    evaluating the veracity of them now -- that improper collection

5    activities were made.

6          And I guess the issue -- if those facts are asserted

7    and proven, whether they properly state a claim under state or

8    federal law, Fair Debt Collection Practices Act, a variety of

9    other state similar statutes.

10         MR. WISHNEW:  Sure, Your Honor.  I would say this.  I

11   recognize there are causes of action under the Fair Debt

12   Collection Practices Act for egregious collection practices.

13   What is before the Court within the four corners of the claim

14   is simply a allegation of mental, emotional hardship.  There

15   have been some additional facts that have come out at the

16   hearing.  But it's the debtors' position that what is before

17   the Court is not enough to substantiate a claim against the

18   debtors.

19         THE COURT:  The only issue for me today is whether

20   I've heard enough -- either read enough or heard enough from a

21   pro se party to determine that this raises a contested matter

22   that's going to require another hearing.  I don't -- does --

23   let me ask this.  Have you or your colleagues looked at the

24   Yelders' file to see what, if any, correspondence -- are there

25   logs of telephone calls?  Is there any indication whether the

RESIDENTIAL CAPITAL, LLC, et al.                    118

1  debtor employed a debt collector in connection with the

2  Yelders' account?  Who that is; things of that nature?

3          MR. WISHNEW:  We would have to go back and

4  specifically check our servicing notes with regards to the

5  specific collection actions that were taken as to Ms. Yelder.

6  I guess the only thing I would add, Your Honor, is that what we

7  have before you are very general allegations.  I'm not sure

8  they rise to the level of specificity to substantiate and state

9  a claim.

10         THE COURT:  All right.  I'm going to take the matter

11 under submission, and don't be surprised if I determine that

12 it's a contested matter and is going to require some further

13 evidentiary support from the debtors to refute the claim, and

14 further evidentiary -- and clearly further evidentiary support

15 by Mrs. Yelder.

16         It's not sufficient to simply state on the telephone

17 that -- something that was not in the proof of claim, that

18 there were ten to twelve collections calls per day and various

19 other statements made.  It's easy to say it and another thing

20 to prove it.  But for today, I'm going to adjourn the matter.

21 I'll enter a written order in connection with it.

22         Thank you very much, Mrs. Yelder.

23         MR. JENKINS:  Thank you, Your Honor.

24         THE COURT:  Thank you, Mr. Jenkins.

25         All right.  What's the next matter, Mr. Wishnew?

RESIDENTIAL CAPITAL, LLC, et al.                    119

1          MR. WISHNEW:  Thank you, Your Honor.  The next matter

2     is the claim of Freddie Scott, claim 3751.  This is a claim

3     filed in the amount of 208,250 dollars on an unsecured basis

4     against Residential Capital.  The allegations, which are made

5     without any sort of supporting documentation, is that two

6     debtor entities purportedly overstated the income of the

7     claimant and her husband in the mortgage application and

8     misrepresented to them that the mortgage would have a fixed

9     rate.

10          This claim speaks specifically to practices or what

11     occurred at the origination of the loan.  The loan was not

12     originated by the debtor entity.

13          THE COURT:  The loan was originated by Stonecreek

14     Funding Corporation.

15          MR. WISHNEW:  Correct.

16          THE COURT:  That's not affiliated with the debtor?

17          MR. WISHNEW:  That's correct, Your Honor.  So the only

18     role the debtor had here was -- at the time of the alleged

19     wrongdoing was the servicing.  And --

20          THE COURT:  How long after the origination of the loan

21     did -- because the loan was acquired by RFC, is that correct?

22          MR. WISHNEW:  Correct, Your Honor.  And then I believe

23     it was --

24          THE COURT:  And service by Homecomings?

25          MR. WISHNEW:  Serviced by Homecomings.  Correct, Your

RESIDENTIAL CAPITAL, LLC, et al.                    120

 1   Honor.

 2          THE COURT:  And when was the loan originated and when

 3   did RFC acquire it?

 4          MR. WISHNEW:  Let's -- hold on one minute, Your Honor.

 5   So the -- it was originated in October 26th, 2001.  The

 6   debtor -- Homecomings began servicing November 21st, 2001.

 7          THE COURT:  And when did RFC acquire the loan?

 8          MR. WISHNEW:  I believe RFC acquired it within -- hold

 9   on one minute, Your Honor.  Within that same time period,

10   between October 26th and November 21st, RFC acquired the loan.

11          THE COURT:  Was this -- this loan go under a

12   securitization?

13          MR. WISHNEW:  I believe so, Your Honor.

14          THE COURT:  So essentially RFC was warehousing the

15   loan until a securitization was done.

16          MR. WISHNEW:  That would be correct, Your Honor.

17          THE COURT:  Go ahead.

18          MR. WISHNEW:  So, again, Your Honor, it's the debtors'

19   position that there's not a valid claim being stated against

20   the debtors because the alleged wrongdoing that was -- is being

21   asserted by Ms. Scott is -- really goes back to the origination

22   of the loan.  I'd also add in terms of her damages, it's not

23   clear to us how she's been damaged considering that the loan at

24   this point current and not in any sort of foreclosure

25   proceeding.

1        THE COURT:  See, I don't -- this has come up

2    repeatedly today.  I don't expunge a claim because damages are

3    uncertain.  Okay.  That's not really today's issue.  The issue

4    for me is whether the claim as asserted properly states a

5    claim.

6        That's essentially -- you're arguing that it does not

7    because the claims that have been raised focused on the loan

8    origination which was not done by any of the debtors.  So I

9    don't want to deal with whether there's damages or whether it's

10   overstated or any of that.  Okay.

11       MR. WISHNEW:  I would say that, then, that really is

12   how -- the debtors' --

13       THE COURT:  Okay.

14       MR. WISHNEW:  -- position, and don't have much more to

15   add --

16       THE COURT:  All right.

17       MR. WISHNEW:  -- unless Your --

18       THE COURT:  Let me hear --

19       MR. WISHNEW:  -- Honor has any questions.

20       THE COURT:  Mr. Scott, I'm going to let you speak on

21   behalf of --

22       MR. SCOTT:  Yes.

23       THE COURT:  -- Freddie Scott.

24       MR. SCOTT:  This is Timothy Scott.  I am on the

25   original proof of claim that was filed in the case.  But

1   basically the information we received -- and this is a case

2   that we've been dealing with primarily for twelve years.  They

3   indicate in the -- in this document at number 9, number 37,

4   they allege that the representatives of GMAC and RFC overstated

5   the income of the plaintiff.

6           Now, what we have always maintained was that when we

7   sat down at the closing, October 26th, 2001, and prior to

8   that -- prior to that we filled out a universal -- excuse me --

9   a uniform residential loan application to apply for a loan

10  which we indicated to the representative had to be a fixed rate

11  loan only because prior to that, when we purchased a home, we'd

12  also had a fixed rate only loan simply because I only received

13  disability income as a VA disabled veteran.

14          And the problem began to occur -- when we gave to the

15  representative -- we gave him a copy of our prior uniform

16  residential loan application, which indicated -- and we've

17  always purchased property as borrower and co-borrower, always.

18  This particular loan, which was a refinancing, we applied for

19  it, we qualified for the loan.  The indication here was that,

20  in this document, they're stating that apparently causing them

21  to obtain a mortgage that they would not otherwise have

22  qualified for.

23          We had qualified for the loan because it was similar

24  in nature to the previous loan that we had had on the property.

25  The only difference being the previous loan was a twenty-five-

1   year loan with about the same interest rate.  The refinancing,

2   the only difference was it was to be a thirty-year loan with

3   the same foundation of being a fixed rate loan because we could

4   not afford any adjustments that would occur.

5          THE COURT:  Mr. Scott, let me ask you this.  When you

6   met with -- you described it as a representative.  Was it a

7   representative of Stonecreek Funding Corporation or of some

8   other entity?  Was it a loan broker that you dealt with?

9          MR. SCOTT:  We initially had a loan broker.  The loan

10  broker basically, I guess, a representative of the loan broker

11  took all of the information.

12         THE COURT:  Did the broker shop the loan?  I mean, a

13  lot of loan brokers are independent and they ascertain what

14  loans are available from various parties.  Could you just tell

15  me what -- did you understand that this was a representative of

16  Stonecreek Funding?

17         MR. SCOTT:  At that particular time of filling out the

18  application, we didn't know who the prospective lender would be

19  or could be.

20         THE COURT:  Okay.

21         MR. SCOTT:  We had no idea.

22         THE COURT:  Okay.

23         MR. SCOTT:  We were just supplying our information.

24         THE COURT:  So you met with a loan broker; you filled

25  out an application; you get it to him; and he comes back with

1    who prospective lender is.  Is that what happened?

2          MR. SCOTT:  No.  We didn't know who the lender was

3    until after the closing.

4          THE COURT:  Okay.  All right.  So you didn't --

5          MR. SCOTT:  In the --.

6          THE COURT:  Go ahead.

7          MR. SCOTT:  On the application -- go ahead.  I'm

8    sorry.

9          THE COURT:  No, go ahead.  You go ahead.

10         MR. SCOTT:  On the application that we filled out,

11   both the names of myself and my wife, Freddie M. Scott, were

12   included in the application along with what type of loan we

13   were attempting to get, which was a conventional at a fixed

14   rate --

15         THE COURT:  When did you find out that you --

16         MR. JENKINS:  -- which was noted on the original

17   application.

