REED SMITH LLP
Eric A. Schaffer
David M. Schlecker
Mark D. Silverschotz
Sarah K. Kam
599 Lexington Avenue
New York, New York 10022
Telephone: 212-521-5400
Facsimile: 212-561-5450

*Counsel for Wells Fargo Bank, N.A., in its*
*capacities as First Priority Collateral Agent, Third Priority*
*Collateral Agent, and Collateral Control Agent*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
In re:                                          :
                                                :    Chapter 11
RESIDENTIAL CAPITAL, LLC, et al.,               :    Case No. 12-12020 (MG)
                                                :    Jointly Administered
                         Debtors.               :
                                                :
------------------------------------------------------------x
```

**OBJECTION OF WELLS FARGO BANK, N.A., IN ITS CAPACITIES AS FIRST
PRIORITY COLLATERAL AGENT, THIRD PRIORITY COLLATERAL AGENT, AND
COLLATERAL CONTROL AGENT, TO CONFIRMATION OF THE
JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, ET AL.
AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Wells Fargo Bank N.A., in its capacities as first priority collateral agent, third priority

collateral agent, and collateral control agent (collectively, the "Collateral Agent"), by and

through its undersigned counsel, files this objection to confirmation of the Joint Chapter 11 Plan

Proposed by Residential Capital, LLC, *et al.* and the Official Committee of Unsecured Creditors

(Docket No. 4819) (the "Plan").  In support of this objection, the Collateral Agent respectfully

states as follows:

US_ACTIVE-114446282-SKKAM-260708-60066

## PRELIMINARY STATEMENT

1.      The Collateral Agent's strictly ministerial role in connection with the AFI Revolver and issuance by the above-captioned debtors (the "Debtors") of the Junior Secured Notes is set forth in the unequivocal language of the governing agreements.[1]  The Collateral Agent holds certain liens and security interests securing the obligations under the AFI Revolver and the Junior Secured Notes and, from time to time, has been directed to release certain of them. In connection with these releases, the Collateral Agent "conclusively" relied on, among other things, Officer's Certificates and Opinions of Counsel delivered to it by the Debtors' officers, directors, and counsel.

2.      The Collateral Agent's release of liens and security interests securing the Junior Secured Notes has been among the many issues raised in the adversary proceedings commenced by the Official Committee of Unsecured Creditors (the "Committee") and the Debtors, *Official Committee of Unsecured Creditors v. UMB Bank, et al.*, Adv. Pro. No. 13-01277, and *Residential Capital, LLC v. UMB Bank, N.A., et al.*, Adv. Pro. No. 13-01343 (collectively, the "JSN Adversary Proceedings").  During the course of the JSN Adversary Proceedings, it became clear that there is a real and credible threat that claims may be asserted against the Collateral Agent in connection with its release of liens and security interests.

3.      The governing agreements provide the Collateral Agent with a charging lien and require the Debtors to pay the Collateral Agent's fees and expenses and fully indemnify the Collateral Agent, including with regard to any challenge to the Collateral Agent's releases of liens and security interests.  The Collateral Agent's liens attach to and its rights may be enforced against the Collateral upon which, as a secured creditor, it holds first and third priority liens.

---

[1]      The Collateral Agent's ministerial role is further reflected by its annual compensation of approximately $75,000.

4.      The Plan appears to contemplate a "pass through" of the governing agreements allowing the Collateral Agent to exercise its charging lien and receive payment both of all its fees and expenses and in full satisfaction of its rights to indemnification.  The Collateral Agent, out of an abundance of caution, seeks clarification that sufficient Collateral or proceeds thereof will be reserved and withheld from distribution as reasonably may be required to protect the Collateral Agent's rights.

5.      Separately, on a limited basis, the Collateral Agent objects to the Plan's purported release of the Collateral Agent's independent claims against those who delivered documents upon which the Collateral Agent relied conclusively when releasing Collateral as required by the governing documents.  As explained below, the Collateral Agent respectfully submits that the Bankruptcy Court lacks subject matter jurisdiction to grant such releases.  Although the releases contemplated by the Plan are broad, the Collateral Agent objects only to the extent that they impermissibly purport to release the Collateral Agent's direct and independent claims not affecting property of the Debtors' estates.

## **BACKGROUND**

6.      The relationships between the Collateral Agent and the Debtors and others are governed by certain key documents.  Attached hereto as <u>Exhibit A</u> is a chart containing the actual text of the key provisions of these documents which, pursuant to Fed. R. Evid. 1006, the Bankruptcy Court may consider.[2]  Further, pursuant to Fed. R. Evid. 201, the Collateral Agent also requests that, as may be appropriate, the Bankruptcy Court take judicial notice of the documents admitted into evidence in the JSN Adversary Proceedings.

---

[2]      Capitalized terms not defined herein shall have the meanings ascribed to such terms in the underlying agreement.

