"**Ownership Interest**":  As to any Certificate, any ownership or security interest in such Certificate, including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

"**Pass-Through Rate**":  With respect to each Class of Certificates (other than the Class PO-1, Class PO-2, Class PO-3A, Class PO-3B, Class PO-B, Class 1-P, Class 2-P, Class 3-P, Class ES and Class A-R-II Certificates) and any Distribution Date, the rate set forth below:

(i)    The Pass-Through Rate for the Class 1-A1A Certificates shall be equal to the least of (a) LIBOR plus the applicable Margin, (b) Group 1 Net WAC Cap for that Distribution Date and (c) 11.00% per annum;

(ii)    The Pass-Through Rate for the Class 1-A1B Certificates shall be equal to the least of (a) LIBOR plus the applicable Margin, (b) the Group 1 Net WAC Cap for that Distribution Date and (c) 11.00% per annum;

(iii)    The Pass-Through Rate for the Class A-R Certificates shall be equal to the Net WAC of the Group 1 Mortgage Loans for that Distribution Date;

(iv)    The Pass-Through Rate for the Class 2-A1A1 Certificates shall be equal to the least of (a) LIBOR plus the applicable Margin, (b) the Group 2 Net WAC Cap for that Distribution Date and (c) 11.00% per annum;

(v)    The Pass-Through Rate for the Class 2-A1A2 Certificates shall be equal to the least of (a) LIBOR plus the applicable Margin, (b) the Group 2 Net WAC Cap for that Distribution Date and (c) 11.00% per annum;

(vi)    The Pass-Through Rate for the Class 2-A1B Certificates shall be equal to the least of (a) LIBOR plus the applicable Margin, (b) the Group 2 Net WAC Cap for that Distribution Date and (c) 11.00% per annum;

(vii)    The Pass-Through Rate for the Class 2-A1C Certificates shall be equal to the least of (a) LIBOR plus the applicable Margin, (b) the Group 2 Net WAC Cap for that Distribution Date and (c) 11.00% per annum;

(viii)    The Pass-Through Rate for the Class 3-A1A1 Certificates shall be equal to the least of (a) MTA plus the applicable Margin, (b) the Group 3 Net WAC Cap for that Distribution Date and (c) the applicable Net Maximum Cap Rate for that Distribution Date;

(ix)    The Pass-Through Rate for the Class 3-A1A2 Certificates shall be equal to the least of (a) LIBOR plus the applicable Margin, (b) the Group 3 Net WAC Cap for that Distribution Date and (c) 11.00% per annum;

(x)    The Pass-Through Rate for the Class 3-A1B Certificates shall be equal to the least of (a) LIBOR plus the applicable Margin, (b) the Group 3 Net WAC Cap for that Distribution Date and (c) 11.00% per annum;

(xi)    The Pass-Through Rate for the Class 3-A1C Certificates shall be equal to the least of (a) LIBOR plus the applicable Margin, (b) the Group 3 Net WAC Cap for that Distribution Date and (c) 11.00% per annum;

(xii)    The Pass-Through Rate for the Class X-1 Certificates shall be equal to the excess, if any, of (i) the Group 1 Net WAC of the Mortgage Loans over (ii) the product of (A) the sum of (x) the amount of interest accrued for the related Accrual Period on the Group 1 Certificates (other than the Class X-1 Certificates) at the applicable Pass-Through Rate and (y) the Aggregate Premium Amount due to the Certificate Insurer for that Distribution Date and (B) 12, divided by the aggregate Principal Balance of the Group 1 Certificates immediately prior to such Distribution Date;

(xiii)    The Pass-Through Rate for the Class X-2 Certificates shall be equal to the excess, if any, of (i) the Group 2 Net WAC of the Mortgage Loans over (ii) the product of (A) the sum of the amount of interest accrued for the related Accrual Period on the Group 2 Certificates (other than the Class X-2 Certificates) at the applicable Pass-Through Rate and (B) 12, divided by the aggregate Principal Balance of the Group 2 Certificates immediately prior to such Distribution Date;

(xiv)    The Pass-Through Rate for the Class X-3A Certificates shall be equal to the excess, if any, of (i) the Group 3 Net WAC of the Mortgage Loans over (ii) the product of (A) the sum of the amount of interest accrued for the related Accrual Period on the Class 3-A1A1 Certificates at the applicable Pass-Through Rate and (B) 12, divided by the aggregate Principal Balance of the Class 3-A1A1 and Class PO-3A Certificates immediately prior to such Distribution Date;

(xv)    The Pass-Through Rate for the Class X-3B Certificates shall be equal to the excess, if any, of (i) the Group 3 Net WAC of the Mortgage Loans over (ii) the product of (A) the sum of the amount of interest accrued for the related Accrual Period on the Class 3-A1A2, Class 3-A1B and Class 3-A1C Certificates at the applicable Pass-Through Rate and (B) 12, divided by the aggregate Principal Balance of the Class 3-A1A2, Class 3-A1B, Class 3-A1C and Class PO-3B Certificates immediately prior to such Distribution Date;

(xvi)    The Pass-Through Rate for the Class X-B Certificates shall be equal to the excess, if any, of (i) the Subordinate Net WAC of the Mortgage Loans over (ii) the product of (A) the sum of the amount of interest accrued for the related Accrual Period on the Subordinate Certificates at the applicable Pass-Through Rate and (B) 12, divided by the aggregate Principal Balance of the Subordinate Certificates and the PO-B1, PO-B2 and PO-B3 Components of the Class PO-B Certificates immediately prior to such Distribution Date;

(xvii)    The Pass-Through Rate for the Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7, Class B-8, Class B-9, Class B-10, Class B-11 and Class B-12 Certificates shall be equal to the least of (a) LIBOR plus the applicable Margin, (b) the Subordinate Net WAC Cap for that Distribution Date and (c) the related Net Maximum Rate Cap for that Distribution Date.

51

"**Paul Financial**": Paul Financial, LLC, and its successors and assigns, in its capacity as Originator of the Paul Financial Mortgage Loans.

"**Paul Financial Mortgage Loans**": The Mortgage Loans for which Paul Financial is listed as "Originator" on the Mortgage Loan Schedule.

"**Paul Financial Purchase Agreement**": The Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of January 1, 2004, between GCFP, as purchaser, and Paul Financial, as seller, as the same may be amended from time to time, and any assignments and conveyances related to the Paul Financial Mortgage Loans.

"**Paying Agent**": Any paying agent appointed pursuant to Section 6.05 hereof.  The initial Paying Agent shall be Wells Fargo Bank, N.A., for so long as it is acting as Securities Administrator under this Agreement.

"**Percentage Interest**": With respect to any Certificate other than a Class 1-P, Class 2-P, Class 3-P, Class ES, Class A-R or Class A-R-II Certificate, a fraction, expressed as a percentage, the numerator of which is the Initial Certificate Principal Balance or Initial Certificate Notional Balance, as applicable, represented by such Certificate and the denominator of which is the Original Class Certificate Principal Balance or Original Class Certificate Notional Balance, as applicable, of the related Class.  With respect to the Class 1-P, Class 2-P, Class 3-P, Class ES, Class A-R and Class A-R-II Certificates, 100%.

"**Permitted Investments**": Any one or more of the following obligations or securities acquired at a purchase price of not greater than par, regardless of whether issued or managed by the Depositor, the Trustee, the Master Servicer or any of their respective Affiliates or for which an Affiliate of the Trustee serves as an advisor:

(i)    direct obligations of, or obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States;

(ii)    (A) demand and time deposits in, certificates of deposit of, bankers' acceptances issued by or federal funds sold by any depository institution or trust company (including the Trustee, the Master Servicer or their agents acting in their respective commercial capacities) incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state authorities, so long as, at the time of such investment or contractual commitment providing for such investment, such depository institution or trust company or its ultimate parent has a short-term uninsured debt rating in one of the two highest available rating categories of each Rating Agency and (B) any other demand or time deposit or deposit which is fully insured by the FDIC;

(iii)    repurchase obligations with respect to any security described in clause (i) above and entered into with a depository institution or trust company (acting as principal) rated A or higher by each Rating Agency;

(iv)    securities bearing interest or sold at a discount that are issued by any corporation incorporated under the laws of the United States of America, the District of Columbia or any State thereof and that are rated by each Rating Agency in its highest long-term unsecured rating categories at the time of such investment or contractual commitment providing for such investment;

(v)    commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations) that is rated by each Rating Agency in its highest short-term unsecured debt rating available at the time of such investment;

(vi)    units of money market funds (which may be 12b-1 funds, as contemplated by the Commission under the Investment Company Act of 1940) registered under the Investment Company Act of 1940 including funds managed or advised by the Trustee, the Master Servicer or an affiliate thereof having the highest applicable rating from each Rating Agency; and

(vii)    if previously confirmed in writing to the Trustee, any other demand, money market or time deposit, or any other obligation, security or investment, as may be acceptable to each Rating Agency in writing as a permitted investment of funds backing securities having ratings equivalent to its highest initial ratings of the Senior Certificates;

*provided, however*, that no instrument described hereunder shall evidence either the right to receive (a) only interest with respect to the obligations underlying such instrument or (b) both principal and interest payments derived from obligations underlying such instrument and the interest and principal payments with respect to such instrument provide a yield to maturity at par greater than 120% of the yield to maturity at par of the underlying obligations.

"**Permitted Transferee**": Any Transferee of a Residual Certificate other than a Disqualified Organization or a non-U.S. Person.

"**Person**": Any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**Physical Certificates**": The Class A-R, Class A-R-II and Class 1-P, Class 2-P, Class 3-P and Class ES Certificates.

"**Plaza**": Plaza Home Mortgage, Inc., and its successors and assigns, in its capacity as Originator of the Plaza Mortgage Loans.

"**Plaza Mortgage Loans**": The Mortgage Loans for which Plaza is listed as "Originator" on the Mortgage Loan Schedule.

"**Plaza Purchase Agreement**": The Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of November 1, 2004, between GCFP, as purchaser, and Plaza, as seller, as the same may be amended from time to time, and any assignments and conveyances related to the Plaza Mortgage Loans.

"**PMC**": PMC Bancorp, and its successors and assigns, in its capacity as Originator of the PMC Mortgage Loans.

"**PMC Mortgage Loans**": The Mortgage Loans for which PMC is listed as "Originator" on the Mortgage Loan Schedule.

"**PMC Mortgage Purchase Agreement**": The Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of April 1, 2005, between GCFP, as purchaser, and PMC Mortgage, as seller, as the same may be amended from time to time, and any assignments and conveyances related to the PMC Mortgage Loans.

"**PO Components**": The PO-B1, PO-B2 and PO-B3 Component, as applicable.

"**PO-B1 Component**": The Principal-Only Component of the Class PO Certificates that relates to the Group 1 Mortgage Loans.

"**PO-B1 Component Principal Balance**": As of the Closing Date, $10; thereafter, as increased by amounts of Net Deferred Interest allocated to the Class X-B Certificates in respect of the Group 1 Mortgage Loan as set forth in Section 5.02 herein.

"**PO-B2 Component**": The Principal-Only Component of the Class PO Certificates that relates to the Group 2 Mortgage Loans.

"**PO-B2 Component Principal Balance**": As of the Closing Date, $10; thereafter, as increased by amounts of Net Deferred Interest allocated to the Class X-B Certificates in respect of the Group 2 Mortgage Loan as set forth in Section 5.02 herein.

"**PO-B3 Component**": The Principal-Only Component of the Class PO Certificates that relates to the Group 3 Mortgage Loans.

"**PO-B3 Component Principal Balance**": As of the Closing Date, $10; thereafter, as increased by amounts of Net Deferred Interest allocated to the Class X-B Certificates in respect of the Group 3 Mortgage Loan as set forth in Section 5.02 herein.

"**Pool Balance**": As to any Distribution Date, the aggregate of the Stated Principal Balances, as of the Close of Business on the first day of the month preceding the month in which such Distribution Date occurs, of the Mortgage Loans that were Outstanding Mortgage Loans on that day.

"**Premium Letter**": The letter dated the Closing Date from the Certificate Insurer to the Seller, the Depositor and the Securities Administrator (a copy of which has been furnished to the Trustee) setting forth the payment arrangements for the Aggregate Premium Amount on the Certificate Insurance Policy and certain related expense payment arrangements.

"**Premium Proceeds**": The amount by which the Termination Price paid in connection with the termination pursuant to Section 10.01 exceeds the sum of unpaid principal and accrued and unpaid interest on the Certificates and unreimbursed Advances and Servicing Advances.

54

"**Premium Rate**": As specified in the Premium Letter.

"**Prepayment Penalty Amount**": With respect to any Mortgage Loan and each Distribution Date, all premiums or charges, if any, paid by Mortgagors under the related Mortgage Notes as a result of full or partial Principal Prepayments collected and retained by the Servicers during the immediately preceding Prepayment Period, under the terms of the Servicing Agreements.

"**Prepayment Period**": With respect to any Distribution Date the calendar month preceding the month in which such Distribution Date occurs.

"**Primary Insurance Policy**": Mortgage guaranty insurance, if any, on an individual Mortgage Loan, as evidenced by a policy or certificate.

"**Principal Balance**": As to any Mortgage Loan, other than a Liquidated Mortgage Loan, and any day, the related Cut-Off Date Principal Balance, *minus* all collections credited against the Principal Balance of such Mortgage Loan after the Cut-Off Date, as increased by the amount of any Deferred Interest added to the outstanding Principal Balance of such Mortgage Loan pursuant to the terms of the related Mortgage Note. For purposes of this definition, a Liquidated Mortgage Loan shall be deemed to have a Principal Balance equal to the Principal Balance of the related Mortgage Loan as of the final recovery of related Liquidation Proceeds and a Principal Balance of zero thereafter. As to any REO Property and any day, the Principal Balance of the related Mortgage Loan immediately prior to such Mortgage Loan becoming REO Property.

"**Principal Deficiency Amount**": For any Distribution Date and for any Undercollateralized Group, the excess, if any, of the aggregate Class Certificate Principal Balance and Component Principal Balance of such Undercollateralized Group immediately prior to such Distribution Date over the sum of the Principal Balances of the Mortgage Loans in the related Loan Group immediately prior to such Distribution Date.

"**Principal Distribution Amount**": With respect to each Loan Group and any Distribution Date, the sum of (a) each scheduled payment of principal collected or advanced on the related Mortgage Loans by the Servicers in respect of the related Due Period, (b) that portion of the Purchase Price, representing principal of any repurchased Mortgage Loan in that Loan Group, deposited to the Distribution Account during the related Prepayment Period, (c) the principal portion of any related Substitution Adjustments with respect to that Loan Group deposited in the Distribution Account during the related Prepayment Period, (d) the principal portion of all Insurance Proceeds received during the related Prepayment Period with respect to Mortgage Loans in that Loan Group that are not yet Liquidated Mortgage Loans, (e) the principal portion of all Net Liquidation Proceeds received during the related Prepayment Period with respect to Liquidated Mortgage Loans in that Loan Group, (f) all Principal Prepayments in part or in full on Mortgage Loans in that Loan Group applied by the Servicers during the related Prepayment Period, (g) all Recoveries related to that Loan Group received during the calendar month preceding the month of that Distribution Date and (h) on the Distribution Date on which the Trust is to be terminated pursuant to Section 10.01 hereof, that portion of the Termination Price in respect of principal for that Loan Group.

55

"**Principal-Only Component**":  Any of the PO-B1, PO-B2 and PO-B3 Components, as applicable.

"**Principal Prepayment**":  Any payment of principal made by the Mortgagor on a Mortgage Loan that is received in advance of its scheduled Due Date and that is not accompanied by an amount of interest representing the full amount of scheduled interest due on any Due Date in any month or months subsequent to the month of prepayment.

"**Private Certificates**":  The Class B-11, Class B-12, Class A-R-II, Class 1-P, Cass 2-P, Class 3-P and Class ES Certificates.

"**Private Placement Memorandum**":  The Private Placement Memorandum dated October 27, 2005 relating to the initial sale of the Class B-11 and Class B-12 Certificates.

"**Pro Rata Share**":  As to any Distribution Date and any Class of Subordinate Certificates, the portion of the Subordinate Principal Distribution Amount allocable to such Class, equal to the product of the (a) Subordinate Principal Distribution Amount on such date and (b) a fraction, the numerator of which is the related Class Certificate Principal Balance of that Class and the denominator of which is the aggregate of the Class Certificate Principal Balances of all the Classes of Subordinate Certificates.

"**Proprietary Lease**":  With respect to any Cooperative Unit, a lease or occupancy agreement between a Cooperative Corporation and a holder of related Cooperative Shares.

"**Prospectus**":  The Prospectus Supplement, together with the accompanying prospectus dated September 26, 2005, relating to the Senior Certificates and the Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7, Class B-8, Class B-9 and Class B-10 Certificates.

"**Prospectus Supplement**":  The Prospectus Supplement dated October 29, 2005 relating to the offering of the Senior Certificates and the Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7, Class B-8, Class B-9 and Class B-10 Certificates.

"**Purchase Agreement**":  Each of the Alliance Purchase Agreement, Commercial Capital Purchase Agreement, E-Loan Purchase Agreement, Gateway Purchase Agreement, GMAC Purchase Agreement, Loan Center Purchase Agreement, Loan Link Purchase Agreement, Metrocities Purchase Agreement, MortgageIT Purchase Agreement, Paul Financial Purchase Agreement, Plaza Purchase Agreement, PMC Purchase Agreement, ResCap Mortgage Purchase Agreement, Secured Bankers Purchase Agreement, Sierra Pacific Purchase Agreement and Washington Mutual Purchase Agreement as applicable.

"**Purchase Price**":  With respect to any Mortgage Loan or REO Property to be purchased pursuant to or as contemplated by Section 2.03 hereof, and as confirmed by an Officers' Certificate from the Seller to the Trustee, an amount equal to the sum of (i) 100% of the Principal Balance thereof as of the date of purchase (or such other price as provided in Section 10.01), plus (ii) in the case of (x) a Mortgage Loan, accrued interest on such Principal Balance at the applicable Loan Rate (or if the servicers are repurchasing such Mortgage Loan, the Loan

56

Rate minus the Servicing Fee Rate) from the Due Date as to which interest was last covered by a payment by the Mortgagor through the end of the calendar month in which the purchase is to be effected, and (y) an REO Property, the sum of (1) accrued interest on such Principal Balance at the applicable Loan Rate (or if the servicers are repurchasing such Mortgage Loan, the Loan Rate minus the Servicing Fee Rate) from the Due Date as to which interest was last covered by a payment by the Mortgagor plus (2) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such purchase is to be effected, net of the total of all net rental income, Insurance Proceeds and Liquidation Proceeds that as of the date of purchase had been distributed as or to cover REO Imputed Interest, plus (iii) any unreimbursed Servicing Advances and any unpaid Expense Fees allocable to such Mortgage Loan or REO Property, plus (iv) in the case of a Mortgage Loan required to be purchased pursuant to Section 2.03 hereof, expenses reasonably incurred or to be incurred by the Trustee in respect of the breach or defect giving rise to the purchase obligation and plus (v) any costs and damages incurred by the Trust in connection with any violation by such Mortgage Loan of any predatory- or abusive-lending laws.

   "**Qualified Insurer**":  A mortgage guaranty insurance company duly qualified as such under the laws of the state of its principal place of business and each state having jurisdiction over such insurer in connection with the insurance policy issued by such insurer, duly authorized and licensed in such states to transact a mortgage guaranty insurance business in such states and to write the insurance provided by the insurance policy issued by it, approved as a Fannie Mae-approved mortgage insurer and having a claims paying ability rating of at least "AA" or equivalent rating by a nationally recognized statistical rating organization.  Any replacement insurer with respect to a Mortgage Loan must have at least as high a claims paying ability rating as the insurer it replaces had on the Closing Date.

   "**Qualified Substitute Mortgage Loan**":  A mortgage loan substituted for a Deleted Mortgage Loan pursuant to the terms of this Agreement which must, on the date of such substitution, (i) have an outstanding principal balance, after application of all scheduled payments of principal and interest due during or prior to the month of substitution, not in excess of, and not more than 5% less than, the Principal Balance of the Deleted Mortgage Loan as of the Due Date in the calendar month during which the substitution occurs, (ii) have a maximum loan rate not less than the Maximum Loan Rate of the Deleted Mortgage Loan, (iii)  have a gross margin equal to or greater than the Gross Margin of the Deleted Mortgage Loan, (iv) have the same Index as the Deleted Mortgage Loan, (v) have its next adjustment date not more than two months after the next Adjustment Date of the Deleted Mortgage Loan, (vi) have a remaining term to maturity not greater than (and not more than one year less than) that of the Deleted Mortgage Loan, (vii) be current as of the date of substitution, (viii) have a Loan-to-Value Ratio as of the date of substitution equal to or lower than the Loan-to-Value Ratio of the Deleted Mortgage Loan as of such date, (ix) have been underwritten or re-underwritten in accordance with the same or substantially similar underwriting criteria and guidelines as the Deleted Mortgage Loan, (x) is of the same or better credit quality as the Deleted Mortgage Loan and (xi) conform to each representation and warranty set forth in Section 2.04 hereof applicable to the Deleted Mortgage Loan.  In the event that one or more mortgage loans are substituted for one or more Deleted Mortgage Loans, the amounts described in clause (i) hereof shall be determined

on the basis of aggregate principal balances, the terms described in clause (vi) hereof shall be determined on the basis of weighted average remaining term to maturity and the Loan-to-Value Ratio described in clause (viii) hereof shall be satisfied as to each such mortgage loan and, except to the extent otherwise provided in this sentence, the representations and warranties described in clause (x) hereof must be satisfied as to each Qualified Substitute Mortgage Loan or in the aggregate, as the case may be.

