HEARING DATE AND TIME: November 19, 2013, at 10:00 a.m. (Eastern)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Case No. 12-12020 (MG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DECLARATION OF DAVID S. COHEN IN SUPPORT OF OBJECTION OF THE NOTES TRUSTEE AND AD HOC COMMITTEE OF JUNIOR SECURED NOTEHOLDERS <u>TO CONFIRMATION OF PLAN PROPONENTS' CHAPTER 11 PLAN</u>

I, DAVID S. COHEN, declare as follows:

1.      I am a partner with the firm of Milbank Tweed Hadley & McCloy LLP, counsel for (i) UMB Bank, N.A., as successor Notes Trustee  under that certain Indenture dated as of June 6, 2008  for 9.625% Junior Secured Guaranteed Notes due 2015 of Residential Capital, LLC and (ii) the Ad Hoc Committee of Junior Secured Noteholders.

2.      Annexed hereto as <u>Exhibit A</u> is a true and correct copy of the Expert Report of Robert S. Bingham, dated October 18, 2013.

3.      Annexed hereto as <u>Exhibit B</u> is a true and correct copy of the  Expert Report of Michael Fazio, dated October 18, 2013.

4.      Annexed hereto as <u>Exhibit C</u> is a true and correct copy of the Expert Report of Raymond T. Lyons, Esq., dated October 18, 2013.

I declare, under penalty of perjury pursuant to 28 U.S.C. §1746, that the foregoing

is true and correct to the best of my knowledge, information, and belief.

Dated:  October 22, 2013
        New York, New York

                                        /s/ David S. Cohen
                                        David S. Cohen

## Exhibit A

**Expert Report of Robert S. Bingham, dated October 18, 2013**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>al</u>.,<br><br>          Debtors. | Case No. 12-12020 (MG)<br>Chapter 11<br><br>Jointly Administered |
| RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>al</u>.,<br><br>          Plaintiffs,<br><br>       v.<br><br>UMB BANK, N.A., IN ITS CAPACITY AS<br>INDENTURE TRUSTEE FOR THE 9.625%<br>JUNIOR SECURED GUARANTEED NOTES, <u>et</u> <u>al</u>.,<br><br>          Defendants. | Adv. Case No. 13-01343 (MG) |
| OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS, on behalf of the estate of the Debtors,<br><br>          Plaintiffs,<br><br>       v.<br><br>UMB BANK, N.A., AS SUCCESSOR INDENTURE<br>TRUSTEE UNDER THAT CERTAIN INDENTURE,<br>dated as of June 6, 2008, <u>et</u> <u>al</u>.,<br><br>          Defendants. | Adversary Proceeding<br>No. 13-01277 (MG) |

**EXPERT REPORT OF ROBERT S. BINGHAM**

**OCTOBER 18, 2013**

## TABLE OF CONTENTS

**Page**

I.    PROFESSIONAL QUALIFICATIONS ............................................................................ 4

II.   SCOPE OF SERVICES ................................................................................................. 5

III.  BACKGROUND ........................................................................................................... 6

IV.   SUMMARY OF OPINIONS .......................................................................................... 8

V.    BASIS FOR OPINIONS AND OBSERVATIONS.......................................................... 9

VI.   THE DEBTORS' CASH MANAGEMENT SYSTEM .................................................... 13

VII.  DEBTORS' INTERNAL AND EXTERNAL PRESENTATION OF INTERCOMPANIES
      BALANCES ................................................................................................................. 16

   A.   Audited Financial Statements of Certain ResCap Subsidiaries ............................ 16

   B.   Rescap's Federal Income Tax Returns................................................................... 17

   C.   Rescap's Securities & Exchange Commission Filings ........................................... 17

   D.   Rescap's Trial Balances and General Ledgers....................................................... 18

   E.   Internal Memorandum ........................................................................................... 19

VIII. THE NINE LARGEST PETITION DATE INTERCOMPANY BALANCES .................. 20

   A.   Intercompany Claim #1 – Residential Capital, LLC Claim against GMAC Residential
        Holding Company, LLC ........................................................................................ 20

      i.    Background .................................................................................................... 20

      ii.   Observations .................................................................................................. 21

   B.   Intercompany Claim #2 – Residential Funding Company, LLC Claim against Residential
        Capital, LLC ......................................................................................................... 23

      i.    Background .................................................................................................... 23

      ii.   Observations .................................................................................................. 24

   C.   Intercompany Claim #3 – Homecomings Financial, LLC Claim against Residential Funding
        Company, LLC ...................................................................................................... 27

      i.    Background .................................................................................................... 27

      ii.   Observations .................................................................................................. 27

   D.   Intercompany Claim #4 – Passive Asset Transactions, LLC Claim against GMAC Mortgage,
        LLC....................................................................................................................... 30

      i.    Background .................................................................................................... 30

      ii.   Observations .................................................................................................. 30

E.    Intercompany Claim #5 – Executive Trustee Services, LLC Claim against GMAC Mortgage, LLC ............................................................................................................................... 32

    i.   Background ................................................................................................................ 32

    ii.  Observations ............................................................................................................. 32

F.    Intercompany Claim #6 – Residential Funding Company, LLC Claim against RFC Asset Holdings II, LLC ..................................................................................................................... 34

    i.   Background ................................................................................................................ 34

    ii.  Observations ............................................................................................................. 34

G.   Intercompany Claim #7 – Residential Funding Company, LLC Claim against GMAC Mortgage, LLC .......................................................................................................................... 36

    i.   Background ................................................................................................................ 36

    ii.  Observations ............................................................................................................. 36

H.   Intercompany Claim #8 – Home Connect Lending Services, LLC Claim against GMAC Residential Holding Company, LLC ................................................................................... 37

    i.   Background ................................................................................................................ 37

    ii.  Observations ............................................................................................................. 38

I.    Intercompany Claim #9 – GMAC Residential Holding Company, LLC Claim against GMAC Mortgage, LLC ............................................................................................................ 39

    i.   Background ................................................................................................................ 39

    ii.  Observations ............................................................................................................. 39

IX.  DEBT FORGIVENESS AMONG RESCAP ENTITIES AND APPROVALS RECEIVED FROM ALLY'S BOARD OF DIRECTORS ...................................................................................... 41

X.   SIGNATURE AND RIGHT TO SUPPLEMENT AND/OR MODIFY ........................................... 45

XI.  INDEX OF EXHIBITS ........................................................................................................................ 46

## I.    PROFESSIONAL QUALIFICATIONS

1.      I am a Senior Director with Zolfo Cooper LLC ("Zolfo Cooper").  I have
35 years of experience in a variety of auditing, financial and accounting management and
consulting positions.  I have provided over 15,000 hours of service as either an officer of or
advisor to companies operating, restructuring and/or liquidating in bankruptcy.  My experience
includes working on several large bankruptcies involving multiple affiliated entities and
significant, intercompany claims among the entities. I served as a confirmation hearing witness
related to the treatment of intercompany claims in the Enron Corp, Prime Motor Inns, Inc. and
The Loewen Group Inc. bankruptcy proceedings.  I have also provided financial advisory
services in bankruptcy matters including New Stream Secured Capital, Inc., New York Racing
Association, Blue Bird, Sunbeam Corporation, and the Washington Group.

2.      In August 2011, I issued an expert report in an adversary proceeding (Adv.
Pro. No. 2:10-CV-198-MHT) related to the Colonial Bancgroup, Inc. chapter 11 bankruptcy for
the Middle District of Alabama Case No. 2:10-cv-00409-MHT-WC (Bankr. Case No. 09-32303
(DHW)).  My opinions and observations expressed in that report related to the treatment of
intercompany transactions pursuant to a corporate tax sharing agreement.

3.      I served on a panel at the 2011 Association of Insolvency and
Restructuring Advisors annual conference discussing the treatment of intercompany claims in
bankruptcy.  I am a Certified Insolvency and Restructuring Advisor.  I was also named the 2002
Gold Medal winner for achieving the highest score on the Certified Insolvency and Restructuring
Advisor Exam.  I began my career in public accounting, serving as an auditor with Ernst &
Young for 9 years.

4.      My Curriculum Vitae is attached as Exhibit 1, which includes a more

detailed summary of my credentials and experience.

## II.      SCOPE OF SERVICES

5.      Zolfo Cooper has provided this report at the request of White & Case LLP

and Milbank, Hadley, Tweed, & McCloy LLP as counsel to the Ad Hoc Group of Junior Secured

Noteholders ("Ad Hoc Group") of the 9.625% Junior Secured Guaranteed Notes due 2015

("JSNs") and counsel to UMB Bank, N.A. as Trustee for the JSNs ("Notes Trustee"), and also to

Akin Gump Strauss Hauer Feld LLP as special litigation counsel to the Trustee relating to the

Chapter 11 proceedings of the Debtors in the United States Bankruptcy Court for the Southern

District of New York, Case No. 12-12020.

6.      No portion of Zolfo Cooper's compensation is dependent upon the nature

of my opinions or on the outcome of this proceeding.  In connection with the preparation of this

report, Zolfo Cooper is being compensated based on the time incurred providing such services.

My hourly billing rate is $750.00.  I have been asked by Counsel to prepare an expert report and

provide expert testimony (if necessary) on certain topics and issues related to these Consolidated

Adversary Proceedings and the confirmation of the Debtors' plan of reorganization.

7.      Counsel and the Trustee engaged Zolfo Cooper to review and assess the

following:

- The Debtors' use of a centralized cash management system (the "Debtors' Cash
  Management System") in their normal business operations;
- The nature of the transactions that comprise the Debtors' nine largest
  intercompany balances as of May 14, 2012 (the "Petition Date"), the date of
  Debtors' bankruptcy petitions (the "Nine Largest Petition Date Intercompany
  Balances"), which comprises $8 billion of the total $8.4 billion intercompany
  balances scheduled by the Debtors; and

5

- The presentation of the Debtors' intercompany balances as reflected in the Debtors' pre-petition internal accounting records and external reports, including SEC filings, audited financial statements provided to various lenders and used to determine compliance with certain federal and state licensing agency minimum net worth and solvency requirements and federal income tax returns.[1]

## III.    BACKGROUND

8.    A review of the Company's books and records reveals that Residential Capital, LLC ("ResCap", the "Company" or the "Debtors"), GMAC Mortgage LLC ("GMACM"), Residential Funding Company, LLC ("RFC") and each of their affiliated debtors (the "Debtors") accounted for the transfer of value between and among affiliates as debt transactions, resulting in corresponding intercompany payables and receivables being recorded in the Company's general ledgers.  The intercompany accounts in their general ledgers included titles/account names such as, "Note Receivable," "Intercompany," "Intercompany Receivable," "Intercompany Recvable," "Intercompany Rec," "Intercompany Payable/Recvable," "Interco LOC," "Interco Payable," "Intracompany payable – US Subs" and/or "A/P affiliates." Intercompany balances fluctuated as transactions were recorded into the intercompany accounts. Transactions that were recorded in the Debtors' intercompany accounts are referred to throughout my report as "Intercompany Transactions."  Occasionally, intercompany receivables, or portions thereof, were forgiven by the obligee in order to permit the obligor to meet regulatory or loan agreement net worth and solvency requirements applicable to ResCap and certain of its subsidiaries including, but not limited to, GMAC Residential Holding, LLC, RFC, GMACM and Executive Trustee Services ("ETS").  As to relationships between entities that are now Debtors, such forgiveness was infrequent and required the approval of ResCap's Chief Financial Officer

---

[1] EXAM10362088-90

and/or the Board of Directors or the Executive Committee.[2]  Forgiveness of an intercompany

receivable of more than $50 million also required the approval of the Board of Directors of Ally

Financial Inc. ("Ally," formerly known as GMAC).[3]

       9.     Pre-petition note receivables, intercompany receivables and intercompany

payables among ResCap, GMACM, RFC and their affiliates arose from a variety of types of

transactions.  As discussed in more detail throughout my report and specifically explained in the

Ally/ResCap Accounting Policy for Intercompany Accounting effective on January 1, 2011 and

November 28, 2011,[4] it appears that the balances in the note receivables, note payables,

intercompany receivables and intercompany payables fluctuate primarily as a result of the

following types of transactions:

- Functioning of the centralized cash management system - with the recipient of cash recording an intercompany payable to the transferor and the transferor recording an intercompany receivable from the recipient;[5]
- Loans from one entity to another - generating an intercompany note or accounts payable on the books of the borrower and an intercompany note or accounts receivable on the books of the lender;[6]
- Charges for services provided by affiliates - creating an intercompany liability on the books of the service beneficiary to the service provider and intercompany receivable from the beneficiary on the books of the service provider for the value of the services provided.  For example, the general ledger data provided by the Debtors includes certain intercompany transactions that are described as relating

---

[2] Transcript of the Deposition of Barbara Westman, dated October 15, 2013 ("Westman Dep. Tr.") at 219:12-21.
[3] Hamzehpour Ex. 1 (EXAM10362088) at EXAM10362089.
[4] RC40000118-37, Ally/ResCap Accounting Policy 1040, Intercompany Accounting, effective January 1, 2011; and RCJSNII10131858-78, Ally/ResCap General Intercompany Accounting Policy, effective November 28, 2011.
[5] See, e.g., Westman Ex. 2 (RCJSNII10041452), Sept. 10, 2011 Email from Barbara Westman.
[6] See, e.g., Westman Ex. 19 (EXAM00107037), ResCap Restated Loan Agreement.  Moreover, the intercompany balances were considered as assets or liabilities for the purposes of evaluating solvency.  See Dondzila Tr. at 19:13-22; 22:21-23; 23:3-9.

to "Service Fee Accruals", "IT and Marketing Cross Charge" and "OPEX Allocation"; [7]

- Accrual of interest on certain intercompany loans - generating an intercompany accounts payable on the books of the borrower and an intercompany accounts receivable on the books of the lender;[8]

- Payments against intercompany notes payable or accrued intercompany interest payable, which reduced the intercompany assets on the books of the lender and the intercompany liabilities on the books of the borrower;[9]

- Transfers or sales of assets - creating an intercompany receivable from the transferee on the books of the transferor and an intercompany payable to the transferor on the books of the transferee for the value of the assets transferred;[10] and

- Occasional forgiveness of intercompany obligations - resulting in a reduction of the intercompany note or account payable on the books of the obligor and a reduction in the intercompany note or account receivable on the books of the beneficiary.[11]

## IV.    SUMMARY OF OPINIONS

10.    My opinions are based on my review and analysis of the information and documents identified in the attached Exhibit 2.

11.    The Debtors consistently treated intercompany obligations as valid liabilities.  Those liabilities arose from accurately recorded transactions entered into in the normal course of business.  The liabilities were included in the Debtors' financial statements, which were prepared in accordance with the Generally Accepted Accounting Principles ("GAAP").  Accordingly, the Debtors assessed the obligors' ability to satisfy these intercompany

[7] RCUCCJSN00012497-575, General ledger account # 2020100001, account name GMAC RESI Intercompany.
[8] *See, e.g.,* Westman Tr. at 156:12-157:2; Westman Ex. 26 (RCUCCJSN10692261) Dec. 1, 2012 Email from Barbara Westman.
[9] Westman Ex. 33 (RCJSNII10074531) Bill of Sale and Transfer Agreement.
[10] Westman Ex. 33 (RCJSNII10074531) Bill of Sale and Transfer Agreement.
[11] Westman Ex. 39 (RCUCCJSN00030215) Debt Forgiveness spreadsheet.

liabilities before determining whether they should be included in the reported financial statements.

12.     I found no evidence suggesting that the transactions recorded that comprise the intercompany liabilities (i) were not accurately recorded in amount, (ii) were not recorded between the proper entities, (iii) were not recorded in the appropriate general ledger account, or (iv) not done in the normal course of business, for legitimate business purposes. Further, I found no evidence that, prior to the Petition Date, the Debtors viewed these intercompany liabilities as anything other than valid and collectible obligations.  In fact, the Ally General Intercompany Accounting Policy states that:  "The objective of this policy is to reduce the risk of inaccurate record keeping, unreliable financial information, misappropriation of assets, incorrect payments, and fraud, as well as to establish uniform standard for all Ally Business Units (Bus) and operations to facilitate an efficient consolidation process."[12]

## V.    BASIS FOR OPINIONS AND OBSERVATIONS

13.     My review and analysis of the Debtors' external financial reports and internal records revealed that the Debtors' consistently treated and reported intercompany balances as either intercompany receivables, payables or borrowings in their internal accounting records and external financial reports.  They also relied on these financial records for determining and certifying compliance with certain regulatory and licensing requirements.  Such accounting and reporting is an indication that the ResCap entities expected the intercompany balances would be repaid, and/or that repayment could be demanded.  For example, during the deposition of Barbara Westman, one of the Debtors' Corporate Representative, Ms. Westman

---

[12] RCJSNII10131859 at page 2 of 21.

testified about the validity and collectability of the $1.8 billion RFC intercompany receivable due from ResCap as of December 31, 2011: "[I]t was a valid receivable as there was an ability for that to be collected, if necessary."[13]

14.    Specifically, the Debtors identified and reported intercompany balances as intercompany receivables, payables or borrowings in each of the following:

- Audited financial statements for certain ResCap subsidiaries that were provided to the Department of Housing and Urban Development ("HUD"), and made available to certain lenders through an Intralinks site[14];
- ResCap's Federal income tax returns;
- ResCap's SEC filings;
- Trial balances and general ledgers; and
- Internal memoranda regarding intercompany accounting and intercompany balances.

15.    Based on my review and analysis of the general ledger data produced by the Debtors,[15] the intercompany transactions and their related descriptions that were recorded in the Debtors' general ledgers for the Nine Largest Petition Date Intercompany Balances are generally consistent with the information contained in the following Debtor prepared documents and the testimony of the Debtors' Corporate Representative (Westman):

- The Revised Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors (the "Revised Disclosure Statement"),[16] including Exhibit 6 (List of Seven Largest Intercompany Balances) attached to the Revised Disclosure Statement;

---

[13] Westman Tr. at 188: 9-11; *see also* Dondzila Ex. 8 (RCUCCJSN20080064).
[14] Westman Tr. at 165:7-9; 172:5-9.
[15] RCUCCJSN00012497-575.
[16] Docket No. 4733.

- The Schedules of Assets and Liabilities for the Debtors (the "Debtors' Schedules");[17]

- The April 4, 2013 presentation prepared by the Debtors, Morrison & Foerster LLP and FTI Consulting, Inc. relating to intercompany balances as of the Petition Date, including information related to the debt forgiveness transactions from 2008 through the Petition Date (the "Debtors' Intercompany Analysis");[18]

- Email attachment containing fifteen intercompany balances as of the Petition Date and descriptions related to certain of those balances (the "January 2013 Intercompany Analysis");[19] and

- The Debtors' Motion for Order Under Bankruptcy Code Sections 105(a), 345, 363, 364, and 503(b)(1) and Bankruptcy Rules 6003 and 6004 Authorizing (I) Continued Use of Cash Management Services and Practices…(the "First Day Cash Management Motion").[20]

16.    Occasionally, intercompany debt was forgiven to allow an intercompany obligor to comply with regulatory and/or loan agreement net worth or solvency requirements applicable to various Debtors.[21]  A September 2007 Board Presentation noted that "Rescap and its subsidiaries have approximately 40 debt facilities that contain financial covenants.  Failure of covenants not desirable as in most cases would trigger cross defaults and/or potential cross acceleration on other facilities."[22]  In many cases, the debt forgiveness was necessary to allow the Debtors to continue to operate their business.  The Debtors' Corporate Representative

---

[17] Docket Nos. 548 through 597 and 649.
[18] RCUCCJSN11979453-63.
[19] RCUCCJSN30004106-11 and RCUCCJSN30004112-4, email thread starting on December 12, 2012 through January 17, 2013, including the attachment to the email thread.
[20] Docket No. 16.
[21] RCJSNII00025680 (Email from B. Westman, ResCap, to M. Renzi, FTI Consulting) ("[I]n order to maintain sufficient regulatory net worth to satisfy requirements, and to clean up balance sheets as part of entity minimization or sale activities, intercompany balances have been forgiven.  In many cases, with the approval of the Ally Board of Directors.  In most cases, but not all, the forgiveness has been treated as equity. In limited cases, where the forgiveness occurred with respect to collateralized borrowings, it may have been treated as income/expense.")
[22] EXAM10199064, at EXAM10199076.

(Hamzehpour), in testifying about a $2 billion forgiveness in 2008, described the result of a

failure to provide such forgiveness as follows:

> Q.  And if [RFC] had breached its financial covenants in March of 2008, would it
> have been able to continue to operate?
>
> MR. KERR: Objection. Asked and answered.
>
> A.  It would have triggered a cross-default across all the company's credit
> facilities, putting in danger everyone's ability to operate.
>
> Q.  And the forgiveness of the indebtedness in 2008 by Residential Capital at least
> alleviated the danger that you just testified to; correct?
>
> A. Correct.[23]

17.    Intercompany debt forgiveness required approval of the ResCap CFO,

Board of Directors, and/or Executive Committee,[24] and in some instances could be effectuated

only after receiving the approval of the Ally Board of Directors.[25]  These debt forgiveness

transactions were generally effectuated by way of capital contributions.  Significant capital

contributions made to any direct or indirect Ally subsidiary required the advance approval of the

Ally Board of Directors.[26]

18.    The fact that the Debtors followed this formal process—requiring Board-

level approvals for capital contributions—reinforces the notion that the Debtors regarded the

underlying Intercompany Transactions as debt.  If the underlying intercompany transactions were

actually created by way of capital contributions or equity distributions, clearly such debt

forgiveness would have been unnecessary.  Moreover, if the intercompany transactions were

actually equity transactions, effectuating them on a regular basis, in the ordinary course, without

---

[23] Hamzehpour Tr. at 23:10-23.
[24] RCUCCJSN10025065, Approval for the $2 billion ResCap/RFC debt forgiveness, RCJSNII10118386-8,
Approval for $500 million GMACM/ResHolding debt forgiveness and RC40006523 at RC40006568-71, Approval
for $2 billion GMACM/ResHolding debt forgiveness.
[25] Westman Tr. at 219:18-24; Hamzehpour Ex. 1 (EXAM10362088) at EXAM10362089.
[26] Hamzehpour Ex. 1 (EXAM10362088) at EXAM10362089; Westman Tr. 45:20-25, 46:2-5.

requesting or receiving CFO, Board or Executive Committee approval, would have violated the policies and procedures governing when a subsidiary was permitted to make capital contributions and equity distributions.

19.    My experience related to companies' use of centralized cash management systems is consistent with how the Debtors used the Debtors' Cash Management System, including the creation of intercompany accounts receivable and intercompany accounts payable as a result of the movement of cash resulting from the Debtors' Cash Management System.  In my experience, I have not seen equity transactions among affiliates flow through centralized cash management systems; instead, transactions flowing through centralized cash management systems generally result from ordinary course operating transactions and result in the creation of intercompany assets and liabilities.

20.    Although this report focuses primarily on the 9 largest intercompany balances, I have no reason to believe that my analysis would not apply equally to the intercompany transactions representing the remaining $0.4 billion.

## VI.    THE DEBTORS' CASH MANAGEMENT SYSTEM

21.    In the First Day Cash Management Motion, the Debtors explain that "the Cash Management System is an ordinary course, customary, and essential business system comprising a group of bank accounts and cash management practices. . . ."[27]

22.    The Debtors also explain in the First Day Cash Management Motion that:

> In the normal operation of the Debtors' businesses, the Debtors maintain business relationships and undertake transactions with each other (the 'Intercompany Transactions').    As a result, there are numerous intercompany claims that reflect intercompany receivables and payments made to each other in the ordinary course of the Debtors businesses (the

---

[27] Docket No. 16, at ¶ 6.

'Intercompany Claims'). Debtors maintain records of all Intercompany Transactions and can ascertain, trace, and account for all Intercompany Claims.

The Intercompany Transactions are ordinary course transactions that are integral to the Debtors' businesses and the function of their Cash Management System.[28]

23.     The Debtors' assertion that, as of the Petition Date, the Intercompany Balances generally were a result of the Debtors' Cash Management System[29] is consistent with the information I have reviewed and analyzed in connection with preparing my report. I found no evidence suggesting that the Debtors' statement that the various intercompany payables and receivables were largely accumulated through tens of thousands of separate transactions over a period of years under pre-petition loan agreements for the benefit of other Debtors or by operation of the Debtors' Cash Management System[30] is inaccurate.

24.     Based on my review of the information related to the Debtors' Cash Management System, including its bank account structure and funds transfer processes,[31] I believe the practices used by the Debtors to aggregate liquidity were somewhat less automated but generally consistent with my experience and understanding of how other companies use centralized cash management tools to process and record ordinary course operating transactions.

25.     Based on my understanding of the Debtors' Cash Management System and the testimony of the Debtors' Corporate Representative (Westman),[32] it is reasonable to conclude that the Debtors' Nine Largest Petition Date Intercompany Balances primarily arose from either: a) ordinary course operating transactions that flowed through the Debtors' Cash

---

[28] *Id.* at ¶¶ 71-72.
[29] Docket No. 4733 at 38, the Revised Disclosure Statement.
[30] *Id.*
[31] PWC_001_1_00000154.
[32] *See generally,* Westman Tr. at 37:12-44:24.

14

Management System, b) other ordinary course business transactions such as overhead allocations and asset sales, and/or c) transactions related to a specific borrowing arrangement.[33]  The Debtors' businesses did not require substantial capital expenditures and consequently, it is unlikely that balances arose from capital investments.[34]

26.      My analysis of the intercompany balances indicates that the balances changed frequently and often materially in the years leading up to the Petition Date.[35]  Debtors' Corporate Representative (Westman) testified that the intercompany balances changed monthly during the period 2008 through March 31, 2012.[36]  For a number of the intercompany relationships discussed in this report, the "creditor" and the "debtor" in the intercompany relationship reversed over time.[37]  This is not unusual with the normal operation of a cash management system, where operating subsidiaries both generate cash (creating a receivable) and use cash (creating a payable) in the ordinary course of their activities.  In my opinion, this pattern is consistent with treating the intercompany balances as debt because the balances are typically incurred with an expectation that they will be repaid as business circumstances require.  Indeed, that was the experience with respect to most of the intercompany balances examined in this report.

27.      If the Debtors had intended the Intercompany Transactions to be equity contributions they would have recorded them as "additional paid-in capital" rather than as intercompany liabilities.[38]  Indeed, the frequent movement of cash between an operating subsidiary and parent company, with both entities playing the roles of lender and borrower at

---

[33] RCJSNII10037951-3.
[34] Dondzila Tr. at 91:5-9.
[35] UCC18658, UCC17942 and RCJSNII10037951-3.
[36] Westman Tr. at 200:9-16.
[37] UCC18658 and UCC17942.
[38] Westman Tr. at 44:15-19.

various times, is not consistent with an equity investment.  Equity investments in the parent-

subsidiary context tend to be made by the parent to the operating subsidiary, typically to

facilitate large capital expenditures and without recording an intercompany obligation.  I have

not seen any evidence that this type of activity generated the balances recorded in the

intercompany accounts examined in this report.

## VII.    DEBTORS' INTERNAL AND EXTERNAL PRESENTATION OF INTERCOMPANIES BALANCES

28.    The Debtors consistently recorded and reported intercompany balances as

either intercompany receivables, payables or borrowings in their external financial reports and

internal accounting records. Such reporting is another indication that the ResCap entities

expected these intercompany balances to be repaid.  Specifically, the Debtors clearly identified

and reported intercompany balances as intercompany receivables, payables or borrowings in

each of the following:

- Audited financial statements for certain ResCap subsidiaries that were provided to HUD, and made available to certain lenders through an Intralinks site;
- ResCap's Federal income tax returns;
- ResCap's SEC filings;
- Trial balances and general ledgers; and
- Internal memoranda regarding intercompany accounting and intercompany balances.

## A.  Audited Financial Statements of Certain ResCap Subsidiaries

29.    The audited consolidated financial statements of certain ResCap

subsidiaries, including GMACM, RFC and Homecomings Financial LLC ("Homecomings"),

clearly identified and reported intercompany receivables and payables and borrowings in their

respective balance sheets.  This is discussed more fully in other sections of my report.

16

30.    Further, GAAP require that the preparer of financial statements conclude that receivables reflected on the balance sheet are collectible.  Here, the collectability of intercompany receivables was evaluated by both the preparer and the auditors and the receivable amounts were determined to be collectible.[39]  Ms. Dondzilla testified that intercompany receivables were evaluated for valuation or potential impairment under GAAP and only reflected in the financial statements as receivables after an evaluation of whether the receivable needed to be impaired.[40]

## B.  Rescap's Federal Income Tax Returns

31.    In its 2009, 2010 and 2011 federal income tax returns, ResCap reported intercompany payables within the "Other Liabilities" line 21 in Schedule L (Balance Sheet per Books) of Form 1120.[41]

32.    In addition, the supporting schedule for Schedule L, Line 21 (Other Liabilities) indicates that there are Intercompany Payables and "Accounts Payable – Affiliates" that are recorded as liabilities on ResCap's balance sheet.[42]

33.    Such reporting is an indicator that the ResCap entities believed these intercompany balances were accurate and properly recorded as liabilities.

## C.  Rescap's Securities & Exchange Commission Filings

34.    ResCap regularly reported supplemental financial information that included separate parent and subsidiary balance sheet information to the Securities and Exchange

---

[39] Westman Tr. at 184:13-185:4 ("[T]here is a receivable from ResCap on its financial statements, and we had to evaluate that receivable for collectability as part of our year-end audit. . . . . The determination was, from a GAAP perspective, that that intercompany receivable could be reflected within the financial statements and it met the GAAP determination for collectability.")
[40] Dondzila Tr. at p. 61:23-62:6, 62:17-21.
[41] ALLY_0337039-127, ALLY_0337325-408 and ALLY_0336317-756.
[42] Ibid, at ALLY_0337329, ALLY_0337363, ALLY_0337044, ALLY_0337077, ALLY_0336322 and ALLY_0336585.

Commission.  For example, in its Form 10Q/A for the quarterly period ended June 30, 2009,

ResCap reported in excess of $5.5 billion of borrowings outstanding among ResCap and its

subsidiaries as of June 30, 2009 in the liabilities section of its condensed consolidating balance

sheet.[43]

35.      ResCap similarly disclosed borrowings by its subsidiaries as liabilities in

its SEC filings for the years ended December 31, 2007 and December 31, 2008 and for the

quarterly periods ended March 31, 2008, June 30, 2008, September 30, 2008 and March 31,

2009.  The table below sets forth a summary of this information.

| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| *Borrowings from Parent ($, 000s)* | | | | | |
| 6/30/09 | - | 4,774,831 | 3,694,134 | (5,537,796) | 2,931,169 |
| 3/31/09 | - | 4,829,939 | 2,922,968 | (5,342,982) | 2,409,925 |
| 12/31/09 | - | 5,345,597 | 3,266,399 | (5,948,675) | 2,663,321 |
| 9/30/08 | 2,172,124 | 6,911,201 | 4,370,387 | (10,183,129) | 3,270,583 |
| 6/30/08 | 2,750,000 | 6,955,000 | 6,891,937 | (11,896,937) | 4,700,000 |

## D.  Rescap's Trial Balances and General Ledgers

36.      The intercompany accounts in the Debtors' general ledgers are generally

titled/named, "Note Receivable," "Intercompany," "Intercompany Receivable," "Intercompany

Recvable," "Intercompany Rec," "Intercompany Payable/Recvable," "Interco LOC," "Interco

Payable," "Intracompany payable – US Subs" and/or "A/P affiliates".  The Debtors consistently

---

[43] Residential Capital, LLC Form 10-Q/A for the quarterly period ended June 30, 2009, filed on August 25, 2009, at
p. 74.

treated and reported these intercompany account balances as either intercompany receivables,

payables or borrowings in their trial balances.[44]

37.    In my opinion, the internal tracking and public reporting of intercompany

balances is a strong indicator that the ResCap entities regarded the transactions as valid debt

transactions and expected that the intercompany balances would be repaid.

## E.  Internal Memorandum

38.    An April 22, 2012 email between the Debtors' Controller, Cathy

Dondzila, to the Debtors' financial advisor, FTI, titled "Intercompany Follow Up"[45] also reflects

that the ResCap entities expected the intercompany balances to be repaid:

- "As the operating companies generate cash, through asset sales, borrowings, asset liquidations etc., this cash moves upstream to ResCap.  This again creates the payable on the Parent and the receivable at the operating company."

- "Finally, in order to maintain sufficient regulatory net worth to satisfy requirements, and to clean up balance sheets as part of entity minimization or sale activities, intercompany balances have been forgiven.  In many cases, with the approval of the Ally Board of Directors."

- "Explain intent for each balance - loan or equity?  Was there an expectation of repayment?  This is not a question accounting can answer.  *To the extent we have deemed a collateralized affiliate balance impaired we have impaired it through earnings.  Otherwise we have concluded for GAAP financial statement purposes the balances were expected to be repaid.*" (emphasis added).

- "In standalone financial statements of the operating companies they are reported as affiliate receivables/payables/debt."

---

[44] *See, e.g.* EXAM00231095, EXAM00231097, EXAM00231098, EXAM00231100, EXAM00231101, EXAM00231103, EXAM00231104, EXAM00231105, EXAM00231106, EXAM00231107, EXAM00231108, EXAM00231109, EXAM00231110, EXAM00231111, and EXAM00231113.

[45] RCUCCJSN30023149-55, April 22, 2012 email from Cathy Dondzila (Ally) to Mark Renzi (FTI Consulting) and Barbara Westman (GMACM), including others from FTI Consulting on the cc line, re: Bounce – Intercompany Follow Up.

## VIII. THE NINE LARGEST PETITION DATE INTERCOMPANY BALANCES

36.    The Debtors have represented in the Debtors Schedules that they "have made every attempt to properly characterize, prioritize and classify all intercompany transaction(s)."[46]  The Debtors' Corporate Representative (Westman) testified about the months of diligence she engaged in with the Debtors' lawyers and financial advisors to collect information regarding the intercompany balances, before they were scheduled.  She testified that she was: "responsible for providing information that went into the[] schedules",[47] and that "when we provided information for the SOAL, [ ] we believed it was accurate to the best of our knowledge at the time."[48]  She further specifically testified to the accuracy of the intercompany balances discussed herein.[49]

### A.  Intercompany Claim #1 – Residential Capital, LLC Claim against GMAC Residential Holding Company, LLC

#### i.    Background

39.    According to Exhibit 6 to the Revised Disclosure Statement, GMAC Residential Holding Company, LLC ("ResHolding") owes ResCap $3,333.9 million of intercompany liabilities (the "ResHolding-ResCap Petition Date Intercompany Balance").[50]  The ResHolding Schedule F-1[51] and the ResCap Schedule B-18[52] reflect amounts owing by ResHolding to ResCap as follows:

---

[46] Docket No. 548, at p. 5 (Global Notes and Statement of Limitations, Methodology and Disclaimers regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs).
[47] Westman Tr. at 116:3-5.
[48] Westman Tr. at 112:13-15.
[49] Westman Tr. at 112:16-113:2; 116:6-10; 117:17-20; 119:2-11; 119:12-24; 120:5-6; 122:13-20; 122:21-123:2; 123:3-8.
[50] Docket No. 4733, Revised Disclosure Statement, Exhibit 6.
[51] Creditors Holding Unsecured Claims - ResHolding Schedules of Assets and Liabilities, Docket #565, pages 41 and 42.
[52] Schedule of Other Liquidated Debts Owed to Debtor - ResCap Schedules of Assets and Liabilities, Docket #549, page 32.



($ in Millions)

| Account # (per Stmt of Assets) | Account Name (per General Ledger) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 1140500006 | Note Receivable from RESI | GMAC Residential Holding Company, LLC | Residential Capital, LLC | $ 3,295.6 |
| 1140500007 | Interest Rec from RFC/RESI | GMAC Residential Holding Company, LLC | Residential Capital, LLC | 38.3 |
| | | | | $ 3,333.9 |

### ii.   Observations

40.     The Debtors' Corporate Representative (Westman) testified that the above balances were accurately reported as intercompany receivables and intercompany payables.[53]  As the Debtors noted in Exhibit 6 to the Revised Disclosure Statement, this "[b]alance generally arose from transactions under an agreement between ResCap and ResHolding.  ResHolding borrowed funds from ResCap and then distributed funds to GMACM for general operating purposes…"

41.     The Debtors further noted that "[w]hile there was no fixed interest rate in the loan agreement, interest was paid regularly until the Petition Date".

42.     The Debtors' disclosures appear consistent with what I observed in examining the general ledger data and other information produced by the Debtors.

43.     In a March 20, 2012 memorandum from Barbara Westman discussing whether ResCap had the capacity to meet its intercompany obligations to RFC, Ms. Westman notes that "ResCap also maintains a $3.6 billion receivable from GMACM, and could move assets from GMACM to RFC to reduce both outstanding balances."[54]

44.     According to the Debtors' Corporate Representative (Westman), interest accrued on this intercompany balance.[55]

---

[53] Westman Tr. at 123:3-8.
[54] RCUCCJSN20051022, RCUCCJSN20051023, GMAC ResCap internal memo prepared by Barbara Westman on 3/20/2012.
[55] Westman Tr. at 155:25-157:2.

45.     According to Exhibit 6 to the Revised Disclosure Statement, "In 2009, $2.52 billion of debt owed by GMACM to ResHolding was forgiven so that GMACM could meet certain tangible net worth debt covenants.  ResCap did not forgive any of ResHolding's debt at that time because ResHolding was not at risk of defaulting on its net worth requirements."[56]  Based on my review of the Intercompany Transactions that the Debtors extracted from their general ledgers, the $2.52 billion of debt owed by GMACM to ResHolding that was forgiven in 2009 was effectuated at GMACM by reducing its intercompany liability and increasing its member's equity.  This forgiveness was effected through a formal process, including approval of the Executive Committee of the ResCap Board of Directors[57] and the Ally Board of Directors.[58]  As described above, if the intercompany payable did not reflect a bona fide liability, such forgiveness of the debt would have been unnecessary.[59]

46.     There is other evidence in the record that suggests that the Debtors treated this intercompany payable as a bona fide liability.  The Company's Controller, Cathy Dondzila, testified that the Intercompany receivable between ResHolding and RFC acted as a "line of credit" between ResCap and ResHolding (for the benefit of ResHolding's operating subsidiary GMACM).[60]  Internal documents similarly characterized this intercompany balance as a "LOC where GMACM can borrow funds, or contribute funds, to ResCap as needed.  This borrowing is funneled through its parent, [ResHolding]."[61]

---

[56] Docket No. 4733, Revised Disclosure Statement, Exhibit 6.
[57] RCUCCJSN10025065, Approval for the $2 billion ResCap/RFC debt forgiveness, RCJSNII10118387-8, Approval for $500 million GMACM/ResHolding debt forgiveness and RC40006568-71, Approval for $2 billion GMACM/ResHolding debt forgiveness.
[58] Hamzehpour Ex. 1 (EXAM10362088) at EXAM10362089.
[59] *See* ¶ 18.
[60] Dondzila Tr. at 32:6.
[61] Dondzila Ex 2 (RCJSN20085254) at RCJSN20085255.

47.     Similarly, this intercompany balance was used to facilitate other large intercompany transfers of value between GMACM and ResCap.  For example, on April 22, 2011, GMACM, RFC, ResHolding, and ResCap executed a letter agreement regarding netting in connection with the sale of certain mortgage loans from GMACM to RFC, (the "Netting Agreement").  The Netting Agreement stated that "Pursuant to various intercompany loans, [ResHolding] owes amounts to [ResCap] in excess of the Purchase Price as of the date hereof."[62]  Under the Netting Agreement, among other things, ResCap "fully and finally discharges [ResHolding] from its obligation to repay $171,323,565.91 to ResCap under the intercompany loans (and subtracts such amount from the total amount due by [ResHolding] to ResCap under the intercompany loans)."[63]

## B. Intercompany Claim #2 – Residential Funding Company, LLC Claim against Residential Capital, LLC

### i.     Background

48.     According to Exhibit 6 to the Revised Disclosure Statement, ResCap owes its direct subsidiary, RFC, $1,954.9 million (net) of intercompany liabilities (the "ResCap-RFC Petition Date Intercompany Balance").  The RFC Schedule F-1[64], the ResCap Schedule F-1[65], the RFC Schedule B-18[66] and the ResCap Schedule B-18[67] reflect net amounts owing by ResCap to RFC as follows:

---

[62] Westman Ex 33 (RCJSNII10074531) at RCJSN10074537.
[63] *Id*. at RCJSN10074538.
[64] Schedule of Other Liquidated Debts Owed to Debtor - RFC Schedules of Assets and Liabilities, Docket #548, page 115.
[65] Creditors Holding Unsecured Claims - ResCap Schedules of Assets and Liabilities, Docket #549, page 46.
[66] Schedule of Other Liquidated Debts Owed to Debtor - RFC Schedules of Assets and Liabilities, Docket #548, page 41.
[67] Schedule of Other Liquidated Debts Owed to Debtor - ResCap Schedules of Assets and Liabilities, Docket #549, page 32.



*($ in Millions)*

| Account # (per Stmt of Assets) | Account Name (per General Ledger ) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 2041200001 | Intracompany payable - US Subs | Residential Funding Company, LLC | Residential Capital, LLC | $    (0.1) |
| 2020100002 | ResCap Intercompany | Residential Capital, LLC | Residential Funding Company, LLC | 1,955.0 |
| | | | | $    1,954.9 |

### ii.    Observations

49.    The Debtors' Corporate Representative (Westman) testified that the above balances were accurately reported as intercompany receivables and intercompany payables.[68]  As the Debtors disclosed in Exhibit 6 to the Revised Disclosure Statement, this Balance generally arose out of operation of the company's centralized cash management system.  As RFC generated cash, that cash would be swept to ResCap.  This Balance changed frequently."[69]

50.    Based on my review of RFC's independently audited financial statements for the years ended December 31, 2011 and 2010, RFC treated and recorded its intercompany balance due from ResCap as a fully collectible intercompany receivable.  In fact, RFC clearly identified and reported $1.84 billion and $2.30 billion of receivables from its parent (ResCap) in the asset section of its balance sheet as of December 31, 2011 and December 31, 2010, respectively.[70]

51.     ResCap's own contemporaneous internal accounting memo, dated March 20, 2012,[71] acknowledged that it was appropriate for RFC to record its intercompany balance due from ResCap as a fully collectible intercompany receivable as of December 31, 2011.  A summary of this memo is presented below:

---

[68] Westman at 115:14-116:10.
[69] Docket No. 4733, Revised Disclosure Statement, Exhibit 6.
[70] RCUCCJSN00007239-99, at 242 (p. 4).
[71] RCUCCJSN20051023, GMAC ResCap internal memo prepared by Barbara Westman on 3/20/2012.

- "This memo supports the appropriate accounting treatment for intercompany balances between RFC and ResCap.  As of 12/31/11, RFC has an intercompany receivable balance from ResCap.  This receivable is carried at its full value."

- "To best facilitate this process, ResCap centralizes cash balances, and does not hold cash within most of its operating units.  As operating entities acquire cash, it is moved through intercompany transactions to ResCap.  Likewise, as operating entities require cash, the cash is provided by ResCap to those entities."

- "Generally, assets presented in accordance with GAAP would be assessed for collectability.  FASB Codification Subtopic 310-10-35-22 provides guidance on the impairment of receivables.  A creditor is deemed impaired when it is probable that a creditor will be unable to pay all amounts due according to the contractual terms of the loan agreement."

- "If required, ResCap could support its payable to RFC through sales or other liquidations of its GMACM holdings.  ResCap also maintains a $3.6 billion receivable from GMACM, and could move assets from GMACM to RFC to reduce both outstanding balances."

- "Due to these circumstances, management concludes that ResCap maintains the ability to support its intercompany obligations with RFC, and therefore, no impairment of this receivable is warranted for the RFC stand-alone financial statements."

    52.    The Debtors' Corporate Representative (Westman) testified that in April 2011 and again in March 2012, they considered whether the intercompany receivable from ResCap could remain on RFC's balance sheet.  In both instances, after making a GAAP determination for collectability, i.e., considering whether the receivable could be collected, and conferring with their auditors Deloitte & Touche, the Debtors concluded that the receivable could remain on the balance sheet of RFC.[72]

---

[72] Westman Tr. 183:4-190:11.

53.    According to Exhibit 6 to the Revised Disclosure Statement, "In 2008, $2 billion of debt owed by RFC to ResCap was forgiven so that RFC could meet certain tangible net worth debt covenants."[73]  Based on my review of the Intercompany Transactions that the Debtors extracted from their general ledgers, the $2 billion of debt owed by RFC to ResCap that was forgiven in 2009 was effectuated at RFC by reducing its intercompany liability and increasing its member's equity.  This forgiveness was effected through a formal process, including approval of the Executive Committee of the ResCap Board of Directors.[74]  As described above, if the intercompany payable did not reflect a bona fide liability, such forgiveness of the debt would have been unnecessary.[75]

54.    There is other evidence in the record that suggests that the Debtors treated this intercompany payable as a bona fide liability.  The Company's Controller, Cathy Dondzila, testified that the Intercompany receivable between ResCap and RFC acted as a "line of credit" between ResCap and RFC.[76]

55.    Similarly, this intercompany balance was used to facilitate other large intercompany transfers of value between RFC and ResCap.  As noted above, on April 22, 2011, GMACM, RFC, ResHolding, and ResCap executed a letter agreement regarding netting in connection with the sale of certain mortgage loans from GMACM to RFC, (the "Netting Agreement") that stated that "Pursuant to various intercompany loans, ResCap owes amounts to [RFC] in excess of the Purchase Price as of the date hereof."[77]  Under the Netting Agreement, among other things, RFC "fully and finally discharges ResCap from its obligation to repay

---

[73] Docket No. 4733, Revised Disclosure Statement, Exhibit 6.
[74] Hamzehpour Ex. 1 (EXAM10362088) at EXAM10362089.
[75] *See* ¶ 18.
[76] Dondzila Tr. at 31:13-32:11.
[77] Westman Ex 33 (RCJSNII10074531) at RCJSN10074537.

$171,323,565.91 to [RFC] under the intercompany loans (and subtracts such amount from the total amount due by ResCap to [RFC] under the intercompany loans)."[78]

## C. Intercompany Claim #3 – Homecomings Financial, LLC Claim against Residential Funding Company, LLC

### i.  Background

56.    According to Exhibit 6 to the Revised Disclosure Statement, RFC owes its direct subsidiary Homecomings $1,251.5 million of intercompany liabilities (the "RFC-Homecomings Petition Date Intercompany Balance").  The RFC Schedule F-1[79] and the Homecomings Schedule B-18[80] reflect amounts owing by RFC to Homecomings as follows:



($ in Millions)

| Account # (per Stmt of Assets) | Account Name (per General Ledger) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 2041200001 | Intracompany payable - US Subs | Residential Funding Company, LLC | Homecomings Financial, LLC | $          1,251.5 |

### ii.  Observations

57.    The Debtors' Corporate Representative (Westman) testified that the above balances were accurately reported as intercompany receivables and intercompany payables.[81] Debtors disclosed in Exhibit 6 to the Revised Disclosure Statement that this "[b]alance generally arose out of operation of the company's centralized cash management system.  Homecomings sold loans to RFC for securitization as part of normal business operations, subserviced loans, and generated other cash through operations that was swept up to RFC.  The receivable balance

---

[78] *Id*. at RCJSN10074538.
[79] Creditors Holding Unsecured Claims - RFC Schedules of Assets and Liabilities, Docket #548, page 110.
[80]  Schedule of Other Liquidated Debts Owed to Debtor - Homecomings Schedules of Assets and Liabilities, Docket #579, page 31.
[81] Westman Tr. at 117: 17-20.

consists largely of this, less payables to RFC for general overhead expenses. The balance changed frequently until 2008."

58.    By 2008, all of the business activities of Homecomings "were sold, transferred, or discontinued and it no longer had any licensing requirements that required financial statements,[82] Nevertheless, Homecomings still maintained assets as it "was listed as the named servicer for a variety of different. . . private label securitizations and the cost, effort, and exercise of having that changed was prohibitive. . . ."[83]

59.    The Debtors further noted that while Homecomings became largely dormant in 2008, it continued to have wind down activity that created cash that was swept up to RFC.

60.    The Debtors also stated that interest was accrued but not settled in cash on the intercompany balance (this amount was included in the intercompany balance).[84]

61.    The information appears consistent with what I observed in examining the general ledger data produced by the Debtors.

62.    By virtue of the Debtors' Cash Management System, cash was routinely swept up from Homecomings to RFC, creating an intercompany payable owed to Homecomings. Homecomings clearly identified and reported intercompany receivable balances as affiliate receivables (net), in its independently audited financial statements. For example:

- Homecomings reported $1.05 billion of affiliate receivables, net, as of December 31, 2008 in the assets section of its balance sheet.[85]

---

[82] Dondzila Tr. at 14:13-16.
[83] Dondzila Tr. at 15: 10-15.
[84] Docket No. 4733, Revised Disclosure Statement, Exhibit 6.
[85] EXAM00122166-94 at 68 (p. 2)

- Homecomings stated that "affiliate receivables are comprised of amounts due for servicing advances transferred at carrying value, fees charged for subservicing activities, and mortgage loans sold to affiliates of the Company. These receivables are recorded at their net realizable value."[86]

63.    Indeed, it is apparent from the contemporaneous financial statements prepared by Homecomings that Homecomings expected its intercompany receivable balance due from RFC to be repaid.

64.    The Debtors also observed that interest was accrued but not settled in cash. The audited financial statements prepared by Homecomings clearly reports that the interest income, like the principal, was recorded on the books and records of Homecomings. For example, the Homecomings December 31, 2008 audited financial statements states as follows:

> "[Homecomings] is charged or credited interest by RFC for the net affiliate receivable/payable balance outstanding each month at a rate that represents RFC's borrowing rate. At December 31, 2008, $1,051,047 [$ is thousands] net receivable was outstanding at an interest rate of 8.9%. The net interest credited and included in the consolidated statement of operations for the year ended December 31, 2008 is $45,125 [$ in thousands]."[87]

65.    Debtors have identified a loan agreement that relates to the intercompany relationship between Homecomings and RFC, although the lender-borrower relationship appears to have reversed.[88] The Debtors' Corporate Representative (Westman) testified that neither she, nor anyone within the Company, knew the particulars about this agreement, including whether it would apply to the current Intercompany Balance. The Debtors' Corporate Representative

---

[86] EXAM00122166-94 at 76 (p. 10)
[87] *Ibid*, at p. 25.
[88] *See* Westman Ex. 20, Amended and Restated Intercompany Advance Agreement between Homecomings and RFC.

(Westman) noted that interest accrued on this balance at the same rate provided for in the

agreement identified.[89]

### D. Intercompany Claim #4 – Passive Asset Transactions, LLC Claim against GMAC Mortgage, LLC

#### i. Background

66.    According to Exhibit 6 to the Revised Disclosure Statement, GMACM

owes its direct subsidiary, Passive Asset Transaction, LLC ("PATI") $697.0 million.[90]  The

GMACM Schedule F-1[91] and the PATI Schedule B-18 [92] reflect amounts owing by GMACM to

PATI as follows:



*($ in Millions)*

| Account # (per Stmt of Assets) | Account Name (per General Ledger) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 24000195 | Interco Payable (001 / 095) | GMAC Mortgage, LLC | Passive Asset Transactions, LLC | $    689.2 |
| 20412001 | Intercompany Payable/Recvable | GMAC Mortgage, LLC | Passive Asset Transactions, LLC | 7.8 |
| | | | | $    697.0 |

#### ii. Observations

67.    The Debtors' Corporate Representative (Westman) testified that the above

balances were accurately reported as intercompany receivables and intercompany payables.[93]

The Debtors disclosed in Exhibit 6 to the Revised Disclosure Statement that this "[b]alance

generally arose out of operation of the company's centralized cash management system.

Majority of balance reflects cash collected by PATI from non-Debtor entities (Flume and GX II)

---

[89] Westman Tr. 143:19-144:3; 153:7-155:16.
[90] Docket No. 4733, Disclosure Statement, Exhibit 6.
[91] Creditors Holding Unsecured Claims - GMACM Schedules of Assets and Liabilities, Docket #550, page 779.
[92] Schedule of Other Liquidated Debts Owed to Debtor - PATI Schedules of Assets and Liabilities, Docket #582, page 32.
[93] Westman Tr. at 120:5-6.

that were swept to GMACM and then to ResCap."[94]  As the Debtors' Corporate Representative (Westman) explained, "Passive Asset Transactions was a holder of international notes and it would receive cash as a holder of those international notes in receipt of that cash through the cash management process, it would have pushed that cash up to its parent, GMAC Mortgage."[95]

68.    The information is consistent with what I observed in examining the general ledger data and other information produced by the Debtors.

69.    According to Exhibit 6 to the Revised Disclosure Statement, "In 2008, $44 million of debt owed by PATI to GMACM was forgiven so that PATI could meet certain tangible net worth debt covenants."[96]  Based on my review of the Intercompany Transactions that the Debtors extracted from their general ledgers, the $44 million of debt owed by PATI to GMACM that was forgiven in 2008 was effectuated at PATI by reducing its intercompany liability and increasing its member's equity.  The Debtors' Corporate Representative (Westman) testified that all debt forgiveness received the appropriate approvals as required by a particular transaction.[97]  Thus, it is my understanding that the ResCap CFO approved this debt forgiveness in accordance with the RFC/GMACM Debt Forgiveness Procedures.[98]  As described above, if the intercompany payable did not reflect a bona fide liability, such forgiveness of the debt would have been unnecessary.[99]

---

[94] Docket No. 4733, Revised Disclosure Statement, Exhibit 6.
[95] Westman 205:24-206:10.
[96] Docket No. 4733, Revised Disclosure Statement, Exhibit 6.
[97] Westman Tr. at 219:25-220:6.
[98] Hamzehpour Ex. 1 (EXAM10362088) at EXAM10362089-90.
[99] *See* ¶ 18.

### E. Intercompany Claim #5 – Executive Trustee Services, LLC Claim against GMAC Mortgage, LLC

#### i.    Background

70.    According to Exhibit 6 to the Revised Disclosure Statement, GMACM owes its direct subsidiary, ETS, $265.4 million (net).  The GMACM Schedule F-1[100], the ETS Schedule F-1[101], the GMACM Schedule B-18[102] and the ETS Schedule B-18[103] reflect net amounts owing by GMACM to ETS as follows:



| | | | | ($ in Millions) |
|---|---|---|---|---|
| Account # (per Stmt of Assets) | Account Name (per General Ledger ) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
| 20412001 | Intercompany Payable/Recvable | Executive Trustee Services, LLC | GMAC Mortgage, LLC | $ (10.9) |
| 2041200001 | Intracompany payable - US Subs | Executive Trustee Services, LLC | GMAC Mortgage, LLC | (0.2) |
| 24008888 | Interco Payable Self Elim | Executive Trustee Services, LLC | GMAC Mortgage, LLC | (0.0) |
| 24000102 | A/P Affiliates - 001 / 002 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 276.5 |
| | | | | $ 265.4 |

#### ii.    Observations

71.    The Debtors' Corporate Representative (Westman) testified that the balances above were accurately reported as intercompany receivables and intercompany payables.[104]  Debtors disclosed in Exhibit 6 to the Revised Disclosure Statement that this:

- "Balance generally arose out of operation of the company's centralized cash management system.  Revenue received by ETS (as foreclosure trustee) was swept to

---

[100] Creditors Holding Unsecured Claims - GMACM Schedules of Assets and Liabilities, Docket #550, page 760.
[101] Creditors Holding Unsecured Claims - ETS Schedules of Assets and Liabilities, Docket #561, page 44.
[102] Schedule of Other Liquidated Debts Owed to Debtor - GMACM Schedules of Assets and Liabilities, Docket #550, page 42.
[103] Schedule of Other Liquidated Debts Owed to Debtor - ETS Schedules of Assets and Liabilities, Docket #561, page 31.
[104] Westman Tr. at 119:2-120:6.

GMACM.  GMACM, in turn, satisfied ETS's cash needs.  Intercompany balances were created to record impact to ETS, but no cash settlements occurred."

- ETS is composed of a group of companies whose principal business activities, for which they received revenue, "were attempts at recovery against losses that were incurred for liquidated loans.  So attempting to collect from borrowers any amounts that had been lost through other avenues, and also providing Trustee Services around the foreclosure process. . . ."[105]  Cash was generated by ETS's business activities.[106]

- Interest was accrued but not paid on the intercompany balance (this amount has been included in the intercompany balance)."[107]

72.     As noted above, the Intercompany Balances created through the ordinary course activities of an operating subsidiary are generally recorded as debt.  In this instance, ETS performed services and received cash in consideration for those services.  The cash was swept up to GMACM as part of the cash management process and, in return for its cash, ETS recorded a receivable from GMACM.[108]  As described above, this accounting is consistent with recording the receivable as debt and inconsistent with an equity transaction.[109]

---

[105] Dondzila Tr. at 36:25-37:7.
[106] *Id*. at 99:17-23.
[107] Docket No. 4733, Revised Disclosure Statement, Exhibit 6.
[108] *See* Westman Tr. at 103:4-104:18, Westman Ex. 7 (RCUCCJSN20064737) at RCUCCJSN20064744-45.
[109] *See* ¶ 18 (ordinary course intercompany transactions are more consistent with debt because effecting equity transactions in the ordinary course would violate policies and procedures) and ¶ 27 (subsidiaries do not typically make equity investments in their parents).

### F. Intercompany Claim #6 – Residential Funding Company, LLC Claim against RFC Asset Holdings II, LLC

#### i. Background

73.    According to Exhibit 6 to the Revised Disclosure Statement, RFC Asset Holdings II, LLC ("RAHI") owes its direct parent, RFC $231.9 million. The RAHI Schedule F-1[110] and the RFC Schedule B-18[111] reflect amounts owing by RAHI to RFC as follows:



*($ in Millions)*

| Account # (per Stmt of Assets) | Account Name (per General Ledger ) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 2041200001 | Intracompany payable - US Subs | RFC Asset Holdings II, LLC | Residential Funding Company, LLC | $    231.9 |

#### ii. Observations

74.    The Debtors' Corporate Representative (Westman) testified that the balance above was accurately reported as intercompany receivables and intercompany payables.[112] Debtors disclosed in Exhibit 6 to the Revised Disclosure Statement that this "[b]alance generally arose out of operation of the company's centralized cash management system. RAHI owned a portfolio of non-economic residuals that generated excess inclusion income that resulted in current taxes payable. Balance primarily attributable to settlement of taxes under the tax sharing agreement." As Ms. Westman explained, this balance reflected monies used for accounts payable and interest expense.[113]

---

[110] Creditors Holding Unsecured Claims - RAHI Schedules of Assets and Liabilities, Docket #586, page 44.
[111] Schedule of Other Liquidated Debts Owed to Debtor - RFC Schedules of Assets and Liabilities, Docket #548, page 41.
[112] Westman at 112:16-113:2.
[113] *Ibid*, at 207.

75.     The Debtors further stated that, "Interest was accrued but not paid on the
intercompany balance (this amount has been included in the intercompany balance)."[114]  This
was confirmed by the Debtors' Corporate Representative who testified that interest accrued on
this account but was not cash-settled.[115]

76.     According to Exhibit 6 to the Revised Disclosure Statement, "In 2008,
$1.2 billion of debt owed by RAHI to RFC was forgiven so that RAHI could meet certain
tangible net worth debt covenants."[116]  Based on my review of the Intercompany Transactions
that the Debtors extracted from their general ledgers, the $1.2 billion of debt owed by RAHI to
RFC that was forgiven in 2008 was effectuated at RAHI by reducing its intercompany liability
and increasing its member's equity.  The Debtors' Corporate Representative (Westman) testified
that all debt forgiveness received the appropriate approvals as required by a particular
transaction.[117]  Thus, it is my understanding that the Ally Board of Directors approved this debt
forgiveness in accordance with the RFC/GMACM Debt Forgiveness Procedures.[118]  As
described above, if the intercompany payable did not reflect a bona fide liability, such
forgiveness of the debt would have been unnecessary.[119]

---

[114] Docket No. 4733, Revised Disclosure Statement, Exhibit 6.
[115] Westman Tr. at 160:2-9.
[116] Docket No. 4733, Revised Disclosure Statement, Exhibit 6.
[117] Westman Tr. 219:25-220:6.
[118] Hamzehpour Ex. 1 (EXAM10362088) at EXAM10362089.
[119] *See* ¶ 18.

### G. Intercompany Claim #7 – Residential Funding Company, LLC Claim against GMAC Mortgage, LLC

#### i.    Background

77.    According to Exhibit 6 to the Revised Disclosure Statement, GMACM owes an affiliate, RFC $139.7 million.  The GMACM Schedule F-1[120] and the RFC Schedule B-18 [121] reflect amounts owing by GMACM to RFC as follows:



| ($ in Millions) | | | | |
|---|---|---|---|---|
| Account # (per Stmt of Assets) | Account Name (per General Ledger ) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
| 2020100001 | GMAC RESI Intercompany | GMAC Mortgage, LLC | Residential Funding Company, LLC | $         133.7 |
| 20412001 | Intercompany Payable/Recvable | GMAC Mortgage, LLC | Residential Funding Company, LLC | 6.0 |
| | | | | $         139.7 |

#### ii.    Observations

78.    The Debtors disclosed in Exhibit 6 to the Revised Disclosure Statement that the "[m]ajority of balance consists of: (i) amounts recorded in connection with AFI billings for shared services (e.g. payroll, outside counsel) – RFC routinely remitted payment to AFI for services and RFC then charged GMACM for its portion; and (ii) service fee income received by GMACM as subservicer relating to RFC MSR."[122]

79.    Cathy Dondzila, the former Controller for ResCap, explained with respect to the shared services balance that "Ally Financial allocated costs.  Those allocations and charges related to those allocations were recorded initially to [RFC], and then the appropriate portion

---

[120] Creditors Holding Unsecured Claims - GMACM Schedules of Assets and Liabilities, Docket #5550, page 783.
[121] Schedule of Other Liquidated Debts Owed to Debtor - RFC Schedules of Assets and Liabilities, Docket #548, page 41.
[122] Docket No. 4733, Revised Disclosure Statement, Exhibit 6.

would then be moved from [RFC] down to GMAC Mortgage." [123] Ms. Dondzila then explained

that GMAC Mortgage and RFC were actually "sister" companies and that she did not know why

Ally did not just allocate its costs directly to GMACM.[124]

80.    The fact that the Intercompany Balance was between two sister companies

(rather than a parent making an investment in a wholly-owned subsidiary) is also reflective of an

intent to treat this balance as debt.  I would not expect an equity investment between sister

companies to be reflected on a company's book and records as an intercompany receivable.

Indeed, the sister company would receive none of the customary benefits attributable to an equity

investment in connection with this type of transaction.

81.    GMACM clearly identified and reported intercompany balances as "Other

Liabilities – Payables" to RFC in its independently audited financial statements.  For example,

GMACM reported $69.79 million of payables owed to RFC as of December 31, 2011. (*See*

EXAM00234281 at 316 (p. 36)).[125]  It is apparent from these contemporaneous financial

statements that GMACM expected to repay its intercompany payable due to RFC since it

specifically reported those amounts as debts in its financial statements.

## H.  Intercompany Claim #8 – Home Connect Lending Services, LLC Claim against GMAC Residential Holding Company, LLC

### i.   Background

82.    According to the January 2013 Intercompany Analysis,[126] ResHolding

owes Home Connects Lending Services, LLC $54.6 million.  The ResHolding Schedule F-1[127]

---

[123] Tr. of Cathy Dondzila at 42-43.
[124] *Id*. at 43.
[125] EXAM0234281-349, at 345 (p.65).
[126] RCUCCJSN30004106-11 and RCUCCJSN30004112-4, email thread starting on December 12, 2012 through January 17, 2013, including the attachment to the email thread.
[127] Creditors Holding Unsecured Claims - ResHolding Schedules of Assets and Liabilities, Docket #565, page 41.

and the Home Connects Lending Services, LLC Schedule B-18 [128] reflect amounts owing by

GMACM to Home Connects Lending Services, LLC as follows:



| Account #<br>(per Stmt of<br>Assets) | Account Name<br>(per General Ledger ) | Accounts Payable<br>Entity | Accounts Receivable<br>Entity | Petition Date<br>Intercompany<br>Balance |
|---|---|---|---|---|
| 24000267 | Intercompany Payable (033/067) | GMAC Residential Holding Company, LLC | Home Connects Lending Services, LLC | $          54.6 |

($ in Millions)

### ii.    Observations

83.    The Debtors' Corporate Representative (Westman) testified that the

balance above was accurately reported as intercompany receivables and intercompany

payables.[129]  According to Exhibit 6 to the January 2013 Intercompany Analysis, "[t]he balances

at October 31, 2012 have not changed significantly since December 2008.  The balances resulted

from intercompany clean up to the closure of HCLS, LLC (SS097) and related entities."[130]  The

Debtors' Corporate Representative testified that this intercompany balance also reflected, in part,

the movement of cash through the cash management system.[131]

84.    The information is consistent with what I observed in examining the

general ledger data and other information produced by the Debtors, and the testimony of the

Debtors' witnesses and Corporate Representatives that have proceeded to date.

---

[128] Schedule of Other Liquidated Debts Owed to Debtor - Home Connects Lending Services, LLC Schedules of Assets and Liabilities, Docket #575, page 23.
[129] Westman Tr. at 122:21-123:2.
[130] RCUCCJSN30004106-11 and RCUCCJSN30004112-4, email thread starting on December 12, 2012 through January 17, 2013, including the attachment to the email thread.
[131] Westman Tr. at 76:8-79:23.

## I. Intercompany Claim #9 – GMAC Residential Holding Company, LLC Claim against GMAC Mortgage, LLC

### i. Background

85.    According to the January 2013 Intercompany Analysis,[132] GMACM owes ResHolding $51.4 million (net).  The GMACM Schedule F-1[133], the ResHolding Schedule F-1[134], the GMACM Schedule B-18[135] and the ResHolding Schedule B-18[136] reflect net amounts owing by GMACM to ResHolding as follows:



($ in Millions)

| Account # (per Stmt of Assets) | Account Name (per General Ledger ) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 24000033 | Interest Rec/Pay (001/033) | GMAC Mortgage, LLC | GMAC Residential Holding Company, LLC | $ 108.0 |
| 20412001 | Intercompany Payable/Recvable | GMAC Mortgage, LLC | GMAC Residential Holding Company, LLC | 1.5 |
| 24000233 | Interco LOC (001/033) | GMAC Residential Holding Company, LLC | GMAC Mortgage, LLC | (58.2) |
| | | | | $ 51.4 |

### ii. Observations

86.    The Debtors' Corporate Representative (Westman) testified that the above balances were accurately reported as intercompany receivables and intercompany payables.[137]

87.    Debtors disclosed in Exhibit 6 to the January 2013 Intercompany Analysis that "The balance at October 31, 2102 represents borrowings under an unsecured credit facility between GMAC Mortgage and its parent, RHC.  This agreement was originally entered into in December 1998.  The monthly activity represents the borrowings for the general

---

[132] RCUCCJSN30004106-11 and RCUCCJSN30004112-4, email thread starting on December 12, 2012 through January 17, 2013, including the attachment to the email thread.
[133] Creditors Holding Unsecured Claims - GMACM Schedules of Assets and Liabilities, Docket #550, page 763
[134] Creditors Holding Unsecured Claims - ResHolding Schedules of Assets and Liabilities, Docket #565, page 41.
[135] Schedule of Other Liquidated Debts Owed to Debtor - GMACM Schedules of Assets and Liabilities, Docket #550, page 42.
[136] Schedule of Other Liquidated Debts Owed to Debtor - ResHolding Schedules of Assets and Liabilities, Docket #565, page 23.
[137] Westman Tr. at 119:12-24; 122:13-20.

operating needs of GMAC Mortgage.  Repayments on these borrowings were made on a

recurring basis until the petition date."  The Debtors' Corporate Representative (Westman)

testified that this intercompany balance also reflected, in part, the movement of cash through the

cash management system.[138]

88.    The Debtors further stated that "[t]he interest rate under this agreement

fluctuates monthly and is a stated margin, agreed between the Company and RHC, which is

generally between 100 and 300 basis points above a quoted short-term market rate.  Interest was

accrued on a monthly basis until the petition date.  The credit facility is payable upon

demand."[139]

89.    GMACM clearly identified and reported intercompany balances, including

the Intercompany Balance between GMACM and ResHolding as receivables from affiliates or

borrowings from parent (ResHolding) in its independently audited financial statements.  For

example, GMACM reported $515.89 million and $358.71 million of borrowings from parent

(ResHolding) as of December 31, 2010 and 2009, respectively.[140]

90.    It is apparent from the contemporaneous financial statements prepared by

GMACM that GMACM expected to repay its intercompany payable due to ResHolding since it

specifically reported those amounts as debts.

91.    The Debtors also observed that interest was accrued on these

borrowings.[141]  The audited financial statements prepared by GMACM clearly reports that the

interest expense, like the principal, was recorded on the books and records of GMACM.  For

---

[138] Westman Tr. 79:12-18.
[139] RCUCCJSN30004106-11 and RCUCCJSN30004112-4, email thread starting on December 12, 2012 through January 17, 2013, including the attachment to the email thread.
[140] EXAM00234350-412 at 353 (p. 4).
[141] *See also* Westman Tr. at 159:18-25.

example, GMACM reported $15.54 million and $30.15 million of interest expense on
borrowings from parent (ResHolding) for the years ended December 31, 2010 and December 31,
2009, respectively.[142]

## IX.    DEBT FORGIVENESS AMONG RESCAP ENTITIES AND APPROVALS RECEIVED FROM ALLY'S BOARD OF DIRECTORS

92.    According to Article II, Section K of the Revised Disclosure Statement:
"On numerous occasions, where the existence of an intercompany payable on a Debtor's balance
sheet threatened the solvency and net worth thresholds required under external funding
agreements, or by federal or state regulations, the putative debt obligations were forgiven.
Additionally, putative debt obligations were forgiven among the Debtors and certain non-Debtor
subsidiaries in connection with the Debtors' international transactions and the dissolution of
entities.  Approximately $16.6 billion of debt was forgiven without consideration from 2007
through the Petition Date."

93.    The Debtors have noted the fact that the debt forgiveness was effectuated
through a capital contribution (i.e., through the equity account).  However, Cathy Dondzilla, the
Debtors' former Controller, testified that the Debtors did so only because they had concluded
that GAAP required that intercompany indebtedness be written off in this manner.[143]  Internal
communications reflect that the Debtors were relying upon AICPA Practice Alert 00-1
(Extinguishment of related Party Debt) ¶¶ 27-28[144] in arriving at their determination to use the
equity account to effectuate the debt forgiveness.

---

[142] *Ibid*, at 410 (p. 61).
[143] Dondzila Tr. at 84:13-86:6.
[144] RCJSNII10041531 at RCJSNII10041532.

94.     The forgiveness of intercompany debt required various levels of approval depending upon the amount forgiven.  As the Debtors' Corporate Representative (Westman) explained, "[g]enerally, it would be determined that a particular debt was a balance that we would look to forgive to solve a certain net worth issue, et cetera.  That balance would be identified and documentation would be put together in a request form. That would -- that request would go through Cathy, generally, and would be provided to the CFO or on up to board of directors or Executive Committee, depending on where it - where it needed to go for the particular balance and dollar amount, and it would be presented for recommendation and approval.[145]  To the knowledge of the Debtors' Corporate Representative: "all debt forgiveness received the appropriate approvals as required by the particular transaction."[146]  This review and approval process is set forth in detail in a document prepared by Ms. Westman in 2010.[147]

95.     The ResCap Debt Forgiveness Schedule by Legal Entity (the "Debt Forgiveness Schedule")[148] identifies approximately $16.6 billion of debt forgiveness between 2008 and 2012.  Of this amount, approximately $7.9 billion, $4.1 billion, $1.9 billion, $2.3 billion and $0.4 billion was forgiven in 2008, 2009, 2010, 2011 and 2012 respectively.  This schedule does not appear to specifically enumerate the $44 million in debt owed to GMACM by PATI that was forgiven in 2008 (See Section VII. D. to this report).

96.     The Debt Forgiveness Schedule identifies the specific "debt forgiveness":

- $2.151 billion owed by ResFunding to ResCap was forgiven between 2008 ($2.0 billion) and 2009 ($0.151 billion).  The ResCap Executive Committee approved the forgiveness of the $2.0 billion on March 26, 2008 (RCUCCJSN10025065).

---

[145] Westman Tr. at 219:12-24.
[146] *Ibid*, at p. 220.
[147] Hamzehpour Ex. 1 (EXAM10362088) at EXAM10362089.
[148] RCUCCJSN11270924.

- $2.52 billion owed by GMACM to GMAC Residential Holding Co, LLC was forgiven in 2009. The ResCap Executive Committee approved the forgiveness of $0.5 billion on June 3, 2009 (RCJSNII10118387-8) and $2 billion on June 25, 2009 (RC40006569 – 70).

- $1.228 billion owed by RHAI to ResFunding was forgiven in 2008.

- The majority of the remaining forgiveness ($10.69 billion) relates to approximately 50 entities; consisting of foreign affiliates, special purpose entities and entities that were dissolved or sold.

- This schedule does not appear to include the $44 million in debt owed to GMACM by PATI that was forgiven in 2008 (See Section VII. D. to this report).

97.    Concerning the first two items above, analysis of entries in Debtors' general ledgers shows that the "debt forgiveness" transactions were recorded as "capital injections . . . . In the form of forgiveness of debt"[149] or debt for equity exchanges. The entries recorded on the books of the obligor were:

- Debit: Intercompany Payable – reducing the amount of the obligation by the "forgiven" amount.
- Credit: Additional Paid in Capital (a component of the equity section of a company's balance sheet) – increasing equity by the "forgiven" amount.

98.    It should be noted that a description field in the Debtors' general ledgers for the entries reflecting these "forgiveness" transactions identifies the transactions as "Debt Forgiveness." Regardless of whether such a transaction is recorded as a forgiveness or a capital infusion, the impact on the obligor's balance sheet is essentially identical:

- Intercompany debt is reduced by the amount of the "forgiveness."
- The obligor's equity is increased by the amount of the "forgiveness."

---

[149] RCUCCJSN30002765.

99.     Releasing intercompany obligors from amounts owing required approval

of ResCap's Chief Executive Officer, Board of Directors and/or Executive Committee.  Debt

forgiveness in amounts greater than $50 million also required the approval of the Ally Board of

Directors.[150]  The Debtors' Corporate Representative (Westman) testified that all debt

forgiveness received appropriate approvals as required by a particular transaction.[151]  The formal

process described and carefully followed for each such transaction is further evidence that the

transactions that resulted in the intercompany balances were considered debt transactions, not

equity investments or distributions, when they were completed.  As Ms. Westman testified,

generating intercompany receivables or payables happened in the normal course of business and

did not require Board approval.  In contrast, "a capital contribution or a dividend would have

been something that had to be declared by the board of those entities and would have been a

specific type of transaction."[152]

100.    The Debtors focused on both the interests of the "lender" and the

"borrower" entity in connection with the debt forgiveness process.   Ms. Hamzehpour testified

that the entity forgiving intercompany debt would have had no desire to forgive more than the

amount required to meet net worth or solvency requirements.[153]  This suggests that the ResCap

entities only exchanged debt for equity when it was absolutely necessary to do so in order to

continue normal operations and avoid defaults under debt agreements.  As articulated in a

contemporaneous communication from Ms. Hamzehpour (in which she articulates the interests

of the "lender" being asked to forgive the "debt"): "It is not in ResCap's or the Group's best

---

[150] EXAM10362089
[151] Hamzehpour Ex. 1 (EXAM10362088) at EXAM10362089.
[152] Westman Tr. 45:25-46:5.
[153] Hamzehpour Tr. at 31:13-16.

interest to release debt in excess of the amount needed to meet the above goals and, for this

reason, the GMAC Inc. Board Resolutions authorizing debt forgiveness for certain ResCap

subsidiaries referred to releases 'up to' a maximum amount."[154]

      101.    As set forth in paragraphs 16-18 of my report, the debt forgiveness process

was formal and, according to the Debtors' Corporate Representative (Hamzepour), enabled the

Debtors to continue operating from 2008 on.[155]  Complying with the various tangible net worth

requirements imposed on the Debtors by liquidity providers, state and federal regulators, and the

GSE's were all, to varying degrees, critical to the continued operations of the Debtors.  In that

way, the debt forgiveness (which facilitated compliance with those tangible net worth

requirements) provided value to both the obligor and obligee of the debt being forgiven.

      102.    In my opinion, there is nothing about the debt forgiveness process that

would suggest to me that the Debtors intended to treat the Intercompany Balances as anything

other than debt.

## X.  SIGNATURE AND RIGHT TO SUPPLEMENT AND/OR MODIFY

      103.    I reserve the right to supplement and/or modify my report based on the

production of and/or access to additional information or any other information or data, including

additional deposition testimony, that was not available to me prior to the issuance my report.

      104.    This report has been prepared for use in these subject legal proceedings

and may not be used or relied upon for any other purpose without the express written consent of

Zolfo Cooper.

---

[154]  Hamzehpour Ex. 6 (EXAM11148024); *see also* Hamzehpour Tr. 30:15-32:10.
[155]  Hamzehpour Ex. 6; Hamzehpour Tr. at 20:25-24:16.

**XI. <u>INDEX OF EXHIBITS</u>**

1. Curriculum Vitae of Robert S. Bingham

2. Documents Considered

## X.  <u>SIGNATURE AND RIGHT TO SUPPLEMENT AND/OR MODIFY</u>

103.    I reserve the right to supplement and/or modify my report based on the production of and/or access to additional information or any other information or data, including additional deposition testimony, that was not available to me prior to the issuance my report.

104.    This report has been prepared for use in these subject legal proceedings and may not be used or relied upon for any other purpose without the express written consent of Zolfo Cooper.

**Robert S. Bingham**

**October 18, 2013**



**EXHIBIT 1**

### Curriculum Vitae of Robert S. Bingham, CIRA

I am a Senior Director with Zolfo Cooper LLC.  I have 35 years of experience in a variety of auditing, financial and accounting management and consulting positions, including over 15,000 hours as an officer or advisor to companies either in preparing to file bankruptcy, in bankruptcy or recently emerged from bankruptcy.  I have been an officer and/or advisor and confirmation hearing witness on several large bankruptcies involving multiple affiliated entities with large claims among the entities.  I am a Certified Insolvency and Restructuring Advisor.


**Representative Experience – Bankruptcies**

- Enron Corp. – Associate Director of Restructuring; Interim Chief Financial Officer and Treasurer; 2002 through 2006

  The Enron group included in excess of 2,000 entities and in excess of 26,000 intercompany accounts with pre-petition balances amounting to multiple tens of billions of dollars.  My primary responsibilities included plan of reorganization development, claims classification, including evaluation and treatment of intercompany claims, plan explanation and negotiation with various constituencies, resolution of certain claims and supervision of treasury, insurance and tax departments. Additionally, I served as a member of the board of directors and chairman of the audit committee for Portland General Electric, an Enron subsidiary with public reporting requirements. At the confirmation hearing, I testified concerning specific asset dispositions and claims settlements related to the recovery model, treatment of claims, including intercompany claims, the mechanics of a very complicated plan of reorganization and best interest test.  I testified at the final status conference concerning plan implementation and distribution status.


- The Loewen Group Inc. – Financial Advisor to the Company, 2000 and 2001

  The Loewen Group Inc. was a holding company whose subsidiaries operated funeral homes throughout the United States and Canada.  There were in excess of 1,500 legal entities in the group; over 800 of which filed for bankruptcy protection in the United States.   Total intercompany claims amounted to several billion dollars.  My responsibilities included plan development, recovery model preparation (including analysis and classification of intercompany claims). I testified at the confirmation hearing concerning the mechanics of a very complicated plan of reorganization, creditor recoveries under the plan at various debtors, intercompany claim treatment and best interest test.

Exhibit 1
1 of 3



EXHIBIT 1

### Curriculum Vitae of Robert S. Bingham, CIRA

- <u>Prime Motor Inns, Inc. – Co-Chief Financial Officer,  1990 through 1993</u>

  Prime Motor Inns, Inc. was the holding company for a group of hotel-owning subsidiaries.  My responsibilities included plan development, recovery model preparation, claims reconciliation (each of which involved analysis of the treatment of intercompany claims) and supervision of the treasury, budget, insurance and tax departments.  I testified concerning certain assets sales and specific claims resolutions.

## Expert Report

- In August 2011, I issued an expert report in an adversarial proceeding (Adv. Pro. No. 2:10-CV-198-MHT) related to the Colonial Bancgroup, Inc. chapter 11 bankruptcy for the Middle District of Alabama Case No. 2:10-cv-00409-MHT-WC (Bankr. Case No. 09-32303 (DHW)).  My opinions and observations expressed in this report related to the treatment of intercompany transactions pursuant to a corporate tax sharing agreement.

## Additional Experience – Bankruptcies and Public Accounting

- In addition to the above referenced bankruptcies, I have provided financial advisory services in bankruptcy matters including New Stream, New York Racing Association, Blue Bird, Sunbeam Corporation, and the Washington Group. I began my career in public accounting, serving as an auditor with Ernst & Young for 9 years.

## Education & Certifications

- B.S. in mathematics from Trinity College, Hartford, Ct.
- M.B.A. from the Amos Tuck School at Dartmouth College
- Certified Insolvency and Restructuring Advisor (CIRA) program
- Numerous continuing education programs from 1976 forward to maintain CPA (now Inactive) and CIRA credentials

## Professional Affiliations, Activities & Awards

- Member, Association of Insolvency & Restructuring Advisors; Board member for more than 6 years (AIRA)
- 2002 Gold Medal winner on CIRA Exam
- Frequent panelist at AIRA Annual Conference on topical issues, e.g., *Treatment of Intercompany Claims*, 2011; *Ethics for Financial Advisors*, 2009, 2008

Exhibit 1
2 of 3



**EXHIBIT 1**

### Curriculum Vitae of Robert S. Bingham, CIRA

**Teaching Experience**

- CIRA course Part II (Bankruptcy Plan Development):  2009, 2010 and 2011

- CIRA course Part III (Bankruptcy Accounting and Reporting Issues and Taxes):  2009 and 2010.

Exhibit 1
3 of 3

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| 001-EXAM00220919 | | | Other |
| 002-EXAM00220938 | | | Other |
| 003-EXAM00220948 | | | Other |
| 004-EXAM00220949 | | Timeline of key events 2007 to 2012; including notes on debt forgiveness | Bankruptcy Filings & Background Information |
| 005-EXAM00220955 | | Debt Forgiveness by Asset Silo | Internal & External Financial Statements |
| 006-EXAM00220956 | | | Other |
| 007-EXAM00221011 | | | Other |
| 008-EXAM00221012 | | | Other |
| 009-EXAM00221053 | | | Other |
| 010-EXAM00221452 | | | Other |
| 011-EXAM00221453 | | | Other |
| 012-EXAM00221454 | | | Other |
| 013-EXAM00221458 | | A/P file includes Intercompany Partner RC item | Internal & External Financial Statements |
| 014-EXAM00221459 | | | Other |
| 015-EXAM00221460 | | | Other |
| 016-EXAM00221475 | | | Other |
| 017-EXAM00221485 | | | Other |
| 018-EXAM00221497 | | | Other |
| 019-EXAM00221498 | | | Other |
| 020-EXAM00221499 | | | Other |
| 021-EXAM00221509 | | | Other |
| 022-EXAM00221518 | | Settlement Credit Model, reference forgiveness | Internal & External Financial Statements |
| 023-EXAM00221519 | | | Other |
| 024-EXAM00221529 | | Terms of Support Relating to Possible DOJ/State Attorney's General Settlement, Includes Form Of Debt Forgiveness Letter, 1/30/2012 | Legal |
| 025-EXAM00221558 | | | Other |
| 026-EXAM00221559 | | | Other |
| 027-EXAM00221563 | | | Other |
| 028-EXAM00221565 | | | Other |
| 029-EXAM00221577 | | | Other |
| 030-EXAM00221579 | | Interco Interest Summary | Internal & External Financial Statements |
| 031-EXAM00221580 | | | Other |
| 032-EXAM00221838 | | Illustrative Waterfall Analysis Asset & Liabilities Input with intercompany | Internal & External Financial Statements |
| 033-EXAM00221839 | | | Other |
| 034-EXAM00221840 | | | Other |
| 035-EXAM00221841 | | | Other |
| 036-EXAM00221844 | | | Other |
| 037-EXAM00221847 | | | Other |
| 038-EXAM00221850 | | | Other |
| 039-EXAM00221851 | | All Consolidated Entities Balance Sheet Trial Balance Reporting Period 2007 as of 1/25/2008 | Internal & External Financial Statements |
| 040-EXAM00221852 | | | Other |
| 041-EXAM00221854 | | | Other |
| 042-EXAM00221855 | | | Other |
| 043-EXAM00221856 | | | Other |
| 044-EXAM00221857 | | | Other |
| 045-EXAM00221858 | | | Other |
| 046-EXAM00221859 | | | Other |
| 047-EXAM00221860 | | | Other |
| 048-EXAM00221861 | | | Other |

Exhibit 2
1 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| 049-EXAM00221862 | | Debt Forgiveness Schedule for the years: 2007, 2008, 2009 | Internal & External Financial Statements |
| 050-EXAM00221863 | | | Other |
| 051-EXAM00221866 | | | Other |
| 052-EXAM00228748 | | | Other |
| 053-EXAM00229653 | | | Other |
| 054-EXAM00229654 | | | Other |
| 055-EXAM00229655 | | | Other |
| 056-EXAM00229659 | | Related Party Footnotes for the years: 2006 - 2011 | Internal & External Financial Statements |
| 057-EXAM00229660 | | | Other |
| 058-EXAM00229664 | | | Other |
| 059-EXAM00229668 | | | Other |
| 060-EXAM00229672 | | | Other |
| 061-EXAM00229675 | | | Other |
| 062-EXAM00229681 | | | Other |
| 063-EXAM00229953 | | | Other |
| 064-EXAM00229954 | | | Other |
| 065-EXAM00229955 | | | Other |
| 066-EXAM00229956 | | | Other |
| 067-EXAM00229957 | | | Other |
| 068-EXAM00229958 | | | Other |
| 069-EXAM00229959 | | | Other |
| 070-EXAM00229960 | | | Other |
| 071-EXAM00230933 | | Draft - 24 Month DIP and Wind-Down Analysis, 1/22/2012 | Bankruptcy Filings & Background Information |
| 072-EXAM00230986 | | Draft - 24 Month DIP and Wind-Down Analysis, 1/22/2012 | Bankruptcy Filings & Background Information |
| 073-EXAM00231039 | | | Other |
| 076-EXAM00231093 | | | Other |
| 077-EXAM00231094 | | | Other |
| 078-EXAM00231095 | | | Other |
| 079-EXAM00231101 | | | Other |
| 080-EXAM00231105 | | | Other |
| 081-EXAM00231109 | | | Other |
| 082-EXAM00231114 | | | Other |
| 083-EXAM00232588 | | | Other |
| 084-EXAM00232589 | | | Other |
| 085-EXAM00232590 | | | Other |
| 086-EXAM00232591 | | | Other |
| 087-EXAM00232592 | | | Other |
| 088-EXAM00232593 | | | Other |
| 089-EXAM00232594 | | | Other |
| 090-EXAM00232595 | | | Other |
| 091-EXAM00232596 | | | Other |
| 092-EXAM00232597 | | | Other |
| 093-EXAM00232598 | | | Other |
| 094-EXAM00232599 | | | Other |
| 095-EXAM00232600 | | | Other |
| 096-EXAM00232601 | | | Other |
| 097-EXAM00232602 | | | Other |
| 098-EXAM00232603 | | | Other |

Exhibit 2
2 of 50

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| 099-EXAM00232604 | | | Other |
| 100-EXAM00232605 | | | Other |
| 101-EXAM00232606 | | | Other |
| 102-EXAM00232607 | | | Other |
| 103-EXAM00232608 | | | Other |
| 104-EXAM00232639 | | | Other |
| 105-EXAM00232669 | | | Other |
| 106-EXAM00232699 | | | Other |
| 107-EXAM00232730 | | | Other |
| 108-EXAM00232761 | | | Other |
| 109-EXAM00232785 | | | Other |
| 110-EXAM00232809 | | | Other |
| 111-EXAM00232833 | | | Other |
| 112-EXAM00232858 | | | Other |
| 113-EXAM00232883 | | | Other |
| 114-EXAM00232907 | | | Other |
| 115-EXAM00232931 | | | Other |
| 116-EXAM00232947 | | | Other |
| 117-EXAM00232962 | | | Other |
| 118-EXAM00232976 | | | Other |
| 119-EXAM00232989 | | | Other |
| 120-EXAM00233003 | | | Other |
| 121-EXAM00233016 | | | Other |
| 122-EXAM00233017 | | | Other |
| 123-EXAM00233018 | | | Other |
| 124-EXAM00233019 | | | Other |
| 125-EXAM00233020 | | | Other |
| 126-EXAM00233021 | | | Other |
| 127-EXAM00233022 | | | Other |
| 128-EXAM00233023 | | | Other |
| 129-EXAM00233024 | | | Other |
| 130-EXAM00233027 | | | Other |
| 131-EXAM00233029 | | | Other |
| 132-EXAM00233100 | | | Other |
| 133-EXAM00233174 | | | Other |
| 134-EXAM00233176 | | Unaudited Consolidated Balance Sheet for periods ending: 6/30/2012 and 6/30/2011 | Internal & External Financial Statements |
| 135-EXAM00233178 | | ResCap Consolidation - Income Tax return ending 12/31/2009 | Tax Returns |
| 136-EXAM00233263 | | ResCap Consolidation - Income Tax return ending 12/31/2010 | Tax Returns |
| 137-EXAM00233517 | | ResCap Consolidation - Income Tax return ending 12/31/2011 | Tax Returns |
| 138-EXAM00233352 | | | Other |
| 139-EXAM00233353 | | | Other |
| 140-EXAM00233374 | | Audited Non-Consolidated Financial Statements of GMAC Residential Funding of Canada, Limited as of 12/31/2009 | Internal & External Financial Statements |
| 141-EXAM00233396 | | Audited Non-Consolidated Financial Statements of GMAC Residential Funding of Canada, Limited as of 12/31/2008 | Internal & External Financial Statements |
| 142-EXAM00233423 | | Audited Non-Consolidated Financial Statements of GMAC Residential Funding of Canada, Limited as of 12/31/2007 | Internal & External Financial Statements |
| 143-EXAM00233957 | | | Other |
| 144-EXAM00233958 | | | Other |
| 145-EXAM00233959 | | | Other |
| 146-EXAM00233960 | | | Other |

Exhibit 2
3 of 50

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| 147-EXAM00233970 | | | Other |
| 148-EXAM00233971 | | | Other |
| 149-EXAM00233972 | | | Other |
| 150-EXAM00233973 | | | Other |
| 151-EXAM00233961 | | | Other |
| 152-EXAM00233968 | | | Other |
| 153-EXAM00233969 | | | Other |
| 154-EXAM00233976 | | | Other |
| 155-EXAM00233977 | | | Other |
| 156-EXAM00233978 | | | Other |
| 157-EXAM00233979 | | | Other |
| 158-EXAM00233980 | | | Other |
| 159-EXAM00233981 | | | Other |
| 160-EXAM00233982 | | | Other |
| 161-EXAM00233983 | | | Other |
| 162-EXAM00233984 | | | Other |
| 163-EXAM00233985 | | | Other |
| 164-EXAM00233986 | | | Other |
| 165-EXAM00233987 | | | Other |
| 166-EXAM00233988 | | | Other |
| 1679_001 | | Letter written to Richard of Collura of Zolfo Cooper confirming delivery of external hard drive of documents below | General Ledger Transactional Data |
| 167-EXAM00233989 | | | Other |
| 168-EXAM00233990 | | | Other |
| 169-EXAM00233991 | | | Other |
| 170-EXAM00233992 | | | Other |
| 171-EXAM00233993 | | | Other |
| 172-EXAM00233994 | | | Other |
| 173-EXAM00233995 | | | Other |
| 174-EXAM00233996 | | | Other |
| 175-EXAM00233997 | | | Other |
| 176-EXAM00233998 | | | Other |
| 177-EXAM00233999 | | | Other |
| 178-EXAM00234000 | | | Other |
| 179-EXAM00234001 | | | Other |
| 180-EXAM00234002 | | | Other |
| 181-EXAM00234003 | | | Other |
| 182-EXAM00234004 | | Audited Consolidated Financial Statements of GMAC Mortgage, LLC as of 12/31/2006 | Internal & External Financial Statements |
| 183-EXAM00234058 | | Audited Consolidated Financial Statements of GMAC Mortgage, LLC as of 12/31/2007 | Internal & External Financial Statements |
| 184-EXAM00234112 | | Audited Consolidated Financial Statements of GMAC Mortgage, LLC as of 12/31/2008 | Internal & External Financial Statements |
| 185-EXAM00234189 | | Audited Consolidated Financial Statements of GMAC Mortgage, LLC as of 12/31/2009 | Internal & External Financial Statements |
| 186-EXAM00234281 | | Audited Consolidated Financial Statements of GMAC Mortgage, LLC as of 12/31/2011 | Internal & External Financial Statements |
| 187-EXAM00234350 | | Audited Consolidated Financial Statements of GMAC Mortgage, LLC as of 12/31/2010 | Internal & External Financial Statements |
| 188-EXAM00234413 | | | Other |
| 189-EXAM00234414 | | | Other |
| 190-EXAM00234415 | | | Other |
| 191-EXAM00234416 | | | Other |
| 192-EXAM00234417 | | | Other |
| 193-EXAM00234418 | | | Other |

Exhibit 2
4 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| 194-EXAM00234419 | | | Other |
| 195-EXAM00234420 | | | Other |
| 196-EXAM00234421 | | | Other |
| 197-EXAM00234422 | | | Other |
| 198-EXAM00234423 | | | Other |
| 199-EXAM00234424 | | | Other |
| 200-EXAM00234425 | | | Other |
| 201-EXAM00234426 | | | Other |
| 202-EXAM00234427 | | | Other |
| 203-EXAM00234428 | | | Other |
| 204-EXAM00234429 | | | Other |
| 205-EXAM00234430 | | | Other |
| 207-EXAM00234462 | | | Other |
| 208-EXAM00237709 | | | Other |
| 209-EXAM00237710 | | | Other |
| 210-EXAM00237711 | | | Other |
| 211-EXAM00237712 | | | Other |
| 212-EXAM00237715 | | | Other |
| 213-EXAM00237716 | | | Other |
| 214-EXAM00237717 | | | Other |
| 215-EXAM00237718 | | | Other |
| 216-EXAM00237719 | | | Other |
| 217-EXAM00237720 | | | Other |
| 218-EXAM00237721 | | | Other |
| 219-EXAM00237722 | | | Other |
| 220-EXAM00237723 | | | Other |
| 221-EXAM00237724 | | | Other |
| 222-EXAM00237725 | | | Other |
| 223-EXAM00237726 | | | Other |
| 224-EXAM00237727 | | | Other |
| 225-EXAM00237728 | | | Other |
| 226-EXAM00237729 | | | Other |
| 227-EXAM00237730 | | | Other |
| 228-EXAM00237731 | | | Other |
| 229-EXAM00237732 | | | Other |
| 230-EXAM00237733 | | | Other |
| 231-EXAM00237734 | | | Other |
| 232-EXAM00237735 | | | Other |
| 233-EXAM00237736 | | | Other |
| 234-EXAM00237737 | | | Other |
| 235-EXAM00237738 | | | Other |
| 236-EXAM00237739 | | | Other |
| 237-EXAM00237740 | | | Other |
| 238-EXAM00237741 | | | Other |
| 239-EXAM00237742 | | | Other |
| 240-EXAM00237743 | | | Other |
| 241-EXAM00237744 | | | Other |
| 242-EXAM00237745 | | | Other |

Exhibit 2
5 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| 243-EXAM00237746 | | | Other |
| 244-EXAM00237747 | | | Other |
| 245-EXAM00237748 | | | Other |
| 246-EXAM00237749 | | | Other |
| 247-EXAM00237750 | | | Other |
| 248-EXAM00237751 | | | Other |
| 249-EXAM00237752 | | | Other |
| 250-EXAM00237753 | | | Other |
| 251-EXAM00237754 | | | Other |
| 252-EXAM00237755 | | | Other |
| 253-EXAM00237756 | | | Other |
| 254-EXAM00237757 | | | Other |
| 255-EXAM00237758 | | | Other |
| 256-EXAM00237759 | | | Other |
| 257-EXAM00237760 | | | Other |
| 258-EXAM00237761 | | | Other |
| 259-EXAM00237762 | | | Other |
| 260-EXAM00237763 | | | Other |
| 261-EXAM00239387 | | | Other |
| 262-EXAM00239388 | | | Other |
| 263-EXAM00267946 | | | Other |
| 264-EXAM00267959 | | | Other |
| 265-EXAM00267972 | | | Other |
| 266-EXAM00267985 | | | Other |
| 267-EXAM00267998 | | | Other |
| 268-EXAM00268011 | | Debt Forgiveness Transactions from 1/1/2008 - 5/13/2012 (Petition) | Internal & External Financial Statements |
| 269-EXAM00268012 | | | Other |
| 270-EXAM00295528 | | | Other |
| 271-EXAM00295529 | | | Other |
| 272-EXAM00295553 | | | Other |
| 273-EXAM00295557 | | | Other |
| 274-EXAM00295573 | | | Other |
| 275-EXAM00295589 | | Operating Agreement.pdf, references IC notes | Legal |
| 276-EXAM00295603 | | | Other |
| 277-EXAM00295615 | | | Other |
| 278-EXAM00295633 | | | Other |
| 279-EXAM00295653 | | | Other |
| 280-EXAM00295670 | | | Other |
| 281-EXAM00295688 | | | Other |
| 282-EXAM00295692 | | | Other |
| 283-EXAM00295701 | | | Other |
| 284-EXAM00295706 | | | Other |
| 285-EXAM00295710 | | | Other |
| 286-EXAM00295721 | | | Other |
| 287-EXAM00295725 | | | Other |
| 288-EXAM00295735 | | | Other |
| 289-EXAM00295738 | | | Other |
| 290-EXAM00295743 | | | Other |

Exhibit 2
6 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| 291-EXAM00295752 | | | Other |
| 292-EXAM00295756 | | | Other |
| 293-EXAM00295760 | | | Other |
| 294-EXAM00295768 | | | Other |
| 295-EXAM00295772 | | | Other |
| 296-EXAM00295776 | | | Other |
| 297-EXAM00295781 | | | Other |
| 298-EXAM00295783 | | | Other |
| 299-EXAM00295790 | | | Other |
| 300-EXAM00295848 | | | Other |
| 301-EXAM00295860 | | | Other |
| 302-EXAM00295870 | | | Other |
| 303-EXAM00295872 | | | Other |
| 304-EXAM00295875 | | | Other |
| 305-EXAM00295883 | | | Other |
| 306-EXAM00295887 | | | Other |
| 307-EXAM00295892 | | | Other |
| 308-EXAM00295902 | | | Other |
| 309-EXAM00295958 | | | Other |
| 310-EXAM00295971 | | | Other |
| 311-EXAM00295973 | | | Other |
| 312-EXAM00295983 | | | Other |
| 313-EXAM00295985 | | | Other |
| 314-EXAM00295992 | | | Other |
| 315-EXAM00296000 | | | Other |
| 316-EXAM00296004 | | | Other |
| 317-EXAM00296009 | | | Other |
| 318-EXAM00296017 | | | Other |
| 319-EXAM00296034 | | | Other |
| 320-EXAM00296035 | | | Other |
| 321-EXAM00296059 | | | Other |
| 322-EXAM00296063 | | | Other |
| 323-EXAM00296294 | | | Other |
| 324-EXAM00296301 | | | Other |
| 325-EXAM00296305 | | | Other |
| 326-EXAM00296316 | | | Other |
| 327-EXAM00296345 | | | Other |
| 328-EXAM00296350 | | | Other |
| 329-EXAM00296352 | | | Other |
| 330-EXAM00296353 | | | Other |
| 331-EXAM00296359 | | | Other |
| 332-EXAM00296509 | | | Other |
| 333-EXAM00296515 | | | Other |
| 334-EXAM00296615 | | | Other |
| 335-EXAM00296706 | | | Other |
| 336-EXAM00329293 | | | Other |
| 337-EXAM00329295 | | | Other |
| 338-EXAM00329296 | | | Other |

Exhibit 2
7 of 50

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| 339-EXAM00338622 | | | Other |
| 340-EXAM00338623 | | Loan Level reimbursement from 4/2012 - 1/2013, 2nd Lien Extinguishment | Internal & External Financial Statements |
| EXAM10362089 | | Debt Forgiveness Procedures | Email and Memo Communications |
| EXAM00107204 | | Note Certificate & Viaduct (No. 7) Limited | Other |
| EXAM00107205 | | Note Issuance Facility Deed | Other |
| EXAM00125358 | | GMAC Residential Folding Company, LLC Consolidated Financial Statements as of and for years ended Dec. 31, 2007 and 2006 | Internal & External Financial Statements |
| EXAM00125417 | | Homecomings Financial, LLC Consolidated Financial Statements for the Years Ended December 31, 2006 | Internal & External Financial Statements |
| EXAM00125624 | | GMAC Residential Holding Company, LLC Consolidated Financial Statements as of and for the years ended Dec. 31, 2006 and 2005 | Internal & External Financial Statements |
| EXAM00125685 | | GMAC Residential Holding Corp. Consolidated Financial Statements as of and for the years ended Dec. 31, 2005 and 2004 (Restated) | Internal & External Financial Statements |
| EXAM00221003 | | Memo from Westman, B. to Disclosure Committee re: Q4 2011 ResCap Disclosure Committee Meeting Minutes | Email and Memo Communications |
| EXAM10184779 | | Letter to PricewaterhouseCoopers LLP re: Audits of the Combined Financial Statements of Residential Capital Corporation as of Dec. 31, 2004 and 2003 | Email and Memo Communications |
| EXAM10490749 | | Email from Barberot, D. to Lombardo, J. re GMAC BoD Meeting Materials | Email and Memo Communications |
| EXAM10755596 | | Email from Hahn, R. to Corrigan, L. among other re SOX Control - Verification of Intercompany Transactions | Email and Memo Communications |
| EXAM10755597 | | RFG Intercompany Eliminations - Eliminations Between Resi/Bank (Smartstream) and RFC (PeopleSoft) Legal Entities Master List | Other |
| EXAM11944646 | | GMAC Residential Holding Corp Consolidated Financial Statements as of and for the years ended December 31, 2003 and 2002 | Other |
| EXAM12263381 | | Email from Westman, B. to Stern, J. and Renzi, M. re: Waterfall Questions | Email and Memo Communications |
| EXAM12412896 | | Email from Dondzila, C. to Westman, B. re: RFC/ResCap Receivable Support Memo | Email and Memo Communications |
| EXAM12431944 | | Email from Dondzila, C. to Shapiro, D. re: Heads Up - GMAC Mortgage Agency Covenants | Email and Memo Communications |
| 6-28-13 Answer And Counterclaims - Unredacted Final | | Answer, Affirmative Defenses And Counterclaims Of Defendants Umb Bank, N.A. And The Ad Hoc Group Of Junior Secured Noteholders To Debtors' First Amended Complaint To Determine Extent Of Liens And For Declaratory Judgment | Bankruptcy Filings & Background Information |
| Adversary Complaint For Declaratory Judgment | 3069 | Adversary Complaint For Declaratory Judgment, Avoidance Of Liens, And Disallowance Of Claims | Bankruptcy Filings & Background Information |
| AFIJSN_0121091 | | ResCap Consolidation - Income Tax return ending 11/30/2006 | Tax Returns |
| AFIJSN_0121092 | | ResCap Consolidation - Income Tax return ending 11/30/2006 | Tax Returns |
| AFIJSN_0121093 | | ResCap Consolidation - Income Tax return ending 11/30/2006 | Tax Returns |
| AFIJSN_0121094 | | ResCap Consolidation - Income Tax return ending 12/31/2006 | Tax Returns |
| ALLY_0044635 | | | Other |
| ALLY_0172540 | | GMAC, LLC- Return of Partnership Income ending 2007 | Tax Returns |
| ALLY_0173635 | | GMAC, LLC- Return of Partnership Income ending 2008 | Tax Returns |
| ALLY_0173654 | | GMAC, LLC- Return of Partnership Income ending 2008 | Tax Returns |
| ALLY_0173687 | | GMAC, LLC- Return of Partnership Income ending 2008 | Tax Returns |
| ALLY_0173738 | | GMAC, LLC - Reportable Transaction Disclosure Statement ending 12/31/2007 | Tax Returns |
| ALLY_0173763 | | Ally Financial Inc. & Subsidiaries - Income Tax return ending 2010 | Tax Returns |
| ALLY_0175031 | | GMAC, LLC- Return of Partnership Income ending 2009 | Tax Returns |
| ALLY_0176077 | | GMAC, LLC - Information Return of U.S. Persons with Respect to Certain Foreign Confirmations ending 2009 | Tax Returns |
| ALLY_0176269 | | GMAC, LLC - Information Return of U.S. Persons with Respect to Certain Foreign Confirmations ending 2009 | Tax Returns |
| ALLY_0176426 | | GMAC, LLC- Return of Partnership Income ending 2006 | Tax Returns |
| ALLY_0177397 | | GMAC, LLC - DC Tax Return 2008 | Tax Returns |
| ALLY_0177399 | | GMAC, LLC - IL Tax Return 2008 | Tax Returns |
| ALLY_0177402 | | GMAC, LLC - ND Tax Return 2008 | Tax Returns |
| ALLY_0177405 | | GMAC, LLC - SD Tax Return 2008 | Tax Returns |
| ALLY_0177410 | | GMAC, LLC - TN Tax Return 2008 | Tax Returns |
| ALLY_0177416 | | GMAC, LLC - WV Tax Return 2008 | Tax Returns |
| ALLY_0177428 | | GMAC, LLC - DC Tax Return 2008 | Tax Returns |
| ALLY_0177430 | | GMAC, LLC - IL Tax Return 2008 | Tax Returns |
| ALLY_0177433 | | GMAC, LLC - ND Tax Return 2008 | Tax Returns |

Exhibit 2
8 of 50

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| ALLY_0177436 | | GMAC, LLC - SD Tax Return 2008 | Tax Returns |
| ALLY_0177441 | | GMAC, LLC - TN Tax Return 2008 | Tax Returns |
| ALLY_0177447 | | GMAC, LLC - WV Tax Return 2008 | Tax Returns |
| ALLY_0208426 | | GMAC, LLC - NH Tax Return 2006 | Tax Returns |
| ALLY_0208478 | | Ally Financial Inc. & Subsidiaries - ALLOCATION OF 12.31.11 TAX LIABILITY | Tax Returns |
| ALLY_0208479 | | G/L Acct No. 281132001 - Accrued US State and Local inc taxes - prior years | Tax Returns |
| ALLY_0208480 | | G/L Acct No. 281132001 - Accrued US State and Local inc taxes - prior years | Tax Returns |
| ALLY_0208481 | | All Account Reconciliation 12/31/2011 - Accrued US State and Local inc taxes - prior years | Tax Returns |
| ALLY_0208482 | | System Export -Journal Entries | Internal & External Financial Statements |
| ALLY_0208485 | | Intercompany Settlement - 5Q11 (2011 Extension) | Internal & External Financial Statements |
| ALLY_0208486 | | Intercompany Settlement - 4Q11 | Internal & External Financial Statements |
| ALLY_0208487 | | Memo from Ally re: Tax Payments due from GMAC Insurance Holdings Inc. to Ally Financial Inc., date 4/18/11 | Email and Memo Communications |
| ALLY_0208490 | | Ally Financial Inc. & Subs - Income Tax return ending 12/31/2011 | Tax Returns |
| ALLY_0209096 | | | Other |
| ALLY_0209100 | | Tax Payment Records - Q311 and Q411 tax payment from GMAC Insurance to Ally Financial | Tax Returns |
| ALLY_0242821 | | Accounting Policy 1040 Intercompany Accounting (Effective Jan 1, 2010) | Other |
| ALLY_0242959 | | Accounting Policy 1040 Intercompany Accounting (Effective Jan. 1, 2011) | Other |
| ALLY_0276171 | | Email from Malloy, J. to Peterson, J. among other re: ResCap Daily Recap/Liquidity Rollforward - 11/13/08 | Email and Memo Communications |
| ALLY_0276172 | | ResCap Daily Liquidity Rollforward | Other |
| ALLY_0287162_email | | | Other |
| ALLY_0287163 | | | Other |
| ALLY_0297136 | | | Other |
| ALLY_0297137 | | | Other |
| ALLY_0301438 | | | Other |
| ALLY_0301439 | | | Other |
| ALLY_0311783 | | GMAC ResCap Treasury Monthly Reports (July 2008) | Internal & External Financial Statements |
| ALLY_0336317 | | ResCap Consolidation - Income Tax return ending 12/31/2011 | Tax Returns |
| ALLY_0336757 | | Residential Capital, LLC Consolidated Financial Statements for the Years ended December 31, 2011 and 2010 | Internal & External Financial Statements |
| ALLY_0337021 | | ETS of Virginia - Income Tax return ending 12/31/2011 | Tax Returns |
| ALLY_0337039 | | ResCap Consolidation - Income Tax return ending 12/31/2010 | Tax Returns |
| ALLY_0337325 | | ResCap Consolidation - Income Tax return ending 12/31/2009 | Tax Returns |
| ALLY_0337409 | | ResCap Consolidation - Capital Gains & Losses ending 12/31/2009 | Tax Returns |
| ALLY_0337524 | | ResCap Consolidating Schedules | Tax Returns |
| ALLY_0337795 | | ResCap, LLC- Return of Partnership Income ending 2009 | Tax Returns |
| ALLY_0337807 | | ResCap, LLC- Schedule C of Form 1065 ending 2009 | Tax Returns |
| ALLY_0337941 | | ResCap, LLC- Form 8916-A ending 2009 | Tax Returns |
| ALLY_0388745 | | Ally Financial Inc. & Subs - Income Tax return ending 12/31/2009 | Tax Returns |
| ALLY_0390037 | | GMAC, LLC- Return of Partnership Income ending 2008 | Tax Returns |
| Cash Management Motion | 16 | Debtors' Motion For Order Under Bankruptcy Code Sections 105(A), 345, 363, 364, And 503(B)(1) And Bankruptcy Rules 6003 And 6004 Authorizing (I) Continued Use Of Cash Management Services And Practices, (II) Continued Use Of Existing Bank Accounts, Checks, And Business Forms, (III) Implementation Of Modified Cash Management Procedures, (IV) Interim Waiver Of The Investment And Deposit Requirements Of Bankruptcy Code Section 345, (V) Debtors To Honor Specified Outstanding Prepetition Payment Obligations, (VI) Continuation Of Intercompany Transactions, Including Intercompany Transactions With Future Debtors, And Granting Administrative Expense Status To Intercompany Claims, And (VII) Scheduling A Final Hearing On The Relief Requested | Bankruptcy Filings & Background Information |
| Complaint To Determine Extent Of Liens | 3592 | Complaint To Determine Extent Of Liens And For Declaratory Judgment | Bankruptcy Filings & Background Information |
| Disclosure Statement | 4157 | Disclosure Statement For The Joint Chapter 11 Plan Proposed By Residential Capital, Lilac, Et Al. And The Official Committee Of Unsecured Creditors | Bankruptcy Filings & Background Information |
| Revised Disclosure Statement | 4733 | Revised Disclosure Statement | Bankruptcy Filings & Background Information |
| Doc Requests | | | Other |

Exhibit 2
9 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| Document Requests to Debtors (4822-9311-1317-3) | | | Other |
| Document Requests to Debtors (4822-9311-1317-3) ZC | | | Other |
| DT000673 | | | Other |
| DT002796 | | | Other |
| DT003621 | | | Other |
| DT005538 | | | Other |
| EXAM00107022 | | ResCap-RAHI Intercompany Advance Agreement as of 6/1/09 | Legal |
| EXAM00107030 | | Homecomings-RFC A&R Intercompany Agreement as of 6/30/06 | Legal |
| EXAM00107037 | | ResCap Restated Loan Agreement as of 1/1/2006 | Legal |
| EXAM00107300 | | Passive Asset Transactions Intercompany Advance Agreement as of 6/1/09 | Legal |
| EXAM00122166 | | Audited Consolidated Financial Statements of Homecomings Financial, LLC as of 12/31/2008 | Internal & External Financial Statements |
| EXAM00123277 | | Audited Financial Statements of Residential Funding Company, LLC as of 12/31/2010 | Internal & External Financial Statements |
| EXAM00124670 | | Audited Financial Statements of Residential Funding Company, LLC as of 12/31/2009 | Internal & External Financial Statements |
| EXAM00124988 | | Audited Financial Statements of Residential Funding Company, LLC as of 12/31/2008 | Internal & External Financial Statements |
| EXAM00125159 | | Audited Financial Statements of Residential Funding Company, LLC as of 12/31/2007 | Internal & External Financial Statements |
| EXAM00125452 | | Audited Financial Statements of Residential Funding Company, LLC as of 12/31/2006 | Internal & External Financial Statements |
| EXAM00125738 | | Audited Consolidated Financial Statements of Homecomings Financial Network, Inc. as of 12/31/2005 | Internal & External Financial Statements |
| EXAM00125930 | | Audited Consolidated Financial Statements of Homecomings Financial Network, Inc. as of 12/31/2004 | Internal & External Financial Statements |
| EXAM00135471 | | Audited Consolidated Financial Statements of Homecomings Financial, LLC as of 12/31/2006 | Internal & External Financial Statements |
| EXAM00229659 | | | Other |
| EXAM00231095 | | Consolidated Trial Balance for 12/31/2008 | Internal & External Financial Statements |
| EXAM00231096 | | | Other |
| EXAM00231097 | | Resi Trial Balance for 12/31/2008 | Internal & External Financial Statements |
| EXAM00231098 | | RFC Trial Balance for 12/31/2008 | Internal & External Financial Statements |
| EXAM00231099 | | | Other |
| EXAM00231100 | | Parent Trial Balance for 12/31/2008 | Internal & External Financial Statements |
| EXAM00231101 | | Consolidated Trial Balance for 12/31/2011 | Internal & External Financial Statements |
| EXAM00231102 | | Resi Trial Balance for 12/31/2011 | Internal & External Financial Statements |
| EXAM00231103 | | Parent Trial Balance for 12/31/2011 | Internal & External Financial Statements |
| EXAM00231104 | | RFC Trial Balance for 12/31/2011 | Internal & External Financial Statements |
| EXAM00231105 | | Resi Trial Balance for 12/31/2010 | Internal & External Financial Statements |
| EXAM00231106 | | RFC Trial Balance for 12/31/2010 | Internal & External Financial Statements |
| EXAM00231107 | | Consolidated Trial Balance for 12/31/2010 | Internal & External Financial Statements |
| EXAM00231108 | | Parent Trial Balance for 12/31/2010 | Internal & External Financial Statements |
| EXAM00231109 | | RFC Trial Balance for 12/31/2009 | Internal & External Financial Statements |
| EXAM00231110 | | Parent Trial Balance for 12/31/2009 | Internal & External Financial Statements |
| EXAM00231111 | | Resi Trial Balance for 12/31/2009 | Internal & External Financial Statements |
| EXAM00231112 | | | Other |
| EXAM00231113 | | Consolidated Trial Balance for 12/31/2009 | Internal & External Financial Statements |
| EXAM00268011 | | ResCap Debt Forgiveness Schedule 1/1/2008 - 5/13/2013 | Internal & External Financial Statements |
| EXAM00345894 | | Draft - Debtors' Intercompany & Debt Forgiveness Presentation, 4/4/2013 | Bankruptcy Filings & Background Information |
| EXAM10115822 | | | Other |
| EXAM101158361637631 | | | Other |
| EXAM10115846 | | From: Todd Block, to Tom Marano, Email on use of cash collateral, 2/4/2009 | Email and Memo Communications |
| EXAM10115851 | | | Other |
| EXAM10115885 | | | Other |
| EXAM1015266 | | | Other |
| EXAM10199064 | | ResCap Board of Directors Meeting - ResCap Review, 9/26/2007 | Bankruptcy Filings & Background Information |

Exhibit 2
10 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| EXAM10362088 | | Debt Forgiveness Procedures | Email and Memo Communications |
| EXAM10362090 | | Debt Forgiveness Procedures | Bankruptcy Filings & Background Information |
| EXAM104432225513821 | | | Other |
| EXAM10443226 | | | Other |
| EXAM104907501706861 | | | Other |
| EXAM10509272 | | Cash Management System Work Plan | Internal & External Financial Statements |
| EXAM11144172 | | | Other |
| EXAM11144174 | | | Other |
| EXAM11148007 | | | Other |
| EXAM11148024 | | From: Tammy Hamzehpour, to Tom Marano & James Young, Intercompany debt forgiveness email, 3/22/2010 | Email and Memo Communications |
| EXAM11150308 | | | Other |
| EXAM11150309 | | | Other |
| EXAM11150310 | | | Other |
| EXAM11195215 | | | Other |
| EXAM11195581 | | From: James Young, To: Jill Horner, Intercompany balance increases, 11/17/2010 | Email and Memo Communications |
| EXAM11195706 | | From: James Young, To: Cathy Dondzila, Forgiven borrowings email, 4/20/2010 | Email and Memo Communications |
| EXAM11195942143199997 | | | Other |
| EXAM11196051 | | From: James Young, To: Jill Horner, Debt forgiven email, 10/20/2010 | Email and Memo Communications |
| EXAM11316929 | | From: James Young, To: Jim Jones and Tammy H, ResCap Debt Forgiveness to RFC - Subsidiary Capital need, 3/20/2008 | Email and Memo Communications |
| EXAM11316941 | | | Other |
| EXAM12263417 | | Note Issuance Facility Deed: Viaduct No. 7 as SPE, ResCap as Note Purchaser | Legal |
| EXAM12263518 | | From: Mark Renzi, 2013-04-23 Intercompany and OID Discussion | Email and Memo Communications |
| EXAM12431943 | | From: Cathy Dondzila, To: Dina Shapiro, Net Worth covenants email, 6/26/2009 | Email and Memo Communications |
| EXAM20118572 | | | Other |
| EXAM20118573 | | | Other |
| EXAM20144871 | | | Other |
| EXAM30006774 | | Report of Examination of GMAC Mortgage, LLC, as of 12/31/2009 | Legal |
| PWC_001_1_00000021 | | Sarbanes Oxley, Mega Process: Cash Management, Sub-process: Bank Administration (Revised 8/19/2008) | Other |
| PWC_001_1_00000023 | | Sarbanes Oxley, Mega Process: Cash Management, Sub-process: Bank Administration (Revised 8/6/2009) | Other |
| PWC_001_1_00000053 | | Sarbanes Oxley, Mega Process: Cash Management, Sub-Process: Funds Transfer Process - Quantum (Revised 8/26/2008) | Other |
| PWC_001_1_00000056 | | Test Inter-company Elimination of Cash | Other |
| PWC_001_1_00000080 | | Sarbanes Oxley, Mega Process: Cash Management, Sub-process: Funds Transfer Process - WebSeries (Revised 8/19/2008) | Other |
| PWC_001_1_00000129 | | Sarbanes Oxley, Mega Process: Cash Management, Sub-process: Funds Transfer Process - WebSeries (Revised 10/28/2009) | Other |
| PWC_001_1_00000154 | | Sarbanes Oxley Mega Process: Cash Management Sub-process: ResCap Funds Transfer Process – Quantum | Email and Memo Communications |
| PWC00000056 | | | Other |
| PWC00690 | | | Other |
| PWC07231 | | | Other |
| PWC07321 | | Description of Intercompany or Related-Party Transactions | Internal & External Financial Statements |
| PWC07709 | | | Other |
| PWC07746 | | | Other |
| PWC07810 | | | Other |
| PWC07818 | | Trial balance detail on IC, Dec. 2007 | Internal & External Financial Statements |
| PWC07820 | | Trial balance detail on IC, Dec. 2007 | Internal & External Financial Statements |
| PWC07842 | | Trial balance detail on GMAC Mortgage Group IC, Dec. 2008 | Internal & External Financial Statements |
| PWC07893 | | | Other |
| PWC07895 | | | Other |

Exhibit 2
11 of 50

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| PWC08278 | | Memo from Tax Team/McLean to Files/McLean re: ResCap LLC Conversion | Email and Memo Communications |
| PWC08437 | | Spreadsheet re: Flume, Warehouse Lending, GMAC LOC | Other |
| PWC08576 | | Spreadsheet re: Transactions Descriptions between Entities | Other |
| PWC07079 | | | Other |
| PWC07082 | | | Other |
| PWC07083 | | | Other |
| PWC07084 | | | Other |
| PWC07088 | | | Other |
| PWC07093 | | | Other |
| PWC07096 | | | Other |
| PWC07097 | | | Other |
| PWC07106 | | | Other |
| PWC07108 | | | Other |
| PWC07109 | | | Other |
| PWC07110 | | | Other |
| PWC07123 | | | Other |
| PWC07126 | | | Other |
| PWC07127 | | | Other |
| PWC07128 | | | Other |
| PWC07129 | | | Other |
| PWC07132 | | | Other |
| PWC07142 | | | Other |
| PWC07150 | | | Other |
| PWC07156 | | | Other |
| PWC07159 | | | Other |
| PWC07160 | | | Other |
| PWC07161 | | | Other |
| PWC07164 | | | Other |
| PWC07165 | | | Other |
| PWC07167 | | | Other |
| PWC07168 | | | Other |
| PWC07169 | | | Other |
| PWC07170 | | | Other |
| PWC07171 | | | Other |
| PWC07172 | | | Other |
| PWC07176 | | | Other |
| PWC07178 | | | Other |
| PWC07191 | | | Other |
| PWC07204 | | | Other |
| PWC07207 | | | Other |
| PWC07211 | | | Other |
| PWC07214 | | | Other |
| PWC07219 | | | Other |
| PWC07220 | | | Other |
| PWC07222 | | | Other |
| PWC07223 | | | Other |
| PWC07224 | | | Other |
| PWC07228 | | | Other |

Exhibit 2
12 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| PWC07231 | | | Other |
| PWC07232 | | | Other |
| PWC07233 | | | Other |
| PWC07234 | | | Other |
| PWC07235 | | | Other |
| PWC07261 | | | Other |
| PWC07263 | | | Other |
| PWC07265 | | | Other |
| PWC07267 | | | Other |
| PWC07272 | | | Other |
| PWC07273 | | | Other |
| PWC07281 | | | Other |
| PWC07282 | | | Other |
| PWC07291 | | | Other |
| PWC07297 | | | Other |
| PWC07301 | | | Other |
| PWC07306 | | | Other |
| PWC07308 | | | Other |
| PWC07310 | | | Other |
| PWC07311 | | | Other |
| PWC07314 | | | Other |
| PWC07410 | | | Other |
| PWC07414 | | | Other |
| PWC07417 | | | Other |
| PWC07421 | | | Other |
| PWC07422 | | | Other |
| PWC07423 | | | Other |
| PWC07426 | | | Other |
| PWC07444 | | | Other |
| PWC07451 | | | Other |
| PWC07452 | | | Other |
| PWC07453 | | | Other |
| PWC07454 | | | Other |
| PWC07455 | | | Other |
| PWC07479 | | | Other |
| PWC07529 | | | Other |
| PWC07534 | | | Other |
| PWC07535 | | | Other |
| PWC07536 | | | Other |
| PWC07537 | | | Other |
| PWC07540 | | | Other |
| PWC07543 | | | Other |
| PWC07546 | | | Other |
| PWC07549 | | | Other |
| PWC07552 | | | Other |
| PWC07555 | | | Other |
| PWC07558 | | | Other |
| PWC07563 | | | Other |

Exhibit 2
13 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| PWC07691 | | | Other |
| PWC07692 | | | Other |
| PWC07693 | | | Other |
| PWC07694 | | | Other |
| PWC07697 | | | Other |
| PWC07703 | | | Other |
| PWC07709 | | | Other |
| PWC07710 | | | Other |
| PWC07736 | | | Other |
| PWC07745 | | | Other |
| PWC07746 | | | Other |
| PWC07747 | | | Other |
| PWC07751 | | | Other |
| PWC07752 | | | Other |
| PWC07754 | | | Other |
| PWC07755 | | | Other |
| PWC07756 | | | Other |
| PWC07757 | | | Other |
| PWC07758 | | | Other |
| PWC07759 | | | Other |
| PWC07761 | | | Other |
| PWC07766 | | | Other |
| PWC07780 | | | Other |
| PWC07794 | | | Other |
| PWC07802 | | | Other |
| PWC07803 | | | Other |
| PWC07805 | | | Other |
| PWC07807 | | | Other |
| PWC07809 | | | Other |
| PWC07814 | | | Other |
| PWC07818 | | | Other |
| PWC07819 | | | Other |
| PWC07820 | | | Other |
| PWC07821 | | | Other |
| PWC07822 | | | Other |
| PWC07823 | | | Other |
| PWC07827 | | | Other |
| PWC07828 | | | Other |
| PWC07829 | | | Other |
| PWC07830 | | | Other |
| PWC07831 | | | Other |
| PWC07832 | | | Other |
| PWC07833 | | | Other |
| PWC07834 | | | Other |
| PWC07839 | | | Other |
| PWC07841 | | | Other |
| PWC07842 | | | Other |
| PWC07843 | | | Other |

Exhibit 2
14 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| PWC07846 | | | Other |
| PWC07849 | | | Other |
| PWC07850 | | | Other |
| PWC07851 | | | Other |
| PWC07852 | | | Other |
| PWC07853 | | | Other |
| PWC07888 | | | Other |
| PWC08305 | | | Other |
| PWC08309 | | | Other |
| PWC09029 | | | Other |
| PWC09031 | | | Other |
| PWC09035 | | | Other |
| RC00034684 | | Audited Consolidated Financial Statements of Homecomings Financial, LLC as of 12/31/2007 | Internal & External Financial Statements |
| RC40000001 | | Accounting Policy 1005 Creation, Approval, and Maintenance of Accounting Policies | Other |
| RC40000010 | | | Other |
| RC40000035 | | Accounting Policy 1020 Financial Guarantees | Other |
| RC40000056 | | Accounting Policy 1025 Accounting Changes and Error Corrections | Other |
| RC40000082 | | Ally Accounting Policy 1030: Offsetting And Netting | Internal & External Financial Statements |
| RC40000099 | | Accounting Policy 1035 General Contingencies | Other |
| RC40000118 | | Ally Accounting Policy 1040: Intercompany Accounting | Internal & External Financial Statements |
| RC40000138 | | | Other |
| RC40000173 | | | Other |
| RC40000202 | | Accounting Policy 1060 Fair Value Measurement | Other |
| RC40000254 | | Accounting Policy 1065 The Fair Value Option | Other |
| RC40000275 | | | Other |
| RC40000342 | | Ally Accounting Policy 1075: Related Party | Internal & External Financial Statements |
| RC40000361 | | | Other |
| RC40000403 | | | Other |
| RC40000421 | | | Other |
| RC40000439 | | Accounting Policy 1205 Subsequent Events | Other |
| RC40000450 | | Accounting Policy 2055 Cash and Cash Equivalents | Other |
| RC40000462 | | Accounting Policy 2105 Retained Interests | Other |
| RC40000498 | | | Other |
| RC40000536 | | Ally Accounting Policy 2115: Cost, Equity Method, And Consolidation Accounting | Internal & External Financial Statements |
| RC40000585 | | | Other |
| RC40000608 | | Accounting Policy 2220 Loan and Lease Charge-Offs | Other |
| RC40000620 | | Global Nonaccrual Loans Policy: Accounting Policy 2255 | Other |
| RC40000640 | | Accounting Policy 2260 Lending & Finance Receivables | Other |
| RC40000660 | | Accounting Policy 2270 Loan Modifications and Troubled Debt Restructurings | Other |
| RC40000689 | | Accounting Policy 2275 Purchased Distressed Loans & Securities | Other |
| RC40000718 | | | Other |
| RC40000763 | | Global Allowance for Credit Losses Policy: Accounting Policy 2305 | Other |
| RC40000790 | | Accounting Policy 2315 Reverse for Assets Sold with Recourse | Other |
| RC40000802 | | Accounting Policy 2451 Mortgage Servicing Rights | Other |
| RC40000823 | | Accounting Policy 2601 Fixed Assets | Other |
| RC40000839 | | Accounting Policy 2602 Software & Development Cost | Other |
| RC40000857 | | Accounting Policy 2650 Repossessed and Foreclosed Assets and Other Real Estate Owned | Other |
| RC40000876 | | Accounting Policy 2715 Goodwill | Other |

Exhibit 2
15 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RC40000900 | | Accounting Policy 2725 Intangible Assets | Other |
| RC40000916 | | | Other |
| RC40000936 | | Accounting Policy 2740 Loan Premiums, Discounts, and Deferred Fees or Costs | Other |
| RC40000953 | | | Other |
| RC40001003 | | Accounting Policy 2905 Impairment of Long-Lived Assets (To be Held and Used) | Other |
| RC40001021 | | | Other |
| RC40001043 | | Accounting Policy 4105 Preferred Stock | Other |
| RC40001058 | | Accounting Policy 5205 Insurance  Accounting and Reporting | Other |
| RC40001092 | | Accounting Policy 5305 Advertising and Marketing | Other |
| RC40001105 | | Ally Accounting Policy 3055: Debt | Internal & External Financial Statements |
| RC40001136 | | | Other |
| RC40001150 | | Accounting Policy 3310 Costs Associated with Exit or Disposal Activities | Other |
| RC40001174 | | Accounting Policy 3315 Employee Benefit Plans | Other |
| RC40001204 | | Accounting Policy 3320 Share Based Compensation | Other |
| RC40001269 | | Accounting Policy 3325 Accounting for Uncertain Tax Positions | Other |
| RC40001284 | | Accounting Policy 3330 Accounting for Income Taxes | Other |
| RC40001301 | | Accounting Policy 3405 Deposit Liabilities | Other |
| RC40001322 | | Accounting Policy 7105 Regulatory Capital | Other |
| RC40001369 | | Accounting Policy 7205 Average Daily Balance Policy | Other |
| RC40006523 | | Written Consent of the Executive Committee of ResCap, LLC for the Proposed Capital Infusion for GMAC-RFC Australia 3/31/2009 | Legal |
| RC40006568 | | Debt Forgiveness from GMAC Residential Holding Company to GMAC Mortgage | Email and Memo Communications |
| RC40008678 | | | Other |
| RCCUCCJSN20051023 | | | Other |
| RCJSNII00003298 | | Intercompany Balances for February [Year Unknown] | Internal & External Financial Statements |
| RCJSNII00003299 | | Intercompany Balances for April and May [Year Unknown] | Internal & External Financial Statements |
| RCJSNII00003300 | | ResCap Consolidated - Intercompany Balances for period ending 1/31/2011 | Internal & External Financial Statements |
| RCJSNII00003301 | | GMAC Mortgage Ops - External Reporting - Intercompany Accounts 1/31/2011 | Internal & External Financial Statements |
| RCJSNII00003304 | | GMAC Mortgage Ops - External Reporting - Intercompany Accounts 2/28/2011 | Internal & External Financial Statements |
| RCJSNII00003307 | | GMAC Mortgage Ops - External Reporting - Intercompany Accounts 3/31/2011 | Internal & External Financial Statements |
| RCJSNII00003311 | | GMAC Mortgage Ops - External Reporting - Intercompany Accounts 4/30/2011 | Internal & External Financial Statements |
| RCJSNII00003318 | | GMAC Mortgage Ops - External Reporting - Intercompany Accounts 6/30/11 | Internal & External Financial Statements |
| RCJSNII00003322 | | GMAC Mortgage Ops - External Reporting - Intercompany Accounts 7/31/11 | Internal & External Financial Statements |
| RCJSNII00003325 | | ResCap Consolidated - Intercompany Balances for period ending 8/31/2011 | Internal & External Financial Statements |
| RCJSNII00003326 | | GMAC Mortgage Ops - External Reporting - Intercompany Accounts 8/31/2011 | Internal & External Financial Statements |
| RCJSNII00003330 | | GMAC Mortgage Ops - External Reporting - Intercompany Accounts 9/30/2011 | Internal & External Financial Statements |
| RCJSNII00003334 | | GMAC Mortgage Ops - External Reporting - Intercompany Accounts 10/31/2011 | Internal & External Financial Statements |
| RCJSNII00003337 | | GMAC Mortgage Ops - External Reporting - Intercompany Accounts 11/30/2011 | Internal & External Financial Statements |
| RCJSNII00003340 | | ResCap Intercompany Certification Document | Other |
| RCJSNII00003344 | | ResCap Intercompany Inventory Certification - 12/31/2011 | Bankruptcy Filings & Background Information |
| RCJSNII00003350 | | ResCap Intercompany Inventory Certification - 12/31/2011 | Bankruptcy Filings & Background Information |
| RCJSNII00003355 | | GMAC Mortgage Ops - External Reporting - Intercompany Accounts 12/31/2011 | Internal & External Financial Statements |
| RCJSNII00003359 | | Intercompany Balances for April May and June [Year Unknown] | Internal & External Financial Statements |
| RCJSNII00003360 | | Intercompany Balances - ResCap, GMAC, RFC - 9/30/2012 | Internal & External Financial Statements |
| RCJSNII00003361 | | Intercompany Balances - ResCap, GMAC, RFC - 7/31/2012 | Internal & External Financial Statements |
| RCJSNII00003362 | | ResCap - Consolidated Intercompany Balance Information as 5/13/2012 | Internal & External Financial Statements |
| RCJSNII00003363 | | Intercompany Balance - GMAC and ResCap at 1/31/2009 | Internal & External Financial Statements |
| RCJSNII00003370 | | Intercompany Balance - GMAC, RFC and ResCap at 1/31/2009 | Internal & External Financial Statements |
| RCJSNII00003371 | | Intercompany Balance - GMAC, RFC and ResCap at 1/31/2009 | Internal & External Financial Statements |

Exhibit 2
16 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII00003372 | | Intercompany Balance - GMAC, RFC and ResCap at 1/31/2009 | Internal & External Financial Statements |
| RCJSNII00003374 | | Intercompany Balance - GMAC, RFC and ResCap at 1/31/2009 | Internal & External Financial Statements |
| RCJSNII00003376 | | Consolidated Intercompany Balance Information at 1/31/2009 | Internal & External Financial Statements |
| RCJSNII00003377 | | Intercompany Balance details for GMAC including Collateral Silo Info - at 1/31/2009 | Internal & External Financial Statements |
| RCJSNII00003379 | | Intercompany Balance - GMAC, RFC and ResCap at 2/28/2009 | Internal & External Financial Statements |
| RCJSNII00003381 | | Intercompany Balance details for GMAC including Collateral Silo Info - at 2/28/2009 | Internal & External Financial Statements |
| RCJSNII00003384 | | Intercompany Balance - GMAC and ResCap at 2/28/2009 | Internal & External Financial Statements |
| RCJSNII00003387 | | Intercompany Balance - GMAC, RFC and ResCap at 3/31/2009 | Internal & External Financial Statements |
| RCJSNII00003389 | | ResCap - Consolidated Intercompany Balance Information at 3/31/2009 | Internal & External Financial Statements |
| RCJSNII00003390 | | ResCap - Consolidated Intercompany Balance Information at 3/31/2009 | Internal & External Financial Statements |
| RCJSNII00003392 | | Intercompany Balance details for GMAC including Collateral Silo Info - at 3/31/2009 | Internal & External Financial Statements |
| RCJSNII00003393 | | Intercompany Balance -RFC - 3/31/2009 | Internal & External Financial Statements |
| RCJSNII00003396 | | Intercompany Balance -GMAC, Resi, RFC - 3/31/2009 | Internal & External Financial Statements |
| RCJSNII00003399 | | ResCap - Consolidated Intercompany Balance Information at 4/30/2009 | Internal & External Financial Statements |
| RCJSNII00003400 | | Intercompany Balance -RFC - 4/30/2009 | Internal & External Financial Statements |
| RCJSNII00003401 | | Intercompany Balance -GMAC, ResMor, RFC - 4/30/2009 | Internal & External Financial Statements |
| RCJSNII00003402 | | | Other |
| RCJSNII00003403 | | | Other |
| RCJSNII00003404 | | Intercompany Balance -RFC, Resi - 4/30/2009 | Internal & External Financial Statements |
| RCJSNII00003405 | | Intercompany Balance -RFC Corp - 4/30/2009 | Internal & External Financial Statements |
| RCJSNII00003406 | | Intercompany Balance -RFC - 4/30/2009 | Internal & External Financial Statements |
| RCJSNII00003407 | | | Other |
| RCJSNII00003408 | | Intercompany Balance -GMAC, ResCap, RFC - 4/30/2009 | Internal & External Financial Statements |
| RCJSNII00003409 | | Intercompany Balance -GMAC, ResCap, RFC - 4/30/2009 | Internal & External Financial Statements |
| RCJSNII00003410 | | Intercompany Balance -RFC, Resi - 4/30/2009 | Internal & External Financial Statements |
| RCJSNII00003411 | | ResCap - Consolidated Intercompany Balance Information at 5/31/2009 | Internal & External Financial Statements |
| RCJSNII00003412 | | Intercompany Balance -GMAC, ResMor, RFC - 5/31/2009 | Internal & External Financial Statements |
| RCJSNII00003413 | | Intercompany Balance -GMAC, ResMor, RFC - 5/31/2009 | Internal & External Financial Statements |
| RCJSNII00003414 | | Intercompany Balance -GMAC, ResMor, RFC - 5/31/2009 | Internal & External Financial Statements |
| RCJSNII00003415 | | | Other |
| RCJSNII00003416 | | Intercompany Balance - RFC, Resi - 5/31/2009 | Internal & External Financial Statements |
| RCJSNII00003417 | | Intercompany Balance - GMAC, RFC Corp, Resi - 5/31/2009 | Internal & External Financial Statements |
| RCJSNII00003418 | | | Other |
| RCJSNII00003419 | | Intercompany Balance - RFC, ResMor, Resi - 5/31/2009 | Internal & External Financial Statements |
| RCJSNII00003420 | | Intercompany Balance - RFC, Resi - 5/31/2009 | Internal & External Financial Statements |
| RCJSNII00003421 | | Intercompany Balance - RFC, ResMor, Resi - 5/31/2009 | Internal & External Financial Statements |
| RCJSNII00003422 | | Intercompany Balance - RFC, ResMor, Resi - 6/30/2009 | Internal & External Financial Statements |
| RCJSNII00003423 | | ResCap - Consolidated Intercompany Balance Information at 6/30/2009 | Internal & External Financial Statements |
| RCJSNII00003424 | | ResCap - Consolidated Intercompany Balance Information at 6/30/2009 | Internal & External Financial Statements |
| RCJSNII00003425 | | | Other |
| RCJSNII00003426 | | Intercompany Balance - GMAC, Resi - 6/30/2009 | Internal & External Financial Statements |
| RCJSNII00003427 | | Intercompany Balance - GMAC, Resi - 6/30/2009 | Internal & External Financial Statements |
| RCJSNII00003428 | | Intercompany Balance -GMAC, ResMor, RFC - 6/30/2009 | Internal & External Financial Statements |
| RCJSNII00003429 | | Intercompany Balance - RFC, ResMor, Resi - 6/30/2009 | Internal & External Financial Statements |
| RCJSNII00003430 | | Intercompany Balance - RFC, ResMor, Resi - 6/30/2009 | Internal & External Financial Statements |
| RCJSNII00003431 | | Intercompany Balance - RFC, Resi - 6/30/2009 | Internal & External Financial Statements |
| RCJSNII00003432 | | Intercompany Balance -GMAC, ResMor, RFC - 7/31/2009 | Internal & External Financial Statements |
| RCJSNII00003433 | | ResCap - Consolidated Intercompany Balance Information at 7/31/2009 | Internal & External Financial Statements |

Exhibit 2
17 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII00003434 | | ResCap - Consolidated Intercompany Balance Information at 7/31/2009 | Internal & External Financial Statements |
| RCJSNII00003435 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 7/31/2009 | Internal & External Financial Statements |
| RCJSNII00003436 | | Intercompany Balance - RFC, Resi - 7/31/2009 | Internal & External Financial Statements |
| RCJSNII00003437 | | Intercompany Balance - RFC, Resi - 7/31/2009 | Internal & External Financial Statements |
| RCJSNII00003438 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 7/31/2009 | Internal & External Financial Statements |
| RCJSNII00003439 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 7/31/2009 | Internal & External Financial Statements |
| RCJSNII00003440 | | | Other |
| RCJSNII00003441 | | | Other |
| RCJSNII00003442 | | Intercompany Balance - Resi, RFC - 7/31/2009 | Internal & External Financial Statements |
| RCJSNII00003444 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 7/31/2009 | Internal & External Financial Statements |
| RCJSNII00003445 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003446 | | ResCap - Consolidated Intercompany Balance Information at 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003447 | | ResCap - Consolidated Intercompany Balance Information at 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003448 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003449 | | | Other |
| RCJSNII00003450 | | Intercompany Balance - RFC, Resi - 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003451 | | Intercompany Balance - RFC, Resi - 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003452 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003453 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003454 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003455 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003456 | | Intercompany Balance - RFC, Resi - 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003457 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003458 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 8/31/2009 | Internal & External Financial Statements |
| RCJSNII00003459 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII00003460 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII00003461 | | ResCap - Consolidated Intercompany Balance Information at 9/30/2009 | Internal & External Financial Statements |
| RCJSNII00003462 | | ResCap - Consolidated Intercompany Balance Information at 9/30/2009 | Internal & External Financial Statements |
| RCJSNII00003463 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII00003464 | | | Other |
| RCJSNII00003465 | | Intercompany Balance - RFC, Resi - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII00003466 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII00003467 | | Intercompany Balance - RFC Corp. - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII00003468 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII00003469 | | Intercompany Balance - RFC, Resi - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII00003470 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII00003471 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII00003472 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 10/31/2009 | Internal & External Financial Statements |
| RCJSNII00003473 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 10/31/2009 | Internal & External Financial Statements |
| RCJSNII00003474 | | ResCap - Consolidated Intercompany Balance Information at 10/31/2009 | Internal & External Financial Statements |
| RCJSNII00003475 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 10/31/2009 | Internal & External Financial Statements |
| RCJSNII00003476 | | | Other |
| RCJSNII00003477 | | Intercompany Balance - RFC Corp. - 10/31/2009 | Internal & External Financial Statements |
| RCJSNII00003478 | | Intercompany Balance - RFC, Resi - 10/31/2009 | Internal & External Financial Statements |
| RCJSNII00003479 | | | Other |
| RCJSNII00003480 | | Intercompany Balance - RFC Corp. - 10/31/2009 | Internal & External Financial Statements |
| RCJSNII00003481 | | ResCap - Intercompany Out of Balance Condition - 10/2009 Month-End Status | Internal & External Financial Statements |
| RCJSNII00003482 | | Intercompany Balance - RFC, Resi - 10/31/2009 | Internal & External Financial Statements |

Exhibit 2
18 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII00003483 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 11/30/2009 | Internal & External Financial Statements |
| RCJSNII00003484 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 11/30/2009 | Internal & External Financial Statements |
| RCJSNII00003485 | | ResCap - Consolidated Intercompany Balance Information at 11/30/2009 | Internal & External Financial Statements |
| RCJSNII00003486 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 11/30/2009 | Internal & External Financial Statements |
| RCJSNII00003487 | | | Other |
| RCJSNII00003488 | | Intercompany Balance - RFC, Resi - 11/30/2009 | Internal & External Financial Statements |
| RCJSNII00003489 | | Intercompany Balance - RFC, Resi - 11/30/2009 | Internal & External Financial Statements |
| RCJSNII00003490 | | Intercompany Balance - GMAC, RFC, ResMor, Resi - 11/30/2009 | Internal & External Financial Statements |
| RCJSNII00003491 | | Intercompany Balance - RFC Corp. - 11/30/2009 | Internal & External Financial Statements |
| RCJSNII00003492 | | | Other |
| RCJSNII00003493 | | ResCap - Intercompany Out of Balance Condition - 11/2009 Month-End Status | Internal & External Financial Statements |
| RCJSNII00003494 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 11/30/2009 | Internal & External Financial Statements |
| RCJSNII00003495 | | Intercompany Balance - RFC Corp. - 11/30/2009 | Internal & External Financial Statements |
| RCJSNII00003496 | | Intercompany Balance - RFC, Resi - 11/30/2009 | Internal & External Financial Statements |
| RCJSNII00003497 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 12/31/2009 | Internal & External Financial Statements |
| RCJSNII00003499 | | ResCap - Consolidated Intercompany Balance Information at 12/31/2009 | Internal & External Financial Statements |
| RCJSNII00003506 | | ResCap - Intercompany Out of Balance Condition - 12/2009 Month-End Status | Internal & External Financial Statements |
| RCJSNII00003507 | | Intercompany Balance - RFC, Resi - 12/31/2009 | Internal & External Financial Statements |
| RCJSNII00003508 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 12/31/2009 | Internal & External Financial Statements |
| RCJSNII00003509 | | Intercompany Balance - RFC Corp. - 12/31/2009 | Internal & External Financial Statements |
| RCJSNII00003510 | | Intercompany Balances and Trial Balances as of January 31, 2013 | Internal & External Financial Statements |
| RCJSNII00003511 | | Intercompany Balances w/ GL Account Numbers [Period Unknown] | Internal & External Financial Statements |
| RCJSNII00003512 | | ResCap - Consolidated Intercompany Balance Information at 6/30/2012 | Internal & External Financial Statements |
| RCJSNII00003513 | | ResCap - Consolidated Intercompany Balance Information at 5/31/2012 | Internal & External Financial Statements |
| RCJSNII00003514 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 1/31/2010 | Internal & External Financial Statements |
| RCJSNII00003515 | | | Other |
| RCJSNII00003516 | | Intercompany Balance - RFC Corp. - 1/31/2010 | Internal & External Financial Statements |
| RCJSNII00003517 | | ResCap - Intercompany Out of Balance Condition - 01/2010 Month-End Status | Internal & External Financial Statements |
| RCJSNII00003518 | | Intercompany Balance - RFC, Resi - 1/31/2010 | Internal & External Financial Statements |
| RCJSNII00003519 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 1/31/2010 | Internal & External Financial Statements |
| RCJSNII00003521 | | Intercompany Balance - RFC Corp. - 2/28/2010 | Internal & External Financial Statements |
| RCJSNII00003522 | | ResCap - Intercompany Out of Balance Condition - 02/2010 Month-End Status | Internal & External Financial Statements |
| RCJSNII00003523 | | Intercompany Balance - RFC, Resi - 2/28/2010 | Internal & External Financial Statements |
| RCJSNII00003524 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 2/28/2010 | Internal & External Financial Statements |
| RCJSNII00003525 | | Intercompany Balance - RFC, Resi - 2/28/2010 | Internal & External Financial Statements |
| RCJSNII00003526 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 3/31/2010 | Internal & External Financial Statements |
| RCJSNII00003527 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 3/31/2010 | Internal & External Financial Statements |
| RCJSNII00003528 | | Intercompany Balance - RFC Corp. - 3/31/2010 | Internal & External Financial Statements |
| RCJSNII00003529 | | ResCap - Intercompany Out of Balance Condition - 03/2010 Month-End Status | Internal & External Financial Statements |
| RCJSNII00003530 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 3/31/2010 | Internal & External Financial Statements |
| RCJSNII00003531 | | Intercompany Balance - RFC, Resi - 4/30/2010 | Internal & External Financial Statements |
| RCJSNII00003532 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 4/30/2010 | Internal & External Financial Statements |
| RCJSNII00003533 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 4/30/2010 | Internal & External Financial Statements |
| RCJSNII00003534 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 4/30/2010 | Internal & External Financial Statements |
| RCJSNII00003535 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 4/30/2010 | Internal & External Financial Statements |
| RCJSNII00003536 | | Intercompany Balance - RFC Corp. - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003537 | | ResCap - Intercompany Out of Balance Condition - 04/2010 Month-End Status | Internal & External Financial Statements |
| RCJSNII00003538 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 5/31/2010 | Internal & External Financial Statements |

Exhibit 2
19 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII00003539 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003540 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003541 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003542 | | ResCap - Intercompany Out of Balance Condition - 05/2010 Month-End Status | Internal & External Financial Statements |
| RCJSNII00003543 | | Intercompany Balance - Resi - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003544 | | Intercompany Balance - RFC, Resi - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003545 | | Intercompany Balance - RFC Corp. - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003546 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003547 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003548 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003549 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003550 | | ResCap - Intercompany Out of Balance Condition - 06/2010 Month-End Status | Internal & External Financial Statements |
| RCJSNII00003551 | | Intercompany Balance - Resi - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003552 | | Intercompany Balance - RFC, Resi, ResMor, Ally Bank - 5/31/2010 | Internal & External Financial Statements |
| RCJSNII00003553 | | GL Trial Balance - Intercompany Accounts 7/31/2010 | Internal & External Financial Statements |
| RCJSNII00003555 | | GL Trial Balance - Intercompany Accounts 8/31/2010 | Internal & External Financial Statements |
| RCJSNII00003556 | | GL Trial Balance - Intercompany Accounts 9/30/2010 | Internal & External Financial Statements |
| RCJSNII00003558 | | GL Trial Balance - Intercompany Accounts 10/31/2010 | Internal & External Financial Statements |
| RCJSNII00003560 | | GL Trial Balance - Intercompany Accounts 11/30/2010 | Internal & External Financial Statements |
| RCJSNII00003562 | | GL Trial Balance - Intercompany Accounts 12/31/2010 | Internal & External Financial Statements |
| RCJSNII00003564 | | ResCap Out of Balance Condition - 12/2010 Month-End Status | Internal & External Financial Statements |
| RCJSNII00003565 | | Intercompany Balances/GL Account Balances - 10/31/2012 | Internal & External Financial Statements |
| RCJSNII00003566 | | Intercompany Balances/GL Account Balances - 12/31/2012 | Internal & External Financial Statements |
| RCJSNII00003567 | | GL Trial Balance - Intercompany Accounts 1/31/2012 | Internal & External Financial Statements |
| RCJSNII00003569 | | ResCap - January 2012 Intercompany Out-of-Balance Certification | Internal & External Financial Statements |
| RCJSNII00003570 | | ResCap - February 2012 Intercompany Out-of-Balance Certification | Internal & External Financial Statements |
| RCJSNII00003571 | | Summary of I/C Account Reconciliations - ResCap at 2/29/12 | Internal & External Financial Statements |
| RCJSNII00003572 | | GL Trial Balance - Intercompany Accounts 2/29/2012 | Internal & External Financial Statements |
| RCJSNII00003573 | | GL Trial Balance - Intercompany Accounts 2/29/2012 | Internal & External Financial Statements |
| RCJSNII00003575 | | Intercompany - asset balance difference reconciliation 2/29/12 | Bankruptcy Filings & Background Information |
| RCJSNII00003578 | | ResCap Intercompany Inventory Certification - 3/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003579 | | GL Trial Balance - Intercompany Accounts 3/31/2012 | Internal & External Financial Statements |
| RCJSNII00003584 | | | Other |
| RCJSNII00003585 | | GL Trial Balance - Intercompany Accounts by Subsidiary [Period Unknown] | Internal & External Financial Statements |
| RCJSNII00003588 | | ResCap - March 2012 Intercompany Out-of-Balance Certification | Internal & External Financial Statements |
| RCJSNII00003589 | | ResCap - April 2012 Intercompany Out-of-Balance Certification | Internal & External Financial Statements |
| RCJSNII00003590 | | GL Trial Balance - Intercompany Accounts 4/30/2012 | Internal & External Financial Statements |
| RCJSNII00003592 | | GL Trial Balance - Intercompany Accounts 5/31/2012 | Internal & External Financial Statements |
| RCJSNII00003593 | | ResCap - May 2012 Intercompany Out-of-Balance Certification | Internal & External Financial Statements |
| RCJSNII00003594 | | GL Trial Balance - Intercompany Accounts 6/30/2012 | Internal & External Financial Statements |
| RCJSNII00003595 | | ResCap - June 2012 Intercompany Out-of-Balance Certification | Internal & External Financial Statements |
| RCJSNII00003596 | | GL Trial Balance - Intercompany Accounts 7/31/2012 | Internal & External Financial Statements |
| RCJSNII00003598 | | ResCap - July 2012 Intercompany Out-of-Balance Certification | Internal & External Financial Statements |
| RCJSNII00003599 | | ResCap - July 2012 Intercompany Out-of-Balance Certification | Internal & External Financial Statements |
| RCJSNII00003601 | | GL Trial Balance - Intercompany Accounts 9/30/2012 | Internal & External Financial Statements |
| RCJSNII00003603 | | | Other |
| RCJSNII00003604 | | GL Trial Balance - Intercompany Accounts 10/31/2012 | Internal & External Financial Statements |
| RCJSNII00003605 | | ResCap - October 2012 Intercompany Out-of-Balance Certification | Internal & External Financial Statements |

Exhibit 2
20 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII00003606 | | GL Trial Balance - Intercompany Accounts 11/30/2012 | Internal & External Financial Statements |
| RCJSNII00003607 | | ResCap - November 2012 Intercompany Out-of-Balance Certification | Internal & External Financial Statements |
| RCJSNII00003608 | | ResCap Intercompany Certification - 12/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003610 | | ResCap - December 2012 Intercompany Out-of-Balance Certification | Internal & External Financial Statements |
| RCJSNII00003612 | | GL Trial Balance - Intercompany Accounts 12/31/2012 | Internal & External Financial Statements |
| RCJSNII00003613 | | Intercompany Balances for April [Year Unknown] | Internal & External Financial Statements |
| RCJSNII00003624 | | Intercompany Balances for March [Year Unknown] | Internal & External Financial Statements |
| RCJSNII00003625 | | ResCap - Consolidated IC Balances and Debt Forgiveness Entries - 2/29/2012 | Internal & External Financial Statements |
| RCJSNII00003626 | | Intercompany Account Relationships - Compliant and Non-Compliant - December 2011 | Bankruptcy Filings & Background Information |
| RCJSNII00003627 | | Intercompany Balances/GL Account Balances - 8/31/2012 | Internal & External Financial Statements |
| RCJSNII00003681 | | ResCap Intercompany Inventory Certification - 12/31/2011 | Bankruptcy Filings & Background Information |
| RCJSNII00003682 | | ResCap Intercompany Inventory Certification - 12/31/2011 | Bankruptcy Filings & Background Information |
| RCJSNII00003683 | | ResCap Intercompany Inventory Certification - 12/31/2011 | Bankruptcy Filings & Background Information |
| RCJSNII00003684 | | ResCap Intercompany Inventory Certification - 12/31/2011 | Bankruptcy Filings & Background Information |
| RCJSNII00003685 | | ResCap Intercompany Inventory Certification - 12/31/2011 | Bankruptcy Filings & Background Information |
| RCJSNII00003686 | | ResCap Intercompany Inventory Certification - 12/31/2011 | Bankruptcy Filings & Background Information |
| RCJSNII00003687 | | ResCap Intercompany Inventory Certification - 12/31/2011 | Bankruptcy Filings & Background Information |
| RCJSNII00003688 | | ResCap Intercompany Inventory Certification - 12/31/2011 | Bankruptcy Filings & Background Information |
| RCJSNII00003692 | | ResCap Intercompany Inventory Certification - 12/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003694 | | ResCap Intercompany Inventory Certification - 3/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003695 | | ResCap Intercompany Inventory Certification - 3/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003696 | | ResCap Intercompany Inventory Certification - 3/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003697 | | ResCap Intercompany Inventory Certification - 3/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003698 | | ResCap Intercompany Inventory Certification - 3/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003699 | | ResCap Intercompany Inventory Certification - 3/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003700 | | ResCap Intercompany Inventory Certification - 3/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003701 | | ResCap Intercompany Inventory Certification - 3/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003702 | | ResCap Intercompany Inventory Certification - 3/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003703 | | ResCap Intercompany Inventory Certification - 9/30/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003704 | | ResCap Intercompany Inventory Certification - 12/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003705 | | ResCap Intercompany Inventory Certification - 12/31/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003706 | | ResCap Intercompany Inventory Certification - 9/30/2012 | Bankruptcy Filings & Background Information |
| RCJSNII00003707 | | Intercompany Balances/GL Account Balances - 11/30/2012 | Internal & External Financial Statements |
| RCJSNII00019891 | | Residential Funding - Corporation Franchise Tax (Minnesota) - 2007 | Tax Returns |
| RCJSNII00019897 | | Residential Funding - Corporation Franchise Tax (California) - 2007 | Tax Returns |
| RCJSNII00019923 | | Homecomings - Corporation Franchise Tax (Minnesota) - 2007 | Tax Returns |
| RCJSNII00019927 | | Homecomings - Corporation Franchise Tax (California) - 2007 | Tax Returns |
| RCJSNII00019939 | | RFC Asset Holdings II - LLC Return of Income (California) - 2007 | Tax Returns |
| RCJSNII00019951 | | Residential Funding - PA Corporate Tax Report (2007) | Tax Returns |
| RCJSNII00019959 | | Residential Funding - LLC Return of Income (California) - 2007 | Tax Returns |
| RCJSNII00019969 | | Asset Management Performance Services- LLC Return of Income (California) - 2007 | Tax Returns |
| RCJSNII00019976 | | LenOne - LLC Return of Income (California) - 2007 | Tax Returns |
| RCJSNII00019986 | | KBOne - LLC Return of Income (California) - 2007 | Tax Returns |
| RCJSNII00019996 | | GMCMTH - LLC Return of Income (California) - 2007 | Tax Returns |
| RCJSNII00020007 | | GMAC Model Home Finance - PA Corporate Tax Report (2007) | Tax Returns |
| RCJSNII00020015 | | GMAC Model Home Finance - LLC Return of Income (California) - 2007 | Tax Returns |
| RCJSNII00020028 | | RFC Construction Funding - LLC Return of Income (California) - 2007 | Tax Returns |
| RCJSNII00020035 | | Homecomings Financial - Rhode Island Business Corporation Tax Return (2007) | Tax Returns |

Exhibit 2
21 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII00020037 | | PA CORPORATE TAX REPORT 2007 | Tax Returns |
| RCJSNII00020045 | | Homecomings Financial, LLC - NH Tax Return 2007 | Tax Returns |
| RCJSNII00020051 | | State Tax Return | Tax Returns |
| RCJSNII00020053 | | State Tax Return | Tax Returns |
| RCJSNII00020066 | | State Tax Return | Tax Returns |
| RCJSNII00020073 | | State Tax Return | Tax Returns |
| RCJSNII00020080 | | State Tax Return | Tax Returns |
| RCJSNII00020087 | | RFC, LLC - RI Tax Return 2007 | Tax Returns |
| RCJSNII00020089 | | RFC, LLC - PA Tax Return 2007 | Tax Returns |
| RCJSNII00020097 | | RFC, LLC - NH Tax Return 2007 | Tax Returns |
| RCJSNII00020104 | | RFC, LLC - CA Tax Return 2007 | Tax Returns |
| RCJSNII00020118 | | RFC, LLC - AL Tax Return 2008 | Tax Returns |
| RCJSNII00020123 | | RFC Resort Funding, LLC - CA Tax Return 2008 | Tax Returns |
| RCJSNII00020129 | | RFC Asset Holdings II, LLC - CA Tax Return 2008 | Tax Returns |
| RCJSNII00020139 | | Residential Funding USA Corporation - CA Tax Return 2008 | Tax Returns |
| RCJSNII00020159 | | Residential Funding USA Corporation - MN Tax Return 2008 | Tax Returns |
| RCJSNII00020166 | | Residential Funding Securities, LLC - PA Tax Return 2008 | Tax Returns |
| RCJSNII00020174 | | Residential Funding Securities, LLC - CA Tax Return 2008 | Tax Returns |
| RCJSNII00020184 | | Residential Funding Real Estate Holdings, LLC - CA Tax Return 2008 | Tax Returns |
| RCJSNII00020185 | | KBOne, LLC - CA Tax Return 2008 | Tax Returns |
| RCJSNII00020194 | | Lenone, LLC - CA Tax Return 2008 | Tax Returns |
| RCJSNII00020200 | | MFC Asset, LLC - CA Tax Return 2008 | Tax Returns |
| RCJSNII00020207 | | RC Properties VI, LLC - CA Tax Return 2008 | Tax Returns |
| RCJSNII00020212 | | RC Properties V, LLC - CA Tax Return 2008 | Tax Returns |
| RCJSNII00020217 | | Homecomings Financial, LLC - KS Franchise Tax 2008 | Tax Returns |
| RCJSNII00020218 | | Homecomings Financial, LLC - NH Tax Return 2008 | Tax Returns |
| RCJSNII00020230 | | Homecomings Financial, LLC - PA Tax Return 2008 | Tax Returns |
| RCJSNII00020239 | | Homecomings Financial, LLC - CA Limited Liability Return of Income 2008 | Tax Returns |
| RCJSNII00020252 | | Homecomings Financial, LLC - RI Tax Return 2008 | Tax Returns |
| RCJSNII00020255 | | Homecomings Financial, LLC - MN Tax Return 2008 | Tax Returns |
| RCJSNII00020261 | | Homecomings Financial USA Corporation - CA Tax Return 2008 | Tax Returns |
| RCJSNII00020276 | | GMCMTH, LLC - CA Limited Liability Return of Income 2008 | Tax Returns |
| RCJSNII00020287 | | GMAC Model Home Finance, LLC - Tax Report 2008 | Tax Returns |
| RCJSNII00020295 | | GMAC Model Home Finance, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020306 | | Equity Investments II, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020316 | | RFC Construction Funding, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020322 | | Residential Funding Company, LLC - RI Tax Return 2008 | Tax Returns |
| RCJSNII00020325 | | Residential Funding Company, LLC - PA Tax Return 2008 | Tax Returns |
| RCJSNII00020333 | | Residential Funding Company, LLC - NH Tax Return 2008 | Tax Returns |
| RCJSNII00020346 | | Residential Funding Company, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020359 | | RFC Funding Company, LLC - AL Financial Institution Tax Return 2009 | Tax Returns |
| RCJSNII00020365 | | Asset Management Performance Services, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020371 | | Residential Funding Company, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020385 | | RFC Funding Company, LLC - AL Financial Institution Tax Return 2010 | Tax Returns |
| RCJSNII00020390 | | Residential Funding Company, LLC - NH Tax Return 2009 | Tax Returns |
| RCJSNII00020405 | | Residential Funding Company, LLC - PA Corporate Tax Report 2008 | Tax Returns |
| RCJSNII00020415 | | Residential Funding Company, LLC - RI Corporate Tax Report 2008 | Tax Returns |
| RCJSNII00020418 | | RFC Asset Holdings II, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |

Exhibit 2
22 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII00020427 | | MFC Asset, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020433 | | Equity Investment II, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020440 | | Homecomings Financial, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020453 | | Homecomings Financial, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020465 | | Homecomings Financial, LLC - PA Corporate Tax Report 2008 | Tax Returns |
| RCJSNII00020475 | | Homecomings Financial, LLC - RI Corporate Tax Report 2008 | Tax Returns |
| RCJSNII00020478 | | RFC Construction Funding, LLC - Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020484 | | Asset Management Performance Services, LLC - Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020489 | | Residential Funding Real Estate, LLC - RI Corporate Tax Return 2009 | Tax Returns |
| RCJSNII00020493 | | RC Properties V, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020499 | | RC Properties VI, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020505 | | RC Properties XVIII, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020511 | | Residential Funding Securities, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020520 | | (AMENDED) Residential Funding Securities, LLC - CA Limited Liability Company Return of Income 2008 | Tax Returns |
| RCJSNII00020529 | | Residential Funding Securities, LLC - PA Corporate Tax Report 2009 | Tax Returns |
| RCJSNII00020537 | | Residential Funding Securities, LLC - PA Corporate Tax Report 2008 | Tax Returns |
| RCJSNII00020545 | | Residential Funding Company, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020560 | | Residential Funding Company, LLC - AL Excise Tax Return 2010 | Tax Returns |
| RCJSNII00020566 | | Residential Funding Company, LLC - NH Business Tax Summary 2009 | Tax Returns |
| RCJSNII00020582 | | Residential Funding Company, LLC - PA Corporate Tax Report 2009 | Tax Returns |
| RCJSNII00020590 | | Residential Funding Company, LLC - RI Business Corporate Tax Return 2009 | Tax Returns |
| RCJSNII00020595 | | RFC Asset Holdings II, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020606 | | MFC Asset, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020614 | | Equity Investments II, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020622 | | Homecomings Financial, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020636 | | Homecomings Financial, LLC - NH Business Tax Summary 2009 | Tax Returns |
| RCJSNII00020649 | | Homecomings Financial, LLC - PA Corporate Tax Report 2009 | Tax Returns |
| RCJSNII00020657 | | Homecomings Financial, LLC - RI Tax Return 2009 | Tax Returns |
| RCJSNII00020662 | | RFC Construction Funding, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020670 | | Asset Management Performance Services, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020678 | | Residential Funding Real Estate Holdings, LLC - RI Tax Return 2009 | Tax Returns |
| RCJSNII00020683 | | RC Properties V, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020689 | | RC Properties VI, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020697 | | RC Properties XVIII, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020703 | | RC Properties XX, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020709 | | Residential Funding Securities, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020715 | | Residential Funding Company, LLC - AL Excise Tax Return 2010 | Tax Returns |
| RCJSNII00020722 | | Residential Funding Company, LLC - PA Corporate Tax Report 2009 | Tax Returns |
| RCJSNII00020731 | | Residential Funding Company, LLC - RI Tax Return 2009 | Tax Returns |
| RCJSNII00020734 | | RFC Asset Holdings II, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020740 | | MFC Asset, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020746 | | Equity Investments II, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020752 | | Homecomings Financial, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020762 | | Homecomings Financial, LLC - PA Corporate Tax Report 2009 | Tax Returns |
| RCJSNII00020771 | | Homecomings Financial, LLC - RI Tax Return 2009 | Tax Returns |
| RCJSNII00020774 | | RFC Construction Funding, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020780 | | Asset Management Performance Services, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |

Exhibit 2
23 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII00020785 | | Residential Funding Real Estate Holdings, LLC - RI Tax Return 2009 | Tax Returns |
| RCJSNII00020788 | | RC Properties V, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020794 | | RC Properties VI, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020800 | | RC Properties XVIII, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020806 | | RC Properties XX, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020812 | | Residential Funding Securities, LLC - CA Limited Liability Company Return of Income 2009 | Tax Returns |
| RCJSNII00020818 | | Residential Funding Securities, LLC - PA Corporate Tax Report 2009 | Tax Returns |
| RCJSNII00020824 | | | Other |
| RCJSNII00020826 | | Residential Funding Company, LLC - CA Limited Liability Company Return of Income 2010 | Tax Returns |
| RCJSNII00020836 | | Residential Funding Company, LLC - AL Excise Tax Return 2011 | Tax Returns |
| RCJSNII00020843 | | Residential Funding Company, LLC - PA Corporate Tax Report 2010 | Tax Returns |
| RCJSNII00020853 | | Residential Funding Company, LLC - RI Tax Return 2010 | Tax Returns |
| RCJSNII00020857 | | RFC Asset Holdings II, LLC - CA Limited Liability Company Return of Income 2010 | Tax Returns |
| RCJSNII00020866 | | MFC Asset, LLC - CA Limited Liability Company Return of Income 2010 | Tax Returns |
| RCJSNII00020872 | | Equity Investments II, LLC - CA Limited Liability Company Return of Income 2010 | Tax Returns |
| RCJSNII00020879 | | Homecomings Financial, LLC - CA Limited Liability Company Return of Income 2010 | Tax Returns |
| RCJSNII00020888 | | Homecomings Financial, LLC - PA Corporate Tax Report 2010 | Tax Returns |
| RCJSNII00020898 | | Homecomings Financial, LLC - RI Tax Return 2010 | Tax Returns |
| RCJSNII00020902 | | RFC Construction Funding, LLC - CA Limited Liability Company Return of Income 2010 | Tax Returns |
| RCJSNII00020908 | | Asset Management Performance Services, LLC - CA Limited Liability Company Return of Income 2010 | Tax Returns |
| RCJSNII00020913 | | Residential Funding Real Estate Holdings, LLC - RI Tax Return 2010 | Tax Returns |
| RCJSNII00020916 | | RC Properties V, LLC - CA Limited Liability Company Return of Income 2010 | Tax Returns |
| RCJSNII00020922 | | RC Properties VI, LLC - CA Limited Liability Company Return of Income 2010 | Tax Returns |
| RCJSNII00020928 | | RC Properties XVIII, LLC - CA Limited Liability Company Return of Income 2010 | Tax Returns |
| RCJSNII00020934 | | RC Properties XX, LLC - CA Limited Liability Company Return of Income 2010 | Tax Returns |
| RCJSNII00020940 | | Residential Funding Company, LLC - CA Limited Liability Company Return of Income 2011 | Tax Returns |
| RCJSNII00020947 | | Residential Funding Company, LLC - AL Tax Return & Annual Report 2011 | Tax Returns |
| RCJSNII00020950 | | Residential Funding Company, LLC - PA Corporate Tax Report 2011 | Tax Returns |
| RCJSNII00020958 | | Residential Funding Company, LLC - RI Tax Return 2011 | Tax Returns |
| RCJSNII00020962 | | Residential Funding Real Estate Holdings, LLC - RI Tax Return 2011 | Tax Returns |
| RCJSNII00020966 | | Homecomings Financial, LLC - CA Limited Liability Company Return of Income 2011 | Tax Returns |
| RCJSNII00020972 | | Homecomings Financial, LLC - PA Corporate Tax Report 2011 | Tax Returns |
| RCJSNII00020980 | | Homecomings Financial, LLC - RI Tax Return 2011 | Tax Returns |
| RCJSNII00020985 | | RFC Asset Holdings II, LLC - CA Limited Liability Company Return of Income 2011 | Tax Returns |
| RCJSNII00020992 | | RFC Construction Funding, LLC - CA Limited Liability Company Return of Income 2011 | Tax Returns |
| RCJSNII00020998 | | Equity Investments II, LLC - CA Limited Liability Company Return of Income 2011 | Tax Returns |
| RCJSNII00021004 | | RC Properties XX, LLC - CA Limited Liability Company Return of Income 2011 | Tax Returns |
| RCJSNII00021010 | | RC Properties V, LLC - CA Limited Liability Company Return of Income 2011 | Tax Returns |
| RCJSNII00021016 | | RC Properties VI, LLC - CA Limited Liability Company Return of Income 2011 | Tax Returns |
| RCJSNII00021022 | | RC Properties XVIII, LLC - CA Limited Liability Company Return of Income 2011 | Tax Returns |
| RCJSNII00021028 | | Several Entities - Federal Tax Returns 2010 | Tax Returns |
| RCJSNII00021514 | | Several Entities - Federal Tax Returns 2010 | Tax Returns |
| RCJSNII00021895 | | Several Entities - Federal Tax Returns 2011 | Tax Returns |
| RCJSNII00025494 | | ResCap - Monthly Intercompany Balances from 12/31/2007 - 10/31/2012 | Internal & External Financial Statements |
| RCJSNII00025497 | | | Other |
| RCJSNII00025498 | | | Other |
| RCJSNII00025499 | | | Other |
| RCJSNII00025500 | | | Other |

Exhibit 2
24 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII00025502 | | | Other |
| RCJSNII00025509 | | | Other |
| RCJSNII00025516 | | | Other |
| RCJSNII00025518 | | ResCap - Debt Forgiveness Schedule 2008-2009 | Internal & External Financial Statements |
| RCJSNII00025521 | | | Other |
| RCJSNII00025523 | | | Other |
| RCJSNII00025524 | | Memo: ResCap Capital Contributions to Meet Net Worth Covenants | Email and Memo Communications |
| RCJSNII00025534 | | Memo: ResCap to Write Down a Viaduct 7 Note | Email and Memo Communications |
| RCJSNII00025542 | | | Other |
| RCJSNII00025547 | | Proposed Debt Forgiveness for RFC -9/21/2009 | Legal |
| RCJSNII00025553 | | Memo: From James Young, Allocation of Capital - Forgiveness of Intercompany Debt, June 25, 2009 | Email and Memo Communications |
| RCJSNII00025557 | | | Other |
| RCJSNII00025562 | | | Other |
| RCJSNII00025565 | | | Other |
| RCJSNII00025572 | | | Other |
| RCJSNII00025581 | | | Other |
| RCJSNII00025588 | | | Other |
| RCJSNII00025589 | | | Other |
| RCJSNII00025630 | | | Other |
| RCJSNII00025670 | | | Other |
| RCJSNII00025672 | | | Other |
| RCJSNII00025673 | | ResCap Capital Support for RFC | Legal |
| RCJSNII00025675 | | Memo: From James Young: Allocation of Capital - Intercompany Debt Forgiveness 12/8/2009 | Email and Memo Communications |
| RCJSNII00025680 | | Intercompany Information | Email and Memo Communications |
| RCJSNII00025681 | | | Other |
| RCJSNII00025682 | | | Other |
| RCJSNII00025683 | | ResCap - Intercompany Balances as of 12/31/2012 | Internal & External Financial Statements |
| RCJSNII00025738 | | | Other |
| RCJSNII00025745 | | | Other |
| RCJSNII00025746 | | | Other |
| RCJSNII00025747 | | Summary of Intercompany relationships with SOALs Descriptions | Internal & External Financial Statements |
| RCJSNII00025748 | | | Other |
| RCJSNII00025750 | | Summary of Intercompany relationships with SOALs balances | Internal & External Financial Statements |
| RCJSNII00025751 | | | Other |
| RCJSNII00025752 | | | Other |
| RCJSNII00025755 | | Top 7 Intercompany Receivables | Bankruptcy Filings & Background Information |
| RCJSNII00025767 | | | Other |
| RCJSNII00025768 | | | Other |
| RCJSNII00025769 | | | Other |
| RCJSNII00025770 | | | Other |
| RCJSNII00025885 | | | Other |
| RCJSNII00025886 | | Background of the April 20th Debt Forgiveness Report | Internal & External Financial Statements |
| RCJSNII00026018 | | | Other |
| RCJSNII00026019 | | | Other |
| RCJSNII00026020 | | | Other |
| RCJSNII00026023 | | | Other |
| RCJSNII00026037 | | | Other |
| RCJSNII00026052 | | Debt Forgiveness Procedures | Bankruptcy Filings & Background Information |

Exhibit 2
25 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII00026151 | | | Other |
| RCJSNII00026152 | | | Other |
| RCJSNII00026153 | | | Other |
| RCJSNII00026154 | | | Other |
| RCJSNII00026156 | | | Other |
| RCJSNII10000453 | | | Other |
| RCJSNII10000454 | | | Other |
| RCJSNII10000457 | | | Other |
| RCJSNII10000461 | | | Other |
| RCJSNII10000462 | | | Other |
| RCJSNII10000464 | | | Other |
| RCJSNII10000465 | | | Other |
| RCJSNII10002592 | | | Other |
| RCJSNII10002593 | | | Other |
| RCJSNII10002594 | | | Other |
| RCJSNII10002595 | | | Other |
| RCJSNII10002596 | | | Other |
| RCJSNII10002909 | | | Other |
| RCJSNII10002910 | | | Other |
| RCJSNII10002916 | | | Other |
| RCJSNII10002917 | | | Other |
| RCJSNII10006084 | | | Other |
| RCJSNII10006085 | | | Other |
| RCJSNII10006961 | | | Other |
| RCJSNII10006962 | | | Other |
| RCJSNII10006968 | | | Other |
| RCJSNII10006983 | | | Other |
| RCJSNII10006984 | | | Other |
| RCJSNII10006996 | | | Other |
| RCJSNII10006997 | | | Other |
| RCJSNII10006998 | | | Other |
| RCJSNII10007106 | | | Other |
| RCJSNII10007112 | | | Other |
| RCJSNII10007117 | | | Other |
| RCJSNII10007122 | | | Other |
| RCJSNII10007168 | | | Other |
| RCJSNII10007171 | | | Other |
| RCJSNII10007224 | | | Other |
| RCJSNII10007239 | | | Other |
| RCJSNII10008960 | | | Other |
| RCJSNII10008962 | | | Other |
| RCJSNII10009353 | | | Other |
| RCJSNII10009375 | | | Other |
| RCJSNII10009376 | | | Other |
| RCJSNII10009377 | | | Other |
| RCJSNII10009378 | | | Other |
| RCJSNII10009379 | | | Other |
| RCJSNII10009383 | | | Other |

Exhibit 2
26 of 50

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10009384 | | | Other |
| RCJSNII10009385 | | | Other |
| RCJSNII10009386 | | | Other |
| RCJSNII10009387 | | | Other |
| RCJSNII10009390 | | | Other |
| RCJSNII10009392 | | | Other |
| RCJSNII10009404 | | | Other |
| RCJSNII10009757 | | | Other |
| RCJSNII10009758 | | | Other |
| RCJSNII10009767 | | | Other |
| RCJSNII10009768 | | | Other |
| RCJSNII10009796 | | | Other |
| RCJSNII10009797 | | | Other |
| RCJSNII10010083 | | | Other |
| RCJSNII10010085 | | | Other |
| RCJSNII10010124 | | | Other |
| RCJSNII10010125 | | | Other |
| RCJSNII10010182 | | | Other |
| RCJSNII10010183 | | | Other |
| RCJSNII10010347 | | | Other |
| RCJSNII10010349 | | | Other |
| RCJSNII10010350 | | | Other |
| RCJSNII10010357 | | | Other |
| RCJSNII10010358 | | | Other |
| RCJSNII10010360 | | | Other |
| RCJSNII10010362 | | | Other |
| RCJSNII10010363 | | | Other |
| RCJSNII10010487 | | | Other |
| RCJSNII10010489 | | | Other |
| RCJSNII10010490 | | | Other |
| RCJSNII10010491 | | | Other |
| RCJSNII10010492 | | | Other |
| RCJSNII10010495 | | | Other |
| RCJSNII10010497 | | | Other |
| RCJSNII10010498 | | | Other |
| RCJSNII10010499 | | | Other |
| RCJSNII10010500 | | | Other |
| RCJSNII10010501 | | | Other |
| RCJSNII10010503 | | | Other |
| RCJSNII10010504 | | | Other |
| RCJSNII10010505 | | | Other |
| RCJSNII10010506 | | | Other |
| RCJSNII10010523 | | | Other |
| RCJSNII10010524 | | | Other |
| RCJSNII10010526 | | | Other |
| RCJSNII10010536 | | | Other |
| RCJSNII10010538 | | | Other |
| RCJSNII10010539 | | | Other |

Exhibit 2
27 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10010580 | | | Other |
| RCJSNII10010638 | | | Other |
| RCJSNII10010639 | | | Other |
| RCJSNII10010640 | | Intercompany interest accrual | Internal & External Financial Statements |
| RCJSNII10010641 | | Intercompany interest | Internal & External Financial Statements |
| RCJSNII10010644 | | | Other |
| RCJSNII10010645 | | | Other |
| RCJSNII10010647 | | RFC PeopleSoft Detail 2012 | Internal & External Financial Statements |
| RCJSNII10010651 | | | Other |
| RCJSNII10010654 | | | Other |
| RCJSNII10010658 | | 2012 - Negative assets in PeopleSoft | Email and Memo Communications |
| RCJSNII10010730 | | | Other |
| RCJSNII10010731 | | | Other |
| RCJSNII10010734 | | | Other |
| RCJSNII10010768 | | | Other |
| RCJSNII10010773 | | | Other |
| RCJSNII10010777 | | | Other |
| RCJSNII10010780 | | | Other |
| RCJSNII10011305 | | | Other |
| RCJSNII10011306 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10011488 | | | Other |
| RCJSNII10011490 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10012936 | | | Other |
| RCJSNII10012937 | | | Other |
| RCJSNII10012960 | | | Other |
| RCJSNII10012964 | | | Other |
| RCJSNII10012965 | | | Other |
| RCJSNII10012966 | | | Other |
| RCJSNII10012975 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10012976 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10013050 | | | Other |
| RCJSNII10013052 | | | Other |
| RCJSNII10013201 | | | Other |
| RCJSNII10013202 | | | Other |
| RCJSNII10013575 | | Summary Model Input - Resi | Other |
| RCJSNII10013629 | | | Other |
| RCJSNII10013631 | | | Other |
| RCJSNII10013729 | | | Other |
| RCJSNII10013731 | | | Other |
| RCJSNII10013766 | | | Other |
| RCJSNII10013768 | | | Other |
| RCJSNII10013771 | | | Other |
| RCJSNII10014058 | | | Other |
| RCJSNII10014059 | | | Other |
| RCJSNII10014153 | | | Other |
| RCJSNII10014455 | | ResCap Intercompany Balances Consolidated Version (2/29/2012) | Internal & External Financial Statements |
| RCJSNII10014742 | | Email from Westman, B. to Kornfeld, J. re: Intercompany Balances | Email and Memo Communications |
| RCJSNII10014743 | | ResCap Intercompany Balances Consolidated Version (2/29/2012) | Internal & External Financial Statements |

Exhibit 2
28 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10015113 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10015116 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10015117 | | Intercompany Legal Document | Legal |
| RCJSNII10015251 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10015258 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10015262 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10015265 | | Notes Legal Structure | Legal |
| RCJSNII10015269 | | | Other |
| RCJSNII10015271 | | | Other |
| RCJSNII10015298 | | | Other |
| RCJSNII10015317 | | | Other |
| RCJSNII10015574 | | | Other |
| RCJSNII10015580 | | Intercompany Funding Schedule | Legal |
| RCJSNII10015721 | | | Other |
| RCJSNII10015722 | | | Other |
| RCJSNII10015800 | | | Other |
| RCJSNII10015906 | | | Other |
| RCJSNII10015992 | | | Other |
| RCJSNII10015993 | | | Other |
| RCJSNII10016075 | | | Other |
| RCJSNII10016137 | | | Other |
| RCJSNII10016138 | | | Other |
| RCJSNII10016244 | | | Other |
| RCJSNII10016317 | | | Other |
| RCJSNII10016318 | | | Other |
| RCJSNII10016409 | | | Other |
| RCJSNII10016485 | | | Other |
| RCJSNII10016654 | | | Other |
| RCJSNII10016655 | | | Other |
| RCJSNII10016776 | | | Other |
| RCJSNII10016778 | | | Other |
| RCJSNII10016887 | | | Other |
| RCJSNII10016888 | | | Other |
| RCJSNII10016983 | | | Other |
| RCJSNII10016984 | | | Other |
| RCJSNII10017079 | | | Other |
| RCJSNII10017080 | | | Other |
| RCJSNII10017173 | | | Other |
| RCJSNII10017254 | | ResCap Financial Statements | Internal & External Financial Statements |
| RCJSNII10017333 | | | Other |
| RCJSNII10017334 | | | Other |
| RCJSNII10017403 | | | Other |
| RCJSNII10017485 | | | Other |
| RCJSNII10017591 | | | Other |
| RCJSNII10017592 | | | Other |
| RCJSNII10017593 | | | Other |
| RCJSNII10017655 | | | Other |
| RCJSNII10017720 | | | Other |

Exhibit 2
29 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10017799 | | | Other |
| RCJSNII10017800 | | | Other |
| RCJSNII10017884 | | | Other |
| RCJSNII10017885 | | | Other |
| RCJSNII10017965 | | | Other |
| RCJSNII10017966 | | | Other |
| RCJSNII10018000 | | | Other |
| RCJSNII10018001 | | ResCap Financial Statements | Internal & External Financial Statements |
| RCJSNII10018080 | | | Other |
| RCJSNII10018162 | | | Other |
| RCJSNII10018242 | | | Other |
| RCJSNII10018248 | | | Other |
| RCJSNII10018530 | | | Other |
| RCJSNII10018532 | | | Other |
| RCJSNII10018613 | | | Other |
| RCJSNII10018615 | | | Other |
| RCJSNII10018702 | | | Other |
| RCJSNII10018784 | | ResCap Financial Statements | Internal & External Financial Statements |
| RCJSNII10018904 | | | Other |
| RCJSNII10018908 | | | Other |
| RCJSNII10018988 | | | Other |
| RCJSNII10019070 | | ResCap Financial Statements | Internal & External Financial Statements |
| RCJSNII10019155 | | | Other |
| RCJSNII10019156 | | | Other |
| RCJSNII10019221 | | | Other |
| RCJSNII10019283 | | | Other |
| RCJSNII10019348 | | | Other |
| RCJSNII10019349 | | | Other |
| RCJSNII10019429 | | | Other |
| RCJSNII10019502 | | | Other |
| RCJSNII10019595 | | | Other |
| RCJSNII10019596 | | | Other |
| RCJSNII10019675 | | | Other |
| RCJSNII10019745 | | | Other |
| RCJSNII10019807 | | | Other |
| RCJSNII10019808 | | | Other |
| RCJSNII10019873 | | | Other |
| RCJSNII10019874 | | | Other |
| RCJSNII10019956 | | | Other |
| RCJSNII10019958 | | | Other |
| RCJSNII10020023 | | | Other |
| RCJSNII10020024 | | | Other |
| RCJSNII10020027 | | | Other |
| RCJSNII10020028 | | | Other |
| RCJSNII10020112 | | | Other |
| RCJSNII10020113 | | | Other |
| RCJSNII10020114 | | | Other |
| RCJSNII10020204 | | | Other |

Exhibit 2
30 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10020205 | | | Other |
| RCJSNII10020284 | | | Other |
| RCJSNII10020285 | | | Other |
| RCJSNII10020354 | | | Other |
| RCJSNII10020355 | | | Other |
| RCJSNII10020435 | | | Other |
| RCJSNII10020436 | | | Other |
| RCJSNII10020437 | | | Other |
| RCJSNII10020519 | | | Other |
| RCJSNII10020520 | | | Other |
| RCJSNII10020589 | | | Other |
| RCJSNII10020590 | | | Other |
| RCJSNII10020654 | | | Other |
| RCJSNII10020655 | | | Other |
| RCJSNII10020724 | | | Other |
| RCJSNII10020785 | | | Other |
| RCJSNII10020854 | | | Other |
| RCJSNII10020917 | | | Other |
| RCJSNII10020920 | | | Other |
| RCJSNII10020989 | | | Other |
| RCJSNII10021136 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10021139 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10021300 | | | Other |
| RCJSNII10021301 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10021430 | | | Other |
| RCJSNII10021434 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10021885 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10021888 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10022135 | | | Other |
| RCJSNII10022136 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10022137 | | | Other |
| RCJSNII10022138 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10022186 | | | Other |
| RCJSNII10022187 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10022822 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10022825 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10022970 | | | Other |
| RCJSNII10022973 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10023007 | | | Other |
| RCJSNII10023008 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10023009 | | | Other |
| RCJSNII10023355 | | | Other |
| RCJSNII10023357 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10023866 | | | Other |
| RCJSNII10023869 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10024002 | | | Other |
| RCJSNII10024004 | | | Other |
| RCJSNII10024005 | | | Other |

Exhibit 2
31 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10024006 | | | Other |
| RCJSNII10024007 | | | Other |
| RCJSNII10024008 | | | Other |
| RCJSNII10024009 | | | Other |
| RCJSNII10024010 | | | Other |
| RCJSNII10024011 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10024027 | | | Other |
| RCJSNII10024029 | | | Other |
| RCJSNII10024030 | | | Other |
| RCJSNII10024031 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10024034 | | Debt Forgiveness Schedule | Bankruptcy Filings & Background Information |
| RCJSNII10024182 | | | Other |
| RCJSNII10024183 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10024205 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10024209 | | | Other |
| RCJSNII10024210 | | | Other |
| RCJSNII10024215 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10024220 | | Debt Forgiveness Schedule | Bankruptcy Filings & Background Information |
| RCJSNII10024224 | | | Other |
| RCJSNII10024225 | | | Other |
| RCJSNII10024273 | | | Other |
| RCJSNII10024276 | | State Tax Return | Tax Returns |
| RCJSNII10024279 | | State Tax Return | Tax Returns |
| RCJSNII10024282 | | State Tax Return | Tax Returns |
| RCJSNII10024285 | | State Tax Return | Tax Returns |
| RCJSNII10024288 | | State Tax Return | Tax Returns |
| RCJSNII10024289 | | | Other |
| RCJSNII10024290 | | | Other |
| RCJSNII10024291 | | | Other |
| RCJSNII10024292 | | | Other |
| RCJSNII10024293 | | | Other |
| RCJSNII10024294 | | | Other |
| RCJSNII10024295 | | | Other |
| RCJSNII10024296 | | | Other |
| RCJSNII10024297 | | | Other |
| RCJSNII10024298 | | | Other |
| RCJSNII10024841 | | | Other |
| RCJSNII10024842 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10024856 | | | Other |
| RCJSNII10024857 | | | Other |
| RCJSNII10024858 | | Accounting Memo | Bankruptcy Filings & Background Information |
| RCJSNII10024866 | | | Other |
| RCJSNII10024867 | | Accounting Memo | Bankruptcy Filings & Background Information |
| RCJSNII10024869 | | Accounting Memo | Bankruptcy Filings & Background Information |
| RCJSNII10024870 | | Accounting Memo | Bankruptcy Filings & Background Information |
| RCJSNII10024872 | | Accounting Memo | Bankruptcy Filings & Background Information |
| RCJSNII10024874 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10024943 | | | Other |

Exhibit 2
32 of 50

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10024944 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10024953 | | | Other |
| RCJSNII10024954 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10024955 | | | Other |
| RCJSNII10024956 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10024957 | | | Other |
| RCJSNII10024958 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10025379 | | | Other |
| RCJSNII10025380 | | | Other |
| RCJSNII10025475 | | | Other |
| RCJSNII10025476 | | | Other |
| RCJSNII10025490 | | | Other |
| RCJSNII10025498 | | | Other |
| RCJSNII10025565 | | | Other |
| RCJSNII10025567 | | | Other |
| RCJSNII10025581 | | | Other |
| RCJSNII10025582 | | | Other |
| RCJSNII10025583 | | | Other |
| RCJSNII10025584 | | | Other |
| RCJSNII10025642 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10025645 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10025646 | | Intercompany Legal Document | Legal |
| RCJSNII10025652 | | Intercompany Legal Document | Legal |
| RCJSNII10025660 | | Intercompany Legal Document | Legal |
| RCJSNII10027092 | | | Other |
| RCJSNII10027093 | | | Other |
| RCJSNII10027241 | | | Other |
| RCJSNII10027242 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10027247 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10027285 | | | Other |
| RCJSNII10027286 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10027291 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10027292 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10027299 | | Intercompany Schedule | Bankruptcy Filings & Background Information |
| RCJSNII10027311 | | | Other |
| RCJSNII10027313 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10028118 | | Email from Park, L. to Dondzila, C. re: Proj Bounce - Top Intercompany Relationships | Email and Memo Communications |
| RCJSNII10028373 | | E-mail discussing intercompany | Email and Memo Communications |
| RCJSNII10028376 | | | Other |
| RCJSNII10028377 | | Schedule with Intercompany Balances | Internal & External Financial Statements |
| RCJSNII10028378 | | | Other |
| RCJSNII10028467 | | | Other |
| RCJSNII10028472 | | | Other |
| RCJSNII10028547 | | | Other |
| RCJSNII10028548 | | | Other |
| RCJSNII10028549 | | | Other |
| RCJSNII10029545 | | | Other |
| RCJSNII10029546 | | Legal Entity Tree, Accounts Tree, Department Tree | Internal & External Financial Statements |

Exhibit 2
33 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10029547 | | ResCap Month End Close and Consolidation Process - High Level | Bankruptcy Filings & Background Information |
| RCJSNII10029548 | | ResCap Month End Close and Consolidation Process - High Level | Email and Memo Communications |
| RCJSNII10029549 | | ResCap Financial Reporting, Monthly Schedule, August 2012 | Bankruptcy Filings & Background Information |
| RCJSNII10029550 | | | Other |
| RCJSNII10029551 | | Accounting Month End Close Calendar, August 2012 | Bankruptcy Filings & Background Information |
| RCJSNII10029657 | | Debt forgiveness | Email and Memo Communications |
| RCJSNII10029661 | | ResCap, HoldCo Balance Sheets | Internal & External Financial Statements |
| RCJSNII10029662 | | ResCap, HoldCo Balance Sheets | Internal & External Financial Statements |
| RCJSNII10029672 | | | Other |
| RCJSNII10029673 | | | Other |
| RCJSNII10029683 | | | Other |
| RCJSNII10029684 | | | Other |
| RCJSNII10029685 | | | Other |
| RCJSNII10029686 | | Debt Forgiveness - Residential Capital, LLC, PeopleSoft Financials, JOURNAL ENTRY DETAIL | Internal & External Financial Statements |
| RCJSNII10029687 | | | Other |
| RCJSNII10029688 | | | Other |
| RCJSNII10030238 | | GMAC Mortgage Annual Financial Statements | Email and Memo Communications |
| RCJSNII10030239 | | GMAC Mortgage Annual Financial Statements 2011 | Internal & External Financial Statements |
| RCJSNII10030538 | | | Other |
| RCJSNII10030540 | | Affiliate Transaction Deposit Requirements Tracking, Through 2/29/12 | Bankruptcy Filings & Background Information |
| RCJSNII10030551 | | Intercompany Balances, 2012 | Email and Memo Communications |
| RCJSNII10030552 | | ResCap Intercompany Balances, Consolidated Version, 2/29/2012 | Bankruptcy Filings & Background Information |
| RCJSNII10030576 | | Top intercompany balances, 2012 | Email and Memo Communications |
| RCJSNII10030579 | | Top intercompany balances, PeopleSoft data | Internal & External Financial Statements |
| RCJSNII10030580 | | Loan agreement for ICC, May 4, 2005 | Legal |
| RCJSNII10030809 | | From: Barb Westman, To: Jeremy Stern and Mark Renzi, Intercompany with Parent, 3/19/2012 | Email and Memo Communications |
| RCJSNII10030812 | | Top intercompany balances, PeopleSoft data | Internal & External Financial Statements |
| RCJSNII10030813 | | Amended and Restated Intercompany Advance Agreement, Homecomings Financial Network, June 30 2006 | Legal |
| RCJSNII10030819 | | Intercompany Advance Agreement  for PATI June 1, 2009 | Legal |
| RCJSNII10030827 | | Intercompany Advance Agreement  for RFC Asset Holdings II June 1, 2009 | Legal |
| RCJSNII10031658 | | Intercompany Analysis | Email and Memo Communications |
| RCJSNII10031660 | | Affiliate Transactions | Email and Memo Communications |
| RCJSNII10031661 | | ResCap Intercompany Balances, 12/31/2011 | Internal & External Financial Statements |
| RCJSNII10031678 | | | Other |
| RCJSNII10031684 | | | Other |
| RCJSNII10031693 | | Intercompany Balances, 2012 | Email and Memo Communications |
| RCJSNII10031695 | | ResCap Intercompany Balances, Consolidated Version, 2/29/2012 | Internal & External Financial Statements |
| RCJSNII10031711 | | Bounce - List of Legal Entities for AP | Email and Memo Communications |
| RCJSNII10031712 | | PROJECT BOUNCE, Financial Summary by Legal Entity Balances | Bankruptcy Filings & Background Information |
| RCJSNII10031728 | | Interco Inventory Schedule | Email and Memo Communications |
| RCJSNII10031731 | | ResCap Intercompany Balances, Consolidated Version, 5/13/2012 | Bankruptcy Filings & Background Information |
| RCJSNII10031975 | | Interco file | Email and Memo Communications |
| RCJSNII10031977 | | ResCap Intercompany Balances, Consolidated Version, Period @ 5/13/2012 | Bankruptcy Filings & Background Information |
| RCJSNII10032068 | | Intercompany Relationship Analysis | Email and Memo Communications |
| RCJSNII10032070 | | Intercompany Balances, Consolidated Version, Period @ 5/13/2012 | Bankruptcy Filings & Background Information |
| RCJSNII10032129 | | Intercompany Relationship Analysis | Email and Memo Communications |
| RCJSNII10032131 | | Intercompany Balances, Consolidated Version, Period @ 5/13/2012 | Bankruptcy Filings & Background Information |
| RCJSNII10032135 | | Intercompany Balances | Email and Memo Communications |

Exhibit 2
34 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10032136 | | Intercompany Balances, Consolidated Version, Period @ 5/13/2012 | Bankruptcy Filings & Background Information |
| RCJSNII10033540 | | Debt forgiveness | Email and Memo Communications |
| RCJSNII10033541 | | Residential Capital, LLC, Debt Forgiveness, January 1, 2008 - March 31, 2012 | Bankruptcy Filings & Background Information |
| RCJSNII10033544 | | | Other |
| RCJSNII10033545 | | ResCap/GMACM loan agreement | Bankruptcy Filings & Background Information |
| RCJSNII10033550 | | Intercompany Advance Agreement - Homecomings Financial  - 6/30/2006 | Legal |
| RCJSNII10033556 | | Note Issuance Facility Deed - 6/4/2008 | Legal |
| RCJSNII10033603 | | | Other |
| RCJSNII10033604 | | Project Bounce, Summary of Top 10 Intercompany Relationships, Balances as of 12/31/12 | Bankruptcy Filings & Background Information |
| RCJSNII10033605 | | Top intercompany balances, PeopleSoft data | Internal & External Financial Statements |
| RCJSNII10033699 | | | Other |
| RCJSNII10033701 | | ResCap Intercompany Balances | Bankruptcy Filings & Background Information |
| RCJSNII10034044 | | Email from Westman, B. to Dondzila, C. re: Discuss GSAP and Legal Entity Certifications | Email and Memo Communications |
| RCJSNII10035431 | | | Other |
| RCJSNII10035433 | | ResCap - Draft Consolidated Financials December 2009 and 2010 | Legal |
| RCJSNII10035541 | | | Other |
| RCJSNII10037951 | | | Other |
| RCJSNII10037952 | | Cash management generated balances | Email and Memo Communications |
| RCJSNII10037953 | | Intercompany Account Relationships in Compliance with Policy | Bankruptcy Filings & Background Information |
| RCJSNII10038865 | | | Other |
| RCJSNII10038866 | | GL Trial Balance - Resi/GMAC Bank/BMMZ/RFC - 9/30/2011 | Internal & External Financial Statements |
| RCJSNII10038886 | | | Other |
| RCJSNII10038887 | | RFC - Unaudited Trial Balances 9/30/2011 | Internal & External Financial Statements |
| RCJSNII10040842 | | | Other |
| RCJSNII10040843 | | | Other |
| RCJSNII10041452 | | Email from Westman, B. to Venne, S. re: Intercompany Files | Email and Memo Communications |
| RCJSNII10041500 | | Email from Jeffress, B. to Gyasi-twum, K. and Venne, S. re: Cash Management Policy | Email and Memo Communications |
| RCJSNII10042129 | | | Other |
| RCJSNII10042130 | | | Other |
| RCJSNII10042139 | | | Other |
| RCJSNII10042140 | | | Other |
| RCJSNII10042510 | | | Other |
| RCJSNII10042512 | | | Other |
| RCJSNII10042513 | | | Other |
| RCJSNII10042514 | | | Other |
| RCJSNII10042517 | | | Other |
| RCJSNII10042530 | | | Other |
| RCJSNII10042531 | | Balance Sheet - Period 10 - 2011-10-01 with  Clear Intercompany Payable | Internal & External Financial Statements |
| RCJSNII10042777 | | I/C receivable at RFC | Email and Memo Communications |
| RCJSNII10042778 | | | Other |
| RCJSNII10042928 | | | Other |
| RCJSNII10042929 | | | Other |
| RCJSNII10042994 | | | Other |
| RCJSNII10042995 | | | Other |
| RCJSNII10042996 | | Revolver Trial Balances (RFC/RFOC) - September 2011 | Internal & External Financial Statements |
| RCJSNII10047980 | | | Other |
| RCJSNII10047981 | | Intercompany Balance Information & Instructions | Internal & External Financial Statements |
| RCJSNII10047982 | | RFG Intercompany Eliminations | Internal & External Financial Statements |

Exhibit 2
35 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10049180 | | | Other |
| RCJSNII10049182 | | Accounting treatment | Internal & External Financial Statements |
| RCJSNII10049183 | | | Other |
| RCJSNII10049184 | | Intercompany accounting T account | Bankruptcy Filings & Background Information |
| RCJSNII10049185 | | | Other |
| RCJSNII10049309 | | | Other |
| RCJSNII10049310 | | | Other |
| RCJSNII10049801 | | | Other |
| RCJSNII10049802 | | | Other |
| RCJSNII10049803 | | ResCap - GL Trial Balance -12/31/2012 | Internal & External Financial Statements |
| RCJSNII10050710 | | | Other |
| RCJSNII10050711 | | Berkshire and Walter Asset Sales, Accounting Coordination, 1/31/2013 | Bankruptcy Filings & Background Information |
| RCJSNII10050712 | | | Other |
| RCJSNII10050713 | | | Other |
| RCJSNII10051853 | | | Other |
| RCJSNII10051855 | | ResCap - GL Trial Balance -9/30/2012 | Internal & External Financial Statements |
| RCJSNII10051856 | | | Other |
| RCJSNII10051857 | | RESI - GL Trial Balance -9/30/2012 | Internal & External Financial Statements |
| RCJSNII10051858 | | RFC - GL Trial Balance -9/30/2012 | Internal & External Financial Statements |
| RCJSNII10053760 | | | Other |
| RCJSNII10053763 | | Intercompany Payables | Bankruptcy Filings & Background Information |
| RCJSNII10053764 | | | Other |
| RCJSNII10053765 | | | Other |
| RCJSNII10053766 | | | Other |
| RCJSNII10053767 | | RESI - GL Trial Balance - 3/31/2008 | Internal & External Financial Statements |
| RCJSNII10053768 | | RFC - GL Trial Balance - 3/31/2008 | Internal & External Financial Statements |
| RCJSNII10053769 | | | Other |
| RCJSNII10053770 | | | Other |
| RCJSNII10053771 | | | Other |
| RCJSNII10053772 | | | Other |
| RCJSNII10053773 | | RESI - GL Trial Balance - 6/30/2008 | Internal & External Financial Statements |
| RCJSNII10053774 | | RFC - GL Trial Balance - 6/30/2008 | Internal & External Financial Statements |
| RCJSNII10053775 | | | Other |
| RCJSNII10053776 | | | Other |
| RCJSNII10053777 | | | Other |
| RCJSNII10053778 | | | Other |
| RCJSNII10053779 | | RESI - GL Trial Balance - 9/30/2008 | Internal & External Financial Statements |
| RCJSNII10053780 | | RFC - GL Trial Balance - 9/30/2008 | Internal & External Financial Statements |
| RCJSNII10053781 | | | Other |
| RCJSNII10053782 | | | Other |
| RCJSNII10053783 | | | Other |
| RCJSNII10053784 | | | Other |
| RCJSNII10053785 | | RESI - GL Trial Balance - 3/31/2009 | Internal & External Financial Statements |
| RCJSNII10053786 | | RFC - GL Trial Balance - 3/31/2009 | Internal & External Financial Statements |
| RCJSNII10053787 | | | Other |
| RCJSNII10053788 | | | Other |
| RCJSNII10053789 | | GMAC Mortgage - Trial Balance and Income Statement - 6/30/2009 | Internal & External Financial Statements |
| RCJSNII10053790 | | | Other |

Exhibit 2
36 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10053791 | | RESI - GL Trial Balance - 6/30/2009 | Internal & External Financial Statements |
| RCJSNII10053792 | | RFC - GL Trial Balance - 6/30/2009 | Internal & External Financial Statements |
| RCJSNII10053793 | | | Other |
| RCJSNII10053794 | | | Other |
| RCJSNII10053795 | | | Other |
| RCJSNII10053796 | | RESI - GL Trial Balance - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII10053797 | | RFC - GL Trial Balance - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII10053798 | | GMAC Mortgage - Trial Balance and Income Statement - 9/30/2009 | Internal & External Financial Statements |
| RCJSNII10055074 | | PATI debt forgiveness | Email and Memo Communications |
| RCJSNII10055079 | | | Other |
| RCJSNII10056338 | | Cash management generated balances | Email and Memo Communications |
| RCJSNII10056341 | | ResCap Intercompany Balances | Bankruptcy Filings & Background Information |
| RCJSNII10056342 | | Intercompany Discussion, 2012 | Email and Memo Communications |
| RCJSNII10056345 | | ResCap Intercompany Balances | Bankruptcy Filings & Background Information |
| RCJSNII10056756 | | Project Bounce Intercompany Payable Balances | Internal & External Financial Statements |
| RCJSNII10056857 | | | Other |
| RCJSNII10056858 | | | Other |
| RCJSNII10056859 | | Cash management flow chart | Bankruptcy Filings & Background Information |
| RCJSNII10057257 | | | Other |
| RCJSNII10057258 | | ResCap Intercompany Balances, Consolidated Version, 2/29/2012 | Bankruptcy Filings & Background Information |
| RCJSNII10057291 | | | Other |
| RCJSNII10057292 | | GSAP - Restatement and Trial Balances - 3/31/2012 | Internal & External Financial Statements |
| RCJSNII10057293 | | | Other |
| RCJSNII10057294 | | GSAP - Restatement and Trial Balances - 3/31/2012 | Internal & External Financial Statements |
| RCJSNII10057317 | | | Other |
| RCJSNII10057318 | | Liabilities Subject to Compromise at 5/13/2012 | Internal & External Financial Statements |
| RCJSNII10057319 | | | Other |
| RCJSNII10057320 | | ResCap, LLC, Liabilities Subject to Compromise - Open Items, Open Item as of 5/30/12 | Bankruptcy Filings & Background Information |
| RCJSNII10057329 | | | Other |
| RCJSNII10057330 | | | Other |
| RCJSNII10057331 | | ResCap Intercompany, Debtor-to-Non Debtor balances, 4/1/2012 | Bankruptcy Filings & Background Information |
| RCJSNII10057332 | | | Other |
| RCJSNII10057333 | | | Other |
| RCJSNII10057334 | | ResCap and Subsidiaries - GL Trial Balances at 5/13/2012 | Internal & External Financial Statements |
| RCJSNII10057342 | | | Other |
| RCJSNII10057343 | | Liabilities Subject to Compromise at 5/13/2012 | Internal & External Financial Statements |
| RCJSNII10057344 | | | Other |
| RCJSNII10057345 | | | Other |
| RCJSNII10057346 | | | Other |
| RCJSNII10057347 | | | Other |
| RCJSNII10057349 | | ResCap and Subsidiaries - Trial Balances at 5/13/2012 | Internal & External Financial Statements |
| RCJSNII10057350 | | | Other |
| RCJSNII10057351 | | | Other |
| RCJSNII10057352 | | Liabilities Subject to Compromise at 5/13/2012 | Internal & External Financial Statements |
| RCJSNII10057353 | | | Other |
| RCJSNII10057354 | | ResCap Intercompany Balances | Bankruptcy Filings & Background Information |
| RCJSNII10057355 | | | Other |
| RCJSNII10057356 | | | Other |

Exhibit 2
37 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10057368 | | Liabilities Subject to Compromise at 5/13/2012 | Internal & External Financial Statements |
| RCJSNII10057369 | | Residential Capital, LLC, et al. - Liabilities Subject to Compromise Matrix - Effect on Accounting Practices | Bankruptcy Filings & Background Information |
| RCJSNII10057370 | | | Other |
| RCJSNII10057379 | | | Other |
| RCJSNII10057380 | | Intercompany Discussion, 2012 | Email and Memo Communications |
| RCJSNII10057385 | | | Other |
| RCJSNII10057390 | | | Other |
| RCJSNII10057392 | | ResCap Consolidated - Intercompany Balances - 5/13/2012 | Internal & External Financial Statements |
| RCJSNII10057442 | | | Other |
| RCJSNII10057443 | | Intercompany Borrowings and Reconciliation - [Period Unknown] | Internal & External Financial Statements |
| RCJSNII10057444 | | | Other |
| RCJSNII10057445 | | FTI Report - Claims Processing including Intercompany Liability | Bankruptcy Filings & Background Information |
| RCJSNII10057458 | | | Other |
| RCJSNII10057459 | | Intercompany Relationships | Email and Memo Communications |
| RCJSNII10057462 | | | Other |
| RCJSNII10057552 | | | Other |
| RCJSNII10057553 | | Intercompany | Email and Memo Communications |
| RCJSNII10057555 | | ResCap - Intercompany Balances (5/31/2012 & 9/30/2012) - FTI Review | Internal & External Financial Statements |
| RCJSNII10058065 | | | Other |
| RCJSNII10058066 | | ResCap - GL Detail Run - April 2008 | Internal & External Financial Statements |
| RCJSNII10058090 | | ResCap - GL Detail Run - March 2008 | Internal & External Financial Statements |
| RCJSNII10058109 | | | Other |
| RCJSNII10058110 | | 2008 GL Query | Internal & External Financial Statements |
| RCJSNII10058111 | | | Other |
| RCJSNII10058112 | | 2007 GL Data Reconciliation including intercompany transactions | Internal & External Financial Statements |
| RCJSNII10058113 | | | Other |
| RCJSNII10058114 | | 2008 GL Extract including intercompany transactions | Internal & External Financial Statements |
| RCJSNII10058115 | | | Other |
| RCJSNII10058117 | | ResCap Account Reconciliation Policies | Bankruptcy Filings & Background Information |
| RCJSNII10058155 | | ResCap Account Reconciliation Policies | Bankruptcy Filings & Background Information |
| RCJSNII10058167 | | 2007 GL Extract including intercompany transactions | Internal & External Financial Statements |
| RCJSNII10058168 | | 2007 GL Extract including intercompany transactions | Internal & External Financial Statements |
| RCJSNII10058169 | | | Other |
| RCJSNII10058170 | | ResCap Account Reconciliation Policies | Bankruptcy Filings & Background Information |
| RCJSNII10058208 | | ResCap Account Reconciliation Policies | Bankruptcy Filings & Background Information |
| RCJSNII10058220 | | 2007 GL Extract including intercompany transactions | Internal & External Financial Statements |
| RCJSNII10058221 | | 2007 GL Extract including intercompany transactions | Internal & External Financial Statements |
| RCJSNII10058514 | | Equity Adjustments | Email and Memo Communications |
| RCJSNII10058516 | | RFC - October 2009 Balance Sheet (Unaudited) | Internal & External Financial Statements |
| RCJSNII10058554 | | | Other |
| RCJSNII10058556 | | RESI/GMAC Bank/ResMor/ResCap Consol Trial Balance - 10/31/2009 (Unaudited) | Internal & External Financial Statements |
| RCJSNII10058559 | | | Other |
| RCJSNII10058560 | | RESI/GMAC Bank/ResMor/ResCap Consol Trial Balance - 10/31/2009 (Unaudited) | Internal & External Financial Statements |
| RCJSNII10058563 | | Debt forgiveness | Email and Memo Communications |
| RCJSNII10058564 | | | Other |
| RCJSNII10058610 | | Equity Adjustments | Email and Memo Communications |
| RCJSNII10058613 | | RFC - October 2009 Balance Sheet (Unaudited) | Internal & External Financial Statements |
| RCJSNII10058614 | | | Other |

Exhibit 2
38 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCJSNII10058616 | | RFC - October 2009 Balance Sheet (Unaudited) | Internal & External Financial Statements |
| RCJSNII10059750 | | RFC Net Worth Covenants | Email and Memo Communications |
| RCJSNII10074531 | | Bill of Sale and Transfer Agreement (Execution Copy) | Legal |
| RCJSNII10082197 | | | Other |
| RCJSNII10082198 | | | Other |
| RCJSNII10082199 | | | Other |
| RCJSNII10082200 | | | Other |
| RCJSNII10082202 | | | Other |
| rcjsnii10082203 | | | Other |
| RCJSNII10082208 | | | Other |
| rcjsnii10082210 | | | Other |
| rcjsnii10082213 | | | Other |
| RCJSNII10082215 | | | Other |
| RCJSNII10082216 | | | Other |
| RCJSNII10082262 | | | Other |
| RCJSNII10082263 | | | Other |
| RCJSNII10118386 | | Debt Forgiveness from GMAC Residential Holding Company to GMAC Mortgage | Email and Memo Communications |
| RCJSNII10131858 | | Ally General Intercompany Accounting Policy | Internal & External Financial Statements |
| RCUCCJSN00007239 | | Audited Financial Statements of Residential Funding Company, LLC as of 12/31/2011 | Internal & External Financial Statements |
| RCUCCJSN00007300 | | | Other |
| RCUCCJSN00007301 | | | Other |
| RCUCCJSN00007302 | | | Other |
| RCUCCJSN00007502 | | | Other |
| RCUCCJSN00007504 | | | Other |
| RCUCCJSN00007508 | | | Other |
| RCUCCJSN00007509 | | | Other |
| RCUCCJSN00007510 | | | Other |
| RCUCCJSN00007511 | | | Other |
| RCUCCJSN00007513 | | | Other |
| RCUCCJSN00007516 | | | Other |
| RCUCCJSN00007520 | | | Other |
| RCUCCJSN00010178 | | | Other |
| RCUCCJSN00010228 | | | Other |
| RCUCCJSN00012497 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012498 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012499 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012500 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012501 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012502 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012503 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012504 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012505 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012506 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012507 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012508 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012509 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012510 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012511 | | General ledger extract | General Ledger Transactional Data |

Exhibit 2
39 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCUCCJSN00012512 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012513 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012514 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012515 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012516 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012517 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012518 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012519 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012520 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012521 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012522 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012523 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012524 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012525 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012526 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012527 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012528 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012529 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012530 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012531 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012532 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012533 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012534 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012535 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012536 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012537 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012538 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012539 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012540 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012541 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012542 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012543 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012544 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012545 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012546 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012547 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012548 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012549 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012550 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012551 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012552 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012553 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012554 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012555 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012556 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012557 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012558 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012559 | | General ledger extract | General Ledger Transactional Data |

Exhibit 2
40 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCUCCJSN00012560 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012561 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012562 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012563 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012564 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012565 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012566 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012567 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012568 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012569 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012570 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012571 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012572 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012573 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012574 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00012575 | | General ledger extract | General Ledger Transactional Data |
| RCUCCJSN00030169 | | Intercompany loan detail on filing date | Internal & External Financial Statements |
| RCUCCJSN00030170 | | Interco graph (in April 20 Intercompany Analysis Report) | Internal & External Financial Statements |
| RCUCCJSN00030215 | | Debt Forgiveness Transactions from 1/1/2008 - 5/13/2012 (Petition) | Internal & External Financial Statements |
| RCUCCJSN00050365 | | | Other |
| RCUCCJSN00050366 | | | Other |
| RCUCCJSN00050367 | | | Other |
| RCUCCJSN00050368 | | | Other |
| RCUCCJSN00050369 | | | Other |
| RCUCCJSN00050370 | | | Other |
| RCUCCJSN00050371 | | | Other |
| RCUCCJSN00050372 | | | Other |
| RCUCCJSN00050373 | | | Other |
| RCUCCJSN00050374 | | | Other |
| RCUCCJSN10005622 | | | Other |
| RCUCCJSN10005688 | | Email From James Young authorizing Debt Forgiveness | Email and Memo Communications |
| RCUCCJSN10011161 | | Email From James Young authorizing Debt Forgiveness | Email and Memo Communications |
| RCUCCJSN10025065 | | Approval for $2.0 billion of ResCap forgiveness to RFC | Email and Memo Communications |
| RCUCCJSN10031823 | | | Other |
| RCUCCJSN10032484 | | | Other |
| RCUCCJSN10032487 | | | Other |
| RCUCCJSN10032780 | | | Other |
| RCUCCJSN10032788 | | | Other |
| RCUCCJSN10032813 | | | Other |
| RCUCCJSN10032820 | | | Other |
| RCUCCJSN10032828 | | | Other |
| RCUCCJSN10032835 | | | Other |
| RCUCCJSN10038836 | | | Other |
| RCUCCJSN10038909 | | | Other |
| RCUCCJSN10208959 | | | Other |
| RCUCCJSN10208961 | | | Other |
| RCUCCJSN10209039 | | | Other |
| RCUCCJSN10209041 | | | Other |

Exhibit 2
41 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCUCCJSN10250359 | | | Other |
| RCUCCJSN10252518 | | | Other |
| RCUCCJSN10252582 | | | Other |
| RCUCCJSN10293887 | | From: James Young, To: Cathy Dondzila, Tammy H., Tom Marano, Forgiveness of intercompany debt memo, 12/14/2009 | Email and Memo Communications |
| RCUCCJSN10295626 | | | Other |
| RCUCCJSN10295647 | | | Other |
| RCUCCJSN10295655 | | | Other |
| RCUCCJSN10354687 | | Email from Westman, B. to McDonald, B. and Renzi, M. re: Open Items for Various Requests | Email and Memo Communications |
| RCUCCJSN10354691 | | Residential Capital, LLC Accounting Operations - Open Items List | Other |
| RCUCCJSN10354692 | | Residential Capital, LLC Debt Forgiveness (January 1, 2008 - May 13, 2012) | Other |
| RCUCCJSN10357468 | | Email from Westman, B. to Dondzila, C. re: Interco File | Email and Memo Communications |
| RCUCCJSN10357470 | | ResCap Intercompany Balances Consolidated Version (5/13/2012) | Internal & External Financial Statements |
| RCUCCJSN10365228 | | Examiner Presentation - IC accounting overview, 12/4/2012 | Bankruptcy Filings & Background Information |
| RCUCCJSN10371390 | | | Other |
| RCUCCJSN10371391 | | | Other |
| RCUCCJSN10371398 | | | Other |
| RCUCCJSN10371399 | | | Other |
| RCUCCJSN10371408 | | | Other |
| RCUCCJSN10371409 | | | Other |
| RCUCCJSN10383574 | | | Other |
| RCUCCJSN10390867 | | | Other |
| RCUCCJSN10427474 | | | Other |
| RCUCCJSN10427475 | | | Other |
| RCUCCJSN10427478 | | | Other |
| RCUCCJSN10461561 | | | Other |
| RCUCCJSN10461567 | | | Other |
| RCUCCJSN10463436 | | | Other |
| RCUCCJSN10465666 | | | Other |
| RCUCCJSN10465669 | | | Other |
| RCUCCJSN10465699 | | | Other |
| RCUCCJSN10465701 | | | Other |
| RCUCCJSN10465702 | | | Other |
| RCUCCJSN10465704 | | | Other |
| RCUCCJSN10467071 | | | Other |
| RCUCCJSN10467082 | | | Other |
| RCUCCJSN10473726 | | | Other |
| RCUCCJSN10473734 | | | Other |
| RCUCCJSN10566639 | | Email from Dondzila, C. to Young, J. re Refreshed RFC Equity Projection | Email and Memo Communications |
| RCUCCJSN10566662 | | | Other |
| RCUCCJSN10566670 | | | Other |
| RCUCCJSN10567368 | | Email from Haugen, S. to Bode, S. re: High Level Description of Solvency Entries | Email and Memo Communications |
| RCUCCJSN10605077 | | Memo from Young, J. to GMAC Inc. Board of Directors re: Request for Action by Board of Directors, GMAC Inc. Approval of Capital Allocation from ResCap to RFC and Certain of Its Subsidiaries | Email and Memo Communications |
| RCUCCJSN10692261 | | | Other |
| RCUCCJSN10692261209226122612978989 | | | Other |
| RCUCCJSN10692264 | | List created by MoFo that shows there should be a schedule of intercompany interest | Bankruptcy Filings & Background Information |
| RCUCCJSN10692265 | | Summary of Intercompany balances and schedule of interest payments | Internal & External Financial Statements |
| RCUCCJSN10692266 | | | Other |

Exhibit 2
42 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCUCCJSN10692377 | | | Other |
| RCUCCJSN10718209 | | | Other |
| RCUCCJSN10718211 | | | Other |
| RCUCCJSN10742580 | | | Other |
| RCUCCJSN10744019 | | Ally Financial Inc., formerly GMAC Inc. Amended and Restated Loan Agreement dated as of 12/30/09 | Legal |
| RCUCCJSN10745574 | | | Other |
| RCUCCJSN10745614 | | Uncommitted Intercompany Advance Agreement | Legal |
| RCUCCJSN10780327 | | | Other |
| RCUCCJSN10833618 | | Email from Ruhlin, J. to Dondzila, C. re: Intercompany Agreements | Email and Memo Communications |
| RCUCCJSN10881204 | | | Other |
| RCUCCJSN10883521 | | | Other |
| RCUCCJSN10883522 | | | Other |
| RCUCCJSN10888066 | | | Other |
| RCUCCJSN10891667 | | | Other |
| RCUCCJSN10891668 | | | Other |
| RCUCCJSN10891669 | | | Other |
| RCUCCJSN10891684 | | | Other |
| RCUCCJSN10891687 | | | Other |
| RCUCCJSN10891969 | | | Other |
| RCUCCJSN10891974 | | | Other |
| RCUCCJSN10891977 | | Cash Balances including Intercompany Transactions | Internal & External Financial Statements |
| RCUCCJSN10891978 | | Post-Petition Intercompany Balance Summary, 11/3/2012 | Bankruptcy Filings & Background Information |
| RCUCCJSN10891987 | | Cash Balances without Intercompany Movement of Cash | Email and Memo Communications |
| RCUCCJSN10891999 | | Cash Balances without Intercompany Movement of Cash | Email and Memo Communications |
| RCUCCJSN10892006 | | | Other |
| RCUCCJSN10892015 | | | Other |
| RCUCCJSN10895541 | | From: Joe Ruhlin, To: Tim McDonagh, intercompany interest payment details, 6/1/2012 | Email and Memo Communications |
| RCUCCJSN10934309 | | | Other |
| RCUCCJSN10934310 | | | Other |
| RCUCCJSN10935402 | | | Other |
| RCUCCJSN10935403 | | From: James Young, To: Jim Mackey, Request for action by the Board of Directors - Approval to adjust intercompany notes memo, 4/2011 | Email and Memo Communications |
| RCUCCJSN10935407 | | Memo requesting intercompany debt forgiveness to be allowed | Email and Memo Communications |
| RCUCCJSN10962759 | | Email from Ruby, S. to Westman, B. re: Resolution of Ditech Issue | Email and Memo Communications |
| RCUCCJSN11077472 | | | Other |
| RCUCCJSN11077708 | | | Other |
| RCUCCJSN11077752 | | | Other |
| RCUCCJSN11077934 | | | Other |
| RCUCCJSN11077942 | | | Other |
| RCUCCJSN11078338 | | | Other |
| RCUCCJSN11078368 | | | Other |
| RCUCCJSN11081836 | | | Other |
| RCUCCJSN11081837 | | | Other |
| RCUCCJSN11091668 | | Email from Horner, J. to Sullivan, C. re Legal Entity Report for 11/30/11 | Email and Memo Communications |
| RCUCCJSN11091669 | | Consolidated ResCap Legal Entity - YTD November 2011 | Other |
| RCUCCJSN11092270 | | | Other |
| RCUCCJSN11186259 | | Meeting agenda, in attendance Jill Horner and Cathy Dondzila, meeting contained intercompany discussions, 10/10/2012 | Email and Memo Communications |
| RCUCCJSN11186261 | | | Other |

Exhibit 2
43 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCUCCJSN11241086 | | | Other |
| RCUCCJSN11241093 | | | Other |
| RCUCCJSN11241094 | | | Other |
| RCUCCJSN11241095 | | | Other |
| RCUCCJSN11243606 | | Request of Action from the BoD for approval of capital allocation within ResCap and certain of its subsidiaries | Email and Memo Communications |
| RCUCCJSN11254278 | | Special Examiner Presentation | Other |
| RCUCCJSN11254307 | | | Other |
| RCUCCJSN11270924 | | Debt Forgiveness Schedule | Internal & External Financial Statements |
| RCUCCJSN11330021 | | | Other |
| RCUCCJSN11330023 | | | Other |
| RCUCCJSN11330048 | | | Other |
| RCUCCJSN11448924 | | Email from Perlman, A. to Kook, J. among other re: Preliminary Chart of Accounts Strawman | Email and Memo Communications |
| RCUCCJSN11448925 | | SAP GGL Operational Accounts | Other |
| RCUCCJSN11465342 | | Debt Forgiveness on the Flume and Viaduct Notes | Email and Memo Communications |
| RCUCCJSN11624790 | | | Other |
| RCUCCJSN11666201 | | | Other |
| RCUCCJSN11666352 | | | Other |
| RCUCCJSN11680080 | | | Other |
| RCUCCJSN11680081 | | | Other |
| RCUCCJSN116830153209658 | | | Other |
| RCUCCJSN116830203209659 | | | Other |
| RCUCCJSN116830253209660 | | | Other |
| RCUCCJSN116830313209661 | | | Other |
| RCUCCJSN116830393209662 | | | Other |
| RCUCCJSN11683042 | | | Other |
| RCUCCJSN116830433209664 | | | Other |
| RCUCCJSN116830903209665 | | | Other |
| RCUCCJSN11683095 | | | Other |
| RCUCCJSN116830963209667 | | | Other |
| RCUCCJSN116831433209668 | | | Other |
| RCUCCJSN116831443209669 | | | Other |
| RCUCCJSN116831523209670 | | | Other |
| RCUCCJSN11683153 | | Summary of Top 10 Intercompany Relationships, 12/31/2012 | Bankruptcy Filings & Background Information |
| RCUCCJSN11685937 | | | Other |
| RCUCCJSN11685938 | | | Other |
| RCUCCJSN11685939 | | | Other |
| RCUCCJSN11690799 | | | Other |
| RCUCCJSN11690804 | | | Other |
| RCUCCJSN118604473277081 | | | Other |
| RCUCCJSN118604483277082 | | | Other |
| RCUCCJSN118604493277083 | | | Other |
| RCUCCJSN118604503277084 | | | Other |
| RCUCCJSN118604513277085 | | | Other |
| RCUCCJSN11860454 | | | Other |
| RCUCCJSN118604553277087 | | | Other |
| RCUCCJSN118605023277088 | | | Other |
| RCUCCJSN11860507 | | | Other |
| RCUCCJSN118605083277090 | | | Other |

Exhibit 2
44 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCUCCJSN118605553277091 | | | Other |
| RCUCCJSN118605563277092 | | | Other |
| RCUCCJSN118605643277093 | | | Other |
| RCUCCJSN11860565 | | | Other |
| rcuccjsn11922194 | | | Other |
| RCUCCJSN11922198 | | ResCap Bank Account Structure at April 11, 2012 | Bankruptcy Filings & Background Information |
| rcuccjsn11922208 | | | Other |
| RCUCCJSN11979453 | | Draft - Debtors' Intercompany & Debt Forgiveness Presentation, 4/4/2013 | Bankruptcy Filings & Background Information |
| RCUCCJSN20021816 | | Email from Szymik, F. to Whilinger, J. re: Interco Summary for Internal Distribution | Email and Memo Communications |
| RCUCCJSN20021817 | | ResCap Intercompany Balances  Summary as of the Petition Date | Internal & External Financial Statements |
| RCUCCJSN20027424 | | | Other |
| RCUCCJSN20027833 | | | Other |
| RCUCCJSN20033109 | | | Other |
| RCUCCJSN20033114 | | | Other |
| RCUCCJSN20033249 | | | Other |
| RCUCCJSN20033253 | | | Other |
| RCUCCJSN20033254 | | | Other |
| RCUCCJSN20037211 | | | Other |
| RCUCCJSN20037674 | | | Other |
| RCUCCJSN20038720 | | | Other |
| RCUCCJSN20045765 | | | Other |
| RCUCCJSN20045766 | | | Other |
| RCUCCJSN20045767 | | | Other |
| RCUCCJSN20047935 | | | Other |
| RCUCCJSN20047936 | | | Other |
| RCUCCJSN20051023 | | GMAC ResCap internal memo prepared by Barb Westman on 3/20/2012 | Email and Memo Communications |
| RCUCCJSN20054889 | | Email from Westman, B. to Dondzila, C. re: GMACM Management Fee Writeup | Email and Memo Communications |
| RCUCCJSN20064737 | | Email from Dondzila, C. to Westman, D. re: Bounce - Intercompany Follow Up | Email and Memo Communications |
| RCUCCJSN20080786 | | Email from Dondzila, C. to Renzi, M. and Westman, B. re: Bounce - Intercompany Follow Up | Email and Memo Communications |
| RCUCCJSN20085299 | | | Other |
| RCUCCJSN20090333 | | | Other |
| RCUCCJSN20090334 | | | Other |
| RCUCCJSN20090347 | | | Other |
| RCUCCJSN20090357 | | | Other |
| RCUCCJSN20090358 | | | Other |
| RCUCCJSN20092910 | | | Other |
| RCUCCJSN30000236 | | | Other |
| RCUCCJSN30000243 | | | Other |
| RCUCCJSN30000244 | | | Other |
| RCUCCJSN30000245 | | | Other |
| RCUCCJSN30001108 | | | Other |
| RCUCCJSN30001110 | | | Other |
| RCUCCJSN30001111 | | | Other |
| rcuccjsn30001112 | | | Other |
| RCUCCJSN30001113 | | | Other |
| RCUCCJSN30001114 | | | Other |
| rcuccjsn30001115 | | | Other |
| RCUCCJSN30002097 | | Examiner List of Intercompany Files (and Bates numbers for various subjects) for UCC | Bankruptcy Filings & Background Information |

Exhibit 2
45 of 50

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| RCUCCJSN30002758 | | From: Barb Westman, To: Mark Renzi & Brian McDonald, Intercompany and OID discussion, 3/4/2013 | Email and Memo Communications |
| RCUCCJSN30002763 | | Intercompany payables, document attached in email: RCUCCJSN30002758 | Internal & External Financial Statements |
| RCUCCJSN30002764 | | Intercompany balances & debt forgiveness entries, attached in email: RCUCCJSN30002758 | Internal & External Financial Statements |
| RCUCCJSN30002765 | | Intercompany capital injections, RCUCCJSN30002758 | Legal |
| RCUCCJSN30003025 | | Email from Bazella, J. to Westman, B. and Renzi, M. re: Interco File | Email and Memo Communications |
| RCUCCJSN30004106 | | January 2013 Intercompany Analysis | Email and Memo Communications |
| RCUCCJSN30004112 | | Email body only, contains explanation of top intercompany balances | Email and Memo Communications |
| RCUCCJSN30005418 | | GMAC Residential Holding Corp Consolidated Financial Statements as of and for the years ended December 31, 2004 and 2003 (Restated) | Other |
| RCUCCJSN30005837 | | Summary of Top 10 Intercompany Relationships (Native), 12/31/2012 | Bankruptcy Filings & Background Information |
| RCUCCJSN30006751 | | Summary of Intercompany Balances as of 9/30/2012 | Internal & External Financial Statements |
| RCUCCJSN30006785 | | From: Cathy Dondzila, To: Brian McDonald, Intercompany follow-up response Alix's questions, 11/1/2012 | Email and Memo Communications |
| RCUCCJSN30006795 | | Audited Financial Statements of ditech, LLC as of 12/31/2011 | Internal & External Financial Statements |
| RCUCCJSN30006804 | | Audited Financial Statements of ditech, LLC as of 12/31/2008 | Internal & External Financial Statements |
| RCUCCJSN30006824 | | | Other |
| RCUCCJSN30006835 | | Audited Financial Statements of ditech.com, LLC as of 12/31/2007 | Internal & External Financial Statements |
| RCUCCJSN30006849 | | | Other |
| RCUCCJSN30006860 | | | Other |
| RCUCCJSN30014296 | | Email from Westman, B. to Park, L. and Szymik, F. re: Legal Entity Trial Balance | Email and Memo Communications |
| RCUCCJSN30016049 | | Email from Westman, B. to Stern, J. and Renzi, M. re: Waterfall Questions | Email and Memo Communications |
| RCUCCJSN30017113 | | | Other |
| RCUCCJSN30017115 | | Summary of Intercompany balances, netting to $7.8 Billion | Bankruptcy Filings & Background Information |
| RCUCCJSN30017116 | | ResCap Restated Loan Agreement | Legal |
| RCUCCJSN30021675 | | | Other |
| RCUCCJSN30023149 | | From: Cathy Dondzila, To: Mark Renzi & Barb Westman, Responses and discussion regarding intercompany questions, 4/22/2012 | Email and Memo Communications |
| RCUCCJSN30023156 | | | Other |
| RCUCCJSN30038469 | | | Other |
| RCUCCJSN30047169 | | Intercompany Relationships 05-31-12-FTI Analysis 07-20-2012 | Internal & External Financial Statements |
| RCUCCJSN30054571 | | | Other |
| ResCap - Auditors (Deloitte PwC) Search Terms (4813-5214-5429-1) | | | Other |
| ResCap - Auditors (Deloitte PwC) Search Terms (4813-5214-5429-1) ZC | | | Other |
| ResCap - Debtors Search Terms (4828-0789-7365-1) | | | Other |
| ResCap - Debtors Search Terms (4828-0789-7365-1) ZC | | | Other |
| ResCap - Deloitte - Second Request for Documents (4836-8456-9621-2) | | | Other |
| ResCap - Deloitte - Second Request for Documents (4836-8456-9621-2) ZC | | | Other |
| ResCap - KPMG - Request for Documents (4816-0386-9205-3) | | | Other |
| ResCap - KPMG - Request for Documents (4816-0386-9205-3) ZC | | | Other |
| ResCap - KPMG Search Terms (4827-0258-1013-1) | | | Other |
| ResCap - KPMG Search Terms (4827-0258-1013-1) ZC comments | | | Other |
| ResCap - PwC - Second Request for Documents (4844-0612-0981-2) | | | Other |
| ResCap - PwC - Second Request for Documents (4844-0612-0981-2) ZC | | | Other |
| Response_to_September_30__2013_Letter_from_Dan_Perry | | | Legal |
| Schedule of Assets and Liabilities | 548 | RFC | SOALs |
| Schedule of Assets and Liabilities | 549 | ResCap HoldCo | SOALs |
| Schedule of Assets and Liabilities | 550 | GMACM | SOALs |

Exhibit 2
46 of 50

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| Schedule of Assets and Liabilities | 551 | Ditech, LLC | SOALs |
| Schedule of Assets and Liabilities | 552 | PATI Real Estate Holdings, LLC | SOALs |
| Schedule of Assets and Liabilities | 553 | DOA Holding Properties, LLC | SOALs |
| Schedule of Assets and Liabilities | 554 | DOA Properties IX (Lots-Other), LLC | SOALs |
| Schedule of Assets and Liabilities | 555 | RAHI A, LLC | SOALs |
| Schedule of Assets and Liabilities | 556 | EPRE LLC | SOALs |
| Schedule of Assets and Liabilities | 557 | Equity Investment I, LLC | SOALs |
| Schedule of Assets and Liabilities | 558 | ETS of Virginia, Inc | SOALs |
| Schedule of Assets and Liabilities | 559 | ETS of Washington, Inc | SOALs |
| Schedule of Assets and Liabilities | 560 | RAHI B, LLC | SOALs |
| Schedule of Assets and Liabilities | 561 | Executive Trustee Services, LLC | SOALs |
| Schedule of Assets and Liabilities | 562 | GMAC Model Home Finance I, LLC | SOALs |
| Schedule of Assets and Liabilities | 563 | RAHI Real Estate Holdings, LLC | SOALs |
| Schedule of Assets and Liabilities | 564 | GMAC Mortgage USA Corporation | SOALs |
| Schedule of Assets and Liabilities | 565 | GMAC Resi Hold Co | SOALs |
| Schedule of Assets and Liabilities | 566 | RCSF JV2004, LLC | SOALs |
| Schedule of Assets and Liabilities | 567 | GMAC RH Settlement Services, LLC | SOALs |
| Schedule of Assets and Liabilities | 568 | GMACM Borrower LLC | SOALs |
| Schedule of Assets and Liabilities | 569 | Residential Accredit Loans, Inc | SOALs |
| Schedule of Assets and Liabilities | 570 | GMACM REO LLC | SOALs |
| Schedule of Assets and Liabilities | 571 | GMACR Mortgage Products, LLC | SOALs |
| Schedule of Assets and Liabilities | 572 | GMAC-RFC Hold Co | SOALs |
| Schedule of Assets and Liabilities | 573 | Residential Asset Securities Corporation | SOALs |
| Schedule of Assets and Liabilities | 574 | HFN Reo Sub II, LLC | SOALs |
| Schedule of Assets and Liabilities | 575 | Home Connects Lending Services, LLC | SOALs |
| Schedule of Assets and Liabilities | 576 | Residential Services of Alabama, LLC | SOALs |
| Schedule of Assets and Liabilities | 577 | Homecomings Financial Real Estate Holdings, LLC | SOALs |
| Schedule of Assets and Liabilities | 578 | Residential Consumer Services of Ohio, LLC | SOALs |
| Schedule of Assets and Liabilities | 579 | Homecomings Financial, LLC | SOALs |
| Schedule of Assets and Liabilities | 580 | Ladue Associates, Inc | SOALs |
| Schedule of Assets and Liabilities | 581 | ential Consumer Services of Texas, LLC | SOALs |
| Schedule of Assets and Liabilities | 582 | Passive Asset Transactions, LLC | SOALs |
| Schedule of Assets and Liabilities | 583 | PATI A, LLC | SOALs |
| Schedule of Assets and Liabilities | 584 | Residential Consumer Services, LLC | SOALs |
| Schedule of Assets and Liabilities | 585 | PATI B, LLC | SOALs |
| Schedule of Assets and Liabilities | 586 | RFC Asset Holdings II, LLC | SOALs |
| Schedule of Assets and Liabilities | 587 | Residential Funding Mortgage Exchange, LLC | SOALs |
| Schedule of Assets and Liabilities | 588 | RFC Asset Management, LLC | SOALs |
| Schedule of Assets and Liabilities | 589 | Residential Funding Mortgage Securities I, LLC | SOALs |
| Schedule of Assets and Liabilities | 590 | RFC Borrower LLC | SOALs |
| Schedule of Assets and Liabilities | 591 | RFC Construction Funding, LLC | SOALs |
| Schedule of Assets and Liabilities | 592 | Residential Funding Mortgage Securities II, LLC | SOALs |
| Schedule of Assets and Liabilities | 593 | RFC REO LLC | SOALs |
| Schedule of Assets and Liabilities | 594 | Residential Funding Real Estate Holdings, LLC | SOALs |
| Schedule of Assets and Liabilities | 595 | RFC SFJV-2002, LLC | SOALs |
| Schedule of Assets and Liabilities | 596 | Residential Mortgage Real Estate Holdings, LLC | SOALs |
| Schedule of Assets and Liabilities | 597 | RFC-GSAP Servicer Advance, LLC | SOALs |
| Schedule of Assets and Liabilities | 649 | Residential Asset Mortgage Products, Inc | SOALs |

Exhibit 2
47 of 50

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| UCC02853 | | Intercompany Relationships Spreadsheet | Other |
| UCC12846 | | From: Mark Renzi, To: AlixPartners, Email providing summary of top ten intercompany notes, 9/17/2012 | Email and Memo Communications |
| UCC12848 | | Intercompany Balance Detail of Top Ten Accounts, 4/24/2012 | Bankruptcy Filings & Background Information |
| UCC12852 | | | Other |
| UCC14249 | | Email from Dove, A. to Goren, T. re: ResCap - Intercompany Rollforward | Email and Memo Communications |
| UCC14251 | | | Other |
| UCC142512906182 | | | Other |
| UCC17941 | | | Other |
| UCC179412906433 | | | Other |
| UCC17942 | | ResCap Monthly Intercompany Balances from 12/31/2007 - 10/31/2012 | Internal & External Financial Statements |
| UCC179422906434 | | | Other |
| UCC18655 | | | Other |
| UCC18658 | | Monthly Changes in Intercompany Relationships | Internal & External Financial Statements |
| UCC24985 | | | Other |
| UCC249852907050 | | | Other |
| UCC24986 | | Index of relevant Intercompany documents as classified by AlixPartners | Bankruptcy Filings & Background Information |
| UCC25033 | | | Other |
| UCC25289 | | | Other |
| UCC27521 | | Written Consent from the BoD for the forgiveness of ResCap debt | Email and Memo Communications |
| CCM00199890 | | Liquidity Update - GMAC LLC Board of Directors Meeting | Other |
| DEH_001_1_00000001-01776-2 | | ResCap Notes From Intercompany Receivable Call | Other |
| ResCap 10Q/A | | 10Q for the Period ending June 30, 2009, filed on August 25, 2009 | Internal & External Financial Statements |
| B. Westman Deposition - 10-15-13 Transcript | | Deposition Transcript of B. Westman on 10/15/2013 | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_01 (Deposition Agreement) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_02 (RCJSNII10041452) | | Email: Intercompany files, cash management, with exhibits | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_03 (RCJSNII10041500) | | Email: Cash management policy | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_04 (RCJSNII10037951) | | Email: Intercompany process memo | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_05 (RCJSNII00003340) | | ResCap IC certification | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_06 (RCUCCJSN30016049) | | Email: Top 10 IC Relationships agreements | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_07 (RCUCCJSN200064737) | | Email: Bounce Intercompany | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_08 (EXAM12263518) | | Email: Cash management process | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_09 (Docket 586) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_10 (Docket 683) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_11 (Docket 684) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_12 (Docket 685) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_13 (Docket 687) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_14 (RCJSNII10028118) | | Email: Bounce Intercompany | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_15 (UCC12846) | | Email: TOP 10 IC | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_16 (RCUCCJSN30002758) | | Email: debt forgiveness | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_17 (RCJSNII00025680) | | Email: cash movement into debt | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_18 (EXAM00345894) | | FTI IC presentation April 4, 2013 | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_19 (EXAM00107037) | | | Deposition Transcripts and Exhibits |

Exhibit 2
48 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| B. Westman Deposition Exhibit_20 (EXAM00107030) | | Amended and Restated Intercompany Loan Agreement | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_21 (EXAM00107022) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_22 (EXAM00107300) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_23 (EXAM12263381) | | Email: IC balances "flip" | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_24 (RCJSNII10034044) | | Email: subs filings | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_25 (RCUCCJSN10895541) | | Email: cash management | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_26 (RCUCCJSN10692261) | | Email: GL data | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_27 (EXAM00123277) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_28 (EXAM00234281) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_29 (EXAM00125358) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_30 (RCUCCJSN30014296) | | Email: IC recoverable support | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_31 (RCJSNII10015251) | | Email: IC impairment | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_32 (EXAM12412896) | | Email: IC impairment | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_33 (RCJSNII10074531) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_34 (RCUCCJSN30003025) | | Email: Key IC balances | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_35 (RCUCCJSN30016049) | | Email: IC balance generation | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_36 (RC40000118) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_37 (RCJSNII10131858) | | | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_38 (RCUCCJSN20080786) | | Email: Bounce Intercompany | Deposition Transcripts and Exhibits |
| B. Westman Deposition Exhibit_39 (RCUCCJSN00030215) | | Debt forgiveness | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition - 10-17-2013 Transcript | | Deposition Transcript of Cathy Dondzila on 10-17-2013 | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_01 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_02 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_03 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_04 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_05 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_06 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_07 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_07a | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_08 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_09 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_10 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_11 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_12 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_13 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_14 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_15 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_16 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_17 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_18 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_19 | | | Deposition Transcripts and Exhibits |
| C. Dondzila Deposition Exhibit_28 | | | Deposition Transcripts and Exhibits |

Exhibit 2
49 of 50

Exhibit 2
Documents Considered

| Bates # / File Name | Docket # | Document Description | Category |
|---|---|---|---|
| C. Dondzila Deposition Exhibit_31 | | | Deposition Transcripts and Exhibits |
| T. Hamzehpour Deposition - 10-18-2013 Transcript | | Deposition Transcript of T. Hamzehpour on 10/15/2013 | Deposition Transcripts and Exhibits |
| T. Hamzehpour Deposition Exhibit_1 | | | Deposition Transcripts and Exhibits |
| T. Hamzehpour Deposition Exhibit_2 | | | Deposition Transcripts and Exhibits |
| T. Hamzehpour Deposition Exhibit_3 | | | Deposition Transcripts and Exhibits |
| T. Hamzehpour Deposition Exhibit_4 | | | Deposition Transcripts and Exhibits |
| T. Hamzehpour Deposition Exhibit_5 | | | Deposition Transcripts and Exhibits |
| T. Hamzehpour Deposition Exhibit_6 | | | Deposition Transcripts and Exhibits |

Exhibit 2
50 of 50

**<u>Exhibit B</u>**

**Expert Report of Michael Fazio, dated October 18, 2013**

# Residential Capital, LLC

## Expert Report of Michael Fazio – Recovery Analysis

October 18, 2013

Residential Capital, LLC

# Table of Contents

| | Page |
|---|---|
| Executive Summary | 2 |
| Summary of Recovery Waterfall Model | 5 |
| Recovery Scenarios & Analyses | 9 |
| Conclusions | 21 |
| Appendices | 23 |
|     Schedule of Intercompany Claims | 24 |
|     Legal Entities | 30 |
|     Due Diligence Conducted | 32 |
|     Expert Qualifications | 34 |
|     Compensation of Expert | 36 |

# Executive Summary

# Overview of Report

- This report (the "Report") has been prepared by Michael Fazio on behalf of Houlihan Lokey Capital, Inc. ("Houlihan Lokey") at the request of White & Case LLP and Milbank, Tweed, Hadley & McCloy LLP as counsel to the Ad Hoc Group of Junior Secured Noteholders ("Ad Hoc Group") of the 9.625% Junior Secured Guaranteed Notes due 2015 ("JSNs") and counsel to UMB Bank, N.A. as Trustee for the JSNs ("Trustee"), and Akin Gump Strauss Hauer & Feld LLP as special litigation counsel to the Trustee, in connection with that certain consolidated adversary proceeding (Adv. Pro. Nos. 13-01343 and 13-01277 (collectively, the "Adversary Proceeding")) relating to the Chapter 11 proceedings of Residential Capital, LLC ("ResCap", the "Company" or the "Debtors") in the U.S. Bankruptcy Court for the Southern District of New York, Case No. 12-12020

- In conjunction with preparing the Report, Houlihan Lokey has made the reviews, analyses and inquiries deemed necessary and appropriate. See Appendices: Due Diligence Conducted

HOULIHAN LOKEY    3

| Executive Summary | Overview of Report (cont.) |
|---|---|

- Houlihan Lokey has been asked by counsel to provide sensitivity outputs on the Debtors' Collateral Scenario (as defined herein) recoveries to estimate the impact of certain issues subject to Phase II of the Adversary Proceeding
  - Counsel has requested the sensitivity output for the following three scenarios:
    - (A) Intercompany Claims: Utilize Debtors' Collateral Scenario assumptions, but include all pre-petition intercompany claims as valid and as scheduled in the SOALs
    - (B) AFI Contribution: Utilize Debtors' Collateral Scenario assumptions, but assume the JSNs have a direct lien on certain of the contemplated $2.1 billion AFI contribution
    - (C) Both Intercompany Claims & AFI Contribution: Utilize Debtors' Collateral Scenario assumptions, but assume both intercompany claims and the JSNs' lien on a portion of the AFI contribution are valid
  - In addition to these scenarios, Houlihan Lokey has been asked by counsel to show the impact on recoveries in Scenarios A, B and C assuming the subordination of the RMBS Trust and Monoline claims as indicated in the Debtors' Disclosure Statement
- Counsel has also asked Houlihan Lokey to calculate the aggregate value recoverable from individual deficiency claims asserted by the JSNs in the following two scenarios:
  - The Debtors' Collateral Scenario
  - The Debtors' Collateral Scenario, but assuming the Committee prevails in certain challenges to the JSNs' collateral being pursued in the Adversary Proceeding
- Counsel has also asked Houlihan Lokey to assess the potential impact on intercompany claim value from the reinstatement of approximately $16.6 billion in previously-forgiven intercompany claims

# Summary of Recovery Waterfall Model

| Summary of Recovery Waterfall Model | Introduction |
|---|---|

- Houlihan Lokey has developed a recovery model for ResCap (the "Waterfall Model") in order to determine the value of intercompany claims and resulting total recovery for the JSNs based on assumptions provided by:
  - Counsel
  - The Expert Report of Robert S. Bingham and the Expert Report of Raymond T. Lyons, Esquire, both dated October 18, 2013
  - The Debtors, either through their Disclosure Statement or related disclosures / discussions
- The Waterfall Model calculates the recovery for creditors at each legal entity and includes the impact of intercompany claims, Equity Pledges (as defined herein) and deficiency claims (if any)
- The Waterfall Model was developed by Houlihan Lokey professionals during the pre-petition period and has since been maintained and refined as additional information becomes available and additional or different assumptions become relevant
- I understand that the Debtors and the Debtors' advisors have developed and maintained a similar recovery model
  - I also understand that prior to and subsequent to the petition date, Houlihan Lokey professionals and the Debtors' advisors have run scenarios through their respective models and agreed that both the Debtors' and Houlihan Lokey's models produce substantially similar results when using the same assumptions
- The following two pages summarize the general design, methodology and assumptions of the Waterfall Model
  - As a general mater, the assumptions utilized in the Debtors' Collateral Scenario (as defined herein) in this Report are intended to be consistent with those utilized by the Debtors in their Disclosure Statement and updates thereto.  The Debtors' Collateral Scenario shown herein is for illustrative purposes only and is utilized solely to isolate and quantify the impact of certain individual assumptions on the Collateral Scenario's projected recoveries
  - Houlihan Lokey is providing no opinion on the merits or validity of any assumptions utilized herein

| Summary of Recovery Waterfall Model | Waterfall Model Architecture & Methodology |
|---|---|

**Debtors & Legal Structure**

- Includes 27 of the 51 Debtors, including the two borrowing entities created in connection with ResCap's debtor-in-possession facility ("Barclays DIP")

- The remaining 24 Debtors are excluded from the Debtors' trial balances, because they do not have distributable assets of value or are otherwise not material or impactful on the recovery analysis results[1]

**Financial Assets**

- The Waterfall Model utilizes the Debtors' April 30, 2013 trial balances containing the book value of assets at each entity. The Debtors carry their assets at fair value in accordance with GAAP. The Debtors' estimate of the JSNs' secured recovery in the Debtors' Collateral Scenario includes estimates of the recovery value of the remaining unsold assets. As indicated in the Disclosure Statement, the Debtors' estimate of recovery value is more conservative than the Debtors estimate of fair value of the assets in the Debtors' trial balances. For the purposes of this Report, the Debtors' estimates have been utilized

  - The Company-provided trial balances also include a designation of assets pledged to each collateral silo / debt facility; for the purposes of this Report, such allocation has been utilized

- For the purposes of this Report, certain items from the trial balances are excluded, including:

  - Intercompany claims (analyzed separately as described on subsequent slides)

  - Non-economic assets (e.g., certain consolidated held-for-investment balances, contingent repurchase obligations and similar assets that are recognized by the Company in accordance with GAAP, but are assumed in this Report to provide no recovery value)

- For the purposes of this Report, certain additional value is assumed in the recovery calculations and added to the assets in the trial balances, consistent with the Debtors' assumptions, including:

  - $68 million from true-up associated with Ocwen transaction ($51 million allocated to JSNs' collateral) and $24 million from the assets of non-Debtor subsidiaries ($2 million allocated to JSNs' collateral)

**Secured Debt Obligations**

- Outstanding debt facility balances at April 30, 2013

  - *First Lien Facilities:* Ally LOC balance of $380 million and Ally Revolver balance of $747 million

  - *JSNs:* Claim varies based on scenario being utilized (as described on subsequent pages); the Debtors' Collateral Scenario claim is $2,223 million, reflecting no adjustments from the Adversary Proceeding

(1)   See Appendices for more detail; as a point of comparison, in the Debtors' Disclosure Statement (ECF #4819), the Debtors provide recovery analyses detail for 15 legal entities; a Summary of Unscheduled Entities is provided for the others, which shows no assets for the remaining unscheduled Debtors

 HOULIHAN LOKEY    7

# Waterfall Model Architecture & Methodology (cont.)

Summary of Recovery Waterfall Model

**Admin / Priority Claims**

- After satisfaction of secured debt recovery, distributable value, including from the contribution of Ally Financial Inc. ("AFI"), is used to satisfy administrative / priority / wind-down claims ("Admin Claims")
- The amount and allocation of Admin Claims is consistent with the Debtors' Disclosure Statement, including $250 million against Residential Funding Company, LLC ("RFC") and $836 million against GMAC Mortgage, LLC ("GMACM")[1]

**General Unsecured Claims ("GUC")**

- Distributable value after satisfaction of Admin Claims is used to satisfy GUCs, which share in distributable value pro-rata at each legal entity
- The amount and allocation of GUCs is consistent with the Debtors' Disclosure Statement[2]

**Inter-Company Claims**

- The Debtors' Collateral Scenario excludes the impact of pre-petition intercompany claims
- When assumed in this Report as valid / not re-characterized, intercompany claims are included in GUCs and the amounts and allocation are per the Debtors' Statements of Assets and Liabilities ("SOALs"). Net balances are utilized (i.e., receivables and payables between the same two entities are assumed to be netted)

**Equity Value / Pledges**

- Any value remaining at each legal entity after the satisfaction of secured debt obligations, Admin Claims and GUCs is distributed to each entity's parent entity
- If the parent entity has pledged this equity value to a secured debt obligation ("Equity Pledges"), the equity is used to satisfy that obligation, otherwise the equity is assumed to be available to GUCs at that parent entity

**Other Recovery Calculation Notes**

- *Secured Recovery*: The satisfaction of secured debt facilities is assumed to be from (i) pledged collateral at borrower / issuer entities, (ii) pledged collateral at guarantor entities, (iii) pledged collateral at all other entities and (iv) Equity Pledges (if applicable), in that order
- *Unsecured Recovery*: Any remaining deficiency claims are treated pari passu to GUCs and asserted at a debt facility's borrower / issuer and guarantor entities. The amount of deficiency claim asserted varies by entity and equals the claim less amounts already recovered from the entity as a secured recovery

(1) *Per disclosures in the Expert Report of Mark Renzi dated September 20, 2013 ("Renzi Report"), $10 million of such claims against GMACM are assumed to be asserted against Executive Trustee Services, LLC ("ETS"), and $27 million of such claims are assumed to have been charged to the JSNs' collateral since April 30, 2013 (assumed from GMACM, which is allocated approximately 77% of total Admin Claims in the Disclosure Statement)*
(2) *Per disclosures in the Renzi Report, $5 million of additional GUCs above what is shown in the Disclosure Statement is assumed to be allocated to ETS*

HOULIHAN LOKEY

# Recovery Scenarios & Analyses

| Recovery Scenarios & Analyses | Debtors' Collateral Scenario |

- As used herein, the Debtors' "Collateral Scenario" includes the secured recovery assumptions and methodology employed by the Debtors in their Disclosure Statement, as subsequently updated or amended
- The Disclosure Statement and certain related filings originally indicated the JSNs' secured recovery totaled $1.689 billion
- This amount has since been updated by the Debtors to incorporate the impact of subsequent developments, primarily the Ocwen true-up
- The Debtors' projected JSNs' secured recovery includes Debtors' estimates of the recovery value of remaining unsold assets. The Debtors' estimates are more conservative than the fair value of the assets in the Debtors' trial balances. For purposes of this Report, Houlihan Lokey is using the Debtors' estimates to isolate and highlight the change in the JSNs' recovery from the assumptions discussed herein
- The Debtors' estimate of the JSNs' secured recovery includes certain assumptions that are being litigated in the Adversary Proceeding, including:
  - Adequate Protection (Debtors' Collateral Scenario ascribes zero value to adequate protections claims for the JSNs)
  - Purchase price allocation (Debtors' Collateral Scenario ascribes zero value to intangible / going-concern / goodwill)
  - AFI contribution allocation (Debtors' Collateral Scenario assumes zero value is subject to JSNs' liens)
  - Intercompany claims (Debtors' Collateral Scenario ascribes zero value)
  - Recovery on unsold assets (Debtors' Collateral Scenario makes certain disputed estimates of recovery values)
- It is not the intent of this Report to opine on these disputed issues which the Court will address in the Adversary Proceeding. Houlihan Lokey has developed a Debtors' Collateral Scenario which replicates the Debtors' assumptions and projected results for the JSNs
  - All assumptions known to be utilized by the Debtors are incorporated, with the exception of projected Admin Claim allocations beyond what has already been charged to JSNs' collateral[1][2], in an attempt to develop a comparable result from which to layer in additional assumptions

### Collateral Scenario Secured Recovery ($ in millions)

|  | Renzi Report | | Houlihan Model | |
|---|---|---|---|---|
| Cash & Remaining Assets | $ | 2,513 | $ | 2,512 |
| Equity Pledges | | 99 | | 100 |
| Pledged Intercompany Claims | | - | | - |
| Pledged AFI Contribution | | - | | - |
| Impact of Ocwen True-Up | | 51 | | 51 |
| Revolver Pay-Down | | (747) | | (747) |
| Additional Expense Allocation | | (180) | | (27) |
| **Total Secured Recovery** | | **1,735** | | **1,888** |
| Plus:  Add-Back of Addt'l. Exp.[2] | | 153 | | NA |
| **Adj. Secured Recovery** | $ | **1,888** | $ | **1,888** |

(1)  Trial balances in the Waterfall Model are as of April 30, 2013
(2)  The Renzi Report indicates $27 million in stipulated costs have been charged to the JSNs' collateral since April 30, 2013; implying an estimated $153 million in additional Admin Claims that the Debtors intend to charge against the JSNs' collateral

# Adjusted Intercompany Claim & AFI Contribution Scenarios

Recovery Scenarios & Analyses

- Houlihan Lokey has been asked by counsel to provide sensitivity outputs on the Debtors' Collateral Scenario recoveries to estimate the impact of certain issues subject to Phase II of the Adversary Proceeding

- Counsel has requested the following three scenarios:

    **A** Intercompany Claims:  Utilize Debtors' Collateral Scenario assumptions, but include all pre-petition intercompany claims as valid and as scheduled in the SOALs

    **B** AFI Contribution:  Utilize Debtors' Collateral Scenario assumptions, but assume the JSNs have a direct lien on certain of the contemplated $2.1 billion AFI contribution, which includes the following assumptions

      - $624.5 million recovered from Residential Capital, LLC ("HoldCo") on account of breach of contract claims related to the first 2009 tax allocation agreement[1]

      - $338.8 million recovered from GMACM on account of breach of contract claims related to failure to pay value of purchased mortgage servicing rights[1]

      - $234.6 million recovered from GMACM on account of breach of contract claims related to the misallocation of net revenues on loans brokered by GMACM[1]

      - The remaining $902.1 million is allocated pro-rata to claimants / legal entities in the same manner as the $2.1 billion allocation contemplated by the Disclosure Statement

    **C** Both Intercompany Claims & AFI Contribution:  Utilize Debtors' Collateral Scenario assumptions, but assume both intercompany claims and the JSNs' lien on a portion of the AFI contribution are valid

*(1)   Per the Expert Report of Raymond T. Lyons, Esquire dated October 18, 2013*

HOULIHAN LOKEY          11

# Impact of Adjusted Intercompany Claim & AFI Contribution Scenarios

**Recovery Scenarios & Analyses**

■ Counsel has informed Houlihan Lokey that the JSNs' ultimate recovery will be limited to the amount of their allowed claim, including accrued post-petition interest and unpaid fees / expenses if the JSNs are deemed over-secured

■ The table below shows the maximum secured recovery available to the JSNs under the scenarios previously described and is presented to illustrate the JSNs' total collateral value and amount of over-collateralization under the scenarios assumed

| JSNs' Maximum Secured Recovery ($ in millions) | | | | | |
|---|---|---|---|---|---|
| | Debtors' Collateral Scenario | | Ⓐ W/ InterCo. | Ⓑ W/ AFI Contr. | Ⓒ W/ Both |
| | Renzi Report | Houlihan Model | Houlihan Model | Houlihan Model | Houlihan Model |
| Cash & Remaining Assets | $ 2,513 | $ 2,512 | $ 2,512 | $ 2,512 | $ 2,512 |
| Equity Pledges | 99 | 100 | 238 | 100 | 158 |
| Pledged Intercompany Claims | - | - | 602 | - | 342 |
| Pledged AFI Contribution | - | - | - | 1,198 | 1,198 |
| Impact of Ocwen True-Up | 51 | 51 | 51 | 51 | 51 |
| Revolver Pay-Down | (747) | (747) | (747) | (747) | (747) |
| Additional Expense Allocation | (180) | (27) | (27) | (27) | (27) |
| **Total Secured Recovery** | **1,735** | **1,888** | **2,628** | **3,086** | **3,486** |
| Plus:  Add-Back of Addt'l. Exp. | 153 | NA | NA | NA | NA |
| **Adj. Secured Recovery** | **$ 1,888** | **$ 1,888** | **$ 2,628** | **$ 3,086** | **$ 3,486** |
| *Memo:  Incremental Collateral* | | | $ 740 | $ 1,198 | $ 1,598 |

■ As shown above, Scenarios A, B and C result in incremental JSNs' collateral ranging from $740 million to $1,598 million

● The assumption that intercompany claims remain valid increases JSNs' collateral value through both "Pledged Intercompany Claims" (value of intercompany claims owed to the JSNs' issuer and guarantor entities, on which counsel has indicated the JSNs' lien directly attaches) and Equity Pledges (the increased equity value of certain entities that hold intercompany receivables and whose equity is pledged to the JSNs)

HOULIHAN LOKEY    12

# Impact of RMBS Trust & Monoline Claim Subordination on Adjusted Scenarios

**Recovery Scenarios & Analyses**

- In addition to the scenarios previously described, Houlihan Lokey has also been asked by counsel to show the impact on recoveries in Scenarios A, B and C assuming the subordination of the RMBS Trust and Monoline claims indicated in the Debtors' Disclosure Statement as allowed GUCs

- The table below shows the maximum secured recovery available to the JSNs under the scenarios previously described, but assuming the subordination of RMBS Trust and Monoline claims to GUCs

| JSNs' Maximum Secured Recovery ($ in millions) | | | A | B | C |
|---|---|---|---|---|---|
| | Debtors' Collateral Scenario | | W/ InterCo. | W/ AFI Contr. | W/ Both |
| | Renzi Report | Houlihan Model | Houlihan Model | Houlihan Model | Houlihan Model |
| Cash & Remaining Assets | $  2,513 | $  2,512 | $  2,512 | $  2,512 | $  2,512 |
| Equity Pledges | 99 | 100 | 563 | 100 | 338 |
| Pledged Intercompany Claims | - | - | 1,864 | - | 1,285 |
| Pledged AFI Contribution | - | - | - | 1,198 | 1,198 |
| Impact of Ocwen True-Up | 51 | 51 | 51 | 51 | 51 |
| Revolver Pay-Down | (747) | (747) | (747) | (747) | (747) |
| Additional Expense Allocation | (180) | (27) | (27) | (27) | (27) |
| **Total Secured Recovery** | 1,735 | 1,888 | 4,215 | 3,086 | 4,609 |
| Plus:  Add-Back of Addt'l. Exp. | 153 | NA | NA | NA | NA |
| **Adj. Secured Recovery** | $  1,888 | $  1,888 | $  4,215 | $  3,086 | $  4,609 |
| *Memo:  Incremental Collateral* | | | $  2,327 | $  1,198 | $  2,721 |

- As shown above, the subordination of RMBS Trust and Monoline claims substantially increases the JSNs' collateral value if intercompany claims are not re-characterized or waived

  - The subordination of claims does not impact Scenario B relative to the previous slide, as Scenario B does not derive any value from intercompany claims (which increase in value with the subordination of GUCs)

HOULIHAN LOKEY

13

# Impact of Previously-Forgiven Intercompany Claims

Recovery Scenarios & Analyses

- Houlihan Lokey has been asked by counsel to assess the potential impact of reinstating intercompany claims forgiven by the Debtors between 2008 and the petition date[1]

- According to Article II, Section K of the Disclosure Statement: "On numerous occasions, where the existence of an intercompany payable on a Debtor's balance sheet threatened the solvency and net worth thresholds required under external funding agreements, or by federal or state regulations, the putative debt obligations were forgiven. Additionally, putative debt obligations were forgiven among the Debtors and certain non-Debtor subsidiaries in connection with the Debtors' international transactions and the dissolution of entities. Approximately $16.6 billion of debt was forgiven without consideration from 2007 through the Petition Date."

  - Houlihan Lokey has been provided with information on approximately $16.6 billion of intercompany claims forgiven between the beginning of 2008 and the petition date[2]

- Generally, the reinstatement or addition of additional intercompany claims between Debtors will have a positive impact on the JSNs' secured recovery if intercompany claims are assumed valid / not re-characterized. However, there are two primary ways in which the reinstatement of forgiven claims could potentially reduce the secured recovery JSNs receive from intercompany claims outstanding on the petition date

**Offset / Reduce Existing Intercompany Claim Balances**

  - The reinstatement of intercompany claims between the same legal entities as intercompany claims existing on the petition date, but in the opposite lending direction, could potentially reduce or offset the amount of intercompany claims at the petition date

**Dilute Existing Intercompany Claim Recoveries**

  - The reinstatement of certain intercompany claims could reduce intercompany recoveries to the JSNs if the reinstated claims are both: (i) owed from an entity that is an obligor for an existing intercompany claim that benefits the JSNs, and (ii) owed to an entity that is not a JSNs' issuer, guarantor or Equity Pledge entity

- These two issues are addressed in more detail on the following slides

(1)   *Such reinstatement assumes that the claims which were forgiven are successfully avoided and reinstated*
(2)   *Per RCUCCJSN11270924*

HOULIHAN LOKEY    14

| Recovery Scenarios & Analyses | Impact of Previously-Forgiven Intercompany Claims (cont.) |

## Offset / Reduce Existing Intercompany Claim Balances

■ In the secured recovery amounts shown in this Report, the JSNs only derive intercompany claim secured recovery from claims between entities included in the Waterfall Model. Therefore, only the reinstatement of claims between these entities could offset and decrease the secured recovery benefit shown herein

■ Of the $16.6 billion of previously-forgiven intercompany claims identified, $9.1 billion are between entities in the Waterfall Model (see Appendices)

● Of this $9.1 billion, $2.6 billion are between legal entities with existing intercompany claim relationships, but in the opposite lending direction

➤ There are $2.2 billion of previously-forgiven intercompany claims owed from RFC to HoldCo, which if reinstated could offset a $2.0 billion existing intercompany claim owed from HoldCo to RFC. If the reinstated intercompany claim is allowed to offset / partially net against the existing claim, the adjusted net balance would be a $0.2 billion claim from RFC to HoldCo, which would reduce the value of the intercompany claims to the JSNs

➤ The other $0.4 billion of previously-forgiven claims are in the opposite lending direction of existing intercompany claims with outstanding balances of $5 million or less

● $6.5 billion of previously-forgiven intercompany claims are between legal entities that have no existing intercompany claim in the opposite lending direction. As a result, the reinstatement of these intercompany claims would generally increase intercompany claim value to the JSNs (as the JSNs would have a direct lien on certain of the receivables and an indirect benefit from others through Equity Pledges)

■ If the forgiveness of these $9.1 billion of intercompany claims is successfully avoided and the claims are reinstated and added to the Waterfall Model (and all existing intercompany claims are assumed valid / not re-characterized), the JSNs' collateral value is equal to $2.467 billion under Scenario A (as compared to $2.628 billion under Scenario A on slide 11)

HOULIHAN LOKEY    15

## Recovery Scenarios & Analyses

# Impact of Previously-Forgiven Intercompany Claims (cont.)

**Dilute Outstanding Intercompany Claim Recoveries**

■ Of the $16.6 billion of previously-forgiven intercompany claims identified, there are $1.3 billion that could dilute existing intercompany claim recovery that otherwise benefit the JSNs. These previously-forgiven claims are owed from legal entities in the Waterfall Model to legal entities that are not a JSNs' issuer, guarantor or Equity Pledge entity

- Seven of these intercompany claim relationships totaling $0.9 billion are between legal entities in the Waterfall Model, and therefore their negative impact is already reflected in the analysis described on the previous slide

- The remaining $0.3 billion of previously-forgiven intercompany claims are owed from legal entities in the Waterfall Model to non-Debtor entities that are not included in the Waterfall Model

■ If the forgiveness of these $0.3 billion of intercompany claims is successfully avoided and the claims are reinstated as GUCs at their respective Waterfall Model legal entities, the JSNs' collateral value under Scenario A decreases from $2.467 billion (as reflected on the prior slide) to $2.451 billion

- Approximately 40% of these previously-forgiven intercompany claims are obligations of lower-tier ResCap subsidiaries, and thus their reinstatement has no impact / dilution on the benefit the JSNs' otherwise receive from intercompany claims

**Other Impacts**

■ Approximately $6.3 billion of the previously-forgiven $16.6 billion are owed to legal entities in the Waterfall Model from entities not included in the Waterfall Model. A majority of these receivables are owed to JSNs' issuer, guarantor or Equity Pledge entities

- Any recovery on these intercompany claims if reinstated would increase the JSNs' secured recovery

HOULIHAN LOKEY    16

| Recovery Scenarios & Analyses | Impact of Deficiency Claim Aggregation |

- Houlihan Lokey has also been asked by counsel to calculate the total value recovered from individual deficiency claims by the JSNs under the Debtors' Collateral Scenario, utilizing the following assumptions
  - The JSNs assert a deficiency claim (if under-secured) at each of their issuer and five guarantor entities equal to the total allowed JSNs' claim less secured recovery from that specific entity
  - The total amount of deficiency claims asserted by the JSNs (when aggregated across individual entities) is larger than the total amount of the JSNs' allowed claim
  - As a result, it is possible for the JSNs to recover more from their deficiency claims than is required to satisfy their total allowed claim
- These assumptions result in a $1.888 billion secured recovery and $767 million deficiency recovery (without consideration of intercompany claims or a direct lien on the AFI contribution)
- This analysis confirms that even if the Debtors' disputed valuation is used, the JSNs recover in full on their prepetition claim. Additionally, there is excess recovery available to pay the JSNs post-petition interest

| JSNs' Total Recovery By Entity ($ in millions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Issuer** | | **Guarantors** | | | | | **Grand Total** |
| | HoldCo | GMACM | GMACM HoldCo | RFC | RFC HoldCo | Home-Comings | All Other | Grand Total |
| Total Secured Recovery[1][2] | $ 159 | $ 1,576 | $ - | $ 152 | $ - | $ - | $ 0 | $ 1,888 |
| Memo: Deficiency Claim | 2,063 | 646 | 2,223 | 2,070 | 2,223 | 2,223 | NA | NA |
| Plus: Deficiency Recovery[3] | 390 | 136 | 0 | 242 | - | 0 | - | 767 |
| Initial Total Recovery | $ 549 | $ 1,712 | $ 0 | $ 394 | $ - | $ 0 | $ 0 | $ 2,655 |

(1) Waterfall Model's recreation of Debtors' Renzi Report secured recovery valuation; excludes impact of all currently-litigated issues
(2) The value of equity pledges is included in the parent entity that pledges such equity, including the Barclays DIP borrowers
(3) Waterfall Model's projected recovery output; differs from Debtors' recovery allocation proposed under the Disclosure Statement, as (i) deficiency recovery is not limited by the amount of the allowed claim; (ii) the Debtors' allocate additional Admin Claims to the JSNs' collateral beyond what has already been charged and (iii) the Debtors do not assume the JSNs have a deficiency claim, rather allocate enough collateral to the JSNs to repay the JSNs' assumed claim in full

# Impact of Deficiency Claim Aggregation (cont.)

**Recovery Scenarios & Analyses**

- Houlihan Lokey has also been asked by counsel to calculate the total value recovered from individual deficiency claims by the JSNs under the Debtors' Collateral Scenario, utilizing the assumptions on the previous slide, but also assuming the Committee prevails in certain challenges to the JSNs' collateral being pursued in the Adversary Proceeding, specifically:

  - $127 million aggregate value of collateral not encumbered in favor of the JSNs, per the Expert Report of Marc E. Landy dated September 20, 2013 ("Landy Report")

  - $284 million aggregate value of preference assets, per the Landy Report

    - For the purposes of this analysis, it is assumed that 87% of the value from liens challenged by the Committee is allocated to GMACM, with the remainder at RFC. This assumption is based on the distribution of the fair market value of the subject assets at the petition date as identified in the Landy Report

- These assumptions result in a $1.477 billion secured recovery and $950 million deficiency recovery (without consideration of intercompany claims or a direct lien on the AFI contribution)

- This analysis confirms that even if the Debtors' disputed valuation is used and the Committee's collateral challenges are successful, the JSNs recover in full on their prepetition claim. Additionally, there is excess recovery available to pay a portion of the JSNs' post petition interest

| JSNs' Total Recovery By Entity ($ in millions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Issuer | Guarantors | | | | | | Grand Total |
| | HoldCo | GMACM | GMACM HoldCo | RFC | RFC HoldCo | Home-Comings | All Other | |
| Total Secured Recovery[1][2] | $ 159 | $ 1,211 | $ - | $ 107 | $ - | $ - | $ 0 | $ 1,477 |
| Memo: Deficiency Claim | 2,063 | 1,012 | 2,223 | 2,116 | 2,223 | 2,223 | NA | NA |
| Plus: Deficiency Recovery[3] | 390 | 304 | 0 | 256 | 0 | 0 | - | 950 |
| Initial Total Recovery | $ 549 | $ 1,515 | $ 0 | $ 363 | $ - | $ 0 | $ 0 | $ 2,427 |

(1) Waterfall Model's recreation of Debtors' Renzi Report secured recovery valuation; excludes impact of all currently-litigated issues, except Committee's collateral challenges listed
(2) The value of equity pledges is included in the parent entity that pledges such equity, including the Barclays DIP borrowers
(3) Waterfall Model's projected recovery output; differs from Debtors' recovery allocation proposed under the Disclosure Statement, as (i) deficiency recovery is not limited by the amount of the allowed claim; (ii) the Debtors' allocate additional Admin Claims to the JSNs' collateral beyond what has already been charged and (iii) the Debtors do not assume the JSNs have a deficiency claim, rather allocate enough collateral to the JSNs to repay the JSNs' assumed claim in full

**HOULIHAN LOKEY**

18

| Recovery Scenarios & Analyses | # Deficiency Claim Aggregation Conclusion |
| --- | --- |

- As shown on the previous slide, even if it is assumed that the Committee prevails on its collateral challenges in the Adversary Proceeding and the JSNs' secured recovery from the Debtors' Collateral Scenario is reduced by $411 million, the JSNs still recover at least the full amount of their assumed allowed claim of $2,223 million as a result of the JSNs' ability to assert multiple deficiency claims at their issuer and guarantor legal entities, and there is excess recovery available to pay at least a portion of the JSNs' post-petition interest

## Select Issues With Debtors' Hypothetical Chapter 7 Liquidation Analysis

Recovery Scenarios & Analyses

■ The Debtors' Liquidation Analysis, which provides low and high liquidation recovery scenarios under which the JSNs are shown to not recover their full $2,223 million assumed allowed claim, is misleading for several reasons:

- The Debtors' liquidation analysis ascribes zero value to claims against AFI, despite the $2.1 billion settlement between ResCap and AFI contemplated under the Debtors' Plan of Reorganization and the claims identified by the Examiner, which include approximately $3.1 billion of ResCap causes-of-action deemed "likely to prevail" or "more than likely to prevail" and approximately $5.5 billion of total causes-of-action

  ➤ Counsel has informed me that claims against AFI will survive in a liquidation and therefore it is inappropriate to ascribe zero value to such claims

- The Debtors' liquidation analysis ascribes zero value to intercompany claims

- The Debtors' liquidation analysis also makes certain disputed assumptions about the size and priority of unsecured claims

# Conclusions

| Conclusions | # Summary of Conclusions |

- Based on the analysis contained herein, I have reached the conclusions as set forth herein

Houlihan Lokey Capital, Inc.

_____

Michael Fazio, Managing Director

# Appendices

# Appendices

## Schedule of Intercompany Claims

# Schedule of Intercompany Claims

# Scheduled Intercompany Claims

| ECF Number | Lender (Receiving Entity) | Borrower (Paying Entity) | Claim ($ mm) | JSNs Recovery Impact |
|---|---|---|---|---|
| 0549 | Residential Capital, LLC | GMAC Residential Holding Company, LLC | $ 3,295.6 | Direct Lien |
| 0548 | Residential Funding Company, LLC | Residential Capital, LLC | 1,955.0 | Direct Lien |
| 0579 | Homecomings Financial, LLC | Residential Funding Company, LLC | 1,251.5 | Direct Lien |
| 0582 | Passive Asset Transactions, LLC | GMAC Mortgage, LLC | 689.2 | Equity Pledge |
| 0561 | Executive Trustee Services, LLC | GMAC Mortgage, LLC | 276.5 | Equity Pledge |
| 0548 | Residential Funding Company, LLC | RFC Asset Holdings II, LLC | 231.9 | Direct Lien |
| 0548 | Residential Funding Company, LLC | GMAC Mortgage, LLC | 133.7 | Direct Lien |
| 0565 | GMAC Residential Holding Company, LLC | GMAC Mortgage, LLC | 108.0 | Direct Lien |
| 0550 | GMAC Mortgage, LLC | GMAC Residential Holding Company, LLC | 58.2 | Direct Lien |
| 0575 | Home Connects Lending Services, LLC | GMAC Residential Holding Company, LLC | 54.6 | - |
| 0567 | GMAC RH Settlement Service, LLC | Home Connects Lending Services, LLC | 50.0 | Equity Pledge |
| 0588 | RFC Asset Management, LLC | Residential Funding Company, LLC | 45.7 | Equity Pledge |
| 0549 | Residential Capital, LLC | GMAC Residential Holding Company, LLC | 38.3 | Direct Lien |
| 0595 | RFC SFJV-2002, LLC | RFC Asset Management, LLC | 36.3 | - |
| 0550 | GMAC Mortgage, LLC | CAP RE of Vermont LLC | 17.5 | Direct Lien |
| 0566 | RCSFJV2004, LLC | Residential Funding Company, LLC | 17.0 | - |
| 0579 | Homecomings Financial, LLC | RFC Asset Holdings II, LLC | 11.9 | Direct Lien |
| 0548 | GMAC Res Fund of Canada | Residential Funding Company, LLC | 11.4 | - |
| 0550 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 10.9 | Direct Lien |
| 0550 | GMAC Mortgage, LLC | GMAC RH Settlement Service, LLC | 9.6 | Direct Lien |
| 0582 | Passive Asset Transactions, LLC | GMAC Mortgage, LLC | 7.8 | Equity Pledge |
| 0548 | Residential Funding Company, LLC | GMAC Mortgage, LLC | 6.0 | Direct Lien |
| 0548 | Residential Funding Company, LLC | RFC SFJV-2002, LLC | 5.8 | Direct Lien |
| 0588 | RFC Asset Management, LLC | RCSFJV2004, LLC | 5.7 | Equity Pledge |
| 0548 | Residential Funding Company, LLC | Equity Investments I, LLC | 5.2 | Direct Lien |
| 0548 | Residential Funding Company, LLC | DOA Holding Properties, LLC | 3.7 | Direct Lien |
| 0550 | GMAC Mortgage, LLC | Homecomings Financial, LLC | 3.0 | Direct Lien |
| 0550 | GMAC Mortgage, LLC | Home Connects Lending Services, LLC | 3.0 | Direct Lien |
| 0549 | Residential Capital, LLC | GMAC Mortgage, LLC | 2.7 | Direct Lien |
| 0595 | RFC SFJV-2002, LLC | RCSFJV2004, LLC | 2.6 | - |

*Source: Debtors' SOALs (as noted)*

## Scheduled Intercompany Claims (cont.)

Schedule of
Intercompany Claims

| ECF Number | Lender (Receiving Entity) | Borrower (Paying Entity) | Claim ($ mm) | JSNs Recovery Impact |
|---|---|---|---|---|
| 0551 | ditech, LLC | GMAC Mortgage, LLC | 2.6 | Equity Pledge |
| 0562 | GMAC Model Home Finance I, LLC | Residential Funding Company, LLC | 2.0 | Equity Pledge |
| 0549 | Residential Capital, LLC | RFC Asset Holdings II, LLC | 1.7 | Direct Lien |
| 0565 | GMAC Residential Holding Company, LLC | GMAC Mortgage, LLC | 1.5 | Direct Lien |
| 0558 | ETS of Virginia, Inc. | Executive Trustee Services, LLC | 1.2 | - |
| 0564 | GMAC Mortgage USA Corporation | GMAC Mortgage, LLC | 0.6 | Equity Pledge |
| 0584 | Residential Consumer Services, LLC | GMAC Mortgage, LLC | 0.5 | Equity Pledge |
| 0550 | GMAC Mortgage, LLC | Residential Consumer Services, LLC | 0.5 | Direct Lien |
| 0591 | RFC Construction Funding, LLC | Residential Funding Company, LLC | 0.4 | Equity Pledge |
| 0561 | Executive Trustee Services, LLC | Residential Funding Company, LLC | 0.4 | Equity Pledge |
| 0586 | RFC Asset Holdings II, LLC | Passive Asset Transactions, LLC | 0.3 | Equity Pledge |
| 0550 | GMAC Mortgage, LLC | Home Connects Lending Services, LLC | 0.2 | Direct Lien |
| 0550 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 0.2 | Direct Lien |
| 0550 | GMAC Mortgage, LLC | CAP RE of Vermont LLC | 0.2 | Direct Lien |
| 0558 | ETS of Virginia, Inc. | Executive Trustee Services, LLC | 0.2 | - |
| 0549 | Residential Capital, LLC | Residential Funding Company, LLC | 0.1 | Direct Lien |
| 0548 | Residential Funding Company, LLC | DOA Properties IX (Lots-Other), LLC | 0.1 | Direct Lien |
| 0549 | Residential Capital, LLC | GMAC RFC Europe Limited | 0.0 | Direct Lien |
| 0550 | GMAC Mortgage, LLC | ETS of Washington, Inc. | 0.0 | Direct Lien |
| 0558 | ETS of Virginia, Inc. | GMAC Mortgage, LLC | 0.0 | - |
| 0561 | Executive Trustee Services, LLC | ETS of Washington, Inc. | 0.0 | Equity Pledge |
| 0548 | Residential Funding Company, LLC | Home Connects Lending Services, LLC | 0.0 | Direct Lien |
| 0550 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 0.0 | Direct Lien |
| 0564 | GMAC Mortgage USA Corporation | GMAC Mortgage, LLC | 0.0 | Equity Pledge |
| 0550 | GMAC Mortgage, LLC | ditech, LLC | 0.0 | Direct Lien |
| 0550 | GMAC Mortgage, LLC | ETS of Virginia, Inc. | 0.0 | Direct Lien |
| 0595 | RFC SFJV-2002, LLC | Homecomings Financial, LLC | 0.0 | - |
| 0579 | Homecomings Financial, LLC | RFC Asset Management, LLC | 0.0 | Direct Lien |

*Source: Debtors' SOALs (as noted)*

**Schedule of Intercompany Claims**

# Debt Forgiveness by Year

## Debt Forgiveness by Year[1] ($ in millions)

| Forgiven By | In Favor Of | Entity Status | 2008 | 2009 | 2010 | 2011 | 2012 | Grand Total |
|---|---|---|---|---|---|---|---|---|
| Residential Capital, LLC | Residential Funding Co., LLC | Debtor | $ 2,000 | $ 151 | $ - | $ - | $ - | $ 2,151 |
| | GMAC RFC Europe Limited | Non Debtor/Active | 1,800 | - | - | - | - | 1,800 |
| | GMAC - RFC (UK) Limited | Sold 9/30/2010 | 725 | 371 | 80 | - | - | 1,176 |
| | GMAC RFC Investment B.V. | Sold 10/01/2010 | 154 | 435 | - | - | - | 589 |
| | Investments BV GX1 | SPE/Active | - | 165 | 285 | 3 | - | 452 |
| | RFC UK Ltd Viaduct | SPE/Active | 15 | 175 | 231 | - | - | 420 |
| | GMAC Res Fund of Canada | Non Debtor/Active | 154 | 5 | - | - | - | 159 |
| | Australia GMAC RFC | Sold 7/02/2009 | 23 | 122 | - | - | - | 145 |
| | Viaduct (no.7) | SPE/Active | - | - | - | - | 134 | 134 |
| | Financiera Auritec, S.A. | Non Debtor/Active | - | 39 | - | - | - | 39 |
| | GMAC-RFC Property Finance Ltd | Non Debtor/Active | - | 33 | - | - | - | 33 |
| | PREEMAC 2 NL NETH B.V. | SPE/Active | - | - | 19 | 3 | - | 22 |
| | Subtotal | | $ 4,871 | $ 1,495 | $ 615 | $ 5 | $ 134 | $ 7,120 |
| GMAC Residential Holding Co LLC | GMAC Mortgage LLC | Debtor | $ - | $ 2,520 | $ - | $ - | $ - | 2,520 |
| Residential Funding Co., LLC | RFC Asset Holdings II, LLC | Debtor | $ 1,228 | $ - | $ - | $ - | $ - | 1,228 |
| | GMAC Model Home Finance, LLC | Sold 6/2008 | 481 | - | - | - | - | 481 |
| | Equity Investment I, LLC | Debtor | 392 | - | - | - | - | 392 |
| | RC Properties I, LLC | Dissolved 12/30/2011 | - | 88 | - | - | - | 88 |
| | CMH Holdings, LLC | Non Debtor/Active | 48 | - | - | - | - | 48 |
| | DOA Properties IX, LLC | Debtor | - | - | - | 45 | - | 45 |
| | DOA Holding Properties, LLC | Debtor | 43 | 0 | - | - | - | 43 |
| | DOA Properties I, LLC | Dissolved 8/09/2011 | 31 | - | - | - | - | 31 |
| | Equity Investment IV | Dissolved 8/09/2011 | - | 21 | - | - | - | 21 |
| | KBOne, LLC | Sold 6/2008 | 18 | - | - | 1 | - | 18 |
| | DOA Properties II, LLC | Dissolved 8/09/2011 | 14 | - | - | - | - | 14 |
| | RFC-GSAP Servicer Advance, LLC | Debtor | 7 | - | - | - | - | 7 |
| | DOA Properties IV, LLC | Dissolved 12/30/2011 | - | - | - | 7 | - | 7 |
| | Developers of Hidden Springs | Dissolved 12/30/2011 | 6 | - | - | - | - | 6 |
| | DOA Holdings NoteCo, LLC | Dissolved 4/12/2012 | - | - | - | 5 | - | 5 |
| | REG-PFH, LLC | Dissolved 12/30/2001 | 5 | - | - | - | - | 5 |
| | LenOne, LLC | Sold 6/2008 | 4 | - | - | 0 | - | 4 |
| | RFC Construction Funding LLC | Debtor | - | - | - | 2 | - | 2 |
| | Hidden Springs Sewer Company | Sold 9/23/2009 | 2 | - | - | - | - | 2 |
| | GMAC Model Home I, LLC | Debtor | - | 1 | - | - | - | 1 |

# Debt Forgiveness by Year (cont.)

Schedule of Intercompany Claims

## Debt Forgiveness by Year[1] ($ in millions)

| Forgiven By | In Favor Of | Entity Status | 2008 | 2009 | 2010 | 2011 | 2012 | Grand Total |
|---|---|---|---|---|---|---|---|---|
| Residential Funding Co., LLC | Ameriland LLC | Dissolved 12/30/2011 | 1 | - | - | - | - | 1 |
| | GMCMTH, LLC | Sold 6/2008 | 0 | - | - | 0 | - | 1 |
| | DOA Properties IIIB, LLC | Sold 9/30/2008 | - | - | - | 0 | - | 0 |
| | DOA Properties V, LLC | Dissolved 12/30/2011 | 0 | - | - | - | - | 0 |
| | DOA Properties VIII, LLC | Cancelled 6/06/2008 | - | 0 | - | - | - | 0 |
| | RFC Resort Funding LLC | Sold 7/23/2008 | - | - | - | 0 | - | 0 |
| | DOA Properties VII, LLC | Dissolved 8/09/2011 | 0 | - | - | - | - | 0 |
| | Subtotal | | $ 2,280 | $ 111 | $ - | $ 61 | $ - | $ 2,452 |
| Passive Asset Transactions LLC | Flume (no.8) | SPE/Active | $ - | $ - | $ 351 | $ - | $ 53 | $ 404 |
| | GX CE Funding II B.V. | SPE/Active | - | - | 311 | - | - | 311 |
| | Subtotal | | $ - | $ - | $ 662 | $ - | $ 53 | $ 715 |
| RFC Asset Holdings II, LLC | CMH Holdings, LLC | Sold to CMH 6/2008 | $ - | $ - | $ - | $ 209 | $ - | $ 209 |
| Homecomings Financial, LLC | GMAC Model Home Finance, LLC | Sold 6/2008 | $ - | $ - | $ - | $ 0 | $ - | $ 0 |
| | DOA Properties IIIB, LLC | Sold 9/30/2008 | - | - | - | 0 | - | 0 |
| | KBOne, LLC | Sold 6/2008 | - | - | - | 0 | - | 0 |
| | LenOne, LLC | Sold 6/2008 | - | - | - | 0 | - | 0 |
| | Subtotal | | $ - | $ - | $ - | $ 0 | $ - | $ 0 |
| | Subtotal of Top Interco Notes | | $ 7,150 | $ 4,126 | $ 1,277 | $ 275 | $ 187 | $ 13,015 |
| GMAC Model Home Finance, LLC | Various | | $ 636 | $ - | $ - | $ 503 | $ - | $ 1,139 |
| CMH Holdings, LLC | Various | | - | - | - | 457 | - | 457 |
| Flume (no.8) | Various | | - | - | 351 | - | 53 | 404 |
| GX CE Funding II B.V. | Various | | - | - | 311 | - | - | 311 |
| DOA Holding Properties, LLC | Various | | - | - | - | 268 | - | 268 |
| Remaining | Various | | 89 | - | - | 773 | 134 | 997 |
| | Total | | $ 7,876 | $ 4,126 | $ 1,938 | $ 2,276 | $ 374 | $ 16,589 |
| | *Memo: % of Total* | | 47% | 25% | 12% | 14% | 2% | 100% |

(1) Per RCUCCJSN11270924

Houlihan Lokey    28

| Schedule of Intercompany Claims | Stratification of Previously-Forgiven Intercompany Claims |
|---|---|

| Previously-Forgiven Intercompany Claim Summary ($ in millions) | | | |
|---|---|---|---|
| Category | Relationships | Amount | Comments |
| Offset / Reduce Existing InterCo Claims | 30 | $ 9,061 | Claims between the same legal entities as existing intercompany claims |
| Dilute Existing InterCo Claims | 28 | 1,272 | Claims owed from entities that are obligors on existing intercompany claims |
| Less: Duplicates | (7) | (923) | Claims included in both categories above |
| Claims Benefiting JSNs' Recovery | 49 | 6,328 | Additional value into Debtors' estates (receivables from entities outside Waterfall Model) |
| Other / No Impact | 5 | 850 | No impact on Debtors' Collateral Scenario (claims between entities outside Waterfall Model) |
| **Total** | **105** | **$ 16,589** | |

HOULIHAN LOKEY    29

# Appendices

## Legal Entities

# Waterfall Model Entities

Legal Entities

### Debtors Included In Waterfall Model

- GMAC-RFC Holding Company, LLC
- Residential Funding Company, LLC
- Homecomings Financial, LLC
- RFC Borrower LLC (DIP Borrower)
- RFC Asset Holdings II, LLC
- Equity Investments I, LLC
- Residential Funding Mortgage Exchange, LLC
- RFC Asset Management, LLC
- RFC SFJV-2002, LLC
- RCSFJV2004, LLC
- GMAC Model Home Finance I, LLC
- DOA Holding Properties, LLC
- DOA Properties IX (Lots-Other), LLC
- RFC Construction Funding, LLC
- Residential Capital, LLC
- GMAC Mortgage, LLC
- Executive Trustee Services, LLC
- Residential Consumer Services, LLC
- GMAC Mortgage USA Corporation
- ETS of Washington, Inc
- ETS of Virginia, Inc.
- GMACM Borrower LLC (DIP Borrower)
- Ditech, LLC
- GMAC Residential Holding Company, LLC
- GMAC RH Settlement Service, LLC
- Home Connects Lending Services, LLC
- Passive Asset Transactions, LLC

### Non-Debtors Included In Waterfall Model

- GMAC Model Home Finance, LLC
- CMH Holdings, LLC
- GMEN 04 Variable Funding Trust
- GMAC Mortgage Servicer Advance Fund

### Debtors Excluded From Waterfall Model

- EPRE LLC
- GMACM REO LLC
- GMACR Mortgage Products, LLC
- HFN REO Sub II, LLC
- Homecomings Financial Real Estate Holdings, LLC
- Ladue Associates, Inc.
- PATI A, LLC
- PATI B, LLC
- PATI Real Estate Holdings, LLC
- RAHI A, LLC
- RAHI B, LLC
- RAHI Real Estate Holdings, LLC
- Residential Accredit Loans, Inc.
- Residential Asset Mortgage Products, Inc.
- Residential Asset Securities Corporation
- Residential Consumer Services of Alabama, LLC
- Residential Consumer Services of Ohio, LLC
- Residential Consumer Services of Texas, LLC
- Residential Funding Mortgage Securities I, Inc.
- Residential Funding Mortgage Securities II, Inc.
- Residential Funding Real Estate Holdings, LLC
- Residential Mortgage Real Estate Holdings, LLC
- RFC – GSAP Servicer Advance, LLC
- RFC REO LLC

HOULIHAN LOKEY    31

# Appendices

## Due Diligence Conducted

| Due Diligence Conducted | Due Diligence Conducted |
|---|---|

**In conjunction with preparing the Report, Houlihan Lokey has made the reviews, analyses and inquiries we deemed necessary and appropriate, including, but not limited to, the following:**

- ECF #s 548-595 (Debtors' SOALs)

- ECF # 4819 (Corrected Solicitation Version of the Disclosure Statement and Joint Chapter 11 Plan)

- RENZI0000001 (April 30, 2013 Trial Balances)

- RENZI00000002 (Estimated Recovery On Remaining Assets)

- RENZI00000003 (Ocwen True-Up Summary)

- EXAM00345894 (ResCap – Intercompany Transactions Presentation)

- RCUCCJSN00012496 (Post-Petition Intercompany Claims)

- RCUCCJSN00030213 (Draft Trial Balance)

- RCUCCJSN11270924 (Forgiven Intercompany Claim Balances)

- Expert Report of Mark Renzi dated September 20, 2013

- JSNs' Indenture Dated as of June 6, 2008

- JSNs' Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy Dated December 30, 2009

HOULIHAN LOKEY    33

# Appendices

## Expert Qualifications

Expert Qualifications | # Biography

## Michael Fazio

Mr. Fazio is a Managing Director in Houlihan Lokey's Financial Restructuring Group and Co-Head of the firm's European Financial Institutions Group. Mr. Fazio previously lead the firm's Global Portfolio Valuation Practice and its New York office Financial Advisory Services Practice. He brings nearly three decades of experience in advisory services in connection with acquisitions, divestitures, corporate strategy, operational oversight, and restructurings for financial institutions. He advised the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. in connection with the company's bankruptcy. As part of that engagement, he valued and restructured the significant derivatives and special purpose vehicle portfolios of Lehman Brothers and was involved in oversight of the Lehman Banks. He previously advised the Official Committee of Unsecured Creditors of Refco, Inc. in connection with its bankruptcy and advised in the restructurings of the structured investment vehicles Cheyne and Mainsail II. He also advised a committee of bondholders of CIT Group in their recent $3 billion financing. Mr. Fazio is based in the firm's London office. Mr. Fazio is a member of the firm's management committee

Before joining Houlihan Lokey, Mr. Fazio was President and Chief Operating Officer of Comdisco, Inc., an $8 billion equipment-leasing and technology services company, which he led through the bankruptcy process. Earlier, he served as Executive Vice President/Managing Director and COO-Americas of Deutsche Bank AG, managing the integration of Deutsche Bank NA and Bankers Trust Corp., as well as directing all non-front office functions in the Americas (Legal, Controlling, Risk Management, Real Estate, and Operations). He chaired the bank's regional operating committee and was a member of the executive committee

Mr. Fazio began his career at Arthur Andersen LLP, where he was partner-in-charge of the New York Banking, Brokerage and Investment Banking Industry practice in his last position with the firm. His responsibilities there included serving as lead partner in the firm's relationship with J.P. Morgan, Bankers Trust, Bank of America, and Deutsche Bank. He was a member of the firm's Financial Markets Global Advisory Group, responsible for setting the strategic direction of the firm's industry program, developing methodology, marketing, and implementation

Mr. Fazio received a joint B.B.A./MBA, with honors, in Accounting from Pace University. He was a Certified Public Accountant and a member of AICPA. Mr. Fazio is a Series 7, 24, 79, and 63 certified representative

# Appendices

## Compensation of Expert

| Compensation of Expert | Compensation of Expert |
| --- | --- |

- Houlihan Lokey is receiving a professional fee, reflected in its Engagement Letter, in the total amount of $2,500,000, for conducting the expert analyses and opinions contained in the expert reports provided by Houlihan Lokey personnel.  No portion of those fees is contingent upon any conclusions reached by Houlihan Lokey or the outcome of the Chapter 11 proceedings

**<u>Exhibit C</u>**

**Expert Report of Raymond T. Lyons, Esq., dated October 18, 2013**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                                        )
In re:                                              )          Case No. 12-12020 (MG)
                                                        )
RESIDENTIAL CAPITAL, LLC, et. al.,    )          Chapter 11
                                                        )
                              Debtors.              )          Jointly Administered
_____)


**EXPERT REPORT OF RAYMOND T. LYONS, ESQUIRE**


**Dated:  October 18, 2013**

**Page**

I.     THE OPINION OF RAYMOND T. LYONS, ESQUIRE ................................................. 1

     A.      THE EXPERT ................................................................................................. 1

         1.      Retention ................................................................................. 1

         2.      Qualifications ....................................................................... 1

         3.      Limitations ............................................................................ 2

     B.      ORGANIZATION OF THE OPINION .................................................. 2

     C.      THE INVESTIGATION ............................................................................ 2

     D.      METHODOLOGY OF EXPERT AND SUMMARY OF CONCLUSIONS ......... 3

         1.      Legal Conclusions ............................................................... 3

         2.      Citations to Examiner's Report ........................................ 3

         3.      Summary of Conclusions .................................................. 4

     E.      DETAILED REVIEW OF EXPERT OPINION REGARDING
              SETTLEMENT VALUES OF POTENTIAL ESTATE CLAIMS ........................ 6

         1.      Claims of GMAC Mortgage and ResCap Relating To The MMLPSA,
                   Pipeline Swap, MSR Swap, and Broker Agreement .................................. 8

              a.      Misallocation of Net Revenues on Loans Brokered by GMAC
                      Mortgage ................................................................... 8

              b.      Failure to Pay Value of Purchased MSRs and Correspondent
                      Loan MSRs to GMAC Mortgage under the MSR Swap .............. 15

              c.      Representation and Warranty Liabilities Under the 2001 and
                      2006 MMLPSAs .......................................................... 22

              d.      Application of the Pipeline Swap To The "Funding To Sale"
                      Period And To Ally Bank-Originated Loans ................................ 24

              e.      Failure To Obtain Independent Director Approval ..................... 27

         2.      Government Settlements ................................................................... 28

         3.      Causes of Action Relating To Use And Allocation Of ResCap's Tax
                  Attributes ................................................................................. 34

| | 4. | Minnesota Insider Preference Claims | 41 |
|---|---|---|---|
| | 5. | Ally Bank Transactions | 45 |
| | | a. 2006 Bank Restructuring | 45 |
| | | b. 2008 Bank Transaction and 2009 Bank Transaction | 49 |
| | 6. | ResCap's Directors And Officers | 51 |
| | 7. | Single Entity Theories Of Liability | 54 |
| | | a. Piercing The Corporate Veil | 54 |
| | | b. Substantive Consolidation | 56 |
| | 8. | Debt Re-characterization | 58 |
| | 9. | Equitable Subordination And Equitable Disallowance | 59 |
| | 10. | Constructive Trust Claim | 61 |
| | 11. | Prepetition Asset Sales | 62 |
| | 12. | Financing Affiliate Transactions | 66 |
| F. | | VALUE OF SETTLED ESTATE CAUSES OF ACTION | 70 |
| G. | | OPINION REGARDING PROPOSED POST-PETITION TRANSACTIONS AND AGREEMENTS | 72 |
| H. | | OPINION REGARDING SETTLEMENT VALUES OF POTENTIAL THIRD PARTY CLAIMS | 72 |
| | 1. | Third Party Claims Against AFI | 73 |
| | | a. RMBS Claims | 73 |
| | | b. Fraudulent Transfer Claim | 79 |
| | 2. | Third Party Claims Against Ally Securities | 81 |
| | 3. | Third Party Claims Against Ally Bank | 84 |
| | 4. | Unsecured Noteholder Causes Of Action | 86 |
| | | a. Tortious Interference Under 2005 Indenture | 86 |

ii

b.      Claims Related To The 2006 Bank Restructuring ........................ 88

5.      Junior Secured Noteholder Causes Of Action .......................................... 92

I.      OPINION REGARDING CONSIDERATION FOR RELEASES AND
CONCLUSION REGARDING ALLOCATION OF SETTLEMENT FUND..... 93

II.     EXHIBIT A................................................................................................................... 1

# I.    THE OPINION OF RAYMOND T. LYONS, ESQUIRE

## A.    THE EXPERT

### 1.    Retention

I prepared, with the assistance of Fox Rothschild LLP ("Fox Rothschild"), this opinion (the "Opinion") at the request of (a) White & Case LLP and Milbank, Tweed, Hadley & McCloy LLP, co-counsel to (i) the Ad Hoc Group of Junior Secured Noteholders ("Ad Hoc Group") of the 9.625% Junior Secured Guaranteed Notes due 2015 ("JSNs") and (ii) UMB Bank, N.A. as Trustee for the JSNs ("Notes Trustee"), and (b) Akin Gump Strauss Hauer Feld LLP, as special litigation counsel to the Trustee relating to the Chapter 11 proceedings of Residential Capital, LLC ("ResCap", the "Company" or the "Debtors") in the United States Bankruptcy Court for the Southern District of New York, Case No. 12-12020. I was asked to provide my opinion as to the reasonable settlement value of each of the claims identified in the Report of Arthur J. Gonzalez, Esquire, As Examiner, released June 26, 2013 ("Examiner's Report"). I have also been asked to give my opinion as to the reasonable allocation of the $2.1 billion dollar settlement fund provided by AFI among the various settled claims. I and Fox Rothschild are being compensated at Fox Rothschild's usual and customary hourly billing rates.

### 2.    Qualifications

Prior to joining Fox Rothschild on July 1, 2013, I served as a United States Bankruptcy Judge for the District of New Jersey for over 14 years. I conducted settlement conferences in cases assigned to me and for my colleagues in the District of New Jersey. While on the bench I was authorized by the Court of Appeals for the Third Circuit to serve as mediator in the U.S. Bankruptcy Court for the District of Delaware. Among the matters I mediated in Delaware was the plan of reorganization for Washington Mutual, Inc. involving twenty-two classes of claims and interests and $7 billion in distributions.

I completed the forty-hour Bankruptcy Mediation Training program in the first class conducted by the American Bankruptcy Institute and St. John's University School of Law. I am a member of the Dispute Resolution Section of the New Jersey State Bar Association and the Justice Marie L. Garibaldi ADR Inn of Court. I am on the Roster of Mediators for the American Arbitration Association (AAA), the CPR Panel of Distinguished Neutrals for the International Institute For Conflict Prevention and Resolution (CPR), and the Panel of Arbitrators and Mediators for Federal Arbitration, Inc. (FedArb). I am also on the court-annexed Panel of Mediators in the U.S. Bankruptcy Courts for the Southern District of New York, the Eastern District of New York, the District of Delaware and the Western District of Pennsylvania.

Before taking the bench, I was in private practice for more than 25 years as a commercial lawyer with a concentration in chapter 11 bankruptcy. I taught banking law as an adjunct professor at Seton Hall University School of Law. I received my J.D. from Seton Hall University School of Law and my LL.M. in tax law from New York University School of Law.

Other than the opinions that I have written in my position as a United States Bankruptcy Judge, I have not authored any publications in the last 10 years. I have not testified as an expert either at trial or by deposition in the last four years.

### 3.    Limitations

The opinions expressed herein represent my reasonable professional judgment as to the matters expressed herein, based upon the facts presented in the Examiner's Report and are not guarantees that a court would reach any particular result. In fact, the opinion of settlement amount for each claim is not intended to predict the legal outcome of the claim but rather to estimate the settlement value based on the possibility of various alternative legal outcomes.

My Opinion is limited to the matters stated herein. No opinion is implied or may be inferred beyond the matters expressly stated. The Opinion is given as of the date hereof, and I expressly disclaim any obligation to update or supplement my opinions contained herein to reflect any facts or circumstances that may hereafter come to my attention or any changes in laws which may hereafter occur.

### B.    ORGANIZATION OF THE OPINION

For ease of reference I have organized the Opinion using, for the most part, the same sections as Section I of the Examiner's Report. Section A sets out the background relating to my employment as the expert, my qualifications, the scope of my retention and opinion, and the limitations of the Opinion. Section B discusses the Organization of the Opinion. Section C explains the Examiner's investigation. Section D explains the methodology employed in arriving at my Opinion regarding the settlement values of the potential claims of the estate and the potential claims of third parties and a summary of my Opinion. Section E follows the outline of potential Estate Causes of Action as set forth in Summary Section I.E of the Examiner's Report, and sets forth my opinion regarding the likely settlement amount of each claim. Section F contains a chart of all Estate Causes of Action identified by the Examiner with my opinion on the reasonable settlement value of each claim. Section G relates to the proposed post-petition transactions and agreements. Section H follows the outline of potential third party claims as set forth in Summary Section I.H of the Examiner's Report and contains my opinion concerning the reasonable settlement value of each of those claims. Section I contains my opinion regarding the reasonable allocation of the $2.1 billion dollar settlement fund provided by AFI among the various settled claims.

### C.    THE INVESTIGATION

The Examiner did an evaluation of the facts, including review and examination of almost nine million pages of documents produced by twenty-three different parties, ninety-nine formal interviews of eighty-three witnesses, sixty-six meetings with interested parties, and review of multiple written submissions from a dozen parties. Unless specifically noted, I have relied on the factual findings of the Examiner in reaching my opinion regarding the settlement values of the claims identified by the Examiner.

2

To the extent that a potential claim identified by the Examiner in his report referenced a pertinent contract or order, such contract or order was reviewed to confirm the Examiner's interpretation of the terms and effect of that contract or order. A list of the documents that were reviewed in order to render my Opinion is attached hereto as Exhibit A.

## D.       METHODOLOGY OF EXPERT AND SUMMARY OF CONCLUSIONS

To render my Opinion, the Examiner's Report has been carefully reviewed in full to assign a settlement value to each of the potential causes of action identified in the Examiner's Report and to allocate the $2.1 billion settlement fund to those settled claims. Importantly, as noted by the Examiner, given the expansive evidence and data reviewed and the nature of sometimes unsettled legal issues raised by many of the claims, the Examiner's assessment of the likelihood of success of each cause of action is inherently imprecise. The Examiner's Report contains nuanced conclusions and therefore, the Examiner cautions against applying probabilities or mathematical models to the results contained in his report.

I have heeded this caution and have applied a non-formulaic, nuanced approach to determining the reasonable settlement value of each claim and the allocation of the $2.1 billion settlement fund provided by AFI among the various settled claims. Although under the absolute priority rule, I could have allocated the settlement first to secured claims such as the JSNs, and second to unsecured claims, instead I made allocations pro rata based on the reasonable value of each of the claims. I did so based on my 25 years of experience as a practitioner, my 14 years of experience as a U.S. Bankruptcy Judge for the District of New Jersey, as well as my experience as a mediator. When appropriate, I have provided more than one method in arriving at my opinion regarding the reasonable settlement amount of a claim. For example, I applied a discounting method focused on the likely outcome or merits of a particular issue and my perception of the motivation of the parties to arrive at a reasonable settlement value of the cause of action. I also applied a likely settlement negotiation scenario to arrive at a settlement value from a second approach. If the settlement value of a particular claim was less than or equal to 1% of the gross value of the $2.1 billion dollar settlement fund provided by AFI (approximately $21 million), I deemed that claim to be not material for purposes of allocating the $2.1 billion settlement fund to the claims.

### 1.       Legal Conclusions

I reviewed each of the legal conclusions of the Examiner and I generally reviewed the statutory and case law cited by the Examiner in support of each potential claim discussed in the Examiner's Report. Unless specifically noted, I agree with and rely on the legal conclusions reached by the Examiner as set forth in his Examiner's Report in rendering my Opinion.

### 2.       Citations to Examiner's Report

For each claim, I have listed the references to relevant information in the Examiner's Report. However, for ease of reading, for the most part I have not pin cited the reference to the Examiner's Report. Unless specifically noted, I agree with the Examiner and rely on the factual conclusions reached by the Examiner as set forth in his Examiner's Report in rendering my Opinion. In addition,

the capitalized terms not defined in this Opinion shall have the meaning as defined in the Examiner's Report and the Appendix thereto.

### 3.    Summary of Conclusions

After reviewing each of the causes of action identified in the Examiner's Report, in my opinion the reasonable settlement value of the Estate Causes of Action is $1,920.0 million and the reasonable settlement value of the Third Party Claims is $480 million for a total reasonable settlement value of all claims and causes of action of $2,400.0 million.  In my opinion the settlement fund of $2.1 billion to be paid by AFI should be allocated to the reasonable settlement value of each claim *pro rata*.

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*)[1] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| ***ESTATE CAUSES OF ACTION*** | | | | | |
| Breach of Contract for Misallocation of Net Revenues on Loans brokered by GMAC | $520.5 | **$268.2** | **51.5%** | **$234.6** | **45.1%** |
| Breach of Contract for Failure To Pay Value of Purchased MSRs | $1,725.0 | **$387.2** | **22.4%** | **$338.8** | **19.6%** |
| Preferential Transfer relating to DOJ/AG Consent Order | $109.6 | **$60.0** | **54.7%** | **$52.5** | **47.9%** |
| Preferential Transfer relating to 2012 Letter Agreement and A&R Servicing Agreement | $48.4 | **$32.0** | **66.1%** | **$28.0** | **57.9%** |

---

[1] Zeros are omitted for any settlement value that does not meet my threshold for materiality ($21 million).

| Claims | Potential Damages (in millions) | Reasonable Settlement Amount (in millions)[1] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (in millions) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Breach of contract regarding the First 2009 Tax Allocation Agreement | $1,770.0 | $713.7 | 40.3% | $624.5 | 35.3% |
| Minnesota Insider Preference Claims | $566.0 | $328.9 | 58.1% | $287.8 | 50.8% |
| Fraud related to 2006 Bank Restructuring | $569.0 | $130.0 | 22.8% | $113.8 | 20.0% |
| | | | | | |
| **TOTAL** | | $1,920.0 | | $1,680.0 | |
| ***THIRD PARTY CAUSES OF ACTION*** | | | | | |
| Third Party Claims against AFI | | | | | |
| a. RMBS Claims, including veil-piercing, control person liability, aiding and abetting fraud | $20,000.0[2] | $480.0 | 2.4% | $420.0 | 2.1% |
| | | | | | |
| ***GRAND TOTAL*** | | $2,400.0 | | $2,100.0 | |

[2] The Examiner did not quantify the potential damages for the Third-Party RMBS Claims against AFI.

**E.    DETAILED REVIEW OF EXPERT OPINION REGARDING SETTLEMENT VALUES OF POTENTIAL ESTATE CLAIMS**

In reaching an opinion concerning the likely settlement value of each of the Estate Causes of Action, I have considered a number of factors, including the factors relevant in determining whether the settlement is fair and equitable, the *Iridium* factors.[3]

Bankruptcy Rule 9019 provides that after notice and a hearing, "the court may approve a compromise or settlement."  In determining whether to approve a settlement, the court must determine whether the settlement is "fair, equitable and in the best interests of the estate."[4]  To determine whether a proposed compromise is fair and equitable, the court must review all facts necessary to (i) determine the probabilities of success should the claim be litigated, (ii) estimate the complexity, expenses and duration of litigating the claims, (iii) evaluate the possible difficulties of collecting on a judgment and all other factors relevant to an assessment of the settlement.[5]

In *Iridium*, the Second Circuit enumerated seven factors that should be evaluated in determining whether a settlement is fair and equitable and should be approved under Bankruptcy Rule 9019. Those factors are:

- The balance between the litigation's possibility of success and the settlement's future benefits;
- The likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;
- The paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;
- Whether other parties in interest support the settlement;
- The competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;
- The nature and breadth of releases to be obtained by officers and directors; and
- The extent to which the settlement is the product of arm's length bargaining.[6]

I have considered each of these factors, as relevant, in determining the likely settlement amount of each claim identified by the Examiner.  For all of the Estate Causes of action I assumed that collection is not a significant factor.

---

[3] *Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)(citing *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006); *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992).
[4] *TMT Trailer Ferry,* 390 U.S. at 424-25.
[5] *Id*.
[6] *Iridium*, 478 F.3d at 462.

In arriving at the likely settlement amount for each of the potential claims identified by the Examiner, I have also considered the likely motivation of the particular litigants regarding the decision to settle the claims. Estate causes of action are likely to be pursued by a fiduciary such as a liquidating trustee or a committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to reduce litigation costs and expedite distributions to creditors.

In assessing the likely settlement value of a potential claim identified by the Examiner, I have also considered the state of the law post-*Stern v. Marshall.*[7] There are many procedural hurdles that attend bankruptcy litigation, including the constitutional authority of a bankruptcy judge to render a final judgment in a state law contract dispute or a tort claim, federal statutory claims such as securities law claims, or an avoidance action under the Bankruptcy Code or state law such as a preference or a fraudulent transfer action. In addition, litigation of estate claims raises procedural issues of withdrawal of the reference and demands for a jury trial (the "Procedural Factors"). The Supreme Court has granted certiorari in the *Bellingham* case,[8] a Ninth Circuit case holding that fraudulent conveyance claims against non-creditors cannot be adjudicated by non-Article III judges. Thus, the Supreme Court may finally resolve these issues and offer both lower Article III courts and bankruptcy courts further guidance on the scope of a bankruptcy judge's authority.

Although *Stern v. Marshall* initially resulted in litigants requesting the withdrawal of the reference resulting in delay of the proceedings, the District Court for the Southern District of New York attempted to ameliorate these procedural roadblocks by entry of its Amended Standing Order of Reference on January 31, 2012. The Standing Order provides that if a bankruptcy judge or district judge determines that the entry of a final order or judgment by the bankruptcy judge would not be consistent with Article III of the United States Constitution in a particular proceeding referred under the standing order and determined to be a core matter, the bankruptcy judge shall hear the proceeding and submit proposed findings of fact and conclusions of law to the district court unless otherwise ordered by the district court. This procedure is the same procedure currently prescribed by 28 U.S.C. § 157(c) relating to non-core matters. Nevertheless, parties must still evaluate which is their preferred forum and take steps they deem in their best interest.

Also, the parties will have the right to a jury trial in many of the estate claims identified by the Examiner such as contract disputes and securities law claims. It is anticipated that some parties may request a jury trial. Many of the procedural issues pertaining to bankruptcy litigation will be present in the estate claims identified by the Examiner. They add complexity, risk, uncertainty, delay and expense to the litigation which must be factored into the evaluation of a reasonable settlement amount.

---

[7] 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011).
[8] *Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F. 3d 553 (9th Cir. 2012).

1.    **Claims of GMAC Mortgage and ResCap Relating To The MMLPSA, Pipeline Swap, MSR Swap, and Broker Agreement**

   a.    *Misallocation of Net Revenues on Loans Brokered by GMAC Mortgage*

**Examiner's Report References:**

Section I.E pages I-8 to I-9

Section V.B.6 pages V-123 to V-154

Section VII.L pages VII.L-64 to VII.L-66

**Description:**

The implementation of the agreements between GMAC Mortgage and Ally Bank concerning the allocation of revenues on loans GMAC Mortgage brokered to Ally Bank between January 1, 2009 and April 30, 2012.

**Background:**

In 2008, ResCap was facing severe liquidity issues, while Ally Bank maintained excess liquidity and was searching for ways to grow its business. As a solution to those issues, in March 2008, ResCap and Ally Bank personnel began work on the "Brokering Consumer Loans to Bank" project. Prior to the project, the Bank's ability to purchase loans originated by GMAC Mortgage were subject to the "250.250 exception" limit which capped it at 50% of GMAC Mortgage's preceding twelve-month rolling production. Loans brokered to Ally Bank by GMAC Mortgage and then originated by Ally Bank would not be subject to this limit. Under the parties' then-existing agreement, Ally Bank recognized as revenue only the "net interest carry" for the period the loan was on Ally Bank's books. GMAC Mortgage realized the benefit of any points or other origination fees charged.

Contemporaneous e-mails among Albert Celini (an Ally Bank official and its "Sponsor" of the Brokering Consumer Loans to Bank Project), his subordinate Debra Scott (Bank Project Leader), and Matthew Whitehead (a ResCap representative) reflect a mutual understanding that the parties intended to maintain the same economics that had been in place for loans sold under the 250.250 program. The parties' agreement is further reflected in a slide presentation dated November 19, 2008, entitled "Brokering Consumer Loans 2 Bank Project (BCL2B), Legal Entity Revenue, Expense, and Broker Fee Proposal" (the "BCL2B Presentation"). The BCL2B Presentation states, among other things, that Ally Bank would "recognize" origination income, overage/shortage or pricing subsidies, broker fees, and underwriting expense, these items would be deferred and capitalized, and, upon the sale of the loan, their resulting economic effects would be transferred to GMAC Mortgage through the Master Mortgage Loan Purchase and Sale Agreement ("MMLPSA") and Pipeline Swap. Ally Bank would retain net interest carry, and would retain the mortgage servicing rights ("MSRs") upon sale of the loan. From an accounting standpoint, the deferred loan

8

origination fees and expenses, including broker fees, was governed by Statement of Financial Accounting Standards No. 91 ("FAS 91").

To achieve this goal on the loans brokered to Ally Bank by GMAC Mortgage, origination fees (*e.g.*, discount points) would be paid by the borrower to Ally Bank, and Ally Bank would then defer and capitalize that income. This would reduce the cost basis of the loan, which, under the Pipeline Swap and MMLPSA, would in turn reduce the price charged to GMAC Mortgage when it purchased the loan from GMAC Bank. Similarly, any brokerage fee paid by GMAC Bank to GMAC Mortgage would also be deferred and capitalized, which, under the Pipeline Swap and MMLPSA, would increase GMAC Mortgage's purchase price of the loan. In this way, Ally Bank was able to recoup the brokerage fees.

On November 20, 2008, GMAC Mortgage and its subsidiary, Ditech, LLC, as brokers and GMAC Bank, predecessor to Ally Bank, entered into the Broker Agreement, which is the only new written agreement into which the parties entered in connection with BCL2B. The Broker Agreement does not specify the fee that is to be paid to GMAC Mortgage for acting as a broker. However, Celini stated that any change in the pre-Broker Agreement economics (or any change in the accounting that required such a change) would have required "a change in affiliate agreements" then in place.

GMAC Bank and GMAC Mortgage initially allocated revenue and expense as agreed when they implemented the Broker Agreement. That is, from January 1, 2009 to July 31, 2009 (when Ally Bank elected an accounting change discussed below), Ally Bank realized only the net interest carry on the loans, while also retaining the MSRs on the increased volume of loans passing through Ally Bank by virtue of avoiding the 250.250 limits. GMAC Mortgage, through the impact of FAS 91 deferrals, continued to reap the benefit of points and other origination-related revenues, as well as the impact of capitalized expenses. The accounting for sample loans from this period produced by the Debtors confirms the above-described treatment, and matched the sample loan-level accounting provided by the BCL2B Presentation. For the period January 1, 2009 through July 31, 2009, the net benefit to GMAC Mortgage from adjusting the purchase price of the brokered loans by the FAS 91 deferrals was $47.2 million. In other words, GMAC Mortgage received net revenue of $47.2 million on the loans that it brokered to GMAC Bank under the Broker Agreement during this period.

Effective August 1, 2009, Ally Bank implemented an accounting change to convert to fair-value accounting. As a consequence of this accounting change, beginning August 1, 2009, rather than realizing the benefit of points and the gain on sale as the parties had agreed (and as it had received under the 250.250 program and for third-party brokered loans), GMAC Mortgage instead received the cost-based, below market broker fee (which, since it was no longer capitalized, GMAC Mortgage did not have to repay to Ally Bank when it purchased the loan). However, GMAC Mortgage had agreed to such a fee with the understanding that, whatever the fee charged, the fee would be a "wash" because of the FAS 91 deferrals, and with the expectation that it would continue to receive the benefit of the FAS 91 deferrals. The Examiner illustrated the changed allocation of revenues resulting from Ally Bank's August 1, 2009 change to fair-value accounting as follows:



**EXHIBIT V.B.6.d**
**Accounting for Loans Brokered by GMAC Mortgage to the Bank**
**Pre and Post Fair Value Election**

▢ GMAC Mortgage     ▮ Ally Bank

| | Pre-Fair Value Election | Post-Fair Value Election |
|---|---|---|
| Points collected | GMACM | BANK |
| Lender paid closing costs | GMACM | BANK |
| "Day one" gain | GMACM | BANK |
| Net interest carry | BANK | BANK |
| Gain on sale to third party | GMACM | GMACM |
| Broker fee (at cost) | N/A | GMACM |

*Source: Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505].*

There appears to be no evidence that this change in the underlying economics was understood and agreed to by GMAC Mortgage, or that the parties even recognized at the time that the fair-value election would have the effect described above, which was to allow Ally Bank to keep a significant portion of the gain on sale while still assuming no representation and warranty exposure or hedge exposure, and while paying a below-market broker fee in the bargain. Instead, the matter appears to have come to light in December 2011 when Adam Glassner, Ally Bank Senior Managing Director, noticed "the revenue recognition by legal entity was more in the bank and less in ResCap," which he thought erroneous in light of his understanding that GMAC Mortgage was supposed to receive the entire gain on sale.

Upon this discovery, Glassner reached out to James Whitlinger, then Chief Financial Officer, Mortgage Operations, ResCap, and James Young, Chief Financial Executive, Ally Bank. Ally Bank and AFI began a review into the appropriate allocation of revenue under the Broker Agreement, MMLPSA, and Pipeline Swap. Ally Bank personnel initially concluded that the intent of the Brokering Consumer Loans to Bank Project was that Ally Bank was not to receive gain on sale revenue, yet Ally Bank was currently recording a piece of gain on sale.

Despite the initial reactions which favored GMAC Mortgage retaining the entire gain on sale, KPMG (retained by AFI General Counsel William Solomon on AFI's behalf) and an Ally Bank investigation both concluded that the accounting methods employed by Ally Bank after August 1, 2009 were consistent with the agreements between the parties. However, KPMG's report does not acknowledge the BCL2B Presentation's explicit references to FAS 91 deferrals of fees and expenses and does not address the sample accounting provided with the BCL2B Presentation or the fact that it aligns with the accounting treatment implemented from January 1, 2009 to July 1, 2009 by those who had just negotiated the broker arrangement, but not with the accounting treatment implemented after Ally Bank's fair-value election.

Joe Cortese (for Ally Bank) and Cathy Dondzila (for ResCap) also prepared virtually identical, internal accounting memos concluding that the revenue recognition for January 1, 2009 to July 31, 2009, "was done in error." Interestingly, the memos state that there were "conflicting

corporate evidential documents" and recognize that there was some support in the documents that Ally Bank was not to receive any gain on sale revenue.    Importantly, the accounting method employed during January 1, 2009 through July 31, 2009 was in accordance with GAAP, and neither memo claimed otherwise.

Subsequently, in March 2012 and at the insistence of Ally Bank, GMAC Mortgage paid Ally Bank $51.4 million, representing the $47.2 million received for the January 1, 2009 to July 31, 2009 time period, plus interest.  From the August 1, 2009, fair value election through April 2012, Ally Bank retained additional revenues that would have been allocated to GMAC Mortgage under the revenue allocation implemented from January 1, 2009 through July 31, 2009, illustrated by the Examiner as follows:

EXHIBIT V.B.6.g

**Amounts Retained by Ally Bank But Owed to GMAC Mortgage Under the Revenue Allocation Implemented Between January 1, 2009, and July 31, 2009**

August 2009 – April 2012

*($ in Thousands)*

| | 2009 | | 2010 | | 2011 | | YTD April 2012 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Loan discount (net, borrower and lender paid) | $ | 144,503 | $ | 40,461 | $ | 10,540 | $ | 513 | $ | 196,017 |
| Loan discount (Capital Markets Required Price) | | 209 | | 113,920 | | 158,852 | | 137,775 | | 410,756 |
| Non-broker activity | | 853 | | 178 | | 635 | | - | | 1,667 |
| Loan discount income | | 145,566 | | 154,559 | | 170,028 | | 138,288 | | 608,440 |
| Loan processing fee income | | 44,268 | | 47,419 | | 46,709 | | 12,267 | | 150,663 |
| Pricing adjustments | | (7,551) | | (9,064) | | (9,831) | | (3,816) | | (30,262) |
| Overage/shortage | | 17 | | - | | - | | - | | 17 |
| Origination fee | | 16,801 | | (666) | | (13) | | (17) | | 16,104 |
| Broker fee expense | | (78,089) | | (64,543) | | (55,622) | | (30,416) | | (228,670) |
| Total FAS 91 deferral at origination for the period January 1, 2009 to YTD April 2012 | $ | 121,010 | $ | 127,704 | $ | 151,270 | $ | 116,306 | $ | 516,291 |
| FAS 91 deferral at origination for the period January 1, 2009 to July 31, 2009 | | (47,180) | | - | | - | | - | | (47,180) |
| Total amount retained by Ally Bank but owed to GMAC Mortgage under the revenue allocation implemented from Jan. 1, 2009 – July 31, 2009 [1] | $ | 73,830 | $ | 127,704 | $ | 151,270 | $ | 116,306 | $ | 469,111 |

[1]  Under this allocation, Ally Bank receives interest carry only and GMAC Mortgage receives the effect of income and expense items that would have been deferred under FAS 91 before the fair value election consistent with the original accounting allocation for the period January 1, 2009 through July 31, 2009.

Source:    Exam Requested Loan Origination Revenue [ALLY_0402447]; Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505].

As illustrated above, from August 2009 to April 2012, Ally Bank retained a further $469.1 million that would have been paid to GMAC Mortgage had the revenue allocation originally agreed to remain in place.  This amount is in addition to the $51.4 million paid by GMAC Mortgage to Ally Bank in March 2012 for amounts received by GMAC Mortgage for the period January 1, 2009 through July 31, 2009.

**Examiner's Analysis and Conclusions:**

1.      The Examiner concluded that it is likely that Ally Bank's August 1, 2009 conversion to fair-value accounting resulted in a breach by Ally Bank of the parties' agreement, documented in the MMLPSA and Pipeline Swap and in the parties' communications and documentation concerning the Brokering Consumer Loans to Bank Project and in their subsequent conduct from January 1, 2009 to July 31, 2009.

2.      The Examiner concluded that it is likely that GMAC Mortgage would prevail on a contractual claim that the allocation of revenues from January 1, 2009 to July 31, 2009 was proper, and that it is therefore entitled to payment of the revenues misallocated to Ally Bank from and after August 1, 2009.

3.      The Examiner concluded that GMAC Mortgage's contract claim under the MMLPSA, Pipeline Swap, and the parties' agreement about the combined effect of those contracts is estimated at $520.5 million, consisting of: (i) $51.4 million, representing return of GMAC Mortgage's March 2012 payment to Ally Bank for amounts received by GMAC Mortgage between January 1, 2009 and July 31, 2009; and (ii) $469.1 million in additional revenues (net of expenses including the below-market broker fee) that GMAC Mortgage would have received had the parties' agreed-upon revenue allocation been respected from August 1, 2009 to April 30, 2012.

4.      The Examiner concluded that although it is unclear which interest rate would apply to these circumstances, the pertinent rate (possibly 9% per annum under New York law or 5% above the Federal Reserve discount rate under Delaware law) would be applied to the $51.4 million component repaid to Ally Bank from the repayment date, and to the $469.1 million in revenues retained by Ally Bank for the period August 1, 2009 through April 30, 2012, from the date on which each of the constituent portions of those revenues was due to GMAC Mortgage (*i.e.*, the sale date of the pertinent loan).

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a bankruptcy fiduciary such as a trustee or committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to expedite distributions to creditors.  All of the procedural hurdles that attend bankruptcy litigation would be present in this case including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law contract dispute, (ii) withdrawal of the reference, and (iii) demand for a jury trial.  In addition, all litigation carries risk uncertainty and expense.  As a result, it is highly likely that any settlement would reflect a discount of 20% from the face value of the claim.

The Examiner concludes that GMAC Mortgage's claim would be predicated on the MMPLSA (governed by Delaware law), and the Pipeline Swap (governed by New York law), and

12

the parties' agreements reflected in the documentation of the BCL2B. The possible application of the law of two different states would increase the complexity of this litigation and likely allow either side to argue for the application of the law most beneficial to it on a particular issue. In addition, the MMPLSA contains a choice of venue provision calling for resolution of related disputes in the United States District Court for the District of Delaware, which would allow for even more preliminary jurisdictional and venue related disputes than ordinarily present in bankruptcy litigation.

Although the Examiner concludes that GMAC Mortgage would likely prevail on a claim for breach of the parties' agreement, he concedes it is possible that the contemplated allocation of revenues was not mandated by the terms of the 2008 MMLPSA and Pipeline Swap. If so, GMAC Mortgage would need to prove that the contemporaneous Brokering Consumer Loans to Bank Project documentation and the parties' ensuing implementation of the arrangement constituted a written modification of those agreements to provide for the contemplated revenue allocation. Because the 2008 MMLPSA requires that any modification include a signed writing, GMAC Mortgage would need to rely upon the case law that permits modifications to agreements even if such modifications do not comply with the terms set forth for modifications in the original agreement. Although permissible, pursuing a claim based upon an alleged modification to an agreement that does not comply with that agreement's requirements for modifications is substantially more difficult than pursuing a claim based upon a straightforward breach of the agreement's terms. For example, in *Continental Insurance Company v. Rutledge & Company, Inc.,*[9] which the Examiner cites for the general proposition that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision, the court refused to enforce an alleged non-written contractual modification based on the parties' prior course of dealing because the parties' prior course of conduct demonstrated that they did, in fact, amend the agreement in writing.[10] Here, the parties similarly amended and restated the MMLPSA, in writing, on at least June 1, 2007 and July 1, 2008. Thus, even though the Examiner concludes that GMAC Mortgage would likely prevail on such a claim, the claim is not without risk. Nonetheless, the parties' conduct before and after the implementation of the BCL2B and the limited scope of the KPMG Report (which does not cover the accounting for the transaction prior to the fair value election), would likely overcome AFI's arguments in this regard. I estimate that the existence of disputed facts, associated risk, and likely need for substantial discovery to develop and resolve those disputed facts, would further reduce the settlement value of the claim by 30%.

Even though AFI would likely dispute the claim, the magnitude of the claims (at $520.5 million) would likely be a strong motivating factor for AFI to settle. In addition, the likelihood of success identified by the Examiner would also incline AFI toward a substantial settlement. Legal fees and expenses in prosecuting and defending the claim would run into the tens of millions of

---

[9] 750 A.2d 1219 (Del. Ch. 2000).

[10] To the extent the Pipeline Swap, which is governed by New York law, needs to be amended or modified, New York law similarly permits oral modifications to written contracts that purport to prohibit oral modifications, albeit under a slightly different standard. *See O'Reilly v. NYNEX Corp.*, 693 N.Y.S.2d 13 (N.Y. App. Div. 1999); *Rose v. Spa Realty Assoc.*, 366 N.E. 2d 1279 (N.Y. 1977)); *Honeywell Int'l. Inc. v. Air Prods & Chems, Inc.*, 872 A.2d 944 (Del. 2005) (applying New York law).

dollars, but pale in comparison to the magnitude of the claims. However, the MMPLSA contains a fee-shifting provision in § 8.13, which adds additional litigation risk.

The Examiner noted that there is "ample fodder" for an argument that the initial reaction of those reviewing the revenue allocation issue in 2011 was squelched, and that the resulting reports in 2012 labeling the initial allocation in GMAC Mortgage's favor from January 1, 2009 to July 31, 2009 an accounting error, was the product of a desire to avoid restating Ally Bank's financials and the regulatory scrutiny that would have ensued, rather than a fair and objective attempt to resolve the matter. I agree with that conclusion, and if developed through discovery, this argument would provide GMAC Mortgage with a compelling story of cover-up and wrongdoing that could significantly impact the fact finder's decision and further incentivize AFI to settle.[11]

As the Examiner notes, under either New York or Delaware law, GMAC Mortgage would be entitled to prejudgment interest if successful on its contractual claim for misallocation of net revenues on loans it brokered to Ally Bank. The potentially applicable interest rates are not insignificant (9% under New York Law, and 5% above the Federal Reserve discount rate under Delaware law), and would amount to tens of millions of dollars per year when applied to the total $520.5 million claim. Interest would run on the $51.4 million payment from GMAC Mortgage from the date of that payment in March 2012. Interest on the $469.1 component of the claim for amounts that GMAC Mortgage should have received between August 1, 2009 and April 30, 2012 would ordinarily run from the date on which each of the constituent portions of those revenues was due to GMAC Mortgage. Given the significant amounts involved, the parties would likely submit expert calculations of the interest due on the $469.1 million component of the claim, but it is also possible that a court, applying New York law, would select a single reasonable intermediate date or, if it could not determine a single reasonable intermediate date, to fix interest from the date of commencement of the action.[12] However, cases rarely settle for full value of the claim and less frequently settle for full value of the claim, plus interest. I estimate that the likelihood of interest at a rate of between 5.5% and 9% per annum for a period of, as to some portions of the claim, up to four years, adds 15% to the settlement value of the claim.

Under these circumstances, I would expect plaintiff's initial settlement demand to be at $540 million, approximately 90% of the gross amount of the claim (of approximately $600 million, including interest and attorneys' fees), and defendant's initial offer at $90 million, approximately 15% of the claim. Taking into account the discounts and enhancements identified above, as well as the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate the fair and likely settlement of the misallocation of net revenues on loans brokered by GMAC Mortgage claim at $268.2 million.

---

[11]  The Examiner also notes that it may be possible to fashion a breach of fiduciary duty claim against ResCap officials who apparently succumbed to AFI's and Ally Bank's desires, but that such a claim faces a variety of substantial obstacles and would appear to be wholly redundant of the recoveries the Examiner concludes are already available to Debtors under contract law. Accordingly, the analysis of the claim for Misallocation of Net Revenues on Loans Brokered by GMAC Mortgage does not include any value for such a claim of breach of fiduciary duty.

[12]  *See, e.g.*, *Gelco Builders & Burjay Constr. Corp. v. Simpson Factors Corp.*, 60 Misc. 2d 492 (N.Y. Sup. Ct. 1969).

| | |
|---|---|
| Potential Damages: | $520.5 million |
| Reduced by: | |
| 20% inherent risk= | $416.4 million |
| 30% risk for possible pursuit of claim under modification theory= | $291.5 million |
| 20% risk based on disputed facts & GMAC Mortgage approval of allocation to be challenged= | $233.2 million |
| Increased By: | |
| 15%  for interest= | $268.2 million |

> **b.    *Failure to Pay Value of Purchased MSRs and Correspondent Loan MSRs to GMAC Mortgage under the MSR Swap***

**Examiner's Report References:**

Section I.E.b pages I-10

 Section III.F.3.c pages III-93

Section V.B.9 pages V-157 to V-184

Section V.B.12 pages V-199 to V-209

Section VII.L.2 pages VII.L-29

Section VII.L-66 to VII.L-73

**Description:**

The implementation, between September 2007 and April 2012, of the agreement between GMAC Mortgage and the federal savings bank now known as National Motors Bank FSB ("Old GMAC Bank")/Ally Bank concerning the application of the MSR Swap,[13] the 2010 Net Funding Schedule,[14] and the April 2011 MSR Swap Confirmation[15] to mortgage servicing rights (MSRs) (i)

---

[13] The "MSR Swap" means the ISDA Master Agreement between GMAC Mortgage and GMAC Bank, dated June 12, 2007, including the FMV Schedule thereto, dated August 31, 2007 and the Net Funding Schedule thereto, dated August 31, 2007.

[14] The "2010 Net Funding Schedule" means the Schedule to the ISDA Master Agreement (Net Funding) between GMAC Mortgage and GMAC Bank, dated July 1, 2010.

arising from loans Ally Bank purchased from correspondents and (ii) to MSRs that Ally Bank purchased from third parties.

**Background:**

When ResCap was formed, its subsidiaries GMAC Mortgage and RFC owned substantial portfolios of MSRs, which are contractual rights to service loans and receive the related fees and certain ancillary income. Since at least 2005, ResCap and Ally Bank had considered entering into an arrangement whereby Ally Bank would hold MSRs in order to, among other things, realize savings associated with no longer financing MSRs through regular lending channels. The Examiner observed that, "[f]rom early on, the personnel involved contemplated that the movement of the MSRs to Ally Bank would be accompanied by a 'total return swap,' transferring the MSRs' economics (positive and negative) back to ResCap in exchange for providing Ally Bank a fixed rate of return." Examiner's Report, at V-159.

The FDIC eventually approved Ally Bank's retention of MSRs on loans sold by Ally Bank to GMAC Mortgage, but repeatedly refused to approve Ally Bank's acquisition of existing MSRs from ResCap entities. In addition, the regulators opposed Ally Bank's retention of the MSRs without the protection of the MSR Swap, which went into effect on August 31, 2007. The original MSR Swap is documented on an ISDA Master Agreement and two Schedules – the FMV Schedule and the Net Funding Schedule, each dated August 31, 2007.

First, under the FMV Schedule, changes in the "FMV Change," defined as "FAS 156 mark to market for the Valuation Period as recorded by [Ally Bank] against the mortgage servicing right asset," were measured each business day. If the FMV Change was positive, then Ally Bank owed GMAC Mortgage the amount of the increase. Conversely, if the FMV Change was negative, GMAC Mortgage owed Ally Bank the amount of the decrease.[16]

Simultaneously, under the Net Funding Schedule, Ally Bank was required to pay GMAC Mortgage all the servicing income it received on its portfolio of MSRs, net of expenses incurred, which included the fees paid to GMAC Mortgage under the Original Servicing Agreement for Bank-owned MSRs. In return, the Net Funding Schedule required GMAC Mortgage to pay Ally Bank a "Funding Fee," which was a LIBOR-based fixed rate payment calculated on the value of the MSRs and servicing revenues. In essence, the combined effect was to transfer the MSRs' economics (positive and negative) to GMAC Mortgage under the FMV Schedule in exchange for a LIBOR-based fixed rate payment to Ally Bank under the Net Funding Schedule.

On its face, the FMV Schedule required that _all_ increases in the value of Ally Bank's mortgage servicing right assets flow to GMAC Mortgage, without distinguishing among MSRs arising from Bank-originated loans, purchased MSRs, and MSRs arising from purchased loans. In practice, however, Ally Bank paid to GMAC Mortgage only for increases related to Bank-originated

---

[15] The "April 2011 MSR Swap Confirmation" means the Confirmation of the Total Return Swap Relating to Mortgage Servicing Rights of Ally Bank, dated April 1, 2011.
[16] 2007 FMV Schedule, parts 6(a)(vii), 6(d) [RC00027822].

loans; it did not include increases related to MSRs arising from correspondent loans Ally Bank had purchased or to MSRs purchased separately. Instead, for correspondent loans, Ally Bank paid the capitalized value of excess servicing rights to GMAC Mortgage, but not the capitalized value of the MSRs themselves. The capitalization and purchase of new MSRs was always handled in this fashion from the August 2007 inception of the MSR Swap, despite the plain language of the FMV Schedule. In contrast, when GMAC Mortgage paid the LIBOR-based Funding Fee, the value of the newly recognized MSRs (including both MSRs on loans Ally Bank sold to GMAC Mortgage and MSRs that Ally Bank periodically purchased from third parties) was included in the amounts used to calculate the Funding Fee.

Although, individuals who had subsequent involvement with the MSR Swap, including Joe Cortese (for Ally Bank) and James Young (for ResCap), offered conflicting explanations for the parties' differing treatment of MSR capitalization under the MSR Swap, the Examiner concluded that none of these explanations perfectly explains the parties' actions.

In April 2011, the parties entered into the MSR Swap Confirmation, which covered the previously separately-documented FMV Swap and Net Funding Swap. After reviewing these changes, the Examiner concluded that the April 2011 MSR Swap Confirmation is, if anything, even clearer than the original MSR Swap and FMV Schedule that it applies not just to MSRs on bank-originated loans, but to all MSRs, including purchased MSRs and correspondent-loan MSRs.

ResCap's records indicate that Ally Bank paid GMAC Mortgage a total of $699.7 million over the duration of the MSR Swap from September 2007 through termination in April 2012. The Examiner illustrated the key financial elements of the MSR Swap, on an annual basis, as follows:

EXHIBIT V.B.12.b(1)—5
**MSR Swap – Key Financial Elements**
September 2007 – April 2012
($ in Millions)

| | 2007 | | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FMV change - interest rate [1] | $ | (0.0) | $ | (296.4) | $ | 257.8 | $ | 171.7 | $ | (430.0) | $ | (0.2) | $ (297.3) |
| FMV change - amortization [1] | | - | | – | | (117.9) | | (318.2) | | (364.1) | | (127.2) | (927.4) |
| Funding fees (LIBOR +) | | (0.4) | | (14.0) | | (9.1) | | (23.5) | | (59.6) | | (16.1) | (122.6) |
| Gain on new cap - MSR | | 8.6 | | 53.4 | | 77.6 | | 136.1 | | 61.6 | | 27.0 | 364.2 |
| Gain on new cap - excess servicing | | 14.6 | | 219.5 | | 95.9 | | 209.9 | | 69.4 | | 10.9 | 620.2 |
| Net servicing fees | | 3.9 | | 102.2 | | 177.3 | | 294.0 | | 362.8 | | 122.2 | 1,062.5 |
| Total cash settlement paid to GMAC Mortgage | $ | 26.6 | $ | 64.7 | $ | 481.6 | $ | 469.9 | $ | (360.0) | $ | 16.7 | $ 699.7 |

[1] For 2007 to 2008, economic amortization was not calculated separately from changes to interest rate assumptions.
Source: ResCap - MSR Cash Summary [EXAM00231039]; OMSR Values [EXAM00339036].

The value of Ally Bank's MSR asset attributable to correspondent loans and purchased MSRs, which were not paid to GMAC Mortgage under the MSR Swap despite the plain language of the MSR Swap and the MSR Swap Confirmation, and thus the value of GMAC Mortgage's potential contract claim under those agreements, totals $1.725 billion, illustrated by the Examiner as follows:

EXHIBIT V.B.10.b(2)

**Additions to the Value of Ally Bank's MSR Asset Attributable to Correspondent Loan MSRs and Purchased MSRs**

*($ in Thousands)*

|  | Sep. 2007 - Dec. 2008[(1)] | Jan.2009 - Mar. 2011 | Apr. 2011 - Mar. 2012 | Total |
|---|---|---|---|---|
| New capitalizations - purchased MSRs | $   421,860 | $   256,239 | $     28,986 | $   707,085 |
| New capitalizations - originated and correspondent loan MSRs | 19,035 | 923,463 | 404,805 | 1,347,303 |
| Sub-total new capitalization | 440,895 | 1,179,702 | 433,790 | 2,054,387 |
| New capitalizations - excess servicing (originated and correspondent) | 271,602 | 325,647 | 62,153 | 659,402 |
| Gain paid to GMAC Mortgage on new capitalizations | (310,934) | (578,364) | (99,152) | (988,450) |
| Additions attributable to correspondent loan MSRs and purchased MSRs | $   401,563 | $   926,985 | $   396,791 | $1,725,340 |

[(1)]  *Period before the 2009 Bank Transaction; monthly data not available for January 2009.*

*Source:  MSR Swap Review, dated May 2012 [ALLY_0368244]; MSR Rollforward YTD 2009, dated Dec. 31, 2009 [EXAM00232590]; MSR Rollforward YTD 2010, dated Dec. 31, 2010 [EXAM00232591]; MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592].*

## Examiner's Analysis and Conclusions:

1.     The Examiner concluded that GMAC Mortgage has a potential claim that Ally Bank breached the MSR Swap's requirements by failing to pay to GMAC Mortgage the value of MSRs arising from loans Ally Bank purchased from correspondents or for purchased MSRs.  The value of the MSRs, and thus the base value of GMAC Mortgage's potential claim, is approximately $1.725 billion, including $1.329 billion for the period before the April 2011 revision of the MSR Swap.

2.     The Examiner concluded that James Young's attempt to reconcile the parties' practices with the terms of the MSR Swap (by asserting that increases in the value of Ally Bank's MSR portfolio due to newly recognizes MSRs were not required to be paid under the MSR Swap's FMV Schedule) is not likely to prevail.

3.     The Examiner concluded that the parties consistently applied the MSR Swap in a way that is at odds with its language.

4.     The Examiner concluded that the MSR Swap is governed by New York law.

5.     The Examiner concluded that the doctrine of modification is not the proper rubric for analysis, at least before the April 2011 revisions, because there is no suggestion of an agreement after the MSR Swap was adopted to alter its terms.  In addition, it does not appear that a modification in which GMAC Mortgage simply gave up the right to receive the newly recognized value of correspondent-loan MSRs and purchased MSRs would be supported by mutual consideration.

6.       The Examiner concluded that Ally Bank may have substantial arguments that the MSR Swap would not have withstood regulatory scrutiny had it been applied to require payment of the value of purchased and correspondent-loan MSRs upon recognition.

7.       The Examiner concluded that based on the available evidence and the exacting standard which governs the application of the doctrine of mistake, although a close question, a court more likely than not would reform the pre-April 2011 MSR Swap to require payment of the value of newly recognized MSRs only for those MSRs on which Ally Bank recognized a gain (*i.e.*, not for the $1.329 billion attributable to purchased MSRs and purchased-loan MSRs).

8.       The Examiner concluded that while a close question, a court more likely than not would reform the April 2011 MSR Swap Confirmation under the doctrine of mistake to require payment of the value of newly recognized MSRs only for those MSRs on which Ally Bank recognized a gain (*i.e.*, not for the $396 million attributable to purchased MSRs and purchased-loan MSRs).

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a bankruptcy fiduciary such as a trustee or committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to save cost and expedite distributions to creditors. All of the procedural hurdles that attend bankruptcy litigation would be present in this case including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law contract dispute, (ii) withdrawal of the reference, and (iii) demand for a jury trial. In addition, all litigation carries risk uncertainty and expense. As a result, it is highly likely that any settlement would reflect a substantial discount ( of 30%) from the face value of the claim.

GMAC Mortgage would base its claim on the straightforward terms of the MSR Swap, both before and after the April 2011 revisions. As the Examiner notes, by their terms, the relevant provisions turn on the value of the MSRs on Ally Bank's balance sheet, not on whether Ally Bank has recognized a gain on the asset in its income statement, and therefore facially apply to all of Ally Bank's MSR assets. Due to the relative ease with which GMAC Mortgage could meet its initial burden, it would likely initiate settlement discussions with an aggressive opening demand of 60% of the total claim amount, approximately $1 billion.

At that point, the burden would be on AFI to prove its affirmative defenses under either of the theories primarily highlighted by the Examiner: mistake and modification. The Examiner concludes that AFI would likely succeed on the close question of a defense under the doctrine of mistake, despite the exacting standard which governs that doctrine. However, that same "exacting standard" would likely have a significant impact on the parties' settlement positions and the ultimate settlement value of this claim. Under New York law, AFI would need to establish mutual mistake

by clear and convincing evidence in order to overcome a "heavy presumption that a deliberately prepared and executed [agreement] manifest[s] the true intention[s] of the parties, . . . especially between counseled businessmen."[17]  This would require AFI to show that both Ally Bank and GMAC Mortgage shared the same erroneous belief that the MSR Swap would not require Ally Bank to pay GMAC Mortgage the value of MSRs Ally Bank purchased separately or of MSRs arising from correspondent loans Ally Bank purchased.[18]

AFI may face evidentiary difficulties proving mutual mistake because, as the Examiner noted, the recollection of the participants to the negotiation of the MSR Swap, particularly with respect to the issue of the treatment of newly recognized MSRs, was limited.  However, the Examiner concluded that the documentary evidence (other than the MSR Swap itself) supports application of the doctrine of mistake, as does the parties' conduct and the disparate economic effect of transferring the newly recognized value of purchased MSRs and correspondent-loan MSRs to GMAC Mortgage.  Indeed, the parties' mutual and uniform performance under the MSR Swap, throughout its entire term, in a manner inconsistent with its terms but consistent with what AFI would argue was their true understanding, would weigh heavily in favor of AFI's efforts to reform the MSR Swap under the doctrine of mistake.  The regulatory scrutiny and concerns raised by Ally Bank's regulators concerning the MSR Swap, as applied, also supports a claim of mutual mistake.[19]  Nonetheless, AFI would likely attach significant settlement value to this claim in recognition of the decidedly demanding burden it would need to overcome to reform the MSR Swap.  In addition, both parties would likely recognize that AFI would most likely succeed, if at all, only after a trial, because mistake turns on the parties' intent and "[q]uestions of intent . . . are usually inappropriate for disposition on summary judgment."[20]  Thus, AFI would need to factor the substantial costs and risk associated with trial into its settlement analysis.  The magnitude of the claims (at $1.725 billion), combined with the high likelihood that AFI would need to take the claim to trial to prevail, would likely be a strong motivating factor for AFI to settle.  In view of the foregoing procedural and evidentiary hurdles, but accepting the Examiner's conclusion that, although a close question, AFI would more likely than not succeed in reforming the MSR Swap based on the doctrine of mistake to apply to only Bank-originated MSRs, I estimate that the settlement value of this claim would be reduced by 55%.

The Examiner concludes that the doctrine of modification is inapplicable to the parties' dealings with respect to this claim for several reasons, including, among others, the lack of any suggestion of an agreement after the MSR Swap was adopted to alter its terms and the likely lack of mutual consideration for a modification in which GMAC Mortgage simply gave up the right to

---

[17]  *See Healy v. Rich Products Corp.*, 981 F.2d 68, 73 (2d Cir. 1992) (citations and internal quotations omitted).

[18]  *Id.* (mutual mistake occurs when both parties "[s]hare the same erroneous belief and their actions do not in fact accomplish their mutual intent.") (citations omitted); *K.I.D.E. Assocs., Ltd. v. Garage Estates Co.*, 720 N.Y.S.2d 114, 116 (N.Y. App. Div. 2001) (proponent of reformation must show not only that mistake exists, but exactly what was really agreed upon between the parties, particularly where negotiations were conducted by sophisticated, counseled parties).

[19]  As discussed by the Examiner and in more detail below, these same regulatory concerns may provide AFI with arguments in support of a defense that the MSR Swap would not have withstood regulatory scrutiny if applied to correspondent loan MSRs and purchased MSRs.

[20]  *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., v. Turtur*, 892 F.2d 199, 205 (2d Cir. 1989).

receive the newly recognized value of correspondent-loan MSRs and purchased MSRs.[21]    AFI would also likely face difficulties proving a modification of the MSR Swap where the parties subsequently confirmed the MSR Swap through the April 2011 MSR Swap Confirmation, but did not at that time revise the agreement in a manner consistent with the purported modification.  AFI would likely nonetheless pursue a modification defense as an alternative to a mistake defense.  The mere availability of a second plausible theory under which AFI could achieve the same successful result, even if it was unlikely to ultimately succeed under the doctrine of modification, would reduce the settlement value of the claim by approximately 5%.

The settlement value of the claim would be further reduced by the possibility of AFI successfully defending the claim on the grounds that the MSR Swap, if applied to correspondent loan MSRs and purchased MSRs, would not have withstood regulatory scrutiny.  The MSR Swap was implemented and subsequently revised with the involvement and approval of Ally Bank's regulators, who, at its inception, refused to approve Ally Bank's acquisition of existing MSRs from ResCap entities and apparently insisted on the protection of the MSR Swap as a condition of Ally Bank retaining MSRs.  Later, the parties agreed to increase the interest rate applicable to the Funding Fee paid by GMAC Mortgage to Ally Bank pursuant to the 2010 Net Funding Schedule in what the Examiner describes as a partially successful effort to appease the regulators.  In light of these facts, the Examiner notes that Ally Bank would have substantial arguments that the arrangement would not have withstood regulatory scrutiny had it been applied to require payment of the value of purchased and correspondent-loan MSRs upon recognition.  This possible defense would reduce the settlement value of the claim by approximately 20-30%.

Under these circumstances, I would expect plaintiff's initial settlement demand to be at approximately 60% of the gross amount of the claim (approximately $1.725 billion), *i.e.*, $1 billion, and defendant's initial offer at approximately 10% of the claim, *i.e.*, $175 million.  Taking into account the discounts and enhancements identified above, as well as the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate the fair and likely settlement of the failure to pay value of purchased MSRs under MSR Swap claim at $387.2 million.

| | |
|---|---|
| Potential Damages: | $1,725.0 million |
| Reduced By: | |
| 30% inherent risk= | $1,207.5 million |
| 55% risk associated with mutual mistake defense= | $543.4 million |
| 5% risk associated with modification defense= | $516.2 million |
| 25% risk associated with regulatory-based defense= | $387.2 million |

---

[21]  *See Estate of Anglin v. Estate of Kelley*, 705 N.Y.S.2d 769 (N.Y. App. Div. 2000) (any change in an existing contract must have a new consideration to support it) (citations omitted).

          *c.*       ***Representation and Warranty Liabilities Under the 2001 and 2006
MMLPSAs***

**Examiner's Report References:**

Section I.E.c pages I-10

V.B.3.a, b pages V-96 to V-109

VII.L.2.a pages VII.L-29 to VII.L-55

**Description:**

      The potential liability of AFI or Ally Bank for representations and warranties provided by
Old GMAC Bank in the 2001 MMLPSA and by Ally Bank in the 2006 MMLPSA.

**Background:**

      Under the terms of the 2001 MMLPSA, Old GMAC Bank provided representations and
warranties for all mortgage loans sold pursuant to its terms, while under the 2006 MMLPSA, Ally
Bank provided representations and warranties only for second lien loans sold to GMAC Mortgage.
ResCap/GMAC Mortgage later assumed financial responsibility for repurchase and representation
and warranty liabilities on loans purchased from Old GMAC Bank and Ally Bank under the
MMLPSA.  The Examiner analyzed whether ResCap/GMAC Mortgage have claims against AFI
and/or Ally Bank with respect to such liabilities based upon the representations and warranties
provided by Old GMAC Bank under the 2001 MMLPSA and by Ally Bank under the 2006
MMLPSA.

      As to loans purchased from Old GMAC Bank under the 2001 MMLPSA, the liabilities
assumed by ResCap/GMAC Mortgage include: (i) charge-offs incurred as a result of loans
repurchased from investors; (ii) a portion of the settlements with Fannie Mae and Freddie Mac in
2010; and (iii) a portion of the related 2013 "cure" settlements with Fannie Mae and Freddie Mac.
The potential claims against AFI/Ally Bank for representations and warranties provided by Old
GMAC Bank in the 2001 MMLPSA and by Ally Bank in the 2006 MMLPSA would also include a
portion of the Trust R&W Claims covered by the $8.7 billion proposed RMBS Trust Settlement
Agreement.

      Based upon an analysis of available records, the Examiner's Professionals estimate that the
total dollar amount of representation and warranty and settlement liabilities incurred by GMAC
Mortgage that would comprise the potential representation and warranty claims against AFI/Ally
Bank under the 2001 and 2006 MMLPSAs total approximately: (i)  $278.2 million in charge-offs as
a result of repurchases, and the 2010 settlements and 2013 "cure" settlements with Freddie Mac and
Fannie Mae, relating to First Lien Loans sold by Old GMAC Bank under the 2001 MMLPSA; (ii)
$5.1 million for charge-offs as a result of repurchases of Second Lien Loans sold by Old GMAC
Bank under the 2001 MMLPSA; (iii) no more than $400 million relating to First and Second Lien
Loans sold by GMAC Bank under the 2001 MMLPSA that are included in the securitizations that

comprise the Trust R&W Claims; and (iv) less than $86.1 million relating to Second Lien Loans sold by Ally Bank under the 2006 MMLPSA that are included in the securitizations that comprise the Trust R&W Claims. For a variety of reasons detailed in the Examiner's report, including limitations in the available data, the estimated values of these potential liabilities are likely overstated.

**Examiner's Analysis and Conclusions:**

      1.     Ally Bank was not a party to, and did not assume, the 2001 MMLPSA, and is unlikely to be held liable on successor liability or indemnification theories.

      2.     It is likely that representation and warranty claims would be time-barred under the 2001 MMLPSA's two-year "survival" provision.

      3.     For first lien loans (but not second lien loans), the evidence supports the proposition that the 2001 MMLPSA was modified to eliminate representation and warranty liability.

      4.     The Examiner concluded that it is unlikely that any claim against AFI or Ally Bank for loan representations and warranties under the 2001 MMLPSA would prevail.

      5.     The Examiner concluded that while Ally Bank likely would be held to have provided representations and warranties for second lien loans under the 2006 MMLPSA, representation and warranty (or indemnification) claims against Ally Bank for second lien loans sold under the 2006 MMLPSA are unlikely to prevail because they would be time-barred under the two-year "survival" provision in the 2006 MMLPSA.

**Review of Examiner's Analysis and Conclusion:**

      After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

      Because Ally Bank is not a party to the 2001 MMLPSA and did not assume that agreement in the 2006 Bank Restructuring, ResCap would face many obstacles pursuing a claim against Ally Bank or AFI based on representations and warranties in the 2001 MMLPSA. The Examiner's well-reasoned analysis concludes that ResCap is unlikely to prevail on contractual claims under the 2001 MMLPSA, which would require ResCap to show either that (1) Ally Bank is responsible for the liabilities of Old GMAC Bank under a theory of successor liability; or (2) AFI is responsible for Old GMAC Bank's liabilities under (a) the indemnification provided in connection with the OTS approval of the 2006 Bank Restructuring or (b) the indemnification provisions of the 2005 Operating Agreement or the 2006 Amended Operating Agreement. Because ResCap would likely be unable to meet the elements of any of the recognized exceptions to the general rule of no successor liability, those claims do not add materially to the settlement value of the claims for representation and warranty liabilities under the 2001 MMLPSA. The potential claims based upon indemnification provided in connection with the OTS approval of the 2006 Bank Restructuring similarly add minimal, if any, settlement value to these claims based upon the OTS's non-objection letter with

respect to the indemnification proposed by AFI, which was narrower than that initially requested by OTS and would not subject AFI to liability under the 2001 MMLPSA. The potential claims based upon the indemnification provisions of the 2005 Operating Agreement or the 2006 Amended Operating Agreement are similarly weak and add only minimal settlement value based upon the plain language of those agreements as applied to the relevant facts.

More fundamentally, any claims against AFI or Ally Bank based upon the 2001 and 2006 MMLPSAs are unlikely to succeed because they are likely time-barred under the two-year "survival" provisions in those agreements, which the Examiner found would have resulted in the expiration of representations and warranties in those agreements, at latest, in November 2008 and June 1, 2009, respectively. In the face of such strong defenses based upon the "survival" clauses, which could likely be presented to a court as a motion to dismiss, AFI/Ally Bank would be unlikely to place significant settlement value on claims against them based upon representations and warranties in the 2001 and 2006 MMLPSAs.

The Examiner also concludes that it is more likely than not that AFI/Ally Bank would prevail on a claim that the 2001 MMLPSA had been modified to eliminate representations and warranties with respect to First Lien Loans, which would significantly reduce the potential total value of the claims based upon representations and warranties in the 2001 MMLPSA. Contractual modification is a fact-sensitive issue. Thus, if it was the only defense available to AFI/Ally Bank, they would likely place substantial settlement value on the claims under the 2001 MMLPSA, recognizing that even a nuisance value settlement should account for the anticipated expense of substantial discovery needed to develop that defense. Here, however, and as set forth above, AFI/Ally Bank have other strong defenses to potential claims based upon representations and warranties in the 2001 and 2006 MMLPSAs, particularly the "survival" clause defenses, which could likely be presented to the court without undertaking the type of costly discovery that would be involved in a contractual modification defense.

Under these circumstances, I would expect the defendants' initial settlement offer to be based largely on the anticipated cost of defense in preparing a motion to dismiss the claims as time-barred, and therefore not material for purposes of this Opinion.

> **d.    Application of the Pipeline Swap To The "Funding To Sale" Period And To Ally Bank-Originated Loans**

**Examiner's Report References:**

Section I.E.1.d pages I-10-11

Section V.B.4, 5, and 10 pages V-114 to V-123 and V-178 to V-188

Section VII.L.2.c pages VII.L-58 to VII.L-64

**Description:**

Potentially there is a claim against AFI for applying the Pipeline Swap to the time period between the funding and the sale of loans and to loans originated by Ally Bank, notwithstanding contract language to the contrary.

**Background:**

GMAC Mortgage purchased and originated conforming loans with the intent to sell them to government-sponsored entities (GSE) while retaining the associated mortgage servicing rights (MSRs). Over time, GMAC's production came increasingly from Ally Bank. By 2009, almost all the loan production was being channeled through Ally Bank, which retained the MSRs on loans sold to Fannie Mae and Freddie Mac (but not to Ginnie Mae).

GMAC Mortgage and Ally Bank entered into a number of agreements related to this business. One of these Agreements was the Pipeline Swap, a derivative transaction in which GMAC Mortgage assumed certain risks and rewards related to changes in the market value of certain Ally Bank loans. Until 2008, the Pipeline Swap covered only Ally Bank's HFI portfolio. The swap was designed to insulate Ally Bank from changes in the market value of loans (typically due to interest rate changes) between rate lock and the funding of the loan. The Examiner noted that considering the original Pipeline Swap on its own, GMAC Mortgage would realize neither profit nor suffer loss assuming that its hedges were effective, although it presumably incurred some incremental hedging expense.

In 2005, the Pipeline Swap was amended to eliminate loans originated by Ally Bank, thereby limiting it to loans purchased by Ally Bank. The Pipeline Swap was not effective from April 2006 to April 2007, but was renewed effective May 1, 2007.

In July 2008, GMAC Mortgage and Ally Bank amended the Pipeline Swap because the FDIC was urging Ally Bank to document its hedges more thoroughly. Ally Bank's HFS loans were added to the Pipeline Swap, although it remained limited to purchased loans, and was not applicable to originated loans.

In addition, the Pipeline Swap continued to apply only to the period from rate lock until funding. In order for the loans to be fully hedged by the Pipeline Swap, however, the Swap would have needed to cover the period not just from rate lock to funding, but from rate lock to sale. Despite the fact that no change was made to the Pipeline Swap to extend the time period covered, many of the people involved believed that it did cover the entire period from rate lock to sale.

At the same time, the 2008 MMLPSA revised the pricing of first mortgage loans to a cost basis. Despite this, and based on the apparently mistaken understanding that the Pipeline Swap applied for the entire period from rate lock to sale, the loans were accounted for on a hedge-accounting basis, "marked to market," and sold to GMAC mortgage at market value, rather than at Ally Bank's cost. The combined effect was to preserve the same economics that had prevailed under prior version of the MMLPSA.

25

If, however, the July 2008 Pipeline Swap Schedule had been applied as written and covered only the period from rate lock to funding, rather than sale, then (1) application of hedge fund accounting would be improper under GAAP, so that the MMLPSA pricing would not be a marked to market price, and (2) the risks and rewards of changes in fair market value of the loans between funding and sale of the loans would reside with Ally Bank, not GMAC Mortgage.  Further, the Pipeline Swap did not include brokered loans originated by Ally Bank, but it was applied to such loans.

In 2011, in response to FDIC pressure, the parties again amended the Pipeline Swap and related agreements.  The 2011 Amendment extended the time period of the swaps to cover the time from funding to sale.  It did not address the omission of loans originated by Ally Bank, however.

**Examiner's Analysis and Conclusions:**

1.    With respect to extending the time period from funding to sale, although it is a close question, the Examiner found it more likely than not that the court would reform the Pipeline Swap under the doctrine of mutual mistake to include that time period.  Therefore, while it is a close question, a claim for breach based on the extension of the Pipeline Swap is unlikely to prevail.

2.    With respect to both extending the time period of the Pipeline Swap from funding to sale and extending it to loans originated by Ally Bank, it is likely that the court would find that the Pipeline Swap was modified to include both.  Therefore, a claim for breach is unlikely to succeed.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  The Examiner does not quantify any harm to GMAC Mortgage from the alleged breaches of the Pipeline Swap, and the Examiner further notes that, except for un-quantified incremental hedging costs, the economic effect on GMAC Mortgage was neutral, assuming that GMAC Mortgage's hedging was effective.

**Settlement Considerations:**

As the Examiner notes, the extension of the Pipeline Swap to include the period between funding and sale and to include loans originated by Ally Bank does not comply with the plain language of the relevant agreements.  On their face, therefore, these appear to be strong breach of contract claims.  However, as the Examiner found, they are unlikely to succeed due to strong affirmative defenses.

First, as to the extension of the Pipeline Swap to the time period from funding to sale, the Examiner found that the claim would not succeed because the contract would be reformed under the doctrine of mutual mistake.  As noted by the Examiner, the parties drafting the Pipeline Swap agreements appeared not to have understood the effect of the language they chose.  More importantly, ending the Pipeline Swap at the time of funding made little business sense.  As a practical matter, GMAC Mortgage hedged the risk in the market as though it had assumed the risk for the entire time, further indicating the intent of the parties.

26

As acknowledged by the Examiner and discussed elsewhere in this report, however, the burden for establishing mutual mistake is high and would be on AFI.  This creates risk that a reformation argument would not succeed and a breach would be found.  Therefore, if no other affirmative defenses existed and damages from the breach could be shown, this claim would still have settlement value.

Second, as to both the extension of the Pipeline Swap to the time period from funding to sale and to loans originated by Ally Bank, there is substantial evidence that the parties modified the contract to include these.  Specifically, as noted by the Examiner, the written record of the Brokering Customer Loans to Bank Project supports the view that the parties intended the Pipeline Swap to apply to brokered loans and to the "funding to sale" period.  This strong written evidence, including e-mails, makes it likely that a court would find that the parties modified the Pipeline Swap, so there is no breach.  Crucially, while AFI would bear the burden of proof on a claim of modification, it would not be a heightened burden.  Therefore, given the high likelihood of establishing this defense as to both potential breaches, this claim has little settlement value.

Buttressing this analysis, the Pipeline Swaps appear to have been economically-neutral for GMAC Mortgage.  Therefore, even if the claims had merit, the damages, if any, would be less than $21 million the threshold for materiality I have used for the purposes of my report.  Accordingly, these claims are not assigned any material settlement value.

### e.    Failure To Obtain Independent Director Approval

**Examiner's Report References:**

Section I.E.1.e page I-11

Section VII.L.2.b  pages VII.L-56 to VII.L-58

**Description:**

Whether there is a viable claim for failure to obtain independent director approval of various agreements and amendments to agreements that occurred between the inception of the 2005 Operating Agreement and November 2010.

**Background:**

The 2005 Operating Agreement and the 2006 Amended Operating Agreement barred any transactions between ResCap and GMAC affiliates that were not consistent with what parties would agree to at arm's length and for fair value unless waived by the independent directors.  The MMLPSA, Pipeline Swap, and MSR Swap were not entered into on terms that were available in the market and to which parties at arm's length would have agreed.  Yet there was no independent director approval of these transactions.

27

**Examiner's Analysis and Conclusions:**

     1.     The agreements at issue did not appear to result in losses for GMAC Mortgage, were not economically unfair to ResCap, and did not materially and adversely affect ResCap's creditors.

     2.     Neither AFI nor Ally Bank was involved in the decision whether to seek independent director approval.

     3.     The rights of third-party beneficiary creditors are limited to specific enforcement of the requirement of independent director approval, and money damages are specifically foreclosed.

     4.     Claims resulting from the lack of independent director approval of these transactions are unlikely to succeed.

**Review of Examiner's Analysis and Conclusion:**

     After reviewing the facts and legal conclusions sets forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

     The issues identified by the Examiner make it highly unlikely that claims regarding the failure to obtain independent director approval will succeed. Because the agreements at issue were not unfair to ResCap or the creditors, there are no damages and no likelihood of recovery. Even if there were, such damages would be barred by the contractual provisions barring monetary damages and limiting the remedy to specific performance. Accordingly, these claims are not material and do not add any settlement value.

### 2.     Government Settlements

#### *$109.6 Million Preference Claim*

**Examiner's Report References:**

Section I.E.2 pages I-12 to I-13

Section V.C pages V-210 to V-299

Section VII.F.5 pages VII.F-1 to VII.F-154

**Description:**

     Whether the obligations of the Debtors and AFI were appropriately allocated with respect to two settlements between governmental entities on the one hand, and AFI, ResCap and certain of their subsidiaries on the other hand. This claim analysis reviews the potentially preferential payment of approximately $109.6 Million made by GMAC Mortgage on March 14, 2012 pursuant to the DOJ/AG Consent Judgment.

**Background:**

Pursuant to the DOJ/AG Consent Judgment (the "Judgment") memorializing the DOJ/AG Settlement between the Department of Justice and various state Attorneys General on the one hand, and AFI, ResCap and GMAC Mortgage, on the other, GMAC Mortgage paid approximately $109.6 million to the government on March 14, 2012 (within 90 days of the Petition Date of May 14, 2012). The Judgment provides that the Defendant (defined, collectively, as AFI, ResCap and GMAC Mortgage) shall pay the "$109.6 million hard dollar payment". ResCap, through GMAC Mortgage, paid the entire $109.6 million on March 14, 2012. The Examiner evaluated whether the approximately $109.6 million payment may be avoidable as a preference under Code section 547 and recoverable from AFI "as an entity for whose benefit such transfer was made . . .."

**Examiner's Analysis and Conclusions:**

1.       AFI is liable, together with ResCap, GMAC Mortgage and RFC, for payment of the full amount of the $109.6 million Judgment.

2.       AFI received a direct, ascertainable and quantifiable benefit of $109.6 million by being relieved of the obligation to make that payment if ResCap did not.

3.       It is likely that an action against AFI to recover the March 14, 2013 payment of $109.6 million as a preferential transfer under Bankruptcy Code section 547 and 550 would prevail.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution of disputes in order to save costs and expedite distributions to creditors.

The Examiner reviewed the potential defenses which could be raised. In reviewing potential defenses, the Examiner addressed, *inter alia*, whether AFI was liable for the $109.6 million payment in light of Exhibit I attached to the Judgment which provides that ResCap, GMAC Mortgage and RFC shall pay the $109.6 million payment but is silent as to AFI's payment obligation. Because of the debt forgiveness under the credit facilities provided by AFI, the Examiner also considered whether the "Earmarking Doctrine" would protect AFI from liability under Bankruptcy Code section 550, as well as other issues and potential defenses. The Examiner concluded, after his review and analysis of the interaction, relationship and effect of the relevant judgments, orders and agreements, that AFI was liable for the entire approximately $109.6 million obligation and that, accordingly, the payment thereof by GMAC Mortgage is avoidable as a preference under Bankruptcy Code section 547 and recoverable from AFI as the entity for whose benefit the payment was made.

AFI would most likely vigorously defend the claim and raise all of the issues and potential defenses addressed by the Examiner.  Although the Examiner concludes that the preference claim is likely to be successful, all litigation carries risk, uncertainty and expense.  Similarly, AFI would also incur significant legal cost and expense to defend this claim.

Given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand at $98.6 million, approximately 90% of the total amount of the claim, and defendant's initial offer at $16.4 million, approximately 15% of the total claim.  Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate a fair settlement of this preference claim at approximately $60 million.

### *$48.4 Million Preference Claim*

**Examiner's Report References:**

Section I.E.2 pages I-12 to I-13

Section V.C pages V-210 to V-299

Section VII.F.5 pages VII.F-1 to VII.F-154

**Description:**

Whether the obligations of the Debtors and AFI were appropriately allocated with respect to two settlements between governmental entities on the one hand and AFI, ResCap and certain of their subsidiaries on the other hand.  This claim analysis reviews the payments totaling approximately $48.4 million made by GMAC Mortgage on May 10 and 11, 2012 pursuant to the terms of the various agreements under which GMAC Mortgage was required to indemnify Ally Bank for losses incurred as a result of certain loan modifications in connection with the government settlements.

**Background:**

Pursuant to the terms of the January 30 Letter Agreement and the A&R Servicing Agreement, GMAC Mortgage was permitted to modify certain Ally Bank loans to a greater extent than permitted under the Original Servicing Agreement, but GMAC Mortgage was required to indemnify Ally Bank for losses incurred resulting from such loan modifications to the extent they exceeded the modifications permitted under the Original Servicing Agreement.  The A&R Servicing Agreement, however, was not actually executed until after the May 10 and 11, 2012 payments were made.

**Examiner's Analysis and Conclusions:**

1.      It is likely that an action on behalf of GMAC Mortgage against Ally Bank to avoid and recover the May 10 and 11, 2012 payments as preferential transfers under Bankruptcy Code sections 547 and 550 would prevail.

2.      Even though the A&R Servicing Agreement was not executed until after the subject payments were made, GMAC Mortgage was required to make those payments pursuant to the terms of the January 30 Letter Agreement.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee.  This type of plaintiff is typically motivated to reach an early resolution of disputes in order to save costs and expedite distributions to creditors.

In determining that a preference action to avoid and recover the payments made to Ally Bank would likely prevail, the Examiner concluded that the evidence supports the proposition that Ally Bank, for whose benefits the payments were made, was a creditor of GMAC Mortgage and that the payments were made on account of an antecedent debt within 90 days prior to the Petition Date.  The Examiner also analyzed the potential defenses which could be raised and primarily focused on whether GMAC Mortgage was obligated to pay Ally Bank since the A&R Servicing Agreement was not executed prior to the payments made on May 10 and 11, 2012.  However, the Examiner also concluded that pursuant to the January 30 Letter Agreement, GMAC Mortgage was obligated to indemnify Ally Bank.

Ally Bank would most likely defend the claim and raise the foregoing issue (as well as requiring the trustee to meet its evidentiary burden on all other elements of a preference action).  Although the Examiner concludes that the preference claim is likely to be successful, all litigation carries risk, uncertainty and expense.  Similarly, Ally Bank would also incur significant legal cost and expense to defend this claim.

Given the likelihood of success identified by the Examiner with a claim of $48.4 million, I would expect the plaintiff's initial settlement demand at $43.6 million, approximately 90% of the total amount of the claim and defendant's initial offer at $7.3 million, approximately 15% of the total claim.  Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate a fair settlement of this preference claim at approximately $32 million.

### *$12.9 Million Post-petition Transfer*

**Examiner's Report References:**

Section I.E.2 pages I-13

Section V.C pages V-210 to V-291

Section VII.F.7 pages VII.F-148 to VII.F-151

**Description:**

Whether the obligations of the Debtors and AFI were appropriately allocated with respect to two settlements between governmental entities on the one hand and AFI and ResCap and certain of their subsidiaries on the other hand. This claim analysis reviews the approximate post-petition payment of $12.9 million made by Debtors to Ally Bank on June 13, 2012 pursuant to the terms of the various agreements under which GMAC Mortgage was required to indemnify Ally Bank for losses incurred as a result of certain loan modifications in connection with the government settlements. The post-petition payment, however, was for indemnification obligations for loan modifications which were performed prepetition.

**Background:**

Pursuant to the terms of the January 30 Letter Agreement and the A&R Servicing Agreement, GMAC Mortgage was permitted to modify certain Ally Bank loans to a greater extent than permitted under the Original Servicing Agreement, but GMAC Mortgage was required to indemnify Ally Bank for losses incurred resulting from such loan modifications to the extent they exceeded the modifications permitted under the Original Servicing Agreement. On May 12, 2012, that certain Interim Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreements in the Ordinary Course of Business [Dkt. No. 90] ("Interim Order") was entered.

**Examiner's Analysis and Conclusions:**

1.      The approximately $12.9 million payment was not made in the ordinary course of Debtors' business and, therefore, could only be made by the Debtor if the Bankruptcy Court authorized the Debtor to make such post-petition payments after notice and a hearing pursuant to Bankruptcy Code Section 363.

2.      While a close question, it appears more likely than not that the Interim Order did not authorize the Debtors to make payments to satisfy obligations incurred prepetition.

3.      While a close question, it is more likely than not that the approximately $12.9 million post-petition payment relating to obligations incurred prepetition may be avoided under Bankruptcy Code section 549(a).

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution of disputes in order to save costs and expedite distributions to creditors.

In determining that an action to avoid the post-petition payment made to Ally Bank would more likely than not prevail, the Examiner concluded that the obligation to make a post-petition indemnification payment, which stemmed from GMAC Mortgage's responsibilities under a one-time settlement agreement with the government, would not be considered an ordinary course payment and, therefore, could only be made if authorized by the Bankruptcy Court.

The Examiner reviewed the Interim Order which authorized the Debtors' "to continue to perform under the terms of the [A&R] Servicing Agreement…" and considered the argument that such broad language could cover the $12.9 million payment on account of a prepetition obligation. However, the motion seeking entry of the Interim Order did not specifically mention these obligations and stated that the Debtors "were not seeking to pay any prepetition claims through or pursuant to the [A&R] Servicing Agreement." The Examiner concluded that this representation clarifies any ambiguity found in the Interim Order regarding whether payments with respect to prepetition obligations were authorized. The Examiner considered other arguments, including, without limitation, the fact that the agreement which contained the indemnity provisions was attached to the motion, but concluded that the indemnification obligation was not conspicuously disclosed in the motion or exhibits thereto, and there was no mention of the amount of payments to be made. Therefore, the Examiner concluded that, while it is a close question, based on the Debtors' express representations in the motion and lack of disclosure it appears more likely than not that the Interim Order did not authorize the Debtors to make payments to satisfy obligations incurred prepetition.

Ally Bank would most likely defend the claim and raise the foregoing issue (as well as other issues noted and considered by the Examiner). The Examiner concludes that, although a close question, a claim to recover the post-petition payment is more likely than not to prevail, all litigation carries risk, uncertainty and expense. Similarly, Ally Bank would also incur significant legal cost and expense to defend this claim.

Given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand at $10.3 million, approximately 80% of the total amount of the claim and defendant's initial offer at $1.9 million, approximately 15% of the total claim. Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate a fair settlement of this post-petition transfer claim at $7.1 million. Accordingly, this claim is not assigned any material settlement value and will not be included in the allocation of the $2.1 billion settlement fund.

33

3.    **Causes of Action Relating To Use And Allocation Of ResCap's Tax Attributes**

*First and Second 2009 Tax Allocation Agreements*

**Examiner's Report References:**

Section I.E pages I-13 to I-14

Section V.D pages V-300 to V-344

Section VII.K pages VII.K-1 to VII.K-49

**Description:**

The historical and prospective use and allocation, between ResCap and AFI, of ResCap's tax attributes.

**Background:**

As required by the November 2006 sale of 51% of AFI to Cerberus Capital Management, LP ("Cerberus"), ResCap was converted into a limited liability company and with AFI's consent, became a disregarded entity for federal income tax purposes in the fall of 2006. ResCap remained a disregarded entity, treated as a division of AFI from December 1, 2006 through June 30, 2009.

The 2006 Amended Operating Agreement required that "ResCap and GMAC shall maintain in effect an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap."[22]

Between July 1, 2009 and November 2, 2009, ResCap became a partnership for federal income tax purposes. It reverted to disregarded entity status on November 2, 2009 to preserve substantial tax losses that would be generated by Ally Bank and its wholly-owned subsidiary, GMACB Asset Management Corporation.

In connection with this reversion, AFI suggested and drafted the First 2009 Tax Allocation Agreement. In December 2009, William Marx, Executive Director Tax Operations and Analysis at AFI, notified both AFI and ResCap that under the proposed tax allocation agreement, any deviation from strict stand-alone accounting would "in all cases be either neutral or more beneficial to ResCap." Consistent with that statement, AFI drafted the First 2009 Tax Allocation Agreement to treat ResCap generally as if it were a stand-alone taxpayer, except that it treated ResCap more favorably in that it entitled ResCap to be paid for its tax benefits that AFI could currently use even if ResCap could not currently use the benefits on a stand-alone basis. The proposed agreement provided that ResCap would be compensated based on AFI's use of ResCap's tax benefits, not hypothetical use by GMAC Mortgage Group LLC, a disregarded entity. The proposed agreement

---

[22] 2006 Amended Operating Agreement, at § 2(b)(iii), [ALLY_0041818].

further provided that AFI would reimburse GMAC Mortgage Group LLC to the extent the Group would have to compensate ResCap for AFI's use of ResCap's tax benefits.

ResCap's legal staff advised the board that it believed that First 2009 Tax Allocation Agreement was "on terms consistent with those that parties at arms' length would agree to and for fair value." The ResCap Board unanimously approved the First 2009 Tax Allocation Agreement at its regularly-scheduled board meeting on August 6, 2010.

On September 9, 2010, Marx prepared a memorandum with instructions for executing the First 2009 Tax Allocation Agreement (and similar agreements) to among others, David DeBrunner, Chief Accounting Officer and Corporate Controller of AFI, and James Young, the CFO of ResCap. The memorandum and agreements were delivered promptly to DeBrunner, who executed the First 2009 Tax Allocation Agreement on behalf of AFI on or about September 13, 2010. Debrunner believed he was acting pursuant to "delegated authority". The First 2009 Tax Allocation Agreement was not approved by the board of directors of AFI, but that practice was consistent with "Ally Accounting Policy 3330" which provided that "[a]ll tax sharing agreements must be approved by the respective boards of directors *or appropriate management designee.*" [23] The memorandum and accompanying agreements were apparently not delivered to Young until approximately October 15, 2010.

In the meantime, AFI began calculating the amounts due to ResCap for 2009 under the First 2009 Tax Allocation Agreement and realized the amounts due to ResCap would be substantial, *i.e.*, approximately $250 million for 2009 and $400 million for 2010. Starting on October 13, 2010, Marx raised his concerns and the possibility of proposing a less-favorable tax allocation agreement to ResCap with James Mackey, the CFO of AFI. The Examiner noted that Marx, on his own initiative, attempted to hold up the completion of the execution of the First 2009 Tax Allocation Agreement, collecting and destroying the partially-executed versions. In addition, it appears that Marx or Mackey (or both) spoke to Young and told him that the agreement had not been fully discussed or vetted within AFI. As a result, Young never signed the First 2009 Tax Allocation Agreement

AFI provided ResCap with proposed revisions to the First 2009 Tax Allocation Agreement (the "Second 2009 Tax Allocation Agreement"). The proposed Second 2009 Tax Allocation Agreement removed ResCap's right to receive compensation from AFI for AFI's use of ResCap's tax benefits. In addition, ResCap became liable to pay AFI for tax on excess inclusion income, which totaled approximately $50 million from 2009 to 2012.

The ResCap Board and Independent Directors reviewed the Second 2009 Tax Allocation Agreement. Counsel for the Independent Directors advised that the Second 2009 Tax Allocation Agreement seemed "very unfair" to ResCap. Nevertheless, after certain revisions were made, the Independent Directors believed that the fairness concerns had been resolved and the ResCap board approved the transaction, which was executed by all parties in 2011.

---

[23] Ally Accounting Policy 3330, Issued by Director of Accounting Policy, Effective June 1, 2011 (emphasis added), [EXAM12354093].

Although the Second 2009 Tax Allocation Agreement appears to be a pure stand-alone agreement in that ResCap is obligated to pay to AFI its hypothetical separate tax liability each year, the Examiner found that a closer look reveals that it is significantly worse for ResCap in that there is nothing in the agreement that would require AFI to pay ResCap any refund ResCap might be entitled to on a stand-alone basis. In addition, the Second 2009 Tax Allocation Agreement does not meet the requirement of the 2006 Amended Operating Agreement that it "shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap." Nor does it meet the standard set by the ResCap board when it approved the First 2009 Tax Allocation Agreement, *i.e.*, that the agreement be "on terms not more disadvantageous in any material respect to the holders of [ResCap's] notes than those existing tax allocation agreement(s) [it is] intended to replace[.]"

**Examiner's Analysis and Conclusions:**

1.     While a close case, it is more likely than not that the First 2009 Tax Allocation Agreement was a valid, binding, and enforceable contract against AFI.

2.     While a close question, it is more likely than not that ResCap's CFO did not breach his fiduciary duties by failing to execute the First 2009 Tax Allocation Agreement.

3.     It is likely that the Second 2009 Tax Allocation Agreement constituted a fraudulent transfer of the contract benefits belonging to ResCap under the First 2009 Tax Allocation Agreement.

4.     While a close question, it is more likely than not that the Second 2009 Tax Allocation Agreement would not be set aside on equitable theories related to overreaching.

5.     While a close question, it is more likely than not that ResCap's Board of Directors did not breach its fiduciary duties by approving the Second 2009 Tax Allocation Agreement.

6.     The benefits that ResCap would have received under the First 2009 Tax Allocation Agreement but for the Second 2009 Tax Allocation Agreement are estimated at $1.77 billion.[24]

7.     Even if the First 2009 Tax Allocation Agreement is not enforceable, it is likely that ResCap could recover the payments made to AFI under the Second 2009 Tax Allocation Agreement in the approximate amount of $50 million as a constructively fraudulent conveyance.

8.     It is likely that the Second 2009 Tax Allocation Agreement would be found to be in violation of the 2006 Amended Operating Agreement.

---

[24] It should be noted that the Examiner's estimate was based on the assumption that AFI would be making a $750 million contribution contemplated by the terminated AFI Settlement and Plan Sponsor Agreement. If a $2.1 billion dollar contribution was assumed, the benefits that ResCap would have received under the First 2009 Tax Allocation Agreement but for the Second 2009 Tax Allocation Agreement would have been greater.

36

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This contract claim would likely be pursued by a bankruptcy fiduciary such as a trustee or committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to expedite distributions to creditors. All of the procedural hurdles that attend bankruptcy litigation would be present in this case, including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law contract dispute and a fraudulent transfer action, (ii) withdrawal of the reference, and (iii) demand for a jury trial. In addition, all litigation carries risk, uncertainty, and expense. As a result, it is highly likely that any settlement would reflect a discount of 20% from the face value of the claim.

The plaintiff would have to establish that the First 2009 Tax Allocation Agreement was binding on AFI, which the Examiner evaluates as a close case. Among the evidentiary and substantive issues highlighted by the Examiner are: (a) the lack of approval by AFI's board or senior management; (b) the testimony of participants that neither side considered the First 2009 Tax Allocation Agreement binding; (c) fading memories and unavailability of witness to events that occurred in 2009 and 2010; (d) lack of signature by ResCap; and (e) the destruction of partially signed copies. Because this is a close question, the risk involved in this threshold determination substantially lowers the maximum settlement value of the claim by 40%, even before the inherent risks of litigation are considered.

If the First 2009 Tax Allocation Agreement were deemed to be binding on AFI, then the failure of ResCap's CFO to execute the First 2009 Tax Allocation Agreement is of no moment. The failure to sign only matters if the First 2009 Tax Allocation Agreement is not binding. In that case, there is a possibility of a claim for breach of fiduciary duty against ResCap's CFO, who is one of the released parties. Based on the Examiner's finding that it is more likely than not that ResCap's CFO did not breach his fiduciary duties, with which I concur, this claim adds only minimal settlement value.

Even if the First 2009 Tax Allocation Agreement were deemed to be binding on AFI, that agreement was superseded by the Second 2009 Tax Allocation Agreement. Thus, to prevail on a claim for breach of contract damages related to the First 2009 Tax Allocation Agreement, the plaintiff would also have to convince the court to set aside the Second 2009 Tax Allocation Agreement. Although the Examiner concludes that the Second 2009 Tax Allocation Agreement is likely to be set aside as a fraudulent transfer, there are still significant risks associated with that claim. As the Examiner noted, AFI would likely argue that ResCap received substantial capital contributions and other assistance from AFI around the time of the Second 2009 Tax Allocation Agreement which could represent reasonably equivalent value for the transaction. Notwithstanding the Examiner's conclusion that he was unable to connect these contributions to the Second 2009 Tax Allocation Agreement, this issue creates further risk for the plaintiff. In addition, as noted above, the First 2009 Tax Allocation Agreement was overly favorable to ResCap. Undoubtedly, AFI would

37

vigorously defend the claim and raise the issues highlighted by the Examiner.  Therefore, the value of the claim would be further reduced by 20%.

If the First 2009 Tax Allocation Agreement were to be found non-binding on AFI, the plaintiff could, nevertheless, seek to set aside the Second 2009 Tax Allocation Agreement as a fraudulent transfer.  The Examiner concludes that ResCap did not receive reasonably equivalent value because there was no possibility for ResCap to ever receive a payment thereunder.  However, the payments of approximately $50 million are not material in this context because the value of the settlement amount of such payments would be less than $21 million and therefore does not merit separate valuation for settlement purposes.  The payments made are included in the total recovery if the First 2009 Tax Allocation Agreement is upheld.

The Examiner also considered whether the Second 2009 Tax Allocation Agreement could be set aside on an overreaching theory.  As part of his analysis, the Examiner found that the violation of the 2006 Amended Operating Agreement was further evidence that the Second 2009 Tax Allocation Agreement was unfair and evidenced overreaching.  This theory is an alternative argument which only matters if the Second 2009 Tax Allocation Agreement is not set aside as a fraudulent transfer. Because the Examiner concluded that the Second 2009 Tax Allocation Agreement is likely to be set aside as a fraudulent transfer, this theory is unlikely to come into play.  Moreover, even if it did come into play, the Examiner concluded that this claim was more likely than not to fail. Accordingly, this claim adds minimal settlement value.

Likewise, the Examiner considered whether ResCap's board breached its fiduciary duties by approving the Second 2009 Tax Allocation Agreement.  Again, this is an alternative theory which only applies if the Second 2009 Tax Allocation Agreement is not set aside as a fraudulent transfer. Because the Examiner concluded that the Second 2009 Tax Allocation Agreement is likely to be set aside as a fraudulent transfer, this theory is unlikely to come into play.  As above, even if this claim did come into play, the Examiner concluded that it was more likely than not to fail.  As a result, this claim also adds minimal settlement value.  I estimate that, together, the three alternative theories add 5% to the settlement value of the claim.

On the other side, even assuming that AFI would dispute the Examiner's calculation, the magnitude of the claims ($1,770 million) would likely be a strong motivating factor for AFI to settle. In addition, the likelihood of success identified by the Examiner would also incline AFI toward a substantial settlement.  Legal fees and expenses in prosecuting and defending the claim would run into the tens of millions of dollars, but pale in comparison to the magnitude of the claims. Accordingly, I conclude that AFI would make a substantial offer to resolve these claims.

Under these circumstances, I would expect plaintiff's initial settlement demand to be $1,500 million, approximately 85% of the gross amount of the claim, and defendant's initial offer to be $265 million, approximately 15% of the claim. The back and forth of the negotiation process would ensue taking into account the discounts and enhancements identified above, as well as the relative bargaining power of the parties.  The anticipated settlement range would be between $750 million, 50% of the plaintiff's initial demand, and $530 million, twice the defendant's initial offer, with a likely value of $713.7 million, calculated as follows:

| | |
|---|---|
| Potential Damages: | $1,770.0 million |
| Reduced By: | |
| 20% inherent risk = | $1,416.0 million |
| 40% on enforceability = | $849.6 million |
| 20% on fraudulent transfer = | $679.7 million |
| Increased By: | |
| 5% for alternative theories = | **$713.7 million** |

### *Claim re 2005 Tax Allocation Agreement*

**Examiner's Report References:**

Section VII.K pages VII.K-1 to VII.K-17

Section V.D pages V-300 to V-345

**Description:**

Whether ResCap has a contractual claim against AFI under the Implemented 2005 Tax Allocation Agreement.

**Background:**

From March 2005 through November 30, 2006 ResCap was included in the GM consolidated federal income tax return. During this period, AFI and ResCap were parties to the Implemented 2005 Tax Allocation Agreement, pursuant to which ResCap was entitled to be compensated by AFI to the extent that ResCap's NOLs and other tax benefits were used by both GM and AFI to reduce each of their separate group tax liabilities. In the case of AFI, this was a hypothetical computation. ResCap received a payment from AFI of $85.9 million for GM's and AFI's use of ResCap tax benefits for the tax year ending November 30, 2006. It was later determined that ResCap generated potential tax savings for GM of $101 million for that tax year so that ResCap still had a contingent right to the remaining $15.1 million in potential tax savings, which would become fixed if and when GM used the tax benefits. During the Examiner's investigation, GM confirmed that it used all of ResCap's tax benefits that were originally unused by GM in 2006; however, the Implemented 2005 Tax Allocation Agreement was terminated prior to GM's use of ResCap's tax attributes.

**Examiner's Analysis and Conclusions:**

It is likely that a contract claim in the approximate amount of $15.1 million against AFI arising under the Implemented 2005 Tax allocation Agreement would prevail.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This cause of action would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution in order to save cost and expedite distributions to creditors.

As part of his extensive analysis of estate causes of action arising out of ResCap's tax sharing arrangements, the Examiner considered whether ResCap has a contract claim against AFI based on the tax benefits that were generated by ResCap and passed to, but unused by, GM in 2006. The Implemented 2005 Tax Allocation Agreement required that both GM and AFI be able to use ResCap tax benefits before ResCap would be entitled to compensation for use of its tax benefits (as opposed to the more standard construction which would require that only AFI use ResCap's tax benefits for ResCap to receive compensation). The Examiner also considered whether the claim would be time barred under applicable law. The Examiner concluded that ResCap's right to payment on account of its 2006 tax benefits was unaffected by the subsequent termination of the Implemented 2005 Tax Allocation Agreement as the agreement itself provided that even if it terminated, it would "continue to apply" to determine the parties' respective rights and obligations for the 2006 tax year and that ResCap's right to payment against AFI, albeit contingent and conditional, arose when it performed under the Implemented 2005 Tax Allocation Agreement (*i.e.*, when it generated tax benefits through November 30, 2006 that passed to GM).

Although the Examiner concludes that a claim to recover the $15.1 million contract claim is likely to prevail, all litigation carries risk, uncertainty and expense. AFI would incur legal cost and expense to defend this claim which it is likely to lose.

Given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand at approximately 85% of the total amount of the claim (approx. $12.8 million) and defendant's initial offer at approximately 15% (approx. $2.3 million). Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate a fair settlement of this contract claim at approximately $7 million. Accordingly, this claim is not material and will not be accorded any proposed allocation of the settlement fund.

**4.        Minnesota Insider Preference Claims**

**Examiner's Report References:**

Section I.E.4 pages I-14 to I-16

Section VII.F.4 pages VII.F-26 to VII.F-95

Section VII.F.6 pages VII.F-122 to VII.F-148

**Description:**

Application of Minnesota's substantive fraudulent transfer law to transfers made by ResCap and RFC to AFI and its affiliates, including GMAC Commercial Finance LLC ("GMAC CF").

**Background:**

The Examiner reviewed seven transactions or loan facilities between ResCap as the borrower and AFI or AFI's affiliates, including GMAC CF : (1) the Secured Revolver Facility; (2) the A&R Line of Credit Facility; (3) the Secured MSR Facility; (4) the Servicing Advance Factoring Facility; (5) the Resort Finance Facility; (6) the 2008 Bank Transaction; and (7) the 2009 Bank Transaction (collectively, the "Transactions") to determine whether they implicate potential claims under Minnesota's Insider Preference Statute.

**Examiner's Legal Analysis and Conclusions:**

1.        The Bankruptcy Court would likely apply Minnesota's Insider Preference statute to transfers made by ResCap and RFC to AFI in the six years prior to ResCap's bankruptcy filing.

2.        Minnesota's version of the UFTA has an Insider Preference cause of action. A transfer is fraudulent under Minnesota's Insider Preference statute if: (1) there exists a creditor of the transferor-debtor whose claim arose before the transfer, (2) the transfer was made to an insider of the debtor, (3) the transfer was made for an antecedent debt, (4) the debtor was insolvent at the time of the transfer, and (5) the insider had reasonable cause to believe the debtor was insolvent.

3.        Although a close call, the Minnesota Insider Preference statute allows a "substantially contemporaneous" limitation to the antecedent debt requirement despite the express wording of the statute.

4.        The Minnesota Insider Preference statute has four defenses: good faith transferee; new value; ordinary course; and, good faith effort to rehabilitate the Debtor.

5.        All of AFI's potential insider preference liability stems from the A&R Line of Credit Facility either because payments under the other loan facilities do not meet all the elements of a preference or are offset by new value contributions.

41

6.    The Subsequent New Value Defense is available to AFI and, although a close call, it likely will be applied as a netting out of all value given against all transfers made during the subject transfer period.  The value of non-cash contributions would be an issue.

7.    Under Minnesota's Insider Preference statute, only the parties' history of dealings is to be considered in determining ordinary course of dealings.  All of the transfers between the Debtors and AFI occurred post-insolvency, and thus the Examiner concluded that AFI would be unlikely to prevail on an ordinary course defense.

8.    It is likely that AFI would not be able to establish the good faith effort to rehabilitate defense.

9.    While Minnesota's Insider Preference statute allows for a six-year reach-back period from the Petition Date, the Examiner concluded that prior to December 30, 2009, AFI provided new value to ResCap and RFC which, taken as a whole as against extensions of credit, exceeded the value of the transfers made by ResCap and RFC to AFI during that same period.

10.    From December 30, 2009 to the Petition Date, RFC made transfers to AFI under the A&R Line Of Credit Facility totaling approximately $650 million, and AFI extended new value to RFC totaling approximately $116 million. GMAC Mortgage and certain of the other Debtors entered into the A&R Line of Credit Facility as well.  The estimated Insider Preference liability for AFI to RFC is $534 million.

11.    GMAC CF, a wholly-owned subsidiary of AFI, has approximately $32 million in potential Insider Preference liability with a potential offset of $1.5 million for new value.  However, the Debtors' records are unclear as to whether the transfers were made by RFC or GMAC Mortgage. To the extent the transfers were made by GMAC Mortgage the Minnesota Insider Preference statute would not apply because Pennsylvania law applies to the GMAC Mortgage.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  I believe it noteworthy that the Examiner was unable to find Minnesota state law directly interpreting Minnesota's ordinary course defense.  The Examiner predicts that, in the absence of a baseline course of dealings predating the financial turmoil, AFI would be unable to look to Minnesota's ordinary course of dealings defense. I believe that application of this narrow reading of the statute overlooks the policy underlying preference defenses to protect creditors who continue to transact business with companies in financial distress. Moreover, under Bankruptcy Code section 547(c)(2)(A), some bankruptcy courts have deemed transfers to be in the ordinary course which occurred only during the preference period.  Although looking to industry practices is not available under Minnesota's UFTA, AFI may nonetheless argue that its dealings with ResCap and RFC during the look-back period should be treated as ordinary course even though ResCap and RFC were in dire financial straits throughout the period.

42

**Settlement Considerations:**

### *Claims Against AFI*

This cause of action likely would be pursued by a bankruptcy fiduciary such as a committee or a post-confirmation trustee. Although the Examiner concludes that Bankruptcy Code section 546(e)'s safe harbor likely does not apply to these transactions, if the court were to deem the safe harbor applicable, then an estate fiduciary might not be able to pursue these claims; these claims may then be pursued by a non-estate fiduciary, such as a creditor (pursuant to the *Tribune* work-around). The dynamics of settlement may change in the event a creditor seeking its own recovery were substituted for a fiduciary looking to maximize recovery for a broader group of creditors.

Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to expedite distributions to creditors. All of the procedural hurdles that attend bankruptcy litigation would be present in this case, including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law fraudulent transfer action, (ii) withdrawal of the reference, and (iii) demand for a jury trial. AFI would most likely vigorously defend the claim and raise all of the issues and potential defenses addressed by the Examiner. Although the Examiner concludes that the preference claim is likely to be successful, all litigation carries risk, uncertainty and expense. Similarly, AFI would also incur significant legal cost and expense to defend this claim. As a result, given the foregoing factors and the initial face-amount of the claim, I believe that it is highly likely that any settlement would reflect a substantial discount of 30% on the face value of the claim, reducing the claim to $373.8 million.

Further, the Examiner's report details several issues in litigating these Insider Preference Claim that would reduce the settlement value of the claim. First, the Examiner's choice-of-law analysis, which determined Minnesota law to be applicable, is certainly well-reasoned but not an absolute. In the event that the court does not apply the Minnesota Insider Preference statute, AFI will have a stronger ordinary course defense to a preference claim. Likewise, the Bankruptcy Code section 546(e) safe-harbor may arguably remain available to AFI, though a creditor work-around may nonetheless allow for the later prosecution of this claim against AFI by a non-estate fiduciary, thus reducing the strength of the preference claim. Based on these additional issues, I believe that an additional discount of 20% of the claim is warranted, further reducing the claim to $299.0 million.

On the other hand, the Examiner's claim value of $534 million is conservative and there is the possibility, although likely remote, that the court would not net out all transfers between ResCap and AFI, thereby potentially increasing AFI's Insider Preference exposure. Also, there are numerous transfers that the Examiner concludes do not meet all the elements of a preference or are offset by new value contributions; however, the plaintiff would argue otherwise. This is a potential risk of additional exposure to AFI, and thus I have ascribed a 10% increase in value of the settlement amount, bringing the overall likely settlement value of the AFI claims to $328.9 million.

Potential Damages:                                           $534.0 million

Reduced By:

| | |
|---|---|
| 30% inherent risk= | $373.8 million |
| 20% for choice of law= | $299.0 million |
| Increased By: | |
| 10% for no netting of transfers= | $328.9 million |

As an alternative method of determining settlement value, given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand at $480.6 million, approximately 90% of the total amount of the claim, and defendant's initial offer at $80.1 million, approximately 15% of the total claim. Taking into account the relative bargaining power of the parties, the back and forth to be expected in the negotiating process, the strong merits of this insider preference claim, and the risk of additional exposure, I expect a reasonable settlement at the upper end of the range at approximately $300 million.

### Claims against GMAC CF

With respect to the Insider Preference claims of approximately $32 million against GMAC CF, I believe that the sole defense raised by the Examiner was the new value offset of $1.5 million, reducing the claim to $30.5 million. As with the AFI Insider Preference claims, applying the same discounts and enhancements as above, likely settlement value of the GMAC CF claim is reduced to $18.8 million.

| | |
|---|---|
| Potential Damages: | $30.5 million |
| Reduced By: | |
| 30% inherent risk= | $21.4 million |
| 20% for choice of law= | $17.1 million |
| Increased By: | |
| 10% for no netting of transfers= | $18.8 million |

As an alternate method of determining settlement value, given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand to be $28.4 million, approximately 90% of the total amount of the claim, and defendant's initial offer at $4.7 million, approximately 15% of the total amount of the claim. Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate that a fair settlement of this preference claim at approximately $18 million. This is below the materiality threshold of $21 million. In addition, the Examiner was unable to determine from the Debtors' records whether the transfers were made by RFC or GMAC Mortgage. To the extent the transfers were made by GMAC Mortgage Pennsylvania law would apply, not the Minnesota Insider Preference statute with the longer reach back period. Accordingly, these claims are not assigned any material settlement value.

44

5.      **Ally Bank Transactions**

*a.       2006 Bank Restructuring*

**Examiner's Report References:**

Section I.E.5.a pages I-16 to I-19

Section V.A.1.a pages V-1 to V24

Section V.A.2.a and b pages V-44 to V-70

Section VII.F.6.d pages VII.F-134 to VII.F-142

Section VII.E.2 pages VII.E-28 to VII.E-40

Section VII.L.1 pages VII.L-1 to VII.L-28

**Description:**

ResCap exchanged 100% ownership of Old GMAC Bank, a valuable asset, for non-voting shares in IB Financial, the holding company of Ally Bank, which were much less valuable, in a transaction where ResCap's Independent Directors were not informed of, and perhaps misled about, viable alternate structures that would have preserved the full value of Old GMAC Bank for ResCap.

**Background:**

In 2005 AFI and ResCap sought to separate from GM to reduce their high cost of funds due to GM's poor credit rating. Cerberus agreed to acquire 51% of AFI, which would accomplish the desired separation from GM. One glitch was that ResCap owned a federal savings bank, *i.e.*, Old GMAC Bank. If Cerberus acquired indirect ownership of a federal savings bank, it would become subject to the Bank Holding Company Act (BHCA), an undesirable consequence for Cerberus. Fortunately, AFI owned a Utah industrial bank, GMAC Automotive Bank. Indirect ownership of that industrial bank would not implicate the BHCA. A plan was devised to transfer the assets and liabilities from the federal savings bank to the industrial bank and avoid Cerberus becoming subject to the BHCA. Various structures for ownership of the industrial bank were discussed to account for the value and earnings contributed by ResCap. A structure was developed whereby ResCap was given non-voting shares in IB Financial, a new holding company for the industrial bank. However, AFI retained 100% of the voting shares in IB Financial. AFI wanted to retain 100% of the voting rights to accommodate GM's request for a call option on the automotive finance business. ResCap's Independent Directors were told that this arrangement was necessary to consummate the desired deal with Cerberus, but were not told that Cerberus' agreement placed no restriction on ResCap receiving voting shares and that AFI devised the structure to appease GM. The Independent Directors were also not shown a memo from ResCap's General Counsel suggesting that the proposed structure would violate a 2005 Operating Agreement for the benefit of ResCap's creditors that required Independent Director approval of transactions not at arm's length and at fair value. Nor were they

45

told that alternate structures were possible, or that ResCap's CEO had proposed giving ResCap voting control of the industrial bank. Nevertheless, ResCap's board, including the Independent Directors, unanimously approved the transaction. The Examiner estimates that the loss of equity value of the non-voting shares versus the equity in the federal savings bank was between $533 million and $608 million. Giving credit for the benefit to ResCap of lower borrowing costs after the Cerberus deal, the Examiner estimated that the net difference in value to ResCap was a loss of between $390 million and $465 million. The Examiner included $360 million of cash and mortgages contributed by ResCap to the industrial bank, for which it received no stock or other consideration, in his calculations of net difference in value.

**Examiner's Analysis and Conclusions:**

1.     While a close question, it is more likely than not that a fraud claim by ResCap against AFI related to the 2006 Bank Restructuring would not prevail in light of the *in pari delicto* defense and the *Wagoner* Rule.

2.     While a close question, it is more likely than not that a breach of contract claim under the 2005 Operating Agreement by ResCap against AFI related to the 2006 Bank Restructuring would not prevail in light of the *in pari delicto* defense and the *Wagoner* Rule.

3.     It is unlikely that a claim for tortious interference with the 2005 Operating Agreement would prevail against AFI related to the 2006 Bank Restructure because only a non-party may be liable for interfering with a contract.

4.     A fraudulent transfer claim against AFI based upon actual intent is unlikely to prevail with respect to the 2006 Bank Restructure because the evidence does not support actual intent to hinder, delay or defraud creditors.

5.     It is unlikely that a constructive fraudulent conveyance action against AFI would prevail with regard to the 2006 Bank Restructure because ResCap was not financially distressed.

6.     While a close question, it is more likely than not that a claim for breach of fiduciary duties against dual-affiliated ResCap insiders would not prevail.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  Moreover, since the date of the Examiner's Report, the Second Circuit has reaffirmed the *in pari delicto* doctrine and the *Wagoner* rule in *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Investment Securities, LLC).*[25]  I further note that the Examiner did not consider the possibility or likelihood of punitive damages on the fraud claim.

---

[25]   721 F.3d 54 (2d Cir. 2013).

**Settlement Considerations:**

The Examiner posited two different sets of possible values for these claims.  First, the Examiner estimated the loss of equity value to ResCap at between $530 million and $608 million. Giving credit for the benefit to ResCap of the reduction in the cost of the lower borrowing costs, the net difference in value was between $390 million and $465 million. However, the core of the Examiner's conclusion was that alternative structures for completing the Cerberus transaction and reducing ResCap's borrowing costs were available.  If these structures had been utilized, ResCap would still have received the lower borrowing costs without the loss of equity value.  The measure of damages for both fraud and breach of contract claims is to put the injured party in the same position it would have been in but for the fraud or breach.  Accordingly, for purposes of valuing settlement, I used the midpoint of the higher range of values, which was $569 million.

This claim would likely be pursued by a bankruptcy fiduciary such as a trustee or committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to save cost and expedite distributions to creditors.  All of the procedural hurdles that attend bankruptcy litigation would be present in this case, including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law contract dispute and a fraudulent transfer action, (ii) withdrawal of the reference, and (iii) demand for a jury trial.  In addition, all litigation carries risk, uncertainty, and expense.  As a result, it is highly likely that any settlement would reflect a substantial discount (30%) from the face value of the claim.

The Examiner concluded that, while a close question, both the fraud and contract claims were likely to be barred by the *in pari delicto* doctrine and the *Wagoner* rule.  The Examiner's conclusion is supported by the evidence and case law.  As a result, any settlement would reflect a discount of over half the settlement value for these defenses, and I estimate settlement value using a 60% discount.

In addition, the Examiner correctly noted other problems with the claims even if the plaintiffs could get past the *in pari delicto* doctrine and the *Wagoner* rule.  On the contract claim, the Examiner acknowledged that AFI could use the "sole obligation" language in Section 7 of the 2005 Operating Agreement to bar a claim under that Agreement.  Although the Examiner concluded that the plaintiffs could defeat this defense by reliance on the implied duty of good faith and fair dealing, this issue creates further risk for plaintiffs.  In addition, claims based on the implied duty of good faith and fair dealing are inherently risky, as they depend not on specific contract language, but on the finder of fact's subjective view of the conduct.  Likewise, the Examiner also noted that if Minnesota law applies to the fraud claim, the *per curiam* decision of the Minnesota Supreme Court in the case of *Blenda Life Corp. v. Blenda Life, Inc.,*[26] appears to establish a blanket bar to a claim by a subsidiary against a parent.  Although the Examiner was unsure whether a court would follow this decision, which has not been cited for this proposition since, and although this case would not apply to the contract claim which is governed by New York law, this issue creates further risk for the plaintiffs.  Accordingly, any settlement would likely reflect a discount of an additional 25% due to risks on the merits.

---

[26] 196 N.W.2d 925, 927 (Minn. 1972) (per curiam).

The Examiner next concluded that a claim of tortious interference against AFI was not likely to succeed, based on the fact that a party cannot be liable for tortiously interfering with its own contract. I did not attribute any settlement value to this claim.

The Examiner also considered the possibility of breach of fiduciary duty claims against ResCap insiders (who also had dual affiliations with AFI) for concealing information from the independent directors.[27] In favor of the claim, the Examiner identified substantial evidence that material information regarding alternative structures was withheld. However, the Examiner also noted that because ResCap was not insolvent at the time, it is unclear that these insiders had a fiduciary duty to disclose this information. Moreover, there is a substantial risk that any such fiduciary duty claims are time-barred. Even if plaintiffs could surmount these hurdles, the harm from the alleged breaches is unclear, as the independent directors may have approved the transaction even if the information was not withheld. These arguments make a breach of fiduciary duty claim unlikely to succeed. Nevertheless, the Examiner found it to be a close question and I thus estimate that the existence of this alternative theory of recovery adds 10% to the settlement value of the claim.

On the other hand, even assuming that AFI would dispute the Examiner's calculation, the magnitude of the claims ($569 million) would likely be a strong motivating factor for AFI to settle. In addition, the fact that these are close issues would also incline AFI toward a substantial settlement. Legal fees and expenses in prosecuting and defending the claim would run into the tens of millions of dollars. Accordingly, I conclude that AFI would make a substantial offer to resolve these claims.

Under these circumstances, I would expect plaintiff's initial settlement demand to be $320 million, approximately 55% of the gross amount of the claim, and defendant's initial offer at $60 million, approximately 10% of the claim. The back and forth of the negotiation process would ensue, taking into account the discounts and enhancements identified above, as well as the relative bargaining power of the parties. The anticipated settlement range would be between $156 million, 50% of the plaintiff's initial demand, and $120 million, twice the defendant's initial offer, with a likely settlement value of $130.0 million, calculated as follows:

| | |
|---|---|
| Potential Damages: | $569 million |
| Reduced By: | |
| 30% inherent risk = | $398.3 million |
| 60% on in *pari delicto*/merits = | $159.3  million |

---

[27] The Examiner also considered a claim for breach of fiduciary duty against the independent directors, but concluded that it was unlikely to succeed because the independent directors did conduct some due diligence, reasonably relied on the advice of outside counsel, and would likely be exculpated under ResCap's charter. In view of the minimal likelihood of success, this claim does not add any settlement value.

25% merits=                                                    $119.5 million

Increased By:

10% for breach of fiduciary theory alternative=                $130.0 million*

* As noted above we have rounded down from $131.4 million to $130 million

### b.    2008 Bank Transaction and 2009 Bank Transaction

**Examiner's Report References:**

Section I.E.5.b pages I-19 to I-20

Section V.A.1.b and c pages V-24 to V-44

Section V.A.2.c and d pages V-70 to V-89

Section VII.F.6.d pages VII.F-134 to VII.F-148

**Description:**

*2008 Bank Transaction.* At a time when it was insolvent, ResCap issued new ResCap Preferred Interests, convertible into Preferred Interests in IB Finance (the holding company for Ally Bank), in exchange for ResCap bonds that AFI had purchased on the open market. ResCap retained the right to redeem the IB Finance Preferred Interests.

*2009 Bank Transaction.* At a time when it was insolvent, ResCap sold its remaining non-voting Class M stock in IB Finance (the holding company for Ally Bank) to AFI and surrendered its right to redeem the IB Finance Preferred Interests. In exchange, AFI contributed to ResCap Senior Secured Notes of ResCap.

**Background:**

In March 2008, ResCap was experiencing liquidity problems and projected that it would be in breach of a Tangible Net Worth ("TNW") covenant as of March 31, 2008. AFI devised a plan to contribute ResCap bonds that AFI had acquired at a discount on the open market in exchange for newly issued Preferred Interests in ResCap that would be convertible into Preferred Interests in IB Finance, the holding company for Ally Bank. If AFI exercised its conversion rights, ResCap's nonvoting Class M tracking shares in IB Finance would be reduced *pro tanto*; however, ResCap retained the right to redeem the IB Finance Preferred Interests. ResCap's outside counsel reviewed and recommended the transaction and its outside financial advisors opined that the deal was at arm's length and for fair value. A similar exchange occurred in June 2008. The Examiner's advisors value the debt contributed to ResCap at $841 million and the value of the Preferred Interest with conversion rights transferred by ResCap at between $571 million and $714 million.

49

In 2009, ResCap continued to experience liquidity pressure and teetered on the brink of breaching its TNW covenant. AFI again contributed ResCap bonds it had acquired on the open market and extended the maturity of the Initial Line of Credit Facility. In exchange, ResCap transferred its remaining IB Finance non-voting Class M tracking stock and its right to redeem the IB Finance Preferred Interests. The Examiners valued the debt received by ResCap at $600 million and the stock and rights given up by ResCap at between $106.5 million and $217.5 million.

After the 2009 Bank Transaction, equity of the Mortgage Bank which the Class M shares tracked became negative and remained so up until April 30, 2013. Even in hindsight, the 2008 and 2009 Bank Transactions were favorable to ResCap.

**Examiner's Analysis and Conclusions:**

1.      Although the transfer was to an insider at a time when ResCap was in financial distress, the weight of the evidence does not support a finding of actual intent to hinder, delay or defraud ResCap's creditors in connection with the 2008 Bank Transaction. An action to set aside the transfer as an actual fraudulent transfer is not likely to prevail.

2.      ResCap received more than reasonably equivalent value in the 2008 Bank Transaction, making it unlikely that a constructive fraudulent transfer action would be successful.

3.      Although the transfer was to an insider at a time when ResCap was in financial distress, the weight of the evidence does not support a finding of actual intent to hinder, delay or defraud ResCap's creditors in connection with the 2009 Bank Transaction. An action to set aside the transfer as an actual fraudulent transfer is not likely to prevail.

4.      ResCap received more than reasonably equivalent value in the 2009 Bank Transaction, making it unlikely that a constructive fraudulent transfer action would be successful.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Actions to set aside the 2008 and 2009 Bank Transactions as fraudulent transactions are outside the two-year look-back period of Bankruptcy Code section 548. The Examiner determined that these claims would be brought, if at all, under the Minnesota UFTA by a bankruptcy fiduciary using the strong arm provisions of Bankruptcy Code section 544. In light of the Examiner's conclusion that ResCap received reasonably equivalent value in each transaction, I believe that these claims would probably not be pursued. Therefore I ascribe no settlement value to the potential fraudulent transfer actions relating to the 2008 Bank Transaction or the 2009 Bank Transaction.

### 6.    ResCap's Directors And Officers

**Examiner's Report References:**

Section I.E.6 pages I-20 to I-23

Section IV pages IV-1 to IV-69

Section VII.E pages VII.E-1 to VII.E-43

Section VII.K.2.b pages VII.K-31 to VII.K-37

Section VII.K.2.f  pages. VII.K-45 to VII.K-50

**Description:**

Whether any of ResCap's directors or officers are liable for breaches of fiduciary duty. Relatedly, whether AFI is liable for aiding and abetting any such breach of fiduciary duty.

**Background:**

The Examiner considered whether ResCap's directors or officers might be liable for breaches of fiduciary duty regarding several transactions and events, including: (a) the 2006 Bank Restructure; (b) the Second 2009 Tax Allocation Agreement; (c) James Young's failure to sign the First 2009 Tax Allocation Agreement; (d) the prepetition asset sales; (e) the January 30 Letter Agreement, and the A&R Servicing Agreement and the $48 million indemnity payment thereunder; (f) the work of the Special Review Committee, the AFI Settlement and  Plan Sponsor Agreement; and (g) the RMBS Trust Settlement Agreements.  The Examiner also considered whether AFI could be liable for aiding and abetting any such breaches of fiduciary duties.

**Examiner's Analysis and Conclusions:**

1.    Although troubling facts exist, no claims for breach of fiduciary duty by ResCap's directors and officers are likely to prevail.

*(a)    2006 Bank Restructure*

2.    Potential breach of fiduciary claims with regard to the 2006 Bank Restructure exist because fiduciaries with dual affiliations to AFI and ResCap may have purposefully concealed material information from ResCap's Independent Directors.  However, the Examiner is dubious that the dual-affiliated fiduciaries had a duty to disclose to the Independent Directors because their primary duty was to the parent, AFI, so long as ResCap was solvent, which it was in 2006, and there was no apparent self-dealing.  In addition,  it is likely that the applicable statute of limitations expired before ResCap's bankruptcy filing.  Although the actions of the fiduciaries are troubling, breach of fiduciary claims related to the 2006 Bank Restructure, while a close question, are more likely than not to fail because of an absence of a duty to disclose and because the claims are untimely.

3.      The Independent Directors potentially breached their fiduciary duty with regard to the 2006 Bank Restructure by failing to adequately investigate the option for ResCap to receive voting stock in the industrial bank and by not seeking a fairness opinion.  However, it is unlikely that a claim against the Independent Directors for breach of fiduciary duty would prevail because they relied on the advice of counsel and the candor of their co-fiduciaries.

(b)      *Second 2009 Tax Allocation Agreement*

4.      Although the Second 2009 Tax Allocation Agreement was very unfair to ResCap, there was a thorough review process with the assistance of able advisors and there is no evidence to suggest a breach of the duty of loyalty or an intention to act against ResCap's best interests.  The Examiner therefore concluded that, while a close question, a potential breach of fiduciary claim relating to the Second 2009 Tax Allocation Agreement would more likely than not be unsuccessful.

(c) *Young's Failure to Sign First 2009 Tax Allocation Agreement*

5.      The evidence does not establish that Mr. Young intentionally (a) refrained from signing the First 2009 Tax Allocation Agreement with a purpose other than to advance the best interests of ResCap, or (b) acted in dereliction of his duties.  The Examiner accordingly concluded that a claim of breach of fiduciary duty against him, while a close question, would more likely than not be unsuccessful.

(d)      *Prepetition Asset Sales*

6.      Breach of fiduciary claims related to the prepetition asset sales are unlikely to prevail.  Although the transactions occurred in a hurried manner, there is no evidence that the fiduciaries lacked adequate information on which to base their decisions.  In addition, ResCap may have benefited from the time pressure of the transactions and it received fair value in each case.

(e)      *January 30, Letter Agreement and the A&R Servicing Agreement and the $48 million Indemnity Payment Thereunder*

7.      The January 30 Letter Agreement was the result of extensive arm's length negotiations and informed decisions.  It provided fair value to ResCap and allowed it to continue operating despite liquidity challenges. A breach of fiduciary claim related to the January 30 Letter Agreement is therefore unlikely to be successful.

8.      While a close question, the Examiner concludes it is more likely than not that a breach of fiduciary claim related to the $48.4 million payment from ResCap to AFI for indemnification obligations without board authorization would not prevail because it was a reasonable exercise of business judgment by ResCap's executive.

9.      The Examiner also concluded that potential breach of fiduciary claims relating to the A&R Servicing Agreement would not be likely to prevail.  The A&R Servicing Agreement was the product of extensive negotiations with both sides represented, and was at arm's length and for fair value.

*(f)      The Work of the Special Review Committee, the AFI Settlement and  Plan Sponsor Agreement*

10.      The Examiner concluded that although the work of the Special Review Committee was flawed and tainted by conflict of interest, a breach of fiduciary duty claim will more likely than not fail, although it is a close question. The Independent Directors on the Special Review Committee were disinterested and they relied heavily on counsel. The business judgment rule will likely preclude a breach of fiduciary duty claim.

11.      Likewise, the Examiner concluded that the AFI Settlement and Plan Sponsor Agreement, although flawed, do not support claims for breach of fiduciary duty.  Relying on the advice of counsel, ResCap's board concluded that the AFI Settlement was reasonable in light of the challenging and complex legal issues. The business judgment rule will likely preclude a breach of fiduciary claim.

*(g)      The RMBS Trust Settlement Agreements*

12.      The Examiner also found that the RMBS Trust Settlement Agreements were hurriedly approved with possibly flawed advice. However, the negotiations were conducted at arm's length by counsel upon whom the board reasonably relied.  While a close question, it is more likely than not that a breach of fiduciary claim related to the RMBS Trust Settlement Agreements would not prevail.

13.      Since none of the predicate breach of fiduciary claims is likely to prevail, the Examiner did not believe there is a viable claim of aiding and abetting a breach of fiduciary duty.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Many of the events and transactions that may give rise to potential breach of fiduciary claims are analyzed separately for reasonable settlement value elsewhere in this report.  Specifically, the claims for breaches of fiduciary duty claims relating to the 2006 Bank Restructure, the 2009 Tax Allocation Agreements, the pre-petition asset sales, the $48.4 million payment, and the RMBS Trust Settlement Agreements are addressed in those sections.  The existence and settlement value of breach of fiduciary duty claims related to those events or transactions are considered in those sections.  Because duplicative damages are not available for such claims, these claims do not have additional settlement value above and beyond what is considered in the underlying transactions.

As for the remaining claims, claims for breach of fiduciary duty are expensive to litigate and are susceptible to threshold issues and strong defenses.  Specifically, as the Examiner noted, claims for breach of fiduciary duty will have to overcome standing obstacles under Delaware law, and likely will have to be brought derivatively.  In addition, the Examiner observed that the defendants

will likely rely on the business judgment rule, experts, and exculpatory clauses to defend against such claims. As a result, the settlement value of any claim for breach of fiduciary duty is subject to a significant discount of 40%, from its face value.

Turning to specific claims, the Examiner found that breach of fiduciary duty claims based on the January 30 Letter Agreement were not likely to succeed, as it was subject to extensive arm's length negotiation and ResCap received fair value. Given the cost of bringing such a claim, as well as the availability of the defenses noted above, such a claim is unlikely to be brought and does not add any settlement value.

Similarly, the Examiner found that claims regarding the A&R Servicing Agreement were not likely to prevail. The Examiner observed that the A&R Servicing Agreement was entered into at arm's length and for fair value, and it was critical to GMAC Mortgage's valuable servicing platform, so that the lack of approval by the GMAC Mortgage Board is not likely to be significant. Given the cost of bringing such a claim, as well as the availability of the defenses noted above, such a claim is unlikely to be made and does not add any settlement value.

Finally, the Examiner found that fiduciary duty claims related to the AFI Settlement and Plan Sponsor Agreement were not likely to succeed. The Examiner noted that the performance of the board was incomplete and tainted by conflicts of counsel. At the same time, the Examiner found that the board and the independent directors reasonably relied on the advice of outside counsel and that they were entitled to defer to that expertise. Accordingly, such a claim is not likely to be brought and does not add any settlement value.

Because these claims are subject to significant defenses, not likely to prevail, and not likely to be brought, they are not material and do not add any settlement value.

### 7. Single Entity Theories Of Liability

#### a. *Piercing The Corporate Veil*

**Examiner's Report References:**

Section I.E.7.a pages I-23 to I-25

Section VII.A pages VII.A-1 to VII.A-64

**Description:**

Whether ResCap and AFI operated as a single economic entity in an unjust or unfair manner such that a claim could be successfully asserted on behalf of ResCap to pierce its corporate veil, thereby making AFI liable for all of ResCap's debts.

**Background:**

ResCap was a wholly owned subsidiary of AFI. The Examiner's Investigation uncovered evidence of certain indicia that ResCap and AFI operated as a single economic entity. ResCap's

conduct in connection with a number of Affiliate Transactions (*e.g.*, the 2006 Bank Restructuring, the MSR Swap, the Pipeline Swap, the First 2009 Tax Allocation Agreement, the Second 2009 Tax Allocation Agreement, and the allocation of liability in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement) departed in some important respects from appropriate corporate formalities, including the requirements of ResCap's own operating agreements.

**Examiner's Analysis and Conclusions:**

1.      The application of Delaware law to the assessment of potential veil-piercing claims is consistent with the weight of authority in the Second Circuit.

2.      Delaware law recognizes the existence of a claim on behalf of a debtor to pierce its own corporate veil.

3.      An "alter ego" claim constitutes property of the debtor corporation, and the debtor-in-possession or bankruptcy trustee has exclusive standing to assert the claim.

4.      A debtor that succeeds in piercing its own corporate veil may hold its parent liable for all of its debts.

5.      In order to pierce the corporate veil and establish alter ego liability under Delaware law, a plaintiff must show (1) that the parent and subsidiary operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present. The fact that the subsidiary is a limited liability company does not change the analysis.

6.      Factors considered by courts applying Delaware law to determine whether a parent and its subsidiary should be deemed a "single economic entity" include: (1) undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of the debtor corporation at the time, (5) siphoning off of the corporation's funds by the dominant parent, (6) absence of corporate records, and (7) the fact that the corporation is merely a façade for the operations of the dominant parent.

7.      The evidence does not support the proposition that ResCap was inadequately capitalized or insolvent at or around its formation.

8.      The evidence does not support the proposition that AFI siphoned assets from ResCap.

9.      The Examiner did not afford any weight to ResCap's nonpayment of dividends.

10.     The Examiner concluded that the evidence supported the proposition that ResCap failed to follow or followed inconsistently, certain appropriate corporate formalities.

11.     The Examiner concluded that a court would likely find that the operations of ResCap and AFI would be consistent with the operations of a subsidiary and its parent.

12.     The Examiner does not consider any theory of injustice or unfairness likely to succeed.

55

13.      Any veil-piercing claims asserted on behalf of ResCap against AFI are unlikely to prevail.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Based upon the Examiner's factual and legal conclusions, it would initially seem that if this claim were pursued by a bankruptcy fiduciary, such as a trustee or a committee, it would likely be pursued on a contingent fee basis in view of the uphill battle evidenced by the Examiner's conclusions. However, there are third party contingent claims against AFI for RMBS litigation in the tens of billions of dollars. Thus, I believe that a creditors' committee and third party plaintiffs would work together to overcome any "standing" issues to receive authority from a court to pursue the single entity claim theories, including veil-piercing and alter ego, on behalf of the estate. Despite the fact that the Examiner concludes, and I agree, that veil-piercing and alter ego claims are unlikely to succeed, I conclude there is significant settlement value not to exceed $480 million as discussed in the Third Party RMBS litigation analysis below.

### b.      *Substantive Consolidation*

**Examiner's Report References:**

Section I.E.7.b  page I-25

Section VII.A.2  pages VII.A-65 to VII.A-85

**Description:**

Whether there is evidence to support the consolidation of AFI into the estate of ResCap or any other subsidiary.

**Background:**

Substantive consolidation is an equitable doctrine pursuant to which the assets and liabilities of affiliated entities are treated as one for purposes of a bankruptcy case. Intercompany claims of the consolidated debtors are eliminated, the assets of the consolidated debtors are treated as common assets, and the claims of outside creditors against any of the debtors are treated as claims against the consolidated entity. The only finding of the Examiner in support of substantive consolidation is the absence of certain corporate formalities. However, the Examiner uncovered no credible evidence that creditors dealt with ResCap and AFI as a single entity. Trading activity in ResCap bonds, CDS pricing and credit ratings, consolidated financial statements, and lack of guarantees (although guarantees might negate single entity status) were considered by the Examiner.

56

**Examiner's Analysis and Conclusions:**

1.      Controlling Second Circuit law regarding substantive consolidation is set forth in the *Augie/Restivo*[28] case and requires that either (i) creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit, or (ii) the entities' affairs are so entangled that substantive consolidation would benefit all creditors.

2.      While a close question, it is more likely than not that a court would find that ResCap and AFI operated as a single economic entity.

3.      However, there is no evidence that creditors relied upon ResCap and AFI being a single economic entity.

4.      The evidence does not support the proposition that AFI and ResCap's affairs were hopelessly entangled.

5.      It is unlikely that a motion for substantive consolidation on either theory would prevail.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  Both tests for substantive consolidation are fact specific.

**Settlement Considerations:**

If a claim for substantive consolidation were successful, creditors of ResCap would share in the assets of AFI *pari passu* with AFI's creditors (and vice versa) thereby significantly enhancing their recovery.  Because of the fact intensive nature of substantive consolidation, it may be possible for a trustee or other estate representative to withstand a motion to dismiss, although based on the facts found by the Examiner, the likelihood of such success is minimal.

However, there is always the chance that litigation with a low probability of success will prevail and so the risk to AFI and its creditors increases.  There are third party contingent claims against AFI for RMBS litigation in the tens of billions of dollars.  Despite the fact that the Examiner concludes, and I agree, that a substantive consolidation claim is unlikely to succeed, I conclude there is significant settlement value not to exceed $480 million as discussed in the Third Party RMBS litigation analysis below.

---

[28] *Union Savings Bank v. Augie/Restivo Baking Company, Ltd. (In re Augie/Restivo Baking Company, Ltd.)*, 860 F.2d 515 (2d Cir. 1988).

## 8.    Debt Re-characterization

**Examiner's Report References:**

Section I.E.8 pages I-25 to I-26

Section VII.B pages VII.B-1 to VII.B-27

Section V.E.3, 5, and 8 pages V-357 to V-362, V-368 to V-372 and V-377 to V-379

Section VI.B.2 and 3 pages VII.B-1 to VII.B-13

**Description:**

Whether any of the claims held by AFI are subject to re-characterization as equity.

**Background:**

AFI holds two categories of claims: (1) claims under the A&R Secured Revolver Loan Agreement (approximately $747 million) and under the A&R Line of Credit Agreement (approximately $380 million); and (2) claims with respect to Unsecured Notes and Senior Secured Notes (aggregating $2.4 billion in face principal amount) that were exchanged by AFI for, among other things, ResCap Preferred Interests in the 2008 Bank Transaction and ResCap's remaining IB Finance Class M Shares in the 2009 Bank Transaction.

**Examiner's Analysis and Conclusions:**

1.    It is unlikely that an effort to re-characterize the AFI Secured Revolver Facility claims as equity would prevail.

2.    It is unlikely that an effort to re-characterize the AFI Line of Credit Agreement claims as equity would prevail.

3.    It is unlikely that an effort to retroactively re-characterize the Unsecured Notes and the Senior Secured Notes used by AFI as consideration in connection with the 2008 Bank Transaction and the 2009 Bank Transaction would prevail.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This cause of action would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution in order to save cost and expedite distributions to creditors.

58

The Examiner evaluated each of the AFI Secured Revolver Facility, the AFI Line of Credit Agreement, the Unsecured Notes and the Senior Secured Notes used by AFI as consideration in connection with the 2008 Bank Transaction and the 2009 Bank Transaction  (i) in light of the evidence related to the material of issue whether the parties intended them to be debt or equity, (ii) application of the factors courts generally consider in determining whether to re-characterize claims as equity (the "*Autostyle* Factors"), and (iii) possible defenses.  The facts and the application of the *Autostyle* Factors (as well as some other factors) support a determination that the all of the claims and notes constitute debt that cannot be re-characterized as equity.[29]  Significantly, the Examiner's investigation did not reveal any evidence that the parties ever intended, considered or treated the loans as anything other than loans.

The Examiner also considered possible defenses including, *inter alia*, the statute of limitations.

AFI would most likely vigorously defend any re-characterization action because, as set forth above, the facts and the law are almost exclusively in its favor.

Although it appears that AFI would successfully defend such actions, all litigation carries some risk, uncertainty and expense regardless of how strong a case may be.  Thus, AFI may be willing to offer a small settlement ("nuisance settlement") to prevent the limited possibility of losing the litigation, which settlement would be less than $10 million and therefore not material to the allocation of the $2.1 billion settlement fund.  Alternatively, the fiduciary is unlikely to be willing to incur significant legal cost and expense to pursue these complex actions which are unlikely to prevail.

Given the Examiner's factual and legal conclusions, I believe there is no material settlement value to these claims.

## 9.    Equitable Subordination And Equitable Disallowance

**Examiner's Report References:**

Section I.E.9 pages I-26 to I-28

Section VII.C  pages VII.C-1 to VII.C-18

Section VII.D  pages VII.D-1 to VII.D-3

---

[29] I note that the Court of Appeals for the Tenth Circuit in *Sender v. Bronze Group, Ltd.* (*In re Hedged-Investment Assocs., Inc.*), 380 F.3d 1292 (10th Cir. 2004) discussed many of the *Autostyle* Factors plus some additional factors such as the right to enforce payment, the intent of the parties, failure of debtor to repay on due date, and  participation in management, and did not include some of the *Autostyle* Factors such as sinking fund for interest, or security for payment.  However, the Examiner separately considered some of *Sender's* additional factors such as the intent of the parties and right to enforce payment.  Also, in support of his statement that "courts would likely undertake an analysis of the *Autostyle* factors", the Examiner cited *In Re BH S&B Holdings LLC*, 420 B.R. 112 (2009), a Bankruptcy Court case from the Southern District of New York.

**Description:**

Creditors assert that AFI's claims against ResCap, including $747 million under the A&R Secured Revolver and $380 million under the A&R Line of Credit, should be subordinated or disallowed to the claims of all other creditors under Bankruptcy Code section 510(c).

**Background:**

The Examiner investigated the following matters for evidence of inequitable conduct by AFI, harm to other creditors, or unfair advantage to AFI: (1) the 2006 Bank Restructuring, (2) the Second 2009 Tax Allocation Agreement, (3) the misallocation of revenues on brokered loans, (4) ResCap's forgiveness of subsidiary indebtedness and the 2009 Bank Transaction, (5) the Line of Credit Facilities, and (6) alter ego, asset stripping and aiding and abetting breach of fiduciary claims.

**Examiner's Analysis and Conclusions:**

1.      ResCap and its creditors were harmed by AFI's inequitable and unfair conduct in connection with the 2006 Bank Restructuring in an amount of between $390 million and $608 million.

2.      ResCap and its creditors were harmed by AFI's inequitable and unfair conduct in connection with the Second 2009 Tax Allocation Agreement in the approximate amount of $50 million.

3.      It is more likely than not that ResCap and its creditors were harmed by AFI and Ally Bank in the amount of approximately $520.5 million with respect to the misallocation of revenues on the brokered loans.

4.      AFI, however, provided ResCap with substantial capital support totaling in excess of $8 billion in the form of cash contributions, debt forgiveness, and contributions of other assets.

5.      While a close case, it is more likely than not that equitable subordination of AFI's claims would not prevail.

6.      Equitable disallowance requires a showing of more serious conduct than that necessary for equitable subordination.

7.      It is unlikely that equitable disallowance of AFI's claims would prevail.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Each of the claims in which inequitable conduct was found by the Examiner is also ascribed value separately by the Examiner, therefore, each of those claims is evaluated separately for settlement purposes in this report and ascribed significant settlement value. However, I believe that the prospect that AFI's claims might be equitably subordinated or equitably disallowed adds little to the evaluation of those claims and has no independent settlement value on its own.

### 10.    Constructive Trust Claim

**Examiner's Report References:**

Section I.E.10 page I-28

Section VII.I  pages VII.I-1 to VII.I-17

**Description:**

Whether a constructive trust should be imposed on ResCap's interest in the mortgage division of Ally Bank or on proceeds of TARP funds that AFI received by virtue of its relationship with ResCap.

**Background:**

The Examiner considered whether AFI orchestrated the "Ally Bank Transactions," which consist of the 2006 Bank Restructuring, the 2008 Bank Transaction, and the 2009 Bank Transaction, to strip ResCap of its assets, resulting in AFI being unjustly enriched. The details of these transactions are discussed elsewhere in this report.

The Examiner also considered whether the Troubled Asset Relief Program ("TARP") funds received by AFI were received, at least in part, as a result of ResCap's financial difficulties, such that ResCap was an intended beneficiary of these funds and AFI was unjustly enriched by the retention of these funds. AFI received a total of $17.2 billion under TARP, but the Examiner's focus was on the first $5.7 billion received.

**Examiner's Analysis and Conclusions:**

1.    A constructive trust claim is unlikely to prevail with regard to the Ally Bank Transactions. First, claims regarding the 2006 Bank Restructuring are governed by the 2005 Operating Agreement and the indenture governing the Unsecured Notes, and claims for unjust enrichment and a resulting constructive trust do not apply where the relationship is governed by an express contract. Second, the Examiner found that ResCap received reasonably equivalent values in the 2008 Bank Transaction and the 2009 Bank Transaction, negating any claim against AFI for unjust enrichment.

2.      A constructive trust claim is unlikely to prevail for the TARP funds. The evidence shows that the funds went to AFI because of AFI's involvement in the automotive business, not because of ResCap.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Regarding the 2006 Bank Restructuring, it is black-letter law that there can be no unjust enrichment when the claims at issue are governed by a written contract.  Accordingly, constructive trust or unjust enrichment claims are highly unlikely to succeed.  Moreover, as discussed elsewhere in the report, ResCap has much stronger claims regarding the 2006 Bank Restructuring.  Therefore, the unjust enrichment/constructive trust theory does not add materially to the settlement value of those claims.

Similarly, based on the Examiner's well-supported finding that ResCap received fair value in the 2008 Bank Transaction and the 2009 Bank Transaction, a constructive trust claim regarding those transactions is highly unlikely to succeed.  I discuss elsewhere that fraudulent transfer claims regarding the 2008 Bank Transaction and the 2009 Bank Transaction would not likely be pursued in light of the Examiner's determination that ResCap received reasonably equivalent value.  For the same reason I do not believe that a constructive trust claim would be pursued.

Regarding the TARP funds, the Examiner found significant evidence that the TARP funds were given to AFI not because of ResCap but because of the government's interest in preserving the automotive industry.  As a result, the claim is highly unlikely to succeed and AFI would likely be successful in having any claim dismissed on summary judgment.  The only countervailing consideration is the sheer size of the claim - $5.7 billion.  To avoid the risk of liability as to this large number and the cost of litigating the claim, AFI would likely be willing to settle this for nuisance value, which I believe would be less than $21 million and therefore not material for purposes of the allocation of the $2.1 billion settlement fund.

## 11.      Prepetition Asset Sales

**Examiner's Report References:**

Section I.E.11 page I-29

Section V.F pages V-383 to V-468

Section VII.F.6  pages VII.F-122 to VII.F-147

**Description:**

Whether any of seven prepetition asset sale transactions constitute constructive fraudulent transfers.

**Background:**

The Examiner reviewed the following sales of assets to affiliates of ResCap ("Prepetition Asset Sales"):

> (a)    *Health Capital Sale by RFC to GMAC CF in August 2007*

> *The sale of substantially all assets and operations of Health Capital for $900.5 million;*

> (b)    *June 2008 Model Home Sale by GMAC MHF to Cerberus*

The sale of 1,614 model homes and 127 lots for $230 million plus Class B Junior Preferred Shares in CMH;

> (c)    *Resort Finance Sale by RFC and GMAC Canada to GMAC CF in July 2008*

Sale of substantially all of Resort Finance for cash consideration of $96.1 million (later increased to $111.1 million) plus the assumption of $1,125 billion of debt;

> (d)    *Excess Servicing Rights Sales by GMAC Mortgage to Cerberus in July 2008*

Following two auctions, the sale to Cerberus, as highest bidder, of certain excess servicing rights on (i) Freddie Mac Loans with $13.8 billion unpaid principal balance, and (ii) Fannie Mae loans with $24.8 billion unpaid principal balance, capturing, respectively, $591.2 and $981.9 million notional interest-only securities;

> (e)    *September 2008 Model Home Sale by DOA Holding Properties, LLC to Cerberus*

Following an auction, the sale of two pools of model home assets for net cash proceeds of $59.2 million;

> (f)    *ResMor Sale by GMAC Canada to AFI in January 2009*

Sale of all outstanding shares in ResMor for C$82 million (approximately $67 million as of December 31, 2008); and

> (g)    *US/UK Broker-Dealer Sale by RFC to AFI in May 2009*

Sale of RFC's interests in Ally Securities and RFCIL for $42.3 million and $18.1 million, respectively, plus payment to RFC of an amount equal to the entire outstanding principal due and payable under an existing $50 million subordinated loan between RFC and Ally Securities.

63

**Examiner's Analysis and Conclusions:**

1.      The evidence supports the proposition that RFC, GMAC Canada, GMAC Mortgage and their affiliate sellers received reasonably equivalent value in each of the Prepetition Asset Sales, with the possible exception of the June 2008 Model Home Sale by GMAC MHF to Cerberus.

2.      While a close question with respect to the June 2008 Model Home Sale, it is more likely than not that a constructive fraudulent transfer claim against Cerberus would not succeed under existing law.

3.      It is more likely than not that a court would find that the value received by RFC as the equity owner of GMAC MHF, as well as by GMAC MHF, would constitute reasonably equivalent value.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

These causes of action would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution of disputes in order to save costs and expedite distributions to creditors.

The Examiner evaluated each of the Prepetition Asset Sales to determine if any would constitute a constructive fraudulent transfer under applicable law, focusing on whether or not the selling Debtor(s) received "reasonably equivalent value" for the transfer. In that regard the Examiner addressed three fundamental questions: (i) what was the form and value of the property transferred by the Debtor(s); (ii) did the Debtor(s) receive value in exchange for the property transferred, and, if so, in what form and amount; and (iii) was the value received by Debtor(s) a reasonably equivalent in exchange for the property transferred.

With respect to each of the following Prepetition Asset Sales, the Examiner concluded as follows:

(a)      *Health Capital Sale by RFC to GMAC CF in August 2007*

Based on his analysis and the totality of the circumstances, including, without limitation, the valuation prepared by Houlihan Lokey and other market indicators, the evidence supports the proposition that RFC received reasonably equivalent value in this sale.

(b)      *June 2008 Model Home Sale by GMAC MHF to Cerberus*

Although RFC received at least $30 million less than the Fair Market Value, based on the totality of the circumstances, it is more likely than not that a court would find that the value received by RFC would constitute reasonably equivalent value in this sale.

64

*(c)       Resort Finance Sale by RFC and GMAC Canada to GMAC CF in July 2008*

Based the totality of the circumstances, including, without limitation, the Houlihan Lokey valuation, the Morgan Stanley Fairness opinion, prior sales attempts by Bear Stearns, Morgan Stanley's orderly liquidation analysis, and various adjustments to the calculation of the purchase price, the evidence supports the proposition that RFC and GMAC Canada received reasonably equivalent value in this sale.

*(d)       Excess Servicing Rights Sales by GMAC Mortgage to Cerberus in July 2008*

Based on the totality of the circumstances, including, without limitation, the nature of the auctions, Pentalpha's memorandum, and market conditions at the time of the auctions, the evidence supports the proposition that GMAC Mortgage received reasonably equivalent value in this sale.

*(e)       September 2008 Model Home Sale by DOA Holding Properties, LLC to Cerberus*

Based on the totality of the circumstances, including, without limitation, an auction process including non-affiliated bidders conducted by a nationally recognized broker in an arm's length manner, the degree of differential between the bids received and the temporal and contingent factors surrounding such bids, the evidence supports the proposition that RFC (as the owner of GMAC Canada), and GMAC Canada received reasonably equivalent value in this sale.

*(f)       ResMor Sale by GMAC Canada to AFI in January 2009*

Based on the totality of the circumstances, including, without limitation, the fairness opinions by Goldin Associates and Sandler O'Neill, the GMAC Canada investment in ResMor in the prior year and other market indicators, the evidence supports the proposition that RFC as the owner of GMAC Canada, and GMAC Canada, received reasonably equivalent value in this sale.

*(g)       US/UK Broker-Dealer Sale by RFC to AFI in May 2009*

Based on the totality of the circumstances, including, without limitation, the Goldin Associates valuation analyses and fairness opinion, and prevailing market indicators, the evidence supports the proposition that RFC received reasonably equivalent value in this sale.

The purchasers (AFI and Cerberus) would most likely vigorously defend any fraudulent transfer actions because, as set forth above, the facts and the law are almost exclusively in their favor as to all of the above transactions, with the possible exception of the June 2008 Model Home Sale transaction, and with respect to that sale the Examiner has concluded it is unlikely to prevail.

Although it appears that the purchasers would successfully defend such actions, all litigation carries some risk, uncertainty and expense regardless of how strong a case may be. Alternatively, the fiduciary is unlikely to incur significant legal cost and expense to pursue what would be complex actions which are unlikely to prevail.

Thus, Cerberus may be willing to offer a small settlement ("nuisance settlement") with respect to the June 2008 Model Home Sale transaction to prevent the small possibility of losing the litigation. However, considering that the upside to the fiduciary in that transaction is likely to be no more than $30 million, the fiduciary must also consider the cost and benefit in pursuing same.

Given the Examiner's factual and legal conclusions, I believe there is no material settlement value to these claims.

## 12. Financing Affiliate Transactions

**Examiner's Report References:**

Section I.E.12  page I-29

Section V.E pages V-350 to V-383

Section VII.F pages VII.F-1 to VII.F-154

**Description:**

Whether the terms of material prepetition financing Affiliate Transactions were entered into at arm's length and on balance were more favorable to ResCap than would have been obtained in third party financings of comparable size and nature.

**Background:**

The Examiner reviewed the following prepetition financing Affiliate Transactions ("Financing Affiliate Transactions"):

(a)    Resort Finance Facility;

(b)    Secured MSR Facility;

(c)    Secured Revolver Facility;

(d)    Servicing Advance Factoring Facility;

(e)    Initial Line of Credit Facility;

(f)    ResMor Loan Facility;

(g)    Second Line of Credit Facility;

(h)    Amended and Restated Credit Facilities; and

(i)    BMMZ Repo Facility.

**Examiner's Analysis and Conclusions:**

All of the these Financing Affiliate Transactions were entered into at arm's length and on balance were more favorable to ResCap than would have been obtained in the third-party financings of comparable size and nature.[30]

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

The Examiner evaluated the Financing Affiliate Transactions to determine if each was entered at arm's length or were less favorable to ResCap than would have been obtained in the third-party financings of comparable size and nature.

With respect to each of the following Financing Affiliate Transactions, the Examiner found as follows:

> *(a)      Resort Finance Facility*

This facility entered by RFC, as borrower, with AFI, as lender, was intended to be bridge financing while ResCap searched for a third party to purchase its Resort Finance business (at the time there were already discussions with third parties for such sale). Bear Stearns issued a fairness opinion concluding that the financial terms and conditions were no less favorable to RFC than the financial terms and conditions that would be expected to be obtained in a comparable financing with an unaffiliated third party at arm's length.

> *(b)      Secured MSR Facility*

This facility, entered by RFC and GMAC Mortgage as borrowers, and ResCap as guarantor, with AFI, as lender, was to provide additional liquidity.  At the time, Barclays contemplated providing RFC with a secured facility and sent a term sheet.  However, ResCap's liquidity needs were imminent and several months of negotiations could have been required to complete and syndicate a facility with Barclays.  This led to a proposal for AFI to provide the Secured MSR Facility as a bridge to the Barclays facility.  Morgan Stanley viewed the terms favorably, concluding, among other things, that the facility provided materially better economic terms than the proposed Barclays facility and existing facilities and was more attractive than facilities available in the then current marketplace.  The search for a lender to refinance this facility proved to be futile.  AFI ultimately forgave all indebtedness under this facility.

---

[30] The Examiner noted that notwithstanding this conclusion, certain of Financing Affiliate Transactions implicate potential Estate Causes of Action as discussed in Section VII.F (each of which are discussed in other sections of this report).

67

*(c)    Secured Revolver Facility*

This facility, entered by RFC and GMAC Mortgage as borrowers, ResCap and various ResCap Subsidiaries as guarantors, and AFI as lender, was required to provide more liquidity due to looming credit maturities and capital needs. Two of the maturing credit facilities were (i) the unsecured JP Morgan 364 Day Facility of $875 million and (ii) the JP Morgan 2005 Term Loan Facility in the amount of $1.75 billion. On the closing date of this facility, AFI converted approximately $1.3 billion of term loans under the JPMorgan 2005 Term Loan Facility (that AFI obtained through assignment) into the equivalent amount of the Secured Revolver Facility and $450 million was borrowed thereunder to repay the principal of the JPMorgan 2005 Term Loan Facility. Also, this facility was used to pay the $1.75 billion cash portion of the ResCap tender and bond exchange (pursuant to which $8.6 million in unsecured ResCap notes were exchanged for approximately $5.6 million of the Senior Secured Notes and Junior Secured Notes). As a result, the Secured Revolver Facility was fully drawn in the amount of $3.5 billion with the proceeds used to exchange direct unsecured ResCap obligations owed to unaffiliated parties. The Secured Revolver Loan Agreement was amended and restated by the A&R Secured Revolver Loan Agreement.

*(d)    Servicing Advance Factoring Facility*

ResCap, seeking to monetize certain non-GSE Servicing Advances, entered this facility with GMAC CF which was structured as a "true sale" of receivables and not financing. GMAC CF was reluctant to enter into this facility, but after intensive negotiations, agreed to an 85% advance rate which provided RFC and GMAC Mortgage with greater liquidity than they would have if they borrowed against the same assets under the Secured Revolver Facility. AFI entered into a collateral release agreement with respect to the Servicing Advances. Morgan Stanley delivered a fairness opinion with respect to this facility which concluded that the purchase price for the initial and contemplated subsequent purchase of receivables were fair to RFC. This facility contained provisions commonly found in receivables factoring transactions and other representations, warranties, termination events and indemnification provisions standard for receivables factoring transactions between unaffiliated parties.

*(e)    Initial Line of Credit Facility*

Despite a first lien secured credit facility and second and third lien secured bonds, due to the favorable permitted lien and collateral release provisions in the Secured Revolver Loan Agreement, Senior Secured Notes Indenture and Junior Secured Notes Indenture, PATI and RATI, as borrowers, were able to enter this facility, guaranteed by ResCap, with AFI as lender, in the amount of $430 million. Failing to find unaffiliated lenders, AFI became the lender of last resort for this facility. This facility exemplified an affiliate transaction more favorable to the borrowers than would have been obtained in a syndicated credit facility with unaffiliated lenders, and it would be extremely unlikely for a single lender to provide this facility. This facility was amended and restated by the A&R Line of Credit Facility.

(f)    *ResMor Loan Facility*

GMAC Canada entered into this facility with AFI in the amount of CDN $82 million. At the same time, AFI as purchaser, entered into a purchase agreement to purchase from GMAC Canada, as seller, the stock of 1020491 Alberta Ltd. and ResMor. The principal amount of this loan was intended to be repaid at the closing on the sale by setting it off against the purchase price. The sale closed and the loan was repaid as contemplated. Goldin Associates rendered a fairness opinion stating that the ResMor Sale was fair, from a financial point of view, to ResCap and its creditors (other than AFI). This facility contained very basic representations, warranties and covenants and the events of default were standard for facilities of comparable size and nature.

(g)    *Second Line of Credit Facility*

Instead of increasing the Line of Credit commitment amount, AFI, as lender, provided PATI and RAHI, as borrowers, with this facility in the initial amount of $370 million on substantially similar terms to the Initial Line of Credit Facility (and together with the Second Line of Credit Facility, the "Line of Credit Facilities"). This facility was later increased to $470 million. On December 30, 2009 this facility and the Initial Line of Credit Facility were combined into the A&R Line of Credit Facility. Goldin Associates provided a fairness opinion concluding the terms of the documents were fair to ResCap and its creditors (other than AFI) and provided a further fairness opinion for the amendment of this facility to increase it. The provisions of this facility exemplified an affiliate transaction more favorable to the borrowers than would have been obtained in a third party financing. Goldin Associates delivered a favorable fairness opinion in connection with the increase of the cumulative commitment under the Line of Credit Facilities up to an additional $500 million. Just before the consolidation of the Line of Credit Facilities, this facility was increased from $470 million to $670 million.

(h)    *Amended and Restated Credit Facilities*

The Line of Credit Facilities were combined into one agreement and the Secured Revolver Loan Agreement was amended and restated to convert $1.55 billion of Secured Revolver Facility Revolver Loans into Secured Revolver Facility Term Loans. After assignments of obligations, the new borrowers under the A&R Line of Credit were GMAC Mortgage and RFC, and they were required to provide a solvency representation which was similar to the solvency representation for the A&R Secured Revolver Loan Agreement. The A&R Line of Credit Agreement contained representations, warranties, covenants, events of default and indemnification provisions that were standard for facilities of comparable size and nature (and would be typical for a syndicated credit facility with unaffiliated lenders). Provisions exemplifying an affiliate transaction that were more favorable to the borrowers, were the same as those under the Line of Credit Facilities.

(i)    *BMMZ Repo Facility*

GMAC Mortgage and RFC had each entered separate financing agreements with Citibank and Goldman Sachs in the form of mortgage loan repurchase facilities with an aggregate commitment of $300 million. ResCap guaranteed these obligations. AFI proposed to ResCap a

69

new mortgage loan repo facility to be provided by one of its Subsidiaries, BMMZ, on substantially the same terms as proposed by Citibank, but with some advantages to ResCap including no commitment fee, more favorable advance rates, and no aggressive amortization schedule. Goldin Associates was engaged to provide an analysis of the terms of the Citibank proposal and of the AFI proposal, and to provide a fairness opinion. Goldin Associates concluded that this facility contained terms that were at least as favorable to ResCap and its creditors (other than AFI) as those that could reasonably be obtained by ResCap from an unaffiliated third party lender. This facility contained closing conditions, representations, warranties, events of default and indemnification provisions that were generally customary for a repo facility. This facility terminated in connection with the transactions consummated under the Barclays DIP Financing Agreement.

The Examiner determined, and I concur, that each of these Financing Affiliate Transactions were entered into at arm's length and on balance were at least as favorable to ResCap than would have been obtained in the third-party financings of comparable size and nature. The Examiner does not discuss any potential causes of action in this section of his Examiner's Report. However, he does note that certain of the Financing Affiliate Transactions are implicated in potential fraudulent transfer Estate Causes of Action, for example, but not by way of limitation, the Minnesota Insider Preference claims, however, the settlement value of those potential Estate Causes of Action are addressed elsewhere in this Opinion.

## F.    VALUE OF SETTLED ESTATE CAUSES OF ACTION

| Claims | Potential Damages (in millions) | Reasonable Settlement Amount (in millions) | Percentage of Potential Damages |
|---|---|---|---|
| ***ESTATE CAUSES OF ACTION*** | | | |
| Breach of Contract for Misallocation of Net Revenues on Loans brokered by GMAC | $520.5 | **$268.2** | **51.5%** |
| Breach of Contract for Failure To Pay Value of Purchased MSRs | $1,725.0 | **$387.2** | **22.4%** |
| Breach of Representations and Warranties under 2001 and 2006 MMLPSAs | No Amount Given | | |
| Breach of Contract Claims relating to Pipeline Swap | No Amount Given | | |
| Breach of 2005 Operating Agreement or 2006 Amended Operating Agreement in connection with MMLPSA, Pipeline Swap or MSR Swap | No Amount Given | | |

70

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|
| Preferential Transfer relating to DOJ/AG Consent Order | $109.6 | **$60.0** | **54.7%** |
| Preferential Transfer relating to 2012 Letter Agreement and A&R Servicing Agreement | $48.4 | **$32.0** | **66.1%** |
| Unauthorized Post-petition Transfer relating to Indemnification Obligations under A&R Servicing Agreement | $12.9 | | |
| Breach of contract regarding the First 2009 Tax Allocation Agreement | $1,770.0 | **$713.7** | **40.3%** |
| Constructive Fraudulent Transfer relating to 2nd 2009 Tax Allocation Agreement | $50.0 | | |
| Contract Claim re 2005 Tax Allocation Agreement | $15.1 | | |
| Minnesota Insider Preference Claims | $566.0 | **$328.9** | **58.1%** |
| Fraud related to 2006 Bank Restructuring | $569.0 | **$130.0** | **22.8%** |
| Tortious Interference with Contract relating to 2006 Bank Restructuring | No Amount Given | | |
| Fraudulent Transfer in connection with Ally Bank Transactions | No Amount Given | | |
| Miscellaneous Breach of Fiduciary Duty Claims against ResCap's D&Os | No Amount Given | | |
| Aiding and Abetting Breach of Fiduciary Duty against AFI (other than re 2006 Restructuring) | No Amount Given | | |
| Single Entity theories of liability regarding AFI and ResCap and/or affiliates, including Piercing Corp Veil and Substantive Consolidation | No Amount Given | | |

71

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|
| Debt Re-characterization | No Amount Given | | |
| Equitable Subordination and Disallowance | No Amount Given | | |
| Constructive Trust | No Amount Given | | |
| Constructive Fraudulent Transfer Against Cerberus relating to 2008 Model Home Sale | $30.0 | | |
| Fraudulent Transfer relating to Prepetition Asset Sales (other than 2008 Model Home Sale) | No Amount Given | | |
| Financing Affiliate Transactions | | | |
| **TOTAL** | | **$1,920.0** | |

## G.    OPINION REGARDING PROPOSED POST-PETITION TRANSACTIONS AND AGREEMENTS

This section of the Examiner's Report did not address any potential claims.

## H.    OPINION REGARDING SETTLEMENT VALUES OF POTENTIAL THIRD PARTY CLAIMS

In reaching an opinion concerning the likely settlement value of each claim, I have considered a number of factors, including the factors identified by the Supreme Court in *Protective Committee For Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*[31] applicable to settlement negotiations outside of bankruptcy. Parties will consider: (i) the probabilities of success should the claim be litigated, (ii) the complexity, expenses and duration of litigating the claims, (iii) the possible difficulties of collecting on a judgment and all other factors relevant to an assessment of the settlement as well as factors relevant in determining the motivations of the particular parties to the litigation regarding settlement posture.

---

[31] 390 U.S. 414, 424-25 (1968).

### 1.        Third Party Claims Against AFI

### *a.        RMBS Claims*[32]

**Examiner's Report References:**

Section I.H pages I-36 to I-39

Section VIII.C pages VIII-27 to VIII-109

Section VIII.D pages VIII-201 to VIII-202

Appendix VIII.D.1 page 1

**Description:**

The third-party liability claims ("RMBS Claims") against AFI, whether by investors or financial guaranty insurers (collectively, "Third-Party Claimants"), arising out of the issuance of residential mortgage-backed securities ("RMBS") by ResCap.

**Background:**

The RMBS Claims, estimated in the tens of billions of dollars, are the largest potential liability against AFI as the parent of ResCap. Between approximately 2004 and 2007, ResCap issued 392 private label RMBS securitizations with an original deal balance of $221 billion. (Ally Securities was an underwriter on 105 of those securitizations; Ally Bank acted as loan custodian on approximately 34 of them.) A total of 38 separate suits have been brought by investors such as public pension funds, insurance companies, and others in federal and state courts throughout the country naming AFI as a defendant. Primarily, those suits allege false or misleading statements or omissions of material fact by ResCap in connection with the issuance of the RMBS securitizations in violation of the Securities Act of 1933, the Securities Exchange Act of 1934, various state securities acts and common law. The monoline insurers also have overlapping contract claims for breach of representations and warranties. The Examiner did not consider claims by the RMBS Trusts asserting breach of contract for failure to repurchase defective loans because the Debtors proposed to treat those claims in a separate settlement.

The Third-Party Claimants seek to impose liability on AFI under one or more of the following theories: (i) piercing of the corporate veil or alter ego; (ii) "control person" liability for ResCap's primary violation of federal or state securities laws; and (iii) common-law aiding and abetting fraud by ResCap. Total damages reported by Third-Party Claimants to the Examiner for the RMBS Claims are approximately $6.3 billion, although the number is likely much higher in light of the fact that, as of March/April 2012, the outstanding principal balance of the RMBS issued by

---

[32] The Examiner's Report discusses non-RMBS claims related to mortgage origination, servicing, foreclosure, insurance and other consumer type claims. He concludes that most would not survive a motion to dismiss. Accordingly, no settlement value has been ascribed to the non-RMBS third party claims against AFI.

ResCap was $62.4 billion, with estimated lifetime losses of $43.8 billion. The RMBS Claims are at various stages of the litigation process, with most at or just beyond the motion-to-dismiss stage and none having reached trial.

## Examiner's Analysis and Conclusions:

1.      It is unlikely that any pending or potential claims seeking to hold AFI liable for RMBS Claims asserted against ResCap under a veil-piercing or alter ego theory will prevail.

2.      Even if the requisites for veil-piercing against AFI could be established, the Third-Party Claimants may lack standing because the veil-piercing claim belongs to the bankruptcy estate under applicable Delaware law.

3.      While a close question, it is more likely than not that the Third-Party Claimants will not be able to establish "control person" liability against AFI under various federal and state securities laws for primary violations of those laws by ResCap.

4.      Even if the requisites for "control person" liability against AFI could be established, certain of those claims could be time-barred by applicable statutes of limitations or repose.

5.      It is unlikely that the Third-Party Claimants will be able to establish liability against AFI under common law claims of aiding and abetting fraud by ResCap in connection with the issuance of RMBS.

## Review of Examiner's Analysis and Conclusion:

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions. With respect to AFI's potential control person liability, the inquiry in each case asserting such claims is fact-intensive. Therefore, it is not possible at this point to conclude definitively whether control person liability will be found in any particular case.

## Settlement Considerations:

The RMBS Claims are being pursued primarily by large institutional investors – insurance companies and pension funds – as well as monoline financial guaranty insurers. As such, they have the motivation and the means to prosecute full-scale, no-holds-barred litigation against AFI that could take many years and hundreds of millions of dollars to reach conclusion. Considering the size of the claims, the time and expense to conduct this complex litigation, the inherent risk warrants a discount of 50%.

The Examiner concludes, and I agree, that under applicable Delaware law efforts to impose liability on AFI on a veil-piercing or alter ego theory are unlikely to succeed. Delaware law is highly protective of the corporate form, which can be pierced only by a showing that ResCap and AFI operated as a single economic entity *and* by the presence of an overall element of injustice or unfairness. Delaware law requires consideration of multiple factors in determining whether to pierce

a corporate veil: "(1) undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of the debtor corporation at the time, (5) siphoning off of the corporation's funds by the dominant parent, (6) absence of corporate records, and (7) the fact that the corporation is a mere façade for the operations of the dominant parent." The Examiner's extensive consideration of the evidence strongly militates against piercing the corporate veil here. This warrants a 70% discount in the value of the claims.

Furthermore, even if ResCap and AFI could be deemed to be a single economic entity, Third-Party Claimants would still need to show "injustice or unfairness" in the use of the corporate form. While the Examiner concludes that ResCap was left with unreasonably small capital and became balance sheet insolvent in 2007, this was due to sizeable operating losses beginning in the last quarter of 2006, not misconduct by AFI such as initial undercapitalization or siphoning of funds. In short, the Third-Party Claimants are unlikely to be able to show that AFI used ResCap as part of a corporate "shell game."

The value of the veil-piercing theory is lessened more by the likelihood that, even assuming veil-piercing is warranted, the Third-Party Claimants lack standing to assert it. I agree with the Examiner that, under Delaware law, a veil-piercing claim generally belongs to the estate of the debtor, and not to creditors, at least where the harm suffered is "generalized" to all creditors. However, as discussed above, I anticipate that the standing issue can be finessed by the Third-Party Claimants cooperating with an estate fiduciary to pursue the veil-piercing theory. Nevertheless, in light of the discount already applied to the veil-piercing theory, I do not make any additional discount for the plaintiffs' standing issue since I anticipate an easy resolution.

With respect to "control person" liability, the Examiner concludes that while it is a close question, it is more likely than not that the Third-Party Claimants will not be able to establish "control person" liability against AFI for the primary violations of ResCap in connection with the RMBS securitizations. "Control person" liability can arise under Section 15 of the Securities Act, Section 20 of the Securities Exchange Act or their state analogues and impose liability for material misstatements, omissions or fraud committed by a primary violator. After extensively analyzing the available evidence, the Examiner concludes that the Third-Party Claimants are unlikely to be able to establish that AFI exercised the requisite control over ResCap *with respect to the RMBS securitizations* during the relevant 2004-2007 period. While I agree with the Examiner's analysis, "control person" issues are particularly fact-intensive, discovery in the various cases is incomplete, and different fact-finders are likely to weigh competing evidence differently. Accordingly, although these claims are more likely than not to fail, I discount the settlement value of the claims by only 60%.

Likewise, there appear to be strong arguments, especially in RMBS claims brought by investors, that some of their claims are barred by applicable statutes of limitations or repose. These also are fact-intensive questions, however, and not subject to definitive analysis at this point. The closeness of these questions leads us to discount the value of the RMBS Claims by 60% based on the statute of limitations.

The Examiner also concludes that the Third-Party Claimants are unlikely to prevail against AFI on the RMBS Claims on the common-law theory that AFI aided and abetted fraud by ResCap.

75

Such claims have been asserted in 14 of the 38 cases, 10 in RMBS Insurer Actions, four in RMBS Investor Actions. These claims are subject to higher burdens of proof and the heightened pleading requirements of Fed. R. Civ. P. 9. They require a showing of (1) the existence of fraud by ResCap, (2) actual knowledge of the fraud by AFI, and (3) AFI's substantial assistance in the commission of that fraud. While the existence of actual fraud by ResCap was beyond the Examiner's scope of investigation, the Examiner was presented with no evidence of AFI's actual knowledge of fraudulent conduct by ResCap. Nor was there any evidence that AFI provided substantial assistance to ResCap in committing the fraud as opposed to providing capital support and general corporate functions and services, which cannot be deemed to be the proximate cause of ResCap's fraud. Therefore, I do not attribute any settlement value to this theory.

While it was not possible for the Examiner to establish with precision the value of the RMBS Claims, at least $6.3 billion in alleged damages has been asserted by Third-Party Claimants. The Examiner states that as of March/April 2012, the outstanding principal balance of RMBS was $62.4 billion and the estimated lifetime losses were $43.8 billion.[33] This data appears in the Declaration of Frank Sillman in support of the Debtors' motion to approve the RMBS Trust Settlement Agreements. Mr. Sillman also calculated the Debtors' potential repurchase requirements to RMBS Trusts for defective mortgages at $6.7 billion to $10.3 billion. Of course, he assumed that the Trusts could prove that the Debtors breached the representations and warranties in the governing agreements. Also, he was focused on the Debtors' potential exposure, not the parent company AFI which was not a party to the governing agreements.

In the Appendix, the Examiner lists the RMBS Claims Damages to the extent he could obtain information. I note that of the eighteen Parties/Actions listed, only three asserted damages greater than $1 billion: (i) AIG, Allstate, Mass Mutual and Prudential - $1.5 billion, (ii) FGIC - $1.85 billion, and (iii) MBIA Insurance Company - $2 billion. Nine of the other listed Parties/Actions with damage amounts shown are less than $100 million. Only three others are over $100 million with the highest of those being $293 million. Given the magnitude of the expected lifetime losses of $43.8 billion, and the magnitude of claims that could be asserted by investors, purchasers, and insurers, it is reasonable and conservative to estimate for settlement purposes that the total of the RMBS claims is in the range of $20 billion.

Since the Examiner Scope Approval Order directs him not to attempt to independently quantify the Third-Party RMBS damages, I have looked for publicly available information on settlements in similar or analogous cases.

Cornerstone Research publishes an annual review of Securities Class Action Settlements. Their data is focused on suits brought by securities purchasers alleging fraudulent inflation in the price of a corporation's common stock. I have reviewed the 2012 Review and Analysis.[34] The year

---

[33] "RMBS Claims" is defined by the Examiner as "claims against the Debtors and the AFI Defendants on account of residential mortgage-backed securities." Examiner's Report, VIII-2.

[34] Ellen M. Ryan & Laura E. Simmons, *Sec. Class Action Settlements, 2012 Review and Analysis* (Cornerstone Research, Inc., Boston, MA), 2013.

2012 saw an extraordinary number of settlements in excess of $100 million that Cornerstone Research classifies as "mega-settlements," a significant portion of which were related to the credit crisis. Many of the larger cases take three to five years to settle indicating that they commenced in 2007 to 2009 when the stock price of financial corporations was impacted by their ownership or issuance of RMBS during the financial crisis. Approximately one-third of settlements in 2012 were for issuers in the financial industry and they rank highest in median settlement value.

Cornerstone Research posits that "estimated damages" is the most important factor in determining settlement amounts. Mega-settlements traditionally settle for a smaller proportion of estimated damages. Settlements as a percentage of estimate damages typically decrease as estimated damages increase. Larger cases tend to settle for smaller proportions of losses. For cases with estimated damages in excess of $5 billion, the median settlement amount was 1.3% of the estimated damages. Institutional investors as lead plaintiffs, particularly public pension funds, tend to be associated with significantly higher settlement amounts according to Cornerstone Research. Also, the later the stage at which the litigation settles, the higher the settlement values. Cases that survive motions to dismiss or summary judgment motions tend to settle for higher amounts.

NERA Economic Consulting published *Recent Trends in Securities Class Action Litigation: 2012 Full-Year Review*.[35] Among the highlights is that financial institutions are no longer the focus of new filings, indicating that the wave of credit-crisis related litigation ended in 2012. The stage of the litigation, *i.e.* whether it has survived a motion to dismiss, summary judgment, or class certification, is important in settlement of securities class action litigation. Most cases are resolved before a class certification motion has been filed or decided. Investor losses are a powerful predictor of settlement size. There are only a handful of cases each year with investor losses greater than $10 billion. As of the end of 2012, only ten securities class action cases ever have settled for over $1 billion. Larger cases settle for a smaller percentage of investor losses. The median ratio of settlement to investor losses decreases as investor losses increase. The median settlement for cases with investor losses over $1 billion has been 0.7% of the investor losses. Where the lead plaintiff is an institutional investor, especially a public pension fund, settlements tend to be larger.

The D&O Diary[36] publishes a list titled *Subprime and Credit Crises-Related Lawsuits, Settlements, Dismissals and Denials*. Of the sixty settlements listed, only one exceeded $1 billion. That settlement was the Bank of America/Merrill Lynch Merger Case for $2.43 billion, which is an outlier. Five cases settled for between $500 million and $730 million: Citigroup Bondholders Action - $730 million, Wachovia Preferred Securities and Bond/Notes Litigation - $627 million, Countrywide Financial - $624 million; Citigroup - $590 million; and Countrywide Mortgage Backed Securities Action - $500 million. Both Citigroup cases and the Wachovia case were brought by purchasers of common stock or bonds issued by the defendant/parent corporation, not mortgage backed securities ("MBS"). Although the price of the stock or bonds were allegedly overstated by

---

[35] Dr. Renzo Comolli, *et al.*, *Recent Trends in Securities Class Action Litigation: 2012 Full-Year Review* (NERA Economic Consulting, New York, NY), Jan., 2013.

[36] Kevin M. LaCroix, *The D&O Diary Subprime and Credit Crisis-Related Lawsuits Settlements, Dismissals and Denials* (RT ProExec, Beachwood, OH) April, 2013.

the defendants' inaccurate statements regarding subprime and other mortgage products, the plaintiffs were not purchasers of MBS as are those pursuing ResCap and AFI.

In valuing ResCap as part of the solvency analysis, the Examiner's Financial Advisors identified Countrywide, Washington Mutual (WaMu) and Indybank as similar institutions to ResCap. Indybank is not listed as a party to a settlement in the D&O Diary, but Countrywide and WaMu are. The Countrywide Financial settlement for $624 million was a class action by purchasers of common stock and notes issued by Countrywide, not MBS. Although plaintiffs allege that Countrywide did not accurately disclose problems with its mortgage business and portfolio that lead to an overstatement of stock value, that litigation is not exactly similar to the Third-Party RMBS claims against AFI.

The Countrywide Mortgaged Back Securities Action in the U.S. District Court for the Central District of California (2:10-CV-00302) that settled for $500 million is analogous to the Third-Party RMBS claims against ResCap and AFI. The Countrywide MBS settlement involved 429 MBS with an original issue principal of $351 billion. The Examiner's Report states that ResCap issued 392 RMBS with an original deal balance of $221 billion. A settlement of ResCap's RMBS Claims on a proportional basis would be approximately $315 million.

The Washington Mutual Securities Multi-District Litigation settled for $208.5 million. Once again the plaintiffs were purchasers of securities issued by the parent company, Washington Mutual, Inc. (WMI) and not MBS. Because Washington Mutual Bank had been seized and sold by the FDIC, and the parent company, WMI, was in bankruptcy, the settlement fund consisted of contributions by the Directors and Officers insurance carriers ($105 million), the underwriters ($85 million) and the auditors ($18.5 million). This is not indicative of reasonable settlement value of the secondary liability of AFI for RMBS issued by ResCap.

I mediated an objection in the bankruptcy case of WMI to the claim of the MBS plaintiffs who sued WaMu's securities subsidiary that was not a debtor in bankruptcy. That securities subsidiary had been acquired by JPMorgan Chase but had limited resources of its own. That underlying action involving hundreds of millions of dollars in alleged damages, settled for $26 million.

Under these circumstances, even assuming that the gross value of the RMBS Claims is $20 billion, the unlikelihood of the Third-Party Claimants prevailing on two of their three major theories (veil-piercing/alter ego and aiding and abetting fraud), the questionable likelihood of prevailing on their third major theory ("control person" liability), the statute of limitations defenses, and the significant cost, time and uncertainty of pursuing 38 separate cases, militate in favor of a deeply discounted settlement value. Securities litigation is like a game of *Survivor*. If plaintiff can survive a motion to dismiss, class certification or summary judgment, it is likely to reach a settlement with the amount increasing at each stage. Some of the pending cases against AFI have survived motions to dismiss and thus are prime candidates for settlement. Moreover, similar claims against other RMBS issuers such as Countrywide (whose liability is primary, not secondary like AFI's) have settled recently in the range of 0.14% of the original deal balance. Analysis of settlements of securities class actions by Cornerstone Research and NERA Economic Consulting consistently find that settlements in securities class actions seeking in excess of $10 billion in damages average less

than 0.5% of claimed damages, and those are against the issuer, not a parent company.  If AFI had the time and inclination to litigate its contingent exposure to ResCap's RMBS Claims, it could end up with a total cost less than the $500 million paid by Countrywide.

On the other hand, AFI has some unique motivations that may influence its willingness to make a substantial payment to obtain the solid gold release it seeks in a confirmed plan of reorganization.  AFI professes a great desire to repay the American taxpayers for the assistance provided in the TARP program and elsewhere.  The looming specter of huge, unliquidated, contingent liabilities associated with ResCap preclude AFI from an initial public offering (IPO) or other alternatives to allow the U.S. government to monetize its stake in AFI and permit AFI to return to private ownership.  Considering the massive size of the claims, the not-inconsequential risk that plaintiffs will prevail at least on the issue of control person liability, the time and cost required to defend the 38 cases, and the prospect of additional actions being filed, the RMBS Claims are not devoid of substantial settlement value.  Taking into account the factors discussed above, especially the Countrywide settlement of larger, primary claims at $500 million, I ascribe a settlement value of no more than $480 million to the RMBS Claims, calculated as follows:

| | |
|---|---|
| Potential Damages: | $20,000 million |
| Reduced By: | |
| 50% inherent risk = | $10,000 million |
| 70% veil-piercing alter ego risk = | $3,000 million |
| 60% risk on control person theory = | $1,200 million |
| 60% statute of limitations risk = | $480 million |
| Total Settlement Value = | **$480 million** |

### b.      Fraudulent Transfer Claim

**Examiner's Report References:**

Section I.H.1.b page I-39

Section VIII.D.5 pages VIII-207 to VIII-215

**Description:**

Whether transfers of funds from Ally Securities to AFI can be recovered as fraudulent transfers.

**Background:**

On April 16, 2012, Ally Securities transferred $200 million to AFI.  On August 20, 2012 Ally Securities transferred $25.5 million to AFI.  Ally Securities characterized the two transfers to AFI as "distributions of excess capital"; thus, these transfers were payments of dividends to Ally's sole member.

**Examiner's Analysis and Conclusions:**

1.    The Examiner's Financial Advisers determined that Ally Securities' total capital following the transfers was $49.5 million and $16.3 million, respectively.  Since Ally Securities was then a defendant in ten RMBS-related lawsuits involving billions of dollars, the Examiner concluded that a reasonable quantification of these contingent liabilities would likely overwhelm Ally Securities' equity on the transfer dates and that Ally Securities was insolvent on the transfer dates.

2.    The transfers were not made for reasonably equivalent value.

3.    It is likely that the transfers could be avoided as constructively fraudulent transfers.

4.    While a close question, it is more likely than not that these transfers were actual fraudulent transfers.

5.    It unlikely that a court would determine that these transfers constituted unlawful dividends.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  The determinations of the amount of the contingent liability and of actual fraud are fact intensive.

**Settlement Considerations:**

Consideration of the avoidance of these transfers is only relevant to the evaluation of the reasonable settlement value of RMBS actions against Ally Securities, which are evaluated elsewhere in this report.  The Examiner notes that Ally Securities has an equity value that is dwarfed by the potential third party RMBS claims.  However, those third party creditors would seek to augment the funds available to Ally Securities by avoiding the transfers from Ally Securities to AFI discussed in this section. If any one of the three recovery theories discussed by the Examiner is successful, Ally Securities, or its representative, would be able to recover $225.5 million from AFI.  Although the actual fraud theory is fact intensive and the unlawful dividend theory is unlikely to prevail, the constructive fraudulent theory appears strong.

I would expect the plaintiff to open with a settlement demand of $191.7 million, approximately 85% of the amount in controversy.  AFI would likely initially offer to settle the litigation for $33.8 million, 15% of the amount in controversy.  Due to the strength of the law and

the facts, I would expect an ultimate settlement of approximately $157.9 million, 60% of the amount in controversy. This fraudulent transfer claim is only relevant to the potential liability of Ally Securities for third party claims which would be considered in all of the third party claims against AFI. Thus, this fraudulent transfer claim has no independent settlement value.

## 2.    Third Party Claims Against Ally Securities

**Examiner's Report References:**

Section I.H pages I-39 to I-41

Section VIII.C pages VIII-109 to VIII-129

Section VIII.D pages VIII-201 to VIII-203

**Description:**

Evaluation of the RMBS Claims against Ally Securities by Third-Party Claimants arising out of Ally Securities' role as an underwriter of RMBS issued by ResCap.

**Background:**

Between approximately 2004 and 2007, ResCap issued 392 RMBS securitizations with an original deal balance of $221 billion. Ally Securities acted as lead or co-lead underwriter on 105 of them with a principal balance of $57.2 billion, and also served as co-underwriter on an additional 131 of them. Suits by Third-Party Claimants against Ally Securities primarily allege claims for violations of Sections 11 and 12(a)(2) of the Securities Act of 1933 and analogous state statutes, fraud and fraudulent inducement, aiding and abetting fraud, and negligent misrepresentation. The RMBS Claims are at various stages of the litigation process, with most at or just beyond the motion-to-dismiss stage and none having reached trial.

**Examiner's Analysis and Conclusions:**

1.      Neither ResCap nor AFI challenges that the Third-Party Claimants have standing to bring their securities law claims against Ally Securities or that Ally Securities' participation in the securitizations suffices to give rise to potential liability.

2.      The claims of fraud and fraudulent inducement are similar to the securities claims because they are based on misrepresentations and omissions in the RMBS Offering Documents, but more difficult to prove because they require proof of Ally Securities' knowledge of the fraud and intent to defraud, along with justifiable reliance and damages causation.

3.      No evidence supports the assertions that Ally Securities knowingly made untrue or misleading material statements, but such claim requires further factual development.

4.      The claims of aiding and abetting fraud require proof of an underlying fraud, knowledge of the fraud by Ally Securities and substantial assistance to ResCap in perpetrating the

fraud.  If the Third-Party Claimants can show a fraud, they are likely to prevail against Ally Securities on a claim of aiding and abetting.

5.      A claim of negligent misrepresentation turns on the issue of whether a plaintiff can establish a special relationship between itself and Ally Securities, an inquiry beyond the scope of the Examiner's Investigation.  Nevertheless, in most transactions between sophisticated corporate parties, no duty of care is required.

6.      While Ally Securities participated as lead or co-lead underwriter on 105 RMBS deals with an original principal balance of $57.2 billion and acted as co-underwriter on 131 more securitizations, its limited net equity ($11.7 million as of December 31, 2012) may make it difficult for Third-Party Claimants to collect.

## Review of Examiner's Analysis and Conclusions:

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  The ultimate issue of whether the RMBS Offering Materials contained misstatements or omissions of material fact was beyond the scope of the Examiner's Investigation.  AFI likely received two avoidable fraudulent transfers totaling $225.5 million in 2012.  The reasonable settlement value of those claims should be added to Ally Securities' net equity in evaluating collectability.

## Settlement Considerations:

Despite the overall enormity of the Third-Party RMBS Claims (billions of dollars), I believe that the settlement value of the claims against Ally Securities for its role as underwriter is ultimately affected more by its relative lack of resources to satisfy a judgment than the  actual merits of the claims themselves and, therefore, the settlement value is small.

Each of the RMBS Claims against Ally Securities requires a factually-intensive inquiry with respect to each deal in which it was involved as an underwriter to determine whether the RMBS Offering Documents contained untrue misstatements or omissions of material fact.

Claims for violations under Section 11 of the Securities Act do not require a plaintiff to allege or prove scienter, reliance or loss causation; a plaintiff need only show purchase of a registered security from the issuer or in the aftermarket following an offering, participation by the defendant in the offering sufficient to give rise to liability (almost always the case for an underwriter), and that the registration statement contained an untrue statement of material fact or omitted a material fact required to be stated therein or necessary to make the registration statement not misleading.

Section 12(a)(2) of the Securities Act requires a showing that the defendant is a "statutory seller," the sale was effectuated by prospectus or oral communication, and the prospectus or oral communication contained an untrue statement of material fact or omitted to state a material fact necessary to make the statements not misleading.

A plaintiff's burden of proof under section 11 and 12(a)(2) of the Securities Act is a preponderance of the evidence, while a defendant such as Ally Securities bears the burden of proving affirmative defenses such as due diligence (*e.g.*, after reasonable investigation, the defendant believed the statements in the registration statement were true and there was no omission to make the statements not misleading) or loss causation (*e.g.*, a plaintiff's losses are not attributable to the misrepresentations, but rather to a general market decline).

Of all of the Third-Party RMBS Claims against Ally Securities, the Examiner concludes that the securities law claims have some viability.

The essentially identical common-law claims of fraud and fraudulent inducement place a much higher burden on a plaintiff. They require a showing by clear and convincing evidence of (1) a misrepresentation or omission of material fact which was false and known by the defendant to be false, (2) made with an intention to induce reliance, (3) justifiable reliance thereon, and (4) damages caused by the misrepresentation. It is likely that Ally Securities will argue that the sophistication of the Third-Party Claimants will make it difficult for them to establish justifiable reliance. The lack of proof at this stage of Ally Securities' actual knowledge of the statements' falsity, combined with the difficulty in establishing justifiable reliance, causes us to discount the settlement value of these claims significantly.

Aiding and abetting fraud requires (1) existence of a fraud, (2) knowledge of the fraud by the defendant, and (3) substantial assistance to the one committing the fraud. Although only one Third-Party Claimant (MBIA) has asserted such a claim against Ally Securities so far, I agree with the Examiner that if the existence of a fraud by ResCap is proved, a claim of aiding and abetting is likely to prevail.

Claims of negligent misrepresentation, however, are likely not to succeed. The key element to a negligent misrepresentation claim is demonstrating a duty of care owed by the defendant to the plaintiff. Most courts that have considered the question have found that sophisticated parties engaged in RMBS transactions do not owe one another a duty of care and have dismissed negligent misrepresentation claims at the pleadings stage. I do not attribute any settlement value to such claims.

Ordinarily, the sheer size of the Third-Party RMBS Claims, and the relative ease of prevailing at least on a securities law claim if an untrue statement or omission of material fact is established, would be cause for attributing a high settlement value to the Third-Party RMBS Claims against Ally Securities. That would be offset by ordinary litigation uncertainty and costs, although in this instance, Ally Securities' small equity ($11.7 million as of December 31, 2012), not to mention the probability that most if not all of that could be consumed by defense costs, dictates a very low settlement value. Ally Securities equity could be augmented by avoiding transfers to AFI in the amount of $225.5 million made in 2012, the reasonable settlement value of which I have estimated at $157.9 million.

The claims have a face value of $1 billion, which is reduced by 50% for inherent risk, and 20% for the difficulty of prevailing on the securities claims, for a merits value of $400 million.

I anticipate that settlement discussions would quickly switch focus away from the merits of the claim to collectability. If the maximum fund available is Ally Security's net equity of $11.7 million plus $157.9 million, the reasonable settlement value of the fraudulent transfer claim against AFI, the reasonable settlement value at 10% of the funds available, approximately $16 million, is appropriate in light of the dubious merits and risk of litigation.

Because the settlement value of these claims is less than $21 million, it is not material in light of the magnitude of the $2.1 billion settlement fund, and because I believe these claims are duplicative of claims made against ResCap and AFI, I ascribe no value to Third Party Claims against Ally Securities for purpose of allocating the settlement fund.

### 3.    Third Party Claims Against Ally Bank

**Examiner's Report References:**

Section I.H pages I-41 to I-42

Section VIII.C pages VIII-129 to VIII-150

Section VIII.D pages VIII-201 to VIII-203

**Description:**

Evaluation of the RMBS Claims against Ally Bank by Third-Party Claimants arising out of Ally Bank's role as a loan originator and custodian of mortgage loan notes in connection with RMBS issued by ResCap.

**Background:**

Between approximately 2004 and 2007, ResCap issued 392 RMBS securitizations with an original deal balance of $221 billion. Ally Bank and its predecessor, Old GMAC Bank, acted as loan custodian for approximately 34 of those deals representing a principal balance of a $21.7 billion. Ally Bank was original loan custodian on six of the deals; Old GMAC was original custodian on 28. Ally Bank also acted as a loan originator in some 124 instances, in the approximate amount of $16 billion. As a custodian, Ally Bank entered into contracts to hold and review the mortgage notes underlying the securitizations and to give various notices to the loan servicer, trustee and monoline insurer. The principal direct claims asserted against Ally Bank are (1) breach of contract for failing to provide proper notice or certifications under the custodial agreements and (2) aiding and abetting fraud by ResCap.

**Examiner's Analysis and Conclusions:**

1.    There is no evidence that Ally Bank breached its obligations under the custodial agreements to gather, review and certify mortgage notes, although the Examiner did not audit individual mortgage notes. There is also no evidence that Ally Bank breached obligations to the

trustees and monoline insurers to alert them to breaches of representations and warranties related to the securitizations.

2.      The Examiner reaches no conclusion with respect to the existence of an underlying fraud by ResCap, but notes that the Third-Party Claimants proffered no evidence of Ally Bank's actual knowledge of the alleged fraud.  The Examiner also notes, however, that discovery has been limited and that evidence exists showing Ally Bank was "intricately involved" in the operations of ResCap.  Likewise, if ResCap engaged in fraud, there is evidence that Ally Bank's financing activities constituted "substantial assistance" to that fraud.

3.      Under applicable Utah law, it is unlikely that Ally Bank will be found to be a successor in liability of Old GMAC Bank and, therefore, the RMBS Claims against it would be limited to securitizations containing loans sold by Ally Bank after the 2006 Bank Restructuring.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Under Pennsylvania law, which governs the custodial agreements, a claim for breach of contract requires three elements:  (1) existence of a contract; (2) breach of its terms; and (3) damages.  Although the mortgage notes themselves were not audited by the Examiner, there is no evidence that Ally Bank breached its contractual obligations to obtain, review and certify the mortgage notes underlying the securitizations.  While the Third-Party Claimants allege that Ally Bank also breached its obligation to notify them of breaches of representations and warranties in the loan purchase agreements, Ally Bank was not required to look for breaches, only report them if it learned of them.  There is no evidence that Ally Bank had actual knowledge of any breaches of representations and warranties by ResCap.  Accordingly, I ascribe no settlement value to this claim.

With respect to the aiding and abetting claims, controlling New York law requires (1) the existence of an underlying fraud, (2) actual knowledge of the fraud, and (3) substantial assistance in committing the fraud.  Even assuming a fraud by ResCap (which the Examiner does not), the Third-Party Claimants have not identified any evidence showing actual knowledge of the fraud by Ally Bank, although discovery has been limited and Ally Bank and ResCap were closely connected, with overlapping leadership and working cooperation between personnel.  There is evidence that Ally Bank's financing activities provided "substantial assistance" to ResCap since Ally Bank was created to serve as a funding conduit for ResCap's securitization activity by providing loan originations.  Given the lack of evidence of actual knowledge of the underlying fraud, albeit with limited discovery, this claim has minimal settlement value.

Moreover, it is unlikely that Ally Bank will be deemed to be a successor to the liability of Old GMAC Bank, so even if Ally Bank it is found liable, that liability would be limited to securitizations containing loans sold by Ally Bank after the 2006 Bank Restructuring, further reducing the already tenuous settlement value of the claims.

Under these circumstances, I conclude that these claims are not material and have only nominal settlement value.

### 4.    Unsecured Noteholder Causes Of Action

#### a.    *Tortious Interference Under 2005 Indenture*

**Examiner's Report References:**

Section I.H.4.a pages I-42 to I-43

Section VIII.C.5.a pages VIII-163 to VIII-190

**Description:**

Whether AFI tortiously interfered with the 2005 Indenture by causing ResCap to transfer all or substantially all of its assets in violation of the 2005 Indenture.

**Background:**

In the 2005 Indenture, ResCap covenanted not to transfer "all or substantially all" of its assets, with certain exceptions. The Unsecured Noteholders allege that AFI induced ResCap to breach this covenant by entering into a series of transactions in furtherance of a pre-arranged plan which resulted in the transfer of substantially all of ResCap's assets. Those transactions include ResCap's forgiveness of indirect and direct debts owed by certain subsidiaries, including GMAC Mortgage and RFC, and the 2009 Bank Transaction. Although none of the transactions would trigger the covenant when considered individually, the Unsecured Noteholders contend that the transactions should be aggregated for purposes of determining whether ResCap transferred substantially all of its assets.

**Examiner's Analysis and Conclusions:**

1.    The Unsecured Noteholders would likely have standing to pursue this claim.

2.    Although it is a close question, it is more likely than not that the transactions would not be aggregated.

3.    Even if the transactions were aggregated, although it is a close question, a court would more likely find that the transactions did not result in a breach of the covenant.

4.    Even if a court found a breach of the covenant, it is unlikely that a claim for tortious interference would prevail because the Examiner did not uncover any evidence that AFI intended to cause a breach and because AFI has an economic justification defense, as it acted to protect its own interests.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would be pursued by the Unsecured Noteholders at their own expense. Given the high hurdles found by the Examiner, the Unsecured Noteholders would likely be motivated to reach an early resolution of disputes in order to expedite distributions. All of the procedural hurdles that attend bankruptcy litigation would be present in this case including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law action, (ii) withdrawal of the reference, and (iii) demand for a jury trial. In addition, all litigation carries risk, uncertainty, and expense. As a result, it is highly likely that any settlement would reflect a substantial discount (30%) from the face value of the claim.

Before reaching the merits of their claim, the Unsecured Noteholders would first need standing to bring this claim. Although the Examiner concluded that the Unsecured Noteholders would have standing, he recognized standing as a serious threshold issue, which could be resolved against the Unsecured Noteholders, thereby creating additional risk and reducing the settlement value of the claim by 10%.

Once the merits are reached, the Examiner identified three hurdles that the Unsecured Noteholders would have to overcome to establish a claim of tortious interference: (1) whether to aggregate the challenged transactions; (2) whether the transactions, if aggregated, resulted in a transfer of substantially all of the assets in breach of the covenant; and (3) whether, if a breach were found, AFI intentionally procured the breach. The Unsecured Noteholders would have to win each of these issues to prevail on this claim.

First, under the leading *Sharon Steel*[37] case, whether to aggregate the challenged transactions is a fact-intensive inquiry dependent on whether the challenged liquidation was piecemeal or part of a preconceived plan. The Examiner found substantial facts indicating that the challenged transactions were not part of a preconceived plan. Accordingly, the Examiner concluded that it was more likely than not that the transactions would not be aggregated. The Examiner also concluded that the court would not apply the step-transaction doctrine advocated by the Unsecured Noteholders. AFI would no doubt litigate these issues thoroughly, raising the arguments and facts identified by the Examiner. Accordingly, the more-likely-than-not risk of not prevailing on this issue lowers the settlement value of the claim by 60%.

Second, even if the transactions were aggregated, the Unsecured Noteholders would have to show that the aggregated transactions resulted in the transfer of substantially all of ResCap's assets, resulting in a breach of the covenant. On a quantitative basis, the Examiner found that the transfers

---

[37] *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982).

were approximately 50% of the book value of the operating assets and the total assets, which is most likely not sufficient to constitute a transfer of substantially all of ResCap's assets. On the other hand, on a fair market value basis, the transfers amounted to 34% of the total assets, but 100% of the operating assets. Because the quantitative analysis was unclear, the Examiner also conducted a qualitative analysis, and concluded it did not support the Unsecured Noteholders' claim. Therefore, while it is a close question, the Examiner concluded that it is more likely than not that the Unsecured Noteholders would not be able to establish this element. Again, AFI would litigate these issues thoroughly, using the points made by the Examiner. As a result, the substantial risk of not prevailing on this issue lowers the settlement value of the claim by another 60%.

Third, even if the aggregated transactions breached the covenant, the Unsecured Noteholders would have to show that AFI intentionally procured the breach without justification. However, the Examiner's Investigation did not uncover any evidence that AFI intended to cause such a breach. Moreover, the evidence reviewed by the Examiner showed that AFI's alleged interference was to protect its own economic interest in ResCap. As the Examiner notes, absent evidence of malice, fraud, or illegality, acting to protect an economic interest is a complete defense to the tortious interference claim. The Examiner found no evidence of malice, fraud, or illegality. The minimal likelihood that the Unsecured Noteholders would prevail on these issues reduces the settlement value of the claim by an additional 90%.

Because the likelihood of success is so low, any settlement offer from AFI would likely be a nuisance or cost of litigation settlement and therefore, not material.

### b.    *Claims Related To The 2006 Bank Restructuring*

**Examiner's Report References:**

Section I.H.4.b page I-43

Section VIII.C.5.b pages VIII-190 to VIII-201

**Description:**

Whether the Unsecured Noteholders have viable claims against AFI arising out of the 2006 Bank Restructuring.

**Background:**

The 2006 Bank Restructuring and potential estate claims against AFI are discussed in detail at Section E.5. The Examiner observed that the Unsecured Noteholders, as third-party beneficiaries, could have claims for breach of the 2005 Operating Agreement by AFI. The Examiner also considered whether misrepresentations or omissions by AFI to ResCap and its directors could give rise to fraud claims by the Unsecured Noteholders on the ground that the Unsecured Noteholders were harmed by ResCap's detrimental reliance. However, there is no claim here that misrepresentations or omissions were made directly to the Unsecured Noteholders, or that they relied on any such misrepresentations or omissions.

**Examiner's Analysis and Conclusions:**

1.      The Unsecured Noteholders would have standing to assert these claims.

2.      A breach of contract claim would likely be barred by the statute of limitations.

3.      While a close question, it is more likely than not that a fraud claim against AFI would not be barred by the statute of limitations.

4.      A fraud claim by the Unsecured Noteholders against AFI related to the 2006 Bank Restructuring would not prevail under Minnesota law because Minnesota law does not recognize claims based on reliance by third parties.

5.      Although it is a close question, it is more likely than not that a fraud claim by the Unsecured Noteholders against AFI related to the 2006 Bank Restructuring would not succeed under New York law because it is not clear if New York would recognize a claim based on third-party reliance and it is not clear that the Unsecured Noteholders could make out such a claim.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I largely agree with the Examiner's analysis and conclusions, subject to two qualifications.

First, the Examiner concluded that the Unsecured Noteholders would have standing for two reasons: (1) they suffered a particularized injury under the 2005 Operating Agreement; (2) because *Wagoner* and the *in pari delicto* defense would bar the estate from bringing these claims (see Section E.5), the Unsecured Noteholders would have standing. I find only the second of these persuasive as to the fraud claim, which is the only possibly viable claim.

The case law cited by the Examiner makes clear that for a creditor to have standing to bring a claim against third parties outside of the bankruptcy proceeding, it must be suing for separate and distinct injuries it suffered directly, not for injuries to the debtor or the estate that harmed all creditors.[38] Where, however, the injury alleged is not particularized to the plaintiff, but rather is a generalized injury to the debtor that affects all creditors, then the creditor does not have standing.[39] The Examiner stated that a court would more likely than not find that the Unsecured Noteholders could allege a particularized injury here because of the Unsecured Noteholders' rights under the 2005 Operating Agreement, *i.e.*, because they are third-party beneficiaries of that agreement.[40]

---

[38] *See Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1101 (2d Cir. 1988); *Fisher v. Apostolou*, 155 F.3d 876, 881 (7th Cir. 1998).

[39] *See St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688, 701 & 705-06 (2d Cir. 1989); *Securities Investor Protection Corp. v. Bernanrd L. Madoff Investment Securities, LLC (In re Madoff)*, 429 B.R. 423, 431 (Bankr. S.D.N.Y. 2010).

[40] Examiner's Report, VIII-191, fn. 1034.

89

While that may create a particularized injury as to the breach of contract claim,[41] the Unsecured Noteholders' contract claims are barred by the statute of limitations and do not add value, as discussed below.

The key question, therefore, is whether there is any particularized injury with regard to the fraud claim which would confer standing on the Unsecured Noteholders. The alleged fraud claim is not based on an allegation that AFI made a misrepresentation or a material omission to the Unsecured Noteholders. Nor is there any allegation that the Unsecured Noteholders relied in any way on any such misrepresentation or omission. Rather, this fraud claim is based on reliance by ResCap. The injury allegedly resulting from ResCap's reliance is the loss in value to ResCap, because ResCap did not receive fair value in exchange for the 2006 Bank Restructuring, thereby reducing the fund from which ResCap's debts could be paid. Therefore, the injury is not a direct and particularized injury to the Unsecured Noteholders, but rather an injury to ResCap and a generalized injury to all the creditors, so that the Unsecured Noteholders would likely not have standing.[42]

I find the alternative ground for standing to bring a fraud claim more persuasive. As discussed in Section E.5, the Examiner found that, although it is a close question, it is more likely than not that the estate could not bring a fraud claim because of the *Wagoner* rule and the *in pari delicto* defense. If those defenses applied, then the estate could not bring the claim, but the Unsecured Noteholders could.[43] Thus, the Unsecured Noteholders would have standing only to the extent that the estate were barred from bringing the claim.

Second, the Examiner did not expressly consider who would benefit from a recovery on these claims. As discussed above, the alleged fraud claim is not based on an allegation that AFI made a misrepresentation or a material omission to the Unsecured Noteholders, or that there was any reliance by the Unsecured Noteholders. Again, the harm was that ResCap did not receive fair value in the 2006 Bank Restructuring. This is an injury to all creditors, not a particularized injury to the Unsecured Noteholders. Moreover, the only reason I believe that the Unsecured Noteholders are likely to have standing to pursue this claim is because, although it is a close question, the estate is likely barred from bringing it under *Wagoner*. Therefore, if there were a recovery on the fraud claim, I believe that the recovery would inure to the benefit of the estate and all its creditors, not just the Unsecured Noteholders. As a result, the claims of the Unsecured Noteholders are duplicative of the estate's claims regarding the 2006 Bank Restructuring, which I consider at length in Section 5.E, above. Because these claims are duplicative of the estate's claims, and because the benefit would inure to the estate regardless of whether it is brought by the estate or the Unsecured Noteholders, I only analyze here whether the alternative claims of the Unsecured Noteholders would add any value to the estate's claims.

---

[41] Even as to the breach of contract claim, it is worth noting that the Unsecured Noteholders' remedies as third-party beneficiaries are limited to specific enforcement of the provisions of the 2005 Operating Agreement. Examiner's Report, III-21-22.

[42] *See St. Paul*, *supra*, 884 F.2d at 705-06 (holding that challenge to actions that allegedly reduced the fund from which debtor's debts would be paid was not a particularized harm allowing a claim to be brought outside of bankruptcy).

[43] *See In re The Bennett Funding Group, Inc.*, 336 F.3d 94, 102 (2d Cir. 2003).

**Settlement Considerations:**

As to the breach of contract claim, the Examiner concluded that the Unsecured Noteholders' breach of contract claims would be barred by the statutes of limitation. Because this would be a complete bar to the claim and easily established by AFI, the breach of contract claims by the Unsecured Noteholders do not add any settlement value to the estate's claims.

The third-party fraud claim faces a number of difficult hurdles. As a threshold matter, the Examiner considered whether such a claim was viable under both Minnesota law and New York law. The Examiner first concluded that it was not viable under Minnesota law because Minnesota does not recognize a fraud claim based on reliance by a third party. He also concluded that if the claim were brought in New York, the court would apply Minnesota law, which would bar the claim. Thus, if the fraud claim were brought in New York, it would fail and does not add any settlement value to the estate's claims.

The Examiner considered the possibility that New York law would apply if the Unsecured Noteholders could bring the fraud claim in Minnesota. For the reasons discussed above and in *St. Paul*,[44] I believe that it is unlikely that the court would allow the claim to be brought in Minnesota outside of the bankruptcy. This severely limits any settlement value to the claim. But even if the Unsecured Noteholders were allowed to bring this claim in Minnesota, the Examiner found that, although it is a close question, the fraud claim would more likely than not fail. The Examiner concluded that if the fraud claim were brought in Minnesota, New York law would apply. The Examiner found that it was unclear whether New York law would recognize a fraud claim based on reliance by a third party; the law supporting that theory had a "somewhat checkered" history and has been rejected by the Second Circuit. Moreover, even if the Unsecured Noteholders could get over that hurdle, they would still have to establish the remaining elements of a fraud claim. Together these factors render the third-party fraud claim of minimal settlement value, even if it were allowed to be brought outside the bankruptcy.

The Examiner also considered whether the statute of limitations would bar a fraud claim. Although the Examiner found it a close question, he concluded it was more likely than not that the statute of limitations would not bar the claim. Nonetheless, because this is a significant risk, and would completely bar the claim if AFI prevailed, it further detracts from the settlement value.

To gain a recovery on their third-party fraud claim, the Unsecured Noteholders would have to establish standing, obtain permission to bring the claim outside the bankruptcy, have New York law apply, have the court apply a questionable interpretation of New York law, establish the elements of a fraud claim, and defeat a statute of limitations argument. In light of these substantial hurdles, I do not believe that the third-party fraud claim by the Unsecured Noteholders adds materially to the settlement value of the estate's claims regarding the 2006 Bank Restructuring.

---

[44] 884 F.2d 688, 705-06 (2d Cir. 1989).

### 5.    Junior Secured Noteholder Causes Of Action

**Examiner's Report References:**

Section I.H.5 pages I-43 to I-44

Section V.E pages V-350 to V-383

**Description:**

Whether ResCap and AFI breached the Secured Revolver Loan Agreement, the Junior Secured Notes Indenture, the Senior Secured Notes Indenture, or the Intercreditor Agreement by either: (1) entering into the Line of Credit Facilities; or (2) releasing the liens on certain assets securing the Secured Revolver Facility, the Junior Secured Notes, and the Senior Secured Notes, and having such assets secure the Line of Credit Facilities.

**Background:**

Due to persistent liquidity shortages, ResCap entered into a series of financing transactions between 2007 and 2010.  In particular, in late 2008, facing liquidity shortfalls, two ResCap affiliates (PATI and RAHI) entered into the Initial Line of Credit Facility, with AFI as lender in the amount of $430 million.  ResCap guaranteed the Initial Line of Credit Facility on a full recourse basis. Although ResCap had attempted to find unaffiliated lenders for this transaction, it was unable to do so and AFI was the lender of last resort.  In order to have collateral available to secure the Initial Line of Credit Facility, collateral had to be released from other credit facilities, *i.e.*, the Secured Revolver Facility, the Senior Secured Notes, and the Junior Secured Notes.  In a typical case, this would have been an impediment to a new line of credit.

In June 2009, PATI and RAHI entered into a Second Line of Credit Facility with AFI for an additional $370 million on substantially similar terms to the Initial Line of Credit Facility.  Goldin Associates rendered a fairness opinion in connection with the Second Line of Credit Facility, finding it fair to ResCap and its creditors (other than AFI).  In late 2009, the amount available under the Line of Credit Facilities was increased, and Goldin Associates again issued a favorable fairness opinion. Finally, in late 2009, the Line of Credit Facilities were combined into one agreement and the Secured Revolver Loan Agreement was amended and restated.  Under the Amended and Restated Line of Credit Facility, RFC and GMAC Mortgage replaced PATI and RAHI as the borrowers.

**Examiner's Analysis and Conclusions:**

The Examiner concluded that the evidence does not support the allegations made by the Ad Hoc Group of Junior Secured Noteholders that either: (1) entering into the Line of Credit Facilities; or (2) releasing the liens on certain assets securing the Secured Revolver Facility, the Junior Secured Notes, and the Senior Secured Notes, and having such assets secure the Line of Credit Facilities, violated the terms of the Secured Revolver Loan Agreement, the Junior Secured Notes Indenture, the Senior Secured Notes Indenture, or the Intercreditor Agreement.

92

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

The Examiner found that the evidence does not support the allegations of breach of the Secured Revolver Loan Agreement, the Junior Secured Notes Indenture, the Senior Secured Notes Indenture, or the Intercreditor Agreement. Accordingly, this claim is not assigned any settlement value.

## I.    OPINION REGARDING CONSIDERATION FOR RELEASES AND CONCLUSION REGARDING ALLOCATION OF SETTLEMENT FUND

**Examiner's Report:**

Section I.I pages I-44

Section IX pages IX-1 to IX-28

**Description:**

In order to provide guidance to the parties, the Examiner reviewed the terminated AFI Settlement and Plan Sponsor Agreement to determine whether the Debtor Release and Third-Party Release would have been warranted based upon AFI's contributions.

A new settlement has been reached that is embodied in a Plan Support Agreement dated May 13, 2013 and provides for AFI to contribute $2.1 billion in exchange for a broad release in a confirmed plan of reorganization. I opine on the reasonable allocation of that fund among the causes of action that have material settlement value.

**Background:**

The terminated AFI Settlement and Plan Sponsor Agreement proposed to settle all Estate Causes of Action and Third Party Claims against the AFI Released Parties in exchange for a cash contribution from AFI to the Debtor of $750 million plus other non-cash contributions. No party in interest or creditor group, other than the RMBS Institutional Investors, supported the terminated AFI Settlement and Plan Support Agreement. Ultimately, the Debtor withdrew from the AFI Settlement and Plan Sponsor Agreement.

The Bankruptcy Court directed the parties to mediation before the Hon. James M. Peck, U.S. Bankruptcy Judge. When the Examiner was ready to release his report, the parties asked that it be delayed to afford them the opportunity to complete mediation. Following extensive marathon mediation sessions, on May 13, 2013 a Plan Support Agreement was reached among the Debtors, AFI, the Creditors Committee and certain Consenting Claimants. Under the Plan Support Agreement, AFI is to contribute $2.1 billion to the Debtors in exchange for a broad release of the

AFI Released Parties upon confirmation of a plan of reorganization. On June 26, 2013, the Bankruptcy Court granted the Debtors' motion for approval to enter into the Plan Support Agreement.

**Examiner's Analysis and Conclusions:**

1.      A court would consider the *Iridium* factors in deciding whether to approve the terminated AFI Settlement and Plan Sponsor Agreement.

2.      Creditor support, a major consideration in the approval of settlements, was lacking.

3.      It is extremely difficult to confirm a plan with a third-party release absent consent of substantially all of the third party claimants.

4.      The evidence does not support ascribing significant value to AFI's non-cash contributions under the terminated AFI Settlement and Plan Sponsor Agreement.

5.      The cash contribution of $750 million and the non-cash contributions from AFI were inadequate to support a release of the Estate Causes of Action, let alone the Third Party Claims.

6.      It is unlikely that a court would have approved the terminated AFI Settlement and Plan Sponsor Agreement.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions. My opinion on the reasonable settlement value of each of the Estate Causes of Action, when added together, totals $1,920.0 million and is consistent with the Examiner's conclusion that $750 million was insufficient consideration to support releases of the Estate Causes of Action, let alone the Third Party Claims.

**Conclusion:**

In the following chart, I have compiled my assessment of the reasonable settlement value of each of the Estate Causes of Action and the Third Party Claims. In my opinion, the reasonable settlement value of Estate Causes of Action is $1,920.0 million and the reasonable settlement value of the Third Party Claims is $480 million. Although under the absolute priority rule, I could have allocated the settlement first to secured claims such as the JSNs, and second to unsecured claims, instead I made allocations pro rata based on the reasonable value of each of the claims. Because in determining the reasonable settlement amount of each claim I have taken into account the merits of the claim, the motivations of the parties to settle, the time and expenses associated with litigation and all of the other relevant factors relative to a reasonable settlement value, there is no reason to apply these factors again, and therefore, I have allocated the settlement fund of $2.1 billion among the reasonable settlement values for each claim on a *pro rata* basis.

The $2.1 billion settlement fund is smaller than my estimate of the reasonable settlement value of the claims done on a claim-by-claim basis, and it may be that in this instance the sum of the parts is greater than the whole.  Also, the magnitude of the settlement fund that AFI has agreed to contribute, *i.e.*, $2.1 billion, and the opportunity to resolve numerous claims at one time in the context of a bankruptcy, may warrant a discount. Overall I feel that my assessment of the reasonable settlement value of each individual claim, when combined and compared with the settlement fund of $2.1 billion, is appropriate.  I have allocated the settlement fund of $2.1 billion among the reasonable settlement values.

| **Claims** | **Potential Damages** (*in millions*) | **Reasonable Settlement Amount** (*in millions*)[45] | **Percentage of Potential Damages** | **Allocation from $2.1 billion AFI Settlement Fund** (*in millions*) | **Percentage of Potential Damages** |
|---|---|---|---|---|---|
| **ESTATE CAUSES OF ACTION** | | | | | |
| Breach of Contract for Misallocation of Net Revenues on Loans brokered by GMAC | $520.5 | **$268.2** | **51.5%** | **$234.6** | **45.1%** |
| Breach of Contract for Failure To Pay Value of Purchased MSRs | $1,725.0 | **$387.2** | **22.4%** | **$338.8** | **19.6%** |
| Breach of Representations and Warranties under 2001 and 2006 MMLPSAs | No Amount Given | | | | |
| Breach of Contract Claims relating to Pipeline Swap | No Amount Given | | | | |

---

[45] Zeros are omitted for any settlement value that does not meet my threshold for materiality ($21 million).

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Breach of 2005 Operating Agreement or 2006 Amended Operating Agreement in connection with MMLPSA, Pipeline Swap or MSR Swap | No Amount Given | | | | |
| Preferential Transfer relating to DOJ/AG Consent Order | $109.6 | **$60.0** | **54.7%** | **$52.5** | **47.9%** |
| Preferential Transfer relating to 2012 Letter Agreement and A&R Servicing Agreement | $48.4 | **$32.0** | **66.1%** | **$28.0** | **57.9%** |
| Unauthorized Post-petition Transfer relating to Indemnification Obligations under A&R Servicing Agreement | $12.9 | | | | |
| Breach of contract regarding the First 2009 Tax Allocation Agreement | $1,770.0 | **$713.7** | **40.3%** | **$624.5** | **35.3%** |
| Constructive Fraudulent Transfer relating to 2nd 2009 Tax Allocation Agreement | $50.0 | | | | |
| Contract Claim re 2005 Tax Allocation Agreement | $15.1 | | | | |

96

| Claims | Potential Damages (in millions) | Reasonable Settlement Amount (in millions)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (in millions) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Minnesota Insider Preference Claims | $566.0 | $328.9 | 58.1% | $287.8 | 50.8% |
| Fraud related to 2006 Bank Restructuring | $569.0 | $130.0 | 22.8% | $113.8 | 20.0% |
| Tortious Interference with Contract relating to 2006 Bank Restructuring | No Amount Given | | | | |
| Fraudulent Transfer in connection with Ally Bank Transactions | No Amount Given | | | | |
| Miscellaneous Breach of Fiduciary Duty Claims against ResCap's D&Os | No Amount Given | | | | |
| Aiding and Abetting Breach of Fiduciary Duty against AFI (other than re 2006 Restructuring) | No Amount Given | | | | |
| Single Entity theories of liability regarding AFI and ResCap and/or affiliates, including Piercing Corp Veil and Substantive Consolidation | No Amount Given | | | | |
| Debt Re-characterization | No Amount Given | | | | |
| Equitable Subordination and Disallowance | No Amount Given | | | | |

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Constructive Trust | No Amount Given | | | | |
| Constructive Fraudulent Transfer Against Cerberus relating to 2008 Model Home Sale | $30.0 | | | | |
| Fraudulent Transfer relating to Prepetition Asset Sales (other than 2008 Model Home Sale) | No Amount Given | | | | |
| Financing Affiliate Transactions | | | | | |
| **TOTAL** | | **$1,920.0** | | **$1,680.0** | |
| **THIRD PARTY CAUSES OF ACTION** | | | | | |
| Third Party Claims against AFI | | | | | |
| a. RMBS Claims, including veil-piercing, control person liability and aiding and abetting fraud | $20,000.0 | **$480.0** | **2.4%** | **$420.0** | **2.1%** |

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| b. Fraudulent Transfer Claims for Payments of $200 M and 25.5 M | | | | | |
| Third Party Claims against Ally Securities, including Fed and State Securities law, common law fraud, aiding and abetting fraud, and negligent misrepresentation | | | | | |
| Third Party Claims against Ally Bank | | | | | |
| Unsecured Noteholder Causes of Action, including tortious interference under 2005 Indenture and claims relating to the 2006 Bank Restructuring | | | | | |
| Junior Noteholder Causes of Action | | | | | |
| *Total  Third Party Claims* | $480.0 | | | $420.0 | |
| *GRAND TOTAL* | $2,400.0 | | | $2,100.0 | |

99

After reviewing each of the causes of action identified in the Examiner's Report, in my opinion the reasonable settlement value of the Estate Causes of Action is $1,920.0 million and the reasonable settlement value of the Third Party Claims is $480 million for a total reasonable settlement value of all claims and causes of action of $2,400.0  million.  In my opinion the settlement fund of $2.1 billion to be paid by AFI should be allocated to the reasonable settlement value of each claim *pro rata*.

October 18, 2013

Raymond T. Lyons

**EXHIBIT A**

**Documents Reviewed**

1.      *Report of Arthur J. Gonzales, as Examiner, released June 26, 2013*

2.      <u>**Documents**</u>[1]

    (a)      Implemented 2005 Tax Allocation Agreement
    (b)      Other 2005 Tax Allocation Agreement
    (c)      2006 Tax Allocation Agreement
    (d)      First 2009 Tax Allocation Agreement
    (e)      Second 2009 Tax Allocation Agreement
    (f)      2001 MMLPSA
    (g)      March 2008 Pipeline Swap Schedule
    (h)      July 2008 Pipeline Swap Schedule
    (i)      Amended and Restated Schedule to the 2002 ISDA Master Agreement
          dated April 1, 2011
    (j)      2006 MMPLSA
    (k)      2007 MMPLSA
    (l)      2005 Operating Agreement
    (m)      2008 MMPLSA
    (n)      2010 Net Funding Schedule
    (o)      April 2011 MSR Swap Confirmation
    (p)      MSR Swap
    (q)      2006 Amended Operating Agreement
    (r)      November 20, 2008 Broker Agreement
    (s)      First Priority Security Agreement
    (t)      Junior Notes Indenture
    (u)      Senior Secured Notes Indenture
    (v)      Intercreditor Agreement
    (w)      Initial Line of Credit Agreement
    (x)      Second Line of Credit Agreement
    (y)      A&R Line of Credit Agreement
    (z)      Ally Accounting Policy 3330 – Accounting for Income Taxes, effecrtive
          October 1, 2010
    (aa)      FMV Schedule
    (bb)      Secured Revolver Loan Agreement

---

[1] Unless otherwise noted with an asterisk, the documents listed in this Exhibit are defined in the Appendix to the Examiner's Report.

1

3.      *Reports Regarding Securities Settlements*

    a.  *The D&O Diary* – Subprime and Credit Crisis-Related Lawsuits, Settlements, Dismissals and Denials – April 30, 2013 (Kevin LaCroix)

    b.  *NERA Economic Consulting* – Recent Trends in Securities Class Action Litigation:  2012 Full-Year Review – January 29, 2013 (Dr. Renzo Comoli, Sukaina Klein, Dr. Roald I. Miller and Svetlana Starykh)

    c.  *Cornerstone Research (Economic and financial Consulting and Expert Testimony)* – Securities Class Action Settlements - 2011 Review and Analysis

4.      *Related Mortgage Backed Securities Settlements*

    a.  *In re Residential Capital, LLC, et al.* (U.S. Bankruptcy Court, Southern District of New York, Case No. 12-12020 MG)

        (1)  Reply Declaration of Jeffrey A. Lipps (Docket No. 2805)

        (2)  Direct Testimony of Jeffrey A. Lipps (Docket No. 4433)

    b.  *In re Citigroup Inc. Securities Litigation.* (U.S. District Court, Southern District of New York, Case No. 07:cv-09901)

        (1)  Order Preliminarily Approving Proposed Settlement and Providing for Notice dated August 29, 2012 (Docket No. 156)

        (2)  Final Judgment and Order of Dismissal With Prejudice dated August 1, 2013 (Docket No. 276); *also see b(1) below*

    c.  *In re Citigroup Inc. Securities Litigation.* (U.S. District Court, Southern District of New York, Case No. 09 MD 2070)

        (1)  Opinion dated August 1, 2013 (Docket No. 275)

    d.  *In re Citigroup Inc. Bond Litigation*. (U.S. District Court, Southern District of New York, Case No. 08-Civ. 9522)

        (1)  Final Opinion and Order dated August 20, 2013 (Docket No. 180)

    e.  *Maine State Retirement System, et al. v. Countrywide Financial Corporation.* (U.S. District Court, Central District of California, Case No. 10-cv-00302); *David H. Luther, et al. v. Countrywide Financial Corporation.* (U.S. District Court, Central District of California, Case No. 12-cv-05125); *Western Conference of Teamsters Pension Trust Fund, et al. v. Countrywide Financial*

*Corporation, et al.* (U.S. District Court, Central District of California, Case No. 12-cv-05122)

    (1)    Order Granting Preliminary Approval to Settlement and Directing Dissemination of Notice to the Class

    (2)    Notice of Pendency and Proposed Settlement of Class Actions, Fairness Hearing and Motion for an Award of Attorneys' Fees and Litigation Expenses

f.    ***George Pappas, et al. and Countrywide Financial Corp., et al. v. The Bank of America 401(k) Plan for Legacy Companies as a Successor to the Countrywide Financial Corporation 401(k) Savings and Investment Plan.*** (United States Court of Appeals for the Ninth Circuit, Case No. 11-55570)

    (1)    Mandate dated June 20, 2013 (Docket No. 1104)

g.    ***Countrywide Financial Corporation Securities Litigation*** (U.S. District Court, Central District of California, Western Division Lead, Case No. CV 07-05295)

    (1)    Notice of Pendency and Proposed Settlement of Class Action and Fairness Hearing

h.    ***In re Washington Mutual Mortgage Backed Securities Litigation.*** (U.S. District Court, Western District of Washington, Case No. 09-cv-00037)

i.    ***In re Washington Mutual, Inc. Securities Litigation***. (US District Court for the Western District of Washington at Seattle, Case No. 2:08-md-1919 MJP, Lead Case No. C08-387-MJP)

    (1)    Stipulation and Agreement of Settlement with Individual Officer and Director Defendants and with Washington Mutual, Inc. (Exhibit 1 to Docket No. 308)

    (2)    Stipulation and Agreement of Settlement with the Underwriter Defendants (Exhibit 2 to Docket No. 308)

    (3)    Stipulation and Agreement of Settlement with Defendant Deloitte & Touche LLP (Exhibit 3 to Docket No. 308)

    (4)    [Proposed] Order Preliminarily Approving Proposed Settlements and Providing for Notice (Exhibit 3 to Docket No. 308)

j.    ***United States of America, et al. v. Bank of America Corp., et al.*** (United States District Court for the District of Columbia, Case No. 12-0361)

    (1)    Consent Judgment

3

 (2) Earmark and Indemnification Agreement

k. ***Ally Financial Inc., Residential Capital, LLC and GMAC Mortgage LLC***
(United States of America before the Board of Governors of the Federal Reserve
System, Washington, D.C., Docket No. 12-006 CMP-HC & 12-006 CMP DEO)

 (1) Order of Assessment of a Civil Money Penalty Issued Upon Consent
Pursuant to the Federal Deposit Insurance Act, as Amended

 (2) January 30, 2012 letter re: Terms of Support Relating to Possible
DOJ/State Attorneys' General Settlement

l. ***Ally Financial Bank Inc., Ally Bank, Residential Capital, LLC and GMAC
Mortgage, LLC*** (United States of America before the Board of Governors of the
Federal Reserve System, Washington, D.C. and Federal Deposit Insurance
Corporation, Washington, D.C., Docket No. 11-020-B-HC and 11-020-B-DEO)

 (1) Consent Order

4