# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

In re:

COMMUNITY BANK OF NORTHERN VIRGINIA          Case No. 03-425
AND GUARANTY NATIONAL BANK OF
TALLAHASSEE SECOND MORTGAGE LOAN             Hon. Gary L. Lancaster
LITIGATION


## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT


R. Bruce Carlson, Pa. I.D. #56657              A. Hoyt Rowell, III
**SPECTER SPECTER EVANS**                      Daniel O. Myers
**& MANOGUE, P.C.**                            **RICHARDSON, PATRICK,**
The 26th Floor                                 **WESTBROOK & BRICKMAN,**
**LLC**
Koppers Building                               1037 Chuck Dawley Blvd., Bldg. A
Pittsburgh, Pennsylvania 15219                 Mt. Pleasant, SC 29464
(412) 642-2300                                 (843) 727-6500


*Co-Class Counsel*

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

In re:

COMMUNITY BANK OF NORTHERN VIRGINIA       Case No. 03-425
AND GUARANTY NATIONAL BANK OF
TALLAHASSEE SECOND MORTGAGE LOAN          Hon. Gary L. Lancaster
LITIGATION

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

### PRELIMINARY STATEMENT

1.      This class action is filed on behalf of all persons who entered into a loan agreement

with Community Bank of Northern Virginia ("CBNV") or, Guaranty National Bank of Tallahassee

("GNBT"), where the loan is, or was, secured by a second mortgage or deed of trust on property

located in the United States whose loan was purchased by Residential Funding Corporation ("RFC")

and who was not a member of the class certified in the action captioned *Baxter v. Guaranty National*

*Bank, et al.*, Case No. 01-CVS-009168 in the General Court of Justice, Superior Court Division of

Wake County, North Carolina.

2.      Plaintiffs and the Class were victimized by a fraudulent scheme calculated in relevant

part to extract bogus fees for alleged "loan origination" and alleged "title services," in connection

with the mortgage loans at issue.

3.      While the subterfuge invoked to conceal the fraudulent scheme was complex, the

actual mechanics of the scheme were straightforward.

4.      With respect to the term "loan origination fees," Plaintiffs are referring to all of the

miscellaneous fees that were delineated in Section 800 of the HUD-1A Settlement Statements used

in connection with the closing of each loan at issue.  While the Settlement Statements uniformly

indicated that these origination fees were being paid to CBNV or GNBT, this representation was fraudulent.

5.    In truth, only a small percentage of the "origination fees," was ever disbursed to the banks by the title company that closed the loans.

6.    Contrary to the representations made to Plaintiffs and the Class in their Settlement Statements, the majority of the origination fees were actually disbursed to a company doing business as EquityPlus Financial, LLC, (CBNV loans), or EquityGuaranty, LLC (GNBT loans).

7.    Uniformly, the fact that the vast majority of these fees were being paid to EquityPlus or EquityGuaranty, and not to CBNV or GNBT, was concealed from Plaintiffs and the Class.

8.    The purpose of defrauding Plaintiffs and the Class regarding the true recipient of these fees was to evade state fee caps and usury laws, thereby permitting the generation of tens of millions of dollars in bogus fee income that was shared by EquityPlus, EquityGuaranty, CBNV, GNBT and GMAC-RFC.

9.    The fact that these fees were being paid to EquityPlus or EquityGuaranty, and not to CBNV or GNBT, was widely known among the employees at EquityPlus/EquityGuaranty and by Defendant GMAC-Residential Funding Corporation (hereafter "GMAC-RFC").

10.    With respect to the term "title services," Plaintiffs are referring to all of the miscellaneous fees that were delineated in Section 1100 of the Settlement Statements used in connection with the closing of each loan at issue.

11.    The Settlement Statements indicated that miscellaneous fees for these alleged "title services," were being paid to one of multiple title companies.

12.    All of these title companies were owned or controlled by the same individuals who

2

owned EquityPlus Financial/EquityGuaranty, and the businesses operated from the same location.

13.     Contrary to the representations in the Settlement Statements, no services were actually performed for the majority of the fees for "title services." For the nominal services that were actually rendered, the fees did not bear a reasonable relationship to the value of the services rendered, as compared to fees charged for similar services rendered by non-affiliated service providers in the open market place. Instead, these fees were a pretext created to divert settlement funds from Plaintiff and the Class to the owners of EquityPlus/EquityGuaranty (who also owned or controlled the title companies)(EquityPlus, EquityGuaranty and all of the affiliates of these companies that are/were owned or controlled by David Shumway, Chris Shumway and Randy Bapst are referred to herein, collectively, as the "Shumway/Bapst operation.")

14.     The fact that no services, or nominal services, were performed in exchange for these fees was widely known among the employees at EquityPlus/EquityGuaranty and by Defendant GMAC-RFC.

15.     The loans at issue are "high-cost" loans under the Home Ownership and Equity Protection Act, 15 U.S.C. § 1641 (hereinafter "HOEPA").

16.     The named Defendants in this action are GMAC-RFC, which purchased all of the loans at issue from CBNV/GNBT, thereby "stepping into the shoes of" CBNV/GNBT with respect to any liability arising from the loan transactions pursuant to 15 U.S.C. § 1641(d)(1), and CBNV and GNBT.

17.     GMAC-RFC was aware of the fraudulent conduct at issue, participated directly in the fraudulent conduct at issue and knowingly profited from the fraudulent conduct at issue, as is discussed in detail below.

3

**II.**      **JURISDICTION AND VENUE**

18.      Plaintiffs seek relief under the Real Estate Settlement Procedures Act, 12 U.S.C. §
2601 et seq., (hereinafter "RESPA"), and the Racketeer Influenced & Corrupt Organizations Act,
18 U.S.C. §§'s 1962(c), 1962(d) (hereinafter "RICO"), as well as various claims under state common
and statutory law.  Therefore, federal question jurisdiction is appropriate pursuant to 28  U.S.C. §
1331 and Supplemental jurisdiction over the state claims is appropriate pursuant to 28 U.S.C. §
1367.

19.      Personal jurisdiction and venue in this district are proper because Defendants
regularly solicited business in this judicial district and because Defendants own, or owned,
substantial interests in real property in this district.

**III.**      **THE PARTIES**

20.      Plaintiff Ruth J. Davis is an adult individual residing at 1206 Stratford Court,
Coraopolis, Allegheny County, Pennsylvania.

21.      Plaintiffs Philip F. Kossler and Jeannie C. Kossler are lawfully married individuals
residing at 127 Huron Drive, Carnegie, Allegheny County, Pennsylvania.

22.      Plaintiffs Brian W. and Carla M. Kessler are a lawfully married couple residing at
6466, Route 908, Allegheny County, Pennsylvania.

23.      Plaintiff Patrice Porco is an adult individual residing at 805 Center Avenue,
Pittsburgh, Pennsylvania 15202.

24.      Plaintiff Thomas T. Mathis is an adult individual residing at 1435 LaSalle Avenue,
Allegheny County, Pennsylvania.

4

25.    Plaintiffs Stephen R. Haney and Amy L. Haney, are lawfully married individuals residing at 868 Flemington Street, Allegheny County, Pennsylvania.

26.    Plaintiffs John and Rebecca Picard, husband and wife, reside at 5214 Becky Drive, Pittsburgh, PA 15236.

27.    Plaintiffs William and Ellen Sabo, husband and wife, reside at 3812 Cambria Street Munhall, PA 15120.

28.    Plaintiffs Russell and Kathleen Ulrich are lawfully married individuals residing at 515 Fieldcrest Drive, Pittsburgh, PA 15209.

29.    Plaintiff Nora H. Miller is an adult individual residing at 1610 Sahara Street, Buena Vista, PA, 1518.

30.    Plaintiffs Robert A. and Rebecca A. Clark, husband and wife, reside at 3020 Hebron Drive, Pittsburgh, PA, 15235.

31.    Plaintiff Edward R. Kruszka Jr. is an adult individual residing at 1320 Coronado Drive, Port Vue, PA 15133.

32.    Defendant GMAC-Residential Funding Corporation is a Delaware corporation with its principal place of business located at 8400 Normandale Lake Boulevard, Minneapolis, MN 55437.

33.    Defendant Guaranty National Bank of Tallahassee is a national bank and is a wholly owned subsidiary of Evergreen Bancshares, Inc. with a principal place of business at 1706 West Tallahassee Street, Tallahassee, Florida 32304.

34.    Defendant Community Bank of Northern Virginia is a Virginia corporation with a principal place of business at 8150 Leesburg Pike, Vienna, Virginia 22182.

5

## IV.    THE FRAUDULENT SCHEME

35.    Beginning in early 1998, three brothers, David, DeVan and Chris Shumway, in concert with Randy Bapst, commenced operation of what was to become a massive mortgage fraud scheme.

36.    David and DeVan Shumway, and Randy Bapst, all had extensive previous experience in the mortgage industry.

37.    Chris Shumway is the younger brother of David and DeVan. He amassed a substantial personal fortune during his tenure at the Tiger Fund, a hedge fund that was based in New York City.

38.    Chris Shumway ultimately resigned from the Tiger Fund and relocated to Northern Virginia, where he provided seed money from his personal wealth that permitted the Shumway brothers and Mr. Bapst to launch their mortgage operation on a national scale.

39.    The Shumway brothers and Mr. Bapst created multiple business forms through which they controlled their mortgage operation. In the first incarnation, these entities included: EquityPlus, LLC, EquityPlus Financial, Inc., EquityPlus Management Consulting Group, Inc., Title America, LLC and Title America Holdings, Inc.

40.    The Shumway/Bapst business plan was to aggressively solicit residential mortgage loan business through a massive national direct mail marketing campaign.

41.    The business plan had a unique twist, however. That is, because a non-depository lender must comply with fee caps and interest ceilings imposed by the laws of the various states, thereby creating a practical ceiling with respect to maximum revenue potential, the Shumway/Bapst plan envisioned an association with a regulated depository institution, which arguably would not be

6

bound by these same fee caps and interest ceilings. This association would permit the Shumway/Bapst mortgage operation to disguise the source of origin for the loans, and concomitantly permit the operation to play a fraudulent shell game calculated to defraud borrowers by generating bogus fee revenue.

42.    In other words, **if** certain settlement fees collected in connection with the loans were made to appear to have been paid to a state-chartered or national bank, then to the uninitiated observer it might appear that the fees were exempt from fee caps imposed by state mortgage lending laws **because they were apparently being paid to a state-chartered or national bank**.

43.    Therefore, the EquityPlus plan envisioned associating with a bank so that EquityPlus could deceive borrowers with fraudulent settlement disclosures that made it appear on paper that certain settlement fees were being paid to the bank, when in fact the majority of the fees would be disbursed directly to EquityPlus or one of its affiliates.

44.    The business plan specifically contemplated that EquityPlus would target a financially distressed bank, which would be offered an opportunity to derive significant income in exchange for nothing more than permitting the EquityPlus mortgage loans to be made in the bank's name.

45.    In fact, CBNV agreed to the Shumway/Bapst proposal some time in early 1998, at which time CBNV entered into a formal "consulting agreement" with EquityPlus.

46.    The EquityPlus operation began to originate loans in the name of CBNV shortly thereafter.

47.    EquityPlus used its own employees to perform virtually all activity necessary to support the mortgage lending operation.

48.    EquityPlus paid the salaries of all of the employees of the mortgage operation, the substantial direct mail marketing costs, the office rent and all other overhead.

49.    CBNV had no supervisory authority with respect to the increasingly massive EquityPlus lending operation which was generating a huge volume of loans in CBNV's name. Instead, EquityPlus operated its mortgage loan business, which was now making loans in CBNV's name, with complete autonomy.

50.    EquityPlus contracted with Harte Hanks Direct Marketing of San Antonio, Texas, to support the massive direct mail campaign used to market the loans.

51.    Prospective borrowers would apply with EquityPlus by phone and loan closing and funding typically occurred in as little as fifteen days from the initial phone call from the borrower.

52.    EquityPlus sometimes disregarded federal notice and disclosure requirements in connection with the origination of these loans.  On occasion, disclosures that should have been supplied to borrowers in advance of closing were not supplied until the time of closing.

53.    Because borrowers were sometimes not provided with disclosures that required their signature either until the time of closing, or not at all, EquityPlus is rumored to have set up "tracing tables" in its offices on occasion, so that loan processors could forge borrowers' signatures on required documents.

54.    On May 15, 1998, Defendant GMAC-RFC entered into an agreement with CBNV whereby it agreed to purchase all of the loans being originated by EquityPlus in CBNV's name. GMAC-RFC dealt almost exclusively with EquityPlus and the Shumway/Bapst operation, generally, as opposed to CBNV, with respect to all matters relating in any way to the origination of these loans and to  GMAC-RFC's ultimate purchase of these loans.

8

55.     While Plaintiffs believe that CBNV funded the loans, its ability to fund the loans was wholly dependent upon the fact that GMAC-RFC was committed to purchase the loans shortly after closing. In other words, CBNV did not have the financial wherewithal to provide the reserves that would have been required to hold these loans in its own portfolio.

56.     Notwithstanding that the loans were made in the name of CBNV, GMAC-RFC at all material times knew that CBNV was a straw-party that had virtually no input with respect to the origination and underwriting of the loans. Representatives of GMAC-RFC were regular visitors to the EquityPlus operation, and GMAC-RFC was unambiguously aware of who was in charge of the operation. GMAC-RFC always dealt with the management and employees of EquityPlus regarding business issues that arose in connection with these loans, not with the management or employees of CBNV.

57.     In addition, at all material times GMAC-RFC knew that contrary to the representations in the Settlement Statements used in connection with the loans, the overwhelming majority of the origination fees were being paid to EquityPlus, not CBNV.

58.     Similarly, at all material times GMAC-RFC knew that contrary to the representations in the Settlement Statements, virtually no services were performed by the Shumway/Bapst controlled title companies in exchange for most of the fees for "title services" that were imposed upon the borrowers.

