# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re:<br>COMMUNITY BANK OF NORTHERN<br>VIRGINIA AND GUARANTY NATIONAL<br>BANK OF TALLAHASSEE SECOND<br>MORTGAGE LOAN LITIGATION | : Case No. 03-425<br>:<br>:<br>: Hon. Gary L. Lancaster<br>:<br>: Electronically Filed<br>:<br>:<br>:<br>:<br>:<br>: |

## PLAINTIFFS' BRIEF ADDRESSING THE THIRD CIRCUIT MANDATE THAT THE RECORD BE SUPPLEMENTED ON REMAND

### I.    Introduction

At issue here is the propriety of a proposed class action settlement with a cash value in excess of $33,000,000.00 negotiated on behalf of more than 44,000 residential mortgage borrowers residing throughout the country. The proposed settlement relates to multi-jurisdictional litigation that was commenced by class counsel beginning on May 1, 2001.[1] The litigation challenges the legality of certain settlement fees charged to consumers in connection with second mortgage loans.

The defendants in the case are Community Bank of Northern Virginia n/d/b/a Mercantile Bank (hereafter referred to as "CBNV"), Guaranty National Bank of Tallahassee (now represented by the FDIC as receiver—hereafter referred to as "GNBT") and Residential Funding Corporation (hereafter referred to as "RFC"). The two banks funded the loans in dispute, which

---

[1] The term "class counsel" refers to Bruce Carlson, of the law firm Carlson Lynch, LTD, and Hoyt Rowell and Daniel Myers of the law firm Richardson, Patrick, Westbrook and Brickman. These counsel acknowledge that there is disagreement about how the Third Circuit opinion impacted the District Court's Order conditionally certifying the class and appointing them as class counsel. In acknowledgement of this dispute, the term "class counsel" is used here not as a term of art, but for ease of reference.

were originated by various mortgage brokerage companies that plaintiffs would characterize as being non-party co-conspirators (hereafter referred to as the "Shumway Operation"). RFC is an assignee of all of the loans in dispute, having purchased them from the bank defendants. Because it is uncontested that the loans at issue were high-cost loans under the Home Ownership Equity Protection Act, it is plaintiffs' position that RFC stepped into the shoes of the banks with respect to any illegality in connection with the origination and/or settlement of the loans.

The primary legal theory utilized by class counsel to challenge the lawfulness of the settlement fees at issue was asserted under the Real Estate Settlement Procedures Act, 12 U.S.C. § 1601 *et seq.*[2] The proposed settlement was based upon the disgorgement of a percentage of alleged out-of-pocket damages, and did *not* require the disgorgement of class-wide "enhanced" or exemplary damages (the availability of so-called "enhanced" damages under HOEPA is *always* discretionary in a class-action, not "mandatory" or "automatic" as the objectors have always argued, as will be discussed below).[3] The damage assumption built into the proposed

---

[2] Class counsel alleged that the settlement fees at issue (both origination and title fees) were unlawfully "kicked-back" to the Shumway Operation, and/or, illegally split or marked-up, in violation of the anti-kickback and illegal fee split provisions of RESPA.

[3] As will be discussed in detail below, the objectors are challenging two specific title fees that they claim resulted in the borrowers being overcharged by an average of several hundred dollars per loan. Under their punitive damage model, objectors' counsel now argue (in contrast to what they argued to this Court at the original Fairness Hearing, and in contrast to what objectors' counsel Nix asserted to class members in a letter dated December 5, 2005) that this alleged overcharge of several hundred dollars per loan should result in per borrower damages in excess of $50,000, which, they assert, would yield total damages in excess of $2,000,000,000 (two billion dollars) on a class basis. Objectors' Viability Brief at 59. By way of contrast, at the original Fairness Hearing, objectors' counsel argued that the TILA/HOEPA damages would be "on average" $20,000 per borrower, as follows: (objectors' counsel Vaughan): "These claims are worth $20,000 apiece;" (objectors' counsel Nix): "The objection I have to the settlement, Your Honor, is directed to the incredibly small amount of money that is being paid for claims which are a virtual slam dunk under federal law, which would entitle each borrower on average to over $20,000 in statutory, strict liability, truth-in-lending, and HOEPA damages." *See* Transcript from November 14, 2003, Fairness Hearing (hereafter "FH Transcript") at page 37, line 23 through page 38, line 2, and, page 45, line 7, attached to Plaintiffs' Supplemental

settlement paradigm was that the total arguable maximum settlement fees that defendants would

have to disgorge upon a demonstration of liability under RESPA would average approximately

$4,765.00 per loan, yielding a total maximum theoretical damage exposure under RESPA of

$213,700,720.00.[4]

---

Compendium Of Exhibits In Support Of Certification Of A Settlement Class And In Support Of Fairness, Adequacy And Reasonableness Of Proposed Settlement ("Supplemental Compendium") at Exhibit 1. In a letter that he sent to certain class members dated December 5, 2005, touting his "victory" in the Third Circuit, objectors' counsel Nix stated: "The defendants' total liability for violating your federal Truth-in-Lending rights is presently estimated to exceed **Five Billion Dollars** ($5,000,000,000)."(emphasis in original). *See* December 5, 2005, letter from Franklin R. Nix to class members attached to the Supplemental Compendium at Exhibit 2; Supplemental Carlson Declaration at ¶ 3, Supplemental Compendium Exhbit 3. The fact that objectors' counsel presume to take *any* position regarding the ostensible damage value of theoretical TILA/HOEPA claims is utterly astonishing, given that the award of "enhanced" damages under HOEPA is wholly discretionary, as is discussed in detail below.

[4] This theoretical maximum exposure assumes total disgorgement of the fees in dispute, without any credit for the settlement services that were unquestionably performed in connection with the loans at issue. Class counsels' position regarding the proper calculation of damages under RESPA has been strengthened since the execution of the Settlement Agreement as the result of another case pending in the Western District of Pennsylvania in which class counsel represent plaintiff and seek to represent a putative national class, as will be discussed in the text below. *See* Magistrate Judge Hay's Report and Recommendation that defendant's Rule 12 Motion be denied, and Judge Schwab's Order adopting the Report and Recommendation, in *Kehrer v. Ameriquest Mortgage, Inc.,* attached to the Supplemental Compendium at Exhibits 4 and 5. In the proposed settlement, monetary relief to the class is derivative of actual damages and does **not** include trebling under RESPA. This is because it is well-settled that the determination of the fairness, adequacy and reasonableness of a negotiated class-based settlement should **not** include the calculation of potential exemplary or enhanced damages. *See, e.g., In re Warfarin Sodium Antitrust Litigation,* 212 F.R.D. 231, 257 (D.Del.2002)("Some Class members also contend that the damages estimate should have taken into account the potential for treble damages under antitrust or consumer fraud statutes. Recovery of such damages is purely speculative, however, and need not be taken into account when calculating the reasonable range of recovery.")(*citing Lorazepam & Clorazepate Antitrust Litigation,* 205 F.R.D. 369, 376 (D.D.C.2002); *see also, Detroit v. Grinnel Corporation,* 495 F.2d 448, 458-59, (2nd Cir. 1974); *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1324 (2d Cir. 1990)("Nassau and the ratepayer Appellants object primarily to the size of the settlement fund . . . which they consider unduly small in light of what they assert was the total possible recovery by the class . . . after trebling under RICO . . . . Initially, we note the district judge correctly recognized that it is inappropriate to measure the adequacy of a settlement amount by comparing it to a possible trebled base recovery figure."); *Ohio Public Interest Campaign v. Fisher Foods, Inc.,* 546 F.Supp. 1, 9-10 (N.D.Ohio, 1982).

As noted, plaintiffs and class counsel proposed that these claims be settled for a class wide total of $33,000,000.00. Under the terms of the proposed settlement, $23,220,455.00 was to be mailed directly to class members without any claims process. Every class member was to receive at least $250.00 automatically and every class member was to be eligible to receive a total of at least $552.00, by participating in a simple, streamlined claims process. A significant percentage of the class was to receive automatic payments of up to $925.00, without the necessity of submitting any claim.

The proposed settlement agreement was executed on July 11, 2003. Counsel representing plaintiffs in two "competing" class actions (hereafter referred to as "Objectors' Counsel") mounted a multi-state opt-out campaign calculated to solicit opt-outs from and/or objectors to the proposed settlement.[5] The objectors asserted, *inter alia,* that the amount of the settlement was too low, and suggested that class counsel should have pursued claims that were ostensibly more valuable under various state laws and under the Truth in Lending Act and the Home Ownership Equity Protection Act (hereinafter "TILA/HOEPA" claims).[6] Following a fairness hearing on

---

[5] Lead Objectors' counsel filed their first complaint based upon the mortgage loan transactions at issue in June 2001, in Missouri state court, more than a month after class counsel filed their initial complaint in this litigation (the first complaint filed by objectors' counsel was based upon loans funded by CBNV). On April 3, 2003, after class counsel Carlson had spoken to lead objectors' counsel and invited them to participate directly in the settlement negotiations, lead objectors' counsel filed a second complaint based upon loans funded by GNBT. Copies of both of these complaints filed by objectors' counsel are appended to the Supplemental Compendium at Exhibits 6 and 7.

[6] As noted, objectors' counsel were pursuing their own separate class actions based upon the transactions at issue. Those class actions were based upon Missouri state law, and did **not** include TILA/HOEPA claims. Both of these cases sought certification of a class of Missouri borrowers only, **not** certification of a national class. In their objections to the settlement, objectors' counsel originally challenged class counsels' failure to pursue state claims like the ones that they (objectors' counsel) were pursuing in Missouri. Their focus shifted after one of their cases was removed to federal court on preemption grounds, and both of their cases were dismissed on Rule 12 motions, with the dismissals being affirmed by the United States Court of Appeals for the 8th Circuit, *Phipps v. FDIC et al.,* 417 F.3d 1006 (8th Cir. 2006) and the Missouri

November 14, 2003, this Court approved the settlement, over the objections, in an Order dated December 4, 2003.

The objectors appealed the order approving the settlement to the United States Court of Appeals for the Third Circuit. There was extensive motions practice in connection with the appeal. Ultimately, in an opinion dated August 11, 2005, a Third Circuit panel vacated the order approving the settlement and remanded the case to this Court for further proceedings. *See, In re Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee Second Mortgage Loan Litigation,* 418 F.3d 277 (3d Cir. 2005)(hereafter referred to as "Third Circuit Opinion")

In its opinion, the Third Circuit concluded that the original record before this Court did not establish a sufficient independent review of the proposed settlement (by this Court) to confirm compliance with Federal Rule of Civil Procedure 23(a). The Third Circuit suggested that this fact precluded it (the Third Circuit) from reviewing this Court's evaluation of certain arguments raised by the objectors. In particular, and by way of example, the Third Circuit focused on what it deemed to be the inadequacy of the record regarding the objectors' argument that the monetary amount of the settlement was too low (and therefore allegedly not fair, adequate and reasonable for the class) because, *inter alia,* class counsel did **not** pursue federal statutory claims under the Truth in Lending Act and the Home Ownership Equity Protection Act (hereinafter "TILA/HOEPA" claims), that, if litigated successfully to judgment and appeal

---

Court of Appeals *Avila v. Community Bank of Northern Virginia, et al.,* 143 S.W.3d 1 (Mo. App. W.D. 2003). Copies of the *Phipps* and *Avila* opinions are attached to the Supplemental Compendium as Exhibits 8 and 9. As a result, the claims of the named plaintiffs in both *Phipps* and *Avila* have been dismissed with prejudice and the named plaintiffs in those cases are permanently precluded from recovering any damages arising from the conduct in dispute. Objectors' counsel never raised TILA/HOEPA claims on behalf of those named plaintiffs who now find themselves out of court with prejudice.

through the United States Supreme Court, might theoretically result in substantial (albeit entirely

discretionary) exemplary or "enhanced" damages. The Third Circuit held that this issue

potentially impacted this Court's analysis of the adequacy of representation prong of Fed. R. Civ.

