# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: COMMUNITY BANK OF NORTHERN VIRGINIA SECOND MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1674 <br><br> Case No. 03-0425 <br> Case No. 02-01201 <br> Case No. 05-0688 <br> Case No. 05-1386 <br><br> Hon. Gary L. Lancaster |

THIS DOCUMENT RELATES TO ALL MDL ACTIONS

## PLAINTIFFS' JOINT CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs jointly amend all previously filed complaints in this multidistrict proceeding by substituting the following allegations of this *Joint Consolidated Amended Class Action Complaint* (sometimes the "*MDL Complaint*").

## I.      THE NATURE OF THIS ACTION

1.      This action is brought by a Plaintiffs' Class of residential mortgage borrowers against Community Bank of Northern Virginia ("CBNV")(a Virginia state-chartered, federally insured bank), now owned by PNC Bank, N.A., the Federal Deposit Insurance Corporation as receiver for Guaranty National Bank of Tallahassee ("GNBT") (a national bank)(collectively "the Banks"), and GMAC-Residential Funding Corporation n/k/a Residential Funding Company, LLC ("RFC").[1]

2.      The conduct being challenged in this action demonstrates the types of sharp practices that fueled the collapse of the American mortgage market.  The objective of the conspiracy at issue was to generate the highest possible volume of residential second mortgage

loans as a vehicle to extract exponentially excessive settlement fees from borrowers (Plaintiffs are challenging the practices that occurred in approximately 50,000 loan transactions). These loans had an average principal balance of approximately $35,000. Every borrower who was enticed to close one of these loans paid "origination" and "title" fees in excess of 12% of the original principal balance of the loan – as well as exorbitant interest rates that were largely unrelated to the credit worthiness of the borrowers.[2] The fees that were charged in connection with these loans were at least four times as high as the fees that would have been available to these borrowers in a true free market for settlement services that was not impeded by the presence of a fraudulent kick-back scheme.

3.      The kickback scheme at issue was conceived by brothers David, DeVan and Chris Shumway and Randy Bapst. The Shumway/Bapst "business plan" was to drive loan volume via a massive nationwide direct mail marketing campaign. Borrowers who were identified by the marketing campaign were referred to the Bank Defendants, who would process and originate the loans in their own names, and then kick-back the overwhelming majority of the settlement fees to companies controlled by Messrs. Shumway and Bapst (the entities controlled by Shumways and Bapst will hereafter be referred to generally as the "Shumway/Bapst Organization"), notwithstanding that the Shumway/Bapst Organization was not providing any compensable settlement services in connection with the loans.

4.      Defendant RFC (and in terms of loan volume to a lesser extent the other Investor Defendants) played a crucial role in the scheme. Specifically, RFC would purchase the loans

---

[1]  RFC purchased the vast majority of the second mortgage loans at issue. A number of other entities, however, also purchased second mortgage loans originated by the Banks, including, Irwin Union Bank and Trust Company, Household Finance, Inc., Wilshire Funding Corporation, Fairbanks Capital Corporation and Morequity, Inc..

[2]  During the period of time when GNBT was making the mortgage loans at issue -- from approximately April 2000 through August 2002 -- it originated more than 28,000 loans for a cumulative loan amount in excess of $1 billion. The vast majority of these loans, like the loans originated by CBNV, were sold to RFC on a correspondent basis.

from the Banks on a correspondent basis, shortly after the settlement of the loans. RFC profited from interest incurred while holding the loans in its own portfolio, and then again after it securitized pools of loans for sale on Wall Street. The capital provided by RFC was integral to the successful operation of the scheme, in that the Banks did not have sufficient capital to permit them to hold the loans in their own portfolios for any appreciable period of time.

5.      The profits realized by the participants in the scheme were directly tied to loan volume, and every participant in the scheme ignored the unlawful aspects of the settlement practices at issue to maximize loan volume.

6.      This action includes both a plaintiffs' and a defendants' class in connection with the second mortgage home loans made by the Banks. The class of Plaintiffs includes all persons obtaining high-cost, high-interest loans from CBNV and/or from GNBT . The loans at issue are all "high-cost" loans under the Home Ownership and Equity Protection Act, 15 U.S.C. § 1641 ("HOEPA").

7.      In two prior opinions, the Third Circuit has confirmed that this matter can likely proceed as a class action. Specifically, two District Court orders approving previous proposed national settlements of the class claims at issue have been considered, vacated and remanded with instructions by the Third Circuit. In these opinions, the Third Circuit held that the claims at issue satisfy the numerosity, typicality and commonality elements of Rule 23(a), as well as the predominance and superiority elements of Rule 23(b)(3). *In re Community Bank of Northern Virginia,* 418 F.3d 277, 309-310 (3rd Cir. 2005). The Third Circuit offered detailed guidance regarding how to address potential adequacy issues under Rule 23(a)(4). *Id.* Any potential adequacy issue is resolved through the filing of this Joint Consolidated Amended Complaint.

8. This *MDL Complaint* relates back to the initial filings in *Davis v. Community Bank of Northern Virginia, et al.* (Case No. 02-1201)(May 1, 2000) for CBNV and the Investor Defendants and *Ulrich v. Guaranty National Bank of Tallahassee, et al.* (Case No. 02-1616)(September 18, 2001) for GNBT pursuant to Federal Rule 15 and principles of class action tolling. The claims alleged herein arise out of the conduct, transactions or occurrences set forth in the *Davis* and *Ulrich* complaints and the Defendants have long had notice of these claims such that they will not be prejudiced in maintaining a defense on the merits to these claims.

9. Each of the Plaintiffs and the Plaintiff Class Members loan transaction is a federally related mortgage loan and is governed by and subject to the Real Estate Settlement Practices Act 12 U.S.C. § 2601 *et seq.* ("RESPA"), the Truth in Lending Act ("TILA") and HOEPA (15 U.S.C. § 1602 and Regulation Z at 12 C.F.R. § 226.2). Each loan transactions is a consumer credit transactions within the meaning of the TILA and HOEPA. The loans were federally related mortgage loans obtained primarily for personal, family, or household purposes, and the mortgages were all secured by the Class Members' respective principal dwellings. None of the Class Members' loans were for business, commercial or agricultural purposes..

10. The Banks and RFC and others, were jointly engaged in a conspiracy and racketeering enterprise, described more fully below, from which they each profited by the origination and sale of HOEPA loans through extensive mail and wire fraud.

11. The Investor Defendants, including specifically RFC, are liable as conspirators with the Banks under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and common law, as conspirators and joint venturers, and as assignees under HOEPA.

12. HOEPA, at 15 U.S.C. § 1641(d) states that:

Any person who purchases or is otherwise assigned a mortgage referred to in section 1602 (aa) of this title shall be subject to all claims and defenses with

respect to that mortgage that the consumer could assert against the creditor of the mortgage, unless the purchaser or assignee demonstrates, by a preponderance of the evidence, that a reasonable person exercising ordinary due diligence, could not determine, based on the documentation required by this subchapter, the itemization of the amount financed, and other disclosure of disbursements that the mortgage was a mortgage referred to in section 1602 (aa) of this title.

13.     Each of the Investor Defendants knew they were acquiring HOEPA loans. The Investor Defendants were, upon information and belief, often involved in the making of many of the Class members' loans, such as by giving written or electronic pre-approval to the underwriting of loans and by its commitments to purchase loans from the Banks prior to the time the loans were closed.

14.     The Class members' claims arise under RESPA, TILA, HOEPA and RICO, 18 U.S.C. §§ 1961, *et seq*.  The Plaintiff Class does not state any claims for "usury" under state or federal law and expressly disclaims any such claims as part of this lawsuit.

15.     Pending completion of discovery, the Class members all state claims for (1) violations of RESPA for kickbacks, unearned fees, and impermissible affiliated business relationships; (2) violations of TILA and HOEPA for inaccurate and understated material disclosures; (3) violations of TILA and HOEPA for other disclosure and substantive violations;; and (4) violations of RICO for Defendants' racketeering activities used to perpetuate and further the predatory lending scheme. Plaintiffs also seek a declaratory judgment related to their rescission rights under 15 U.S.C. § 1635.

## II.    THE PARTIES, JURISDICTION AND VENUE

### The Plaintiffs

16.    Plaintiff Ruth J. Davis resides at 302 Trotwood Drive, Coraopolis, Allegheny County, Pennsylvania.

17.    Plaintiffs Philip F. Kossler and Jeannie C. Kossler, husband and wife, reside at 127 Huron Drive, Carnegie, A11egheny County, Pennsylvania.

18.    Plaintiffs Brian W. and Carla M. Kessler, husband and wife, residing at 6466 State Route 908, Apt. 908, Tarentum, Allegheny County, Pennsylvania.

19.    Plaintiff Patrice Porco resides at 805 Center Avenue, Avalon, Pennsylvania.

20.    Plaintiff Thomas T. Mathis resides at 1435 LaSalle Avenue, Pittsburgh, Pennsylvania.

21.    Plaintiffs Stephen R. Haney and Amy L. Haney, husband and wife, reside at 868 Flemington Street, Pittsburgh, Pennsylvania.

22.    Plaintiffs John and Rebecca Picard, husband and wife, reside at 5214 Becky Drive, Pittsburgh, Pennsylvania.

23.    Plaintiffs William and Ellen Sabo, husband and wife, reside at 3812 Cambria Street, Homestead, Pennsylvania.

24.    Plaintiffs Russell and Kathleen Ulrich, husband and wife, reside at 515 Fieldcrest Drive, Pittsburgh, Pennsylvania.

25.    Plaintiff Nora H. Miller resides at 304 Brookston Drive, Cranberry TWP, Pennsylvania.

26.    Plaintiffs Robert A, and Rebecca A, Clark, husband and wife, reside at 3020 Hebron Drive, Pittsburgh, Pennsylvania.

27.      Plaintiff Edward R. Kruszka Jr., resides at 1320 Coronado Drive, McKeesport, Pennsylvania.

28.      Plaintiff Tina Merl Boor reside at 231 Marshall St, Perkasie, Pennsylvania 19844-1440.

29.      Plaintiff Martin J. Baratz resides at resides at 1727 Graces Ter, Edmond, Oklahoma 73025.

30.      Plaintiff Clell L. Hobson resides at 5100 Old Birmingham Hwy, Apt. 1001, Tuscaloosa, Alabama.

31.      Plaintiff Rosa Kelly Parkinson, a Captain in the United States Army, resides at 3736 Patti Parkway, Decatur, Georgia.

32.      Plaintiffs John and Kathy Nixon, husband and wife, reside at 6701 Hibiscus Lane, Northport, Alabama.

33.      Plaintiff Brian Cartee resides at 125 Palmetto Bay Road, Savannah, Georgia.

34.      Plaintiffs Mack and Robin Dorman, husband and wife, reside at 318 Foxwood Circle, St. Mary's Georgia.

35.      Plaintiffs Jerome and Charretta Roberts, husband and wife, reside at 415 Suwanee East Drive, Lawrenceville, Georgia.

36.      Plaintiff Melba Brown resides at 2553 Riverside Drive, Mobile, Alabama.

37.      Plaintiff Flora A. Gaskin, resides at 3408 22nd Street, Northport, Alabama.

38.      Plaintiffs Roy Lee and Ruthie Mae Logan, husband and wife, reside at 5565 Jug Factory Road, Tuscaloosa, Alabama.

39.      Plaintiffs Shawn and Lorene Starkey, husband and wife, reside at 1461 Spruce Ave., Liberty, Missouri.

40.     Plaintiffs John and Rowena Drennen, husband and wife, reside at 2703 Bellefontaine Ave., Kansas City, Missouri.

41.     Plaintiff Richard Montgomery resides at 4904 Whitney Drive, Independence, Missouri.

42.     Plaintiffs Tammy and David Wasem reside at 710 Ballantrae Drive, Wentzville, Missouri.

43.     Each of the above identified plaintiffs is a member of the Plaintiff Class and representative of all of the Class members.

44.     Plaintiffs reserve the right to add additional proposed representative plaintiffs, if necessary and in accordance with the Order of the Court.

## Defendants

### The Bank Defendants

45.     COMMUNITY BANK OF NORTHERN VIRGINIA ("CBNV") is a Virginia corporation with its principal place of business in Virginia and which does business in Pennsylvania and which as a lender and as part of the aforementioned predatory lending scheme made at least 22,810 and more likely close to 30,000 HOEPA loans to certain of the Plaintiffs and to members of the Plaintiff Class.  CBNV is now known as PNC National Bank.

46.     .GUARANTY NATIONAL BANK OF TALLAHASSEE ("GNBT") is (or was) a national bank with its principal place of business in Tallahassee, FL. As indicated above, GNBT is named as a Defendant because it was previously named as a defendant in one or more prior complaints although it was closed by the OCC in March 2004 and the FDIC appears in this matter as the receiver of GNBT.  As a lender and as part of the aforementioned predatory lending

scheme, GNBT made at least 21,725 HOEPA loans to certain of the Plaintiffs and to members of the Plaintiff Class.

### The Investor or Non-Bank Defendants

47.     DEFENDANT GMAC-RESIDENTIAL FUNDING CORPORATION n/k/a RESIDENTIAL FUNDING COMPANY, LLC (sometimes referred to above and below as "RFC") is a Delaware corporation (it is now a limited liability company) with its principal place of business in Minnesota and is a 100% subsidiary of GMAC-RFC Holding Corporation. GMAC-RFC is licensed to and does business nationwide and purchased at least 44,535 loans of the Plaintiff Class directly or indirectly from the Banks

48.     Defendant JP MORGAN CHASE BANK, F/K/A THE CHASE MANHATTAN BANK (sometimes "JP Morgan-Chase") is a New York corporation with its principal place of business in New York and which does business nationwide. JP Morgan-Chase acts as trustee for trusts and loan pools created by RFC for the purpose of "securitizing" mortgage loans.  The specific identity of each of the trusts that have been assigned the loans of the Plaintiff Class, either directly or indirectly or through an intervening depositor of other special purpose entity or "shelf" from the Banks is unknown at this time but is known by RFC and JP Morgan-Chase.

49.     Defendant IRWIN UNION BANK AND TRUST COMPANY ("Irwin") is (or was) an Indiana corporation with its principal place of business in California.  Irwin did business nationwide and purchased loans of the Plaintiff Class directly or indirectly from the Banks. As indicated above, Irwin is named as a Defendant because it was previously named as a defendant in one or more prior complaints although it was closed by the FDIC on September [1]8, 2009.

50.     Pursuant to HOEPA, 15 U.S.C. § 1641(d), each Investor Defendant is liable for the violations of TILA, HOEPA, RESPA and RICO committed by CBNV and GNBT against Plaintiffs and the members of the Class under rules of conspiracy and assignee liability.

51.     The Investor Defendants are entities or the trustees of entities that purchased HOEPA loans from CBNV or GNBT.  The Investor Defendants held or still hold the loans of Plaintiffs or members of the Plaintiff Class.

## The Defendant Class

52.     The Defendants also include members of a Defendant Class as more specifically alleged below.  The Defendant Class purchased *all* of the HOEPA loans of the Plaintiff Class directly or indirectly from the Banks and/or the Investor  Defendants and as such stand in the shoes of the Banks and/or the Non-Bank Defendants under 15 U.S.C. § 1641(d) and under the rules of conspiracy and assignee liability.  As such, Pursuant to HOEPA, 15 U.S.C. § 1641(d), the Defendant Class is liable to Plaintiffs and the Plaintiff Class for the violations of TILA, HOEPA, RESPA and RICO committed by CBNV and GNBT and/or the Investor Defendants.

## Jurisdiction And Venue

53.     Federal question jurisdiction is proper under 28 U.S.C. § 1331, 12 U.S.C. § 2614, 18 U.S.C. § 1964, and 15 U.S.C. § 1640(e) as the federal claims asserted herein arise under federal law.

54.     Venue and personal jurisdiction are proper in this Court pursuant to recognized principles of due process and in accordance with 28 U.S.C. § 1407, and also 28 U.S.C. § 1391 and 18 U.S.C. § 1965. Specifically, each of the actions in which this *Joint Consolidated Amended Class Action Complaint* has been filed are part of a multi-district preceding  No. 1674,

which was consolidated in this Court as part of the "*In re: Community Bank of Northern Virginia Second Mortgage Loan Litigation*."

55.     Defendants have either directly, or indirectly, purposefully directed their activities toward Pennsylvania and nationwide residents and because the Plaintiffs' causes of action arise out of and relate to the Defendants' activities, in part, within this judicial district and nationwide.

56.     Because Defendants do business nationwide, they are subject to the general jurisdiction of all district courts in the United States. Defendants have substantial, continuous, and systematic contacts with the State of Pennsylvania and/or other states nationwide. By virtue of the scheme and conspiracy described in this Complaint, CBNV and GNBT made and the Non-Bank Defendants and the Defendant Class members acquired over 50,000 loans nationwide, including hundreds of loans in Pennsylvania, from CBNV and GNBT. The Non-Bank Defendants and the Defendant Class members have thus, in essence, funded and/or purchased HOEPA mortgage loans made to Pennsylvania and nationwide borrowers, and they have liens on real property in Pennsylvania and other states nationwide (which was used as collateral for HOEPA mortgage loans) and the power of the Pennsylvania and other courts nationwide to enforce those liens, which they have undoubtedly done in the past.

57.     The Plaintiffs and the Class members made monthly payments on their HOEPA mortgage loans and Defendants and the Defendant Class members continued to profit directly or indirectly from the revenue stream generated by the HOEPA mortgage loans.

58.     The Investor  Defendants and the Defendant Class members are or were in the business of funding and purchasing HOEPA mortgage loans, and such activities were central to the conduct of their business, and their funding and servicing of Pennsylvania and/or nationwide mortgage loans has been substantial and continuous.

59.    The contacts of the Defendants with Pennsylvania and/or other states nationwide are sufficient, substantial and continuous, and the Plaintiffs and the Class members' causes of action arise from and relate to those contacts so that the maintenance of the suit in this Court and the transferee Court does not offend traditional notions of fair play and substantial justice. Defendants should reasonably anticipate being haled into this Court in this judicial district in Pennsylvania and other districts nationwide to answer for their own unlawful acts, especially since Pennsylvania and all other states have a strong interest in providing a forum for their residents aggrieved by schemes to violate consumer protection acts and fair lending laws.

60.    Indeed, Plaintiffs' and Class Members' mortgage instruments expressly provide that "[t]he state and local laws applicable to this [mortgage] shall be the laws of the jurisdiction in which the property is located. The foregoing sentence shall not limit the applicability of Federal law to this [mortgage]."  Moreover, these loans which were purchased by the Investor Defendants and the Defendant Class members were purchased with notice pursuant to 15 U.S.C. § 1641(d)(4) that these loans were HOEPA loans and that the Investor Defendants and the Defendant Class members stood in the shoes of the Banks with respect to liability for such loans.

### III.    FACTUAL BACKGROUND

### Overview of the Shumway/Bapst Scheme

61.    Beginning in early 1998, three brothers, David, DeVan and Chris Shumway, in concert with Randy Bapst, conceived what was to become a massive mortgage fraud scheme.

