B 10 Modified (Official Form 10) (12/11)

COPY

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

Name of Debtor and Case Number: **Residential Funding Company, LLC, Case No. 12-12019**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

**Neville Evans and Maribeth Evans**

Name and address where notices should be sent:

James B. Blackburn, Jr.
Wiseman, Blackburn & Futrell
P.O. BOX 8996
Savannah, GA 31412

Telephone number: 912-232-2136    email: jbbjratty@aol.com

Name and address where payment should be sent (if different from above):

Telephone number:    email:

Claim # 5267
Initials PMH

1. Amount of Claim as of Date Case Filed: $ **850,000.00**

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: wrongful foreclosure, conversion and other tort and contract claims
(See instruction #2)

3. Last four digits of any number by which creditor identifies debtor:

| 3a. Debtor may have scheduled account as: | 3b. Uniform Claim Identifier (optional): |
|---|---|
| (See instruction #3a) | (See instruction #3b) |

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐Real Estate ☐Motor Vehicle ☐Other
Describe:

Value of Property: $_____ Annual Interest Rate_____% ☐Fixed ☐Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any: $_____

Basis for perfection: _____

Amount of Secured Claim: $_____    Amount Unsecured: $_____

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____    (See instruction #6)

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

9. Signature: (See instruction #9) Check the appropriate box.
☐ I am the creditor.    ☑ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor, or    ☐ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)    their authorized agent.    indorser, or other codebtor.
(See Bankruptcy Rule 3004.)    (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: James B. Blackburn, Jr.
Title: Attorney for Creditor
Company: Wiseman, Blackburn & Futrell
Address and telephone number (if different from notice address above):

Telephone number:    Email:

11/13/2012
(Signature)    (Date)

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

Right column:

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number: _____
(If known)

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

Amount entitled to priority:

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

RECEIVED

NOV 1 6 2012

KURTZMAN CARSON CONSULTANTS

COURT USE ONLY

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE:

Residential Funding Company, LLC

Homecomings Financial, LLC

                    Debtors.

Case Number:   12-12019-MG

12-12042-MG

**Jointly Administered**

### CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing Proof of Claims and copy of Complaint on the following counsel or parties:

Office of United States Trustee SDNY
33 Whitehall Street, 21st Floor
New York, NY 10004-2111
*U.S. Trustee*
-------------------------------------------------

Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi
Anthoni Princi
MORRISON & FOERSTER, LLP
1290 Avenue of the Americas, 40th Floor
New York, NY 10104
*Attorneys for Debtors, and Debtors in Possession*
-------------------------------------------------

Residential Funding Company, LLC
8400 Normandale Lake Blvd.; Suite 350
Minneapolis, MN 55437
*Debtor*
-------------------------------------------------

Douglas Mannal
Kenneth H. Eckstein
Steven S. Sparling
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
-------------------------------------------------

Lorraine S. McGowen
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
-------------------------------------------------

Robert J. Feinstein
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, NY 10017-2024
*Creditor Committee*
*Official Committee Of Unsecured Creditors*
-------------------------------------------------

Homecomings Financial, LLC
8400 Normandale Lake Drive, Suite 350
Minneapolis, MN 55437
*Debtor*

by causing a copy to be:

■    deposited in a properly addressed envelope with sufficient postage affixed thereto and placed into first class mail.

This 14th day of November, 2012

WISEMAN, BLACKBURN & FUTRELL

James B. Blackburn, Jr.
Georgia State Bar No.: 060250
Attorneys for Creditors, Neville Evans and Maribeth Evans

Wiseman, Blackburn & Futrell
P.O. BOX 8996
Savannah, GA 31412-8996
(912) 232-2136 Telephone
(912) 232-6246 Facsimile
jbbjratty@aol.com

B 10 Modified (Official Form 10) (12/11)



| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | |
|---|---|
| Name of Debtor and Case Number: Homecomings Financial, LLC, Case No. 12-12042 | |

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

**Neville Evans and Maribeth Evans**

Name and address where notices should be sent:

James B. Blackburn, Jr.
Wiseman, Blackburn & Futrell
P.O. BOX 8996
Savannah, GA 31412

Telephone number: 912-232-2136          email: jbbjratty@aol.com

Name and address where payment should be sent (if different from above):

Telephone number:          email:

**Claim # 5272**
**Initials PMH**

□ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
(*If known*)

Filed on:_____

□ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

1. Amount of Claim as of Date Case Filed: $ **850,000.00**

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

□ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: wrongful foreclosure, conversion and other tort and contract claims
   (See instruction #2)

3. Last four digits of any number by which creditor identifies debtor: _ _ _ _

3a. Debtor may have scheduled account as: (See instruction #3a)

3b. Uniform Claim Identifier (optional): (See instruction #3b)

4. Secured Claim (See instruction #4)

Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: □Real Estate □Motor Vehicle □Other

Describe:

Value of Property: $_____  Annual Interest Rate_____% □Fixed □Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,

if any: $_____          Basis for perfection: _____

Amount of Secured Claim: $_____          Amount Unsecured: $_____

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):

Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____  (See instruction #6)

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. (See instruction #8, and the definition of "redacted".)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

9. Signature: (See instruction #9) Check the appropriate box.

□ I am the creditor.   ■ I am the creditor's authorized agent.   □ I am the trustee, or the debtor, or   □ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)   their authorized agent.   indorser, or other codebtor.
   (See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: James B. Blackburn, Jr.
Title: Attorney for Creditor
Company: Wiseman, Blackburn & Futrell          (Signature)          11/13/2012
Address and telephone number (if different from notice address above):          (Date)

Telephone number:          Email:

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

□ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

□ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

□ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

□ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

□ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

□ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**RECEIVED**

NOV 16 2012

KURTZMAN CARSON CONSULTANTS

**COURT USE ONLY**

## IN THE UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

IN RE:

Residential Funding Company, LLC

Homecomings Financial, LLC

                              Debtors.

Case Number:    12-12019-MG

                12-12042-MG

**Jointly Administered**

### CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing Proof of Claims and copy of Complaint on the following counsel or parties:

Office of United States Trustee SDNY
33 Whitehall Street, 21st Floor
New York, NY 10004-2111
*U.S. Trustee*
-------------------------------------------------------

Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi
Anthoni Princi
MORRISON & FOERSTER, LLP
1290 Avenue of the Americas, 40th Floor
New York, NY 10104
*Attorneys for Debtors, and Debtors in Possession*
-------------------------------------------------------

Residential Funding Company, LLC
8400 Normandale Lake Blvd.; Suite 350
Minneapolis, MN 55437
*Debtor*
-------------------------------------------------------

Douglas Mannal
Kenneth H. Eckstein
Steven S. Sparling
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
-------------------------------------------------------

Lorraine S. McGowen
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
-------------------------------------------------------

Robert J. Feinstein
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, NY 10017-2024
*Creditor Committee*
*Official Committee Of Unsecured Creditors*
-------------------------------------------------------

Homecomings Financial, LLC
8400 Normandale Lake Drive, Suite 350
Minneapolis, MN 55437
*Debtor*

by causing a copy to be:

- ■    deposited in a properly addressed envelope with sufficient postage affixed thereto
       and placed into first class mail.

This 14th day of November, 2012

WISEMAN, BLACKBURN & FUTRELL

James B. Blackburn, Jr.
Georgia State Bar No.: 060250
Attorneys for Creditors, Neville Evans and Maribeth Evans

Wiseman, Blackburn & Futrell
P.O. BOX 8996
Savannah, GA 31412-8996
(912) 232-2136 Telephone
(912) 232-6246 Facsimile
jbbjratty@aol.com

IN THE SUPERIOR COURT OF CHATHAM COUNTY
STATE OF GEORGIA

RECEIVED FOR RECORD

2008 APR -3  PM 4: 46

| | |
|---|---|
| NEVILLE W. EVANS and MARIBETH R. EVANS<br>Plaintiffs, | )<br>)<br>)<br>) |
| | ) Civil Action No. CV   DANIEL W MASSEY |
| vs. | )   SUPER-  N   CT GA. |
| | ) |
| RESIDENTIAL FUNDING COMPANY, LLC, HOMECOMINGS FINANCIAL, LLC, GMFS, L.L.C., THE KROGER CO., ALISON HIRATA, WESTERN UNION FINANCIAL SERVICES, INC., QUEENSBOROUGH NAT'L BANK AND TRUST DBA FIRST NATL, MORRIS, SCHNEIDER, PRIOR, JOHNSON & FREEDMAN, LLC, and JOEL A. FREEDMAN | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

## COMPLAINT

NOW COME NEVILLE W. EVANS AND MARIBETH R. EVANS, Plaintiffs in the above-styled action and state their complaint against Defendants:

1.  This Complaint is filed under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, et seq. to enforce Plaintiffs' right to recover actual and statutory damages, reasonable attorney's fees and costs by reason of the defendants' violations of FDCPA.

2.  Neville W. Evans and Maribeth R. Evans ("Plaintiffs") are residents of Chatham County, Georgia.

3.  The Plaintiffs were owners of the property that is a subject of this action, Lot 50 Mills Run Subdivision, Chatham County, Georgia, commonly known as 168 Mills Run Drive, Savannah, Georgia 31405, as more particularly described in that certain Warranty Deed dated December 20, 2005, recorded in Deed Book 299R, Page 651, in the Office of the Clerk of Superior Court, Chatham County, Georgia, and attached hereto and made a part hereof as Plaintiffs' Exhibit "A".

4.  Queensborough Natl Bank and Trust DBA First Natl ("Queensborough") is a

bank with an office located at 6605 Abercorn Street, Suite 112 , Savannah, Chatham County, Georgia 31405 and is subject to the jurisdiction of this court. Venue is proper as to it.

5.  Residential Funding Company, LLC ("Residential") is a foreign limited liability company registered to do business in Georgia, whose Georgia registered agent is Corporation Service Company, located at 40 Technology Parkway South, Norcross, Georgia 30092. Residential is subject to the jurisdiction of this court. Venue is proper as to it.

6.  Homecomings Financial, LLC ("Homecomings") is a foreign limited liability company registered to do business in Georgia, whose Georgia registered agent is Corporation Service Company, located at 40 Technology Parkway South, Norcross, Georgia 30092. Homecomings is subject to the jurisdiction of this court. Venue is proper as to it.

7.  GMFS, L.L.C. ("GMFS") is a foreign limited liability company registered to do business in Georgia, whose Georgia registered agent is CT Corporation System, located at 1201 Peachtree Street, Atlanta, Georgia 30361. GMFS is subject to the jurisdiction of this court. Venue is proper as to it.

8.  The Kroger Co. ("Kroger") is a foreign profit corporation registered to do business in Georgia,  which operates a retail establishment at 318 Mall Boulevard, Savannah, Chatham County, Georgia. Kroger's Georgia registered agent is Corporation Service Company, located at 40 Technology Parkway South, #300, Norcross, Georgia 30092. Kroger  is subject to the jurisdiction of this court. Venue is proper as to it.

9.  Alison Hirata is or was an employee of Kroger at all pertinent times and is a resident of Chatham County, Georgia. Ms. Hirata is subject to the jurisdiction of this court. Venue is proper as to her.

10.  MORRIS, SCHNEIDER, PRIOR, JOHNSON & FREEDMAN, L.L.C., formerly known as MORRIS, SCHNEIDER & PRIOR, L.L.C., (MSPJ&F) is a Georgia Limited Liability Company registered to do business in Georgia.  MSPJ&F is subject to the jurisdiction of this court. Venue is proper as to it.

11.  JOEL A. FREEDMAN (Freedman) is a resident of the State of Georgia, a member of MORRIS, SCHNEIDER, PRIOR, JOHNSON & FREEDMAN, L.L.C. and was an employee or member of MSPJ&F or its predecessor at all pertinent times. Mr. Freedman is subject to the jurisdiction of this court.  Venue is proper as to him.

12.  Western Union Financial Services, Inc. ("Western Union") is a foreign profit corporation registered to do business in Georgia, whose Georgia registered agent is  Corporation Service Company, located at 40 Technology Parkway

South, #300, Norcross, Georgia 30092. Western Union operates offices in Chatham County, Georgia and is subject to the jurisdiction of this court. Venue is proper as to it.

13. On June 20, 2005, Plaintiffs and Lopez Construction, Inc. entered into a contract for purchase of a home located at 168 Mills Run Drive, Savannah, Chatham County, Georgia 31405. A legal description of the property appears on the Warranty Deed, Plaintiffs' Exhibit "A," attached hereto and made a part hereof.

14. The contract for purchase was made conditional upon the Plaintiffs' obtaining a loan for 95% of the purchase price, such loan's interest rate to not exceed 11%. The contract is attached hereto as Plaintiffs' Exhibit "B" and made a part hereof.

15. Defendant Queensborough steered Plaintiffs into obtaining two loans to purchase the subject property, against the terms of the contract for purchase and against the Plaintiffs' best interest.

16. On December 20, 2005 Plaintiffs closed on their purchase of the home.

17. Plaintiffs executed a note and primary security deed securing a loan of One Hundred Twenty-Four Thousand Nine Hundred Twenty and 00/100 Dollars ($124,920.00) to Queensborough Natl Bank and Trust DBA First Natl, with MERS as the nominee ("Queensborough"). The interest rate of this note was 8.5% per annum. The note is attached hereto as Plaintiffs' Exhibit "C" and made a part hereof. The security deed is attached hereto as Plaintiffs' Exhibit "D" and made a part hereof.

18. Plaintiffs executed a secondary note and subordinate lien deed to secure debt securing a loan of Thirty-One Thousand Two Hundred Thirty and 00/100 Dollars ($31,230.00) to Queensborough Natl Bank and Trust DBA First Natl. The interest rate of this note was 12.115% per annum. The secondary note is attached hereto as Plaintiffs' Exhibit "E" and made a part hereof. The subordinate lien deed to secure debt is attached hereto as Plaintiffs' Exhibit "F" and made a part hereof.

19. Concurrent with the closing, Queensborough assigned both notes to GMFS, L.L.C., as evidenced by Plaintiffs' Exhibits "C" and "E."

20. GMFS, L.L.C. misapplied the payments Plaintiffs made on both loans and assigned both loans to Residential Funding Company, LLC, before correcting their errors. Record proof of the assignment of the subject security deeds to Residential is attached hereto as Plaintiffs' Exhibit "G" and made a part hereof.

21. Homecomings Financial, LLC acted as a servicer for both of Plaintiffs' loans.

22. Plaintiffs made regular payments on both loans to Homecomings.

23. On January 31, 2007, Plaintiff Maribeth Evans filled out two Western Union money transfer requests at Kroger #957, located at 318 Mall Boulevard, Savannah, GA 31406.

24. One money transfer request, filled out by Plaintiff Maribeth Evans in the amount of $1950.00 was to be made payable to Homecomings for the loan number ending in -7884, as evidenced by Plaintiffs' Exhibit "H," attached hereto and made a part hereof. The other in the amount of $975.00 was made payable to Homecomings for loan number ending in 8015.

25. An employee of Kroger and agent of Western Union, Alison Hirata, who completed the transfer forms, wrote the same loan number on each transfer form, as evidenced by the transfer forms attached hereto as Plaintiffs' Exhibit "I" and made a part hereof.

26. As a result of the error in completing the transfer requests, the Plaintiffs loan payments were misapplied and it appears as if Plaintiffs defaulted on their primary loan.

27. Residential, Homecomings, and all of their agents failed to notify Plaintiffs of the apparent default on their primary loan. Therefore, Plaintiffs were unaware that their home was susceptible to foreclosure.

28. Plaintiffs continued to make regular payments to Homecomings.

29. On April 23, 2007, Joe Drescher ("Drescher"), a Savannah real estate agent, met the Plaintiffs at their home and informed them that their Lender, Residential Funding Company, LLC, had foreclosed on and bought the subject property.

30. Drescher informed Plaintiffs that they must move immediately, or else Residential would institute eviction proceedings.

31. The Plaintiffs did not receive notice of their alleged default, notice of acceleration, or notice of foreclosure at any point in time, until Joe Drescher notified them that the foreclosure sale had occurred.

32. The primary security deed is a Fannie Mae/Freddie Mac uniform instrument. Section 22 of the security deed states that the "Lender should give notice to borrower prior to acceleration following borrower's breach of any covenant or agreement in this security instrument...the notice shall specify (a) the default; (b) the action required to cure the default; (c) a date not less than thirty days from the date the notice is given to borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this security instrument and

sale of the property." The primary security deed is attached hereto as Plaintiffs' Exhibit "D" and made a part hereof.

33.    Neither Defendant Residential, nor its agents and attorneys, Joel Freedman and Morris, Schneider, Prior, Johnson & Freedman, L.L.C., ever sent the notice required by Section 22 of the Security Deed.

34.    Upon receiving notice of foreclosure from Joe Drescher, Plaintiffs immediately contacted Homecomings. Plaintiffs took off from work on April 24 and 25, 2007 in an attempt to resolve the situation with Homecomings, as agent of Residential.

