## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE :                                     CASE NO. 12-12020 MG

RESSIDENTIAL CAPITAL LLC et al          Chapter 11

Debtors                                     Jointly Administered

### RESPONSE TO THE OBJECTION OF FUTRELL CLAIM

COMES NOW the claimant, William J Futrell, by counsel, and submits the response to the objection. Their claim was placed in *General Unsecured-Unliquidated*, as per the statement of the Court. *Liquidated* claims are those that may be ascertained and discernable, where an *unliquidated* claims are those that are unknown.

In the immediate claim, there are both kinds of claims. The servicer engaged in documented conduct, and under RESPA and other law, liability is prescribed. RESPA has provisions for statutory and actual damages where there are violations under that statute. Those would be liquidated. There are the unliquidated and contingent claims, to be determined. The provisions of chapter 11 may have applicable provisions to change their status from unliquidated to liquidated, where any provisions would be used, as permitted in the circumstances. Law and equity should preclude the granting of the objection.

### FACTS

The matter relates back to the mortgage heretofore obtained by the claimant, for the real estate 8391 N 550 W, Bryant IN 47326. Their mortgage ultimately was serviced by Homecomings Financial, GMAC and OCWEN.

RESPA has provisions for record keeping, and that was a violated by the servicer.

A letter was sent to Futrell dated June 10, 2009, from Homecomings/GMAC, noting *"...as of June 4, 2009, your current principal is $71,251.99..."; and a Debt Validation Letter from GMAC dated June 10, 2009, noting "...as of June 4, 2009, the total amount of the debt is $73,341.47...".* (exh. 29) A zero escrow amount was stated with the Homecomings/GMAC document. A letter also dated June 10, 2010, stated a different amount for the borrower's debt, also as of June 4, 2009. (exh. 28)

There was the subsequent document of June 17, 2009, that noted a shortage in the escrow of $1,249.71 from Homecomings. (exh. 4B)

Also, on the June 17, 2009, Homecomings document, a double escrow payment was charged, in the amounts of $229.11. It was added to their stated payment, for the *then* total of $886.36. Efforts to resolve the issues were unsuccessful, and the ability to refinance was stated as the goal, from their employee, Romeo. (exh. 4B)

1



GMAC notified the borrower that he was approved for a loan modification, in a letter dated May 20, 2010, for a Fixed Rate Loan Modification Agreement. (exh. 27D, E,F,G ) That document had the undated signature of the borrower (exh. G)

Another eligibility letter was received from GMAC, dated October 14, 2009, for a Home Affordable Modification, subject to the stated terms and conditions. (exh. 30A)

Other modifications were proffered to Futrell. (exh. 31E, 32A, 33, 34A, 34C) There was rendundancy in the proposed and problems in the proffered modifications. They were presented to the servicer to be addressed by them, they were not and items were included in a subsequent document from them. That specifically includes the $579.75 *monthly principal and interest; $150.66 adjusts annually after one year monthly escrow payment account, and the 7.750% interest rate,* all of which were raised with the servicer. (exh. 31F, 32B, 34D)

This was in contrast, their nonbinding information sheet expressly stated a 3.88% under number 27, *Interest Rate of the Proposed Modification* and $7,419.99 under number 31, *Principal Forgiveness Amount.* (exh. 36B)

These problems and concerns were presented in the form of qualified written requests, where RESPA. contained controlling law in the matter of the pursuit of the loan modification. (exh. 14, 15A, 16A, 17A, 18, 19A, 20A)

The last qualified written request was dated March 14, 2013, and the first was October 31, 2009, where the servicer failed and refused to address them under the law, RESPA.

GMAC did respond on November 13, 2009, (exh. 21A) with an explanation. It expressly mentioned the escrow and the items of taxes and homeowners insurance, which excluded the actions of the borrower to address them independently. They did note the $1,249.71 escrow shortage in the June 17, 2009 analysis, and attributed it to yearly taxes and insurance.

It was with this figure from GMAC, where they stated in their letter of June 10, 2009, there was an escrow shortage of $0.00. (exh. 29) Each document was generated by GMAC. RESPA was cited by them as the controlling law. (exh. 21A)

Other correspondence from the servicer included acknowledgement of the qualified written request, November 13, 2009 (exh. 21B); a December 3, 2009 (exh. 22) letter stating the application was being reviewed for a possible loan; a January 12, 2010 (exh. 23) letter that included content on the need for an escrow account; a April 16, 2010 (exh. 24) letter that stating a repayment plan was cancelled for making the incorrect payment; and May 3, 2010 (exh. 25) letter noting the return of $355.

As to their letters of April 16, 2010 and May 3, 2010, the amount of $355 was stated in the terms of the Repayment Agreement from GMAC. (exh. 27C) GMAC stated the terms for an agreement, the borrower complied with terms (payment amount), and GMAC stated the borrower acted contrary to the agreement.

2

Documents were requested for submission in support of any loan modification, with the need to submit them multiple times. There were four (4) initial offers, that were the same essential content and the dates were changed. The escrow amounts were incorrectly stated, with a typo that increased the amount. ($1,352.53 instead of $352.37 ) Further, there was the statement made June 17, 2009, that there was a shortage of $1,249.71, yet GMAC never stated where that amount came from. (exh. 27D,27F,30A,31A31E,32A,33,34C,4A/B)

Loan modifications were made with nominal changes in the terms, including the interest rate. loan statements noted the interest rate at 8.5%. That saved the borrower $.047 a month and interest dropped at less than 2%, in 2010.

Qualified Written Requests were made, where under RESPA, there were to be the acknowledgement within 20 Days and a substantive response in 60 days. GMAC was not responsive and there were problems with the application of the controlling law. (RESPA section 3500.21(e)).

