Craig Nazzaro | LinkedIn

EX. 32

## Craig Nazzaro
Vice President and Assistant General Counsel at JPMorgan Chase
Greater New York City Area . Law Practice

**Join LinkedIn and access Craig Nazzaro's full profile.**

As a LinkedIn member, you'll join 200 million other professionals who are sharing connections, ideas, and opportunities. And it's free! You'll also be able to:

- See who you and Craig Nazzaro know in common
- Get introduced to Craig Nazzaro
- Contact Craig Nazzaro directly

View full profile

### Craig Nazzaro's Overview

| | |
|---|---|
| Current | Vice President and Assistant General Counsel at JPMorgan Chase |
| Past | Partner at Law Offices of Craig P. Nazzaro |
| | Partner at Crescent Lake Settlement Services, LLC |
| | Associate at Stiene & Edwards |
| Education | Hofstra University School of Law |
| | American University |
| Connections | 62 connections |

### Craig Nazzaro's Summary

I have been practicing law since 2003. I am admitted in both New York and New Jersey specializing in Real Estate Lending (commercial & residential) and general corporate work. I previously worked at two boutique real estate/mortgage banking firms and am currently in house counsel at JP Morgan Chase providing support to the mortgage bank.

Specialties
Real Estate Transactions(Both Commercial & Residential), including acquisition & sales, leasing, title and finance. General Coprporate transactions; including drafting and review of contracts of sale, leases, employment and sales contracts, non disclosure and non circumvent agreements, as well as operating, vendor and JV agreements

### Craig Nazzaro's Experience

**Vice President and Assistant General Counsel**
JPMorgan Chase
Public Company; 10,001+ employees; JPM; Financial Services industry
April 2011– Present (2 years)

- Identify risk trends and root causes of complaints originating from the Mortgage Banking Executive Office; consult with senior management to develop course of action for resolution.
- Provide feedback and determine corrective action to present to senior management and business teams.
- Provide direction to the mortgage bank regarding various customer complaint projects including high-risk cases and high profile media inquiries.
- Interface with regulators, attorneys and investors.
- Manage general litigation and supervise outside counsel in matters filed against or on behalf of the mortgage bank.

**Partner**
Law Offices of Craig P. Nazzaro
April 2005– April 2011 (6 years 1 month)

- Represented lenders, purchasers and sellers in residential and commercial real estate transactions. Drafted and reviewed all legal documents including mortgages, notes, consolidations, assignment of rents and leases, and lease abstracts.
- Negotiated and drafted agreements, including contracts of sale (commercial and residential property), commercial leases (including amendments, assignments, renewals, subleases and terminations), employment and sales contracts, non-disclosure and non-circumvent agreements, as well as operating, vendor and JV agreements.
- Advised national mortgage lender ($800M, 2009 sales) on all compliance and licensing issues at the time of company's expansion in the Northeast. Acted as liaison between retained counsel and the lender in matters of lending and employment disputes.
- Redesigned and implemented new closing procedures for a mortgage lender's closing department in order to facilitate cleaner origination files to improve turn time of investor purchases.
- Handled all stages of foreclosure actions from inception to completion.
- Cleared clouded title for bank-owned REO portfolios. Negotiate REO contracts and attend closing of title.
- Held monthly training seminars for mortgage banking clients educating their sales and processing personnel on issues including GFE reviews, RESPA reviews, TILA, and post closing collateral package reviews.
- Responsible for management of firm's employees and personnel issues.

**Partner**
Crescent Lake Settlement Services, LLC
April 2005– April 2011 (6 years 1 month)

- Supervised production, review and clearance of title abstracts for issuance of policies on residential and commercial properties.
- Oversaw process of loan originations from application, title clearance, closing and post-closing reviews for loan sales.
- Disposed of defects in title to issue commitments free from objections, clear defects, and restore chain of title on closed loans for sale on secondary markets.
- Responsible for all escrow accounts, including balancing, funding and reconciling all loans and escrowed funds.
- Established all software necessary to close, fund and track title and loan files.
- Formed and secured underwriting and agency agreements from Fidelity National Title. Fully staffed and manage the company.
- Grew business to insuring $15M a month in declining mortgage market.

**Associate**
Stiene & Edwards
August 2003– April 2005 (1 year 9 months)

- Represented J.P. Morgan Chase in courts of New York State on contested & uncontested foreclosure matters.
- Handled disposition of JP Morgan Chase's REO properties in New York
- Reviewed foreclosure searches to identify necessary title claims.
- Represented JP Morgan Chase in residential refinance and purchase transactions.
- Drafted, negotiated, and reviewed commercial leases for clients including amendments, assignments, renewals, subleases, and terminations.
- Headed projects to clear defects in closed loans, including unrecorded liens and/or missing documentation from collateral files.
- Consulted with brokers and mortgage banks regarding issues of compliance on documentation and payout practices.

