Wendy Alison Nora  Hearing Date: November 19, 2013
310 Fourth Avenue South, Suite 5010  Hearing Time: 10:00 a.m. EST
Minneapolis, Minnesota 55415  Response Deadline: October 21, 2013
Telephone (612) 333-4144     4:00 p.m. EDT
Facsimile (608) 497-1026

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

___

In re:

Residential Capital, LLC *et al.,*   Chapter 11
   Debtors    Case No. 12-12020 (MG)
      Administratively Consolidated

___

**PARTIAL JOINDER IN**
**OBJECTION TO CONFIRMATION OF DEBTORS' CHAPTER 11 PLAN**
**BY THE OFFICE OF THE UNITED STATES TRUSTEE [DOC. 5412]**
**AND STATEMENT ON APPLICABLE LAW**
(<u>NOTICE:</u> [1] JUDGE GLENN HAS BEEN DISQUALIFIED TO HEAR AND DETERMINE
THESE PROCEEDINGS BY HIS DISPLAY OF EXTREME PREJUDICE AGAINST
THE UNDERSIGNED IN HER CAPACITY AS PRO HAC VICE COUNSEL FOR
INTERESTED PARTIES IN THE CLASS OF HOMEOWNERS AND THEIR
COUNTERPARTIES, DESIGNATED BY THE DEBTORS AS "BORROWERS," ON
OCTOBER 9, 2013 AND NO FURTHER PROCEEDINGS BEFORE JUDGE GLENN MAY
BE PERMITTED UNDER THE FIFTH AND FOURTEENTH[2] AMENDMENTS TO THE
*UNITED STATES CONSTITUTION*)
**(ALL RIGHTS RESERVED)**

___

Wendy Alison Nora partially joins in the Objection to the Confirmation of Debtors'

Chapter 11 Plan filed by the Office of the United States Trustee, which correctly states the law

___

[1] See Order to Show Cause Why Pro Hac Vice Admission of Wendy Alison Nora Should Not Be Revoked (Doc. 5330) dated October 10, 2013 at page 5, ¶1 which provides that the "rights, if any," of homeowner clients, who she represented prior to the October 9, 2013 sua sponte revocation of the pro hac vice admission, should be addressed in her Response to the post facto rule nisi proceedings initiated sua sponte by Judge Glenn after he displayed extreme prejudice against this Claimant and her clients.

[2] The Fourteenth Amendment to the <u>United States Constitution</u> provides for equal protection of the laws and is applicable in federal court proceedings by reverse incorporation.

1

applicable to the attempt to obtain a Third Party Release in favor of Ally Financial, Inc. and other nondebtors in these proceedings and seeks to be heard by the Court, at such time as a qualified and unbiased judge is appointed to preside in this matter and shows the Court:

1. The undersigned holds Proofs of Claims #1 (KCC, LLC Proof of Claim #2) and KCC, LLC Proof of #440 (collectively, the Nora Proofs of Claims.)

2. Nora and other homeowners, former homeowners, and their counterparties are entitled to pursue Ally Financial, Inc. (AFI) and Cerberus Capital Management, LP (Cereberus) and the parties with which they engaged in the forgery/perjury/wire fraud/mail fraud/identity theft/racketeering enterprise but for the threatened wholly unjustified Third Party Release proposed to be granted to AFI for mere financial consideration, contrary to the law of the Second Circuit. See In re Johns-Manville Corp., 517 F.3d 52 (2d Cir. 2008) ("Manville II"), vacated & remanded on other grounds, 557 U.S. 137 (2009), aff'g in part & rev'g in part, 600 F.3d 135 (2d Cir. 2010) ("Manville III") and Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F. 3d 136, 141 (2d Cir. 2005) as set forth in the Objection of the United States Trustee (Doc. 5412.)

