UNITED STATES BANKR[...]
SOUTHERN DISTRICT [...]

```
                                    )
In re:                              )
                                    )
RESIDENTIAL CAPITAL, LLC,           )
et al.,                             )
                                    )
                        Debtors.    )
                                    )
```

*From:*
Daniel Daly, Esq.
Metrowest Legal Srvs.
63 Fountain St, Ste. 304
Framingham, MA
01702

OBJECTION BY JAMES LAD[...]
TO DEBTORS' FORTY-NINTH OMNIBUS OBJECTION TO CLAIMS
(NO LIABILITY BORROWER CLAIMS—BOOKS AND RECORDS)

Now come the claimants, James Ladd and Anne M. Ladd, by counsel, and object to the Debtors' Forty-Ninth Omnibus Objection to Claims requesting that their claim, no. 4722, be disallowed and expunged. In support of this Objection, Mr. and Mrs. Ladd state as follows:

1.    *Procedural background.*  On or about November 13, 2012, Mr. and Mrs. Ladd timely filed their proof of claim against GMAC Mortgage, LLC.  Their claim number is 4722.

2.    The general basis for the Ladds' claim is a wrongful foreclosure conducted by GMAC on October 14, 2011.  The approximate value of the property at the time of the foreclosure sale was $289,000—the amount of the claim.[1]

3.    In May or June of 2013, the Ladds received a notice from Claims Management, Residential Capital, LLC, requesting additional information about their claim for purposes of evaluating it.  The deadline to submit this additional information was June 24, 2013.

4.    On June 21, 2013, the Ladds, through undersigned counsel, timely responded to the Debtors' request for additional information concerning their claim.  The response was sent to the Debtors by regular mail and email, as instructed.  The response consisted of seven pages of explanation (facts and law) for the claim and ten exhibits, including the mortgage and rate rider, right-to-cure

---

[1] The Ladd's property is located at 5 Barrows Street, Middleborough, Massachusetts.  The Debtors have not objected to the subject claim based on the claim amount.

notice, mortgage loan transfer notice, assignment, foreclosure deed with affidavit of sale and assignment of bid, M.G.L. c. 224, section 35A, relevant cases, loan workout plan, and loan modification agreement.  (*See*, Letter Response dated June 21, 2013, at **Attachment 1**).

5.   *Factual background*.  On May 30, 1997, James and Anne Ladd purchased the subject property located at 5 Barrows Street, Middleborough, Massachusetts.

6.   On June 25, 2005, Mr. and Mrs. Ladd obtained a new mortgage loan in the amount of $267,800.  The lender was Advanced Financial Services, Inc., and the mortgagee was Mortgage Electronic Registration Systems, Inc. ("MERS"), acting solely as a nominee for the Advanced Financial Services, Inc.

7.   On April 15, 2009, GMAC Mortgage, LLC, as the servicer of the subject mortgage, sent Mr. Ladd a Right-to-Cure Notice as required by the mortgage itself (para. 22) and under Massachusetts law, M.G.L. c. 244, § 35A.  *See*, Right-to-Cure Notice, at **Attachment 1, Exhibit 2**.

8.   On December 30, 2009, Residential Funding Corporation[2] appears to have acquired ownership of the subject mortgage.  *See*, Notice from GMAC Mortgage dated January 5, 2010, at **Attachment 1, Exhibit 3**.  According to the notice, this transfer of ownership of mortgage (i.e., the assignment) was **not** publicly recorded.[3]

9.   On January 4, 2010, MERS purported to assign the mortgage loan to GMAC Mortgage, LLC ("GMAC").  This assignment was recorded at the Plymouth County Registry of Deeds on January 22, 2010.  *See*, Assignment, at **Attachment 1, Exhibit 4**.

10.   GMAC foreclosed on the property on October 14, 2011.  GMAC transferred the property to Federal Home Loan Mortgage Corporation by an assignment of bid on February 3, 2012.  *See*, Foreclosure Deed and Assignment of Bid, at **Attachment 1, Exhibit 5**.

---

[2] Residential Funding Corporation is a subsidiary of Residential Capital Company, LLC.  Residential Capital Company, LLC, is a subsidiary of GMAC, LLC. As such, these companies are separate legal entities.

[3] It should be noted that pursuant to St. 2012, c. 194, M.G.L. c. 244, section 14 was amended (effective November 1, 2012) to require that all mortgage assignments be recorded to show a complete chain of title from the original lender to the foreclosing entity, presumably to avoid the confusion caused by off-record transfers of title.

2

11.    On July 19, 2012, Federal Home Loan Mortgage Corporation sold the property to Angela Chin, as Trustee of the Fonda Revocable Trust.

12.    *Legal claims*.   The foreclosure sale was wrongful because GMAC failed to strictly comply with the statutory power of sale in Massachusetts (its Right to Cure Notice violated M.G.L. c. 244, § 35A), it had an invalid assignment, it violated the Home Affordable Modification Program, and it violated M.G.L. Chapter 93A.

13.    *Failure to strictly comply with the statutory power of sale*.   In Massachusetts, the foreclosure procedures are governed by M.G.L. 183, § 21, and M.G.L. c. 244 (titled "Foreclosure and Redemption of Mortgages").   The statutory power of sale, set forth in M.G.L. c. 183, § 21, provides that upon default by the borrower, the mortgagee may sell the property after "first complying with the terms of the mortgage and with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale."   *See, also, U.S. Bank Nat'l Ass'n v. Ibanez*, 458 Mass. 637, 646 (2011) ("Where a mortgage grants a mortgage holder the power of sale…it includes by reference the power of sale set out in G.L. c. 183, § 21[;]" and only the original mortgagee or a holder by virtue of a validly executed assignment may exercise the statutory power of sale).   If the mortgagee fails to strictly comply with the statutory power of sale, then the foreclosure sale is wholly void.   *Moore v. Dick*, 187 Mass. 207, 211 (1975).

14.    *a.   Violation of M.G.L. c. 244, § 35A*.   One of the statutes relating to the foreclosure of mortgages is the right-to-cure notice found in M.G.L. c. 244, § 35A.   Section 35A requires the mortgage holder to give the borrower a notice of his/her right to cure the mortgage default.[4]   At the relevant time in this case, Section 35A provided:

> (a)    Any mortgagor of residential real property located in the commonwealth…shall have a 90-day right to cure a default of a required payment as provided in such residential mortgage or note secured by such residential real property by full payment of all amounts that are due without acceleration of the maturity of the unpaid balance of such mortgage….

---

[4] A notice of default, acceleration and cure right is also required by Paragraph 22 of the Ladds' mortgage itself.

3

(b)    The mortgagee, or anyone holding thereunder, shall not accelerate maturity of the unpaid balance of such mortgage obligation or otherwise enforce the mortgage because of a default consisting of the mortgagor's failure to make any such payment…by any method authorized by this chapter or any other law until at least 90 days after the date a written notice is given by the mortgagee to the mortgagor....

(c)    The notice required in subsection (b) shall inform the mortgagor of the following:…(4) the name and address of the mortgagee, or anyone holding thereunder, and the telephone number of a representative of the mortgagee whom the mortgagor may contact if the mortgagee disagrees with the mortgagee's assertion that a default has occurred or the correctness of the mortgagee's calculation of the amount required to cure the default[.]

M.G.L. c. 244, section 35A (*see*, Chapter 206 of the Acts of 2007, Section 11), at **Attachment 1, Exhibit 6**.

15.    Numerous trial courts throughout Massachusetts have found that Section 35A is part of the statutory scheme regulating foreclosure, and therefore, it must be strictly adhered to in order to have a valid foreclosure sale pursuant to the power of sale.  *See, e.g., Ross v. Deutsche Bank Nat. Trust Co.*, 2013 WL 1225621 (D.Mass., March 27, 2013) (Young, J.) (Section 35A is part of the Massachusetts statutory scheme regulating foreclosures, and must be strictly complied with) (**Attachment 1, Exhibit 7**); *Silva v. Deutsche Bank Trust Company*, Middlesex Superior Court, Case No. 2012-3951-H, 2012 WL 601681 (November 14, 2012) (Wilson, J.) (the principle of "strict compliance" applies equally to the notice requirements in M.G.L. c. 244, § 35A, as it does to M.G.L. c. 244, § 14) (**Attachment 1, Exhibit 8**); and *Federal Home Loan Mortgage Corp. v. Sensini*, Northeast Housing Court, Case No. 12-SP-0871 (Kerman, J.) (dismissing Plaintiff's complaint because the foreclosing entity failed to strictly comply with the requirements under Section 35A, regardless of any actual prejudice resulting from the defects) (**Attachment 1, Exhibit 9**).

16.    In this case, the Right-to-Cure Notice sent to Mr. Ladd on April 15, 2009 (*see*, Right-to-Cure Notice, at **Attachment 1, Exhibit 2**), appears to identify GMAC Mortgage LLC as the mortgagee, but the actual mortgagee at the time of the notice was clearly MERS. MERS was the original mortgagee and MERS did not assign the mortgage

4

to GMAC Mortgage LLC until January 4, 2010 (see, MERS Assignment, at **Attachment 1, Exhibit 4**) several months *after* GMAC Mortgage LLC gave Mr. Ladd the right to cure notice on April 15, 2009.  Section 35A(c)(4) requires that the notice must include "the name and address of the mortgagee," but the notice did not provide any such information.  Mr. Ladd's right to cure notice also failed to specify the name of a designated individual whom he could contact about the default, in violation of Section 35A(c)(4), as it refers only to the "Collections Department."  Section 35A requires that the right to cure notice be sent exclusively by the mortgagee, which did not happen in this case.  Finally, the right-to-cure notice should have been sent to Mrs. Ladd as well, as a co-mortgagor, but it was not.  Because the right to cure notice here was issued by GMAC Mortgage LLC, an entity other than the mortgagee, and was substantively defective in content, there was not strict compliance with the statutory power of sale under M.G.L. c. 244, Section 35A, and thus the foreclosure is void.

17.    b.    *Invalid assignment to GMAC Mortgage, LLC.*  In Massachusetts, only a current holder of the mortgage loan is able to exercise a statutory power of sale.  *See*, M.G.L. c. 183, § 21.  In *U.S. Bank National Association v. Ibanez*, 458 Mass. 637, 648 (2011), the Supreme Judicial Court found that the bank could not prove its authority to foreclose because it did not have a valid assignment of the mortgage at the time of the notice of sale and the subsequent foreclosure sale.  Thus, in the case at bar, GMAC Mortgage LLC, as the foreclosing entity, must have held the mortgage at the time of the notice of sale and foreclosure sale in order to exercise the statutory power of sale.

18.    In this case, Residential Funding Corp. acquired ownership of the mortgage on December 30, 2009, (see, **Attachment 1, Exhibit 3**), prior to the assignment by MERS to GMAC on January 4, 2010, (*see* **Attachment 1, Exhibit 4**).  Therefore, in order for GMAC to have had proper authority to foreclose on the property and execute the foreclosure deed, there must have been an assignment or transfer from Residential Funding Corp. to either MERS or GMAC to complete the chain of title, and to establish GMAC's legal authority to foreclose.

19.    After a diligent search of the Plymouth County Registry of Deeds where the property is located, undersigned counsel was not able to find any assignment from Residential Funding Corp. to GMAC (or to MERS).  Because ownership in the mortgage had been transferred previously to Residential Funding Corp., GMAC did not receive anything in its assignment from MERS.  *See*, *Powers v. Orr*, 10 Land

5

Court Reporter 137 (February 15, 2002) (bank could not convey what it did not own).  As a result, GMAC has never been a valid holder of the mortgage.

20.  Since GMAC has never held the mortgage, its attempt to carry out the foreclosure sale is void.  *Ibanez*, 458 Mass. 637, at 647 (foreclosing entity must hold the mortgage at the time of notice and sale).  "[An] attempt to foreclose by a party that had not yet been assigned [the] mortgage results in 'structural defect that goes to the very heart of [the mortgagee's] ability to foreclose by advertisement,' and renders the foreclosure sale void."  *Id.*, at 647 (quoting *Davenport v. HSBC Bank USA*, 739 N.W.2d 383 (2007)).

21.  *Violation of the Home Affordable Modification Program.* In April 2009, the Ladds contacted GMAC Mortgage LLC for the purpose of requesting a loan modification under the Home Affordable Modification Program ("HAMP").  They provided all documentation required to GMAC, and as a result, GMAC offered them a HAMP Loan Workout Plan (Step One), which the Ladds accepted.  *See*, HAMP Loan Workout Plan (Step One of Two-Step Documentation Process), at **Attachment 1, Exhibit 10.**  Upon the successful completion of Step One, GMAC gave the Ladds Step Two documents, consisting of the approved Loan Modification Agreement.  See, GMAC Mortgage Letter dated February 24, 2010, and Loan Modification Agreement, at **Attachment 1, Exhibit 11.** There were a few discrepancies with the Loan Modification Agreement, including whether the document needed to be notarized, and whether the proposed escrow was $200 more than the actual escrow associated with the loan.  The Ladds made numerous attempts to contact the loan modification specialist at GMAC without success, and GMAC never answered questions concerning the Loan Modification Agreement.  As a result, the Ladds were not able to execute the Loan Modification Agreement before the deadline.  The Ladds were prepared to execute the Loan Modification Agreement subject to the resolution of the escrow issue, but instead, GMAC moved forward with the foreclosure.  GMAC was legally required to use good faith in administering the HAMP program, but in this case, it failed to do so.

22.  *Violation of M.G.L. Chapter 93A.*  M.G.L. Chapter 93A prohibits any unfair or deceptive acts or practices in the conduct of any trade or commerce.  M.G.L. c. 93A, § 2.  GMAC Mortgage LLC has engaged in such trade or commerce in Massachusetts, and therefore, is subject to Chapter 93A.  Chapter 93A liability is decided on a case-by-case basis, and has a very broad definition. An act is unfair "if it is within the penumbra of some common-law,

6

statutory, or other established concept of unfairness." *Linkage Corp. v. Trs. Of Bos. Univ.*, 425 Mass. 1, 27, 679 N.E.2d 191, 209 (1977). Chapter 93A also grants to the Attorney General the power to promulgate rules and regulations that define certain acts and practices which violate Chapter 93A. These rules and regulations have the force of law. *Purity Supreme, Inc. v. Attorney General*, 380 Mass. 762, 775, 407 N.E.2d 297, 306 (1980).

23.    Because M.G.L. c. 244, § 35A, is a consumer protection statute, GMAC's violation of Section 35A is a *per se* violation under the Attorney General's regulations.[5] Section 3.16 of those regulations, expressly prohibits conduct that fails to comply with existing statutes or laws meant for the protection of the public's health, safety, and welfare. A violation of Section 3.16 is therefore a *per se* violation of Chapter 93A. *MacGillivary v. W. Dana Bartlett Ins. Agency of Lexington, Inc.*, 14 Mass.App.Ct. 52, 61 (1982).

24.    In addition, a non-compliant Section 35A notice is also "deceptive" within the meaning of Chapter 93A. An act or practice may violate Chapter 93A as deceptive if it "possesses a tendency to deceive," as considered in view of the effect the act or practice would be expected to have upon members of the general public. *Leardi v. Brown*, 394 Mass. 151, 156 (1985). It is the <u>tendency</u> to deceive that determines liability: actual reliance is not an element of liability. *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 703 (1975). The non-compliant Section 35A notice sent to Mr. Ladd had a plain tendency to deceive because it communicated misleading information (about the status of the foreclosure, about who had the legal authority to foreclose on the home, and about his cure rights as well—i.e., that the cure period had lawfully begun when it had not).

---

[5] Pursuant to her statutory authority, the Massachusetts Attorney General has declared that:

> [A]n act or practice is a violation of [Chapter 93A] if. . . [i]t fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection.

940 C.M.R. 3.16(3). Section 35A is clearly "meant for the protection of the public's. . . welfare" and is "intended to provide the consumers of this Commonwealth protection." When § 35A was promulgated, the Legislature declared that its purpose was "to provide forthwith mortgage protection for existing and new home owners." Mass. Acts 2007, c. 206. The statute protects the public welfare by specifically protecting homeowners and not businesses or investors.

25.   GMAC's behavior and conduct in conducting the foreclosure
without legal authority (and then having sold Mr. and Mrs. Ladd's
home) is also unfair within the meaning of Chapter 93A.   An act or
practice may violate Chapter 93A as unfair if (1) it is within at
least the penumbra of some common-law, statutory, or other
established concept of unfairness; (2) it is immoral, unethical,
oppressive, or unscrupulous; or (3) it causes substantial injury to
consumers.   *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass.
593, 596 (1975).   Massachusetts has long recognized a claim for
wrongful foreclosure.   *Sandler v. Green*, 287 Mass. 404 (1934).
Thus, the common law has recognized that improper foreclosures are
unfair.   *See, also, Kattar v. Demoulas*, 433 Mass. 1 (2000)
(retaliatory foreclosure violated Chapter 93A, even though actual
default existed).

26.   It is within the "penumbra" of established concepts of
unfairness that GMAC sold the Ladds' home to itself and then re-sold
it to an unsuspecting third party, all based upon a foreclosure that
is void as a matter of law.   GMAC's failure to properly foreclose
on the Ladds' home (and the resulting eviction action) is also
unethical.   As a mortgagee, GMAC owed the Ladds a duty of good faith
and fair dealing.   *West Roxbury Co-Operative Bank v. Bowser*, 324
Mass. 489 (1949).   It also held a strong degree of power over the
Ladds, as it was able to foreclose without judicial oversight.

27.   GMAC Mortgage LLC should have acted in good faith and used
reasonable diligence to protect the interests of the mortgagor.
*Williams v. Resolution GGF OY*, 417 Mass. 377, 382-383, 630 N.E.2d
581 (1994).   Chapter 93A empowers a court to rescind a foreclosure
and re-convey the property to the former owner.    *Kattar v. Demoulas*,
433 Mass. at 17.   GMAC failed to act in good faith when it refused
to respond to the phone calls by the Ladds to answer simple questions
about the Loan Modification Agreement, in which GMAC had invited such
inquiry.   The Ladds had every intention to modify their mortgage loan
and prevent a foreclosure sale.   GMAC's failure to respond to them
and finalize the HAMP loan modification is thus a violation of Chapter
93A.

28.   *Conclusion*.   Mr. and Mrs. Ladd timely filed their claim
and timely responded to the Debtors' request for a further
explanation of their claim.   The Ladds have a meritorious claim in
that the Debtors did not acquire valid title to the property because
the underlying foreclosure sale is void.   Without a valid
foreclosure sale, Mr. and Mrs. Ladd's objection to the Debtors'

8

request to disallow their claim should be sustained.

WHEREFORE, Mr. and Mrs. Ladd object to the Debtors' Forty-Ninth
Omnibus Objection to Claims requesting that their claim be disallowed
and expunged.

