Hearing Date: November 19, 2013 at 10:00 a.m. (ET)
Response Deadline: November 7, 2013 at 4:00 p.m. (ET)

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Joel C. Haims
James J. Beha II
Naomi Moss

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------ | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------ | ) | |

**DEBTORS' MOTION FOR APPROVAL OF THE SETTLEMENT AGREEMENT
BETWEEN THE DEBTORS AND THE NATIONAL CREDIT UNION
ADMINISTRATION BOARD AS LIQUIDATING AGENT FOR
WESTERN CORPORATE FEDERAL CREDIT UNION AND
U.S. CENTRAL FEDERAL CREDIT UNION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

JURISDICTION, VENUE AND STATUTORY PREDICATE .................................................. 2

BACKGROUND ........................................................................................................................ 2

    A.    These Chapter 11 Cases and the NCUAB's Claims ................................................. 2

    B.    The Debtors' Securitization Business ....................................................................... 3

    C.    The Credit Union's RMBS Investments .................................................................... 4

    D.    When the Debtors' RMBS Decreased in Value, the Debtors Faced
           an Onslaught of Lawsuits, Including the NCUAB's Pre-Petition
           Complaints ................................................................................................................ 4

    E.    The NCUAB Filed Claims in these Chapter 11 Cases Seeking to
           Recover the Damages Asserted in its Pre-Petition Complaints ............................. 7

    F.    The Subordination Proceeding.................................................................................. 8

    G.    The Proposed Settlement of the NCUAB Claims ................................................... 9

RELIEF REQUESTED.............................................................................................................. 10

ARGUMENT ............................................................................................................................. 11

I.        THE LEGAL STANDARD GOVERNING THIS MOTION ......................................... 11

II.      THE NCUAB SETTLEMENT IS FAIR, EQUITABLE, AND IN THE
         BEST INTERESTS OF THE ESTATE.......................................................................... 12

    A.    The NCUAB Settlement Resolves Highly Uncertain, Complex,
           and Potentially Protracted Litigation ................................................................... 13

    B.    The Settlement Agreement is the Product of Arm's-Length
           Negotiations by Experienced Counsel .................................................................. 16

    C.    The Settlement Agreement Benefits the Estates and their Creditors .................... 16

    D.    Other Parties in Interest Support the NCUAB Settlement..................................... 17

    E.    The Settlement Agreement Provides for Reasonable Releases of
           the Debtors' Officers and Directors and Affiliates .............................................. 18

NOTICE..................................................................................................................................... 18

NO PRIOR REQUEST ............................................................................................................. 18

CONCLUSION.......................................................................................................................... 19

## TABLE OF AUTHORITIES

Page(s)

CASES

*Air Line Pilots Ass'n, Int'l v. Am Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*,
   156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) .........................................11

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
   699 F.2d 599 (2d Cir. 1983)...................................................................................................12, 18

*In re Dewey & LeBoeuf LLP*,
   478 B.R. 627 (Bankr. S.D.N.Y. 2012) ...............................................................................11, 12

*In re Hibbard Brown & Co.*,
   217 B.R. 41 (Bankr. S.D.N.Y. 1998) ...........................................................................................13

*In re MF Global Inc. (HSBC Bank USA v. Fane)*,
   466 B.R. 244 (S.D.N.Y. 2012).....................................................................................................11

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
   478 F.3d 452 (2d Cir. 2007)..........................................................................................................12

*Nellis v. Shugrue*,
   165 B.R. 115 (S.D.N.Y. 1994).......................................................................................................11

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972)..........................................................................................................11

STATUTES & RULES

11 U.S.C.
   § 105...............................................................................................................................................3
   § 363...............................................................................................................................................3
   § 502...............................................................................................................................................9
   § 510...............................................................................................................................................9
   § 1107(a) ........................................................................................................................................2
   § 1108.............................................................................................................................................2

28 U.S.C.
   § 157...............................................................................................................................................2
   § 1334.............................................................................................................................................2
   § 1408 ............................................................................................................................................2
   § 1409.............................................................................................................................................2

ii

FED. R. BANKR. P.

