**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------- )
In re:                                                            )   Case No. 12-12020 (MG)
                                                                  )
RESIDENTIAL CAPITAL, LLC, <u>et al</u>.,                          )   Chapter 11
                                                                  )
                                              Debtors.            )   Jointly Administered
                                                                  )
----------------------------------------------------------------- )

**DECLARATION OF LEWIS KRUGER IN SUPPORT OF
DEBTORS' MOTION FOR APPROVAL OF THE SETTLEMENT AGREEMENT
BETWEEN THE DEBTORS AND THE NATIONAL CREDIT UNION
ADMINISTRATION BOARD AS LIQUIDATING AGENT FOR WESTERN
CORPORATE FEDERAL CREDIT UNION AND
<u>U.S. CENTRAL FEDERAL CREDIT UNION</u>**

I, Lewis Kruger, being duly sworn, state the following under penalty of perjury:

1.     I am the Chief Restructuring Officer ("<u>CRO</u>") of the debtors and debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned cases. I submit this declaration (the "<u>Declaration</u>") in support of the *Debtors' Motion for Approval of the Settlement Agreement Between the Debtors and the National Credit Union Administration Board as Liquidating Agent for Western Corporate Federal Credit Union and U.S. Central Federal Credit Union* (the "<u>NCUAB 9019 Motion</u>"),[1] filed contemporaneously herewith. Except as otherwise noted, I have personal knowledge of the matters set forth herein. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

2.     I offer this Declaration to show that the settlement of certain claims held by the NCUAB, embodied in the Settlement Agreement dated October 2, 2013 (the "<u>Settlement Agreement</u>"), represents a fair and reasonable compromise and to attest that the Debtors

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the NCUAB 9019 Motion.

ny-1111437                                                1

negotiated the Settlement Agreement at arm's-length and without undue influence or coercion by any party.

## BACKGROUND

3.   On February 7, 2013, I was appointed by the Debtors to serve as CRO and spearhead the plan formulation process. On February 11, 2013, the Debtors filed the *Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer* [Docket No. 2887].[2] My appointment contemplated that I would "make decisions on behalf of each Debtor with respect to Chapter 11 plan negotiations and formulation, in such a manner as is consistent with the business judgment rule, the provisions of applicable law, taking into account the respective fiduciary duties of the CRO to each Debtor's respective estate." *See* Amendment 1. On March 5, 2013, the Court entered an order approving my appointment in accordance with the terms of Amendment 1. [Docket No. 3103]. On September 13, 2013, the Court found that I, on behalf of the Debtors, was authorized to enter into a settlement agreement among the Debtors, Financial Guaranty Insurance Company, the FGIC Trustees and the Institutional Investors.[3]

4.   Prior to my appointment as CRO, I was a partner and Co-Chair of the Financial Restructuring Group at Stroock & Stroock & Lavan LLP, a law firm that has extensive experience in all aspects of restructuring and insolvency matters. I have over fifty years of restructuring experience. I have played a role in many significant reorganization proceedings in the United States, representing debtors, official and ad hoc creditors' committees, financial institutions and acquirers of assets.

---

[2] The scope of my authority was modified pursuant to Amendment 1 to the Engagement Letter. A copy of Amendment 1 to the Engagement Letter was filed with the Court on March 1, 2013 [Docket No. 3074].
[3] As defined in the *Memorandum Opinion and Order, and Conclusions of Law, Approving the FGIC Settlement Motion* [Docket No. 5042].

5. In my capacity as CRO, I am generally familiar with the parties' respective positions regarding the priority and nature of the various claims asserted against the Debtors in these Chapter 11 cases (including the claims asserted by the NCUAB), as well as the terms of the Settlement Agreement negotiated between the Debtors, the Creditors' Committee and the NCUAB (collectively, the "Parties").

6. In connection with working to formulate and confirm the Plan, I participated in analyzing the validity, priority and amount of any claims asserted by the NCUAB. I was also involved in the process of preparing the Objection to the NCUAB Claims and planning for anticipated litigation regarding the Objection.

