**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---------------------------------------------------------------

**DECLARATION OF JEFFREY A. LIPPS IN SUPPORT OF DEBTORS' MOTION FOR APPROVAL OF THE SETTLEMENT AGREEMENT BETWEEN THE DEBTORS AND THE NATIONAL CREDIT UNION ADMINISTRATION BOARD**

I, Jeffrey A. Lipps, under penalty of perjury, testify as follows:

1.      I am a partner with Carpenter Lipps & Leland LLP, 280 Plaza, Suite 1300, 280 North High Street, Columbus, Ohio  43215 (the "<u>Firm</u>").

2.      I submit this declaration (the "<u>Declaration</u>") in connection with the *Debtors' Motion for Approval of the Settlement Agreement Between the Debtors and the National Credit Union Administration Board as Liquidating Agent for Western Corporate Federal Credit Union and U.S. Central Federal Credit Union* (the "<u>NCUAB 9019 Motion</u>"),[1] filed contemporaneously herewith.

3.      Except as otherwise noted, I have personal knowledge of the matters set forth herein.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

**BACKGROUND**

4.      I have over thirty years' experience as a trial lawyer representing and counseling clients in complex commercial litigation matters, including commercial disputes, class action

---

[1]  Capitalized terms otherwise not defined herein shall have the meanings ascribed to them in the NCUAB 9019 Motion.

litigation, securities litigation, procurement matters, and bankruptcy litigation.  I have handled

cases in state and federal courts in over a dozen states.  I was a partner at the law firm of Jones

Day before becoming a founding partner in my current firm, which is a litigation boutique with a

national practice.

5.    Since 2010, I have represented certain of the Debtors, four non-debtor affiliated

entities, and several individual former directors and officers of the Debtors in over a dozen

separate lawsuits involving the issuance of residential mortgage-backed securities ("RMBS") by

certain of the Debtors.

6.    Those representations include defending the Debtors in numerous lawsuits

brought prepetition by securities investors against various Debtors and affiliated entities.  The

plaintiffs in those cases assert claims under federal and state securities fraud statutes, as well as

claims for common law fraud and other associated causes of action arising from alleged

misrepresentations in offering materials related to RMBS.

7.    Similarly, I also represented the Debtors in more than a dozen lawsuits brought by

monoline insurance companies involving bond insurance issued by them on a total of more than

twenty securitizations.  Although the monoline claims involved claims of breaches of

representations and warranties and arose from the terms of certain applicable contracts, they, like

the investor claims, relate to underwriting practices and inclusion of allegedly "defective" loans

in RMBS.

8.    In addition, prepetition, the Debtors and their other outside counsel frequently

called upon me and my Firm to evaluate various issues relating to RMBS litigation, including the

litigation commenced by the National Credit Union Administration Board ("NCUAB") against

certain of the Debtors, which serves as the basis for the proofs of claim filed by the NCUAB in

these Chapter 11 Cases (the "NCUAB Claims").

9.      Postpetition, my firm was retained as special litigation and discovery counsel in

the Debtors' bankruptcy cases. *See Order Under Section 327(e) of the Bankruptcy Code,*

*Bankruptcy Rule 2014(a) and Local Rule 2014-1 Authorizing the Employment and Retention of*

*Carpenter Lipps & Leland LLP as Special Litigation Counsel to the Debtors, Nunc Pro Tunc to*

*May 14, 2013* (Doc. 907).   In that capacity, I helped the Debtors analyze various claims related

to their issuance of RMBS, including claims filed by monolines and security claimants.  Based

on my experience with the range of RMBS claims asserted against the Debtors and the Debtors'

operations, I was asked by the Examiner to present to them on these topics.  With the Debtors'

permission, I did so.  I also supervised my firm's work as special discovery counsel in helping

the Debtors' respond to the Examiner's investigation.  As part of this work, I personally

participated in many of the preparation and interview sessions with the Debtors' current and

former employees who were interviewed by the Examiner.

10.      I am also deeply familiar with the Debtors' history and practices with respect to

RMBS securitizations and, in particular, the second-lien and Alt-A securitizations at issue in the

NCUAB Action.  Generally, Alt-A securitizations issued on the RALI shelf involve "Alt-A"

loans, which bridged the prime and subprime markets, and which involve slightly higher LTV

limits, non-owner occupied properties and more limited documentation options.  Second-lien

securitizations, in turn, issued on the RFMSII shelf involve closed-end or home equity line of

credit second liens.  The closed-end loans typically involve second lien, fixed-rate loans with

CLTVs up to 100% made to borrowers with "A" quality credit and high residual income.  The

home equity line of credit loans involve second-lien, variable rate, revolving lines of credit with

3

CLTVs up to 100% and also made to borrowers with "A" quality credit and high residual income.

