MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew
Jonathan M. Petts

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑ | ) | |

**DEBTORS' MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEBTORS' THIRTIETH OMNIBUS OBJECTION TO
CLAIMS OF RON BEJARANO (CLAIM NO. 604)
AND PAUL AND MARGE PFUNDER (CLAIM NO. 1430)**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ............................................................................................................. 3

LEGAL ANALYSIS......................................................................................................... 5

I.      OVERVIEW ........................................................................................................ 5

        A.      Causes of Action Under HAMP or the SPA ......................................... 5

        B.      Breach of Contract Claims.................................................................... 6

        C.      Other Common Law Causes of Action ................................................ 10

II.     APPLICATION OF THE ABOVE LEGAL ANALYSIS TO THE BEJARANO
        AND PFUNDER CLAIMS ................................................................................ 17

        A.      Bejarano Claim (Claim 604)............................................................... 17

                (i)      *Factual Background*............................................................. 17

                (ii)     *Analysis* ................................................................................ 19

        B.      Pfunder Claim (Claim 1430)............................................................... 22

                (i)      *Factual Background*............................................................. 22

                (ii)     *Analysis* ................................................................................ 25

CONCLUSION.............................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aceves v. U.S. Bank, N.A.*,
   192 Cal. App. 4th 218 (2011) ............................................................28

*Allen v. CitiMortgage*,
   2011 WL 3425665 (D. Md. 2011) ......................................................16

*Armstrong Petroleum Corp. v. Tri–Valley Oil & Gas Co.*,
   116 Cal. App. 4th 1375 (2004) ..........................................................26

*Aspiras v. Wells Fargo Bank, N.A.*,
   219 Cal. App. 4th 948 (2013) ............................................................15

*Barroso v. Ocwen Loan Servicing, LLC*,
   208 Cal. App. 4th 1001 (2012) .....................................................10, 27

*Bourdelais v. J.P. Morgan Chase Bank*,
   2011 WL 1306311 (E.D. Va. 2011)......................................................5

*Brown v. Bank of N.Y. Mellon*,
   2011 WL 206124 (W.D.Mich. 2011)...............................................8, 15

*Bushell v. JPMorgan Chase Bank, N.A.*,
   2013 WL 5723074 (2013)......................................................... passim

*Clark v. Scena*,
   83 P.3d 1191 (Colo. App. 2003) ........................................................20

*Corvello v. Wells Fargo Bank, N.A.*,
   728 F.3d 878 (9th Cir. 2013) ...............................................................8

*Costigan v. CitiMortgage, Inc.*,
   2011 WL 3370397 (S.D.N.Y. 2011)......................................... passim

*Denver Truck Exchange v. Perryman*,
   307 P.2d 805 (1957).............................................................................20

*Division of Labor Law Enforcement v. Transpacific Transportation Co.*,
   69 Cal. App. 3d 268 (1977) ...............................................................28

*Edwards v. Aurora Loan Services, LLC*,
   791 F. Supp. 2d 144 (D.D.C. 2011)......................................................6

*Gorbaty v. Wells Fargo Bank*, *NA*,
  2012 WL 1372260 (E.D.N.Y. 2012)................................................................6

*Green v. Wells Fargo Bank*,
  927 F. Supp. 2d 244 (D. Md. 2013) .......................................................14, 17

*Grill v. BAC Home Loans Servicing*,
  2011 WL 127891 (E.D. Cal. 2011)..................................................................6

*Hartford Accident & Indemnity Co. v. Millis Roofing & Steel Metal, Inc.*,
  418 N.E.2d 645 (Mass. App. Ct. 1981) .........................................................12

*Harvey v. Bank of America, N.A.*,
  906 F. Supp. 2d 982 (N.D. Cal. 2012) .............................................................5

*In re Bank of America HAMP Contract Litigation*,
  2011 WL 2637222 (D.Mass. 2011) .............................................................9, 12

*Jolley v. Chase Home Finance*,
  213 Cal. App. 4th (2013) ...........................................................11, 13, 15, 16

*JP Morgan Chase Bank, National Association v. Ilardo*,
  36 Misc.3d 359 (Sup. Ct. Suffolk Cnty. 2012) ...............................................7

*Kimball v. Flagstar Bank F.S.B.*,
  881 F. Supp. 2d 1209 (S.D. Cal. 2012)............................................................6

*Lazar v. Superior Court*,
  12 Cal.4th 631 (1996) ..................................................................................29

*Love v. Fire Insurance Exchange*,
  221 Cal. App. 3d 1136 (1990) ......................................................................27

*Lund v. CitiMortgage, Inc.*,
  2011 WL 1873690 (D. Utah 2011) .................................................................8

*Mendez v. Bank of America Home Loan Servicing*,
  840 F. Supp. 2d 639 (E.D.N.Y. 2012) ..........................................................12

*Morgan v. Aurora Loan Services*, LLC,
  2013 WL 5539392 (C.D. Cal., Oct. 7, 2013).................................................11

*Moore v. Mortgage Electronic Registration Systems, Inc.*,
  848 F. Supp. 2d 107 (D.N.H. 2012)..............................................................15

*National Union Fire Insurance Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc.*
  171 Cal. App. 4th 35 (2009) .........................................................................29

*Nations Enterprises, Inc. v. Process Equipment Co.*,
   40 Colo. App. 390 (1978) ...................................................................................21

*Nelson v. Bank of America, N.A.*,
   2011 WL 5138591 (11th Cir. 2011) .......................................................................5

*Pandit v. Saxon Mortgage Services, Inc.*,
   2012 WL 4174888 (E.D.N.Y. 2012)........................................................................7

*Picini v. Chase Home Finance LLC*,
   854 F. Supp. 2d 266 (E.D.N.Y. 2012) ..................................................................14

*Pool v. Wells Fargo Bank, N.A.*,
   2012 WL 3264294 (2012)..............................................................17, 20, 21, 22

*Reitz v. Nationstar Mortgage LLC*,
   2013 WL 3282875 (E.D. Mo. 2013)......................................................................8, 9

*Rossberg v. Bank of America, N.A.*,
   219 Cal. App. 4th 1481 (2013) ............................................................................13

*Scoular Co. v. Denney*,
   151 P.3d 615 (Colo. App. 2006) ..........................................................................20

*Senter v. JPMorgan Chase*,
   810 F. Supp. 2d 1339 (S.D. Fla. 2011) ...............................................................12

*Spaulding v. Wells Fargo Bank*, N.A.,
   714 F.3d 769 (4th Cir. 2013) ..............................................................................15

*Stolba v. Wells Fargo & Co.*,
   2011 WL 3444078 (D.N.J. 2011) ..........................................................................5

*Wallace v. Bank of America*,
   2011 WL 3859745 (D.N.J. 2011) ..........................................................................5

*Washington Metropolitan Area Transit Authority v. Ferguson*,
   977 A.2d 375 (D.C. 2009) ...................................................................................15

*Wells Fargo Bank, N.A. v. FSI, Financial Solutions, Inc.*
   196 Cal. App. 4th 1559 (2011) ...........................................................................29

*West v. JPMorgan Chase*,
   214 Cal. App. 4th 780 (2013), reh'g denied (Apr. 11, 2013), review filed (Apr. 26,
   2013) ............................................................................................................... passim

*Western Distributing Co. v. Diodosio*,
   841 P.2d 1053 (Colo. 1992)................................................................................20

*Wigod v. Wells Fargo Bank*,
    673 F.3d 547 (7th Cir. 2012) ........................................................................... passim

*Young v. Wells Fargo Bank, N.A.*,
    717 F.3d 224 (1st Cir. 2013) ............................................................................8, 15