18         THE COURT:  When did you find out that you got --

19         MR. SCOTT:  Along with that, as I stated earlier, we

20   gave him a copy of our previous universal residential loan

21   application --

22         THE COURT:  Right.

23         MR. SCOTT:  -- that had all of the information, which

24   would make it easier for him to transcribe a lot of the details

25   which didn't really change a whole lot except for maybe dates

1  and a few amounts.

2          THE COURT:  Mr. Scott, when did you find out that you

3  got a variable rate loan rather than a fixed rate loan?

4          MR. SCOTT:  After the closing and subsequent days and

5  weeks because we didn't get all of our loan documents on

6  October 26th, 2001.  And several things happened during that

7  period of time.  But they stated at number 38 in this document

8  that a review of the note establishes that the debtors have

9  claimed that they played no role in the origination of the

10  claimants' mortgage.

11          We doubt that simply because in this adjustable rate

12  note, at the bottom of the page and on subsequent pages, it

13  indicates that this a GMAC Residential Funding form 1555.

14  Unless Stonecreek Funding decided to create their own note and

15  put GMAC at the bottom, they did know when the closing occurred

16  and after that.

17          2004, this loan began to adjust upwards.  Prior to

18  that we had made inquiries.  We said this is not the loan that

19  we applied for.  It began to escalate upwards of over 900

20  dollars more than what we had initially had.

21          THE COURT:  All right.  Let me ask -- Mr. Scott, I

22  want to ask Mr. Wishnew some questions.

23          MR. SCOTT:  Sure.

24          THE COURT:  Did RFC have a contract or agreement with

25  Stonecreek Funding to originate loans and sell them to RFC?

1            MR. WISHNEW:  Yes, Your Honor.

2            THE COURT:  Do I have that document?

3            MR. WISHNEW:  You do not, Your Honor.

4            THE COURT:  All right.  I'm determining that this a

5    contested matter, and a subsequent hearing will be set down.

6    Mr. Wishnew, your main argument here is that this loan wasn't

7    with the debtors, with any of the debtors, and that really this

8    is an origination claim against Stonecreek Funding.  I need to

9    see whether Stonecreek Funding throughout this transaction was

10   acting as the agent for RFC and consequently whether any --

11   whether RFC would be liable for any misrepresentations,

12   omissions, or other wrongful acts committed by Stonecreek

13   funding.

14           Now, also I'm going to need to know whether this loan

15   broker who arranged this loan with Stonecreek Funding had a

16   contractual arrangement with either RFC or Stonecreek Funding.

17   So this is, again, an instance where I'm not sure that the face

18   of the claim is sufficient, but it's a pro se creditor.  And it

19   may well be that you'll prevail, but I have questions where

20   Stonecreek was clearly under contra -- I mean, this sounds like

21   the typical arrangement, that Stonecreek was originating the

22   loans, warehousing them all with RFC for securitization

23   purposes, and there are lots of issues that arise from that.

24   And there's certainly -- whether the creditors have asserted a

25   proper claim for some wrongful conduct in connection with the

1  origination of the loan, that it was represented it was going

2  to be a fixed rate loan when it was -- the documents said it

3  was a variable is going to remain to be seen.

4       So I'm determining this to be a contested matter.

5  What that means, Mr. Scott, is a subsequent order will be

6  entered by the Court in due course explaining what the

7  procedures will be going forward.  Basically, you're going to

8  have the burden of proving your claim, but I do have -- you've

9  raised enough factual issues that the debtors' got some answers

10  it's going to have to provide.

11       Mr. Scott, you and Ms. Scott will be notified.

12       MR. SCOTT:  Could I just indicate one last thing

13  before you end this?

14       THE COURT:  Sure, go ahead.

15       MR. SCOTT:  On the uniform residential loan

16  application that they've supplied, it shows only my wife as a

17  borrower, but the potential issue is that they either altered,

18  changed, or what we maintain is falsified the application.

19  They show her as making 10,000 dollars per month.  In the

20  application itself, it shows that she made no more than 2,900

21  dollars a month.  At the closing they told us that your income,

22  Mr. Scott, is not needed.  Your loan can go through just based

23  on her income.

24       THE COURT:  May I ask you this, Mr. Scott?  Did they

25  ask for -- did somebody ask you for W-2 forms or other evidence

1  or your or Mrs. Scott's income?

2         MR. SCOTT:  Yes.  Prior to -- during the application

3  process we supplied to them copies of W-2s, tax return, and,

4  again, the prior application.

5         THE COURT:  So is it your representation today that

6  the actual application, when it was filled out, overstated

7  yours or your wife's income?

8         MR. SCOTT:  Well, it absolutely overstated the income,

9  but that was intentional.

10        THE COURT:  Well, whether it's intentional or not, I'm

11 not going to get into.  I just --

12        MR. SCOTT:  Okay.  That's fine.

13        THE COURT:  -- wanted to deal with the issue of

14 whether you're representing that the application that the

15 broker, when he completed it, overstated the income, and that

16 you had given him documents that showed what the actual income

17 was.  Is that a fair statement?

18        MR. SCOTT:  Absolutely.

19        THE COURT:  Okay.  All right.

20        MR. SCOTT:  They had a complete --

21        THE COURT:  Okay.  Mr. Scott, just --

22        MR. SCOTT:  -- what would normally, I guess,

23 classified as a fully doc'ed loan.

24        THE COURT:  Okay.  So just so you understand, you'll

25 get a notice.  There'll be further notice of how this matter is

1  going to proceed.  So you'll have plenty of notice of when

2  there's going to be a subsequent hearing, okay?

3           MR. SCOTT:  Okay.

4           THE COURT:  You're going to have to come forward with

5  proof to establish the basis for your -- the assertions you've

6  made on the phone today, but we'll go from here, okay?

7           MR. SCOTT:  That's fine.

8           THE COURT:  Thank you very much, Mr. Scott.

9           MR. SCOTT:  Thank you.  So I can get off the call now?

10          THE COURT:  You are.  You're excused.

11          MR. SCOTT:  Okay.  Thank you very much.

12          THE COURT:  Mr. Wishnew?

13          MR. WISHNEW:  Thank you, Your Honor.  That brings us

14 to item 10 on page 22 of the agenda, the debtors' thirtieth

15 omnibus objection.  There are eight contested matters in this

16 objection.  If it would be okay with the Court, I'd like to

17 proceed in the manner we address the claims in our reply.

18          THE COURT:  Go ahead.

19          MR. WISHNEW:  Thank you, Your Honor.  The first claim

20 is the claim of Anthony Fisher, claim 1972, filed in the amount

21 of $286,223.93, regarding his mortgage note.  Again, the claim

22 is for the outstanding balance of his mortgage note.  Mr.

23 Fisher received a loan modification in 2010, and he complains

24 that there were 38,000 dollars of illegal fees.  Part of that

25 loan modification was a deferral of that exact amount, for

1    38,000 and change, to the tail end of the loan so that it was

2    not being forgiven, rather it was the amount that was being

3    modified and --

4        THE COURT:  Let me just ask.  Is Mr. Fisher or someone

5    on behalf of Mr. Fisher in court or on the phone?

6        Go ahead Mr. Wishnew.

7        MR. WISHNEW:  Thank you, Your Honor.  So simply, to

8    the extent that the claim does address damages, those damages

9    are nothing more than the deferred amounts on which the

10   claimant is not required to pay interest during the term of the

11   loan, rather it would get paid when the loan matures or is

12   ultimately paid off.  Based on our review -- extensive review

13   of our servicing notes, books, and records, we don't see a

14   valid basis for a claim against the debtors in this case.

15       THE COURT:  All right.  The Court has reviewed the

16   thirtieth omnibus objection with respect to the claim of

17   Anthony Fisher.  Mr. Fisher filed two claims against ResCap:

18   $38,835 administrative priority claim and a $282,222.93 secured

19   claim.  The debtors objected to both as wrongful --

20   categorizing them in the category wrongful foreclosure claims.

21       In his response, Mr. Fisher stated that the 38,835

22   dollars were illegal fees for a home that was sold "under

23   corrupt practices."  Mr. Fisher asked the Court to review the

24   process whereby his home was allegedly purchased and sold to an

25   attorney named David Sterns in 2008, and then resold several

1  times to entities that include the debtors.

2        Mr. Fisher said he wanted to work diligently for a

3  resolution of the matter.

4        In the reply, the debtors refute Mr. Fisher's

5  allegations that his loan was illegally purchased by David

6  Stern and, according to the debtors, GMAC as servicer referred

7  Mr. Fisher's loan to foreclosure in 2008.  The Law Offices of

8  David J. Stern was the foreclosing attorney for GMAC.  And on

9  April 9th, 2010, Mr. Fisher entered into a loan modification,

10 and at no time did Mr. Stern, the lawyer, own the property.

11       As to the $38,835.20 in so called illegal fees, the

12 debtors have demonstrated that this amount was the balance of

13 the loan that was deferred as part of a loan modification and

14 the deferred balance was a non-interest-bearing principal

15 balance that consisted of due payments, escrow, and/or

16 principal balance and was placed at the end of Mr. Fisher's

17 loan to assist in lowering Mr. Fisher's monthly payments.  And

18 that's a very typical structure for a loan modification as you

19 go through the various iterations to get down to the thirty-one

20 percent threshold.