A.    **The AFI Revolver and Related Security Agreement**

7.    On or about June 4, 2008, certain of the Debtors entered into a Loan Agreement (the "Original Loan Agreement") with Ally Financial, Inc. (f/k/a GMAC, LLC) ("AFI"), as agent and lender.  In accordance with the Original Loan Agreement, certain Debtors, AFI, as agent and lender, and the Collateral Agent entered into a First Priority Pledge and Security Agreement and Irrevocable Proxy (as amended, the "Original Revolver Security Agreement").

8.    On or about December 30, 2009, (i) the Original Loan Agreement was amended and restated in its entirety by the Amended and Restated Loan Agreement (the "AFI Revolver"), and (ii) the Original Revolver Security Agreement was amended and restated in its entirety by the Amended and Restated First Priority Pledge and Security Agreement and Irrevocable Proxy (the "Revolver Security Agreement").  The Revolver Security Agreement granted the Collateral Agent liens on and security interests in certain collateral (the "Collateral") to secure the Debtors' obligations under the AFI Revolver.  *See* Revolver Security Agreement, §§ 2-5.

B.    **The Junior Secured Notes**

9.    On or about June 6, 2008, Residential Capital, LLC ("ResCap"), as issuer, certain of the Debtors, as guarantors, and U.S. Bank, National Association (the "Indenture Trustee")[3] entered into a certain Indenture, dated as of June 6, 2008 (the "Junior Secured Notes Indenture"). In accordance with the Junior Secured Notes Indenture, ResCap issued approximately $4 billion of 9.625% Junior Secured Guaranteed Notes due 2015 (the "Junior Secured Notes," and the holders of the Junior Secured Notes, the "Junior Secured Noteholders").

10.    Pursuant to Section 8.01 of the Junior Secured Notes Indenture, on or about June 6, 2008, the certain Debtors, the Indenture Trustee, and the Collateral Agent entered into a Third Priority Pledge and Security Agreement and Irrevocable Proxy (the "Original Notes Security

---

[3]    UMB Bank, N.A. is the successor Indenture Trustee under the Junior Secured Notes Indenture.

Agreement"). On or about December 9, 2009, the Original Notes Security Agreement was amended and restated in its entirety by the Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy (the "Notes Security Agreement").

11.  The Notes Security Agreement granted the Collateral Agent liens on and security interests in the Collateral to secure the payment of the Debtors' obligations under the Junior Secured Notes Indenture and the Junior Secured Notes. *See* Notes Security Agreement, §§ 2-5.

**C.  The Intercreditor Agreement**

12.  On or about June 6, 2008, the Indenture Trustee, the Collateral Agent, AFI, as lender agent, and certain Debtors entered into an intercreditor agreement (as amended, the "Intercreditor Agreement").

13.  Section 2.1(b) of the Intercreditor Agreement provides that the liens and security interests granted under the Revolver Security Agreement are first priority liens and security interests senior to the liens and security interests granted under the Notes Security Agreement.[4]

**D.  The Collateral Agent's Limited Duties**

14.  As set forth in the governing documents, the Collateral Agent undertook a strictly ministerial role with regard to the Collateral. The governing documents expressly limit the Collateral Agent's duties and provide it with exculpation in connection therewith. More specifically, the AFI Revolver provides the Collateral Agent with full protection with respect to any "action or inaction." AFI Revolver, § 13.15.

15.  The Revolver Security Agreement expressly provides that:

---

[4]  At the time the parties entered into the Intercreditor Agreement, certain other obligations of the Debtors were secured by second priority liens and security interests in the Collateral (the "Original Second Lien Obligations"). Upon information and belief, the Original Second Lien Obligations were repaid and retired in full. Upon further information and belief, upon the repayment and retirement of the Original Second Lien Obligations, the liens and security interests granted under the Notes Security Agreement became second priority liens and security interests.

- the Collateral Agent has *no* duty to act unless directed (§ 14(a));
- the Collateral Agent *only* has those duties set forth in the Revolver Security Agreement and related agreements (§ 14(d));
- the Collateral Agent has *no* obligation to investigate *any* instruction received and has *no* liability (§ 14(f));
- the Collateral Agent is *not* liable for the misconduct of its agents (§ 14(g));
- the Collateral Agent has *no* liability for *any* action taken (except for gross negligence or willful misconduct) (§ 14(h)); and
- the Collateral Agent is entitled to rely conclusively on documents believed to be genuine (§ 14(o)).

16.     Similarly, the Intercreditor Agreement provides that:

- the Collateral Agent is *not* liable for *any* action or inaction (except for gross negligence or willful misconduct) (§ 5.6(e)); and
- the Collateral Agent has *no* liability with respect to the Collateral (except for gross negligence, bad faith, or willful misconduct) (§ 5.6(j)).

17.     Likewise, the Junior Secured Notes Indenture provides that:

- the Indenture Trustee and its agents (including the Collateral Agent) have *no* liability for the protection of the Collateral (§ 8.02).

18.     Lastly, the Notes Security Agreement provides that:

- the Collateral Agent has *only* those duties set forth in the Notes Security Agreement and related agreements (§ 15(d));
- The Collateral Agent is *not* liable for the misconduct of its agents (§ 15(g));
- the Collateral Agent has *no* liability for *any* action taken (except for gross negligence or willful misconduct) (§ 15(h)); and
- the Collateral Agent is entitled to rely conclusively on documents believed to be genuine (§ 15(o)).