"**Rating Agency**": Fitch, S&P and Moody's. If any rating agency or its successor shall no longer be in existence, "Rating Agency" shall include such nationally recognized statistical rating agency, or other comparable Person, as shall have been designated by the Depositor, notice of which designation shall be given to the Trustee and the Master Servicer.

"**Realized Loss**": With respect to any Liquidated Mortgage Loan, the amount of loss realized equal to the portion of the Principal Balance remaining unpaid after application of all Net Liquidation Proceeds in respect of such Liquidated Mortgage Loan.

"**Recognition Agreement**": With respect to any Cooperative Loan, an agreement between the related Cooperative Corporation and the originator of such Mortgage Loan to establish the rights of such originator in the related Cooperative Property.

"**Record Date**": With respect to each Distribution Date (other than the initial Distribution Date) and the Certificates (other than the LIBOR Certificates), the last Business Day of the calendar month preceding the month in which such Distribution Date occurs. With respect to each Distribution Date (other than the initial Distribution Date) and the LIBOR Certificates, the last Business Day preceding that Distribution Date, unless any Class of LIBOR Certificates are no longer Book-Entry Certificates, in which case the Record Date for such Class of LIBOR Certificates shall be the last Business Day of the calendar month preceding the month in which that Distribution Date occurs. With respect to the initial Distribution Date and all Classes of Certificates, the Closing Date.

"**Recovery**": With respect to any Distribution Date and Mortgage Loan that became a Liquidated Mortgage Loan in a month preceding the month prior to that Distribution Date and with respect to which the related Realized Loss was allocated to one or more Classes of Certificates, an amount received in respect of such Liquidated Mortgage Loan during the prior calendar month, net of any reimbursable expenses.

"**Reference Bank**" shall be a leading bank engaged in transactions in Eurodollar deposits in the international Eurocurrency market, which shall not control, be controlled by, or be under common control with, the Securities Administrator and shall have an established place of business in London. Until all of the LIBOR Certificates are paid in full, the Securities Administrator will at all times retain at least four Reference Banks for the purpose of determining LIBOR with respect to each LIBOR Determination Date. The Securities Administrator initially shall designate the Reference Banks (after consultation with the Depositor). If any such Reference Bank should be unwilling or unable to act as such or if the Securities Administrator should terminate its appointment as Reference Bank, the Securities Administrator shall promptly appoint or cause to be appointed another Reference Bank (after consultation with the Depositor). The Securities Administrator shall have no liability or

58

responsibility to any Person for (i) the selection of any Reference Bank for purposes of determining LIBOR or (ii) any inability to retain at least four Reference Banks which is caused by circumstances beyond its reasonable control.

"**Refinancing Mortgage Loan**": Any Mortgage Loan originated in connection with the refinancing of an existing mortgage loan.

"**Regular Certificate**": Any Class 1-A1A, Class 1-A1B, Class 2-A1A1, Class 2-A1A2, Class 2-A1B, Class 2-A1C, Class 3-A1A1, Class 3-A1A2, Class 3-A1B, Class 3-A1C, Class X-1, Class X-2, Class X-3A, Class X-3B, Class X-B, Class PO-1, Class PO-2, Class PO-3A, Class PO-3B, Class PO-B, Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7, Class B-8, Class B-9, Class B-10, Class B-11 and Class B-12 Certificate.

"**Regulation S**": Regulation S promulgated under the Securities Act or any successor provision thereto, in each case as the same may be amended from time to time; and all references to any rule, section or subsection of, or definition or term contained in, Regulation S means such rule, section, subsection, definition or term, as the case may be, or any successor thereto, in each case as the same may be amended from time to time.

"**Regulation S Global Security**": The meaning specified in Section 6.01.

"**Relief Act**": The Servicemembers Civil Relief Act, as amended, or any similar state or local law.

"**Relief Act Reductions**": With respect to any Distribution Date and any Mortgage Loan as to which there has been a reduction in the amount of interest collectible thereon for the most recently ended Due Period as a result of the application of the Relief Act, the amount, if any, by which (i) interest collectible on that Mortgage Loan during such Due Period is less than (ii) one month's interest on the Stated Principal Balance of such Mortgage Loan at the Loan Rate for such Mortgage Loan before giving effect to the application of the Relief Act.

"**REMIC**": A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

"**REMIC Opinion**": An Independent Opinion of Counsel, to the effect that the proposed action described therein would not, under the REMIC Provisions, (i) cause any REMIC created hereunder to fail to qualify as a REMIC while any regular interest in such REMIC is outstanding, (ii) result in a tax on prohibited transactions with respect to any REMIC created hereunder or (iii) constitute a taxable contribution to any REMIC created hereunder after the Startup Day.

"**REMIC Provisions**": Provisions of the federal income tax law relating to real estate mortgage investment conduits which appear at Section 860A through 860G of Subchapter M of Chapter 1 the Code, and related provisions, and regulations and rulings promulgated thereunder, as the foregoing may be in effect from time to time.

"**Remittance Report**": The Master Servicer's Remittance Report to the Securities Administrator providing information with respect to each Mortgage Loan which is provided no

59

later than the 15th calendar day of each month and which shall contain such information as may be agreed upon by the Master Servicer and the Securities Administrator and which shall be sufficient to enable the Securities Administrator to prepare the related Distribution Date Statement.

"**Rents from Real Property**":  With respect to any REO Property, gross income of the character described in Section 856(d) of the Code.

"**REO Account**":  The account or accounts maintained by the Servicers in respect of an REO Property pursuant to the Servicing Agreements.

"**REO Disposition**":  The sale or other disposition of an REO Property on behalf of the Trust.

"**REO Imputed Interest**":  As to any REO Property, for any calendar month during which such REO Property was at any time part of the Trust Fund, one month's interest at the applicable Net Loan Rate for such REO Property on the Principal Balance of such REO Property (or, in the case of the first such calendar month, of the related Mortgage Loan if appropriate) as of the Close of Business on the Due Date in such calendar month.

"**REO Principal Amortization**":  With respect to any REO Property, for any calendar month, the excess, if any, of (a) the aggregate of all amounts received in respect of such REO Property during such calendar month, whether in the form of rental income, sale proceeds (including, without limitation, that portion of the Termination Price paid in connection with a purchase of all of the Mortgage Loans and REO Properties pursuant to Section 10.01 hereof that is allocable to such REO Property) or otherwise, net of any portion of such amounts (i) payable pursuant to the applicable provisions of the Servicing Agreements in respect of the proper operation, management and maintenance of such REO Property or (ii) payable or reimbursable to the Servicers pursuant to the applicable provisions of the Servicing Agreements for unpaid Master Servicing Fees and Servicing Fees in respect of the related Mortgage Loan and unreimbursed Servicing Advances and Advances in respect of such REO Property or the related Mortgage Loan, over (b) the REO Imputed Interest in respect of such REO Property for such calendar month.

"**REO Property**":  A Mortgaged Property acquired by the Servicers on behalf of the Trust Fund through foreclosure or deed-in-lieu of foreclosure in accordance with the applicable provisions of the Servicing Agreements.

"**Request for Release**":  A release signed by a Servicing Officer, in the form of Exhibit F attached hereto.

"**Residential Dwelling**":  Any one of the following: (i) a detached one-family dwelling, (ii) a detached two- to four-family dwelling, (iii) a one-family dwelling unit in a condominium project, (iv) a manufactured home, (v) a cooperative unit or (vi) a detached one-family dwelling in a planned unit development, none of which is a mobile home.

"**Residual Certificate**":  Each of the Class A-R and the Class A-R-II Certificate.

"**Responsible Officer**": When used with respect to the Trustee or any director, the President, any vice president, any assistant vice president, any associate or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and, with respect to a particular matter, to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"**ResCap**": Residential Mortgage Capital, and its successors and assigns, in its capacity as Originator of the ResCap Mortgage Loans.

"**ResCap Mortgage Loans**": The Mortgage Loans for which ResCap is listed as "Originator" on the Mortgage Loan Schedule.

"**ResCap Mortgage Purchase Agreement**": The Master Mortgage Loan Purchase and Interim Servicing Agreement dated as of October 1, 2004, between GCFP, as purchaser, and ResCap, as seller, as the same may be amended from time to time, and any assignments and conveyances related to the ResCap Mortgage Loans.

"**Restricted Classes**": As defined in Section 5.01(d).

"**Restricted Global Security**": As defined in Section 6.01.

"**Sarbanes-Oxley Certification**": A written certification covering, among other things, servicing of the Mortgage Loans by the Servicers and signed by an officer of the Master Servicer that complies with (i) the Sarbanes-Oxley Act of 2002, as amended from time to time, and (ii) the February 21, 2003 Statement by the Staff of the Division of Corporation Finance of the Securities and Exchange Commission Regarding Compliance by Asset-Backed Issuers with Exchange Act Rules 13a-14 and 15d-14, as in effect from time to time; *provided* that if, after the Closing Date (a) the Sarbanes-Oxley Act of 2002 is amended, (b) the Statement referred to in clause (ii) is modified or superseded by any subsequent statement, rule or regulation of the Securities and Exchange Commission or any statement of a division thereof, or (c) any future releases, rules and regulations are published by the Securities and Exchange Commission from time to time pursuant to the Sarbanes-Oxley Act of 2002, which in any such case affects the form or substance of the required certification and results in the required certification being, in the reasonable judgment of the Master Servicer, materially more onerous than the form of the required certification as of the Closing Date, the Sarbanes-Oxley Certification shall be as agreed to by the Master Servicer, Depositor and the Seller following a negotiation in good faith to determine how to comply with any such new requirements.

"**S&P**": Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Secured Bankers**": Secured Bankers Mortgage Company, and its successors and assigns, in its capacity as Originator of the Secured Bankers Mortgage Loans.

"**Secured Bankers Mortgage Loans**": The Mortgage Loans for which Secured Bankers is listed as "Originator" on the Mortgage Loan Schedule.

"**Secured Bankers Purchase Agreement**":  The Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of March 1, 2004, between GCFP, as purchaser, and Secured Bankers, as seller, as the same may be amended from time to time, and any assignments and conveyances related to the Secured Bankers Mortgage Loans.

"**Securities Administrator**":  Wells Fargo Bank, N.A., or its successor in interest, or any successor securities administrator appointed as herein provided.

"**Security Agreement**":  With respect to any Cooperative Loan, the agreement between the owner of the related Cooperative Shares and the originator of the related Mortgage Note that defines the terms of the security interest in such Cooperative Shares and the related Proprietary Lease.

"**Seller**":  GCFP, in its capacity as seller under this Agreement.

"**Senior Certificate**":  Any one of the Class 1-A1A, Class 1-A1B, Class 2-A1A1, Class 2-A1A2, Class 2-A1B, Class 2-A1C, Class 3-A1A1, Class 3-A1A2, Class 3-A1B, Class 3-A1C, Class X-1, Class X-2, Class X-3A, Class X-3B, Class X-B, Class PO-1, Class PO-2, Class PO-3A, Class PO-3B, Class PO-B, Class A-R or Class A-R-II Certificates.

"**Senior Certificate Group**":  Any of (a) the Class 1-A1A, Class 1-A1B, Class X-1, Class PO-1 and Class A-R Certificates with respect to Loan Group 1 and (b) the Class 2-A1A1, Class 2-A1A2, Class 2-A1B, Class 2-A1C, Class X-1 and Class PO-1 Certificates with respect to Loan Group 2 and (c) the Class 3-A1A1, Class 3-A1A2, Class 3-A1B, Class 3-A1C, Class X-3A, Class X-3B, Class PO-3A and Class PO-3B Certificates with respect to Loan Group 3.

"**Senior Certificateholder**":  Any Holder of a Senior Certificate.

"**Senior Credit Support Depletion Date**":  The date on which the Class Certificate Principal Balance of each Class of Subordinate Certificates has been reduced to zero.

"**Senior Percentage**":  With respect to each Loan Group and any Distribution Date, the percentage equivalent of a fraction the numerator of which is the aggregate of the Class Certificate Principal Balances and Component Principal Balances of the Classes of Senior Certificates and Principal-Only Components relating to that Loan Group immediately prior to such Distribution Date and the denominator of which is the Loan Group Balance in the related Loan Group for such Distribution Date; *provided, however*, that on any Distribution Date after a Senior Termination Date has occurred with respect to the Senior Certificates and Principal-Only Component related to a Loan Group, the Senior Percentage for the related Loan Group will be equal to 0% and; *provided, further*, that on any Distribution Date after a Senior Termination Date has occurred with respect to the Senior Certificates and Principal-Only Component related to one Loan Group, the Senior Percentage of the Loan Group related to the remaining Senior Certificates and Principal-Only Component is the percentage equivalent of a fraction, the numerator of which is the aggregate of the Certificate Principal Balances of each remaining Class of Senior Certificates and Principal-Only Component immediately prior to such date and the denominator of which is the aggregate of the Certificate Principal Balances of all Classes of Certificates, immediately prior to such date.

62

"**Senior Prepayment Percentage**":  With respect to each Loan Group and any Distribution Date before the Distribution Date in November 2015, 100%.  Except as provided herein, the Senior Prepayment Percentage for each Loan Group for any Distribution Date occurring on or after the tenth anniversary of the first Distribution Date will be as follows: (i) from November 2015 through October 2016, the related Senior Percentage plus 70% of the related Subordinate Percentage for that Distribution Date; (ii) from November 2016 through October 2017, the related Senior Percentage plus 60% of the related Subordinate Percentage for that Distribution Date; (iii) from November 2017 through October 2018, the related Senior Percentage plus 40% of the related Subordinate Percentage for that Distribution Date; (iv) from November 2018 through October 2019, the related Senior Percentage plus 20% of the related Subordinate Percentage for that Distribution Date; and (v) from and after November 2019, the related Senior Percentage for that Distribution Date; *provided, however,* that there shall be no reduction in the Senior Prepayment Percentage for any Loan Group unless the Step Down Conditions are satisfied; and *provided, further,* that if on any Distribution Date occurring on or after the Distribution Date in November 2019, the Senior Percentage for any Loan Group exceeds the initial Senior Percentage for such Loan Group, the related Senior Prepayment Percentage for that Distribution Date will again equal 100%.

Notwithstanding the above, (i) if on any Distribution Date prior to November 2008 the Two Times Test for such Loan Group is satisfied, the Senior Prepayment Percentage for each Loan Group will equal the related Senior Percentage for such Distribution Date plus 50% of the related Subordinate Percentage for such Distribution Date and (ii) if on any Distribution Date in or after November 2008 the applicable Two Times Test is satisfied, the Senior Prepayment Percentage for each Loan Group will equal the related Senior Percentage for such Distribution Date.

"**Senior Principal Distribution Amount**":  With respect to each Loan Group and any Distribution Date, the sum of:

(1)      the related Senior Percentage of all amounts described in clauses (a) through (d) of the definition of "Principal Distribution Amount" with respect to such Loan Group for that Distribution Date;

(2)      with respect to each Mortgage Loan in that Loan Group which became a Liquidated Mortgage Loan during the related Prepayment Period, the lesser of

(x)      the related Senior Percentage of the Stated Principal Balance of that Mortgage Loan; and

(y)      the related Senior Prepayment Percentage of the amount of the Net Liquidation Proceeds allocable to principal received with respect to that Mortgage Loan

(3)      the related Senior Prepayment Percentage of the amounts described in clauses (f) and (g) of the definition of "Principal Distribution Amount" with respect to such Loan Group.

63

"**Senior Termination Date**": For each Senior Certificate Group and Principal-Only Component, the Distribution Date on which the aggregate of the Class Certificate Principal Balances and related Component Principal Balance of the related Senior Certificates and Principal-Only Component is reduced to zero.

"**Servicer**": Each of GMAC and Washington Mutual, as primary servicers of the Mortgage Loans as set forth and as individually defined in the Mortgage Loan Schedule hereto and any successors thereto.

"**Servicer Remittance Date**": The "Remittance Date" defined in the Servicing Agreement.

"**Servicing Account**": Any account established and maintained by the Servicers with respect to the related Mortgage Loans and any REO Property, pursuant to the terms of the Servicing Agreements.

"**Servicing Addendum**": As defined in the Servicing Agreements.

"**Servicing Advances**": With respect to the Master Servicer and the Servicers, all customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Master Servicer or the Servicers in the performance of its servicing obligations hereunder, including, but not limited to, the cost of (i) the preservation, restoration, inspection and protection of the Mortgaged Property, (ii) any enforcement or judicial proceedings, including foreclosures, (iii) the management and liquidation of the REO Property and (iv) compliance with the obligations under Article III hereof or the Servicing Agreements.

"**Servicing Agreement**": Each of (i) the GMAC Sale and Servicing Agreement relating to the Mortgage Loans as set forth in Exhibit M hereto, as reconstituted by the Reconstituted Servicing Agreement, and any other servicing agreement entered into between a successor Servicer, the Master Servicer and the Seller or the Trustee on behalf of the Trust pursuant to the terms hereof (ii) the GMAC Sub-Servicing Agreement relating to the Mortgage Loans as set forth in Exhibit M hereto, as reconstituted by the Reconstituted Servicing Agreement, and any other servicing agreement entered into between a successor Servicer, the Master Servicer and the Seller or the Trustee on behalf of the Trust pursuant to the terms hereof and (iii) Washington Mutual Servicing Agreement relating to the Mortgage Loans as set forth in Exhibit M hereto, as reconstituted by the Reconstituted Servicing Agreement, and any other servicing agreement entered into between a successor Servicer, the Master Servicer and the Seller or the Trustee on behalf of the Trust pursuant to the terms hereof.

"**Servicing Fee**": With respect to the each Servicer and each Mortgage Loan serviced by such Servicer and for any calendar month, the fee payable to the Servicer determined pursuant to the applicable Servicing Agreement.

"**Servicing Fee Rate**": With respect to each Mortgage Loan other than any SRO Mortgage Loan, the per annum servicing fee rate set forth on the Mortgage Loan Schedule. With respect to any SRO Mortgage Loan, the applicable Subservicing Fee Rate.

64

"**Servicing Officer**": Any officer of the Master Servicer or the Servicers involved in, or responsible for, the administration and servicing (or master servicing) of Mortgage Loans, whose name and specimen signature appear on a list of servicing officers furnished by the Master Servicer to the Trustee and the Depositor on the Closing Date, as such list may from time to time be amended.

"**Servicing Rights**": With respect to any SRO Mortgage Loan, any and all of the following: (a) the right, under each Servicing Agreement, to terminate the related SRO Servicer as servicer of the Mortgage Loan, with or without cause, subject to Section 3.03 of this Agreement; (b) the right, under each Servicing Agreement, to transfer the Servicing Rights and/or all servicing obligations with respect to such Mortgage Loan, subject to Section 3.03 of this Agreement; (c) the right to the GMACM Subservicing Fee, subject to Section 3.03 of this Agreement and (d) all powers and privileges incident to any of the foregoing.

"**Servicing Rights Owner**": With respect to the SRO Mortgage Loans, GCFP or any successor or assign of GCFP.

"**Sierra Pacific**": Sierra Pacific Mortgage, Inc., and its successors and assigns, in its capacity as Originator of the Sierra Pacific Mortgage Loans.

"**Sierra Pacific Mortgage Loans**": The Mortgage Loans for which Sierra Pacific is listed as "Originator" on the Mortgage Loan Schedule.

"**Sierra Pacific Purchase Agreement**": The Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of July 1, 2003, between GCFP, as purchaser, and Sierra Pacific, as seller, as the same may be amended from time to time, and any assignments and conveyances related to the Sierra Pacific Mortgage Loans.

"**SRO Mortgage Loans**": The Mortgage Loans for which GMAC is the SRO Servicer and GCFP is the Servicing Rights Owner, and which are identified in the Mortgage Loan Schedule.

"**SRO Servicer**": GMAC in its capacity as Servicer of the SRO Mortgage Loans.

"**Startup Day**": As defined in Section 9.01(b) hereof.

"**Stated Principal Balance**": With respect to any Mortgage Loan: (a) as of the Distribution Date in November 2005, the Cut-Off Date Principal Balance of such Mortgage Loan, (b) thereafter as of any date of determination up to and including the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan would be distributed, the Cut-Off Date Principal Balance of such Mortgage Loan *minus*, in the case of each Mortgage Loan, the sum of (i) the principal portion of each Monthly Payment due on a Due Date subsequent to the Cut-Off Date, whether or not received, (ii) all Principal Prepayments received after the Cut-Off Date, to the extent distributed pursuant to Section 5.01 before such date of determination and (iii) all Liquidation Proceeds and Insurance Proceeds applied by the Servicers as recoveries of principal in accordance with the applicable provisions of the Servicing Agreement, to the extent distributed pursuant to Section 5.01 before such date of determination;

65

and (c) as of any date of determination subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan would be distributed, zero; *provided that*, such Stated Principal Balance shall be increased by the amount of any Deferred Interest added to the outstanding Principal Balance of such Mortgage Loan pursuant to the terms of the related Mortgage Note. With respect to any REO Property: (x) as of any date of determination up to and including the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such REO Property would be distributed, an amount (not less than zero) equal to the Stated Principal Balance of the related Mortgage Loan as of the date on which such REO Property was acquired on behalf of the Trust, minus the aggregate amount of REO Principal Amortization in respect of such REO Property for all previously ended calendar months, to the extent distributed pursuant to Section 5.01 before such date of determination; and (y) as of any date of determination subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such REO Property would be distributed, zero.