59.     The Shumway/Bapst title companies, Title America, LLC, for CBNV loans and USA Title, LLC, for EquityGuaranty loans, did not have their own employees but instead shared employees with EquityPlus and EquityGuaranty.

9

60.    The Shumway/Bapst title companies were not separately capitalized, but instead shared funds with EquityPlus and EquityGuaranty.

61.    The Shumway/Bapst title companies did not manage their own business affairs, but instead were controlled completely by Messrs. Shumway and Bapst.

62.    The Shumway/Bapst title companies operated solely as captives of EquityPlus and EquityGuaranty and did not otherwise compete in the marketplace for business.

63.    GMAC-RFC's knowledge and level of participation is discussed in more detail below.

64.    As mentioned above, CBNV was compensated for its willingness to permit the loans to be made in its name.  This compensation was in two forms: 1) CBNV was paid the short term interest float on the loans between the time of funding and the date on which GMAC-RFC formally purchased the loans; and, 2) CBNV was paid 1-2 points of the average 10-12% (of the original principal balance) in origination fees collected in connection with each loan transaction.

65.    Between approximately May of 1998 and December of 1999, CBNV derived significant income as a function of its agreement to permit EquityPlus to originate loans in the CBNV name.

66.    By December of 1999, however, EquityPlus had concluded that CBNV was being too "greedy" with respect to the fees that it was receiving in exchange for nothing beyond its willingness to permit EquityPlus to make the loans in CBNV's name.

67.    As a result, the owners of EquityPlus approached a second financially distressed bank – this time a national bank doing business as Guaranty National Bank of Tallahassee (hereinafter

10

"GNBT") – and negotiated an agreement similar to the agreement that was entered with CBNV, albeit on terms that were more acceptable from the perspective of the Shumway/Bapst coalition.

68.    Around this time, the Shumways and Mr. Bapst created a distinct group of companies through which to originate loans in the name of GNBT. These companies included: Equity Guaranty, LLC, Equity Guaranty Holdings, Inc., Mediapro, LLC, USA Settlements, LLC, USA Settlements Holdings, Inc., USA Title, LLC and Save Banc Holdings, Inc.

69.    The last of these entities was a pun that played on the Shumway/Bapst business model. That is, they sought financially distressed bank partners which, in their view, were more likely to be receptive to the legally dubious offer being peddled by the Shumway/Bapst coalition to the bank.

70.    At any rate, while the names of the business entities fronting the scheme were changed in or around March or April of 2000, it was business as usual for the Shumway/Bapst coalition, on an increasingly massive scale.

71.    At some point in time after the name-change, the operation was relocated from 11417 Sunset Hills, Reston, Virginia, 20190 to more spacious quarters at 4501 Singer Court, Chantilly, VA 20151.

72.    This new space included approximately 80,000 square feet – all of which was needed because by January of 2002 the operation employed over 500 people.

73.    During 2001, the now "EquityGuaranty" operation began to saturate consumers in 45 states with direct mail solicitations for mortgage loans.

74.    The direct mail campaign averaged 7-8 million pieces of mail per month, reaching its zenith of in excess of 10 million pieces by January of 2002.

11

75.     On average, the direct mail campaign generated approximately 30,000 calls per month. These calls were fielded by a team of approximately 300 loan officers.

76.     Again, the massive mailing costs and payroll costs were paid by "EquityGuaranty" or one of the then current versions of the Shumway/Bapst companies, and certainly not by GNBT.

77.     For the six month period between March and September of 2001, "EquityGuaranty" or one of its affiliate companies paid in excess of $18,000,000 in direct mailing costs.

78.     During that same six month period, "EquityGuaranty" or one of its affiliate companies generated in excess of 53 million direct mail solicitations.

79.     The direct mail campaign violated the Fair Credit Reporting Act in wholesale fashion. This fact was corroborated in an audit by an outside law firm which recommended that Equity Guaranty change its marketing practices. This recommendation was disregarded.

80.     By August of 2001, EquityGuaranty or one of its affiliates, had shifted the bulk of the direct mail operation to another outside vendor, ICS Corporation.

81.     The Shumway/Bapst practice of defrauding borrowers by representing in Settlement Statements that origination fees were being paid to GNBT, when the fees were in fact being paid to Equity Guaranty or one of its affiliates, continued unabated.

82.     The Shumway/Bapst practice of defrauding borrowers with respect to fees for supposed "title services" also continued unabated.

83.     Substantially all of the loans originated by EquityGuaranty in the name of GNBT were purchased by Defendant GMAC-RFC, pursuant to a separate agreement between and GMAC-RFC and GNBT, executed on February 10, 2000.

12

84.    Once again, representatives of GMAC-RFC were regular visitors to the Shumway/Bapst operation, and GMAC-RFC knew that nothing material had changed in the operation from the EquityPlus/CBNV days other than the names of the business forms generating the loans.

85.    Unlike the agreement with CBNV, however, GNBT's primary compensation for its agreement to permit loans to be made in its name was the interest float generated between the date of loan funding and the date on which GMAC-RFC formally purchased the loan. GNBT received only a *de minimis* share of the origination fees.

86.    Between March and September of 2001, approximately 8948 loans were originated by Equity Guaranty in the name of GNBT, with a total original principal balance of $335,070,300, or an average per loan balance of $37, 446.00.

87.    With respect to those loans, Equity Guaranty or its affiliates defrauded borrowers out of in excess of $ 32,000,000 in origination fees, and in excess of $8,000,000 in fees for supposed title services.

88.    Regarding the origination fees, substantially every Settlement Statement indicated that these fees were being paid to GNBT when in truth, the fees were paid to Equity Guaranty or one of its affiliates.

89.    Regarding the fees for alleged "title services," substantially every Settlement Statement listed fees in amounts approximating or exceeding $1,000.00, in exchange for which virtually no services were rendered in relevant part.

13

## The Role Of Defendant GMAC-Residential Funding Corporation

90.    In the above text, the Consolidated Amended Complaint suggests that Defendant GMAC-RFC "purchased" all of the loans generated by the Shumway/Bapst operation in the name of CBNV and GNBT.  While that is a true statement, it is an oversimplification and it is useful to review GMAC-RFC's specific role in these transactions within the historical context of GMAC-RFC's business model.

91.    Residential Funding Corporation ("RFC") traces its roots to 1982, when it was formed as a subsidiary of Banco Mortgage Company, an affiliate of Northwestern National Bank, the predecessor of Norwest Bank.

92.    Initially, RFC focused on buying and securitizing "jumbo" mortgages (mortgages with loan balances above the purchasing authority of Freddie Mac and Fannie Mae).

93.    In the most simple terms, "securitization" refers to the process of packaging loans (not only mortgage loans) for sale as securities.

94.    In other words, RFC's income was generated in two fundamental ways: 1) income derived from holding performing loans in inventory; and, 2) the more substantial income derived when loans are packaged and sold as securities.[1]

95.    Since RFC does not really originate mortgage loans directly, it is necessary for it to cultivate relationships with third-party loan "originators" so that RFC has access to a steady flow

---

[1]  Doing business as "Homecomings Financial Network," GMAC-RFC also derived income by retaining the servicing rights to the loans.

14

of loan "product,"which will then generate income for RFC while it is held in inventory and subsequently packaged, and then generate even more income when the packages are sold as securities.

96.    In 1990, RFC was acquired by General Motors Acceptance Corporation. Throughout the early and mid-1990's the company that had become GMAC-RFC expanded the variety of loan "products" that it would purchase and securitize.

97.    By the late 1990's, profit margins derived from the securitizations of lower-risk loan products began to dissipate and many companies, eventually including GMAC-RFC, began to securitize higher-risk loan products.

98.    Eventually, GMAC-RFC achieved overwhelming market dominance with respect to the purchase and securitization of higher-risk mortgage loans known as "125" loans, so-called because the amount financed represented up to 125% of the value of the collateral securing the loan. These loans were also know as High-LTV (loan-to-value) loans.

99.    By 1999, the Shumway/Bapst operation had become the largest single source of "125" loan product for GMAC-RFC.

100.    Because the Shumway/Bapst operation was, by far, the largest producer in the 125% securitization market that GMAC-RFC had begun to dominate, and because the relationship was therefore so profitable, GMAC-RFC became a co-conspirator with respect to the massive fraud being perpetrated by the Shumway/Bapst businesses.

101.    As noted above, GMAC-RFC unambiguously knew that all of these loans were being originated by the Shumway/Bapst operation and that CBNV and then GNBT were straw-parties

15

being used to fraudulently funnel origination fees, and fees for so-called "title services," to the Shumway/Bapst operation.

102.    The bogus settlement fees being charged by the Shumway/Bapst operation were significant profit centers not only for the Shuway/Bapst companies, but also for GMAC-RFC. More specifically, these fees were rolled into the principal of the loans and GMAC-RFC derived substantial interest income from these illegal fees while the loans were held in portfolio and then again as a function of the fact that the illegal fees padded the income received from GMAC-RFC when the loans were ultimately securitized.

103.    In part because GMAC-RFC derived substantial income from the fraudulent origination and title fees, GMAC-RFC actively worked with the Shumway/Bapst operation to expand the loan volume being generated by the operation.

104.    GMAC-RFC directly participated in the fraudulent lending activities in that it provided the Shumway/Bapst operation with a continuing commitment to purchase all of the operation's high-cost loan production, notwithstanding its familiarity with the fraudulent nature of the loans.

105.    As noted, GMAC-RFC was a regular presence at the Shumway/Bapst operation, and representatives of GMAC-RFC met regularly with the Shumway/Bapst management team.  As a function of this fact, GMAC-RFC knew, with certainty, that CBNV, and then GNBT, had absolutely no input with respect to the conduct of the mortgage lending operation which was originating loans in their names.

106.    As a function of its regular presence at the Shumway/Bapst operation, in all of its incarnations, as a function of the fact that it audited the financial statements of CBNV, GNBT,

16

EquityPlus and/or EquityGuaranty, and as a function of the fact that it received all of the original

loan files, including the final Settlement Statements, when it purchased the loans at issue, and as a

function of the fact that it audited the loans that it was purchasing, GMAC-RFC knew the precise

extent to which every borrower was being defrauded with respect to both the identity of the actual

recipient of origination fees assessed at closing and with respect to the fact that virtually no services

were being performed in exchange for the overwhelming majority of the fees being imposed upon

the borrowers for so-called title-services.

### The Downfall Of The Shumway/Bapst Empire

107.    In mid-2001, national bank GNBT was audited by the Office of the Comptroller of

Currency ("OCC").

108.    In the course of this audit, the OCC requested that GNBT provide basic

documentation supporting the EquityGuaranty loans bearing the GNBT name.

109.    GNBT was unable to satisfy the OCC with respect to much of the requested

documentation because it had no control over EquityGuaranty, which had failed to provide GNBT

with the required documents.  More specifically, notwithstanding that the "consulting agreement"

between EquityGuaranty and GNBT required that EquityGuaranty would provide GNBT with

various periodic reports and other documents related to the loan operation, EquityGuaranty simply

refused to supply the information.

110.    As a function of this dynamic, GNBT's president and outside counsel traveled to the

EquityGuaranty facility in Chantilly, Virginia for a series of "closed door" meetings that occurred

over the course of several days.

17

111.   GNBT's President and outside counsel approached several key EquityGuaranty managerial employees and directly requested that these employees provide GNBT with certain specified reports relating to their areas of responsibility in the EquityGuaranty operation.

112.   After the GNBT representatives had left the EquityGuaranty facility, however, David Shumway instructed the employees to disregard the GNBT requests.

113.   On January 26, 2002, GNBT entered into a formal agreement with the OCC that placed tight controls on the Bank.

114.   The Shumway/Bapst operation was initially unconcerned by the complaints from GNBT, however.

115.   This lack of concern was largely a function of the fact that the Shumway/Bapst operation was planning to cut GNBT, and any other bank, out of the picture by starting its own bank, to be headquartered at its Chantilly, Virginia facility.

116.   Toward this end, an actual retail banking facility, complete with teller booths and mahogany detailing, was constructed on the first floor of the Shumway/Bapst building in Chantilly.

117.   In addition, the operation had hired several key employees intended to launch the banking operation.  These employees included a former bank president and a lawyer who had previously worked for the OCC.

118.   By January of 2002, however, relations had also deteriorated with GMAC-RFC.

119.   The Shumway/Bapst operation had been resistant to certain requests from GMAC-RFC, including a repeated request that the operation install and use GMAC-RFC proprietary software that was contemplated by GMAC-RFC's agreements with CBNV and GNBT.

18

120.   By January of 2002, GMAC-RFC had become increasingly concerned about its perception that the Shumway/Bapst operation had by this point in time become reckless and cavalier with respect to business practices that both Shumway/Bapst and GMAC-RFC knew were fraudulent and illegal.

121.   Ultimately, GMAC-RFC determined that notwithstanding the tremendous income derived from the Shumway/Bapst loan operation, it was unwilling to continue to shoulder the risk that came with the unlawful lending practices of the Shumway/Bapst companies.

122.   In January of 2002, then, GMAC-RFC telephoned David Shumway to inform him that GMAC-RFC was unwilling to purchase any additional Shumway/Bapst loan production and that it would be returning approximately $40,000,000.00 in loans that had already been delivered to GMAC-RFC for purchase.

123.   As a direct result of its experiences with EquityPlus/EquityGuaranty, GMAC-RFC now places significant restrictions on its willingness to purchase HOEPA high-cost loans. These restrictions are articulated, in part, in the August 23, 2002, edition of GMAC-RFC's "Broker/Lender Manual." Indeed, in a press release dated March 28, 2002, GMAC-RFC announced that it was no longer willing to purchase HOEPA high-cost loans.

124.   GMAC-RFC's action had dire implications for both the Shumway/Bapst operation and GNBT.

125.   Without any purchaser for the loan production, GNBT did not have adequate reserves to maintain the loans in its own portfolio.