P. 23(a) and directed the Court to fully develop the record regarding the issue on remand.

Against the backdrop of this language from the Third Circuit opinion, this Court held a

post-remand status conference on November 4, 2005, and appointed a Steering Committee. The

Steering Committee was directed to negotiate a briefing schedule pursuant to which the parties

would submit their positions regarding the "viability" of the TILA/HOEPA claims championed

*post hoc* by the objectors (but never actually alleged by objectors' counsel in their own cases

based upon these transactions—or alleged by objectors' counsel in other cases wherein they

could have, but did not, raise the claims), to aid this Court with respect to creating a thorough

record that will support its independent rigorous analysis of whether the proposed settlement

class satisfies the requirements of Fed. R. Civ. P. 23(a), as part of its overall evaluation of the

proposed settlement.[7]

### A.    The Precise Mandate To This Court On Remand

The Third Circuit specifically held that it was an abuse of discretion for this Court to

adopt plaintiffs' proposed findings and conclusions regarding class certification, without any

indication in the record that the Court exercised "independent judgment" in an "objective form"

in reaching the conclusion that the settlement class can be properly certified. The precise

mandate from the Third Circuit on remand, then, is no different than what is always required by

Rule 23(a), to wit:  this Court must ensure that a sufficient record is developed to support the

Court's obligation to independently confirm that the proposed settlement can satisfy all of the

---

[7] The Steering Committee includes class counsel, counsel for defendants and objectors' counsel.

requirements of Rule 23(a), paying particular attention to adequacy of representation. *See* Third

Circuit Opinion, 418 F.3d at 301: ("[W]hat is required at a minimum is a statement of reasons,

expressed in objective form, how the court exercised independent judgment in evaluating the

settlement . . . . Because we are not convinced that the District Court exercised `independent

judgment' in adopting the proposed findings of the settling parties, we conclude that the

settlement-only class was never properly certified in accordance with *Amchem.* ")

Case law governing this Court's precise burden in this context is well-settled and

uniform. Specifically, this Court must conclude, after a *"rigorous analysis,"* that the

prerequisites of Rule 23(a) have been satisfied. *General Telephone Co. v. Falcon*, 457 U.S. 147,

161 (U.S. 1982); *Robinson v. Lehman*, 771 F.2d 772, 783 (3d Cir. 1985); *Meyer v. CUNA*

*Mutual Group*, 2006 WL 197122, \*10 (W.D.Pa. January 25, 2006)(Conti, J.)("In deciding a

motion for class certification, the court must be satisfied `after a rigorous analysis' that all the

requirements for class certification are met."); *Yang v. Odom,* 2005 WL 2000156, \*3 (D.N.J.

August 19, 2005)(Pisano, J.); *Williams v. Empire Funding Corporation*, 227 F.R.D. 362, 372

(E.D.Pa. 2005).

Once there is an adequate record to support the fact that this Court exercised

"independent judgment" in an "objective form," then any appellate review of its certification

decision and its decision regarding approval of the proposed settlement would be for an abuse of

discretion. Third Circuit Opinion at 418 F.3d at 298 ("An appellate court reviews the initial

certification of the class and the decision whether to approve the proposed settlement for abuse

of discretion.")

In turn, the law governing the issue of adequacy of representation in the context of a

class action settlement is well-developed and uniform. The Third Circuit has repeatedly held

that "[a]dequate representation depends upon two factors: (a) the plaintiff's attorney must be

qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff

must not have interests antagonistic to those of the class." *Hoxworth v. Blinder, Robinson &

Co.,* 980 F.2d 912, 923 (3d Cir. 1992). Further, in the context of a settlement class, the Third

Circuit requires that a District Court reviewing a proposed settlement assure that class counsel:

1) possess adequate experience; 2) vigorously prosecuted the action; 3) acted at arms length

from the defendant. *In re General Motors Corporation Pick-Up Truck Fuel Tank Products

Liability Litigation,* 55 F.3d 768, 801 (3d Cir. 1995).[8]

In its opinion, the Third Circuit held that the original record before this Court was

inadequate to permit it (the Third Circuit) to review this Court's analysis of either prong of the

---

[8] It should be noted that almost every class action settlement includes the release of claims that
were not actually pled in the litigation being settled, and frequently includes the release of claims
that were jurisdictionally precluded from being raised in the court where final judgment is
entered. Lead objectors' counsel is plainly aware of this doctrine, since they recently invoked it
in opposition to objections to the proposed settlement of a securities derivative action in which
they represented the settling plaintiffs. *See Epstein v. Wittig, et al.,* 2005 WL 3276390, *4
(D.Kan. Dec. 2, 2005)("As the Court noted at the September 1, 2005, hearing, it is routine for
courts to approve settlements with broad releases of claims arising out of facts and circumstances
that were or could have been asserted in the case.") The propriety of this practice is black-letter
law in the Third Circuit and every other federal appellate venue. *See, e.g. In re Prudential
Insurance Company of America Sales Practice Litigation,* 261 F.3d 355, 366-67 (3d Cir. 2001);
*Grimes v. Vitalink Communications Corporation,* 17 F.3d 1553, 1563-1564 (3d Cir. 1994); *In re
General American Life Insurance Company Sales Practices Litigation,* 357 F.3d 800, 805 (8th
Cir. 2004)("There is no impropriety in including in a settlement a description of claims that is
somewhat broader than those that have been specifically pleaded. In fact, most settling
defendants insist on this."); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 113 (2nd Cir.
2005)("[W]e agree with respondents [settling parties] that due process does not require that all
class claims be pursued. Instead, where different claims within a class involve the identical
factual predicate, adequate representation of a particular claim is determined by the alignment of
interests of class members, not proof of vigorous pursuit of that claim. Thus, the district court
did not err in ruling that plaintiffs' release of the *Reyn's and Membership Rules* claims did not
violate due process, where plaintiffs are members of the *Reyn's and Membership Rules* classes
and the release was part of the consideration necessary to obtain the largest antitrust settlement in
history.") The obvious reason for this policy is that no sophisticated defendant would ever enter
into a class-based settlement without protection from future litigation arising out of the same
conduct.

adequacy inquiry. By way of example, it stated that because the record did not adequately

illustrate that this Court independently considered whether the ostensible TILA/HOEPA claims

were "viable" on a class basis, and therefore whether class counsel made an informed decision

when it elected to compromise the alleged TILA/HOEPA claims, then, the record was

inadequate to establish that this Court rigorously analyzed whether: 1) the named plaintiffs'

interests were consistent with the interests of all class members; and, 2) class counsel

"vigorously prosecuted the action." Third Circuit Opinion, 418 F.3d at 306-307. The Third

Circuit made it clear, however, that it was not rendering an opinion regarding either the

"viability" of the alleged TILA/HOEPA claims *or* the adequacy of representation. Specifically,

the Third Circuit stated:

> Because we are not convinced that the District Court exercised
> 'independent judgment' in adopting the proposed findings of
> the settling parties, we conclude that the settlement-only class
> was never properly certified in accordance with *Amchem*.
> 'Without certification there is no class action, and in a settlement
> entered without class certification the judgment will not have
> res judicata effect on the claims of absent class members.
> *G.M. Trucks*, 55 F.3d at 800 . . . . We will therefore vacate
> the settlement Order and remand to the District Court.
>
> Our conclusion that the settlement class was not properly
> certified does not mean that the class could not be
> certified on remand. Because we believe certification may
> indeed be appropriate, we examine some of the relevant
> factors to be considered on remand.
>
> *    *    *    *
>
> [B]ecause we do not have before us its analysis of the viability
> of the TILA and HOEPA claims, we will not pretermit its decision.
> We merely conclude that Appellants' arguments merit more attention
> than they were given by the District Court as reflected in the record.
>
> *    *    *    *
>
> We emphasize, as we stated above, that we do not preclude the

> possibility that the adequacy of class representation can be
> established on a more developed record. The District Court
> is instructed to examine carefully this matter on remand.

Third Circuit Opinion, 418 F.3d at 301-302, 306, 308.

This Court's role on remand, then, is to shepherd the development of a comprehensive

record that: 1) permits an independent rigorous analysis of whether the named plaintiffs *truly*

had interests that were antagonistic to other class members; and, 2) permits an independent

rigorous analysis of whether class counsel vigorously pursued the interests of all class members,

and acted at arm's length from defendants. Class counsel can and will create an adequate record

in support of this effort. As part of this task, the record will demonstrate that class counsel and

the named plaintiffs made an informed, reasonable and appropriate decision to negotiate a

settlement that was derivative of alleged out-of-pocket damages, as opposed to class-based

punitive damages, and that the adequacy of representation requirement of Rule 23(a) was

satisfied.[9]

The named plaintiffs and all class members shared identical interests: maximizing their

recovery in this litigation. It was reasonable and appropriate for class counsel to negotiate a

settlement for all class members that was derived from the alleged out-of-pocket damages to the

---

[9] Plainly, the issue to be considered on remand is *not* whether class counsel could have alleged
facts that might state a TILA/HOEPA claim when reviewed through a Rule 12 standard. If this
were the standard for evaluating the adequacy of representation, *all* class action settlements
would be vulnerable to baseless objections and class counsel would effectively be required to
plead *every* potential legal claim, whether class counsel believed that the claim ultimately had
merit, or not. This is obviously *not* what the law requires, nor has the Third Circuit so much as
hinted that a Rule 12 standard should be applied by this Court in the context of its adequacy
evaluation. There is and could be no law anywhere that would support this proposition by the
objectors. Instead, what the law plainly requires is that this Court perform an independent
rigorous analysis of whether the Rule 23(a) requirements have been satisfied in the context of the
proposed settlement, and ensure that its analysis is supported by the record. The question of
whether the TILA/HOEPA claims raised by objectors for the first time in their proposed
complaint in intervention (their motion to intervene was denied) would survive a Rule 12
motion, or not, is irrelevant to this analysis.

class.  Class counsel did, in fact, prosecute this litigation vigorously and it was reasonable and appropriate for class counsel *not* to pursue the ostensible TILA/HOEPA claims raised *post hoc* by the objectors.[10]

After the record is supplemented on remand to permit this Court to exercise its "independent judgment," it will become manifest through the Court's "rigorous analysis" that the settlement class should be certified and that the proposed settlement should be approved.

## II.   Class Counsels' Investigation Into The Conduct At Issue

### A.   The Third Circuit's Characterization Of The Record Regarding Class Counsels' Investigation.

The Third Circuit's discussion of this Court's obligation to confirm adequacy of representation noted gaps in the original record regarding the extent of class counsels' investigation into the conduct in dispute.  The Third Circuit's discussion of this issue is in part based upon mischaracterizations regarding class counsels' investigation by objectors' counsel, as will be discussed below.  On this issue, the Third Circuit stated:

> Class counsel admitted during oral argument that no formal discovery was conducted whatsoever – either in Kessler or in any of the five consolidated actions.  While Appellees submit that formal discovery was not necessary because of the sufficiency of `informal discovery obtained  by Class Counsel from witnesses and former employees," Appellees' Br. at 27, `we are loathe to place . . . dispositive weight on the parties' self-serving remarks.'  G.M. Trucks, 55 F.3d at 804.  Without adequate exploration of the absent class members' potential claims, it is questionable whether class counsel could have negotiated in their best interests.