62.    David and DeVan Shumway, and Randy Bapst, all had extensive previous experience in the mortgage industry.

63.    Chris Shumway is the younger brother of David and DeVan. He provided seed money from his substantial personal wealth that permitted the Shumway/Bapst Organization to mount a very large direct mail marketing campaign and thereby maximize the volume of second mortgage loans available to refer to the Bank Defendants.

64.    The Shumway brothers and Mr. Bapst created multiple business forms through which they ultimately referred the loans. The form and/or names of these entities was changed as part of the Shumway/Bapst Organization's effort to stay one step ahead of the Virginia state banking regulators (i.e. the Bureau of Financial Institutions of the Virginia State Corporation Commission), including their ultimate effort to avoid the reach of Virginia regulators altogether through a relationship with Florida-domiciled national bank GNBT.

65.    As noted, the plan conceived by the Shumway/Bapst Organization sought to maximize loan volume, and thereby maximize loan settlement fees and interest. However, a non-depository lender must comply with fee caps and interest ceilings imposed by the laws of the various states, thereby limiting potential profits. To evade this problem, the Shumway/Bapst plan envisioned an association with a regulated depository institution, which arguably would not be subject to these same fee caps and interest ceilings.[3]

---

[3] The Shumway/Bapst Organization obtained formal opinion letters from prominent law firms regarding their ability to export interest rates and avoid state fee caps. For example, it obtained a letter from the Washington, D.C. office

66.    The business plan specifically contemplated that the Shumway/Bapst Organization would target a financially distressed bank, which would be offered an opportunity to derive significant income through the loans referred to the Banks by the Shumway/Bapst Organization, so long as the Banks would agree to kick-back the lion's share of the origination fees generated through the loans to the Shumway/Bapst Organization.

67.    The plan also required that the Banks would use title companies controlled by the Shumway/Bapst Organization to extract additional excessive and unearned fees from the borrowers.

68.    The initial structure used by the Shumway/Bapst Organization and Bank Defendant CBNV (now PNC) was an LLC designated EquityPlus Financial, LLC. EquityPlus, Inc. owned 75% of the LLC and CBNV owned 25%.[4]

69.    This initial structure utilized by EquityPlus Financial, Inc. and CBNV was in place for approximately five months (May 29, 1998, through October 29, 1998). During that five month period, the LLC originated loans that violated the Affiliate Business Arrangement requirements of RESPA, thereby invalidating RESPA's ABA exemption, by:  a) failing to disclose the relationship among CBNV, EquityPlus Financial, Inc. and EquityPlus Financial,

---

of Pittsburgh-based law firm Kirkpatrick & Lockhart dated May 18, 2000, which addressed the applicability of the National Bank Act to loans made by GNBT. David Shumway, and GNBT's president, asked that Kirkpatrick and Lockhart address the following issues:  1) whether GNBT could rely upon the most favored lender provisions of the National Bank Act to export Florida interest rates;  2) the fees that are included in the "interest rate" under the most favored lender provisions;  3) how high of an "interest rate" could be contracted for under Florida's usury provisions and mortgage laws; and, 4) the maximum prepayment fee and number of discount points that could be charged under Florida law.

[4] This particular business form was conceived in response to past regulatory problems experienced by the Shumway/Bapst Organization.  Specifically, the Virginia banking regulators had previously challenged a "net branch" arrangement pursuant to which Shumway/Bapst controlled company EquityPlus Financial, Inc. was brokering loans for Virginia state bank Resource Bank without the required licensure.  The regulators terminated the arrangement by issuing a cease and desist order.  Thus, when EquityPlus, Inc. commenced business with CBNV, it created an entity which was partially owned by a state-chartered bank, so that it could that assert that the LLC was a subsidiary of the bank, and thus would not need state

LLC;  b)  requiring the use of the settlement services being provided by EquityPlus, LLC and title companies which had common ownership with EquityPlus Financial, Inc.; and,     c) providing a thing of value pursuant to the arrangement that was other than a return on ownership interest.

70.     During the pendency of the LLC structure described above, the mortgage loans at issue were funded by the Bank with all origination services other than loan funding being provided by the LLC.  Nonetheless, the HUD-1s issued to borrowers at closing indicated that all settlement services delineated in Section 800 of the HUD-1s were being performed by the Bank and that all fees for those services were being paid to the Bank.  This was untrue.  Most of the services were being performed by the LLC and the majority of the fees for the services were being paid to the LLC.  The concealment of the actual allocation of fees collected impeded the operation of a free market for settlement services and contributed to the Bank's ability to significantly overcharge borrowers for these services.[5]

71.     After the Virginia banking regulators expressed concern regarding the legality of the LLC structure being utilized by EquityPlus Financial, Inc. and CBNV, the parties to that arrangement changed the form of the operation.  David Summers, the president of CBNV, described this change in a March 11, 1999, letter to the Virginia banking regulators wherein he stated:   "[T]he mortgage affiliations have been restructured as loan production offices of Community Bank.  The loan originators and processors of the limited liability mortgage affiliates are now employees of the Bank and the principals of the limited liability companies (such as EquityPlus Financial, LLC) are now consultants to the Bank."

---

licensure to broker mortgage loans in Virginia. Therefore, EquityPlus, Inc. and CBNV combined to form EquityPlus, LLC.

72.    In other words, beginning in approximately October 1998, EquityPlus Financial, Inc. became a "consultant" to CBNV. After that date, all settlement services related to the loans at issue were performed by CBNV.  EquityPlus Financial, Inc. did not provide any settlement services in connection with these loans after that date.

73.    Commencing in approximately October 1998, borrowers identified by the EquityPlus Financial, Inc. would be referred to CBNV for second mortgage loans. Toward that end, EquityPlus Financial, Inc. would identify potential borrowers from address lists which it purchased from credit reporting agency Equifax.  It would then contract with direct mail marketing company Hart Hanks of San Antonio, Texas to do mass mailings to the selected potential borrowers.

74.    Notwithstanding that EquityPlus Financial, Inc. was not providing any settlement services, CBNV paid kick-backs to EquityPlus Financial, Inc. in exchange for the referral of the loan business at issue. Those kick-backs consisted of all origination fees, net of expenses, less 1% of the loan balance plus $75 (these latter amounts were retained by CBNV as "loan funding fees").  The kick-backs paid to EquityPlus Financial, Inc. were directly derivative of loan volume, and did not bear any relationship to settlement services provided by EquityPlus Financial, Inc. in connection with the loans, in that, as noted, EquityPlus Financial, Inc. did not perform any compensable settlement services in connection with the loans.

75.    CBNV actively concealed the payment of kick-backs to EquityPlus Financial, Inc. in the loan documents issued to each borrower.  For example, the HUD-1s issued to each borrower indicated that all origination fees were being paid to CBNV, when in reality most of the fees were being kicked-back to EquityPlus Financial, Inc., an entity not identified anywhere

---

[5] During this time frame, borrowers were also required to use title companies owned and controlled by the Shumway/Bapst Organization.  These companies were used to extract additional excessive and unearned fees from

on the borrowers' HUD-1s.

76.     In the spring of 2000, EquityPlus, Inc. began to wind down its relationship with CBNV.  David Shumway, the president of EquityPlus Financial, Inc., asserts that around that time he was introduced to the principals of GNBT by Don Schmoltz, a former consultant to CBNV.

77.     In April 2000, using a new entity with the name Equity Guaranty, LLC, the Shumway/Bapst Organization entered into a Consulting Agreement with GNBT which was in all material respects identical to the agreement that was in place between EquityPlus Financial, Inc. and CBNV for the period between October 1998 and November 1999.  This Consulting Agreement remained in place through approximately February 2002.

78.     Despite having the Shumway/Bapst Organization move on to an arrangement with GNBT, CBNV continued to originate second mortgage loans via other consultants, which loans, upon information and belief, perpetrated many of the same wrongs associated with the CBNV-Shumway/Bapst relationship and which loans were purchased by RFC and perhaps other Investor Defendants.

79.     As to the Shumway/Bapst Organization, regardless of whether through CBNV or GNBT, the fundamentals of the scheme did not change.

80.     RFC purchased substantially all of the loans made to borrowers who were referred to both CBNV and GNBT by the Shumway/Bapst Organization.

81.     Representatives of RFC knew that nothing material had changed in the operation from the Shumway/Bapst/CBNV days other than the names of the business forms generating the loans. RFC suspected that unlawful fees were being paid to the Shumway/Bapst Organization.

---

borrowers.  These fees were delineated in Section 1100 of the HUD-1s issued to the borrowers.

Indeed, a memorandum of a conversation with Don Russell of RFC and Paul Schieber, one of its attorneys, on January 29, 2001 notes:

> "GMAC/RFC's continuing concerns with title fee charges.  GMAC/RFC believes that the fees are excessive."

82.     On information and belief, between March and September of 2001, approximately 8948 loans were originated by GNBT, with a total original principal balance of $335,070,300, or an average per loan balance of $37, 446.00.

83.     With respect to those loans, GNBT collected in excess of $ 32,000,000 in origination fees, nearly all of which was illegally kicked-back to the Shumway/Bapst organization.  Shumway/Bapst-controlled title companies were also paid in excess of $8,000,000 in fees for ostensible title-services in connection with these loans, much of which was collected in violation of applicable federal law.

84.     The kick-back scheme conceived by the Shumway/Bapst Organization and carried out by the Bank Defendants – with the facilitation of RFC—eliminated the possibility of a free market for settlement services in connection with the loans at issue to the demonstrable financial detriment of Plaintiffs and the putative Class.

### The Role of Defendant GMAC-Residential Funding Corporation

85.     In the above text, this *MDL Complaint* suggests that Defendant RFC "purchased" nearly all of the loans referred to CBNV/GNBT by the Shumway/Bapst Organization. While that is a true statement, it is an oversimplification and it is useful to review GMAC-RFC's specific role in these transactions within the historical context of RFC's business model.

86.     Residential Funding Company LLC traces its roots to 1982, when it was formed as a subsidiary of Banco Mortgage Company, an affiliate of Northwestern National Bank, the predecessor of Northwest Bank.

87.    Initially, RFC focused on buying and securitizing "jumbo" mortgages (mortgages with loan balances above the purchasing authority of Freddie Mac and Fannie Mae).  Over time, it moved toward buying and securitizing other mortgage products including, in a very material way, second mortgage loans.

88.    In the most simple terms, ''securitization'' refers to the process  of packaging loans (not only mortgage loans) for sale as securities. Based on its business model, RFC's income was generated in two fundamental ways: 1) income derived from holding performing loans in inventory; and, 2) the more substantial income derived when loans are packaged and sold as securities. GMAC-RFC also derived income from loan servicing through other affiliated companies generally known as Homecomings.

89.    Since RFC does not really originate mortgage loans directly, it is necessary for it to cultivate relationships with third-party loan "originators" to insure that RFC has access to a steady flow of loan "product" which will then generate income for RFC while it is held in inventory and subsequently packaged, and then generate even more income when the packages are sold as securities.

90.    In 1990, RFC was acquired by General Motors Acceptance Corporation. Throughout the early and mid-1990's the company that had become GMAC-RFC expanded the variety of loan "products" that it would purchase and securitize.

91.    By the late 1990's, profit margins derived from the securitizations of lower-risk loan products began to dissipate and many companies, including GMAC-RFC, began to securitize higher-risk loan products.

92.    Eventually, GMAC-RFC achieved market dominance with respect to the purchase and securitization of higher-risk mortgage loans known as "125" loans, so-called

because the amount financed represented up to 125% of the value of the collateral securing the loan. These loans were also known as High-LTV (loan-to-value) loans. This "125" loan product was the marketing focus of the Shumway/Bapst Organization and, by 1999, the Shumway/Bapst operation had become the largest referral source for banks originating the "125" loan product that was ultimately purchased by RFC.

93. Because the Shumway/Bapst Organization was the largest source of referrals for loans in the 125% securitization market that GMAC-RFC had begun to dominate, and because the relationship was so profitable, GMAC -RFC turned a blind eye to the illegal settlement practices that pervaded the loans at issue.

94. The settlement fees collected in connection with the loans at issue were significant sources of revenue not only for the Banks and the Shumway/Bapst companies, but also for GMAC-RFC. More specifically, these fees were typically rolled into the principal of the loans and GMAC-RFC derived substantial interest income from these illegal fees while the loans were held in portfolio and then again as a function of the fact that the illegal fees padded the income received from GMAC-RFC when the loans were ultimately securitized.

95. Because GMAC-RFC derived substantial income from the unlawful settlement fees, GMAC-RFC actively worked with the Bank Defendants to expand the loan volume being generated by the operation.

96. GMAC-RFC directly participated in the fraudulent lending activities in that it provided the Bank Defendants with a continuing commitment to purchase all of the high-cost loan production, notwithstanding that it knew that the loans included unlawful terms.

97. As a function of its regular presence at the offices where the loans at issue were being solicited, referred and originated, as a function of the fact that it audited the financial

statements of CBNV and GNBT, and as a function or the fact that it received all of the original

loan files, including the final Settlement Statements, when it purchased the loans at issue, and as

a function of the fact that it audited the loans that it was purchasing, GMAC-RFC knew the

precise extent to which every borrower was being defrauded in connection with the loans at

issue.

### Other Investor Defendants

98.    After CBNV began to wind down its relationship with the Shumway/Bapst

Organization and RFC, it continued to originate loans through other "consultants" and  sell such

loans to other investor-purchasers like Irwin Union, Household Finance and Morequity.  These

loans had settlement terms that were very similar to the terms in the loans that were sold to RFC.

99.    These other Investor-Defendants were also integral to CBNV's continued

scheme.  For example, in 2001, Irwin purchased 1610 loans from CBNV and throughout the

scheme it purchased as many as 3,200 loans from CBNV.

### The Downfall of the GNBT – Shumway/Bapst Operation

100.    In mid-2001, the Office of the Comptroller of the Currency ("OCC") performed

an examination of GNBT.  Its findings were set forth in a Report of Examination dated July 23,

2001.  The OCC noted myriad deficiencies in GNBT's mortgage lending practices.

101.    In January 2002, GNBT entered into a Letter Agreement with the OCC which

placed tight controls on the Bank.

102.    By this time, however, relations had also deteriorated with GMAC-RFC.  By

January of 2002, GMAC-RFC had become increasingly concerned about GNBT's loan

origination practices.

103.    Ultimately, GMAC-RFC determined that notwithstanding the substantial income

derived from the GNBT loans, it was unwilling to continue to shoulder the risk that came with
the unlawful lending practices of GNBT.

104.    Thus, in January of 2002, GMAC-RFC stated that it was unwilling to purchase
any additional GNBT loans and that it would be returning approximately $40,000,000.00 in
loans that had already been delivered to GMAC-RFC for purchase.[6]

105.    GMAC-RFC's actions had adverse implications for both the Shumway/Bapst
Organization and GNBT. Without any purchaser for the loan production, GNBT did not have
adequate reserves to maintain the loans in its own portfolio. Therefore, the Shumway/Bapst
Organization had no bank to which to refer additional loans, and the Bank had no secondary
market purchaser to buy additional loans.  Thus the mortgage fraud scheme conceived by the
Shumway/Bapst Organization ultimately withered away.

106.    Subsequently, the Shumway/Bapst Organization attempted to obtain a license for
a new mortgage company named Calusa Investments.  Rejecting that entities license application
for the second time, the Virginia banking regulators stated:  "The applicant's principals have an
attitude of utter disdain for compliance with laws and regulations applicable to the mortgage
lending/brokering business."

107.    As to GNBT, it was closed by regulators and in the OCC news release regarding
that closure it was reported that as to the high loan-to-value home equity lending program, i.e.,
the scheme with Shumway/Bapst, the OCC found numerous violations of consumer laws.

---

[6] On July 17, 2002, David Shumway sent a letter to Bruce Paradis, then President and C.E.O. of RFC, demanding
that RFC purchase the loans that it had returned.  RFC reconsidered its decision, and ultimately did repurchase those
loans but did not purchase any new loans.

**Assignee, Joint Venturer and Conspirator Liability**

108.    Pursuant to HOEPA, at 15 U.S.C. § 1641(d), the Investor Defendants and the Defendant Class members are liable to the Plaintiffs and the Plaintiff Class for the Banks' violations of federal and state law just as the Banks are to the Plaintiffs.

109.    The Investor Defendants and the Defendant Class members are also liable to the Plaintiffs and the Plaintiff Class for the Banks' violations of federal or state law just as the Banks are liable, because they were engaged in a joint venture, partnership and conspiracy to make, originate and sell as many high-cost mortgage loans as possible, as described fully above.  The participants in the consulting/loan production office scheme were jointly engaged in and responsible for the violations of federal law.

110.    Additionally, while HOEPA denies the Investor and the Defendant Class members of any "holder in due course" defenses, such defense is not and would not otherwise be available to the Investor Defendants and the Defendant Class members because they did not take the notes and purchase the Plaintiffs' loans in "good faith" and without notice that Plaintiffs' had defenses to the loans. The Investor Defendants and the Defendant Class members were, to some extent, involved in the making of the loans, and they pre-approved loans for purchase prior to the time they were closed.

111.    Also, each of the loans that the Investor Defendants and the Defendant Class members received contained the required Section 32 or HOEPA Assignment Notice required by 15 U.S.C. § 1641(d) (4) and the standard forms in the Class members' loan files such as the TILA and HOEPA Disclosures and the HUD-1s, provided actual knowledge of the TILA and HOEPA violations and would have provided notice to the Investor Defendants and the Defendant Class members that the Class members had defenses to enforcement of the loans.

112.    In addition, the Non-Bank Defendants and the Defendant Class members individually reviewed each loan file and performed their own HOEPA calculations to determine if the loans were high-cost loans covered by HOEPA and otherwise met their criteria for purchase.

113.    Further, the existence of the HOEPA § 1641(d)(4) notice eliminates any "holder in due course" defenses to the Class members' claims.

114.    The Non-Bank Defendants and the Defendant Class members took the promissory notes and trust deeds subject to the same restrictions, limitations, and defects as they had in the hands of the Banks and acquired no greater rights than its assignors had at the time of the assignment or sale of the loans.

### The Plaintiffs' Loans

### The Davis Loan

115.    In the winter of 1999 Ruth Davis received a solicitation in the mail indicating that she had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

116.    Ms. Davis called the toll free phone number to apply for a second mortgage loan.

117.    On or about February 22, 1999 CBNV closed the Davis loan.  On this date, Ms. Davis first received her TILA and HOEPA disclosures.

118.    In connection with the above-alleged predatory lending scheme, CBNV loaned Ms. Davis a total sum of $24,100.00 to be repaid with interest at a rate of 13.75% (APR of 15.456%) in consecutive monthly installments over a period of 24 years.  The loan was a consumer loan obtained for personal, family or household purposes.

119.  To secure repayment of their note, Ms. Davis executed a deed of trust for the benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

120.  In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Davis loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 1,928.00 |
| 802 | Loan Discount | CBNV | 482.00 |
| 804 | Credit Report | EPF | 45.00 |
| 807 | Flood Certification Fee | EPF | 20.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 283.00 |
| 1102 | Abstract or Title Search | Title America LLC | 300.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Processing Fee | Title America LLC | 250.00 |
| 1201 | Recording Fee | Allegheny County | 41.50 |

121.  The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity Plus Financial, Inc.

122.  Moreover, the title charges set forth in Section 1100 of the Davis HUD-1 were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of actual cost of the property report is a RESPA violation.