35.    On April 26, 2007, on instruction of Homecomings's employees, Plaintiffs forwarded over Seven Thousand Dollars ($7,000.00) to Homecomings, as they were informed that this amount would cure any claimed default.

36.    Beginning on May 22, 2007, Counsel for Plaintiffs notified Joel Freedman of Morris, Schneider, Prior, Johnson & Freedman, L.L.C., in multiple letters, emails, and facsimiles of their request for all notices sent by his firm or his client, Residential, to Plaintiffs regarding the alleged default, acceleration, and foreclosure. Only as of July 8, 2007, did Counsel receive any documents. See such correspondence attached hereto as Plaintiffs' Exhibit "J" and made a part hereof.

37.    Residential bought in Plaintiff's home at foreclosure sale for the amount it claimed due under the first Security Deed. Said amount was substantially less than its fair market value, as shown by the consideration recited in the deed under power, recorded in Deed Book 325G, Page 66, in the Office of the Clerk of the Superior Court of Chatham County, attached hereto and made a part hereof as Exhibit "K ."

38.    At great emotional and financial expense, Plaintiffs moved out of their home.

39.    After the foreclosure sale, Homecomings pursued Plaintiffs personally for repayment of the subordinate loan, claiming it was now in default.

40.    Residential later sold the subject property for an amount greater than the amount due on the original two loans it held for Plaintiffs. See the special Warranty Deed attached hereto as Plaintiffs' Exhibit "L" and made a part hereof. Plaintiffs were not in default at the time of the foreclosure sale.

41.    Residential and their agents sold the property even though their agents had been informed that they had wrongfully foreclosed on the property.

42.    Counsel for Plaintiffs demanded in a letter to Bruce Paridis, Manager of Residential Funding Company, LLC, that Residential reconvey the property to the Plaintiffs, reinstate their loans, and reimburse them for any expenses

incurred as a result of the wrongful foreclosure and sale of their residence. Counsel also notified Paridis of Residential's bad faith in foreclosing upon Plaintiffs' home without sending proper notice. The letter is attached hereto as Plaintiffs' Exhibit "M" and made a part hereof.

## Claim I. Wrongful Foreclosure

43.    Plaintiffs incorporate paragraphs 1 through 42 by reference thereto.

44.    Plaintiffs were current in the scheduled loan payments to Defendant Residential. At the time of the acceleration and at the time of the sale under power, Plaintiffs were not in default according to the terms of either Deed to Secure Debt.

45.    Joel Freedman and Morris Schneider, Prior, Johnson & Freedman, L.L.C., as agents of Residential, recklessly disregarded the terms of notice and procedure for foreclosure in the Deed to Secure Debt which Plaintiffs granted to Queensborough National Bank, its successors and assigns, causing Plaintiffs irreparable harm. Specifically, Residential Funding and their agents, as attorneys in fact, breached their fiduciary duty by failing to cause appropriate notice to be sent to Plaintiffs regarding their alleged default on the subject loans. Residential and their agents were never entitled under the Security Deed to accelerate the loan and begin foreclosure proceedings.

46.    At the time of the sale Defendants had failed to give the notices required by the Deed to Secure Debt and required by law.

47.    As a result of Defendant's wrongful foreclosure, Plaintiffs have suffered substantial and irreparable harm and are entitled to a cancellation of the foreclosure reconveyance of the property, general and exemplary damages.

## Claim II. Breach of Contract

48.    Plaintiffs incorporate paragraphs 1 through 47 by reference thereto.

49.    Residential had a duty to give all notices, including notice of default and notice of right to reinstate, prior to acceleration under the terms of the contract.

50.    Defendant Residential intentionally breached the terms of the Primary Deed to Secure Debt by failing to give the notice of default as required by Section 22 of said contract.

51.    Residential's failure to do so was intentional and in bad faith. As a result of this breach Plaintiffs have suffered actual and consequential damages and are entitled to recover for such damages.

## Claim III. Fair Debt Collection Practices Act

52.   Plaintiffs incorporate paragraphs 1 through 51 by reference thereto.

53.   Residential is charged with specific knowledge of the notice requirements regarding default and acceleration as they appear in the Primary Deed to Secure Debt, which it acquired from Queensborough.

54.   Residential, through its agents, Joel Freedman and Morris, Schneider, Prior, Johnson & Freedman, L.L.C., and Joel Freedman and M,S,P,J & F, as debt collectors, violated the Fair Debt Collection Practices Act, specifically 15 U.S.C.A. §1692(f)(6)(A) by taking nonjudicial action to affect dispossession of Plaintiffs' property when there was no present right to possession of the property. In addition to the Plaintiffs having done nothing to place their loan in default, Residential never sent Plaintiffs the required notice of default that would have allowed their later acceleration.

55.   As a result of Defendant's violation of the Fair Debt Collection Practices Act, Plaintiffs have suffered substantial and irreparable harm and are entitled to damages.

## Claim V. Negligence

56.   Plaintiffs incorporate paragraphs 1 through 55 by reference thereto.

57.   Defendant Alison Hirata, individually and as an employee of Kroger and agent of Western Union, had a duty to use reasonable care in completing a money transfer form on behalf of Maribeth Evans.

58.   Defendant Hirata breached her duty of reasonable care by negligently completing the January 31, 2007 money transfer form which was to be made payable to Homecomings for the loan number ending in -7884 to the loan number ending in -8015.

59.   Defendant Hirata's breach proximately caused Homecomings to misapply the payment so that Plaintiffs' primary loan, ending in number -7884, appeared to be in default.

60.   Such actions caused Plaintiffs irreparable harm and damages and Plaintiff is entitled to general and special damage as a result.

## Claim VI. Negligence

61.   Plaintiffs incorporate paragraphs 1 through 60 by reference thereto.

62. Defendant Kroger had a duty to use reasonable care in the hiring, training, and supervision of its employee, Alison Hirata, and in the operation of its Western Union Agency.

63. Defendant Kroger breached its duty of reasonable care in the hiring, training, and supervision of its employee, Alison Hirata.

64. Defendant Kroger breached its duty to Plaintiffs to cause the wire transfer to be transmitted accurately to its destination with the information submitted.

65. Defendant Kroger's breach of its duties proximately caused Plaintiffs' primary loan, ending in number -7884, to appear in default upon the books of its holder's servicer.

66. Such negligence and breach of duty caused Plaintiffs irreparable harm and damages, and they are entitled to recover for such damages.

## Claim VII. Negligence and Agency Liability

67. Plaintiffs incorporate paragraphs 1 through 66 by reference thereto.

68. Defendant Western Union had a duty to use reasonable care in supervising the operations of its agents, Kroger and Alison Hirata, in completing accurate money transfers properly labeled for delivery in accordance with its customers' transfer requests.

69. Defendant Western Union breached its duty of reasonable care in supervising the operations of its agents, Kroger and Alison Hirata.

70. Defendants Kroger and Alison Hirata were acting within the terms of their agency with Western Union when they wired Plaintiffs' funds intended to apply to loan number ending in -7884 labeled so as to be applied to the loan number ending in -8015.

71. Defendants' Kroger and Hirata's breach of duty to use reasonable care in labeling funds to be applied to the proper loan account numbers has caused Plaintiffs irreparable harm and damage, and Plaintiffs are entitled to recover general and special damages therefor.

72. Defendant Western Union is liable for the negligent acts and omissions by its agents, Kroger and Alison Hirata and Plaintiffs are entitled to recover damages from them.

## Claim VIII. Negligence

73. Plaintiffs incorporate paragraphs 1 through 72 by reference thereto.

74. Defendants GMFS, Residential and Homecomings had a duty to use reasonable care in servicing or having serviced the subject loans.

75. Defendants GMFS, Residential and Homecomings had a fiduciary duty to keep accurate books and records and apply payments to the appropriate loan.

76. Defendants GMFS, Residential and Homecomings breached their duty to Plaintiffs by failing to correctly apply the Plaintiffs' subject loan payments.

77. Defendants Residential and Homecomings failed to cause notice of default to be transmitted to Plaintiffs as required by the notes and security deeds it was servicing.

78. Defendants Residential's and Homecomings's acts and omissions proximately caused Plaintiffs' primary loan, ending in number -7884, to appear to be in default.

79. Defendants Residential's and Homecomings's acts and omissions caused Plaintiffs to lose their property and to be substantially damaged thereby. Plaintiffs suffered irreparable harm and damages and are entitled to recover for such damages from Homecomings.

## Claim IX. Unjust Enrichment

80. Plaintiffs incorporate paragraphs 1 through 79 by reference thereto.

81. Defendant Residential unjustly enriched themselves by purchasing Plaintiffs' home at foreclosure sale for less than its fair market value and selling the same property to a third party for significantly more money than the combined value of both loans it had made to Plaintiffs while still holding the second loan and demanding payment.

82. Plaintiffs have been economically injured by Defendant's unjust enrichment and are entitled to the increase in equity value as manifested by the recent purchase price of their home and other damage.

## Claim X. Deceptive Trade Practices

83. Plaintiffs incorporate paragraphs 1 through 82 by reference thereto.

84. Defendants Queensborough and Residential, through its agent Homecomings, violated the Uniform Deceptive Trade Practices Act, O.C.G.A. §10-1-372 (a)(12) by engaging in conduct creating confusion and misunderstanding. Specifically,

Plaintiffs continued to pay both loans to Defendant after Defendant had accelerated the first loan without notice and continued to collect both loans when Defendant never notified Plaintiffs of their default.

85. Plaintiffs have incurred severe and irreparable damages as a result of Defendants conduct and are entitled to recover for such damages.

## Claim XI. Defamation

86. Plaintiffs incorporate paragraphs 1 through 85 by reference thereto.

87. Defendant Residential, through their agent Mr. Freedman and his firm Morris, Schneider, Prior, Johnson & Freedman, L.L.C. libeled the Plaintiffs by intentionally publishing a notice of foreclosure in the Savannah Morning News, even though Plaintiffs never defaulted on their loan, injuring their reputation, and most importantly, their credit rating. The publishing of this falsity has exposed the Plaintiffs to public ridicule and seriously threatened their ability to borrow any funds long into the future.

88. Defendant Residential, through their agents, slandered Plaintiffs by intentionally conducting and publishing the sale of Plaintiffs' home on April 3, 2007 in front of the Chatham County Courthouse, even though the Plaintiffs never defaulted on their loan, injuring their reputation, and most importantly, their credit rating. The publishing of this falsity has exposed the Plaintiffs to public ridicule and seriously threatened their ability to borrow any funds long into the future.

89. Plaintiffs made demand upon Defendant Residential to amend or correct any adverse credit information it had reported but never received a response from Residential.

90. Defendant's libelous and slanderous acts were committed recklessly, without regard to the truthfulness of their statements, have caused Plaintiffs serious economic injury, and Plaintiffs are entitled to recover for general and exemplary damages.

## Claim XII. Bad Faith and Attorney's Fees

91. Plaintiffs incorporate paragraphs 1 through 90 by reference thereto.

92. Defendants Homecomings, Residential, Freedman, and MSPJ & F were repeatedly placed on notice of the lack of a default, the misapplication of funds, and the wrongful foreclosure, but failed and refused to correct the errors.

93. Plaintiffs made a demand upon Residential through its Manager, Bruce J. Paradis, "that [his company] reconvey the property to our clients, reinstate their loans, reimburse them for the expense of moving out and back into the

residence, and reimburse them for the expenses they have incurred, including attorney's fees and costs, as a result of the wrongful foreclosure and sale of their residence." A copy of the demand sent to Defendant Residential by certified mail, return receipt requested, is attached hereto as Plaintiffs' Exhibit "M" and made a part hereof.

94.    Residential failed to respond to Plaintiffs' demands.

95.    Defendants have acted in bad faith, have been stubbornly litigious and have caused Plaintiffs unnecessary trouble and expense, and plaintiffs are entitled to recover attorney's fees and all costs of this action.

96.    Defendants' bad faith is so egregious as to authorize an award of exemplary damages, and Plaintiffs will hereinafter pray for same.

Claim XIII. Tortious Interference With Contract

97.    Plaintiffs incorporate paragraphs 1 through 96 by reference thereto.

98.    Defendant Queensborough was notified of the terms of the Purchase and Sale Agreement which required Plaintiffs to obtain a single loan for ninety-five percent (95%) of the purchase price, with a per annum interest rate not to exceed eleven percent (11%). See Plaintiffs' Exhibit "B," previously incorporated herein.

99.    Defendant Queensborough intentionally steered Plaintiffs into obtaining two loans for the purchase of the subject Property, in violation of the terms of the Purchase and Sale Agreement, for the purpose of increasing its profits and decreasing its expenses of underwriting the sale of the notes.

100.    As a result of this piggyback loan arrangement, Plaintiffs were made susceptible to the misapplication of funds among the two loans, as long as they were serviced by the same loan servicer, and Plaintiffs have suffered irreparable harm as a result of Queensborough's tortious interference with the terms of the Purchase and Sale Agreement, and Plaintiffs are entitled to exemplary and regular damages.

Therefore, Plaintiffs pray:

(a)    That process issue and Defendants be served with a copy of this Summons and Complaint as provided by Georgia law;

(b)    For a trial by a fair and impartial jury of twelve;

(c)    That Plaintiffs be awarded special damages against Defendants in such amount as are proven at trial;

(d)    That Plaintiffs be awarded general damages against Defendants in an amount as determined by a fair and impartial jury;

(e)    That Plaintiffs be awarded exemplary damages in an amount determined by the enlightened conscience of a fair and impartial jury;

(f)    That Plaintiffs be awarded attorney's fees and all costs of this action, including costs for records and depositions;

(g)    That the deed under power of sale, dated April 3, 2007, recorded in Deed Book 325G, Page 66, be set aside and cancelled.

(h)    For such other and further relief as this Court deems just and proper.

This _____ day of _____, 2008.

Wiseman, Blackburn & Futrell

James B. Blackburn, Jr.
Georgia State Bar No. 060250
Collin R. Glidewell
Georgia State Bar No. 076114
Attorneys for Plaintiffs

Wiseman, Blackburn & Futrell
240 W. Broughton Street
P. O. Box 8996
Savannah, Georgia 31412
(912) 232-2136
(912) 232-6146 (facsimile)

# EXHIBIT A

Clock#: 752897
FILED FOR RECORD

12/28/2005  04:32pm

PAID: 10.00

Daniel W. Massey, Clerk
Superior Court of Chatham County
Chatham County, Georgia

Real Estate Transfer Tax

PAID #$156.20

[ SPACE ABOVE THIS LINE FOR RECORDING DATA ]

For Clerk of Superior Court

Return Recorded Document to:
WEINER, SHEARHOUSE, WEITZ, GREENBERG & SHAWE, LLP
Attn: William W. Shearouse, Jr.
14 E. State Street
Savannah, Georgia 31401

STATE OF GEORGIA        )
                        )    **WARRANTY DEED**
COUNTY OF CHATHAM       )    **WITH JOINT TENANCY SURVIVORSHIP**

This Indenture made this 20th day of December, 2005, between LOPEZ CONSTRUCTION, INC., of the County of CHATHAM, State of Georgia, as party or parties of the first part, hereinafter called Grantor, and NEVILLE W. EVANS and MARIBETH R. EVANS as joint tenants with rights of survivorship and not as tenants in common as parties of the second part, hereinafter called Grantees (the words "Grantor" and "Grantees" to include their respective heirs, successors and assigns where the context requires or permits).

## WITNESSETH:

Grantor, for and in consideration of the sum of TEN AND 00/100'S ($10.00) Dollars and other good and valuable considerations in hand paid at and before the sealing and delivery of these presents, the receipts whereof is hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto the said Grantees, as joint tenants and not as tenants in common, for and during their joint lives, and upon the death of either of them, then to the survivor of them, in fee simple, together with every contingent remainder and right of reversion, and to the heirs and assigns of said survivor, the following described property, to-wit:

ALL that certain lot, tract or parcel of land situate, lying and being in the 7th G.M. District of Chatham County, Georgia and being known as LOT 50, MILLS RUN SUBDIVISION, being a subdivision of a 33.86 acre tract, known as the remaining lands of Brandlewood Subdivision, 7th G.M. District, Chatham County, State of Georgia, according to that certain survey prepared by Kern-Coleman & Co., dated February 28, 2004, and recorded in Subdivision Map Book 31-S, Page 57A, in the Office of the Clerk of Superior Court of Chatham County, Georgia. For a more particular description of said lots conveyed herein, reference is made to said Subdivision Map which is incorporated herein and made a part hereof by reference.

Subject, however, to all valid restrictions, easements and rights of way of record.

Subject, however, to a limited home buyer's warranty, which shall constitute a covenant running with the land, which shall inure to the benefit of grantee's heirs, successors and assigns and which limits the liability of the grantor herein to the grantee and to the grantee's heirs, successors and assigns.