Statements were made by persons at GMAC as to the status of the process for Futrell. Issues with presented, and they included the charges that appeared on the statements from GMAC for multiple property inspections that totaled eight (8) with different charges for property inspection in their February 18, 2010 account statement and OCWEN statement of July 18, 2013. (exh. 5A,/B,12,13A)

The interest rate with GMAC in February, 2010, was 9.75%; and that rate was 8.5% with OCWEN in July, 2013. OCWEN ultimately was the successor servicer of the mortgage, and carried on as GMAC had heretofore done in the matter, with a loan modification with preferred terms not received by them.

Futrell did *not* sign any Loan Modification, where OCWEN sent the borrower a page with an undated signature of William J Futrell. There was included in the documentation two (2) dated signatures, where one was on a provided document from GMAC and the other is on check for payment of $355 to them. The supporting signatures of Futrell are pages to the GMAC letter to Futrell, dated February 18, 2010; That problem signature is an attachment to the May 20, 2010, letter from GMAC, with the signature fixed to the **FIXED RATE LOAN MODIFICATION AGREEMENT**. (exh. 5A/B25, 27B, 27C, 27G)

There is the Affidavit of Allicia Futrell, in support of the claim heretofore filed in the instant matter. That contains the personal knowledge of the course and conduct of the involvement with the servicer, and reference to the sailent documentation in their possession.

VIOLATIONS OF LAW

RESPA

The RESPA law 'Background' includes relevant content, to wit: "*The Act requires lenders, mortgage brokers, or servicers of home loans to provide borrowers with pertinent and timely disclosures regarding the nature and costs of the of the real estate settlement process. The Act also protects borrowers against certain abusive practices, such as kickbacks, and place limitations upon the use of escrow accounts.*

3

The National Affordable Housing Act of 1900 amended RESPA to require detailed disclosures concerning the transfer, sale or assignment of mortgage servicing...itemizing the charges to be paid by the borrower and what is to be paid out by the servicer." 12 USC 2601, et.seq.

Under RESPA, the provisions include for the escrow account section 3500.17, record keeping 3500.17l, good faith estimate 3500.17f. Penalties are in place against a service provider, $75 per violation for a term of 12 months not to exceed $130,000, and $110 per violation if deemed intentional per violation and no cap on the total damages.

Good Faith Estimate (GFE) 3500.7

This is directed to the settlement costs and loan terms.

There was the matter of the mortgage, where the loan was a problem due to the financial circumstances of Futrell, but also the real estate market and the adverse impact of the condition of the real estate. That request by Futrell for assistance from the USDA was initially denied, and they noted the condition of the premises and the impact on any actions that they would take in the matter. It made reference to the condition of the real estate and the Futrell's credit issues. (exh. 39A)

Loan modification was a significant issue in the matter of this borrower, where RESPA is concerned with the *costs and loan terms*. An essential problem here were the terms of any loan modification, where the actual interest rate was a critical term. There were the rates of 9.75% and 8.5% that are noted on the account statements generated by Homecomings Financial/GMAC, but were in stark contrast with the statement that there was a 3.88% interest rate. That was in their non binding information sheet, and this and other items therein were never an option for the borrower. (exh. 36A/B)

Transperancy was codified in RESPA, notably in 3500.10, which expressly provided for the 'one day advance inspection of the settlement statement'.

Futrell was presented with terms and addressed them with the servicer. RESPA That was expressly permitted in 3500.7(f)(3), for a revised GFE. The law provided for a three (3) business day time frame to respond there. For Futrell and the loan modification, the servicer did not respond many times and for the matter of the Fire Insurance mistake they made; it took over a year for them to affirmatively address and correct.

There could be the rebuttable response of GMAC in the matter, under *Changed Circumstances (3500.2(b);3500.7(f)(f2)*; where they include inaccurate information and new information particular to the borrower. Futrell dealt with Homecomings/GMAC/OCWEN, where there was the transperancy for the borrower in the loan modification process, which was not reciprocated by any servicer.

RESPA may focus on the GFE with the loan originator, the spirit of the law is that the borrower be an *informed* borrower, and the provider of any prospective loan modification, servicer, or other designated party be transparent in the disclosures to the borrower, Futrell here.

Prohibition Against Kickbacks and Unearned Fees 3500.14

Unearned Fees are defined in RESPA as *Payments in excess of the reasonable value of goods provided or services rendered are considered unearned fees.*

There are the facts from the documents generated by Homecomings/GMAC/OCWEN account statements that raise the matter of the *unearned fees.*

There were the *multiple property inspection fees*, where the account statements generated by the contained the following with the number of inspection (assessment) and reference dates, to wit: February 18, 2010, eight (8) times, with a ninth noted with a 2 day difference; January 10, 2011, five (5) times; and July 18, 2013, eight (8) times. (exh. 5A/B,12,13A) Other instances are in the statements. The number of inspections would indicate they were a mechanism to generate revenue.

There were the category from the servicer, *other*. They were requested for explanations and none were forthcoming from the servicer. Under the category of *other*, there was the unexplained assessment of $237.22 in the February 18, 2010, account statement.

The servicer assessed *late fees*, including $821.50/ February 18, 2010; $65.68/December 20, 2010; and $32.84/November 18, 2010. For these specific *late fees* assessments, they resulted in the gain to GMAC that created the terms, and the problems that generated the ability to assess these extra amounts. The obligations were on Futrell, where the servicer put forth the terms and applied them. GMAC refused to accept payment at different times and applied their procedures against the borrower, with another assessment of late fees of 558.62 in the April 20, 2009, account statement. (exh. 5A, 1A, 10B, 11) And the borrower paid installments in a timely manner, when they paid and were accepted by the servicer.

There were the known *unearned* fees, and those instance have been documented, where the full extent and the amount of those fees are unknown in the absence of the explanations and transperancy from the servicer.

Escrow Account, section 3500.17 and Record Keeping 3500.17j.

Escrow fees are funds that can be collected at settlement or upon the creation of an escrow account, and is restricted to an amount sufficient to pay charges. They include taxes and insurance.