## Craig Nazzaro's Education

**Hofstra University School of Law**
J.D.,Corporate Law, Real Estate
2000 – 2003
*Activities and Societies:*Member: Corporate Law Society & Domestic Abuse Clinic

**American University**
B.A.,Communication
1997 – 2000

## Contact Craig for:

- career opportunities
- expertise requests
- reference requests

- job inquiries
- business deals
- getting back in touch

## View Craig Nazzaro's full profile to...

- See who you and Craig Nazzaro know in common
- Get introduced to Craig Nazzaro
- Contact Craig Nazzaro directly

**View Full Profile**

Not the Craig Nazzaro you were looking for?View more »

linkedin member directory – Browse members by country ab cd ef gh ij kl mn op qr st uv wx yz more

LinkedIn Corporation © 2011

951702 04/09/07 08:30 0001284 20070514 GE395301 BDACH   1 DZ DDM GE19510000= 14E116   NO

#BWNHJPY
#KW75967B36782#

PERRY GOERNER
12 WANTAGE SCHOOL ROAD
SUSSEX NJ 07461-3322



| Customer Care Inquiries: | 1-800-206-2901 |
| Home Financing Needs: | 1-877-695-3633 |

Please verify your mailing address, borrower and co-borrower information. Make necessary corrections on this portion of the statement, detach and mail to address listed for inquiries on the reverse side.

## DO NOT PAY. AMOUNT WILL AUTOMATICALLY BE DRAFTED FROM YOUR ACCOUNT.

### Account Information

| | |
|---|---|
| Account Number | 7473329357 |
| Current Statement Date | May 09, 2007 |
| Maturity Date | April 01, 2037 |
| Interest Rate | 7.50000 |
| Current Principal Balance* | $322,019.82 |
| Current Escrow Balance | $2,001.27 |
| Interest Paid Year-to-Date | $3,830.96 |
| Taxes Paid Year-to-Date | $0.00 |

**For Customer Care inquiries call:** 1-800-206-2901
**For Insurance inquiries call:** 1-800-237-6787

### Details of Amount Due/Paid

| | |
|---|---|
| Principal and Interest | $2,254.97 |
| Subsidy/Buydown | $0.00 |
| Escrow | $555.09 |
| Amount Past Due | $0.00 |
| Outstanding Late Charges | $0.00 |
| Other | $0.00 |
| Total Amount Due | $2,810.06 |
| Account Due Date | July 01, 2007 |

### Account Activity Since Last Statement

| Description | Due Date | Tran. Date | Tran. Total | Principal | Interest | Escrow | Add'l Products | Late Charge | Other |
|---|---|---|---|---|---|---|---|---|---|
| Payment | 06/01/07 | 05/09/07 | $2,810.06 | $240.84 | $2,014.13 | $555.09 | | | |

*This is your Principal Balance only, not the amount required to pay the loan in full. For payoff figures and mailing instructions, call the Customer Care number above or you may obtain necessary payoff figures through our automated system (24 hours a day, 7 days a week).

See back for automatic payment sign-up information and other payment options.

### Important News

**Pay down debt! Fund a home improvement project or tuition! Call the number above to apply for a Home Equity Line or Loan!**

### See Reverse Side For Important Information

### Your Payment Will Automatically Be Drafted

### Mortgage Payment Coupon

| Account Number | Due Date | Mortgage Payment | Amount to Be Drafted | Homecomings Financial |
|---|---|---|---|---|
| | 07/01/07 | $2,810.06 | $2,810.06 | |

PERRY GOERNER

| Check below if you need information on: | Please assist Homecomings in applying your payment | |
|---|---|---|

**Homecomings Financial**
A GMAC Company

April 27, 2007

Perry Goerner
12 Wantage School Road
Sussex, NJ 07461

RE: Homecomings Loan Number 0███████

Dear Perry Goerner:

This letter serves as notification that HomeComings will begin drafting your bank
account for your mortgage payment pursuant to your request.

Your Monthly Automated Payment withdrawals are scheduled to begin 6/1/2007 in the
amount of $2810.06.  This draft is based on the following information:

Checking Account #: XXXXXXXXX5893

If your regularly scheduled draft is returned for insufficient funds (NSF), a second draft
will be attempted.  Each NSF will result in a fee.  We must receive 30 days advance
notice to process all requests regarding your Automated Payment Option.

We appreciate you as a customer and we value your business.  If you have any questions,
please write or contact our Customer Service Department at 1-800-206-2901.

Sincerely,

*Nancy Marks*

Nancy Marks
Account Manager

You can access and update your drafting information via our secure Web site at
https://www.homecomings-loaninfo.com

P.O. BOX 890036          DALLAS          TX          75389          1-800-206-2901

**Return To:**

Homecomings Financial

One Meridian Crossing, Ste. 100

Minneapolis, MN 55423

**Loan Number:** 047-332935-7

Prepared By:
Homecomings Financial
9 Sylvan Way, Suite 310
Parsippany, NJ 07054

———————————————————[Space Above This Line For Recording Data]———————————————————

# MORTGAGE

MIN 10006260473329357

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated    MARCH 30TH, 2007                ,
together with all Riders to this document.
**(B) "Borrower"** is
PERRY GOERNER

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

NEW JERSEY - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3031 1/01
MFNJ7770 (09/2006) / 047-332935-7
VMP®-6A(NJ) (0512)
Page 1 of 15    Initials: _____

VMP Mortgage Solutions, Inc.