3. The Objection of the United States Trustee correctly states the impropriety of the attempted Third Party Release on page 7 of Doc. 5412:

> The Second Circuit held that "[i]n bankruptcy cases, a Court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the Debtors' reorganization plan." Id. at 141 (quoting SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 292 (2d Cir. 1992)). The appellate court cautioned, however, that a non-debtor third-party release is not considered to be adequately supported by consideration simply because the non-debtor contributed something to the reorganization and the enjoined creditor took something out. *Metromedia*, 416 F.3d at 143. Rather, "[a] non-debtor third-party release should not be approved absent a finding by the court that 'truly unusual circumstances' exist that render

the release terms important to the success of the plan." Id.

4. The Third Party Release proposed in the Chapter 11 Plan is not supported by an evidentiary showing of "truly unusual circumstances that render the release terms important to the success of the plan." The Chapter 11 Plan makes no showing whatsoever that the Third Party Release is important to the success of the Plan as required under the precedents of the Second Circuit. Debtors do not appear to propose ongoing business upon completion of the proposed Plan although no where in the Disclosure Statements or the Plan iterations is it revealed that the Plan is actually a liquidation plan. AFI, Cerberus and the nonbankrupt entities selected by AFI and Cerberus to survive the liquidation, such as Ally Bank, BMMZ Holdings LLC, GMAC Mortgage Group, LLC, are the intended surviving entities, none of which have presented themselves to this Court for reorganization upon disclosure of their actual interests in these proceedings. Rather, for a mere monetary contribution purportedly in "settlement" of the Debtors claims against AFI, AFI seeks indemnification against the claims of third parties (homeowners and former homeowners and their counterparties) against AFI (and Cerberus, now one of AFI's largest private shareholders) which, as gently stated by the United States Trustee in her Objection, "should warrant even greater Court scrutiny of proposed third-party releases, given the existence of such a large numbers of potential claims by third-party borrowers and other claimants."

5. The Trustee is a little late in recognizing the claims of third-party "borrowers[3]" in these proceedings, considering the rapid pace of the disallowance of "borrower" claims under an

---

[3] The homeowners and former homeowners are not "borrowers." The Debtors did not loan any money to any of the homeowners. They acted, at most, as loan originators for undisclosed third parties in order to obtain homeowners' notes and mortgages and deeds of trust as collateral for securities issued by other alter egos of AFI, or as servicers for the owners of the securities in trusts which never received the collateral taken from the homeowners and are, therefore, empty of any assets.

unconstitutional and void "special procedures order" dated March 21, 2013 (Doc. 3294) since the Disclosure Statement and Plan were filed on July 3, 2013 and July 4, 2013 respectively, but the expressed concern is better late than never.

6. This joinder is partial only because, as a matter of law, "greater Court scrutiny" is not the test for the confirmation of the Plan containing the Third Party Release. The Debtors have the burden of proof by a preponderance of evidence *in contested proceedings* that the proposed Plan is not forbidden by law and is proposed in good faith. 11 USC sec. 1129(a)(3). The homeowners claims against AFI, Cerberus and the select subsidiaries chosen to survive the bankruptcy proceedings do not affect the property of the estate or the administration of this estate which is, in fact, a liquidation plan (improperly not disclosed) through which AFI seeks to escape its liability to homeowners for designing, directing and controlling the ubiquitous foreclosure fraud scheme throughout the nation by placing its liability for the frauds on its alter ego subsidiaries and seeking to avoid its liability through these proceedings, while retaining over 12 billion in TARP funds for its own operations. See In re Drier, 429 BR. at 133 in which the Court found that it lacked jurisdiction to enjoin claims that do not affect property of the estate or the administration of the estate, non-debtor third-party releases must be limited to claims that are derivative of the debtors. Debtors have not even attempted to make a showing that the non-debtor third party releases are "derivative of the debtors" and indeed they cannot do so.[4]

7. The real significant contribution to the estate of the Debtors did not come from AFI at

---

[4] Here, any claims against the Debtors are claims for which AFI is liable for its own illegal actions. Its alter ego subsidiaries, the Debtors herein, were simply instruments through which their parent company created the forged and perjured documents and executed the fraudulent foreclosures.