Respectfully submitted,
JAMES and ANNE LADD,
By their Attorney,

Oct. 21, 2013
_____                    _____
Date                                       Daniel Daley   BBO#560500
                                           MetroWest Legal Services
                                           63 Fountain Street, Suite 304
                                           Framingham, MA 01702
                                           (508) 620-1830

<u>CERTIFICATE OF SERVICE</u>

I, Daniel Daley, hereby certify that on October 21, 2013, I
served a copy of the foregoing upon the following list:

Debtors' counsel:
ATTN: Gary S. Lee,
Norman S. Rosenbaum, and
Jordon A. Wishnew
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

Counsel of the Committee of Unsecured Creditors
ATTN: Kenneth Eckstein and
Douglas Mannal
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

ATTN: Tracy Hope Davis,
Linda A. Riffkin, and
Brian S. Masumoto
Office of the US Trustee
for the Southern District of New York
U.S. Federal Office Building
201 Varick Street

9

Suite 1006
New York, NY 10014

Special counsel for the Committee
ATTN: Ronald J. Friedman
SilvermanAcampora LLP
100 Jericho Quadrangle
Suite 300
Jericho, NY 11753

all by express mail, next day delivery.

_____          _____
Date                               Daniel Daley

10

# ATTACHMENT 1

# R E S C A P

M O R R I S O N | F O E R S T E R

## Claim Information

| Claim Number | 4722 |
|---|---|
| **Basis of Claim**<br><br>Explanation that states the legal and factual reasons why you believe you are owed money or are entitled to other relief from one of the Debtors as of May 14, 2012 (the date the Debtors filed their bankruptcy cases) and, you **must** provide copies of any and all documentation that you believe supports the basis for your claim. | See attached letter dated June 21, 2013 (7 pages) and Exhibits 1 through 11. |

**If your claim relates to a mortgage loan that you believe was originated or serviced by one of the Debtors, please be sure to include the following loan information, so that we can effectively search our records for information on your property and loan, and evaluate your claim.**

| Loan Number: | ████0410 |
|---|---|

| Address of property related to the above loan number: |
|---|
| 5 Barrows Street |

| City: Middleborough | State: MA | ZIP Code: 02346 |
|---|---|---|

**Additional resources may be found at  -  http://www.kccllc.net/rescap**

Residential Capital, LLC    P.O. Box 385220  Bloomington, MN  55438

Claim Number: 4722
James Ladd and Anne Ladd

Claim no. 4722

METROWEST
**Legal Services**

Protecting rights. Improving lives.

June 21, 2013

BY MAIL and EMAIL TO Claims.Management@gmacrescap.com

Claims Management
Residential Capital, LLC
PO Box 385220
Bloomington, Minnesota 55438

    Re:   Your Claim Number: 4722
          Proof of Claim filed by James Ladd and Anne Ladd
          GMAC Mortgage, LLC, Case No. 12-12032

Dear Sir or Madam:

    I represent James Ladd and Anne Ladd regarding the captioned claim. This letter is in response to your written request for additional information concerning Mr. and Mrs. Ladd's proof of claim that I filed on their behalf.

    The basis for my clients' claim that is GMAC Mortgage, LLC, wrongfully foreclosed on Mr. and Mrs. Ladd's home located at 5 Barrows Street, Middleborough, Massachusetts.

    *Background.* James and Anne Ladd purchased their home located at 5 Barrows Street, Middleborough, Massachusetts, on May 30, 1997.

    On June 25, 2005, Mr. and Mrs. Ladd obtained a new mortgage loan in the amount of $267,800. The lender was Advanced Financial Services, Inc., and the mortgagee was Mortgage Electronic Registration Systems, Inc. ("MERS"), acting solely as a nominee for the Advanced Financial Services, Inc. *See,* Mortgage dated June 25, 2005, attached as Exhibit 1.

    On April 15, 2009, GMAC Mortgage, LLC, as the servicer of the subject mortgage, sent Mr. Ladd a Right-to-Cure Notice as required by the mortgage itself (para. 22) and under Massachusetts law, M.G.L. c. 244, § 35A. *See,* Right to Cure Notice, attached as Exhibit 2.

Claim No. 4722

On December 30, 2009, Residential Funding Corporation[1] appears to have acquired ownership of the subject mortgage. *See*, Notice from GMAC Mortgage dated January 5, 2010, attached as Exhibit 3.  According to the notice, this transfer of ownership of mortgage (i.e., the assignment) was **not** publicly recorded.[2]

On January 4, 2010, MERS purported to assign the mortgage loan to GMAC Mortgage, LLC ("GMAC").  This assignment was recorded at the Plymouth County Registry of Deeds on January 22, 2010.  *See*, Assignment, attached as Exhibit 4.

GMAC foreclosed on the property on October 14, 2011.  GMAC transferred the property to Federal Home Loan Mortgage Corporation by an assignment of bid on February 3, 2012.  *See*, Foreclosure Deed and Assignment of Bid, attached as Exhibit 5.

*Legal claims.*  The foreclosure was wrongful for multiple reasons: GMAC failed to strictly comply with the statutory power of sale in Massachusetts, its Right to Cure Notice violated M.G.L. c. 244, § 35A, it had an invalid assignment, it violated the Home Affordable Modification Program, and it violated M.G.L. Chapter 93A.

*Failure to strictly comply with the statutory power of sale.*  In Massachusetts, the foreclosure procedures are governed by M.G.L. 183, § 21, and M.G.L. c. 244 (titled "Foreclosure and Redemption of Mortgages").  The statutory power of sale, set forth in M.G.L. c. 183, § 21, provides that upon default by the borrower, the mortgagee may sell the property after "first complying with the terms of the mortgage and with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale."  *See, also, U.S. Bank Nat'l Ass'n v. Ibanez*, 458 Mass. 637, 646 (2011) ("Where a mortgage grants a mortgage holder the power of sale…it includes by reference the power of sale set out in G.L. c. 183, § 21[;]" and only the original mortgagee or a holder by virtue of a validly executed assignment may exercise the statutory power of sale).  If the mortgagee fails to strictly comply with the statutory power of sale, then

---

[1]Residential Funding Corporation is a subsidiary of Residential Capital Company, LLC.  Residential Capital Company, LLC, is a subsidiary of GMAC, LLC.  As such, these companies are separate legal entities.

[2]It should be noted that pursuant to St. 2012, c. 194, M.G.L. c. 244, section 14 was amended (effective November 1, 2012) to require that all mortgage assignments be recorded to show a complete chain of title from the original lender to the foreclosing entity, presumably to avoid the confusion caused by off-record transfers of title.

*Claim no. 4722*

the foreclosure sale is wholly void. *Moore v. Dick*, 187 Mass. 207, 211 (1975).

*Violation of M.G.L. c. 244, § 35A.* One of the statutes relating to the foreclosure of mortgages is the right to cure notice found in M.G.L. c. 244, § 35A. Section 35A requires the mortgage holder to give the borrower a notice of his/her right to cure the mortgage default.[3] At the relevant time in this case, Section 35A provided:

> (a)    Any mortgagor of residential real property located in the commonwealth…shall have a 90-day right to cure a default of a required payment as provided in such residential mortgage or note secured by such residential real property by full payment of all amounts that are due without acceleration of the maturity of the unpaid balance of such mortgage….
> (b)    The mortgagee, or anyone holding thereunder, shall not accelerate maturity of the unpaid balance of such mortgage obligation or otherwise enforce the mortgage because of a default consisting of the mortgagor's failure to make any such payment…by any method authorized by this chapter or any other law until at least 90 days after the date a written notice is given by the mortgagee to the mortgagor....
> (c)    The notice required in subsection (b) shall inform the mortgagor of the following:…(4) the name and address of the mortgagee, or anyone holding thereunder, and the telephone number of a representative of the mortgagee whom the mortgagor may contact if the mortgagee disagrees with the mortgagee's assertion that a default has occurred or the correctness of the mortgagee's calculation of the amount required to cure the default[.]

M.G.L. c. 244, section 35A (*see*, Chapter 206 of the Acts of 2007, Section 11) (attached as Exhibit 6).

Numerous trial courts throughout Massachusetts have found that Section 35A is part of the statutory scheme regulating foreclosure, and therefore, it must be strictly adhered to in order to have a valid foreclosure sale pursuant to the power of sale. *See, e.g., Ross v. Deutsche Bank Nat. Trust Co.*, 2013 WL 1225621 (D.Mass., March 27, 2013) (Young, J.) (Section 35A is part of the Massachusetts statutory scheme regulating foreclosures, and must be strictly complied with) (attached as

---

[3] A notice of default, acceleration and cure right is also required by Paragraph 22 of the Ladds' mortgage itself.

*Claim no. 4722*

Exhibit 7); *Silva v. Deutsche Bank Trust Company*, Middlesex
Superior Court, Case No. 2012-3951-H, 2012 WL 601681 (November
14, 2012) (Wilson, J.) (the principle of "strict compliance"
applies equally to the notice requirements in M.G.L. c. 244, §
35A, as it does to M.G.L. c. 244, § 14) (attached as Exhibit 8);
and *Federal Home Loan Mortgage Corp. v. Sensini*, Northeast
Housing Court, Case No. 12-SP-0871 (Kerman, J.) (dismissing
Plaintiff's complaint because the foreclosing entity failed to
strictly comply with the requirements under Section 35A,
regardless of any actual prejudice resulting from the defects)
(attached as Exhibit 9).

     In this case, the Right-to-Cure Notice sent to Mr. Ladd on
April 15, 2009 (*see*, Right to Cure Notice, at Exhibit 2),
appears to identify GMAC Mortgage LLC as the mortgagee, if it
identifies a mortgagee at all, but the actual mortgagee at the
time of the notice was clearly MERS.  MERS was the original
mortgagee and MERS did not assign the mortgage to GMAC Mortgage
LLC until January 4, 2010 (see, MERS Assignment, at Exhibit 4),
several months *after* GMAC Mortgage LLC gave Mr. Ladd the right
to cure notice on April 15, 2009.  Section 35A(c)(4) requires
that the notice must include "the name and address of the
mortgagee," but the notice did not provide any such information.
Mr. Ladd's right to cure notice also failed to specify the name
of a designated individual whom he could contact about the
default, in violation of Section 35A(c)(4), as it refers only to
the "Collections Department."  Finally, Section 35A requires
that the right to cure notice be sent exclusively by the
mortgagee, which did not happen in this case.  Because the right
to cure notice here was issued by GMAC Mortgage LLC, an entity
other than the mortgagee, and was substantively defective in
content, there was not strict compliance with the statutory
power of sale under M.G.L. c. 244, Section 35A, and thus the
foreclosure is void.

     *Invalid assignment to GMAC Mortgage, LLC*.  In
Massachusetts, only a current holder of the mortgage loan is
able to exercise a statutory power of sale.  *See*, M.G.L. c. 183,
§ 21.  In *U.S. Bank National Association v. Ibanez*, 458 Mass.
637, 648 (2011), the Supreme Judicial Court found that the bank
could not prove its authority to foreclose because it did not
have a valid assignment of the mortgage at the time of the
notice of sale and the subsequent foreclosure sale.  Thus, in
the case at bar, GMAC Mortgage LLC, as the foreclosing entity,
must have held the mortgage at the time of the notice of sale
and foreclosure sale in order to exercise the statutory power of
sale.

*Claim no. 4722*

In this case, Residential Funding Corp. acquired ownership of the mortgage first on December 30, 2009, (*see* Exhibit 3), prior to the assignment by MERS to GMAC on January 4, 2010, (*see* Exhibit 4). Therefore, in order for GMAC to have had proper authority to foreclose on the property and execute the foreclosure deed, there must have been an assignment or transfer from Residential Funding Corp. to either MERS or GMAC to complete the chain of title, and to establish GMAC's legal authority to foreclose.

After a diligent search of the Plymouth County Registry of Deeds where the property is located, undersigned counsel was not able to find any assignment from Residential Funding Corp. to GMAC (or to MERS). Because ownership in the mortgage had been transferred previously to Residential Funding Corp., GMAC did not receive anything in its assignment from MERS. *See*, *Powers v. Orr*, 10 Land Court Reporter 137 (February 15, 2002) (bank could not convey what it did not own). As a result, GMAC has never been a valid holder of the mortgage.

Since GMAC has never held the mortgage, its attempt to carry out the foreclosure sale is void. *Ibanez*, 458 Mass. 637, at 647 (foreclosing entity must hold the mortgage at the time of notice and sale). "[An] attempt to foreclose by a party that had not yet been assigned [the] mortgage results in 'structural defect that goes to the very heart of [the mortgagee's] ability to foreclose by advertisement,' and renders the foreclosure sale void." *Id.*, at 647 (quoting *Davenport v. HSBC Bank USA*, 739 N.W.2d 383 (2007)).

*Violation of the Home Affordable Modification Program*. In April 2009, the Ladds contacted GMAC Mortgage LLC for the purpose of requesting a loan modification under the Home Affordable Modification Program ("HAMP"). They provided all documentation required to GMAC, and as a result, GMAC offered them a HAMP Loan Workout Plan (Step One), which the Ladds accepted. *See*, HAMP Loan Workout Plan (Step One of Two-Step Documentation Process), attached as Exhibit 10. Upon the successful completion of Step One, GMAC gave the Ladds Step Two documents, consisting of the approved Loan Modifcation Agreement. See, GMAC Mortgage Letter dated February 24, 2010, and Loan Modification Agreement, attached as Exhibit 11. There were a few discrepancies with the Loan Modification Agreement, including whether the document needed to be notarized, and that the proposed escrow was $200 more than the actual escrow associated with the loan. The Ladds made numerous attempts to contact the loan modification specialist at GMAC without success, and GMAC never answered questions concerning the Loan

*Claim no. 4722*

Modification Agreement.  As a result, the Ladds were not able to
execute the Loan Modification Agreement in a timely fashion.
The Ladds were prepared to execute the Loan Modification
Agreement subject to the resolution of the escrow issue, but
instead, GMAC moved forward with the foreclosure.  GMAC was
legally required to use good faith in administering the HAMP
program, but in this case, it failed to do so.

  *Violation of M.G.L. Chapter 93A.*  M.G.L. Chapter 93A
prohibits any unfair or deceptive acts or practices in the
conduct of any trade or commerce.  M.G.L. c. 93A, § 2.  GMAC
Mortgage LLC has engaged in such trade or commerce in
Massachusetts, and therefore, is subject to Chapter 93A.
Chapter 93A liability is decided on a case-by-case basis, and
has a very broad definition.  An act is unfair "if it is within
the penumbra of some common-law, statutory, or other established
concept of unfairness."  *Linkage Corp. v. Trs. Of Bos. Univ.*,
425 Mass. 1, 27, 679 N.E.2d 191, 209 (1977).  Chapter 93A also
grants to the Attorney General the power to promulgate rules and
regulations that define certain acts and practices which violate
Chapter 93A.  These rules and regulations have the force of law.
*Purity Supreme, Inc. v. Attorney General*, 380 Mass. 762, 775,
407 N.E.2d 297, 306 (1980).  Section 3.16 of those regulations,
940 C.M.R. § 3.16, expressly prohibits conduct that fails to
comply with existing statutes or laws meant for the protection
of the public's health, safety, and welfare.  A violation of
Section 3.16 is therefore a *per se* violation of Chapter 93A.
*MacGillivary v. W. Dana Bartlett Ins. Agency of Lexington, Inc.*,
14 Mass.App.Ct. 52, 61 (1982).

  In Massachusetts, foreclosure laws protect mortgage loan
consumers.  The statutory power of sale set forth in G.L. c.
183, § 21, provides that upon default by the mortgagor, the
mortgagee may sell the property but only after "first complying
with the terms of the mortgage and with the statutes relating to
the foreclosure of mortgages by the exercise of a power of
sale."  The wrongful foreclosure of Ladds' home, as explained
above, constitutes an unlawful act under Chapter 93A.  In *Kattar
v. Demoulas*, 433 Mass. 1, 739 N.E.2d 246 (2000), the defendants
were found liable under Chapter 93A for wrongfully foreclosing
on the plaintiff's property.  The SJC determined that the
"[l]egality of underlying conduct is not necessarily a defense
to a claim under c. 93A" even if the defendants had the right to
foreclose.  *Kattar v. Demoulas*, 433 Mass. at 13.  Conduct that
fails to comply with existing statutes or laws meant for the
protection of the public's health, safety, and welfare is
prohibited by 940 C.M.R. § 3.16(3).  However, a challenge to the
validity of a foreclosure sale does not need to include a

*Claim no. 4722*

showing of actual prejudice resulting from defects in the foreclosure procedures.  Further, conduct "in disregard of known contractual arrangements" may also constitute a violation of Chapter 93A.  *Anthony's Pier Four, Inc. v. HBC Association*, 411 Mass. 451, 474, 583 N.E.2d 806, 821 (1991).

GMAC Mortgage LLC should have acted in good faith and used reasonable diligence to protect the interests of the mortgagor. *Williams v. Resolution GGF OY*, 417 Mass. 377, 382-383, 630 N.E.2d 581 (1994). Chapter 93A empowers a court to rescind a foreclosure and re-convey the property to the former owner. *Kattar v. Demoulas*, 433 Mass. at 17. GMAC failed to act in good faith when it refused to respond to the phone calls by the Ladds to answer simple questions about the Loan Modification Agreement, in which GMAC had invited such inquiry.  The Ladds had every intention to modify their mortgage loan and prevent a foreclosure sale.  GMAC's failure to respond to them and finalize the HAMP loan modification is thus a violation of Chapter 93A.

I hope this additional information is helpful in your assessment of my clients' claims.  If you require any other information or wish to speak with me directly, you can call me at 508-629-1830, extension 226 or email me at DDaley@mwlegal.org.