Rule 1015(b) ..................................................................................................................2
Rule 9019 ................................................................................................2, 10, 11, 18, 19

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

Residential Capital, LLC ("ResCap") and its affiliated debtors in the above-captioned

Chapter 11 cases (the "Chapter 11 Cases"), as debtors and debtors in possession (collectively, the

"Debtors"), submit this motion under Federal Rule of Bankruptcy Procedure (the "Bankruptcy

Rules") 9019 for entry of an order substantially in the form attached as **Exhibit 1** (the "Proposed

Order") approving the Settlement Agreement,[1] dated October 2, 2013, between the Debtors and

the National Credit Union Administration Board (the "NCUAB") as liquidating agent for

Western Corporate Federal Credit Union ("WesCorp") and U.S. Central Federal Credit Union

("U.S. Central," and, together with WesCorp, the "Credit Unions"). In support of this motion,

the Debtors submit the accompanying declarations of Lewis Kruger (the "Kruger Decl.") and

Jeffrey Lipps (the "Lipps Decl.") and respectfully represent as follows:

**PRELIMINARY STATEMENT**

1.      The Debtors seek Court approval of a settlement resolving hundreds of

millions of dollars of claims related to the Debtors' residential mortgage-backed securities

("RMBS"). At the initial hearing on the Debtors' objection to the NCUAB's claims,[2] the Court

encouraged the parties to resolve the claims through a settlement. After extensive, arm's-length

negotiations and with the Creditors' Committee's substantial assistance and involvement, the

Debtors and the NCUAB have reached a settlement that the Debtors believe is reasonable. This

Settlement Agreement resolves over $290 million in claims the NCUAB has asserted against the

---

[1] A copy of the *Stipulation with National Credit Union Administration Board Regarding Allowed Claims* (the "Settlement Agreement") is attached to this Motion as **Exhibit 2**.

[2] On June 20, 2013, the Debtors filed their *Objection to Proofs of Claim Filed By The National Credit Union Administration Board as Liquidating Agent for Western Corporate Federal Credit Union and U.S. Central Federal Credit Union* [Docket No. 4050] (the "Objection"). On July 19, 2013, the NCUAB filed its response to the Objection [Docket No. 4299]. On July 26, 2013 the Court held a preliminary hearing on the status of the Objection.

1

Debtors in these Chapter 11 cases for an allowed claim in the amount of $78 million.  Absent a

settlement, litigating these claims would undoubtedly have required the Debtors to engage in

costly, burdensome, and ultimately uncertain litigation for months or even years.

2.      Resolution of the NCUAB's claims is an important step towards Plan

confirmation, and the occurrence of the effective date of the Plan is a condition of the Settlement.

The Creditors' Committee supports the settlement.  The Debtors and the Creditors' Committee

believe that avoiding protracted litigation over the NCUAB's claims benefits the estates and their

creditors.  Accordingly, and for the reasons stated below, the Debtors respectfully request that

the Court approve the Settlement Agreement.

<u>**JURISDICTION, VENUE AND STATUTORY PREDICATE**</u>

3.      This Court has jurisdiction to consider this motion under 28 U.S.C. §§ 157

and 1334 and Bankruptcy Rule 9019.  This is a core proceeding under 28 U.S.C. § 157(b)(2).

Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

<u>**BACKGROUND**</u>

A.      **These Chapter 11 Cases and the NCUAB's Claims**

4.      On May 14, 2012 (the "<u>Petition Date</u>"), each of the Debtors filed a

voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors

are managing and operating their businesses as debtors in possession under Bankruptcy Code

sections 1107(a) and 1108.  These cases are being jointly administered under Bankruptcy Rule

1015(b).  No trustee has been appointed in these Chapter 11 cases.

5.      On May 16, 2012, the United States Trustee for the Southern District of

New York appointed a nine-member official committee of unsecured creditors (the "<u>Creditors'</u>

<u>Committee</u>").

2

6.      On May 23, 2013, the Debtors entered into a plan support agreement (the "Plan Support Agreement") and filed the *Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants* [Docket No. 3814] (the "PSA Approval Motion").  On June 27, 2013, the Court granted the PSA Approval Motion [Docket No. 4102].

7.      On July 3, 2013, the Debtors and the Creditors' Committee filed the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4153] (the "Plan") and the *Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4157] (the "Disclosure Statement").  The Court approved the Disclosure Statement on August 23, 2013 [Docket No. 4809].  The hearing on confirmation of the Plan is scheduled to commence on November 19, 2013.[3]

**B.      The Debtors' Securitization Business**

8.      Before they filed their Chapter 11 petitions, the Debtors were a leading residential real estate finance services company.  The Debtors and their non-debtor affiliates operated the fifth-largest mortgage servicing business and the tenth largest mortgage origination business in the United States.[4]

9.      As part of this mortgage servicing and origination business, from 2001 to 2007, the Debtors issued RMBS certificates in an aggregate original principal balance of more

---

[3] The NCUAB's claims are being resolved separately from those claims receiving distributions pursuant to the Private Securities Claims Trust embodied in the Plan.