7. I was also involved in the plan negotiations with the Creditors' Committee and many of the Debtors' major creditor constituencies, as well as entry into the Plan Support Agreement (the "Plan Support Agreement") and Plan Term Sheet, dated as of May 13, 2013, among the Debtors, the Creditors' Committee and the Supporting Parties (as defined in the Plan Support Agreement), and the Supplemental Term Sheet dated as of May 23, 2013.

## THE NCUAB CLAIMS

8. As of the Petition Date, RMBS investors had filed dozens of lawsuits asserting claims against the Debtors under Sections 11 and 12(a)(2) of the Securities Act, Section 10(b) of the Securities Exchange Act, and various state securities laws seeking to recover their losses on Debtor-issued RMBS.

9. On November 8, 2013, the NCUAB filed ten proofs of claim against RALI and one proof of claim against RFMS II. The NCUAB Claims relate to the NCUAB Actions and assert claims in the aggregate amount of approximately $293 million.

10. It is my understanding that in addition to the actions filed against the Debtors and the related NCUAB Claims, the NCUAB has asserted that it has related claims against Ally

Financial Inc. ("AFI") and Ally Securities, LLC ("Ally Securities") that it believes are timely, notwithstanding the failure of the NCUAB to include AFI and Ally Securities as defendants in the NCUAB Actions. The NCUAB asserts that their purported claims against AFI and Ally Securities are timely based on equitable tolling and constructive notice arguments. The alleged claims against AFI and Ally Securities are based on the same basic facts at issue in the NCUAB Actions, but seek to hold AFI and Ally Securities liable under a "control person" theory and as an underwriter of the Debtors' RMBS, respectively. The NCUAB has submitted that its claims against AFI, under Section 15 of the Securities Act, equal over $390 million, and its claims against Ally Securities, under Section 11 of the Securities Act, equal approximately $200 million.

## THE SETTLEMENT

11.  Following the Court's encouragement, the Parties engaged in lengthy negotiations regarding a possible settlement of the NCUAB Claims, the alleged claims against AFI and Ally Securities, and related issues. As a result of those discussions, the Debtors and the NCUAB reached an agreement, with the support of the Creditors' Committee, as forth in the Settlement Agreement.

12.  The Settlement is subject to the occurrence of the effective date of the Plan and provides that (i) the NCUAB Claims shall be reduced and allowed in the aggregate amount of $78 million in full and final satisfaction of any and all claims that have been or could have been asserted by the NCUAB or Credit Unions in the Debtors' bankruptcy cases, including any and all claims that the NCUAB or the Credit Unions purport to have against AFI or Ally Securities. Pursuant to the Settlement Agreement, the NCUAB Claims will be allowed in the amount of $149,000 against RFMS II and in the amount of $77,851,000 against RALI. The Settlement

Agreement further provides that the allowed NCUAB Claims will not be subject to subordination.

**Considerations That Informed my Decision to Enter Into the Settlement Agreement**

13. Prior to approving the Settlement, I reviewed, along with the Debtors' advisors, materials related to the NCUAB Claims including, but not limited to, the complaints filed prepetition in the NCUAB Actions, the NCUAB Claims, and presentations by (i) the advisors to the Debtors, (ii) the advisors to the Creditors' Committee, and (iii) counsel for the NCUAB. I also engaged in discussions with Debtors' counsel, and the other parties and constituencies involved in the settlement discussions.

14. In making my decision, I relied on my independent business judgment and balanced the benefits and risks associated with the Settlement. It is my understanding that absent a settlement, the NCUAB's claims against the Debtors could result in claims totaling hundreds of millions of dollars. Additionally, I believe that the costs associated with litigating the NCUAB Claims would be great and that such litigation could take years. I also considered the potential drawbacks to entering into the Settlement Agreement, such as a waiver of the possibility to subordinate the NCUAB Claims under Section 510(b) of the Bankruptcy Code.