11.     In two cases brought by monoline insurer MBIA Insurance Corp. ("MBIA") against the Debtors (discussed further below), the parties engaged in extensive fact discovery involving the exchange and analysis of millions of pages of discovery material and the completion of dozens of depositions and had begun expert discovery with an exchange of initial expert reports in one of those cases.  The Firm also actively defended certain of the Debtors and their non-debtor affiliates in securities investor litigation matters brought by a number of investors, including Allstate Insurance Company, Thrivent Financial for Lutherans, Huntington Bancshares, Inc., Stichting Pensioenfounds ABP, New Jersey Carpenters Health Fund, Union Central Life Insurance Company, The Western and Southern Life Insurance Company, the West Virginia Investment Management Board, and the Federal Housing Finance Agency in its capacity as the conservator for Freddie Mac.

12.     All of the matters described above involve claims substantially identical to those asserted by the NCUAB, and a number of them specifically related to the second-lien and Alt-A securitizations at issue in the NCUAB Actions.

## OVERVIEW OF THE KANSAS ACTION

13.     On June 20, 2011, the NCUAB, as liquidating agent for U.S. Central, filed a complaint in the United States District Court for the District of Kansas (the "Kansas Court") against debtor Residential Funding Mortgage Securities II, Inc. ("RFMSII") and several other non-debtor financial institutions involved in structuring, issuing, and selling RMBS (the "Kansas Action").

14.     The NCUAB asserted claims against RFMSII under Section 11 of the Securities

Act based on alleged material misstatements in the registration statements for the Home Equity

Loan Trust 2007-HSA2 securitization issued by RFSMII.

15.     The Home Equity Loan Trust 2007-HSA2 securitization involves 24,092 second-

lien loans and had an original principle balance of $1,231,394,000.

16.     RFMSII and the other non-debtor defendants moved to dismiss the Kansas Action

and the court granted in part and denied in part the motions on July 25, 2012.  Because of the

filing of the Debtors' bankruptcy cases, the Kansas Court has yet to rule on RFMSII's motion.

17.     The remaining non-debtor defendants to the Kansas Action appealed certain

issues in the court's order on the motion to dismiss.  In particular, the remaining non-debtor

defendants appealed the Kansas Court's ruling that the NCUAB's so-called "extender statute"

applied to the Securities Act's three year statute of repose, thereby rendering the NCUAB's

claims timely filed.  On August 27, 2013, the Tenth Circuit affirmed the Kansas Court's

decision.

18.     On August 24, 2012, the NCUA filed an amended complaint in the Kansas

Action, again naming RFMSII as a defendant notwithstanding the automatic stay.  Most of the

remaining defendants moved to dismiss the amended complaint, with the rest filing answers.

19.     On September 12, 2013, the Kansas Court denied all pending motions to dismiss,

and the deadline for filing any remaining answers to the complaint is November 1, 2013.

### OVERVIEW OF THE CALIFORNIA ACTION

20.     On August 9, 2011, the NCUAB, as liquidating agent for the WesCorp, filed a

complaint in the Central District of California (the "California Court") against Residential

5

Accredit Loans, Inc. ("RALI") and several other financial institutions involved in the issuance

and sale of RMBS (the "California Action").

21.     In the California Action, the NCUAB asserted claims against RALI under Section

11 based on alleged material misstatements in registration statements for RMBS issued by RALI.

The claims asserted against RALI relate to six securitizations:  RALI 2006-QO6; RALI 2006-

QO10; RALI 2007-QH2; RALI 2007-QH3; RALI 2007-QH5; and RALI 2007-QH6.

Collectively, these six securitizations involve 10,836 mortgage loans and had an original

principal balance of more than $3,968,000,000.

22.     RALI and the other defendants moved to dismiss the California Action complaint

and, on March 15, 2012, the California Court issued a tentative ruling granting in part and

denying in part the motions.  The bulk of the claims that the California Court dismissed were

federal securities laws claims, and the denial was based on the California Court's determination

that the NCUAB's federal securities claims were untimely under the Securities Act's three year

statute of repose—the opposite conclusion reached by the Tenth Circuit in the Kansas Action.

23.     On September 4, 2012, the California Court issued an Order generally confirming

its March 15, 2012 tentative ruling.  Because of the automatic stay imposed by the filing of these

Chapter 11 cases, however, the California Court expressly did not rule on RALI's motion.