*York Linings v. Roach*,
    1999 WL  608850  (Del. Ch. July 28, 1999) ..........................................................16

**STATUTES**

California's Unfair Business Practices Act (Bus. & Prof. Code § 17200) .............................26, 30

Residential Capital, LLC ("ResCap") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this memorandum of law (the "Memorandum") in further support of the *Debtors' Thirtieth Omnibus Objection to Claims* (Docket No. 4887) (the "Objection") as well as in further reply to certain responses, objections, and oppositions submitted by Ron Bejarano and Paul and Marge Pfunder, *Response of Paul and Marge Pfunder to Debtors' Thirtieth Omnibus Objetion to Claims*, (Docket No. 5259) and *Response of Ron R. Bejarano to Debtors' Thirtieth Omnibus Objections to Claims*, (Docket No. 5167) (collectively, the "Responses" and individually, the "Claimants"). In support of the Memorandum, the Debtors submit the Second Supplemental Decl. of Deanna Horst, ResCap's Chief Claims Officer, annexed hereto as Exhibit 1 (the "Supplemental Declaration, hereafter Supplemental Decl. at ¶ —"). In further support hereof, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.     On October 9, 2013, the Court considered, among other matters, the Objection. During the hearing on the Objection, the Court advised counsel for the Debtors as well as Special Borrowers' counsel to the Creditors' Committee that it would like for them "address the issue of whether courts have recognized a cause of action for wrongful denial of a loan modification." October 9, 2013 Hearing Transcript ("Oct. 9 Hrg. Tr.") at 94:14-16 (Docket No. 5399).[1]

2.     As a former mortgage servicer, one aspect of the Debtors' ordinary business practice was to work with borrowers and assist them, to the extent possible, to continue making monthly payments on their mortgage note during times in which they were experiencing

---

[1] *See* Docket No. 5390 (as amended).

1

financial distress.   Before HAMP (as defined and described in greater detail herein) was

instituted by the federal government, the Debtors' loss mitigation department regularly worked

with borrowers to try and adjust their monthly payments based on the guidelines provided to the

Debtors by the third-party investors who held the mortgages.   These loan modifications were

referred to as "traditional" loan modifications.  *See* Supplemental Decl. at ¶ 4.  Once HAMP was

instituted, the Debtors considered borrowers for both "traditional" loan modifications as well as

modifications consistent with the HAMP guidelines. *See* id. at ¶ 5.

   3. Since the commencement of HAMP, a body of case law has developed

that addresses whether a servicer has wrongfully denied a loan modification requested by a

borrower.   Borrowers have pursued a variety of legal theories in an attempt to impose liability

against servicers such as the Debtors.   To date, the Debtors are not aware that any court has

found there to be a specific cause of action for wrongful denial of a loan modification under any

state or federal law. For example, borrowers have sought to enforce the terms of HAMP against

servicers; however, courts have universally rejected a direct cause of action for wrongful denial

of a loan modification under HAMP, noting that HAMP does not authorize a private cause of

action for borrowers.   Additionally, borrowers have attempted to enforce the provisions of

HAMP against loan servicers through state breach of contract claims under the SPAs (defined

herein) under applicable state law, but courts have similarly rejected this theory of liability and

held that borrowers are mere incidental beneficiaries of, and have no private rights under, an

SPA.   Finally, borrowers have pursued breach of contract claims (and other common law torts)

against servicers. Based on the research conducted, the Debtors are not aware of any instance in

which a servicer has been found liable under such a cause of action on account of a purported

wrongful denial of a loan modification; rather, in certain jurisdictions, borrowers have only succeeded in defeating motions to dismiss such causes of action.

4.        The Debtors assert that neither Bejarano nor Pfunder have stated a colorable claim under Colorado or California law, respectively, upon which relief can be granted against the Debtors.  Neither Bejarano nor the Pfunders qualified for modifications under HAMP and were not parties to a Trial HAMP Modification (defined herein).  Rather, the Claimants were offered Traditional Modifications (defined herein) that identified specific conditions that must first be satisfied before the modification became effective, and both Claimants failed to satisfy those prerequisites.  Accordingly, the Claimants never had binding contracts with the Debtors that would allow for them to enforce a breach of contract or similar claim against the Debtors. Moreover, as described in greater detail herein, the Debtors did what they could to assist these borrowers with a modification of the payment terms of their mortgage note.  The Debtors acted reasonably and there is no valid basis to assert a claim for wrongful denial of a loan modification against the Debtors.

## BACKGROUND

5.        As a regular part of the Debtors' business practices, the Debtors offered mortgage loan modifications to Borrowers[2] in financial distress, pursuant to certain guidelines established by the investors ("Traditional Modifications").   The purpose of a Traditional Modification, as with other types of loan modifications, is to provide assistance to a Borrower who is facing unavoidable financial circumstances that prevent him or her from upholding the terms of his or her mortgage note.  Although the mortgage documents did not require the Debtors

---

[2] As used herein, term "Borrower" has the definition set forth in the *Order Pursuant to Sections 105(a) of the Bankruptcy Code and Bankruptcy Rules 1009, 3007 and 9019(b) Approving (I) Claim Objection Procedures, (II) Borrower Claim Procedures, (III) Settlement Procedures, and (IV) Schedule Amendment Procedures* [Docket No. 3294].

3

to offer Traditional Modifications, the Debtors would review accounts for loan modification options at the request of a Borrower. The Debtors' ability to offer a Traditional Modification, as well as the limits of what assistance the Debtors could provide in a Traditional Modification, hinged on the loan modification programs available to the Debtors at the time of the request and, more importantly, on the investor's loan modification guidelines. Investor guidelines are set at the sole discretion of the investor and in some cases, investors do not allow the servicer to provide the Borrower with any loan modification options. *See* <u>Supplemental Decl</u>. at ¶ 4.

6.    The Home Affordable Modification Program ("<u>HAMP</u>") is an administrative program that was implemented in April 2009 by the United States Treasury Department to help eligible homeowners with loan modifications on their home mortgage debt. *See* <u>id.</u> at ¶ 5. HAMP provided the Debtors with an additional type of loan modification (a "<u>HAMP Modification</u>") for assisting eligible Borrowers experiencing financial distress. Therefore, beginning in April 2009, the Debtors reviewed every loan modification application from Borrowers for both a HAMP Modification and a Traditional Modification. *See* <u>id</u>.

7.    Mortgage servicers, such as Debtor GMAC Mortgage, LLC ("<u>GMACM</u>"), voluntarily participate in HAMP by executing a servicer participation agreement ("<u>SPA</u>") with the Federal National Mortgage Association ("<u>Fannie Mae</u>") in its capacity as financial agent for the United States. The SPA is not an agreement between the servicer and the borrower. Under an SPA, Fannie Mae agrees to provide the servicer with financial incentives for modifying eligible loans pursuant to HAMP guidelines. HAMP also provides financial incentives to investors to participate in the program, and as with servicers, an investor's participation in HAMP is voluntary. *See* <u>id.</u> at ¶ 5.

8.      In addition to providing permanent HAMP Modifications and Traditional Modifications, the Debtors also provided certain eligible Borrowers with temporary loan modifications on a trial basis ("<u>Trial HAMP Modifications</u>" and "<u>Trial Traditional Modifications</u>," and together, "<u>Trial Modifications</u>"). Trial HAMP Modifications and Trial Traditional Modifications were payment plans lasting a short period of time, usually three months, for Borrowers determined to be eligible for either a HAMP Modification or a Traditional Modification. Trial HAMP Modifications, unlike Traditional Modifications, must meet certain guidelines as part of the HAMP program, as outlined by the Treasury Department. The terms of a Trial Modification were based the information taken from the Borrower's workout package and evidence submitted by the Borrower to the Debtors for review. Trial Modifications were consummated by a written agreement signed by the Borrower. The Trial Modification's payments had to be paid on time in order for a Traditional Modification or a HAMP Modification to be considered. *See* <u>id.</u> at ¶ 6.