21       Based on the Court's review of the papers, the

22 objection to the Fisher claim is sustained.

23       MR. WISHNEW:  Thank you very much, Your Honor.  That

24 brings us to the next claim of Barry Eskanos, claim number 19.

25 This is a claim in the amount of 264.5 million dollars.  And I

1  believe it's --

2          MR. ESKANOS:  Your Honor --

3          THE COURT:  Hold on.  Mr. Eskanos, are you on the

4  phone?

5          MR. ESKANOS:  Yeah, I just want to let you know I'm

6  here, Your Honor.

7          THE COURT:  Okay.  I'll give you a chance after Mr.

8  Wishnew has spoken.  Go ahead, Mr. Wishnew.

9          MR. WISHNEW:  Thank you, Your Honor.  So, Your Honor,

10 this claim goes back to a --

11         THE COURT:  This is a claim of both Barry Eskanos and

12 Ami Eskanos.

13         MR. WISHNEW:  That's correct, Your Honor.

14         THE COURT:  All right.  Go ahead.

15         MR. WISHNEW:  The --

16         MR. ESKANOS:  Yeah, she had to go to work, Your Honor.

17 So I'm sorry --

18         THE COURT:  That's okay.  That's okay.  Just wait your

19 turn and I'll hear from you.

20         Go ahead, Mr. Wishnew.

21         MR. WISHNEW:  Sure.  The debtors have objected to this

22 claim on the basis that is precluded by res judicata,

23 collateral estoppel, and the Rooker-Feldman doctrine.  This is

24 essentially a recital and trying to re-begin or recommence

25 earlier litigation that has been fully adjudicated on the

RESIDENTIAL CAPITAL, LLC, et al.                    133

1  merits in the Florida courts.

2         Just by way of some background, Your Honor, this loan

3  was originated back in 1999.  I believe the principal amount

4  was 364,000 dollars.  And back in 2005, Washington Mutual and

5  Litton Loan Servicing, who had respectively owned and serviced

6  the loan, began a foreclosure proceeding in Florida.  That

7  matter proceeded up through the -- there were counterclaims by

8  Mr. Eskanos, there was a motion to dismiss that then allowed

9  Mr. Eskanos to amend his counterclaims, and it's the debtors'

10 position that the counterclaims that have been fully

11 adjudicated in the Florida State Courts are the same claims

12 that are at issue in the four corners of the claim before your

13 Court.

14        THE COURT:  The prior case was against WaMu, not

15 against GMAC.

16        MR. WISHNEW:  That's correct, Your Honor.  Absolutely.

17        THE COURT:  So why does res judicata bar the claim

18 against GMAC?

19        MR. WISHNEW:  Because subsequently, to the extent that

20 GMAC acted as a servicer and took it over from Litton Loan,

21 then Litton Loan acting for Washington Mutual, it should have

22 the benefit of the same preclusive effect.

23        I'd also argue, Your Honor, that essentially this is,

24 like I said, it's gone -- summary judgment -- sorry.  Let me

25 start over.  The counterclaims and the amended counterclaims

1    were disposed of by the Florida courts in 2009 on -- by final

2    order.  That was then appealed by the claimants to the next

3    appellate level in Florida.  That was affirmed.

4            THE COURT:  Yeah.  It went to Third District Court of

5    Appeals, which affirmed, and then the Florida Supreme Court

6    denied a petition for writ of mandamus on February 4th, 2013,

7    correct?

8            MR. WISHNEW:  That's exactly correct, Your Honor.  So

9    at this point in time, the actions that are at issue in this

10   claim are actions that preceded GMAC Mortgage's or ResCap's

11   involvement in any way with these claimants.  And they should

12   not be given an opportunity through the claim to try and

13   recommence and rehash claims fully adjudicated previously.

14           THE COURT:  Okay.  So the Eskanoses had a Chapter 13

15   in Florida as well?

16           MR. WISHNEW:  That is correct.  Mr. --

17           THE COURT:  Did the debtor --

18           MR. WISHNEW:  -- Eskanos --

19           THE COURT:   -- debtor intervene -- did the debtor --

20           MR. WISHNEW:  The debt --

21           THE COURT:  -- appear in that?

22           MR. WISHNEW:  The debtor did intervene.  Did not --

23   intervened in an adversary proceeding.

24           THE COURT:  Okay.

25           MR. WISHNEW:  He had commenced an adversary proceeding

1    against Washington Mutual, and because of a non-response, GMAC

2    Mortgage as a servicer sought to intervene in order to ensure

3    that there was not a default judgment placed against --

4            THE COURT:  And what happened in the Chapter 13?

5            MR. WISHNEW:  The Chapter 13 was ultimately -- it is

6    my understanding, it was ultimately dismissed because of Mr.

7    Eskanos' liability.  So both the adversary proceeding and the

8    proceeding itse -- the Chapter 13 itself were essentially

9    closed.

10           THE COURT:  Okay.  All right.  Let me hear from Mr.

11   Eskanos.  Thank you, Mr. Wishnew.

12           MR. ESKANOS:  Thank you.

13           THE COURT:  Go ahead, Mr. Eskanos.

14           MR. ESKANOS:  Thank you, Your Honor.  And first of

15   all, I want to say that that totally and utterly misrepresents

16   our claim, totally and utterly avoids what our claim is about,

17   and we've actually filed before this Court, a motion for relief

18   from the automatic stay, and we're seeking relief on two

19   grounds.

20           First of all, we -- would be the Florida Fraudulent

21   Transfer Act.  What opposing counsel didn't tell you was that

22   bankruptcy adversary action, we've obtained a default judgment

23   for the amount of 249-million out of our claim, we obtained

24   default judgment in that amount by clerk's entry.  And on

25   default judgment -- excuse me, clerk's entry default on

1  February 10th, 2012 --

2          THE COURT:  Against WaMu.

3          MR. ESKANOS:  That same day a --

4          THE COURT:  Stop.  That was a default judgment against

5  WaMu as I understand.  Is that correct.

6          MR. ESKANOS:  Yes, against WaMu on February 10th,

7  2012.  It was the clerk's entry of default.  And a copy of that

8  was filed with our pleading.

9          On that same day, GMAC filed a motion with the Third

10 District Court of Appeals substituting plaintiffs.  And when we

11 objected to that substitution before Judge Cristol, the

12 attorney for GMAC specifically told Judge Cristol in the

13 bankruptcy court in our adversary proceeding, Your Honor, we --

14         THE COURT:  This was in your Chapter 13 case --

15         MR. ESKANOS:  But --

16         THE COURT:  -- in Florida --

17         MR. ESKANOS:  Yes.

18         THE COURT:  -- that was subsequently dis --

19         MR. ESKANOS:  No, no --

20         THE COURT:  Stop.

21         MR. ESKANOS:  Yeah, the --

22         THE COURT:  Stop.  Stop.  This was in your Chapter 13

23 that was subsequently dismissed and the adversary proceeding

24 was dismissed with it, is that correct?

25         MR. ESKANOS:  No.  That's not correct.  We asked -- we

1  filed -- the adversary complaint was not dismissed until much

2  later and the actual dismissal is attached, it's the second to

3  last page in the documents they sent us and it says that

4  "Plaintiff may move for an order reinstating this cause of

5  action and the matter may be reset for pre-trial or trial."

6         So it was dismissed with the right to reinstate the

7  action, not dismissed without (sic) prejudice.

8         THE COURT:  And did you --

9         MR. ESKANOS:  So the adversary action that we filed on

10  February 10th, the same date that Washington Mutual -- as the

11  court entered -- the court's entry of default for the 200-and-

12  some-odd million against Washington Mutual, GMAC, at that

13  minute filed a motion for substitution of plaintiffs --

14         THE COURT:  Well, you didn't --

15         MR. ESKANOS:  -- and then they told Judge --

16         THE COURT:  -- get a determin --

17         MR. ESKANOS:  -- Cristol?

18         THE COURT:  -- you didn't get a determination from the

19  court to enter judgment; that was a clerk's entry of default --

20         MR. ESKANOS:  Yes.  It was a clerk's entry.

21         THE COURT:  -- because no answer was filed.

22         MR. ESKANOS:  The Florida Fraudulent Transfer

23  statute -- I'm sorry; I didn't mean to stop you; I'm sorry.

24         THE COURT:  Go ahead and finish up your argument.

25         MR. ESKANOS:  Okay.  The Florida Fraudulent Transfer

1   statute is very clear.  It says, "Once a claim is made," it

2   doesn't matter -- "Once a lawsuit is filed, if an asset is

3   transferred solely to avoid enforcement of the judgment," and

4   that's exactly what the attorney told the judge, Your Honor, we

5   are doing this to avoid Mr. Eskanos enforcing his default

6   judgment against WaMu against his mortgage.

7           Our plan was to get a default judgment against WaMu

8   and then enforce that judgment against the mortgage that GMAC

9   claimed belong to them.

10          Now, GMAC says, Your Honor, we purchased this in

11  2010 -- excuse me; February 2nd, 2012 and we just purchased

12  this mortgage and that's why we transferred it.  They didn't

13  say they were servicing it, they didn't say that they were

14  holding it for someone else.  They told the judge that they

15  purchased that mortgage in February of 2012.  That was an utter

16  lie.