**E.      The Collateral Agent's Charging Lien, Right to Payments of its Fees and Expenses, and Indemnification**

19.     In furtherance of the foregoing provisions of the governing agreements, the Collateral Agent has rights to payment of its fees and expenses and complete indemnification. *See, e.g.*, Revolver Security Agreement, §§ 12(f), 14(r), 14(t); Intercreditor Agreement, §§ 5.6(o), 5.6(q); Notes Security Agreement, §§ 13(f), 15(r), 15(t); Indenture, § 7.07(g).

20.     The Revolver Security Agreement provides that:

- the Debtors will pay *all* fees and expenses of the Collateral Agent (§ 14(r));
- the Debtors will indemnify the Collateral Agent against *all* liabilities (except for gross negligence or willful misconduct) (§ 14(t)); and
- the proceeds of the Collateral must be applied *first* to the payment of the Collateral Agent's fees and expenses (§ 12(f)).

21.    The Intercreditor Agreement provides that:

- the Debtors will pay *all* fees and expenses of the Collateral Agent (§ 5.6(o)); and
- the Debtors will indemnify the Collateral Agent from *all* liabilities (except for gross negligence or willful misconduct) (§ 5.6(q)).

22.    The Notes Security Agreement provides that:

- the Debtors will pay *all* fees and expenses of the Collateral Agent (§ 15(r));
- the Debtors will indemnify the Collateral Agent against *all* liabilities (except for gross negligence or willful misconduct) (§ 15(t)); and
- the proceeds of the Collateral must be applied *first* to the payment of the Collateral Agent's fees and expenses (§ 13(f)).

23.    The Junior Secured Notes Indenture provides that:

- the Debtors will indemnify the Collateral Agent from *all* liabilities (except for negligence or bad faith) (§ 7.07(g));
- the Collateral Agent is empowered to collect funds (§ 8.03(b)); and
- money collected must be first paid *pro rata* to the Indenture Trustee and the Collateral Agent for outstanding amounts due (§ 6.10).

**F.    Releases of Collateral under the AFI Revolver and the Junior Secured Notes Indenture**

24.    From time to time, in accordance with the terms prescribed by the Revolver Security Agreement, AFI Revolver, and the Intercreditor Agreement, the Collateral Agent was directed to execute releases of liens and security interests granted under the Revolver Security Agreement.

25.    More specifically, the Revolver Security Agreement provides, in relevant part, "Collateral shall from time to time be released from the security interest created by this

Agreement pursuant to and in accordance with the provisions of the Loan Agreement." Revolver Security Agreement, § 9.

26.     The AFI Revolver authorizes the Collateral Agent to release certain Collateral. AFI Revolver, § 12.11.  In executing such releases of liens and security interests, the Collateral Agent is entitled to rely conclusively on a Collateral Release Certificate directing the release of the Collateral.  *See* AFI Revolver, § 12.11.

27.     The Collateral Agent received Collateral Release Certificates and directions in accordance with the AFI Revolver and Revolver Security Agreement.

28.     The Intercreditor Agreement provides that the Collateral Agent is entitled to rely conclusively on documents believed to be genuine, including a Collateral Release Certificate delivered by the Relevant Directing Party.[5]  Intercreditor Agreement, § 5.6(l).  From time to time, in accordance with the terms prescribed by the Intercreditor Agreement, the Junior Secured Notes Indenture, and the Notes Security Agreement, the Collateral Agent was directed to execute releases of liens and security interests granted under the Notes Security Agreement.

29.     The Intercreditor Agreement further provides that, if liens under the Revolver Security Agreement are released, the associated liens under the Notes Security Agreement automatically are released.  Intercreditor Agreement, § 5.1.

30.     The Junior Secured Notes Indenture provides that the liens and security interests under the Notes Security Agreement may be released in accordance with the Intercreditor Agreement and also under the enumerated circumstances.  Junior Secured Notes Indenture, § 8.04.

---

[5]     "Relevant Directing Party" is defined as "the following Person(s) who are entitled to instruct or direct the Collateral Control Agent: (a) (i) until the Discharge of First Priority Claims has occurred, the Lender Agent . . . ."  Intercreditor Agreement, § 1.

31.     In executing releases of liens and security interests granted under the Notes Security Agreement, the Collateral Agent was entitled to rely conclusively on Officer's Certificates and Opinions of Counsel delivered to the Collateral Agent.    Notes Security Agreement, § 10.

32.     In accordance with the governing documents, the Officer's Certificates delivered to the Collateral Agent (i) stated the authorization of the signatory to execute and deliver the Officer's Certificate, (ii) requested the release of liens and security interests on certain Collateral, and (iii) stated that the conditions specified in Section 8.04 of the Junior Secured Notes Indenture applicable to the release of liens and security interests on the Collateral had been satisfied.