"**Step Down Conditions**": As of the first Distribution Date as to which any decrease in any Senior Prepayment Percentage applies and each Loan Group, (i) the outstanding Principal Balance of all Mortgage Loans in such Loan Group 60 days or more Delinquent (including related Mortgage Loans in REO and foreclosure) (averaged over the preceding six month period), as a percentage of the aggregate of the Class Certificate Principal Balances of the Classes of Subordinate Certificates related to such Loan Group on such Distribution Date, does not equal or exceed 50% and (ii) cumulative Realized Losses with respect to all of the Mortgage Loans in such Loan Group do not exceed:

- for any Distribution Date on or after the tenth anniversary of the first Distribution Date, 30% of the aggregate Certificate Principal Balance of the related Subordinate Certificates as of the Closing Date,

- for any Distribution Date on or after the eleventh anniversary of the first Distribution Date, 35% of the aggregate Certificate Principal Balance of the related Subordinate Certificates as of the Closing Date,

- for any Distribution Date on or after the twelfth anniversary of the first Distribution Date, 40% of the aggregate Certificate Principal Balance of the related Subordinate Certificates as of the Closing Date,

- for any Distribution Date on or after the thirteenth anniversary of the first Distribution Date, 45% of the aggregate Certificate Principal Balance of the related Subordinate Certificates as of the Closing Date, and

- for any Distribution Date on or after the fourteenth anniversary of the first Distribution Date, 50% of the aggregate Certificate Principal Balance of the related Subordinate Certificates as of the Closing Date.

"**Strike Rate**": With respect to any Distribution Date and the Yield Maintenance Agreement, the strike rate listed on Schedule III hereto.

165371 Harborview 2005-15
Pooling and Servicing Agreement

"**Subordinate Adjusted Cap Rate**": For any Distribution Date, the weighted average of the Group 1 Adjusted Cap Rate, the Group 2 Adjusted Cap Rate and the Group 3 Adjusted Cap Rate for such Distribution Date (computed without regard to the adjustments applicable to the Class 1-A1B Certificates), weighted on the basis of the Subordinate Component for Loan Group 1, Loan Group 2 and Loan Group 3 for such Distribution Date.

"**Subordinate Adjusted Net WAC**": For any Distribution Date, the weighted average of the Group 1 Adjusted Net WAC, the Group 2 Adjusted Net WAC and the Group 3 Adjusted Net WAC for such Distribution Date, weighted on the basis of the Subordinate Component for Loan Group 1, Loan Group 2 and Loan Group 3 for such Distribution Date.

"**Subordinate Certificate**": Any one of the Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7, Class B-8, Class B-9, Class B-10, Class B-11 or Class B-12 Certificates.

"**Subordinate Class Expense Share**": For each Class of Subordinate Certificates and each Accrual Period, the Subordinate Class Expense Share shall be allocated in reverse order of their respective numerical Class designations (beginning with the Class of Subordinate Certificates with the highest numerical Class designation) and will be an amount equal to (i) the sum of, without duplication, (a) the amounts paid to the Trustee from the Trust Fund during such Accrual Period pursuant to Section 8.05 hereof to the extent such amounts were paid for ordinary or routine expenses and were not taken into account in computing the Net Loan Rate of any Mortgage Loan and (b) amounts described in clause (y) of the definition of Available Funds herein to the extent such amounts were paid for ordinary or routine expenses and were not taken into account in computing the Net Mortgage Rate of any Mortgage Loan *minus* (ii) amounts taken into account under clause (i) of this definition in determining the Subordinate Class Expense Share of any Class of Subordinate Certificates having a higher numeric designation. In no event, however, shall the Subordinate Class Expense Share for any Class of Subordinate Certificates and any Accrual Period exceed the product of (i) (a) the lesser of the Pass-Through Rate for such Class or the Subordinate Adjusted Cap Rate, divided by (b) 12 and (ii) the Class Certificate Principal Amount of such Class of Subordinate Certificates as of the beginning of the related Accrual Period.

"**Subordinate Component**": With respect to each Loan Group and any Distribution Date, the excess of the related Loan Group Balance for such Distribution Date over the aggregate Class Certificate Principal Balance of the related Senior Certificate Group immediately preceding such Distribution Date. The designation "1," "2" and "3" appearing after the corresponding Loan Group designation is used to indicate a Subordinate Component allocable to Loan Group 1, Loan Group 2 and Loan Group 3, respectively.

"**Subordinate Net WAC**": For any Distribution Date, the weighted average of the Group 1 Net WAC, the Group 2 Net WAC and the Group 3 Net WAC for such Distribution Date, weighted on the basis of the Subordinate Component for Loan Group 1, Loan Group 2 and Loan Group 3 for such Distribution Date.

"**Subordinate Net WAC Cap**": With respect to the Subordinate Certificates and any Distribution Date, the weighted average of the Group 1 Net WAC Cap, the Group 2 Net WAC

67

Cap and the Group 3 Net WAC Cap; *provided*, that the Group 1 Net WAC Cap is computed without regard to the adjustments applicable to the Class 1-A1B Certificates, weighted on the basis of the Subordinate Component for each Loan Group.

"**Subordinate Percentage**": With respect to each Loan Group and any Distribution Date, the difference between 100% and the related Senior Percentage for such Loan Group and Distribution Date; *provided, however*, that on any Distribution Date occurring after a Senior Termination Date has occurred with respect to the Senior Certificates and Principal-Only Components related to two Loan Groups, the Subordinate Percentage will represent the entire interest of the Subordinate Certificates in the Mortgage Loans and will equal the difference between 100% and the related Senior Percentage for such Distribution Date.

"**Subordinate Prepayment Percentage**": With respect to each Loan Group and any Distribution Date, the difference between 100% and the related Senior Prepayment Percentage for such Distribution Date.

"**Subordinate Principal Distribution Amount**": With respect to each Loan Group and any Distribution Date, an amount equal to the sum of for all Loan Groups:

(1)    the related Subordinate Percentage of all amounts described in clauses (a) through (d) of the definition of "Principal Distribution Amount" for that Loan Group and Distribution Date;

(2)    with respect to each Mortgage Loan in such Loan Group that became a Liquidated Mortgage Loan during the related Prepayment Period, the amount of the Net Liquidation Proceeds allocated to principal received with respect thereto remaining after application thereof pursuant to clause (2) of the definition of "Senior Principal Distribution Amount" for that Loan Group and Distribution Date, up to the related Subordinate Percentage of the Stated Principal Balance of such Mortgage Loan; and

(3)    the related Subordinated Prepayment Percentage of all amounts described in clause (f) of the definition of "Principal Distribution Amount" for such Loan Group and Distribution Date;

*provided, however*, that on any Distribution Date occurring after a Senior Termination Date has occurred with respect to the Senior Certificates and Principal-Only Component related to two Loan Groups, the Subordinate Principal Distribution Amount will not be calculated by Loan Group but will equal the amount calculated pursuant to the formula set forth above based on the applicable Subordinate Percentage or Subordinate Prepayment Percentage, as applicable, for such Distribution Date with respect to all the Mortgage Loans rather than the Mortgage Loans in the related Loan Group only.

"**Subservicing Fee**": For any SRO Mortgage Loan, an amount equal to (a) one-twelfth the product of (i) the Subservicing Fee Rate and (ii) the Stated Principal Balance of such SRO Mortgage Loan as of the first day of the related month.

"**Subservicing Fee Rate**": For any SRO Mortgage Loan serviced by GMAC on behalf of the Trust Fund, the "GMACM Subservicing Fee Rate" as defined in the GMAC Reconstituted Servicing Agreement reconstituting the GMAC Sub-Servicing Agreement. For any SRO Mortgage Loan serviced by any successor Servicer pursuant to Section 3.03(f) of this Agreement, the subservicing fee as set forth in the related Servicing Agreement for such successor Servicer.

"**Substitution Adjustment**": As defined in Section 2.03(d) hereof.

"**Tax Returns**": The federal income tax return on Internal Revenue Service Form 1066, U.S. Real Estate Mortgage Investment Conduit Income Tax Return, including Schedule Q thereto, Quarterly Notice to Residual Interest Holders of the REMIC Taxable Income or Net Loss Allocation, or any successor forms, to be filed on behalf of every REMIC created hereunder under the REMIC Provisions, together with any and all other information reports or returns that may be required to be furnished to the Certificateholders or filed with the Internal Revenue Service or any other governmental taxing authority under any applicable provisions of federal, state or local tax laws.

"**Termination Price**": As defined in Section 10.01(a) hereof.

"**Transfer**": Any direct or indirect transfer or sale of any Ownership Interest in a Residual Certificate.

"**Transfer Affidavit**": As defined in Section 6.02(e)(ii) hereof.

"**Transferee**": Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

"**Trust**": HarborView Mortgage Loan Trust 2005-15, the trust created hereunder.

"**Trust Fund**": The segregated pool of assets subject hereto, constituting the primary trust created hereby and to be administered hereunder, with respect to which a REMIC election is to be made, such Trust Fund consisting of: (i) such Mortgage Loans as from time to time are subject to this Agreement, together with the Mortgage Files relating thereto, and together with all collections thereon and proceeds thereof, excluding Prepayment Penalty Amounts, (ii) any REO Property, together with all collections thereon and proceeds thereof, (iii) the Trustee's rights with respect to the Mortgage Loans under all insurance policies required to be maintained pursuant to this Agreement and any proceeds thereof, (iv) the Depositor's rights under the Mortgage Loan Purchase Agreement (including any security interest created thereby); (v) the Distribution Account (subject to the last sentence of this definition), any REO Account and such assets that are deposited therein from time to time and any investments thereof, together with any and all income, proceeds and payments with respect thereto; (vi) all right, title and interest of the Seller in and to the Servicing Agreement; (vii) the Basis Risk Reserve Fund and the Yield Maintenance Account; (viii) the rights of the Trust under the Yield Maintenance Agreements, (ix) the Certificate Insurance Policy and (x) all proceeds of the foregoing. Notwithstanding the foregoing, however, the Trust Fund specifically excludes (1) all payments and other collections of interest and principal due on the Mortgage Loans on or before the Cut-Off Date and principal

69

received before the Cut-Off Date (except any principal collected as part of a payment due after the Cut-Off Date), (2) all income and gain realized from Permitted Investments of funds on deposit in the Distribution Account and (3) all Servicing Rights with respect to the SRO Mortgage Loans.

"**Trustee**": Deutsche Bank National Trust Company, its successors and assigns, or any successor trustee appointed as provided herein.

"**Two Times Test**": As to any Distribution Date, (i) the Aggregate Subordinate Percentage is at least two times the Aggregate Subordinate Percentage as of the Closing Date; (ii) the aggregate of the Principal Balances of all Mortgage Loans Delinquent 60 days or more (including Mortgage Loans in REO and foreclosure) (averaged over the preceding six-month period), as a percentage of the aggregate of the Class Certificate Principal Balances of the Subordinate Certificates, does not equal or exceed 50%; and (iii) on or after the Distribution Date in November 2008, cumulative Realized Losses do not exceed 30% of the Original Subordinated Principal Balance or prior to the Distribution Date in November 2008, cumulative Realized Losses do not exceed 20% of the Original Subordinated Principal Balance.

"**Undercollateralized Group**": With respect to any Distribution Date and any Loan Group, as to which the aggregate Class Certificate Principal Balance and Component Principal Balance of the related classes of Senior Certificates and Principal-Only Component, after giving effect to distributions pursuant to Section 5.01(a) on such date, is greater than the Loan Group Balance of the related Loan Group for such Distribution Date.

"**Underwriter's Exemption**": Prohibited Transaction Exemption 90-59 (Exemption Application No. D-8374), as amended by Prohibited Transaction Exemption 97-34 (Exemption Application Nos. D-10245 and D-10246), as amended by Prohibited Transaction Exemption 2000-58 (Exemption Application No. D-10829) and as amended by Prohibited Transaction Exemption 2002-41 (Exemption Application No. D-11077) (or any successor thereto), or any substantially similar administrative exemption granted by the U.S. Department of Labor.

"**Uninsured Cause**": Any cause of damage to a Mortgaged Property such that the complete restoration of such property is not fully reimbursable by the hazard insurance policies required to be maintained on such Mortgaged Property.

"**United States Person**" or "**U.S. Person**": A "United States person" within the meaning set forth in Section 7701(a)(30) of the Code or successor provisions.

"**Unpaid Interest Shortfall Amount**": With respect to each Class of Certificates (other than the Class PO Certificates and the Class 1-P, Class 2-P, Class 3-P, Class ES and Class A-R-II Certificates), and (i) the first Distribution Date, zero, and (ii) any Distribution Date after the first Distribution Date, the amount, if any, by which (1)(a) the Monthly Interest Distributable Amount for that Class for the immediately preceding Distribution Date exceeds (b) the aggregate amount distributed on that Class in respect of such Monthly Interest Distributable Amount on the preceding Distribution Date plus (2) any such shortfalls remaining unpaid from prior Distribution Dates.

"**Upper Tier REMIC**":  As described in the Preliminary Statement.

"**Value**":  With respect to any Mortgage Loan and the related Mortgaged Property, the lesser of:

> (i)     the value of such Mortgaged Property as determined by an appraisal made for the originator of the Mortgage Loan at the time of origination of the Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac; and

> (ii)    the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Mortgage Loan;

*provided, however*, that in the case of a Refinancing Mortgage Loan, such value of the Mortgaged Property is based solely upon the value determined by an appraisal made for the originator of such Refinancing Mortgage Loan at the time of origination by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac.

"**Voting Rights**":  The portion of the voting rights of all of the Certificates which is allocated to any Certificate.  91% of the voting rights shall be allocated among the Classes of Regular Certificates (other than the Class X-1, Class X-2, Class X-3A, Class X-3B, Class X-B, Class 1-P, Class 2-P, Class 3-P, Class ES, Class A-R and Class A-R-II Certificates), *pro rata*, based on a fraction, expressed as a percentage, the numerator of which is the Class Certificate Principal Balance of such Class and the denominator of which is the aggregate of the Class Certificate Principal Balances then outstanding; 1% of the voting rights shall be allocated to the Class X-1 Certificates, 1% of the voting rights shall be allocated to the Class X-2 Certificates, 1% of the voting rights shall be allocated to the Class X-3A Certificates, 1% of the voting rights shall be allocated to the Class X-3B Certificates, 1% of the voting rights shall be allocated to the Class X-B Certificates, 1% of the voting rights shall be allocated to the Class 1-P Certificate, 1% of the voting rights shall be allocated to the Class 2-P Certificate, 1% of the voting rights shall be allocated to the Class 3-P Certificate and 1% of the voting rights shall be allocated to the Class A-R Certificate; *provided, however*, that when none of the Regular Certificates is outstanding, 100% of the voting rights shall be allocated to the Holder of the Class A-R Certificate.  The voting rights allocated to a Class of Certificates shall be allocated among all Holders of such Class, *pro rata*, based on a fraction the numerator of which is the Certificate Principal Balance or Certificate Notional Balance, as applicable, of each Certificate of such Class and the denominator of which is the Class Certificate Principal Balance or Class Certificate Notional Balance, as applicable, of such Class; *provided, however*, that any Certificate registered in the name of the Master Servicer, the Securities Administrator or the Trustee or any of their affiliates shall not be included in the calculation of Voting Rights.  No voting rights shall be allocated to the Class A-R-II Certificate or the Class ES Certificates.

"**Washington Mutual**":  Washington Mutual Bank, and its successors and assigns, in its capacity as servicer of the Mortgage Loans as set forth and as individually defined in the Mortgage Loan Schedule hereto and in its capacity as Originator of the Washington Mutual Mortgage Loans, as applicable

"**Washington Mutual Mortgage Loans**": The Mortgage Loans for which Washington Mutual is listed as "Originator" on the Mortgage Loan Schedule.

"**Washington Mutual Purchase Agreement**": The Mortgage Loan Purchase and Sale Agreement, dated as of June 1, 2004, between GCFP, as purchaser, and Washington Mutual, Washington Mutual Bank FA and Washington Mutual Bank fsb, as sellers, as the same may be amended from time to time, and any assignments and conveyances related to the Washington Mutual Mortgage Loans.

"**Writedown Amount**": The reduction described in Section 5.03(c).

"**X-1 Required Reserve Fund Deposit**": With respect to the Class X-1 Certificates and any Distribution Date, an amount equal to the lesser of (i) the Interest Distributable Amount for the Class X-1 Certificates for such Distribution Date (after giving effect to such Certificate's share of any Net Deferred Interest and after any reduction in the Interest Distributable Amount due to Net Interest Shortfalls on such Distribution Date) and (ii) the amount required to bring the balance on deposit in the Basis Risk Reserve Fund X-1 Subaccount up to an amount equal to the Basis Risk Shortfalls for such Distribution Date with respect to the Class 1-A1A and Class 1-A1B Certificates (after giving effect to distributions of payments made pursuant to the Yield Maintenance Agreement).

"**X-2 Required Reserve Fund Deposit**": With respect to the Class X-2 Certificates and any Distribution Date, an amount equal to the lesser of (i) the Interest Distributable Amount for the Class X-2A Certificates for such Distribution Date (after giving effect to such Certificate's share of any Net Deferred Interest and after any reduction in the Interest Distributable Amount due to Net Interest Shortfalls on such Distribution Date) and (ii) the amount required to bring the balance on deposit in the Basis Risk Reserve Fund X-2 Subaccount up to an amount equal to the Basis Risk Shortfalls for such Distribution Date with respect to the Class 2-A1A1, Class 2-A1A2, Class 2-A1B and Class 2-A1C Certificates (after giving effect to distributions of payments made pursuant to the Yield Maintenance Agreement).

"**X-3A Required Reserve Fund Deposit**": With respect to the Class X-3A Certificates and any Distribution Date, an amount equal to the lesser of (i) the Interest Distributable Amount for the Class X-3A Certificates for such Distribution Date (after giving effect to such Certificate's share of any Net Deferred Interest and after any reduction in the Interest Distributable Amount due to Net Interest Shortfalls on such Distribution Date) and (ii) the amount required to bring the balance on deposit in the Basis Risk Reserve Fund X-3A Subaccount up to an amount equal to the Basis Risk Shortfalls for such Distribution Date with respect to the Class 3-A1A1 Certificates.

"**X-3B Required Reserve Fund Deposit**": With respect to the Class X-2B Certificates and any Distribution Date, an amount equal to the lesser of (i) the Interest Distributable Amount for the Class X-3B Certificates for such Distribution Date (after giving effect to such Certificate's share of any Net Deferred Interest and after any reduction in the Interest Distributable Amount due to Net Interest Shortfalls on such Distribution Date) and (ii) the amount required to bring the balance on deposit in the Basis Risk Reserve Fund X-3B Subaccount up to an amount equal to the Basis Risk Shortfalls for such Distribution Date with

72

respect to the Class 3-A1A2, Class 3-A1B and Class 3-A1C Certificates (after giving effect to distributions of payments made pursuant to the Yield Maintenance Agreement).

"**X-B Required Reserve Fund Deposit**": With respect to the Class X-B Certificates and any Distribution Date, an amount equal to the lesser of (i) the Interest Distributable Amount for the Class X-B Certificates for such Distribution Date (after giving effect to such Certificate's share of any Net Deferred Interest and after any reduction in the Interest Distributable Amount due to Net Interest Shortfalls on such Distribution Date) and (ii) the amount required to bring the balance on deposit in the Basis Risk Reserve Fund X-B Subaccount up to an amount equal to the Basis Risk Shortfalls for such Distribution Date with respect to the Subordinate Certificates.

"**Yield Maintenance Account**": The separate trust account maintained and held by the Securities Administrator pursuant to Section 4.04, which account shall bear a designation clearly indicating that the funds deposited therein are held in trust for the benefit of the Trust on behalf of the holders of the Yield Maintenance Certificates, and which account provides that the Securities Administrator may make, or cause to be made, withdrawals therefrom in accordance with Section 4.04.

"**Yield Maintenance Agreement**": Each of the four transactions evidenced by the confirmation dated October 31, 2005 together with any other related documents thereto, between the Yield Maintenance Provider and the Trust. The Yield Maintenance Agreements will be for the benefit of (i) the Class 1-A1A Certificates, (ii) the Class 1-A1B Certificates, (iii) the Class 2-A1A1, Class 2-A1A2, Class 2-A1B and Class 2-A1C Certificates and (iv) the Class 3-A1A2, Class 3-A1B and Class 3-A1C Certificates.

"**Yield Maintenance Certificates**": Each of the Class 1-A1A, Class 1-A1B, Class 2-A1A1, Class 2-A1A2, Class 2-A1B, Class 2-A1C, Class 3-A1A2, Class 3-A1B and Class 3-A1C Certificates.

"**Yield Maintenance Distributable Amount**": With respect to each Distribution Date and the Yield Maintenance Certificates, an amount equal to the product of (i) the excess, if any, of (x) LIBOR, subject to a maximum of 11.00%, over (y) the applicable Strike Rate, (ii) the related Yield Maintenance Notional Balance and (iii) a fraction, the numerator of which is the actual number days in the related interest Accrual Period and the denominator of which is 360.

"**Yield Maintenance Notional Balance**": For each Yield Maintenance Agreement and any Distribution Date, the lesser of (i) the amount set forth on Schedule III hereto for the applicable Class or Classes of Certificates and (ii) the aggregate Class Certificate Principal Balance of the related Yield Maintenance Certificates.

"**Yield Maintenance Payment**": The payment remitted to the Securities Administrator by the Yield Maintenance Provider under the Yield Maintenance Agreement.