126.   As a function of this dynamic, the Shumway/Bapst operation cut a check to cover the reserve requirements and to buy time to plot a course of action.

19

127.    At the same time, by re-characterizing certain of the loans in the portfolio returned by GMAC-RFC, the Shumway/Bapst operation was able to create loan-to-value ratios of approximately 110%, and by so doing they were able to sell approximately $10,000,000 in loans from this portfolio to another purchaser.

128.    At the same time, the Shumway/Bapst operation threatened GMAC-RFC with litigation over its decision to terminate its commitment to purchase loans generated by the Shumway/Bapst operation.

129.    Ultimately, GMAC-RFC reportedly relented and agreed to re-purchase the remaining $30,000,000.00 from the original portfolio, in exchange for a release from liability and from any obligation to purchase future loan production.

130.    During this same general period of time, the Shumway/Bapst operation was approached by the sub-prime lending unit one of the largest mortgage lending companies in the country.

131.    After performing due diligence at the Chantilly offices, however, this major mortgage lending company declined to make an offer for the business.

132.    Subsequently, one additional potential suitor reviewed the Shumway/Bapst operation, but also declined to make an offer for the business.

133.    Thereafter, the Shumway/Bapst operation laid-off the majority of its staff.

134.    Today, there is a small skeleton crew (including David and DeVan Shumway) originating mortgage loans at the Chantilly facility under the name "Calusa Investments."

135.    As of early February 2003, there was a sign on the interior door at the Chantilly facility that reads as follows: "ATTENTION DELIVERIES: Please go to the far left side of the

20

building from the main entrance for the following companies: Calusa Investments, Equity Guaranty, USA Title, Guaranty National Bank."

## The Significance of OCC Advisory Letter 2003-3

136.    As noted above, the OCC did an extensive investigation of Guaranty National Bank of Tallahassee, which in part resulted in a formal agreement between the OCC and GNBT, entered on or about January 26, 2002.  See Formal Agreement #2002-2 appended hereto as Exhibit 1.

137.    The department of the OCC that conducted the investigation of GNBT was the Special Supervision and Fraud Division.

138.    In connection with this investigation, the OCC performed an on-site audit at the EquityGuaranty facility in Chantilly, Virginia.

139.    As a result of its investigation, the OCC concluded, in part, that GNBT's relationship with EquityGuaranty was problematic in two fundamental respects: 1) the relationship created significant safety and soundness issues, generally, in that GNBT did not have a meaningful mechanism in place with which to oversee EquityGuaranty's origination of second mortgage loans in GNBT's name; and, 2) relatedly, GNBT was susceptible to significant exposure as a function of the predatory nature of certain features in the loans being originated by EquityGuaranty.

140.    In significant part (if not exclusively) based upon its investigation of GNBT, the OCC issued Advisory Letter 2003-3 on February 21, 2003.  This Advisory Letter deals with the subject of: "Avoiding Predatory and Abusive Lending Practices in Brokered and Purchased Loans," (the letter is hereinafter referred to as "AL 2003-3").  See Advisory Letter 2003-3 appended hereto as Exhibit 2.

21

141.    Though AL 2003-3 does not identify GNBT (or any of the other players in the

Shumway/Bapst conspiracy) by name, it is a veritable mini-treatise descriptive of the unlawfulness

of many of the Shumway/Bapst lending practices being challenged in this action, drafted from the

perspective of a federal regulator focusing on why it is that predatory practices by the third-party

broker may subject a national bank to both regulatory and civil liability exposure.

142.    Toward that end, AL 2003-3 notes that, [p]redatory loans originated through mortgage

brokers . . . may subject national banks to liability or supervisory action under a wide range of federal

consumer protection laws.  For example, in typical mortgage broker transactions, the loan will be

closed in the name of the bank as the initial creditor, and thus, the bank generally will have direct

liability for any violations of law committed in connection with the loan.  In addition, the bank could

be liable under agency, `common enterprise,' or other theories for violations committed by the

broker, and may be jointly and severally liable with the broker – for example, under the Real Estate

Settlement Procedures Act (RESPA) – for violations it is deemed to commit in conjunction with the

broker."  See AL 2003-3 at 4.

143.    Listing examples of predatory practices by mortgage brokers that might subject a

national bank to liability, AL 2003-3 includes the following description of the practices imposed

upon borrowers by EquityGuaranty (and EquityPlus before it) that are being challenged in this

action: "Predatory loans often include features that are designed to strip away or reduce borrowers'

equity in the collateral for the loan, and thus enhance the likelihood for foreclosure.  The

mechanisms by which this `equity stripping' may occur are various, and include . . . `fee packing'

(including in the loan principal amount such costs as points, mortgage broker fees, prepayment

penalties on a prior loan, and charges for related products such as credit insurance).  The potential

22

for abuse is exacerbated when these fees and other charges far exceed those that would reflect the true costs and risks of the transaction, or are assessed and included in the loan principal without the borrowers informed consent." See AL 2003-3 at 3 (emphasis added).

144.    AL 2003-3 notes further: "[P]olicies should address the maximum points and other charges that may be imposed on brokered and repurchased loans . . . . In the case of brokered loans, these policies should address total compensation to the broker and the lender, and establish limits on broker compensation."

145.    Without repeating the entire text of AL 2003-3 *verbatim*, its significance cannot be understated.  This document reflects the extreme level of concern within the OCC regarding precisely the conduct being challenged in this action.

146.    Having said that, because the OCC was focusing on the Shumway/Bapst operation only to the extent that it impacted GNBT – the national bank within the OCC's sphere of regulatory responsibility, the OCC's investigation did not extend to the full scope of unlawful conduct being challenged in this action.  For example, the OCC did not focus upon Shumway/Bapst loans originated in the name of state-chartered bank CBNV.

147.    In addition, while the OCC recognized that the loans at issue included certain predatory features, it is unclear whether the OCC understood that the loans were also fraudulent, in that the Settlement Statements misrepresented that GNBT was the intended recipient of origination fees, when GNBT, EquityGuaranty and GMAC-RFC all knew that those fees would be paid to EquityGuaranty, not GNBT.  Utimately, then, the OCC underestimates the extent of the fraud and illegality that occurred in connection with the loans at issue because of the limitations of the OCC's regulatory authority.

23

### THE LOANS MADE TO PLAINTIFFS

#### The Davis Loan

148.    In the winter of 1999, the Davis Plaintiff received a mail solicitation suggesting that she was "Pre-Approved" for a debt consolidation loan.  While the solicitation was made in the name of CBNV, CBNV was a straw-party providing cover for EquityPlus Financial.

149.    The President/Treasurer/Registered Agent of EquityPlus Financial was David B. Shumway.

150.    The Vice President/Secretary of EquityPlus Financial was Randy A. Bapst.

151.    The solicitation listed a toll free telephone number, and suggested that interested potential borrowers "Call Community Bank" at the toll free number to confirm eligibility for a loan.

152.    The Davis Plaintiff called the toll free number to apply for a loan.

153.    The investigation conducted on behalf of Plaintiffs revealed that the toll free number called by the Davis Plaintiff was registered to EquityPlus Financial, and that the Davis Plaintiff's loan application was processed from start to finish by employees of EquityPlus.

154.    The Davis Plaintiff's loan application was ultimately approved.

155.    The Davis Plaintiff closed a loan in which CBNV was identified as the lender on or about February 22, 1999. See HUD-1A Settlement Statement used in connection with the Davis loan appended hereto as Exhibit 3.

156.    In the HUD-1A used in connection with this loan, CBNV's address was listed as being: 11417 Sunset Hills Road, Suite #228, Reston, Virginia, the business address for EquityPlus Financial.

24

157.    The principal amount of the loan was $24,100.00, with an A.P.R. of 15.456%. See Truth in Lending Disclosure Statement appended hereto as Exhibit 4, Mortgage appended hereto as Exhibit 5, and Mortgage Note appended hereto as Exhibit 6.

158.    In connection with the settlement of the loan, the Davis Plaintiff was charged an "origination fee" of $1,928.00 which was noted as being payable to CBNV. This fee is set forth on line 801 of the Settlement Statement. This line item was fraudulent.

159.    In fact, the same individuals who owned EquityPlus Financial (Messrs. Shumway and Bapst), owned or controlled Title America, LLC, the title company used to close the Davis loan.

160.    Thus, the Shumway/Bapst operation controlled the distribution of settlement proceeds generated in connection with the Davis loan (and the distribution of settlement proceeds in connection with all of the loans made to Class members in the name of CBNV).

161.    Contrary to the representation in the Davis Settlement Statement, only a small percentage of the $1,928.00 in alleged "origination fees" imposed upon Davis was distributed to CBNV, and the vast majority of this alleged "origination fee" was distributed to EquityPlus Financial and possibly to other businesses owned or controlled by the Shumway/Bapst operation.

162.    Also in connection with the settlement of the loan, the Davis Plaintiff was charged a "loan discount" of $482.00, which was noted as being payable to CBNV. This fee is set forth on line 802 of the Settlement Statement. Once more, this line item was fraudulent in that only a small percentage of this "fee" was paid to CBNV and the majority of the fee was diverted to EquityPlus and possibly other businesses owned or controlled by EquityPlus.

25

163.    The Davis Plaintiff was assessed various "Title Charges" in connection with the settlement of her loan. All of these fees are noted as being payable to Title America, LLC. Title America, LLC was operated at the same business location as EquityPlus Financial.

164.    The charges for alleged "title services" are set forth in Section 1100 of the Settlement Statement. These fees were fraudulent in that, overwhelmingly, no services were provided in connection with the fees.

### The Kossler Loans

165.    In the summer of 1998, the Kossler Plaintiffs received a mail solicitation suggesting that they were "Pre-Approved" for a debt consolidation loan. While the solicitation was made in the name of CBNV, CBNV was a straw-party providing cover for EquityPlus Financial.

166.    The President/Treasurer/Registered Agent of EquityPlus Financial was David B. Shumway.

167.    The Vice President/Secretary of EquityPlus Financial was Randy A. Bapst.

168.    The solicitation listed a toll free telephone number, and suggested that interested potential borrowers "Call Community Bank" at the toll free number to confirm eligibility for a loan.

169.    The Kossler Plaintiffs called the toll free number to apply for a loan.

170.    The investigation conducted on behalf of Plaintiffs reveals that the toll free number called by the Kossler Plaintiffs was registered to EquityPlus Financial, and that the Kossler Plaintiffs' loan application was processed from start to finish by employees of EquityPlus.

171.    The Kossler Plaintiffs' loan application was ultimately approved.

26

172.    The Kossler Plaintiffs closed a loan in which CBNV was identified as the lender on or about July 28, 1998. See HUD-1A Settlement Statement used in connection with the Kossler loan appended hereto as Exhibit 7.

173.    In the HUD-1A used in connection with this loan, CBNV's address was listed as being: 11400 Commerce Park Drive, Suite 110, Reston, Virginia, the business address for EquityPlus Financial.

174.    The principal amount of the loan was $30,000.00, with an A.P.R. of 14.817%. See Truth in Lending Disclosure Statement appended hereto as Exhibit 8, Mortgage appended hereto as Exhibit 9, and Mortgage Note appended hereto as Exhibit 10.

175.    In connection with the settlement of the loan, the Kossler Plaintiffs were charged an "origination fee" of $2,250.00, which was noted as being payable to CBNV. This fee is set forth on line 801 of the Settlement Statement.   This line item was blatantly fraudulent.

176.    In fact, the same individuals who owned EquityPlus Financial (Messrs. Shumway and Bapst), owned or controlled First National Title & Escrow, the title company used to close the Kossler's loan.

177.    Thus, the Shumway/Bapst operation controlled the distribution of settlement proceeds generated in connection with the Kossler  loan (and the distribution of settlement proceeds in connection with all of the loans made to Class members in the name of CBNV).

178.    Contrary to the representation in the Kossler Settlement Statement, only a small percentage of the $2,250.00 in alleged "origination fees" imposed upon the Kosslers was distributed to CBNV, and the vast majority of this alleged "origination fee" was distributed to EquityPlus Financial and possibly to other businesses owned or  controlled by the Shumway/Bapst operation.

27

179.    Also in connection with the settlement of the loan, the Kossler Plaintiffs were charged a "document review" of $250.00, which was noted at line 808 of the Settlement Statement as being payable to CBNV.  This line item was fraudulent in that only a small percentage of this "fee" was paid to CBNV and the majority of the fee was diverted to EquityPlus and possibly other businesses owned or controlled by EquityPlus.

180.    Also in connection with the settlement of the loan, the Kossler Plaintiffs were charged an "processing fee" of $150.00, which was noted at line 809 of the Settlement Statement as being payable to CBNV.  This line item was fraudulent in that only a small percentage of this "fee" was paid to CBNV and the majority of the fee was diverted to EquityPlus and possibly other businesses owned or controlled by EquityPlus.

181.    The Kossler Plaintiffs were assessed various "Title Charges" in connection with the settlement of their loan.  All of these fees are noted as being payable to First National Title & Escrow.  First National Title & Escrow was operated at the same business location as EquityPlus Financial.

182.    The charges for alleged "title services" are set forth in Section 1100 of the Settlement Statement.  These fees were fraudulent in that, overwhelmingly, no services were provided in connection with the fees.

### The Kessler Loan

183.    In the spring of 1999, the Kessler Plaintiffs received a mail solicitation suggesting that they were "Pre-Approved" for a debt consolidation loan.  While the solicitation was made in the name of CBNV, CBNV was a straw-party providing cover for EquityPlus Financial.

28

184.    The President/Treasurer/Registered Agent of EquityPlus Financial was David B. Shumway.

185.    The Vice President/Secretary of EquityPlus Financial was Randy A. Bapst.

186.    The solicitation listed a toll free telephone number, and suggested that interested potential borrowers "Call Community Bank" at the toll free number to confirm eligibility for a loan.