---

[10] In *dicta*, the Third Circuit made a comment about the conduct of the litigation that, respectfully, is simply inaccurate, and demonstrably so.  Specifically, the Third Circuit stated: "Often, *as in this case*, the parties never intend to litigate the claims; rather, from the time the plaintiffs file the complaint, the goal on both sides is to reach a nationwide settlement."  Third Circuit Opinion, 418 F.3d at 299 (emphasis added).  However, there is not, and could not be, any evidence that the parties "never intended to litigate" these claims."  In the supplemental record, class counsel will demonstrate why this is true.

418 F.3d at 307. On remand, however, class counsels' supplementation of the record will address these mischaracterizations by the objectors and correct any gaps in the record regarding the adequacy of their investigation.

**B.    The Reality Of Class Counsels' Informal Investigation**

While the appeal of this Court's order approving the settlement was pending before the Third Circuit, the objectors' filed a Motion for Leave to Supplement the Record on Appeal. In the motion, the objectors requested that the Third Circuit take judicial notice of various items, in relevant part including the pre-filed testimony of Michael Kevin Morin, a former insider who managed the direct mail marketing subsidiary of the Shumway Operation. Mr. Morin is also the former college roommate of the key principals in the Shumway Operation and knew them very well on a personal level.

In the pre-filed testimony, Mr. Morin says some fairly damning things about the former Shumway Operation, some of it based upon first hand knowledge, and most of it clearly reported to Mr. Morin in a manner that was several steps removed. Mr. Morin's testimony was proffered by the Virginia State Corporation Commission in opposition to a mortgage license application that was filed on behalf of Calusa Investments, the successor entity to the Shumway Operation.[11] Commenting on this material in their Motion to Supplement the Record On Appeal (before the Third Circuit), the objectors stated:

> The pre-filed testimony of Mr. Morin was obtained by the Virginia State
> Corporation Commission in connection with Calusa Investment's perhaps
> misguided attempt to obtain a mortgage broker's license in Virginia and was
> obtained by Appellant's through the Virginia State Corporation
> Commission's website . . . .

---

[11] Notwithstanding opposition to the application by the Virginia state regulators, said application was ultimately approved by Order dated December 13, 2004. Supplemental Compendium at Exhibit 10.

> This material is only a sample of what is now available, along with the
> hundreds of other exhibits and pages of testimony of "insiders," in the
> public domain through the website. This material leaves little question
> as to what information regarding the predatory lending scheme was
> available through discovery – the same discovery sought by Appellants
> and shut down by the district court **and the same discovery class counsel
> did not do**.[12]

(emphasis added). The problem with this characterization of class counsels' investigation –

which was accepted by the Third Circuit – is that it is false.[13] In fact, class counsel Bruce

Carlson began what was to become an ongoing dialogue with Michael Morin in January 2003,

after Jonathan Finer, an investigative reporter for the Washington Post, called Carlson (in

November 2002) to discuss the litigation and suggested that Mr. Morin was anxious to talk to

him (Carlson) about the litigation.

On January 29, 2003, Carlson received an e-mail from Mr. Morin, in which he (Mr.

Morin) indicated that he was a senior employee of the direct mail marketing subsidiary of the

Shumway Operation between March 2001 and March 2002 and that further, he possessed

"information which could be very useful to your efforts against that operation."[14] From the day

of that e-mail forward, Carlson had very regular contact with Mr. Morin. Carlson first met face

---

[12] *See also*, Lead objectors' counsels' brief on appeal to the Third Circuit at n.3: "[A]dditionally,
Appellants have referred the Court to the testimony of Michael Morin, a former executive within
the Shumway Organization before the Virginia State Corporation Commission. This testimony
is addressed in, and is the subject of, Appellants contemporaneously filed Motion to Supplement
the Record on Appeal and for Judicial Notice. This testimony gives a clear and startling view of
the Shumways' rouge [sic] lending operation and utter disdain for compliance with any lending
laws or regulations."

[13] Ironically, while objectors' counsel attacked the adequacy of class counsels' investigation
before the Third Circuit, they applauded the investigation when they appeared before this Court
at the Fairness Hearing. Specifically, they stated: (objectors' counsel Vaughan): "Certainly Mr.
Carlson has to be congratulated for the efforts that he did in uncovering this scheme . . . .
Certainly he deserves a great deal of credit for that work;" (objectors' counsel Borison): "[I]
also applaud their efforts, they did a lot of work, I am not taking anything away from them." FH
Transcript at page 35, line 11, page 40, line 24, Supplemental Compendium at Exhibit 1.

[14] *See* January 29, 2003, e-mail from Mike Morin to Carlson attached to Supplemental
Compendium at Exhibit 11.

to face with Mr. Morin in Northern Virginia on January 31, 2003.[15]  Information provided by Mr. Morin, either directly or indirectly, permitted class counsel to corroborate facts developed in their prior investigation into the conduct in dispute.[16]

Unbeknownst to objectors' counsel, in addition to the testimony offered in connection with the Calusa license application, Mr. Morin also provided deposition testimony in another related regulatory matter during this same general time frame.  Carlson was provided with a copy of the deposition subpoena in connection with that other matter.[17]  While Carlson was vacationing with his family during the winter of 2003, Mr. Morin called Carlson on his (Carlson's) cell phone immediately after he (Mr. Morin) completed his deposition testimony in this other related regulatory matter, and discussed his testimony with Carlson in detail.  In short, Carlson not only knew Mr. Morin, he knew him very well and conversed with him on a regular, at times daily, basis about Mr. Morin's knowledge of the events in dispute.

Furthermore, Carlson shared information developed in his investigation with the Virginia State Corporation Commission when lawyers for the Commission contacted him in connection with the Calusa license application.  The regulatory investigation in connection with the Calusa application was driven by information developed in the first instance *by Carlson* and/or his investigator.  Ironically then, not only is the pre-filed testimony of Mr. Morin **not** evidence of the inadequacy of class counsels' investigation, but in reality, the Virginia state regulators *learned the identity of Mr. Morin, and many other relevant witnesses, from class counsel*.[18]

---

[15] Carlson was accompanied by his investigator during this initial face-to-face meeting.  See Carlson Supplemental Declaration at ¶ 4;  Brian Thomas Affidavit at ¶ 53-54, Supplemental Compendium at Exhibits 3 and 12.

[16] *See* Thomas Affidavit at ¶ 53;  Supplemental Carlson Declaration at ¶ 5, Supplemental Compendium at Exhibits 3and 12.

[17] Supplemental Compendium at Exhibit 13.

[18] Thomas Affidavit at Exhibit H, Supplemental Compendium at Exhibit 12.

In addition to Mr. Morin, class counsel and/or his investigator (Brian Thomas) did background checks regarding, and/or interviewed a large number of additional knowledgeable witnesses. Class counsel learned of the content of important written communications among the stakeholders in this litigation. These witnesses or sources included, *inter alia*, David Shumway, Lisa Perdue,[19] Theresa Ritter,[20] Jonathan Finer (Washington Post reporter), Rocky Scott (Tallahassee Democrat reporter), Tom Eck, Carl Mugnolo, James Bell, Lee Jacobsen, George Hopper, Mary Helms, Mary Jo Speier, Jerry Hartzell (a lawyer representing plaintiffs in another class action based upon the same transactions, who conducted his own personal investigation and discovery),[21] and a host of other loan officers, employees, and other sources, including: Joseph Malone, David Dickens, William Easby-Smith, Norman Hardee, Cyrus Katzen, Otis Poole, David Summers, James Thomson, Malcom Mitchell, Paul McGlone, Jack Grace, Linda

---

[19] Lisa Perdue handled the accounting functions for Title America and USA Title and indicated that the financial statements for the title companies were audited by public accounting firms on an annual basis. She stated the title companies at one time employed in excess of forty individuals, all of whom provided title services for CBNV, and then GNBT loans. *See,* Supplemental pre-filed testimony of Lisa Perdue, attached to Supplemental Compendium at Exhibit 14.

[20] *See* February 8, 2003, e-mail from Mike Morin to Carlson relaying the sum and substance of a conversation between Mr. Morin and Ms. Ritter, and suggesting that Carlson call Ms. Ritter, Supplemental Compendium at Exhibit 15.

[21] Lawyer Jerry Hartzell is an experienced complex litigation attorney, generally, and an experienced consumer finance attorney, specifically. He is the lawyer who took the deposition of Mary Jo Speier in connection with the transactions in dispute. He (Mr. Hartzell) originally filed "conditional objections" to the proposed settlement, on behalf of two North Carolina borrowers, which challenged certain of the administrative aspects of the proposed deal. However, he *never* challenged the monetary sufficiency of the proposed deal. To the contrary, he repeatedly endorsed the adequacy and reasonableness of the proposed settlement to Carlson, and confirmed that fact at the original Fairness Hearing, to wit: (Mr. Hartzell: "It does in fact accurately convey my belief that a $33 million settlement is not objectionable because of the amount.") *See* FH Transcript at page 27, line 11, Supplemental Compendium at Exhibit 1. The "conditional objections" filed by Mr. Hartzell on behalf of his North Carolina clients were ultimately withdrawn and he did not appeal this Court's Order approving the settlement.

Alexionok, David A. Barrett, Rica Barrett, Lawrence H. Fuchs, Kenneth Fuqua, Wilma Lauder, Marilyn Newton and Frederic Vroom.[22]

As noted above, then, in addition to the information provided by Mr. Morin and various other witnesses that was critical of the Shumway Operation, the banks and RFC in various respects, class counsel also developed information from witnesses who defended the conduct at issue, either in whole or in part. Most significantly for purposes of the current discussion, the investigation yielded information corroborating the fact that services were performed in exchange for title fees charged to borrowers at loan closing.[23]

Mr. Morin's testimony in connection with the Virginia licensure proceedings for Calusa Investments does not tell the whole story of his knowledge. The knowledge that he did **not** disclose in his testimony highlights an obvious problem with the TILA/HOEPA claims. Mr. Morin knew that there were employees who worked exclusively for the title companies and he knew that these individuals performed title services in connection with the loans at issue.[24]

The title companies that provided services in connection with the majority of the loans in dispute were real companies staffed by real people who performed real services. Mary Jo Speier, who was the president of Title America (which serviced the majority of the loans for CBNV) and USA Title (which serviced the majority of the loans for GNBT) is a lawyer. Ms. Speier was

---

[22] Thomas Affidavit at ¶ 50, Supplemental Compendium at Exhibit 12.
[23] The Shumway Operation was headquartered in a massive 80,000 square foot facility at 4501 Singer Court, Chantilly, Virginia. Class counsel Carlson personally visited the facility with his investigator and was familiar with the general lay out of the building. Though the employees of the various title companies were housed in this building, they were segregated from other employees in the Shumway Operation. Supplemental Carlson Declaration at ¶ 6; Thomas Affidavit at ¶ 62, Supplemental Compendium at Exhibits 3 and 12.
[24] In the Final Order granting Calusa Investment's Virginia license application, the presiding judge noted that most of Mr. Morin's testimony had been stricken as inadmissible, stating, "[w]e do not believe that the rank, uncorroborated hearsay allegations that were stricken upon objection constitute 'probative' evidence." *See Final Order at n. 2.* Supplemental Compendium at Exhibit 10.

deposed in a related case captioned *Bumpers v. Community Bank of Northern Virginia, et al.*

Her testimony in that case is completely consistent with the information developed by class

counsel in their investigation. The testimony describes, *inter alia,* the services provided in

exchange for the Line 1102 and 1103 fees. Specifically, Ms Speier testified:

> Q:    Now, what did you understand that Title America was to do in its role
>       as a title and settlement coordination company? What specific tasks
>       was Title America to perform?

> A:    Okay. Title America was to accept orders for property reports or current
>       owner searches.

>       And then they were to place those orders with abstractors. And what we
>       did was we placed those orders with a company by the name of General
>       American Corporation, by and large; and they have a network of abstractors
>       all over the country that actually go to the courthouses and do the search.