123.  Also, in violation of RESPA's prohibition against unearned fees, Ms. Davis was charged a loan discount fee for which no discount in her loan rate was given.

124.    In connection with this loan, Ms. Davis was provided with a Federal Truth-In-Lending Disclosure Statement that stated that her Finance Charge was $63,971.58 and that her annual percentage rate was 15.46%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Kossler Loan

125.    In the summer of 1998 the Kosslers received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

126.    Mr. and Mrs. Kossler called the toll free phone number to apply for a second mortgage loan.

127.    On or about July 28, 1998, CBNV closed the Kossler loan.  On this date, Mr. and Mrs. Kossler first received their TILA and HOEPA disclosures.

128.    In connection with the above-alleged predatory lending scheme, CBNV loaned Mr. and Mrs. Kossler a total sum of $30,000.00 to be repaid with interest at a rate of 12.99% (APR of 14.817%) in consecutive monthly installments over a period of 15 years.  The loan was a consumer loan obtained for personal, family or household purposes.

129.    To secure repayment of their note, Mr. and Mrs. Kossler executed a deed of trust for the benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

130.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Kossler loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 2,250.00 |
| 804 | Credit Report | CREDCO | 13.00 |

| 808 | Document Review | CBNV | 250.00 |
| 809 | Processing Fee | CBNV | 150.00 |
| 1101 | Settlement or Closing Fee | First National Title & Escrow | 450.00 |
| 1102 | Abstract or Title Search | First National Title & Escrow | 25.00 |
| 1103 | Title Examination | First National Title & Escrow | 325.00 |
| 1111 | Signing Agent | NSC | 200.00 |
| 1201 | Recording Fee | Not identified | 43.50 |

131.    The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage,  kicked-back to EquityPlus Financial, Inc. and/or Equity Plus Financial, LLC.  Plaintiffs did not receive an Affiliate Business Disclosure in connection with this loan apprising them of the relationship among CBNV, EquityPlus Financial, Inc. and Equity Plus Financial, LLC.

132.    Moreover, the title charges were neither bona fide nor reasonable. The $325.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RESPA.

133.    In connection with this loan, Mr. and Mrs. Kossler were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $40,938.40 and that their annual percentage rate was 14.817%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Kessler Loan

134.    In the Spring of 1999 Mr. and Mrs. Kessler received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

135.    Mr. and Mrs. Kessler called the toll free phone number to apply for a second mortgage loan.

136.    On or about April 30, 1999 CBNV closed the Kessler loan.  On this date, Mr. and Mrs. Kessler first received their TILA and HOEPA disclosures.

137.    In connection with the above-alleged predatory lending scheme, CBNV loaned Mr. and Mrs. Kessler a total loan of $33,000.00 to be repaid with interest at a rate of 14.75% (APR of 17.841%) in consecutive monthly installments over a period of 15 years.  The loan was a consumer loan obtained for personal, family or household purposes.

138.    To secure repayment of their note, Mr. and Mrs. Kessler executed a deed of trust for the benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

139.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Kessler loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 2,640.00 |
| 802 | Loan Discount | CBNV | 990.00 |
| 807 | Application Fee | CBNV | 95.00 |
| 811 | Underwriting Fee | CBNV | 185.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 283.50 |
| 1102 | Abstract or Title Search | Title America LLC | 300.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Document Review | Title America LLC | 250.00 |
| 1201 | Recording Fee | Allegheny County | 41.50 |

140.     The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to EquityPlus Financial, Inc.

141.     Moreover, the title charges were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RESPA. The charge for post-settlement document review was unlawful under RESPA.

142.     Also, in violation of RESPA's prohibition against unearned fees, Mr. and Mrs. Kessler were charged a loan discount fee for which no discount in her loan rate was given.

143.     In connection with this loan, Mr. and Mrs. Kessler were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $53,587.45 and that their annual percentage rate was 17.841%. Both the Finance Charge and Disclosed APR are materially inaccurate.

**The Porco Loan**

144.     In the summer of 2000 Patrice Porco received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

145.     Ms. Porco called the toll free phone number to apply for a second mortgage loan.

146.     On or about September 9, 2000 GNBT closed the Porco loan. On this date, Ms. Porco first received her TILA and HOEPA disclosures.

147.     In connection with the above-alleged predatory lending scheme, GNBT loaned Ms. Porco a total loan of $29,800.00 to be repaid with interest at a rate of 12.99% (APR of 16.71%) in consecutive monthly installments over a period of 15 years. The loan was a consumer loan obtained for personal, family or household purposes.

148.    To secure repayment of her note, Ms. Porco executed a deed of trust for the benefit of GNBT. The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

149.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Porco loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 2,980.00 |
| 802 | Loan Discount | GNBT | 894.00 |
| 811 | Underwriting Fee | GNBT | 185.00 |
| 813 | Application Fee | GNBT | 150.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 250.00 |
| 1102 | Abstract or Title Search | Title America LLC | 63.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Document Review | Title America LLC | 250.00 |
| 1113 | Processing Fee | Title America LLC | 260.00 |
| 1201 | Recording Fee | Title America LLC | 41.50 |

150.    The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity Guaranty.

151.    Moreover, the title charges were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RESPA. Additionally, the charge for post-settlement document review violated RESPA.

152.    Also, in violation of RESPA's prohibition against unearned fees, Ms. Porco was charged a loan discount fee for which no discount in her loan rate was given.

153.    In connection with this loan, Ms. Porco was provided with a Federal Truth-In-Lending Disclosure Statement that stated that her Finance Charge was $43,024.86 and that her annual percentage rate was 16.7196%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Mathis Loan

154.    In the spring of 2001 Mathis received a solicitation in the mail indicating that he had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

155.    Mr. Mathis called the toll free phone number to apply for a second mortgage loan.

156.    On or about June 7, 2001 GNBT closed the Mathis loan.  On this date, Mr. Mathis first received her TILA and HOEPA disclosures.

157.    In connection with the above-alleged predatory lending scheme, GNBT loaned Mr. Mathis a total loan of $25,000.00 to be repaid with interest at a rate of 14.99% (APR of 17.24%) in consecutive monthly installments over a period of 25 years.  The loan was a consumer loan obtained for personal, family or household purposes.

158.    To secure repayment of their note, Mr. Mathis executed a deed of trust for the benefit of GNBT.  The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

159.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Mathis loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 2,375.00 |
| 804 | Credit Report | GNBT | 60.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 812 | Flood Certification Fee | GNBT | 20.00 |

| 1101 | Settlement or Closing Fee | USA Title LLC | 175.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 63.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |
| 1201 | Recording Fee | Allegheny County | 43.50 |

160.    The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity Guaranty.

161.    Moreover, the title charges were neither bona fide nor reasonable. The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of cost of the property report is a violation of RESPA. Additionally, the charge for a post-settlement document review violated RESPA.

162.    In connection with this loan, Mr. Mathis was provided with a Federal Truth-In-Lending Disclosure Statement that stated that his Finance Charge was $74,020.58 and that his annual percentage rate was 17.2411%. Both the Finance Charge and Disclosed APR are materially inaccurate.

**The Haney Loan**

163.    In the spring of 2001 Mr. and Mrs. Haney received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

164.    Mr. and Mrs. Haney called the toll free phone number to apply for a second mortgage loan.

165.    On or about May 23, 2001 GNBT closed the Haney loan.  On this date, Mr. and Mrs. Haney first received her TILA and HOEPA disclosures.

166.    In connection with the above-alleged predatory lending scheme, GNBT loaned Mr. and Mrs. Haney a total loan of $24,500.00 to be repaid in consecutive monthly installments over a period of 15 years.  The loan was a consumer loan obtained for personal, family or household purposes.

167.    To secure repayment of their note, Mr. and Mrs. Haney executed a deed of trust for the benefit of GNBT.  The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

168.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Haney loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 2,450.00 |
| 802 | Loan Discount | GNBT | 490.00 |
| 804 | Credit Report | GNBT | 50.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 812 | Flood Certification Fee | GNBT | 20.00 |
| 1101 | Settlement or Closing Fee | USA Title LLC | 175.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 50.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |
| 1201 | Recording Fee | Allegheny County | 43.60 |

169.    The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity Guaranty, LLC.

170.    Moreover, the title charges were neither bona fide nor reasonable. The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD

regulations and the mark up of the actual cost of the property report is a violation of RESPA. Additionally, the charge for a post-settlement document review violated RESPA.

171.    Also, in violation of RESPA's prohibition against unearned fees, Mr. and Mrs. Haney were charged a loan discount fee for which no discount in her loan rate was given.

172.    In connection with this loan, Mr. and Mrs. Haney were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $31,996.99 and that their annual percentage rate was 15.0957%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Picard Loan

173.    In the late Fall of 1999 Mr. and Mrs. Picard received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

174.    Mr. and Mrs. Picard called the toll free phone number to apply for a second mortgage loan.

175.    On or about November 30, 1999 CBNV closed the Picard loan.  On this date, Mr. and Mrs. Picard first received her TILA and HOEPA disclosures.

176.    In connection with the above-alleged predatory lending scheme, CBNV loaned Mr. and Mrs. Picard a total loan of $47,900.00 to be repaid with interest at a rate of 14.99% (APR of 18.416%) in consecutive monthly installments over a period of 15 years.  The loan was a consumer loan obtained for personal, family or household purposes.

177.    To secure repayment of their note, Mr. and Mrs. Picard executed a deed of trust for the benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

178.   In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Picard loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 3,832.00 |
| 802 | Loan Discount | CBNV | 2,155.00 |
| 803 | Appraisal Fee | Not identified | 175.00 |
| 807 | Application Fee | CBNV | 95.00 |
| 811 | Underwriting Fee | CBNV | 185.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 250.00 |
| 1102 | Abstract or Title Search | Title America LLC | 50.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Document Review | Title America LLC | 260.00 |
| 1113 | Processing Fee | Title America LLC | 250.00 |
| 1201 | Recording Fee | Allegheny County | 41.50 |

179.   The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to EquityPlus Financial, Inc.

180.   Moreover, the title charges were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RICO. The charge for a post-settlement document review violated RESPA.

181.   Also, in violation of RESPA's prohibition against unearned fees, Ms. Porco was charged a loan discount fee for which no discount in her loan rate was given.

182.   In connection with this loan, Mr. and Mrs. Picard were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $79,767.89 and

that their annual percentage rate was 18.416%. Both the Finance Charge and Disclosed APR are materially inaccurate.

**The Sabo Loan**

183.    In the Fall of 1999 Mr. and Mrs. Sabo received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

184.    Mr. and Mrs. Sabo called the toll free phone number to apply for a second mortgage loan.

185.    On or about October 15, 1999 CBNV closed the Sabo loan.  On this date, Mr. and Mrs. Sabo first received her TILA and HOEPA disclosures.

186.    In connection with the above-alleged predatory lending scheme, CBNV loaned Mr. and Mrs. Sabo a total loan of $35,000.00 to be repaid with interest at a rate of  14.75% (APR of 17.390%) in consecutive monthly installments over a period of 15 years.  The loan was a consumer loan obtained for personal, family or household purposes.

187.    To secure repayment of their note, Mr. and Mrs. Sabo executed a deed of trust for the benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

188.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Sabo loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 3,500.000 |
| 808 | Application Fee | CBNV | 95.00 |
| 809 | Underwriting Fee | CBNV | 185.00 |
| 1101 | Settlement or Closing Fee | Resource Title LLC | 250.00 |

| 1102 | Abstract or Title Search | Resource Title LLC | 275.00 |
| 1103 | Title Examination | Resource Title LLC | 370.00 |
| 1111 | Overnight Fee | Resource Title LLC | 85.00 |
| 1112 | Disbursement Fee | Resource Title LLC | 26.50 |
| 1201 | Recording Fee | Not identified | 45.50 |

189.    The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to EquityPlus Financial, Inc.

190.    Moreover, the title charges were neither bona fide nor reasonable. The $370.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is also a violation of RESPA.

191.    In connection with this loan, Mr. and Mrs. Sabo were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $56,211.00 and that their annual percentage rate was 17.39%. Both the Finance Charge and Disclosed APR are materially inaccurate.

**The Ulrich Loan**

192.    In the Summer of 2000 Mr. and Mrs. Ulrich received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

193.    Mr. and Mrs. Ulrich called the toll free phone number to apply for a second mortgage loan.

194.    On or about August 8, 2000 GNBT closed the Ulrich loan.  On this date, Mr. and Mrs. Ulrich first received her TILA and HOEPA disclosures.

195.     In connection with the above-alleged predatory lending scheme, GNBT loaned
Mr. and Mrs. Ulrich a total loan of $46,850.00 to be repaid with interest at a rate of 12.99%
(APR of15.469%) in consecutive monthly installments over a period of 25 years.  The loan was a
consumer loan obtained for personal, family or household purposes.

196.     To secure repayment of their note, Mr. and Mrs. Ulrich executed a deed of trust
for the benefit of GNBT.  The deed of trust granted GNBT a security lien in residential real
estate subject to one or more prior mortgage loans.

197.     In connection with this HOEPA Mortgage Loan, as shown on her HUD-1
Settlement Statement, the following fees and costs were charged, contracted for and paid at or
before closing of the Ulrich loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 4,685.00 |
| 802 | Loan Discount | GNBT | 937.00 |
| 807 | Application Fee | GNBT | 150.00 |
| 811 | Underwriting Fee | GNBT | 185.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 275.00 |
| 1102 | Abstract or Title Search | Title America LLC | 83.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Document Review | Title America LLC | 260.00 |
| 1113 | Processing Fee | Title America LLC | 250.00 |
| 1201 | Recording Fee | Allegheny County | 41.50 |

198.     The HUD-1 is fraudulent in that the line items shown as being payable to GNBT
in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity
Guaranty.

199.     Moreover, the title charges were neither bona fide nor reasonable. The $300.00
charge for title examination of a third-party's property report is illegal per se under HUD

regulations and the mark up of the actual cost of the property report is a violation of RESPA. The post-settlement document review fee violated RESPA.

200.    Also, in violation of RESPA's prohibition against unearned fees, Mr. and Mrs. Ulrich were charged a loan discount fee for which no discount in her loan rate was given.

201.    In connection with this loan, Mr. and Mrs. Ulrich were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $118,324.73 and that their annual percentage rate was 15.469%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Miller Loan

202.    In the spring of 1999 Nora Miller received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

203.    Ms. Miller called the toll free phone number to apply for a second mortgage loan.

204.    On or about April 30, 1999 CBNV closed the Miller loan.  On this date, Ms. Miller first received her TILA and HOEPA disclosures.

205.    In connection with the above-alleged predatory lending scheme, CBNV loaned Ms. Miller a total loan of $34,000.00 to be repaid with interest at a rate of 12.50% (APR of 15.590%) in consecutive monthly installments over a period of 15 years.  The loan was a consumer loan obtained for personal, family or household purposes.

206.    To secure repayment of their note, Ms. Miller executed a deed of trust for the benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

207.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1
Settlement Statement, the following fees and costs were charged, contracted for and paid at or
before closing of the Miller loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 2,380.00 |
| 802 | Loan Discount | CBNV | 1,870.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 283.50 |
| 1102 | Abstract or Title Search | Title America LLC | 300.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Document Review | Title America LLC | 250.00 |
| 1201 | Recording Fee | Allegheny County | 41.50 |

208.    The HUD-1 is fraudulent in that the line items shown as being payable to CBNV
in Section 800 were, other than perhaps a very small percentage, kicked-back to EquityPlus
Financial, Inc.

209.    Moreover, the title charges were neither bona fide nor reasonable. The $300.00
charge for title examination of a third-party's property report is illegal per se under HUD
regulations and the mark up of the actual cost of the property report is a violation of RESPA.
The charge for post-settlement document review also violates RESPA.

210.    Also, in violation of RESPA's prohibition against unearned fees, Ms. Miller was
charged a loan discount fee for which no discount in her loan rate was given.

211.    In connection with this loan, Ms. Miller was provided with a Federal Truth-In-
Lending Disclosure Statement that stated her Finance Charge was $46,332.99 and that her annual
percentage rate was 15.59%. Both the Finance Charge and Disclosed APR are materially
inaccurate.

Case 2:03-cv-00425-GLL    Document 507    Filed 10/04/11    Page 41 of 112

## The Clark Loan

212.    In the Spring of 2001 Mr. and Mrs. Clark received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

213.    Mr. and Mrs. Clark called the toll free phone number to apply for a second mortgage loan.

214.    On or about March 20, 2001 GNBT closed the Clark loan.  On this date, Mr. and Mrs. Clark first received her TILA and HOEPA disclosures.

215.    In connection with the above-alleged predatory lending scheme, GNBT loaned Mr. and Mrs. Clark a total loan of $27,500.00 to be repaid with interest at a rate of 11.99% (APR of 16.0042%) in consecutive monthly installments over a period of 10 years.  The loan was a consumer loan obtained for personal, family or household purposes.

216.    To secure repayment of their note, Mr. and Mrs. Clark executed a deed of trust for the benefit of GNBT.  The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

217.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Clark loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
| --- | --- | --- | --- |
| 801 | Loan Origination Fee | GNBT | 2,750.00 |
| 802 | Loan Discount | GNBT | 550.00 |
| 804 | Credit Report | GNBT | 50.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 812 | Flood Certification Fee | GNBT | 20.00 |
| 1101 | Settlement or Closing Fee | USA Title LLC | 175.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 63.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |

| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |
| 1201 | Recording Fee | Allegheny County | 39.50 |

218.   The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity Guaranty.

219.   Moreover, the title charges were neither bona fide nor reasonable. The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RESPA. The charge for post-settlement document review also violated RESPA.

220.   Also, in violation of RESPA's prohibition against unearned fees, the Clarks were charged a loan discount fee for which no discount in her loan rate was given.

221.   In connection with this loan, Mr. and Mrs. Clark were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $23,785.92 and that their annual percentage rate was 16.0042%. Both the Finance Charge and Disclosed APR are materially inaccurate.

**The Kruszka Loan**

222.   In the Spring of 2001 Mr. and Mrs. Kruszka received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

223.   Mr. and Mrs. Kruska called the toll free phone number to apply for a second mortgage loan.

224.    On or about May 5, 2001 GNBT closed the Kruszka loan.  On this date, Mr. and
Mrs. Kruszka first received their TILA and HOEPA disclosures.

225.    In connection with the above-alleged predatory lending scheme, GNBT loaned
Mr. and Mrs. Kruszka a total loan of $20,100.00 to be repaid with interest at a rate of 16.99%
(APR of 19.772%) in consecutive monthly installments over a period of 20 years.  The loan was
a consumer loan obtained for personal, family or household purposes.