TO HAVE AND TO HOLD the said tract or parcel of land, with all and singular the rights, members and appurtenances thereof, to the same being, belonging, or in anywise appertaining, to the only proper use, benefit and behoof of the said Grantees, as joint tenants and not as tenants in common, for and during their joint lives, and upon the death of either of them, then to the survivor of them forever in FEE SIMPLE, together with every contingent remainder and right of reversion, and to the heirs and assigns of said survivor. Grantor expressly covenants that Grantor is seized of said property in good fee simple title and that Grantor has the full right, power and authority to convey the same; that the said property and the Grantor thereof are free and clear of any lions, claims or encumbrances whatsoever whereby the title to said property may in anywise be charged, changed, impaired or defeated and that the Grantor will forever WARRANT and DEFEND the said premises against the lawful claims of all persons whomsoever.

IN WITNESS WHEREOF, the Grantor has executed this instrument by and through its duly authorized Corporate Officers with the Corporate Seal affixed thereto on the day and year first above written.

Signed, sealed and delivered in the presence of:

Witness

Notary Public
My commission expires:

LOPEZ CONSTRUCTION, INC.

By:
Its: Jaime Lopez, Vice-President        (CORPORATE SEAL)

Attest:
Its:                                    (Seal)

(CORPORATE SEAL)

BOOK 299 R
PAGE 651

 

Revised 3/04



LOPEZ CONSTRUCTION, INC.
2702 WHATLEY AVENUE, SUITE B-3
THUNDERBOLT, GEORGIA 31404
(912) 355-7890 - PHONE
(912) 355-5153 - FAX

OFFER DATE: 06/20/05

THIS AGREEMENT OF SALE is made and entered into as of the date of the final execution hereof by and between LOPEZ CONSTRUCTION, INC., hereinafter called "Seller", and Neville W. Evans Maribeth R. Evans , herein collectively referred to as "Buyer", and Weichert Realtors, Prestige Properties – Mark Keller hereinafter called "Agent". and

Buyer agrees to purchase through Agent, and Seller agrees to construct and sell a home on that certain lot or parcel of land situate, lying and being in the County of Chatham, State of Georgia (all hereinafter referred to as the "Property") and described as follows:

Legal Description Lot # 50 Mills Run Subdivision, Phase II .

Street Address: 168 Mills Run Drive Savannah, Georgia 31405

NOW, THEREFORE, all parties to this Agreement mutually agree as follows:

1.    Seller is to construct a home known under the model name as Chattahoochee (1644) in accordance with the plans and specifications on file in Seller's office and Buyer's selection sheet. The selection sheet will contain the optional selections by Buyer and agreed to by Seller and will, along with the plans and specifications, be held on file at Seller's office. The selection sheet will take precedence over the plans and specifications in the case of any conflict between the two.

2.    The following are additional provisions of this Contract:

Brick Front at no charge

3.    The full purchase price of the Property is: One Hundred Fifty Six Thousand One Hundred Fifty & 00/100 ($156,150.00 ) DOLLARS and will be paid as follows:

|            |                                                  |
|------------|--------------------------------------------------|
| $1,000.00  | By earnest money deposit herewith                |
|            | By non-refundable option deposit herewith        |
| $6,000.00  | By additional cast at closing                    |
| $149,150.00| By mortgage loan as provided for in Paragraph 5  |
| $156,150.00| Total purchase price                             |

4.    This Agreement is conditioned on Buyer making loan application within five (5) days of the date of the Agreement and depositing a permanent loan commitment with Seller by the 27th day of June 2005 . Should Buyer fail to complete said application within five (5) days, Seller shall have the option of voiding this Agreement at any time hereafter by written notice to Buyer. In addition, Buyer shall deposit the completed selection sheet with Seller within ten (10) days of the date of this Agreement. Should Buyer fail to deposit the completed selection sheet within the allotted time, Seller shall have the option of making all sections on behalf of the Buyer after five (5) days written notice to Buyer. Failure of the Buyer to make loan application timely or to deposit the loan commitment and/or selection sheet as set forth above shall constitute a default on Buyer's part and shall give Seller the right to forfeiture of the deposit and to void this Agreement upon written notice to Buyer, and to avail itself of all other legal remedies. If Buyer commits any act or fails to do any act resulting in Buyer's inability to procure such loan, Buyer shall be considered in breach of contract, and Seller shall have the right to forfeiture of the deposit and to immediately void this Agreement, and to avail itself of all other legal remedies. Retention of Buyer's deposit by Seller

Revised 3/04

upon forfeiture shall not be construed as liquidated damages, and Seller shall have the right to avail itself of any and all other legal remedies available to it.

5.      See the attached Exhibit for financing contingencies, i.e. FHA, VA, or Conventional loan. Buyer hereby gives Seller the right to contact Buyer's lender and receive any and all information regarding the loan application and approval. Buyer shall have the sole authority and duty to lock in any and all information regarding the loan application and that Buyer agrees that any lock selected shall expire no sooner than fifteen (15) days after the closing date contained in Paragraph 9 herein. Any discount to be paid by Seller shall not be used to obtain a buy-down or below market rate on the loan to be obtained by the Buyer. If the Seller is paying any discount, and Buyer has locked the loan in, the Buyer may not change the loan in any way that would cause the Seller to pay any more discount than the lock-in. The Buyer shall immediately disclose to Seller if loan approval is contingent upon the sale of Buyer's current residence, whether or not this contract is contingent on such a sale. If any change in loan type or financing is desired, it must be made by separate agreement, signed by both Buyer and Seller.

6.      In addition to the purchase price, Buyer agrees to pay all prepaid items and to pay or finance as a part of the loan any VA funding fee, FHA mortgage insurance or private mortgage insurance premiums required as a part of the loan and the purchase.

7.      <u>Earnest Money and Non-Refundable Construction Deposit</u> (select A and/or B below). The section not marked is deemed not part of this Agreement.
_____ A. Non-Refundable Construction Deposit.
__x___ B. Earnest Money
1. Buyer has paid $ 1,000.00 _____ as A or B above to Seller, in the form of_____ cash or x ___ check.
2. Within five (5) banking days, the Earnest Money shall be deposited in the Seller's general account. The Earnest Money may be deposited in an interest bearing account and the interest earned thereon, shall be retained by the holder of those funds. The Earnest Money, deposited in Seller's general account, shall not be segregated and Seller may use such funds for whatever purpose Seller deems fit. Seller and Buyer agree that Brokers have no responsibility for Earnest Money deposited with Seller.
3. If any check given as Earnest Money is not honored, Seller may terminate this Agreement by notice to Buyer and Brokers.
4. The Earnest Money shall be applied to the Purchase Price at closing.
5. If the sale is not closed because of Seller's inability, failure or refusal to perform the Agreement or because Buyer never had an unconditional obligation to close because of a contingency in the Agreement, the Earnest Money shall be refunded to Buyer.
6. If Buyer fails or refuses to close for any reason other than provided in paragraph 5.13.5., Seller shall be entitled to the Earnest Money as liquidated damages for damages other than those damages covered by any Non-Refundable Construction Deposit, if any such deposit. The parties agree that it would be extremely difficult to ascertain such actual damages to Seller in such event, that the Earnest Money is a reasonable estimate of such actual damages to Seller and that the retention of the Earnest Money by Seller under such circumstances is not intended as a penalty but rather as full liquidated damages to Seller to the than for damages covered by any Non-Refundable Construction Deposit, if any such deposit. As an alternative to retaining the earnest money as damages, Seller may seek specific performance of the Agreement. If specific performance is granted, the Earnest Money shall be applied to the Purchase Price at closing.
7. No party shall be entitled to recover damages relating to Earnest Money against Broker.

8.      <u>Liquidated Damages.</u> Seller and Buyer acknowledge that it would be extremely impractical and difficult to ascertain the actual damages that would be suffered by Seller if Buyer fails or refuses to consummate the purchase of the Property for any reason other than Seller's inability, failure or refusal to perform any of Seller's covenants herein or because Buyer never had an unconditional obligation to close the purchase and sale on the closing date as the result of one or more contingencies in the Agreement not being fulfilled as of the closing date. Seller and Buyer have considered carefully the loss to Seller as a consequence of the negotiation and execution of this Agreement; the personal expenses Seller incurred in connection with the preparation of this Agreement; Seller's performances hereunder; and the other damage, general and special, which Seller and Buyer realize and recognize that Seller would sustain, but Seller cannot calculate with absolute certainty. Based upon all those considerations, Seller and Buyer have agreed that the damage to Seller would reasonably be expected to be equal to the amount of the earnest money. Accordingly, if all conditions precedent to Buyer's obligation to consummate the purchase of the Property have been waived by Buyer or have been satisfied, and if Seller has performed Seller's covenants hereunder, ut Buyer has failed or refused to consummate the purchase of the Property by the closing date, then Seller shall be entitled to retain the earnest money as full and complete liquidated damages for such default of Buyer. Such

2

Revised 3/04

retention of the earnest money is intended not as a penalty, but as full liquidated damages pursuant to O.C.G.A. § 13-8-7. however, in lieu of retaining the earnest money as liquidated damages, Seller shall have the right to bring an action for specific performance of the terms of this Agreement.

9.    The estimated completion date of construction is December 12, 2005    This is approximately when the home will have passed the final inspection by the appropriate Building inspector. Buyer acknowledges that the above completion date is an estimate only, and Seller will not be liable for any delay in completion of work caused by factors outside of Seller's control and particularly by weather conditions, material and manpower shortages, and delays in selections by Buyer. Seller will provide a revised completion date if such factors are encountered. It is further understood and agreed that Seller has the right not to commence construction of the improvements on the property until all contingencies herein contained have been satisfied, including without limitation, the depositing of the permanent loan commitment with Seller and the sale of Buyer's existing residence. Seller shall provide a revised completion date at which time all contingencies have been satisfied and construction of the improvements commences.    Buyer and Seller's agent agree to schedule a pre-construction meeting with a LOPEZ Construction representatives to discuss the construction process on or before TBD

Seller's Initials                    Buyer's Initials                    Buyer's Initials

10.    Settlement will occur on or before the 20th    day of December    2005    , or as soon thereafter as appropriate loan and title papers can be prepared, construction completed, and all required inspections made, but in no event more than one (1) year from the date hereof. Should settlement fail to occur within one (1) year from the date of this Agreement, this Agreement shall be voidable at the option of the Buyer. Should Buyer fail to close immediately on the Property upon completion and completion of the documents specified above, Buyer shall pay to Seller a per them charge of Thirty Five and No/100 ($35.00) Dollars until such time as settlement takes place. Seller will grant possession at his office immediately after settlement.

11.    Real estate taxes, interest and all charges and assessments payable to any applicable homeowner's association shall be prorated as of the date of settlement.

12.    Seller shall furnish Buyer with a termite inspection report or soil treatment guarantee from a licensed termite control company on or before the date of settlement. If termite infestation should occur within a period of five (5) years from the date of treatment, Seller shall retreat the soil in conformance with HUD standards in effect at the time of the original treatment, or Seller may choose to use standards in effect at the time of re-treatment. Buyer agrees to maintain a termite bond for a period of five (5) years from the date of the treatment from a licensed termite control company. Seller further agrees to repair all construction damage by termites within the one (1) year builders warranty.

13.    CONTINGENT CONTRACT. If this Paragraph is initialed, then Buyer's obligation hereunder is contingent upon the sale of the Buyer, s existing residence located at N/A So long as the contingency remains in effect, the Seller shall be entitled to list and market the property for sale and accept additional contracts. Upon receipt of another contract acceptable to Seller, the Seller shall give written notice to Buyer or their agent, and Buyer shall have forty-eight (48) hours from receipt of such notice to remove the contingency and comply with the provisions of Paragraph 13. If Buyer fails to remove the contingency and comply with Paragraph 13 within said time period, Seller shall be entitled to terminate this contract upon the return of the deposit to Buyer. Failure of the Buyer to disclose the ownership of any property which may affect Buyer's ability to obtain the mortgage loan specified in this contract will constitute a default and result in the forfeiture of Buyer's deposit and will obligate the Buyer to reimburse the Seller for any and all costs associated with the resale of the Property, should the Buyer be disqualified by Buyer=s mortgage company on the basis of the Buyer's payment obligation for such property.

N/A
Seller, s Initials

N/A
Buyer, s Initials

N/A
Agent's Initials

Revised 3/04

14.    In the event that this contract is contingent on the sale of the Buyer's current residence, and Buyer desires to remove this contingency by reason of the sale of the current residence, then Buyer shall notify the Seller in writing and provide a copy of the fully executed contract for such sale. Seller may, at its option at that time, also require Buyer to provide additional documentation from Buyer's proposed lender under this contract in which represents that Buyer is fully qualified or approved for the loan contemplated under this contract. Seller may also require Buyer to provide additional earnest money. In the event that this contract is contingent on the sale of the Buyer's current residence and Buyer desires to remove this contingency without having sold the current residence, then Buyer shall notify the Seller in writing and provide Seller with evidence satisfactory to the Seller that Buyer is fully qualified or approved for the loan contemplated under this contract without any requirement by the proposed lender of the sale of the current residence. If Buyer cannot produce such satisfactory evidence, then Seller shall be free to exercise its rights under the termination provision and to void this contract and to accept any other contract presented to the Seller. Should this contingency not be waived within four (4) months from the date of this Agreement, Seller shall have the option of voiding this Agreement at any time thereafter by written notice to Buyer.

15.    It is understood that until settlement, the house, either under construction or completed, and all materials and supplies stored or installed on the Property remain the property of the Seller. Seller will have the right to substitute materials of equal quality, pattern and design if it is unable to obtain the exact materials indicated on the plans, specifications, options list and selection sheet through the Seller's ordinary and usual sources. It is also understood that dimensions may vary somewhat according to field conditions. Buyer will have a scheduled walk-through prior to settlement.

16.    Change Orders made after commencement of construction will be charged to Buyer at a rate of cost plus $100.00 per item. Change Order charges shall be paid in advance. No alterations or extra work shall be done on the home without a written change order from Buyer, signed and approved by Buyer and Seller describing the alteration or additional work and charges and shall be accompanied by payment in full by Buyer of the amount of such changes. All change order charges shall be deemed non-refundable, forfeitable expenses if materials have been ordered or installed. Should the Buyer wish to include the cost of any alteration in its mortgage, an addendum to this contract must be signed and approved by the Buyer, Seller and Broker prior to the commencement of the alterations by the Seller. In the event of an addendum, Buyer, at Buyer's expense, shall provide Seller with evidence satisfactory to the Seller that Buyer is fully qualified or approved for the amended loan amount and that the home appraises for the amended purchase price. Seller reserves the right to deny any addendum or change order request for any reason.

17.    The house shall be considered completed when it has been constructed in substantial conformance with the plans and specifications and when a Certificate of Occupancy has been issued or when the dwelling has passed the final inspection by the appropriate building inspector. IT IS EXPRESSLY UNDERSTOOD AND AGREED, HOWEVER, THAT THE CLOSING SHALL NOT OCCUR UNLESS AND UNTIL THE CERTIFICATE OF OCCUPANCY HAS BEEN DELIVERED TO AND RECEIVED BY THE CLOSING ATTORNEY. Seller shall make all efforts to complete all items prior to settlement; however, Buyer understands that all items are covered under the Seller's one (1) year warranty policy and completion of all items shall not be mandatory prior to settlement. No funds shall be escrowed as a provision for completion of any item.

18.    Buyer acknowledges that they have examined the property and are familiar with the physical condition thereof. Broker has not made and does not make any representation as to the physical condition, expenses, operation, value of the land or improvements thereon, or any other matter or thing affecting or related to the Property, and Buyer hereby expressly acknowledges that no such representations have been made.

19.    In the event of an FHA or VA sale, Seller is hereby providing Buyer with the Warranty contained in the most recent edition of the Buyer's Warranty Booklet, as of the date of the execution of this agreement. That Booklet has been made available to Buyer and is incorporated by reference and made a part of this Purchase Agreement. The Warranty contained in the 2-1 0 Buyer's Warranty Booklet is the sole Warranty provided to Buyer. Any other warranty or warranties, whether express or implied, are disclaimed by Seller and waived by Buyer, unless otherwise provided by a particular State law. Seller will assign any warranties furnished by fixture or appliance manufacturers to Buyer. Seller makes no representation or warranty of any other kind, express or implied, whether as to merchantability, fitness for a particular purpose, quality, habitability, or any other matter except as provided in the 2-10 Warranty. Buyer's exclusive remedy for claims shall be under the 2-10 Warranty Policy. Buyer understands that Seller's one(1) year builder warranty is included in the 2-10 Warranty Policy. In the event that 2-10 Warranty is not provided, all parties to this Agreement acknowledge that in the event of a dispute arising after execution of this Agreement, the parties will submit to the binding arbitration procedures available to the parties to this Agreement in accordance with

4

Revised 3/04

the Official Code of Georgia, Section 9-9-1, et seq. It is expressly understood and agreed by the parties hereto that the only remedies available to each in the event of dispute are those afforded by the 2-10 Warranty and by arbitration. This provision shall survive the closing of the transaction contemplated herein.