There is the affirmative duty of the servicer to conduct a periodic escrow analysis account to determine the periodic payments and the amount to be deposited. 3500.17(c)(2)(3)(k) One such analysis was conducted, dated June 17, 2009, where the issue of the Fire Insurance was noted and the action of the service provider to add a "1". It was not corrected for over 12 months and that generated problems for the borrower. This is addressed, along with other specific issues, below. (exh. 4B)

The servicer violated the record keeping obligation, and subject to the penalties under 3500.17(m). They include a civil penalty for each failure, and no cap if the actions were intentional disregard.

5

RESPA deals with Shortages, Surpluses, and Deficiency Requirements, 3500.17(f).

That issue with the obligatory Fire Insurance. The problem was created by GMAC, and part of their June 17, 2009, document, and thereafter noted as the proper amount, $352.37, in the November 18, 2010, GMAC account statement. This delay was a further prejudice to the position of the borrower. (exh. 4B, 10A/B)

That failure of GMAC to respond timely and promptly to their error was one more action that created and compounded problems for Futrell. This was part of the pattern or practice of noncompliance.

From the facts, there was a flow of the ownership in the stated ownership of the mortgage servicer. The mortgage was acquired by Futrell, and it was thereafter sold to Homecomings Financial, a GMAC company. The escrow became an issue in the instant matter.

The borrower reached a point where the mortgage fell in arrears. Homecomings sent the borrower paperwork a statement with the analysis date of June 17, 2009, that the arrears in the escrow were $229.00 (escrow $124.97 + 104.14). Further, they stated a shortage of $1,249.71, where it was not readily explained to Futrell as to the specifics. (exh. 4B)

There was another document generated by Homecomings/GMAC, dated June 10, 2009. In pertinent part, they notified Futrell, "...As of June 4, 2009, your current principal is $71,351.99, you current escrow balance is $0.00, your current interest is 9.75%, your monthly payment is $657.25...". (exh. 1A,29)

Another document generated by them, with the same language, *As of June 4, 2009*...the amount of the debt is $74,341.47, and that had the heading, *GMAC* and titled *Debt Validation Letter*. (exh. 28) **Both were dated June 10, 2010**, issued through GMAC, where the matter of escrow (shortage) was addressed In June, 2009.

Their conflicting documents thereafter go on to state in the June 17, 2009, analysis (exh. 4B), noting: *If you pay the escrow shortage of $1,249.71, your new total payment will automatically be adjusted to $782.22...* Again, in one document the escrow balance is $0.00 balance, then they state a balance of $1,249.71. There was a patent failure of the servicer to maintain records and accurately report information regarding the account number 7432626646, Futrell's account and RESPA violation.

This also is at odds with the obligation of Homecomings/GMAC with regard to 3500.17l, record keeping. There was the documented in their own paperwork, and a blatant failure to comply with the provision, and a violation of RESPA and its provisions.

The record keeping of Homecomings is further called into question with the category of "Total Amount Due".

The account statement dated April 20, 2009, stated that amount was $2,702.62 for "Total Amount Due", but their letter dated May 18, 2008, stated a *different* "Total Amount Due", as $2,746.62. The account of the borrower had a change in this stated time period, that is not readily explained with reference to the terms and conditions set by the servicer. (exh. 1A, 2A)  There was a third document generated by

6

Homecomings Financial on this point, correspondence dated May 4, 2009, stating the amount at $2,056.62. (exh. 3) This is another example of the servicer's pattern of carelessness.
the stated payments for that period of time, $657.25, with the interest rate at 9.75%.

The matter of their record keeping was again violated with the matter of the "Fire Insurance" for November 2009. The Homecomings escrow account with the analysis of June 17, 2009, stated the amount of $1,352.53. That was an incorrect figure and the borrower promptly notified them that the figure was incorrect in June 2009. (exh. 4B), with the proper amount $352.37. (exh. 10A).
This was raised with Jenna Williams, in the GMAC executive offices, who said it was a 'typo'.

Property taxes were included in the problems with the service provider, with a stated escrow shortage of $1,249.71 in the June 17, 2009 document from the servicer. (exh. 4B) The borrower was provided an explanation that property tax for multiple years were paid, where the borrower was advised that their protocol was not to take multiple payments. There was the payment County Tax in 2010 for $82.83, By GMAC. An explanation for the $1,249.71 was in their November 13, 2009 (exh. 21A) letter.

This stated escrow shortage was stated in the June 17, 2009 analysis (exh. 4B), and that was in contrast to the letter from Homecomings/GMAC of June 10, 2009 (exh. 29) where they stated *"...your current escrow balance is $0.00..."*

There was the item on the account statements for **receipts**, and there was no explanation tendered for this when it was presented to the servicer. Specific documents for this are the June 8, 2010, account statement from GMAC, and July 18, 2013, account statement from OCWEN. (exh. 6A, 6B)

RESPA addresses the penalties for escrow issues, 3500.17(m).

Servicer Must Respond to Borrowers Inquiries 3500.21(e)

RESPA provides for the servicer to respond to borrower's qualified written request. The acknowledgement sent in 20 days and the 60 days to address the borrower's inquiries. The written inquiry from the borrower must include the name and account number of the borrower, and the reasons for the belief of an error.

Within the 60 days from the receipt of the inquiry from the borrower, *a financial institution may not provide adverse information regarding any payment that is the subject of the qualified written request to any consumer reporting agency.*

There was the specific situation for Futrell, where GMAC stated the payments of $355 as a part of a loan modification. They received and kept two (2) payments, as per their agreement, but returned the third. It was stated in a letter from the service May 3, 2010. An acknowledged payment is on the February 18, 2010 GMAC account statement. (exh. 5A/B, 25, 27C)

This was submitted to GMAC and there was no affirmative response to the same, and Futrell became aware that this *failure* of payment was reported to a credit reporting agency.