(D) "Lender" is HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

Lender is a   LIMITED LIABILITY COMPANY
organized and existing under the laws of   DELAWARE
Lender's address is  9 SYLVAN WAY, SUITE 100
PARSIPPANY, NJ 07054

(E) "Note" means the promissory note signed by Borrower and dated   MARCH 30TH, 2007
The Note states that Borrower owes Lender   THREE HUNDRED TWENTY TWO THOUSAND FIVE HUNDRED AND NO/100                                                            Dollars
(U.S. $  322,500.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   APRIL 1ST, 2037

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such terms includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

Initials: _____

VMP® -6A(NJ) (0512)                    Page 2 of 15                    Form 3031 1/01

MFNJ7770 (09/2006) / 047-332935-7

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the COUNTY                    of      SUSSEX                              :
             [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]
Legal description attached hereto and made a part hereof

Property Account Number: BLOCK: 43 LOT: 7.18          which currently has the address of
12 WANTAGE SCHOOL ROAD                                              ,          [Street]
SUSSEX                                          [City], New Jersey  07461          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials: _____

-6A(NJ) (0512)          Page 3 of 15          Form 3031 1/01
MFNJ7770 (09/2006) / 047-332935-7

**UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:**

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

Initials: _____

Form 3031 1/01

(VMP) -6A(NJ) (0512)
MFNJ7770 (09/2006) / 047-332935-7

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials: _____

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _____

VMP® -6A(NJ) (0512)

MFNJ7770 (09/2006) / 047-332935-7

Form 3031 1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: _____

-6A(NJ) (0512)

Page 12 of 15

Form 3031 1/01

MFNJ7770 (09/2006) / 047-332935-7

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____ (Seal)
                                                                                                    -Borrower
                                                        PERRY  GOERNER


_____          _____ (Seal)
                                                                                                    -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                                                              -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                                                              -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                                                              -Borrower

Initials:_____

-6A(NJ) (0512)                              Page 14 of 15                    Form 3031 1/01
MFNJ7770 (09/2006)  /  047-332935-7

On this _____ day of _____ 2007, before me, the subscriber,
personally appeared    **PERRY GOERNER**

who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

_____

Notary Public

# NOTE

MARCH 30TH, 2007                    GARDEN CITY                    NEW YORK
          [Date]                        [City]                        [State]

12 WANTAGE SCHOOL ROAD, SUSSEX, NJ 07461

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    322,500.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is    HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    7.5000    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    FIRST    day of each month beginning on    MAY 1ST, 2007    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    APRIL 1ST, 2037    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    9 SYLVAN WAY, SUITE 100, PARSIPPANY, NJ 07054    or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $    2,254.97    .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3200 1/01

Wolters Kluwer Financial Services
VMP ®-5N (0207).01                                        MFCD6054 (09/2006) / 047-332935-7
Page 1 of 3                Initials: _____



loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.00           % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

Form 3200 1/01

Initials: _____

VMP ®-5N (0207).01
MFCD6054 (09/2006) / 047-332935-7

Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

_____ (Seal)          _____ (Seal)
PERRY  GOERNER                              -Borrower                                                                  -Borrower

_____ (Seal)          _____ (Seal)
                                                      -Borrower                                                                  -Borrower

_____ (Seal)          _____ (Seal)
                                                      -Borrower                                                                  -Borrower

_____ (Seal)          _____ (Seal)
                                                      -Borrower                                                                  -Borrower

*[Sign Original Only]*

Name (as shown on your income tax return)

PERRY ROBBINS

**Business name, if different from above**

Check appropriate box: ☐ Individual/Sole proprietor  ☐ Corporation  ☐ Partnership  ☐ Other ▶    ☐ Exempt from backup withholding

**Address (number, street, and apt. or suite no.)**
12 WANTAGE SCHOOL ROAD

**City, state, and ZIP code**
SUSSEX, NJ 07461

**Requester's name and address (optional)**

HOMECOMINGS FINANCIAL, LLC (F/K/A
HOMECOMINGS FINANCIAL NETWORK, INC.)

List account number(s) here (optional)

### Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

**Social security number**
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

**or**

**Employer identification number**

### Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

**Sign Here** | Signature of U.S. person ▶ | Date ▶

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),
2. Certify that you are not subject to backup withholding, or
3. Claim exemption from backup withholding if you are a U.S. exempt payee.

In 3 above, if applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes you are considered a person if you are:

● An individual who is a citizen or resident of the United States,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

● Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purpose of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

● The U.S. owner of a disregarded entity and not the entity,

● The U.S. grantor or the other owner of a grantor trust and not the trust, and



VMP-9030 (0801)    Form **W-9** (Rev. 11-2005)
VMP Mortgage Solutions, Inc.

Page 1 of 4    Cat. No. 10231X    MFCD8634 (09/2006) / 047-332935-7

instead, use the appropriate Form W-8 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity not subject to backup withholding, give the requester the appropriate completed Form W-8.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments (after December 31, 2002). This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 4 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions below and the separate Instructions for the Requester of Form W-9.