all, but consisted of an involuntary contribution of homeowners notes, mortgages and deeds of trust and real estate foreclosed on forged and perjured documents which have been illegally sold in these proceedings, without disclosure and without lawful authority to do so.   Take, for example, the single case of Nora's note and mortgage and the void foreclosure judgment procured by forged and perjured documents:

    a.  The forged endorsements on Nora's note was created by employees of Residential Funding Company, LLC (RFC) by Judy Faber pretending to be "Vice President" of RFC and the allonge signed by Amy Nelson, an employee of Lender Processing Services, Inc. (LPS), purporting to be "Assistant Vice President" of RFC;

    b.   The forged mortgage assignment signed by Jeffrey Stephan, an employee of GMAC Mortgage, LLC, pretending to be Vice President of Mortgage Electronic Registration Systems, Inc. (MERS) as well as Kenneth Urgwuadu, pretending to be "Assistant Secretary" of MERS, when he was Stephan's document forgery trainer at GMAC Mortgage, LLC on a document created by RFC's attorney, Jay J. Pitner of GRAY & ASSOCIATES, LP, in 2009, purporting to assign Aegis Mortgage Corporation's (AEGIS) mortgage interest out of the MERS database, when AEGIS was in bankruptcy in the District of Delaware Bankruptcy Case No. 07-11119-BLS;

    c.   The false affidavit of Manish Verma, a GMAC Mortgage, LLC employee, uttered by David Potteiger in the Nora state foreclosure proceedings swearing that a second version of a copy of the Nora note was a true and correct "machine copy;"

    d.  The sale of Nora's home to a third party purchaser during the pendency of this action for which the proceeds have not been disclosed; and

    d.  The Debtors' failure to disclose its possession of the Nora note as an asset in these

proceedings on any Debtors' Schedule B but which was promised to be returned to Nora by these Debtors if the foreclosure dispute was resolved.

    8. It is reasonable to infer that if the Nora note was still in the possession of the Debtors after the purported foreclosure was effectuated, then many of the notes secured by REO properties disclosed on Debtors' Schedule A were still in Debtors' possession on the date of filing, were never disclosed as assets on Schedule B, and have not been returned to any of the homeowners whose homes were purportedly foreclosed. It is the homeowners who have been fraudulently foreclosed who have significantly contributed to the assets administered in these proceedings. AFI is trying to escape its liability to the homeowners who actually funded these proceedings with real assets by settling claims which the Debtors could bring against it for a sum of "money" and seeking to avoid its direct liability to the homeowners by the Third Party Release–all without adequate disclosure and examination by the Court and the fiduciaries of the estate and without any definition of the *res* of the estate which is intended to be affected thereby. The supposed "res" of the estate has largely been frittered away on useless professional services which failed to disclose the true nature of these proceedings–bankruptcy fraud as repeatedly described by this Claimant and others in her class and related to her class, i.e., the Papas issues–for which the Debtors have used stolen real estate as one of the sources of their interim operational funding. This problem belongs to AFI and Cerberus, who designed these proceedings to "isolate its money-losing businesses and shed as much of the present and future liabilities associated with those businesses as possible." (Decision and Order of Judge Martin Glenn on October 23, 2012 at Doc. 1921, page 6.) AFI/Cerberus has sought to pay for its liabilities from the securitization fraud/mortgage foreclosure fraud scheme with the real estate assets of the very victims of its fraud scheme. A

Plan based upon the liquidation of stolen property can never be confirmed because it is prohibited by law. 11 USC sec. 1129(a)(3). The Debtors cannot do so and its parent cannot be released from claims arising from the Debtors' attempt to do so, at the direction of its parent.