Sincerely,

Daniel Daley
Staff Attorney

c:   James and Anne Ladd
        (by mail without enclosures)

Claim no. 4722

EXHIBIT 1

*Claim no. 4722* 76400

Received & Recorded
PLYMOUTH COUNTY
REGISTRY OF DEEDS
30 JUN 2005  09:48AM
JOHN R. BUCKLEY, JR.
REGISTER
Bk 30824 Pg 51-70

Return To:
Advanced Financial Services,
Inc.
25 Enterprise Center
Newport, RI  02842

Prepared By:

25 Enterprise Center,
Newport, RI  02842

————————————————[Space Above This Line For Recording Data]————————————————

# MORTGAGE   MIN ███████ 7203

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **June 25, 2005**
together with all Riders to this document.
(B) "Borrower" is **James B Ladd & Ann M Ladd**

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

2005-642720                                                                                      5-642720 5594

MASSACHUSETTS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS     Form 3022  1/01

VMP®-6A(MA) (0401).01
Page 1 of 15                         Initials:
     VMP Mortgage Solutions (800)521-7291

*Claim no. 4722*

(D) "Lender" is **Advanced Financial Services, Inc.**

Lender is a **Corporation**
organized and existing under the laws of
Lender's address is **25 Enterprise Center, Newport, RI   02842**

(E) "Note" means the promissory note signed by Borrower and dated **June 25, 2005**
The Note states that Borrower owes Lender **two hundred sixty-seven thousand eight
hundred and 00/100**                                                                Dollars
(U.S. $**267,800.00**          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **July 1, 2035**.
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[x] Adjustable Rate Rider   [ ] Condominium Rider            [ ] Second Home Rider
[ ] Balloon Rider           [ ] Planned Unit Development Rider [ ] 1-4 Family Rider
[ ] VA Rider                [ ] Biweekly Payment Rider        [ ] Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used

2005-642720                                                            5-642720 5594

VMP-6A(MA) (0401).01              Page 2 of 15                    Form 3022  1/01

*Claim no. 4722*

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

|  | County | of |  | Plymouth |  | : |
| [Type of Recording Jurisdiction] | | | | [Name of Recording Jurisdiction]: | | |

**See Attached Exhibit A**

Parcel ID Number:                                                                    which currently has the address of

**5 Barrows St**                                                                                              [Street]

**Middleboro**                                            [City] , Massachusetts 02346              [Zip Code]

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

2005-642720                                                                                      5-642720 5594

VMP®-6A(MA) (0401).01                              Page 3 of 15              Initials:                Form 3022   1/01

Claim no. 4722

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

2005-642720

5-642720 5594

-6A(MA) (0401).01

Page 4 of 15

Initials:

Form 3022   1/01

Claim no. 4722

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

2005-642720

-6A(MA) (0401).01

Page 5 of 15

Initials:

5-642720 5594

Form 3022   1/01

*Claim no. 4722*

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

2005-642720

5-642720 5594

Initials:

*Claim no 4722*

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Claim no. 4722

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

2005-642720

 -6A(MA) (0401).01

Page 8 of 15

Initials:

5-642720 5594

Form 3022   1/01

*Claim no. 4722*

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Claim no. 4722

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

2005-642720

5-642720 5594

VMP®-6A(MA) (0401).01

Page 10 of 16

Form 3022   1/01



**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

Claim no. 4722

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

*Claim no. 4722*

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall he sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

2005-642720

-6A(MA) (04011.01

Page 13 of 15

Initials:

5-642720 5594

Form 3022   1/01

*Claim no.*
*4722*

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          James B Ladd                -Borrower

_____          _____ (Seal)
                                          Ann M Ladd                  -Borrower

_____ (Seal)            _____ (Seal)
                 -Borrower                                 -Borrower

_____ (Seal)            _____ (Seal)
                 -Borrower                                 -Borrower

_____ (Seal)            _____ (Seal)
                 -Borrower                                 -Borrower

2005-642720                               5-642720 5594

VMP-6A(MA) (0401).01          Page 14 of 15          Form 3022   1/01

C taim no. 4722

COMMONWEALTH OF MASSACHUSETTS, Plymouth                    County ss:

On this 25th      day of June, 2005                    , before me, the undersigned notary public,
personally appeared James B Ladd & Ann M Ladd

proved to me through satisfactory evidence of identification, which was/were
to be the person(s) whose name(s) is/are signed on the preceding document, and acknowledged to me that
he/she/they signed it voluntarily for its stated purpose.
My Commission Expires:
(Seal)



_____
Notary Public

ALAN G. TREBAT
Notary Public
Commonwealth of Massachusetts
My Commission Expires
September 1, 2011

2005-642720                              5-642720 5594

VMP-6A(MA) (0401).01        Page 15 of 15        Form 3022  1/01

Claim no.
4722

1051767
5 Barrows Street
Middleboro, Massachusetts  02346
James B. Ladd

## EXHIBIT A

That certain piece or parcel of land, and the buildings and improvements thereon, known as 5 Barrows Street located in the Town of Middleboro, County of Plymouth, and Commonwealth of Massachusetts, and being more particularly described in a Deed recorded at Book 15212, Page 289 of the Plymouth County Registry of Deeds.

For title reference see Deed dated May 30, 1997 and recorded Book 15212, Page 289

*Claim no. 4722*

# FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*)- Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 25th    day of June, 2005
, and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given
by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the
"Note") to **Advanced Financial Services, Inc.**

("Lender") of the same date and covering the property described in the Security Instrument
and located at: 5 **Barrows St**
**Middleboro, MA   02346**
[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of        5.875 %. The Note also
provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the
first day of July, 2010    , and the adjustable interest rate I will pay may change
on that day every 12th month thereafter. The date on which my initial fixed interest rate
changes to an adjustable interest rate, and each date on which my adjustable interest rate
could change, is called a "Change Date."

2005-642720                                        5-642720 5594
MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family -
Fannie Mae Uniform Instrument
Form 3187 6/01
VMP®-168R (0401).01
Page 1 of 4        Initials: _____
    VMP Mortgage Solutions, Inc.
        (800)521-7291



Claim no.
4722

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and one-quarter                                                                                        percentage points
(                2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.875 % or less than                                        2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than                      10.875 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

2005-642720                                                                                        5-642720 5594

VMP-168R (0401).01                                        Page 2 of 4                                        Form 3187 6/01

Initials:



Claim no.
4722

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within

2005-642720

⊚-168R (0401).01

Page 3 of 4

Initials:

5-642720 5594

Form 3187 6/01

Claim no.
4722

which Borrower must pay all sums secured by this Security Instrument. If Borrower
fails to pay these sums prior to the expiration of this period, Lender may invoke any
remedies permitted by this Security Instrument without further notice or demand on
Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained
in this Fixed/Adjustable Rate Rider.

_____ (Seal)        _____ (Seal)
James B Ladd                  -Borrower      Ann M Ladd                    -Borrower

_____ (Seal)        _____ (Seal)
                              -Borrower                                    -Borrower

_____ (Seal)        _____ (Seal)
                              -Borrower                                    -Borrower

_____ (Seal)        _____ (Seal)
                              -Borrower                                    -Borrower

2005-642720                                              5-642720 5594

VMP-168R (0401).01              Page 4 of 4             Form 3187 6/01

The foregoing is a true copy from the
Plymouth County Registry of Deeds.
Book 30824    Page 51
Attest: John R Buckley Jr.
              Register

Claim NO. 4722

# EXHIBIT 2

# GMAC Mortgage

3451 Hammond Ave
P.O. Box 780
Waterloo, IA 50704-0780

*Claim no. 4722*

*COURT*
*FILED*
*10 JAN -8 PM 2:47*

04/15/09

JAMES B LADD

5 BARROWS ST
MIDDLEBORO          MA 02346

LAST KNOWN ADDRESS
Loan Number:          ▮▮▮▮▮▮▮
Property Address:      5 BARROWS ST
                      MIDDLEBORO          MA 02346

Dear Customer(s):

### YOU ARE IN DEFAULT UNDER THE TERMS OF YOUR MORTGAGE AND NOTE.

You have not made the payments as required by your Mortgage and Note. Please refer to your mortgage documents for additional information.GMAC Mortgage, LLC is providing this notice as servicing agent, or otherwise on behalf of, GMAC Mortgage, LLC whose address is; 3451 Hammond Ave Waterloo, IA 50702

Pursuant to M.G.L Chapter 244, Section 35A (b) & (c) as amended, failure to bring your account current by 07/14/2009 may result in our election to exercise our right to accelerate the Mortgage and take steps to terminate your ownership in the property by a foreclosure proceeding. Upon acceleration, your total obligation will be immediately due and payable without further demand.

04/15/09
Account Number: ███████
Page 2

*Claim no. 4722*

Your account is now due for the 03/01/09 payment and succeeding payments and late charges. This is a demand for payment of the total amount due and owing as of the date of this letter, which is as follows:

Payments
Late Charges
Fees, costs and other amounts accrued to date



Less: Suspense

Total Amount Due Calculation

You have the right to cure your default on or before 07/14/2009. In order to cure your default, you must bring your account current by remitting the total amount due as shown above, plus any additional monthly payments, late charges and other charges that may become due under applicable law between the date of this letter and the date that we receive, your payment. If you do not cure your default by 07/14/2009 we may take steps to terminate your ownership in the property by a foreclosure proceeding or other action to seize the property. If you are unable to bring your account current, we urge you to contact our Loss Mitigation Department at 888-714-4622 to discuss possible alternatives to foreclosure.

PAYMENT REMITTANCE INFORMATION (always include Loan # with your payment) - **Please send certified funds (certified check, cashier's check, or money order) using one of the following options:**
Western Union /Money Gram, or send regular or overnight mail to:

GMAC Mortgage, LLC
PO Box 780
Waterloo IA 50704-0780
888-714-4622

In the event you disagree with the alleged default, or the amount required to cure your default, please contact us at the above address or phone number.

04/15/09
Account Number: ███████████
Page 3

Claim no. 4722 

The name of the person that originated your loan is Advanced Financial Services, Inc. Notwithstanding anything herein to the contrary, you have the right to reinstate your Mortgage even after acceleration and the right to bring a court action to assert the non- existence of a default or any other defense to acceleration and sale.

Financial assistance may be available to you from programs operated by the State or Federal Government. Below is a list of Government agencies that you may wish to contact or ascertain whether you qualify for assistance.

    Massachusetts Division of Banks
        **(617) 956-1501 or (800) 495-BANK, ext.501**
    Massachusetts Housing Finance Agency
        **(617) 854-1000, (413) 733-0999 or (888) 995 HOPE**
    HUD approved Housing Counseling:
        1-800-569-4287
        http://www.hud.gov/offices/hsg/sfh/hcc/hccprof14.cfm
    Veterans Administration:
        1-800-827-1000

If you are represented by an attorney, please consult with that attorney and provide us with the attorney's name, address and telephone number. To the extent your obligation has been discharged, or is subject to the automatic stay in a bankruptcy proceeding under Title 11 of the United States Code, this notice is for informational purposes only and does not constitute a demand for payment or an attempt to collect an indebtedness as your personal obligation.

Sincerely,


Collections Department



This is an attempt to collect on a debt and any information obtained will be used for that purpose.


5:64

5/13/13
THE FOREGOING DOCUMENT IS A TRUE
FOREGOING DOCUMENT IS A TRUE
ORIGINAL ON FILE IN MY OFFICE
AND IN MY LEGAL CUSTODY
DEBORAH J. PATTERSON
RECORDER
LAND COURT

Claim no. 4722

EXHIBIT 3

GMAC Mortgage
P.O. Box 4622
Waterloo, IA 50704-4622

*Claim no. 4722*

January 05, 2010

12305

JAMES B. LADD
ANN M. LADD
5 BARROWS ST
MIDDLEBORO         MA 02346-2201

Re:  8690111410 – MORTGAGE LOAN TRANSFER NOTICE

Dear JAMES B. LADD and ANN M. LADD,

We appreciate the opportunity to serve your mortgage needs.  We are sending you this notice to inform you that your mortgage loan has been transferred to Residential Funding Corp.  The transfer of ownership of your mortgage has not been publicly recorded.  **Please note that there is nothing you need to do.**  This notice is for your information only.  It does not require any action and you can rest assured that nothing has changed regarding the servicing, terms or conditions of your mortgage loan.  GMAC Mortgage will continue to service your mortgage and provide customer care and support for your home loan needs.

GMAC Mortgage, as the servicer of your mortgage loan, has authority to act on the Creditor's behalf with regard to the administration of your loan. **Please contact GMAC Mortgage at 800-766-4622 if you have any questions regarding this notice.**

Thank you for this opportunity to serve your needs.

---

Mortgage Loan Transfer Information:

Date of transfer to new Creditor: December 30, 2009

Creditor name:     Residential Funding Corp
Address:           One Meridian Crossings, Suite 100
                   Minneapolis, MN 55423

Phone:             800-766-4622

**Do not use this address to send mortgage payments.**

Claim no. 4722

# EXHIBIT 4

Bk: 38163 Pg: 241

*Claim no. 4722*



2016 0000504B
Bk: 38163Pg: 241 Page: 1 of 2
Recorded: 01/22/2010 12:16 PM

ATTEST: *John R Buckley Jr.*
REGISTER
PLYMOUTH COUNTY REGISTRY OF DEEDS

*Property, S Borrows St Middleboro*

## ASSIGNMENT

<u>Mortgage Electronic Registration Systems, Inc.</u>

holder of mortgage from

James B. Ladd and Ann M. Ladd

to <u>Mortgage Electronic Registration Systems, Inc.</u>

dated <u>June 25, 2005</u>

recorded with Plymouth County Registry of Deeds in Book 30824, Page 51 assigns said
mortgage secured thereby to <u>GMAC Mortgage, LLC, 1100 Virginia Drive, Fort Washington, PA
19034</u>

In witness whereof the said <u>Mortgage Electronic Registration Systems, Inc.</u>

Has caused its corporate seal to be hereto affixed and these presents to be signed, in its name and
behalf by

Jeffrey Stephan
Vice President            its _____ *VP* _____

Mortgage Electronic Registration Systems,
Inc.

BY: _____

Jeffrey Stephan
Vice President

_____ *Jan 4* _____, 20*10*

STATE OF        *PA*

COUNTY OF        **Montgomery**

On this _4_ day of _Jan_ _____, 200*10* before me, the undersigned notary
public, personally appeared _____~~Jeffrey Stephan~~_____ as _____ *VP* _____, of

Bk: 38163 Pg: 242

*Claim no. 4722*

Mortgage Electronic Registration Systems, Inc., who I have personal knowledge of identity, to be the person whose name is signed on the proceeding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.

Official Signature and Seal of Notary
My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Trina Wiltbank, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires Sept. 10, 2013
Member, Pennsylvania Association of Notaries

File No. 618.2782

Return to:
Orlans Moran PLLC
P.O. Box 5041
Troy, MI 48007-5041

The foregoing is a true copy from the
Plymouth County Registry of Deeds.
Book 38163   Page 341
Attest: John R Buckley Jr.
Register

Claim no. 4722

# EXHIBIT 5

Bk: 41073 Pg: 272



*Claim No. 4722*

2012 00020549
Bk: 41073 Pg: 272 Page: 1 of 4
Recorded: 03/08/2012 11:51 AM
ATTEST: John R. Buckley, Jr. Register
Plymouth County Registry of Deeds

## FORECLOSURE DEED

GMAC Mortgage, LLC, having its usual place of business at 3451 Hammond Ave, Waterloo, IA, 50702 the present holder of a mortgage from James B. Ladd and Ann M. Ladd to Mortgage Electronic Registration Systems, Inc. dated June 25, 2005 recorded with the Plymouth County Registry of Deeds at Book 30824, Page 51, by the power conferred by said mortgage and by every other power, for TWO HUNDRED EIGHTY-EIGHT THOUSAND DOLLARS AND 00/100 ($288,000.00) paid, grants to Federal Home Loan Mortgage Corporation, 8200 Jones Branch Drive, McLean, VA 22102-3110 the premises conveyed by said mortgage. This conveyance is exempt from the Massachusetts Deed Excise, M.G.L.C. 64D Section 1, pursuant to Massachusetts Department of Revenue Directive 91-2 (Sept. 19, 1991), and pursuant to 12 United States Code Sections 1452, 1723a, or 1835.

Executed as a sealed instrument this *Feb. 3* , 2012.

GMAC MORTGAGE LLC
CORPORATE SEAL
2006
DELAWARE

GMAC Mortgage, LLC

By: _____
Pratiksha Jain
Title: Authorized Officer

*STATE OF* Pennsylvania

Montgomery ss                    2/3/2012

On this *Feb. 3* , 2012, before me, the undersigned notary public, personally appeared __Pratiksha Jain__ GMAC Mortgage, LLC, proved to me through satisfactory evidence of identification, which was personal knowledge, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.

_____
Mary Jo McDermott , Notary Public
My Commission Expires: *10·21·2015*

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
MARY JO McDERMOTT, Notary Public
City of Philadelphia, Phila. County
My Commission Expires October 21, 2015

RE: 5 Barrows Street, Middleboro, MA 02346

Return to:
Orlans Moran PLLC
P.O. Box 5041
Troy, MI 48007-5041
File Number: 618.2782

Bk: 41073 Pg: 273

*Claim no. 4722*

RE: 5 Barrows Street, Middleboro, MA 02346

*Affidavit of Sale*

I, Justin D. Cohen, Employee, Authorized Signatory, Real Property of Orlans Moran PLLC under a Certificate of Authorization for GMAC Mortgage, LLC, ("Lender") named in the foregoing deed, make oath and say, based on the written information provided to Orlans Moran PLLC by GMAC Mortgage, LLC, that the principal, interest and other obligations mentioned in mortgage from above referred to were not paid or tendered or performed when due or prior to the sale, and that this law firm caused to be published on the 22nd day of September, 2011, on the 29th day of September, 2011 and on the 6th day of October, 2011, in the MIDDLEBORO GAZETTE (SEE MIDDLEBOROUGH GAZETTE) a newspaper published or by its title page purporting to be published in MIDDLEBOROUGH and circulated in Middleboro, a copy of which is attached hereto as Exhibit A.

This law firm also complied with Chapter 244, Section 14 of Massachusetts General Laws, as amended.

Pursuant to said notice at the time and place therein appointed

The Lender sold the mortgaged premises at public auction by Nancy Freni, a licensed auctioneer, of Monroe Auction Group to the successful purchaser GMAC Mortgage, LLC, 3451 Hammond Ave, Suite 100, Waterloo, IA, 50702, for the sum of TWO HUNDRED EIGHTY-EIGHT THOUSAND DOLLARS AND 00/1 00 ($288,000.00), being the highest bid made therefor at said auction.

Said bid was then assigned to Federal Home Loan Mortgage Corporation as evidenced by Assignment of Bid recorded herewith as Exhibit B.

For signatory authority, see Delegation of        By: _Justin D. C_
Authority and Appointment registered with            Justin D. Cohen, Employee,
the Suffolk County Registry District of the           Authorized Signatory, Real Property
Land Court as Document Number 795898.              of Orlans Moran, PLLC
                                                                              on behalf of
See recorded Certificate of Authorization            GMAC Mortgage, LLC
recorded herewith.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK COUNTY, SS            February 28, 2012

On this 28th of February 2012, before me, the undersigned notary public, personally appeared Justin D. Cohen, Employee, Authorized Signatory, Real Property, of Orlans Moran PLLC, on behalf of GMAC Mortgage, LLC, proved to me through satisfactory evidence of identification, which was personal knowledge, to be the person(s) whose name(s) is on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of their knowledge and belief.