[4] A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the event leading to the filing of these bankruptcy cases, may be found in the affidavit of James Whitlinger, dated May 14, 2012 [Docket No. 6].

ny-1110416

than approximately $330 billion.  (Local Rule 7056-1 Statement of Stipulated Undisputed Facts

and Agreed-To Exhibits ¶ 1, *Residential Capital, LLC v. Allstate Ins. Co.*, No. 13-ap-01262-mg,

Docket No. 23.)  In these RMBS securitizations, the Debtors pooled together mortgage loans and

conveyed them to trusts in exchange for certificates that were sold to investors, including the

Credit Unions.  (*Id.* ¶ 2.)  The RMBS certificates entitle holders to receive principal and interest

collected on the issuing trusts' mortgage loans.  (*Id.* ¶ 3.)

> **C.**    **The Credit Union's RMBS Investments**

10.    Before their liquidations, U.S. Central and WesCorp were the two largest

corporate credit unions in the United States and invested tens of billions of dollars in RMBS,

including hundreds of millions of dollars in Debtor-issued RMBS.  Specifically, in 2006 and

2007, the Credit Unions purchased a total of approximately $643 million of RMBS issued by

Debtors Residential Funding Mortgages Securities II ("RFMSII") and Residential Accredit

Loans, Inc. ("RALI").

> **D.**    **When the Debtors' RMBS Decreased in Value, the Debtors Faced an
> Onslaught of Lawsuits, Including the NCUAB's Pre-Petition Complaints**

11.    In 2007, U.S. home prices began to drop and RMBS and other credit

markets began to freeze up.  As of the Petition Date, RMBS investors had filed dozens of

lawsuits asserting claims against the Debtors under Sections 11 and 12(a)(2) of the Securities

Act, Section 10(b) of the Securities Exchange Act, and various state securities laws.  (Kruger

Decl. ¶ 8.)

**The Kansas Action**

12.    On June 20, 2011, the NCUAB, as liquidating agent for U.S. Central, filed

a complaint in the U.S. District Court for the District of Kansas (the "Kansas Court") against

RFMSII and several other financial institutions (all of which are unaffiliated with the Debtors

ny-1110416

and Ally) involved in structuring, issuing, and selling RMBS (the "Kansas Action"). (Lipps

Decl. ¶ 13.) The NCUAB asserted claims against RFMSII under Section 11 of the Securities Act

("Section 11") based on alleged material misstatements and omissions in the registration

statements for RMBS issued by RFSMII. (*Id.* ¶ 14.) The claims against RFMSII in the Kansas

Action related to U.S. Central's purchase of $20,000,000 of Debtor sponsored RMBS.

        13.     RFMSII and the other defendants moved to dismiss the Kansas Action

complaint. (*Id.* ¶ 16.) The Kansas Court did not rule on RFMSII's motion, however, because of

the commencement of these bankruptcy cases. (*Id.*) The Kansas Court granted in part, and

denied in part, the other defendants' motions. (*Id.*) Those defendants appealed the Kansas

Court's ruling that the NCUAB's so-called "extender statute" extending the statute of limitations

for claims the NCUAB brings as liquidating agent for the failed Credit Unions applied to the

Securities Act's three-year statute of repose, and that the NCUAB's claims were, therefore,

timely. (*Id.* ¶ 17.) On August 27, 2013, the Tenth Circuit affirmed the Kansas Court's decision.

(*Id.*) On August 24, 2012, the NCUAB filed an amended complaint in the Kansas Action, again

naming RFMSII as a defendant notwithstanding the automatic stay. (*Id.* ¶ 18.) Most of the

remaining defendants moved to dismiss the amended complaint. The rest answered the

complaint. (*Id.*) On September 12, 2013, the Kansas Court denied all pending motions to

dismiss, and the deadline to answer the amended complaint is November 1, 2013. (*Id.* ¶ 19.)

**The California Action**

        14.     On August 9, 2011, the NCUAB, as liquidating agent for WesCorp, filed a

complaint in the United States District Court for the Central District of California (the

"California Court") against RALI and several other financial institutions (all of which are

unaffiliated with the Debtors and Ally) involved in the issuance and sale of RMBS (the

"California Action" and, together with the Kansas Action, the "NCUAB Actions"). (*Id.* ¶ 20.)