15. I believe that the benefits to be received through the Settlement outweigh the attendant risks, therefore I believe that the Settlement is in the best interests of the Debtors' estates. The reasoning underlying my decision to approve the Settlement is set forth below.

## THE IRIDIUM FACTORS

A.  **The Settlement Resolves Highly Uncertain, Complex, and Potentially Protracted Litigation**

16. It is my understanding that significant uncertainty exists regarding the outcome of litigation regarding the validity, priority and amount of the NCUAB Claims through the claims

resolution process. In part due to this uncertainty, I, along with the Debtors' advisors, believe that the Settlement Agreement provides substantial benefits to the Debtors' creditors and their estates.

17. After reviewing the NCUAB Claims, the relevant prepetition complaints filed by the NCUAB against the Debtors, and the NCUAB's response to the Objection, the Debtors believe that they have valid defenses to the NCUAB Claims. If forced to litigate, the Debtors would mount a vigorous defense. Nonetheless, I understand that the issues that would be involved in litigating the NCUAB Claims are likely to be fact-intensive in nature and the legal issues involved relatively unsettled. Accordingly, I, along with the Debtors, understand that such litigation would involve litigation risk. Additionally, the Debtors' advisors have informed me that they believe that litigation of these claims could take several years and result in the incurrence of substantial administrative costs.

**B.    The Settlement Agreement is the Product of Arm's-Length Negotiations by Experienced Counsel**

18. The Settlement Agreement is the result of arm's-length negotiations between the Debtors, the Creditors' Committee and the NCUAB, which were all represented by competent and experienced counsel with particular expertise in these matters. I personally have over fifty years of experience as a practicing attorney in restructuring matters. The Debtors were represented by competent and experienced counsel at Morrison & Foerster LLP. In their negotiations, the Debtors were also guided, in part, by lawyers and other professionals highly experienced in similar securities litigation, including in the settlement of complex RMBS-related litigation. In my view, the Creditors' Committee and the NCUAB were both represented by competent and experienced counsel.

### C. The Settlement Agreement Benefits the Debtors' Estates and Their Creditors

19. I, along with the Debtors, believe that the Settlement Agreement is reasonable and provides substantial benefits to their estates and their creditors. In particular, the Settlement Agreement provides benefits in the form of (i) a reduction of claims asserted against each of the Debtors' estates in the amount of approximately $215 million, (ii) certainty regarding the validity, priority and amount of the NCUAB Claims and (iii) substantial cost savings when compared with the likely costs of professional fees and experts associated with litigation over the NCUAB Claims being released.

20. Moreover, absent a settlement, the Debtors could be required to set aside a large reserve to pay the NCUAB Claims as ultimately allowed, which could delay and/or reduce other unsecured creditors' recoveries. The Settlement Agreement allows the Debtors to continue to focus on confirmation of the Plan, which is supported by a majority of the Debtors' creditors.

21. Furthermore, it is my understanding, based on my discussions with the Debtors' advisors who have particular expertise in securities litigation, that the Settlement is consistent with settlements in similar securities cases.

### D. Support of Other Parties-in-Interest for the Settlement Agreement

22. As discussed above, the Creditors' Committee actively participated in the settlement negotiations and supports the Settlement Agreement.

### E. Nature and Breadth of Releases To Be Obtained by Officers and Directors

23. In my view, the releases of the Debtors' officers and directors embodied in the Plan that the NCUAB has agreed to support as part of the Settlement are reasonable and, based on my understanding, consistent with releases in settlement agreements approved in other cases in this district. Additionally, NCUAB consents to the third-party releases against AFI and other affiliated entities as set forth in the Plan.

## CONCLUSION

24. Based on all of the factors described above, I conclude that settlement on the terms set forth in the Settlement Agreement is fair to the Debtors and well within the range of reasonableness and certainly not below the lowest point in the range of reasonableness.

*[signature page follows]*

I declare under penalty of perjury that the foregoing is true and correct.

Executed the 28th day of October, 2013, at New York, New York.

                                                                     /s/ Lewis Kruger
                                                                        Lewis Kruger