24.     The NCUAB filed an interlocutory appeal of the California Court's dismissal of

its federal securities law claims, and that appeal remains pending.

25.     On October 29, 2012, the NCUAB filed an amended complaint in the California

Action.  The non-debtor defendants again moved to dismiss the amended complaint.  The court

denied that motion on July 29, 2013.  Following the denial of the motion to dismiss the amended

complaint, the NCUAB and the non-debtor defendants entered into a stipulated protective order

and the California Court has indicated that certain limited discovery may proceed among those

parties pending resolution of the interlocutory appeal.

**ANTICIPATED SCOPE OF DISCOVERY IN THE NCUAB ACTIONS**

26.     Considering the similarities between the RMBS cases already litigated by the

Debtors and the NCUAB Claims specifically, litigating the NCUAB Claims will likely take

years and the Debtors' estates would incur significant administrative expenses doing so.  All of

the RMBS lawsuits in which I have represented the Debtors are premised on the central

allegation that the Debtor entities misrepresented the characteristics of the mortgage loans

underlying the subject securitizations.  Likewise, the Kansas Action and the California Action

(and therefore the NCUAB Claims) are based on the central allegations that the Debtors

misrepresented the characteristics of the subject mortgage loans.  There is also some overlap

among the securitizations in the NCUAB Claims and those in the other RMBS lawsuits against

the Debtors, as discussed in further detail below.  Accordingly, the NCUAB Claims present the

same complexities, litigation risk and discovery burdens as the other RMBS lawsuits against the

Debtors.

27.     My Firm, for example, represented RALI and other debtor entities in *New Jersey

Carpenters Health Fund et al. v. RALI Series 2006-QO1 Trust, et al.*, Case No. 08-CV-08781-

HB, United States District Court, Southern District of New York ("New Jersey Carpenters").  In

New Jersey Carpenters, the plaintiff institutional investors asserted claims against RALI and

other Debtor and non-debtor entities relating to securitizations issued using the same RALI shelf

registrations and basic securitization process at issue in the California Action.  Plaintiffs asserted

claims under Sections 11, 12 and 15 of the Securities Act.

28.     One of the securitizations at issue in the New Jersey Carpenters case—RALI

2006-QO10—is also at issue in the NCUAB Claims.  Likewise, the other securitizations

originally at issue in New Jersey Carpenters, while not identical to those involved in the NCUAB

Claims, nonetheless include securitizations from the "2006-QO" series and "2007-QH" series of

securitizations also at issue in the NCUAB Claims.[2]

29.    Discovery in the New Jersey Carpenters case was extensive and costly.  The

original four securitizations in the New Jersey Carpenters case involve more than 12,000

mortgage loan files with a face value of approximately $3.8 billion.  Prepetition, discovery

focused on class certification issues.  Nonetheless, as of the Petition Date, the Debtors had

already produced more than 175,000 pages of documents, including underwriting guidelines,

transaction documents, contract files reflecting agreements between Debtor RFC and various

loan originators, emails for over 20 custodians, and selected loan files.  The plaintiffs also

indicated that they intended to take 80 depositions on the merits.  Discovery did not proceed past

class certification issues because of the automatic stay effectuated by the filing of these Chapter

11 cases, and a class action settlement of the matter has now been preliminarily approved by the

District Court.

30.    As noted above, the Firm also represented Debtor entities RFC and GMACM in

two cases brought by monoline insurer MBIA Insurance Corp.: *MBIA Insurance Corp. v.

Residential Funding Co., LLC*, No. 603552/2008 (Sup. Ct., N.Y. Cnty.) and *MBIA Insurance

Corp. v. GMAC Mortgage, LLC*, No. 600837/2010 (Sup. Ct., N.Y. Cnty.)  The enormous fact

discovery in MBIA's lawsuits is likewise indicative of the potential discovery burden in

litigating the NCUAB Claims.

31.    MBIA's case against RFC was filed in 2008, but discovery on certain issues was

still ongoing at the time these Chapter 11 cases were filed.  The MBIA case against RFC

---

[2]  The pending settlement reached in New Jersey Carpenters involves an expanded settlement class, which includes
all of the securitizations at issue in the California Action.  The NCUAB, however, has opted out of the class
settlement.

involved just five securitizations made up of second-lien loans issued by RFC in less than a year.

Those securitizations were issued using the same RFMSII shelf registration statement and the

same basic securitization process that is at issue in the Kansas Action, and one of the

securitizations—RFMSII 2007-HSA2—is at issue in both NCUAB Cases.

33.    Despite the relatively small number of securitizations, RFC had produced more

than a million pages of documents, over 63,000 mortgage loan files, and source code and other

data totaling over a terabyte of data in the MBIA cases as of the Petition Date.