## LEGAL ANALYSIS

### I.      OVERVIEW

#### A.      Causes of Action Under HAMP or the SPA

9.      Courts have universally rejected a direct cause of action for wrongful denial of a loan modification under HAMP, noting that HAMP does not authorize a private cause of action. See *Nelson v. Bank of Am., N.A.*, 2011 WL 5138591 (11th Cir. Oct. 31, 2011); *Wallace v. Bank of America*, 2011 WL 3859745, at *2 n.3 (D.N.J. Aug. 30, 2011); *Stolba v. Wells Fargo & Co.*, 2011 WL 3444078 (D.N.J. Aug. 8, 2011); *Bourdelais v. J.P. Morgan Chase Bank*, 2011 WL 1306311, at *3 (E.D. Va. Apr. 1,2011); *Harvey v. Bank of Am., N.A.*, 906 F. Supp. 2d 982, 990 (N.D. Cal. 2012).

5

10.     Courts have similarly rejected borrower attempts to enforce the provisions

of HAMP against loan servicers under SPAs.  Such state law breach of contract claims have been

unsuccessful because courts have held that borrowers are mere incidental beneficiaries of, and

have no private rights under, an SPA.  *Edwards v. Aurora Loan Servs., LLC*, 791 F. Supp. 2d

144, 151 (D. D.C. 2011) *accord Grill v. BAC Home Loans Servicing*, 2011 WL 127891, at *5-6

(E.D. Cal. Jan. 14, 2011), *Gorbaty v. Wells Fargo Bank*, *NA*, 2012 WL 1372260, at *15

(E.D.N.Y. Apr. 18, 2012); *Kimball v. Flagstar Bank F.S.B.*, 881 F. Supp. 2d 1209, 1224 (S.D.

Cal. 2012).

11.     Even though courts have rejected attempts by borrowers to bring direct

causes of action under HAMP and breach of contract claims under an SPA, borrowers also have

attempted to enforce the provisions of HAMP against loan servicers through state law claims

under Trial HAMP Modifications.  The most common state law cause of action brought under a

Trial HAMP Modification is breach of contract.

**B.     Breach of Contract Claims**

12.     The reported "breach of contract" cases have not imposed liability on a

servicer.  Rather, the reported decisions only addressed whether the plaintiff-borrowers had pled

a cause of action sufficient to survive a motion to dismiss.  Furthermore, where the court found

the allegations were sufficient to support a cause of action, the plaintiff-borrower was in a Trial

HAMP Modification and had fully performed each of its obligations.

13.     Courts have reached inconsistent results in determining whether a cause of

action for breach of contract under a Trial HAMP Modification can survive dismissal.  The two

questions that have split courts are whether (i) the terms of the Trial HAMP Modification create

a binding contract that requires the servicer to grant a permanent modification if the borrower

6

follows the requirements under the agreement, and (ii) a Trial HAMP Modification creates sufficient consideration between the servicer and the borrower to constitute a valid, binding contract.

14.    The Southern District of New York addressed the first issue in *Costigan v. CitiMortgage, Inc.*, 2011 WL 3370397 (S.D.N.Y. Aug. 2, 2011).  Applying New York law, it held that the language of the Trial HAMP Modification did not create a binding contract.[3]  Courts in New York have followed *Costigan* and similarly found that the terms of a Trial HAMP Modification do not create a binding contract to support a breach of contract claim.  *See Pandit v. Saxon Mortg. Servs, Inc*., 2012 WL 4174888, at *4 (E.D.N.Y. Sept. 17, 2012) (holding that while some clauses in the Trial HAMP Modification seemed to create a contract for a permanent loan modification, when read as a whole it is clear that a permanent modification was conditioned on additional requirements being met); *JP Morgan Chase Bank, NA v. Ilardo*, 36 Misc.3d 359, 365 (Sup. Ct. Suffolk Cnty., 2012) (finding the Trial HAMP Modification did not create a contract for a permanent modification because it expressly stated a permanent modification is subject to subsequent approval by the servicer and receipt of a modification agreement).

---

[3] "Although the [Trial HAMP Modification] states that Citi 'will provide [the borrower] with a Home Affordable Modification Agreement' if the borrower is in compliance with the [Trial HAMP Modification], it also unequivocally states that the [Trial HAMP Modification] does not constitute a permanent modification of the original loan; by signing the [Trial HAMP Modification], Costigan attested that he understand[s] that this Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) [he] meets all of the conditions required for modification, (ii) [he] receive[s] a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed.  The [Trial HAMP Modification] ponders that '[i]f prior to the Modification Effective Date ... the Lender does not provide [the borrower] with a fully executed copy of ... the Modification Agreement ... the Loan documents will not be modified ....' By signing the [Trial HAMP Modification], Costigan 'agree[d] that [Citi] will not be obligated or bound to make any modification of the Loan Documents if [Citi] determines that [Costigan does] not qualify.' The Complaint fails to plead that Costigan met 'all of the conditions required for modification' and Citi clearly never received a 'fully executed copy of the Modification Agreement.'" *Costigan v. CitiMortgage, Inc.*, 2011 WL 3370397, at* 6.

15.    Outside of the Southern District of New York, other district courts have also found that Trial HAMP Modifications with language similar to the provisions relied on by the court in *Costigan* do not create a binding obligation on loan servicers to provide a permanent modification.  These courts determined that when a Trial HAMP Modification clearly states the modification was subject to certain conditions precedent and would not be made permanent until the borrower receives an executed copy of the modification agreement, and the servicer does not send said executed copy, then a contract for a permanent modification has not been formed. See *Lund v. CitiMortgage, Inc.*, 2011 WL 1873690, at *2 (D. Utah May 17, 2011); *Brown v. Bank of N.Y. Mellon*, 2011 WL 206124, at *3 (W.D. Mich. Jan. 21, 2011); *Reitz v. Nationstar Mortg., LLC*, 2013 WL 3282875, at *11 (E.D. Mo. June 27, 2013).

16.    However, some courts have come to the opposite conclusion when applying their respective state laws, finding that a contract that is premised on the servicer executing a valid copy of the modification agreement is still enforceable against the servicer and requires the servicer to offer the modification.  These courts have interpreted the language stating that the modification will not be made permanent until the borrower receives an executed copy of the modification agreement to only mean that the modification does not technically go into effect until the moment when the servicer executes the agreement by mailing the paperwork, not that the servicer is never required to execute a modification.  *See Wigod v. Wells Fargo Bank*, 673 F.3d 547, 577 (7th Cir. 2012); *Corvello v. Wells Fargo Bank, N.A.*, 728 F.3d 878, 882 (9th Cir. 2013).   These courts reasoned that language, like that in *Costigan*, could be plausibly interpreted by borrowers to mean that if they complied with the terms of the Trial HAMP Modification, then they would receive a permanent loan modification.  *See Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 229 (1st Cir. 2013).  These courts have determined that since HAMP

guidelines require the servicer to determine if the borrower qualifies for a modification under HAMP before the Trial HAMP Modification is executed, the servicer is not permitted to later deny a permanent loan modification for the reason that the borrower does not meet the HAMP eligibility requirements.  See *Wigod,* 673 F.3d at 585; *Corvello,* 728 F.3d 878, 883-884; *West v. JPMorgan Chase*, 214 Cal. App. 4th 780 (2013), [reh'g denied (Apr. 11, 2013), review filed (Apr. 26, 2013)]; and *Bushell v. JPMorgan Chase Bank, N.A.*, 2013 WL 5723074, at *1 (Cal. App. 3rd 2013) (citing *Wigod* and *West*).