17          Second lie that they committed was when we filed --

18  after all this fraudulent foreclosure action was going on, the

19  IFR came about.  We said great.  Maybe this will be a way for

20  us to get relief.  So we filed a claim with the IFR.  IFR never

21  notified us we had a right to file a claim; we had to notify

22  them that we wanted to pursue a claim.  Then we filed our claim

23  with the IFR and Rust Consulting.  We received a letter back

24  from Rust Consulting that says, "GMAC Mortgage, LLC's records

25  indicate that your mortgage loan was not in the foreclosure

RESIDENTIAL CAPITAL, LLC, et al.                    139

1    process during the eligible review period of January 1st, 2009

2    to December 31st, 2010."  That is a blatant lie.  Whether they

3    were servicing it, whether they actually owned our loan,

4    whatever you want to call it, they lied to the IFR.  Once they

5    lied to the IFR, the IFR believed their story and deprived us

6    of our claim.  That's when they sent the IFR the 5,000 pages

7    that I've attached as an exhibit to the Court.  And I apologize

8    for length.  I don't have any way to electronically file that.

9    I apologize.

10           Anyway, so we sent the -- we sent the IFR the 5,000

11   pages showing yes, in fact, we were victims of fraud.  There's

12   a forged note in our case, the whole thing.  We sent all that

13   stuff to the IFR.  After they received our proof including a

14   copy of the docket showing that we were in foreclosure during

15   that trial period, they told us well, we don't really have an

16   appeal process but we'll consider the document.  They looked at

17   the document, they called GMAC then they called us back and

18   said sorry, GMAC says you weren't in the foreclosure process,

19   we stand by our ruling, you are now deprived of any right of

20   any recovery whatsoever under the IFR.

21           Our claim and our motion for relief from the automatic

22   stay is on two grounds; one for the violation of the Florida

23   Fraudulent Transfer Act, that is the admitted on-the-record

24   transfer of the asset or the proposed asset --

25           THE COURT:  I don't have your motion --

RESIDENTIAL CAPITAL, LLC, et al.                    140

1          MR. ESKANOS:  -- or our mortgage --

2          THE COURT:  -- I don't have your motion to lift the

3   automatic stay in front of me, Mr. Eskanos.  All I'm doing --

4          MR. ESKANOS:  Oh, I'm sorry.  Well, I gave that -- I

5   paid the fee.  I'm not sure --

6          THE COURT:  Stop.

7          MR. ESKANOS:  -- of the hearing, Your Honor.

8          THE COURT:  Stop.  What I'm dealing with is the

9   debtors' objection to your claim.  I haven't seen --

10         MR. ESKANOS:  And I understand that but the basis for

11  our motion for relief from the automatic stay is listed as the

12  first basically two or three pages of our response, Your Honor.

13  I'm sorry.  It's the same reasoning -- the same reasoning

14  behind our motion for relief from the automatic stay is also in

15  here, and that is a violation of the Fraudulent Transfer Act

16  that occurred in February of 2012.  Forget about all the other

17  prior stuff.  Yes, we won, we won, we won.  We went up to the

18  Supreme Court with the fraudulent, whatever.  The fact of the

19  matter are two things; one, once we got a judgment against

20  Washington Mutual, they substituted plaintiffs.  We contacted

21  JPMorgan Chase who filed a pleading with the court in a

22  separate Washington Mutual case that Washington Mutual did not

23  exist on February 10th of 2012, could not have signed, and did

24  not assign any right or sign any agreement which gives JPMorgan

25  Chase -- excuse me -- JPMorgan Chase, Washington Mutual never

1  gave any right to GMAC to service our loan, to own our loan,

2  and it didn't sell it on that date, and that's the date that

3  they told the Court they purchased it.

4           THE COURT:  All right, let me --

5           MR. ESKANOS:  It was a fraudulent transfer and a

6  fraudulent concealment of --

7           THE COURT:  I have your --

8           MR. ESKANOS:  -- action and that was the basis of our

9  claim.

10          THE COURT:  -- I have your argument --

11          MR. ESKANOS:  I'm sorry?

12          THE COURT:  -- Mr. Eskanos.  Mr. Wishnew, when did

13 GMAC acquire the loan?

14          MR. WISHNEW:  October 27, 2011, Your Honor.

15          THE COURT:  2011?

16          MR. WISHNEW:  Sorry.  Wait.  GMAC Mortgage acquired

17 the servicing rights to service this mortgage or service this

18 loan October 2011.

19          THE COURT:  And did it acquire the loan subsequently?

20          MR. WISHNEW:  RSC had acquired the loan previously.

21          THE COURT:  When?

22          MR. WISHNEW:  I believe that's -- it was in 2005, Your

23 Honor.

24          THE COURT:  All right.  Let me take the matter

25 under --

1      MR. ESKANOS:  You want to know the date, Your Honor?

2      THE COURT:  No.  I'm going to stop.  I'm going to take

3  the matter under submission.

4      MR. ESKANOS:  Thank you.

5      THE COURT:  All right.

6      MR. ESKANOS:  Thank you, Your Honor.

7      MR. WISHNEW:  Your Honor, I understand you're taking

8  it under submission, do you want me to address any of the

9  factual points that Mr. Eskanos raised?

10     THE COURT:  Well, go ahead.  I'm going to -- briefly.

11     MR. WISHNEW:  Okay.  Very briefly.

12     So with regards to -- I think as Your Honor

13  recognizes, the entry of default was not a default judgment

14  just simply entry of default.  Very well.

15     With regards to whether the proceeding has been

16  closed, according to the docket on April 23rd, 2013, the

17  adversary case was closed and the adversary case was dismissed

18  as a result of the dismissal of the bankruptcy case.

19     Last point, with regards to the IFR allegation.

20  Simply, Your Honor this is something where we serviced the

21  loan -- it's a matter of chronology -- we began servicing the

22  loan October 27th, 2011.  The question from the IFR is was GMAC

23  Mortgage in a foreclosure with Mr. and Ms. Eskanos from January

24  1st, 2009 through December 2010?  The answer is no.  So that's

25  why we said to them we -- it's not on our records because we

RESIDENTIAL CAPITAL, LLC, et al.                    143

1   were not in a foreclosure so our representation was completely

2   accurate and I'll leave it at that, Your Honor.

3           THE COURT:  I'm taking the matter under submission.

4           MR. WISHNEW:  Thank you.

5           MR. ESKANOS:  Your Honor, am I excused?

6           THE COURT:  Yes, you are.

7           MR. ESKANOS:  Thanks, Your Honor.  Have a great day.

8           MR. WISHNEW:  Your Honor, that brings us to the matter

9   of Caren Wilson, claim number 4754.  I believe Ms. Nora's in

10  the courtroom and has put in an appearance for Ms. Wilson.

11          This is a matter, Your Honor, which we are not going

12  to proceed with today.  The reason --

13          THE COURT:  As I understand it, there was an amended

14  claim, 475 --

15          MR. WISHNEW:  7181 --

16          THE COURT:  Okay.  4754, which is the claim as to

17  which you have objected, has been superseded by an amended

18  claim?

19          MR. WISHNEW:  That's the representation, Your Honor,

20  yes.

21          THE COURT:  Have you verified that there was an

22  amended claim that was filed.

23          MR. WISHNEW:  Yes, there was an amended claim that was

24  filed.

25          THE COURT:  And what is your intention to do with

1  respect to the amended claim?

2          MR. WISHNEW:  Our intention is to address both this

3  claim, 4754, and 7181 in a more complete objection that

4  addresses not only the merits of 4754 but also the timeliness

5  and merits of 7181.

6          THE COURT:  All right.  Ms. Nora, do you want to be

7  heard briefly?  This was filed as a -- Ms. Wilson filed this

8  claim without counsel but when did you begin -- have you filed

9  an appearance in this?

10         MS. NORA:  I believe I have, Your Honor.

11         THE COURT:  Come on up to the microphone.

12         MS. NORA:  Thank you.

13         Your Honor, we object to the debtors' taking this

14 matter off of the calendar for today without notice to us.  Ms.

15 Wilson and her expert witness have come to court today, would

16 like to make at least a partial record so that the Court is

17 partially informed.  I --

18         THE COURT:  The matter is adjourned.

19         MS. NORA:  Thank you.

20         THE COURT:  The matter is adjourned and, Mr. Wishnew,

21 you'll put it back on the calendar after the Court hears its

22 order to show cause why Ms. Nora's pro hac application or pro

23 hac status should be -- whether it should be revoked.  We'll

24 see -- Ms. Wilson better consider other counsel, but for now

25 we'll go forward but I'm -- Mr. Wishnew, when was the amended

RESIDENTIAL CAPITAL, LLC, et al.                    145

1    claim filed?

2           MR. WISHNEW:  The amended --

3           THE COURT:  It was filed on September 23rd, 2013.

4           MR. WISHNEW:  That's correct, Your Honor.

5           THE COURT:  And --

6           MR. WISHNEW:  Which was three weeks after --

7           THE COURT:  After you filed your objection.

8           MR. WISHNEW:  -- the objection was filed and one week

9    before the response was filed.

10          THE COURT:  Absolutely.  Which seems to be Ms. Nora's

11   method of dealing with matters.  So the matter is adjourned.

12          MS. NORA:  Your Honor, I --

13          THE COURT:  I don't want to hear anything more from

14   you, Ms. Nora.

15          MS. NORA:  That is unfair to me.

16          THE COURT:  Ms. Nora, I don't want to hear anything

17   more from you.  Let's move on, Mr. Wishnew.