33.     Further, in accordance with the governing documents, the Opinions of Counsel delivered to the Collateral Agent (i) stated that the signatory was counsel, (ii) stated that the signatory examined the Notes Security Agreement, Junior Secured Notes Indenture, and the Officer's Certificate, and (iii) opined that the Officer's Certificate was in the form required by Section 8.04 of the Junior Secured Notes Indenture and that no other documents were required to be delivered to the Collateral Agent or the Indenture Trustee as a condition to the requested release of liens and security interests on the Collateral.

G.     **The Bankruptcy Cases and Adversary Proceedings**

34.     On May 14, 2012, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

35.     At that time, the Debtors sought approval for post-petition debtor-in-possession financing from AFI.  The Court granted interim relief on the request on May 15, 2012 (Docket No. 80) and entered the Final Cash Collateral Order granting final approval on June 25, 2012 (Docket No. 491).  Pursuant to the Final Cash Collateral Order, the Debtors stipulated to the

Pg 10 of 23

validity of the liens and security interests on all assets constituting "Collateral" under the Notes Security Agreement and related documents.

36.    On February 28, 2013, the Committee filed a complaint against the Indenture Trustee and the Collateral Agent challenging certain of the liens and security interests stipulated to in the Final Cash Collateral Order and alleging that the Junior Secured Noteholders are not oversecured under section 506 of the Bankruptcy Code (Adv. Pro. No. 13-0277).

37.    On May 3, 2013, the Debtors filed a complaint against the Indenture Trustee, the Collateral Agent, and an Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group of JSNs") asserting further challenges to the oversecured status of the Junior Secured Noteholders (Adv. Pro. No. 13-01343).  The Bankruptcy Court consolidated the two adversary proceedings for trial.

38.    In connection with these adversary proceedings, the Collateral Agent has been threatened with potential claims concerning the Collateral Agent's release of liens and security interests on the Collateral.  At the inception of the litigation, the Indenture Trustee and Junior Secured Noteholders refused to provide the Collateral Agent with direction and indemnification in accordance with the governing agreements.  Thereafter, in the Answer, Affirmative Defenses and First Amended Counterclaims of Defendants UMB Bank, N.A. and the Ad Hoc Group of Junior Secured Noteholders to Debtors' First Amended Complaint to Determine Extent of Liens and for Declaratory Judgment, Adv. Pro. No. 13-01343 (Docket No. 29), the Indenture Trustee and the Ad Hoc Group of JSNs sought in their twenty-second and twenty-third counterclaims declarations that (i) certain lien releases breached the Junior Secured Notes Indenture and the Notes Security Agreement, and (ii) certain lien releases of mortgage loans were ineffective releases of collateral in violation of the New York Uniform Commercial Code.

39.     In moving to dismiss these counterclaims, the Debtors and the Committee argued that the Collateral Agent properly released the liens referenced by the Indenture Trustee and Ad Hoc Group of JSNs.  Memorandum of Law in Support of the Debtors' and Official Committee of Unsecured Creditors' Motion to Dismiss Certain of the Defendants' Counterclaims (Docket No. 22) at p.15 n.13.  Nonetheless, the Debtors and the Committee contended that the Indenture Trustee's and Ad Hoc Group of JSNs' "remedy, if any, lies in a claim against the Collateral Agent, not in a claim against the Debtors seeking to invalidate the release of such liens."  *Id.* at 15.

40.     The Court dismissed the Indenture Trustee and the Ad Hoc Group of JSNs' twenty-second and twenty-third counterclaims, among other counterclaims.  *See* Memorandum Opinion Denying Without Prejudice UMB Bank's Motion to Dismiss Counts 3 and 5, and Granting in Part and Denying in Part the Committee's Motion to Dismiss Certain Junior Secured Noteholder Counterclaims, at p. 23 (Docket No. 49).  The Court ruled that "the Defendants claim that the releases breached the JSN Indenture and JSN Pledge Agreement.  But that argument is irrelevant here because it only implicates a potential claim against the Collateral Agent, not a claim against the Plaintiffs that would somehow render the releases ineffective."  *Id.*  The Court expressed "no opinion about the potential merits of any cause against the Collateral Agent."  *Id.* at p. 23 n.7.

41.     The trial in the adversary proceedings began on October 15, 2013.  During the opening statements, in a colloquy with the Court, counsel for the Ad Hoc Group of JSNs stated, "Your Honor said if there is evidence of that lien release, it's released.  That's Wells' issue now."  Transcript of Oct. 15, 2013 at p. 101.

42.    The Indenture Trustee has not responded to the Collateral Agent's inquiry as to whether the Indenture Trustee and the Ad Hoc Group of JSNs intend to assert claims against the Collateral Agent.

43.    Taken together, there is a real and credible threat that claims may be asserted against the Collateral Agent in connection with the Collateral Agent's wholly proper release of liens and security interests securing the Junior Secured Notes.