"**Yield Maintenance Provider**": The Bank of New York.

SECTION 1.02. Accounting.

Unless otherwise specified herein, for the purpose of any definition or calculation, whenever amounts are required to be netted, subtracted or added or any distributions are taken into account such definition or calculation and any related definitions or calculations shall be determined without duplication of such functions.

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
ORIGINAL ISSUANCE OF CERTIFICATES

SECTION 2.01. Conveyance of Mortgage Loans.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage Loan Schedule, including the related Cut-Off Date Principal Balance, all interest due thereon after the Cut-Off Date and all collections in respect of interest and principal due after the Cut-Off Date; (ii) all the Depositor's right, title and interest in and to the Distribution Account and all amounts from time to time credited to and the proceeds of the Distribution Account; (iii) any real property that secured each such Mortgage Loan and that has been acquired by foreclosure or deed in lieu of foreclosure; (iv) the Depositor's interest in any insurance policies in respect of the Mortgage Loans; (v) all proceeds of any of the foregoing; and (vi) all other assets included or to be included in the Trust Fund; *provided* that such assignment shall not include any Servicing Rights with respect to the SRO Mortgage Loans. Such assignment includes all interest and principal due to the Depositor or the Master Servicer after the Cut-Off Date with respect to the Mortgage Loans. In addition, on or prior to the Closing Date, the Depositor shall cause the Yield Maintenance Provider to enter into the Yield Maintenance Agreement with the Securities Administrator. The Depositor hereby directs the Securities Administrator to execute, not in its individual capacity, but solely as Securities Administrator on behalf of the Trust, and deliver the Yield Maintenance Agreement.

It is agreed and understood by the Depositor, the Seller and the Trustee that it is not intended that any Mortgage Loan be included in the Trust Fund that is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act, effective as of November 27, 2003, or The Home Loan Protection Act of New Mexico, effective as of January 1, 2004, or that is a "High Cost Home Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act, effective as of November 7, 2004, or that is an "Indiana High Cost Home Mortgage Loan" as defined in the Indiana High Cost Home Loan Act, effective as of January 1, 2005.

Notwithstanding anything provided herein to the contrary, each of the parties hereto agrees and acknowledges that, notwithstanding the transfer, conveyance and assignment of the Mortgage Loans from the Depositor to the Trustee pursuant to this Agreement, the Servicing

74

Rights Owner remains the sole and exclusive owner of the related Servicing Rights with respect to the SRO Mortgage Loans.

Concurrently with the execution and delivery of this Agreement, the Depositor does hereby assign to the Trustee all of its rights and interest under the Mortgage Loan Purchase Agreement, including all rights of the Seller under the Servicing Agreements and the Assignment Agreements (as defined in the Mortgage Loan Purchase Agreement), each to the extent assigned in the Mortgage Loan Purchase Agreement. The Trustee hereby accepts such assignment, and shall be entitled to exercise all rights of the Depositor under the Mortgage Loan Purchase Agreement and all rights of the Seller under each Servicing Agreement and Assignment Agreement as if, for such purpose, it were the Depositor or the Seller, as applicable, including the Seller's right to enforce remedies for breaches of representations and warranties and delivery of Mortgage Loan documents. The foregoing sale, transfer, assignment, set-over, and conveyance does not and is not intended to result in creation or assumption by the Trustee of any obligation of the Depositor, the Seller or any other Person in connection with the Mortgage Loans or any other agreement or instrument relating thereto except as specifically set forth herein.

In connection with such transfer and assignment, the Seller, on behalf of the Depositor, does hereby deliver on the Closing Date, unless otherwise specified in this Section 2.01, to, and deposit with the Trustee, or the Custodian as its designated agent, the following documents or instruments with respect to each Mortgage Loan (a "**Mortgage File**") so transferred and assigned:

(i)     the original Mortgage Note, endorsed either on its face or by allonge attached thereto in blank or in the following form: "Pay to the order of Deutsche Bank National Trust Company, as Trustee for HarborView Mortgage Loan Trust 2005-15, Mortgage Loan Pass-Through Certificates, Series 2005-15, without recourse", or with respect to any lost Mortgage Note, an original Lost Note Affidavit stating that the original mortgage note was lost, misplaced or destroyed, together with a copy of the related mortgage note; *provided, however*, that such substitutions of Lost Note Affidavits for original Mortgage Notes may occur only with respect to Mortgage Loans the aggregate Cut-Off Date Principal Balance of which is less than or equal to 2% of the Cut-Off Date Aggregate Principal Balance;

(ii)    except as provided below, for each Mortgage Loan that is not a MERS Mortgage Loan, the original Mortgage, and in the case of each MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN for that Mortgage Loan and either language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, or if such Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment to MERS, in each case with evidence of recording thereon, and the original recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon or, if such Mortgage or power of attorney has been submitted for recording but has not been returned from the applicable public recording office, has been lost or is not otherwise available, a copy of such Mortgage or power of attorney, as the case may be, together with an Officer's Certificate of the

75

Seller certifying that the copy of such Mortgage delivered to the Trustee (or its Custodian) is a true copy and that the original of such Mortgage has been forwarded to the public recording office, or, in the case of a Mortgage that has been lost, a copy thereof (certified as provided for under the laws of the appropriate jurisdiction) and a written Opinion of Counsel (delivered at the Seller's expense) acceptable to the Trustee and the Depositor that an original recorded Mortgage is not required to enforce the Trustee's interest in the Mortgage Loan;

(iii)    the original of each assumption, modification or substitution agreement, if any, relating to the Mortgage Loans, or, as to any assumption, modification or substitution agreement which cannot be delivered on or prior to the Closing Date because of a delay caused by the public recording office where such assumption, modification or substitution agreement has been delivered for recordation, a photocopy of such assumption, modification or substitution agreement, pending delivery of the original thereof, together with an officer's certificate of the Seller, title company, escrow agent or closing attorney certifying that the copy of such assumption, modification or substitution agreement delivered to the Trustee (or its Custodian) on behalf of the Trust is a true copy and that the original of such agreement has been forwarded to the public recording office;

(iv)    in the case of each Mortgage Loan that is not a MERS Mortgage Loan, an original Assignment of Mortgage, in form and substance acceptable for recording.  The Mortgage shall be assigned to "Deutsche Bank National Trust Company, as Trustee for HarborView Mortgage Loan Trust 2005-15, Mortgage Loan Pass-Through Certificates, Series 2005-15, without recourse;"

(v)    in the case of each Mortgage Loan that is not a MERS Mortgage Loan, an original copy of any intervening Assignment of Mortgage showing a complete chain of assignments, or, in the case of an intervening Assignment of Mortgage that has been lost, a written Opinion of Counsel (delivered at the Seller's expense) acceptable to the Trustee that such original intervening Assignment of Mortgage is not required to enforce the Trustee's interest in the Mortgage Loans;

(vi)    the original Primary Insurance Policy, if any, or certificate, if any;

(vii)    the original or a certified copy of lender's title insurance policy; and

(viii)    with respect to any Cooperative Loan, the Cooperative Loan Documents.

In connection with the assignment of any MERS Mortgage Loan, the Seller agrees that it will take (or shall cause the applicable Servicer to take), at the expense of the Seller (with the cooperation of the Depositor, the Trustee and the Master Servicer), such actions as are necessary to cause the MERS® System to indicate that such Mortgage Loans have been assigned by the Seller to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans that are repurchased in accordance with this Agreement) in such computer files the information required by the MERS® System to

76

identify the series of the Certificates issued in connection with the transfer of such Mortgage Loans to the HarborView Mortgage Loan Trust 2005-15.

With respect to each Cooperative Loan the Seller, on behalf of the Depositor does hereby deliver to the Trustee the related Cooperative Loan Documents and the Seller will take (or cause the applicable Servicer to take), at the expense of the Seller (with the cooperation of the Depositor, the Trustee and the Master Servicer), such actions as are necessary under applicable law (including but not limited to the relevant UCC) in order to perfect the interest of the Trustee in the related Mortgaged Property.

Assignments of each Mortgage with respect to each Mortgage Loan that is not a MERS Mortgage Loan (other than a Cooperative Loan) shall be recorded; *provided, however*, that such assignments need not be recorded if, in the Opinion of Counsel (which must be from Independent Counsel and not at the expense of the Trust or the Trustee) acceptable to the Trustee, the Rating Agency and the Master Servicer, recording in such states is not required to protect the Trustee's interest in the related Mortgage Loans; *provided, further*, notwithstanding the delivery of any Opinion of Counsel, each assignment of Mortgage shall be submitted for recording by the Seller (or the Seller will cause the applicable Servicer to submit each such assignment for recording), at the cost and expense of the Seller, in the manner described above, at no expense to the Trust or Trustee, upon the earliest to occur of (1) reasonable direction by the Majority Certificateholders, (2) the occurrence of a bankruptcy or insolvency relating to the Seller or the Depositor, or (3) with respect to any one Assignment of Mortgage, the occurrence of a bankruptcy, insolvency or foreclosure relating to the Mortgagor under the related Mortgage. Subject to the preceding sentence, as soon as practicable after the Closing Date (but in no event more than three months thereafter except to the extent delays are caused by the applicable recording office), the Seller shall properly record (or the Seller will cause the applicable Servicer to properly record), at the expense of the Seller (with the cooperation of the Depositor, the Trustee and the Master Servicer), in each public recording office where the related Mortgages are recorded, each assignment referred to in Section 2.01(v) above with respect to a Mortgage Loan that is not a MERS Mortgage Loan.

The Trustee agrees to execute and deliver to the Depositor on or prior to the Closing Date an acknowledgment of receipt of the original Mortgage Note (with any exceptions noted), substantially in the form attached as Exhibit G-1 hereto.

If the original lender's title insurance policy, or a certified copy thereof, was not delivered pursuant to Section 2.01(x) above, the Seller shall deliver or cause to be delivered to the Trustee the original or a copy of a written commitment or interim binder or preliminary report of title issued by the title insurance or escrow company, with the original or a certified copy thereof to be delivered to the Trustee, promptly upon receipt thereof, but in any case within 175 days of the Closing Date. The Seller shall deliver or cause to be delivered to the Trustee, promptly upon receipt thereof, any other documents constituting a part of a Mortgage File received with respect to any Mortgage Loan sold to the Depositor by the Seller, including, but not limited to, any original documents evidencing an assumption or modification of any Mortgage Loan.

77

For Mortgage Loans (if any) that have been prepaid in full after the Cut-off Date and prior to the Closing Date, in lieu of the Seller delivering the above documents, the Master Servicer shall deliver to the Trustee, or to the Custodian on behalf of the Trustee, prior to the first Distribution Date, an Officer's Certificate, based on information provided to the Master Servicer from the Servicers, which shall include a statement to the effect that all amounts received in connection with such prepayment that are required to be deposited in the Distribution Account have been so deposited.  All original documents that are not delivered to the Trustee on behalf of the Trust shall be held by the Master Servicer or the applicable Servicer in trust for the Trustee, for the benefit of the Trust and the Certificateholders.

The Depositor herewith delivers to the Trustee an executed copy of the Mortgage Loan Purchase Agreement.

SECTION 2.02.  Acceptance by Trustee.

The Trustee hereby accepts its appointment as Custodian hereunder and acknowledges the receipt, subject to the provisions of Section 2.01 and subject to the review described below and any exceptions noted on the exception report described in the next paragraph below, of the documents referred to in Section 2.01 above and all other assets included in the definition of "Trust Fund" and declares that, in its capacity as Custodian, it holds and will hold such documents and the other documents delivered to it constituting a Mortgage File, and that it holds or will hold all such assets and such other assets included in the definition of "Trust Fund" in trust for the exclusive use and benefit of all present and future Certificateholders.

The Trustee further agrees, for the benefit of the Certificateholders, to review each Mortgage File delivered to it and to certify and deliver to the Depositor, the Seller and the Rating Agency an interim certification in substantially the form attached hereto as Exhibit G-2, within 90 days after the Closing Date (or, with respect to any document delivered after the Startup Day, within 45 days of receipt and with respect to any Qualified Substitute Mortgage, within five Business Days after the assignment thereof) that, as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in the exception report annexed thereto as not being covered by such certification), (i) all documents required to be delivered to it pursuant to Section 2.01 of this Agreement are in its possession, (ii) such documents have been reviewed by it and have not been mutilated, damaged or torn and relate to such Mortgage Loan and (iii) based on its examination and only as to the foregoing, the information set forth in the Mortgage Loan Schedule that corresponds to items (i), (ii) and (iii) of the Mortgage Loan Schedule accurately reflects information set forth in the Mortgage File.  It is herein acknowledged that, in conducting such review, the Trustee is under no duty or obligation to inspect, review or examine any such documents, instruments, certificates or other papers to determine that they are genuine, enforceable, or appropriate for the represented purpose or that they have actually been recorded or that they are other than what they purport to be on their face.

No later than 180 days after the Closing Date, the Trustee shall deliver to the Depositor and the Seller a final certification in the form annexed hereto as Exhibit G-3 evidencing the completeness of the Mortgage Files, with any applicable exceptions noted thereon.

78

Upon the discovery by the Seller or the Depositor (or upon receipt by the Trustee of written notification of such breach) of a breach of any of the representations and warranties made by the Seller in the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan that materially adversely affects such Mortgage Loan or the interests of the related Certificateholders or the Certificate Insurer in such Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties to this Agreement.

The Depositor and the Trustee intend that the assignment and transfer herein contemplated constitute a sale of the Mortgage Loans, the related Mortgage Notes and the related documents, conveying good title thereto free and clear of any liens and encumbrances, from the Depositor to the Trustee and that such property not be part of the Depositor's estate or property of the Depositor in the event of any insolvency by the Depositor.  In the event that such conveyance is deemed to be, or to be made as security for, a loan, the parties intend that the Depositor shall be deemed to have granted and does hereby grant to the Trustee a first priority perfected security interest in all of the Depositor's right, title and interest in and to the Mortgage Loans, the related Mortgage Notes and the related documents, and that this Agreement shall constitute a security agreement under applicable law.

SECTION 2.03.  Repurchase or Substitution of Mortgage Loans by the Originators and the Seller.

(a) Upon its discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by the related Originator of any representation, warranty or covenant under the related Purchase Agreement in respect of any Mortgage Loan which materially adversely affects the value of that Mortgage Loan or the interest therein of the Certificateholders or the Certificate Insurer, the Trustee shall promptly notify such Originator of such defect, missing document or breach and request that such Originator deliver such missing document or cure such defect or breach within 90 days from the date that the Seller was notified of such missing document, defect or breach, and if such Originator does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce such Originator's obligation under the related Purchase Agreement and cause such Originator to repurchase that Mortgage Loan from the Trust Fund at the Repurchase Price (as defined in the related Purchase Agreement) on or prior to the Determination Date following the expiration of such 90 day period.  It is understood and agreed that the obligation of the related Originator to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a document is missing, a material defect in a constituent document exists or as to which such a breach has occurred and is continuing shall constitute the sole remedy against such Originator respecting such omission, defect or breach available to the Trustee on behalf of the Certificateholders.

(b) Upon discovery or receipt of written notice of the breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement or in Section 2.04 or Section 2.08 hereof in respect of any Mortgage Loan which materially adversely affects the value of that Mortgage Loan or the interest therein of the Certificateholders or the Certificate Insurer, the Trustee (or the Custodian as its designated agent) shall promptly notify the Seller of such breach and request that the Seller cure such breach within 90 days from the

date that the Seller was notified of such breach, and if the Seller does not cure such breach in all material respects during such period, the Trustee shall enforce the Seller's obligation under the Mortgage Loan Purchase Agreement and cause the Seller to repurchase that Mortgage Loan from the Trust Fund at the Purchase Price on or prior to the Determination Date following the expiration of such 90 day period (subject to Section 2.03(e) below); *provided, however,* that, in connection with any such breach that could not reasonably have been cured within such 90 day period, if the Seller shall have commenced to cure such breach within such 90 day period, the Seller shall be permitted to proceed thereafter diligently and expeditiously to cure the same within the additional period provided under the Mortgage Loan Purchase Agreement; and, *provided further,* that, in the case of the breach of any representation, warranty or covenant made by the Seller in Section 2.04 hereof, the Seller shall be obligated to cure such breach or purchase the affected Mortgage Loans for the Purchase Price or, if the Mortgage Loan or the related Mortgaged Property acquired with respect thereto has been sold, then the Seller shall pay, in lieu of the Purchase Price, any excess of the Purchase Price over the Net Liquidation Proceeds received upon such sale.

(c) The Purchase Price or Repurchase Price (as defined in the related Purchase Agreement) for a Mortgage Loan purchased or repurchased under this Section 2.03 or such other amount due shall be deposited in the Distribution Account on or prior to the next Determination Date after the Seller's or the related Originator's obligation to repurchase such Mortgage Loan arises. The Trustee, upon receipt of written certification from the Master Servicer of the related deposit in the Distribution Account, shall release to the Seller or the related Originator, as applicable, the related Mortgage File and shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as the Seller or the related Originator, as applicable, shall furnish to it and as shall be necessary to vest in the Seller or the related Originator, as applicable, any Mortgage Loan released pursuant hereto and the Trustee shall have no further responsibility with regard to such Mortgage File (it being understood that the Trustee shall have no responsibility for determining the sufficiency of such assignment for its intended purpose). In lieu of repurchasing any such Mortgage Loan as provided above, the Seller may cause such Mortgage Loan to be removed from the Trust Fund (in which case it shall become a Deleted Mortgage Loan) and substitute one or more Qualified Substitute Mortgage Loans in the manner and subject to the limitations set forth in Section 2.03(d) below. It is understood and agreed that the obligation of the Seller to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a document is missing, a material defect in a constituent document exists or as to which such a breach has occurred and is continuing shall constitute the sole remedy against the Seller respecting such omission, defect or breach available to the Trustee on behalf of the Certificateholders.

The Trustee shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement including, without limitation, any obligation of the Seller to purchase a Mortgage Loan on account of a breach of a representation, warranty or covenant as described in this Section 2.03(b).

(d) If pursuant to the provisions of Section 2.03(b), the Seller repurchases or otherwise removes from the Trust Fund a Mortgage Loan that is a MERS Mortgage Loan, the Seller shall take (or shall cause the applicable Servicer to take), at the expense of the Seller (with the

cooperation of the Depositor, the Trustee and the Master Servicer), such actions as are necessary either (i) cause MERS to execute and deliver an Assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Seller and shall cause such Mortgage to be removed from registration on the MERS® System in accordance with MERS' rules and regulations or (ii) cause MERS to designate on the MERS® System the Seller or its designee as the beneficial holder of such Mortgage Loan.

(e) [Reserved].

(f) Any substitution of Qualified Substitute Mortgage Loans for Deleted Mortgage Loans made pursuant to Section 2.03(a) above must be effected prior to the last Business Day that is within two years after the Closing Date.  As to any Deleted Mortgage Loan for which the Seller substitutes a Qualified Substitute Mortgage Loan or Loans, such substitution shall be effected by the Seller delivering to the Custodian, on behalf of the Trustee, for such Qualified Substitute Mortgage Loan or Loans, the Mortgage Note, the Mortgage, the Assignment to the Trustee, and such other documents and agreements, with all necessary endorsements thereon, as are required by Section 2.01 hereof, together with an Officers' Certificate stating that each such Qualified Substitute Mortgage Loan satisfies the definition thereof and specifying the Substitution Adjustment (as described below), if any, in connection with such substitution; *provided, however,* that, in the case of any Qualified Substitute Mortgage Loan that is a MERS Mortgage Loan, the Seller shall provide such documents and take such other action with respect to such Qualified Substitute Mortgage Loans as are required pursuant to Section 2.01 hereof.  The Custodian, on behalf of the Trustee, shall acknowledge receipt for such Qualified Substitute Mortgage Loan or Loans and, within five Business Days thereafter, shall review such documents as specified in Section 2.02 hereof and deliver to the related Servicer, with respect to such Qualified Substitute Mortgage Loan or Loans, a certification substantially in the form attached hereto as Exhibit G-2, with any exceptions noted thereon.  Within 180 days of the date of substitution, the Custodian, on behalf of the Trustee, shall deliver to the Seller and the Master Servicer a certification substantially in the form of Exhibit G-3 hereto with respect to such Qualified Substitute Mortgage Loan or Loans, with any exceptions noted thereon.  Monthly Payments due with respect to Qualified Substitute Mortgage Loans in the month of substitution are not part of the Trust Fund and will be retained by the Seller.  For the month of substitution, distributions to Certificateholders will reflect the collections and recoveries in respect of such Deleted Mortgage Loan in the Due Period preceding the month of substitution and the Depositor or the Seller, as the case may be, shall thereafter be entitled to retain all amounts subsequently received in respect of such Deleted Mortgage Loan.  The Seller shall give or cause to be given written notice to the Certificateholders that such substitution has taken place, shall amend the Mortgage Loan Schedule to reflect the removal of such Deleted Mortgage Loan from the terms of this Agreement and the substitution of the Qualified Substitute Mortgage Loan or Loans and shall deliver a copy of such amended Mortgage Loan Schedule to the Trustee.  Upon such substitution, such Qualified Substitute Mortgage Loan or Loans shall constitute part of the Trust Fund and shall be subject in all respects to the terms of this Agreement and, in the case of a substitution effected by the Seller, the Mortgage Loan Purchase Agreement, including, in the case of a substitution effected by the Seller all representations and warranties thereof included in the Mortgage Loan Purchase Agreement and all representations and warranties thereof set forth in Section 2.04 hereof, in each case as of the date of substitution.