187.    The Kessler Plaintiffs called the toll free number to apply for a loan.

188.    The investigation conducted on behalf of Plaintiffs reveals that the toll free number called by the Kessler Plaintiffs was registered to EquityPlus Financial, and that the Kessler Plaintiffs' loan application was processed from start to finish by employees of EquityPlus.

189.    The Kessler Plaintiffs' loan application was ultimately approved.

190.    The Kessler Plaintiffs closed a loan in which CBNV was identified as the lender on or about April 30, 1999.   See HUD-1A Settlement Statement used in connection with the Kessler loan appended hereto as Exhibit 11.

191.    In the HUD-1A used in connection with this loan, CBNV's address was listed as being: 11417 Sunset Hills Road, Suite #105, Reston, Virginia, the business address for EquityPlus Financial.

192.    The principal amount of the loan was $33,000.00, with an A.P.R. of 17.841%. See Truth in Lending Disclosure Statement appended hereto as Exhibit 12, Mortgage appended hereto as Exhibit 13, and Mortgage Note appended hereto as Exhibit 14.

193.    In connection with the settlement of the loan, the Kessler Plaintiffs were charged an "origination fee" of $2,640.00, which was noted as being payable to CBNV.  This fee is set forth on line 801 of the Settlement Statement.   This line item was fraudulent.

194.    In fact, the same individuals who owned EquityPlus Financial (Messrs. Shumway and Bapst), owned or controlled Title America, LLC, the title company used to close the Kessler's loan.

195.    Thus, the Shumway/Bapst operation controlled the distribution of settlement proceeds generated in connection with the Kessler loan (and the distribution of settlement proceeds in connection with all of the loans made to Class members in the name of CBNV).

196.    Contrary to the representation in the Kessler Settlement Statement, only a small percentage of the $2,640.00 in alleged "origination fees" imposed upon the Kesslers was distributed to CBNV, and the vast majority of this alleged "origination fee" was distributed to EquityPlus Financial and possibly to other businesses owned or controlled by the Shumway/Bapst operation.

197.    Also in connection with the settlement of the loan, the Kessler Plaintiffs were charged a "loan discount" of $990.00, which was noted as being payable to CBNV. This fee is set forth on line 802 of the Settlement Statement. Once more, this line item was fraudulent in that only a small percentage of this "fee" was paid to CBNV and the majority of the fee was diverted to EquityPlus and possibly other businesses owned or controlled by EquityPlus.

198.    Also in connection with the settlement of the loan, the Kessler Plaintiffs were charged an "application fee" of $95.00, which was noted at line 807 of the Settlement Statement as being payable to CBNV. This line item was fraudulent in that only a small percentage of this "fee" was paid to CBNV and the majority of the fee was diverted to EquityPlus and possibly other businesses owned or controlled by EquityPlus.

199.    Also in connection with the settlement of the loan, the Kessler Plaintiffs were charged an "underwriting fee" of $185.00, which was noted at line 811 of the Settlement Statement as being

payable to CBNV. This line item was fraudulent in that only a small percentage of this "fee" was paid to CBNV and the majority of the fee was diverted to EquityPlus and possibly other businesses owned or controlled by EquityPlus.

200.    The Kessler Plaintiffs were assessed various "Title Charges" in connection with the settlement of their loan. All of these fees are noted as being payable to Title America, LLC. Title America, LLC was operated at the same business location as EquityPlus Financial.

201.    The charges for alleged "title services" are set forth in Section 1100 of the Settlement Statement. These fees were fraudulent in that, overwhelmingly, no services were provided in connection with the fees.

### The Porco Loan

202.    In the summer of 2000, Plaintiff Porco received a mail solicitation suggesting that she was "pre-approved" for a debt consolidation loan. See Solicitation Letter appended hereto as Exhibit 15.

203.    The solicitation was made in the name of EquityGuaranty, which was depicted as being, "a division of Guaranty National Bank of Tallahassee."

204.    The President/Treasurer/Registered Agent of EquityGuaranty was David B. Shumway.

205.    The Vice President/Secretary of EquityGuaranty was Randy A. Bapst.

206.    The solicitation listed a toll free telephone number, and suggested that interested potential borrowers "Call EquityGuaranty" at the toll free number to confirm eligibility for a loan.

207.    Plaintiff Porco called the toll free number to apply for a loan.

31

208.    The investigation conducted on behalf of Plaintiffs reveals that the toll free number called by Plaintiff Porco was registered to EquityGuaranty, and that Plaintiff Porco loan application was processed from start to finish by employees of EquityGuaranty.

209.    Plaintiff Porco's loan application was ultimately approved.

210.    Plaintiff Porco closed a loan in which GNBT was identified as the lender on or about September 9, 2000.  See HUD-1A Settlement Statement used in connection with the Porco loan appended hereto as Exhibit 16.

211.    In the HUD-1A used in connection with this loan, GNBT's alleged address was listed as being, 11417 Sunset Hills Road, Suite 105, Reston, Virginia, the business address for EquityGuaranty.

212.    The principal amount of the loan was $29,800.00, with a listed A.P.R. of 16.71%. See Truth in Lending Statement appended hereto as Exhibit 17, Mortgage appended hereto as Exhibit 18 and Mortgage Note appended hereto as Exhibit 19.

213.    In connection with the settlement of the loan, Plaintiff Porco was charged an "origination fee" of $2,980.00, which was noted as being payable to GNBT.  This fee is set forth on line 801 of the Settlement Statement.  This line item was fraudulent.

214.    In fact, the same individuals who owned EquityGuaranty (Messrs. Shumway and Bapst), owned or controlled "Title America, LLC" the title company used to close Plaintiff Porco's loan.

215.    Thus, the Shumway/Bapst operation controlled the distribution of settlement proceeds generated in connection with the Porco loan (and the distribution of settlement proceeds in connection with all of the loans made to Class members in the name of GNBT).

32

216.    Contrary to the representation in the Porco Settlement Statement, only a *de minimis* amount of the $2,980.00 in alleged "origination fees" imposed upon Plaintiff Porco were distributed to GNBT. Instead, these "fees" were distributed to EquityGuaranty and possibly to other businesses controlled by the Shumway/Bapst operation.

217.    Also in connection with the settlement of the loan, Plaintiff Porco was charged a "loan discount" of $894.00, which was noted as being payable to GNBT. This fee is set forth on line 802 of the Settlement Statement. Once more, this line item was fraudulent in that the alleged "fee" was not paid to GNBT, but was instead paid to GNBT and possibly other businesses controlled by EquityGuaranty.

218.    Also in connection with the settlement of the loan, Plaintiff Porco was charged an "application fee" of $150.00, which was noted at line 813 of the Settlement Statement as being payable to GNBT. This line item was fraudulent in that only a small percentage of this "fee" was paid to GNBT and the majority of the fee was diverted to Equity Guaranty Financial and possibly other businesses owned or controlled by Equity Guaranty Financial.

219.    Also in connection with the settlement of the loan, Plaintiff Porco was charged an "underwriting fee" of $185.00, which was noted at line 811 of the Settlement Statement as being payable to GNBT. This line item was fraudulent in that only a small percentage of this "fee" was paid to GNBT and the majority of the fee was diverted to Equity Guaranty Financial and possibly other businesses owned and controlled by Equity Guaranty Financial.

220.    Plaintiff Porco was assessed various "Title Charges" in connection with the settlement of her loan. All of these fees are noted as being payable to Title America, LLC. Title America, LLC was operated at the same business location as EquityGuaranty Financial.

33

221.    The charges for alleged "title services" are set forth in Section 1100 of the Settlement Statement. These fees were fraudulent in that, overwhelmingly, no services were provided in connection with the fees.

**The Mathis Loan**

222.    In the spring of 2001, Plaintiff Mathis received a mail solicitation suggesting that he was "pre-approved" for a debt consolidation loan.

223.    The solicitation was made in the name of EquityGuaranty, which was depicted as being, "a division of Guaranty National Bank of Tallahassee."

224.    The President/Treasurer/Registered Agent of EquityGuaranty was David B. Shumway.

225.    The Vice President/Secretary of EquityGuaranty was Randy A. Bapst.

226.    The solicitation listed a toll free telephone number, and suggested that interested potential borrowers "Call EquityGuaranty" at the toll free number to confirm eligibility for a loan.

227.    Plaintiff Mathis called the toll free number to apply for a loan.

228.    The investigation conducted on behalf of Plaintiffs reveals that the toll free number called by Plaintiff Mathis was registered to EquityGuaranty, and that Plaintiff Mathis' loan application was processed from start to finish by employees of EquityGuaranty.

229.    Plaintiff Mathis' loan application was ultimately approved.

230.    Plaintiff Mathis closed a loan in which GNBT was identified as the lender on or about June 7, 2001. See HUD-1A Settlement Statement used in connection with the Mathis loan appended hereto as Exhibit 20.

34

231.   In the HUD-1A used in connection with this loan, GNBT's alleged address was listed as being, 4501 Singer Court, Third Floor, Chantilly, Virginia, the business address for EquityGuaranty.

232.   The principal amount of the loan was $25,000.00, with a listed A.P.R. of 17.24 %. See Truth in Lending Statement appended hereto as Exhibit 21, Mortgage appended hereto as Exhibit 22 and Mortgage Note appended hereto as Exhibit 23.

233.   In connection with the settlement of the loan, Plaintiff Mathis was charged an "origination fee" of $2,375.00, which was noted as being payable to GNBT. This fee is set forth on line 801 of the Settlement Statement. This line item was fraudulent.

234.   In fact, the same individuals who owned EquityGuaranty (Messrs. Shumway and Bapst), owned or controlled "USA Title, LLC" the title company used to close Plaintiff Mathis' loan.

235.   Thus, the Shumway/Bapst operation controlled the distribution of settlement proceeds generated in connection with the Mathis loan (and the distribution of settlement proceeds in connection with all of the loans made to Class members in the name of GNBT).

236.   Contrary to the representation in the Mathis Settlement Statement, only a *de minimis* amount of the $2,375.00 in alleged "origination fees" imposed upon Plaintiff Mathis were distributed to GNBT. Instead, these "fees" were distributed to EquityGuaranty and possibly to other businesses controlled by the Shumway/Bapst operation.

237.   Plaintiff Mathis was charged an underwriting fee of $200, which was noted as being payable to GNBT. Contrary to this representation, set forth at Line 811 of the Settlement Statement, most of this fee was distributed to Equity Guaranty.

35

238.    Plaintiff Mathis was assessed various "Title Charges" in connection with the settlement of his loan. All of these fees are noted as being payable to USA Title, LLC. USA Title, LLC was operated at the same business location as EquityGuaranty Financial.

239.    The charges for alleged "title services" are set forth in Section 1100 of the Settlement Statement. A significant percentage of these fees were fraudulent in that, overwhelmingly, no services were provided in connection with the fees.

**The Haney Loan**

240.    In the spring of 2001, the Haney Plaintiffs received a mail solicitation suggesting that they were "pre-approved" for a debt consolidation loan.

241.    The solicitation was made in the name of EquityGuaranty, which was depicted as being, "a division of Guaranty National Bank of Tallahassee."

242.    The President/Treasurer/Registered Agent of EquityGuaranty was David B. Shumway.

243.    The Vice President/Secretary of EquityGuaranty was Randy A. Bapst.

244.    The solicitation listed a toll free telephone number, and suggested that interested potential borrowers "Call EquityGuaranty" at the toll free number to confirm eligibility for a loan.

245.    The Haney Plaintiffs called the toll free number to apply for a loan.

246.    The investigation conducted on behalf of Plaintiffs reveals that the toll free number called by the Haney Plaintiffs were registered to EquityGuaranty, and that the Haney Plaintiffs' loan application was processed from start to finish by employees of EquityGuaranty.

247.    The Haney Plaintiffs' loan application was ultimately approved.

248.   The Haney Plaintiffs closed a loan in which GNBT was identified as the lender on or about May 23, 2001. See HUD-1A Settlement Statement used in connection with the Haney loan appended hereto as Exhibit 24.

249.   In the HUD-1A used in connection with this loan, GNBT's alleged address was listed as being, 4501 Singer Court, Suite 100, Chantilly, Virginia 20651, the business address for EquityGuaranty.

250.   The principal amount of the loan was $24,500.00, with a listed A.P.R. of 15.0957 %. See Truth in Lending Statement appended hereto as Exhibit 25, Mortgage appended hereto as Exhibit 26.

251.   In connection with the settlement of the loan, the Haney Plaintiffs were charged an "origination fee" of $2,450.00. This fee is set forth on line 801 of the Settlement Statement. This line item was fraudulent.

252.   In fact, the same individuals who owned EquityGuaranty (Messrs. Shumway and Bapst), owned or controlled "USA Title, LLC" the title company used to close the Haney Plaintiffs' loan.

253.   Thus, the Shumway/Bapst operation controlled the distribution of settlement proceeds generated in connection with the Haney loan (and the distribution of settlement proceeds in connection with all of the loans made to Class members in the name of GNBT).

254.   Contrary to the representation in the Porco Settlement Statement, only a *de minimis* amount of the $2,450.00 in alleged "origination fees" imposed upon the Haney Plaintiffs were distributed to GNBT. Instead, these "fees" were distributed to EquityGuaranty and possibly to other businesses controlled by the Shumway/Bapst operation.

37

255.    Also in connection with the settlement of the loan, the Haney Plaintiffs were charged a "loan discount" of $490.00, which was noted as being payable to GNBT, and an underwriting fee of $200, which was also noted as being payable to GNBT. The fees are set forth on lines 802 and 811 of the Settlement Statement. Once more, these line items were fraudulent in that the alleged "fees" were not paid to GNBT, but instead paid to EquityGuaranty and possibly other businesses controlled by EquityGuaranty.

256.    The Haney Plaintiffs were assessed various "Title Charges" in connection with the settlement of their loan. All of these fees are noted as being payable to USA Title, LLC. USA Title, LLC was operated at the same business location as EquityGuaranty Financial.