>       The search was limited to a current owner search. And the results of the
>       search would come back to Title America in the form of a – we called
>       them property reports.

>       And what was contained in the property report was the deed record, the
>       mortgage record, the judgment record, the tax record, and the legal
>       description for this particular piece of property that would serve as
>       security under the mortgage loan.

>       All right. So our function was to make sure those orders got out, that
>       they were tracked, and that they came back in to a hub, Title America,
>       sort of coordinating so that all of this then got disseminated back out
>       to Community Bank of Northern Virginia.

>       Then what we were to do was to process that particular information,
>       determine – knowing that Community Bank wanted to be in second
>       position, to make sure that that – not to – you know, to process it to
>       find out, okay, this has three mortgages on the report, and are these old
>       mortgages that were never released? Are these active mortgages?

>       There is, you know, a million John Smith judgments for this Mr. John
>       Smith, investigate the judgments, talk to the borrower. So process that
>       report.

>       And then give the fruits of that process to Community Bank so that they
>       could make a decision whether they wanted to lend on this transaction or

not.

If they made a decision that they wanted to lend on the transaction, then the next step at Title America was to coordinate the closing of the actual loan, the presentation and execution of the loan documents.

And they did that through independent contractors, a network of independent contractors across the country.

Then those documents were to come back to Title America once they were executed. We were to track them, make sure that they got back in time, log the package in, open it up, look to make sure that it was – you know, that the people signed where they were supposed to, the notary notarized correctly, that all of the documents were returned, and then get them back to the lender.

For instance, if a notary forgot to seal the documents, which can happen, if the borrower forgot to sign a particular line, we would then coordinate the effort to get that corrected.

Then once the loan was funded, Title America was responsible to disburse the loan funds.

And so they would have to assure that the money for this particular transaction made it into their trust account. They would have to reconcile and balance that money with the settlement statement.

They would have to cut the checks, package them up, get them to the borrower, or the mortgage company if you are paying off an existing second mortgage. They would obviously have to pay any type of liens they would pay off directly.

They would have to reconcile those trust accounts to make sure that they were – each individual transaction had its own ledger and that it balanced.

And then they had to coordinate the recordation of the mortgage. So They would forward the mortgage to the county courthouse. They would track it. They would make sure it got recorded. They took care of any rejection and cleaned those up to make sure it got recorded.

And then they would report back to Community Bank all the recording information and get those original mortgages returned back to Title America. And they were sent out back to Community Bank once they were recorded.

> So it was very departmentalized, very assembly line like, and that's
> what Title America did.
>
>    *      *      *      *
>
> Q:   1102 is title abstract or title search.  What did that fee cover?
>
> A:   That covered the actual search and then coordination of service to
> get that out to the abstractor get it back, get it printed, get it in-
> house.
>
> Q:   1103 it titled title examination.  What fees did that cover?
>
> A:   That included a review of the actual results of the abstract search and any
> resolution of title issues. [25]

The title companies employed over forty people.  It is simply indisputable that they were

performing title services in connection with the loans at issue, and it cannot be credibly disputed

that the fees charged in connection with these services were "[f]ees for title examination, abstract

of title, title insurance, property survey, ***and similar purposes***," and thereby properly excludable

from the Finance Charge calculation pursuant to Regulation Z .

     The chronological history of class counsels' investigation is set forth in the Thomas

Affidavit.[26]   The investigation was thorough, extensive and more than adequate to permit class

counsel to assess the strengths and weaknesses of the case against defendants.  It is well-settled

that so-called formal discovery does not warrant talismanic significance.  *See, e.g., In re Cendant*

*Corporation Securities Litigation*, 264 F.3d 201, 236 (3d Cir. 2001)("The objectors are correct

that the settlement was reached early in the litigation, with discovery itself at an early stage.

However, the merits of the liability case against Cendant were fairly clear . . . . Given the

foregoing, it is unclear what depositions and interrogatories (with the requisite motions to

---

[25] Supplemental Compendium at Exhibit 16, page 51, line 16, through page 56 line 2;  page 89,
line 19, through page 90, line 4.
[26] Supplemental Compendium at Exhibit 12.

compel) would have added to the liability considerations . . . ."); *In re ATI Technologies, Inc. Securities Litigation,* 2003 WL 1962400, *2 (E.D. Pa. April 28, 2003)("Although formal discovery did not ensue after our July, 2002 decision, the Ryan Declaration details how the parties were able to assess their strengths and weaknesses before they began the mediation with Judge Hart. The Ryan Declaration at ¶ 13 details the thorough investigation plaintiffs' counsel undertook before reaching an agreement to the settlement."); *Bowling v. Pfizer,* 143 F.R.D. 141, 161 (S.D.Ohio 1992)("We can imagine an inadequate settlement with much discovery done; similarly, we can envision an outstanding settlement with little discovery done."); *In re Jiffy Lube Securities Litigation,* 927 F.2d 155 (4th Cir. 1991)(plaintiffs were sufficiently informed about the strength of the case as a result of evidence obtained through informal discovery); *Cotton v. Hinton,* 559 F.2d 1326, 1332 (5th Cir. 1977) )(approving settlement over objection that not enough discovery was conducted because plaintiffs were adequately informed despite fact that "very little formal discovery was conducted and that there is no voluminous record in this case."); *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 211 (5th Cir. 1981)("[W]e are not compelled to hold that formal discovery was a necessary ticket to the bargaining table. Because the plaintiffs did have access to information, this case cannot be characterized as an instance of the unscrupulous leading the blind.") As this now record evidence of the investigation unambiguously illustrates, any suggestion by the objectors that there was "collusion" between class counsel and RFC is not just frivolous, it is outrageous.

III.   **The Negotiation Of A Settlement Derived From Alleged
Out Of Pocket Damages, As Opposed To Class-Based
Punitive Damages, Was Informed, Reasonable And
Appropriate**

A.   **The Award Of So-Called "Enhanced" Damages For
A Class-Based HOEPA Violation Is Wholly Discretionary**

Unbelievably, the objectors have repeatedly represented to both this Court and the Third

Circuit that "enhanced" damages for the types of TILA/HOEPA violation(s) that they invoke are

"mandatory" or "automatic." They have claimed repeatedly that "enhanced" HOEPA damages

are "strict liability" damages. Indeed, the very premise of the damage model invoked by the

objectors in the "viability" brief that they filed with this Court on February 15, 2006, is that the

HOEPA claims that they champion require "strict liability damages:

> Using this more conservative number, extrapolated across the entire
> 44,045 loans with violations that were contained in the putative class
> action settlement, gives a total damage number in the amount of
> $2,079,807,102.00. *And to repeat, any such damage number relates
> only to these strict liability damages under TILA and HOEPA.*

Objectors' Viability Brief at 58 (emphasis added).

However, what the objectors have failed to disclose in hundreds of pages of briefing

before this Court and the Third Circuit is that while "enhanced" TILA/HOEPA damages *might*

be mandatory in connection with certain *individual* claims (assuming that the plaintiff can

overcome the very real hurdle of proving "materiality," *inter alia*), they are *never* mandatory or

automatic in a class action. Instead, in a class action, TILA/HOEPA "enhanced" damages are

*always* discretionary. Specifically, the "enhanced" damage provision of HOEPA is set forth at

15 U.S.C. § 1640(a)(4), which entitles a borrower with a HOEPA loan to damages, "[in] an

amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor

demonstrates that the failure to comply is not material." In the context of class actions, however,

Section 1640(a)(4) is qualified in a very significant way by the following paragraph of the statute, which states:

> In determining the amount of award in any class action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

The objectors have never once acknowledged that a Court must perform a balancing test before it makes what is, in effect, an equitable (albeit wholly discretionary) decision about what damages are appropriate for a class-based HOEPA claim.[27] This is because the objectors realize that the primary target defendant in this litigation (RFC) has a compelling equitable argument that it should not be subjected to class-based "enhanced" or punitive damages. Specifically, RFC was an assignee to the loans in dispute, it was not the original creditor. Therefore, in addition to all of the other myriad problems with the objectors TILA/HOEPA claim, which are discussed below, their entire theory assumes that a Court would be willing to impose class-based punitive damages against an assignee defendant that had nothing to do with the conduct that allegedly violates TILA/HOEPA.

The fact that TILA/HOEPA "enhanced" damages are discretionary, not mandatory (as the objectors have always argued) in and of itself justifies class counsels' decision to negotiate a settlement in this case derived from alleged out-of-pocket damages, and not punitive damages.

---

[27] Objectors' expert Margot Saunders does acknowledge this statutory requirement at footnote 60 in her Affidavit. However, after acknowledging, but never discussing, the statutory language in a footnote, the text of the affidavit disregards the fact that class action damages are wholly discretionary and assumes that the full "enhanced" damages will be available "automatically," which is untrue by definition given the literal statutory text. *See* Saunders Affidavit at ¶'s 89-92.

**B.    The Objectors' Argument That Fees Charged To The Class Under The Designation "Title Abstract Fees" And "Title Examination Fees" Should Have Been Excluded From The Finance Charge Disclosed To The Class Because The Fees Were Allegedly Not "Bona Fide And Reasonable" Is Devoid Of Merit**

In connection with the loans in dispute, class members were charged fees for various title services. These fees were set forth in Section 1100 of the HUD-1 Settlement Statements that were used in the loan transactions. In their opposition to the settlement, the objectors' focus on two fees in particular. Specifically, the objectors' question the legitimacy of a fee denoted as a "title abstract" fee, appearing at Line 1102 of the HUD-1s, and question the legitimacy of a fee denoted as a "title exam" fee, appearing at Line 1103 of the HUD-1s. The objectors suggest that these specific fees should <u>not</u> have been excluded from the Finance Charge disclosed to class members because they were not "bona fide and reasonable." Because they were not included in the Finance Charge, so the argument goes, the Annual Percentage Rate ("APR") was understated in connection with the loans made to members of the class. Because the APR was understated, and because the loans in dispute are HOEPA loans, the argument continues, class members are ostensibly entitled to enhanced damages (which, again, are wholly discretionary in the class action context).[28]

---

[28] As noted, class counsel also sought to challenge certain aspects of the title fees under RESPA (in addition to certain aspects of the origination fees). *See* Affidavit of Brian Thomas at ¶ 18; Supplemental Declaration of Bruce Carlson at ¶ 7, Supplement Compendium at Exhibits 3 and 12. In contrast to the TILA/HOEPA theories championed *post hoc* by the objectors' counsel, but never actually pursued by objectors' counsel in their own cases arising from the transactions at issue, there is abundant legal support for class counsels' approach. This legal support includes other national class actions in which class counsel represent the plaintiffs. *See, Price v. Countrywide Home Loans, Inc.*, attached to the Supplemental Compendium as Exhibit 17. Further, plaintiffs' ability to challenge fee mark-ups under RESPA has been upheld by the Third Circuit. *See, Santiago v. GMAC Mortgage*, 417 F.3d 384 (3d Cir. 2005).

The objectors acknowledge that their argument assumes that the title fees at issue were not "bona fide and reasonable." *See Objectors Viability Brief at 24,* ("If the charge at issue is listed in 15 U.S.C. §1605(e) and/or 12 C.F.R. § 226.4(c)(7), then the second question in the analysis asks whether the charges for the fees were 'bona fide' and 'reasonable.' 12 § 226.4(c)(7). **This analysis as to the HUD-1 Line 1102 (title abstract) and Line 1103 (title exam) charges are [sic] the crux issue as to the Objectors' TILA and HOEPA claims".**)(emphasis added.)  In other words, if the objectors are wrong about their assumption that the subject fees were not "bona fide and reasonable," their position is baseless.