226.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1
Settlement Statement, the following fees and costs were charged, contracted for and paid at or
before closing of the Kruszka loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 1,507.00 |
| 802 | Loan Discount | GNBT | 402.00 |
| 804 | Credit Report | GNBT | 50.00 |
| 807 | Flood Certification Fee | GNBT | 20.00 |
| 810 | E Appraisal | GNBT | 32.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 1101 | Settlement or Closing Fee | USA Title LLC | 175.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 63.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |
| 1201 | Recording Fees | Allegheny County | 43.50 |

227.    The HUD-1 is fraudulent in that the line items shown as being payable to GNBT
in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity
Guaranty.

228.    Moreover, the title charges were neither bona fide nor reasonable. The $450.00
charge for title examination of a third-party's property report is illegal per se under HUD

regulations and the mark up of the actual cost of the property report is likewise illegal under RESPA.

229.    Also, in violation of RESPA's prohibition against unearned fees, Ms. Porco was charged a loan discount fee for which no discount in her loan rate was given.  The charge for post-settlement document review also violates RESPA.

230.    In connection with this loan, Mr. and Mrs. Kruszka were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $53,198.40 and that their annual percentage rate was 19.772%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Merl Boor Loan

231.    In the fall of 2000, Tina Merl Boor received a solicitation in the mail indicating that she had been "pre-approved" for a debt-consolidation second mortgage loan with CBNV.

232.    Tina Merl Boor called the toll-free number to apply for a second mortgage loan.

233.    On or about December 9, 2000, CBNV closed the Merl Boor loan.  On this date, Ms. Merl Boor first received her TILA and HOEPA disclosures.

234.    Upon information and belief, this loan included all of the unlawful fees and charges described in connection with the loans made to other borrowers by CBNV as set forth herein.

235.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of Mr. Merl Boor's loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 4,396.32 |
| 802 | Loan Discount Fee | | |

| 808 | Lender Document Review Fee | | |
|------|------|------|------|
| 810 | Lender Underwriting Fee | CBNV | 295.00 |
| 811 | Document Review | CBNV | 150.00 |
| 1101 | Settlement or Closing Fee | First Title and Escrow | 50.00 |
| 1102 | Abstract or Title Search | | |
| 1103 | Title Examination | | |
| 1105 | Document Preparation | | |
| 1201 | Recording Fee | First Title and Escrow | 48.00 |
| 1202 | City/County/stamps | | |

### The Baratz Loan

236.    In late 2001, Mr. Baratz received a solicitation in the mail indicating that he had

been "pre-approved" for a debt-consolidation second mortgage loan with GNBT.

237.    Mr. Baratz called the toll-free number to apply for a second mortgage loan.

238.    On or about January 16, 2002, GNBT closed the Baratz loan.  On this date, Mr.

Baratz first received their TILA and HOEPA disclosures.

239.    Upon information and belief, this loan included all of the unlawful fees and

charges described in connection with the loans made to other borrowers by GNBT as set forth

herein.

### The Hobson Loan

240.    In early 2001 Mr. Hobson received a solicitation in the mail indicating that he had

been "pre-approved" for a debt-consolidation second mortgage loan with CBNV.

241.    Mr. Hobson called the toll-free number to apply for a second mortgage loan.

242.    On or about May 2, 2001, CBNV closed Mr. Hobson's loan by Fed Ex delivery in

Alabama and return the very next day via the return, pre-paid Fed Ex envelope provided. For the

first time, when the papers were delivered to him for closing did Mr. Hobson receive his TILA

and HOEPA disclosures, which was less than 3 days prior to the closing of his loan.

243.    In connection with the above-alleged predatory lending scheme, CBNV loaned Mr. Hobson a total loan of $55,500.00 to be repaid with a note interest rate of 17.75% (APR of 19.904%) in consecutive monthly installments over a period of 20 years.  The loan was a consumer loan obtained for personal, family or household purposes.

244.    To secure repayment of his note, Mr. Hobson executed a deed of trust for the benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

245.    In connection with this HOEPA Mortgage Loan, as shown on his HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of Mr. Hobson's loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 2,497,50 |
| 802 | Loan Discount Fee | CBNV | 2,220.00 |
| 808 | Lender Document Review Fee | CBNV | 150.00 |
| 809 | Lender Underwriting Fee | CBNV | 295.00 |
| 810 | Lender Application Fee | CBNV | 275.00 |
| 1101 | Settlement or Closing Fee | Resource Title | 50.00 |
| 1102 | Abstract or Title Search | Resource Title/"GAC" | 175.00 |
| 1103 | Title Examination | Resource Title | 695.00 |
| 1105 | Document Preparation | Resource Title | 175.00 |
| 1201 | Recording Fee | Not identified | 45.00 |
| 1202 | City/County/stamps | Not identified | 83.25 |

246.    The HUD-1 is fraudulent in that the line items shown as being paid to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to a mortgage consultant for CBNV.

247.    Moreover, the fees were neither bona fide nor reasonable.  Indeed, Mr. Hobson was charged a total of $870.00 for an abstract of title ($175.00) and a title examination ($695.00).  Charging $695.00 for a review of another settlement provider's property report is per

se illegal under HUD regulations. The only evidence of title work that was done on his loan is a
Real Estate Property Report in which the third party service provider charged $120.00. The
Property Report was marked up $55.00 over its actual cost of $120.00.

248.    The charge for document preparation was bogus since the title company did not
prepare any of the documents. Moreover, charging for preparation of TILA, HOEPA and RESPA
disclosures is illegal under 12 U.S.C. § 2610.

249.    In connection with this loan, Mr. Hobson was provided with a Federal Truth-In-
Lending Disclosure Statement that stated that his Finance Charge was $152,996.30 and that his
annual percentage rate was 19.904%, the same APR incorrectly disclosed in the 3-day advance
HOEPA Notice that was not delivered to Mr. Hobson until closing.

250.    The HOEPA Notice contained extraneous matter designed to detract from the
elements required under 15 U.S.C. 1639, violated the "conspicuous type size" requirement of 15
U.S.C. § 1639(a) and contained a false acknowledgement of receipt "3 days before closing."
Furthermore, even the false acknowledgement is deficient on its face for failing to state that the
HOEPA Notice had been received "3 *business* days prior" to closing, 15 U.S.C.
1639(b)(1)(emphasis added). Mr. Hobson's HOEPA Notice merely states "3 days before
closing."

251.    Finally, the HOEPA Notice states the "*Note*" interest rate of 17.750 % in the
upper right-hand corner in a deliberate ploy designed to detract and confuse the borrower's
understanding of the true APR disclosed below. 15 U.S.C. § 1639(a) defines the "Specific
disclosures" required and makes no provision, expressly or implicitly, for the HOEPA Notice to
contain any interest figure other than the required APR. This represents yet another separate
violation of HOEPA Notice requirements for which Defendants are jointly and severally liable.

252.    Both the stated Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

253.    The terms of Mr. Hobson's Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

254.    In violation of RESPA's prohibition against unearned fees, Mr. Hobson was charged a loan discount fee for which no discount was given.

**The Kelly Loan**

255.    In the late summer of 2000, Captain Kelly received a solicitation in the mail indicating that she had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

256.    Captain Kelly called the toll-free number to apply for a second mortgage loan.

257.    On or about September 27, 2000, GNBT closed Captain Kelly's loan by delivery of her closing documents via a courier who obtained Captain Kelly's execution of her closing documents in a public library near Decatur, Georgia, thereby violating Georgia's requirement that all "face-to-face" closings be conducted by a licensed attorney.  Captain Kelly first received her TILA and HOEPA disclosures upon the courier's arrival, and upon the same date as the settlement date of her loan.

258.    In connection with the above-alleged predatory lending scheme, GNBT loaned Captain Kelly a total loan of $51,000 to be repaid with interest at a rate of 13.990%  (APR of 16.532 %) in consecutive monthly installments over a period of 25 years.  The loan was a consumer loan obtained for personal, family or household purposes.

259.   To secure repayment of her note, Captain Kelly executed a security deed for the benefit of GNBT.  The security deed granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

260.   In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of Captain Kelly's loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 5,160.00 |
| 802 | Loan Discount | GNBT | 516.00 |
| 807 | Application | GNBT | 150.00 |
| 811 | Underwriting Fee | GNBT | 185.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 250.00 |
| 1102 | Abstract or Title Search | Title America LLC | 106.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1112 | Document Review | Title America LLC | 260.00 |
| 1113 | Processing Fee | Title America LLC | 250.00 |

261.   The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for GNBT, Equity Guaranty.

262.   Moreover, the title charges were marked up and neither bona fide nor reasonable.

263.   Captain Kelly was charged and "Title America" purportedly received $406.00 for an abstract of title and a title examination, as shown in Lines 1102 and 1003 of her HUD-1.  The title examination fee of $300 for review of General American's property report is per se illegal under HUD regulations.  The only title work appearing in her loan file is a Real Property Report prepared by General American Corporation South, which charged "Title America" $81.00 for the report.  The actual cost of the property was illegally marked up from $81.00 to $106.00.

264.    The charge for post-settlement document review violated RESPA.

265.    In connection with this loan, Captain Kelly was provided with a Federal Truth-In-Lending Disclosure Statement that stated that her Finance Charge was $109,105.81 and that her APR was 16.532 %.

266.    The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

267.    The same APR was incorrectly disclosed in Captain Kelly's HOEPA Notice that she never received until the papers were delivered by courier for her closing, which was the same date as her date of settlement. Her HOEPA Notice violated the "conspicuous type size" requirement of 15 U.S.C. § 1639(a) and contained a false acknowledgement of receipt.

268.    The terms of Captain Kelly's Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

269.    In violation of RESPA's prohibition against unearned fees, Captain Kelly was charged a loan discount fee for which no discount was given.

**The Nixon Loan**

270.    In early 2001, the Nixons received a solicitation in the mail indicating that they had been approved for a debt consolidation second mortgage loan with CBNV.

271.    The Nixons called the toll-free number to apply for a second mortgage loan.

272.    On or about February 2, 2001, CBNV closed the Nixons' loan. The closing documents were Fed Ex'd to their home in Florida and were subsequently forwarded to Mr. Nixon at a meeting he was attending in Florida. Upon receipt, Rev. Nixon complied with the closing instructions and returned the executed closing documents the day after their receipt in Florida.

273.    In connection with the above-alleged predatory lending scheme, CBNV loaned
the Nixons a total loan of $49,999.00 to be repaid with interest at a rate of 18.25% (APR of
20.261%) in consecutive monthly installments over a period of 25 years.  The loan was a
consumer loan obtained for personal, family or household purposes.

274.    To secure repayment of their note, the Nixons executed a deed of trust for the
benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate
subject to one or more prior mortgage loans.

275.    In connection with this HOEPA Mortgage Loan, as shown on his HUD-1
Settlement Statement, the following fees and costs were charged, contracted for and paid at or
before closing of the Nixons' loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 3,999.92 |
| 807 | Application | CBNV | 275.00 |
| 1101 | Settlement or Closing Fee | Paramount Title | 50.00 |
| 1102 | Abstract or Title Search | "GAC" | 260.00 |
| 1103 | Title Examination | Paramount Title | 595.00 |
| 1105 | Document Preparation | Paramount Title | 175.00 |
| 1201 | Recording Fee | Clerk of Court | 109.00 |
| 1203 | Mortgage Tax | Clerk of Court | 74.99 |

276.    The HUD-1 is fraudulent in that the line items shown as being paid to CBNV in
Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for
CBNV.

277.    Moreover, such fees were neither bona fide nor reasonable. Indeed, while the
Nixons were charged for an Abstract of Title and a Title Examination (which perform the same
function) no evidence whatsoever exists in the Nixons' loan file to suggest that an abstract of
title or a title examination was even done.  The $595 charge for title examination of a third-

party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $260.00 is likewise illegal. The charge for document preparation was bogus since the title company did not prepare any of the documents. Moreover, charging for the preparation of TILA, HOEPA and RESPA disclosures is illegal under 12 U.S.C. § 2610.

278.    In connection with this loan, the Nixons were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $185,347.31 and that their APR was 20.261%.

279.    The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

280.    The same APR was incorrectly disclosed in the Nixons' HOEPA Notice that they did not receive until the day before they signed and returned their loan documents. The HOEPA Notice the Nixons received the day before signing and returning their closing papers violates the "conspicuous type size" requirement of 15 U.S.C. 1639(a) and contains the false acknowledgement that the Nixons received their HOEPA Notice "at least three (3) business days before closing."

**The Cartee Loan**

281.    In late 2001 or early 2002 Mr. Cartee received a solicitation in the mail indicating that he had been "pre-approved" for a debt-consolidation second mortgage loan with GNBT.

282.    Mr. Cartee called the toll-free number to apply for a second mortgage loan.

283.    On or about February 25, 2002, "GNBT" closed Mr. Cartee's loan by Fed Ex delivery. For the first time, when the papers were delivered to him for closing did Mr. Cartee

receive his TILA and HOEPA disclosures, which was less than 3 days prior to the closing of his loan.

284.    In connection with the above-alleged predatory lending scheme, GNBT loaned Mr. Cartee a total loan of $29,500.00 to be repaid with a note interest rate of 12.750% (APR of 15.5596%) in consecutive monthly installments over a period of 15 years.  The loan was a consumer loan obtained for personal, family or household purposes.

285.    To secure repayment of his note, Mr. Cartee executed a deed of trust for the benefit of GNBT.  The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

286.    In connection with this HOEPA Mortgage Loan, as shown on his HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of Mr. Cartee's loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 2,802.50 |
| 802 | Loan Discount Fee | GNBT | 590.00 |
| 808 | GA State Tax Fee | Not identified | 6.50 |
| 810 | Lender Application Fee | GNBT | 125.00 |
| 1101 | Settlement or Closing Fee | USA Title, LLC | 100.00 |
| 1102 | Abstract or Title Search | USA Title, LLC | 81.00 |
| 1103 | Title Examination | USA Title, LLC | 450.00 |
| 1113 | Processing Fee | USA Title, LLC | 265.00 |
| 1201 | Recording Fee | Chatham County Clerk | 22.00 |
| 1202 | City/County/stamps | Clerk of the Superior Court | 88.50 |

287.    The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to the Shumway/Bapst entity.

288.    Moreover, the fees were neither bona fide nor reasonable.  Indeed, Mr. Cartee was charged a total of $531.00 for an abstract of title ($81.00) and a title examination ($450.00). The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations. The only title work that was done on his loan is a Real Estate Property Report, which charges were marked up and for which no title examination was performed.

289.    In connection with this loan, Mr. Cartee was provided with a Federal Truth-In-Lending Disclosure Statement that stated that his Finance Charge was $40,694.64 and that his annual percentage rate was 15.5596%, the same APR incorrectly disclosed in the 3-day advance HOEPA Notice that was not delivered to Mr. Cartee until closing.

290.    Both the stated Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

291.    Mr. Cartee's Note contains an illegal prepayment penalty.  The terms of Mr. Cartee's Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

292.    In violation of RESPA's prohibition against unearned fees, Mr. Cartee was charged a loan discount fee for which no discount was given.

**The Dorman Loan**

293.    In late 2001 or early 2002 Mr. and Mrs. Mack Dorman received a solicitation in the mail indicating that they had been "pre-approved" for a debt-consolidation second mortgage loan with GNBT.

294.    The Dormans called the toll-free number to apply for a second mortgage loan.

295.    On or about February 11, 2002, GNBT closed the Dorman loan (by Fed Ex delivery.) For the first time, when the papers were delivered to them for closing did the Dormans

receive their TILA and HOEPA disclosures, which was less than 3 days prior to the closing of his loan.

296.   In connection with the above-alleged predatory lending scheme, GNBT loaned the Dormans a total loan of $29,600.00 to be repaid with at an APR of 16.4352% in consecutive monthly installments over a period of 10 years.   The loan was a consumer loan obtained for personal, family or household purposes.

297.   To secure repayment of his note, the Dormans executed a deed of trust for the benefit of GNBT.   The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

298.   In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Dorman's loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 2,812.50 |
| 802 | Loan Discount Fee | GNBT | 592.00 |
| 808 | GA State Tax Fee | Not identified | 6.50 |
| 810 | Lender Application Fee | GNBT | 125.00 |
| 1101 | Settlement or Closing Fee | USA Title, LLC | 100.00 |
| 1102 | Abstract or Title Search | USA Title, LLC | 81.00 |
| 1103 | Title Examination | USA Title, LLC | 450.00 |
| 1113 | Processing Fee | USA Title, LLC | 265.00 |
| 1201 | Recording Fee | County Clerk | 22.00 |
| 1202 | City/County/stamps | Clerk of the Superior Court | 88.50 |

299.   The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, actually kicked-back to a Shumway/Bapst entity.

300.    Moreover, the fees were neither bona fide nor reasonable.  Indeed, the Dormans were charged a total of $531.00 for an abstract of title ($81.00) and a title examination ($450.00). The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations.  The only title work that was done on his loan is a Real Estate Property Report, which charges were marked up and for which no title examination was performed.

301.    In connection with this loan, the Dormans were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $40,694.64 and that their annual percentage rate was 16.4352%, the same APR incorrectly disclosed in the 3-day advance HOEPA Notice that was not delivered to the Dormans until closing.

302.    Both the stated Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

303.    In violation of RESPA's prohibition against unearned fees, the Dormans were charged a loan discount fee for which no discount was given.

**The Roberts Loan**

304.    In the fall of 2000, Mr. and Mrs. Jerome Roberts received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

305.    Mr. and Mrs. Roberts called the toll-free number to apply for a second mortgage loan.

306.    On or about October 9, 2000, GNBT closed the Roberts loan with a courier who conducted the closing at Mr. Robert's work location in Sandy Springs, in violation of Georgia's requirement that face-to-face closings must be conducted by a licensed attorney. Upon meeting with the courier the Roberts immediately executed their closing documents. The Roberts first

received their TILA and HOEPA disclosures at the time the documents were delivered by courier. Since they signed immediately, their advance HOEPA Notice was not delivered three business days before their closing.

307. In connection with the above-alleged predatory lending scheme, GNBT loaned the Roberts a total loan of $39,000 to be repaid with interest (14.99%)(APR of 17.828%) in consecutive monthly installments over a period of 25 years. The loan was a consumer loan obtained for personal, family or household purposes.

308. To secure repayment of their note, the Roberts executed a security deed for the benefit of GNBT. The security deed granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

309. In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Roberts' loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 3,900.00 |
| 802 | Loan Discount | GNBT | 780.00 |
| 811 | Underwriting Fee | GNBT | 185.00 |
| 813 | Application Fee | GNBT | 150.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 250.00 |
| 1102 | Abstract or Title Search | Title America LLC | 106.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1112 | Document Review Fee | Title America LLC | 260.00 |
| 1113 | Processing Fee | Title America LLC | 250.00 |

310. The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for GNBT, Equity Guaranty.

311.    Moreover, the title charges were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $106.00 is likewise illegal.   The charge for post-settlement document review violates RESPA.

312.    In connection with this loan, the Roberts were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $116,570.41 and that their APR was 17.828 %.

313.    The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate. The same APR was incorrectly disclosed in the Roberts' HOEPA Notice, which they never received until the papers were delivered by courier and signed immediately.