Subject to and in addition to any and all warranty agreements between the parties and any and all requirements for arbitration contained in this agreement,

GEORGIA LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT OR OTHER ACTION FOR DEFECTIVE CONSTRUCTION AGAINST THE CONTRACTOR WHO CONSTRUCTED, IMPROVED, OR REPAIRED YOUR HOME. NINETY DAYS BEFORE YOU FILE YOUR LAWSUIT OR OTHER ACTION, YOU MUST SERVE ON THE CONTRACTOR A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE. UNDER THE LAW, A CONTRACTOR HAS THE OPPORTUNITY TO MAKE AN OFFER TO REPAIR OR PAY FOR THE DEFECTS OR BOTH. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY A CONTRACTOR. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER STATE LAW, AND FAILURE TO FOLLOW THEM MAY AFFECT YOUR ABILITY TO FILE A LAWSUIT OR OTHER ACTION.

20.    SURVEY WAIVER. Buyer acknowledges that he/they have been advised of the availability of a survey of the property to show the elevation and dimensions of the property, encroachments onto the property, and the location of improvements on the property. Such survey is not required by the lender or by Georgia law and may be obtained by the Buyer at Buyer's expense.

Seller's Initials          Buyer's Initials          Buyer's Initials

21.    Seller will use his discretion in setting the house on the lot (including reversing floor plans) to ensure that it blends with surrounding homes, is properly sited for drainage, and protects as many trees as practicable. Seller does not remove trees or undergrowth outside the area affected by construction; and Seller reserves the right to determine which trees affect construction and drainage. Seller will make every effort not to damage trees during construction, but because of possible unforeseen damages and diseases, and the effects of grade alterations, does not guarantee the life of any tree.

22.    FHA / VA CLAUSE. When FHA or VA financing applies, it is expressly agreed that, notwithstanding any other provisions of this Agreement, the Buyer shall not incur any penalty or forfeiture of earnest money or otherwise, or be obligated to complete the purchase of the property described herein, if the contract purchase price or costs exceed the reasonable value of the Property established by the FHA Commissioner or the Veterans Administration, whichever is applicable, setting forth the appraised value of the Property (excluding closing costs) of not less than

N/A

which statement the Seller hereby agrees to deliver to the Buyer promptly after such appraised value statement is made available to the Seller. The Buyer shall, however, have the privilege and option of proceeding with the consummation of the Agreement without regard to the amount of the reasonable value established by the FHA Commissioner or the Veterans Administration, whichever is applicable. If Buyer is unable to obtain FHA or VA financing, any earnest money deposit of Buyer, less out of pocket expenses, shall be returned to Buyer and Buyer shall be released from any liability under this Agreement. The appraised valuation is arrived at to determine the maximum mortgage or deed of trust the Department of Housing and Urban Development (HUD) will ensure. HUD does not warrant the value or condition of the Property. Buyer should satisfy themselves that the price and condition of the Property are acceptable.

23.    Seller agrees to convey the property to Buyer by General Warranty Deed with the usual covenants of title and free and clear of all encumbrances except as may be otherwise provided above and subject to applicable easements and restrictive covenants of record not adversely affecting the use of the property. Seller makes no representation to Buyer with regard to the location of utility company's equipment on any easements. Seller is to pay the expenses of preparing the deed and of recordation tax applicable to grantor. Buyer acknowledges receipt of the Easements, Restrictions and Covenants recorded in the Office of the Clerk of the Superior Court of Chatham County, Georgia, and Buyer agrees to be bound by the restrictions.

Revised 3/04

24.    The property is X is not_____ located in a community which requires mandatory membership in a homeowner's association. The fee is $ 35.00 (__) per month ( X ) per year.

25.    AGENCY DISCLOSURE.. Welchert Realtors, Prestige Properties - Mark Keller have acted as agents for the Seller in this transaction and are to be paid a commission of 4 % of the total sales price for negotiating this contract. Neither Welchert Realtors, Prestige Properties nor Mark Kellerhave acted as agent for the Buyer.

26.    CO-OP TRANSACTION. This contract has been made in cooperation with ___N/A___ a licensed broker, which will receive _N/A_ % of the total sales price.

27.    DEFAULT. In the event Buyer defaults in the timely and complete performance of any provision herein contained, which default is not cured within five (5) days from the date of notice of default given as hereinafter provided, then Seller shall have the option to terminate this contract, retain the deposit and apply the same against its damages, and to avail itself of all other remedies against the Buyer.

28.    GENERAL:
A.    Buyer's rights and interest hereunder shall not be assignable without the written consent of Seller.
B.    Any notice given hereunder shall be in writing and shall be deemed given when deposited in the United States mail, certified, postage prepaid, addressed to the party to whom such notice shall have directed in writing or when delivered in person or transmitted by facsimile to the Buyer or the Buyer's agent.
C.    Seller may waive the benefit of any provisions contained herein for its benefit without in any way affecting the obligation of the Buyer hereunder.
D.    Whenever the context hereof shall require, the singular shall include the plural, the plural the singular, and references to any gender shall include all genders.
E.    This agreement contains the full understanding of the parties, and both parties acknowledge that neither has relied upon any oral representation or agreement by the other or by any person acting on behalf of the other.
F.    This Agreement of Sale constitutes the entire agreement between the parties, and all prior agreements, whether written or oral, are superseded hereby. This agreement may not be modified, except by a writing signed by both Buyer and Seller. If any term or provision of this Agreement of Sale is declared illegal or otherwise invalid, the remaining terms and provisions shall remain in full force and effect.
G.    Parties agree that numerical or clerical errors discovered after execution of the contract are subject to correction.

29.    CLOSING COSTS. Closing costs to be paid by ___X___ Builder, _____ Buyer, _____ Other.
See Special Stipulation #_____ If the closing cost (including cost not allowed to be paid by Buyer and a 2-10 Warranty (If required) is to be paid by the Builder, then the Builder's entire part of the closing cost shall not exceed Four Thousand and 00/100 ($4,000.00 ). Any cost in excess of the amount paid by the Builder will be paid by the Buyer, and Buyer shall pay all prepaid and escrow items. The closing attorney will be William W. Shearouse, Jr., who shall represent the Lender. The Buyers may retain their own attorney to represent them at closing and to review the closing documents at Buyer's expense. Builder shall pay Georgia State Transfer Tax. Buyer and Seller mutually agree to close at a time and place designated by closing attorney within five (5) working days after notification from the closing attorney that the sale is ready to close. If the Seller/Builder is to pay closing costs, he has the right to approve the Lending Institution.

30.    ADDITIONAL SPECIAL STIPULATIONS. In the event of conflict with the printed matter, these special stipulations shall control:
a.    Brick Front at no charge
b.    No pass thru from Kitchen to Family Room
c.    _____
d.    _____
e.    _____

31.    MISCELLANEOUS.
a.    Should Buyer choose to use a Lender other than, Georgia Bank and Trust, SunTrust Bank, or iance Bank, Seller shall have five (5) days from the date that Seller receives a commitment letter to notify the Buyer in writing that the Lender is not approved by Seller and Seller will not be contributing to Buyer's closing costs. If

6

Revised 3/04

Lender is not approved, Buyer shall either select an approved Lender or pay their own closing costs.
    b.    Buyer acknowledges that he has received a 2-1 0 Home buyers Warranty booklet and video. The Seller and Seller's agent encourage Buyer to review all of the warranty information and pose any applicable questions prior to closing.

    c.    Buyer acknowledges receipt of the community covenants, conditions and restrictions.

    d.    Buyer acknowledges that Buyer will inspect landscaping and trees at final walk through and request any unhealthy trees, shrubs or grass to be replaced. The parties acknowledge and agree that after the final walk through, there are no warranties on trees, shrubs, landscaping or grass.

WITNESS, the following signatures causing the Agreement to be executed on the day and year below stated:

BUYER:

Neville W. Evans _____ DATE: 6-20-05

Maribeth R. Evans _____ DATE: 6-20-05

WORK PHONE: 912-350-8538

HOME PHONE: 912-925-6818

CELL PHONE: 912-596-8509

CELL PHONE: _____

CURRENT ADDRESS: 8506 Waters Ave # 74   Savannah, GA 31406

NAMES IN WHICH BUYERS WISH TO HOLD TITLE (PLEASE PRINT):

Neville W and Maribeth R Evans

SELLER:
LOPEZ CONSTRUCTION, INC.

By: _____ DATE: 6-23-2005

LISTING AGENT:

Weichert Realtors Prestige Properties   H-47835

By: _____ Mark D. Keller - 232479

DATE: 6-20-05

SELLING AGENT:

Weichert Realtors Prestige Properties   H-47835

By: Karen Thornburg - 281215

DATE: 6/20/05

The above proposition is hereby accepted _____ o, clock _____ • M. this _____ day of

_____

# *Mills Run*

## Sales Price Worksheet Addendum

| | |
|---|---|
| **Buyer(s):** | Neville W. & Maribeth R. Evans |
| **Homesite:** | 50 / 168 Mills Run Drive |
| **Plan Name:** | Chatahoochee |
| **Builder:** | Lopez Construction, Inc. |
| **Date:** | June 20, 2005 |

| Item | Charge Amount |
|---|---|
| Base Price | |
| Lot Upgrade | $152,900.00 |
| Master Bath Upgrade (sep. shower & tub) | $1,000.00 |
| | $2,250.00 |

| | |
|---|---|
| **Sales Price** | $156,150.00 |

Listed Options and prices are subject to change at Builder's discretion prior to signing.   Design consultation choices may not be included in this addendum
Refer to plan drawing for architectural options and cable and telephone placement.   Changes may not be possible due to construction schedules

APPROVED: _____
Home Buyer

_____
Builder

_____
Home Buyer

# AMENDMENT TO AGREEMENT
## AMENDMENT #    1

*To Be Used With Conventional Loan*

Date: June 20, 2005

*[Select sections A, B, C, and/or D below. The sections not marked are not a part of this Agreement.]*

☐ **A. All Cash At Closing:** Buyer shall pay the purchase price to Seller in cash, or its equivalent. Buyer's obligation to close shall not be subject to any financial contingency. Buyer shall pay all closing costs.

☐ **B. Loan To Be Assumed:** See Exhibit" _____

☒ **C. New Loan To Be Obtained:** This Agreement is made conditioned upon Buyer's ability to obtain a loan (except if the loan is denied because Buyer lacks sufficient cash to close excluding the amount of the loan and/or because Buyer has not sold or leased other real property) in the principal amount of 95 % of the purchase price listed above, with an interest rate at par of not more than 11 % per annum on the unpaid balance, to be secured by a first lien security deed on the Property; the loan to be paid in consecutive monthly installments of principal and interest over a term of not less than 30 years. "Ability to obtain" as used herein means that Buyer is qualified to receive the loan described herein based upon lender's customary and standard underwriting criteria. The loan shall be of the type selected below: [The sections not marked are not a part of this Agreement.]
(1) Loan Type:    ☒ Conventional;        ☐ FHA (see attached exhibit);        ☐ VA (see attached exhibit) ;        ☐ Other (see attached exhibit)
(2) Rate Type:        ☒ Fixed Rate Mortgage Loan;    ☐ Adjustable Rate Mortgage ("ARM") Loan;
(3) Closing Costs and Discount Points: Seller shall, at the time of closing, contribute a sum not to exceed $ 4,000.00
to be used by Buyer to pay for: (a) preparation of the warranty deed and owner's affidavit by the closing attorney; (b) at Buyer's discretion, closing costs, loan discount points, survey costs, and insurance premiums (including flood insurance, if applicable) relating to the Property and/or loan; and (c) at Buyer's discretion, other costs to close including escrow establishment charges and prepaid items, if allowed by lender. Buyer shall pay all other costs, fees, and amounts for the above referenced items and to fulfill lender requirements to otherwise close this transaction.

Selling Brokers Initials: _____
(or Brokers Affiliated Licensee)

Listing Brokees Initials: _____
(or Brokees Affiliated Licensee)

Buyer's Initials: _____

Seller's Initials: _____

EXHIBIT " I "

# MOLD DISCLOSURE AND WAIVER

Printed Name(s) of Buyer(s):  Neville W. Evans & Maribeth R. Evans

Printed Name(s) of Seller(s):  Lopez Construction , Inc.

Property Address:  168 Mills Run Dr.

Savannah, GA 31405

_____ *Clients Initials* MOLD INSPECTIONS. Mold contaminants may exist in the Property of which the Broker or Agent(s) is unaware. These contaminants generally grow in places where there is or may have been excessive moisture, such as where leakage may have occurred in roofs, pipes, walls, plant pots, or where there has been flooding; these conditions may be identified with a typical home inspection. Broker recommends CLIENT obtain a home inspection to better determine the condition of the property. Neither the Broker nor the Broker's Agents are experts in the field of mold contaminants. In the event they suspect mold contamination is discovered, it is recommended that our clients satisfy themselves as to property condition by having a mold inspection performed. The cost and quality of such inspection may vary. Companies able to perform appropriated inspections may be found in the Yellow Pages or on the World Wide Web under "Microbial or Mold Inspections" or "Environmental and Ecological Services."

> **CLIENT DISCLOSURE.**
>
> • The Broker or Broker's Agent has recommended the client obtain a Home Inspection: *NWE  MRE*  Initials
>
> • The Broker or Broker's Agent has recommended the client obtain a Mold Inspection: *NWE  MRE*  Initials

WAIVER. Client agrees to hold the Broker and Broker's Agents harmless in the event any mold contaminants are discovered on the property. Client understands mold is a naturally occurring microbe and that mold should pose no health threat unless concentrated at high levels in the living environment. The Broker and the Broker's Agents agree that in the event mold like contamination is discovered, this condition will be immediately reported to the client. The only way to determine if a mold like substance is truly mold or is present at high levels is through sample collecting and analytical testing.

RECEIPT OF COPY. Client(s) have read this Mold Disclosure/Waiver and by their signatures heron acknowledge receipt of a copy thereof.

PROFESSIONAL ADVICE. Client(s) execute the Disclosure/Waiver with the understanding that they should consult with a professional of their choice regarding any questions or concerns before its execution.

LEGAL ADVICE. Client(s) acknowledge that this waiver does not attempt to offer legal advice. If client(s) feel their need for legal advice they should consult an attorney of their choice prior to the execution of this document.

Customer: *Neville H. Evans*                                     Date: *6-20-05*

Customer: *Maribeth R. Evans*                                   Date: *6-20-05*

Agent: *Mark D. Keller*                                         Date: *6-20-05*

Broker: Weichert Realtors/Prestige Properties - H-47835          Date: _____

Agent: _____                                                Date: *6/20/05*

Broker: Weichert Realtors/Prestige Properties - H-47835          Date: *6/20/05*



**Quality Construction By:**
**Lopez Construction, Inc.**
**Wardlaw Construction, Inc.**

# STANDARD FEATURES
UPDATED 11/19/03

## WARRANTY
Builder's 1 -year warranty
Manufacturers 1 -year warranty
2-10 Residential warranty

## EXTERIOR,- FEATURES
R-30 insulation in ceilings
R- 1 3 insulation in walls
Double insulated windows
Atrium patio doors
Insulated exterior doors
Vinyl siding and soffit
Vinyl shutters
Standardized Mail Boxes
Black Uniform Shingles
15 - 3 gallon plants in front
4 pallets of sod in front yard
Choice of siding, door, brick and shutter colors
Raised panel steel garage door
Good cents rating from Savannah Electric and Power Company
20-year fiberglass shingle with ridge vent
Payne Heat & Air System
Single story plans will be built with 1 garage door
2 story plan will have 2 single garage doors

## INTERIOR,- FEATURES
Washable antique white paint
Deluxe wood cabinets
Choice of cabinet and counter top colors
30 oz. Wall to wall carpet with 5 year warranty and 6 lb pad
Choice of carpet and vinyl flooring colors
Molded six panel door
Kwick set hardware
Polished chrome bath hardware
Decorative light fixture with one ceiling fan
10 Seer high-efficiency electric heat pump
Moen plumbing fixtures
Carefree fiberglass tubs
Stainless steel kitchen sink
50-gallon high efficiency water heater
Whirlpool appliances (white)
Range (white)
Dishwasher (white)
Range hood and back splash
Mirror over vanities
Total of 5 outlets - standard phone or cable
One volume ceiling
Garbage Disposal

> **\* Note: Material and features may change without notice. Equal materials may be substituted without notice.**

---

**Buyer acknowledges receipt of the following:**

Standard Features Sheet Dated 01/09/03
Sample copy of 2/10 Home Warranty
Restrictions and Protective Covenants of Mills Run Subdivision

Buyer: _Nev.lle W Evans_     Date: _6. 20. 05_

Buyer: _Maybeth R Evans_     Date: _6-20-05_

# AGENCY EXHIBIT
## (BUYERS AND SELLERS)
### EXHIBIT " 2 "



Georgia
Association of
REALTORS®

**(TO BE USED WITH NON-GAR CONTRACTS)**

2005 Printing

This Exhibit sets forth the relationship of the Broker(s) to Buyer and Seller for the purchase and sale of real property located at:
_____ 168 Mills Run Drive _____ Savannah _____, Georgia,
31405 ___ with an Offer Date of the _20th_ day of ____ June ____ , 2005 .