7

There were numerous qualified written requests made to the servicer, notably to GMAC and OCWEN. Issues and concerns were presented, without adequate resolution and to the detriment of Futrell.

Homecomings/GMAC/OCWEN were under affirmative obligations, including *responding to borrower inquiries; provide notice of receipt in the specified time; provide written notification of corrections taken; and no reporting to any credit reporting agency of missed payments during the period.*

RESPA provided for penalties for the violation, 3500.21(f), to wit: *The failure to comply with any provision of section 3500.21 will result in actual damages and, where there is a pattern or practice of **noncompliance**, any **additional** damages in an account not to exceed $1,000.*

There are damages for class actions, and they include costs of the action and attorney fees for a successful case.

## FAIR DEBT COLLECTIONS PRACTICES ACT

For the purpose of this action, it incorporates by reference the RESPA content, Affidavit of Allicia Futrell and the content of the designation.

The Servicer, Homecomings/GMAC/OCWEN, were debt collectors, for a mortgage instrument that they did not own.

The identity of the debt collector was known, where there was a general number and the need to deal with those persons that answered the telephones. There were the issues of getting through to the persons that were in the best position to render the needed assistance, where there would be conflicting information from the servicer's employees at this level.

The need existed to find someone to assist, and actually refer the borrower to one in the correct department. They only gave first names, and refused any further identification.

805   communication

The communications were by telephone and letter. With regard to the telephone communications, they would call periodically, sometimes 2-3 times per day, and several days in a row. This was in the context of any number of calls that were initiated by the borrower and/or his spouse.
(see designation)

806   harassment

There were the telephone calls, where the number of calls was a problem. They ceased to have any legitimate communications with the borrower, where the circumstances were established and their extent of their resources to pay were established.

There would be the demand for payment with every telephone call, and for the purpose to get payment, without regard to the FDCPA and its provision

8

807   misrepresentation

The servicer, primarily GMAC, misstated essential and relevant information to the borrower.
It expressly included the interest rates that would be applicable for any loan modification, the
payment installments, a promise of actually having a loan modification into an interest rate and
payment that the borrower could afford. The purpose was to obtain a loan modification, where the
employees of GMAC misstated the essential facts, contradicted other GMAC employees, be they
in the same or other department of GMAC.

Their statement in/about October 2010, was that the borrower was current. There were two (2)
payments behind (November & December), and there was the telephone call to GMAC concerning
catching up these payments and being current. The borrower became current thereafter.

GMAC employee, Janelle, stated that an "underwater mortgage refinance program", from the
government was available. Any application for that program was through GMAC, where GMAC was
aware of all the prerequisites and requirements before they stated that as an option for the
borrower.

A pre requisite was that an applicant had to be current, and based on that, the borrower went into
their 401k to become **current**. The application process was to be done through the mortgage servicer,
GMAC, and they never followed through with their obligations there.

There were other employees of GMAC that were presented with the refinance request, and they did
nothing. They stated that this was due to the poor credit, where they failed to state it would be a
problem, regardless of whether we became current, or not. They were patently deceptive.

808   unfair practices  (6)(B)

The servicer, primarily GMAC here, made the threats to take the mortgage into legal process, where
that was an often repeated threat they would use to cajole, coerce or anything to collect on the
mortgage.

809   validation

There were the issues, where they included the matter of the escrow, and the other essential terms for
any loan modification enumerated by the servicer, notably GMAC.

813   damages

There are the statutory damages under the FDCPA, as well actual damages, including *the depreciation in
the value of the real estate where GMAC had a value of $59,000, 401k cashed in at approximately
$10,000, property that had to be sold for the purpose of satisfying the demands of GMAC and the other
servicer, notably personal property, the amount that had been borrowed from third parties as a result of
the calculated actions of the servicers, notably for any public assistance, lost wages, where Allicia was
unable to work, where the actions of the servicers precluded that ability, in the main.*

9

*There were health issues that affected the borrower, primarily flowing from the stress levels that
were being exponentially compounded on the borrower, his spouse and family.*

All other relief available under controlling law, including attorney fees, costs and expenses would be
requested.

There has been the continuing course of conduct and contact with the servicers, with the last qualified
written request March 14, 2013 to OCWEN. GMAC last qualified written request was October 23, 2011,
and the proof of claim was filed on September 24, 2012 with the Bankruptcy Court. Any statute of
limitations under FDCPA should be a non-issue.

### OTHER SUPPORTING BASIS FOR THE BORROWER'S CLAIM

The actions of the servicer, GMAC in chief, raised state claims, under pendent jurisdiction of the federal
courts.  They included, and incorporating the content herein, affidavit and documents:

### FRAUD

The servicer was the collector and the owner/holder of the paper is unknown. On behalf of the
owner/holder and themselves, there was the representation that there would be a loan modification
for the borrower, on favorable terms and condition.

There was the borrower that was dealing with the servicer, where there was the loan modification
presented, if the terms and conditions were met.

That material promise of a loan modification was an illusory promise. The terms and conditions were
presented to the borrower, and changed by the servicer, seemingly at their whim. RESPA was
acknowledged as controlling law by them, but they failed and refused to be bound to those limitations.
Their course of conduct included the promise of the loan modification on favorable terms, notably any
interest rate attached to any loan modification. Their account statements had 9.75% for 2009, which
were 8.5% in 2011. (exh. 1A, 6A); and the mentioning of the 7.750% in proffered modifications (exh.
31F)

Those interest rates were in contrast with the 3.88% rate (exh. 36B) in their information sheet, where
that was never a serious possibility for the borrower.

Another material statement was the matter of any escrow (shortage) and the amount of the same.
The servicer's June 17, 2009 analysis (exh. 4B) stated the escrow shortage amount at $1,249.71.
That correspondence from Homecomings, *a GMAC company*, and GMAC stated on June 10, 2009
that *"...your current escrow balance is $0.00..."* (exh. 29)

The servicer had the basis to know their statements were false, where they were based on their records,
where the borrower was effectively ignorant of the falsity of statements, based on access to the
controlling information held by the servicer. The process was controlled by the servicer, and the
borrower relied to their detriment.