Also see *Special rules regarding partnerships* on page 1.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Name

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name" line.

**Limited liability company (LLC).** If you are a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Treasury regulations section 301.7701-3, enter the owner's name on the "Name" line. Enter the LLC's name on the "Business name" line. Check the appropriate box for your filing status (sole proprietor, corporation, etc.), then check the box for "Other" and enter "LLC" in the space provided.

**Other entities.** Enter your business name as shown on required Federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name" line.

**Note.** You are requested to check the appropriate box for your status (individual/sole proprietor, corporation, etc.).

### Exempt From Backup Withholding

If you are exempt, enter your name as described above and check the appropriate box for your status, then check the "Exempt from backup withholding" box in the line following the business name, sign and date the form.

Note. If you are no longer subject to backup withholding, the [illegible] still complete this form to avoid possible erroneous backup withholding.

**Exempt payees.** Backup withholding is not required on any payments made to the following payees:

1. An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2),

2. The United States or any of its agencies or instrumentalities,

3. A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities,

4. A foreign government or any of its political subdivisions, agencies, or instrumentalities, or

5. An international organization or any of its agencies or instrumentalities.

Other payees that may be exempt from backup withholding include:

6. A corporation,

7. A foreign central bank of issue,

8. A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States,

9. A futures commission merchant registered with the Commodity Futures Trading Commission,

10. A real estate investment trust,

11. An entity registered at all times during the tax year under the Investment Company Act of 1940,

12. A common trust fund operated by a bank under section 584(a),

13. A financial institution,

14. A middleman known in the investment community as a nominee or custodian, or

15. A trust exempt from tax under section 664 or described in section 4947.

The chart below shows types of payments that may be exempt from backup withholding. The chart applies to the exempt recipients listed above, 1 through 15.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt recipients except for 9 |
| Broker transactions | Exempt recipients 1 through 13. Also, a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker |
| Barter exchange transactions and patronage dividends | Exempt recipients 1 through 5 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt recipients 1 through 7 [2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation (including gross proceeds paid to an attorney under section 6045(f), even if the attorney is a corporation) and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees; and payments for services paid by a Federal executive agency.

you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-owner LLC that is disregarded as an entity separate from its owner (see *Limited liability company (LLC)* on page 2), enter your SSN (or EIN, if you have one). If the LLC is a corporation, partnership, etc., enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form on-line at *www.socialsecurity.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/businesses* and clicking on Employer ID Numbers under Related Topics. You can get Forms W-7 and SS-4 from the IRS by visiting *www.irs.gov* or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Writing "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** *A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.*

resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 2, 4, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). Exempt recipients, see *Exempt From Backup Withholding* on page 2.

**Signature requirements.** Complete the certification as indicated in 1 through 5 below.

    **1.** Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983. You must give your correct TIN, but you do not have to sign the certification.

    **2.** Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983. You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

    **3.** Real estate transactions. You must sign the certification. You may cross out item 2 of the certification.

    **4.** Other payments. You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

    **5.** Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions. You must give your correct TIN, but you do not have to sign the certification.

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
|    b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or single-owner LLC | The owner [3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship or single-owner LLC | The owner [3] |
| 7. A valid trust, estate, or pension trust | Legal entity [4] |
| 8. Corporate or LLC electing corporate status on Form 8832 | The corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership or multi-member LLC | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the second name line. You may use either your SSN or EIN (if you have one). If you are a sole proprietor, IRS encourages you to use your SSN.

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules regarding partnerships* on page 1.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

---

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA, or Archer MSA or HSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation, and to cities, states, and the District of Columbia, and U.S. possessions to carry out their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

    You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 28% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.

---

Loan #:      047-332935-7

Lender:      HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)
             LIMITED LIABILITY COMPANY


Borrower:    PERRY GOERNER


Property Address:    12 WANTAGE SCHOOL ROAD
                     SUSSEX, NJ 07461


**LOST, MISPLACED, MISSTATED, OR INACCURATE DOCUMENTS:** Occasionally, documents evidencing
loans (such as notes) or securing loans (such as deeds of trust or mortgages) are either lost or misplaced, or
misstate or inaccurately reflect the true and correct covenants, terms and conditions of the loans. Loss,
misplacement, misstatement or inaccuracy can be caused solely by the Lender, solely by the Borrower (whether
one or more), or otherwise.

**AGREEMENT TO REPLACE LOST OR MISPLACED DOCUMENTS AND TO CORRECT MISSTATED OR
INACCURATE DOCUMENTS:** Regardless of the reason for any loss, misplacement, or inaccuracy in any
document evidencing and/or securing the above referenced loan (the "loan"), Borrower agrees to execute and/or
initial and deliver pursuant to this paragraph shall hereinafter be referred to as "Replacement Documents".
Borrower agrees to deliver to Lender any documents Lender deems necessary to replace or correct the lost,
misplaced, misstated or inaccurate document(s). The documents Lender requests Borrower to execute and/or
initial and deliver pursuant to this paragraph shall hereinafter be referred to as "Replacement Documents".
Borrower agrees to deliver the Replacement Documents within 10 (ten) days after receipt by Borrower of a
written request from Lender for them.