      9. What should be happening in these proceedings is that the Debtors must be compelled to disclose the fact that they are currently in possession of notes having a face value of billions of dollars which have not been returned upon foreclosure of the underlying security therefor, mortgages and deeds of trust, or, if they are not in possession of the notes upon which they pursued the foreclosure of the securities taken in connection with the notes, they must be required to disclose what entities are now "holding" the notes. The United States Trustee is partially forgiven for not understanding the full scope of the bankruptcy fraud being perpetrated herein, because these are "large and complex cases" (Doc. 5412, page 6) but it is not the Court which is required to give these cases greater scrutiny as to the proposed Third Party Release in favor of AFI, but the United States Trustee itself. The Court is required to adjudicate the confirmation of the Chapter 11 Plan, which cannot be confirmed because the Debtors have wholly failed to establish by even a scintilla of the evidence that AFI's proposed contribution to the estate of 2.1 billion dollars (after AFI has already taken more that 1 billion dollars from the estate as a priority payment for intercompany advances, Doc. 4404) is significant compared to the benefit AFI seeks to gain by the Third Party Release. Nora's punitive damages claim on behalf of the injured homeowner class against AFI and Cerberus alone represents punitive damages of 10 billion dollars, yet the Debtors propose to pay only 57.6 million dollars into a "Borrower" Trust while pretending that "unsecured creditors" will recover approximately 30 percent of the value of their claims.

10. The standard for the Third Party Release cannot be met in this case. AFI is attempting to off-load its liabilities for fraud on homeowners and investors alike for a financial contribution, which has already been reduced to less than 1.1 billion dollars by AFI's fictitious priority intercompany payments during the course of this action. AFI was not making a donation to its alter ego subsidiaries for the benefit of creditors. It has been keeping its fraud scheme operational in exchange for a hoped-for Third Party Release in which the only parties with real assets at stake in these proceedings–the homeowners–would be crammed down into a minuscule trust (@ 5.76 percent of the net AFI contribution) after an unprecedented rampage of disallowances of their claims without contested proceedings under an unconstitutional and, therefore, void, rewrite of contested claims proceedings in the March 21, 2013 Order (Doc. 3294) entered 5 months after the bar date for claims.

11. The United States Trustee cites, however weakly, to supposedly applicable case law at page 8, footnote 3, without adequate analysis and not coming close to meeting their duty to address the standards for confirming this Plan as to the Third Party Release. Footnote 3 reads, as to the requirements for a Third Party Release:

> Other examples include: (i) *Adelphia*, 368 B.R. at 268–69 (holding that three categories of non-debtor third-party releases are acceptable under *Metromedia*: (1) persons indemnified by the estate under by-laws, employment contracts, or loan agreements, (2) persons involved in unique transactions, such as a party who makes a substantial financial contribution to the estate; and (3) persons who consent to the releases); (ii) In re Karta Corp., 342 B.R. 45 (S.D.N.Y. 2006) (framing inquiry as "whether a significant non-debtor financial contribution plus other unusual factors render a situation so "unique" that the non-debtor third-party releases are appropriate"). Id. at 55; (iii) In re Oneida Ltd., 351 B.R. 79 (Bankr. S.D.N.Y. 2006) (the equity committee had raised, but then abandoned, an objection to the validity of the non-debtor third-party releases, and the court found that the releases in that case were acceptable because all of the affected creditors had consented by affirmatively checking a box on the ballot indicating their willingness to grant the releases); (iii) In re Spiegel, Inc., No. 03-11540 (BRL), 2006 WL 2577825, *7 (Bankr.

S.D.N.Y. Aug. 16, 2006) (plan's non-debtor third-party releases and injunctions were critical components of the settlement that played a "vital part in the plan" and "were necessary to the proposed reorganization of the Debtors and the successful administration of their estates"); and (iv) In re XO Commc'ns, Inc., 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) (non-debtor third-party releases were permissible where the non-debtors provided significant consideration, the non-debtors were integral to the plan, and the non-debtors' interests aligned with those of the debtors with regard to the claims).