_____, Notary Public  8-26-16
My Commission Expires

ANDREW C. ARNOLD
COMMISSION EXPIRES
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS

Return to:
Orlans Moran PLLC
P.O. Box 5041
Troy, MI 48007-5041
File Number: 618.2782

Bк: 41073 Pg: 274

EXHIBIT "A"

*Claim no. 4722*

ATTACHED TO AND FORMING A PART OF FORECLOSURE DEED AND
AFFIDAVIT FOR PROPERTY LOCATED AT 5 BARROWS STREET,
MIDDLEBORO, MA 02346

RE: 5 Barrows Street, Middleboro, MA 02346

## MORTGAGEE'S NOTICE OF SALE OF REAL ESTATE

By virtue and in execution of the Power of Sale contained in a certain Mortgage given by James B. Ladd and Ann M. Ladd to Mortgage Electronic Registration Systems, Inc., dated June 25, 2005 and recorded with the Plymouth County Registry of Deeds at Book 30824, Page 51 of which the Mortgage the undersigned is the present holder by assignment for breach of the conditions of said Mortgage and for the purpose of foreclosing same will be sold at Public Auction at 09:00 AM on October 14, 2011 at 5 Barrows Street, Middleboro, MA, all and singular, the premises described in said Mortgage, to wit:

That certain piece or parcel of land, and the buildings and improvements thereon, known as 5 Barrows Street located in the Town of Middleboro, County of Plymouth, and Commonwealth of Massachusetts, and being more particularly described in a Deed recorded at Book 15212, Page 289 of the Plymouth County Registry of Deeds.

For title reference see Deed dated May 30, 1997 and recorded Book 15212, Page 289

The premises are to be sold subject to and with the benefit of all easements, restrictions, building and zoning laws, unpaid taxes, tax titles, water bills, municipal liens and assessments, rights of tenants and parties in possession.

### TERMS OF SALE:
A deposit of FIVE THOUSAND DOLLARS AND 00 CENTS ($5,000.00) in the form of a certified check or bank treasurer's check will be required to be delivered at or before the time the bid is offered. The successful bidder will be required to execute a Foreclosure Sale Agreement immediately after the close of the bidding. The balance of the purchase price shall be paid within thirty (30) days from the sale date in the form of a certified check, bank treasurer's check or other check satisfactory to Mortgagee's attorney. The Mortgagee reserves the right to bid at the sale, to reject any and all bids, to continue the sale and to amend the terms of the sale by written or oral announcement made before or during the foreclosure sale. If the sale is set aside for any reason, the Purchaser at the sale shall be entitled only to a return of the deposit paid. The purchaser shall have no further recourse against the Mortgagor, the Mortgagee or the Mortgagee's attorney. The description of the premises contained in said mortgage shall control in the event of an error in this publication. TIME WILL BE OF THE ESSENCE.

Other terms if any, to be announced at the sale.

GMAC Mortgage, LLC
Present Holder of said Mortgage,
By its Attorneys,
Orlans Moran PLLC
P.O. Box 962169
Boston, MA 02196
Phone: (617) 502-4100
September 22, 29, & Oct. 6, 2011

Return to:
Orlans Moran PLLC
P.O. Box 5041
Troy, MI 48007-5041

Bk: 41073 Pg: 275

*Claim no 4722*

EXHIBIT B

ASSIGNMENT OF BID

Whereas, GMAC Mortgage, LLC, 3451 Hammond Ave, Waterloo, IA, 50702 ("Assignor"), was the successful purchaser at the public sale of property located at 5 Barrows Street, Middleboro, MA, 02346, which sale was made on the premises hereinabove described on October 14, 2011 at 09:00 AM by GMAC Mortgage, LLC, 3451 Hammond Ave, Waterloo, IA, 50702, dated June 25, 2005 and recorded with the Plymouth County Registry of Deeds at Book 30824, Page 51, of which Mortgage the undersigned is the present holder by Assignment.

For TWO HUNDRED EIGHTY-EIGHT THOUSAND DOLLARS AND 00/100 ($288,000.00), the undersigned Assignor unconditionally sells, assigns, and sets over unto Federal Home Loan Mortgage Corporation, 8200 Jones Branch Drive, McLean, VA 22102-3110, its successors and assigns, ("Assignee"), all of the Assignor's right, title and interest in and to said bid for the said property with the right to said Assignee to take and receive title thereto by conveyance directly from said Mortgagee pursuant to its power and authority under and by virtue of the aforesaid Mortgage.

Executed as a sealed instrument this *Feb. 3*, 2012.

GMAC Mortgage, LLC,

Name: Pratiksha Jain

Title: Authorized Officer

*STATE OF* Pennsylvania

Montgomery SS                    *2/3/*, 2012

On this *Feb. 3*, 2012, before me, the undersigned notary public, personally appeared ___Pratiksha Jain___ GMAC Mortgage, LLC, proved to me through satisfactory evidence of identification, which was personal knowledge, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.

Mary Jo McDermott , Notary Public
My Commission Expires: *10-21-2015*

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
MARY JO McDERMOTT, Notary Public
City of Philadelphia, Phila. County
My Commission Expires October 21, 2015

Return to:
Orlans Moran PLLC
P.O. Box 5041
Troy, MI 48007-5041
File Number: 618.2782

The foregoing is a true copy from the Plymouth County Registry of Deeds.
Book *41073* Page *272*
Attest: *John R Buckley Jr*

RE: 5 Barrows Street, Middleboro, MA 02346

Claim no. 4722

# EXHIBIT 6

Claim no. 4777

🖨 Print

**Acts**
**2007**    **CHAPTER 206** AN ACT PROTECTING AND PRESERVING HOME OWNERSHIP.

*Whereas,* The deferred operation of this act would tend to defeat its purpose, which is to provide forthwith mortgage protection for existing and new home owners, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience.

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same as follows:*

**SECTION 1.** To provide for certain unanticipated obligations of the commonwealth, to provide for an alteration of purpose for current appropriations and to meet certain requirements of law, the sums set forth in this section are hereby appropriated from the General Fund unless specifically designated otherwise in this section for the several purposes and subject to the conditions specified in this section, and subject to the laws regulating the disbursement of public funds for the fiscal year ending June 30, 2008. These sums shall be in addition to any amounts previously appropriated and made available for the purposes of said items.

7006-0011.. For the costs incurred by the division of banks associated with licensure of loan originators pursuant to chapter 255F of the General Laws; provided, that the division may expend revenues in an amount not to exceed $5,000,000 from the revenue received from administrative fees associated with said licensure fees and from civil administrative penalties pursuant to said chapter 255F; provided that, $2,000,000 shall be expended from such revenue as grants for the operation of a pilot program for best lending practices, first-time homeowner counseling for non-traditional loans and 10 or more foreclosure education centers pursuant to section 16 and that the grants shall be awarded through a competitive application process under criteria created by the division and that no funds shall be expended from this item in the AA object class for the compensation of state employees for such program; provided, further, that notwithstanding any general or special law to the contrary, for the purpose of accommodating timing discrepancies between the receipt of revenues and related expenditures, the commissioner may incur expenses and the comptroller may certify for payment the amounts not to exceed the lower of this authorization or the most recent revenue estimate, as reported in the state accounting system....................................................... $5,000,000

**SECTION 2.** Chapter 6 of the General Laws is hereby amended by inserting after Section

Claim No. 4722

172I the following section:-
Section 172J. Notwithstanding section 172 or any other general or special law to the contrary, the commissioner of the division of banks may obtain all available criminal offender record information and juvenile data as found in the court activity record information from the criminal history systems board of all applicants for licensure pursuant to chapter 255F. Information obtained under this section shall not be disseminated for any purpose other than to provide mortgage protection for home owners.

**SECTION 3.** Chapter 183 of the General Laws is hereby amended by inserting after section 6C the following section:-
Section 6D. Every mortgage and assignment of mortgage secured by residential property, as defined in section 1 of chapter 255E, presented for record, in which a mortgage broker, as defined in said section 1 of said chapter 255E, is involved shall contain or have endorsed upon it the name, post office address and license number of the mortgage broker and, if applicable, the mortgage loan originator, as defined in section 1 of chapter 255F, responsible for placing the mortgage loan with the mortgagee. This endorsement, or notation that no mortgage broker or mortgage loan originator was involved in the mortgage, if known, shall be recorded as part of the mortgage or assignment of mortgage. Failure to comply with this section shall not affect the validity of any mortgage or the recording of any mortgage or assignment of mortgage.

**SECTION 4.** Section 27 of said chapter 183, as appearing in the 2006 Official Edition, is hereby amended by adding the following paragraph:-
The holder of a mortgage of real estate, or the holder's representatives, shall provide to the mortgagor or the mortgagor's heirs, successors or assigns a written notice containing an itemized accounting of the disposition of the proceeds arising from a sale under the power of sale including, but not limited to, the sale price, legal fees, auctioneer fees, publication costs and other fees, and any surplus due to the mortgagor, within 60 days after the receipt of such funds provided, that if such sale is subject to further legal proceedings, such accounting shall be stayed until the conclusion of such proceedings.

**SECTION 5.** Section 63A of said chapter 183, as so appearing, is hereby amended by inserting after the word "interest", in line 2, the following words:- , change an adjustable or variable rate to a fixed rate.

**SECTION 6.** Said section 63A of said chapter 183, as so appearing, is hereby further amended by striking out, in line 44, the words "one-half of".

**SECTION 7.** Chapter 184 of the General Laws is hereby amended by inserting after section 17B the following section:-
Section 17B1/2. No mortgagee who makes a loan to a first-time home loan borrower, to be

Claim no. 4722

secured by a mortgage on owner-occupied, 1 to 4 family residential property in the commonwealth, shall make a subprime loan at a variable or adjustable rate of interest unless the mortgagor affirmatively opts in writing for the variable or adjustable rate subprime loan and receives certification from a counselor with a third-party nonprofit organization that the mortgagor has received counseling in person on the advisability of the loan transaction; provided, further that said third party nonprofit organization shall have been approved by: (1) the United States Department of Housing and Urban Development; (2) a housing financing agency of the commonwealth; (3) the Massachusetts Homeownership Collaborative; (4) or the regulatory agency which has jurisdiction over the mortgagee. The commissioner of the division of banks shall maintain a list of approved counseling programs. At or before closing such a loan, the mortgagee shall obtain evidence that the mortgagor has completed an approved counseling program. If such subprime mortgage loan is made by a mortgagee in violation of this section, the variable or adjustable rate terms of the loan shall not be enforceable and the mortgagee shall only be entitled to collect an interest rate equal to the lesser of the original interest rate, including any discounted rate, or the current adjusted interest rate throughout the remaining term of the loan. The commissioner of banks shall issue directives or guidelines or adopt regulations to administer and carry out this section and to further define the terms used in this section.

**SECTION 8.** The last sentence of section 13 of chapter 186 of the General Laws, as appearing in the 2006 Official Edition, is hereby amended by adding the following words:- or by foreclosure.

**SECTION 9.** Said chapter 186, is hereby further amended by inserting after section 13 the following section:-

Section 13A. Upon a foreclosure of residential real property pursuant to chapter 244, a tenant, occupying a dwelling unit under an unexpired term for years or a lease for a definite term in effect at the time of the foreclosure by sale, shall be deemed a tenant at will. Foreclosure shall not affect the tenancy agreement of a tenant whose rental payment is subsidized under state or federal law.

**SECTION 10.** Chapter 244 of the General Laws is hereby amended by inserting after section 14 the following section:-

Section 14A. The commissioner of the division of banks, hereinafter referred to as the commissioner, shall maintain a foreclosure database that shall include, but not be limited to, foreclosure activity by mortgage lenders, mortgage holders and mortgage servicers, as well as the mortgage brokers and loan originators who placed these mortgage loans in the commonwealth, including information relative to the original mortgagee and any

Claim no. 4722

subsequent assignee. Based on the information received, the commissioner shall produce a report, at least annually, to track developments and trends of mortgage foreclosures on residential property in the commonwealth including, but not limited to, an analysis of the pre-foreclosure notices submitted to the commissioner compared to the final foreclosure notices, and any trends or patterns relative to the geographic location of the residential properties and interest rates. The report shall be available to the public upon request, and the commissioner shall make it available in any other manner that he may choose.

**SECTION 11.** Said chapter 244 is hereby further amended by inserting after section 35 the following section:-

Section 35A. (a) Any mortgagor of residential real property located in the commonwealth consisting of a dwelling house with accommodations for 4 or less separate households and occupied in whole or in part by the mortgagor, shall have a 90 day right to cure a default of a required payment as provided in such residential mortgage or note secured by such residential real property by full payment of all amounts that are due without acceleration of the maturity of the unpaid balance of such mortgage. The right to cure a default of a required payment shall be granted once during any 5 year period, regardless of the mortgage holder.

(b) The mortgagee, or anyone holding thereunder, shall not accelerate maturity of the unpaid balance of such mortgage obligation or otherwise enforce the mortgage because of a default consisting of the mortgagor's failure to make any such payment in subsection (a) by any method authorized by this chapter or any other law until at least 90 days after the date a written notice is given by the mortgagee to the mortgagor. Said notice shall be deemed to be delivered to the mortgagor when delivered to the mortgagor or when mailed to the mortgagor at the mortgagor's address last known to the mortgagee or anyone holding thereunder.

(c) The notice required in subsection (b) shall inform the mortgagor of the following:-

(1) the nature of the default claimed on such mortgage of residential real property and of the mortgagor's right to cure the default by paying the sum of money required to cure the default;
(2) the date by which the mortgagor shall cure the default to avoid acceleration, a foreclosure or other action to seize the home, which date shall not be less than 90 days after service of the notice and the name, address and local or toll free telephone number of a person to whom the payment or tender shall be made;
(3) that, if the mortgagor does not cure the default by the date specified, the mortgagee, or anyone holding thereunder, may take steps to terminate the mortgagor's ownership in

Claim No. 4722

the property by a foreclosure proceeding or other action to seize the home;

(4) the name and address of the mortgagee, or anyone holding thereunder, and the telephone number of a representative of the mortgagee whom the mortgagor may contact if the mortgagor disagrees with the mortgagee's assertion that a default has occurred or the correctness of the mortgagee's calculation of the amount required to cure the default;

(5) the name of any current and former mortgage broker or mortgage loan originator for such mortgage or note securing the residential property; and

(6) that the mortgagor may be eligible for assistance from the Massachusetts Housing Finance Agency and the division of banks and the local or toll free telephone numbers the mortgagor may call to request this assistance.

(d) To cure a default prior to acceleration under this section, a mortgagor shall not be required to pay any charge, fee, or penalty attributable to the exercise of the right to cure a default. The mortgagor shall pay late fees as allowed pursuant to section 59 of chapter 183 and per-diem interest to cure such default. The mortgagor shall not be liable for any attorneys' fees relating to the mortgagor's default that are incurred by the mortgagee or anyone holding thereunder prior to or during the period set forth in the notice required by this section. The mortgagee, or anyone holding thereunder, may also provide for reinstatement of the note after the 90 day notice to cure has ended.

(e) A copy of the notice required by this section and an affidavit demonstrating compliance with this section shall be filed by the mortgagee, or anyone holding thereunder, in any action or proceeding to foreclose on such residential real property.

(f) A copy of the notice required by this section shall also be filed by the mortgagee, or anyone holding thereunder, with the commissioner of the division of banks. Additionally, if the residential property securing the mortgage loan is sold at a foreclosure sale, the mortgagee, or anyone holding thereunder, shall notify the commissioner of the division of banks, in writing, of the date of the foreclosure sale and the purchase price obtained at the sale.

**SECTION 12.** Section 2 of chapter 255E of the General Laws, as appearing in the 2006 Official Edition, is hereby amended by striking out, in lines 34 to 39, inclusive, the words ", or to any nonprofit agency or corporation incorporated under the laws of the commonwealth for the purpose of assisting low to moderate income households in the purchase or rehabilitation of family residences of four units or less and which holds tax-exempt status granted under the provisions of Section 501(c)(3) or 501(c)4 of the Internal Revenue Code".

**SECTION 13.** Section 8 of said chapter 255E, as so appearing, is hereby amended by

Claim no. 4722

striking out the third paragraph and inserting in place thereof the following 8 paragraphs:-

The commissioner shall inspect a licensee's relevant records and evidence of compliance with the provisions of this chapter or any rule or regulation issued hereunder and with any other law, rule or regulation applicable to the conduct of the business for which it is licensed under this chapter. For the purposes of such inspection, the commissioner or a representative of the commissioner shall have access to the offices and place of business, books, accounts, papers, records and files of all such licensees. The commissioner, and any person designated by him, may require the attendance and testimony of any person whom the commissioner deems necessary relative to the conduct and operation of such business. The total cost for any such inspection, which shall be paid by the licensee within 30 days after the receipt of an invoice therefore, shall be in accordance with fees determined annually by the commissioner of administration pursuant to section 3B of chapter 7, including expenses for necessary travel outside the commonwealth for the purposes of conducting such inspections.

During the course of such inspection, a mortgage lender that has made 50 or more home mortgage loans in the last calendar year shall be examined for its compliance with fair lending laws including, but not limited to, the requirements of the federal Equal Credit Opportunity Act, Home Mortgage Disclosure Act, and the Predatory Home Loan Practices Act. Such examination shall also include an evaluation of such mortgage lender's: (a) origination of loans and other efforts to assist low and moderate income residents, without distinction, to be able to acquire or to remain in affordable housing at rates and terms that are reasonable considering the lender's history with similarly situated borrowers, the availability of mortgage loan products suitable for such borrowers, and consistency with safe and sound business practices; (b) origination of loans and other efforts to assist low and moderate income residents' ability to acquire or to remain in affordable housing; (c) origination of loans that show an undue concentration and a systematic pattern of lending resulting in the loss of affordable housing units; (d) efforts working with delinquent residential mortgage customers to facilitate a resolution of the delinquency; and (e) other efforts, including public notice of the scheduling of examinations and the right of interested parties to submit written comments relative to any such examination to the commissioner, as, in the judgment of the commissioner, reasonably bear upon the extent to which a mortgage lender is complying with the requirements of fair lending laws and helping to meet the mortgage loan credit needs of communities in the commonwealth.

Upon the completion of such examination, the commissioner shall prepare a written evaluation of such lender's rec

Claim no. 4722

ord of performance, which shall be open to public inspection upon request, and said written evaluation shall include: (a) the assessment factors utilized to determine the mortgage lender's descriptive rating; (b) the commissioner's conclusions with respect to each such assessment factor; (c) a discussion of the facts supporting such conclusions; and (d) the mortgage lender's descriptive rating and the basis therefor.

Based upon such examination, the mortgage lender shall be assigned 1 of the following descriptive ratings: (a) outstanding record of performance in meeting the mortgage loan credit needs of communities in the commonwealth; (b) high satisfactory record of performance in meeting the mortgage loan credit needs of communities in the commonwealth; (c) satisfactory record of performance in meeting the mortgage loan credit needs of communities in the commonwealth; (d) needs to improve record of performance in meeting the mortgage loan credit needs of communities in the commonwealth; or (e) substantial noncompliance in meeting the mortgage loan credit needs of communities in the commonwealth.

Notwithstanding the foregoing, the commissioner may establish an alternative examination procedure for any mortgage lender, which, as of the most recent examination, has been assigned a rating of outstanding or high satisfactory for its record of performance in meeting its community mortgage loan credit needs.
In considering an application from a licensed mortgage lender for a renewal of a license issued pursuant to this chapter, the commissioner shall consider, but not be limited to, the record of performance of any such lender in accordance with this section. Said record of performance may provide the basis for the denial of any such renewal application.