In the California Action, the NCUAB asserted Section 11 claims against RALI based on alleged

material misstatements and omissions in registration statements for RMBS issued by RALI. (*Id.*

¶ 21.) The claims against RALI in the California Action related to WesCorp's purchase of

approximately $620 million of Debtor sponsored RMBS.

15.    RALI and the other defendants moved to dismiss the California Action

complaint, and the California Court granted in in part, and denied in part, the motion. (*Id.* ¶ 22.)

In contrast to the Kansas Court and the Tenth Circuit, the California Court held that the extender

statute did <u>not</u> apply to the Securities Act's statute of repose. Accordingly, the California Court

dismissed the NCUAB's federal securities claims as untimely. (*Id.*) The California Court did

not rule on RALI's motion, however, because of the automatic stay imposed by these cases. (*Id.*

¶ 23.) The NCUAB filed an interlocutory appeal of the California Court's dismissal of its

federal securities law claims, and that appeal remains pending. (*Id.* ¶ 24.)

16.    On October 29, 2012, the NCUAB filed an amended complaint in the

California Action. (*Id.* ¶ 25.) The non-debtor defendants again moved to dismiss the amended

complaint. (*Id.*) The California Court denied that motion on July 29, 2013. (*Id.*) Following the

denial of the motion to dismiss the amended complaint, the parties entered into a stipulated

protective order, and discovery has proceeded. (*Id.*) The non-debtor defendants answered the

amended complaints in mid-September 2013, and the California Action proceeds. (*See id.*)

17.    In short, the NCUAB Actions allege that the Debtors' RMBS registration

statements mischaracterized the securities' underlying mortgage loans. Among other things, the

NCUAB alleges that the Debtors (a) misstated the average loan-to-value ratios of the loans; (b)

misstated the owner-occupancy rates of the underlying loans; (c) conducted insufficient due

ny-1110416

diligence on the underlying loans; and (d) misstated the amount of documentation required from borrowers. (*See generally* NCUAB Claims.)

**Southwest Action**

18.     On September 23, 2013, the NCUAB, as liquidating agent for the Southwest Corporate Federal Credit Union ("Southwest"), filed a complaint against Ally Securities asserting claims under Sections 11 and 12(a)(2) of the Securities Act and Texas state securities laws in connection with Southwest's alleged purchase of approximately $65 million of RMBS issued by RALI. *NCUAB v. Residential Funding Secs., LLC*, No. 13-06730-DLC (S.D.N.Y. Sept. 23, 2013) (the "Southwest Action"). The Debtors were not named in the Southwest Action.

**E.     The NCUAB Filed Claims in these Chapter 11 Cases Seeking to Recover the Damages Asserted in its Pre-Petition Complaints**

19.     On November 8, 2012, the NCUAB filed eleven proofs of claim related to the NCUAB Actions: ten claims against RALI [Claim Nos. 2626, 2627, 2628, 2629, 2630, 2631, 2632, 2634, and 2636] and one claim against RFMS II [Claim No. 2635] (collectively, the "NCUAB Claims"). The NCUAB Claims assert approximately $293 million in aggregate claims, comprising a $558,160 claim against RFMS II and $292,398,187 in claims against RALI.

20.     On June 20, 2013, the Debtors filed the Objection seeking to disallow and expunge the NCUAB Claims on the grounds of untimeliness, absence of material misrepresentations, and absence of loss causation. The NCUAB filed a response to the Objection on July 19, 2013.

21.     The Court held a hearing on the Objection on July 26, 2013. At that hearing, the Court encouraged the parties to settle, stating

> I certainly encourage the parties to continue to try and resolve
> these claims. Judge Peck remains available as the mediator. The

7

> parties are sophisticated; sophisticated counsel, and may be able to
> resolve these issues without having to add to Judge Peck's burdens
> in the mediation. You ought to carry forward with that. I think your
> efforts are all better spent trying to resolve the issues now. . . . I
> think at this stage, everybody ought to make a full effort to see
> whether you can resolve the claims. . . .

*See* Transcript of Hearing at 33:13-34:8, *In re Residential Capital, LLC*, Case No. 12-12020

(Bankr. S.D.N.Y. July 26, 2013).