33.    In addition, MBIA took over eighty days of depositions of then current or former

RFC, GMACM, or ResCap personnel.  RFC took fifty days of depositions of current or former

MBIA personnel.  Ten expert reports were exchanged prior to the Petition Date, and rebuttal

reports were anticipated.

34.    Fact discovery in MBIA's lawsuits against GMACM was also ongoing when

these Chapter 11 cases were filed.  That case involved just three second-lien securitizations

issued by GMACM.  As of the Petition Date, GMACM had already produced more than a

million pages of documents, over 95,000 loan files, and additional electronic records.

35.    Litigating the NCUAB Claims would likely involve extensive, burdensome, and

costly discovery.  It is likely, for example, that dozens of email custodians would be involved.

Given that the seven securitizations upon which the NCUAB Claims are based involve different

loan types and span a period of at least two years, the number of individuals' emails and other

electronic communications that would have to be searched would be extensive in any event.

Compounding that issue, the issues to be discovered in any litigation with NCUAB—even on a

single securitization—would touch on many areas of the Debtors' business, ranging from loan

product development, loan acquisition processes, and internal quality control processes to the

9

capital markets area (which includes the trading group, investor relations, and structured finance managers).

36.    Each securitization at issue also involves its own set of transaction documents, a unique group of mortgage loans, and underwriting guidelines that have varied over time. Where different securitizations and loan products are involved, different witnesses (and different email accounts and other sources of information) must be searched.

37.    Furthermore, the emails for the time period of the seven securitizations at issue are only available on backup tapes, of which there are thousands. Those tapes would need to be restored (a manual, time-consuming and expensive process, as has been amply demonstrated by the Examiner's investigation and other bankruptcy-related discovery). Based on past experience, searching of email custodians' accounts is likely to produce millions of pages of results, both paper and electronic, all of which must be processed and then reviewed for relevance, responsiveness, and privilege.

38.    In addition, the seven securitizations at issue in the NCUAB Claims involve more than 35,000 mortgage loans. Producing the loan files for this large number of loans would be time-consuming and expensive. Given that typical loan files can contain several hundred pages each, production of all 35,000 loan files could easily involve more than 5,000,000 pages of documents. Using a ballpark estimate of $35 per loan file (which the Debtors have previously estimated as an average per-file cost), the cost of producing just the loan files could exceed $1,200,000.

39.    Production of loan files is even further complicated by the sale of the Debtors' servicing platform. Many of the personnel and systems needed to efficiently search for, copy,

and produce loan files are no longer with the estates, making it difficult to collect and produce the relevant materials.

40.    In addition to the number of loan files produced, an additional driver of cost would be how many loan files are reunderwritten by the parties' experts.  In RMBS litigation, reunderwriting of loan files is necessary to resolve the issue of alleged misrepresentations. Reunderwriting loan files is a very expensive exercise.  How many loans the Debtors would need to reunderwrite would be driven in part by how many loans the NCUAB decided to reunderwrite. Based on other cases, even using a statistical sampling approach to limit the underwriting burden, the NCUAB's experts would likely submit reports analyzing alleged misrepresentations on thousands of individual loans, which the Debtors would need to rebut on an individual basis.

41.    Even the limited file review that was conducted in connection with the Rule 9019 settlement motion with certain institutional investors led to a file review that lasted several months and cost the Debtors millions of dollars.  *See* Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of The RMBS Trust Settlement Agreements (Doc. 320).  A file review and the associated expert reports that would likely be required to litigate the NCUAB's claims likewise would be time-consuming and expensive.

42.    Furthermore, relevant loan-level data for these 35,000 mortgage loans—such as information about loan-level performance data, loan originators, underwriting parameters, due diligence, quality audit results, payment history and other relevant metrics—is housed in or was processed through a number of electronic systems.  Some of these electronic systems are no longer operational and require extensive involvement of IT professionals to access.  Others have been largely transitioned to Ally or Ocwen and would require their assistance for the Debtors to access.  Producing such information also requires the export of large volumes of loan-level data,

as well as grappling with complex issues surrounding "structured data" such as source code,

underwriting rules programmed into automated loan evaluation systems, automated loan pricing

tools, automated loan pooling tools, and others.  The anticipated cost of searching, reviewing,

and producing such documents and information will inevitably run into the hundreds of

thousands, if not millions of dollars.