17.    In one case, the court found that HAMP guidelines required the servicer to grant a permanent loan modification if the borrower complied with the terms of the Trial HAMP Modification.  As a result, the court held that even when there is no promise in the Trial HAMP Modification itself of a permanent modification upon successful completion of the Trial HAMP Modification, the promise should nonetheless be read into the agreement because the HAMP guidelines require it.  *See West*, 214 Cal. App. 4th 780.

18.    As noted above, the second issue of contention among courts is whether providing additional documentation and financial information (which is usually required of borrowers in order to qualify for a Trial HAMP Modification) is sufficient consideration to create a binding contract.  In *Reitz v. Nationstar*, the court found that the borrower did not provide sufficient new consideration to create a contract when it provided the servicer with additional documentation and financial information. 2013 WL 3282875, at *12.  However, the court in *In re Bank of Am. HAMP Contract Litig.* came to the opposite conclusion, finding that things like providing financial information, opening an escrow account, and agreeing to undergo credit counseling if asked were all sufficient consideration to create a valid contract. *In re Bank of Am. HAMP Contract Litig.,* 2011 WL 2637222, at *1 (D. Mass. July 6, 2011).  In California,

9

courts have also identified borrower actions in support of loan modification review to be sufficient consideration. *See Bushell*, 2013 WL 5723074, at *9 (finding that repeatedly contacting the servicer, preparing documents at the servicer's request, and discontinuing efforts to pursue a refinance from other financial institutions was sufficient).

19.    Even when courts find a contract has been formed, they will not find liability for breach of contract unless the plaintiff has performed their obligation under the contract in order for there to be a cause of action. Thus, where the borrower fails to sign, notarize and return the agreement by a stated deadline, courts have dismissed claims for failure to properly allege that the plaintiff performed. *See Barroso v. Ocwen Loan Servicing, LLC*, 208 Cal. App. 4th 1001, 1014 (2012) (sustaining challenge to the pleadings on a breach of contract cause of action where the borrower admittedly did not fully perform because he did not sign and return the written agreement as required).

### C.    Other Common Law Causes of Action

20.    In addition to breach of contract claims, borrowers have also alleged other common law causes of action related to the alleged wrongful denial of loan modifications. These include promissory estoppel, breach of the implied duty of good faith and fair dealing, fraud, misrepresentation, negligent and intentional infliction of emotional distress, negligence, and breach of fiduciary duty. As with the "breach of contract" cases, based on the research the Debtors have conducted, the Debtors are not aware of any reported decision that has reached a judgment against a servicer that imposed monetary damages or equitable relief against the servicer under these theories. Rather, the courts only addressed whether plaintiff-borrowers had pled a cause of action sufficient to survive a motion to dismiss.

*Promissory Estoppel*

21.   To establish a claim for promissory estoppel, courts generally require some version of the following elements: (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendant, and (4) plaintiff relied on the promise to its detriment. *See Wigod*, 673 F.3d at 566.

22.   When courts have found that a Trial HAMP Modification does not create a valid contract, they also rejected the borrower's claim for promissory estoppel.  *See Costigan*, 2011 WL 3370397, at *7; *Morgan v. Aurora Loan Services*, LLC, 2013 WL 5539392 at *7 (C.D. Cal., Oct. 7, 2013).

23.   Courts that have recognized a Trial HAMP Modification as a valid contract were far more likely to allow claims for promissory estoppel to survive a motion to dismiss, particularly under circumstances when borrowers specifically alleged that the servicers assured the borrowers that a modification was forthcoming. *See Wigod,* 673 F.3d at 566 (finding that since the plaintiff's complaint adequately alleged a promise in the form of a contract, that promise was sufficient to support a claim for promissory estoppel); *West*, 214 Cal. App. 4th at 803-04 (finding that representations in the Trial HAMP Modification were sufficient to create a promise under promissory estoppel); *Jolley v. Chase Home Fin.,* 213 Cal. App. 4th 872, 897 (2013) (after finding that the Trial HAMP Modification created a contract, the court found that assurances from the servicer's employee that a modification was forthcoming was sufficient to support a claim for promissory estoppel); and *Bushell*, 2013 WL 5723074, at *9 (finding that the servicer's representations over the phone that the borrower would receive a modification was sufficient to support a cause of action for promissory estoppel).

*Breach of the Implied Covenant of Good Faith and Fair Dealing*

24.    In order to allege a cause of action for breaching the covenant of good faith and fair dealing, the plaintiff must allege that the defendant acted in bad faith by doing something that had the effect of destroying or injuring the right of the plaintiff to its fruits of the contract. Lack of good faith "carries an implication of a dishonest purpose, conscious doing of wrong, or breach of a duty through motive of self-interest or ill will. Lack of good faith 'carries an implication of a dishonest purpose, conscious doing of wrong, or breach of a duty through motive of self-interest or ill will." *See In re Bank of Am. HAMP Contract Litigation*, 2011 WL 2537222, at *5, (citing *Hartford Accident & Indem. Co. v. Millis Roofing & Steel Metal, Inc*., 418 N.E.2d 645 (Mass. App. Ct. 1981)).

25.    Most states allow a cause of action for breach of the implied covenant of good faith and fair dealing only if there is a valid contract.  As a result, courts have dismissed this cause of action if they find that the Trial HAMP Modification does not create a valid contract.  *See Senter v. JPMorgan Chase,* 810 F. Supp. 2d 1339 (S.D. Fla. 2011); *Mendez v. Bank of Am. Home Loan Servicing*, 840 F. Supp. 2d 639 (E.D.N.Y. 2012).  However, courts have allowed these causes of action to go forward when they find both a valid contract as well as some evidence of behavior on the part of the loan servicer, such as allowing employees to make inaccurate representations to borrowers in bad faith, which frustrate the counterparty's right to the benefit of the contract or failing to offer a permanent modification after full compliance with the Trial HAMP Modification.  *See In re Bank of Am. HAMP Contract Litigation*, 2011 WL 2637222, at *5 (finding that allegations that the servicer willfully failed to modify loan when it promised it would and encouraged employees to make inaccurate statements was sufficient to support a cause of action); *Bushell*, 2013 WL 5723074, at *9 (2013) (finding that allegations that

12

the servicer failed to offer a modification in good faith and in violation of HAMP guidelines after the borrower complied with the terms of the Trial HAMP Modification was sufficient to support a cause of action for breach of the implied covenant of good faith and fair dealing).

*Fraud and Misrepresentation*

26.     Most states require some version of the following elements to sufficiently allege a cause of action for fraud or misrepresentation: (a) misrepresentation; (b) knowledge of falsity; (c) intent to defraud, i.e., induce reliance; (d) justifiable reliance; and (e) damage.  *See* e.g. *Jolley,* 213 Cal. App. 4th at 893.