18          MR. WISHNEW:  Your Honor, the next matter before the

19   Court is the claim 2552 by Constantino and Sybil Acevedo.  Your

20   Honor, this is a claim in the matter -- in the amount of

21   $497,839.61.  Based on extensive review of the debtors' books

22   and records, we show that this claim was -- actually, the

23   underlying note and loan were paid off, funds were applied on

24   August 9, 2013 and a refund of escrow was disbursed to Mr. and

25   Ms. Acevedo August 27, 2013.

1        What they seem to be asserting in their claim is that

2  since GMAC has sought financial relief, they too should be

3  given financial relief.  I'm not quite sure -- it's our

4  position that does not serve as a valid basis for a claim, and

5  that at this point, we would ask the claim be disallowed and

6  expunged.

7        THE COURT:  For the reasons argued by the debtors the

8  claim of Constantino and Sybil Acevedo, the objection is

9  sustained and the claim is expunged.

10        MR. WISHNEW:  Thank you, Your Honor.

11        The next matter is Jan Ibrahim, claim number 997, in

12  the amount of $206,922.56.

13        THE COURT:  Is anybody appearing for Jan Ibrahim?

14        MS. NORA:  Your Honor?

15        THE COURT:  Go ahead.

16        MS. NORA:  I have consulted with Mr. Ibrahim and --

17        THE COURT:  Have you filed an appearance on behalf of

18  Ibrahim?

19        MS. NORA:  I have not because I --

20        THE COURT:  Then I'm not going to hear you.

21        MS. NORA:  -- Your Honor --

22        THE COURT:  I'm not going to hear you.

23        MS. NORA:  -- Mr. Ibrahim's position was if he could

24  not appear himself he wanted me to advise the Court of the

25  facts of his case.

RESIDENTIAL CAPITAL, LLC, et al.                    147

1          THE COURT:  You're not permitted, Ms. Nora.  You have

2     not appeared on behalf of Jan Ibrahim.  I'm not going to listen

3     to you.

4          MS. NORA:  Thank you, Your Honor.

5          THE COURT:  One more -- one more episode of your

6     speaking on matters in which you do not appear and the court

7     security officer who's in the back of the room will escort you

8     out.

9          Go ahead, Mr. Wishnew.

10          MR. WISHNEW:  Thank you, Your Honor.

11          With regards to Mr. Ibrahim's allegations of wrongful

12     foreclosure and wrongful reporting of loan modifications, this

13     is nothing more -- we felt it best to, again, revisit our

14     records, our servicing notes and related records and through

15     Ms. Horst, supplemental declaration and as set forth for the

16     Court the efforts made to -- to work with the debtor -- work

17     with the claimant, ultimately the loan was charged off, meaning

18     that simply the debtor ceased collection efforts -- I'm sorry;

19     ceased foreclosure efforts, and simply the loan remains

20     outstanding at this point in time.  It's the debtors' position

21     that they acted properly in connection with any foreclosure and

22     credit reporting activities.  They were doing what they were

23     supposed to be doing as a servicer to protect the property and

24     don't believe that Mr. Ibrahim has stated a valid claim for --

25          THE COURT:  Let me ask you some questions.

RESIDENTIAL CAPITAL, LLC, et al.                    148

1           There was a loan modification that was entered into.

2   Is that correct?

3           MR. WISHNEW:  That is -- it was --

4           THE COURT:  Well, there was --

5           MR. WISHNEW:  -- it was --

6           THE COURT:  -- a trial period.

7           MR. WISHNEW:  That's correct.  It was set to begin May

8   3rd, 2009.

9           THE COURT:  And were there signed papers for a trial

10  modification?

11          MR. WISHNEW:  Yes, Your Honor.

12          THE COURT:  And what happened?  Was there ever a final

13  loan modification approved?

14          MR. WISHNEW:  It was not, Your Honor, because the loan

15  modification was denied on June 30th because Mr. Ibrahim failed

16  to make the first payment due under the modification.

17          THE COURT:  Okay.  All right.  The Court has reviewed

18  the objection to the claim of Jan B. Ibrahim.  Mr. Ibrahim

19  filed a claim in the amount of $206,922.56 as a general

20  unsecured claim against GMACM.  Homecomings began servicing the

21  loan on April 1, 2009, and GMACM assumed servicing of the loan

22  on or about July 1, 2009.  On August 1, 200- -- what's the

23  date?  It was transferred to Ocwen.  This is --

24          MR. WISHNEW:  One minute, Your Honor.

25          THE COURT:  This was an older trans -- this wasn't in

RESIDENTIAL CAPITAL, LLC, et al.                    149

1  connection with the sale, was it?

2            MR. WISHNEW:  My understanding is that it was

3  transferred to Ocwen contemporaneous with the sale, February

4  16th of this year.

5            THE COURT:  Okay.  All right.

6            Mr. Ibrahim acknowledges that he applied for a loan

7  modification and he alleges that while he was waiting for a

8  modification, his loan was transferred to a collection agency,

9  FBCS, Inc.  The debtors' reply shows that Mr. Ibrahim ceased

10  making payments on his loan in November 2008.  The debtors

11  mailed Mr. Ibrahim several breach of contract letters in 2009

12  and offered him a permanent loan modification on April 1, 2009.

13  That loan modification was ulti -- was denied on June 30, 2009

14  because Mr. Ibrahim failed to make the first payment under the

15  modification.  The debtors reported Mr. Ibrahim's account to

16  the credit bureau on several occasions in 2009 because his

17  account was past due at the time.  Based on the Court's review

18  of the papers, in particular the events submitted by the

19  debtors, the objection to the claim of Mr. Ibrahim is

20  sustained.

21            MR. WISHNEW:  Thank you very much, Your Honor.

22            That brings us to the claim of Pamela Z. Hill, claim

23  number 2429.  This is a claim in the amount of 389,331 dollars.

24  This matter -- again, it's not quite clear what the basis of

25  Ms. Hill's claim is.  She is not --

RESIDENTIAL CAPITAL, LLC, et al.                    150

1          THE COURT:  Hang on.  Is Ms. Hill appearing or anyone

2   appearing on Ms. Hill's behalf?

3          Go ahead, Mr. Wishnew.

4          MR. WISHNEW:  Thank you, Your Honor.

5          At this point in time, the matter is not in a

6   foreclosure.  As Ms. Hill has set forth in her response she has

7   continued making payments to GMAC Mortgage in its capacity of

8   servicer of the loan, and any other allegations are really

9   unsupported and unsubstantiated, and we assert that the claim

10  on its face does not state a valid liability.

11         THE COURT:  All right.  The Court has reviewed the

12  claim of Pamela Hill and the debtors' objection.  Based on that

13  review, the Court finds that the claim fails to state a basis

14  for liability on the part of the debtors.  The debtors'

15  objection to the claim is sustained.

16         MR. WISHNEW:  Thank you very much, Your Honor.

17  Two more in the -- on the thirtieth omni then I will turn the

18  mike over to my colleague.

19         The claim of Paul and Marge Pfunder, claim number

20  1430, asserted in the amount of 435,000 dollars for the

21  debtors' purported refusal -- or the debtors' refusal to

22  provide a loan modification in regards to Mr. and Ms. Pfunder's

23  loan.

24         THE COURT:  All right.  With respect to the Pfunder's

25  loan, I'm -- with respect to the Pfunder's claim, I'm

1    adjourning the matter.

2            This is one of those matters that involves a loan

3    modification request.  And I expect to get -- we'll talk about

4    as soon as we finish when I'm going to get briefs from the

5    debtor and the committees' special borrower counsel with

6    respect to whether there's any legal claim as I described

7    earlier for wrongful denial of a loan modification, what are

8    the elements of claim.  And I'm not intending by my comment to

9    limit it to a specific cause of action.  There have been a

10   variety of theories that have been pressed elsewhere and not

11   sufficiently addressed here.

12           I understand the Pfunders' argument.  This really --

13   essentially, they're arguing that GMAC refused to complete a

14   loan modification.  The Pfunders originally had a 435- -- well

15   they filed a 435,000-dollar secured claim against ResCap on the

16   basis of GMACM's refusal to complete a loan modification.  So

17   I'm going to put this one off.

18           MR. WISHNEW:  Understood, Your Honor.

19           MS. PFUNDER:  Excuse me.  This is Marge Pfunder.

20           THE COURT:  I'm sorry, Ms. Pfunder.

21           MS. PFUNDER:  Am I being excused?

22           THE COURT:  Yes, you are.  You were able to hear what

23   I indicated?  You'll get a further notice of another hearing.

24   I -- if you were listening earlier, I need some additional

25   briefing from both the debtor and the creditors' committee's

RESIDENTIAL CAPITAL, LLC, et al.                    152

1  special borrower counsel with respect to potential causes of

2  action dealing with denial of a loan modification.  That's what

3  I understood your claim to relate to and so I want to get that

4  briefing, and then you'll be notified when we're going to have

5  a subsequent hearing.

6         Is there anything you want to add?  I'm sorry; I

7  failed to ask you first whether anyone was appearing on your

8  behalf.

9         MS. PFUNDER:  If I could, Your Honor.

10        THE COURT:  Go ahead.

11        MS. PFUNDER:  Just briefly.  I'm addressing docket

12  5297, the debtors' reply in support of the thirtieth omnibus

13  objection.