**H.    The Collateral Agent's Secured Claims against the Debtors and Independent Claims against Non-Debtors**

44.    To the extent a cause of action is brought against the Collateral Agent, including any action challenging the Collateral Agent's release of liens and security interests securing the Junior Secured Notes, the Debtors are required to pay the Collateral Agent's fees and expenses and fully indemnify the Collateral Agent.[6]  *See, e.g.*, Revolver Security Agreement, §§ 14(r), 14(t); Intercreditor Agreement, §§ 5.6(o), 5.6(q); Notes Security Agreement, §§ 15(r), 15(t).  The proceeds of the Collateral must be applied first to the payment of the Collateral Agent's fees and expenses and in satisfaction of the Collateral Agent's right to indemnification.  *See* Revolver Security Agreement, § 12(f); Notes Security Agreement, § 13(f); Junior Secured Notes Indenture, § 6.10.

45.    Also, to the extent any action is brought against the Collateral Agent challenging the Collateral Agent's release of liens and security interests, the Collateral Agent holds direct, independent claims against the officers and counsel who – in connection with such releases – delivered the Officer's Certificates and Opinions of Counsel, as wells as against any Relevant

---

[6]    The Collateral Agent timely filed secured proofs of claim for, among other things, claims for indemnification in unliquidated amounts, including, but not limited to, Claims numbered 5609, 5616, 5619, 5623, 5627, 5629, 5631, 5639, 5650, 5654, 5657, 5660, 5663, 5668, 5671, 5673, 5678, 5685, 5697, 5699, 5700, 5702, 5757, 5759, and 5760.  No party in interest has objected to these claims.  11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f).

Directing Party that delivered Collateral Release Certificates or directions. As discussed above, the Collateral Agent was entitled to – and did – rely conclusively on Officer's Certificates, Opinions of Counsel, Collateral Release Certificates, and directions delivered in connection therewith. See Notes Security Agreement, § 10; Junior Secured Notes Indenture, § 8.04; AFI Revolver, § 12.11; Intercreditor Agreement, § 5.6(l).

**I.    The Treatment of the Collateral Agent's Secured Claims under the Proposed Plan**

46.    The Plan properly provides for the payment of the First Priority Collateral Agent Fees and Expenses and the Junior Secured Notes Collateral Agent Fees and Expenses. *See, e.g.,* Plan, Article IV.K., VII.G, VII.M. Such payment necessarily includes payment of the Collateral Agent's claims for fees, expenses, and indemnification against the Debtors, including claims for fees, expenses, and indemnification in the event the Collateral Agent's releases of liens and security interests are challenged.

47.    Further, the Plan provides for the Revolver Security Agreement to continue in effect to allow the Collateral Agent to exercise its liens and security interests in connection with the Revolver Security Agreement, *i.e.*, the First Priority Collateral Agent Lien.[7] *See* Plan, Article IV.K.

48.    The Plan also provides that the Junior Secured Notes, Junior Secured Notes Indenture, and the Notes Security Agreement will continue in effect to allow the Indenture Trustee to exercise the Junior Secured Notes Indenture Trustee Charging Lien.[8] *See* Plan, Article

---

[7]    "First Priority Collateral Agent Lien" is defined as "the Liens and other priority in payment and rights of the First Priority Collateral Agent under the First Priority Security Agreement, the Intercreditor Agreement, and related documents, or otherwise available to the First Priority Collateral Agent under applicable law, for the payment of First Priority Collateral Agent Fees and Expenses." Plan, Article I.A.109.

[8]    "Junior Secured Notes Indenture Trustee Charging Lien" is defined as "any Lien or other priority in payment to which the Junior Secured Notes Indenture Trustee is entitled, pursuant to the Junior Secured Notes Indenture, against distributions to be made to holders of Junior Secured Notes Claims for payment of

IV.K.  The Plan provides that distributions to holders of claims under the Junior Secured Notes are subject to the right of the Indenture Trustee to exercise the Junior Secured Notes Indenture Trustee Charging Lien against such distributions.  *See* Plan, Article VII.G.  The Plan further provides that distributions to holders of claims under the Junior Secured Notes are subject to the Junior Secured Notes Indenture Trustee Charging Lien.  *See* Plan, Article VII.M.

**J.     The Proposed Third Party Release**

49.     Article IX.D of the Plan provides a Third Party Release to the "Ally Released Parties."  The Third Party Release appears to extinguish impermissibly the Collateral Agent's rights against the non-Debtors that delivered Officer's Certificates, Opinions of Counsel, Collateral Release Certificates, and directions in connection with the Collateral Agent's release of liens and security interests.

<u>**OBJECTIONS**</u>

50.     The Collateral Agent objects to confirmation of the Plan to the extent that the Collateral Agent's secured claims for fees, expenses, and indemnification claims are *not* anticipated, protected, and paid in full under the Plan.  To ensure that such claims will be paid in full, the Collateral Agent requests that any confirmation order (i) confirm the Collateral Agent's secured claim for indemnity, (ii) provide that the liens and security interests of the Collateral Agent attach to any distribution made on account of the AFI Revolver or the Junior Secured Notes, and (iii) require that the Junior Secured Notes Indenture Trustee hold for the benefit of the Collateral Agent an amount equal to all accrued fees and expenses of the Collateral Agent *plus* a sufficient amount to ensure full payment of the Collateral Agent's secured claims for fees, expenses, and indemnification.  The Collateral Agent further objects to confirmation of the Plan

any Junior Secured Notes Indenture Trustee Fees and Junior Secured Notes Collateral Agent Fees and Expenses."  Plan, Article I.A.148.