81

For any month in which the Seller substitutes one or more Qualified Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the Seller shall determine, and provide written certification to the Trustee and the Seller as to the amount (each, a "**Substitution Adjustment**"), if any, by which the aggregate Purchase Price of all such Deleted Mortgage Loans exceeds the aggregate, as to each such Qualified Substitute Mortgage Loan, of the principal balance thereof as of the date of substitution, together with one month's interest on such principal balance at the applicable Net Loan Rate. On or prior to the next Determination Date after the Seller's obligation to repurchase the related Deleted Mortgage Loan arises, the Seller will deliver or cause to be delivered to the Master Servicer for deposit in the Distribution Account an amount equal to the related Substitution Adjustment, if any, and the Custodian, on behalf of the Trustee, upon receipt of the related Qualified Substitute Mortgage Loan or Loans, shall release to the Seller the related Mortgage File or Files and shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as the Seller shall deliver to it and as shall be necessary to vest therein any Deleted Mortgage Loan released pursuant hereto.

In addition, the Seller shall obtain at its own expense and deliver to the Trustee and the Securities Administrator an Opinion of Counsel to the effect that such substitution (either specifically or as a class of transactions) will not cause an Adverse REMIC Event. If such Opinion of Counsel cannot be delivered, then such substitution may only be effected at such time as the required Opinion of Counsel can be given.

(g) Upon discovery by the Seller, the Depositor or the Trustee that any Mortgage Loan does not constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code, the party discovering such fact shall within two Business Days give written notice thereof to the other parties. In connection therewith, the Seller shall repurchase or, subject to the limitations set forth in Section 2.03(e), substitute one or more Qualified Substitute Mortgage Loans for the affected Mortgage Loan within 90 days of the earlier of discovery or receipt of such notice with respect to such affected Mortgage Loan. Any such repurchase or substitution shall be made in the same manner as set forth in Section 2.03(b) above, if made by the Seller. The Trustee shall reconvey to the Seller the Mortgage Loan to be released pursuant hereto in the same manner, and on the same terms and conditions, as it would a Mortgage Loan repurchased for breach of a representation or warranty.

(h) Notwithstanding the foregoing, to the extent that any fact, condition or event with respect to a Mortgage Loan constitutes a breach of both (i) a representation or warranty of the applicable Originator under the applicable Purchase Agreement and (ii) a representation or warranty of the Seller under this Agreement, in each case, which materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders or the Certificate Insurer, the Trustee shall first request that the Originator cure such breach or repurchase such Mortgage Loan and if the Originator fails to cure such breach or repurchase such Mortgage Loan within 60 days of receipt of such request from the Trustee, the Trustee shall then request that the Seller cure such breach or repurchase such Mortgage Loans.

In addition to the foregoing, within 120 days of the earlier of discovery by the Seller or receipt of notice by the Seller of (i) the breach of any representation or warranty of any Originator (other than GMAC or Washington Mutual) under the applicable Purchase Agreement which materially and adversely affects the interests of the Certificateholders or the Certificate

Insurer in any of the related SRO Mortgage Loans and for which such Originator has failed to cure such breach in accordance with the terms of the related Purchase Agreement and (ii)(a) the fact that such Originator is no longer an operating company or (b) an Officers' Certificate certifying to the fact that such Originator is financially unable to cure such breach pursuant to the terms of the Purchase Agreement, the Seller shall repurchase or substitute for such Mortgage Loan in accordance with this Section 2.03 of this Agreement. Such obligation of the Seller shall continue until such time that the Rating Agencies inform the Depositor and the Seller in writing that such obligation is no longer required in order for the Rating Agencies to maintain their then-current ratings on the Certificates and the Certificate Insurer consents in writing to the removal of such obligation.

SECTION 2.04.  Representations and Warranties of the Seller with Respect to the Mortgage Loans.

The Seller hereby makes the following representations and warranties to the Trustee on behalf of the Certificateholders and the Certificate Insurer as of the Closing Date with respect to the Mortgage Loans:

(i)    Each Mortgage Loan at the time it was made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, all applicable predatory and abusive lending laws.

(ii)    No Mortgage Loan is a "High Cost Loan" or "Covered Loan," as applicable, as such terms are defined in Standard & Poor's LEVELS® Glossary, Appendix E, in effect as of the Closing Date and no Mortgage Loan originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act;

(iii)    With respect to each representation and warranty with respect to any Mortgage Loan made by the related Originator in the related Purchase Agreement that is made as of the related Closing Date (as defined in the related Purchase Agreement), to the Seller's knowledge, no event has occurred since the related Closing Date (as defined in the related Purchase Agreement) that would render such representations and warranties to be untrue in any material respect as of the Closing Date; and

(iv)    [reserved].

With respect to the representations and warranties in this Section 2.04 that are made to the best of the Seller's knowledge or as to which the Seller has no knowledge, if it is discovered by the Depositor, the Seller, the Certificate Insurer or the Trustee that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan or the interest therein of the Certificateholders then, notwithstanding the Seller's lack of knowledge with respect to the substance of such representation and warranty being inaccurate at the time the representation or warranty was made, such inaccuracy shall be deemed a breach of the applicable representation or warranty.

It is understood and agreed that the representations and warranties in this Section 2.04 shall survive delivery of the Mortgage Files to the Trustee and shall inure to the benefit of the

83

Certificateholders notwithstanding any restrictive or qualified endorsement or assignment.  Upon discovery by any of the Depositor, the Seller, the Certificate Insurer or the Trustee of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of any Mortgage Loan or the interests therein of the Certificateholders, the party discovering such breach shall give prompt written notice to the other parties, and in no event later than two Business Days from the date of such discovery.  It is understood and agreed that the obligations of the Seller set forth in Section 2.03(b) hereof to cure, substitute for or repurchase a related Mortgage Loan pursuant to the Mortgage Loan Purchase Agreement constitute the sole remedies available to the Certificateholders or to the Trustee on their behalf respecting a breach of the representations and warranties incorporated in this Section 2.04.

SECTION 2.05.  [Reserved].

SECTION 2.06.  <u>Representations and Warranties of the Depositor</u>.

The Depositor represents and warrants to the Master Servicer, the Certificate Insurer, the Securities Administrator and the Trustee on behalf of the Certificateholders and to as follows:

(i)      this agreement constitutes a legal, valid and binding obligation of the Depositor, enforceable against the Depositor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general an except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity);

(ii)      immediately prior to the sale and assignment by the Depositor to the Trustee on behalf of the Trust of each Mortgage Loan, the Depositor had good and marketable title to each Mortgage Loan (insofar as such title was conveyed to it by the Seller) subject to no prior lien, claim, participation interest, mortgage, security interest, pledge, charge or other encumbrance or other interest of any nature;

(iii)      as of the Closing Date, the Depositor has transferred all right, title and interest in the Mortgage Loans to the Trustee on behalf of the Trust;

(iv)      the Depositor has not transferred the Mortgage Loans to the Trustee on behalf of the Trust with any intent to hinder, delay or defraud any of its creditors;

(v)      the Depositor has been duly incorporated and is validly existing as a corporation in good standing under the laws of Delaware, with full corporate power and authority to own its assets and conduct its business as presently being conducted;

(vi)      the Depositor is not in violation of its certificate of incorporation or by-laws or in default in the performance or observance of any material obligation, agreement, covenant or condition contained in any contract, indenture, mortgage, loan agreement, note, lease or other instrument to which the Depositor is a party or by which it or its properties may be bound, which default might result in any material adverse changes in the financial condition, earnings,

84

affairs or business of the Depositor or which might materially and adversely affect the properties or assets, taken as a whole, of the Depositor;

(vii)    the execution, delivery and performance of this Agreement by the Depositor, and the consummation of the transactions contemplated hereby, do not and will not result in a material breach or violation of any of the terms or provisions of, or, to the knowledge of the Depositor, constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Depositor is a party or by which the Depositor is bound or to which any of the property or assets of the Depositor is subject, nor will such actions result in any violation of the provisions of the certificate of incorporation or by-laws of the Depositor or, to the best of the Depositor's knowledge without independent investigation, any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over the Depositor or any of its properties or assets (except for such conflicts, breaches, violations and defaults as would not have a material adverse effect on the ability of the Depositor to perform its obligations under this Agreement);

(viii)    to the best of the Depositor's knowledge without any independent investigation, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body of the United States or any other jurisdiction is required for the issuance of the Certificates, or the consummation by the Depositor of the other transactions contemplated by this Agreement, except such consents, approvals, authorizations, registrations or qualifications as (a) may be required under State securities or "blue sky" laws, (b) have been previously obtained or (c) the failure of which to obtain would not have a material adverse effect on the performance by the Depositor of its obligations under, or the validity or enforceability of, this Agreement; and

(ix)    there are no actions, proceedings or investigations pending before or, to the Depositor's knowledge, threatened by any court, administrative agency or other tribunal to which the Depositor is a party or of which any of its properties is the subject: (a) which if determined adversely to the Depositor would have a material adverse effect on the business, results of operations or financial condition of the Depositor; (b) asserting the invalidity of this Agreement or the Certificates; (c) seeking to prevent the issuance of the Certificates or the consummation by the Depositor of any of the transactions contemplated by this Agreement, as the case may be; or (d) which might materially and adversely affect the performance by the Depositor of its obligations under, or the validity or enforceability of, this Agreement.

SECTION 2.07.    Issuance of Certificates.

The Trustee acknowledges the assignment to it of the Mortgage Loans and the delivery to it of the Mortgage Files, subject to the provisions of Sections 2.01 and 2.02 hereof, together with the assignment to it of all other assets included in the Trust Fund, receipt of which is hereby acknowledged. Concurrently with such assignment and delivery and in exchange therefor, the Trustee, pursuant to the written request of the Depositor executed by an officer of the Depositor, has caused to be executed, authenticated and delivered to or upon the order of the Depositor, the Certificates in authorized denominations. The interests evidenced by the Certificates constitute the entire beneficial ownership interest in the Trust Fund.

85

SECTION 2.08.  Representations and Warranties of the Seller.

The Seller hereby represents and warrants to the Trustee on behalf of the Certificateholders and the Certificate Insurer that, as of the Closing Date or as of such date specifically provided herein:

(i)    The Seller is duly organized, validly existing and in good standing and has the power and authority to own its assets and to transact the business in which it is currently engaged.  The Seller is duly qualified to do business and is in good standing in each jurisdiction in which the character of the business transacted by it or properties owned or leased by it requires such qualification and in which the failure to so qualify would have a material adverse effect on (a) its business, properties, assets or condition (financial or other), (b) the performance of its obligations under this Agreement, or (c) the value or marketability of the Mortgage Loans.

(ii)    The Seller has the power and authority to make, execute, deliver and perform this Agreement and to consummate all of the transactions contemplated hereunder and has taken all necessary action to authorize the execution, delivery and performance of this Agreement which is part of its official records.  When executed and delivered, this Agreement will constitute the Seller's legal, valid and binding obligations enforceable in accordance with its terms, except as enforcement of such terms may be limited by (1) bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws affecting the enforcement of creditors' rights generally and the rights of creditors of federally insured financial institutions and by the availability of equitable remedies, (2) general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law) or (3) public policy considerations underlying the securities laws, to the extent that such policy considerations limit the enforceability of the provisions of this Agreement which purport to provide indemnification from securities laws liabilities.

(iii)    The Seller holds all necessary licenses, certificates and permits from all governmental authorities necessary for conducting its business as it is currently conducted.  It is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except for such consents, licenses, approvals or authorizations, or registrations or declarations as shall have been obtained or filed, as the case may be, prior to the Closing Date.

(iv)    The execution, delivery and performance of this Agreement by the Seller will not conflict with or result in a breach of, or constitute a default under, any provision of any existing law or regulation or any order or decree of any court applicable to the Seller or any of its properties or any provision of its articles of incorporation, charter or by-laws, or constitute a material breach of, or result in the creation or imposition of any lien, charge or encumbrance upon any of its properties pursuant to any mortgage, indenture, contract or other agreement to which it is a party or by which it may be bound.

86

(v)    No certificate of an officer, written statement or written report delivered pursuant to the terms hereof of the Seller contains any untrue statement of a material fact or omits to state any material fact necessary to make the certificate, statement or report not misleading.

(vi)    The transactions contemplated by this Agreement are in the ordinary course of the Seller's business.

(vii)    The Seller is not insolvent, nor will the Seller be made insolvent by the transfer of the Mortgage Loans to the Depositor, nor is the Seller aware of any pending insolvency of the Seller.

(viii)    The Seller is not in violation of, and the execution and delivery of this Agreement by the Seller and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court, or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction, which violation would materially and adversely affect the Seller's financial condition (financial or otherwise) or operations, or materially and adversely affect the performance of any of its duties hereunder.

(ix)    There are no actions or proceedings against the Seller, or pending or, to its knowledge, threatened, before any court, administrative agency or other tribunal; nor, to the Seller's knowledge, are there any investigations (i) that, if determined adversely, would prohibit the Seller from entering into this Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or (iii) that, if determined adversely, would prohibit or materially and adversely affect the Seller's ability to perform any of its respective obligations under, or the validity or enforceability of, this Agreement.

(x)    The Seller did not transfer the Mortgage Loans to the Depositor with any intent to hinder, delay or defraud any of its creditors.

(xi)    The Seller acquired title to the Mortgage Loans in good faith, without notice of any adverse claims.

(xii)    The transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Seller to the Depositor are not subject to the bulk transfer laws or any similar statutory provisions in effect in any applicable jurisdiction.

SECTION 2.09.    Covenants of the Seller.

The Seller hereby covenants that, except for the transfer hereunder, the Seller will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any lien on any Mortgage Loan, or any interest therein; the Seller will notify the Trustee, as assignee of the Depositor, and the Master Servicer of the existence of any lien on any Mortgage Loan immediately upon discovery thereof, and the Seller will defend the right, title and interest of the Trustee, as assignee of the Depositor, in, to and under the Mortgage Loans, against all claims of third parties claiming through or under the Seller; *provided, however*, that nothing in

this Section 2.09 shall prevent or be deemed to prohibit the Seller from suffering to exist upon any of the Mortgage Loans any liens for municipal or other local taxes and other governmental charges if such taxes or governmental charges shall not at the time be due and payable or if the Seller shall currently be contesting the validity thereof in good faith by appropriate proceedings and shall have set aside on its books adequate reserves with respect thereto.

ARTICLE III

ADMINISTRATION AND MASTER SERVICING OF THE MORTGAGE LOANS

SECTION 3.01.  Master Servicer to Service and Administer the Mortgage Loans.

The Master Servicer shall supervise, monitor and oversee the obligation of the Servicers to service and administer their respective Mortgage Loans in accordance with the terms of the applicable Servicing Agreement and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection with such master servicing and administration.  In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with Accepted Master Servicing Practices.  Furthermore, the Master Servicer shall oversee and consult with each Servicer as necessary from time-to-time to carry out the Master Servicer's obligations hereunder, shall receive, review and evaluate all reports, information and other data provided to the Master Servicer by each Servicer and shall cause each Servicer to perform and observe the covenants, obligations and conditions to be performed or observed by such Servicer under the applicable Servicing Agreement.  The Master Servicer shall independently and separately monitor each Servicer's servicing activities with respect to each related Mortgage Loan, reconcile the results of such monitoring with such information provided in the previous sentence on a monthly basis and coordinate corrective adjustments to the Servicers' and Master Servicer's records, and based on such reconciled and corrected information, prepare the Remittance Report and any other information and statements required of the Master Servicer hereunder.

The Trustee shall furnish the Servicers and the Master Servicer with any limited powers of attorney and other documents in form acceptable to the Trustee, necessary or appropriate to enable the Servicers and the Master Servicer to service and administer the related Mortgage Loans and REO Property, which limited powers of attorney shall provide that the Trustee will not be liable for the actions or omissions of the Servicers or Master Servicer in exercising such powers.

The Trustee shall provide access to the records and documentation in possession of the Trustee (including in its capacity as Custodian hereunder) regarding the related Mortgage Loans and REO Property and the servicing thereof to the Certificateholders, the FDIC, and the supervisory agents and examiners of the FDIC, such access being afforded only upon reasonable prior written request and during normal business hours at the office of the Trustee; *provided, however*, that, unless otherwise required by law, the Trustee shall not be required to provide access to such records and documentation if the provision thereof would violate the legal right to privacy of any Mortgagor.  The Trustee shall allow representatives of the above entities to

88

photocopy any of the records and documentation and shall provide equipment for that purpose at a charge that covers the Trustee's actual costs.

The Trustee shall execute and deliver to the related Servicer and the Master Servicer any court pleadings, requests for trustee's sale or other documents necessary or desirable to (i) the foreclosure or trustee's sale with respect to a Mortgaged Property; (ii) any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or Mortgage; (iii) obtain a deficiency judgment against the Mortgagor; or (iv) enforce any other rights or remedies provided by the Mortgage Note or Mortgage or otherwise available at law or equity.

SECTION 3.02.  REMIC-Related Covenants.

For as long as any REMIC created hereunder shall exist, the Trustee and the Securities Administrator shall act in accordance herewith to assure continuing treatment of such REMIC as a REMIC, and the Trustee and the Securities Administrator shall comply with any directions of the Depositor, the related Servicer or the Master Servicer to assure such continuing treatment.  In particular, the Trustee shall not (a) sell or permit the sale of all or any portion of the Mortgage Loans or of any investment of deposits in an Account unless such sale is as a result of a repurchase of the Mortgage Loans pursuant to this Agreement or the Trustee has received a REMIC Opinion prepared at the expense of the Trust; and (b) other than with respect to a substitution pursuant to the Mortgage Loan Purchase Agreement or Section 2.04 of this Agreement, as applicable, accept any contribution to any REMIC after the Startup Day without receipt of a REMIC Opinion.

SECTION 3.03.  Monitoring of Servicers.

(a) The Master Servicer shall be responsible for reporting to the Trustee (on behalf of the Trust) and the Depositor the compliance by each Servicer with its duties under the related Servicing Agreement.  In the review of each Servicer's activities, the Master Servicer may rely upon an officer's certificate of the Servicer with regard to such Servicer's compliance with the terms of its Servicing Agreement.  In the event that the Master Servicer, in its judgment, determines that a Servicer should be terminated in accordance with its Servicing Agreement, or that a notice should be sent pursuant to such Servicing Agreement with respect to the occurrence of an event that, unless cured, would constitute grounds for such termination, the Master Servicer shall notify the Depositor and the Trustee thereof, and with respect to the SRO Servicer, the Master Servicer shall also notify the Servicing Rights Owner, and the Master Servicer shall issue such notice or take such other action as it deems appropriate and is consistent with Section 3.03(b) or, with respect to the SRO Servicer, Section 3.03(f) below.

(b) The Master Servicer, for the benefit of the Trust and the Certificateholders, shall enforce the obligations of each Servicer under the related Servicing Agreement, and shall, in the event that a Servicer fails to perform its obligations in accordance with the related Servicing Agreement, subject to the preceding paragraph, (a) for the SRO Servicer, act in accordance with Section 3.03(f) below and (b) for any other Servicer, terminate the rights and obligations of such Servicer thereunder and act as servicer of the related Mortgage Loans or enter into a new Servicing Agreement with a successor Servicer selected by the Master Servicer which the Master

89

Servicer shall cause the Trustee to acknowledge; *provided, however*, it is understood and acknowledged by the parties hereto that there will be a period of transition (not to exceed 90 days) before the actual servicing functions can be fully transferred to such successor Servicer. Such enforcement, including, without limitation, the legal prosecution of claims, termination of Servicing Agreements and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Master Servicer, in its good faith business judgment, would require were it the owner of the related Mortgage Loans. The Master Servicer shall pay the costs of such enforcement at its own expense, provided that the Master Servicer shall not be required to prosecute or defend any legal action except to the extent that the Master Servicer shall have received reasonable indemnity for its costs and expenses in pursuing such action from the Trust Fund.

(c) To the extent that the costs and expenses of the Master Servicer related to any termination of a Servicer, appointment of a successor Servicer or the transfer and assumption of servicing by the Master Servicer or a successor Servicer with respect to any Servicing Agreement (including, without limitation, (i) all reasonable legal costs and expenses and all due diligence costs and expenses associated with an evaluation of the potential termination of the Servicer as a result of an event of default by such Servicer and (ii) all reasonable costs and expenses associated with the complete transfer of servicing, including all servicing files and all servicing data and the completion, correction or manipulation of such servicing data as may be required by the successor servicer to correct any errors or insufficiencies in the servicing data or otherwise to enable the successor service to service the Mortgage Loans in accordance with the related Servicing Agreement) are not fully and timely reimbursed by the terminated Servicer, or with respect to any terminated SRO Servicer, are not fully and timely reimbursed by the terminated SRO Servicer (or, solely with respect to a termination of any SRO Servicer without cause, the Servicing Rights Owner), the Master Servicer shall be entitled to reimbursement of such reasonable costs and expenses from the Distribution Account.

(d) The Master Servicer shall require each Servicer to comply with the remittance requirements and other obligations set forth in the related Servicing Agreement.

(e) If the Master Servicer acts as Servicer, it will not assume liability for the representations and warranties of the predecessor Servicer, if any, that it replaces or for any errors, acts or omissions of such predecessor Servicer occurring prior to the termination of such Servicer; *provided, however,* the Master Servicer shall not be relieved of its liability, if any, as Master Servicer under this Section 3.03(e).