257.    The charges for alleged "title services" are set forth in Section 1100 of the Settlement Statement. These fees were fraudulent in that, overwhelmingly, no services were provided in connection with the fees.

### The Picard Loan

258.    In the late fall of 1999, the Picards received a mail solicitation suggesting that they were "Pre-Approved" for a debt consolidation loan. While the solicitation was made in the name of CBNV, CBNV was a straw-party providing cover for EquityPlus Financial.

259.    The President/Treasurer/Registered Agent of EquityPlus was David B. Shumway

260.    The Vice President/Secretary of EquityPlus was Randy A. Bapst.

261.    The solicitation listed a toll free number, and suggested that interested potential borrowers "Call Community Bank" at the toll free number to confirm eligibility for a loan.

262.    The Picards called the toll free number to apply for a loan.

263.    The investigation conducted on behalf of Plaintiffs reveals that the toll free number

38

called by the Picards was registered to EquityPlus, and that the Picards' loan application was processed from start to finish by employees of EquityPlus.

264. The Picards' loan application was ultimately approved.

265. The Picards closed a loan in which CBNV was identified as the lender on or about November 30, 1999. See HUD-1A Settlement Statement used in connection with the Picard loan appended hereto as Exhibit 27.

266. In the HUD-1A used in connection with this loan, CBNV's alleged address was listed as being 11417 Sunset Hills Road, Reston, Virginia, the business address for EquityPlus.

267. The principal amount of the loan was $47,900.00, with a listed A.P.R. of 18.416%. See Truth in Lending Disclosure appended hereto as Exhibit 28, Mortgage appended hereto as Exhibit 29, and Mortgage Note appended hereto as Exhibit 30.

268. In connection with the settlement of the loan, the Picards were charged an "origination fee" of $3,832.00, which was noted as being payable to CBNV. This fee is set forth in line 801 of the Settlement Statement. This line item was fraudulent.

269. In fact, the same individuals who owned EquityPlus (Messrs. Shumway and Bapst), owned or controlled "Title America, LLC," the title company used to close the Picard's loan.

270. Thus, the Shumway/Bapst operation controlled the distribution of settlement proceeds generated in connection with the Picard loan (and the distribution of settlement proceeds in connection with all of the loans made to Class members in the name of CBNV).

271. Contrary to representation in the Picard Settlement Statement, only a small percentage of the $3,832.00 in alleged "origination fees" imposed upon the Miller's was distributed to CBNV.

39

Instead, these "fees" were distributed to EquityPlus and possibly to other businesses controlled by the Shumway/Bapst operation.

272.    Also in connection with the settlement of the loan, the Picards were charged a "loan discount" of $2,155.00, which was noted as being payable to CBNV. This fee is set forth in line 802 of the Settlement Statement. Once more, this line item was fraudulent in that the alleged "fee" was not paid to CBNV, but was instead paid to EquityPlus and possibly other businesses owned or controlled by the Shumway/Bapst operation.

273.    Also in connection with the settlement of the loan, the Picards were charged an "application fee" of $95.00 that was noted as being payable to CBNV, and an underwriting fee of $185. These fees are set forth in lines 807 and 811 of the Settlement Statement. These line items were fraudulent in that the alleged "fees" were not paid to CBNV, but instead paid to EquityPlus and possibly other businesses owned or controlled by the Shumway/Bapst operation.

274.    The Picards were assessed various "Title Charges" in connection with the settlement of their loan. All of these fees are noted as being payable to Title America, LLC. Title America was operated at the same business location as EquityPlus, and was owned or controlled by Messrs. Shumway and Bapst.

275.    The charges for alleged "title services" are set forth in Section 1100 of the Settlement Statement. These fees were fraudulent in that, overwhelmingly, no services were provided in connection with the fees.

**The Sabo Loan**

276.    In the fall of 1999, the Sabo Plaintiffs received a mail solicitation suggesting that they were "Pre-Approved" for a debt consolidation loan. While the solicitation was made in the name of CBNV, CBNV was a straw-party providing cover for EquityPlus Financial.

277.    The President/Treasurer/Registered Agent of EquityPlus Financial was David B. Shumway.

278.    The Vice President/Secretary of EquityPlus Financial was Randy A. Bapst.

279.    The solicitation listed a toll free telephone number, and suggested that interested potential borrowers "Call Community Bank" at the toll free number to confirm eligibility for a loan.

280.    The Sabo Plaintiffs called the toll free number to apply for a loan.

281.    The investigation conducted on behalf of Plaintiffs reveals that the toll free number called by the Sabo Plaintiffs was registered to EquityPlus Financial, and that the Sabo Plaintiffs' loan application was processed from start to finish by employees of EquityPlus.

282.    The Sabo Plaintiffs' loan application was ultimately approved.

283.    The Sabo Plaintiffs closed a loan in which CBNV was identified as the lender on or about October 15, 1999.  See HUD-1A Settlement Statement used in connection with the Sabo loan appended hereto as Exhibit 31.

284.    In the HUD-1A used in connection with this loan, CBNV's address was listed as being: 10999 Red Run Blvd., Suite 207, Owings Mills, MD, a business address for EquityPlus Financial.

285.    The principal amount of the loan was $35,000.00, with an A.P.R. of 17.390 %. See

41

Truth in Lending Disclosure Statement appended hereto as Exhibit 32, Mortgage appended hereto

as Exhibit 33, and Mortgage Note appended hereto as Exhibit 34.

286.    In connection with the settlement of the loan, the Sabo Plaintiffs were charged an

"origination fee" of $3,500.00, which was noted as being payable to CBNV. This fee is set forth on

line 801 of the Settlement Statement.   This line item was fraudulent.

287.    In fact, the same individuals who owned EquityPlus Financial (Messrs. Shumway

and Bapst), owned or controlled Resource Title, LLC, the title company used to close the Sabo's

loan.

288.    Thus, the Shumway/Bapst operation controlled the distribution of settlement proceeds

generated in connection with the Sabo loan (and the distribution of settlement proceeds in connection

with all of the loans made to Class members in the name of CBNV).

289.    Contrary to the representation in the Sabo Settlement Statement, only a small

percentage of the $3,500.00 in alleged "origination fees" imposed upon the Sabos was distributed

to CBNV, and the vast majority of this alleged "origination fee" was distributed to EquityPlus

Financial and possibly to other businesses owned or controlled by the Shumway/Bapst operation.

290.    Also in connection with the settlement of the loan, the Sabo Plaintiffs were charged

an "application fee" of $95.00, which was noted at line 808 of the Settlement Statement as being

payable to CBNV.   This line item was fraudulent in that only a small percentage of this "fee" was

paid to CBNV and the majority of the fee was diverted to EquityPlus and possibly other businesses

owned or controlled by EquityPlus.

291.    Also in connection with the settlement of the loan, the Sabo Plaintiffs were charged

an "underwriting fee" of $185.00, which was noted at line 809 of the Settlement Statement as being

42

payable to CBNV. This line item was fraudulent in that only a small percentage of this "fee" was paid to CBNV and the majority of the fee was diverted to EquityPlus and possibly other businesses owned or controlled by EquityPlus.

292.    The Sabo Plaintiffs were assessed various "Title Charges" in connection with the settlement of their loan. All of these fees are noted as being payable to Resource Title, LLC. Resource Title, LLC was operated at the same business location as EquityPlus Financial.

293.    The charges for alleged "title services" are set forth in Section 1100 of the Settlement Statement. These fees were fraudulent in that, overwhelmingly, no services were provided in connection with the fees.

**The Ulrich Loan**

294.    In the summer of 2000, the Ulrich Plaintiffs received a mail solicitation suggesting that they were "pre-approved" for a debt consolidation loan.

295.    The solicitation was made in the name of EquityGuaranty, which was depicted as being, "a division of Guaranty National Bank of Tallahassee."

296.    The President/Treasurer/Registered Agent of EquityGuaranty was David B. Shumway.

297.    The Vice President/Secretary of EquityGuaranty was Randy A. Bapst.

298.    The solicitation listed a toll free telephone number, and suggested that interested potential borrowers "Call EquityGuaranty" at the toll free number to confirm eligibility for a loan.

299.    The Ulrich Plaintiffs called the toll free number to apply for a loan.

43

300.    The investigation conducted on behalf of Plaintiffs reveals that the toll free number called by the Ulrich Plaintiffs was registered to EquityGuaranty, and that the Ulrich Plaintiffs' loan application was processed from start to finish by employees of EquityGuaranty.

301.    The Ulrich Plaintiffs' loan application was ultimately approved.

302.    The Ulrich Plaintiffs closed a loan in which GNBT was identified as the lender on or about August 8, 2000. See HUD-1A Settlement Statement used in connection with the Porco loan appended hereto as Exhibit 35.

303.    In the HUD-1A used in connection with this loan, GNBT's alleged address was listed as being, 11417 Sunset Hills Road, Suite 105, Reston, Virginia, the business address for EquityGuaranty.

304.    The principal amount of the loan was $46,850.00, with a listed A.P.R. of 15.469%. See Truth in Lending Statement appended hereto as Exhibit 36, Mortgage appended hereto as Exhibit 37 and Mortgage Note appended hereto as Exhibit 38.

305.    In connection with the settlement of the loan, the Ulrich Plaintiffs were charged an "origination fee" of $4,685.00, which was noted as being payable to GNBT. This fee is set forth on line 801 of the Settlement Statement. This line item was fraudulent.

306.    In fact, the same individuals who owned EquityGuaranty (Messrs. Shumway and Bapst), owned or controlled "Title America, LLC" the title company used to close the Ulrich Plaintiffs' loan.

307.    Thus, the Shumway/Bapst operation controlled the distribution of settlement proceeds generated in connection with the Ulrich loan (and the distribution of settlement proceeds in connection with all of the loans made to Class members in the name of GNBT).

44

308.    Contrary to the representation in the Ulrich Settlement Statement, only a *de minimis* amount of the $4,685.00 in alleged "origination fees" imposed upon the Ulrich Plaintiffs were distributed to GNBT. Instead, these "fees" were distributed to EquityGuaranty and possibly to other businesses controlled by the Shumway/Bapst operation.

309.    Also in connection with the settlement of the loan, the Ulrich Plaintiffs were charged a "loan discount" of $937.00, which was noted as being payable to GNBT. This fee is set forth on line 802 of the Settlement Statement. Once more, this line item was fraudulent in that the alleged "fee" was not paid to GNBT, but was instead paid to GNBT  and possibly other businesses controlled by EquityGuaranty.

310.    Also in connection with the settlement of the loan, , the Ulrich Plaintiffs were charged an "application fee" of $150.00, which was noted at line 807 of the Settlement Statement as being payable to GNBT. This line item was fraudulent in that only a small percentage of this "fee" was paid to GNBT and the majority of the fee was diverted to Equity Guaranty and possibly other businesses owned or controlled by Equity Guaranty.

311.    Also in connection with the settlement of the loan, the Ulrich Plaintiffs were charged an "underwriting fee" of $185.00, which was noted at line 811 of the Settlement Statement as being payable to GNBT. This line item was fraudulent in that only a small percentage of this "fee" was paid to GNBT and the majority of the fee was diverted to Equity Guaranty and possibly other businesses owned or controlled by Equity Guaranty.

312.    The Ulrich Plaintiffs were assessed various "Title Charges" in connection with the settlement of their loan. All of these fees are noted as being payable to Title America, LLC. Title America, LLC was operated at the same business location as EquityGuaranty Financial.

45

313.    The charges for alleged "title services" are set forth in Section 1100 of the Settlement Statement.  These fees were fraudulent in that, overwhelmingly, no services were provided in connection with the fees.

**The Miller Loan**

314.    In the spring of 1999, Ms. Miller received a mail solicitation suggesting that she was "Pre-Approved" for a debt consolidation loan.  While the solicitation was made in the name of CBNV, CBNV was a straw-party providing cover for EquityPlus Financial.

315.    The President/Treasurer/Registered Agent of EquityPlus was David B. Shumway.

316.    The Vice President/Secretary of EquityPlus was Randy A. Bapst.

317.    The solicitation listed a toll free number, and suggested that interested potential borrowers "Call Community Bank" at the toll free number to confirm eligibility for a loan.

318.    Ms. Miller called the toll free number to apply for a loan.

319.    The investigation conducted on behalf of Plaintiffs reveals that the toll free number called by Ms. Miller was registered to EquityPlus, and that Ms. Miller's loan application was processed from start to finish by employees of EquityPlus.

320.    Ms. Miller's loan application was ultimately approved.

321.    Ms. Miller closed a loan in which CBNV was identified as the lender on or about April 30, 1999.  See HUD-1A Settlement Statement used in connection with the Miller loan appended hereto as Exhibit 39.

322.    In the HUD-1A used in connection with this loan, CBNV's alleged address was listed as being 11417 Sunset Hills Road, Reston, Virginia, the business address for EquityPlus.

323.    The principal amount of the loan was $34,000.00, with a listed A.P.R. of 15.590%.

46

See Truth in Lending Disclosure appended hereto as Exhibit 40, Mortgage appended hereto as Exhibit 41, and Mortgage Note appended hereto as Exhibit 42.

324.    In connection with the settlement of the loan, Ms. Miller was charged an "origination fee" of $2,380.00, which was noted as being payable to CBNV. This fee is set forth in line 801 of the Settlement Statement. This line item was blatantly fraudulent.

325.    In fact, the same individuals who owned EquityPlus (Messrs. Shumway and Bapst), owned or controlled "Title America, LLC," the title company used to close Ms. Miller's loan.

326.    Thus, the Shumway/Bapst operation controlled the distribution of settlement proceeds generated in connection with the Miller  loan (and the distribution of settlement proceeds in connection with all of the loans made to Class members in the name of CBNV).

327.    Contrary to representation in the Miller Settlement Statement, only a small percentage of the $2,380.00 in alleged "origination fees" imposed upon the Miller's was distributed to CBNV. Instead, these "fees" were distributed to EquityPlus and possibly to other businesses controlled by the Shumway/Bapst operation.