The phrase "bona fide and reasonable" is a term of art under TILA and its implementing regulations.  The critical language is set forth in Regulation Z to TILA, at 12 C.F.R. § 226.4(c)(7)(i), which identifies, in relevant part, items that can properly be excluded from the Finance Charge, to wit: "[f]ees for title examination, abstract of title, title insurance, property survey, *and similar purposes.*" (emphasis added).

1.    **The  Alleged Evidence That The Title Fees In Dispute Were Not Bona Fide And Reasonable.**

The objectors' argument is **not** that no services were performed in exchange for the fees at issue.  Instead, the objectors concede (at least implicitly) that services were performed in exchange for these fees and that the fees were paid to the companies denoted in the loan documents.[29]  Notwithstanding this concession, they take issue with whether the services performed were "title examinations" or "title abstracts" as they, the objectors, would prefer to define those terms. The problem with the objectors' argument is that it ignores the analysis that is required by Regulation Z, which sets forth the controlling standard under TILA.  That is,

---

[29] This concession is well-taken in that the fact that services were performed in exchange for these fees is beyond credible dispute.

Regulation Z states that fees can appropriately be excluded from the Finance Charge if they are

"[f]ees for title examination, abstract of title, title insurance, property survey, *and similar*

*purposes.* 12 C.F.R. § 226.4(c)(7)(i).

Specifically, the objectors argue:

> Regulation X to the Real Estate Settlement Procedures Act speaks to what
> and where any particular fee or cost should appear on a HUD-1 settlement
> statement. See 24 C.F.R. Part 3500. Appendix A to Regulation X
> provides that the section 1100 Lines (1100-1113) of the HUD-1 cover
> 'title charges and charges by attorneys.' Id. As to lines 1102 and 1103,
> Regulation X states that '[l]ines 1102 and 1103 are used for the abstract
> or title search and title examination. In some jurisdictions the same person
> both searches the title (that is, performs the necessary research in the
> records) and examines title (that is, makes a determination as to what
> matters affect title, and provides a title report or opinion.')

*See Objectors Viability Brief at 41.* The objectors thereafter invoke three separate expert

opinions calculated to "demonstrate" that the fees in dispute could not have been "bona fide and

reasonable" because the services that were undeniably provided in exchange for the fees in

dispute allegedly did not constitute the performance of a "title abstract" or a "title examination,"

as the objectors' experts would prefer to define those terms. However, all of these expert

opinions disregard the fact that the relevant analysis cannot be performed in a vacuum, but

instead must comply with the actual language of Regulation Z, which all them conveniently

ignore.

First, the objectors submit a voluminous affidavit from Margot Saunders, a lawyer for the

National Consumer Law Center. While the affidavit includes a long, detailed explanation

regarding the purpose and history of TILA and HOEPA, it assumes away the erroneous premise

of the objectors' argument. Specifically, at Paragraphs 43 and 44 of her affidavit, Ms. Saunders

states:

25

I understand that virtually every consumer in the plaintiff class was charged fees similar to those charged in the ten files that I was given to review. I also understand that an expert in real estate closings will state that the property reports provided in these cases were not really 'abstracts' and were not sufficiently detailed to provide an attorney with information to make a finding related to clear title. I understand that an expert on title issues will opine that the entire fee charged for 'title examination' on line 1103 of the HUD-1s provided to consumers in these cases is neither bona fide, nor reasonable.

> **If the fees charged on lines 1103 are not bona fide and reasonable, they cannot be excluded from the finance charge . . . .**

(emphasis added).

The objectors also invoke the affidavits of William H. Dodson, an attorney from Atlanta, Georgia, and John T. Coghlan, an attorney from Kansas City, Missouri. Both of these so-called title experts completely ignore the controlling language from Regulation Z of TILA, and opine that, though title services were performed in connection with the loans in dispute, they (the objectors' experts) don't consider the services performed to represent "title examinations" or "title abstracts" as those experts would prefer to define those terms and from this facially dubious conclusion, they assert that the fees at issue were not "bona fide and reasonable." Both experts completely ignore the fact that the fees collected in exchange for the title services, that were undeniably performed, were, "[f]ees for title examination, abstract of title, title insurance, property survey, *and similar purposes.*" 12 C.F.R. § 226.4(c)(7)(i).

These so-called title experts opine that although "property reports" were obtained in connection with the fees charged for "title abstracts" at Line 1102 of the HUD-1s, these fees were not "reasonable" to the extent that the fee charge exceeded the actual cost of obtaining the "property report." *Coghlan Affidavit at ¶6; Dodson Affidavit at ¶C.* With respect to the fees collected for services denominated "title examination" at Line 1103 of the HUD-1s, both experts assert that while services might have been performed in exchange for the fee charged, those

26

services do not satisfy their preferred definition of the term "title examination," and therefore the fee was ostensibly not "bona fide and reasonable." *Coghlan Affidavit at ¶7; Dodson Affidavit at ¶B and D.*

2.  **The Question Of Whether The Fees In Dispute Were "Bona Fide And Reasonable" Is Controlled Solely By Regulation Z, 12 U.S.C. § 226.4(c)(7)(i).**

As noted, the objectors argue that notwithstanding that title services were admittedly provided in connection with the loans at issue, when a fee is charged for the services specifically identified at Lines 1102 and 1103 of a HUD-1 Settlement Statement, so the argument goes, that fee must relate solely to the procurement of a "title abstract" or the provision of a "title examination," as the objectors would prefer to define those terms, irrespective of the actual language of Regulation Z. Under the terms of Regulation Z, however, it is proper to exclude from the Finance Charge, "[f]ees for title examination, abstract of title, title insurance, property survey, *and similar purposes.*" 12 C.F.R. § 226.4(c)(7)(i). Therefore, contrary to what the objectors argue without acknowledging the language of Regulation Z, and consistent with the literal terms of that governing regulation (Regulation Z), if the fee collected was for a service with a purpose "*similar*" to a "title examination, abstract of title, title insurance, or property survey," then it is unambiguously appropriate that the fee be excluded from the Finance Charge.

The precise argument being advocated by the objectors has been squarely rejected. Specifically, in *Brannam v. Huntington Mortgage Company,* 287 F.3d 601 (6th Cir. 2002), plaintiffs argued that a "document preparation" fee invoiced to borrowers at Line 1105 of a Good Faith Estimate Form (a preliminary version of a HUD-1 Settlement Statement) was not "bona fide and reasonable" and should not have been excluded from the Finance Charge disclosed to the borrower because Regulation X of RESPA suggests that Line 1105 should be used "for

27

charges for preparation of deeds, mortgages, notes, etc . . . ." Based upon this language from

Regulation X of RESPA (as opposed to TILA), plaintiff argued that, to the extent that the

"document preparation" fee collected was for anything other than documents relating to the

transfer of title, it was not "bona fide and reasonable." Affirming the District Court's grant of

summary judgment to defendant, the Sixth Circuit rejected this argument, indicating that the

applicable language from Regulation Z of TILA – as opposed to Regulation X of RESPA -

permits lenders to exclude from Finance Charge disclosures "[f]ees for preparing loan related

documents, such as deeds, mortgages, and reconveyance *or settlement documents*," so long as

such fees are "bona fide and reasonable" in amount. 12 C.F.R. § 226.4(c)(7)(ii), (emphasis

added). Specifically, the court stated:

> First, plaintiffs argue that the fee charged is not bona fide because it is not
> `exactly what it purports to be.' Plaintiffs go to great lengths to establish that the
> court must adopt this dictionary definition of `bona fide,' in accordance with
> TILA's definition provisions. This means, they suggest, that Huntington can
> charge only its costs of preparing title-related documents, such as notes,
> mortgages and deeds. This is so, the argument goes, because Huntington itself
> claimed that these were what the fee was for by entering the amount of $250 on
> Line 1105 of the Good Faith Estimate form required by regulation X. As the
> district court noted, this is a strained effort by plaintiffs to bootstrap an arguable
> violation of Regulation X, for which there is no private right of action, into a
> TILA violation. **Regulation X is simply not germane to plaintiffs' TILA**
> **claim.** (internal citation omitted) **Moreover, the plaintiffs seemingly ignore the**
> **plain language of Regulation Z, which permits the exclusion of fees for the**
> **preparation of not only mortgages and deeds, but also `settlement**
> **documents,' – a broad term that would seem to encompass any other**
> **documents necessary for the closing of a mortgage loan . . . . [E]ven assuming**
> **arguendo that the Line 1105 definition is limited to only title-transferring**
> **documents, it does not establish a violation of Regulation Z, which contains a**
> **different definition.** Like the district court, we reject plaintiffs' strained
> construction of the applicable regulations.

*Id.* at 603-604, (emphasis added).

Consistent with the logic in this analysis, it was proper for the title fees in dispute in

the case *sub judice* to be excluded from the Finance Charge so long as the services performed were consistent with the requirements of Regulation Z, 12 U.S.C. § 226.4(c)(7)(i), to wit: "[f]ees for title examination, abstract of title, title insurance, property survey, *and similar purposes.*" The supplemental record on remand will establish that when the proposed settlement was presented to this Court, class counsel were aware that title services were being performed that would plainly satisfy the Regulation Z definition.

### IV.    The TILA/HOEPA Claims Advocated By The Objectors Are Plainly Not Suitable For Class Certification

The objectors' entire argument is predicated upon the assumption that the title fees in dispute were not "bona fide and reasonable" and therefore should not have been excluded from the Finance Charge. Despite their attempt to bootstrap their way into this position without acknowledging the actual controlling language from Regulation Z, the reality is that any determination of whether the subject fees were "bona fide and reasonable" is mired in individual issues which would destroy predominance under a Rule 23 analysis.

It is indisputable that services were actually performed in exchange for the fees at issue. The fees charged for these services varied across the universe of loans in dispute. To determine whether a fee charged in a given loan was "bona fide," it would be necessary to determine whether the services provided in connection with the loan fit within Regulation Z, specifically, whether the amount charged to the borrower was a "[f]ee for title examination, abstract of title, title insurance, property survey, *and similar purposes.*"

In the context of the "title abstract" fee set forth at Line 1102 in the HUD-1s at issue, the objectors concede that a "property report" was obtained by or on behalf of the title company receiving the fees set forth at Lines 1102 and 1103, and that the title companies actually had to pay for the report, but they allege further that the title company "marked-up" the fee, and that

said mark-up renders the fee "unreasonable" by definition. However, the law requires a different analysis.

Specifically, every court that has opined on the issue has concluded that "reasonableness" is measured by comparing charges imposed by a particular creditor with the prevailing practices in the locality where the loan was made, irrespective of whether there has been a mark-up to the cost of some service provided by a third-party vendor. *See, e.g., Inge v. Rock Financial Corporation,* 388 F.3d 930, 939-940, *citing Brannam, supra., at 602, 606; see also, In re Grigsby,* 119 B.R. 479, 488 (E.D.Pa. Bankr. 1990), *vacated on other grounds by* 127 B.R. 759 (E.D.Pa. 1991)(*quoting R. Rohner, The Law of Truth In Lending, § 3.03[2][a], at 3-30 to 3-31 (1984)).* This issue, which is ignored by the objectors, has dispositive impact on the suitability of the TILA/HOEPA claims championed by the objectors for class treatment. To determine whether a given fee is "reasonable," it would be necessary to ascertain what services were performed in connection with the individual loan at issue and then do a market analysis regarding the fees charged for similar services in the hundreds of communities throughout the country where these loans were originated. It is not coincidental that the objectors' so-called title experts, with fifty years of experience in the title business between them, fail to acknowledge this very basic fact. Nor is it coincidental that though the objectors cite *Inge v. Rock Financial Corporation, supra.,* as their lead case on the "bona fide and reasonable" issue, they fail to acknowledge the language from that opinion that plainly states that "reasonableness" must be determined by a local market analysis. *See Objectors Viability Brief at 39.*

In the context of the "Title Examination" fee set forth at Line 1103 of the HUD-1s, again, the objectors concede (at least implicitly) that services were provided in exchange for the fee but argue that because no title insurance was issued, those services do not meet their expert's

preferred definition of the term "title examination." Once more, Regulation Z, the law that actually applies to this analysis, requires that each loan be evaluated to determine whether the fees charged for the title services that were undeniably rendered were "[f]ees for title examination, abstract of title, title insurance, property survey, *and similar purposes*." Thus the objectors' experts' preferred definition of the term "title examination" is irrelevant, to the extent that it differs from the language of Regulation Z (which it plainly does).