314.    The HOEPA Notice contained the false acknowledgement that the Roberts had "read and received, three business days prior to settlement, a copy of this disclosure statement." The acknowledgement, besides being false, is deficient on its face in that it does not state the required elements in a "conspicuous type size" as required by 15 U.S.C. § 1639(a).

315.    The terms of the Roberts' Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

316.    In violation of RESPA's prohibition against unearned fees, the Roberts were charged a loan discount fee for which no discount was given.

### The Brown Loan

317.    In the summer of 2000, Ms. Melba Brown received a solicitation in the mail indicating that she had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

318.    Ms. Brown called the toll-free number to apply for a second mortgage loan.

Case 2:03-cv-00425-GLL   Document 507   Filed 10/04/11   Page 59 of 112

319.   On or about August 12, 2000, CBNV closed the Brown loan with a courier who conducted the closing. Upon meeting with the courier Ms. Brown immediately executed her closing documents. Ms. Brown first received her TILA and HOEPA disclosures at the time the documents were delivered by courier. Since she signed immediately, her advance HOEPA Notice was not delivered three business days before her closing.

320.   In connection with the above-alleged predatory lending scheme, CBNV loaned Ms. Brown a total loan of $30,000 to be repaid with interest (17.450%)(APR of 20.704%) in consecutive monthly installments over a period of 15 years.   The loan was a consumer loan obtained for personal, family or household purposes.

321.   To secure repayment of her note, Ms. Brown executed a security deed for the benefit of CBNV.   The security deed granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

322.   In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Brown loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 2,400.00 |
| 802 | Loan Discount | CBNV | 600.00 |
| 804 | Credit Report | CBNV | 15.75 |
| 808 | Lender Underwriting Fee | CBNV | 295.00 |
| 809 | Lender Application Fee | CBNV | 95.00 |
| 810 | Lender Document Review Fee | CBNV | 150.00 |
| 1101 | Settlement or Closing Fee | Resource Title LLC | 250.00 |
| 1102 | Abstract or Title Search | Resource Title LLC/GAC | 275.00 |
| 1103 | Title Examination | Resource Title LLC | 95.00 |
| 1111 | Disbursement Fee | Resource Title LLC | 150.00 |

323.     The HUD-1 is fraudulent in that the line items shown as being paid to CBNV in Section 800 were, other than perhaps a very small percentage, actually kicked-back to a mortgage consultant for CBNV.

324.     Moreover, the title charges were neither bona fide nor reasonable. T The $95.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $275.00 is likewise illegal.

325.     In connection with this loan, Ms. Brown was provided with a Federal Truth-In-Lending Disclosure Statement that stated that her Finance Charge was $58,774.00 and that her APR was 20.704 %. The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

326.     The HOEPA Notice contained the false acknowledgement that Ms. Brown had "read and received, three business days prior to settlement, a copy of this disclosure statement." The acknowledgement, besides being false, is deficient on its face in that it does not state the required elements in a "conspicuous type size" as required by 15 U.S.C. § 1639(a).

327.     In violation of RESPA's prohibition against unearned fees, Ms. Brown was charged a loan discount fee for which no discount was given.

**The Gaskin Loan**

328.     In the summer of 2001, Ms. Flora Gaskin received a solicitation in the mail indicating that she had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

329.     Ms. Gaskin called the toll-free number to apply for a second mortgage loan. On or about August 8, 2001, CBNV closed the Gaskin loan with a courier who conducted the closing.

Upon meeting with the courier, Ms. Gaskin immediately executed her closing documents. She first received her TILA and HOEPA disclosures at the time the documents were delivered by courier. Since she signed immediately, her advance HOEPA Notice was not delivered three business days before her closing.

330.    In connection with the above-alleged predatory lending scheme, CBNV loaned Ms. Gaskin a total loan of $30,000 to be repaid with interest at a rate of 15.99% (APR of 17.965%) in consecutive monthly installments over a period of 15 years.  The loan was a consumer loan obtained for personal, family or household purposes.

331.    To secure repayment of her note, Ms. Gaskin executed a security deed for the benefit of CBNV.  The security deed granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

332.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Gaskin loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 3,129.00 |
| 805 | Application Fee | CBNV | 275.00 |
| 810 | Underwriting Fee | CBNV | 295.00 |
| 811 | Lender Document Review Fee | CBNV | 150.00 |
| 1101 | Settlement or Closing Fee | Paramount Title | 50.00 |
| 1102 | Abstract or Title Search | Paramount Title | 260.00 |
| 1103 | Title Examination | Paramount Title | 675.00 |
| 1105 | Document Preparation Fee | Paramount Title | 175.00 |

333.    The HUD-1 is fraudulent in that the line items shown as being paid to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for CBNV operating a loan production office in Columbia, Maryland.

334.     Moreover, the title charges were neither bona fide nor reasonable. The $675.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $260.00 is likewise illegal. The charge for document preparation was bogus since the title company did not prepare any of the documents, and it is illegal to charge for preparation of TILA, HOEPA and RESPA disclosures under 12 U.S.C. § 1610.

335.     In connection with this loan, Ms. Gaskin was provided with a Federal Truth-In-Lending Disclosure Statement that stated that her Finance Charge was $49,435.17 and that her APR was 17.965 %.

336.     The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

337.     The HOEPA Notice contained the false acknowledgement that Ms. Gaskin had "read and received, three business days prior to settlement, a copy of this disclosure statement." The acknowledgement, besides being false, is deficient on its face in that it does not state the required elements in a "conspicuous type size" as required by 15 U.S.C. § 1639(a).

338.     The terms of Ms. Gaskin's Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

**The Turner Loan**

339.     In the fall of 2000, Mr. and Mrs. Roger Turner received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

340.     Mr. and Mrs. Turner called the toll-free number to apply for a second mortgage loan.

341.    On or about October 10, 2000, "GNBT" closed the Turner loan with a courier who conducted the closing. Upon meeting with the courier, the Turners immediately executed their closing documents. The Turners first received their TILA and HOEPA disclosures at the time the documents were delivered by courier. Since they signed immediately, their advance HOEPA Notice was not delivered three business days before their closing.

342.    In connection with the above-alleged predatory lending scheme, GNBT loaned the Turners a total loan of $16,200 to be repaid with interest at a rate of 14.375% (APR of 18.033%) in consecutive monthly installments over a period of 25 years.  The loan was a consumer loan obtained for personal, family or household purposes.

343.    To secure repayment of their note, the Turners executed a security deed for the benefit of GNBT.  The security deed granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

344.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Turners' loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 1,620.00 |
| 802 | Loan Discount | GNBT | 324.00 |
| 807 | Application Fee | GNBT | 150.00 |
| 811 | Underwriting Fee | GNBT | 185.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 250.00 |
| 1102 | Abstract or Title Search | Title America LLC | 130.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Document Review Fee | Title America LLC | 260.00 |
| 1113 | Processing Fee | Title America LLC | 250.00 |

345.    The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for GNBT, Equity Guaranty.

346.    Moreover, the title charges were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $130 is likewise illegal.   The charge for post-settlement document review violates RESPA.

347.    In connection with this loan, the Turners were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $46,761.38 and that their APR was 18.033 %.

348.    The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

349.    The HOEPA Notice contained the false acknowledgement that the Turners had "read and received, three business days prior to settlement, a copy of this disclosure statement." The acknowledgement, besides being false, is deficient on its face in that it does not state the required elements in a "conspicuous type size" as required by 15 U.S.C. § 1639(a).

350.    The terms of the Turners' Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

351.    In violation of RESPA's prohibition against unearned fees, the Turners were charged a loan discount fee for which no discount was given.

**The Logan Loan**

352.    In the summer of 2001, Mr. and Mrs. Roy Lee Logan received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

353.    The Logans called the toll-free number to apply for a second mortgage loan.

354.    On or about July 11, 2001, GNBT closed the Logan loan with a courier who conducted the closing. Upon meeting with the courier, the Logans immediately executed their closing documents. They first received their TILA and HOEPA disclosures at the time the documents were delivered by courier. Since they signed immediately, their advance HOEPA Notice was not delivered three business days before their closing.

355.    In connection with the above-alleged predatory lending scheme, GNBT loaned the Logans a total loan of $18,600 to be repaid with interest at a rate of 11.99% (APR of 15.692%) in consecutive monthly installments over a period of 10 years.  The loan was a consumer loan obtained for personal, family or household purposes.

356.    To secure repayment of their note, the Logans executed a security deed for the benefit of GNBT.  The security deed granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

357.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Logans' loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 1,860.00 |
| 804 | Credit Report | GNBT | 50.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 812 | Flood Certification Fee | GNBT | 20.00 |

| 1101 | Settlement or Closing Fee | USA Title LLC | 150.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 130.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review Fee | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |

358.    The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for GNBT, Equity Guaranty.

359.    Moreover, the title charges were neither bona fide nor reasonable. The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $130.00 is likewise illegal.   The post-settlement document review fee violates RESPA.

360.    In connection with this loan, the Logans were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $15,904.64 and that their APR was 15.6972 %.

361.    The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

362.    The HOEPA Notice contained the false acknowledgement that the Logans had "read and received, three business days prior to settlement, a copy of this disclosure statement." The acknowledgement, besides being false, is deficient on its face in that it does not state the required elements in a "conspicuous type size" as required by 15 U.S.C. § 1639(a).

363.    The terms of the Logans' Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

**The Starkey Loan**

364.    In the fall of 2001, the Starkeys received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

365.    The Starkeys called the toll-free number to apply for a second mortgage loan.

366.    On or about October 31, 2001, GNBT closed the Starkeys' loan in Missouri.  On this date, the Starkeys first received their TILA and HOEPA disclosures.

367.    In connection with the above-alleged predatory lending scheme, GNBT loaned the Starkeys a total loan of $30,300 to be repaid with interest at a rate of 11.99% in consecutive monthly installments over a period of 15 years.  The loan was a consumer loan obtained for personal, family or household purposes.

368.    To secure repayment of their note, the Starkeys executed a deed of trust for the benefit of GNBT.  The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

369.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Starkey loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 3,030.00 |
| 802 | Loan Discount | GNBT | 606.00 |
| 804 | Credit Report | GNBT | 50.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 812 | Flood Certification Fee | GNBT | 20.00 |
| 1101 | Settlement or Closing Fee | USA Title LLC | 150.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 134.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |

370.     The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for GNBT, Equity Guaranty.

371.     Moreover, the title charges were neither bona fide nor reasonable. T The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $134.00 is likewise illegal.   The charge for post-settlement document review violates RESPA.

372.     In connection with this loan, the Starkeys were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $39,391.81 and that their annual percentage rate was 14.9528%.

373.     Both the Finance Charge and Disclosed APR are materially inaccurate.

374.     In violation of RESPA's prohibition against unearned fees, the Starkeys were charged a loan discount fee for which no discount was given.

### The Drennen Loan

375.     In the summer of 2001, the Drennens received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

376.     The Drennens called the toll-free number to apply for a second mortgage loan.

377.     On or about July 28, 2001, GNBT closed the Drennens' loan in Missouri.  On this date, the Drennens first received their TILA and HOEPA disclosures.

378.     In connection with the above-alleged predatory lending scheme, GNBT loaned the Drennens a total loan of $47,100.00 to be repaid with interest at a rate of 15.99% (APR of 18.6284%) in consecutive monthly installments over a period of 25 years.  The loan was a consumer loan obtained for personal, family or household purposes.

379.   To secure repayment of their note, the Drennens executed a deed of trust for the benefit of GNBT.   The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

380.   In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Drennen loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 4,239.00 |
| 802 | Loan Discount | GNBT | 942.00 |
| 804 | Credit Report | GNBT | 50.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 812 | Flood Certification Fee | GNBT | 20.00 |
| 813 | E Appraisal Fee | GNBT | 32.00 |
| 1101 | Settlement or Closing Fee | USA Title LLC | 150.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 134.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |

381.   The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for GNBT, Equity Guaranty.

382.   Moreover, the title charges were neither bona fide nor reasonable. The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $109 actual cost of the property report to $134.00 is likewise illegal.   The charge for post-settlement document review violates RESPA.

383.    In connection with this loan, the Drennens were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $150,605.00 and that their annual percentage rate was 18.3996%.

384.    Both the Finance Charge and Disclosed APR are materially inaccurate.

385.    In violation of RESPA's prohibition against unearned fees, the Drennens were charged a loan discount fee for which no discount was given.

**The Montgomery Loan**

386.    In the Fall of 2001, Mr. Montgomery received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

387.    Mr. Montgomery contacted GNBT to apply for a second mortgage loan. While he believed he was dealing with a bank, he was, in fact, dealing with a consultant for GNBT, Equity Guaranty.

388.    On or about November 16, 2001, GNBT closed the Montgomery loan in Missouri.

389.    In connection with the above-alleged predatory lending scheme, GNBT loaned Mr. Montgomery a total loan of $81,000.00 to be repaid with interest at a rate of 13.2483% (APR of 18.6284%) in consecutive monthly installments over a period of 15 years. The loan was a consumer loan obtained for personal, family or household purposes.

390.    To secure repayment of their note, Mr. Montgomery executed a deed of trust for the benefit of GNBT. The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

Case 2:03-cv-00451-GLL    Document 607    Filed 10/04/11    Page 74 of 112

391.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Montgomery loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 8,100.00 |
| 802 | Loan Discount | GNBT | 1,620.00 |
| 804 | Credit Report | Chase | 50.00 |
| 812 | Flood Certification Fee | GNB | 20.00 |
| 813 | E Appraisal | GNB | 32.00 |
| 1101 | Settlement or Closing Fee | USA Title, LLC | 150.00 |
| 1102 | Abstract or Title Search | USA Title, LLC | 184.00 |
| 1103 | Title Examination | USA Title, LLC | 450.00 |
| 1111 | Overnight Fee | USA Title, LLC | 25.00 |
| 1112 | Document Review | USA Title, LLC | 250.00 |
| 1113 | Processing Fee | USA Title, LLC | 260.00 |
| 1201 | Recording Fees | Not identified | 41.00 |

392.    The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, actually paid to a consultant for GNBT, Equity Guaranty.

393.    The title charges accessed against Mr. Montgomery were neither bona fide nor reasonable. The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RESPA.

394.    In connection with this loan, Mr. Montgomery was provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $92,588.65 and that their annual percentage rate was13.2483%.

395.    Both the Finance Charge and Disclosed APR are materially inaccurate.

396.    The required HOEPA disclosures were not timely provided to Mr. Montgomery.

397.    In violation of RESPA's prohibition against unearned fees, Mr. Montgomery was charged a loan discount fee for which no discount was given.

### The Wasem Loan

398.    In the summer of 2001 Mr. and Mrs. Wasem received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

399.    The Wasems called CBNV via their toll free phone number to apply for a second mortgage loan. Upon information and belief, the Wasems were instead dealing with a consultant of CBNV.

400.    On or about August 9, 2001 CBNV closed the Wasem loan. On this date, Mrs. And Mrs. Wasem first received her TILA and HOEPA disclosures.

401.    In connection with the above-alleged predatory lending scheme, CBNV loaned Mr. and Mrs. Wasem a total loan of $47,000.00 to be repaid with interest at a rate of 14.5% (APR of 15.456%) in consecutive monthly installments over a period of 15 years. The loan was a consumer loan obtained for personal, family or household purposes.

402.    To secure repayment of their note, Mr. and Mrs. Wasem executed a deed of trust for the benefit of CBNV. The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

403.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Wasem loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 4,700.00 |
| 805 | Application Fee | CBNV | 275.00 |

| 810  | Underwriting Fee          | CBNV                | 295.00 |
| 1101 | Settlement or Closing Fee | Paramount Title     | 50.00  |
| 1102 | Abstract or Title Search  | GAC                 | 260.00 |
| 1103 | Title Examination         | Paramount Title     | 675.00 |
| 1105 | Document Preparation      | Paramount Title     | 175.00 |
| 1112 | Document Review           | CBNV                | 150.00 |
| 1201 | Recording Fees            | Clerk of the Court  | 53.00  |

404.     The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, actually paid to a consultant of CBNV.

405.     Moreover, the title charges were neither bona fide nor reasonable. The $675.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and upon information and belief, the actual cost of the property report was illegally marked up. The charge for document preparation was bogus since the title company did not prepare any of the documents and it is illegal to charge for preparation of TILA, HOEPA and RESPA disclosures under 12 U.S.C. § 1610.

406.     In connection with this loan, Mr. and Mrs. Wasem were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $60,683.67 and that their annual percentage rate was 14.527%. Both the Finance Charge and Disclosed APR are materially inaccurate.

407.     The required HOEPA disclosures were not timely provided to the Wasems.

## Equitable Tolling and Equitable Estoppel

408.     The Defendants, and each of them, knowingly and actively misled the Class

Members concerning material facts related to their individual mortgage loans and knowingly and

actively prevented the Class Members from pursuing their claims by, among other things:

(a) Engaging in a scheme that was by its nature and design "self-concealing" and not reasonably discoverable by Plaintiffs and the Class notwithstanding the exercise of due diligence;

(b) Issuing fraudulent mortgage loan settlement documents to Plaintiffs and the Class which concealed the fact that the Bank Defendants were paying the Shumway/Bapst organization a referral fee for the residential mortgage loans at issue by way of a kick-back to companies controlled by the Shumway/Bapst organization, notwithstanding that the Shumway/Bapst organization was not performing any compensable settlement services in connection with the loans at issue;

(c) Falsely representing that title examinations were performed on each borrowers' loans by way of the imposition and disclosure of a settlement charge in Line 1103 of each borrowers' HUD-1 Settlement Statement for such service;

(d) Falsely representing that a true abstract or title search was performed on each of the borrowers' loans by way of the imposition of a settlement charge in Line 1102 of each borrowers' HUD-1 Settlement Statement for such service;

(e) Falsely representing that compensable "document review" services were performed in connection with the settlement of Plaintiffs' loans by disclosing such charge at Line 1112 of the Title Fee section of Plaintiffs' HUD-1s when in fact any document review services ostensibly performed in exchange for this fee were in fact non-compensable post-settlement services;

(f) Knowingly and actively concealing the understatement of Finance Charges, the overstatement of the Amount Financed and the resulting understatement of the APRs on the TILA Disclosure Statements and HOEPA Notices provided to Plaintiffs and all Class Members by, among other things, failing to include in their calculations certain title charges that were not bona fide, reasonable, lawful and/or not paid to true third parties;

(g) Falsely representing on each HUD-1 Settlement Statement that a true, honest, and independent settlement agent was performing services on the loan, when in fact the settlement agents were part of the racketeering and overall conspiracy;

(h) Knowingly and actively concealing that the origination fees, discount fees or other types of fees and charges listed in Section 800 of the HUD-1s were not being paid to GNBT or CBNV;

(i) Knowingly and actively concealing that the origination fees, discount fees or other types of fees and charges listed in Section 1100 of the HUD-1s were being paid to third-party title companies when such fees and charges were instead being kick-backed to and shared with, directly or indirectly, the Consultants  and their affiliated entities;

(j) Concealing the import of the false acknowledgement of receipt in all HOEPA Notices:

(k) Knowing of their various HOEPA violations as detailed above and  falsely representing to the  Class Members that they had a right to rescind within three (3) days when the Banks knew or should have known that their violations of HOEPA in fact afforded every Class Member a full *three-year* period to rescind under the provisions of 15 U.S.C. § 1635(f), thereby estopping as a matter of law Defendants' assertion of the three-year repose period under 15 U.S.C. § 1635; and

(l) Knowingly and actively preventing the Banks' federal regulators (FDIC and OCC) from disseminating reports of their wrongdoing to the public, thereby suppressing and preventing the Class Members from discovering their causes of action against the Banks and Defendants until the one-year limitations periods for TILA and RESPA had since elapsed for many Class Members.