## 1. Agency and Brokerage.

**A.** **Agency Disclosure:** In this Agreement, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and, where the context would indicate, the Broker's affiliated licensees. No Broker in this transaction shall owe any duty to Buyer or Seller greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. § 10-6A-1 et. seq.;

1. **No Agency Relationship.** Buyer and Seller acknowledge that, if they are not represented by a Broker, they are each solely responsible for protecting their own interests, and that Broker's role is limited to performing ministerial acts for that party.
2. **Listing Broker.** Broker working with the Seller is identified on the signature page as the "Listing Broker"; and said Broker is ☒ , OR, is NOT ☐ representing Seller;
3. **Selling Broker.** Broker working with Buyer is identified on the signature page as "Selling Broker"; and said Broker is ☐ , OR, is NOT ☒ representing Buyer; and
4. **Dual Agency or Designated Agency.** If Buyer and Seller are both being represented by the same Broker, a relationship of either designated agency ☐ , OR, dual agency ☐ shall exist.
   a. **Dual Agency Disclosure.** [Applicable only if dual agency has been selected above] Buyer and Seller are aware that Broker is acting as a dual agent in this transaction and consent to the same. Buyer and Seller have been advised that:
   (1) In serving as a dual agent, Broker is representing two clients whose interests are or at times could be different or even adverse;
   (2) As dual agent, Broker will disclose all known adverse, material facts relevant to the transaction to all parties in the transaction, except for information made confidential by request or instructions from either client, and which is not otherwise required to be disclosed by law;
   (3) Buyer and Seller do not have to consent to dual agency and, the consent of the Buyer and Seller to dual agency has been given voluntarily and the parties have read and understand their brokerage engagement agreements; and
   (4) Notwithstanding any provision to the contrary contained herein, Buyer and Seller each hereby direct Broker, while acting as a dual agent, to keep confidential and not reveal to the other party any information which could materially and adversely affect its negotiating position.
   b. **Designated Agency Assignment.** [Applicable only if the designated agency has been selected above] Broker has assigned _____ N/A _____ Buyer's designated agent and _____ N/A _____ to work exclusively with Buyer as Seller as Seller's designated agent. Each designated agent shall exclusively represent the party to whom each has been assigned as a client and shall not represent in this transaction the client assigned to the other designated agent.

**B.** **Disclosure of Commission, Rebate, or Direct Profit:** Broker hereby discloses that Broker may receive a commission, rebate or direct profit for procuring a mortgage loan, insurance or other services on behalf of Buyer or Seller.

**C.** **Material Relationship Disclosure:** The Broker and/or affiliated licensees have no material relationship with either client except as follows: N/A
(A material relationship means one actually known of a personal, familial or business nature between the Broker and/or affiliated licensees and a client which would impair their ability to exercise fair judgment relative to another client.)

Selling Broker's Initials: _____
(or Broker's Affiliated Licensee)

Buyer's Initials: _E.W. B_ / _MRE_

Listing Broker's Initials: _MBK_
(or Broker's Affiliated Licensee)

Seller's Initials: _____

Copyright© 2005 by Georgia Association of REALTORS®, Inc.
WEICHERT REALTORS 10 SUNDANCE RD, POOLER GA 31322
Weichert Realtors Prestige Pro

F12, Agency Exhibit (Buyers and Sellers) 01/01/05

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035, (800) 383-9805 www.zipform.com    Phone: 9127483830    Fax: 9123384239    Test.zfx

# AMENDMENT TO AGREEMENT
## AMENDMENT #  2

Date: June 20                                      ,20 05

**2002 Printing**

Whereas, the undersigned parties have entered into a certain Agreement with a Binding Agreement Date of _____

20 _____ for the purchase and sale of real property located at: 168 Mills Run Drive

Savannah _____, Georgia, 31405 _____ and

Whereas, the Undersigned parties desire to amend the aforementioned Agreement, it being to the mutual benefit of all parties to do so;

Now therefore, for and in consideration of the sum of One Dollar and other valuable considerations paid by each to the other, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to modify and amend the aforementioned Agreement as follows:
[Note: The following language is *furnished by the parties* and is particular to this transaction]

Buyer and Seller acknowledge that they have not relied upon any advice, representation or statements of Brokers and waive and shall not assert any claims against Brokers involving the same. Buyer and Seller agree that Brokers shall not be responsible to advise Buyer and Seller on any matter including but not limited to the following: any matter which could have been revealed through a survey, title search or. inspection of the Property; the condition the Property, any portion thereof, wetlands, or any item therein; building products and construction techniques; the necessity or cost of any repairs to the Property; molds; hazardous or toxic materials or substances; termites and other wood destroying organisms; the tax or legal consequences of the transaction; the availability and cost of utilities or community amenities; the appraised of future value of the Property; any condition(s) existing off the Property which may affect the Property; the terms, conditions and availability of financing; and the uses and zoning of the Property whether permitted or proposed. All square footage and lot sizes are approximate. Buyer needs to secure a survey or measure the home if accuracy is desired. Buyer should secure a home inspection if such matters are of such concern to them. Bonier has no knowledge of building materials and exterior finishes such as synthetic stucco, vinyl siding, Louisiana Pacific Siding (LP) or Polybutylene (PB) pipes and tubing. Buyer and Seller acknowledge that Multi-List System information deemed reliable but not guaranteed. Buyer and Seller acknowledge that the Brokers are not experts with respect to the above matters and that, if any of these matters or any other matters are of concern to them, they shall seek independent expert advice relative thereto. Buyer further acknowledges that in every neighborhood there are conditions which different buyers may find objectionable. Buyer shall therefore be responsible to become fully acquainted with neighborhood and other off site condition which could affect the Property.

☐ **(Mark box if additional pages are attached.)**

It is agreed by the parties hereto that all of the other terms and conditions of the aforementioned Agreement shall remain in full force and effect other than as modified herein. Upon execution by all parties, this Amendment shall be attached to and forma part of said Agreement.

Weichert Realtors/Prestige Properties - H-47835         859
Selling Broker                                          MLS Office Code

By: _____
    Broker or Brokers Affiliated Licensee

Print or Type Name: Karen Thornburg - 281215

Phone: (912) 920-9400 _____ FAX #(912) 920-9410

Weichert Realtors, Prestige Properties         859
Listing Broker                                 MLS Office Code

By: _____
    Broker or Brokers Affiliated Licensee

Print or Type Name: Mark D. Keller - 232479

Phone: 238-4212 _____ FAX # 238-4229

Buyer's Signature: _Neville W Evans_          SS/FEI#

Print or Type Name: Neville W. Evans

Buyer's Signature: _Maribeth R Evans_          SS/FEI#

Print or Type Name: Maribeth R. Evans

Seller's Signature: _____          SS/FEI#
Print or Type Name: Lopez Construction Inc.

Seller's Signature: _____          SS/FEI#
Print or Type Name: _____

**Acceptance Date**
The above amendment is hereby accepted, _____ o'clock _____ M. on the _____ day of _____, 20 _____
("Acceptance Date"). This Amendment will become binding upon the parties when notice of the acceptance of this Amendment
has been received by offeror. The offeror shall promptly notify offeree when acceptance has been received.

Copyright@ 2002 by Georgia Association of REALTORS@, Inc.

F1 05, Amendment to Agreement 01101102



Marketed By:



**Weichert, Realtors®**
Prestige Properties

(912) 748-8830

# CHATAHOOCHEE (1644 PLAN)
### 4 Bedrooms – 2 Baths



Elevation A

Shown with upgraded
vaulted ceiling and large
½ round window

Master Bath
Upgrade

\*\* Plan will be built with 1 garage door \*\*

Quality Construction By:



JERRY C. WARDLAW
CONSTRUCTION, INC.




The house plan depicted herein are for presentation only. They do not reflect the
builder's final specifications and layout. Any price quoted is subject to change
without prior notice and subject square footage is approximate.

Quality Construction By:



Jun.20. 2005  4:59PM

No.8209   P. I

# MORTGAGE LOAN COMMITMENT

| | | | |
|---|---|---|---|
| Applicants: | Neville W. Evans | | |
| | Maribeth R. Evans | | |
| Property Address: | TBD | Lender: | Queensborough National Bank & Trust |
| | Savannah, GA 31408 | | 6809 Abercorn Street, Ste. 112 |
| Application No: | 8010508130 | | Savannah, GA 31408 |
| | | Date Prepared: | 06/19/2005 |

It is a pleasure to notify you that your application for a first mortgage loan has been approved subject to the following matters set forth below. See Good Faith Estimate of Settlement Charges for any related closing costs.

| Amount of Loan: $ | 140,150 | Contract Interest Rate: | 10.375 % | LTV: | 95.000 % |
|---|---|---|---|---|---|
| Terms/Due In: | 360/360 | Commitment Expires: | 12/18/2005 | CLTV: | 95.000 % |

30 Year Fixed - Non-Conventional Mortgage Loan
95% Financing with 5% Down
Current Rate 10.375%
Rates subject to change daily until locked 30 days prior to closing.

The following Evidence of Title is to be provided to the Lender and must indicate no liens, encumbrances, or any adverse covenants or conditions to title unless approved by Lender. The Evidence of Title must be issued from a firm or source, and in a form, acceptable to Lender.

Borrower will be charged for the cost of providing such title and the cost of recording documents, all of which will be ordered by Lender unless requested otherwise.

Fees required upon acceptance of Mortgage Loan Commitment: $315.80
($300.00 for Appraisal and $15.80 for Credit Report)

All documents listed below will be required within the next 30 days:
Uniform Residential Loan Application completed, signed & dated.
All required disclosures completed, signed and dated.
Copy of Contract/Purchase Agreement accepted, signed and dated by all parties.
Verification of Income, Assets, Employment & Credit supplied will be updated within 30 days prior to closing.
Other documents or verification may be required within 30 days prior to closing.
Credit scores and Debt-to-Income ratios are a large determining factor in loan approval and will be re-verified 30 days prior to closing. An increase in credit scores along with a decrease in debt-to-income ratio will allow for consideration of a lower interest rate and possibly 100% financing.
Debt-To-Income Ratios are 2.7% too high - must reduce monthly obligations by $120.00 prior to closing to qualify.
Gift Funds are not acceptable - 2 months bank statement will be required prior to closing and deposits exceeding monthly income of any one borrower will be sourced and cannot be gift funds from a relative or other person.

Upon acceptance of the loan commitment, you are agreeing to allow Queensborough National Bank & Trust Co. to provide the permanent financing for your new home. Once accepted, if the Borrower(s) decide to terminate this commitment for any reason, an application fee of $300.00 will be assessed.

The Continuation of Commitment Conditions is made a part of this Commitment. Please sign and return Lender's COPY of this Commitment, along with any required fee and items requested, to the lender at the: ☐ above address ☐ following address, within ___ 10___ days of date hereof, or at the option of Lender, this commitment shall become null and void.

**SEE NEXT PAGE INSTRUCTIONS**

I (WE) hereby accept the terms and conditions of this Commitment.

COMMITMENT ISSUED BY:                          ADDRESS:

_____   6/9/05
Authorized Signature                      Date

| | | | |
|---|---|---|---|
| Applicant  Neville W. Evans | Date | Applicant  Maribeth R. Evans | Date |
| Applicant | Date | Applicant | Date |

Ostyx Form MLC 12/03

NEVILLE W. OR MARIBETH R. EVANS
8506 WATERS AVE.   #74
SAVANNAH, GA 31406

0216

38-3/612

DATE  6-20-06

PAY TO THE ORDER OF _Lopez Construction_    $ 1000 00

One thousand and 00/100    DOLLARS

SUNTRUST
SunTrust Bank, Savannah, N.A.
Savannah, Georgia

FOR _down payment #50 mr Maribeth R Evans_

⑈061200090⑈ 1512553445⑈ 0216

**EXHIBIT C**

Loan No.: 2000015537
MIN No.: 1002480-0000200022-2

## NOTE

December 20, 2005

**168 MILLS RUN DRIVE
SAVANNAH, GA 31405**
[Property Address]

SAVANNAH, Georgia

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $124,920.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL**. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

**2.    INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.500%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.    PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the First day of each month beginning on **February 01, 2006**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **January 01, 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at

**QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL
6605 ABERCORN STREET
SAVANNAH, GA 31405**

or at a different place if required by the Note Holder.

**(B)    Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $960.53.

**4.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.    BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)    Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of Ten calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)    Default**

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Loan No. 2000015537 (R&A) RA0079444 - nt3200.mis - Rev. 06/29/2005          Form 3200 1/01(Page 1 of 3 Pages)

Loan No.: 2000015537
MIN No.: 1002480-0000200022-2

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)    **Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)    **No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)    **Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

7.    **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

8.    **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

9.    **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

10.    **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Loan No.: 2000015537
MIN No.: 1002480-0000200022-2

NEVILLE W. EVANS _____ (Seal)
Social Security Number 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                              -Borrower

MARIBETH R. EVANS _____ (Seal)
Social Security Number 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                              -Borrower

PAY TO THE ORDER OF
GMFS, LLC WITHOUT RECOURSE                          [Sign Original Only]

QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL

By:_____

Name:_____

Title:_____

Loan No.: 2000015537

## PREPAYMENT RIDER TO NOTE

This PREPAYMENT RIDER TO NOTE is made this **Twentieth** day of December, 2005, and is incorporated into and shall be deemed to amend and supplement the Note of the same date given by the undersigned (the "Borrower," or "I") in favor of QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL (who together with anyone who later owns or holds the note, the "Lender").

Notwithstanding anything to the contrary set forth in the Note, Borrower and Lender covenant and agree that the provisions in the section of the Note entitled "BORROWER'S RIGHT TO PREPAY" or "BORROWER'S PAYMENTS BEFORE THEY ARE DUE" are amended to read as follows:

I have the right to make payments of principal at any time before they are due. Such a payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a partial prepayment without paying any prepayment fee. If within the first ___36___ months after the date of the note, I make a full prepayment, the Lender may charge and I agree to pay a prepayment fee equal to ___1%___ computed on the principal prepaid when I make the full prepayment. A "full prepayment" means that I pay the entire remaining principal balance on the loan.

There will be no prepayment fee if a) this loan is prepaid with insurance proceeds, b) this loan is prepaid as a result of a lawsuit or foreclosure, c) the prepayment fee is prohibited by applicable law, or d) this loan is prepaid more than ___36___ months after the date of the note. I understand that except as I have agreed in this Prepayment Rider, all other terms of the note still apply and are in effect.

BY SIGNING BELOW, the Borrower accepts and agrees to the terms and provisions contained in this PREPAYMENT RIDER TO NOTE.

Borrower: **NEVILLE W. EVANS**                          DEC 2 0 2005
_____      _____
                                                           Date

Borrower: **MARIBETH R. EVANS**                        DEC 2 0 2005
_____      _____
                                                           Date

# ALLONGE TO NOTE

Loan No.:                    2000015537

Property:                    168 MILLS RUN DRIVE, SAVANNAH GA 31405

Loan Amount:                 $124,920.00

Allonge to Note Dated:       December 20, 2005

In Favor of:                 QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL

and Executed by:             NEVILLE W. EVANS and MARIBETH R. EVANS

Pay to the order of:_____

_____ without recourse


GMFS, LLC

By:_____
Brenda Guidry
Funder, GMFS, LLC

After Recording Return To:
CMFS, LLC
ATTN: Final Docs
7389 Florida Blvd., Ste. 200A
Baton Rouge, LA 70806
Prepared By:
Robertson & Anschutz, P.C.
10333 Richmond Avenue, Suite 550
Houston, TX 77042

EXHIBIT D

# SECURITY DEED

Loan No. 2000015537
MIN No. 1002480-0000200022-2

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    "Security Instrument" means this document, which is dated December 20, 2005, together with all Riders to this document.

(B)    "Borrower" is NEVILLE W. EVANS and MARIBETH R. EVANS, husband and wife. Borrower is the grantor under this Security Instrument.

(C)    "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the grantee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D)    "Lender" is QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL. Lender is a Commercial Bank organized and existing under the laws of the State of Georgia. Lender's address is 6605 ABERCORN STREET, SAVANNAH, GA 31405.

(E)    "Note" means the promissory note signed by Borrower and dated December 20, 2005. The Note states that Borrower owes Lender One Hundred Twenty-Four Thousand Nine Hundred Twenty Dollars (U.S. $124,920.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than January 01, 2036.

(F)    "Property" means the property that is described below under the heading "Transfer of Rights in the Property".

(G)    "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)    "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:
--No Riders Required--

(I)    "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)    "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)    "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)    "Escrow Items" mean those items that are described in Section 3.