OCWEN incorporated the actions of GMAC, and relied on their file with regard to the borrower's account. That specifically included the stated escrow shortage of $1,249.71, that never really existed. (exh. 4B, 29,35A) With all the essential knowledge, OCWEN maintained the pattern of deception established by GMAC, and supports exemplary damages assessed against them in the matter.

Another material stated was that the loan modification was a benefit to the borrower, where it saved them $.047 per month and reduced the interest by less than 2%, from 2010. OCWEN statements and actions are on par with GMAC, and part of the continuing violations of the controlling state and federal laws and statutes.  Their actions were cumulative, to the detriment of Futrell.

As a direct and proximate result of the pattern of misconduct from the servicer, there was the actual harm included their out of pocket, their 401k, deteriorating condition of the real estate, their worsening financial situation as a result of dealing with the servicer, and left to their detriment with no loan modification on favorable terms and conditions. The servicer failed to comply with RESPA, and profited at the expense of the borrower.

Additional state claims include *breach of contract, emotional distress and defamation.* Any action on the matter of *defamation* would be embraced based on their responsibility under RESPA.

The borrower, William J Futrell, requests that their claim be allowed against the servicer, Home-comings Financial, GMAC and OCWEN; for all liquidated and unliquidated claims in the matter, with the full measure of relief permitted to him under the law.

Respectfully submitted,

Thomas Margolis   10189-18
125 E Charles Street   Suite 214
Muncie IN 47305
Telephone 765-288-0600

11

STATE OF INDIANA )
                 )
COUNTY OF JAY    )

### AFFIDAVIT OF ALLICIA FUTRELL

COMES NOW the affiant, Allicia Futrell, and says as follows:

1.  I am the spouse of the mortgagee, William J Futrell, and reside at 8391 N 550 N, Bryant IN at all relevant times in the instant matter.
2.  I have personal knowledge of the details regarding the mortgage for the property, account number 7432626646.
3.  There was a mortgage for the real estate, where there was the contact with Homecomings Financial, where they were a GMAC company.
4.  There were issues that arose where the ability to pay the mortgage current on an ongoing basis.
5.  The servicing of the mortgage shifted to GMAC in 2009, and there was the successor entity, OCWEN, that assumed the responsibility in 2013.
6.  Homecomings Financial/GMAC sent a letter to the mortgagee, June 10, 2009, with the statement that as of June 4, 2009, the current principal balance was $71,251.99. They stated that the "...current escrow balance is $0.00, your current interest rate is 9.750%, your total monthly payment $657.25..." This was the effective beginning of the modification
7.  GMAC sent the mortgagee a Debt Validation Letter, dated June 10, 2009, with the statement that as of June 4, 2009, the total amount of the debt was $73,341,47. They stated that "...interest, late charges , legal costs and fees and other charges may be included..." It was silent on any escrow balance and/or shortage. And thereafter, in the escrow analysis of June 17, 2009, there **was** an escrow balance of $1,249.71. (     )
8.  GMAC charged **twice** for the escrow in the June 17, 2009, analysis, and a shortage that never did truly exist in the matter. Romeo, the employee of GMAC, was the contact person, he was presented with the matter, and told to disregard the entry, in June 2009.
9.  The Mortgage Account Statement of July 18, 2013, noted that the interest rate was 8.5% and the payment (principal and interest) was $656.86, (     )
10. There were charges assessed against the mortgage by OCWEN, notably for the property inspections, in the account statement of July 18, 2013, for eight (8) times for the total of $332.00. (     )
11. There were charges against the mortgage by GMAC, notably for the property inspections, in the account statement of January 10, 2011, for five (5) times at $11.25 for each. (     )
12. There were charges against the mortgage by GMAC for more property inspections in the account statement of February 18, 2010, for a total of eight (8), for the same reference dates, and a 9th one with a different reference date. The GMAC employee, Jenna Williams, was a contact person at that time.
13. GMAC sent the mortgage a second account statement, bearing the date of February 18, 2010, which noted nine (9) property inspections, with the same reference dates. (     )
14. On the two (2) nearly identical account statements, they did not have conforming 800 contact numbers, and the figures, including but not limited to escrow and outstanding late charges were conforming.

15.    There were payments to the mortgage servicer, paid within the time frames stated for payment and by the means stated. It was a condition and/or term from GMAC.

16.    There was the stated amounts to be paid by Futrell, that was issued by them in an enclosure dated February 18, 2010, for three (3) payments of $355, by 3/1/10, 4/1/10 & 5/1/10. There were two (2) payments of $355 sent, but a third pay agreed payment was returned by GMAC to Futrell. Those payments were acknowledged on the GMAC account statement, in the 'Important News Box', stating, *"...Your special repayment plan request has been honored. Your next installment due is 3/1/10 in the amount of $355.00..."* in the February 18, 2010 (2 dated February 18, 2010) account statements. The check for $355 was returned May 3, 2010.

17.    That check was returned to the mortgagee in correspondence dated May 3, 2010, where it was returned to the mortgagee from GMAC. Jenna Williams made an immediate demand of over $700, and if not, foreclosure would commence promptly. That payment was made, where it was paid, other parties were not paid and/or checks bounced; and were forced to pay the electronic fee to GMAC, in the amount of $12.50.