**FAILURE TO DELIVER REPLACEMENT DOCUMENTS CAN CONSTITUTE DEFAULT:** Borrower's failure
or refusal to execute and/or initial and deliver Replacement Documents more than 10 (ten) days after written
request by Lender shall, at Lender's sole option, constitute a default under the note evidencing the Loan.

**BORROWER LIABLE FOR LOSS ATTRIBUTABLE TO FAILURE TO EXECUTE AND/OR INITIAL AND
DELIVER THE REPLACEMENT DOCUMENTS:** Should the Borrower fail or refuse to execute and/or initial
and deliver the replacement Documents to the Lender more than 10 (ten) days after being requested to do so by
the Lender, Borrower agrees to be Liable for any and all loss or damage which Lender sustains by reason thereof
including, but not limited to all attorney's fees and cost incurred by Lender.

**AGREEMENT BENEFITS LENDER'S SUCCESSORS AND BINDS BORROWER'S SUCCESSORS:** This
agreement shall insure to the benefit of Lender's successor's and assigns and be binding upon the heirs,
personal representatives, successors and assigns of Borrower.


Borrower:_____      Date: _____
         PERRY GOERNER


Borrower:_____      Date: _____


Borrower:_____      Date: _____


Borrower:_____      Date: _____


---

*DOCUMENT AGREEMENT - (Errors and Omissions Letter)*                    MFCD8084 (09/06)
                                                                        047-332935-7

Property Address:   12 WANTAGE SCHOOL ROAD                    Date:   MARCH 30, 2007
                    SUSSEX, NJ 07461

---

**NOTICE TO FIRST LIEN MORTGAGE LOAN APPLICANTS: THE RIGHT TO COLLECT YOUR MORTGAGE
LOAN PAYMENTS MAY BE TRANSFERRED.  FEDERAL LAW GIVES YOU CERTAIN RELATED RIGHTS.
IF YOUR LOAN IS MADE, SAVE THIS STATEMENT WITH YOUR LOAN DOCUMENTS. SIGN THE
ACKNOWLEDGMENT AT THE END OF THE STATEMENT ONLY IF YOU UNDERSTAND ITS CONTENTS.**

Because your are applying for a mortgage loan covered by the Real Estate Settlement Procedures Act (RESPA)
(12 U.S.C. Section 2601 et seq.)  You have certain rights under Federal law.  This statement tells you about those
rights.  It also tells you what the chances are that the servicing for this loan may be transferred to a different loan
servicer.  "Servicing" refers to collecting your principal, interest and escrow account payments, if any.  If your loan
servicer changes, there are certain procedures that must be followed.  This statement generally explains those
procedures.

**Transfer Practices and Requirements**

If the servicing of your loan is assigned, sold, or transferred to a new servicer, you must be given written notice of
that transfer.  The present loan servicer must send you notice in writing of the assignment, sale or transfer of the
servicing not less than 15 days before the effective date of the transfer.  The new loan servicer must also send
you notice within 15 days after the effective date of the transfer.  The present servicer and the new servicer may
combine this information in one notice, so long as the notice is sent to you 15 days before the effective date of
transfer.  The 15 day period is not applicable if a notice of prospective transfer is provided to you at settlement.
The law allows a delay in the time (not more than 30 days after a transfer) for servicers to notify you, upon the
occurrence of certain business emergencies.

*Notices must contain certain information.  They must contain the effective date of the transfer of the servicing of
your loan to the new servicer, the name, address, and toll-free or collect call telephone number of the new servicer,*
and toll-free or collect call telephone numbers of a person or department for both your present servicer and your
new servicer to answer your questions.  During the 60-day period following the effective date of the transfer of
the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the
new loan servicer as late, and a late fee may not be imposed on you.

**Complaint Resolution**

Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights, *whether or not your loan servicing
is transferred*.  If you send a "qualified written request" to your loan servicer, your servicer must provide you with
a written acknowledgment within 20 Business Days of receipt of your request.  A "qualified written request" is a
written correspondence, other than notice on a payment coupon or other payment medium supplied by the
servicer, which includes your name and account number, and the information regarding your request.  Not later
than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to
your account, or must provide you with a written clarification regarding any dispute.  During this 60 Business
Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue
payment related to such period or qualified written request.  A Business Day is any day in which the offices of
the business entity are open to the public for carrying on substantially all of its business functions.

**Servicing Transfer Estimates**

1.  The following is the best estimate of what will happen to the servicing of your mortgage loan: We may assign, sell or transfer the servicing of your loan while the loan is outstanding. We are able to service your loan and at this time we plan to do so.

2.  For all the first lien mortgage loans that we make in the 12-month period after your mortgage loan is funded, we estimate that the percentage of such loans for which we will transfer servicing is between 0 and 25 %. This estimate does not include assignments, sales or transfers to affiliates or subsidiaries. This is only our best estimate and it is not binding. Business conditions or other circumstances may affect our future transferring decisions.