12.  To briefly address the references to the United States Trustees' "other examples," this Claimant states that the *Adelphia*, supra, reasoning does not apply because as to the class of homeowners AFI is not a person indemnified by the estate under by-laws, employment contracts, or loan agreements.  AFI is not a person involved in unique transactions, such as a party who makes a substantial financial contribution to the estate because its contribution is not significant to offset the damages that AFI itself caused to the class of homeowners and former homeowners and and there is no present available evidence that the affected homeowners and former homeowners have consented to the releases.  In re Karta Corp., 342 B.R. 45 (S.D.N.Y. 2006) does not apply because there is no evidence of any other unusual factors, in addition to the financial contribution which render the situation so "unique" that the non-debtor third-party releases are appropriate. AFI is paying far too little for releases of homeowner and former homeowner claims against it and the unusual circumstance presented is AFI's attempt to keep the balance of 12 billion dollars in TARP funds for its own use, which clearly demonstrates the insignificance of its financial contribution and the impropriety of the release sought.  As to In re Oneida Ltd., 351 B.R. 79 (Bankr. S.D.N.Y. 2006) which the United States Trustee cites for the proposition that "the equity committee had raised, but then abandoned, an objection to the validity of the non-debtor third-party releases, and the court found that the releases in that case were acceptable because all of the affected creditors had consented by affirmatively checking a box on the ballot indicating their

willingness to grant the releases," this Claimant, who holds a representative claim of 10 billion dollars has rejected the Plan and it remains to be seen the extent to which homeowners and former homeowners are willing to accept far less than the balance of the class of unsecured creditors which include the investor class for their claims. The Plan is unconfirmable anyway because it unfairly discriminates against the homeowner class as compared to the investor class of unsecured creditors in violation of 11 USC sec. 1122. As to In re Spiegel, Inc., No. 03-11540 (BRL), 2006 WL 2577825, *7 (Bankr. S.D.N.Y. Aug. 16, 2006) there is no showing that the Plan's non-debtor third-party releases and injunctions were critical components of the settlement that played a "vital part in the plan" and "were necessary to the proposed reorganization of the Debtors and the successful administration of their estates" because Debtors have ceased operating their businesses, which have been sold pursuant to 11 USC sec. 363, and have filed a liquidation Plan without disclosing it as such. The Third Party Releases have no bearing on the successful administration of the Debtors' estates which now exist solely for the purpose of paying claims and not for any ongoing business purpose whatsoever. Finally, as to In re XO Commc'ns, Inc., 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) in which the Court allowed non-debtor third-party releases as "permissible where the non-debtors provided significant consideration, the non-debtors were integral to the plan, and the non-debtors' interests aligned with those of the debtors with regard to the claims," the consideration is not significant compared to the value of the release, if allowed and the consideration does not go to the injured parties in any event; AFI is not integral to the Debtors' reorganization plan because the Debtors are being liquidated and are not reorganizing; and the only portion of the interests of AFI and the Debtors which are aligned is their desire to avoid paying the damages claims of thousands of affected homeowners and former homeowners

and to cram down the claims of the investors to the amount Debtors are able to pay based upon the sale of homeowners' assets and the sale of ongoing servicing rights to the homeowners' payments to previously undisclosed investors class.[5]

13. In her less than 10 page Objection in which the United States Trustee fails to assert a firm position with respect to the homeowners' and former homeowners' rights in these proceeding, homeowners are at least recognized as parties whose rights against AFI might be extinguished by the Third Party Release for about the first time by the Office of the United States Trustee since the erroneous appointment of a single "homeowner"representative to the Unsecured Creditors Committee at the outset of this case. That single homeowner representative has have a claim arising from a second mortgage transaction which does not involve foreclosure on forged and perjured documents. It is the fact that foreclosures have been based on forged and perjured documents which is the common claim of the majority of the homeowners affected by these proceedings.