For the purposes of this section, no mortgage lender may include a loan origination or loan purchase for consideration as part of its examination under this section if another mortgage lender claims the same loan origination or purchase for its review under this section or under section 14 of chapter 167.
The commissioner shall adopt regulations implementing the requirements of this section.

**SECTION 14.** Section 10 of said chapter 255E, as so appearing, is hereby amended by striking out the first sentence and inserting in place thereof the following sentence:- Whoever violates section 2 or any rule or regulation promulgated thereunder shall be punished by a fine of not more than $2,000 or by imprisonment in the house of correction for not more than 2 ½ years or by imprisonment in state prison for not more than 5 years, or both such fine and imprisonment.
**SECTION 15.** The General Laws are hereby amended by inserting after chapter

*Claim no. 4722*

255E the following chapter:-

## CHAPTER 255F.
## LICENSING OF MORTGAGE LOAN ORIGINATORS.

Section 1. As used in this chapter, the following words shall, unless the context otherwise requires, have the following meanings:-

"Commissioner", the commissioner of banks.

"Division", the division of banks.

"Entity", a person or entity that is a licensee under chapter 255E, as regulated by the division.

"Mortgage loan originator", a natural person who:- (a) is employed by or associated with 1 and not more than 1 entity; and (b) negotiates, solicits, arranges, provides or accepts residential mortgage loan applications, or assists consumers in completing such applications, except that employees whose responsibilities are limited to clerical and administrative tasks and who do not solicit borrowers, accept applications or negotiate the terms of residential mortgage loans on behalf of the employer shall not be considered mortgage loan originators and do not require licenses.

"Mortgage loan", a loan or an extension of credit including, but not limited to, an extension of credit pursuant to a contract or an assigned contract for the sale of goods or services, made to a natural person, the proceeds of which are to be used primarily for personal, family or household purposes, and which is secured wholly or partially by a mortgage on residential property.

"Residential property", real property located in the commonwealth having thereon a dwelling house with accommodations for 4 or less separate households and occupied, or to be occupied, in whole or in part by the obligor on the mortgage debt.

Section 2. No natural person shall act as a mortgage loan originator unless such person has first obtained a mortgage loan originator license from the commissioner. An entity shall not knowingly employ or retain a mortgage loan originator unless the mortgage loan originator is licensed under this chapter.

Section 3. (a) The application for a mortgage loan originator license shall be in the form prescribed by the commissioner and shall contain the name, address and license number of the entity with whom a mortgage loan originator is or will be employed or associated with and other information as the commissioner may require, including evidence of compliance with subsection (b). The application shall also include a description of the activities of the applicant, in such detail and

*Claim no. 4722*

for such periods as the commissioner may require, and such further information as the commissioner may require. The commissioner may obtain, pursuant to section 172J of chapter 6 all available criminal offender record information from the criminal history systems board on an applicant for a mortgage loan originator license by means of fingerprint checks, and from the Federal Bureau of Investigation for a national criminal history records check. The information obtained thereby may be used by the commissioner to determine the applicant's eligibility for licensing under this chapter. Receipt of criminal history record information by a private entity is prohibited. Each application for a license shall be accompanied by an investigation fee. Investigation and license fees shall be determined annually by the secretary of administration under section 3B of chapter 7, but such total annual fees shall be not less than $500; provided, that such investigation and license fees shall not apply to any community development corporation as defined in section 1 of chapter 40F and organized under the General Laws.

(b) An applicant shall have completed a residential mortgage lending course, approved by the division, not later than the 2 year period immediately preceding the date of the application.

Section 4. If the commissioner finds that the financial responsibility, character, reputation, integrity and general fitness of the applicant is such as to warrant belief that the applicant will act honestly, fairly, soundly and efficiently in the public interest, consistent with the purposes of this chapter, the commissioner shall issue the applicant a license to engage in the business of a mortgage loan originator upon payment of the required fees. If the commissioner shall not so find, or if the applicant's criminal history demonstrates any felony convictions or other convictions or admissions to sufficient facts involving fraud or if the applicant has had any adverse civil judgments involving fraudulent dealings, the commissioner shall not issue a license and shall notify the applicant of the denial. Within 20 days thereafter, the commissioner shall enter upon the division's records a written decision and findings containing the reasons supporting the denial and shall forthwith give written notice thereof by registered mail to the applicant. Within 30 days after receipt of such notice, the applicant may seek judicial review of the denial in accordance with section 14 of chapter 30A.

Section 5. A mortgage loan originator may transact business only for an employing entity. Each original license issued to a mortgage loan originator must be provided to and maintained by the employing entity at the entity's main office. If the employment of a mortgage loan originator is terminated, the employing

*Claim No. 9722*

entity shall return the mortgage loan originator's license to the division within 5 business days after termination. The reason for termination shall be given in a format determined by rules and regulations of the commissioner. For a period of 1 year after the termination of employment, the mortgage loan originator may request the re-assignment of the license to another entity by submitting an application to the division, along with a fee established by the division by rule. The return of the license of any mortgage loan originator to the division that is not re-assigned to another entity terminates the right of the mortgage loan originator to engage in any residential mortgage loan origination activity until division procedures have been followed to reactivate such license. The license of any mortgage loan originator that has been returned to the division and not re-assigned to another entity within 1 year of termination of employment shall be cancelled.

Each license shall state the name of the mortgage loan originator licensee and the name and main office address of the entity employing such mortgage loan originator.

The commissioner may establish an expedited re-assignment process of a mortgage loan originator's license to another entity if the reason for such re-assignment is directly related to increased responsibilities or compensation.

The commissioner may adopt, amend or repeal rules and regulations to aid in the administration and enforcement of this chapter.

Section 6. Each application for a license shall be accompanied by an investigation fee. Investigation and license fees shall be determined annually by the secretary of administration under section 3B of chapter 7 provided that such total annual fees shall be not less than $500; provided further, that such investigation and license fees shall not apply to any community development corporation as defined in section 1 of chapter 40F and organized under the General Laws. The license of a mortgage loan originator shall expire annually. Each licensee, shall annually, on or before a date to be determined by the commissioner, submit a license renewal application. The license renewal application shall be on a form prescribed by the commissioner, signed under the pains and penalties of perjury, containing such information as the commissioner may require.

As determined by the commissioner, licensees shall complete at least 8 hours of residential mortgage lending continuing education courses every 3 years. Failure of the licensee to satisfy the continuing education requirement shall render the mortgage loan originator ineligible for renewal and such license shall

Claim no. 4722

be deemed to be inactive. A mortgage loan originator who neglects to file an application or fails to amend the same within 15 days of notice from the commissioner directing that the application be amended shall be deemed inactive. Inactive mortgage loan originators shall be prohibited from engaging in business as a mortgage loan originator.

Section 7. The commissioner may suspend, revoke or refuse to renew any license issued pursuant to this chapter if the commissioner finds that:- (1) the licensee has violated this chapter or any rule or regulation adopted hereunder, or any other law applicable to the conduct of its business; (2) any fact or condition exists which, if it had existed at the time of the original application for such license, would have warranted the commissioner in refusing to issue such license; or (3) the licensee has committed any fraud, misappropriated funds or misrepresented any of the material particulars of a mortgage loan transaction.

Except as provided in section 8, no license shall be revoked or suspended except after notice and a hearing thereon pursuant to chapter 30A. Any order issued pursuant to this section shall be subject to judicial review in accordance with section 14 of said chapter 30A.

A licensee may surrender his license by delivering to the commissioner written notice that he hereby surrenders such license, but such surrender shall not affect the civil or criminal liability of the licensee for acts committed before such surrender.

Section 8. (a) If the commissioner determines, after giving notice of and opportunity for a hearing, that a licensee has engaged in an act or practice constituting a violation of this chapter or a rule, regulation or order promulgated hereunder, the commissioner may order such licensee to cease and desist from such unlawful act or practice and take such affirmative action as in the commissioner's judgment will affect the purposes of this chapter.

(b) If the commissioner makes written findings of fact that the public interest will be irreparably harmed by delay in issuing an order under subsection (a), the commissioner may issue a temporary cease and desist order. Upon the entry of a temporary cease and desist order, the commissioner shall promptly notify, in writing, the licensee and the employing entity affected thereby that such order has been so entered, the reasons therefore, and that, within 20 days after the receipt of a written request from such licensee, the matter will be scheduled for hearing to determine whether such temporary order shall become permanent and final. If no such hearing is requested and none is

Claim no. 4722

ordered by the commissioner, the order shall remain in effect until it is modified or vacated by the commissioner. If a hearing is requested or ordered, the commissioner, after giving notice of and opportunity for a hearing to the licensee and the employing entity subject to said order shall, by written findings of fact and conclusions of law, vacate, modify or make permanent the order.

(c) No order issued pursuant to this section, except an order issued pursuant to subsection (b), may be entered without prior notice of and opportunity for a hearing. The commissioner may vacate or modify an order under this section upon finding that the conditions which required such an order have changed and that it is in the public interest to so vacate or modify.

Any order issued pursuant to this section shall be subject to judicial review in accordance with section 14 of chapter 30A.

Section 9. The commissioner may enforce this chapter, or restrain any violations thereof, by filing a civil action in any court of competent jurisdiction. Section 10. Whoever violates section 2 or any rule or regulation promulgated thereunder shall be punished by a fine of not more than $2,000 or by imprisonment in the house of correction for not more than 2 ½ or by imprisonment in state prison for not more than 5 years, or by both such fine and imprisonment. Each day such violation occurs or continues shall be deemed a separate offense. The penalty provision of this section shall be in addition to any other law applicable to a licensee or other person for violating section 2 or any rule or regulation made thereunder.

Section 11. (a) Whenever the commissioner finds that any licensee has violated this chapter or any rule or regulation promulgated thereunder, or any other law of the commonwealth applicable to the conduct of a mortgage loan originator on residential property in the commonwealth, the commissioner may, by order, in addition to any other action authorized under this chapter or any rule or regulation made thereunder, impose a penalty upon the person which shall not exceed $5,000 for each violation up to a maximum of $100,000 for such violation plus the costs of investigation. The commissioner may impose a penalty which shall not exceed $5,000 for each violation of this chapter, or any rule or regulation promulgated hereunder, by a person other than a licensee, plus the costs of investigation.

(b) Nothing in this section shall limit the right of any individual or entity who has been injured as a result of any violation of this chapter by a licensee, or

Claim no. 4722

any person other than a licensee, to bring an action to recover damages or restitution in a court of competent jurisdiction.

(c) Any findings or orders issued by the commissioner pursuant to this section shall be subject to review as provided in chapter 30A.

Section 12. (a) Whenever the commissioner determines that any person has, directly or indirectly, violated this chapter or any rule or regulation promulgated hereunder, applicable to the conduct of a mortgage loan originator on residential property in the commonwealth, any order issued by the commissioner pursuant to this chapter or any written agreement entered between the licensee and the commissioner, the commissioner may serve upon that person a written notice of intention:-

(1) to prohibit the person from performing in the capacity of a principal employee on behalf of any licensee for a period of time that the commissioner considers necessary;

(2) to prohibit the person from applying for or obtaining a license from the commissioner for a period up to 36 months following the effective date of an order issued under subsection (b) or (c); or

(3) to prohibit the person from any further participation, in any manner, as a mortgage loan originator in the commonwealth or to prohibit the person from being employed by, as agent of, or operating on behalf of a licensee under this chapter or any other business which requires a license from the commissioner.

(b) A written notice issued under subsection (a) shall contain a written statement of the facts that support the prohibition and shall give notice of an opportunity for a hearing to be held thereon. The hearing shall be fixed for a date not more than 30 days after the date of service upon the commissioner of the request for a hearing. If the person fails to submit a request for a hearing within 20 days of service of notice under subsection (a), or otherwise fails to appear in person or by a duly authorized representative, the party shall be considered to have consented to the issuance of an order of prohibition in accordance with the notice.

(c) In the event that consent is granted by operation of subsection (b), or if after a hearing the commissioner finds that any of the grounds specified in the notice have been established, the commissioner may issue an order of

*Claim no. 4722*

prohibition in accordance with subsection (a) as the commissioner finds appropriate.

(d) An order issued under subsection (b) or (c) shall be effective upon service upon the person. The commissioner shall also serve a copy of the order upon the licensee of which the person is an employee or on whose behalf the person is performing. The order shall remain in effect and enforceable until it is modified, terminated, suspended or set aside by the commissioner or a court of competent jurisdiction.

(e) Except as consented to in writing by the commissioner, any person who, pursuant to an order issued under subsection (b) or (c), has been prohibited from participating in whole or in part as a mortgage loan originator may not, while the order is in effect, continue or commence to perform in the capacity of a mortgage loan originator, or otherwise participate in any manner, if so prohibited by order of the commissioner, in the conduct of the affairs of:-

(1) any licensee under this chapter;
(2) any other business which requires a license from the commissioner; or
(3) any bank as defined under section 1 of chapter 167 or any subsidiary thereof.

Section 13. The commissioner may suspend, revoke or refuse to renew the license of the entity employing any licensed mortgage originator if the commissioner finds that: (a) the entity knew or should have known that the mortgage loan originator violated this chapter or any rule or regulation promulgated hereunder, or any other law applicable to the conduct of its business; (b) the entity knew of any fact or condition to exist which, if it had existed at the time of the original application for such license, would have warranted the commissioner in refusing to issue such license; (c) the mortgage loan originator committed any fraud, misappropriated funds or misrepresented any of the material particulars of a mortgage loan transaction approved by the entity; or (d) The entity has failed to comply with the reporting requirements set forth in section 15.

Section 14. Each licensee shall, when directed by the commissioner, permit the commissioner or a duly authorized representative to inspect its relevant records and evidence of compliance with this chapter or any rule or regulation issued hereunder and with any other law, rule and regulation applicable to the conduct of a mortgage loan originator licensed under this

Claim no 4722

chapter.

Section 15. An entity employing any licensed mortgage originator shall annually report the following to the commissioner of banks:- (1) the total number of loans originated by all such licensees; (2) the geographic distribution of such loans; (3) the number of defaults of such loans; and (4) any such other information the commissioner may require consistent with this chapter.

SECTION 16. The division of banks, in consultation with the city of Boston, the department of housing and community development, the Massachusetts Housing Finance Agency and the Massachusetts Bankers Association, shall develop a pilot program to identify best practices for financial institutions to provide first time homebuyer loans, to provide for foreclosure prevention for at-risk homeowners, and to assist approved counseling programs with in-person counseling pursuant to section 17B1/2 of chapter 184 of the General Laws, as provided for in item 7006-0011 in section 1.

Such pilot program, shall also provide for best lending and borrowing practices for consumers and mortgagees in cities or towns with: (1) housing units within low or moderate income census tracts as defined by the United States census bureau; or (2) high foreclosure activity as measured by residential foreclosure petitions filed over the total number of 1 to 4 family housing units within such city or town. Such guidelines and counseling shall provide for best practices that: (a) attain a minimal risk of high cost lending; (b) have a demonstrated ability to avoid foreclosures; (c) have a demonstrated record of pricing that ensures uniformity of lending; (d) avoid a disparity of pricing in low and moderate income census tracts; and (e) maintain foreclosure prevention practices that meet or exceed standards met by government sponsored enterprises.

Such pilot program shall also provide for foreclosure training to 10 or more foreclosure education centers for counseling and assistance to owner-occupied 1 to 4 family dwellings in such geographic areas.

On or before December 31, 2008, the division of banks shall report the results of such pilot program to the general court.

SECTION 17. Notwithstanding any general or special law to the contrary, the division of banks shall open an investigation and study relative to a

Claim no. 4722

residential mortgage lending course examination process pursuant to subsection (b) of section 3 of chapter 255F of the General Laws. The division shall report to the general court the results of its investigation and study and its recommendations by filing the same with the clerks of the house of representatives and the senate, who shall forward the same to the chairmen of the joint committees on financial services and housing on or before December 1, 2008.

The commissioner of the division of banks shall adopt rules and regulations to produce an examination to be administered to mortgage loan originators upon completion of a residential mortgage lending course as provided under said chapter 255F. Such rules or regulations shall require that, after December 1, 2009, the commissioner shall administer such examination in the manner he deems appropriate for any applicant for a mortgage loan originator license who shall first pass such examination to be eligible to apply for a license under said chapter 255F.

**SECTION 18.** The commissioner of the division of banks shall adopt the initial rules and regulations required under section 17 not later than December 1, 2009.

**SECTION 19.** A natural person who meets the definition of a mortgage loan originator under section 1 of chapter 255F of the General Laws before the effective date of this act may obtain a mortgage loan originator license from the commissioner of banks pursuant to said chapter 255F within 180 days after said effective date, notwithstanding the requirements of subsection (b) of section 3 of said chapter 255F, if he submits an application therefor and otherwise complies with the requirements of said chapter 255F.

**SECTION 20.** Section 7 shall take effect on January 31, 2008.

**SECTION 21.** Section 11 shall take effect on May 1, 2008 and apply to all mortgages of residential real property located in the commonwealth consisting of a dwelling house with accommodations for 4 or less separate households and occupied in whole or in part by the mortgagor and which secures a loan before, on or after the effective date of this act. Said section 11 shall not apply to such mortgages accelerated or whose statutory condition has been voided under the terms of the mortgage to secure the note, prior to the effective date of this act.

12-12020-mg    Doc 5529    Filed 10/25/13    Entered 10/28/13 15:47:03    Main Document
Pg 72 of 102

Claim no. 4722

**SECTION 22.** Section 15 shall take effect on July 1, 2008.

*Approved November 29, 2007.*

Claim no. 4722

EXHIBIT 7

claim no.
4722

2013 WL 1225621
Only the Westlaw citation is currently available.
United States District Court,
D. Massachusetts.

Alan J. ROSS and Ruth Ross, Plaintiffs,
v.
DEUTSCHE BANK NATIONAL TRUST
COMPANY and Deutsche Bank National Bank
Company, as Indenture Trustee for New Century
Home Equity Loan Trust 2005–4, Defendants.

Civil Action No. 12–10586–WGY. | March 27, 2013.

### Attorneys and Law Firms

Carl D. Goodman, Law Office Of Carl D. Goodman,
Lynn, MA, for

Dean J. Wagner, Shechtman Halperin Savage, LLP,
Pawtucket, RI, for Defendants.

### Opinion

### *MEMORANDUM AND ORDER*

WILLIAM G. YOUNG, District Judge.