22.    In addition to the actions filed against the Debtors and the related NCUAB

Claims, the NCUAB has stated that it has related claims against Ally Financial Inc. ("AFI") and

Ally Securities, LLC ("Ally Securities") that it believes are timely, notwithstanding the failure of

the NCUAB to include AFI and Ally Securities as defendants in the NCUAB Actions.  (Kruger

Decl. ¶ 10.)  NCUAB asserts that their claims are timely based on equitable tolling and

constructive notice arguments.  (*Id.*)  The alleged claims against AFI and Ally Securities are

based on the same basic facts at issue in the NCUAB Actions, but seek to hold AFI and Ally

Securities liable under a "control person" theory and as an underwriter of the Debtors' RMBS,

respectively.  (*Id.*)  The NCUAB has submitted that its claims against AFI, under Section 15 of

the Securities Act, equal over $390 million, and its claims against Ally Securities, under Section

11, equal approximately $200 million.  (*Id.*)

### F.    The Subordination Proceeding

23.    On November 27, 2012, certain investors in the Debtors' RMBS filed in

these bankruptcy cases the *Motion of AIG Asset Management (U.S.), LLC, the Allstate Entities,*

*Massachusetts Mutual Life Insurance Company, and the Prudential Entities for an Order Under*

*Bankruptcy Rule 3013 (i) Classifying RMBS Fraud Claims in the Same Class as the*

*Securitization Trusts Claims for Purposes of any Chapter 11 Plan for the Debtors and (ii)*

*Directing that Misrepresentation Claims Cannot Be Placed in a Plan Class That Will Be*

*Subordinated Under Bankruptcy Code Section 510(b)* (the "Subordination Motion") [Docket No.

2284].  The NCUAB later joined that motion.  *See Joinder of National Credit Union*

*Administration Board to the Motion of AIG Asset Management (U.S.), LLC, et al.* [Docket No.

2555].

24.    On February 19, 2013, the Debtors filed an opposition to the

Subordination Motion and commenced an adversary proceeding[5] before this Court seeking to

subordinate the NCUAB's claims—among other provisions—pursuant to 11 U.S.C. § 502 (the

"Subordination Adversary Proceeding").  On April 2, 2013, the Debtors and the NCUAB

(joining the other investors) filed cross-motions for summary judgment.  The motions for

summary judgment were fully briefed on May 7, 2013.

25.    At a preliminary hearing on the cross motions for summary judgment on

May 14, 2013, the Court adjourned the hearing due to the imminent signing of the Plan Support

Agreement.  The parties to the Plan Support Agreement agreed to adjourn the Subordination

Adversary Proceeding during the term of the Plan Support Agreement.  *See* Plan Support

Agreement at 12.  The cross motions remain held in abeyance since that time.

### G.    The Proposed Settlement of the NCUAB Claims

26.    The Debtors and the NCUAB, with the Creditors' Committee's direct

involvement, engaged in lengthy settlement negotiations over the NCUAB Claims, the alleged

claims against AFI and Ally Securities, and related issues.  (Kruger Decl. ¶ 11.)  The parties have

---

[5] On February 19, 2013, the Debtors filed their *Complaint Against AIG Asset Management (U.S.), LLC and Its Affiliated Entities, Allstate Insurance Company and Its Affiliated Entities, Massachusetts Mutual Life Insurance Company, Prudential Insurance Company of America, and Its Affiliated Entities* and commenced adversary proceeding number 13-ap-01262-mg.

reached an agreement (the "Settlement"), as set forth in the Settlement Agreement, with the support of the Creditors' Committee. (*Id.*)

27.    Under the Settlement Agreement the NCUAB agreed to release: (a) all claims that were or could have been asserted in the NCUAB Actions or the NCUAB Claims against the Debtors or their non-debtor affiliates; (b) all of the Credit Unions purported claims against AFI and Ally Securities; and (c) all claims that were or could have been asserted against the Debtors or their non-debtor affiliates in the Southwest Action.  In exchange, the NCUAB will receive allowed general unsecured claims in the aggregate amount of $78 million in full and final satisfaction of any and claims that have been or could have been asserted by the NCUAB or the Credit Unions in these cases.  (Ex. 2, Settlement Agreement at ¶ 2.)   The allowed claims are divided between Debtors as follows: $149,000 against RFMS II; and $77,851,000 against RALI. (*Id.*)  In addition, the Parties have agreed that the allowed NCUAB claims will not be subject to subordination.  (*Id.*)  The Settlement is conditioned upon the occurrence of the Effective Date of the Plan.

28.    As additional consideration for the $78 million in allowed claims, the NCUAB (i) agreed to support the Plan and (ii) consented to the releases embodied in the Plan— including the third-party releases against AFI and other affiliated entities as set forth in the Plan. (*Id.* at ¶¶ 3-4.)  As part of the settlement, the NCUAB has also agreed that third-party releases contained in the plan will apply to the Southwest Action.