43.    Obtaining testimony at depositions or at trial in the NCUAB Actions would also

be difficult, time-consuming and expensive because there has been tremendous attrition among

the Debtors' employees since the key events occurred in 2006 and 2007.  For example, of the

seventy-six witnesses deposed in the two MBIA cases as of the petition date, many of whom

would also be witnesses in the NCUAB Actions, 80% were former employees.  In addition,

because of the Debtors' platform sales, many who were current employees at the time of their

deposition have since left the company.  Indeed, at present, *none* of the key RFC capital markets

employees who worked on the securitizations at issue remains an employee of the Debtors.  Most

of these former employees reside in Minnesota and Pennsylvania, beyond the reach of a trial

subpoena.  Almost none left the company with any ongoing contractual obligation to cooperate

with future litigation.

44.    This Court has previously recognized that this tremendous attrition of employees

presents a particular challenge to litigation of claims against the Debtors.  *See* September 13,

2013 Memorandum Opinion And Order, And Findings Of Fact And Conclusions Of Law,

Approving The FGIC Settlement Motion at 19 (Doc. 5042).

45.    In addition to the discovery discussed above, the Debtors would also need to take

further discovery from the NCUAB and the liquidated entities on behalf of which it is suing.  For

example, in order to establish its affirmative defenses, including statute of limitations and/or

repose, the Debtors would need to take discovery relating to the entities' knowledge of the

purported misrepresentations, the information they purportedly relied upon, and alternative

potential causes of the entities' losses. Such discovery further adds to the already extensive

discovery needed to litigate the NCUAB's affirmative claims.

46.     In sum, the anticipated scope of discovery would likely involve millions of pages

of documents and hundreds of days of deposition testimony from current and former employees

of the debtor entities.

### COMPLEXITY OF THE NCUAB CLAIMS

47.     The scope of the anticipated discovery also demonstrates that the NCUAB Claims

are both legally and factually complex. While the outcome of any litigation is uncertain, this is

particularly true in RMBS cases like the NCUAB Claims. There is uncertainty—both legally

and factually—on a broad array of issues, each of which will require discovery and further

litigation before they can be resolved.

48.     For example, the extensive risk disclosures provided to investors through the

prospectus and prospectus supplement for each securitization raise a number of issues relating to

what the NCUAB knew regarding the quality of the loans included in the securitizations that

would need to be resolved should litigation on the NCUAB Claims go forward. The risk

disclosures in the offering materials for RFMSII 2007-HSA2 and RALI 2006-QO6, for example,

were extensive. They included disclosures regarding the stringency of underwriting standards,

whether/which underwriting standards were used, the verification of borrower income, the

occupancy status of the mortgaged property, the value of the mortgaged property, the amount

and nature of documentation available on the mortgage transaction, and the due diligence

performed on the loans by or on behalf of the Debtors, among others.

49.     The Debtors would argue that their risk disclosures adequately placed investors such as the credit unions NCUAB is successor to on notice of potential discrepancies or deviations from published underwriting guidelines and that, where the disclosures clearly state the data provided elsewhere in the Offering Materials is less than 100% reliable, the investors had no basis to rely on such data.  Thus, for example, the Debtors would argue that because the risk disclosures make clear that owner-occupancy data is frequently self-reported by borrowers, and that self-reported data is the basis for the calculations provided by the Debtors, it cannot be a misrepresentation of owner-occupancy data if it turns out some of the self-reporting was inaccurate.

50.     The NCUAB, however, would likely argue that where data is presented in tables in the Offering Materials, the Debtors are responsible for inaccuracies in that data, regardless of the source of the underlying information—and, moreover, that while the possibilities of some discrepancies in underwriting was disclosed, the true extent of such discrepancies was not adequately disclosed.

51.     These diametrically opposed—and hotly contested—issues would need to be resolved in order to adjudicate the NCUAB Claims.

52.     Other key legal issues would likely to have to be litigated should litigation on the NCUAB Claimss move forward, including the extent of NCUAB's knowledge of market factors influencing the quality of the loans and the expected performance of the securitizations.

## CONCLUSION

53.     The NCUAB Actions have already survived motions to dismiss, and limited fact discovery is only just beginning.  Because of the complexities involved, and because RMBS claims turn on individual analysis of thousands of mortgage loans underlying the subject securitizations, it is not likely that the NCUAB Claims would be disposed of in summary

fashion.  To the contrary, although the claims process in this Court is likely to be more expedited

than if the NCUAB Actions were to proceed in federal district court, full adjudication of the

NCUAB's claims would still involve substantial time, cost and burden.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct to the best of my knowledge, information, and belief.  Executed the 25th day of

October, 2013, at Columbus, Ohio.


/s/ Jeffrey A. Lipps
Jeffrey A. Lipps