27.     Plaintiffs have alleged common law fraud and misrepresentation based on allegations that the servicer made representations that a modification would be forthcoming but that never came to fruition.  Absent an existing Trial HAMP Modification, a claim premised on the mere allegation that the servicer promised a modification could not survive a motion to dismiss. *See Rossberg v. Bank of Am., N.A.*, 219 Cal. App. 4th 1481 (2013), as modified on Cal. Rptr. 539 denial of reh'g (Sept. 26, 2013), review filed (Oct. 9, 2013) (finding that allegations that the servicer promised a loan modification with no intent to actually grant the modification were insufficient for alleging fraud because without a contract there was not a sufficient causal link between the alleged fraud and the alleged damages suffered by the borrower).  However, some courts have allowed fraud claims based on alleged misrepresentations about the likelihood of the borrower obtaining a permanent modification including *Jolley,* 213 Cal. App. 4th at 893 (finding that allegations that an employee implied he was a decision maker at the highest level of Chase Bank and stated there was a "high probability" that Chase would modify the loan, were grounds for fraud under California law); *West,* 214 Cal. App. 4th  at 792 (finding allegations by

13

the borrower that Chase had both verbally, and in the Trial HAMP Modification, misrepresented to her that she had been granted a modification when in reality it had already made plans to go forward with a foreclosure sale were sufficient to allege fraud under California law); and *Bushell*, 2013 WL 5723074, at *9-10 (citing *West* 214 Cal. App. 4th at 795).

28.    The viability of causes of action for negligent misrepresentation have also been mixed, and the difference often depends on the underlying state precedent.  Typically, torts based on negligence require a showing that a duty was owed to the plaintiff by the defendant. Some states require plaintiffs to show such a duty when alleging negligent misrepresentation.  In such states, the courts have dismissed claims for negligent misrepresentation because they have found there is no duty of care between a servicer and a borrower.[4]  *See Green v. Wells Fargo Bank,* 927 F. Supp. 2d 244, 252 (D. Md. 2013) (finding that while a duty could arise between a borrower and the original lender of the loan, it does not arise between a borrower and the servicer of a loan).  However, when the state does not require a showing that a duty exists between a servicer and a borrower, courts are more likely to allow the cause of action to go forward.  *See West,* 214 Cal. App. 4th at 804 (finding sufficient allegations for a negligent misrepresentation action without addressing whether a duty existed between the plaintiff-borrower and defendant-servicer because California does not require such a duty).

*Negligent and Intentional Infliction of Emotional Distress*

29.    To assert a cause of action for either negligent or intentional infliction of emotional distress most states require the plaintiff to allege that the defendant's extreme and

---

[4] Some courts have found there to be an exception to this general rule when the servicer assigned the borrower a personal "manager" to guide them through the process, finding that this sort or relationship lies outside the typical borrower-servicer relationship and therefore could potentially support a cause of action for misrepresentation.  *Picini v. Chase Home Fin. LLC*, 854 F. Supp. 2d 266, 277 (E.D.N.Y. 2012).

outrageous conduct intentionally or recklessly (or negligently if asserting negligent infliction of emotional distress) caused severe emotional distress to another. *See e.g. Moore v. Mortg. Elec. Registration Sys., Inc.,* 848 F. Supp. 2d 107, 136 (D.N.H. 2012).

30.    Causes of action for either negligent or intentional infliction of emotional distress have typically not survived a motion to dismiss.  Most courts have determined that the stress alleged to have been experienced by the borrower as a result of not receiving a modification "did not go beyond all possible bounds of decency," the standard usually required. *See Moore v. Mortg. Elec. Registration Sys., Inc.,* 848 F. Supp. 2d at 136*; Young,* 717 F.3d at 240.  The only reported decision the Debtors found that allowed an emotional distress cause of action to survive dismissal involved a servicer that *wrongly* attempted to foreclose on the borrower's home *three* times while the servicer was still reviewing her situation for a loan modification. *See Brown*, 2011 WL 206124, at *6.


*Negligence*

31.    In order to assert a cause of action for negligence, the plaintiff must show there was (i) a duty of care owed to the defendant, (ii) a breach of that duty of care, and (iii) damage to the plaintiff that was proximately caused by the breach.  *See Wash. Metro. Area Transit Auth. v. Ferguson*, 977 A.2d 375, 377 (D.C. 2009).

32.    Causes of action for negligence are generally dismissed based on the well established principle that neither a lender nor a servicer owes a duty to a borrower.  *See Spaulding v. Wells Fargo Bank*, N.A. 714 F.3d 769, 776 (4th Cir. 2013) (applying principle to a lender); *Aspiras v. Wells Fargo Bank, N.A.*, 219 Cal. App. 4th 948, 963 (2013) (finding no duty even where the financial institution in question is the loan servicer and the challenged activity is

review for a loan modification). The general rule remains in California that no duty arises unless the bank exceeds "the scope of its conventional role as mere lender of money." *See* <u>id</u>. However, in the context of a construction loan, a court has found a duty where the bank was sufficiently involved during loan modification negotiations. *See Jolley,* 213 Cal. App. 4th at 905-06.

*Breach of Fiduciary Duty*

33.    Typically, the elements of a claim for breach of fiduciary include (i) the existence of a fiduciary duty and (ii) a breach of that duty.  See *York Linings v. Roach*, 1999 WL 608850, at *2 (Del Ch. July 28, 1999).

34.    The Debtors have not come across a case where a court recognized the existence of a fiduciary duty between a borrower and a servicer.  Courts have been exceedingly reluctant to transform an ordinary contractual relationship between banker and customer into a fiduciary relationship.  *See Allen v. CitiMortgage*, 2011 WL 3425665, at *8 (D. Md. Aug. 4, 2011) (holding that entering into a Trial HAMP Modification was not a sufficiently special circumstance to transfer an ordinary contractual relationship into a fiduciary relationship).

*Claims Under State Consumer Protection Statutes*

35.    Many states have consumer protection statutes, such as California's unfair competition law, and many borrowers have brought claims under these statutes in addition to their common law claims.  Whether causes of action for wrongful denial of a loan modification are successful on these grounds is highly dependent on the language and interpretation of each state's statute.  For example, California's statute bars "fraudulent activity," which includes any act or practice likely to deceive the public, even if no one is deceived.  *See Jolley,* 213 Cal. App.

4th at 893.  Similarly, in Maryland, the law requires a showing that the plaintiff reasonably relied

on the fraudulent conduct or the misrepresentation (i.e. actually was deceived).  To the best of

the Debtors' knowledge, courts have been less likely to find that denial of a permanent HAMP

Modification after providing a Trial HAMP Modification was a deceptive practice. *See Green,*

927 F. Supp. 2d at 255.


II.     **APPLICATION OF THE ABOVE LEGAL ANALYSIS TO THE BEJARANO
        AND PFUNDER CLAIMS**

        36.     Bejarano and Pfunder are residents of, and the properties subject to the

mortgages serviced by the Debtors are located in, Colorado and California, respectively.  As a

result, any causes of action based on state law will need to be based on the laws of each

claimant's respective state. *See West*, 214 Cal. App. 4th at 788 (applying California law to a case

where the plaintiff-borrower was a California resident and the mortgaged property was located in

California); *Pool v. Wells Fargo Bank,   N.A.*, 2012 WL 3264294 (Colo. Aug. 10, 2012)

(applying Colorado Law to a case where the plaintiff-borrower was a resident of Colorado and

the mortgaged property was located in Colorado).

        A.      **Bejarano Claim (Claim 604)**

                **(i)**     *Factual Background*

        37.     Mr. Bejarano's mortgage loan was serviced by GMACM.  On September

17, 2012, Mr. Bejarano filed proof of claim number 607 (the "Bejarano Claim") against ResCap

on the asserted basis of "breach of contract" on account of his requests for loan modifications.

*See* Supplemental Decl. at ¶8.  In replying to Bejarano's response to the Objection, the Debtors

reviewed Mr. Bejarano's payment history, the Debtors' internal servicing notes and Mr.

Bejarano's loan modification applications, loan modification denial letters, loan modification

document request letters, as well as his compliance with modifications (trial and/or permanent) and any applicable investor guidelines. *See* <u>id.</u> at ¶ 3.