14        THE COURT:  Yes.

15        MS. PFUNDER:  And page 20 is where our claim begins,

16  1430 -- number 1430 is our claim.  There are many false

17  statements within here that -- asserted by GMAC.  They're -- in

18  paragraph 57 on page 21, they're asserting that we did, in

19  fact, ask for the loan in August of '08, mentioned that there

20  was full-time employment, you know, opportunities disappearing,

21  but we never once said that it was not affordable because

22  myself, I was still fully employed.  So that is an incorrect

23  statement.

24        The trial modification -- the modifications that they

25  submitted to us were very unreasonable.  They, first of all,

1  asked us for a contribution which was several thousand dollars,
2  which when we asked attorneys about that they didn't understand
3  what that was.  They did not provide us with the type of a loan
4  that we were asking for which was a fixed rate.  They wanted to
5  give us an adjustable.  And they also didn't really reduce the
6  payments.  There was really no essential modification, and the
7  loan was extended for another ten years.  So, in essence, there
8  was no benefit for us to do the modification at the time that
9  we did qualify, and we went through this process over two
10  years.

11          My assertion is that they maybe were dealing with
12  unfair business practices and stalling tactics.  Additionally,
13  when we went into the short sale because we had no other
14  options at that point to try to save our credit, they -- GMAC
15  continued to harass us with collection calls even though I
16  asked them to stop and I told them under California law, which
17  is where we reside, that when someone asks them to stop
18  calling, that's what the local law is, and I can produce phone
19  records that show that they continually called us and harassed
20  us about the unpaid debt.

21          THE COURT:  All right.  There's going to be a
22  subsequent hearing, Ms. Pfunder, and you'll be given notice of
23  it and an opportunity to appear.  Okay?

24          MS. PFUNDER:  Okay.  So am I dismissed at this point?

25          THE COURT:  You are.  Well, I wouldn't say dismissed

RESIDENTIAL CAPITAL, LLC, et al.                    154

1   but you don't have to remain on the phone.

2          MS. PFUNDER:  Well, excused from this call.

3          THE COURT:  You're excused from the call, Ms. Pfunder.

4          MS. PFUNDER:  Thank you very much.

5          THE COURT:  Thank you very much.

6          MS. PFUNDER:  Bye.

7          MR. WISHNEW:  Lastly, Your Honor, with regards to the

8   claim number 604 by Ron Bejarano, this is a claim for 402,000

9   dollars filed on a secured basis.  Without getting too far into

10  it, the allegations appear to be that he did not get a loan

11  modification.

12         THE COURT:  We're going to put this one in the same

13  category, Mr. Wishnew.

14         MR. WISHNEW:  Understood, Your Honor.

15         THE COURT:  Look, I'm putting it in the same category.

16         MR. WISHNEW:  Okay.  Okay.

17         THE COURT:  I need to under -- I need to give the

18  debtor and the committee an opportunity to -- and, obviously,

19  look, the issue with most of these creditors is they're pro se

20  and if they want to respond further after they see your briefs

21  that's fine but -- well, let me ask, Mr. Bejarano, are you on

22  the phone?

23         MS. BEJARANO:  Yes, Your Honor.

24         THE COURT:  Oh, Ms.

25         MS. BEJARANO:  This is Ms. Bejarano.

RESIDENTIAL CAPITAL, LLC, et al.                    155

1          THE COURT:  Go ahead.  Okay.  So just so you

2  understand what's happening from listening to the prior

3  matters, I hope you understand that --

4          MS. BEJARANO:  Yes, I do understand.

5          THE COURT:  -- I'm -- and you'll get a chance, you'll

6  see what -- the briefs that are filed and you or a lawyer on

7  your behalf would have an opportunity to respond as well but

8  you'll be given notice when there'll be a further hearing.

9  Okay?

10         MS. BEJARANO:  Yes.

11         THE COURT:  All right.  Thank you very much.

12         Anything else you want to add?

13         MS. BEJARANO:  I had a lot of stuff to add but I'll

14  wait.

15         THE COURT:  Okay.  Thank you very much.

16         MS. BEJARANO:  Okay.

17         MR. WISHNEW:  Your Honor, that brings me to the end of

18  my presentation today with regards to the thirtieth omnibus.

19  We will submit the order to chambers that addresses the

20  approvals of the contested matters and those that were not

21  approved -- I'm sorry; those that were not contested as well as

22  submit orders consistent with your rulings on the twentieth,

23  twenty-second, twenty-sixth and twenty-seventh omnis.

24         THE COURT:  All right.  So let's talk about when

25  you're going to submit briefs.

RESIDENTIAL CAPITAL, LLC, et al.                    156

1          MR. NOSEK:  Your Honor, Robert Nosek.  My first point
2     of clarification --
3          THE COURT:  Why don't you go up to the microphone --
4          MR. NOSEK:  Oh, I'm sorry.
5          THE COURT:  -- otherwise we have a hard time picking
6     it up from that microphone.  Okay, Mr. Nosek?
7          MR. NOSEK:  For clarification, the briefs that you're
8     looking for, are you looking for a brief from special
9     counsel --
10         THE COURT:  I am.
11         MR. NOSEK:  -- and a separate brief from the debtor?
12         THE COURT:  I am.  I'm looking -- because you
13    represent very different interests, in my view.
14         MR. NOSEK:  Okay.
15         THE COURT:  And -- so I am looking for separate
16    briefs.
17         MR. NOSEK:  Okay.
18         THE COURT:  They could be -- it does seem to me they
19    could be simultaneous.
20         MR. NOSEK:  That's fine.
21         MR. WISHNEW:  Your Honor --
22         THE COURT:  So what's --
23         MR. WISHNEW:  -- we'd be in a position to submit
24    something in two weeks, Your Honor?
25         THE COURT:  Mr. Nosek, is that -

1      MR. NOSEK:  Yes.  Yes, we would be able to do it the

2   same thing.

3      THE COURT:  You know, I mean -- look, none of the

4   papers I had for today -- obviously, this has been something

5   that's been on my mind for a while; that's why I wanted

6   procedures with loan modification issues.  And when I started

7   looking, there are -- the Young v. Wells Fargo is the only

8   circuit case I know of, but there are other -- there are

9   bankruptcy court decisions, there may be other state court

10   decisions, there are an array of decisions, not all uniform,

11   and I want -- so two weeks is fine.

12      MR. WISHNEW:  Just so I can understand the context of

13   what we're submitting, Your Honor.  Are we submitting both a

14   recital of what the elements are of a wrongful denial of a loan

15   modification and also identifying our position as to whether

16   the claims that are being adjourned to address that matter fall

17   within or could constitute a colorable claim under that cause

18   of action?

19      THE COURT:  Obviously, the latter would be more

20   helpful to me but I don't expect that from the committee.  The

21   committee because you're not representing the borrowers but

22   you're representing creditors, and I am very interested in the

23   committee's view as to what, if any, causes of action exist and

24   what the elements of those claims would be.

25      Mr. Wishnew, do you think you could address both the

RESIDENTIAL CAPITAL, LLC, et al.                    158

1  elements -- you may conclude there aren't any causes of action.

2  I don't know.

3         MR. WISHNEW:  Right.

4         THE COURT:  That will shorten what you have to do with

5  the individual claims if that's the position you take.

6         MR. WISHNEW:  I mean, I would just envision

7  essentially enhancing -- from a factual standpoint, enhancing

8  Ms. Horst's declaration that we submitted here to address

9  some -- some of the gaps that might exist.

10         THE COURT:  That would be most helpful to me.  And

11  then when you serve those on the creditors, they can file an

12  additional response before we --

13         MR. WISHNEW:  Right.

14         THE COURT:  And you ought to have maybe somebody from

15  SilvermanAcampora talk to them about getting the resp -- as

16  you've done in the past, Mr. Nosek, talking to people about if

17  they want -- when you want to file stuff.  Okay?

18         MR. NOSEK:  Absolutely, Your Honor.

19         MR. WISHNEW:  Your Honor, should we just contact

20  Deanna in terms of a hearing date on this, Your Honor?

21         THE COURT: Yes.  Absolutely.

22         MR. WISHNEW:  Okay.

23         MR. NOSEK:  Okay.

24         MR. WISHNEW:  Very well.

25         THE COURT:  We got a lot on the plate over the next --

1          MR. WISHNEW:  We do.  So I'm ever mindful of that.

2          THE COURT:  Yeah.

3          MR. WISHNEW:  So that, Your Honor, brings us to item

4   11, on page 23 of the agenda, the thirty-first omnibus

5   objection to claims, late-filed borrower claims.  I will cede

6   the podium to my colleague, Meryl Rothchild.

7          THE COURT:  Okay.

8          MS. ROTHCHILD:  Good afternoon, Your Honor.  Meryl

9   Rothchild of Morrison & Foerster on behalf of the debtors.

10         As Mr. Wishnew stated, the next claims objection

11  matter is the debtors' thirty-first omnibus objection to

12  claims, late-filed borrower claims filed at docket number 4902.

13         Your Honor, through this objection, the debtors sought

14  to expunge certain borrower claims that were filed after the

15  general bar date.  There were two responses to this objection

16  filed by the September 30th response deadline which are going

17  forward today.  These responses include a statement filed by

18  Mr. Paul Anthony Corrado at docket number 5200 in connection

19  with claim numbers 6855 and 6856, and a response filed by Mr.