to the extent that the Plan will release the Collateral Agent's direct, independent claims against the former and current officers and directors of the Debtors who delivered Officer's Certificates, counsel who delivered Opinions of Counsel, and any Relevant Directing Party.

## A.    The Plan Must Provide for Payment in Full of the Collateral Agent's Secured Claims for Fees, Expenses, and Indemnification

51.    The Collateral Agent holds liens and security interests in the Collateral and is a secured creditor of the Debtors.  In order for the Plan to be confirmed, the Collateral Agent's secured claims for fees, expenses, and indemnification, as provided for under the governing agreements, must be paid in full.  11 U.S.C. § 1129(b).  On its face, the Plan provides for the payment in full of the First Priority Collateral Agent Fees and Expenses and the Junior Secured Notes Collateral Agent Fees and Expenses, which would include the payment of the Collateral Agent's secured claims for fees, expenses, and indemnification.  *See, e.g.,* Plan, Article IV.K., VII.G, VII.M.

52.    The Collateral Agent, out of an abundance of caution, nevertheless objects.  There is a real and credible threat that claims may be asserted against the Collateral Agent challenging the Collateral Agent's releases of Collateral.   The Collateral Agent therefore requests confirmation that the Collateral Agent's claims for fees, expenses, and indemnification, especially (but without limitation) in the event the Collateral Agent's releases of liens and security interests are challenged, are anticipated and protected and will be paid in full under the Plan.  *See* Plan, Article VII.G ("The Junior Secured Notes Indenture Trustee may withhold distribution of any Cash it receives on account of the Junior Secured Notes Claim until such time as it determines that it has received sufficient payments to satisfy all accrued and reasonably expected . . . Junior Secured Notes Collateral Agent Fees and Expenses . . . .").

53.    The Collateral Agent requests the implementation of a mechanism that will ensure the payment in full of the Collateral Agent's secured claims for fees, expenses, and indemnification.  In that regard, the Collateral Agent requests that the Court direct the Junior Secured Notes Indenture Trustee to withhold distribution to holders of Junior Secured Notes Claims for all of the Collateral Agent's accrued fees and expenses *plus* an additional amount sufficient to ensure full payment of the Collateral Agent's secured claims for fees, expenses, and indemnification in the event the Collateral Agent's releases of liens and security interests are challenged.

**B.    The Court Lacks Subject Matter Jurisdiction to Release Non-Debtors from Liability to the Collateral Agent**

54.    The Collateral Agent objects to the Third Party Release, as defined in Article IX.D of the Plan, which proposes to discharge the Collateral Agent's direct, non-derivative claims and causes of action against non-Debtors, including the Debtors' former and current officers and directors, and former and current principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals, as well as any Relevant Directing Party.  The Court lacks jurisdiction to release the Collateral Agent's claims against the Debtors' officers and directors who delivered the Officer's Certificates, the counsel who delivered the Opinions of Counsel, and any Relevant Directing Party.  Even assuming that the Court has such jurisdiction (which it does not), the release of such claims is not essential to the reorganization of the Debtors.  For those reasons, the Court should not grant the Third-Party Release as requested in Article IX.D of the Plan.

55.    The Third Party Release in the Plan impermissibly extends to claims and causes of action that the Collateral Agent may hold against non-Debtors, including the Debtors' officers, directors, and counsel, and any Relevant Directing Party, which claims and causes of

action do not impact property of the Debtors' estates, the administration of the Debtors' cases, or the consummation of the Plan.

56.     By definition, a non-consensual third-party release involves a bankruptcy court's release of a creditor's claim against a nondebtor without the creditor's consent.  Such a third-party release tests "the outer reaches of a bankruptcy court's jurisdiction." *Johns-Manville Corp. v. Chubb Indemn. Ins. Co. (In re Johns-Manville Corp.),* 517 F.3d 52, 55 (2d Cir. 2008), *vacated & remanded on other grounds*, 129 S.Ct. 2195 (2009), *afff'g in part & rev'g in part*, 600 F.3d 135 (2d Cir. 2010).  "[A] bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate." *Id.* at 66.

57.     Courts in this district recently have disapproved of third-party releases and exculpations of creditors' direct, non-derivative claims.  For example, in *In re Dreier LLP*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010), the bankruptcy court recognized that it must first consider whether it has subject matter jurisdiction to release third-party claims before it can consider whether the case presents the "rare" or "unique" circumstances in which a third-party release may be permissible.  *Id.* at 132 (citing *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 695 (Bankr. S.D.N.Y. 2010)).  The court in *Dreier* concluded that it lacked jurisdiction to release creditors' direct claims against third parties.  *Id. See also, In re Chemtura Corp.*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) (holding that releases and exculpations of creditors' claims against third parties were "plainly impermissible").