(f) The Master Servicer, for the benefit of the Trust and the Certificateholders, shall enforce the obligations of the SRO Servicer under the related Servicing Agreement. In the event that the SRO Servicer fails to perform its obligations in accordance with the related Servicing Agreement, subject to the paragraph (a) above, the Master Servicer shall terminate the rights and obligations of such Servicer thereunder and the Master Servicer shall act as servicer of the related Mortgage Loans or enter into a new Servicing Agreement with a successor Servicer that is an Acceptable Successor Servicer selected by the Master Servicer, which the Master Servicer shall cause the Trustee to acknowledge; *provided, however*, it is understood and acknowledged by the parties hereto that (i) there will be a period of transition (not to exceed 90 days) before the actual servicing functions can be fully transferred to such successor Servicer and (ii) during the

90

period in which any successor Servicer appointed by the Master Servicer services the SRO Mortgage Loans, notwithstanding anything to the contrary in this Agreement or the related Servicing Agreement, (a) in connection with such appointment and assumption, the Trustee, the Seller or the Master Servicer, as applicable, may make such arrangements for the compensation of such successor out of payments on the SRO Mortgage Loans as it and such successor shall agree; *provided*, however, that no Subservicing Fee for such successor Servicer shall be in excess of a per annum rate of 0.375% and (b) such successor Servicer must assume all of the obligations of the terminated Servicer under the related Servicing Agreement.  Such enforcement, including, without limitation, the legal prosecution of claims, termination of Servicing Agreements and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Master Servicer, in its good faith business judgment, would require were it the owner of the related Mortgage Loans.  The Master Servicer shall pay the costs of such enforcement at its own expense, provided that the Master Servicer shall not be required to prosecute or defend any legal action except to the extent that the Master Servicer shall have received reasonable indemnity for its costs and expenses in pursuing such action from the Trust Fund.  Notwithstanding anything to the contrary herein, upon the termination of the SRO Servicer for any reason whatsoever, the Servicing Rights Owner, as owner of the related Servicing Rights, shall at all times have the right to present the Master Servicer with a successor Servicer which the Master Servicer will not unreasonably fail to select as the successor Servicer, assuming that such servicer is an Acceptable Successor Servicer and that such servicer will assume all of the obligations of the terminated Servicer under the related Servicing Agreement. The Trustee shall have no duty, and shall not be required, to review the terms of such assumption under the Servicing Agreements.

(g) It is understood and acknowledged by the parties hereto that, under the related Servicing Agreement, the SRO Servicer has the right to resign as a SRO Servicer under the related Servicing Agreement, provided that such resignation shall not become effective until (i) the Servicing Rights Owner has consented to such resignation, and (ii) a successor Servicer is appointed which (a) is an Acceptable Successor Servicer and (b) which has assumed all of the obligations of the terminated Servicer under the related Servicing Agreement.

(h) It is understood and acknowledged by the parties hereto that, subject to the provisions of Section 3.03(f) of this Agreement, under the related Servicing Agreement, the Servicing Rights Owner has the right to terminate the SRO Servicer, without cause, as provided and subject to the limitations of the related Servicing Agreement; provided that such termination shall not become effective until a successor Servicer is appointed which (a) is an Acceptable Successor Servicer and (b) which has assumed all of the obligations of the terminated Servicer under the related Servicing Agreement.  Any termination fees owed to the terminated SRO Servicer and any reasonable costs and expenses of the Master Servicer incurred in connection with such termination and transfer of servicing shall be paid by the Servicing Rights Owner.

SECTION 3.04.  Fidelity Bond.

The Master Servicer, at its expense, shall maintain in effect a blanket fidelity bond and an errors and omissions insurance policy, affording coverage with respect to all directors, officers, employees and other Persons acting on such Master Servicer's behalf, and covering errors and

omissions in the performance of the Master Servicer's obligations hereunder. The errors and omissions insurance policy and the fidelity bond shall be in such form and amount generally acceptable for entities serving as master servicers or trustees.

SECTION 3.05. Power to Act; Procedures.

The Master Servicer shall master service the Mortgage Loans and shall have full power and authority, subject to the REMIC Provisions and the provisions of Article X hereof, to do any and all things that it may deem necessary or desirable in connection with the master servicing and administration of the Mortgage Loans, including but not limited to the power and authority (i) to execute and deliver, on behalf of the Certificateholders, the Trust and the Trustee, customary consents or waivers and other instruments and documents, (ii) to consent to transfers of any Mortgaged Property and assumptions of the Mortgage Notes and related Mortgages, (iii) to collect any Insurance Proceeds and Liquidation Proceeds, and (iv) to effectuate, either in its own name on behalf of the Trust, or in the name of the Trust, foreclosure or other conversion of the ownership of the Mortgaged Property securing any Mortgage Loan, in each case, in accordance with the provisions of this Agreement and the related Servicing Agreement, as applicable; *provided, however*, that the Master Servicer shall not (and, consistent with its responsibilities under Section 3.03, shall not permit any Servicer to) knowingly or intentionally take any action, or fail to take (or fail to cause to be taken) any action reasonably within its control and the scope of duties more specifically set forth herein, that, under the REMIC Provisions, if taken or not taken, as the case may be, would cause an Adverse REMIC Event unless the Master Servicer has received an Opinion of Counsel (but not at the expense of the Master Servicer) to the effect that the contemplated action will not cause the REMIC created hereunder to fail to qualify as a REMIC or result in the imposition of a tax upon such REMIC created hereunder. The Trustee shall furnish the Master Servicer, upon written request from a Servicing Officer, with any limited powers of attorney empowering the Master Servicer or any Servicer to execute and deliver instruments of satisfaction or cancellation, or of partial or full release or discharge, and to foreclose upon or otherwise liquidate Mortgaged Property, and to appeal, prosecute or defend in any court action relating to the Mortgage Loans or the Mortgaged Property, in accordance with the applicable Servicing Agreement and this Agreement, and the Trustee shall execute and deliver such other documents, as the Master Servicer may request, to enable the Master Servicer to master service and administer the Mortgage Loans and carry out its duties hereunder, in each case in accordance with Accepted Master Servicing Practices (and the Trustee shall have no liability for misuse of any such powers of attorney by the Master Servicer or any Servicer). In instituting foreclosures or similar proceedings, the Master Servicer shall institute such proceedings either in its own name on behalf of the Trust, or in the name of the Trust (or cause the related Servicer, pursuant to the related Servicing Agreement, to institute such proceedings either in the name of such Servicer on behalf of the Trust, or in the name of the Trust), unless otherwise required by law or otherwise appropriate. If the Master Servicer or the Trustee has been advised that it is likely that the laws of the state in which action is to be taken prohibit such action if taken in the name of the Trust or the Trustee on behalf of the Trust or that the Trust or the Trustee would be adversely affected under the "doing business" or tax laws of such state if such action is taken in its name, the Master Servicer shall join with the Trustee, on behalf of the Trust, in the appointment of a co-trustee pursuant to Section 8.10 hereof. In the performance of its duties hereunder, the Master Servicer shall be an independent contractor and

92

shall not, except in those instances where it is taking action in the name of the Trustee, be deemed to be the agent of the Trustee.

SECTION 3.06. Due-on-Sale Clauses; Assumption Agreements.

To the extent provided in the applicable Servicing Agreement and to the extent Mortgage Loans contain enforceable due-on-sale clauses, the Master Servicer shall cause the Servicers to enforce such clauses in accordance with the applicable Servicing Agreement. If applicable law prohibits the enforcement of a due-on-sale clause or such clause is otherwise not enforced in accordance with the applicable Servicing Agreement, and, as a consequence, a Mortgage Loan is assumed, the original Mortgagor may be released from liability in accordance with the applicable Servicing Agreement.

SECTION 3.07. Release of Mortgage Files.

(a) Upon becoming aware of the payment in full of any Mortgage Loan, or the receipt by any Servicer of a notification that payment in full has been escrowed in a manner customary for such purposes for payment to Certificateholders on the next Distribution Date, the Servicer will, if required under the applicable Servicing Agreement, promptly furnish to the Custodian, on behalf of the Trustee, two copies of a certification substantially in the form of Exhibit F hereto signed by a Servicing Officer or in a mutually agreeable electronic format which will, in lieu of a signature on its face, originate from a Servicing Officer (which certification shall include a statement to the effect that all amounts received in connection with such payment that are required to be deposited in the related Servicing Account maintained by the applicable Servicer pursuant to Section 4.01 or by the applicable Servicer pursuant to its Servicing Agreement have been or will be so deposited) and shall request that the Trustee (or the Custodian, on behalf of the Trustee) deliver to the applicable Servicer the related Mortgage File. Upon receipt of such certification and request, the Trustee (or the Custodian, on behalf of the Trustee), shall promptly release the related Mortgage File to the applicable Servicer and the Trustee (and the Custodian, if applicable) shall have no further responsibility with regard to such Mortgage File. Upon any such payment in full, each Servicer is authorized, to give, as agent for the Trustee, as the mortgagee under the Mortgage that secured the Mortgage Loan, an instrument of satisfaction (or assignment of mortgage without recourse) regarding the Mortgaged Property subject to the Mortgage, which instrument of satisfaction or assignment, as the case may be, shall be delivered to the Person or Persons entitled thereto against receipt therefor of such payment, it being understood and agreed that no expenses incurred in connection with such instrument of satisfaction or assignment, as the case may be, shall be chargeable to the related Servicing Account.

(b) From time to time and as appropriate for the servicing or foreclosure of any Mortgage Loan and in accordance with the applicable Servicing Agreement, the Trustee shall execute such documents as shall be prepared and furnished to the Trustee by a Servicer or the Master Servicer (in form reasonably acceptable to the Trustee) and as are necessary to the prosecution of any such proceedings. The Trustee (or the Custodian, on behalf of the Trustee), shall, upon the request of a Servicer or the Master Servicer, and upon delivery to the Trustee (or the Custodian, on behalf of the Trustee) of two copies of a request for release signed by a Servicing Officer

93

substantially in the form of Exhibit F (or in a mutually agreeable electronic format which will, in lieu of a signature on its face, originate from a Servicing Officer), release the related Mortgage File held in its possession or control to the Servicer or the Master Servicer, as applicable. Such trust receipt shall obligate the Servicer or the Master Servicer to return the Mortgage File to the Trustee (or the Custodian on behalf of the Trustee) when the need therefor by the Servicer or the Master Servicer no longer exists unless the Mortgage Loan shall be liquidated, in which case, upon receipt of a certificate of a Servicing Officer similar to that hereinabove specified, the Mortgage File shall be released by the Trustee (or the Custodian, on behalf of the Trustee), to the Servicer or the Master Servicer.

SECTION 3.08.  <u>Documents, Records and Funds in Possession of Master Servicer to be Held for Trust</u>.

(a) The Master Servicer shall transmit and each Servicer (to the extent required by the related Servicing Agreement) shall transmit to the Trustee (or Custodian) such documents and instruments coming into the possession of the Master Servicer or such Servicer from time to time as are required by the terms hereof or, in the case of the Servicers, by the applicable Servicing Agreement, to be delivered to the Trustee (or Custodian). Any funds received by the Master Servicer or by a Servicer in respect of any Mortgage Loan or which otherwise are collected by the Master Servicer or by a Servicer as Liquidation Proceeds or Insurance Proceeds in respect of any Mortgage Loan shall be held for the benefit of the Trust and the Certificateholders, subject to the Master Servicer's right to retain or withdraw from the Distribution Account the Master Servicing Fee, any additional compensation pursuant to Section 3.14 and any other amounts provided in this Agreement, and to the right of each Servicer to retain its Servicing Fee and any other amounts as provided in the applicable Servicing Agreement. The Master Servicer shall, and (to the extent provided in the applicable Servicing Agreement) shall cause each Servicer to, provide access to information and documentation regarding the Mortgage Loans to the Trustee, its agents and accountants at any time upon reasonable request and during normal business hours, and to Certificateholders that are savings and loan associations, banks or insurance companies, the Office of Thrift Supervision, the FDIC and the supervisory agents and examiners of such Office and Corporation or examiners of any other federal or state banking or insurance regulatory authority if so required by applicable regulations of the Office of Thrift Supervision or other regulatory authority, such access to be afforded without charge but only upon reasonable request in writing and during normal business hours at the offices of the Master Servicer designated by it. In fulfilling such a request the Master Servicer shall not be responsible for determining the sufficiency of such information.

(b) All Mortgage Files and funds collected or held by, or under the control of, the Master Servicer, in respect of any Mortgage Loans shall be held by the Master Servicer for and on behalf of the Trust and the Certificateholders and shall be and remain the sole and exclusive property of the Trust; *provided, however*, that the Master Servicer and each Servicer shall be entitled to setoff against, and deduct from, any such funds any amounts that are properly due and payable to the Master Servicer or such Servicer under this Agreement or the applicable Servicing Agreement.

94

SECTION 3.09.  Standard Hazard Insurance and Flood Insurance Policies

(a)  For each Mortgage Loan (other than a Cooperative Loan), the Master Servicer shall enforce any obligation of the Servicers under the related Servicing Agreements to maintain or cause to be maintained standard fire and casualty insurance and, where applicable, flood insurance, all in accordance with the provisions of the related Servicing Agreements.  It is understood and agreed that such insurance shall be with insurers meeting the eligibility requirements set forth in the applicable Servicing Agreement and that no earthquake or other additional insurance is to be required of any Mortgagor or to be maintained on property acquired in respect of a defaulted loan, other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance.

(b) Pursuant to Sections 4.01 and 4.02, any amounts collected by any Servicer or the Master Servicer under any insurance policies (other than amounts to be applied to the restoration or repair of the property subject to the related Mortgage or released to the Mortgagor in accordance with the applicable Servicing Agreement) shall be deposited into the Distribution Account, subject to withdrawal pursuant to Sections 4.02 and 4.03.  Any cost incurred by the Master Servicer or any Servicer in maintaining any such insurance if the Mortgagor defaults in its obligation to do so shall be added to the amount owing under the Mortgage Loan where the terms of the Mortgage Loan so permit; *provided, however*, that the addition of any such cost shall not be taken into account for purposes of calculating the distributions to be made to Certificateholders and shall be recoverable by the Master Servicer or such Servicer pursuant to Sections 4.02 and 4.03.

SECTION 3.10.  Presentment of Claims and Collection of Proceeds.

The Master Servicer shall (to the extent provided in the applicable Servicing Agreement) cause the related Servicer to prepare and present on behalf of the Trustee, the Trust and the Certificateholders all claims under the Insurance Policies and take such actions (including the negotiation, settlement, compromise or enforcement of the insured's claim) as shall be necessary to realize recovery under such policies.  Any proceeds disbursed to the Master Servicer (or disbursed to a Servicer and remitted to the Master Servicer) in respect of such policies, bonds or contracts shall be promptly deposited in the Distribution Account upon receipt, except that any amounts realized that are to be applied to the repair or restoration of the related Mortgaged Property as a condition precedent to the presentation of claims on the related Mortgage Loan to the insurer under any applicable Insurance Policy need not be so deposited (or remitted).

SECTION 3.11.  Maintenance of the Primary Insurance Policies.

(a)  The Master Servicer shall not take, or permit any Servicer (to the extent such action is prohibited under the applicable Servicing Agreement) to take, any action that would result in noncoverage under any applicable Primary Insurance Policy of any loss which, but for the actions of such Master Servicer or Servicer, would have been covered thereunder.  The Master Servicer shall use its best reasonable efforts to cause each Servicer (to the extent required under the related Servicing Agreement) to keep in force and effect (to the extent that the Mortgage Loan requires the Mortgagor to maintain such insurance), primary mortgage insurance applicable

95

to each Mortgage Loan (including any lender-paid Primary Insurance Policy) in accordance with the provisions of this Agreement and the related Servicing Agreement, as applicable. The Master Servicer shall not, and shall not permit any Servicer (to the extent required under the related Servicing Agreement) to, cancel or refuse to renew any such Primary Insurance Policy that is in effect at the date of the initial issuance of the Mortgage Note and is required to be kept in force hereunder except in accordance with the provisions of this Agreement and the related Servicing Agreement, as applicable.

(b) The Master Servicer agrees to cause each Servicer (to the extent required under the related Servicing Agreement) to present, on behalf of the Trustee, the Trust and the Certificateholders, claims to the insurer under any Primary Insurance Policies and, in this regard, to take such reasonable action as shall be necessary to permit recovery under any Primary Insurance Policies respecting defaulted Mortgage Loans. Pursuant to Section 4.01, any amounts collected by the Servicer under any Primary Insurance Policies shall be remitted to the Master Servicer for deposit in the Distribution Account, subject to withdrawal pursuant to Section 4.03.

SECTION 3.12.  Trustee to Retain Possession of Certain Insurance Policies and Documents.

The Trustee (or the Custodian, as directed by the Trustee), shall retain possession and custody of the originals (to the extent available) of any Primary Insurance Policies or certificate of insurance if applicable, and any certificates of renewal as to the foregoing as may be issued from time to time as contemplated by this Agreement. Until all amounts distributable in respect of the Certificates have been distributed in full and the Master Servicer otherwise has fulfilled its obligations under this Agreement, the Trustee (or the Custodian, as directed by the Trustee) shall also retain possession and custody of each Mortgage File in accordance with and subject to the terms and conditions of this Agreement. The Master Servicer shall promptly deliver or cause to be delivered to the Trustee (or the Custodian, as directed by the Trustee), upon the execution or receipt thereof the originals of any Primary Insurance Policies, any certificates of renewal, and such other documents or instruments that constitute portions of the Mortgage File that come into the possession of the Master Servicer from time to time.

SECTION 3.13.  Realization Upon Defaulted Mortgage Loans.

The Master Servicer shall cause each Servicer (to the extent required under the related Servicing Agreement) to foreclose upon, repossess or otherwise comparably convert the ownership of Mortgaged Properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments, all in accordance with the applicable Servicing Agreement.

SECTION 3.14.  Additional Compensation to the Master Servicer.

Pursuant to Article IV, all income and gain realized from any investment of funds in the Distribution Account shall be for the benefit of the Master Servicer as additional compensation. Servicing compensation in the form of assumption fees, if any, late payment charges, as collected, if any, or otherwise (but not including any Prepayment Penalty Amounts) shall be

96

retained by the applicable Servicer, or the Master Servicer, and shall not be deposited in the related Servicing Account or the Distribution Account. The Master Servicer shall be required to pay all expenses incurred by it in connection with its activities hereunder and shall not be entitled to reimbursement therefor except as provided in this Agreement. The amount of the aggregate compensation payable as set forth in this Section 3.14 plus the Master Servicing Fee due to the Master Servicer in respect of any Distribution Date shall be reduced in accordance with Section 5.06.

SECTION 3.15.  REO Property.

(a) In the event the Trust (or the Trustee, on behalf of the Trust), acquires ownership of any REO Property in respect of any related Mortgage Loan, the deed or certificate of sale shall be issued to the Trust, or if required under applicable law, to the Trustee, or to its nominee, on behalf of the Trust. The Master Servicer shall, to the extent provided in the applicable Servicing Agreement, cause the applicable Servicer to sell any REO Property as expeditiously as possible (and in no event later than three years after acquisition) and in accordance with the provisions of this Agreement and the related Servicing Agreement, as applicable. Pursuant to its efforts to sell such REO Property, the Master Servicer shall cause the applicable Servicer to protect and conserve such REO Property in the manner and to the extent required by the applicable Servicing Agreement, in accordance with the REMIC Provisions and in a manner that does not result in a tax on "net income from foreclosure property" or cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code.

(b) The Master Servicer shall, to the extent required by the related Servicing Agreement, cause the applicable Servicer to deposit all funds collected and received in connection with the operation of any REO Property in the related Servicing Account.

(c) The Master Servicer and the applicable Servicer, upon the final disposition of any REO Property, shall be entitled to reimbursement for any related unreimbursed Advances and other unreimbursed advances as well as any unpaid Servicing Fees from Liquidation Proceeds received in connection with the final disposition of such REO Property; provided, that any such unreimbursed Advances as well as any unpaid Servicing Fees may be reimbursed or paid, as the case may be, prior to final disposition, out of any net rental income or other net amounts derived from such REO Property.

(d) To the extent provided in the related Servicing Agreement, the Liquidation Proceeds from the final disposition of the REO Property, net of any payment to the Master Servicer and the applicable Servicer as provided above shall be deposited in the related Servicing Account on or prior to the applicable Determination Date in the month following receipt thereof and be remitted by wire transfer in immediately available funds to the Master Servicer for deposit into the Distribution Account on the next succeeding Servicer Remittance Date.

SECTION 3.16.  Annual Officer's Certificate as to Compliance.

(a) The Master Servicer shall deliver to the Trustee and each Rating Agency on or before March 1 of each year, commencing on March 1, 2006, an Officer's Certificate, certifying that

97

with respect to the period ending December 31 of the prior year: (i) such Servicing Officer has reviewed the activities of such Master Servicer during the preceding calendar year or portion thereof and its performance under this Agreement, (ii) to the best of such Servicing Officer's knowledge, based on such review, such Master Servicer has performed and fulfilled its duties, responsibilities and obligations under this Agreement in all material respects throughout such year, or, if there has been a default in the fulfillment of any such duties, responsibilities or obligations, specifying each such default known to such Servicing Officer and the nature and status thereof, (iii) nothing has come to the attention of such Servicing Officer to lead such Servicing Officer to believe that any Servicer has failed to perform any of its duties, responsibilities and obligations under its Servicing Agreement in all material respects throughout such year, or, if there has been a material default in the performance or fulfillment of any such duties, responsibilities or obligations, specifying each such default known to such Servicing Officer and the nature and status thereof.