328.    Also in connection with the settlement of the loan, Ms. Miller was charged a "loan discount" of $1,870.00, which was noted as being payable to CBNV. This fee is set forth in line 802 of the Settlement Statement. Once more, this line item was fraudulent in that the alleged "fee" was not paid to CBNV, but was instead paid to EquityPlus and possibly other businesses owned or controlled by the Shumway/Bapst operation.

329.    The Miller's were assessed various "Title Charges" in connection with the settlement

of their loan. All of these fees are noted as being payable to Title America, LLC. Title America was operated at the same business location as EquityPlus, and was owned or controlled by Messrs. Shumway and Bapst.

330.    The charges for alleged "title services" are set forth in Section 1100 of the Settlement Statement. Specifically, lines 1101, 1102, 1103, and 1112 of the Settlement Statement reflect total charges of $1,133.50, for various supposed title services. These fees were fraudulent in that, overwhelmingly, no services were provided in connection with the fees.

**The Clark Loan**

331.    In the spring of 2001, the Clark Plaintiffs received a mail solicitation suggesting that they were "Pre-Approved" for a debt consolidation loan.

332.    The solicitation was made in the name of EquityGuaranty, which was depicted as being, "a division of Guaranty National Bank of Tallahassee."

333.    The President/Treasurer/Registered Agent of EquityGuaranty was David B. Shumway.

334.    The Vice President/Secretary of EquityGuaranty was Randy A. Bapst.

335.    The solicitation listed a toll free number, and suggested that interested potential borrowers "Call EquityGuaranty" at the toll free number to confirm eligibility for a loan.

336.    The Clark Plaintiffs called the toll free number to apply for a loan.

337.    The investigation conducted on behalf of Plaintiffs reveals that the toll free number called by the Clark Plaintiffs was registered to EquityGuaranty, and that the Clark Plaintiffs' loan application was processed from start to finish by employees of EquityGuaranty.

338.    The Clark's loan application was ultimately approved.

48

339.   The Clark's closed a loan in which GNBT was identified as the lender on or about March 20, 2001.  See HUD-1A Settlement Statement used in connection with the Clark loan appended hereto as Exhibit 43.

340.   In the HUD-1A used in connection with this loan, GNBT's alleged address was listed as being 4501 Singer Court, Chantilly, Virginia, the business address for EquityGuaranty.

341.   The principal amount of the loan was $27,500.00, with a listed A.P.R. of 16.0042%. See Truth in Lending Disclosure appended hereto as Exhibit 44, Mortgage appended hereto as Exhibit 45, and Mortgage Note appended hereto as Exhibit 46.

342.   In connection with the settlement of the loan, the Clark's  were charged an "origination fee" of $2,750.00, which was noted as being payable to GNBT.  This fee is set forth in line 801 of the Settlement Statement.  This line item was blatantly fraudulent.

343.   In fact, the same individuals who owned EquityGuaranty (Messrs. Shumway and Bapst), owned or controlled "USA Title, LLC," the title company used to close the Clark's loan.

344.   Thus, the Shumway/Bapst operation controlled the distribution of settlement proceeds generated in connection with the Clark's loan (and the distribution of settlement proceeds in connection with all of the loans made to Class members in the name of GNBT).

345.   Contrary to representation in the Clark Settlement Statement, only a *de minimis* amount of the $2,750.00 in alleged "origination fees" imposed upon the Clark's was distributed to GNBT.  Instead, these "fees" were distributed to EquityGuaranty and possibly to other businesses controlled by the Shumway/Bapst operation.

346.   Also in connection with the settlement of the loan, the Clark's were charged a "loan discount" of $550.00, which was noted as being payable to GNBT.  This fee is set forth in line 802

49

of the Settlement Statement. Once more, this line item was fraudulent in that the alleged "fee" was not paid to GNBT, but was instead paid to EquityGuaranty and possibly other businesses owned or controlled by the Shumway/Bapst operation.

347.    Also in connection with the settlement of the loan, the Clark's were charged an "underwriting fee" of $200.00 that was noted as being payable to GNBT. This fee is set forth in line 811 of the Settlement Statement. This line item was fraudulent in that the alleged "fee" was not paid to GNBT, but was instead paid to EquityGuaranty and possibly other businesses owned or controlled by the Shumway/Bapst operation.

348.    The Clark's were assessed various "Title Charges" in connection with the settlement of their loan. All of these fees are noted as being payable to USA Title, LLC. USA Title was operated at the same business location as EquityGuaranty.

349.    The charges for alleged "title services" are set forth in Section 1100 of the Settlement Statement. These fees were fraudulent in that, overwhelmingly, no services were provided in connection with the fees.

**The Kruszka Loan**

350.    In the spring of 2001, the Kruszka Plaintiffs received a mail solicitation suggesting that they were "Pre-Approved" for a debt consolidation loan.

351.    The solicitation was made in the name of EquityGuaranty, which was depicted as being, "a division of Guaranty National Bank of Tallahassee."

352.    The President/Treasurer/Registered Agent of EquityGuaranty was David B. Shumway.

353.    The Vice President/Secretary of EquityGuaranty was Randy A. Bapst.

50

354.    The solicitation listed a toll free number, and suggested that interested potential borrowers "Call EquityGuaranty" at the toll free number to confirm eligibility for a loan.

355.    The Kruszka Plaintiffs called the toll free number to apply for a loan.

356.    The investigation conducted on behalf of Plaintiffs reveals that the toll free number called by the Kruszka Plaintiffs was registered to EquityGuaranty, and that the Kruszka Plaintiffs loan application was processed from start to finish by employees of EquityGuaranty.

357.    The Kruszka's loan application was ultimately approved.

358.    The Kruszka's closed a loan in which GNBT was identified as the lender on or about May 5, 2001.  See HUD-1A Settlement Statement used in connection with the Kruszka loan appended hereto as Exhibit 47.

359.    In the HUD-1A used in connection with this loan, GNBT's alleged address was listed as being 4501 Singer Court, Chantilly, Virginia, the business address for EquityGuaranty.

360.    The principal amount of the loan was $20,100.00, with a listed A.P.R. of 19.772%. See Truth in Lending Disclosure appended hereto as Exhibit 48, Mortgage appended hereto as Exhibit 49, and Mortgage Note appended hereto as Exhibit 50.

361.    In connection with the settlement of the loan, the Kruszka's were charged an "origination fee" of $1,507.00, which was noted as being payable to GNBT.  This fee is set forth in line 801 of the Settlement Statement.  This line item was blatantly fraudulent.

362.    In fact, the same individual who owned EquityGuaranty (Messrs. Shumway and Bapst), owned or controlled "USA Title, LLC," the title company used to close the Kruszka's loan.

51

363.   Thus, the Shumway/Bapst operation controlled the distribution of settlement proceeds generated in connection with the Kruszka's loan (and the distribution of settlement proceeds in connection with all of the loans made to Class members in the name of GNBT).

364.   Contrary to representation in the Kruszka Settlement Statement, only a *de minimis* amount of the $1,507 in alleged "origination fees" imposed upon the Kruszka's was distributed to GNBT. Instead, these "fees" were distributed to EquityGuaranty and possibly to other businesses controlled by the Shumway/Bapst operation.

365.   Also in connection with the settlement of the loan, the Kruszka's were charged a "loan discount" of $402.00, which was noted as being payable to GNBT. This fee is set forth in line 802 of the Settlement Statement. Once more, this line item was fraudulent in that the alleged "fee" was not paid to GNBT, but was instead paid to EquityGuaranty and possibly other businesses owned or controlled by the Shumway/Bapst operation.

366.   Also in connection with the settlement of the loan, the Kruszka's were charged an "underwriting fee" that was noted as being payable to GNBT. This fee is set forth in line 811 of the Settlement Statement. This line item was fraudulent in that the alleged "fee" was not paid to GNBT, but was instead paid to EquityGuaranty and possibly other businesses owned or controlled by the Shumway/Bapst operation.

367.   The Kruszka's were assessed various "Title Charges" in connection with the settlement of their loan. All of these fees are noted as being payable to USA Title, LLC. USA Title was operated at the same business location as EquityGuaranty.

368.   The charges for alleged "title services" are set forth in Section 1100 of the Settlement

52

Statement. These fees were fraudulent in that, overwhelmingly, no services were provided in connection with the fees.

## CLASS ACTION ALLEGATIONS

369.    This class action is filed on behalf of all persons who entered into a loan agreement with Community Bank of Northern Virginia ("CBNV") or, Guaranty National Bank of Tallahassee ("GNBT"), where the loan is, or was, secured by a second mortgage or deed of trust on property located in the United States whose loan was purchased by Residential Funding Corporation ("RFC") and who was not a member of the class certified in the action captioned *Baxter v. Guaranty National Bank, et al.*, Case No. 01-CVS-009168 in the General Court of Justice, Superior Court Division of Wake County, North Carolina.

370.    The class is so numerous as to make it impracticable to bring all members of the Class before the Court. It is believed , based upon publicly available information, that the Class includes tens of thousands of members.  In some instances, such persons may be unaware that claims exist on their behalf. To the extent that the Class members have knowledge of their claims, their damages are in such amounts that when taken individually, they may be too small to justify the expense of a separate lawsuit.

371.    The representative Plaintiffs' claims are typical of, if not identical to, the claims of the Class.  Plaintiffs received  second mortgage loans in the names of CBNV and GNBT which included  the same fraudulent fees imposed upon each and every Class member.

372.    The representative Plaintiffs will fairly and adequately represent the members of the Class and have no interests which are antagonistic to the claims of the Class. They are  aware that they cannot settle this action without Court approval. Their interests in this action are antagonistic

to the interests of CBNV, GNBT and GMAC-RFC and they will vigorously pursue the claims of the Class.

373.    The representative Plaintiffs have retained counsel who are competent and experienced in class action litigation, and have represented other consumers in complex class actions. Counsel have agreed to handle this case on a contingent basis, with their compensation for professional services only as awarded by the Court. Counsel have agreed to advance the expenses of the litigation contingent upon its outcome.

374.    Common questions of law and fact impact the rights of each member of the Class and a common remedy by way of permissible damages and declaratory relief is sought for the Class.

375.    There are numerous and substantial questions of law and fact common to all members of the Class which will control in this litigation and which will predominate over any so-called individual issues. These common questions of law and fact include the following:

a)    Whether the "origination fees" imposed upon Plaintiffs and the Class were paid to EquityPlus and EquityGuaranty, as opposed to CBNV and GNBT;

b)    Whether services were performed in exchange for the fees for "title services" that were imposed upon Plaintiffs and the Class;

c)    The identities of the specific recipients of fees for "title services" imposed upon Plaintiffs and the Class;

d)    Whether the conduct alleged herein violates the illegal kickback and unlawful fee split provisions of RESPA;

e)    Whether the conduct alleged herein violates RICO;

f)    Whether the conduct alleged herein violates the Pennsylvania Secondary Mortgage Loan Act and similar laws in other states;

g)  Whether the imposition of "origination fees" and fees for "title services" upon Plaintiffs and the Class, as alleged, constituted breaches of contract;

h)  Whether the imposition of "origination fees" and fees for "title services" upon Plaintiffs and the Class, as alleged, constituted fraud;

i)  Whether the imposition of "origination fees" and fees for "title services" upon Plaintiffs and the Class, as alleged, violated the Pennsylvania Unfair Trade Practices and Consumer Protection law or similar laws in other states;

j)  The extent to which GMAC-RFC conspired with EquityPlus, EquityGuaranty, CBNV, GNBT, and the other Shumway/Bapst affiliates to commit the unlawful acts alleged herein;

k)  Whether the loans made to Plaintiffs and the Class were high-cost loans under HOEPA.

l)  Whether Defendants' conduct violated § 2607-2608 of RESPA.

376.  A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of the representative Plaintiffs and the Class are identical and will require evidentiary proof of the same kind and application of the same law.

377.  The representative Plaintiffs will seek to identify all Class members through discovery procedures as may be appropriate and will provide to the Class such notice of this action as the Court may direct.

**Equitable Tolling**

378.  Any applicable statute of limitations that might otherwise bar certain of Plaintiffs' claims should be tolled because EquityPlus, EquityGuaranty, TitleAmerica, USA Title, GMAC-RFC, CBNV, GNBT and possibly other businesses affiliated with the Shumway/Bapst operation fraudlently concealed:

55

a)    The actual recipient of the supposed "origination fees," imposed upon Plaintiffs and the Class;

b)    The fact that it would have been unlawful for EquityPlus and EquityGuaranty to collect the "origination fees" in dispute in their own names because said fees would have been substantially excessive under state law;

c)    The fact that virtually no services were performed in exchange for the supposed "title fees" imposed upon Plaintiffs and the Class.

379.    Plaintiffs both exercised due diligence during the loan transactions at issue but could not reasonably have been expected to discover the fraud that was being perpetrated against them.

380.    Specifically, Plaintiffs scrutinized all relevant loan documents and actively participated in all aspects of the loan transactions at issue but nonetheless did not discover, and could not reasonably have been expected to discover, that they were being defrauded.

381.    Indeed, due to the elaborate nature of the conspirators' fraudulent concealment, it has required a tremendous amount of investigation and effort by counsel for Plaintiffs to reconstruct the details of the fraud that was perpetrated on Plaintiffs and the Class.

382.    In addition, with respect to the RESPA claims asserted on behalf of Plaintiffs with loans made in the name of CBNV, the limitations period regarding said claims was tolled by the filing of the Second Amended Complaint in <u>Davis v. Community Bank of Northern Virginia, et al.</u> in the Court of Common Pleas of Allegheny County on June 12, 2002.

56

**COUNT I**

**RESPA–12 U.S.C. § 2607(a)-(b)–Origination Fees**

383.    The other Paragraphs of this Complaint are hereby incorporated as if set forth in their entirety.

384.    The note and mortgage that each Plaintiff and the Class entered into with CBNV and GNBT created a "federally related mortgage loan" as defined at 12 U.S.C. § 2602(1).