Once you start down the path of having to deconstruct individual loan transactions – and that is plainly what is required in the context of the specific TILA/HOEPA claims being championed by the objectors – you run into abundant and uniform adverse class certification authority spawned in the yield spread premium litigation under RESPA. *See, e.g., Schuetz v. Banc One Mortgage Corporation*, 292 F.3d 1004, 1114 (9th Cir. 2003)("Yield spread premiums are not illegal per se, so whether they amount to a prohibited referral in any particular case depends upon the services provided by the broker and the total compensation paid for those services."); *Heimmermann v. First Union Mortgage Corporation*, 305 F.3d 1257 (11th Cir. 2002)(same); *O'Sullivan v. Countrywide Home Loans*, 319 F.3d 732 (5th Cir. 2003)(same).

The Eighth Circuit, lead objectors' counsels' home federal venue, reached the following holding regarding this issue:

> The plain language of RESPA, then, demands that there be a determination of which settlement services are provided in connection with each real estate settlement including such things as title searches, title examinations, the preparation of documents, property surveys, and other potential services . . . .It appears, therefore, that RESPA anticipates an inquiry into the services provided in order to determine whether a prohibited referral occurred in the first instance . . . . This loan-specific analysis is required to determine civil liability as well as to measure damages under RESPA . . . .
>
> Our only conclusion today is that the determination must be made on a loan-by-loan basis. Class certification being impracticable, the judgment of the district court is reversed . . . .

*Glover v. Standard Federal Bank*, 283 F.3d 953, 966 (8th Cir. 2002).

The analysis required in the yield spread premium cases is conceptually analogous to the loan specific analysis that is required to determine whether the title fees in dispute should be properly excluded from Regulations Z of TILA.[30]

The necessity of conducting a loan specific inquiry was integral to class counsels' decision not to pursue TILA/HOEPA claims.[31] Class counsel knew that "title services" were provided in exchange for the fees charged to the borrowers and knew that there was no way to prove a class-based TILA violation without deconstructing every loan transaction. This fact made it patently apparent that TILA/HOEPA claims would *not* be class-appropriate given the specific nature of the conduct in dispute.[32] In fact, the most telling aspect of the objectors'

---

[30] The legal authority invoked by objectors' actually supports class counsels' position on this issue. *See, e.g., Inge v. Rock Financial Corporation*, 388 F.3d 930 at 940: ("The relevant inquiry is . . . . whether the fee is reasonable given the prevailing practices in the relevant market, meaning reasonable given the prevailing practices of the industry in the locality.")

[31] Class counsel noted this fact at the original Fairness Hearing, wherein class counsel Carlson stated: "We had challenges with respect to certification. Those challenges are reflected by the abundance of recent authority in the RESPA yield spread premium context." *See* FH Transcript at pages 21, line 24 through page 22, line 2, Supplemental Compendium at Exhibit 1.

[32] The Court should note that a loan-specific analysis is *not* required for the RESPA claims advocated by class counsel in this litigation (in contrast to RESPA yield spread premium cases— though defendants would certainly raise other certification defenses). Instead, the relevant liability analysis focuses on the issue of whether there were kick-backs and/or fee-splits, or mark-ups, all of which can be readily demonstrated on a class basis without the necessity of deconstructing each individual loan transaction. For example, the allegedly illegal kick-back of origination fees challenged by class counsel was memorialized in a written document. An exemplar Mortgage Origination Agreement is attached to the Supplemental Compendium at Exhibit 18. Class counsel directs the Court's attention to paragraph 9 of the Agreement. This paragraph describes how the Shumway Operation would be compensated by way of "kick-backs" consisting of settlement fees collected from plaintiffs and the class in the banks' names. Pursuant to the terms of this Agreement, an illegal kick-back occurred in connection with every loan, irrespective of what specific settlement services might have been performed in connection with that loan. It is the fact of the kick-back or fee split, not the nature of the settlement services performed in connection with any individual loan, that renders this conduct unlawful. The

viability brief is its failure to cite even a single case certifying a TILA class wherein the "bona

fide and reasonable" test is part of the required analysis.

A very recent opinion that specifically considers virtually identical TILA/HOEPA claims

in the class context further illustrates this point. Specifically, Judge Herndon from the United

States District Court for the Southern District of Illinois recently *denied* a motion for class

certification in a precisely analogous situation. In that case, plaintiffs sought certification of a

national TILA/HOEPA class, arguing that class members' APRs were understated because of a

"bogus" fee for closing services. Refusing to certify the class, the court stated:

> Plaintiffs contend that class certification of a national class is proper
> based on the allegation that each putative class member paid a $450
> fee for closing services attributed to the Johnson & Payne law firm on
> every second mortgage loan made by Mortgage Capital even though
> the Johnson & Payne law firm did not perform any such services. Plaintiffs
> further contend that Mortgage Capital obtained all or some of the fee.
> Defendants argue that Plaintiffs' motion must fail because the record
> demonstrates that the Johnson & Payne law firm provided a variety of
> different closing and title services that varied depending on the individual
> circumstances of each particular loan transaction. The Court agrees.
>
> The record contains testimony that demonstrates that the $450 fee was not
> a sham, but that the Johnson & Payne law firm provided services on every
> loan sent by Mortgage Capital. These declarations are from attorneys,
> Robert Payne, James A. Dooley, Robert Rivers, former attorneys with
> the Johnson & Payne law firm and the Johnson & Dooley law firm who
> performed work related to closing residential mortgage loan transactions.
> In addition, the record contains declarations from three former employees
> of the Johnson & Payne law firm, Rebecca Champaign, Sheila Elmore, and
> Janelle Soto, who worked on residential mortgage loan transactions. These
> declarations reveal that the Johnson & Payne law firm performed various
> services in connection with the making and the closing of Mortgage Capital
> loans and that such services varied from loan to loan.
>
> Based on the record, the Court finds that Plaintiffs failed to satisfy the
> commonality issue and, thus, failed to meet the requirements of Fed. R.
> Civ. P. 23(b)(3). Specifically, the Court finds that Plaintiffs' claims

participation of the Shumway Operation in the transactions at issue was never disclosed to
plaintiffs and/or the class.

> cannot be adjudicated on a class-wide basis because each borrowers'
> claims and various defenses hinge on individualized documentary and
> testimonial evidence. These individual issues will predominate over any
> questions of law or fact common to the proposed class, such that class
> action is not the superior method available for the fair and efficient
> adjudication of the controversy. In effect, the Court would have to
> conduct 'mini' trials to determine the value of the services performed, the
> fees actually charged, whether such fees qualify as a finance charge, the
> amount of the fee, if any, remitted to Mortgage Capital and whether the
> inclusion of any overcharge in the calculation of the annual percentage rate
> would cause a material adjustment in the annual percentage rate. This places
> the Court in the position of considering each claimants' charges on a case
> by case basis. The Court rejects Plaintiffs' assertion that the Johnson &
> Payne fees only fit into the lump sum category . . . .

*Reiser v. Residential Funding Corporation*, Slip Op. at 7-9.[33]

The decision in *Reiser* demonstrates why lead objectors' counsel Walters Benders did

***not*** to pursue TILA/HOEPA claims in their own cases based upon the transactions in dispute, to

wit: these cases cannot be properly certified as class actions. The *post hoc* invocation of these

ostensible claims to attack the proposed settlement, notwithstanding that objectors' counsel have

serially refused to assert these very same claims in their own cases, reinforces the lack of merit in

their position before this Court.

**V.     Class Counsels' Litigation Strategy Revisited**

**A.     Class Counsels' Litigation Strategy.**

**1.     Class Counsels' Strategy In The Specific Context Of This Litigation.**

Throughout the course of this litigation, there has always been healthy debate among

class counsel regarding how to best position plaintiffs' claims for success. When class counsel

filed their initial cases challenging the conduct at issue, they sought only certification of state

classes under state law (both statutory and common law). Increasingly, because of the

availability of a fairly compelling federal preemption defense (the same defense that caused both

---

[33] Supplemental Compendium at Exhibit 19.

of lead objectors' counsels' cases to be dismissed, with the named plaintiffs in those cases now forever precluded from recovering damages in any litigation arising out of the transactions at issue), they began to doubt the wisdom of proceeding solely with state law claims.[34] Additionally, as their investigation into the underlying conduct progressed they learned new details regarding the conduct and became familiar with its national scope. Therefore, they increasingly began to favor pursuing these claims in federal court, invoking federal law and seeking certification of a national class. This is the strategy that they ultimately pursued, as described below.

### 2.    The Prosecution Of The Litigation

**(a)**    **Davis v. CBNV.**  The *Davis* case was commenced on May 1, 2001, when Plaintiffs Ruth Davis and Phillip and Jeanie Kossler (the "Davis Plaintiffs") filed a three-count class action complaint against CBNV and RFC in the Court of Common Pleas of Allegheny County ("Davis I").[35]

On July 3, 2001, the Davis plaintiffs filed an amended complaint.  On July 27, 2001, CBNV and RFC removed Davis I to this Court based upon the plaintiffs' assertion of assignee liability under HOEPA.[36]

---

[34] Class counsel actually overcame preliminary objections based upon the preemption argument in a similar case in the Court of Common Pleas of Allegheny County. *See Westell v. FirstPlus Homeowners Trust, et al.*, Supplemental Compendium at Exhibit 20.  For much of the litigation encompassed by the proposed settlement, class counsel endeavored to keep at least one case in state court (in the Allegheny County Court of Common Pleas), and class counsel were confident that they could overcome preliminary objections in the state court venue and that they would be able to get a state-wide class certified in that venue.  However, unlike the situation in the *Westell* case, class counsel had serious doubts about their ability to overcome summary judgment in state cases related to the litigation *sub judice* in that they ultimately confirmed that the loans at issue were, in fact, funded by a state-chartered or national bank, which rendered the state claims vulnerable to the same federal preemption defense that proved fatal to the objectors' cases.
[35] The complaint also named a number of alleged assignees and securitization trusts as defendants, which were subsequently dismissed.

On August 16, 2001, the Davis plaintiffs moved to remand the action to state court. On March 27, 2002, Magistrate Judge Benson issued a report and recommendation that the plaintiffs' motion to remand be granted. On April 25, 2002, this Court adopted the Magistrate Judge's report and recommendation and granted remand. Thereafter, Davis I proceeded in state court until the Davis plaintiffs filed a second amended complaint on June 12, 2002. This second amended complaint added a claim under section 8(b) of RESPA, 12 U.S.C. § 2607(b), which reflected class counsels' evolving strategy in the litigation.