409.    The Class members exercised reasonable diligence during their loan transactions and dealings with the Banks and in reviewing their loan documentation, but could not have, nor been reasonably expected to, uncover the complex set of facts and the highly sophisticated scheme giving rise to their claims against Defendants due to the fraudulent concealment, unlawful and conspiratorial conduct of Defendants.

410.    For example, by withholding the Property Reports from the borrowers and by their failure to disclose that no title examinations were in fact performed on the loans, the Banks actively misled the borrowers and prevented them from discovering that the settlement charges imposed in Lines 1102 and 1103 of the HUD-1 Settlement Statements were neither bona fide nor reasonable and had been improperly marked up.

411.    Defendants are estopped to challenge the Class Members' reliance upon equitable tolling and estoppel to toll TILA's and RESPA's one-year statute of limitations Because the Defendants knowingly and intentionally concocted and concealed their fraudulent scheme, the Banks and the Investor Defendants and the Defendant Class members are estopped by their unclean hands to rely upon statutes of limitations that, if sustained, would reward these Defendants' efforts to conceal their wrongdoing. Any equitable tolling or equitable estoppel that

lies against the Banks to support the claims against such Banks applies with equal force to the

Investor Defendants and the Defendant Class members who stand in the Banks' shoes under the

assignee liability provisions of HOEPA. 15 U.S.C. § 1641(d).

### Class Action Tolling

412.    In addition, the statutes of limitations for each of the Plaintiffs' and the Class

members' individual claims has been tolled by virtue of class action tolling since May 1, 2001

and continues to be tolled.

413.    Specifically, on May 1, 2001, a class action captioned as *Davis v. CBNV, et al.*

was brought against Community Bank of Northern Virginia, RFC and a number of other

assignee/purchasers of its high-cost or HOEPA loans seeking to impose liability upon those

entities based upon the same facts giving rise to claims described in this Consolidated Class

Action Complaint; namely the wrongs perpetrated by the Shumway/Bapst scheme through

CBNV.  The *Davis* lawsuit adequately notified CBNV, its conspirators, and the purchasers of its

loans, not only of the substantive claims being brought against them, but also of the number and

generic identities of the potential plaintiffs who may participate in the judgment such that the

defendants had the essential information necessary to determine both the subject matter and size

of the prospective class action litigation.  Since May 1, 2001, no court has *denied* certification of

a class action for which the loans of the class members are within the defined class.

Consequently, at the time of the filing of this lawsuit, the Class members' statutes of limitation

for their individual claims remained tolled, and there should be no question as to the timeliness

of their claims.

414.    The statutes of limitations for those Class members whose loans were made by

GNBT have been tolled by virtue of class action tolling since September 19, 2002 and continue

to be tolled.  On September 19, 2002, a class action lawsuit captioned as *Ulrich v. GNBT* was brought against GNBT and the assignee/purchasers of GNBT's loans including RFC.  This action sought relief for the class members based upon the same facts giving rise to claims described in this Consolidated Class Action Complaint.  This lawsuit adequately notified Defendants, its conspirators, and the purchasers of the GNBT loans, not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment such that the defendants had the essential information necessary to determine both the subject matter and size of the prospective class action litigation.  Further, those Class members whose loans were purchased by RFC have been tolled as to RFC since the *Davis* filing regardless of which bank originated their loan as the *Davis* filing put RFC on notice of the claims arising from the Shumway/Bapst scheme which they knew at the time of that *Davis* filing was ongoing and continuing in connection with the Shumway/Bapst Organization's affiliation and conspiracy with GNBT.

## IV.    CLASS ACTION ALLEGATIONS

### The Plaintiff Class

415.    The Plaintiffs properly bring their claims set forth herein as a Plaintiff class action under Fed.R.Civ.P. 23(b)(3).  The Plaintiffs propose, as the definition of the Plaintiff Class, that the Plaintiff Class consists of:

> all persons nationwide who obtained a second or subordinate, residential, federally related, non-purchase money, HOEPA qualifying mortgage loan from CBNV or GNBT that was secured by residential real property used by the Class Members as their principal dwelling.

416.    Plaintiffs reserve the right to revise and amend this class definition, perhaps to include sub-classes, as proper and necessitated by the progression of discovery and other issues in this class action case.

417.     Specifically excluded from the proposed Class are officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, of any of the Defendants or entities controlled by the Defendants and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants, or any of them and all governmental entities.

418.     For the purposes of the Class definition, the term "person" shall also include the person(s) to whom the loan was made and who signed the Note or, if such person(s) have filed for bankruptcy or otherwise voluntarily or involuntarily transferred his or her rights to pursue claims in this lawsuit, then that person(s)' bankruptcy trustee or legal assign.

419.     Having previously stipulated or acquiesced to certification of a class defined similarly to that above but limited to borrowers whose loans were purchased by RFC, the Banks and RFC are estopped to contest certification of the Class defined above.

420.     The particular members of the Plaintiff Class are capable of being identified without difficult managerial or administrative problems.  For example, the members of the Plaintiff Class are readily identifiable from the information and records in the possession or control of CBNV, GNBT and the Non-Bank Defendants and the Defendant Class members and/or the representatives or servicing agents of each.

421.     The Class Members are so numerous that individual joinder of all members is impractical.  Upon information and belief, this Plaintiff Class includes as many as 50,000 borrowers.

422.     There are questions of law and fact common to the Plaintiff Class, which questions predominate over any questions affecting only individual Plaintiff Class members and, in fact, the wrongs suffered and remedies sought by the Plaintiff Class members involve

numerous common violations of TILA, HOEPA, RESPA and RICO, which involve common documentary proof, the only difference being the exact monetary amount to which each Plaintiff Class member is entitled, a matter of mere mathematical calculation.  The principal common issues include, but are not limited to, the following:

(a) Whether the Plaintiff Class Members' HUD-1 or HUD1-A Settlement Statements concealed and/or misrepresented the identity of the recipients, nature or the amounts of the settlement fees and charges imposed on their loans;

(b) Whether the Plaintiff Class Members' HUD-1 or HUD1-A Settlement Statements contained false statements;

(c) Whether the applicable statutes of limitation are tolled against the Defendants under the doctrines of equitable tolling, equitable estoppel, legal tolling and other maxims of equity;

(d) The effect of class action tolling on the claims of the Plaintiff Class Members;

(e) The nature of the Defendants' violations of RESPA, TILA,  HOEPA and RICO;

(f) Whether, CBNV and GNBT utilized a practice or device whereby the mandatory disclosures under TILA were not timely made;

(g) Whether CBNV and GNBT made inaccurate TILA disclosures to the Plaintiff Class Members;

(h) Whether certain of the Plaintiff Class Members' Notes failed to disclose required HOEPA disclosures restricting prepayment penalties or other prohibited terms;

(i) Whether the Plaintiff Class Members' HOEPA Notices were displayed in the required conspicuous type size manner; contained knowingly false acknowledgments of receipt before closing; or were nevertheless deficient in asserting receipt within no

specified period or within "3 days" or "72 hours" before closing, but *not asserting* the number of "*business*" days before closing;

(j) The nature and extent of the remedies available to the Plaintiff Class Members under TILA and HOEPA;

(k) Whether Plaintiffs and the Class members are entitled to additional damages and remedies for Defendants separate violations of the substantive provisions of TILA and HOEPA;

(l) Whether the Plaintiff Class Members who closed their loans within three years before the *Davis* and *Ulrich* cases were filed, are entitled to rescind their loans;

(m) Whether the assignee liability of HOEPA (15 U.S.C. § 1641(d)) applies to the claims of Plaintiffs and the Plaintiff Class and to the Defendants;

(n) Whether Defendants are liable in treble damages to the Plaintiff Class Members for violations of RESPA;

(o) The  nature and extent of the remedies available to the Plaintiff Class members under RESPA;

(p) Whether the Defendants were involved in or participants in RICO enterprises;

(q) Whether the aforesaid use of the U.S. Postal Service and interstate couriers in furtherance and consummation of the Banks' lending scheme constituted mail fraud;

(r) Whether the aforesaid use of interstate wires in furtherance and consummation of the Banks' lending scheme constituted wire fraud:

(s) The nature and extent of the remedies available to the Plaintiff Class Members under RICO;

(t)  The nature and extent of the declaratory and injunctive relief available to the Plaintiff

Class members; and

(u)  Whether Defendants are liable for punitive damages

423.    The Plaintiffs' claims are typical of those of the members of the Plaintiff Class.
The claims are based on the same legal and factual theories because those claims depend upon
the existence of uniform scheme which uniformly impacted all Class members, including the
named Plaintiffs.  The named Plaintiffs claims are sufficiently aligned with the claims of the
class to permit them to pursue their own litigation goals and simultaneously pursue the interests
of the absentee class members in adequate fashion. Because this action challenges the same
course of unlawful conduct which affects the putative class, the typicality requirement is satisfied
irrespective of any slight factual variation that might underlie an  individual Class member's
claims.

424.    The Plaintiffs will fairly and adequately represent and protect the interests of the
Plaintiff Class.  The Plaintiffs have suffered substantial economic injury in their own capacity
from the practices complained of and understand the nature of their duty as representatives of the
Class, the nature and extent of their claims against Defendants Class and the relief available to
them and the Class Members.

425.    Neither the Plaintiffs nor their counsel have any conflicting interests which might
cause them not to vigorously pursue this action.  Further, the class representatives include
representative of the different subclasses, if any, that may arise in connection with Plaintiffs'
claims.

426.    The Plaintiffs have retained counsel who are experienced in complex and class
action litigation generally, and in the types of claims at issue in this lawsuit specifically, are

knowledgeable in the applicable law, and have done a significant amount of work in identifying and investigating potential claims in this action.

427.    Certification of a Plaintiff Class under Fed. R. Civ. P. 23(b)(3) is appropriate, in that while injunctive and declaratory relief is sought, this action seeks predominantly monetary damages.  The questions of law and fact that are common to the Plaintiff Class predominate over any questions of fact pertaining to individual Plaintiff Class Members and a Plaintiff class action is superior to other available methods for the fair and efficient adjudication of this controversy. A Plaintiff class action will cause an orderly and expeditious administration of Plaintiff Class Members' claims and economies of time, effort and expense will be fostered and uniformity of decisions will be insured.  Moreover, the individual Plaintiff Class Members are likely unaware of their rights and/or not in a position (either through experience or financially) to commence individual litigation against Defendants. Expecting the Plaintiff Class Members to bring claims individually is unrealistic and unfeasible, which is evidenced by the fact that Congress specifically provided for class actions in TILA and HOEPA. The only practical means of rectifying these problems and providing wide spread relief is through class action procedure.

428.    To the extent that the Court deems the Plaintiffs' request for declaratory or injunctive relief, including the claim set forth in Count III, as an integral part of relief for the Class, then certification of a Plaintiff Class under Fed. R. Civ. P. 23(b)(2) is also appropriate as Defendants acted or refused to act on grounds generally applicable to the class without regard to the individual facts and circumstances of each individual class member.

## **The Defendant Class**

429.     This action is also properly brought as a Defendant Class under Fed.R.Civ.P. 23.
Plaintiffs propose, as the definition of the Defendant Class, that the Defendant Class be defined
as follows:

> Those persons or entities, or their trustees, that purchased or were assigned the
> HOEPA loans of the Plaintiffs or the Plaintiff Class.

430.     The particular members of the Defendant Class are capable of being described
without difficult managerial or administrative problems.  The members of the Defendant Class
are readily identifiable from the information and records in the possession or control of CBNV,
GNBT or the Shumway Organization or its affiliated entities and from the other Defendants who
have since assigned these loans to other members of the Defendant Class and/or their
representatives or servicing agents of such HOEPA loans.

431.     The Defendant Class members are sufficiently numerous that individual joinder of
all members is impractical.  This allegation is based on the fact that CBNV and GNBT
"generated" extensive HOEPA loans on a nationwide basis.

432.     There are questions of law and fact common to the Defendant Class which
questions predominate over any questions affecting only individual members of the Defendant
Class and, in fact, the wrongs alleged against non-Bank Defendants and the Defendant Class
members and the remedies sought by Plaintiffs and the Plaintiff Class members against such
Defendants are identical, the only difference being the exact monetary amount to which each
Defendant and Defendant Class Member is liable to the respective members of the Plaintiff
Class.  The principal common issues include, but are certainly not limited to:

a)     The Defendant Class members' conduct related to the predatory lending scheme;

b)      Whether the Defendant Class members are liable for the Banks' wrongful acts under HOEPA;

c)      Whether the Defendant Class members are liable for the Banks' wrongful acts under principles of assignee, conspiracy and/or partnership liability;

d)      The Defendant Class members' involvement in the racketeering enterprises;

e)      Whether the Defendant Class is entitled to assert any defenses to the Banks' violations of TILA, HOEPA, RESPA and RICO; and

f)      Whether the Defendant Class members are liable to the Plaintiff and the Plaintiff Class members as a result of their involvement in the aforementioned predatory lending scheme.

433.    The Non-Bank Defendants' defenses and those of the Defendant Class Members (which defenses are denied) are typical of those of the individual Non-Defendants and will be based on the same legal and factual theories.

434.    The Non-Bank Defendants, in representing their own interests, will also fairly and adequately represent and protect the interests of the Defendant Class.  Those Non-Bank Defendants will, as they have in the past, retain counsel experienced in defending class actions and actions involving unlawful commercial practices.  Said defendants do not, based upon information and belief, have any interests which might cause them not to vigorously defend this action.

435.    Certification of a defendant class under Fed.R.Civ.P. 23 (b)(3) is appropriate as to the Defendant Class Members in that common questions predominate over any individual questions and a defendant class action is superior for the fair and efficient adjudication of this controversy.  A defendant class action will cause an orderly and expeditious administration of

Defendant Class members' defenses, if any, and economies of time, effort and expenses will be fostered and uniformity of decisions will be insured.

## V.    CAUSES OF ACTION AGAINST DEFENDANTS

### COUNT I

**Violations of the Real Estate Settlement Procedures Act**

436.    Each preceding paragraph of this *MDL Complaint* is hereby incorporated as if fully set forth herein.

437.    The scheme described above violated the anti-kick back and unearned fee provisions of RESPA (including the Affiliate Business Arrangement requirements, when applicable).

438.    The note and mortgage that each Class Member entered into with CBNV and GNBT created a "federally related mortgage loan" as defined at 12 U.S.C. § 2602(1).

439.    The Bank Defendants used the Plaintiffs' HUD-1 Settlement Statements (and other loan disclosure documents required by federal law including the Good Faith Estimate)  to conceal illegal kickbacks and unearned fees being paid to the Shumway/Bapst Organization on the HOEPA mortgage loans made by the Banks and purchased by RFC (and other Investor Defendants).

440.    The section 800 charges listed on the HUD-1s uniformly misrepresented that origination and loan discount fees were being paid to the Banks when, in fact, said fees were being kicked-back almost entirely to the Shumway/Bapst Organization in exchange for the referral of the loans to the banks, notwithstanding that the Shumway/Bapst Organization was not performing any compensable settlement services in connection with the loans.[7]  The amount of

---

[7] The term "origination fees" as used in this context includes all fee delineated in Section 800 of the HUD-1s issued to borrowers in connection with the loans at issue.

the kickbacks was directly derivative of loan volume, and the Banks retained only a small "funding fee" in connection with each disbursed loan.[8]

441.    As described in the text above, the title companies used in the loans referred to the Banks by the Shumway/Bapst Organization were entities owned and controlled by Messrs. Shumway and Bapst.    The fees charged to borrowers for ostensible title services by those companies were delineated in Section 1100 of the HUD-1s issued in connection with the loans.

442.    As noted, most of the fees reflected in Section 1100 were unearned in violation of Section 8(b) of RESPA in that the fees charged were not in exchange for compensable settlement services.

443.    To the extent that any affiliated business arrangement disclosures were required, they were not provided until closing, and those disclosures falsely stated or misrepresented the nature and extent of the affiliation.    Further, the disclosures were meaningless since the borrowers were required by the Banks to use title companies owned and controlled by the Shumway/Bapst Organization, thereby impeding the operation of a free marked for title-related settlement services.

444.    The Investor Defendants and the Defendant Class members were aware that fees charged for title services were excessive and often unearned.

445.    Additionally, Plaintiffs and each class member, as evidenced at line 802 of their HUD-1 Settlement Statement, was charged a "loan discount fee."

446.    HUD describes a loan discount fee as follows: "Also called 'points' or 'discount

---

[8] As previously noted, the first business structure used by CBNV and EquityPlus Financial, Inc. to generate loans was EquityPlus Financial, LLC, which they owned jointly.  With respect to loans made during the pendency of that LLC, CBNV violated RESPA's affiliate business arrangement disclosure requirements as follows:  a)  it did not disclose the relationship among CBNV, EquityPlus Financial, Inc. and EquityPlus Financial, LLC;  b)  it required the use of EquityPlus Financial, LLC, for the provision of settlement services; and, c)  The parties to the arrangement were being provided with a thing of value that was other than a return on ownership interest.

points', a loan discount is a one-time charge imposed by the lender or broker to lower the rate at which the lender or broker would otherwise offer the loan to you. Each 'point' is equal to one percent of the mortgage account…." Here, however, the interest rate on the loans to Plaintiffs and other class members' was not discounted or lowered in exchange for the payment of the loan discount fee. Rather, the fee was wholly unearned in that there was no compensable settlement service provided in exchange for the fee. As such, it was a fee collected "other than for services actually performed" in violation of Section 8(b) of RESPA. The collection of the purported "loan discount fee" therefore constitutes a separate and actionable violation of RESPA.

447. As a result of the RESPA violations above alleged, the Class has been damaged in an amount to be determined at a trial of this action, where they will seek all permissible treble damages, costs and reasonable attorneys' fees.

## COUNT II

### Violations of TILA, as Amended by HOEPA, for
### Inaccurate and Understated Material Disclosures

448. Each preceding paragraph of this *MDL Complaint* is hereby incorporated as if fully set forth herein.

449. The loans of the Plaintiffs are "HOEPA" loans governed by the provisions of the HOEPA amendments to TILA and satisfy the definition for HOEPA loans provided at 15 U.S.C. § 1602(aa) and at Regulation Z at 12 C.F.R. § 226.32.

450. As an incident to, or a condition of, the Banks' extension of credit to the Plaintiff Class members, the Banks withheld and charged to the Class members at closing certain fees and charges to be paid directly or indirectly by the Plaintiff Class members in order to obtain the HOEPA mortgage loans.