(M)    "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (I) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)    "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)    "Periodic Payment" means the regularly scheduled amount due for (I) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)    "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

GEORGIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3011 1/01
(R&A) RA0079444 - sicmers.ga - Rev. 11/11/2005                (Page 1 of 9 Pages)

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)    "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:. (I) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the County of Chatham:

See Exhibit "A" attached hereto and made a part hereof for all purposes

which currently has the address of **168 MILLS RUN DRIVE, SAVANNAH, GA 31405** ("Property Address"):

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

**GEORGIA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Form 3011 1/01
(R&A) RA0079444 - sicmers.ga - Rev. 11/11/2005                    (Page 2 of 9 Pages)

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment

of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or

GEORGIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3011 1/01
(R&A) RA0079444 - sicmers.ga - Rev. 11/11/2005                              (Page 4 of 9 Pages)

assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, drain water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.    Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this

Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or

formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.

If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property.

**25. Assumption Not a Novation.** Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

**26. Security Deed.** This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

_____ NEVILLE W. EVANS

(Seal)
-Borrower

_____
**MARIBETH R. EVANS** _____ (Seal)
-Borrower

Signed, sealed and delivered in the presence of:

Unofficial Witness

_____
Notary Public, _____Chatham_____ County

Unofficial Witness

_____
Notary Public, _____Chatham_____ County

GRANTOR:
LENDER:    NEVILLE W. EVANS and MARIBETH R. EVANS
DATE OF SECURITY DEED:    QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL
December 20, 2005

Loan No.: 2000015537

## GEORGIA'S WAIVER OF BORROWER'S RIGHTS

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE RIGHT TO ACCELERATE THE DEBT AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NON-JUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF; **THIS MEANS THAT MY FAILURE TO MEET EVERY CONDITION OF THE MORTGAGE LOAN MAY RESULT IN THE LOSS OF MY PROPERTY THROUGH FORECLOSURE;** (2) WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW, TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

### FORECLOSURE CLOSING DISCLOSURE

O.C.G.A. SECTION 7-1-1014(3) REQUIRES THAT WE INFORM YOU THAT IF YOU FAIL TO MEET ANY CONDITION OR TERM OF THE DOCUMENTS THAT YOU SIGN IN CONNECTION WITH OBTAINING A MORTGAGE LOAN YOU MAY LOSE THE PROPERTY THAT SERVES AS COLLATERAL FOR THE MORTGAGE LOAN THROUGH FORECLOSURE.

READ AND AGREED BY GRANTOR:

Borrower: **NEVILLE W. EVANS**

DEC 20 2005

Date

Borrower: **MARIBETH R. EVANS**

DEC 20 2005

Date

Signed, sealed and delivered in the presence of:

Notary Public

(R&A) RA0079444 - waivborr.ga - rev. 06/22/2005

Loan No.: 2000015537

## CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who, having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Security Deed and "Waiver of the Borrower's Rights" by the Borrower(s), I reviewed with and explained to the Borrower(s) the terms and provisions of the Security Deed and particularly the provisions thereof authorizing the Lender to sell the secured property by a non-judicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower(s) of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower(s) of Borrower's rights. After said review with an explanation to Borrower(s), Borrower(s) executed the Security Deed and "Waiver of Borrower's Rights."

Based on said review with an explanation to the Borrower(s), it is my opinion that Borrower(s) knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such non-judicial foreclosure.

Sworn to and subscribed before me
on the date set forth above.

DEC 20 2005
_____

_____
Notary Public

_____
William W. Shearouse, Jr.    Closing Attorney

(R&A) RA0079444 - waivborr.ga - rev. 06/22/2005

EXHIBIT "A"

ALL that certain lot, tract or parcel of land situate, lying and being in the 7th G.M. District of Chatham County, Georgia and being known as LOT 50, MILLS RUN SUBDIVISION, being a subdivision of a 33.86 acre tract, known as the remaining lands of Brandlewood Subdivision, 7th G.M. District, Chatham County, State of Georgia, according to that certain survey prepared by Kern-Coleman & Co., dated February 28, 2004, and recorded in Subdivision Map Book 31-S, Page 57A, in the Office of the Clerk of Superior Court of Chatham County, Georgia. For a more particular description of said lots conveyed herein, reference is made to said Subdivision Map which is incorporated herein and made a part hereof by reference.

Subject, however, to all valid restrictions, easements and rights of way of record.

Subject, however, to a limited home buyer's warranty, which shall constitute a covenant running with the land, which shall inure to the benefit of grantee's heirs, successors and assigns and which limits the liability of the grantor herein to the grantee and to the grantee's heirs, successors and assigns.

*EXHIBIT E*

Loan No.: 2000015538
MIN No.: 1002480-0000200023-0

## BALLOON SUBORDINATE LIEN
## FIXED RATE NOTE

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

December 20, 2005

**168 MILLS RUN DRIVE**                                    SAVANNAH, Georgia
**SAVANNAH, GA 31405**
[Property Address]

**1.     BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$31,230.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL.** I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

**2.     INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **12.115%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.     PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **First** day of each month beginning on **February 01, 2006**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **January 01, 2021**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at

**QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL**
**6605 ABERCORN STREET**
**SAVANNAH, GA 31405**

or at a different place if required by the Note Holder.

**(B)     Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$324.00**.

**4.     BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5.     LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal

I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Loan No.: 1000015538<br>
MIN No.: 1002480-0000200023-0

## 6.    BORROWER'S FAILURE TO PAY AS REQUIRED

**(A)    Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)    Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)    Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)    No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)    Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7.    GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8.    OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9.    WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10.    UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

GEORGIA SUBORDINATE LIEN FIXED RATE NOTE--Single Family--Fannie Mae/Freddie Mac MODIFIED BY R&A
Loan No. 1000015538
(R&A) RA0079426 - rt3900.ga - Rev. 07/06/2005

Form 3911  1/80(Page 2 of 3 Pages)

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

Loan No.: 2000015538
MIN No.: 1002480-0000200023-0

NEVILLE W. EVANS
Social Security Number 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

_____ (Seal)
-Borrower

MARIBETH R. EVANS
Social Security Number 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

_____ (Seal)
-Borrower

PAY TO THE ORDER OF
GMFS, LLC WITHOUT RECOURSE

[Sign Original Only]

QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL

By:_____

Name:_____

Title: _____

GEORGIA SUBORDINATE LIEN FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac MODIFIED BY R&A
Loan No. 2000015538
(R&A) RA0079426 - ns3900.ga - Rev. 07/06/2005

Form 3911 1/80(Page 3 of 3 Pages)

Loan No.: 2000015538

## PREPAYMENT RIDER TO NOTE

This PREPAYMENT RIDER TO NOTE is made this **Twentieth** day of **December, 2005**, and is incorporated into and shall be deemed to amend and supplement the Note of the same date given by the undersigned (the "Borrower," or "I") in favor of **QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL** (who together with anyone who later owns or holds the note, the "Lender").

Notwithstanding anything to the contrary set forth in the Note, Borrower and Lender covenant and agree that the provisions in the section of the Note entitled "BORROWER'S RIGHT TO PREPAY" or "BORROWER'S PAYMENTS BEFORE THEY ARE DUE" are amended to read as follows:

I have the right to make payments of principal at any time before they are due. Such a payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a partial prepayment without paying any prepayment fee. If within the first __36__ months after the date of the note, I make a full prepayment, the Lender may charge and I agree to pay a prepayment fee equal to __1%__ computed on the principal prepaid when I make the full prepayment. A "full prepayment" means that I pay the entire remaining principal balance on the loan.

There will be no prepayment fee if a) this loan is prepaid with insurance proceeds, b) this loan is prepaid as a result of a lawsuit or foreclosure, c) the prepayment fee is prohibited by applicable law, or d) this loan is prepaid more than __36__ months after the date of the note. I understand that except as I have agreed in this Prepayment Rider, all other terms of the note still apply and are in effect.

BY SIGNING BELOW, the Borrower accepts and agrees to the terms and provisions contained in this PREPAYMENT RIDER TO NOTE.

Borrower: **NEVILLE W. EVANS**                    DEC 20 2005
                                                  Date

Borrower: **MARIBETH R. EVANS**                   DEC 20 2005
                                                  Date

# ALLONGE TO NOTE

Loan No.: **2000015538**

Property: **168 MILLS RUN DRIVE, SAVANNAH GA 31405**

Loan Amount: **$31,230.00**

Allonge to Note Dated: **December 20, 2005**

In Favor of: **QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL**

and Executed by: **NEVILLE W. EVANS and MARIBETH R. EVANS**

Pay to the order of: _____ without recourse

**GMFS, LLC**

By: _____
Brenda Guidry
Funder, GMFS, LLC

(R&A) RA0079426 - allonge.gmf - Rev. 11/04/2004

After Recording Return To:
GMFS, LLC
ATTN:  Final Docs
7389 Florida Blvd., Ste. 200A
Baton Rouge, LA  70806
Prepared By:
Robertson & Anschutz, P.C.
10333 Richmond Avenue, Suite 550
Houston, TX 77042

**EXHIBIT  F**

## SUBORDINATE LIEN SECURITY DEED

### DEFINITIONS

Loan No. 2000015538
MIN No. 1002480-0002200023-0

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    "Security Instrument" means this document, which is dated  December 20, 2005,  together with all Riders to this document.

(B)    "Borrower" is NEVILLE W. EVANS and MARIBETH R. EVANS, husband and wife. Borrower is the grantor under this Security Instrument.

(C)    "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the grantee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D)    "Lender" is QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL. Lender is a Commercial Bank organized and existing under the laws of the State of Georgia. Lender's address is 6605 ABERCORN STREET, SAVANNAH, GA 31405.

(E)    "Note" means the promissory note signed by Borrower and dated  December 20, 2005.  The Note states that Borrower owes Lender Thirty-One Thousand Two Hundred Thirty Dollars (U.S. $31,230.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than January 01, 2021.

(F)    "Property" means the property that is described below under the heading "Transfer of Rights in the Property".

(G)    "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)    "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

    [X] Subordinate Lien Rider

(I)    "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)    "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)    "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)    "Escrow Items" mean those items that are described in Section 3.

(M)    "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (I) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)    "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)    "Periodic Payment" means the regularly scheduled amount due for (I) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)    "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or

GEORGIA—Single Family—Fannie Mae/Freddie Mac MODIFIED BY R&A
Form 3811 1/80
(R&A) RA0079426 - sicmers2.gh - Rev. 11/11/2005
(Page 1 of 9 Pages)

regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (I) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the County of Chatham:

### See Exhibit "A" attached hereto and made a part hereof for all purposes

which currently has the address of 168 MILLS RUN DRIVE, SAVANNAH, GA 31405 ("Property Address"):

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment

of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a

one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to

GEORGIA--Single Family--Fannie Mae/Freddie Mac MODIFIED BY R&A
Form 3811 1/80                                    (Page 4 of 9 Pages)
(R&A) RA0079426 - sicmers2.ga - Rev. 11/11/2005

enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, drain water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.    Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender

of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser..

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property: Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.

If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property.

25. **Assumption Not a Novation.** Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

26. **Security Deed.** This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

**REQUEST FOR NOTICE OF DEFAULT
AND FORECLOSURE UNDER SUPERIOR
MORTGAGES OR DEEDS OF TRUST**

GEORGIA--Single Family--Fannie Mae/Freddie Mac MODIFIED BY R&A
Form 3811 1/80
(R&A) RA0079426 - sicmers2.ga - Rev. 11/11/2005                 (Page 8 of 9 Pages)

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Deed of Trust to give Notice to Lender, at Lender's address set forth on page one of this Deed of Trust, of any default under the superior encumbrance and of any sale or other foreclosure action.

It is expressly agreed by Borrower and Lender that the lien created by this Deed of Trust is inferior and subordinate to that certain lien created by Deed of Trust ("First Deed of Trust") dated __December 20, 2005__, executed by Borrower to secure that certain Note ("First Lien Note") of even date therewith in the original principal sum of __$124,920.00__ and payable to the order of __QUEENSBOROUGH NATIONAL BANK AND TRUST__, and if said first lien is secured by a balloon note this lien shall remain inferior and subordinate in the event Borrower exercised a right set forth in the first lien to reset the terms thereof.

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any rider executed by Borrower and recorded with it.

.IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

NEVILLE W. EVANS _____ (Seal)
                                                                    -Borrower


MARIBETH R. EVANS _____ (Seal)
                                                                    -Borrower

Signed, sealed and delivered in the presence of:

Unofficial Witness


Notary Public, ___Chatham___ County

Unofficial Witness


Notary Public, ___Chatham___ County.

GEORGIA--Single Family--Fannie Mae/Freddie Mac MODIFIED BY R&A
Form 3811 1/80                                                            (Page 9 of 9 Pages)
(R&A) RA0079426 - sicmerx2.ga - Rev. 11/11/2005

## SUBORDINATE LIEN RIDER

Loan No.: 2000015538

THIS SUBORDINATE LIEN RIDER is made this **Twentieth** day of **December, 2005**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**168 MILLS RUN DRIVE
SAVANNAH, GA 31405**
[Property Address]

**SUBORDINATE LIEN COVENANTS:** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.     Prior Mortgages and Deeds of Trust; Charges; Liens.** Notwithstanding the provisions set forth in the second paragraph of Section 4 of the Security Instrument, Borrower and Lender acknowledge their intent that the Security Instrument be subordinate to one or more mortgages, deeds of trust or other security instruments that has priority over it (each a "Superior Security Instrument") and agree that the provisions of such second paragraph of Section 4 shall be inapplicable to any Superior Security Instrument. Borrower agrees to perform all of Borrower's obligations under any Superior Security Instrument, including Borrower's covenants to make payments when due.

**B.     Funds for Escrow Items.** Notwithstanding the provisions of Section 3 of the Security Instrument, Borrower shall not be obligated to make payments of Funds for Escrow Items to Lender to the extent that Borrower makes such payments to the holder of a Superior Security Instrument if such holder is an institutional lender.

**C.     Property Insurance.** Lender agrees that its right to hold insurance policies and renewals, as set forth in Section 5 of the Security Instrument, shall be subject to the terms of any Superior Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Subordinate Lien Rider.

NEVILLE W. EVANS _____ (Seal)
-Borrower

MARIBETH R. EVANS _____ (Seal)
-Borrower

(R&A) RA0079426 - rdsubordin.rx - rev. 08/22/2005          Page 2

GRANTOR:
LENDER:          NEVILLE W. EVANS and MARIBETH R. EVANS          Loan No.: 2000015538
DATE OF SECURITY DEED:  QUEENSBOROUGH NATL BANK AND TRUST DBA FIRST NATL
December 20, 2005

## GEORGIA'S WAIVER OF BORROWER'S RIGHTS

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY:  (1) ACKNOWLEDGES THE RIGHT TO ACCELERATE THE DEBT AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NON-JUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF; THIS MEANS THAT MY FAILURE TO MEET EVERY CONDITION OF THE MORTGAGE LOAN MAY RESULT IN THE LOSS OF MY PROPERTY THROUGH FORECLOSURE;  (2)  WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW, TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

## FORECLOSURE CLOSING DISCLOSURE

O.C.G.A. SECTION 7-1-1014(3) REQUIRES THAT WE INFORM YOU THAT IF YOU FAIL TO MEET ANY CONDITION OR TERM OF THE DOCUMENTS THAT YOU SIGN IN CONNECTION WITH OBTAINING A MORTGAGE LOAN YOU MAY LOSE THE PROPERTY THAT YOU SIGN IN CONNECTION WITH OBTAINING A MORTGAGE LOAN THROUGH FORECLOSURE.

READ AND AGREED BY GRANTOR:

DEC 2 0 2005

Borrower: **NEVILLE W. EVANS**

Date

DEC 2 0 2005

Borrower: **MARIBETH R. EVANS**

Date

Signed, sealed and delivered in the presence of:

_____

_____

Notary Public

Loan No.: 2000015538

## CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who, having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Security Deed and "Waiver of the Borrower's Rights" by the Borrower(s), I reviewed with and explained to the Borrower(s) the terms and provisions of the Security Deed and particularly the provisions thereof authorizing the Lender to sell the secured property by a non-judicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower(s) of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower(s) of Borrower's rights. After said review with an explanation to Borrower(s), Borrower(s) executed the Security Deed and "Waiver of Borrower's Rights."

Based on said review with an explanation to the Borrower(s), it is my opinion that Borrower(s) knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such non-judicial foreclosure.

Sworn to and subscribed before me
on the date set forth above.                    DEC 2 0 2005

_____
Notary Public

_____
William W. Shearouse, Jr.     Closing Attorney

(R&A) RA0079426 - waivborr.ga - rev. 06/22/2005

EXHIBIT "A"

ALL that certain lot, tract or parcel of land situate, lying and being in the 7th G.M. District of
Chatham County, Georgia and being known as LOT 50, MILLS RUN SUBDIVISION, being a
subdivision of a 33.86 acre tract, known as the remaining lands of Brandiewood Subdivision,
7th G.M. District, Chatham County, State of Georgia, according to that certain survey
prepared by Kern-Coleman & Co., dated February 28, 2004, and recorded in Subdivision
Map Book 31-S, Page 57A, in the Office of the Clerk of Superior Court of Chatham County,
Georgia. For a more particular description of said lots conveyed herein, reference is made
to said Subdivision Map which is incorporated herein and made a part hereof by reference.