18.    There was the matter of the stated agreed payments, where that included language , "...The payment received does not represent the correct amount as specified in the signed repayment agreement." (      )

19.    There was no repayment that was agreed to by the mortgage, where there was a signature presented by the mortgagor, which is not the signature of the mortgage. (      )

20.    A sample of the true signature of the mortgage is found on *      (      )

21.    The payment was mentioned in another letter from GMAC dated April 6, 2010.  (      )

22.    There was the account statement from Homecomings of April 20, 2009, noting the interest rate of 9.75% and the payment of $657.25, and the total amount due in the sum of $2,702.62.  (      )

23.    There was the account statement from Homecomings of May 18, 2009, with the payment of $657.25, and the interest rate of 9.75% and the total amount due in the sum of $2,746.73. (      )

24.    The change in the total amount due had the difference of $44.11  between April 20, 2009, and May 18, 2009.

25.    Homecomings sent the mortgage correspondence dated May 4, 2009, noting the default status of the mortgage and the total amount due was $2,056.62. (      )

26.    The Homecomings correspondence of June 10, 2009 (paragraph 6) had the statement that the escrow is $0.00.

27.    The Homecomings Initial Escrow Account Disclosure Statement analysis of June 17, 2009, stated that the escrow $124.97 + $104.14= $229.11. This is a double incorrect escrow.

28.    The Homecomings document added that to the payment, for a total of $886.36.

29.    The Homecomings document included the statement, "...IF you pay the escrow shortage amount of $1,249.71, your new payment will be automatically adjusted to $782.22 effective with your August 1, 2009 payment..." (      )

30.    The account statements included fees that were assessed by the mortgage servicer, yet were not explained when the explanation were requested from them.

31.    Those unexplained charges from GMAC included the assessed amount of $94.72, which were noted in the GMAC account statements for June 8, 2010, July 1, 2010, September 15, 2010, October 18, 2010 and December 20, 2010. (      )

32.    There were additional unexplained assessed fees, including but not limited to "PD CORP ADV 3 DRM" (3) in the June 8, 2010 account statement; and July 18, 2013 with OCWEN, with four (4) entries. (      )

33.    That same document noted the Fire insurance in the sum of $1,352.53, which was stated in the mortgage servicer paperwork with the analysis date: June 17, 2009. Jenna Williams was presented with the matter in October 2009, Jenna called the problem a *typo*, which was still not corrected promptly following that telephone conversation.

34.    There was an error in the record keeping by the mortgage service provider, where the actual issue was noted as "Fire Ins Paid" with the payment date of October 1, 2010, and the amount of $352.37. (    )

35.    The error was presented to Homecomings, where they failed and refused to correct the problem for a period of over one (1) year, to the detriment of the mortgage with regard to the mortgage service provider.

36.    The Homecomings had a second page (    ), where they stated if there were any questions concerning the escrow analysis, they provided an address to send any inquiries and the toll free number of 1-800-206-2901.

37.    That contact number was used frequently and often, speaking to different persons, where problems raised were not addressed and cleared up in a prompt and timely manner.

38.    There were Qualified Written Requests sent to the mortgage servicer, including: October 30, 2009, November 13, 2009; December 2, 2009; October 23, 2011, where this expressly mentioned the Fire insurance and the "1" that was added at the mortgage servicer (see paragraph 32-33); April 14, 2012; August 31 2012; and March 14, 2013.

39.    RESPA provides for the period of twenty (20) days in which the mortgage servicer acknowledges the qualified written request, and a response in sixty (60) days.

40.    The mortgage servicer, GMAC, acted, including but not limited to November 13, 2009, where the generic customer care number of 1-800-766-4622 was provided, with a response; December 3, 2009; and January 12, 2010, with the Loss Mitigation Department at1-800-850-4622. (    )

41.    There were Loan Modifications submitted, under the heading of the Home Affordable Modification Program, that was commenced with the, "**Congratulations!** You are eligible for a Home Affordable Modification", dated October 14, 2009. There were four (4) proposals submitted, where there was duplication in the terms and conditions, with no significant change in terms offered, be it by GMAC or OCWEN. This modification had an APR of 7.50%, however the APR in the final modification jumped to 8.50%. Incorrect escrow figures were cited by GMAC.

42.    The mortgage servicer, GMAC, that bore the statement atop, *This information is provided for your information only and has no bearing on the outcome of the modification decision.* (    )

43.    The items included *current borrowers credit score 517, property value $30,000, data collection date 4/5/12, unpaid principal balance $76,500 at origination, unpaid principal balance of the proposed Modification $82,714.71, Next Adjustable Rate Mortgage 9.75, Principal Forgiveness Amount of Proposed Modification $7,415.65, and interest rate at the proposed Modification 3.88%.* No mortgage servicer provided the noted 3.88% interest rate, forgiveness, or other.

44.    There was no matching of specific items, specifically including any forgiveness of any amount, the proposed interest rate for a Modification, and the value of the real estate.

45.    USDA noted the diminished value of the real estate, based on problems with the property; in an August 10, 2011 letter. (    )

46.    The values stated for the real estate were between $59,000 (as is) from GMAC, April 25, 2010. (    )

47.    A year later in the USDA August 10, 2011, denial letter, stated the $30,000 appraisal, but the requested financing for $76,000 was not going to happen because the property was "underwater" and the condition of the real estate. (    )

48.  The denial was appealed to USDA, successfully, where USDA approved the amount of $10,000, because the other $20,000 was needed to bring the property 'up to code'.

49.  GMAC was contacted, Jerimiah in liquidation at GMAC, 1-877-521-3698, ext. 8743698; and he stated the need for 'good faith estimate' from USDA, pre-approval from USDA, and borrower hardship letter, in August, 2010.The purpose was for a 'short sale' to the borrower.

50.  The borrower attempted to comply, thereafter contacted GMAC, where it was learned that Jerimiah was no longer at GMAC and the present employee, Henry, said Jerimiah lied and there would be no 'short sale' to anyone, but a third party. Jerimiah stated there could be a 'short sale' to the borrower. The time frame here was August, 2010. **One month later**, there was the offer from GMAC to settle the entire matter for the price of $27,000.

51.  There were contacts with GMAC, by telephone and with their different employees in different departments, employees in the same department, correspondence, including but not limited to Qualified Written Requests, and faxes to employees of GMAC and outside parties.