3.  We have previously assigned, sold, or transferred the servicing of first lien mortgage loans.

## ACKNOWLEDGMENT OF MORTGAGE LOAN APPLICANT

I/We have read this disclosure form, and understand its contents, as evidenced by my/our signature(s) below. I/We understand that this acknowledgment is a required part of the mortgage loan application.

_____     _____

PERRY GOERNER

_____     _____

_____

Date

MFCD8707 (09/2006)
047-332935-7  /  BBFF-06

*Page 2 of 2*

SECURED PROPERTY: 12 WANTAGE SCHOOL ROAD
                  SUSSEX, NJ 07461

1. Borrower(s) hereby acknowledge that upon taking title to the secured property, their occupancy status will be as follows:

**PLEASE CHECK ONE**

[X]   **PRIMARY RESIDENCE:  Occupied by owner as his/her principal residence within sixty (60) days ( ) of the date hereof ( ) of the completion date of the improvements to the secured property hereof and same shall remain such for a continuous period of twelve (12) months.**

[ ]   **SECONDARY RESIDENCE:  A second home not to be rented, considered the owner's second principal residence and to be occupied by the owner no less than three (3) months in a twelve month period.**

[ ]   **VACATION PROPERTY:  A vacation home for the owner used occasionally and not rented.**

[ ]   **INVESTMENT PROPERTY:  Not owner occupied.  Purchased as an investment to be held or rented.**

2. Borrower(s) acknowledge that this Statement of Occupancy is given as a material inducement to cause Lender to make a mortgage loan to borrower(s) and that any false statements, misrepresentations or material omissions shall constitute a breach of the borrower(s) obligation to Lender and that all the provisions of the mortgage indenture concerning default on the Promissory Note will thereupon be in full force and effect.

3. Borrower(s) understand that it is a Federal crime punishable by $5,000 fine or 2 years imprisonment or both to knowingly make any false statement concerning any of the above facts, as applicable under the provision of Title 18, United States Code Section 1014.

4. The agreement and covenants contained herein shall survive the closing of the mortgage loan transaction.

| | | |
|---|---|---|
| PERRY GOERNER | Date | Date |
| | Date | Date |
| | Date | Date |
| | Date | Date |

MFCD9028 (4/02) / 047-332935-7

1.   I/We have applied for a mortgage loan from HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

     In applying for the loan, I/We completed a loan application containing various information on the purpose of the loan, the amount and source of the downpayment, employment and income information, and assets and liabilities. I/We certify that all of the information is true and complete. I/We made no misrepresentations in the loan application or other documents, nor did I/We omit any pertinent information.

2.   I/We fully understand and agree that HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)   reserves the right to change the mortgage loan review process to a full documentation program. This may include verifying the information provided on the application with the employer an/or financial institution.

3.   I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014.

To Whom It May Concern:           **Authorization to Release Information**

1.   I/We have applied for a mortgage loan from HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)   . As part of the application process, HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)   , and the mortgage guaranty insurer (if any), may verify the information contained in my/our loan application and in other documents required in connection with the loan, either before the loan is closed or as part of its quality control program.

2.   I/We authorize you to provide to HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)   and to any investor to whom HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)   may sell my mortgage, and to the mortgagor guaranty insurer (if any), any and all information and documentation that they request. Such information includes, but is not limited to, employment history and income: bank money market, and similar balances; credit history; and copies of income tax returns. The source of the information may come from, but is not limited to: credit bureaus; banks and other depository institutions; current and former employers; federal or state records including State Employment Security Agency records.

3.   HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)   or any investor that purchases the mortgage, or the mortgage guaranty insurer (if any), may address this authorization to any party named in the loan application.

4.   A copy of this authorization may be accepted as an original.

5.   Your prompt reply to HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)   , the investor that purchased the mortgage, or the mortgage guaranty insurer, (if any), is appreciated.

6.   Mortgage guarantee insurer (if any)   00 - NO INSURANCE REQUIRED   .

**PRIVACY ACT NOTICE:** This information is to be used by the agency collecting it in determining whether you qualify as a prospective mortgagor or borrower under its program. It will not be disclosed outside the agency without your consent except to your employer(s) for verification of employment and as required and permitted by law. You do not have to give us this information, but if you do not your application for approval as a prospective mortgagor or borrower may be delayed or rejected. The information requested in this form is authorized by Title 38, U.S.C., Chapter 37 (if VA); by 12 U.S.C., Section 1701 et seq. (if HUD/FHA); by 42 U.S.C., Section 1452b (if HUD/CPD); and Title 42, U.S.C., 1471 et seq. or 7 U.S.C., 1921 et seq (if USD, FmHA).