---

[5] It was not until October 11, 2013, 10 days before the ballots and the objections to the Plan were due on October 21, 2013, that Debtors provided the Exhibits to the Plan (Doc. 5342) which purports to disclose to homeowners where their collateral is now purportedly held. Doc. 5342 is 324 pages long and was impossible to thoroughly review before the Objection deadline. This is typical of the Debtors' violations of their creditors' minimal due process rights in these proceedings, exemplified by several similar events: (1) seeking and obtaining orders which allowed the continuation of foreclosures without filing their schedules and statements to disclose the homeowners affected by the orders being sought and then filing their schedules and statements on June 30, 2013, 11 days before hearing on the final order to allow continued foreclosure proceedings and claiming that their filing of the schedules and statements mooted the objections to their fraudulent foreclosure scheme sought to be justified by court order; (2) obtaining retroactive special orders to disallow homeowners' claims after the claims bar date in order to create grounds for objections not recognized by the Bankruptcy Code and Rules; (3) continuing to withhold critical information about the extent of their claims to assets consisting of notes and mortgage security interests; (4) amending their Disclosure Statement 5 days before the date set for hearing on Objections to its approval and obtaining approval thereof without the notice required for lawful contest proceedings; and now providing Exhibits to the Chapter 11 Plan to be read in conjunction therewith 11 days before the date for objections to the Plan contrary to the reasonable time frames required for creditors to frame and file their objections and vote on the Plan under Bankruptcy Rule 2002(b).

14. To assist the Court in analyzing the legal deficiencies as to proposed treatment of the "borrower" (homeowner and former homeowner's) interest as a subclass of "unsecured creditors" in these proceedings, this Claimant states:

    a. Debtors' Chapter 11 Plan is based upon a fraudulently administered estate in which homeowners whose real estate assets are listed on the Debtors' Schedules A have been illegally taken. The Schedules A assets consist largely of homes and other real property which Debtors have obtained by a claim of a right to the remedy of foreclosure founded upon forged and/or perjured documents created by DOCX, a division of Lender Processing Services, Inc. (LPS) or manufactured at the offices of GMAC Mortgage, LLC (GMACM) in Pennsylvania and Iowa and Residential Funding Company, LLC (RFC) in Minnesota, but forged documents have also been manufactured by LPS in Florida, Georgia and Minnesota and used by the Debtors whose officers and the officers of its parent company, AFI, knows are forgeries.

    b. Debtors' Chapter 11 Plan is based upon the retention of assets belonging to homeowners in thousands of pending judicial and nonjudicial foreclosure proceedings throughout the nation have been undertaken and continue to be pursued upon forged and/or perjured documents created by DOCX, a division of Lender Processing Services, Inc. (LPS) or manufactured at the offices of GMAC Mortgage, LLC (GMACM) in Pennsylvania and Residential Funding Company, LLC (RFC) in Minnesota, now being pursued by Ocwen, from which the Debtors have illegally profited under the 363 sale.

c. Debtors' Chapter 11 Plan wholly fails to account for the funds which Debtors have obtained through the liquidation of the illegally confiscated real estate assets during the pendency of these proceedings.

d. Debtors failed to provide this Claimant, and every other homeowner, with sufficient information about the true ownership of the real estate assets after foreclosure with adequate advance notice that their homes were being sold as assets of the Debtors' estate, when they were not lawfully taken by the Debtors, in order to prevent them from paying an amount greater than the third party offered in an effort to launder their title by its transfer to a "bona fide purchaser" in good faith and without notice of their rights to recover possession and control of their homes.

e. Debtors' Chapter 11 Plan proposes to pay other creditors in these proceedings with the proceeds of sale of illegally confiscated real estate assets belonging to the class of homeowner claimants, many of whom received no notice of these proceedings.

f. Debtors used their servicing platform to obtain access to images of notes and mortgages scanned into a computer database after the documents were signed by persons who were defrauded into believing they were borrowing mortgage funds from "originating lenders," when the "originating lenders" appeared at the real estate closings to obtain the notes and mortgage securities for immediate resale by undisclosed entities providing warehouse lines of credit to facilitate the sale of the notes and mortgages to government sponsored entities (GSEs) and sponsors of private label securities offerings to pension funds.

g. Debtors operated largely as loan servicers for the concealed real parties in interest and had no ownership interest in the notes and mortgages taken from parties who have been fraudulently identified as "borrowers"[6] of the Debtors in these proceedings. Debtors were merely the loan servicers for the real parties in interest, GSEs and holders of certificates on beneficial interest consisting of "private label" securities. The private label securities were issued by Real Estate Mortgage Investment Conduit (REMIC) Trusts.