## I. INTRODUCTION

*1 Plaintiffs Alan J. Ross and Ruth Ross (collectively,
"the Rosses") brought this action against the defendants,
Deutsche Bank National Trust Company and Deutsche
Bank National Bank Company, as Indenture Trustee for
New Century Home Equity Loan Trust 2005–4,
(collectively, "Deutsche Bank") seeking injunctive and
declaratory relief in order to prevent the foreclosure sale
of their residence (the "subject property") in Newton,
Massachusetts. Deutsche Bank, after removing the action
from state court, moved to dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") for
lack of subject matter jurisdiction and Federal Rule of
Civil Procedure 12(b)(6) ( "Rule 12(b)(6)") for failure to
state a claim upon which relief may be granted.

### A. Procedural Posture
The Rosses originally filed suit in the Massachusetts

Superior Court sitting in and for the County of Middlesex
to enjoin Deutsche Bank from conducting a foreclosure
sale of the subject property. Notice Removal, Ex. 9,
Verified Compl. ("Compl."), ECF No. 1–9. The Superior
Court granted a preliminary injunction. Am. Notice
Removal, Ex. 2, Prelim. Inj. ("Prelim.Inj.") 1, ECF No. 2–
2. On April 4, 2012, Deutsche Bank removed the case to
the United States District Court for the District of
Massachusetts. Am. Notice Removal, ECF No. 2. On
April 9, 2012, Deutsche Bank moved to dismiss the
Rosses' complaint. Mot. Dismiss Pls.' Compl., ECF No.
3; Mem. Law Supp. Mot. Dismiss Pls.' Compl. ("Defs.'
Mem."), ECF No. 4. The Rosses opposed this motion on
April 20, 2012. Pls.' Mem. Opp'n Mot. Dismiss Pls.'
Compl., ECF No. 5.

On June 6, 2012, the Court heard oral argument on the
motion to dismiss and ordered both parties to submit
supplemental briefs addressing the bankruptcy of the
original lender. Elec. Clerk's Notes, June 6, 2012. In
accordance with the Court's order, the Rosses and
Deutsche Bank filed supplemental memoranda on July 6,
2012. Pls.' Supplemental Mem. Opp'n Defs.' Mot.
Dismiss Pls.' Compl. Addressing New Century Mortg.
Corp. Ch. 11 Bankr., ECF No. 9; Defs.' Supplemental
Mem. Law Supp. Mot. Dismiss Pls.' Compl. ("Defs .'
Supplemental Mem."), ECF No. 10.

### B. Facts Alleged

#### 1. Origination of Note and Mortgage
On September 10, 1986, the Rosses became the owners of
the subject property, which is located at 974 Dedham
Street in Newton, Massachusetts. Compl. ¶ 3. On June 24,
2005, the Rosses executed an adjustable rate note (the
"Note") against the property payable to the order of New
Century Mortgage Corporation ("New Century
Mortgage"). Id. ¶ 4. The Rosses also executed a mortgage
(the "Mortgage") securing the Note in favor of New
Century Mortgage. Id.

#### 2. New Century Mortgage Bankruptcy
On April 2, 2007, New Century Financial Corporation
("New Century Financial"), New Century Mortgage's
parent company, filed a Chapter 11 bankruptcy petition in
the United States Bankruptcy Court for the District of
Delaware ("Bankruptcy Court"). Id. ¶ 5. Shortly after the
bankruptcy filing, New Century Mortgage granted
Carrington Mortgage Services ("Carrington") a limited
power of attorney to execute, record, and assign

*Claim no.*
*4722*

mortgages and other documents. Notice Removal, Ex. 8, Limited Power Att'y 53, ECF No. 1–12.

*2 On April 6, 2008, New Century Financial and its subsidiaries, including New Century Mortgage, filed notice of an agreement establishing the New Century Liquidating Trust (the "Liquidating Trust") with the Bankruptcy Court. Compl. ¶ 6; Notice Removal, Ex. 4, Notice Filing Liquidating Trust Agreement 25–50, ECF No. 1–10. On July 15, 2008, the Bankruptcy Court confirmed the liquidation plan of New Century Financial and its subsidiaries, including New Century Mortgage. Notice Removal, Ex. 6, Order Confirming Second Am. Joint Ch. 11 Plan Liquidation Debtor & Official Comm. Unsecured Creditors Dated Apr. 23, 2008 ("Confirmation Order") 51, ECF No. 1–12. Pursuant to the plan, all assets of the debtors vested in the Liquidating Trust effective July 15, 2008. *Id.* ¶ 22, at 24. The plan also excluded the debtors from any further interest in the assets or the trust subsequent to the liquidation. *Id.;* Notice Removal, Ex. 5, Notice Filing Second Am. Joint Ch. 11 Plan Liquidation Debtors & Official Comm. Unsecured Creditors Dated Apr. 23, 2008 ("Plan") 51, ECF No. 1–11. Prior to July 15, 2008, New Century Mortgage was the record holder of the Mortgage. Compl. ¶¶ 11–12.

### 3. Post–Bankruptcy Events
On August 7, 2008, Carrington, representing Deutsche Bank, sent a notice of default to the Rosses. Compl. ¶ 25. The Rosses deny receiving such notice. *Id.* On January 15, 2010, the Rosses and Carrington entered into a loan modification agreement. Compl. ¶ 27. The Rosses maintain that the loan modification was not designed to cure a default. *See id.* As required under the loan modification agreement, the Rosses made monthly payments on the Mortgage. *Id.* ¶ 28. On December 1, 2010, Carrington sent the Rosses a second notice of intent to foreclose. *Id.* ¶ 18. On June 8, 2011, the Marinosci Law Group, P.C., acting for Deutsche Bank, sent the Rosses a third notice of default indicating an intent to foreclose. *Id.* ¶ 29. On the same day, Deutsche Bank petitioned the Massachusetts Land Court for a declaration that the Rosses were not entitled to the protections of the Servicemembers Civil Relief Act, 50 App. U.S.C. § 533. *See id.* ¶ 21.

On August 1, 2011, an assignment of mortgage dated May 24, 2011, was recorded in the Middlesex South District Registry of Deeds. *Id* . ¶ 13. Carrington, acting as attorney in fact for New Century Mortgage, executed the assignment, which transferred the Mortgage from New Century Mortgage to Deutsche Bank in its capacity as Trustee for New Century Home Loan Trust 2005–4.

Notice Removal, Ex. 7, Assignment Mortg. 52, ECF No. 1–12.

On February 17, 2012, Deutsche Bank notified the Rosses that the foreclosure sale of the subject property was scheduled for March 14, 2012. Compl. ¶ 22. On March 12, 2012, the Rosses obtained a preliminary injunction preventing Deutsche Bank from conducting the sale. Prelim. Inj. 1.

### C. Federal Jurisdiction
*3 This Court may exercise federal-question jurisdiction pursuant to 28 U.S.C. section 1331 because the Rosses' claims arise under the provisions of the Bankruptcy Code, 11 U.S.C. §§ 101–1532. Supplemental jurisdiction over the remaining claims is proper under 28 U.S.C. section 1367.

## II. STANDARD OF REVIEW
When presented with a motion to dismiss a claim under both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), "a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." *Northeast Erectors Ass'n of the BTEA v. Sec'y Labor, Occupational Safety & Health Admin.,* 62 F.3d 37, 39 (1st Cir.1995). If, however, the Rule 12(b)(1) motion is premised on a challenge to prudential standing, the motion is properly reviewed under Rule 12(b)(6). *See Katz v. Pershing, LLC,* 806 F.Supp.2d 452, 456 (D.Mass.2011) (Stearns, J.), *aff'd,* 672 F.3d 64 (1st Cir.2012). Because the capacity of a Massachusetts mortgagor to challenge the validity of an assignment to which he is not a party presents a question of prudential standing, *Culhane v. Aurora Loan Servs. of Neb.,* No. 12–1285, 2013 WL 563374, at *4–5 (1st Cir. Feb. 15, 2013), this Court will consider the present motion under Rule 12(b)(6).

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A mere recital of the legal elements supported only by conclusory statements is not sufficient to state a cause of action. *See id.* at 555, 557. In reviewing a motion to dismiss under Rule 12(b)(6), a district court may consider the complaint, annexed exhibits, documents referenced but not attached to the complaint, and matters

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Claim no.
4722

Ross v. Deutsche Bank Nat. Trust Co., --- F.Supp.2d ---- (2013)

subject to judicial notice, such as public records. *See Rodi v. S. New Eng. Sch. of Law,* 389 F.3d 5, 12 (1st Cir.2004). A court may not review, however, affidavits and miscellaneous documents submitted by the parties. *Id.*

## III. ANALYSIS

All three counts of the Rosses' complaint allege violations of the Massachusetts statutory foreclosure scheme. Count I alleges that Deutsche Bank does not have valid title to either the Note or the Mortgage and thus lacks the legal authority to conduct a foreclosure sale of the subject property. Count I also alleges that the second notice of foreclosure was deficient under the terms of the Mortgage. Count II alleges that Deutsche Bank violated its obligation to notify the Rosses of their right to cure the default. Count III seeks a declaratory judgment on Deutsche Bank's legal standing to foreclose on the subject property.

### A. Deutsche Bank's Standing to Exercise the Power of Sale (Count I)

#### 1. Legal Framework

*4 A mortgage that includes a power of sale# —# as the Rosses' Mortgage does # —# incorporates by reference the statutory power of sale established under Massachusetts General Laws chapter 183, section 21 and Massachusetts General Laws chapter 244, section 14 ("Section 14"). *U.S. Bank Nat'l Ass'n v. Ibanez,* 458 Mass. 637, 646–47 (2011). A mortgage holder may foreclose on a mortgage that includes a power of sale without prior judicial authorization.[1] *See Id.* at 647. The Massachusetts statutory scheme limits this privilege, however, to the mortgagee and those duly authorized. Mass. Gen. Laws ch. 244, § 14. In recognition of "the substantial power that the [law] affords to a mortgage holder to foreclose without immediate judicial oversight," courts have required strict compliance with the regulations governing who has legal standing to foreclose under the power of sale. *Ibanez,* 458 Mass. at 647. Consequently, "[a]ny effort to foreclose by a party lacking 'jurisdiction and authority' to carry out a foreclosure under [Section 14] is void." *Id.* at 647 (quoting *Chace v. Morse,* 189 Mass. 559, 561 (1905)). A mortgage assignment executed by an assignor who has no interest to assign or "no authority to make an assignment to a particular assignee" is thus void and does not confer upon the assignee the legal status required to exercise the power of sale. Culhane. 2013 WL 563374, at *5.

#### 2. Standing

The Rosses contend that Deutsche Bank lacks legal standing to conduct the foreclosure sale because the 2011 assignment of the Mortgage from New Century Mortgage to Deutsche Bank is invalid. *See* Compl. ¶ 17. Deutsche Bank argues that the Rosses lack standing to contest the validity of the assignment. Defs.' Mem. 4–7.

The First Circuit has recently held that mortgagors have standing "to challenge the assignment of a mortgage ... to the extent that such a challenge is necessary to contest a foreclosing entity's status qua mortgagee." *Culhane,* 2013 WL 563374, at *5. This holding is narrow and limits such challenges to cases of "invalid, ineffective, or void" assignments. *Id.* The Rosses' contention that New Century Mortgage held no interest in the Mortgage to assign to Deutsche Bank in 2011 qualifies as a challenge that would render that assignment void. See id. Therefore, the Court concludes that the Rosses have standing and will now turn to the merits of their claim.

#### 3. Validity of the 2011 Assignment

The Rosses contend that the 2011 assignment transferring the Mortgage from New Century Mortgage to Deutsche Bank is void because New Century Mortgage had been divested of its assets as a result of its 2008 bankruptcy and held no interest in either the Note or Mortgage that it could validly assign to Deutsche Bank in 2011. Compl. ¶¶ 10, 16–17. Deutsche Bank asserts that, at the time of the 2011 assignment, New Century Mortgage was a debtor in possession with the authority and discretion to manage its property and to execute assignments of mortgage. Defs.' Mem. 6–7, ECF No. 4.

*5 While it is true that bankruptcy law ordinarily permits a mortgage lender with debtor in possession status to execute and record assignments in the normal course of its business, *Juarez v. Select Portfolio Servicing, Inc.,* No. 11–2431, 2013 WL 500868, at *11 (1st Cir. Feb. 12, 2013), the presumption that such transfers are permitted is defeated when a bankruptcy court has confirmed a plan requiring the dissolution of the corporation, the termination of the company's operations, or the divestiture of its assets. *See Juarez v. U.S. Bank Nat. Ass'n ex rel. Holders of the Asset Backed Sec. Corp. Home Equity Loan Trust, Series NC 2005–HE8,* No. 11–10318–DJC, 2011 WL 5330465 at *7 (D.Mass. Nov. 4, 2011) (Casper J .), *rev'd on other grounds sub nom. Juarez,* 2013 WL 500868 (observing that the plaintiff did not allege any action# —# such as dissolution, cessation of operations, or divestiture # —# prohibiting the post-petition assignment of mortgage); *New Century Mortg. Corp. v. Braxton,* No. 09 MISC 393485(GHP), 2010 WL

Claim no.
4722

Ross v. Deutsche Bank Nat. Trust Co., --- F.Supp.2d ---- (2013)

59277, at *6 (Mass. Land Ct. Jan. 11, 2010) (noting that lender failed to show how it retained the authority to assign mortgage during its bankruptcy proceedings in light of the transfer of its assets to a liquidating trust). As matter of bankruptcy law, a confirmed reorganization plan is binding on the debtor. *See* 11 U.S.C. § 1141(a); *In re New Seabury Co. Ltd. P'ship*, 450 F.3d 24, 33 (1st Cir.2006) ( "A plan of reorganization is a binding contract between the debtor and the creditors and is subject to the general rules of contract construction and interpretation."). Pursuant to the Bankruptcy Court order confirming New Century Financial's reorganization plan, all of the assets of New Century Mortgage were conveyed to a separate entity, the New Century Liquidating Trust, effective July 15, 2008. Confirmation Order ¶ 22, at 24. The plan also precluded New Century Mortgage and the other petitioners from having any interest in the assets or the trust following the transfer. Plan 51; Confirmation Order ¶ 22, at 24. In a second and final amended plan also confirmed by the Bankruptcy Court in 2009, the debtors, including New Century Mortgage, confirmed that their assets were conveyed to the trust as provided for in the original plan on the effective date, July 15, 2008. Order Confirming Modified Second Am. Joint Ch. 11 Plan Liquidation Dated September 30, 2009, *In re New Century TRS Holdings, Inc.*, No. 07–10416, at *24 (Bankr.D.Del. Nov. 20, 2009), ECF No. 9957. Thus, accepting as true the Rosses' claim that New Century Mortgage held the Note and the Mortgage during the pendency of its bankruptcy, the Rosses have a plausible claim that these assets became the property of the Liquidating Trust on July 15, 2008, and that New Century Mortgage retained no valid interest to assign to Deutsche Bank in 2011.

Deutsche Bank, however, maintains that the assignment was valid because the Note and the Mortgage were not included in the bankruptcy estate and thus not controlled by the property distribution provided for under the plan. Defs.' Supplemental Mem. 7. Specifically, Deutsche Bank claims that the Mortgage and the Note are securitized mortgage assets excluded under 11 U.S.C. section 541(d), which excludes from the bankruptcy estate mortgages "sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage[s]." 11 U.S.C. § 541(d); see Defs.' Supplemental Mem. 7–8. In reviewing this claim, the Court takes judicial notice of public Securities and Exchange Commission records submitted by Deutsche Bank documenting the 2005 sale of mortgage and servicing rights assets from New Century Mortgage Securities to Deutsche Bank. *See New Century Equity Loan Trust 2005–4, Current Report (Form 8–K)*, U.S. Sec. & Exch. Comm'n (Sept. 1, 2005),

http://www.sec.gov/Archives/edgar/data/1336261/000088237705002419/ 0000882377–05–002419–index.htm. The mortgage asset sale agreement does not, however, list the Mortgage among the purchased assets. *See id.* The Court thus concludes that the Ros have pleaded a plausible claim that the Mortgage and the Note were part of the bankruptcy estate conveyed to the Liquidating Trust under the confirmation plan.

*6 Because the Court concludes that the Rosses have stated a plausible claim that the 2011 assignment from New Century Mortgage to Deutsche Bank was invalid, it need not address the Rosses' second claim under Count I, which alleges that Deutsche Bank's notice was deficient under the terms of the Mortgage.

### B. The Adequacy of Deutsche Bank's Notice under the Massachusetts Right–to–Cure Law (Count II)
Under Massachusetts law, mortgagors are entitled to the right to cure a default on a mortgage loan. Mass. Gen. Laws ch. 244, § 35A(b). Pursuant to the statutory scheme, a mortgagor is entitled to either a 150–day or a 90–day grace period to cure a default of mortgage. *Id.* This right may only be exercised once in any three year period, *id.*, and requires a mortgagee seeking to accelerate and foreclose on a mortgage in default to notify the mortgagor of his right to cure, *id.* § 35A(g). Because the notice requirement is part of the Massachusetts statutory scheme regulating foreclosure, mortgagees seeking to foreclose must comply strictly with the notice requirement. *See Silva v. Deutsche Bank Nat'l Trust Co.*, No. MICV201203951H, 2012 WL 6016813, at *3 (Mass.Super.Ct. Nov. 14, 2012) (Wilson, J.).

The Rosses contend that Deutsche Bank's June 8, 2011, notice was invalid because it failed to notify them of their right to cure. Compl. ¶ 29. Deutsche Bank presents two separate defenses of its foreclosure notice. First, it erroneously contends that the Massachusetts law is preempted by the Home Owners' Loan Act ("HOLA"), 12 U.S.C. §§ 1461–1468c, which reserves "the entire field of lending regulation for federal savings associations" to the federal statutory scheme. 12 C.F.R. § 560.2(a); see Defs.' Mem. 9. In support of this contention, Deutsche Bank relies on *Sovereign Bank v. Sturgis*, 863 F.Supp.2d 75 (D.Mass.2012) (Woodlock, J.), which holds that Massachusetts General Laws chapter 24, Section 35A ("Section 35A") regulations imposing requirements on terms related to the maturity of loans are expressly preempted by federal law. *Id.* at 103; see Defs.' Mem. 9.

Sovereign Bank, however, is inapposite. In Sovereign Bank, the plaintiff was a federal savings association

Claim No.
4722

Ross v. Deutsche Bank Nat. Trust Co., --- F.Supp.2d ---- (2013)

governed by HOLA. 863 F.Supp.2d at 87, 91. In the present case, HOLA preemption is inapplicable because Deutsche Bank is a national bank[2] neither subject to HOLA nor regulated by the Office of Thrift Supervision, the agency responsible for determining whether state laws are preempted under HOLA. See *Gerber v. Wells Fargo Bank, N.A.,* No. 11–01083–PHX–NVW, 2012 WL 413997, at *4 (D.Ariz. Feb. 9, 2012) (Wake, J.).[3]

As a national bank, Deutsche Bank is entitled only to the applicable preemption laws promulgated under the National Banking Act ("NBA"). *See Appling v. Wachovia Mortg., FSB,* 745 F.Supp.2d 961, 970–71 (N.D.Cal.2010) (Koh, J.) Pursuant to the NBA, the Office of the Comptroller of the Currency ("OCC") has the authority to determine whether "federal law preempts the application of any state consumer protection or fair lending statute to a national bank." *In re Hollingworth,* 453 B.R. 32, 35 (Bankr.D.Mass.2011). Under federal law, national banks may "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate, subject to ... such restrictions and requirements as the [OCC] may prescribe by regulation or order." 12 U.S.C. § 371(a). Specifically,

> *7 a national bank may make real estate loans under 12 U.S.C. § 371 ... without regard to state law limitations concerning ... [t] he terms of credit, including schedule for repayment of principal and interest, amortization of loans, balance, payments due, minimum payments, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan.