### RELIEF REQUESTED

29.    The Debtors respectfully request that this Court enter an order under Bankruptcy Rule 9019(a), substantially in the form of the Proposed Order, approving the Settlement Agreement.

ny-1110416

## ARGUMENT

### I.    THE LEGAL STANDARD GOVERNING THIS MOTION

30.    Bankruptcy Rule 9019(a) provides, in part, that "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  This rule empowers bankruptcy courts to approve a settlement agreement where "it is supported by adequate consideration, is 'fair and equitable,' and is in the best interests of the estate."  *Air Line Pilots Ass'n, Int'l v. Am Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993)*, aff'd*, 17 F.3d 600 (2d Cir. 1994); *accord In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012). The Court's analysis is not a mechanical process, but rather contemplates a "range of reasonableness . . . which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

31.    "As a general matter, '[s]ettlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate.'"  *Dewey & LeBoeuf*, 478 B.R. at 640 (quoting *In re MF Global Inc.*, No. 11–2790, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012)).  The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court.  *See Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994); *Ionosphere Clubs, Inc.*, 156 B.R. at 426.  Bankruptcy courts, however, should consider and factor in the debtor's exercise of its reasonable business judgment when reviewing a proposed settlement and may rely on the opinion of the debtor, parties to the settlement, and professionals.  *In re MF Global Inc. (HSBC Bank USA v. Fane)*, 466 B.R. 244, 247 (S.D.N.Y. 2012); *Dewey & LeBoeuf*, 478 B.R. at 641.

11

32.    To approve a proposed settlement, courts "need not conduct a mini-trial" or definitively decide the numerous issues of law and fact raised by the settlement. *Dewey & LeBoeuf*, 478 B.R. at 640-641 (internal quotations omitted). Rather, courts should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983).

33.    In deciding whether a particular settlement falls within the "range of reasonableness," courts in the Second Circuit consider the following factors (the "Iridium Factors"): (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay"; (c) the paramount interests of creditors; (d) whether other parties in interest support the settlement; (e) "the nature and breadth of releases to be obtained by officers and directors"; (f) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing the settlement; and (g) "the extent to which the settlement is the product of arm's-length bargaining." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal citations and quotations omitted).

## II.    THE NCUAB SETTLEMENT IS FAIR, EQUITABLE, AND IN THE BEST INTERESTS OF THE ESTATE

34.    The Debtors believe that the Settlement is fair, equitable, and in the best interests of these estates. The Debtors respectfully submit that each of the Second Circuit's *Iridium* Factors weighs in favor of this Court's approval of the Settlement Agreement.

A.    **The NCUAB Settlement Resolves Highly Uncertain, Complex, and Potentially Protracted Litigation**

35.    To avoid protracted and complex litigation over the validity, amount, and priority of the NCUAB Claims, the Debtors determined that entering into the Settlement Agreement is in the best interests of the Debtors' estates and their creditors.

36.    The NCUAB has asserted claims under Section 11 of the Securities Act based on alleged material misstatements and omissions in the registration materials for Debtor-issued RMBS.  As set forth in the Objection, the Debtors believe that they have valid defenses to the NCUAB Claims, and if forced to litigate, the Debtors would mount a vigorous defense.  In particular, the Debtors deny that any of their RMBS registration statements contained material misstatements or that any such misstatements caused any losses to the Credit Unions.  The Debtors also contend that some of the NCUA Claims are barred by the Securities Act's statute of repose. (Objection at ¶ 3.)

37.    Nonetheless, the NCUAB Claims are legally and factually complex and the ultimate outcome of any litigation is uncertain.  (Lipps Decl. ¶ 47.)  In addition, because these claims have largely survived motions to dismiss in the federal district courts, the NCUAB Claims are unlikely to be resolved on the pleadings.  And, although litigation is always uncertain, complex RMBS litigation is particularly so.  (Lipps Decl. ¶ 26.)  Among other things, RMBS-related claims turn on individual analysis of the thousands of mortgage loans underlying the relevant RMBS certificates.  (Lipps Decl. ¶ 53.)  Uncertainty of outcome in complex cases is an important consideration in whether to approve a settlement.  *See, e.g., In re Hibbard Brown & Co.*, 217 B.R. 41, 45 (Bankr. S.D.N.Y. 1998) (approving settlement after finding that the multiple legal issues presented were "complex" and carried "no guarantee of success").