38.    Since 2007, Mr. Bejarano's loan has been foreclosed upon three times. The first foreclosure was commenced on March 2, 2007, but the loan was reinstated on July 20, 2007.  On February 2, 2009, a second foreclosure was initiated, but the loan was again reinstated on April 15, 2011.  On August, 16, 2011, a third foreclosure was initiated with regard to Mr. Bejarano's loan.  Mr. Bejarano's loan account was service-released to Ocwen on September 1, 2013.  Mr. Bejarano's loan was still in active foreclosure at the time of the transfer. *See* <u>id.</u> at ¶ 9.

39.    In 2009, Mr. Bejarano began working with MDF Financial Services to negotiate a loan modification on his behalf with the Debtors.  Mr. Bejarano applied for loan modifications with GMACM several times between 2009 and 2013.  Initially, Mr. Bejarano was provided a Traditional Trial Modification signed March 25, 2009 (the "<u>March 23 Modification</u>") and made payments under such trial modification in the months of March 2009 through June 2009, as well as in August and November of 2009 and January 2010.  The Debtors offered Mr. Bejarano a permanent Traditional Modification on December 2, 2009 (the "<u>December 2 Offer</u>"). On February 17, 2010, Mr. Bejarano was denied a permanent loan modification due to his failure to provide certain documentation. *See* <u>Supplemental Decl.</u> at ¶ 10.

40.    On December 8, 2010, Mr. Bejarano was then offered a permanent Traditional Modification (the "<u>December 8 Offer</u>"), which reduced his monthly mortgage payments by $470 a month. However, Mr. Bejarano failed to sign or execute the modification agreement so he was denied the modification on January 4, 2011. *See* <u>Supplemental Decl</u>. at ¶ 11.

41.    Mr. Bejarano subsequently requested another loan modification, and, on May 4, 2011, a missing item letter was mailed to Mr. Bejarano, and Mr. Bejarano provided the requested information.  After receiving the requisite information, Mr. Bejarano's loan account was reviewed for both a traditional and HAMP loan modification options.  On May 26, 2011, Mr. Bejarano's account was denied a HAMP loan modification due to Mr. Bejarano's income being insufficient to support the loan.  On June 2, 2011, Mr. Bejarano's account was denied a traditional modification on the same basis.  At that time, the Debtors recommended that Mr. Bejarano consider selling the property, as his mortgage payments were unaffordable based on his stated income and expenses.  *See* id. at ¶ 11.

42.    Mr. Bejarano continued to request loan modifications.  Each request was reviewed by the Debtors, for both a HAMP Modification and a Traditional Modification, and the requests were denied on the following dates for the following reasons:  (i) on August 12, 2011, December 2, 2011, August 16, 2012, October 18, 2012, November 18, 2012, January 14, 2013, February 4, 2013, March 8, 2013, March 28, 2013, and May 10, 2013, Mr. Bejarano was denied a loan modification for failing to provide additional information; (ii) on January 26, 2012, September 5, 2012, and June 27, 2013, Mr. Bejarano was denied a HAMP loan modification for failing to meet the HAMP criteria; and (iii) on February 3, 2012 and September 10, 2012, Mr. Bejarano was denied a loan modification for failing to meet the program guidelines for a Traditional Modification.  *See* Supplemental Decl. at ¶ 12.

(ii)    *Analysis*

43.    Because Mr. Bejarano's trial modifications were always Traditional Modifications rather than HAMP modifications, cases such as *Wigod*, *Young*, and *Costigan* that deal with loan modifications under HAMP are not necessarily instructive under the circumstances.

19

44.     There have been very few cases in Colorado that have dealt with the question of wrongful denial of a loan modification, and none have dealt with breach of contract specifically.[5]

45.     To succeed on a breach of contract claim, a plaintiff must prove: (1) the existence of a contract; (2) performance by the plaintiff or some justification of non-performance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *W. Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo. App. 1992). A contract is formed when an offer is made and accepted, *see Scoular Co. v. Denney,* 151 P.3d 615, 617 (Colo. App. 2006), and the agreement is supported by consideration. *See Clark v. Scena,* 83 P.3d 1191, 1194 (Colo. App. 2003); *see also Denver Truck Exch. v. Perryman,* 307 P.2d 805, 810 (Colo. App. 1957).

46.     The Debtors acknowledge that the March 23 Modification was a contract for a trial modification. The contract stated that in exchange for Mr. Bejarano making trial payments, the Debtors agreed to suspend its foreclosure proceeding and review Mr. Bejarano's situation to determine if a permanent modification could be granted. *See* Exhibit A, *Bejarano Loan Modification Documents*, at 1-2.[6]  However, the temporary modification agreement provided to Mr. Bejarano did not promise him that he would receive a permanent modification. The March 23 Modification only provided that the Debtors would not foreclose on his property while they were reviewing his case if he made the temporary payments. *See* id.  The Debtors

---

[5] One case, *Pool*, 2012 WL 3264294, dealt with the question of breach of contract resulting from denial of a loan modification, but dismissed the cause of action because the agreement was never signed by the servicer, and therefore did not address the substantive question of whether a Trial HAMP Modification could be a valid contract under Colorado law.

[6] "Lender agrees to suspend foreclosure activity on the delinquent account provided that you execute and return this Agreement and the initial payment toward delinquency… At the conclusion of the scheduled payments below, we will review your situation to determine the best option for resolving the remaining delinquency."  See  Exhibit A, *Bejarano Loan Modification Documents*, at 2.

fulfilled their obligation under this contract when they made a decision on his case and provided Mr. Bejarano with the December 2 Offer.  As a result, Mr. Bejarano cannot state a claim for breach of contract based on the March 23 Modification because all of the terms of the contract were fulfilled. See *Nations Enters., Inc. v. Process Equip. Co.* 40 Colo App. 390, 393 (1978) (stating generally that when the terms of a contract are fulfilled, there is no breach of contract).

47.    The December 2 Offer specifically noted, "The loan modification will not be completed until we receive all properly executed documents and the Contribution." [7] See Exhibit A, *Bejarano Loan Modification Documents*, at 4-5.  The December 2 Offer also explicitly noted that the Contribution and executed loan modification documents are due back by January 1, 2010. *See* id.  As noted above, Debtors received the Contribution amount from Mr. Bejarano, but never received the executed documents.  As a result, the Debtors informed Mr. Bejarano on February 17, 2010 that his modification was denied for failure to provide the executed documents.   *See* Exhibit A, *Bejarano Loan Modification Documents,* at 12-13.

48.    Since Mr. Bejarano never returned the executed loan document, he never accepted the Debtors' offer.  As a result, no valid contract for a permanent modification was ever formed, and Mr. Bejarano cannot assert a claim for breach of contract based on the December 2 Offer. See *Pool,* 2012 WL 3264294 at *5 (finding that servicer's failure to sign the modification agreement meant that no contract was formed).

49.    Similarly, the December 8 Offer required Mr. Bejarano to sign and execute the loan modification agreement *See* Exhibit A, *Bejarano Loan Modification*

---

[7] As used herein, the term "Contribution" refers to money that must be paid by a borrower to finalize a loan modification.  The Debtors typically require payment of a Contribution at the time the executed loan modification documents are delivered to the mortgage company.  The Debtors may apply a Contribution, for example, toward either the first payment due on the loan after the modification takes effect, the principal balance of the loan or fees that could not be capped under the loan modification.  *See* Supplemental Decl. at ¶ 19, n.6.

21

*Documents*, at 25-31.  Since Mr. Bejarano never signed and executed the agreement, no contract

for a loan modification was created, and Mr. Bejarano cannot assert a clam for breach of contract

based on the December 8 Offer.  See *Pool,* 2012 WL 3264294 at *5.