20  Kenneth Russo, Jr. and Ms. Rayietta Hill filed at docket number

21  5232 -- I apologize -- yes, 5232 in connection with claim

22  number 6843.

23         The debtors filed their omnibus reply in support of

24  the thirty-first omnibus claims objection filed at docket

25  number 5296.  And before going into my argument, Your Honor,

1    I'm not sure if any of the respondents or their representatives

2    have appeared.

3            THE COURT:  Was there another one by Anaissa Gerwald?

4            MR. RUSSO:  Kenneth Russo is here.

5            THE COURT:  Hang on a second.

6            What about Gerwald?

7            MS. ROTHCHILD:  I was going to raise that a bit later,

8    Your Honor.  We weren't sure whether or not this particular

9    filing by Ms. Gerwald at docket 5290 was in connection with the

10   objection because it didn't reference her filed proof of claim

11   or the objection, but we wanted to state it on the agenda out

12   of an abundance of caution.  If Your Honor would like, I can

13   certainly fold our arguments in with respect to that if you

14   would like to treat it as a response.

15           THE COURT:  All right.  Let's deal with -- I'm sorry;

16   who was on -- somebody was on the phone?  Was it -- well, first

17   off, is there someone on the phone for Mr. Corrado?

18           All right.  And what about for Russo and Hill?

19           MR. RUSSO:  Kenneth Russo is here, Your Honor.

20           THE COURT:  Thank you very much, Mr. Russo.

21           MR. RUSSO:  Thank you.

22           THE COURT:  All right.  Go ahead.

23           MS. ROTHCHILD:  Thank you, Your Honor.

24           THE COURT:  So let's deal with Corrado and Russo

25   first, okay.

1          MS. ROTHCHILD:  I'm sorry; deal with Mr. Corrado

2    first?

3          THE COURT:  Yes, deal with Corrado first.

4          MS. ROTHCHILD:  Sure.

5          So, Your Honor, as set forth in the objection, based

6    on a review of Mr. Corrado's proof of claim, it was filed well

7    beyond the November 16th bar date.  Specifically, his proof of

8    claim was filed this past June which is nearly seven months

9    after the bar date.

10         As an initial matter, Mr. Corrado does not -- has

11   failed to rebut the presumption that the debtors provided him

12   or his representative with sufficient notice of the bar date,

13   and KCC's affidavits of service and declaration that were filed

14   as exhibits to the reply support that.  The filing was properly

15   mailed and timely provided.

16         Further, Mr. Corrado failed to meet his burden of

17   demonstrating that the delay in filing his respective proofs of

18   claim amounted to excusable neglect that would meet the Pioneer

19   standard to permit a late-filed proof of claim.

20         THE COURT:  All right.  The debtors' objection to the

21   Corrado late-filed claim is sustained.

22         MS. ROTHCHILD:  Thank you, Your Honor.

23         With respect to Mr. Russo and Ms. Hill, they filed

24   their proof of claim this past April which is over five months

25   after the bar date.  The debtors also believe that these

RESIDENTIAL CAPITAL, LLC, et al.                    162

1  respondents failed to rebut the presumption that the debtors

2  properly provided them with sufficient notice of the bar date.

3          Mr. Russo and Ms. Hill do make an allegation in their

4  response that they only received notice of the commencement of

5  the cases as well as the bar date this past April, however,

6  through KCC's affidavits of service and particular the

7  declaration which notes that they didn't -- that KCC did not

8  receive a notice of an undeliverable mailing, Mr. Russo and Ms.

9  Hill have not provided any evidence to contradict this proper

10 mailing.

11         Again, we -- the debtors also believe that these

12 respondents failed to meet their burden of demonstrating that

13 the delay in filing their proof of claim amounted to excusable

14 neglect standard, and for these reasons we seek to --

15         THE COURT:  Let me ask you first before -- I'll let

16 Mr. Russo speak in a minute.  Does KCC have an affidavit -- or

17 do their records establish that notice of the bar date was

18 mailed to Russo and Hill?

19         MS. ROTHCHILD:  Yes, Your Honor.

20         THE COURT:  And was it mailed to the correct address?

21         MS. ROTHCHILD:  Yes, Your Honor, and I believe, Mr.

22 Morrow, from KCC is on the line, but if not both Exhibits 2 and

23 3 to the debtors' reply note that KCC mailed notice of the

24 commencement of the cases and the bar date notice to Mr. Russo

25 and Ms. Hill's address, valid addresses which is the very same

1  one that they note on their response as well.

2          THE COURT:  Okay.  All right.  Mr. Russo, let me hear

3  from you.

4          MR. RUSSO:  Well, thank you, Your Honor, for just

5  giving me the opportunity to respond, and in the scope of

6  things, although my claim is very small compared to everything

7  else that's going on.  You know, it's very important to myself

8  and my family.  Basically, the bar date notice was never

9  received.  We do not have an individual mailbox attached to our

10  home, Your Honor.  It's a community mail slot -- mail box and

11  the United States Postal Service from time-to-time is not

12  always one hundred percent efficient, as we know.

13          We respect the bankruptcy court proceedings but these

14  are just simply the facts.  I mean considering the devastating

15  financial outcome that the GMAC Mortgage foreclosure process

16  took, including but not limited to the depletion of our

17  savings, demands for huge lump sum payments, a lawsuit for

18  missed HOA payments, personal family loans, eight months of

19  food bank shopping.  I mean if we saw anything, any

20  notification of a potential GMAC Mortgage lawsuit, we would

21  have responded immediately.

22          THE COURT:  Let me understand.

23          MR. RUSSO:  Once the lawsuit was --

24          THE COURT:  You worked for -- who did you work for?

25          MR. RUSSO:  I was self-employed, sir --

RESIDENTIAL CAPITAL, LLC, et al.                    164

1          THE COURT:  Okay.

2          MR. RUSSO:  -- at the time.  It's just caused a lot of

3   hardship.  And I know that every time GMAC demanded payments,

4   had any type of notification whatsoever, we've always received

5   a certified overnight delivery.  I would think that a two

6   million claimant case would be handled with the same urgency

7   and care.  You know, basically all I have to say is that we do

8   oppose to the expungement based just on a late-claim filed.

9          THE COURT:  But here --

10         MR. RUSSO:  We've replied immediately --

11         THE COURT:  -- let me ask -- let me ask --

12         MR. RUSSO:  -- once we found out through --

13         THE COURT:  I want to ask you a couple --

14         MR. RUSSO:  -- yes, Your Honor.

15         THE COURT:  I want to ask you a couple questions.

16         MR. RUSSO:  Yes, sir.

17         THE COURT:  Because as I understood your claim, you're

18  seeking to recover money for restitution of lost wages, salary

19  and commission, taxes and penalties to government units, mental

20  anxiety and physical stress.  What's the legal theory for your

21  claim against any of the debtors?  I mean assuming you were

22  permitted to file a late claim, what's the theory on which you

23  believe you're entitled to recover lost wages, salary,

24  commission, et cetera?

25         MR. RUSSO:  Well, I'm not a lawyer, Your Honor, and

1    I'm trying to do the best job that I can.  I know that we've

2    just --

3            THE COURT:  Just tell me --

4            MR. RUSSO:  -- facing a huge hit --

5            THE COURT:  Tell me in layman's terms what is it that

6    you believe the debtors did that violated your rights that you

7    believe you're entitled to recover from them?

8            MR. RUSSO:  In layman's terms, I believe that we've

9    met the agreement of our contract for eight years and the one

10   time that we needed a little bit of patience or a little

11   leniency or a little understanding, we were met with a severe

12   demand or potential eviction.  It was a very stressful process

13   and it caused my income to go way down, caused my wife to

14   become addicted to certain things.  It caused a lot of

15   embarrassing unfortunate outcomes, and I just believe that it

16   was handled in a very unprofessional, unkind, unhuman way.

17           THE COURT:  Let me just back --

18           MR. RUSSO:  Legally --

19           THE COURT:  I want to understand that what, you missed

20   a mortgage payment one or more -- how many mortgage payments

21   did you miss?

22           MR. RUSSO:  I believe we missed six mortgage payments.

23           THE COURT:  Okay.  And --

24           MR. RUSSO:  And we had to pay a lump sum of about

25   29,000 dollars to just get back into our home and to, you know,

1  deserve or earn a loan modification which we've remained

2  current on since with now Ocwen.

3          The claim we're making is very small, Your Honor, but

4  it's --

5          THE COURT:  Well, let me just --

6          MR. RUSSO:  -- my family and they give us an

7  opportunity to have another beginning, and I believe that it's

8  justified.

9          THE COURT:  Well, here's what I'm trying to

10  understand.

11          MR. RUSSO:  Yes, sir.

12          THE COURT:  So you say you got a loan modification,

13  did you get it from GMAC or from Ocwen?

14          MR. RUSSO:  We believe -- I believe that we did

15  receive it from GMAC before they, you know, declared

16  bankruptcy.

17          THE COURT:  Okay.  And have you -- since getting the

18  load modification, you've performed in accordance with the

19  terms of the loan modification, in other words, you made the

20  payments that you had to make?