58.     The Collateral Agent alone owns its direct, non-derivative claims based on the representations made to it in the relevant Officer's Certificates and Opinions of Counsel and by any Relevant Directing Party.  The Debtors have no right to assert such direct, non-derivative claims.  The Plan, however, provides *blanket* releases and injunctions that impermissibly and

permanently enjoin (*i.e.,* effectively release) such direct, non-derivative claims, which do not affect the Debtors' property.[9]

59.    The Bankruptcy Court simply lacks subject matter jurisdiction to grant such releases.  Even if this Court had such jurisdiction, it would lack the authority to enter a final order releasing or permanently enjoining (and thereby extinguishing) the Collateral Agent's direct, non-derivative claims against the officer, directors, and counsel delivering the Officers Certificates and Opinions of Counsel, as well as against any Relevant Directing Property delivering Collateral Release Certificates or directions.  *See generally Stern v. Marshall*, 564 U.S. __,  131 S.Ct. 2594 (2011) (discussing bankruptcy court's lack of authority to enter final order in dispute that was not part of the claims allowance process).

60.    For the foregoing reasons, to the extent the Court determines to confirm the Plan, a qualifying section must be added that limits the Third Party Release to causes of action that the Debtors would have been entitled to assert in their own right (*i.e.,* derivative claims) and which directly affect property of the Debtors' estates, and thereby preserve any actions of the Collateral Agent's independent claims against non-Debtors.

**C.    The Plan Does Not Satisfy the *Metromedia* Standards**

61.    Because the Bankruptcy Court lacks jurisdiction to release the Collateral Agent's direct, non-derivative claims, consideration of the *Metromedia* standards is inappropriate.  That

---

[9]    *In re Fairpoint Communications, Inc.*, 452 B.R. 21 (S.D.N.Y. 2011), requires no different a result.  In dismissing on equitable mootness grounds an appeal by a creditor bound by a third-party release, the District Court wrote: "The court suspects that this appeal is much ado about nothing:  at oral argument, neither side was able to identify a single potential claim to which the injunction might realistically apply.  However, that is beside the point. The injunction is carefully tailored to bar only third party actions that could call on the resources of FairPoint or reorganized FairPoint to make a losing third party whole." *Id.* at 28.  In this case, by contrast, the Debtors have their own separate obligations to the Collateral Agent.  Indemnity claims of their officers and directors would track those responsibilities and not further affect property of the estate.

said, the proposed releases also would fail scrutiny under the *Metromedia* test.  *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005)

62.    Section 524(e) of the Bankruptcy Code explicitly provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e).  Certain Ally Released Parties who would obtain releases under the proposed Plan are non-Debtors.  The proposed release granted to these non-Debtors is not authorized by section 524(e) of the Bankruptcy Code.

63.    The Second Circuit has recognized the lack of express authority in the Bankruptcy Code for the granting of non-debtor releases and that "a non-debtor release is a device that lends itself to abuse."  *Metromedia Fiber Network*, 416 F. 3d at 142.  "[I]n effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code."  *Id.* Accordingly, "a non-debtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan."  *Id.* at 143; *see also In re Adelphia Communications Corp.*, 368 B.R. 140, 267 (Bankr. S.D.N.Y. 2007) ("[I]n the Second Circuit, third-party releases or injunctions to prevent a creditor from suing a third party now are permissible under some circumstances, but not as a routine matter."); *In re Adelphia Communications Corp.*, 364 B.R. 518, 529 (Bankr. S.D.N.Y. 2007) ("The applicable law authorizing the approval of channeling injunctions and third party releases has become increasingly restrictive, and now permits such relief only under limited circumstances - most significantly, where they are critical to the reorganization of the debtor.").

64.    Truly unique circumstances that would render a non-debtor release important to the success of a plan may exist where (1) the estate received substantial consideration, *see In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992) (multi-billion dollar

settlement including a payment of over a billion dollars into fund by Michael Milken and other

co-liable Drexel personnel); (2) enjoined claims were "channeled" to a settlement fund rather

than extinguished, *see MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,

837 F.2d 89, 93-94 (2d Cir. 1988); (3) the enjoined claims would indirectly impact the debtor's

reorganization "by way of indemnity or contribution," *and* the plan otherwise provided for the

full payment of the enjoined claims, *see Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880

F.2d 694, 701 (4th Cir. 1989); and (4) the affected creditors consented.  *See In re Specialty*

*Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993); *see also Metromedia*, 416 F.3d at 142.  The

analysis "is not a matter of factors and prongs."  *Metromedia,* 416 F. 3d at 142.  "No case has

tolerated nondebtor releases absent the finding of circumstances that may be characterized as

unique."  *Id*. at 142–43 (citing *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002)).

65.    This case presents none of the "unusual" circumstances that the Second Circuit

has identified as potentially justifying the release of the Collateral Agent's claims against the

Debtors' former and current officers, directors, and counsel, and any Relevant Directing Party.