(b) Copies of such statements shall be provided to any Certificateholder and the Certificate Insurer upon request by the Master Servicer or, by the Trustee at the Master Servicer's expense, if the Master Servicer failed to provide such copies (unless (i) the Master Servicer shall have failed to provide the Trustee with such statement or (ii) the Trustee shall be unaware of the Master Servicer's failure to provide such statement).

SECTION 3.17.    Annual Independent Accountant's Servicing Report.

If the Master Servicer has, during the course of any fiscal year, directly serviced any of the Mortgage Loans, then the Master Servicer at its expense shall cause a nationally recognized firm of independent certified public accountants to furnish a statement to the Trustee, each Rating Agency and the Depositor on or before March 1 of each year, commencing on March 1, 2006 to the effect that, with respect to the most recently ended fiscal year, such firm has examined certain records and documents relating to the Master Servicer's performance of its servicing obligations under this Agreement and pooling and servicing and trust agreements in material respects similar to this Agreement and to each other and that, on the basis of such examination conducted substantially in compliance with the audit program for mortgages serviced for Freddie Mac or the Uniform Single Attestation Program for Mortgage Bankers, such firm is of the opinion that the Master Servicer's activities have been conducted in compliance with this Agreement, or that such examination has disclosed no material items of noncompliance except for (i) such exceptions as such firm believes to be immaterial, (ii) such other exceptions as are set forth in such statement and (iii) such exceptions that the Uniform Single Attestation Program for Mortgage Bankers or the Audit Program for Mortgages Serviced by Freddie Mac requires it to report.  Copies of such statements shall be provided to any Certificateholder and the Certificate Insurer upon request by the Master Servicer, or by the Trustee at the expense of the Master Servicer if the Master Servicer shall fail to provide such copies.  If such report discloses exceptions that are material, the Master Servicer shall advise the Trustee whether such exceptions have been or are susceptible of cure, and will take prompt action to do so.

SECTION 3.18.  <u>Reports Filed with Securities and Exchange Commission</u>.

Within 10 days after each Distribution Date, the Securities Administrator shall, in accordance with industry standards, file with the Commission via the Electronic Data Gathering and Retrieval System ("**EDGAR**"), a Form 8-K (or other comparable Form containing the same or comparable information or other information mutually agreed upon) with a copy of the statement to the Trustee who shall furnish a copy of the statement to the Certificateholders for such Distribution Date as an exhibit thereto.  Prior to January 30, 2006, the Securities Administrator shall, in accordance with industry standards, file a Form 15 Suspension Notice with respect to the Trust, if applicable.  Prior to (i) March 15, 2006, or sixteen (16) days prior to such earlier date as such filing may be required to be made under the rules of the Commission, and (ii) unless and until a Form 15 Suspension Notice shall have been filed, prior to March 15, or sixteen (16) days prior to such earlier date as such filing may be required to be made under the rules of the Commission, of each year thereafter, the Master Servicer shall provide the Securities Administrator with a Sarbanes-Oxley Certification, together with a copy of the annual independent accountant's servicing report and annual statement of compliance of the Servicer, in each case, required to be delivered pursuant to its Servicing Agreement, and, if applicable, the annual independent accountant's servicing report and annual statement of compliance to be delivered by the Master Servicer pursuant to Sections 3.16 and 3.17.  Prior to (i) March 31, 2006, or such earlier date as such filing may be required to be made under the rules of the Commission, and (ii) unless and until a Form 15 Suspension Notice shall have been filed, March 31, or such earlier date as such filing may be required to be made under the rules of the Commission, of each year thereafter, the Securities Administrator shall file a Form 10-K, in substance conforming to industry standards, with respect to the Trust.  Such Form 10-K shall include the Sarbanes-Oxley Certification and other documentation provided by the Master Servicer pursuant to the second preceding sentence.  The Securities Administrator shall promptly send copies of each periodic report filed on Form 8-K or other applicable form, each annual report on Form 10-K, and each Form 15 Suspension Notification, together in each case with the acceptance confirmation receipt from EDGAR, to McKee Nelson LLP and to the Depositor (i) by e-mail to the e-mail addresses provided in writing by each of McKee Nelson LLP and the Depositor, respectively and (ii) to McKee Nelson LLP at 1919 M Street, N.W., Washington, D.C. 20036, and to the Depositor at the address specified in Section 12.05, in each case to the attention of a designated contact specified by each of McKee Nelson LLP and the Depositor, respectively.  The Depositor hereby grants to the Securities Administrator a limited power of attorney to execute and file each such 8-K on behalf of the Depositor; provided, that notwithstanding anything to the contrary provided herein, the Master Servicer shall be responsible for signing on its own behalf, and shall sign on its own behalf, the Sarbanes-Oxley Certification and each form 10-K.  Such power of attorney shall continue until the earlier of either (i) receipt by the Securities Administrator from the Depositor of written termination of such power of attorney or (ii) the termination of the Trust.  The Depositor agrees to promptly furnish to the Securities Administrator, from time to time upon request, such further information, reports and financial statements within its control related to this Agreement and the Mortgage Loans as the Securities Administrator reasonably deems appropriate to prepare and file all necessary reports with the Commission.  The Securities Administrator shall have no responsibility to file any items other than those specified in this Section 3.18; *provided, however*, the Securities Administrator will cooperate with the Depositor *in connection with any additional filings with respect to the Trust as the Depositor deems*

99

necessary under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**").
Copies of all reports filed by the Securities Administrator under the Exchange Act shall be sent
to the Depositor. Fees and expenses incurred by the Securities Administrator in connection with
this Section 3.18 shall not be reimbursable from the Trust.

SECTION 3.19. [Reserved].

SECTION 3.20. [Reserved].

SECTION 3.21. [Reserved.].

SECTION 3.22. [Reserved.].

SECTION 3.23. Closing Opinion of Counsel.

On or before the Closing Date, the Master Servicer shall cause to be delivered to the
Depositor, the Seller, the Trustee, and Greenwich Capital Markets, Inc. an Opinion of Counsel,
dated the Closing Date, in form and substance reasonably satisfactory to the Depositor,
Greenwich Capital Markets, Inc., and the Seller as to the due authorization, execution and
delivery of this Agreement by the Master Servicer and the enforceability thereof.

SECTION 3.24. Liabilities of the Master Servicer.

The Master Servicer shall be liable in accordance herewith only to the extent of the
obligations specifically imposed upon and undertaken by it herein.

SECTION 3.25. Merger or Consolidation of the Master Servicer.

(a) The Master Servicer will keep in full force and effect its existence, rights and
franchises as a national banking association under the laws of the jurisdiction of its
incorporation, and will obtain and preserve its qualification to do business as a foreign
corporation in each jurisdiction in which such qualification is or shall be necessary to protect the
validity and enforceability of this Agreement, the Certificates or any of the Mortgage Loans and
to perform its duties under this Agreement.

(b) Any Person into which the Master Servicer may be merged or consolidated, or any
corporation resulting from any merger or consolidation to which the Master Servicer shall be a
party, or any Person succeeding to the business of the Master Servicer, shall be the successor of
the Master Servicer hereunder, without the execution or filing of any paper or further act on the
part of any of the parties hereto, anything herein to the contrary notwithstanding.

SECTION 3.26.  Indemnification of the Trustee, the Master Servicer and the Securities Administrator.

(a)  The Master Servicer agrees to indemnify the Indemnified Persons for, and to hold them harmless against, any loss, liability or expense (except as otherwise provided herein with respect to expenses) (including reasonable legal fees and disbursements of counsel) incurred on their part that may be sustained in connection with, arising out of, or relating to this Agreement or the Certificates (i) related to the Master Servicer's failure to perform its duties in compliance with this Agreement (except as any such loss, liability or expense shall be otherwise reimbursable pursuant to this Agreement) or (ii) incurred by reason of the Master Servicer's willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder, provided, in each case, that with respect to any such claim or legal action (or pending or threatened claim or legal action), an Indemnified Person shall have given the Master Servicer and the Depositor written notice thereof promptly after such Indemnified Person shall have with respect to such claim or legal action knowledge thereof.  The Indemnified Person's failure to give such notice shall not affect the Indemnified Person's right to indemnification hereunder.  This indemnity shall survive the resignation or removal of the Trustee, the Master Servicer or the Securities Administrator and the termination of this Agreement.

(b)  The Trust will indemnify any Indemnified Person for any loss, liability or expense of any Indemnified Person not otherwise referred to in Subsection (a) above or Subsection (c) below.

(c)  The Securities Administrator agrees to indemnify the Indemnified Persons (other than the Securities Administrator) for, and to hold them harmless against, any loss, liability or expense (except as otherwise provided herein with respect to expenses) (including reasonable legal fees and disbursements of counsel) incurred on their part (i) in connection with, arising out of, or relating to the Securities Administrator's failure to file a Form 10-K in accordance with Section 3.18, (ii) by reason of the Securities Administrator's willful misfeasance, bad faith or gross negligence in the performance of such obligations pursuant to Section 3.18 or (iii) by reason of the Securities Administrator's reckless disregard of such obligations pursuant to Section 3.18, provided, in each case, that with respect to any such claim or legal action (or pending or threatened claim or legal action), an Indemnified Person shall have given the Securities Administrator written notice thereof promptly after such Indemnified Person shall have with respect to such claim or legal action knowledge thereof.  The Indemnified Person's failure to give such notice shall not affect the Indemnified Person's right to indemnification hereunder.  This indemnity shall survive the resignation or removal of the Trustee, the Master Servicer or the Securities Administrator and the termination of this Agreement.

SECTION 3.27.  Limitations on Liability of the Master Servicer and Others.

Subject to the obligation of the Master Servicer to indemnify the Indemnified Persons pursuant to Section 3.26:

(a) Neither the Master Servicer nor any of the directors, officers, employees or agents of the Master Servicer shall be under any liability to the Indemnified Persons, the Depositor, the Trust or the Certificateholders for taking any action or for refraining from taking any action in good faith pursuant to this Agreement, or for errors in judgment; *provided, however*, that this provision shall not protect the Master Servicer or any such Person against any breach of warranties or representations made herein or any liability which would otherwise be imposed by reason of such Person's willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder.

(b) The Master Servicer and any director, officer, employee or agent of the Master Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.

(c) The Master Servicer, the Trustee, the Custodian (including for such purpose, the Trustee acting in its capacity as Custodian) and any director, officer, employee or agent of the Master Servicer, the Trustee or the Custodian shall be indemnified by the Trust and held harmless thereby against any loss, liability or expense (except as otherwise provided herein with respect to expenses) (including reasonable legal fees and disbursements of counsel) incurred on their part that may be sustained in connection with, arising out of, or relating to, this Agreement, the Certificates or any Servicing Agreement or the transactions contemplated hereby or thereby (except to the extent that the Master Servicer is indemnified by the Servicer thereunder), other than (i) with respect to the Master Servicer or Custodian only, any such loss, liability or expense related to the Master Servicer's failure to perform its duties in compliance with this Agreement or, if applicable, to the Custodian's failure to perform its duties under this Agreement, or (ii) with respect to the Master Servicer or Custodian only, any such loss, liability or expense incurred by reason of the Master Servicer's or the Custodian's willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder or under a custodial agreement.

(d) The Master Servicer shall not be under any obligation to appear in, prosecute or defend any legal action that is not incidental to its duties under this Agreement and that in its opinion may involve it in any expense or liability; *provided, however*, the Master Servicer may in its discretion, undertake any such action which it may deem necessary or desirable with respect to this Agreement and the rights and duties of the parties hereto and the interests of the Trust and the Certificateholders hereunder. In such event, the legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities of the Trust, and the Master Servicer shall be entitled to be reimbursed therefor out of the Distribution Account as provided by Section 4.03. Nothing in this Section 3.27(d) shall affect the Master Servicer's obligation to supervise, or to take such actions as are necessary to enforce, the servicing and administration of the Mortgage Loans pursuant to Sections 3.01 and 3.03.

(e) In taking or recommending any course of action pursuant to this Agreement, unless specifically required to do so pursuant to this Agreement, the Master Servicer shall not be required to investigate or make recommendations concerning potential liabilities which the Trust might incur as a result of such course of action by reason of the condition of the Mortgaged Properties but shall give notice to the Trustee if it has notice of such potential liabilities.

165371 Harborview 2005-15
Pooling and Servicing Agreement

(f) The Master Servicer shall not be liable for any acts or omissions of any Servicer, except as otherwise expressly provided herein.

SECTION 3.28.  Master Servicer Not to Resign.

(a) Except as provided in Section 3.30, the Master Servicer shall not resign from the obligations and duties hereby imposed on it except upon a determination that any such duties hereunder are no longer permissible under applicable law and such impermissibility cannot be cured.  Any such determination permitting the resignation of the Master Servicer shall be evidenced by an Independent Opinion of Counsel (delivered at the expense of the Master Servicer) to such effect delivered to the Trustee.  No such resignation by the Master Servicer shall become effective until the Trustee or a successor to the Master Servicer reasonably satisfactory to the Trustee shall have assumed the responsibilities and obligations of the Master Servicer in accordance with Section 7.02 hereof.  The Trustee shall notify the Rating Agency of the resignation of the Master Servicer.

(b) If, at any time, Wells Fargo Bank, N.A., as Master Servicer resigns under this Section 3.28, or sells or assigns its rights and obligations under Section 3.30, or is removed as Master Servicer pursuant to Section 7.01, then at such time Wells Fargo Bank, N.A. also shall resign (and shall be entitled to resign) as Securities Administrator, Paying Agent and Certificate Registrar under this Agreement.

SECTION 3.29.  Successor Master Servicer.

In connection with the appointment of any successor Master Servicer or the assumption of the duties of the Master Servicer, the Trustee may make such arrangements for the compensation of such successor Master Servicer out of payments on the Mortgage Loans as the Trustee and such successor Master Servicer shall agree which in no case shall exceed the Master Servicing Fee.  If the successor Master Servicer does not agree that the proposed compensation is fair, such successor Master Servicer shall obtain two quotations of market compensation from third parties actively engaged in the servicing of single-family mortgage loans; *provided, however*, that the Rating Agency shall confirm in writing that any appointment of a successor Master Servicer (other than the Trustee) will not result in a downgrade in the then current rating of any Class of Certificates.

SECTION 3.30.  Sale and Assignment of Master Servicing.

The Master Servicer may sell and assign its rights and delegate its duties and obligations in their entirety as Master Servicer under this Agreement, provided that: (i) the purchaser or transferee accepting such assignment and delegation (a) shall be a Person which shall be qualified to service mortgage loans for Fannie Mae or Freddie Mac; (b) shall have a net worth of not less than $10,000,000 (unless otherwise approved by the Rating Agency pursuant to clause (ii) below); (c) shall be reasonably satisfactory to the Trustee and the Depositor; and (d) shall execute and deliver to the Trustee and the Depositor an agreement, in form and substance reasonably satisfactory to the Trustee, which contains an assumption by such Person of the due and punctual performance and observance of each covenant and condition to be performed or

103

observed by it as master servicer under this Agreement or any custodial agreement from and after the effective date of such agreement; (ii) each Rating Agency shall be given prior written notice of the identity of the proposed successor to the Master Servicer and the Rating Agency's ratings of the Certificates in effect immediately prior to such assignment, sale and delegation will not be downgraded, qualified or withdrawn as a result of such assignment, sale and delegation, as evidenced by a letter to such effect delivered to the Master Servicer, the Trustee and the Depositor; and (iii) the Master Servicer assigning and selling the master servicing shall deliver to the Trustee, the Certificate Insurer and the Depositor an Officer's Certificate and an Independent Opinion of Counsel, (delivered at the Master Servicer's expense) each stating that all conditions precedent to such action under this Agreement have been completed and such action is permitted by and complies with the terms of this Agreement. No such assignment or delegation shall affect any liability of the Master Servicer arising prior to the effective date thereof.

ARTICLE IV

ACCOUNTS

SECTION 4.01. Servicing Accounts

(a) The Master Servicer shall enforce the obligation of each Servicer to establish and maintain one or more custodial accounts (the "**Servicing Accounts**") in accordance with the applicable Servicing Agreement, with records to be kept with respect thereto on a Mortgage Loan by Mortgage Loan basis, into which accounts shall be deposited within 48 hours (or as of such other time specified in the related Servicing Agreement) of receipt all collections of principal and interest on any Mortgage Loan and with respect to any REO Property received by a Servicer, including Principal Prepayments, Insurance Proceeds, Liquidation Proceeds, Recoveries and advances made from the Servicer's own funds (less, in the case of each Servicer, the applicable servicing compensation, in whatever form and amounts as permitted by the applicable Servicing Agreement) and all other amounts to be deposited in each such Servicing Account. The Servicer is hereby authorized to make withdrawals from and deposits to the related Servicing Account for purposes required or permitted by this Agreement and the applicable Servicing Agreement. For the purposes of this Agreement, Servicing Accounts shall also include such other accounts as the Servicer maintains for the escrow of certain payments, such as taxes and insurance, with respect to certain Mortgaged Properties. Each Servicing Agreement sets forth the criteria for the segregation, maintenance and investment of each related Servicing Account, the contents of which are acceptable to the parties hereto as of the date hereof and changes to which shall not be made unless such changes are made in accordance with the provisions of Section 12.01 hereof.

(b) [Reserved];

(c) To the extent provided in the related Servicing Agreement and subject to this Article IV, on or before each Servicer Remittance Date, each Servicer shall withdraw or shall cause to be withdrawn from the related Servicing Account and shall immediately remit or cause to be remitted to the Master Servicer for deposit into the Distribution Account, amounts representing the following collections and payments (other than with respect to principal of or interest on the

104

Mortgage Loans due on or before the Cut-off Date) with respect to each of the Mortgage Loans it is servicing:

(i)    Monthly Payments on the Mortgage Loans received or any related portion thereof advanced by the Servicers pursuant to the Servicing Agreements which were due on or before the related Due Date, net of the amount thereof comprising the Servicing Fees and Lender-Paid Mortgage Insurance Fees, if any;

(ii)    Principal Prepayments in full and any Liquidation Proceeds received by the Servicers with respect to such Mortgage Loans in the related Prepayment Period, with interest to the date of prepayment or liquidation, net of the amount thereof comprising the Servicing Fees;

(iii)    Principal Prepayments in part received by the Servicers for such Mortgage Loans in the related Prepayment Period;

(iv)    Prepayment Penalty Amounts, if any, and only if required under the related Servicing Agreement;

(v)    Recoveries received by the Servicers with respect to such Mortgage Loans; and

(vi)    any amount to be used as a delinquency advance or to pay any Interest Shortfalls, in each case, as required to be paid under the related Servicing Agreement.

(d) Withdrawals may be made from a Servicing Account only to make remittances as provided in Section 4.01(c), to reimburse a Servicer for advances which have been recovered by subsequent collection from the related Mortgagor, to remove amounts deposited in error, to remove fees, charges or other such amounts deposited on a temporary basis, or to clear and terminate the account at the termination of this Agreement in accordance with Section 10.01. As provided in Section 4.01(c), certain amounts otherwise due to the Servicers may be retained by them and need not be remitted to the Master Servicer.

SECTION 4.02.  Distribution Account.

(a) The Master Servicer shall establish and maintain an account, in the name of the Trustee, for the benefit of the Securities Administrator, as Paying Agent for the Trustee, and the Certificateholders, as a segregated account which shall be an Eligible Account (the "**Distribution Account**"). The Master Servicer shall, promptly upon receipt from the Servicers on the Servicer Remittance Date, deposit into the Distribution Account and retain on deposit until the related Distribution Date, the following amounts:

(i)    any amounts withdrawn from a Servicing Account pursuant to Section 4.01(c);

(ii)    any amounts required to be deposited by the Master Servicer with respect to the Mortgage Loans pursuant to this Agreement, including (a) Advances and any Compensating Interest Payments required to be made by the Master Servicer to the extent required but not made by a Servicer and (b) the amount of any Insurance Proceeds or Liquidation Proceeds

105

received by or on behalf of the Master Servicer which were not deposited in a Servicing Account;

(iii)    the Purchase Price with respect to any Mortgage Loans purchased by the Seller or the related Originator under this Agreement or the related Purchase Agreement, as applicable, any Substitution Adjustments pursuant to Section 2.03 of this Agreement and all proceeds of any Mortgage Loans or property acquired with respect thereto repurchased by the Master Servicer pursuant to Section 10.01;

(iv)    any amounts required to be deposited by the Master Servicer with respect to losses on investments of deposits in the Distribution Account; and

(v)    any other amounts so required to be deposited in the Distribution Account pursuant to this Agreement.

(b) All amounts deposited to the Distribution Account shall be held by the Master Servicer in the name of the Trustee in trust for the benefit of the Securities Administrator, as Paying Agent for the Trustee, and the Certificateholders in accordance with the terms and provisions of this Agreement. The requirements for crediting the Distribution Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of (i) late payment charges or assumption fees, tax service fees, statement account charges or payoff charges, substitution, satisfaction, release and other like fees and charges (but excluding all Prepayment Penalty Amounts) and (ii) the items enumerated in Subsections 4.03(a)(i), (ii), (iii), (iv), (vi), (vii), (x) and (xi) with respect to the Servicer, need not be remitted by the related Servicer to the Master Servicer or with respect to the Master Servicer, be deposited by the Master Servicer to the Distribution Account. In the event that a Servicer has remitted to the Master Servicer any amount not required to be credited to the Distribution Account, such Servicer may at any time, by delivery of a written request signed by a Servicing Officer of such Servicer which describes the amount deposited in error, direct the Master Servicer to withdraw such amount from the Distribution Account for repayment to such Servicer. In the event that the Master Servicer has deposited to the Distribution Account any amount not required to be credited thereto, it may at any time, withdraw such amount from the Distribution Account.