385.    The Shumway/Bapst operation, CBNV/GNBT, and GMAC-RFC defrauded Plaintiffs and the Class in violation of RESPA's anti-kickback and unlawful fee-split provisions by misrepresenting the identities of the intended recipients of the "origination fees" delineated in Section 800 of Plaintiffs' and the Classes' Settlement Statements, to facilitate the generation and subsequent distribution of unlawful settlement fees, as is set forth above in detail.

386.    Specifically, the Settlement Statements uniformly indicated that these fees would be paid to CBNV/GNBT, when, in fact, the Shumway/Bapst operation, CBNV/GNBT and GMAC-RFC knew at all material times that the majority of the fees would be dispersed to EquityPlus/EquityGuaranty, by the title company used to close the loan transaction, which title company was owned or controlled by Messrs. Shumway and Bapst.

387.    As a pattern and practice, borrowers would not receive the disclosure of affiliate relationship form required by 12 U.S.C. § 2607(c)(4)(A) apprising them of the joint ownership or control of EquityPlus/EquityGuaranty and the title companies used to close the loans of Plaintiffs and the Class.

388.    CBNV/GNBT did receive a small percentage of the Section 800 fees, but the majority of the fees were distributed to EquityPlus/EquityGuaranty.

57

389.    Uniformly, the Shumway/Bapst operation, CBNV/GNBT and GMAC-RFC used the Settlement Statements disseminated to Plaintiffs and the Class to conceal this massive kickback and unlawful fee split scheme.

390.    As a result of the RESPA violations above alleged, Plaintiffs and the Class have been damaged in an amount to be determined at a trial of this action where they will seek all permissible damages, fees and costs.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment against GMAC-RFC, and CBNV (CBNV loans), and GMAC-RFC and GNBT (GNBT loans), jointly and severally, and that the Court award all permissible damages sustained by Plaintiffs and the Class, including treble damages, along with statutory counsel fees, costs and other appropriate relief.

## COUNT II

### RESPA–12 U.S.C. § 2607 (a)-(b)-- Title Charges

391.    The other Paragraphs of this Complaint are hereby incorporated as if set forth in their entirety.

392.    The note and mortgage that each Plaintiff and the Class entered into with CBNV and GNBT created a "federally related mortgage loan" as defined at 12 U.S.C. § 2602(1).

393.    The Shumway/Bapst operation, CBNV/GNBT and GMAC-RFC defrauded Plaintiffs and the Class in violation of RESPA's anti-kickback and unlawful fee split provisions by misrepresenting in the Settlement Statements disseminated to Plaintiffs and the Class the actual amount of fees being retained for so-called "Title Charges," delineated in Section 1100 of the Settlement Statements, by the title company owned or controlled by Messrs. Shumway and Bapst,

and concealing the distribution of a percentage of the fees paid for title services to EquityPlus/EquityGuaranty, and CBNV/GNBT.

394.    More specifically, the title companies used to close the loans at issue, which were owned or controlled by Messrs. Shumway and Bapst, uniformly and pursuant to a pre-existing formula applied to each loan transaction, collected fees from Plaintiffs and the Class for which no services were provided.

395.    In addition, contrary to the representations made to Plaintiffs and the Class in Settlement Statements, a percentage of these bogus fees for "title services" was distributed to EquityPlus/EquityGuaranty and CBNV/GNBT.

396.    Unequivocally, neither EquityPlus/EquityGuaranty nor CBNV/GNBT performed any "title services" in connection with the loans at issue, nor could they have, but fees for so-called title services were illegally diverted to them nonetheless.

397.    As a result of the RESPA violations above alleged, Plaintiffs and the Class have been damaged in an amount to be determined at a trial of this action, where they will seek all permissible damages, fees and costs.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment against GMAC-RFC, and CBNV (CBNV loans), and GMAC-RFC and GNBT (GNBT loans), jointly and severally, and that the Court award all permissible damages sustained by Plaintiffs and the Class, including treble damages, along with statutory counsel fees, costs and other appropriate relief.

## COUNT III

## Violation of 18 U.S.C. §§'s 1962(c) and 1962(d)

59

398.    The other Paragraphs of this Complaint are hereby incorporated as if set forth in their entirety.

399.    Defendants have violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sections 1962(c) and(d), in that Defendants conducted or participated, directly or indirectly, in the conduct of an Enterprise's affairs through a pattern of racketeering activity, and conspired to participate in the conduct of and Enterprise's affairs, proximately resulting into monetary injury to Plaintiffs and the Class as is above-discussed.

400.    Defendant CBNV is a "person" as that term is defined in 18 U.S.C. § 1961(3).

401.    Defendant GMAC-RFC is a "person" as that term is defined in 18 U.S.C. § 1961(3).

402.    Defendant GNBT is a "person" as that term is defined in 18 U.S.C. § 1961(3).

403.    Plaintiffs are each "persons" as that term is defined at 18 U.S.C. § 1961(3).

**Enterprise # 1**

404.    Defendants GMAC-RFC and CBNV, along with EquityPlus and its affiliates, the Shumway brothers and Mr. Bapst, willfully combined, conspired and agreed to form an association in fact which constitutes a RICO "Enterprise" under 18 U.S.C. § 1961(4). This Enterprise was engaged in, and its activities affected, interstate commerce.

**Enterprise # 2**

405.    Defendants GMAC-RFC and GNBT, along with EquityGuaranty and its affiliates, the Shumway brothers and Mr. Bapst, willfully combined, conspired and agreed to form an association in fact which constitutes a RICO "Enterprise" under 18 U.S.C. § 1961(4). This Enterprise was engaged in, and its activities affected, interstate commerce.

60

406.   Defendants and the Enterprises knowingly devised, and participated in, a scheme whereby they: (1) deceived Plaintiffs and the Class to generate bogus fee income as is described above at length; (2) used HUD-1A Settlement Statements and other settlement disclosures to effect and further that deception; (3) did, in fact generate the bogus fee income in tens of thousands of loans, resulting in tens of millions of dollars in ill-gotten gains; (4) the banks and GMAC-RFC knowingly collected improper interest on the bogus fees as a function of the fact that the fees were rolled into the principal of the loans; (5) GMAC-RFC collected additional improper income because the bogus fees generated by the loans increased the value of the loans in the context of securitization. Defendants, and their non-party co-conspirators identified above, devised and participated in this scheme with the intent of defrauding borrowers to enhance their own income.

407.   The Enterprises were conceived by the Shumway brothers and Mr. Bapst. Also, the Shumway brothers and Mr. Bapst were the conductors of the Enterprises, in that they orchestrated, brought together and coordinated on a day-to-day basis all of the different components of the Enterprises. However, Defendants, individually, were integral links, and active participants, in the Enterprises.

408.   With respect to both of the Enterprises above alleged, the relationship among the various components in the Enterprises was continuous and defined in part by formal contractual agreements. Specifically, CBNV and GNBT both had "Consulting Agreements" with EquityPlus and EquityGuaranty, respectively, that purported to define the terms of the relationship between those entities. Similarly, GMAC-RFC had "Broker/Lender" agreements with CBNV and GNBT (or EquityPlus/EquityGuaranty), that in part purported to define the terms of the relationship between GMAC-RFC and the banks/Shumway-Bapst operation..

61

409.   The Enterprises engaged in a pattern of racketeering activity, as defined at 18 U.S.C.

§ 1961(5), by committing a pattern of more than two predicate acts of mail and wire fraud, within

a single ten year period, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, by using the United

States Mails and interstate wires for advancing, furthering and carrying out the scheme to defraud.

410.   More specifically, the Enterprises defrauded Plaintiffs and the Class regarding bogus

origination fees and title charges, as is set forth above in detail, by using the mails to (1) solicit

business from potential borrowers, including Plaintiffs and the Class; (2) disseminate fraudulent

Settlement Statements, and other settlement disclosures, which were calculated to induce Plaintiffs

and the Class to agree to loans that included the bogus fees; (3) transfer the original loan files of

Plaintiffs and the Class from EquityPlus and EquityGuaranty to GMAC-RFC; (4) transfer the

original loan files to the appropriate securitization Trustee.  These acts of mail fraud were carried

out with the intent of defrauding Plaintiffs and the Class.

411.   In addition, the Enterprises used interstate wires to (1) solicit loan applications from

potential borrowers, including Plaintiffs and the Class (through toll free phone numbers registered

to EquityPlus and EquityGuaranty); (2) wire settlement funds, including the funds for the bogus fees,

between the banks and the title companies owned or controlled by EquityPlus and EquityGuaranty;

(3) wire funds between GMAC-RFC and CBNV/GNBT after the loans were purchased by GMAC-

RFC. These acts of wire fraud were carried out with the intent of defrauding Plaintiffs and the Class.

412.   The Enterprises concealed the pattern of racketeering activity from Plaintiffs and the

Class so that Plaintiffs and the Class could not learn that they had been defrauded, as is discussed

above at length.

413.    As a direct and proximate result of the acts as alleged herein, and Defendants' violations of 18 U.S.C. §§'s 1962(c) and 1962(d), Plaintiffs and the Class have suffered substantial economic injury and injury to their property.

## COUNT IV

### BREACH OF CONTRACT–Origination Fees

414.    The other Paragraphs of this Complaint are hereby incorporated as if set forth in their entirety.

415.    Plaintiffs and the Class entered into written loan agreements with CBNV and GNBT, respectively, pursuant to which they received mortgage loans in exchange for an agreement to repay the principal balance loaned, plus interest, plus certain specifically identified settlement fees.

416.    As is required by federal law, the settlement fees which Plaintiffs and the Class agreed to pay in exchange for receipt of the mortgage loans at issue were delineated in HUD-1A Settlement Forms.

417.    The Settlement Forms used in Plaintiffs' loan transactions are appended hereto as Exhibits 3, 7, 11, 15, 20, 24, 27, 31, 35, 39, 43 and 47 respectively.

418.    As is discussed in detail above, the "origination" related settlement fees delineated in Section 800 of the HUD-1A's used during loan closing for both of the Plaintiffs and all of the Class Members indicated that these fees would be paid to either CBNV or GNBT.

419.    However, contrary to this express written representation, the banks received only a very small percentage of these fees.

420.    Instead of being paid to CBNV/GNBT, these fees were paid to EquityPlus (CBNV loans) and EquityGuaranty (GNBT loans).

63

421.    Plaintiffs and the Class were misled regarding the actual intended recipient of these fees because EquityPlus (CBNV loans) and EquityGuaranty (GNBT loans) could not have collected the substantial fees being imposed directly without violating Pennsylvania Secondary Mortgage Loan Act, 7 P.S. §6601 et seq., regarding fee caps. Thus, by misleading Plaintiffs and the Class with respect to the actual recipient of these fees, EquityPlus/EquityGuaranty were able to generate, on average, in excess of $3,000.00 in fees per loan that they could not have charged if the actual recipient of the fees was disclosed.

422.    GMAC-RFC profited significantly from these excess fees while collecting interest on the loans after purchase, and, subsequently, by the value that the fees added to the loans which was realized by GMAC-RFC upon securitization of the loans.

423.    Though CBNV and GNBT were identified as the intended recipients of these origination fees, they did absolutely no work to support the origination of the loans at issue that would have justified these substantial fees, or any fees.

424.    In fact, CBNV and GNBT both had separate "Consulting" agreements with EquityPlus and EquityGuaranty as a result of which they knew in advance that, contrary to the representations that were made in the HUD-1A's, the origination fees generated in connection with these loans would be paid to EquityPlus and EquityGuaranty, and not to the banks.

425.    Thus the banks entered into loan agreements with Plaintiffs and the Class that were calculated, *ab initio*, to cause the borrowers to agree to the payment of origination fees to the banks, when in fact the banks had no intention of actually collecting said fees, but instead intended to participate in the diversion of these funds to EquityPlus and EquityGuaranty.

426.    Against the above factual backdrop, because the identity of the actual recipient of the

64

"origination fees" directly impacted the amount that could be charged for the fees, the identity of the actual recipient was a material element of the loan agreements at issue.

427.    The above-described conduct constituted a breach of the express terms of the loan agreements.    Specifically, CBNV and GNBT breached their contractual duties by knowingly inducing Plaintiffs and the Class to agree to terms set forth in Section 800 of the HUD-1A's, with actual knowledge that the representations in the HUD-1A's regarding the recipients of the "origination fees" were false.

428.    This breach of contract damaged Plaintiffs and the Class in that they were induced into paying far more in so-called "origination fees" than EquityPlus/EquityGuaranty could have collected from them had the HUD-1A's acknowledged the actual recipients of these fees.

429.    This breach of contract was intentional and was uniform across the entire universe of loans made to Plaintiffs and the Class.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment on their behalf, awarding damages to Plaintiffs and the Class including a refund of all origination fees paid plus interest, plus all additional permissible damages, penalties, attorneys fees, costs and other relief which the Court deems proper.

## COUNT V

## BREACH OF CONTRACT– Fees for "Title Services"

430.    The other Paragraphs of this Complaint are hereby incorporated as if set forth in their entirety.

431.    Plaintiffs and the Class entered into written loan agreements with CBNV and GNBT,

65

respectively, pursuant to which they received mortgage loans in exchange for an agreement to repay the principal balance loaned, plus interest, plus certain specifically identified settlement fees.

432.    As is required by federal law, the settlement fees which Plaintiffs and the Class agreed to pay in exchange for receipt of the mortgage loans at issue were delineated in HUD-1A Settlement Forms.

433.    As is discussed in detail above, Plaintiffs and the Class were charged substantial fees for so-called title services.    These fees were all delineated in Section 1100 of the HUD-1A Settlement Statements distributed to Plaintiffs and the Class in connection with each loan.