Based on the then newly asserted RESPA claim, the defendants removed the action to this Court on July 9, 2002 ("Davis II").[37] On July 25, 2002, the Davis plaintiffs filed a third amended complaint adding several additional claims. On September 9, 2002, the defendants each filed a substantial motion to dismiss the third amended complaint with prejudice.[38]

Among other grounds, the defendants argued that the RESPA claims were barred by a one year statute of limitations and/or a three year statute of repose, and that the state law claims were preempted by federal law because CBNV had "most favored lender" status under Section 521 of the Depository Institutions Deregulation and Monetary Control Act, 12 U.S.C. § 1831d. In addition, they contended that the Pennsylvania Secondary Mortgage Loan Act ("SMLA") was inapplicable to the plaintiffs' loans based on a so-called "financial institutions" exemption found in section 23 of the SMLA, 7 Pa. Cons. St. 6623. They also argued that there is no claim under

---

[36] Davis I was docketed at Civil Action No. 01-1406.

[37] Davis II was docketed at Civil Action No. 02-1201.

[38] On June 3, 2002, class counsel filed a class action complaint involving CBNV loans in state court in Tennessee captioned Terry v. Community Bank of Northern Virginia (the "Terry Case"). On July 3, 2002, the defendants removed the case to the United States District Court for the District Court of Tennessee. On December 17, 2002, the plaintiffs in Terry filed a First Amended Complaint which added various defendants, including GNBT and expanded the alleged class to include GNBT loans. Subsequently, the district court granted in part and denied in part various motions to dismiss filed by the defendants.

RESPA for an alleged misstatement on the borrower's HUD-1 and that the origination fees and title charges were disclosed to the borrowers. These motions were fully briefed by counsel for all parties.

(b)    **Sabo v. CBNV**. On September 11, 2002, on behalf of William and Ellen Sabo, class counsel filed a class action complaint in this Court against CBNV and RFC alleging claims under Sections 8(a) and 8(b) of RESPA on behalf of a putative nationwide class (the "Sabo complaint").[39] The filing of this new complaint was largely responsive to the statute of repose argument raised on behalf of defendants in motions to dismiss filed two days earlier (in the Davis case), and in response to certain technical RESPA defenses raised in those same motions.[40] That is, because of the date of the closing for their loan, the Sabo plaintiffs were unambiguously not vulnerable to the statute of repose argument. On November 12, 2002, the defendants moved to dismiss the Sabo complaint with prejudice. In these motions, defendants argued that the RESPA claims were barred by the expiration of the statute of limitations. The motion was fully briefed by counsel for all parties.

(c)    **Ulrich v. GNBT**. On September 19, 2002, on behalf of Russell and Kathleen Ulrich, class counsel filed a class action complaint in this Court similar to the complaint in the Sabo case, but naming GNBT and RFC as defendants (the "Ulrich" complaint).[41] The Ulrich complaint asserted claims under Sections 8(a) and 8(b) of RESPA on behalf of a nationwide class of GNBT borrowers. This filing was calculated to capitalize on class counsels'

---

[39] The Sabo case was docketed at Civil Action No. 02-1563.
[40] Class counsel had litigated and lost the statute of repose issue in an unrelated case in the United States District Court for the Northern District of Ohio, and they were particularly sensitive to this issue.
[41] The Ulrich case was docketed at Civil Action No. 02-1616. By this time, class counsel had corroborated details regarding the relationship between the Shumway Operation and GNBT. *See* Thomas Affidavit, Supplemental Compendium at Exhibit 12.

confirmation of the fact that the Shumway Operation was originating loans for GNBT, in

addition to CBNV. By adding a case wherein the class definition captured all loans originated

by GNBT that were purchased by RFC, the total number of loans in dispute doubled. On

November 18, 2002, RFC filed a motion to dismiss the Ulrich complaint with prejudice. GNBT

filed a motion to dismiss on November 25, 2002. Like Sabo, the primary thrust of these motions

to dismiss was that the RESPA claims were time-barred. The motions were fully briefed by

counsel for all parties.

      **(d)**    **Miller v. CBNV.** On or about September 24, 2002, on behalf of Nora Miller,

class counsel filed a complaint against CBNV and RFC in state court (the "Miller case").[42] This

filing reflected class counsels' continuing desire to force defendants to defend two separate

fronts (federal and state).[43] On October 15, 2002, the defendants removed the Miller case to this

Court based upon the plaintiff's reference to RESPA in her complaint. On October 25, 2002, the

plaintiff moved to voluntarily discontinue the Miller case (because they had already filed a

separate state court case by this time, which did not include any reference to RESPA). In early

November, 2002, the defendants filed motions to dismiss for failure to state any claim. On

November 21, 2002, Judge Cercone granted plaintiff's motion to discontinue the Miller case

without prejudice.

      **(e)**    **Picard v. CBNV.** On October 23, 2002, on behalf of John and Rebecca Picard,

class counsel filed a four-count complaint against CBNV and RFC in state court. On November

19, 2002, the defendants removed the case to this Court, invoking the doctrine of complete

preemption as the ostensible basis of federal subject matter jurisdiction.[44] After being served the

---

[42] The Miller case was docketed at Civil Action No. 02-1735.
[43] See Supplemental Carlson Declaration at ¶ 7, Supplemental Compendium at Exhibit 3.
[44] The Picard case was docketed at Civil Action No. 02-2000.

removal papers late in the day on November 19, class counsel worked all night so that they could file a motion to remand the very next day.[45]  A motion to remand and supporting brief was, in fact, filed on November 20, 2002.  All of these litigation activities in November 2002 were occurring simultaneously with the commencement of settlement negotiations, as discussed below.  On January 30, 2003, the defendants filed a notice of the grant of writ of certiorari in *Anderson v. H&R Block*, 287 F.3d 1038 (11th Cir. 2002) to decide whether the National Bank Act, 12 U.S.C. §§ 85-86, completely preempted a state usury claim.  *See Beneficial National Bank v. Anderson,* 123 S.Ct. 2058 (June 2, 2003)(National Bank Act completely preempts usury claim against national bank).  On February 27, 2003, the Picards filed an amended class action complaint (the "Picard amended complaint").

The Picard amended complaint alleged a nationwide class that included GNBT and CBNV borrowers throughout the United States.  The allegations in the Picard amended complaint were similar to, although much more detailed than, the allegations of the Ulrich, Mathis, and Kessler complaints.  The Picard amended complaint alleged a substantial amount of the factual detail developed in class counsels' investigation, and added a RICO claim.[46]  Class counsel filed this complaint – adding a RICO claim – in the middle of ongoing settlement negotiations.

(f)    **Mathis v. GNBT**.  On November 16, 2002, class counsel filed a case in state court against GNBT and RFC.  On November 19, 2002, the defendants removed the Mathis case to this Court on the basis of complete preemption.[47]  The Mathis complaint relied on allegations similar to those previously made in the Ulrich case.  The Mathis complaint alleged a class of

---

[45] Carlson Affidavit at ¶ 9, Supplemental Compendium at Exhibit 3.

[46] See Supplemental Carlson Affidavit at ¶ 10, Supplemental Compendium at Exhibit 3.

[47] The Mathis case was docketed at Civil Action No. 02-1999.

borrowers whose GNBT loans were secured by real property located in Pennsylvania. The complaint alleged state law claims for illegal contract, civil conspiracy and certain Pennsylvania statutory violations. On January 3, 2003, the defendants answered the complaint. Initially, the Mathis case was pending before Judge Conte. However, on March 7, 2003, the parties jointly moved for the administrative transfer of the case to this Court's docket.

    **(g)**    **Kessler v. RFC**. On February 26, 2003, on behalf of Brian and Carla Kessler, class counsel filed a case challenging GNBT and CBNV loans in state court in Pennsylvania naming only RFC as a defendant (the "Kessler complaint"). While class counsel recognized that RFC would likely remove the case to federal court nonetheless, they believed that their opposition to the complete preemption doctrine argument being urged on behalf of RFC and the bank defendants would be stronger without the bank defendants being named as defendants. On March 26, 2003, RFC in fact removed the case on the basis of complete preemption.[48]  The Kessler complaint included allegations similar to those in Ulrich and Mathis.[49]

### 3.    Settlement Negotiations

In November 2002, while litigation was still very much actively proceeding, as described above, the parties, through their respective counsel, began to explore the possibility of settling these actions. The topic of potential settlement negotiations was first raised following the depositions of two class representatives in an unrelated mortgage lending case conducted by RFC counsel Roy Arnold, in which the deponent was being defended by class counsel Carlson,

---

[48] The Kessler case was docketed at Civil Action No. 03-425.

[49] Again, the above litigation history, with which this Court is well-familiar, in combination with the course of settlement negotiations and the evolution of class counsels' investigation plainly belies any suggestion that there was "collusion" between class counsel and defendants. There is and could never be even a scintilla of evidence that supports a contention that the proposed settlement was collusive in any way.

at the Reed Smith law offices in Pittsburgh (RFC was a defendant in this other, unrelated litigation).[50]

Subsequently, in November 2002, class-counsel Carlson tendered a written settlement demand to counsel for RFC. The demand was premised upon a disgorgement of a substantial percentage of the total settlement fees collected in connection with the loans in dispute. In other words, the demand was derivative of the alleged out-of-pocket damages to plaintiffs and the class (and *not* derivative of class-based punitive damages).

Thereafter, in the winter of 2002, there were two additional face-to-face settlement meetings in Pittsburgh. The first meeting was attended by class counsel Carlson and RFC counsel Tom Allen. This meeting occurred at the Reed Smith offices in Pittsburgh. The second meeting was attended by class counsel Carlson, RFC counsel Allen and the assistant general counsel of RFC. This meeting occurred at Carlson's former law offices in Pittsburgh. At these meetings, the parties moved slightly from their initial settlement positions, but it is fair to say that they were not really in the same general ballpark.[51]

Based upon these initial negotiations, class counsel were not optimistic about the prospects of a negotiated resolution of the litigation. While counsel continued to communicate regularly by phone, and while the negotiations were never formally ended, class counsel continued to aggressively pursue their investigation into the conduct in dispute, and continued the prosecution of the litigation. They began to prepare a comprehensive list of probable deposition witnesses, and ultimately disseminated this list of witnesses to counsel for RFC, so that the parties could begin to schedule depositions.

---

[50] *See* Supplemental Carlson Declaration at ¶ 12, Supplemental Compendium at Exhibit 3.
[51] Supplemental Carlson Declaration at ¶13-14, Supplemental Compendium at Exhibit 3.

Concurrently, working with their investigator, class counsel continued the process of interviewing witnesses and gathering additional information informally. By early 2003, class counsel had accumulated substantial and detailed information about the inner-workings of the Shumway Operation. The factual detail gleaned from their investigation permitted class counsel to file a comprehensive Amended Complaint in *Picard*, on February 27, 2003, in which subtle detail illustrative of the extent of class counsels' access to inside information was articulated for the first time. Contrary to representations that have been made by the objectors at various times, the amended *Picard* complaint included a RICO claim. Class counsel added the RICO claim only after much reflection, internal debate and legal research that cumulatively persuaded them that the claim could be alleged in good faith.

During the winter of 2003, as class counsel prepared the amended complaint in *Picard*, they again considered the possibility of alleging a TILA claim. Once more, they concluded that such a claim would **_not_** be meritorious and elected **_not_** to assert it.[52]

In the spring of 2003, the parties conducted additional face to face settlement negotiations in Pittsburgh, and, ultimately, in Charleston, South Carolina (at co-class counsels' offices). Ultimately, with a fully informed appreciation of the factual and legal strengths of their claims, as well as the factual and legal weaknesses, plaintiffs formally agreed to a settlement in principle in the late spring of 2003. The basic structure of the agreement was described to the Court at a status conference on June 6, 2003, and the parties signed the formal settlement agreement on or about July 11, 2003.

---

[52] *See,* Supplemental Carlson Declaration at ¶ 11, Supplemental Compendium at Exhibit 3.