451. CBNV and GNBT issued to each borrower a HOEPA Notice (15 U.S.C. §

1639(a) & (b)) and issued to the Non-Bank Defendants and the Defendant Class a HOEPA *Notice of Assignment* (15 U.S.C. § 1641(d)(4)). The Non-Bank Defendants and the Defendant Class members reviewed the loan files at their purchase and were aware that the mortgages were HOEPA loans.

452.    Each of the Plaintiff Class members' loans that was consummated within the three-year period preceding the filing of the *Davis* case on May 1, 2001 and the *Ulrich* case on September 19, 2002, retains the right of cancellation or rescission provided by 15 U.S.C. § 1635 and 12 C.F.R. § 226.23. As to RFC only, each of the class members whose loans closed within three years before the *Davis* filing on May 1, 2001, approximately 33,335 loans by extrapolation, remains entitled to rescission.

453.    TILA, as amended by HOEPA, at 15 U.S.C. §§ 1602(u), 1638, 1639, and its implementing regulation, Regulation Z, requires creditors to make specific, timely and accurate disclosures of "material" information to borrowers to promote the "informed use of credit." The "material" information includes the "annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, the due dates or periods of payments scheduled to repay the indebtedness," and the disclosures required by HOEPA at § 1639(a).

454.    Certain tolerances for accuracy (or inaccuracies) are permitted as set forth  at 15 U.S.C. §§ 1605(f), 1610(c) and Regulation Z, at 12 C.F.R. §§ 226.22 and 226.23 for the disclosure of the Finance Charge and Annual Percentage Rate. No tolerances are available, however, in connection with certain of the title fees being challenged in this action, including the impermissible title examination fees, impermissible marked up "property report" fees and

impermissible "abstract fees."

455.    CBNV and GNBT violated HOEPA and TILA on every loan by failing to provide accurate disclosures of the Finance Charge and APR as required by 15 U.S.C. §§ 1638 and 1639 and as calculated by Regulation Z with tolerance for inaccuracies at 12 C.F.R. §§ 226.22, 226.23 and 226.32.

456.    The Banks falsely and incorrectly represented that the amounts charged to the Plaintiffs and Plaintiff Class members as title charges in section 1100 of the Plaintiffs' HUD-1s for such things as "abstract or title searches" (line 1102) and "title examinations" (line 1103) and in certain instances "document review" (line 1112) and/or "settlement or closing fees" (line 1101) and document preparation fees were charges incurred by the Banks.  Instead, the charges listed on the HUD-1 Settlement Statements were standardized fees that were charged on all of the second mortgage loans. These charges were not "bona fide" and "reasonable" nor paid to "true" third parties. In fact, they were being used directly or indirectly to further the scheme and to provide unearned fees to the Shumway/Bapst Organization.

457.    By virtue of the fact that the title companies were required by the Banks and/or affiliated with and/or controlled by the Shumway/Bapst Organization, the title work done by them was required to be included within the Banks' calculations of the Finance Charges and Annual Percentage Rates that TILA and HOEPA required to be disclosed to the Class members.

458.    Moreover, and regardless of the required use of the title companies and their affiliations, because title work charges were not bona fide and reasonable, these charges should have been included within the Banks' calculations of the Finance Charges and Annual Percentage Rates.

459.    The Banks, as a routine and typical practice, as evidenced from the HUD-1s and

the Truth-in-Lending Disclosure Statements that they provided to the Plaintiffs and the Plaintiff

Class members, *excluded* the section 1100 title charges from their calculations of the Finance

Charge and the Amount Financed.

460.    For example, in each instance, the marked up, bogus, excessive and unnecessary

"abstract of title" (line 1101), "title search" (line 1102) and "title examination" (line 1103) fees

charged to the Plaintiffs and Plaintiff Class members were excluded from the calculation of the

Finance Charge when they should have been *included* in the Finance Charge. Conversely, the

same amounts were used in the calculation of the Amount Financed when they should have been

*deducted* from the Amount Financed.  Although the section 1100 title charges for title abstracts,

title searches and title examinations were required and/or paid to affiliates and controlled entities

they were always improperly excluded from the calculations of the Finance Charge and Amount

Financed and should have been included in the calculation of the Finance Charge and Amount

Financed.

461.    Even if the section 1100 title charges for title abstracts, title searches and title

examinations were not required or not paid to affiliates and controlled entities, the charges were

always marked up (Lines 1102) and were neither bona fide nor reasonable (Lines 1102 and

1103) and, as such, were always improperly excluded from the calculations of the Finance

Charge and Amount Financed and should have been included in the calculation of the Finance

Charge and Amount Financed.

462.    Thus, in each and every instance, by virtue of their mechanism or formula of

making these calculations, the *disclosed* Finance Charge on the Plaintiffs' and the Plaintiff Class

Members' loans was understated, and the Amount Financed on which the APR is calculated was

overstated. As a result, the *disclosed* Finance Charges and Amount Financed were inaccurate and

violated TILA and HOEPA at 15 U.S.C. §§ 1605(f), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. §§ 226.23 and 226.32.

463.    Further, having improperly overstated the Amount Financed, the Banks inaccurately disclosed the Annual Percentage Rate (APR) on the loans of the Plaintiffs and the Plaintiff Class Members.  In each and every instance, as evidenced from the HUD-1s and the Truth in Lending Disclosure Statements that they provided to the Plaintiffs and the Plaintiff Class Members, the Banks disclosed APRs that were understated from the properly calculated and actual APR.

464.    In each and every instance, the disclosed APR was understated by more than the 1/8th of a basis point or the 0.125% tolerance for error provided by Congress. In the case of loan padding of the "title examinations" and the "property reports" fees, the tolerance for error is zero. As a result, the disclosed APRs were inaccurate and violated TILA and HOEPA at 15 U.S.C. §§ 1606(c), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. §§ 226.22, 226.32.

465.    Because certain of the section 1100 title charges were improperly excluded from the calculation of the Finance Charge and should have been included in the calculation of the Finance Charge, in each and every instance the *disclosed* Finance Charge on the Plaintiffs' and the Plaintiff Class members' loans was understated, and varied from the Actual Finance Charge by more than $100 or by more than ½ of one percent of the gross loan amount for purposes of rescission (not damages).  As stated, loan padding reduces these normal tolerances to zero. Because the APR is a required element of the advance HOEPA Notice required 3 business days before closing, 15 U.S.C. § 1639(a)(2)(A), it matters not when the HOEPA pre-closing notice was delivered because the disclosed APR in the notice, being identical to the underdisclosed APR in the TILA Statement, rendered the notice defective as a matter of law and represented a

*per se* violation of HOEPA Notice requirements without regard to the timeliness of delivery. Because it is an *advance* disclosure, a HOEPA Notice's deficiencies cannot be cured after the fact without closing a new loan with proper advance disclosures.

466.    The Defendants were well aware of the fraudulent conduct described above and the violations of HOEPA and TILA and knew at all material times that the majority of the fees would be dispersed to companies owned and controlled by the Shumway/Bapst Organization by the sham title companies used to close HOEPA mortgage loans.   However, because of the Investor Defendants' and the Defendant Class members' insatiable appetite for the high-cost, high-interest loans, the Defendants allowed the loan production offices and the Banks to violate HOEPA and TILA.   As described above, by agreeing to purchase the HOEPA mortgage loans from the Banks, in essence funding the loans, the cycle of HOEPA/TILA violations was perpetuated and continued by RFC and, to a lesser degree, other purchasers of these predatory and illegal loans.

467.    Under 15 U.S.C. § 1641(d) the Non-Bank Defendants and the Defendant Class members are subject to all claims and defenses that the Plaintiff Class members have against CBNV and GNBT.   Under 15 U.S.C. § 1635(g), the Plaintiff Class members are also entitled to additional relief under 15 U.S.C. § 1640 not related to their rescission rights.

468.    Accordingly, even disregarding the zero error tolerances applicable to loan padding, as a result of (1) the *disclosed* Finance Charges being inaccurate and understated by more than $100 or ½ of one percent of the gross loan amount in every instance and (2) the *disclosed* APRs being inaccurate and understated by more than 0.125 % in every HOEPA Notice; the loans violate HOEPA and TILA and the Plaintiff Class is entitled to damages under 15 U.S.C. §§ 1635, 1639, 1640 and 1641(d), including, all (1) actual and statutory damages; (2)

rescission rights and damages; and (3) an amount equal to the sum of all finance charges and fees paid by the Class Members for each and every *separate* HOEPA violation as to each and every *separate* borrower.

## COUNT III

**Multiple Violations of the Substantive Provisions of TILA and HOEPA**

469.    Each preceding   paragraph of this *MDL Complaint* is hereby incorporated as if fully set forth herein.

470.    CBNV and GBNT committed multiple violations of the substantive provisions of TILA and HOEPA, giving rise to multiple damage awards under 15 U.S.C. § 1640(a).  These violations are in addition to, and cumulative of the violations of TILA and HOEPA for inaccurate and understated material disclosures set forth above in Count I.

471.    15 U.S.C. § 1640(a) specifies that "any creditor who fails to comply with any requirement imposed under this part ... or part D or E of this subchapter ... is liable." This broad language encompasses all violations of the relevant parts of TILA and each violation committed by the Banks results in a separate statutory recovery for Plaintiffs.

472.    The loans of the Plaintiff Class members are HOEPA loans governed by the provisions of the HOEPA amendments to TILA and satisfy the definitions for HOEPA loans provided in 15 U.S.C. § 1602(aa).

473.    CBNV and GNBT issued to each borrower a HOEPA Notice (15 U.S.C. § 1639(a) & (b)) and to the Non-Bank Defendants and the Defendant Class a HOEPA Notice of Assignment (15 U.S.C. §1641(d)(4)); 12 C.F.R. §§ 226.34(a)(2).

474.    The predatory lending scheme also violated TILA and HOEPA because the Banks made untimely material disclosures on the Plaintiffs and the Class members' loans.

475.    TILA, as amended by HOEPA, at 15 U.S.C. §1639(b)(1) expressly required the Banks to provide certain HOEPA disclosures "not less than three *business* days *prior* to consummation of the transaction."

476.    Section 103(y) of TILA (15 U.S.C. § 1602(y)) incorporates by reference any requirement imposed by Regulation Z promulgated by the Federal Reserve Board.  Section 103(y) specifically provides: "Any reference to any requirement imposed under this [TILA] title or any provision thereof includes reference to the regulation of the [Federal Reserve] Board under this title or the provision thereof in question."

477.    Regulation Z, Section 226.2 (a)(13) defines "consummation" as follows: "(13) *Consummation* means that time the consumer becomes contractually obligated on a credit transaction." 12 C.F.R. §226.2(a)(13).  The Class Members became "contractually obligated" when they executed their notes and security deeds on the dates of their closings.

478.    Defendants had actual knowledge that the Class members' HOEPA mortgage loans were subject to the requirements of HOEPA.

479.    GNBT and CBNV, in contravention of HOEPA at 15 U.S.C. §1639(b)(1), did not provide timely notice as required by TILA and HOEPA, but, in fact, first provided the required HOEPA Notice with the closing papers for such loans and less than 3 business days before the consummation of such loans, which can be readily ascertained by a review of the applicable Fed Ex closings or the records of the attorney or courier closings.

480.    The Banks' violations of HOEPA were intentional.  Integral to the predatory lending scheme was the Banks regular practice of withholding timely disclosures.

481.    The Banks' HOEPA Notices contained an additional violation in that the warnings, APR and monthly payment disclosures were printed in a non-bold, non-capital, type

size *smaller than* the other type in the notice, thereby violating HOEPA's requirement that the required warnings, APR and monthly payment disclosures in the HOEPA Notice be printed "in conspicuous type size." (15 U.S.C. § 1639(a); 12 C.F.R. § 226.32 (c)).

482.    The Banks' notices also routinely included both the APR and the note interest rate such that the disclosures were misleading and confusing.

483.    The Banks also routinely included in their HOEPA Notices a line immediately above the borrowers' signature lines that typically and falsely required the borrower to acknowledge having received the HOEPA Notice either 3 days before closing or 72 hours before closing, when the Banks knew to a certainty that such was not the case.   To the extent that such acknowledgment was known to be false to the loan's originator, the originator's wrongful conduct estops any reliance upon such acknowledgement under the equitable doctrine that no man may profit or gain an advantage over another by his own wrongdoing.

484.    In addition, such a falsification of the HOEPA Notices' receipt acknowledgement constitutes a separate HOEPA violation in that it falsely represents compliance with the 3-business-day advance delivery requirement of 15 U.S.C. § 1639(b)(1). Addition of any false information beyond the required disclosures of 15 U.S.C. § 1639(a)(1) & (2) constitutes a separate HOEPA violation for which the Banks and their Investor assignees are jointly and severally liable.

485.    Wholly apart from their false acknowledgement of receipt, many such acknowledgements are deficient on their face in that they acknowledge receipt: (1) without stating any period at all of purported pre-closing notice, or (2) merely attest delivery "3 days" or "72 hours" before closing without acknowledging receipt "3 *business* days prior" to closing. 15 U.S.C. § 1639(b)(1). Such deficient acknowledgements raise a presumption of non-compliance

and constitute yet another separate violation of HOEPA for which the Banks and RFC are jointly and severally liable.

486.    The promissory notes of the Class Members also contained an additional and separate HOEPA violation respecting HOEPA's restriction on the collection of prepayment in refinancings by original lenders.  Specifically, most of the note forms utilized by CBNV and GNBT contain provisions providing for prepayment penalties but *do not* disclose the HOEPA restriction that a prepayment penalty may be collected "if … (B) the penalty applies only to a prepayment made with amounts obtained by the consumer by means *other than* a refinancing by the creditor under the mortgage, or an affiliate of that creditor."  (15 U.S.C. § 1639(c)(2)(B)).  The lack of such disclosure constitutes an additional and separate violation of HOEPA for which the Banks and the Non-Bank Defendants and the Defendant Class members are jointly and severally liable.

487.    Because the HOEPA Notices were defective as a matter of law for understatement of the true APR, failure to set forth the required disclosures in conspicuous type size, insertion of false receipt acknowledgements as to the HOEPA Notices, and deficient receipt acknowledgements failing to specify the receipt period in "business" days, the HOEPA Notices were worth nothing for compliance purposes regardless of when they were purportedly delivered.

488.    Under 15 U.S.C. § 1641(d) the Non-Bank Defendants and the Defendant Class members are subject to all claims and defenses that the Plaintiff Class members have against CBNV and GNBT.

489.    Accordingly, as a result of the additional violations of the substantive provisions of TILA and HOEPA, Plaintiffs are entitled to multiple damage awards under 15 U.S.C. §§

1635, 1639, 1640 and 1641(d), including, all (1) actual and statutory damages; (2) rescission

rights and damages; and (3) an amount equal to the sum of all finance charges and fees paid by

the Class Members for each and every *separate* HOEPA violation as to each and every *separate*

borrower.

490.    Under 15 U.S.C. § 1635(g), the Plaintiff Class members are also entitled to

additional relief under 15 U.S.C. § 1640 not related to their rescission rights.

491.    Under 15 U.S.C. § 1635(a), those certain Plaintiff Class members whose loans

were consummated within three years of the filing of the *Davis* case on May 1, 2001 and the

*Ulrich* case on September 19, 2002 are entitled to assert claims for rescission against any

assignee or holder of their notes and mortgages. As to RFC the legal tolling date for rescission

for all class members, based on *Davis*, is May 1, 1998.

## COUNT IV

### Declaratory Judgment that the Class Members have a Right to Rescind Their Loans

492.    Each preceding paragraph of this *MDL Complaint* is hereby incorporated as if

fully set forth herein.

493.    Rescission is available for three business days following the finalization of the

transaction, and, if the creditor fails to make all material disclosures consumer's ability to rescind

may be extended for up to three years. 15 U.S.C. § 1635(a).

494.    Defendants' actions affected the entire Class such that declaratory relief would be

appropriate for the entire class. This request for declaratory relief is appropriate with respect to

the entire class.

495.    The Plaintiffs and the members of the Plaintiff Class seek a declaration that the

Banks violated TILA and HOEPA as set forth above in Counts II and III, and thus under 15

U.S.C. § 1635(a), those class members whose loans were consummated within three years of the

date of the filing the *Davis* case on May 1, 2001 and the *Ulrich* case on September 19, 2002 are

entitled to assert claims for rescission against any assignee or holder of their notes and

mortgages.

496.    As to the CBNV loans and GNBT loans that have been paid off, those Class

members are not obligated to make a tender of the principal back to Defendants.

497.    In addition, because the HOEPA enhanced damages and rescission damages to the

Class members will exceed any tender obligation, those Class members are not required to tender

any principal back to Defendants.  Instead, the Class members are entitled to a return of finance

charges and interest paid on their loans.

## COUNT V

### Violation of the Racketeer Influenced and Corrupt Organizations Act,
### 18 U.S.C. § 1962(c) and 1962(d)

498.    Each preceding paragraph of this *MDL Complaint* are hereby incorporated as if

fully set forth herein.

499.    Each Plaintiff and member of the Class is a "person" within the meaning of 18

U.S.C. §§ 1961(3) and 1964(c).

500.    The Banks, the Shumway/Bapst Organization and related entities as well as other

"consultants" to the Banks (collectively the "Consultants"), the Investor Defendants and the

Defendant Class members are persons within the meaning of 18 U.S.C. §§ 1961(3).

501.    The Banks, the Shumway/Bapst Organization and related entities as well as other

"consultants" to the Banks (collectively the "Consultants"), the Investor Defendants and the

Defendant Class members are each "persons" as defined under 18 U.S.C. § 1961(3) and have

violated the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1962(c)

and 1962(d) because they were associated with enterprises, as defined in more detail below, which enterprises engaged in and wholesale activities of which affect interstate commerce and which said Defendants conducted and participated, both directly and indirectly in the conducting of the affairs of such enterprises through a pattern of racketeering activity, and which Defendants conspired to violate the provisions of 18 U.S.C, § 1962(d).

502.    Further, even if the Investor Defendants and the Defendant Class members did not conduct or participate directly in the enterprises, they agreed with the Consultants and the Banks and became co-conspirators with them as to the goal of the enterprises and facilitated and supported the endeavor by providing the flow of capital to the Banks, making them subject to conspiracy liability under 18 U.S.C. § 1962(d). The scheme described in detail above ended when the loan purchasers, including the Investor Defendants and the Defendant Class members stopped the flow of capital to the Banks and the Consultants.

503.    The Investor Defendants and the Defendant Class members are also liable for the RICO violations of the Banks and the Consultants by virtue of 15 U.S.C. § 1641, in that the Investor Defendants and the Defendant Class members stand in the shoes of the creditors, the Banks.

504.    The Banks, the Consultants, and the Investor Defendants and the Defendant Class members used the mails and the wires and as described in more detail below, as such are defined and prohibited in 18 U.S.C. §§ 1341 and 1343, and engaged in the laundering of monetary instruments as defined and prohibited at 18 U.S.C. § 1956, as part of a fraudulent scheme and pattern of racketeering activity that was perpetrated on a nationwide basis against the home equity mortgage borrowers of the Banks and in particular on the Plaintiffs and the Plaintiffs Class.