Subject, however, to all valid restrictions, easements and rights of way of record.

Subject, however, to a limited home buyer's warranty, which shall constitute a covenant
running with the land, which shall inure to the benefit of grantee's heirs, successors and
assigns and which limits the liability of the grantor herein to the grantee and to the
grantee's heirs, successors and assigns.

Subject, however, to that certain First Deed to Secure Debt, filed simultaneously herewith in
the Office of the Clerk of the Superior Court of Chatham County, Georgia. (To Secure
$124,920.00)

*record first*

**EXHIBIT** G

Clock#: 939232
FILED FOR RECORD
5/07/2007  03:51pm          4/5?
PAID:  5.00                 *Return To:*
Daniel W. Massey, Clerk
Superior Court of Chatham County
Chatham County, Georgia

MORRIS, SCHNEIDER & PRIOR
1587 NORTHEAST EXPRESSWAY
ATLANTA, GA 30329

BOOK 3256

382. 0704214

WHEN RECORDED MAIL TO:
RESIDENTIAL FUNDING COMPANY, LLC
One Meridian Crossings, Ste. 100
Minneapolis, MN 55423
RFC Loan Number: 10288756
Seller Loan Number: 2000015537
MIN: 100248000002000222      MERS Phone: 1-888-679-6377

PAGE 065

## CORPORATION ASSIGNMENT of DEED OF TRUST

FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc. ("MERS") *acting solely as nominee for
Queensborough National Bank and Trust dba First Natl, its successors and assigns*
the undersigned hereby grants, assigns and transfers to

### Residential Funding Company, LLC

8400 Normandale Lake Blvd, Suite 600, Minneapolis, MN 55437-1085

all beneficial interest under that certain Deed of Trust dated 12/20/2005
executed by NEVILLE W EVANS *and Maribeth Evans*

TO/FOR: *MERS, acting solely as nominee for Queensborough National Bank and Trust dba First
Natl, its successors and assigns*
and recorded in Book _2998_ on Page _652_ as Instrument No. _____ on _12/28/05_ of official
Records in the County Recorder's Office of _Chatham_ County, Georgia.

MORTGAGE AMOUNT: $124,920.00
TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest,
and all rights accrued or to accrue under said Deed of Trust.

Mortgage Electronic Registration Systems, Inc. ("MERS") *

Witness: S. Seidel

Name: S. Seidel

Witness: C. Murphy

Name: C. Murphy

BY: _____

NAME: Matt Favorite
TITLE: Assistant Vice President

STATE OF                    Minnesota )
COUNTY OF                   Hennepin )
On 02/20/2007 before me, the undersigned, a Notary Public in and for said State personally appeared Matt Favorite,
Assistant Vice President of Mortgage Electronic Registration Systems, Inc. ("MERS") personally known to me to be the
person whose name is subscribed to the within instrument and acknowledged to me that s/he executed the same in his/her
authorized capacity, and that by his/her signature on the instrument the entity upon behalf of which the person acted,
executed the instrument. WITNESS my hand and official seal.

_____
Notary Public in and for said State

Elhanna Taylor
Notary Public - Minnesota
My Commission Expires Jan. 31, 2008

Prepared 02/20/2007 by Matt Favorite, Residential
Funding Company, LLC, One Meridian Crossings,
Suite 100, Minneapolis, MN 55423, (952) 979-4000.

EXHIBIT H



EXHIBIT I

**ESTERN UNION**

Customer Receipt / Recibo del Cliente

KROGER #957
318 MALL BLVD
SAVANNAH GA 31406

Oper ID: 192    Quick Collect
01/31/07
833P EST        MTCN: 929-858-0157

Sender/Remitente: MARIBETH EVANS
Receiver/Destinatario: HOMECOMINGS FINANCIAL USA

Code City/Codigo de la ciudad: CITYPLACE TX
Account #/Numero de cuenta: 0440878015
Reference #/Numero de referencia:
Attn/Atencion:

Western Union Card Number / Numero de Tarjeta: 400818956

Amount/Cantidad:     $ 1950.00
Charge (s)/Cargos:
    Service/Servicio:      12.95
Total/Total:          $ 1962.95

OU`VE BEEN ENROLLED IN THE GOLD CARD REWARDS PROGRAM! To activate your
.ewards Card just use the Card Number listed above again. Once you do, we
ill send your Card in the mail and you`ll begin earning valuable rewards!

.gent Signature /                                        Customer Signature /
ma del Agente                                            Firma del Cliente
J ADDITION TO THE TRANSFER FEE, WESTERN UNION ALSO MAKES MONEY WHEN IT CHANGES YOUR DOLLARS INTO FOREIGN CURRENCY.
.EASE SEE REVERSE SIDE FOR MORE INFORMATION REGARDING CURRENCY EXCHANGE. *ADEMAS DE LOS CARGOS POR EL SERVICIO DE
.RANSFERENCIA, WESTERN UNION TAMBIEN GANA DINERO CUANDO CAMBIA SUS DOLARES A MONEDA EXTRANJERA. POR FAVOR LEA AL
.DE. BY SIGNING THIS RECEIPT, YOU AGREE TO THOSE TERMS. *CERTAIN TERMS GOVERNING THIS TRANSACTION ARE ON THE REVERSE
.TE FOR YOUR TRANSACTION WERE DETERMINED AT THE TIME OF SEND. OTHERWISE, THE CURRENCY TO BE PAID OUT AND THE EXCHANGE
.CEIVER RECEIVES THE FUNDS. * ALGUNOS TERMINOS QUE RIGEN ESTA TRANSACCION SE ESTABLECEN AL REVERSO. AL FIRMAR ESTE
.CIBO USTED ACEPTA DICHOS TERMINOS Y CONDICIONES ADEMAS DE LOS CARGOS POR EL SERVICIO DE TRANSFERENCIA. SI APARECEN
.S ARRIBA, LA MONEDA DE PAGO Y LA TASA DE CAMBIO DE SU TRANSACCION SE DETERMINARON EN EL MOMENTO DEL ENVIO. SI NO, LA
.SA DE CAMBIO SE ESTABLECERA CUANDO EL DESTINATARIO RECIBA EL DINERO.

DBCMICRNB 06/04
3

IMPORTANT CONSUMER FRAUD ALERT: SEE REVERSE SIDE FOR DETAILS. AVISO IMPORTANTE SOBRE FRAUDE AL CONSUMIDOR, VER DORSO PARA DETALLES.

**TERN UNION**

Customer Receipt / Recibo del Cliente

ER #957
MALL BLVD
NNAH GA 31406

Oper ID: 192    Quick Collect
01/31/07
836P EST    MTCN: 715-327-0264

er/Remitente: MARIBETH EVANS
iver/Destinatario: HOMECOMINGS FINANCIAL USA

City/Codigo de la ciudad: CITYPLACE TX
unt #/Numero de cuenta: 0440878015
rence #/Numero de referencia:
/Atencion:

*feb mar abril*

ern Union Card Number / Numero de Tarjeta: 400818956
l WU Card Points/Total puntos en tarjeta WU          : 10
gned WU Card Points/Puntos asignados a la tarjeta WU : 10

Amount/Cantidad:    $   975.00
Charge(s)/Cargos:
Service/Servicio:       12.95
Total/Total:        $   987.95

RATULATIONS! YOU JUST ACTIVATED YOUR GOLD CARD REWARDS ACCOUNT! Your
ome Kit and Card will arrive in 4-5 weeks. Use your Gold Card to save
on transactions AND earn phone time and valuable Reward Points!

nature /
Agente    *alison Hirata*    Customer Signature /
Firma del Cliente

ION TO THE TRANSFER FEE, WESTERN UNION ALSO MAKES MONEY WHEN IT CHANGES YOUR DOLLARS INTO FOREIGN CURRENCY.
EE REVERSE SIDE FOR MORE INFORMATION REGARDING CURRENCY EXCHANGE. *ADEMAS DE LOS CARGOS POR EL SERVICIO DE
RENCIA, WESTERN UNION TAMBIEN GANA DINERO CUANDO CAMBIA SUS DOLARES A MONEDA EXTRANJERA. FOR FAVOR LEA AL
MAS INFORMACION SOBRE EL CAMBIO DE MONEDA. * CERTAIN TERMS GOVERNING THIS TRANSACTION ARE ON THE REVERSE
SIGNING THIS RECEIPT, YOU AGREE TO THOSE TERMS. IF LISTED ABOVE, THE CURRENCY TO BE PAID OUT AND THE EXCHANGE
R YOUR TRANSACTION WERE DETERMINED AT THE TIME OF SEND. OTHERWISE, THE EXCHANGE RATE WILL BE SET WHEN THE
R RECEIVES THE FUNDS. * ALGUNOS TERMINOS QUE RIGEN ESTA TRANSACCION SE ESTABLECEN AL REVERSO. AL FIRMAR ESTE
STED ACEPTA DICHOS TERMINOS Y CONDICIONES ADEMAS DE LOS CARGOS POR EL SERVICIO DE TRANSFERENCIA. SI APARECEN
BA, LA MONEDA DE PAGO Y LA TASA DE CAMBIO DE SU TRANSACCION SE DETERMINARON EN EL MOMENTO DEL ENVIO. SI NO, LA
CAMBIO SE ESTABLECERA CUANDO EL DESTINATARIO RECIBA EL DINERO.

ARNED 5 (INT L) OR 20 (US) MINUTES OF PHONE TIME! Your time is
directly on your Card. Calling instructions are on the Card
or dial 888-628-8862 & enter your personal PIN: 499109812181

ORCMICRNB 08/04
7108G

Jun.19. 2007  7:40PM    WISEMAN BLACKBURN & FUTRELL                No.1004  P. 1

LAW OFFICES

**WISEMAN, BLACKBURN & FUTRELL**
POST OFFICE BOX 1025
SAVANNAH, GEORGIA 31412

# EXHIBIT J

JAMES B. BLACKBURN
JAMES B. BLACKBURN, JR.
JONATHAN J. HUNT
PATRICK F. ROUGHEN, JR.

OFFICES:
340 WEST BROUGHTON STREET
TELEPHONE: (912) 232-2186
FACSIMILE: (912) 233-6349

CASPER WISEMAN (1902-1991)
HUGH F. FUTRELL, JR. (1923-1996)

## FAX TRANSMISSION COVER SHEET

DATE: June 19, 2007        FAX NO.: 770-234-9192

## PLEASE DELIVER THE FOLLOWING MATERIALS UPON RECEIPT:

TO: Joel A. Freedman, Esq
and Travis Rose
FROM:    James B. Blackburn, Jr., Esq.        678-913-2936

RE: Residential Funding Co, LLC
Loan # 0440579 884 - 0910421Y
+ Loan # 0440 5 78015
NUMBER OF PAGES INCLUDING COVER SHEET: 4

PLEASE CONTACT:        AT (912) 232-2136 IF THIS FAX IS NOT RECEIVED
PROPERLY OR IF ANY PAGES ARE MISSING.

## SPECIAL NOTICE

### PRIVILEGED ATTORNEY CLIENT INFORMATION

The information contained in this transmission is privileged and confidential. It is intended for the use of the individual or entity named above. If the reader of this message is not the intended addressee, the reader is hereby notified that any consideration, dissemination or duplication of this communication is strictly prohibited. If the addressee has received this communication in error, please return this transmission to us at the above address by mail. We will reimburse you for postage. In addition, if this communication was received in the U.S. please notify us immediately by phone (call collect).

It has been almost a month since this letter was first mailed to you. Your failure to respond until I send several follow up faxes and emails defies comprehension. As we requested a month ago, if you cannot respond in a timely manner, Please give us the name, address & telephone number of a responsible officer at Residential Funding.

Jun.19. 2007  7:41PM   WISEMAN BLACKBURN & FUTRELL              No.1004   P. 2

LAW OFFICES
**WISEMAN, BLACKBURN & FUTRELL**
POST OFFICE BOX 8899
SAVANNAH, GEORGIA 31412-8969

Jbbjratty at aol.com

JAMES B. BLACKBURN
JAMES B. BLACKBURN, JR.
JONATHAN J. HUNT
PATRICK F. ROUGHEN, JR.

OFFICES:
240 WEST BROUGHTON STREET
TELEPHONE: (912) 232-2134
FACSIMILE: (912) 232-6245

CASPER WISEMAN (1902-1991)
HUGH P. FUTRELL, JR. (1923-1996)

May 22, 2007

3rd transmission
via Facsimile
(770)234 9192

Joel A. Freedman, Esq.
Morris, Schneider & Prior, L.L.C.
1587 Northeast Expressway
Atlanta, GA 30329

Dear Mr. Freedman:

We represent Neville W. Evans and Maribeth R. Evans. It appears from the records of the Clerk of the Superior Court of Chatham County, Georgia that you prepared a Deed under Power concerning the Evans and Residential Funding Company, LLC. Please advise if you also handled the foreclosure on behalf of Residential Funding. If you did handle the foreclosure, please send us copies of all notices you claim to have sent, copies of all return receipt cards, copies of all advertisements you ran and the dates on which they were run.

In addition, please provide us with copies of any letter you or your client sent concerning the default and the right to reinstate, as well as any proof of mailing as to these notices.

We have enclosed herewith an authorization singed by Mr. Evans and one signed by Mrs. Evans. Please have your clients provide us with a full loan history on this loan (loan number 0440877884) As well as a full loan history of the loan secured by the second deed to secure debt (loan number 0440878015) which was cut out by this foreclosure.

If you cannot provide this information in a timely manner please promptly provide us with the name and address of a responsible officer at Residential Funding who can provide this information.

Should you have any questions concerning our request, please do not hesitate to contact us.

Very truly yours,

JBBJr/cas
cc: Neville and Maribeth Evans
H:\SALESTY\CLIENTS\Evans, Neville\Freedman, Joel, Atty, ltr 5-22-07.wpd

James B. Blackburn, Jr.

Dear Mr. Freedman:

We have written you three times now concerning the forclosure on Neville W. Evans and Maribeth R. Evans in Chatham County Georgia requesting various information and documents. To date we have not received a response of any kind. Please advise whether you intend to supply any of the documents requested or if you are going to supply us with the name of an officer of Residential Funding Company, LLC from whom we may obtain a full loan history.

A prompt reply would be greatly appreciated. If no reply is forthcoming by June 23, 2007 we will have no choice but to file a lawsuit to determine our clients rights.

James B. Blackburn, Jr.
Wiseman, Blackburn & Futrell
P.O. Box 8996
Savannah, Georgia 31412
(912) 232-2136   .
*jbbjratty@aol.com*

CONFIDENTIALITY NOTICE: This message originates from the law firm of Wiseman, Blackburn and Futrell. This message and any attachments are intended solely for the indicated recipient and may contain confidential information protected by the attorney-client privilege or other protections against unauthorized use. The information contained in this message and any attachments is transmitted based on a reasonable expectation of privacy consistent with ABA Formal Opinion No. 99-413. Any disclosure, distribution, copying of use of this information by anyone other than the intended recipient is strictly prohibited. All attachments are believed to be free of viruses, but any attachments should be checked for viruses before being opened. If you received this message in error, please delete it, without copying or reading it, and notify the sender by return e-mail or by calling (912) 232-2136

record second

CLOCK#: 9392?E
FILED FOR RECORD04314\CLH
LOG#NO OF FEES77864CONV
5/07/2007   03:51pm
PAID: 14.00
Daniel W. Massey, Clerk
Superior Court of Chatham County
Chatham County, Georgia

# EXHIBIT K

**BOOK 325G**

**PAGE 066**

JOEL A. FREEDMAN, ESQ.
Morris, Schneider & Prior, L.L.C.
1587 Northeast Expressway
Atlanta, GA 30329
(770) 234-9181

STATE OF ___MN___

COUNTY OF ___DAKOTA___

## DEED UNDER POWER

THIS INDENTURE, dated April 03, 2007 by NEVILLE W. EVANS AND MARIBETH R. EVANS ("Borrower") acting through his or her duly appointed agent and attorney in fact RESIDENTIAL FUNDING COMPANY, LLC FKA RESIDENTIAL FUNDING CORPORATION ("Lender") as Party of the First Part, and RESIDENTIAL FUNDING COMPANY, LLC FKA RESIDENTIAL FUNDING CORPORATION as Party of the Second Part:

## WITNESSETH:

WHEREAS, Borrower executed and delivered to Mortgage Electronic Registration Systems, Inc. acting solely as nominee for Queensborough National Bank and Trust dba First Natl. its successors and assigns that certain Security Deed dated December 20, 2005 and recorded in Deed Book 299R, Page 652, Chatham County, Georgia Records, conveying the after-described property, as last transferred to Residential Funding Company, LLC fka Residential Funding Corporation, to secure the payment of a Promissory Note of even date therewith, in the original principal amount of ONE HUNDRED TWENTY-FOUR THOUSAND NINE HUNDRED TWENTY AND 00/100 DOLLARS ($124,920.00); and

WHEREAS, default in the payment under said Note occurred, and whereas by reason of said default, Lender elected, pursuant to the terms of said Deed and Note, and declared the entire principal and interest immediately due and payable; and

FILE NO.: 3820704314\CLH
LOAN NO.: 0448877234\CONV

WHEREAS, the entire indebtedness remaining in default, and in accordance with the terms of said Security Deed, Lender did advertise said property for sale once a week for four (4) weeks in the newspaper in Chatham County, Georgia, wherein the Sheriff carried his advertisement, namely The Savannah News Press said dates of publication being 3/8/07;3/15/07;3/22/07;3/29/07; and

WHEREAS, notice was given in compliance with Georgia Laws 1981, Volume I, Page 834, codified as O.C.G.A. 44-14-162.2 and 44-14-162.4. The notice required was rendered by mailing a copy of the Notice of Sale Under Power that was submitted to the publisher of The Savannah News Press, to the Borrower and other "debtors" (as defined by O.C.G.A. 44-14-162.1) on February 15, 2007; and

WHEREAS, Lender did expose said land for sale to the highest bidder for cash on the first Tuesday in April 03, 2007 within the legal hours of sale at the usual place for conducting Sheriff's sales in Chatham County before the Courthouse door and offered said property for sale at public outcry to the highest bidder for cash when and where Party of the Second Part bid ONE HUNDRED THIRTY-FIVE THOUSAND ONE HUNDRED NINETY-TWO AND 42/100 DOLLARS ($135,192.42); and

WHEREAS, said property was knocked off to the Party of the Second Part for the aforementioned sum of money in cash.