52.  The outside parties included, the member of congress, Treasury Department (Lynn Jones), Fannie Mae (Joe Scott), during the entirety of the process in the dealings with GMAC and the prescribed process to seek to obtain a loan modification.

53.  Contact with GMAC included contact with the executive office, Jenna Williams, where there were her efforts to address the multiple issues with regard to the actions of GMAC, at 319-236-5257, as of 2011. A fax number was provided, 866-502-6427, which is the same fax number for GMAC.

54.  There was the matter of our credit being adversely affected, where USDA noted that there had been missed payments on the mortgage, and that was one factor considered by the USDA in their ultimate decision in the application. GMAC had made a report to the credit reporting agencies that there were multiple missed payments, contained in the credit report of myself and my spouse, that were refused by the servicer.

55.  Shelia was the GMAC employee in November 2009, for the denial of the payment, with the explanation that GMAC would not accept a partial payment, where they deemed the alleged escrow shortage part of the *proper* payment that was to be paid by the borrower. She was an employee with whom the escrow shortage was discussed, but no inquiry was made by GMAC because the modification process for the borrowed had been started.

56.  There were to be no adverse credit reports made during the Qualified Written Request periods, considering the purpose of the request for loan modification, where GMAC failed and refused to follow RESPA on this and other points, to our detriment.

57.  There was the $1,249.71 in the June 17, 2009 document, where an employee in the escrow department stated that the shortage was from paying three (3) years of property taxes. The local assessor was called and told that they would not receive such a multiple payment of property taxes, based on their procedure.

58.  There were the account statements from GMAC and OCWEN, where under *description*, they had **receipt**; but there was no (further) explanation provided in the matter. Examples are in the GMAC June 8, 2010, account statement and the OCWEN July 18, 2013, account statement.

59.  There was adverse credit reporting against the credit of the borrower from the servicer, where USDA stated in their letter that there had been *11 mortgage delinquencies since 09/09*.

60.  There is the fact that GMAC caused that, where GMAC refused to accept the state payment of $657.25, and demanded the payment of $886.36. There was their inclusion of an *escrow shortage* which did not really exist in the sum of $229.11. Assuming there was an escrow, it was an incorrect number.

61.   There were the loan modifications sent in 2010, where the net effect of them were to save the borrower $.047 a month, and reduced the interest rate less than 2%.

62.   There was a contact with Johnsey, November 2009, and was asked *what* if the loan modification was declined. His response was that the effect would revert back to the original payment of $657.25 and the escrow shortage of $1,249.71 would be due immediately.

63.   That stated escrow shortage never existed, see exh. 4B, 29, from June 2009.

64.   In all the time that the borrower has been dealing with the servicer, there still is lacking the exact information who is the owner of the underlying mortgage instrument; where the explanations OCWEN included *it could be JP Morgan-Chase, NY Mellon, or First Bank of New York, and no verification, in any form from any servicer, on the point.*

65.   There were the substantive statements in the FDCPA portion of the Memorandum, which are true, accurate and correct.

The foregoing affidavit of Allicia Futrell was reviewed and signed under the penalty of perjury on the ___20___ day of October, 2013, and stated on my knowledge of the relevant facts and the review of the documentation available to the affiant, consisting of _____ pages.

Allicia Futrell
8391 N 550 W
Bryant IN 47326

## DESIGNATION OF EXHIBITS

1.  Homecomings Financial mortgage account statement *a GMAC company* April 20, 2009
2.  Homecomings Financial                                              May 18, 2009
3.  Homecomings Financial-   correspondence                            May 4, 2009
4.  Document:Analysis date  and notice                                 June 17, 2009
5.  GMAC mortgage account statement   (2) dated the same)              February 18, 2010
6.  GMAC mortgage account statement                                    June 08, 2010
7.  GMAC mortgage account statement                                    July 1, 2010
8.  GMAC mortgage account statement                                    September 15, 2010
9.  GMAC mortgage account statement                                    October 18, 2010
10. GMAC mortgage account statement                                    November 18, 2010
11. GMAC mortgage account statement                                    December 20, 2010
12. GMAC mortgage account statement                                    January 10, 2011
13. OCWEN  mortgage account statement (2) dated the same)              July 18, 2013
14. GMAC QWR                                                           November 13, 2009
15. GMAC/loss mitigation (loan modification) QWR                       December 2, 2009
16. GMAC  QWR                                                          December 30, 2009
17. GMAC  QWR                                                          October 23, 2011
18. GMAC  QWR                                                          April 14, 2012
19. GMAC  QWR                                                          August 31, 2012
20. GMAC  QWR                                                          March 14, 2013
21. GMAC correspondence/response                                       November 13, 2009
22. GMAC correspondence/response                                       December 3, 2009
23. GMAC correspondence/response                                       January 12, 2010
24. GMAC correspondence/response                                       April 16, 2010
25. GMAC correspondence/response                                       May 03, 2010
26. GMAC correspondence/response                                       May 13, 2010
27. GMAC correspondence/$355 payment/check/accepted                    February 18, 2010
        Dated signatures –Futrell attachments – in contrast with a disputed
    Futrell signature alleged to be part of a loan modification- part #27
        (CROSS REFERENCE-MAY 3, 2010/*FUNDS RETURNED* –MAY 3, 2010 #25)
28. GMAC correspondence-*as of June 4, 2010*                           June 10, 2010
29. GMAC/Homecomings-*as of June 4, 2010*                              June 10, 2010
30. GMAC-loan modification document/"...you are eligible..."           October 14, 2009
31. GMAC-loan modification document-effective August 1, 2009          ----------
32. GMAC-loan modification document-#2                                ----------
33. GMAC-loan medication document-#3                                  --------
34. GMAC-loan modification document-#4                                 December 17, 2009
35. OCWEN cover letter/loan modification/Futrell signature/undated     April 4, 2013
    (CROSS REFERENCE-FEBRUARY 18, 2010/DATED SIGNATURES #26)
36. Loan Modification information sheet – non binding                  undated
37. Documents noting valuation/appraisal of real estate:
    USDA 7/29/11, $30,000; GMAC 4/25/10, $59,000; --12/3/07, $55,000;
38. GMAC -$27,000 offer as full satisfaction of Futrell account  November 17, 2011
39. USDA to Futrell  August 10, 2011- *unable to take favorable action letter-application*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE :                                    Case No:    12-12920
RESIDENTIAL CAPITAL LLC                              Chapter 11
Debtors                                    Jointly Administered