---

_____          _____
(Borrower's Signature)                    (Social Security Number)

PERRY GOERNER
_____
(Borrower's Printed Name)

_____          _____
(Borrower's Signature)                    (Social Security Number)

_____
(Borrower's Printed Name)

_____          _____
(Borrower's Signature)                    (Social Security Number)

_____
(Borrower's Printed Name)

_____          _____
(Borrower's Signature)                    (Social Security Number)

_____          _____
(Borrower's Printed Name)                 (Dated)

HFN P-55
MFCD8185 (09/2008) / 047-332935-7

Date:   MARCH 30, 2007                    Loan Number:    047-332935-7

# IMPORTANT INFORMATION ABOUT YOUR PRIVACY

The privacy and security of personal financial information about our customers is important to us.  Our Privacy
Policy is designed to tell you of the types of information we get from customers, how we use and protect that
information, and when we will share it with third parties.  Our Privacy Policy also tells you how to direct us not
to share certain information within our General Motors family of related companies and with unrelated third parties.
This is your right to "opt out." While we are required to send you a copy of our Privacy Policy each year, if you
choose to limit the sharing of information you only need to make your "opt out" request once.  Our Privacy Policy
governs Customer Information, which means personally identifiable information about a customer or their relationship
with us.  The policy covers individuals who obtain products or services from us in the United States for personal,
family, or household uses.  If you are a co-borrower or have a joint account with someone else, you should give this
Privacy Policy to the other joint account holders to make sure that each of you is aware of our policy and your options.

Our Privacy Policy applies only to Customer Information obtained by the following companies within the General
Motors family of related companies:

- Residential Funding Corporation
- Homecomings Financial Network, Inc.
- Residential Funding Company, LLC
- Homecomings Financial, LLC

- Residential Funding USA Corporation
- Homecomings Financial USA Corporation
- Residential Funding Company of DE, LLC
- Homecomings Financial of DE, LLC

## Confidentiality and Security

We limit use of Customer Information about you to our employees, agents, and third parties who perform services
on behalf of you or us.  While no company can guarantee the security of your information, we take steps to protect
information from unauthorized access, including reasonable administrative, physical, and technical safeguards
designed to protect Customer Information about you.

## Information Obtained for Your Benefit

We obtain information about you that we believe will be necessary or useful in processing or servicing your loan.  We
also obtain information about you to provide products and services that we think will be of interest to you.

## We Obtain the Following Types of Customer Information:

- Information we receive from you on your loan application or that you provide to us, such as your name,
  address, social security number and income.
- Information we receive from you when we are servicing your loan that you provide us verbally or through our
  websites.
- Information about your transactions with us, our related family of companies or others, such as your beginning
  loan amount, the balance of your loan or account, your payment history, and the parties to the loan.
- Information we receive from consumer reporting agencies, such as your credit score or credit history.
- Information we receive from other third parties, such as employers, appraisers, and information available
  in public records.

## Information Sharing within our Family of Related Companies

To better serve you and tell you about new products and services, we may share all of the types of Customer

MFCD6102 (08/2006) / 047-332935-7                    *Page 1 of 3*
FEDERAL PRIVACY NOTICE

Information that we obtain about you, as described above, within our General Motors family of related companies.
Related companies who may receive this information are:

- General Motors related companies providing financial services such as home equity loans, first mortgage loans and insurance; and
- General Motors related companies providing non-financial products such as cars.

You may request that we not share the following additional types of information with related companies by "opting out". See the Opt Out section of this Privacy Policy.

- Certain information from your application, such as your income, employment history, bank account balances, and other information used to determine your eligibility for credit.
- Credit report information, such as a credit score or your credit history with others.
- Information we obtain from a person or institution regarding employment, credit, or other relationships with you, such as your employment history, your bank account balance or your rental payment history.

Even if you "opt out" of the sharing of information within our related family of companies as described above, we will continue to share the following information as permitted by law:

- Information **about your identity, such as your name, address, and social security number.**
- Information about your transactions with us, such as your beginning loan amount, the balance of your loan, your loan number, your payment record, and the parties to the loan.

### Information Sharing with Unrelated Third Parties

To tell you of products and services that may be of interest to you, we may share all of the Customer Information that we obtain about you with unrelated third parties unless prohibited by law.

Companies who may receive this information include:

- Financial service providers such as credit card issuers, finance companies, insurance companies, banks, and mortgage companies; and
- Non-financial companies including retailers, airlines, marketing companies, manufacturers and publishers.

You may request that we not share this information with such unrelated third parties by "opting out". See the Opt Out section of this Privacy Policy, below.

### Opt Out

If you want to "opt out" of information sharing within our related family of companies or with unrelated third parties, as described above, you may do so by calling us at the following toll free number: **877-207-3863.** You may call us to "opt out" at any time. Once we receive your opt out request, we will update our records to indicate your preference regarding the sharing of Customer Information within a reasonable period of time. Your "opt out" request does not require us to refrain from contacting you, even if we choose to contact you through companies that perform marketing services on our behalf or with other financial institutions with whom we have joint marketing relationships, as described below.

If you call us to "opt out," we will ask you to provide your social security number. We will also for the social security number of any joint account holder who also wishes to "opt out."

### Information Sharing with Companies that Perform Services on our Behalf

We may share all of the types of Customer Information we obtain about you with companies that perform marketing services for us or with other financial institutions with whom we have joint marketing relationships, as permitted

- General Motors related companies providing financial services such as home equity loans, first mortgage loans and insurance; and
- General Motors related companies providing non-financial products such as cars.