h. The mortgage notes were not transferred by delivery to the GSEs or the REMIC Trusts as required by the Uniform Commercial Code in the various states of the United States of America. Rather, the mortgage notes were scanned into a central computer data base and available to be viewed on computer screens accessed by employees of the Debtors as servicers for the GSEs and REMIC Trusts and the notes were either destroyed after they were scanned or the notes were placed in a vault without being endorsed in blank or by special endorsement to the GSEs or the REMIC Trusts.

i. The mortgages or deeds of trust either named another computer data base,

---

[6] The Debtors use the term "borrowers" to imply that members of the class obtained funds from the Debtors for the financing of real estate assets. As used in this objection the term "borrowers" is defined as the owners of interests in real estate who were entitled, by law, to the use, occupancy and possession of the real estate, subject to claims for repayment of funds to the real party in interest which advanced the funds. The class of "borrowers" identified as homeowners in this objection is further defined as the class of individuals and entities who are victims of the forgery/perjury operation by which their real estate assets were and are being confiscated by the Debtors and their successors in interest on false claims brought by servicers to foreclose on the "borrowers'" real estate titles and rights to occupancy. The relationship of the Debtors to the class of "borrowers" in these proceedings is generally that of a loan servicing fiscal intermediary between the owners and occupants of real estate and the entities were led to believe that they are entitled to receive a stream of income from the owners' and occupants' loan payments.

Mortgage Electronic Registration Systems, Inc. (MERS) as mortgagee or beneficiary or maintained the name of the "originating lender" as the mortgagee or beneficiary in order to fraudulently conceal the true nature of the loan transaction which they almost uniformly believed were conventional mortgages to be paid according to the terms appearing on the notes and mortgages or in accordance with the terms of notes and deeds of trust. The mortgagors and holders of the possessory interest in the subject real estate under the deeds of trust were actually deceived by their reliance on the terms of the loan documents because the essential terms of the transactions: that the loan documents were being used to create securities and that the securities were being sold to obtain the loan funds from undisclosed third parties and that the Debtors did not have a financial interest in the loan transactions, except for the right to receive servicing fees.

j. When the United States Congress authorized funds for the Troubled Asset Relief Program (TARP) in October, 2008, the Debtors, as servicers, sought to foreclose on real estate assets throughout the nation in order to obtain payment in full for long-term mortgages under 12 USC sec. 5212 and, commencing in January, 2009, a massive enterprise popularly known as "robo-signing" began.

k. "Robo-signing" is the popular name for forgery and perjury on a massive scale by which the Debtors and other servicers of mortgage loans uttered forged and perjured documents in order to make it appear that the servicers were lawfully entitled to foreclose on real estate throughout the nation. The foreclosure "crisis" is nothing more than an effort to obtain double payments on loan instruments not

owned by the Debtors, first, by the claim for TARP payments and, second, by the liquidation of the real estate by the servicers.[7]

l. Debtors, the Committee of Unsecured Creditors, the unsecured creditor class represented by Trustees of REMIC Trusts, the classes of super-priority and priority claimants all seek to benefit from the liquidation of the real estate assets confiscated by forged and perjured documents. Even the detailed investigation by the Examiner in these proceedings entirely disregards the claims of the defrauded owners of real estate assets taken by the Debtors on forged and perjured documents. There is no mention[8] in the Examiner's report of the 17 Billion Dollars in TARP funds paid to the Debtors' parent, Ally Financial, Inc. (AFI) by the United States Treasury, which is the core reason why the Debtors, as wholly owned subsidiaries of AFI, were forced by its parent into Chapter 11–that AFI seeks to "ring-fence" its legacy liabilities for the forgery/perjury operation by which thousands of homes have been confiscated and are still being confiscated.

m. The Debtors' Chapter 11 Plan is fatally deficient because its claims to real estate titles listed on their various Schedules A (most particularly those of GMACM and RFC) were obtained by forged and perjured documents, and which it

---

[7] There were often multiple payments in full of the mortgage loans procured from unsuspecting real estate owners whose loan documents were fraudulently procured without disclosure of the true nature of the transaction. The first payment in full was upon the sale of the loan to the REMIC Trust. Often mortgage insurance was also claimed and received as well as credit default swaps, culminating with the TARP payment.