12 C.F.R. § 34.4(a),(a)(4). Before determining whether the Massachusetts right-to-cure law should be preempted under 12 C.F.R. section 34.4(a)(4), this Court will first consider whether the assignee of the Mortgage, Deutsche Bank National Trust Company, as Indenture Trustee for New Century Home Equity Loan Trust 2005–4, has made or purchased a real estate loan within the meaning of 12 U.S.C. section 371. Examined in light of the OCC's interpretive letter on preemption as applied to the trustees of securitized trusts, it has not. See OCC Interpretive Letter 1016 (Jan. 14, 2005), *available at* http://www.occ.gov/static/interpretations-and-precedents/feb05/ intl1016.pdf. Because the Deutsche Bank trustee neither originated the loan, funded the loan

at inception, nor "purchase[d] the loan[s] as part of any real estate lending program comprehended by the regulation," *id.* at 3 (internal quotation marks omitted), the Massachusetts right-to-cure law is not preempted under the NBA.

Deutsche Bank argues that in the alternative, the Rosses have already exercised their right to cure under the 2010 loan modification agreement, and as a result, are not entitled to notice of a right that they no longer enjoy. Defs.' Supplemental Mem. 14–15.

Despite Deutsche Bank's allegations, the Rosses do not admit that the loan modification was granted to cure a default. See Compl. ¶ 27. In light of the absence of the Rosses' premodification payment history from the record, whether the Rosses have already exercised their statutory right to cure implicates a factual dispute not amenable to resolution under the Rule 12(b)(6) standard. Drawing all inferences in their favor, the Rosses' complaint states sufficient facts for a plausible claim under Section 35A.

**C. The Rosses' Standing to Pursue a Declaratory Judgment (Count III)**
In Count III of their complaint, the Rosses seek a declaratory judgment with respect to Deutsche Bank's right to conduct the foreclosure sale as mortgagee of record. Compl. ¶ 39. The Rosses also request a declaration as to whether Deutsche Bank's foreclosure notices complied with the Massachusetts statutory scheme. *Id.* Deutsche Bank contends that a declaratory judgment is inappropriate because the Rosses lack standing to request such a judgment. Defs.' Mem. 9–10.

A district court may grant a declaratory judgment only "where there is an actual case or controversy within the meaning of Article III." *Ferreira v. Dubois,* 963 F.Supp. 1244, 1261 (D.Mass.1996) (Bowler, M.J.) (quoting *Interstate Food Processing Corp. v. Maine,* 826 F.Supp. 24, 25 (D.Me.1993) (Brody, J.) (internal quotation mark omitted). Such a judgment is "moot where 'the question presented for decision seeks a judgment upon a matter which, even if the sought judgment were granted, could not have any practical effect upon the parties.' " *Id.* at 1262(quoting *Perez v. Sec'y of Health, Educ., & Welfare,* 354 F.Supp. 1342, 1346 (D.P.R.1972) (Toledo, J.). Because this Court has determined that the Rosses have standing to challenge the validity of Deutsche Bank's status as mortgagee, *see supra* section III.A.2, it concludes that the Rosses have presented a plausible claim of an actual controversy within the meaning of Article III.

Claim no. 4722

Ross v. Deutsche Bank Nat. Trust Co., --- F.Supp.2d ---- (2013)

**SO ORDERED.**

**IV. CONCLUSION**
*8 For the reasons stated above, the motion to dismiss, ECF No. 3, is DENIED on all counts.

Footnotes

1    Effective June 22, 2012, a mortgagee seeking to conduct a foreclosure sale in Massachusetts must hold both the note and the mortgage. *See Eaton v. Fed. Nat'l Mortg. Ass'n*, 462 Mass. 569, 587–89 (2012); *cf. Douglas J. Whaley, Mortgage Foreclosures, Promissory Notes, and the Uniform Commercial Code*, 39 W. St. U.L.Rev. 313 (2012) (describing "the Golden Rule of Mortgage Foreclosure" under the Uniform Commercial Code as prohibiting foreclosure unless the creditor "possess[es] the "properlynegotiated original promissory note.")

2    The Court takes judicial notice that Deutsche Bank is a national bank and not a federal savings association. *See National Banks and Federal Savings Associations*, Off. Comptroller Currency (Feb. 28, 2013), http:// www.occ.treas.gov/topics/ licensing/national-bank-lists/ind ex-active-bank-lists.html.

3    While several federal courts in California have applied HOLA preemption to national banks, such cases are limited to those institutions that are successors to or assignees of loans originally extended by a federal savings association. *See, e.g., Rodriguez v.. U.S. Bank Nat'l Ass'n*, No. C 12–00989 WHA, 2012 WL 1996929, at *7 (N.D. Cal. June 4, 2012) (Alsup, J.). In this case, neither the original lender, New Century Mortgage, nor Deutsche Bank are federal savings associations.

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

Claim no.
4722

EXHIBIT 8

/O

Claim no.
4722

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 2012-3951-H

MARIA SILVA
and VALDIRENE BATISTA
v.

DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR
MORGAN STANLEY IXIS REAL ESTATE CAPITAL TRUST 2006-2

## PRELIMINARY INJUNCTION

Defendant ["Deutsche Bank as Trustee"] held a mortgage on the home of Plaintiffs [the
"Borrowers"], and now purports to hold title to the home after purchasing it at a foreclosure sale.
When Deutsche Bank as Trustee sent the Sheriff to Borrowers' home with a notice to vacate,
Borrowers filed this lawsuit and obtained a temporary restraining order against enforcement of
the notice to vacate.

Borrowers contend that they still own the home because of defects in the foreclosure
process. Borrowers now seek a preliminary injunction prohibiting Deutsche Bank as Trustee
from taking any action against them resulting from the foreclosure and eviction. I find that
Borrowers have established a likelihood of success on the merits as to one set of defects in the
original notice of default. I also find that Borrowers will suffer irreparable harm in the absence
of a preliminary injunction, and that the balance of harms favors issuance of an injunction.

### Background

Borrowers, two sisters who owned a home in Somerville, Massachusetts, granted a
mortgage on that home on July 18, 2006 to secure a note for $480,250. The original mortgagee
was Mortgage Electronic Registration Systems, Inc. as nominee for Accredited Home Lenders,
Inc. At some point, that original mortgagee assigned the mortgage to Defendant Deutsche Bank

*Claim no 4722*

National Trust Company as Trustee for Morgan Stanley IXIS Real Estate Capital Trust 2006-2.
Borrowers state in their Amended Verified Complaint that this assignment occurred on August
17, 2009, but Defendant Deutsche Bank as Trustee has submitted evidence that the assignment
may have occurred on November 1, 2006. The date of the assignment is irrelevant to this
decision, so I do not resolve it.

In late 2008 or early 2009, Borrowers defaulted on their loan. During the first half of
2009, Saxon Mortgage Services, Inc., as servicer of the loan, sent a notice to Borrowers that the
loan was in default (the "Notice") and offered them the 90-day cure period required by M.G.L. c.
244, § 35A. The parties provided different versions of that Notice, with Borrowers presenting an
undated version which, according to the Amended Verified Complaint, was sent on May 24,
2009, and Deutsche Bank as Trustee presenting a version of the Notice dated February 24, 2009.
While Borrowers' version of the Notice lacks letterhead and a date, its text is identical to the
version submitted by Deutsche Bank as Trustee. The three-month difference in the purported
dates of these two versions of the Notice is irrelevant to this decision, and so I do not resolve the
question of the date on which the Notice was sent.

Borrowers apparently did not cure their default, because Deutsche Bank as Trustee began
foreclosure proceedings in Middlesex Superior Court by filing a Complaint to Determine
Military Status in Civil Action No. MICV2009-4448. Borrowers did not respond to this lawsuit,
default was entered, and ultimately this court issued an order under the provisions of the
Soldiers' and Sailors' Civil Relief Act granting Deutsche Bank as Trustee the authority to
foreclose under the power of sale contained in the mortgage.

Deutsche Bank as Trustee then held a foreclosure sale, again after notice to Borrowers.
Deutsche Bank as Trustee purchased the property at that foreclosure sale.

Claim no.
4722

By the summer of 2012, more than three years had passed since the beginning of these foreclosure proceedings, and the Borrowers had never responded to any notice or other action taken by Deutsche Bank as Trustee. Nor, however, had they moved out of the property at issue. Therefore Deutsche Bank as Trustee filed a summary process lawsuit in Somerville District Court, obtaining judgment on July 20, 2012, again by default when Borrowers did not respond to the lawsuit.

At this point Borrowers finally took action, asking the Somerville District Court to vacate the default judgment against them in the eviction proceeding. Borrowers contended that they had mailed a discovery request to Deutsche Bank as Trustee which should have put off the District Court proceedings for two weeks under Summary Process Rule 7(b), but this discovery request was not delivered on time because of an unexplained delay in mail delivery. The Somerville District Court denied Borrowers' motion to vacate, and, in any event, it is unlikely that the result of the eviction proceeding would have been any different had it occurred two weeks later.

On September 21, 2012, the Middlesex County Sheriff served a notice to quit, requiring Borrowers to move out by October 5, 2012. On October 4, however, Borrowers filed the current lawsuit, and obtained a temporary restraining order against the Sheriff's enforcement of the notice to quit.

On October 26, 2012, I heard argument on Borrowers' request that the temporary restraining order be converted to a preliminary injunction. After the hearing, Deutsche Bank as Trustee submitted additional factual material, pursuant to a request that I had allowed at the hearing, and Borrowers submitted a supplemental opposition discussing that additional factual material.

3

Claim no.
4722

## Analysis

"A party seeking a preliminary injunction must show that (1) success is likely on the merits; (2) irreparable harm will result from denial of the injunction; and (3) the risk of irreparable harm to the moving party outweighs any similar risk of harm to the opposing party." *Cote-Whitacre v. Dept. of Public Health*, 446 Mass. 350, 357 (2006) (Spina, J., concurring), citing *Packaging Industries Group v. Cheney*, 380 Mass. 609, 616-17 (1980). Here, to justify the issuance of a preliminary injunction against Deutsche Bank as Trustee, Borrowers must show, first, a likelihood that they will prevail at trial on their theory that the foreclosure sale was void, and second, that in the absence of an injunction Borrowers will suffer harm that is both irreparable and severe enough to outweigh the harm that an injunction will impose on Deutsche Bank as Trustee.

1. Likelihood of Success on the Merits

Borrowers point to several defects in the Notice and in the two affidavits filed by Deutsche Bank as Trustee after the foreclosure. (In these two affidavits, which are required by M.G.L. c. 244, § 15, Deutsche Bank as Trustee swore that it had complied with the statutory requirements for foreclosure under a power of sale.) Borrowers contend that, because of these defects, the foreclosure sale in 2011 was void, and therefore they remain owners of the property at issue. In this lawsuit, they seek a declaratory judgment to that effect, and injunctive relief prohibiting Deutsche Bank as Trustee from offering the property for sale, transferring its purported interest in the property, or removing them or their possessions from the property.

One of the defects in the Notice, according to Borrowers, is that it fails to list "the name and address of the mortgagee, or anyone holding thereunder, and the telephone number of a representative of the mortgagee whom the mortgagor may contact..." M.G.L. c. 244, §

4

Claim no.
4722

35A(c)(4). I find that Borrowers are likely to succeed in undoing the foreclosure because

Deutsche Bank as Trustee failed to strictly comply with this statutory requirement, and so I do

not consider the other defects alleged by Borrowers.

The mortgagee who purported to foreclose was Deutsche Bank as Trustee, in its role as

assignee of the mortgage. In the versions of the Notices presented by both parties, the following

text appears:

> Creditor:     Deutsche Bank
> SERVICER:   Saxon Mortgage Services, Inc.

Ex. 2 to Defendant's Opposition to Plaintiffs' Application for Preliminary Injunction at 1;

*accord*, Ex. 4 to Amended Verified Complaint at 1. In addition, the Notice in both versions

contains the following language on page 2:

> You are encouraged to call Saxon to discuss the default on your
> loan. We can be reached at 1-800-874-9516. You may contact us
> in writing at the following address: Saxon Mortgage Services, Inc,
> 4708 Mercantile Dr. North, Fort Worth, TX, 76137-3605 or P.O.
> Box 966, 1106 Fort Worth, TX, 76161-0106.

Deutsche Bank as Trustee asserts that, through the text quoted above, the Notice satisfied

the requirements of section 35A(c)(4). Borrowers, on the other hand, contend that there is no

address listed for Deutsche Bank as Trustee and therefore the Notice fails to satisfy the

requirement the "address of the mortgagee" be given. Borrowers further point out that even "the

name... of the mortgagee" is inaccurate, because it says merely "Deutsche Bank," leaving out the

fact that Deutsche Bank was the mortgagee as a trustee of a particular Trust. Finally, Borrowers

argue that the Notice is insufficient because the does not identify Deutsche Bank as "the

mortgagee," but instead refers to it as "Creditor."

There is little doubt that the Notice provided Borrowers with sufficient information to

allow them to contact a representative of the mortgagee if they disagreed with the assertion that a

*Claim no.*
*4722*

default had occurred or with the accuracy of the calculation of the amount owed. They could

contact Saxon, the servicer of the mortgage and therefore "a representative of the mortgagee," to

discuss those topics. Thus the Notice accomplished the legislative purpose behind section

35A(c)(4).

However, the law of Massachusetts requires a mortgagee to do more than simply satisfy

the purpose behind the statute that requires advance notice of an impending foreclosure. "The

manner in which the notice of a proposed sale shall be given is one of the important terms of the

power [of sale in a mortgage], and a *strict compliance* with it is essential to the valid exercise of

the power." *U.S. Bank N.A., Trustee v. Ibanez*, 458 Mass. 637, 647-48 (2011), quoting *Moore v.

Dick*, 187 Mass. 207, 212 (1905) (emphasis added). Although the *Ibanez* court was considering

the notice requirement in M.G.L. c. 244, § 14, the principle of "strict compliance" applies

equally to the notice requirement in M.G.L. c. 244, § 35A(c)(4).

That statute requires that a notice of the right to cure must include "the name and address

of the mortgagee." In this case, the Notice does not name the mortgagee as such, only

identifying Deutsche Bank as the "Creditor." As the Supreme Judicial Court recently pointed

out, the mortgagee is not always the creditor, because sometimes the mortgage is assigned

without the underlying promissory note being assigned to the same party, or vice versa. *Federal

National Mortgage Ass'n v. Eaton*, 462 Mass. 569, 576 (2012)("in Massachusetts, a mortgage

and the underlying note can be split"); *accord, Lamson & Co. v. Abrams*, 305 Mass. 238, 245

(1940)("The holder of the mortgage and the holder of the note" -- that is, the mortgagee and the

creditor – "may be different persons"). "Strict compliance" with section 35(c)(4), therefore,

would require that Deutsche Bank be identified as the mortgagee, not just the creditor, and the

Notice does not do that.

6

Claim no.
4722

Assuming that Deutsche Bank was in fact the mortgagee at the time that Saxon sent to the notice to Borrowers (a disputed question I need not resolve at this stage), Deutsche Bank held that status as the trustee for a particular trust, and not in its individual corporate capacity. When an entity does not identify itself as "trustee" in signing a legal document, the trust is not bound by its actions, because an entity acting in its capacity as trustee "is treated as a different party when acting individually." *Rogaris .v Albert*, 431 Mass. 833, 836 (2000). In a case like this, where the purpose of identifying the mortgagee is to allow the party receiving the Notice to contact that mortgagee or its representative, the distinction between "Deutsche Bank" and "Deutsche Bank National Trust Company as Trustee for Morgan Stanley IXIS Real Estate Capital Trust 2006-2" matters little. However, in failing to identify Deutsche Bank as a trustee, the Notice again failed to meet the standard of "strict compliance" with section 35A(c)(4).

Finally, the Notice nowhere lists the address of the mortgagee, Deutsche Bank as Trustee. Again, this is an omission of little importance, because the Notice gives an address and a phone number for Saxon, the servicer, so Borrowers would have someone they could easily contact were they so inclined. But, again, omitting the address of the mortgagee means the Notice did not meet the test of "strict compliance" with the statutory requirements.

"Foreclosure is a powerful act with significant consequences, and Massachusetts law has always required that it proceed strictly in accord with the statutes that govern it …Such strict compliance is necessary because Massachusetts both is a title theory State and allows for extrajudicial foreclosure." Ibanez, 458 Mass. at 655 (Cordy, J., concurring). Because the Notice fails to strictly comply with the requirements of M.G.L. c. 244, § 35A(c)(4) in the respects described above, Borrowers have established a likelihood that they will succeed on the merits of their claim that the foreclosure sale was invalid.

Claim no.
4722

2. Irreparable Harm

Borrowers live in the home at issue in this lawsuit. Their two minor children live with

them. In the absence of an injunction, Deutsche Bank as Trustee undoubtedly will enforce the

Sheriff's notice to vacate, and Borrowers and their minor children will be forced to move.

It is true that prevailing in this lawsuit would not necessarily guarantee that Borrowers

would be able to retain their home. Borrowers do not dispute that they are in default. If

Borrowers cannot pay what they owe, which is quite possible, then Deutsche Bank as Trustee

could immediately begin the foreclosure process anew, curing all the alleged defects, and

eventually Borrowers would again face the loss of their home.

It is also true that Borrowers have stood silent for three years as Deutsche Bank as

Trustee reacted to their default by taking measured, progressive steps toward foreclosure and

eviction, and that, on the eve of eviction, Borrowers raised, for the first time, defects in a Notice

served on them at the outset of this long process. That fact weighs against issuance of an

injunction.

Nonetheless, if the temporary restraining order is not converted to an injunction,

Borrowers and their minor children will be forced to leave their home of many years. Despite

the fact that Borrowers have generally ignored the good faith efforts of their mortgagee to follow

a legal process to collect what Borrowers owe, an eviction would constitute irreparable harm.

On the other hand, in the absence of an injunction, Deutsche Bank as Trustee will suffer

the inconvenience of being unable to sell the real estate at issue, even while it is apparently

unable to collect the back mortgage payments from Borrowers. For an institution the size of

Deutsche Bank, even in its role as Trustee of a Trust that owns hundreds or thousands of

*Claim no. 4722*

mortgages, this does not constitute irreparable harm that would outweigh the harm faced by

Borrowers and their children should an injunction not issue.