38.     In the absence of a settlement, litigating these claims would require substantial and costly discovery.  The Debtors base this conclusion, in large part, on their substantial pre-petition experience litigating similar cases with RMBS investors.  The dozens of cases filed against the Debtors based on the issuance of RMBS have required extensive factual and expert discovery.  (Lipps Decl. ¶¶29-37.)  In particular, the parties would have had to engage in extensive discovery related to the loans underlying the securitizations in which the Credit Unions invested.  (*Id*. ¶¶ 38-42.)  This "loan-level" discovery would require locating and producing thousands of loan files—a task which is always expensive and cumbersome, and has only become more so since the sale of the Debtors' loan servicing platform earlier this year.  (*Id*. ¶ 42.)  Those loan files would then have to be "re-underwritten" by underwriting experts, a task that is both costly and time-consuming.   (*Id*. ¶ 40.)

39.     Loan level discovery is only the tip of the iceberg.  Also likely relevant to the NCUAB's claims would be email communications among Debtor employees and many other electronically stored materials.  (*Id*.  ¶¶ 29, 35-37.)  This "defensive" discovery typically costs hundreds of thousands—if not millions—of dollars and can take many months to complete.  (*Id*. ¶ 42.)  And, of course, this says nothing of the discovery that the Debtors would need to take of the NCUAB, including extensive document discovery of what the Credit Unions knew and relied on in purchasing Debtors' RMBS, as well as discovery into key threshold issues such as when the Credit Unions became aware of their alleged claims against the Debtors (for statute of limitations purposes).  (*Id*. ¶ 45.)

40.     The Court previously cited to this discovery as showing the likely burden of discovery of other cases in deciding to extend the automatic stay to stop the litigation being pursued by Western & Southern and in approving the FGIC Settlement Motion.  *See* Transcript

of Hearing at 137:11-15, *In re Residential Capital, LLC*, Adv. Proc. No. 12-0167 ("The debtors

have provided specific samples of cases that involved a small number of securitizations, but still

produced millions of pages in discovery and upwards of eighty days' worth of depositions from

the debtors' current and former employees."); *see also September 13, 2013 Memorandum*

*Opinion And Order, And Findings Of Fact And Conclusions Of Law, Approving The FGIC*

*Settlement Motion* (the "FGIC Settlement Motion") at 19-20, 48 [Docket No. 5042].

41.    Because of the nature of the NCUAB's claims, they are not likely subject

to summary disposition, and would take months—and possibly years—to fully adjudicate.

(Lipps Decl. ¶ 26.)  In fact, the NCUAB filed its Kansas and California Actions in mid-2011, and

fact discovery is just beginning in those proceedings.  (*Id*. ¶¶ 13-25.)  Unless the NCUAB settles

with the non-Debtor defendants, those cases will continue for years.[6]  (*Id*. ¶ 26.)  Despite the

more expedited claims process available to litigants in this Court, the cost and time associated

with fully adjudicating the NCUAB Claims would also be substantial.  (*Id*. ¶ 53.)

42.    In short, litigation of these claims could take several years and incur

substantial administrative costs.  And, of course, there is no guarantee of the ultimate outcome at

the conclusion of such litigation.  Accordingly, the Debtors believe that the Settlement

Agreement constitutes a far more efficient, reasonable, and cost-effective resolution of these

claims than proceeding with litigation.

43.    Meanwhile, litigating the NCUAB claims would distract the Debtors from

focusing on critical aspects of their restructuring process, including confirmation of the Plan and

resolving open confirmation issues with other creditors.  As a result, the Debtors believe that it

would be improvident in light of the circumstances of these cases and the attempts by the

---

[6] Due to the pendency of these Chapter 11 Cases, all claims against the Debtors related to the Kansas and California
actions have either already been asserted as proofs of claim in these cases or are barred by the automatic stay.

ny-1110416

Debtors to confirm the Plan to incur the expense, burden and delay incident to litigating these claims.  (Kruger Decl. ¶ 17.)

### B.    The Settlement Agreement is the Product of Arm's-Length Negotiations by Experienced Counsel

44.    The Settlement Agreement is the result of arm's-length negotiations between the Debtors, the Creditors' Committee and the NCUAB, which were all represented by competent and experienced professionals with particular expertise in these matters.  (*Id*. ¶ 18.) Counsel for the parties negotiated without collusion and in good faith.  In their negotiations, the Debtors and the Creditors' Committee were guided, in part, by lawyers and other professionals highly experienced in similar securities litigation, including in the settlement of complex, RMBS-related litigation. (*Id*.)  The Debtors, in exercising their reasonable business judgment, considered the advice of their advisors in making the determination that the Settlement is in the best interest of these estates.