      50.    Mr. Bejarano cannot allege a cause of action for breach of contract based

on the loan modification denials discussed in paragraph 42 *supra* because, again, a contract was

never formed.  In those cases, the Debtors never offered Mr. Bejarano a modification because he

either failed to provide the required information or failed to meet the criteria necessary to receive

either a HAMP or traditional modification.

      51.    Therefore, based on the information set forth above, Mr. Bejarano's claim

(Claim No 604) should be disallowed and expunged.


      **B.**    **Pfunder Claim (Claim 1430)**

      **(i)**    *Factual Background*

      52.    Mr. and Ms. Pfunder are residents of California, and the property in

question is located in California, and as a result any cause of action they assert would be

governed by California law. See *West*, 214 Cal. App. 4th at 788.  Mr. and Ms. Pfunder filed

proof of claim number 1430 (the "Pfunder Claim") in the amount of $435,000.00 alleging that

the Debtors refused to provide a loan modification in relation to Mr. and Ms. Pfunder's loan (the

"Pfunder Loan"), which was originated with Quicken Loans Inc. on December 18, 2004 and was

being serviced by GMACM as of January 18, 2005.    Mr. and Ms. Pfunder further allege that

they were forced to sell their home through a short sale as a result of the Debtors' refusal to

provide a loan modification.  *See* Supplemental Decl. at ¶ 15.

      53.    The Debtors' servicing records reflect that Mr. and Ms. Pfunder first

contacted GMACM regarding a loan modification on August 5, 2008.  At that time, the only

payment due and owing on the Pfunder Loan was for August 1, 2008.  Mr. and Ms. Pfunder

indicated that Mr. Pfunder had lost his full-time employment.  On September 25, 2008, Mr. and

Ms. Pfunder's request for a Traditional Loan Modification was denied because the payment

options at the time of the request were not affordable to Mr. and Ms. Pfunder.  *See* id. at ¶ 16.

54.    On April 29, 2009, the Debtors received an unsolicited workout package

from Mr. and Ms. Pfunder, and on May 11, 2009, the Debtors informed Monica Ortiz, Mr. and

Ms. Pfunder's authorized third party agent, that the package was missing certain documents that

were required for consideration of the requested loan modification. *See* id. at ¶ 17.

55.    On May 26, 2009, Mr. and Ms. Pfunder's loan account was approved for a

Forbearance Plan[8] (the "May Forbearance Plan"), with monthly payments due from June 1, 2009

through December 1, 2009, while the Debtors continued to review Mr. and Ms. Pfunder's

applications for HAMP and Traditional Modifications.   According to the Debtors' servicing

records, on May 29, 2009, the Debtors advised Ms. Ortiz of the approval of the Forbearance

Plan.  The Debtors explained that the Forbearance Plan was not a permanent loan modification

and the completion of the Forbearance Plan would not guarantee obtaining such a modification

with a lower interest rate or lower monthly payment.   The monthly payment under the

Forbearance Plan was $1,418.31, the same amount as Mr. and Ms. Pfunder's monthly mortgage

---

[8] For a brief period of time in 2009 and 2010 after HAMP was announced, the Debtors implemented forbearance plans ("Forbearance Plans") as a means to address the high volume of interest in loan modifications from Borrowers.  The Forbearance Plans were offered by the Debtors' call center to allow time for the Debtors' loss mitigation department to review the workout package submitted by the Borrower, or to allow time for the Borrower to submit a complete workout package.  The payment amount of a Forbearance Plan was determined by the income the Borrower provided over the telephone.  The Debtors' call center would set the monthly payment at 31% of the Borrower's stated income.  A Forbearance Plan would be established only if the Borrower's account and *stated* information met all eligibility requirements based on HAMP guidelines.  Forbearance Plans were oral agreements and there was no signature required of a Borrower to consummate the plan.  See id. at ¶7.  Forbearance Plans were not part of the HAMP program.

23

payment, because their account was current at the time and their stated income and expenses indicated that they could afford the current monthly payment. *See* id. at ¶ 17.

56.    Ms. Ortiz told the Debtors that Mr. and Ms. Pfunder could not afford the monthly payments of the Forbearance Plan.  On June 19, 2009, GMACM employees spoke to Ms. Ortiz and explained, among other things, the basis for the Forbearance Plan and the reason for its payment amount.  On July 23, 2009, Ms. Ortiz was advised by GMACM that it still required a Profit and Loss Statement for Mr. and Ms. Pfunder.  The Profit and Loss Statement was received on July 23, 2009; however, the statement was not properly completed and was not useable for review.  *See* id. at ¶ 18.

57.    On October 27, 2009, Mr. and Ms. Pfunder were approved for and were offered a traditional loan modification (the "October 27 Offer").    GMACM mailed the documents to Mr. and Ms. Pfunder on November 9, 2009, and the documents, along with a Contribution, were to be returned by Mr. and Ms. Pfunder by November 17, 2009.  As of January 14, 2010, the documents[9] had not been returned to GMACM and, as a result, the permanent loan modification was denied. *See* id. at ¶ 19.

58.    Mr. and Ms. Pfunder's account was again reviewed and another Traditional Modification was offered on January 26, 2010 (the "January 26 Offer").  However, the modification was ultimately denied on April 12, 2010 because Mr. and Ms. Pfunder did not return the executed loan modification documents to the Debtors.  The Debtors kept the Pfunders' file open and subsequently re-reviewed Mr. and Ms. Pfunder's account for a possible loan modification.   The Debtors subsequently re-reviewed Mr. and Ms. Pfunder's account and, on August 19, 2010, denied the requested loan modification because Mr. and Ms. Pfunder's income

---

[9] The Debtors do not have a copy of these documents because they were never returned by the Pfunders

was insufficient to support the mortgage based on the modification programs available at time of review. *See* id. at ¶ 20.

59.     In sum, the Debtors attempted to assist Mr. and Ms. Pfunder with their loan modification requests, however, the parties were unable to reach a resolution due to Mr. and Ms. Pfunder either not accepting, not being able to afford or not qualifying for the terms of the loan modification.   Based on the Debtors' review of their books and records, as set forth above, the Debtors assert that they complied with the appropriate guidelines and policies governing the loan modification process and acted properly with respect to Mr. and Ms. Pfunder's loan modification requests. *See* id. at ¶ 21

(ii)     *Analysis*

60.     The May Forbearance Plan was not part of HAMP but rather part of the Debtors' Traditional Modification process.   The other offers made to the Pfunders were also made in connection with the Debtors' Traditional Modification program.   Therefore, similar to Mr. Bejarano's claim, the applicable reported decisions that deal with loan modifications under HAMP, such as *Wigod*, *Young*, and *Costigan*, have no bearing on the Pfunder's situation.

61.     At the hearing held on October 9, 2013, the Pfunders made allegations that the Debtors used stalling tactics and unfair business practices and that they did not provide them with the kind of loan modification they had asked for. *See* Oct. 9 Hrg. Tr. at 152-53. Based on the Pfunders' allegations, the Debtors reviewed potential causes of action under California law and assert that the Pfunders cannot sustain a cause of action under any legal theory, including breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing,

fraud, negligent misrepresentation, and claims under California's Unfair Business Practices Act (Bus. & Prof. Code, § 17200).

62.    To assert a cause of action for breach of contract, a plaintiff must plead: (1) the existence of a contract; (2) the plaintiff's performance or excuse for non-performance; (3) the defendant's breach; and (4) damages to the plaintiff as a result of the breach. *Armstrong Petrol. Corp. v. Tri–Valley Oil & Gas Co.,* 116 Cal. App. 4th 1375, 1391 n.6 (2004).