21          MR. RUSSO:  Yes, we have, Your Honor.

22          THE COURT:  Okay.  So what -- here's what I'm trying

23  to understand, Mr. Russo, is --

24          MR. RUSSO:  Yes.

25          THE COURT:  -- I understand what you're seeking to

1  recover for lost wages and a bunch of other things, and I don't

2  diminish that this has all been very upsetting to you; but you

3  acknowledge that you missed six mortgage payments.  What I'm

4  trying to understand is --

5          MR. RUSSO:  Yes, sir.

6          THE COURT:  -- what is it that you think that GMAC did

7  that was wrong that would entitle you -- if you were permitted

8  to file a late claim -- that would permit you to recover money

9  from GMAC?

10         MR. RUSSO:  Well, I believe that the entire mortgage

11 process was done incorrectly.  The reason why we missed six

12 payments is because we were now involved with an adjustable

13 rate mortgage with a big balloon payment.  The payments were

14 going to go roughly from 5,000 dollars a month to 10- to 14,000

15 dollars a month.  When we originally signed the mortgage

16 documents, they were over two inches thick.  The gentleman came

17 over to our home, sir, and he just said, you know, we would --

18 I said I would like some explanation.  He said this is just

19 standard.  If you'd like to get the home, this is what you need

20 to sign.  Sign and date.  I don't believe that all of the

21 information was given.  I believe that it was done in a very

22 unprofessional way with unprecedented consequences, and I

23 believe that that nonexplanation of the original terms led to

24 the six missed payments which is basically were due to --

25         THE COURT:  Who was the --

1          MR. RUSSO:  -- something that wasn't able to be paid

2     for, sir.

3          THE COURT:  -- who was the original lender?

4          MR. RUSSO:  GMAC.

5          THE COURT:  They were servicing the loan.  Who

6     actually -- who is listed on your loan documents as the lender?

7          MR. RUSSO:  I believe that -- there's always -- it was

8     just GMAC, sir.  I don't know if there was a difference between

9     a lender or the servicer itself.

10          THE COURT:  Okay.

11          MR. RUSSO:  I know since February, it's been handed to

12     Ocwen, but before that I don't know of any other name besides

13     GMAC Mortgage.

14          THE COURT:  And when did you take out the loan?  Was

15     this a -- was this a purchase money loan or a refinance?

16          MR. RUSSO:  This would have been a refinancing.

17     Possibly around 2005; maybe around that time.

18          THE COURT:  All right.  Thank you.

19          MR. RUSSO:  2004.

20          THE COURT:  All right.  Let me hear the debtors'

21     response.  Was GMAC the original lender?

22          MS. ROTHCHILD:  Your Honor, we don't have that

23     information at this time, but we can certainly provide that to

24     the Court.

25          THE COURT:  All right.  I'm going to take the matter

1    under submission.

2            MS. ROTHCHILD:  Okay.  Thank you, Your Honor.

3            THE COURT:  Thank you.

4            MS. ROTHCHILD:  And with respect to Ms. Gerwald's

5    filing, how would you like us to proceed?

6            THE COURT:  Tell me about -- what -- I'm at a loss

7    about this.

8            MS. ROTHCHILD:  We're a bit unclear as to what it is

9    proposing --

10           THE COURT:  Let's adjourn the -- well, let me ask you.

11   Mr. Nosek, have you had any commun -- you or one of your

12   colleagues had communication with Ms. Gerwald?

13           MR. NOSEK:  Your Honor, we have had communication with

14   Ms. Gerwald, or who we believe to be Ms. Gerwald, by mail only.

15   We believe that she's in prison in Florida; and our information

16   is it was for bankruptcy fraud in the case.

17           THE COURT:  Say that again.

18           MR. NOSEK:  For bank -- she is in prison for

19   bankruptcy fraud in some other case somewhere --

20           THE COURT:  Okay.

21           MR. NOSEK:  -- that she was involved in.

22           We have had communications back-and-forth again but

23   it's by writing, but we have a hard time understanding what her

24   claim is as well.  I believe she's not on a mortgage on the --

25   if this is the correct one, she's --

RESIDENTIAL CAPITAL, LLC, et al.                    170

1        THE COURT:  When was -- when was she -- when did she

2    seek to file a late claim?  I guess its styled as a motion to

3    request original mortgage loan presented to the debtor and the

4    court.

5        MS. ROTHCHILD:  Based on --

6        THE COURT:  If that's the way it's styled but --

7        MS. ROTHCHILD:  Yes.  Based on my understanding, Your

8    Honor, Ms. Gerwald and Mr. Brian Powers of SilvermanAcampora

9    had some communications, and she sought his assistance in

10   submitting proofs of claim in June of 2013 to KCC.  So it was

11   this past June.  And I think -- I'm not exactly sure of the

12   entire nature of her communications with Mr. Powers but I

13   believe he attempted to explain to her that the bar date had

14   certainly passed and she --

15       THE COURT:  Okay.  And the bar date was November 16,

16   2012?

17       MS. ROTHCHILD:  Correct.

18       THE COURT:  The objection to the Gerwald claim is

19   sustained.

20       MS. ROTHCHILD:  Thank you, Your Honor.

21       MR. RUSSO:  Is Russo finished, Your Honor?

22       THE COURT:  Yes, it is, Mr. Russo.

23       MR. RUSSO:  Thank you, Your Honor.

24       MS. ROTHCHILD:  So, Your Honor, I believe next on the

25   agenda is the debtors' thirty-third omnibus objection which I

 1  believe is Maryann Gallagher of Curtis Mallet will be

 2  presenting that.

 3          THE COURT:  Okay.

 4          MS. GALLAGHER:  Good afternoon, Your Honor.  Maryann

 5  Gallagher from Curtis, Mallet-Prevost Colt & Mosle on behalf of

 6  the debtor as its conflicts counsel.

 7          I'm here today on the debtors' thirty-third omnibus

 8  claims objection to facially defective and time barred

 9  securities claims, docket number 4996.  Fortress is the

10  conflict party in this claims objection.

11          Curtis filed the thirty-third omnibus claims objection

12  and the declaration of the Lewis Kruger in support on September

13  9th, 2013.  Service was done by KCC on that same day.  The

14  response date for the debtors' thirty-third omnibus claims

15  objection was September 30th, and no responses were received by

16  the debtors.

17          THE COURT:  All right.  As I understand it, the

18  debtors believe that the claims to be based on alleged

19  misstatements and offering materials for RMBS securities that

20  were -- the debtors issued between 2001 and 2007.  Am I correct

21  so far?

22          MS. GALLAGHER:  That's correct, Your Honor.

23          THE COURT:  And that the claims that they seek to

24  assert are based on Sections 11 and 12(a)(2) of the Securities

25  Act of 1933.  Is that correct?

RESIDENTIAL CAPITAL, LLC, et al.                    172

1          MS. GALLAGHER:  To the best we can ascertain, Your

2     Honor.

3          THE COURT:  And Section 13 of the Securities Act

4     requires claims under Section 11 and 12(a)(2) to be asserted

5     within one year from when the plaintiff discovered or

6     reasonably could have discovered the alleged instrument within

7     three years from the security -- the date the security was

8     offered or sold.  Correct?

9          MS. GALLAGHER:  Correct.

10          THE COURT:  And the debtor asserts that the claims as

11     listed in Exhibit A were not brought within those time periods.

12          MS. GALLAGHER:  That's correct, Your Honor.  There's

13     no record of any claims being brought.

14          THE COURT:  Okay.  And that statute of limitations --

15     or limitations is in 15 U.S.C., Section 77(m).  No responses

16     were filed to the objection based on -- you've indicated the

17     Kruger declaration was submitted in support of the objection.

18     The objection is sustained.

19          MS. GALLAGHER:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          (Whereupon these proceedings were concluded at 1:58 PM)

22

23

24

25

```
 1
 2                         I N D E X
 3
 4                     E X H I B I T S
 5  DEBTORS'            DESCRIPTION        PAGE
 6  1 [Docket #5228]    West declaration   15
 7  2 [Docket #2559]    Dempsey            15
 8                      declaration and
 9                      exhibits
10  3 [Docket #5230]    Nolan declaration  16
11
12
13                         RULINGS
14                                   Page      Line
15  Debtors' motion for amendment of Kruger     18        20
16   engagement letter approved
17  Foreclosure Review Professional motions     19         9
18   continued until November 7
19  Order to show cause why Ms. Nora's pro      75         9
20  hac vice admission is unclear
21  Debtors' objection to Juana Cerna's        106         6
22  claim 3816 sustained
23  Debtors' objection to Fannie Kendrick      107        25
24  Dietrich's claim 1385 sustained
25
```

```
 1
 2                    I N D E X (Contd.)
 3
 4                    RULINGS (Contd.)
 5                                         Page    Line
 6   Debtors' objection to Phenon Walker's    110      14
 7   claims 5429 and 4942 sustained
 8   Debtors' objection to Fisher claim 1972  131      22
 9   is sustained
10   Constantino/Sybil Acevedo claim expunged 146       7
11   Jan Ibrahim's objection to claim sustained 149    20
12   Debtors' objection to claim by Pamela Hill 150    13
13   sustained
14   Debtors' objection to Paul Corrado        161      21
15   late-filed claim sustained
16   Objection to Anaissa Gerwald claim        170      18
17   sustained
18   Debtors' Thirty-Third omnibus objection   172      18
19   to claims sustained
20
21
22
23
24
25
```

1

2                           C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   SHARONA SHAPIRO

11   AAERT Certified Electronic Transcriber CET**D 492

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  October 11, 2013

18

19

20

21

22

23

24

25