The Debtors' bankruptcy cases may be large, but they are not "unique."  Importantly, this is not a

mass tort case like *Johns-Manville* or *A.H. Robbins.*  The Debtors and the Committee have made

no showing that the officers and directors have provided "substantial consideration" to the estate

or the creditors in exchange for releases of claims relating to the certificates and opinions they

delivered to the Collateral Agent.  *See Metromedia Fiber Network*, 416 F. 3d at 142 (citing *SEC*

*v. Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992)).[10]   There has

---

[10]    Proposed releasees' contributions to the reorganization, as a matter of law, are insufficient to release the
creditors' direct claims.  *See*, *e.g.*, *Chemtura*, 439 B.R. at 611 (proposed releasees' "tireless efforts" to
compromise and the fact that the releases were part of a global settlement did not permit release of
creditors' claims against third parties).  Fundamentally, such "consideration" does not create subject matter
jurisdiction for the release of creditors' claims against third parties.  *See Johns-Manville*, 517 F.3d at 56.

similarly been no showing that any of "the enjoined claims were 'channeled' to a settlement fund rather than extinguished altogether." *Id.* (citing *Johns-Manville*, 837 F.2d at 93-94).

66.    The Debtors and the Committee have not established that the Collateral Agent's claims against the Debtors' former and current officers and directors would indirectly impact the Debtors' reorganization by way of indemnity or contribution in any significant manner. *Id.* (quoting *Johns-Manville*, 837 F.2d at 93-94).    The mere fact that such officers, directors, or counsel may have indemnification claims against the Debtor does not justify the non-consensual release of the Collateral Agent's direct, non-derivative claims.   *See In re Continental Airlines*, 203 F.3d 203, 216 (3d Cir. 2000) ("[T]hat the reorganized Continental Airlines might face an indemnity claim sometime in the future, in some unspecified amount, does not make the release and permanent injunction of Plaintiffs' claims 'necessary' to ensure the success of the Continental Debtors' reorganization"); *In re SL Liquidating, Inc.*, 428 B.R. 799, 802 (Bankr. S.D. Ohio 2010) ("The existence of a common indemnification agreement between a corporation and its directors and officers is not a justification for a non-consensual third party release.  Rather, this factor requires that the plan proponent show that there is a real threat to the debtor because such a suit against the third parties 'will deplete the assets of the estate.'") (quoting *In re Dow Corning Corp.*, 280 F.3d at 658).[11]

67.    Finally, although a plan may "provide for the full payment of the enjoined claims," this factor is not determinative.   *Id.*   In the absence of the unusual circumstances identified by the Second Circuit, the Court should not grant the Third Party Release contained in Article IX.D of the Plan.

---

[11]       In *Dow Corning* and *A.H. Robins*, mass tort cases, the indemnification claims threatened the debtors' reorganizations.  For example, in *A.H. Robins*, the indemnification claims totaled 2.2 to 2.3 billion dollars.  *See In re A.H. Robins Co.*, 880 F.2d at 700.  That is not the case here.

68.    The Collateral Agent has a specific and demonstrable need to narrow the proposed Third Party Release and exculpations.  The Collateral Agent remains concerned that, as already threatened, an action – even if frivolous – may be brought against it in connection with the Collateral Agent's release of liens and security interests.  The Collateral Agent conclusively relied on Officer's Certificates, Opinions of Counsel, Collateral Release Certificates, and directions delivered in connection with such releases and, as may be necessary, it is entitled to pursue its direct, non-derivative claims against the third parties that provided same.

69.    Second Circuit law forbids approval of the Plan as proposed, with the releases and exculpations ostensibly blocking direct, non-derivative claims by the Collateral Agent against those officers, directors, and counsel who delivered the Officer's Certificates and Opinions of Counsel, and any Relevant Directing Party.  The Third Party Release must be modified to preserve the Collateral Agent's independent claims against non-Debtors.  Without such amendments, the Plan cannot be confirmed.

## **CONCLUSION**

For the reasons set forth herein, the Collateral Agent (a) objects to plan confirmation and requests clarification from the Debtors and the Committee that the Collateral Agent's secured claims for fees, expenses, and indemnification are anticipated, protected, and reserved against, and will be paid in full under the Plan; (b) requests that the Court deny confirmation of the Plan to the extent the Plan will release the Collateral Agent's direct, independent claims against the non-Debtor former and current officers and directors of, and counsel to, the Debtors, or any Relevant Directing Party; and (c) further requests such other relief as may be just and proper.

Dated:  October 21, 2013
        New York, New York

REED SMITH LLP

*/s/ Eric A. Schaffer* _____

Eric A. Schaffer
David M. Schlecker
Mark D. Silverschotz
Sarah K. Kam
599 Lexington Avenue
New York, New York 10022
Telephone: 212-521-5400
Facsimile: 212-561-5450

*Counsel for Wells Fargo Bank, N.A., in its
capacities as First Priority Collateral Agent,
Third Priority Collateral Agent, and Collateral
Control Agent*