(c) Funds in the Distribution Account shall, if invested, be invested, in the name of the Trustee, or its nominee, for the benefit of the Trust, in Permitted Investments as directed by the Master Servicer. All Permitted Investments shall mature or be subject to redemption or withdrawal no later than one Business Day prior to the next succeeding Distribution Date (except that if such Permitted Investment is an obligation of the Master Servicer, then such Permitted Investment shall mature not later than such applicable Distribution Date). Any and all investment earnings from any such Permitted Investment shall be for the benefit of the Master Servicer and shall be subject to its withdrawal or order from time to time, and shall not be part of the Trust Fund. The risk of loss of moneys required to be distributed to the Certificateholders resulting from such investments shall be borne by and be the risk of the Master Servicer. The Master Servicer shall deposit the amount of any such loss in the Distribution Account immediately as realized, but in no event later than the related Distribution Date.

165371 Harborview 2005-15
Pooling and Servicing Agreement

SECTION 4.03.  <u>Permitted Withdrawals and Transfers from the Distribution Account</u>.

(a) The Securities Administrator shall, from time to time, withdraw or transfer funds from the Distribution Account to a Servicer, to the Master Servicer, to the Trustee or to itself for the following purposes:

(i)    to reimburse the Master Servicer or any Servicer for any Advance or advance, respectively, of its own funds or of such Servicer's own funds, the right of the Master Servicer or a Servicer to reimbursement pursuant to this subclause (i) being limited to amounts received on a particular Mortgage Loan (including, for this purpose, the Purchase Price therefor, Insurance Proceeds and Liquidation Proceeds) which represent late payments or recoveries of the principal of or interest on such Mortgage Loan respecting which such Advance was made;

(ii)    to reimburse the Master Servicer or any Servicer from Insurance Proceeds or Liquidation Proceeds relating to a particular Mortgage Loan for amounts expended by the Master Servicer or such Servicer in good faith in connection with the restoration of the related Mortgaged Property which was damaged by an Uninsured Cause or in connection with the liquidation of such Mortgage Loan;

(iii)    to reimburse the Master Servicer or any Servicer from Insurance Proceeds relating to a particular Mortgage Loan for insured expenses incurred with respect to such Mortgage Loan and to reimburse the Master Servicer or such Servicer from Liquidation Proceeds from a particular Mortgage Loan for Liquidation Expenses incurred with respect to such Mortgage Loan;

(iv)    to pay the Master Servicer or any Servicer, as appropriate, from Liquidation Proceeds or Insurance Proceeds received in connection with the liquidation of any Mortgage Loan, the amount which it or such Servicer would have been entitled to receive under subclause (x) of this Subsection 4.03(a) as servicing compensation on account of each defaulted scheduled payment on such Mortgage Loan if paid in a timely manner by the related Mortgagor;

(v)    to pay the Master Servicer or any Servicer from the Purchase Price for any Mortgage Loan, the amount which the Master Servicer or such Servicer would have been entitled to receive under subclause (x) of this Subsection 4.03(a) as servicing compensation;

(vi)    to reimburse the Master Servicer or any Servicer for servicing related advances of funds, the right to reimbursement pursuant to this subclause being limited to amounts received on the related Mortgage Loan (including, for this purpose, the Purchase Price therefor, Insurance Proceeds and Liquidation Proceeds) which represent late recoveries of the payments for which such servicing advances were made;

(vii)    to reimburse the Master Servicer or any Servicer for any Advance or advance, after a Realized Loss has been allocated with respect to the related Mortgage Loan if the Advance or advance has not been reimbursed pursuant to clauses (i) and (vi);

165371 Harborview 2005-15
Pooling and Servicing Agreement

(viii)    to pay the Master Servicer its monthly Master Servicing Fee and any other servicing compensation payable pursuant to Section 3.14;

(ix)    to pay the Master Servicer any investment income;

(x)    to reimburse the Master Servicer for any expenses recoverable by it pursuant to Sections 3.03 and 3.27;

(xi)    to reimburse or pay any Servicer any such amounts as are due thereto under the applicable Servicing Agreement and have not been retained by or paid to the Servicer, to the extent provided in the related Servicing Agreement;

(xii)    to reimburse the Trustee and the Securities Administrator for expenses, costs and liabilities incurred by or reimbursable to it pursuant to Sections 3.27, 8.05 or 8.10 (including those related to the fees and expenses of the Custodian);

(xiii)    to pay to the Certificate Insurer its Aggregate Premium Amount;

(xiv)    to remove amounts deposited in error; and

(xv)    to clear and terminate the Distribution Account pursuant to Section 10.01.

(b) The Master Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of accounting for any payments or reimbursements from the Distribution Account pursuant to subclauses (i) through (vii), inclusive and subclause (x) or with respect to any such amounts which would have been covered by such subclauses had the amounts not been retained by the Master Servicer without being deposited in the Distribution Account under Section 4.02(b).

(c) On each Distribution Date, the Securities Administrator, as Paying Agent, shall withdraw funds on deposit in the Distribution Account to the extent of the aggregate Available Funds and distribute such funds to the Holders of the Certificates and any other parties entitled thereto, in accordance with Section 5.01.

SECTION 4.04.  Yield Maintenance Account.

On or prior to the Closing Date, the Securities Administrator, on behalf of the Trustee, shall cause to be established and maintained the Yield Maintenance Account, into which Yield Maintenance Payments received by the Securities Administrator pursuant to the Yield Maintenance Agreements shall be deposited for the benefit of the Class 1-A1A, Class 1-A1B, Class 2-A1A1, Class 2-A1A2, Class 2-A1B, Class 2-A1C, Class 3-A1A2, Class 3-A1B and Class 3-A1C Certificates.  Amounts on deposit in the Yield Maintenance Account shall not be invested and shall not be held in an interest-bearing account.

The Securities Administrator shall deposit all amounts received from the Yield Maintenance Provider under the Yield Maintenance Agreements into the Yield Maintenance Account immediately upon receipt.  On each Distribution Date, the Securities Administrator, as

108

Paying Agent for the Trustee, shall withdraw from the Yield Maintenance Account (i) the Yield Maintenance Distributable Amount with respect to the Yield Maintenance Agreement related to the Class 1-A1A Certificates then on deposit therein and distribute such amounts in respect of any Basis Risk Shortfalls for such Class on such Distribution Date and (ii) any amounts remaining on deposit therein after distributions made pursuant to (i) above shall be distributed amounts to the Class X-1 Certificates.

On each Distribution Date, the Securities Administrator, as Paying Agent for the Trustee, shall withdraw from the Yield Maintenance Account (i) the Yield Maintenance Distributable Amount with respect to the Yield Maintenance Agreement related to the Class 1-A1B Certificates then on deposit therein and distribute such amounts in respect of any Basis Risk Shortfalls for such Class on such Distribution Date and (ii) any amounts remaining on deposit therein after distributions made pursuant to (i) above shall be distributed amounts to the Class X-1 Certificates.

On each Distribution Date, the Securities Administrator, as Paying Agent for the Trustee, shall withdraw from the Yield Maintenance Account (i) the Yield Maintenance Distributable Amount with respect to the Yield Maintenance Agreement related to the Class 2-A1A1, Class 2-A1A2, Class 2-A1B Certificates and Class 2-A1C Certificates then on deposit therein and distribute such amounts in respect of any Basis Risk Shortfalls for such Classes on such Distribution Date, *pro rata*, based on amounts due and (ii) any amounts remaining on deposit therein after distributions made pursuant to (i) above shall be distributed amounts to the Class X-2 Certificates.

On each Distribution Date, the Securities Administrator, as Paying Agent for the Trustee, shall withdraw from the Yield Maintenance Account (i) the Yield Maintenance Distributable Amount with respect to the Yield Maintenance Agreement related to the Class 3-A1A2, Class 3-A1B Certificates and Class 3-A1C Certificates then on deposit therein and distribute such amounts in respect of any Basis Risk Shortfalls for such Classes on such Distribution Date, *pro rata*, based on amounts due and (ii) any amounts remaining on deposit therein after distributions made pursuant to (i) above shall be distributed amounts to the Class X-3B Certificates.

If the Seller or its affiliate is the Holder of a Class 1-A1A, Class 1-A1B, Class 2-A1A1, Class 2-A1A2, Class 2-A1B, Class 2-A1C, Class 3-A1A2, Class 3-A1B or Class 3-A1C Certificate, the Seller or its affiliate shall remit to the Securities Administrator the portion of Yield Maintenance Distributable Amounts received by the Holder of such Certificate on any Distribution Date, and the Securities Administrator will remit such amounts to the Yield Maintenance Provider. For purposes of this Agreement, the Securities Administrator shall have no duty to confirm that each amount received by it from the Seller or its affiliate with respect to the preceding sentence is the correct amount.

To the extent that it constitutes a "reserve fund" for purposes of the REMIC Provisions, the Yield Maintenance Account established hereunder shall be an "outside reserve fund" as defined in Treasury Regulation 1.860G-2(h), and in that regard (i) such fund shall be an outside reserve fund and not an asset of any REMIC, (ii) such fund shall be owned for federal tax purposes by the Holders of the Class X-1, Class X-2 and Class X-3B Certificates, and the Holders of the Class X-1, Class X-2 and Class X-3B Certificates shall report all amounts of

income, reduction, gain or loss accruing therefrom and (iii) amounts transferred by the REMIC to the fund shall be treated as distributed by the REMIC to the Holders of the Class X-1, Class X-2 and Class X-3B Certificates.

The Securities Administrator shall terminate the Yield Maintenance Agreements upon the occurrence of an event of default or termination event under the related Yield Maintenance Agreements of which a Responsible Officer of the Securities Administrator has actual knowledge. In the event that a Yield Maintenance Agreement is canceled or otherwise terminated for any reason (other than the exhaustion of the interest rate protection provided thereby), the Securities Administrator shall, at the direction of Certificateholders evidencing Voting Rights not less than 50% of the Certificates related to such Yield Maintenance Agreement, and to the extent a replacement contract is available (from a counterparty designated by the Depositor and acceptable to Certificateholders evidencing Voting Rights not less than 50% of the related Certificates), execute a replacement contract comparable to such Yield Maintenance Agreement providing interest rate protection which is equal to the then-existing protection provided by such Yield Maintenance Agreement as certified to the Securities Administrator by the Depositor; *provided, however,* that the cost of any such replacement contract providing the same interest rate protection may be reduced to a level such that the cost of such replacement contract shall not exceed the amount of any early termination payment received from the Yield Maintenance Provider.

On any Distribution Date on or prior to the Distribution Date in May 2016, if the aggregate Class Certificate Principal Balance of the Certificates related to a Yield Maintenance Agreement equals zero (but not including the Distribution Date on which such aggregate Class Certificate Principal Balance is reduced to zero), all amounts received by the Securities Administrator with respect to such Yield Maintenance Agreement shall be distributed directly to the Class X-1, Class X-2 and Class X-3B Certificateholders, as applicable. On the Distribution Date in June 2016 or upon the termination of the Trust, the Yield Maintenance Agreements shall be terminated.

SECTION 4.05. Certificate Insurance Policy.

(a)    On or prior to the Closing Date, the Securities Administrator, on behalf of the Trustee, shall cause to be established and maintained the Policy Account, into which amounts received by the Securities Administrator pursuant to the Certificate Insurance Policy shall be deposited for the benefit of the Insured Certificate. Amounts on deposit in the Policy Account shall not be invested and shall not be held in an interest-bearing account.

(b)    As soon as possible, and in no event later than 12:00 noon New York time on the second Business Day immediately preceding any Distribution Date, the Securities Administrator shall furnish the Certificate Insurer and the Master Servicer with a completed Notice in the form set forth as Exhibit A to the Endorsement to the Certificate Insurance Policy in the event that (a) the related Available Funds (other than any amounts in respect of Insured Amounts) are insufficient to pay the Monthly Interest Distributable Amount (net of any Net Interest Shortfalls, Basis Risk Shortfalls or Net Deferred Interest) with respect to the Class 1-A1B Certificateholder, as applicable, on such Distribution Date or (b) a Realized Loss is to be allocated to the Class 1-

A1B Certificates on such Distribution Date; *provided, however*, that if such Distribution Date is the Final Distribution Date, the Notice shall also include the aggregate outstanding Class Certificate Principal Balance of the Class of the Insured Certificate, after giving effect to all payments of principal on the Insured Certificate on such Final Distribution Date, other than pursuant to the Certificate Insurance Policy. The Notice shall specify the amount of Insured Amounts for the Class of the Insured Certificate and shall constitute a claim for an Insured Amount pursuant to the Certificate Insurance Policy.

(c)    Upon receipt of an Insured Amount from the Certificate Insurer on behalf of the Holder of the Insured Certificate, the Securities Administrator shall deposit such Insured Amount into the Policy Account. All such amounts on deposit in the Policy Account shall remain uninvested. On or prior to each Distribution Date, the Securities Administrator shall transfer amounts on deposit in the Policy Account to the Distribution Account and shall distribute such Insured Amounts to Insured Certificate pursuant to Section 5.01.

The Securities Administrator shall include on each Distribution Date any Insured Amounts received by it from or on behalf of the Certificate Insurer for such Distribution Date (i) in the amount distributed to the Holder of the Insured Certificate pursuant to Section 5.01 and (ii) in the amount deemed to have been distributed to the Class 1-A1B regular interests and deposited for their benefit into the Distribution Account. If on any Distribution Date the Securities Administrator determines that the Certificate Insurer has paid more under the Certificate Insurance Policy than is required by the terms thereof, the Securities Administrator shall promptly return the excess amount to the Certificate Insurer.

(d)    The Securities Administrator shall (i) receive as attorney-in-fact of the Holders of the Insured Certificate any Insured Amount or Avoided Payment delivered to it by the Certificate Insurer for payment to such Holders and (ii) distribute any such Insured Amount to such Holder as set forth in Section 5.01. Insured Amounts disbursed by the Securities Administrator from proceeds of the Certificate Insurance Policy shall not be considered payment by the Trust Fund with respect to the Insured Certificate, nor shall such disbursement of Insured Amounts discharge the obligations of the Trust Fund with respect to the amounts thereof, and the Certificate Insurer shall become owner of such amounts to the extent covered by such Insured Amounts as the deemed assignee of such Holders. The Securities Administrator hereby agrees on behalf of the Holders of the Insured Certificate (and each such Holder, by its acceptance of its Insured Certificate, hereby agrees) for the benefit of the Certificate Insurer that, to the extent the Certificate Insurer pays any Insured Amount or Avoided Payment, either directly or indirectly (as by paying through the Securities Administrator), to the Holders of the Insured Certificate, the Certificate Insurer will be entitled to be subrogated to any rights of such Holder to receive the amounts for which such Insured Amount or Avoided Payment was paid, to the extent of such payment, and will be entitled to receive the Certificate Insurer Reimbursement Amount as set forth in Section 5.01.

(e)    At the end of the Term of the Certificate Insurance Policy (as defined in the Certificate Insurance Policy), the Securities Administrator shall return the Certificate Insurance Policy to the Certificate Insurer for cancellation.

165371 Harborview 2005-15
Pooling and Servicing Agreement

ARTICLE V

FLOW OF FUNDS

SECTION 5.01.  Distributions.

(a) On each Distribution Date and after making any withdrawals from the Distribution
Account pursuant to Section 4.03(a), the Securities Administrator, as Paying Agent, shall
withdraw funds on deposit in the Distribution Account to the extent of Available Funds for each
Loan Group for such Distribution Date and, based on the Distribution Date Statement provided
by the Securities Administrator, make the following disbursements and transfers as set forth
below:

      (i)    any Class ES Distributable Amount shall be distributed on each Distribution
Date to the Class ES Certificates;

      (ii)    the Available Funds for Loan Group 1 remaining after giving effect to the
distributions specified in subsection (i) shall be distributed on each Distribution Date (other
than on the Distribution Date following the optional purchase of the Mortgage Loans by the
Master Servicer) in the following order of priority:

      (A)    to the Class A-R, Class 1-A1A, Class 1-A1B, Class X-1 and Class
X-B Certificates, the related Interest Distributable Amounts for
that date, *pro rata*, based on the Interest Distributable Amount to
which each such Class is entitled; *provided, however*, that for
purposes of distributions for the Class X-B Certificates pursuant to
this paragraph 5.01(a)(ii)(A), the Interest Distributable Amount for
the Class X-B Certificates from Loan Group 1 will be determined
by the Group 1 Class X-B Apportionment Rule; *provided, further,*
that on each Distribution Date, the related Interest Distributable
Amount for the Class X-1 Certificates up to the X-1 Required
Reserve Fund Deposit shall be deposited in the Basis Risk Reserve
Fund X-1 Subaccount and shall not be distributed to the Class X-1
Certificates and the related Interest Distributable Amount for the
Class X-B Certificates up to the X-B Required Reserve Fund
Deposit shall be deposited in the Basis Risk Reserve Fund X-B
Subaccount and shall not be distributed to the Class X-B
Certificates; and

      (B)    an amount equal to the Senior Principal Distribution Amount for
Loan Group 1 for that date, as follows:

      *first*, to the Holder of Class A-R Certificate, until
the Class Certificate Principal Balance of such
Class is reduced to zero;

112

*second*, to the Class 1-A1A and Class 1-A1B Certificates, *pro rata* based on their respective Class Certificate Principal Balances, until the Class Certificate Principal Balances of such Classes are reduced to zero; and

*third*, to the Class PO-1 Certificate and PO-B1 Component, *pro rata* based on their Class Certificate Principal Balance and Component Principal Balance, until the Class Certificate Principal Balance or Component Principal Balance, respectively, of such Class or Component is reduced to zero;

(iii)    the Available Funds for Loan Group 2 remaining after giving effect to the distributions specified in subsection (i) shall be distributed on each Distribution Date (other than on the Distribution Date following the optional purchase of the Mortgage Loans by the Master Servicer) in the following order of priority:

(A)    to the Class 2-A1A1, Class 2-A1A2, Class 2-A1B, Class 2-A1C, Class X-2 and Class X-B Certificates, the related Interest Distributable Amounts for that date, *pro rata,* based on the Interest Distributable Amount to which each such Class is entitled; *provided, however*, that for purposes of distributions for the Class X-B Certificates pursuant to this paragraph 5.01(a)(iii)(A), the Interest Distributable Amount for the Class X-B Certificates from Loan Group 2 will be determined by the Group 2 Class X-B Apportionment Rule; *provided, further,* that on each Distribution Date, the related Interest Distributable Amount for the Class X-2 Certificates up to the X-2 Required Reserve Fund Deposit shall be deposited in the Basis Risk Reserve Fund X-2 Subaccount and shall not be distributed to the Class X-2 Certificates and the related Interest Distributable Amount for the Class X-B Certificates up to the X-B Required Reserve Fund Deposit shall be deposited in the Basis Risk Reserve Fund X-B Subaccount and shall not be distributed to the Class X-B Certificates; and

(B)    an amount equal to the Senior Principal Distribution Amount for Loan Group 2 for that date, as follows:

*first*, to the Class 2-A1A1, Class 2-A1A2, Class 2-A1B and Class 2-A1C Certificates, *pro rata* based on their respective Class Certificate Principal Balances, until the Class Certificate Principal Balances of each such Class are reduced to zero; and

*second*, to the Class PO-2 Certificate and PO-B2 Component, *pro rata* based on their Class Certificate Principal Balance and Component Principal Balance, until the Class Certificate Principal Balance or Component Principal Balance, respectively, of such Class or Component is reduced to zero;

(iv)    the Available Funds for Loan Group 3 remaining after giving effect to the distributions specified in subsection (i) shall be distributed on each Distribution Date (other than on the Distribution Date following the optional purchase of the Mortgage Loans by the Master Servicer) in the following order of priority:

(A)    to the Class 3-A1A1, Class 3-A1A2, Class 3-A1B, Class 3-A1C, Class X-3A, Class X-3B and Class X-B Certificates, the related Interest Distributable Amounts for that date, *pro rata*, based on the Interest Distributable Amount to which each such Class is entitled; *provided, however,* that for purposes of distributions for the Class X-B Certificates pursuant to this paragraph 5.01(a)(iv)(A), the Interest Distributable Amount for the Class X-B Certificate from Loan Group 3 will be determined by the Group 3 Class X-B Apportionment Rule; *provided, further,* that on each Distribution Date, the related Interest Distributable Amount for the Class X-3A Certificates up to the X-3A Required Reserve Fund Deposit shall be deposited in the Basis Risk Reserve Fund X-3A Subaccount and shall not be distributed to the Class X-3A Certificate, the related Interest Distributable Amount for the Class X-3B Certificates up to the X-3B Required Reserve Fund Deposit shall be deposited in the Basis Risk Reserve Fund X-3B Subaccount and shall not be distributed to the Class X-3B Certificate and the related Interest Distributable Amount for the Class X-B Certificates up to the X-B Required Reserve Fund Deposit shall be deposited in the Basis Risk Reserve Fund X-B Subaccount and shall not be distributed to the Class X-B Certificate; and

(B)    an amount equal to the Senior Principal Distribution Amount for Loan Group 3 for that date, as follows:

*first*, to the Holders of the Class 3-A1A1, Class 3-A1A2, Class 3-A1B and Class 3-A1C Certificates, *pro rata* based on their Class Certificate Principal Balances, until the Class Certificate Principal Balances of each such Class are reduced to zero; and

114