434.    The HUD-1A's indicated that these fees would be paid to one of the title companies owned or controlled by the Shumway brothers and Mr. Bapst, as is discussed in greater detail above.

435.    However, contrary to the representations made in the Settlement Statements, there were no services being performed in exchange for the overwhelming majority of these fees, a fact that was widely known by the employees of the Shumway/Bapst operation and GMAC-RFC.

436.    The contractual promise made to Plaintiffs and the Class that described the services that were allegedly performed in exchange for the fees collected from Plaintiffs and the Class was a material part of these loan agreements.

437.    The act of collecting fees without providing the described services constituted a material breach of the contract.

438.    Plaintiffs and the Class were damaged as a result of this breach by being induced to pay fees for services that were not, in fact, provided.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment on their behalf, awarding damages to Plaintiffs and the Class including a refund of all fees for title services plus

interest, plus all additional permissible damages, penalties, attorneys fees, costs and other relief

which the Court deems proper.

## COUNT VI

### Contract Void Or Voidable As A Result Of Being
### Calculated To Achieve An Illegal Purpose

439.    The other Paragraphs of this Complaint are hereby incorporated as if set forth in their

entirety.

440.    The loan agreements entered by Plaintiffs and the Class were calculated to induce

Plaintiffs and the Class to agree to pay origination fees based upon the misrepresentation that the fees

were being paid to a state chartered or national bank, when in reality the banks, GMAC-RFC and

EquityPlus/EquityGuaranty always knew and intended that the fees would be paid to

EquityPlus/EquityGuaranty, and not the banks.

441.    The purpose of this subterfuge was to circumvent the Pennsylvania Secondary

Mortgage Loan Act (and other analogous law in other states), pursuant to which the amount that

could be charged by EquityPlus/EquityGuaranty for "origination fees" was capped by state law.

442.    Because the loan agreements were calculated to circumvent state law in this fashion,

they are void or voidable as being against public policy.

443.    The claim that Plaintiff and the Class are asserting in this Count is predicated upon

state common law and this claim is expressly not seeking to assert a private right of action under

the Pennsylvania Secondary Mortgage Loan Act or any other statutory law.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment on their behalf,

awarding damages to Plaintiffs and the Class including a refund of all origination fees paid plus

interest, plus all additional permissible damages, penalties, attorneys fees, costs and other relief which the Court deems proper.

## COUNT VII

## CONVERSION

444.    The other Paragraphs of this Complaint are hereby incorporated as if set forth in their entirety.

445.    By inducing Plaintiffs and the Class to pay "origination fees" and fees for "title services" under false pretenses as is described above in detail, EquityPlus/EquityGuaranty and GMAC-RFC deprived Plaintiffs and the Class of a right in property without their consent and without lawful justification.  This conduct by GMAC-RFC thus supports a claim for common law conversion.

446.    While a claim for conversion is typically not appropriate when a breach of contract claim is available to redress the same claimed harm, GMAC-RFC was not a party to the loan agreements in dispute.  However, it was a participant in the conduct being challenged as above-described and thus a conversion claim can be properly asserted against GMAC-RFC, as distinct from CBNV/GNBT.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment on their behalf, awarding damages to Plaintiffs and the Class including a refund of all origination fees paid, and a refund of all fees paid for title services, plus interest, plus all additional permissible damages, penalties, attorneys fees, costs and other relief which the Court deems proper.

68

## COUNT VIII

### UNJUST ENRICHMENT

447.   The other Paragraphs of this Complaint are hereby incorporated as if set forth in their entirety.

448.   By inducing Plaintiffs and the Class to pay "origination fees" and fees for "title services" under false pretenses as is described above in detail, EquityPlus/EquityGuaranty and GMAC-RFC derived monetary benefits to the direct detriment of Plaintiff and the Class.

449.   GMAC-RFC was a direct participant in the conduct being challenged and GMAC-RFC knowingly accepted and retained the monetary benefits of its unlawful conduct as is described above in detail.

450.   Under the circumstances described above in detail, it would be inequitable for GMAC-RFC to retain any sums related to or derivative of the unlawful origination fees and unlawful fees for title services being challenged in this action.

451.   Though the agreement in dispute was memorialized in a writing, GMAC-RFC was not a party to the writing, so a claim for unjust enrichment is proper as to GMAC-RFC.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment on their behalf, awarding damages to Plaintiffs and the Class including a refund of all origination fees paid, and a refund of all fees paid for title services, plus interest, plus all additional permissible damages, penalties, attorneys fees, costs and other relief which the Court deems proper.

## COUNT IX

### MONEY HAD AND RECEIVED

452.   The other Paragraphs of this Complaint are hereby incorporated as if set forth in their

69

entirety.

453.    As described above in detail, Defendant GMAC-RFC knowingly participated in and profited from fraudulent conduct which resulted in the diversion of tens of millions in dollars in unlawful settlement fees from Plaintiffs and the Class to EquityPlus/EquityGuaranty, and, ultimately, to GMAC-RFC.

454.    GMAC-RFC in equity and good conscience should not be permitted to keep these ill-gotten gains and should be required to refund to Plaintiffs and the Class all illegal fees and interest.

455.    GMAC-RFC will not be prejudiced by the refund of this money in that it was directly involved with, and facilitated, the fraudulent and unlawful conduct alleged herein.

456.    Weighing the balance of the equities, GMAC-RFC should be required to make restitution to Plaintiffs and the Class of all unlawful origination fees and title fees, plus interest.

457.    Plaintiffs and the Class have been injured as the direct and proximate result of the payment of unlawful origination fees and title fees that were procured through the fraudulent and unlawful conduct of GMAC-RFC and others.

458.    As stated above, there is no question that GMAC-RFC had prior knowledge of the fact that the origination fees and fees for title services were unlawful prior to the point in time at which it began to directly profit from the unlawful fees.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment on their behalf, awarding damages to Plaintiffs and the Class including a refund of all origination fees paid, and a refund of all fees paid for title services, plus interest, plus all additional permissible damages, penalties, attorneys fees, costs and other relief which the Court deems proper.

## COUNT X

70

**FRAUD**

459.    The other Paragraphs of this Complaint are hereby incorporated as if set forth in their

entirety.

460.    EquityPlus/EquityGuaranty masterminded a scheme calculated to extract unlawful

settlement fees from Plaintiffs and the Class as above described.  This scheme was predicated upon

the false written representations presented to Plaintiffs and the Class in the Settlement Statements

that were distributed to Plaintiffs and the Class in connection with the closing of their mortgage

loans.

461.    At    the    time    that    these    false    written    representations    were    made,

EquityPlus/EquityGuaranty knew that the statements were false.  These false statements were

disseminated uniformly by way of the Settlement Statements.

462.    Because of its comprehensive knowledge of the EquityPlus/EquityGuaranty

operation, generally, and because it had a contractual commitment to purchase loans originated by

EquityPlus/EquityGuaranty that it knew were fraudulent, GMAC-RFC directly participated in,

facilitated, and profited from the unlawful conduct at issue.

463.    The common, uniform false statements at issue, made by way of standardized loan

documents, were calculated to induce Plaintiffs and the Class to rely upon said false statements, and

Plaintiffs and the Class did, in fact, rely upon the false statements and the Class is entitled to a

presumption of reliance regarding these uniform fraudulent statements communicated

to the Class in standardized documents.

464.    More specifically, Plaintiffs and the Class relied on the false statements and took

action based upon this reliance by entering into the subject loan agreements and acceding to the

fraudulent terms in the loan agreements. Plaintiffs and the Class entered into the subject loan agreements believing that the common and uniform false statements in the loan documents were truthful, valid and accurate disclosures of the terms for their loans. Again, the Class is entitled to a presumption of reliance.

465.    As a direct and proximate result of the false statements noted above, Plaintiffs and the Class suffered damages, by agreeing to pay unlawfully excessive origination fees and fees for title services.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment on their behalf, awarding damages to Plaintiffs and the Class including a refund of all origination fees paid, and a refund of all fees paid for title services, plus interest, plus all additional permissible damages, penalties, attorneys fees, costs and other relief which the Court deems proper.

## COUNT XI

### Violation Of The Pennsylvania Unfair Trade Practices And Consumer Protection Act

466.    Plaintiffs hereby incorporate every Paragraph in this Complaint as if fully set forth herein.

467.    The loans made to Plaintiff and the Class were primarily for personal, family or household purposes.

468.    The acts and practices by EquityPlus, EquityGuaranty, GMAC-RFC, CBNV and GNBT constitute violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. 201-2(4)( xxi):

(xxi)   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

72

469.    EquityPlus, EquityGuaranty, GMAC-RFC, CBNV, and GNBT engaged in unfair or

deceptive acts or practices in connection with making secondary mortgage loans to Plaintiff and the

Class by engaging in the following acts and practices:

    a)    Fraudulently misrepresenting the identity of the intended recipient of
          "origination fees" in the Settlement Statements disseminated to
          Plaintiffs and the Class in connection with their loans by indicating
          that these fees were being paid to CNBV or GNBT when, in fact, they
          were paid to EquityPlus and EquityGuaranty; and,

    b)    Fraudulently charging Plaintiffs and the Class fees for so-called "title
          services" when, in fact, virtually no services were performed in
          exchange for the fees;

470.    EquityPlus, EquityGuaranty, GMAC-RFC, CBNV and GNBT had a contractual duty

not to intentionally and/or knowingly mislead Plaintiffs and the Class with respect to the payment

of origination fees and fees for so-called "title services"

471.    The fraudulent disclosures and non-disclosures by EquityPlus, EquityGuaranty,

GMAC-RFC, CBNV and GNBT as above-described were made with the knowledge that the

misrepresentations being made to Plaintiffs and the Class would justifiably induce Plaintiffs and the

Class to agree to pay the origination fees and fees for so-called title services at issue.  In fact,

Plaintiffs did rely upon the material misrepresentations and/or omissions and the Class is entitled

to a presumption of reliance.

472.    EquityPlus, EquityGuaranty, GMAC-RFC, CBNV and GNBT carried out this

misconduct willfully, wantonly and with reckless disregard for the interests of Plaintiff and the Class.

73

473.    These misrepresentations and omissions were likely to make a difference in the decision by Plaintiffs to agree to pay the origination fees and fees for so-called "title services" at issue.

474.    Plaintiffs have suffered ascertainable losses of money and property as a result of these violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

WHEREFORE, Plaintiff and the Class  request that the Court enter judgment of behalf of Plaintiffs and the Class and award triple the actual damages sustained by Plaintiff and the Class, along with statutory counsel fees, costs and other appropriate relief.

## COUNT XII

### Civil Conspiracy

475.    Plaintiffs hereby incorporate every Paragraph in this Complaint as if fully set forth herein.

476.    The Shumway/Bapst operation, GMAC-RFC, CBNV, and GNBT conspired to violate Pennsylvania law as set forth in Counts I-VIII of this Complaint by combining with a common plan to engage in or facilitate the unlawful conduct delineated herein for the unlawful purpose of extracting illegal fees and interest from Plaintiffs and the Class.

477.    In furtherance of this conspiracy, EquityPlus, EquityGuaranty, GMAC-RFC, CBNV and GNBT engaged in all of the illegal acts and omissions set forth in this Complaint.

478.    Plaintiffs and the Class have been damaged by this conspiracy in that they have been fraudulently induced to pay illegal settlement fees in connection with the second mortgage loans at issue.

74

WHEREFORE Plaintiff and the Class request that the Court enter judgment awarding

Plaintiff and the Class all of the damages, costs and fees requested in Counts I-XI of this Complaint.

**PLAINTIFFS DEMAND TRIAL BY JURY.**

SPECTER SPECTER EVANS
& MANOGUE, P.C.

By: _____

R. Bruce Carlson, Pa. I.D. #56657

The 26th Floor
Koppers Building
Pittsburgh, Pennsylvania 15219
(412) 642-2300

*OF COUNSEL:*

A. Hoyt Rowell, III
Daniel Myers
Kevin Oufnac
RICHARDSON, PATRICK, WESTBROOK
    & BRICKMAN, LLC
503 Wando Park Boulevard
Suite 200
Mt. Pleasant, SC 29464

75

# Exhibits Omitted Due To Lengthiness-
# Exhibits May Be Found In Pleadings File

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **Consolidated Amended Class Action Complaint** was served upon the following counsel of record on this date by the method indicated:

**via U.S. Mail:**

David J. Armstrong, Esquire
Dickie McCamey & Chilcote, P.C.
Suite 400
Two PPG Place
Pittsburgh, PA 15222

Louis M. Tarasi, Jr.
Tarasi Tarasi & Fishman, P.C.
510 3rd Avenue
Pittsburgh, PA 15219-2107

Stanley A. Kirshenbaum
1602 Law & Finance Building
429 Fourth Avenue
Pittsburgh, PA 15219

Robert B. Smith, Esquire
Smith Cohen & Mork
210 Fort Pitt Commons
Pittsburgh, PA 15219

J. Jerome Hartzell, Esquire
Hartzell & Whiteman, L.L.P.
2626 Glenwood Avenue
Suite 500
Raleigh, NC 27608

Roy W. Arnold, Esquire
Thomas Allen, Esquire
Reed Smith, LLP
435 Sixth Avenue
Pittsburgh, PA 15219

F. Douglas Ross, Esquire
Odin Felman & Pittleman, PC
9302 Lee Highway, Suite 1100
Fairfax, VA 22031

Gary P. Hunt, Esquire
Tucker Arensberg, P.C.
1500 One PPG Place
Pittsburgh, PA 15222

Thomas P. Oldweilder, Esquire
Armbrecht Jackson, LLP
1300 Riverview Plaza
P.O. Box 290
63 S. Royal Street
Mobile, AL 36602

Scott C. Borison, Esquire
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick, MD 21703

David G. Oberdick, Esquire
Meyer Unkovic & Scott, LLP
1300 Oliver Building
Pittsburgh, PA 15222

R. Bruce Carlson

Dated: November 10, 2003