**2.    The Success Of Class Counsels' Litigation Strategy In Other Similar Cases.**

Class counsel are currently lead or co-lead counsel in a substantial number of consumer

finance class actions pending in state and federal courts throughout the country. When

challenging conduct that includes a "kick-back" scheme in these cases, or certain categories of

mark-ups, they frequently proceed under RESPA, as they did in the cases in dispute. In one such

case currently pending in the Western District of Pennsylvania, they recently obtained a

significant ruling that strongly supports the propriety of their legal strategy in the cases now on

remand to this Court.

Specifically, they are plaintiffs' counsel in a putative class action captioned *Kahrer v.

Ameriquest Mortgage Company.* In this case, plaintiffs are challenging a practice pursuant to

which Ameriquest has agreements with various credit card issuers, whereby the creditors will

refer their delinquent credit card customers to Ameriquest for mortgage refinancing, and in

exchange the delinquent debt owed to the credit card issuers will be paid-off through the loan

proceeds. Plaintiffs argued that this arrangement constituted an unlawful kickback scheme that

violated RESPA.

Defendant filed a Rule 12 motion, arguing that since plaintiffs did not have the ability to

demonstrate an "injury in fact" (i.e. actual out of pocket damages), they did not have Article III

standing to sue. Agreeing with plaintiffs and departing from the holdings of every court that had

directly decided this issue to date, Magistrate Judge Hay recommended that the defendants' Rule

12 Motion be denied. The report and recommendation was recently adopted by Judge Schwab.[53]

This decision represents the first and only authority in the country that supports plaintiffs'

argument that the literal statutory language of RESPA, considered in conjunction with its

---

[53] Supplemental Compendium at Exhibits 4 and 5.

legislative history, does **not** require that a plaintiff be able to demonstrate actual out-of-pocket damages in order to recover under Section 8(a) of RESPA. Under this analysis, if plaintiffs are able to prove a kickback scheme, then the relevant damages are the entire amount of the settlement fee(s) in dispute trebled, irrespective of whether a given plaintiff or class member has the ability to demonstrate that they have been overcharged. This holding, which is consistent with HUD's position on this issue, has tremendous potential significance nationally, and, as noted, it further validates the litigation strategy pursued by class counsel in connection with the cases *sub judice*. Most importantly, it strongly bolsters the damage analysis employed by class counsel in these cases.

The *Kahrer* decision reinforces the legitimacy of class counsels' strategy of using RESPA as the primary vehicle to challenge the lending practices at issue here. By advancing claims for violations of RESPA, class counsel were able to identify specific, clearly indicated fees that were improperly split with the Shumway Operation. This simplifies class certification because it is the fact of the fee split, which can be easily demonstrated across the universe of loans in dispute, that constitutes the common, predominate issue under Rule 23.

Class counsel also represent plaintiffs in another putative national RESPA class action currently pending in the United States District Court for the Southern District of Georgia captioned *Price v. Countrywide Home Loans, Inc.* In that case, they recently achieved an important litigation victory supporting their interpretation of RESPA. That same interpretation is reflected in the litigation strategy pursued by them in the cases before this Court. The *Price* case validates class counsels' strategy of challenging title fee mark-ups under RESPA. Class

counsels' strategy is also supported by Third Circuit authority, specifically *Santiago v. GMAC Mortgage*, 417 F.3d 384 (3d Cir. 2005).[54]

In short, class counsels' litigation strategy in the cases encompassed by the proposed settlement was reasonable and appropriate and they have successfully utilized a variation on the same strategy in other similar cases.

### 3.    The Objectors' Litigation Strategy.

In class-based cases arising from the same transactions that are in dispute before this Court, lead objectors' counsel have repeatedly elected ***not to pursue*** the very same TILA/HOEPA claims that they now invoke *post hoc* to attack the adequacy of representation in the remanded cases. Instead, lead objectors' counsel pursued, and lost, claims asserted on behalf of Missouri state borrowers that were based upon Missouri state law. The claims of the named plaintiffs in those cases have been dismissed with prejudice and those named plaintiffs are thus forever barred from any recovery in litigation arising from the conduct in dispute. In connection with the claims that they ultimately lost, lead objectors' counsel engaged in precisely the same type of rhetoric about the supposed value of the claims that it now invokes in connection with the ostensible TILA/HOEPA claims.

As noted above, objectors' counsel filed a case on behalf of Missouri state CBNV borrowers captioned *Avila v. Community Bank of Northern Virginia*. After a Missouri state trial court granted defendants' motion to dismiss in *Avila*, objectors' counsel represented to the United States District Court for the Western District of Missouri, where the second case was pending (the *Phipps* case), that the dismissal by the state trial court in *Avila* was "absurd" and would almost certainly be reversed. Specifically, objectors' counsel stated:

---

[54] A copy of the *Price* Rule 12 opinion is attached to the Supplemental Compendium at Exhibit 17.

> The RFC Defendants suggest the settlement [the proposed settlement in
> this case] is fair because the Missouri borrowers will get a recovery
> despite the 'dubious' nature of their SMLA claims. (SIS Motion to
> Stay at p. 6-7) In support of this claim, they point to the currently
> on appeal decision in *Adkinson v. FirstPlus Bank et al.* and *Avila
> v. Community Bank of Northern Virginia, et al*, the ruling in which
> will impact the claims against GNBT. There is no need to repeat the
> arguments and issues presented in those like appeals. The bottom
> line, however, is that for the position of the RFC defendants to be
> upheld in those cases, the Missouri Court of Appeals is going to have
> to find that the Missouri legislature intended for the consumer
> protections of the SMLA to apply only to Missouri headquartered
> banks while allowing foreign lenders to come here and ignore the
> SMLA. We are confident that the Missouri Court of Appeals will
> not agree with such an absurdity. (emphasis added)[55]

Four days after objectors' counsel characterized its unsuccessful result before the trial court in

*Avila* as an anomalous "absurdity," a unanimous panel of the Missouri Court of Appeals

affirmed the dismissal of the *Avila* claims.[56]  Subsequently, the Missouri Supreme Court

declined to hear an appeal of the Court of Appeals affirmance.

Undeterred, objectors' counsel continued to defend their strategy of pursuing only state

law claims at the original fairness hearing before this Court on November 14, 2003, wherein lead

objectors' counsel told this Court:

> So then we must look at the various state defenses. And Mr. Carlson
> is certainly right, we have pursued these cases in Missouri and have
> lost twice. So you should immediately say, well, why does Missouri
> have any entitlement. Well, first of all, Your Honor, these cases are
> not final. The *Avila* decision that was rendered, motion for rehearing
> was filed, and typically if that motion was to be denied, it would have
> been denied certainly within the month of October. That has not yet
> happened. So these matters are not final, nor is the *Phipps* case final
> at all.[57]

---

[55] See Compendium of Unpublished Authority at Exhibit 18.
[56] See Compendium of Unpublished Authority at Exhibit 3.
[57] See Transcript from original Fairness Hearing conducted on November 14, 2003, at page 36,
line 9, attached to Supplemental Compendium at Exhibit 1.

After the fairness hearing, and after the Missouri Court of Appeals affirmed the dismissal of the claims asserted by objectors' counsel in *Avila*, and denied plaintiffs' motion for rehearing, the United States District Court for the Western District of Missouri dismissed the claims asserted by objectors' counsel in *Phipps*, the case that they (objectors' counsel) filed on behalf of Missouri GNBT borrowers.  This dismissal was subsequently affirmed by the United States Court of Appeals to the Eighth Circuit.[58]

Objectors' counsels' own litigation strategy related to the transactions in dispute has been unsuccessful.  Their litigation strategy depended upon the invocation of state law claims to challenge the conduct in dispute.  In their original objections to the proposed settlement, objectors' counsel attacked class counsel for electing *not* to feature state law claims, but to instead feature RESPA claims.  Objectors' counsel argued that state law claims were exponentially more valuable than the RESPA claims.

History now illustrates that this argument was incorrect.  Objectors' counsel have never recovered a dime on behalf of any class member in this case.  Undeterred by history, objectors' counsel now attack the proposed settlement by arguing that class counsel should have pursued ostensible TILA/HOEPA claims, which are supposedly exponentially more valuable than the RESPA claims pursued by class counsel (notwithstanding that "enhanced" damages under HOEPA are wholly discretionary, and notwithstanding the myriad additional problems with this claim discussed above).  However, this argument is facially incredible in that in connection with multiple cases, objectors' counsel themselves could have, but never did, raise the very same TILA/HOEPA claims that they now invoke in opposition to the proposed settlement.  That is because the claims are devoid of merit, as demonstrated above.

---

[58] *Phipps v. FDIC, et al.*, 417 F.3d 1006 (8th Cir. 2005), Supplemental Compendium at Exhibit 9.

## CONCLUSION

Contrary to the objectors' representations to the Third Circuit, class counsel conducted an extensive pre-filing investigation and was familiar with the underlying facts prior to filing their first complaint in May 2001. Their factual knowledge increased as the litigation, and their investigation, progressed. At the time that the proposed settlement was negotiated, class counsel were familiar with both the underlying facts and the relevant law. Considered in combination, this knowledge caused class counsel to reasonably and appropriately recommend a settlement derived from alleged out-of-pocket damages. This knowledge also caused class counsel to reasonably and appropriately pursue claims under RESPA, and to refrain from asserting TILA/HOEPA claims in this litigation.

When the Court performs an independent, rigorous analysis of whether the proposed settlement class satisfies the requirements of Rule 23(a), the record will demonstrate that there was adequate representation by both the named plaintiffs and by class counsel.

The named plaintiffs shared an overriding common interest with all class members: maximizing their recovery in connection with the claims in dispute. In contrast to their counterparts in the *Phipps* and *Avila* cases filed by objectors' counsel in Missouri, who endorsed a losing litigation strategy and are now forever barred from any remedy arising out of the conduct in dispute, the named plaintiffs in the remanded cases have endorsed a litigation strategy that resulted in a proposed settlement that would afford payment of a substantial percentage of the alleged out-of-pocket losses at issue. The named plaintiffs do *not* have interests that are in any way antagonistic to other class members, and the invocation by the objectors of baseless legal theories that might have been pursued by the named plaintiffs does not change this fact.

Class counsel are experienced in consumer finance litigation, as the Third Circuit acknowledged in its opinion. 418 F.3d at 307 ("We find no reason to doubt that class counsel are sufficiently experienced to represent the class . . . .") Further, the supplemental record will plainly establish that class counsel vigorously prosecuted the action. Finally, the record will plainly establish that class counsel acted at arm's length from the defendant.

Therefore, because all of the other requirements of Rule 23(a) can be satisfied in this case, as the Third Circuit noted, this Court should ultimately certify a settlement class, confirm through its independent evaluation that the settlement is fair, adequate and reasonable and approve the settlement.[59]

The proposed settlement offers real, meaningful monetary relief to the class that represents a substantial percentage of their alleged out of pocket damages. Notwithstanding that their positions are wholly devoid of merit, the objectors have succeeded in delaying the distribution of this money for almost three years. This Court should act now to put an end to unnecessary further delay.

---

[59] Regarding the requirements of Rule 23(a) other than adequacy of representation, the Third Circuit stated: "Having determined that the numerosity, typicality, and commonality prongs are met, we turn to the issue of the adequacy of class representation." 418 F.3d at 303.

Respectfully submitted,


ON BEHALF OF PLAINTIFFS AND THE
CLASS:

/s/ R. Bruce Carlson
R. Bruce Carlson
PA56657
**CARLSON LYNCH**
P.O. Box 367
231 Melville Lane
Sewickley, PA  15143
(724) 749-1677 (p)
(724) 749-7686 (f)
bcarlson@carlsonlynch.com

A. Hoyt Rowell, III
Daniel Myers
**RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN, LLC**
1037 Chuck Dawley Blvd. Bldg A
Mt. Pleasant, SC  29464