505.    The first enterprise, "the CBNV Consultant Enterprise," consisted of a formal or informal association in fact of individuals and legal entities which included CBNV, its Consultants  (including EquityPlus Financial and any successor or affiliated entity which was controlled by the owners of EquityPlus and not otherwise delineated here, Community Home Mortgage, LLC, Community Plus Financial, Community First Financial, America's Mortgage, LLC, First Security Savings, Inc., and Interbank/Market Makers, LLC), its loan purchasers-investors (primarily, RFC, Irwin, Household Finance and Countrywide), and the title companies (including Title America LLC, Resource Title, Paramount Title, Home Title and Escrow and Papermaster Title and Escrow) which were used by CBNV and its Consultants . This enterprise functioned as a continuing unit, and the liable persons were joined in purpose and in their goals to solicit and make the illegal and false second mortgage loans to borrowers of CBNV nationwide (including Plaintiffs whose loans were made by CBNV) and to sell those loans to the Investor Defendants, including primarily RFC, and the Defendant Class members.

506.    This enterprise was an association in fact that promoted and consummated and assigned and received an assignment of such home equity mortgage loans made by CBNV.  The enterprise was participated in by CBNV, who made the loans to its borrowers, who funneled the illegal and excessive charges from the loans to the Consultants, who also sold the loans to the Investor Defendants and the Defendant Class members. The Investor Defendants and the Defendant Class members participated in the enterprise through their provision of the flow of operating capital to the enterprise through the purchase of the loans that met their criteria for their securitization purposes.  The title companies were affiliated with the Consultants and CBNV and were participating in a RESPA markup and kickback scheme.

507.    The second enterprise, "the GNBT Consultant Enterprise," consisted of a formal

or informal association in fact of individuals and legal entities which included GNBT, their primary consultant Equity Guaranty LLC and any successor or affiliated entity which was controlled by the owners of Equity Guaranty LLC and not otherwise delineated here, its investor-purchasers, primarily RFC, and the title companies (primarily Title America LLC and USA Title, LLC) which were used by GNBT and its consultant.  This enterprise functioned as a continuing unit, and the liable persons were joined in purpose and in their goals to solicit and make the false and illegal second mortgage loans to borrowers of GNBT nationwide (including Plaintiffs whose loans were made by GNBT) and to sell those loans to RFC.

508.    This enterprise was an association in fact that promoted and consummated and assigned the home equity mortgage loans made by GNBT. The enterprise was participated in by GNBT, who made the loans to its borrowers, who funneled the illegal and excessive charges from the loans to the consultant, who also sold the loans to the investor-purchasers, primarily RFC.  RFC participated in the enterprise through its provision of the flow of operating capital to the enterprise through the purchase of the loans that met their criteria for their securitization purposes.  The title companies were affiliated with and controlled by the consultant and GNBT and were participating in a RESPA markup and kickback scheme.

509.    These first two enterprises had a structure that shared a commons and shared purpose, and had a continuity of structure and personnel and which structure, as an association in fact, was ascertainable and distinct from the pattern of racketeering itself, and which pattern of racketeering activity which was continuous, spanning a period of more than four years from the period in late 1997 until late in 2002, which included some 50,000 borrower/victims and which activity was related by the making of some 50,000 home equity loans through the concealed scheme as outlined above.

510. Alternatively, and in addition to the first two enterprises referenced above, CBNV as an enterprise and with whom the "persons" within the following association in fact enterprise conspired in violation of 18 U.S.C. § 1962(d), and an association in fact enterprise, consisting of the Shumway/Bapst Organization along with the EquityPlus Financial, LLC and EquityPlus Financial, Inc., and CBNV and RFC; and each of which enterprises formed an "enterprise" as defined by RICO, 18 U.S.C. § 1961(4), which enterprises and each of them, were continuous with respect to their structure and shared a common and shared purpose with a continuity of structure and personnel and which enterprises were ascertainable and distinct from the pattern of racketeering activity under which enterprises were conducted, and which continued in existence from a period in late 1997 until in or about 2000.

511. When their relationship with CBNV soured, GNBT as an enterprise and with whom the "persons" within the following association in fact enterprise conspired in violation of 18 U.S.C. § 1962(d), and an association in fact enterprise consisting of the Shumway/Bapst Organization and Equity Guaranty and related entities, including Title America and Title USA, and GNBT and RFC; and each of which enterprises formed an "enterprise" as defined by RICO, 18 U.S.C. § 1961(4), which enterprises and each of them were continuous with respect to their structure and shared a common and shared purpose with a continuity of structure and personnel and which enterprises were ascertainable and distinct from the pattern of racketeering activity under which enterprises were conducted, and which continued in existence from the period in late 1999 or early 2000 until late in 2002.

512. The pattern of racketeering activity through each above enterprises included the illegal use of the mails and the wires, as such are defined and prohibited in 18 U.S.C. §§ 1341 and 1343 related directly to the scheme, as evidenced by the HUD-1 Settlement Statements

which uniformly misrepresented the disposition or payment of proceeds to CBNV, GNBT or to the title companies, when in fact the majority of the proceeds were being paid to the Consultants. In particular, the Plaintiffs' and the Plaintiffs Class' HUD-1 Settlement Statements were standard form, RESPA required documents used by the Banks and the Consultants and the Investor Defendants and the Defendant Class in the Class Members' HOEPA mortgage loan transactions, which HUD-1 Settlement Statements uniformly concealed or misrepresented the nature, amount and disposition of the charges and proceeds paid to the Banks and the title companies, or other affiliate entities, which payments, in fact, were illegally kicked back, marked-up, concealed and, without limitation, certain of such charges were illegal disbursed and concealed as being disbursed to the Consultants including in most instances persons or entities within the Shumway/Bapst Organization.

513. Additionally, the Truth In Lending Disclosure for Real Estate Mortgage Loans and the Truth In Lending Disclosure (For Section 32 Mortgages) as provided to the Plaintiffs were false and misleading in that the Annual Percentage Rate (the "APR") was understated and in violation of TILA and HOEPA and disclosures were provided to the Class Members (albeit not necessarily timely).

514. The enterprises used the interstate mails and wires to market their second mortgage loan programs and to solicit loans from potential borrowers. The use of the wires and mails was essential to each mortgage loan transaction.

515. The enterprises also engaged in money laundering as a part of, and in furtherance of, its scheme and artifice to defraud the Class members in violation of 18 U.S.C. § 1956.

516. The enterprises knew that the property involved in the second mortgage loan

transactions that they conducted with the Class members represented the proceeds of activities which constituted felonies under federal law (*i.e.*, mail and wire fraud).

517.    The second mortgage loan transactions were "financial transactions" as defined by 18 U.S.C. § 1956(c)(4).

518.    The enterprises conducted the second mortgage loan transactions with the intent of carrying on, promoting and facilitating further acts of mail and wire fraud and/or knowing that the second mortgage loan transactions were designed in whole or in part to conceal or disguise the nature, source and control of the mail and wire fraud The Defendants and the enterprises knew that the property involved in their financial transactions represented the proceeds of unlawful activities and they conducted and/or attempted to conduct their financial transactions, which involved the proceeds of the unlawful activities, with the intent to promote the carrying on of the unlawful activities and to with intent to avoid taxation on these proceeds and regulation by state licensing entities.

519.    Further, Defendants and the enterprises knew that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activities and to avoid a transaction reporting requirement under State or Federal law (as found by the OCC in its Reports of Examination).

520.    Indeed, among other things, the predicate acts of mail and wire fraud and money laundering, which are described with particularity above, and can be referenced by reviewing the loan papers found in the Plaintiffs' loan files and which are evidenced by the closing of the borrowers' loans, consisted of and used the mails and wired as follows:

(a) the purchase of credit/customer lists from the major credit reporting agencies;

(b) the false representations used by the Consultants and the loan production offices to the credit reporting agencies to obtain the customer lists;

(c) the directed mailings to the Class members used to falsely lure borrowers to the loan production offices including as set forth with more particularity immediately below;

(d) the directed mailings to the Class members which falsely contained non-existent and misrepresented loan offers, such as the borrowers were "pre-approved" for offers of credit that were not being offered;

(e) the use of the wires and telephones to intake applications for loans;

(f) the ordering of credit reports for every borrower on every loan (as evidenced by the charges for credit reports on Line 804 of the Plaintiffs' HUD-1s);

(g) the receipt of the credit reports on the borrowers (as evidenced by the charges for credit reports on Line 804 of the Plaintiffs' HUD-1s);

(h) the use of the mails and carriers such as Federal Express to "overnight" the closing papers and HUD-1's to and from the Banks and/or the Consultants ;

(i) the wiring of settlement funds, including the funds for the bogus and unlawful fees, between the Banks, the Investor Defendants and the Defendant Class members, and the Consultants  and the title companies;

(j) the wiring of funds between the Investor Defendants and the Defendant Class members and the Banks after the loans were purchased by the Investors;

(k)  the Banks' and the Consultants' use of the Internet to obtain funding and purchase approvals from the Investor Defendants and the Defendant Class members;

(l) the disbursement of payments to the Class members' creditors through disguised sources;

(m) the collection and receipt the Class members' monthly loan payments;

(n) the maintenance of separate books and records for the Consultants  in the Banks' records;

(o) the use of shared bank accounts to deposit and withdraw proceeds of the unlawful activities; and

(p) the dozens of letters and emails which are set forth above, that were designed to perpetuate and further the consulting/franchising scheme.

521.    In addition, the racketeering activity consisted of the representations and concealment included in the HUD-1s as referenced in specific detail above as to each Class member, which HUD-1s were false and misleading and contained fraudulent misrepresentations and concealments as set forth in particular detail above, relating to each of the Plaintiffs' loans.

522.    Additionally, the racketeering activity consisted of the representations and concealments included in the Truth In Lending Disclosure for Real Estate Mortgage Loans and the Truth In Lending Disclosure (For Section 32 Mortgages) as referenced in specific detail above as to each Class member, which Disclosures were false and misleading and contained fraudulent misrepresentations and concealments as set forth in particular detail above, relating to each of the Plaintiffs' loans.

523.    Although not a necessary element of this RICO claim, the Class members relied to their detriment by consummating the lending transactions with what was represented to be and was believed to be legitimate lenders, but were, in fact, part of a predatory scheme in which the promoter used a consulting/franchising scheme to lend an air of legitimacy to the transaction.  It was, in fact a false air of legitimacy, upon which misrepresentations plaintiffs

justifiably and reasonably relied, all to the Class members' detriment in that instead of dealing with legitimate lenders, Class members unknowingly, dealt with a fraudulent and illegitimate scheme. The Class members were damaged by reason of such fraudulent racketeering activity.

524. The racketeering activity was "self-concealing" and the very essence of these enterprises was to conceal the racketeering activity from the Class members.

525. The Defendants, including the Banks and the Investor Defendants and the Defendant Class members are therefore liable persons to the Plaintiffs and the Plaintiff Class for the violation of 18 U.S.C. § 1962(c) and 1862(d) for having participated and conducted the operation and management of enterprises as described with specificity above and in accordance with the definition of an enterprise as set forth in 18 U.S.C. § 1961(4), through a pattern of racketeering activity of mail and wire fraud and money laundering activity, and as a conspiracy to violate the provisions of 18 U.S.C. § 1962(c), and the Class members were injured in their property by reason of such racketeering activity, which injury by virtue of the fraudulent and concealing racketeering activity was not discovered and could not have been discovered exercising reasonable diligence until and in fact, after this lawsuit was first filed. As such, the Class members' RICO claims are timely for the four-year period preceding the filing of the filing of the *Davis* case on May 1, 2001 and the *Ulrich* case on September 19, 2002.

526. Additionally, the Defendants, including the Banks and the Investor Defendants and the Defendant Class members and the Consultants and the related and affiliate title companies conspired with and agreed, knowingly, to participate in the racketeering acts and goals of the enterprises as set forth with particularity above and agreed with one another to

conduct the enterprises through the fraudulent consulting scheme, which agreement included in specific part, the actual lending of the money to the borrowers, including the Class members, and the falsification of the HUD-1s and the Truth In Lending Disclosures, and by funneling the fraudulent and illegitimate charges to the unregulated and illegitimate promoters of these loans with the excessive charges, all in violation of 18 U.S.C. § 1962(d). The Defendants, including the Banks and Investor Defendants and the Defendant Class members are therefore liable by virtue of 15 U.S.C. § 1641.

527. Additionally, the Investor Defendants and the Defendant Class members conspired with and agreed, knowingly, to participate in the racketeering acts and goals of the enterprise as set forth with particularity above. They agreed with the Consultants and the Banks to the conducting of the enterprise through the fraudulent scheme, which agreement included the their actual participation in the enterprises by pre-approving loans and financing their operations, which allowed the enterprises to not only continue, but to proliferate, making more victims on the one hand, but on the other, more profits for the Consultants, the Banks and the Investor Defendants and the Defendant Class members, The scheme was dependent upon the continuous source of money and flow of capital necessary to continue the scheme and the enterprise, all in violation of 18 U.S.C. § 1962(d).

528. Further, the Investor Defendants and the Defendant Class members are liable to the Plaintiffs and the Plaintiff Class just as the Banks are liable for the above RICO violations by virtue of 15 U.S.C. § 1641(d) because the underlying racketeering activities involved high cost loans.

529. The Class members were in fact injured by the actions of Defendants by the conduct constituting violations of RICO, and suffered monetary damages as a result. That the

Class members relied upon the predicate acts of mail and wire fraud and money laundering is evidenced by their agreement to enter into the second mortgage loan transactions with the Banks, their payment of fees and charges on their loans and the continued monthly payments on their second mortgage loans. As a direct, foreseeable and proximate result of the acts as alleged herein, and the violations of 18 U.S.C. §§ 1962(c) and 1962(d) by the Defendants, the Class members suffered substantial economic injury and injury to their property and they shall recover threefold the damages sustained by them, the cost of this lawsuit, and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, on all asserted causes of action against Defendants, Plaintiffs and the Plaintiff Class members pray for judgment against said Defendants and the Defendant Class members as follows:

(a) For an Order certifying that this action may be maintained as a Plaintiff class action, as defined above, under Fed. R. Civ. P. 23(a) and 23(b)(3);

(b) For an Order appointing the Plaintiffs to act as representatives of the Plaintiff Class Members and the Plaintiff Class;

(c) For an Order appointing the undersigned counsel, Carlson Lynch, LTD and Walters, Bender, Strohbehn & Vaughan, P.C. to act as Co-Lead counsel for the Plaintiffs' Class pursuant to Fed. R. Civ. P. 23(g);

(d) For an Order directing that reasonable notice of the Plaintiff Class action be given to all members of the Plaintiff Class at the appropriate time and in the manner directed by the Court;

(e) For violating the HOEPA requirements of 15 U.S.C. §§ 1635, 1638, and 1639, a declaration that those certain Plaintiff Class members whose loans were closed within the three-year period preceding the filing of the filing of the *Davis* case on May 1, 2001 and the *Ulrich* case on September 19, 2002, remain entitled to rescind their loans and that to any pending or current loans that Defendants are prohibited from foreclosing on the Plaintiffs' and Plaintiff Class members' mortgages;

(f) For damages related to Defendants' failure to rescind the Plaintiffs' and the Class members' HOEPA loans;

(g) For violating the HOEPA requirements of 15 U.S.C. §§ 1635, 1638, and 1639, an Order and Judgment finding that Defendants and the Defendant Class members are liable as a matter of law to each Plaintiff Class member for damages and declaratory and injunctive relief allowable under 15 U.S.C. §§ 1635, 1639, 1640 and 1641(d), including, all (1) actual and statutory damages; (2) rescission rights and damages; and (3) an amount equal to the sum of all finance charges and fees paid by the Plaintiff Class members for each and every *separate* HOEPA violation as to each and every *separate* borrower;

(h) For violations of the above laws a finding of assignee liability under the provisions of HOEPA;

(i) For violating RESPA, an Order and Judgment finding that the Defendants and the Defendant Class members are liable as a matter of law to each member of the Plaintiff Class for treble damages;

(j) For violating RESPA, an Order and Judgment awarding RESPA treble damages to the Plaintiff Class members and against the Defendants and the Defendant Class

members in accordance with the loans which were "made" or assigned to the said Defendants and the Defendant Class members;

(k) For violating RICO 18 U.S.C. § 1962(c) and 1962(d), a finding that the Defendants and the Defendant Class members are jointly and severally liable as a matter of law to each member of the Class for actual damages;

(l) For a trebling of the actual damages as provided in 18 U.S.C. § 1964(c);

(m) For a permanent injunction enjoining Defendants and the Defendant Class members, together with their officers, directors, employees, agents, partners or representatives, successors and any and all persons acting in concert with them or by agreement with them from directly or indirectly engaging in the wrongful acts and practices described above, all for the benefit of the Plaintiff Class Members and other future borrowers;

(n) For reasonable attorneys' fees as provided by law and statute;

(o) For pre-and-post judgment interest as provided by law in amount according to proof at trial;

(p) For an award of costs and expenses incurred in this action; and

(q) For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted:

By____/s/ R. Bruce Carlson_____
R. Bruce Carlson (PA ID #56657)
Gary Lynch (PA ID # 56887)
Stephanie K. Goldin (PA ID # 202865)
CARLSON LYNCH LTD.
– *Proposed Co-Lead Counsel*
P.O. Box 367
231 Melville Lane
Sewickley, PA 15143
(412) 749-1677
(412) 749-1686 (Facsimile)

*-and-*

Daniel O. Myers
LAW OFFFICES OF DANIEL O. MYERS
1127 Queensborough Blvd., Suite 105
Mt. Pleasant, SC 29464
(843) 654-7440
(843) 654-7441

*-and-*

A. Hoyt Rowell, III
RICHARDSON, PATRICK, WESTBROOK
  & BRICKMAN, LLC
1037 Chuck Dawley Blvd., Bldg. A
Mt. Pleasant, SC  29464
(843) 727-6550

By____/s/ David M. Skeens_____
J. Michael Vaughan
R. Frederick Walters
David M. Skeens
Kip D. Richards
Garrett M. Hodes
WALTERS BENDER STROHBEHN &
  VAUGHAN, P.C.
– *Proposed Co-Lead Counsel*
2500 City Center Square
12th & Baltimore
P.O. Box 26188
Kansas City, MO  64196
(816) 421-6620
(816) 421-4747 (Facsimile)

*-and-*

Scott C. Borison
LEGG LAW FIRM, LLC
5500 Buckeystown Pike
Frederick, MD 21703
(301) 620-1016
(301) 620-1018 (Facsimile)

*-and-*

Franklin R. Nix
LAW OFFICES OF FRANKLIN NIX
1020 Foxcroft Road, N.W.
Atlanta, GA 30327-2624
(404) 261-9759
(404) 261-1458 (Facsimile)

*-and-*

Knox McLaney
MCLANEY & ASSOCIATES, P.C.
P. O. Box 4276
Montgomery, AL 36104
(334) 265-1282
(334) 265-2319 (Facsimile)

## **ATTORNEYS FOR PLAINTIFFS**