NOW, THEREFORE, in consideration of the premises and said sum of money and by virtue of and in the exercise of the power of sale contained in the Security Deed, the Party of the First Part has bargained, sold, granted and conveyed, and by these presents does hereby bargain, sell, grant and convey to the Party of the Second Part, said Party's representatives, heirs, successors and assigns, the following described property:

All that certain lot, tract or parcel of land situate, lying and being in the 7th G.M. District of Chatham County, Georgia and being known as LOT 50, MILLS RUN SUBDIVISION, being a subdivision of a 33.86 acre tract, known as the remaining lands of Brandlewood Subdivision, 7th G.M. District, Chatham County, State of Georgia, according to that certain survey prepared by Kern-Coleman & Co., dated February 28, 2004, and recorded in Subdivision Map Book 31-S, Page 57A, in the Office of the Clerk of Superior Court of Chatham County, Georgia. For a more particular description of said lots conveyed herein, reference is made to said Subdivision Map which is incorporated herein and made a part hereof by reference. Subject, however, to all valid restrictions, easements and rights of way of record. Subject, however, to a limited home buyer's warranty, which shall constitute a covenant running with the land, which shall inure to the benefit of grantee's heirs, successors and assigns and which limits the liability or the grantor herein to the grantee end to the grantee's heirs, successors and assigns.

Together with all rights, members and appurtenances thereto, also all the estate, right, title, interest, claim or demand of Party of the First Part, or said Party's representatives, heirs, successors and assigns, legal, equitable or otherwise whatsoever, in and to the same.

THIS CONVEYANCE IS SUBJECT TO all zoning ordinances; matters which would be disclosed by an accurate survey or by an inspection of the property; any outstanding taxes, including but not limited to ad valorem taxes, which constitute liens upon said property; all restrictive covenants, easements, rights-of-way and any other matters of record superior to said Security Deed.

BOOK 325G PAGE 067

TO HAVE AND TO HOLD the said property and every part thereof unto the Party of the Second Part and said Party's representatives, heirs, successors and assigns, to said Party's own proper use, benefit and behoof in FEE SIMPLE, in as full and ample a manner as said Party of the First Part or said Party's representatives, heirs, successors and assigns, did hold and enjoy the same.

IN WITNESS WHEREOF, Lender as Attorney in Fact for Borrower has affixed its hand and seal this date first above written.

RESIDENTIAL FUNDING COMPANY, LLC FKA
RESIDENTIAL FUNDING CORPORATION By Residential
~~Funding Company DBA with Power of Attorney. Only Accepted X~~
~~Date X~~

as Attorney-in-fact for

NEVILLE W. EVANS AND MARIBETH R. EVANS

BY: _____ (SEAL)
NAME: Bethany Hood
TITLE: Default Services Jr. Officer

BY: _____ (SEAL)
NAME: Eric Tate
TITLE: Default Services Asst. Jr. Officer

(CORPORATE SEAL)

Signed, Sealed and Delivered
in the presence of:

_____
UNOFFICIAL WITNESS


_____
NOTARY PUBLIC

My commission expires: 1-31-11
(NOTARY SEAL)

PARIS Y. JACKSON
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2011

BOOK 325G

PAGE 068



#18963

DAVID E. ZEIGLER
ATTORNEY AT LAW
STEPHENSON AVENUE, SUITE A
SAVANNAH, GEORGIA 31405

RETURN TO:
Morris|Hardwick|Schneider, LLC
2401 Lake Park Drive, Suite 150
Smyrna, GA 30080
Final Documents
File #: SMR-070804285A

Clock#: 985226
FILED FOR RECORD

9/10/2007  01:04pm

PAID:  14.00

Daniel W. Massey, Clerk
Superior Court of Chatham County
Chatham County, Georgia

Real Estate Transfer Tax

PAID $$164.90

**EXHIBIT L**

BOOK 331 H
PAGE 094

## SPECIAL WARRANTY DEED

For Clerk of Superior Court

STATE OF Texas
COUNTY OF Dallas

THIS INDENTURE made this __30th__ day of __August 2007__ between
Residential Funding Company, LLC FKA Residential Funding Corporation
of the County of __Dallas__, State of __Texas__, as party or parties of the first part,
hereinafter called Grantor, and

### Alexander and Eneida Roman

as party or parties of the second part, hereinafter called Grantee (the words "Grantor" and "Grantee" to
include their respective heirs, successors and assigns where the context requires or permits).

W I T N E S S E T H that: Grantor, for and in consideration of the sum of TEN AND 00/100 DOLLARS
($10.00) and other good and valuable consideration in hand paid at and before the sealing and delivery of these
presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold, aliened, conveyed and
confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto the said Grantee,

Property Address: 168 Mills Run Drive, Savannah, GA 31405

Subject to all easements and restrictions of record.

TO HAVE AND TO HOLD the said tract or parcel of land, with all and singular the rights, members and
appurtenances thereof, the same being, belonging, or in anywise appertaining, to the only proper use, benefit and
behoof of the said Grantee, forever in FEE SIMPLE.

AND THE SAID Grantor will warrant and forever defend the right and title to the above described property
unto the said Grantee against the lawful claims and demands of all persons claiming by, through or under the above
named Grantor, but against none other.

## SPECIAL WARRANTY DEED
### (Continued)

IN WITNESS WHEREOF, Grantor has hereunto set Grantor's hand and seal this day and year first above written.

Signed, sealed and delivered in the presence of:

Residential Funding Company, LLC FKA
Residential Funding Corporation

Witness    Floyd McCain

By:    Patrick McClain, Vice President    (Seal)

Notary Public

By: _____ (Seal)

My Commission Expires:  6-15-11

(Corporate Seal)

ALICIA ELECTOR GATSON
Notary Public, State of Texas
My Commission Expires
June 15, 2011

CORPORATE
SEAL

Deed_GA_WarrantyDeed_Special_2ppt_New.rtu    Page 2 of 2

Property Address: 168 Mill Run Drive, Savannah, GA 31405

SMR-070804285A

BOOK N 331

PAGE 095

## SPECIAL WARRANTY DEED
### (Continued)

### Exhibit "A"

ALL THAT CERTAIN LOT, TRACT OR PARCEL OF LAND I,SITUATE, LYING AND BEING IN
THE 7TH G.M. DISTRICT OF CHATHAM COUNTY, GEORGIA AND BEING KNOWN AS LOT 50,
MILLS RUN SUBDIVISION, BEING A SUBDIVISION OF A 33.86 ACRE TRACT, KNOWN AS THE
REMAINING LANDS OF BRANDLEWOOD SUBDIVISION, 7TH G.M. DISTRICT, CHATHAM &
CO., DATED FEBRAURY 28, 2004, AND RECORDED IN SUBDIVISION MAP BOOK 31-S, PAGE
57A, IN THE OFFICE OF THE CLERK OF SUPERIOR COURT OF CHATHAM COUNTY, GEORGIA,
FOR A MORE PARTICULAR DESCRIPTION OF SAID LOTS CONVEYED HEREIN, REFERENCE IS
MADE TO SAID SUBDIVISION MAP WHICH IS INCORPORATED HEREIN AND MADE A PART
HEREOF BY REFERENCE.

SUBJECT, HOWEVER, TO ALL VALID RESTRICTIONS, EASEMENT AND RIGHTS OF WAY OF
RECORD.

SUBJECT, HOWEVER, TO A LIMITED HOME BUYER'S WARRANTY, WHICH SHALL
CONSITUTE A COVENANT RUNNING WITH THE LAND, WHICH SHALL INSURE TO THE
BENEFIT OF GRANTEE'S HEIRS, SUCCESSORS AND ASSIGNS, AND WHICH LIMITS THE
LIABILITY OF THE GRANTOR HEREIN TO THE GRANTEE AND TO THE GRANTEE'S HEIRS,
SUCCESSORS AND ASSIGNS.

BOOK N 331    PAGE 096

Deed_GA_WarrantyDeed_Special_2pgs_New.rdw        Page 2 of 2

Property Address: 168 Mills Run Drive, Savannah, GA 31405

SMR-070804285A

Return To:  LOAN # 6898587064
FL9-700-01-01
JACKSONVILLE POST CLOSING
BANK OF AMERICA
9000 SOUTHSIDE BLVD.
BLDG 700, FILE RECEIPT DEPT.
JACKSONVILLE, FL 32256
Prepared By:
    JAYANNA JAYNES
    BANK OF AMERICA N.A.
    9000 SOUTHSIDE BLVD - BLDG 600
    JACKSONVILLE, FL 322560000

Clock#: 985228
FILED FOR RECORD
SEP 10 2007  01:04pm

Massey, Clerk
Superior Court of Chatham County
Chatham County, Georgia

GEORGIA INTANGIBLE TAX
PAID $$305.50
PEN&INT $$.00

BOOK **331 N**
PAGE **097**

_____ [Space Above This Line For Recording Data] _____

# SECURITY DEED

LOAN # 6898587064

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined
in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this
document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  AUGUST 30, 2007
together with all Riders to this document.
(B) "Borrower" is  ALEXANDER ROMAN AND ENEIDA ROMAN, HUSBAND AND WIFE

Borrower is the grantor under this Security Instrument.
(C) "Lender" is  BANK OF AMERICA N.A.

Lender is a  NATIONAL BANKING ASSOCIATION
organized and existing under the laws of  UNITED STATES OF AMERICA

GEORGIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3011 1/01

-6(GA) (0005)
Page 1 of 16          Initials:
VMP MORTGAGE FORMS - (800)521-7291

CVGA 08/29/07 1:01 PM 6898587064

Lender's address is  9000 SOUTHSIDE BLVD - BLDG 600, JACKSONVILLE, FL 322560000

Lender is the grantee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated  AUGUST 30, 2007
The Note states that Borrower owes Lender  ONE HUNDRED SIXTY EIGHT THOUSAND FOUR
HUNDRED FORTY FIVE AND 00/100                                                    Dollars
(U.S. $      168,445.00    ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than    SEPTEMBER 01, 2037

(E) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account. Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.)
and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended
from time to time, or any additional or successor legislation or regulation that governs the same
subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

-6(GA) (0608)                                    Page 2 of 18                 Initials: _____    Form 3011 1/01

CVGA 08/29/07 1:01 PM 6999587664

**EXHIBIT** M

LAW OFFICES

## WISEMAN, BLACKBURN & FUTRELL
POST OFFICE BOX 8996
SAVANNAH, GEORGIA 31412-8996

JAMES B. BLACKBURN
JAMES B. BLACKBURN, JR.
JONATHAN J. HUNT
PATRICK F. ROUGHEN, JR.
COLLIN R. GLIDEWELL

OFFICES:
240 WEST BROUGHTON STREET
TELEPHONE: (912) 232-2136
FACSIMILE: (912) 232-6246

CASPER WISEMAN (1802 -1991)
HUGH P. FUTRELL, JR. (1923-1996)

September 28, 2007

VIA CERTIFIED AND FIRST CLASS MAIL

Bruce J. Paradis, Manager
Residential Funding Company, LLC
8400 Normandale Blvd., Suite 250
Minneapolis, MN 55437

    RE:    Neville W. Evans and Maribeth R. Evans
            Lender's Loan No. 0440877884
            Wrongful Foreclosure

Dear Mr. Paradis:

      We represent Neville and Maribeth Evans who were obligated to Residential Funding under Loan No. 0440877884 and Loan No. 0440878015. These loans have been declared in default by your company and the residential property securing them has been foreclosed and conveyed to your company.

      Our investigation into this matter has disclosed that at the time of the foreclosure sale, the Evans were not in default, but in fact were current with their payments. Your company, or its sister company and agent, Homecomings Financial, LLC, misapplied the Evans' timely payments causing the loan to appear in default and foreclosure was initiated. Our clients never received notice of the foreclosure and only became aware that it had occurred when your real estate agent gave them notice to vacate the premises.

      Despite the clear and straightforward requirements of the standard form FNMA\FHLB Deed to Secure Debt you failed to give the Evans notice of the claimed default. In addition to your company misapplying our clients' funds, it did not send our clients proper notice that their payments on the first loan were delinquent. Your company failed to follow the provisions set forth in the Deed to Secure Debt regarding notice of default, acceleration, and foreclosure. In particular, your communications with our clients failed to provide 30 days notice of acceleration and properly notify them of their right to protest the default declared upon the loan and their right to reinstate the loan. Furthermore, the notices required by the Deed to Secure Debt were not given and the acceleration provisions were not followed.

Bruce J. Paradis
Page 2 of 2

Your company then offered for sale and purchased our clients' property in a manner contrary to the terms of the Deed to Secure Debt, for less than its true market value, in violation of Georgia Law, equity, and good conscience. We believe that these and your company's other actions show it has conducted its dealings with our clients in bad faith.

Homecomings Financial, LLC, as your agent has now begun aggressive efforts to collect the loan secured by the secondary Deed to Secure Debt. Since these Deeds to Debt were both held by you and you had the option of foreclosing the second subject to the first and fully paying off the both loans, you had an obligation to do so, rather than buying the property in at a value less than the amount of the two mortgages you held.

In a letter dated May 22, 2007, we notified your attorney, Joel A. Freedman of Morris, Schneider & Prior, LLC, of our request to receive copies of all notices published or sent to our clients regarding the default, acceleration and foreclosure. Only as of Sunday, July 8, 2007 did we receive any documents. In a time-sensitive situation, such a lack of responsiveness is further evidence of the bad faith your company and attorney have shown our clients.

We demand that you reconvey the property to our clients, reinstate their loans, reimburse them for the expense of moving out and back into the residence, and reimburse them for the expenses they have incurred, including attorney's fees and costs, as a result of the wrongful foreclosure and sale of their residence. Furthermore we demand that you amend and correct any adverse credit information which you may have reported to any credit bureau. Otherwise, we will have no choice but to file a lawsuit against your company and its sister companies for wrongful foreclosure, breach of contract, negligence, bad faith and stubborn litigiousness. Please be advised that if this is made necessary that we will seek attorney's fees and costs because of the bad faith. Please advise as to your intentions.

Very truly yours,

James B. Blackburn, Jr.

JBBjr.:cnm



■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

Bruce J. Paradis, Manager
Residential Funding Corporation
8400 Normandale Blvd
    Ste 250
Minneapolis, MN 55437

A. Signature

X _____    ☐ Agent
                            ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

                                   10-5-07

D. Is delivery address different from item 1?    ☐ Yes
   If YES, enter delivery address below:          ☐ No

MN-UB-S-55436
Shadow Tree
OCT 05 2007

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7099 3400 0016 6049 0736

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

|  | Postage | $ |  |
| Certified Fee |  |  | Postmark |
| Return Receipt Fee (Endorsement Required) |  |  | Here |
| Restricted Delivery Fee (Endorsement Required) |  |  |  |
| Total Postage & Fees | $ |  |  |

Recipient's Name (Please Print Clearly) (to be completed by mailer)
Bruce J. Paradis
Street, Apt. No.; or PO Box No.
8400 Normandale Blvd
City, State, ZIP+4
Minneapolis, MN

7099 3400 0016 6049 0736

PS Form 3800, June 2002