### STATEMENT OF CLAIMANT

COMES NOW William J Futrell, by counsel and says:

1.  The category of the claim filed by Futrell is under General Unsecured-Unliquidated.

2.  There have been violations from the servicers, Homecomings Financial, GMAC, and OCWEN, under the controlling laws.

3.  The instant matter is subject to RESPA, and its provisions.

4.  The claimant's memorandum pointed to specific violations of RESPA and the penalties that are present, where Futrell, as borrower, would be entitled to the prescribed penalties.

5.  The provisions include 3500.21(e) Servicers Must Respond to Borrowers, and the penalties section for that provision 3500.21(f), including but not limited to actual damages and statutory damages.

6.  The provisions include 3500.17(j) Record Keeping, and the penalties section for that provision 3500.17(m), including but not limited to a civil penalty of money to the borrower, and a cap of $130,000 for a 12 month period, where not deemed intentional, and no cap when deemed intentional.

7.  Any damages, be they actual or statutory under FDCPA.

8.  Any damages under Fraud.

9.  Any damages under any other theory that has been presented and/or may be presented that would be the basis for damages against the servicer.

10. The statement of damages were heretofore provided to Residential Capital, notably actual damages, including but not limited to:

    The addressing of the matter of the real estate and addressing its problems from the inability to obtain the loan modification and doing the essential maintenance of the real estate, an unknown total amount, mortgage related, $50,000, minimum;
    The monies that were obtained by the cashing in of the 401k, and the penalties paid for the premature cashing in for the same and penalties paid, $15,000, minimum;
    selling personal property to meet the demands of the servicer, $10,000, minimum.

page 2, Statement of Claimant

Lost income, where the sale of assets, and the inability to perform work for compensation, $100,000 minimum;
The real estate and the present condition, as opposed to the structural and other problems with the need ultimately take the structure down, $160,000 insurance value.

Respectfully submitted,

Thomas Margolis  10189-18
125 E Charles Street  Suite 214
Muncie IN 47305
Telephone 765-288-0600

**THIS IS A NOTICE REGARDING YOUR CLAIM.  YOU MUST READ IT
AND TAKE ACTION IF YOU DISAGREE WITH THE OBJECTION.**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**NOTICE OF HEARING ON DEBTORS' FORTY-NINTH OMNIBUS OBJECTION TO
CLAIMS (NO LIABILITY BORROWER CLAIMS – BOOKS AND RECORDS)**

**William J Futrell**

| Proposed Claim(s) to be Disallowed and Expunged | | | | Reason for Disallowance |
|---|---|---|---|---|
| Claim No(s); Date Filed | Debtor | Classification | Amount | |
| 725

09/24/12 | GMAC Mortgage, LLC | Administrative Priority | N/A | Liability Not Reflected in Debtors' Books and Records |
| | | Administrative Secured | N/A | |
| | | Secured | N/A | |
| | | Priority | N/A | |
| | | General Unsecured | UNLIQUIDATED | |

PLEASE TAKE NOTICE that, on September 20, 2013, Residential Capital, LLC and certain of its affiliates (collectively, the "**Debtors**") filed the *Debtors' Forty-Ninth Omnibus Objection to Claims (No Liability Borrower Claims – Books and Records)* (the "**Objection**") with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").[1] The basis for the claim objection applicable to you is identified in the table above in the column entitled "**Reason for Disallowance**".

The Objection requests that the Bankruptcy Court expunge and/or disallow one or more of your claims listed above under PROPOSED CLAIM(S) TO BE DISALLOWED AND EXPUNGED on the ground that the claim(s) is a liability not reflected in the Debtors' books and records.  **Any claim that the Bankruptcy Court expunges and disallows will be treated as if it had not been filed and you will not be entitled to any distribution on account thereof.**

---

[1]    A list of the Debtors, along with the last four digits of each Debtor's federal tax identification number, is available on the Debtors' website at http://www.kccllc.net/rescap.

TO   United State Bankruptcy Court
      Southern District of New York

      Et.al.

FROM   Thomas Margolis


Response to Objection filed with regard to the claim of William J Futrell

Acct # ▇▇▇▇6646

Debtor :   Residential Capital LLC

      Case no. :   12-12020 MG

      Chapter 11


Response to Objection
affidavit
designation
Statement

Certificate of Service

The memorandum, designation of exhibits, exhibits and affidavit of Alisha Futrell were served on the parties designated by the Bankruptcy Court on the ___21___ day of October 2013, by

Thomas Margolis

Honorable Martin Glenn    United States Bankruptcy Court  (Chambers of)
One Bowling Green            Southern District of New York
New York, New York 10004
Courtroom 501

Debtors Counsel   Morrison & Foerster
                  1290 Avenue of the Americas
                  New York New York 10104
                  Attn  Gary Lee   Norman Rosenbaum  Jordan Wishnew

Counsel for official Committee of unsecured creditors  "committee"
                  Kramer Naftalis & Frankel
                  1117 Avenue of the Americas
                  New York, New York 10036

United States trustee for Southern Dist of New York
                  US Federal office building
                  201 Varick Street  Suite 1006
                  New York New York 10014
                  Attn  Tracy Hope Davis

Special Counsel for Committee   Silverman Acampora
                  100 Jericho Quadrangel Suite 300
                  Jericho New York 4753
                  Attn  Ronald Friedman