You may request that we not share the following additional types of information with related companies by "opting out". See the Opt Out section of this Privacy Policy.

- Certain information from your application, such as your income, employment history, bank account balances, and other information used to determine your eligibility for credit.
- Credit report information, such as a credit score or your credit history with others.
- Information we obtain from a person or institution regarding employment, credit, or other relationships with you, such as your employment history, your bank account balance or your rental payment history.

Even if you "opt out" of the sharing of information within our related family of companies as described above, we will continue to share the following information as permitted by law:

- Information **about your identity, such as your name, address, and social security number.**
- Information about your transactions with us, such as your beginning loan amount, the balance of your loan, your loan number, your payment record, and the parties to the loan.

### Information Sharing with Unrelated Third Parties

To tell you of products and services that may be of interest to you, we may share all of the Customer Information that we obtain about you with unrelated third parties unless prohibited by law.

Companies who may receive this information include:

- Financial service providers such as credit card issuers, finance companies, insurance companies, banks, and mortgage companies; and
- Non-financial companies including retailers, airlines, marketing companies, manufacturers and publishers.

You may request that we not share this information with such unrelated third parties by "opting out". See the Opt Out section of this Privacy Policy, below.

### Opt Out

If you want to "opt out" of information sharing within our related family of companies or with unrelated third parties, as described above, **you may do so by calling us at the following toll free number: 877-207-3863.** You may call us to "opt out" at any time. Once we receive your opt out request, we will update our records to indicate your preference regarding the sharing of Customer Information within a reasonable period of time. Your "opt out" request does not require us to refrain from contacting you, even if we choose to contact you through companies that perform marketing services on our behalf or with other financial institutions with whom we have joint marketing relationships, as described below.

If you call us to "opt out," we will ask you to provide your social security number. We will also for the social security number of any joint account holder who also wishes to "opt out."

### Information Sharing with Companies that Perform Services on our Behalf

We may share all of the types of Customer Information we obtain about you with companies that perform marketing services for us or with other financial institutions with whom we have joint marketing relationships, as permitted

## Information Sharing in Other Situations

We may continue to share all of the types of Customer Information that we obtain about you, as permitted by law, such as:

- If you authorize us to share information for a specific purpose.
- To carry out your transactions with us and maintain your account, such as recording of deeds of trust and mortgages in public records.
- In response to a subpoena, a fraud investigation, or other legal process.
- To credit bureaus or similar reporting agencies.
- To governmental agencies.
- To another financial institution or third party that buys your loan or account, or if we sell or combine parts of our business.
- To another company that we hire to collect on your account.
- To affiliates, investors, servicers, rating agencies, mortgage insurers, due diligence firms and others in connection with loan sales and securitizations.

## Our Former Customers

This Privacy Policy and your opt out choice will apply even if our customer relationship with you ends.

## Correct Information

We try to keep our records free from error and up to date. When you tell us of an error, we will correct our active records within a reasonable time of verifying the accuracy of the information.

## State Laws

The practices described above are in accordance with federal law. We also comply with state laws, such as California, North Dakota, and Vermont that provide greater protection to the extent such laws apply. For example, Vermont provides greater protection and requires that we tell you about the additional limits on sharing of Customer Information.

## Vermont

As long as you remain a resident in Vermont, we will not share Customer Information we obtain about you with unrelated third parties except:

- To companies that perform marketing or other services for us;
- Contact information (such as name and address), and transaction information (such as your payment history) to other financial institutions with whom we have joint marketing agreements;
- With your authorization; or
- As permitted by law.

We also will not share credit report information about you within our related family of companies unless you authorize us to do so.

Flood Zone:            C

Property Location:  12 WANTAGE SCHOOL ROAD
                    SUSSEX, NJ 07461

This Notice Date is as of: 03/30/2007


The Flood Disaster Protection Act of 1973, as amended, requires that
all federally insured or regulated lenders require the purchase of
flood insurance on all buildings being financed in Special Flood
Hazard Areas (SFHAs) of communities participating in the National
Flood Insurance Program.

Special Flood Hazard Areas are defined by the Federal Emergency Man-
agement Agency (FEMA) and are indicated on FEMA Flood Insurance Rate
Maps (FIRMs) or, if the FIRM is unavailable, on Flood Hazard Boundary
Maps (FHBMs).

A review of the FIRM or FHBM on which the improved real estate or
mobile home securing your loan is located shows that on  03/19/2007
the subject property location was not located in a FEMA determined
SFHA.  As a result of this determination, flood insurance is not
a requirement of your loan at this time.

If, during the term on your loan with us the subject property
is identified as being a SFHA, as defined by FEMA and indicated
on a FIRM or FHBM, we may, at our option, require that your purchase
and maintain Flood Insurance at your expense.

I/We hereby understand and agree to all of the above.



Name of Borrower/Applicant:

    _____

    PERRY GOERNER

    _____


    _____


    _____


MFCD8229 (01/2006)                                    047-332935-7