[8] If the Examiner did mention the TARP funds paid to Ally Financial, Inc. (AFI) this Claimant was unable to find any mention of the TARP payments in the Examiner's Report.

has been liquidating in these proceedings. This scheme was engineered by AFI/Cerberus and associated enterprises and the Chapter 11 Plan proposes to hold the AFI/Cerberus securitization fraud scheme harmless without disclosing the foreclosure fraud, designed and implemented by AFI/Cerberus, which is at the core of these proceedings.

n. The Debtors' Chapter 11 Plan is not permitted by law because it provides unjustified treatment of the claims of the class which it designates as "borrowers" who have claims for "robo-signing" against AFI, which seeks to be released from liability for the forgery/perjury operations of its Debtor subsidiaries, of which its CEO, Michael Carpenter, was specifically and personally placed on notice by the United States Department of Justice, 49 State Attorneys General and financial regulators in the investigations which culminated in the National Mortgage Settlement and the Independent Foreclosure Review.

o. The subset of the class of unsecured creditors in these proceedings–designated "borrowers" have been repeatedly denied procedural and substantive due process in these proceedings and are being subjected to unconstitutional and void special orders to effectuate the disallowance of their claims.

p. The subset of the class of unsecured creditors designated "Borrowers" in these proceedings is being treated differently than the other unsecured creditors with contingent, unliquidated claims in these proceedings, e.g. the investors in the empty REMIC Trusts, and whereas the investors have experienced only economic loss, the homeowners have suffered tort damages as well and are entitled to

17

both economic and non-economic damages, wholly unaddressed by the discriminatory treatment of the "Borrower" subclass. The "Borrower" subclass is proposed to receive a fraction of the recovery of claims allowed to the investor subclass, when the "Borrower" subclass has suffered the greater injury in estimated value, which estimation is required under 11 USC sec. 502( c). To the contrary, the Debtors are attempting to cram down and estimate homeowner and former homeowner claims at far below face value without due process whereas the investor claims are estimated at face value because those are the claims which are well-defended.

WHEREFORE, the undersigned files this partial joinder to the United States Trustee's Objection to the confirmation of the Debtors' Chapter 11 Plan, which is actually the AFI/Cerberus Chapter 11 Plan, designed to obtain a Third Party Release of their liabilities for Mortgage Securitization/Foreclosure Fraud scheme, in exchange for the payment of a sum of money into the estate and not otherwise justified under the Bankruptcy Code, which has been filed in these proceedings.

Dated at Madison, Wisconsin this 26th day of October, 2013.

                          */s/ Wendy Alison Nora*
                          Wendy Alison Nora
                 310 Fourth Avenue South, Suite 5010
                    Minneapolis, Minnesota 55415
                       Telephone (612) 333-4144
                       Facsimile (608) 497-1026
                    accesslegalservices@gmail.com

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY OF
## WENDY ALISON NORA, IN HER OWN NAME AND RIGHT

Wendy Alison Nora declares under penalty of perjury, pursuant to 28 USC sec. 1746, that the facts set forth in the foregoing motion are true and correct, to the best of her knowledge, information and belief.

*/s/ Wendy Alison Nora*
Wendy Alison Nora

## UNSWORN DECLARATION OF SERVICE

Wendy Alison Nora declares, under penalty of perjury, that she filed the above-captioned document with the United States Bankruptcy Court for the Southern District of New York on October 26, 2013 by CM/ECF and thereby served the same on all parties capable of service thereby.

*/s/ Wendy Alison Nora*
Wendy Alison Nora