### ORDER

For the foregoing reasons, I **ISSUE** the following preliminary injunction:

Defendant is enjoined from offering the property of Plaintiffs Maria Silva and Valdirene Batista

for sale, transferring any interests in the property, removing any of Borrowers' personal property

from the premises, or preventing Borrowers from continuing to live at the premises until further

order of this court.

So Ordered.

Paul D. Wilson
Justice of the Superior Court

November 14, 2012

*Entered: 11/14/12*

Claim no. 4722

# EXHIBIT 9

Claim no.
4722    26

COMMONWEALTH OF MASSACHUSETTS
NORTHEAST HOUSING COURT

FEDERAL HOME LOAN MORTGAGE CORP.

                    Plaintiff

        - v. -                                    No. 12-SP-0871

PAULA SENSINI

                    Defendant

RULINGS AND ORDER

        After hearing in this post-foreclosure summary process case,
and on material facts similar to those in  EMC Mortgage LLC v.
Rivera, N.E. Hsg.Ct. No. 11-SP-3842 (October 3, 2012) and FHLMC v.
Bisnath, N.E. Hsg.Ct. No. 11-SP-4131 (December 17, 2012), I deny
the plaintiff's motion for summary judgment and allow the cross
motion by the defendant, for the reason that the "Notice of
Intention to Foreclose" dated November 17, 2008, did not comply
with the requirements of Gen.L. c.183 §21 ("first complying with
the terms of the mortgage and with the statutes relating to the
foreclosure of mortgages by the exercise of a power of sale") and
Gen.L. c.244 §35A.

        The statute, Gen.L. c.244 §35A(c)(5), required that "the name
of any current and former mortgage broker or mortgage loan
originator for such mortgage or note securing the residential
property" be included in the notice.  As in the EMC and Bisnath
cases, the notice in this case acknowledged that "applicable law
requires the disclosure of the following information" but then
misinformed the borrower that "The mortgage broker(s) associated
with this loan are/were [we were unable to ascertain this
information]" and that "The mortgage loan originator(s) associated
with this loan are/were [we were unable to ascertain this
information]."

        The original mortgage was given to "MSA Mortgage, LLC" on
June 20, 2003, and was assigned to MERS as nominee for "Countrywide
Home Loans, Inc." the same day.  The Gen.L. c.244 §35A notice dated
November 17, 2008, which was on the letterhead of "Countrywide Home
Loans" and which was given by "Countrywide Home Loans Servicing,
LP" as servicing agent on behalf of the "Noteholder" which was

*Claim no. 4722*

unnamed, referred to "your loan documents." It was obviously known to the author of the notice that "MSA Mortgage, LLC" was the "mortgage loan originator" as "MSA Mortgage, LLC" was the original "Lender" described in the "Mortgage" dated June 20, 2003, and the original mortgage had been assigned to MERS as nominee for "Countrywide Home Loans, Inc." on the same day. The conclusion is inescapable that "Countrywide Home Loans" and "Countrywide Home Loans, Inc." were not in fact "unable to ascertain this information" and that their representations to the contrary were false when made.

Whether the falsehoods resulted from scofflaw misconduct or from mere sloppiness is not material for purposes of the present motion. Nor does it matter that the borrower might have known or might have been able to independently ascertain the information that the foreclosing entity was required by law to give as a pre-condition of its right to foreclose. It is well established that strict compliance with the terms of the mortgage and with the applicable statutes is required for a non-judicial foreclosure under a power of sale, and that actual prejudice resulting from defects and irregularities in foreclosure procedures need not be shown in order to challenge the validity of the ensuing deed and title. See, EMC Mortgage LLC v. Rivera, N.E. Hsg.Ct. No. 11-SP-3842 (October 3, 2012) and FHLMC v. Bisnath, N.E. Hsg.Ct. No. 11-SP-4131 (December 17, 2012).

It is unnecessary to consider the other arguments advanced by the defendant.

Enter judgment dismissing the complaint.

David D. Kerman
Associate Justice

December 31, 2012

Claim no
4722

EXHIBIT 10



Claim no.
4722

Investor Loan #  **0410**

## HOME AFFORDABLE MODIFICATION PROGRAM
## LOAN WORKOUT PLAN
### (Step One of Two-Step Documentation Process)

Loan Workout Plan Effective Date: [Beginning of Trial Period]
Borrower ("I")[1]:
Lender ("Lender"):
Date of first lien Security Instrument ("Mortgage") and Note ("Note"):
Loan Number:
Property Address ("Property"):

If I am in compliance with this Loan Workout Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Plan and not defined have the meaning given to them in the Loan Documents.

If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all of my income (except that I understand that I am not required to disclose any child support or alimony unless I wish to have such income considered) to determine whether I qualify for the offer described in this Plan (the "Offer"). I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer. This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

1.  **My Representations**. I certify, represent to Lender and agree:

    A.  I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

    B.  I live in the Property as my principal residence, and the Property has not been condemned;

    C.  There has been no change in the ownership of the Property since I signed the Loan Documents;

    D.  I am providing or already have provided documentation for **all** income that I receive (except that I understand that I am not required to disclose any child support or alimony that I receive, unless I wish to have such income considered to qualify for the Offer);

---

[1]  If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I". For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

*Claim no. 4722*

E.   Under penalty of perjury, all documents and information I have provided to Lender pursuant to this Plan, including the documents and information regarding my eligibility for the program, are true and correct; and

F.   If Lender requires me to obtain credit counseling, I will do so.

G.   If I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents, Lender agrees that I will not have personal liability on the debt pursuant to this Plan.

2.   **The Loan Workout Plan.** On or before each of the following due dates, I will pay the Lender the amount set forth below ("Trial Period Payment"), which includes payment for Escrow Items (where not prohibited by law), including real estate taxes, insurance premiums and other fees, if any, of U.S. $ 431.93.

|     |            |            |
|-----|------------|------------|
| 1.  | 06/01/2009 | $ 1,168.24 |
| 2.  | 07/01/2009 | $ 1,168.24 |
| 3.  | 08/01/2009 | $ 1,168.24 |

The Trial Period Payment is an estimate of the payment that will be required under the modified loan terms, which will be finalized in accordance with Section 3 below.

During the period (the "Trial Period") commencing on the date of this Plan and ending on the earlier of: (i) the first day of the month following the month in which the last Trial Period Payment is due (the "Modification Effective Date") or (ii) termination of this Plan, I understand and acknowledge that:

A.   TIME IS OF THE ESSENCE under this Plan;

B.   Except as set forth in Section 2.C. below, the Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under this Plan, but any pending foreclosure action will not be dismissed and may be immediately resumed from the point at which it was suspended if this Plan terminates, and no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will be necessary to continue the foreclosure action, all rights to such notices being hereby waived unless prohibited by law;

C.   If my property is located in Georgia, Hawaii, Missouri, or Virginia and a foreclosure sale is currently scheduled, the foreclosure sale will not be suspended and the lender may foreclose if I have not made each and every Trial Period Payment that is due before the scheduled foreclosure sale. If a foreclosure sale occurs pursuant to this Section 2.C., this agreement shall be deemed terminated;

D.   The Lender will hold the payments received during the Trial Period in a non-interest bearing account until they total an amount that is enough to pay my oldest delinquent monthly payment in full. If there is any remaining money after such payment is applied, such remaining funds will be held by the Lender and not posted to my account until they total an amount that is enough to pay the next oldest delinquent monthly payment in full;

E.   When the Lender accepts and posts a payment during the Trial Period it will be without prejudice to, and will not be deemed a waiver of, the acceleration of the loan or foreclosure action and related activities and shall not constitute a cure of my default under the Loan Documents unless such payments are sufficient to completely cure my entire default under the Loan Documents and are not prohibited by law;

F.   If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents, and any payment I make under this Plan shall be applied to amounts I owe under the Loan Documents and shall not be refunded to me;

*Claim no. 4722*

and

G.  I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan.

3.  **The Modification**. I understand that once Lender is able to determine the final amounts of unpaid interest and any other delinquent amounts (except late charges) to be added to my loan balance and after deducting from my loan balance any remaining money held at the end of the Trial Period under Section 2.D. above, the Lender will determine the new payment amount. If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date. Upon execution of a Modification Agreement by the Lender and me, this Plan shall terminate and the Loan Documents, as modified by the Modification Agreement, shall govern the terms between the Lender and me for the remaining term of the loan.

4.  **Additional Agreements**. I agree to the following:

A.  That, unless a borrower or co-borrower is deceased, all persons who signed the Loan Documents have signed this Plan.

B.  To comply, except to the extent that they are modified by this Plan, with all covenants, agreements, and requirements of Loan Documents, including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my loan (unless prohibited by law).

C.  That this Plan constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my Escrow Account, unless prohibited by law.

D.  That all terms and provisions of the Loan Documents remain in full force and effect; nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents. The Lender and I will be bound by, and will comply with, all of the terms and provisions of the Loan Documents.

In Witness Whereof, the Lender and I have executed this Plan.

_____     _____ (Seal)
GMAC Mortgage, LLC                    JAMES B LADD
                                      _5-18-09_
By: _____     Date
_____     _____ (Seal)
Date                                  _5-18-09_
                                      Date

**HOME AFFORDABLE MODIFICATION PROGRAM – LOAN WORKOUT PLAN**

Claim no.
4722

# EXHIBIT 11

2/24/2010

**GMAC** Mortgage

JAMES B LADD
ANN LADD
5 BARROWS ST
MIDDLEBORO  MA  02346

Re: ████0410
    5 BARROWS ST
    MIDDLEBORO  MA  02346

Dear JAMES B LADD    ANN LADD

**Congratulations!  Your request for a loan modification has been approved subject to the following:**
    -Receipt of your contribution in the form of certified funds
    -Receipt of the signed and notarized loan modification agreement and any attachments
    -Receipt of clear title, if applicable

Highlights of the enclosed Loan Modification Agreement and instructions for completing and returning it are as
follows:

- The contribution amount of $ 1,684.65 in the form of certified funds is due in our office by March 3, 2010.
- The interest rate is  3.87500%.
- The first modified payment begins April 1, 2010.

|  |  |
|---|---|
| Principal and Interest | 1,184.89 |
| Escrow | 499.76 |
| **Total Payment** | **$1,684.65** |

Do NOT sign the enclosed Loan Modification Agreement unless you are in the presence of a notary.  This document
must be signed in the presence of a notary and (if applicable) other witnesses.  All of the documents must be executed
and the signatures must be exactly as the names are typed.

- The signed and notarized Loan Modification Agreement should be returned using the enclosed pre-paid
  overnight envelope.
- If any modification closing costs are more than projected, the difference will be assessed to the account.
- All miscellaneous fees and costs – excluding late charges – may not have been included in the loan modification
  and will remain outstanding.

| We are NOT required to record the modification document; therefore, only your signature(s) are required.  No notary is required. |
|---|

The contribution and executed loan modification documents are due back by March 3, 2010.  Please return to:

GMAC Mortgage, LLC
Attn: Loan Modification
3451 Hammond Avenue
Waterloo, IA 50702

IMPORTANT!  The loan modification will not be complete until we receive all properly executed documents and the
contribution amount.  If the modification is not completed we will continue to enforce our lien.  If the conditions
outlined above are not satisfied the modification will be withdrawn.

If you have any questions regarding this modification offer, please contact a modification specialist directly at 1-800-
799-9250 Monday – Thursday 8:00 AM to 7:00 PM, Friday 8:00 AM to 5:00 PM, Central Time.

Loan Modification Specialist

Enclosures

Claim no.
4722

[Space Above This Line For Recording Data]

Freddie Mac Loan #: ██ 8031

This document was prepared by:

After recording please return to: GMAC Mortgage, LLC
Attention: Loss Mitigation Department
3451 Hammond Avenue
Waterloo, IA 50702-5345

THIS MODIFICATION IS TO BE EXECUTED IN DUPLICATE ORIGINALS.
ONE ORIGINAL IS TO BE AFFIXED TO THE ORIGINAL NOTE AND
ONE ORIGINAL IS TO BE RECORDED IN THE LAND RECORDS WHERE
THE SECURITY INSTRUMENT IS RECORDED.

## LOAN MODIFICATION AGREEMENT
### (Providing for Fixed Interest Rate)

"Intangible tax is not required to be paid on any instrument that modifies by extension, transfer, assignment, or renewal, or gives additional security for an existing note, when the intangible recording tax has been paid on the original instrument, or the original note, or holder of the original instrument was exempt."

This Loan Modification Agreement ("Modification"), is effective March 1, 2010, between JAMES B LADD    ANN LADD    ("Borrower") and GMAC Mortgage, LLC ("Lender"), and amends and supplements (1) the Note (the "Note") made by the Borrower, dated June 25, 2005, in the original principal sum of U.S. Two Hundred Sixty Seven Thousand Eight Hundred Dollars and No Cents $ 267,800.00 and (2) the Mortgage, Deed of Trust or Deed to Secure Debt (the "Security Instrument"), recorded on, with Instrument Number in Book and/or Page Number(s) , of the official Records of PLYMOUTH County, MA [County and state, or other jurisdiction]. The Security Instrument, which was entered into as security for the performance of the Note, encumbers the real and personal property described in the Security Instrument (and defined in the Security Instrument as the "Property"), which is located at 5 BARROWS ST  MIDDLEBORO MA 02346. That real property is described as follows:

          See Attached Sheet.

The Borrower has requested that the Lender modify the terms of the Note and Security Instrument. The Lender has agreed to do so pursuant to the terms and conditions stated in this Modification. In consideration of the agreements made in this Modification, and other good and valuable consideration which the parties agree they have received, the Borrower and Lender agree to modify the terms of the Note and Security Instrument as follows.  The Borrower and the Lender agree that the provisions of this Modification supersede and replace any inconsistent provisions set forth in the Note and Security Instrument.

1.     The Borrower represents that the Borrower _X_ is, ___is not, the occupant of the Property.

2.     The Borrower acknowledges that interest has accrued but not been paid and the Lender has incurred, paid or otherwise advanced taxes, insurance premiums and other expenses necessary to protect or enforce its interest in the Note and the Security Instrument, and that such interest, costs and expenses in the total amount of $21,160.79, have been added to the indebtedness under the terms of the Note and Security Instrument. As of , the amount, including such amounts which have been added to the indebtedness (if any), payable under the Note and Security Instrument (the "Unpaid Principal Balance") is U.S. $ 288,859.39

3.     The Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of the  Lender,

Claim No. 4722

until the Unpaid Principal Balance has been paid.  Interest will be charged on the Unpaid Principal Balance at the yearly rate of  3.875%, beginning March 1, 2010.  The Borrower promises to make monthly payments of principal and interest of U.S. $ 1,184.89 beginning on the April 1, 2010, and continuing thereafter on the same day of each succeeding month.  If on March 1, 2050 the ("Modified Maturity Date") the Borrower still owes amounts under the Note and Security Instrument, as amended by this Modification, the Borrower will pay these amounts in full on the Modified Maturity Date.  The Borrower will make such payments at 3451 Hammond Avenue, Waterloo, IA 50702-5345 or at such other place as Lender may require.

4.    If at any time the Borrower is in default, the Lender may, by providing a written notice to the Borrower, notify the Borrower that the Borrower is in default and that the interest which will be charged on the Unpaid Principal Balance may be increased to a yearly rate of  3.875% beginning on an effective date stated in the above notice.  That date will be at least 30 days after the date on which the notice is delivered or mailed to the Borrower.  If the Borrower defaults, the Lender may, at its election, require the Borrower to pay immediately the Unpaid Principal Balance that remains unpaid at that time, all interest that has accrued but not been paid, and any other sums that are evidenced are secured by the Note and Security Instrument.  If the Lender does not require that such payment be made immediately, the Borrower shall pay an increased monthly payment that will be based on upon the interest rate stated in this Paragraph 4 instead of the interest rate stated in Paragraph 3.  The Borrower acknowledges that the increased rate of interest will only be charged if the Borrower does not meet its obligations under the Note and Security Instrument, as modified by this Modification.

5.    Except to the extent that they are modified by this Modification, the Borrower will comply with all of the covenants, agreements, and requirements of the Note and the Security Instrument, including without limitation, the Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that    the Borrower is obligated to make under the Security Instrument.

6.    Nothing in this Modification shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.  Except as otherwise specifically provided in this Modification, the Note and the Security Instrument will remain unchanged and in full effect, and the Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Modification.

7.    Borrower releases Servicer, its subsidiaries, affiliates, agents, officers and employees, from any and all claims, damages or liabilities of any kind existing on the date of this Agreement, which are in any way connected with the origination and/or servicing of the Loan, and/or events which resulted in Borrower entering into this Agreement.  Borrower waives any rights which Borrower may have under federal or state statutes or common law principal which may provide that a general release does not extend to claims which are not known to exist at the time of execution, including without limitation (if applicable), California Civil code Sec. 1542, which provides as follows: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

8.    If one or more riders are executed by the Borrower and recorded together with this Modification, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Modification as if the rider(s) were a part of this Modification. [Check applicable box(es)]

         1-4 Family Rider - Assignment of Rents

         Modification due on transfer rider

Claim No. 4722

[Space Below This Line for Acknowledgment in Accordance with Laws of Jurisdiction]

Witness

Signature_____

Print_____                          _____(Seal)

                                                        JAMES B LADD


Signature_____

Print_____                          _____(Seal)


Witness

Signature_____

Print_____                          _____(Seal)

                                                        ANN LADD

Signature_____                      _____(Seal)

Print_____


MULTISTATE LOAN MODIFICATION- Single Family- Freddie Mac

Claim no. 422

*Modification Due on Transfer Rider*

## Modification Due on Transfer

THIS MODIFICATION DUE ON TRANSFER RIDER, effective the 2/24/2010, is incorporated into and shall be deemed to amend and supplement the Loan Modification Agreement of the same date made by JAMES B LADD  ANN LADD  (the "Borrower") and GMAC Mortgage, LLC (the "Lender") covering the Property described in the Loan Modification Agreement located at:

5 BARROWS ST  MIDDLEBORO MA 02346

In addition to the covenants and agreements made in the Loan Modification Agreement, the Borrower and Lender covenant and agree as follows:

A. Notwithstanding any other covenant, agreement or provision of the Note and Security Instrument, as defined in the Loan Modification Agreement, the Borrower agrees as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**   If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of the Loan Modification Agreement.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

B. Except as otherwise specifically provided in this Modification Due On Transfer Rider, the Loan Modification Agreement, the Note and Security Instrument will remain unchanged and in full effect.

_____
Date

_____(Seal)
JAMES B LADD                         -Borrower

_____
Date

_____(Seal)
                                    -Borrower

_____
Date

_____(Seal)
ANN LADD

_____
Date

_____(Seal)

GMAC Mortgage, LLC

By:_____

_____
Date