### C.    The Settlement Agreement Benefits the Estates and their Creditors

45.    The Settlement Agreement benefits the Debtors' estates and their creditors.  The Settlement Agreement is well within the range of reasonableness and resolves significant claims against the Debtors' estates.  (*Id*. ¶ 19.)  Through the Settlement, the NCUAB is releasing claims asserted against the Debtors that, as set forth in the NCUAB Claims, totaled approximately $293 million (approximately $292.5 million in claims against RALI and $500,000 in claims against RFMSII), in exchange for allowed claims in the aggregate amount of $78 million.  The Debtors believe that the Settlement is clearly in the best interests of their creditors because it resolves significant claims against their estates for far less than the amounts asserted and avoids potentially years of protracted litigation.

16

46.     The certainty provided by the Settlement Agreement and resolution of the NCUAB Claims is in the best interest of the estates because it will allow the Debtors to continue on the path towards Plan confirmation.  Absent a settlement, the Debtors could be forced to set aside a large distribution reserve to pay the NCUAB Claims as ultimately allowed, delaying and reducing other unsecured creditors' recoveries. (*Id*. ¶ 20.)

47.     Furthermore, in determining that the Settlement is reasonable and in the best interests of these estates, the Debtors considered the arguments made in the Subordination Adversary Proceeding.  While the Debtors believe they have strong arguments to support the subordination of the NCUAB Claims, whether these types of claims should be subordinated has been hotly contested in the Subordination Adversary Proceeding.

48.     The Debtors believe that the benefit of certainty regarding the amount of the NCUAB Claims outweighs the risks regarding the potential subordination of those claims. Moreover, in approving the FGIC Settlement Motion this Court rejected the argument that a court cannot approve a settlement where the claims could potentially be subordinated.  (FGIC Settlement Motion at 51 [Docket No. 5042].)

### D.    Other Parties in Interest Support the NCUAB Settlement

49.     The Creditors' Committee's extensive involvement in settlement negotiations with the NCUAB and the Committee's support of the Settlement Agreement show that the settlement is in the creditors' best interest.  Continued litigation over these claims would burden the Debtors' estates with significant legal expense and would almost certainly result in delays in distribution of the estates' assets to creditors.  (*See* Lipps Decl. ¶ 26.)  The Settlement Agreement allows the Debtors to continue to focus on confirmation of the Plan, which is supported by a majority of the Debtors' creditors.  Continued litigation would distract the Debtors' limited personnel and professionals from more critical tasks, slow the Debtors'

17

emergence from bankruptcy, and potentially delay distributions to creditors. For this reason as well, the Debtors believe approval of the Settlement Agreement is in the best interest of their creditors.

**E.    The Settlement Agreement Provides for Reasonable Releases of the Debtors' Officers and Directors and Affiliates**

50.    The Settlement Agreement provides reasonable releases of the Debtors' officers and directors. Pursuant to the Settlement Agreement, the NCUAB agreed to the releases embodied in the Plan, including the voluntary releases of the Debtors' offices, directors, and non-Debtor Affiliates (including AFI) by the NCUAB.

*                              *                              *

51.    The Debtors have determined, in exercising their reasonable business judgment, that the terms of the Settlement are fair, equitable and eminently reasonable to the Debtors' estates and creditors, thereby satisfying the standards of Bankruptcy Rule 9019. The Settlement is fair and well within the range of reasonableness—and certainly not "below the lowest point in the range of reasonableness." *W.T. Grant Co.*, 699 F.2d at 608. Accordingly, the Debtors respectfully request that the Court approve the Debtors' entry into the Settlement Agreement pursuant to Bankruptcy Rule 9019.

## NOTICE

52.    The Debtors have provided notice of this Motion in accordance with the Case Management Procedures Order, approved by this Court on May 23, 2012 [Docket No. 141].

## NO PRIOR REQUEST

53.    Except as otherwise noted herein, no prior application for the relief requested has been made to this Court or any other court.

ny-1110416

## **CONCLUSION**

54.     WHEREFORE, the Debtors respectfully request that the Court enter an

order substantially in the form of the Proposed Order, authorizing the Debtors, pursuant to

Bankruptcy Rule 9019(a), to enter into the Settlement Agreement.


Dated: October 28, 2013

/s/ Gary S. Lee
Gary S. Lee
Joel C. Haims
James J. Beha II
Naomi Moss
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel for the Debtors and*
*Debtors in Possession*