63.    The Debtors acknowledge that the May Forbearance Plan was a contract, as there was a mutual exchange of consideration by the parties that represented an offer and acceptance of terms. It required the Pfunders to make payments under the plan while the Debtors reviewed their situation to determine if the Pfunders could be eligible for a permanent modification.    However, the Pfunders were told that this agreement was not a permanent modification, and the Debtors did not represent to the Pfunders that if they complied with the terms of the May Forbearance Plan they would receive a permanent modification.    Moreover, in connection with the May Forbearance Plan, there were no representations made by the Debtors that the Pfunders would receive a lower monthly payment or a lower interest rate.    *See* Supplemental Decl. at ¶ 17.    The Debtors complied with the terms of this contract when they reviewed the Pfunder's situation and offered them the October 27 Offer, two months before the May Forbearance Plan concluded.    As a result, the Pfunders cannot bring a cause of action for breach of contract based on the May Forbearance Plan because the terms of that agreement were fulfilled by the Debtors.

64.    The October 27 Offer required the Pfunders to execute and return the modification documents to the Debtors by November 17, 2009.    The Pfunders failed to execute the modification documents and as a result the permanent loan modification was denied on

January 14, 2010. Because the Pfunders never executed the documents, they never accepted the

Debtors' offer for a modification, and as a result a contract was never created. *See Barroso,* 208

Cal. App. 4th at 1014 (sustaining challenge to the pleadings on breach of contract cause of action

where the borrower admittedly did not perform because he did not sign and return the written

agreement as required). Therefore, the Pfunders cannot state a cause of action for breach of

contract based on the October 27 Offer.

65.     Similarly, the January 26 Offer required the Pfunders to sign and execute

the loan modification agreement. Since the Pfunders never signed and executed the agreement,

no contract for a loan modification was created, and the Pfunders cannot assert a claim for

breach of contract based on the January 26 Offer.

66.     In addition to the breach of contract claims, as discussed above, some

courts have allowed causes of action in the context of the denial of loan modifications for breach

of the implied covenant of good faith and fair dealing and promissory estoppel. In order to

breach the implied covenant of good faith and fair dealing, there must be a valid contract and the

defendant must have taken some action that frustrates the other party's right to the benefit of the

contract. See *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1153 (1990). While those courts

that have found the borrower-plaintiffs sufficiently pled a breach of the duty of good faith and

fair dealing also found that the defendant-servicer breached the contract (and therefore based

their determination on the tort claim at least partly on the same behavior as the breach of contract

claim), the circumstances under which liability exists are markedly different from what is before

the Court. For example, courts have noted that actions such as waiting until the borrower had

made 26 payments under a Trial HAMP Modification (which was viewed as an enforceable

contract) before advising the borrower that it would not receive a permanent modification were

deemed to be sufficient to plead a claim under this specific tort. See *Bushell,* 2013 WL 5723074. In this case, the only valid contract was the May Forbearance Plan. As noted above, the Debtors met all of their obligations under the May Forbearance Plan and did so in a timely manner. The terms of the May Fobearance Plan required the Pfunders to make payments through December 1, 2009 while the Debtors reviewed their situation. Therefore, the Pfunders had no reason to believe they would receive a decision on their case before the end of the year. The Debtors were in constant communication with the Pfunders' representative while they were reviewing the Pfunders' workout package, and promptly alerted her to any missing documents that were needed to complete the review. Any delay in making a determination on the loan was due to the Pfunders not providing necessary documentation. As a result, the Pfunders' allegations of stalling tactics are unfounded and the Pfunders cannot sustain a cause of action based on breach of the implied duty of good faith and fair dealing because the Debtors complied with their obligations under the May Forbearance Plan.

67.      If the Pfunders were to assert a claim for promissory estoppel, it would similarly fail. The equitable doctrine of promissory estoppel, which is recognized in California, has three basic elements: (1) promise; (2) reasonable reliance; and (3) injury. *Div. of Labor Law Enforcement v. Transpacific Transp. Co.,* 69 Cal. App. 3d 268, 275 (1977). Since the Debtors never made any promises to the Pfunders that they would receive a permanent modification, a lower interest rate, or a lower monthly payment, the Pfunders cannot state a claim for promissory estoppel. Furthermore, assuming arguendo there was a promise made, the Pfunders cannot demonstrate that they acted in any sort of reasonable reliance on that promise. In *Aceves v. U.S. Bank, N.A.*, 192 Cal. App. 4th 218, 223 (2011), the Court found that allegations that the servicer promised to work in good faith with the borrower in exchange for the borrower forbearing from

converting her bankruptcy petition from Chapter 7 to Chapter 13 was sufficient for promissory estoppel because the plaintiff had asserted that she relied on the promise in not converting her bankruptcy case.  In this case, the Pfunders continued to make mortgage payments that they were already obligated to make.  As a result, even if the Pfunders allege a promise on the part of the Debtors, they cannot state a claim for promissory estoppel because they cannot show they acted in reliance on the Debtors' representations and were somehow damaged.

68.     If the Pfunders were to allege a cause of action for fraud or negligent misrepresentation, this would also fail. The elements of fraud are: (1) the defendant made a false representation as to a past or existing material fact; (2) the defendant knew the representation was false at the time it was made; (3) in making the representation, the defendant intended to deceive the plaintiff; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered resulting damages. *See Lazar v. Superior Court*, 12 Cal.4th 638. (Sup. Ct. 1996). The elements of negligent misrepresentation are the same except the second element. A cause of action for negligent misrepresentation must plead that the defendant made the representation without reasonable ground for believing it to be true. *Wells Fargo Bank, N.A. v. FSI, Fin. Solutions, Inc.* 196 Cal. App. 4th 1559, 1573 (2011); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Servs. Grp., Inc.* 171 Cal. App. 4th 35, 50  (2009).

69.     The Debtors never made any representations in connection with the May Forebearance Plan, false or otherwise, that the Pfunders would receive a permanent loan modification, a lower interest rate, or a lower monthly payment.  *See* Supplemental Decl. at ¶ 17. As a result, the Pfunders would be unable to bring a cause of action for fraud or negligent misrepresentation.

70.     Finally, a cause of action under California's Unfair Competition Law would also fail.[10]    The Pfunders alleged during the hearing that the Debtors used stalling techniques and unfair business practices in their dealings with the Pfunders.  *See* Oct. 9 Hrg. Tr. at 152-53.  Based on the Debtors' review of their books and records, and as stated above and in the Supplemental Declaraion, the Debtors have always responded timely to the Pfunders and dealt with their requests for loan modifications in good faith.  Furthermore, causes of action under this statute are only viable if any other underlying claims (such as breach of contract or fraud) are viable.  *See West*, 214 Cal. App. 4th 780, 806.  Since the Pfunders cannot state any other causes of action, they will not be able to state a cause of action under the Unfair Competition Law.

71.     Therefore, based on applicable law and facts, the Pfunders' cannot sustain a viable cause of action, and as a result, Claim No. 1430 should be disallowed and expunged.

---

[10]   California Bus. & Prof. Code, § 17200.  The statute prohibits "unfair competition," which it defines as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

## **CONCLUSION**

72.    WHEREFORE, the Debtors respectfully submit that the relief sought in the Objection with respect to each claimant should be granted.

Dated:  October 29, 2013
        New York, New York

      /s/ Norman S. Rosenbaum
      Gary S. Lee
      Norman S. Rosenbaum
      Jordan A. Wishnew
      Jonathan M. Petts
      MORRISON & FOERSTER LLP
      1290 Avenue of the Americas
      New York, New York 10104
      Telephone: (212) 468-8000
      Facsimile: (212) 468-7900

      *Counsel for the Debtors and*
      *Debtors in Possession*